**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6260 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**ANSWER OF FRATERNAL ORDER OF POLICE LODGE NO. 7
IN SUPPORT OF MOTION TO INTERVENE**

The Fraternal Order of Police Chicago Lodge No. 7 (Lodge), by and through its attorneys files this answer in support of its motion to intervene pursuant to Rule 24(a) of the Federal Rules of Civil Procedure and states as follows:

1.      The State of Illinois ("State"), by Lisa Madigan, Attorney General of the State of Illinois, brings this action against the City of Chicago ("City") to ensure the City enacts comprehensive, lasting reform of the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA"), and the Chicago Police Board ("Police Board").

**ANSWER:**  The Lodge admits this action is brought by the Attorney General of Illinois but denies the remaining allegations.

2.      Pursuant to 42 U.S.C. § 1983, the U.S. Constitution, the Illinois Constitution, the Illinois Civil Rights Act of 2003, and the Illinois Human Rights Act, the State seeks to enjoin CPD from engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harms Chicago's African American and Latino residents.

**ANSWER:**  The Lodge admits the State seeks to in join the CPD, denies the Attorney General has standing pursuant to 42 U.S.C. § 1983 to bring such action and denies the remaining allegations.

## BACKGROUND

3.    For nearly 50 years, reviews of CPD's policing practices have identified significant failures by CPD officers to act lawfully: in 1973, a Blue Ribbon Paneled by former U.S. Congressman Ralph Metcalfe identified a pattern of excessive force and other police abuse directed disproportionately at Chicago's African American community; in 1990, an internal CPD report concluded that Jon Burge and his subordinates repeatedly and methodically abused arrestees; in 1997, the Commission on Police Integrity recommended extensive reforms to CPD's hiring, training, and accountability processes; in the 2000s, court-appointed special prosecutors again concluded that Burge and other CPD officers regularly abused arrestees with impunity; in 2014, a report commissioned by the City recommended sweeping reforms to CPD's process for disciplining officers; and in 2015, data regarding CPD's stop-and-frisk practices revealed widespread constitutional violations. More recently, two separate reports issued by the U.S. Department of Justice ("DOJ") and Chicago's Police Accountability Task Force concluded that CPD has continued to engage in a repeated pattern of using excessive force and racially discriminatory policing practices.

**ANSWER:**  The Lodge denies the allegation

4.    Along with these assessments of CPD's policing practices, the City's defense of lawsuits alleging police misconduct has taken a severe financial toll on the City's taxpayers. Between 2004 and early 2016, the City paid approximately $662 million in settlements, judgments, and outside legal fees for police misconduct cases.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

5.    The longstanding policing problems have led to profound mistrust between many Chicago communities and CPD. This mistrust reached its most recent flashpoint

2

in late November 2015following the release of a videotape depicting the fatal shooting of Laquan McDonald, a 17-year old African American, by a CPD officer.

**ANSWER:** The Lodge admits the first sentence of this allegation and denies the remaining allegations.

6.     In response to the release of this videotape, Chicago Mayor Rahm Emanuel announced the creation of the Police Accountability Task Force ("Task Force") to review the system of training, oversight, and accountability for CPD officers.

**ANSWER:** The Lodge admits the allegations.

7.     In April 2016, the Task Force released a report ("Task Force Report," attached as Exhibit A and incorporated herein by reference) finding that "CPD's response to the violence [in Chicago] is not sufficiently imbued with Constitutional policing tactics," and that "[e]very stage of investigations and discipline is plagued by serious structural and procedural flaws that make real accountability nearly impossible."

**ANSWER:** The Lodge admits the Task Force released a report but denies its findings.

8.     The videotape of Laquan McDonald's shooting also prompted DOJ to investigate whether CPD engages in a pattern or practice of unconstitutional policing, including the use of excessive force.

**ANSWER:**     The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

9.     In January 2017, DOJ and the U.S. Attorney's Office for the Northern District of Illinois released a report ("DOJ Report," attached as Exhibit B and incorporated herein by reference) finding that "CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable," and that the pattern "is largely attributable to systemic deficiencies within CPD and the City."

**ANSWER:**     The Lodge admits DOJ issued a report in January 2017 and denies CPD officers engaged in a pattern or practice of using force, including deadly force, that is unreasonable, and that the pattern is largely attributable to systemic deficiencies within CPD and the City.

10.     While the DOJ Report acknowledged the reforms that the City had announced during the course of the investigation, it stressed the need for court oversight through a consent decree to ensure implementatio11 of the many required reforms:

> Our investigation found that the reforms the City already plans to implement, as well as the additional reforms our investigation found necessary, will likely not happen or be sustained without the reform tools of an independent monitoring team and a court order. An independent team of policing and other experts will be charged with assessing and publicly reporting on CPD's and the City's progress implementing reforms. A court-ordered, over-arching plan for reform that is overseen by a federal judge will help ensure that unnecessary obstacles are removed, and that City and police officials stay focused on carrying out promised reforms. Together, an independent monitor and court decree will make it much more certain that Chicago is finally able to eliminate patterns of unconstitutional conduct,   and can bolster community confidence to make policing in Chicago more effective and less dangerous.

**ANSWER:**   The Lodge admits the DOJ report acknowledge reforms that had been announced by the City by denies the reaming allegations and findings of the DOJ.

11.     The State brings this action to obtain injunctive relief that will finally enable the City to eliminate unconstitutional conduct that has plagued CPD for decades.  After decades of attempts to reform, a court order mandating effective, lasting changes is the only way to restore the badly broken trust between Chicago's residents and CPD and increase safety for residents and police officers.

**ANSWER:**   The Lodge admits the State brings this action to obtain injunctive relief but denies the remaining allegations.

12.     In seeking injunctive relief, the State aims to help provide the City's residents with what they deserve: a police department that respects their constitutional rights, protects their safety, and supports the officers brave enough to take on these difficult responsibilities.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

**ANSWER:**   The Lodge denies this allegation.

14.      Venue is proper under 28 U.S.C. § 1391(b) because the City is located in the Northern District of Illinois and the principal events, actions, or omissions giving rise to these claims occurred in the Northern District of Illinois.

**ANSWER:**      The Lodge admits these allegations.

## PARTIES

15.      The State brings this action on behalf of the People of Illinois by and through Lisa Madigan, Attorney General of the State of Illinois, as authorized by her authority under the doctrine of *parens patriae* and pursuant to the Illinois Human Rights Act, 775 ILCS 5/10-104(A) (1).

**ANSWER:**   The Lodge admits this allegation.

16.      The State also brings this action on its own behalf to protect its proprietary interests.

**ANSWER:**   The Lodge admits this allegation.

17.      Defendant City of Chicago is a municipality and a political subdivision of the State of Illinois located in the Northern District of Illinois.

**ANSWER:**   The Lodge admits this allegation.

18.      CPD is an agency of the City and the primary law enforcement agency in Chicago.

**ANSWER:**   The Lodge admits this allegation.

19.      The City funds and operates various municipal entities including CPD, the Police Board, the Independent Police Review Authority ("IPRA"), and the Civilian Office of Police

Accountability ("COPA")-the civilian oversight body that is scheduled to replace IPRA in September 2017.

**ANSWER:** The Lodge admits this allegation.

20. The interest in the health and well-being of Illinois residents-both physical and economic-is implicated in this case, and the Attorney General therefore possesses *parens patriae* authority to commence legal actions for violations of any federal or state laws.

**ANSWER:** The Lodge denies the Attorney General has standing to commence legal actions for violations of Section 1983 and admits the remaining allegation.

21. The Attorney General brings this action to defend the State of Illinois's quasi-sovereign interest in the prevention of present and future harm to its residents, including individuals who are, have been, or would be victims of the City's unconstitutional law enforcement practices.

**ANSWER:** The Lodge admits the Attorney General brings this action on behalf of the state of Illinois but denies the remaining allegations.

22. The City's violations affect a substantial segment of the residents of the State of Illinois, including direct victims as well as other members of the public who suffer the indirect effects of the City's unconstitutional law enforcement practices.

**ANSWER:** The Lodge denies this allegation.

23. The Attorney General enforces the public policy of the State of Illinois to secure for all of its residents the freedom from discrimination against any individual because of his or her race, color, or national origin in connection with law enforcement. 775 ILCS 5/l-102(A).

**ANSWER:** The Lodge admits these allegations.

24. It is the declared interest of the State of Illinois that all people in Illinois can maintain personal dignity, realize their full productive capacities, and further their interests, rights, a n d p r i v i l e g e s a s r e s i d e n t s o f I l l i n o i s . 775 ILCS 5/l-102(E). The City's actions

6

substantially affect or threaten the State of Illinois's public policy and its stated interest in the nondiscriminatory treatment of its residents.

**ANSWER:** The Lodge admits the first sentence of this allegation and denies the allegation in the second sentence paragraph.

25. The Attorney General, in her *parens patriae* capacity, is uniquely situated to seek injunctive relief that upholds the rights of Chicago residents that the City, through its agents and officers, has repeatedly and systemically violated.

**ANSWER:** The Lodge denies the allegation in this paragraph.

26. In addition to affecting Chicago residents, CPD officer misconduct harms the State of Illinois's proprietary interests.

**ANSWER:** The Lodge denies the allegation in this paragraph.

27. The State of Illinois, through its Department of Healthcare and Family Services ("DHFS"), spends billions of dollars annually on health care benefits and services for Illinois residents enrolled in Medicaid, a public insurance program for low-income families and individuals that is jointly funded by the State and the federal government.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

28. In 2016, nearly 1 million Chicago residents were enrolled to receive full or partial Medicaid benefits from the State of Illinois.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

29. Multiple persons injured as a result of excessive force by CPD officers have incurred medical care costs that Illinois has paid for through DHFS in combination with Medicaid.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

30.     Absent the injunctive relief that the State seeks, Chicago residents will continue to be subjected to unconstitutional policing practices and, as a result, will incur medical expenses that the State will pay.

**ANSWER:**     The Lodge denies the allegations in this paragraph.

### FACTUAL ALLEGATIONS

31.     The State, based in part on several recent investigations of CPD, alleges that, through acts and omissions, the City maintains a policy, custom, or practice of police conduct that violates federal and state law.

**ANSWER:**     The Lodge denies the allegations in this paragraph.

32.     This policy, custom, or practice includes a repeated pattern of using excessive force without legal justification, in violation of the Fourth Amendment to the U.S. Constitution and Article I, Section 6 of the Illinois Constitution. This policy, custom, or practice has a disparate impact on the City's African American and Latino residents in violation of the Illinois Civil Rights Act of 2003 and the Illinois Human Rights Act.

**ANSWER:**     The Lodge denies the allegations in this paragraph.

33.     This policy, custom, or practice is further reflected in, and caused by, the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline.

**ANSWER:**     The Lodge denies the allegations in this paragraph.

34.     Following the release of the videotape depicting the death of Laquan McDonald, the City has made certain changes to its law enforcement practices. The changes implemented to date, however, are insufficient to eliminate the City's decades-long policy, custom, or practice of unlawful conduct and to ensure it will not recur.

**ANSWER:** The Lodge admits the allegations of the first sentence of paragraph 34 and denies the remaining allegations.

35. Given the nature, extent, and history of the City's unlawful police practices, the City will continue to engage in the unconstitutional and illegal conduct alleged herein, causing irreparable harm to the people of Chicago-as it has for decades-unless directed by this Court pursuant to a judicially enforceable consent decree.

**ANSWER:** The Lodge denies the allegations in this paragraph.

**A. CPD officers engage in a repeated pattern of using excessive force. This pattern disproportionately impacts Chicago's African American and Latino residents.**

36. CPD officers engage in a repeated pattern of using excessive force when conducting law enforcement activities in a way that disproportionately affects Chicago's African American and Latino residents.

**ANSWER:** The Lodge denies the allegation in this paragraph.

37. Many of these incidents involve the use of deadly force in situations in which less or no force is objectively reasonable-for example, when a suspect is fleeing on foot and poses no serious risk of harm to officers or others, and when a suspect is in a vehicle moving away from officers.

**ANSWER:** The Lodge denies the allegation in this paragraph.

38. Other incidents concern the use of less-deadly force such as Tasers and batons when even less force or no force whatsoever is appropriate-for example, when a suspect is not actively resisting arrest, has been sufficiently subdued with handcuffs, or is suspected of having committed minor offenses.

**ANSWER:** The Lodge denies the allegation in this paragraph.

39. In each of these situations, the force used by CPD officers exceeds the bounds established by federal and state law.

**ANSWER:**    The Lodge denies the allegation in this paragraph.

1. Deadly Force

40.    CPD officers engage in a repeated pattern of using deadly force against suspects fleeing on foot who pose no immediate danger to anyone. Such uses of force violate the U.S. Supreme Court's holding in *Tennessee v. Garner* that deadly force may be used only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." 471 U.S. 1, 3 (1985).

**ANSWER:**  The Lodge denies the allegations in this paragraph.

41.    The repeated occurrence of CPD officers shooting fleeing suspects when not needed to protect themselves or others put CPD and the City on notice that corrective action was needed, but these warning signs were not heeded for many years.

**ANSWER:**    The Lodge denies the allegations in this paragraph.

42.    Indeed, it was not until May 2017 that CPD announced for the first time that its use-of-force policy would prohibit shooting at a fleeing suspect who did not pose an "imminent threat" to police or others.

**ANSWER:**  The Lodge asserts the use-of-force policing as stated in paragraph 42 was in effect prior to May 2017.

43.    This change, though important, is only an initial step toward adequately addressing CPD's use of excessive force; officers must be adequately trained on the new policy, supervisors must help ensure that the policy is being adhered to, and investigators must help ensure that officers are held to account when they deviate from the policy.

**ANSWER:**  The Lodge denies the change in the use of force policy is only an initial step toward adequately addressing the CPD use of excessive force and admits the remaining allegations.

44.    Because CPD does not have a policy that expressly advises officers on when and how to conduct foot pursuits, there remains a risk of CPD officers unnecessarily putting

themselves and others in danger of unreasonable harm.

**ANSWER:**  The Lodge denies the allegation in this paragraph.

45.  CPD officers also use deadly force against residents in vehicles when it is not reasonably necessary to do so.

**ANSWER:**  The Lodge denies the allegation alleged in this paragraph.

46.  Between September 2002 and February 2015, CPD's written policy on the use of deadly force instructed officers confronted with an oncoming vehicle to move out of the vehicle's path.

**ANSWER:**  The Lodge admits the allegation in this paragraph.

47.  In practice, however, numerous CPD officers either were unaware of this policy or ignored it.

**ANSWER:**  The Lodge admits the allegations in this paragraph.

48.  In February 2015, CPD amended its policy on the use of deadly force to prohibit officers from firing at or into a moving vehicle when the vehicle is the only force used against the officer or another person.

**ANSWER:**  The Lodge admits the allegation in this paragraph.

49.  Nevertheless, certain officers either were unaware of or ignored the policy change and continued to fire at suspects inside moving vehicles that represented the only force being used against the officers.

**ANSWER:**  The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

50.  In addition, CPD officers frequently fire more rounds of ammunition than is necessary to subdue suspects.

**ANSWER:**  The Lodge denies the allegation in this paragraph.

51.  In doing so, the officers' risk killing or injuring other officers and members of the

public, as well as unnecessarily injuring suspects who have been subdued.

**ANSWER:**   The Lodge denies the allegation in this paragraph.

     2.  Less-Lethal Force

52.     Deadly force is not the only type of force that CPD officers routinely and unreasonably employ against Chicago residents. Officers also engage in a repeated pattern of using/less-lethal force against individuals who pose no risk to officers or others, and in situations in which less severe force is both available and appropriate.

**ANSWER:**   The Lodge denies the allegations in this paragraph.

53.     CPD officers routinely punch, knee, and use objects to strike individuals who present no threat to officers or others and who are suspected of committing only minor offenses, if any.

**ANSWER:**   The Lodge denies the allegations in this paragraph.

54.     In addition, CPD officers routinely use Tasers against individuals who present no threat to officers or others and who are suspected of committing only minor offenses, if any.

**ANSWER:**   The Lodge denies the allegation alleged in this paragraph.

55.     A Taser is a type of electronic control weapon that has two modes: "drive-stun" mode, in which the Taser is pressed against someone and causes pain, and "probe" mode, in which the Taser shoots barbs into a person's body that incapacitate the person by causing his or her muscles to lock up.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

56.     CPD's current use-of-force policy permits use of a Taser to defeat an "active resister" defined by the policy as "a person whose actions attempt to create distance between that person and the member's reach with the intent to avoid physical control and/or defeat arrest." However, the policy does not reference the severity of the suspected crime that permits

12

Taser use or whether a suspect must pose a danger to the officer or others for Taser use.

**ANSWER:** The Lodge admits the allegations in this paragraph.

57.    Additionally problematic is the fact that the use-of-force policy describes Tasers only with regard to their probe mode capabilities. As a result, officers are denied critical information about the circumstances in which drive-stun mode is permissible.

**ANSWER:** The Lodge denies the allegations in this paragraph.

58.    The deficiencies in the current use-of-force policy regarding Taser discharges have contributed to CPD officers repeatedly using Tasers in an improper fashion.

**ANSWER:** The Lodge denies the allegation in this paragraph.

3.    <u>CPD's Use of Excessive Force Has a Discriminatory Impact on the City's African American and Latino Residents.</u>

59.    CPD officers' pattern of using excessive force is disproportionately harmful to Chicago's African American and Latino residents.

**ANSWER:** The Lodge denies the allegation in this paragraph.

60.    CPD officers shoot African Americans at a disproportionately high rate that has remained virtually unchanged since the disparity was documented by Congressman Metcalfe's Blue Ribbon Panel in 1973.

**ANSWER:** The Lodge denies the allegation in this paragraph.

61.    Between 1969 and 1970, 75% of individuals fatally shot by CPD officers were African Americans, even though African Americans constituted 33% of Chicago's population in 1970.

**ANSWER:** The Lodge denies the allegation in this paragraph.

62.    Nearly 40 years later, between 2008 and 2015, approximately 74% of the 404 individuals shot by CPD officers were African Americans, even though African Americans still

constituted 33% of Chicago's population in 2010.

**ANSWER:** The Lodge denies the allegation in this paragraph.

63. The statistics for less-lethal use of force are similar: for example, between 2012 and 2015, approximately 76% of the 1,886 individuals Tasered by CPD officers were African Americans.

**ANSWER:** The Lodge denies the allegation in this paragraph.

64. The rates in which IPRA sustains police misconduct complaints further underscore the discriminatory impact of the City's law enforcement practices on African Americans and Latinos.

**ANSWER:** The Lodge denies the allegation in this paragraph.

65. The DOJ Report found that complaints filed by Caucasians were sustained at a rate that is nearly three times higher than the rate for complaints filed by African Americans, and nearly twice as high as the rate for complaints filed by Latinos.

**ANSWER:** The Lodge admits the DOJ report made findings but denies the findings in the report as stated.

66. The disparity is even higher with regard to misconduct complaints that allege excessive force.

**ANSWER:** The Lodge denies the allegation in this paragraph.

67. Excessive force complaints filed by Caucasians were sustained at a rate that is three times higher than the rate for complaints filed by African Americans, and six times higher than the rate for complaints filed by Latinos.

**ANSWER:** The Lodge denies the allegation in this paragraph.

68. In addition, the DOJ Report found that between 2011 and March 2016, 980 officer misconduct complaints were coded as discriminatory verbal abuse on the basis of race or ethnicity.

**ANSWER:**   The Lodge admits DOJ report was issued but denies the report concerning misconduct complaints and allegations of discriminatory verbal abuse on the basis of race or ethnicity.

69.   Unless restrained by this Court, CPD's pattern or practice of using excessive force in a manner that disparately impacts the City's African American and Latino communities will continue.

**ANSWER:**   The Lodge denies the allegation in this paragraph.

**B.   The City is deliberately indifferent to the repeated pattern of CPD's use of excessive force and racially discriminatory policing practices.**

70.   External complaints, threatened and actual lawsuits, and government-commissioned reports, along with the media's frequent coverage of CPD's repeated use of excessive force and racially discriminatory police action, have put the City on notice of CPD's unconstitutional conduct.

**ANSWER**:   The Lodge denies the allegation in this paragraph.

71.   However, the City has acted with deliberate indifference to excessive force and discriminatory police action, as evidenced by the inadequate training, supervision, accountability, and officer wellness systems that the City has erected and maintained.

**ANSWER:**   The Lodge denies the allegations in this paragraph.

72.   As a direct and proximate result of CPD's systemic failure to provide officers with adequate training, supervision, accountability, and mental health support, numerous Illinois residents have been subjected to a repeated pattern of unconstitutional uses of force.

**ANSWER:**   The Lodge denies the allegation in this paragraph.

1.   CPD's training programs do not adequately prepare new and existing officers for their jobs.

73.   CPD's Police Academy, Field Training Officer program, and in-service training

program do not give cadets, recent Academy graduates, or existing officers the necessary tools to lawfully and effectively police Chicago neighborhoods.

**ANSWER:** The Lodge admits the allegation in this paragraph.

      a. Police Academy

74. The DOJ Report found that the Police Academy relies on outdated training materials that conflict with not only current legal standards but also current CPD policies.

**ANSWER:** The Lodge admits the allegations in this paragraph.

75. In addition, the DOJ Report found that training at the Police Academy failed to utilize "widely accepted teaching methods centered on adult learning principles, in particular scenario-based training and encouraging hands-on skills."

**ANSWER:** The Lodge admits the allegations in this paragraph.

76. Instead, the Police Academy's curriculum was "over-reliant on the PowerPoint/ lecture model of classroom instruction," which one Academy instructor referred to as "check the box" training.

**ANSWER:** The Lodge admits the allegation in this paragraph.

77. The DOJ Report further found that instructors were unable to deviate from prepared PowerPoint decks and that at least one instructor was teaching a particular procedure that CPD had not used in years.

**ANSWER:** The Lodge admits the allegation in this paragraph.

      b. Field Training Officer program

78. CPD also does not adequately train individuals once they graduate from the Police Academy and transition to probationary officer status-the last step in training before an individual can attain the rank of Police Officer.

**ANSWER:** The Lodge admits the allegation in this paragraph.

79. One of the principal problem areas concerns CPD's Field Training Officer

("FTO") program, in which probationary officers should be paired with FTOs who monitor, train, and evaluate their performance before the officers' probationary period ends.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

80.   Despite the critical guidance that the FTO program should provide, it lacks the personnel and resources necessary to ensure quality training and mentorship.

**ANSWER**:   The Lodge admits the allegation in this paragraph.

81.   The most qualified FTO mentor candidates often decline to apply to the program, in part, because the modest salary increase (approximately $3,000 annually) for FTOs is viewed as an inadequate trade-off for the resulting loss of control over their district and shift assignments.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

82.   Another barrier to a quality FTO program is the fact that, unlike FTO programs in other parts of the country, CPD's FTO program is not a stepping stone to promotion for officers who choose to participate.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

83.   Also problematic is the inadequate FTO mentor screening process. An FTO applicant's disciplinary history is considered only if the officer received either one sustained misconduct finding within the prior year resulting in more than seven days' suspension, or three or more sustained misconduct findings within the prior three years resulting in a suspension of any length.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

84.   As a result, officers who have been the subject of numerous .misconduct complaints or have been involved in one or more instances of gross misconduct can be approved for FTO mentoring.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegations.

85.   FTOs also are routinely assigned two, and sometimes four, probationary officers to supervise at a time, thereby limiting the amount of one-on-one attention that the FTO can devote to each new officer.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

86.   In addition, FTOs are not formally evaluated and many have never received FTO training. As a result, FTOs are often unable to provide effective supervision and guidance.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

c.   In-service training

87.   Another critical training deficiency is that, after graduating from the Police Academy, CPD officers are not required to participate in any regular, live in-service training for the remainder of their careers as a police officer.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

88.   In-service training consists of e-learning videos, roll call announcements, and videos shown at roll call.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

89.   However, supervisors told DOJ investigators that officers do not pay attention to these trainings.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

90.   Even if officers paid attention to these videos and announcements, the content in them would not adequately apprise officers of new or existing lawful policing methods.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

91.     The DOJ Report found, for example, that CPD does not regularly update officers about relevant changes in CPD policy, law, or technology or about developments in national best practices for policing.

**ANSWER:**     The Lodge admits the DOJ found that CPD does not regularly update officers about relevant changes in policy, law, technology or other development in national best practices for policing.

92.     The DOJ Report also found that CPD does not provide its officers with regular refresher trainings on proper handcuffing techniques, proper pursuit tactics, and other basic skills that can help reduce the officers' use of both deadly and less-lethal force.

**ANSWER:**      The Lodge admits the DOJ Report found that the CPD does not provide its officers with regular refresher training on proper handcuffing techniques, proper pursuit tactics, and other basic skills that can help reduce the officers' use of both deadly and less-lethal force.

93.     In addition, CPD does not use data to identify patterns of excessive force or other types of officer misconduct to determine areas of needed training.

**ANSWER:**     The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

94.     Using data to identify problematic patterns would allow CPD to tailor in-service training to officers' needs.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

2.   CPD's supervisory structure prevents supervisors from adequately reviewing and critiquing their subordinates' performance.

95.     CPD supervisors lack the resources necessary to identify officer misconduct, help officers modify their conduct, or correct misconceptions about the proper uses of force specifically and proper policing more broadly.

**ANSWER:**     The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

a.   Overburdened personnel

19

96.     CPD's inadequate system of supervision is caused, in part, by high supervisor-to-officer ratios. The DOJ Report found that, while CPD officials and consultants have recommended that sergeants supervise no more than 8 to 10 officers at a time, sergeants frequently supervise 24 or more officers.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

97.     Also problematic is the fact that supervisors spend too little time engaging with their subordinates one-on-one. The DOJ Report found that sergeants spend most of their shifts completing administrative tasks rather than personally interacting with officers.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

98.     The DOJ Report also observed that CPD employs a rotational system of scheduling in which officers are regularly supervised by different sergeants due to non-overlapping days off, preventing sergeants from forming mentoring relationships with officers and from consistently monitoring officers' conduct.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

99.     The Task Force Report found that sergeants' ability to supervise is further diminished by the fact that sergeants must frequently respond to calls for police assistance due to a lack of available officers.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

> b.   Review of officers' use-of-force reports

100.     CPD mandates that officers complete a tactical response report ("TRR") any time they use force (with a limited number of exceptions), and promptly notify their immediate supervisors of these incidents. However, the review process for TRRs is inconsistent and inadequate.

**ANSWER:**   The Lodge admits the first sentence of this allegation and states that it lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations.

101.   The TRR form contains a set of boxes to check that contain boilerplate use-of-force and resistance terms that often do not convey enough detail to provide for meaningful review by supervisors. And while the TRR form contains a textbox for officers to include additional, descriptive information, the textbox is small and rarely used.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

102.   Under CPD policy, supervisors, in turn, must investigate every use of non-shooting force and review and approve all TRRs.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

103.   In practice, however, supervisors typically review for correctness and completeness-rather than to determine whether force was properly used-and approve the TRRs within minutes of submission.

**ANSWER:**   The Lodge denies the allegation in this paragraph.

104.   In addition, supervisors seldom respond to the scene of an incident, request the Taser deployment report (if a Taser was used), ask the officer to supply additional information, or refer the incident to IPRA.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

     c.   Access to information

105.   Supervisors also lack reliable, usable data to monitor the contacts CPD officers have with the public.

**ANSWER:**   the Lodge admits the allegation alleged in this paragraph.

106.   CPD uses a system called CLEAR to collect data about policing activities. The DOJ Report found that CLEAR contains "several discrete, disconnected modules," and that "information is generally not accessible across these modules."

**ANSWER:** The Lodge admits CPD uses a system called CLEAR, admits the DOJ issued a Report but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations or findings in the Report.

107. The DOJ Report also found that "thousands of people (IPRA, BIA, officers, command staff, Human Resources, and more) are inconsistently filling out" certain data fields.

**ANSWER:** The Lodge admits the DOJ issued a Report but lacks knowledge or information sufficient to form a belief about the truth of the allegation or findings in the Report.

108. The DOJ Report concluded that, as a result of the inconsistent and siloed nature of this data, "supervisors are not able to properly review [officer] activity, command staff are not able to properly discern patterns and deficiencies, and oversight bodies are not able to properly monitor activity and complaints."

**ANSWER:** The Lodge admits the DOJ issued a Report but the Lodge lacks knowledge or information sufficient to form a belief about the truth of findings in the Report.

109. In addition, supervisors are limited in critical background information they can review about their subordinates.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

110. The DOJ Report found that supervisors consider themselves unable to discover the misconduct history of their officers and take it into account when distributing assignments.

**ANSWER:** The Lodge admits the DOJ issued a Report but lacks knowledge or information sufficient to form a belief about the truth of the findings in the Report.

111. Supervisors also are not able to access the personnel or complaint records of new officers who are assigned to their districts.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

d. Early intervention system

112. An additional supervisory deficiency is the absence of robust early-intervention mechanisms that supervisors can use to identify and respond to patterns of problematic officer

22

behavior. Instead of a comprehensive mechanism, CPD operates several separate identification programs that are poorly understood and infrequently used by supervisors.

**ANSWER:** The Lodge admits the allegations in this paragraph.

113. One such program is the Performance Recognition System ("PRS"), a computer-based program that, according to the DOJ Report, is designed to "assist[] Department Supervisors in recognizing exceptional or adverse behavior related to job performance of members under their command."

**ANSWER:** The Lodge admits the allegation in this paragraph.

114. CPD also operates the Behavioral Intervention System ("BIS"). Under this system, CPD's Human Resources Division can recommend that an officer enroll in BIS if the officer meets or exceeds a threshold of sustained misconduct charges, low performance reviews, or incidents of misbehavior. When enrolled in BIS, officers typically undergo a physical examination but not a psychological evaluation.

**ANSWER:** The Lodge admits the allegation in this paragraph.

115. Finally, the Personnel Concerns Program ("PCP") is mandated for more serious actions, such as sustained excessive force charges, domestic violence, and five or more sustained misconduct charges within five years. According to CPD, PCP is used as an "attempt[] to intervene in an employee's problems, behavior, or performance issues which, without assistance, may lead to severe disciplinary measures or separation from [CPD]."

**ANSWER:** The Lodge admits the allegations in this paragraph.

116. These programs are not consistently or effectively utilized.

**ANSWER:** The Lodge admits the allegations in this paragraph.

117. The DOJ Report found that supervisors-do not understand how PRS is calibrated or how the information it presents should be used, and that they rarely consult or use the tool.

**ANSWER:** The Lodge admits the allegation in this paragraph.

118.    Moreover, the Task Force Report found that supervisors are not subjected to any enforcement mechanisms to ensure that they are actually using PRS appropriately.

**ANSWER:**    The Lodge admits the Task Force Report made a finding concerning supervisors and PRS but lacks knowledge or information sufficient to form a belief about the findings in the Report.

119.    The DOJ Report found that between January 2010 and July 2016, CPD enrolled only 38 officers in BIS. An additional 60 officers were referred for enrollment but never enrolled. During the same five-year period, however, approximately 1,627 officers received five or more misconduct complaints, and 350 of those officers received 10 or more complaints.

**ANSWER:**    The Lodge admits the allegations in this paragraph.

120.    The DOJ Report also found that between March and June 2016, 50 additional officers were identified as eligible for BIS, but that by mid-July 2016, their BIS status was still listed as "pending."

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the findings in the Report.

121.    As a result of these deficient behavioral tracking programs, officers in need of corrective action too often evade detection, thereby enabling officers to engage in misconduct with impunity.

**ANSWER:**    The Lodge denies the alleged allegation in this paragraph.

e.    Promotion

122.    Another impediment to effective supervision within CPD is CPD's process for promotions, which fails to sufficiently identify individuals with certain key supervisory skills and suffers from a perceived lack of transparency and fairness.

**ANSWER:**    The Lodge admits the allegation in this paragraph.

123.    Individuals can achieve promotion to detective, sergeant, or lieutenant based on

their performance on a two-part examination.

**ANSWER:**    The Lodge denies the allegations in this paragraph.

124.    Promotion is also possible if the individual passes the first part of the examination and is nominated for a "merit" promotion, regardless of his or her score on the second portion.

**ANSWER:**    The Lodge admits the allegation in this paragraph.

125.    The DOJ Report found that numerous officers believe that merit promotions are attributable to connections rather than leadership qualifications, and that these negative opinions undermine officer acceptance of CPD's supervision and accountability systems.

**ANSWER:**    The Lodge admits the allegations in this paragraph.

126.    In addition to officer dissatisfaction, CPD's promotion system is not sufficiently tailored to identify candidates with certain critical supervisory skills or to weed out individuals with potentially problematic backgrounds.

**ANSWER:**    The Lodge admits the allegations in this paragraph.

127.    The Task Force Report found that, with regard to the sergeant promotion process, there is no assessment of "an individual's ability to mentor or otherwise manage the health and well-being of officers or other accountability measures like citizen or administrative complaints or interventions"

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

128.    The Task Force Report also found that an officer's disciplinary record is not considered for promotion to sergeant, nor is a sergeant's disciplinary record or the record of his or her subordinates considered for promotion to lieutenant.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

3.    <u>The City fails to adequately investigate allegations of officer misconduct and, when appropriate, discipline offending officers:</u>

129.    CPD's system of accountability does not adequately identify and investigate allegations of officer misconduct. As a result, officers are not consistently held accountable for engaging in misconduct or deterred from engaging in future misconduct.

**ANSWER:**  The Lodge denies the allegation alleged in this paragraph.

130.    The lack of officer accountability is evident in a number of ways. The Task Force Report found, for example, that out of the 28,567 misconduct complaints filed between March 2011 and September 2015, only 1% resulted in actual discipline.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

131.    The DOJ Report found that only 13 of 980 (1.3%) complaints filed between 2011 and March 2016 alleging discriminatory verbal abuse on the basis of race or ethnicity were ultimately sustained by investigators.

**ANSWER:**  The Lodge admits the DOJ issued a report but lacks knowledge or information sufficient to form a belief about the truth of the Report.

132.    In addition, the Task Force Report found that between October 2007 and September 2015, only two of 409 officer-involved shootings (0.49%) were found to be unjustified.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

133.    In the small number of cases in which IPRA and the Superintendent have recommended discipline, the Police Board frequently disagreed with the recommendations. The Task Force Report found that between 1999 and 2008, the Police Board agreed with the Superintendent's discharge recommendation in only 39% of cases; between 2011 and 2015, the rate was 41%.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the

truth of the allegation in the first sentence of this paragraph and admits a Task Force Report was issued but lacks knowledge or information sufficient to form a belief about the truth of the matters contained in the Report.

134.    The City also has not adequately investigated instances of alleged police misconduct when sued by victims. Of the hundreds of such cases since 2004, for which the City has spent over half a billion dollars to settle or pay judgments, only half involved official disciplinary investigations, and fewer than 4% of those investigations resulted in disciplinary recommendations.

**ANSWER:** The Lodge denies the allegations in this paragraph.

135.    These systemic flaws not only result in a failure to hold CPD officers accountable for instances of excessive force and racially discriminatory policing practices, but also signal to officers that they can engage in misconduct with little to no risk that their actions will result in discipline.

**ANSWER:** The Lodge denies the allegations alleged in this paragraph.

a.    <u>Overview of the investigatory and disciplinary process for misconduct complaints</u>

136.    CPD receives on average almost 7,000 citizen complaints of alleged officer misconduct annually.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

137.    IPRA conducts an initial review of all complaints to determine whether it or CPD's Bureau of Internal Affairs ("BIA") will be responsible for any investigation.

**ANSWER:** The Lodge admits that allegation in this paragraph.

138.    If the complaint alleges domestic violence, excessive force, c o e r c i o n , or verbal abuse-which together constitute approximately 30% of all citizen complaints-IPRA is charged with investigating. IPRA is also required to investigate all instances of officer firearm discharge and Taser deployment that could potentially strike an individual, even if no

misconduct allegation is made.

**ANSWER:**     The Lodge admits the allegations of the paragraph as to the responsibility of IPRA to investigate certain allegations as stated but lacks knowledge or information sufficient to form a belief as to the number of citizens' complaints submitted to IPRA.

139.     If the complaint alleges criminal misconduct, substance abuse, or abuse of CPD administrative policy, BIA typically will investigate.

**ANSWER:**     The Lodge admits the allegation in this paragraph.

140.     If the complaint makes allegations that fall within the jurisdiction of both IPRA and BIA, IPRA handles the complaint.

**ANSWER:**     The Lodge admits the allegation in this paragraph.

141.     At the conclusion of their investigations, IPRA and BIA investigators issue a finding of "sustained," "not sustained," "unfounded," or "exonerated." A "sustained" finding means "[t]he allegation was supported by sufficient evidence to justify disciplinary action." A "not sustained findings mean "[t]he allegation was not supported by sufficient evidence which could be used to prove or disprove the allegation." An "unfounded" finding means "[t]he complaint was not based on facts as shown by the investigation, or the reported incident did not occur." An "exonerated" finding means "[t]he incident occurred, but the action taken by the officer(s) was deemed lawful and proper."

**ANSWER:**     The Lodge admits the allegation in this paragraph.

142.     If a misconduct complaint is sustained, it is the responsibility of the investigator's supervisor to supply a discipline recommendation.

**ANSWER:**     The Lodge admits the allegation in this paragraph.

143.     Once a recommendation is made by IPRA or BIA, CPD employs a multi-step review process before finalizing most investigatory findings and recommendations.

28

**ANSWER:** The Lodge admits the allegation in this paragraph.

144.    First, a Command Channel Review ("CCR") occurs, in which the supervisors in the officer's chain of command review the discipline recommendation made by IPRA or BIA and provide their comments.

**ANSWER:** The Lodge admits the allegation in this paragraph.

145.    The CCR input is then sent to the Superintendent for review. (The CCR process is bypassed, however, if IPRA or BIA recommends that the officer be dismissed.) If the Superintendent agrees with BIA's or IPRA's recommendation, the decision typically is final. An exception is when the recommended discipline involves a suspension exceeding 30 days or a discharge; in that situation, the Police Board will hear the matter.

**ANSWER:** The Lodge admits the allegations in this paragraph.

146.    If the Superintendent does not agree with IPRA's recommendation, IPRA's chief administrator can ask a three-person panel from the Police Board to review the matter.

**ANSWER:** The Lodge admits the allegation in this paragraph.

147.    In practice, however, investigations of officer misconduct complaints rarely result in discipline for the officers involved.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

b.    Procedural and training deficiencies relating to IPRA investigations

148.    A number of systemic problems contribute to the City's failure to adequately review and investigate officer use of excessive force and other alleged misconduct.

**ANSWER:** The Lodge denies the allegation alleged in this paragraph.

149.    A complaint of officer misconduct generally will not be investigated unless the complainant supplies an affidavit and signed statement of alleged facts made under oath. If the complainant declines to provide an affidavit with his or her name when alleging misconduct,

29

the investigation typically will not move forward.

**ANSWER:** The Lodge admits the allegation in this paragraph.

150. The DOJ Report found that approximately 40% of all complaints are closed before a full investigation occurs because the complainant did not submit an affidavit.

**ANSWER:** The Lodge admits the DOJ issued a Report but lacks knowledge or information sufficient to confirm the findings of the Report.

151. Critically, lPRA investigators c a n o v e r r i d e the affidavit requirement and investigate a complaint in the absence of an affidavit by obtaining approval from the director of BIA.

**ANSWER:** The Lodge admits the allegation in this paragraph.

152. However, investigators do not receive training on the circumstances in which override may be proper and in practice rarely employ it.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

153. Also, IPRA regularly closes complaint investigations if it determines that "de minimis" force was employed by officers.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

154. The DOJ Report found that, pursuant to this practice, IPRA prematurely closed the investigation of most complaints alleging excessive force in connection with handcuffing, take-downs incidental to arrest, and displays of an officer's gun.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

155. IPRA's reliance on mediation as a tool for resolving complaints of officer misconduct is another impediment to officer accountability.

**ANSWER:** The Lodge denies the allegation alleged in this paragraph.

156. As employed by IPRA, mediation is a process by which an officer typically

agrees to a sustained finding of misconduct in exchange for reduced punishment.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

157.    Mediation occurs frequently: the **DOJ** Report found that between 2013 and 2015, 65% of sustained complaints involved mediation and that by December 2012 multiple IPRA Investigators were instructed to attempt mediation in every case.

**ANSWER:**    The Lodge admits the DOJ issued a Report but does lacks knowledge or information sufficient to confirm the findings of the Report.

158.    Critically, however, when mediation occurs, it always takes place before IPRA has completed its misconduct investigation and often before the accused officer has been interviewed by investigators. This means that IPRA investigators undertake mediation potentially without possessing all relevant evidence-information that could prove key to determining the severity and breadth of the alleged misconduct.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

159.    As a result, the discipline an officer receives is often less severe than the facts would merit.

**ANSWER:**    The Lodge denies the allegation alleged in this paragraph.

160.    IPRA officials admitted to DOJ investigators that the mediation process is being used in ways that are inappropriate and impede officer accountability.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

c. Data and transparency

161.    The data IPRA publishes reflects only the initial step in resolving a misconduct allegation, i.e., IPRA's findings-and does not indicate how the allegation is ultimately resolved after the layers of review during which IPRA's findings can be modified or overruled.

**ANSWER:**     The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

162.    IPRA also does not analyze complaint data (o identify racial, ethnic, gender, or other disparities that may be present.

**ANSWER:**     The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

163.    These deficiencies prevent advocates and other members of the general public from sufficiently assessing IPRA's work and identifying potential areas of improvement.

**ANSWER:**    The Lodge denies the allegation alleged in this paragraph.

164.    In addition, until this year, there has been no standardize disciplinary m atrix on which IPRA, the Superintendent, and the Police Board can rely to ensure that officers are disciplined consistently and equitably.

**ANSWER:**     The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

     d.  <u>Procedural and training deficiencies relating to the Police Board</u>

165.    The DOJ Report found that due at least in part to the absence of such a matrix, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct."

**ANSWER:**     The Lodge admits the DOJ Report but lacks knowledge or information sufficient to confirm the findings of the Report.

166.    The Police Board reviews cases in which the Superintendent has recommended that an officer be suspended for over 30 days or discharged.

**ANSWER:**    The Lodge admits the allegation in this paragraph.

167.    The Police Board has typically disagreed with the Superintendent's discipline recommendations over 50% of the time. This low rate of agreement is due, at least in part, to several procedural deficiencies.

**ANSWER:**   The Lodge denies the allegation alleged in this paragraph.

168.    While the Police Board/is not presented with evidence concerning an officer's disciplinary and lawsuit history when determining whether to sustain the Superintendent's misconduct conclusions, the Board's decisions can be skewed in an officer's favor by the introduction of complimentary evidence about the officer, including testimony from character witnesses such as the officer's commander.

**ANSWER:**   The Lodge denies the allegations alleged in this paragraph.

169.   The Police Board is also deprived of relevant information based on how evidence is gathered for the Board's consideration: because the Board reviews testimony and exhibits only after the hearing has concluded, it is unable to ask any clarifying questions of the parties.

**ANSWER:**   The Lodge denies the allegation alleged in this paragraph, except that the Lodge admits Police Board members are unable to ask any clarifying questions of the parties.

170.    In addition, the proper consideration of evidence is negatively affected by a lack of investigative timeliness. For IPRA cases that the Police Board considered after 2010, four years is the median elapsed time between the date of an incident and the filing of charges by the Superintendent. In proceedings before hearing officers, these delays result in reduced witness availability and recollection. The delays also inhibit an officer's ability to present an adequate defense.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

171.    Police Board members and hearing officers also have historically received inadequate training. Over the last 20 years, there was no set or required training for Board members or hearing officers.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

172.   This inadequate training is particularly problematic for certain Board members who may not be lawyers or have prior experience with policing or accountability. As a result, Board members and hearing officers in some cases have failed to properly apply rules during the misconduct adjudication process.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

4.   <u>CPD does not adequately invest in officer mental health support. thereby contributing to officer fatigue, stress, and decreased morale.</u>

173.   The DOJ Report concluded that "[o]fficer wellness in CPD is not an integral part of the Department's operations," with too few officers being notified about and taking advantage of CPD's mental health resources-resources that do not adequately reflect the size of CPD's workforce.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

174.   For CPD officers to be able to lawfully, safely, and effectively do their jobs, a significantly increased investment in officer wellness is critical.

**ANSWER:**   The Lodge admits the allegation alleged in this paragraph.

175.   Policing in Chicago is especially stress-inducing, given the increase in shootings, homicides, and community mistrust of CPD officers.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

176.   This stress is manifested in a number of ways, including officer suicide. According to the Fraternal Order of Police-the union that represents CPD officers-an average of three CPD officers commit suicide every year.

**ANSWER:**   The Lodge admits the allegations in this paragraph.

177.   The DOJ Report found that between 2013 and 2015, CPD's officer suicide rate

was 29.4 per 100,000-60% higher than the national average for law enforcement officers.

**ANSWER:** The Lodge admits the allegation in this paragraph.

178. Despite the fact that during the past decade approximately twice as many officers died from suicide as compared to deaths in the line of duty, CPD has failed to allocate adequate resources to its officers' mental and emotional wellness.

**ANSWER:** The Lodge admits the allegation in this paragraph.

179. CPD's Employee Assistance Program ("EAP") provides nearly all of the physical and mental wellness services that are available to officers through CPD.

**ANSWER:** The Lodge admits the allegations in this paragraph.

180. EAP is understaffed, under-resourced, and under-utilized.

**ANSWER:** The Lodge admits the allegations in this paragraph.

181. EAP officials have stated that to meet patient needs, employees routinely have to shorten, reschedule, or cancel previously scheduled appointments.

**ANSWER:** The Lodge admits the allegations in this paragraph.

182. CPD has also failed to foster a culture in which officers in need of EAP's services are willing to seek them out.

**ANSWER:** The Lodge admits the allegation in this paragraph.

183. The DOJ Report found that CPD fails to provide officers with adequate information regarding the support services available to them and their families, the practical benefit these services may have, or how to access them.

**ANSWER:** The Lodge admits the allegations in this paragraph.

184. Notably, the stress management training that CPD has offered to at least some probationary officers does not offer any information about EAP or its services.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

185.  CPD has also failed to adequately address unfounded officer concerns that seeking counseling through EAP will result in their Firearm Owner Identification card being confiscated. Officers' misunderstanding of this policy leads some officers to avoid EAP entirely.

**ANSWER:**     The Lodge admits the allegation in this paragraph.

186.  The DOJ Report also found that within CPD, use of EAP is stigmatized. Seeking out counseling is perceived to be a sign of weakness, and contacting EAP on a fellow officer's behalf is viewed as a betrayal.

**ANSWER:**     The Lodge admits the DOJ Report but lacks knowledge information sufficient to from a belief as to the truth of the findings.

5.  CPD's policies and activities are not sufficiently imbued with community policing principles.

187.  CPD must also renew its commitment to community policing and provide the resources necessary to make community policing ingrained in CPD's culture.

**ANSWER:**   The Lodge admits the allegation in this paragraph.

188.  The President's Task Force on 21st Century Policing recently observed that "[c]ommunity policing must be a way of doing business by an entire police force, not just a specialized unit of that force."

**ANSWER:**   The Lodge admits the allegation in this paragraph.

189.  The DOJ Report found, however, that "community policing in Chicago has been relegated, through [the Department's Chicago Alternative Policing Strategy program], to a small group of police officers and civilians at each district," and that the program is "poorly funded and institutionally neglected." Specifically, the DOJ Report noted that CAPS officials said that their offices were "understaffed, and that CAPS officers receive little training on how to accomplish their mandate."

**ANSWER:** The Lodge admits the allegations in this paragraph.

190. CPD has recently announced new initiatives to implement community policing, but these efforts must be sustained and adequately supported. Truly implementing community policing will help provide CPD officers and Chicago residents the respect they all deserve.

**ANSWER:** The Lodge admits the allegations in this paragraph.

**C. The reforms that the City and CPD have announced to date are an important step but do not sufficiently remedy the problem of excessive force and racially discriminatory policing.**

191. Following the release of the videotape of the Laquan McDonald shooting, the City and CPD have announced certain reforms to CPD's officer training, supervision, accountability, and wellness systems.

**ANSWER:** The Lodge denies the allegations alleged in this paragraph.

192. These announced reforms do not adequately remedy CPD's repeated pattern of using excessive force and racially discriminatory policing practices against Chicago residents.

**ANSWER:** The Lodge denies the allegations alleged in this paragraph.

193. A judicially enforceable consent decree is the only viable method for reforming CPD to ensure effective, constitutional policing, as well as public and officer safety.

**ANSWER:** The Lodge denies the allegation alleged in this paragraph.

1. The City's and CPD's recently announced reforms will not put an end to the repeated pattern of unconstitutional policing in Chicago.

194. The reforms that the City and CPD have announced do not cover many of the areas in need of change. With regard to use of force, for example, officers are not instructed to deescalate situations as soon as practicable, when a Taser set to "drive stun" is properly used, and what types of foot-pursuit tactics are permissible.

**ANSWER:** The Lodge asserts the CPD has announced a new use of force policing and that officers are instructed to deescalate situations, when to use a "drive stun," but foot-pursuant tactics are not defined.

195. In addition, many of the announced reforms have indicated the City's and CPD's policy goals but have not provided a comprehensive roadmap regarding what will be done, when it will be done, and what resources will be used to accomplish the needed changes. Other announcements have identified specific steps that the City and CPD are taking, but the steps are incomplete solutions. To be effective, they require not only consistent attention and buy-in from policymakers and officers over multiple years, but also the implementation of additional policies.

**ANSWER:** The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

2. Lasting, comprehensive reform to policing in Chicago requires a judicially enforceable consent decree and an independent monitor.

196. As discussed above, CPD's pattern of using excessive force and racially discriminatory policing practices against Chicago residents dates back decades. During this period, the City was repeatedly notified of officer misconduct by a half dozen government commissioned reports.

**ANSWER:** The Lodge denies the allegations in this paragraph.

197. In the wake of each of these reports, the City and CPD endeavored to reform police practices and accountability. However, the pattern of unconstitutional policing persisted, leading to the erosion of community trust and confidence in CPD.

**ANSWER:** The Lodge denies the allegations alleged in this paragraph.

198. In order to ensure that the DOJ and Task Force Reports chart a new course for CPD by serving as the catalysts for real, lasting reform and the rebuilding of community confidence in CPD, the City needs significant oversight in implementing reforms.

**ANSWER:** The Lodge denies the allegations alleged in this paragraph.

199.   To ensure that the City's actions to implement and sustain reforms will be measured and tested, the State seeks a consent decree in which this Court would appoint an independent monitor.

**ANSWER:**   The Lodge denies the allegations alleged in this paragraph.

200.   To further ensure accountability in the reform process, the State seeks a consent decree that contains outcome measures that will assess progress on implementation of reforms, as well as whether the implemented reforms have led to reduced patterns of excessive force and discriminatory policing.

**ANSWER:**   The Lodge denies the allegations alleged in this paragraph.

201.   The decree would cover several substantive reform areas to address the critical deficiencies at CPD, including departmental policies and practices, such as use of force, accountability, training, community policing and engagement, supervision and promotion, transparency and data collection, and officer assistance and support.

**ANSWER:**   The Lodge denies the allegations in this paragraph.

202.   Transparency will also be a key feature of the consent decree that the State seeks. For example, this decree would require the independent monitor to submit his or her reports to the Court-not only the parties-and to immediately make these reports available to the general public.

**ANSWER:**   The Lodge lacks knowledge or information sufficient to form a belief about the truth of the allegation.

203.   The State believes that the decree also should require that status hearings occur regularly. Such hearings would be an effective forum within which to discuss and resolve implementation challenges and disagreements between the parties.  The decree would further provide that, in the event the parties could not resolve a material disagreement, the decree would possess jurisdiction to resolve the dispute.

**ANSWER:**    The Lodge lacks knowledge or information sufficient to from a belief about the truth
of the allegation.

204.    Many of CPD's challenges are not new. Prior reform efforts have failed to adequately address these challenges. This Court's intervention is necessary to ensure that the City and CPD can finally break with the patterns of the past, restore trust with Chicago's residents, and reduce violence.

**ANSWER:**  The Lodge denies the allegations alleged in this paragraph.

## CLAIMS

### Count I: Violation of Section 1983 (Fourth Amendment)

205.    The State incorporates by reference the allegations set forth in paragraphs 1-204 above.

**ANSWER:**  The Lodge does not answer the allegations of this paragraph but has filed a motion
to dismiss the allegations of this paragraph.

206.    The City and its agents engage in a repeated pattern of using force against persons in Chicago without lawful justification.

**ANSWER:**  The Lodge does not answer the allegations of this paragraph but has filed a motion
to dismiss the allegations of this paragraph.

207.    This pattern is intentional and willful and exhibits a conscious disregard of or deliberate indifference to the rights of persons in Chicago.

**ANSWER:**  The Lodge does not answer the allegations of this paragraph but has filed a motion
to dismiss the allegations of this paragraph.

208.    This pattern is undertaken pursuant to a policy, custom, or practice that deprives persons of their rights under the Fourth Amendment to the U.S. Constitution, in violation of 42 U.S.C. § 1983.

**ANSWER:**  The Lodge does not answer the allegations of this paragraph but has filed a motion
to dismiss the allegations of this paragraph.

### Count II: Violation of the Illinois Constitution (Search and Seizure)

40

209. The State incorporates by reference the allegations set forth in paragraphs 1-208 above.

**ANSWER:** The Lodge incorporates by reference the answers to paragraphs 1– 208.

210. The City and its agents use force against persons in Chicago without lawful justification.

**ANSWER:** The Lodge denies the allegations in this paragraph.

211. The actions of the City and its agents are intentional and willful and exhibit a conscious disregard of or deliberate indifference to the rights of persons in Chicago.

**ANSWER:** The Lodge denies the allegations in this paragraph.

212. The actions of the City and its agents, including CPD officers, are undertaken pursuant to a p o l i c y custom, or practice that deprives persons of their rights under Article I, Section 6 of the Illinois Constitution.

**ANSWER:** The Lodge denies the allegations in this paragraph.

<u>Count III: Violation of the Illinois Civil Rights Act of 2003</u>

213. The State incorporates by reference the allegations set forth in paragraphs 1-212 above.

**ANSWER:** The Lodge incorporates by reference the answers to paragraphs 1-212.

214. When undertaking law enforcement practices, the City and its agents utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their  or national origin in violation of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(b).

**ANSWER:** The Lodge denies the allegations in this paragraph.

215. The City and its agents engage in law enforcement practices that have a disproportionate impact on African Americans and Latinos in Chicago.

**ANSWER:** The Lodge denies the alleged allegations in this paragraph.

41

216.    The practices of the City and its agents are undertaken pursuant to a policy, program, or activity that deprives persons of their rights under the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(a).

**ANSWER:**   The Lodge denies the allegations in this paragraph.

<u>Count IV: Violation of the Illinois Human Rights Act</u>

217.    The State incorporates by reference the allegations set forth in paragraphs 1-216 above.

**ANSWER:**   The Lodge incorporates by reference the answers to paragraphs 1-216.

218.    The City and its agents engage in a pattern or practice of discrimination that denies African Americans and Latinos in Chicago the full and equal enjoyment of the privileges of the City's law enforcement services, in violation of the Illinois Human Rights Act, 775 ILCS 5/5-102(C).

**ANSWER:**   The Lodge denies the allegations of this paragraph.

## PRAYER FOR RELIEF

Wherefore, the State prays that this Court:

A. Declare that the City and its agents have a policy or custom that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, in violation of Section 1983;

B. Declare that the City and its agents have a policy, custom, or practice that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the State of Illinois, in violation of the Illinois Constitution, the Illinois Human Rights Act, and the Illinois Civil Rights Act;

C. Enjoin the City and its agents from engaging in any of the predicate acts forming the basis of the policy, custom, or practice described herein;

D. Order the City and its agents to adopt and implement policies and procedures that identify, correct, and prevent the unlawful conduct described herein that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States;

E. Order the City and its agents to adopt and implement policies and procedures that identify, correct, and prevent the unlawful conduct described herein that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the State of Illinois;

F. Appoint an independent monitor to oversee the City's adoption and implementation of the required policies and procedures and to report to the Court;

G. Order the City and its agents to pay attorney's costs and expenses; and

H. Order such other appropriate relief as the interests of justice may require. Dated:

Respectfully submitted,

_____

Joel A. D'Alba
ASHER, GITTLER & D'ALBA
200 West Jackson Blvd.,
Suite 720
Chicago, Illinois 6060
ARDC No: 0571121
Phone (312) 263-1500
jad@ulaw.com