**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-6260 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

On August 29, 2017, the State of Illinois ("State") filed this lawsuit against the City of Chicago ("City") pursuant to 42 U.S.C. § 1983, the U.S. Constitution, the Illinois Constitution, the Illinois Civil Rights Act of 2003, the Illinois Human Rights Act, and the *parens patriae* doctrine "to ensure the City enacts comprehensive, lasting reform" of the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA"), and the Chicago Police Board ("Police Board"). [1] at 1. Currently before the Court is the Motion to Intervene [51] filed on June 6, 2018, by the Fraternal Order of Police Chicago Lodge No. 7 ("FOP"). For the reasons explained below, the FOP's motion [51] is respectfully denied and the FOP's motion to hold proceedings in abeyance pending ruling on motion to intervene [65] is denied as moot. This case remains set for status hearing on August 30, 2018 at 10:30 a.m.

## I. Background

The State filed this lawsuit against the City to enjoin the CPD "from engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harms Chicago's African American and Latino residents." [1] at 1, ¶ 2. As evidence of this pattern, the complaint points to reviews of CPD's policing practices over the last

fifty years, including most recently two separate reports issued by the U.S. Department of Justice ("DOJ") (the "DOJ Report") and Chicago's Police Accountability Task Force ("Task Force") concluding that "CPD has continued to engage in a repeated pattern of using excessive force and racially discriminatory policing practices." [1] at 2, ¶ 3; see also *id*. at 13-29 (detailing the DOJ Report's findings). The State contends that CPD's "policy, custom, or practice" of police misconduct is reflected in and caused by "the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline." *Id*. at 7, ¶ 33. The State asserts that these failures have created "profound mistrust between many Chicago communities and CPD," which "reached its most recent flashpoint in late November 2015, following the release of a videotape depicting the fatal shooting of Laquan McDonald, a 17-year old African American, by a CPD officer." *Id*. at 2, ¶ 5. According to the State, the City has spent approximately $662 million on settlements, judgments, and outside legal fees for police misconduct cases between 2004 and early 2016.

The DOJ Report acknowledges that the City has announced a number of reforms to CPD but opines that necessary reforms "will likely not happen or be sustained without the reform tools of an independent monitoring team and a court order." [1] at 3, ¶ 10 (quoting the DOJ Report). The DOJ Report advises that "[a] court-ordered, over-arching plan for reform that is overseen by a federal judge will help ensure that unnecessary obstacles are removed, and that City and police officials stay focused on carrying out promised reforms." *Id*.

The State brings this lawsuit in response to the DOJ Report "to obtain injunctive relief that will finally enable the City to eliminate unconstitutional conduct that has plagued CPD for decades." *Id*. at 4, ¶ 11. The State alleges that it is authorized to bring suit on behalf of the People

of Illinois based on the doctrine of *parens patriae* and the Illinois Human Rights Act, 775 ILCS 5/10-104(A)(1), to defend its "quasi-sovereign interest in the prevention of present and future harm to its residents, including individuals who are, have been, or would be victims of the City's unconstitutional law enforcement practices."  [1] at 5, ¶ 21.  The State also seeks to protect its proprietary interests.  According to the complaint, "[m]ultiple persons injured as a result of excessive force by CPD officers have incurred medical care costs that Illinois has paid for" through its Department of Healthcare and Family Services ("DHFS") and Medicaid.  [1] at 6, ¶ 29.

The State's complaint contains four counts.  In Count I, the State alleges that the City and its agents maintain a policy, custom or practice of using force against persons in Chicago without lawful justification, in violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Count II alleges that these practices also deprive persons in Chicago of their rights under Article I, Section 6 of the Illinois Constitution.  In Count III, the State alleges that the City and its agents have violated the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(b), by engaging in law enforcement practices that have a disproportionate impact on African Americans and Latinos in Chicago.  Finally, Count IV alleges that the City and its agents have violated the Illinois Human Rights Act, 775 ILCS 5/5-102(C), by engaging in a pattern or practice of discrimination that denies African Americans and Latinos in Chicago the full and equal enjoyment of the privileges of the City's law enforcement services.

As relief, the State seeks a consent decree covering "several substantive reform areas to address the critical deficiencies at CPD, including departmental policies and practices, such as use of force, accountability, training, community policing and engagement, supervision and promotion, transparency and data collection, and officer assistance and support."  [1] at 31, ¶ 201.

The State requests that the Court appoint an independent monitor to measure and test these reforms. *Id*. at 31, ¶ 199.

Since the lawsuit was filed approximately one year ago, counsel for the State and City have engaged in extensive negotiations to arrive at a draft consent decree. The draft consent decree has been released to the public for comment and ultimately will be presented to the Court with a request for approval. According to the State, there have been 250 hours of face-to-face negotiation thus far between the City and State. [73] at 6. The State reports that it has a team of nine attorneys working on the case and has retained a team of six experts who have conducted site visits, meetings, and interviews with City and CPD personnel. The State also represents that, since the complaint was filed, its counsel have had eight in-person meetings with the FOP's President, Kevin Graham, to discuss, among other things, provisions that might be included in the consent decree. See *Id*. at 5. The State advises that the Office of the Illinois Attorney General ("OAG") "sought and obtained input on reform of the Chicago Police Department from CPD officers through 13 focus groups." "Chicago Police Consent Decree," http://chicagopoliceconsentdecree.org/ (last visited Aug. 15, 2018).[1]

The State and City also have engaged in public outreach to obtain the input of community groups and other stakeholders on the contents of the consent decree. The OAG held fourteen consent decree community roundtables "to ensure that interested Chicago residents had a meaningful opportunity to provide their input on reform of CPD." "Chicago Police Consent

---

[1] The web page maintained by the OAG contains a link to a document entitled "Opinions of Officers of the Chicago Police Department on the Upcoming Consent Decree," http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/07/Opinions-of-Officers-of-the-Chicago-Police-Department-on-the-Upcoming-Consent-Decree-Final.pdf (last visited Aug. 15, 2018), which was compiled by the Police Foundation and dated July 2018. According to its authors, the document summarizes the input from focus groups with a total of 170 CPD officers who were asked about "their perceptions of the department's challenges and areas of change needed under a consent decree." *Id*. at 6.

Decree," http://chicagopoliceconsentdecree.org/ (last visited Aug. 15, 2018). In March 2018, the State and the City entered into a memorandum of agreement ("MOA") with a coalition of community groups ("Coalition") that "afford[s] the Coalition certain rights to raise objections and provide input regarding any consent decree proposed to the Court before the Court decides whether to approve and enter a final consent decree." [73] at 5. According to the State, it "offered FOP the same rights provided to the Coalition in the MOA, but FOP refused this offer." *Id.* (The FOP does not dispute that it refused the State's offer.)

On June 6, 2018, the FOP filed a motion to intervene in the lawsuit. The FOP is the "exclusive representative for the purpose of negotiating with the City of Chicago for wages, hours and working conditions of Chicago police officers pursuant to Sections 3 and 7 of the Illinois Public Labor Relations Act, ('IPLRA')." [51] at 1 (citing 5 ILCS 315/3 and 7). According to the motion to intervene, the "FOP has the right to bargain collectively and negotiate in good faith with the City of Chicago with respect to wages, hours and other conditions of employment, to bargain about matters that may be covered by other laws that pertain in part to a matter affecting wages, hours and other conditions of employment, and to enter into collective bargaining agreements containing causes which either supplement, implement or relate to the effect of such provisions in other laws." [51] at 5. The most recent collective bargaining agreement ("CBA") between the FOP and the City has a term of July 1, 2012, to June 30, 2017, but remains in full force and effect during the negotiation of a successor agreement.

The FOP asserts that it has a "substantial interest in the subject of this litigation which may, as a practical matter, impair or impede the [FOP's] ability to protect its collective bargaining representational interests of the Chicago police officers it represents." [51] at 1. According to the FOP, "[t]he CBA contains provisions addressing a number of the subjects raised in the complaint

filed by the [OAG] in this case," including "the investigation of allegations of police officer misconduct and related discipline, the field training officer program, police officer promotions, officer mental health and support programs, including the performance recognition system, behavioral intervention system, personal concerns program, and the requirement that allegations of misconduct by police officers be supported by affidavits." [51] at 6. The FOP also attaches to its motion a draft answer to the complaint and a draft motion to dismiss, in which the FOP asserts that the State lacks standing to sue the City under 42 U.S.C. § 1983. See [51-1] & [51-2].

The FOP, City, and State agreed to extend the briefing schedule on the motion to intervene by a couple of weeks to allow for "discussions concerning the motion." [61] at 1 (agreed motion); see also [63] (order granting motion). Once it became apparent that those discussions would not moot the motion, the FOP filed a motion to hold proceedings in abeyance pending a ruling on the motion to intervene [65] and the parties agreed to a new briefing schedule on both motions. See [68]. The City and State filed responses to both motions on July 24. See [73] & [75]. Both oppose intervention, for reasons explained in the analysis section below.

On July 27, 2018, the State and City released a draft consent decree for public review. It is posted online at http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/07/Illinois-v.-Chicago-Consent-Decree-Draft-for-Public-Review-2018-7-27.pdf (last visited Aug. 15, 2018). See also "Chicago Police Consent Decree," http://chicagopoliceconsentdecree.org/ (last visited Aug. 15, 2018). The 232-page, 775-paragraph document covers a broad range of topics, including community policing; impartial policing; crisis intervention; use of force; recruitment; hiring and promotion; training; supervision; officer wellness and support; accountability and transparency; data collection, analysis and management; and implementation, enforcement and monitoring. Most notably for purposes of the instant motion, the draft consent decree acknowledges that the

City is subject to several CBAs into which it has entered with the FOP and other police officers' unions.  In particular, paragraphs 686 and 687 of the draft consent decree provide:

> 686. The Parties acknowledge the City has entered into four collective bargaining agreements effective July 1, 2012 (individually, and collectively, the "CBAs") with unions representing sworn police officers ("Unions"). The Parties further acknowledge that the City and the Unions are currently negotiating successor agreements to the CBAs ("Successor CBAs"). The Parties further acknowledge that the Unions and the City have certain rights and obligations under the Illinois Public Labor Relations Act, 5 ILCS 315 ("IPLRA") and that the IPLRA contains provisions for the City and the Unions to enforce their respective rights and obligations, including a process, set forth in Section 14 of the IPLRA and Section 28.3 of the current CBAs, for resolving bargaining impasses between the City and the Unions over issues subject to a bargaining obligation under the IPLRA ("Statutory Impasse Resolution Procedures").

> 687. Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.

The parties have invited interested persons and entities to provide comments on the draft consent decree by August 17, 2018.  The parties plan to consider these comments prior to filing the proposed consent decree with the Court.  Pursuant to their MOA with the Coalition, the State and City have committed to jointly request a fairness hearing on the consent decree, which would provide interested parties and members of the public an opportunity to comment both orally and in writing on the proposed consent decree.

On August 7, 2018, the FOP filed its reply brief in support of its motion for intervention. See [81]. The FOP identifies multiple provisions of the proposed consent decree that allegedly conflict with the CBA, the FOP members' collective bargaining rights, the IPLRA, and other state laws. The FOP also filed a motion for leave to file an appendix, which "outline[s] in great detail" the provisions of the consent decree that allegedly "interfere with the collective bargaining agreement statutory rights." [79] at 1. The Court has granted that motion, see [87], and has reviewed the appendix materials.

On August 8, 2018, after its preliminary review of the opening, response, and reply briefs, the Court ordered supplemental briefing concerning whether paragraphs 686 and 687 of the proposed consent decree would "adequately address the FOP's concerns about the potential effects of the consent decree on its collective bargaining and statutory rights." [82] at 2. The parties filed their supplemental briefs on August 10. See [84], [85] & [86].

## II.   Legal Standard

FOP seeks to intervene in this proceeding either as of right under Rule 24(a)(2) or permissively under Rule 24(b). See Fed. R. Civ. P. 24. The rule for intervention as of right provides that, "[o]n timely motion, the court must permit anyone to intervene who *** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). As the Seventh Circuit has explained, this rule imposes four requirements for intervention of right: "(1) timeliness, (2) an interest relating to the subject matter of the main action, (3) at least potential impairment of that interest if the action is resolved without the intervenor, and (4) lack of adequate representation by existing parties." *Reid L. v. Illinois State Bd. of Educ.*, 289

F.3d 1009, 1017 (7th Cir. 2002); see also *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007). "The burden is on the party seeking to intervene of right to show that all four criteria are met." *Reid L.*, 289 F.3d at 1017. "A failure to establish any of these elements is grounds to deny the petition." *Ligas*, 478 F.3d at 773. The Court "must accept as true the non-conclusory allegations of the motion" to intervene. *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995). A district court's denial of a motion to intervene as of right on timeliness grounds is reviewed for abuse of discretion, *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 945 (7th Cir. 2000), while the application of the other requirements is reviewed *de novo*, *Reich*, 64 F.3d at 321; *Ligas*, 478 F.3d at 773.

Even if intervention as of right is not warranted, the Court may, "[o]n timely motion, *** permit anyone to intervene who *** has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). "A court may allow intervention under Rule 24(b) only if: (1) a claim or defense of the would-be intervenor has 'a question of law or fact in common' with the main action; and (2) the intervention request is timely." *Kostovetsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 728 (N.D. Ill. 2017) (quoting *Sokaogon Chippewa Cmty.*, 214 F.3d at 949). "Permissive intervention under Rule 24(b) is wholly discretionary and will be reversed only for abuse of discretion." *Sokaogon Chippewa Cmty.*, 214 F.3d at 949.

## III.    Analysis

### A.    Intervention as of Right

#### 1.    Timeliness

"The test for timeliness is essentially one of reasonableness: 'potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly.'" *Reich*, 64 F.3d at 321 (quoting *Nissei Sangyo America, Ltd. v.*

*United States*, 31 F.3d 435, 438 (7th Cir. 1994)). "'The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal.'" *Sokaogon Chippewa Cmty.*, 214 F.3d at 949 (quoting *United States v. South Bend Cmty. Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983)). Thus, "'[a]s soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene.'" *Id.* (quoting *South Bend Community Sch. Corp.*, 710 F.2d at 396); see also *Heartwood, Inc. v. U.S. Forest Service, Inc.*, 316 F.3d 694, 701 (7th Cir. 2003); *Kostovetsky*, 242 F. Supp. 3d at 728. The Court considers the following factors to determine whether a motion to intervene is timely: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances." *Sokaogon Chippewa Cmty.*, 214 F.3d at 949 (citing *Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991)); see also *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 797-98 (7th Cir. 2013); *Jeffries v. Swank*, 317 F.R.D. 543, 549 (N.D. Ill. 2016).

### a.    Intervenor's Knowledge of Its Interest

This action was filed on August 29, 2017. The FOP moved to intervene more than nine months later, on June 6, 2018. The FOP argues that it should not be expected to have intervened earlier because it was not given drafts of the consent decree and thus did not know if or how this lawsuit would affect its members' rights. Kevin Graham, the President of FOP, submits an affidavit stating that OAG's representatives advised the FOP that the consent decree "was not going to get involved in police disciplinary issues or deal with 'core mandatory matters,'" which he understood to mean subjects of bargaining. [81] at 12 (citing [81-4] at 8-9). The FOP explains that it "filed this motion for intervention only after it had learned on May 15, 2018, that community

groups *** published and undoubtedly submitted to the OAG a report that contains recommendations for the consent decree *** which are extensive and adverse to the interests of the FOP and the employees it represents." [51] at 5.

The City disputes the FOP's position that community groups' publication of recommendations for the consent decree was "the catalyst for [the FOP's] attempted intervention." [75] at 7. Instead, the City contends that the FOP's motion is untimely because "it has been clear since day one that this action would result in a consent decree that affects CPD"—indeed, the complaint specifically requests a consent decree and outlines topics it should cover. [75] at 1. The State concurs that the motion to intervene is untimely because the FOP has known about its asserted interest in this case since the complaint was filed, as demonstrated by FOP President Graham's public comments immediately following the filing of the suit.

Considering these arguments together, the Court concludes that the FOP must have known about its interest in the case when the complaint was filed, but delayed nine months before filing suit. The FOP did not need a draft consent decree or community groups' recommendations to recognize that this lawsuit "could impact [its members'] interests." *Heartwood*, 316 F.3d 694 at 701. The complaint itself requests a consent decree and details a variety of topics it should cover, including "departmental policies and practices, such as use of force, accountability, training, community policing and engagement, supervision and promotion, transparency and data collection, and officer assistance and support." [1] at 31, ¶ 201. FOP's motion to intervene identifies multiple "subjects raised in the complaint" that are also covered by its "CBA *** provisions," [51] at 6, and thus "might" place the terms of the requested decree in conflict with the CBA or its members' bargaining rights. *Kostovetsky*, 242 F. Supp. 3d at 728. To trigger the obligation to seek intervention, all that the lawsuit needed to do was advise the FOP was that its

interests "might be adversely affected" (*Sokaogon Chippewa Cmty.*, 214 F.3d at 949), and the State's complaint clearly did that.

The FOP's own public statements immediately after the complaint was filed confirm that it recognized the profound potential impact of the requested consent decree on the interests of its members. On the day that the lawsuit was filed, the FOP publicly took the position that the consent decree would be "a potential catastrophe for Chicago" and would "only handcuff the police even further." "FOP President Graham Response to Consent Decree," The Watch (Aug. 29, 2017), https://fop7blog.org/news/2017/8/29/fop-president-graham-response-to-consent-decree (last visited Aug. 15, 2018). Even more tellingly, in FOP's September 2017 newsletter, Graham criticized the lawsuit in an article titled "No Reason to 'Consent.'" Graham specifically mentioned that negotiating a consent decree to resolve this case "'*could seriously threaten our collective bargaining rights*' and that '[n]o one in my administration, and few Lodge 7 members, believe that such actions are necessary.'" [73] at 4 (emphasis added) (quoting [73-1] at 13). These statements in August and September 2017 demonstrate that the FOP and its leadership almost immediately recognized that their interests—including in regard to their CBA rights—"might be adversely affected by the outcome of the litigation," thereby triggering the obligation to "move promptly to intervene" if they wished to participate as a party to the litigation. *Sokaogon Chippewa Cmty.*, 214 F.3d at 949.[2]

### b.    Prejudice to the Original Parties

The Court next considers whether allowing intervention would prejudice the original parties. See *Sokaogon Chippewa Cmty.*, 214 F.3d at 950 (district court must "weigh[] the interests

---

[2] The more than nine-month delay between the commencement of this lawsuit and the filing of the FOP's motion to intervene stands in stark contrast to the circumstances in *United States v. City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002), cited in the FOP's briefs. In that case, "the motion [to intervene] was filed only approximately one and [a] half months after the suit was filed." *Id*. at 398.

on both sides" when faced with a late motion to intervene).  The City and State both argue that they would suffer prejudice if the FOP is allowed to intervene at this point in the proceeding.  The City explains that "[t]he Parties began negotiating the draft decree shortly after this action was filed and have spent countless hours exchanging proposals and working toward compromise and agreement on the multitude of topics covered by the decree."  [75] at 3.  The parties have come to agreement on all but one point, concerning whether CPD officers must document every time they point their weapon at an individual.  The parties are in the process of gathering written comments from the public.  After incorporating these comments into the draft consent decree, they plan to file the consent decree with the Court and request a formal fairness hearing.  The State contends that "[i]ntroducing an intervenor on equal footing with the existing parties at this late date— particularly one that has repeatedly stated its public opposition to any consent decree—holds the real danger of undoing much of this work and, at best, substantially delaying the progress the parties have made toward a complete consent decree."  [73] at 10.

The Court agrees that the original parties to this lawsuit would experience prejudice if the FOP is allowed to intervene at this advanced date.  In the analogous context of settlements, the Seventh Circuit "has held that once complex settlement negotiations that are well publicized begin parties may not be allowed to intervene."  *Ragsdale*, 941 F.2d at 504 (citing *City of Bloomington v. Westinghouse Electric Corp.*, 824 F.2d 531, 525 (7th Cir. 1987)).  The City and State have deployed vast resources negotiating and drafting the proposed consent decree, which is 232 dense pages covering a wide range of topics.  Beyond the attorney hours, the parties have spent time obtaining and incorporating input from community groups and members of the general public on the terms of the proposed consent decree.  In March 2018, the parties entered into an MOA with certain plaintiffs in other pending actions in this district pursuant to which those individuals and

entities participated more robustly in shaping the contours of the current draft. The FOP declined the parties' invitation to provide input pursuant to the MOA, thereby foregoing an opportunity to provide months ago the input that it now contends is crucial. Yet, despite the FOP's decision to opt out of the MOA, some Chicago police officers—both rank-and-file and upper management—have provided input. See [73] at 5; "Chicago Police Consent Decree," http://chicagopoliceconsentdecree.org/ (last visited Aug. 15, 2018); Police Foundation, "Opinions of Officers of the Chicago Police Department on the Upcoming Consent Decree: A Report to the State of Illinois Office of the Attorney General" (July 2008), http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/07/Opinions-of-Officers-of-the-Chicago-Police-Department-on-the-Upcoming-Consent-Decree-Final.pdf (last visited Aug. 15, 2018).

The foregoing demonstrates that to the extent the FOP's interests have not been fully vetted in the drafting of the consent decree to date, that deficiency is at least in part a self-inflicted wound. Allowing intervention now would undoubtedly delay the proceedings to the detriment of the original parties' interests. See, e.g., *Sokaogon Chippewa Cmty*., 214 F.3d at 950 (affirming district court's finding that original parties "would be prejudiced by" late motion to intervene, where "the parties had spent substantial time (nearly six months), effort, and money in settlement negotiations" and "[t]o allow a tardy intervenor to block the settlement agreement after all that effort would result in the parties' combined efforts being wasted completely").

### c.    Prejudice to the Proposed Intervenor

The Court must also consider any prejudice to the FOP. Parties seeking to intervene in the Seventh Circuit must show that "the decision of a legal question involved in the action would as a practical matter foreclose rights of the proposed intervenors in a subsequent proceeding."

*Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982). The City asserts that the FOP is not likely to suffer significant prejudice if intervention is denied because the State and the City have already committed to requesting a fairness hearing before the Court on the consent decree, where the FOP, like all other interested stakeholders, may present both written and oral arguments concerning the consent decree—perhaps similar to those that it submitted along with its reply brief and appendix. Further, the State explains, the FOP can file a petition with the Illinois Labor Relations Board to challenge changes to CPD policy that FOP believes concern its CBA.

As noted in the Court's August 8 supplemental briefing order [82], the central thrust of the FOP's argument for intervention is that "[t]he [FOP] will have its collective bargaining rights and statutory rights adversely affected by the consent decree which has already been disclosed to the public and which is expected to be filed in this Court." [81] at 1. The FOP elaborates on this argument in detail, setting out on pages 2 through 7 of its reply brief numerous specific provisions of the proposed consent decree that, according to the FOP, "[c]onflict[] with the CBA, statutes, and the ILPRA bargaining obligation." *Id.* at 2-7.

The City and State respond that the draft consent decree's "carve-out" provisions (paragraphs 686 and 687)—which the FOP inexplicably ignored in its reply brief[3]—adequately address the FOP's concerns about the potential effects of the consent decree on its collective bargaining and statutory rights. The City explains that the carve-out "provides that the Consent Decree does not modify any CBA and will not be interpreted to violate the terms of any CBA, Successor CBA or applicable law." [84] at 6. Thus, the City contends, to the extent that any

---

[3] At the very end of its appendix, the FOP included a single, rather cryptic reference to the "[c]arve-out language," noting that it "cuts any reference to direct conflict and protection of successor CBAs." [81-1] at 22, ¶ 84.

conflict between the proposed Consent Decree and the CBA does appear to exist, the CBA will govern to eliminate the conflict. The City provides the following example: "[T]he FOP claims that Paragraph 454 of the Proposed Consent Decree conflicts with Section 6.1(E) of the CBA. Section 6.1(E) of the CBA provides that CPD officers under investigation will be informed in writing of the names of the complainants. In contrast, Paragraph 454 of the proposed Consent Decree states that '[t]he City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.' *** The City and the Attorney General drafted that language of the proposed Consent Decree recognizing that the proposed requirement of not revealing complainants' identity was inconsistent with current CBA obligations. The City intends to (and would be required to) use best efforts in its negotiations with the FOP to modify this requirement under the CBA. If the City's efforts are unsuccessful, however, the CBA Carve-Out language mandates that the CBA govern, and the identities of complainants will continue to be revealed to CPD members prior to interrogation." [84] at 7.

The FOP contends the carve-out language is insufficient to protect its interests for multiple reasons. First, it does not "address[] the various rights adversely affected by the consent decree that arise under statutes other than the IPLRA." [86] at 1.[4] Second, "[w]hile the parties may not intend to change existing contract rights or impair statutory bargaining rights, this provision fails

---

[4] The FOP maintains that: (1) The draft consent decree would require the COP to accept complaints that are not supported by a sworn affidavit, which conflicts with a provision of the Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/3.8(b), that requires "[a]nyone filing a complaint against a sworn peace officer [to] have the complaint supported by a sworn affidavit." [86] at 3. (2) The draft consent decree does not require a state certified homicide investigator to investigate officer-involved shootings and deaths, as required by the Police and Community Relations Improvement Act, 50 ILCS 727/1-10. (3) The draft consent decree requires an officer to "immediately notify a supervisor" any time his or her body camera becomes inoperable or damaged, which is stricter than the Law Enforcement Officer-Worn Body Camera Act, which requires notice be given "as soon as practicable," 50 ILCS 706/10-20(a)(10).

to square with the several provisions of the consent decree *** that already impair the [FOP]'s contractual and statutory rights," and therefore "[t]his statement of intent falls far short of offering the [FOP] and its members a clear assurance that their rights under the CBA and the IPLRA will not be disturbed." [86] at 9.

The FOP has presented some evidence that parts of the current draft consent decree may conflict with the CBA, the IPLRA, or other state laws. The parties dispute whether particular provisions actually "conflict." For several provisions, the State makes a fairly convincing argument that there is no conflict—or at least will be no conflict in any final consent decree—due to the inclusion of language deferring to the CBA to the extent that it applies. See [85] at 6. And, as a general concept, the parties have expressed an intent to respect the CBA and the FOP members' collective bargaining rights. Plainly, the parties and the Court will need to be mindful that the final version of the consent decree is properly deferential to the CBA—and state law—in all relevant respects. See *People Who Care v. Rockford Bd. of Educ. School Dist. No. 205*, 961 F.2d 1335, 1337 (7th Cir. 1992) (parties to consent decree "may not alter collective bargaining agreements without the union's assent" or "agree to disregard valid state laws"); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995) (same); *United States v. Board of Educ. of City of Chicago*, 11 F.3d 668, 672–73 (7th Cir. 1993) ("A consent decree entered by a federal court, like any other injunction, can have adverse consequences on third parties without thereby being rendered invalid. But it is not a proper vehicle for extinguishing the legal rights and duties of third parties."). But the Court cannot—and need not—resolve all of these details now, on the limited record and argument before it, in order to decide the FOP's motion to intervene. As the City points out, "any perceived conflict or legal violation the FOP identifies can be addressed prior to the entry of the Consent Decree, either through the public comment process, or in a public fairness hearing,

in which comments to the terms of the proposed Consent Decree can be presented to the Court."
[84] at 3. The FOP has now placed this issue before the Court front and center and will have a full opportunity to continue to present its views, both in writing and orally, even if it is not a party to the litigation. Moreover, as further explained in the paragraphs that follow, the Court is obligated to uphold the applicable law in resolving any real conflicts between the proposed decree and any existing or future contracts, including the CBAs.

The draft consent decree brings into sharp relief two sets of negotiations, proceeding simultaneously, that will shape the future of this case. The first, which going forward will take place under the Court's watchful eye, involves the parties' continuing efforts to incorporate outside input (including from the CPD and the FOP to the extent they are willing to provide it) into the terms of the final proposed consent decree that they will ask the Court to enter. The second, in which the Court has no direct involvement, concerns the successor agreements that will replace the previous CBAs that have expired but still (by agreement) govern the FOP's members' relationship with the City. As both of these negotiations move forward, the parties will be "bargaining in the shadow of the law" (see Robert H. Mnookin & Lewis Kornhausert, *Bargaining In the Shadow of the Law: The Case of Divorce*, 88 YALE L.J. 950 (1979)), with "the prospect of judicial review serving to constrain the range of potential outcomes." Lars Noah, *Administrative Arm-Twisting in the Shadow of Congressional Delegations of Authority*, 1997 WIS. L. REV. 873, 912 (1997).

As the seminal law review article on the topic explains, the parties to these important negotiations come to the bargaining table with "an endowment of sorts" that consists of "the outcome that the law will impose if no agreement is reached." Mnookin & Kornhausert, *supra*, at 968. In regard to any consent decree, the "contractual aspect" follows from the fact that the

"source of the obligations in the decree is the parties' will, not federal law." *Kasper v. Bd. of Election Commissioners of the City of Chicago*, 814 F.2d 332, 338 (7th Cir. 1987). But that principle has limits, for "[a] consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature that created them." *Id*. at 341-42. In the same vein, the Seventh Circuit has remarked that "[b]efore entering a consent decree the judge must satisfy himself that the decree is consistent with the Constitution and laws, does not undermine the rightful interests of third parties, and is an appropriate commitment of the court's limited resources." *Id*. at 338. Of course, a CBA also must comply with federal law; for example, the parties may not include in their contract an agreement to permit the police department to violate the Fourth Amendment. See *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982) ("illegal promises will not be enforced in cases controlled by the federal law"); *Stuart Park Associates Ltd. Partnership v. Ameritech Pension Trust*, 846 F. Supp. 701, 707 (N.D. Ill. 1994) ("Ordinarily, a contract whose performance would violate federal law is unenforceable and, therefore, neither party can recover on it."); cf. *People Who Care*, 961 F.2d at 1339 (consent decree may alter contractual or state-law entitlements where the court "find[s] the change necessary to an appropriate remedy for a legal wrong"); *Application of County Collector of County of Winnebago, Ill.*, 96 F.3d 890, 901 (7th Cir. 1996) ("Consent decrees can alter the state law rights of third parties only where the change is necessary to remedy a violation of federal law."). In short, the environment in which the proposed consent decree and the successor CBAs will be discussed and debated is challenging, but it does contain significant legal safeguards that will guide the endeavors and constrain the range of possible outcomes.

In sum, taking into consideration (1) the FOP's delay in moving to intervene, (2) any prejudice to the existing parties, and (3) any prejudice to the FOP in light of the safeguards noted

above, the Court concludes that the FOP's motion to intervene is not timely and therefore must be denied.  See *Ligas*, 478 F.3d at 773.

## 2.     Other Factors

Although lack of timeliness alone is dispositive under circuit law (see *Ligas*, 478 F.3d at 773; *Reid L.*, 289 F.3d at 1017), the Court briefly addresses the other requirements for intervention as of right.  It is beyond dispute that the FOP has an interest in the subject matter of this litigation. Its members would be working under the consent decree, which no doubt would affect their day-to-day work.  It is also apparent that a consent decree at least has the *potential* to affect the FOP's ability to protect its interests in the current or successor CBAs.  However, this would be the case whether or not the FOP is allowed to intervene, as no consent decree could anticipate every potential conflict that may arise in the years to follow.  The City and State have committed in the carve-out language not to alter the CBA or to impair or conflict with collective bargaining rights and the City appears to recognize that it cannot compel the FOP to accept provisions of any decree that conflict with existing rights under a CBA.  Rather, to the extent that the City wishes to implement such provisions, it will need to do so in the bargaining process.  Finally, and most importantly, the FOP will have multiple opportunities in the course of this proceeding to present its views, including by identifying any provisions of the consent decree that conflict with the CBA and/or collective bargaining rights and proposing alternative language.  Before deciding whether to enter a consent decree, and on what terms, the Court will give the FOP and indeed all Chicago police officers every opportunity to be heard—just not as parties to the litigation.

Finally, the Court addresses whether FOP's interests are adequately represented by the existing parties.  This requirement for intervention as of right "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing

should be treated as minimal." *Lake Investors*, 715 F.2d at 1261 (quoting *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10 (1972)). The FOP argues that neither the City nor the State adequately represents its interests in this proceeding. The FOP explains that the City "engages in collective bargaining with the [FOP] as the employer, and their interests are most often diametrically opposite and adversarial, especially in [an unfair labor practice case now pending at the ILRB] in which the [FOP] alleged that the City unilaterally without bargaining with the [FOP] implemented a wholesale change in the CPD's discipline system." [51] at 12. The State does not represent its interests either, the FOP explains, because the State "has filed the complaint against the City alleging *** that the current systems and procedures some of which are based on the provisions of the collective bargaining agreement are inadequate, haphazard and need to be replaced." *Id*.

The State responds that "when a party to a proceeding 'is a governmental body charged by law with protecting the interests of the proposed intervenors, the representative is presumed to adequately represent their interests unless there is a showing of gross negligence or bad faith.'" [73] at 14 (quoting *Ligas*, 478 F.3d at 774). The State contends that, by initiating this action as *parens patriae*, it is acting on behalf of all Illinois residents and therefore FOP must, but cannot, show that the State has acted with gross negligence or in bad faith in representing its interests.

The Court is not convinced that the FOP must show that the State has acted with gross negligence or bad faith in order to call into question whether the State can adequately represent the FOP's interests. The State's interests in this proceeding clearly are at odds with the FOP's expressed views in significant ways. To begin, a premise of the State's lawsuit is that some of the FOP's members have committed constitutional violations. And most fundamentally, the State wants a consent decree; the FOP does not. Further, although the City has taken certain positions

21

in this proceeding that are consistent with—and perhaps even based on—the advice and urging of the FOP, the City's and the FOP's positions also conflict in significant ways. The same probably can be said of other interested stakeholders. It would not be surprising if, even after months of input from a panoply of groups and individuals and months of protracted and sometimes difficult negotiations, many in an incredibly diverse city of 2.7 million people might disagree with one or more provisions of the existing draft consent decree. But it is not necessary for the State, acting in its *parens patriae* capacity, to allege an equal and indivisible injury to every resident in its jurisdiction. Rather, the Supreme Court has emphasized that in a *parens patriae* action the State must allege "injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). And the Third Circuit has held that allegations of violations of constitutional rights by police officers clearly suffice in regard to the "sovereign interests" that must be present for a state to invoke a *parens patriae* remedy, notwithstanding the fact that there, as here, the defendant officer and borough officials opposed the action and the Commonwealth's right to bring it. *Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 316 (3rd Cir. 1981).

*Alfred L. Snapp & Son* and *Porter* also answer another of the FOP's principal contentions— namely, that the State of Illinois lacks standing to advance a claim under Section 1983. See [51-1] (proposed motion to dismiss); see also [51] at 2 (making argument in support of proposed motion to dismiss Count 1). The FOP's argument appears to be correct as far as it goes, for the Seventh Circuit has observed that "[t]he usual basis of constitutional litigation, 42 U.S.C. § 1983, is unavailable to Illinois, for a state is not a 'person' under that statute." *State of Illinois v. City of Chicago*, 137 F.3d 474, 477 (7th Cir. 1998). But that obstacle is not necessarily fatal, as "states have frequently been allowed to sue in *parens patriae* to enforce federal statutes that * * * do not

specifically provide standing for state attorneys general." *People by Vacco v. Mid Hudson Medical Group, P.C.*, 877 F. Supp. 143, 146 (S.D.N.Y. 1995). Here, the State has invoked both Section 1983 and the *parens patriae* doctrine in its complaint. See [1], at 1, ¶ 1; 4, ¶ 15. The Court need not definitively resolve at this time any issues regarding Plaintiff's standing, as those issues remain underdeveloped on the current record. Nevertheless, it is worth mentioning that although the Court's initial research has not revealed an on-point Seventh Circuit decision, in *Porter*, the Third Circuit, sitting *en banc*, upheld *parens patriae* standing in a lawsuit brought by the Commonwealth of Pennsylvania seeking an injunction prohibiting police and municipal officials from subjecting residents to "unconstitutional physical violence, mistreatment, threats, or harassment; from unconstitutional detention, searches, seizures, arrests, and imprisonment; and from interference with the free exercise of their rights." 659 F.2d at 310, 314-17.

To sum up, the Court recognizes that the FOP and its members have important interests in this litigation and would be on the front line in regard to carrying out the provisions of any consent decree that the Court may enter. The Court has received—and will continue to encourage and consider—input from Chicago police officers as it considers the myriad issues for decision, from the broadest question of whether to enter a consent decree at all to the narrow potential disputes over the language of specific provisions. But the Court need not allow the FOP party status in this litigation when the FOP chose to sit on the sidelines for nine months despite its clear recognition, as reflected in the public statements of its leadership, that the litigation could have a significant effect on policing in Chicago, including the CBAs that contractually govern the relationship between the City and its police force. In truth, the most recent drive to subject the Chicago Police Department to a consent decree predates the filing of this lawsuit, as the United States Department of Justice took the same position at the conclusion of an investigation in 2016 and early 2017. Far

from taking CPD and the FOP by surprise with the filing of the August 2017 lawsuit, the State was essentially picking up where the federal government left off, focusing on many of the same allegations and seeking the same prospective injunctive relief in the form of a consent decree. The FOP's decision to publicly oppose that relief—and correspondingly to limit its participation in the negotiation process despite invitations to join in more formally and comprehensively—appears to have been strategic, and it must live with the consequences of that decision as it relates to this belated attempt to intervene as a party in this lawsuit.[5]

### B.    Permissive Intervention

The parties spend very little of the briefs arguing about whether the FOP should be granted permissive intervention. The Court need not devote much further attention to this issue, either. Motions to intervene under Rule 24(b) must be timely. In evaluating timeliness, the Court examines the same four factors that it does when a motion to intervene as of right has been filed. See *Kostovetsky*, 242 F. Supp. 3d at 728. The Court concludes that the FOP's intervention under Rule 24(b) is untimely for the same reasons that intervention under Rule 24(a) is untimely.

---

[5] The Court adds this caveat: if the assumptions about the future course of this litigation described above should turn out to be radically incorrect, nothing in the rules or the case law of which the Court is aware would prevent re-examination of the matter of intervention. See *State of Maine v. Director, U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 21 (1st Cir. 2001) (affirming denial of motion to intervene as of right and noting district court's authority "to revisit the matter of intervention" at a later stage of a case).

## IV.     Conclusion

For the reasons stated above, the FOP's motion to intervene [51] is respectfully denied and the FOP's motion to hold proceedings in abeyance pending ruling on motion to intervene [65] is denied as moot.

Dated: August 16, 2018

_____

Robert M. Dow, Jr.
United States District Judge