**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, | |
| Plaintiff, | Case No. 17-cv-6260 |
| v. | Judge Robert M. Dow, Jr. |
| CITY OF CHICAGO, | |
| Defendant. | |

**<u>CONSENT DECREE</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................1

II. COMMUNITY POLICING ...........................................................................2

    A. Guiding Principles ............................................................................2

    B. Community Policing Advisory Panel ...............................................3

    C. Problem-Solving Measures ..............................................................4

    D. Community Partnerships ...................................................................6

    E. Interactions with Youth....................................................................8

    F. Community Policing Training .........................................................10

    G. School-Assigned Officers................................................................11

    H. Ongoing Assessment and Improvement..........................................13

III. IMPARTIAL POLICING ...............................................................................15

    A. Guiding Principles ...........................................................................15

    B. Impartial Policing Policies and Procedures.....................................15

        1. General Policies and Procedures...........................................15

        2. Providing Police Services to Diverse Communities...............17

    C. Impartial Policing Training .............................................................22

    D. Hate Crimes ....................................................................................23

    E. Ongoing Assessment and Improvement...........................................24

IV. CRISIS INTERVENTION...............................................................................25

    A. Guiding Principles ...........................................................................25

    B. Crisis Intervention Team Program...................................................26

    C. Certified CIT Officer Designation ...................................................29

    D. Certified CIT Officer Implementation Plan and Response to Incidents ..............32

i

    E.      CIT Coordinator.................................................................................34

    F.      Crisis Intervention Reporting and Data......................................35

    G.     Crisis Intervention Plan .................................................................37

    H.     Non-CIT Crisis Intervention Training .......................................40

    I.       Advisory Committee .......................................................................41

    J.       Crisis Intervention Policies............................................................43

    K.     Crisis Intervention-Related Call Intake and Dispatch..............44

V.     USE OF FORCE ..........................................................................................46

    A.     Objectives ..........................................................................................47

    B.     Use of Force Policies ......................................................................49

          1.      General Policy Requirements...................................................49

          2.      Policies Regarding Specific Weapons ....................................53

               a.      Firearms.............................................................54

               b.      Electronic Control Weapons ("Tasers")......................57

               c.      Oleoresin Capsicum Devices ("OC Devices") ...........................60

               d.      Impact Weapons .........................................................61

    C.     Reporting Uses of Force.................................................................61

    D.     Supervisory Review of Reportable Uses of Force...............................65

    E.     Body-Worn Cameras.......................................................................67

    F.      Use of Force Training .....................................................................69

VI.    RECRUITMENT, HIRING, AND PROMOTION .......................................72

    A.     Guiding Principles ...........................................................................72

    B.     Policies and Practices.......................................................................73

    C.     Recruitment and Hiring...................................................................73

    D.     Sergeant and Lieutenant Promotions ..........................................74

E.      Captain and Commander Promotions .................................................................75

VII.    TRAINING ...............................................................................................................76

A.      Guiding Principles ...............................................................................................76

B.      Training Plan .......................................................................................................76

C.      Training Development and Delivery.....................................................................79

D.      Instructor Selection and Development ................................................................81

E.      Training Evaluation..............................................................................................82

F.      Training Records..................................................................................................83

G.      Recruit Training ...................................................................................................84

H.      Field Training and Evaluation Program ...............................................................85

I.       In-Service Training Program ...............................................................................89

J.       Supervisory Training............................................................................................93

K.      Training on this Agreement .................................................................................96

VIII.   SUPERVISION........................................................................................................96

A.      Guiding Principles ...............................................................................................96

B.      Responsibilities and Duties .................................................................................98

C.      Staffing, Allocation, and Deployment ...............................................................100

        1.      Generally...............................................................................................100

        2.      Unity of Command and Span of Control ...............................................101

D.      Performance Evaluation ....................................................................................104

IX.     OFFICER WELLNESS AND SUPPORT................................................................106

A.      Guiding Principles .............................................................................................106

B.      Expanding and Improving Officer Support Systems .........................................106

        1.      Officer Support Systems Plan ...............................................................107

        2.      Clinical Mental Health Services.............................................................110

3.     Alcohol and Other Addiction Services ...................................112

4.     Peer Support Program ..............................................................113

5.     Chaplains Unit .........................................................................114

6.     Traumatic Incident Response ...................................................115

7.     Training ....................................................................................116

C.     Equipment and Technology ................................................................117

X.     ACCOUNTABILITY AND TRANSPARENCY ...........................................118

A.     Guiding Principles .............................................................................118

B.     Receiving and Tracking Misconduct Complaints ..............................119

1.     Receiving Complaints .............................................................119

2.     Classifying and Tracking Investigations ................................123

3.     Communicating with Complainants and CPD Members.........127

C.     Disciplinary Investigations ................................................................130

1.     Investigative Practices ............................................................131

a.     Preliminary Investigations...........................................131

b.     Misconduct Investigations...........................................133

2.     Officer-Involved Shootings and Deaths .................................142

3.     Accountability Sergeants ........................................................144

4.     Supervisory Review and Analysis of Investigations.............146

5.     Investigation Findings and Recommendations .......................148

D.     Case Management System..................................................................149

E.     Community Mediation of Complaints ...............................................151

F.     Final Disciplinary Decision ...............................................................152

G.     Staffing and Equipment Needs ..........................................................153

H.     Training ..............................................................................................154

I.    Police Board ....................................................................................156

J.    Transparency and Trend Analysis .....................................................160

      1.    CPD Transparency and Annual Report ...................................160

      2.    BIA and COPA Transparency and Reporting..........................164

      3.    Police Board....................................................................167

      4.    Deputy Inspector General for Public Safety ...........................167

K.    CPD Policy Recommendations..........................................................169

XI.   DATA COLLECTION, ANALYSIS, AND MANAGEMENT .....................170

A.    Guiding Principles .........................................................................170

B.    Use of Force Data Collection, Review, and Auditing.........................170

C.    Publication of Data Regarding Reportable Uses of Force ..................176

D.    Early Intervention System ...............................................................177

E.    Data Systems Plan.........................................................................184

XII.  IMPLEMENTATION, ENFORCEMENT, AND MONITORING ...............186

A.    Independent Monitor......................................................................186

B.    Selection and Compensation of the Monitor .....................................187

C.    Review of CPD Policies and Procedures ..........................................191

D.    Review of Implementation Plans and Training Materials....................194

E.    Compliance Reviews and Audits......................................................196

F.    Community Surveys........................................................................197

G.    Monitoring Plan and Review Methodology .......................................199

H.    Monitoring Technical Assistance and Recommendations ...................200

I.    Comprehensive Assessment .............................................................200

J.    Coordination with the Office of Inspector General ............................203

K.    Communication Among the Monitor, the Parties, and the Public........203

L.     Public Statements, Testimony, Records, and Conflict of Interest ......................204

M.    CPD Consent Decree Implementation ................................................................205

N.    Implementation Assessment and Report .............................................................205

O.    Access and Confidentiality .................................................................................206

P.    Court Jurisdiction, Modification of the Agreement, and Enforcement...............208

Q.    Scope of the Agreement .....................................................................................211

R.    Other Relevant Agreements ...............................................................................212

S.    Termination of the Agreement...........................................................................214

XIII.   DEFINITIONS AND ABBREVIATIONS ....................................................................217

## I.    INTRODUCTION

1.    The State of Illinois ("State") and the City of Chicago ("City") (collectively, the "Parties") hereby enter into this consent decree ("Agreement") on the terms and conditions set forth below.

2.    The State, the City, and the Chicago Police Department ("CPD" or the "Department") are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.

3.    On August 29, 2017, the State, by Lisa Madigan, Attorney General of the State of Illinois, filed a Complaint against the City pursuant to 42 U.S.C. § 1983; the U.S. Constitution; the Illinois Constitution; the Illinois Civil Rights Act of 2003, 740 ILCS 23/5; and the Illinois Human Rights Act, 775 ILCS 5/5-102(C) ("the Complaint" or the "State's Complaint").

4.    The Complaint alleged that CPD violates the Constitution, and state and federal laws, by engaging in a pattern of using excessive force, including deadly force, in a manner that disproportionately harms Chicago's African American and Latino residents. The Complaint sought to address allegations that CPD engages in a pattern and practice of civil rights violations and unconstitutional policing and address recommendations and conclusions set forth by the U.S.

1

Department of Justice ("DOJ Report") and the Police Accountability Task Force convened by Mayor Rahm Emanuel ("PATF Report").

5.     The City has denied the claims in the Complaint. However, without admitting any liability of any sort, because the City is committed to continual improvement in the delivery of police services, and in order to avoid protracted and expensive litigation, the City publicly committed to working with the State to negotiate and implement this Agreement.

6.     In this Agreement, the City commits to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. The City also commits to providing CPD members with the resources and support they need, including improved training, supervision, and wellness resources.

7.     In negotiating this Agreement, the Parties have consulted with community leaders, community members, police officers, police officer unions, civilian CPD members, advocates, and other concerned individuals who offered meaningful insights and recommendations for change. This Agreement reflects the broad input received by the Parties from the diverse communities that make up the City of Chicago.

## II.     COMMUNITY POLICING

### A.     Guiding Principles

8.     Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.

9.     To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.

10.     CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.

11.     The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.

**B.     Community Policing Advisory Panel**

12.     In 2016, the Superintendent commissioned the Community Policing Advisory Panel ("CPAP"), made up of community members, CPD members, public safety policy experts, practitioners, and researchers, to provide recommendations for improving CPD's community policing efforts. CPAP organized its recommendations around the following pillars:

a.   sustainable relationships of trust between police and community;

b.   a strong focus on engagement with the city's youth;

c.   standards for community policing initiatives so that these initiatives have clearly-defined objectives and contribute to the overall community policing effort;

d.   a structure that reinforces community policing in every aspect of policing;

3

e.   robust community-oriented training for all members of the Department;

f.   effective problem-solving exercised jointly with the community and other City agencies; and

g.   regular evaluation of the quality of community policing throughout the Department.

13.   In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.

**C.    Problem-Solving Measures**

14.   Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing.

15.   With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will:

a.   within 180 days of the Effective Date, provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing;

4

     b.   require CPD's command staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and

     c.   designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district-level crime reduction strategies, excluding operational strategies that are determined on a day-to-day or short term basis, to ensure they are community-oriented and consistent with the principles of community policing.

16.    CPD Bureau of Patrol Area Deputy Chiefs and District Commanders will regularly review district efforts and strategies for building community partnerships and using problem-solving techniques.

17.    The overall effectiveness of CPD's department-wide and district-level crime reduction strategies will be determined by a reduction in crime and not by the number of arrests, stops, or citations.

18.    The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security, and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communications ("OEMC"), the Mayor's Office for

People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.

19.     CPD will ensure that officers are provided with information regarding the communities they serve, including their assets and challenges, community groups and leaders, and business, residential, and demographic profiles.

20.     Within 180 days of the Effective Date, CPD will develop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.

### D.     Community Partnerships

21.     Strong partnerships between CPD and the community enable law enforcement to build and strengthen trust, identify community needs, and produce positive policing outcomes.

22.     CPD will encourage and create opportunities for CPD members to participate in community activities and have positive interactions with the community, including those that extend beyond the context of law enforcement duties.

23.     CPD has established and will continue and build upon a variety of community partnerships and engagement strategies designed to encourage positive community interactions, such as Bridging the Divide, Officer Friendly, and youth mentorship and engagement programs.

24.     Each district will identify and maintain collaborative partnerships with community stakeholders to serve the specific needs of the community. District representatives will meet, as appropriate, with residential, business, religious, civic, educational, youth, and other community-based groups to proactively maintain these relationships and identify and address community problems and needs.

25.     CPD will meet with members of the community from each beat and District Advisory Committee members at least once every two months. These community meetings will be scheduled in consultation with the community, be used to identify problems and other areas of concern in the community, and provide an opportunity to discuss responses and solutions through problem-solving tactics and techniques.

26.     CPD's Office of Community Policing will designate CPD members, as needed, to serve as points of contact for organizations to assist with access to police services, including those serving communities that have experienced previous challenges with access to police services, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, homeless individuals, and survivors of sexual assault and domestic violence. The designated CPD members will provide feedback to the Deputy Chief of the Office of Community Policing about the issues or potential policy recommendations raised by community-based organizations or the community in order to improve access to police services.

27.     CPD will facilitate relationships with youth by establishing regular meetings to serve as opportunities to provide input to CPD about the issues affecting their lives and their communities. CPD will partner with community-based organizations to identify strategies to include participants that represent a racially, geographically, and socio-economically diverse cross section of Chicago youth, including, but not limited to, at-risk youth and youth who have been arrested, incarcerated, or otherwise involved in the criminal or juvenile legal systems.

28.     CPD will, with the assistance of the Office of Community Policing, institute a public awareness campaign to inform the public, at least once a year, about: (a) CPD policies most relevant to police interactions with the public, including, but not limited to: use of force, body worn cameras, and Tasers; (b) steps for filing a complaint against CPD or a CPD member;

7

and (c) the public's rights when stopped, arrested, or interrogated by police. CPD's public awareness campaign may include presentations, trainings, written guides, or web-accessible videos.

29.     Fair, unbiased, and respectful interactions between CPD members and victims of crime provide an opportunity to strengthen community trust and foster public confidence in CPD. CPD will continue to require that CPD members interact with victims of crime with courtesy, dignity, and respect. CPD will continue to require that CPD members inform victims of crime of the availability of victim assistance and resources, including providing written notices of victim's rights, when applicable. CPD will also have such victim assistance information readily available on its public website and at all district stations.

30.     CPD will prominently display signs both in rooms of police stations or other CPD locations that hold arrestees or suspects and near telephones which arrestees or suspects have access to. These signs will state:

a.   that arrestees and suspects have the right to an attorney;

b.   that if an arrestee cannot afford an attorney, one may be appointed by the court for free; and

c.   the telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees.

31.     CPD will provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody.

**E.      Interactions with Youth**

32.     Within 180 days of the Effective Date, CPD will review and revise its current policies relating to youth and children and, within 365 days, will revise its training, as necessary,

8

to ensure that CPD provides officers with guidance on developmentally appropriate responses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law.

33. When interacting with youth and children, CPD will, as appropriate and permitted by law, encourage officers to exercise discretion to use alternatives to arrest and alternatives to referral to juvenile court, including, but not limited to: issuing warnings and providing guidance; referral to community services and resources such as mental health, drug treatment, mentoring, and counseling organizations, educational services, and other agencies; station adjustments; and civil citations.

34. CPD will clarify in policy that juveniles in CPD custody have the right to an attorney visitation, regardless of parent or legal guardian permission, even if the juvenile is not going to be interviewed.

35. If a juvenile has been arrested CPD will notify the juvenile's parent or guardian as soon as possible. The notification may either be in person or by telephone and will be documented in any relevant reports, along with the identity of the parent or guardian who was notified. Officers will document in the arrest or incident report attempts to notify a parent or guardian. If a juvenile is subsequently interrogated, CPD policy will comply with state law and require, at a minimum, that:

    a. Juvenile Miranda Warning will be given to juveniles prior to any custodial interrogation;

    b. the public defender's office may represent and have access to a juvenile during a custodial interrogation, regardless of parent or legal guardian permission;

    c.   CPD officers will make reasonable efforts to ensure a parent or legal guardian is present for a custodial interrogation of a juvenile arrestee under 15 years of age in custody for any felony offense; and

    d.   juveniles in custody for felony offenses and misdemeanor sex offenses under Article 11 of the Illinois Criminal Code will have their custodial interrogation electronically recorded.

36.    When determining whether or not to apply handcuffs or other physical restraints on a juvenile, CPD officers will consider the totality of the circumstances, including, but not limited to, the nature of the incident and the juvenile's age, physical size, actions, and conduct, when known or objectively apparent to a reasonable officer, and whether such restraints are necessary to provide for the safety of the juvenile, the officer, or others.

**F.    Community Policing Training**

37.    Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the philosophy of community policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics:

    a.   an overview of the philosophy and principles of community policing, consistent with this Agreement;

    b.   methods and strategies for establishing and strengthening community partnerships that enable officers to work with communities to set public safety and crime prevention priorities and to create opportunities for positive interactions with all members of the community, including, but not limited to, youth, people of color, women, LGBTQI individuals, religious minorities,

immigrants, individuals with limited English proficiency, homeless

individuals, and individuals with disabilities;

c.  problem-solving tactics and techniques;

d.  information about adolescent development and techniques for positive

interactions with youth; and

e.  effective communication and interpersonal skills.

### G.    School-Assigned Officers

38.    Through inter-governmental agreements between CPD and Chicago Public

Schools ("CPS"), CPD has assigned officers to work in CPS schools. In the event that CPD and

CPS decide to continue this practice, officers assigned to work in CPS schools will be

appropriately vetted, trained, and guided by clear policy in order to cultivate relationships of

mutual respect and understanding, and foster a safe, supportive, and positive learning

environment for students.

39.    Before the 2019-2020 school year begins, in consultation with CPS and

considering input from CPD members, including officers assigned to work in CPS schools,

school personnel, families, students, and community stakeholders, CPD will develop and

implement screening criteria to ensure that all officers assigned to work in CPS schools have the

qualifications, skills, and abilities necessary to work safely and effectively with students, parents

and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be

assigned to work in CPS schools.

40.    Before the 2019-2020 school year begins, in consultation with CPS and

considering input from CPD members, including officers assigned to work in CPS schools,

school personnel, families, students, and community stakeholders, CPD will develop a policy

that clearly defines the role of officers assigned to work in CPS schools. This policy will be

reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to:

      a.   the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers;

      b.   selection criteria for officers assigned to work in CPS schools;

      c.   the requirement that officers assigned to work in CPS school receive initial and refresher training; and

      d.   the collection, analysis, and use of data regarding CPD activities in CPS schools.

41.     CPD will, within 60 days of the completion of the 2019-2020 school year, and on an annual basis thereafter, review and, to the extent necessary, revise its policies and practices regarding officers assigned to work in CPS schools to ensure they are responsive to the needs of the Department, CPS, and its students. This evaluation will include input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders. Any revisions to CPD's policies and procedures regarding officers assigned to schools will be submitted to the Monitor and OAG in accordance with the requirements of Part C of the Implementation, Enforcement, and Monitoring section of this Agreement.

42.     CPD officers assigned to work in CPS schools will receive specialized initial and annual refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to:

a.   school-based legal topics;

b.   cultural competency;

c.   problem-solving;

d.   the use of de-escalation techniques, use of restorative approaches, and
available community resources and alternative response options;

e.   youth development;

f.   crisis intervention;

g.   disability and special education issues; and

h.   methods and strategies that create positive interactions with specific student
groups such as those with limited English proficiency, who are LGBTQI, or
are experiencing homelessness.

The training will be developed and delivered in accordance with the requirements of the Training
section of this Agreement.

43.     The curricula, lesson plans, and course materials used in initial training provided
before the 2019-2020 school year will be reviewed by the Monitor by the end of 2019. Any
suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before
the 2020-2021 school year.

44.     Before the 2019-2020 school year begins, CPD will undertake best efforts to enter
into a memorandum of understanding with CPS, to clearly delineate authority and specify
procedures for CPD officer interactions with students while on school grounds, consistent with
the law, best practices, and this Agreement.

**H.     Ongoing Assessment and Improvement**

45.     By January 1, 2020, and annually thereafter, District Commanders will review
their district's policing strategies, with input from the District Advisory Committees and the

Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to:

    a.   reviewing available district resources and personnel assignments;

    b.   identifying methods to support their district's ability to effectively problem-solve, including collaborating with City departments, services, and sister agencies; and

    c.   identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence.

46.    Within 180 days of the Effective Date, and as appropriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross section of the community each district serves.

47.    Within 180 days of the Effective Date, CPD will develop procedures to annually evaluate the effectiveness of the Department's efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any necessary adjustments based on its annual evaluation.

48.     CPD will create opportunities to highlight, reward, and encourage officer, supervisory, and district performance on furthering community partnerships, engaging in problem-solving techniques, effective use of de-escalation, exemplary and effective supervision, and implementing community-oriented crime prevention strategies.

## III.     IMPARTIAL POLICING

### A.     Guiding Principles

49.     The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.

50.     In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.

51.     CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

### B.     Impartial Policing Policies and Procedures

### 1.     General Policies and Procedures

52.     In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.

15

53.     CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan, 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).

54.     CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner. CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.

55.     CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.

56.     CPD will provide guidance, through training and supervision, that reinforces to officers that substitutes or stereotypes for the demographic categories listed above in Paragraph 55, such as manner of dress, mode of transportation, or language ability, is prohibited when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.

57.     CPD will continue to prohibit CPD members from posting, displaying, or transmitting content that is disparaging to a person or group based on race, religion, sexual orientation, or any other protected class on personal social media accounts.

58.     Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.

59.     Consistent with the requirements in the Accountability and Transparency section of this Agreement and CPD policy, CPD will require that CPD members immediately report to a CPD supervisor all incidents where they observe other CPD members who have engaged in misconduct, including discrimination, profiling, or other bias-based policing.

**2.      Providing Police Services to Diverse Communities**

60.     Within 365 days of the Effective Date, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance.

61.     Within 180 days of the Effective Date, CPD will review and, as necessary, revise its policies guiding CPD members' interactions with transgender, intersex, and gender non-conforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum:

        a.   terms are properly defined;

17

b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual;

c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification;

d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety;

e. absent exigent circumstances, a transgender, intersex, or gender non-conforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and

f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose.

62. CPD will require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. All

18

officers will receive in-service training every three years to ensure CPD's response to allegations of gender-based violence, including dispatch response, initial officer response, and on-scene and follow-up investigation, is both effective and unbiased.

63.     Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature.

64.     Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based groups serving LEP communities in Chicago.

65.     Within 180 days of the Effective Date, the City will designate a language access coordinator who will coordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary.

66.     Within 365 days of the Effective Date, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services.

67.     Within 180 days of the Effective Date, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago Municipal Code. CPD will publish translated versions of its language access policy on its website.

68.     Before January 1, 2020, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to:

      a.   properly defining terms related to individuals with disabilities and the disability community;

      b.   providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability;

      c.   the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and

d.  using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings.

69.  Before January 1, 2020, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including:

a.  recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes;

b.  providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions;

c.  attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and

d.  recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law.

70.  Within 180 days of the Effective Date, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and:

a.  regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the

21

Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement;

b.   serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and

c.   act as a liaison between CPD and individuals with disabilities.

71.   Within 180 days of the Effective Date, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult.

### C.   Impartial Policing Training

72.   The Parties recognize that training is a necessary component of impartial policing. CPD will integrate the concept of impartial policing into related CPD training courses when appropriate, including, but not limited to, use of force courses, weapons training courses, and Fourth Amendment subjects courses.

73.   The Parties acknowledge that CPD has developed, with the aid of subject-matter experts, a three-part course called Procedural Justice, which covers certain impartial policing subjects including the principles of procedural justice, the importance of police legitimacy, and the existence of and methods for minimizing the impact of implicit bias. By the end of the year 2020, all officers, including supervisors, will complete the Procedural Justice course.

74.   Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the concept of impartial policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics:

a.   CPD's anti-bias and impartial policing policies, including, but not limited to, the policies referenced in this section unless otherwise required;

22

    b.   refreshers of topics covered in Procedural Justice;

    c.   appropriate use of social media;

    d.   cultural competency training that prepares officers to interact effectively with people from diverse communities including, but not limited to, people of color, LGBTQI individuals, religious minorities, and immigrants;

    e.   recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities; and

    f.   the specific history and racial challenges in the City of Chicago.

75.    OEMC currently provides diversity awareness training to all new tele-communicators which, among other things, addresses the existence of and methods for minimizing the impact of implicit bias. OEMC will continue to provide training on this topic to all new tele-communicators and, beginning in 2020, will provide all tele-communicators with refresher training every two years on this topic that is adequate in quantity, quality, type, and scope.

### D.    Hate Crimes

76.    By January 1, 2020, CPD will review and, to the extent necessary, revise its policies and procedures to ensure that allegations and complaints of hate crimes, as defined by federal, state, and local law, are comprehensively investigated.

77.    CPD will ensure that all officers receive in-service training every two years on methods, strategies, and techniques for recognizing and responding to hate crimes, including CPD's procedures for processing reports and complaints.

78.    Within 180 days following the expiration of each calendar year of the term of this Agreement, CPD will publish an annual report summarizing reported hate crimes and non-

criminal incidents motivated by hate during the previous calendar year ("CPD Hate Crime Report"). The CPD Hate Crime Report will provide information regarding the total number of reported hate crimes and non-criminal incidents motivated by hate, organized by type of crime, classification of bias motivation, and disposition of hate crime investigations in each district.

### E. Ongoing Assessment and Improvement

79.     By April 1, 2020, and every year thereafter, CPD will conduct an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ("ANOVs") effectuated by CPD members of persons in specific demographic categories, including race and gender.

80.     Prior to conducting this assessment, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement. Upon completion of the assessment, CPD will identify any modifications to CPD's practices to address the findings in the assessment and develop a timeline for implementation, subject to Monitor review and approval. Upon completion of the assessment, CPD will publish the underlying data, excluding personal identifying information (e.g., name, address, contact information), via a publicly-accessible, web-based data platform.

81.     If at any point, the City's obligations under the August 6, 2015 Investigatory Stop and Protective Pat Down Settlement Agreement ("ACLU Agreement") terminate, CPD will include all stops effectuated by CPD members that were subject to the ACLU Agreement in the assessment required by this Part.

82.     Nothing in this Part will be interpreted to require CPD to analyze statistical data beyond that currently collected and maintained in electronic databases unless otherwise required

under this Agreement. In instances in which race or gender data is not maintained in an electronic database, CPD may use geographic data in its assessment. For purposes of this paragraph, information contained solely in a scanned PDF document or other image of a document, and not otherwise collected and maintained in an electronic database, is not considered data maintained in an electronic database.

## IV. CRISIS INTERVENTION

### A. Guiding Principles

83. CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.

84. A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.

85. CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions

with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To achieve these outcomes, the City and CPD will implement the requirements set out below.

86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.

**B.    Crisis Intervention Team Program**

87. The Crisis Intervention Team ("CIT") Program will continue to be responsible for CPD's crisis intervention response functions, including, but not limited to:

    a.   developing CIT strategy and initiatives;

    b.   supporting officers in the districts who respond to incidents involving individuals in crisis;

    c.   engaging the community and community stakeholders to raise awareness of the CIT Program and issues involving individuals in crisis;

    d.   coordinating among City agencies that respond to individuals in crisis;

    e.   recruiting officers to apply for CIT training;

    f.   developing and delivering CPD's Basic CIT Training and other CIT training, including Advanced CIT (e.g., youth, veterans) and refresher trainings, in accordance with the requirements of the Training section of this Agreement;

    g.   delivering roll call trainings and mental health awareness initiatives;

    h.   compiling and retaining the reports identified in Part F of this section and collecting and maintaining the appropriate CPD data related to incidents

26

involving individuals in crisis to support and evaluate the effectiveness of the CIT Program and CPD's response to incidents identified as involving individuals in crisis, including identifying any district-level and department-wide trends;

i. coordinating data and information sharing with OEMC; and

j. communicating with and soliciting feedback from crisis intervention-related community stakeholders, Certified CIT Officers, and OEMC call-takers and dispatchers regarding the effectiveness of CPD's CIT Program.

88. The CIT Program will serve to meet the objectives of:

a. improving CPD's competency and capacity to effectively respond to individuals in crisis;

b. de-escalating crises to reduce the need to use force against individuals in crisis;

c. improving the safety of officers, individuals in crisis, family members, and community members;

d. promoting community-oriented solutions to assist individuals in crisis;

e. reducing the need for individuals in crisis to have further involvement with the criminal justice system; and

f. developing, evaluating, and improving CPD's crisis intervention-related policies and trainings to better identify and respond to individuals in crisis.

89. The CIT Program, through the CIT Coordinator, will annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program.

27

90.     The City and CPD will ensure that the CIT Program is provided with:

    a.  the resources and access to data and information necessary to fulfill the objectives and functions of the CIT Program; and

    b.  a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program.

91.     Additionally, the City and CPD will ensure that the CIT Program has sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator, and approved by the Chief of the Bureau of Patrol, as needed to carry out the overall objectives and functions of the CIT Program at the district-level, which include, but are not limited to:

    a.  supporting officers in the district with incidents involving individuals in crisis;

    b.  delivering CIT Program-approved roll call trainings and mental health awareness initiatives;

    c.  establishing relationships between the district and local service providers and healthcare agencies;

    d.  referring and, when appropriate, connecting individuals in crisis with local service providers;

    e.  engaging with the community to raise awareness of the CIT Program and issues involving individuals in crisis; and

    f.  providing administrative support to the coordinator of the CIT Program.

### C. Certified CIT Officer Designation

92. Certified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT Officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned.

93. To be eligible for consideration as a Certified CIT Officer, applicants must have at least 18 months of experience as a CPD officer and no longer be on probationary status. CPD will assess each applicant's fitness to serve as a Certified CIT Officer by considering the applicant's application, performance history, and disciplinary history.

94. Under the direction of the CIT Coordinator, supervisors and instructors teaching crisis intervention-related topics will assist in identifying and recruiting qualified officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals in crisis to apply to receive CIT training.

95. Certified CIT Officers, at a minimum, must complete the specialized 40-hour Basic CIT Training ("Basic CIT Training") and receive CIT certification by the Illinois Law Enforcement Training and Standards Board before being identified as a "Certified CIT Officer." To maintain the Certified CIT Officer designation, officers must receive a minimum of eight hours of CIT refresher training ("CIT Refresher Training") every three years and maintain the eligibility requirements established by the CIT Program.

96. CPD's Basic CIT Training is an in-depth, specialized course that teaches officers how to recognize and effectively respond to individuals in crisis. In addition to the crisis intervention-related topics covered in the training provided to all officers, the Basic CIT Training will address signs and symptoms of individuals in crisis, suicide intervention, community resources, common mental health conditions and psychotropic medications, the effects of drug

and alcohol abuse, perspectives of individuals with mental conditions and their family members, the rights of individuals with mental conditions, civil commitment criteria, crisis de-escalation, and scenario-based exercises.

97.     CPD's CIT Refresher Training is a specialized, advanced training to further develop and expand Certified CIT Officers' skills in recognizing and appropriately responding to calls for service that involve individuals in crisis. The CIT Refresher Training will include a review of the concepts, techniques, and practices offered in the Basic CIT Training as well as relevant and/or emerging topics in law enforcement responses to individuals in crisis, general and specific to CPD. Additionally, the CIT Refresher Training may cover the content included in the in-service crisis intervention training.

98.     Certified CIT Officers may satisfy the in-service training requirements, as outlined in Part H, by completing the CIT Refresher Training.

99.     Within 365 days of the Effective Date, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training.

100.     All Certified CIT Officers who completed the Basic CIT Training before the development of the CIT Refresher Training must complete their first CIT Refresher Training within four years of the date that the CIT Refresher Training is developed. All Certified CIT Officers who complete Basic CIT Training on or after the date that the CIT Refresher Training is developed must complete their first CIT Refresher Training within three years of receiving the Basic CIT Training.

30

101.    Certified CIT Officers who fail to complete the CIT Refresher Training within three years of taking their most recently required CIT Training, whether the Basic CIT Training or a prior CIT Refresher Training, will be deemed out of compliance with the CIT Program's CIT Refresher Training requirement. CPD will confirm on a quarterly basis that Certified CIT Officers remain in compliance with the CIT Refresher Training requirement. Any Certified CIT Officer found to be out of compliance during the quarterly review may not continue to be identified by CPD as a Certified CIT Officer and may not continue to be prioritized to respond to calls for service involving individuals in crisis. Each quarter, CPD will inform OEMC of officers who are out of compliance with the CIT Refresher Training requirement. An officer out of compliance with the CIT Refresher Training requirement must complete the most recently offered version of the CIT Refresher Training before CPD may resume identifying the officer as a Certified CIT Officer and before OEMC may resume prioritizing that officer to respond in the field to calls involving individuals in crisis.

102.    All newly assigned Field Training Officers ("FTOs") and promoted Sergeants and Lieutenants will continue to receive the Basic CIT Training. To be considered Certified CIT Officers, FTOs, Sergeants, and Lieutenants must meet the eligibility criteria and training requirements established by the CIT Program and this Agreement.

103.    The CIT Program staff responsible for the CIT training curriculum will, where it would add to the quality or effectiveness of the training and when feasible and appropriate, encourage and seek the participation of professionals and advocates who work with individuals in crisis, and persons with lived experiences of behavioral or mental health crisis, including those with involvement in the criminal justice system, in developing and delivering CPD CIT trainings.

31

104.     CPD will develop policies regarding the criteria for ongoing participation as a Certified CIT Officer, consistent with this Agreement.

105.     CPD will continue to maintain an up-to-date list of Certified CIT Officers, including their unit of assignment.

### D.     Certified CIT Officer Implementation Plan and Response to Incidents

106.     CPD will require that, when available, at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis. Certified CIT Officers will continue to be prioritized for dispatch to incidents identified as involving individuals in crisis, as assigned. CPD will review and revise the appropriate policies to ensure that, in situations in which a Certified CIT Officer is not available to respond to a call or incident identified as involving an individual in crisis, the responding officer engages in crisis intervention response techniques, as appropriate and consistent with CPD policy and their training, throughout the incident. Responding officers will document all incidents involving an individual in crisis in a manner consistent with this Agreement.

107.     Within 180 days of the Effective Date, and quarterly thereafter, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond to incidents and to assess the Department's progress towards achieving the response ratio targets. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis intervention services for the particular watch and district.

108.     Within 180 days of the Effective Date, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan

32

will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets:

    a.   a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and

    b.   a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target").

109. The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target by January 1, 2020, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets.

110. Within 180 days of completing the CIT Officer Implementation Plan, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney General ("OAG") regarding the progress the Department has made to meet: (a) the response ratio targets ("Implementation Plan Goals") identified in the Implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG.

111.    Through the execution of the CIT Officer Implementation Plan, CPD will ensure that it maintains a sufficient number of Certified CIT Officers on duty on every watch of each district to help ensure that a Certified CIT Officer is available to timely respond to each incident identified as involving individuals in crisis, absent extraordinary circumstances.

112.    If the Monitor determines that CPD has not made material progress toward achieving the CIT Officer Implementation Plan Goals during any given reporting period, CPD will review and revise the CIT Officer Implementation Plan as necessary to enable CPD to make material progress to achieve the Implementation Plan Goals.

113.    CPD will require that responding Certified CIT Officers will take the lead in interacting with individuals in crisis, once on scene, when appropriate and with supervisory approval, if required by CPD policy. If an officer who is not a CIT-Certified Officer has assumed responsibility for the scene, the officer will seek input from the on-scene Certified CIT Officer on strategies for resolving the crisis, when it is safe and practical to do so.

114.    Certified CIT Officers will receive ongoing feedback from the CIT Program and unit supervisors regarding their responses to incidents identified as involving individuals in crisis.

**E.    CIT Coordinator**

115.    CPD has designated and will maintain a Certified CIT Officer, at the rank of Lieutenant or above, with the sole responsibility to act as a Crisis Intervention Team Program Coordinator ("CIT Coordinator"). The CIT Coordinator will work to increase the effectiveness of CPD's CIT Program, improve CPD's responses to incidents involving individuals in crisis, and facilitate community engagement between CPD and crisis intervention-related stakeholders.

116.    The CIT Coordinator will receive initial and refresher professional development training that is adequate in quality, quantity, type, frequency, and scope to prepare the CIT

34

Coordinator to take on the role and responsibilities of the CIT Coordinator, in addition to the Basic CIT training.

117.    The responsibilities of the CIT Coordinator will include, at a minimum:

    a.    developing and managing a uniform CIT Program strategy;

    b.    researching and identifying best practices to incorporate into CPD response to individuals in crisis;

    c.    reviewing and, when necessary to meet the requirements of this Agreement, enhancing the CIT training curricula;

    d.    selecting and removing Certified CIT Officers from the CIT Program consistent with the requirements of this Agreement;

    e.    overseeing crisis intervention-related data collection, analysis, and reporting;

    f.    developing and implementing CPD's portion of any Crisis Intervention Plan;

    g.    supervising CIT Program staff;

    h.    participating in the Advisory Committee;

    i.    encouraging the public recognition of the efforts and successes of the CIT Program and individual Certified CIT Officers; and

    j.    regularly communicating and interacting with relevant CPD command staff to recommend improvements to Department crisis intervention-related strategies, staffing and deployment, policies, procedures, and training.

**F.    Crisis Intervention Reporting and Data**

118.    By January 1, 2020, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include:

a.  the nature of the incident;

b.  the date, time, and location of the incident;

c.  the subject's age, gender, and race/ethnicity;

d.  whether the subject is or claims to be a military veteran, if known;

e.  the relationship to the subject, if any and if known, of the individual calling for service;

f.  whether the subject has had previous interactions with CPD, if known;

g.  whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis;

h.  the behaviors observed during the incident, including whether the subject used or displayed a weapon;

i.  the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers;

j.  the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene;

k.  the skills, techniques, or equipment used by the responding CPD officers;

l.  whether a reportable use of force was documented on a Tactical Response Reports ("TRR"), or whatever similar form of documentation CPD may implement, for the incident ;

m.  a narrative describing the CPD officer's interaction with the subject, when no other CPD report captures a narrative account of the incident; and

n.  the disposition of the incident, including whether the individual was transported to municipal or community services, transported to a hospital, subject to a voluntary or involuntary commitment, or arrested.

119.  CPD will require that a supervisory member reviews and approves completed CIT Reports, or any similar form of documentation CPD may implement to document incidents involving an individual in crisis, before submitting them to the CIT Program.

120.  CPD will collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis. The CIT Program will review the data contained within the submitted CIT Reports, or any similar form of documentation CPD may implement, to evaluate the overall response and effectiveness by CPD officers and identify any district-level and department-wide trends regarding responses to incidents identified as involving individuals in crisis.

121.  CPD will identify and assign a sufficient number of data analysts to collect and analyze data related to the CIT Program and CPD's response to incidents involving individuals in crisis.

**G.  Crisis Intervention Plan**

122.  Within 365 days of the Effective Date, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research

37

reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee.

123.     The purpose of the Crisis Intervention Plan will be to evaluate the City's identification of and response to incidents involving individuals in crisis and recommend any changes to staffing and deployment, policy, or training to ensure consistency with CPD and OEMC policy, this Agreement, and best practices. CPD will implement the Crisis Intervention Plan in accordance with the specified timeline for implementation. The Crisis Intervention Plan will:

     a.   report the number, type, and outcome of incidents involving individuals in crisis, the number of Certified CIT Officers available and on duty in each district and on each watch, the percentage of calls for service involving individuals in crisis for which Certified CIT Officers were the first officers to respond to the scene for each watch in every district, and the response times for calls for service involving individuals in crisis for each watch in every district;

     b.   evaluate the CIT Program's compliance with the objectives and functions identified above;

c.   identify strategies to ensure that CPD has a sufficient number of Certified CIT Officers to meet its response ratio targets for calls for service involving individuals in crisis;

d.   describe any additional resources, including program staff or equipment, the CIT Program needs to perform its functions;

e.   identify safety issues and trends regarding interactions between individuals in crisis and officers;

f.   identify deficiencies and opportunities for improvement in identifying and dispatching calls for service involving individuals in crisis;

g.   recognize and highlight CIT Program and Certified CIT Officer successes, including successful individual officer performance;

h.   develop response strategies for repeat calls for service involving individuals who are frequently in crisis;

i.   recommend any changes to crisis intervention-related strategies, policies, and procedures;

j.   recommend any changes to CPD and OEMC trainings related to individuals in crisis, including any case studies and teaching scenarios; and

k.   include a timeline and plan for implementing recommended changes.

124.   The data included in the Crisis Intervention Plan will not include any personal identifying information.

125.   The CIT Coordinator will have CPD's portion of the Crisis Intervention Plan reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the plan's completion.

### H.     Non-CIT Crisis Intervention Training

126.    Consistent with the requirements set forth in the Training section of this Agreement, all officers will receive in-service training, every three years, regarding responding to individuals in crisis that is adequate in quality, quantity, and scope for officers to demonstrate competence in the subject matter. This in-service training will include, but not be limited to, the following topics:

a.  a history of the mental health system;

b.  how to recognize and respond to individuals in crisis, including, but not limited to, identifying types of mental health conditions, signs and symptoms of mental health conditions, common treatments and medications, and common characteristics, behaviors, or conduct associated with individuals in crisis;

c.  the potential interactions officers may have on a regular basis with individuals in crisis, their families, and service providers, including steps to ensure effective communication and avoid escalating an interaction with an individual in crisis;

d.  techniques to safely de-escalate a potential crisis situation;

e.  the circumstances in which a Certified CIT Officer should be dispatched or consulted; and

f.  local resources that are available to provide treatment, services, or support for individuals in crisis, including available pre- and post-arrest diversion programs, and when and how to draw upon those resources.

40

127.     All new recruits will receive training that is adequate in quantity, quality, and scope regarding responding to individuals in crisis. It will include, but not be limited to, training on the subjects identified above.

I.     **Advisory Committee**

128.     The City will have a crisis intervention response advisory committee ("Advisory Committee") with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services. The Parties acknowledge that the City has formed the City-wide Mental Health Steering Committee and that the City may draw upon those resources to satisfy the requirements of this Agreement.

129.     The Advisory Committee, at a minimum, will meet quarterly to review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program.

130.     The City will request that the Advisory Committee provide guidance on crisis response-related policies, procedures, and training of City agencies, including CPD and OEMC, and assist the City in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central non-emergency crisis line). The City will further request that in providing the guidance detailed above the Advisory Committee will consider specific strategies for responding to children and youth when they experience a behavioral or mental health crisis.

41

131.     Within 365 days of the Effective Date, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining.

132.     The Advisory Committee will be chaired by the Mayor's Office. The Mayor's Office will invite individuals who have personally experienced a behavioral or mental health crisis, people with experience working with individuals in crisis, and experts with knowledge in law enforcement responses to individuals in crisis. At a minimum, the Mayor's Office will invite individuals from the following groups: first responders; the CIT Coordinator; OEMC; county and

city hospitals, health care providers, and mental health professionals; the Cook County State's

Attorney's Office; the Cook County Public Defender's Office; at least one academic research

entity; community behavioral and mental health professionals; advocacy groups for consumers

of behavioral and mental health services; behavioral and mental health service providers;

homeless service providers; substance abuse service providers; persons with lived experiences

of behavioral or mental health crises; and other similar groups.

       **J.**      **Crisis Intervention Policies**

      133.    CPD policy will provide that a crisis intervention response may be necessary even

in situations where there has been an apparent violation of law.

      134.    CPD policy will encourage officers to redirect individuals in crisis to the

healthcare system, available community resources, and available alternative response options,

where feasible and appropriate.

      135.    CPD will ensure that the language used in policies, procedures, forms, databases,

and trainings to communicate about incidents involving individuals in crisis is appropriate,

respectful, and consistent with industry recognized terminology. CPD will seek input from

community stakeholders, including the Advisory Committee, for recommendations to identify

appropriate and respectful terminology.

      136.    CPD will develop and implement policies, procedures, and protocols regarding

the collection, maintenance, and use of information related to an individual's medical and mental

health to facilitate necessary and appropriate communication while adequately protecting an

individual's confidentiality. To develop these policies, procedures, and protocols, CPD will seek

input from community stakeholders, including the Advisory Committee.

      137.    Within 180 days of the Effective Date, CPD will review and revise its crisis

intervention-related policies as necessary to comply with the terms of this Agreement. CPD will

consider any recommendations or feedback provided by the Advisory Committee when revising its policies.

### K.    Crisis Intervention-Related Call Intake and Dispatch

138.    OEMC call-takers will continue to identify calls for service involving an individual known, suspected, or perceived to be in crisis.

139.    OEMC will continue to code all incidents identified as potentially involving an individual in crisis in a manner that allows for subsequent data analysis necessary for the evaluation of CPD and OEMC responses to individuals in crisis and the development of the plans required by this section of the Agreement.

140.    OEMC police communication dispatchers will continue to prioritize Certified CIT Officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. If a Certified CIT Officer is not available to timely respond, OEMC will continue to dispatch an available officer to avoid compromising response time. OEMC dispatchers will dispatch a Certified CIT Officer, when available, if the responding officer requests assistance from a Certified CIT Officer.

141.    CPD will provide OEMC with an updated list of current and active Certified CIT Officers and their assignment at least every week. At the beginning of each watch, CPD will continue to identify for OEMC the Certified CIT Officers on duty for each watch and in each district so that OEMC dispatchers know which Certified CIT Officers to prioritize for dispatch to incidents involving an individual known, suspected, or perceived to be in crisis.

142.    Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.

143.     The OEMC Training will be at least an eight-hour course taught jointly by qualified OEMC staff and a mental health clinician or advocate.

144.     The OEMC Training will cover, at a minimum, the following topics: identification of individuals in crisis; telephonic suicide prevention strategies; crisis and stress management, de-escalation, and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered and shared with the responding officer or Certified CIT Officer when the call-taker suspects that the call involves an individual in crisis; the types of calls that may require the dispatching of a Certified CIT Officer or a coordinated crisis response of first responders reflective of established policy for intake and dispatch; and the procedures for dispatching a Certified CIT Officer.

145.     Any training on mental health and CIT awareness that has already been provided to tele-communicators may fulfill the OEMC Training requirement of this Agreement, if the previously provided training satisfies the criteria for the OEMC Training described in this Agreement.

146.     All tele-communicators will receive at least annual refresher training on mental health and CIT awareness that is adequate to refresh the tele-communicators' skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.

147.     OEMC will evaluate all mental health and CIT awareness trainings for tele-communicators on at least an annual basis to ensure that the trainings meet OEMC needs, comply with this Agreement, incorporate best practices, and ensure that the training is effective for personnel and for the individuals in crisis served. OEMC will consider recommendations and

feedback from the CIT Coordinator and the Advisory Committee when conducting its evaluation.

148.    OEMC will develop and implement its portion of the Crisis Intervention Plan.

149.    OEMC supervisors, on an ongoing basis, will audit and provide feedback to call-takers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis.

150.    The Parties acknowledge that OEMC currently meets regularly with CPD and the City-wide Mental Health Steering Committee. OEMC will continue to meet regularly with CPD, in addition to appropriate members of the Advisory Committee, including service providers and advocates, to review and assess data and information regarding the identification of, the dispatch of, and response to calls for service involving individuals in crisis by OEMC tele-communicators.

151.    Within 180 days of the Effective Date, and annually thereafter, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.

152.    OEMC will ensure that the language used in policies, procedures, forms, databases, trainings, and by tele-communicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. OEMC will seek input from the Advisory Committee for recommendations to identify appropriate and respectful terminology.

## V.    USE OF FORCE

153.    CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and

46

the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.

154.    CPD adopted revised use of force policies on October 16, 2017 ("October 2017 Policies"). The October 2017 Policies incorporated multiple best practices that were not reflected in CPD's prior use of force policies. Building on these improvements, CPD will maintain the best practices reflected in the October 2017 Policies and make additional improvements to its policies consistent with the terms of this Agreement.

A.    **Objectives**

155.    CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

156.    CPD's use of force policies and training, supervision, and accountability systems will be designed, implemented, and maintained so that CPD members:

a.    act at all times in a manner consistent with the sanctity of human life;

b.    act at all times with a high degree of ethics, professionalism, and respect for the public;

c.    use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible;

47

d.   use sound tactics to eliminate the need to use force or reduce the amount of force that is needed;

e.   only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances;

f.   only use force for a lawful purpose and not to punish or retaliate;

g.   continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary;

h.   truthfully and completely report all reportable instances of force used;

i.   promptly report any use of force that is excessive or otherwise in violation of policy;

j.   are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy; and

k.   act in a manner that promotes trust between CPD and the communities it serves.

157.   CPD will collect and analyze information on the use of force by CPD members, including whether and to what extent CPD members use de-escalation techniques in connection with use of force incidents. CPD will use this information to assess whether its policies, training, tactics, and practices meet the goals of this Agreement, reflect best practices, and prevent or reduce the need to use force.

**B.    Use of Force Policies**

158.    CPD's use of force policies must comply with applicable law and this Agreement, reflect the objectives described above, and promote trust between CPD and the communities that it serves.

159.    CPD will conduct an annual review of its use of force policies consistent with accreditation requirements of the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). In addition, every two years, CPD will conduct a comprehensive review of its use of force policies to assess whether CPD's use of force policies meet the requirements of this Agreement, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law.

160.    CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.

**1.    General Policy Requirements**

161.    CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of techniques that may include, but are not limited to, the following:

    a.    using time as a tactic by slowing down the pace of an incident;

    b.    employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover;

49

    c.   continual communication, including exercising persuasion and advice, and providing a warning prior to the use of force;

    d.   requesting assistance from other officers, mental health personnel, or specialized units, as necessary and appropriate; and

    e.   where appropriate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.

162.    Consistent with CPD's commitment to preventing and reducing the need for force, CPD officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).

163.    CPD officers may only use force for a lawful purpose. CPD officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).

164.    CPD officers must only use force when it is objectively reasonable, necessary, and proportional under the totality of the circumstances.

165.    CPD officers are prohibited from using deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person. CPD officers are not permitted to use deadly force against a person who is a threat only to himself or herself or to property. CPD officers may only use deadly force as a last resort.

166.    CPD officers are prohibited from using deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm to an officer or another person.

167.    CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved. CPD will periodically include instruction regarding sound vehicle maneuvers in its in-service training regarding use of force. As appropriate, CPD will provide supplemental training guidance regarding dangerous vehicle maneuvers that should be avoided.

168.    Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.

169.    For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.

170.    CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will:

    a.  identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit;

    b.  provide guidance to officers regarding radio communications during a foot pursuit;

    c.  instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit;

51

    d.   provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and

    e.   inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.

171.    CPD will provide scenario-based training regarding foot pursuits and the supplemental foot pursuit training bulletin during the first annual use of force training required by this Agreement.

172.    By no later than January 1, 2021, the Monitor will complete an assessment of CPD data and information to determine whether CPD should adopt a foot pursuit policy. If the Monitor recommends that CPD should adopt a foot pursuit policy, CPD will adopt a foot pursuit policy no later than July 1, 2021. Any foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG.

173.    Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropriate medical aid for injured persons or persons who claim they are injured.

174.    Before January 1, 2021, CPD will ensure that all CPD officers receive Law Enforcement Medical and Rescue Training ("LEMART"). The LEMART training provided to CPD officers will incorporate scenario-based elements. Before January 1, 2021, CPD will equip all CPD officers engaged in patrol activities who have completed LEMART training with an individual first aid kit ("IFAK") (as defined in current CPD policy, U06-02-23).

175.    Starting January 1, 2021, in use of force incidents involving CPD officers, CPD will require CPD officers to provide life-saving aid consistent with their LEMART training to injured persons as soon as it is safe and feasible to do so until medical professionals arrive on

scene. CPD will replenish IFAKs, and the contents thereof, used by CPD officers as necessary to ensure officers have the equipment necessary to render aid consistent with their LEMART training. Subsequent to January 1, 2021, CPD will ensure that any officer regularly engaged in patrol activities who has no prior LEMART training receives LEMART training within one year of beginning his or her regular patrol activities.

176.    CPD officers must recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force.

177.    Consistent with CPD policy that force must be objectively reasonable, necessary, and proportional, CPD officers must generally not use force against a person who is handcuffed or otherwise restrained absent circumstances such as when the person's actions must be immediately stopped to prevent injury or escape or when compelled by other law enforcement objectives.

178.    CPD officers are prohibited from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized. CPD officers must not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway or carotid artery restraints as take-down techniques.

### 2.    Policies Regarding Specific Weapons

179.    CPD's use of force policies must guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use. CPD's use of force policies must clearly define and describe each force option and the circumstances under which use of such force is appropriate to address potential types of resistance.

53

180.    CPD will maintain policies for each of the following weapons, using the following guidelines.

> **a.    Firearms**

181.    CPD will continue to require that only officers who are currently certified may be issued, carry, and use firearms.

182.    CPD will require officers to consider their surroundings before discharging their firearms and take reasonable precautions to ensure that people other than the target will not be struck.

183.    CPD will require officers to issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so.

184.    When CPD officers discharge firearms, they must continually assess the circumstances that necessitated the discharge and modify their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it (e.g., when a subject is no longer a threat).

185.    CPD will continue to prohibit officers from firing warning shots.

186.    CPD officers must not fire at moving vehicles when the vehicle is the only force used against the officer or another person, except in extreme circumstances when it is a last resort to preserve human life or prevent great bodily harm to a person, such as when a vehicle is intentionally being used to attack a person or group of people. CPD will continue to instruct officers to avoid positioning themselves or remaining in the path of a moving vehicle, and will provide officers with adequate training to ensure compliance with this instruction.

187.    CPD will prohibit officers from firing from a moving vehicle unless such force is necessary to protect against an imminent threat to life or to prevent great bodily harm to the officer or another person.

188.    By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.

189.    CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.

190.    Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.

191.    OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy.  CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.

192.    A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will:

    a.   identify whether the pointing of the firearm at a person allegedly violated CPD policy;

    b.   identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and

    c.   identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed.

The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy.  At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.

193.    CPD will ensure that the designated unit at the CPD headquarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise.

194.    CPD officers will not be required to notify OEMC of the pointing of a firearm at a person when the CPD officer is a SWAT Team Officer responding to a designated SWAT incident, as defined in CPD Special Order S05-05, or an officer assigned to a federal task force during the execution of federal task force duties.

195.     CPD officers will not be required to notify OEMC of any unholstering or display of a firearm or having a firearm in a "low ready" position during the course of an investigation, unless the firearm is pointed at a person.

196.     The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. Beginning January 1, 2020, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing these occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding the whether the Monitor's recommendations should be implemented will be resolved by the Court.

**b.     Electronic Control Weapons ("Tasers")**

197.     CPD will continue to require that only officers who are currently certified may be issued, carry, and use Tasers.

198.     CPD will instruct officers that Tasers can cause serious injury or death and, as a result, officers should use Tasers only after balancing relevant factors including the threat presented by the subject, the risk of injury if a Taser is used, and the seriousness of the suspected offense. Consistent with this standard, CPD officers should not use Tasers against persons who are reasonably perceived to be non-violent, unarmed, and suspected of low-level offenses, such as property-related misdemeanors, quality of life offenses, moving or traffic violations, or municipal code violations.

199.     CPD will clarify in policy that flight alone, without any other basis for reasonable articulable suspicion or probable cause, does not justify use of a Taser against a subject.

200.    When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after deployment of a Taser. When safe and feasible to do so, CPD officers will allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Taser, unless doing so would compromise the safety of an officer or another person.

201.    CPD will strongly discourage the use of Tasers in schools and on students. CPD will require officers to consider the totality of the circumstances, including a subject's apparent age, size, and the threat presented, in assessing the reasonableness and necessity of using a Taser in a school.

202.    CPD officers will treat each application or standard cycle (five seconds) of a Taser as a separate use of force that officers must separately justify as objectively reasonable, necessary, and proportional. CPD will continue to require officers to, when possible, use only one five-second energy cycle and reassess the situation before any additional cycles are given or cartridges are discharged. In determining whether any additional application is necessary, CPD officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.

203.    CPD will require that if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the officer has not gained control, officers switch to other force options unless the officer can reasonably justify that continued Taser use was necessary to ensure the safety of the officer or another person, recognizing that prolonged Taser exposure may increase the risk of death or serious injury.

204.    CPD officers must:

a. determine the necessity, objective reasonableness, and proportionality of Taser use based on the totality of the circumstances, including the subject's apparent age, size, physical and mental condition, disability, and impairment;

b. not use Tasers in drive-stun mode unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective;

c. when practicable, avoid the use of Tasers when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is elevated above the ground, if the subject is operating or riding any mode of transportation, or if the subject may be less able to catch or protect themselves in a fall;

d. not use Tasers in any environment that contains potentially flammable, volatile, or explosive material;

e. not use Tasers on a subject who is at a greater risk of serious injury or death from Taser use, including, but not limited to, children, pregnant individuals, and the elderly, unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective;

f. target the Taser in probe mode at the lower center mass and avoid the head, neck, and genitalia;

g. not activate more than one Taser at a time against a subject, unless an officer already attempted to use a Taser against the subject but the probes did not make contact with the subject; and

h. keep Tasers in a weak-side holster.

205.     CPD officers must request medical aid for a person subjected to a Taser application. CPD officers must place any person subjected to a Taser application in a position that does not impair respiration, as soon as it is safe and feasible to do so. CPD officers must render life-saving aid to injured persons consistent with their training until medical professionals arrive on scene. Only trained medical personnel may remove Taser probes from a subject.

206.     CPD will conduct Taser inspections on a periodic basis to perform information downloads, ensure Tasers are operable, and perform necessary maintenance or repairs.

### c.     Oleoresin Capsicum Devices ("OC Devices")

207.     CPD officers may use OC devices only when such force is objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.

208.     CPD officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.

209.     When safe and feasible to do so, CPD officers must issue verbal commands and warnings to the subject prior to, during, and after the discharge of an OC device. When safe and feasible to do so, CPD will require officers to allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device, unless doing so would compromise the safety of an officer or another person.

210.     Each individual application of an OC device (e.g., each spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.

60

211.    CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment).

212.    CPD officers may only use department-issued or approved OC devices.

### d.    Impact Weapons

213.    CPD officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.

214.    When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after using an impact weapon.

215.    CPD officers must receive training on proper use of an impact weapon before being permitted to carry such weapon.

216.    CPD officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. CPD officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.

### C.    Reporting Uses of Force

217.    To be effective, the foundation of CPD's accountability system must be CPD members. When CPD members use force, they must be able to demonstrate that the force used complies with the law and CPD policy. When a member's use of force does not comply with the law and CPD policy, the member's supervisors must be able to identify the non-compliance and

61

take appropriate action to address it. To facilitate evaluation of how CPD members use force, CPD will ensure that members report incidents when they use force and that supervisors collect and review available information about the incidents.

218.     CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels:

a.     A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance.

b.     A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg

62

        sweep, weaponless defense technique, or takedown resulting in an injury or

        complaint of injury.

    c.   A level 3 reportable use of force is when a CPD member does any of the

        following: uses any force that constitutes deadly force, such as discharging a

        firearm or using an impact weapon to strike a person's head or neck; uses a

        chokehold or other maneuver for intentionally putting pressure on a person's

        airway or carotid artery; uses any force that causes the death of any person; or

        uses any force that causes injury to any person resulting in admission to a

        hospital.

219.    Whenever a CPD member engages in a reportable use of force, the member must complete a TRR, or any similar form of documentation CPD may implement, prior to the end of his or her tour of duty. In addition to completing the TRR, officers must also document the reason for the initial stop, arrest, or other enforcement action per CPD policy. CPD may allow members requiring medical attention a reasonable amount of additional time to complete the required documentation. CPD may allow supervisors to complete the TRR for members who are unable to complete the report due to injury or in other extraordinary circumstances.

220.    In completing the TRR, or whatever similar documentation CPD may implement, CPD members must include a narrative that describes with specificity the use of force incident, the subject's actions, or other circumstances necessitating the level of force used; and the involved member's response, including de-escalation efforts attempted and the specific types and amounts of force used. The narrative requirement does not apply to CPD members who discharged a firearm in the performance of duty or participated in an officer-involved death in the performance of duty. Any CPD member who observes or is present when another CPD

member discharges a firearm or uses other deadly force must complete a written witness statement prior to the end of his or her tour of duty. CPD members will note in their TRRs the existence of any body-worn camera or in-car camera audio or video footage, and whether any such footage was viewed in advance of completing the TRR or any other incident reports. CPD members must complete TRRs, or whatever similar documentation CPD may implement, and other reports related to the incident, truthfully and thoroughly.

221.     Any CPD member who engages in a reportable use of force must immediately report the incident to OEMC. OEMC is required to notify the involved member's immediate supervisor and the Watch Operations Lieutenant of the district of occurrence.

222.     A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.

223.     For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum:

a.   identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene;

b.   coordinating with COPA, as appropriate;

c.   gathering and preserving evidence related to the use of force;

    d.   requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained;

    e.   ensuring that members and subjects receive appropriate medical care;

    f.   making notifications as required by CPD policy; and

    g.   reviewing reports regarding the incident for legibility and completeness.

224.    In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.

225.    A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.

226.    CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.

227.    Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.

**D.    Supervisory Review of Reportable Uses of Force**

228.    Supervisors play a critical role in ensuring that force is used legally, consistent with CPD policy, and in a manner that will promote community confidence in the Department. Supervisor reviews and investigations of uses of force are essential to identify necessary individual and departmental corrective action.

229.    All reportable uses of force by CPD members must be reviewed by CPD supervisors.

65

230.     After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").

231.     The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.

232.     For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.

233.     For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as

necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.

234.    CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.

235.    All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.

### E.    Body-Worn Cameras

236.    CPD will continue to develop, implement, and maintain a system of video recording officers' encounters with the public with body-worn cameras. The use of body-worn cameras will be designed to increase officer accountability, improve trust and CPD legitimacy in the community, and augment CPD's records of law enforcement-related activities.

237.    CPD will continue to require all officers assigned to patrol field duties to wear body-worn cameras and microphones with which to record law-enforcement related activities as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-1 et seq.), with limited exceptions, including, but not limited to, when requested by a victim or witness of a crime, or interacting with a confidential informant. CPD will develop and implement a written policy delineating the circumstances when officers will not be equipped with body-worn cameras.

238.    CPD will continue to maintain a policy regarding body-worn camera video and audio recording that will require officers to record their law-enforcement related activities, and that will ensure the recordings are retained in compliance with the Department's Forms Retention Schedule (CPD-11.717) and the Illinois Law Enforcement Officer-Worn Body Camera Act. At a minimum, CPD's body-worn camera policy will:

a.    clearly state which officers are required to use body-worn cameras and under which circumstances;

b.    require officers, subject to limited exceptions specified in writing, to activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while on duty, and to continue recording until the conclusion of the incident(s);

c.    require officers to articulate in writing or on camera their reason(s) for failing to record an activity that CPD policy otherwise requires to be recorded;

d.    require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible;

e.    address relevant privacy considerations, including restrictions on recording inside a home, and the need to protect witnesses, victims, and children;

f.    establish a download and retention protocol;

g.    require periodic random review of officers' videos for compliance with CPD policy and training purposes;

h.    require that the reviewing supervisor review videos of incidents involving reportable uses of force by a subordinate; and

      i.    specify that officers who knowingly fail to comply with the policy may be subject to progressive discipline, training, or other remedial action.

239.    CPD officers must comply with the body-worn camera policy. CPD will impose progressive discipline, training, or other remedial action on officers who do not comply with the body-worn camera policy, as permitted by applicable law.

240.    Any CPD officer required to wear a body-worn camera must:

      a.    visually and physically inspect the body-worn camera and ensure that it is the member's assigned camera, fully charged, and operational at the beginning of each tour of duty; and

      b.    notify a supervisor as soon as practical if, at any time, the member's assigned body-worn camera becomes inoperable (including when either or both of the audio or video recording functions is inoperable) or is damaged.

241.    CPD will ensure that any CPD officer who reports an inoperable or damaged body-worn camera is promptly provided with a temporary or replacement body-worn camera, which will in no event be later than the beginning of the member's next tour of duty.

242.    CPD will ensure that CPD officers assigned to Department vehicles that are equipped with in-car cameras check that the cameras are fully functional at the beginning of each watch and make appropriate notifications when they are not. CPD will ensure that any non-functioning or malfunctioning in-car camera is repaired or replaced within two weeks of a CPD officer reporting that the in-car camera is not functioning properly.

**F.**    **Use of Force Training**

243.    CPD's pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or, when force must be used,

to use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and ensure appropriate supervision and accountability.

244.    CPD's training regarding the use of firearms, Tasers, OC devices, impact weapons, and other force options that CPD currently authorizes or may authorize in the future will be consistent with its commitment to de-escalation as a core principle. Any initial training, qualification, or requalification regarding these force options will incorporate scenario-based elements, including scenarios in which officers achieve resolution without employing force. CPD's training regarding these force options will also provide specific guidance to officers regarding required procedures and techniques after each of these force options are used, including procedures and techniques for limiting a subject's injuries.

245.    CPD will provide all current CPD officers with in-service use of force training on at least an annual basis, and more frequently when necessitated by developments in applicable law and CPD policy. CPD will coordinate and review all use of force training to ensure quality, consistency, and compliance with federal and state law, CPD policy, and this Agreement.

246.    The annual use of force training will include the following topics:

a.    CPD policies and Fourth Amendment law governing the use of force;

b.    proper use of force decision-making that utilizes a critical thinking framework in which officers gather relevant facts; assess the situation, threats, and risks; consider CPD policy; identify options and determine the best course of action; and act, review, and reassess the situation;

c.    role-playing scenarios and interactive exercises that illustrate proper use of force decision-making;

    d.   ethical decision-making and peer intervention, principles of procedural justice, the role of implicit bias, and strategies for interacting with individuals in crisis;

    e.   de-escalation techniques and tactics to prevent or reduce the need for force, including exercising persuasion and advice, and providing a warning; stabilizing the situation through the use of time, distance, or positioning to isolate and contain a subject; and requesting additional personnel to respond or make use of specialized units or equipment; the proper deployment of CPD-issued or -approved weapons or technologies, including firearms and Tasers;

    f.   use of force reporting, investigation, and review requirements, including documenting reportable use of force incidents; and

    g.   other topics as determined based on the training needs assessment required by this Agreement.

247.    CPD will also provide initial training on all of the topics identified above, as well as others, to all recruits as part of its recruit training curriculum.

248.    Supervisors of all ranks, as part of their initial pre-service promotional training and other identified supervisory training, will receive training on the following:

    a.   conducting use of force reviews or investigations appropriate to their rank;

    b.   strategies for effectively directing officers in de-escalation principles and acting to intervene on the subject's behalf when any use of force is observed that is excessive or otherwise in violation of policy; and

c. supporting officers who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force.

## VI. RECRUITMENT, HIRING, AND PROMOTION

### A. Guiding Principles

249. Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.

250. The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.

251. The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.

252. The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.

72

### B.     Policies and Practices

253.     The City and CPD will ensure that its recruitment, hiring, and promotion policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws, and the terms of this Agreement.

254.     CPD will provide clear guidance on its policies and procedures for recruiting, hiring, and promoting police officers and will clearly allocate responsibilities for recruitment, hiring, and promotion efforts.

255.     To further this goal, the City and CPD will publish job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position.

256.     The City and CPD will continue to review any hiring and promotional exams to ensure they are fair, validated, and properly administered.

257.     CPD will inform officers of the role of the Office of the Inspector General ("OIG") in overseeing the hiring and promotions processes.

### C.     Recruitment and Hiring

258.     By December 31, 2020, and at least every three years thereafter, CPD will assess its recruitment and hiring processes to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement.

259.     The recruitment and hiring assessment will identify and consider:

    a.   the core set of characteristics and capabilities of qualified recruits;

    b.   methods for consideration of discriminatory or biased behavior by the applicant against a member of a protected class in hiring decisions;

    c.   barriers and challenges to successfully completing the recruit application process;

73

d. Department strategies for attracting and hiring qualified applicants that reflect a broad cross section of the Chicago community;

e. input, which could consider surveys, from successful and unsuccessful applicants, recruits and other CPD members, community members, community-based organizations, legal and law enforcement professionals, and internal and external subject matter experts regarding the strengths and weaknesses of the recruitment and hiring processes;

f. recommendations for any modifications to the current recruitment and hiring processes that would enable CPD to satisfy the requirements of this section; and

g. a plan for implementing any recommended modifications with a timeline for implementation.

260. CPD will implement the plan above in Paragraph 259 in accordance with the specified timeline for implementation.

**D. Sergeant and Lieutenant Promotions**

261. Within 18 months of the Effective Date, and at least every three years thereafter, CPD will obtain an independent expert assessment of its promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement. The independent expert will review the existing Hiring Plan, and any relevant collective bargaining agreements in order to conduct the assessment of the Sergeant and Lieutenant promotions processes. The Sergeant and Lieutenant promotions assessment, at a minimum, will identify:

a. the processes by which CPD selects candidates for promotion to Sergeant and Lieutenant who possess a core set of competencies, characteristics, and

74

capabilities and, when applicable, who are effective supervisors in compliance with CPD policy and this Agreement;

b.  methods for consideration of each candidate's disciplinary history in the selection process;

c.  Department strategies for promoting qualified applicants who reflect a broad cross section of the Chicago community;

d.  the frequency with which CPD should hold promotional exams;

e.  opportunities to increase transparency and officer awareness about the promotions process and promotions decisions, including, but not limited to, identifying criteria for promotions; and

f.  recommendations for any modifications to the current promotions processes, which would enable CPD to address the requirements of this section.

262.    Within 60 days of the completion of the independent expert's promotions assessment, CPD will develop an implementation plan to respond to any recommendations identified in the assessment, including any recommended modifications to the promotions processes and a timeline for implementation. Upon completion, CPD will share the results of the assessment and its implementation plan with the Monitor for review and approval. Within 60 days of receiving the Monitor's approval, CPD will begin to implement the plan.

### E.    Captain and Commander Promotions

263.    Within 365 days of the Effective Date, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement.

264.    Within 365 days of the Effective Date, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions.

## VII.    TRAINING

### A.    Guiding Principles

265.    CPD will enhance its recruit training, field training, in-service training, and pre-service promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.

266.    CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.

267.    CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.

268.    The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.

### B.    Training Plan

269.    The Parties acknowledge that in late 2016, CPD established the Training Oversight Committee ("TOC"), which is responsible for overseeing the Department's training program.

270.    The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also

include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes.

271.    Within 180 days of the Effective Date, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider:

    a.   information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues;

    b.   input from CPD members of all ranks and their respective collective bargaining units, if applicable;

    c.   input from members of the community;

    d.   recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board;

    e.   changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any;

    f.   court decisions and litigation;

    g.   research reflecting the latest in training and law enforcement best practices;

    h.   information obtained from evaluation of training courses, instructors, and FTOs; and

i.  member reaction to, and satisfaction with, the training they received.

272.    Within one year of the Effective Date, and on an annual basis thereafter, the Education and Training Division will develop—and the TOC will review and approve—a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will:

a.  identify training priorities, principles, and broad goals consistent with this Agreement;

b.  prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan;

c.  include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement;

d.  identify subject areas for CPD training;

e.  determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program;

f.  develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements;

g.  determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material;

h.  address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement;

i.  identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities;

j.  determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff;

k.  develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training;

l.  develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and

m.  identify community-based organizations that represent a broad cross section of the city to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community policing, and make efforts to encourage such participation by such organizations.

## C.    Training Development and Delivery

273.    With oversight from the TOC, CPD will develop and implement recruit, field, in-service, and pre-service promotional training curricula and lesson plans that comport with CPD's Training Plan and that address the requirements and goals of this Agreement.

274.    Under the supervision of the TOC, CPD's Education and Training Division, pursuant to the Training Plan, will develop and approve training curricula, lesson plans, and

course materials that are (a) consistent across subjects; (b) of sufficient quality to adequately communicate the intended subject matter to CPD members; and (c) in accordance with the law, CPD policy, best practices, and this Agreement.

275.    The TOC will oversee the integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training, including, but not limited to use of force, weapons training, and Fourth Amendment subjects, as appropriate.

276.    The TOC will oversee continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques—in addition to traditional lecture formats—into training delivery.

277.    Where it would add to the quality or effectiveness of the training program, the Education and Training Division will seek the assistance of outside expertise, as feasible, practical, and appropriate, either in developing or reviewing CPD curricula and lesson plans, or reviewing pilot versions of CPD courses.

278.    The TOC will continue to oversee a process that effectively incorporates material changes in relevant case law, statutes, and CPD policy into recruit, field, in-service, and pre-service promotional training in a timely and effective manner.

279.    All training materials disseminated to CPD members and displayed at CPD facilities will reflect current CPD policy.

280.    CPD will develop, implement, and utilize a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.

281.    The City will be responsible for providing appropriate training facilities that offer adequate access to safe and effective training.

### D.    Instructor Selection and Development

282.    All CPD training instructors must be appropriately qualified for their instructional roles and use only approved curricula and lesson plans. CPD will actively recruit and retain qualified instructors to ensure that CPD has sufficient qualified instructors to meet the needs of the Department and requirements of the Training Plan.

283.    As appropriate to accomplish the requirements and goals of this Agreement, CPD will incorporate experts and guest speakers to participate in the development and instruction of relevant courses, as feasible, practical, and appropriate, including, but not limited to:

    a.  CPD members of all ranks;

    b.  members of the community;

    c.  legal and law enforcement professionals, such as judges, prosecutors, and public defenders;

    d.  crime victims; and

    e.  subject matter experts.

284.    CPD will require that all new and current Education and Training Division instructors and curriculum developers are certified by the Illinois Law Enforcement Training and Standards Board and, as appropriate to their roles, receive initial and annual refresher training on subjects including, but not limited to, effective teaching, adult-learning techniques, and curriculum development. CPD will further require that instructors are trained in the specific subject matter they are assigned to teach and are also cross-trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction. Instructor training will also include peer review.

285.    The Education and Training Division will conduct annual instructor performance reviews. Performance reviews will include classroom observations, member feedback, and in-person meetings with instructors to discuss performance and areas of improvement. These performance reviews will be considered in assessing whether instructors may continue to serve in that role.

### E.    Training Evaluation

286.    The review and analysis of the content and delivery of training will enable CPD to determine whether the training provided to members effectively prepares them to police fairly, safely, and in accordance with the law, CPD policy, best practices, and this Agreement.

287.    Pursuant to its Training Plan, CPD will develop and implement a process that provides for the collection, analysis, and review of course and instructor evaluations to document the effectiveness of existing training and to improve the quality of future instruction and curriculum. This process will include member feedback on the training they have received and analysis of the extent to which such training is reflected in how members perform. The Education and Training Division will consider this information in conducting its annual needs assessment.

288.    The Education and Training Division will develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs.

289.    CPD will develop and implement testing policies and procedures to ensure that any member testing that is administered is reliable and fair. To achieve this purpose, both knowledge-based and performance-based tests will be designed, developed, administered, and scored according to best practices. All tests will assess the knowledge and skills required for successful job performance and will align with the materials delivered in training.

F.      **Training Records**

290.    CPD will develop, implement, and utilize a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. This system will, at a minimum:

     a.   maintain training records for each member of the Department;

     b.   record the course description, duration, curriculum, date, location, and the members who completed the training; and

     c.   identify members who did not complete required training and describe remedial training actions that were taken.

291.    The Education and Training Division will document all training provided to or received by CPD members, whether required or not. Members will sign an acknowledgement of attendance or digitally acknowledge completion of training.

292.    The Education and Training Division will, on an annual basis, report on training to the TOC and the Superintendent. At a minimum, this report will:

     a.   contain a description of each course, including a summary of the subject matter;

     b.   state the duration, date, location, and number of persons by rank who completed the training;

     c.   identify whether the training was part of the recruit, in-service, or pre-service promotional training program;

83

    d.   state whether the training was centralized or decentralized, and delivered in person or through electronic means;

    e.   list whether the training was mandatory, elective, or remedial; and

    f.   document the members who did not complete required training and any remedial training actions taken.

## G.   Recruit Training

293.    A solid foundation of recruit training is important for equipping new police officers with the skills, knowledge, and values to police fairly, safely, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.

294.    CPD will ensure that upon graduation from the Academy, recruits demonstrate a firm grasp of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. In order to do so, CPD will rely on appropriate evaluation tools to measure recruits' skills and qualifications.

295.    The Parties acknowledge that CPD, through its Recruit Curriculum Working Group, revised and updated the content and delivery of its recruit training curriculum in 2017. CPD will further modify the amount, content, and delivery of its recruit training to comport with its Training Plan and the requirements and goals of this Agreement.

296.    CPD will ensure that the Academy is sufficiently staffed to effectively train recruits. CPD will further ensure that, except in extraordinary circumstances, courses are scheduled with sufficient advance time for instructors to be notified of the class and to properly prepare and deliver quality instruction.

297.    CPD will require end-of-course training evaluations of recruits that ensure they graduate with the requisite knowledge and skills to engage in policing activities safely, effectively, and lawfully.

### H.  Field Training and Evaluation Program

298.    An effective field training program is necessary for reinforcing the policies, practices, and skills taught in recruit training and instilling in new police officers the principles of safe, effective, and lawful policing that will guide them throughout their careers. CPD will sufficiently staff, supervise, and manage its field training program ("Field Training and Evaluation Program") to train and evaluate new officers in the necessary skills required to de-escalate or use force in accordance with the sanctity of life, the law, CPD policy, and this Agreement.

299.    CPD will revise, as necessary and appropriate, the Field Training and Evaluation Program to comport with CPD's Training Plan and this Agreement.

300.    The Field Training and Evaluation Program will follow recruit training and be at least 12 weeks in duration and include at least three training cycles. The Field Training and Evaluation Program will not designate probationary police officers ("PPOs") as "field qualified," as defined by this Agreement, until they have successfully completed the entire program.

301.    CPD will review and revise as necessary its FTO selection policies and procedures to establish and implement a program that effectively attracts and retains qualified FTOs.

302.    CPD's policies and procedures will continue to delineate the criteria and methodology for selecting FTOs. Subject to its collective bargaining agreements with the CPD unions, CPD will review and, as appropriate, revise its eligibility criteria and promotional practices to ensure that FTOs are selected based on their applications, previous performance as police officers, FTO training examination scores, and disciplinary histories.

303.    FTOs will receive initial and refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management

and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum. FTOs will receive refresher training on an annual basis as part of the In-Service Training Program outlined in this Agreement. FTOs will be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of PPOs.

304.    FTOs will be required to maintain and demonstrate their proficiency in managing and mentoring PPOs, as well as modeling and teaching, by their example, procedural justice, de-escalation, impartial policing, and community policing. The Education and Training Division will maintain documentation of the training of FTOs. The Bureau of Patrol will maintain documentation of the evaluations of FTOs.

305.    CPD will revise the Field Training and Evaluation Program to ensure that no more than one PPO is assigned to an FTO during each training cycle. The City will provide CPD with the necessary support and resources to designate a sufficient number of FTOs to meet the requirements of this Agreement. Officers performing FTO duties in a temporary capacity are considered FTOs under this Agreement so long as they meet the requirements set forth for FTOs in this Agreement, except for the selection requirements.

306.    CPD will ensure that PPOs in the Field Training and Evaluation Program train with different FTOs during each of their training cycles.

307.    CPD will ensure that PPOs awaiting assignment to an FTO will not be placed on assignments in the field without adequate supervision. CPD will track and document all instances of PPOs placed in field assignments prior to starting the Field Training and Evaluation Program.

308.    The Field Training and Evaluation Program will continue to require that FTOs document PPO progress and performance each day in the Daily Observation Report, at the end of

each of the first two cycles in the Cycle Summary Report, at the end of the third cycle in the Final Summary Report and, if necessary, at the end of any additional cycles in the Remedial Summary Report. FTOs will identify and document in those reports areas for PPO improvement.

309.    In each Cycle Summary Report, the FTO will assess whether the PPO should progress to the next cycle of training based on the PPO's performance and compliance with the Field Training and Evaluation Program standards.

310.    A PPO must be deemed "field qualified" in order to complete the Field Training and Evaluation Program. For a PPO to be deemed "field qualified," all end-of-cycle reports must be completed by the FTO and reviewed and approved by the necessary supervisors.

311.    FTOs may recommend specific remedial field or classroom training for a PPO. Any recommendation for remedial training will be provided as promptly as possible to the necessary supervisors and must be documented in the PPO's training record, including, but not limited to, the Final Summary Report or Remedial Summary Report. Recommendations for remedial training must be reviewed by the necessary supervisors and, if approved, recommended training must be completed by the PPO before the PPO completes the Field Training and Evaluation Program.

312.    The Field Training and Evaluation Review Board, or other entity with similar responsibilities, will review a PPO's performance at the request of an assigned FTO or supervisor and have the power to recommend separation, re-training by the Academy, or additional field training. A request for review by the Board must be made, and the Board must convene, if a PPO is not deemed "field qualified" at the end of any remedial training cycle. The Field Training and Evaluation Review Board will provide all such referrals and recommendations for action to the Chief of the Bureau of Patrol.

313.     CPD will create a mechanism for PPOs to provide confidential feedback regarding their field training, including the extent to which their field training was consistent with what they learned at the Academy; whether their FTOs did or did not provide effective guidance and instruction; and suggestions for changes to recruit training based upon their experience in the Field Training and Evaluation Program.

314.     The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, aggregate PPO feedback on a quarterly basis; document their responses, including the rationale behind any responsive action taken or decision to take no action; and share such feedback with the TOC and, as necessary, FTOs and FTO supervisors.

315.     CPD will create a mechanism for FTOs to provide feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training. The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, FTO feedback on a quarterly basis and, as necessary and appropriate, share such feedback with the TOC, FTOs, and FTO supervisors.

316.     The TOC will annually review the Field Training and Evaluation Program and consider best practices in this area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program.

## I.    In-Service Training Program

317.    Regular in-service training is critical to ensure that CPD officers continue to hone important policing skills and remain up-to-date on changes in the law, CPD policy, technology, community expectations, and developments in best practices. In-service training should, as appropriate, reinforce CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.

318.    The Parties recognize that CPD has begun to develop and implement an In-Service Training Program for its officers. The Parties acknowledge that CPD has developed a project plan establishing development and implementation of the In-Service Training Program from 2018 through 2019 that includes the following components:

a.   a list of planned courses, including the status of the development and approval of any new course curricula;

b.   the dates that CPD officers collectively will start and complete the planned courses;

c.   the identification of any need for additional instructors, equipment, and training facilities and a schedule for addressing the needs; and

d.   a list of CPD personnel responsible for overseeing each project plan task.

319.    CPD will implement the In-Service Training Program to comport with the Training Plan and the requirements and goals of this Agreement.

320.    The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year:

a.   16 hours by the end of 2018;

b.   24 hours by the end of 2019;

89

     c.  32 hours by the end of 2020; and

     d.  40 hours by the end of 2021, and in each subsequent year.

321.    CPD's In-Service Training Program will include specific courses that will be mandatory for every officer in that training year.

322.    CPD's In-Service Training Program may also offer specific courses as elective subjects. The elective subjects will be selected and approved by the TOC in accordance with the Training Plan. The TOC will solicit and consider officer requests and will rely on the Education and Training Division's needs assessments when selecting and evaluating elective subjects.

323.    As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows:

     a.  in 2018, CPD will require that each officer receive at least 16 hours of in-person mandatory courses;

     b.  in 2019, CPD will require that each officer receive at least 16 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC;

     c.  in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC;

     d.  starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and

    e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training.

324. Various sections of this Agreement contain in-service training requirements which require CPD to provide some or all of its members with training on specific topics. CPD retains the discretion to determine the sequencing, scheduling, and location of such training, unless otherwise specified by this Agreement, provided that: all in-service training identified herein will begin no later than the 2021 calendar year; is adequate in quantity, quality, type, and scope; and is consistent with the terms of this Agreement.

325. The Parties acknowledge that CPD has begun to develop and implement decentralized training in CPD districts and units. To date, decentralized training instructors have been selected by CPD's Education and Training Division and have received instructor certification by the Illinois Law Enforcement Training and Standards Board.

326. Training provided through the In-Service Training Program may take place at the Academy or in a decentralized manner, including at the district or unit level, so long as the training is:

    a. developed by the Education and Training Division;

    b. reviewed by the TOC and approved by the Education and Training Division before training is delivered; and

    c. taught by instructors pursuant to the requirements provided above Part D of this section.

327. Courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person may be provided through e-learning or other electronic means, so long as they are reviewed and approved by the TOC and are consistent with this

Agreement. In considering e-learning courses for approval, the TOC will ensure that instructional objectives can be sufficiently achieved through e-learning. Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter.

328.    CPD will develop and implement a process for addressing non-compliance with training requirements to ensure that all officers who are active duty and available for assignment, including supervisors and command staff, successfully complete all required training programs within the time frames set out in this Agreement.

329.    Officers, including supervisors and command staff, returning to active duty after taking a leave of absence of a year or more must complete all mandatory training content required as part of the In-Service Training Program that was missed during the previous three years, in addition to the mandatory courses required in the current year.

   a.  At a minimum:

       i.  officers must complete training on the content required in Part F of the Use of Force section of this Agreement before returning to assignment; and

       ii.  officers must complete training on all other mandatory content required during the previous three years within the first full year of resumed active duty.

   b.  Where the same mandatory content has been updated or required multiple times during the period of inactivity, officers are only required to take the most recent offering. The training required in this paragraph will count

towards the total amount of training required by the In-Service Training Program.

**J.    Supervisory Training**

330.    Effective, comprehensive pre-service promotional and in-service training for supervisors is essential to successful supervision.

331.    CPD will require that every newly promoted supervisor, except those promoted to the rank of Commander and above, receives mandatory supervisory, management, leadership, and command accountability training, tailored to each level of supervision and command before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.

332.    CPD will require that supervisors, upon their first promotion to the rank of Commander or above, receive mandatory supervisory, management, leadership, and command accountability training, tailored to command staff positions within six months of assignment to or assumption of supervisory responsibilities as a member of CPD's command staff.

333.    The amount of pre-service promotional training may differ according to rank and command, but all pre-service promotional training will be adequate in quality, quantity, type, and scope and will cover topics appropriate to the specific rank and command.

334.    By January 1, 2020, as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to:

      a.    an overview of CPD's department-wide crime reduction strategies;

      b.    specific methods for developing district-level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate

principles of community policing in implementing those crime reduction strategies;

c.   techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias-based profiling and other forms of discriminatory policing;

d.   de-escalation strategies and the principles of force mitigation;

e.   intervening on a subject's behalf when observing a use of force that is excessive or otherwise in violation of policy;

f.   evaluating the completeness, correctness, and sufficiency of written reports;

g.   monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies;

h.   understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank;

i.   evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process;

j.   CPD and COPA's disciplinary system requirements and available non-punitive corrective action;

k.   mentoring officers and fostering career development;

l.   responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA;

m.  building community partnerships and guiding officers on how to implement this requirement; and

94

n. CPD policy and legal updates.

335. The pre-service promotional training for new Sergeants and Lieutenants will include a field training component to provide newly promoted supervisors with a better understanding of the requirements of the position to which they have been promoted.

a. The field training component for new Sergeants will consist of two days of shadowing current Sergeants in districts: one day observing the activities of a District Station Supervisor and one day observing the activities of a Field Sergeant.

b. The field training component for new Lieutenants will consist of one day of shadowing a current Lieutenant in a district and observing the activities of a Watch Operations Lieutenant.

336. Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.

337. CPD will ensure that all supervisors who are active duty and available for assignment also receive in-service training consistent with the requirements of CPD's In-Service Training Program. As part of the In-Service Training Program, supervisors will receive refresher training related to their supervisory duties and training that covers managerial and leadership skills. The in-service training for supervisors may include, but is not limited to, the topics identified above for pre-service promotional training.

338.     Any training course offered as part of a pre-service promotional training, which is also a mandatory In-Service Training Program course, satisfies that mandatory In-Service Training Program requirement. Any other training course completed during a pre-service promotional training will count towards the total amount of training required by the In-Service Training Program requirement.

### K.     Training on this Agreement

339.     Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.

340.     In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that:

    a.     all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy;

    b.     supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and

    c.     CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.

## VIII.  SUPERVISION

### A.     Guiding Principles

341.     Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective,

96

and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.

342.    The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.

343.    CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.

344.    Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.

345.    Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

346.    Effective supervisors will:

    a.   engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement;

b. model appropriate conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and

c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.

**B. Responsibilities and Duties**

347. CPD will require its supervisors, through policy and auditing, to consistently apply CPD policies and procedures from shift to shift, among all geographic areas of the city, and in all units of the Department.

348. By January 1, 2020, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement.

349. CPD will require that all supervisors perform their specific duties and responsibilities in compliance with CPD policy, including the terms of this Agreement.

350. CPD will regularly inform its members, including supervisors, of available training, professional development opportunities, and employee assistance resources.

351. Supervisors of all ranks will effectively supervise the members under their command to ensure accountability across the Department.

352. Effective supervision requires that all supervisors, at a minimum, will:

a. establish and enforce the expectation that members under their command perform their duties in a manner that complies with federal and state law, CPD policy, this Agreement, and that is consistent with the principles of procedural justice, de-escalation, impartial policing, and community policing;

98

    b.   provide leadership, guidance, mentoring, direction, and support to members under their command to promote improved performance and professional development; and

    c.   lead efforts to ensure that members under their command are working actively to engage the community and promote public trust and safety.

353.    Additionally, effective supervision requires that immediate supervisors will, for members under their direct command:

    a.   respond to, review, and investigate uses of force and other incidents and conduct as required by CPD policy and this Agreement;

    b.   monitor, manage, and coordinate incident response;

    c.   confirm the correctness, sufficiency, and completeness of written reports submitted for review and approval;

    d.   identify any adverse behavior or misconduct and ensure that it is adequately addressed through corrective action, training, or referral for discipline;

    e.   respond appropriately to each complaint of misconduct received, in accordance with CPD's complaint and disciplinary policies;

    f.   review and act upon information regarding at-risk behavior by the members under their direct command, as required by the Data Collection, Analysis, and Management section of this Agreement;

    g.   advise members under their direct command of available training, professional development opportunities, and employee assistance resources;

    h.   conduct annual performance evaluations and meet with members under their direct command on an ongoing basis as necessary to provide guidance,

mentoring, direction, and support to the members regarding their performance and to identify areas for improvement; and

i.  document the performance of their supervisory duties as required by CPD policy and this Agreement using the appropriate records management system, the Performance Recognition System ("PRS"), and/or the EIS.

354. During their tour of duty, immediate supervisors in the Bureau of Patrol will spend time interacting with, observing, and overseeing the members under their direct command, including time in the field, consistent with their duty assignment.

355. Immediate supervisors will be required to document their actions taken with members under their direct command, pursuant to CPD policy, including, but not limited to:

a.  non-disciplinary or corrective actions, including, but not limited to, those taken pursuant to any internal or external review of the conduct of CPD officers or taken pursuant to the operation of any existing and future automated electronic systems contemplated by Part D of the Data Collection, Analysis, and Management section of this Agreement;

b.  disciplinary referrals;

c.  response to incident scenes as required by CPD policy;

d.  observations of member conduct, as required by CPD policy; and

e.  reviews and investigations of reportable uses of force and other reports required by CPD policy and this Agreement.

**C.  Staffing, Allocation, and Deployment**

**1.  Generally**

356. As otherwise set out in this Agreement, CPD will ensure that it makes staffing and allocation decisions that provide for:

a.  the number of patrol field supervisors to ensure span of control and unity of command as required in this Part;

b.  the number of well-trained, qualified FTOs, as required in Part H of the Training section of this Agreement;

c.  the number of well-trained, qualified staff to train recruits and officers, as required in Part D of the Training section of this Agreement;

d.  the number of well-trained, qualified staff to conduct timely misconduct investigations, as required in the Accountability and Transparency section of this Agreement;

e.  the number of certified CIT Officers, as required in Part D of the Crisis Intervention section of this Agreement; and

f.  the number of officer assistance and wellness staff as required in the Officer Wellness and Support section of this Agreement.

### 2.  Unity of Command and Span of Control

357.  The City and CPD will deploy a sufficient amount of qualified supervisors to provide effective supervision, as outlined in this section.

358.  For purposes of this section, the following definitions apply:

a.  "District law enforcement" means the CPD patrol districts, which are currently organized into three police areas (North, Central, South), with the responsibility of general field operations, including but not limited to, the protection of life and property; enforcement of laws and ordinances; and response to dispatched calls for service.

b. "Field units" means the primary beat cars, rapid response cars, and watch specialty cars (squadrol, traffic car, and park car), assigned to watch field operations in district law enforcement.

c. "Sector" means a specific and contiguous grouping of geographic beats within a designated district or a Sergeant and a team of officers assigned to field units within district law enforcement.

d. "Span of control" means the number of officers assigned to each immediate supervisor for a tour of duty.

e. "Unity of command" means officers are supervised by a consistent and clearly identified immediate supervisor. Additionally, officers and their immediate supervisor will regularly have the same start time, the same day-off-group, and patrol the same geographic areas.

359.    CPD will ensure that the principles of unity of command and span of control are realized for watch personnel assigned to field units within district law enforcement.

360.    By January 1, 2020, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.

361.    In order to achieve unity of command and a span of control of no more than ten officers to one Sergeant in the field units on each watch in each patrol district, the staffing model may consider:

a. staffing requirements for watch operations, including, but not limited to, watch personnel assigned to field duties and watch administration functions;

b. staffing requirements for all other district law enforcement functions, including, but not limited to, district administration, community policing, and tactical teams;

c. data-driven resource allocation methods incorporating district-specific factors, including, but not limited to, calls for service, public violence, and property crime; and

d. any other considerations CPD deems relevant to achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant in all field units on each watch of the City's patrol districts.

362.    By January 1, 2020, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control.

363.    When calculating the span of control ratios for field units, CPD may not use department-wide averages or factor in span of control ratios for Bureau of Patrol units or functions that are not included in the definition of field units above.

364.    Beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district.

365.    By January 31, 2022, CPD will fully implement and maintain a staffing model that achieves unity of command and a span of control ratio of no more than ten officers to one

Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.

366. CPD will continue to maintain unity of command and a span of control ratio of no more than ten officers to one Sergeant for district tactical teams and area saturation teams.

367. CPD may review and revise its staffing model as necessary to ensure that all field units on each watch in each patrol district achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant.

368. Beginning 365 days after the Effective Date, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant.

### D. Performance Evaluation

369. A performance evaluation process will enable CPD to identify, support, and recognize members who perform their duties lawfully, safely, and effectively, as well as to identify and respond to members who perform poorly, demonstrate adverse behaviors, or engage in inappropriate conduct or conduct that otherwise undermines member or public safety and community trust.

370. CPD's performance evaluation process will identify, support, and recognize members' activity, performance, and conduct through an assessment of specific quantitative and qualitative performance dimensions, which will address, among other things, constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. Although CPD may use quantitative measures in evaluating members to ensure that members are performing their required duties, CPD will not require members to achieve specific numerical thresholds, such as the number of arrests, investigatory stops, or citations. CPD will ensure that its performance evaluation process is consistent with the law and

104

best practices. Within 18 months of the Effective Date, CPD will revise its performance evaluation policies and practices as necessary to meet the requirements of this Agreement.

371.     Annual performance evaluations for members of all ranks, excluding the Superintendent, will be based upon work performance completed during a specific rating period and will include a written description of performance dimension expectations; the member's proficiency in fulfilling the specific duties and responsibilities of the assigned position, unit, or team; any areas of particular growth and achievement; and areas where the member requires further support and/or supervision. The evaluation process will provide for support, feedback, communication of expectations, and, when appropriate, corrective actions.

372.     CPD will require supervisors of all ranks to conduct timely, accurate, and complete performance evaluations.

373.     Supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.

374.     In addition to the formal annual performance evaluation, supervisors will meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify opportunities for improvement.

375.     Supervisors will recognize, when appropriate, formally (e.g., recommendation for commendation) and/or informally (e.g., public and private praise) subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, and/or community policing.

376.     CPD will maintain records of performance evaluations in the appropriate electronic data tracking system.

## IX.    OFFICER WELLNESS AND SUPPORT

### A.    Guiding Principles

377.    In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.

378.    The City and CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.

379.    The City and CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.

380.    The City and CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.

### B.    Expanding and Improving Officer Support Systems

381.    CPD will provide its members with a range of support services that comport with mental health professional standards and that seek to minimize the risk of harm from stress, trauma, alcohol and substance abuse, and mental illness. These support services will include: readily accessible confidential counseling services with both internal and external referrals; peer support; traumatic incident debriefings and crisis counseling; and stress management and officer wellness training.

1.     **Officer Support Systems Plan**

382.    CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. By September 1, 2019, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards.

383.    The needs assessment should analyze, at a minimum:

a.   staffing levels in CPD's Professional Counseling Division;

b.   the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD;

c.   how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor;

d.   the professional specialties of CPD's licensed mental health professionals;

e.   the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services;

f.   CPD member feedback, through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program;

g.   similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week;

     h.   guidance available from law enforcement professional associations;

     i.   the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them;

     j.   the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and

     k.   the quality of recruit training related to stress management, officer wellness, and related topics.

384.    Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation.

385.    As a component of CPD's Officer Support Systems Plan, CPD will develop and implement a communications strategy. The objectives of this communications strategy will be:

     a.   to inform CPD members of the support services available to them;

     b.   to address stigmas, misinformation, or other potential barriers to members using these services; and

     c.   to emphasize that supporting officer wellness is an integral part of CPD's operations.

386.    As part of this communications strategy, CPD will, at a minimum:

     a.   make information about the support services available, on a continuing basis, to members on its internal websites;

b.  post information, including pamphlets and posters, in each CPD facility in areas frequented by officers;

c.  issue wallet-sized cards to every CPD member with contact information for the CPD support services available;

d.  inform and remind members about the CPD support services offered, including providing handouts with contact information, at the annual use of force training required by this Agreement, during Academy training of new recruits, and at in-service trainings relating to stress management and officer wellness;

e.  provide training to supervisory personnel regarding available CPD officer support services and strategies for communicating with officers about these services in a manner that minimizes any perceived stigma; and

f.  seek to identify and correct misperceptions among CPD members about receiving counseling services.

387.    Within 180 days of the Effective Date, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.

388.    As a component of the Officer Support Systems Plan, by January 1, 2020, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initiatives implemented in other large departments and incorporate guidance available from law

enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member.

389.    At least annually, the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan.

### 2.    Clinical Mental Health Services

390.    CPD currently employs three licensed mental health professionals and a supervising psychologist who serves as the Director of CPD's Professional Counseling Division. CPD offers free counseling services to CPD members through the Professional Counseling Division and through external referrals in certain circumstances. CPD will expand its capacity to provide the counseling services to CPD members as set forth in this Agreement.

391.    CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) by January 1, 2020. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan.

392.    CPD will ensure that its staff of licensed mental health professionals includes individuals with specialized training in one or more of each of the following subjects: post-traumatic stress disorder, domestic violence, alcohol and substance abuse, anger management, depression, and anxiety.

393.    In order to provide support services that are culturally appropriate, sensitive to differing circumstances, and attentive to the issues facing all CPD members, including, but not limited to, women, people of color, religious minorities, and LGBTQI individuals, CPD will ensure that:

      a.    the licensed mental health professionals and counselors employed by CPD are trained and equipped to provide services in a manner respectful of these diverse experiences and perspectives;

      b.    CPD members receiving services have the opportunity to provide feedback regarding whether such services are culturally appropriate and adapted to diverse experiences and perspectives; and

      c.    appropriate corrective action is taken to the extent necessary based on feedback received.

394.    CPD will offer members referrals for counseling services by external clinical service providers, including, but not limited to, private therapists, specialists, outside agencies, or hospitals, when a member requires specialized counseling that is beyond the training and expertise of CPD's licensed mental health professionals or certified counselors.

395.    CPD will ensure that CPD members have access to:

      a.    non-emergency, generalized counseling sessions with CPD's licensed mental health professionals within two weeks of a member's request; and

b. generalized emergency counseling by CPD's licensed mental health professionals within 24 hours of a member's request.

396. CPD will continue to ensure that any mental health counseling services provided to CPD members remain confidential in accordance with state law, federal law, and current CPD policy.

397. CPD will continue to ensure that licensed mental health professionals employed by the Professional Counseling Division do not participate in fitness for duty evaluations, which will be conducted exclusively by third-party licensed mental health professionals.

**3.      Alcohol and Other Addiction Services**

398. CPD currently employs five drug and alcohol counselors, all of whom are sworn CPD officers operating under the supervision of the Director of the Professional Counseling Division. These counselors provide free counseling for alcohol and substance abuse. CPD will continue to offer counseling services to CPD members for alcohol and substance abuse.

399. CPD will ensure the number of drug and alcohol counselors available, either on staff or through referrals, meets the needs of CPD members consistent with the needs assessment and the Officer Support System Plan.

400. CPD will ensure that its drug and alcohol counselors are certified in Illinois as Certified Alcohol and Other Drug Abuse Counselors.

401. CPD currently offers anonymous support groups and programs for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Professional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted practices in the field of addiction treatment (e.g., 12-step addiction treatment program), and that each program is reviewed at least annually by the Director of the Professional Counseling Division.

402.    CPD will train all supervisors regarding recognizing signs and symptoms of alcoholism and substance abuse, how to recommend available support services to CPD members experiencing alcoholism and substance abuse issues, and their obligations under CPD policy to report members exhibiting signs of alcohol or drug impairment.

### 4.    Peer Support Program

403.    CPD currently has a peer support program consisting of specially trained volunteer officers ("Peer Support Officers"). A well-run peer support program can provide an important access point for CPD members encountering challenging emotional or personal circumstances.

404.    CPD will maintain a peer support program, ensuring that:

a.    a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program;

b.    Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symptoms and conditions, suicide assessment and prevention, dependency and abuse, and support services available to CPD members;

c.    Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training;

d.    CPD offers Peer Support Officers the opportunity to meet at least annually to share successful strategies and identify ways to enhance the program;

113

     e.   Peer Support Officers receive and comply with a written procedures manual approved by a licensed mental health professional assigned to the Professional Counseling Division;

     f.   Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruitment of volunteers and widespread access to peer support services; and

     g.   the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective management of the program and that preserves the anonymity and confidentiality of members receiving peer support services.

**5.    Chaplains Unit**

405.    CPD maintains a Chaplains Unit consisting of CPD officers and non-CPD volunteers, operating under the supervision of a Director, who reports directly to a command staff member.

406.    By January 1, 2020, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that:

     a.   the purpose of the Chaplains Unit is to:

        i.   support the wellness of CPD members who voluntarily seek consultation with representatives of the Chaplains Unit;

        ii.   make referrals to licensed mental health professionals and other service providers, when appropriate;

        iii.  provide pastoral care to CPD members who voluntarily seek such services;

        iv.  offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and

        v.  provide support in moments of crisis as requested by CPD members.

    b.  when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy.

    c.  representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit.

### 6. Traumatic Incident Response

407.    CPD will continue to require that whenever a CPD member has experienced a duty-related traumatic incident, the member must attend counseling with a licensed mental health professional. The Director of the Professional Counseling Division or his or her designee will be responsible for documenting that a CPD member has attended the mandatory counseling and has completed the requirements of the Traumatic Incident Stress Management Program prior to the member returning to regular duty assignment. CPD will require any CPD member who has experienced a duty-related traumatic incident, unless medically unable to do so, to meet with a licensed mental health professional within seven days of the incident, and will ensure that it has an adequate staff of licensed mental health professionals who can accommodate this timing requirement.

408.    In addition to providing mandatory initial consultations and additional consultations as appropriate or as requested by CPD members, CPD's licensed mental health

professionals will follow up with members who have experienced a duty-related traumatic incident within six months to offer additional support services.

409.    CPD has also implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.

410.    CPD will continue to place any CPD member who has discharged a firearm, excluding training discharges, unintentional discharges, or discharges for the destruction of an animal where no person was injured, on mandatory administrative duty assignment for a minimum period of 30 days. Prior to permitting the member to return to regular field duties, CPD will require the member to (a) complete the Traumatic Incident Stress Management Program and any training determined by CPD to be appropriate; and (b) receive authorization from the First Deputy Superintendent. Authorization to return to regular field duties may be withheld pending the outcome of any administrative or criminal investigation.

411.    At least annually, CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program.

**7.    Training**

412.    Where it would add to the quality or effectiveness of the training, CPD will involve mental health professionals, as feasible, practical, and appropriate, in developing and reviewing recruit and in-service training on stress management, alcohol and substance abuse, officer wellness, and the support services available to CPD members.

116

413.    CPD will involve experts, such as psychologists and cognitive and behavioral scientists, in developing training on use of force where their expertise would enhance the effectiveness of the training. The training topics that may benefit from such expertise could include:

    a.    peer intervention by fellow officers to stop the use of excessive force;

    b.    the interaction of human perception and threat assessment; and

    c.    de-escalation and defusing techniques, including psychological methods of situation control, verbal control and communication, conflict resolution, and anger management.

414.    CPD will ensure that all CPD members are provided in-service training on stress management, alcohol and substance abuse, and officer wellness at least every three years. CPD will include training regarding stress management, alcohol and substance abuse, officer wellness, and support services in the recruit training program.

### C.    Equipment and Technology

415.    By July 1, 2020, and periodically thereafter, CPD will conduct a department-wide equipment and technology audit to determine what equipment is outdated, broken, or otherwise in need of repair or replacement. During each audit, CPD will solicit feedback from representatives of the collective bargaining units representing CPD members.

416.    Within 90 days of the completion of the initial audit, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs for repair or replacement of equipment and technology as identified through the needs assessment ("Equipment and Technology Audit Response Plan"). CPD will implement the Equipment and Technology Audit Response Plan in accordance with the specified timeline for implementation.

417.     As a component of the Equipment and Technology Audit Response Plan, CPD will develop a schedule for future periodic audits. The schedule will specify the time period within which future periodic audits will occur. The time period may vary for different equipment types to account for differences in the expected useful life of different equipment types. CPD will perform the periodic audits in accordance with the schedule.

418.     In order to facilitate physical health and mental well-being, CPD will ensure its members have access to exercise equipment at CPD facilities in geographically dispersed areas throughout the City.

X.     **ACCOUNTABILITY AND TRANSPARENCY**

   A.     **Guiding Principles**

419.     Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.

420.     A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.

421.     In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.

422.     Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a

118

community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.

423.    The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.

### B.    Receiving and Tracking Misconduct Complaints

424.    When members of the public submit complaints to the City ("complainants"), those complaints must be courteously received, properly classified, and efficiently investigated. Throughout a non-criminal investigation of the actions of a member (an "administrative investigation"), complainants should be able to track the status of their complaints and receive current, accurate information.

### 1.    Receiving Complaints

425.    The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date:

a.  the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online;

b. the City, CPD, and COPA will make the process for filing a complaint available electronically;

c. the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement;

d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income;

e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials;

f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and

g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.

426.    As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.

427.    The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by a third-party representative.

428.    When a CPD member becomes aware of an individual who wants to make a complaint regarding a CPD member's conduct, he or she will promptly provide the individual with COPA's contact information and notify a supervisor of the complaint received in the field. CPD will also ensure that, in response to complaints about CPD members, supervisors respond to the scene, document the complaint, and submit it to COPA. If the supervisor allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident complained of, the supervisor will contact his or her immediate supervisor, who will assign another supervisor to immediately document the complaint and submit it to COPA.

429.    The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.

121

430.     COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.

431.     The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation.

432.     The City and CPD will require that complaints about any CPD member are accepted, documented, submitted to COPA, and investigated even if the complainant could not identify the CPD member's name or other employee-identifying number, including star or badge number.

433.     CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.

434.     When CPD responds to or investigates incidents involving allegations of officer-involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.

435.     The City, CPD, and COPA will require that complaints alleging that a CPD member refused to accept a complaint, discouraged the filing of a complaint, or provided false or misleading information about filing a complaint are accepted, documented, and submitted to COPA for investigation and, where appropriate, recommended for discipline.

436.     Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum:

122

a. that CPD members promptly report any misconduct of which they are aware to a supervisor;

b. that the supervisor document such alleged misconduct and promptly report it to COPA; and

c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.

437. CPD will expressly prohibit all forms of retaliation, intimidation, coercion, or adverse action against any person who reports misconduct or cooperates with an administrative investigation.

## 2. Classifying and Tracking Investigations

438. OAG acknowledges that the City, CPD, and COPA are working to create an electronic Case Management System ("CMS"). The City, CPD, and COPA will ensure that the CMS maintains accurate data regarding the number, classification, and status of all administrative investigations, from the intake process through the final disciplinary decision, if any, and through any grievance process, arbitration, Police Board proceeding, or appeal relating to the final disciplinary decision (the "final disposition"). CMS will be maintained by appropriate personnel from the City, CPD, and COPA. The CMS will be fully operational by June 30, 2020.

439. The City and CPD will ensure that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person. By June 30, 2020, the City will also ensure complainants and their representatives are able to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.

440. The City, CPD, and COPA will ensure that all non-confidential complaints are processed by COPA as follows:

    a.   all non-confidential complaints of alleged misconduct received by CPD, including BIA and CPD supervisors, are documented and submitted to COPA within 24 hours of receipt;

    b.   all complaints of alleged misconduct submitted to the anonymous reporting website and all non-confidential complaints of alleged misconduct received by the OIG will be submitted to COPA by the end of the next business day after the complaint was received;

    c.   upon receipt of a complaint, COPA will promptly assign the complaint a unique tracking number, make an initial determination of the classification(s) of the alleged misconduct, and will either retain the complaint for investigation or transfer the complaint to BIA for investigation;

    d.   COPA, pursuant to its ordinance and this Agreement, will have the jurisdiction to conduct administrative investigations of all allegations of misconduct that involve:

        i.   excessive force;

        ii.   domestic violence;

        iii.   improper search or seizure of individuals or property;

        iv.   coercion;

        v.   verbal abuse as defined under Municipal Code of Chicago, § 2-78-100, including any unwelcome sexual advances or requests for sexual favors; or

        vi.   unlawful denial of access to counsel.

e.  COPA, pursuant to its ordinance and this Agreement, will receive immediate administrative notification of and have jurisdiction to conduct administrative investigations of all incidents, including those in which no allegation of misconduct has been made, involving:

   i.  firearm discharges by CPD officers that could potentially strike an individual ("officer-involved shooting");

   ii.  Taser or stun gun discharges by CPD officers that result in death or serious bodily injury;

   iii.  any person who dies or sustains serious bodily injury while in CPD custody, or as a result of CPD actions;

   iv.  "officer-involved deaths," as that term is defined in 50 ILCS 727/1-5; and

   v.  other weapons discharges and other uses of CPD-issued equipment as a weapon that results in death or serious bodily injury, at the COPA Chief Administrator's discretion;

f.  the City, CPD, and COPA will ensure that all allegations are recorded and classified appropriately, even if the complainant does not accurately characterize the alleged misconduct;

g.  if BIA or district personnel conducting investigations into misconduct identify allegations of misconduct that are within COPA's administrative investigative jurisdiction as defined herein, the investigator will promptly notify COPA; and

h.  if a complaint contains multiple allegations of misconduct, one or more of which falls within COPA's administrative investigation jurisdiction as defined

125

herein, COPA will have the right of first refusal to conduct an administrative investigation of the entire complaint.

441. The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.

442. The City will ensure COPA has appropriately trained and experienced staff to conduct sexual misconduct investigations.

443. Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.

444. Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report:

    a. assessing the quality of the sexual misconduct administrative investigations reviewed;

    b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and

    c. providing aggregate data on the administrative investigations reviewed, including:

126

i.   the volume and nature of allegations investigated, broken down by investigating agency;

ii.  the percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review;

iii. the percentage of investigations criminally prosecuted;

iv.  the percentage of investigations closed after the preliminary investigation;

v.   the percentage of investigations closed for lack of a signed complainant affidavit; and

vi.  the investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.

445.   The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process.

**3.      Communicating with Complainants and CPD Members**

446.   In the course of investigating a complaint, the City, CPD, and COPA will ensure:

a.   within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written

127

notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation.

b. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.

447.    The City and CPD will require that all COPA and BIA personnel and Accountability Sergeants communicate with complainants and involved CPD members in a professional and respectful manner.

448.    If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.

449.    The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.

128

450.    CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum:

    a.   CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant;

    b.   such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and

    c.   once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings:

        i.   any investigative files;

        ii.   any reports (except for reports about the incident authored by the CPD member); or

        iii.   any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).

451.    A CPD member who reviews audio or video evidence for purposes of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.

452.    Consistent with the applicable collective bargaining agreements, CPD will require members to cooperate with administrative investigations, including appearing for an administrative interview when requested by COPA, BIA, or an Accountability Sergeant and will provide all requested documents and evidence under the CPD member's custody and control.

453.    If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.

### C.    Disciplinary Investigations

454.    COPA, BIA, and the districts will conduct objective, comprehensive, and timely investigations of complaints.

455.    All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.

456.    The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.

457.    Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary

history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.

458.    Nothing in this Agreement is intended to overrule paragraph 1 of the Arbitrator's Award in City of Chicago v. Policemen's Benevolent & Protective Assoc. of Illinois, Unit 156A – Sergeants and Unit 156B – Lieutenants, Gr. Nos. SGTS 14-023 and LTS 14-004 (Aug. 21, 2015) (Roumell, Jr., Arb.), that OIG may investigate any alleged misconduct on the part of CPD members.

    **1.**    **Investigative Practices**

        **a.**    **Preliminary Investigations**

459.    Within 30 days of receiving an allegation:

    a.   COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and

    b.   if potential misconduct is alleged, COPA, BIA, or the district will initiate a preliminary investigation into the complaint.

460.    Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the preliminary investigation.

461.    Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is

appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.

462.    A signed complainant affidavit will not be required to conduct a preliminary investigation.

463.    The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status.

    a.   If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the preliminary investigation is sufficient to continue the investigation.

    b.   If the preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA.

    c.   The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is

necessary and appropriate, and in the interests of justice, for the investigation to continue.

### b. Misconduct Investigations

464. In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will:

    a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices;

    b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible;

    c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate;

    d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded;

    e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so;

    f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated;

133

g.  as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and

h.  identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.

465.  When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will:

a.  ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law;

b.  ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed;

c.  ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage;

d.  note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview;

  e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and

  f. audio record all CPD member in-person interviews.

466. When assessing credibility, COPA, BIA, and the districts will:

  a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and

  b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.

467. For each allegation associated with a misconduct investigation, COPA, BIA, or the districts will explicitly identify and recommend one of the following findings:

  a. "Sustained," where it is determined the allegation is supported by a preponderance of the evidence;

  b. "Not Sustained," where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence;

  c. "Unfounded," where it is determined, by clear and convincing evidence, that an allegation is false or not factual; or

  d. "Exonerated," where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.

468. COPA, BIA, and the districts will ensure that investigators do not:

a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member;

b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations;

c. close an administrative investigation solely because of findings in a related criminal proceedings;

d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct;

e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or

f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.

469.   The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following:

a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest;

b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation;

c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and

d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.

470. The City will ensure that COPA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief Administrator of COPA, or his or her designee, who must provide a short explanation of the reason(s) for granting or denying the extension.

471. The City and CPD will ensure that BIA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief of BIA or his or her designee.

472. The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.

473. The City will ensure that if COPA does not arrive at the investigative findings and recommendations within 180 days, the Chief Administrator of COPA, or his or her designee, will notify, within five days after the end of the 180-day period, the Mayor or his or her designee, the Superintendent, the Chairman of the City Council Committee on Public Safety, the complainant or his or her representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons the administrative investigation has not concluded within 180 days. COPA will update such notice every 180 days until the administrative investigation is completed.

474. CPD will ensure that if BIA does not arrive at the investigative findings and recommendations within 180 days, or an Accountability Sergeant does not arrive at the investigative findings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complainant or complainant representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Accountability Sergeant will update such notice every 90 days until the administrative investigation is completed.

475. The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.

476. The City, CPD, and COPA will require that COPA and BIA supervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.

477. The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.

478. Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding preliminary investigations, including preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.

479. Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.

480. Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.

481. The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.

482. The City and CPD will ensure that BIA regularly conducts proactive investigations and integrity tests.

483. The City and CPD will ensure there are regularly conducted satisfaction surveys relating to the complaint intake and investigation processes. The City and CPD will evaluate trends and training opportunities identified as a result of information received from such quality control surveys.

484. If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.

485. The City will continue to provide the Chief Administrator of COPA the discretion to direct COPA to review and investigate the facts of individual civil lawsuits and criminal proceedings involving alleged misconduct in order to identify and investigate incidents of misconduct.

486. The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include:

    a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will

140

include all available identifying information for anyone who refuses to provide a statement;

b.   documentation of each interview conducted and the recording of those interviews, if available;

c.   the names of all CPD members who have been identified as witnesses to the alleged misconduct;

d.   COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members;

e.   in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed and written credibility findings;

f.   if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current;

g.   all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and

h.   an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.

487.     Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.

### 2.     Officer-Involved Shootings and Deaths

488.     In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that:

a.   COPA investigators be provided the opportunity to participate in the preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident;

b.   the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems.

   i.   the requirements of subparagraph (b), above, will not apply if:

      (1)   the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and

      (2)   COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene.

c.   there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene;

d.   within 30 days of the Effective Date, CPD issues a policy providing that:

    i.  involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs;

    ii.  COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and

    iii.  in no event may this prohibition extend beyond the final disciplinary decision, if any.

e.  involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander ;

f.  administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and

g.  investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all requests made on behalf of involved or witness CPD members to reschedule an interview.

489.    The City recognizes that officer-involved shootings are traumatic incidents. The City and CPD are committed to treating all impacted with dignity and respect.

490.    The City and CPD are committed to ensuring their actions do not unreasonably impede access to information for families of the injured and deceased.

491.    In addition to the investigative requirements set forth in this Agreement, with respect to officer-involved shootings and officer-involved deaths, the City and CPD will ensure that CPD members act in a manner that is consistent with CPD's commitment to the principle of the sanctity of life, and will treat the deceased with respect, including the prompt screening from public view or covering of the deceased and, following timely evidence collection procedures, removal of the deceased.

492.    Criminal investigations into the actions of any CPD member relating to any "officer-involved death" will comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 *et seq.* ("PCRIA"). The City will use best efforts to ensure that a "law enforcement agency," as that term is defined under PCRIA, will conduct such investigations. The "law enforcement agency" conducting criminal investigations into the actions of any CPD member relating to any "officer-involved death" will have substantial experience and expertise in criminal homicide investigations.

### 3.    Accountability Sergeants

493.    OAG acknowledges that, in many districts, CPD has designated Accountability Sergeants whose responsibilities include receiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. Within 120 days of the Effective Date, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the

Accountability Sergeant's investigations ("BIA Lieutenants"). The policy will provide, among other things, a process by which:

    a.  within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a summary of the complaint allegations concerning the involved CPD member;

    b.  within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or corrective action, if any; and

    c.  an immediate supervisor of the involved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative findings, recommended discipline or corrective action, if any, unless the CPD member declines to meet.

494.  CPD will require that:

    a.  investigations completed by Accountability Sergeants are held to the same investigative standards as those completed by BIA;

    b.  beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose primary responsibility is receiving, processing, and investigating complaints against CPD members;

    c.  before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review;

d.  each Accountability Sergeant is provided with the name of and contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work;

e.  BIA Lieutenants provide regular case-related and overall performance feedback to each of the Accountability Sergeants and his or her respective District Commander;

f.  BIA Lieutenants review and approve all of the Accountability Sergeant's proposed investigative findings and disciplinary recommendations;

g.  all Accountability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS;

h.  all Accountability Sergeants have access to BIA policies, directives, protocols, and training materials; and

i.  all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.

**4.    Supervisory Review and Analysis of Investigations**

495.  Supervisory reviews of investigations will be conducted as follows:

a.  Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant:

i.  the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof;

ii.  BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order

146

additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and

iii. whenever a higher ranking officer orders additional investigation, it will be documented in writing.

b. all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively:

i. COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof;

ii. the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and

iii. whenever COPA or BIA orders additional investigation, the request and resulting investigation will be documented in writing.

496.     The City and CPD will ensure that interfering with an administrative investigation, including being untruthful in an investigation into misconduct or colluding with other individuals to undermine such an investigation, or intentionally withholding requested evidence or information from an investigator, will result in disciplinary action and/or criminal prosecution based on the seriousness of the conduct.

147

497.     COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this Agreement.

498.     The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.

**5.     Investigation Findings and Recommendations**

499.     When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include:

   a.   a description of the CPD members and individuals involved in the alleged misconduct;

   b.   the date, time, and location of the alleged misconduct;

   c.   a description of the allegations and applicable policies;

   d.   a narrative summary of the alleged misconduct;

   e.   a narrative summary of the investigation; and

   f.   the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended.

500.     For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.

501.     Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and

the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.

502.     Information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication.

503.     When an allegation of misconduct contains multiple separate potential policy violations, all applicable violations will be identified and investigated. Exoneration for the most serious allegations of misconduct will not preclude the recommendation of discipline, training, or other corrective measures for less serious misconduct stemming from the same set of allegations.

504.     As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.

**D.     Case Management System**

505.     The CMS will have the following capacities:

    a.   maintain accurate and reliable data regarding the number, nature, and status of all complaints and administrative notifications, from the intake process to final disposition;

    b.   identify the status of administrative investigations;

    c.   identify caseloads for investigators; and

    d.   maintain all documents and investigative materials—including audio and video—in a digital format, accessible via the CMS.

506.    COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.

507.    Administrative investigative files will be electronically preserved within the CMS.

508.    The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.

509.    For each complaint, the CMS will separately track, and have capacity to conduct searches and generate reports sufficient to identify and analyze trends relating to, at a minimum, the following:

      a.   allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age;

      b.   allegations of unlawful stop, search, citation, or arrest practices;

      c.   allegations of excessive force;

      d.   allegations of misconduct arising during an interaction with individuals in crisis;

      e.   allegations of retaliation against non-CPD members;

      f.   allegations of conduct alleged to have occurred in retaliation for engaging in First Amendment protected activities, such as lawful demonstrations,

protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct;

g.   allegations of officer-involved gender-based violence, domestic violence, or sexual misconduct;

h.   allegations of CPD member substance and/or alcohol abuse; and

i.   the self-reported demographic information of complainants, including race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age.

### E.   Community Mediation of Complaints

510.   Mediation can be a valuable tool for expediting the resolution of complaints, building trust between community members and police, and fostering mutual respect.

511.   In order to develop a new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant, the City will solicit public input, through community engagement efforts, regarding the methods by which mediation will most effectively build trust between community members and police and foster mutual respect.

512.   The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants

regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.

### F. Final Disciplinary Decision

513. COPA and CPD will ensure that the recommended level of discipline for findings is consistently applied in a fair, thorough, and timely fashion, based on the nature of the misconduct. COPA and CPD will also ensure that mitigating and aggravating factors are identified, consistently applied, and documented.

514. The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.

515. All disciplinary decisions and discipline imposed will be documented in writing, maintained in the administrative investigative file and the CPD member's disciplinary history, and reported within the CMS consistent with CPD policy and this Agreement.

516. Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding for a period of up to five years after the date of the incident or the date on which the violation is discovered, whichever is later.

517. The City, CPD, and COPA will ensure that findings of "Sustained – Violation Noted, No Disciplinary Action":

    a. may not be used in any investigation in which the conduct resulted in injury to any person; and

    b. will only be used for investigations that warrant a sustained finding, but were a result of unintentional violations of policy or law.

518.    CPD will provide the required notice regarding disciplinary matters to the Illinois Law Enforcement Training and Standards Board, including when an officer resigns while a misconduct investigation or disciplinary charges are pending.

519.    The failure to complete an administrative investigation within the timeframes set forth in this Agreement will not invalidate, impair, or otherwise negatively impact CPD's ability to issue discipline for sustained findings.

### G.    Staffing and Equipment Needs

520.    OAG acknowledges that the City has spent considerable time and resources to create and staff COPA and the Deputy PSIG.

521.    The City, CPD, and COPA will continue to build on these critical efforts by ensuring that BIA, COPA, the Police Board, and the Deputy PSIG have sufficient funding and an adequate number of qualified staff to fulfill their respective missions as required by law, each entity's policies, and this Agreement.

522.    Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.

523.    On an annual basis, COPA, the Deputy PSIG, and BIA will review and revise, if needed, each entity's respective staffing and equipment-needs plans.

524.    BIA's staffing and equipment-needs plans will include the investigation staffing and equipment needs of the districts.

525.    Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for

COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.

**H.      Training**

526.      Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.

527.      Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.

528.      The initial and annual in-service training for COPA and BIA investigators will include instruction in:

a.   how to properly handle complaint intake, and the consequences for failing to take complaints;

b.   best practices in procedural justice, including techniques for communicating with complainants and members of the public;

c.   the collection of objective verifiable evidence;

d.   the process for seeking an override affidavit in the absence of a signed complainant affidavit;

e.   for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct;

f.   for BIA investigators, techniques for conducting impartial investigations of sexual misconduct;

g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;

h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation;

i. properly weighing the credibility of witnesses against CPD members;

j. using objective evidence to identify and resolve inconsistent statements;

k. implicit bias;

l. the proper application of the relevant standards of proof;

m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement;

n. relevant state and federal law;

o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22;

p. the CMS;

q. the applicable collective bargaining agreements; and

r. how to access and use the PRS or information available on the PRS.

529. Within 180 days of the Effective Date, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on:

      a.   identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation;

      b.   use of the City's anonymous reporting website;

      c.   for CPD supervisors:

          i.   the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and

          ii.   techniques for turning the initiation of a complaint into a positive police-community member interaction.

530.    Within 90 days of the Effective Date, COPA and BIA will create separate initial and in-service training plans.

**I.    Police Board**

531.    In order to function effectively, CPD's accountability system must protect the due process rights of involved CPD members. In order to build public trust and credibility, CPD must provide opportunities for meaningful community engagement that extends beyond the complaint process. The Police Board strives to play the important dual roles of protecting CPD members' due process rights and providing a platform for regular community feedback. The City will ensure that the Police Board has adequate resources, training, and institutional support to fulfill its important duties.

532.    Within 180 days of the Effective Date, the City will draft selection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judgment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-

based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public review and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.

533.    Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.

534.    In any disciplinary action requiring the vote of the Police Board, the City will ensure:

    a.   a hearing officer will preside over the disciplinary proceedings; and

    b.   disciplinary hearings will be videotaped in their entirety.

535.    Prior to any vote by the Police Board following any disciplinary hearing, the City will ensure:

    a.   all Police Board members are required to watch and certify that they have watched the videotape of the entire evidentiary hearing;

    b.   all Police Board members are provided copies of the complete record, including demonstrative exhibits;

c. hearing officers will prepare a written report that sets forth evidence presented at the hearing: (i) in support of the charges filed; (ii) in defense or mitigation; and (iii) in rebuttal, including evidence and aggravation, if any; the hearing officer's report will also include information relating to witness credibility;

d. the Police Board may, at its discretion, ask a hearing officer to additionally prepare a written report and recommendation that sets forth findings of fact and conclusions of law, including any findings relating to witness credibility;

e. the parties before the Police Board will have 14 days to review the hearing officer's report, and recommendation, and file any written objections; and

f. all Police Board members will review *de novo* the hearing officer's report and any recommendation, and the parties' written objections to the same.

536. As part of the Police Board proceedings, the parties to the Police Board case (the Superintendent and the involved CPD member) will be given access to the CPD member's complete disciplinary file and will have the opportunity to move for entry into the record of proceedings any relevant aspect of the CPD member's disciplinary file, as permitted by law and any applicable collective bargaining agreements.

537. All regular meetings convened by the Police Board that are open to the public will be attended by the CPD Superintendent or his or her designee; the Chief Administrator of COPA or his or her designee; the Deputy PSIG or his or her designee; and the Chief of BIA or his or her designee.

538. Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the

Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.

539.     The Police Board will make best efforts to streamline discovery efforts in all pending proceedings.

540.     Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics:

      a.  constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests;

      b.  police tactics;

      c.  investigations of police conduct;

      d.  impartial policing;

      e.  policing individuals in crisis;

      f.  CPD policies, procedures, and disciplinary rules;

      g.  procedural justice; and

      h.  community outreach.

541.     The trainings will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures, and disciplinary rules.

542.     Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.

543.     With regard to the promulgation or adoption of CPD rules and regulations, the Police Board's authority will be limited to issuing policy recommendations in the manner set forth in this Agreement.

### J.     Transparency and Trend Analysis

544.     The City, CPD, and COPA recognize the importance of transparency to improving CPD-community relations, and the City, CPD, and COPA have taken important steps to increase transparency about their operations, including how they conduct investigations into CPD member misconduct. The City, CPD, and COPA will continue to take steps to increase transparency, including the implementation of the requirements set forth below.

### 1.     CPD Transparency and Annual Report

545.     To the extent permissible by law, within 60 days of its implementation, each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent.

546.     Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). The purpose of the CPD Annual Report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes. The CPD Annual Report will further provide information regarding the City's implementation and status of this Agreement. The CPD Annual Report will not include any specific information or data by law that may not be disclosed. Subject to applicable law, the CPD Annual Report will provide data and program updates analyzing:

a. community engagement and problem-solving policing efforts, identifying successes, challenges, and recommendations for future improvement;

b. stop, search, and arrest data and any analysis of that data that was undertaken;

c. use-of-force data and associated analyses;

d. CPD responses to requests for service from individuals in crisis;

e. initiatives that CPD has implemented for officer assistance and support;

f. recruitment efforts, challenges, and successes; and

g. in-service and supplemental recruit training.

547. CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends. CPD will include information about any such trends in the CPD Annual Report.

548. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). The CPD Annual Litigation Report will not include any specific information or data that may not be disclosed pursuant to applicable law. Subject to applicable law, the CPD Annual Litigation Report will address:

a. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and information that either (i) the lawsuit was concluded by final order and all opportunities for appellate review were exhausted, or (ii) any judgment was satisfied during the prior calendar year. This list will include civil lawsuits handled by the City's Department of Law's ("DOL's") Federal Civil Rights

161

Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only.

b. for each case identified in (a) above, the following information will be provided in spreadsheet or open-data format:

    i.   case name;

    ii.  case number;

    iii. the date the trial court entered the final order;

    iv. a list of the parties at the time the final order was entered;

    v.  the nature of the order (e.g., dismissal with prejudice, summary judgment for plaintiff(s)/defendant(s), judgment of not liable, judgment of liable);

    vi. the amount of the compensatory and punitive damages awarded (if applicable); and

    vii. the amount of attorney's fees and costs awarded (if applicable).

c. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and a settlement was reached (including approval by City Council, if applicable) during the prior calendar year. This list will include civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only.

d. for each case identified in (c) above, the following information will be provided in spreadsheet or open-data format:

    i.   case name;

162

ii. case number;

iii. a list of the parties at the time the case was settled;

iv. the amount of the settlement; and

v. the amount of settlement allocated to attorney's fees and costs (if known).

e. the amount of attorney's fees paid by the City during the prior calendar year to outside counsel engaged to defend the City and/or one or more current or former CPD members in civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Tort's Division if the complaint seeks relief associated with a vehicle pursuit, only. This amount will be presented in the aggregate.

f. for all individually named defendants in the cases identified in (a) and (c) above, the status (e.g., pending with BIA/COPA/OIG or charges sustained, not sustained, unfounded, or exonerated by BIA/COPA/OIG) of any administrative investigation(s) by BIA, COPA, or OIG at the time the trial court entered its final order or the settlement was reached.

g. the disposition of any felony criminal prosecutions of current or former CPD members from the previous year.

h. the number of pending civil lawsuits that seek to hold the City responsible for one or more current or former CPD members that the City is defending. This number will include civil lawsuits handled by the Department of Law's Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle only.

163

549.     As part of the CPD Annual Litigation Report, the City will analyze the data and trends collected, and include a risk analysis and resulting recommendations.

## 2.     BIA and COPA Transparency and Reporting

550.     By April 2020, CPD and COPA will electronically publish quarterly and annual reports that will include, at a minimum, the following:

a.   aggregate data on the classification of allegations, self-reported complainant demographic information, and complaints received from anonymous or third party complainants;

b.   aggregate data on complaints received from the public, specified by district or unit of assignment and subcategorized by classification of allegations;

c.   aggregate data on the processing of investigations, including:

i.   The average time from the receipt of the complaint by COPA, BIA, or the district to the next or initial contact with the complainant or his or her representative;

ii.  the average time from the investigative findings and recommendations to the final disciplinary decision;

iii. the average time from the investigative findings and recommendations to a final disposition; and

iv.  the number of investigations closed based on the absence of a complainant affidavit, including the number of attempts (if any) to obtain an override affidavit in the absence of a signed complainant affidavit;

d.   aggregate data on the outcomes of administrative investigations, including the number of sustained, not sustained, exonerated, and unfounded allegations;

the number of sustained allegations resulting in a non-disciplinary outcome; and the number resulting in disciplinary charges;

e.  aggregate data on discipline, including the number of investigations resulting in written reprimand, suspension, demotion, and termination;

f.  aggregate data on grievance proceedings arising from misconduct investigations, including: the number of cases grieved; the number of cases that proceeded before the Police Board; the number of cases that proceeded to arbitration; and the number of cases that were settled prior to a full evidentiary hearing, whether before the Police Board or in arbitration;

g.  aggregate data on outcomes of misconduct investigations by classification of allegations, broken down by self-reported race, gender, and age of the complainant and the CPD member;

h.  aggregate data on (i) the number of CPD members who have been the subject of more than two completed misconduct investigations in the previous 12 months, and (ii) the number of CPD members who have had more than one sustained allegation of misconduct in the previous 12 months, including the number of sustained allegations;

i.  aggregate data on CPD members who have been the subject, in the previous 12 months, of more than two complaints in the following classifications of allegations, regardless of the outcome of those complaint investigations:

   i.  allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based

upon, but not limited to: race, physical or mental disability, gender, gender

identity, sexual orientation, religion, and age;

ii.  allegations of excessive force; and

iii.  allegations of unlawful stops, searches and arrests;

j.  the disposition of misdemeanor criminal prosecutions of current CPD

members.

551.    BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts.

552.    For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.

553.    Beginning in 2020, CPD will audit, on at least an annual basis, the investigation and disciplinary process involving complaints investigated by BIA and the districts to ensure that the investigations are conducted in accordance with BIA policies and this Agreement. The audits will include completed investigations and the recommendations of discipline. CPD will make public any of the audit findings, ensuring that any personally identifiable information is redacted.

554.    OAG acknowledges that the City adopted a policy relating to the public release of video footage capturing weapons discharges and incidents involving death or serious bodily injury. Consistent with applicable law, the City will continue to ensure COPA publicly releases such video footage pursuant to the June 2016 Video Release Policy for the City of Chicago. The Video Release Policy will not supersede or otherwise limit the City's legal obligations pursuant to state and federal transparency laws, including the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.*

### 3. Police Board

555.    On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following:

a.   the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation;

b.   the date of the Police Board hearing over which the hearing officer presided;

c.   the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board;

d.   the average time between the filing of disciplinary charges with the Police Board and the first day of hearing;

e.   the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision;

f.   the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision;

g.   the date of the alleged misconduct;

h.   the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and

i.   whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.

### 4. Deputy Inspector General for Public Safety

556.    The Deputy PSIG will conduct periodic analysis and evaluations, and perform audits and reviews as authorized by Municipal Code of Chicago § 2-56-230.

167

557.     The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.

558.     Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include:

    a.  analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken;

    b.  analysis of complaint trends;

    c.  analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22;

    d.  analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations;

    e.  analysis of disciplinary grievance procedures and outcomes; and

    f.  analysis of complainant-involved mediations.

559.     The Deputy PSIG will conduct reviews of individual closed COPA and CPD administrative investigative files for thoroughness, fairness, and objectivity, and will make recommendations based on those reviews, including the recommendation that an investigation be reopened upon a finding of a deficiency that materially affects the outcome of the investigation.

560.     The Deputy PSIG will have timely and full access to all information in the possession or control of COPA, CPD, the Police Board, and any other City departments or agencies in order to conduct any review or audit within the Deputy PSIG's jurisdiction.

561.     The Deputy PSIG will hire a full-time staff member responsible for diversity and inclusion issues, who will have specific authority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.

562.     The Deputy PSIG will provide all staff members with comprehensive initial on-boarding training and annual in-service training. The Deputy PSIG will create initial and in-service training plans and submit these plans to the Monitor and OAG for review and comment.

563.     At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.

564.     The Deputy PSIG will exercise his or her discretionary and oversight responsibilities without interference from any person, group, or organization, including CPD, COPA, the Police Board, and City officials. Any person that knowingly interferes with the Deputy PSIG's performance of his or her duties will be subject to the penalties set forth in Municipal Code of Chicago Sections 2-56-140, 145, 270.

**K.     CPD Policy Recommendations**

565.     At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter:

a. the Superintendent will respond to any such recommendation within 60 days of receipt;

b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and

c. all policy recommendations and responses to the same will be published on a City website.

## XI.    DATA COLLECTION, ANALYSIS, AND MANAGEMENT

### A.    Guiding Principles

566.    Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.

567.    In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.

### B.    Use of Force Data Collection, Review, and Auditing

568.    CPD will collect and maintain the data and records necessary to accurately evaluate its use of force practices and to facilitate transparency and accountability regarding those practices.

569.    CPD must collect, track, and maintain all available documents related to use of force incidents, including:

170

a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents;

b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents;

c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents;

d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident;

e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and

f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.

570. The City will ensure that reasonably available documents related to reportable uses of force that are or become subject to misconduct complaints or investigations are promptly provided to the appropriate investigative entity (e.g., COPA, BIA). The City will ensure that any reasonably available documents related to reportable uses of force subject to misconduct complaints or investigations, except for open confidential investigations, are accessible in the CMS the City is working to create, or in any similar electronic system, by June 30, 2020. Within

seven days of the receipt of a misconduct complaint or the initiation of an administrative investigation, whichever occurs first, the City will identify any available reportable use of force documentation associated with the incident and ensure such documentation is accessible via the CMS or similar system. By June 30, 2020, whenever a reportable use of force incident becomes the subject of a misconduct investigation, COPA will notify CPD via the CMS within three days of the initiation of the investigation.

571.    CPD must have an electronic system that accurately and reliably tracks all data derived from reportable use of force incidents, including:

      a.   the response by CPD members during the incident, including the type(s) of force used;

      b.   the date, time, location, and district of the incident;

      c.   whether a foot or vehicle pursuit occurred that is associated with the incident;

      d.   the actual or, if unavailable, perceived race, ethnicity, age, and gender of the subject;

      e.   the name, watch, employee number, and unit and beat of assignment of any CPD member(s) who used force;

      f.   CPD units identified in the incident report as being on the scene of the use of force incident;

      g.   whether the incident occurred during an officer-initiated contact or a call for service;

      h.   the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used;

172

i.   the subject's actions that led to the CPD member's use of force;

j.   whether the CPD member perceived that the subject possessed a weapon and, if so, what type(s);

k.   whether the subject possessed a weapon and, if so, what type(s);

l.   whether reportable force was used against a subject that was handcuffed or otherwise in physical restraints;

m.  any injuries sustained by CPD members;

n.   any injuries sustained or alleged by the subject(s) and any medical treatment that was offered or performed on the scene of the incident;

o.   for each weapon discharged by an officer, including firearms, Tasers, and OC devices, the number of discharges per weapon; and

p.   whether the subject was charged with an offense and, if so, which offense(s).

572.   CPD will regularly review citywide and district-level data regarding reportable uses of force to:

a.   assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status; and

b.   identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice.

573.   Prior to conducting the initial assessment required by Paragraph 572, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's

173

proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement.

574. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected regarding each level 2 reportable use of force incident, a representative sample of level 1 reportable use of force, and incidents involving accidental firearms discharges and animal destructions with no human injuries to ensure:

      a. CPD members completely and thoroughly reported the reason for the initial stop, arrest, or other enforcement action, the type and amount of force used, the subject's actions or other circumstances necessitating the level of force used, and all efforts to de-escalate the situation;

      b. the district-level supervisory review, investigation, and policy compliance determinations regarding the incident were thorough, complete, objective, and consistent with CPD policy;

      c. any tactical, equipment, or policy concerns are identified and, to the extent necessary, addressed; and

      d. any patterns related to use of force incidents are identified and, to the extent necessary, addressed.

575. CPD recently established a Force Review Unit ("FRU") and tasked the FRU with certain responsibilities described in the preceding paragraph. CPD will ensure that the FRU or any other unit tasked with these responsibilities has sufficient resources to perform them. CPD will ensure that the FRU or any other unit tasked with these responsibilities is staffed with CPD members, whether sworn or civilian, with sufficient experience, rank, knowledge, and expertise to: effectively analyze and assess CPD's use of force practices and related reporting and review

procedures; conduct trend analysis based on use of force data; identify tactical, equipment, training, or policy concerns based on analysis of use of force incidents and data; and develop recommendations regarding modifications to tactics, equipment, training, or policy as necessary to address identified practices or trends relating to the use of force.

576.    CPD will conduct random audits of body-worn and in-car camera recordings of incidents that involved civilian interactions to assess whether CPD officers are complying with CPD policy. CPD will take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice.

577.    CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member.

578.    For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to:

    a.  evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and

    b.  if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public.

579.    The FRB will be chaired by the Superintendent, or his or her designee, and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD

members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB.

580.    The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. Within 30 days after its review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation.

### C.    Publication of Data Regarding Reportable Uses of Force

581.    Beginning within 180 days of the Effective Date, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform.

582.    The publicly accessible, web-based data platform will enable visitors to:

a.    identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level;

b.    identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and

c.    review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district,

neighborhood, and ward level through graphs, charts, and other data visualizations.

**D.      Early Intervention System**

583.    CPD must collect and provide information to supervisors that enables them to proactively identify at-risk behavior by officers under their command, and to provide individualized interventions and support to address the at-risk behavior. CPD must provide supervisors with an automated electronic system that provides this information and equips supervisors to perform these duties.

584.    The automated electronic system must be:

   a.   data-driven and developed with statistical methods and analytic techniques;

   b.   customizable to CPD's particular needs;

   c.   adaptive as new information becomes available;

   d.   capable of being audited and evaluated to improve accuracy; and

   e.   able to generate sufficient data that enables assessment of the effects, if any, of support provided and interventions undertaken.

585.    The automated electronic system must perform these primary functions:

   a.   using statistical methods to identify officers who are at elevated risk of engaging in conduct leading to at-risk behavior;

   b.   identifying and facilitating support and interventions that prevent or reduce the occurrence of the identified at-risk behavior;

   c.   providing supervisors with a dashboard of relevant information about members under their direct command to facilitate appropriate supervisory intervention and support; and

177

        d.   performing peer group analysis with comparative data to account for differences in job assignments, and to identify group- and unit-level patterns of activity.

586.    A primary goal of the automated electronic system will be to facilitate early identification of officers at elevated risk of being involved in certain types of events so that the officers can receive tailored interventions intended to reduce such risk. The types of events sought to be avoided could include, depending upon the feasibility of identifying these events using statistical methods and analytic techniques, examples such as any instance in which a CPD member is: directly involved in an excessive force incident; subject to a sustained finding in a misconduct investigation; a defendant in a civil lawsuit resulting in an adverse judgment or settlement; suspended more than five days; the subject of a recommendation of employment termination by COPA, BIA, or the Superintendent; a direct participant in an officer-involved shooting or death determined to be unjustified or out of policy by COPA, BIA, the Superintendent, the Police Board, or a court of law; convicted of a crime; or subject to an increased risk of suicide or alcohol and/or substance abuse.

587.    The automated electronic system must include a computerized relational database that will be used to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer. The information collected and maintained must include but is not limited to:

        a.   all reportable uses of force;

        b.   all arrests by CPD personnel;

        c.   all injuries to and deaths of persons in CPD custody;

        d.   all injuries and deaths resulting from conduct by CPD personnel;

e.   all vehicle pursuits and traffic collisions involving CPD equipment or personnel;

f.   all misconduct complaints and investigations involving CPD officers, including the disposition of each allegation;

g.   all civil or administrative claims initiated against the City or CPD, or CPD officers for job-related conduct;

h.   all criminal proceedings initiated against a CPD officer, which CPD will require officers to report;

i.   all instances in which CPD is notified that a court has made a negative credibility determination regarding a CPD officer;

j.   instances in which CPD learns through the Cook County State's Attorney's Office that an affirmative finding was made during the course of a criminal proceeding that a CPD member was untruthful, including any findings made at suppression hearings;

k.   all instances in which CPD learns through the Cook County State's Attorney Office, the United States Attorney's Office for the Northern District of Illinois, or other prosecutorial authority that prosecution was declined based in whole or in part on concerns about a CPD officer's credibility;

l.   judicial proceedings where an officer is the subject of a restraining or protective order, which CPD will require officers to report;

m.  disciplinary history for all CPD members;

n.   all non-disciplinary corrective action retained electronically;

o.   all violations of CPD's body-worn and in-car camera policies;

p.   all awards and commendations received by CPD officers;

q.   officer sick leave usage;

r.   missed court appearances;

s.   training history; and

t.   rank, assignment, and transfer history.

588.    CPD will collect and maintain all information reasonably necessary to identify patterns of behavior that are indicative of a future instance of at-risk behavior. The automated electronic system must employ specific criteria to identify officers who will be subject to an intervention or targeted support. The criteria may be based on a single indicator, such as the number of misconduct complaints against an officer, a combination of multiple indicators, or an algorithmic scoring model. CPD will adjust the criteria as necessary based on data and experience to ensure interventions and support are optimally targeted.

589.    CPD will ensure that all required information is entered into the automated electronic system in a timely, accurate, and complete manner. All information captured within the automated electronic system will be accessible in an organized manner that facilitates identification of at-risk officer conduct.

590.    CPD will require unit commanding officers to review the automated electronic system data regarding all officers who are transferred to their command within 14 days of the transfer. CPD will require supervisors to conduct monthly reviews of the automated electronic system data regarding officers under their direct command. The purpose of these reviews will be for supervisors to identify and address patterns of behavior by officers under their direct command that are indicative of a future instance of at-risk behavior. CPD will also require

supervisors to review the automated electronic system data together with officers under their direct command during the annual performance evaluation process.

591.    The automated electronic system will employ push notifications and similar mechanisms to alert supervisors when patterns of conduct indicative of a future instance of at-risk behavior are identified. CPD will provide appropriate interventions and support in a timely manner.

592.    CPD will ensure that any CPD member required to receive counseling after being identified through the automated electronic system has the opportunity to participate in an initial counseling session within 14 days of the member being notified of the requirement.

593.    CPD will ensure that command staff regularly use the automated electronic system data to effectively manage CPD officers and supervisors across all ranks, watches, beats, and districts.

594.    CPD will provide training to all officers, supervisors, and command staff regarding the automated electronic system to ensure proper understanding and use of the system.

595.    CPD will train all supervisors to use the automated electronic system as designed, to interpret the outputs, to perform appropriate interventions and support, to address underlying stressors to promote officer well-being, and to improve the performance of officers under their direct command.

596.    CPD will conduct annual audits of the automated electronic system. The audits will:

      a.    assess the overall effectiveness of the automated electronic system and the support and interventions prompted by the system;

      b.   assess whether and to what extent supervisors are completing monthly reviews of the automated electronic system information regarding officers under their direct command;

      c.   assess whether and to what extent CPD is providing interventions and support in a timely manner;

      d.   assess whether the interventions and support provided are appropriate and effective; and

      e.   identify any recommended changes to improve the effectiveness of the automated electronic system.

597.    CPD will provide timely and appropriate interventions and support to officers identified through the automated electronic system. Interventions and support will be designed to assist officers in avoiding and correcting at-risk behavior. All interventions and support will be documented in the automated electronic system. CPD will review, evaluate, and document in the automated electronic system the progress and effectiveness of the intervention or support strategy for each officer.

598.    In seeking to provide improved support and wellness to its officers, CPD will seek to identify which supports and interventions are most helpful to officers and develop support and training based on CPD feedback and best practices. The types of support services offered to CPD officers may include, but not be limited to: counseling; training; coaching and mentoring; and additional supervision or monitoring.

599.    CPD currently maintains a PRS, which is modeled on first-generation attempts by other large departments to develop early intervention systems to identify and address at-risk conduct by officers. CPD has partnered with the University of Chicago's Crime Lab ("Crime

Lab") to develop a next-generation EIS that will improve on early intervention systems implemented in other jurisdictions.

600.    CPD will maintain its partnership with the Crime Lab or another similarly qualified service provider until such time as an EIS consistent with the requirements of this Agreement has been implemented department-wide, and CPD has developed sufficient technical competency to maintain and improve the EIS as necessary.

601.    CPD will continue to solicit input and feedback from representatives of its collective bargaining units during the development and implementation of the EIS.

602.    Prior to beginning the phased implementation of the EIS, CPD will develop and implement new or revised policies and procedures for using the EIS and, if applicable, the updated PRS and information obtained from them. The policies and procedures will address data storage, data retrieval, data analysis, reporting, pattern identification, supervisory use, intervention and support options and procedures, documentation and audits, access to the system, and confidentiality of personally identifiable information.

603.    After the completion of the development of the EIS, CPD will implement the EIS through a phased rollout that incorporates pilot testing to identify and address any technical or design issues. CPD will begin phased implementation of the EIS within 18 months of the Effective Date, and will complete full implementation of the EIS by no later than 24 months after the Effective Date.

604.    Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a

183

combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by no later than January 1, 2020.

605.    The City will ensure CPD has adequate funding to develop, implement, and maintain the EIS and, if necessary, the updated PRS, including ongoing hardware and support requirements and officer support services.

### E.    Data Systems Plan

606.    Within 365 days of the Effective Date, CPD will conduct an assessment of CPD's current information collection mechanisms and data management technology to identify:

  a.   what data CPD currently collects and what additional data is required to be collected to comply with this Agreement;

  b.   the manner of collection (e.g., electronic or paper);

  c.   the frequency with which each type of data is updated;

  d.   the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected;

  e.   what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members;

  f.   redundancies or inefficiencies among the applications and systems currently in use; and

  g.   the extent to which the applications and systems currently in use interact with one another effectively.

607.     Within 90 days of completion of the assessment described in the preceding paragraph, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified to enhance CPD's information collection mechanisms and data management technology ("Data Systems Plan"). CPD will implement the Data Systems Plan in accordance with the specified timeline for implementation.

608.     CPD will continue to maintain an Information Systems Development Group ("ISDG"). The ISDG will continue to be chaired by the Chief of the Bureau of Technical Services or other high-ranking member of CPD's command staff. The ISDG will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; conducting criminal investigation and processing juvenile offenders; initiating and conducting investigations of organized crime; overseeing the administrative aspects of CPD; managing data, technology, and information systems; coordinating and exercising supervision over disciplinary matters; administering training; providing legal advice; developing and publishing department policies and procedures; and overseeing and coordinating CPD's budget and fiscal responsibilities. The ISDG will be responsible for:

      a.   ensuring implementation of the Data Systems Plan;

      b.   ensuring CPD's information collection mechanisms and data management technologies are in the best long-term interests of the Department for improving operations and management consistent with the terms of this Agreement; and

      c.  recommending strategies to promote the development, sharing, and reporting of relevant information to the Superintendent, the public, the FRB, COPA, BIA, and OIG.

609.    On an annual basis, to improve the accuracy, reliability, and efficiency of its data collection, CPD will review and, as necessary, revise departmental forms relating to: use of force, arrests, interactions with individuals in crisis, and the disciplinary process.

## XII.  IMPLEMENTATION, ENFORCEMENT, AND MONITORING

### A.  Independent Monitor

610.    The Parties will jointly select an independent monitor who will assess and report whether the requirements of this Agreement have been implemented, and whether implementation is resulting in constitutional policing and increased community trust of CPD. The independent monitor will be assisted by a team of individuals (collectively, "Monitor") with the knowledge, skills, and expertise necessary to accomplish the Monitor's duties under this Agreement.

611.    The Monitor will be the agent of the Court and subject to the supervision and orders of the Court, consistent with this Agreement. The Monitor will only have the duties, responsibilities, and authority conferred by this Agreement. The Monitor will not, and is not intended to, replace or assume the role or duties of any CPD or City official. The Superintendent of CPD continues to be in charge of the Department.

612.    In order to assess and report on whether the requirements of this Agreement have been implemented and its objectives are being achieved, the Monitor will conduct the reviews, audits, and assessments specified below, and such additional audits, reviews, and assessments as the Monitor reasonably deems necessary to determine whether the Agreement has been implemented as required.

186

**B.      Selection and Compensation of the Monitor**

613.     The Parties will jointly select a Monitor, acceptable to both. The Monitor will
have expertise in: policing and law enforcement practices, monitoring and oversight, preparation
of reports or other written materials for diverse audiences on complex topics, law and civil
rights, project management, data analysis and information technology, communication, and
budgeting. The Monitor will also have a demonstrated ability to collaborate with government
entities, and members of the monitoring team should have knowledge of Chicago communities
and experience working in Chicago with various constituencies. The Monitor and personnel
assisting the monitor will act in accordance with standards of integrity, and will consistently
demonstrate professionalism and respect in all interactions with the community, CPD members,
and all others with whom they interact in the course of performing the Monitor's duties.

614.     In selecting the Monitor, the Parties have established a mutually agreed process in
which the public has opportunities to provide input.

      a.   Request for Proposals: The Parties have issued a Request for Proposals
          ("RFP") from candidates interested in serving as the Monitor. Responses to
          the RFP will be due no earlier than 39 days after issuance. Representatives of
          the Parties will form an Evaluation Committee, which will include
          representation from OAG and the City and will be authorized to conduct the
          selection process on behalf of the Parties.

      b.   Evaluation of Proposals and Public Comment: Following the RFP submission
          deadline, the Parties will publicly identify the RFP respondents and publicly
          post RFP responses for all respondents. The Parties will establish a public
          comment period during which members of the public can review the
          submissions and provide feedback about the applicants to the Parties. The

Evaluation Committee will evaluate the RFP Respondents' written submissions, conduct due diligence on the applicants, review and consider the public comments, and use that information to reach agreement on a subset of the teams to interview as finalists.

c. Interviews of Finalists: After the Evaluation Committee narrows the pool of candidates to a group of finalists, those finalists will be invited to participate in a series of interviews with the Parties and various engaged community stakeholders. All interviews will be in person and conducted in Chicago.

d. Public Forum: The Parties will also provide an opportunity for finalists to present and respond to questions and concerns from the Chicago community. The Evaluation Committee will host a public meeting during which finalists will make short presentations and respond to written questions submitted by members of the public in attendance at the forum. The public will be given an opportunity to provide additional feedback on the finalists at the end of the in-person forum.

e. Selection and Recommendation to the Court: The Parties will review and consider all information gathered by the Evaluation Committee regarding each finalist and work to jointly select a Monitor and monitoring team. The Parties will then submit a joint motion to the Court seeking approval of the Monitor they have selected. The Court may also conduct a private interview of the Parties' selection before granting or denying its approval of the Monitor.

615. The Parties' Monitor selection will be subject to the Court's approval.

616.    If the Parties are unable to agree on a Monitor, each Party will submit the name of one individual or one group of individuals, along with resumes and cost proposals, to the Court, and the Court will choose a candidate or candidate team proposed by one of the Parties. When deciding between the Parties' preferred candidates, the Court may consider submissions from the Parties in making its determination.

617.    The City will bear all reasonable fees and costs of the Monitor. During the selection process for the Monitor, the Parties agreed to an annual cap of $2.85 million per year.

618.    The Parties recognize the importance of ensuring that the fees and costs borne by the City are reasonable. Accordingly, the Monitor will submit a proposed budget annually to the Court for approval. Upon a motion by the Monitor or either Party, or *sua sponte*, the Court may revise the Monitor's annual budget consistent with the terms of this Agreement if it finds that the increase is necessary for the Monitor to fulfill its duties under the Agreement and the increase is not due to a failure in planning, budgeting, or performance by the Monitor.

619.    In the event that any dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, the Parties and the Monitor will attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.

620.    The City will provide the Monitor with office space and reasonable office support, such as furniture, telephones, computers, internet access, information technology support, secure document storage, and document scanning and copying capabilities.

621.    At any time after being selected, the Monitor may request to be allowed to hire, employ, or contract with such additional persons or entities as are reasonably necessary to perform the tasks assigned to the Monitor by this Agreement. Any person or entity hired or otherwise retained by the Monitor will be subject to the provisions of this Agreement, including

189

the cap and annual budget provisions set out in this Section. The Monitor will notify the Parties in writing if the Monitor wishes to hire or retain such additional person or entity. The notice will identify and describe the qualifications of the person or entity to be hired or retained, as well as the monitoring task to be performed. If the Parties agree with the Monitor's proposal, the Monitor will be authorized to hire or retain such additional person or entity. The Parties will have 21 days to object to any such proposal after being notified of it. If the Parties and the Monitor are unable to reach agreement regarding the proposal within this time period, the Court will resolve the dispute.

622. At least annually, the Parties will submit written feedback to the Monitor, the Parties, and the Court regarding the Monitor. The feedback may address such topics as the Monitor's overall effectiveness in carrying out the Monitor's duties, suggestions for enhancing the Monitor's effectiveness, the Monitor's ability to work cost-effectively and on budget, and whether the Monitor is adequately engaging the community and relevant stakeholders. Upon receiving the Parties' feedback, the Court may convene the Parties and the Monitor to discuss the feedback.

623. At any time, on motion by either of the Parties or the Court's own determination, the Court may remove the Monitor for good cause.

624. In the event the Monitor is removed, resigns, or is no longer able to fulfill its responsibilities under this Agreement, the Court will appoint a replacement, acceptable to both Parties. The selection of the new Monitor will be made pursuant to a method agreed to by the Parties. If the Parties are unable to agree on a method of selection or make a selection within 45 days of the Monitor's removal, resignation, or incapacitation, each Party will submit the names of one individual or one group of individuals, along with resumes and cost proposals, to the

Court, and the Court will choose a candidate or candidate team proposed by one of the Parties. In the event of the Monitor's removal, resignation, or incapacitation, the Court may appoint an interim Monitor to serve until such time as the replacement selection process has been completed.

625.     Except for the period in which a new or replacement Monitor is being selected, there will be a Monitor in place at all times while this Agreement is in effect.

### C.     Review of CPD Policies and Procedures

626.     CPD will develop, revise, implement, and maintain policies and procedures as required by this Agreement consistent with the timelines identified herein. CPD will ensure that its policies and procedures are plainly written, logically organized, and use clearly defined terms.

627.     The City and CPD will submit all policies and procedures required to be implemented or maintained by this Agreement to the Monitor and OAG for review, comment, and, subsequently, if necessary, objection. When the City and CPD have developed the draft of a new or revised policy or procedure required by this Agreement, they will consult in a collaborative manner at the earliest feasible time with the Monitor and OAG, with the goal of developing consensus on the substance of the policy or procedure, and make any necessary and appropriate adjustments based on those consultations. The City and CPD will submit the final draft of any new or revised policy or procedure subject to review and comment by the Monitor and OAG to the Monitor and OAG at least 30 days before the policy or procedure is scheduled to take effect, unless the Parties and the Monitor agree that a shorter period of time is appropriate under the circumstances. The Parties and the Monitor will work collaboratively on developing and revising policies and procedures related to this Agreement.

628.     In the event that the Monitor and OAG fail to comment on submitted policies or procedures within the 30-day period, the policy or procedure will be deemed to be non-

objectionable by the Monitor and OAG, unless the Monitor, OAG, or both state in writing that additional time is necessary to complete an adequate review and the reason why additional time is necessary. In such writing, the Monitor, OAG, or both will specify how much additional time is necessary, which will not exceed 15 additional days. Any additional time required by the Monitor or OAG beyond the initial 30-day review period will extend CPD's deadline for implementing the policy or procedure. The Parties may seek relief from the Court to the extent the process of reviewing and approving a particular policy or procedure has become unreasonably delayed.

629.    To the extent the Parties and the Monitor have unresolved disagreements regarding a particular policy or procedure after attempting to resolve them for at least 30 days, the Monitor or OAG may provide a written notice of outstanding objections to the City and CPD ("objection notice"). The Monitor or OAG may object only if a policy or procedure does not incorporate the requirements of this Agreement or is inconsistent with the goals and objectives of this Agreement or applicable law.

630.    In the event the Monitor or OAG provides an objection notice, the Monitor will convene the Parties and attempt to resolve the identified objections within 30 days of the objection notice being received by the City ("workout period"). The Monitor will issue a proposed resolution of remaining objections in writing at the conclusion of the workout period. If either Party disagrees with the Monitor's resolution of an objection, either Party may ask the Court to resolve such dispute. Subject to the limited extraordinary circumstances exception set out below, CPD will not publish or implement new or revised policies or procedures required by this Agreement until the Monitor and OAG have reviewed and commented on such policies or procedures, or until the workout period and related resolution processes have occurred.

631.    If extraordinary circumstances demand an immediate revision or clarification (e.g., due to a change in law or other urgent circumstance), CPD may issue a temporary policy or procedure. CPD must provide prompt notice of the temporary policy or procedure to the Monitor and OAG, and the temporary policy or procedure will only remain in effect until the adoption of a revised policy or procedure pursuant to the review, comment, and objections process set forth above. This paragraph does not permanently exempt any new or revised policy or procedure from the review and comment process.

632.    The Parties and the Monitor will work collaboratively and cooperatively to establish and adhere to a schedule that ensures policies and procedures required by this Agreement are reviewed adequately, efficiently, and expeditiously.

633.    CPD will ensure that its officers and the public have a meaningful opportunity to review and comment on material changes to CPD policies and procedures required by this Agreement. CPD will publish upcoming opportunities for CPD member and/or community input, involvement, or engagement that relate to the material requirements of this Agreement. After the Monitor and OAG comment on a proposed policy or procedure, or all workout period processes described above have been completed, CPD will post proposed policies and procedures on its public website and provide its officers and the public with an opportunity to comment for a period of not less than 15 days. There will be reasonable exceptions to the posting requirement for policies and procedures that are law enforcement sensitive, such as procedures regarding undercover officers or operations. In response to any comments received, CPD will consider whether any further revisions to the proposed policy or procedure are appropriate. Changes implemented in response to public or officer comment will be subject to consultation among the

193

Parties, and review and comment by the Monitor and OAG prior to publication and implementation.

634.    CPD will post final and published department-wide directives, policies, and procedures on CPD's public website, subject to reasonable exceptions for policies and procedures that are law enforcement sensitive.

635.    CPD will provide a mechanism to electronically access approved and published department-wide directives in a usable, organized, and searchable format.

636.    CPD will periodically review each policy required to be revised or developed by this Agreement. CPD will conduct an initial review of each such policy no later than two years after the policy's implementation as provided for in this Agreement. CPD will conduct subsequent reviews every two years thereafter, although the Parties may modify the timeframe for the review of a specific policy. The purpose of the initial and subsequent reviews is to evaluate whether the policy provides effective guidance and direction to CPD members and is consistent with the requirements of this Agreement and current law.

637.    CPD will make any necessary updates to its policies and training based on changes in the law that are relevant to CPD's law enforcement activities and will promptly communicate to its members such changes in the law and related policies.

### D.    Review of Implementation Plans and Training Materials

638.    CPD will submit the following plans required by this Agreement to the Monitor and OAG for their review and approval:

  a.   the Crisis Intervention Plan referenced in Part G of the Crisis Intervention section of this Agreement;

  b.   the CIT Officer Implementation Plan referenced in Part D of the Crisis Intervention section of this Agreement;

c.   the Training Plan referenced in Part B of the Training section;

d.   the plan regarding span of control and unity of command referenced in Part C of the Supervision section of this Agreement;

e.   the recruitment, hiring, and promotion plans referenced in Parts C and D of the Recruitment, Hiring, and Promotion section of this Agreement;

f.   the Officer Support Systems Plan referenced in Part B of the Officer Wellness and Support section of this Agreement;

g.   the Equipment and Technology Audit Response Plan referenced in Part C of the Officer Wellness and Support section of this Agreement;

h.   the training plans for COPA, the Deputy PSIG, and BIA referenced in Part H of the Accountability and Transparency section of this Agreement; and

i.   the Data Systems Plan referenced in Part E of the Data Collection, Analysis, and Management section of this Agreement.

639.   When the City and CPD have developed the draft of a plan, they will consult at the earliest feasible time with the Monitor and OAG, with the goal of developing consensus on the substance and timetable for the plan, and make any necessary and appropriate adjustments based on those consultations.

640.   CPD will submit the final draft of each plan required by this Agreement and subject to review and approval by the Monitor and OAG to the Monitor and OAG at least 30 days prior to the proposed date for initial implementation. In the event that the Monitor and OAG fail to comment on a submitted plan within the 30-day period, the Monitor and OAG will be deemed to have no objection to the plan, unless the Monitor, OAG, or both state in writing that additional time is necessary to complete an adequate review. Requests for additional time to

review plans will be subject to the same standard and process set forth above for requesting additional time to review policies and procedures. The Parties and the Monitor will adhere to the dispute resolution process described in Part C of this Section to resolve objections as necessary. The Monitor or OAG may object if a proposed plan does not incorporate the requirements of this Agreement or is inconsistent with the goals and objectives of this Agreement. Final versions of the plans will be made public.

641.    CPD will submit all new or revised curricula, lesson plans, and course materials related to trainings required by this Agreement to the Monitor and OAG for their review, comment, and, subsequently, if necessary, objection. When the City and CPD have developed the draft of any such materials required by this Agreement, they will consult at the earliest feasible time with the Monitor and OAG, with the goal of developing consensus on the substance of the materials, and make any necessary and appropriate adjustments based on those consultations. CPD will provide final drafts of curricula, lesson plans, and course materials subject to review and comment by the Monitor and OAG to the Monitor and OAG at least 30 days prior to instituting the applicable training. In the event that the Monitor and OAG fail to comment on submitted training materials within the 30-day period, the Monitor and OAG will be deemed to have no objection to the training materials, unless the Monitor, OAG, or both state in writing that additional time is necessary to complete an adequate review. Requests for additional time to review training materials will be subject to the same standard and process set forth above for requesting additional time to review policies and procedures. The Parties and the Monitor will adhere to the workout period process to resolve objections as necessary.

### E.    Compliance Reviews and Audits

642.    The Monitor will conduct reviews or audits as necessary to determine whether the City and CPD have substantially complied with the requirements of this Agreement. Compliance

196

with a requirement means that the City and CPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) are carrying out the requirement in actual practice.

643.    CPD members who violate policies, procedures, orders, or directives that are required by this Agreement or that implement its provisions will be held accountable by CPD and the City, including through CPD's progressive discipline process. The Monitor may review and audit whether CPD is enforcing the policies, procedures, orders, or directives required by or implementing this Agreement.

644.    The Monitor will conduct compliance reviews in a fair manner with reliable means and methods. The Monitor may use sampling and compilation data based on standard and reliable methodologies, to be shared with the Parties, in conducting compliance reviews and audits. Those methodologies will be shared with the Parties in advance of their use.

### F.    Community Surveys

645.    Within 180 days of being appointed by the Court, and every two years thereafter, the Monitor will conduct reliable, representative, and comprehensive surveys of a broad cross section of members of the Chicago community regarding CPD.

646.    The surveys will seek to assess perceptions of, and satisfaction with, CPD. The surveys will examine perceptions of CPD's overall police services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community, including interactions with individuals who are people of color, LGBTQI, in crisis, youth, members of religious minorities, or have disabilities.

647.    Analysis of the results of the surveys may be used as assessments to demonstrate sustained and continuing improvement in constitutional policing and community trust of CPD.

648. To assist the Monitor in conducting the surveys, and only if the Monitor's team does not include a person or entity capable of conducting the surveys, the Monitor will retain an individual or entity, approved by the City and OAG, and timely included in the Monitor's annual budget submission, that will:

    a. design, conduct, and analyze the surveys in a statistically reliable manner;

    b. develop a baseline of measures on community satisfaction with policing, attitudes among CPD officers, and the quality of police-community interactions;

    c. ensure that the surveys are designed to capture a representative sample of Chicago residents drawn from its many diverse communities;

    d. conduct the surveys required by this Agreement in English, Spanish, and other languages, as necessary, to ensure appropriate representation from the sample group;

    e. solicit input from CPD officers and command staff, OAG representatives, and community members to identify emerging issues or concerns related to policing in Chicago;

    f. consult with CPD and OAG regarding the development and methodology of the surveys; and

    g. prepare a report of the findings, including pattern and trend analysis, for each survey conducted.

649. CPD and the City will cooperate with the design and delivery of the surveys, including by allowing CPD officers to confidentially respond.

650.    The results of the survey will be provided to the Court and be publicly distributed and posted on CPD's and the Monitor's websites.

651.    CPD will consider the results of the surveys in reviewing CPD policies, training, and practices as necessary and appropriate.

### G.    Monitoring Plan and Review Methodology

652.    Within 90 days of being appointed by the Court, the Monitor will develop a plan for conducting compliance reviews and audits ("Monitoring Plan") for the first year of implementation. The Monitor will submit a draft Monitoring Plan to the Parties for their review and approval within 75 days of the selection of the Monitor. The Parties will have 15 days following receipt of a draft to review it, and provide comment or notice of any objections to the Monitor and the other Party. In subsequent years, the Monitor will, in coordination with the Parties and pursuant to the process outlined in this paragraph, prepare an annual Monitoring Plan for each year this Agreement remains in effect. The Monitoring Plans will be made public.

653.    Each Monitoring Plan will clearly delineate the requirements of this Agreement to be assessed for compliance, indicating which requirements will be assessed together.

654.    Each Monitoring Plan will create a tentative schedule for conducting compliance reviews or audits of applicable requirements.

655.    At least 45 days prior to the initiation of any compliance review or audit, the Monitor will submit a proposed methodology for the review or audit to the Parties. The Parties will submit any comments or concerns regarding the proposed methodology to the Monitor no later than 30 days prior to the proposed date of the review or audit. The Monitor will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it does not modify its proposed methodology.

## H.  Monitoring Technical Assistance and Recommendations

656.  The Monitor may, at the request of the City, CPD, or OAG, or on its own initiative, provide technical assistance and make recommendations to the Parties regarding measures that may facilitate timely full and effective compliance with this Agreement and achievement of its underlying objectives. Such technical assistance and recommendations may include suggestions to change, modify, or amend a provision of this Agreement; to develop or amend policy; to provide additional training in any area related to this Agreement; or to modify the content or form of existing training.

## I.  Comprehensive Assessment

657.  Three years after the Effective Date, the Monitor will conduct a comprehensive assessment to determine whether and to what extent the City and CPD are in compliance with this Agreement, whether the outcomes intended by this Agreement are being achieved, and whether any modifications to this Agreement are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements.

658.  This comprehensive assessment will also address areas of greatest progress and achievement, and the requirements that appear to have contributed to these achievements, as well as areas of greatest concern, including strategies for accelerating full and effective compliance.

659.  Based upon this comprehensive assessment, the Monitor will recommend any modifications to this Agreement necessary to achieve and sustain intended results. Where the Parties agree with the Monitor's recommendations, the Parties will move the Court to modify this Agreement accordingly. In the event of a disagreement, the Parties will submit their positions to the Court for resolution. This provision in no way diminishes the Parties' ability to move to modify this Agreement subject to the Court's approval. Nothing in this Agreement will empower the Monitor to unilaterally modify the terms of this Agreement.

660.     The Monitor will be appointed for an initial period running from the Monitor's appointment by the Court through the completion of the comprehensive assessment. At the conclusion of the comprehensive assessment, there will be an evaluation by the Court to determine whether to renew the Monitor's appointment until the termination of this Agreement. The Court will renew the Monitor's appointment unless there is substantial evidence that the Monitor has: materially exceeded the Monitor's authority under this Agreement; engaged in misconduct or unethical behavior; demonstrated a lack of competence to perform the duties required by this Agreement; or materially failed to perform its responsibilities under this Agreement.

661.     On a semiannual basis, the Monitor will file with the Court written public reports regarding the status of compliance with this Agreement, which will include, but not be limited to, the following information:

   a.  a description of the work conducted by the Monitor during the reporting period;

   b.  a description of each Agreement requirement assessed during the reporting period, indicating which requirements have been, as appropriate:

      i.   incorporated into policy,

      ii.  the subject of sufficient training for all relevant CPD or City personnel, and

      iii. carried out in actual practice;

   c.  the methodology and specific findings for each compliance review conducted;

d.  for any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations, if any, regarding necessary steps to achieve compliance;

e.  a projection of the work to be completed during the upcoming reporting period; and

f.  a summary of principal challenges or concerns related to the City's achieving full and effective compliance with this Agreement.

662.    For the final semiannual report for each calendar year, the Monitor will also include: a summary of all Agreement requirements indicating which requirements have been incorporated into policy, the subject of sufficient training for all relevant CPD or City personnel, and carried out in actual practice.

663.    The Monitor will provide a copy of the semiannual reports to the Parties in draft form no more than 30 days after the end of each reporting period. The Parties will have 15 days following receipt of a draft report to comment on the draft report, and provide those comments to the Monitor and the other Party. The Monitor will consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

664.    The Monitor will maintain a public website and publish each semiannual report, together with the Parties' comments on the draft report, on the website immediately after filing the report with the Court.

665.    In addition to the mandatory semiannual reports, the Monitor may, at any time, prepare written reports on any issue or set of issues covered by the Agreement. The process for commenting on and publishing these additional reports will be the same as the process applicable to semiannual reports.

666. As an agent of the Court, the Monitor may raise any issue related to this Agreement with the Court at any time.

### J. Coordination with the Office of Inspector General

667. In conducting compliance reviews, and audits, and in developing its monitoring plan and review methodologies, the Monitor may coordinate and confer with the OIG for the City to avoid duplication of effort. However, it is the exclusive role of the Monitor and OAG to assess compliance with this Agreement.

### K. Communication Among the Monitor, the Parties, and the Public

668. The Monitor will maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of compliance with this Agreement. To facilitate this communication, the Monitor will conduct monthly meetings, which will include, at a minimum, participation by the CPD Superintendent, counsel for the City, other CPD personnel designated by the Superintendent to implement this Agreement, and OAG.

669. The Parties have entered into a Memorandum of Agreement ("MOA") with certain community organizations that have established a broad-based community coalition ("Coalition") committed to monitoring, enforcing, and educating the community about this Agreement. No less frequently than quarterly, the Monitor will participate in meetings with the Coalition, as provided in Paragraph 9 of the MOA.

670. The Monitor will hold public meetings to explain the Monitor's reports and inform the public about this Agreement's implementation process, as well as to hear community perspectives on police interactions. The Monitor will notify the Parties in advance of the date, time, and location when such meetings are scheduled.

671. The Monitor will periodically meet with CPD officers to provide them with information about the Agreement and its implementation, and to respond to their questions,

203

concerns, and suggestions. The Monitor will also periodically meet with the collective

bargaining representatives of CPD officers.

### L. Public Statements, Testimony, Records, and Conflict of Interest

672.    Except as required or authorized by the terms of this Agreement, or when

authorized jointly by the Parties, or by the Court, the Monitor will not make any public

statements or issue findings with regard to any act or omission of the Parties, or their agents,

representatives, or employees, or disclose confidential, non-public information and materials

received by or reviewed by the Monitor pursuant to this Agreement.

673.    The Monitor will not testify in any other litigation or proceeding with regard to

any act or omission of the City, CPD, or any of their officials, officers, agents, or employees

related to this Agreement or regarding any matter or subject that the Monitor may have received

knowledge of as a result of the Monitor's performance under this Agreement without an order

issued by the Court. This paragraph does not apply to any proceeding before the Court related to

performance of contracts or subcontracts for monitoring this Agreement.

674.    Unless such conflict is disclosed and waived by the Parties, the Monitor and

members of his or her team will not accept employment or provide consulting services that

would present a conflict of interest with the team member's responsibilities under this

Agreement, including being retained (on a paid or unpaid basis) by any current or future private

litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit

against the City, CPD, or their officials, officers, agents, or employees.

675.    The Monitor is an agent of the Court and not a state or local agency, or an agent

thereof. Accordingly, the records maintained by the Monitor will not be deemed public records

subject to public inspection under the Illinois Freedom of Information Act, or subject to

discovery in any litigation.

676.    The Monitor will not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement brought by non-parties to this Agreement.

### M.    CPD Consent Decree Implementation

677.    The City and CPD agree to hire, retain, or reassign current City or CPD employees to form a unit with the knowledge, skills, and abilities necessary to facilitate compliance with this Agreement.

678.    At a minimum, CPD will designate personnel to be responsible for:

    a.  coordinating the City's and CPD's compliance and implementation activities;

    b.  facilitating the provision of data, documents, materials, and access to the City's and CPD's personnel to the Monitor and OAG, as needed;

    c.  ensuring that all data, documents, and records are maintained as provided in this Agreement; and

    d.  assisting in assigning implementation and compliance related tasks to CPD personnel, as directed by the Superintendent or the Superintendent's designee.

### N.    Implementation Assessment and Report

679.    The City and CPD agree to collect and maintain all data and records necessary to document compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable compliance reviews and audits.

680.    Beginning with the Monitor's first report filed with the Court, and for each subsequent semiannual report by the Monitor, the City agrees to file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement.

### O.     Access and Confidentiality

681.     To facilitate the Monitor's work, the Monitor may conduct on-site visits and assessments with or without prior notice to the City or CPD. While the Monitor has the right to conduct on-site visits and assessments without prior notice at any time, in order to facilitate the efficiency and effectiveness of its monitoring activities, the Monitor will make good faith efforts to provide advance notice of its on-site visits and activities to the City and CPD to the extent practicable and appropriate.

682.     The Monitor will have access to all individuals, facilities, trainings, meetings, disciplinary proceedings, reviews, and incident scenes that the Monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement. The City will ensure that it facilitates the Monitor's access in a prompt, cooperative, and unobstructive manner.

683.     CPD will notify the Monitor as soon as practicable, and in any case within 24 hours, of any officer-involved shootings, any death of a person in CPD custody, or any arrest of a CPD member. In the event a CPD member is arrested by a law enforcement agency other than CPD, CPD will notify the Monitor as soon as practicable, and in any case within 24 hours of receiving notice of the arrest. The Monitor will cooperate with the City to obtain access to people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.

684.     The City and CPD will ensure that the Monitor has prompt access to all City and CPD documents and data related to the Agreement that the monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any communications, documents, or data to which access is limited or precluded by court order, or protected by the work product doctrine or the attorney-client privilege (collectively, "privilege").

685.    Privilege may not be used to prevent the Monitor from observing training sessions, disciplinary hearings, or other CPD, COPA, or Police Board activities or proceedings that do not involve the provision or receipt of legal advice. The City is not required to provide the Monitor with access to documents or data that is privileged. Should the City or CPD decline to provide the Monitor with access to communications, documents, or data based on privilege, the City or CPD will inform the Monitor and OAG that documents or data are being withheld on the basis of privilege which may, but need not be, in the form of a privilege log. If the Monitor or OAG objects to an assertion of privilege, the Monitor or OAG may challenge the propriety of the privilege assertion before the Court.

686.    In coordination with the City's legal counsel, OAG and its consultants and agents will have access to all City and CPD personnel, facilities, training, documents, and data related to this Agreement, except any documents or data protected by privilege. OAG and its consultants and agents will coordinate with the City's legal counsel to access personnel, facilities, training, documents, and data in a reasonable manner that is consistent with OAG's right to seek enforcement of this Agreement and that minimizes interference with daily operations. The City is not required to provide the Monitor with access to communications, documents, or data that is privileged. Should the City or CPD decline to provide OAG with access to documents or data based on privilege, the City or CPD will inform OAG that that documents or data are being withheld on this basis, which may, but need not be, in the form of a privilege log. If OAG objects to a privilege assertion by the City or CPD, OAG may challenge the propriety of the privilege assertion before the Court.

687.    The Monitor and OAG will provide the City and CPD with reasonable notice of a request for documents or data. Upon such request, the City and CPD will provide the documents

207

or data (in electronic format, where readily available) in a timely manner, unless withheld based on privilege.

688.     Nothing in this Agreement is intended to conflict with the Illinois Freedom of Information Act.

689.     The Monitor and OAG will maintain all confidential or non-public information provided by the City and CPD in a confidential manner. Other than as expressly provided in this Agreement, disclosure to the Monitor will not be deemed a waiver of any privilege or right the City or CPD may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document or data.

### P.     Court Jurisdiction, Modification of the Agreement, and Enforcement

690.     This Agreement will become effective upon Court approval and entry as an order of the Court.

691.     This Court has jurisdiction over the action that led to this Agreement pursuant to 28 U.S.C. §§ 1331 and 1367. The Court is adopting and entering this Agreement as a judgment of the Court pursuant to 42 U.S.C. § 1983 and the Constitution and laws of the United States; the Illinois Constitution; the Illinois Human Rights Act, 775 ILCS 5/5-102(C); and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.

692.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391, because the City is located in the Northern District of Illinois.

693.     The Court will retain jurisdiction of this action for all purposes until such time as the Court finds that the City has achieved full and effective compliance with this Agreement and maintained such compliance for no less than two consecutive years.

694.     The State, through OAG, acknowledges the good faith of the City and CPD in trying to take actions necessary to ensure constitutional policing and improve community trust in CPD. However, the State, through OAG, reserves the right to seek enforcement of the provisions of this Agreement as set forth herein if OAG determines that the City and CPD have failed to comply with any provision of this Agreement.

695.     Prior to initiating enforcement proceedings before the Court, the State, through OAG, will notify the City in writing of the provisions of this Agreement for which Court enforcement will be sought. The State will not initiate enforcement proceedings until at least 90 days after providing the notice required by this paragraph to the City ("cure period"). During the cure period, the State, the City, and CPD will make a good faith attempt to resolve the issues underlying the planned enforcement proceedings without intervention from the Court. In the event OAG provides notice of enforcement in accordance with this paragraph, at the request of either Party, the Monitor will convene the Parties and attempt to resolve the identified issues within 45 days of the written notice to the City. If the Monitor's efforts are unsuccessful, either Party may ask the Court to attempt to resolve such dispute. If the Parties are unable to resolve the identified issues or to reach agreement regarding a plan for resolution during the cure period, the State, through OAG, may initiate enforcement proceedings with the Court after the conclusion of the cure period.

696.     OAG and the City may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court. Such changes, modifications, and amendments to this Agreement will be encouraged when the Parties agree, or where the Monitor's reviews or audits demonstrate that an Agreement provision as drafted is not

furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose.

697.    At any time, the City, OAG, or the Monitor may propose substituting alternative requirements for one or more requirements of this Agreement. In any case when such a proposal is made, the Parties may agree to suspend the current Agreement requirement for an agreed-upon time period while the alternative is being considered. If the Parties and the Monitor agree that the alternative requirements are as effective or more effective at achieving the purpose of the original requirements, the alternative requirements will be adopted and submitted to the Court for incorporation in the Agreement. If the Parties and the Monitor cannot agree on the proposed alternative, either Party or the Monitor can submit the matter to the Court for resolution.

698.    The Parties agree to defend the provisions of this Agreement. The Parties will notify each other of any proceeding in which a non-party challenges a provision or provisions of this Agreement. In the event any provision of this Agreement is challenged in any state court, the Parties will seek removal to federal court and consolidation with this action.

699.    The City agrees to require compliance with this Agreement by its officers, officials, employees, agents, agencies, assigns, or successors.

700.    The City will be responsible for providing necessary and reasonable financial resources necessary through steps or processes that can include the budget process to fulfill its obligations under this Agreement, subject to the terms and conditions set forth herein.

701.    The City's entry into this Agreement is not an admission by the City, CPD, or any agent or employee of either entity that it has engaged in any unconstitutional, illegal, or otherwise improper activities or conduct. The City's entry into this Agreement is not an admission of any of the findings or conclusions contained in the DOJ's Report.

## Q.     Scope of the Agreement

702.     This Agreement resolves all claims in the State's Complaint filed in this case. This Agreement also constitutes a full and complete settlement of any and all civil claims, known or unknown, the State may have, as of the Effective Date of this Agreement, against the City regarding any alleged pattern or practice of unconstitutional conduct, civil rights violations, or other unlawful conduct by the City as referenced in the DOJ Report, the PATF Report, or the Complaint.

703.     This Agreement was reached as a result of the authority granted to the State under the doctrine of *parens patriae,* the Illinois Human Rights Act, and pursuant to the State's proprietary interests under 42 U.S.C. § 1983, to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement that deprives individuals of rights, privileges, or immunities secured by the Constitution or Illinois law.

704.     This Agreement is binding upon all Parties hereto, by and through their officials, employees, agents, representatives, agencies, assigns, and successors. If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, investigating, or otherwise reviewing the operations of CPD or any aspect thereof, the City agrees to ensure that these functions and entities are consistent with the terms of this Agreement and will incorporate the terms of this Agreement into the oversight, regulatory, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

705.     Nothing in this Agreement will in any way prevent or limit the City's right to adopt future measures that exceed or surpass the obligations contained herein, as long as the terms of this Agreement are satisfied.

706.     The City is responsible for providing necessary support and resources to CPD to enable CPD to fulfill its obligations under this Agreement.

707.    No person or entity is or is intended to be a third-party beneficiary of this Agreement for the purposes of any civil, criminal, or administrative action. The Parties agree that this Agreement is not, and will not be construed as, an admission of liability by the City or CPD, or any of their departments, entities, agencies, officials, agents, or employees. Nothing in this Agreement will be used by any third party to create, establish, or support a claim of liability by or against the City or the CPD or any of their officials, officers, agents or employees under any federal, state or municipal law, including, but not limited to, 42 U.S.C. § 1983, the U.S. Constitution, the Illinois Constitution, the Illinois Civil Rights Act of 2003, or the Illinois Human Rights Act.

708.    This Agreement is an integrated agreement. It contains the entire understanding and agreement of the Parties, and supersedes all prior agreements, understandings, negotiations, and discussion of the Parties, whether oral or written, relating to its contents. There are no other agreements, understandings, restrictions, representations, or warranties other than as set forth in this Agreement. No prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

### R.    Other Relevant Agreements

709.    As set forth in the MOA regarding the Coalition, the Parties have conferred certain rights on the Coalition relating to the enforcement of this Agreement (which is referred to in the MOA as the "Consent Decree"):

      a.    Notwithstanding any other provision of this Consent Decree, the Consent Decree is enforceable by the Court upon a motion by the Coalition subject to the conditions in subparagraphs (a) through (b) herein. Prior to filing any enforcement motion the Coalition will (i) meet and confer in good faith with

212

the Parties to attempt to resolve issues identified by the Coalition without the need for intervention by the Court, and (ii) follow the prerequisites for filing enforcement motions required of the State set forth above.

b. The Coalition is defined as the plaintiff organizations in the *Campbell* lawsuit and the plaintiffs in the *Communities United* lawsuit (collectively "Coalition Founders"), as well as other civil rights and community organizations in the City of Chicago who are members of the Coalition. The Coalition's rights set forth in Paragraph (a) above will not apply to any individual or organization that is not a member of the Coalition, including but not limited to individuals or organizations that were once members of the Coalition but subsequently left or were removed from the Coalition. The Coalition Founders are the sole arbiters of the Coalition's objectives, composition, and structure.

710. The Parties acknowledge the City has entered into four collective bargaining agreements effective July 1, 2012 (individually, and collectively, the "CBAs") with unions representing sworn police officers ("Unions"). The Parties further acknowledge that the City and the Unions are currently negotiating successor agreements to the CBAs ("Successor CBAs"). The Parties further acknowledge that the Unions and the City have certain rights and obligations under the Illinois Public Labor Relations Act, 5 ILCS 315 ("IPLRA") and that the IPLRA contains provisions for the City and the Unions to enforce their respective rights and obligations, including a process, set forth in Section 14 of the IPLRA and Section 28.3 of the current CBAs, for resolving bargaining impasses between the City and the Unions over issues subject to a bargaining obligation under the IPLRA ("Statutory Impasse Resolution Procedures").

213

711. Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.

712. Nothing in this Agreement alters or incorporates any provision in the August 6, 2015 Investigatory Stop and Protective Pat Down Settlement Agreement between the City and the American Civil Liberties Union of Illinois ("ACLU Agreement") for the duration of the ACLU Agreement. Nor does this Agreement involve the Monitor reviewing the reforms mandated by the ACLU Agreement or assessing compliance with the ACLU Agreement.

713. Nothing in this Part R is intended to otherwise modify the City's obligations under this Agreement.

### S.      Termination of the Agreement

714. The City will endeavor to achieve full and effective compliance within five years of the Effective Date. On or about five years from the Effective Date, the Court will hold a hearing to assess whether the Agreement should be terminated. This Agreement will terminate when the Court finds that the City has achieved full and effective compliance with this

214

Agreement and has maintained such compliance with the material requirements for at least one year for the sections delineated as Group A below, and for at least two years for the sections delineated as Group B below.

    a.   Group A: Recruitment, Hiring, and Promotions; Training; and Officer Wellness and Support.

    b.   Group B: Community Policing; Impartial Policing; Crisis Intervention; Use of Force; Supervision; Accountability and Transparency; and Data Collection, Analysis, and Management.

715.    Upon request by the City, the Court will determine whether the City is in full and effective compliance regarding any of the material requirements under the Agreement. The Court's determination of full and effective compliance will start the relevant one- or two- year compliance periods detailed in Paragraph 714 above.

716.    If the City and CPD have achieved compliance with some requirements, but not others, the Court may terminate the Agreement as to those requirements for which compliance has been achieved. The Monitor will not review, assess, or audit requirements that are so terminated. At any time prior to the full termination of this Agreement, the Court may reinstate previously terminated requirements upon a showing that compliance with such requirements has materially lapsed.

717.    Full and effective compliance with this Agreement means sustained compliance with all material requirements of this Agreement. No specific numerical threshold will be required to demonstrate full and effective compliance. Non-compliance with mere technicalities, or temporary or isolated failure will not constitute failure to achieve full and effective

compliance. However, temporary compliance during a period of otherwise sustained non-compliance will not constitute full and effective compliance with the Agreement.

718.    In order for the City to seek to terminate this Agreement or portions of this Agreement, the City must file a motion with the Court. Prior to filing a motion to terminate, the City agrees to notify OAG and the Monitor in writing when the City believes that it is in full and effective compliance with this Agreement and that such compliance has been maintained for the required time period. Within 14 days of notification, the Parties will meet and confer at a mutually agreeable time as to the status of compliance. If, after a period of 30 days of consultation, the Parties cannot resolve any compliance issues, the City may file a motion to terminate all or part of the Agreement.

719.    If the City moves to terminate the Agreement, OAG will have 60 days after the receipt of the City's motion to file an objection to the motion. The Monitor will have 60 days after the receipt of the City's motion to certify whether it agrees that the City is in compliance with the Agreement using methods for assessing compliance contemplated by a Monitoring Plan or this Agreement. If the Monitor requests additional time, the Court may extend the Monitor's deadline to so certify if it determines that additional time is required by the Monitor to determine compliance using methods for assessing compliance contemplated by a Monitoring Plan or this Agreement. The Court will hold a hearing on the motion. To terminate a portion of the Agreement, the Court must find that that portion of the Agreement is sufficiently severable from the other requirements of the Agreement such that partial termination would not impede the Monitor's ability to assess the City's compliance with other requirements of this Agreement.

720. At all times, the City will bear the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement.

721. Prior to termination of this Agreement, CPD will develop a plan, in consultation with the Monitor and OAG, to conduct compliance reviews, audits, and community surveys deemed necessary and appropriate following the termination of the Consent Decree. CPD will publish the plan for continuing assessments, if any, on CPD's website.

## XIII. DEFINITIONS AND ABBREVIATIONS

722. The following terms—in their singular and plural forms and regardless of their capitalization—and definitions apply to this Agreement:

723. "Academy" means CPD's central training facility or the CPD staff assigned to the Education and Training Division of CPD.

724. "Accountability Sergeant" means a CPD member at the rank of Sergeant assigned to a district who is responsible for receiving, processing, and investigating complaints made against CPD members, which are referred to the district by BIA.

725. "Administrative investigation" means the non-criminal investigation related to misconduct or the actions of a CPD member.

726. "Administrative investigation files" means the materials collected during the course of an administrative investigation and maintained in the investigation file.

727. "Administrative notification" means the notification of COPA of one or more of the incidents set forth in Chicago Municipal Code Section 2-78-120(c)–(e) or a domestic violence incident involving a CPD officer.

728. "Anonymous reporting website" means a website available to CPD members for the purpose of anonymously reporting member misconduct.

217

729.    "Best efforts" require a party, in good faith, to take all reasonable steps to achieve the stated objective.

730.    "Best practices" means any guidelines, standards, policies, procedures, or methods that are consistent with the requirements and goals of this Agreement, and are either supported by research or empirical evidence or are accepted by industry-recognized professionals, agencies, or organizations in the relevant subject area. In case of any conflict or inconsistency between industry-recognized professionals, agencies, or organizations regarding a best practice, CPD is entitled to adopt the practice it prefers, provided that the practice is consistent with the requirements and goals of this Agreement.

731.    "BIA" means CPD's Bureau of Internal Affairs.

732.    "BIA Lieutenant" means a CPD member in the rank of Lieutenant assigned to BIA and responsible for supervising investigations conducted by Accountability Sergeants in accordance with this Agreement.

733.    "Body-worn camera" means audio-visual recording equipment that is worn affixed to an officer's person, uniform, or equipment, with the capability of capturing, recording, and storing audio and/or visual information for later viewing.

734.    "Case Management System" or "CMS" means an electronic case management system meeting, at a minimum, the requirements of this Agreement.

735.    "Child" means an individual under the age of 13.

736.    "City" means the City of Chicago, an Illinois municipal corporation, and any agent, agency, officer, employee, assignee, or successor thereof.

737.    "Command channel review" means the process by which one or more supervising CPD officers at or above the rank of Commander review the investigative findings and recommendations.

738.    "Command staff" means sworn officers at the rank of Commander or above (e.g., Commander or Superintendent) and civilian members (e.g., Director) assigned at the discretion of the Superintendent and charged with holding strategic leadership positions within CPD.

739.    "Complainant" means any person, including a CPD member, who makes a Complaint against a CPD member.

740.    "Complaint" means one or more allegations of misconduct reported to COPA, CPD, or OIG.

741.    "COPA" means the Civilian Office of Police Accountability.

742.    "CPD" or "Department" means the Chicago Police Department and its agents, officers, and employees (both sworn and civilian) in their official capacities.

743.    "CPD member" or "member" means any sworn or civilian employee of CPD.

744.    "CPD officer" or "officer" means any sworn CPD member at any rank.

745.    "Crisis Intervention Team" or "CIT" means a first responder model of police-based crisis intervention that involves the collaboration of community, health care, and advocacy groups committed to improving the way law enforcement and the community responds to individuals in crisis. The Crisis Intervention Team provides CPD members with support, resources, education, and training to safely and effectively interact with individuals in crisis.

746.    "Days" means calendar days unless otherwise specified.

747.    "Decentralized training" means training approved by the Education and Training Division or the Training Oversight Committee, with a uniform curriculum, that takes place at the

district or unit level rather than at the Academy or other centralized location and is not necessarily required to be received by all members of the Department.

748.    "Deputy PSIG" means the Deputy Inspector General for Public Safety of the City of Chicago Office of Inspector General. In the event the Office of the Deputy PSIG is vacant, its obligations under this Agreement run to the Officer of the Inspector General for the City of the Chicago.

749.    "District" means one of the geographic subdivisions designated by CPD, currently numbering 22 in total, which together cover the entirety of the City and are each led by a member of the command staff.

750.    "Duty-related traumatic incident" means any police incident or action that a CPD member is involved in or observes that has the potential to result in the member experiencing emotional or psychological distress, ranging from mild to severe. For the purposes of the CPD Traumatic Incident Stress Management Program, the following incidents have been identified as traumatic incidents:

    a.    A firearms discharge incident, except for the destruction of an animal.

    b.    On-duty traffic crashes involving serious personal injury.

    c.    Other serious personal injury incidents involving CPD members occurring while in the performance of duty.

    d.    Any other great bodily harm or death incidents based on the actions or use of force of a CPD member while in the performance of his or her duty.

In addition to the above incidents, any other incident where a CPD member sustains serious physical or emotional trauma from a duty-related activity may be designated as a traumatic incident by the appropriate CPD supervisor.

751.    "Effective Date" means the day this Agreement is entered as an order of the Court.

752.    "Exonerated" means a finding where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.

753.    "Field qualified" means a designation required for a probationary police officer to successfully complete the Field Training and Evaluation Program.

754.    "Field Training Officer" or "FTO" means a sworn member responsible for providing field training to probationary police officers pursuant to CPD's Field Training and Evaluation Program.

755.    "Final disciplinary decision" means the final decision of the Superintendent or his or her designee regarding whether to issue or recommend discipline after review and consideration of the investigative findings and recommendations, including after any additional investigation conducted as a result of such review. For COPA investigations, the final disciplinary decision occurs after the conclusion of the process described in Chicago Municipal Code Section 2-78-130(a).

756.    "Final disposition" means the status of a misconduct investigation after the final disciplinary decision, and any grievance process, arbitration, Police Board proceeding, or appeal relating to the final disciplinary decision.

757.    "Guiding Principles" refers to the paragraphs included in the "Guiding Principles" sections of this Agreement. They are not intended to impose substantive requirements subject to compliance audits or assessments on either of the Parties. "Guiding Principles" are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements of this Agreement and the overall goals for each section.

758.    "Immediate supervisor" means a CPD officer at the rank of Sergeant or above (or anyone acting in those capacities) and civilian CPD members with day-to-day oversight responsibility for the CPD members under their direct command.

759.    "Individual in crisis" means an individual who exhibits symptoms of known, suspected, or perceived behavioral and mental health conditions, including, but not limited to, mental illness, intellectual or developmental disability, or co-occurring conditions, such as substance use disorders.

760.    "Intake process" means the system for processing all non-confidential complaints and administrative notifications by COPA.

761.    "Investigative findings and recommendations" means following a misconduct investigation, COPA, BIA or the district's issuance of investigative findings and recommendations to the Superintendent of CPD, or his or her designee.

762.    "Involved member" means a CPD member who is alleged to be involved in misconduct.

763.    "Juvenile" means an individual under the age of 18.

764.    "Law Enforcement Medical and Rescue Training" or "LEMART" means training designed to provide tactical medical and self-rescue capabilities, including the ability to identify and tactically treat otherwise critical wounds and provide hemorrhage control.

765.    "LGBTQI" means lesbian, gay, bisexual, transgender, queer, and intersex. Gender-nonconforming, while not included in the LGBTQI acronym, is included wherever the LGBTQI acronym is used in this Agreement.

766.    "Licensed mental health professional" means any of the following as defined by 59 Ill. Admin. Code. 132/25: (a) a Licensed Practitioner of the Healing Arts (LPHA); (b) a

222

Licensed Social Worker (LSW) possessing at least a master's degree in social work and licensed under the Clinical Social Work and Social Work Practice Act, 225 ILCS 20, with specialized training in mental health services or with at least two years' experience in mental health services; or (c) a Licensed Professional Counselor (LPC) possessing at least a master's degree and licensed under the Professional Counselor and Clinical Professional Counselor Licensing Act, 225 ILCS 107, with specialized training in mental health services or with at least two years' experience in mental health services.

767.    "Misconduct" means any violation of CPD policy or the law by a CPD member.

768.    "Misconduct investigation" means the administrative investigation of a complaint or an administrative notification that progresses past a preliminary investigation.

769.    "Not sustained" means a finding where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence.

770.    "OAG" means the Office of the Attorney General of the State of Illinois

771.    "OEMC" means the Office of Emergency Management and Communications.

772.    "Officer-involved shooting" means a firearm discharge by a CPD officer that could potentially strike an individual.

773.    "Oleoresin capsicum device" or "OC Device" means any Department-authorized implement capable of dispensing a nonflammable propellant, containing inflammatory agents that occur naturally in cayenne peppers (oleoresin capsicum).

774.    "Parties" means the State of Illinois, acting through the Office of the Attorney General of the State of Illinois, and the City of Chicago.

223

775. "Performance Recognition System" or "PRS" means the electronic assessment tool for assisting Department supervisors in recognizing and addressing job performance of members under their command.

776. "Probationary police officer" or "PPO" means a new CPD officer who has completed recruit training at the Academy and is receiving field training or is otherwise employed on a provisional basis.

777. "Procedural justice" refers to a concept involving four central principles designed to build public confidence in the police: (1) treating people with dignity and respect; (2) giving individuals a chance to be heard during encounters; (3) making decisions fairly and transparently, based on facts; and (4) conveying goodwill and trustworthiness.

778. "Require" means make mandatory, demand, compel, and enforce.

779. "Responding supervisor" means a CPD supervisor who immediately responds to the scene when a level 2 or level 3 reportable use of force occurs.

780. "Roll call training" means in-service training that takes place at the district or unit level during the beginning of a tour of duty.

781. "Safe and feasible" means conditions that are objectively safe and feasible under the totality of the circumstances, consistent with law and CPD policy.

782. "Sexual misconduct" means any behavior by a CPD member that takes advantage of the member's position in law enforcement to misuse authority and power (including force) in order to commit a sexual act, initiate sexual contact with another person, or respond to a perceived sexually motivated cue (from a subtle suggestion to an overt action) from another person; any sexual communication or behavior by a CPD member that would likely be construed as lewd, lascivious, inappropriate, or conduct unbecoming of a member; any attempted or

completed act by a CPD member of nonconsensual sexual conduct or nonconsensual sexual penetration, as defined in Section 11-0.1 of the Illinois Criminal Code of 2012; any attempted or completed act by a CPD member of criminal sexual assault, as defined in Sections 11-1.20 through 11-1.40 of the Illinois Criminal Code; or any attempted or completed act by a CPD member of criminal sexual abuse, as defined in Sections 11-1.50 and 11-1.60 of the Illinois Criminal Code of 2012.

783.  "Squadrol" means a unit assigned to a district vehicle that has the primary function of transportation of arrestees in addition to field patrol duties.

784.  "State" means the State of Illinois acting through the Office of the Attorney General of the State of Illinois.

785.  "Superintendent" means the Superintendent of CPD or a properly designated Acting or Interim Superintendent.

786.  "Supervisor" means a sworn CPD member at the rank of Sergeant or above (or anyone acting in those capacities) and non-sworn CPD members with oversight responsibility for other CPD members.

787.  "Sustained" means a finding, where it is determined the allegation is supported by a preponderance of the evidence

788.  "Taser" means any Electronic Control Weapon, regardless of whether such weapon is sold or manufactured under the brand-name "Taser."

789.  "Tele-communicators" means the Police Communication supervisors, call-takers, and dispatchers employed by OEMC.

790.  "Tour of duty" means the period of time during which a CPD member is considered to be on duty. It may be a scheduled or unscheduled period, including periods

assigned to members in advance of the performance of work (i.e., watches or shifts) or time spent on work performed outside of the assigned watch.

791.    "Trauma-informed crisis intervention techniques" means appropriate strategies, approaches, or tactics that consider symptoms of trauma and mental health conditions when determining how to respond to and de-escalate incidents involving individuals in crisis.

792.    "TRR" means the CPD form titled Tactical Response Report.

793.    "TRR-I" means the CPD form titled Tactical Response Report – Investigation.

794.    "TRR-R" means the CPD form titled Tactical Response Report – Review.

795.    "Unfounded" means a finding where it is determined, by clear and convincing evidence, that an allegation is false or not factual

796.    "Unique tracking number" means a number assigned to a complaint or administrative notification, including a Log Number, linked with all phases of the administrative investigation and disciplinary recommendation, grievance process, arbitration, Police Board proceeding, and appeals therefrom.

797.    "Unit" means any bureau, group, section, organizational segment, or other subset of CPD that is officially established within CPD's organizational structure and commanded by supervisory Department members.

798.    "Will" means that the relevant provision imposes a mandatory duty.

799.    "Youth" means an individual of the age 13 through 24.


Respectfully submitted this 13th day of September, 2018.

For Plaintiff STATE OF ILLINOIS:


_____
LISA MADIGAN
Attorney General of the State of Illinois


_____
GARY S. CAPLAN
Assistant Chief Deputy Attorney General


_____
CARA A. HENDRICKSON
Chief, Public Interest Division


_____
KARYN L. BASS EHLER
Chief, Civil Rights Bureau


BRENT D. STRATTON
CYNTHIA L. FLORES
SHAREESE N. PRYOR
LEIGH J. RICHIE
MIKIKO A. THELWELL
THOMAS J. VERTICCHIO
CHRISTOPHER G. WELLS
Office of the Attorney General of the State of Illinois
100 West Randolph Street, 12th Floor
Chicago, IL 60601
Phone: (312) 814-3000

For Defendant CITY OF CHICAGO:


RAHM EMANUEL
Mayor
City of Chicago


EDDIE JOHNSON
Superintendent
Chicago Police Department


EDWARD SISKEL
Corporation Counsel
City of Chicago


ALLAN T. SLAGEL
HEATHER A. JACKSON
ELIZABETH E. BABBITT
RACHEL L. SCHALLER
Taft Stettinius & Hollister LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011
*Counsel for the City of Chicago*

228

SO ORDERED, this _____ day of _____, 2018.


_____
ROBERT M. DOW, JR.
United States District Court Judge
Northern District of Illinois