**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, | |
| Plaintiff, | |
| v. | Case No. 1:17-cv-06260 |
| | Honorable Robert M. Dow, Jr. |
| CITY OF CHICAGO, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
APPROVAL OF THE PROPOSED CONSENT DECREE**

The State of Illinois ("State"), by Lisa M. Madigan, Attorney General, respectfully submits this Memorandum in Support of Approval of the Proposed Consent Decree, and states:

**I.      INTRODUCTION**

The Proposed Consent Decree filed by the parties represents a unique opportunity to address Chicago's long history of policing problems by mandating reform of the Chicago Police Department ("CPD"). The broad-based reforms set forth in the Proposed Consent Decree seek to ensure constitutional policing that protects the civil rights of all residents of Chicago, demands police accountability, and provides transparency to the Chicago community. To implement and sustain the required reforms, the Proposed Consent Decree requires that Chicago police officers receive the training, resources, and support necessary to perform their jobs professionally and safely.

For over 50 years, reviews of CPD's policing practices have consistently identified significant failures by CPD officers to act in accordance with the law. One of the first of these reviews, in 1973, described a pattern of excessive force and police abuse directed

disproportionately at Chicago's African American community. In the years since, significant investigations, reports, and lawsuits have continued to reveal widespread constitutional violations, including repeated police abuse, use of excessive force, and torture, that have disproportionately harmed Chicago's African American and Latino residents. Following each review, efforts aimed at reforming CPD have fallen far short, proving insufficient to eliminate the unlawful policing practices. This longstanding history of unconstitutional policing and the failure to enact effective, sustained reforms has led to profound mistrust between many Chicago communities, particularly communities of color, and CPD.

The latest flashpoint in the City's policing history occurred in late 2015, after the delayed release of a videotape of the fatal police shooting of Laquan McDonald, a 17-year-old African-American youth, by CPD officer Jason Van Dyke. The videotape highlighted serious questions about the use of unlawful and excessive force by CPD officers and the lack of accountability for such misconduct. At that time, Illinois Attorney General Lisa Madigan called on the U.S. Department of Justice ("DOJ") to initiate a pattern and practice investigation to determine whether CPD had engaged in systemic violations of the U.S. Constitution and federal civil rights laws. Given the City's well-documented, decades-long failure to reform CPD, it was clear that Chicago could not move forward to improve policing practices and build needed trust between the police and the community without an outside, independent investigation of CPD.

At the same time, Chicago Mayor Rahm Emanuel announced the creation of the Police Accountability Task Force ("PATF"). Mayor Emanuel charged the PATF with recommending reforms to improve independent oversight of police misconduct, ensure officers with repeated complaints are identified and evaluated appropriately, and establish best practices for release of videos of police-involved incidents. In April 2016, the PATF released a comprehensive 183-page

report with details and findings about a broad range of issues organized around five areas: video release policies, de-escalation, community and police relations, early intervention and personnel concerns, and legal oversight and accountability.

On December 7, 2015, DOJ and the U.S. Attorney's Office for the Northern District of Illinois jointly launched an investigation into CPD that would focus on CPD's use of force and its systems of accountability. The DOJ investigation reviewed over 170 officer-involved shooting investigations and 425 incidents involving less-lethal force; conducted over 60 ride-alongs with CPD officers; visited each of Chicago's 22 police districts; and met with over 90 community organizations. (Compl., Ex. B., DOJ Report, at 21–22.)

In January 2017, at the conclusion of its year-long investigation, DOJ issued a 161-page report which concluded that "CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable," in violation of the Fourth Amendment to the U.S. Constitution. (*Id.* at 5.) DOJ's investigation revealed that this pattern or practice, which disproportionately impacts African American and Latino communities in Chicago, "is largely attributable to systemic deficiencies within CPD and the City" in the training and supervision of officers, accountability systems, and the collection and reporting of data on officer use of force. (*Id.* at 5–15.) In addition, DOJ determined that the lack of effective community-oriented policing strategies, unaddressed racially discriminatory conduct by officers, and insufficient support for officer wellness contributed to the pattern or practice of unconstitutional use of force. (*Id.*) To remedy these systemic deficiencies, the DOJ Report made 99 specific recommendations regarding reforms in the areas of use of force, accountability, training, supervision, officer wellness and safety, data collection and transparency, promotions, and community policing. (*Id.* at 150–61.)

3

In making its recommendations, the DOJ Report noted the importance of building trust "for the police within Chicago's neighborhoods most challenged by violence, poverty, and unemployment. … This will be difficult, but will benefit both the public and CPD's own officers. The increased trust these reforms will build is necessary to solve and prevent violent crime." (*Id.* at 4.) The DOJ Report emphasized, however, that the required reforms "will likely not happen or be sustained without the reform tools of an independent monitoring team and a court order. … Together, an independent monitor and court decree will make it much more certain that Chicago is finally able to eliminate patterns of unconstitutional conduct, and can bolster community confidence to make policing in Chicago more effective and less dangerous." (*Id.* at 16.)

In the spring of 2017, the new U.S. Attorney General, Jeff Sessions, issued a memorandum indicating that under the administration of President Donald J. Trump, DOJ was adopting the policy that state and local police matters should be handled at the state and local level. As a result, DOJ indicated that it would not take steps to seek a consent decree to reform CPD.

Accordingly, in August 2017, the State brought this action against the City to address the findings and recommendations of the DOJ and PATF reports and eliminate the unconstitutional conduct that has plagued CPD for decades. The State's Complaint, based on the DOJ and PATF reports, seeks injunctive relief for alleged violations of the Fourth Amendment to the U.S. Constitution; Article I, Section 6 of the Illinois Constitution; the Illinois Civil Rights Act of 2003; and the Illinois Human Rights Act.

At the time that the State filed the lawsuit against the City, Mayor Emanuel and CPD Superintendent Johnson committed to work with Attorney General Madigan to negotiate an enforceable consent decree. The Office of the Attorney General ("OAG") and the City agreed

that enforceable reforms were necessary to permanently change the conduct of CPD, provide the training and support officers need, and build trust between Chicago's residents and their police department. In agreeing to negotiate, the OAG and the City recognized that after decades of attempts to reform, the best way to ensure lasting change was to obtain a consent decree that would put in place a plan for reform, require that an independent monitoring team assess CPD's and the City's progress in implementing reform, and be enforced by a federal judge.

The Proposed Consent Decree is the product of thorough investigation, including input from subject matter experts, CPD officers, and the Chicago community, and a robust arms-length negotiation between the parties. The Proposed Consent Decree ensures that the City and CPD provide police services in a manner that fully complies with the Constitution and laws of the United States and State of Illinois, respects the rights of the people of Chicago, promotes community and officer safety, and builds trust between officers and the communities they serve. The Proposed Consent Decree seeks to achieve CPD reform by addressing the following subjects: community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotion; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.

## II. THE PROPOSED CONSENT DECREE IS THE PRODUCT OF THOROUGH INVESTIGATION.

### A. The OAG dedicated significant resources and expertise to ensure the Proposed Consent Decree provides a framework for real reform.

The OAG has dedicated a team of nine attorneys to conduct the factual investigation, prepare drafts of consent decree provisions, participate in negotiations, and review and incorporate public feedback into the consent decree. In addition, attorneys from the law firm Robins Kaplan LLP have also assisted the State *pro bono*.

In addition to attorneys, the OAG hired a team of experts with extensive experience and knowledge, including experience in the investigation and oversight of large city police forces as well as police reform. The State's experts include:

- Ronald L. Davis, who previously served as Executive Director of the President's Task Force on 21st Century Policing during the administration of President Barack Obama; Director of DOJ's Office of Community Oriented Policing Services; Chief of the East Palo Alto Police Department; and a police officer and Captain in the Oakland Police Department;

- Kathleen M. O'Toole, who previously served as Chief of the Seattle Police Department; the independent monitor overseeing a police reform consent decree between DOJ and the town of East Haven, Connecticut; and as a former police officer in and later Commissioner of the Boston Police Department;

- Greg Ridgeway, who holds a Ph.D. in statistics and is currently an Associate Professor of Criminology and Statistics at the University of Pennsylvania, and whose prior work includes analyzing police practices for evidence of racial bias in jurisdictions including Cincinnati, Ohio and New York, New York;

- Ellen Scrivner, who is a Board Certified Police and Public Safety Psychologist and whose prior experience includes working on monitoring teams for consent decrees regarding the Seattle Police Department, the Cleveland Division of Police, and the New Orleans Police Department;

- Jonathan M. Smith, who previously served as Chief of the Special Litigation Section of DOJ's Civil Rights Division from 2010 to 2015, during which time he was responsible for 18 pattern or pattern practice investigations of civil rights violations by law enforcement; and

- Scott Thomson, who is currently serving as Chief of the police department in Camden County, New Jersey and President of the Police Executive Research Forum; and who has served as a policing expert in DOJ investigations in jurisdictions such as Baltimore, Maryland.

In addition to these resources the OAG has dedicated to the investigation and negotiation process, two additional attorneys, experienced community outreach staff, and a team of dedicated support staff have assisted the State with other aspects of the case, including the extensive process of soliciting public input regarding the consent decree, both during the initial drafting phase and after the draft of the consent decree was released for public comment.

### B.      The OAG performed extensive factual investigation.

Since filing suit, the OAG has undertaken wide-ranging and detailed factual investigation and discovery to further inform its understanding of CPD's former and current practices. Specifically, the OAG propounded 242 document requests and reviewed over 10,000 documents, totaling over 97,000 pages. In addition, to inform the parties' negotiations, the OAG conducted interviews of officers throughout all ranks of CPD, including the commanding officer of CPD's in-service and recruit training programs, the commanding officer of CPD's Force Review Unit, Training Academy staff, and field training officers.

During the OAG's investigation, attorneys and experts for the OAG also observed the department-wide use of force training provided to current CPD officers, train-the-trainer sessions, and numerous courses provided to CPD recruits at CPD's Training Academy. In addition, the OAG participated in ride-alongs in neighborhoods throughout the City, met with officers, sergeants, and watch commanders in various CPD districts, conducted site visits, and attended several detailed presentations provided by CPD and the City regarding ongoing and planned reform efforts intended to address use of force, officer training, accountability, promotions, crisis intervention, officer wellness, data management, community policing, and impartial policing.

## III.   THE PARTIES TO THE PROPOSED CONSENT DECREE SOUGHT AND RECEIVED SUBSTANTIAL INPUT FROM INTERESTED STAKEHOLDERS.

### A.      The parties requested and received extensive community input.

As part of the process of drafting a consent decree, the OAG worked with community organizations throughout Chicago to ensure that all interested Chicago residents had a meaningful opportunity to provide input on police reform, much of which was incorporated in the draft of the consent decree posted on July 27, 2018. The OAG established a website

dedicated to providing information on this case and offering an avenue for Chicagoans to submit input, and also created an email address and telephone hotline for community members to provide input. Moreover, with the expert assistance of the Institute for Policy and Civic Engagement ("IPCE") at the University of Illinois at Chicago, the OAG and community organizations held 14 Consent Decree Community Roundtables in neighborhoods throughout Chicago, with a focus on the communities most impacted by the police misconduct identified in the DOJ and PATF reports. At the same time as a draft of the consent decree was publicly released, IPCE issued a report summarizing the community input received from the 14 Community Roundtables, as well as from numerous facilitated small group conversations and online and email feedback.[1]

Additionally, the plaintiffs in two separate cases relating to police reform, *Campbell v. City of Chicago*, No. 17-cv-4467 (U.S. Dist. Ct., N.D. Ill.), and *Communities United v. City of Chicago*, No. 17-cv-7151 (U.S. Dist. Ct., N.D. Ill.), established a coalition of community organizations (the "Coalition") with an interest in the topics anticipated to be addressed in the consent decree. Pursuant to a Memorandum of Agreement between the parties and the Coalition, the Coalition has shared its ideas regarding each of the specific areas anticipated to be addressed in the consent decree. The parties then reviewed and considered all of the community input, and numerous provisions in the Proposed Consent Decree ultimately reflect that input.

**B.    The State received meaningful input from CPD, the police unions, and individual police officers.**

Throughout the negotiations with the City, high-ranking members of CPD were present for and deeply involved in the negotiations. In addition, the OAG repeatedly met and negotiated

---

[1] Institute for Policy and Civic Engagement, University of Illinois at Chicago, *Consent Decree Community Engagement* (July 2018), available at http://chicagopoliceconsentdecree.org/resources/.

with counsel and high-ranking members of the Fraternal Order of Police ("FOP"), the union representing CPD officers below the rank of sergeant. From September 2017 to the present, the OAG, at times together with the City, has met on at least ten separate occasions with the leadership of and counsel for the FOP. On September 29, 2017, the FOP presented the OAG with a list of 22 topics the FOP wished to include in a consent decree, including "carve-out" language intended to define the relationship between the consent decree and the collective bargaining agreements entered into between the FOP and the City. The Proposed Consent Decree includes numerous elements that align with the FOP's proposals, including, for example, a carve-out provision regarding the FOP's collective bargaining agreement, as well as enhanced training and support services for CPD officers. The FOP also submitted written comments in response to the publicly released draft of the consent decree, and the parties incorporated that feedback as appropriate by, for example, changing a provision regarding the timeframe within which officers must report broken body-worn cameras.

The OAG also met on at least five separate occasions with the leadership of and counsel for the three unions representing CPD sergeants, lieutenants, and captains (collectively, "Supervisors' Unions"). The Supervisors' Unions provided input both before and after the release of the public draft, and the final draft of the Proposed Consent Decree reflects that input. As one example, the Supervision Section of the Proposed Consent Decree requires CPD to attain a ratio of no more than ten officers assigned to one sergeant in CPD's field units, which is in part intended to address a concern raised by the Supervisors' Unions about high subordinate-to-supervisor ratios.

The State also partnered with the Police Foundation, a national nonprofit organization, to conduct outreach to CPD officers across the department of various ranks and assignments in

order to solicit input and feedback on the department's challenges and the ways to address those challenges through a consent decree. Experts from the Police Foundation, including two former police chiefs, facilitated 13 focus groups of sworn CPD officers. The Police Foundation also set up a password-protected comment box on its website to provide all CPD officers (who received the password and information on how to access the comment box via email and during roll calls) with a way to provide input. The Police Foundation issued a report summarizing the key findings and themes from the focus groups and website comments.[2]

## IV.  THE PUBLIC COMMENT PERIOD PROVIDED ADDITONAL FEEDBACK AND REVISIONS TO THE PROPOSED CONSENT DECREE.

After publication of a draft of the consent decree on July 27, 2018, the parties encouraged the public to comment on how they believed the draft could be improved. After receiving nearly 1,700 comments and suggestions about a diverse range of topics, the parties then began a new round of extensive negotiations relating to the feedback from the public comment period. After many additional calls, exchanges of drafts, and numerous face-to-face negotiation sessions, the parties made additions and changes to the draft of the consent decree incorporating public feedback in a number of areas, including, but not limited to:

- requiring the City to use best efforts to expand the Civilian Office of Police Accountability's ("COPA") jurisdiction to conduct administrative investigations for all types of sexual misconduct by CPD officers;

- providing additional protections for individuals with disabilities, including ensuring reasonable accommodations are provided for individuals with physical disabilities or mental or developmental disabilities, providing training to all CPD officers regarding recognizing and responding to individuals with disabilities, and mandating that CPD designate a liaison responsible for coordinating compliance with the Americans with Disabilities Act;

- requiring improvements to how CPD and the City handle crisis intervention, such as by enhancing data collection, and requiring identification and evaluation of

---

[2] Police Foundation, *Opinions of Officers of the Chicago Police Department on the Upcoming Consent Decree: A Report to the State of Illinois Office of the Attorney General* (July 2018), available at http://chicagopoliceconsentdecree.org/resources/.

ways to increase opportunities to divert individuals in crisis away from the criminal justice system, where appropriate; and

- providing increased transparency and expanded opportunities for community input, including by requiring CPD to publish the underlying data used to annually assess whether certain CPD law enforcement practices are impartial, requiring publication of CPD's plans for implementing various sections of the consent decree and the independent monitor's plans for assessing compliance, requiring stakeholder input in the initial development and future revisions of CPD policies related to officers assigned to Chicago Public Schools, and requiring CPD to publicize in advance opportunities for the community to provide input on CPD's efforts to implement the material requirements of the consent decree.

## V. THE PROPOSED CONSENT DECREE IS LAWFUL, FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED.

### A. Legal Standard

The law favors voluntary resolution of litigation through settlement. *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888–89 (7th Cir. 1985); *Donovan v. Robbins*, 752 F.2d 1170, 1177 (7th Cir. 1985). A consent decree is "a means by which parties settle their disputes without having to bear the financial and other costs of litigating." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528 (1986). When a consent decree resolves constitutional claims, the consent decree "may embody conditions beyond those imposed directly by the Constitution itself." *Komyatti v. Bayh*, 96 F.3d 955, 959 (7th Cir. 1996). A requirement imposed by a consent decree must simply be "related to elimination of the condition that is alleged to offend the Constitution." *Id.* (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992); *Milliken v. Bradley*, 418 U.S. 717, 738 (1974)).

When presented with a proposed consent decree, a district court must determine whether the proposed decree is lawful, fair, reasonable, and adequate. *Hiram Walker*, 768 F.2d at 889 (citing, *inter alia*, *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)). The factors that district courts consider in making this determination include: the strength of the plaintiff's case compared to the terms of the settlement; the likely complexity, length, and expense of the

11

litigation; the amount of opposition to settlement among affected parties; the opinion of competent counsel; and the stage of the proceedings and the amount of discovery completed at the time of settlement. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (citing *Hiram Walker*, 768 F.2d at 889). Of these factors, the most important is the first. *Id.*

Because "settlements are favored and ordinarily should be approved," *Donovan*, 752 F.2d at 1177, a district court "may not deny approval of a consent decree unless it is unfair, unreasonable, or inadequate," *Hiram Walker*, 768 F.2d at 889. The proposed consent decree must be examined in its entirety, rather than focusing on individual components. *Isby*, 75 F.3d at 1199 (internal quotations and citations omitted). Approval of a consent decree by a district court is reviewed on appeal under a "highly deferential version" of the abuse of discretion standard. *Donovan*, 752 F.2d at 1177.

**B.  The Court should approve the Proposed Consent Decree because it is lawful, fair, reasonable, and adequate.**

The Proposed Consent Decree is lawful, fair, reasonable, and adequate, and it should be approved. *See Hiram Walker*, 768 F.2d at 889. Taken together, the 229 pages and 799 paragraphs of the Proposed Consent Decree provide a robust and comprehensive remedy to address the pattern of unconstitutional policing alleged in the Complaint and described in the two extensive reports upon which the Complaint is based. All of the factors relevant to the Court's assessment of the Proposed Consent Decree favor approval.

**1.  The Proposed Consent Decree appropriately reflects the breadth and strength of the State's case.**

The first and most important factor district courts consider in deciding whether to approve a proposed consent decree is how the terms of the proposed decree compare to the strength of the plaintiff's case. *Isby*, 75 F.3d at 1199. The Proposed Consent Decree is a remedy that is historic in its breadth and strength. For good reason: the State's Complaint alleges

systemic problems in the Chicago Police Department, decades in the making, that have led to a pattern of unconstitutional use of excessive force and other violations of law. In other words, the breadth and strength of the Proposed Consent Decree appropriately reflect the breadth and strength of the underlying claims that will be resolved by it.

The DOJ Report and the PATF Report provide a strong factual basis for the State's claims. The Proposed Consent Decree addresses, in full or in substantial part, the vast majority of the 99 specific recommendations included in the DOJ Report as well as numerous additional recommendations included in the PATF Report. Indeed, the Proposed Consent Decree includes a section addressing each of the subject areas in which the DOJ Report recommended reforms, and each of those sections contains detailed provisions implementing specific reforms called for by the DOJ Report. Many of the specific provisions included in the Proposed Consent Decree also mirror similar provisions in consent decrees approved by district courts in other jurisdictions to remedy comparable allegations of unconstitutional conduct by police.[3]

Other aspects of the Proposed Consent Decree break new ground, such as provisions requiring unprecedented transparency in how CPD publishes data regarding use of force incidents, and provisions significantly expanding the support services provided to CPD officers. The Proposed Consent Decree is also appropriately reflective of Chicago's unique

---

[3] *See United States v. Police Department of Baltimore City*, No. 1:17-cv-00099, Dkt. No. 2-2 (D. Md. Jan. 12, 2017); *United States v. City of Newark*, No. 2:16-cv-01731, Dkt. No. 4-1 (D. N.J. Apr. 29, 2016); *United States v. City of Cleveland*, No. 1:15-cv-01046, Dkt. No. 7-1 (N.D. Ohio June 12, 2015); *United States v. City of Albuquerque*, No. 1:14-cv-01025, Dkt. No. 9-1 (D. N.M. June 2, 2015); *United States v. County of Los Angeles*, No. 2:15-cv-03174, Dkt. No. 4 (C.D. Cal. Apr. 28, 2015); *United States v. Commonwealth of Puerto Rico*, No. 3:12-cv-2039, Dkt. No. 57-1 (D. P.R. July 17, 2013); *United States v. City of New Orleans*, No. 2:12-cv-01924, Dkt. No. 159-1 (E.D. La. Jan. 11, 2013); *United States v. City of Portland*, No. 3:12-cv-02265, Dkt. No. 4-1 (D. Or. Dec. 17, 2012); *United States v. Town of East Haven*, No. 3:12-cv-01652, Dkt. No. 2-1 (D. Conn. Nov. 20, 2012); *United States v. City of Seattle*, No. 2:12-cv-01282, Dkt. No. 3-1 (W.D. Wash. July 27, 2012).

circumstances. For example, the Proposed Consent Decree includes a 52-page section implementing numerous reforms intended to ensure accountability for police misconduct by strengthening and improving the coordination among the various oversight agencies, such as COPA and the Police Board, that have come into existence in response to Chicago's uniquely troubling and long history of police misconduct directed toward African American communities.

The Proposed Consent Decree provides a robust, comprehensive, and durable framework for remedying the systemic deficiencies that gave rise to the State's claims. Because the Proposed Consent Decree reflects the strength of the underlying claims at issue, it should be approved. *See Isby*, 75 F.3d at 1199.

> **2.** **The Proposed Consent Decree should be approved in light of the proceedings conducted to date and the burden and complexity of resolving the case through litigation.**

District courts considering a proposed consent decree also examine the stage of the proceedings at the time of settlement, as well as the likely complexity, length, and expense of the litigation. *Isby*, 75 F.3d at 1199. The Proposed Consent Decree in this case is the product of the DOJ and PATF pre-litigation investigations, as well as the additional investigation conducted by the OAG. These three investigations have required significant time and resources, and the breadth, complexity, and thoughtfulness of the Proposed Consent Decree are a reflection of that hard work. The extensive resources that have been dedicated to formulating this Proposed Consent Decree are now best spent implementing the reforms it contains, instead of engaging in protracted litigation.

In addition to being a reflection of the investigations and the extensive process for soliciting community and police input, the Proposed Consent Decree is also the product of hundreds of hours of painstaking negotiations between the parties. In total, the parties have participated in approximately 300 hours of face-to-face negotiations from November 2017

through September 2018. During these negotiations, the parties addressed their disagreements regarding draft provisions that took hundreds of hours to prepare. Simply put, the process of drafting and negotiating the Proposed Consent Decree has been extensive. Given what has been required to get to this point, *see Isby*, 75 F.3d at 1199, the proceedings conducted to date favor approval of the Proposed Consent Decree.

Beginning the implementation of the Proposed Consent Decree is also preferable to engaging in the lengthy litigation that would be required to resolve the underlying claims. The Complaint alleges a pattern of unconstitutional conduct covering decades and involving many people. Discovery would entail production and review of files regarding hundreds of individual incidents, many of which have already been the subject of protracted litigation. Given the scope of the claims at issue and the time span involved, the list of potential witnesses would likely number in the hundreds. Extensive expert discovery would also be required. Indeed, the OAG has retained six experts to advise in the negotiating process, and it is likely that the State would rely on a comparable number of experts to prove its case. All told, the process of litigating this case would take several years. That time is better spent implementing the Proposed Consent Decree. *See Williams v. Vukovich*, 720 F.2d 909, 923 (6th Cir. 1983) ("Consent Decrees minimize the delay, expense, psychological bitterness, and adverse publicity which frequently accompanies adjudicated guilt.").

The Proposed Consent Decree is also a superior outcome to a litigated judgment because the Proposed Consent Decree is more likely to achieve the reform sought. The Seventh Circuit has long recognized that the consensual nature of a consent decree increases the likelihood of voluntary compliance. *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980). The process of implementing the hundreds of provisions in the Proposed

Consent Decree will be a significant undertaking. Given the critical importance of cooperation to the overall success of the reform effort embodied in the Proposed Consent Decree, the parties have appropriately recognized that settlement is a better course of action than litigation. The proceedings conducted to date and the complexity of the anticipated litigation therefore favor approval of the Proposed Consent Decree. *See Hiram Walker*, 768 F.2d at 889.

### 3. While the Proposed Consent Decree may face opposition, the Proposed Consent Decree appropriately balances the interests of affected parties.

The Court may well hear from some members of the Chicago community who believe the Proposed Consent Decree goes too far and from others who believe it does not go far enough. Taken together, these conflicting perspectives highlight the impossibility of achieving a perfect balance between the interests of affected parties and suggest that the Proposed Consent Decree strikes an appropriate balance between these interests. A fair assessment of the amount of opposition among affected parties leads to the conclusion that the Proposed Consent Decree should be approved. *See Isby*, 75 F.3d at 1199.

The Court has already heard and will likely hear again opposition to the Proposed Consent Decree from the FOP. As the State demonstrated in opposing the FOP's belated attempt to intervene in this litigation, the FOP has vocally opposed the very concept of a consent decree since this litigation was first filed. (*See* Dkt. 73, at 1–3 (describing statements by FOP leadership opposing the parties' efforts to negotiate a consent decree).) Despite the FOP's opposition, the OAG solicited the FOP's views regarding potential reforms to CPD (*see* Dkt. 81-3 (summarizing proposals the FOP provided to the State in September 2017)), and the Proposed Consent Decree implements reforms that align with the FOP's proposals in many areas. The Proposed Consent Decree also appropriately respects the contractual rights embodied in the FOP's collective bargaining agreement ("CBA") with the City. Paragraphs 710 and 711 of the Proposed Consent

16

Decree expressly provide that nothing in the Proposed Consent Decree is intended to alter the CBA or to "impair or conflict with the collective bargaining rights" of the FOP's members. In addition to containing language that the FOP itself suggested (*compare* Dkt. 81-3, at 1 *with* Proposed Consent Decree, ¶¶ 710–11), these paragraphs provide the same type of protection for collective bargaining rights founds in similar police reform consent decrees entered by federal courts around the country.[4]

Although the FOP's opposition to the very concept of a consent decree is unfortunate, FOP's consent is not required. Even where, unlike here, a union successfully intervenes in litigation involving a potential consent decree between a plaintiff and the union's municipal employer, the Supreme Court has held that the intervening union "does not have power to block the decree merely by withholding its consent." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528 (1986) (affirming entry of consent decree that "impose[d] no legal duties or obligations" on objecting union).

On the other side, there will no doubt be some who object to the Proposed Consent Decree as inadequate to remedy the mistrust in CPD that has been many decades in the making. The Proposed Consent Decree is, however, more extensive than any other police reform consent decree ever approved by a federal court. The Proposed Consent Decree prescribes hundreds of

---

[4] *See United States v. Police Department of Baltimore City*, No. 1:17-cv-00099, Dkt. No. 2-2, ¶¶ 497-98 (D. Md. Jan. 12, 2017); *United States v. City of Newark*, No. 2:16-cv-01731, Dkt. No. 4-1, ¶ 220 (D. N.J. Apr. 29, 2016); *United States v. City of Cleveland*, No. 1:15-cv-01046, Dkt. No. 7-1, ¶ 399 (N.D. Ohio June 12, 2015); *United States v. City of Albuquerque*, No. 1:14-cv-01025, Dkt. No. 9-1, ¶ 340 (D. N.M. June 2, 2015); *United States v. County of Los Angeles*, No. 2:15-cv-03174, Dkt. No. 4, ¶ 209 (C.D. Cal. Apr. 28, 2015); *United States v. Commonwealth of Puerto Rico*, No. 3:12-cv-2039, Dkt. No. 57-1, ¶ 298 (D. P.R. July 17, 2013); *United States v. City of New Orleans*, No. 2:12-cv-01924, Dkt. No. 159-1, ¶ 489 (E.D. La. Jan. 11, 2013); *United States v. City of Portland*, No. 3:12-cv-02265, Dkt. No. 4-1, ¶ 189 (D. Or. Dec. 17, 2012); *United States v. Town of East Haven*, No. 3:12-cv-01652, Dkt. No. 2-1, ¶ 231 (D. Conn. Nov. 20, 2012); *United States v. City of Seattle*, No. 2:12-cv-01282, Dkt. No. 3-1, ¶ 227 (W.D. Wash. July 27, 2012).

requirements in ten different substantive areas that touch on virtually every aspect of CPD's operations. If implemented properly, the Proposed Consent Decree will fundamentally transform CPD for the better. While there may be individual provisions in the Proposed Consent Decree that will draw objections, the Court must view the document as a whole. *See Isby*, 75 F.3d at 1199. Taken as a whole, the Proposed Consent Decree is a bold, comprehensive, and durable foundation for ensuring constitutional policing in Chicago.

Of course, the Proposed Consent Decree cannot and will not cure every concern Chicagoans have about CPD. The Proposed Consent Decree does, however, provide a broad and strong remedy for redressing the decades-long pattern of unconstitutional conduct that led to this litigation. Thus, while there will be opposition to the Proposed Consent Decree, that opposition should not preclude approval of what is a fundamentally lawful, fair, reasonable, and adequate agreement.

**4.     The opinions of competent counsel favor approval of the Proposed Consent Decree.**

District courts also look to the opinions of competent counsel in assessing whether to approve a proposed consent decree. *Isby*, 75 F.3d at 1199. The opinions of competent counsel in this case favor approval of the Proposed Consent Decree.

In addition to the support of Attorney General Madigan and the rest of the State's legal and expert team, one of the State's experts, Jonathan M. Smith, was Chief of DOJ's Special Litigation Section from 2010 to 2015. In that capacity, Mr. Smith oversaw the negotiation and implementation of numerous police reform consent decrees. In light of the caliber of the State's representation, the Court can and should rely on the opinion of the State's counsel that the Proposed Consent Decree is a lawful, fair, adequate, and reasonable agreement.

The City has also been ably represented by competent counsel, including multiple attorneys from two large law firms, Taft, Stettinius & Hollister LLP, and Wilmer, Cutler, Pickering, Hale & Dorr LLP. The City has also relied on the expertise of Michael R. Bromwich, who served as the independent monitor responsible for overseeing implementation of reforms to the police department in Washington, D.C. As a result, the Court can confidently rely on the opinion of the City's counsel that the Proposed Consent Decree should be approved.

In addition to the parties' counsel, the Proposed Consent Decree has also drawn praise from the attorneys who oversaw the DOJ's investigation into CPD and helped prepare the DOJ Report. Specifically, in an August 3, 2018 letter to the *Chicago Tribune*, Christy E. Lopez, former Deputy Chief of DOJ's Special Litigation Section, praised the publicly released draft of the consent decree as "the best hope in a generation" of reforming CPD.[5] Given Ms. Lopez's role in the investigation precipitating this litigation, the Court can place confidence in Ms. Lopez's endorsement.

### 5. The parties' arms-length negotiations extended over ten months.

The negotiation process that led to the parties' agreement on the Proposed Consent Decree shows that it is not "tainted by collusion." *See Isby*, 75 F.3d at 1200.

As the Court is aware, the Proposed Consent Decree is the product of over ten months of negotiations between the parties. Those negotiations were arms-length and robust. The parties sought the Court's assistance on multiple occasions to work through disputed issues in settlement conferences. *See id.* (noting that the district court's involvement in the settlement process weighed against any suggestion of collusion). The adversarial posture of the negotiating process

---

[5] Christy E. Lopez, *Letter: The Chicago Police Department gets a chance at reform, thanks to the consent decree*, CHICAGO TRIBUNE (Aug. 3, 2018), available at http://www.chicagotribune.com/news/opinion/letters/ct-letters-chicago-police-reform-consent-decree-20180803-story.html.

is further evidenced by the fact that one issue remained outstanding as of the public release of a draft of the consent decree: whether officers should report when they point a firearm at a person. For more than a month, the parties continued to negotiate potential resolutions of that issue, while simultaneously preparing to litigate if a reasonable resolution was not attained. The parties reached agreement on that issue on September 5, 2018, and that agreement is contained in the Proposed Consent Decree.

The parties' adversarial posture during negotiations, as well as the degree to which the discussions were informed by national policing experts, CPD, and members of the public and civil rights organizations, provides further assurance that the Proposed Consent Decree is lawful, fair, reasonable, and adequate.

## VI.    CONCLUSION

The State respectfully requests that the Court, following the public hearing scheduled for October 24 and 25, 2018, grant the motion to approve the Proposed Consent Decree, and enter the Proposed Consent Decree as an order of the Court.

Dated:  September 13, 2018                     Respectfully submitted,

                                              LISA MADIGAN
                                              ATTORNEY GENERAL OF
                                              THE STATE OF ILLINOIS


                                       By:    /s/ Cara A. Hendrickson
                                              Chief, Public Interest Division
                                              OFFICE OF THE ILLINOIS ATTORNEY GENERAL
                                              100 W. Randolph St., 12th Floor
                                              Chicago, Illinois 60601
                                              (312) 814-3000
                                              chendrickson@atg.state.il.us

                                              Brent D. Stratton
                                              Gary S. Caplan

Karyn L. Bass Ehler
Thomas Verticchio
Cynthia L. Flores
Shareese N. Pryor
Leigh J. Richie
Christopher G. Wells
Mikiko Thelwell
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
100 West Randolph Street, 11th floor
Chicago, Illinois 60601
Phone: (312) 814-3000
Attorney No. 99000

Martin R. Lueck
Munir R. Meghjee
Timothy Q. Purdon
Anne M. Lockner
Patrick M. Arenz
Sharon Roberg-Perez
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Phone: (612) 349-8591