**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>              Plaintiff,<br><br>    v.<br><br>CITY OF CHICAGO,<br><br>            Defendant. | Case No. 17-cv-6260<br><br>Hon. Robert M. Dow Jr. |

**COMMENTS SUBMITTED ON BEHALF OF PLAINTIFFS IN
*CAMPBELL ET AL. v. CITY OF CHICAGO* RELATING TO THE PROPOSED
<u>CONSENT DECREE FILED IN *STATE OF ILLINOIS v. CITY OF CHICAGO*</u>**

MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-1336

Shiller Preyar LLC
601 S. California Avenue
Chicago, Illinois 60612
(312) 226-4590

Samuels & Associates, Ltd.
3440 S. Cottage Grove, #504
Chicago, Illinois 60616
(872) 588-8726

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Avenue
Chicago, Illinois 60637
(773) 702-9611

Action Injury Law Group
191 North Wacker Drive, #2300
Chicago, Illinois 60606
(312) 977-1300

Karchmar & Lambert, P. C.
211 W. Wacker, Ste. 1400
Chicago, Illinois 60606
(312) 977-1300

Northside Transformative Law Center
1543 W. Morse, 2nd Floor
Chicago, Illinois 60626
(312) 219-6544

Counsel for *Campbell* Plaintiffs

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT OF INTEREST**………………………………………...1

**COMMENTS ON THE PROPOSED CONSENT DECREE**……………………………...5

**I.     A COURT-ENFORCED CONSENT DECREE IS ESSENTIAL TO REFORM THE CHICAGO POLICE DEPARTMENT**………………………………………………5

**II.    ADDITIONAL KEY PROVISIONS ARE ESSENTIAL FOR REDUCING CPD EXCESSIVE FORCE AND DISCRIMINATORY TREATMENT, AND ENSURING LASTING CHANGE IN THE DEPARTMENT**………………………12**

**A.   The Proposed Consent Decree Must Be Modified to Insert Sufficient Protections for Survivors, Victims of Police Misconduct and their Families**………………………...12

**B.   The Proposed Consent Decree Must Be Modified to Insert Sufficient Protections for Survivors, Victims of Police Misconduct and their Families**………………………...12

**C.   The Consent Decree Must Be Modified to Include the Implementation of Diversion Programs, which are Essential to Reducing Excessive Uses of Force and Unwarranted Arrests**……………………………………………………………......39

**D.   The Consent Decree Should Require the Least-Intrusive Police Response and Protect Communities from Police Surveillance Conducted Under the Guise of "Community Policing."** ……………………………………………………………..55

**E.   If CPD Officers Continue to Be Stationed in Schools, the Proposed Consent Decree Should Be Modified to Address Key Concerns Raised in the Chicago Inspector General's Recent Investigative Report on School Resource Officers, and by DOJ in its Findings Report**……………………………………………………………...61

**F.   The Proposed Consent Decree Must Ensure All Uses Of Force Are Adequately Documented and All Taser Discharges Are Investigated**.…………………………67

**G.   The Consent Decree Should Be Modified to Require Robust Transparency Provisions in Order to Ensure Public Accountability**…………………………..74

**CONCLUSION**……………………………………………………………………81

**APPENDIX:** *Campbell* **Organizational Plaintiffs Positions of Interest**

*Exhibit A – Declarations of Survivors of CPD Violence*

*Exhibit B – Invisible Institute, Citizens Police Data Project, Data Screenshots*

***Exhibit C – Proposed Provisions Related to CPD Sexual Assault and Domestic Violence Response***

***Exhibit D – Proposed Diversion Provisions***

***Exhibit E – Proposed Modifications to Transparency Provisions***

## PRELIMINARY STATEMENT OF INTEREST

This set of written comments in response to the Proposed Consent Decree (Dkt. No. 107-1), filed by the State of Illinois and the City of Chicago ("the Parties"), is presented on behalf of the Individual and Organizational Plaintiffs who brought suit against the City of Chicago in *Campbell et al. v. City of Chicago et al.*, Dkt. No. 17-cv-4467 (N.D. Ill. Judge Lee) ("*Campbell* Plaintiffs"). *Campbell* Plaintiffs comprise the following:

*Organizational Plaintiffs*:

Black Lives Matter Chicago

Blocks Together

Brighton Park Neighborhood Council

Chicago Urban League

Justice for Families - Black Lives Matter Chicago

NAACP Westside Branch

Network 49

Women's All Points Bulletin

411 Movement for Pierre Loury

*Individual Plaintiffs*

Immanuel Campbell

Chante Linwood

Rachel Jackson

Rubin Carter

More than two months before the State filed the above-captioned action against the City, alleging widespread unconstitutional use of force by the Chicago Police Department ("CPD"),

1

*Campbell* Plaintiffs—both individuals subjected to excessive force by CPD officers and community groups that actively engage with and provide services to Chicago communities most affected by police violence—filed a civil rights class action alleging longstanding misconduct by CPD and seeking injunctive reform of the Department. *See Campbell* Class Action Compl., Dkt. No. 1. *Campbell* Plaintiffs have been on the front lines of the struggle to transform CPD for years, even decades. Their commitment to this cause, and strong advocacy on behalf of those who both have been harmed by the police and who remain at risk of future harm by CPD, is well-established.[1] It is in recognition of this strong interest that *Campbell* Plaintiffs, along with other community groups ("the Coalition"),[2] signed a Memorandum of Agreement ("MOA") with the Parties. That MOA provides the Coalition the right to enforce any consent decree entered by this Court. *See* Proposed Decree, ¶¶ 669, 709.

As set forth in these comments, *Campbell* Plaintiffs believe strongly in the need for the proposed court-enforced agreement to provide external oversight of CPD. This consent decree is essential to, at last, end CPD's well-documented practice of engaging in excessive and racially-biased force, to provide accountability for the officers who commit abuses against civilians, and to end the culture of impunity among CPD officers, supervisors and command staff, all of which has persisted in this City for generations.

In support of achieving judicial oversight of the Department, *Campbell* Plaintiffs provided recommendations to the Parties last spring concerning the content of any potential agreement governing the reform of CPD. Those recommendations culminated in a "Chicago

---

[1] The organizational groups that make up *Campbell* Plaintiffs possess unique knowledge about the issues of racially discriminatory policing, excessive force, and lack of police accountability in Chicago. Plaintiffs attach here an appendix detailing their historical efforts to reform CPD, and their particular interest in this litigation. *See* App.

[2] The Coalition consists of the *Campbell* Plaintiffs and the plaintiffs in *Communities United v. City of Chicago*, who filed their own suit against the City on October 4, 2017. *See* Compl., Case No. 17-cv-7151 (N.D. Ill.), Dkt. No. 1.

Community Consent Decree," drafted by *Campbell* Plaintiffs, and with input from other

community groups with an interest in police reform.[3]  The Community Decree is a grassroots

model for CPD's transformation.  Many of the specific provisions addressed in these comments

derive from the Community Decree, which itself is grounded in legal and empirical research, the

findings of the United States Department of Justice ("DOJ") in Chicago in 2017, provisions of

consent decrees entered into by the DOJ in other jurisdictions, model policing policies, and,

perhaps most importantly, the lived experiences of those who suffer first-hand CPD excessive

force and discriminatory treatment.

     The Parties took into account many of the recommendations encapsulated in the

Community Decree, particularly as to use of force, and including those found in the following

provisions:

- Proposed Decree, ¶ 20: Prohibits "dumping," the CPD practice of transporting "individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate."

- *Id.*, ¶¶ 30-31: Requires CPD to inform individuals in CPD custody about their right to counsel and to affirmatively provide people with access to telephones.

- *Id.*, ¶ 33: Encourages CPD officers to use alternatives to arrest and court referrals when interacting with children and teenagers.

- *Id.*, ¶ 54: Prohibits CPD officers from "using language or taking action intended to taunt or denigrate an individual including using racist or derogatory language."

- *Id.*, ¶¶ 55-56: Prohibits CPD officers from engaging in racial profiling.

- *Id.*, ¶ 58: Mandates that CPD officers allow the public to photograph and record CPD officers while officers perform police duties.

- *Id.*, ¶ 59: Mandates that CPD officers report on other officers who engage in "misconduct, including discrimination, profiling or other bias-based policing."

---

[3] That Community Decree was provided to the Parties, and then disseminated publicly in May 2018.  It is available electronically at https://www.cpdclassaction.com/cccd/.

3

- *Id.*, ¶¶ 65-67: Requires CPD to take affirmative steps to ensure language access for non-native English speakers.

- *Id.*, ¶¶ 153, 165: Requires officers to deescalate, under most all circumstances prior to using force and prohibits the use of force unless it is "objectively reasonable, necessary and proportional." Further, prohibits deadly force unless there is an imminent threat of death or great bodily harm and prohibits deadly force against a person who is a threat only to him or herself or property; requires that deadly force may be used only as a last resort.

- *Id.*, ¶ 163: Prohibits CPD officers from using force as punishment or for retaliation (including for engaging in protests and other kinds of protected First Amendment activity)

- *Id.*, ¶176: Requires that CPD officers intervene when another officer is using excessive force.

- *Id.*, ¶198: Prohibits the use of tasers on people who are non-violent, unarmed, and suspected of low-level offenses.

- *Id.*, ¶ 249: Requires hiring CPD officers so to "reflect a broad cross-section of the Chicago Community."

- *Id.*, ¶ 441: Requires the City to take steps to ensure that the independent civilian oversight agency (COPA) investigate complaints of officer sexual misconduct, including sexual abuse and assaults (as opposed to allowing CPD to continue to investigate these complaints).

- *Id.*, ¶ 488 (d) and (e): Prohibits officers who are involved in and witnesses to officer-involved shootings from discussing facts with one another before being interviewed by COPA, and establishes affirmative measures to ensure that such prohibited contact does not take place.

- *Id.*, multiple provisions: Requires that CPD and the City solicit and consider community input and feedback prior to issuing Consent Decree related policies and plans.

However, key sections of the Community Decree were *not* adopted in the Proposed Consent Decree. In particular, *Campbell* Plaintiffs object to the exclusion of essential provisions relating to Survivors' Rights and Protections, Gender- and LGBTQI-Based Protections, Diversion, Schools, and Transparency. *Campbell* Plaintiffs also take issue with the formulation

4

of the sections of the Proposed Decree addressing Community Policing, ¶¶ 8-48, and reporting and accountability for the pointing of a weapon, *id.*, ¶¶ 188-196. Plaintiffs accordingly seek specific modifications of the Decree, as outlined below.

*Campbell* Plaintiffs appreciate the Court's willingness to consider written comments from stakeholders who have a real and particular stake in the outcome of the proceedings relating to the fairness hearing and entry of a decree. *Campbell* Plaintiffs include individuals who have themselves been unfairly policed and abused by CPD and individuals who have lost loved ones at the hands of CPD. They represent groups whose members have experienced abuse, racism, and unlawful and derogatory treatment by police on a regular basis. They will feel the very real effects of any order this Court ultimately enters. Consequently, *Campbell* Plaintiffs strive to provide a perspective here that is different from any that could be offered by the Parties, or indeed by any political entity. These comments are submitted as a community vision of how policing could look in Chicago, if changes to CPD were truly transformative.

## COMMENTS ON THE PROPOSED CONSENT DECREE

## I.     A COURT-ENFORCED CONSENT DECREE IS ESSENTIAL TO REFORM THE CHICAGO POLICE DEPARTMENT.

CPD has a well-documented history of using excessive force and engaging in biased treatment of those it is sworn to protect. After a comprehensive review of CPD's records, policies, and practices, the DOJ concluded that CPD "engages in a pattern or practice of force in violation of the Constitution," DOJ Report, *State of Illinois* Compl. Ex. B,[4] at 5, that it has "tolerated racially discriminatory conduct that . . . contributes to the pattern of unreasonable

---

[4] *See also* United States Department of Justice Civil Rights Division & United States Attorney's Office Northern District of Illinois, *Investigation of the Chicago Police Department* (Jan. 2017), https://www.justice.gov/opa/file/925846/download (DOJ Report).

force,"[5] that the "CPD's pattern or practice of unreasonable force and systemic deficiencies fall heaviest on the predominantly black and Latino neighborhoods on the South and West Sides of Chicago,"[6] and that "a code of silence exists, and officers and community members know it."[7] The DOJ ultimately concluded that the City would not be able to reform "the broad problems with the Chicago Police Department . . . without a consent decree with independent monitoring."[8] *Campbell* Plaintiffs stand in strong support of the DOJ's position, and affirm that the egregious misconduct and failures of accountability described in detail in the DOJ report, the *Campbell* complaint, and the *State of Illinois* complaint, and experienced personally by thousands of civilians in Chicago, cannot and will not be remedied by the City acting alone. *Campbell* Plaintiffs ask that this Court enter the Proposed Consent Decree (with modifications), mandating CPD's reform, but with strong independent monitoring and data collection provisions to ensure the City and CPD comply with its obligations.

The *Campbell* Plaintiffs' position has been reinforced by officials at all levels of government, all of whom support the entry of a federal court-enforced consent decree over CPD. This list of advocates includes City of Chicago Inspector General Joseph Ferguson,[9] Cook County Board President Toni Preckwinkle and County Commissioner Jesus "Chuy" Garcia,[10] the

---

[5] DOJ Report, *supra* note 4, at 15.

[6] *Id.*

[7] *Id.* at 75.

[8] *Id.* at 16.

[9] Fran Spielman, *Ferguson Joins Call for Federal Court Oversight Over CPD*, CHI. SUN-TIMES (Jun. 27, 2017), https://chicago.suntimes.com/news/ferguson-joins-call-for-federal-court-oversight-over-cpd/.

[10] Bill Ruthhart and Hal Dardick, *Preckwinkle, Garcia Push Emmanuel on Federal Court Oversight of Police Reform*, CHI. TRIB. (Jun. 19, 2017), http://www.chicagotribune.com/news/local/politics/ct-toni-preckwinkle-rahm-emanuel-consent-decree-met-0619-20170616-story.html (Garcia stated: "We need a consent decree, and we need some judicial power to make sure that it happens . . . Some power brokers in decision-making positions are even reluctant to acknowledge that injustices have occurred. They're still in denial to this day that there's been torture, that there's been racism, that there's been excessive use of force when everyone in Chicago seems to know it, and the whole world seems to know it.").

Progressive Aldermanic Caucus and members of the Black Caucus within City Council,[11] and former United States Attorney for the Northern District of Illinois Zachary Fardon.[12] CPD Superintendent Eddie Johnson has declared his support for the Decree, commenting that it "will fundamentally change how CPD does business."[13] State Senator and Democratic attorney general candidate Kwame Raoul has publicly come out in support of federal court oversight, encouraged "by the prospects for meaningful and sustainable change."[14]

These prospects for systematic change under the Proposed Consent Decree are not an abstract possibility. Other jurisdictions across the country have transformed deeply troubled police departments by initiating reforms in accordance with the mandates of a strong court mandate. DOJ Civil Rights Division attorney Emily Guston described the New Orleans Police Department as "the worst police department in the country" at the time DOJ launched its investigation in 2011;[15] six years later, after the entry of a decree, Guston declared New Orleans "a completely different department…[with] the markers of true culture change."[16] United States District Judge James Robart, who oversaw the Seattle Police Department's road to compliance with a federal consent decree, found the Department to be "in full and effective compliance" in

---

[11] Fran Spielman, *Progressive Caucus Joins Chorus Demanding Federal Oversight of CPD*, CHI. SUN-TIMES (Jun. 19, 2017), https://chicago.suntimes.com/chicago-news/progressive-caucus-joins-chorus-demanding-federal-oversight-over-cpd/.

[12] Zachary Fardon, *Commentary: Chicago, Get That Consent Decree*, CHI. TRIB. (Jul. 5, 2017), http://www.chicagotribune.com/news/opinion/commentary/ct-chicago-police-consent-decree-perspec-20170706-story.html; Jason Meisner, *Fardon Issues Fiery Letter on Exist as U.S. Attorney in Chicago*, CHI. TRIB. (Mar. 14, 2017), http://www.chicagotribune.com/news/local/breaking/ct-zachary-fardon-resigns-met-20170313-story.html.

[13] Greg Hinz, *Here's What's in the Plan for Police Reform*, CRAIN'S CHICAGO BUSINESS (Jul. 27, 2018), https://www.chicagobusiness.com/article/20180727/BLOGS02/180729897/chicago-police-city-reach-consent-decree-on-police-reform.

[14] Megan Hickey, *New Consent Decree Addition Would Require CPD Officers to Report Each Time a Gun is Pointed at a Person*, ABC5 NEWS (Sept. 6, 2018), https://abc7chicago.com/cpd-may-have-to-document-each-time-gun-pointed-at-person-s-say/4160488/.

[15] Amir Vera, *Should Police Use of Force Be Regulated? The Answer Isn't Simple and That's a Problem*, CNN (Sept. 30, 2018), https://www.cnn.com/2018/09/30/us/police-use-of-force-legislation/index.html.

[16] *Id.*

2018.[17]  The Court praised Seattle's Chief of Police Kathleen O'Toole for sustaining significant progress under the agreement.[18]  Police officials operating under consent decrees herald their transformative power.  They find the results of such court oversight have been "mostly positive…and in some cases absolutely essential."[19]  Baltimore police commissioner Kevin Davis declared at a recent news conference, "I want this consent decree…We know we have to get better.  We know that over many, many years, things have occurred here that prevent the Baltimore Police Department from being the best that I can be."[20]  Former Los Angeles Police Department Chief Bill Bratton embraced the DOJ decree entered with that Department;[21] his successor, Chief Bill Beck, has been equally supportive of the decree's imposed reforms: "[The consent decree] has been the catalyst for incredible change in my Police Department. We've become accountable, we've become transparent and we've become more effective than we've ever been."[22]  Newark Police Captain Brian O'Hara has emphasized to all the officers acting under his command that the still-new consent decree is an essential order for needed change.[23]

---

[17] *United States v. City of Seattle*, Case No. 12-cv-1282-JLR, 2018 WL 348372, at *6 (W.D. Wash. Jan. 10, 2018)

[18] *Id*. at *5.

[19] Richard Perez-Pena and Sheryl Gay Stolberg, *Police Unions Hail Trump's Easing of Scrutiny. Local Officials Worry*, NYTIMES (Apr. 4, 2017), https://www.nytimes.com/2017/04/04/us/trump-police-unions-obama-justice-department-doj.html.

[20] Steve Eder, Ben Protess and Shaila Dewan, *How Trump's Hands-Off Approach to Policing is Frustrating Some Chiefs*, NYTIMES (Nov. 21, 2017), https://www.nytimes.com/2017/11/21/us/trump-justice-department-police.html. (Police chiefs and politicians "who have been living under agreements struck with the Justice Department" say that "the results of consent decrees, which are backed by court order…have been mostly positive…in some cases absolutely essential.").

[21] Joel Rubin, *Federal Judge Lifts LAPD Consent Decree* LATIMES (May 16, 2013), http://articles.latimes.com/2013/may/16/local/la-me-lapd-consent-decree-20130517.

[22] *Id*.

[23] Barry Carter, *Newark Police Train to Rebuild Trust with Residents*, NJ.COM (Mar 23, 2018), https://www.nj.com/essex/index.ssf/2018/03/newark_police_train_to_rebuild_trust_with_resident.html (Referencing the changes to the Department under the still-new decree, O'Hara affirmed that the Department can only improve: "That's how you build trust and de-escalate.").

Law enforcement officials across the country recognize a principal virtue of consent decrees, which is that they are enduring, and outlast changes in political administrations and key law enforcement posts.[24]  As T.J. Smith, a spokesperson for the Baltimore Police Department, noted, "One of the purposes that the consent decree serves is to bust right through all of that political mess that agencies like [BPD] have to deal with."[25]  Indeed, ranking law enforcement entities continue to request federal intervention as a necessary step to reform, even in the absence of support for intercession by the current administration.[26]

Empirical evidence confirms the value of consent decrees in promoting reform of large municipal police forces.  A recent study of structural reform litigation initiated by the DOJ pursuant to 42 U.S.C. §14141 revealed four overarching benefits of such intervention; in particular, a federal decree: (1) "[F]orces municipalities to invest into police reform measures that are necessary to reduce unconstitutional misconduct but that may lack local democratic support"; (2) Ensures officers "substantively comply with stated mandates" through external

---

[24] Kevin Rector, *Consent Decree Reforms Progressing Despite Leadership Shake-up, Baltimore Police Officials Say*, BALT. SUN. (Oct. 3, 2018), http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-consent-decree-progress-20180522-story.html.

[25] *Id.*

[26] Many high-level police officials have decried the federal administration's new policy of not intervening in local police departments, even in cases of systemic constitutional misconduct.  *See* Eder et al., *supra* note 20: "I kind of resist the attorney general's narrative that the Department of Justice has been this oppressive presence in law enforcement," said Chris Magnus, the police chief in Tucson, Ariz…" I actually think it's exactly the opposite. There are far more examples when they have really supported us to do innovative things."); J. Brian Charles, *Justice Dep't Ends Era of Pushing Police Reform*, GOVERNING (Sept. 28, 2017), http://www.governing.com/topics/public-justice-safety/lc-sessions-justice-police-reforms-trump-doj-milwaukee.html  (Former Chief of Police in Philadelphia and Washington D.C., Charles Ramsay, recently stated in response to a shift in federal policing priorities: "It is critical in my mind that the Justice Department be there to help institute change[.]"); *id.* (Chief of Police Chuck Jordan in Tulsa, Oklahoma has decried the Justice Department's rejection of his request to review his department, stating "Everything is on hold, and that's not a good place to be in."); Mark Berman, *San Francisco's Police Force Will Be Under State Oversight After Justice Dept. Rolls Back Federal Program*, WASH. POST (Feb. 6, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/02/06/san-franciscos-police-force-will-be-under-state-oversight-after-justice-dept-rolls-back-federal-program/?utm_term=.3673bcc29424 (Upon the Justice Department rolling back its federal police oversight program, the state of California initiated oversight of San Francisco's police department in its stead.  California Attorney General Xavier Becerra stated: "When local law enforcement agencies reach out for support, the last thing our federal government should do is abandon them.").

9

monitoring, which also generates "extensive data on frontline officer behavior, thereby enhancing transparency and proving opportunities for public accountability"; (3) "[P]rovides leadership within police departments with a rare opportunity to enact top-down misconduct reforms," and (4) May even "reduce a police department's civil liability."[27]   Other studies of structural litigation have similarly found that it reduces police misconduct.  The Vera Institute of Justice, in an analysis of the aftermath of the federal consent decree entered in Pittsburgh, concluded that as a result of the decree, the police department both revised "policies on the use of force and other tactics" and "training in cross-cultural communication and tactics to defuse confrontational situations," and additionally made it easier for civilians to file complaints.[28] Importantly, Vera determined that "the accountability mechanisms remained intact after the lifting of the decree."[29] A study by the RAND Corporation of the Cleveland Police Department, conducted eight years after the entry of a collaborative agreement with the Department that included court-ordered monitoring, found the force "is not the same as the department that policed Cincinnati in 2001."[30]  Among many of the described changes was one of perception; in a survey of police-community relations, Black respondents reported "greater perceived police professionalism" and "significant decreases in the perception of the use of racial profiling" by

---

[27] Stephen Rushin, *Structural Reform Litigation in American Police Departments*, 99 MINN. L. REV. 1343, 1396-97 (2015).  The study was based on interviews with stakeholders in jurisdictions subject to such litigation, as well as statistical data gleaned from court documents, monitor reports, and police departmental records.  *Id.* at 1365-66, 1396-97.

[28] Robert C. Davis et al., *Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree*, VERA 2 (Apr. 2005), https://storage.googleapis.com/vera-web-assets/downloads/Publications/can-federal-intervention-bring-lasting-improvement-in-local-policing-the-pittsburgh-consent-decree/legacy_downloads/277_530.pdf. Vera relied on interviews with over a hundred officers, focus groups, interviews with officials, a review of monitor reports, a survey of Pittsburg civilians, and an analysis of police statistics. Id. at 5-6.

[29] *Id.* at 17.

[30] Greg Ridgeway et al., *Police-Community Relations in Cincinnati*, RAND xxx (2009), https://www.rand.org/pubs/monographs/MG853.html.

the police.[31]  Finally, a 2009 analysis of the Los Angeles Police Department determined that as a

result of the court-ordered decree over the department, serious crime was down in the City,

residents saw substantial improvement in the ability of LAPD to police effectively while

respecting people's rights, and the use of serious force had fallen dramatically.[32]

Academic opinion, too, supports court-ordered reform of police departments.[33]  This is

particularly true where those efforts include the participation of community stakeholders to

ensure "the legitimacy of the reform process."[34]  Beyond the improvements to human welfare

and in community perceptions of police, consent decrees also provide financial benefits to those

municipalities operating under their edicts, *i.e.*, a reduction in the number of civil lawsuits filed

against the police department.[35]

The strength of support for such intervention, and from such diverse sources, is indicative

of the established benefits of court-ordered decrees—and their history of turning around even

large departments with long records of misconduct.  Law Professor Stephen Rushin, who has

---

[31] *Id.* at 89-90.

[32] Christopher Stone et al., *Policing Los Angeles Under a Consent Decree: They Dynamics of Change at the LAPD*, http://assets.lapdonline.org/assets/pdf/Harvard-LAPD%20Study.pdf.  The Harvard analysis relied on participant observation at all levels of police command, surveys of officers and LA residents, analysis of administrative data on crime, arrests, stops, civilian complaints, police personnel and use of force, and a series of focus groups and interviews with officers, officials and LA residents.  *Id.*

[33] See, e.g., Debra Livingston, *Police Reform and the Department of Justice: An Essay on Accountability*, 2 BUFF. CRIM. L. REV. 815, 845 (1999) (Federal consent decree s provide "an opportunity to push local police departments in the direction of best practices in the area of police accountability while not relinquishing the benefits of local knowledge and experimentation with regard to this subject.") (examining the results of consent decrees entered in Pittsburgh and Steubenville, Ohio); Mary D. Fan, *Panopticism for Police: Structural Reform Bargaining and Police Regulation by Data-Driven Surveillance*, 87 WASH. L. REV. 93, 93 (2012) (arguing that structural reform litigation, like that brought by DOJ, "may yield smarter and farther-reaching reforms and remedies based on data-driven surveillance than could be achieved through litigation and judicial decision.").

[34] Kami Chavis Simmons, *The Politics of Policing: Ensuring Stakeholder Collaborating in the Federal Reform of Local Law Enforcement Agencies*, 98 J. CRIM. L. & CRIMINOLOGY 489, 494 (2008).

[35] Zachary A. Powell et al., *Police Consent Decrees and Section 1983 Civil Rights Litigation*, 16 CRIMINOLOGY & PUB. POL'Y 575, 591 (2017) (conducting statistical analysis of 23 jurisdictions under decrees to find that DOJ intervention is associated with a decrease in the expectation of civil filings by 23% to 36%)

provided perhaps the most in-depth academic analysis of structural police reform in recent years, contends that consent decrees remain "by far the best mechanism we have to combat police misconduct."[36]

A decree is a critically important mechanism that will ensure true change in the Chicago Police Department and protect the communities that have been most harmed by police abuse.

**II.     ADDITIONAL KEY PROVISIONS ARE ESSENTIAL FOR REDUCING CPD EXCESSIVE FORCE AND DISCRIMINATORY TREATMENT, AND ENSURING LASTING CHANGE IN THE DEPARTMENT.**

*Campbell* Plaintiffs support the entry of the Proposed Decree. However, in order to truly transform CPD, this Decree must be modified to meet the needs of Chicago's communities, as set forth below.

**A.     The Proposed Consent Decree Must Be Modified to Insert Sufficient Protections for Survivors, Victims of Police Misconduct and their Families.**

The Proposed Consent Decree fails to provide comprehensive, community-based, and trauma-informed support services for people victimized by CPD officers. In fact, the Consent Decree lacks even the most basic language aimed at governing how police interact with those who have survived law enforcement violence or lost loves ones because of unwarranted police shootings and other forms of excessive force. These omissions all but guarantee that the deep divides that exist between CPD and communities will persist. The Decree should be modified to include specific protections for survivors.

---

[36] Matt Stroud and Mira Rojanaskul, *A 'Pattern or Practice' of Violence in America*, BLOOMBERG (May 27, 2015), https://www.bloomberg.com/graphics/2015-doj-and-police-violence/ (After reviewing outcomes of federal interventions in local law enforcement since 1994, the authors determined that federal oversight results in "positive changes and forces police officials and officers to give serious thought to how they interact with the citizens they serve.").

**1. Chicago Communities Have Overwhelmingly Negative Interactions with the Police.**

Across the country, confidence in law enforcement is low among Black and Latinx populations.[37]  A nationwide Pew Research Center survey found that while 77% of White people express confidence in the ability of police in their community to gain the trust of local residents, just 51% of Hispanic people and 45% of Black people say the same.[38]  Chicago is no exception to this trend.  The Chicago Police Accountability Task Force (PATF) released a report nine months prior to the DOJ Findings, found that communities of color in Chicago were "justified" in their lack of trust in CPD, a result of "disproportionately negative experiences with the police over an extended period of time."[39]  The PATF determined that the lack of community trust was closely tied to patterns of excessive force by law enforcement, in particular: "CPD's own data gives validity to the widely held belief the police have no regard for the sanctity of life when it comes to people of color."[40]

This lack of trust is exacerbated by the poor interactions between CPD and survivors of police abuse.  The DOJ rendered clear observations about the failure of CPD officers to treat victims of police abuse, and their families, with respect:

---

[37] See Ranjana Natarajan, *Racial Profiling Has Destroyed Public Trust In Police. Cops Are Exploiting Our Week Laws Against It*, WASH. POST (Dec. 15, 2014), https://www.washingtonpost.com/posteverything/wp/2014/12/15/racial-profiling-has-destroyed-public-trust-in-police-cops-are-exploiting-our-weak-laws-against-it/?utm_term=.155f6cd11a8d.

[38] See Jens Manuel Krogstad, *Latino Confidence in Local Police Lower than among Whites*, PEW RESEARCH CENTER (Aug. 28, 2014), available at http://www.pewresearch.org/fact-tank/2014/08/28/latino-confidence-in-local-police-lower-than-among-whites/.

[39] Chicago Police Accountability Task Force, *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities They Serve* 13 (Apr. 2016), https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf (PATF Report).

[40] *Id.* at 7.  Statistical evidence emphasizes the racial disparities in use of force by police.  Between 2010 and 2015 about four out of every five people shot by police were Black males—or, 80% of the 262 people shot by Chicago Police (this is despite Black people comprising just one-third of Chicago's population). See Jennifer S. Richards, et al., *92 deaths, 2,6623 bullets: Tracking every Chicago police shooting over 6 years*, CHI. TRIB. (Aug. 26, 2016), http://www.chicagotribune.com/news/watchdog/ct-chicago-police-shooting-database-met-20160826-story.html.

> A striking feature of our conversations with members from Chicago's challenged communities was the consistency with which they expressed concern about the lack of respect in their interactions with police, whether those interactions come when they are targets of police activity or when they or their family members are the victims of crime.[41]

The DOJ also found that officers face little accountability for being disrespectful toward community members, using derogatory and foul language toward civilians, and otherwise evincing an attitude of disdain toward those they are sworn to protect.[42]  The DOJ determined that, time and again, CPD officers made little effort to provide information to family members of people who were crime victims, or to otherwise do what was necessary "to convey their commitment and care" to the communities affected by violence.[43]  In particular, the DOJ detailed the following:

> A young man told us how, after his brother was killed, he would go to the station to talk to someone about the investigation and officers would roll their eyes and say dismissively, 'we're working on it.  Families told us of detectives not interviewing key homicide witnesses or suspects, declining to obtain relevant video footage, and failing to update parents on the status of investigations, or even return their calls.  One woman said that the Department switched the detective who was handling her son's homicide investigation without telling her.  Another woman stated that she has to resort to getting information "on the street" about her son's case instead of from the detective, who told her that she "calls too much."  This same woman told us that it took a week after her son was killed before anyone at CPD reached out to her.  One mother told us that she felt CPD did not think her child was worthy of having his homicide solved.  Yet another mother complained that police did not investigate the murder of her son, but sent her a bill for the cleanup of his body.

The experiences of *Campbell* Plaintiffs, and their loved ones, underscore these investigative findings.  Attached to this brief are the declarations of survivors of police violence whose loved ones were killed by the police.  *See* Declarations, attached hereto as

---

[41] DOJ Report, *supra* note 4, at 14-15.

[42] *Id.* at 99, 113

[43] *Id.* at 140.

14

Exhibit A.  They include the declarations of Dorothy Holmes, whose son, Ronald

"Ronnieman" Johnson, was killed by Chicago Police on October 12, 2014; Arewa Karen

Winters, whose nephew, Pierre Loury, was shot and killed by CPD on April 11, 2016;

Martinez Sutton, whose sister, Rekia Boyd, was shot in the head by a former CPD

officer; Tiffany Boxley, whose son, Joshua Beal, was shot and killed by an off-duty

officer on November 5, 2016; and Cynthia Lane, whose son, Roshad McIntosh, was

killed by Chicago Police on August 24, 2014.  These survivors speak in heart-wrenching

detail about the utter lack of respect showed to them by the CPD officers assigned to their

loved ones' cases.  They describe the lack of information they received when searching

for their loved ones' bodies (and in some cases, the misinformation they received, in

CPD's apparent attempts to thwart their ability to locate family members).  Above all,

they highlight CPD's and the City's failure to provide any kind of services, including

trauma-informed counseling, and even information about the investigation into their

loved ones' cases, in the aftermath of the police-involved shootings.

      The case of Bettie Jones is also symbolic of CPD's culture of disrespect that

surrounds police victims and their families.  On December 26, 2015, Bettie Jones, a 55-

year-old mother of five, was accidentally killed by Chicago Police who were responding

to a domestic disturbance call at a West Garfield Park apartment building.  After the

shooting, police did not check to see whether Bettie, an innocent bystander, was alive.[44]

Instead, Bettie's daughter, Latisha Jones, was the one to find her mother, bleeding and

injured inside of the building.[45]  While seeking the assistance of officers on the scene, a

---

[44] *See* Compl., ¶ 26, filed in *Latarsha Jones v. City of Chicago*, Case No. 2016-L-000012 (Cir. Ct. Ck. Cty.),
available at https://www.scribd.com/doc/294604896/Jones-Lawsuit (Jones Complaint).

[45] *Id.*, ¶ 31.

CPD officer told Latisha to just "get over it" because her mother was dead.[46] The survivors of Bettie Jones' family, including her children, were given no financial or emotional support in the aftermath of the shooting. The City ultimately reached a $16 million settlement with the family in 2018.[47]

In short, the experiences of survivors and community members detailed here, as well as the many others that occur on a regular basis in this city, are indicative of a widespread practice of CPD officers mistreating victims, and survivors, and depriving them of dignity.[48]

Officers on the ground experience the ramifications of declining civilian trust in the police. During focus groups of sworn officers conducted at the request of the Attorney General's Office, 33% of officers opined that the biggest challenge the Department faced was a general lack of support.[49] In particular, "[m]any of the focus group participants indicated that the ability to conduct their job safely and effectively was impeded by a decline in police-community relations in recent years, and a general lack of community support."[50]

## 2. The Decree Must Provide Services and Support for Survivors of Police Violence.

---

[46] *Id.*, ¶ 32.

[47] See Dan Hinkel, *City Reaches $16 Million Settlement Over Innocent Bystander Shot Dead By Cop*, Chi. Trib., (Jun. 12, 2018), available at http://www.chicagotribune.com/news/local/breaking/ct-met-bettie-jones-settlement-20180611-story.html.

[48] "When state actors ignore the voice of individuals based on racial or ethnic hostility … they affix a more or less permanent label on an individual as somehow worthless and deprive the communities of dignity." Andrew S. Baer, *Dignity Restoration and the Chicago Police Torture Reparations Ordinance*, 92 Chi. Kent. L. Rev. 769, 775 (2017) (quoting Robert E. Lane, *Procedural Goods in a Democracy: How is Treated Versus What One Gets*, 2 Soc. Just. Res. 177, 179 (1988)).

[49] See *Opinions of Officers of the Chicago Police Department on the Upcoming Consent Decree: A Report to the State of Illinois Office of the Attorney General*, Police Foundation 9 (July 2018), available at http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/07/Opinions-of-Officers-of-the-Chicago-Police-Department-on-the-Upcoming-Consent-Decree-Final.pdf.

[50] *Id.* at 17.

Survivors of police violence and their families are entitled to be treated fairly, with dignity and respect. This should be a fundamental component of all policing activities and can be accomplished through the adoption of procedural justice mechanisms.[51] These processes are designed to provide both parties (in this case, the police and the community) with a voice, to ensure that each party is treated with respect and courtesy, to promote trustworthiness among all stakeholders, and to require that each party act without bias.[52] In the law enforcement context, this requires the implementation of strong transparency policies within police departments, *i.e.*., "[w]hen a critical incident occurs, [law enforcement] agencies should try to release as much information about it as possible, as soon as possible."[53] It also requires that departments provide robust, trauma-informed services for victims and survivors of crime,[54] including for those who are victimized by police officers.

The IACP has identified the "seven critical needs" of victims and survivors that law enforcement "must address[.]"[55] These include: *Safety* ("Law enforcement officers must protect victims from intimidation and educate them as to how to decrease their likelihood of re-victimization, thereby helping community members feel safer and more secure.); *Support* ("Law enforcement needs to ensure that victims receive current and accurate referral information about

---

[51] *Id.* at 10 ("External procedural justice focuses on the ways officers and other legal authorities interact with the public and how the characteristics of those interactions shape the public's trust of the police.").

[52] See Rebecca Hollander-Blumoff, *Procedural Justice and Policing: Four New Directions*, 52 WASH U. J. L. & POL'Y 67, 69 (2016).

[53] United States Department of Justice, Community Relations Services Toolkit for Policing, *Importance of Police-Community Relationships* 2, https://www.justice.gov/crs/file/836486/download.

[54] See International Association of Chiefs of Police, *Enhancing Law Enforcement Response to Victims: A 21st Century Strategy* 14 (Aug. 31, 2018), https://www.theiacp.org/sites/default/files/all/i-j/IACP_Strategy_REV_09_Layout_1.pdf ("When victims observe law enforcement officers who can understand crisis and trauma reactions and facilitate access to appropriate support services and information, they are more likely to cooperate in ongoing investigations and follow up.").

[55]*Id.* at 23.

17

victim service professionals whose role is to provide ongoing support and assistance.");
*Information* ("[L]aw enforcement should assist in keeping victims apprised of the status of the
investigation and prosecution."); *Access* ("Law enforcement agencies need to ensure that
information is readily available in languages that represent the community's composition.");
*Continuity* ("Law enforcement needs to collaborate with victim service providers and other
criminal justice professionals to ensure that victims receive consistent information and support
throughout their involvement with the justice system."); *Voice* ("Law enforcement needs to
empower victims by encouraging them to ask questions and listening to their concerns."); and
*Justice* ("Law enforcement needs to directly improve victims' sense of safety and well being by
conducting thorough investigations, follow-ups, and doing their part to hold offenders
accountable.").[56]  The City of Chicago, through the Consent Decree, should adopt its own
procedural justice mechanisms, similar to those outlined by the IACP, in order to assist
communities (and in particular survivors of police violence).

### 3.  The Proposed Consent Decree Should Be Modified to Adopt Strong Survivor Rights Protections.

The current iteration of the Consent Decree contains no provisions providing support or
assistance to those who are harmed by police, or to the families of victims of police violence.
This is despite the fact that the Proposed Decree contains detailed provisions concerning officer
wellness and support, which include access to clinical mental health services for those who
"expose themselves to significant danger, high stress, and a wide spectrum of human tragedy."
*See* Proposed Decree, Section IX.  Victims and survivors of police violence, who have

---

[56] *Id.* at 23-24.

themselves experienced trauma, high stress, and danger as a result of CPD actions, are entitled to no less.

Specifically, in order to address the systemic deficiencies outlined by DOJ and experienced by the survivor declarants, the Decree should require that the City provide at least three types of services following a police use of force resulting in injury or death: (1) respectful treatment of the victim and survivors; (2) physical and mental healthcare and trauma-informed support services for survivors; and (3) the provision of information to families and loved ones relevant to the investigation of police misconduct and any subsequent court proceedings. Accordingly, *Campbell* Plaintiffs seek the following modifications to the Decree:

<u>Respectful Treatment of Victims and Survivors of Police Violence</u>: The Proposed Consent Decree provides only that, in event of an officer-involved shooting or death, CPD members "will treat the deceased with respect, including the prompt screening from public view or covering of the deceased…."). Proposed Decree, ¶ 491. This is a critically important provision, but it is insufficient to promote the legitimacy of a police force that has just harmed a member of the community. In addition to the above, CPD officers must:

    a. Refrain from handcuffing the deceased or family members;

    b. Allow family members and/or emergency contacts access to the deceased loved one, if requested;

    c. Remove the deceased from the scene as soon as it is documented, in most cases with an hour of the time of death;

    d. Facilitate access of the deceased's family members and support system at any medical facility or morgue; and

    e. Allow an individual who is receiving emergency medical care to contact their family/support system so that the individual can immediately inform them of their whereabouts and the nature of the injury. In the event that the individual is unable to make such contact themselves, CPD must provide the relevant information to the individual's family/next of kin.

<u>Physical and Mental Health Care, and Trauma-Informed Support Services</u>:  In the event that a CPD officer's actions have resulted in an individual's death or injury, the Decree must ensure that physical and mental health care and trauma-informed support services are available for survivors and their families.  In particular, the City should:

    a. Ensure that a trained bereavement specialist immediately contacts the deceased individual's family/next of kin or closest known associate and provides them with accurate information about the whereabouts of their loved one;

    b. Fund and make available trauma-informed psycho-social support services for survivors of police violence and the families of both victims and survivors of police violence, for as long as necessary. These services should be made available to individuals and families within 24 hours of the incident; and

    c. Provide financial resources for families left with exorbitant and unexpected expenses incurred as a result of police violence, including burial costs and lost wages.

<u>Investigation and Case Information</u>:  The Decree must task CPD with keeping victims, family members and close associates apprised of developments in any investigation stemming from the police use of force.  In this vein, the City should provide, at no cost to the individual or his or her survivors, medical examiners' reports, arrest reports, TRRs, investigative reports, and all other documentation related to the incident.  Additionally, should the case proceed to criminal court, CPD must keep in regular touch with survivors about those proceedings.

The Consent Decree is an appropriate vehicle by which to ensure the protection of victims and survivors of police violence.  It is typical for consent decrees addressing systemic police misconduct to implement substantive sections aimed at remedying problems particular to that municipality.  For instance, prior to 2014, the New Orleans Police Department received widespread criticism, including from the City's Inspector General, for failing to pursue a

significant number of complaints of sexual assault.[57]  As a result, the consent decree subsequently entered into by the City and the NOPD included a detailed section on sexual assault investigations and supervision, specifically addressing the investigative problems identified by the Inspector General.[58]  The Ferguson decree, in order to address what the DOJ found to be rampant distrust of the Ferguson Police Department by the community, and in particular, "a 'systemic problem' with youth not wanting to work with police,"[59] contained provisions intended to foster better civilian-police relationships, including thorough revisions of FPD's school resource officer program that were designed to limit the arrests of youth at school.[60]

The survivor protections outlined here are essential to address the specific challenges facing Chicago Police.

### B. The Consent Decree Must Contain Provisions Designed to Stop Gender- and LGBTQI-Based Violence Perpetuated By CPD.

According to recent census data, over half of Chicago's population is comprised of women and girls.[61]  Black women make up 18% and Latinas 14% of Chicago's overall population.[62]  Chicago is also home to a growing LGBT population—7.5% of Chicago's adult

---

[57] See Campbell Robertson, *New Orleans Police Routinely Ignored Sex Crimes*, Report Finds, NYTIMES (Nov. 12, 2014), https://www.nytimes.com/2014/11/13/us/new-orleans-police-special-crimes-unit-inquiry.html.

[58] See Section X(A), Amended and Restated Consent Decree Regarding the New Orleans Police Department, *United States v. City of New Orleans*, Case No. 12-cv01924 (E.D. La), available at https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/2018-03-15-Amended-and-Restated-NOPD-Consent-Decree-CLEAN.pdf/ (New Orleans Consent Decree).

[59] United States Department of Justice, Civil Rights Division, *Investigation of the Ferguson Police Department* 80 (Mar. 4, 2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department_report.pdf.

[60] See Section XI, Consent Decree, *United States of America v. City of Ferguson*, Case No. 16-cv-180-CDP (E.D. Mo.), available at https://www.justice.gov/opa/file/833431/download (Ferguson Consent Decree).

[61] *See* Suburbanstats, https://suburbanstats.org/population/illinois/how-many-people-live-in-chicago (last accessed Oct. 11, 2018) (citing United States Census Bureau data).

[62] *Id.*

21

population currently identifies as such.[63]  The Proposed Consent Decree purports to protect all Chicagoans from police misconduct, but it lacks many of the specific provisions required in order to ensure the safety and well-being of women, girls and members of the LGBTQI community.  There is a critical need for these provisions.  Driven by deficiencies in CPD practices and policies, officers frequently engage in gender- and LGBTQI-based bias, violence and misconduct, both on- and off-duty.  The provisions recommended here will ensure that the tenets of the Proposed Decree apply with full force to all Chicagoans, without regard to gender or LGBTQI status.  In the absence of these provisions, women, girls and members of the LGBTQI community will remain vulnerable to systemic police abuse and violence.

    **1.  The Public Record Demonstrates That CPD Systemically Targets Women and LGBTQI Individuals with Violence and Abuse.**

CPD's violence against Black men has generated national headlines over recent years.[64] Less reported but no less significant is the pattern of CPD's targeted violence towards women, girls and LBTQI individuals.  According to the journalism production company, the Invisible Institute, which tracks police misconduct complaints, 43% of all complaints filed against CPD officers from 2006 to 2016 were filed by women.[65]  These include over 5,000 allegations of

---

[63] *See* Tanveer Ali, 1*46,000 Chicago Adults Identify as LGBTQ: City Study*, CHI. SUN-TIMES (Mar. 30, 2018), https://chicago.suntimes.com/news/146000-chicago-adults-identify-as-lgbtq-according-to-a-city-study/.

[64] *See, e.g.*, Sentinel News Service, *Report: Black Men, Boys Shot Most by Chicago Police*, LA SENTINEL (Sept 1, 2016), https://search-proquest-com.turing.library.northwestern.edu/docview/1822592988?accountid=12861; Katie Reilly, *Majority of Chicago Police Shooting Victims are Black Men or Boys: Report*, TIME (Aug. 27, 2016), http://time.com/4469377/chicago-police-shootings-black-men/; Rob Waters, H*elping Boys Become Men – And Stay Alive in Chicago*, FORBES (Mar. 9, 2016), https://www.forbes.com/sites/robwaters/2016/03/09/helping-boys-become-men-and-stay-alive-in-chicago-2/#1fbdf3615a50; Dahleen Glanton, *Another Black Man is Killed By Police, and the Distrust Grows Deeper,* CHI. TRIB. (Jul. 16, 2018), http://www.chicagotribune.com/news/columnists/glanton/ct-met-glanton-column-south-shore-killing-20180716-story.html.

[65] Invisible Institute, Citizens Police Data Project, Data Screenshots (last accessed Oct. 12, 2018), attached as Exhibit B.

excessive force, 2,242 allegations of domestic violence, and 1,130 allegations of verbal abuse.[66]

During the same time, 1,668 people complained of verbal abuse on the basis of "sexual

orientation."[67]   The narratives below underscore the extent to which CPD's abuse of women,

girls and members of the LGBTQI community has become systemic:

- On April 3, 2016, CPD Officers beat Chante Linwood, a Black woman, at a nightclub.  The club security had denied Ms. Linwood entrance to the club and then called over CPD officers to intervene.  The officers proceeded to slam Ms. Linwood to the ground, pull her hair and push her into a building.  Throughout this encounter, CPD taunted and harassed her.[68]  Ms. Linwood is one of the named Plaintiffs in the *Campbell* litigation and she seeks relief on behalf of herself and all women who encounter CPD.

- CPD also used physical force to stop Rachel Jackson, a 26-year-old Black woman, from filming the abuse Ms. Linwood suffered at the hands of CPD officers.  CPD also slammed Ms. Jackson into a wall, handcuffed her, taunted her, and harassed her.[69] She, too, is a named Plaintiff in the *Campbell* litigation and seeks relief on behalf of herself and all women who encounter CPD.

- On December 26, 2015, a police officer shot and killed 55-year old Bettie Jones, an innocent bystander, while attempting to apprehend a teenager who was experiencing a mental health crisis.[70]

- On October 6, 2015, a CPD officer physically assaulted off-duty female police officer Venus Rodriguez and her female companion.  The responding officers, upon discovering that the assailant was a member of CPD, refused to allow the victims to lodge official complaints, did not provide medical attention for the women, and refused to investigate the incident, including by interviewing witnesses or reviewing security camera footage.[71]

- On December 12, 2014, a CPD officer struck Josette Roberts in the face as she was walking home from a gathering, causing her to fall to the ground and lose consciousness.  As a result of the abuse, Ms. Roberts lost a tooth and suffered facial

---

[66] *Id.*

[67] Invisible Institute, Citizens Police Data Project, https://data.cpdp.co/data/LdRzj3/ (last accessed Oct. 10, 2018) (CPDP).

[68] *See* Second Am. Compl., *Campbell v. City of Chicago*, No. 17-cv-4467, Dkt. No. 83, ¶¶ 266-78.

[69] *Id.*, ¶¶ 279-91.

[70] Hinkel, *supra* note 47; *see also* Jones Complaint, *supra* note 44.

[71] See *Rodriguez v. City of Chicago*, Case No. 17 CV 7248, 2018 WL 3474538 (N.D. Ill. Jul. 19, 2018)

fractures, bruising, and ongoing headaches. Because of her injuries, she was unable to immediately return to work and lost her job.[72]

- On September 22, 2014, Paris Martin sustained a fractured collarbone when CPD officers forcibly removed her from her car, slammed her against the vehicle, twisted her arm painfully behind her back and "slammed [her] body, including her left upper chest, against the car several more times."[73]

- In March 2012, an off-duty CPD officer was engaged in an argument with a group of people. The officer drew his gun and fired five shots in a dark alley, hitting Rekia Boyd, a 22-year-old woman, in the back of the head and killing her.[74]

- On April 14, 2009, CPD officers arrested Adrian Searcy, a LGBTQ individual, in connection with a traffic incident, despite the reports of eyewitnesses who stated that Searcy had not caused the accident. The officers made several offensive remarks about Searcy's sexual orientation. Searcy spent several months in jail and had his license revoked, but was later acquitted of all charges.[75]

- On July 15, 2012, Regina Willis was listening to music from her car radio when CPD officers told her to turn it down and asked for her license. After she refused, the officers removed her forcibly from the car and handcuffed her. The officers then "struck [her] to the ground" and threw her in the squad car, causing her to suffer a "contusion to her left brow, swelling and bruising to her left eye, and swelling and bruising to both her arms."[76]

- On October 13, 2011, CPD officers, without cause, dragged Jermeka Neil out of the passenger side of a vehicle and made derogatory comments about her sexuality.[77]

During its investigation, the DOJ highlighted several other incidents of police targeting women and girls. In particular:

---

[72] See *Settling for Misconduct: Police Lawsuits in Chicago*, CHI. REPORTER, http://projects.chicagoreporter.com/settlements/case/15-cv-1463/ (last accessed Oct. 11, 2018) (Settling for Misconduct). This database summarizes complaints against Chicago Police officers resulting in lawsuits and settlements or judgments. The information is based on federal and state court records, as well as City of Chicago records. *See Settling for Misconduct: About this Project*, http://projects.chicagoreporter.com/settlements/about.html.

[73] Compl., *Martin v. City of Chicago*, et al., Case No. 1:14-cv-08940, Dkt. No. 1 (N.D. Ill. Nov. 7, 2014).

[74] Zach Stafford, *Chicago Police Officer Who Fatally Shot Rekia Boyd Quits Force Before Hearing*, THE GUARDIAN (May 17, 2016), https://www.theguardian.com/us-news/2016/may/17/rekia-boyd-chicago-police-quits-dante-servin. *See also* Ex. A (Declaration of Martinez Sutton).

[75] Settling for Misconduct, *supra* note 72, http://projects.chicagoreporter.com/settlements/case/11-cv-432/.

[76] *See* Compl., *Willis v. City of Chicago et al.*., Case No. 1:13-cv-04385, Dkt. No. 1 (N.D. Ill. Jun. 13, 2013).

[77] *See* Compl., *Neil v. Lesch et al.*, Case No. 1:12-cv-08220, Dkt. No. 1 (N.D. Ill. Oct. 12, 2012).

- Officers used a taser in "drive-stun mode" against a woman in mental health crisis and whose only documented actions were that she failed to follow verbal commands and that she stiffened. Officers provided no narrative of the encounter other than to write that the woman was "a high risk mental" who needed to be transported to a hospital for a "mental evaluation."[78]

- CPD Officers hit a 16-year-old girl with a baton and then tasered her after she was asked to leave the school for having a cell phone in violation of school rules.[79]

- A CPD officer pushed an 18-year-old female student onto his police car, chipping her tooth, purportedly because she screamed profanities and flailed her arms. The officer reported that the injury occurred when he performed "an emergency take-down maneuver to regain control." The girl was 5'4" tall and weighed 120 pounds, while the officer was 6'1" and weighed 186 pounds.[80]

In addition to physical abuse and verbal harassment, CPD Officers routinely engage in sexual misconduct, ranging from lewd remarks to sexual photography, groping, and rape. In several cases, the officers involved escaped punishment and were allowed to perpetrate additional acts of misconduct. An analysis of some of the settlement agreements reached between the City of Chicago and survivors of sexual abuse reveals that a majority of such victims are women of color or LGBTQI individuals.

- In February 2018, a CPD officer who was assigned to watch over a man on suicide watch in police custody grabbed the man's genitals and took pictures of the man's genital area. The officer later forced the victim into a bathroom and sexually assaulted him.[81]

- On September 20, 2016, a CPD officer took a woman, who approached him to report an unrelated incident, into his office, pressed her against the wall, groped her, kissed

---

[78] DOJ Report, *supra* note 4, at 32-33.

[79] *Id.* at 34.

[80] *Id.* at 43.

[81] Megan Crepeau, *Chicago Cop Charged with Sexually Assaulting Suspect Who was in Custody at Hospital*, CHI. TRIB. (Mar. 20, 2018), http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-cop-charged-sex-assault-20180320-story.html.

her neck, tried to reach into her clothing, and directed sexual comments toward her. She was forced to drive to a different police district to file a complaint.[82]

- On October 8, 2015, CPD officers falsely claimed that they had observed James Crockett make a drug sale and subsequently subjected him to a strip search. The charges were dropped and the City settled with the Crockett.[83]

- On June 13, 2015, CPD officers handcuffed Jimmie Dale Miller, placed him in a headlock, kicked him, and subjected him to a strip-search. As a result, Mr. Miller suffered multiple broken bones in his face. None of the officers who witnessed this conduct intervened to protect Mr. Miller. [84]

- On November 8, 2013, a CPD Sergeant was accused of sexually harassing and abusing a female police officer, Kelly Hespe, who worked under his supervision over the course of 5 years. Hespe alleged that the sergeant sent her sexually suggestive text messages and eventually forced her to engage in sex with him repeatedly, while both were on-duty, from November 2009 until 2012. When Hespe tried to end the relationship, the sergeant threatened to end her career, stalked her at her home and at her daughter's school, and followed her movements at work using GPS.[85] Despite a subsequent internal investigation and lawsuit, the sergeant was recently promoted to lieutenant. He also has a history of sexual harassment allegations over the course of his career, including fondling and taking sexual photographs of a woman while he frisked her.[86]

- On September 20, 2013, a CPD officer falsely arrested Virgil Gipson for theft and then subjected him to a strip-search, ordering Gipson to spread his buttocks and squeezing his genitals while searching his underwear.[87]

- On June 25, 2013, a CPD officer took Lemia Britt's cellphone while she was in police custody, and searched it without her consent. The officer found several sexual photos of the victim on her phone and forwarded them to his personal cellphone.[88]

---

[82] Megan Crepeau, *Former Chicago Cop Charged with On-Duty Sexual Abuse*, CHI. TRIB. (MAR. 29, 2018), http://www.chicagotribune.com/news/local/breaking/ct-met-chicago-police-officer-sex-abuse-charge-20180329-story.html.

[83] *See* Settling for Miscon*duct*, *supra* note 72, http://projects.chicagoreporter.com/settlements/case/15-cv-8757/.

[84] *See id.*, http://projects.chicagoreporter.com/settlements/case/16-cv-2446/.

[85] See Liam Ford, *Chicago Police Officer Says Sergeant Forced Her to Have Sex*, CHI. TRIB. (Nov. 8, 2013), http://www.chicagotribune.com/news/ct-xpm-2013-11-08-chi-chicago-police-officer-says-sergeant-forced-her-to-have-sex-20131107-story.html.

[86] Tim Novak and Robert Herguth, *Chicago Cop Promoted to Lieutenant Amid Sexual Misconduct Investigation*, Lawsuit, CHI. SUN-TIMES (Aug. 24, 2018), https://chicago.suntimes.com/news/chicago-police-department-cop-promoted-lieutenant-amid-sexual-misconduct-investigation-lawsuit-watchdogs/.

[87] *See* Settling for Misconduct, *supra* note 72, http://projects.chicagoreporter.com/settlements/case/14-cv-8151/.

[88] *See id.*, http://projects.chicagoreporter.com/settlements/case/14-l-2820/.

- On November 30, 2004, Lilia Arias was pulled over by a CPD officer, who demanded that Arias "flash" him. Arias refused and she was taken to the station, where the same officer told Arias that she should meet him the following day, without underwear, and "do a little dance for him." Arias refused again. The officer asked her once again to flash him. She refused yet another time. When Arias complained to CPD, the Internal Affairs Division investigated the incident, found Arias credible, but failed to discipline the officer. That same officer went on to engage in similar sexual misconduct with other women. As a result of one of those other incidents, the officer was criminally charged with official misconduct and suspended from the force.[89]

- On March 30, 2011, CPD officers offered to drive Jane Doe home from the El train station. While Doe was in the car, one of the CPD officers sexually assaulted her. When the officers arrived at Doe's home, they insisted on coming inside, where she was sexually assaulted again. The officers were subsequently charged with criminal sexual assault and official misconduct.[90]

- On July 6, 2010, CPD officers entered Tiwanda Moore's bedroom while responding to a domestic disturbance call and proceeded to sexually assault her by touching her breasts and buttocks. The woman attempted to file a complaint but was dissuaded from doing so by CPD officers. The woman recorded the officers attempts to prevent her from reporting their colleagues and was prosecuted (and found not guilty) of illegally recording law enforcement.[91]

- The DOJ documented an incident in which a CPD officer was reported to have raped a woman, who subsequently filed a complaint but who did not want to sign an affidavit out of fear of retaliation. The woman provided an account of the rape to investigators on two separate occasions, yet the investigators did nothing to pursue her claims.[92]

- On May 22, 2010, a CPD officer told Charles Norwood, who was in police detention, that he would receive bail sooner if he engaged in sexual acts with the officer. Norwood was then sexually abused by the officer. Norwood was later arrested four more times for minor offenses, and while in lockup on each of these instances, was

---

[89] *See* Arias v. Allegretti, Case No. 05 C 5940, 2008 WL 191185 (N.D. Ill. Jan. 22, 2008).

[90] *See* Settling for Misconduct, *supra* note 72, http://projects.chicagoreporter.com/settlements/case/11-cv-3502/.

[91] Eugene Volokh, *Women Jailed Two Weeks for Recording Chicago P.D.'s Internal Affairs Officers Can Sue for a Fourth Amendment Violation*, WASH. POST (May 1, 2014), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/01/woman-jailed-two-weeks-for-recording-chicago-p-d-s-internal-affairs-officers-can-sue-for-a-fourth-amendment-violation/?utm_term=.a624001ce870 (citing Mem. Op. and Order, Moore v. City of Chicago, Case No. 12-cv-238, Dkt. No. 106 (N.D. Ill. Apr. 28, 2014)).

[92] DOJ Report, *supra* note 4, at 79.

coerced by the same officer into performing sexual acts. That officer had a pattern of targeting and abusing gay men in his custody.[93]

- On June 6, 2012, a CPD officer made suggestive comments towards Parresse Edwards, who was in his custody, and ordered her to engage in sexual acts with him. Edwards was able to collect evidence of the assault, however, when she attempted to report the incident to another officer, she was redirected to the officer who assaulted her. That officer attempted to intimidate her out of filing a complaint. Edwards later reported the officer's misconduct yet again, after which the officer was fired and charged with multiple felonies.[94]

- On July 26, 2012, a CPD officer ordered Michael Ivy into his squad car and threated to arrest him unless he performed oral sex on the officer. Ivy complied but preserved the DNA evidence in a tissue and later filed a complaint. There is no record of the DNA evidence having been tested.[95]

- In 2005, a CPD officer made repeated unlawful sexual contact with a fourteen-year-old girl who he met in the Cook County Juvenile Court. The officer resigned in 2008, ostensibly to avoid termination.[96]

### 2. CPD Fails to Address Domestic Violence Allegations Against Officers, or Track Physical Abuse Allegations, in Order to Identify Officers with a Propensity for Violence.

A study by the Invisible Institute found that between 2000 and 2016, more than 6% of all CPD officers were accused of physical domestic abuse.[97] Those same officers also received 50% more use-of-force complaints than their peers.[98] The study found that officers with the most complaints were less likely to be disciplined, and only 1.2% of domestic abuse cases resulted in

---

[93] *See* Settling for Misconduct, *supra* note 72, http://projects.chicagoreporter.com/settlements/case/13-cv-2590/.

[94] *Id.*, http://projects.chicagoreporter.com/settlements/case/13-cv-4228/.

[95] *Id.*, http://projects.chicagoreporter.com/settlements/case/13-fcrl-1/.

[96] Order, *In the Matter of Charges Filed Against Police Officer George Aonate*, Star. No. 8612, Department of Police, City of Chicago, Case No. 07 PB 2649 (CR No. 309801), https://policeboard-prod.s3.amazonaws.com/uploads/case/files/07PB2649_Order.pdf.

[97] Josh McGhee, *Cops Accused Of Domestic Violence Get 50 Percent More Excessive Force Complaints, Are Rarely Punished: Invisible Institute Data*, BLOCK CLUB CHICAGO (Aug. 16, 2018), https://blockclubchicago.org/2018/08/16/cops-with-domestic-violence-history-get-50-more-excessive-complaints-are-rarely-punished-invisible-institute-data/.

[98]*Id.*

an officer being suspended or fired.[99]  A separate investigation by news channel ABC 7 uncovered 5,280 domestic violence complaints filed against CPD officers between 2000 and 2017.[100]  Following an internal Department investigation, 92% of the police domestic violence complaints led to no disciplinary action against the involved officers.[101]

The DOJ Report likewise noted that in about half of all credible domestic violence complaints lodged against Chicago Police Officers, no real discipline was meted out; the officer's record received a simple "violation noted."[102]  This occurred even in cases where the allegations of violence were supported by physical evidence or witness accounts.[103]  Further, although allegations of domestic violence or excessive force by officers are facially inappropriate for mediation,[104] approximately 50% of the mediations from 2013 to 2015 were for such claims.[105]  The DOJ also found that in domestic violence cases, investigators were quick to credit officers' versions of events despite the availability of additional evidence. [106]  In particular, the agency determined that investigators tasked with investigating domestic violence cases did not appear to be trained in understanding the dynamics involved in such cases.   One investigator stated that he believed that it was "up to [the survivors of domestic violence] if they wanted to talk," and admitted that he had not received any training on how to get domestic violence victims

---

[99] *Id.*

[100] Chuck Goudie et al., *Most Chicago Police Accused of Domestic Violence Go Undisciplined*, ABC7 NEWS (Feb. 17, 2017), https://abc7chicago.com/news/cpd-officers-who-are-accused-of-domestic-violence-often-go-undisciplined/1758664/.

[101] *Id.*

[102] DOJ Report, *supra* note 4, at 55.

[103] *Id.*

[104] See Section B(3)(b)(2), *infra*.

[105] DOJ Report, *supra* note 4, at 55.

[106] *Id.* at 68.

to trust him and provide information about the assault.[107]  Another conceded that many of the investigators handling domestic violence cases believe that an incident does not qualify as domestic violence unless it is "a punch in the face,"; as a result, many allegations of abuse that do not meet this threshold are not investigated.[108]

Unsurprisingly, the DOJ documented several instances in which CPD officers involved in domestic violence incidents received either little or no punishment; some of those officers went on to commit acts of excessive force while on the job.  CPD officers have used their badges as shields to protect them from consequences resulting from physical domestic battery. For instance:

- A CPD officer's wife called the police to report that her husband had pointed his gun at her during an argument.  The investigation revealed that the officer had a 19-year history of physically abusing her.  The victim's son told investigators that he had pulled out a barbeque fork during the incident to protect himself and his mother.  The officer admitted to pulling out his gun during the argument but said he did so because his son had come at him with the fork and had punched him.  The investigator's summary report noted that there were "conflicting descriptions" of the physical altercation, and that the officer "denied committing the alleged act."  The investigator also noted that "although it is undisputed that [the officer] pointed his weapon at [the victim's son], the described sequence of events is in conflict, and the appropriate finding is not sustained."  Throughout the case summary report, the investigator credited the officer's version of events over others at the scene and, despite two contrary witnesses and the officer's history of domestic abuse, found that because the officer claimed the alleged events did not occur, there was not enough evidence to sustain any of the allegations of misconduct.[109]

- An officer fractured his girlfriend's nose during a domestic dispute.  In that case, investigators recognized the seriousness of the allegations and requested an affidavit override after they could not secure the victim's agreement to participate in the investigation because the victim feared retaliation from the officer and his friends within CPD.[110]

---

[107] *Id.* at 70.

[108] *Id.*

[109] *Id.* at 68.

[110] *Id.* at 55.

- An officer was the subject of several complaints of domestic violence over the course of just a few years, none of which CPD acted upon. After the officer's ex-wife brought four separate complaints of domestic violence and harassment against him between 2007 and 2008, many of which were closed for no affidavit or deemed not sustained, CPD finally disciplined the officer for domestic violence, and gave the officer a 15-day suspension. The officer then went on to engage in domestic violence on two more occasions, which resulted in serious injuries to the officer's victims.[111]

- An officer allegedly pushed his girlfriend to the ground, hit her on the head with an object and injured her, having allegedly abused her four other times in the past. The victim said she wanted to "work on their relationship" and CPD closed the case rather than attempting to gain her cooperation and investigate fully.[112]

- A CPD officer was involved in three shootings within one year, and received three domestic violence allegations against him in the years prior—yet he was not listed by CPD as an individual who was considered for enrollment in the CPD's early warning system.[113]

### 3. The Proposed Consent Decree Needs to Mandate Systemic Change in CPD Practice and Policy in Order to Prevent Gender- and LGBTQ-Based Bias and Abuse.

The Proposed Decree contains important provisions that prohibit the use of verbal abuse by officers, mandate independent investigation of sexual misconduct by officers, and implement transparency and oversight measures related to such investigations. However, the Decree is missing key components, essential to address the violence and abuse suffered by women and LGBTQI individuals at the hands of police. In particular, in order to address gender- and LGBTQI-based bias and abuse within CPD, the Department must: (1) prevent such abuse from occurring through the use of proactive hiring, promotion, and training procedures, the creation of an effective early intervention system, and new policy development; (2) respond to any abuse committed by CPD officers through an appropriately rigorous accountability and disciplinary system; and (3) ensure public transparency by documenting investigations, officer discipline, and

---

[111] *Id.* at 115.

[112] *Id.* at 70.

[113] *Id.* at 115.

reporting data on incidents of gender-and LGBTQI-based bias. The proposed modifications are set forth in more detail below.

### a. Provisions Related to the Prevention of Bias and Abuse

### 1) Hiring and Continuous Screening of CPD Officers

Once CPD officers are hired and have passed their probationary periods, because of various provisions contained in the collective bargaining agreement, there are multiple barriers to terminating an officer even where he or she engages in serious misconduct. Because of this, CPD must select new recruits with the upmost care. The Decree provides that CPD will recruit and hire only those who have "the core set of characteristics and capabilities of qualified recruits." Proposed Decree, ¶ 259(a). This core set of characteristic and capabilities must include the demonstrative ability to police without engaging in gender or sexual orientation bias or abuse. Accordingly, CPD should be required to conduct extensive background investigations of new recruits that includes an evaluation of divorce and family court records and social media records for evidence of a history of domestic violence or bias.

The IACP's recent publication on addressing sexual misconduct by law enforcement similarly suggests that potential recruits be subjected to a rigorous screening process consisting of medical, psychiatric, psychological, polygraph, and integrity testing; detailed personal interviews; and thorough background investigations, including a review of social networking websites.[114] The IACP further recommends that any candidate found to have a history of sexual misconduct or to have participated in unacceptable sexual activities be deemed ineligible for

---

[114] International Association of Chiefs of Police, *IACP Executive Guide: Addressing Sexual Offenses and Misconduct by Law Enforcement* 7 (Aug. 13, 2018), https://www.theiacp.org/sites/default/files/all/a/AddressingSexualOffensesandMisconductbyLawEnforcementExecut iveGuide.pdf (IACP Executive Guide).

employment.[115]  Sexual misconduct in this context includes both criminal and non-criminal

behavior.  Screening is an effective tool to stave off future problems: "[Addressing these issues]

after they arise is an ineffective operating model and a lapse in critical oversight that can create

significant liability while risking the public's trust and confidence."[116]  Including provisions in

the Decree aimed at combating gendered misconduct starting as early as the officer hiring

process will both affirm CPD's stance against such conduct and exclude individuals more likely

to commit such acts from the force, thereby reducing instances of future misconduct.

 CPD must also put in place policies to ensure continuous screening of officers once they

are on the job to determine if they remain fit for duty and to evaluate whether they have

demonstrated any propensity for gender bias and/or violence.  The Decree provides for an Early

Intervention System that requires an analysis of multiple data points to determine if an officer is

"at-risk" for engaging in behavior that violates CPD policy.  Proposed Decree, ¶ 587.  One of

those data points concerns analysis of "judicial proceedings where an officer is the subject of a

restraining order or protective order, which CPD will require officers to report."  *Id*.  Given the

data discussed above regarding the correlation between domestic violence and unlawful uses of

force, this data point must also take into account accusations of domestic violence.  Additionally,

CPD must not rely solely upon officers to report these instances, but should set up a confidential

reporting line for the partners and family members of officers to report, in addition to

affirmatively conducting searches of the relevant court dockets.

 Finally, CPD must be mandated to regularly conduct background checks to ensure

compliance with the federal Lautenberg Amendment, 18 USC § 922 (g)(9), which prohibits

---

[115] *Id*. at 8.

[116] *Id.* at 6.

anyone convicted of misdemeanor that has an element of domestic violence from possessing a firearm. As noted in the Congressional record "anyone who attempts or threatens violence against a loved one has demonstrated that he or she poses an unacceptable risk, and should be prohibited from possessing firearms."[117] CPD must comply with this law.

### 2) Policy Development and Implementation

CPD's policies animate department practices and inform officer training. Despite the importance of maintaining comprehensive policies governing CPD's interactions with the public, CPD fails to explicitly prohibit its officers from engaging in sexual misconduct. To remedy this, the Consent Decree provides that within 180 days of the effective date, the Department will develop and implement a sexual misconduct policy that is "consistent with best practices." Proposed Decree, ¶ 63. There are two problems with this requirement. First, six months is far too long for the CPD to continue to operate without a policy that it should have had in place long ago—and desperately needs now. The time for policy development should be cut down to three months. Second, CPD's sexual misconduct policy must be required to include, at a minimum, specific prohibitions on the following: (1) verbal sexual harassment; (2) sexual harassment using physical gestures; (3) taking and/or transmitting sexually-motivated pictures or videos and transmitting sexually-motivated texts; (4) sexual humiliation; (5) sexually-motivated traffic stops, street stops, summonses or arrests; 6) sexual or romantic propositions; (7) gratuitous physical contact with suspects (*e.g.*, over-the-clothing groping during frisks, inappropriate or unnecessary searches or frisks, etc.); (8) on-duty sexual activity; (9) any sexual activity with any person in CPD custody or in the custody of any law

---

[117] CONGRESSIONAL RECORD, p. S11878 (Sept. 30, 1996), available at https://www.congress.gov/crec/1996/09/30/CREC-1996-09-30.pdf.

enforcement or correctional department; and (10) conducting cavity searches, including vaginal and/or rectal searches, of any person on the street and/or in an environment where the person being searched lacks sufficient privacy.[118]  In this vein, the language in paragraph 63 of the Proposed Decree should be interpreted as requiring these specific prohibitions to ensure that the policy comforts with best practices governing accountability for law enforcement. Incorporating the specific language into the text of the Decree, however, will help to conserve the resources of the Court, the Parties and the Coalition by obviating the need to argue over which "best practices" should govern the sexual misconduct policy.

Additionally, the Consent Decree makes no mention of body-cavity searches or strip-searches.  Such invasive searches have been found to be invasive, humiliating, and traumatizing, even when conducted according to protocol.[119]  Additionally, strip searches can easily escalate to a form of sexual violence where officials are in a position to order an individual in their custody to remove clothing and make physical contact with the searching officers.[120]  Consequently, the Consent Decree must include language restricting the use of these practices.  It should prohibit body cavity searches unless there exists a warrant based on probable cause and a medical professional is present to conduct the search.[121]  Further, strip searches should be prohibited except in "exigent circumstances where the life of the officers or

---

[118] See IACP Executive Guide, *supra* note 114, at 3-4.

[119] Daphne Ha, *Note: Blanket Policies For Strip Searching Pretrial Detainees: An Interdisciplinary Argument For Reasonableness*, 79 FORDHAM L. REV. 2721, 2722 (2011).

[120] See *IACP Model Policy for Strip and Body Cavity Searches* (Dec. 1995), https://www.theiacp.org/sites/default/files/all/s/StripBodyCavitySearchesPolicy.pdf.

[121] New Orleans Consent Decree, *supra* note 58, ¶ 134.

others may be placed at risk, under conditions that provide privacy, and with the explicit approval of a supervising officer."[122]

### 3) Training Related to Gender-Based Crimes

Training is the primary method by which CPD communicates and reinforces policies, procedures and expectations. The issues emphasized in training demonstrate CPD's values and priorities. Positively, the Consent Decree requires annual training related to use of force. *See* Proposed Decree, ¶ 245. In contrast, however, training related to CPD's response to gender-based crimes is slated to occur only every three years and there is no explicit training requirement related to the still-to-be-formulated sexual misconduct policy. The Consent Decree should be amended to provide for annual training—developed with input from sexual assault and gender based violence survivors—on these matters.

It is similarly imperative that the Decree contain provisions governing how officers respond to people who report that they have survived sexual assault and/or domestic violence at the hands of other civilians. As noted by the IACP, "predators select victims based on vulnerabilities and a perceived lack of credibility, and therefore, victimization is often higher among certain populations including: (1) minors; (2) individuals in prostitution and/or the commercial sex industry; (3) individuals under the influence of drugs or alcohol; (4) immigrants and undocumented persons; (5) individuals with limited English proficiency; (6) people with mental illness or developmental challenges; (7) individuals with physical disabilities; and (8) those who have been victimized previously."[123] To ensure that the police response does not further victimize those who are already vulnerable, the Decree should be modified to include the

---

[122] *Id.*, ¶ 132.

[123] IACP Executive Guide, *supra* note 114, at 15.

provisions set forth in Exhibit C, in order to ensure that CPD responds to and investigates such reports appropriately.

### b. Provisions Related to CPD's Response to Gender- and LGBTWI-Based Bias and Abuse.

#### 1) Review of Complaints for Bias and Audit of CPD Response to Survivors of Sexual Assault and Domestic Violence

Given the sensitive nature of acts involving gender- and LGBTQI-based violence, bias, and sexual misconduct, such offenses are significantly under-reported.[124]  For these reasons, the Consent Decree should require that CPD and the police oversight entity take affirmative steps to screen all complaints for evidence of bias.  If the complaint indicates the possibility of gender or sexual orientation bias, even if not specially alleged by the complainant, the investigation should result in explicit findings related to whether the officer's actions were motivated by animus and/or implicit or explicit bias.  Relatedly, the Consent Decree should also mandate that both CPD and the oversight body conduct regular check-ins with individuals who report gender-based crimes and sexual assault, to ensure that CPD's response is trauma-informed and survivor-centered and not undermined by bias.

#### 2) Ending the Use of "Mediation" to Ensure Accountability for Domestic Violence Perpetrated by CPD Officers

Mediation is a tool that the police oversight apparatus can use to address complaints community members allege against police officers.  *See* Proposed Decree, ¶¶ 510-12. However, as noted by the DOJ, without proper checks and balances, mediation can be misused, allowing violent officers to circumvent accountability.  The DOJ explicitly found that using mediation to

---

[124] The IACP has described the problem of underreporting this way: "[F]urther complicating a full understanding of the scope of the problem is due in part to the reluctance of victims to report to authorities. In addition to experiencing the trauma of the violation, victims struggle with feelings of humiliation and fear retaliation or not being believed." IACP Executive Guide, *supra* note 114, at 3-4.

resolve domestic violence is inappropriate.[125] Mediation in this context is particularly "problematic because it minimizes the serious, repetitive nature of this abuse and allows abusers to avoid meaningful punishment, which may empower them to continue the cycle of abuse.[126] In spite of this, approximately 50% of the police mediations from 2013 to 2015 were for domestic violence or other facially inappropriate issues.[127] Moreover, mediation often leads to lesser disciplinary penalties for the officer involved and allows officers to accept a sustained finding on a less serious charge in exchange for the more serious complaint being dropped from the file.[128]

The Proposed Consent Decree does provide that within one year of the effective date, CPD's accountability system will develop policies related to the "criteria for determining incidents eligible for resolution through mediation." Proposed Decree, ¶ 512. The Consent Decree should be modified to provide that mediation should only be used in limited circumstances, and never for allegations that include actual or attempted physical harm, harassment, constitutional violations or discrimination. This will help prevent the abuse of the mediation process, and ensure accountability for officers facing allegations of domestic violence and other gender-based offences.

### 3) Generation of Gender and LGBTQI Bias Report by the Deputy OIG

Paragraph 561 of the Consent Decree provides that the OIG will hire a staff person "responsible for diversity and inclusion issues who will have specific authority to review CPD actions for potential bias, including racial bias … [and] will regularly publish reports on

---

[125] DOJ Report, *supra* note 4, at 55.

[126] *Id.* at 55 n. 19.

[127] *Id.*at 55.

[128] *Id.*

38

diversity and inclusion issues…."  This analysis must also incorporate a review of CPD's actions for potential gender bias and biased conduct based on LGBTQI status.

### c. Provisions Related to Transparency and Gender Bias and Gender/LGBTQI-Based Violence

The public has a right to know when its police force is engaging in sexual misconduct, and/or gender/LGBTQI bias.  The Consent Decree provides that on a *monthly* basis aggregate data will be made available related to use of force.  Proposed Decree, ¶ 581.  But it states that only on an *annual* basis will the OIG will publish data related to investigations of sexual misconduct complaints against CPD officers.  *Id.*, ¶ 444.  Data related to police misconduct that disproportionately affects women and members of the LGBTQI community should be made available on the same basis and as often as use of force data—in order to ensure parity and to provide the public with a full and accurate picture of CPD operations.

### C. The Consent Decree Must Be Modified to Include the Implementation of Diversion Programs, which are Essential to Reducing Excessive Uses of Force and Unwarranted Arrests.

There is widespread documentation of CPD over-policing Black and Brown neighborhoods and escalating incidents when encountering people suspected of non-violent offenses.  Data and narratives collected by the Independent Police Review Authority ("IPRA") and its successor—the Civilian Office of Police Accountability ("COPA")[129]—demonstrate this pattern of escalation, incidents that often result in excessive uses of both non-deadly and deadly force.  The implementation of pre-arrest diversion programs, in conjunction with policies that

---

[129] COPA was established pursuant to Municipal Code of Chicago Chapter 2-78 (COPA ordinance). The City agency should, by design, operate independently from CPD.  Its mission is to: "Provide a just and efficient means to fairly and timely conduct investigations within our jurisdiction; Determine whether allegations of police misconduct are well-founded; Identify and address patterns of police misconduct; and Make policy recommendations to improve the Chicago Police Department, thereby reducing incidents of police misconduct." *See* COPA, About COPA, https://www.chicagocopa.org/about-copa/mission-history/ (last accessed Oct. 12, 2018).  Prior to the creation of COPA in 2016, this same function was supposed to be performed by IPRA.  *See id.*

require supervisorial approval for certain minor offenses, reduce incentives for police to escalate incidents and result in the development of community mediation and restorative justice programs, will go farther than any other proposed change in CPD policy and practice to transform the culture of the Department and mitigate its officers' use of excessive force.[130]  A diverse array of organizations serving both law enforcement and communities have endorsed the diversion approach to reducing harm.  Further, jurisdictions throughout the country have successfully implemented diversion programs, with positive reductions in recidivism and police abuses.  Chicago should follow these models.

### 1. Chicago Police Escalate Situations, Leading to Unnecessary and Avoidable Uses of Force.

CPD officers frequently engage in overly aggressive tactics that unnecessarily escalate situations and lead to excessive force and needless arrests.[131]  In situations that do not require police intervention, as well as where officers stop individuals for low-level offenses, officers repeatedly resort to excessive force by using tasers and guns, even when the individuals do not present a threat to the officers or any bystanders.[132]  The Police Accountability Task Force found that CPD officers approach "routine situations with an overaggressive and hostile demeanor,

---

[130] *See, e.g.*, Emily Haney-Caron, Juvenile Law Center, *Diversion Programs Can Help Keep Youth Out of "The System" By Preventing Arrests* (Apr. 15, 2016) (describing a youth diversion program in Clayton County, Georgia that involved referral to a mediation program and lesser consequences for certain offenses and was successful in reducing school arrests by more than 80% without reducing safety); Karen Tamis and Cymone Fuller, *It Takes A Village*, VERA (Jun. 2016), https://www.vera.org/publications/it-takes-a-village (describing a pre-arrest diversion crisis mediation program in Sarpy County, Nebraska that "reduces the average call time for a police officer from two or three hours to just 76 minutes…[which allows] police [to] have more time to respond to other calls, leaving them poised to better serve the needs of the community at large"); *United States of America v. Baltimore*, Case No. 17-cv-00099-JKB, Dkt. No. 2-2, at ¶ 63 (Jan. 12, 2017), available at https://www.justice.gov/opa/file/925056/download (Baltimore Consent Decree); *see also note* 160 *infra*, describing the link between diversion and reduced uses of police force.

[131] DOJ Report, *supra* note 4, at 28.

[132] *Id.* at 32.

using racially charged and abusive language."[133]  The DOJ similarly found that CPD officers

commit tactical errors that unnecessarily escalate situations and "result in avoidable uses of force

and resulting harm, including deaths."[134]  The DOJ also reported that CPD officers regularly use

retaliatory force against people who object to being stopped.[135]  Addressing people in crisis in

particular, the DOJ determined that CPD uses excessive force against these individuals when

force is avoidable and appropriately-trained officers could de-escalate the situations.[136]  The risk

of excessive force stemming from escalation of minor incidents is made worst by the fact that

Chicago has engaged in quality-of-life policing for years.  CPD officers as a matter of practice

arrest people, disproportionately in minority communities, for minor offenses that include

congregating, sleeping, eating and/or drinking in public places; graffiti; public urination;

panhandling; littering; unlicensed street vending; disorderly conduct; street drug trafficking,

prostitution; and gambling.[137]

Further contributing to the problem of unnecessary escalation, CPD has created economic

incentives for officers to arrest people and thereby intensify interactions with community

members.[138]  A 2017 audit conducted by the OIG detailed findings about CPD's practice of

---

[133]  PATF Report, *supra* note 39, at 16.

[134] *Id*. at 28.

[135] DOJ Report, *supra* note 4, at 33-34.

[136] *Id*. at 37.

[137] *See* Dirk Johnson, *Chicago Council Tries Anew With Anti-Gang Ordinance*, NYTIMES (Feb. 22, 2000), https://www.nytimes.com/2000/02/22/us/chicago-council-tries-anew-with-anti-gang-ordinance.html; CBS Chicago, *City Council Approves Increased Penalties For 'Quality of Life' Crimes*, CBS CHICAGO (Apr. 10, 2013), https://chicago.cbslocal.com/2013/04/10/city-council-approves-increased-penalties-for-quality-of-life-crimes/; Quinn Ford, *Broken Windows Policing Strategy Needed in Chicago, Garry McCarthy Says*, DNAINFO (Mar. 11, 2013), https://www.dnainfo.com/chicago/20130311/chicago/broken-windows-policing-strategy-needed-chicago-garry-mccarthy-says/; Mick Dumke, *Watchdogs: Blacks Bear Brunt of Marijuana Enforcement in Chicago*, CHI. SUN-TIMES (Aug. 22, 2016), https://chicago.suntimes.com/news/watchdogs-the-grass-gap-racial-disparities-in-pot-enforcement/.

[138] Office of Inspector General, *CPD Overtime Controls Audit* (Oct. 3, 2017), https://igchicago.org/2017/10/03/cpd-overtime-controls-audit/ (last accessed Oct. 11, 2018).

trolling, which occurs when officers actively seek "traffic, disorderly conduct or other violations at the end of a shift" or when they "make an arrest at the end of a shift as a result of escalating a situation which would have been in the officer's discretion to dismiss."[139]  Officers are encouraged to troll by the promise of receiving financial compensation for additional arrests. Under most circumstances, officers will make "one and one half times" their regularly hourly rate when they accumulate trolling-related overtime, a perverse incentive that does little to improve community-police relations or reduce occurrences of excessive force.[140]

There are numerous documented examples of CPD failing to apply de-escalation and diversion principles on the job.  In each of the below scenarios, officers responded with unreasonable force through the use of tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat.

- On April 27, 2012, a Black teenager refused to give up his cell phone in school, and in response, a CPD officer yelled and pointed his finger in the teen's face, directed profanities at him, and chest bumped, choked, and pushed him.[141]

- On December 22, 2013, a Black woman was traveling in a car near 95th Street and South LaSalle Street, where CPD officers were conducting a traffic stop on another vehicle.  The woman stopped her vehicle behind the car on which the officers were conducting the stop.  An officer arrived on the scene, jumped out of his car, and began shooting in the direction of the woman's vehicle, firing approximately sixteen rounds.  The woman put her vehicle into reverse to avoid the gunfire but struck another vehicle, injuring herself and damaging both cars. The woman also witnessed the officers using unnecessary force on the juveniles who had been stopped in the other vehicle.[142]

- On September 11, 2015, officers conducted a field interview on someone suspected of drinking an alcoholic beverage from a cup.  The suspect was a Black man who started to run away from the police as they approached him.  The

---

[139] *Id.* at 6.

[140] *Id.* at 13.

[141] Independent Police Review Authority, *Abstracts of Sustained Cases*, CHICAGO COPA (Jan. 2017), https://www.chicagocopa.org/wp-content/uploads/2017/02/January-2017-Abstracts.pdf.

[142] See Compl., *Clark v. City of Chicago, et al.*, Case No. 15-cv-11467, Dkt. No. 1 (N.D. Ill. Dec. 18, 2015).

officers chased him, and tased him in the back. Officers then transported the man to the hospital for treatment for lacerations on his face that he sustained after falling to the ground when he was tased. The man also suffered bruises and a swollen eye, more indicative of a punch than a laceration sustained from a fall. The man was charged with resisting, drinking on the public way and marijuana possession.[143]

- On October 7, 2015, a Black man and an officer were having a conversation in a lockup. Video depicts them speaking calmly. Suddenly, the officer grabbed the man around the neck, pushed him against the door and choked him. The video clearly shows that the man was no threat to the officer and made no motions that could be construed as threatening. Another white officer, who was sitting behind a desk, walked over to the officer and the man, but failed to intervene, standing and watching as the first officer continued to choke the man, who was by that point on the ground.[144]

- Videos from March 11, 2016 depict a man, who was filming during the Donald Trump rally and protest, being grabbed from behind and thrown to the ground by officers. As he was being handcuffed, an officer placed his boot on the man's neck. The man was charged with resisting arrest, though the videos evidence no show of resistance.[145]

- On April 16, 2016, officers responded to a retail theft at Walmart. A Black man was suspected of taking deodorant and soap without paying for the purchase. The man started to flee from the officers who responded to the call. For this minor offense, officers performed an emergency takedown of the man, as well as an "armbar" and "wrist lock." The man was subsequently arrested and taken to the hospital for injuries.[146]

- On May 7, 2016, a man was in police custody, calmly walking, when an officer grabbed his hoodie from behind and threw him to the floor. When the man attempted to get up, the officer slammed him to the floor again and pinned him down. Another officer pointed his Taser at the man. The officers then dragged the man on the floor and handcuffed his arm to a bench. The man remained on the floor unmoving, surrounded by officers, until the paramedics arrived about eight minutes later. The officer's report states that during processing, the man became aggressive and began swinging his fist at the officer, attempting to strike

[143] Independent Police Review Authority, LOG #1079273, CHICAGO COPA, https://www.chicagocopa.org/case/1079273-3/.

[144] Independent Police Review Authority, LOG #1077477, CHICAGO COPA, https://www.chicagocopa.org/case/1077477-2/.

[145] Independent Police Review Authority, LOG #1080601, CHICAGO COPA, https://www.chicagocopa.org/case/1080601/.

[146] Independent Police Review Authority, LOG #1084058, CHICAGO COPA, https://www.chicagocopa.org/case/1084058/.

the officer, and necessitating the deployment of a taser and a takedown. This report is a fabrication; the video does not show the man swinging his fists or in any way threatening the officer.[147]

- Videos from June 13, 2016 show a White officer on top of a Black man, pushing him into the ground and grabbing his dreadlocks. A crowd of Black people surrounded the officer and the man, yelling for the officer to let the man go. Another White officer arrived on the scene and he screamed at the crowd to retreat. At one point the man's hand reached up in the air and the second officer responded by stomping on the man's face. The crowd yelled at the officers, telling them that they stomped the man for no reason. By that point, the man was lying on the street, unmoving. He remained on the street, as officers yelled at the individual recording on his cell phone to "put down the phone" and "get off the street or else you're going to jail."[148]

- On June 23, 2016, officers responded to a disturbance at a Walgreens. A 59-year-old man refused to leave the store after being denied a refill of his prescription. When officers attempted to arrest the man, he swore at the officers and pulled away from the officers' grip. The officers then physically detained the man by using "wrist locks" and an "arm bar." The man was arrested and taken to the hospital for injuries incurred in the incident.[149]

- On August 18, 2016, a CPD officer pulled over a Black man for disobeying traffic codes, failure to stop at a stop sign, and using an alley as a through street. Immediately after pulling the man over, the officer drew his gun and pointed it near the man and his passenger. After the man got out of his vehicle, the officer handcuffed him for nearly twenty-five minutes.[150]

- On September 1, 2016, a CPD officer responding to a domestic disturbance call discharged his Taser at a Black man while he was in handcuffs and beat him with a baton, despite the fact that the man was not combative or resistant.

- On November 5, 2016, a Latinx man was brought into police custody at the 9th District police station on a charge of criminal damage to property. Video shows that, while he was in custody, the man began banging on the door to the holding cell with his handcuffs. The officer entered the holding cell and shoved the man down so hard that his head hit the floor, causing him to suffer a head fracture and

---

[147] Independent Police Review Authority, LOG #1080437, CHICAGO COPA, https://www.chicagocopa.org/case/1080437/.

[148] Independent Police Review Authority, LOG #1080972, CHICAGO COPA, https://www.chicagocopa.org/case/1080972-2/.

[149] Independent Police Review Authority, LOG #1081740, CHICAGO COPA, https://www.chicagocopa.org/case/1081740/.

[150] Independent Police Review Authority, *Abstracts of Sustained Cases*, CHICAGO COPA (May 2017), https://www.chicagocopa.org/wp-content/uploads/2017/06/May-Abstracts-2017.pdf.

brain bleed. The man was hospitalized in critical condition as a result of the unnecessary use of force.

- On November 21, 2016, officers pulled over the vehicle of a 20-year-old Black man for failure to signal and a broken light over his license plate. The officers asked the man to get out of his vehicle and instructed him to put his hands up and stop moving. Video of the incident shows that while attempting to search the man, the officers violently pushed him to the ground and handcuffed him, kneeling on top of him and at one point suggested tasing him. A police report of the incident states that the officers searched the car because they smelled marijuana during the stop, but the man was not charged with drug possession. Officers did charge the man with resisting arrest and ticketed him for not having functioning license plate, failing to use a turn signal, failing to have a valid driver's license, and failing to show proof of insurance.[151]

- On January 10, 2017, officers observed a vehicle with an inoperable tail light stopped at a red light. The officers pulled over the vehicle and asked the driver to get out of the car. The driver allegedly tried to swing his arm at the officer, at which point the officer issued several knee strikes to the driver's chest, while performing an emergency takedown. Backup officers arrived and tased the driver. The driver was taken to the emergency room, where he was again tased. The driver incurred serious bruising and swelling to his face and head as a result of the incident.[152]

- On March 3, 2017, officers attempted to de-escalate a fight between two men along their patrol route. One of the men left the area, but the other refused to leave and was verbally aggressive towards the officers. The officers never attempted to arrest the man and never suspected that he had a weapon. One of the officers ordered the man to take a step back, and as the man was doing so, the officer tased him.[153]

- On April 8, 2017, two officers stopped a 30-year-old Black man named Rubin Carter, one of the *Campbell* Plaintiffs, on a street corner. The officers falsely stated that Carter posed a physical threat to them, and both officers repeatedly tased Mr. Carter in the stomach and chest. One officer continued to tase him as he lay on the ground. The officers arrested Mr. Carter and charged him with two counts of aggravated assault on a peace officer. Mr. Carter suffered an exacerbation of a pre-existing heart condition as a result of the officers tasing him,

---

[151] Phil Rogers, *Police Video Shows How Quickly Simple Traffic Stop Can Escalate to Conflict*, NBC CHICAGO (Aug. 15, 2017), https://www.nbcchicago.com/investigations/Police-Video-Illustrates-How-Quickly-Simple-Traffic-Stop-Can-Escalate-to-Conflict-437977313.html.

[152] Independent Police Review Authority, LOG #1083633, CHICAGO COPA, https://www.chicagocopa.org/case/1083633/.

[153] Civilian Office of Police Accountability, *Summary Report of Investigation* – LOG #1086048, CHICAGO COPA, https://www.chicagocopa.org/wp-content/uploads/2018/02/1086048-redacted.pdf.

and required hospital treatment. Mr. Carter was ultimately found not guilty of all charges.[154]

- On May 2, 2017, officers responded to a request to remove two people who refused to leave a fast food restaurant. Body-camera footage shows officers directing profanities at and pushing the men while escorting them out of the restaurant.[155]

- On May 15, 2017, two officers on routine patrol saw two men on the porch of an abandoned house, one of whom was drinking alcohol. The officers suspected that the other man had a bag of drugs in his mouth that he was trying to swallow. Body-camera footage shows an officer pulling one of the men by his arms, and another officer pushing the other man to the ground, telling the man "stop resisting" and "now you're resisting." The video shows the two officers holding the man to the ground by putting a leg into his back and holding the left side of the man's face into the concrete. The man drinking the alcohol was arrested for possession, while the other was arrested for possession, attempt to obstruct justice, resisting, and aggravated assault on a police officer.[156]

- On November 28, 2017, two officers pulled a Black man over for having expired license plates. The officers doubted the validity of the man's driver's license and asked him to get out of his vehicle. Video shows that the man began to run away when one officer tried to place him in handcuffs. The officers chased him, repeatedly telling the man to put his hands up. When the man jumped on a fence, an officer tased him, causing the man to fall to the other side of the fence on his head. Another officer forced through the fence, threatening to tase the man again, and pinned the man on the ground to prevent him from crawling away.[157]

The use of diversion could have resulted in less harmful outcomes in each of the incidents listed above, as well as in the countless other situations where CPD officers engage in overly aggressive responses while on the job. CPD clearly has the capacity to implement formal diversion programs. The Department partnered with the University of Chicago's Crime and Health Lab to develop and launch a small pilot pre-arrest diversion program for low-level drug

---

[154] *See* Campbell Second Am. Compl., *supra* note 68, ¶¶ 234-42.

[155] Civilian Office of Police Accountability, *Summary Report of Investigation* – LOG #1085055, CHICAGO COPA, https://www.chicagocopa.org/wp-content/uploads/2018/03/1085055-Redacted-POSTED-without-SRI.pdf.

[156] Civilian Office of Police Accountability, *Summary Report of Investigation* – LOG #1085217, CHICAGO COPA, https://www.chicagocopa.org/wp-content/uploads/2018/01/1085217-Redacted.pdf.

[157] Chicago Police Department, *Original Case Incident Report*, CHICAGO COPA, https://www.chicagocopa.org/wp-content/uploads/2018/01/1087646-Original-Case-Incident-Report-Redacted.pdf.

offenders in 2016.[158]  However, this program included less than one hundred people, and CPD

has yet to expand programs of this nature citywide.[159]  CPD and the City of Chicago must

commit to full-scale diversion programs, as well as implement new policies and practices for

policing and responding to minor offenses, to eliminate CPD's pattern of escalation which leads

to excessive uses of force and unnecessary arrests.

### 2.  Diversion Averts Escalation, Reduces Uses of Force, and Offers Additional Benefits for Communities.

Diversion programs, specifically pre-arrest diversion programs, give police officers the

discretion to divert people from the formal justice system, which subsequently reduces police

uses of force and unnecessary police escalation.[160]  Scholarly research also demonstrates that

diversion allows individuals with substance and/or mental health issues to seek necessary and

---

[158] Policies for Action, *Diverting Opioid Addicts Away from Criminal Justice and Toward Treatment*, POLICIES FOR ACTION, https://www.policiesforaction.org/project/diverting-opioid-addicts-away-criminal-justice-and-toward-treatment (last accessed Sept. 29, 2018); Curtis Black, *Instead of More Policing, A Model to Provide More Services*, CHI. REPORTER (May 24, 2018), https://www.chicagoreporter.com/instead-of-more-policing-a-model-to-provide-more-services/.

[159] Frank Main, *Drug Treatment or Jail: Chicago Police to Expand Unique Pilot Program*, CHI. SUN-TIMES (Dec. 10, 2017), https://chicago.suntimes.com/news/chicago-police-drug-treatment-heroin-opioid-epidemic-west-side-pilot-program/.

[160] *See* Nat'l Assoc. of Counties et al., *Stepping Up: Effective Law Enforcement and Diversion Strategies,* NAT'L ASSOC. OF COUNTIES (Sept. 15, 2010) https://www.naco.org/sites/default/files/event_attachments/Effective%20Law%20Enforcement%20and%20Diversion%20Strategies%20-%20Sept%2010.pdf (noting that pre-arrest diversion programs like CIT programs can reduce use of force and arrests); CMHS Nat'l GAINS TAPA Ctr. for Jail Diversion, *Practical Advice on Jail Diversion: Ten Years of Learnings on Jail Diversion from the CMHS National GAINS Center*, CMHS NAT'L GAINS CTR (2007), https://www.prainc.com/wp-content/uploads/2015/10/practical-advice-jail-diversion-ten-years-learnings-cmhs-national-gains-center.pdf (noting that diversion programs can reduce arrest rates and harm for people with mental illnesses); Pennsylvania Mental Health & Justice Center of Excellence, B*ackground and Summary of Evidence About Crisis Intervention Team Policing*, PENNSYLVANIA MENTAL HEALTH & JUSTICE CTR. OF EXCELLENCE, http://www.pacenterofexcellence.pitt.edu/documents/CIT%20Background%20and%20Evidence%20Summary.pdf (noting that research shows that diversion programs such as CIT programs can lead officers to be less likely to endorse use of force); Laura and John Arnold Foundation, *Reimagining America's Crisis Response Systems* (Sept. 2018), https://www.arnoldfoundation.org/wp-content/uploads/A2A-RFP-1.pdf (discussing that programs like pre-arrest diversion programs can reduce the use of force and arrest). *See also, e.g.,* Whatcom County Washington, *Prearrest Diversion – A Review of Programs and Implications for Program Design*, (Oct. 21, 2016), http://www.co.whatcom.wa.us/DocumentCenter/View/24564/LJS-Committee-PACKET-December-14-2016?bidId= (noting that a CIT diversion program and de-escalation training reduced use of force in Bexar County, Texas "against those with mental illness from about 50 times per year to less than once a year").

effective help, reduces recidivism rates, keeps youth out of the criminal justice system, permits police to dedicate more time and resources to addressing serious crime and reduces prison/jail overcrowding.[161]  Diversion also provides individuals with access to substance use and mental health treatment programs in the community, rather than in jails or prisons, further "reduc[ing] the demand on the criminal justice system."[162]

### a. Jurisdictions across the Country Have Adopted Diversion Programs, with Positive Results in Community Welfare.

Given the positive community outcomes linked to diversion programs, there has been rapid expansion of such pre-arrest programs nationwide.[163]  It is clear, at this moment, that implementing strong pre-arrest diversion programs constitutes best practices in policing.  The Obama Administration's Task Force on 21st Century Policing embraced diversion programs as alternatives to arrest.[164]  Specifically for youth, the report suggested that police implement restorative justice and diversion programs as opposed to traditional criminal justice responses to infractions.[165]  According to Treatment Alternatives for Safe Communities (TASC), the

---

[161] See Jordan B. Charnetsky, *Revolutionizing Fractured Drug Treatment Courts: An Analysis and Critique of LEAD and CARA*, 68 SYRACUSE L. REV. 455, 474 (2018); Robert W. Mason, *Disposition in Delinquency Cases*, JUVL FL-CLE 8-1 (2018); Don Stemen, *Beyond the War: The Evolving Nature of the U.S. Approach to Drugs*, 11 HARV. L & POL'Y REV. 375, 418, n. 192 (2017); Faye S. Taxman, *Justice Reinvestment: Extending the Framework to Non-Justice Efforts*, 29 FED. SENT. R. 52, 54 –55 (Oct. 1, 2016); Christina Canales, *Prisons: The New Mental Health System*, 44 CONN. L. REV. 1725, 1744–45 (Jul. 2012); Jac Charlier et al., *Pre-Arrest Diversion: The Long Overdue Collaboration Between Police and Treatment*, POLICE CHIEF MAGAZINE (Mar. 2018), http://www.policechiefmagazine.org/pre-arrest-diversion/; LEAD National Support Bureau, About LEAD, LEAD NATIONAL SUPPORT BUREAU, https://www.leadbureau.org/about-the-bureau (last accessed Sept. 28, 2018).

[162] Taxman, *supra* note 161.

[163] Stemen, *supra* note 161, at 418 n. 192; Greg Frost, *Pre-Arrest Diversion – An Effective Model Ready for Widespread Adoption*, OFFICIAL BLOG OF THE INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE (Jun. 17, 2016), https://theiacpblog.org/2016/06/17/pre-arrest-diversion-an-effective-model-ready-for-widespread-adoption/; Charlier et al, *Pre-Arrest Diversion*, *supra* note 161.

[164] Office of Community Oriented Policing Services, U.S. Department of Justice, *Final Report of the President's Task Force on 21st Century Policing* 43 (May 2015), https://ric-zai-inc.com/Publications/cops-p311-pub.pdf ("Law enforcement agencies should consider adopting preferences for seeking 'least harm' resolutions, such as diversion programs or warnings and citations in lieu of arrest for minor infractions.").

[165] *Id*. at 48.

expansion of diversion programs "suggests a growing institutional acceptance among policymakers and practitioners" that alternatives to the traditional criminal justice system are appropriate and more effective responses to certain low-level offenses and circumstances.[166]

There are now over five hundred expansive pre-arrest diversion initiatives in place in cities and counties across the country, including in Atlanta, Seattle, Baltimore, Burlington, Philadelphia, Santa Fe, Albany, Fayetteville, Tallahassee, Minneapolis, and Portland, among numerous others.[167]  And indeed, the power of diversion programs can be best observed at the local level.

In 2011, Seattle and King County began implementing the Law Enforcement Assisted Diversion Program ("LEAD") as a response to allegations of racial bias in police enforcement of drug laws, and to address low-level drug and prostitution offenses.[168]  This pre-arrest diversion program involves police collaboration with community organizations and stakeholders, and gives police the discretion to divert suspected offenders from the criminal justice system to community-based, harm-reduction services, including substance use disorder treatment, mental health support, housing, and job training.[169]  The program, which seeks to improve public safety and order and reduce criminal behavior,[170] is subject to regular evaluations, and the results are promising.  Specifically, people who participate in LEAD are 58% less likely to be re-arrested and charged in the six-month period after beginning the program, 89% more likely to secure

---

[166] Stemen, *supra* note 161, at 418 n. 192.

[167] Charlier et al., *Pre-Arrest Diversion*, *supra* note 161; LEAD NATIONAL SUPPORT BUREAU, *supra* note 161.

[168] Randy Petersen, *Pre-arrest and Pre-booking Diversion and Mental Health in Policing*, TEXAS PUBLIC POLICY FOUNDATION 1 (Mar. 2017), https://www.texaspolicy.com/library/doclib/2017-03-PP05-PrearrestPrebookingDiversion-CEJ-RandyPeterson.pdf; National League of Cities, *Seattle-King County Police Diversion Program*, NLC (Apr. 2016), https://www.nlc.org/seattle-king-county-police-diversion-program.

[169] *Seattle-King County Police Diversion Program*, *supra* note 168.

[170] *Id.*

permanent housing, 46% more likely to obtain employment or employment training, and 33% more likely to connect with income and benefit services; moreover, the costs of running the LEAD program are significantly lower than average criminal justice and legal system costs. [171]

Atlanta and Fulton County have also implemented a pre-arrest diversion program, developed to address high recidivism rates and allegations that the criminal justice system was unfairly targeting the mentally ill, formerly incarcerated, and substance users.[172]  Under the program, law enforcement and social service providers collaborate "to divert people into services instead of arresting them, when the activity is likely related to unmet mental health needs, substance use/misuse, and/or extreme poverty."[173]  Participants receive drug treatment, mental health assistance, and housing and job placement.[174]  The goals of the program include reducing criminal justice system involvement, strengthening social service infrastructure, improving participants' quality of life, and improving relationships between communities and police.[175]

Leon County, Florida is another jurisdiction that has adopted a pre-arrest diversion program, which has become "a successful alternative to arrest and a law enforcement tool for improving public safety and community-police relations."[176]  Under the program, law

---

[171]  LEAD National Support Bureau, Evaluations, LEAD NATIONAL SUPPORT BUREAU, https://www.leadbureau.org/evaluations (last accessed Sept. 30, 2018); Rebecca Neusteter & Megan O'Toole, *Emerging Issues in American Policing*, VERA (Jan. 2018), https://www.vera.org/publications/emerging-issues-in-american-policing-digest/volume-1/digest.

[172]  LEAD National Support Bureau, *Atlanta and Fulton County Join Forces to Design Innovative New Public Safety Initiative*, LEAD NATIONAL SUPPORT BUREAU (Jun. 20, 2016), https://www.leadbureau.org/june-20.

[173]  Atlanta/Fulton County Pre-Arrest Diversion Initiative, *Learn About Pre-Arrest Diversion*, ATLANTA/FULTON COUNTY PRE-ARREST DIVERSION INITIATIVE, http://prearrestdiversion.org/learn-about-pre-arrest-diversion/ (last accessed Sept. 28, 2018).

[174]  Michelle Wright, *Atlanta's Pre-Arrest Diversion Initiative Offers an Updated Model for Law Enforcement Assisted Diversion*, DRUG POLICY ALLIANCE (Oct. 30, 2017), http://www.drugpolicy.org/blog/atlantas-pre-arrest-diversion-initiative-offers-updated-model-law-enforcement-assisted.

[175]  ATLANTA/FULTON COUNTY PRE-ARREST DIVERSION INITIATIVE, *supra* note 173.

[176]  *Frost, supra* note 163.

enforcement officers can choose to divert first-time low-level misdemeanor offenders away from the criminal justice system to a behavioral health intervention program.[177] Eligible offenses include disorderly conduct, trespass, criminal mischief, petty theft, underage possession of alcohol, possession of less than 20 grams of marijuana, possession of drug paraphernalia, and non-domestic simple battery and assault.[178] Program participants have a documented recidivism rate of 6%, compared to the 40% recidivism rate of the general category of low-level misdemeanor offenders.[179]

### b. Other Federal Consent Decrees Mandate the Implementation of Diversion Programs to Reform Troubled Police Departments.

Jurisdictions operating under federal consent decrees mandating police reform, and in particular Ferguson and Baltimore, have also implemented substantive diversion-related provisions.[180] In its Community-Oriented and Problem-Solving Policing section, the Ferguson decree, which went into effect in March 2016, provides for "mediation at all stages of the dispute, from early-intervention to intervention after charges have been filed, as a diversion from the criminal justice system."[181] The decree further mandates that the City "affiliate with the Community Mediation Services of St. Louis to conduct neighborhood mediations that promote lasting resolutions of appropriately selected disputes among community members, while reducing the need for involvement in the criminal justice system."[182] The decree outlines

---

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] While the Ferguson and Baltimore decrees do not reflect the full scope of diversion provisions recommended by the *Campbell* Plaintiffs, the cities' inclusion of diversion programs in their decrees reflects the importance of such initiatives in reducing police excessive force and harm.

[181] Ferguson Consent Decree, *supra* note 60, ¶ 34.

[182] *Id.*, ¶ 32.

requirements for the implementation and administration of neighborhood mediation programs, and provides conditions for assessment and improvement of these programs moving forward.[183] In addition to the community mediation program, the Ferguson decree includes specific language regarding diversion programs and alternatives to arrest for youth and individuals with mental illness or intellectual or developmental disabilities.[184] The School Resource Officer Program section provides that the police department must use school resource officers who "understand the importance of diversion programs and alternatives to arrest for youth," and requires the department to work with the school district "to develop a conflict resolution program in the schools; a system for referrals to school discipline personnel; alternatives to arrest; and diversion programs for students who are charged with offenses to minimize the involvement of students and youth in the juvenile and criminal justice systems."[185] A subsection regarding defendants with mental illness and intellectual or developmental disabilities states that the City will provide these individuals with information about diversion programs.[186] The decree additionally requires the Independent Monitor to report statistical information about the number of individuals in schools, as well as individuals in crisis situations, who are diverted from the criminal justice system.[187]

Baltimore and the DOJ entered into a consent decree on April 7, 2017.[188] That agreement requires the city to assess "efforts to decrease Youth involvement with the juvenile and criminal justice systems … including the [c]ity's diversion programs, community-based alternatives to

---

[183] *Id.*, ¶¶ 32-35.

[184] *Id.*, ¶¶ 220, 359.

[185] *Id.*, ¶¶ 208, 220.

[186] *Id.*, ¶ 359.

[187] *Id.*, ¶ 435.

[188] Baltimore Consent Decree, *supra* note 130.

incarceration, and treatment options for Youth in need of mental health treatment, drug

treatment, or other services."[189]  This provision further requires the city to issue a report that

articulates its findings and recommendations regarding youth and diversion programs.[190]  In

addition, the decree also includes provisions addressing arrests for low-level offenses, which

include: obstructing, hindering, or resisting an officer, disorderly conduct, failure to obey an

officer, gambling, making a false statement to an officer, and misdemeanor trespassing

offenses.[191]  For these offenses, the police department must "require that an officer seek

permission from a permanent rank supervisor prior to effectuating an Arrest, unless not

practicable under the circumstances, in which case officers must notify a permanent rank

supervisor as soon as practicable after effectuating an Arrest."[192]  Similarly, for quality of life

offenses, which encompasses loitering, trespassing, public urination/defecation, disorderly

conduct, failure to obey, disturbing the peace, hindering, open container, and littering, the decree

articulates that the policy for the police department should be "the least intrusive response

appropriate under the circumstances as reasonably understood by the officer at the time,"

meaning that "a verbal warning and counseling is preferable to a Citation, and a Citation is

preferable to a custodial Arrest."[193]  Moreover, as with low-level offenses, "a permanent rank

supervisor [must] approve or disapprove the officer's request to make an Arrest and [the police

department] will ensure that its supervisors ensure that any Arrest is based on the existence of

probable cause and that the officer adhered to [department] policy when determining when to

---

[189] *Id.*, ¶ 219.

[190] *Id.*

[191] *Id.*, ¶ 61.

[192] *Id.*

[193] *Id.*., ¶¶ 62, 511.

verbally warn and counsel, issue Citations, or Arrest individuals for Quality of Life Offenses."[194]
The police department is also required to develop a system that tracks citations for low-level and
quality of life offenses, and this data must be regularly reported to the Monitor and analyzed by
the police department to assess its effectiveness in quality of life policing.[195]

### 3. The Limited Diversion-Related Language in the Proposed Consent Decree Must be Expanded to Align with Best Practices and Reduce Harm to the Community.

The Proposed Consent Decree contains only two primary provisions addressing
diversion. In particular:

"The City and CPD are committed to exploring diversion programs, resources, and

alternatives to arrest." Proposed Decree, ¶ 11

"The City and CPD are committed to exploring diversion programs, resources, and

alternatives to arrest for individuals in crisis." Proposed Decree, ¶ 86.

These brief provisions fail to provide any specific mandates related to the implementation of
diversion programs.

In order for the Decree to adequately address CPD's systemic use of excessive force and
discriminatory treatment of community members, it must be revised to establish substantive
diversion requirements that are subject to assessments and audits, as well as enforcement by the
parties. In particular, the provisions included in Exhibit D must be incorporated into the final
decree. These provisions require: (1) the development of a city-wide pre-arrest diversion
program; (2) the creation of a citation program and a mandate that officers receive supervisory
approval prior to making an arrest for minor and quality of life offenses; (3) the creation of a

---

[194] *Id..,* ¶ 63.

[195] *Id.,* ¶ 62.

mediation/restorative justice program for the purpose of promoting the voluntary resolution of disputes between community members, to reduce the need for involvement in the justice system; and (4) prohibitions on officers engaging in the practice of trolling and on CPD using arrest, stops, tickets, citations or investigatory stop reports to evaluate an officer's productivity.  Such provisions are in line with the national best practices set forth above.  They will also address the pattern and practice issues raised in the DOJ Report and *Campbell* Complaint.  Consequently, if properly implemented, are likely to have a positive impact on community-police relations in this City.

> **D.    The Consent Decree Should Require the Least-Intrusive Police Response and Protect Communities from Police Surveillance Conducted Under the Guise of "Community Policing."**

The Proposed Consent Decree contains numerous "community policing" provisions, heralded by guiding principles that include "frequent positive interactions between police and members of the public," Proposed Decree, ¶ 8, and the integration of "community policing philosophy into CPD operations," *id*., ¶ 9, where the philosophy will be "a core component of its provision of police services, *id*., ¶ 10.  The Decree provides that CPD will "ensure its command staff develop crime reduction and problem-solving strategies that are consistent with the principles of community policing." *Id*., ¶ 15.  In this vein, the agreement requires that the City establish and coordinate regular meetings with City representatives, CPD, and sister agencies "to collaborate on developing strategies…to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being." *Id*., ¶ 18.  CPD officers will be provided with information about the communities that they serve, including "their assets and challenges, community groups and leaders, and business, residential, and demographic profiles." *Id*., ¶ 19.  Each CPD district will collaborate with community

stakeholders, and district representatives will be tasked with outreach to residential, business, religious, civic, youth and other community groups "to proactively maintain these relationships and identify and address community problems and needs." *Id.*, ¶ 24. CPD as a whole will also "incorporate the philosophy of community policing into its annual in-service training for all officers…." *Id.*, ¶ 37.

Despite the Proposed Decree's emphasis on its principles, *see id.*, Section II, research shows that in jurisdictions that have implemented such community policing strategies, arrests for minor offenses have gone up, and the law enforcement efforts have created divisions within communities and between police and residents. In sharp contrast, the principles of diversion, discussed in section II(C), *infra*, are proven to help create safer communities without reliance on police intervention. For these reasons, the community policing provisions should be omitted from the decree, or in the alternative, modified with language that would ensure these initiatives do not affirmatively harm Chicago communities.

1. **As Currently Drafted, the Community Policing Provisions Put Chicago's Communities of Color at Risk of Greater Harm from the CPD and Provide No Community Benefit.**

Chicago has a long, unsuccessful history with community policing. Chicago Mayor Rahm Emmanuel declared "Chicago is where the whole idea of community policing began."[196] But Chicago's community policing effort have failed to reduce officer misconduct and have not created safer communities.[197] Indeed, traditional community policing principles often go hand-in-hand with "aggressive stop-and-frisk practices, off-the-books detention and interrogation, and

---

[196] Nissa Rhee, Manny Ramos, & Andrea Salcedo, *The Rise and Fall of Community Policing in Chicago*, CHICAGO READER (Sept. 22, 2016), https://www.chicagoreader.com/chicago/caps-cpd-community-policing-analysis/Content?oid=23635982.

[197] *See id.*; We Charge Genocide, *Counter-CAPS Report: The Community Engagement Arm of the Police State* 13, http://wechargegenocide.org/wp-content/uploads/2015/10/CAPSreport-final.pdf (last accessed Oct. 8, 2018) (We Charge Genocide *Counter-CAPS Report*).

the routine surveillance of social movement organizations, including those that have demanded greater police accountability."[198]  Thus it is unsurprising Chicagoans do not feel protected as a result of these intrusive law enforcement efforts.  In a 2006 survey of Chicago residents, businesspersons, religious leaders, educators, non-profit directors, and community organization staff, respondents reported feeling as if "crime and community policing [were] being manipulated to control or displace low-income residents."[199]  In communities where tensions around gentrification were high, respondents felt that community policing initiatives promoted "the power of higher-income, incoming residents, while disempowering the less affluent, current residents."[200]

    Further, contrary to the assumption that community policing "increases public confidence in law enforcement," Proposed Decree, ¶ 8, in Chicago, it has served more as a shield for the police, and can be fairly described as the "superficial involvement of select community members in providing police with legitimacy."[201]  Research demonstrates that participation in police-community meetings ("CAPS meetings")[202] is low, particularly in communities of color, and that those community members who do participate tend to be "self-selecting group[s] of residents…mobilized by police to surveil their communities."[203]  In these meetings, police encourage citizens to report on their neighbors, including for engaging in minor crimes such as

---

[198] Brendan McQuade, *Against Community Policing*, JACOBIN (Nov. 18, 2015),
https://www.jacobinmag.com/2015/11/obama-chicago-black-lives-matter-police-brutality/.

[199] Philip Nyden, Emily Edlynn, & Julie Davis, *The Differential Impact of Gentrification on Communities in Chicago*, LOYOLA UNIVERSITY CHICAGO CENTER FOR URBAN RESEARCH AND LEARNING FOR THE CITY OF CHICAGO COMMISSION ON HUMAN RELATIONS 2, 16 (Jan. 2006),
https://www.luc.edu/media/lucedu/curl/pdfs/HRC_Report.pdf.

[200] *Id.* at 17.

[201] We Charge Genocide *Counter-CAPS Report*, *supra* note 197, at 3; WESLEY G SKOGAN, POLICE AND COMMUNITY IN CHICAGO: A TALE OF THREE CITIES (2006).

[202] CAPS stands for Chicago Alternative Policing Strategy.

[203] We Charge Genocide *Counter-CAPS Report*, *supra* note 197, at 9; *see also* SKOGAN, *supra* note 201.

loitering and public consumption of alcohol.[204]  This type of community engagement can lead to the legitimization and amplification of individual biases, particularly on issues of class and race, and create divisions within communities.[205]

Chicago's negative experiences with community policing initiatives are not anomalous. The DOJ defines community policing as a "philosophy that promotes organizational strategies, which support the systematic use of partnerships and problem-solving techniques, to proactively address the immediate conditions that give ruse to public safety issues such as crime, social disorder, and fear of crime."[206]  Over the past fifty or more years, many police departments in jurisdictions across the country have implemented community policing programs ostensibly based on these DOJ principles, in attempts to reduce crime and build legitimacy within communities.[207]  However, police departments often label efforts as "community policing" solely to gain public and political support,[208] but fail to actively engage with communities, or at least fail to engage in a meaningful way that incorporates community participation and input.[209] Research shows that while this brand of community policing may change the rhetoric of "tough

---

[204] We Charge Genocide *Counter-CAPS Report*, *supra* note 197, at 4;  McQuade, *supra* note 198 ("In all the observed CAPS meetings, the officers encouraged residents to act as the eyes and ears of the police department and urged residents to report anything that seemed suspicious.").

[205] We Charge Genocide *Counter-CAPS Report*, *supra* note 197, at 4.

[206] Office of Community Oriented Policing Services, U.S. Department of Justice, *Community Policing Defined* (2014 ), https://cops.usdoj.gov/pdf/vets-to-cops/e030917193-cp-defined.pdf; see also Terrell Jermaine Starr, *Community Policing is Not The Solution To Police Brutality. It Makes It Worse.*, WASH. POST (Nov. 3, 2015), https://www.washingtonpost.com/posteverything/wp/2015/11/03/community-policing-is-not-the-solution-to-police-brutality-it-makes-it-worse/?noredirect=on&utm_term=.64f6ebf5f253.

[207] *See* We Charge Genocide *Counter-CAPS Report*, *supra* note 197.

[208]  *See* Lance Eldridge, *The Impending Death of Community Policing*, POLICEONE (Jul. 28, 2010), https://www.policeone.com/community-policing/articles/2147172-The-impending-death-of-community-policing.

[209] *See* Brandon Garrett, *Remedying Racial Profiling*, 33 COLUM. HUM. RTS. L. REV. 41, 128–29 (2001) ("Even though community policing has become a mantra adopted by most police departments, few actively engage the community, and even when they do, community policing has generally occurred on the police's terms and without full disclosure of information to participants.").

on crime" policing, it does not change actual practices on the ground,[210] particularly where police officers retain broad discretion in their law enforcement activities.[211]

Many community policing efforts are ineffective from their inception because they fail to acknowledge past breaches of trust by the police in the community; instead, they "trea[t] symptoms rather than root causes by prioritizing relationship over partnership and damage control over reconciliation."[212] Further, in jurisdictions like Chicago where community mistrust of police is particularly deep-seated, it is difficult for community policing efforts to establish the intensive cooperation between communities and police that is necessary for these efforts to succeed.[213] The issue of public trust is particularly cogent given that under the community policing model, officers encourage community members to report low-level crimes,[214] leading to avoidable uses of force, needless arrests, and violations of community members' constitutional rights, as shown in Section II(C). Furthermore, once implemented, community policing programs frequently increase police presence in communities, and can encourage officers to become involved in non-law enforcement matters, including civil disputes, family issues, and

---

[210] *See* Seth W. Stoughton, *Principled Policing: Warrior Cops and Guardian Officers*, 51 WAKE FOREST L. REV. 611, 631 (2016); ("[A]gencies and officers that have no sincere interest in altering the traditional crime-fighting focus of modern law enforcement have used the rhetoric of community policing as political cover to bolster legitimacy with a superficial public-relations facelift."); We Charge Genocide *Counter-CAPS Report*, *supra* note 197, at 5.

[211] *Cf.* Janet Chan, *Changing Police Culture*, 36 (1) BRIT. J. CRIMINOLOGY 109, 110 (1996) ("[B]ecause police officers at the rank-and-file level exercise enormous discretion in their work, their informal working rules can subvert or obstruct policing reforms initiated at the top, or law reforms imposed externally.").

[212] Yulise Waters, *Community Policing is Not the Answer to the Nation's Growing Distrust of Officers*, THE DALLAS MORNING NEWS (May 2017), https://www.dallasnews.com/opinion/commentary/2017/05/02/community-policing-answer.

[213] *See* Anthony A. Braga, *Better Policing Can Improve Legitimacy and Reduce Mass Incarceration*, 129 HARV. L. REV. F. 233, 241 (Mar. 2016).

[214] *See* We Charge Genocide *Counter-CAPS Report*, *supra* note 197.

59

social contracts, regardless of whether community members request police involvement in these matters.[215]  These interactions, too, can lead to unnecessary arrests and unlawful uses of force.

Finally, empirical data shows that many community policing programs do not necessarily reduce crime rates.  In cities that were given federal funding to implement community policing programs, those programs were ineffective at reducing crime rates in municipalities with populations greater than 250,000; they even had a negative impact for certain types of offenses.[216]  A study of 164 American cities in the 1990s, a period when many jurisdictions first implemented community policing programs, found that such efforts "had little effect on controlling violent crime or its reduction over time."[217]

### 2.  The Community Policing Consent Decree Provisions Should be Deleted or, in the Alternative, Modified to Protect Communities.

To effectively address the issues of police misconduct and unlawful use of force outlined by the DOJ, the Proposed Consent Decree should re-direct attention and resources away from community policing to diversion-related programs, described in Section II(C).[218]  In the alternative, in order to prevent the harms attendant to community policing regimes, the Community Policing section should be modified, including as follows:

Paragraphs 8, 10, 19: Community policing efforts shall not be used to as a pretext to gather law enforcement intelligence or conduct surveillance on civilians.  The effectiveness of

---

[215] *See* Eldridge, *supra* note 208.

[216] Derek A. Bisig, *"All I Want to Say is That They Don't Really Care About Us:" Reducing Police Misconduct Via Social Control Theory*, 44 S.U. L. REV. 344, 355 (2017).

[217] John M. MacDonald, *The Effectiveness of Community Policing in Reducing Urban Violence*, 48(4) CRIME & DELINQ. 592, 612 (Oct. 2002).

[218] The entire Community Policing Section should be deleted except for Paragraph 20, which prohibits CPD from transporting people to locations where their rivals live or congregate.

community policing efforts will be measured by a reduction in arrests and in uses of forces, rather than by frequent interactions between police and members of the public.

Paragraphs 8, 15: "Problem-solving" techniques will be defined as policing efforts that lead to the least intrusive intervention for community members and that rely on informal dispute resolution processes and/or referrals to services providers, which operate outside of the criminal justice system.

Paragraph 28: The City of Chicago will provide *community-based organizations* with sufficient resources to institute a public awareness campaign about CPD policies and community members' rights when interacting with CPD.

      **E.**     **If CPD Officers Continue to Be Stationed in Schools, the Proposed Consent Decree Should Be Modified to Address Key Concerns Raised in the Chicago Inspector General's Recent Investigative Report on School Resource Officers, and by DOJ in its Findings Report.**

CPD officers, as members of law enforcement, should not be stationed within Chicago Public School District (CPS) schools or on CPS school grounds.  However, if CPD officers continue to operate in CPS schools as School Resource Officers (SROs), the Proposed Consent Decree should provide clear limitations on SRO authority, as well as standards governing SRO conduct when operating with youth and children.

In September of this year, the City of Chicago Office of Inspector General (OIG) released a "Review of the Chicago Police Department's Management of School Resource Officers."[219]  In that report, the OIG criticized CPD for its failure to implement a formal legal agreement (Memorandum of Understanding, or MOU) with CPS, concluding that the lack of formal guidance for CPD officers in schools results in grave consequences, including "that students are

---

[219] CITY OF CHICAGO OFFICE OF THE INSPECTOR GENERAL, REVIEW OF THE CHICAGO POLICE DEPARTMENT'S MANAGEMENT OF SCHOOL RE OFFICERS (Sept. 2018), available at https://igchicago.org/wp-content/uploads/2018/09/CPD-Management-of-School-Re-Officers-Review.pdf (OIG Report).

unnecessarily becoming involved in the criminal justice system, despite the availability of alternative solutions."[220]  The OIG also identified other systemic deficits pertaining to the presence of CPD officers in schools, and offered multiple recommendations for reform, all grounded in federal best practices.[221]

Prior to the OIG's investigation, the DOJ made a number of findings indicating that CPD regularly targeted CPD students and youth with unlawful, unnecessary uses of force.  The DOJ Report included the following specific examples:

- "[O]fficers hit a 16-year-old girl with a baton and then Tasered her after she was asked to leave the school for having a cell phone in violation of school rules. Officers were called in to arrest her for trespassing."[222]

- "[O]fficers unnecessarily drive-stunned students to break up fights, including one use of a Taser in drive-stun mode against a 14-year-old girl. There was no indication in these files that these students' conduct warranted use of the Taser instead of a less serious application of force."[223]

- "The girl claimed the officer got out of the car and yelled profanity (calling her 'fucking idiot' among other things), drawing the attention of a female witness. The girl claimed that when she told the officer that they had the right of way, he pushed her in the back with both hands so hard she fell into a newspaper stand, after which he handcuffed her arms behind her back while she still wore her backpack, hurting her wrists, and did not loosen the cuffs when she complained. The officer called for backup, two officers responded, and the teens were released without charges."[224]

- [A]n officer pushed an 18-year-old female student onto his police car, chipping her tooth, because, as he was walking her to his squad car after breaking up a fight between her and another girl outside of their school, she screamed profanities and flailed her arms. The officer reported that the injury occurred when he performed

---

[220] *See* OIG, Press Release, REVIEW OF THE CHICAGO POLICE DEPARTMENT'S MANAGEMENT OF SCHOOL RE OFFICERS (Sept. 13, 2018), https://igchicago.org/2018/09/13/review-of-the-chicago-police-departments-management-of-school-re-officers/ (OIG Press Release).

[221] OIG Report, *supra* note 219.

[222] DOJ Report, *supra* note 4, at 34.

[223] *Id.*

[224] *Id.* at 35.

'an emergency take-down maneuver to regain control.' The girl was 5'4" tall and weighed 120 pounds, while the officer was 6'1" and weighed 186 pounds."[225]

- [A]n 8-year-old girl who complained that a CPD officer working secondary employment in a school grabbed the girl by her hair, swung her around, and choked her while breaking up a fight in a school hallway."[226]

- "[T]wo teenage boys and their mothers complained to a supervising sergeant at a CPD district that an officer slammed one of the boys to the ground, cuffed him, shoved a gun in his face, and threatened to blow up the boy's house."[227]

The Parties' Proposed Consent Decree does not adequately address some of the OIG's significant concerns, or the findings of the DOJ—findings that are affirmed by the experiences of the young people represented by and associated with the *Campbell* Plaintiffs. In order to protect the well-being of CPS students and youth, clear modifications to the Decree can and should be made, in particular by following the roadmap provided by the OIG. These modifications will align CPD policy with best practices regarding officers in schools. More importantly, the modifications will ensure that children and youth in schools are safe in the presence of armed officers, and reduce the likelihood of officers abusing their positions of trust for law enforcement purposes.

> **1.  The City Should Adopt Formal SRO Evaluation Processes and Standards, Through a MOU, in Collaboration with Community and Civil Rights Stakeholders, Parents and Families, and Juvenile Justice Entities.**

CPD lacks sufficient guidance and clear standards for evaluating the performance of school-assigned officers who operate in CPS schools.[228] The OIG found that a SRO's job performance is currently evaluated "in the same way as all other Department members," a

---

[225] *Id.* at 43.

[226] *Id.* at 59.

[227] *Id.* at 110-11.

[228] OIG Report, *supra* note 219, at 10.

63

process that fails to capture the "unique roles and functions" of officers operating in schools.[229] The OIG consequently recommended that performance evaluations not only be specified through a formal MOU, but that they be based on criteria specific to policing in schools, and include, in particular, measurements of SROs' "ability to de-escalate situations and use alternatives to arresting students."[230]

      The Proposed Consent Decree does not address the serious deficiencies related to SRO evaluation identified by the OIG. In particular, it contains no provisions for performance evaluations of officers stationed in schools or acting on school grounds, and it certainly does not mandate that officers be evaluated based on their ability to de-escalate and use alternatives to arrest. *See* Proposed Decree at ¶¶ 38-44. Such provisions are essential to curtail the school-to-prison pipeline identified in the OIG's report[231]; they are also necessary to address significant and growing concerns in the Chicago community that the police presence in schools serves less to protect youth than to facilitate the entry of children and teenagers into the criminal justice system.[232] In addition, explicit evaluation standards are crucial to ensure accountability for abusive officers, like those detailed in the DOJ Report, who should not be permitted to continue on the job, near youth and children.[233] Consequently, evaluations of officers in schools should

---

[229] *Id.* at 11.

[230] *Id.* at 16.

[231] *See* OIG Press Release, *supra* note 220.

[232] Sargent Shriver National Center on Poverty Law, *Handcuffs in Hallways: The State of Policing in Chicago Public Schools* 4 (Feb. 2017), http://povertylaw.org/files/docs/handcuffs-in-hallways-final.pdf ("The student population in CPS overwhelmingly consists of a demographic that has been historically marginalized and disproportionately incarcerated. These children regularly interact with police officers during the school day, putting them in greater risk of being pulled into the criminal justice system.").

[233] *Id.* at 24-25 ("Key components of accountability include routine review of SROs' activities and the creation of systems that enable the school community to provide feedback and lodge complaints…. Where serious allegations of abuse or misconduct are raised, the officer should be temporarily removed from having contact with students as appropriate.").

be mandated in the MOU.  The criteria for such assessments should be outlined in accordance with best practices,[234] and with the input of community members, school personnel, families and students, as provided for in other provisions of the Proposed Decree, governing SRO policy and practice.  *See* Proposed Decree, ¶¶ 39-41.  Civil rights stakeholders and juvenile justice experts should also have the opportunity to weigh in.

### 2. The Parties Should Mandate the Retention and Maintenance of Rosters of Officers Working as SROs and the Schools to Which They are Assigned.

The OIG's investigation revealed that CPD fails to maintain an accurate roster of officers who are stationed in schools, or a list of the schools to which they are assigned.[235]  The OIG specifically found that "CPD's administrative data [] includes a number of internal inconsistencies between officers' postings compared to their assignments and details …. [and] OIG could not resolve these inconsistencies."[236]  In follow-up communications with the OIG, the City of Chicago did not indicate that it planned to change its policies to ensure accurate and updated recordkeeping for school-assigned officers.[237]

The Proposed Decree also omits any mention of recordkeeping relating to who is assigned to CPS schools, and where they are stationed.  A modification should require that CPD maintain up-to-date rosters of its school-assigned officers, as well as their locations, to ensure both accountability and transparency. Students, families, and community members are entitled to basic information about the CPD officers serving as SROs in their schools, including how many CPD officers are in each CPS school and the demographic information of assigned officers.

---

[234] OIG Report, *supra* note 219, at 10 (citing United States Department of Education and Department of Justice, *Safe School-Based Enforcement Through Collaboration, Understanding and Respect SECURe Local Implementation Rubric*, available at https://www2.ed.gov/documents/press-releases/secure-implementation.pdf.).

[235] OIG Report, *supra* note 219, at 13-15.

[236] *Id.* at 14.

[237] *Id.* at 17-18.

### 3. The Consent Decree Should Protect Students' Privacy Rights and Establish Standards for Information-Sharing Between CPS and CPD.

In accordance with the OIG's recommendations and with best educational and law enforcement practices, any policies and procedures governing school-assigned officers should prioritize protecting students' privacy rights and establish standards pertaining to information-sharing between CPS and CPD.[238] The Proposed Consent Decree does not explicitly address this issue. *Campbell* Plaintiffs seek a modification of the agreement, so that any SRO policies developed in accordance with the Decree, *see* Proposed Decree ¶ 40, specifically prohibit CPS from sharing student records and/or student-related information with CPD in the absence of a subpoena or court order.

It is particularly important that SROs not be allowed to exploit their positions within schools to search for and collect surveillance information on behalf of CPD and/or any other law enforcement agencies.[239] For instance, CPD officers should not record the actions of students on school grounds in the Department's Strategic Subjects List (SSL), CLEAR database, or gang database.[240] Relatedly, CPD should also ensure that officers do not use information contained in the SSL, CLEAR or gang databases to take law enforcement action against students at school. These measures are essential to protect the educational opportunities of students, and to ensure SROs are not being used for improper police investigative purposes.

---

[238] *Id.* at 16.

[239] *See Handcuffs in Hallways*, *supra* note 232, at 15 ("The ability of the CPD to surveil and collect investigative information about public school students has outpaced the necessary infrastructure to monitor the surveillance and ensure compliance with students' constitutional rights.").

[240] *See id.* (describing the surveillance practices of CPD officers in schools, which results in data collection for a host of law enforcement databases) ("The CLEAR database houses a variety of investigative tools that allow officers to file reports and store information about students—these investigative documents are generally kept private from the public because they are considered part of ongoing criminal investigations. These practices criminalize adolescent behavior, which may be mere infractions of school discipline code.").

**4.  The MOU Should Be Developed with Input from Community Stakeholders, Students, Parents, School Personnel and Experts in Youth Development and Civil Rights.**

Finally, Plaintiffs interpret the current iteration of the Consent Decree as providing community stakeholders, school personnel, families, and students, as well as experts in juvenile development and civil rights, with the right to provide input on the language of any MOU developed between CPD and CPS.  *See* Proposed Decree, ¶ 44.  This interpretation would be in accordance with the other school-related provisions, *see id.*, Section II(G), which provide for significant community participation in the development of SRO policies and the elucidation of the role of CPD officers in schools.  *See id.*, ¶¶ 39-41.  A useful modification of the decree would make explicit the role of the community in formulating any MOU between CPD and CPS, so that stakeholders inarguably have a voice in that process.

**F.  The Proposed Consent Decree Must Ensure All Uses Of Force Are Adequately Documented and All Taser Discharges Are Investigated.**

The State's litigation—and that of *Campbell* Plaintiffs—results from CPD's policy and practice of using force in an unlawful and racially biased manner.  CPD's unreasonable use of tasers and firearms is particularly problematic because of the deadly nature of these weapons.  For these reasons, it is critical that the Decree contain comprehensive reporting requirements to capture and make public data about uses of force, *including* when an officer points a gun or taser at a member of the community.  It is also essential that COPA, and not CPD, launch an investigation whenever an officer discharges a taser.

**1.  CPD Has a Well-Documented Pattern and Practice of Using Firearms and Tasers in an Unlawful Manner, Which Inflicts Disproportionate Harm on Chicago's Black and Brown Communities.**

Use of firearms and tasers by Chicago police officers has become routine, with Chicagoans facing a pervasive, traumatizing, and often deadly threat from CPD officers as a

result.  The DOJ found that CPD "engages in dangerous and unnecessary foot pursuits and other unsound tactics that result in CPD shooting people, including those who are unarmed."[241]  In some instances, "officers appeared to fire their weapons merely because others had done so."[242]  As set forth in this brief, teenagers in vehicles, teenagers walking on the street, unarmed men, innocent bystanders, and those fleeing on foot have all been shot and killed by Chicago police officers.  In one incident, three CPD officers fired 45 rounds, including 28 rifle rounds, at a man during a foot pursuit in a residential area, killing the man, who was unarmed.[243]  While the City could not accurately identify the total number of people shot by CPD officers—a result of inaccurate and incomplete reporting procedures—the DOJ was able to "identify 203 officer-involved shooting incidents …between January 1, 2011 and March 21, 2016"; a total of 223 civilians were shot in these incidents.[244]  In addition, CPD reported "22 shooting files that pertained to officer-involved shootings that CPD refers to as 'no-hits'"—that is, cases in which CPD offices shot at but did not hit civilians.  Such cases are not investigated by CPD.[245]

CPD has also long been criticized for the offhand manner in which it uses tasers against people.  The DOJ investigation highlighted the tendency of CPD officers to use the weapons as a "tool of convenience," with insufficient concern for the inherent risks that tasers pose.  The DOJ, as well as investigative journalists examining the use of tasers in Chicago, carefully

---

[241] DOJ Report, *supra* note 4, at 25.

[242] *Id.* at 28.

[243] *Id.* at 25-26.

[244] *Id.* at 24.

[245] *Id.*

detailed the many instances where tasers were used against vulnerable or non-threatening civilians, as well as instances where unreasonable taser usage led to people being killed. [246]

Chicago's Black communities bear the brunt of all this violence. Between 2008 and 2015, 74% of the people shot by CPD officers with firearms were Black.[247] Additionally, 76% of the taser discharges by CPD between 2012 and 2015 targeted Black people.[248]

Finally, Chicagoans have voiced complaints about the manner in which officers yield their weapons. Between 2000 and 2018, almost 1,600 complaints were filed by people complaining about officers' unnecessary display of a weapon while off duty.[249] Another 538 have complained about on-duty officers unnecessarily displaying their weapons.[250]

## 2. Redressing Abusive Force Requires Accurately Reporting Force and Investigating Taser Discharges.

Police departments with restrictive use of force policies that include strong reporting provisions have enhanced officer and civilian safety outcomes. Officers operating in departments with more restrictive policies are less likely to be killed in the line of duty and less likely to be assaulted than officers in departments with more permissive requirements.[251] These officers are also less likely to kill people.[252] The implementation of an "enhanced accountability

---

[246] *See id*. at 32-34 (describing a pattern or practice of unreasonable force against people who do not present a threat, or who were suspected of only low-level crimes, as well as the use of tasers against people in active mental health crises and against children in violation of school rules). *See also* Dan Hinkel and Jennifer Smith Richards, *Chicago Cops Get More Tasers, But Red Flags Remain*, CHI. TRIB. (Aug. 28, 2017), http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-tasers-met-20170825-story.html (outlining the fact that at least eight people have died after having Tasers used on them by CPD since 2005).

[247] *See* PATF Report, *supra* note 39, at 7.

[248] *Id.*

[249] CPDP, *supra* note 67, https://data.cpdp.co/data/Day7d3/.

[250] *Id*.

[251] Samuel Sinyangwe, *Examining the Role of Use of Force Policies in Reducing Police Violence* 4 (Sept. 20, 2016), https://static1.squarespace.com/static/56996151cbced68b170389f4/t/57e17531725e25ec2e648650/1474393399581/Use+of+Force+Study.pdf.

[252] *Id*. at 3.

framework" in departments that relies on use of force reporting is in fact "essential for reducing force."[253] Mandated reporting ensures valuable checks on officer conduct through "compulsory inclusion of justifications, supervisor sign off, and discussions between officers and supervisors."[254] However, use of force reporting is only effective if such reports are analyzed, and the findings shared with the public.[255] That is, providing a framework "of internal and external accountability" through use of force reporting, investigation, *and* public dissemination are the "keys to reducing negative behavior and outcomes."[256]

The importance of reporting extends to incidents in which an officer points a firearm or taser. These incidents are in fact no different from any other police use of force. City Inspector General Joe Ferguson, who also served as co-chair of the Task Force on Police Accountability, noted that the pointing of a firearm constitutes a "use of force that under the law constitutes an aggravated assault" since it involves the use of "potentially deadly force." [257] Ferguson opined that such incidents must therefore be "reported, tracked, analyzed, and accounted for[.]"[258] In short, firearm pointing is a serious use of force incident, and should reported as such. This is why consent decrees in numerous other jurisdictions, including Ferguson, New Orleans, Newark, and Cleveland, require full use of force reporting whenever an officer points a firearm (and in some municipalities, *e.g.*, Ferguson, when an officer points a taser).[259]

---

[253] Tim Prenzler et al., *Reducing Police Use of Force: Case Studies and Prospects*, 18 AGGRESSION AND VIOLENT BEHAV. 343, 354 (2013).

[254] *Id.*

[255] *See id.*

[256] *Id.* at 355

[257] Fran Spielman, *Ferguson Makes Case for Documenting Police Pointing Guns*, CHI. SUN-TIMES (Jul. 25, 2018), https://chicago.suntimes.com/news/ferguson-police-pointing-guns-chicago-police-department-lisa-madigan/.

[258] *Id.*

[259] *See* Ferguson Consent Decree, *supra* note 60, ¶ 183(a); New Orleans Consent Decree, *supra* note 58, ¶ 76; Consent Decree, *United States of America v. City of Newark*, Case No. 16-cv-1731-MCA-MAH, Dkt. No. 4-1 (D.

But protocols for accurate reporting, alone, are not sufficient. There also must be rigorous, independent investigations of each use of force—including each taser discharge. This has not been Chicago's practice, however. The DOJ found that documentation of CPD taser usage was consistently insufficient, and it identified issues at each level of internal investigation—from officers employing boilerplate language on use of force reports (TRRs) that obfuscated the reasonableness of force used, to CPD supervisors consistently failing to undertake mandated investigations into uses of non-lethal force.[260] These findings have been corroborated by other sources, including in a 2017 investigation by the Chicago Tribune, which reviewed about 100 TRRs from taser incidents to find that CPD supervisors unilaterally ruled taser uses to be justified, without exception.[261]

### 3. The Proposed Consent Decree's Reporting and Taser Investigation Requirements are Insufficient.

#### a. Reporting Requirements

While the Proposed Consent Decree does mandate that Chicago Police verbally report when they point a firearm at civilians, the specific requirements of the relevant provisions fall far short of what is required in order to ensure sufficient oversight and accountability.

The Decree states "CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented." Proposed Decree, ¶ 189. An officer is expected to document his actions, not through a TRR as with any other use of force, but instead by notifying *OEMC* of all "investigatory stop or arrest occurrences in which [he or she] points a firearm at a person in the

---

N.J. Apr. 29, 2016), at ¶ 67(j); Settlement Agreement, *United States of America v. City of Cleveland*, Case No. 15-cv-1046-SO, Dkt. No. 7-1 (N.D. Ohio Jun. 12, 2015), ¶ 56 (Cleveland Consent Decree).

[260] DOJ Report, *supra* note 4, at 42-45.

[261] See Hinkel and Richards, *supra* note 246.

course of effecting the seizure." *Id.*, ¶ 190.  OEMC will then "notify an immediate supervisor of the identified beat(s) [of the involved officer(s)] each time the pointing of a firearm is reported." *Id.*, ¶ 191.  The Proposed Consent Decree exempts, without explanation, SWAT team members and "officer[s] assigned to a federal task force during the execution of federal task force duties" from documenting when they point their firearm.  *Id.*, ¶ 194.  Moreover, the reporting mechanisms kick in only when a CPD officer points a firearm "*to detain* the person," adding additional ambiguity to a section infused with reporting loopholes.  *Id.*,

Overall, the proposed language: (1) lacks specific, well-defined reporting requirements; (2) provides no standards for the supervisory review process; (3) contains reporting exceptions (*e.g.*., for SWAT and task force officers) not found in other police decrees[262]; and (4) exempts from public dissemination critically important data about officer conduct.  It also wholly exempts the pointing of a taser from any kind of documentation or review process.  These deficiencies should be remedied by removing the exceptions for reporting, and amending Paragraph 218 of the Proposed Consent Decree to include the pointing of a firearm and the pointing of a taser as a level one reportable use of force, subject to the same written reporting, supervisory review and transparency requirements as any comparable use of force.

### b.  Investigating Taser Discharges

Under the terms of the Proposed Consent Decree, COPA is only given jurisdiction to conduct administrative investigations into taser and stun gun discharges by CPD officers that result in death or serious bodily injury.  Proposed Decree, ¶ 440(e)(ii).  All other discharges are

---

[262] No other consent decree contains as broad and sweeping a blanket exemption from reporting as the proposed Chicago decree.  Ferguson and New Orleans lack any such exceptions for SWAT or task force members.  *See* Ferguson Consent Decree, *supra* note 60; New Orleans Consent Decree, *supra* note 58.  Cleveland's agreement, which does contain some exceptions to reporting weapon displays, has very specific requirements about when and where those exemptions apply.  *See* Cleveland Consent Decree, *supra* note 259, ¶ 56.

relegated to internal CPD advisory review. *See id.*, ¶¶ 568-80. Given CPD's pattern and practice of excessive force against people who present no serious threat, this investigatory structure will fail to adequately hold CPD accountable for abusive taser discharges. In order to effectively identify police misconduct and training deficiencies, and to ensure officers are held accountable for misconduct, every taser and stun gun discharge should trigger an automatic and independent COPA investigation.

When IPRA, the predecessor to COPA, was created by ordinance in 2007, it was charged with reviewing all taser usage by the CPD.[263] The agency did not meet this responsibility. The DOJ and local newspaper reporting revealed that full investigation of taser-related incidents rarely occurred.[264] In 2016, IPRA was replaced by COPA; however, the ordinance creating COPA actually gave it less authority than IPRA had to monitor taser usage. COPA was—and currently remains—mandated only to investigate taser usage that results in death or serious injury, or in response to the filing of a civilian complaint.[265]

Instead, CPD supervisors and command officers are currently tasked with investigating and reviewing each use of force incident that does not result in a complaint, death or serious injury, including each taser discharge. The Proposed Consent Decree does nothing to remedy this policy. Instead it ratifies it, placing CPD supervisors in charge of gathering evidence and investigating the circumstances surrounding a taser incident in circumstances where COPA does not have jurisdiction. Proposed Decree, ¶ 274. This is the kind of investigative policy that was

---

[263] *See* Chicago Municipal Code § 2-57-040 ("In addition to other powers conferred herein, the chief administer shall have the following powers and duties . . . [t]o conduct investigations into all cases in which a department member discharges his or her firearm, stun gun, or taser in a manner which could strike an individual, even if no allegation of misconduct is made . . .").

[264] *See* Hinkel and Richards, *supra* note 246.

[265] *See* COPA ordinance, *supra* note 129, at § 2-78-100.

summarily criticized by the DOJ as largely superficial.[266]  Internal CPD investigations lack the rigor sufficient to ensure CPD officers use tasers in a reasonable manner.  Furthermore, when disciplinary actions are left to the whims of supervising officers, creating a culture of accountability within the CPD will be nearly impossible.[267]

Accordingly, the Proposed Decree should be amended to give COPA sole jurisdiction over *any* investigations into taser or stun gun discharges.  The following language should be inserted to modify Paragraph 440(e)(ii):

> "[I]nvestigations of cases in which a CPD officer discharges and/or uses his or her stun gun, taser, or any other weapon to inflict pain or induce compliance in a manner that could potentially strike an individual, and cases in which a person dies or sustains any injury that requires medical attention as a result of an interaction with CPD or while in CPD custody.  Under no circumstances will discharges of such weapons be referred to investigation by the districts."

### G.    The Consent Decree Should Be Modified to Require Robust Transparency Provisions in Order to Ensure Public Accountability.

Any consent decree entered in Chicago must require greater transparency on the part of CPD.  The Proposed Decree includes many provisions that will improve upon the status quo.  Yet, it still fails to provide the type of robust transparency provisions required to eradicate CPD's systemic denial of police abuse.  CPD will not eliminate its unconstitutional practices unless its members are regularly held accountable for their misconduct.  That accountability is impossible without transparency.

---

[266] *See* DOJ Report, *supra* note 4, at 44.

[267] *See id*. at 44-45.

1. **The City of Chicago Has a History of Concealing Police Abuses and Promoting a Code of Silence, and This Pattern Will Not Be Remedied Without Rigorous Public Scrutiny of CPD Conduct.**

The well-oiled machinery of denial operating within the CPD, as revealed in the DOJ and PATF Reports, is a major if not the primary obstacle to real police reform in Chicago. Those reports identified CPD's lack of transparency as fundamentally responsible for Chicago's unique problems with police abuse.[268] They also detailed Chicago's historical cycle of half-hearted reform followed by backslides into old patterns of misconduct and cover-ups.[269] The Consent Decree must provide for long-lasting, affirmative transparency that will lay the groundwork for enduring reform, by empowering the public to hold CPD accountable long after the independent monitoring process has ended. An agreement that fails to ensure that CPD and the City will publicly report all relevant information—both during the monitoring process and beyond—will only allow the cycle of failed reform attempts to continue.

The Laquan McDonald case dramatizes the acute need for honesty and transparency in Chicago. In addition to exposing the systemic cover-up of the murder of a 17-year-old boy by a Chicago police officer, the case pulled back the curtain on Chicago's entrenched code of silence.[270] CPD manufactured and enforced a false official narrative of a justified shooting in self-defense—a narrative that would have prevailed, had a Cook County Circuit Court judge

---

[268] *See* DOJ Report, *supra* note 4, at 12; PATF Report, *supra* note 39, at 63.

[269] *See* DOJ Report, *supra* note 4, at 19; PATF Report, *supra* note 39, at 22.

[270] *See* Andy Grimm and Sam Charles, *Fellow Officers May Have Lied, Conspired For Months to Cover For Jason Van Dyke*, CHI. SUN-TIMES (Oct. 4, 2018), https://chicago.suntimes.com/news/van-dyke-proffer-coverup-conspiracy-email-applaud-second-guess/; Mark Konkol and Paul Biasco, *Chicago Police Hid Mics, Destroyed Dashcams to Block Audio, Records Show*, DNAINFO (Jan. 27, 2016), https://www.dnainfo.com/chicago/20160127/archer-heights/whats-behind-no-sound-syndrome-on-chicago-police-dashcams/; Nausheen Hausein, *Laquan McDonald Timeline: The Shooting, The Video, The Verdict*, CHI. TRIB. (OCT. 5, 2018), http://www.chicagotribune.com/news/laquanmcdonald/ct-graphics-laquan-mcdonald-officers-fired-timeline-htmlstory.html.

refused to order the release of CPD video of the killing.[271]  The primary remedy for denial, dishonesty, and secrecy is requiring that the City share accurate and timely information with the public each time an officer uses force or is accused of misconduct.  It should come as no surprise that the communities most impacted by CPD abuse and dishonesty do not trust the CPD.[272]  Transparency is a prerequisite to the success of the Consent Decree.

Many provisions in the Proposed Decree require CPD to improve transparency.  The Decree gives the Independent Monitor the power to review and approve all plans and training materials proposed by CPD during the monitoring process.  Proposed Decree, ¶ 638.  Those plans will in turn be made publicly available.  *Id.*, ¶ 640.  The agreement also requires the public reporting of some CPD assessments, including of discriminatory practices in misdemeanor arrests.  *Id.*, ¶ 80.  These types of provisions are necessary components of a larger transparency regime.

However, the Proposed Decree fails to impose affirmative transparency obligations on CPD to report on use of force, misconduct investigations, and other information vital to accountability efforts.  If communities in Chicago are to be real partners in addressing the lack of CPD accountability and realizing police reform, the Decree must require CPD to *publicly* report the data it collects in real time and in a form that is easily accessible by members of the public.  The City recently committed to making a great deal of police use of force and misconduct information publicly available through the OIG.[273]  The Consent Decree must memorialize that

---

[271] *See id.*

[272] *See* DOJ Report, *supra* note 4, at 140-50.

[273] *See* Press Release, OIG, City of Chicago, *OIG Launches New Information Portal* (Aug. 20, 2018), https://igchicago.org/2018/08/20/oig-launches-new-information-portal/.

commitment in writing, and not leave the community's access to important information entirely at the discretion of the City.

### 2. The Consent Decree Must Impose More Robust, Long-Lasting, and Affirmative Transparency Provisions.

The Proposed Consent Decree lacks sufficient transparency provisions requiring CPD and the City of Chicago to publicly release information that is essential to accountability efforts. To ensure real reform, the Decree must be modified to include the following transparency requirements: (1) CPD and the City of Chicago must publish relevant use of force and misconduct data and update it in real time; (2) Data must be easily accessible in electronic form; (3) Information provided must be broken down with enough specificity to enable pattern analysis; and (4) CPD's Video Release Policy must be updated to require more immediate release of videos.[274]

First, the consent decree ultimately entered in Chicago must require CPD and the City to publicly report information that is relevant to public accountability efforts in a timely fashion. The Proposed Decree requires CPD to collect data on use of force by CPD officers, ¶ 157, including data on foot pursuits, *id*., ¶ 168, and instances of CPD officers aiming firearms at a person, *id*., ¶¶ 188-196.   But it does not require any of this data to be publicly reported.  The Proposed Decree also provides for publication of some information related to individual uses of force, but it does not mandate the publication of other fundamental information, such as the identity of officer who used the force, the type of force used (including weapons used), the proffered reasons for the use of force, whether CPD found the force to be justified, and the

---

[274] The *Campbell* Plaintiffs have attached as Exhibit E their suggested modifications to the parties' proposed decree to implement the affirmative transparency requirements described in this section.

demographics of the officers using force and the victims of the force.  *See id.*, ¶ 582.  All of this information lives in CPD databases and is easy to publish.

Similarly, the Proposed Decree requires tracking of misconduct investigations involving each CPD officer, but does not require that data to be made publicly available.  *Id.* ¶ 552.  Except in a small subset of cases that may come into play under the City's video release policy, the Decree also fails to require the City to publish any information about complaints of police misconduct until "60 days of the final disciplinary decision," *id.*, ¶¶ 500-501, which historically has not occurred until a year or more after the incident of police abuse.  Accordingly, under the current draft, CPD could conceal the fact that an officer was accused of excessive force or racial discrimination until more than 12 months after the alleged abuse occurred.

Data on complaints against CPD officers and misconduct investigations, including investigations into use of force, is public information under Illinois law.[275]  Chicago communities cannot be real partners in ensuring accountability if they are left in the dark about incidents of alleged police misconduct.  This information is essential for the public to be able to monitor patterns in officer use of force, and determine whether misconduct allegations against CPD officers are investigated thoroughly and fairly.  In particular, in order to remedy the harm caused by decades of secrecy and denial by CPD, the City must be required to publish this information proactively, as it becomes available in real time, rather than on a case-by-case basis in response to individual Freedom of Information Act requests.

Second, all publicly reported data must be published on the Internet in an easily accessible and digestible electronic format.  Full transparency should empower all members of the public to view and understand the data that is released.  No one in Chicago should be denied

---

[275] *See Kalven v. City of Chicago*, 2014 IL App (1st) 121846, ¶ 32, 7 N.E.3d 741, 749.

access to information in the public record because it is only available in a form that is either logistically difficult to obtain or incomprehensibly presented. Creating such a publicly accessible online database would present no great burden to the City. The Proposed Decree already requires that the City, CPD, and COPA maintain much of the relevant data on use of force, complaints, arrests, and other relevant categories in their forthcoming Case Management System (CMS). Proposed Decree, ¶ 438. It would not require significant additional effort to simply make the non-confidential components of CMS public once the system is completed.

Furthermore, the OIG recently launched an electronic Information Portal on its website, which either already includes or will include much of the necessary data to ensure public accountability. If the City intends to make such information available through the new portal, it cannot claim that a requirement in the Consent Decree to publish that very information presents any kind of undue burden. However, affirmatively requiring public reporting in the Decree itself will ensure that the City cannot later renege on its commitment to transparency through the OIG portal.

Third, in addition to specifying the timing and manner of required data publication, the Proposed Consent Decree must identify with greater specificity the actual information that the City and the CPD must release publicly. The agreement already specifies particular fields of information that must be included in CPD's data tracking and analysis of misconduct investigations via CMS. Proposed Decree, ¶ 509. But the listed fields do not include key pieces of information, such as the demographic information of accused officers, disagreements between COPA and the CPD Superintendent on investigatory findings and discipline, and the duration of each investigation. Specificity in the required information is similarly missing from the Decree's

provisions on the CPD Annual Report,[276] *id*., ¶ 546, and the CPD Annual Litigation Report, *id*.,

¶ 548.[277] These breakdowns are essential for assessing patterns of abuse, such as discriminatory

use of stops and arrests.

Fourth, the Proposed Consent Decree fails to require a significant and necessary update to

the CPD Video Release Policy. Current CPD policy requires the release of videos 60 days after

an incident involving death or serious bodily injury. The Decree merely requires that the City

maintain and adhere to this policy. Proposed Decree, ¶ 554. Allowing CPD and the City to hold

back footage of serious incidents is an impediment to public accountability. A sixty-day window

provides CPD with more than sufficient time to fabricate justifications for abuse. The Consent

Decree therefore needs to require a change to the existing policy, and mandate the release of

CPD videos within 48 hours in the absence of documented exceptional circumstances and, in all

cases, within 14 days.

The monitoring process, too, must be as transparent as possible—yet much of the process

outlined by in the Decree will take place behind closed doors. Policies born of an opaque

monitoring process outside of public view will suffer from the same diminished legitimacy as the

policies they are meant to improve. The Proposed Decree gives the Monitor significant power to

effect reform, but the Monitor's authority is necessarily limited in temporal scope and by the

interests it represents. The Consent Decree must ensure that transparency endures beyond the

---

[276] Examples of information missing from the Decree's required list of fields for the CPD Annual Report include, but are not limited to, (a) a breakdown of pedestrian and vehicle stops by race, gender, age, and ethnicity, (b) the number and percentage of frisks that result in uncovering a weapon, broken down by race, gender, age, and ethnicity, (c) a breakdown of use of force data by the demographics of both subjects and involved officers, and (d) a breakdown of use of force data by justification used.

[277] Examples of information missing from the Decree's required list of fields for the CPD Annual Litigation Report include, but are not limited to, (a) the status of pending criminal cases against CPD members, and (b) the disposition of misdemeanor criminal cases against CPD members.

monitoring process, empowering the people of Chicago to hold CPD accountable for misconduct in perpetuity.

Finally, the Consent Decree must eradicate barriers to full transparency and accountability imposed by the collective bargaining agreements ("CBA") between the City of Chicago and the unions representing CPD officers. The Proposed Decree, ¶ 711, provides, in part, that in "negotiating CBAs . . . the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree or to the extent necessary to provide for the effective implementation for the provisions of this Consent Decree." This provision must be read as ensuring that the unions do not defeat the protections included in the decree and that the contract provisions that have historically aided in institutionalizing the code of silence are eliminated.[278]

## CONCLUSION

For well over one hundred years, Chicago's communities and officials have launched effort after effort to end police corruption, violence, and racism and to redress other forms of police misconduct.[279] Each effort—including dedicated commissions, strategic criminal prosecutions of individual officers, and various forms of external oversight—ultimately failed.[280] But never has CPD been subject to a consent decree or to any other form of federal court oversight to address its pattern and practice of discriminatory force. Consent decrees and the accompanying judicial enforcement mechanisms have unparalleled powers to end government abuse and misconduct. For these reasons, the entry of a consent decree here would be historic and could represent a long overdue turning point for CPD and the communities it polices.

---

[278] *See* PATF Report, *supra* note 39, at 70-73.
[279] *See id.* at 23-24 for a brief overview of these past efforts.
[280] *Id.*

A consent decree has the potential to put a permanent end to systemic deficiencies in one of the most notorious and intractable police departments in the United States.   That historic potential will only be fully realized if the final consent decree contains the provisions outlined here, which are deemed essential by Chicago's communities most affected by police violence and misconduct.

Dated: October 12, 2018
          Chicago, Illinois

                                         Respectfully submitted,


                                         /s/ Alexa Van Brunt_____
                                         One of the Attorneys for *Campbell* Plaintiffs


Sheila A. Bedi                            Craig Futterman
Alexa Van Brunt                           Mariah Garcia, JD
Vanessa del Valle                         Sarah Kinter, JD
Theo Benjamin, JD                         Mandel Legal Aid Clinic
Devaanjana Goel, JD                       University of Chicago Law School
Kiera Janzen, JD                          6020 S. University Avenue
Mason Willis, JD                          Chicago, Illinois 60637
MacArthur Justice Center                  (773) 702-9611
Northwestern Pritzker School of Law
375 E. Chicago Avenue                     Andrew M. Stroth
Chicago, Illinois 60611                   Carlton Odim
(312) 503-1336                            Action Injury Law Group
                                          191 North Wacker Drive, #2300
Brendan Shiller                           Chicago, Illinois 60606
April Preyar                              (312) 977-1300
Shiller Preyar LLC
601 S. California Avenue                  Cannon Lambert, Sr.
Chicago, Illinois 60612                   Karchmar & Lambert, P. C.
(312) 226-4590                            211 W. Wacker, Ste. 1400
                                          Chicago, Illinois 60606
Jeanette S. Samuels                       (312) 977-1300
Samuels & Associates, Ltd.
3440 S. Cottage Grove, #504               Emmanuel Andre
Chicago, Illinois 60616                   Northside Transformative Law Center
(872) 588-8726                            1543 W. Morse, 2nd Floor
                                          Chicago, Illinois 60626
Thomas J. Moloney                         (312) 219-6544
Roger A. Cooper
Jared Gerber
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000


Counsel for *Campbell* Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby states that on Friday, October 12, 2018, before 4:30 p.m., she served the above document, and the accompanying appendix and exhibits, upon all parties who have filed appearances in the above-captioned case via the CMECF electronic system.

/s/ Alexa Van Brunt____
One of the Attorneys for *Campbell* Plaintiffs