# EXHIBIT A

# Declarations of Survivors of CPD Violence

Comments Submitted on Behalf of Plaintiffs in *Campbell v. City of Chicago et al.*
*State of Illinois v. City of Chicago*, Case No. 17-cv-6260

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| State of ILLINOIS,<br><br>    *Plaintiff,*<br><br>v.<br><br>CITY OF CHICAGO,<br><br>    *Defendant.* | Case No.: 17-cv-6260<br><br>Honorable Robert M. Dow |

## DECLARATION OF AREWA KAREN WINTERS

I, Arewa Karen Winters, pursuant to 28 U.S.C. § 1746, declare as follows:

    1.    I am over the age of 18 and fully competent to make this Declaration. This Declaration is based on my personal knowledge, except where expressly note otherwise.

    2.    I am a named plaintiff and class member in *Campbell v. City of Chicago, et al.*, No. 1:17–cv–04467 (N.D. Ill.).

    3.    I am the great aunt of Pierre Loury. My sixteen-year-old nephew was shot and killed on April 11, 2016. I'm not sure about all of the details but I know that he was in a car that was allegedly stolen, and the police stopped the car. Pierre got out of the car, and police pursued him on foot. As Pierre was hopping over a gate, he was shot. The shooting raised many questions for us, and we knew that we had to get a lawyer because we knew that the CPD has a history of lying.

    4.    After Pierre had been shot, Police tried calling my Niece, but by the time they had called her, somebody from the community had already called her and she was already at the

hospital. On the phone, Officers demanded to know how she knew about where to go, as if they were surprised she knew.

5. When I got to the hospital, my niece had already been there for about 4 hours. There were no detectives and no officers there. Hospital personnel had to tell us what had happened. We knew that there were opportunities to help him on the scene. While I'm not saying they could have saved Pierre's life, they could have been given the opportunity to try but police didn't let paramedics through at the scene.

6. The thing that really upset us the most was that before talking to any police officers, the news was reporting that a 30-year-old black man had been shot and killed. I remember that at that time, we remained hopeful because Pierre was NOT 30-years-old – he was a 16-year-old boy – so we thought it couldn't be him. Sometime after that, in the hospital, we learned that he had already been transferred to the morgue and that the man the news was reporting about was Pierre. We were not given the opportunity to identify him.

7. After the shooting, we didn't hear from the police at all. We secured an attorney the next day. The police never called, and we didn't hear anything else about Pierre's death. What I do know is that we had to request access to the police report and that the report was $75. There are other families in Chicago that need help with these resources, like the Bettie Jones family —and these services should be provided at no cost.

8. For the City to ignore the voices of victims' families when we have first-hand experience of police abuse is a travesty of justice. When you sit in the waiting room at a hospital or when you talk to other families, you notice similarities. The only thing that changes are the names of the victims, and the dates of the shootings. We are always sent to wrong hospitals and we never get information from the police. It's a horrific experience to lose anyone; then when

you lose someone at the hands of the police department the families have to go through a long crazy fight and we endure a lot. For them to provide no support for families or to give families accurate information is unacceptable. As a civil servant, Police officers need to treat mothers and families with some dignity and respect. We are human and we have just lost someone. The police are supposed to understand human nature and they are just mean and nasty especially when they are in groups.

9. At the end of the day the Consent Decree is an opportunity to take a real step forward. We want the City and the police to care about families in Chicago and the community at large. For the decree to have these omissions for survivors rights is very hurtful. As a secondary survivor, a lot of time, effort, and tears has gone into our efforts. No family feels hopeful about their court cases and we know that officers just get off without discipline. We are asking that our families be given information when their young black sons are shot and killed.

10. This Decree is an opportunity to give voice to our community. Survivors' voices are important and for these voices to be completely ignored by the Police and the City is devastating. It hurts us immensely. If the City were honest about what CPD is doing to their most vulnerable communities, you would think they would have compassion. And it's scary to think at this point, in the Decree, we've been completely ignored.

Dated: October 11, 2018                               /s/ _____
                                                     Arewa Karen Winters

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| State of ILLINOIS,<br><br>    *Plaintiff,*<br>v.<br><br>CITY OF CHICAGO,<br><br>    *Defendant.* | Case No.: 17-cv-6260<br><br>Honorable Robert M. Dow |

## DECLARATION OF CYNTHIA LANE

I, Cynthia Lane, pursuant to 28 U.S.C. § 1746, declare as follows:

- I am over the age of 18 and fully competent to make this Declaration. This Declaration is based on my personal knowledge, except where expressly stated otherwise.

- I am the mother of Roshad McIntosh who was killed by Chicago Police on August 24, 2014, when he was nineteen-years-old—just a week before his birthday. He is survived by a son, Roshad Jr., who was two years old when Roshad was killed.

- I remember when I first got the call that my son had been shot. I rushed to the location on California and Polk. The police had yellow tape up around the scene and they weren't letting anybody through. I wanted to go the back porch where my son was still laying but they would not let me back there. They kept pushing me back. I remember begging and pleading, and officers just pushing me back. I was just so hurt. I just fell to my knees and cried.

- I remember that at that point someone yelled out that there was an ambulance

1

coming back my way. As the ambulance passed me by I could clearly see through the little window that they were pumping on his chest. I ran to my truck and proceeded to follow the ambulance and I could see through the back of the window that they were trying to save my son's life.

- When I arrived at Mount Sinai Hospital, nobody would let me let me back to see my son. I remember sitting in the waiting room with my mom and the other grandmother when two police officers came into the sitting room. They wanted me to verify my son's identify: his name, date of birth, etc. I was trying to ask the officers questions about what happened, and they only said, "we really can't say anything now, but you will get the police report." They promised me that they were finishing up the police report and that they would get me a copy. I have never seen those two officers again and I have never seen a police report. I never got a chance to see my son that night. To say my last goodbyes. I never got to see my baby.

- In fact, I wasn't able to see my son until I went to the morgue a few days later. And then, I only saw him on a little 4x6 monitor where I only saw his face.

- After the fact, there was no communication from the Chicago Police Department at all, none. I never received calls from IPRA or the police department about my son's case. It took me a while to learn what happened to my son—as far as the police's version of the story goes. I never received a police report despite their promises, and when I would call to ask what the status of my son's case was or what happened, IPRA just told me that it was an ongoing investigation and that there wasn't much they could discuss. I remember calling several times, but each time they would just give me the runaround.

- I only learned about what happened through my lawyer—otherwise I would have been thrown out there on a limb, wondering and guessing. Throughout the whole process of dealing with CPD it pretty much seemed like they were just laughing with each other—as if what was done was done and that I would never get justice. They had an it-is-what-it-is mentality. It was so hurtful. When a loved one dies, they give you no information, there is no communication.

- The police also never followed up about counseling. They never asked whether Roshad's siblings were okay. I'm still going through stuff myself, I'm seeing a psychiatrist every week, but it's through my own insurance from work. It is very traumatizing.

- Both of my two older sons, Roshad's older brothers, deal with the trauma in their own private moments. They still think about him a lot—Roshad was their younger brother. They try and let me not see it, but you can tell when stuff is bothering them because they're quieter now. It really affected my daughter Destiny, who was just fourteen years old when Roshad was killed. Even though the school was giving her counseling, her grades dropped tremendously. Depression set in and she didn't even want to get out of bed and go to school. Her grades became so terrible that she had to be taken out of school and placed in an alternative school. It has been very traumatizing for all of us and the police have done nothing.

- My middle son Romeel is constantly bothered by the police. They take his ID and run his name. I'm sure they have Roshad in their database as being shot and killed by the police; and I'm also sure they know I have a case against the CPD. Romeel tells me that they just run his name in the database and come back laughing. It's just so sad.

3

Police killed his brother and how they are picking on my other son. He's such a good kid, but they're always bothering him. Harassing him. It's ridiculous that they have to through life getting picked on—just because his last name is McIntosh.

Dated: October 11, 2018　　　　　　　　　/s/ *Cynthia Lane*
　　　　　　　　　　　　　　　　　　　　　　Cynthia Lane

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| State of ILLINOIS,<br><br>      *Plaintiff,*<br><br>v.<br><br>CITY OF CHICAGO,<br><br>      *Defendant.* | Case No.: 17-cv-6260<br><br>Honorable Robert M. Dow |

## **DECLARATION OF DOROTHY HOLMES**

I, Dorothy Holmes, pursuant to 28 U.S.C. § 1746, declare as follows:

    1.    I am over the age of 18 and fully competent to make this Declaration. This Declaration is based on my person knowledge, except where expressly note otherwise.

    2.    I am a member of one of the Plaintiff organizations, Justice for Families-Black Lives Chicago, in *Campbell v. City of Chicago, et al.*, No. 1:17–cv–04467 (N.D. Ill.).

    3.    I am the mother of Ronald "Ronnieman" Johnson, who was killed by a Chicago Police Officer on Sunday, October 12, 2014. On that day, at about 12:30 p.m., I remember my phone ringing nonstop and my daughter informing me that my son, Ronnieman, had been shot. I remember driving down to the scene immediately and seeing flashing lights and police everywhere.

    4.    When I was at the scene, I asked police officers where my son was and remember officers telling me that he had been transferred to Northwestern Hospital. While I was on my way to Northwestern Hospital, I received another call from the police informing me that my son was actually at the University of Chicago, so they had told me the wrong information. I

remember Police telling my other family members that Ronnieman had been transferred to different hospitals around the city, like Mount Sinai and Stroger hospital.

5. I believe this was a deliberate attempt to scatter family members throughout Chicago and provide us with misinformation.

6. When I arrived at the University of Chicago hospital, I asked Police Officers there whether I could see my son. They just told me that I had to wait. I asked an officer who I was told was handling my case what happened to my son and how many times he had been shot. I remember that officer laughing at me, telling me that Ronald had only been shot once, and walking away. Police officers kept telling me that I would be allowed to see my son that night, but hours passed, and I was never given the opportunity to identify Ronald that night.

7. The following day, on Monday, October 13, 2014, I went to the morgue to see my son but was told that his body was not ready. I was not able to see my son until Wednesday, October 15, 2014, and at that point, I still had heard nothing from the City of Chicago or CPD. I only heard about my son's case on TV news channels that had been reporting that Ronald pointed a gun at an officer.

8. Sometime after putting my son to rest, I went to CPD headquarters to ask what happened to my son and why they still had not told me any information. Officers at the Department headquarters told me they had sent a letter to me. I believe this was a deliberate lie because I had not received any letter. They never sent me a letter or called me to follow up.

9. I remember telling officers there that someone at the scene had given me a video the night my son was shot. They demanded to see a copy of the video I had. At that point, they told me they had dashcam video footage of my son's murder. But they refused to let me see any of the dashcam footage.


10. When I left the Department headquarters, I called my lawyer and he didn't know about the dashcam footage either. I had to do a lot of paperwork at the CPD's headquarters to get them to show me the dashcam footage, and when I finally saw it, I saw that my son never pointed a gun at a police officer. I saw that my son was shot five times and that my son was running, scared for his life.

Dated: October 12, 2018

/s/ Dorothy Holmes
Dorothy Holmes

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| State of ILLINOIS, *Plaintiff,* v. CITY OF CHICAGO, *Defendant.* | Case No.: 17-cv-6260 Honorable Robert M. Dow |

### DECLARATION OF TIFFANEY BOXLEY

I, Tiffaney Boxley, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18 and fully competent to make this Declaration. This Declaration is based on my personal knowledge, except where expressly note otherwise.

2. I am a member of one of the Plaintiff organizations, Justice for Families-Black Lives Chicago, in *Campbell v. City of Chicago, et al.*, No. 1:17–cv–04467 (N.D. Ill.).

3. I am the mother of Joshua Beal. My son was killed on November 5, 2016 by Chicago Police Officer Treacy.

4. The day my son was killed I believe the Police wanted to kill somebody. The 911 call described a black man that did not even fit Joshua's description. The call named somebody with a white shirt and jeans, and my son had on a bright shirt with black dress pants and dress shoes. It was nothing like the description.

5. The police were horrible to me and my family immediately following my son's death. They closed off the scene in a four-block radius, so we could not see what was going on. They treated me and my family like we were animals. They kept yelling "Get the fuck back,"

"Move the fuck back before you get locked up." My family and I just wanted to know what was going on with my son and whether Joshua was alive.

6. Then, that's when I had an experience with one of the officers on the scene that I will never forget. Her name was Officer Archer, I will never forget that. She was very, very rude and disrespectful. To this day, that interaction still leaves a bad taste in my mouth. When I asked her what happened to my son and whether he was alive or not, all she said was, "The only thing I can advise you to do is go to the hospital." But, it was the way she said it that has stayed with me this whole time. Mean and dismissive, like I wasn't human, like I didn't deserve to know what was going on, like I didn't just have a son that was killed by the police. When I asked her again where my son was she just yelled at me "Christ!"

7. When we arrived at the hospital, the police had shut down the hospital and they weren't letting anyone inside. I was with fifteen other family members waiting outside the hospital. I remember that after about an hour they only wanted to let me in, but because my first cousin was a cop (he was visiting from Minneapolis) they let him in as a professional courtesy. They also let my son's aunt in because she was a member of the clergy.

8. I remember when we went into the hospital, there was enough space for about twenty-five people to sit in the room, so I didn't understand why they couldn't let the fifteen of us there all in. If you're bringing family members with you, everyone should be allowed to wait with you in the hospital. My mom was there and my cousins, and none of them were allowed in.

9. At the hospital, the police refused to speak to us. I wasn't allowed to see my son and someone from the hospital said that the only time I could see my son was when I went to the county morgue.

10. Nobody from the Chicago Police Department ever followed up with me. I was never notified whether the officers involved were going to be charged or whether the case was still under investigation. There was one police detective, named Officer Davis, that claimed to be from IPRA who called me at least twice—it turned out he actually wasn't from IPRA. He acted nice, but I knew that was because all he wanted was information, so I told him he could talk to my lawyer. I never gave him any information.

11. I received no information on mental health services at all. I filed for the crime victim's compensation program, because I had heard about that program from my sister's friend. But I learned from other mothers who had lost sons to crime that the program doesn't give crime victim assistance if it was an officer-involved shooting.

Dated: October 11, 2018                    /s/ Tiffaney Boxley

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

State of ILLINOIS,

    Plaintiff,

v.

CITY OF CHICAGO,

    Defendant.

Case No.: 17-cv-6260

Honorable Robert M. Dow

### DECLARATION OF MARTINEZ SUTTON

I, Martinez Sutton, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18 and fully competent to make this Declaration. This Declaration is based on my personal knowledge, except where expressly stated otherwise.

2. [MS] I am the brother of Rekia Boyd, who was shot and killed by off-duty cop Dante Servin on the ~~night~~ *early Morning* of March 21, 2012.

3. After Rekia was shot, the police didn't let us know until the ~~next day~~ *10 hours later*. At about 10:30 a.m. on March 22, 2012, I remember CPD investigators coming to my house and asking me "Are you Martinez Sutton?" "Is Rekia Boyd your sister?" and them telling me without any emotion "Your sister has been involved in a crime. Here's the address of the hospital. She's been shot in the head. Sorry." And then they just walked away.

4. My sister was not involved in a crime. That was the first thing that was really hurtful because for officers to just lie to me and say that my sister was involved in a crime was shocking. That was the only contact that the City or the Police Department had with me and my family until we filed a lawsuit against Officer Servin.

5. During the criminal trial, one officer threatened me and said "we can't wait to get you," even though I wasn't doing anything disruptive—I was just trying to prosecute Officer Servin for shooting my sister in the head.

6. When they announced a not guilty verdict, I remember standing up in the court room and yelling "What? Not Guilty?" and ~~walking~~ me trying to out. I remember one of the Cook County Sheriff's ~~sitting me down outside~~ me standing inside of the court room and saying "You need to sit down and shut up." ~~I remember~~ me Every officer in the courtroom surrounded me other officers surrounding me and that made community members angry. They have footage of that incident, but they won't release it because it shows the officers acting in a bad light.

7. Since the trial, I've had one encounter with the police that made me feel like I was nothing. Police officers pulled my car over and while I was sitting in the car, another police officer drove by and said, while chuckling, "that's the guy whose sister got shot in the head."

8. After the trial I began suffering from anxiety. The City never offered me any mental health services. It started small and then got worse. I had to deal with the grief of my sister's death, learn how to live without my sister in everyday life, and focus on work and school. Then, depression kicked in. I started losing track of time, days, hours, and I had to drop classes in school because I couldn't focus. I couldn't hold a job, I just had to survive on my own.

9. ~~I remember that I~~ me couldn't show my family any of these emotions because a lot of people depended on me. It was hard to hold up a ~~fake~~ me Emotionless face. I stopped going outside. I was scared to go outside, especially when it got dark. I used to love being outside at night but after my sister was killed at night, I'm afraid of the dark.

10. I really had to find my own mental health services and even trying on your own is difficult. Once health professionals saw my record and saw that it was an officer-involved shooting, they started treating me like I was the criminal.

11. I hope they have services for police officers involved in shootings. I know that if I suffer because my sister was killed, then officers out there on duty who takes lives—whether they are protecting themselves or not—definitely need mental health services. If they don't get help, it will fester into something that will become destructive.

Dated: October 10, 2018

/s/ _____
Martinez Sutton