# EXHIBIT D

# Proposed Diversion Provisions

Comments Submitted on Behalf of Plaintiffs in *Campbell v. City of Chicago et al.*
*State of Illinois v. City of Chicago*, Case No. 17-cv-6260

*Chicago Community Consent Decree, May 2018*

E. **Diversion**[7]

1. **Reducing Unnecessary Negative Police/Community Interaction: Development of a City-Wide Pre-Arrest Diversion Program**

43. Within six months of the implementation of this Agreement, the City will adequately fund a data driven Pre-Arrest Diversion Program (PADP). The goal of PADP is to reduce unnecessary arrests and the use of force by encouraging and enabling officers to provide direct referrals and facilitate access to community resources and programming, rather than forcibly arresting and/or formally processing people through the justice system.[8]

44. Within six months of the Effective Date of this Agreement, the City will establish and maintain a PADP Design Team ("Design Team") that will be comprised of:

   a. One representative from the City's Department of Family and Support Services;

   b. One representative with expertise in each of the following areas:

   i. Housing;
   ii. Community-based mental health services;
   iii. Substance use treatment;
   iv. Job training and development;
   v. Non-traditional education;
   vi. Human trafficking;
   vii. Street intervention;
   viii. Immigration;
   ix. Domestic violence;
   x. Youth development;
   xi. Restorative justice;

   c. One representative from the Cook County States' Attorney Office;

   d. One representative from the Cook County Public Defender's Office;

   e. The CPD CIT Coordinator;

   f. One representative of the Behavioral Health Unit, once established; and

   g. Four representatives from the Coalition.

45. The Design Team will develop PADP. Within one year, the Design Team will

---

[7] Sources: Atlanta/Seattle Pre-Arrest Diversion Project; Baltimore Consent Decree.
[8] None of the programs described in this Agreement shall result in the Coalition or Coalition organizations from benefitting financially or receiving funding from the City of Chicago or the State of Illinois.

18

present the Plan for PADP to the Monitor, the Office of the Attorney General (OAG), and Coalition for review. The Monitor, Coalition, and OAG shall have fifteen (15) days following the submission of the plan to give input, comments, and objections to the plan. The City will then either accept the suggestions or the issue will be resolved through a dispute resolution process established by the Design Team. PADP will begin operations within 18 months from the Effective Date.

46. PADP will provide a system to facilitate direct referrals by OEMC call-takers and police officers to programs that can provide individuals with the necessary support and services to resolve the situation or concern at issue in the call or incident. Such programs may include emergency housing, peer-intervention services, community mental health services, substantive use treatment including administration of overdose reversal drugs, drop-in centers, and shelters.

47. PADP will include a process by which members of the community can contact PADP for direct referrals to identified programs. PADP assistance will be accessible to the public, including through 311, and the City will fund an advertising and public outreach campaign to encourage communities to call PADP program. 311 call-takers will receive comprehensive training on PADP and how to identify calls that can be served by PADP. The Design Team will develop a plan for ensuring that 311 calls made afterhours will be responded to in a timely and effective manner. OEMC will be required to direct specific calls for services that fall under PADP's jurisdiction to PADP and not to CPD.

48. PADP will be developed in such a manner that an officer's tasks when referring someone to pre-arrest diversion are less time consuming or onerous than arresting someone and referring them for prosecution.

49. CPD's deployment decisions, overtime processes and shift scheduling shall be conducted in a manner supportive of PADP.

50. PADP shall use a harm-reduction framework for addressing substance use and mental health needs. Cultural competency shall be built into all aspects of the program

51. For complex cases and those involving repeat consumers, PADP shall use peer-outreach workers to facilitate a comprehensive approach to the case and other services to diverted individuals.

52. PADP, through the Design Team, will continually assess, improve, and develop the diversion resources and programs. PADP referrals and diversion programs will be specifically tailored to address the needs of the individual. PADP program development will take into account the needs and strengths of particular communities within Chicago. PADP program development will prioritize Chicago communities with high levels of arrests and use of force incidents.

53. The Design Team will be tasked with developing collaborations between the necessary governmental and non-governmental entities in order to launch PADP. The Design Team will further be required to develop the necessary policies, procedures, and training materials required for CPD to employ the pre-arrest diversion process, including but not limited to those related to data collection, oversight, and quality control.

54. Within six months of Effective Date, the City shall hire a program manager who will not be an employee of CPD and who will be charged with coordinating, managing, and overseeing the development and implementation of this program. The City will ensure that PADP is launched within one year from the Effective Date.

**2. Reducing Unnecessary Police/Community Interaction: Development of Citation Program**

55. CPD will ensure that officers issue a citation or make a custodial arrest only where they have probable cause to believe a person has committed or is committing a criminal infraction. Officers will not rely on information known to be materially false or incorrect in making an arrest.

56. For any of the following offenses, CPD will require that an officer obtain permission from a permanent rank supervisor prior to effectuating an arrest, unless not practicable under the circumstances, in which case the officer must notify a permanent rank supervisor as soon as practicable after effectuating the arrest:

   a. Obstructing, Assaulting, or Resisting an Officer;

   b. Disorderly Conduct;

   c. Failure to Obey an Officer;

   d. Gambling;

   e. Making a False Statement to an Officer;

   f. Misdemeanor Trespassing Offenses;

   g. Drug Possession for Personal Consumption;

   h. Drinking on the Public Way;

   i. Narcotics-Related Loitering;

   j. Gang Loitering;

   k. Mob Action;

   l. Loitering;

   m. House of Ill-Fame;

   n. Prostitution;

  o. Solicitation of Prostitution;

  p. Theft of Items of Less than $1000;

  q. Fare Jumping;

  r. Selling Nontransferable Railroad Tickets;

  s. Selling or Giving Away Transfers;

  t. Misdemeanor Vandalism;

  u. Public Urination or Defecation;

  v. Ragpicking, Peddling, Junk Collecting;

  w. Begging or Soliciting;

  x. Contributing to Delinquency of Minor; and

  y. Chronic Illegal Activity Premises.

  57. CPD will develop and enforce a policy instructing officers that, for minor, non-violent and Quality of Life Offenses and/or offenses falling under Title 8 of the City of Chicago Municipal Code, they must choose the least intrusive response appropriate under the circumstances as reasonably understood by the officer at the time. In other words, a verbal warning and counseling and/or referral to mediation or a public health program is preferable to a citation, and a citation is preferable to a custodial arrest. CPD will develop a system for tracking all citations given for Quality of Life Offenses or for any of the offenses listed above. CPD will analyze citation data using Peer Group Analysis on at least an annual basis to assess how officers are enforcing Quality of Life Offenses and to identify officers who may benefit from additional guidance or counseling. CPD will identify, encourage, and incentivize officers who successfully deescalate situations and utilize PADP resources without resorting to arrest or use of force.

  58. CPD will require that a permanent rank supervisor approve or disapprove the officer's request to make an arrest for minor, non-violent or Quality of Life Offenses and the supervisor must ensure that any arrest is based on the existence of probable cause and that the officer adhered to CPD policy when determining when to verbally warn and counsel, issue citations, or arrest individuals for Quality of Life Offenses.

*Chicago Community Consent Decree, May 2018*

3. **Development of a Mediation Program**[9]

59. The City shall establish mediation programs that promote voluntary resolutions of certain disputes among community members, and reduce the need for involvement in the criminal justice system.

60. Within 180 days of the Effective Date, the City will issue grants to fund new and existing mediation and restorative justice practitioners who are not employees of CPD or the City to conduct neighborhood mediations that promote lasting resolutions of appropriately-selected disputes among community members, while reducing the need for involvement with CPD and/or the criminal justice system. The OAG and Coalition will approve the affiliation to ensure it comports with best practices in community meditation and the requirements below. The programs will develop intake and case selection procedures informed by community need and best practices in the dispute resolution field.

61. Within 90 days of the Effective Date, the City will, in consultation with members of the Chicago community and the Monitor and Coalition, develop a plan for providing neighborhood mediations in Chicago. The plan will include an implementation timeline for interim steps, as appropriate, such as the retention of an administrator and volunteers; training; and initiation of mediations.

62. The neighborhood mediation programs will:

   a. Support mediation and restorative justice at all stages of the dispute, from early-intervention to intervention after charges have been filed, as a diversion from the criminal justice system;

   b. Be administered by an individual with experience in neighborhood mediation or the administration of mediation programs, including the selection and training of mediators;

   c. Use practitioners who reflect the diversity of, and come from the communities served by, the program;

   d. Ensure that mediators are trained consistently with best practices;

   e. Have quality assurance mechanisms to ensure that all components of the program, including volunteer participants, are operating effectively and consistently with best practices;

   f. Be accessible to public referrals through 311; and

---

[9] Source: Modified from Ferguson Consent Decree.

*Chicago Community Consent Decree, May 2018*

      g.    Fund an advertising and community outreach campaign to encourage communities to utilize neighborhood-based mediation programs.

4. **Reducing Unnecessary and Negative Police/Community Interactions: Reducing Officer Incentives to Escalate Encounters and Providing Know-Your-Rights-Training to Chicago Public School Students[10]**

      63.    CPD is prohibited from either formally or informally using arrests, stops, tickets, citations, and/or completed Investigatory Stop Reports to evaluate an officer's productivity.

      64.    CPD officers are prohibited from engaging in the practice of "trolling." Trolling is defined as the practice of an officer pursuing activities or situations that result in an extension of tour overtime. This includes: (a) actively seeking traffic, disorderly conduct, or other violations at the end of a shift; and (b) making an arrest at the end of a shift as a result of escalating a situation where it would have been in the officer's discretion to disengage. CPD will implement comprehensive policies, practices, supervisory procedures, and training modules (pre-approved by the Monitor and the OIG) to ensure that that no CPD officer engages in trolling.

      65.    CPD members shall conduct themselves in a professional, courteous manner, consistent with professional standards. When a community member is stopped or detained, the officer shall explain in a professional, courteous manner to the community member why he or she was stopped or detained. An officer must always display his or her badge and must never retaliate against or express disapproval toward a community member who seeks to record an officer's badge number. An officer shall always provide his or her name and badge number when asked for such information by a community member.

      66.    The City shall ensure that, starting in third grade, CPS students will receive annual instruction on how to exercise their Fourth, Fifth, and Sixth Amendment rights.

---

[10] Sources: City of Chicago Office of Inspector General (OIG), CPD Overtime Controls Audit; Chicago Police Accountability Task Force (PATF), Community Relations Working Group Recommendations.