**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

STATE OF ILLINOIS,

        Plaintiff,

    v.

CITY OF CHICAGO,

        Defendant.

Case No. 1:17-cv-06260
Honorable Robert M. Dow, Jr.

**COMMENTS ON THE PROPOSED CONSENT DECREE**
**BY PLAINTIFFS IN *COMMUNITIES UNITED, ET AL. V. CITY OF CHICAGO***

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

      A.     The *Communities United* Lawsuit ................................................................. 2

      B.     The *Communities United* Plaintiffs' Role in the Proposed Decree .................... 4

ARGUMENT .......................................................................................................................... 6

I.     THE CITY OF CHICAGO NEEDS A CONSENT DECREE TO REFORM
      POLICE USE OF FORCE. ....................................................................................... 6

      A.     The City's Unconstitutional and Unlawful Policies and Practices Have
             Injured Thousands of Illinois Residents, and Will Continue to Do So Absent
             a Consent Decree. ................................................................................... 6

      B.     The Proposed Decree Provides a Framework for the City to Improve Its
             Policies and Practices and Begin to Adequately Train, Supervise, and
             Discipline Officers to Prevent Excessive Use of Force. ................................... 11

II.    THE PROPOSED DECREE IS INCOMPLETE AND SHOULD BE EXPANDED. . 12

      A.     The Consent Decree Should Require the City to Investigate All Incidents
             That Lead to Lawsuits and Findings of Misconduct by Criminal Courts. ......... 14

      B.     The Consent Decree Should Require Investigative Agencies to Preserve
             Evidence Promptly Upon Receiving Civilian Complaints. .............................. 16

      C.     The Consent Decree Should Require In-Service Training on Disabilities and
             Include Protections for Personal Health Information. ..................................... 17

            1.     A Training Bulletin Will Not Prepare CPD Officers to Recognize
                  and Respond to People with Disabilities. ............................................... 17

            2.     The City Must Protect Individuals' Sensitive Information. .................. 18

      D.     The Consent Decree Should Require the Monitor, Not CPD, to Decide
             What Standard Will Be Used to Assess Discrimination. .................................. 21

      E.     The Consent Decree Should Require the City to Provide Information to Meet
             Its Obligations Under *Giglio*. ............................................................... 23

CONCLUSION ...................................................................................................................... 26

## INTRODUCTION

The proposed consent decree comes to this Court after decades of anger in the streets, pressure in courtrooms, dramatic revelations from newsrooms, and contentious negotiations in conference rooms. That the City, finally, has agreed to a broad court-enforceable policing reform package demonstrates the strength of the pending legal claims.

Chicago cannot wait for a panacea. The Chicago Police Department has systemic problems that prevent it from supporting good officers and reigning in bad ones. The cover-up culture must end. Officers must start receiving the training and supervision they need to do their jobs safely, and they must see good officers promoted and bad officers disciplined. Black and Latino Chicagoans and people with disabilities should see police officers as there to help them, not as a threat to their safety.

Still, the *Communities United* Plaintiffs are deeply disappointed that weighty reforms that were needed yesterday will be delayed until tomorrow. If this Court approves the current agreement, the *Communities United* Plaintiffs will need to continue to urge the City elsewhere to fulfill its promise of civilian oversight, to increase diversion and improve police services to people with disabilities, to reduce the use of force in schools, and more. Because of courts' limited role reviewing parties' settlement agreements, however, this brief puts many important issues to the side in order to draw attention to five discrete omissions that could easily be resolved before a decree is entered. The Court should urge the Parties to not miss this opportunity to address them.

The *Communities United* Plaintiffs are ready to work alongside other community and local civil rights groups to ensure the City complies with any consent decree the Court orders. While the proposed reforms do not go far enough, those that are included are fair, appropriate, reasonable, in the public interest, and urgently needed. We cannot afford delay.

1

## BACKGROUND

### A.  The *Communities United* Lawsuit

The *Communities United* Plaintiffs have a related case pending against the City of Chicago ("City") that also seeks reform of the Chicago Police Department ("CPD") and other City agencies involved in emergency response, and which led to their having a role in the Proposed Decree.

On October 4, 2017, Communities United, Community Renewal Society, Next Steps, ONE Northside and the American Civil Liberties Union of Illinois (collectively, the "*Communities United* Plaintiffs") filed a Complaint against the City of Chicago, later amended on November 28, 2017. (*Communities United v. City of Chicago*, Case No. 17-cv-7151, ECF 1, 28). The Amended Complaint contains six claims for relief against the City related to the City's and CPD's pattern of excessive use of force and discrimination in the use of force against Black and Latino residents and people with disabilities.

Police use of force disproportionately impacts people with disabilities. Without adequate guidance, training, and oversight on how to recognize or respond to people with disabilities, police officers react quickly and with force to disability-related behavior that they perceive as non-cooperation. Police use physical force on deaf people who do not hear police commands, and on people with autism spectrum disorders who take longer to process a verbal command. Countless examples exist of people with disabilities—including mental illness, seizure disorder, diabetes, developmental and intellectual disabilities—being injured and killed because force is used in response to impairments in their communication, difficulties with processing commands and information, or atypical physical movements. Nationally, an estimated one-third to one-half of all

2

people killed by police have a disability,[1] and nearly one-quarter of people killed by police in 2017 were reported to have been experiencing some form of mental distress.[2]

This is true too in Chicago, where CPD provides little guidance or training regarding disability, and currently neither tracks nor analyzes data to improve interactions with people with disabilities. As a result, information about CPD interactions with people with disabilities is limited to those tragic stories which sporadically receive media attention. (*See, e.g.*, *Communities United* Am. Compl. ¶¶ 362-398, ECF No. 28 (highlighting instances of excessive force against people with disabilities in Chicago).)

The *Communities United* Plaintiffs know the role disability plays in CPD's use of excessive force: Their members have experienced it, and they live in fear of it. The group is comprised of five organizations:

- **Communities United** uses grassroots community organizing to advance policy changes on a variety of social justice issues. It develops local leaders to address immigrants' rights, affordable housing, public education, healthcare, violence prevention and gang involvement of young people, and workers' rights. Communities United also advocates to strengthen CPD accountability and has organized youth around policing issues.

- **Community Renewal Society** (CRS) is a 135-year-old faith-based organization that works with people and communities to address racism and poverty. CRS organizes its member congregations to work on issues at the local level, including housing and employment. One of CRS's primary campaigns is police accountability and reform.

---

[1] *See* DAVID M. PERRY & LAWRENCE CARTER-LONG, RUDERMAN FAMILY FOUNDATION, THE RUDERMAN WHITE PAPER ON MEDIA COVERAGE OF LAW ENFORCEMENT USE OF FORCE AND DISABILITY: A MEDIA STUDY (2013-2015) AND OVERVIEW 4, 7-9 (March 2016) (roughly a third to a half of all people killed by police are disabled), *available at* http://rudermanfoundation.org/wp-content/uploads/2017/08/MediaStudy-PoliceDisability_final-final.pdf.

[2] Editorial, *Almost 1,000 Were Killed by Police Last Year. Here's What to Do About It*, WASH. POST (Jan. 8, 2018) (about one in four people killed by police were reported to be experiencing mental distress), *available at* https://www.washingtonpost.com/opinions/almost-1000-were-killed-by-police-last-year-heres-what-to-do-about-it/2018/01/08/198fb0a0-f4be-11e7-a9e3-ab18ce41436a_story.html?utm_term=.9d1c26d62ec1.

- **Next Steps** is dedicated to ensuring that people with lived experiences of homelessness, mental illness, substance use, and/or substance abuse lead the development and implementation of healthcare, housing, and social policies at the state and local levels.

- **ONE Northside** organizes diverse communities in the areas of violence prevention, public education, affordable housing, healthcare and mental health justice, youth empowerment, and economic justice. ONE Northside has specifically offered policy assistance to CPD in an effort to reform its policies and practices.

- **The American Civil Liberties Union of Illinois** (ACLU) advocates on behalf of people harmed by unlawful policing practices in the City of Chicago, including practices that disproportionately impact people of color, and has a long history of representing people with disabilities in fights against unlawful discrimination and segregation.

*Communities United* Plaintiffs are all organizations with members who have been and will continue to be harmed by CPD's continued failure to train, supervise, and discipline officers. (*Id*. at ¶¶ 86-281 (describing harm)).

**B. The *Communities United* Plaintiffs' Role in the Proposed Decree**

The *Communities United* Plaintiffs have a special relationship to the Parties, and a strong interest in this Court entering a robust consent decree. In March 2018, the *Communities United* Plaintiffs, the City, the Office of the Attorney General for the State of Illinois ("Attorney General"), along with organizational plaintiffs from another lawsuit, *Campbell v. City of Chicago*, N.D. Ill. Case No. 17-cv-4467, entered into a Memorandum of Agreement. (Pl.'s Opp'n to Mot. to Intervene, Ex. D, ECF 73-1 ("MOA").) The MOA confirmed that the organizational plaintiffs in both lawsuits had formed a Coalition "committed to monitoring, enforcing, and educating the community about the consent decree" being negotiated by the City and Attorney General (¶ 1); defined how the *Communities United* Plaintiffs and the *Campbell* organizational plaintiffs ("Coalition Founders") would propose terms for the decree as it was being negotiated (¶¶ 2, 6); and promised that the City and Attorney General would include terms in their decree to make it

enforceable by the Coalition (¶¶ 12-13). In exchange, the organizational plaintiffs agreed to request a stay of their injunctive claims against the City.

Pursuant to the MOA, the *Communities United* Plaintiffs and Defendant City of Chicago filed a joint motion to stay that case. (*Communities United*, ECF 58). The Court granted the motion on March 26, 2018, and the case remains stayed today. (*Communities United*, ECF 60).

The Coalition Founders have since participated in developing the Proposed Decree as provided in the MOA:

- In April and May 2018, the Coalition Founders proposed provisions. (*See* MOA ¶ 2; Fourth Joint Status Report, ECF 53 ¶ 2; *Communities United*, ECF 65 ¶ 5.)

- After the City and the Attorney General released a draft consent decree for public comment on July 27, 2018 ("Draft Decree"), the Coalition Founders submitted comments and proposed revisions to the Draft Decree to the City and the Attorney General on August 13, 2018. (*See* MOA ¶ 6; *Communities United*, ECF 65 ¶¶ 7-9, Exs. A-C.)

- The Coalition Founders met with the City and the Attorney General to discuss proposed revisions to the Draft Decree on August 28, 2018. (*See* MOA ¶ 5; *Communities United*, ECF 65 ¶ 10.)

- In August and September 2018, the City and the Attorney General negotiated limited revisions to the Draft Decree based on feedback from the Coalition Founders and on other public comments, and filed a revised version with this Court. (*See* Joint Mot. to Approve Proposed Consent Decree ¶ 2, ECF 107.)

The Coalition will have a role in monitoring and enforcing the consent decree. (MOA ¶¶ 9, 12; Proposed Decree ¶ 669, 709, ECF 107-1.) It is essential that the Coalition has this power not only because it was negotiated by the parties in exchange for staying legal claims, but also because the Coalition represents people who would be impacted by ongoing unconstitutional and unlawful

policing practices and because the Coalition can provide stability in the enforcement process as the Parties' leadership changes.[3]

## ARGUMENT

*Communities United* Plaintiffs strongly support this Court entering a robust consent decree to remedy the City's systemic problems that cause, and fail to hold officers accountable for, constitutional and civil rights violations related to the excessive use of force. Part I below briefly reviews the undisputed need for the reforms contained in the Proposed Decree. Part II notes some of the ways the Proposed Decree is incomplete and will need to be followed with additional measures, and then highlights a few discrete provisions the Parties should revise before a decree is entered.

### I.   THE CITY OF CHICAGO NEEDS A CONSENT DECREE TO REFORM POLICE USE OF FORCE.

#### A.   The City's Unconstitutional and Unlawful Policies and Practices Have Injured Thousands of Illinois Residents, and Will Continue to Do So Absent a Consent Decree.

For generations, the Chicago Police Department has been marked by corruption, too often turned to violence, and targeted communities of color. The most recent "task force" appointed to recommend reforms to CPD was *the sixth* of its kind. (Compl. Ex. A at 23, ECF 1.) And for the last 60 years, the City has been stuck in a demoralizing cycle of reacting to scandals with investigations and recommendations, followed by superficial or temporary corrections. (*See*

---

[3] In light of the Court's broad invitation for comments from any person or entity (Order, ECF 114), the Coalition decided to not file a comment as a coalition despite the Coalition's unanimous support for a consent decree. Instead, individual members of the Coalition may file comments or speak at the upcoming public fairness hearing regarding different perspectives on reform priorities. The brief that follows is filed on behalf of the *Communities United* Plaintiffs.

Compl. ¶ 3, Ex. A at 23-24, Ex. B at 18-20.) Comprehensive court oversight of CPD and the City's related agencies is the only way to achieve meaningful reform.

For example, in 1960, a group of officers in the Summerdale District was caught operating a large-scale burglary ring. (Compl. Ex. A at 23.) In response, Mayor Richard J. Daley appointed a committee to "professionalize" the police department, leading to the creation of the Police Board. (*Id.* at 23-24.) These measures, however, were not enough to prevent history from repeating itself. In the 1990s, another group of officers were discovered to be robbing and extorting drug dealers, and that new batch of indictments led to Mayor Richard M. Daley's Commission on Police Integrity. (Compl. Ex. A at 24, Ex. B at 19.) The Commission recommended improvements to CPD's oversight structures, including increasing training requirements and establishing an early warning system, but without court oversight the reforms fell dormant. (Compl. ¶ 3, Ex. A at 24, Ex. B at 19.)

Several investigations of CPD have also focused specifically on police abuse and found the same problems over and over. After CPD officers were filmed brutally beating protestors at the 1968 Democratic National Convention, an investigative committee found the actions of the officers to constitute a "police riot." (Compl. Ex. B at 19.) A few years later, in response to two high-profile incidents of CPD officers using excessive force or failing to provide aid to black men, U.S. Congressman Ralph Metcalfe convened a Blue Ribbon Panel to hear testimony on "The Misuse of Police Authority in Chicago." (Compl. ¶ 3, Ex. A at 24, Ex. B at 19.) Finding a pattern of excessive force and "psychological violence" waged against minority communities with almost no accountability, the Panel recommended the creation of an independent investigative agency, which became the Office of Professional Standards ("OPS"). (Compl. Ex. A at 24.) OPS was

dissolved in 2007 after two high-profile incidents of police abuse;[4] later that year, a study revealed that OPS recommended meaningful discipline to less than one percent of officers charged with abusing a civilian.[5]

With each set of new recommendations, the City tried some, while rejecting, ignoring, or letting others lapse. (Compl. Ex. B at 19.) None of the City's half-measures prevented Detective Jon Burge and his subordinates from employing torture tactics, primarily on black men, throughout the 1980s and 1990s. (Compl. ¶ 3, Ex. B at 19.) And, more than two decades later, none of the City's self-imposed reforms prevented Officer Jason Van Dyke from needlessly shooting black teenager Laquan McDonald sixteen times in 2014, nor did they prevent his fellow officers and supervisors from attempting to cover up the murder. Even after the reluctant release of the video showing the truth of that shooting, scandals continue to be uncovered.[6]

The tarnished image of a department is nothing compared to the pain that the unabated culture of excessive force has had on people's bodies. But even the litany of lawsuits on behalf of survivors and estates over the years has proven insufficient to force the City to reform itself. Juries have repeatedly found that the City's policing infrastructure encourages excessive force and police misconduct. For example, in 2003 in *Garcia v. Chicago*, No. 01-cv-8945 (N.D. Ill.), a federal jury found that as of 2001 the City had a custom and practice of not adequately investigating,

---

[4] Will Cabaniss, *The Origins of IPRA: How Chicago Was Pressured to Establish an Independent Police Review Authority*, SOUTH SIDE WEEKLY (Oct. 13, 2015), *available at* https://southsideweekly.com/the-origins-of-ipra/.

[5] Craig B. Futterman, et al., *Use of Statistical Evidence to Address Police Supervisory and Disciplinary Practices: The Chicago Police Department's Broken System*, 1 DEPAUL J. SOC. JUST. 251, 265 (2007). OPS was replaced with the Independent Police Review Authority ("IPRA"), but facing similar failures, IPRA was replaced by the Civilian Office of Police Accountability ("COPA") in 2017. (Compl. Ex. B at 46-49.)

[6] *E.g.*, Jamie Kalven, *Operation Smoke and Mirrors*, INTERCEPT (Oct. 6, 2016), *available at* https://theintercept.com/2016/10/06/in-the-chicago-police-department-if-the-bosses-say-it-didnt-happen-it-didnt-happen/.

disciplining, or prosecuting off-duty Chicago police officers who use excessive force. In February 2007 in *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill.), a federal jury found that as of 1994 the CPD maintained a code of silence that facilitated police misconduct. In November 2012, a federal jury in the case of *Obrycka v. City of Chicago, et al.*, No. 07-cv-2372 (N.D. Ill.), found that the City had either a widespread custom or practice of failing to investigate and/or discipline its officers, or a widespread custom or practice of a police code of silence, or both, which was the moving force behind the beating of Karolina Obrycka in February 2007. And just last year a federal jury in the case of *First Midwest Bank v. City of Chicago, et al*., No. 14-cv-9665 (N.D. Ill.) found that the City maintained the following policies, customs, or practices that were so persistent and widespread as to constitute the City's standard operating procedure in 2010: failure to investigate, failure to discipline, and failure to maintain an adequate early warning system regarding CPD officers.

The City's failure to systematically reform its use of force has not only been immoral and unlawful—it has been expensive. The City spent more than $280 million settling 943 misconduct lawsuits from 2011 to 2016 alone, plus another $91 million for outside counsel to defend police officers in those suits. (*See* City's Answer to Second Am. Class Action Compl. ¶ 59, *Campbell v. Chicago*, ECF 104).) In the first eight months of this year, Chicago taxpayers have already paid about $50 million in misconduct cases, and are on track to spend over $100 million once several high-profile judgments and settlements are paid.[7] While verdicts pile up against the City, even the high fiscal costs appear incapable of motivating the City to end the unlawful policies and practices that continue to cause devastating harm to Chicago residents.

---

[7] Larry Yellen, *Payouts for Chicago Police Misconduct: $50 Million This Year*, FOX 32 CHICAGO (Aug. 14, 2018), *available at* http://www.fox32chicago.com/news/local/payouts-for-chicago-police-misconduct-50-million-this-year.

Most recently, in 2017 and 2016 the U.S. Department of Justice ("DOJ") and the City's own Police Accountability Task Force ("Task Force") found systemic problems with the department that require a long-term commitment for change. (Compl. Exs. A, B.)[8] The DOJ declined to pursue a consent decree with Chicago, however, shortly after its new U.S. Attorney General adopted a policy emphasizing that "[l]ocal control and local accountability are necessary for effective local policing." *See* Attorney General Sessions' Memorandum Supporting Federal, State, Local and Tribal Law Enforcement (March 31, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-memorandum-supporting-federal-state-local-and-tribal-law. The City initially adopted a small fraction of the recommendations outlined by its Task Force but progress stalled, and lawsuits followed. Today, the City still has not taken the necessary steps to end its pattern and practice of unconstitutional and excessive use of force. A consent decree with court oversight and a monitor is the best chance for lasting reform.

---

[8] While this Court need not decide the admissibility of these reports, it is relevant to the strength of the Attorney General's claims that the Seventh Circuit has found that DOJ reports, such as the one attached to the Complaint, fall under the hearsay exception of Federal Rule of Evidence 803(8)(A)(iii) because they constitute "factual findings from a legally authorized investigation." *See, e.g.*, *Daniel v. Cook Cnty.*, 833 F.3d 728, 740 (7th Cir. 2016). Courts have specifically found the DOJ and Task Force reports attached to the Complaint admissible against the City under Rules 803(8)(A)(iii) and 810(d)(2). *E.g.*, *First Midwest Bank v. City of Chicago*, No. 14-cv-9665, 2018 WL 4126570, at *13 (N.D. Ill. Aug. 29, 2018); *Simmons v. City of Chicago*, No. 14-cv-9042, 2017 WL 3704844, at * 7-8 (N.D. Ill. Aug. 28, 2017).

**B. The Proposed Decree Provides a Framework for the City to Improve Its Policies and Practices and Begin to Adequately Train, Supervise, and Discipline Officers to Prevent Excessive Use of Force.**

The Proposed Decree contains the structure to begin long overdue reforms needed to ensure that the City and CPD recruit, train, and supervise officers to respect constitutional and civil rights. It also provides important minimum standards that are critical to beginning the process of reform.

For example, Section V of the Proposed Decree requires that de-escalation be central to CPD's use of force policies and practices, and outlines parameters for using and reporting force. De-escalation is essential to reverse CPD's practice of "using excessive force against people who do not present a threat and who are suspected only of low-level crimes or, in some cases, no crime at all." (Compl. Ex. B at 32.)

Section VII includes benchmarks and strategies to ensure that CPD's training program is ongoing, responsive to the needs of officers and the community, and utilizing effective methods and up-to-date curriculum. In its interviews of CPD members, the DOJ found that "[o]fficers at all ranks—from new recruits to the Superintendent—agree that CPD's training is inadequate," and "interviewees were unanimous in their belief that the lack of continuing training has a direct connection to the improper use of force in patrol and other field assignments." (Compl. Ex. B at 94, 100. *See also* FOP Answer, ECF 51-2 ¶¶ 73-83, 85-88, 94 (admitting that CPD's training program is outdated, inadequate, and fails to prepare officers to lawfully police Chicago neighborhoods).) Indeed, "only one in six recruits" who spoke with the DOJ "came close to properly articulating the legal standard for use of force." (Compl. Ex. B at 10.)

Section VIII of the Proposed Decree sets guidelines to improve officer supervision, mentorship, and evaluation, such as lowering supervisor-to-officer ratios. (Proposed Decree ¶¶ 364-66.) Both the Task Force and DOJ reports concluded that high supervisor-to-officer ratios prevent adequate supervision of officers. (Compl. Ex. A at 140, Ex. B at 108-09. *See also* FOP

Answer, ECF 51-2 ¶¶ 96-99 (admitting inadequate supervision is caused by high supervisor-to-officer ratios and lack of one-on-one engagement).)

Sections X and XI-D establish processes to ensure community complaints are properly received and investigated, and officers are fairly disciplined or assigned other corrective action. The DOJ found that "there is no meaningful, systemic accountability for officers who use force in violation of the law or CPD policy." (Compl. Ex. B at 7.) Furthermore, the City and CPD's failure to track officer behavior led to the DOJ's discovery of "two egregious examples of excessive force where, in each incident, the officers involved had extensive histories of complaints of excessive force but were not on the [Behavioral Intervention System] roster." (*Id.* at 115. *See also* FOP Answer, ECF 51-2 ¶¶ 105, 112, 116-17 (admitting that CPD's supervisory deficiencies stem from a failure to properly utilize data on officer performance and behavior).) These standardized processes and data analyses will help Chicagoans regain trust in their police department and allow CPD members to trust the system holding them accountable.

A consent decree is necessary to ensure that CPD's patterns of excessive force and code of silence do not continue for decades more.

## II.    THE PROPOSED DECREE IS INCOMPLETE AND SHOULD BE EXPANDED.

While Chicagoans need a consent decree to reform the police department, the Proposed Decree reveals that the City has not agreed to all of the necessary reforms. The City failed to adopt many of the recommendations put forward by the *Communities United* Plaintiffs in spring 2018. Once a draft decree was released, the *Communities United* Plaintiffs focused on twelve specific groups of line-edits that could be made to build upon the Draft Decree; that feedback also was not fully adopted despite the fact that more than 800 members of the public wrote to the Parties in support of them. (*Compare Communities United*, ECF 65-1-65-3, *with* OFFICE OF THE ATT'Y GEN.

STATE OF ILL. & CITY OF CHI., SEPTEMBER 13, 2018 PROPOSED CONSENT DECREE WITH LINE EDITS, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/09/Comparison-July-27-Sept.-12-2018-CLEAN-versions-Consent-Decree.pdf.) Having failed to include all of these reforms, the *Communities United* Plaintiffs view the Proposed Decree as incomplete.

Some of the gaps in the Proposed Decree would require significant, substantive additions, such as adding specific commitments to provide alternatives to police response for calls about people in a behavioral health crisis, improve diversion efforts, comprehensively address disability and crisis intervention, or implement a civilian oversight body like that recommended by the Task Force and supported by the broad collection of groups comprising GAPA,[9] who spent nearly two years engaging community groups across Chicago. Many omissions may be a result of the limited scope of the Attorney General's complaint. If the City continues to avoid those additional reforms, however, it will be vulnerable to claims from other plaintiffs under the Americans with Disabilities Act and other civil rights laws. *See, e.g.*, *Hayes v. City of Chicago*, No. 18-cv-5515 (N.D. Ill.) (filed Aug. 13, 2018).

Other areas in need of additional reform, such as policies and training for school-assigned officers, are incomplete in so far as the Proposed Decree sets up a rudimentary framework for the City to make changes later, without guaranteeing those changes will be improvements. (*See* Proposed Decree ¶¶ 38-44.) For those areas, the Monitor will play an essential role in ensuring that the City takes seriously its commitment to reduce the use of excessive force, and that students,

---

[9] The Grassroots Alliance for Police Accountability ("GAPA"), founded in 2016, is a broad-based coalition of community organizations committed to making neighborhoods safer, improving police practices and accountability, and transforming the relationship between the CPD and the communities it serves. (*Our Coalition*, GAPA, *available at* http://chicagogapa.org/our-coalition (last visited Oct. 12, 2018). *See also* Compl. Ex. A at 169-171 (recommending creation of a community oversight board).

families, community stakeholders, and applicable best practices inform the drafting of future policies and procedures.[10]

Discussed below are a few discrete gaps in the Proposed Decree that can easily be closed by the Parties before the Proposed Decree is approved.

**A. The Consent Decree Should Require the City to Investigate All Incidents That Lead to Lawsuits and Findings of Misconduct by Criminal Courts.**

The Proposed Decree does not require COPA, or any other oversight agency, to investigate the facts of civil lawsuits and criminal proceedings involving allegations of police misconduct. These investigations should be required, not discretionary, and the City should provide sufficient funding to ensure these investigations are conducted to prevent repeat, unnecessary harm when the City is aware of information regarding these officers' bad behavior.

COPA is the City's current iteration of the entity charged with investigating possible police misconduct.[11] It is permitted, but not required, to review lawsuits or claims alleging police misconduct where the lawsuit or claim was subsequently settled or resulted in a judgment against a CPD member.[12] COPA's predecessor, the Independent Police Review Authority ("IPRA"), was required to review cases that were settled to decide whether further investigation was warranted.[13] However, both the City's Task Force and the DOJ Report found that IPRA failed to conduct these

---

[10] *See* CITY OF CHI. OFFICE OF INSPECTOR GEN., REVIEW OF THE CHICAGO POLICE DEPARTMENT'S MANAGEMENT OF SCHOOL RESOURCE OFFICERS (2018) (finding that CPD lacks basic policies relating to school-based officers, and recommending that CPD collaborate with the community to establish hiring guidelines for school-based officers), *available at* http://bit.ly/SROReport.

[11] *Mission & History*, COPA, *available at* https://www.chicagocopa.org/about-copa/mission-history/ (last visited Oct. 11, 2018).

[12] *See* COPA Ordinance, CHI., ILL., MUNICIPAL CODE § 2-78-120(h) (2016), *available at* http://www.chicagocopa.org/wp-content/uploads/2016/07/COPA-Ordinance.pdf (last visited Oct. 11, 2018).

[13] *See* IPRA Ordinance, CHI., ILL., MUNICIPAL CODE § 2-57-040(e) (2007), *available at* https://www.cityofchicago.org/content/dam/city/depts/ipra/general/IPRAOrdinance.pdf (last visited Oct. 11, 2018).

reviews. Even though IPRA was only required to review closed, settled cases, IPRA failed to comply with its ordinance due to a lack of resources from the City. (Compl. Ex. A at 79-80, Ex. B at 71-72.) Both the Task Force and the DOJ recommended that the City develop a system to investigate *all* incidents that are the subject of civil or criminal proceedings indicating police misconduct, and dedicate sufficient resources to accomplish this critical task. (Compl. Ex. A at 73-74, 76, 82, 161-63, Ex. B at 65-66, 154-55.)

Without prompt and adequate investigations of relevant civil or criminal cases, the City misses numerous opportunities to identify abusive officers and broader trends, yet "routinely *pays large sums* to police misconduct victims." (Compl. Ex. B at 51 (emphasis in original), Ex. A at 98 ("a portion of CPD's officers are costing the City and its taxpayers many millions of dollars each year").) As the Attorney General identified in its complaint, "[o]f the hundreds of [misconduct] cases since 2004, for which the City has spent over half a billion dollars to settle or pay judgments, only half involved official disciplinary investigations." (Compl. ¶ 134.)

A simple revision to the Proposed Decree can require these crucial investigations. In its current form, it leaves the decision to pursue valuable information within COPA's discretion, and requires the City to publish an annual litigation report, without specifically requiring incidents be investigated by an oversight body. (*See* Proposed Decree ¶¶ 485, 548-49.) Paragraph 485 should be revised to state:

> 485. ~~The City will continue to provide the Chief Administrator of COPA the discretion to direct~~ COPA shall ~~to~~ review and investigate the facts of individual civil lawsuits and criminal proceedings involving alleged misconduct in order to identify and investigate incidents of misconduct.

Paragraph 521 shall then be understood to provide that COPA will have the appropriate staff and resources to comply with the consent decree.

**B. The Consent Decree Should Require Investigative Agencies to Preserve Evidence Promptly Upon Receiving Civilian Complaints.**

The Proposed Decree does not require investigative agencies to immediately act to preserve evidence upon receiving civilian complaints. The *Communities United* Plaintiffs previously recommended that this be accomplished by assigning an investigator to assess allegations of police misconduct within 72 hours. This is a best practice incorporated in other consent decrees. *See, e.g.*, Consent Decree ¶ 338(e), *United States v. Police Dept. of Baltimore City*, No. 1:17-cv-00099-JKB (D. Md. filed Jan. 12, 2017) ("Upon being notified of any allegation of misconduct through an internal or external complaint, the OPR will, within 72 hours, make an initial determination of the classification of the alleged offense and will assign a misconduct investigator[.]") ("Baltimore Consent Decree"). The intent behind this recommendation was to ensure that investigators promptly seek out and preserve vital evidence concerning misconduct allegations, especially evidence maintained by private parties or businesses that may be routinely destroyed, such as video surveillance.

The Proposed Decree, however, only requires COPA and BIA[14] to initiate a preliminary investigation within 30 days of receiving a misconduct allegation, and states that all reasonable steps will be taken during this investigation to discover and preserve relevant evidence. (Proposed Decree ¶¶ 459-60). In this 30-day window critical evidence may be permanently lost if efforts to preserve evidence are not immediately initiated.

Plaintiffs have reason to be concerned. The DOJ Report details the ways in which IPRA and BIA investigations "suffer from entrenched investigative deficiencies," including a failure to collect or consider crucial evidence. (*E.g.*, Compl. Ex. B at 56, 64-65.) Historically, "[v]ideo

---

[14] The Bureau of Internal Affairs ("BIA") is CPD's investigative agency, which investigates police complaints that are outside of COPA's jurisdiction. (Compl. Ex. B at 48.)

evidence [has been] available in only a sliver of force incidents," so it is especially critical that investigative agencies work to immediately preserve any available evidence before it is destroyed. (*Id*. at 37.) Also, in 2017, 30% of COPA's concluded investigations resulted in a finding of "not sustained," meaning there was insufficient evidence available to prove or disprove the allegation.[15] A directive requiring the City's investigative agencies to reach out to third parties within hours, or at least within a few days, of receiving a complaint to attempt to preserve evidence would improve COPA investigations.

Other consent decrees require the prompt identification and preservation of evidence concerning police misconduct. *E.g.*, Baltimore Consent Decree ¶ 206(d) (requiring a team "ensure all video evidence is immediately gathered and assessed" when investigating a Level 3 Reportable Force incident, including but not limited to "CCTV footage, private or public surveillance, cell phone video footage, and body-worn camera footage"). The Proposed Decree should as well.

**C. The Consent Decree Should Require In-Service Training on Disabilities and Include Protections for Personal Health Information.**

**1. A Training Bulletin Will Not Prepare CPD Officers to Recognize and Respond to People with Disabilities.**

The Proposed Decree begins the important process of providing guidance and training to officers on disability: It requires the creation of an ADA coordinator to assess CPD's disability training (¶ 70), includes disability in impartial policing in-service training (¶ 74), requires CPD to review its disability policies (¶ 68), and requires CPD to issue a training bulletin on how to recognize disability and respond to people with disabilities (¶ 69).

---

[15] CIVILIAN OFFICE OF POLICE ACCOUNTABILITY, 2017 ANNUAL REPORT 8, *available at* https://www.chicagocopa.org/wp-content/uploads/2018/02/2017-Annual-Report-Final.pdf (last visited Oct. 11, 2018).

Despite these signs of progress, the Proposed Decree's reliance on a training "bulletin" is unacceptable in light of the complexities of disabilities and the dynamic nature of use of force incidents which require in-person training. With broad community support, the *Communities United* Plaintiffs proposed comprehensive annual disability in-service training, both as the decree was being negotiated and in response to the Parties' Draft Decree. These proposals would have required training that used best practices for adult learning, including scenario-based training, role-playing, and interactive exercises with people with disabilities. The DOJ Report also emphasized that training must be done in-service and use best practices for adult learning. (Compl. Ex. B at 156. *See also id.* at 100 (explaining that "[i]n lieu of actual in-service training, CPD disseminates new information to Department members through roll call, using techniques that are not effective for adult learning and often not appropriate for the complexity of the material being presented").) The Proposed Decree, however, allows this training to be delivered through a "bulletin." (Proposed Decree ¶ 69.) Training on complex topics such as disability awareness and best practices for police encounters with people with disabilities (including effective communication, reasonable modifications of use of force procedures and response options, accommodations, de-escalation, diversion, and community resources) cannot be done effectively through a memo in a mailbox. Formats like training bulletins, roll call, and videos, are simply not effective. (Compl. Ex. B at 99-100.)

### 2. The City Must Protect Individuals' Sensitive Information.

Requirements in the Proposed Decree to report, track, and analyze the role of disability in use of force incidents are essential to the development of more comprehensive training and policy reforms on interactions with people with disabilities in the Chicago Police Department (CPD). (*See* Proposed Decree ¶ 120 (requiring collection, analysis, and reporting of data relating to crisis

incidents); ¶¶ 509, 550(i) (requiring collection, tracking, and analysis of disability-related misconduct complaints), ¶¶ 571, 572 (requiring collection, tracking, and analysis of disability information in use of force reports).) Without these important reforms to understand the nature and extent of CPD's use of force against people with disabilities, CPD will be unable to provide appropriate services to the hundreds of thousands of people with disabilities in Chicago.

This critical first step of analyzing the role of disability in CPD use of force, however, cannot be taken without accompanying measures to ensure it will not impose significant harms on people with disabilities. Disability and related medical information can be extremely sensitive and private.[16] The Proposed Decree requires two "fixes" to mitigate the potential for harm.

*First*, the Proposed Decree should require that the City's **electronic systems** containing unredacted use of force and Crisis Intervention Team ("CIT")[17] reports **have restricted access**. The Proposed Decree requires all use of force reports include "the subject's mental health or medical condition, . . . ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used." (¶ 571(h).) Likewise, the Proposed Decree requires that CIT Reports be completed following responses to individuals in crisis[18] and include "whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis"

---

[16] For example, a person with mental illness may not want that information accessible to their employer, neighbors, or other community members. If disability-related information is contained in police reports without privacy protections, it could be easily accessed by thousands of CPD employees and misused for personal or professional purposes. It also could be publicly released.

[17] CPD's Crisis Intervention Team ("CIT") is designed to respond incidents involving someone in crisis, whether related to addiction, trauma, or mental health. (Compl. Ex. B at 38.)

[18] The Proposed Decree defines an "individual in crisis" to include any person with mental illness, intellectual disability, or developmental disability, regardless of the nature of the police contact or whether that person is actually experiencing a crisis. (¶¶ 83, 759.)

and subjects' history of hospitalization, medications, and treatment status. (*Id.* ¶ 118.)[19] It is necessary for certain City employees to review this information, such as the reporting officer's direct supervisor, an investigator assigned to review the incident, or employees who conduct aggregate data analysis. However, because of the sensitive nature of this information, most City employees and the public should not have access to this information.

*Second*, the **CIT Report should be modified** to stop eliciting unnecessary, sensitive information about medical care. The information currently called for by a template CIT Report—which is to be completed by every officer responding to an individual in crisis—includes the person's history of hospitalization, medications, and treatment status. There is no reason for police to collect this sensitive medical information in every crisis response report, and the prompts should be deleted.[20] If officers opt to record such information in the narratives in their reports, then access to that information should be limited, as described above.

---

[19] While the Proposed Decree does not specifically require that CIT reports include hospitalization, medication, and treatment information, it incorporated CPD's existing CIT forms, which do. (*See* Proposed Decree ¶ 118; CHI. POLICE DEP'T, CPD-15.520, MENTAL HEALTH—CRISIS INTERVENTION (CIT) REPORT (rev. May 2018) *available at* http://directives.chicagopolice.org/forms/CPD-15.520.pdf.)

[20] In a report titled, "Improving Responses to People with Mental Illnesses: The Essential Elements of a Specialized Law Enforcement-Based Program," the Council of State Governments Justice Center and the Police Executive Research Forum emphasized that the use of health information must be done "in a way that protects individuals' confidentiality rights as mental health consumers and constitutional rights as potential defendants." The report recommends that "[i]nformation exchanges . . . be limited strictly to what is needed to inform an appropriate incident response or disposition, and officers . . . focus on documenting observable behaviors only." And communications of that information, of course, must comply with state and federal protections. COUNCIL OF STATE GOVERNMENTS JUSTICE CENTER & POLICE EXECUTIVE RESEARCH FORUM, IMPROVING RESPONSES TO PEOPLE WITH MENTAL ILLNESSES: THE ESSENTIAL ELEMENTS OF A SPECIALIZED LAW ENFORCEMENT-BASED PROGRAM (2008), *available at* https://csgjusticecenter.org/law-enforcement/publications/improving-responses-to-people-with-mental-illnesses-the-essential-elements-of-a-specialized-law-enforcement-based-program.

These revisions should be made to the Proposed Decree to ensure the City and CPD complies with federal and state laws, as well as public policy. Public entities covered by Title II of the Americans with Disabilities Act—including the Chicago Police Department—"may not make unnecessary inquiries into the existence of a disability." *See* DEP'T OF JUST., THE AMERICANS WITH DISABILITIES ACT, TITLE II TECHNICAL ASSISTANCE MANUAL ¶ II-3.5300 (1993) (unnecessary inquiries), a*vailable at* https://www.ada.gov/taman2.html. The Constitution and state and federal statutes protect against the unnecessary collection and disclosure of disability and medical information, as well as protect the confidentiality of that information where it is maintained. *See, e.g.*, *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) ("Information about one's body and state of health is [a] matter which the individual is ordinarily entitled to retain within the private enclave where he made lead a private life.") (internal quotation marks and footnote omitted); Personal Information Protection Act, 815 ILCS 530/45 (requiring agencies that maintain identifiable health information to "implement and maintain reasonable security measures to protect those records from unauthorized access, . . . use, modification, or disclosure"); and HIPAA Privacy Rule, 45 C.F.R. § 164.502 (requiring that disclosures of protected health information be limited to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request).

Here, while the City has an important need for gathering and analyzing disability information and we urge it to do so, further detail should be added to paragraph 136 of the Proposed Decree—or elsewhere—to limit and protect that information.

**D. The Consent Decree Should Require the Monitor, Not CPD, to Decide What Standard Will Be Used to Assess Discrimination.**

While it is promising that the Proposed Decree requires an assessment of misdemeanor arrests and administrative notices of violation by race and gender (¶ 79), the Proposed Decree

unfortunately allows CPD to select the methodology for the study instead of the Monitor (¶ 80). In statistical analysis, the choice of instrument can determine the findings. While the public will have access to the raw data (*id.*), the City has negotiated for it to have the ability to craft the narrative about the data in the first instance. By placing this decision with the City, rather than the Monitor, the City does a disservice to this reform process by building suspicion, rather than trust, with the public. The same flawed framework will be used for analyzing use of force, but for that study the underlying data will not even be made public. (*Id.* ¶ 572.)

We believe CPD should have the internal ability to assess whether its practices are discriminatory; however, to earn public trust in such assessments the Monitor—not CPD—should be empowered to select the methodology for this assessment during the course of the consent decree. Indeed, we are not aware of any other consent decree that allows a police department to do this: Monitors typically determine or propose the methodologies. *See, e.g.*, Consent Decree ¶¶ 460, 467, *United States v. Police Dept. of Baltimore City*, No. 1:17-cv-00099-JKB (D. Md. filed Jan. 12, 2017); Supplemental Motion for Entry of Consent Decree at 60, *United States v. City of Newark*, No. 2:16-cv-01731-MCA-MAH (D.N.J. filed Apr. 29, 2016); Consent Decree at 106, *United States v. City of Ferguson*, No. 4:16-cv-00180-CDP (E.D. Mo. filed Mar. 17, 2016); Settlement Agreement and [Proposed] Order at 47, *United States v. Town of East Haven*, No. 3:12-cv-01652-AWT (D. Conn. filed Nov. 20, 2012); Settlement Agreement at 91, *United States v. City of Albuquerque*, No. 1:14-cv-01025 (D.N.M. filed Nov. 14, 2014); Settlement Agreement at 61, *United States v. Portland*, No 3:12-cv-02265-SI (D. Or. filed Dec. 17, 2012).

Thus, paragraph 80 should be revised to state:

80. Prior to conducting this assessment, CPD will ~~share its~~ proposed methodolog~~y~~ies, including any proposed factors to be considered as part of the assessment, ~~with~~ to the Monitor for ~~review and approval~~ the Monitor to choose among or request additional options. ~~The Monitor will approve CPD's proposed~~

22

~~methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement.~~ Upon completion of the assessment, CPD will identify . . . .

### E. The Consent Decree Should Require the City to Provide Information to Meet Its Obligations Under *Giglio*.

The government has an obligation under *Giglio v. United States* to disclose evidence affecting the credibility of police officers who testify as material witnesses in criminal trials; the failure to do so violates due process. *See* 405 U.S. 150, 154 (1972). Courts often frame this rule as part of the government's broader duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose evidence that is "favorable to the accused." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985). This disclosure requirement for impeachment evidence extends, moreover, to evidence that is known only to police investigators, not just prosecutors. *Strickler*, 527 U.S. at 281-82.

The DOJ admonished the City for failing to comply with this constitutional requirement, finding that "there is no system in place to ensure that all officer disciplinary findings bearing on credibility, including Rule 14 findings, are supplied to the State's Attorney's Office and criminal defendants, even though this is required under *Giglio*." (Compl. Ex. B at 76-77.) Yet the Proposed Decree still ignores the DOJ's recommendation to prevent these violations.

One source of the problem is the City's failure to investigate evidence of false statements, falsified evidence, and other misconduct related to an officer's credibility. (*See id.* at 8-9, 75-77.) Officers who make false statements should be subject to what is known as a Rule 14 charge, but the DOJ's investigation found that "enforcement in this area is rarely taken seriously and is largely ignored." (*Id.* at 75.) Worse still, the DOJ said that the City's unwillingness to pursue Rule 14 investigations "perpetuates the code of silence" among officers, which "extend[s] to lying and affirmative efforts to conceal evidence," including "mishandling video and audio equipment or . .

. retaliating against civilians who witness misconduct." (*Id*. at 8-9, 77.) The DOJ Report also criticized the City for not investigating and sharing information about "judicial proceedings where judges . . . make affirmative findings that an officer's testimony is not credible." (*Id*. at 77.) "When [the City] is aware of information that an officer lied or otherwise covered up misconduct," the report concluded, it "must actively and aggressively investigate and consistently seek to discipline officers who do so." (*Id*. at 9.)

Fortunately, the Proposed Decree adopts initiatives to improve data collection and reporting that will better enable the City to identify when officers have been found to give false testimony. The Proposed Decree would, for example, establish an early intervention system to identify officers who engage in "at-risk behavior." (Proposed Decree ¶ 583.) The cornerstone of this initiative will be an automated electronic system that will collect data on, among other things, instances in which CPD learns "that a court has made a negative credibility determination regarding a CPD officer," "an affirmative finding was made during the course of a criminal proceeding that a CPD member was untruthful," or "prosecution was declined based in whole or in part on concerns about a CPD officer's credibility." (*Id.* at ¶ 587(i-k).) This is precisely the kind of information, along with findings of credibility-related misconduct arising from internal investigations, that the City should ensure CPD discloses to prosecutors and defense attorneys.

Despite these improvements, criminal defendants are still unlikely to receive this critical information. The immediate source of *Giglio* violations is the absence of a system for CPD to share findings of credibility-related misconduct by their officers with prosecutors and defense attorneys. "[E]ven in the rare case where a Rule 14 charge is made and results in a sustained finding," the DOJ Report found, "officers face little risk that such finding will impact their ability to testify in criminal cases in support of the prosecution." (Compl. Ex. B at 76.) The problem of officers

providing false testimony in court is acknowledged and long-standing.[21] This consent decree presents a historic opportunity to address it.

To remedy this ongoing threat to due process, the final consent decree must establish a system "to ensure that all officer disciplinary findings bearing on credibility" are communicated to prosecutors and defense counsel. (*See id.* at 77.) The Proposed Decree would not achieve this goal because it does not specify that CPD will be responsible for sharing this information with prosecutors and defense counsel, or that the information-sharing be automatic. While it requires CPD make best efforts to meet with prosecutors and public defenders, at those meetings prosecutors and public defenders will give information about officer misconduct they learn of in criminal proceedings to CPD; CPD is not required to share any information itself.

The City may respond that creating this system would be too burdensome, but the Supreme Court has already rejected this justification for non-compliance. In *Giglio*, the Court acknowledged that sharing information about witness credibility with criminal defendants may impose a burden on "large prosecution offices," but insisted that "procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio*, 405 U.S. at 154.

We strongly recommend that the Proposed Decree be modified to bring the City into compliance with its constitutional duties, by creating a system that automatically shares

---

[21] *See* Myron W. Orfield, Jr., *Deterrence, Perjury, and the Heater Factor: An Exclusionary Rule in the Chicago Criminal Courts*, 63 U. COLO. L. REV. 75, 107 (1992) (finding that 92 percent of judges, prosecutors, and public defenders in the study believe that police lie at least some of the time at suppression hearings, and that respondents believe that perjury occurred on average about 20 to 50 percent of the time).

impeachment evidence regarding CPD members with prosecutors and defense attorneys.[22]

Paragraph 445 could be revised as follows:

> 445. The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful or engaged in other misconduct, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct[,] COPA will initiate the intake process. Likewise, the City will create and implement a policy to ensure that all *Giglio* material is maintained and provided to prosecutors and defense attorneys.

Baltimore has undertaken this effort in the context of the implementation of its consent decree addressing police misconduct.[23] Chicago should as well.

## CONCLUSION

The *Communities United* Plaintiffs appreciate the opportunities for members of the public to comment, and look forward to assisting the Monitor and Court after a consent decree has been entered by the Court.

---

[23] *See* Baltimore Police Department, Draft Policy 1809: *Brady/Giglio* Disclosure Requirements (Mar. 20, 2018), *available at* https://www.baltimorepolice.org/transparency/draft-policies.

DATED: October 12, 2018

Respectfully submitted,

COMMUNITIES UNITED; COMMUNITY
RENEWAL SOCIETY; NEXT STEPS; ONE
NORTHSIDE; and the ACLU OF ILLINOIS

 /s/ *Kathryn Hunt Muse*

Counsel for *Communities United* Plaintiffs

Barry C. Taylor                           Karen Sheley
Laura J. Miller                           Kathryn Hunt Muse
Amanda Antholt                            Rachel Murphy
EQUIP FOR EQUALITY                        ROGER BALDWIN FOUNDATION OF ACLU, INC.
20 N. Michigan Ave., Ste. 300             150 N. Michigan, Suite 600
Chicago, IL 60602                         Chicago, IL 60601
(312) 341-0022                            (312) 201-9740
barryt@equipforequality.org               ksheley@aclu-il.org
laura@equipforequality.org                kmuse@aclu-il.org
amanda@equipforequality.org               rmurphy@aclu-il.org

Bradley S. Phillips
Jacob S. Kreilkamp
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
(213) 683-9190
brad.phillips@mto.com
jacob.kreilkamp@mto.com