IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS, ) | |
| ) | Case No. 17-cv-6260 |
| Plaintiff, ) | |
| ) | Judge Robert M. Dow, Jr. |
| v. ) | |
| ) | |
| CITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' STATEMENT OF INTEREST
OPPOSING PROPOSED CONSENT DECREE[1]**

Over the last several years, the City of Chicago has experienced an alarming and unprecedented surge in violent crime and homicide. From 2015 to 2016, violent crime increased by twenty-two percent and murders increased by nearly *sixty* percent. *Compare* Fed. Bureau of Investigation, Crime in the United States, Table 6 (2015) (24,663 violent crimes and 478 murders), *to* Fed. Bureau of Investigation, Crime in the United States, Table 4 (2016) (30,126 violent crimes and 765 murders). The victims of this violent crime often reside in the City's most vulnerable neighborhoods. This violence must end. The safety of the people of Chicago is paramount, and it cannot be achieved without the Chicago Police Department ("CPD"). The CPD must be empowered to properly utilize proven, effective, constitutional law enforcement tactics. The

---

[1] The United States files this Statement of Interest under 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in a federal court. The United States has a substantial interest in this case because its resolution will have a significant impact on public safety in Chicago, including public-safety issues addressed by federal statutes, federal funding, and federal law enforcement officers.

1

excessive restraints imposed on the CPD by the November 2015 settlement agreement with the American Civil Liberties Union, with its "Consultant" and many burdensome provisions, significantly contributed to this shocking homicide rise and increase in violent crime to a historic and unacceptable level. *See* Paul G. Cassell, and Richard Fowles, *What Caused the 2016 Chicago Homicide Spike? An Empirical Examination of the 'ACLU Effect' and the Role of Stop and Frisks in Preventing Gun Violence*, 2018 U. Ill. L. Rev. __ (forthcoming 2018), *available at*: https://ssrn.com/abstract=3145287.

While the leadership of the City of Chicago, the CPD, and the State of Illinois are the front-line officials who must address this crisis, the United States Department of Justice stands ready to help. Indeed, in the last two years, the Department has increased its federal law enforcement resources to the City of Chicago by establishing the Chicago Gun Strike Force and committing to the City twenty-one additional agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives and seven additional violent crime prosecutors.[2] This influx of federal resources has led to more federal prosecutions of violent and gun crimes than at any time in Chicago's recent history. Today, the Department is adding another five federal prosecutors to establish a new Gun Crimes Prosecution Team in the Northern District of Illinois.

The responsibility of law enforcement is given to the executive branches of our state, local, and federal governments. The principal duty of law enforcement is to ensure the safety and protection of the public in a manner consistent with our Constitution and laws. *See* Attorney General Memorandum On Supporting Federal, State, Local and Tribal Law Enforcement (March

---

[2] *See* Press Release, Dep't of Justice, Attorney General Jeff Sessions: We Cannot Accept these Levels of Violence in Chicago (June 30, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-we-cannot-accept-these-levels-violence-chicago.

31, 2017), *available at* https://www.justice.gov/opa/press-release/file/954916/download. The United States Department of Justice partners with local law enforcement agencies, who make up 85% of all law enforcement, to help carry out this mission—both through cooperative crime prevention and detection operations and through enforcement of state and local agencies' constitutional obligation to uphold the civil rights of all members of the public. Accordingly, the Department wholeheartedly supports the goals of ensuring "that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely" and that "the City [of Chicago] and the [CPD] deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." *Illinois v. Chicago*, No. 17-cv-6260, Dkt. No. 107-1 (Sept. 13, 2018 N.D. Il.) (hereinafter "Proposed Consent Decree" or "Decree") at ¶ 2. Furthermore, the Department recognizes and supports the efforts that the CPD and local leadership have already taken to address practices that the Department previously alleged violate the Constitution. For example, in 2016, the CPD established a committee to oversee its training program, *see id.* at ¶¶ 269–70, and the CPD has begun to develop and implement an in-service training program for its officers, *see id.* at ¶ 318. In our system of federalism, this kind of local control and accountability is the best way to secure safe, effective, and constitutional policing.

Given this progress and the expressed determination at both the City and State levels to address use-of-force issues to ensure constitutional policing, a consent decree that shifts control of CPD policy and budgets—for the indefinite future—from local, politically accountable officials to a federal court and a private-party monitor is not tenable while Chicago is addressing the current challenge of solving its violent-crime crisis. That crisis will not be solved through civil litigation,

and murders of Chicagoans will not be prevented by subjecting the CPD and its officers to multiple, costly monitors through various settlement agreements and consent decrees. Nor will actions that reduce police productivity or restrain their use of lawful procedures advance that goal.

There may be times when ongoing federal court oversight is necessary to ensure that a recalcitrant local government agency comes into compliance with federal law. But this is not such a time. The State Attorney General, the Chicago Mayor, and the CPD Superintendent of Police ("Superintendent") have all expressed a commitment to ensuring constitutional policing—and as the duly elected and authorized officials responsible for policing in Chicago, they can collaboratively bring about the desired reforms without years of entanglement in a federal court consent decree.[3] Indeed, the parties to this adversarial lawsuit held a *joint* press conference upon its filing. Press Release, Illinois Attorney General, Attorney General Madigan Files Lawsuit Against City of Chicago to Obtain Consent Decree for Police Reform (Aug. 29, 2017); *see also Horne v. Flores*, 557 U.S. 433, 449 (2009) ("public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law" so that they can "'sidestep political constraints'") (citations omitted).

---

[3] The Illinois Attorney General, the plaintiff here, has emphasized her office's commitment to "work[ing] to provide the people of Chicago with a city and a police department that respects their rights, protects their safety, and provides support and resources to" CPD officers. Press Release, Illinois Attorney General, Attorney General Madigan Files Lawsuit Against City of Chicago to Obtain Consent Decree for Police Reform (Aug. 29, 2017). The Mayor's Office has expressed a similar commitment. *See, e.g.*, Press Release, Office of the Mayor, City Builds on Road to Reform, Immediately Implements Nearly a Third of Police Accountability Task Force Recommendations (Apr. 21, 2016) ("[T]he city is committing to the police oversight concepts recommended by the Task Force, including independent investigations of serious police misconduct, a new Public Safety Auditor, a role for citizen oversight, and increased transparency and independence for the entire system."). And CPD Superintendent Johnson has stressed his commitment to police reform, pointing out the value to policing of "best-in-class training," "de-escalation tactics, body cameras, and cultural sensitivity." Press Release, Office of the Mayor, Mayor Emanuel, Chicago Police Celebrate 338 New and Promoted Officers at Graduation (Aug. 28, 2018).

The Supreme Court has explained that, once entered, consent decrees in "institutional reform litigation" like this case "bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* at 449 (citations omitted). The problem is even more acute when a mayor who is not running for reelection will sign the Proposed Consent Decree on one of his final days in office. These decrees "often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Id.* at 447–48. Consent decrees, such as the one proposed here, can cause "state and local officials . . . [to] inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents," and "constrain[] their ability to fulfill their duties as democratically-elected officials." *Id.* at 449. Once a consent decree is entered, the parties to the decree are bound to comply with and implement its provisions, and may seek the court's amendment or termination of that decree only in the circumstances that the law or the decree permit. Consent decrees can thus strip local government officials of the flexibility they need to address evolving issues, and can deprive the local populace of the ability to control their policies through the democratic process.

These concerns are paramount in this case. The Proposed Consent Decree currently before the Court will not permit local leaders the flexibility they need to proactively adjust law enforcement strategies to address the crime wave across the City. This is demonstrated by four major—and problematic—features of the Decree.

First, the Proposed Consent Decree goes beyond remedying specific violations of federal law cognizable in federal court. *See Horne*, 557 U.S. at 450 ("[C]ourts must remain attentive to

the fact that 'federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'") (citation omitted; alteration in original). The Decree is a 226-page document governing virtually every facet of CPD operations, in excruciating detail. The Decree's 799 paragraphs (and hundreds more subparagraphs) cover: community policing, impartial policing, crisis intervention, use of force, recruitment, hiring, promotion, training, supervision, officer wellness and support, accountability, transparency, and data collection. The broad scope of this Decree is not, as the Supreme Court requires, "limited to reasonable and necessary implementations of federal law," and thus "may 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* (citation omitted).

In addition, micro-management of police department procedures and policies, as contemplated by the Proposed Consent Decree, can result in decreased responsiveness to residents, decreased accountability, increased crime, and other unintended and deleterious consequences. Indeed, there is evidence that the recent deadly crime surge in Chicago resulted, in significant part, from the sweeping 2015 settlement agreement between the CPD and the American Civil Liberties Union—an agreement that has already imposed an invasive "Consultant" and significant, unjustified administrative burdens upon street-level policing, and has dramatically decreased police officers' use of commonsense, effective policing tactics. *See, e.g.*, Paul G. Cassell, and Richard Fowles, *What Caused the 2016 Chicago Homicide Spike? An Empirical Examination of the 'ACLU Effect' and the Role of Stop and Frisks in Preventing Gun Violence*, 2018 U. Ill. L. Rev. __ (forthcoming 2018), *available at*: https://ssrn.com/abstract=3145287 (analyzing the impact of the settlement agreement). Such overly burdensome administrative requirements not only decrease officer morale and discourage proven policing practices, but also take officers off

6

of the streets—where they are needed to protect neighborhoods and fight crime—and entangle them in paperwork and red tape.

Second, the Proposed Consent Decree strips the Superintendent—who is appointed by, and accountable to, the popularly elected Mayor—of his duty and ability to administer the CPD. *See* Chicago Municipal Code § 2-24-850(3) (the Superintendent is charged with "administer[ing] the affairs" of CPD). The Proposed Consent Decree broadly states that the Superintendent "continues to be in charge" of the CPD, Proposed Consent Decree at ¶ 611, but the specific provisions of the Decree dictate that the Superintendent will, in fact, cede significant operational control of the CPD to the Monitor. For example, the Proposed Consent Decree requires the Superintendent to obtain the Monitor's approval for each and every one of the hundreds of "policies and procedures required to be implemented or maintained" by the Decree; for plans affecting a wide swath of CPD operations, including crisis intervention, officer training, span of control and unity of command, recruitment, promotion, hiring, officer support systems, equipment and technology, and data systems; and for "curricula, lesson plans, and course materials" for officer training. *See* Proposed Consent Decree at ¶¶ 627, 638–41. Moreover, under the Proposed Consent Decree, the Monitor must be given "prompt, cooperative, and unobstruct[ed]" access, at any time and without notice to or approval by the Superintendent, to all "individuals, facilities, meetings, disciplinary proceedings, reviews, [and] incident scenes." *Id.* at ¶¶ 681–82. The Monitor's substantial degree of control over the Superintendent and the CPD leave it at best unclear in what operational sense the Superintendent will "continue[] to be in charge" of the CPD. Here, the Monitor is not accountable to the local residents who elect local officials and expect them to lead, and the Monitor cannot and should not act as a substitute for the considered policy judgments and leadership of local officials, or the difficult, real-time decisionmaking of officers on the beat. This sweeping

Decree gives far too much power to a private-party Monitor who will control the CPD for years to come.[4]

Third, the Proposed Consent Decree turns over long-term budgetary control of the CPD to the federal Court and the Monitor through vague mandates that there must be "sufficient funding and an adequate number of qualified staff" to fulfill the provisions of the sweeping Decree, that there will be "adequate funding" to develop and implement various programs, and that the City will be responsible for providing "necessary support and resources" to the CPD. *See* Proposed Decree at ¶¶ 521, 605, 706. Because the Decree does not define "sufficient," "adequate," or "necessary," these budgetary decisions will be left to this federal Court and its Monitor, rather than local elected officials who are accountable to the residents whose taxes must fund CPD operations and compliance with the Decree, and who are in the best position to make difficult funding decisions (and tradeoffs) that affect the community and taxpayers' daily lives. *See Horne,* 557 U.S. at 448 ("Federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities. States and local governments have limited funds. When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs."). It is, of course, obvious that the judicial branch and this federal Court are not empowered—and do not have the training or resources—to administer executive law-enforcement functions.

---

[4] And the Monitor proposed by this Decree will be the *second* imposed on the CPD in the last three years. The CPD-ACLU agreement already establishes a "Consultant" to review investigatory stops and pat downs. *See* Investigatory Stop and Protective Pat Down Settlement Agreement, Section V (August 5, 2015), *available at* https://www.aclu-il.org/sites/default/files/wp-content/uploads/2015/08/2015-08-06-Investigatory-Stop-and-Protective-Pat-Down-Settlement-Agreeme....pdf.

The costs of the Decree will be significant, draining limited resources that could be used to prevent crime or fund other important City priorities. The Monitor costs alone will be staggering. The Monitor can be paid up to $2.85 million per year—more than ten times both the Superintendent's salary and the Mayor's salary, and fifty-nine times the starting salary for CPD officers. *See* Proposed Consent Decree at ¶ 617.[5] In addition, the Court can, on its own and without request from any of the parties to the Decree, increase the Monitor's budget if it finds, in its sole discretion, that the increase is necessary for the Monitor to fulfill its duties. Proposed Consent Decree at ¶ 618. These costs will not be paid by the plaintiff, the court, the federal government, or the "certain community organizations" that the Decree also empowers to monitor and enforce its provisions, *see* Proposed Consent Decree at ¶¶ 669, 709. Instead, these costs will be borne by the very taxpayers of Chicago who are the victims of the violent crime surge (and who are already paying for the Consultant required by the CPD-ACLU agreement). These taxpayer funds thus will not be available to hire and train more CPD officers and equipment to protect Chicago residents.

Fourth, the Proposed Consent Decree provides that the Court will retain jurisdiction until the City has achieved "full and effective compliance" with the Decree for two consecutive years. Proposed Consent Decree at ¶ 693. But the Decree employs vague, subjective terms and metrics—subject to a wide range of interpretations—that may make it difficult for future City leadership to

---

[5] The 2017 salary for the Superintendent is $260,004.00. *See* 2017 Position & Salary Schedule Chicago Police Department (July 14, 2017), *available at* http://directives.chicagopolice.org/forms/CPD-61.400.pdf. The salary for the Mayor is $216,216.00. *See* Chicago Data Portal: Current Employee Names, Salaries, and Position Titles – Dashboard (2018), *available at* https://data.cityofchicago.org/Administration-Finance/Current-Employee-Names-Salaries-and-Position-Title/aned-ke5c. The starting salary for a CPD officer is $48,078.00. *See* Classification and Pay Plan: Salary Resolution 115 (2017) *available at* https://www.cityofchicago.org/content/dam/city/depts/dhr/supp_info/JobClassification/2017_Schedule_A_revised.pdf.

demonstrate, as an objective matter, that the CPD is in compliance with, and may thus terminate, the Decree. *See, e.g.*, *id.* at ¶ 126 (requiring in-service training "that is adequate in quality, quantity, and scope"); *id.* at ¶ 135 (requiring "language used in policies, procedures, forms, databases, and trainings … is appropriate, respectful, and consistent with industry recognized terminology"); *id.* at ¶ 282 (requiring training instructors to be "appropriately qualified"); *id.* at ¶ 424 (requiring public complaints to "be courteously received, properly classified, and efficiently investigated"); *id.* at ¶ 721 (requiring "compliance reviews, audits, and community surveys deemed necessary and appropriate"). A consent decree carefully tailored to remedy specific violations of federal law should have specific, objective remedies, the achievement of which will demonstrate compliance. *See Horne*, 557 U.S. at 450 ("If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, it is improper."). This Proposed Consent Decree fails on that score and thus would not be a proper order for a federal district court. *See id.* (holding that district courts "exceed appropriate limits" if their decrees "are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation").

\*\*\*

Now, before the Court supplants the traditional role of democratically accountable local officials, is the best time to assess whether a decree such as this one is appropriate. The City and the State have already begun to take crucial and laudable steps to improve the CPD's compliance with federal law and protect the rights of its citizens. There may be times and places that necessitate carefully tailored consent decrees to bring a local agency into compliance with federal law. But this sweeping Proposed Consent Decree is not the right vehicle for the City of Chicago right now, as the City's law enforcement professionals seek to combat a historic violent crime wave. Because necessary reforms are, currently, better addressed through the legislative and

administrative process than through broad judicial oversight from a federal court, and because the Decree would strip the CPD of the flexibility it needs to address the violent crime crisis in Chicago, the Proposed Consent Decree is not in the public interest.  The United States therefore opposes entry of the Proposed Consent Decree.  The United States asks the Court not to enter the Proposed Consent Decree but, rather, to allow state and local officials—and Chicago's brave front-line police officers—to engage in flexible and localized efforts to advance the goal of safe, effective, and constitutional policing in Chicago.

    Respectfully submitted,

    JEFFERSON B. SESSIONS III
    Attorney General


    John M. Gore
    Acting Assistant Attorney General
    Civil Rights Division


    John R. Lausch
    United States Attorney
    Northern District Of Illinois
    219 S. Dearborn Street, 5th Floor
    Chicago, IL 60604
    312-353-5300

DATED:  October 12, 2018