

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-6260 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Per its 11/5/18 minute order [646], the Court has reviewed the materials on the docket that are currently under seal and identified documents that should be unsealed and, in some instances, redacted to remove individuals' personal identification information (e.g., addresses and phone numbers). The Court has identified the following docket entries as containing information that should not be sealed: 244, 245, 255, 258, 264, 286, 289, 290, 291, 292, 293, 294, 295, 297, 298, 299, 300, 301, 302, 303, 304, 305, 333, 388, 389, 399, 400, 401, 402, 403, 404, 406, 476, 491, 512, 515, 536, 537, 570, 597, 602, 604, and 640. The Court has redacted any personal identification information from these documents and is attaching the unsealed, redacted documents to this order as a single document. For purposes of efficiency, the original docket entries shall remain sealed.

Dated: November 16, 2018

_____
Robert M. Dow, Jr.

BG
EC

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



*FILED*

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

MANOLITA L. HUBE

*Printed full name*

October __11__, 2018

# REDACTED

Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604

Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



*FILED*

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Crescencia Delgado*

*Printed full name*

**REDACTED**

October /0/11, 2018

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

DAFNE DEL MISCO – JOLLA

*Printed full name*

October __10__, 2018

**REDACTED**

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Eddie A. Rosa-Fuentes                                      October _10_, 2018

*Printed full name*

**REDACTED**

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT


To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

James H Ridker

*Printed full name*

October ___5___, 2018

**REDACTED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 20

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

    **I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

    I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

    I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Printed full name*

ALLEN STRYCZEK

October ___, 2018

**REDACTED**



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

FILED

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Anna Case-Winters*

Anna Case-Winters

October __10__, 2018

*Printed full name*

**REDACTED**



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20ᵗʰ Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Anita Crittenden* ,

October __10__, 2018

*Printed full name*   **REDACTED**

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Printed full name*

**REDACTED**

October ___10___, 2018

*AM*

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Jennifer M. McBride*

October ___10___, 2018

*Printed full name*

*Jennifer m McBride*

**REDACTED**



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

LASHUNDRA STEPHENS                              October __10__, 2018

*Printed full name*

**REDACTED**

Case: 1:17-cv-06260 Document #: 294 *SEALED* Filed: 10/12/18 Page 1 of 2 PageID #:3048



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

D5
**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Elisabe l Ruiz*

October ___10___, 2018

*Printed full name*
*Elisabel Ruiz*

**REDACTED**

*AM*

F I L E D

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 12 2018 *LA*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Douglas T. Gaines                                                October _10_, 2018

*Printed full name*

**REDACTED**



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

**THOMAS G BRUTON**
**CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

L.s  Valle                                          October  10  , 2018

*Printed full name*

**REDACTED**



FILED

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 12 2018 м

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Wanda Elaine Simpson*

*Printed full nam* **REDACTED**

October _10_, 2018

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

LAVonne C. BURLEIGH

October __10__, 2018

*Printed full name*

**REDACTED**



FILED

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 12 2018 *LA*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

October ⧸⟡ , 2018

*Printed full name*

**REDACTED**



*An]*

**FILED**

OCT 12 2018 LA

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Margaret Brim **REDACTED**          October __10__, 2018

*Printed full name*

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

David W. Watkins, III

*Printed full name*

October 10, 2018

**REDACTED**

2



**FILED**

OCT 12 2018 LA

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Printed full name*

October _10_, 2018

**REDACTED**

2

*AM*

F I L E D

OCT 12 2018 *UH*

T⸳⸳⸳⸳⸳⸳⸳⸳⸳⸳⸳⸳⸳
CLERK, U.S DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GA⸳ ⸳ Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. C y of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to exp nd diversion efforts, support survivors of police violence, limit use of force in schools, and im rove crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully, *Gary Rand*

_____

*Printed full name* **REDACTED**
    GARY RAND

October _/0_, 2018

2

*AH*

**FILED**

OCT 12 2018 LA

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

DAVID H. CRAWFORD

October /0, 2018

*Printed full name*

**REDACTED**



**FILED**

OCT 1 2 2018

**THOMAS G. BRUTON**
**CLERK, U.S DISTRICT COURT**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully, *Sarah g. Tanzer*

SARAH J. TANZER

October 10 , 2018

*Printed full name*      **REDACTED**

**FILED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Sophie Bara Candir

October _____, 2018

*Printed full name*

2



**FILED**

OCT 1 2 2018 CA

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the **Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

RISHONA TAYLOR

October 9, 2018

*Printed full name*

2

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

concern about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility**. (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

David Bolled

*Printed full name*

October _____, 2018

# REDACTED

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 12 2018 LA

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Kishawna Bailey*

*Printed full name*

October __11__, 2018

**REDACTED**

Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**F I L E D**

OCT 12 2018 LA

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Roxanne M. Smith

*Printed full name*

October __11__, 2018

**REDACTED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

   **I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

   I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

   I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility**. (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Mahl C B*

*Printed full name*

October __7__, 2018



United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018 ᏝᏛ

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Shaun Bailey

*Printed full name*

October 11, 2018

**REDACTED**

**FILED**

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 12 2018 LA

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

question about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Deontae Moore

*Printed full name*

October 11, 2018

# REDACTED

Clerk of Court

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 12 2018 ᐸ

**THOMAS G. BRUTON**
**CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Tyshawn Reddin

*Printed full name*

October 11, 2018

**REDACTED**

FILED

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

2018 OCT 12 PM 2: 43

CLERK
U.S. DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the **Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility**. (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*William Beermann*

October __9__, 2018

*Printed full name*
William H. Beermann

**REDACTED**

2





October 5, 2018

$$\mathcal{D}$$
**FILED**

OCT 1 5 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604

Re: State of Illinois v. City of Chicago, Case No. 17-cv-6260

U.S. District Judge Robert Dow:

Thank you for the opportunity to comment to the court on the proposed consent decree to reform the Chicago Police Department (CPD). As organizations committed to improving the lives of people living with mental health conditions, we are appreciative of the efforts of the Illinois Attorney General's Office and City of Chicago to address the issues surrounding police practices, training, and accountability.

NAMI Chicago, the National Alliance on Mental Illness, provides hope and improves the quality of life for those whose lives are affected by mental illness by providing information and referrals, education, support, advocacy, and active community outreach. Through our partnership with CPD, we deliver Crisis Intervention Team (CIT) training to officers and this gives us a unique perspective on the proposed reforms being considered in this consent decree. NAMI Chicago was a member of the Police Accountability Task Force (PATF), co-chair of the statewide Illinois Mental Health Opportunities for Youth Diversion Task Force, and sits on the Mayor's Mental Health Steering Committee.

Thresholds is the largest community mental health provider in Illinois, serving over 15,000 people throughout the Chicago Metropolitan Region living with serious mental health conditions. Thresholds is the lead coordinator of the statewide Healthy Minds Healthy Lives Coalition, a member of the statewide Illinois Mental Health Opportunities for Youth Diversion Task Force, and sits on the Mayor's Mental Health Steering Committee.

Illinois Collaboration on Youth (ICOY) provides training, technical assistance, and advocacy to build the capacity of youth- and family-serving agencies and stakeholders, and to ensure that they are equipped to provide developmentally appropriate, trauma-informed, and culturally-responsive care to youth who may be at risk of juvenile justice or child welfare involvement. ICOY also provides technical assistance around the state to ensure that the Illinois juvenile justice system complies with federal protections outlined by the Juvenile Justice & Delinquency Prevention Act.



Mental health
community education
and support

To that end, ICOY coordinates the Disproportionate Minority Contact (DMC) Committee of the Illinois Juvenile Justice Commission, which has focused its efforts on school discipline reform including improving service accessibility and law enforcement training. ICOY was also a member of the Illinois Mental Health Opportunities for Youth Diversion Task Force.

Through years of diverse experience with the mental health and crisis response system in Chicago, we are well aware of the efforts being made to improve operations at the Chicago Police Department along with the challenges the consent decree seeks to address. With this in mind, we share our comments on the proposed consent decree.

**Crisis Intervention Team Training for Youth (CIT-Y) (Section IV.):**
The proposed section on Crisis Intervention Team (CIT) training references advance CIT training, such as training for youth and veterans. We appreciate this inclusion and are eager to share more about the importance of CIT-Y, particularly for officers in schools and working with youth directly.

Similar to the benefits of the CIT program for adults, reviews of CIT-Y programs have found that these programs[1]:

- Reduce the need for the use of force in a crisis, thereby reducing the trauma experienced by police officers who injure youth and improving the safety of law enforcement personnel.
- Provide a proactive approach to prevent crises in schools.
- Link youth with mental health conditions to services in the community and reduce the need for treatment in more costly and restrictive settings.
- Reduce the lag time between the first onset of mental health symptoms and when an intervention is provided.

Ensuring that the right officers receive the right training around mental health and crisis de-escalation helps improve outcomes, such as diversion from the juvenile justice system, and builds trust. Without training, officers may see the behavior of youth living with mental health conditions as intentional, when it may be related to their mental health condition. This can lead to arrest, removal from community support, or increased isolation and further traumatization, which can exacerbate their mental health conditions.

Previously, CIT-Y was offered within CPD and an evaluation[2] of the program concluded that CIT-Y trained officers had increased knowledge and more favorable attitudes toward handling service calls for youth crisis. Further, officers were very satisfied with the training curriculum. However, some barriers to

---

[1] Markey, D. et al., (2009). Supporting Schools and Communities in Breaking the Prison Pipeline: A Guide to Emerging and Promising Crisis Intervention Programs for Youth. Arlington, VA: National Alliance on Mental Illness.
[2] Skorek, R. R. & Devitt Westley, C. (2015). Evaluation of Chicago Police Department's Crisis Intervention Team for Youth training curriculum: Year 2. Chicago, Il.: Illinois Criminal Justice Information Authority.



continued implementation of the program existed, including lack of program awareness among the department and public, lack of department support, difficulties with dispatcher linkage to calls, unavailability of non-emergency community-based treatment providers besides psychiatric hospital admission, and difficulty in accessing department paperwork to document the event.[3]

These barriers are fixable. For these reasons, we recommend including the following requirements in the final consent decree:

- Designate and permanently staff a CIT-Y liaison under the leadership of the CIT Coordinator (Section IV. B.)
- Integrate planning around CIT-Y in all areas of CIT Program functions (Section IV. B. 78).
- Integrate CIT-Y into the Advisory Committee in order to ensure youth servicing community partners, providers, educators, justice system partners and other government agencies guide collaboration and promote program sustainability (Section IV. I).
- Address staffing ratios to maintain a sufficient number of CIT-Y trained officers on every watch in every district, based on analysis of the demand, within the CIT Implementation Plan. Staffing for CIT-Y trained officers should meet or exceed ratio targets for CIT trained officers (Section IV. D).
- Conduct CIT-Y advanced training at least twice a year for eligible officers who are being newly trained in CIT-Y (Section IV. B. 78).
- To the greatest extent possible, ensure that the training for School-Assigned Officers described in Section II. G. 38 include CIT-Y.
- To the greatest extent possible, ensure that any security personnel working in schools, whether off-duty sworn CPD or other security personnel, are required to meet the same training requirements as those officers who are formally detailed to a school (Section II. G).

**General comments:**

While the primary focus of the proposed consent decree are the policies and practices within CPD, we strongly think it's worth noting that many of the underlying issues around police response during mental health emergencies stem from the lack of a comprehensive, efficient mental health system in our city. After many years where resources in the mental health system have been lacking, we see a population of people living with serious mental illness(es) exhibiting a very high acuity of symptoms. This inadequate mental health system is felt directly by service providers and the emergency response system. Simply put, the needs of individuals living with serious mental illness(es) who are not treatment connected are more

---

[3] *Ibid.*



challenging because of insufficient resources and access to affordable and stable housing to meet their mental health, substance use, and trauma-related needs.[4]

The chronic lack of access to mental health and support services can lead to individuals and families getting stuck in a constant cycle of crisis. For decades, police have been the de facto mental health safety net - being the most immediate and direct linkage between a person in crisis to a mental health facility and officers continue to be used as mental health crisis first responders. Chicago relies on law enforcement, the Chicago Fire Department, and hospital emergency departments to fill gaps in the city's mental health system, acting as a last option for those who lack necessary supports to prevent, identify, and properly treat mental health crises.

Using the criminal justice system as the main entry point into the mental health system further stigmatizes, criminalizes, and marginalizes those who need help and is tremendously fiscally irresponsible. CPD has worked to improve officer response to mental health crises, but this is not a panacea – police officers are not mental health professionals.

For these reasons, it's critical to highlight the ways in which the City of Chicago can improve access to needed services for individuals living with mental health conditions and help prevent initial or further interaction with law enforcement. While we know that resources for mental health services are primarily funded through public or private insurance, or through safety-net services like the Cook County Health and Hospital System, the City of Chicago can and should fill gaps in the mental health service system in the following ways:

- Provide funding for supportive housing units across the city and further incentivize the development of supportive and affordable housing in Chicago. Safe and stable housing is an integral part of living in recovery.
- Provide funding for wrap-around services, such as supportive employment, vocational training, supportive education, and peer support, approaches that when combined with clinical treatment have been shown to assist individuals living in recovery with meeting their recovery goals, such as getting and maintaining a job or graduating from school. These providers are typically connected to an individual's clinical team and can identify changes in symptoms that might impact an individual's recovery, helping to avoid increased acuity and mental health emergencies. Additional wrap-around services include provider-based outreach and engagement, which allows providers to actively identify individuals in need of connection to services and meet them where they are.
- Provide funding to coordinate this mobile assessment model, including increasing the availability of open access care throughout Chicago. Currently there are initiatives underway through provider

---

[4] Institute for Housing Studies at DePaul University. (2018). 2018 State of Rental Housing in Cook County. Retried at: https://www.housingstudies.org/research-publications/state-of-housing/2018-state-rental-housing-cook-county/



agencies to respond to adults in the community who need immediate crisis intervention with mobile assessment.[5] This is a missing link to the crisis system.

- Given that the State is the primary funder of mental health treatment through Medicaid, urge state lawmakers to increase significantly its investment in community-based mental health treatment, and early treatment in particular, to avoid using the Chicago Police Department as first responders for preventable mental health crises. Moreover, people living with mental illness(es) are overrepresented in our criminal justice system[6], due in large part to a lack of access to mental health resources in the community.

We appreciate the opportunity to share our comments with the court. Please feel free to reach out with questions at 312-563-0445 or alexa@namichicago.org.

Sincerely,

Alexa James
Executive Director
NAMI Chicago

Andrea Durbin
Chief Executive Officer
Illinois Collaboration on Youth

Mark Ishaug
CEO
Thresholds

[5] State of Illinois, Proposed, Public Notice (2018) https://www.illinois.gov/hfs/SiteCollectionDocuments/PublicNoticeCrisis.pdf
[6] Prins, Seth J. (2015). The Prevalence of Mental Illnesses in U.S. State Prisons: A Systemic Review: National Institutes of Health - U.S. National Library of Medicine.

NATIONAL ALLIANCE ON MENTAL ILLNESS | NAMI | CHICAGO
1801 West Warner, Suite 202    Chicago, IL 60613    312.563.0445    namichicago.org

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: State of Illinois v. City of Chicago, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of all people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the Communities United, et al. v. City of Chicago and Campbell v. City of Chicago lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. The City Should Investigate All Incidents That Lead to Lawsuits. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be required to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. Disabilities Should Not Be an Afterthought. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. CPD Should Not Decide for Itself Whether It Is Discriminating. (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. CPD Should Have a Process to Share Findings Related to Officer Credibility. (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

A. Anne Holcomb

Printed full name

October __8__, 2018

**REDACTED**

2

**FILED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 1 7 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the **Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Allan J. Lindrup*

October __8__, 2018

*Printed full name*

**REDACTED**

## Inner City Youth and Adult Foundation, Inc.
*(Not for Profit 501C3 tax exempt Organization)*
### Swift Mansion
**National and State Historical Landmark Site**
*(Former Home of the Commuter Rail Station)*
**4500 South Michigan Avenue**
**Chicago, Illinois 60653**
**773 285-2000**
*(Save the Children)*

Suggested

Police Advisory Committe

FILED

OCT 12 2018

THOMAS G. BRUTON
CLERK U.S. DISTRICT COURT

The following people are invited to a Save the Children conference conducted by Inner City Youth and Adult Foundation. Over our 37 year career the list of people below have proven themselves to be dedicated public servants and have acted in the best interest of the community, Therefore we would like to convene these individuals to develop a broad base strategy to eliminate violence in inner city communities therefore consider this an invitation for us to come to together at a later agreed upon date.

Harley
Director Lappin, Director
Federal Bureau of Prisons

John W
James Richardson
Former Commander
Chicago Police Department  2nd District

Odie Washington
Former Director
Illinois Dept. of Correction

Clarence English
Former Director
Cook County Jail

Paul Biebel, Chief Judge
Cook County Circuit Court

Thomas O'Grady
Former 21st District Chicago Police Commander
Former Cook County Sherriff

Officer Austin Ware
Mass Transit, CPD

Sergeant Kevin Marshall, Records Department
Chicago Police Department Headquarters

Officer O'Conner
2nd District Police Department

Officer Zapolsky
2nd District Police Department

Don Dirkey
Coalition Manager
Street Organization S

Superintendent Charles Ramsey
Philadelphia Police Department

To the hundreds of Police Officers that have shown serious concern for the inner city community and have remain professional throughout their career. Thank you;

**CITY OF CHICAGO / DEPARTMENT OF POLICE**
1121 South State Street
Chicago, Illinois 60605

(312) 744-4000

Text Telephones
(312) 922-1414 (24 Hrs & Emergency)
(312) 744-8006 (Business Hours)

Richard M. Daley, Mayor
Matt L. Rodriguez, Superintendent of Police

07 November 1995

Mr. Maurice Perkins
**REDACTED**

Dear Mr. Perkins:

In response to your letter regarding the Basketball Athletic program at Woodson North School, the 002nd District is in full support of this project.

My office is available for any ideas for security that you might want to present and encourage you to contact me with your agenda regarding these games.

Sincerely,

John W. Richardson,
Commander, 002nd District
5101 S. Wentworth Avenue
Chicago, IL. 60609

## Inner City Youth and Adult Foundation, Inc.
*(Not for Profit 501C3 tax exempt Organization)*
### Swift Mansion
**National and State Historical Landmark Site**
(Former Home of the Commuter Rail Station)
**4500 South Michigan Avenue**
**Chicago, Illinois 60653**
**773 285-2000**
(Save the Children)

Suggested

Police Advisory Committe*n*

The following people are invited to a Save the Children conference conducted by Inner City Youth and Adult Foundation. Over our 37 year career the list of people below have proven themselves to be dedicated public servants and have acted in the best interest of the community, Therefore we would like to convene these individuals to develop a broad base strategy to eliminate violence in inner city communities therefore consider this an invitation for us to come to together at a later agreed upon date.

*Harley*
Director Lappin, Director
Federal Bureau of Prisons

*John W.*
James Richardson
Former Commander
Chicago Police Department  2 nd District

Odie Washington
Former Director
Illinois Dept. of Correction

Clarence English
Former Director
Cook County Jail

Paul Biebel, Chief Judge
Cook County Circuit Court

Thomas O'Grady
Former 21st District Chicago Police Commander
Former Cook County Sherriff

Officer Austin Ware
Mass Transit, CPD

Sergeant Kevin Marshall, Records Department
Chicago Police Department, Head quarters

Officer O'Conno r
2nd District Police Department

Officer Zapolsky
2nd District Police Department

Don Dirkey
Coalition Manager
Street Organization S

Superintendent Charles Ramsey
Philadelphia Police Department

To the hundreds of Police Officers that have shown serious concern for the inner city community and have remain professional throughout their career. Thank you;

CITY OF CHICAGO / **DEPARTMENT OF POLICE**
1121 South State Street
Chicago, Illinois 60605

(312) 744-4000

Text Telephones
(312) 922-1414 (24 Hrs & Emergency)
(312) 744-8006 (Business Hours)

**Richard M. Daley,** Mayor
**Matt L. Rodriguez,** Superintendent of Police

07 November 1995

Mr. Maurice Perkins

**REDACTED**

Dear Mr. Perkins:

In response to your letter regarding the Basketball Athletic
program at Woodson North School, the 002nd District is in full
support of this project.

My office is available for any ideas for security that you might
want to present and encourage you to contact me with your agenda
regarding these games.

Sincerely,

John W. Richardson,
Commander, 002nd District
5101 S. Wentworth Avenue
Chicago, IL.  60609

**CHICAGO SUN-TIMES**  Tues., March 6, 1982. pg5

# Ex-big shot at disco relishes service role

### By Rick MacArthur

Until about two years ago Maurice Perkins was, in his own words, living the life of a "total capitalist."

In those days, he owned Ceasar's Palace disco lounge at Cottage Grove and 45th, lived in luxurious Lake Point Tower and drove a new Cadillac. At 27, a product of a South Side public housing project, he had become a big shot. In conventional terms he had it made.

"I was just having fun," he recalled, "seeing how high I could go."

But something inside him changed radically and he sold the disco.



Today, it's hard to believe he's the same person.

Now an employee of the city Department of Human Services, Perkins is described as a dedicated community servant, instead of the flashy, high-living nightclub owner he once was.

And for that, he has been chosen as one of 11 unsung heroes selected from among hundreds of "good people" whose names were submitted by readers for Sun-Times Thomas Jefferson Awards for community service.

Perkins' wife, Christine, thought so much of his community work that she nominated him for the award he won.

Nowadays Perkins likes talking about the softball league he organized last summer for children who live in public housing on State St. from 22nd to 43rd Streets. Or he enjoys discussing his job as a community development representative at DHS' Englewood Urban Progress Center, where he handles everything from relocating fire victims to helping teen-agers get their first job.

Andrew Brown, community administrator for the Martin Luther King Jr. Center, said organizing the softball league has been Per-

kins' most significant achievement because it helped combat re-emerging gang recruitment and helped defuse violent rivalries among housing projects.

"Since the gangs of the '60s were around, we have ignored the young people completely," said Perkins, who moved to a South Side apartment with his wife and their two children. "With so many families broken up and no male head of the household, someone has to tell them what's happening and how to stay out of trouble. I've got to be there to let them know it's not make-believe that they can make it."

Perkins is up for a promotion to youth counselor which he said "would give me the leverage with the people from 13 to 30 so that when they have a problem they could contact me right away."

Still, it might be hard for some to understand why he gave up all that luxury. Why did he come back to the ghetto?

"I figured I'd been blessed and that if I didn't share it, it would all disappear," said Perkins. "It was like my old neigborhood had the plague and everyone was dying. I just wanted to stop young people from destroying themselves. When you save a guy and he begins to show some respectability, it feels great."

Even better than Cadillacs and Lake Point Tower?

"That didn't particularly excite me anymore," said Perkins. "I drive a 1970 station wagon now."

On March 21, Perkins and the other award winners will be honored by the Sun-Times at a luncheon, where they'll be presented bronze medallions of the Great Seal of the United States. And he and the others will be considered for one of five $1,000 national Jefferson Awards to be presented in Washington, D.C., in July by the American Institute of Public Service.

**Research: Maurice Parkins**



EX-NIGHTCLUB OWNER Maurice Perkins directs a group of boys painting a South Side Perkins gave up his flashy life to return to the ghetto. "I figured I'd been blessed and didn't share it, it would all disappear," said Perkins. (Sun-Times Photo by Bob.)

**Work History**
**(over)**

**THIS IS AN IMPORTANT RECORD**
**SAFEGUARD IT.**

| | | | |
|---|---|---|---|
| **PERSONAL DATA** | 1. LAST NAME—FIRST NAME—MIDDLE NAME<br>PERKINS MAURICE | 2. SERVICE NUMBER | 3. SOCIAL SECURITY NUMBER |
| | 4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS | 5a. GRADE, RATE OR RANK    b. PAY GRADE    c. DATE OF RANK | DAY   MONTH   YEAR |
| | 7. U. S. CITIZEN    ☒ YES    ☐ NO | 8. PLACE OF BIRTH (City and State or Country)<br>CHICAGO ILL | 9. DATE OF BIRTH   DAY   MONTH   YEAR |

| **SELECTIVE SERVICE** | 10a. SELECTIVE SERVICE NUMBER<br>NA | b. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE<br>NA | c. DATE INDUCTED<br>DAY   MONTH   YEAR<br>NA |
|---|---|---|---|

| **TRANSFER OR DISCHARGE DATA** | 11a. TYPE OF TRANSFER OR DISCHARGE | b. STATION OR INSTALLATION AT WHICH EFFECTED | |
|---|---|---|---|
| | c. REASON AND AUTHORITY | | d. EFFECTIVE DATE   DAY   MONTH   YEAR |
| | 12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 13a. CHARACTER OF SERVICE | b. TYPE OF CERTIFICATE ISSUED |
| | 14. DISTRICT, AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED | | 15. REENLISTMENT CODE |

| **SERVICE DATA** | 16. TERMINAL DATE OF RESERVE/UMT&S OBLIGATION<br>DAY   MONTH   YEAR | 17. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION<br>a. SOURCE OF ENTRY:<br>☒ ENLISTED (First Enlistment)   ☐ ENLISTED (Prior Service)   ☐ REENLISTED   ☐ OTHER | b. TERM OF SERVICE (Years)   c. DATE OF ENTRY   DAY   MONTH   YEAR |
|---|---|---|---|
| | 18. PRIOR REGULAR ENLISTMENTS<br>NONE | 19. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC<br>PV1 | 20. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State)<br>CHICAGO ILL |
| | 21. HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County, State and ZIP Code) | 22. STATEMENT OF SERVICE | YEARS   MONTHS   DAYS |
| | | a. CREDITABLE FOR BASIC PAY   (1) NET SERVICE THIS PERIOD<br>(2) OTHER SERVICE | |
| | 23a. SPECIALTY NUMBER & TITLE<br>91F | | |
| | 24. DECORATIONS, MEDALS, BADGES<br>GOOD CONDUCT MEDAL<br>NATIONAL DEFENSE S | REDACTED | urope High Command<br>obet E. Hardaway III<br>lajor Prince Walker |
| | 25. EDUCATION AND TRAINING COMP | | |

| **VA AND EMP. SERVICE DATA** | 26a. NON-PAY PERIODS TIME LOST (Preceding Two Years) | b. DAYS ACCRUED LEAVE PAID | 27a. INSURANCE IN FORCE (NSLI or USGLI) | b. AMOUNT OF ALLOTMENT<br>NA | c. MONTH ALLOTMENT DISCONTINUED<br>NA |
|---|---|---|---|---|---|
| | | 28. VA CLAIM NUMBER<br>C- | 29. SERVICEMEN'S GROUP LIFE INSURANCE COVERAGE | | |

| **REMARKS** | 30. REMARKS | | |
|---|---|---|---|

| **AUTHENTICATION** | 31. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County, State and ZIP Code) | 32. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED<br>*Maurice Perkins* |
|---|---|---|
| | 33. | 34. SIGNATURE OF OFFICER AUTHORIZED TO SIGN |

**DD** FORM 214
1 JUL 66

PREVIOUS EDITIONS OF THIS FORM
ARE OBSOLETE EFFECTIVE 1 JAN 67.

☆ GPO: 1970—383-496

**ARMED FORCES OF THE UNITED STATES**
**REPORT OF TRANSFER OR DISCHARGE**

2



## GEORGETOWN LAW

Christy E. Lopez
Distinguished Visitor from Practice

The Honorable Robert M. Dow, Jr.
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604



October 12, 2108

### Re: State of Illinois vs. City of Chicago, Case No. 17-cv-6260

To the Honorable Robert M. Dow, Jr.:

Thank you for the opportunity to submit this letter. We write to urge the Court to approve the proposed consent decree between the Office of Illinois Attorney General and the City of Chicago and Chicago Police Department (CPD). This agreement offers the most promise in at least a generation for ending systemic misconduct in the CPD. It will help ensure lawful and effective policing that will make communities more confident in their police department, and police officers more capable and safer, as we personally have seen similar agreements do in cities across the United States.

There is an undeniable need for a court-enforced police reform agreement in Chicago. As two of the attorneys who conducted the Department of Justice Civil Rights Division investigation of the Chicago Police Department, we saw first-hand the devastation that decades of police abuses had worked on Chicago's diverse communities.

As documented in the public findings report, the DOJ team reviewed thousands of pages of documents, including policies, training plans, CPD orders and memos, and internal and external reports. The City provided DOJ access to its entire misconduct complaint database and all officer use of force reports. DOJ also interviewed City officials, and current and former CPD officers and IPRA (now COPA) investigators. The analysis of the evidence confirmed what DOJ heard from community members: CPD has a pattern or practice of unconstitutional use of force, including deadly and less-lethal force, and these practices acutely affect Chicago's marginalized communities.

# REDACTED

During the investigation, DOJ held public forums where community members came forward to share stories about their interactions and experiences with CPD. Whether Black, Latinx, Muslim, immigrant, LGBTQ, female, or a person with a disability, there was a common theme that bound these Chicagoans' experiences together. It was a profound mistrust of the police. Likewise, our conversations with scores of officers revealed a deep distrust among many officers of the Chicago communities most in need of protection. The investigation found that this mutual-mistrust is the result of CPD's inadequate policies, practices, training, and accountability systems that have allowed a toxic policing culture and patterns of misconduct to persist for decades. Because previous reform efforts failed to improve CPD's practices and accountability systems, communities were resigned to the fact that they would continue to be subject to unlawful police practices, and too many police officers became part of a self-reinforcing culture of dehumanizing the people they were sworn to protect.

We have reviewed the proposed consent decree carefully and have followed the months of officer and community engagement that went into its creation. Both because we have committed our professional lives to ensuring policing that is both lawful and effective, and because we have seen up-close the acute need for this agreement in Chicago, we are grateful that the Illinois Attorney General's Office and the City of Chicago committed the months upon months of incredible effort, thoughtfulness and expertise to getting reform right.

And this consent decree does get it right. It will promote sustainable, constitutional, and effective policing by implementing 21st Century, evidence-based, community-informed policies, practices, training, and accountability systems. The agreement gives Chicago communities a meaningful voice in developing CPD's policies and helps empower a broad-based community coalition to monitor and enforce it. This level of transparency and engagement will help repair the broken relationship between CPD and the communities it serves. The agreement further advances transparency by requiring that CPD collect, analyze, and publish enforcement data. Public data will allow community members to see how officers are engaging with residents, and through analyses of the data, the department will be able to monitor and intervene in potential misconduct. The decree also provides provisions designed to enhance CPD's force and impartial policing practices, crisis intervention tactics, recruitment and hiring, academy and in-service training, officer wellness and support, and supervision and accountability systems.

Most importantly, this agreement includes the elements that have been missing from previous reform efforts in Chicago—elements that decades of work have shown are essential—i.e. oversight by a federal court and an independent monitoring team. Experience has shown that, regardless of how good intentions are, without these elements, reform efforts in police departments like CPD are unlikely to be successful. We at DOJ learned this as we had to return to Cleveland, New Orleans, and elsewhere after first attempting to achieve reform through voluntary measures. A consent decree does not guarantee that police reform takes hold for good, but sometimes one is necessary to give reform a fighting chance.

Case: 1:17-cv-06260 Document #: 662-1 Filed: 11/16/18 Page 84 of 92 PageID #:4356
Case: 1:17-cv-06260 Document #: 537 *SEALED* Filed: 10/12/18 Page 3 of 4 PageID #:3870

Page 3

The concern that consent decrees result in "de-policing" that, in turn, causes an increase in serious crime, is not borne out by the evidence. One has only to look at New York City, where a dramatic drop in stops and searches by NYPD was accompanied by a decrease in homicides, notwithstanding confident assertions by NYPD's Chief that crime would unquestionably rise should the number of stops go down. *See* Ashley Southall, *Crime Level in New York Plunges to a Level Not Seen Since the 1950s*, N.Y. TIMES, Dec. 27, 2017, *available at* https://www.nytimes.com/2017/12/27/nyregion/new-york-city-crime-2017.html. It is difficult, some would say impossible, to determine precisely the impact of policing on crime rates. But, with that caveat, it is worth noting that studies of the impact of consent decrees in numerous cities have not demonstrated that they cause increases in crime. In fact, the most comprehensive studies have indicated that they may not even result in de-policing at all. *See, e.g.,* Joshua Chanin & Brittany Sheats, *Depolicing as Dissent Shirking: Examining the Effects of Pattern or Practice Misconduct Reform on Police Behavior*, CRIM. JUST. REV., 2017.

We found no reporting requirements in this consent decree that have not been successfully implemented in other cities. It is of course possible that some officers will decide not to carry out their responsibilities to protest being required to both abide by the law and to document that they are doing so. In our experience, most officers care far too much about their work and the people they serve to neglect their duty. Once provided the training, supervision, and clear direction that the consent decree requires, officers often realize that they are better able to do their jobs, and their fears about reform dissipate. Those officers that cannot adjust to systemic constitutional policing, or who simply refuse to do their jobs, should be held accountable, and the accountability systems set in place by the consent decree will make it easier to do so.

In contrast to the lack of evidence that consent decrees cause crime, there is abundant and growing evidence that when communities do not have confidence that the police can or will protect them, they are more likely to eschew formal legal regimes and create their own system of rules and enforcement mechanisms. The work of Tracey L. Meares and Tom R. Tyler, some of which stems from their experience in Chicago, is central to this body of research. Restoring community confidence, and thereby increasing CPD's ability to keep communities safe, is one of the central aims of this consent decree.

Even after discarding the red-herring of "de-policing," the effort to reform the Chicago Police Department will not be an easy one, and it will take time. Nor is the consent decree perfect—perhaps no product of compromise ever is. Change along the way will likely be necessary—a consent decree is a static document applied to a very dynamic context. The parties to the agreement and the monitor will of course need to genuinely listen to both members of the public and CPD officers regarding how the consent decree is being implemented and do the hard work of discerning when to adjust a decree requirement and when to stay the course. None of that is easy. But it can and has been done elsewhere and it can be done in Chicago.

Regarding cost, we all wish consent decrees could be costless to implement. But the reality is that for too long the City of Chicago has put the true cost of CPD policing literally on the back of

its poorest communities, and, through millions in lawsuit payouts, on Chicago taxpayers. This must change. And experience tells us that benefits of the consent decree will be well-worth the cost. In a conference held by the Police Executive Research Forum in 2013, law enforcement officials spoke of implementing these agreements in their own departments. "I think the money was well spent in terms of preventing future litigation and gaining credibility with the community. So yes it was a lot of money, but I think we got our money's worth," said a Los Angeles Police Commander who helped implement the DOJ consent decree there. "[W]e would not have been able to make the changes we made without the consent decree . . . . The end result was very positive. Shootings dropped by 80 percent and have remained low. And it gave us credibility with the public," said retired Chief (and former CPD officer) Charles Ramsey, speaking of the agreement he helped implement in Washington D.C.'s Police Department. Many other police executives offered similar assessments. *See Civil Rights Investigations of Local Police: Lessons Learned.* Police Executive Research Forum Critical Issues Series (July 2013). Of course, notwithstanding these positive cost-benefit assessments, we urge the Court to ensure that the independent monitoring team is neither rendered ineffective by being given too little resources, nor allowed to undermine the integrity of the reform process through financial carelessness or too little appreciation for the importance of being beyond reproach.

Bringing lasting and transformative change to policing in Chicago will take the sustained commitment of the City and the Chicago Police Department, the ongoing input and support of Chicago's diverse communities, and the close oversight of this Court. The consent decree is the mechanism by through which this can be accomplished. We therefore respectfully urge you to approve the proposed consent decree.

Sincerely,

*Christy E. Lopez*

**Christy E. Lopez**
Distinguished Visitor from Practice
Co-Founder, Program on Innovative Policing
Georgetown University Law Center

Former Deputy Chief, Special Litigation Section
Civil Rights Division, United States Department of Justice

**Lynda Garcia**
Former Trial Attorney, Special Litigation Section
Civil Rights Division, United States Department of Justice



*MARY LYNN PARISH*

**REDACTED**

FILED

OCT 16 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

October 11 , 2018

The Honorable Robert Dow
United States District Court for the Northern District of Illinois,
219 S. Dearborn,
20th Floor,
Chicago, IL 60604

re: Enforcement of State of Illinois v. City of Chicago, Case No. 17-cv-6260

Dear Judge Dow,

As a resident of the city of Chicago, I believe that it is critically important that the Court approves and fully implements the Consent Decree, Case No. 17-cv-6260, developed by Lisa Madigan, Attorney General of the State of Illinois, regarding police conduct in Chicago. In addition, we hope still more can be done to strengthen the Decree by means of greater public partnership and participation in the process of police reform in Chicago.

The City and CPD have proven that they are unable to put an end to their years-long and ongoing civil rights violations without independent external oversight, which has the power to ensure that the City lives up to its commitments. This is a unique moment when attention is highly focused on police misconduct in Chicago, and so we hope for legal actions and structures that will address this problem for now and far into the future.

Sincerely yours,

Mary Lynn Parish

Mary Lynn Parish

# FILED

OCT 1 8 2018

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

**TEMPLE**
**SHOLOM**



*Illuminating the Future*
*Since 1867*

SENIOR RABBI
Dr. Edwin C. Goldberg

ASSOCIATE RABBI
Shoshanah Conover

CANTOR
Sheera Ben-David

ASSISTANT RABBI
Scott Gellman

RABBIS EMERITI
Aaron M. Petuchowski
Dr. Frederick C. Schwartz z"l

CANTOR EMERITA
Aviva Katzman

EXECUTIVE DIRECTOR
Jeremy F. Perlin

DIRECTOR OF ENGAGEMENT
AND MEMBERSHIP SERVICES
Stacy Charnay

DIRECTOR OF EARLY
CHILDHOOD EDUCATION
Heidi Cooper

DEVELOPMENT DIRECTOR
Marla Krupman

DIRECTOR OF FINANCIAL SERVICES
Jodi Morady

DIRECTOR OF LIFELONG LEARNING
Jay Rapoport

**Westlawn Cemetery**
Vickie Pulido, *General Manager*

**Lakeshore Jewish Funerals**
Dan Schubring, *Funeral Director*

**Officers**
Marc Kaufman, *President*
Karen Lewis, *Secretary*
Michael Radner, *Treasurer*

**Directors**
Audra Berg
John Bremen
Aaron Charlow
Matthew Dicker
Steve Fadem
Irene Goldstein
Lilli Kornblum
\* David Lipschultz
Pam Lookatch
Jeff Luchs
Matty Major
Pamela Narins
Kimberly Pendo
Aaron Rius-Lebowitz
Jed Silberg
Julie Walner
Sherry Weil

\* *Past President*

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604

Re: State of Illinois vs. City of Chicago, Case No. 17-cv-6260

Dear Sir/Madam,

The proposed consent decree mandates comprehensive reform of CPD's policies, practices, training and accountability mechanisms to address the use of force, ensure police accountability, improve public and officer safety and, ultimately, build trust between CPD and Chicago's residents. Below, we have set forth suggested language for the consent decree.

It is our understanding that the spirit of this paragraph has been accepted into the Consent Decree. For purposes of clarification, we suggest that officers work with mental health professionals who can be called in cases when officers suspect a person may be going through an acute episode of mental illness. One or more mental health professional should be assigned to every police precinct to ensure fast and contemporaneous intervention whenever the police confront such situations. A Consent Decree should require that when this occurs, the detaining officer and mental health professional shall consult at that time with the precinct captain-in-charge to determine whether the person detained shall be incarcerated for Bond Court, diverted to an appropriate mental health facility, or if an arrest does occur, that the mental health professional be present in Bond Court to make appropriate diversion recommendations to the Judge.

Equally important to us, is the idea of Restorative Justice and how peace circles are used to achieve restoration rather than incarceration. We suggest that officers work closely with Restorative Justice Hubs (that are currently in 8 neighborhoods throughout the city – our synagogue has partnerships with Precious Blood Ministry and Circles and Ciphers) – and visit the Juvenile Detention Center to observe and learn about this practice. In situations where there are minor infractions by a youth (someone whose age ranges from 14-24 years-old), we recommend that officers work with directors of one of these hubs for alternative ways to hold these youth accountable instead of pressing charges. A Consent Decree should require that in these situations, the police ask a representative from a Restorative Justice Hub to be involved in the charging and bail process, if applicable, and to also be present in Bail Court to make appropriate diversion recommendations to the Judge.

Sincerely,

Rabbi Shoshanah Conover
Temple Sholom of Chicago

**Temple Sholom of Chicago**
3480 N. Lake Shore Dr.
Chicago, IL 60657
**773-525-4707**
**773-525-3502 fax**
sholomchicago.org



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility**. (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*REV. RICHARD J. PRENDERGAST*

October __13__, 2018

*Printed full name*

**REDACTED**



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



FILED

OCT 16 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

 **I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

 I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

 I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Michael Neuberger

*Printed full name*

October _09_, 2018

Case: 1:17-cv-06260 Document #: 640 *SEALED* Filed: 10/31/18 Page 1 of 1 PageID #:4177

**FILED**

OCT 3 1 2018 UA

**THOMAS G BRUTON**
**CLERK, U.S DISTRICT COURT**

Larry Bienz

**REDACTED**

Re: Supporting the Implementation of the Consent Decree for the Chicago Police Department
Date: October 29, 2018

To: The Honorable Judge Robert Dow

Thank you for your time in reading my comments, You Honor. I write to offer my support of the CPD consent decree as a social worker and a concerned citizen of Chicago. I am concerned because I believe that the culture within the police department has become problematic, to the point that it too often leads officers to misunderstand the power they have and how easily they can misuse it.

I was in attendance to observe the fairness hearing on Wednesday, Oct 24, and was struck by the testimony of Officer John Catanzara. You may recall him as the gentleman wearing the red, white, and blue sweatshirt. He spoke of the need for citizens, when approached by police, to obey their command to "stop now," as he phrased it. While this is a seemingly simple order, in theory, I believe a social work perspective can clarify that this is not as simple as one may initially think.

The value known as "trauma-informed care" is a central tenet of our field, and it keeps a client's previous experiences at the center of how we provide service to them. Trauma-informed care will be designed with factors in mind that may not be obvious to the initial observer. For example, if a clinician is planning a meeting in their office with a child who has suffered abuse, it would be critical for them to find out if the child's trauma occurred in an office of similar resemblance. If that were the case, the simple request to "come in and sit down" may not be nearly so simple for that child to obey. With this in mind, Mr. Catanzara's comment that one must simply "stop now," particularly if the officer's weapon is drawn in that circumstance, may not be nearly as simple to obey if the individual has suffered trauma from an officer in the past.

With this in mind, I believe this consent decree is a reasonable set of reforms that includes the recording of every time an officer's weapon is pointed at a member of the community. In no way does this punish an officer who is afraid for their safety, but it does keep a record of their use of a weapon and allows for the measurement of frequency with which it occurs. I believe this is just one way in which the consent decree will bring about needed changes that ensure more accountability for police without taking away their ability to protect themselves and others.

Thank you again for your time and for your serious consideration of this issue, Your Honor. I close with noting that your kind demeanor at the hearing has helped me believe in our government a little more.

Be well,
Larry Bienz                    10-31-18