

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

State of Illinois,

Plaintiff

v.

City of Chicago,

Defendant.

Case No.  17 C 6260
Judge  Robert M. Dow

## ORDER

Counsel for the City has notified the Court via email that several docket entries remain under seal following the Court's 11/16/18 order, which attached unsealed, redacted copies of certain public comments. The Court has reviewed the additional docket entries identified by the City and identified those documents that should be unsealed and, in some instances, redacted to remove individuals' personal identification information (e.g., addresses and phone numbers). The Court has identified the following docket entries as containing information that should not be sealed: 164, 166, 167, 198, 199, 200, 201, 213, 314, 338, 339, 341, 342, 345, 350, 383, 385, 393, 398, 479, 480, 481, 482. The Court has redacted any personal identification information from these documents and is attaching the unsealed, redacted documents to this order as a single document. The FOP is given until 12/3/18 to files its comments, should it need the additional time. The parties' joint motion for extension of time to respond to public comments [663] is granted; the parties are given until 12/10/18 to file their responses to public comments, including the FOP's comments.

Date:  11/26/2018

/s/ Robert M. Dow, Jr.
United States District Court Judge



Lisa Madigan
Illinois Attorney General
100 W. Randolph Street
Chicago, IL. 60601

**FILED**

OCT 11 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Dear Attorney General Madigan,

This letter is written on behalf of a coalition of Chicago Southside neighborhood organizations identified as signatories below. The purpose of this letter is to inform you that this coalition has met to review, discuss and then submit our recommendations on the proposed Consent Decree between your office and the City of Chicago that will create a legal guideline for the actions of the Chicago Police Department in communities they serve throughout the city. We would be remiss not to identify our coalition as being made up primarily of residents from the Black communities that we live in. Knowing that the proposed Consent Decree is meant to govern the interactions between Chicago police officers in all communities, it is important that we reaffirm our contention that people of color are treated differently than our White peers in their communities.

Our coalition met on 8/14/18 in a special meeting of the Grand Crossing Park Neighborhood Network (GCPNN) that was held at the Grand Crossing Park Field House, located at 7655 S. Ingleside Avenue. All regular business was suspended in favor of this coalitions' conference on the proposed City of Chicago Consent Decree. Coalition partners were given an agenda, and a two page outline of points for discussion. A copy of the Community Consent Decree (CCD) was projected on screen, visible to the entire group. A paper copy of the Opinion of Officers of the Chicago Police Department* (OOCPD) was also made available for review and discussion. The conference ran a little more then two (2) hours and everyone in attendance either asked questions, offered opinion(s) and/or made recommendations that we believe will benefit the communities, and the city in drafting a fair, impartial and enforceable Consent Decree. Some concerns that were raised by the coalition were not clearly explained/defined in the CCD or the OOCPD. The coalition respectfully suggests that it is in the best interest of all parties to extend the time period for review of, and commentary on the Chicago Community Consent Decree.

*The OOCPD raises particular concern for the ability of this process to result in consensus of all parties. The response of the police officers Union, the Fraternal Order of Police (FOP) is openly defiant of the process and dismissive of the severity of the disparities in the services delivered to communities of color, by the police department.

Thank you for your attention to these concerns.

Matthew Brandon - Communities Organized to Win; Lori Burns 400 E. 89th Street Block Club; Ashley Casiello -Greater Chatham Initiative; Clifola Coleman - 3rd District CAPS Beat Facilitator; George Crouse - Grand Crossing Park Neighborhood Network; Jennifer Edwards - Communities Organized to Win; Robert Hodges - House of Israel Temple of Faith, Breaking Bread Youth Mentoring; June Norfleet - 7300 University Block Club; Monte Rollerson - Grand Crossing Park Neighborhood Network; Tazama Sun - Triangle Neighborhood Association; Jose Wilson - Antonio's Response, Grand Crossing Park Neighborhood Network

Attachments: Appendix A, Appendix B

## Appendix A
## Grand Crossing Park Neighborhood Network
## Comments on the Chicago Police Department Consent Decree Draft

**USE OF FORCE & FORCE REPORTING**

| | |
|---|---|
| ☑ Enhances CPD's de-escalation tactics. | No shooting fleeing people in the back<br>What is the chart of escalation currently in place?<br>What is the proposed enhancement? |
| ☑ Requires officers to provide life-saving aid. | With what training?<br>What is the scope/limits of what officers must do?<br>Does this include stopping another officer from harming a citizen?<br>The lifesaving kits currently exists what will better ensure their proper use? |
| ☑ Requires tracking and analyzing all foot pursuits and, if recommended by the independent monitors, adopting a new foot pursuit policy. | Ensure that example and case studies are given to officers in training and re training |
| ☑ Further restricts officers from shooting at moving vehicles. | This prohibition currently exists, what will better ensure execution of policy?  What are consequences? |
| ☑ Requires CPD to adopt a policy prohibiting the use of Tasers for flight alone and strongly discourages the use of Tasers in schools and on students. | Why are guidelines for firearms/guns different from Tasers?  What are the use of force general orders? |
| ☑ Requires monthly publication of use of force data. | What's currently happening with this data?<br>Will the data be 'digested' or simply 'made available'? |

**Use of force was a major concern for our community representatives.  Our community has few issues with the appropriate application of force in challenging incidents.  But the high propensity of use of force violation are against members of African American/black and Hispanic communities.**

**COMMUNITY POLICING & IMPARTIAL POLICING**

| | |
|---|---|
| ☑ Integrates community policing principles in all CPD operations. | What does this mean from CPD's perspective?  Give examples for clarity |
| ☑ Requires structure and oversight for CPD officers in Chicago schools. | |
| ☑ Improves CPD interactions with diverse communities. | How?  Explicit testing for race bias & consequences for operating against policy.<br>CPD must first address racism within its ranks.<br>Provide demographic identification breakdown of |

| | the CPD. |
|---|---|
| ⯑ Ensures access for individuals with disabilities. | What technology can help bridge communication gaps with hearing impaired, non-English speakers? Design program and training for better identification of persons with disabilities. |
| ⯑ Requires CPD to incorporate community input into key CPD operations. | Define Key Operations? How will this be gathered/incorporated? Provide a pathway for the integration of civilian polices. |

### ACCOUNTABILITY & TRANSPARENCY

| | |
|---|---|
| ⯑ Improves transparency at all stages of misconduct investigations. Requires that every complaint to the City and the Civilian Office of Police Accountability (COPA) receive a unique tracking number that will be linked with all stages of the process. By 2020, allows members of the public to track the status of complaints on-line. | What's the goal – what does improvement upon what currently happens looks like> What happens before 2020? |
| ⯑ Requires COPA and CPD's Bureau of Internal Affairs (BIA) to complete investigations within 180 days, and the districts to complete investigations within 90 days. | Is this dependent upon Police Union contract? |
| ⯑ Requires the City to ensure adequate staffing levels and training for COPA and CPD internal investigators. | How many staff is adequate? Will there be full transparency of all facts like evidence sharing is required in court? |
| ⯑ Addresses the code of silence and officer collusion. | Addresses or solves? Guidelines already exist... what practices will be instituted to support Public Safety employees who report? |
| ⯑ Improves independence and transparency of gender-based misconduct investigations, including requiring automatic investigations of officer-involved domestic violence allegations and extensive review and public reporting on each investigation of officer-involved sexual misconduct and assault. | |
| Requires CPD and the City to use their best efforts to renegotiate collective bargaining provisions, including the prohibition on anonymous complaint investigations and revealing complainant identities prior to administrative interviews. | Already strong resistance to the consent decree – what process is in place to negotiate? What happens to officers who refuse to comply? |

| ☐ Establishes transparency into misconduct investigations and CPD-related lawsuits by requiring on-going and annual publication of data | Is there any thought of officers holding or contributing to malpractice insurance vs 100% taxpayer paid settlements? |

### RECRUITMENT, HIRING, & PROMOTION

| ☐ Improves recruitment and hiring diversity efforts. | Must confront the inner department racism There used to be high school cadet program which worked well to groom future officers. |
| ☐ Assesses fairness and transparency in supervisor promotions. | Are stats made public now or will they be? |

**The perception of the CPD is not favorable among many young potential cadets in the African American/black and Hispanic communities.  This is a considerable challenge. One of our member grass root community group notes this section is the most important aspect of the decree and requires significant community input.**

### TRAINING & SUPERVISION

| ☐ Improves training for probationary officers in the Field Training Program. | What kind of psychological well-being check happens along this process? Require, monitor and provide provisions for probationary offices to live 9 months in their assigned area of service. |
| ☐ Requires 40 hours of annual, in-service training. | |
| ☐ Expands supervisor training by requiring supervisors to have ongoing, in-service training on topics including managerial and leadership skills. | Include a civilian component of this training review. |
| ☐ Lowers the number of officers per supervisor to one sergeant for every 10 officers and ensures that officers have one consistent supervisor. | How/where will supervisors come from if people they are currently poorly trained? Good this provides better accountability for probationary cadets and their training supervisors. |

**The perception of the CPD is not favorable among many young potential cadets in the African American/black and Hispanic communities.  This is a considerable challenge. One of our member grass root community group notes this section is the most important aspect of the decree and requires significant community input.**

### OFFICER WELLNESS

| ☐ Improves efforts to destigmatize officer wellness programs. | Must be required ongoing. Must be staffed so that everyone who wants/needs to participate can. Good, make stress reduction/PTS training mandatory |

| ▢ Develops and implements a comprehensive suicide prevention initiative. | Compassion & self-compassion training modules are proven to help high-stress workers develop & USE better coping skills to ease burn out, fatigue, anger & apathy. |
|---|---|
| ▢ Increases CPD's licensed mental health professional staff from three to at least 10. | Is 10 enough given the extreme need here for 14000+ humans? What about inner departmental peace circle/conflict resolutions practices which are promoted for communities? Unacceptable....it is possible to get a well rounded program and significant professional without a table of review of at least 20 mental health professionals. |

**Implement compassion and self-compassion training modules which are proven to help high-stress environment workers develop and USE coping skills to prevent and address burn out, fatigue, anger and apathy.**

### CRISIS INTERVENTION

| ▢ Enhances training requirements by requiring CPD to begin providing at least eight hours of ongoing training every three years. | |
|---|---|
| ▢ Requires CPD to document and track all service calls involving individuals in crisis, and adopt a demand-driven model for staffing crisis intervention-certified officers | Will this cause work slow-downs again due to increased paperwork? |
| ▢ Requires crisis intervention training for all CPD officers | |

### DATA MANAGEMENT

| ▢ Requires CPD to create and implement an electronic case management system by 2020. | What's in place now? Why not until 2020? |
|---|---|

### INDEPENDENT MONITOR

| ▢ Requires evaluation by an independent monitor who will publicly report on consent decree progress and assist the federal judge overseeing the case with enforcement. | These reports must be made available in formats other than written/online. On demand audio/video, etc. |
|---|---|
| ▢ A Request for Proposals (RFP) was issued on July 27, 2018. Responses are due Sept. 4 and will be posted at chicagopoliceconsentdecree.org for public comment. A public forum will also be held with independent monitor finalists. | NOTE – future community input needed |
| ▢ The Attorney General's Office and the City will consider all information gathered during the | |

| monitor selection and make recommendations to the federal judge overseeing the case for consideration and approval. | |

### IMPLEMENTATION, ENFORCEMENT, & MONITORING

| ▪ Filed in federal court, the consent decree will operate as a federal court order once approved by a judge. | |
|---|---|
| ▪ Terminates only when the City and CPD have demonstrated full and effective compliance. | Who decides when full & effective compliance is achieved? How will this be different from the past Chicago consent decrees with public schools & park district. |

### GENERAL COMMENTS/QUESTIONS:

- Use of 'best efforts' although defined, is concerning in how this may be interpreted very differently without specific measures.
- What are the current measures for the many references to 'improve', 'address', 'enhance' various?
- Which items in the decree rely on the Union contract being changed?
- The fact sheet is lacking in detail – the entire doc really needs to be read. Adding links to background material & offering examples will help citizens to understand.
- What are the baseline facts/stats for use of force, current training, etc.?
- Why do some things have to wait for 2020 vs 2019?
- Will the new rules also help police understand/train for what they CAN do to effectively deal with violent situations & not feel 'tied down by regulations'?
- Police comments show the contempt & racism within the department. What will be done to identify, address through training & eliminate officers who refuse to or are unable to change?
- Recruitment & training & accountability – racism is a huge problem in the city in general & CPD specifically.
- Need to look at being over policed in other ways as well with tickets, etc.
- COPA/IPRA – sometimes doesn't do the best job investigating bad cops due to withholding facts.
- Misconduct – political protection is the worst thing that enables bad police behavior.
- Community training – lacking in this decree is a program for the community to be educated on our rights & rights of the police

## Appendix B
## Community Centered Policing
## To be integrated into "principles in all CPD operations"

| Current Community policing practice | Proposed reforms |
|---|---|
| 1 - CAPS | The city should try to keep the CAPS name and vigorously restore the brand, if at all possible. |
| 2 - Meetings every other month | Restore monthly meetings. Boost attendance with an all-out campaign to canvass each beat thoroughly and get citizens out. |
| 3 - Police-Community engagement | Scan best practices from more successful cities to increase police-community participation and partnering.<br>Ensure that police district mirror the same programs across the board instead of varied programs from district to district |
| 4 - Special city-wide programs and strategies | Ensure that there remains a strong finance/funding of the city's main community relations strategies like the Chicago violence Reduction strategy, so that they can become familiar and have a chance to be inculcated in the various troubled neighborhoods. |
| 5 - District CAPS operations (Beat meetings) | Usage of a regular meeting format which follows a best practice specific curriculum of the exercise of problem solving.<br><br>Engage in multiple police jurisdictional attendance e.g. Metra, Cook County, State, Railroad etc. |
| 6- District CAPS operations (Court Advocacy) | Pursue the provision of enhanced support of court advocates, in transportation and lunches to compensate for the most stressful and taxing section of CAPS partnering. This advocacy is most vital and has been consistently undervalued, even neglected. in the grand scope of things. |
| 7 - District CAPS operations ( | Required meetings at the home office/facility of community-based organizations. At least quarterly. |
| 8 - District CAPS operations (CAPS training) | A larger pool of officers, other than CAPS officers, need to be trained in the community centered policing strategies, e.g. problem solving in community meetings, |
| 9 - District CAPS operations (Manpower) | Expand CAPS office manpower to cover office and street operations, which give the public enhanced opportunities to build relationships with those officers. |

| | |
|---|---|
| | Districts need 2 community organizers assigned, to manage the relationships, lists and connections to the community, available for phone connections and maintaining a strong community calendar and social media platforms. |
| 10 - District CAPS operations (Schedules) | Maintain a strong community calendar which tracks all know events, community meetings, vigils, sporting events and school closures. |
| 11 - District CAPS operations | |
| 12 - District beat operations | Beat officers mandatory attendance of CAPS meeting and mandatory follow up with beat facilitator when officers miss meetings for any reason. Face to face contact.

Also beat officers' mandatory distribution of next beat meeting information date, time, location along with their business card to victims and complaining citizens along with victim info after completing a case report. |
| 13 - District beat operations (Foot Patrol) | Mandatory use of VETERAN OFFICERS to do meaningful foot patrol. 1-hour increments to build relationships in areas of concern. |
| 14 - District beat operations (Park District coverage) | Strongly Reform past practices. Improve former sign in log process which are seriously out dated. Police supervisors as well as park manager retain sheets for officer performance evaluation of duty. Mandatory check of the full facility, locker rooms, upstairs, gymnasiums and supervisor office areas.

Walk the ball fields when participants are present. |
| 15 - District beat operations (Vehicle identifiers) | Strong enforcement of the display and maintenance of marked patrol vehicles (Beat tags) to be properly displayed at all times so that the community can know who they are and attain trust in what their patrol responsibilities are. |
| 16 - District beat operations (District Border patrol) | Ensure that patrolling officer do not neglect the "other side of the border" when engaging along streets that divide one district from another. Ensure provision of full confidence from the citizen that officers will take action on both sides of the street and not neglect crime because it belongs to the other district. |
| 17 - District beat operations (Combine services) | Increase every possible community event engagement and show positive teamwork with State and county officers who have patrol jurisdictions which. |

Maxwell Little

**Written Comments on Consent Decree**

**REDACTED**

**Submission date:** October 12, 2018

**Author:** Maxwell Little, M.Ed

**FILED**

**Submitted to Responsible Office:** CLERK OF COURT

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**Re: State of Illinois vs. City of Chicago, Case No. 17-cv-6260**

Dear Honorable Judge Robert M. Dow Jr.,

## CONSENT DECREE INPUT - Recommendation for Section: Training VII Focus on Continuing Education for Chicago Police Officers

### I. Background/Reason for Proposed Policy

Currently, the educational requirement to become a Police Officer in the United States of America generally requires a high school diploma or 60 college credit hours (Bureau of Labor Statistics, U.S Department of Labor, 2018; USA Today Classifieds Blog, 2017). For example, the Chicago Police Department educational requirement states the following:

- 60 semester hours (90 quarter hours) from an accredited college or university, or 3 years active duty, or one year active duty and 30 semester hours (45 quarter hours).

The Bureau of Labor under Police and Detectives occupational handbook states that "most police and detectives must graduate from their agency's training academy before completing a period of on-the-job training. Candidates must be U.S. citizens, usually at least 21 years old, and able to meet rigorous physical and personal qualifications" (Bureau of Labor Statistics, U.S Department of Labor, 2018).

If candidates are required to meet rigorous physical and personal qualifications, they must also be required to meet rigorous educational qualifications before completing a period of on-the-job training. This new policy proposal urges a rigorous educational requirement for the Chicago Police Department hiring qualification – Mandatory *Critical Race Theory* classes.

While in graduate school I conducted a content analysis study examining course objectives in the law enforcement training certificate program at Moberly Area Community College. I was particularly exploring criminal justice course content that would be taught to students seeking to enter the field of law enforcement, mainly as a police officer. My goal was to understand what students are learning by using the social science framework of Critical Multiculturalism, similar to Critical Race Theory (CRT) as both theories take an intersectional examination of race and other social identities to challenge and critique historical and current systems of power that operate to subordinate marginalized communities. What I discovered was a lack of diversity training, discussions about race or ethnic studies, gender and sexual identities, economic exploitation, and other forms of marginalization and injustices within society. From my opinion, the students in the program did not receive an adequate education that would prepare them to understand the multiplicity of societal issues. CRT is dedicated to developing critical thinking skills that law enforcement officers must have in order to establish trusted relationship with the diverse communities they serve.

CRT is a pedagogy that creates critical dialogue between individuals and groups that facilities a challenging learning environment where the examination of self and institutions we serve and socialize in are explored to discover whether or not we are more or less complicit in the subordination of historically oppressed people and communities.

Here is an excerpt from my working paper examining law enforcement curriculum:

Psychologists Joshua Correll and Anonthy Greenwald (2003) conducted a study and asked participants to press down to fire a shot or to not fire a shot at male participants either holding a gun or harmless object. The findings were disturbing and illuminated a serious racial and prejudice dangerous problem. Participants fired shots more often at Black targets that were holding harmless objects (as cited in Myers, 2010). Furthermore, Black males are more likely to be seen as a suspect and weapon carriers which influence discriminatory behavior, implicit biases, and automatic prejudices that "can have life or death consequences" (Myers, 2010, p. 314). It is socially constructed thought patterns and studies such as these that help explain why America witnessed the tragic death of Walter Scott (a Black male) who was shot eight times and killed by Michael Slager, a White police officer (Keneally, 2015). What Myers did not address is that individuals understanding of the world and their view of society are formed through historical distributions of power and privilege that gives supremacy to Whites while oppressing non-Whites (Kincheloe & Steinberg, 1998).

### Why does CRT continuing education matter for Chicago Police Department?

There exists a historical and present day level of mistrust between the police and communities of color in America. Tensions are especially high within concentrated communities of color e.g., Chicago. Mapping Police Violence.org has been credited for providing credible statistics on police violence in America. In 2017, Mapping Police Violence reported that the police killed 1,147 people in 2017 and Black people represented 25% of those killed despite being only 13% of the United

States of America population. The more we read into the statistics, the more we see that there is a serious problem with race and law enforcement in this country. Black people are three times more likely to be killed by law enforcement than their White counterparts (Mapping Police Violence, 2018). In 2015, 36% of unarmed people killed by police were Black - unarmed Black people were killed at 5times the rate of unarmed Whites in the same year.

In 2016, the Pew Research Center discovered that "that Blacks are 25 percentage points more likely than whites to say the deaths of Blacks during encounters with police in recent years are signs of a broader societal problem and not merely isolated incidents" (Morin & Stepler, Pew Research Center, 2016). In 2017, there were 68 reported people killed by Chicago Police and 51 of those 68 killed were Black people – many times killed an unarmed.

The Department of Justice recently released a critical investigation report of Chicago Police Department upon receiving an outcry from the community after witnessing the shooting of a Black teenager named Laquan McDonald. The following is an excerpt from the Department of Justice findings:

It has never been more important to rebuild trust for the police within Chicago's neighborhoods most challenged by violence, poverty, and unemployment. As discussed below and throughout our Report, Chicago must undergo broad, fundamental reform to restore this trust. This will be difficult, but will benefit both the public and CPD's own officers...

Our finding that CPD engages in a pattern or practice of force in violation of the Constitution is based on a comprehensive investigation of CPD's force practices and a close analysis of hundreds of individual force incidents. We reviewed CPD's policies related to the use, reporting, and investigation of force, including older versions of polices that were effective during our review period, and CPD's proposed revised policies. We spoke with officers at all ranks, including the Superintendent and the Chief and Deputy Chief of the Bureau of Patrol, to understand how officers are trained to use force, their view of when force is appropriate, and how the policies are interpreted in practice throughout CPD. We also did an in-depth review of officer reports of force, civilian complaints of force, and CPD's and IPRA's review of force, and investigations of allegations of excessive force. We reviewed all documents we were provided related to over 425 incidents of less-lethal force, including representative samples of officers' own reports of force, and of investigations of civilian complaints about officer force between January 2011 and April 2016. We also reviewed over 170 files related to officer-involved shootings. The pattern of unlawful force we found resulted from a collection of poor police practices that our investigation indicated are used routinely within CPD. We found that officers engage in tactically unsound and unnecessary foot pursuits, and that these foot pursuits too often end with officers unreasonably shooting someone—including unarmed individuals. We found that officers shoot at vehicles without justification and in contradiction to CPD policy. We found further that officers exhibit poor discipline when discharging their weapons and engage in tactics that endanger themselves and public safety, including failing to await backup when they safely could and should; using unsound tactics in approaching vehicles; and using their own vehicles in a manner that is dangerous. These are issues that

can and must be better addressed through training, accountability and ultimately cultural change (See Department of Justice, 2017).

Moreover, within the Department of Justice investigation and findings, the word *education* appears a total of 10 times. Within the 10 times education appears, the only continuing education Chicago Police officers may experience as reported by the Department of Justice:

CPD also does not provide regular refresher trainings on important basic skills that can help reduce the need for the use of force, including deadly force. These include proper handcuffing techniques and pursuit tactics. **At a minimum, generally accepted police practices dictate at least 40 hours of continuing education per year, which usually includes roughly 24 hours of force-refresher skills**. Several CPD officers reported to us that, once they left the Academy, they were not required to retrain on any basic skills (Department of Justice, 2017).

We must challenge and change the current hiring practices of Chicago Police Department. Understanding the power and privileges police officers occupy in society, failing to examine and challenge educational requirements is dangerous to the Chicago Police Department, the officers themselves, but it is especially dangerous for community members – especially people of color. An uncritical examination of why a rigorous educational requirement does not exist for law enforcement officers preserves the status quo.

Ian Haney Lopez (2006) stated that "law influences what we look like, the meaning ascribed to our looks, and the material reality that confirms the meanings of our appearances" (p. 79). We have witnessed Black men and women being murdered by law enforcement officers all too often – many times unarmed, many times when there is no reasonable suspicion of criminal activity.

Concerned scholars and citizens can no longer allow our state and local law enforcement agencies to weaponize Blackness. We must confront individuals within law enforcement who exhibit excessive acts of violence, but we must also confront, challenge, and critique our complicit criminal justice system for perpetuating state sanctioned police violence within communities of color. The absence of Critical Race Theory curriculum in law enforcement education is not only dangerous but, it is a form of educational violence. An uncritical examination of negative social constructs concerning communities of color and individuals who live in those communities created under the umbrella of white supremacy is dangerous. We must hold legislators and law enforcement policy-makers accountability and fight to change inadequate educational requirements in law enforcement for the safety and protection of all communities.

I propose that we start at the most critical level and that is requiring all police officers in Chicago (including leadership and department staff) to take rigorous Critical Race Theory courses.

## II. Overview of Proposed Policy

1. From having studied Critical Race Theory and conducting a working paper on a law enforcement certificate program while earning my master's degree in Educational Leadership and Policy Analysis, I propose to help build the necessary curriculum along

with Chicago Police Policy makers, invested community members, knowledgeable CRT scholars, and other necessary constituents.

2. I propose that the Consent Decree final draft include a continuing educational requirement for the Chicago Police Department hiring qualifications by January 1, 2020.

3. I propose that all new candidates be required to take Critical Race Theory designed courses while enrolled in required training academy. I propose current, including veteran and leadership within Chicago Police Department take Critical Race Theory designed courses as continuing education throughout the year. I propose that upon completion of courses within the Critical Race Theory Academy, each successful candidate will receive a certificate of completion.

4. I propose that Chicago Police Policy makers collaborative with local colleges and universities to establish earned college credit for successful completion of Critical Race Theory Academy.

5. I propose that while candidates and officers are enrolled in the designed courses that they are to meet 60 hours of community engagement within the districts they will serve or currently serve in order to build customized relationship with community members. I propose this to be done in or out of uniform – preferably out of uniform e.g., on an off day.

6. I propose the Chicago Police Department to host a Critical Race Theory conference one year after the first graduating Critical Race Theory Academy Class. This conference proposes to allow those of have successfully completed the Academy to present their work i.e., papers from classes and research to discuss among their peers and other law enforcement agencies from other cities and states.



Maxwell Little

# REDACTED

**Written Comments on Consent Decree**

**Submission date:** October 12, 2018

**Author:** Maxwell Little, M.Ed

**Submitted to Responsible Office:** CLERK OF COURT

**FILED**

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604

**Re: State of Illinois vs. City of Chicago, Case No. 17-cv-6260**

Dear Honorable Judge Robert M. Dow Jr.,

**CONSENT DECREE INPUT - Recommendation for Section VI Recruitment, Hiring, and Promotion: Focuses on strengthening the Chicago Police Department Application**

### I. Background/Reason for Proposed Policy

The Department of Justice Investigate Report on Chicago Police Department found that the Chicago Police Department has engaged in systemic racially discriminatory conduct. For example, the Department of Justice Investigate Report found:

Our investigation found also that CPD has tolerated racially discriminatory conduct that not only undermines police legitimacy, but also contributes to the pattern of unreasonable force. The pattern or practice of unreasonable force, coupled with the recurrence of unaddressed racially discriminatory conduct by officers further erodes community trust and police effectiveness. Our review of complaints of racially discriminatory language found repeated instances where credible complaints were not adequately addressed. Moreover, we found that some Chicago police officers expressed discriminatory views and intolerance with regard to race, religion, gender, and national origin in public social media forums, and that CPD takes insufficient steps to prevent or appropriately respond to this animus. As CPD works to restore trust and ensure that policing is lawful and effective, it must recognize the extent to which this type of misconduct

contributes to a culture that facilitates unreasonable force and corrodes community trust. We have serious concerns about the prevalence of racially discriminatory conduct by some CPD officers and the degree to which that conduct is tolerated and in some respects caused by deficiencies in CPD's systems of training, supervision and accountability. In light of these concerns, combined with the fact that the impact of CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods, restoring police-community trust will require remedies addressing both discriminatory conduct and the disproportionality of illegal and unconstitutional patterns of force on minority communities (Department of Justice Investigation Report, 2017).

Currently, the Chicago Police Department hiring standards does not include a questionnaire on the application that would exclude potential candidates from being hired if they have expressed discriminatory views and intolerance with regard to race, religion, gender, and national origin by using the Computer Voice Stress Analyzer exam. If the Department of Justice Investigative Report discovered that the Chicago Police Department has discriminated against citizens of Chicago based on race and other social identities, it makes sense that the department be required to include a questionnaire that would eliminate potential candidates who have expressed discriminatory behavior. By doing this, the department will strengthen its hiring practices and gain trust with communities of color.

Recently, the Chicago Police Department relaxed its hiring standards by eliminating past marijuana use as an automatic disqualifier provided candidates have not smoked in the last three years. If the Chicago Police Department can eliminate past marijuana usage in the last three years to increase their applicant pool, they ought to implement a questionnaire to exclude individuals who have exhibited discriminatory views and intolerance with regard to race, religion, gender, and national origin. In order to change a system, we must challenge institutional practices to rid the system of root problems.

## II. Overview of Proposed Policy

1.    From having experienced going through a hiring process to become a police officer in Columbia, Missouri and knowing that the Chicago Police Department has a history of exhibiting discriminatory behavior which have life and death consequences for people of color, particularly Black and Latin@ people in the city of Chicago, I propose that the Chicago Police Department be mandated to strengthen its hiring standards by implementing a questionnaire that would exclude potential candidates from being hired if they have expressed discriminatory views and intolerance with regard to race, religion, gender, and national origin.

2.    I propose that Chicago Police Department implement the above questionnaire and use the Computer Voice Stress Analyzer exam to see if potential officers are being deceptive while answering the proposed question in order to validate the truth.

3.    I propose that this policy be implemented under the consent decree.

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

    **I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

    I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

    I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

SHYWNA KWMAN

*Printed full name*

October __/()__, 2018

**REDACTED**

**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

David D. Daniel

_____

*Printed full name*

NA 1 N. Daniel

**REDACTED**

October 10, 2018

2

$\beta5$

**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Annette Banks*

*Printed full name*

October __10__, 2018

**REDACTED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Sleji Baiju
_____
*Printed full name*

October ___11___, 2018

**REDACTED**

2

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



FILED

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Antonia Coleman*

*Printed full name*

October 10, 2018

**REDACTED**

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Larry Bienz*

*Printed full name*

October 10, 2018

**REDACTED**

Case: 1:17-cv-06260 Document #: 338 *SEALED* Filed: 10/12/18 Page 1 of 2 PageID #:3183



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



FILED

OCT 1 2 20..

THOMAS G. BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Tabitha Y. Hightower

*Printed full name*

October 10, 2018

**REDACTED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Richard Mays

*Printed full name*

October 11, 2018

**REDACTED**

2



Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20ᵗʰ Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Myrnalis Rios - Nieves

*Printed full name*

October __10__, 2018

**REDACTED**

**FILED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**, (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

DICKSON PETER BARASA OKAKA          October ___10___ , 2018

*Printed full name*


**REDACTED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018

THOMAS G BRUTON
CLERK, U.S DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

_[signature]_

October ___ , 2018

*Printed full name*
LINDA M EA…

**REDACTED**

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260



FILED
OCT 1 2 2018
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility**. (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Spencer Neiman

*Printed full name*

October 09, 2018

**REDACTED**

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 1 2 2018 

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Dagmeandu Reneay*

*Printed full name*

October __11__, 2018

# REDACTED

2



United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 12 2018 LA

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits**. Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints**. (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought**. Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

women about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Printed full name*

October 11, 2018

**REDACTED**

2

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

# FILED

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

bulletin about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

*Maria Elena Sifuentes*

*Printed full name*

October __11__, 2018

**REDACTED**

2

United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604
Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

**FILED**

OCT 12 2018 *LA*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

To the Honorable Robert M. Dow Jr.:

**I write to support a consent decree to reform the pattern of excessive force by the Chicago Police Department** (CPD), which has had a profound impact on too many Black and Latinx Chicagoans and people with disabilities. The proposed consent decree includes long overdue reforms to ensure the City and CPD recruits, hires, trains, and supervises officers to respect the constitutional and civil rights of *all* people in Chicago. Over the past few decades, our leaders have not been able or willing to follow-through on promises to stop unlawful patterns and practices of misconduct by CPD. Ongoing oversight from this Court is necessary to ensure patterns of excessive force do not continue for decades more.

I also believe that the proposed consent decree does not go far enough. Some steps I expect the City to take outside of this consent decree process, such as finally passing an ordinance on civilian oversight developed with GAPA. Other steps, like the reforms advocated by the plaintiffs in the *Communities United, et al. v. City of Chicago* and *Campbell v. City of Chicago* lawsuits (the Coalition) regarding the need to expand diversion efforts, support survivors of police violence, limit use of force in schools, and improve crisis intervention, can and should be addressed by the Parties in this consent decree before it is finalized.

I want to draw the Court's attention to a few discrete gaps before the consent decree is approved:

1. **The City Should Investigate All Incidents That Lead to Lawsuits.** Taxpayers have to pay for settlements of lawsuits regarding officer misconduct based on the City Law Department's work, while COPA—a separate City agency which oversees police officers—is not required to investigate the facts alleged in those lawsuits. COPA should be <u>required</u> to dedicate resources to investigate these incidents in order to prevent repeat, unnecessary harm (and millions of dollars in settlements) when the City is aware of the officers' bad behavior. (Proposed Decree ¶ 485) COPA also should investigate when a criminal court finds there has been misconduct.

2. **Investigative Agencies Should Be Required to Preserve Evidence Promptly Upon Receiving Civilian Complaints.** (¶ 460) The agencies must reach out to third parties within hours, or at least within a couple days, of receiving a complaint to try to preserve evidence like videos that businesses and others routinely delete.

3. **Disabilities Should Not Be an Afterthought.** Approximately 1 in 4 Chicagoans have a disability, so disabilities need to be considered in every way police interact with the public and they certainly must be considered when officers use force. Putting a training

1

culture about disabilities in officers' mailboxes won't adequately prepare them to respectfully and safely interact with the public. (¶ 69) This is insufficient to address the disproportionate use of excessive force against people with disabilities. Also, CPD should be required to safeguard personal health information they collect about people. (¶ 120)

4. **CPD Should Not Decide for Itself Whether It Is Discriminating.** (¶ 80) While CPD should learn how to identify its own discrimination, for the public to be able to trust the findings, an independent monitor must decide what standards will be used to assess discrimination. The proposed decree allows the CPD to select its own statistical methods.

5. **CPD Should Have a Process to Share Findings Related to Officer Credibility.** (¶ 445) In 2017, the Department of Justice report noted with surprise that Chicago does not have a system in place for CPD to provide findings related to officer credibility to prosecutors so the information may in turn be provided to criminal defendants. This process is required under the constitution. Why doesn't CPD automatically provide this information? All too often victims of excessive force by CPD officers are criminally charged and forced to defend themselves in court. They, and defense attorneys, should not have to know to make special requests to try to get this important information.

I also want to express my frustration that there are many other reforms that are needed to create accountability for officers' misconduct, but which are not addressed in the proposed consent decree because the decree does not alter the police unions' contracts. (¶ 711) I expect the City to prioritize removing these contractual barriers to reform when it negotiates collective bargaining agreements.

Finally, I thank the Court for providing this opportunity for comments and for carefully considering this decree; the many CPD members who contributed to the decree and are working hard to improve the Department; the Coalition of organizational plaintiffs who has educated the community about the decree and has committed to monitoring and enforcing it; and the Attorney General for bringing this lawsuit on behalf of residents. We all must view this consent decree as a starting point, rather than a finish line, for repairing institutions that caused decades of mistrust of law enforcement and the justice system.

Respectfully,

Tyrone Baggett

*Printed full name*

October 11, 2018

**REDACTED**



**SIDLEY**

SIDLEY AUSTIN LLP
ONE SOUTH DEARBORN STREET
CHICAGO, IL 60603.
+1 312 853 7000
+1 312 853 7036 FAX

AMERICA • ASIA PACIFIC • EUROPE

**REDACTED**

October 12, 2018

FILED

*Via Messenger*

Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 S. Dearborn St., 20th Floor
Chicago, IL 60604

OCT 12 2018 \|\(\)

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Re: *State of Illinois v. City of Chicago*, Case No. 17-cv-6260

Dear Judge Dow,

I write on behalf of my clients, Central Austin Neighborhood Association ("CANA") and the American Civil Liberties Union of Illinois ("ACLU") (together "Plaintiffs") about a provision in the proposed consent decree concerning police deployment. On balance, Plaintiffs support the proposed consent decree, which will bring long-needed reforms to the Chicago Police Department. However, the Plaintiffs are particularly concerned that the proposed consent decree's reference to "property crime" as a metric for deployment may be interpreted in a way that creates a conflict with Plaintiffs' ongoing efforts to reform the police department through their pending lawsuit in state court. The purpose of this comment is to identify Plaintiffs' concern before any decree is entered, and to encourage the Court and monitor to consider other reform efforts when implementing the decree.

Plaintiffs are currently challenging the City's police deployment practices in a pending state court action, *CANA v. City of Chicago*, No. 11 CH 37299 (Circuit Court of Cook County). Ex. 1, Compl. Plaintiffs contend that the City's methods for deploying police officers violate the Illinois Civil Rights Act, which prohibits the City from providing government services in a way that results in an unjustified racially disparate impact. *Id.* at 1-2. Specifically, the complaint alleges that the City's deployment of police officers results in inequitable police response times to 911 calls in predominantly Black and Latino neighborhoods in Chicago (as compared to white neighborhoods in Chicago). *Id.* Additionally, there are more instances of "RAPs" in Black and Latino neighborhoods: A "RAP" occurs when no officer is available to respond to a call involving danger to a person's safety or property. *Id.* at 4-6.

The proposed consent decree appropriately requires the City to create a deployment plan—doing so will help address the span of control between sergeants and officers. Plaintiffs support the consent decree's requirement that the City create a deployment plan, but they are concerned about its requirement that the City consider "property crime" as a metric when

SIDLEY AUSTIN LLP IS A LIMITED LIABILITY PARTNERSHIP PRACTICING IN AFFILIATION WITH OTHER SIDLEY AUSTIN PARTNERSHIPS

# SIDLEY

Honorable Robert M. Dow, Jr.
Page 2

crafting that plan. *See* Dkt. 107-1, Consent Decree, para. 361(c). "Property crime" is not defined in the proposed consent decree, and Plaintiffs are concerned that certain kinds of property crimes are more frequently reported in predominantly white neighborhoods. The inclusion of "property crime" as a metric may therefore result in a deployment plan that places too many officers in these neighborhoods, despite the greater need for officers in Black and Latino communities to respond to non-property crimes.

The proposed consent decree does not list all the factors that the City must consider when creating the deployment plan. Plaintiffs believe that whatever deployment plan results from the consent decree could be consistent with the goal of racially equitable police response times. However, the inclusion of "property crime" as a metric may unnecessarily complicate the reform efforts in both lawsuits if the City takes the position that "property crime" must be considered in every deployment plan during the pendency of the decree. Plaintiffs suggest that "property crime" be removed from the consent decree. However, if the decree is entered with the inclusion of that term, the consent decree should be construed as complementary to, and not contrary to, other reform efforts.

Very truly yours,

*Eric S. Mattson*

Eric S. Mattson

Exhibit 1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

THE CENTRAL AUSTIN       )
NEIGHBORHOOD ASSOCIATION and  )
THE AMERICAN CIVIL LIBERTIES   )
UNION OF ILLINOIS,          )     **11CH37299**
                           )
        Plaintiffs,       )
                           )
       v.              )
                           )
THE CITY OF CHICAGO,       )
                           )
        Defendant.      )

**FILED**
CH
OCT 27 2011
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## COMPLAINT

Plaintiffs, the Central Austin Neighborhood Association ("CANA") and the American

Civil Liberties Union of Illinois ("ACLU"), on behalf of their respective members, by their

attorneys, for their complaint against defendant the City of Chicago allege as follows:

## NATURE OF THE ACTION

1.    This is a civil rights suit brought pursuant to the Illinois Civil Rights Act of 2003,

740 ILCS 23/5, challenging the City of Chicago's method of deploying police services in the

City of Chicago (or "the City"). This method utilizes criteria that result in a greater frequency of

delays in dispatching police officers to respond to 911 calls for service in neighborhoods that are

predominantly African American and Hispanic ("minority neighborhoods or districts"[1]) than in

predominantly white neighborhoods ("white neighborhoods or districts"[2]). Delays in dispatching

officers cause both longer response times and more denials of service to minority neighborhoods

as compared to white neighborhoods. Thus, the City's deployment practices have a

---

[1] Minority neighborhoods and districts are neighborhoods and districts where African Americans and/or Hispanics comprise the majority of residents.

[2] White neighborhoods or districts are neighborhoods and districts where whites comprise a majority of residents.

1

disproportionally adverse effect on people who live in minority neighborhoods, including members of CANA and the ACLU. Despite this well-known, long standing disparity, the City has failed to deploy police officers to minority neighborhoods in a manner which ensures equal 911 services. Plaintiffs seek declaratory and injunctive relief.

2.      The Illinois Civil Rights Act of 2003, 740 ILCS 23/5, prohibits local governments such as the City from "utiliz[ing] criteria or methods of administration that have the effect of subjecting [Plaintiffs] to discrimination because of their race, color, [or] national origin[.]"

3.      The City violates this law through its method of police deployment.

## THE PARTIES

4.      CANA is a non-profit, community organization whose members are residents of the Austin neighborhood of Chicago. CANA focuses on improving Austin by promoting public safety, beautification and economic development.

5.      The ACLU is a non-profit, non-partisan, statewide organization with more than 20,000 members and supporters, dedicated to protecting and expanding the civil rights and civil liberties enshrined in the United States and Illinois Constitutions. In particular, one of the ACLU's primary purposes is ensuring that all persons are treated fairly by our government and receive equal services and benefits. The ACLU has members throughout Chicago, including the minority neighborhoods of Austin, Chicago Lawn, Grand Central, and Englewood.

6.      The City is responsible for deploying police officers throughout the City. It is a "local government" subject to the Illinois Civil Rights Act of 2003. 740 ILCS 23/5.

2

**FACTS**

A.    Historical Disparities in Police 911 Services

7.      For over two decades, the City has deployed police across the City's districts in a manner that provides fewer resources to minority neighborhoods than white neighborhoods as measured by responsiveness to 911 calls.

8.      For example, in 1992, a report by the consulting firm Booz, Allen, Hamilton, hired by the City to conduct a study of Chicago Police Department (the "CPD") operations, including officer deployment, concluded that the CPD did not deploy officers to districts in proportion to 911 calls and crime rates. As a result, the report found that officers in busier districts took longer to respond to both emergency and non-emergency calls for service. The districts with higher crime, proportionately fewer officers and longer response times were minority districts.

9.      A 1992 study by University of Illinois, authored by professors Barry Rundquist and Jungho Rhee, showed that African-American districts had fewer patrols per 1,000 violent crimes than white districts.

10.     In 1993, the Chicago Reporter published an article showing that police officers had to respond to more crimes and more 911 calls in African-American districts as compared to officers assigned to white police districts.

11.     In 1993, the Illinois Advisory Committee to the U.S. Commission on Civil Rights produced a report showing that neither the number of a district's 911 calls nor the number of violent crimes in that district were related to a significant degree to the number of police officers the CPD allocated to the district. As a result, African-American districts, which tended to have more violent crimes, suffered because the CPD assigned them fewer police resources than white

3

districts. African-American districts were assigned fewer police officers per 1,000 violent crimes than white districts.

B.    Current Police Deployment Results in Disparate Delays and Denials of 911 Services

12.    The Office of Emergency Management and Communications ("OEMC") answers 911 calls and dispatches emergency personnel, including Chicago police officers, to respond to calls.

13.    When a 911 call requires police response, beat officers are the first officers dispatched to respond to the call for service.

14.    When a district receives a high number of 911 calls, OEMC dispatchers cannot dispatch or assign a call if no officers in the district are available.

15.    OEMC dispatchers are authorized only to dispatch officers in response to a call from the police district where that call originates.

16.    When there are no officers available to dispatch to a 911 call, the district is in a "radio assignments pending" situation, or "RAP."

17.    While a district is in RAP, OEMC dispatchers continue to answer 911 calls from that district, but dispatching officers in response to these incoming calls, no matter their nature, is delayed. A district remains in RAP until officers are dispatched to all of the backlogged 911 calls.

911 Calls and Delayed Responses

18.    The City has refused to provide information in response to the ACLU's Freedom of Information Act ("FOIA") requests for information about police deployment, including the redeployment of officers to beat duty under the current administration ("redeployment"), and 911 responses, including RAPs, for all of the City's twenty-five police districts.

4

19.     However, responsible media have published relevant information obtained from sources.

20.     Two districts, Town Hall and Chicago Lawn, were featured in a Chicago Sun-Times article on police response to 911 calls for service. *See* Frank Main and Fran Spielman, "Fewer Cops on North Side?" Chicago Sun-Times (Nov. 22, 2010).

21.     District 23, Town Hall, which includes parts of the neighborhoods of Lincoln Park and East Lakeview in northeastern Chicago, is a white district.

22.     District 8, Chicago Lawn, which is on the southwest side of Chicago, near Midway Airport, is a minority district.

23.     According to an unnamed source cited in the article, between January 2009 and October 2010, residents in Town Hall called 911 for service 64,000 times and residents in Chicago Lawn called 911 for service 130,000 times. Frank Main and Fran Spielman, "Fewer Cops on North Side?" Chicago Sun-Times (Nov. 22, 2010).

24.     According to the article, Town Hall went into RAP 17 times while Chicago Lawn went into RAP 885 times during that same time period. Therefore, Chicago Lawn residents calling 911 faced a situation where there were no police cars to respond to their aid at least 52 times more often than residents of Town Hall.

25.     According to the Chicago Sun-Times article, other minority districts, such as South Chicago (District 4), Englewood (District 7), Harrison (District 11), and Grand Central (District 25), had a higher number of 911 calls and RAPs than white districts.

26.     The white districts of Jefferson Park (District 16) and Foster (District 20) had a lower number of 911 calls and RAP situations as compared to the minority districts.

5

27. The delays in dispatching police to 911 calls in minority districts continue to the present based on current data showing higher numbers of 911 calls, higher incidents of serious violent crime, and proportionately lower numbers of police officers in minority districts as compared to white districts. Furthermore, the City refuses to provide any data to show that it has corrected the inequity.

Data on 911 Calls

28. As recognized by the historical reports referenced in paragraphs 7 through 11 and the data in paragraphs 20 through 26, the number of RAPs is directly related to the number of 911 calls.

29. In response to a FOIA request by the ACLU, the OEMC provided data showing the total number of 911 calls by district for April 2010 through March 2011. While the OEMC refused to provide data on Priority 1 calls for all districts, it did so for six districts. These Priority 1 calls involve an immediate threat to a person's life or property.

30. The data for the districts are attached to and incorporated in this complaint as Exhibit 1.

31. According to this data, minority districts continue to have the highest number of 911 calls. For example, the following districts, which also were identified as having a large number of RAPs, had more 911 calls than white districts:

    a. Chicago Lawn had 357,360 calls (59,473 Priority 1).

    b. South Chicago had 279,646 calls.

    c. Englewood had 325,185 calls (65,272 Priority 1).

    d. Harrison had 302,530 calls.

    e. Grand Central had 349,466 calls (48,444 Priority 1).

6

32.     In contrast, the white districts identified as having a low number of RAPs continued to have fewer 911 calls per district:

     a.  Town Hall had 153,627 calls (18,125 Priority 1).

     b.  Jefferson Park had 191,462 calls.

     c.  Foster had 147,672 calls.

33.     Minority districts continue to have higher numbers of 911 calls as compared to white districts.

34.     The recent redeployment of police officers does not equalize the number of police officers proportional to the number of 911 calls per district.

35.     A recent article cited an anonymous police source for the total number of police officers deployed to each district after the redeployment. *See* Dan Mihalopoulos and Hunter Clauss, "In High-Crime Areas, Still Too Few Police," Chicago News Cooperative (Oct. 21, 2011).

36.     The data for every district, including data on rates of crime, are attached to and incorporated in this complaint as Exhibit 2.

37.     A comparison of the data on the number of 911 calls provided by the OEMC with the number of officers per district published by the Chicago News Cooperative shows a vast disparity between districts in the number of 911 calls per officer.

38.     Minority districts are the districts with the most 911 calls per officer. The following districts are examples:

     a.  The minority district of Chicago Lawn has 995 calls per beat officer.

     b.  The minority district of Grand Central has 1,106 calls per beat officer.

     c.  In contrast, the white district of Near North has 752 calls per beat officer.

7

      d.  The white district of Foster has 753 calls per beat officer.

    39.    Based on the data provided by the OEMC, minority districts also have more Priority 1 calls per beat officer.

      a.  The minority district of Austin had 131 Priority 1 calls per beat officer.

      b.  The minority district of Englewood had 169 Priority 1 calls per beat officer.

      c.  The minority district of Chicago Lawn had 166 Priority 1 calls per beat officer.

      d.  The minority district of Grand Central had 153 Priority 1 calls per beat officer.

      e.  In contrast, the white district of Town Hall had 95 Priority 1 calls per beat officer.

    40.    Because there are more 911 calls per beat officer in minority districts, there continue to be more delays in dispatching police officers in response to 911 calls in those districts than in white districts.

C.    <u>Data on Crime</u>

    41.    As recognized by the historical reports referenced in paragraphs 7 through 11 and the data in paragraphs 20 through 26, the rate of crime in a district is directly related to the number of 911 calls and delays in responses to 911 calls.

    42.    The CPD tracks index and non-index crimes in the districts. Index crimes are the most serious crimes and include murder, criminal sexual assault, robbery, aggravated assault, aggravated battery, burglary, larceny/theft, motor vehicle theft, and arson.

    43.    Non-index crimes include simple assault, simple battery, forgery, counterfeiting, fraud, embezzlement, stolen property offenses, vandalism, weapons charges, prostitution, sexual offense and criminal sexual abuse, drug violations, gambling, offenses against the family, liquor violations, and disorderly conduct.

8

44.     The minority districts, which had a higher number of 911 calls and RAPs, also suffered from higher numbers of crimes in 2010 than the other predominantly white districts which had fewer 911 calls and RAPs. The following minority districts are examples:

     a.  Chicago Lawn had 10,814 index crimes and 15,382 total non-index crimes.

     b.  South Chicago had 8,442 total index crimes and 12,531 non-index crimes.

     c.  Englewood had 8,490 index crimes and 13,952 non-index crimes.

     d.  Harrison had 6,732 index crimes and 15,441 non-index crimes.

     e.  Grand Central had 9,600 index crimes and 13,135 non-index crimes.

45.     The white districts, which had fewer 911 calls and RAPs, also had fewer crimes in 2010 than the minority districts. The following white districts are examples:

     a.  Town Hall had 3,326 total index crimes and 3,743 non-index crimes.

     b.  Jefferson Park had 4,452 index crimes and 7,274 non-index crimes.

     c.  Foster had 2,473 index crimes and 3,552 non-index crimes.

46.     Although the City has refused to make the RAP data for the Austin District available, it is a minority district and had a high number of crimes in 2010: 4,482 total index crimes and 12,052 non-index crimes.

47.     According to data published with the recent article by The Chicago News Cooperative referred to in paragraph 35 above, the redeployment of patrol officers does not equalize the distribution of officers proportional to the rate of violent crime in districts and, in many minority districts, particularly on the South and West sides of Chicago, there were fewer officers per incidents of crime and higher rates of crime compared to white districts on the North side of Chicago.

9

48.     These disparities hold true for the same districts that were the subject of the

Chicago Sun-Times article on disparities in responses to 911 calls.

49.     The minority districts of Chicago Lawn, South Chicago, Englewood, Harrison,

and Grand Central, all of which have a high incidence of RAPs, also have a higher number of

violent crimes per beat officer than the city average of 2.76.

     a.   Chicago Lawn (District 8) has 3.61 violent crimes per beat officer.

     b.   South Chicago (District 4) has 4.05 violent crimes per beat officer.

     c.   Englewood (District 7) has 3.97 violent crimes per beat officer.

     d.   Harrison (District 11) has 4.03 violent crimes per beat officer.

     e.   Grand Central (District 25) has 3.60 violent crimes per beat officer.

50.     Austin, a minority district, also has a higher than average incidence of violent

crimes per beat officer: 3.07.

51.     In comparison, the white districts of Town Hall, Jefferson Park, and Foster, all of

which have a low incidence of RAP, have lower numbers of violent crime per beat officer, as

compared to the City average of 2.76.

     a.   Town Hall (District 23) has 1.63 violent crimes per beat officer.

     b.   Jefferson Park (District 16) has 1.39 violent crimes per beat officer.

     c.   Foster (District 20) has 1.33 violent crimes per beat officer.

52.     Redeployment has not ameliorated the disparity between minority and white

districts in the proportion of officers assigned to the districts as measured by the number of

violent crimes.

10

D.    The City's Liability for Inequitable 911 Services

53.    As a direct and proximate result of the City's current method of deploying police, there are longer response times to 911 calls for service and more denials of service in minority neighborhoods, in comparison to responses in white neighborhoods.

54.    Until the City is enjoined from deploying officers based on its current method, the plaintiffs will continue to be harmed by receiving a lower level of police responsiveness than residents of white districts.

## CLAIM FOR RELIEF UNDER THE ILLINOIS CIVIL RIGHTS ACT OF 2003

55.    For Paragraph 55, Plaintiffs incorporate the allegations set forth in paragraphs 1 through 54 as if fully set forth herein.

56.    The City's method for police deployment, alleged in paragraphs 1 through 55, violates the Illinois Civil Rights Act of 2003 by "utiliz[ing] criteria or methods of administration that have the effect of subjecting [Plaintiffs] to discrimination because of their race, color, [or] national origin[.]"

57.    Under the Illinois Civil Rights Act of 2003, the court has authority to "grant as relief any permanent or preliminary negative or mandatory injunction, temporary restraining order, or other order." 740 ILCS 23/5.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    A declaratory judgment that the City's method of deploying police officers violates the Illinois Civil Rights Act.

11

B. A permanent injunction enjoining the City from employing its present method of

deploying police officers and requiring the City to submit a plan detailing how it will

deploy police officers in a manner which will provide equal services in response to

911 calls to minority neighborhoods.

C. Award Plaintiffs their attorneys' fees, costs and expenses in prosecuting this action.

D. Award Plaintiffs any other appropriate relief.

October 27, 2011                          Respectfully submitted,

                                          THE CENTRAL AUSTIN NEIGHBORHOOD
                                          ASSOCIATION and AMERICAN CIVIL
                                          LIBERTIES UNION OF ILLINOIS

                                          By: _Harvey Grossman_
                                          One of their attorneys

Richard J. O'Brien                        Harvey Grossman, No. 48844
Eric S. Mattson                           Karen Sheley, No. 48845
Sidley Austin LLP – Firm No. 42418        Roger Baldwin Foundation of ACLU, Inc.
One S. Dearborn St.                       180 N. Michigan, Suite 2300
Chicago, Illinois 60603                   Chicago, Illinois 60601
(312) 853-7000                            (312) 201-9740

12

**Data from OEMC Response to ACLU FOIA Request**

| No. | District | Total 911 calls 4/2010 – 3/2011 | Total Priority 1 calls 4/2010 – 3/2011 |
|---|---|---|---|
| 1 | Central | 252,030.00 | |
| 2 | Wentworth | 180,338.00 | |
| 3 | Grand Crossing | 288,144.00 | |
| 4 | South Chicago | 279,646.00 | |
| 5 | Calumet | 222,999.00 | |
| 6 | Gresham | 283,507.00 | |
| 7 | Englewood | 325,185.00 | 65,242.00 |
| 8 | Chicago Lawn | 357,360.00 | 59,473.00 |
| 9 | Deering | 283,462.00 | |
| 10 | Ogden | 268,173.00 | |
| 11 | Harrison | 302,530.00 | |
| 12 | Monroe | 253,088.00 | |
| 13 | Wood | 152,838.00 | |
| 14 | Shakespeare | 223,265.00 | |
| 15 | Austin | 210,203.00 | 37,003.00 |
| 16 | Jefferson Park | 191,462.00 | |
| 17 | Albany Park | 195,232.00 | |
| 18 | Near North | 273,831.00 | 26,613.00 |
| 19 | Belmont | 152,172.00 | |
| 20 | Lincoln/Foster | 147,672.00 | |
| 21 | Prairie | 184,461.00 | |
| 22 | Morgan Park | 189,013.00 | |
| 23 | Town Hall | 153,627.00 | 18,125.00 |
| 24 | Rogers Park | 200,937.00 | |
| 25 | Grand Central | 349,466.00 | 48,444.00 |



**EXHIBIT**

1

## Number of Police Officers, Violent Crimes and Property Crimes, by Police District

### 1st District

| | |
|---|---|
| Police Officers | 296 |
| Violent Crimes (Jan.-Aug. 2011) | 313 |
| Violent Crimes Per Officer | 1.06 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 3,759 |
| Property Crimes Per Officer | 12.70 |
| Citywide Average | 11.34 |

### 2nd District

| | |
|---|---|
| Police Officers | 265 |
| Violent Crimes (Jan.-Aug. 2011) | 394 |
| Violent Crimes Per Officer | 1.91 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 1,911 |
| Property Crimes Per Officer | 9.28 |
| Citywide Average | 11.34 |

### 3rd District

| | |
|---|---|
| Police Officers | 320 |
| Violent Crimes (Jan.-Aug. 2011) | 1,278 |
| Violent Crimes Per Officer | 3.99 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 3,562 |
| Property Crimes Per Officer | 11.13 |
| Citywide Average | 11.34 |

### 4th District

| | |
|---|---|
| Police Officers | 338 |
| Violent Crimes (Jan.-Aug. 2011) | 1,368 |
| Violent Crimes Per Officer | 4.05 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 4,4667 |
| Property Crimes Per Officer | 13.22 |
| Citywide Average | 11.34 |



EXHIBIT
2

### 5th District

| | |
|---|---|
| Police Officers | 266 |
| Violent Crimes (Jan.-Aug. 2011) | 1,049 |
| Violent Crimes Per Officer | 3.94 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,959 |
| Property Crimes Per Officer | 11.12 |
| Citywide Average | 11.34 |

### 6th District

| | |
|---|---|
| Police Officers | 345 |
| Violent Crimes (Jan.-Aug. 2011) | 1,387 |
| Violent Crimes Per Officer | 4.02 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 4,102 |
| Property Crimes Per Officer | 11.89 |
| Citywide Average | 11.34 |

### 7th District

| | |
|---|---|
| Police Officers | 386 |
| Violent Crimes (Jan.-Aug. 2011) | 1,531 |
| Violent Crimes Per Officer | 3.97 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 3,722 |
| Property Crimes Per Officer | 9.64 |
| Citywide Average | 2.76 |

### 8th District

| | |
|---|---|
| Police Officers | 359 |
| Violent Crimes (Jan.-Aug. 2011) | 1,295 |
| Violent Crimes Per Officer | 3.61 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 5,803 |
| Property Crimes Per Officer | 16.16 |
| Citywide Average | 11.34 |

### 9th District

| | |
|---|---|
| Police Officers | 325 |
| Violent Crimes (Jan.-Aug. 2011) | 990 |
| Violent Crimes Per Officer | 3.05 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 3,564 |
| Property Crimes Per Officer | 10.97 |
| Citywide Average | 11.34 |

### 10th District

| | |
|---|---|
| Police Officers | 305 |
| Violent Crimes (Jan.-Aug. 2011) | 984 |
| Violent Crimes Per Officer | 3.23 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,701 |
| Property Crimes Per Officer | 8.86 |
| Citywide Average | 11.34 |

### 11th District

| | |
|---|---|
| Police Officers | 361 |
| Violent Crimes (Jan.-Aug. 2011) | 1,454 |
| Violent Crimes Per Officer | 4.03 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 3,009 |
| Property Crimes Per Officer | 8.34 |
| Citywide Average | 11.34 |

### 12th District

| | |
|---|---|
| Police Officers | 270 |
| Violent Crimes (Jan.-Aug. 2011) | 341 |
| Violent Crimes Per Officer | 1.26 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,347 |
| Property Crimes Per Officer | 8.69 |
| Citywide Average | 11.34 |

### 13th District

| | |
|---|---|
| Police Officers | 192 |
| Violent Crimes (Jan.-Aug. 2011) | 362 |
| Violent Crimes Per Officer | 1.89 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,393 |
| Property Crimes Per Officer | 12.46 |
| Citywide Average | 11.34 |

### 14th District

| | |
|---|---|
| Police Officers | 233 |
| Violent Crimes (Jan.-Aug. 2011) | 592 |
| Violent Crimes Per Officer | 2.54 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 4,116 |
| Property Crimes Per Officer | 17.67 |
| Citywide Average | 11.34 |

### 15th District

| | |
|---|---|
| Police Officers | 283 |
| Violent Crimes (Jan.-Aug. 2011) | 869 |
| Violent Crimes Per Officer | 3.07 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 1,986 |
| Property Crimes Per Officer | 7.02 |
| Citywide Average | 11.34 |

### 16th District

| | |
|---|---|
| Police Officers | 202 |
| Violent Crimes (Jan.-Aug. 2011) | 281 |
| Violent Crimes Per Officer | 1.39 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,663 |
| Property Crimes Per Officer | 13.18 |
| Citywide Average | 11.34 |

### 17th District

| | |
|---|---|
| Police Officers | 202 |
| Violent Crimes (Jan.-Aug. 2011) | 422 |
| Violent Crimes Per Officer | 2.09 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,698 |
| Property Crimes Per Officer | 13.36 |
| Citywide Average | 11.34 |

### 18th District

| | |
|---|---|
| Police Officers | 364 |
| Violent Crimes (Jan.-Aug. 2011) | 491 |
| Violent Crimes Per Officer | 1.35 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 4,879 |
| Property Crimes Per Officer | 13.40 |
| Citywide Average | 11.34 |

### 19th District

| | |
|---|---|
| Police Officers | 217 |
| Violent Crimes (Jan.-Aug. 2011) | 230 |
| Violent Crimes Per Officer | 1.06 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,984 |
| Property Crimes Per Officer | 13.75 |
| Citywide Average | 11.34 |

### 20th District

| | |
|---|---|
| Police Officers | 196 |
| Violent Crimes (Jan.-Aug. 2011) | 261 |
| Violent Crimes Per Officer | 1.33 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 1,390 |
| Property Crimes Per Officer | 7.09 |
| Citywide Average | 11.34 |

**21st District**

| | |
|---|---|
| Police Officers | 206 |
| Violent Crimes (Jan.-Aug. 2011) | 394 |
| Violent Crimes Per Officer | 1.91 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 1,911 |
| Property Crimes Per Officer | 9.28 |
| Citywide Average | 11.34 |

**22nd District**

| | |
|---|---|
| Police Officers | 223 |
| Violent Crimes (Jan.-Aug. 2011) | 579 |
| Violent Crimes Per Officer | 2.60 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,600 |
| Property Crimes Per Officer | 11.66 |
| Citywide Average | 11.34 |

**23rd District**

| | |
|---|---|
| Police Officers | 191 |
| Violent Crimes (Jan.-Aug. 2011) | 311 |
| Violent Crimes Per Officer | 1.63 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 1,879 |
| Property Crimes Per Officer | 9.84 |
| Citywide Average | 11.34 |

**24th District**

| | |
|---|---|
| Police Officers | 261 |
| Violent Crimes (Jan.-Aug. 2011) | 544 |
| Violent Crimes Per Officer | 2.08 |
| Citywide Average | 2.76 |
| | |
| Property Crimes (Jan-Aug. 2011) | 2,391 |
| Property Crimes Per Officer | 9.16 |
| Citywide Average | 11.34 |

**25th District**

| | |
|---|---|
| Police Officers | 316 |
| Violent Crimes (Jan.-Aug. 2011) | 1,137 |
| Violent Crimes Per Officer | 3.60 |
| Citywide Average | 2.76 |
| Property Crimes (Jan-Aug. 2011) | 4,784 |
| Property Crimes Per Officer | 15.14 |
| Citywide Average | 11.34 |

Source:     http://www.chicagonewscoop.org/chicago-police-staffing-crime-rates-by-district/

Viewed 10-24-11





## GEORGETOWN LAW

**Christy E. Lopez**
Distinguished Visitor from Practice

The Honorable Robert M. Dow, Jr.
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604



**FILED**

OCT 12 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

October 12, 2108

### Re: State of Illinois vs. City of Chicago, Case No. 17-cv-6260

To the Honorable Robert M. Dow, Jr.:

Thank you for the opportunity to submit this letter. We write to urge the Court to approve the proposed consent decree between the Office of Illinois Attorney General and the City of Chicago and Chicago Police Department (CPD). This agreement offers the most promise in at least a generation for ending systemic misconduct in the CPD. It will help ensure lawful and effective policing that will make communities more confident in their police department, and police officers more capable and safer, as we personally have seen similar agreements do in cities across the United States.

There is an undeniable need for a court-enforced police reform agreement in Chicago. As two of the attorneys who conducted the Department of Justice Civil Rights Division investigation of the Chicago Police Department, we saw first-hand the devastation that decades of police abuses had worked on Chicago's diverse communities.

As documented in the public findings report, the DOJ team reviewed thousands of pages of documents, including policies, training plans, CPD orders and memos, and internal and external reports. The City provided DOJ access to its entire misconduct complaint database and all officer use of force reports. DOJ also interviewed City officials, and current and former CPD officers and IPRA (now COPA) investigators. The analysis of the evidence confirmed what DOJ heard from community members: CPD has a pattern or practice of unconstitutional use of force, including deadly and less-lethal force, and these practices acutely affect Chicago's marginalized communities.

600 New Jersey Avenue, NW, Washington, DC 20001-2075

**REDACTED**

During the investigation, DOJ held public forums where community members came forward to share stories about their interactions and experiences with CPD. Whether Black, Latinx, Muslim, immigrant, LGBTQ, female, or a person with a disability, there was a common theme that bound these Chicagoans' experiences together. It was a profound mistrust of the police. Likewise, our conversations with scores of officers revealed a deep distrust among many officers of the Chicago communities most in need of protection. The investigation found that this mutual-mistrust is the result of CPD's inadequate policies, practices, training, and accountability systems that have allowed a toxic policing culture and patterns of misconduct to persist for decades. Because previous reform efforts failed to improve CPD's practices and accountability systems, communities were resigned to the fact that they would continue to be subject to unlawful police practices, and too many police officers became part of a self-reinforcing culture of dehumanizing the people they were sworn to protect.

We have reviewed the proposed consent decree carefully and have followed the months of officer and community engagement that went into its creation. Both because we have committed our professional lives to ensuring policing that is both lawful and effective, and because we have seen up-close the acute need for this agreement in Chicago, we are grateful that the Illinois Attorney General's Office and the City of Chicago committed the months upon months of incredible effort, thoughtfulness and expertise to getting reform right.

And this consent decree does get it right. It will promote sustainable, constitutional, and effective policing by implementing 21st Century, evidence-based, community-informed policies, practices, training, and accountability systems. The agreement gives Chicago communities a meaningful voice in developing CPD's policies and helps empower a broad-based community coalition to monitor and enforce it. This level of transparency and engagement will help repair the broken relationship between CPD and the communities it serves. The agreement further advances transparency by requiring that CPD collect, analyze, and publish enforcement data. Public data will allow community members to see how officers are engaging with residents, and through analyses of the data, the department will be able to monitor and intervene in potential misconduct. The decree also provides provisions designed to enhance CPD's force and impartial policing practices, crisis intervention tactics, recruitment and hiring, academy and in-service training, officer wellness and support, and supervision and accountability systems.

Most importantly, this agreement includes the elements that have been missing from previous reform efforts in Chicago—elements that decades of work have shown are essential—i.e. oversight by a federal court and an independent monitoring team. Experience has shown that, regardless of how good intentions are, without these elements, reform efforts in police departments like CPD are unlikely to be successful. We at DOJ learned this as we had to return to Cleveland, New Orleans, and elsewhere after first attempting to achieve reform through voluntary measures. A consent decree does not guarantee that police reform takes hold for good, but sometimes one is necessary to give reform a fighting chance.

The concern that consent decrees result in "de-policing" that, in turn, causes an increase in serious crime, is not borne out by the evidence. One has only to look at New York City, where a dramatic drop in stops and searches by NYPD was accompanied by a decrease in homicides, notwithstanding confident assertions by NYPD's Chief that crime would unquestionably rise should the number of stops go down. *See* Ashley Southall, *Crime Level in New York Plunges to a Level Not Seen Since the 1950s*, N.Y. TIMES, Dec. 27, 2017, *available at* https://www.nytimes.com/2017/12/27/nyregion/new-york-city-crime-2017.html. It is difficult, some would say impossible, to determine precisely the impact of policing on crime rates. But, with that caveat, it is worth noting that studies of the impact of consent decrees in numerous cities have not demonstrated that they cause increases in crime. In fact, the most comprehensive studies have indicated that they may not even result in de-policing at all. *See, e.g.,* Joshua Chanin & Brittany Sheats, *Depolicing as Dissent Shirking: Examining the Effects of Pattern or Practice Misconduct Reform on Police Behavior*, CRIM. JUST. REV., 2017.

We found no reporting requirements in this consent decree that have not been successfully implemented in other cities. It is of course possible that some officers will decide not to carry out their responsibilities to protest being required to both abide by the law and to document that they are doing so. In our experience, most officers care far too much about their work and the people they serve to neglect their duty. Once provided the training, supervision, and clear direction that the consent decree requires, officers often realize that they are better able to do their jobs, and their fears about reform dissipate. Those officers that cannot adjust to systemic constitutional policing, or who simply refuse to do their jobs, should be held accountable, and the accountability systems set in place by the consent decree will make it easier to do so.

In contrast to the lack of evidence that consent decrees cause crime, there is abundant and growing evidence that when communities do not have confidence that the police can or will protect them, they are more likely to eschew formal legal regimes and create their own system of rules and enforcement mechanisms. The work of Tracey L. Meares and Tom R. Tyler, some of which stems from their experience in Chicago, is central to this body of research. Restoring community confidence, and thereby increasing CPD's ability to keep communities safe, is one of the central aims of this consent decree.

Even after discarding the red-herring of "de-policing," the effort to reform the Chicago Police Department will not be an easy one, and it will take time. Nor is the consent decree perfect— perhaps no product of compromise ever is. Change along the way will likely be necessary—a consent decree is a static document applied to a very dynamic context. The parties to the agreement and the monitor will of course need to genuinely listen to both members of the public and CPD officers regarding how the consent decree is being implemented and do the hard work of discerning when to adjust a decree requirement and when to stay the course. None of that is easy. But it can and has been done elsewhere and it can be done in Chicago.

Regarding cost, we all wish consent decrees could be costless to implement. But the reality is that for too long the City of Chicago has put the true cost of CPD policing literally on the back of

its poorest communities, and, through millions in lawsuit payouts, on Chicago taxpayers. This must change. And experience tells us that benefits of the consent decree will be well-worth the cost. In a conference held by the Police Executive Research Forum in 2013, law enforcement officials spoke of implementing these agreements in their own departments. "I think the money was well spent in terms of preventing future litigation and gaining credibility with the community. So yes it was a lot of money, but I think we got our money's worth," said a Los Angeles Police Commander who helped implement the DOJ consent decree there. "[W]e would not have been able to make the changes we made without the consent decree . . . . The end result was very positive. Shootings dropped by 80 percent and have remained low. And it gave us credibility with the public," said retired Chief (and former CPD officer) Charles Ramsey, speaking of the agreement he helped implement in Washington D.C.'s Police Department. Many other police executives offered similar assessments. *See Civil Rights Investigations of Local Police: Lessons Learned,* Police Executive Research Forum Critical Issues Series (July 2013). Of course, notwithstanding these positive cost-benefit assessments, we urge the Court to ensure that the independent monitoring team is neither rendered ineffective by being given too little resources, nor allowed to undermine the integrity of the reform process through financial carelessness or too little appreciation for the importance of being beyond reproach.

Bringing lasting and transformative change to policing in Chicago will take the sustained commitment of the City and the Chicago Police Department, the ongoing input and support of Chicago's diverse communities, and the close oversight of this Court. The consent decree is the mechanism by through which this can be accomplished. We therefore respectfully urge you to approve the proposed consent decree.

Sincerely,

*Christy E. Lopez*

**Christy E. Lopez**
Distinguished Visitor from Practice
Co-Founder, Program on Innovative Policing
Georgetown University Law Center

Former Deputy Chief, Special Litigation Section
Civil Rights Division, United States Department of Justice

**Lynda Garcia**
Former Trial Attorney, Special Litigation Section
Civil Rights Division, United States Department of Justice



# M ENTAL H EALTH S UMMIT
## Invest in Mental Health. Treatment Works.

2018 OCT 12 PH 2:41

6020 S. University Ave. • Chicago, IL 60637 • (773) 702-9611 • (773) 702-2063 (fax)

CLERK
U.S DISTRICT COURT

October 10, 2018

Clerk of Court
United States District Court for the Northern District of Illinois
Dirksen Federal Buidling
219 South Dearborn Street–20th Floor
Chicago, IL 60604

BY
**FILED**

OCT 1 2 2018

Re: *State of Illinois vs. City of Chicago*, Case No 17-cv-6260

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

Dear Sir:

Please acccept this as a comment in support of the Proposed Consent Decree in the above-entitled matter. The Mental Health Summit, a list of our members is enclosed, supports the Proposed Consent Decree because we believe that it will dramatically improve the treatment of persons with mental illnesses by the Chicago Police Department and the provision of mental health services to those police officers who may need such services.

As advocates, mental health professionals and other service providers, we care deeply about the response of police offiers to people who have serious, untreated mental illnesses. Of course, most people with mental illnesses are neither violent nor likely to commit crimes. However, it remains true that persons with mental illnesses often come in contact with the police. Not only are the police required to respond to those persons with mental illnesses who may have committed a crime, but they are often the first responders to people in mental heealth crises. The consent decree should improve training, supervision and the availability of mental health resources to our police.

Of course, the police have very difficult and stressful jobs. This often causes post-traumatic stress disorders or other mental illnesses or exacerbates existing mental illnesses. It is unfortunately the case that police have higher incidents of substance abuse problems, mental illnesses and suicide than the general public. We are pleased that these issues are being addressed by the Proposed Consent Decree.

It is not possible to make sure that every encounter between the police and persons with mental illness goes smoothly. However, we believe that the Proposed Consent Decree represents an

Clerk of the Court
October 11, 2018
Page Two


important step in the right direction.  It will save lives and help the police, persons with mental
illnesses and the general safety of our communities.

We urge the Court to approve the Proposed Consent Decree.


Sincerely,

Mark J. Heyrman
Summit Facilitator


encslosure

Case: 1:17-cv-06260 Document #: 481 *SEALED* Filed: 10/12/18 Page 3 of 3 PageID #:3691

# M ENTAL H EALTH S UMMIT
## Invest in Mental Health. Treatment Works.

5020 S. University Ave. • Chicago, IL 60637 • (773) 702-9611 • (773) 702-2063 (fax)

## Summit Members

Alexian Brothers Center for Mental Health/Behavioral
    Health Hospital
Anixter
Catholic Archdiocese of Chicago, Commission on
    Mental Illness
Chasing Hope Foundation
Chicago Association for Psychoanalytic Psychology
Chicago Institute for Psychoanalysis Community
Behavioral Healthcare Association of Illinois
Community Counseling Centers of Chicago
Community Mental Health Board of Chicago
Cure-IL
Depression and Bipolar Support Alliance
Domestic Violence and Mental Health Policy Initiative
Ecker Center for Mental Health
Equip for Equality, Inc.
GROW in Illinois
Health and Disabilities Advocates
Healthcare Alternative Systems
Heartland Alliance
Hope for the Day
Human Service Center
Illinois Association of Community Mental Health
    Authorities
Illinois Association of Rehabilitation Facilities
Illinois Childhood Trauma Coalition
Illinois Children's Mental Health Partnership
Illinois Council on Problem Gambling
Illinois Counseling Association
Illinois Hospital Association
Illinois Mental Health Counselor's Association
Illinois Mental Health Planning and Advisory Council
Illinois Rural Health Association
Illinois Psychiatric Society
Illinois Psychological Association
Illinois Society for Clinical Social Work
Institute of Medicine of Chicago
John Howard Association
Josselyn Center
Kendall County Health Department
Latino/a Mental Health Providers Network
League of Women Voters of Illinois
Legal Council for Health Justice
Lutheran Social Services of Illinois
Mental Health America of Illinois

Mental Health America/North Shore
Mental Health Consumer Education Consortium
Mental Health Services-DuPage County Health
    Department
Midwest Asian Health Association
National Alliance on Mental Illness Barrington
    Area
National Alliance on Mental Illness
    Cook County North Suburban
National Alliance on Mental Illness
    DuPage County
National Alliance on Mental Illness
    Chicago
National Alliance on Mental Illness
    Illinois
National Alliance on Mental Illness
    McHenry County
National Alliance on Mental Illness
    Metro Suburban
National Alliance on Mental Illness
    Will County
National Alliance on Mental Illness
    South Suburbs of Chicago
National Alliance on Mental Illness
    Southwestern Illinois
National Association of Anorexia Nervosa and
    Associated Disorders
National Association of Social Workers
    Illinois Chapter
New Foundation Center
Next Steps
OCD-Chicago
Psychotherapy Action Network
Recovery, Inc.
Sankofa Organization of Illinois, Inc.
Service Employees International Union
    Local 73
Sonia Shankman Orthogenic School of the
    University of Chciago
Suicide Prevention Association
Supportive Housing Providers Association
Thresholds, Inc.
Trilogy
University of Chicago Foundation for
    Emotionally Disordered Children
Will County Health Department



# LOEVY & LOEVY

311 N. Aberdeen St., 3rd Floor, Chicago, Illinois 60607

October 12, 2018

Hon. Robert M. Dow, Jr.
c/o Clerk of Court
United States District Court
Everett McKinley Dirksen Federal Building
219 South Dearborn Street, 20th Floor
Chicago, IL 60604



**F I L E D**

OCT 1 2 2018

**THOMAS G BRUTON
CLERK, U.S DISTRICT COURT**

Re: *State of Illinois vs. City of Chicago*, Case No. 17-cv-6260

Dear Judge Dow:

I am the attorney who represented independent journalist Brandon Smith in the lawsuit that forced the City of Chicago to release the Laquan McDonald shooting video. I also am of counsel to the Better Government Association, which frequently seeks public records from the Chicago Police Department and defends the public's right to government records across the state. Over the past five years, I have handled at least 200 Freedom of Information Act lawsuits, including dozens of lawsuits against the Chicago Police Department and other City agencies.

I believe that the consent decree will lead to greater government accountability, and I support it.

That said, I have one concern that I would like to see addressed: that the consent decree may have the unintended consequence of interfering with the public's right to information under the Illinois Freedom of Information Act. I have discussed this concern with the parties, who agreed that they do not intend that result and are considering my comment. What I have proposed to resolve that issue is to replace the current Paragraph 688 ("Nothing in this Agreement is intended to conflict with the Illinois Freedom of Act."), with the more definitive statement: "Nothing in this consent decree prohibits the release of any records that are subject to disclosure under the Illinois Freedom of Information Act."

The following is a more detailed explanation of my comment.

By way of background, under Illinois FOIA, "it is declared to be the public policy of the State of Illinois that all persons are entitled to full and complete information regarding the affairs of government and the official acts and policies of those who represent them as public officials and public employees consistent with the terms of this Act. Such access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring government to ensure that it is being conducted in the public interest." 5 ILCS 140/1. Thus, it is not only the role of this Court or the independent monitor to supervise police reform, but a duty of the public itself, the pursuit of which requires access to public records. Indeed, but for the release of the Laquan McDonald shooting video under FOIA, it is doubtful that we would be here today contemplating any consent decree.

My concern is based on my actual experiences litigating many FOIA cases against the City of Chicago and others, and the recognition by the courts of this state that FOIA is too often abused:

> We are not surprised that governmental entities, including the United States Attorney generally prefer not to reveal their activities to the public. If this were not a truism, no FOIA would be needed. Our legislature enacted the FOIA in recognition that (1) blanket government secrecy does not serve the public interest and (2) transparency should be the norm, except in rare, specified circumstances. The legislature has concluded that the sunshine of public scrutiny is the best antidote to public corruption, and Illinois courts are duty-bound to enforce that policy.

*Better Gov't Ass'n v. Blagojevich*, 386 Ill. App. 3d 808, 818 (2008).

To address this concern, the decree should expressly state that "Nothing in this consent decree prohibits the release of any records that are subject to disclosure under the Illinois Freedom of Information Act." This exact wording is important because Section 7(1)(a) of FOIA makes records exempt when release is "specifically prohibited" by state or federal law, 5 ILCS 140/7(1)(a), and under current First District appellate case law, a consent decree might be considered a proper basis to withhold public records, In re Appointment of Special Prosecutor, 2017 IL App (1st) 161376, ¶¶ 43-53 (petition for leave to appeal to Illinois Supreme Court granted). The current version took a step in the right direction by stating "Nothing in this Agreement is intended to conflict with the Illinois Freedom of Act," see paragraph 688, but that language may not be sufficiently specific to ensure that existing FOIA rights are not hampered by the decree, or at least not without litigation over that question. Federal courts have acknowledged the need to preserve state open records rights in similar contexts. *E.g., Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 791 (3d Cir. 1994) (courts contemplating confidentiality orders should ensure "that the scope of the confidentiality order does not extend so as to prevent disclosure pursuant to any freedom of information law").

From my review, it does not appear that the proposed consent decree contains any specific confidentiality provisions expressly prohibiting any release under FOIA. But, some Illinois courts have implied confidentiality restrictions in statutory provisions (and may do the same for court orders), even where the text "does not specifically provide that records are exempt from disclosure under the FOIA or otherwise contain an explicit prohibition against public disclosure," so long as language "reveals that public access to the records was not intended." *Better Gov't Ass'n v. Zaruba*, 2014 IL App (2d) 140071, ¶ 21. And in actual practice, the City has relied on aggressive interpretations of FOIA exemptions in an effort to withhold police-related records in the past. *Kalven v. City of Chicago*, 2014 IL App (1st) 121846, ¶¶ 15-16 (arguing, in effort to withhold police complaint register files, that legislative change from "information concerning" disciplinary proceedings to "related to" them was intended to overrule an explicit appellate court decision requiring the release of CRs). The current consent decree language regarding the "intent" of the consent decree does not foreclose the argument—from the City, from the Fraternal Order of Police (who has sued to block FOIA release of police records in the past), or otherwise—that despite any such intent, there is an actual conflict between some

implied confidentiality provision in the consent decree and Illinois FOIA, with the consent decree taking precedence.

Enhancing my concern is the provision in Paragraph 652 that states that "records maintained by the Monitor will be treated confidentially and will not be deemed public records subject to public inspection under the Illinois [FOIA]." This potentially could be read to make the City's own records exempt in response to a request to the City simply because they have been sent to the Monitor, even though the intent of the provision seems to be that the Monitor itself need not respond to Illinois FOIA requests. For example, if the Monitor requests certain CR records, the City could argue that this provision makes those records exempt under FOIA and the public would lose access to them simply because they have been provided to the Monitor. We have faced similar arguments by public bodies in the context of state inspector general statutes containing similar provisions, which have been met with mixed results at the trial court level. The revision I have proposed should address this concern.

In light of this, I ask the Court to revise the consent decree as provided above. This will cleanly ensure that the public continues to enjoy the same access to information under state law that it currently possesses—no more and no less. It keeps with the notion that federal courts should refrain from interfering with state open records rights. And it protects the public from the potential for extensive future litigation on this issue that my experience has taught me to be a real possibility.

I thank the Court for its consideration of this issue, and reiterate that I otherwise fully support the consent decree.

Sincerely,

Matthew Topic