**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STATE OF ILLINOIS,

                Plaintiff,

       v.

CITY OF CHICAGO,

                Defendant.

Case No. 17-cv-6260
Honorable Robert M. Dow, Jr.

**PLAINTIFF'S RESPONSE TO THE COMMENTS OF
THE FRATERNAL ORDER OF POLICE CHICAGO LODGE NO. 7
<u>REGARDING THE PROPOSED CONSENT DECREE</u>**

# TABLE OF CONTENTS

I.   Introduction ............................................................................................................... 1

II.   The Court can and should approve the Proposed Consent Decree over FOP's objections. ... 2

    A.  Alleged CBA Conflicts ...................................................................................... 3

    B.  Alleged State Law Conflicts .............................................................................. 8

    C.  Alleged Violations of the Obligation to Bargain Under the IPLRA .............................. 9

    D.  FOP's "Additional Concerns" ......................................................................... 14

III.  The Proposed Consent Decree does not conflict with FOP's CBA. ................................. 14

    A.  Sworn Affidavits in Investigations of Misconduct Complaints .................................... 14

    B.  Anonymous Complaints .................................................................................. 17

    C.  Disclosure of a Complainant's Identity to an Officer Under Investigation ................... 20

    D.  CBA Section 6.4 – Photographs of Officers ..................................................... 20

    E.  CBA Section 8.1 – Termination for "Just Cause" ............................................... 23

    F.  CBA Section 8.4 – Retention of Disciplinary Records ......................................... 24

    G.  CBA Sections 9.1 & 9.2 – Grievance Procedures .............................................. 27

    H.  CBA Sections 20.10, 23.2, & 23.3 – Seniority ................................................. 28

    I.  In-Service Training Requirements ................................................................... 29

IV.  The Proposed Consent Decree does not conflict with state law. .................................... 30

    A.  Uniform Peace Officers' Disciplinary Act – Sworn Affidavits ..................................... 30

    B.  Chicago Municipal Code § 2-84-330(D) – Anonymous Complaints ........................... 31

    C.  Police and Community Relations Improvement Act ("PCRIA") .................................. 32

    D.  Chicago Municipal Code § 2-84-330(E) – Disclosing Complainants' Identities .......... 35

    E.  Law Enforcement Officer-Worn Body Camera Act ("Body Camera Act") ................. 35

    F.  Possession of a Firearm Owner's Identification ("FOID") Card ................................. 38

    G.  Union-Agent Privilege .................................................................................... 39

    H.  Personnel Record Review Act .......................................................................... 39

V.   The Proposed Consent Decree does not violate FOP's right to collectively bargain under the IPLRA ..................................................................................................................... 40

VI.  The "additional concerns" that FOP raises are not grounds for denying approval of the Proposed Consent Decree .................................................................................... 44

VII.  The Proposed Consent Decree does not negatively impact officer safety. ....................... 45

VIII. Conclusion .......................................................................................................... 49

## I.   Introduction

The Fraternal Order of Police Chicago Lodge No. 7 ("FOP") raises numerous objections to various provisions in the Proposed Consent Decree. (*See* Dkt. 156.) Citing the Seventh Circuit's decision in *People Who Care v. Rockford Board of Education School District No. 205*, 961 F.2d 1335, 1337 (7th Cir. 1992), FOP contends that portions of the Proposed Consent Decree impermissibly "alter collective bargaining agreements without the union's assent" and "disregard valid state laws." FOP also claims that other portions of the Proposed Consent Decree address topics that are subject to mandatory collective bargaining under the under the Illinois Public Labor Relations Act ("IPLRA"), 5 ILCS 315/1 *et seq*. In its last category of objections, FOP outlines "additional concerns" it has about the Proposed Consent Decree.

The Court can and should approve the Proposed Consent Decree over FOP's objections, all of which are baseless. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528–30 (1986) (affirming entry of a consent decree over an intervening union's objection where the consent decree "impose[d] no legal duties or obligations on the Union at all"). Contrary to FOP's objections, the Proposed Consent Decree does not alter FOP's CBA or disregard state law, but rather expressly abides by the limits reflected in *People Who Care*. The Proposed Consent Decree avoids violating the prohibitions in *People Who Care* in multiple ways: through a "carve-out" that expressly preserves FOP's CBA and collective bargaining rights; through "best efforts" clauses that require the City to negotiate with FOP instead of attempting to unilaterally change existing CBA provisions; through multiple clauses acknowledging and incorporating FOP's CBA throughout the Proposed Consent Decree, including in paragraphs where FOP nonetheless cites an alleged conflict; and through incorporation of applicable state law in various places in the Proposed Consent Decree, including in paragraphs where, again, FOP nonetheless cites an alleged conflict.

The Proposed Consent Decree also does not violate any bargaining obligation under the IPLRA. Under both the IPLRA and FOP's CBA, the City and CPD have the managerial right to adopt the policies and procedures required by the Proposed Consent Decree and need not seek FOP's permission to do so. For many of its objections, FOP hypothesizes that future implementation of these policies and procedures may have disciplinary effects that, in FOP's view, are subject to a bargaining obligation. The carve-out, however, preserves any rights FOP has under the IPLRA to bargain over any such effects, and so the Court need not resolve these objections now. Consistent with the carve-out, FOP remains free to seek to compel the City to bargain in an appropriate forum to the extent any aspect of the Proposed Consent Decree gives rise to a mandatory bargaining obligation under the IPLRA.

As for the last category of FOP's objections, the "additional concerns" FOP articulates do not present any cognizable legal basis for refusing to approve the Proposed Consent Decree.

Taken together, none of FOP's objections preclude approval of the Proposed Consent Decree.[1] Despite FOP's objections, the Court can and should approve the Proposed Consent Decree. *See Local No. 93*, 478 U.S. at 528–30.

## II. The Court can and should approve the Proposed Consent Decree over FOP's objections.

Before addressing specific objections by FOP, the State outlines a framework that it urges the Court to apply in assessing the different categories of objections FOP has raised. As noted, FOP raises four categories of objections: (1) alleged conflicts between the Proposed Consent Decree and FOP's current CBA; (2) alleged conflicts between the Proposed Consent Decree and various state statutes; (3) alleged violations of FOP's right to collectively bargain over wages,

---

[1] What FOP lacks in substance, however, it tries to make up for in volume. FOP's voluminous but threadbare objections leave little doubt that FOP's objections are not about protecting the CBA and statutory bargaining rights of its members, which are already protected by the carve-out. FOP's true objective is the one it has identified publicly: to stop the Proposed Consent Decree.

hours, and terms and conditions of employment under the IPLRA; and (4) "additional concerns" FOP has about the Proposed Consent Decree. In light of *People Who Care*, 961 F.2d at 1337, and consistent with the Court's obligation to ensure that the Proposed Consent Decree is lawful,[2] *see EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888–89 (7th Cir. 1985), the Court can and should expressly overrule each of FOP's objections in the first and second categories (alleged CBA and state law conflicts) in approving the Proposed Consent Decree. At this point, however, the Court need not resolve all of FOP's objections in the third category (alleged violations of bargaining obligations under the IPLRA), because the carve-out preserves FOP's ability to exercise its collective bargaining rights under the IPLRA after approval of the Proposed Consent Decree. The Court also need not resolve the fourth category of FOP's objections (FOP's "additional concerns"), because none of those objections raise colorable grounds for rejecting approval of the Proposed Consent Decree.

### A. Alleged CBA Conflicts

The Court should reject each of FOP's objections alleging that the Proposed Consent Decree "alter[s] [FOP's] collective bargaining agreement[] without the union's assent." *People Who Care*, 961 F.2d at 1337. While FOP's objections in this category are addressed individually below, they collectively suffer from common foundational flaws. The Court can and should overrule FOP's objections alleging conflicts with its CBA and approve the Proposed Consent Decree.

---

[2] With respect to the standard the Court must apply in reviewing the Proposed Consent Decree, FOP's recent submission (*see* Dkt. 673 at 2) urges the Court to follow what FOP calls "the factors the U.S. Attorney General believes are necessary in considering the approval of a civil consent decree." FOP fails to note that the U.S. Attorney General's internal memorandum for the U.S. Department of Justice acknowledges it is not binding on this or any court: "This memorandum provides only internal Department of Justice policy directed at Department components and employees. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." (*Id.*, 11/7/18 U.S. Att'y Gen. Memo., at 2 n.3).

As an initial matter, *People Who Care* does not preclude approval of the many of provisions of the Proposed Consent Decree to which FOP has not objected, even if the Court ultimately concludes some objections by FOP to certain other provisions are valid. (*See* Dkt. 473 at 23 (conceding FOP has no objection to hundreds of provisions in the Proposed Consent Decree).) *People Who Care* dealt with only a limited number of provisions in a consent decree seeking to remedy school segregation in the Rockford school system. *See* 961 F.2d at 1336–37. The Seventh Circuit vacated only those provisions found to violate the intervening union's collective bargaining agreement and rights, while leaving intact the remainder of the consent decree. *Id.* at 1339. Accordingly, in this case, this Court can and should approve all portions of the Proposed Consent Decree to which FOP has not raised a valid objection.

The Proposed Consent Decree in this case is also fundamentally different from the problematic consent decree provisions in *People Who Care* because it expressly protects FOP's CBA and statutory bargaining rights. Unlike in *People Who Care*, the Proposed Consent Decree includes a carve-out that states in pertinent part:

> Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder.

(Dkt. 107-1 ¶ 711.) The carve-out avoids the two fundamental defects the Seventh Circuit found with the consent decree provisions at issue in *People Who Care*. The first problematic provision in *People Who Care* eliminated consideration of seniority in assigning teachers to schools in direct contravention of seniority rights protected by applicable collective bargaining agreements.

4

961 F.2d at 1336. Here, by contrast, the carve-out disclaims any intent to alter FOP's CBA, and as detailed below, none of the provisions to which FOP objects unilaterally change provisions in FOP's CBA. The second group of problematic provisions in *People Who Care* violated the school district's obligation under state law to bargain with the union over the terms and conditions of the teachers' employment. *Id.* But the carve-out in this case expressly preserves the City's obligation to bargain with FOP on issues subject to a bargaining obligation under the applicable state law, the IPLRA.

The Court need not rely only on the parties' view that the carve-out is adequate to protect applicable collective bargaining agreements and rights. In addition to FOP, which represents CPD officers below the rank of sergeant, the three unions representing CPD sergeants, lieutenants, and captains, respectively, also submitted comments regarding the Proposed Consent Decree to the Court. (*See* Dkt. 639.) Unlike FOP, however, these three unions indicated that the carve-out, when interpreted properly, would be adequate to protect their existing rights: "This Court's accurate interpretation of the carve out language will protect the Unions from any attempt by the City to compel these Units to accept provisions of this decree which conflict with existing rights whether those rights arise out of the current CBAs or state law." (*Id.* at 7.)

In addition to the carve-out, several other provisions in the Proposed Consent Decree expressly acknowledge and incorporate applicable collective bargaining agreements, including FOP's CBA, when they are implicated. For example, although FOP repeatedly complains that the Proposed Consent Decree violates limitations in its CBA on the extent of investigations into certain types of complaints submitted anonymously or without a supporting affidavit (Dkt. 156 at 4–5, 8–10, 19, 27–28, 30; *see also* Dkt. 668, 11/19/18 M. Preib Statement), the Proposed

Consent Decree expressly requires complaint investigations to comply with any applicable collective bargaining agreement:

> The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated ***in accordance with this Agreement and the applicable collective bargaining agreement***, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by third-party representative.

(Dkt. 107-1 ¶ 427.) In addition to this provision, there are seven other similar provisions in the Proposed Consent Decree expressly acknowledging and incorporating applicable collective bargaining agreements. (*Id.* ¶¶ 302, 452, 461, 464(g), 468(f), 488(g), 536.) Tellingly, FOP still objects to five of the provisions containing these acknowledgements of its CBA. (Dkt. 156 at 9–10, 24, 31, 45–46.)

Several of FOP's objections also attack "best efforts" provisions in the Proposed Consent Decree, which simply require the City to negotiate with FOP. As the Proposed Consent Decree acknowledges, the City and FOP are currently negotiating a successor agreement to FOP's current CBA, which expired in 2017. (Dkt. 107-1 ¶ 710.) The last sentence of paragraph 711 of the Proposed Consent Decree states:

> In negotiating Successor CBAs and during any Statutory [Impasse Resolution] Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.

(*Id.* ¶ 711.) Throughout the Proposed Consent Decree, there are a total of four "best efforts" provisions addressing topics covered by current CBA provisions, including when a signed affidavit is necessary to conduct a full misconduct investigation (*id.* ¶ 431), disclosure of a complainant's identity to an officer accused of misconduct (*id.* ¶ 475), investigation of anonymous complaints (*id.* ¶ 477), and the time period for retaining officer discipline records (*id.* ¶ 508). Critically, in keeping with the holding of *People Who Care*, 961 F.2d at 1337, all of these

provisions recognize that the Proposed Consent Decree cannot alter FOP's existing CBA rights without FOP's agreement. That is why they require "best efforts," not guaranteed success. As the State has previously acknowledged (*see* Dkt. 85 at 7), the relevant CBA sections addressed by the "best efforts" provisions will remain in effect unless and until the City and FOP agree otherwise, or the issue is resolved through the impasse resolution procedures that govern negotiation of the successor CBA. Because the "best efforts" provisions in the Proposed Consent Decree acknowledge the necessity of negotiating any changes to FOP's CBA with FOP, they fully comport with the holding of *People Who Care*.

FOP stands alone among the unions representing CPD officers in its refusal to acknowledge that the "best efforts" provisions preserve any obligation to bargain over contract changes. The three unions representing CPD sergeants, lieutenants, and captains have collective bargaining agreements with the City that include provisions regarding sworn affidavits, anonymous complaints, and disclosure of a complainant's identity that are functionally indistinguishable from the provisions in FOP's CBA.[3] Yet in their comments to the Court regarding the Proposed Consent Decree, these unions acknowledged: "The proposed decree directly addresses these issues, recognizes that they are properly subjects for bargaining and directs that the City use its best efforts to reach an agreement with the unions on these points." (Dkt. 639 at 4.)

As this Court recognized in its ruling on FOP's motion to intervene (Dkt. 88), the Court must assure itself that the Proposed Consent Decree "does not undermine the rightful interests of

---

[3] *Compare* Dkt. 85-1 §§ 6.1(D)–(E) & App'x L *with* Agreement Between the City of Chicago and the Policemen's Benevolent & Protective Association of Illinois, Unit 156–Sergeants (eff. 7/1/2012), §§ 6.1(E)–(G), 6.10; Agreement Between the City of Chicago and the Policemen's Benevolent & Protective Association of Illinois, Unit 156–Lieutenants (eff. 7/1/2012), §§ 6.1(E)–(G), 6.10; Agreement Between the City of Chicago and the Policemen's Benevolent & Protective Association of Illinois, Unit 156–Captains (eff. 7/1/2012), §§ 6.1(E)–(G), 6.10. All of the aforementioned collective bargaining agreements can be found here: https://www.cityofchicago.org/city/en/depts/dol/supp_info/city_of_chicago_collectivebargainingagreements.html.

third parties . . . ." (Dkt. 88 at 19 (quoting *Kasper v. Bd. of Election Commissioners of the City of Chicago*, 814 F.2d 332, 337 (7th Cir. 1987).) This obligation includes assessing whether any of the provisions in the Proposed Consent Decree "alter [FOP's] collective bargaining agreement[] without the union's assent." *People Who Care*, 961 F.2d at 1337. None do, as the State demonstrates in detail below. As a result, the Court can and should overrule each of FOP's objections alleging that the Proposed Consent Decree violates its CBA rights.

### B. Alleged State Law Conflicts

Given the extent to which the carve-out preserves FOP's CBA and statutory bargaining rights, FOP leads off its litany of objections focusing on the other prong of the *People Who Care* holding: state law. Here, too, however, FOP's objections fail when compared to the actual text of the Proposed Consent Decree, which expressly incorporates several of the state statutes FOP cites.

For example, FOP alleges conflicts based on the Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10-1 *et seq.*, and the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 *et seq.* (*see* Dkt. 156 at 10–11, 12–14), even though the Proposed Consent Decree expressly requires compliance with both (*see* Dkt. 107-1 ¶¶ 238, 492). FOP also claims the Proposed Consent Decree violates state law even when the complained-of paragraph includes the qualification "as permitted by law." (*Compare* Dkt. 156 at 12–15 *with* Dkt. 107-1 ¶ 576.) Similarly, when the Proposed Consent Decree incorporates "any evidentiary privilege recognized under Illinois or federal law" (*see* Dkt. 107-1 ¶ 465(a)), FOP demands an additional, specific citation to the union-agent privilege articulated in 735 ILCS 5/8-803.5 (*see* Dkt. 156 at 16).

Viewed collectively, none of FOP's alleged conflicts between state law and the Proposed Consent Decree are genuine conflicts. While each alleged conflict should be considered, as the State does more fully below, the Court can and should rule that the Proposed Consent Decree does not "disregard valid state laws," *People Who Care*, 961 F.2d at 1337.

### C. Alleged Violations of the Obligation to Bargain Under the IPLRA

In the largest category of objections, FOP contends that numerous provisions of the Proposed Consent Decree address "mandatory subjects of bargaining" under the IPLRA. (Dkt. 156 at 33.) FOP's objections ignore the City's and CPD's extensive managerial rights under the IPLRA and FOP's own CBA that permit the City and CPD to adopt the policies and procedures required by the Proposed Consent Decree. Furthermore, the carve-out preserves whatever bargaining obligations the City and CPD may owe to FOP in the course of implementing the requirements of the Proposed Consent Decree.

Section 4 of the IPLRA establishes that a public employer is "not required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees, examination techniques and direction of employees." 5 ILCS 315/4. To the extent a "policy matter[] directly affect[s] wages, hours and terms and conditions of employment," or has an "impact thereon," *id.*, the employer must bargain over the impacts on wages, hours, and terms and conditions of employment. *Id.* In addition to Section 4, Section 14(i) of the IPLRA, which regulates the arbitration procedure used to resolve bargaining impasses, effectively precludes a union representing "peace officers" from bargaining over certain topics, including "the type of equipment, other than uniforms, issued or used," and "the criterion pursuant to which force, including deadly force, can be used[.]" *Id.* § 14(i). *See Cnty. of Cook v. Illinois Labor Relations Bd.*, 807 N.E.2d 613, 620 (1st Dist. 2004) (explaining that

Section 14(i) "specifically determines the negotiability of certain subjects of bargaining for firefighter and peace officer bargaining units"). FOP has previously failed in an attempt to compel the City to bargain over "matters of inherent managerial policy" under the IPLRA. *See Fraternal Order of Police Chicago Lodge No. 7 v. Illinois Labor Relations Bd.*, 2011 IL App (1st) 103215 ¶¶ 23–25 (affirming state labor board's ruling that the City's decision to consolidate training districts for field training officers was a matter of "inherent managerial authority" and not subject to mandatory bargaining).

Consistent with the IPLRA, FOP's CBA affirms the City's and CPD's broad managerial rights to regulate officer conduct through policy. Article 4 of the CBA, titled "Management Rights," states in pertinent part:

> The Employer has and will continue to retain the right to operate and manage its affairs in each and every respect. ***The rights reserved to the sole discretion of the Employer*** shall include, but not be limited to, rights:
> [ . . . ]
> C. to set standards for the services to be offered to the public;
> D. to direct the Officers of the Department of Police, including the right to assign work and overtime;
> [ . . . ]
> M. to suspend, demote, discharge, or take other disciplinary action against Officers for just cause; and
> N. to add, delete or alter policies, procedures, rules and regulations.

(Dkt. 85-1 at 2–3 (emphasis added).) In other words, FOP's own CBA gives the City and CPD "sole discretion" to "set standards," to "direct" officers, and to "add, delete or alter policies, procedures, rules and regulations." (*Id.*)

Despite the City's and CPD's broad managerial rights, FOP nonetheless claims that the City and CPD must first seek FOP's permission at the bargaining table to enact the various policies and procedures required by the Proposed Consent Decree. (*See, e.g.*, Dkt. 156 at 33–41.) Both the district court and the Tenth Circuit rejected virtually identical objections in another case

involving a consent decree regarding a municipal police department. In *Johnson v. City of Tulsa*, No. 94-CV-39-H(M), 2003 WL 24015151 (N.D. Okla. May 12, 2003), the district court approved a consent decree, over objections by the police officers' union, to resolve claims under 42 U.S.C. § 1983 and Title VII against the City of Tulsa and the Tulsa Police Department. The union in *Johnson* objected that the proposed consent decree required numerous policy changes that "could subject officers to discipline" and thus the changes were subject to mandatory bargaining. *Id.* at 20, 29–41.

The district court rejected all of the union's objections based in significant part on provisions in the union's collective bargaining agreement that mirror those in FOP's CBA, as well as a clause in the proposed consent decree similar to the carve-out here. Specifically, the district court in *Johnson* found that the "management rights" provisions in the applicable collective bargaining agreement—which included the right to "determine Police Department policy including the rights to manage the affairs of the Police Department in all respects," the right to "establish and enforce Police Department rules, regulations, and orders," and the right to discipline officers for "just cause"—permitted the police department to agree to the policy changes in the proposed consent decree without bargaining with the union. *Id.* at 16, 20, 29–41. The district court found that the policy changes contemplated by the proposed consent decree were a valid exercise of the police department's management rights and that none of them altered the "just cause" standard under which the department was entitled to impose discipline. *Id.*

The court also found that "nothing in the proposed decree prevents the [union] or any of its members from filing a grievance with respect to any unjust discipline in the future." *Id.* at 21. In fact, the proposed decree included a provision "recogniz[ing] the existence and validity" of the union's collective bargaining agreement and expressing "the intent of the Parties to comply

with the CBA" in adopting the proposed decree. *Id.* at 19. The district court's denial of the union's objections and approval of the proposed consent decree was subsequently affirmed by the Tenth Circuit. *See Johnson v. Lodge #93 of the Fraternal Order of Police*, 393 F.3d 1096 (10th Cir. 2004).

FOP's objections fail for the same reasons as the union's objections in *Johnson*. The IPLRA and FOP's CBA both recognize the City's and CPD's managerial right to agree to implement the policies contemplated by the Proposed Consent Decree. To the extent those policies have bargainable effects, the carve-out in the Proposed Consent Decree, like the similar provision in *Johnson*, preserves FOP's right to bargain regarding those effects or to bring grievances under its CBA.

The recent proceedings between the City and FOP regarding body-worn cameras before the Illinois Labor Relations Board illustrate how FOP can trigger bargaining over any bargainable effects of the Proposed Consent Decree. *See Fraternal Order of Police, Lodge #7 v. City of Chicago*, ILRB Case No. L-CA-17-037 (Jan. 2, 2018 ALJ Ord.) ("*FOP*").[4] In that proceeding, FOP alleged that the City's department-wide implementation of body-worn cameras violated the City's obligation to bargain with the FOP under the IPLRA. The administrative law judge found that implementation of the program had "bargainable effects" on officer discipline and safety, but, as FOP itself acknowledged in that forum, "the obligation to bargain effects is limited." *Id.* at 19, 30. The administrative law judge concluded that CPD was "not require[d]" to recall the body-worn cameras it issued to officers "or to rescind the discipline it issued based on [body-worn camera] footage." *Id.* at 30. Rather, CPD merely had to rescind and cease imposing discipline based on "misuse/loss" of the cameras "until the parties complete effects bargaining."

---

[4] The administrative law judge's decision can be accessed here:
https://www2.illinois.gov/ilrb/decisions/decisionorders/Documents/L-CA-17-037rdo.pdf.

*Id.* The body-worn camera decision illustrates both that FOP's objections before this Court overstate the scope of what is bargainable,[5] and that FOP has a mechanism to compel bargaining over those issues that are truly subject to a bargaining obligation under Illinois law. Thus, to the extent FOP is correct that any provision in the Proposed Consent Decree has bargainable effects, the carve-out ensures that FOP can seek to compel bargaining over those effects in an appropriate forum.

At this point, however, because the carve-out preserves FOP's ability to seek to compel bargaining when it is required by the IPLRA, the Court need not and should not attempt to resolve each assertion FOP makes about what might be bargainable in the future. In fact, FOP's objections based on alleged future bargaining obligations are not sufficiently ripe or well-developed for this Court to apply the relevant standard under Illinois law for determining when an issue is subject mandatory bargaining.

The Illinois Supreme Court has recognized that "[w]hich issues are mandatory [subjects of bargaining], and which are not, will be very fact-specific questions," *Central City Educ. Ass'n v. Illinois Educ. Labor Relations Bd.*, 599 N.E.2d 892, 905 (Ill. 1992). The hypothetical nature of FOP's objections makes it impossible for this Court to conduct the fact-specific inquiry required by Illinois law. As such, the Court need not individually resolve each of FOP's objections based on alleged duty to bargain under the IPLRA, because another tribunal, such as the Illinois Labor Relations Board, will be better situated to conduct a fact-specific inquiry into whether a particular provision of the Proposed Consent Decree has bargainable effects under the IPLRA.

---

[5] In the proceeding before the administrative law judge, FOP conceded that the City "had no obligation to bargain the methods of collection" of body-worn camera footage. *FOP*, ILRB Case No. L-CA-17-037, at 30–31.

### D.     FOP's "Additional Concerns"

In order to approve the Proposed Consent Decree, the Court does not need to definitively resolve FOP's final category of objections in which FOP raises "additional concerns" about various topics. (Dkt. 156 at 49–54.) Several of these objections are duplicative of FOP's objections in the other three categories. The remainder of FOP's objections in the final category do not raise alleged conflicts with FOP's CBA or state law.[6]

## III.    The Proposed Consent Decree does not conflict with FOP's CBA.

FOP claims that various provisions in the Proposed Consent Decree "should not be approved by the [C]ourt as they violate the contractually protected rights of the police officers covered by [FOP's] CBA." (Dkt. 156 at 22.) A comparison of the cited provisions in the Proposed Consent Decree with the actual text of FOP's CBA—rather than the overly expansive version of what FOP says it says—demonstrates that there are no conflicts and that FOP's objections are baseless. The Court should expressly overrule each of FOP's objections alleging that the Proposed Consent Decree directly conflicts with its CBA.

### A.     Sworn Affidavits in Investigations of Misconduct Complaints

FOP objects to various paragraphs in the Proposed Consent Decree because they allegedly violate limitations in FOP's CBA on the extent to which a misconduct complaint against an officer can be investigated in the absence of a sworn affidavit from the complainant.[7] (Dkt. 156 at 27–28.) FOP's objections are unfounded because the Proposed Consent Decree requires the City to undertake "best efforts" to negotiate with FOP regarding changes to the applicable CBA provisions and, in the interim, to better utilize existing CBA procedures that

---

[6] The State has prepared an appendix, which is attached, that responds to objections by FOP that are not specifically addressed in this brief.

[7] FOP also raises an objection to these paragraphs based on the Illinois Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/3.8(b). (Dkt. 156 at 8 –9.) FOP's statutory objection is addressed below, *see infra* at 30.

permit misconduct investigations without a signed complainant affidavit in multiple circumstances. Utilizing existing CBA procedures does not violate the CBA.

Appendix L of FOP's CBA already authorizes an administrative investigation of a misconduct complaint even when there is no supporting affidavit from the complainant in a variety of circumstances. Appendix L of FOP's CBA, titled "Affidavits in Disciplinary Investigations," begins with five paragraphs enumerating scenarios in which misconduct allegations can be investigated without an affidavit from a complainant, which include: anonymous complaints alleging criminal conduct; anonymous complaints of medical roll abuse or violations of the Chicago-residency requirement for officers; where a supervisor receives a misconduct allegation from a citizen; and where an officer makes a misconduct allegation against another officer. (Dkt. 85-1, App'x L ¶¶ 1–5.) In addition to these specific scenarios, Appendix L includes a catch-all exception, which can be invoked "[w]hen an appropriate affidavit cannot be obtained from a citizen complainant," that authorizes the head of BIA or COPA[8] to provide an affidavit attesting to the existence of "objective verifiable evidence" that justifies permitting "the investigation to continue." (*Id.* ¶ 7.)

As Appendix L of FOP's CBA makes clear, the CBA does not impose a categorical bar on investigating a complaint that lacks a supporting affidavit. Consistent with Appendix L to the CBA, Paragraph 431 of the Proposed Consent Decree states: "The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation." (Dkt. 107-1 ¶ 431.) FOP contends that this provision is in "direct conflict" with its CBA (Dkt. 156 at 28), but one of the ways in which the City and CPD can seek to achieve the objectives of paragraph 431 of the Proposed Consent Decree is to better utilize the existing exceptions to the complainant affidavit requirement provided for by Appendix

---

[8] Appendix L refers to "IPRA," COPA's predecessor, and "IAD," BIA's predecessor. (Dkt. 85-1, App'x L ¶ 7.)

L of the CBA. (*See* Compl., Ex. B, DOJ Rept., at 51 ("CPD's unions correctly note that investigators can 'override' the requirement for a sworn affidavit, and we agree that IPRA and BIA should make more use of the override option.").) The Proposed Consent Decree does not conflict with the CBA by utilizing procedures that the CBA itself provides.

FOP's objections to paragraphs 425, 427, and 462 of the Proposed Consent Decree are meritless for the same reason. FOP objects that paragraph 425 of the Proposed Consent Decree permits complaints about officer misconduct to be submitted by telephone, which, according to FOP, evinces "intent . . . to allow oral complaints that are not to be supported by an affidavit." (Dkt. 156 at 8.) FOP also faults (*see id.*) paragraph 427 for requiring the City and CPD to "ensure all complaints," including those submitted "verbally," "by telephone," or "anonymously," are "accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement . . . ." (Dkt. 107-1 ¶ 427.) As Appendix L to FOP's CBA makes clear, there are multiple ways in which a misconduct complaint can be investigated "in accordance with . . . the applicable collective bargaining agreement" even if the complaint lacks a supporting affidavit from the complainant. (*Id.*) Given that Appendix L permits a full investigation of certain types of complaints without an affidavit, it is entirely consistent with Appendix L to establish avenues for receiving complaints that are not in written form, such as through the phone line described in paragraph 425 and the other means contemplated by paragraph 427 of the Proposed Consent Decree.

The language from Appendix L upon which FOP relies does not prohibit the mere receipt of a complaint that lacks a supporting affidavit. (Dkt. 156 at 27–28.) The cited language in Appendix L only speaks to whether an officer "will be required to answer any allegation of misconduct" when it is not supported by an "appropriate affidavit." (Dkt. 85-1, App'x L ¶ 10.)

Nothing in paragraphs 425 and 427 of the Proposed Consent Decree requires officers to answer all allegations of misconduct in all circumstances, without regard to whether there is a supporting affidavit. To the contrary: paragraph 427 of the Proposed Consent Decree expressly requires that complaint investigations be done "*in accordance with . . . the applicable collective bargaining agreement*." (Dkt. 107-1 ¶ 427.)

Paragraph 462 of the Proposed Consent Decree, which states that "[a] signed complainant affidavit will not be required to conduct a preliminary investigation," is also consistent with Appendix L of FOP's CBA. The Proposed Consent Decree distinguishes between a "preliminary investigation" and a more fulsome "misconduct investigation." (*Compare* Dkt. 107-1 ¶¶ 459–63 *with id.* ¶¶ 464–87; *see also id.* ¶ 444(c)(iv).) Allowing a limited preliminary investigation, regardless of whether the complainant initially provides a signed affidavit, is consistent with Appendix L of FOP's CBA. As noted, Appendix L to FOP's CBA permits an "investigation to continue" even "[w]hen an appropriate affidavit cannot be obtained from a citizen complainant" if the head of COPA or BIA attests to the existence of "objective verifiable evidence." (Dkt. 85-1, App'x L ¶ 7.) Any such "objective verifiable evidence" will necessarily be obtained through a preliminary investigation. The language in this portion of Appendix L, which refers to allowing an "investigation to continue," also acknowledges that an investigation will have already commenced without any affidavit having been received. Once again, using procedures established by FOP's CBA does not violate FOP's CBA.

### B.     Anonymous Complaints

FOP objects (*see* Dkt. 156 at 27) that paragraphs 425, 427, 429, 430, 440(b), 461, and 477 of the Proposed Consent Decree violate Section 6.1(D) of its CBA, which states in pertinent part:

> No anonymous complaint made against an Officer shall be made the subject of a Complaint Register investigation unless the allegation is a violation of the Illinois Criminal Code, the criminal code of another state of the United States or a criminal violation of a federal statute.
>
> No anonymous complaint regarding residency or medical abuse shall be made the subject of a Complaint Register investigation until verified. No ramifications will result regarding issues other than residence or medical roll abuse from information discovered during an investigation of an anonymous complaint regarding residency or medical roll abuse, unless of a criminal nature as defined in the preceding paragraph.

(Dkt. 85-1 § 6.1(D); *see also id.*, App'x L ¶ 2.) As with FOP's objections regarding sworn affidavits from complainants, FOP's objection regarding anonymous complaints fails because the Proposed Consent Decree permits investigation of anonymous complaints to the same extent as FOP's CBA.

Paragraph 461 of the Proposed Consent Decree states in pertinent part: "Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, ***in accordance with the applicable collective bargaining agreements*** in effect at the time [] the allegation is made." (Dkt. 107-1 ¶ 461 (emphasis added).) In other words, as the State has previously pointed out (Dkt. 85 at 6), the Proposed Consent Decree expressly requires compliance with applicable collective bargaining agreements in the investigation of anonymous complaints.

Paragraph 461 also requires that anonymous complaints be "preliminarily investigated," while recognizing that further investigation may not be "appropriate" in light of, among other things, "the applicable collective bargaining agreements." (Dkt. 107-1 ¶ 461.) Section 6.1(D) of FOP's CBA addresses whether an anonymous complaint about non-criminal conduct can be made "the subject of a Complaint Register investigation." (Dkt. 85-1 § 6.1(D).) A "Complaint Register investigation" is synonymous with what the Proposed Consent Decree calls a "misconduct investigation," which, as noted above, is more extensive than a "preliminary

investigation." (*Compare* Dkt. 107-1 ¶¶ 464–487 *with id.* ¶¶ 459–463.) Because paragraph 461 of the Proposed Consent Decree refers to anonymous complaints being "preliminarily investigated," it does not conflict with the limits on "Complaint Register investigations" imposed by Section 6.1(D) of FOP's CBA.

Furthermore, Section 6.1(D) and Appendix L of FOP's CBA recognize three categories of anonymous complaints that can be subject to a "Complaint Register investigation": allegations of criminal conduct, "verified" allegations of medical roll abuse, and "verified" allegations of the Chicago-residency requirement for officers. (Dkt. 85-1 § 6.1(D) & App'x L ¶ 2.) A preliminary investigation must necessarily occur in order to obtain "verifi[cation]" of medical roll abuse or violation of the residency requirement. As such, FOP's CBA acknowledges that there must be at least some preliminary investigation of anonymous complaints to determine if the exceptions in Section 6.1(D) and Appendix L apply.

FOP's objections to paragraphs 425, 427, 429, 430, and 440(b) of the Proposed Consent Decree (Dkt. 156 at 9–10, 27), which deal with the mechanisms for receiving complaints, including anonymous complaints, fail for the same reasons discussed regarding sworn affidavits from complainants. Given that there are various types of anonymous complaints that can be investigated under FOP's CBA, it is entirely appropriate for the City and CPD to maintain channels through which these complaints can be received. Section 6.1(D) of FOP's CBA does nothing to prohibit the receipt of anonymous complaints—it only speaks to whether such complaints can be "made the subject of a Complaint Register investigation[.]"(Dkt. 85-1 § 6.1(D).) FOP's objections to the provisions in the Proposed Consent Decree addressing the mere receipt of anonymous complaints should therefore be overruled.

19

### C. Disclosure of a Complainant's Identity to an Officer Under Investigation

FOP objects that paragraph 475 of the Proposed Consent Decree violates Section 6.1(E) of its CBA. (Dkt. 156 at 30.) Section 6.1(E) of FOP's CBA states: "Immediately prior to the interrogation of an Officer under investigation, he or she shall be informed in writing of the nature of the complaint and the names of all complainants." (Dkt. 85-1 § 6.1(E).) Paragraph 475 of the Proposed Consent Decree states: "The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation." (Dkt. 107-1 ¶ 475.) FOP's objection that paragraph 475 of the Proposed Consent Decree violates the CBA is unfounded because as reflected in paragraph 475 and, later, the carve-out provision in paragraph 711, the Proposed Consent Decree simply requires the City to exercise "best efforts" to attempt to negotiate a change to Section 6.1(E) in future CBAs with FOP. (Dkt. 107-1 ¶¶ 475 & 711.)

### D. CBA Section 6.4 – Photographs of Officers

FOP raises two objections based on Section 6.4 of its CBA (Dkt. 156 at 22–23, 32), which states: "No photo of an Officer shall be made available to the media prior to a conviction for a criminal offense or prior to a decision being rendered by the Police Board, **except where required by law.**" (Dkt. 85-1 § 6.4 (emphasis original).) FOP's objections cite provisions in the Proposed Consent Decree addressing photographs and recordings of officers taken by members of the public (Dkt. 107-1 ¶ 58) and the release of video footage by COPA of "weapons discharges and incidents involving death or serious bodily injury," (*id.* ¶ 554). Neither of FOP's objections has merit because the cited provisions of the Proposed Consent Decree reflect the requirements of state law and thus fall within the express exception provided by Section 6.4 of FOP's CBA.

FOP objects to paragraph 58 of the Proposed Consent Decree, which states:

> Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.

(Dkt. 107-1 ¶ 58.) FOP objects that this provision is "inconsistent with the intent of the City and the Lodge to protect the images of the officers" as purportedly reflected in Section 6.4 of its CBA. (Dkt. 156 at 23.) But Section 6.4 of FOP's CBA does not address photographs and recordings taken by members of the public. Nor could it. Members of the public are not parties to the CBA and the CBA cannot restrict their rights. Members of the public have a First Amendment right to record police officers performing their duties in public places. *See ACLU of Illinois v. Alvarez*, 679 F.3d 583, 586–87 (7th Cir. 2012) (holding that the First Amendment protects the ability of members of the public to record police officers performing their official duties in public places); *see also Glik v. Cunniffe*, 655 F.3d 78, 79–81 (1st Cir. 2011) (same); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) (same). Illinois law also recognizes this right in the Law Enforcement Officer-Worn Body Camera Act ("Body Camera Act"), which requires law enforcement agencies covered by the statute to adopt policies affirming that: "No officer may hinder or prohibit any person, not a law enforcement officer, from recording a law enforcement officer in the performance of his or her duties in a public place or when the officer has no reasonable expectation of privacy." 50 ILCS 706/10-20(a)(11). Because paragraph 58 of the Proposed Consent Decree simply reflects what the First Amendment and state law already require, it does not violate FOP's CBA.[9]

---

[9] FOP also objects that paragraph 58 of the Proposed Consent Decree threatens the integrity of "sensitive or covert operations" and that it provides "no protection" for "those situations in which the officers' operations could be imperiled by citizens coming close to the operation and potentially interfering with the officers." (Dkt. 156 at 23.) FOP's objections ignore the second sentence of paragraph 58 of the Proposed Consent Decree, which permits

FOP's objection to paragraph 554 of the Proposed Consent Decree fails for the same reason. Paragraph 554 of the Proposed Consent Decree states in pertinent part:

> OAG acknowledges that the City adopted a policy relating to the public release of video footage capturing weapons discharges and incidents involving death or serious bodily injury. ***Consistent with applicable law***, the City will continue to ensure COPA publicly releases such video pursuant to the June 2016 Video Release Policy for the City of Chicago. The Video Release Policy will not supersede or otherwise limit the City's legal obligations pursuant to state and federal transparency laws, including the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.*

(Dkt. 107-1 ¶ 554 (emphasis added).) The "applicable law" in this instance includes a section of the Body Camera Act, 50 ILCS 706/10-20(b), that expressly requires public disclosure of body camera recordings that have been "flagged due to the filing of a complaint, discharge of a firearm, use of force, arrest or detention, or resulting death or bodily harm," except when a subject has a reasonable expectation of privacy. Section 6.1 of FOP's CBA does not bar the release of such recordings, because Section 6.1 contains an exception for when release of an officer's photo is "required by law." (Dkt. 85-1 § 6.4.) Because paragraph 554 of the Proposed Consent Decree requires the release of video footage in accordance with state law, it does not violate FOP's CBA.

Paragraph 554 of the Proposed Consent Decree also does not conflict with state law, as FOP asserts. (Dkt. 156 at 32–33.) FOP points to an alleged conflict with Section 7.5(cc) of the Illinois Freedom of Information Act, 5 ILCS 140/7.5(cc), but that provision expressly incorporates the Body Camera Act, which, as noted, requires public disclosure of body camera recordings in circumstances covered by Paragraph 554 of the Proposed Consent Decree. *See* 50 ILCS 706/10-20(b).

---

officers to take "reasonable action" to, among other things, "protect the integrity and confidentiality of investigations, and protect the safety of officers or others." (Dkt. 107-1 ¶ 58.)

FOP further objects to paragraph 554 of the Proposed Consent Decree by claiming that another statutory provision, 625 ILCS 5/11-212(f), "means that the actions of a police officer should not be subject to public release pursuant to the consent decree." (Dkt. 156 at 33.) Section 5/11-212 does not mention video footage and refers exclusively to "identification information" collected on written "uniform stop card[s]," "uniform pedestrian stop card[s]," "uniform traffic citation[s]," and "warning citation[s]" completed by officers following pedestrian and vehicle stops. 625 ILCS 5/11-212(a)-(b), (b-5). Subsection (f) of Section 5/11-212, upon which FOP relies, also makes clear on its face that it is not creating a broad, general protection for officers' identification information, as FOP suggests. Subsection (f) exempts from disclosure "[a]ny law enforcement officer identification information and driver or pedestrian identification information that is compiled by any law enforcement agency . . . *pursuant to this Act for the purposes of fulfilling the requirements of this Section* . . . ." 625 ILCS 5/11-212(f) (emphasis added). The video footage required to be released under paragraph 554 of the Proposed Consent Decree is not "compiled" pursuant to the "Act" referenced in order to satisfy the requirements of Section 5/11-212. As such, Section 5/11-212(f) is irrelevant to paragraph 554 of the Proposed Consent Decree, and FOP's objection based on this provision is unfounded.

### E.      CBA Section 8.1 – Termination for "Just Cause"

FOP objects (*see* Dkt. 156 at 28) to paragraph 312 of the Proposed Consent Decree, which allows the Field Training Review and Evaluation Board "to recommend" termination or additional training for a probationary police officer ("PPO"), because it does not acknowledge that PPOs obtain limited rights under the CBA after twelve months of employment, including the "just cause" standard required for discipline under Section 8.1 of the CBA. (Dkt. 85-1, App'x P.) As FOP's objection implicitly acknowledges, PPOs who have not completed twelve months of

employment have no rights under Section 8.1 of the CBA. (*See id.* § 2.) For those PPOs who are subject to Section 8.1 of the CBA, paragraph 312 of the Proposed Consent Decree does not give the Field Training Review and Evaluation Board the power to terminate them, only the power to recommend termination. To the extent those PPOs have applicable rights under Section 8.1 or another part of the CBA to contest that recommendation, such as through the grievance process, the carve-out preserves those rights. Including a reference to CBA Section 8.1 in paragraph 312 of the Proposed Consent Decree would be both superfluous and misleading.

### F.     CBA Section 8.4 – Retention of Disciplinary Records

FOP objects to various paragraphs in the Proposed Consent Decree for allegedly violating Section 8.4 of its CBA, which purports to require the destruction of officer disciplinary records older than five years or, for certain records, seven years, and which limits the manner and time period for using such records in subsequent disciplinary proceedings. (Dkt. 156 at 24, 29–31, 49–50.) FOP neglects to mention that the First District Appellate Court of Illinois has held that the document destruction requirements in Section 8.4 of FOP's CBA are unenforceable because they violate the public policy of Illinois as reflected in the Illinois Freedom of Information Act. *See Fraternal Order of Police, Chicago Lodge No. 7 v. City of Chicago*, 59 N.E.3d 96, 104 (1st Dist. 2016) ("Enforcement of an arbitration award requiring destruction of the requested records on the ground that the City breached Section 8.4 of the CBA would violate the FOIA as well as the public policy underlying the General Assembly's adoption of the Act.") In addition, a grievance arbitrator also concluded that Section 8.4 was in "direct contravention" of Illinois public policy and ordered the City and FOP to negotiate a substitute provision. *Id.* at 102–03 (quoting arbitration award). FOP's objections based on Section 8.4 of its CBA are unfounded because the document destruction requirements contained in Section 8.4 are void as contrary to public policy.

To the extent FOP contends some portion of Section 8.4 of the CBA remains viable, FOP's objections fail for an additional reason: the cited paragraphs in the Proposed Consent Decree do not conflict with Section 8.4. FOP objects (*see* Dkt. 156 at 29–30) to paragraph 456 of the Proposed Consent Decree, which states: "The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant." (Dkt. 107-1 ¶ 456.) Section 8.4 of FOP's CBA only restricts the use of disciplinary records in "future proceedings" (*see* Dkt. 85-1 § 8.4), but the decision whether to hire a former CPD member at COPA is not a "proceeding," nor is the decision whether to assign a current CPD member to work at BIA or as an Accountability Sergeant. As such, the restriction on the use of disciplinary records in Section 8.4 of the CBA is irrelevant in these contexts.

FOP also complains about paragraph 508 of the Proposed Consent Decree, which states:

> The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.

(Dkt. 107-1 ¶ 508.) FOP contends that "the efforts to do this will involve collective bargaining negotiations with the Lodge." (Dkt. 156 at 30.) Given the First District's ruling, however, that destruction of these materials pursuant to the CBA would violate public policy, *Fraternal Order of Police*, 59 N.E.3d at 104, it is doubtful whether any bargaining obligation exists on this issue. FOP cites no authority holding that a public employer must bargain with a union over whether to comply with state records laws. In any event, paragraph 508 of the Proposed Consent Decree is a "best efforts" provision, which means that it does not unilaterally eliminate an extant, applicable CBA provision, but instead requires the City to pursue a change to the CBA through bargaining.

Thus, any bargaining obligation that may exist under the IPLRA remains undisturbed pursuant to the carve-out. (*See* Dkt. 107-1 ¶ 711.)

> FOP also objects to paragraph 516 of the Proposed Consent Decree, which states:
>
> Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding for a period of up to five years after the date of the incident or the date on which the violation is discovered, whichever is later.

(*Id.* ¶ 516.) FOP objects that this provision violates a portion of Section 8.4 of its CBA (Dkt. 156 at 31), which requires that a finding of "Sustained – Violation Noted, No Disciplinary Action" be "removed from the Officer's disciplinary record and not used to support or as evidence of adverse employment action" after one year. (Dkt. 85-1 § 8.4.) FOP ignores the fact that the Proposed Consent Decree refers to a finding of "Sustained – Violation Noted, No Disciplinary Action" as something distinct from a "sustained finding" as that term is used in paragraph 516. (Dkt. 107-1 ¶¶ 516–17.) Indeed, the subsequent paragraph of the Proposed Consent Decree, paragraph 517, refers to findings of "Sustained – Violation Noted, No Disciplinary Action" as a unique category and limits the circumstances in which this type of finding should be imposed. (*Id.*) This distinction is consistent with FOP's CBA, which excludes such findings from the grievance procedure that applies to sustained findings. (*See* Dkt. 85-1 § 8.4 ("The Department's finding of 'Sustained – Violation Noted, No Disciplinary Action' is not subject to the grievance procedure.").) Given this distinct usage in paragraph 517 of the Proposed Consent Decree, which is also reflected in the CBA, FOP is wrong to presume that the reference to "sustained finding[s]" in paragraph 516 applies to findings of "Sustained – Violation Noted, No Disciplinary Action." As such, paragraph 516 of the Proposed Consent Decree does not violate the one-year limitation in Section 8.4 of FOP's CBA, in the event this contract provision remains valid.

FOP also objects (*see* Dkt. 156 at 31) to paragraph 536 of the Proposed Consent Decree, which requires parties to Police Board proceedings to "be given access" to the "complete disciplinary file" of the involved CPD member and to "have the opportunity to move for entry in to the record of the proceedings any relevant aspect of the CPD member's file, as permitted by law and ***any applicable collective bargaining agreements***." (Dkt. 107-1 ¶ 536 (emphasis added).) FOP contends that this paragraph "should be more specific as to the actual records that will be transmitted to the Police Board" in light of its other objections "concerning the improper use of disciplinary history[.]" (Dkt. 156 at 31.) FOP's objection epitomizes its entire approach to the Proposed Consent Decree: even when there is an express acknowledgment of FOP's CBA rights, FOP still objects. But as the text of paragraph 536 of the Proposed Consent Decree makes clear—and as the carve-out reiterates more generally—there is no conflict with FOP's CBA.

### G.     CBA Sections 9.1 & 9.2 – Grievance Procedures

FOP objects to Paragraph 449 of the Proposed Consent Decree, which requires the City and CPD to notify a person whose complaint resulted in discipline to a CPD officer if the officer files a grievance under the CBA and to "advise the complainant in writing of the final disposition." (Dkt. 107-1 ¶ 449.) FOP objects that the grievance process is "not open to the public." (Dkt. 156 at 29.) FOP cites Sections 9.1 and 9.2 of its CBA, which define the scope of the grievance process and lay out a four-step process for resolving grievances. (Dkt. 85-1 §§ 9.1– 9.2.) But nothing in either of these sections states that the grievance process must be completely shielded from public view. FOP's own objection acknowledges that the complainant may be required to testify in the grievance proceedings. (Dkt. 156 at 29.) In any event, even if grievance proceedings are typically non-public, paragraph 449 of the Proposed Consent Decree does not require making them public—it merely requires notifying a person who has made a misconduct

complaint of the ultimate outcome of the complaint. FOP has pointed to no reason why providing this basic information violates its CBA.

### H.     CBA Sections 20.10, 23.2, & 23.3 – Seniority

FOP repeatedly complains that various paragraphs in the Proposed Consent Decree do not reference Section 23.3 of the CBA, which states in pertinent part that "[s]eniority shall be considered in the promotion of Officers covered by this Agreement." (Dkt. 85-1 § 23.3.) FOP raises this objection regarding: the Recruitment, Hiring, and Promotions Section of the Proposed Consent Decree (Dkt. 156 at 23); provisions regarding the training and selection of Field Training Officers ("FTOs") (*id.* at 24); provisions regarding the training and selection of Certified CIT Officers (*id.* at 33–34); designation of certain CPD members as "points of contact" for community organizations (*id.* at 35); and provisions regarding the selection of CPD officers assigned to work in Chicago Public Schools (*id.* at 36). As an initial matter, it is not clear that each of these roles constitutes a "promotion" such that Section 23.3 of the CBA would apply. (Dkt. 85-1 § 23.3.) Regardless, even if Section 23.3 of the CBA applies, nothing in the Proposed Consent Decree precludes "consider[ation]" of "[s]eniority" as a factor, among others, in the process of selecting officers for these various roles. (*Id.*) To the extent Section 23.3 of the CBA applies to the process of selecting officers for these various roles, the carve-out ensures that FOP's rights under Section 23.3 remain intact by permitting consideration of seniority, among other factors, where required.

FOP's objection regarding the provisions in the Proposed Consent Decree aimed at achieving "unity of command" is without merit for the same reason. FOP objects (*see* Dkt. 156 at 25–26) that paragraph 367 of the Proposed Consent Decree—which permits CPD to "review and revise as necessary its staffing model to ensure that all field units on each watch in each patrol

district achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant" (Dkt. 107-1 ¶ 367)—might affect officers' rights under Sections 20.10 and 23.2 of the CBA. Section 20.10 provides for seniority-based preferences "[i]n the event the Employer determines to change an Officer's day-off group assignment," and Section 23.2 provides for seniority-based preferences when an officer "select[s] his or her furlough" period for the year. (Dkt. 85-1 §§ 20.10, 23.2.)

Nothing in paragraph 367 of the Proposed Consent Decree, or in paragraphs 357 through 366, which also address the unity of command staffing model to which FOP objects (Dkt. 156 at 25), purports to eliminate the role of seniority in selecting day-off groups or furlough periods.[10] As the State has previously noted (Dkt. 85 at 10–11), officers bid for work schedules and assignments, including regular day-off groups and furloughs, on an annual basis. The unity of command staffing model does not begin to phase in until January 31, 2020 (Dkt. 107-1 ¶ 364)— precisely because the City needs time to develop work schedules that meet the unity of command requirements before the annual seniority-based bidding process begins for the year when the schedules take effect. And again, the carve-out leaves no doubt that the City must comply with the CBA in implementing work schedules and staffing plans to meet the unity of command requirements.

## I.      In-Service Training Requirements

FOP objects (*see* Dkt. 156 at 24) to paragraphs 317, 324, 339, and 340 of the Proposed Consent Decree, which deal with in-service training of CPD officers, because there is no express acknowledgement that this training will occur when officers are "in pay status." (Dkt. 156 at 24–

---

[10] As paragraph 366 of the Proposed Consent Decree acknowledges, certain CPD units, district tactical teams and area saturation teams, currently maintain a unity of command staffing model. (Dkt. 107-1 ¶ 366.) FOP has not indicated that the staffing model in these units fails to comply with Sections 20.10 and 23.2 of the CBA. The fact that this type of staffing model is already in effect in certain units demonstrates that there is no irreconcilable conflict with the seniority preferences in these CBA provisions.

25.) Nothing in these paragraphs—or in any part of the Proposed Consent Decree—suggests that officers will be unpaid when attending required in-service training. FOP's demand for an acknowledgement that officers will be "in pay status" during in-service training is unnecessary, and the absence of this acknowledgement does not create a conflict between the Proposed Consent Decree and the CBA. Whenever officers have a right to be paid under the CBA, the carve-out preserves that right.

## IV.  The Proposed Consent Decree does not conflict with state law.

FOP contends that various provisions in the Proposed Consent Decree "directly conflict with or contradict Illinois law and the Chicago Municipal Code," but the text of the Proposed Consent Decree and the statutes FOP cites belie the existence of any conflict. (Dkt. 156 at 7.) In fact, many of the provisions in the Proposed Consent Decree cited by FOP contain express acknowledgements of state law. The Court should expressly overrule each of FOP's objections alleging that the Proposed Consent Decree conflicts with state law.

### A.  Uniform Peace Officers' Disciplinary Act – Sworn Affidavits

In addition to contending that the Proposed Consent Decree violates the CBA provisions regarding sworn affidavits for misconduct complaints, as discussed above, FOP also objects that paragraphs 425, 427, 431, and 462 of the Proposed Consent Decree conflict with a provision in the Uniform Peace Officers' Disciplinary Act. (Dkt. 156 at 8–9.) Specifically, FOP cites 50 ILCS 725/3.8(b), which states that "[a]nyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit." (Dkt. 156 at 8.) But as the State has previously pointed out (Dkt. 85 at 8), the Uniform Peace Officers' Disciplinary Act, by its own terms, "appl[ies] only to the extent there is no collective bargaining agreement currently in effect dealing with the subject matter of this Act," 50 ILCS 725/6. FOP's own objections regarding sworn affidavits from complainants make clear that its CBA addresses the same "subject matter"

as the Uniform Peace Officers' Disciplinary Act.[11] (*See* Dkt. 156 at 8.) Because there is an applicable collective bargaining agreement "dealing with the same subject matter," 50 ILCS 725/6, the Uniform Peace Officers' Disciplinary Act is irrelevant here. *See First Midwest Bank v. City of Chicago*, Case No. 14 C 9665, 2018 WL 5126570, at *3 (N.D. Ill. Aug. 29, 2018) (holding that the statute does not apply to in light of FOP's CBA).

### B. Chicago Municipal Code § 2-84-330(D) – Anonymous Complaints

FOP asserts that, in addition to violating its CBA, the Proposed Consent Decree violates a provision in the Chicago Municipal Code addressing anonymous complaints against police officers. Specifically, FOP objects (*see* Dkt. 156 at 9–10) to paragraphs 425, 427, 429, 440(b), 461, and 478 of the Proposed Consent Decree for allegedly violating Section 2-84-330(D) of the Chicago Municipal Code, which states: "No anonymous complaint made against an officer shall be made the subject of a complaint register investigation unless the allegation is of a criminal nature." If the Chicago Municipal Code were the controlling law, then FOP's own CBA would be invalid because it permits "[a]nonymous complaints of Medical Roll Abuse and/or Residency violations" to be the subject of a complaint register investigation if verified, regardless of whether an affidavit is received. (Dkt. 85-1, App'x L ¶ 2.) The Chicago Municipal Code is not controlling, however, because the City and FOP have elected to adopt different requirements in the CBA, which FOP contends is their right under state law. (*See* Dkt. 156 at 20 (discussing 5 ILCS 315/15).) As already discussed, the Proposed Consent Decree comports with the requirements in the CBA regarding anonymous complaints.

---

[11] Appendix L of FOP's CBA, which, as discussed, permits investigation of complaints without a sworn affidavit from the complainant in multiple circumstances, confirms that the Uniform Peace Officers' Disciplinary Act is inapplicable. If the Uniform Peace Officers' Disciplinary Act applied, Appendix L would be void for conflicting with the statute. Since FOP affirmatively relies upon Appendix L as the basis for its objections (*see, e.g.*, Dkt. 156 at 27–28), Appendix L must still be valid in FOP's view, despite its inconsistency with 50 ILCS 725/3.8(b).

## C.    Police and Community Relations Improvement Act ("PCRIA")

FOP contends (*see* Dkt. 156 at 10–11) that paragraphs 488 through 492 of the Proposed Consent Decree do not comply with the PCRIA, 50 ILCS 727/1-1 *et seq.* But as the State has previously pointed out (Dkt. 85 at 8), the Proposed Consent Decree expressly requires the City and CPD to comply with the PCRIA in paragraph 492, which states in pertinent part: "Criminal investigations into the actions of any CPD member relating to any 'officer involved death' ***will comply with the Police and Community Relations Improvement Act***[.]" (Dkt. 107-1 ¶ 492 (emphasis added).)

Despite this express incorporation of the PCRIA, FOP still objects. The focus of FOP's objection, however, is not the Proposed Consent Decree, but the City's current practice of using COPA investigators to lead officer-involved death investigations. Relying "[o]n information and belief," FOP asserts that the Office of the Attorney General has "failed to ensure" that the City's current investigative practices comply with the PCRIA. (Dkt. 156 at 10–11.) FOP has also separately filed a letter from the Executive Director of the Illinois Law Enforcement Training and Standards Board ("ILETSB"), Brent Fischer (*see* Dkt. 645), regarding the role of COPA investigators. Mr. Fischer's letter—which does not mention either the PCRIA or the Proposed Consent Decree—opines that COPA investigators are ineligible to serve as lead investigators in death and homicide investigations because they are not "law enforcement officers" within the meaning of a separate statute, the Police Training Act, *see* 50 ILCS 705/2 & 10.11. Because Mr. Fischer's letter does not address the PCRIA or the Proposed Consent Decree, it is irrelevant both to FOP's contention that the Proposed Consent Decree violates the PCRIA and to the ultimate issue before this Court: whether the Proposed Consent Decree should be approved. In any event, FOP's objections, and its reliance on Mr. Fischer's letter, mistakenly conflate FOP's dislike of the City's current investigative practices with what the Proposed Consent Decree requires. What

the Proposed Consent Decree requires is a new approach to investigating officer-involved deaths that both complies with the PCRIA and moots the issue addressed by Mr. Fischer.

In addition to insisting upon compliance with the PCRIA, the Proposed Consent Decree goes beyond what the PCRIA requires by mandating that the City use "best efforts" to ensure that a "law enforcement agency," within the meaning of the PCRIA, leads criminal investigations of officer-involved deaths.[12] (Dkt. 107-1 ¶ 492.) COPA is not a "law enforcement agency" within the meaning of the PCRIA, because it does not have the authority "to enforce criminal law or ordinances." *See* 50 ILCS 727/1-5. As a result, the City will need to seek the assistance of an external law enforcement agency, such as the Illinois State Police or another municipal police department, to conduct the criminal component of investigations into officer-involved deaths.[13] This change means that the issue of whether COPA investigators can serve as "lead investigator[s]" in officer-involved death incidents is likely to become irrelevant. 50 ILCS 727/1-10(b).

Nevertheless, FOP still complains that the Proposed Consent Decree refers to compliance with the PCRIA in "[c]riminal investigations" into officer-involved deaths, rather than in both criminal and administrative investigations. (*See* Dkt. 156 at 11.) FOP's objection ignores the fact that the PCRIA itself distinguishes between the criminal and administrative components of officer-involved death investigations. The PCRIA treats the investigation of every officer-involved death as one that could potentially (though not necessarily) result in criminal charges.

---

[12] The PCRIA requires "[e]ach officer-involved death investigation" to "be conducted by at least 2 investigators, or an entity or agency comprised of at least 2 investigators, one of whom is the lead investigator." 50 ILCS 727/1-10(b). The PCRIA does not mandate that an "entity or agency" conducting such an investigation be a "law enforcement agency," which is a separately defined term under the statute. *See* ILCS 727/1-5.

[13] The Proposed Consent Decree requires "best efforts" from the City, rather than guaranteed compliance, in recognition of the PCRIA requirement that the investigators conducting such investigations cannot be employed by the same law enforcement agency as the officers involved in the death being investigated, 50 ILCS 727/1-10(b), and the City's inability to ensure that a non-party law enforcement agency will agree to conduct criminal investigations of these incidents.

This is reflected in the fact that the PCRIA requires the primary investigators of the incident to "provide a complete report" to the relevant State's Attorney, 50 ILCS 727/1-10(d), who must then decide whether to bring criminal charges against the involved officer, *id.* § (e). It is the *potential* for criminal charges that makes an officer-involved death investigation a "[c]riminal investigation[]" (Dkt. 107-1 ¶ 492), regardless of whether the investigation ultimately results in criminal charges. Under the Proposed Consent Decree, the City must seek the assistance of an external "law enforcement agency" to lead this component of the investigation and must ensure that it is conducted in compliance with the PCRIA. (*Id.*)

The PCRIA also contemplates that officer-involved death investigations will have a parallel administrative component. *See* 50 ILCS 727/1-15. Indeed, beginning January 1, 2019, state law will require law enforcement agencies to have policies requiring parallel administrative investigations of officer-involved shooting incidents. *See* 50 ILCS 727/1-30 (eff. Jan. 1, 2019). The requirements in the Proposed Consent Decree focus in large part on these parallel administrative investigations, which will be conducted by COPA. While FOP insinuates (*see* Dkt. 156 at 10) that COPA investigators do not meet the certification requirements for a "lead investigator" under the PCRIA[14] (a factual assertion for which FOP provides no support), the PCRIA does not require parallel administrative investigations to be conducted by a "lead investigator" who meets these requirements.

In short, the Proposed Consent Decree adopts the PCRIA's investigative requirements where they apply, in the criminal component of the investigation. FOP's attempt to extend those

---

[14] FOP's quotation of the certification requirement in the PCRIA omits two of the three bases for certification. (*See* Dkt. 156 at 10.) The PCRIA states in relevant part: "Each officer-involved death investigation shall be conducted by at least 2 investigators, or an entity or agency comprised of at least 2 investigators, one of whom is the lead investigator. The lead investigator shall be a person certified by the Illinois Law Enforcement Training Standards Board as a Lead Homicide Investigator, or similar training approved by the Illinois Law Enforcement Training Standards Board or the Department of State Police, or similar training provided at an Illinois Law Enforcement Training Standards Board certified school." 50 ILCS 727/1-10(b).

requirements to the parallel administrative investigation conducted by COPA investigators is not supported by the statute. Because the Proposed Consent Decree does not conflict with the actual requirements of the PCRIA, FOP's objection should be overruled.

### D. Chicago Municipal Code § 2-84-330(E) – Disclosing Complainants' Identities

FOP objects that paragraph 475 of the Proposed Consent Decree allegedly conflicts with Section 2-84-330(E) of the Chicago Municipal Code, which requires, in pertinent part, that a CPD officer "be informed in writing" of "the names of all complainants" in a misconduct investigation "[i]mmediately prior" to the officer's investigative interrogation. (Dkt. 156 at 11–12.) FOP's objection is unfounded because paragraph 475 of the Proposed Consent Decree is a "best efforts" provision that requires the City and CPD to seek to change the Municipal Code and a corresponding provision in FOP's CBA, but that also acknowledges that FOP's CBA cannot be changed without bargaining with FOP.[15]

### E. Law Enforcement Officer-Worn Body Camera Act ("Body Camera Act")

FOP asserts that paragraphs 238(g) and 576 of the Proposed Consent Decree, which require random audits of recordings collected by CPD officers' body-worn cameras to ensure compliance with CPD policy, violate the Body Camera Act, 50 ILCS 706/10-1 *et seq.* FOP contends that these paragraphs are "not consistent with the time and destruction requirements" under the Body Camera Act, and that they exceed the scope of discipline permitted by the statute. (Dkt. 156 at 12–15.) FOP's objections are unfounded because the Proposed Consent Decree expressly acknowledges and incorporates the Body Camera Act.

FOP contends that the random audits of body-worn camera recordings required by paragraphs 238(g) and 576 of the Proposed Consent Decree ***could*** violate the Body Camera Act

---

[15] The City, of course, has the capacity to change its own ordinances without bargaining with FOP. As such, if the City and FOP agree to eliminate the applicable CBA provision, the City can repeal Section 2-84-330(E) of the Chicago Municipal Code.

because, according to FOP, the statute requires destruction of recordings after 90 days unless they are flagged for a statutorily enumerated reason. (Dkt. 156 at 12–13.) However, the prefatory portion of paragraph 238 expressly incorporates the retention and destruction requirements of the Body Camera Act by specifying that CPD must maintain a policy regarding body-worn cameras "that will ensure the recordings are retained in compliance with . . . the Illinois Law Enforcement Officer-Worn Body Camera Act." (Dkt. 107-1 ¶ 238.) Nothing in either paragraph 238 or paragraph 576 of the Proposed Consent Decree specifies when the random audits will occur. FOP's concern about an audit occurring after the 90-day initial retention period is purely speculative. Given the express incorporation of the retention and destruction requirements of the Body Camera Act, FOP cannot use speculation to create a conflict where the actual text of the Proposed Consent Decree forecloses such a conflict.

FOP's assertion that "[r]andom audits after the 90-day period would violate the statute" is also plainly an overstatement, as FOP itself acknowledges (*see* Dkt. 156 at 12–13 (discussing 50 ILCS 706/10-20(a)(7)(B))) that there are multiple grounds under the statute (including some FOP failed to cite, *see* 50 ILCS 706/10-20(a)(8)) upon which a recording may be retained for longer than 90 days. These grounds are potentially quite broad. For example, any recording may be retained for longer than 90 days "if a supervisor at the law enforcement agency designates the recording for training purposes." 50 ILCS 706/10-20(a)(8). The random audits contemplated by paragraphs 238(g) and 576 of the Proposed Consent Decree can and will occur within the retention framework established by the Body Camera Act, and FOP's speculation about hypothetical violations does not mean the Proposed Consent Decree conflicts with state law.

FOP also complains (*see* Dkt. 156 at 13–14) that paragraphs 238 and 576 of the Proposed Consent Decree violate Section 10-20(a)(9) of the Body Camera Act, which prohibits the use of body-worn camera recordings to discipline officers unless:

(A) a formal or informal complaint of misconduct has been made;
(B) a use of force incident has occurred;
(C) the encounter on the recording could result in a formal investigation under the Uniform Peace Officers' Disciplinary Act; or
(D) as corroboration of other evidence of misconduct.

50 ILCS 706/10-20(a)(9). Far from violating the Body Camera Act, paragraph 576 of the Proposed Consent Decree expressly states that any "corrective action" taken must be "permitted by law," which necessarily includes the limitations on discipline imposed by the Body Camera Act. (Dkt. 107-1 ¶ 576.) Furthermore, despite FOP's suggestion to the contrary (*see* Dkt. 156 at 13), not all "corrective action" constitutes discipline, and Section 10-20(a)(9) of the Body Camera Act expressly states that "[n]othing in this paragraph (9) shall be construed to limit or prohibit a law enforcement officer being subject to an action that does not amount to discipline." 50 ILCS 706/10-20(a)(9). Consistent with this statutory provision, it would be entirely permissible for CPD to require an officer to undergo non-disciplinary corrective action, such as targeted training, in response to a policy non-compliance identified through a random audit of the officer's body-worn camera recordings.

FOP contends that paragraph 238 of the Proposed Consent Decree subjects officers to discipline for "mere violations of a CPD policy" in conflict with the limitations imposed by Section 10-20(a)(9) of the Body Camera Act. (Dkt. 156 at 14–15.) But subpart (i) of paragraph 238 indicates that officers "may be subject to progressive discipline, training, or other remedial action" if they "***knowingly*** fail to comply" with CPD's body-worn camera policy. (Dkt. 107-1 ¶ 238(i).) This elevated intent requirement obviates the risk that officers will be disciplined for

37

mere technical violations of the body-worn camera policy in a manner that could violate the Body Camera Act.[16]

### F. Possession of a Firearm Owner's Identification ("FOID") Card

Paragraph 387 of the Proposed Consent Decree requires CPD to provide training to officers "to explain and address the effects on [FOID] card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment." (Dkt. 107-1 ¶ 387.) FOP faults the Proposed Consent Decree (*see* Dkt. 156 at 15–16) for allegedly failing to recognize officers' rights under 50 ILCS 725/7.2, a statutory provision that took effect on August 17, 2018. The new provision prohibits making possession of a FOID card "a condition of continued employment" for an officer who has lost FOID card eligibility due to being "a patient of a mental health facility," but who has not been deemed a "clear and present danger" to himself or herself or others. 50 ILCS 725/7.2. FOP does not contend that the Proposed Consent Decree violates this new statute in any way. Instead, FOP urges that "the consent decree should be modified" to acknowledge this new statutory right. (Dkt. 156 at 16.)

Including a reference to 50 ILCS 725/7.2 in the Proposed Consent Decree is unnecessary, because the Proposed Consent Decree does not purport to alter FOID card eligibility requirements for CPD officers. It merely requires CPD to provide informational training to officers regarding the relationship between FOID card eligibility and receipt of mental health treatment. While the Proposed Consent Decree cannot conflict with state law, it need not

---

[16] Because of the elevated intent requirement, paragraph 238(i) of the Proposed Consent Decree falls within one of the grounds for discipline under the Body Camera Act. The Body Camera Act permits discipline for conduct that "could result in a formal investigation under the Uniform Peace Officers' Disciplinary Act[.]" 50 ILCS 706/10-20(a)(9)(C). A "formal investigation" under the Uniform Peace Officers' Disciplinary Act is one in which an officer is at risk of a disciplinary penalty ranging from "suspension in excess of 3 days" to discharge. 50 ILCS 725/2(c). The knowing violation of CPD's body-worn camera policy is, at a minimum, insubordination, and it could constitute evidence of an attempt to conceal other misconduct. This type of intentional misconduct could result in a "suspension in excess of 3 days," *id.*, and is therefore a permissible basis for discipline under the Body Camera Act.

expressly acknowledge each statutory right conferred by state law. Furthermore, the training required by paragraph 387 of the Proposed Consent Decree will almost certainly provide information to officers about 50 ILCS 725/7.2, given that the purpose of the training is to "address the effects on [FOID] card eligibility" when a CPD officer seeks mental health treatment. (Dkt. 107-1 ¶ 387.)

### G. Union-Agent Privilege

FOP objects (*see* Dkt. 156 at 16) to paragraph 465(a) of the Proposed Consent Decree because it does not include a specific citation to 735 ILCS 5/8-803.5, which creates a privilege against compelled disclosure, subject to exceptions, of information acquired by a union representative "attending to his or her professional duties or while acting in his or her representative capacity." Paragraph 465(a) of the Proposed Consent Decree states that an agency conducting an administrative interview of a CPD member in a misconduct investigation will "ask the identity of other persons with whom [the CPD member] has communicated regarding the incident in question, and the date, time, place, and content of such communication, ***subject to any evidentiary privilege recognized under Illinois or federal law***[.]" (Dkt. 107-1 ¶ 465.) The text of paragraph 465(a) of the Proposed Consent Decree unambiguously incorporates all evidentiary privileges recognized under state and federal law. FOP's request for 735 ILCS 5/8-803.5 to be "specifically recognized" (*see* Dkt. 156 at 16) is unnecessary given that paragraph 465(a) of the Proposed Consent Decree already incorporates it, along with other evidentiary privileges established by Illinois law.

### H. Personnel Record Review Act

FOP objects that the Proposed Consent Decree "does not mention" the Personnel Record Review Act, 820 ILCS 40/8, which FOP contends "requires an employer to delete disciplinary

records that are more than four years old." (Dkt. 156 at 17.) FOP is simply wrong about what the statute requires. The statute states in pertinent part:

> An employer shall review a personnel record before releasing information to a third party and, except when the release is ordered to a party in a legal action or arbitration, delete disciplinary records, letters of reprimand, or other records of disciplinary action which are more than 4 years old.

820 ILCS 40/8. On its face, this provision only addresses the release of personnel records "to a third party." *Id.* It does not impose a categorical requirement for employers to destroy disciplinary records in their possession that are "more than 4 years old," as FOP suggests. *Id.* In fact, the statute expressly permits the release of disciplinary records that are more than four years old to third parties "when the release is ordered to a party in a legal action or arbitration." *Id.* The statute would not include this exception if it "require[d] an employer to delete disciplinary records that are more than four years old," (Dkt. 156 at 17), because no such records would exist. FOP's reading of 820 ILCS 40/8 is also contrary to its own CBA, which permits CPD to retain several categories of disciplinary records for five years, and, in some instances, for seven years. (Dkt. 85-1 § 8.4.) FOP has failed to identify any conflict between the Personnel Record Review Act and the Proposed Consent Decree, and its objection should be overruled.

### V. The Proposed Consent Decree does not violate FOP's right to collectively bargain under the IPLRA.

FOP raises a litany of objections to provisions in the Proposed Consent Decree based on its view that the provisions address mandatory subjects of bargaining under the IPLRA. The most frequent type of objection FOP raises—that the Proposed Consent Decree requires changes to CPD policy that may, in the future, provide the basis for disciplinary action against an officer—ignores CPD's managerial right, under the IPLRA and FOP's CBA, to set department policy. Like the municipality and police department that entered the consent decree in *Johnson v. City of Tulsa*, No. 94-CV-39-H(M), 2003 WL 24015151 (N.D. Okla. May 12, 2003), the City

40

and CPD have the managerial right to commit to the polices reflected in the Proposed Consent Decree without negotiating with FOP. Furthermore, to the extent the implementation of these policies may have bargainable effects, the carve-out preserves any rights FOP may have to bargain over those effects. (*See* Dkt. 107-1 ¶¶ 710–11.) In light of the carve-out, the Court does not need to expressly rule at this time on FOP's objections based on alleged bargaining obligations under the IPLRA.

FOP raises objections under the IPLRA to paragraphs in the Proposed Consent Decree requiring CPD to maintain or implement policies and procedures addressing various subjects.[17] The primary basis for FOP's objections is that the required policies may have "a disciplinary impact," but, according to FOP, "there is no reference for the Lodge to have a role in bargaining" over the policies. (Dkt. 156 at 38.)

FOP's objections are indistinguishable from the union's objections in *Johnson*, 2003 WL 24015151, and should be overruled for the same reasons. Like FOP does here, the union in *Johnson* objected that numerous policy changes required by the proposed consent decree might be the basis for future discipline and, as a result, those changes were subject to mandatory bargaining. *See id.* at *20–21, 23, 29–41. The district court rejected all of these objections based

---

[17] FOP raises objections regarding provisions requiring policies and procedures: prohibiting sexual misconduct by CPD members (Dkt. 156 at 37 (citing Dkt. 107-1 ¶ 63)); prohibiting CPD members from using personal social media accounts to disparage a person or group based on race, religion, sexual orientation, or another protected basis (Dkt. 156 at 37 (citing Dkt. 107-1 ¶ 57)); requiring CPD members to report when they observe another CPD member engaging in misconduct (Dkt. 156 at 37–38 (citing Dkt. 107-1 ¶ 59)); prohibiting retaliation against individuals who report misconduct by a CPD member (Dkt. 156 at 45 (citing Dkt. 107-1 ¶ 437)); setting protocols for arresting, searching, and detaining transgender, intersex, and gender non-conforming individuals (Dkt. 156 at 38 (citing Dkt. 107-1 ¶ 61)); requiring CPD to track when officers engage in foot pursuits of persons attempting to evade arrest (Dkt. 156 at 38 (citing Dkt. 107-1 ¶ 168)); requiring officers to intervene to stop another officer from using excessive force (Dkt. 156 at 39 (citing Dkt. 107-1 ¶ 176)); requiring officers to report when they point a firearm at a person in the course of a detention (Dkt. 156 at 39–40 (citing Dkt. 107-1 ¶¶ 188–96)); establishing a system for reporting and investigating force used by CPD officers based on three levels of severity (Dkt. 156 at 41 (citing Dkt. 107-1 ¶¶ 217–35)); and ensuring that officers' performance evaluations include performance dimensions addressing, among other things, constitutional policing and de-escalation (Dkt. 156 at 43 (citing Dkt. 107-1 ¶ 370)).

41

primarily on the police department's management rights recognized in the applicable collective bargaining agreement. *Id.*

Similarly, FOP's objections in this case should be rejected based on the management rights provisions in FOP's CBA. Like the police department in *Johnson*, which had the right to "manage the affairs of the Police Department in all respects," *id.* at *16, FOP's CBA recognizes that CPD "has and will continue to retain the right to operate and manage its affairs in each and every respect." (Dkt. 85-1 § 4.) And just as the police department in *Johnson* had the right to "establish and enforce Police Department rules, regulations, and orders," 2003 WL 24015151, at *16, FOP's CBA recognizes that CPD has "the sole discretion" to "add, delete or alter policies, procedures, rules and regulations." (Dkt. 85-1 § 4(N).) The police department in *Johnson* had the right to discipline officers for "just cause," 2003 WL 24015151, at *20, and CPD likewise has the right "to suspend, demote, discharge, or take other disciplinary action against Officers for just cause[.]" (Dkt. 85-1 § 4(M).) The district court in *Johnson* repeatedly relied on the management rights recognized in the collective bargaining agreement to reject the union's contention that provisions in the consent decree were subject to a bargaining obligation. 2003 WL 24015151, *20–24, 27–41. In this case, the Court should also rely on the management rights in FOP's own CBA to reject FOP's objections based on an alleged duty to bargain over policies CPD has the authority to set.

FOP's objections based on potential disciplinary effects of yet-to-be-enacted policies should also be rejected because, like the carve-out in *Johnson*, the carve-out in this case preserves FOP's ability to file a grievance over any allegedly unjust discipline ultimately imposed pursuant to these policies. In rejecting a challenge to new reporting requirements that the union claimed could result in discipline—an objection that mirrors FOP's objection to the

new force reporting requirements in this case (Dkt. 156 at 39–41)—the court in *Johnson* said: "[N]othing in the proposed decree prevents the FOP or any of its members from filing a grievance with respect to any unjust discipline in the future." 2003 WL 24015151, at *21; *see also id.* at *31 (reaching the same conclusion regarding an anti-retaliation provision); *id.* at *34 n. 59 (reaching the same conclusion regarding community partnership policy provisions). Here, too, the carve-out preserves FOP's ability to initiate grievances in the future if the policies in the Proposed Consent Decree result in any discipline that does not accord with the "just cause" standard in Section 8.1 of FOP's CBA.

The distinction between policymaking authority and potential disciplinary effects is also not unique to *Johnson*, as FOP's own authority from the Illinois appellate court demonstrates. In *AFSCME v. State Labor Relations Board*, 190 Ill. App. 3d 259 (1st Dist. 1989), which FOP cites (Dkt. 156 at 37), the First District Appellate Court held that a decision by the Illinois Department of Corrections ("IDOC") to adopt a drug testing policy for its employees was "not a subject for mandatory bargaining" under the IPLRA, *id.* at 266, while also holding that "[i]f the new policy includes disciplinary sanctions, these sanctions are mandatory subjects of bargaining," *id.* at 268 (citing *City of East St. Louis*, 3 PERI ¶ 2011 (Ill. SLRB 1987)). In other words, the employer had the unilateral authority to decide to adopt a drug testing policy and it was only obligated to bargain over disciplinary sanctions, if any, that might flow from the policy.

Just as IDOC had the managerial right to institute an employee drug testing policy in *AFSCME*, 190 Ill. App. 3d at 266, CPD has the managerial right to institute the policies required by the Proposed Consent Decree. Similarly, to the extent a future policy "includes disciplinary sanctions," then the disciplinary sanctions may be subject to bargaining to the extent they materially depart from current CPD practices, *id.* at 268 (citing *City of East St. Louis*, 3 PERI

¶ 2011 (Ill. SLRB 1987)). The Proposed Consent Decree accounts for this possibility through the carve-out, which preserves FOP's ability to seek to compel any such mandatory bargaining regarding disciplinary issues.

## VI. The "additional concerns" that FOP raises are not grounds for denying approval of the Proposed Consent Decree.

In its final category of objections, FOP raises "additional concerns" about various provisions of the Proposed Consent Decree. Some of these objections are duplicative of previously addressed objections and should be overruled for the reasons discussed above. (*See* Dkt. 156 at 49–50 (discussing retention of disciplinary records); *id.* at 51 (discussing the union-agent privilege under 735 ILCS 5/803.5); *id.* at 52 (discussing random audits of body-worn camera recordings).) The remainder of FOP's objections are not based on any applicable rule of law that would preclude entry of the Proposed Consent Decree, and thus the Court does not need to expressly address these objections in order to approve the Proposed Consent Decree.

Several of FOP's "additional concerns" identify paragraphs of the Proposed Consent Decree where FOP feels it should be consulted or involved during the implementation process. For example, FOP complains that: it "should be able to participate in" the selection of the independent monitor (Dkt. 156 at 50); it should have the opportunity to meet with the independent monitor on a quarterly basis, as the Coalition formed under the MOA will (*id.*); it should be the exclusive point of contact through which the independent monitor meets with CPD officers (*id.* at 50–51); it should have the same enforcement powers as the Coalition (*id.* at 51–52); and it should have a role in providing recommendations regarding CPD policy (*id.* at 52).

All of these objections are ironic in light of FOP's prior conduct in this case. As the State recently noted (*see* Dkt. 124 at 14 n.8), FOP rejected the parties' invitation to participate in a committee of engaged stakeholders that conducted interviews of independent monitor finalists as

part of the monitor selection process. FOP's objections requesting the same rights as the Coalition are similarly disingenuous given that, as the State has also previously noted (*see* Dkt. 73 at 3), FOP rejected the parties' invitation to enter into an agreement that would have given FOP the same rights. FOP's objection regarding its desired role in organizing meetings between the independent monitor and CPD officers is also contrary to FOP's behavior during the negotiation process, when FOP refused the parties' invitation to organize a focus group of CPD officers to provide input regarding the content of the Proposed Consent Decree. In short, contrary to the current position FOP takes in its comments, FOP has repeatedly declined invitations from the parties that would have given it a greater role in implementing the Proposed Consent Decree.

## VII.    The Proposed Consent Decree does not negatively impact officer safety.

FOP objects to a small number of provisions in the Proposed Consent Decree based on alleged risks to officer safety. FOP's fears that these provisions will negatively impact officer safety are unfounded.[18]

FOP objects to paragraph 176 of the Proposed Consent Decree, which states: "CPD officers must recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force." (Dkt. 107-1 ¶ 176.) FOP objects that "[t]here is no provision in this proposed rule as to the circumstances in which an officer might place himself or herself in danger in order to comply with the rule."[19] (Dkt. 156 at 39.) FOP's objection ignores the fact that

---

[18] As the State has previously noted (*see* Dkt. 109 at 6), current and former police officers were involved throughout the process of drafting and negotiating the Proposed Consent Decree. The State extensively relied on the expertise of: Ronald Davis, who rose from patrol officer to the rank of captain in the Oakland Police Department and later served as Chief of the East Palo Alto Police Department; Kathleen O'Toole, who rose from patrol officer to Commissioner of the Boston Police Department, and who later served as Chief of the Seattle Police Department; and Scott Thomson, who currently serves as the Chief of the police department in Camden County, New Jersey after years of service as an officer there. The State's experts understand firsthand the risks police officers face on a daily basis. The State's experts, together with the multiple CPD officers who participated in the process of drafting and negotiating the Proposed Consent Decree, were critical in ensuring that the Proposed Consent Decree protects officers' safety.

[19] Although FOP characterizes paragraph 176 of the Proposed Consent Decree as a "proposed rule," current CPD policy requires an officer who "directly observes a use of force that is excessive or otherwise in violation of [CPD's

paragraph 176 of the Proposed Consent Decree simply incorporates an already-existing legal duty CPD officers have "to prevent other law enforcement officers from infringing the constitutional rights of citizens . . . ." *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (setting forth the requirements of an officer's duty to intervene). Critically, the elements of this duty account for considerations of officer safety. The Seventh Circuit has recognized that an officer must have "a realistic opportunity to intervene to prevent the harm from occurring" for the duty to intervene to require action by the officer. *Id.* The "realistic opportunity" element of the duty to intervene requires a reasonable assessment of the circumstances confronted by the officer, *id.* at 285–86, which necessarily includes any risks presented to the officer's safety. Because paragraph 176 of the Proposed Consent Decree incorporates an already-existing legal duty that itself incorporates considerations of officer safety, FOP's objection is unfounded.

FOP objects (*see* Dkt. 156 at 39–40) to paragraphs 188 through 196 of the Proposed Consent Decree, which require training regarding when officers should and should not point their firearms at individuals, affirm that the decision to point a firearm at a person must be objectively reasonable, and require officers to provide a notification by radio of arrests and investigatory stops in which they pointed a firearm at a person. (Dkt. 107-1 ¶¶188-196.) FOP objects to these provisions stating:

> The Lodge believes this is a matter of great personal safety to the officers and that they may be at serious risk to their safety beyond that which is inherent in the normal performance of their police duties. In the history of the Department, the officers have never had to worry about the pointing of a weapon and reporting of that fact.

(Dkt. 156 at 40.) FOP's assertion that officers have "never had to worry about the pointing of a weapon" is incorrect. While the obligation to report firearm-pointing by radio is new, Rule 38 of

---

use of fore policy]" to "intervene on the subject's behalf." CPD, General Order G03-02, § 5(B) (eff. Oct. 16, 2017), available at: http://directives.chicagopolice.org/directives/.

CPD's Rules of Conduct for officers, which has been in effect for decades, has long prohibited the "[u]nlawful or unnecessary use or ***display of a weapon***."[20] Given that CPD policy already regulates when officers may point their firearms, FOP is wrong to suggest that a mere reporting requirement marks a sea change in how officers must conduct themselves.

FOP's objection (*see* Dkt. 156 at 40) to the inclusion in CPD policy of the "objective reasonableness" standard for when officers may point a firearm at a person similarly ignores that this standard already applies. FOP objects to paragraph 189 of the Proposed Consent Decree, which requires CPD to "clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances." (Dkt. 107-1 ¶ 189.) FOP contends that this paragraph "creates a new standard on the use of a weapon . . . ." (Dkt. 156 at 40.) FOP's objection ignores existing Seventh Circuit precedent holding that an officer's decision to point a firearm at a person must be objectively reasonable. *See Baird v. Renbarger*, 576 F.3d 340, 344–45 (7th Cir. 2009) (holding that an officer's pointing of a firearm at a person was not objectively reasonable and violated the Fourth Amendment); *Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000) (same); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992) (same). Once again, the objected-to provisions in the Proposed Consent Decree do not increase the risk to officer safety—they codify existing legal and policy requirements.

FOP also mentions an incident from "[a]pproximately one and one-half years ago" in which a CPD officer was seriously harmed. (Dkt. 156 at 40.) FOP indicates that the officer "hesitated about the deployment of a weapon and in the momentary interval as the officer internally mulled the drawing of the weapon the officer was severely beaten and is now disabled." (*Id.*) This incident is undoubtedly tragic. The injured officer deserves the utmost

---

[20] Rule 38, Rules and Regulations of the Chicago Police Department (Apr. 16, 2015 ver.), available at http://directives.chicagopolice.org/directives/data/a7a57bf0-12d7c186-a4912-d7c1-8b12822c2ca106c4.html.

sympathy and gratitude for paying such a high price in serving the public. FOP is wrong, however, to draw any connection between this incident and the Proposed Consent Decree. As FOP acknowledges, this incident occurred well before the Proposed Consent Decree was even drafted. As such, nothing in the Proposed Consent Decree caused the officer's hesitation.

FOP's suggestion that the reporting requirement for firearm-pointing incidents in the Proposed Consent Decree will increase risk to officers due to hesitation is unsupported speculation that is inconsistent with the experience of other jurisdictions. Ten police reform consent decrees approved by federal courts since 2011 in jurisdictions around the country have included a reporting requirement for firearm-pointing incidents.[21] FOP has identified no evidence indicating that this type of requirement has led to increased injuries to officers in these jurisdictions.

Instead of addressing how this type of reporting requirement has worked in practice, FOP has submitted a statement from a firearms instructor, Raymond Casiano, Jr., focusing on officers' response time in situations requiring them to point or use their firearms. (Dkt. 671.) Mr. Casiano asserts that, "[i]n [his] opinion," these situations will be "made more difficult for the officer by requiring them to worry about and consider the reporting requirement of pointing their weapons." (*Id.* at 3.) Nothing in the Proposed Consent Decree, however, prohibits officers from

---

[21] *See United States v. Police Department of Baltimore City, et al.*, No. 1:17-cv-00099-JKB, Dkt. 2-2, ¶¶ 140(a) & 169 (D. Md. Jan. 12, 2017); *United States v. City of Newark*, No. 2:16-cv-01731-MCA-MAH, Dkt. 4-1, ¶¶ 67(j), 73, 76 & Def. (yy) (D. N.J. Apr. 29, 2016); *United States v. City of Ferguson*, No. 4:16-cv-000180-CDP, Dkt. 41, ¶¶ 173, 183(a), 187 (E.D. Mo. Apr. 19, 2016); *United States v. City of Cleveland*, No. 1:15-cv-01046-SO, Dkt. 7-1, ¶¶ 56, 94 (N.D. Ohio June 12, 2015); *United States v. City of Albuquerque*, No. 1:14-cv-01025-RB-SMV, Dkt. 9-1, ¶¶ 14(h), 42 (D. N.M. Nov. 14, 2014); *United States v. Commonwealth of Puerto Rico, et al.*, No. 3:12-cv-2039-GAG, Dkt. 57-1 ¶¶ 36-37 & Def. (mmm) (D. P.R. July 17, 2013); *United States v. City of New Orleans*, No. 2:12-cv-01924-SM-JCW, Dkt. 159-1, ¶¶ 76, 83 (E.D. La. Jan. 11, 2013); *United States v. City of Portland*, No. 3:12-cv-02265-SI, Dkt. 4-1, ¶¶ 63 & 69 (D. Or. Dec. 17, 2012); *United States v. Town of East Haven, et al.*, No. 3:12-cv-01652-AWT, Dkt. 2-1, ¶¶ 80(h) & 99 (D. Conn. Nov. 20, 2012); *United States v. City of Seattle*, No. 2:12-cv-01282-JLR, Dkt. 3-1, ¶¶ 64, 93, 100 (W.D. Wash. July 27, 2012).

48

pointing their firearms when they need to do so.[22] Officers must simply provide a radio notification that a firearm has been pointed "promptly after the incident is concluded . . . ." (Dkt. 107-1 ¶ 190.) While Mr. Casiano cites various studies assessing how long it takes officers to respond to a threat requiring them to use a firearm, Mr. Casiano offers no evidence that an after-the-fact reporting requirement impacts officers' reaction time or increases the risk of harm. Indeed, as Mr. Casiano acknowledges in discussing CPD's Tactical Response Report ("TRR"), officers already have to report when they discharge a firearm (*see* Dkt. 671 at 5), and Mr. Casiano points to no evidence indicating that requiring officers to report when they discharge their firearms has increased harm to officers. As such, FOP's reliance on Mr. Casiano's personal speculation is misplaced.

## VIII.    Conclusion

None of FOP's objections preclude approval of the Proposed Consent Decree. The Court should approve the Proposed Consent Decree.

---

[22] Mr. Casiano criticizes the reporting requirement regarding firearm-pointing because "it does not account for the context or the reasons why the weapon has been pointed at someone," such as when officers use pistol mounted lights "in searching for armed suspects or identifying high risk or unknown risk subjects." (Dkt. 671 at 4.) But as Mr. Casiano acknowledges, CPD policy already mandates that "these pistol mounted lights are to be used only for illumination in situations where it is appropriate to have the weapon out and pointed at high-risk or unknown risk subjects." (*Id.*; *see also* CPD, Department Approved Handguns and Ammunition, Uniform and Property U04-02-01, § XV(A) (eff. 8/10/18) ("The pistol-mounted light is part of the weapons system and will only be used for illumination when, consistent with Department policy and training, members are justified in deploying the weapon."), available at http://directives.chicagopolice.org/directives/.) In other words, officers are already obligated to ensure that their decision to point a pistol-mounted light (and, by extension, a pistol) at a person is objectively reasonable. *See Baird*, 576 F.3d at 344–45. The reporting requirement in the Proposed Consent Decree is also tied to investigatory stops and arrests, which officers are already required to document in written reports. (Dkt. 107-1 ¶¶ 189–90.) Officers can and should provide necessary context for the firearm-pointing in those reports. Furthermore, as the Court noted during the public hearing, an officer's body-worn camera recording should provide additional context that elucidates an officer's reasons for pointing a firearm at a person. (10/25/18 Tr., Part A, at 232:15-22.)

Dated: December 10, 2018      Respectfully submitted,

For Plaintiff State of Illinois:

LISA MADIGAN
ATTORNEY GENERAL OF
THE STATE OF ILLINOIS


By:  /s/Christopher G. Wells
     Assistant Attorney General
     OFFICE OF THE ILLINOIS ATTORNEY GENERAL
     100 W. Randolph St., 11th Floor
     Chicago, Illinois 60601
     Phone: (312) 814-3000
     CWells@atg.state.il.us

     Brent D. Stratton
     Cara A. Hendrickson
     Gary S. Caplan
     Karyn L. Bass Ehler
     Thomas Verticchio
     Cynthia L. Flores
     Shareese N. Pryor
     Leigh J. Richie
     OFFICE OF THE ILLINOIS ATTORNEY GENERAL
     100 West Randolph Street, 11th floor
     Chicago, Illinois 60601
     Attorney No. 99000

     Martin R. Lueck
     Munir R. Meghjee
     Timothy Q. Purdon
     Anne M. Lockner
     Patrick M. Arenz
     Sharon Roberg-Perez
     ROBINS KAPLAN LLP
     800 LaSalle Avenue, Suite 2800
     Minneapolis, Minnesota 55402
     Phone: (612) 349-8591