UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STATE OF ILLINOIS,

Plaintiff,

v.

CITY OF CHICAGO,

Defendant.

Case No. 17-cv-6260
Judge Robert M. Dow Jr.

## THE CITY OF CHICAGO'S MEMORANDUM IN RESPONSE TO PUBLIC COMMENTS TO PROPOSED CONSENT DECREE

The City of Chicago ("City") respectfully submits this memorandum in response to public comments to the Proposed Consent Decree, Dkt. 107-1.

The Proposed Consent Decree is the result of extraordinary effort. Over the course of nearly a year, the City spent hundreds of hours and dedicated significant resources to negotiate with the State of Illinois a court-enforceable reform plan that comprehensively and fairly addresses allegations of unconstitutional policing raised both in the State's complaint and by community members in similar lawsuits. The resulting Decree is one of the most—if not the single most—extensive and comprehensive policing consent decrees of its kind, covering reforms that touch on myriad aspects of the Chicago Police Department and other City agencies with roles in public safety and policing oversight.

From the beginning, the public has been involved and engaged in the consent decree process in an unprecedented way. It is therefore unsurprising that most of the latest public comments submitted to the Court do not raise fundamental concerns about the decree's fairness, on the whole. Rather, the comments reflect continued engagement and support for this

1

transformative agreement and weigh in favor of a determination that the Proposed Consent Decree is lawful, fair, reasonable, and adequate.

## I.    BACKGROUND

In August 2017, the State of Illinois sued the City of Chicago seeking injunctive relief for alleged unconstitutional policing practices.  The State relied on findings issued by the United States Department of Justice ("DOJ") in January 2017, which concluded, among other things, that the Chicago Police Department ("CPD") had engaged in a pattern and practice of using unconstitutional force, and recommended reform in numerous areas including, among other things, CPD's use of force and accountability systems.  The State's complaint also cited findings and recommendations issued in April 2016 by the Police Accountability Task Force ("PATF"), a body charged by Chicago Mayor Rahm Emanuel with evaluating CPD and recommending policing reforms.[1]

Shortly after the State filed suit, the City committed to avoid protracted litigation and instead to negotiate with the State a court-enforceable consent decree to be overseen by an independent monitor. Around the same time, several community groups brought litigation similarly alleging that CPD had engaged in unconstitutional policing practices.  *See Campbell v. City of Chicago*, No. 17-cv-4467 (N.D. Ill. Lee, J.); *Communities United v. City of Chicago*, No. 17-cv-7151 (N.D. Ill. Bucklo, J.).  In exchange for a stay in the *Campbell* and *Communities United* cases, the City agreed to enter into a memorandum of agreement with those organizational plaintiffs (collectively known as the Coalition), which gave them the opportunity

---

[1] As stated in the Proposed Consent Decree, ¶ 701, the City's entry into this agreement and response to comments provided herein are not an admission by the City, CPD, or any agreement or employer of either entity that it has engaged in any unconstitutional, illegal, or otherwise improper activities or conduct.  The City's entry into this Consent Decree is not an admission of any of the findings or conclusions contained in the DOJ report or the PATF report.

to provide the City and State feedback regarding areas of concern to be addressed in the consent decree.[2]

The community's engagement with the consent decree process is genuine and ongoing. For instance, founders of the Coalition made a presentation to the City and State, explaining how their experiences with the police should inform provisions of the consent decree. The memorandum of agreement also provided the Coalition prospective enforcement rights over the consent decree. Under the terms of the Proposed Consent Decree, the independent monitor is required to meet quarterly with the Coalition. Proposed Consent Decree ¶ 669.

Over the course of nearly a year, the City worked diligently to determine the scope of reforms necessary to address the issues raised by the State, the Coalition, the DOJ, and the PATF. The City spent hundreds of hours and dedicated significant resources to robustly—often contentiously—negotiate with the State a reform plan that would comprehensively and fairly address the critical areas of concern. Multiple constituencies and resources provided feedback and insight throughout the negotiation process. The Coalition, sworn CPD members, the police unions, nationally recognized policing experts, and numerous community groups and individuals raised their concerns and ideas for reform at in-person meetings with the City and State, and through written feedback provided prior to and throughout the negotiation process. The City and State also considered during the drafting process the "Community Decree," a proposed consent decree drafted by the *Campbell* plaintiffs with input from other community groups. These inputs informed the negotiations between the City and State.

---

[2] The Fraternal Order of Police, Chicago Lodge No. 7 (the "FOP") was offered, but declined, the opportunity to enter into the memorandum of agreement and join the Coalition. The City and State nonetheless had multiple contacts with the FOP to get feedback on the consent decree provisions.

The result was one of—if not the most—extensive and comprehensive policing consent decrees of its kind, covering reforms touching all aspects of CPD and various City agencies that play a role in public safety and policing oversight, and incorporating feedback received during the negotiation process.

In July 2018, the City and State publicly released the more than 200-page draft consent decree and solicited the first round of public comment on the draft to build upon the robust feedback the parties had already solicited and incorporated. In response, more than 1,600 comments were submitted from a variety of stakeholders, including sworn CPD members, community groups, non-profit organizations, police unions, individual Chicago residents, and academics.

Upon closure of the public comment period, the Parties spent more than a month carefully considering each submitted comment, and negotiating specific additions and changes identified in the comments.

As a result of negotiations, the City and State agreed to a number of modifications to the terms of the draft consent decree, on myriad subject areas, incorporating the public feedback. For instance, the City and State agreed to:

- add new requirements committing the City to exploring diversion programs, resources, and alternatives to arrest (Proposed Consent Decree ¶ 11);

- provide arrestees access to phones as soon as practicable upon being taken into custody (¶ 31);

- clarify in policy that the public is permitted to photograph and record officers in public (¶ 58);

4

- designate an ADA liaison at CPD to coordinate compliance with the Americans with Disabilities Act (¶ 70);

- revise the definition of "sexual misconduct" to clarify that it includes officer-involved nonconsensual sexual conduct and criminal sexual assault (¶ 782);

- make best efforts to provide the Civilian Office of Police Accountability ("COPA") the authority to conduct sexual misconduct investigations (¶ 441).

These changes—among about two dozen others—are reflected in the Proposed Consent Decree, which the City and State jointly filed to the Court on September 13, 2018 (Dkt. 107-1).

On October 24 and 25, 2018, the Court held two days of fairness hearings on the Proposed Consent Decree, allowing the public the opportunity to provide oral feedback. At these hearings, the Court heard from about 90 members of the public. In addition, more than 500 additional written comments were filed on the Court's docket. (Many of the comments filed with the Court were duplicative of the 1,600 comments received during the first comment period and had been previously considered by the City and State prior to the filing of the Proposed Consent Decree.)

## II. THE OVERWHELMING MAJORITY OF PUBLIC COMMENTS DEMONSTRATES SUPPORT FOR ENTRY OF THE PROPOSED CONSENT DECREE.

A consent decree is "primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 528 (1986). As voluntary settlements are generally favored, the "nature of the district court's function when considering approval" of a consent decree is limited to determining whether the "proposed decree is lawful, fair, reasonable, and adequate." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-9

(7th Cir. 1985). The court considers several factors in making this "fairness" determination, including, as relevant to the public comment process, "the amount of opposition to the settlement among affected parties."[3] *Id.* at 889. The court must consider the facts "in the light most favorable to the settlement." *Id.*

Strikingly, the public comments filed with the court reflect little opposition to the Proposed Consent Decree as a whole. To the contrary, many agree the Proposed Consent Decree is a fair way to resolve the State's lawsuit and the findings of the DOJ and PATF reports. *See, e.g.*, Comments Submitted on Behalf of Plaintiffs in *Campbell*, Dkt. 157 ("*Campbell* plaintiffs believe strongly in the need for the proposed court-enforced agreement."); Dkt. 161 ("BPI unequivocally supports entry of the Consent Decree in this case."). Overall, the commenters acknowledge the extensive level of public engagement the parties undertook in drafting the consent decree, and accordingly, support its approval. *See, e.g.,* Comments Submitted on Behalf of Plaintiffs in *Campbell*, Dkt. 157 at 3 ("The Parties took into account many of the recommendations encapsulated in the Community Decree."); *Comments of the Chicago Lawyers' Committee for Civil Rights,* Dkt. 155 at 2 ("Chicago Lawyers' Committee for Civil Rights is one of the organizations that participated in this process, submitting written comments and participating in collaborative meetings to provide input.").

Still, many of the comments make specific suggested modifications to the Proposed Consent Decree. These suggestions are largely focused on incremental modifications, not opposition to the Proposed Consent Decree as a whole. Accordingly, these comments do not

---

[3] Other factors courts may consider include: the strength of the plaintiff's case compared to the settlement terms (the most important factor); the likely complexity, length, and expense of litigation; the opinion of competent counsel; and the stage of proceeding and amount of discovery completed at the time of settlement. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (citing *Hiram*, 768 F.2d at 889).

weigh against a determination that the Proposed Consent Decree is fair; the courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." *Isby*, 75 F.3d at 1199.

Here, the City carefully weighed and balanced two somewhat competing concerns: the desire to achieve comprehensive reform, and the operational, budgetary, and other practical considerations inherent in negotiating the terms of a comprehensive reform agreement. The City also balanced various possible approaches and had to make difficult assessments about how best to achieve reform—an exercise inherent in this type of public-facing process. This dissonance is reflected in the public comments themselves; even well-meaning advocates can differ in their views on the best way to accomplish reform. *See, e.g.*, Dkt. 157 (proposing alternative ways to modify the community policing provisions).

Ultimately, though—and as with any settlement—"[t]he essence of [a consent decree] is compromise." *Hiram*, 768 F.2d at 889. The Proposed Consent Decree, too, is the product of compromise—thoughtful and carefully negotiated compromise that accounts for the competing concerns of a variety of constituencies.

Indeed, as discussed below, nearly every area of concern raised in the public comments was addressed in the Proposed Consent Decree to at least some degree. The majority of the comments do not raise fundamental objections, but, rather, reflect very specific recommendations about the manner in which to implement certain areas of reform already included in the Proposed Consent Decree. The negotiations between the City and the State were confidential and subject to Fed. R. Evid. 408. *See also Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 517 (7th Cir. 2007) (noting that settlement negotiations generally remain confidential); *see also In re Young*, 253 F.3d 926, 927 (7th Cir. 2001) (same). However, the City

provides additional detail regarding some of the themes that have appeared throughout the public comments to illustrate the balance of various priorities the parties worked to achieve:

*Crisis intervention response*: A number of the public comments sought modifications to the requirements concerning the City's crisis intervention responses. However, even with the significant operational and logistical challenges present, the Proposed Consent Decree's commitments regarding crisis intervention are robust, covering training, deployment, data collection, and reporting. *See* Proposed Consent Decree ¶¶ 83–152. This section of the Proposed Consent Decree in particular incorporates vast community feedback received during the drafting and initial negotiation process. Indeed, the Proposed Consent Decree contemplates a continued platform for community input, establishing an Advisory Committee that will assist the City in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City and CPD services. *See* ¶¶ 128–132. The Proposed Consent Decree also reflects additional changes made as a result of community feedback received during the first public comment period, in which members of the public requested more particular focus on the City's response to responding to youth experiencing a behavioral or mental health crisis. *See* ¶ 130.

*Training and data collection concerning domestic violence, gender-based violence, and sexual assault*. A number of comments recommended measures to increase and improve officer training and data collection concerning domestic and gender-based violence. The Proposed Consent Decree, however, contains a number of provisions aimed at improving communication between the police department and community organizations that work in these areas, and ensuring that CPD members receive training on properly responding to allegations of gender-based violence. *See, e.g.*, ¶¶ 45(c), 62, 392. As an additional level of oversight, the Proposed

Consent Decree also provides for COPA to conduct administrative investigation of allegations of police misconduct involving domestic violence and sexual misconduct. *See* ¶¶ 440(d), 434, 443.

*Persons affected by police conduct*: A number of comments offer recommendations seeking specific services for people affected by police conduct and their families. The Proposed Consent Decree specifically requires CPD members to interact with victims of crime with courtesy, dignity, and respect. *See* ¶ 29. The Proposed Consent Decree also requires that CPD members inform victims of crime of the availability of victim assistance and resources (which often are offered outside of CPD) including providing written notices of victims' rights where appropriate (an additional requirement added in response to the first round of public comment). *Id.* CPD will also make victim assistance information accessible online and at police stations. *Id.*

*Increased community input*: Many of the commenters seek additional community input in a variety of forms. However, a fundamental tenet of the Proposed Consent is the guiding principle that strong community partnerships will make policing safer and more effective. In that vein, the Proposed Consent Decree contains numerous provisions allowing significant community input into the reforms required under the decree, from requiring the solicitation of recommendations from the Community Policing Advisory Panel to seeking community input on key CPD policies, including impartial policing policies and procedures, screening criteria for school resource officers, and crisis intervention policies. *See, e.g.*, ¶¶ 13, 23-26, 39, 40, 46, 52, 135, 136. Further, the Proposed Consent Decree does not limit or impede community participation in CPD's accountability system, and explicitly leaves open the door for the future the creation and participation of a community safety oversight board. *See* ¶ 422. The City and State also added, after the first round of public comment, a number of changes concerning

community feedback, including a requirement that CPD publish opportunities for community involvement, ¶ 633, and that CPD plans required by the consent decree will be made public, ¶ 652.

*Investigation of police misconduct*: A number of comments provide specific recommendations concerning the manner in which investigations of police misconduct should occur. The Proposed Consent Decree, however, provides for a robust and carefully balanced regime of accountability reforms, including changes in receiving and tracking misconduct complaints and conducting disciplinary investigations both internally at CPD and at COPA. *See* ¶¶ 419–565.

*Impartial policing.* A number of comments seek modifications of the Proposed Consent Decree's provisions concerning impartial policing. For instance, some commenters seek changes in officer training on interactions with people with disabilities and more explicit protections for gender non-conforming individuals who interact with police. The majority of these comments are duplicative of feedback received after the first public comment period. Indeed, after much negotiation, the City and State made several changes in response to the public feedback, including, among other things: additional training on interacting with people with disabilities, ¶¶ 42, 69; an accelerated timeframe for establishing policies related to interactions with transgender, intersex, and gender non-conforming individuals, ¶ 61; and designating an ADA Liaison at CPD to coordinate compliance with the Americans with Disabilities Act, ¶ 70. Overall, the impartial policing section of the Proposed Consent Decree commits to a broad range of reforms specifically addressing communities that interact with the police, through training, policies, improved language access, focus on hate crime investigation and data reporting, and increased data collection. *See* ¶¶ 49–82. The Proposed Consent Decree also requires communication

between CPD and the community through surveys that the Independent Monitor must conduct regularly to assess the community's perceptions of and satisfaction with CPD.  *See* ¶ 646.

*Use of force policies*:  A number of comments provide specific recommendations concerning CPD's use of force policies and practices, including how certain uses of force should be categorized and when use of force is appropriate when interacting with youth.  CPD's use of force policies and training were substantially revised at the end of 2017, including an unprecedented two rounds of public comment on the revised policies prior to their finalization. The Proposed Consent Decree requires CPD to maintain best practices and implement improvements to its use of force policies where appropriate.  *See* ¶ 154.

*Access to information under FOIA*:  The court received comments suggesting modifications to ensure that the consent decree does not interfere with the public's right to access information under the Illinois Freedom of Information Act.  To address this concern, following the first public comment period, the City and State added a provision to the Proposed Consent Decree that provides that nothing in the agreement "is intended to conflict with the Illinois Freedom of Information Act."  *See* ¶ 688.

*Evaluating compliance with consent decree*:  Some comments provide suggestions on how the independent monitor should be required to assess compliance with the consent decree provisions.  However, the monitor's review and audit methodology will not be unknown or undefined; the Proposed Consent Decree requires the monitor to determine and propose a methodology for reviewing and auditing.  *See* ¶ 655.  The City and State will have the opportunity to comment on the proposed methodology.

### III.     THE PROPOSED CONSENT DECREE ADEQUATELY ADDRESSES THE AREAS OF CONCERN RAISED IN OPPOSITION.

As discussed above, the majority of public comments submitted to the court express support of the Proposed Consent Decree as a whole.  However, the FOP submitted nine filings through its attorneys and some individual members containing comments in opposition to the proposed Consent Decree.[4]  *See* Dkt. 156, 645, 652, 657, 668, 669, 671, 672, 673. The FOP asserts, primarily, that the Proposed Consent Decree should not be approved because certain provisions would interfere with its bargaining rights, while other provisions purportedly conflict with state law.[5]  *See People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 961 F.2d 1335 (7th Cir. 1992).  However, as discussed below, and in the City's prior filings opposing the FOP's motion to intervene in the instant lawsuit, *see* Dkt. 75, the City and State took all appropriate action to ensure the Proposed Consent Decree neither interferes with the police unions' bargaining rights nor conflicts with applicable state law.  Therefore, the FOP's opposition to the Proposed Consent Decree should not weigh against the court's fairness determination.

---

[4] The DOJ also filed a "Statement of Interest" in opposition to the consent decree pursuant to 28 U.S.C. § 517.  *See* Dkt. 160.  Section 517 provides the U.S. Attorney General the authority to "attend to the interests of the United States in a suit pending" in federal court.  While the DOJ's statement of interest (which is akin to an *amicus* brief) makes a number of policy arguments as to why the consent decree is not, in the DOJ's view, the ideal mechanism for reforming CPD, the statement does not implicate the question central to the court's determination here—whether the consent decree is fair.  *See Hiram*, 768 at 889 (7th Cir. 1985) ("The district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights.").

[5] The City responds to many of the FOP's comments to demonstrate that the FOP objections should not impact the court's fairness determination, as the parties took all appropriate action to ensure the proposed Consent Decree does not conflict with any valid and binding obligation of the City. The City does not waive, but expressly reserves, its right to address any of the FOP's arguments in the appropriate fora.

1. **The Proposed Consent Decree Adequately Protects the Unions' Bargaining Rights.**

As recognized by the police supervisor unions in their written comments, Dkt. 639 at 4, the Proposed Consent Decree will not impair the unions' bargaining agreements, because of carve-out language included in the decree to expressly ensure the preservation of collective bargaining and statutory rights. Specifically, Paragraphs 710 and 711 of the Proposed Consent Decree (the "Carve-Out") expressly forbid any interpretation of the Proposed Consent Decree that modifies or violates the terms of the collective bargaining agreements ("CBAs") or the City's bargaining obligations under the Illinois Public Labor Relations Act, 5 ILCS 315/1 *et seq.* ("IPLRA"). The Carve-Out provides:

> Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.

While the FOP asserts the Carve-Out does not sufficiently protect its rights, Dkt. 156 at 17-18, this court has acknowledged it is obligated to uphold applicable law in resolving any actual conflicts that may surface between the Proposed Consent Decree and any existing or future contracts, including the CBAs. Dkt. 88 at 18. And the Proposed Consent Decree cannot be used to avoid valid and applicable law. *Id*. at 19. Surely, a "statement of intent" in the Carve-Out is adequate to constrain interpretation of the proposed Consent Decree in a manner that does

not undermine the legitimate interests of the FOP.  If not, the "prospect of judicial review" provides sufficient legal safeguards.  *See id*. at 19.

FOP also asserts the Carve-Out does not protect its rights because the proposed Consent Decree itself creates public policy that can be used to invalidate an existing collective bargaining right.  Dkt. 156, at 19, 21. While the proposed Consent Decree may reflect current "public policy," it cannot create it.  Rather, public policy is "ascertained by reference to the laws and legal precedents." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am*., 461 U.S. 757, 766 (1983) (citing *Muschany v. United States,* 324 U.S. 49, 66 (1945)).  Thus, the language in the Carve-Out properly reflects the well accepted principle that "a court may not enforce a collective-bargaining agreement that is contrary to public policy." *Id*. Accordingly, the Carve-Out, as written, is sufficient to address any actual or potential conflict between the terms of the proposed Consent Decree and an obligation of the City with respect to the FOP.

The Proposed Consent Decree's requirement that the City use "best efforts" to secure four specific changes to the CBAs, *see* ¶¶ 431, 475, 477, 508, also does not interfere with the unions' bargaining rights.  As the Carve-Out acknowledges, an employer cannot unilaterally alter a collective bargaining agreement.  Thus, Paragraph 729 of the Proposed Consent Decree defines "best efforts" as merely "requir[ing] a party, in good faith, to take all reasonable steps to achieve the stated objective."  If the City's "best efforts" are unsuccessful, the Carve-Out provides that the relevant provisions of the CBA govern and will continue to govern.

In a similar vein, the FOP speculates that the City will invade its rights unless such rights are *expressly affirmed* in the proposed Consent Decree. For example, the FOP argues the proposed Consent Decree is deficient because it fails to mandate that the City consider seniority

14

when making promotions or assignment to Field Training Officer, achieve unity of command without violating furlough scheduling rights, and pay officers when conducting in-service training. However, these obligations (to the extent they are imposed by a CBA) exist independent of the Proposed Consent Decree, are in no way contradictory to the Proposed Consent Decree, and do not require affirmation or acknowledgment in the Decree.

All in all, the Proposed Consent Decree does nothing to challenge the fact that FOP is the "exclusive representative for purposes of negotiating with the City of Chicago for wages, hours and working conditions of Chicago police officers pursuant to Section 3 and 7 of the Illinois Public Labor Relations Act, ('IPLRA')." *See* Dkt. 88 at 5. To be sure, outside these subjects of mandatory bargaining, the City "has and will continue to retain the right to operate and manage its affairs in each and every respect." FOP CBA, Article 4.[6] But it is mere conjecture to suggest the City will exercise its management rights to implement the Proposed Consent Decree in a manner that intrudes upon an area requiring collective bargaining. Should this occur, the Carve-Out applies to protect the unions' bargained-for rights. As further protection, Section 10 of the IPLRA gives the FOP the right to file an unfair labor practice if its members believe the City has exceeded its management rights in implementing the proposed Consent Decree.[7]

---

[6] The FOP's CBA is available at https://www.cityofchicago.org/content/dam/city/depts/dol/Collective%20Bargaining%20Agreement3/FOPCBA2012-2017_2.20.15.pdf (last accessed 12/10/18).

[7] Indeed, many of the issues the FOP raises in its comments have been the subject of an unfair labor practice. For instance, the FOP filed an unfair labor practice, Case Nol. L-CA-16-079, raising the same objections to the video release policy (¶ 554) and release of officer identities (¶ 58) as are raised here. Docket 156, pp. 22, 32-33. The FOP also filed an unfair labor practice for the disciplinary matrix that is the subject of the Administrative Law Judge's ("ALJ") Recommended Decision and Order attached as Appendix B to the FOP's initial written comments. Dkt. 156, Appendix B. A Recommended Decision and Order, as adopted by the

## 2.  The Proposed Consent Decree Presents No Actual Conflict with State Law.

In its comments, the FOP attempts to create the appearance of conflict between the proposed Consent Decree and three state statutes—(1) the Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/1 *et seq.* (the "Disciplinary Act"); (2) the Police Community Relations Improvement Act, 50 ILCS 727/1-1, *et seq.* ("PCRIA"); and (3) the Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/1 *et seq.* (the "BWC Act"). Because no actual conflicts exist, the proposed Consent Decree should be approved over these objections.

The FOP asserts the proposed Consent Decree violates the Disciplinary Act by requiring the City to investigate complaints in the absence of a sworn affidavit.  Dkt. 156, p. 8–9, citing Proposed Consent Decree ¶¶ 425, 427, 421, 462.  Specifically, the Proposed Consent Decree requires, even in the absence of a sworn affidavit, the preliminary investigation of complaints that allege misconduct (as that term is defined in the proposed Consent Decree) through the preservation and review of objective verifiable evidence (like audio, video, photographic and physical evidence, arrest reports and witness interviews).  *See* ¶¶ 460, 462, 767.  If, in the absence of a sworn complainant affidavit, the preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, the chief of CPD's Bureau of Internal Affairs ("BIA") or COPA may execute an override affidavit, and the investigation will continue past the preliminary investigation to the misconduct investigation.  *See* ¶¶ 463(a)-(c).

---

Illinois Labor Relations Board (the "ILRB"), articulates the parameters of the City's bargaining obligations under the IPLRA. Thus, under the Carve-Out, to the extent there is any inconsistency between the Proposed Consent Decree and a valid and binding order of the ILRB, the decision of the ILRB will govern.

The Disciplinary Act, as relevant here, does provide that "[a]nyone filing a complaint against a sworn peace officer must have the complaint supported by a sworn affidavit." 50 ILCS 725/3.8(b). This provision applies, however, "only to the extent there is no collective bargaining agreement currently in effect dealing with the subject matter of this Act." 50 ILCS 725/6. Consistent with the FOP's CBA, the Proposed Consent Decree does not require CPD members who are accused of misconduct to respond to a complaint unless the administrative investigation has progressed past a preliminary investigation. *See* Appendix L of FOP's CBA (stating no affidavit is required for certain types of complaints, and explaining procedure for the chief of either COPA or BIA to sign an appropriate affidavit to override the affidavit requirement). Thus, the Proposed Consent Decree continues to protect police officers from having to respond to false or malicious allegations against them, consistent with the Disciplinary Act. *See Sherwood v. City of Aurora*, 388 Ill. App. 3d 754, 760, 904 N.E.2d 632, 639 (2009) ("[T]he only reasonable purpose of the affidavit requirement under section 3.8(b) is to discourage complainants from making false or malicious allegations against police officers.").

The FOP also objects that the Proposed Consent Decree violates its CBA by requiring the City to investigate anonymous complaints of misconduct. Dkt. 156, at 9-10, citing Proposed Consent Decree ¶¶ 425, 427, 440(b), 461, 478. But the Proposed Consent Decree requires the City to accept and investigate all complaints, including anonymous complaints, "in accordance with the CBA." *See* ¶ 427. Under the Proposed Consent Decree, anonymously submitted allegations of misconduct must be preliminarily investigated (without a sworn affidavit)—but only "to determine whether it is appropriate to continue the investigation in accordance with the collective bargaining agreements in effect at the time the allegation is made." *See* ¶ 461.

17

Presently, this means preliminary investigation of anonymous complaints must be conducted in accordance with the strictures of CBA Section 6.1D and Appendix L.

The FOP also asserts that training concerning support services offered to CPD officers, ¶ 236, impairs rights protected under a recently enacted provision of the Disciplinary Act regarding Firearm Owners Identification (FOID) cards. Dkt. 156, at 15-16. The Disciplinary Act provides:

> An employer of an officer shall not make possession of a Firearm Owner's Identification Card a condition of continued employment if the officer's Firearm Owner's Identification Card is revoked or seized because the officer has been a patient of a mental health facility and the officer has not been determined to pose a clear and present danger to himself, herself, or others as determined by a physician, clinical psychologist, or qualified examiner. Nothing is this Section shall otherwise impair an employer's ability to determine an officer's fitness for duty.

50 ILCS 725/7.2. Rather than affirming a practice that violates state law, then, the proposed Consent Decree calls for training to *dispel false notions* about this newly enacted law. Because no real conflict exists, the FOP's comments on this issue do not advance its cause.

Next, the FOP contends that the proposed Consent Decree conflicts with PCRIA because the Proposed Consent Decree does not require a state-certified homicide investigator to investigate officer-involved deaths. Dkt. 156, at 10-11, citing Proposed Consent Decree ¶¶ 488–492. The FOP further contends the requirement to have a state-certified homicide investigator extends not only to the investigation of criminal matters, but also a municipality's internal, administrative investigation into the actions of its employees. *Id*. The FOP is wrong on both points.

Contrary to the FOP's assertions, the proposed Consent Decree actually *requires* the City to comply with PCRIA, including its requirement to have a state-certified homicide investigator

18

investigate officer-involved deaths. Paragraph 492 of the proposed Consent Decree states "[c]riminal investigations into the actions of any CPD member relating to any 'officer-involved death' will comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 *et seq*." As to FOP's argument that PCRIA also requires that law enforcement officers conduct *internal, administrative investigations* of officer-involved deaths, PCRIA is explicit that it "does not prohibit any law enforcement agency from conducting an internal investigation into the officer-involved death if the internal investigation does not interfere with the investigation conducted under the requirements of Section 1-10 of this Act." 50 ILCS 727/1-20.

Finally, the FOP claims that where it requires CPD to conduct random audits of body worn camera footage, ¶ 238(g), and evaluate whether to take corrective actions based on conduct captured on body worn cameras, ¶ 576, the Proposed Consent Decree conflicts with the BWC Act. *See* Dkt. 156, Section II.B.14. The FOP's first objection is easily disposed of. While the FOP is correct that body worn camera footage must be destroyed after 90 days unless "flagged" for further review, the City can review the video during an audit at any point during the 90-day period. There is nothing inconsistent about conducting random audits of body worn camera video, flagging those videos requiring further review, and destroying any video older than 90 days that has not been flagged.

The FOP's next argument concerning the BWC Act likewise merits only a brief response. The FOP argues the proposed Consent Decree violates the BWC Act because it requires CPD to take corrective action where officers have not complied with CPD policy. True, the BWC Act provides that body worn camera recordings may only be used to discipline an officer in certain circumstances. 50 ILCS 706/10-20(9)(A)-(D). But the Act continues that these provisions shall not be construed to limit or prohibit law enforcement officers from being subject to an action that

19

does not amount to discipline. 50 ILCS 706/10-20(9). The Proposed Consent Decree is cognizant of this statutory framework as it both: (1) provides that officers may be subject to *corrective action* (not disciplinary action) based on conduct captured on body worn camera footage; and (2) confirms that any such action will only be taken "as permitted by law." *See* ¶ 576.

## IV.    CONCLUSION

The City respectfully submits that the public comments weigh in favor of a determination that the Proposed Consent Decree is lawful, fair, reasonable, and adequate, and respectfully requests the court grant the parties' motion to approve the Proposed Consent Decree and enter it as an order of the court.

Dated: December 10, 2018                                 Respectfully submitted,

                                                         CITY OF CHICAGO

                                        By:   /s/  *Tyeesha I. Dixon*
                                              Deputy Corporation Counsel
                                              City of Chicago Department of Law
                                              121 N. LaSalle St., Suite 600
                                              Chicago, IL 60602
                                              (312) 744-0200
                                              Tyeesha.Dixon@cityofchicago.org

Allan T. Slagel (ARDC No. 6198470)
Heather A. Jackson (ARDC No. 6243164)
Elizabeth E. Babbitt (ARDC No. 6296851)
Rachel L. Schaller  (ARDC No. 6306921)
TAFT STETTINIUS AND HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:    (312) 527-4000
Email:        aslagel@taftlaw.com
              hjackson@taftlaw.com
              ebabbitt@taftlaw.com
              rschaller@taftlaw.com