IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6260 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**
**APPROVING PROPOSED CONSENT DECREE**

For the reasons explained below, the joint motion of Plaintiff State of Illinois and Defendant City of Chicago to approve the proposed consent decree [107] is granted. Proposed Intervenor Fraternal Order of Police Lodge No. 7's motions to stay approval of proposed consent decree during pendency of appeal [110, 118] are denied as moot. The signed consent decree will be entered on the docket today as a separate document. The Effective Date of the decree will be the date on which the Court enters an order appointing the Monitor and the monitoring team. The Court continues to work with the parties on the monitor selection process and anticipates that it will be completed no later than March 1, 2019.

**I.      Background**

On August 29, 2017, the State of Illinois ("State") filed this lawsuit against the City of Chicago ("City") pursuant to 42 U.S.C. § 1983, the U.S. Constitution, the Illinois Constitution, the Illinois Civil Rights Act of 2003, the Illinois Human Rights Act, and the *parens patriae* doctrine. Through this litigation, the State hopes "to ensure the City enacts comprehensive, lasting reform" of the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA"), and the Chicago Police Board ("Police Board"). [1] at 1, ¶ 1. The lawsuit seeks to enjoin the CPD

"from engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harms Chicago's African American and Latino residents." *Id*. at 1, ¶ 2. As evidence of this pattern, the complaint points to reviews of CPD's policing practices over the last fifty years, including most recently two separate reports issued by the U.S. Department of Justice ("DOJ") (the "DOJ Report") and Chicago's Police Accountability Task Force ("Task Force") concluding that "CPD has continued to engage in a repeated pattern of using excessive force and racially discriminatory policing practices." *Id.* at 2, ¶ 3; see also *id*. at 13-29 (detailing the DOJ Report's findings).

The State further contends that CPD's "policy, custom, or practice of police misconduct" is reflected in and caused by "the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline." [1] at 7, ¶ 33. The State asserts that these failures have created "profound mistrust between many Chicago communities and CPD," which "reached its most recent flashpoint in late November 2015, following the release of a videotape depicting the fatal shooting of Laquan McDonald, a 17-year old African American, by a CPD officer." *Id*. at 2, ¶ 5. According to the State, the City spent approximately $662 million on settlements, judgments, and outside legal fees for police misconduct cases between 2004 and early 2016.

The DOJ Report cited by the State acknowledged that the City has announced a number of reforms to CPD but opined that necessary reforms "will likely not happen or be sustained without the reform tools of an independent monitoring team and a court order." [1] at 3, ¶ 10 (quoting the DOJ Report). The DOJ Report advised that "[a] court-ordered, over-arching plan for reform that is overseen by a federal judge will help ensure that unnecessary obstacles are removed, and that City and police officials stay focused on carrying out promised reforms." *Id.*

The State brought this lawsuit in response to the DOJ Report "to obtain injunctive relief that will finally enable the City to eliminate unconstitutional conduct that has plagued CPD for decades." [1] at 4, ¶ 11. The State alleges that it is authorized to bring suit on behalf of the People of Illinois under the doctrine of *parens patriae* and the Illinois Human Rights Act, 775 ILCS 5/10-104(A)(1), to defend its "quasi-sovereign interest in the prevention of present and future harm to its residents, including individuals who are, have been, or would be victims of the City's unconstitutional law enforcement practices." [1] at 4, ¶ 15 and 5, ¶ 21. The State also seeks to protect its proprietary interests. According to the complaint, "[m]ultiple persons injured as a result of excessive force by CPD officers have incurred medical care costs that Illinois has paid for" through its Department of Healthcare and Family Services ("DHFS") and Medicaid. *Id*. at 6, ¶ 29.

The State's complaint contains four counts. In Count I, the State alleges that the City and its agents maintain a policy, custom or practice of using force against persons in Chicago without lawful justification, in violation of the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983. Count II alleges that these practices also deprive persons in Chicago of their rights under Article I, Section 6 of the Illinois Constitution. In Count III, the State alleges that the City and its agents have violated the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(b), by engaging in law enforcement practices that have a disproportionate impact on African Americans and Latinos in Chicago. Finally, Count IV alleges that the City and its agents have violated the Illinois Human Rights Act, 775 ILCS 5/5-102(C), by engaging in a pattern or practice of discrimination that denies African Americans and Latinos in Chicago the full and equal enjoyment of the privileges of the City's law enforcement services.

In its prayer for relief, the State seeks a consent decree covering "several substantive reform areas to address the critical deficiencies at CPD, including departmental policies and practices,

such as use of force, accountability, training, community policing and engagement, supervision and promotion, transparency and data collection, and officer assistance and support." [1] at 31, ¶ 201. The State requests that the Court appoint an independent monitor to measure and test these reforms. *Id*. at 31, ¶ 199.

Since the lawsuit was filed approximately eighteen months ago, counsel for the State and the City have engaged in extensive negotiations to arrive at a draft consent decree to present to the Court. There have been several hundred hours of face-to-face negotiations between the City and State, as well as more than a dozen settlement conferences with the Court. The State has had a team of nine attorneys working on the case and has retained a team of six experts who have conducted site visits, meetings, and interviews with City and CPD personnel. The City likewise has had numerous lawyers and subject matter experts advising it as the consent decree terms have been negotiated. All involved have labored hard to reach through negotiation a resolution that is both more satisfactory and more expeditious than would have been obtainable through contested litigation.

The State and City also have engaged in public outreach to obtain the input of community groups and other stakeholders on the contents of the consent decree. In March 2018, the parties entered into a memorandum of agreement ("MOA") with a coalition of community groups ("Coalition") that "afford[s] the Coalition certain rights to raise objections and provide input regarding any consent decree proposed to the Court before the Court decides whether to approve and enter a final consent decree." [73] at 5.[1] The State held fourteen consent decree community roundtables "to ensure that interested Chicago residents had a meaningful opportunity to provide their input on reform of CPD." "Chicago Police Consent Decree,"

---

[1] Some of these community groups had commenced litigation of their own against the City and/or members of the City's police force alleging unconstitutional policing practices.

http://chicagopoliceconsentdecree.org/ (last visited Jan. 31, 2019). Through the roundtable process, the State received more than 6,000 comments on the proposed consent decree from more than 1,000 participants. Independent of the roundtable, the State collected approximately 1,600 additional comments through its website, e-mail, and in voice messages.

The State offered the Fraternal Order of Police Lodge No. 7 ("FOP") the same rights provided to the Coalition in the MOA, but the FOP declined the offer.[2] Still, since the complaint was filed, the State's counsel have had several in-person meetings with the leadership of the FOP to discuss, among other things, provisions that might be included in the consent decree and have "sought and obtained input on reform of the Chicago Police Department from CPD officers through 13 focus groups." "Chicago Police Consent Decree," http://chicagopoliceconsentdecree.org/ (last visited Jan. 31, 2019). On June 6, 2018, the FOP filed a motion to intervene in the lawsuit. On August 16, 2018, the Court issued a twenty-five page memorandum opinion and order [88] denying the FOP's motion. See *State of Illinois v. City of Chicago*, 2018 WL 3920816 (N.D. Ill. Aug. 16, 2018). On January 2, 2019, the Seventh Circuit affirmed the Court's ruling. See *State of Illinois v. City of Chicago,* — F.3d —, 2019 WL 74366 (7th Cir. Jan. 2, 2019). Although the FOP does not have party status in this litigation, it has provided extensive briefing and written comments and several of the individuals who testified at the public hearing described below identified themselves as FOP members.

---

[2] The FOP is the "exclusive representative for the purpose of negotiating with the City of Chicago for wages, hours and working conditions of Chicago police officers pursuant to Sections 3 and 7 of the Illinois Public Labor Relations Act, ('IPLRA')." [51] at 1 (citing 5 ILCS 315/3 and 7). As such, it "has the right to bargain collectively and negotiate in good faith with the City of Chicago with respect to wages, hours and other conditions of employment, to bargain about matters that may be covered by other laws that pertain in part to a matter affecting wages, hours and other conditions of employment, and to enter into collective bargaining agreements containing causes which either supplement, implement or relate to the effect of such provisions in other laws." *Id.* at 5. The most recent collective bargaining agreement ("CBA") between the FOP and the City has a term of July 1, 2012, to June 30, 2017, but remains in full force and effect during the negotiation of a successor agreement.

On July 27, 2018, the State and City released a draft consent decree for public review. The 232-page, 697-paragraph initial public draft covered a broad range of topics, including community policing; impartial policing; crisis intervention; use of force; recruitment; hiring and promotion; training; supervision; officer wellness and support; accountability and transparency; data collection, analysis and management; and implementation, enforcement and monitoring. The draft consent decree also acknowledged that the City is subject to several CBAs into which it has entered with the FOP and other police officers' unions. In particular, paragraphs 686 and 687 of the draft consent decree provided:

> 686. The Parties acknowledge the City has entered into four collective bargaining agreements effective July 1, 2012 (individually, and collectively, the "CBAs") with unions representing sworn police officers ("Unions"). The Parties further acknowledge that the City and the Unions are currently negotiating successor agreements to the CBAs ("Successor CBAs"). The Parties further acknowledge that the Unions and the City have certain rights and obligations under the Illinois Public Labor Relations Act, 5 ILCS 315 ("IPLRA") and that the IPLRA contains provisions for the City and the Unions to enforce their respective rights and obligations, including a process, set forth in Section 14 of the IPLRA and Section 28.3 of the current CBAs, for resolving bargaining impasses between the City and the Unions over issues subject to a bargaining obligation under the IPLRA ("Statutory Impasse Resolution Procedures").
>
> 687. Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.[3]

---

[3] The corresponding paragraphs in the final decree containing the "carve out" language are 710 and 711.

The parties invited interested persons and entities to provide comments on the draft consent decree by August 17, 2018. That process yielded nearly 1,700 further comments and suggestions on a wide range of topics. After reviewing those comments, the parties made additional substantive revisions to the initial public draft consent decree and, on September 13, 2018, submitted a motion for court approval [107] of the final 236-page, 799-paragraph proposed decree.

The parties also requested a fairness hearing on the proposed decree. In granting that request, the Court provided a time frame within which members of the public could submit written comments and heard from 96 speakers during a two-day public hearing in late October. More than 500 individuals or groups availed themselves of the opportunity to file written comments, all of which are available on the Court's public docket. Since the public hearing, the Court has received and reviewed additional briefing from the parties and the FOP addressing in considerable detail the oral and written comments submitted in connection with the fairness hearing. The commenters have provided thoughtful observations about the issues raised in the proposed decree from a wide range of perspectives.

The final decree that the Court approves today thus represents the culmination of an enormous undertaking by the parties and the thousands of others who have participated in the wide range of opportunities for community input. The comments generally have favored entry of the decree. Many supporters of the decree think it does not go far enough, but they recognize that there will be opportunities to reshape the decree in the years to come. To be sure, some groups—most notably, the FOP and the U.S. Department of Justice—have urged the Court to reject the decree. The Court has given careful consideration to all of the briefs and comments concerning the proposed decree, as well as the oral presentations during the public hearing. Many commenters have provided constructive feedback on specific provisions of the decree. The parties have made

countless revisions to their drafts to take into account this input, and indeed the final wording of the decree has been tweaked even within the past week. Although the Court declines the requests of those commenters who have urged further court-mandated revisions to the parties' final draft prior to approval, it has made special note of several suggestions that are worthy of continued attention and study.

As explained below, on balance, the Court concludes that the proposed decree satisfies the governing legal standards and therefore should be entered. While the decree is not perfect, it is an important first step toward needed reforms of the Chicago Police Department and its policies—and, indeed, includes many provisions that the CPD itself welcomes. In the coming weeks, months, and years, the Court will work closely with the Monitor, the parties, and the people of Chicago to secure and maintain compliance with the terms of the decree with an eye toward ultimately terminating the decree upon a finding of substantial compliance.

## II.     Legal Standard

The Supreme Court has observed that a consent decree is "primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 528 (1986). At the outset of this case, the parties took heed of the opportunity to avoid expensive and protracted litigation of the myriad challenging issues raised in the complaint, opting instead to negotiate the decree that is now before the Court for final approval. Those negotiations have taken considerable time and effort, and the Court can attest that they have been difficult at times because of the complexity of the issues and the diversity of strongly-held opinions on how they should be resolved. Yet, after almost a year and half, the parties have arrived at what they consider to be a satisfactory compromise.

When asked to approve a proposed consent decree, the district court must determine whether the "proposed decree is lawful, fair, reasonable, and adequate." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). In making this determination, the Court may assess the strength of the plaintiff's case compared to the settlement terms; the likely complexity, length, and expense of litigation; the opinion of competent counsel; the amount of opposition to the settlement among affected parties; and the stage of the proceedings and amount of discovery completed at the time of the settlement. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996); see also *Hiram Walker*, 768 F.2d at 889. In the final analysis, the court must satisfy itself that "the decree is consistent with the Constitution and laws, does not undermine the rightful interests of third parties, and is an appropriate commitment of the court's limited resources." *Kasper v. Bd. of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 338 (7th Cir. 1987). Because "[t]he essence of [a consent decree] is compromise" (*Hiram Walker*, 768 F.2d at 889), courts "do not focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness" (*Isby*, 75 F.3d at 1199). Finally, in the absence of contested issues, "[t]he district court should refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." *Hiram Walker*, 768 F.2d at 889.

**III. Discussion**

As the City has observed, the proposed consent decree is a "court-enforceable reform plan that comprehensively and fairly addressed allegations of unconstitutional policing raised both in the State's complaint and by community members in similar lawsuits." [681] at 1. A significant number of the provisions enjoy widespread—and perhaps unanimous—support among the many interested constituencies. For example, the FOP has acknowledged the "substantial benefits" of community policing, training, mental health support and counseling and crisis intervention for

police officers. [156] at 2. These provisions, and others, will provide much needed additional resources for the officers who perform the always challenging and often dangerous work of keeping Chicagoans safe. Other provisions that have been roundly endorsed provide, for the first time, comprehensive guidance on police interactions with persons with disabilities and transgender individuals. Overall, the decree aims to ensure that the critically important job of policing in Chicago is done fairly, transparently, and without bias, affording dignity to those who are served and protected and proper guidance, training, and support for the women and men who comprise the police force.

To be sure, some provisions have been criticized, either as too strict or too lax. The Court will discuss some of these objections below. But, on balance, the vast majority of public commenters have endorsed the vast majority of the decree's provisions—and many who think the decree should go further are content to accept the decree as it is and leave additional progress to future developments. The Court agrees with that approach. The decree takes an important step forward in the City of Chicago's ongoing efforts to repair the damaged relationship between its police department and members of the community whom the department serves and protects. But it is a beginning, not an end.

It is vitally important to call attention not only to what the consent decree is, but also to what it is *not*. The consent decree is not a panacea, nor is it a magic wand. Most notably, there is neither an admission of liability by the City, CPD, or any other entity, nor any finding by the Court of any unconstitutional, illegal, or otherwise improper activity or conduct. As a consequence, the Court's ongoing authority lies largely in contract enforcement rather than in fashioning remedies for violations of federal law. Many of the reforms called for under the decree will need to be negotiated between the City and the unions representing CPD captains, lieutenants, sergeants, and

officers. While the City is obligated to use "best efforts" to achieve compliance, there is no guarantee of immediate success at the bargaining table. To be sure, as recent events have shown, the desire to terminate a decree and end court oversight can provide a strong incentive to reach agreement on the matters that will demonstrate compliance. See *Gautreaux v. Chicago Housing Authority*, No. 66-cv-1459, Docket Entry 824 (N.D. Ill. Jan. 23, 2019) (order approving final settlement 53 years after litigation commenced); *Shakman v. County of Cook*, No. 69-cv-2145, Docket Entry 6078 (N.D. Ill. Oct. 31, 2018) (order terminating federal oversight of county hiring practices 49 years after litigation commenced). But the Court's ability to *order* progress on these issues is limited. See *State of Illinois v. City of Chicago*, 2019 WL 74366, at *7 (7th Cir. Jan. 2, 2019) (explaining that consent decrees can alter the state law rights of third parties "only where the change is necessary to remedy a violation of federal law" and noting that "no finding of necessity" has been made in this case).

These observations provide a useful segue into a discussion of the FOP's principal point of contention with the decree, and its stated rationale for seeking to intervene in this lawsuit—namely, its belief that the draft consent decree will impair CBA rights and displace protections provided by Illinois statutes. Both this Court and the Seventh Circuit have acknowledged at least the *potential* for conflict between the decree and the CBA and state law. Nevertheless, the courts have agreed that "the Lodge's rights are protected" (*State of Illinois*, 2019 WL 74366, at *6) on multiple levels.

To begin, as noted above, the "carve-out language" expressly confirms that "[n]othing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate ... the terms of the CBAs ... with respect to the subject of wages, hours, and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy." The

11

Seventh Circuit has concluded that this "language speaks for itself" and that "[r]ead as a whole, [it] makes clear that the parties do not intend for the consent decree to be interpreted as impairing CBA rights." *State of Illinois*, 2019 WL 74366, at *6. The unions representing CPD sergeants, lieutenants, and captains have recognized the same point, noting that the "Court's accurate interpretation of the carve out language will protect the Unions from any attempt by the City to compel these [collective bargaining] Units to accept provisions of this decree which conflict with existing rights whether those rights arise out of the current CBAs or state law." [639] at 7.

In addition, as this Court noted and the Seventh Circuit reaffirmed, wholly apart from the carve-out provision, "existing law already provides protections for the Lodge." *State of Illinois*, 2019 WL 74366, at *6. Among other things, "consent decrees 'may not alter collective bargaining agreements without the union's assent.'" *Id.* (quoting *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 961 F.2d 1335, 1337 (7th Cir. 1992)). Nor can litigants "agree to disregard valid state laws." *Id.* In other words, because "[c]onsent decrees are fundamentally contracts," the parties to those decrees—here, the State of Illinois and the City of Chicago—"'may not impose duties or obligations on a third party'"—such as the Lodge—"'without that party's agreement.'" *Id.* (quoting *Firefighters Local 93 v. Cleveland*, 478 U.S. 501, 529 (1986)).

Given these controlling legal concepts, the Seventh Circuit rejected the FOP's concern that the language indicating that the decree may displace CBA provisions if they "violate the U.S. Constitution, Illinois law or public policy" swallows the rule. As the court of appeals explained, "[t]he parties negotiate and the district court considers the consent decree against this background law, which protects the Lodge even if ¶ 687[4] contains ambiguities. Simply put, a consent decree cannot accidentally eliminate the rights of third parties." *State of Illinois*, 2019 WL 74366, at *6.

---

[4] As noted above, ¶ 687 of the draft is now ¶ 711 in the final decree.

If the parties try to interpret the decree in a way that the Lodge believes violates CBA rights, the Lodge can avail itself of normal remedies for CBA violations. See *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 770 (1983) (affirming the enforcement of an arbitration award for violating the CBA, even though a settlement agreement required the company's violation). And, as this Court has emphasized, it "is obligated to uphold the applicable law in resolving any real conflicts between the proposed decree and any existing or future contracts." *State of Illinois*, 2018 WL 3920816, at *8.

With this understanding of the law, the Seventh Circuit concurred in this Court's assessment that the FOP's "assertion of prejudice is largely speculative." *State of Illinois*, 2019 WL 74366, at *7. As the court of appeals further explained, "[a]s things stand now, the consent decree cannot impair the CBA or state law rights enjoyed by Chicago police officers. That will change only if the district court concludes that federal law requires the abrogation of those rights. Even then, the abrogation must be narrowly tailored." *Id*. These principles constitute law of the case and thus will control the resolution of any tangible conflicts over CBA rights going forward.[5]

In its recent filings, the FOP identifies a number of areas in which it sees potential conflicts. The parties vigorously dispute these purported conflicts and have offered a detailed and spirited rebuttal of the FOP's arguments. Consistent with the Seventh Circuit's guidance, the Court declines to rule on the scope of these potential conflicts at this time. As the City and the FOP negotiate a successor to the now-expired CBA, they will bargain in the shadow of all the applicable law, including the court of appeals' exposition of the relationship between this consent decree and the parties' pre-existing contractual and state law rights and obligations. The briefing to date will aid the contracting parties as they attempt to reach agreement. If that process yields actual

---

[5] This lengthy exposition of the law, which is binding on the parties, obviates the need for any revisions to ¶ 711, as the FOP has requested [see 693].

13

conflicts—rather than speculative ones—the parties may pursue all available avenues of relief (see *State of Illinois*, 2019 WL 74366, at *6), including bringing their disputes to this Court where appropriate.

Two additional objections to the consent decree warrant brief discussion. A few commenters have questioned whether the parties to this litigation have a genuine case or controversy sufficient to invoke the jurisdiction of the federal courts. One commenter illustrated the point with a photograph of the Attorney General, the Mayor of Chicago, and the Superintendent of the CPD that ran in a local newspaper on the date that the lawsuit was filed. See [189]. This raises a good question—and one that the Court raised as well with the parties during settlement discussions after the initial status hearing in the case in October 2017. Since that time, however, the Court has met with the parties on more than a dozen occasions for settlement discussions, during which they brought disputed issues to the table in good faith efforts to reach resolution. While those discussions always have been professional, they have demonstrated many fundamental disagreements between the two sides on some of the most controversial aspects of the proposed decree. Suffice to say that while the Court shared this commenter's skepticism at the outset of the case, the litigation has unfolded in a manner that confirms the true adversary nature of this case. And the Court has previously addressed why the *parens patriae* doctrine confers standing on Plaintiff to pursue the relief that has culminated in the presentation of a final consent decree. *State of Illinois*, 2018 WL 3920816, at *9 (citing, *inter alia*, *Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 314-17 (3d Cir. 1981) (en banc)).

Other commenters have focused on the financial burden of the decree going forward, as evidenced by the $2.85 million maximum annual budget for the monitoring team. This is a large expenditure of public money by any measure. Yet is is a tiny fraction of what the City has spent

paying out judgments and settlements, not to mention lawyers (both outside and inside counsel), for civil rights litigation over the past few decades. See [158] at 9. Indeed, had a monitoring team been billing the City at the rate of $2.85 million per year since 1790, when Jean Baptiste Point du Sable first set up camp at the mouth of the Chicago River, the total bill of $652.65 million would not equal the City's litigation-related payouts in civil rights actions since 2004. The monitoring team will bring a wealth of experience in dealing with the wide-range of issues encompassed within the decree. The team will work with the Court, the parties, and their constituent groups throughout the City to secure compliance with the decree's goals and objectives—and perhaps reduce the City's litigation costs—for as long as it takes to accomplish them. See Zachary A. Powell, Michele Bisaccia Meitl & John L. Worrall, "Police Consent Decrees and Section 1983 Civil Rights Litigation," Research Article, 16 CRIMINOLOGY & PUBLIC POLICY, Issue 2 (2017) (research study of 23 police department consent decrees between 1990 and 2013 concluding that the "consent decree process may contribute to a modest reduction" in civil rights lawsuits).

  As noted above, the Court is under no illusion that this will be an easy process. It took a long time to get to this place, and it may take a long time to get out of it. With that said, there are good reasons to think that the conditions and incentives may be in place to start making progress right away. As the Department of Justice has stressed, the parties "have already begun to take crucial and laudable steps to improve the CPD's compliance with federal law and protect the rights of its citizens." [160] at 10. The surge in violent crimes and homicides in 2015 and 2016 has been reversed in 2017 and 2018. See, *e.g.*, Ames Grawert & Cameron Kimble, "Crime in 2018: Updated Analysis," BRENNAN CENTER FOR JUSTICE AT NYU LAW SCHOOL, Table 2 (Dec. 12, 2018) (noting a decrease of more than 18% in the 2018 murder rate in Chicago as compared to 2017), available at https://www.brennancenter.org/sites/default/files/publications/2018_09_CrimeUpdate_V2.pdf

(last visited Jan. 31, 2019). The federal government has committed to adding new resources in its ongoing partnership with local law enforcement to bring violent criminals to justice and make our community safer. See [160] at 2 (announcing the addition of five new federal prosecutors in Chicago to establish a Gun Crimes Prosecution Team in the Northern District of Illinois). The trials of the CPD officers charged with criminal offenses relating to the fatal shooting of Laquan McDonald have recently concluded, providing some measure of closure to a very difficult period in the City's history. And within a month's time a monitoring team will be in place, providing a wide range of expert resources to assist the parties in making and tracking progress across the full panoply of issues addressed in this decree. Some of those issues have garnered a great deal of attention. See, *e.g.*, Bill Ruthhart, "Chicago cops to document every time they point a gun at someone as part of CPD overhaul deal, sources say," CHICAGO TRIBUNE (Sept. 6, 2018). Others bring immediate resources to growing crises. Leah Hope, "Officer suicides spur Chicago police effort to break mental health stigma," available at https://abc7chicago.com/health/officer-suicides-spur-cpd-effort-to-break-mental-health-stigma/4881794/ (Dec. 11, 2018) (last visited Jan. 31, 2019). The State of Illinois and the City of Chicago have entered into this consent decree with the goal of using it as a vehicle for solving the common problems identified in the complaint in a manner that defuses tension, respects differences of opinion, and over time produces a "lawful, fair, reasonable, and adequate" result for everyone involved. Let us begin.

Dated: January 31, 2019

                                                    Robert M. Dow, Jr.
                                                    United States District Judge