## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6260 |
| v. | ) | Honorable Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

### FRATERNAL ORDER OF POLICE CHICAGO LODGE NO. 7'S
### MOTION FOR LEAVE TO FILE MOTION TO AMEND CONSENT DECREE
### PURSUANT TO LOCAL RULE 5.6, OR, IN THE ALTERNATIVE, MOTION FOR
### LIMITED INTERVENTION, *INSTANTER*

The Fraternal Order of Police Chicago Lodge No. 7 ("the Lodge"), by and through its attorneys, files this motion for leave to file a motion to amend the Consent Decree pursuant to Local Rule 5.6, *instanter*, for the purpose of protecting statutory rights that are adversely affected by the Consent Decree signed by this Court on January 31, 2019. [Doc. 703-1]. In the alternative, the Lodge seeks, pursuant to Rule 24(a) FRCP, intervention for the limited purpose of protecting statutory and ordinance rights of Chicago Police Officers that are not covered or otherwise protected by the carve out language of the Consent Decree in Paragraph 711. [Doc. 703-1 ¶ 711]. In support of the intervention request, the Lodge submits the answer to the complaint that was previously filed as Doc. 51-2.

Local Rule 5.6 permits a non-party to participate in a judicial proceeding by permission of the Court. As to the alternative motion to intervene, the Lodge is seeking in this second request the same kind of limited intervention that was granted to the union in People Who Care v. Rockford Board of Education, 961 F.2d 1335 (7th Cir. 1992), where the District Court allowed

intervention for the union to protect its contract rights long after the consent decree had been issued and approved and after the initial motion to intervene had been denied. Lodge's Reply Brief, [Doc. 81 at 7-9]. [*See* Doc. 81-5 (District Court's June 11, 1991 order in Case No. 89-C-20168, at Para. at 3, granting intervention to union to protect contract rights approximately two years after filing of complaint and entry of consent decree)]. Here, the Lodge believes that the issues are similar in that the violations of state law and municipal law are clear and direct, and are not protected by the carve out language of the Consent Decree. There is absolutely no reference in the language of the carve out provision to the statutory and ordinance rights at risk here.

The statutory and ordinance rights at issue in this matter are the Police and Community Relations Improvement Act ("PCRIA"), 50 ILCS 727/1-1 et seq.; the Chicago Municipal Code Sections 2-84-330 (D), and 2-84 Department of Police, Article IV – Sworn Member Bill of Rights; and the Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706. These statutes are not part of the Illinois Public Labor Relations Act, which is a key piece of the carve out provision in the Consent Decree. The Court declined to rule on the conflicts asserted in the argument filed by the Lodge. [Doc. 702 at 13-14]. However, the Lodge submits two declarations to show that there are actual conflicts that will result from specific provisions of the Consent Decree and requests the Court to take action to relieve the Lodge and the Police Officers it represents from impairment of rights that will result from the application of certain sections of the Consent Decree. In essence, the Lodge is seeking the kind of relief that the Court suggested in its January 31, 2019, Memorandum Opinion and Order at 14. Id.

## I.      COPA's Investigators Are Not State Certified for Officer-Death Investigations

Veteran Homicide Detective Robert Farrell has covered and investigated hundreds of police-involved shootings that resulted in fatalities, and his declaration, which is attached, demonstrates that Civilian Office of Police Accountability ("COPA") investigators are not Lead Homicide Investigators as required by the PCRIA.  In addition, the declaration of Robert Bartlett supports this statement. He requested a FOIA review of the records of the State's Law Enforcement Training and Standards Board and confirmed that the COPA investigators are not law enforcement officers and do not have the requisite certification.[1] According to Mr. Farrell and a CPD General Order, these uncertified investigators take charge at the scene to investigate an officer-involved death.  This means that the investigation, contrary to the assertions of the State in its comments to the Court [Doc. 679 at 32-5], is controlled by COPA.  For purposes of the alternative motion to intervene, the statements in the Farrell declaration are to be taken as true. See Lake Investors v. Egidi Development Group, 715 F. 2d 1256, 1258 (7th Cir. 1983) ("In evaluating the motion to intervene, the district court must accept as true the non-conclusory allegations of the motion and cross-complaint.") (citations omitted).

The PCRIA statute at section 1-10 clearly requires that the lead investigator shall be a person certified by the Illinois Law Enforcement Training Standards Board. 50 ILCS 727/1-10(b).  The training requirements for this status of Lead Homicide Investigator are set forth in

---

[1] Mr. Bartlett requested, on behalf of the Lodge, a list of the COPA Investigators who are assigned to investigate officer-involved deaths and then sent that list (Exh. E), to the Illinois Law Enforcement Training Standards Board to learn if any of the identified investigators had received the certification necessary to be recognized as a Lead Homicide Investigator.  The response from the Standards Board was that none had received the numbered certificates. (Exhs. F, G, and H). None of the COPA investigators is a law enforcement officer, and, therefore, they are not eligible to receive the requisite certification. Each certificate has a separate number. A sample of the unnumbered certificate that the COPA investigators have received is Exh. E-1. This does not allow them under state law to investigate officer-involved deaths.

the regulations of the Illinois Law Enforcement Training Standards Board. 20 Ill. Admin. Code 1720.320, 1720.330, and 1720.340. Exh. B. As indicated by Mr. Farrell, the COPA investigators do not have this important certification. The General Assembly obviously required that Police Officers receive the best possible investigative services at a time of great stress in their professional lives – officer-involved death. An inadequate investigation by an improperly credentialed investigator could make the difference in whether the Police Officer is charged with improper conduct such as unreasonable or unlawful use of force.

As noted by Mr. Farrell, the CPD General Order 03-06 states that in an officer-involved death case, the COPA investigators are to direct the investigation. The key provisions of that order are stated in the Farrell Declaration at Para. 14. The CPD General Order 03-06 further provides that COPA will conduct the officer- death investigation and that the "investigation into the actions of any Department member in relation to the officer-involved death will be conducted by COPA personnel." General Order 03-06, Section III (D) and (E) (3). Exh. A. COPA investigators are responsible upon notification of an officer-involved death to immediately respond to the scene. General Order 03-06, Section IV (B). Farrell Declaration at Para. 14.

Under the CPD protocol and General Orders, the COPA investigators have appeared at the scene of the shootings in which there has been a death and have asserted a leadership role in the investigations in that they have taken charge of the collection and identification of physical evidence, canvassing the persons who are in the crowd at the edge of the crime scene, knocking on the doors of the persons who may live nearby to find witnesses, determining the priority of the physical evidence to be collected by the evidence technicians, and interviewing the Police Officers who were involved in the shooting or who were witnesses of the shooting. The COPA investigators oversee the work of the evidence technicians and tell them what physical evidence

is to be collected.  <u>Farrell Declaration</u> at Para. 12   Evidence will not be collected or processed until the arrival of COPA personnel.  <u>General Order</u> 03-06, Section V(G)(1)(2)(a). The role of COPA is also to determine the priority of what evidence is to be collected and sent to the crime lab.

This in-charge role of the COPA investigators at the scene of an officer-involved shooting is also prescribed in the Municipal Code of Chicago Section 2-78-120(e) and is repeated in the CPD General Order 03-06 under Section III, Investigative Authority:  "Pursuant to Section 2-78-120(e) of the Municipal Code of the City of Chicago, COPA will have jurisdiction to conduct investigations of officer-involved death incidents."  This authority is also used to justify the role of COPA as stated in its manual for its investigators.  <u>COPA Investigation Manual</u>, Exh. C.  This manual states that the first responding COPA employees on the scene of an officer-involved death are to notify the CPD Street Deputy or On-Call Incident Commander of their presence and request access as soon as safety and security concerns permit.  <u>COPA Manual</u>, at 85.  The on-scene COPA Deputy Chief "maintains primary leadership for the scene and direction of . . . [the COPA specialists and investigators and] shall assign and designate the responsibilities: oversight of evidence identification and collection; canvass of the area [for witnesses], witness identification and interview arrangements; and maintain an activity log/documentation of the investigative action taken by COPA personnel while on the scene."  <u>Id</u>. at 85.  This manual is consistent with the Rules and Regulations of COPA Section 3.10.4 Para. 2. Exh. D.

## II.    The Police and Community Relations Improvement Act Does Not Distinguish Between Criminal and Administrative Investigations

COPA's mandate is to investigate the officer-involved death cases, but there is no distinction in either the CPD General Order or the COPA manual and rules between a criminal

investigation and an administrative one. The PCRIA makes no such distinction, and requires that the investigators conducting the investigation shall provide in an expeditious manner a complete report of the officer-involved death to the State's Attorney in the county in which the death occurred. 50 ILCS 727/1-10(d). Pursuant to this statute, the COPA manual requires the lead COPA investigator to provide a report to the State's Attorney – meaning this is a criminal investigation. COPA Manual, at 88. Exh. C. So does the CPD General Order. General Order 03-06, Section IV (A) (6). Internal investigations may be undertaken by a law enforcement agency, but COPA is not a law enforcement agency and, therefore, the Consent Decree may not authorize an administrative investigation based on the PCRIA's internal investigation provisions in Sections 1-15 and 1-30. 50 ILCS 727/1-15 and 1-30. The key point is that COPA is not a law enforcement agency, so these sections of the Act do not allow for it to refer to its investigation as an administrative one.

Two paragraphs of the Consent Decree provide for COPA to investigate the officer-involved death cases. By characterizing these investigations as administrative, the Paragraph 440(d) of the Consent Decree is inconsistent with the PCRIA. [Doc. 703-1 ¶ 440(d)]. Under an additional paragraph, CPD is to ensure that COPA investigators be provided the opportunity to participate in the preliminary assessment "during the immediate aftermath of an officer-involved shooting or death." [Doc. 703-1 ¶ 488(a)]. Within thirty days of the effective date of the Consent Decree, CPD is to issue a policy that the CPD members in such officer-involved shootings are not to "discuss the facts relating to the incident with any witness until interviewed by COPA." [Doc. 703-1 ¶¶ 488(a) and (d)]. This role of COPA at the immediate aftermath of an incident is consistent with the current Municipal Code requirement for its investigative authority in officer-involved shootings that lead to fatalities.

However, these two paragraphs of the Consent Decree, Paragraphs 440 and 488, conflict with the PCRIA in that Section 1-10 does not distinguish between criminal and administrative investigations. The prohibition in the Act is clear that "each officer-involved death investigation <u>shall</u> be conducted by at least two investigators . . . one of whom . . . is the lead investigator [who] <u>shall</u> be a person certified" by the State's Training Board. 50 ILCS 727/1-10 (emphasis added). There is no modifier in the word "investigation" in this statute, so that an investigation of any kind can only be performed by a law enforcement officer who has the necessary State certification. Paragraph 492 of the Consent Decree states that the City will use its best efforts to ensure a law enforcement agency will conduct such criminal investigations, but that does not give COPA a right to perform any kind of investigation of such officer-involved death cases.

## III. <u>Random Audits of Videos Are Invalid for Videos Stored for More Than Ninety Days</u>

The Consent Decree violates a state statute that requires that videos recorded by body worn cameras must be retained for no longer than 90 days, unless they are flagged for particular reasons that are stated in the law. *See* 50 ILCS 706. Section 706/10-20(a)(7)(B) of that statute requires that "[f]ollowing the 90-day storage period, any and all recordings made with an officer-worn body camera must be destroyed, unless any encounter captured on the recording has been flagged." Paragraphs 238(g) and 576 of the Consent Decree requires random reviews of body worn cameras. [Doc. 703-1 ¶¶ 238(g) and 576]. The random audits required by these two paragraphs of the Consent Decree do not contain any time limits as to the storage of the videos, meaning that supervisors would be able to review videos that have been in storage for more than 90 days. There is no speculation that videos have been in storage for more than 90 days. They should have been destroyed and have not been; that is the violation of this statute.

The attached declaration of Kevin Graham, President of the Lodge, supports the Lodge's claim that the City has agreed with the State to violate this statute by not observing the legal time limit on the storage of the videos. A senior level exempt rank officer of the CPD during the collective bargaining negotiations recently answered Mr. Graham's question about how many videos have been destroyed pursuant to the requirements of the statute. The answer was that no unflagged videos have been destroyed. This admission from the CPD's most senior official who supervises the video operation shows that there has not been compliance with the Act. Para. 238 of the Consent Decree states that the CPD "will ensure the recordings are retained in compliance with the" Act. [Doc. 703-1 ¶ 238]. In the face of serious violations of the Act, the Lodge believes that the Court should amend the Consent Decree to require destruction of the unflagged videos based on the ninety-day time limit.

**IV.**    **Two Municipal Ordinance Are Compromised by the Consent Decree**

Anonymous complaints have been prohibited by the City of Chicago and Lodge collective agreements since the initial agreement that was in effect in January 1, 1981. Section 6.1 (D), CBA January 1,1981, to July 1, 1983. Exh. I. So has the requirement that the officers under investigation be advised prior to the interrogation of the names of all the complainants and the nature of the complaint. Section 6.1 (E), Id. Both of these provisions predate the passage of the Illinois Public Labor Relations Act, 5 ILCS 315/1, and Section 4 [Management Rights] of that Act provides that such provisions are given historical bargaining rights protection in that employers will be required to bargain about such subjects of wages, hours and conditions of employment about which they have bargained and agreed to in a collective bargaining agreement. 5 ILCS 315/4. Not only are these historical subjects of bargaining, but the Chicago City Council has incorporated them into the Municipal Code as protective provisions for Police

Officers. Section 2-84-330(D) (anonymous complaints) and Chapter 2-84, Department of Police, Article IV-Sworn Member Bill of Rights.

Paragraph 425 of the Consent Decree provides that the CPD, COPA and the City will ensure within 90 days of the effective date that persons may submit anonymous complaints against police officers. [Doc. 703-1 ¶ 425]. This means that the parties to this litigation have agreed to allow the use of anonymous complaints in direct violation of existing law, which should not be allowed under the jurisprudence of the Seventh Circuit that protects collective bargaining rights. People Who Care, 961 F.2d at 1337; Kasper v. Board of Election Commissioners, 814 F.2d 332, 340-41 (7th Cir. 1987). Simply put, parties to an agreement may not agree to violate the law, and that is what Paragraph 425 does.

Additional paragraphs on this subject do not relieve the City or the CPD of the obligations under the ordinance that forbids the use of anonymous complaints.

- Para. 427 ensures that all complaints including those that are anonymous will be accepted, documented and submitted to COPA in accordance with the Consent Decree and the applicable CBA. However, the CBA bars the use of anonymous complaints. So how is this possible under the current agreement?

- Para. 429 states that the City will continue to ensure that its website will be available to report officer misconduct anonymously.

- Para. 440 (b) contains a one business day time limit for the submission to COPA of anonymous complaints.

- Para. 461 provides that anonymous allegations of misconduct will be preliminarily investigated.

These provisions are agreements that violate the ordinance.

The CBA allows for the use of anonymous complaints for allegations of medical roll abuse and the CPD residency rules. However, this provision of the CBA, Section 6.1 (D), does not appear in the ordinance, which is the focus of this motion, and the provision itself is a

permissible and limited waiver of the ordinance under Ehlers v. Jackson County Sheriff's Merit Commission, 183 Ill. 2d 83, 94,97, 697 N.E.2d 717,723-4 (1998). As to the general bar on the use of anonymous complaints against Police Officers, the CBA does not contain the kind of clear and unequivocal intent to relinquish the right under the anonymous complaint prohibition of the ordinance. AFSCME v. ILRB, 274 Ill. App. 3d 372, 334, 653 N.E. 2d 1357, 1363 (1st Dist. 1995) (waiver must be specific, may not be inferred and must be clear and unmistakable). There is no waiver of the principal clause in the CBA that tracks the ordinance and states: "No anonymous complaint made against an Officer shall be made the subject of a Compliant Register investigation unless the allegation is a violation of the Illinois Criminal Code, the criminal code of another state of the United States or a criminal violation of a federal statute." Section 6.1 (D), CBA, [Doc. 51-3 at APP000011]. This is the same language that is in the ordinance: "No anonymous complaint made against an officer shall be made the subject of a complaint register investigation unless the allegation is of a criminal nature." Chicago Municipal Code, Section 2-84-330(D). This contract language on the medical roll abuse and residency violations are limited waivers and do not waive the bar on the use of anonymous complaints on other disciplinary actions under Ehlers.

Paragraph 475 of the Consent Decree is an agreement to undertake best efforts to "ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation." The ordinance requires such information to be revealed to the officer prior to the interrogation. The Code section provides: "Immediately prior to the interrogation of an officer under investigation, he shall be informed in writing of the nature of the complaint and the names of all complainants." Chicago Municipal Code, Section 2-84-330. By committing to undertake best efforts not to reveal this information, the City and the CPD

have agreed to violate the ordinance. Illinois courts have long held that "[t]he power to enact ordinances derives from the legislature, so that an ordinance passed within the power conferred by that body has the same force and effect within the corporate limits as a state statute." Lavine Const. Co. v. Johnson, 101 Ill. App. 3d 817, 819, 428 N.E.2d 1069, 1071 (1st Dist. 1981) (citing Archibald v. Board of Education (1959), 19 Ill.App.2d 554, 154 N.E.2d 867). For a home rule unit like the City of Chicago, city ordinances are not only binding law; under most circumstances, they will prevail over conflicting state statutes. See, e.g., Palm v. 2800 Lake Shore Drive Condo. Ass'n, 2013 IL 110505, 988 N.E.2d 75 (ordinance adopted by City of Chicago was binding as a valid exercise of home-rule authority despite conflicts with state statutes); see also Ill. Const. Art. VII, § 6 (granting home rule units power to perform any function pertaining to its government and affairs, and to exercise powers concurrently with the State, unless specifically prohibited).

As this Court and the Seventh Circuit have both noted in this case, parties to a consent decree may not agree to disregard or violate valid state laws. State v. City of Chicago, 912 F.3d 979, 988 (7th Cir. 2019) (citing People Who Care, 961 F.2d at 1337); see also [Doc. 702 at 12]. This rule applies equally to municipal ordinances, which carry the same force and effect as state statutes. Thus, because the Consent Decree directly violates and disregards provisions of the City of Chicago's Code of Ordinances, the language of the Consent Decree identified herein is unenforceable.

Any claim that the ordinances can be unilaterally repealed must be rejected under the mandatory subject of bargaining protection against such changes under the IPLRA. See, Central City Education Ass'n v. IELRB, 149 Ill. 2d 496 (1992) (a public employer violates its obligation to bargain in good faith under the IPLRA when it makes a unilateral change to a mandatory

subject of bargaining, without granting notice and an opportunity to bargain to the union); NLRB v. Katz, 369 U.S. 736 (1962). The carve out language of the Consent Decree does protect bargaining rights under the Illinois Public Labor Relations Act in that unilateral actions would be prohibited. Village of Lyons, 30 PERI ¶ 185 (ILRB GC Jan. 17, 2014). As such, unilateral changes such as the repeal of the ordinances, as suggested by the OAG in its rebuttal to the FOP comments [Doc. 679 at 35, n.15] would not be a reasonable action within the definition of "best efforts" in Para. 729 of the Consent Decree.

## V. Relief Requested Through This Motion or, Alternatively, Through Limited Intervention

These statutes and ordinances are laws that protect the interests of Police Officers as third parties and must not be undermined by the Consent Decree. Memorandum Opinion and Order, State of Illinois v. City of Chicago, Case No. 17-cv-6260 at 9, Jan. 31, 2018. It is clear that the rights of these statutes and ordinances are compromised by certain provisions of the Consent Decree as identified in this motion. With two, broad, non-admission clauses in the Consent Decree, at Paragraphs 701 and 707, there is no sound basis to accept contract provisions that are inconsistent with current and existing law.

Because the carve out language of Paragraph 711 does not refer to the non-IPLRA laws and ordinances at issue here, this Court should amend the Consent Decree to bar the use of non-State certified COPA investigators in the investigation of officer-involved deaths, prohibit the CPD from reviewing unflagged videos that have been stored for more than ninety days, bar the use of anonymous complaints in non-criminal matters that do not involve residency allegations or medical roll abuse, and require the City to reveal to officers the name of the complainants prior to the officers' interrogation.

**<u>Conclusion</u>**

For the foregoing reasons, the Lodge requests this Court to grant leave to file this motion *instanter* and modify the Consent Decree for the limited issues asserted herein. Alternatively, the Lodge requests that the Court allow it to intervene in this case for the limited purposes identified herein, so that the Lodge, as a party to this litigation, may seek appropriate protections of the statutory and ordinance rights of Chicago Police Officers.

Respectfully submitted,

/s/Joel A. D'Alba
Joel A. D'Alba

Joel A. D'Alba
Ryan A. Hagerty
Matthew J. Pierce
ASHER, GITTLER & D'ALBA, LTD.
200 W. Jackson Blvd., Suite 720
Chicago, Illinois 60606
(312) 263-1500
jad@ulaw.com
rah@ulaw.com
mjp@ulaw.com

John Farrell pursuant to 28 U.S.C §1746, submits the following statement in support of of the Fraternal Order of Police, Chicago Lodge No.7, and states:

1. I am John Farrell and state that the following is true and correct to the best of my recollection:

2. For forty-two years I worked as a Chicago Police Officer, I was a detective for eight years, and a supervisor as a Sergeant and Lieutenant in the Detective Division for twenty-two years. I worked in the Detective Division for total of thirty years. For a large number of those years I was assigned to homicide units..

3. For the past eight years, and during my retirement, I have been working for the Fraternal Order of Police Chicago Lodge No. 7. I, along with retired veteran Homicide Detectives, respond to the scene of officer involved shootings to represent, counsel and aid the officers involved in such incidents.

4. I have firsthand knowledge of the role of the Civilian Office of Police Accountability (hereinafter COPA) in the investigation of officer-involved shootings in both fatal and non fatal cases.

5. I also have firsthand knowledge of the COPA procedures and practices in such matters, as well as the applicable general orders of the Chicago Police Department, COPA and the governing statue of the State of Illinois.

6. The Illinois law on officer involve shootings is the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 et seq., which provides that the officer-involved-death investigations for a law enforcement officer shall be investigated and conducted by at least two investigators, or an entity or agency comprised of at least two investigators,

one of whom is the lead investigator. The lead investigator shall be a person certified by the Illinois Law Enforcement Training Standards Board as a Lead Homicide Investigator.

7. The certification process is limited to sworn peace officers in Illinois. In my work with the FOP, I am not a Lead Homicide Investigator because I am retired and no longer a sworn peace officer or law enforcement officer under the Police Community Improvement Relations Act.

8. The standards for reaching the certification status are a law enforcement officer employed by the State, county or municipality as a policeman, police officer or in some like position involving the enforcement of the law and protection of public interest at the risk of the person's life. 50 ILCS 727/1-5. Only law enforcement officers who successfully complete the training program of the Illinois Law Enforcement Training and Standards Board in death and homicide investigation may be assigned as lead investigators in death and homicide investigations. 50 ILCS 705/10.11. Only law enforcement officers are eligible to become Lead Homicide Investigators. COPA investigators do not meet this standard.

9. The investigators assigned by COPA to investigate Chicago Police Officer-involved deaths are not law enforcement officers and therefore are not Lead Homicide Investigators.

10. In addition to the standard Chicago Police Department six month training academy requirement to become a Police Officer, Chicago Police Officers are required to attend an additional six week program before they can be assigned to the work as a Detective. This course of study includes law, the CPD's general orders and the training on how to secure a crime scene and investigate it for probative evidence. The lead homicide training for

Homicide Detectives is a one week course that is taught by state certified CPD instructors. These courses are designed to give Detectives an understanding of what happened at the scene and this would include knowledge of what to look for, i.e., dust, broken windows, body fluids, items that are out of place, fibers, fingerprints and the use of special illuminating lights. For instance, one of our Homicide Detectives discovered a discarded cigarette butt in a curb at the crime scene and placed it in an inventory bag. It turned out that DNA on the cigarette revealed the identity of the person who committed the crime. These are the kind of issues that are covered in the six week detective class and supplemental homicide class used for Chicago Police Officers. Upon completion of this training, the Detectives receive the status of Certified Homicide Investigator.

11. This extensive training is much more detailed than the short forty hour course given to the COPA investigators on issues of crime scene investigations. The CPD training is needed to enable the Detectives on the scene to determine the evidence to be collected and sent to the crime lab, and the priority in which it should be analyzed. In my experience since the start of COPA's role in police-involved death cases, COPA investigators have been responsible for setting the priority of what physical evidence is to be collected.

12. In my experience of investigating hundreds of officer-involved shootings as a member of the Homicide Unit and as a FOP representative, it is only since the January 1, 2016, effective date of the Police and Community Relations Improvement Act, that COPA investigators have appeared at the scene of the shootings in which there has been a death and have asserted a leadership role in the investigations in that they have taken charge of the collection and identification of physical evidence, canvassing the persons who are in

the crowd at the edge of the crime scene and knocking on the doors of the persons who may live nearby to find witnesses, and determining the priority of the physical evidence to be collected by the evidence technicians and interviewing the Police Officers who were involved in the shooting or who were witnesses to the shooting. The COPA investigators oversee the work of the evidence technicians and tell them what physical evidence is to be collected.

13. I am familiar with the provision of the Chicago Municipal Code which authorizes COPA to investigate all incidents of officer-involved deaths. Chicago Municipal Code 2 -78 - 120(e). In this ordinance, there is no distinction in the role of COPA in such investigations as to whether the investigation to be undertaken in such cases is to be for administrative or criminal matters. Nor is there such distinction in the investigation at the scene of the officer-involved death cases. COPA is responsible for reporting about the officer-involved death to the Cook County States Attorney's office for consideration of criminal charges.

14. The CPD General Order G0 3-06 provides that COPA will conduct the officer-involved death investigation and that the "investigation into the actions of any Department member in relation to the officer-involved death will be conducted by COPA personnel." General Order 03-06, Section III (D) and (E) (3). Exh. A. COPA investigators are responsible upon notification of an officer-involved death to immediately respond to the scene. General Order 03-06, Section IV (B).

15. COPA investigators at the scenes of officer-involved deaths, pursuant to the General Order on this subject, and when the scene is safe and secure, are given access to the designated crime scene and take charge, direct the collection of evidence,

and determinate the priority for the collection of such evidence. Pursuant to the General Order on this subject, "Evidence will not be collected until COPA takes charge in such cases in which there has been a fatality." Pursuant to the General Order, "Evidence will not be collected or processed until the arrival of COPA personnel," unless exigent circumstances such as weather conditions warrant the immediate collection of the evidence." General Order 03-06 Section V (G)(1) and (2)(a) allows COPA investigators to take charge in such cases in which there has been a fatality. COPA investigators will also take statements of the shooting officer or officers and witness officers in cases whether or not there has been a fatality.

16. In such cases of an officer-involved shooting with a fatality, the role of the CPD Detectives is limited to the investigation of the underlying crime that was committed by the person or persons who were pursued or being sought by the Police Officers on the scene of the crime. General Order 03-06, Section III (2). Police Officers at the scene are also responsible to engage in activities to ensure public safety. General Order 03-06, Section III (1).

17. In my experience of working officer-involved death cases, COPA has been in charge of the investigations.


John Farrell

Date: February 25, 2019



# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

Declaration of Kevin Graham:

Kevin Graham pursuant to 28 U.S.C §1746, submits the following statement in support of the Fraternal Order of Police, Chicago Lodge No.7, and states:

1. I am Kevin Graham and state that the following is true and correct to best of my recollection.

2. I am the president of the Fraternal Order of Police, Chicago Lodge No. 7.

3. I have been in the collective bargaining negotiations for a successor collective bargaining agreement, and I am the chief negotiator for the Lodge.

4. In these negotiations which started in October 2017, one of the issues has been the use by the Chicago Police Department of body worn cameras and the impact that use and related discipline will have on Chicago Police Officers.

5. Of principal concern to the officers represented by the Lodge is the random review of the videos that are recorded on the body worn cameras. The Law Enforcement Officer-Worn Body Camera Act, 50 OCS 706 requires that a video recording shall be destroyed after a 90-day storage period, unless the encounter depicted on the video has been flagged as provided in the Act. Section 706 /10-20 (a)(7)(B) requires that "[f]ollowing the 90-day storage period, any and all recordings made with an officer-worn body camera must be destroyed, unless any encounter captured on the recording has been flagged."

6. Based on this requirement, the Lodge in the course of the negotiations in the past two months has asked through me as to the status of the videos and whether they have been destroyed. The answer from the principal exempt rank commander of the CPD who has

## THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS



# FRATERNAL ORDER OF POLICE
## CHICAGO LODGE #7

1412 WEST WASHINGTON BOULEVARD • CHICAGO, ILLINOIS 60607-1821
PHONE: 312-733-7776 • FAX: 312-733-1367

7.  participated in the negotiations and who is responsible for the video camera deployment and review, Jonathan Lewin, was that no videos that were not flagged have been destroyed.  This means that thousands of hours of videos that that should be been destroyed are still on file in the CPD and could be used by supervisors for impermissible random review of the officers within their command.

8.  Two paragraphs of the Consent Decree Nos. 238 (g) and 576 provide for random review, but do not state that there is a destruction date for the videos.  The Consent Decree provides in Para. 238 that the CPD will ensure that the recordings are retained in compliance with the Department's Forms and Retention Schedule and the Illinois Law Enforcement Officer-Worn Body Camera Act.  However, it should be clear from what the Department's representative has advised in the negotiations that all videos have been retained and that none have been destroyed.

9.  As a result of the failure of the Department to destroy the videos, they can be subject to periodic random review pursuant to Para. 238 (g) and Para. 576 of the Consent Decree.

10.  Para. 576 does not refer in any way to the destruction limits of the Act.

Kevin Graham

Date:  February 25, 2019

## THE ELECTED REPRESENTATIVE OF CHICAGO'S PATROL OFFICERS

Robert Bartlett pursuant to 28 U.S.C. Section 1745 submits the following statement in support of the Fraternal Order of Police, Chicago Lodge No. 7 (the Lodge) and states:

1.  I am Robert Bartlett and state that the following is true and correct to the best of my recollection.

2.  I am a Chicago Police Officer, and I am currently assigned pursuant to the collective bargaining agreement between the City of Chicago and the Lodge to work as Lodge representative in the Lodge's office.  My principal duties are to be a Lodge representative and enforce the provisions of the collective bargaining agreement and to be the chair of the Lodge's Legal Defense Committee.

3.  I also receive other assignments to perform from the president of the Lodge.

4.  One of those duties was to review the provisions of the Police and Community Relations Improvement Act, 50 ILCS 727, and to learn if any of the COPA investigators have been certified as Lead Homicide Investigators within the meaning of that Act and whether the Illinois Law Enforcement Training Standards Board (Standards Board) has issued certificates to the COPA investigators. I performed these assignments in March and April of 2018.

5.  In the course of my investigation, I contacted the Standards Board to inquire as to whether specific COPA investigators had received the necessary certifications to perform investigations of officer-involved deaths.  The Standards Board indicated that none of the investigators I had identified has received a certification from the Standards Board.

6. I sent to a program manager, Mr. Anthony Raffety, of the Standards Board a list of names of COPA investigators. I obtained this list as a result of FOIA request to COPA. I sent this list that I compiled to the State and asked Mr. Raffety to search the Standards Board records to learn if any person on list of COPA investigators had received a Board certification for Lead Homicide Investigator. Exh E. Mr. Raffety's response is attached as Exh. F in which he stated that no Board certifications have been issued for the persons whose names are on the list that Mr. Bartlett sent to Mr. Raffety.

7. Along with the list of COPA investigators' names, I sent to the Standards Board certificates of completion of a Lead Homicide Investigator's course that I had received in response to my FOIA request to COPA. In response to the certificates that I sent to the Standards Board, Ms. Ellen Petty, the Personal Assistance to the Executive Director of the Standards Board, wrote to me to state that a Lead Homicide Investigator must be sworn law enforcement officer employed by a recognized law enforcement agency. Ms. Perry reported that civilians who attended a 40 hours Lead Homicide Investigator class, such as the COPA investigators whose certificates of completion of the class I sent to the State, are not eligible to become a state certified Lead Homicide Investigator because as civilians they are not law enforcement officers. Exh. G. The certificates that had been given to the COPA investigators to mark their completion of a training seminar for homicide investigators do not contain the numbered certifications that are only given to those persons who complete the course work and who are law enforcement officers. According to Ms. Perry, the Board certified certificates contain a certificate number, and there is no such number on the COPA investigators' seminar certificates.

8. I was advised by Mr. Rafferty that the COPA investigators' certificates that I had received from COPA did not contain the Standards Board certificate numbers which means that those investigators were not certified by the Standards Board. Ms. Perry's email to me explains this in greater detail. Exh. G.

9. Subsequent to the exchange of communications between me and the Standards Board, Lodge President Kevin Graham and I met with the members of the Board at a quarterly meeting to discuss these issues. In reply to that meeting, the Standards Board' Executive Director, Brent Fisher, send a letter that stated the COPA employees "are not police officers of the Chicago Police Department and are not primarily responsible for the prevention and detection of crime, they are not 'law enforcement officers' and are therefore ineligible to serve as lead investigators in death and homicide investigations." Letter Brent Fisher to Kevin Graham, Oct. 25, 2018. Exh. H.

10. On the basis of these reports, I concluded that the COPA investigators do not have the necessary certificate to authorize them to conduct an investigation of an officer-involved death.

Date:

| Chicago Police Department | General Order G03-06 |
|---|---|
| **OFFICER-INVOLVED DEATH INVESTIGATIONS** | |

| ISSUE DATE: | 20 September 2017 | EFFECTIVE DATE: | 15 October 2017 |
|---|---|---|---|
| RESCINDS: | 30 March 2016 Version | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive:

A. *continues* the procedures for investigating officer-involved deaths pursuant to the Illinois Police and Community Relations Improvement Act (50 ILCS 727).

B. *satisfies CALEA Law Enforcement Standard Chapter 41.*

## II. VERBATIM TEXT OF PERTINENT SUB-SECTIONS FROM ILLINOIS COMPILED STATUTES (ILCS)

A. 50 ILCS 727/1-5 "Definitions". As used in this Act:

1. "Law enforcement agency" means an agency of this State or unit of local government which is vested by law or ordinance with the duty to maintain public order and to enforce criminal laws or ordinances.

2. "Law enforcement officer" or "officer" means any person employed by a State, county, or municipality as a policeman, peace officer, or in some like position involving the enforcement of the law and protection of public interest at the risk of the person's life.

3. "Officer-involved death" means any death of an individual that results directly from an action or directly from an intentional omission, including unreasonable delay involving a person in custody or intentional failure to seek medical attention when the need for treatment is apparent, of a law enforcement officer while the officer is on duty, or otherwise acting within the scope of his or her employment, or while the officer is off duty, but performing activities that are within the scope of his or her law enforcement duties. "Officer-involved death" includes any death resulting from a motor vehicle accident, if the law enforcement officer was engaged in law enforcement activity involving the individual or the individual's vehicle in the process of apprehension or attempt to apprehend.

B. 50 ILCS 727/1-10 Investigation of officer-involved deaths; requirements.

1. (a) Each law enforcement agency shall have a written policy regarding the investigation of officer-involved deaths that involve a law enforcement officer employed by that law enforcement agency.

2. (b) Each officer-involved death investigation shall be conducted by at least 2 investigators, or an entity or agency comprised of at least 2 investigators, one of whom is the lead investigator. The lead investigator shall be a person certified by the Illinois Law Enforcement Training Standards Board as a Lead Homicide Investigator, or similar training approved by the Illinois Law Enforcement Training Standards Board or the Department of State Police, or similar training provided at an Illinois Law Enforcement Training Standards Board certified school. No investigator involved in the investigation may be employed by the law enforcement agency that employs the officer involved in the officer-involved death, unless the investigator is employed by the Department of State Police and is not assigned to the same division or unit as the officer involved in the death.

3. (c) In addition to the requirements of subsection (b) of this Section, if the officer-involved death being investigated involves a motor vehicle accident, at least one investigator shall be certified by the Illinois Law Enforcement Training Standards Board as a Crash Reconstruction

**EXHIBIT**

**A**

Specialist, or similar training approved by the Illinois Law Enforcement Training Standards Board or the Department of State Police, or similar training provided at an Illinois Law Enforcement Training Standards Board certified school. Notwithstanding the requirements of subsection (b) of this Section, the policy for a law enforcement agency, when the officer-involved death being investigated involves a motor vehicle collision, may allow the use of an investigator who is employed by that law enforcement agency and who is certified by the Illinois Law Enforcement Training Standards Board as a Crash Reconstruction Specialist, or similar training approved by the Illinois Law Enforcement Training and Standards Board, or similar certified training approved by the Department of State Police, or similar training provided at an Illinois Law Enforcement Training and Standards Board certified school.

4.     (d) The investigators conducting the investigation shall, in an expeditious manner, provide a complete report to the State's Attorney of the county in which the officer-involved death occurred.

5.     (e) If the State's Attorney, or a designated special prosecutor, determines there is no basis to prosecute the law enforcement officer involved in the officer-involved death, or if the law enforcement officer is not otherwise charged or indicted, the investigators shall publicly release a report.

## III.     INVESTIGATIVE AUTHORITY

A.     *Pursuant to Section 2-78-120(e) of the Municipal Code of the City of Chicago, COPA will have jurisdiction to conduct investigations of officer-involved death incidents as defined by 50 ILCS 727/1-5.*

NOTE:     *COPA will have the jurisdiction to conduct investigations into an officer-involved death when a member is off duty but performing activities that are within the scope of his or her law enforcement duties.*

B.     The Deputy Chief assigned to the Street Operations Unit, Office of the First Deputy Superintendent (Street Deputy) will *oversee the Department's on-scene investigative responsibilities into the incident and the underlying criminal conduct of non-Department members and coordinate the Department's on-scene law enforcement related activities related to:*

1.     *the preservation of public safety.*

2.     *the investigation of any underlying criminal offenses by non-Department members.*

3.     *the Department's response, actions, and, if applicable, investigative responsibility, for other non-criminal incidents resulting in an officer-involved death (e.g., suicide in custody).*

4.     *motor vehicle crashes resulting in an officer-involved death (as defined by the Police and Community Relations Improvement Act, 50 ILCS 727) for which COPA will serve as the lead investigative agency.*

C.     Officer-involved death investigations remain bound by the involved members' *respective* collective bargaining agreement(s) and the Department directive entitled "**Department Member's Bill of Rights**," including the timeliness of documented formal statements.

D.     *COPA* will conduct the officer-involved death investigation consistent with the Police and Community Relations Improvement Act (50 ILCS 727). The on-scene *COPA* personnel will coordinate *with the Street Deputy* any investigative activity that is pursued at the scene that relates to the officer-involved death *incident.*

E.     When an officer-involved death incident *requires more than one* concurrent investigation, *the responsibilities of the lead agencies are as follows:*

1.     *Any on-scene activities required to ensure public safety* will be commenced immediately and led and coordinated by Department personnel. *These activities* will take precedence over any investigation.

2. *The investigation of the underlying criminal offense involving non-Department members will be led and coordinated by Department personnel. This investigation will:*

    a. *not interfere with the investigation conducted under the requirements of 50 ILCS 727/1-10;*

    b. *be conducted by the Bureau of Detectives Investigative Response Team (IRT) which will report to and coordinate with the assigned Street Deputy;*

    c. *be assisted by the appropriate Bureau of Detectives Area personnel who will report to and coordinate with the assigned Street Deputy;*

    d. *be conducted independently and consistent with the procedures established by the Chief, Bureau of Detectives.*

3. *The investigation into the actions of any Department member in relation to the officer-involved death will be conducted by COPA personnel.*

    **NOTE:** *Nothing in the Police and Community Relations Improvement Act (50 ILCS 727) prevents the Department from conducting an internal review of use of force incidents to address Department policy, training, tactical, and equipment considerations.*

F. To ensure the proper coordination of activities and investigations, the assigned Street Deputy, appropriate Bureau of Detectives Area *supervisor, IRT supervisor*, and responding *COPA* personnel will confer at the scene about the conduct *of on-scene investigative activity*.

G. When a member of the public has sustained life threatening injuries that resulted directly from an action or intentional omission of a Department member who was on duty or otherwise acting within the scope of his or her employment, *and the* action or omission does not otherwise fall within *COPA's* jurisdiction, the Street Deputy *will* coordinate the investigation of the incident and confer with *COPA's* investigative personnel to assess what, if any, investigative activities shall be led by or otherwise involve *COPA* personnel.

H. *For any officer-involved death incident involving a law enforcement officer employed by a law enforcement agency other than the Department, the Chicago Police Department will conduct all investigative activities related to the incident and perform all of the duties required by the Police and Community Relations Improvement Act (50 ILCS 727). Federal law enforcement agencies and law enforcement agencies from outside of Illinois are not governed by the act and any investigation into an officer-involved death incident or the use of deadly force will be investigated under the jurisdiction of the involved agency. The Chicago Police Department will provide assistance, as needed.*

## IV. INITIAL RESPONSIBILITIES

A. *For incidents* involving *the death of or* life threatening injuries to one or more members of the public, *where such death or injury* resulted directly from an action or intentional omission of a Department member who was on duty or otherwise acting within the scope of his or her employment or duty, the:

1. involved member(s) will:

    a. *immediately* request medical attention for the injured, and *may provide appropriate medical care consistent* with their training.

    b. *immediately* notify the Office of Emergency Management and Communications *providing all relevant information and requesting additional resources.*

    c. *attend to all required emergency and security duties arising from the incident, including crime scene protection,* until the arrival of responding supervisory personnel.

    d. *remain on the scene, if not injured, and report to a field supervisor from the district of occurrence upon his or her arrival.*

2. OEMC will notify the:

   a. *involved member's immediate supervisor.*

   b. *field supervisor and the watch operations lieutenant from* the district of occurrence.

   c. Crime Prevention and Information Center (CPIC).

3. Crime Prevention and Information Center (CPIC) will notify *the following via email and phone communication*:

   a. the Street Deputy.

   b. the commander of the district of occurrence.

   c. *COPA personnel.*

   d. the commander of the affected Bureau of Detectives area.

   e. *Bureau of Detectives Investigative Response Team (IRT).*

   f. the area deputy chief, Bureau of Patrol.

   g. *the involved member's commanding officer.*

   h. *Major Accident Investigation Unit, when appropriate.*

   i. *any other units or agencies as appropriate and consistent with CPIC procedures.*

4. *assigned supervisor from the district of occurrence will:*

   a. immediately respond to the scene.

   b. *ensure the public safety investigation is conducted, including:*

      (1) *securing the scene;*

      (2) *addressing any injuries and public safety issues; and*

      (3) *identifying and securing any victims, offenders, witnesses, and evidence.*

   c. ensure CPIC is notified of the incident and request the assignment of the Street Deputy and additional Department resources, if necessary.

   d. *ensure* the Medical Examiner's Office *is notified* of the officer-involved death and a *Medical Examiner* (ME) number *is obtained.*

5. *IRT supervisor will, if appropriate,* be responsible for notification to the Cook County State's Attorney's Office Felony Review concerning the underlying criminal investigation.

6. *COPA* investigators will be responsible for notification to the Cook County State's Attorney's Office Special Prosecution Bureau concerning the officer-involved death investigation.

   **NOTE:** *During the course of the investigation into the conduct of sworn members related to the officer-involved death, all investigatory inquiries from members of the Cook County State's Attorney's Office Special Prosecution Bureau will be responded to by an IRT supervisor.*

B. Upon notification of an officer-involved death incident as defined by 50 ILCS 727, *COPA* personnel will immediately respond to the scene.

C. Department members will perform all actions necessary to address the immediate needs of the scene, including:

1. *immediately requesting* medical attention for the injured. *A Department member may provide appropriate medical care consistent with their training.*

2. securing the scene of the incident.

3. locating and apprehending any offenders.

    4.      identifying and securing evidence and witnesses.

D.    *Once the scene is safe and secure, the COPA investigative personnel will have immediate access to all areas within the designated crime scene, in coordination with the Street Deputy.*

## V.    PROCEDURES

The following procedures will be followed for all officer-involved death investigations, after the scene has been secured, notifications have been made, and investigative personnel have arrived at the scene.

A.    All involved Department personnel will remain:

    1.    on the scene and be available for assignment by or consultation with the Street Deputy until formally released.

> **NOTE:**    *Any involved member in need of immediate medical treatment will seek such treatment, and thereafter, make themselves available to confer with the Street Deputy.*

    2.    *separate from and avoid any contact or communication with any other involved members until released by the Street Deputy in coordination with COPA.*

B.    *Department members will not disengage his or her activated Department-issued recording equipment (e.g., In-car Video Systems, Body Worn Cameras) until so directed by an on-scene supervisor in accordance with the procedures delineated in the Department directives entitled "**Body Worn Cameras**" and "**In-Car Video Systems.**"*

> **NOTE:**    The Body Worn Camera of the involved member will be secured consistent with the Department directive entitled "**Body Worn Cameras**."

C.    *Department member(s) involved in* an officer-involved death incident will:

    1.    cooperate with the public safety investigation conducted by *a supervisor* by providing an oral response to the public safety questions. The public safety investigation will consist of general safety questions concerning:

        a.    any injuries sustained by the member or other individuals.

        b.    whether weapons were discharged, either by Department members or other individuals, what type of weapons, and the direction of the discharges.

        c.    whether subjects are still at large, their descriptions, direction of travel, and alleged criminal offense(s).

        d.    the identification and location of any *victims*, *offenders*, witnesses, or evidence.

        e.    *information about any involved vehicles, including damage to vehicles or vehicle-related safety concerns.*

        f.    *any officer-wellness related matters.*

> **NOTE:**    *Department members will ensure Department-issued recording equipment (e.g., In-Car Video Systems, Body Worn Camera) are deactivated before providing oral responses to the public safety questions as delineated in the Department directives entitled "**Body Worn Cameras**" and "**In-Car Video Systems.**"*

    2.    *upon arrival of the Street Deputy/on scene incident commander, cooperate with any additional public-safety-related questions as consistent with examples provided above.*

3. continue to follow the existing procedures based on the nature of the incident, including but not limited to:

    a. "<u>Use of Force</u>"

    b. "<u>Firearms Discharge Incidents Involving Sworn Members</u>"

    c. "<u>Incidents Requiring the Completion of a Tactical Response Report</u>"

    d. "<u>Emergency Use of Department Vehicles</u>"

    e. "<u>Traffic Crashes Involving Department Members</u>"

    f. "<u>Miscellaneous Detention Facility Topics</u>"

4. be afforded the opportunity, prior to completing incident reports or other documentation, to listen to any audio and view any video contained on the Department-issued recording equipment (e.g., In-Car Video Systems and Body-Worn Cameras) that contains audio or video of the incident. *This applies solely to audio and video captured* from the perspective of the member making the statement (e.g., the Body-Worn Camera worn by the member and In-Car Video footage taken while the member was in the relevant vehicle). *Any listening to such audio or viewing such video must be disclosed by* the member or his or her supervisor in the reports and documentation *related to the incident. Such information will be documented on the case report, Tactical Response Report (TRR), and any other applicable Department reports completed for the incident.*

D. The on-scene Street Deputy will:

1. *ensure* the public safety investigation at the scene of the incident *is conducted.*

2. *confer with the supervisor who conducted the initial public safety investigation and, if deemed necessary, conduct a voluntary walk through and a public safety interview with each of the involved Department member(s) without delay and outside the presence of any other individual.*

3. *ensure that each involved member is accompanied by a supervisor of higher rank than the involved member, when feasible, who will ensure the involved member is separated and directed not to communicate with any other Department member (except as expressly permitted in accordance with the involved member's respective collective bargaining agreement) or civilian witnesses to the incident. The involved member will be removed from the scene as soon as practicable and remain accompanied by a supervisor until excused by the Street Deputy.*

4. ensure the appropriate notifications and reporting requirements are completed, including the notification to the Medical Examiner's Office and the completion of the secondary case report.

5. *otherwise* coordinate the Department's *on-scene* response to any officer-involved death *incident* and may direct additional investigatory actions *as deemed necessary.*

E. Upon the arrival of *COPA* personnel, the Street Deputy will provide a narrative of the incident to the *COPA* investigators based on the information available at that time, including, but not limited to:

1. walking through the incident scene.

2. providing information obtained from the "public safety" interview conducted with the involved member(s).

3. disclosing any *and all* evidence and witnesses identified by Department personnel.

F. *The Street Deputy has an ongoing obligation to keep COPA personnel apprised of all relevant information or evidence identified pursuant to on-scene law enforcement activity.*

G. Crime Scene Access and Evidence Collection

1. *Once the scene is safe and secure,* the *COPA* investigative personnel will have access to all areas *within the designated* crime scene, *in coordination with the Street Deputy.*

2. Department members will continue to identify, secure, protect, collect, and process evidence at the incident scene consistent with the Department directive entitled "**Crime Scene Protection and Processing.**"

    a. Department members assigned to the Forensic Services Division may mark and photograph evidence at the scene prior to the arrival of the *COPA* investigative personnel. Evidence will not be collected or processed until the arrival of the *COPA* personnel, *unless exigent circumstances necessitate immediate collection and processing (e.g., inclement weather resulting in the loss or destruction of evidence).*

    b. Additional evidence identified by the on-scene *COPA* investigative personnel will be collected by Forensic Services Division *personnel* with the concurrence and approval of the *COPA* investigative personnel.

    c. Any and all items of evidence identified by either the Department or *COPA* will be photographed, collected, and processed by Forensics Services Division *personnel.*

    d. A member of the *COPA* investigative team must be present, when practicable, for the collection and examination of any:

        (1) firearms recovered at the scene; *and*

        (2) *audio/video evidence obtained pursuant to the on-scene investigation.*

H. Witness *Interviews*

1. Department members will continue to identify and transport civilian witnesses to the appropriate Bureau of Detectives Area for the purpose of conducting interviews.

    **NOTE:** Although all witnesses will be encouraged to be transported to the appropriate Bureau of Detectives Area office to be interviewed, witnesses who refuse, but are willing to be interviewed on scene should be accommodated and, if appropriate, afforded safety and security considerations. *On-scene voluntary interviews may be facilitated by the use of Department recording devices (In-Car Video Systems, Body Worn Cameras, etc.) consistent with the Department directives entitled "***Body Worn Cameras***" and "***Preliminary Investigations.***"

2. Witnesses will not be held or detained against their will consistent with the Department directive entitled "**Preliminary Investigations.**"

3. *COPA personnel will be afforded the opportunity to interview all witnesses as soon as practicable. If the Department is conducting a concurrent investigation of criminal conduct by non-Department members related to the officer-involved death incident, the witness interviews may be conducted concurrently, if feasible, by the Department and COPA.*

4. *All witnesses should be informed of the opportunity to speak with investigative personnel from COPA. When known, Department personnel will notify COPA personnel before a witness leaves a Department facility or the scene of the incident. However, witnesses will not be held or detained against their will solely for the purpose of notifying COPA personnel.*

5. *COPA*, and, if appropriate, the ASA, will interview any available civilian witnesses.

    **NOTE:** *If necessary, the order in which Department investigators and COPA investigators conduct witness interviews will be determined by the Street Deputy and the COPA investigative personnel, after consultation with the Bureau of Detectives personnel.*

I. Deceased Removal

1. At any time during the course of the investigation, if the highest ranking on-scene Bureau of Patrol supervisor determines that the safety of officers or the public is in jeopardy, the supervisor may request the immediate removal of the decedent from the scene.

2. If an immediate removal is deemed necessary, *the highest ranking on-scene Bureau of Patrol supervisor will ensure that the deceased remains are pronounced consistent with the Department directive entitled "***Processing and Transportation of Deceased Persons.***" When removing the decedent from the scene, Department members will proceed in a respectful and private manner to the extent possible.*

J. Reporting Requirements

The assigned Bureau of Detectives personnel will complete a secondary case report, consistent with the classifications outlined in the Incident Reporting Guide (CPD-63.451), to *track and* document the officer-involved death investigation.

**NOTE:** The assigned Bureau of Detectives personnel will ensure the secondary case report is associated with the Records Division (RD) number of the original incident case report.

## VI. CONFLICT PROVISION

A. As soon as it becomes apparent, any conflict of opinion between the Street Deputy and *COPA* investigative personnel will be elevated up the respective chains of command for resolution.

B. If this directive conflicts with any other Department directive, this directive will take precedence.

Kevin B. Navarro
Acting Superintendent of Police

16-088 RCL/MWK/KT/TPF

# IL Law on Requirements to be A lead Homicide Investigator.

(50 ILCS 705/10.11)

Sec. 10.11. Training; death and homicide investigation. The Illinois Law Enforcement Training and Standards Board shall conduct or approve a training program in death and homicide investigation for the training of law enforcement officers of local government agencies. Only law enforcement officers who successfully complete the training program may be assigned as lead investigators in death and homicide investigations. Satisfactory completion of the training program shall be evidenced by a certificate issued to the law enforcement officer by the Illinois Law Enforcement Training and Standards Board.

The Illinois Law Enforcement Training and Standards Board shall develop a process for waiver applications sent by a local law enforcement agency administrator for those officers whose prior training and experience as homicide investigators may qualify them for a waiver. The Board may issue a waiver at its discretion, based solely on the prior training and experience of an officer as a homicide investigator. This Section does not affect or impede the powers of the office of the coroner to investigate all deaths as provided in Division 3-3 of the Counties Code and the Coroner Training Board Act.

(Source: P.A. 99-408, eff. 1-1-16.)

TITLE 20: CORRECTIONS, CRIMINAL JUSTICE, AND LAW ENFORCEMENT
CHAPTER V: ILLINOIS LAW ENFORCEMENT TRAINING AND STANDARDS BOARD
PART 1720 ILLINOIS POLICE TRAINING ACT
SECTION 1720.330 WAIVER

---

Section 1720.330  **Waiver** Lead Homicide Investigator

a)      The Board may issue a waiver on a case by case basis stating that an officer has previously received training and experience that is substantially equal to that provided in the Course.

b)      A waiver may be issued only upon the presentation of documentation to the Board evidencing that, at the time of application, the individual seeking the waiver:

1)      Is currently employed full-time as a law enforcement officer in Illinois;

2)      Has at least 3 years of experience as a full-time law enforcement officer;

3)      Has completed formal training regarding death and homicide investigations; and

4)      Has substantial experience in a supervisory or leadership role in homicide investigations.



EXHIBIT
B

c)      Only a duly authorized representative of the law enforcement agency may request a waiver for its officers.

d)      The agency seeking a waiver must apply on a form prescribed by the Board.  The form shall require disclosure of all information requested by the Board regarding applicant, including, but not limited to, applicant's training, experience and background.

e)      Any information requested by the Board and submitted by the applicant shall be considered confidential and shall not be utilized for any purpose other than that described in this Section.

f)      All waiver decisions by the Board are final.

# Certification

## Section 1720.340  Certificate Lead Homicide Investigator

a)      Officers who complete the Course or receive a waiver shall be issued a numbered certificate by the Board.

b)      The certificate issued by the Board upon completion of the Course or receipt of waiver shall be valid for a period of 4 years and must be renewed to remain valid.

# Training required to become A law enforcement Officer

TITLE 20: CORRECTIONS, CRIMINAL JUSTICE, AND LAW ENFORCEMENT
CHAPTER V: ILLINOIS LAW ENFORCEMENT TRAINING AND STANDARDS BOARD
PART 1720 ILLINOIS POLICE TRAINING ACT
SECTION 1720.25 PROCEDURES FOR ADMINISTRATION OF LAW ENFORCEMENT AND CORRECTIONAL
OFFICERS CERTIFICATION EXAMINATION

Section 1720.25  Procedures for Administration of Law Enforcement and Correctional Officers Certification Examination

a)      The Comprehensive Examination will be administered to all trainee law enforcement and correctional officers who successfully complete the Trainee Basic Law Enforcement or Correctional Officers Training Course at a State-certified academy.

b)      Trainees who successfully pass the Comprehensive Examination shall be eligible to receive certification attesting to their successful completion of the Minimum Standard Basic Law Enforcement or Correctional Training Requirements.

c)      Examination scores will be reported in writing to the Chief Administrator of the Trainee's employing agency within 14 days after the examination date.

d)      Law Enforcement or Correctional Trainees are required to successfully complete the Comprehensive Examination on one occasion only.  There are no requirements for re-qualification.

e)      Only trainees who have been certified by the Academy Director as having successfully completed the Trainee Basic Training Law Enforcement or Correctional Officers Course with an average minimum score of 70% are eligible to take the Comprehensive Examination.

f)      Each trainee must be a full-time law enforcement or correctional officer and be employed by a local law enforcement agency.

g)      In the event the trainee fails to successfully complete the Comprehensive Examination on the initial administration, he or she will be allowed to re-take the Comprehensive Examination a maximum of 2 times.

h)      In order to be eligible to re-take the Comprehensive Examination, a written request must be submitted by the Chief Administrator of the Officer's employing agency.  Upon receipt of the written request, the Board shall administer the re-take examination, except as may otherwise be provided in subsection (o).

i)      Law enforcement or correctional officers who initially fail to successfully complete the Comprehensive Examination will be administered an alternate version of the Comprehensive Examination on any successive re-takes.

j)      The Board will establish and publish the locations with the dates and times for the administration of re-take examinations.  Such exams will be given at least twice every 6 months.

k)      In the event that a law enforcement or correctional officer fails to successfully complete the Comprehensive Examination and is discharged as an employee by a law enforcement agency, he or she is nevertheless eligible to re-take the Comprehensive Examination if employed by another local law enforcement agency.  He or she will be viewed as a new trainee by the Board and would be granted all rights that are provided to new trainees as specified in this Part.

l)      The Comprehensive Examination will be administered on site at the academies on the last Thursday on the last week of the basic course.

m)      The trainee will have 3.5 hours to complete the Comprehensive Examination.  A trainee will be excused from completing the examination if he/she is ill and excused by the proctor.

n)   Individuals allowed within the testing area will be limited to Board-approved examination proctors and those who are taking the examination.

o)   Any trainee who is uncooperative, disruptive or is thought to be cheating during the administration of the Comprehensive Examination will be ordered by the proctor to turn in his or her examination and to leave the examination area.  A complete written report of the incident will then be submitted to the Executive Director of the Board and to the Chief Administrator of the officer's employing agency.  The offending trainee shall have the opportunity within 7 days to submit a written report to the Executive Director describing the trainee's version of the event.  In such cases it will be left to the discretion of the Executive Director to determine whether the officer has forfeited the examination and whether the trainee is eligible to re-take the Comprehensive Examination.  The Executive Director's determination will be based on the nature of the officer's misbehavior and on the supporting evidence of such misbehavior.

```
ARTICLE 15. PRIVATE DETECTIVES
(225 ILCS 447/15-5)
    (Section scheduled to be repealed on January 1, 2024)
    Sec. 15-5. Exemptions; private detective. The provisions of this Act
relating to the licensure of private detectives do not apply to any of the
following:

            (6) A person employed as an investigator exclusively
        by only one employer in connection with the exclusive
        activities of that employer and who does not hold himself
        or herself out to be a private detective.
```



# Civilian Office of Police Accountability Investigations Manual

## October 2017

Interim Chief Administrator: Patricia Banks



# TABLE OF CONTENTS

I.   **INTRODUCTION** .................................................................................................... 6
     A.    MISSION & VALUES ........................................................................................ 6
     B.    COPA ORDINANCE ........................................................................................ 6
     C.    RELEVANT RULES AND LAWS ........................................................................ 7

II.   **AGENCY OVERVIEW** ...................................................................................... 9
     A.    INVESTIGATIONS SECTION ............................................................................ 9
         1.   *Investigations Section Roles and Responsibilities* ........................... 9
             a.    Chief Administrator ................................................................. 9
             b.    First Deputy Chief Administrator .......................................... 10
             c.    Deputy Chief of Investigation ................................................ 10
             d.    Deputy Chief of Intake ........................................................... 10
             e.    Director of Investigations Operations & Quality Management (IO/QM) ... 11
             f.    Supervising Investigator ........................................................ 11
             g.    Major Case Specialist ............................................................ 12
             h.    Investigator ........................................................................... 12
             i.    Digital Forensic Analyst ......................................................... 13
             j.    Evidence Specialist ................................................................ 14
             k.    Quality Management Analyst .................................................. 15
     B.    ADMINISTRATION SECTION ......................................................................... 15
     C.    PUBLIC AFFAIRS SECTION ........................................................................... 15

III.   **INVESTIGATIVE PROCESS OVERVIEW** ................................................... 16
     A.    INVESTIGATIVE STANDARDS ....................................................................... 16
     B.    KEY STAGES OF INVESTIGATION ................................................................. 16
     B.    EVIDENCE COLLECTION AND EVALUATION .................................................. 18
     C.    CASE CONCLUSION AND OUTCOME DETERMINATION ................................... 18
     D.    POST-CLOSING LITIGATION ........................................................................ 18
     C.    FINAL DISPOSITIONS AND FINDINGS ............................................................ 18
     D.    BENCHMARKS ............................................................................................ 19
         1.   *Six Month Investigation Benchmark* ............................................ 19
         2.   *Intake Benchmarks* ..................................................................... 20
         3.   *Investigative Case Plan (ICP) Benchmark* ................................... 20
         4.   *Investigative Actions (IA) Benchmarks* ....................................... 20
         5.   *Complainant, Victim, or Witness Interview Benchmark* ................ 22
         6.   *CPD Member Interview Benchmark* .............................................. 22
         7.   *Case Review Benchmark* ............................................................. 23

IV.   **INTAKE** ........................................................................................................... 24
     A.    COPA INTAKE PROCESS ............................................................................ 24
     B.    INTAKE UNIT PROCEDURES ........................................................................ 25
     C.    METHODS OF INTAKE ................................................................................. 26
     D.    JURISDICTION DETERMINATION .................................................................. 27
     E.    NON-COPA JURISDICTION ........................................................................ 29
     F.    COPA JURISDICTION ................................................................................ 30
         1.   *Affidavits and Overrides* ............................................................. 30
         2.   *Requesting an Affidavit Override* ................................................ 30
     G.    CASE ASSIGNMENTS ................................................................................... 31
         1.   *Notification-based Investigations* ................................................ 31
         2.   *Complaint-based Investigations* ................................................... 31
         3.   *Criteria for Assigning Cases* ....................................................... 32

V.   **INVESTIGATIVE PROCESS** ......................................................................... 32
     A.    INVESTIGATIVE CASE PLAN ....................................................................... 32

    B.    CANVASSING ........................................................................................................... 33
        1.    Canvassing Guidelines ................................................................................. 33
        2.    Canvassing Businesses ................................................................................ 34
        3.    Canvassing Private Residences .................................................................. 34
        4.    Documentation ............................................................................................ 34
    C.    CPD REPORTS ....................................................................................................... 35
        1.    Arrest Reports ............................................................................................. 35
        2.    Case Incident Report .................................................................................. 36
        3.    Tactical Response Report (TRR) ................................................................ 36
        4.    Officer Battery Reports (OBR) ................................................................... 37
        5.    Detective Supplemental Reports & General Progress Reports ................... 37
        6.    Traffic Pursuit Package .............................................................................. 38
        7.    Contact Card/Investigatory Stop Reports .................................................. 38
        8.    Taser Download Reports ............................................................................. 38
        9.    Inventory Sheets ......................................................................................... 39
        10.   Crime Scene Processing Reports ................................................................ 39
        11.   Log Scan .................................................................................................... 39
        12.   GPS Reports ............................................................................................... 39
        13.   Watch Commander's Log ............................................................................ 40
        14.   Personnel Action Request .......................................................................... 40
        15.   Training History ......................................................................................... 40
        16.   Officer Complaint Register (CR) History (Last 7 Years) ......................... 40
        17.   Synoptic (Drug/Alcohol) Report ............................................................... 41
        18.   CPD Hospitalization Report ...................................................................... 41
    D.    ADDITIONAL CITY DEPARTMENT REPORTS ........................................................... 41
        1.    OEMC PCAD Reports ................................................................................ 42
        2.    CFD EMS Ambulance Reports .................................................................. 42
        3.    Chicago Department of Transportation ..................................................... 43
        4.    Sister Agencies .......................................................................................... 43

**VI.   EVIDENCE COLLECTION AND EVALUATION** ............................................. 43

    A.    GENERATING LEADS .............................................................................................. 43
        1.    Lead Generation Process ........................................................................... 43
    B.    ACCESSING LEADS (LAW ENFORCEMENT AGENCIES DATA SYSTEM) .................. 44
    C.    SOCIAL MEDIA SEARCHES .................................................................................... 45
    D.    USE OF SUBPOENAS .............................................................................................. 45
        1.    Subpoena Approval Process ....................................................................... 46
        2.    Return Date ................................................................................................ 46
        3.    Witness Fee ................................................................................................. 46
        4.    Service ........................................................................................................ 46
    E.    ELECTRONICALLY STORED INFORMATION (ESI) ................................................... 46
        1.    Assistance from COPA Digital Forensic Analysts ..................................... 46
        2.    Video Evidence ........................................................................................... 47
        3.    Photographic Evidence .............................................................................. 48
        4.    Phones & Electronic Storage Devices ....................................................... 48
    F.    MEDICAL EVIDENCE ............................................................................................. 49
        1.    Medical Examiner Records ........................................................................ 49
        2.    Personal Medical Records ......................................................................... 49
        3.    HIPAA ........................................................................................................ 49
    G.    FORENSIC EVIDENCE ............................................................................................ 50
        1.    Collaboration with COPA Evidence Specialists ........................................ 50
        2.    Ballistics, Firearms & Weapon Related Evidence ..................................... 51
            a.    Scene Reconstruction ........................................................................ 51
            b.    Gunshot Residue ............................................................................... 51
            c.    Weapon DNA Evidence ..................................................................... 52
            d.    Illinois State Police Crime Lab ......................................................... 52

H.     BIOLOGIC EVIDENCE (BLOOD & DNA) ...................................................................53
**VII. INTERVIEWS** ...........................................................................................................**53**
   A.     GOVERNING RULES & REGULATIONS ..................................................................54
   B.     INTERVIEW PREPARATION ...................................................................................55
       1.     Review of Incident and Evidence ...............................................................55
       2.     Interview Materials ....................................................................................56
       3.     Anticipation of Challenges ........................................................................57
       4.     Scheduling and Accommodation ................................................................57
   C.     INTERVIEWER PROFESSIONALISM AND CONDUCT ..............................................57
   D.     INTERVIEW OUTLINE: STRUCTURE AND ORDER OF TOPICS .................................58
       1.     Interview Preamble ....................................................................................59
       2.     Questioning Guidelines ..............................................................................59
       3.     Interview Clarity .......................................................................................60
       4.     Chronological Approach ............................................................................60
       5.     Setting the Scene ........................................................................................61
       6.     Description of Incident ...............................................................................62
       7.     Post-Incident Events ..................................................................................62
       8.     Identify Prior Interactions .........................................................................62
       9.     Identify Injuries and Treatment .................................................................62
       10.    Direct Questioning .....................................................................................63
   E.     INTERVIEWEE LEGAL OR UNION REPRESENTATION ............................................63
   F.     DIGITAL RECORDING OF INTERVIEWS .................................................................64
       1.     Documenting Gestures and Discussions with Representatives ...................64
       2.     Documenting Breaks in Recording .............................................................65
   G.     USE OF EXHIBITS ...............................................................................................65
   H.     INTERVIEW CONCLUSION ...................................................................................66
   I.     CIVILIAN WITNESS INTERVIEWS .........................................................................66
   J.     DEPARTMENT MEMBER INTERVIEWS ...................................................................67
       1.     Scheduling and Logistics ...........................................................................67
           a.    Special Scheduling Protocols for OIS Incidents ...................................67
       2.     Member Status ...........................................................................................68
       3.     Interview Protocols ....................................................................................68
       4.     Access to Prior Statements .........................................................................68
       5.     Member Representation ..............................................................................69
       6.     Advisements ...............................................................................................69
       7.     Preparation for Member Interviews ...........................................................69
       8.     Member Background Information ...............................................................70
   K.     CONFIDENTIALITY ..............................................................................................70
**VIII. PARALLEL CIVIL AND CRIMINAL LITIGATION** ...................................................**71**
   A.     PARALLEL CIVIL LITIGATION .............................................................................71
       1.     Requesting Civil Litigation Files ...............................................................71
       2.     Responding to Discovery Requests .............................................................71
       3.     Obtaining Civil Trial Transcripts ..............................................................71
   B.     PARALLEL CRIMINAL LITIGATION ......................................................................72
       1.     Protocols for Interviewing Charged Individuals ........................................72
       2.     Ordering Criminal Case Transcripts ..........................................................72
**IX. CASE FILE MAINTENANCE** ........................................................................................**72**
   A.     COPA RECORDS RETENTION POLICY ..................................................................74
   B.     LEGAL HOLDS ....................................................................................................74
**X.     CASE CONCLUSION AND OUTCOME DETERMINATION** ........................................**74**
   A.     PREPARATION FOR FINAL REVIEW ......................................................................74
   B.     FINAL SUMMARY REPORT (FSR) ........................................................................74

*1.   FSR Outline*..............................................................................................*75*
   a.   FSR Signatures .......................................................................... 76
   b.   FSR Naming Convention........................................................... 76
   c.   FSR Watermarks........................................................................ 77
*2.   FSR Checklist*............................................................................................*77*
C.   CHAIN REVIEW PROCESS.......................................................................................77
   *1.   Internal Non-Concurrence* ......................................................................*78*
D.   DISCIPLINARY RECOMMENDATIONS.........................................................................78
   *1.   Disciplinary Recommendation Memorandum* .........................................*79*
   *2.   CR Matrix* ...............................................................................................*80*
      a.   Disciplinary Factors ................................................................. 81
      b.   Prescribed Penalty Ranges ....................................................... 81
   *3.   Recommendations for Remedial or Other Action* ...................................*81*

**XI.   POST-CLOSING LITIGATION** .........................................................................**81**

A.   PREPARING FOR ARBITRATION/POLICE BOARD HEARINGS .....................................81
B.   SITTING FOR DEPOSITIONS .....................................................................................82
C.   COURT TESTIMONY ................................................................................................82

**XII.   MAJOR CASE INVESTIGATION PROTOCOLS** ........................................**82**

D.   POLICE AND COMMUNITY RELATIONS IMPROVEMENT ACT (PCRIA) .....................82
E.   RESPONSE TO MAJOR CASE INCIDENTS ...................................................................83
   *1.   Notifications* ...........................................................................................*83*
   *2.   COPA Responders*..................................................................................*83*
   *3.   On-Scene Chain of Command* .................................................................*84*
   *4.   Initial On-Scene Investigative Activities* ................................................*85*
   *5.   Scene Walkthrough*.................................................................................*85*
   *6.   On-Scene Resource Assignments* ...........................................................*86*
   *7.   Canvassing Major Case Incidents*..........................................................*87*
   *8.   Reporting On-Scene Activities* ...............................................................*88*
   *9.   Response to Officer-Involved Shooting Incidents* ...................................*89*
   *10.  Response to Motor Vehicle Death Incidents* ...........................................*89*
      a.   Canvassing Motor Vehicle Death Incidents ............................. 89
   *11.  Response to Death in Custody Incident Investigations* ...........................*90*
F.   MAJOR CASE ASSIGNMENTS ...................................................................................91
G.   FUNCTIONAL ROLES FOR MAJOR CASE INVESTIGATIONS .........................................91
H.   COLLABORATION WITH COPA LEGAL SECTION......................................................92
I.   MAJOR CASE INCIDENT DEBRIEFINGS ....................................................................92
J.   MAJOR CASE INCIDENT INVESTIGATIVE STEPS .......................................................93
K.   MAJOR CASE REVIEW PROCEDURE .........................................................................94
   *1.   Open Investigation Review* .....................................................................*94*
   *2.   Case Closure Review*..............................................................................*94*
      a.   Major Case Review Meeting ..................................................... 95
      b.   Final Case Closure Review Chain ............................................ 96

**XIII. ALTERNATIVE DISPUTE RESOLUTION METHODS** .........................**96**

A.   OVERVIEW OF ADR METHODS ...............................................................................96

**XIV. INVESTIGATIONS MANUAL APPROVAL/EDIT/CHANGE HISTORIES**..............................**96**

**XV.   APPENDICES** .....................................................................................................**97**

Cases involving discipline that can be resolved by grievance and that require a full hearing will proceed to arbitration. Arbitration is a full hearing on the merits of the case before a civilian arbitrator chosen by both CPD and the Union. Though less formal than other hearings, an arbitration requires sworn testimony from relevant parties. COPA staff testimony may be required to address the findings of the case and to address any other relevant issues. Reviewing the file and one's notes is critical. COPA Legal staff will work to ensure that investigators are prepared and ready for any needed hearing.

More serious discipline may be heard by the Police Board. Investigator testimony may be needed for Police Board hearings. The Police Board is a more formal hearing before a hearing office and later the hearing record is reviewed by the members of the Police Board and a decision rendered. COPA staff testimony may be required to address the findings of the case and to address any other relevant issues. Reviewing the file and one's notes is critical. COPA Legal staff will work to ensure that investigators are prepared and ready for any needed testimony.

### B. Sitting for Depositions

If an investigator receives notification that they are to be deposed, they should report such notification to the General Counsel immediately. COPA Legal staff will work to ensure that investigators are prepared for deposition testimony.

### C. Court Testimony

If an investigator receives a subpoena for court testimony in any civil, criminal, or administrative matter, they should report this to the General Counsel. COPA Legal will work with the investigator to ensure that the investigator is prepared for such testimony.

## XII. MAJOR CASE INVESTIGATION PROTOCOLS

COPA defines major cases as any cases that meet one or more of the following criteria:

- Officer-involved death as defined by the Police and Community Relations Improvement Act
- Officer-involved firearms discharge that strikes an individual other than the Department member
- Officer-involved incident that results in great bodily harm or serious bodily injury

  - Note: Incidents may include officer-involved pursuits and motor vehicle incidents, officer-involved weapon discharges, and incidents in custody or while trying to get a subject into custody.
  - Note: Incidents can include on- and off-duty actions.

### D. Police and Community Relations Improvement Act (PCRIA)

Pursuant to the Police and Community Relations Improvement Act (50 ILCS 727), the investigation of an officer-involved death as defined by the Act must be conducted by at least two investigators, or an entity or agency comprised of at least two investigators, one of whom is the lead investigator. Neither can be employed by the same agency as the involved Department member. The lead investigator must be certified as a "lead homicide investigator" by the Illinois Law Enforcement Training Standards Board, or have received similar training approved by the Illinois Law Enforcement Training Standards Board or the

Department of State Police, or similar training provided at an Illinois Law Enforcement Training Standards Board certified school.

Investigators conducting the investigation shall, in an expeditious manner, provide a complete report to the State's attorney. If the State's attorney declines to prosecute any involved member and no involved member is otherwise charged or indicted, the investigator will publicly release a report.

Please see section C below for COPA's Major Case response protocols, which are in accordance with the Act.

Note: See COPA PCRIA Compliance policy (COPA Policy 3.4.3).

### E. Response to Major Case Incidents

COPA will respond to the scene upon notification by OEMC or CPIC.

On-call COPA personnel shall remain within city limits while on call to ensure their ability to respond to incidents in a timely manner. Pursuant to the City's vehicle use policy, on-call COPA personnel may not take city vehicles beyond the City limits for non-COPA business without the prior authorization of a Deputy Chief.

### 1. Notifications

COPA personnel will respond to an incident scene upon notification by the Department's Crime Prevention Information Center (CPIC). A notification matrix developed by COPA provides instruction to CPIC as to the types incidents requiring notice to COPA, as well as the type of notice required (email to COPA on-call distribution list, phone call to COPA during business hours or to on-call supervisor during non-business hours, or both).

Note: On occasion, in situations involving Officer Involved Shooting (OIS) incidents, COPA may receive a notification from OEMC. In the interest of timeliness improving timeliness of notifications, COPA has requested that, since the information regarding OIS incidents flows through OEMC before reaching CPIC, that OEMC provide notice to COPA's on-call supervisor. These notifications may be in place of, or supplemental to, CPIC notifications.

### 2. COPA Responders

| COPA RESPONSE TO MAJOR CASE INCIDENTS | | |
|---|---|---|
| **Type of Incident** | **Full Team Response** | **Limited Response** |
| **OIS with hits** | Always | NA |
| **OIS without hits** | When Appropriate | Always |
| **OIS animal discharge** | Rarely | When Appropriate |
| **Injury in Custody** | When Appropriate | Always |
| **Death in Custody** | Always | NA |
| **Motor Vehicle Death** | Always | NA |
| **Who goes?** | | |
| **Chief Administrator** | ✓ (if available) | |
| **First Deputy Chief Administrator** | ✓ (when not on call, only if available) | |
| **On-Call Deputy Chief** | ✓ | As needed |
| **Supervising Investigator (LHI trained)** | ✓ | ✓ |
| **Major Case team (at least one LHI-trained Major Case Specialist)** | ✓ | ✓ |
| **MIRT Team** | As needed | As needed |
| **Evidence Specialist** | ✓ | As needed |
| **Digital Forensic Analyst** | As needed | As needed |
| **Public Information Officer** | ✓ | As needed |

3. On-Scene Chain of Command

Until a COPA Deputy Chief arrives at the scene, the highest ranking COPA employee at the scene of a Major Case incident assumes leadership for the purpose of COPA's investigation. The on-scene COPA Deputy Chief will receive a status briefing from the on-scene COPA staff-in-charge prior to assuming the on-scene responsibility. Once the Deputy Chief arrives at the scene, Deputy Chief is the COPA's incident commander and directs all COPA's resources. All incident-related information should then be conveyed to the on-scene COPA Deputy Chief.

### 4. Initial On-Scene Investigative Activities

The first responding COPA employees shall notify the CPD Street Deputy or On-Call Incident Commander (OCIC) (or other highest ranking CPD official) that COPA employees are present and request access to the scene as soon as safety and security concerns are no longer present.

The first responding COPA employees shall gather preliminary information for the responding COPA investigators, Supervisors, and Deputy Chiefs. The responding Supervising Investigator will notify the Cook County State's Attorney's Office (CCSAO) Special Prosecutions unit about the incident.

COPA staff will remain near the perimeter (inside the yellow tape – outer secured perimeter) of the scene until the CPD Street Deputy or OCIC confirms that COPA personnel may access the inner perimeter (first red tape) scene. If access to the scene appears unnecessarily delayed, the COPA Deputy Chief will consult with the OCIC to determine the cause for the delay. If the explanation of delay or the delay itself is unreasonable, then the COPA Deputy Chief elevates the issue to the First Deputy Chief Administrator and the Chief Administrator.

The on-scene COPA Deputy Chief maintains primary leadership for the scene and direction of Major Case Specialists, Supervising Investigators, and MIRT Investigator(s). The on-scene Deputy Chief, in consultation with the on-scene COPA Supervising Investigator, shall assign and designate the following responsibilities:

- Oversight of evidence identification and collection;
- Canvass of the area;
- Witness identification and interview arrangements; and
- Maintain activity log/documentation of investigative actions taken by COPA personnel while on the scene.

If there are questions associated with the scene or resources, then COPA Deputy Chief should consult with the First Deputy Chief Administrator. The COPA Deputy Chief will, upon reviewing the available information from the scene, determine whether to request a LEICA Scan (i.e., Scene Reconstruction Analysis). If a LEICA Scan is needed, then the Deputy Chief should notify the Chief Administrator prior to making the request through the ISP.

The Supervising Investigator serves as information hub of information and directs all evidence gathering; also ensuring that the COPA Deputy Chief is kept abreast of any investigative issues and developments.

### 5. Scene Walkthrough

Deputy Chiefs, Supervising Investigators, Major Case Specialists, and any additional COPA employees (as determined by the Deputy Chief) shall participate in the scene walkthrough led by the CPD Street Deputy

or OCIC. When safe and appropriate to do so, and after consulting with the on-scene CPD OCIC or other commanding officer, the COPA team shall conduct an independent survey of the scene (i.e., to gain conceptual view based on forensic evidence displayed at the scene) by using one of three methods:

- Inner out
- Outer in
- Grid Pattern

During the independent survey of the scene, COPA staff should document the scene using graphic drawing (e.g., plat, street, the approximate position of vehicles or evidence, etc.). During the surveying of the scene, COPA staff must not disturb forensic evidence, hinder Evidence Technicians' collection or processing of evidence, nor contaminate the scene in any other way.

COPA employees (as designated by the COPA Deputy Chief or her/his designee) must be present when any weapon is recovered and processed. Similarly, COPA staff shall consult with the CPD Street Deputy or OCIC to ensure that a member of the COPA investigative staff is present when any CPD members recover audio or video recordings related to the incident available on Department issued equipment, including body-worn cameras and in-car cameras, or equipment maintained by any third party.

If called to the scene, a COPA Forensic Digital Analysts or Evidence Specialist will monitor, collaborate, and request (if not already done) the following evidence from CPD:

- Trajectory analysis (if properly equipped);
- Photograph(s) of all items of evidence on-scene or in relation to the scene to document their location;
- Photograph(s) of all involved Department members; and
- Breathalyzer analysis conducted for each involved Department member, in compliance with any applicable CBA (pursuant to GO3-02-06).

As needed and requested by on-scene COPA Supervising Investigators or Deputy Chiefs, COPA Forensic Digital Analysts or Evidence Specialists should conduct measurement analysis, take digital photos and video of the scene, canvass the area for any digital evidence (e.g., security cameras, cell phone videos identified by the on-scene Major Case Specialists).

### 6. On-Scene Resource Assignments

The on-scene Supervising Investigator and Deputy Chief will assign roles and responsibilities to the responding Major Case Specialists and MIRT investigator staff. One or more investigators may be sent to a CPD Area or District office to:

- Observe the processing of any involved weapon and the taking of evidence photos of involved Department members;
- Interview any witness CPD members (subject to CPD CBAs); or
- Interview any non-departmental member witness transported to the CPD Area or District office.

Where there is a concurrent criminal investigation conducted by CPD that is related to an officer-involved death incident, CPD and COPA will confer to coordinate interview scheduling and order. When there is a parallel criminal investigation being conducted by CPD, COPA personnel must confer with CPD prior to attempting to interview any non-Department witnesses on the scene or at the Area office. CCSAO personnel may also participate in witness interviews when they are available on scene.

At the direction of the COPA on-scene Supervising Investigator, and in consultation with the COPA Deputy Chief, an investigator may be assigned to respond to the hospital where an involved person (civilian or Department member) is receiving treatment or has died. The COPA investigator assigned to respond to a hospital must obtain preliminary information from the medical staff or the involved individual (if allowed and able). The information should include contact information for the involved individual or other point of contact, and the medical information should include the type, location, and nature of the wounds (if available). If possible, the COPA investigator should also obtain the preliminary entry/exit assessment (if the medical professional is able to provide her/his opinion). The investigator should also obtain the number of entry and exit points (e.g., how may holes and wounds). The investigator should also be present for any CPD Evidence Technician events taking place at the hospital (e.g., GSR, DNA swabbing, etc.). The assigned investigator shall remain at the hospital until properly relieved by the on-scene Supervisor or the Deputy Chief.

As information becomes available (and if the case involves a death), the COPA Deputy Chief may assign one of the Major Case Specialists or MIRT investigators to be present during the autopsy. The investigator assigned to attend an autopsy should record any information (prior to obtaining official report) obtained during the autopsy, including (non-exhaustive list):

- Toxicology report on the deceased
- Trajectory (if gunshot wound victim) and Rodding
- Information on stippling of the body and clothes from a gunshot wound
- Any notes of comments or information obtained during the autopsy that identify or document any other injuries or anomalies.

If called to the scene, COPA Forensic Digital Analysts or Evidence Specialists should remain at the scene while CPD continues evidence collection. The COPA Deputy Chief on-scene will determine which COPA staff members (in addition to the Digital Forensic Analyst and Evidence Specialist) should remain at the scene to oversee scene processing by CPD evidence technicians and for the purpose of conducting additional canvassing activities. Any assigned investigator, at the direction of on-scene COPA Supervisor or Deputy Chief, must continue to conduct a thorough canvass of the area to generate any potential or additional leads.

## 7. Canvassing Major Case Incidents

Unless the circumstances make doing so unsafe or inappropriate, COPA personnel will conduct a canvass to identify possible witnesses and sources of video or audio recordings at the earliest opportunity as soon as possible. If additional COPA personnel are needed to conduct an effective canvass, the Deputy Chief or Supervising Investigator will take the necessary steps to call out additional COPA personnel to the scene.

A member of the COPA response team will be identified as the lead investigator for the canvass. The lead investigator for the canvass will confer with members of the response team to develop the canvass plan which will identify the scope and location of the canvass. The lead investigator for the canvass will assign specific tasks to members of the canvass team. At the conclusion of the canvass, the lead investigator for the canvass will compile copies of all investigator notes and logs from the canvass and will summarize the results of the canvass in a report.

Canvassing should be conducted as soon as practicable by on-scene Major Case Specialists and the on-scene Supervising Investigator, as well as responding MIRT investigators. Initial canvassing may occur while waiting for the CPD OCIC walkthrough on cases involving death. If the individual shot survived, the COPA response team should consult with CPD Detectives to determine whether CPD had completed their canvassing prior to conducting preliminary COPA canvassing. In cases involving death, additional

canvassing should occur after the CPD walkthrough using inner to the outer method (i.e., closest to the incident extending out). Extreme care and situational awareness should be maintained to ensure the integrity of the evidence being collected. Although the incident may be contained to a city block, the canvass area should extend beyond the initial area (i.e., the area within the yellow tape).

During the initial canvassing of the scene, investigators should identify and document any CPD vehicles involved in the incident and ancillary CPD vehicles by using inner to the outer method. Vehicles with in-car camera should be viewed on scene and should be documented and summarized in the investigator's memo or log. If possible, in-car camera viewing should start from the involved vehicle and subsequently move out to responding vehicles (in order of arrival if known). Investigators must also document any civilian vehicles in the immediate vicinity of the incident.

Investigators must conduct initial canvass interviews of any civilians in/near the scene (if available). In these interviews, investigators should:

- Obtain the civilian's contact information ( e.g., address, phone/cell phone, email) and verify, if possible, their government-issued ID;
- Identify whether the witness saw or heard the incident;
- If witness observed/heard the incident, and time/space allows (e.g., in the COPA agency vehicle, CPD Area/District, or the witnesses residence), conduct a full digitally recorded on-scene interview;
- If there is time restriction (due to CPD OCIC walkthrough, etc.), arrange for post walkthrough interview/information gathering; and
- If the witness indicates that she/he cannot wait, coordinate with the COPA Deputy Chief so that COPA staff can be allocated to conduct an initial eyewitness interview.

Some witnesses residing near the incident may have been present at the time of the incident and subsequently left the area. Consequently, when conducting a canvass of the area of the incident, investigators should start from closest to the incident and extend outward. The primary focus should remain in the initial area (i.e., from the beginning and end of the block of the incident if the incident occurred in the middle of the block or extending to subsequent blocks if the incident occurred near an intersection). Once the canvass of the immediate area is completed, r investigators should "fan out" and canvass the ancillary blocks and parallel streets.

Unless doing so would be impracticable under the circumstances, investigative staff will conduct at least two additional canvasses of the scene following the initial canvass conducted in the immediate aftermath of the incident.

### 8. Reporting On-Scene Activities

COPA Investigators and Major Case Specialists, to the extent that they made relevant individual observations or performed individual tasks, must document their individual observations in To/From reports as soon as practicable, but no later than 48 hours after the event.

> Note: Once the COPA CMS system is operational, documentation shall occur using the electronic CMS system to report any investigative actions/steps taken at the scene.

Pursuant to PCRIA (see section XII.B above), the lead COPA investigator must provide a report to the State's Attorney in an expeditious manner. To fulfill this requirement:

- COPA will refer all officer-involved death investigations to the Cook County State's Attorney's Office ("CCSAO") for consideration of criminal charges;
- When the case is referred to the CCSAO, in addition to providing the CCSAO with case materials, the COPA investigator will provide a Referral Memo which summarizes the available evidence at that time;
- At the conclusion of COPA's investigation, the COPA investigator shall draft a Summary Report pursuant to the relevant COPA policies and procedures regarding final reports of investigation. If the CCSAO has declined to pursue criminal charges against any involved Department member, and no other criminal charges have been filed against any involved Department member, the COPA investigator shall prepare a copy of the Summary Report for public release that has been appropriately redacted pursuant to any applicable collective bargaining agreements and municipal, state, or federal law.

### 9. Response to Officer Involved Shooting Incidents

If the shooting officer is not a member of CPD, COPA has no jurisdiction and does not respond. If the shooting officer is a CPD member, COPA will look to the circumstances of the discharge. COPA may or may not respond to events involving the unintentional discharge of a weapon or a discharge directed at an animal. In those situations, the on-call team should discuss the circumstances with the Deputy Chief, who may also consult with the Chief Administrator, to determine whether the circumstances of the event warrant sending a response team. Such situations that warrant sending a response team include conflicting or questionable factual scenarios that (e.g., where the preliminary narrative of the event received from CPIC has inconsistencies with other initial evidence). COPA will usually send a limited team to these events. If the discharge event resulting in injury to any person, COPA will always send a full response team.

### 10. Response to Motor Vehicle Death Incidents

COPA investigators should consider and document several additional items when reviewing the scene of a Motor Vehicle Death incident. These items (not an exhaustive list) include:

- Direction of the vehicle travel;
- Lighting and weather conditions;
- Location of the deceased and their distance from the scene of crash/accident (e.g., if the deceased is located outside the vehicle or if the deceased was pedestrian);
- Any visible tire marks;
- Any vehicle Event Data Recorder ("black box") from the deceased individual's vehicle if she/he was driving (COPA's Digital Forensic Analyst should secure the data from the box); and
- GPS data of Department members vehicles.

#### a. Canvassing Motor Vehicle Death Incidents

When canvassing the scene of a Motor Vehicle Death Incident, investigators should expand the canvass area to include the location where the pursuit originated, the route of the pursuit, and the scene of the subsequent crash, impact, or death. The Major Case Specialist at the scene and the responding MIRT investigators should conduct canvassing. Once a determination is made regarding the initiation point and path and direction of the CPD vehicle pursuit resulting in death, investigators should identify city-owned and third party video recording devices along the route of the pursuit and secure the recordings as quickly as possible. Investigators should also view and request all available CPD dash cam and body-worn camera footage related to the pursuit.

If applicable, investigators should identify and interview any eyewitnesses who may have seen or recorded the initial interaction between the civilian vehicle and the Department members that resulted in the pursuit, or the crash itself.

For more detail, refer to the Canvassing Guidelines (section V.B.1) and Canvassing Major Case Incidents (section XII.C.7).

### 11. Response to Death in Custody Incident Investigations

The COPA Major Case Incident response team will respond to the incident scene upon notification by OEMC or CPIC (see COPA Responders, section XII.C.2 above). If the death in custody occurred inside a CPD vehicle, then the response and investigative process associated with the section above should be followed.

If the death in custody occurred in at a CPD facility, then the initial response is limited to the incident location.

Irrespective of the initial report (e.g., CPIC notification or preliminary briefing at the scene), COPA Major Case Specialists should carefully consider the circumstances surrounding the death, as the death could have occurred due to a number of possible causes. For example:

- Civilian detainee's action (e.g., suicide, including accidental or unintentional suicide);
- Department member negligence (e.g., incorrect use of control tactics resulting in asphyxiation);
- Medical condition (e.g., heart attack);
- Accidental death (e.g., attempting escape resulting in the detainee's death not resulting from Department members response); or
- Misconduct on the part of the Department member (e.g., beating, torturing, physically abusing the detainee).

In order to initiate a thorough investigation, COPA investigators should secure any document that provides information associated with detainee's physical and medical condition when she/he arrived at the location of the incident. Further, investigators should secure the logbook that documents the frequency and time of each cell check as required by the Department. Investigators should pay particular attention to whether there are any gaps in the regular cell checks, or whether there is a predictive pattern to indicate that the "checks" may have been prefilled and subsequently did not occur as documented.

The COPA investigator should identify and secure all video recording devices located in and near the incident. The investigator should also request all video of the facility in order to examine the sequence of events from when the detainee was brought into the facility to when the person was discovered to be in distress or deceased. Further, the video evidence can serve as a reference point to match whether the documented "checks" match the frequency as required by the Department.

As with any officer-involved death incident, the assigned Major Case Specialist should attend the autopsy of the deceased. The assigned Major Case Specialist should also secure the deceased individual's medical history. Medical history can provide clarity in cases where the evidence secured at the scene does not indicate neglect, misconduct, or suicide.

> Note: See section VI.I "Medical Evidence" for more information on the type of documents needed from the Medical Examiner's Office.