**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

**Monitoring Plan for Year One**

To: See Attached Service List

      The Independent Monitor Maggie Hickey and her Independent Monitoring Team submits the Monitoring Plan for Year One, attached as Exhibit A.

Dated:  May 30, 2019

                                /s/Margaret A. Hickey          
                                Margaret A. Hickey
                                Schiff Hardin LLP (No. 90219)
                                233 S. Wacker Drive, Suite 7100
                                Chicago, IL  60606
                                Telephone: (312) 258-5500
                                Facsimile: (312) 258-5600
                                mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on May 30, 2019, she caused a true and correct copy of the foregoing Monitoring Plan for Year One to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP (No. 90219)
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com



# MONITORING PLAN

*Year One*

May 30, 2019

Chicago Police Department Independent Monitoring Team: Monitoring Plan for Year One

Introduction ........................................................................................... 1

The Independent Monitoring Team ................................................. 3

Consent Decree Stakeholders .......................................................... 6

Purpose of Monitoring ....................................................................... 7

Methodology for Assessing Compliance ..................................... 10

Year One Priorities ............................................................................. 13

Consent Decree Deadlines before March 2020 ............................... 13

Foundational Paragraphs without Deadlines .................................. 14

Notes About Baseline Data ................................................................ 17

Year One Activities ............................................................................. 18

IMT Deadlines ...................................................................................... 18

Tentative Schedule and Site Visits ................................................... 19

Summary of Tasks Performed to Date .............................................. 20

Community Engagement Activities ................................................... 22

Community Survey ............................................................................... 26

Independent Monitoring Reports ................................................. 27

Conclusion and Looking Ahead .................................................... 28


Attachment 1. Deadlines before March 2020 .............................. 30

# Introduction

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the Chicago Police Department's (CPD's) policing practices. The U.S. Department of Justice (DOJ) released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD.[1]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (the City) in federal court, seeking a consent decree that would address DOJ's findings and recommendations. The case was assigned to Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the consent decree with the City.

In March 2018, the Parties to the consent decree, the OAG and the City, also entered into a Memorandum of Agreement with "certain community organizations that have established a broad-based community coalition ('Coalition') committed to monitoring, enforcing, and educating the community about" the consent decree.[2]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft consent decree on the Chicago Police Consent Decree website.[3] In October 2018, Judge Dow received public feedback on the proposed consent decree

---

[1] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

[2] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[3] More information about the IMT selection process is available on this website, which the OAG administers. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/independent-monitor/. Other resources, such as consent decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

through written comments and two days of public fairness hearings. Judge Dow approved and signed the consent decree on January 31, 2019. The consent decree requires actions by the CPD and many other City entities.[4] On March 1, 2019, the effective date of the consent decree, and after a competitive selection process, Judge Dow appointed Ms. Maggie Hickey, a Partner in the Schiff Hardin law firm, as the Independent Monitor. Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree."[5] Both Ms. Hickey, as the Independent Monitor, and Judge Coar, as the special master, will report directly to Judge Dow.

As the Monitor, Ms. Hickey leads a team of professionals and consultants from Schiff Hardin and the CNA Institute for Public Research, including subject matter experts, members of the IMT's Community Engagement Team, and other partners. Our role as the IMT is to assess the CPD's and the City's compliance with the required elements of the consent decree. This Monitoring Plan provides our projected assessments and tasks in Year One (March 1, 2019 through February 29, 2020). Specifically, this Monitoring Plan describes the IMT and the stakeholders to the consent decree; sets out an overview of the purpose of monitoring; introduces our monitoring methodologies; provides our priorities in Year One; describes our anticipated activities in Year One; and explains our upcoming Independent Monitoring Reports. This Monitoring Plan concludes by describing how we anticipate approaching monitoring for the following years.

---

[4] We cite to relevant paragraphs of the final consent decree throughout this Monitoring Plan, which is available on the Chicago Police Consent Decree Website. *See Consent Decree* (January 31, 2019), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf; *also available at Illinois v. City of Chicago*, No. 17-cv-6260, 2019 WL 398703.

[5] *About*, Chicago Police Consent Decree, http://chicagopoliceconsentdecree.org/about/.

# The Independent Monitoring Team

As the IMT, we will assess the CPD's and the City's progress in meeting the consent decree's mandates and will report directly to Judge Dow. We will also support the City and the CPD in implementing the changes that the consent decree requires. **Monitor Maggie Hickey** and **Deputy Monitors Chief Rodney Monroe, Ret., and Dr. James "Chip" Coldren, Jr.** lead the IMT. This document represents our Monitoring Plan for Year One (March 1, 2019 through February 29, 2020). Our full organizational chart is in Figure 1, below, and our team structure is in Figure 2, on the following page.

Figure 1. Organizational Chart

*Judge Dow and Judge Coar are not members of the Independent Monitoring Team

### Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |
| Deputy Monitor | | James "Chip" Coldren Jr. |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Dennis Rosenbaum |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Recruitment, Hiring, and Promotion | | Theron Bowman |
| Training | | Theron Bowman |
| Supervision | | Will Johnson |
| Officer Wellness and Support | | Will Johnson |
| Accountability and Transparency | | Harold Medlock |
| Data Collection, Analysis and Management | | Scott Decker |

| Community Engagement Team | | |
|---|---|---|
| Subject Matter Expert, Analyst, and Support Staff | | Tom Christoff |
| Member and Community Surveys | | Joe Hoereth |
| Subject Matter Expert | | Meghan Maury |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (also Associate Monitor for Community Policing) | | Stephen Rickman |
| Member | | Sodiqa Williams |
| Community Surveys  UIC's Institute for Policy and Civic Engagement & Survey Research Laboratory | | |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Attorney | | Derek Barella |
| Attorney | | Kirstie Brenson |
| Officer Wellness and Support | | Brandi Burque |
| Crisis Intervention and Data Collection, Analysis, and Management | | Tom Christoff |
| Attorney | | Meredith DeCarlo |
| Use of Force and Data Collection, Analysis, and Management | | Terry Gainer |
| Attorney | | Ariel Hairston |
| Community Policing and Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Accountability and Transparency | | Laura McElroy |
| Use of Force | | Denise Rodriguez |
| Community Policing | | Hildy Saizow |
| Attorney | | Anthony-Ray Sepulveda |
| Supervision and Recruitment, Hiring, and Promotion | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Solomon and Decker | | Tom Christoff |
| Project Manager, Analyst for Evans | | Vivian Elliot |
| Analyst for Rickman and Johnson | | Tammy Felix |
| Deputy Project Manager, Analyst for Bowman | | Keri Richardson |
| Analyst for Rosenbaum and Medlock | | Christopher Sun |

We designed this structure to facilitate clear communication between team members and ensure that our data analysis and compliance determinations are effective. Our two Deputy Monitors, Chief Rodney Monroe, Ret., and Dr. James "Chip" Coldren, Jr. will assist Monitor Maggie Hickey. The eight Associate Monitors will oversee the ten topic areas set out in the consent decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff will support the Monitors in several ways: by reaching out to and engaging with all sectors of the Chicago community, by providing general administrative support, and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports. To determine compliance accurately, we assigned team members with the right experience, subject matter expertise, and skills to assess multiple sources of information regarding each section of the consent decree.

As referenced above, Judge Dow also appointed Judge Coar as a special master. Judge Coar will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree."[6]

---

[6] *About*, Chicago Police Consent Decree, http://chicagopoliceconsentdecree.org/about/.

# Consent Decree Stakeholders

This consent decree provides a unique opportunity for feedback from the Chicago community and local stakeholders. As noted above, this consent decree resulted from the OAG's lawsuit against the City. Other than the judicial role played by Judge Dow, the federal government is not a party to the consent decree. Instead, the Illinois Office of the Attorney General will oversee and enforce the consent decree (¶694). The consent decree provides the Coalition with certain enforcement rights (¶709a) and establishes quarterly meetings with the IMT (¶669).[7]

This consent decree is taking effect in the midst of significant personnel changes and other events. For example, there have been numerous investigations (including the DOJ investigation) and studies of the CPD and corresponding reform recommendations. The CPD began work on some of these recommendations before the consent decree was entered. Illinois and Chicago have also seen changes in key personnel: in April 2016, Eddie Johnson was sworn in as the police superintendent; in April 2018, Sydney Roberts became the chief administrator of the Civilian Office of Police Accountability (COPA); in January 2019, Kwame Raoul was sworn in as the new attorney general of Illinois; and this month, Lori Lightfoot was sworn in as Chicago mayor.

In short, this consent decree and its surrounding circumstances are unique. This will present great opportunities and a few challenges for the IMT as police reform in Chicago moves forward.

---

[7] *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs*, ¶9 (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

## Purpose of Monitoring

Our role as the IMT is to assess the CPD's and the City's compliance with the required elements of the consent decree. The IMT reports directly to federal Judge Dow and will communicate with the Parties consistently and openly. Paragraph 2 of the consent decree provides the overarching goals of this monitoring project:

> *ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and State of Illinois, respects the rights of the people of Chicago, builds trust between officers and communities they serve, and promotes community and officer safety.*

To achieve these goals, we will oversee improvements in the ten topic areas that the consent decree addresses: (1) community policing; (2) impartial policing; (3) crisis intervention; (4) use of force; (5) recruitment, hiring, and promotion; (6) training; (7) supervision; (8) officer wellness and support; (9) accountability and transparency; and (10) data collection, analysis, and management.

We will apply the following principles to monitoring all of these topics:

- community engagement and participation with transparency,
- data to establish benchmarks and assess progress,
- independent reviews of police policies and practices to determine progress and outcomes,
- technical assistance that moves the City toward compliance with the consent decree,
- regular communication among the Parties to the consent decree, and
- regular communication with members of Chicago communities, the Coalition, CPD command staff, supervisors, officers, representatives of City government, and labor unions.

We believe that solid policing policy provides the foundation for effective training, which in turn, increases the probability of sustaining the best practices (as defined in ¶730) of thorough implementation and accountability. This work is rooted in sound principles of organizational change and organizational justice. As the IMT, we will conduct innovative, rigorous,

and effective police entity assessment, monitoring, and reform work. We believe that our work will result in sustained positive and measurable change in policies and outcomes, as well as changes in the City's and the CPD's culture. If the City and the CPD do not follow the policies and directives revised and created under the consent decree, and if supervisors and appropriate City personnel do not provide consistent and transparent accountability, the CPD will not institutionalize the necessary changes in policing.

We believe that improvements in policy, training, practice, accountability, data collection and analysis, and transparency will lead to sustainable change in Chicago's policing culture. But the improvements sought at the City and the CPD will not last long if we do not focus on making them sustainable throughout our monitoring process. In addition to committing to improvements in policy, training, and the key practices outlined in the consent decree, the City and the CPD must commit to several key matters linked to sustainability. These include developing and implementing comprehensive internal and external policies and practices that consistently reinforce and continuously cultivate reform at all levels within the City and the CPD. All City and CPD employees, from front-line officers to the superintendent, both sworn and non-sworn, will need to invest in these changes long after the consent decree ends. The IMT will continue to stress these important matters throughout the monitoring process.

We will assess whether the CPD and other City entities comply with the consent decree based on data—both internal and external—including but not limited to direct observations, review of policies, interviews with CPD and City personnel and community members, analysis of CPD and City data sets, training initiatives and curricula, audits, reviews, and community and officer surveys. When change is institutionalized and reflected in routine business documents, we will be able to monitor organizational change and sustainability. We will also review routine business documents, by which we mean documented organizational activities that are typical of the business at hand and consistent with culture, custom, and practice, with respect to quantity and frequency (*e.g.*, forms that are regularly filled out by all patrol officers).

Whenever possible, we will triangulate multiple data sources to ensure that the City and the CPD are not simply "checking the box" to meet the requirements of the consent decree. Specifically, we will use techniques that can help validate data by comparing two or more

sources. The IMT will use several research methods to examine the same issues and events, and the IMT will conduct additional assessments to compare with routine business documents to determine the City's and the CPD's overall compliance efforts. If the City and the CPD do not have records in accordance with professional standards, we will suggest how to incorporate data into existing reports to the extent possible or how to tailor current processes to capture necessary information.

# Methodology for Assessing Compliance

In accordance with ¶¶642, 661, and 662, the IMT will assess how the CPD and other City entities comply with the each paragraph of the consent decree that is under review in three, successive levels: (1) **preliminary/policy compliance**, (2) **secondary/training compliance**, and (3) **full/operational compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach full/operational compliance for the requisite length of time required by the consent decree—either one or two years.[8] We will assess compliance on all appropriate levels for the paragraphs in our Monitoring Plan for Year One.[9]

- **Preliminary/Policy Compliance**: Preliminary/Policy Compliance relates mostly to the development and implementation of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642).[10] The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain preliminary/policy compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers in the performance of the tasks outlined in

---

[8] The consent decree "will terminate when the Court finds that the City has achieved full and effective compliance with [the consent decree] and has maintained such compliance with the material requirements for at least one year for the sections delineated as Group A [(Recruitment, Hiring, and Promotions; Training; and Officer Wellness and Support)] . . . and for at least two years for the sections delineated as Group B" (Community Policing; Impartial Policing; Crisis Intervention; Use of Force; Supervision; Accountability and Transparency; and Data Collection, Analysis, and Management) (¶714).

[9] We will be in the best position to determine which compliance level is appropriate for each paragraph under review after we begin our assessment. Our work during the first year will then inform our subsequent monitoring plans.

[10] Paragraph 730 defines "best practices" as follows: "any guidelines, standards, policies, procedures, or methods that are consistent with the requirements and goals of [the consent decree], and are either supported by research or empirical evidence or are accepted by industry-recognized professionals, agencies, or organizations in the relevant subject area. In case of any conflict or inconsistency between industry-recognized professionals, agencies, or organizations regarding a best practice, CPD is entitled to adopt the practice it prefers, provided that the practice is consistent with the requirements and goals of [the consent decree]."

the consent decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the consent decree's requirements, comply with best practices for effective policing policy, and demonstrate concepts upon which effective training and compliance can be built. We will assess this level of compliance by reviewing applicable policies, procedures, rules, and regulations. We will assess data, including standard operating procedures; policy review processes; baseline data on police actions; Party and stakeholder input, including from community members; and interviews and discussions with City, CPD, and community members.

- **Secondary/Training Compliance**: Secondary/Training compliance relates principally to the development and implementation of acceptable and professional training strategies (¶642), which convey the changes in policies and procedures that were established in the preliminary/policy compliance. Secondary/training compliance also relates to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will assess documentation—including reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, understood by, and important to line, supervisory, and managerial levels of the City and the CPD. The IMT will assess the existence of training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the consent decree. We will consider the effectiveness of training, including delivery, reach, and comprehension—often via direct observations. We will also use various records and data, including training curricula, student learning objectives, student materials and instructor materials, officer surveys, presentations, videos, course agendas, tracking data, training plans, internal communications, evaluation surveys, and corresponding reports.

- **Full/Operational Compliance**: Full/operational compliance relates to adherence to policies within the day-to-day operations (¶642). Full/operational compliance requires that personnel, sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words,

the City "owns" and enforces its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training. When measuring full/operational compliance we will note whether supervisors notice, correct, and supervise officer behavior and whether corrections occur in the routine business of the entity. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are becoming institutionalized. Changes in policy, training, and practice must be embedded in the day-to-day operations of the City. In addition, all levels of the chain of command must ensure consistent and transparent compliance. Examples of data that we will use to assess full/operational compliance include, but are not limited to, calls for service data; incident reports; investigations; records regarding response to community complaints; uses of force; direct observations, including ride-alongs and meetings; interviews with officers; discussions with community members; community and officer surveys; reviews of supervision, correction, and discipline processes; and internal compliance.

If the IMT is unable to adequately assess a requirement under review based on these three levels of compliance, we will still examine that requirement, identify barriers toward progress, provide suggestions and assistance to address those barriers, and describe these steps in the corresponding Independent Monitoring Report.

Paragraph 655 requires the IMT to submit to the Parties for review and comment its proposed methodology for compliance reviews and audits 45 days before we initiate any compliance review or audit. The IMT recognizes that it is important to the Court, the Parties, and the community to identify with as much specificity as possible the sources of information that we will rely on, the methodology to review those sources, and the standards that we will use to measure compliance. At this stage, the IMT is still collecting information on current practices, efforts by the City to implement the consent decree, and the availability and quality of data. In addition, our Community Engagement Team will help identify different or additional sources of important information, as appropriate. The nature of the consent decree provision will determine whether we conduct a quantitative and/or qualitative review and what methods we will use to independently verify information provided to us.

# Year One Priorities

In Year One, the IMT will prioritize (1) the paragraphs in the consent decree with a deadline of less than 365 days from the effective date of the consent decree (March 1, 2019) and (2) foundational requirements agreed to by the Parties and the IMT, regardless of whether the consent decree establishes a deadline for them.

This list is not exhaustive. While we will not begin monitoring compliance for some paragraphs until after Year One, some of these paragraphs require the City and the CPD to take steps *during Year One* to meet the deadlines *after Year One*. Examples of paragraphs with long-term deadlines (*i.e.*, deadlines beyond 365 days of the effective date) that require City and CPD action in Year One include the following:

- The CIT Officer Implementation Plan (¶¶ 107-10);
- In-service training ramp up to 32 hours by end of 2020 (¶¶ 320(c), 323(c));
- The staffing model to address span of control and unity of command (¶¶ 365-66, 368); and
- The development of a case management system (¶¶ 438-39) and an Early Intervention System (¶¶ 583-605).

For this reason, throughout Year One, the IMT will review the steps the City and the CPD take to meet these requirements, regardless of the deadlines or whether those paragraphs are specifically referenced in Attachment 1. Specifically, the IMT will observe and examine these requirements throughout Year One. In our upcoming Independent Monitoring Reports, we will note data sources, metrics, and measures; identify any barriers toward progress; and provide suggestions and assistance to address those barriers.

## CONSENT DECREE DEADLINES BEFORE MARCH 2020

The consent decree and its deadlines became effective on March 1, 2019. More than 100 of the consent decree's almost 800 paragraphs contain specific deadlines for the City and the CPD in Year One. Several of the consent decree's paragraphs contain deadlines for the IMT.

The IMT's activities during Year One will address the paragraphs that contain deadlines of 365 days or fewer, prioritizing the paragraphs with the shortest deadlines—*i.e.*, past due deadlines and deadlines within 30, 60, 90, 180, and 365 days after the effective date of the consent decree.[11]

The Parties negotiated and the Court approved the deadlines in the consent decree. Compliance with those deadlines is important so that the public can begin to see progress in critical areas of the City's and the CPD's operations. Many of the deadlines in the consent decree are interrelated and designed to facilitate compliance. Several deadlines in the consent decree have already passed. Some deadlines predated the appointment of the IMT and the effective date of the consent decree. The IMT will carefully address these requirements to ensure that they are implemented promptly.

Attachment 1 details each paragraph with a Year One deadline and our corresponding data sources, metrics, and measures. Attachment 1 also indicates which requirements we will assess together (¶653).

We will discuss each paragraph in Attachment 1 in our first and/or second Independent Monitoring Reports (IMR-1 and IMR-2, respectively). To be clear, the deadlines of the consent decree vary as to what they require the City and the CPD to achieve. For example, some deadlines require the creation of a policy, others require training, and others require full compliance. Thus, as explained in the previous section, we will assess each of the Year One deadlines at the preliminary/policy, secondary/training, and full/operational compliance levels, as appropriate (¶¶661, 662, and 642).

## FOUNDATIONAL PARAGRAPHS WITHOUT DEADLINES

Many paragraphs in the consent decree do not contain deadlines, but in consultation with the parties, the IMT has determined to assess some paragraphs without deadlines in Year One. The IMT will also focus on these foundational policy and practice requirements of the

---

[11] In our first Independent Monitoring Report, we will address specific consent decree deadlines that have already passed, such as ¶¶188 and 218, which have January 1, 2019 deadlines.

consent decree during Year One because accountable and sustained reform often relies on effective training, which in turn, often relies on solid policy.

These paragraphs involve foundational policy and practice requirements that are fundamental to the success of the consent decree. The IMT will already be assessing many of these paragraphs to the extent that these requirements overlap with the specific deadlines above. For many other paragraphs, the City and the CPD have made corresponding policy, training, and operational changes within the last few years that warrant the IMT's attention during Year One.

While foundational paragraphs for Year One are spread across the consent decree, they are particularly evident in two sections: Use of Force and Accountability and Transparency. First, the Use of Force section requires the CPD and relevant City entities to develop policies and practices and provide appropriate training regarding de-escalation, anti-retaliation, the reasonableness of force, deadly force, fleeing subjects, vehicle operation, requests for medical aid, intervention against excessive force, chokeholds, and weapons policies.[12] Since the City has already adopted policies regarding many of these topics, the IMT can begin its assessment in Year One.

Second, the Accountability and Transparency section requires the City to, for example, make "best efforts" to comply with areas of the consent decree that are not directly under the control of the City or the CPD.[13] Like the requirements in the Use of Force section, the Accountability and Transparency section requires the CPD and relevant City entities to develop policies and practices and provide corresponding training regarding complaints and corresponding investigations, record keeping, notifications, referrals, reports, and policy reforms.[14] Since the City has already adopted policies regarding many of these topics, the IMT can begin its assessment in Year One.

---

[12] *See* ¶¶161-67, 173, 176-78, 181-87, 197-200, and 202-16. *See also* ¶228.

[13] *See, e.g.,* ¶¶431, 441, 445, 475, 477, 508, and 514.

[14] *See* ¶¶429-30, 434, 441-44, 446, 448, 450-51, 453, 455-56, 459-62, 463-69, 484, 486-87, 497, 499-501, 552, and 561.

Additional foundational paragraphs require the City and the CPD to begin collecting data,[15] have sufficient staff members to fulfill the requirements of the consent decree,[16] integrate certain concepts across sections,[17] conduct certain audits,[18] and develop new systems[19] and strategies.[20] Other areas of the consent decree also require the City to make "best efforts," including "best efforts to secure modifications" consistent with the consent decree during negotiations of relevant collective bargaining agreements (¶711).[21]

We will address these foundational paragraphs in our first and/or second Independent Monitoring Reports (IMR-1 and IMR-2, respectively). We will assess whether the relevant City entities are making progress toward compliance. The IMT will assess these paragraphs at the preliminary/policy, secondary/training, and full/operational compliance levels within Year One (¶¶661, 662, and 642), only if the IMT identifies sufficient data sources, metrics, and measurements to make that assessment and if resources permit—given the deadlines above. If the IMT is unable to adequately assess these paragraphs within these three levels of compliance, we will still examine the requirements, identify barriers toward progress, provide assistance to help address those barriers, and describe these steps in the corresponding IMR.

---

[15] *See, e.g.*, ¶¶120 (incidents involving individuals in crisis and responses to individuals in crisis).

[16] *See e.g.*, ¶¶91 (Crisis Intervention Team Program), 92 (Certified Crisis Intervention Team Officers), 116 (initial and refresher training for Crisis Intervention Team Coordinator), 117 (Crisis Intervention Team Coordinator responsibilities), 121 (data analysts for the Crisis Intervention Team Program), 356 (patrol field supervisors, Field Training Officers, training staff, staff for misconduct investigations, Crisis Intervention Team Officers, and officer assistance and wellness staff), and 391 (increase staffing in the CPD's Professional Counseling Division).

[17] *See, e.g.*, ¶¶53 (requiring that CPD's policies and procedures prohibition discrimination on the basis of any protected class under federal, state, and local law), 72 (requiring impartial policing into related CPD courses when appropriate), 74 (impartial policing in annual in-service training), and 414 (CPD training on stress management, alcohol and substance abuse, officer wellness, and support services).

[18] *See, e.g.*, ¶¶576 (random audits of body-worn and in-car camera recordings of incidents).

[19] *See, e.g.*, ¶¶280 (centralized electronic system for scheduling and tracking all CPD training) and 290 (centralized electronic file system for assessing the content and delivery of all CPD training).

[20] *See, e.g.*, ¶¶385 (communications strategy for the Officer Support Systems Plan) and 386 (specific requirements of the communications strategy from ¶385).

[21] Consistent with ¶711, the IMT will seek to engage with the City's collective bargaining teams in a manner that does not compromise the collective bargaining process or any party's rights in that process.

## NOTES ABOUT BASELINE DATA

As part of our effort to understand current policies, practices, training, and organizational structure at the CPD and other City entities, the IMT is in the process of requesting "baseline data" and information about current policies, trainings, and practices for a number of specific requirements. In assessing the data, the IMT will also evaluate the underlying databases and modes of data collection to determine whether the data is of sufficient quality, accuracy, and reliability. To provide effective technical assistance throughout the monitoring process and measure compliance with consent decree requirements, we need a robust understanding of the relevant data integrity, the current status of longstanding practices and recent reform initiatives, and their capacity to implement the requirements of the consent decree.

In particular, baseline data is especially important in the areas of Use of Force and Accountability and Transparency. Regarding Use of Force, the IMT will obtain baseline data about CPD officers' documentation of uses of force, the CPD's review of reportable uses of force, and the extent to which uses of force comply with CPD policy and the Constitution. This is essential groundwork for assessing the CPD's compliance in Year Two and beyond. Similarly, in Year One, the IMT will conduct an initial assessment of the CPD's, COPA's, and the City's handling of misconduct complaints, from intake through resolution. We must develop a baseline assessment of the City's current process for handling misconduct complaints in light of the many requirements in the consent decree that will drive this process in years to come.

Finally, it is important to note that the IMT will make reasonable efforts to assess the methods of collection and quality of all data received from the City and the CPD to ensure that the data is reliable. We will assess the reliability of the data before we use it to measure compliance (at the preliminary/policy, secondary/training, and full/operational levels), and our compliance assessments will be a highly collaborative process among the members of the IMT. We will rely on the IMT members with robust data expertise and decades of research experience to assess the reliability and validity of data.

# Year One Activities

The following section provides the deadlines for the IMT in Year One and our corresponding activities, including actions we have taken, are taking, and will take. This section also explains our community engagement activities and our community survey.

We must emphasize that even though we are independent, our monitoring activities will not occur in isolation. We are committed to establishing solid lines of communication with the Chicago community and developing working relationships between and among the Parties.[22] Thus, Associate Monitors will build relationships with a wide variety of stakeholders for each Topic Area, including IMT staff (Associate Monitors, analysts, and subject matter experts where appropriate), staff from the CPD's Office of Reform Management, staff from the OAG, staff from relevant City entities, collective bargaining representatives, and sworn and community members affected by specific requirements of the consent decree.

The IMT will also confer and collaborate with the long-established Office of the Inspector General for the City (OIG) and the more recently created Deputy Inspector General for Public Safety (Deputy PSIG) to examine ways of using and integrating their data platforms and analytical capabilities for sustainable reforms. The IMT provided a draft of this Monitoring Plan for Year One to the OIG and PSIG for their review and comment to avoid any duplication of effort (¶667).

## IMT DEADLINES

In addition to establishing deadlines for the City, the consent decree also requires the IMT to complete certain tasks within specified timelines. Table 1 on the following page sets out the IMT's responsibilities and corresponding deadlines.

---

[22] For more details regarding our community engagement, please see our "Community Engagement Activities" subsection below.

Table 1: Consent Decree Deadlines for the IMT, up to 365 Days after Effective Date

| Paragraphs | Section | Topic | Deadline | Deadlines |
|---|---|---|---|---|
| 627-637 | Implementation, Enforcement, and Monitoring | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines |
| 638-641 | Implementation, Enforcement, and Monitoring | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with Implementation Plan deadlines |
| 642-644 | Implementation, Enforcement, and Monitoring | Compliance Reviews and Audits | Various, Ongoing | Will occur during each Independent Monitoring period for each IMR |
| 645-651 | Implementation, Enforcement, and Monitoring | Community Surveys | 180 Days & every two years after | August 28, 2019 |
| 652-655 | Implementation, Enforcement, and Monitoring | Monitoring Plan and Review Methodology | 90 Days | May 30, 2019; draft by May 15, 2019 |
| 656 | Implementation, Enforcement, and Monitoring | Monitoring Technical Assistance and Recommendations | Ongoing | Ongoing |
| 661-665 | Implementation, Enforcement, and Monitoring | Written Public Reports | Semi-annual | Draft by September 30, 2019 |
| 667 | Implementation, Enforcement, and Monitoring | Coordination with the Office of Inspector General | Ongoing | Ongoing |
| 668 | Implementation, Enforcement, and Monitoring | Maintain regular contact with the Parties | Ongoing | Monthly |
| 669 | Implementation, Enforcement, and Monitoring | Monitor will participate in meetings with the Coalition | Quarterly | Quarterly |
| 670-671 | Implementation, Enforcement, and Monitoring | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing |

## TENTATIVE SCHEDULE AND SITE VISITS

The IMT will conduct compliance reviews and data analysis on an ongoing basis throughout the monitoring project. We will also conduct many on-site visits during Year One. Our site visit activities may include, but are not limited to, reviewing on-site records, policies, procedures, training curricula, and various data sources; direct observations of training sessions; interviews; ride-alongs; and meetings, conversations, and discussions with the Parties, personnel, community members, and external stakeholders about specific consent decree requirements, progress, and plans to achieve compliance.

IMT members have already committed to attending and observing the CPD's Officer Wellness Summit in June 2019 and the entire IMT will conduct a weeklong site visit in Chicago in July 2019. And because many of our team members are local, IMT members meet nearly every week with the Parties and members of the Chicago community. IMT members have already attended, for example, CPD strategic planning meetings, school resource officer meetings, CPD Pre-Service Captains' training, and several community meetings.

## SUMMARY OF TASKS PERFORMED TO DATE

Since Judge Dow appointed Ms. Hickey as the Independent Monitor on March 1, 2019, she and the IMT have engaged in start-up activities.[23] For example, IMT members have held weekly meetings and conversations with the Parties, including introductory meetings with key personnel from the OAG, the City, the CPD, the Police Board, COPA, the Office of the Inspector General, the Deputy Inspector General for Public Safety, and the Coalition (¶669).

Many of the meetings and conversations addressed the need for a regular system of contacts and protocols among all entities involved in the monitoring process, including a standing conference call, conference schedules, and a mechanism for secure, password-protected communications.

On March 21, 2019, Monitor Hickey convened the entire IMT for an orientation and training session, which addressed each aspect of the consent decree and outlined the research, legal, and administrative support available to the team. The meeting included interactions with the OAG personnel who are responsible for enforcing the consent decree's requirements.

On March 22, 2019, the IMT met with senior members of the City to make introductions, receive an executive-level briefing on reform activities underway at the CPD and other City

---

[23] This section addresses the components listed in our first proposal under the subheading "Prepare for Monitoring," which is available on the Chicago Police Consent Decree website. *See* Schiff Hardin-CNA Monitoring Team, *City of Chicago Police Department Independent Monitoring Proposal*, Chicago Police Consent Decree (September 4, 2018), 20, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/09/Schiff-Hardin-CNA-Proposal.pdf.

entities, and begin discussions between their representatives and IMT members responsible for the key components of the consent decree.

We have also been working to establish the public's access to the IMT. We are exploring options for conducting traveling office hours in local communities. We have also started developing a website, www.CPDmonitoringteam.com, which will include a portal for community and officer inquiries, comments, and suggestions.

Our website will feature the IMT's formal Independent Monitoring Reports and also shorter, narrative reports about the monitoring initiative to update the public on the progress of the monitoring effort and compliance in each of the ten substantive areas in the consent decree. The website will also include contact information for IMT members; a regularly updated calendar of monitoring meetings and events; a portal for receiving public comments, suggestions, and questions; and summaries of our budgets and accounting. We will design the website so that it is easy to navigate and Section 508 compliant.[24]

Further, as part of our start-up efforts, we reviewed each section of the consent decree, noting deadlines for deliverables in Year One, including past due deadlines[25] and deliverables with specific deadlines. The IMT also reviewed various documents submitted by the Parties, including a draft consent decree project list, proposed protocols for access to data, and the CPD's directives system.

The IMT's Community Engagement Team has also been active since March 1, developing an organizational structure and establishing goals, principles, and draft language for public outreach events. For example, beginning in March 2019, the Community Engagement Team began holding meetings with community stakeholders and Chicago organizations to begin its outreach efforts and to obtain suggestions and input regarding this Monitoring Plan.

---

[24] Section 508 is a government-wide IT accessibility program administered by the U.S. General Services Administration that encourages units of government to increase IT accessibility in accordance with the Rehabilitation Act of 1973. More information about Section 508 compliance is available online. *See* United States General Services Administration, *Section 508*, www.section508.gov.

[25] Some requirements within the consent decree have deadlines that have passed. While Judge Dow signed the consent decree on January 31, 2019, the consent decree did not become effective until the monitor was appointed on March 1, 2019.

Overall, members of the IMT, including our Community Engagement Team, have attended numerous community meetings or events and met with many members of the Chicago community.

## COMMUNITY ENGAGEMENT ACTIVITIES

The Community Engagement Team is a critical part of the IMT.[26] Our Community Engagement Team embodies our collaborative approach to this monitoring work. The Community Engagement Team is comprised of experienced Chicago community members, experts in police-community relations, lawyers, and academic scholars. These members work together to meaningfully engage Chicago's communities and ensure their participation throughout the monitoring process. The Community Engagement Team will also work closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community component of compliance with the consent decree.

The Community Engagement Team has a critical role in monitoring levels of trust, sentiment, and improved relationships between the stakeholders to the consent decree. Its work is equally important in the IMT's work to create sustainable change at the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the consent decree. In its 2017 report, the DOJ found that "the impact of CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[27] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[28]

The City and the CPD cannot function effectively when the City and the CPD lack trust from the communities they serve. Effective policing will require both procedural and cultural change and improved relationships between the City and the CPD and the communities

---

[26] *See* Figures 1 and 2 on pages 5 and 6, above.

[27] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolicecon-sentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

[28] *Id.* at 15.

they serve. The Community Engagement Team will encourage improved relationships based on respect, trust, and partnership, which are upheld by transparency and rational account-ability.

The Community Engagement Team's role throughout this process will be to facilitate com-munity engagement regarding the IMT's work. The following definition reflects what we mean by community engagement:

> *Community engagement is the participation of members of a commu-nity in assessing, planning, implementing, and evaluating solutions to problems that affect them. It involves interpersonal trust, communica-tion, and collaboration. Community is not solely defined by geographic boundaries and may include residents, consumers of services, commu-nity organizations and institutions, neighborhood associations, busi-nesses and workers, cultural communities, advocacy groups, students, youth, powerful voices, and less powerful voices of all types.*[29]

We also recognize that high-quality and transparent engagement enables the IMT to mon-itor trust and community relationships. To facilitate quality transparent engagement, we have developed the following principles:

- **Clarity of Purpose** during meetings and engagements. We will explain the IMT's role, its authority and limitations, as well as the specific purpose of the engage-ment activity (*e.g.*, inform, update, and/or gather input).

- **Inclusion** of voices and information across communities. The Community En-gagement Team will make maximum effort to be expansive and inclusive in its outreach efforts, methods, and overall accessibility.

- **Safe Places and Spaces** during every meeting and engagement, with estab-lished ground rules for participating and protections in place against repercus-sions for participating.

---

[29] We adapted this broad definition from one developed by the City of Minneapolis, and it describes our approach well. *See* City of Minneapolis, *Proposed Definition of Community Engagement* (2008), *available at* http://www.minneapolismn.gov/www/groups/public/@communications/docu-ments/webcontent/convert_262934.pdf.

- **Trustworthiness** and credibility developed and maintained by the IMT within the community. This requires that we are honest about our role and its limitations, accurate in conveying information, consistent in our approach across all engagements, and reliable about follow-through. If we field questions, we will respond quickly or pass the question along to someone who can respond quickly so that we communicate our genuine interest, empathy, and desire to be helpful.

With this understanding of the role of the Community Engagement Team and our fundamental principles of engagement, our first-year work will include the following two key elements:

**1. The IMT will maximize community input based on specific requirements in the consent decree, as well as create opportunities and conduits to enhance community engagement more broadly.**

We will reach out to diverse community voices—we will welcome the voices of everyone who has been marginalized, those who have had little involvement in police reform in Chicago, and those organizations that have played an important role in police reform to date. We will make every effort to connect with the neighborhoods, community groups, faith-based communities, activists, and residents in all areas of Chicago. Our communication and outreach methods will include, but not be limited to, the following methods:

- A website for keeping the public informed (¶664). The site will include the bi-annual reports and details of our community participation and a portal for community member and officer input. Community voices will play an important part in the reform process. The website will also feature a calendar of our community meetings and engagement activities.

- Social media as a means of engaging and informing the community. While the decree limits, to a certain extent, what information the team can release (¶672), we will use every method available to maintain transparency of the monitoring process and give residents a voice in the reform process.

- Quarterly meetings with the Coalition. The Coalition is "committed to monitoring, enforcing, and educating the community about" the consent decree (¶669), and the IMT is committed to updating the Coalition on the monitoring process.

- Public meetings to provide updates on our activities, educate the public on the role of the IMT, and gather input regarding policies and police-community relations (¶670). In planning meetings, we will consider geographic distribution across neighborhoods and geographic concentration by race or other demographic factors. We will make efforts to reach out to communities that historically have been most affected by police misconduct and are often the most difficult to reach. The Community Engagement Team prefers meetings with dialogue-based formats and will adhere to the principles of engagement outlined above.

**2. The IMT believes that trust between the community and police will not improve solely because the City and CPD improve internal functions and policies; improving trust requires intentional efforts by the City and CPD to repair harm and show respect.**

All internal City and CPD functions and policies must focus on implementing changes in ways that substantively improve relationships between community members and City and CPD personnel. Repairing harm, building community trust, and improving community sentiment are important aspects of the consent decree. For these reasons, the City and the CPD must incorporate specific steps to repair harm, build trust, and improve sentiment throughout the monitoring process. The IMT's Community Engagement Team looks forward to full collaboration with the OAG, relevant members of the City, and all members of the CPD to engage in ongoing discussions about how new policies will be implemented using procedural justice standards and methods.

The Community Engagement Team will act as observers and assessors where and when police officers and the public meet and will learn how community members experience the CPD and other City entities. The Community Engagement Team will provide these important insights to assist with our determinations of compliance with the consent decree's man-

dates. The Community Engagement Team will capture themes gleaned from its regular participation in community meetings and interactions with community members and share them with the IMT.

## COMMUNITY SURVEY

The IMT will conduct the first of several (bi-annual) community surveys by September 1, 2019.[30] The consent decree requires the IMT to conduct a reliable, representative, and comprehensive survey of Chicago community members covering several important topics, such as "perceptions of CPD's services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community" (¶646). The University of Illinois at Chicago Institute for Policy and Civic Engagement will design and conduct the surveys with the University of Chicago's National Opinion Research Center (NORC), pending negotiations. The City and the CPD will cooperate with the design and delivery of the surveys (¶649), and the survey results will be made public (¶650).

---

[30] Paragraph 645 requires the IMT to conduct this survey within the first 180 days after the effective date of the consent decree.

# Independent Monitoring Reports

The IMT will release two Independent Monitoring Reports (IMRs) each year, as required by ¶661. IMR-1 will cover the first 6-month monitoring period of March 1, 2019, through August 31, 2019. IMR-2 will cover the second 6-month monitoring period of September 1, 2019, through February 29, 2020.[31] The IMRs will summarize monitoring activities, including data analysis and reviews and audits conducted during the six-month reporting periods. The IMRs will also summarize the IMT's determinations of preliminary, secondary, and full compliance for each paragraph reviewed or explain why the IMT was unable to adequately assess a requirement under review. We expect the IMRs to be comprehensive, as they will reference specific data and information we use to make determinations of compliance. IMRs will also include relevant data and observations from the Community Engagement Team.

Together with the IMRs, the IMT will also issue summary, narrative reports about the monitoring progress and the extent to which the City and the CPD is achieving compliance in the ten substantive areas of the consent decree.

The IMT may also release Special Reports when it deems necessary (¶665). These reports may address issues or concerns that arise during the monitoring project.

All reports will be posted on our website: www.CPDmonitoringteam.com, which will be available in June 2019 (¶664) and will be Section 508 compliant.[32]

---

[31] We will provide a copy of the IMR to the Parties in draft form no more than 30 days after the end of the reporting period (¶663).

[32] More information about Section 508 compliance is available online. *See* United States General Services Administration, *Section 508*, www.section508.gov.

# Conclusion and Looking Ahead

As this Monitoring Plan outlines, during Year One, the IMT must focus on a number of immediate and short-term requirements in the consent decree. As important as this early work is, the IMT, the Parties, relevant City personnel, CPD personnel, and members of Chicago communities should consider this first year to be "building the foundation" for sustainable reform.

Much of the work required of the City and the CPD during Year One, for example, involves internal planning and policy development addressing each of the ten topic areas in the consent decree. After the City and the CPD successfully complete this work, it will naturally lead into entity-wide and unit-specific training of various kinds and at various levels in the organizations. The IMT will likely spend significant time monitoring training implementation and progress in the following years. The IMT will also work closely with the Parties and the new leadership at the State and City levels to learn, assess, and integrate their goals and visions for the City and the CPD. Our focus on the various topic areas of the consent decree may shift over time based on the City's and the CPD's progress regarding the foundational elements of the consent decree. The monitoring plans for subsequent years will reflect those shifts.

There are, however, several elements of the IMT's work that will remain consistent over time. The Community Engagement Team will remain involved with local and broad-based groups invested in police reform in Chicago, both providing and disseminating information by reaching out to the community and collecting information. Likewise, the IMT community surveys, which will also solicit input from CPD members, will continue throughout the monitoring project, so that the Parties, the City, and the CPD have ongoing community-oriented information to factor into their plans and work. In subsequent years, we will plan for directed outreach, beyond the community survey, to Chicago police officers to obtain their feedback and experiences regarding the elements of the consent decree. Our Associate Monitors and analysts will also continually conduct rigorous and thorough measurements and analysis.

Our principles will consistently lead us throughout the monitoring process: transparent community engagement and participation; independent reviews of police policies and practices; and regular communication among OAG, the City, the CPD, the Police Board, COPA, the Office of the Inspector General (OIG), the Deputy Inspector General for Public Safety (Deputy PSIG), members of the Coalition, collective bargaining representatives, and members of Chicago communities.

We note the limits of this initial Monitoring Plan. We have just begun to learn about that the issues covered by the consent decree. Any plan is subject to change, and that is especially true of a plan developed at the outset of a monitoring project as complex and comprehensive as this one. As a result, we expect that we may need to add to, subtract from, or modify various aspects of this monitoring plan. This monitoring plan should be viewed as the best estimate of what we expect to monitor during this first year, but that may change as our work proceeds. We will publicly report and explain any major changes in our monitoring plan either in our Independent Monitoring Reports or in some other manner so that the public can keep current with our work.

When Judge Dow approved the consent decree, he set the stage for the years ahead:

> *The State of Illinois and the City of Chicago have entered into this consent decree with the goal of using it as a vehicle for solving the common problems . . . in a manner that defuses tension, respects differences of opinion, and over time produces a 'lawful, fair, reasonable, and adequate' result for everyone involved.*[33]

The IMT is eager to begin this process with this Monitoring Plan and thankful for the opportunity.

---

[33] *See Memorandum Opinion and Order Approving Proposed Consent Decree* (January 31, 2019), 16, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/Order-Approving-Consent-Decree.pdf; *also available at Illinois v. City of Chicago*, No. 17-cv-6260, 2019 WL 398703.

# Attachment 1. Deadlines before March 2020

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| * | *During the monitoring process, the data sources and metrics/measures the IMT will use may adjust from the summaries noted in this Attachment. Throughout this document, "best practices" refers to the definition in ¶730 of the consent decree.* | | | | | |
| ** | *IMR stands for Independent Monitoring Report. Paragraphs in IMR-1 will also be in IMR-2.* | | | | | |
| Community Policing | | | | | | |
| 13 | In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, **within 90 days of the Effective Date**, develop a plan, including a timeline, for implementing CPAP's recommendations. | May 30, 2019 | Rickman, Coldren, Felix | CPD plan and policies for implementing the Community Policing Advisory Panel (CPAP) recommendations; CPAP report; training curricula regarding CPAP recommendations. | Measure extent to which the CPD plan, policies, and training reflect the eight CPAP recommendation, including the 39 sub-recommendations. | IMR-1 |
| 14 | **Within 180 days of the Effective Date**, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing. | August 28, 2019 | Rickman, Coldren, Felix | All policies relevant to the Office of Community Policing and to offices or entities that report to the Office of Community Policing; training curricula regarding community policing policies; CPAP recommendations; CPAP report. | Measure extent to which specific segments and elements of each policy reflect community policing best practices; evidence that CPD reviewed policies regarding community policing; evidence that CPD developed and conducted training regarding community policing policies. | IMR-2 |
| 15 | With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will: a. **within 180 days of the Effective Date** provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing; b. require CPD's staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and c. designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district level crime reduction strategies, excluding operational strategies that are | August 28, 2019 | Rickman, Coldren, Felix | All relevant guidance provided to CPD command staff for ensuring that department-wide and district-wide crime reduction strategies are consistent with community policing; records indicating individual CPD staff's review of the guidelines; records indicating Deputy Chief's review of crime reduction strategies; interviews with community members; records regarding district-level implementation efforts. | Measure extent to which the guidance provided to CPD command staff reflects community policing best practices; number and percentage of staff who have reviewed the guidelines; and number of crime reduction strategies reviewed by the Deputy Chief (including how the review was conducted). | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | determined on a day-to-day or short term basis, to ensure they are community oriented and consistent with the principles of community policing. | | | | | |
| 18 | The City will establish and coordinate regular meet-ings, at minimum **quarterly**, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively ad-dress issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Depart-ment of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protec-tion, the Department of Planning and Development, the Office of Emergency Management and Commu-nication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval. | Quarterly | Rickman, Coldren, Felix | Meeting dates, agendas, and minutes; inter-views with community members. | Number and types of issues discussed at the meetings; responsibilities for specific actions assigned; records regarding progress or com-pletion of assignments. | IMR-1 |
| 20 | **Within 180 days of the Effective Date**, CPD will de-velop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate. | August 28, 2019 | Rickman, Coldren, Felix | Policy prohibiting transport of individuals; relevant training curricula; records of train-ing delivery; records regarding training eval-uation; interviews with supervisors; inter-views with community members. | Measure extent to which new policies are "plainly written, logically organized, and use clearly defined terms" (¶626); number of staff trained; information regarding how staff learn about (i.e., who identifies and who communi-cates) known rivals or enemies and where they live or congregate. | IMR-2 |
| 32 | **Within 180 days of the Effective Date**, CPD will re-view and revise its current policies relating to youth and children and, **within 365 days**, will revise its train-ing, as necessary, to ensure that CPD provides officers with guidance on developmentally appropriate re-sponses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law. | August 28, 2019; February 29, 2020 | Rickman, Coldren, Felix | All CPD policies and guidance regarding youth and children; all training curricula re-garding youth and children; interviews with community members. | Measure extent to which policies address community concerns (Civil Rights Findings, Police Accountability Task Force, CPAP, etc.) and reflect community policing best practices and policing in schools best practices. | IMR-2 |
| 39 | **Before the 2019-2020 school year begins**, in con-sultation with CPS and considering input from CPD members, including officers assigned to work in CPS | September 3, 2019 | Rickman, Coldren, Felix | Records regarding the development and ap-plication of the screening criteria for identi-fying officers qualified to work in Chicago | Measure extent to which the screening criteria reflect best practices for school resource of-ficers and police officers working in public | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools. | | | Public Schools (CPS); records indicating how CPD officers are screened for assignment to CPS, and how assignments to CPS are made; records regarding ongoing performance review of CPD officers according to the screening criteria; interviews with community members. | schools; extent to which officers are screened on the criteria; extent to which school work assignments are made using fair and professional processes; extent to which CPD officers working in CPS are evaluated based on the screening and other criteria; extent to which consultation with community members is meaningful and effective. | |
| 40 | **Before the 2019-2020 school year begins**, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools. | September 3, 2019 | Rickman, Coldren, Felix | Records regarding the development of the CPD school officer policy; records regarding the IMT review of the policy; records regarding any training conducted regarding this policy; and records reflecting CPD response to the IMT review. | Measure extent to which the CPD school officer policy reflects community policing best practices, and extent to which the policy reflects best practices regarding school resource officers and police officers working in schools; extent to which consultation with community members is meaningful and effective. | IMR-1 |
| 42 | CPD officers assigned to work in CPS schools will receive specialized initial and **annual** refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to: a. school-based legal topics; b. cultural competency; c. problem-solving; d. the use of de-escalation techniques, use of restorative approaches, and available community resources and alternative response options; e. youth development; f. crisis intervention; g. | February 29, 2020 | Rickman, Coldren, Felix | The training curriculum, training development processes, including community input; interviews with community members. | Measure extent to which the training curriculum reflects the elements required by this paragraph; extent to which the training curriculum reflects best practices for school resource officer training. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | disability and special education issues; and h. methods and strategies that create positive interactions with specific student groups such as those with limited English proficiency, who are LGBTQI, or are experiencing homelessness. The training will be developed and delivered in accordance with the requirements of the Training section of this Agreement. | | | | | |
| 43 | The curricula, lesson plans, and course materials used in initial training provided before the 2019-2020 school year will be reviewed by the Monitor **by the end of 2019**. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. | December 31, 2019; September 8, 2020 | Rickman, Coldren, Felix | Training documents; source document materials; documentation of community stakeholder input. | Completeness of training materials and extent to which they reflect paragraph requirements; extent to which training materials align with best practices. | IMR-2 |
| 44 | **Before the 2019-2020 school year begins**, CPD will undertake best efforts to enter into a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement. | September 3, 2019 | Rickman, Coldren, Felix | Documentation of meetings to develop a memorandum of understanding (MOU); MOUs and other related documents. | Measure extent to which MOUs detail and specify procedures. | IMR-1 |
| 45 | **By January 1, 2020**, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to: a. reviewing available district resources and personnel assignments; b. identifying methods to support their district's ability to effectively problem solve, including collaborating with City departments, services, and sister agencies; and c. identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence. | January 1, 2020 | Rickman, Coldren, Felix | Community recommendations from each of the 22 Police districts as compiled by CPD, including the processes through which these recommendations are solicited and developed; CPD response to these recommendations; Community Policing Plan; district plans; District Commanders. | Number of completed plans; Number of recommendations from community members and number of documented responses by district personnel; extent to which community member participation reflects demographics of the district and protected populations within the district. | IMR-2 |
| 46 | **Within 180 days of the Effective Date**, and as ap- | August 28, 2019 | Rickman, Coldren, | Community Policing Plan; district plans; District Commanders; district-level community | Evidence of CPD district-level solicitation and | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | propriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross section of the community each district serves. | | Felix | meeting minutes and documentation; district-level community surveys or other sources of documentation and input. | action on community feedback and input regarding policing efforts and strategies, including documentation regarding the methods employed to solicit that input and feedback. | |
| 47 | **Within 180 days of the Effective Date**, CPD will develop procedures to annually evaluate the effectiveness of the Department's efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any necessary adjustments based on its annual evaluation. | August 28, 2019 | Rickman, Coldren, Felix | Documentation regarding any procedures developed by CPD to annually evaluate the effectiveness of community policing and problem-solving; and documentation regarding any policies or training developed and implemented in support of these procedures; interviews with community members. | Existence of developed procedures and related policies and training curricula. | IMR-2 |
| Impartial Policing | | | | | | |
| 58 | **Within 90 days of the Effective Date**, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others. | May 30, 2019 | Rosenbaum, Coldren, Sun | Police officers; all policies and Standard Operating Procedures (SOPs) relevant to police services in public places (or areas where officers have no reasonable expectation of privacy); trainers; all relevant training materials; body worn camera footage; seek community member input (¶52); public postings of interactions between community members and the police. | Measure extent to which relevant policy and SOPs completely and accurately cover and protect these recording activities by community members; training covers this policy and impacts students; training methods are evidence-based; body worn camera footage demonstrates officers' compliance with this policy; officers' demonstrate knowledge of relevant policy and SOP; extent to which exceptions to the policy (if any) were supported. | IMR-1 |
| 60 | **Within 365 days of the Effective Date**, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance. | February 29, 2020 | Rosenbaum, Coldren, Sun | Members of religious communities (¶52); police officers; all policies and SOPs relevant to police interactions with members of religious communities; trainers; all relevant training materials; body worn camera footage. | Measure extent to which relevant policy and SOPs completely and accurately address proper protocol for interacting with members of religious communities; training covers this policy and SOP and impacts students; training methods are evidence-based; body worn camera footage and community surveys show officers' compliance with this policy; officers' awareness of the relevant policy. | IMR-2 |
| 61 | **Within 180 days of the Effective Date**, CPD will review and, as necessary, revise its policies guiding CPD | August 28, 2019 | Rosenbaum, Coldren, Sun | Community members who identify as | Measure extent to which relevant policy and SOPs completely and accurately address | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | members' interactions with transgender, intersex, and gender non-conforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum: a. terms are properly defined; b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual; c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification; d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety; e. absent exigent circumstances, a transgender, intersex, or gender non-conforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose. | | | transgender, intersex, and gender nonconforming; police officers; all policies and SOPs relevant to police interactions with members of these communities; trainers; all relevant training materials; body worn camera footage; police arrest records; seek community member input (¶52). | proper protocol for interacting with persons in these gender groups; extent to which training covers this policy and SOP and impacts students; extent to which training methods are evidence-based; extent to which body worn camera footage and community surveys show that officers comply with this policy; extent to which exceptions to this policy (if any) were supported. | |
| 63 | **Within 180 days of the Effective Date**, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature. | August 28, 2019 | Rosenbaum, Coldren, Sun | Police officers; community members (¶52); all policies and SOPs relevant to police sexual misconduct; trainers; all relevant training materials; body worn camera footage; COPA complaints. | Measure extent to which relevant policy and SOPs completely and accurately address police sexual misconduct; extent to which training covers this policy and SOP and impacts students; extent to which training methods are evidence-based; extent to which body worn camera footage and community surveys show officers' compliance with this policy; (using both behavior and language of officers as | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | | | | | metrics to examine sexual misconduct); officers' awareness of the relevant policy. | |
| 64 | **Within 180 days of the Effective Date**, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based groups serving LEP communities in Chicago. | August 28, 2019 | Rosenbaum, Coldren, Sun | Community members with limited English proficiency (LEP) and related communities organizations (¶52); the City's Language Access Coordinator; police officers; all policies and SOPs relevant to police services that may affect individuals with LEP; trainers; all relevant training materials; body worn camera footage. | Measure extent to which relevant policy and SOPs completely and accurately address the problem of timely and meaningful access and proper protocols; extent to which training covers this policy and SOP and impacts students; extent to which training methods are evidence-based; extent to which the LEP community feels that it has access to police services, including Miranda warnings; extent to which body worn camera footage shows compliance with the policy; whether the LEP policy is posted on CPD's website and is distributed to community-based groups serving the LEP community; officers' awareness of the relevant policy. | IMR-2 |
| 65 | **Within 180 days of the Effective Date**, the City will designate a language access coordinator who will co-ordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary. | August 28, 2019 | Rosenbaum, Coldren, Sun | Language Access Coordinator (LAC); LAC's reports and work products; community organizations that serve individuals with LEP; all LEP-relevant policies and SOPs; trainers; all relevant training materials; body worn camera footage; community members. | Measure extent to which training covers this policy and SOP and impacts students; extent to which training methods are evidence-based; extent to which the limited LEP community feels it has access to police services; extent to which body worn camera footage shows compliance with policy; officers' awareness of the relevant policy; extent to which LAC reports are complete and accurate regarding policy and training content and effectiveness; extent to which resources and authority enables LAC to fulfill its obligations. | IMR-2 |
| 66 | **Within 365 days of the Effective Date**, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services. | February 29, 2020 | Rosenbaum, Coldren, Sun | Chicago Office of Emergency Management and Communications (OEMC) trainers; tele-communicators; Language Access Coordinator; community organizations that serve the LEP community; all LEP-relevant policies and SOPs; all relevant training materials; dispatch records; community members; training records. | Measure extent to which relevant policies and SOPs completely and accurately address the appropriate telecommunication responses the LEP community; extent to which training covers this policy and SOP and impacts tele-communicators; extent to which training methods are evidence-based; extent to which call takers and dispatchers follow policy and are responsive to callers' needs; extent to | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | | | | | which LEP community feels that it has access to police services and is treated with respect. | |
| 67 | **Within 180 days of the Effective Date**, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago municipal Code. CPD will publish translated versions of its language access policy on its website. | August 28, 2019 | Rosenbaum, Coldren, Sun | Language Access Coordinator; community organizations that serve the LEP community; language access policy; all non-English translations of language access policy; CPD website; community members; demographics of Chicago residents and estimates of languages spoken. | Measure extent to which non-English versions of the language access policy have been translated completely and accurately as determined by LEP community experts; Whether all non-English versions of the language access policy (as well as the English vision) have been posted on CPD's website in a location that is easily accessible by the LEP community. | IMR-2 |
| 68 | **Before January 1, 2020**, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to: a. properly defining terms related to individuals with disabilities and the disability community; b. providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability; c. the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and d. using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings. | January 1, 2020 | Rosenbaum, Coldren, Sun | Community members with disabilities (¶52); police officers; trainers; All policies and SOPs relevant to police responses to persons with disabilities; Community complaints; All relevant training materials; body worn camera footage; Police reports on use of force; Social media accounts; ADA Liaison. | Measure extent to which relevant policy and SOPs completely and accurately capture how CPD members are expected to interact with individuals with disabilities; extent to which training covers this policy and impacts students; extent to which training methods are evidence-based; Extent to which persons with disabilities report being treated in a procedurally just manner and given full access to CPD services; extent to which body worn camera footage demonstrates officers' compliance with this policy; extent to which use of force reports, community complaints, and social media accounts show CPD members acting within policy and displaying fair and impartial policing behaviors. Extent to which officers demonstrate knowledge of relevant policy and SOP and express attitudes consistent with procedural justice toward people with disabilities. | IMR-2 |
| 69 | **Before January 1, 2020**, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including: a. recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes; b. providing effective communica- | January 1, 2020 | Rosenbaum, Coldren, Sun | Community members with disabilities (¶52); police officers; trainers; all policies and SOPs relevant to police responses to persons with disabilities; Community complaints; all relevant training materials; body worn camera footage; Police reports on use of force; Social media accounts; training bulletin. | Measure extent to which relevant policy and SOPs completely and accurately capture how CPD members are expected to interact with individuals with disabilities; extent to which training covers this training bulletin and impacts students; extent to which training methods are evidence-based; extent to which people with disabilities report being treated in a | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | tion and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions; c. attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and d. recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law. | | | | procedurally just manner and given full access to CPD services; extent to which body worn camera footage demonstrates officers' compliance with this training bulletin; extent to which use of force reports, community complaints, and social media accounts show CPD members acting within policy and displaying fair and impartial policing behaviors; extent to which officers demonstrate knowledge of relevant policy and SOP and express attitudes consistent with procedural justice toward people with disabilities. | |
| 70 | **Within 180 days of the Effective Date**, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and: a. regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement; b. serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and c. act as a liaison between CPD and individuals with disabilities. | August 28, 2019 | Rosenbaum, Coldren, Sun | ADA liaison job description; ADA liaison selection team; disability communities; police officers; all ADA-relevant policies and SOPs; CPD policy team; community members; ADA liaison; ADA liaison's reports and work products. | Measure extent to which police officers value, respect, and consult ADA liaison; extent to which ADA community values ADA liaison; analysis of obstacles and challenges faced by the ADA Liaison; extent to which resources and authority enables ADA liaison to fulfill its obligations; extent to which ADA liaison executes the following functions with integrity: analyzes and suggests revisions to the ADA-related policies to ensure compliance with the law and the consent decree; properly analyzes the effectiveness of the policy changes; serves as a resource to assist CPD members in providing "meaningful access to police services for individuals with disabilities"; and serves as a liaison between CPD and persons with disabilities. | IMR-2 |
| 71 | **Within 180 days of the Effective Date**, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult. | August 28, 2019 | Rosenbaum, Coldren, Sun | Telecommunicators at OEMC; police officers; all transport-relevant policies and SOPs; all relevant training materials; OEMC dispatch records; police incident reports; community members. | Measure extent to which training covers this policy and SOP and impacts students; extent to which training methods are evidence-based; extent to which body worn camera footage shows compliance with policy; extent to which OEMC records and police reports show that OEMC was notified of the start and end of specific transports and whether the individuals were juveniles or adults; extent of officers' knowledge of the relevant policy and their reported compliance. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| 76 | **By January 1, 2020**, CPD will review and, to the extent necessary, revise its policies and procedures to ensure that allegations and complaints of hate crimes, as defined by federal, state, and local law, are comprehensively investigated. | January 1, 2020 | Rosenbaum, Coldren, Sun | All relevant policies and SOPs regarding CPD response to and investigation of hate crimes; federal, state, and local hate crime laws and ordinances; all training materials and curricula regarding CPD response to and investigation of hate crimes; community members (¶52). | Measure extent to which policies and SOPs completely and accurately address issues regarding the response to and investigation of hate crimes; extent to which training addresses issues regarding CPD response to and investigation of hate crimes. | IMR-2 |
| **Crisis Intervention** | | | | | | |
| 89 | The CIT Program, through the CIT Coordinator, will **annually** review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program. | February 29, 2020 | Solomon, Coldren, Christoff | All relevant policies and SOPs regarding crisis intervention and CPD officer interactions with people with mental illness and/or people in crisis; all relevant training materials and curricula regarding any CIT-related policy revisions; CIT Coordinator, CPD officers and supervisors; body worn camera footage; incident reports; community members. | Processes of review and updating of CIT-related policies. | IMR-2 |
| 99 | **Within 365 days of the Effective Date**, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training. | February 29, 2020 | Solomon, Coldren, Christoff | CIT refresher training curriculum; documents regarding training delivery; interviews with CIT officers, supervisors, command staff, and community members; data regarding response to and disposition of CIT-related calls; agendas from meetings with the Advisory Committee; input from the Advisory Committee. | Measure extent to which refresher training reflects principles of adult learning and use of subject matter experts, including people affected by behavioral health; refresher training reflects generally accepted practice for knowledge content and retention; elements of the refresher policy reflects best practices and addresses operational barriers; refresher training creates officer confidence in response to CIT-related calls, and community satisfaction of the interaction between CIT officer and community member/caregiver; extent to which CPD considered input from the Advisory Committee. | IMR-2 |
| 107 | **Within 180 days of the Effective Date**, and quarterly thereafter, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis intervention services for the particular watch and district. | August 28, 2019 | Solomon, Coldren, Christoff | Data reflecting calls coded as CIT; calls for service (all calls, not just CIT) by call type, shift, and district; CIT calls for service by type, shift, and district; number of CIT officers available and dispatched by shift/district (primary dispatch, secondary dispatch, or no dispatch); frequency and types of dispositions for CIT-related calls. | Measure extent to which call codes, operational procedures, and police database accurately tracks CIT-related calls, response times, and dispatch of CIT certified officers to CIT calls; assess whether a voluntary CIT model provides enough CIT officers to meet the community need by shift/district; assess whether policy and operational changes support timely responses to CIT calls; assess the ability of CIT officers to take the lead on a CIT call as appropriate, chain of command | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | | | | | support for CIT officers to take the time on a call needed to appropriately de-escalate and resolve a call. | |
| 108 | **Within 180 days of the Effective Date**, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets: a. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and b. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target"). | August 28, 2019 | Solomon, Coldren, Christoff | Data reflecting calls coded as CIT; calls for service (all calls, not just CIT) by call type, shift, and district; CIT calls for service by type, shift, and district; number of CIT officers available and dispatched by shift/district (primary dispatch, secondary dispatch, or no dispatch); frequency and types of dispositions for CIT-related calls; best practices of CIT processes and procedures; CIT Officer Implementation Plan and related planning documents. | Measure extent to which the 50% initial response ratio target is met in each district; extent to which the 75% second response ratio target is met in any districts. | IMR-2 |
| 109 | The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target **by January 1, 2020**, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets. | January 1, 2020 | Solomon, Coldren, Christoff | Data reflecting calls coded as CIT; calls for service (all calls, not just CIT) by call type, shift, and district; CIT calls for service by type, shift, and district; number of CIT officers available and dispatched by shift/district (primary dispatch, secondary dispatch, or no dispatch); frequency and types of dispositions for CIT-related calls; best practices of CIT processes and procedures; CIT Officer Implementation Plan and related planning documents. | Measure extent to which the 50% initial response ratio target is met in each district; extent to which the 75% second response ratio target is met in any districts. | IMR-2 |
| 110 | **Within 180 days of completing the CIT Officer Implementation Plan**, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney ("OAG") regarding the progress the Department has made to meet (a) the response ratio targets ("Implementation Plan Goals") identified within the | February 29, 2020 | Solomon, Coldren, Christoff | CPD report on CIT response ratio targets, including supporting analyses and documentation. | Measure extent to which the CPD report addresses issues regarding CPD officers' responses to CIT calls for service and the ratio targets, by district and shift. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and the OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG. | | | | | |
| 118 | **By January 1, 2020**, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include: a. the nature of the incident; b. the date, time, and location of the incident; c. the subject's age, gender, and race/ethnicity; d. whether the subject is or claims to be a military veteran, if known; e. the relationship to the subject, if any and if known, of the individual calling for service; f. whether the subject has had previous interactions with CPD, if known; g. whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis; h. the behaviors observed during the incident, including whether the subject used or displayed a weapon; i. the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers; j. the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene; k. the skills, techniques, or equipment used by the responding CPD officers; l. whether a reportable use of force was documented on a Tactical Response , or whatever similar form of documentation CPD may implement, for the incident ; m. a narrative describing the CPD officer s interaction with the subject, when no other CPD report captures a narrative account of the incident; and n. the disposition of the incident, including whether the individual was transported to municipal or community services, | January 1, 2020 | Solomon, Coldren, Christoff | CIT reports completed by CIT Officers, including automated data from those reports, if available. | Measure extent to which CPD officers are completing and submitting CIT reports, including the completeness and quality of the information submitted in the reports. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | transported to a hospital, subject to a voluntary or in-voluntary commitment, or arrested. | | | | | |
| 122 | **Within 365 days of the Effective Date**, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. | February 29, 2020 | Solomon, Coldren, Christoff | The CPD Crisis Intervention Plan, including supporting documentation and analysis; responses and interviews with CIT officers, dispatchers, chain of command, and advocacy groups; data from newly mandated CIT forms now required for all CIT calls; data from the Computer-Aided Dispatch (CAD) system. | Measure extent to which data from surveys, interviews, CIT forms, and CAD system reflect best practices; extent to which the City responds to recommendations from Advisory Committee, as well as the City's response (including the timeliness of the response) to each issue and recommendation identified by the Advisory Committee. | IMR-2 |
| 131 | **Within 365 days of the Effective Date**, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses | February 29, 2020 | Solomon, Coldren, Christoff | Any written materials from the CIT Advisory Committee (¶128) regarding the issues outlined in this paragraph, including supporting analysis and documentation for the written materials; any written or documented responses from CPD and the City regarding issues and recommendations identified by the Advisory Committee. | Measure extent to which the Advisory Committee, in its written materials, addresses the issues outlined in this paragraph (and other issues identified by the Advisory Committee), as well as the City's response (including the timeliness of the response) to each issue and recommendation identified by the Advisory Committee. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining. | | | | | |
| 137 | **Within 180 days of the Effective Date**, CPD will review and revise its crisis intervention-related policies as necessary to comply with the terms of this Agreement. CPD will consider any recommendations or feedback provided by the Advisory Committee when revising its policies. | August 28, 2019 | Solomon, Coldren, Christoff | All CIT-related policies and SOPs; CIT Training curriculum and materials, including levels and types of training (Basic, Advanced, Telecommunications, Fire Dept., civilian/mobile response); CIT officers, supervisors, and advocacy groups. | Measure extent to which policies, procedures, training, resources, and chain of command supports the culture for improved CIT responses within CPD. | IMR-2 |
| 142 | **Within 90 days of the Effective Date**, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently. | May 30, 2019 | Solomon, Coldren, Christoff | Documentation regarding the training curriculum and training delivery (use of internal/external subject matter experts, adult learning practices, pre-post evaluations, training methods, instructor selection, preparation, and training). | Measure extent to which police telecommunicators report confidence in identifying crisis calls; extent to which call codes, operational procedures/practices, and CAD accurately track and support CIT dispatch; extent to which telecommunicators have a "real-time" list of CIT officers on duty, a number sufficient to support need, and operational procedures that support successful dispatch of CIT calls; total number of police telecommunicators; total number of police telecommunicators who have already received mental health awareness training (and type of training received); total number of police telecommunicators who need to receive the OEMC training; total number of police telecommunicators who received the OEMC training. | IMR-1 |
| 151 | **Within 180 days of the Effective Date**, and annually thereafter, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet | August 28, 2019 | Solomon, Coldren, Christoff | Documentation regarding the review of and any revisions to OEMC intake and dispatch policies, including supporting analysis and | Number of OEMC intake and dispatch policies and protocols revised, including the content of any revisions. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | the requirements of this Agreement. OEMC will consider any recommendations or feedback provided by the Advisory Committee when revising its policies. | | | documentation; documentation of revisions to intake and dispatch policies and protocols provided by the Advisory Board. | | |
| **Use of Force** | | | | | | |
| 168 | Starting **no later than January 1, 2019**, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement. | January 1, 2019 | Evans, Monroe, Elliott | Current system being used to capture foot pursuits by CPD; copy of training bulletin; discussion points; data collected to date; process for distributing and communicating bulletin. | Measure extent to which officers report foot pursuits; number and circumstances of pursuits; reasons for initiating foot pursuits; number of pursuits associated with use of force. | IMR-1 |
| 169 | For foot pursuits associated with reportable use of force incidents, **by January 1, 2020**, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns. | January 1, 2020 | Evans, Monroe, Elliott | Current system being used to capture foot pursuits by CPD; copy of training bulletin; discussion points; data collected to date; process for distributing and communicating bulletin; data provided to headquarters for review; observations noted from reviews; list of persons conducting reviews. | Number of reviews conducted; trends identified; number of uses of force associated with pursuits. | IMR-1 |
| 170 | CPD recently issued a foot pursuit training bulletin. **By July 1, 2019**, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit. | July 1, 2019 | Evans, Monroe, Elliott | Foot pursuit training bulletin; best practices and model policies; records regarding training bulletin development; calls for service regarding foot pursuits; incident reports regarding foot pursuits. | Officer understanding and compliance with current training. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| 188 - 189 | **188. By January 1, 2019**, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019. **189.** CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances. | January 1, 2019 | Evans, Monroe, Elliott | Policies associated with training bulletin; percentage of active officers trained by July 1, 2019; community members. | Officer understanding and compliance regarding current training. | IMR-1 |
| 190 - 193 | **190. Beginning July 1, 2019**, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification. **191.** OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement. **192.** A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed **within 30 days of each** | July 1, 2019; March 31, 2019 | Evans, Monroe, Elliott | Notification records; a sample of body worn camera footage on gun arrests where no notifications are made; all CPD training data and whether officers who pointed weapon received training; dates of firearm pointing; schedule of review personnel; makeup of the Force Review Unit (FRU); dates of firearm pointing; review process and results; review documentation; makeup of review panel; community members. | Average time for notifications; number of notifications; linkage with CPD records to include body worn camera footage; all cases of pointing firearms; review scheduling. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | **such occurrence**. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above. **193.** CPD will ensure that the designated unit at the CPD headquarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise. | | | | | |
| 196 | The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. **Beginning January 1, 2020**, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing those occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding whether the Monitor's recommendations should be implemented will be resolved by the Court. | January 1, 2020 | Evans, Monroe, Elliott | Notification records; a sample of body worn camera footage on gun arrests where no notifications are made; all CPD training data and whether officers who pointed weapon received training; dates of firearm pointing; schedule of review personnel; makeup of the FRU; dates of firearm pointing; review process and results; review documentation; makeup of review panel; community members. | Number of notifications; CPD reports associated with notifications; linkage to body worn camera footage; review of random body worn camera footage; numbers of cases reviewed and recommendations from the CPD unit(s) that review occurrences. | IMR-2 |
| 218 | CPD members must report and document any reportable use of force. **Beginning January 1, 2019**, a reportable use of force will be defined as any use of | January 1, 2019 | Evans, Monroe, Elliott | Use of force data; use of force policies; community complaints; body worn camera footage; interviews with supervisors (*i.e.*, sergeants and lieutenants). | Number of reported uses of force, including uses of force in and out of compliance with policy, and contextual data and records; extent to which use of force reports are filled out | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital. | | | | completely and accurately; number of uses of force in compliance with policy; number of use of force misconduct complaints. | |
| 222 | A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors. | Number of level 1, 2, and 3 uses of force in which supervisors respond. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | level 1 reportable use of force occurs, but they are not required to do so. | | | | | |
| 223 | For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors. | Extent to which responding supervisors fulfill their duties as laid out in this paragraph for level 2 and 3 uses of force. | IMR-1 |
| 224 | In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors; community members/witnesses. | Extent to which responding supervisors make "reasonable efforts to identify and interview additional witnesses beyond those that are known and available." | IMR-1 |
| 225 | A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors. | Responding supervisors' level of involvement in the incident. | IMR-1 |
| 226 | CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors. | Extent to which supervisors correctly fill out their portion of the Tactical Response Report (TRR) or in any other similar form of CPD documentation. | IMR-1 |
| 227 | Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports not only from CPD, but also from the Bureau of Internal Affairs (BIA), COPA, and OIG; officers, supervisors, and community members. | Extent to which officers who become aware of uses of force report them to their supervisors. | IMR-1 |
| 229 | All reportable uses of force by CPD members must be reviewed by CPD supervisors. | March 1, 2019 | Evans, Monroe, | Use of force data and reports; use of force policies; officers and supervisors. | Extent to which supervisors' reviews of uses of force are complete, valid, and reliable. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | | | Elliott | | | |
| 230 | After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor"). | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors. | Rank of officer(s) involved in use of force incident; rank of reviewing supervisor. | IMR-1 |
| 231 | The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors, reviewing supervisor's investigation; reviewing supervisor's interview with subject. | Extent to which reviewing supervisor's investigation includes the requirements of this paragraph; whether subject interviews comply with consent decree requirements, such as documenting injuries. | IMR-1 |
| 232 | For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors; documentation reviewing supervisor's processes and actions. | Manner in which reviewing supervisor determines whether COPA notification is necessary and whether use of force was within CPD policy. | IMR-1 |
| 233 | For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors; documentation reviewing supervisor's processes and actions. | Extent to which reviewing supervisor provides feedback, recommends additional training, or takes other actions. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | action, including referring uses of force that may violate law or CPD policy to COPA. | | | | | |
| 234 | CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors; documentation reviewing supervisor's processes and actions. | Extent to which reviewing supervisor provides feedback, recommends additional training, or takes other actions; extent to which documentation includes identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force | IMR-1 |
| 235 | All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member. | March 1, 2019 | Evans, Monroe, Elliott | Use of force data and reports; use of force policies; officers and supervisors; documentation reviewing supervisor's processes and actions. | Extent to which required documentation is completed within 48 hours. | IMR-1 |
| **Recruitment, Hiring, and Promotion** | | | | | | |
| 263 | **Within 365 days of the Effective Date**, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement. | February 29, 2020 | Bowman, Monroe, Felix | The current and proposed duties, eligibility criteria, knowledge, skills, and abilities considered for Captain and Commander position; the people involved in drafting criteria. | Timely internal and external publishing of criteria; process for developing criteria; criteria and qualifications used make promotions; people responsible for developing criteria; how criteria are published. | IMR-2 |
| 264 | **Within 365 days of the Effective Date**, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions. | February 29, 2020 | Bowman, Monroe, Felix | Previous promotions and criteria for selections; announcements of previous promotional processes; prior and current selection processes; person who makes final selection decision; methods for sharing information about the promotions processes. | Extent to which promotions processes are transparent and CPD members are made aware. | IMR-2 |
| **Training** | | | | | | |
| 270 - 272 | **270.** The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also include, in some capacity, personnel from various | August 31, 2019; February 29, 2020 | Bowman, Monroe, Richardson | Training Plans for recruits, in-service, and pre-service promotions; needs assessment. | Process for developing plans; identified curriculum; various ranks input into development of plans; best practices. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes. **271.Within 180 days of the Effective Date**, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider: a. information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues; b. input from CPD members of all ranks and their respective collective bargaining units, if applicable; c. input from members of the community; d. recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board; e. changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any; f. court decisions and litigation; g. research reflecting the latest in training and law enforcement best practices; h. information obtained from evaluation of training courses, instructors, and FTOs; and i. member reaction to, and satisfaction with, the training they received. **272. Within one year of the Effective Date**, and on an annual basis thereafter, the Education and Training Division will develop and the TOC will review and approve a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will: a. identify training priorities, principles, and broad goals consistent with this Agreement; | | | | | |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | b. prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan; c. include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement; d. identify subject areas for CPD training; e. determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program; f. develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements; g. determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material; h. address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement; i. identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities; j. determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff; k. develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training; l. develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and m. identify community-based organizations that represent a broad cross section of the city to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community policing, and make efforts to encourage such participation by such organizations. | | | | | |
| 316 | The TOC will **annually** review the Field Training and Evaluation Program and consider best practices in this | February 29, 2020 | Bowman, Monroe, | Written methodology for conducting review; | Number and diversity of people involved in | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMR Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program. | | Richardson | recommendations submitted by Field Training Officers (FTOs) and Probationary police officers (PPOs); training plans. | review; number and types of recommendations put forward; critical areas of training identified in review. | |
| 320 & 323 | **320.** The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours **by the end of 2018**; b. 24 hours **by the end of 2019**; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year. **323.** 323. As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in person mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training. | December 31, 2018; December 31, 2019 | Bowman, Monroe, Richardson | Training Plans for in-service training; curricula for both mandatory and elective courses; training tracking records, such as sign-in sheets; relevant Training Oversight Committee (TOC) documents and reports; course evaluation strategies, such as pre- and post-course surveys and course evaluations. | Number of hours for each in-service mandatory or elective course; quality of curricula, including but not limited to student learning objectives; extent to which participating officers demonstrate learning via pre- and post-course surveys. | IMR-1 |
| 334 | **By January 1, 2020,** as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to: a. an overview of CPD's department-wide crime reduction strategies; b. specific methods for developing district- | January 1, 2020 | Bowman, Monroe, Richardson | People identified to develop pre-promotional training; curricula; data sources identified in developing training modules. | Quality of curricula, including but not limited to student learning objectives; extent to which participating officers demonstrate learning via pre- and post-course surveys; extent to which training touches upon the requirements of | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate principles of community policing in implementing those crime reduction strategies; c. techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias based profiling and other forms of discriminatory policing; d. de-escalation strategies and the principles of force mitigation; e. intervening on a subject s behalf when observing a use of force that is excessive or otherwise in violation of policy; f. evaluating the completeness, correctness, and sufficiency of written reports; g. monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies; h. understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank; i. evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process; j. CPD and COPA's disciplinary system requirements and available non-punitive corrective action; k. mentoring officers and fostering career development; l. responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA; m. building community partnerships and guiding officers on how to implement this requirement; and n. CPD policy and legal updates. | | | | this paragraph. | |
| 336 | **Within 30 days of the Effective Date**, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement. | March 30, 2019 | Bowman, Monroe, Richardson | Identified topics for field training; selection process; policies. | Established selection process; consistency among all districts; development of guidance materials. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| 339 - 340 | **339.** Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines. **340.** In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy. | May 30, 2019 | Bowman, Monroe, Richardson | Training documents; method for disseminating to required personnel. | Number of people on active duty and available for assignment receiving training; dates training completed. | IMR-1 |
| **Supervision** | | | | | | |
| 348 | **By January 1, 2020**, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement. | January 1, 2020 | Johnson, Monroe, Felix | Departmental policies that outline supervisory responsibilities; policies mandating supervisory actions (all ranks) to achieve compliance with consent decree; operational orders, training lesson plans, training bulletins, and management meeting agendas and attendance rosters. | New or reissued supervisory policies issued after the consent decree; departmental communications conveying supervisory responsibility to comply with consent decree requirements—this supervisor expectation should exceed the general awareness training of the consent decree required for all employees outlined in ¶339. | IMR-2 |
| 360 | **By January 1, 2020**, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector. | January 1, 2020 | Johnson, Monroe, Felix | Staffing reports; departmental position control reports; daily briefing sheets; staff job descriptions; vacation usage; training leave requirements; CAD activity reports; aggregate calls for service activity; patrol maps; patrol assignments; performance management reports. | The production and publication of a staffing model report that achieves the appropriate span of control, and required sergeant geographic staffing levels, as required by the consent decree; this report should include an executive summary and substantive recommendations and be supported by citable references to the data source requirements. | IMR-2 |
| 362 | **By January 1, 2020**, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control. | January 1, 2020 | Johnson, Monroe, Felix | Staffing reports; departmental position control reports; daily briefing sheets; vacation usage; training leave requirements; CAD activity reports; aggregate calls for service activity; patrol maps; patrol assignments. | Newly established CPD protocols (reports) that create both a daily and strategic approach to evaluating compliance with the staffing model in the field and compliance with the implementation plan for the staffing model. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| 364 | Beginning **no later than January 31, 2020**, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district. | January 1, 2020 | Johnson, Monroe, Felix | Departmental position control reports; daily briefing sheets; CAD activity reports; patrol assignments; sergeant staffing report; CPD budgetary analysis; budgetary financial forecast for sergeant positions. | The production and publication of a staffing model implementation report that describes how CPD will achieve and execute the appropriate span of control, and required minimum sergeant geographic staffing levels, as required by the consent decree; this report should include an executive summary, substantive recommendations that are supported by citable references to the data source requirements, and the implementation strategy should take into consideration a threat and risk model when determining deployment strategies to gain compliance. | IMR-2 |
| 368 | **Beginning 365 days after the Effective Date**, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant. | February 29, 2020 | Johnson, Monroe, Felix | Current sergeant assignments; distribution of patrol sergeants; span of control for sergeants; staffing model report; sergeant staffing implementation report. | Current and future span of control, number of sergeants assigned to districts, and sergeants assigned to watches. | IMR-2 |
| **Officer Wellness and Support** | | | | | | |
| 382 - 384 | **382.** CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. **By September 1, 2019**, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards. **383.** The needs assessment should analyze, at a minimum: a. staffing levels in CPD's Professional Counseling Division; b. the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD; c. how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor; d. the professional specialties of CPD's licensed mental health professionals; e. the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services; f. CPD member feedback, | September 1, 2019 | Johnson, Monroe, Felix | Material and documents prescribed in ¶383; Officer Support Systems Plan; CPD budget; planning documents. | The development and publication of the Officer Support Systems Plan; this needs assessment has numerous requirements outlined in ¶383; the final needs assessment product should include an executive summary, included citable source material, establish the CPD present operational baseline, and clearly define required operational enhancements to comply with the consent decree; the development and publication of the Officer Support Systems implementation plan; final implementation dates, issuance of periodic progress reports, and budgetary scheduling should be included. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program; g. similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week; h. guidance available from law enforcement professional associations; i. the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them; j. the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and k. the quality of recruit training related to stress management, officer wellness, and related topics. **384.** Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation. | | | | | |
| 387 | **Within 180 days of the Effective Date**, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment. | August 28, 2019 | Johnson, Monroe, Felix | Training curriculum; student learning objectives; evaluation plan; instructor qualifications. | Number of people affected by current process regarding FOID cards; types of policies addressing FOID cards; types of Support Services affecting FOID cards. | IMR-1 |
| 388 | As a component of the Officer Support Systems Plan, **by January 1, 2020**, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initia- | January 1, 2020 | Johnson, Monroe, Felix | Comparable benchmarks from other large police departments; best practices; CPD officer wellness programs; employee surveys. | Development and publication of the Suicide Prevention Initiative plan. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | tive implemented in other large departments and incorporate guidance available from law enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member. | | | | | |
| 389 | At least **annually,** the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan. | February 29, 2020 | Johnson, Monroe, Felix | Professional Counseling Division programs; performance metrics; employee surveys or responses; staff interviews; written report to Superintendent. | Analysis of Professional Counseling Division programs; at minimum, this analysis should include required elements of the consent decree as well as an executive summary, citable reference to any emerging best practices in the field, gap analysis between services CPD provides and best practices, and identifiable recommendations. | IMR-2 |
| 391 | CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) **by January 1, 2020**. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan. | January 1, 2020 | Johnson, Monroe, Felix | Licensed mental health professional staffing levels; officer wellness and support program capacity and performance metrics; Officer Support Systems Plan; needs assessment. | At least ten full-time licensed mental health professionals (or equivalent staff hours); staffing levels to meet organizational needs should be established in the Officer Support Systems plan and the Officer Support Systems implementation plan. | IMR-2 |
| 401 | CPD currently offers anonymous support groups and programs for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Professional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted practices in the field of addiction treatment (e.g., 12-step addic- | February 29, 2020 | Johnson, Monroe, Felix | CPD support groups; programs and addiction services; staff interviews; program capacity; program performance data; user surveys. | Analysis of support groups and addiction programs; at minimum, this analysis should include an executive summary, citable reference to any emerging best practices in the field, gap analysis between services CPD provides and best practices, and identifiable recommendations. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | tion treatment program), and that each program is re-viewed at least **annually** by the Director of the Pro-fessional Counseling Division. | | | | | |
| 404 | CPD will maintain a peer support program, ensuring that: a. a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program; b. Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symp-toms and conditions, suicide assessment and preven-tion, dependency and abuse, and support services available to CPD members; c. Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training; d. CPD offers Peer Support Officers the opportunity to meet at least **an-nually** to share successful strategies and identify ways to enhance the program; e. Peer Support Officers re-ceive and comply with a written procedures manual approved by a licensed mental health professional as-signed to the Professional Counseling Division; f. Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruit-ment of volunteers and widespread access to peer support services; and g. the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective man-agement of the program and that preserves the ano-nymity and confidentiality of members receiving peer support services. | February 29, 2020 | Johnson, Monroe, Felix | Peer support programs; performance met-rics; employee surveys or responses; meet-ings that are memorialized in a standing re-port. | Peer Support Officers (at least) annual meet-ing to provide feedback on existing programs and successful strategies. | IMR-2 |
| 406 | **By January 1, 2020**, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that: a. the purpose of the Chaplains Unit is to: i. support the wellness of CPD members who voluntarily seek consultation with rep-resentatives of the Chaplains Unit; ii. make referrals to licensed mental health professionals and other service providers, when appropriate; iii. provide pastoral care | January 1, 2020 | Johnson, Monroe, Felix | CPD policies; chaplain training; selection process for chaplains; chaplain response times; calls for service data. | Development and publication of the Chap-lains Unit SOP. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | to CPD members who voluntarily seek such services; iv. offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and v. provide support in moments of crisis as requested by CPD members. b. when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy. c. representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit. | | | | | |
| 409 | CPD has also implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training. | March 1, 2019 | Johnson, Monroe, Felix | CPD policies; best practices for officers who have experienced a firearms discharge; CPD organizational chart; credentials and qualifications of mental health professionals overseeing the program; officers who have participated in the program. | Extent to which a mental health professional in the Professional Counseling Division has oversight of the program; processes by which officers are invited to participate in the program. | IMR-1 |
| 411 | At least **annually,** CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program. | February 29, 2020 | Johnson, Monroe, Felix | Use of force report(s) and/or use of force database; calls for service data; supervisor referral data. | Reporting process that defines a duty-related traumatic incident and guarantees that staff members receive the required support following a traumatic incident. | IMR-2 |
| Accountability and Transparency | | | | | | |
| 425 - 426 | **425.** The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, **within 90 days of the Effective Date**: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c. the City, CPD, and COPA will make information on fil- | May 30, 2019 | Medlock, Monroe, Sun | Complaint process policies and procedures; number and types of complaints filed through the various systems; minutes from meetings discussing how to widely make available complaint process; plans, policies and procedures for assigning complaint tracking numbers; misconduct complaints. | Joint policy and distribution of materials; how procedures are publicized; identified language support system; final policies and complaint procedure issued; understanding of how system applies; extent to which complaints can be filed through various systems outlined in consent decree and whether unique tracking number is assigned throughout case disposition. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | ing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, online, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form. **426.** As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition. | | | | | |
| 436 | **Within 90 days of the Effective Date**, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor | May 30, 2019 | Medlock, Monroe, Sun | Policies; copies of notes associated with meetings; data from COPA; misconduct complaints. | Final policies issued; number of complaints filed by officers. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited. | | | | | |
| 457 | **Within 90 days of the Effective Date**, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement. | May 30, 2019 | Medlock, Monroe, Sun | Policies; copies of notes associated with meetings; factors considered in determining transfer of cases. | Factors considered; final policy; copies of notes associated with meetings; time factors for investigations; process for coordination between CPD and COPA. | IMR-1 |
| 478 | **Within 120 days of the Effective Date**, CPD and COPA will each review and revise its policies regarding preliminary investigations, including preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit. | June 29, 2019 | Medlock, Monroe, Sun | Policies and procedures; number and types of anonymous complaints; copies of override affidavits; preliminary investigative policies and procedures; override affidavit process and forms. | Final policies developed; anonymous complaints investigated according to policy. | IMR-1 |
| 479 | **Within 120 days of the Effective Date**, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured. | June 29, 2019 | Medlock, Monroe, Sun | Policies and procedures; timelines; benchmarks; and goals for completing investigations. | Revised policies; adherence to timelines; setting and meeting benchmarks and goals. | IMR-1 |
| 480 – 481 | **480. Within 120 days of the Effective Date**, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation. **481.** The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days. | June 29, 2019 | Medlock, Monroe, Sun | COPA, BIA, and Accountability Sergeants; policies relating to review of evidence in civil and criminal litigation; other relevant policies; meeting notes between the relevant organizations. | Development of joint policies; involvement of all parties; process for developing new policies; extent to which Superintendent responds within 30 days. | IMR-1 |
| 488 | In addition to the general investigative requirements | March 31, 2019 | Medlock, Monroe, Sun | Notification policy and protocol of COPA personnel in the event of an officer involved | Measure extent to which relevant individuals understand and adhere to policy; extent to | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMR Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure re that: a. COPA investigators be provided the opportunity to participate in the preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. **within 30 days of the Effective Date**, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded | | | shooting or death; protocol regarding notification procedures; documentation or case examples to demonstrate COPA participation at the scene; evidence to demonstrate the COPA responded to the scene of an officer involved shooting or officer involved death; policy and/or evidence log that documents who/when viewed or listened to evidence; policies and procedures that direct CPD members to not discuss facts of a case until interviewed by COPA, including accommodating an employee's discussion with counsel or in a member's wellness situation; policies directing that CPD members will be transported separately from a scene and will be monitored to avoid contact or communication until being released by a commander; policies directing that CPD member witnesses will be audio-and or video recorded with COPA Investigators present except when a CPD member witness is speaking with legal representation; audio and video files of relevant interviews; policies that direct investigators to interview CPD member witnesses without delay. | which relevant individuals comply with all requirements listed in ¶488, including for example, the extent to which COPA investigators are provided the opportunity to participate in the preliminary assessment during the immediate aftermath of an officer-involved shooting. | |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all requests made on behalf of involved or witness CPD members to reschedule an interview. | | | | | |
| 493 | OAG acknowledges that, in many districts, CPD has designated Accountability Sergeants whose responsibilities include receiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. **Within 120 days of the Effective Date**, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the Accountability Sergeant's investigations ("BIA Lieutenants"). The policy will provide, among other things, a process by which: a. within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a summary of the complaint allegations concerning the involved CPD member; b. within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or corrective action, if any; and c. an immediate supervisor of the involved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative findings, recommended discipline or corrective action, if any, unless the CPD member declines to meet. | June 29, 2019 | Medlock, Monroe, Sun | Policies detailing the responsibilities of the Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the Accountability Sergeants. Policies and Training documents outlined in 493 a, b, and c. | Development process of policy; understanding of policy; measuring timelines of 72 hours and 7 days; measure extent to which Accountability Sergeants, their respective Commanders, and the BIA Lieutenants are following policy. | IMR-1 |
| 498 | The City and CPD will ensure that any command channel review conducted is complete within 30 days. **Within 30 days of the Effective Date**, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which | March 31, 2019 | Medlock, Monroe, Sun | Policies concerning command channel investigative reviews, current timelines for conducting investigations, and the most serious Administrative Investigations; requests for investigation extensions. | Process for drafting policies; adherence to 45 day rule; seriousness of investigation to justify 45 days. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval. | | | | | |
| 504 | As soon as feasible, but **by no later than January 2020**, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor. | January 31, 2020 | Medlock, Monroe, Sun | Administrative Summary Reports and plan for distributing report to district commanders and supervisor; training lesson plans addressing the proper distribution of the report. | Timeline for distributing reports, how reports are being transmitted, who is receiving reports, and when report is sent. | IMR-2 |
| 512 | The City will ensure that **within 365 days of the Effective Date**, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies. | February 29, 2020 | Medlock, Monroe, Sun | Policies; current mediation procedures; cases submitted for mediation; policies; criteria developed to determine which cases are eligible for mediation; letters or correspondence to complainants concerning mediation. | Policy development; clearly defined criteria for determining cases for mediation; clearly defined and published process for engaging in mediation; systematic process for communicating with complainants. | IMR-2 |
| 522 | **Within 365 days of the Effective Date**, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation. | February 29, 2020 | Medlock, Monroe, Sun | Staffing levels at PSIG, COPA, and BIA; cases loads for investigators; current equipment assigned to units; needs plans created by COPA, PSIG, and BIA. | Process developed for conducting personnel and equipment needs assessment; involvement of staff in development of assessment. | IMR-2 |
| 525 | **Within 60 days of the Effective Date**, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders. | April 30, 2019 | Medlock, Monroe, Sun | Selection policy and process, including job requirements of COPA Chief Administrator. | Development of criteria for COPA; involvement of community feedback in development of criteria. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| 526 | Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. **Within 120 days of the Effective Date**, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement. | June 29, 2019 | Medlock, Monroe, Sun | Lesson plans; training materials; rosters documenting training for new and existing COPA and BIA personnel; policies directing the training for COPA and BIA; training tracking data. | Development of on-boarding training; number of personnel receiving on-boarding training; ensuring scope, quality, and type of training is based on best practices. | IMR-1 |
| 527 | **Within 180 days of the Effective Date**, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training. | August 28, 2019 | Medlock, Monroe, Sun | Policies; lesson plans; training materials for COPA and BIA member's annual eight-hour in-service training; training tracking/training rosters. | Process for developing training, effectiveness of training, and extension of training to all personnel. | IMR-2 |
| 528 | The **initial** and **annual** in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, | August 28, 2019 | Medlock, Monroe, Sun | Policies; lesson plans; training materials for COPA and BIA member's annual eight-hour in-service training. | Extent to which curricula reflect the elements required by this paragraph. | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS. | | | | | |
| 529 | **Within 180 days of the Effective Date**, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on: a. identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation; b. use of the City's anonymous reporting website; c. for CPD supervisors: i. the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and ii. techniques for turning the initiation of a complaint into a positive police community member interaction. | August 28, 2019 | Medlock, Monroe, Sun | Training lesson plans; training schedules and training rosters for administrative investigations and discipline, including identifying misconduct, consequences for failing to report misconduct, and consequences of retaliation for reporting misconduct or for participating in an investigation; proper use of the anonymous reporting website; proper procedure for investigative process and consequences for failure to do so. | Tracking and identification of any new or revised policies; development of training process/distribution of new/revised policies. | IMR-2 |
| 530 | **Within 90 days of the Effective Date**, COPA and BIA will create separate initial and in-service training plans. | May 30, 2019 | Medlock, Monroe, Sun | Lesson plans; training schedules and rosters for initial in-service training for COPA and BIA personnel; staffing rosters. | Process for developing training; effectiveness of training; whether all personnel receive training. | IMR-1 |
| 532 | **Within 180 days of the Effective Date**, the City will draft selection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judgment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public review and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of | August 28, 2019 | Medlock, Monroe, Sun | Policies and procedures; selection criteria for public review and comment for potential Police Board members; plan for the 30-day public review and comment period. | Process for developing criteria and publishing of draft criteria for public review and comments; inclusion of public comments in draft criteria; extent to which 30-day review period existed; extent of community engagement in development of criteria. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | Police Board members. | | | | | |
| 533 | **Within 180 days of the Effective Date**, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers. | August 28, 2019 | Medlock, Monroe, Sun | Selection criteria for hearing officers, which should address competence, impartiality, and legal expertise to serve as hearing officers. | Clear concise process for selection criteria; parties' engagement in development of criteria; amount of community engagement into development of criteria; whether and where selection criteria are published. | IMR-2 |
| 538 | **Within 90 days of the Effective Date**, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input. | May 30, 2019 | Medlock, Monroe, Sun | Policy and procedures for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. | Process for policy development; document follow up from Board to community member's input; Board's response to community member's input; process for responding to community comments. | IMR-1 |
| 540 | **Within 180 days of the Effective Date**, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach. | August 28, 2019 | Medlock, Monroe, Sun | Training lesson plans, documentation, and rosters for initial training and annual training; annual training for Police Board members to include constitutional policing, use of force, stops, searches, and arrests; police tactics; investigation of police conduct; impartial policing; crisis response; CPD policies and procedures; procedural justice and community outreach. | Development of training curriculum for Board members; number of members receiving training; extent to which training addressed the required topics. | IMR-2 |
| 542 | **Within 90 days of the Effective Date**, the City will create a training policy for Police Board members and hearing officers. | May 30, 2019 | Medlock, Monroe, Sun | Training policy for Board members and hearing officers, including policies and procedures for Board members; duties and responsibilities of Board members; Police Board members. | Measure extent to which the process for the development of policy includes relevant stakeholders; process for developing training policy. | IMR-1 |
| 558 | **Within 60 days of the Effective Date**, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits | April 30, 2019 | Medlock, Monroe, Sun | Policies and procedures for Deputy PSIG; PSIG audits; data driven review and audit to ensure the effectiveness of the community | Review PSIG auditing processes and practices; validation of data sets to be used for audits | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediations. | | | complaint process, including the number of complaints received; the disposition of complaints; timeliness; length of administrative investigations; disciplinary actions taken; complaint trends; analysis of enforcement of Rules 14, 21, 22; thoroughness of administrative investigations; and disciplinary grievance procedures and outcomes. | and data-driven reviews; process for developing policies. | |
| 563 | At least 60 days prior to publishing its **annual** audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment. | February 29, 2020 | Medlock, Monroe, Sun | PSIG draft annual audit plan; Deputy PSIG; PSIG employees. | Extent to which PSIG's annual audit plan reflects or overlaps with IMT priorities. | IMR-1 |
| 565 | At least **quarterly**, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent s response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website. | Quarterly | Medlock, Monroe, Sun | Meeting dates, agendas, and minutes; information sharing among the entities; any recommendations provided by the entities; Superintendent responses to recommendations and actions taken. | Quarterly meetings held; attendance at meetings; types of recommendations submitted and adopted; actions taken; extent to which Superintendent responds within 60 days; extent to which policy recommendations and responses are posted to the website. | IMR-1 |
| **Data Collection, Analysis, and Management** | | | | | | |
| 569 | CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documenta- | March 1, 2019 | Decker, Coldren, Christoff | All available documents relating to use of force incidents, including but not limited to TRRs, TRR-Is, TRR-Rs, arrest reports, incident reports, investigatory stop reports, officers, | Extent to which documentation regarding the review and investigation of reportable use of force incidents adheres to relevant policies, protocols, and the mandates of the consent | IMR-1 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | tion CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews. | | | supervisors, members of the Force Review Board (FRB) and the FRU, community members, employees of COPA, employees of BIA, and employees of OIG Investigations Unit. | decree; extent to which tracking mechanisms are kept up-to-date. | |
| 577 - 580 | 577. CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member. 578. For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to: a. evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and b. if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public. 579. The FRB will be chaired by the Superintendent, or his or her designee, | April 30, 2019 | Decker, Coldren, Christoff | CPD documentation regarding the creation of and modifications to the FRB; records regarding review and recommendations regarding applicable uses of force, including supporting documentation, the timeliness of FRB review, and delivery of recommendations; CPD documentation regarding FRB recommendations for training or modifications to policy based on its review of applicable use of force incidents, including CPD response to any recommendations. | Extent to which documentation regarding the review and investigation of reportable use of force incidents adheres to relevant policies, protocols, and the mandates of the consent decree; number of recommendations made by the FRB regarding policies, training, tactics, or equipment regarding reportable use of force incidents, and the CPD response to those recommendations; timeliness of FRB review of incidents and issuance of findings and recommendations; extent to which CPD responds to FRB recommendations. | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB. **580.** The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. **Within 30 days after its review of an incident**, the FRB will issue recommendations, if appropriate, to the Superintendent regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation. | | | | | |
| 581 - 582 | **581. Beginning within 180 days of the Effective Date**, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform. **582.** The publicly accessible, web-based data platform will enable visitors to: a. identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level; b. identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and c. review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations. | August 28, 2019 | Decker, Coldren, Christoff | CPD website (or other web-based platform); CPD FRU; CPD FRB; BIA; COPA. | Existence of the web-based use of force incident data platform; number of use of force incidents reported on the platform, including the specific information reported (*i.e.*, data by district, neighborhood, and ward); existence of interactive maps. | IMR-2 |
| 604 | Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers | January 1, 2020 | Decker, Coldren, Christoff | Information regarding the on-going use of the Performance Recognition System (PRS), | Extent to which PRS and other information or utilities are being used at CPD for police of- | IMR-2 |

| ¶ | Consent Decree ¶ Language | Deadline(s) | IMT Member(s) Responsible | Data Sources* | Metrics/Measures* | Initial IMR Period** |
|---|---|---|---|---|---|---|
| | that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by **no later than January 1, 2020**. | | | as well as any information regarding the development and implementation of the Early Intervention System (EIS), including policies and SOPs, relevant supporting documentation, and analysis; CPD supervisors. | ficer early intervention or early warning purposes; progress on the development of the EIS. | |
| 606 | **Within 365 days of the Effective Date**, CPD will conduct an assessment of current information collection mechanisms and data management technology to identify: a. what data CPD currently collects and what additional data is required to be collected to comply with this Agreement; b. the manner of collection (e.g., electronic or paper); c. the frequency with which each type of data is updated; d. the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected; e. what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members; f. redundancies or inefficiencies among the applications and systems currently in use; and g. the extent to which the applications and systems currently in use interact with one another effectively. | February 29, 2020 | Decker, Coldren, Christoff | Information regarding CPD's assessment of its current information collection mechanisms and data management technology, including meeting minutes and summaries; analyses and assessments conducted; outreach to consultants; contracts or consultant agreements formalized; and feedback from relevant and interested parties. | Current information collected by CPD, and CPD plans to collect additional information regarding the consent decree or other needs identified by CPD. | IMR-2 |

Independent | Chicago Police
Monitoring Team | Department
Consent Decree