**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS, | |
| Plaintiff, | |
| | Case No. 17-cv-6260 |
| v. | |
| | Judge Robert M. Dow Jr. |
| CITY OF CHICAGO, | |
| Defendant. | |

## THE CITY OF CHICAGO'S SEMIANNUAL STATUS REPORT

Pursuant to Consent Decree Paragraph 680, the City of Chicago ("City") submits this status report to update the Court on the City's progress in implementing the requirements of the Consent Decree entered in the above-captioned matter (Dkt. 107-1).

## I.  OVERVIEW OF THE CITY'S PROGRESS SINCE MARCH 1, 2019

The Consent Decree contains 799 paragraphs—more than 100 of which include specific deadlines for the City (mostly the Chicago Police Department) to complete in Year One. Largely tracking the early-deadline paragraphs in the Consent Decree, the Independent Monitoring Team's ("IMT") monitoring plan for its first reporting period ("IMR-1 Plan")[1] included 55 Consent Decree paragraphs for which the IMT plans to assess compliance in the first monitoring period.

---

[1] The Independent Monitoring Team ("IMT") was appointed March 1, 2019—the Consent Decree's effective date. On May 30, 2019, IMT published its Monitoring Plan for Year One (March 1, 2019 through February 29, 2020) (Dkt. 743) ("Year One Plan"). The Year One Plan is broken out into two periods—"IMR-1" covers the first six-month monitoring period (March 1, 2019, through August 31, 2019), and "IMR-2" covers the second six-month monitoring period (September 1, 2019, through February 29, 2020).

Even with the numerous aggressive deadlines in the IMR-1 items, and the considerable foundational work needed to help IMT prepare for compliance reviews, the City has made significant progress on achieving the Consent Decree's objectives and implementing the 55 Consent Decree requirements contained in the IMR-1 Plan. More specifically, all IMR-1 requirements are currently in progress; nearly all those requirements are under compliance review by the IMT and Office of the Attorney General of the State of Illinois ("OAG"). Further, the City believes it has achieved the first level of compliance, *i.e.*, primary/policy compliance,[2] for many of those paragraphs, including collaborating with Chicago Public Schools to standardize and improve the school resource officer program (*see* Consent Decree Par. 39-44), and creating standard operating procedures for the Chicago Police Department's review of firearm pointing incidents (*see* Consent Decree Par. 190-193), among numerous others. In addition, as described below, the City has begun implementing numerous other reforms not included in the IMR-1 Plan.

The City's reform progress has been accomplished over the same time period in which Chicago has seen declines in violent crime. The City and CPD believe that public safety and reform strategies are mutually reinforcing and that they can be accomplished simultaneously. The City and CPD have worked—and will continue to work—diligently to advance these twin goals in pursuit of a safer Chicago for all residents.

---

[2] The Monitoring Plan for Year One also sets out the IMT's methodology for assessing compliance with each paragraph of the Consent Decree in three successive levels: (1) preliminary/policy compliance, (2) secondary/training compliance, and (3) full/operational compliance.

## II.     THE CITY HAS BEEN INVESTING IN REFORM FOR SEVERAL YEARS

The City and the Chicago Police Department's ("CPD" or "the Department") reform efforts did not begin on March 1, 2019.  Rather, the work to improve Chicago's public safety system has been ongoing for several years.  These early efforts were, and remain, instrumental in creating the foundation for successful implementation of the Consent Decree and other reform.

Specifically, the City invested in several organizational changes and expansions that enabled CPD and other agencies to immediately begin implementation when the Consent Decree went into effect:

**(1) CALEA accreditation:**     In late 2014, CPD voluntarily enrolled in the Law Enforcement Accreditation program with the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). This accreditation process is nationally recognized as providing the gold standard for law enforcement agencies around the world.  CPD's Research and Development ("R&D") Accreditation Section led the Department in an extensive three-year self-assessment of all Department policies, procedures, and operations, which prompted an overall reform of the Department.  CPD achieved the Advanced Law Enforcement Accreditation in July of 2018, and is currently working to fulfill requirements under CALEA's re-accreditation process, as well as working to achieve accreditation for CPD's Education and Training Division.

**(2) "The Next Steps for Reform":**  In 2017, in advance of the Consent Decree, the City committed to take on a series of reforms, published in a document called "The Next Steps for Reform."  These measures included engaging a national expert to help revamp the Department's use of force policies, instituting a mandatory in-service training program for all sworn members, and re-invigorating the Department's Crisis Intervention Team ("CIT") program, among other reforms.  CPD achieved the majority of these commitments in 2017.  The City went on to release

a second set of "Next Steps for Reform" in 2018, and achieved many of those commitments while simultaneously negotiating the Consent Decree.

(3) **CPD's Long-Term Strategic Plan:**  In 2018, CPD published a long-term strategic plan laying out Superintendent Johnson's key priorities in reform and crime-fighting.  This plan also updated the Department's mission statement, committing Department members to "protect the lives, rights and property of all people in Chicago," carrying out daily duties with the values of "professionalism, integrity, courage, dedication and respect."  The strategic plan lays out how these actions will lead the Department in the direction of achieving its vision, that "all Chicagoans feel safe, supported and proud of the Chicago Police Department."

(4) **Creating the Office of Reform Management:**  In 2018, CPD formed and staffed the Office of Reform Management ("ORM"), a unit that administers the Department's project management functions on behalf of the Superintendent's office.  Combining the project management experience of civilians with the knowledge and skill of sworn members, ORM is led by an exempt-level sworn commander and a civilian director and is staffed by eight sworn officers, as well as nine civilian personnel.  Key to the Consent Decree implementation, ORM assists all CPD units with several critical functions: 1) planning out the implementation of Consent Decree requirements; 2) ensuring each unit and bureau is aware of assignments of responsibility and accountability for Consent Decree tasks; 3) facilitating cross-bureau coordination; and 4) helping ensure the Department is prioritizing resources to achieve the Decree's requirements.

(5) **Creating the Office of Operational Compliance and Strategic Data Analytics Division:**  In 2019, CPD also launched and staffed a new Office of Operational Compliance, which is responsible for auditing compliance with Consent Decree requirements.  The

4

Department recently underwent reorganization to streamline and appropriately staff its data analytics functions to ensure the Department can validate and analyze data related to the Consent Decree. In this reorganization, the Department has hired a team of experienced civilians who have strong backgrounds in data analytics and visualization to aid in this work.

**(6) City Budgetary Commitments:** In addition to the creation of these new CPD units, the City has committed substantial financial resources to advance reform: nearly $26 million was earmarked in the City's 2019 budget to support CPD, the Civilian Office of Police Accountability ("COPA"), the Office of Emergency Management and Communications ("OEMC"), the Police Board, and the Office of the Inspector General ("OIG") to allow these entities to implement Consent Decree requirements.

### III. THE CITY HAS COLLABORATED WITH THE MONITOR TO ESTABLISH EFFICIENT INFORMATION-SHARING

The Consent Decree establishes that the City and CPD will work collaboratively with IMT and OAG to facilitate their conducting compliance reviews. Within the first month of IMT's appointment, CPD hosted the entire monitoring team for a series of detailed presentations, which various departments and divisions of CPD and other City entities involved in the Consent Decree provided. The City and CPD have engaged in near-daily discussions with IMT's several associate monitors and senior leadership and have hosted dozens of meetings and interviews, including a weeklong IMT site-visit in July. The Independent Monitor hosts a monthly meeting with CPD's Superintendent and senior CPD leadership.

ORM, which is CPD's primary point of contact for the IMT, has helped facilitate IMT site visits and assessments and has assisted the Office of Legal Affairs and City Law Department to fulfill IMT and OAG document, data, and information requests. So far, the City has provided about 11,000 documents in response to IMT and OAG requests.

In the first monitoring period, CPD has also made concerted efforts to educate Department members about reform efforts and Consent Decree requirements. Notably, the ORM's Commanding Officer has facilitated roll call presentations, including Q & A sessions, across the Department explaining the ways in which the Consent Decree will help the Department continue to achieve its stated values of professionalism, integrity, courage, dedication, and respect. To date, the Commander has conducted dozens of roll call presentations, visiting every patrol district and almost every bureau. In August 2019, the Commander hosted the first of what will be a series of regular all-unit supervisor briefings at headquarters. These presentations have been supplemented by consistent communication from the Office of Communications at CPD headquarters about Consent Decree progress and events. CPD will also soon launch an e-learning and decentralized training module for all Department members about the Consent Decree, as required by Paragraph 339.

## IV. THE CITY AND CPD HAS MADE SIGNIFICANT PROGRESS IN EACH OF THE 10 REFORM AREAS COVERED IN IMR-1

The Consent Decree is divided into 10 substantive sections: (1) community policing; (2) impartial policing; (3) crisis intervention; (4) use of force; (5) recruiting, hiring, and promotion; (6) training; (7) supervision; (8) officer wellness and support; (9) accountability and transparency; and (10) data collection, analysis, and management.[3] The City provides below a summary of progress in these areas.

---

[3] The Consent Decree includes one additional section addressing the Monitor's role and procedures.

### A.    COMMUNITY POLICING

The IMR-1 plan contains only a handful of community policing requirements.  CPD has submitted compliance materials for each of the IMR-1 requirements, and IMT is currently conducting its compliance reviews for these items.  These items are described in more detail below.

As the Consent Decree acknowledges, strong community partnerships and positive interactions between law enforcement and members of the public are important tenets of effective policing.  Thus, in addition to implementing the IMR-1 requirements, which are explained in more detail below, CPD has also made significant strides in several additional key areas of community policing, including:

- reorganizing the Office of Community Policing ("OCP") to be a "center of excellence" to drive consistent community policing principles and messaging throughout the Department;

- hiring a civilian Deputy Director specifically to lead community policing Consent Decree implementation; and

- making significant progress on implementing recommendations from the Community Policing Advisory Panel's 2017 recommendations.

Below, the City provides additional detail about CPD's community policing reform work during IMR-1.

**Improved Community Engagement**.    The Department recognizes that meaningful engagement with the communities it serves is a critical component to success.  CPD has worked during the past six months to strengthen its community engagement processes.  In response to constructive criticism regarding community meeting format and function, CPD has hosted multiple meetings with community partners to review recommendations and work together to

determine how to incorporate these new ideas into its standard community engagement processes. Additionally, CPD has conducted multiple trainings to educate new conversation facilitators to strengthen their skills and become experienced practitioners of conversation facilitation. This collaboration and training is helping CPD move toward more inclusive, constructive dialogues.

**CPAP Implementation.** Consent Decree Paragraph 13 requires CPD to implement the recommendations of the Community Policing Advisory Panel ("CPAP"), which the CPD Superintendent convened in 2016 to provide recommendations on improving CPD's community engagement. Working with ORM, OCP created project plans to implement CPAP's robust recommendations, mapping out who within OCP is responsible for each task and a timeline for implementation. OCP also made progress on CPAP's recommendations, including:

- completing the April 2019 Citizen's Police Academy training program;

- launching a pilot program for youth-led tours of neighborhoods, which is part of recruit training, and beginning roll out of Youth District Advisory Councils, which target 18-to-24 year olds and created a summer internship for participants;

- launching social media accounts and management tools across all 22 police districts, and completing development of an initial version of the Community Engagement Management System ("CEMS") to manage community engagement opportunities and communication with community members;

- launching Operation Clean, a targeted city services blitz serving particular areas once a week during the summer months;

- creating the Chicago Crime Victim Services Council ("CCVSC"), a new body that will identify Chicago-based crime victim services and educate the public on access to resources;

- creating a visualization dashboard for OCP to use to track community policing-related metrics.

This and other progress toward implementing the CPAP recommendations is detailed in the Office of Community Policing's newly launched *Quarterly Report for the Community Policing Advisory Panel*, which CPD began publishing in August 2019 per CPAP's recommendation.

**Improved School Resource Officer Program.** Another critical piece of the City's community policing reforms is collaborating with Chicago Public Schools ("CPS") to standardize and more clearly delineate the roles and responsibilities of officers who work in the public high schools where CPD officers are currently assigned. *See* Consent Decree Paragraphs 39-44. Specifically, CPD and CPS worked diligently over the past several months to implement several changes to the School Resource Officer ("SRO") Program prior to the start of the coming school year:

*Policy*: CPD drafted a policy that more clearly defines the role of SROs, which was written and revised based on input from a number of stakeholders, including students, teachers, principals, parents, police officers, and the public.

*MOU*: CPD negotiated a memorandum of understanding with CPS which, among other things, delineates the authority of SROs in CPS schools, sets out standardized criteria for selecting SROs, and specifies the manner in which CPD officers will engage with CPS students while on school grounds.

*Training*: CPD engaged a nationally recognized expert in school resource officers to provide a 40-hour specialized training course that all CPD SROs were required to take prior to the start of this school year. SROs are also required to take training from CPS on the student code of conduct and will receive restorative justice training from the CPD Office of Community Policing, in conjunction with CPD's Education and Training Division. SROs were also offered

the opportunity to receive an additional 40 hours of training focused on crisis intervention for youth.

CPD and CPS jointly hosted more than a dozen meetings during IMR-1 to solicit community feedback about the functions of SROs in schools. These meetings included focus groups with students around the City, separate focus groups with teachers, and meetings with principals, local school councils and community organizations. CPD and CPS also held five additional meetings, open to the public, to solicit input regarding how to best employ SROs in a manner that improves the lives and safety of students, teachers, and surrounding communities. After this first round of sessions, CPD compiled the comments regarding SROs to identify the key topics (including SRO selection criteria) it needed to consider and address in drafting the appropriate policy, and held a second round of public meetings to share back these key topics and elicit additional feedback.

As provided for in the Consent Decree and the IMT's Year One Plan, the City anticipates that the IMT will continue to review the SRO policy and training used in this upcoming school year to evaluate any additional changes and improvements for the 2020-21 school year.

**Coordinated Community Response and District Strategic Plans.** Consent Decree Paragraphs 15, 16 and 45 require CPD to ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing, to regularly review strategies for building community partnerships and problem solving, and to work with District Advisory Council chairs to ensure CPD develops comprehensive responses to public safety problems in each district. To that end, CPD developed and executed a community-driven "annual strategic plan" process for districts in spring and early summer 2019. Working

with community partners, each district created plans for addressing crime and community concerns throughout the year.

During IMR-1, CPD held two rounds of community meetings across all 22 CPD Districts to identify priority problems and define responses to these problems. Responses were broken down into three categories: CPD-led responses, collaborative responses, and community-led responses. CPD leveraged its new district-level social media channels to advertise these meetings and is working with partners to increase awareness and broaden the Department's reach. Thousands of community members participated in dialogue with CPD regarding the annual strategic plans.

Working with the IMT and other partners, CPD is preparing to launch next year's cycle of district-level community-led annual strategic plans, working to incorporate learnings from last year's cycle to improve engagement. In mid-September, CPD will kick off an all-district training process to help districts learn from each other's experiences last year and be fully prepared to execute the process in 2020.

In addition, during IMR-1 the Mayor of Chicago has established and begun coordinating meetings with representatives from a number of City departments and sister agencies to develop inter-departmental strategies to address issues impacting the community's sense of safety, security, and well-being, including violence prevention. *See* Consent Decree Par. 18. Senior leadership from across the City Departments and other sister agencies, including CPD, the Department of Streets and Sanitation, the Chicago Fire Department, OEMC, the Department of Family and Support Services, and Chicago Public Schools have participated in these regular meetings.

### B.     IMPARTIAL POLICING

Consistent with the principles of the Consent Decree, CPD is committed to providing services to the public without bias and treating all members of the public with dignity, respect and fairness.  The Impartial Policing section of the Consent Decree focuses heavily on policy creation as the first step in achieving reform in this area.  To that end, during the first monitoring period CPD reviewed and, where necessary, revised its policies to implement these requirements.  Specifically, CPD's Research and Development Unit drafted and/or revised several policies to clarify that officers will permit members of the public to photograph and record officers.  In so doing, CPD solicited feedback on the policy drafts from several community-based organizations.  Per Consent Decree Paragraph 633, CPD will post these policies publicly on its website for additional public feedback after the IMT and OAG review and approve the policies.

**Additional Policy Development.**   CPD also revised polices to implement Consent Decree requirements beyond those included in the IMR-1 plan, including those that:

- ensure CPD prohibits discrimination on the basis of protected class and prohibit retaliation consistent with state and local law (Consent Decree Par. 53);

- require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner and require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language (Paragraph 54);

- prohibit officers from using disparaging language, or information regarding a person's demographics unless part of specific subject description, and reporting misconduct of other officers, including bias-based policing (Paragraphs 55, 57, 59).

As contemplated by the IMR-2 plan, a number of other impartial policing policies are currently in development, such as: a policy to provide additional guidance to officers on interactions with members of religious communities; policies to guide CPD members'

interactions with transgender, intersex, and gender non-conforming individuals; and a policy prohibiting sexual misconduct by CPD members.

CPD has solicited and will continue to solicit feedback from community groups with relevant knowledge and experience as it develops these policies focused on impartial policing and will continue to post them for public comment prior to the policies becoming effective.

**Improving Language Access and Interacting with People with Disabilities.** In addition to policy creation, the Consent Decree includes other requirements that CPD has begun implementing in preparation for IMR-2. In particular, CPD has focused on requirements to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. *See* Paragraphs 64-67. In addition to the City's designation of a language access coordinator in the Mayor's Office of New Americans, *see* Par. 54, CPD will soon post a job for its own language access coordinator, who will assist CPD in reviewing and updating its language access policy and other language access initiatives.

Further, CPD has budgeted for a full-time Americans with Disabilities Act ("ADA") Liaison, and is working with community partners to develop a job posting. This ADA liaison will coordinate CPD's efforts to comply with the ADA, and will serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities.

**Training on Impartial Policing.** CPD has also continued providing Procedural Justice Training as part of its annual in-service training for all sworn members, and is on track for all officers to complete some Procedural Justice Training by the end of 2019, with the goal of all officers completing the full three-part training by the end of next year. *See* Consent Decree Paragraph 73. The training covers, among numerous other topics, cultural competency that prepares officers to interact effectively with people from diverse communities.

### C. CRISIS INTERVENTION

CPD officers often respond to calls for service involving individuals who are experiencing a behavioral or mental health crisis. To better serve those individuals in crisis, the City and CPD developed the Crisis Intervention Team ("CIT") Program. *See* Consent Decree Par. 87-91.

The IMR-1 plan contains only one CIT-related requirement. *See* Par. 142. This paragraph acknowledges that OEMC calltakers and dispatchers must receive the training and preparation necessary to be able to identify calls for service involving an individual known, suspected, or perceived to be in crisis. Consistent with the Consent Decree, OEMC has provided comprehensive mental health and CIT training to all of its tele-communicators prior to any telecommunicator being allowed to handle calls independently and will continue to train new telecommunicators.

Even though not included in the IMR-1 Plan, the Consent Decree requires long-term reforms to the CIT Program, which CPD has made substantial process on implementing:

**CIT Officer Deployment**. CPD has been working diligently on improving its CIT Program. In order to become a CIT-certified officer, the officer must complete a 40-hour Basic CIT Training course, consistent with the Illinois Law Enforcement Training and Standards Board requirements. To date, each watch of every district of the Department is staffed with CIT-trained officers. Citywide, CPD is currently responding to approximately 50% of CIT-related incidents with CIT-trained officers, and the City anticipates that response ratio will continue to improve as more officers receive CIT training. CPD and OEMC are working to coordinate their data systems to determine how many additional officers in each watch and district require CIT training to further facilitate the deployment of CIT-trained officers to crisis incidents. Once this data is coordinated, CPD will create a set of data dashboards to oversee the ratios on each watch

14

in each district and inform which officers will receive priority for training. This data will provide the foundation for the CIT Officer Implementation Plan, which is due in IMR-2.

**CIT Training**. CPD is also committed to providing advanced CIT training, including revamping and reviving courses regarding interacting with military veterans and youth. During IMR-1, CPD partnered with the National Alliance on Mental Health ("NAMI") Chicago office and other community partners to overhaul its curriculum for CIT Youth, a course which previously had not been offered for many years. CPD and its partners tailored this revamped CIT Youth training program toward the needs of officers who have consistent interaction with youth, including SROs, equipping them with better tools and tactics to serve and assist young people experiencing mental health or behavioral crises. CPD conducted three sessions of this course in the summer of 2019, prioritizing officers assigned as SROs in CPS schools.

**City's Crisis Intervention Response.** One of the other key components in which the City is making progress is improving its crisis-intervention response through streamlining resources and maintaining dialogue around needs and best practices. For instance, the Mayor's Office is facilitating the Crisis Intervention Advisory Committee ("CIAC"), the purpose of which is to facilitate collaboration between people with lived experience, City entities, care and social service providers, advocates, and other subject matter experts. The Advisory Committee meets quarterly, with subcommittees meeting more frequently, and will provide recommendations for improving the City's crisis intervention response to the Mayor early next year. Per the Consent Decree and IMR-2 Plan, the City will respond in writing to these recommendations and publish a Crisis Intervention Plan next year. *See* Par. 131.

### D.     USE OF FORCE

CPD's approach to use of force, including gathering and analyzing related data, has undergone tremendous change in the last few years. Beginning in 2016, CPD sought feedback

from use of force experts, the police unions, the Chicago Police Board, and the community (including the general public as well as rank and file officers) to conduct a comprehensive review of its use of force policies and related training. Through this process, CPD developed and revised its use of force policies with an increased emphasis on the sanctity of life; using objectively reasonable, necessary and proportional force; and employing de-escalation techniques and other force mitigation tactics. These revised policies provided officers with clearer guidance on appropriate uses of force, including information on when deadly force may be used, and emphasizing the duty of officers to intervene in the event an officer observes another officer using force that does not comply with CPD policy.

Use of force continues to be a key focus for CPD as it implements the reforms required by the Consent Decree. As provided in the IMR-1 Plan, CPD is on track to provide all officers with 16 hours of in-person use-of-force refresher training by the end of 2019. *See* Consent Decree Par. 323. In addition, during IMR-1 CPD further revised multiple policies to satisfy more than a dozen Consent Decree requirements, which largely focus on clarifying supervisors' roles and responsibilities in reviewing uses of force. *See* Par. 218; 222-235. These policy revisions are currently under IMT review.

**Other Related Data Collection and Analysis.** In IMR-1, CPD made progress on several data collection and analysis initiatives related to use of force. First, several CPD units, including the Research and Development Unit and the Force Review Unit ("FRU"), worked with OEMC to establish processes for collecting, reviewing, and analyzing data related to on-foot pursuits. Second, R&D developed a new policy directly from the Consent Decree requirements that requires officers to notify OEMC with their beat number following a pointing incident. *See*

Consent Decree Par. 168-169. These data collections will allow CPD to conduct aggregate data analysis to inform future policy and training.

In 2017, CPD also created a use of force review process to be implemented in each district, as well as the FRU, which reviews and evaluates tactics of officers' uses of force, providing post-incident review and assessment. Consistent with Consent Decree Paragraphs 168-169 and the IMR-1 Plan, CPD's Force Review Unit is now also responsible for conducting reviews of foot pursuits associated with a use of force, as well as firearms pointing incidents.

### E. RECRUITMENT, HIRING, AND PROMOTION

CPD is committed to maintaining a police department of qualified, well-trained officers who represent a broad cross-section of the Chicago community, and in ensuring fairness in the hiring and promotional processes. For recruitment, hiring and promotion of CPD personnel, the City Department Human Resources ("DHR") and CPD's Human Resources Division share responsibilities. This delineation of responsibilities is laid out in the City's annual hiring plan and overseen by the Office of the Inspector General, continuing the City's compliance with the *Shakman* decree, a previous court settlement which set forth rigorous procedures to ensure fairness in hiring.

Though the IMR-1 Plan does not contain requirements in this area, DHR and CPD have made a concerted effort to recruit and hire diverse candidates for CPD employment opportunities. In 2017 and 2018, 70% of applicants for the police officer exam self-identified as racial minorities. As of March 2019, 52% of all CPD sworn members were members of a racial minority group. CPD has also worked to reduce barriers to entry for applicants, including offering study support for the exam, partnering with gyms to help applicants prepare for the physical examination, and offering smaller size, more frequent testing opportunities.

Currently, CPD is working with a vendor to complete a sergeant job analysis and create a new sergeants exam, which is to be offered prior to the end of 2019. Per the requirements of Consent Decree Paragraph 261, CPD has also developed a procurement scope document to solicit bids in search of an independent expert who will complete a review of the sergeant and lieutenant promotional processes in 2020.

### F.    TRAINING

To be a successful law enforcement agency, CPD must offer high-quality training to its members. In IMR-1, the Education and Training Division of CPD conducted a needs assessment of CPD's training and engaged stakeholders both internal and external to CPD to collect a wide range of input on training needs. *See* Consent Decree Par. 271. Through the needs assessment, CPD evaluated the current training and curriculum development at CPD, and identified the subjects in which CPD officers were in most need of additional training. Some of the key subjects that CPD identified as areas of additional needed training are: use of force, scenario-based training approaches, report writing, officer wellness, and interactions with specific populations such as individuals with mental or behavioral health issues or individuals with limited English proficiency. During IMR-1, the IMT and OAG reviewed the needs assessment and approved CPD's moving forward with developing a written 2020 Training Plan. The needs assessment will inform CPD's approach to developing and implementing the Training Plan, which will ultimately be subject to IMT review and approval by the IMT in IMR-2. *See* Par. 272.

**In-Service Training.** Another significant accomplishment in IMR-1 was the roll-out of an automated system to schedule in-service training. Previous to the development and deployment of this tool, all training at CPD was scheduled manually through a labor-intensive and inflexible process, resulting in complex matrices to track training compliance. The new

automated scheduling tool for in-service training has been a significant help for CPD to schedule the approximately 13,500 officers for the mandatory 24 annual training hours required by the Consent Decree in 2019.  *See* Par. 323.  With the help of the automated scheduling software, CPD is on track to provide nearly every officer in the department with 16 hours of in-person use of force refresher training by the end of this year. Additionally, many CPD officers have completed 8-hours of additional training, including in-person implicit bias training.

**Field Training Program**.  CPD is also continuing to improve its field-training program, in which probationary police officers ("PPOs") are assigned designated field training officers ("FTOs"), who provide mentoring and guidance to new officers.  These three months of field training follow approximately six months of Academy curriculum.  During field training, FTOs guide PPOs through everyday duties, evaluating the PPO's performance daily through Daily Observation Reports.

CPD has been working diligently to recruit and train new FTOs to enable each PPO to have a dedicated FTO during field training. CPD has achieved this 1:1 ratio during several periods in 2019, but CPD anticipates it will continue to occasionally have gaps in maintaining this 1:1 ratio. This is as a result of both CPD's surge in hiring additional new PPOs, as well as the attrition of FTOs from the field due to other details or assignments, promotions, and retirement.  CPD has prepared a new selection procedure to identify qualified FTOs and has re-developed FTOs pre-service training curriculum.  CPD also created a cross-functional FTO-PPO working group to address challenges regarding staffing, recruitment, and training of FTOs.  In addition, CPD has recently administered a survey of FTOs and PPOs to determine how to best improve the field training program.  CPD's progress on improving the FTO and PPO program will be evaluated as part of the IMR-2 Plan.

### G.    SUPERVISION

Although there are no IMR-1 deadlines in the Supervision section of the Consent Decree, this portion of the Agreement contains several provisions which will have significant impacts on Department operations and require careful and thoughtful planning and implementation.  As such, CPD has dedicated significant time and resources to planning for the implementation of these provisions, including assigning a lieutenant to oversee the implementation of the "unity of command" and "span of control" requirements, which requires a single sergeant to oversee no more 10 officers in field units within District Law Enforcement.  Additionally, as noted above, CPD has begun conducting a job analysis for the sergeant role ahead of reviewing and revising supervision policies, and is partnering with the Civic Consulting Alliance to overhaul the Department's performance evaluation system.

The unity of command and span of control provisions require CPD to start implementing the 10:1 officer-to-sergeant ratio by January 31, 2020.  *See* Consent Decree Par. 360. Accordingly, CPD has identified a pilot district and the lieutenant overseeing this work is collaborating with district leadership to prepare for the launch of the program next year.

Lastly, CPD HR recently kicked off a project with the Civic Consulting Alliance to overhaul the Department's performance evaluation system. This project will involve conducting interviews internally, initiating a best practice survey of other law enforcement agencies and reviewing performance evaluation processes in other industries.  Upon completion of this project, CPD will work to incorporate the redesigned process into its revamp of the electronic performance evaluations application, and will roll out training for supervisors to understand and use the new system.

### H.     OFFICER WELLNESS AND SUPPORT

As the Department continues to work toward driving down homicides and gun violence, CPD officers responding to calls routinely encounter fellow Chicagoans struggling with traumatic and stressful situations.  These calls may show up in the media as a statistic, but to responding officers, they are a human experience with a family who has lost a child, a group of panicked and scared people on the scene of a street shooting, or a child encountering an unforgettable image of violence.

Research on vicarious trauma shows that repeated exposure to traumatic incidents can build up over time, and even if an officer does not personally encounter physical danger (though many do in the course of their service), these experiences can create a heavy burden on first responders.  Increasingly, law enforcement organizations are recognizing that they must provide robust support programs to their members to ensure officers are able to carry out their duties while maintaining their mental and emotional health.

In the first reporting period, CPD has taken several significant steps toward improving its officer support services:

**Increased Staffing**. CPD hired an additional seven new professional mental health clinicians, more than doubling the staff of the Professional Counseling Division ("PCD") and expanding the Department's internal clinical capacity for the first time in many years. The Department also hired a new Assistant Director for PCD, creating additional supervisory and administrative capacity.

**Traumatic Incident Stress Management**. Currently, CPD is assessing its Traumatic Incident Stress Management Program, the mandatory program which requires officers involved in firearms discharge incidents (and some other traumatic incidents) to complete mandatory debriefing sessions with one of the Department's licensed clinicians, complete stress

management and critical incident tactical training, and engage in peer group discussions. Results and recommendations of the Department's review of this program will be included in future compliance plans.

**Needs Assessment**. Consistent with the Consent Decree, CPD is working to complete a needs assessment (due in IMR-2) to determine what additional services CPD may need to provide to its members. *See* Par. 382. CPD is also working to provide a technology solution to help maintain data on service demand and activity, which is currently scheduled and tracked by hand.

**Suicide Prevention Initiative**. As law enforcement agencies nationwide work to issue ensure officers stay mentally and emotionally healthy, the CPD Superintendent has made it a priority in 2019 to collaborate with other departments and subject matter experts to develop suicide prevention strategies. In June 2019, the Department hosted a two-day officer wellness summit in partnership with the University of Chicago Crime Lab. This summit brought together more than 100 mental health professionals and subject matter experts from across the country to focus on officer wellness, peer support, and suicide prevention. Recommendations from the event were delivered to the Department's Officer Wellness working group, which is considering them for implementation.

**Reducing Stigma**. As advocates in the mental health community work to address stigma around mental illness and suicide across the country, CPD has made significant efforts in the past two years to combat cultural barriers to seeking help. These include the development of a video series called "You Are Not Alone," which includes several videos with Department leadership sharing stories of seeking help during rough times in their own lives. Similarly, CPD has been working during IMR-1 to address a common misunderstanding and fear about how seeking

mental health treatment might impact an officers' eligibility for a Firearm Owners Identification ("FOID") card, which in turn might affect an officer's employment status. Pursuant to Paragraph 387 in the Consent Decree, CPD is developing a roll-call training and a decentralized training module to help department members understand FOID card eligibility when a CPD member seeks or receives support services. The IMT provided preliminary feedback that will inform the training.

## I.     ACCOUNTABILITY AND TRANSPARENCY

The City is committed to having a robust and highly-functioning system of accountability in which CPD members are held to the highest standards of integrity. A system of accountability strengthens the public's trust in CPD and improves the overall effectiveness of CPD as a law enforcement agency.

Chicago's accountability structure is complex, and many of the items contained in the IMR-1 Plan have aggressive deadlines that require coordination across multiple City entities. In light of the importance of accountability and transparency to the success of the overall reform effort, the City continues to work closely with the IMT to implement these requirements successfully.

Nonetheless, the City and CPD have made significant progress in this space. For example, the City has streamlined the process for the public to file complaints involving misconduct. CPD has also rewritten the Standard Operating Procedures ("SOP") for CPD's Bureau of Internal Affairs ("BIA"), which is tasked with conducting CPD's internal investigations of certain allegations of misconduct. Both the IMT and OAG have submitted comments on this revised SOP, and CPD will work collaboratively with IMT and OAG to address these comments. Revising these procedures was a significant accomplishment for BIA, as this was the first time the SOP have been revised in nearly 30 years.

CPD is also actively engaged in a dialogue with the IMT and OAG regarding how to best complete a command-channel review of an incident in a timely and effective manner, and the IMT has reviewed and provided feedback on multiple drafts of a policy which will guide the review of such internal investigations.

In addition to the work done at CPD on accountability issues, the City is coordinating monthly meetings between BIA and COPA to ensure consistent and thorough accountability practices. COPA has formed its own Policy Review Committee, which undertook a full, intensive review of all of COPA's existing policies to identify aspects that required revisions and topics on which there was no policy in place. This included a review by COPA of its policies regarding preliminary investigations, anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit, as required by the Consent Decree. Upon completion of this review, by July 2019, COPA had revised and/or created more than a dozen of its policies. IMT has also provided technical assistance in the review of these policies and development of training and instruction to correspond with the policy changes.

During IMR-1, CPD and COPA launched a new Case Management System ("CMS") that will allow for consistent and standardized management of investigation records and data by both BIA and COPA for the first time.

COPA, the Deputy Public Safety Inspector General ("Deputy PSIG"), and the Police Board have begun meeting quarterly confer and share information regarding trends and analyses of data relating to CPD. *See* Consent Decree Par. 565. The Deputy PSIG has developed and revised its policies for regularly conducting data-driven reviews and audits to measure the effectiveness of the City's accountability practices, consistent with Consent Decree Par. 558.

The Deputy PSIG has also conducted community surveys and is evaluating the responses to determine what elements of public safety it intends to incorporate into its annual audit plan.

Likewise, the Police Board has taken significant steps to comply with the preliminary requirements set forth under the Consent Decree. The Police Board has drafted selection criteria for Police Board officers, and is currently soliciting public comment on these criteria. The Police Board amended its Rules of Procedures regarding its process for handling disciplinary cases, after receiving and incorporating feedback from the public on these procedures. The Police Board has also created a policy for collecting, documenting, and responding to community input received during the Police Board's regular community meetings. The Police Board is currently developing a training curriculum and training policing for its members and hearing officers. The Police Board tracks and publishes aggregate and case-specific data regarding its decisions on its public website. *See* Consent Decree Par. 531-542.

CPD will continue to coordinate with the IMT to develop and revise certain key directives addressing accountability issues in the coming months, working to make Chicago's complex accountability structure more transparent, accessible, and understandable to the public and CPD officers.

## J. DATA COLLECTION, ANALYSIS, AND MANAGEMENT

As mentioned in the introduction, CPD has made significant organizational changes in pursuit of improved data analysis and management. These changes will support the improvement of these processes and will lay a foundation to achieve compliance on the Consent Decree requirements in this section.

As the Consent Decree requires, CPD is collecting, tracking and maintaining all documentation generated by and related to use of force incidents. CPD, in conjunction with

OEMC, is in the process of developing data "dashboards" which will allow CPD to publish aggregate and incident level data regarding use of force incidents, per Paragraphs 581 and 582.

Another primary data-related objective under the Consent Decree is to create an automated electronic system. Per the Consent Decree, this system must provide information to supervisors about officers under their command that will allow supervisors to proactively identify at-risk behaviors by those officers, and to provide individualized intervention and support to address those behaviors. CPD is working with the University of Chicago Crime Lab to identify the indicators that will make the Officer Support System ("OSS") effective and predictive. CPD has been working with Crime Lab for more than two years to identify and test potential input data (including all the required input data listed in Consent Decree Paragraph 587), work with national experts and internal stakeholders to identify and discuss potential interventions, and to draft preliminary designs around what a workflow and support unit might need or look like.

While the OSS is still under development, CPD will review and revise its policies on the performance recognition system, in accordance with Paragraph 604.

As discussed above, CPD has established a Force Review Unit, and it is carrying out the responsibilities provided in Paragraph 575. Working in consultation with the FRU, CPD is working to revise the directive for the Force Review Board ("FRB"), the executive-level review of the most serious use of force incidents, which will review each of these incidents for tactical training opportunities, potential policy revisions and other factors to improve CPD's response to similar incidents in the future.

Additionally, CPD is in the process of procuring a third-party consultant to conduct a full assessment of its information collection mechanisms and data management technology. *See* Consent Decree Paragraph 607.

## V.   KEY BARRIERS AND CHALLENGES

In this first reporting period, the City and CPD have identified several challenges to implementing the reforms required by the Consent Decree, and are actively working to solve them in order to speed future implementation and ensure the improvements represent long-lasting, sustainable change.

**Data Analysis.** The first of these barriers is related to data analysis. CPD has historically captured a lot of information, and devoted significant effort to producing data in response to FOIA and other requests. CPD has also followed the CompStat model for crime control strategies for several years, but has not built out significant infrastructure for analyzing trends Department-wide, particularly regarding administrative data. CPD's data warehouse and data infrastructure have been developed through various projects over the years but have not been fully audited or validated, which has left a void in how management uses data to drive day-to-day decisionmaking.  To address this, CPD is investing heavily in Tableau business analytics technology, working to develop an expert civilian support team and user community environment to democratize the access to data, and broadening the distribution of data visualization competency throughout the Department.

**Staffing**. A second challenge CPD is facing in addressing requirements in Consent Decree is staffing allocation. While the City and CPD believe that reform and public safety are mutually reinforcing strategies, this work often requires members to take on new and different responsibilities, including additional review, auditing, supervisory and training responsibilities. Though CPD has invested in reforms to date, it has not conducted a full survey of the staffing

requirements of the reform work, and therefore may not be optimized to move into the second year of compliance. To address this, CPD is in the initial stages of exploring a department-wide staffing analysis to ensure it is properly staffing both its public safety and reform strategies.

The Consent Decree also requires the City and CPD to make investments in additional civilian hires, including the language access coordinator and ADA coordinator. The civilian hiring process at CPD and at the City is a lengthy process that can take many months to achieve. To address this issue, CPD is working closely with the City Department of Human Resources to identify opportunities to streamline processes. Additionally, the City is pursuing conversations with community partners to broaden awareness of these hiring opportunities in relevant professional communities.

**Communication**.  Thirdly, CPD is working to improve its internal communication capabilities and channels to ensure members throughout the Department have a broad-based understanding of the changes. Historically, CPD members have not had reliable access to electronic forms of communication and have relied on roll calls and other manual communication methods to ensure understanding throughout the Department. Starting under Superintendent Johnson, CPD's Office of Communication dedicated a sergeant to internal communications.  In 2019, Communications began dedicating an additional sergeant and a new civilian assistant director to oversee reform communications both internally and externally. This team is working to develop new communication tools and methods to ensure CPD members throughout the Department have a broad-based understanding of the Consent Decree and what it means for their day-to-day work.

## VI.    CONCLUSION

The City is working collaboratively with the IMT, OAG, and other stakeholders to implement the requirements of the Consent Decree.  At this early stage in the process, the City is

encouraged by the progress made toward its ultimate goal and remains committed to achieving full compliance.

Dated:  September 3, 2019

Respectfully submitted,
**THE CITY OF CHICAGO**

By:   s/ Allan T. Slagel

Allan T. Slagel (ARDC No. 6198470)
aslagel@taftlaw.com
Elizabeth E. Babbitt (#6296851)
ebabbitt@taftlaw.com
Rachel L. Schaller (#6306921
rschaller@taftlaw.com
Paul J. Coogan (# 6315276)
pcoogan@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Telephone:  (312) 527-4000

Respectfully submitted,
**MARK A. FLESSNER,**
Corporation Counsel of the City of
Chicago

By:   s/ Tyeesha Dixon

Tyeesha Dixon
tyeesha.dixon@cityofchicago.org
Deputy Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, Illinois 60602
Telephone:  (312) 744-1806