**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6260 |
| | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**STATUS REPORT and MOTION TO EXTEND the IMPLEMENTATION DATE of
PARAS. 358 to 361 (Unity of Command)**

This is a status report to the court on the collective bargaining negotiations between Fraternal Order of Police Chicago Lodge No. 7 ("The Lodge") and the City of Chicago and to respond to The City of Chicago's Semiannual Status Report submitted to the court on September 3, 2019. [Doc. 771.]

**I.      Status of Negotiations on Point and Report Requirement**

On June 27, 2019, the Lodge filed with this Court a Status Report on Meet and Confer Activities and Motion to Extend Implementation Date of Paras. 188 to 196 of the Consent Decree [Doc. 747], in which it requested that the implementation date for the point and report policy be extended beyond July 1, 2019. Since the filing of that Motion, the parties have had at least two collective bargaining sessions to discuss the issues concerning the point and report requirements of the Consent Decree but have not completed their discussions or reached agreement on this or the other collective bargaining issues that have been proposed by the parties.

1

As of this date, the Lodge continues to wait for the City to respond to several proposals submitted by the Lodge during the course of collective bargaining negotiations on this issue. The matter of discipline for alleged violations of the point and report rule is addressed by one of the Lodge's proposals. Labor Counsel for the City, David Johnson, during a bargaining session on August 26, 2019, recognized that there would be disciplinary ramifications on the point and report policy for officers alleged to have violated it. In fact, Mr. Johnson admitted that the City would have to bargain about the effects of the policy. One obvious impact of the rule is disciplinary action that could be taken against the officers. The possible disciplinary action for a failure to report the pointing of a firearm at a person is clear from the language of Para. 192 of the Consent Decree and the specific provisions of the CPD Rules and Regulations:

Para. 192 provides that a unit of the CPD, later identified as the Force Review Unit (FRU),
will be responsible for information about "investigatory stops and arrest occurrences in which an CPD officer pointed a firearm at a person in the course of effecting a seizure ... and that unit ... will, where applicable, make appropriate referrals for misconduct investigations or other corrective action for alleged violations of CPD policy." Consent Decree, Para. 192.

- Article IV, "Regulations Establishing the Duties of Members," Section C.3 provides that members will know and conform to the Department's Policy, Rules and Regulations, Orders, Procedures and Directives.

- Article V, "Rules of Conduct," provide in relevant part that the following are prohibited acts:

"Rule 2 - Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department. . .
.

Rule 3 - Any failure to promote the Department's efforts to implement its policy or accomplish its goals.

COMMENT: This rule prohibits any omission or failure to act by any member of the Department . . . which act would be required by the stated policy, goals, rules and regulations, orders and directives of the Department. . . .

2

Rule 5 - Failure to perform any duty.

Rule 6 - Disobedience of an order or directive, whether written or oral."

- Article VI, "Penalties," provides:

"The Department may take any of the following actions against a member found guilty of violating the Rules and Regulations of the Department.

A.     Reprimand.

B.     The assignment of extra duty without compensation.

C.     Suspension without pay for a period not to exceed thirty days.

D.     Institution of charges before the Police Board." <u>Lodge Reply</u>, [Doc. 754 at 5.

Instead of honoring its bargaining obligations under Para. 711 of the Consent Decree, over the new rule and its impact on Police Officers, the City forged ahead. After the August 26, 2019, meeting the Department, on September 30, 2019, notified the Lodge that it would unilaterally implement the Firearm Pointing Incident policy effective November 1, 2019, which *inter alia* provides that the Force Review Unit (FRU) will review information submitted to "identify whether the pointing of the firearm at a person allegedly violated Department policy." This matter of discipline, along with other issues, has not been fully vetted in negotiations with Lodge, nor has any agreement been reached on this issue or any of many other issues that are on the bargaining table.

Another significant issue raised by the Lodge in negotiations regarding point and report is that Officers may need to point a firearm at a person or persons while scanning and assessing a group of people with a flashlight mounted on a firearm at night to search for a person who matches the description of a known offender.  Such an action will have to be reported under the new policy, but that action arguably is not an investigatory stop to detain a person unless the

3

Officer issues a command to stop, raise hands or otherwise not move. In such an instance, the Officer is not detaining a person until the Officer is satisfied that the person meets the description of the alleged officer. Such a police operation is not an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), or U.S. v. Mendenhall, 440 U.S. 544 (1980).

A senior Department officer of the Training Division admitted during the course of a collective bargaining meeting that such scanning does not constitute a seizure because no one is being detained. The same position has been taught by the Illinois Law Enforcement Training and Standards Board Executive Institute in its Online Learning Network. See Aguilar Declaration. Officers should not be placed in a position where their training on Terry stops is inconsistent with the point and report requirements. There should be no confusion over this issue because the lives of Officers are at stake, and the instructions need to be clear and consistent with the law and the Officers' training. The Lodge does not object to a requirement to report where a firearm is used to detain a person in an investigatory stop. Nevertheless, the new policy requires notice if the Officer is merely scanning, and this will be implemented without bargaining with the Lodge and in contradiction of existing law.

It is a central necessity of the Department to train all of the patrol Officers on the new reporting requirements, and the Lodge believes that such training cannot be accomplished in the time frame set by the Department. There is a need to have full and complete training for all Officers assigned to patrol districts. This is especially true given that the policy in its current form, will be in direct contradiction to the Officers' training and current law regarding what constitutes investigatory stops.

An essential point made by the Lodge in these negotiations is that all Officers should be trained before there is complete implementation of the new point and report policy.

4

Furthermore, the training should follow the best practices for use of force role-playing scenarios and hands on training that is required by the Consent Decree in Paras. 244 and 245. Cantore Declaration, Paras. 6-11. This is the kind of training that the Department has used and planned to use for this policy. Id. However, in a rush to implement this policy without complete vetting with the Lodge in collective bargaining negotiations, the Department has chosen to use a less than desirable video presentation with the expectation that all Officers will be trained before the November 1, 2019, effective date of the policy. This is not realistic, is unfair to the Officers and does not assure that the public will be well served by the best possible training available.

The Lodge representatives noted in the negotiations that two or more Officers assigned to a single beat should be trained on the notice requirements because it would make little operational sense for only one of the Officers who work together to have received the training. In the event only one of the Officers had the training and became separated during a pursuit of an alleged offender and both pointed their weapons, they both would have to report but only one would have had the necessary training. For these reasons the Lodge has suggested that all of the Officers assigned to the Bureau of Patrol be trained on this reporting system prior to its implementation.

The scenario No. 2 attached to the new policy describes that Officers on each of two beats should report to OEMC where they have pointed a firearm at a person. In the scenario, the Officers are to prepare an Investigative Stop Report based on detaining a person. During the negotiations on point and report, the Lodge representatives were informed by the Department representatives that no OEMC report is needed if an ISR is to be prepared. This scenario is obviously inconsistent with what the Lodge was told, and there should not be a need to report the pointing of the weapons by the Officers on each of the two beats. Cantore Declaration, Para. 12.

The City has correctly reported to the Court that the Department has created a "new policy directly from the Consent Decree requirements that requires Officers to notify OEMC with their beat number for reporting a pointing incident." Status Report, [Doc. 771 10-17]. However, the City's continues to refuse to recognize the proper role of the Lodge in the collective bargaining process on this issue. The Department does not have a right under Para. 711 of the Consent Decree to unilaterally implement such a policy by avoiding its bargaining obligations. Lodge's Reply In Support of Motion to Extend Implementation of Point and Report Provisions of Consent Decree at [Doc. 754 at 12-14]. In addition there is a pending motion to delay the implementation date based on the City's posture in bargaining over this issue. Because the City has not abided by its collective bargaining responsibilities on the issue of the point and report policy, the Lodge respectfully requests that the Court delay the implementation of the point and report portion of the Consent Decree until the City has fully complied with its duty to bargain the matter with the Lodge.

## II.  Status Report on and Request for Delay of Implementation on Unity of Command (Paras. 358 to 361)

The City also has not noted in its Status Report that is has a collective bargaining obligation to negotiate work schedules as acknowledged most recently in the collective bargaining negotiations on August 19, 2019 by the CPD Director of Personnel, Wynter Jackson, who stated, "We acknowledge we have to bargain over this [days off and furlough scheduling]." In response to the Lodge's president asking to bargain over the day-off groups and other issues, Ms. Jackson stated that she "[w]ant[s] to negotiate this as a process and think[s] this can be done under the collective bargaining agreement." This commitment to bargain is consistent with the parties' negotiations in the past and supports the Lodge's position that the Unity of Command and Span of control provision in paras 357 to 361 of the Consent Decree should be subject to

collective bargaining negotiations. Under the Consent Decree, by January 1, 2020, the CPD is to develop a staffing model to achieve the principles of Unity of Command and Span of Control and to identify methods to implement a Unity of Command and a Span of Control ratio of no more than ten Officers to one Sergeant for all field units on each watch in each of the CPD's patrol districts. Consent Decree, Para. 360.

> Unity of Command means officers are supervised by a consistent and clearly identified immediate supervisor. Additionally, officers and their immediate supervisor will regularly have the same start time, the same day-off-group and patrol the same geographic areas. Para. 358 (e). Id.

A day-off group refers to the days of work for police Officers and their days-off. Due to the seven day, twenty-four hour operation of the CPD, the Officers do not regularly have Saturdays and Sundays as their weekends off from work.

The work day schedule as to hours of work, days of work and days off are a critical part of the daily work life of police Officers affecting their wages, hours and working conditions, and are therefore a mandatory subject of bargaining. See, Local Union No. 189 Amalgamated Meat Cutters, Butcher Workmen of North American, AFL-CIO, 381 U.S. 676, 691 (1965) ("we think that the particular hours of duty and the particular days of the week during which employees shall be required to work are subjects well within the realm of 'wages, hours and other terms and conditions of employment' about which employers and unions must bargain."); Local 2 United Federation of Teachers, 347 NLRB 603, 607 (2006) (unilateral changes in employee work schedules during the course of a collective bargaining relationship are a unfair labor practice).

In recognition of this key labor law principle, the Department and its police unions have bargained over these issues in the past and agreed upon work schedules, including the Officers' day-off rotations. The parties have had an understanding on the day off rotations as an inherent part of the work schedules for the Officers since the inception of the collective bargaining

relationship at which point there were seven day-off groups for the Officers assigned to the district patrol, also known as District Law Enforcement and now known as the Bureau of Patrol. Graham Declaration, Para. 5. These rotations have been changed only by mutual agreement of the parties. On October 20, 2008, the Department issued Department Notice 08-34, the 2009 Work Day Schedule Pilot Programs, which provides:

> **"General Information** The Fraternal Order of Police, Chicago Lodge 7 (FOP), Police Benevolent & Protective Association (PBPA), Sergeants' Association and PBPA Captains' Association along with the Department have entered into an <u>agreement</u> to pilot compressed work schedules." Section II at 1, D.N. 08-34, Exh. A. (emphasis added).

The purpose of that agreement was to create new work schedules in designated districts and units, identify which members would be eligible for the pilot programs, establish work week hours and the day-off groups for each of the pilot programs and to state payroll guidelines for those participating in the pilot programs.

The pilot programs that were negotiated by the CPD and the police unions provided for 10 hour shifts in Districts 5 and 20, 8.5 hour shifts with Officers working 6 days on and 3 days off in Districts 8 and 13, and 8.5 hours shifts with Officers working 4 days on and 2 days off in Districts 14 and 18. Ten hour shifts were also negotiated for Fifth Watch Rapid Response Officers in Districts 3, 7, 10 and 15 and for the Targeted Response Unit, Area 2 Detective Center and the Juvenile Intervention and Support Center. For each of the work schedules, the agreement provided for the starting times for the work shifts, a one half-hour uncompensated lunch period, the hours of work for the watches, the day-off group rotations to be used by the Officers on the watches, the tactical teams and the gang teams and the furlough alterations as follows:

> Section III (D- 7 day-off groups), (E.) and (F.) – ten hour schedule-Districts 05 and 020;

8

Section IV (E- 9 day-off groups), (F.) and (G.) – 8.5 hour work schedule, six days on and three day off rotations – Districts 008 and 013;

Section V (E- 6 day-off groups, (F.) (G.) – 8.5 hour work schedules, for four days and two days off rotation – Districts 014 and 018;

Section VI (E- 7 day off groups, (F) – 10 hour work schedule – watch rapid response in Districts 003, 007, 010 and 015.

These day-off group rotations are a central element of work life in the CPD, and since the 2008 agreement to create pilot projects, the Lodge and the Department have reached agreements on the work schedules and evaluated the pilot programs on the basis of enumerated factors that included crime statistics, response to calls for service, overtime earned, employee morale, manning or staffing and other factors.

As a result of the evaluations, the pilot work day schedules were continued in selected districts for the ten hour days and 8.5 hour days with a four on, two off rotation and six day off groups. A Memorandum of Understanding is contained in the 2007-12 collective bargaining agreement. Exh. B and Graham Declaration, Para. 6. It provides for the work schedules that are set forth in the Department Notice 08-34 and created the Joint Labor Management Committee that was to meet on a regular basis to discuss the pilot work schedules to determine if they should be continued. Under the terms of this agreement, the Department discontinued the pilot programs in some districts for the ten hour day and the 6-3 8.5 hour day work schedule in Districts 008 and 013. The Department did not suspend the pilot program in the schedule for the four days on and two days off program that is described in Section I(F)(4) of the MOU. Exh. B at 4. That schedule was not changed and in fact was extended to a number of other police districts so that all of the districts with the exception of 005 have the four-two work cycle with six day-off groups. Graham Declaration, Para. 7 and 8. Therefore, that four days on and two days off work

9

schedule along with the six day-off groups continues to this day by way to the agreement and the past practice of the parties. Id.

The Department has recently advised the Lodge of its intention to drastically change Officers' work schedules by reducing the day-off groups from six to three for the four day on and two day off work cycle. This intention is to be implemented without completion of the collective bargaining process and is to be announced in connection with the Department's annual November furlough selections for 2020. Since the end of the pilot program and by agreement of the Department and the police unions, the ten hour day program was maintained in District 5 and the Area 2 Detective Center. The Department should not be allowed to change the all-important day-off group rotations of the Officers in the absence of an agreement between the parties.

The Department's clear break with the parties' agreement and the past practice of negotiating day off groups and maintaining the six day off group is inconsistent with the Seventh Circuit's ruling, followed by this Court, that consent decrees are not to be used to change existing contract practices. People Who Care v. Rockford Board of Education School District No. 205, 961 F.2d 1135, 139 (7th Cir. 1992) ("changing seniority or other contractual rights would make the remedial job easier, but this does not license a court to impose these changes on persons who have done no wrong"). State of Illinois v. City of Chicago, [Doc. 702 at 12]. CPD cannot rely on the unity of command paragraphs of the Consent Decree to unilaterally change the work schedule of the Officers covered by the collective bargaining agreement.

The parties are still in collective bargaining negotiations on all other matters for a new collective bargaining agreement, and the unity of command program should not be implemented until contract negotiations have been completed. As previously argued, unilateral implementation of such matters should not be allowed. Lodge Reply Brief, supra, [Doc. 754 at 12-14].

It is for these reasons that the Lodge requests this Court to extend the implementation time for the point and report and the unity of command pilot programs until the collective bargaining negotiations with the Lodge have been completed. The Lodge accepts the invitation of the Court to meet with the parties on the point and report issue as stated by the Court during a status call on May 31, 2019. <u>Transcript of Proceedings</u>, [Doc. 761].

Respectfully submitted,


Joel A. D'Alba