UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6260 |
| | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**FRATERNAL ORDER OF POLICE REPLY
TO CITY OF CHICAGO'S RESPONSE TO MOTION TO EXTEND the
IMPLEMENTATION DATE of PARAS. 358 to 361 (Unity of Command)**

The Fraternal Order of Police, a non-party, by and through its attorneys files this reply to the City of Chicago's Response in Opposition to the FOP's Motion to Extend the Implementation Date of Paragraphs 358-361 of the Consent Decree.

**The City Has Acknowledged Its Bargaining Obligation and Has Bargained in the Past on Day-Off Group Changes**

Directly contrary to the City's claim that the City "has never bargained over DOGs" [Doc. 784 at 4] is the fact that these same parties negotiated over the work schedules, start times and day-off groups for Chicago Police Officers in the negotiations for the 2007-2012 and the 2012 to 2016 collective bargaining agreements, and in the current round of negotiations representatives of the City agreed that it had an obligation to bargain over these issues, and did bargain. Before the court are the sections of these two contracts which are identified as Memoranda of Agreement in which the City and the Lodge agreed to implement work schedules as pilot programs for calendar years 2009 and 2010. [Doc.773-5 and 773-6]. The parties agreed in 2008 to create a four day-on and two day-off schedule that had six day-off groups, a reduction

1

from the prior number of 7, and to implement it on a trial or pilot basis in Districts 14 and 18. Graham Declaration at 4. One year later, the same schedule was extended by agreement of the parties to a number of other police districts. Id. To achieve these very significant work schedule changes, the work days, shift or watch starting times, the number of hours to be worked and the day-off groups were discussed and negotiated between the parties. The agreement was first published in the Department Notice D.N. 08-34 on October 20, 2008. The City's Response does not even mention or otherwise recognize this important agreement or its publication in the Department Notice. [Doc. 784, 4-7]; Dougherty Declaration, at 3 .

How the parties reached these agreements that constituted the first major change in work schedules for Chicago Police Officers in about fifty years is detailed in three separate declarations submitted with this reply brief. Graham Declaration, Exh 1, Douherty Declaration, Exh. 2, Hoffmann Declaration, Exh.3. Retired Police Officer William C. Dougherty has stated that he was a Co-Chair of the Lodge's Work Schedule Subcommittee in the 2008 and 2009 rounds of negotiations on this subject. The Lodge was primarily interested in eliminating the six consecutive work day that had been used in the Department for about fifty years, according to Kevin Graham, who served as a Co-Chair on the work schedule committee at that time this proposal was researched and presented to the Department. The Lodge wanted to eliminate the six consecutive work day schedule because it believed that it created morale problems. Graham Declaration at 2. The City agreed, and in those negotiations, the seven day-off group system was reduced to a six day-off group system as part of the four on and two off schedule.

Both Graham and Dougherty stated that the subcommittee met on multiple days between January 17, 2008, and August 19, 2008, and Dougherty was a member of a smaller group, the CORE Group, which met with the Department's representatives in October 2008 and October

2009; it was that committee that reached an agreement with the Department to extend the four on and two off eight and one-half hour schedule to almost all of the other police districts for calendar year 2010. Dougherty Declaration at 2 and 7. The work schedule with six day-off groups is still being used in the Patrol Division since its inception in 2008.

When the work schedule subcommittee met on January 17, 2008, Deputy Supt. Frank Limon a stated that the CPD had been working on the work schedule issues and expected the FOP's presentation on the issues would give insight into the proposals to be discussed. He commended the Lodge representatives on the substantial research that they had done. Dougherty Declaration at 4. In the May 7, 2008, meeting, the Deputy Chief of Patrol, Mike Chasin, noted that in the pilot project for a work schedule in the Detective Division, the day-off groups would have to be changed, and that rotating day-off schedule being proposed would be similar to those on the CHA schedule. Twelfth District Cmd. Ron Sodini noted that "with regular day-off groups we believe we can manage this and that Saturday night crime could be covered." Id. at 4.

Work schedules were presented by the Department at this meeting, and for each of the groups to be discussed there was a designation of day-off groups. Id. at 4-5. The "10 Hour Schedule" Detective Division provided for each detective and sergeant to be assigned to two day-off groups. Id., Exh. A. For the Patrol Division, the Department proposed a forward rotation of days off and a reverse rotation of days off that represented a change in the current schedule "which rotates forward every week and requires an officer to routinely work six (6) days in a row." Id. Exh. B.

A chart labeled Comparison shows that there would be no change in the seven day-off groups for both the current and proposed schedules. The chart also compares the days and the

3

number of hours to be worked on each of the two schedules.. Id. Exh. C. The Lodge ultimately did not accept the proposed schedule on Exhibit C, and the parties agreed to use six day-off groups in the four on an two off schedule under which a large number of districts now operate. Id. at 5.

A chart that shows the thirteen police periods and the seven day-off groups was presented, at a meeting on June 18, 2008. Id. Exh. E.

On July 30, 2008, Don O'Neill, the Director of Management Labor Affairs Section spoke of the need to have Officers in TRU, a patrol unit, "be given days off based on a rotating basis," and that, "It would be better to have fixed day off groups, if it stays as it is now, but if there is an increase in the number of officers, we would need a different system." Id. at 5. He further stated that "we might need to shift to rotating day off groups." Id. at 6.

Mr. Dougherty stated that on August 6, 2009, the City presented proposals for pilot programs to start on January 1, 2009, in several police districts; these proposals stated the hours of work per day, the watch starting times and the number of day-off groups.

> A ten hour schedule was proposed for the rapid response cars in Districts 3, 7, 10 and 15 to start on Jan. 1. 2009, and it stated that the current day off group schedule, groups 1 through 7 would be used with Officers assigned to two consecutive day off groups. Watch starting times were also proposed. Exh. F.
>
> For Officers and Sergeants in Districts 5 and 20, a ten hour day was proposed to start on January 1, 2000, and the Department proposed watch starting times of 2130, 0700 and 1600 and that the current seven day off group schedule be used referring to groups 1 to 7. Exh. G.
>
> For the Detectives and Sergeants in Area 2 Detective Division, the Department proposed a ten hour day with designated start times of 2200, 0800 and 1600, and the system would use the current seven day off group schedule of groups 1 to 7. Exh. H
>
> The Department also proposed a six days on and three days off nine hour schedule for the Police Officers and Sergeants in Districts 8 and 13 with nine day off groups. The day off groups were designated with DOG codes, 91, 92, 93, 94, 95,

96, 97, 98, and 99. The watch starting times were stated in the proposal as 2200, 0700 and 1500. Exh. I.

Later in the month, when the CORE Group met, the Lodge submitted a work schedule counter proposal that would consist of "fixed or consecutive days off" for the ten hour schedule, three rotating days off for employees with the six-three schedule, and two rotating days off for employees with the four-two schedule. Id. at 6, and Exh. J. The CORE Group continued to meet in August and September for the purpose of reaching an agreement to replace the work schedule; both parties agreed was needed. On September 4, 2008, the parties signed the first of two Memoranda of Agreement that included several work schedules one of which was for a four day-on and two-off plan with six day-off groups that constituted a reduction of one day-off from the schedule that had been in effect. Dougherty Declaration at 7 and Exh. K. This schedule along with the others agreed upon in the September 4, 2008, Memorandum of Agreement was to be evaluated and reviewed by a Labor Management Committee, and each of the schedules would remain in effect through the 2009 thirteenth police period and could be continued or stopped. If the parties disagreed on a decision to discontinue one or more of the pilot programs, the Lodge retained the right to contest the decision of the Department in an arbitration proceeding set forth in the Memorandum of Agreement. The arbitrator would have the authority to determine whether the Department was unreasonable in deciding to discontinue a pilot program. MOU, Exh. K at 4-5.

One year later after reviewing the success of the four days-on and two days-off six day-off group schedule, the CORE Group met, and the Department agreed to expand this schedule to many more districts, approximately twenty-one. Mr. Graham stated that the pilot program for four and two achieved the goals of reducing medical use and Complaint Register numbers. against Police Officers. Graham Declaration at 4. This expansion from two districts to twenty-

5

one represented a major change in the operations work schedule of the Department and affected about 90 percent of the Officers in the Department. The agreement also provided for the watch starting times. Dougherty Declaration at 7-8.

To prepare for an explanation to the Police Officers of the new schedule that would take effect in 2010 as an expansion of the piloted programs, the Lodge submitted to the Department charts that explained the four-two schedule, its work week, the six day-off groups, rotation of the cycle, number of hours worked, a sample of the new calendar, watch start times, furloughs, holidays, and personal days. Graham Declaration, Exh. A. These were used in a power point demonstration that was presented to the Officers on the new system and how it would operate. Graham Declaration at 5. The Department reviewed these charts and approved their use in the Power Point demonstrations. Id.

A retired Captain of the Chicago Police Department, Jeff Hoffmann, has stated that he is aware of the negotiations that transpired over the work schedule pilot program and the expansion of the piloted four on and two off six day-off group program from Districts 14 and 18 to a much larger number of districts. As a result of this expansion, the pilot designation was removed, and the six day-on two day-off program was eliminated. Mr. Hoffmann was a Sergeant on the staff of Deputy Chief of Patrol Mike McCotter and worked with him on the work schedules and pilot programs that had been implemented in 2008. In that capacity, he attended a meeting of the FOP representatives, Deputy Chief McCotter and Don O'Neill, the Director of MLAS.

In that meeting, Director O'Neill agreed to expand the four-two eight and one-half hour schedule to a number of other police districts, and he is aware that Director O'Neill negotiated with the FOP the six day-off group schedule and the roll call starting times for the four-two schedule. This meant that there would be a reduction in the day-off groups from seven to six.

These three declarations and the accompanying charts provide the background detail for the Department Notice 08-34 dated October 20, 2008, which clearly states that an agreement had been reached between the Lodge and the Department on the issue of work schedules that included a change in the day-off groups. All three declarants, Graham, Dougherty, and Hoffmann support the Lodge's argument that day-off changes had been the subject of bargaining in the past, and the the parties have continued to use the four-two six day-off group schedule since its inception in 2008 for use in 2009 and expansion in 2010.

Following the parties bargaining history on reducing day-off groups, the Lodge in the current round of negotiations, which started on July 17, 2017, requested to bargain about the Department's desire to reduce the number of day-off groups from six to three. The Lodge first learned of the Department's intent in July 2019, when a senior command officer acknowledged that the Lodge should be part of the discussion on the issue of Unity of Command. In a negotiations meeting on August 19, 2019, the Department's Director of MLAS stated that, "We acknowledge we have to bargain over this [the Unity of Command and Span of Control issues.]" Graham Declaration, at 6. Both MLAS Director Ms. Wynter Jackson and counsel for the City stated that they wanted the Lodge to be part of the process, meaning the development of the pilot program for these two issues. Id. Ms. Jackson stated that the Department did not want to do this project in a confrontational way, and "We are willing to talk about this and you can call it negotiations." This statement made in the negotiations is obviously contrary to the claim made by City that it "has never taken the position that the City has an obligation to bargain over a change in the number of DOGs...." Response, [Doc. 784 at 5.].

From this evidence, the Lodge asserts that the City agreed in the past and the present to bargain over this issue. Therefore, the court should extend the time for implementation in order

for the parties to complete bargaining and allow them to engage in a collaborative approach to achieve a successful implementation. This evidence of prior negotiations which had been requested by the Department was presented in negotiations and is a major part of the exhibits that are attached to the Dougherty Declaration.

The City relies on an arbitration award to assert its right to change the piloted work schedule. The arbitrator denied a grievance filed by the Lodge to contest the Department's having discontinued a ten hour schedule that had been implemented as a pilot program under the MOU dated November 16, 2009, and discussed above as part of the expansion of four on and two off six day-off group schedule. Dougherty Declaration, Exh. L at 5-7. Under that agreement, the discontinuation of a pilot work schedule could be rejected by an arbitrator's finding that the decision of the Department was unreasonable, and that is what the arbitrator did in City of Chicago, Work Scheduling Grievance, (Perkovich, Arb.) (2010) [Doc. 784-1 at 50-1]. The management rights claims of the City in changing the day-off groups are not issues that were before Arbitrator Perkovich because the Lodge had already agreed that the Department had a right to modify, expand, continue or discontinue the pilot work programs based upon the agreements in the MOU. Dougherty Declaration, Exh. L at 6.

**There is no Waiver by the Lodge of Bargaining Over the Day-Off Groups**

The City may not use the Consent Decree as a crutch on which it can avoid the bargaining obligations under Para. 711 because the Consent Decree does require collective bargaining, and the case law does not allow a Consent Decree to be used in this manner. People Who Care v. Rockford Board of Education School District No. 205, 961 F.2d 1335, 1337-38 (7th Cir. 1992). A perceived need to reduce the number of day-off groups is not a legitimate or reasonable basis to negate bargaining obligations, and the collective bargaining agreement does

not grant a right to make this change. There has been no waiver of the requirement to bargain about this issue.

The City does not have the management prerogative to set the number of day-off groups because there has been no "clear and unmistakable language" waiver to the collective bargaining agreement providing that the parties are waiving any right to bargain over a specific issue, including the day-off groups. *Chicago Park District v. ILRB,* 354 Ill.App.3d 595, 607 (1st Dist. 2004) (no language in the management rights clause showing the parties' intention to waive the right to bargain over a reduction in employee hours). The Park District had argued that its contract provision gave it the right to lay off or relieve employees for lack of funds, but there was no contract language that allowed for the reduction in hours. Similarly, in *Forest Preserve District of Cook County v. ILRB*, 369 Ill. App.3d 733, 755 (1st Dist. 2006), the court noted that the District's management rights clause did not mention layoffs or reductions in force, and, therefore, there was no waiver of the right to bargain over the layoff of employees. *See Id.* at 754 ("The language sustaining the waiver must be specific and waiver is never presumed.").

It is not enough to have a broad management rights clause and related zipper clause as suggested by the City in support of its waiver argument because the case law requires a specific reference to the management right that is sought to be exercised. In *Graymont PA, Inc.,* 364 NLRB No. 37, slip op. at 3 (2016), the National Labor Relations Board rejected an employer's claims that the management rights clause in the collective bargaining agreement allowed it to change work rules, the absenteeism policy, and create a progressive discipline schedule. None of the management rights provisions in the CBA specifically referenced these issues or subjects, and there was no evidence that the parties at the bargaining table ever discussed or consciously explored at the bargaining table a right for the employer to implement such changes without

9

bargaining with the union. This holding follows the teaching of *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983), that "we will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'" *Id.* at 708. The general, broad language of the FOP–City CBA does not contain the kind of explicit waiver needed to support the City's claim in this case.

In *Graymont*, the Board noted that the "clear and unmistakable" waiver standard "requires bargaining partners to unequivocally and specifically express their mutual intention to permit unilateral employer action with respect to a particular employment term, notwithstanding the statutory duty to bargain that would otherwise apply," and this language must be "sufficiently specific." 364 NLRB No. 37, slip op. at 3 (citations omitted). *See also NLRB v. C & C Plywood*, 385 U.S. 421 (1967) (endorsing this standard). Further, while "[w]aiver of a statutory right may be evidenced by bargaining history, the Board requires the matter at issue to have been fully discussed and consciously explored during negotiations and the union to have consciously yielded or clearly and unmistakably waived its interest in the matter." *Graymont*, 364 NLRB No. 37, slip op. at 3. In *Graymont*, the right to discipline as stated in the management rights clause did not create a right for the employer to unilaterally make discipline rules. The ALJ noted that the semi-colons in the management rights clause separate the right to make rules and the general rights to discipline, thereby creating separate enumerated management rights. Therefore, the ALJ rejected the argument that the rule making authority gave the employer a right to determine a progressive discipline schedule. *Id.* at 26.

The management rights section in the Lodge's contract with the City has a series of clauses separated by semi-colons, but none states a separate right to establish day-off groups, and the right to add or alter policies stands alone and does not refer to the requirement at issue in this

case. (Exh. E at 2-3). The broad statement of a right to set a work schedule does not include a right to unilaterally set the day-off groups. Most relevant to this matter is that Lodge witnesses have demonstrated that bargaining has occurred over this issue. Article 4 (H) of the collective bargaining agreement states a management right "to establish work schedules and to determine the starting and quitting time and the number of hours to be worked. [Doc. 784-1 at 30]. The language does not state a right to change the day-off groups. If the parties had wanted to create such a right, they could have done so by adding language of a specific nature, as they did for "starting and quitting times."

The waiver argument asserted by the City has been directly rejected in a case involving the City and the Lodge over the unilateral implementation of a discipline schedule, not unlike the one rejected by the NLRB in *Graymont*. The ALJ held that nothing in the Article 4 Management Rights clause specifies that the City may unilaterally change its penalty selection process, establish new penalties and penalty ranges, change its approach to progressive discipline, escalate penalties for certain violations, or limit consideration of mitigating factors for some violations. *Fraternal Order of Police and City of Chicago,* slip op. at 36-6, ALJ-RDO, Case No. L-CA-17-034 (2017). The ALJ also held that the general-worded zipper clause does not waive the Lodge's right to bargain over the disciplinary changes implemented by the City. The ALJ also found that there was no evidence that the parties fully discussed or consciously explored the City's asserted right to make such changes during the term of the collective bargaining agreement. *Id.*, slip op. at 37. *See also Fraternal Order of Police, Lodge #7, and City of Chicago*, Case No. L-CA-17-037, ALJ-RDO, slip op. at 25-27 (2018) (finding no waiver, either in contract language or based on purported waiver by inaction, of the right to bargain over the effects of an expansion of the City's body-worn camera pilot program); *Fraternal Order of Police, Lodge 7,*

11

*and City of Chicago (Department of Police)*, 21 PERI ¶ 83 (ILRB-LP 2005) (the Lodge and the City's management rights clause, paired with broad contract language about subcontracting, did not constitute clear and unmistakable waiver of right to bargain over decision to subcontract).

As of this filing, the parties have not reached agreement on this issue, and as of the last meeting, the Lodge advised that there are still issues to be discussed. The prime concern of the Lodge is that the Department is rushing to comply with the January 1, 2020, implementation date without having completed the bargaining process and is not complying with the bargaining requirements that are stated in Para. 711 of the Consent Decree. For this reason, the date should be extended.

**Labor Board Cannot Hear Consent Decree Matters**

The Labor Board under the doctrine of exclusive jurisdiction may hear unfair labor practice claims but may not hear breach of the Consent Decree claims because it has no jurisdiction to do so and that is a matter for the Court to decide. Therefore, under Carver v. Nall, 172 F.3d 513, 515-16 (7th Cir. 1999), the Lodge, like the employees in that case, can seek relief in the federal court and the Labor Board. In Carver, the employees had both Labor Board and federal civil rights claims and were not required by the Seventh Circuit under claims preclusion to file in one forum one or the other. "On the one hand, the ISLRB has exclusive jurisdiction to hear unfair labor practice grievances of Illinois state employees. See Stahulak v. City of Chicago, 291 Ill.App.3d 824, 225 Ill.Dec.916, 684 N.E. 2d 907, 911 (1997); Foley v. AFSCME Council 31, Local 2258, 199 Ill.App.3d 6, 144 Ill. Dec. 903, 556 N.E.2d 581, 583-84 (1990). On the other hand, the ISLRB is not empowered to hear a civil rights claim. Thus, because the federal court could not hear the unfair labor practice grievance and the state tribunal could not hear the civil rights claim, Carver and Kientzle were forced to split their claims as they did. Claim preclusion

does not operate so harshly as to bar whichever set of claims the chosen forum could not hear." 172 F.3d at 516. Because the Lodge cannot bring Consent Decree claims to the Illinois Labor Relations Board, the Board's exclusive jurisdiction under the IPLRA does not block the motion filed by the Lodge to delay the implementation of the point and report rule.

## CONCLUSION

For the foregoing reasons, the Lodge requests that the court extend the time for the implementation of the Unity of Command and Span of Control provisions in pilot District 6.

Respectfully submitted,

Joel A. D'Alba

Of counsel:
Asher, Gittler and D'Alba
St. 720
200 W. Jackson Blvd.
Chicago, Illinois 60606
(312) 263- 1500