## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

### Independent Monitoring Report 1

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Independent Monitoring Report 1.

Dated November 15, 2019

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on November 15, 2019, she caused a true and correct copy of the foregoing Independent Monitoring Report 1 to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey          

Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

# INDEPENDENT MONITORING REPORT 1

*Reporting Period March 1, 2019, through August 31, 2019*

Report Date: November 15, 2019

# Monitoring under the Consent Decree

In August 2017, the Office of the Illinois Attorney General sued the City of Chicago in federal court regarding civil rights abuses by the Chicago Police Department, which led to a consent decree, effective March 1, 2019.[1] On March 1, 2019, the effective date of the consent decree, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the consent decree's requirements.

The overall purpose of the consent decree, as provided by ¶2, has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[2]

---

[1]   For more information on the consent decree, see the Background section below. More information is also available on the Independent Monitoring Team's website at https://cpdmonitoringteam.com/) and on the Illinois Attorney General Office's consent-decree website (http://chicagopoliceconsentdecree.org/about/).

[2]   We cite to relevant paragraphs of the consent decree throughout this Independent Monitoring Report. The consent decree is available on the Office of the Illinois Attorney General's consent-decree website. *See Resources*, Chicago Police Consent Decree ("Consent Decree Approved by the Court on January 31, 2019"), http://chicagopoliceconsentdecree.org/resources/ (last visited September 30, 2019).

**Table of Contents**

Executive Summary ............................................................... 1

Roadmap ............................................................................... 5

Introduction ......................................................................... 6

Compliance Activities and Assessments ............................ 14

    I. Community Policing ................................................... 36

    II. Impartial Policing .................................................... 48

    III. Crisis Intervention ................................................ 52

    IV. Use of Force .......................................................... 56

    V. Recruitment, Hiring & Promotions ......................... 86

    VI. Training ................................................................. 88

    VII. Supervision ........................................................ 96

    VIII. Officer Wellness and Support .............................. 99

    IX. Accountability and Transparency ......................... 103

    X. Data Collection, Analysis & Management ............. 139

Conclusion and Looking Ahead to
Independent Monitoring Report 2 .................................. 142

Attachment A.
Office of the Illinois Attorney General Comments ........... 143

Attachment B.
City of Chicago Comments .............................................. 152

\*\*\*

Readers of the electronic pdf can click sections above to jump to the corresponding sections of the report.

# Executive Summary

Our role as the Independent Monitoring Team (IMT) is to assess the City of Chicago's (the City's) compliance with the requirements of the consent decree. Specifically, we assess how all the relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the consent decree.[3] In May 2019, we publicly filed the Monitoring Plan for Year One, which outlined the projected monitoring efforts under the consent decree for Year One (March 1, 2019, through February 29, 2020).[4]

In this report, we discuss our monitoring efforts during the first reporting period, from March 1, 2019, through August 31, 2019. The report therefore includes, among other things required by the consent decree, a compliance or status assessment for each paragraph we identified for this reporting period in our Monitoring Plan, a summary of the principal challenges facing the City's ability to come into compliance with the consent decree, and an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the Independent Monitoring Team (¶661). The consent decree generally prevents us from making any public statements or issue findings regarding any non-public information or materials. The semiannual reports—of which this is the first—give us the opportunity to update the public about the City's compliance efforts. Because the consent decree will be in effect for a minimum of five years, this is the first of at least 10 Independent Monitoring Reports.[5]

We also note that the consent decree is a complex document, which resulted from long and substantive negotiations between the City and the OAG. Throughout the reporting period, and in this report, we have tried to ensure that we address the nuances of that agreement accurately and fairly.

The consent decree itself contains some tensions. For example, there is—and likely will continue to be—a tension between the City's need to make compliance efforts

---

[3] As a party to the consent decree, the City is ultimately responsible for compliance. Unless otherwise specified, our references to the City frequently include its relevant entities.

[4] The IMT's Monitoring Plan for Year One is publicly available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/.

[5] We provided a draft of this report to the City and the OAG on September 30, 2019, as required by ¶¶661–665. Per ¶663, the OAG and the City provided written responses, which are attached to this report as Attachment A and Attachment B, respectively. We have considered those comments and made appropriate changes to this report (¶663). Where necessary, we have included clarifying comments in the footnotes of this report. (Note that this report has different page numbers than the draft report referenced by the Parties).

quickly and the need to ensure that its efforts are effective and sustainable. Because the consent decree prioritizes both, so does the IMT. We recognize that if the City rushes to meet a deadline by creating a policy without, for example, the requisite community involvement, then that may have the unintended effect of delaying the date the City reaches full compliance if the City must re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report. For this reason, we request that readers read this report in full and do not take sections of the report out of context.

We know that many readers will be most interested in learning where the IMT has found the City, the Chicago Police Department (CPD), and the other relevant entities to be in compliance or out of compliance with the consent decree. We therefore clarify what our compliance assessments mean and what they do not mean.

First, this report represents a snapshot of the City's compliance efforts from March 1, 2019, through August 31, 2019. It does not reflect all the efforts from City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined six-month reporting periods (¶661), we stress that the City's, its relevant entities', the OAG's, and the IMT's work is ongoing. In many cases, relevant City entities have continued to develop policies and train personnel after August 31, 2019, and before the date of this report. We have not assessed those efforts in this report, but will do so in the next monitoring report for the second reporting period (September 1, 2019, through February 29, 2020).

Second, we assess compliance in three levels: (1) Preliminary, (2) Secondary, and (3) Full. These compliance levels allow us to share our assessments of the City's progress throughout the life of the consent decree with the City, its relevant entities, the OAG, and the public. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the reform is known to relevant personnel, and (3) whether the City or relevant entity has appropriately implemented the reform.

Third, because of the nuances of each specific requirement and level of compliance, the City and its relevant entities must provide the IMT with records and data—at appropriate times—to establish each level of compliance during the applicable reporting period.

This compliance point is critical. Under the consent decree, the City is not technically in compliance with any of the requirements of the consent decree until the

IMT is satisfied that the City provided sufficient proof to the IMT that the City, the CPD, or its other relevant entities are in compliance. Even if the City has made significant efforts toward complying with a requirement—which in many cases it has—the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its efforts. *This means that on the first day of the consent decree, March 1, 2019, the City and the CPD were not in compliance with any of the 577 paragraphs of the consent decree that contain requirements, because the IMT was only selected on that day.*

Thus, on March 1, 2019, the City had not achieved any level of compliance with the 67 paragraphs that have requirements in the first reporting period, as reflected in Figure 1 below.[6]

**Figure 1:** Compliance Status at the Start of the Reporting Period (March 1, 2019)
Consent Decree Paragraphs with Requirements in the Reporting Period: 67



By the end of this reporting period, August 31, 2019, we found that the City had achieved at least Preliminary compliance with 15 paragraphs, as reflected in Figure 2 below. This means that the City is not in compliance yet with the remaining 52 paragraphs—regardless of any compliance efforts that the City, the CPD, and the other relevant entities may have taken and not yet demonstrated to the IMT.

**Figure 2:** Compliance Status at the End of the Reporting Period (August 31, 2019)
Consent Decree Paragraphs with Requirements in the Reporting Period: 67



Some paragraphs in the consent decree demand more than others. The number of requirements—and the amount of work required under each requirement—can vary drastically within each paragraph, topic area, and reporting period. Moreover, some of the paragraphs in the first reporting period also include requirements that do not apply until later reporting periods. As a result, we have not assessed or not finished assessing some of the requirements in the paragraphs in the first reporting period.

Nonetheless, the City and the OAG agreed to specific deadlines to ensure that the City was making significant efforts to comply with the consent decree in a timely manner. At the end of each reporting period, the corresponding Independent Monitoring Report will reflect whether the City is hitting the benchmarks it agreed

---

[6]     In this report we address 70 paragraphs. The requirements in three of the paragraphs (¶¶169, 425, and 563) are not applicable for compliance assessment in the first reporting period.

to meet. As reflected in Figure 3 below, at the end of this reporting period, the IMT found that the City met 12 of the 50 agreed-upon deadlines. While the City missed 38 deadlines, the City met 4 of the underlying requirements before the end of the reporting period.

Figure 3:        Total Consent Decree Paragraphs with Deadlines in this Reporting Period: 50



In our next semiannual independent monitoring report, we will continue to assess and report on the paragraphs in this report, as well as assess and report on more than 60 additional paragraphs, as described in our Monitoring Plan for Year One.

---

\*  We have placed asterisks on four of the 13 deadlines that the City met, because either the deadlines fell just after the reporting period or the City did not provide sufficient proof that it met the deadline until after the reporting period. Specifically, we included ¶¶39 and 44 in the report because the deadline was just outside of the reporting period and depended on the first day of school for Chicago Public Schools (September 3, 2019). Likewise, for ¶¶323 and 538, the City did not provide sufficient proof that it met the deadline—which it did—until after the reporting period. Because the IMT believes this was a genuine misunderstanding regarding what evidence the City needed to provide to prove compliance, we have included these deadlines as met in this report. The City, the CPD, the other relevant entities, the OAG, and the IMT are actively working to clarify the requisite levels of evidence for the next reporting period. *See generally* The City of Chicago's Achievements and Challenges section, below.

# Roadmap

We wrote this report to be as accessible and readable as possible. We realize that this report is long, but the compliance efforts in the first reporting period require significant attention. As the monitoring efforts continue to move forward and address more requirements, the monitoring reports will also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with an **Introduction** section that provides background about the consent decree and the IMT. This section also addresses frequently asked questions, including questions that the IMT received from community members during the first reporting period, and the IMT's corresponding answers. This section is helpful for those who have not read or would like to reacquaint themselves with the background information from our Monitoring Plan.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the first reporting period:

❖ An overview of the IMT's assessment process and priorities for the first reporting period, including deadlines and foundational paragraphs;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the consent decree, a summary of relevant compliance efforts, a more specific analysis for each consent-decree paragraph with a deadline before September 2019, and if applicable, a summary of efforts regarding the corresponding foundational paragraphs that do not have specific deadlines.

Finally, the last section, **Conclusion and Looking Ahead to Independent Monitoring Report 2**, provides concluding remarks and a projection of the upcoming work by the IMT, the OAG, the City, the CPD, and the City's other relevant entities in the second reporting period.

# Introduction

This is the Independent Monitoring Team's first semiannual Independent Monitoring Report.[7] The report provides the IMT's monitoring activities and findings from the first reporting period—from March 1, 2019, through August 31, 2019. In May 2019, the IMT outlined its efforts in its public Monitoring Plan for Year One.[8]

Specifically, consistent with the consent decree and throughout the sections of this this report, we address the following:

❖ The IMT's efforts during the reporting period;

❖ A description of each consent-decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the principal challenges facing the City's ability to achieve complete compliance with the consent decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (September 1, 2019, through February 29, 2020).

This is the first monitoring report of many. Per ¶661 of the consent decree, the IMT will continue to issue semiannual reports until the consent decree ends.

## Background: The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive

---

[7] We provided a draft of this report to the Parties to the consent decree on September 30, 2019, as required by ¶¶661–65. Per ¶663, the OAG and the City provided written responses, which are attached to this report as Attachment A and Attachment B, respectively. We have considered those comments and made appropriate changes to this report (¶663).

[8] The IMT's Monitoring Plan for Year One is publicly available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. We also note that the City filed their first semiannual status report (¶680) with the Court on September 3, 2019. *See The City of Chicago's Semiannual Status Report* (September 3, 2019).

"pattern or practice" of civil rights abuses by the CPD.[9] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago.*[10]

In August 2017, the OAG sued the City in federal court, seeking a consent decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the consent decree with the City.

In March 2018, the Parties to the consent decree (the OAG and the City) also entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the consent decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[11]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft consent decree on the Chicago Police Consent Decree website.[12] Judge Dow approved and signed a modified version of the consent decree on January 31, 2019. The consent decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the consent decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner in the Schiff Hardin law firm, as the Independent Monitor. Ms. Hickey, as the Independent Monitor, reports directly to Judge Dow.[13]

---

[9]    DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolicensentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPTREPORT.pdf.

[10]   *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[11]   *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopolicensentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[12]   More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopolicensentdecree.org/independent-monitor/. Other resources, such as consent decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopolicensentdecree.org/resources/.

[13]   Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopolicensentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

## The Independent Monitoring Team

As the IMT, we both monitor the City's and the CPD's progress in meeting the consent decree's requirements and support the City and the CPD in implementing the changes that the consent decree requires.

Monitor Maggie Hickey and Deputy Monitors Chief Rodney Monroe, Ret., and Dr. James "Chip" Coldren, Jr. lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the consent decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with all sectors of the Chicago community, by providing general administrative support, and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Figure 4, the next page, and our team structure is in Figure 5, on the following page.[14]

For reference, after these charts, we list the most frequently asked questioned we receive from the community and provide our corresponding answers.

---

[14] On March 1, 2019, Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." *About*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. Both Ms. Hickey, as the Independent Monitor, and Judge Coar, as the special master, report directly to Judge Dow.

Figure 4. Organizational Chart



## Figure 5. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |
| Deputy Monitor | | James R. "Chip" Coldren |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Dennis Rosenbaum |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Recruitment, Hiring, and Promotion | | Theron Bowman |
| Training | | Theron Bowman |
| Supervision | | Kathleen O'Toole |
| Officer Wellness and Support | | Kathleen O'Toole |
| Accountability and Transparency | | Harold Medlock |
| Data Collection, Analysis and Management | | Scott Decker |

| Community Engagement Team | | |
|---|---|---|
| Subject Matter Expert, Analyst, and Support Staff | | Tom Christoff |
| Member | | Joe Hoereth |
| Subject Matter Expert | | Meghan Maury |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (also Associate Monitor for Community Policing) | | Stephen Rickman |
| Member | | Sodiqa Williams |
| Community Surveys | | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Attorney | | Derek Barella |
| Attorney | | Kirstie Brenson |
| Officer Wellness and Support | | Brandi Burque |
| Crisis Intervention and Data Collection, Analysis, and Management | | Tom Christoff |
| Attorney | | Meredith DeCarlo |
| Use of Force and Data Collection, Analysis, and Management | | Terry Gainer |
| Attorney | | Ariel Hairston |
| Community Policing and Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Accountability and Transparency | | Laura McElroy |
| Use of Force | | Denise Rodriguez |
| Community Policing | | Hildy Saizow |
| Attorney | | Anthony-Ray Sepulveda |
| Supervision and Recruitment, Hiring, and Promotion | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Solomon and Decker | | Tom Christoff |
| Project Manager, Analyst for Evans | | Vivian Elliot |
| Analyst for Rickman and O'Toole | | Tammy Felix |
| Deputy Project Manager, Analyst for Bowman | | Keri Richardson |
| Analyst for Rosenbaum and Medlock | | Christopher Sun |

# Frequently Asked Questions from the Community

Throughout the first reporting period, the IMT received many questions from the community. We list the most frequently asked questions and our corresponding answers below.

## What is a consent decree?

A consent decree is a court-approved settlement that resolves a legal dispute between parties. This consent decree requires the CPD and the City to reform training, policies, and practices in many important areas, such as use of force, community policing, impartial policing, training, accountability, officer wellness, and data and information systems. The goal is to ensure that the CPD performs constitutional and effective policing that keeps both community members and officers safe and restores the community's trust in the CPD (¶2).[15] Federal judge Robert M. Dow, Jr. was appointed to oversee the consent decree. He chose the Independent Monitor and oversees the work of the Independent Monitoring Team. The Independent Monitoring Team will assess the CPD's and the City's compliance with the consent decree. The consent decree will be in effect for at least five years so that the CPD can develop, implement, and sustain the training, policies, and practices that the consent decree requires.[16]

## Why is Chicago under a consent decree?

In August 2017, the Office of the Attorney General for the State of Illinois (OAG) sued the City, alleging that the CPD had violated the U.S. Constitution, the Illinois Constitution, and federal and state laws. The OAG's complaint pointed to reviews of the CPD's policing practices over the last fifty years, including a 2017 report by the U.S. Department of Justice (DOJ). According to the DOJ report, the CPD engaged in a repeated pattern and practice of using excessive force and racially discriminatory policing practices.[17] The City did not accept the OAG's allegations but agreed to enter a consent decree with the OAG.

---

[15] The final consent decree is available on the Chicago Police Consent Decree Website. *See Consent Decree* (January 31, 2019), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf.

[16] To learn more about the consent decree, visit the Office of the Attorney General's consent decree website: http://chicagopoliceconsentdecree.org/.

[17] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

## Who is on the IMT?

We have assembled a team of recognized leaders and innovators in police reform from across the country. They have experience as police chiefs, academic scholars, and attorneys and have a wide range of expertise that covers every aspect of the consent decree from use of force and impartial policing to the training and supervision of police officers. We also have a Community Engagement Team that organizes meetings and serves as the outreach arm. Members of the Community Engagement Team meet with residents, stakeholders, and activists to ensure that the community has a voice in this process.

## What is the IMT doing?

The Independent Monitoring Team observes and assesses how the CPD is making progress and complying with the consent decree's requirements. Throughout the process, the IMT collects and analyzes data to measure the City's and the CPD's progress. The Independent Monitoring Team's Community Engagement Team also gathers community input and feedback about the CPD's and the City's progress from a broad range of people and organizations. The Independent Monitoring Team will also develop and release public reports on its monitoring activities, such as this report. We will make all reports available on the Reports section of our website (https://cpdmonitoringteam.com/).

## How can I get involved?

The Community Engagement Team works hard to connect with neighborhoods, community groups, religious organizations, activists, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

Community members can provide input on CPD policy. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/.

Community members can also do the following:

❖ Attend any of our public meetings listed on our website;
❖ Complete an input form on our website; and
❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## How can I contact the IMT?

Community members can reach out to the entire IMT via email (contact@cpdmonitoringteam.com) and also contact individual members of our Community Engagement Team:

❖ Sodiqa Williams (Sodiqa.Williams@cpdmonitoringteam.com),

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Elena Quintana (Elena.Quitana@cpdmonitoringteam.com).

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# Compliance Activities and Assessments

This section provides an overview of our compliance efforts for the first reporting period. We begin this section by re-emphasizing the priorities for the first reporting period from our Monitoring Plan for Year One. We include an overview of the assessment process, the deadlines within the first reporting period, and the foundational paragraphs. We then provide summaries for the period, including summaries of our activities and the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the consent decree, provide a more specific analysis for each consent-decree paragraph with a deadline before September 2019, and if applicable, summarize efforts regarding foundational paragraphs that do not have specific deadlines.

## Assessing Compliance

Overall, in accordance with ¶¶642, 661, and 662, the IMT assesses how the CPD and other City entities comply with each paragraph of the consent decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance.** The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the consent decree—either one or two years (¶714). We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** refers principally to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers in the performance of the tasks outlined in the consent decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the consent decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** refers principally to the development and implementation of acceptable and professional training strategies (¶642) that convey the changes in policies and procedures that were established in our determination of Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement

policies and procedures as written (¶730). The IMT will assess documentation—including reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, understood by, and important to line, supervisory, and managerial levels of the City and the CPD. The IMT will assess the existence of training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the consent decree.

❖ **Full compliance** refers to adherence to policies within day-to-day operations (¶642). Full compliance requires that personnel, sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine business of the entity. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are becoming institutionalized. In addition, all levels of the chain of command must ensure consistent and transparent compliance.

The above-defined levels of compliance guide the IMT in its review of all paragraphs in the consent decree. The IMT understands, however, that the three compliance levels apply differently to various paragraphs. For example, a paragraph that requires a certain type of training does not necessarily require a policy component. In these instances, Preliminary compliance may refer to efforts to establish the requisite training, rather than a policy. To reach and sustain Full compliance, however, the City may need to create a policy to ensure training is provided consistently, as appropriate.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the first reporting period. Under the consent decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they are in compliance. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

## First Reporting Period Priorities

We set out our priorities for the first reporting period in our Monitoring Plan for Year One.[18] Specifically, we prioritized (1) the paragraphs in the consent decree with a deadline before September 1, 2019, and (2) foundational requirements agreed to by the Parties to the consent decree (the City and the OAG) and the IMT, regardless of whether the consent decree established a deadline for these paragraphs. Most of the paragraphs in these two categories contain requirements for the CPD. All deadlines are based on the consent decree. The City and the OAG agreed to these deadlines. The IMT did not create deadlines for the first reporting period, or any other reporting period.[19]

These two categories of priorities, however, do not fully describe all our efforts in the first reporting period. While we monitored the compliance efforts that corresponded with the paragraphs above, some paragraph deadlines fall after the first reporting period but still require the City and its entities to take steps during the first reporting period.[20] Likewise, some of our efforts are ongoing—regardless of deadlines—but are too premature to report here. The IMT has, for example, monitored the City's efforts "to secure modifications" consistent with the consent decree during negotiations of relevant collective bargaining agreements (¶711).[21]

---

[18]  The IMT's Monitoring Plan for Year One is publicly available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[19]  In the City's written comments, the City notes that some of the deadlines in this report were not in the consent decree and were created in the Monitoring Plan, citing ¶¶222–35 and 569. *See* Attachment B at 1. The Monitoring Plan, however, is based on the consent decree. In fact, the IMT did not, and cannot, "unilaterally modify the terms" of the consent decree (¶659). Some context on the development of the Monitoring Plan is helpful (¶652–55). During the development of the Monitoring Plan, the City and the OAG disagreed about the interpretation of a series of paragraphs—with the OAG asserting that many paragraphs had a deadline of the effective date of the consent decree (March 1, 2019). Through further discussions and negotiations, the IMT and the Parties agreed to exclude some of these paragraphs in the Monitoring Plan but to include others, such as ¶¶222–35 and 569 based on the OAG's interpretation. The City may continue to disagree with the OAG's interpretation of the consent decree, but just as the City agreed to the paragraphs and deadlines in the consent decree, the City agreed to the paragraphs and deadlines in the Monitoring Plan.

[20]  *See, e.g.*, ¶¶107–10 (Crisis Intervention Team Officer Implementation Plan); ¶¶320(c) and 323(c) (in-service training ramp up to 32 hours by the end of 2020); ¶¶365–66, 368 (staffing model to address span of control and unity of command); and ¶¶438–39 and 583–605 (development of a case management system and an Early Intervention System).

[21]  Consistent with ¶711, the IMT will seek to engage with the City's collective bargaining teams in a manner that does not compromise the collective bargaining process or any party's rights in that process.

Thus, the IMT and the Parties have been involved with compliance and monitoring efforts beyond those described in this report.

## Consent Decree Deadlines before September 2019

The consent decree became effective on March 1, 2019. The Parties negotiated and the Court approved the deadlines in the consent decree. Compliance with those deadlines is important so that the public can begin to see progress in critical areas of the City's and the CPD's operations. Many of the deadlines in the consent decree are interrelated and designed to facilitate reform holistically. Several of the consent decree's paragraphs also contain deadlines for the IMT.

Specifically, more than 100 of the consent decree's almost 800 paragraphs contain specific deadlines for the City and the CPD in Year One, including over 50 paragraphs with requirements within the first reporting period. Technically, the reporting period spans from March 1, 2019, through August 31, 2019, but it also includes deadlines that ended before the consent decree went into effect (between January 1, 2019, and March 1, 2019). For this reason, the first reporting period is longer than our future reporting periods will be.

To be clear, what the City is required to achieve by certain deadlines vary by paragraph. For example, some paragraphs require the creation of a policy, others require training, and others require another specific action. As explained in the previous section, we assessed and will continue to assess each paragraph and corresponding deadline under the Preliminary, Secondary, and Full compliance levels (¶¶661, 662, and 642).

## Foundational Paragraphs without Deadlines

Many paragraphs in the consent decree do not contain deadlines, but after consulting with the Parties, the IMT has begun to assess some paragraphs without deadlines in the first reporting period. These paragraphs involve foundational policy and practice requirements that are fundamental to the success of the consent decree. The IMT is already in the process of assessing compliance with many of these paragraphs to the extent that these requirements overlap with the specific deadlines above. For many other paragraphs, the City and the CPD have made corresponding policy, training, and operational changes within the last few years that warrant the IMT's attention.

While foundational paragraphs for Year One are spread across the consent decree, they are particularly evident in two sections: (1) Use of Force and (2) Accountability and Transparency. First, the Use of Force section requires the CPD and relevant City entities to develop policies and practices and provide appropriate training regarding de-escalation, anti-retaliation, the reasonableness of force, deadly force,

fleeing subjects, vehicle operation, requests for medical aid, intervention against excessive force, chokeholds, and weapons policies. Since the City has already adopted policies regarding many of these subjects, we began our assessment in those areas.

Second, the Accountability and Transparency section requires that, for example, the City make "best efforts" to comply with areas of the consent decree that are not directly under the control of the City or the CPD. Like the requirements in the Use of Force section, the Accountability and Transparency section requires the CPD and relevant City entities to develop policies, training and practices regarding complaints and corresponding investigations, record keeping, notifications, referrals, reports, and policy reforms. Since the City has also adopted policies regarding many of these areas, we began our assessment in those areas.

## The IMT's Activities during the Reporting Period

While most of this report addresses the City's efforts to meet the consent decree's requirements, the following subsection details the IMT's activities since our appointment on March 1, 2019, to the end of the reporting period, August 31, 2019. We summarize many of our efforts in **Figure 6** below.

Figure 6: IMT Activities (March 1, 2019, through August 31, 2019)



6,600+ Independent Monitoring Team Hours Worked

7 Independent Monitoring Team Formal Site Visits to Chicago

195+ Meetings with Chicago Police Department, COPA, OIG, Police Board, or OEMC

77 Hours of CPD and COPA Training Observed

35 Biweekly Conference Calls by Consent Decree Topic Area

7,600+ Pages of Documents Reviewed

7 Meetings with Superintendent Eddie Johnson

To start, we completed the **Prepare for Monitoring** phase, as set out in our initial proposal.[22] We convened our team for an initial meeting, orientation, and training on March 21–22, 2019, which included a full-day briefing at CPD Headquarters.

We launched our website, www.cpdmonitoringteam.com, and established Independent Monitor Maggie Hickey's Schiff Hardin office as our local office. The IMT also made several staffing changes to meet the needs of the consent decree. We have added subject matter experts and legal support staff. Chief Kathleen O'Toole, Ret., also joined our team as the Associate Monitor for Supervision and Officer Wellness and Support.

We have worked with the City, the CPD, and the OAG to establish effective and efficient communications among all stakeholders including secure data and information sharing systems, feedback loops, regularly scheduled in-person meetings (¶668), and bi-weekly teleconferences among the working groups for each consent decree topic area. The City also sought, and the IMT provided, some technical assistance (¶656) during this reporting period as well. Notably, the IMT provided technical assistance to COPA.

Within 90 days of our appointment by the Court, we produced a Monitoring Plan for Year One (¶652) and filed it with the Court on May 30, 2019. Next, we set about fulfilling our responsibilities within the timelines set by the consent decree. To assist us in fulfilling our responsibilities, we met with the CPD, COPA, the OIG, Police Board, and the OEMC; conducted seven formal site visits; observed over 70 hours of CPD and COPA training; and reviewed over 7,600 pages, as detailed in the chart above.[23] Figure 7, below, summarizes our compliance with the consent decree's deadlines for the IMT in the first reporting period.

---

[22]  Our initial proposal is available on the Chicago Police Consent Decree website. *See* Schiff Hardin-CNA Monitoring Team, *City of Chicago Police Department Independent Monitoring Proposal*, CHICAGO POLICE CONSENT DECREE (September 4, 2018), 20, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/09/Schiff-Hardin-CNA-Proposal.pdf.

[23]  The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

Figure 7: Consent Decree Deadlines for the IMT in the First Reporting Period

| ¶s | Requirement | Deadline | Deadlines | Met or Missed |
|---|---|---|---|---|
| 627–637 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines | Met (ongoing) |
| 638–641 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines | Met (ongoing) |
| 642–644 | Compliance Reviews and Audits | Various, Ongoing | Will occur during each reporting period | Met (ongoing) |
| 645–651 | Community Surveys | 180 Days (and every two years) | August 28, 2019 | Missed (*see below*) |
| 652–655 | Monitoring Plan and Review Methodology | 90 Days (and every year) | May 30, 2019; draft by May 15, 2019 | Met (ongoing) |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing | Met (ongoing) |
| 667 | Coordination with the Office of Inspector General | Ongoing | Ongoing | Met (ongoing) |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly | Met (ongoing) |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly | Met (ongoing) |
| 670–671 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing | Met (ongoing) |

At the time of the filing this report with the Court, the community survey is not yet complete. In September 2019, we sent the survey questions to the Parties and to the Coalition for review.[24] In October 2019, we engaged in discussions with the Parties regarding the survey methodology, and those discussions continue. We anticipate delivery of a complete survey report in early 2020, which we will make public (¶650). There are several reasons for this timeline:

❖ Early in the reporting period, the IMT learned that the Survey Research Laboratory at the University of Illinois at Chicago (UIC) closed. This lab was the proposed partner, along with the Institute for Public and Civic Engagement at UIC, to conduct the community survey. Because the lab closed, we needed to identify a new community survey organization (¶648), negotiate a contract with that organization, and negotiate regarding the survey methodology. All these factors delayed the implementation of the community survey.

---

[24] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

❖ The IMT wanted to provide many opportunities for the Parties and the Coalition to review the survey methodology and questions. The IMT provided two opportunities for the parties and the Coalition to review the community survey methodology—an initial review of the content areas of the survey (¶649) and a subsequent review of the actual community survey questions. The IMT also provided a description of the survey methodology to the Parties and the Coalition for their review.

❖ The consent decree requires the IMT to "conduct reliable, representative, and comprehensive surveys of a broad cross section of members of the Chicago community" (¶645) covering several important topics, such as "perceptions of CPD's services, trustworthiness, community engagement, effectiveness, responsiveness, handling of misconduct complaints and investigations, and interactions with members of the Chicago community, including interactions with individuals who are people of color, LGBTQI, in crisis, youth, members of religious minorities, or have disabilities" (¶646). The University of Illinois at Chicago Institute for Policy and Civic Engagement (IPCE) will design and conduct the surveys with the University of Chicago's National Opinion Research Center (NORC). The community surveys will capture a representative sample of all Chicago residents and a representative sample of the Chicago residents who are stopped most frequently by Chicago Police. The first group will be a random sample of 1,000 Chicago residents, selected from a pool of several thousand randomly selected adults. The second group will be a random sample of 300 African American males ages 18–25, selected from a pool of over 1,000 people. Some community members have expressed concerns about surveys in general and this methodology in particular. We acknowledge that surveys pose challenges regarding response rates, but we understand the requirements of these paragraphs and have crafted our methodology with those challenges in mind.

❖ In addition, during the off years of the biennial community surveys, the IMT will conduct separate studies that target specific population groups mentioned in the decree, including LGBTQI, in-crisis, youth, members of religious minorities, and people with disabilities.[25]

## The IMT's Community Engagement Team Activities

The Community Engagement Team is a critical part of the IMT. Our Community Engagement Team embodies our collaborative approach to this monitoring work. The Community Engagement Team is comprised of experienced Chicago community members, experts in police-community relations, lawyers, and academic

---

[25]  *See* ¶¶37, 42, 45, 74, 393, 646, 765, and 799.

scholars. These members work together to meaningfully engage Chicago's communities and ensure their participation throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community component of compliance with the consent decree.

The Community Engagement Team plays a critical role in monitoring levels of trust and sentiment among the stakeholders to the consent decree. Its work is important to create sustainable change at the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the consent decree. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[26] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[27]

The City and the CPD cannot function effectively when the City and the CPD lack trust from the communities they serve. Effective policing will require both procedural and cultural change and improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership. These relationships will be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the consent decree monitoring process: (1) gathering input from Chicago residents about their concerns about CPD policies and practices and (2) providing information to the Chicago community regarding the IMT's activities and findings.

We introduced the Community Engagement Team at several meetings throughout the Chicago, including meetings with the Coalition, meetings with community-based organizations, and at CPD beat meetings. We also convened quarterly community meetings to explain the consent decree and the IMT's role (¶670), which were organized by our Community Engagement Team and led by the Independent Monitor Maggie Hickey. We held the first meeting in Englewood in June and the second meeting in Austin in September.

In addition to gathering input regularly through in-person interactions, the IMT took steps to conduct its first community survey (¶¶645–46). During this reporting

---

[26]   DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopo-liceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPT-REPORT.pdf.

[27]   *Id.* at 15.

period, the IMT negotiated a survey research agreement with the National Opinion Research Center (NORC) at the University of Chicago to conduct the survey and sought comments from the Parties and the Coalition on the survey methodology and the survey questions. We summarize many of the Community Engagement Team's efforts in Figure 8 below.

Figure 8: IMT Community Engagement Efforts



**55** IMT-initiated Meetings with Chicago Community Groups

**25** Chicago Community Events Attended

**2** IMT Quarterly Community Meetings (Englewood and Austin)

**20** Beat Meetings or District Advisory Council Meetings

**6** Traveling Office Hours Held

# The City of Chicago's Achievements and Challenges

During this reporting period, the City, its relevant entities, the OAG, and the IMT began to lay a foundation to prepare for this long-term monitoring project. We appreciate that the City and the CPD have assigned most of the administrative tasks required by the consent decree to appropriate units and individuals. For example, the City's Office of the Corporation Counsel, along with the CPD's Offices of Reform Management, Legal Affairs, and Research and Development (¶¶677–78) have been fully engaged in the monitoring process since the IMT began its work on March 1, 2019. The City and the CPD have established regular channels of communication with the IMT and the OAG; have engaged in dialogue, problem solving, and brainstorming about requirements and challenges regarding the paragraphs of the consent decree; and have devoted substantial time getting the project off to a productive start. The CPD's Office of Reform Management, for example, facilitates the IMT's access to people and data by organizing introductions, presentations, meetings, weekly calls, site visits, and requests for data and records.

Overall, this monitoring process is progressing in ways that the IMT predicted. As we are still very much at the beginning of this long-term project, we continue to view it as a journey and stand ready to lean into curves in the road ahead.[28] As we learn more about the City and the CPD's operations, we will encourage connecting and reconciling policies and concepts across entities and departments. We emphasize, for example, the importance of consistency between the CPD's Bureau of Internal Affairs and COPA's polices on investigations of officer-involved shootings, a critical facet of the City's accountability structure.

As demonstrated in Figure 9 below, the CPD did not meet most of the deadlines and compliance obligations in the first reporting period. Figure 9 shows that, of all the consent-decree paragraphs monitored in this first reporting period (67 total),[29] we found that the City reached Preliminary compliance related to 15 paragraphs and Secondary compliance for one paragraph. No paragraph achieved Full compliance, which was to be expected during this early phase of the project. Readers of this report should understand that, by design, at the outset of the consent decree, the City, the CPD, and the relevant City entities were not in compliance with any paragraphs. While attaining Preliminary compliance for a small number of paragraphs may seem like little progress has been made, if similar progress is made during each subsequent reporting period, the City will make substantial progress toward fulfilling consent-decree requirements.

---

[28] In accordance with ¶680, the City provided its assessment of its progress in its Semiannual Status Report. *See The City of Chicago's Semiannual Status Report* (September 3, 2019).

[29] In this report we address 70 paragraphs. The requirements in three of the paragraphs (¶¶169, 425, and 563) are not applicable for compliance assessment in the first reporting period.

**Figure 9:**            Compliance Status at the End of the Reporting Period (August 31, 2019)
Consent Decree Paragraphs with Requirements in the Reporting Period: 67



Paragraphs with Requirements in Preliminary Compliance   (15)
Paragraphs with Requirements in Secondary Compliance   (1)
Paragraphs with Requirements in Full Compliance   (0)
Paragraphs with Requirements that are Not in Compliance   (52)
(*including under assessment*)

Paragraph 661 requires us to summarize the "principal challenges or concerns related to the City's achieving full and effective compliance with this Agreement," which we provide below. Independent of this requirement, we believe it is appropriate to present an accurate assessment of the principal challenges facing the City and its relevant entities—both expected and unexpected. We do not discuss these challenges to provide excuses or undue criticism. Instead, we identified various hurdles to compliance for the City, its relevant entities, the OAG, the IMT, and the community, to identify solutions, provide recommendations, plan for improvements, and ultimately, help the City reach compliance.

With that in mind, we believe that the following interrelated list reflects the principal challenges facing the City (presented in the order that is easiest to follow, rather than in the order of the magnitude of each challenge):

❖ Delayed Consent Decree Effective Date

❖ Administrative and Onboarding Challenges

❖ Staffing and Resource Shortages

❖ Data Challenges

❖ Record Production Challenges

❖ Policy Review Challenges

❖ Community Engagement Challenges

❖ Incorporating the IMT's Expertise

As explained further below, many of these challenges are, to some degree, ongoing. As a result, the City, its relevant entities, and when applicable, the IMT and the OAG must continue to work through methods of solving or otherwise mitigating these issues.

## Delayed Consent Decree Effective Date

There were several logistical challenges during the first reporting period, which began with consent decree deadlines that were due even before the consent decree took effect. This situation, in turn, required time for the City, the CPD, and other relevant entities to adapt legacy processes to the reviews required by the consent decree to achieve best practices (¶730).

The consent decree requires that the City and its relevant entities implement reform over time. Some actions were due before the consent decree's effective date, others were required immediately, and most are intended to be met over the course of longer periods, such as those with 60-, 90-, 180-, or 365-day deadlines. In addition to assessing and reporting on the City's and the CPD's compliance with the substantive paragraphs of the consent decree, the IMT also tracks whether the deadlines were met. As this is the IMT's first report (IMR-1), we assessed compliance with paragraphs with deadlines of fewer than 180 days.

In general, we have concerns about the City's, the CPD's, and other relevant entities' abilities to meet the deadlines set forth in the consent decree. As referenced above, the IMT, the OAG, the City, and the City's entities have been challenged by the start date of the consent decree and its retroactive deadlines. As a result, there have been significant struggles for the City to meet deadlines and to create the necessary effective and sustainable changes in policies, training, and practices. As discussed further below, in their attempts to meet these deadlines, the City, the CPD, and its other relevant entities attempted to develop compliant policies, curricula, and plans without input from the IMT or the OAG. This, in turn, required the IMT and the OAG to review policies for the first time after completion, without the consultation period described in the consent decree (¶627). Naturally, this resulted in an extended review period to ensure that the CPD created lasting change and avoided having to reissue and retrain CPD members on non-compliant policies. In the future, and for the long run, if the City and the CPD collaborate at the outset with the IMT, that will facilitate compliance with the consent decree. We look forward to working with the City to continue improving its collaboration with the IMT and the OAG to make more efficient progress toward compliance.

## Administrative and Onboarding Challenges

Our start-up activities were time consuming, but we are confident that time was well spent in developing the internal and collaborative procedures that will guide us for the next few years.

These efforts are not minimal. As referenced above, to reach compliance the City and the CPD must provide the IMT with sufficient evidence that reforms are being made through appropriate procedures that will effectuate timely and sustainable

compliance. As explained further below, the consent decree requires the CPD to include the IMT and the OAG meaningfully in the policy review and approval process. This requirement, in turn, meant that the CPD had to revamp the way that it has historically drafted policies. That process requires additional time and effort to appropriately research, address, and present each reform.

Likewise, the City, the CPD, the OAG, and the IMT have worked to set up various methods of securely sharing compliance materials. In total, the City, the OAG, and the City use over seven programs to share records and data. Each of these programs has a different learning curve.

In many ways, these on-boarding efforts continue. There have been struggles to provide the IMT access to necessary City networks. While the City, the OAG, and the IMT were able to make progress toward the end of the reporting period, these efforts are ongoing, and the IMT continues to investigate ways to improve ease of access and efficiency.

## Staffing and Resource Shortages

As with all entities and organizations, City and CPD resources are limited. As referenced above, the City and the CPD have already added many resources to their compliance efforts, including creating the Office of Reform Management. For example, the CPD acquired a platform called "Tableau" to help organize, track, and present relevant data, both internally and publicly.

While the IMT continues to assess compliance in a growing number of areas, we believe that we have already identified several areas where more resources would improve efficiency and compliance efforts. The compliance efforts of several CPD departments, for example, would benefit from additional staffing:

❖ **The Office of Legal Affairs and the Research and Development Department.** The Office of Legal Affairs and the Research and Development Department must frequently work with the IMT to provide compliance documents, policies, and efforts. The Office of Legal Affairs, for example, reviews every document that the IMT receives, and the Research and Development Department must address all the IMT and the OAG's comments on existing, revised, and new policies. As a result, despite productive interactions with the personnel in these departments and the quality of their work, high-priority items may become bottlenecked with limited personnel.

❖ **Training Academy.** The CPD's Training Academy is, in many ways, at the heart of many consent-decree requirements. The CPD is among the largest police departments in the country, and training personnel requires a massive effort. Our discussions with CPD personnel regarding training efforts, records, and plans strongly suggest the need for additional support in the Training Academy.

❖ **Crisis Intervention.** While many of the requirements regarding Crisis Intervention do not apply until later reporting periods, the consent decree requires significant efforts regarding the Crisis Intervention Team in the immediate future. Several of our meetings and site visits suggest that the Crisis Intervention Team would benefit from additional staff.

❖ **The Force Review Unit.** As discussed further in the Use of Force section below, the Force Review Unit is critical to several consent-decree requirements. Our early assessments suggest that the workload of this department is greater than the department can currently maintain effectively.

In addition to the specific personnel needs discussed above, many of the CPD's compliance efforts would benefit from additional resources. We heard from the community that there are difficulties navigating the CPD's website. Having worked with the website extensively during the first reporting period, we agree. Policies, for example, can be difficult to locate via the search engine, and searching for key words can yield unexpected results. Because the consent decree—and effective policing—require community involvement, we believe that dedicating sufficient resources to ensure the CPD's website is user friendly would be worthwhile.

## Data Challenges

The IMT needs complete and verifiable data to assess compliance across all areas of the consent decree. To effectively identify and resolve existing and upcoming challenges, data must be maintained, tracked, and analyzed. For this reason, the City, the CPD, and the OAG engaged in data discussions early and often. Based on these discussions, there is universal agreement that the CPD has a long way to go to meet the data requirements of the consent decree.

During this initial reporting period, the IMT learned of serious challenges in this area at the CPD. The organization maintains and manages data from over 100 different data systems and databases, which have developed and grown in complexity over time. The IMT has, for example, made several data requests, which have required the CPD to take on significant resources and hours to build systems that can organize and internally verify that data. At this stage, data management, data utilization, and data reporting at the CPD is a labor-intensive, complex, and sometimes frustrating process.

Furthermore, while there have been lessons learned from data usage, the CPD does not have a regular system for auditing and validating its data systems or correcting and upgrading those systems based on regular audits. That is not to say that the CPD is not maintaining, assessing, and correcting data system problems on a regular basis; it is just not doing so based on a regular audit process. This situation is further complicated and becomes additionally burdensome by the research, analysis, and data collection demands created by the consent decree.

In short, the CPD does not currently have the data resources and systems in place to meet all the demands of the consent decree. Toward the end of this reporting period, the IMT became aware that the CPD is reorganizing several facets of its data management systems. We hope that the reorganization leads to improved processes. The IMT will continue to work with the City and the CPD to ensure that these efforts continue.

## Record Production Challenges

As referenced above, the IMT needs to see evidence of the City's and the CPD's compliance efforts. The record production process required significant efforts in the first reporting period. Early in the process, for example, there was not sufficient overlap between the records that the IMT requested and those the City provided. Likewise, there was concern at the City and the CPD that the work to meet the record requests would, with limited resources, take away from the compliance efforts. For these and other reasons, there was significant delay between the first sets of requests and the City's responsive productions.

The IMT appreciates how difficult it is to accurately interpret requests and identify and gather records from throughout the entities, their departments, and Chicago. We also understand the amount of work involved in reviewing records for privilege, organizing those records in a clear and understandable structure, and providing those records in various formats.

There were significant challenges in the first reporting period that further affected the IMT's efforts to assess compliance. In total, the City provided the IMT with over 10,600 records: over 10,000 documents that the City provided to the OAG during negotiations (to establish a baseline) and over 600 documents for the first reporting period. Many of the latter set of documents were provided to the IMT within the last two weeks of the reporting period (over 500 documents) with a significant amount of those records coming on Friday, August 30 (over 190 documents).

To be clear, we would prefer that the City provide the documents on the last day of the reporting period than not provide the documents at all. On the other hand, the IMT cannot fully assess and report on records when the City provides a significant amount of records on the last day. Even if the IMT could fully address all those records and write this report within 30 days, meaningful monitoring efforts frequently require the IMT to, after reviewing records, follow-up with relevant questions, concerns, and additional requests for relevant records.[30]

---

[30]   In the City's written comments, "the City respectfully submits that it was reasonable for the City to utilize all the allotted time in the monitoring period to provide compliance documents and that it should not be penalized this monitoring period for providing records on the final

Since the beginning of the reporting period, the IMT, the OAG, and the City have regularly communicated regarding requests and productions. The City and the CPD have also assured the IMT and the OAG that they have made internal changes to make the process more efficient, and we note that we have seen significant improvement in the City's response times and the clarity of those responses. We look forward to creating additional efficiencies as members of the IMT and the corresponding personnel at the City's relevant entities continue to work together.

## Policy and Plan Review Challenges

> *632. The Parties and the Monitor will work collaboratively and cooperatively to establish and adhere to a schedule that ensures policies and procedures required by this Agreement are reviewed adequately, efficiently, and expeditiously.*

The City and the CPD have appropriately focused on developing optimal policies and plans during this reporting period. The IMT believes that strong policing policies provide the foundation for implementing and sustaining best practices (as defined in ¶730) with transparency and accountability. We are encouraged by the City, the CPD, and the other relevant entities' willingness to collaborate with the IMT regarding their policies.

Because of the significant policy review efforts from the City, the CPD, other relevant City entities, and the OAG, it is important to clarify how this process works. The consent decree outlines the policy review process in ¶¶626–37 and the plan-review process in ¶¶638-41.[31] For policy review, for example, the City and the CPD must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have *at least* 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to Judge Dow to resolve (¶630). On the other hand, when

---

day of the monitoring period." *See* [Attachment B](#) at 1. The IMT agrees that the City should use all the time in a reporting period to meet the demands of the consent decree. The IMT does not note that we received over 500 documents within the last two weeks of the reporting period and over 190 documents on the last day to penalize the City or to imply that the City did so in bad faith. Instead, we include this fact in the report because it reflects the challenges the City faced in the first reporting period, which in turn, affected the IMT's ability to assess compliance and write IMR-1 within 30 days (¶663).

[31] In many respects, the plan-review process tracks the policy review process, but is limited to an enumerated set of plans and does not specify a public comment period (¶¶638-41). Some paragraphs specify unique or additional review criteria. *See, e.g.*, ¶40.

the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

The first policy that the City provided, for example, was the *Command Channel Review Special Order* (S08-01-03, formerly *Complaint Summary Reporting and Review Procedures*), which it provided to the IMT on May 8, 2019. This was the first time that the OAG or the IMT had viewed the revised policy, which meant that the City, the CPD, the OAG, and the IMT did not benefit from a consultation period. As a result, the IMT and the OAG needed the entire review period to review the policy and request corresponding records. Since the IMT did not receive those records before the end of the review period, the IMT requested an extension and provided its first set of comments on June 21, 2019. The City and the CPD reviewed the IMT's and the OAG's comments, made revisions, and submitted an updated draft on July 19, 2019. The IMT and the OAG then provided feedback again. This process continued through four versions, through the end of the reporting period. The IMT provided its "no objection" letter on September 27, 2019, at which point the CPD posted the policy for public comment from October 8 through October 23, 2019.

Overall, during this reporting period, the IMT, the CPD, and the OAG spent significant time working through policies and procedures. The City submitted over 70 records for review and comment. As with the record productions, the City provided some of these records at or near the end of the reporting period on August 30, 2019. The Parties and the IMT continue to work together on many of these records and have not yet needed to utilize the "workout period." While none of these records were finalized before the end of the reporting period—a few of them were finalized afterwards—at the time of this report, the IMT has provided written comments on every requisite record the City provided within the reporting period. Likewise, the IMT has also provided the City with several "no objection" notices since the end of the reporting period.[32] Figure 10 below details the policies, plans, and curricula that the City and the CPD submitted to the IMT during this reporting period.

Figure 10:    Policies, Plans, and Curricula Received and Reviewed by the IMT From May 1, 2019, through August 31

| # | Entity: Record (type of policy) |
|---|---|
| 1 | CPD: Complaint Summary Reporting and Review Procedures (S08-01-03) |
| 2 | CPD: Firearm Pointing Incident Review (SOP #2019-001) |
| 3 | CPD: Curriculum Field Observation Day - District Station Supervisor |
| 4 | CPD: Curriculum Field Observation Day - Field Sergeant |

---

[32]    ¶¶626–44.

Figure 10:    Policies, Plans, and Curricula Received and Reviewed by the IMT
From May 1, 2019, through August 31

| # | Entity: Record (type of policy) |
|---|---|
| 5 | CPD: Curriculum Field Observation Day - Watch Operations Lieutenant |
| 6 | CPD: Bureau of Patrol Field Training Observation Day (S) |
| 7 | CPD: Education and Training Division Pre-Service Supervisory Training (S) |
| 8 | COPA: Training and Professional Development Department In-Service Training Plan |
| 9 | CPD: eLearning Training on the Requirements of the Consent Decree, Together with its Goals, Implementation Process, and Timelines |
| 10 | CPD: Needs Assessment for 2020 Training Plan |
| 11 | CPD: Weapons Discipline Training Bulletin |
| 12 | CPD: Department Approved Weapons and Ammunition (U04-02) |
| 13 | CPD: Control Devices and Instruments (U04-02-02) |
| 14 | CPD: Use of Force (G03-02) |
| 15 | CPD: Force Options (G03-02-01) |
| 16 | CPD: Incidents Requiring the Completion of a Tactical Response Report (G03-02-02) |
| 17 | CPD: Firearms Discharge Incidents Involving Department Members (G03-02-03) |
| 18 | CPD: Taser Use Incidents (G03-02-04) |
| 19 | CPD: Oleoresin Capsicum Devices and Other Chemical Agent Use Incidents (G03-02-05) |
| 20 | CPD: Canine Use Incidents (G03-02-06) |
| 21 | CPD: Baton Use Incidents (G03-02-07) |
| 22 | CPD: Department Review of Use of Force (G03-02-08) |
| 23 | CPD: Tactical Response Report Form |
| 24 | CPD: Tactical Response Report - Investigation Form |
| 25 | CPD: Bureau of Internal Affairs (SOPs) |
| 26 | CPD: Officer-Involved Death Investigations (G03-06) |
| 27 | CPD: Firearms Discharge/Officer-Involved Death Incident, Information Card |
| 28 | CPD: Human Rights and Human Resources (G02-01) |
| 29 | CPD: Prohibition Regarding Racial Profiling and Other Bias Based Policing (G02-04) |
| 30 | CPD: Use of Social Media Outlets (G09-01-06) |
| 31 | CPD: Foot Pursuit Training Bulletin |
| 32 | COPA: Civil-Criminal Complaint Review (1.3.8) |
| 33 | COPA: Transparency Initiatives (2.1.2) |
| 34 | COPA: Fact Gathering (3.1.2) |
| 35 | COPA: Affidavits & Affidavit Overrides (3.1.4) |
| 36 | COPA: Form of COPA Complaint (3.1.4(B)) |
| 37 | COPA: Pattern or Practice Investigations (3.1.5) |
| 38 | COPA: Employee Use of CLEAR and Column CMS Systems (3.1.6) |
| 39 | COPA: Ballistic Vest (3.1.7) |
| 40 | COPA: Vests and Hats (3.1.8) |
| 41 | COPA: Investigative File Maintenance (3.1.9) |
| 42 | COPA: Major Incident Responses (3.1.10) |

Figure 10:   Policies, Plans, and Curricula Received and Reviewed by the IMT
From May 1, 2019, through August 31

| # | Entity: Record (type of policy) |
|---|---|
| 43 | COPA: Recommendations Regarding Officer Powers (3.2.2) |
| 44 | COPA: Quality Assurance (3.3.1) |
| 45 | COPA: Timeliness Benchmarks (3.3.2) |
| 46 | COPA: Superintendent Non-Concurrence (3.4.1) |
| 47 | COPA: Medical Records & HIPAA Compliance (3.4.2) |
| 48 | COPA: Police and Community Relations Improvement (PCRIA) Compliance (3.4.3) |
| 49 | COPA: Compelled Statements (3.4.4) |
| 50 | COPA: Appx. 3.1.6(A) Employee Agreement Regarding Central Management Systems |
| 51 | COPA: Appx. 3.2.2(A) Procedures for Recommending Limit on Officer Duties or Powers |
| 52 | COPA: Appx. 3.2.2(B) Request for Modification of Department Member Duties/Police Powers |
| 53 | COPA: Appendix 3.3.2 Timeliness Benchmarks |
| 54 | COPA: Training and Disciplinary Records (3.1.2(a)) |
| 55 | COPA: Interviews (3.1.2(b)) |
| 56 | COPA: Final Summary Report (3.1.3) |
| 57 | COPA: Disciplinary Recommendations (3.2.1) |
| 58 | COPA: Appendix VI.D Request for Extension of Investigation |
| 59 | CPD: Community Input on Policy Document |
| 60 | Police Board: Member Selection Criteria |
| 61 | Inspector General: Public Safety Section Policies Manual |
| 62 | City: Method of Selecting Chief Administrator of COPA |
| 63 | Police Board: Training Plan |
| 64 | CPD: School Resource Officers and Investigations at Chicago Public Schools (S04-01-02) |
| 65, 66 | CPD: Bureau of Patrol Notice Regarding Mandatory Training for School Liaison Sergeants and School Resource Officers (#19-0123.01 & 19-0159) |
| 67 | CPD: Non-Bid Duty Assignment as a Student Resource Officer Notice of Vacancy[33] |
| 68 | CPD: Memorandum of Understanding with Chicago Public Schools |
| 69 | CPD: Bureau of Internal Affairs Training Plan |
| 70 | Police Board: Community Input Policy |
| 71 | Police Board: Training Policy |
| 72 | Police Board: Hearing Officer Criteria |
| 73 | CPD: Supervisor Consent Decree Briefing |
| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) | |

---

[33]  "Student Resource Officer" and "School Resource Officer" are often used interchangeably to refer to the same position. In this report, we consistently refer to this position as "School Resource officer."

This chart is not comprehensive of all policies, plans, curricula, or other records that the City has submitted to the IMT during this reporting period. We only included records that the IMT provided comments for, either as required by the consent decree or for technical assistance.

Given the delayed consent decree effective date and difficulties in addressing how the City and the CPD could best include the IMT and the OAG in the policy development process, the IMT and the OAG did not have the opportunity to consult with the City or the CPD on most of the draft policies. Instead, the IMT and the OAG frequently saw revisions or new policies for the first time when the City provided them for review 30 days before the implementation date. As a result, the IMT needed to use more of those 30 days—and in some cases, also 15-day extensions—to accurately assess these policies with applicable best practices and records (¶¶617–28).

The IMT believes that this process would be more efficient if there were more consultation during the development process. The City and the OAG also agree that this process could be improved and better defined. Based on conflicting language in the consent decree, the Parties, for example, disagreed on whether relevant City entities other than the CPD were required to follow the same review process. As a result, the Parties and the IMT met with Judge Dow and have agreed to work together to include the other relevant City entities and improve the efficiency of this process for developing policies, procedures, training, and plans that comply with the consent decree. We look forward to continuing to work with the Parties to reach a mutually beneficial solution.

## Community Engagement Challenges

We have concerns about the CPD's efforts to engage the community during the first reporting period. For example, we raised concerns about the CPD's community engagement during its policy development processes. We recommended that the CPD establish regular procedures for garnering community member and community stakeholder input early in the policy development process. Currently, opportunities for community input occur late in the policy development process during public comment phases. Allowing community input at the later stages of the policy development process effectively disenfranchises Chicago community members and prevents them from providing input and comments in the formative stages of the policy development process.[34] In response to this suggestion, the CPD developed a new process that allows for community input earlier on in the policy development process. The IMT reviewed and commented on the documentation

---

[34]    As referenced above, and related to the CPD's overall data organization challenges, public-facing policies are difficult to locate on the CPD's website (http://directives.chicagopolice.org/directives/). Having accessible policies is important to the CPD's community engagement and transparency efforts.

provided on this new process and continues to work with CPD on its community engagement processes.

Relatedly, throughout this reporting period the IMT heard feedback from a wide variety of community members about the CPD's efforts regarding community engagement generally.[35] Some expressed concern about inconsistencies on the CPD's website regarding times, dates, and locations of beat meetings; others expressed concern about the lack of neutral meeting facilitators at CPD-sponsored meetings. We heard the need for the CPD to look at other approaches to increase community representation at CPD-sponsored meetings and events, with some saying that it is a "significant problem." Community members suggested that CPD officers could meaningfully connect with the community by attending meetings that the CPD is not organizing or hosting.

## Incorporating the Independent Monitoring Team's Expertise

Finally, the IMT recognizes that a significant challenge for the City, the CPD, and other relevant entities is to provide the IMT with sufficient proof of compliance. As we have mentioned throughout this report, we believe in the experience and expertise of our team members. We believe that they add significant insight to this process, and the City and its relevant entities did not anticipate some of our feedback and methodologies. To some extent, this is a sign that things are working as they should, and the City and the CPD are now gaining a new perspective on reform.

We believe that the City will more effectively address these challenges as the IMT further develops its working relationships across the City, the CPD, and other relevant entities. Early efforts have been largely administrative and document-based. Many of these efforts are necessary and track the progressive stages of the consent decree. But as we progress through the monitoring process, the IMT must also assess the City's demonstrated ability to implement changes to meet consent-decree requirements, which requires a demonstrated commitment and involvement from City and CPD leadership. Overall, the IMT appreciates the efforts of the City and the CPD, and we look forward to having more dialogue with the CPD's leadership.

---

[35] For example, the ACLU—on behalf of *Communities United*, who are part of the Coalition—provided the City, the CPD, the OAG, and the IMT with a detailed memorandum raising these concerns regarding community engagement.

# I. Community Policing

## Guiding Principles

The IMT assessed compliance with applicable Community Policing paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **8.** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> **9.** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> **10.** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> **11.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

## Summary of Compliance Assessments

In this first reporting period, the IMT assessed the CPD's compliance with five paragraphs of the consent decree within the Community Policing topic area (¶¶13, 18, 39, 40, and 44).

The CPD met its deadlines for three of the four paragraphs with deadlines (¶¶18, 39*, and 44*), meaning that it missed its deadline for ¶13.[36] The IMT determined that the CPD achieved Preliminary compliance for three of the five paragraphs (¶¶13, 18, and 44) and did not achieve Secondary or Full compliance for any of the five paragraphs.

During this reporting period, the CPD shared project plans, draft documents, and notes from various community engagement activities. Our analysis below details how the CPD's activities comply or do not comply with the consent decree and the progress that the CPD is making toward achieving compliance.

In short, the City and the CPD worked to meet the consent decree requirements for community policing during this reporting period. The CPD made significant efforts toward plans for implementing the Community Policing Advisory Panel's (CPAP's) recommendations and reconsidering the qualifications, roles, and responsibilities of School Resource Officers (SROs).

---

[36] We have placed asterisks on ¶¶39 and 44, because the deadlines are technically outside of the first reporting period. Specifically, ¶¶39 and 44 have September 3, 2019 deadlines, based on the first day of school for the Chicago Public Schools.

# Community Policing: ¶13

*13. In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.*

## Compliance Progress     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     May 30, 2019     ☐ **Met**   ☑ **Missed**

**Preliminary:**     *In Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The CPD did not meet the 90-day deadline to develop a plan to implement the CPAP recommendations as required by this paragraph, but the CPD developed the plan before the end of the reporting period. The IMT reviewed the recommendations from the CPAP report and the CPD project plan for implementing CPAP recommendations. The IMT also participated in CPD briefings covering CPAP implementation planning and execution.

After the May 30 deadline, the CPD developed a detailed task-driven plan including a project timeline in Excel format, and submitted it to the IMT for review. The plan identifies nearly 50 different projects, 50 milestones, and about 150 tasks. The project plan aligns with the CPAP recommendations, and the identified tasks are organized around areas such as community partnerships, restorative justice, youth outreach, community policing strategies, annual strategy review and feedback, annual reviews, quarterly reports, community policing staffing and training, selection of Chicago Alternative Policing Strategy (CAPS) officers, coordination of city services, victims resources, and community policing evaluations. These projects and their identified tasks also overlap with actions required to implement the requirements of other consent-decree paragraphs.

The CPD reports that nearly all the 150 tasks identified in its plan are either completed or on track. Most of the CPD's planned timelines fall within 2019 and 2020. The project plan assigns accountability and responsibility for each identified task. The CPD began implementing many CPAP recommendations and, in some instances, completed the tasks associated with implementation. The CPD's implementation progress includes the following:

❖ Piloted a "police immersion" program in Districts 3 and 7 that provides probationary police officers with a week of intensive community engagement in their assigned area. That engagement includes meeting community leaders and stakeholders, and becoming familiar with the areas that they will serve;

❖ Further developed the district-wide community policing strategy development processes, including detailed and comprehensive guidance about training for commanders, community policing sergeants, and other relevant CPD staff to enhance community input and better track actions and responses;

❖ Identified and provided leadership training to prospective members of the Superintendent's youth advisory council;

❖ Developed a robust information system platform called Community Engagement Management System (CEMS) to track non-enforcement contacts and to generate information about community events;

❖ Established the Chicago Crime Victims Coordinating Council to improve coordination of services for victims of crimes, especially gunshot victims; and

❖ Held a "Citizen Police Academy" that served 50 participants who completed 30-hours of training during the first reporting period. (This is an ongoing biannual, 10-week program.)

# Community Policing: ¶18

*18. The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.*

## Compliance Progress   (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**           Quarterly            ☑ **Met**   ☐ **Missed**

**Preliminary:**        *In Compliance*
**Secondary:**          *Not in Compliance*
**Full:**               *Not in Compliance*

The City met Preliminary compliance within the reporting period by holding quarterly meetings. The City provided the IMT with a summary of its activities regarding regular meetings with representatives from City departments. These meetings coordinate the delivery of services to best leverage resources and enhance community safety. The IMT also reviewed agendas, meeting notes, and takeaways from the three meetings held during the first reporting period. These meetings, identified as "cabinet meetings," involved the Mayor and other department heads. The meeting invitees are noted in City documentation, but the City did not provide the IMT with the actual attendance records from these meetings. A review of meeting notes suggests a broad and appropriate attendance. The topics and agendas for each of these meetings focused primarily on community safety issues.

A review of meeting agendas and minutes to date indicates that these meetings narrowly focused on collaboratively developing strategies to enhance community safety. In one meeting, discussions covered the dimensions of addressing open-air

drug markets and the associated violent crime. Representatives from City departments discussed a range of service offerings including drug treatment for residents living in specific areas, better code enforcement, outreach from community volunteers and stakeholders, and strategies to discourage suburban drug buyers from fueling drug purchases in these open-air markets. Takeaways and action items were included in meeting notes with planned activities frequently linked to efforts to reduce gun violence. Examples include the City sharing data maps (depicting the locations of gun violence) with other City entities to target programming, and City agencies reaching out to have discussions with the Cook County Department of Public Health so that it can provide better trauma and mental health support for youth.

Through these cabinet-level meetings, the City is clearly bringing together relevant city agencies to advance community safety and quality of life in Chicago neighborhoods. A review of notes from these meetings demonstrates that City departments are committed to work collaboratively to face challenges that require meaningful participation by multiple agencies.

The City should formalize this cabinet-level working group with documentation that outlines attendance, purpose, governance, membership, meeting support (including roles and responsibilities), and processes for developing and approving action steps and follow-up. This will ensure that the City is able to provide the IMT with consistent and thorough records of these meetings. By providing structure, the City may also optimize value of these meetings and build in more accountability.

# Community Policing: ¶¶39–40

**39.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools.*

**40.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools.*

---

**Compliance Progress**     (Reporting Period: March 1, 2019, through August 31, 2019)

**¶39 Deadline:**     September 3, 2019     ✓ Met*     ☐ Missed

| | ¶39 | ¶40 |
|---|---|---|
| **Preliminary:** | *Under Assessment* | *Not Yet Applicable* |
| **Secondary:** | *Under Assessment* | *Not Yet Applicable* |
| **Full:** | *Under Assessment* | *Not Yet Applicable* |

\* As we explain further below, the IMT found that the City met the deadline for ¶39, which technically falls outside of the reporting period.

Paragraphs 39 and 40 are unique because they divide a related policy and corresponding compliance efforts into separate timelines. Technically, the deadline for

¶39 falls on September 3, 2019 (the first day of school), which is outside of the first reporting period. Nonetheless, the City engaged in significant efforts to meet that deadline within the first reporting period. Because the IMT reviewed many of these efforts, we find that the City met the ¶39 deadline by creating selection criteria by the start of the 2019–2020 school year. The IMT cannot, however, grant Preliminary compliance for ¶39, because we are still assessing the selection criteria and the rest of the policy, which fall under ¶40. Likewise, the IMT began to assess the related requirements under ¶40. Following the longer review periods described in ¶40, we will more fully address those requirements in future monitoring reports.

The CPD provided the IMT with notes from 10 (of 19) input sessions regarding SROs. The CPD held these sessions in schools to gather community input on SRO selection criteria and policy, including the roles and responsibilities of SROs. The notes from the meeting covered roles and responsibilities of SROs; prohibition on the administration of school discipline by CPD officers; selection criteria for SROs; initial and refresher training for SROs; and the collection, analysis, and use of data regarding CPD activities in public schools. Members of the IMT also independently attended two of these sessions as observers and corroborated much of what the CPD reported.

The IMT also met with the CPD leadership staff responsible for SROs and with the Chicago Public Schools security leadership to discuss their individual views of mission, goals, and challenges. The IMT reviewed relevant Chicago Public Schools expulsion and suspension data and the history of SRO use in Chicago Public Schools. The IMT reviewed best practices provided by the National Association of School Resource Officers (NASRO), and discussed SRO issues with national experts. The IMT also reviewed the CPD's SRO training curriculum and observed 40 hours of training provided by NASRO for the CPD SROs. The IMT also began its review of the developed selection criteria to determine the extent of alignment with the newly crafted MOU governing the operations of the CPD SRO program.

Overall, the CPD and the Chicago Public Schools held 15 community input meetings to solicit feedback about the function of SROs and four additional community sessions to gather input on SRO policy, including selection criteria. These meetings occurred in April, May, and July 2019. The number in attendance at these sessions, according to data the IMT received on 10 community input sessions, ranged from four to 59. On average, 28 people attended each meeting, and participants included principals, members of local community-based organizations, local school council representatives, students, faculty, staff, parents, and other community residents. Figure 11 below summarizes information about participation at these meetings based on information reported by the CPD.

Figure 11: Total Meeting Participants for SRO Selection Criteria and Policy Input Reported by the CPD*

| Constituents | Number of Participants | Percentage of Participants |
|---|---|---|
| Principals | 14 | 5.0% |
| Faculty/Staff | 47 | 16.7% |
| Students | 132 | 46.8% |
| Local School Council Representatives/Parents | 23 | 8.2% |
| Community-Based Organization Representatives | 38 | 13.5% |
| Community Members | 28 | 9.9% |
| **Total Participants** | **282** | **100**** |
| * Includes data for 10 of 19 community input sessions the IMT received documentation for. ** Percentage calculations entail rounding error. | | |

The CPD generally conducted these meetings using a "World Café" format, which breaks participants into smaller groups to facilitate brainstorming. This format is designed to create a safe environment for participants to share ideas and avoid the "group think" that often occurs when ideas are solicited in larger groups. In meetings with few participants, the CPD used more traditional approaches to solicit input. This format successfully generated a wide range of thoughts and ideas regarding selection criteria for SROs. Several themes emerged from these meetings regarding SRO selection criteria, including the following considerations: experience working with youth; the necessity of treating people respectfully, fairly, and without prejudice; consideration of police officer backgrounds such as any past disciplinary actions; appropriate training to address students with developmental disabilities or mental illness; familiarity with de-escalation techniques; and connections to communities that SROs serve through work, residence, or volunteer activities. While community members generally appreciated the CPD's efforts to gather feedback and give them a voice on these issues, some community members felt that the meetings that the CPD organized were rushed and did not allow for proper input.[37] One overarching concern the IMT heard from community members was the necessity to clarify the roles of Chicago Public Schools security officers and SROs, making clear distinctions between those roles and responsibilities.

At the community input sessions, some participants questioned the need for CPD officers in school settings at all, suggesting that CPD officers have contributed over the years to involvement of school-aged youth in the juvenile and criminal justice systems. Participants stated that some CPD officers rely on arrests to address what is often a school disciplinary issue. Many also stated that the presence of officers

---

[37] Near the end of the reporting period, for example, the ACLU—on behalf of *Communities United*, who are part of the Coalition—provided the City, the CPD, the OAG, and the IMT with a detailed memorandum raising these concerns regarding community input into the SRO program. The CPD has previously met with members of the Coalition on other policies, and the IMT will continue to monitor the CPD's efforts to solicit, receive, and review community input.

might encourage school officials to request arrests rather than to use restorative justice tools or other options to resolve issues.

The City's approach allows each Local School Council (LSC) to decide whether a corresponding school should have an SRO. In consultation with corresponding principals, each LSC makes the final decision regarding SROs in their schools. In the 2018–2019 school year, the CPD reported placement of SROs in 91 schools for a total of 175 SROs. At the close of the reporting period, the number of SROs for the 2019–2020 school year was not yet available. School officials and the CPD believe that school use of SROs will not decline this year.

The CPD also conducted focus groups with SROs and supervisors. The IMT reviewed the CPD notes from SRO focus group sessions and from a session with supervisors regarding SRO policy. Themes from these sessions highlighted the importance of good working relationships between SROs, with principals, and other staff members; the skills to work with students with developmental disabilities; sharing of information by Chicago Public Schools about individualized education plans; and the Chicago Public Schools not using SROs as extensions of school security staff.

The CPD considered the input from both community meetings and SRO focus groups, consulted and reviewed NASRO standards, and formulated the selection criteria for SRO officers. The CPD also coordinated with the Chicago Public Schools to finalize the selection criteria. The finalized criteria are included in the SRO policy, which the CPD submitted to the OAG and the IMT for review. The CPD started this process in earnest soon after the consent decree's effective date and gathered community input, conducted research, and formulated criteria. The CPD reports that it used the newly developed criteria in the selection of SROs for the 2019–2020 school year. The IMT has some concerns with these criteria, such as the lack of a more formal role for school personnel in the selection process and a disciplinary history standard that is no higher than "acceptable." The IMT will also continue to assess the SRO policy in the coming reporting period.

Current practice and the new policy provide the District Commander with final authority over the selection of SROs. Prospective SROs submit a written request to their District Commander to work as SROs along with a resume that includes additional skills and experience. The District Commander "coordinates with CPS" and then makes the selection and assignment decision. Moving forward and for future reports, the IMT will review SRO applications including letters, résumés, and notes from decision-making deliberations.

# Community Policing: ¶44

**44.** *Before the 2019-2020 school year begins, CPD will undertake best efforts to enter into a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    September 3, 2019    ☑ **Met\***    ☐ **Missed**

**Preliminary:**    *In Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

\* As we explain further below, the IMT found that the City met the deadline for ¶44, which technically falls outside of the reporting period.

The IMT found that the CPD met Preliminary compliance by September 3, 2019. As with ¶39 above, this deadline technically falls outside of the reporting period. The IMT met with the CPD staff who are responsible for developing the CPD SRO policy and negotiating with the Chicago Public Schools regarding a Memorandum of Understanding (MOU) for SRO operations in the Chicago Public Schools. The IMT also interviewed the Chicago Public Schools leadership who are responsible for school security and negotiating the MOU. Additionally, the IMT reviewed NASRO literature on MOUs, the CPD's SRO policy, and the recently developed MOU between the CPD and the Chicago Public Schools.

The CPD reports that after the SRO policy was created, the Chicago Public Schools and the CPD received and considered community input to develop and finalize the MOU. The Chicago Board of Education approved the MOU on August 28, 2019. The IMT reviewed the MOU and determined that it sufficiently "delineates authority and specifies procedures governing the CPD Interactions with students" on school grounds. The MOU reflects many best practices, including the prohibition of SRO involvement in disciplinary matters, collaborative decision-making involving the CPD and the Chicago Public Schools in the selection and assignment of SRO personnel, selection criteria including extensive experience in working with youth, and meaningful input for SRO performance evaluations from the Chicago Public Schools. The MOU does not clearly define SRO roles related to serving as role models or providing classroom instruction or presentations on law-enforcement-related topics, as suggested by NASRO.

The IMT found some inconsistencies between the MOU and the CPD SRO policy in several significant areas. First, the selection process as outlined in the CPD policy

rests final decision-making in the selection and assignment of SROs to the District Commander. The CPD policy provides for decisions to be made in "coordination with CPS"; however, the MOU language suggests that a more collaborative process is required. The MOU states that, "CPS CEO or designee will participate in the interview and selection of the CPD officers assigned under this agreement." The MOU language is more in line with best practices. Second, the CPD remains responsible for delivering SRO training under the new policy while the MOU places that responsibility on the Chicago Public Schools with an expanded curriculum. Finally, the MOU language regarding the Chicago Public Schools' input into SRO performance evaluations is more explicit and references a "complaint process" not included in the CPD's policy.

The City should review both the SRO policy and the recently completed MOU with the Chicago Public Schools to address these inconsistencies.

# II. Impartial Policing

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.

> **50.** In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.

> **51.** CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

## Summary of Compliance Assessments

In the first reporting period, the IMT assessed the CPD's compliance with one paragraph of the consent decree within the Impartial Policing topic area: ¶58. The CPD missed its deadline for ¶58, and the IMT determined that the CPD did not achieve compliance at any level this paragraph (Preliminary, Secondary, or Full).

Paragraph 58 requires that the CPD clarify in policy, among other things, "that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy." The IMT believes the CPD would benefit from more community engagement on this issue to meaningfully clarify the policy for the community and the need for the policy for officers.

Throughout this reporting period, the IMT focused on aspects of community engagement, including impartial-policing concepts. The IMT believes that the CPD should prioritize hearing community voices early and often to address the concerns from various Chicago communities regarding police interactions.

# Impartial Policing: ¶58

*58. Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

| | | | |
|---|---|---|---|
| **Deadline:** | May 30, 2019 | ☐ **Met** | ☑ **Missed** |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

As of the close of this reporting period, the IMT does not find the relevant CPD policy, *Human Rights and Human Resources* (General Order 02-01), to be in compliance with the consent decree. During this reporting period, the CPD worked toward revising the policy to incorporate the requirements of ¶58. This policy is necessary because of some CPD officers' unwillingness to allow community members to photograph or record them in public.

During site visits in March and July 2019, as well as during bi-weekly meetings, the IMT has engaged with CPD officials regarding the requirements of ¶58. We also engaged with community members and reviewed related media coverage. Based on interviews and community engagement in the first reporting period, the IMT has concerns that there may be a significant divide between how the CPD and the community view this issue—with some officials in CPD leadership finding this to be a rare and small problem and community members finding the opposite. As a result, the IMT views this as an ongoing issue that will require continued attention, beginning with appropriate policy revisions.

Moreover, the CPD needs to do more work to achieve Preliminary compliance with ¶58. The CPD should update the language and content of the policy to reflect best practices by, for example, incorporating research on procedural justice and terminology used to describe community members. The relevant policy should also include clearly stated and appropriate enforcement and accountability mechanisms.

The IMT also notes the lack of community engagement in the creation of the draft policy, a requirement of ¶52. When asked about community input during meetings

in July, CPD officials indicated that community comments are allowed once the new or revised draft policy is posted on the CPD's website. Originally, CPD officials maintained that community input was not necessary earlier in the process. The IMT respectfully disagreed.

Through conversations since July, the CPD developed a "tiered system" of community engagement regarding policies that will be revised during the process of consent decree implementation. The CPD was still in the process of developing this system at the end of the reporting period.

While the IMT sees the CPD's plan for community engagement moving forward to be a positive sign of progress, we emphasize that the CPD should identify and fully explore the conditions and factors necessary to the creation of a policy, essentially engaging in a comprehensive and collaborative "needs assessment" process.

# III. Crisis Intervention

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *83. CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> *84. A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> *85. CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available community-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To*

*achieve these outcomes, the City and CPD will implement the requirements set out below.*

*86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

## Summary of Compliance Assessments

In this first reporting period, the IMT assessed the City's compliance with one paragraph of the consent decree within the Crisis Intervention topic area (¶142).

The Office of Emergency Management and Communications (OEMC) met its deadline for ¶142. The IMT determined that the OEMC achieved Preliminary and Secondary compliance for ¶142.

Overall, during this reporting period, the OEMC provided the IMT with robust data to determine compliance, including detailed training records. We look forward to monitoring the OEMC's continued compliance with the requirement that it provide the requisite training to new telecommunicators before they begin answering calls independently.

# Crisis Intervention: ¶142

*142. Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**        May 30, 2019        ☑ Met    ☐ Missed

**Preliminary:**        *In Compliance*
**Secondary:**        *In Compliance*
**Full:**        *Not in Compliance*

The IMT reviewed training documents provided by the OEMC and has determined that nearly all current, active telecommunicators have received mental-health awareness and Crisis Intervention Team (CIT) training. The documentation provided by the OEMC indicates that 464 call takers and telecommunicators have been trained in CIT and Mental Health Awareness between February 21, 2016, and June 24, 2018. Although the IMT was not provided a full roster of current OEMC employees to make a side-by-side comparison with the training records, the IMT checked a sample of employees from the City's employee roster against the training records. The IMT found that employees on the City's roster had a corresponding entry on the OEMC's training records. Three individuals have not yet received the training because they were on leave of absence. The OEMC reports that these three individuals remain on leave of absence and will not return to their duties without receiving the training.

The most recent training date indicated on the OEMC's supporting documentation is June 24, 2018—nearly a year and a half since the last training. The OEMC reported that the OEMC hired one telecommunicator on July 16, 2019, who is currently working under supervision. The employee is scheduled to attend the 40-hour Basic CIT class before undertaking job responsibilities without supervision.[38]

---

[38]    The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 1.

# IV. Use of Force

## Objectives[39]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the consent decree's corresponding objectives:

> **153.** CPD's use of force policies, as well as its training, supervision, and accountability the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.

> \*\*\*

> **155.** CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

---

[39] The Use of Force section of the consent decree includes "objectives" rather than "guiding principles."

## Summary of Compliance Assessments

In the first reporting period, the IMT assessed the CPD's compliance with 25 paragraphs of the consent decree within the Use of Force topic area, including two foundational paragraphs (¶¶160–161, 168–170, 188–193, 218, 222–227, 229–235).

The CPD met its deadlines for three of the paragraphs that had deadlines this reporting period (¶¶222, 226, and 231), meaning it missed its deadlines for 16 of the paragraphs. The deadline for ¶169 is January 1, 2020. The IMT determined that the CPD achieved Preliminary compliance for ¶¶168, 189, 222, 226, 229, and 231, but did not achieve Secondary or Full compliance for any of the paragraphs.

The CPD has made strides to address the consent-decree requirements for use for force. A significant effort was the CPD's creation of a Force Review Unit (FRU) in 2017. The CPD researched similar units across the country, and visited and consulted with law enforcement agencies in Los Angeles; Baltimore; Washington, DC; Seattle; and other cities. The CPD's FRU focuses on review functions and tactical training opportunities, aims to increase community and officer safety, and educates officers to reduce civil liability. The unit was "designed to bridge the gap that occurs when actions fall within the lines of policy but nonetheless present opportunities to improve tactical execution."[40] The unit has been reviewing Tactical Response Reports for use-of-force incidents since 2017. The IMT has concerns that the FRU is understaffed, which has created a backlog of use-of-force incidents to review.

During this reporting period, the CPD shared a number of draft documents for the IMT to review regarding use of force, including draft policies for pointing a firearm, the use-of-force policy suite, an FRU procedure for firearm pointing incidents, training bulletins for foot pursuits, and training bulletins for weapons discipline. Our analysis below details how each of these documents complies, or does not comply, with the consent decree and the progress that the City and the CPD is making toward compliance.

---

[40] Use of Force IMT Kick-off Presentation, 2019.

# Use of Force: ¶168

*168. Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.*

### Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          January 1, 2019          ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The CPD did not meet the January 1, 2019 deadline. However, the CPD reached Preliminary compliance before the end of the reporting period. Before 2019, the CPD did not have the necessary reporting mechanisms and data collection processes to efficiently capture all foot pursuit events, regardless of whether the pursuit was associated with a use-of-force incident. As of January 1, 2019, the CPD began capturing use-of-force incidents involving foot pursuits via the Tactical Response Report (TRR) form. However, foot pursuits that did not include use of force were documented only in the narrative section of officers' incident reports, making it difficult to recover and track this data.

On April 1, 2019, the Office of Emergency Management and Communications (OEMC) revised its existing policy and process for tracking and recording when the CPD officers engage in foot pursuits. The revised policy states, "Whenever a police officer engages in a foot pursuit, a FP (Foot Pursuit) event must be created whether or not the officer is already on an event to gather more accurate statistical data per the consent decree."[41] The OEMC also created new event type "FPX" (Foot Pursuit Cross-reference) to capture foot pursuits that occurred during another event. This new protocol allows the OEMC to cross-reference all calls that result in foot pursuits since April 2019 and aids the CPD in more efficiently tracking and analyzing all foot pursuit incidents.

In summer 2019, the CPD's Bureau of Technical Services developed a strategy to collect, track, and examine trends within foot pursuit data using information from

---

[41]  Office of Emergency Management and Communications: Police Dispatch Operations Training Notice, NO. TNG-19-007, April 3, 2019.

the OEMC, TRRs, and Investigatory Stop Reports (ISRs). It also began developing a data warehouse for foot pursuit data. The IMT appreciates the CPD's efforts to devise methods to record all foot pursuit data. While the CPD did not have the capability to track all foot pursuits by the January 1, 2019 deadline, it achieved this capability on April 1, 2019. Therefore, it is in Preliminary compliance as of August 31, 2019.

On August 22, 2019, the CPD provided the IMT with a foot pursuit analysis. The analysis identified the number of foot pursuits reported by the OEMC, the number of instances in which an officer indicated a foot pursuit during a reportable use-of-force incident using a TRR, and how often foot pursuits were recorded during reportable use-of-force incidents. The analysis reflects a total of 903 foot pursuits from January 1, 2019, to May 20, 2019, 200 of which (22.1 percent) occurred with reportable uses of force. The CPD also developed a "Foot Pursuit and Use of Force" Tableau dashboard at the end of August 2019. The dashboard tracks and analyzes the frequency of foot pursuits since April 1, 2019, by data source (OEMC and TRRs), by use or no use of force, and by level of force (using the CPD's current operational terminology of four levels). This data appears in Figure 12 below.

Figure 12:          Number of Foot Pursuits Reported by the OEMC and the CPD, April 1, 2019 to August 31, 2019

| Total Foot Pursuits | 1,231 |
|---|---|
| Total Foot Pursuits with Use of Force | 300 |
| Total Foot Pursuits with Use of Force, Level 1 | 184 |
| Total Foot Pursuits with Use of Force, Level 2 | 97 |
| Total Foot Pursuits with Use of Force, Level 3 | 32 |
| Total Foot Pursuits with Use of Force, Level 4 | 5 |

Since the IMT received this data near the end of our first reporting period, we have not yet completed a full audit of the data. We plan to review and audit these reports to determine whether they are complete by, in part, selecting certain types of arrests to determine if there are unreported incidents where officers have engaged in foot pursuits. Additionally, the CPD may have data on foot pursuits that resulted in some type of force in its TRRs since January 1, 2019, but the IMT has not yet fully reviewed that data.

# Use of Force: ¶169

**169.** *For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          January 1, 2020        ☑ **Not Yet Applicable**

The IMT included this paragraph in this reporting period, because the City and the CPD have taken several steps to comply with the consent decrees requirements regarding foot pursuits. As noted in the analysis for ¶168, the CPD has achieved the ability to track the frequency of foot pursuits associated with reportable use-of-force incidents, which is valuable and required. However, consent decree ¶169 also addresses the quality of the data being collected and whether that data, with or without TRRs, allows for meaningful assessment of tactical, equipment, or training concerns.

TRRs include details about the nature of the incidents that initiated the pursuits and the nature of the force used. However, the TRR form in its present state does not require officers to include the details of the pursuit. The FRU can review details regarding the foot pursuit in other reports associated with the incident (e.g., the ISR or arrest report). Ideally, moving forward, the data gleaned from TRRs in the future would address the "tactical factors and risks," as enumerated in ¶170(a)–(e). The CPD will only be able to identify equipment, tactical, and training concerns if there is reliable information available to the reviewers and if the reviewers have information about the nature and scope of pursuits. The current version of the TRR will not accomplish this goal for foot pursuits that occur with use-of-force incidents.

# Use of Force: ¶170

*170. CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

## Compliance Progress     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     July 1, 2019     ☐ **Met**   ☑ **Missed**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The CPD was not in compliance by the July 1, 2019 deadline for developing and issuing a supplemental foot pursuit training bulletin. However, on July 22, 2019, the CPD shared a draft bulletin with the IMT for review and comment. On August 21 and August 22, the IMT and the OAG (respectively) provided comments on the training bulletin.

The CPD addressed all requirements identified in the consent decree in its draft training bulletin; however, the draft bulletin does not incorporate best practices from other jurisdictions to the extent expected by the IMT. Specifically, the bulletin does not adequately address some of the behaviors that are prohibited by other jurisdictions (i.e., separating from one's partner or losing contact with the OEMC).

The IMT also believes that the tone of the training bulletin must do more to impress upon officers the inherent danger of foot pursuits. The CPD has been receptive to suggestions in this area and will hopefully set a more cautious tone in future drafts of the training bulletin.

# Use of Force: ¶188

> **188.** *By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.*

## Compliance Progress       (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**        January 1, 2019        ☐ **Met**   ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**       *Not in Compliance*
**Full:**          *Not in Compliance*

The CPD did not meet the January 1, 2019 deadline for developing a Weapons Discipline Training Bulletin. On June 27, 2019, the CPD shared the draft training bulletin with the IMT and the OAG for compliance review. Both the IMT and the OAG provided the CPD with written feedback on the bulletin on July 26, 2019 and discussed the bulletin on its bi-weekly conference calls. The CPD submitted a revised draft bulletin on August 21, 2019 for the IMT and the OAG to review. The draft bulletin describes the circumstances in which officers should and should not point their firearms. The completion of the training bulletin is dependent on completion of the firearm pointing policy and the incident review SOP. As of the end of this reporting period, the training bulletin and policy are in the final stages of development and approval, and the CPD has indicated its intention to complete the training bulletin during the next reporting period.

The CPD started training on its firearm pointing policy during the 2019 annual in-service training (¶188). We anticipate that the CPD will finalize the training bulletin before its officers attend further in-service training. As such, the IMT recommended that the CPD establish measures that will ensure members have properly read and reviewed the training bulletin. The CPD noted that it agrees with this recommendation and plans to deliver the bulletin through its online training portal, eLearning, before it goes into effect.

# Use of Force: ¶189

**189.** *CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.*

## Compliance Progress  (Reporting Period: March 1, 2019, through August 31, 2019)

| | |
|---|---|
| **Preliminary:** | *In Compliance* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

Before the beginning of the reporting period, the CPD developed and issued Department Notice D19-01, *Firearm Pointing Incidents*. Specifically, the CPD posted the policy publicly in January 2019 and listed an intended effective date of July 1, 2019. The CPD shared a draft of the policy with the IMT on May 8, 2019, for compliance review. After careful consideration of the IMT's and the OAG's suggested revisions to the draft policy, the CPD revised the draft policy to adopt the vast majority of the suggested revisions. The CPD posted the revised draft policy on its website from July 16 through July 31, 2019, to provide the public with a 15-day public comment period. The CPD also gave CPD members an opportunity to comment on the policy. The CPD, the OAG, and the IMT reviewed more than 250 comments submitted by the public and CPD members.

The latest version of the policy meets the requirements of the consent decree. The policy makes it clear that when an officer points a firearm at a person to detain the person that action amounts to an investigatory stop or arrest, and therefore, must be documented. It further states that officers are to point a firearm at a person only when objectively reasonable under the totality of the circumstances.

As noted for ¶188, the finalization of the revised firearm pointing policy depends on the completion of the Standard Operating Procedure (SOP) for incident review and the training bulletin. As of the end of this reporting period, the training bulletin and the policy are in the final stages of development and approval.

The CPD initiated training regarding the policy for pointing a firearm in the 2019 annual use-of-force training. We anticipate that the CPD will proceed to finalize the revised policy and the training bulletin before its officers attend further in-service training.

# Use of Force: ¶¶190–93

**190.** *Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

**191.** *OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.*

**192.** *A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.*

**193.** *CPD will ensure that the designated unit at the CPD headquarters level responsible for performing the duties required by*

> *this Part has sufficient resources to perform them, including staff*
> *with sufficient experience, rank, knowledge, and expertise.*

## Compliance Progress  (Reporting Period: March 1, 2019, through August 31, 2019)

| | | | |
|---|---|---|---|
| **¶190 Deadline:** | July 1, 2019 | ☐ Met | ☑ **Missed** |
| **¶192 Deadline:** | July 31, 2019 | ☐ Met | ☑ **Missed** |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The CPD did not meet the July 1, 2019, or the July 31, 2019, deadlines, but the CPD did make progress towards complying with ¶¶190–93 during this reporting period.

In March 2019, the FRU developed its first draft of a Firearms Pointing Incident Review SOP. As the draft states, the purpose of the SOP was to "establish written guidelines to conform with paragraphs 189–193 of the consent decree that mandate the implantation of a procedure to document and review instances in which a CPD officer points a firearm at a person in the course of effecting a seizure." In the following months the CPD revised and refined the SOP. On May 8, 2019, the CPD shared the draft SOP with the IMT and the OAG, both of which provided comments suggesting clarifications to standards, procedures, and reporting requirements. The CPD shared a revised version with the IMT on July 8, 2019, which incorporated suggestions from the IMT and the OAG. On August 6, 2019, the IMT responded that it had no objection to the July 8 revised SOP. Therefore, the CPD stated it would proceed with finalizing and implementing the SOP.

As noted previously, during this reporting period the CPD shared its January 2019 (which had an original effective date of July 1, 2019, to meet the deadline) and revised July 2019 Department Notice D19-01, *Firearm Pointing Incidents* with the IMT. The policy in its current version meets the requirements laid out in the consent decree. It clearly describes the following:

❖ Member and supervisor responsibilities for reporting pointing of a firearm (¶190);

❖ OEMC notifications and responsibilities (¶191); and

❖ The FRU's responsibilities, including review of the incident within 30 days and referrals of policy violations (¶192).

The Weapons Discipline Training Bulletin (referred to above regarding ¶¶188–89) aims to address Secondary compliance. (We note here, to avoid confusion, that

the City and the CPD report that the CPD finalized and disseminated the training bulletin after the reporting period and before the date of this report.)

Regarding Full compliance, the CPD has also exhibited its ability to operationalize elements of the firearm pointing policy and incident review SOP. First, the CPD established the FRU in 2017 after visiting and consulting with force-review units in Los Angeles; Baltimore; Washington, DC; Seattle; and other cities. The CPD's FRU differs significantly from force-review units in other law enforcement agencies in which units commingle review functions and evaluation functions. Because Chicago has the Civilian Office of Police Accountability (COPA), the review and evaluation functions stay separate. The FRU focuses on review functions and tactical training opportunities, with the goal of increasing community and officer safety and educating officers to reduce civil liability. The unit was "designed to bridge the gap that occurs when actions fall within the lines of policy but nonetheless present opportunities to improve tactical execution."[42]

Second, the CPD already links notifications to the OEMC with information required for the FRU's case review (e.g., body worn camera footage, vehicle-camera footage, and reports) (¶190).

The IMT recommends that the CPD address some issues related to the FRU to continue to refine its work. First, the community expressed a variety of concerns about the Firearm Pointing Incidents policy (e.g., how often and when the FRU will identify trends and when exemptions are permitted). The IMT recommends that the CPD respond to those concerns. Second, the CPD's announcement and initial training plan for the pointing policy will play a critical role in department-wide implementation. Finally, the IMT believes that the FRU is currently not sufficiently staffed to adequately perform its duties. The FRU intends to assign three officers to handle pointing incidents (¶193). The IMT is concerned that the current staffing plan will be insufficient due to the current backlog of FRU cases.

The current hiring freeze and the CPD's inability to attract candidates with the appropriate credentials also factors in to the FRU's staffing shortage. The City has assured the IMT that FRU positions are not limited by the hiring freeze. But if the City fills consent-decree-related positions by hiring from within, the CPD will be unable to backfill the new vacancies.

---

[42]    Use of Force IMT Kick-off Presentation, 2019.

# Use of Force: ¶218

*218.* *CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    January 1, 2019    ☐ **Met**  ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The CPD has not met the deadline for implementing a system that classifies force in the requisite three levels by January 1, 2019, and has not indicated when it expects to achieve this requirement (as of the end of the reporting period). The CPD currently operates and investigates using four levels of force.

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements of ¶218. When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph of the consent decree.

# Use of Force: ¶222

**222.** *A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.*

---

**Compliance Progress**     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     March 1, 2019     ☑ Met   ☐ Missed

**Preliminary:**     *In Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

When members discharge their weapons or when a subject is injured even though not designated as level 2 or 3, the CPD's policy has been to respond to the use-of-force incident, per the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017).

The new proposed draft of G03-02-02 retains this responsibility and contains the exact language from this consent decree paragraph.

In interviews conducted by the IMT in July 2019, supervisors were aware of this responsibility. Lieutenants who were interviewed indicated that they would often leave the station, respond to the scene, and oversee the investigation. There was an acute awareness of the importance of use of force investigations in the 11th and 6th Districts, which reported the most use-of-force incidents. In addition, supervisor duties and expectations were posted prominently in the report writing area.

# Use of Force: ¶223

> ***223.*** *For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

| Deadline: | March 1, 2019 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements of ¶223. When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph of the consent decree.

The prior version of the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017), addressed some but not all of requirements of ¶223. In its updated version, the CPD has added new and clarifying language regarding identifying and interviewing known available witnesses "to the extent reasonably possible," and with the exception of "any other circumstance where the Civilian Office of Police Accountability (COPA) receives an administrative notification and responds to the scene."

# Use of Force: ¶224

*224. In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    March 1, 2019    ☐ **Met**    ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements of ¶224. The revisions use almost verbatim language from the consent decree to ensure that responding supervisors comply with ¶224. The revisions state the following: "for Level 2 and Level 3 reportable use of force incidents involving injury or complaint of injury for which a COPA notification is not required, undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available." When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph.

The language of the consent decree and the revised G03-02-02 direct CPD members to do more than they were previously required to do by going door-to-door and actively seeking out witnesses to use-of-force incidents.

# Use of Force: ¶225

**225.** *A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.*

## Compliance Progress     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          March 1, 2019          ☐ **Met**   ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**              *Not in Compliance*

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements of ¶225. The revisions use almost verbatim language from the consent decree to ensure compliance with ¶225. The revisions state, "A supervisor who used reportable force or ordered a use of reportable force during a use of force incident will not perform the functions and responsibilities of the reviewing supervisor or approving supervisor for the incident." When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph.

# Use of Force: ¶226

> **226.** *CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.*

**Compliance Progress**     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          March 1, 2019          ✓ **Met**     ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

It has been the policy of the CPD—as articulated in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017)—that the responding supervisor (or "Reviewing Supervisor," as used in the directive) document information collected and the actions taken. Thus, the CPD is in Preliminary compliance with ¶226. Additionally, the revised proposed policy for completing TRRs, as directed in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), clearly describes the responsibilities of responding supervisors to collect information and document actions.

In 2017, the CPD revised its TRR form to require officers to complete a narrative that describes the force used and the circumstances necessitating the level of force. In the revised form, the CPD also emphasized the need for supervisors to describe in greater detail the extent of their efforts to collect information and identify witnesses in the narrative of the TRR. The CPD has also incorporated instruction on TRRs into in-service training and developed online guides for the completion of TRRs to assist supervisors in fulfilling this responsibility.

In interviews conducted in July 2019, commanders, lieutenants, and sergeants of the 6th and 11th Districts demonstrated a general understanding of their responsibilities pertaining to TRRs. In one district, the responsibilities and expectations for each rank were prominently posted in a superior officer's room. The FRU must ensure that TRRs are completed thoroughly and discuss TRR errors with district supervisors.

# Use of Force: ¶227

***227.*** *Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.*

## Compliance Progress       (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          March 1, 2019          ☐ **Met**    ☑ **Missed**

**Preliminary:**        *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**               *Not in Compliance*

The current policy, General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, does not address ¶227 of the consent decree. However, the proposed revisions to the G03-02-02 (dated July 8, 2019), address the requirements of ¶227. The revisions use almost verbatim language from the consent decree to ensure compliance with ¶227: "any Department member who becomes aware of information indicating that a reportable use of force incident was not reported will immediately notify his or her supervisor." In addition, the proposed revised General Order 03-02, *Use of Force*, addresses the notification of an unreported use of force to a supervisor in the "Duty to Intervene and Report" section. When the CPD finalizes these policies, it will be in Preliminary compliance with this paragraph of the consent decree.

The IMT acknowledges that the CPD could use Rule 22 of the *Rules and Regulations of the Chicago Police Department* for compliance, which prohibits "failure to report to the Department any violation of Rules and Regulations or any other improper conduct which is contrary to the policy, orders or directives of the Department." However, this regulation lacks the specificity that ¶227 requires.

In our discussions during this first reporting period, the CPD indicated it was not aware of any instance where an officer reported a previously unreported use of force. The IMT's request for this information was met with a mixed response regarding where this material would exist and whether it does exist. It is unclear to the IMT whether this information would reside within the Bureau of Internal Affairs or at the district level (which would require the district to forward it to COPA). At a minimum, the IMT believes that the CPD should articulate a clear process for reporting unreported use-of-force incidents and where this data and information will be maintained. The IMT requested this information and discussed this issue during its August 15, 2019 bi-weekly use-of-force conference call with the CPD.

# Use of Force: ¶229

> **229.** *All reportable uses of force by CPD members must be re-viewed by CPD supervisors.*

## Compliance Progress      (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          March 1, 2019          ☐ **Met**   ☑ **Missed**

**Preliminary:**       *In Compliance*
**Secondary:**        *Under Assessment*
**Full:**                  *Not in Compliance*

It has been the policy of the CPD—as articulated in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated October 16, 2017)—for the responding supervisor (or "Reviewing Supervisor," as used in the directive) to document information collected and actions taken. The policy establishes the responsibilities of both reviewing supervisors and approving supervisors. In accordance with this policy, all TRRs have been and are currently reviewed by a supervisor. Furthermore, the current proposed revision to G03-02-02, dated July 8, 2019, also requires review of all reportable uses of force. The CPD is in Preliminary compliance with ¶229.

Regarding Secondary compliance, the CPD has engaged in a variety of activities to educate members on use of force, including reviewing supervisors' responsibilities:

❖ Before the CPD released the 2017 revised use-of-force policy, all CPD members, including supervisors, completed a four-hour classroom training on use of force and the revised policy. Supervisors received training before other CPD members, as well as an extra hour of training on the completion and review of TRRs and the responsibilities of the officers and supervisors. This training approach enabled supervisors to promote the value of the training to officers and answer questions regarding the training and TRRs.

❖ All supervisors are also required to attend the 2019 two-day (16-hour) use of force in-service training. As of July 2019, attendance at the 2019 training for district supervisors was around 50 percent. The IMT attended the two-day use of force training on July 23, 2019, where we observed supervisors and police officers training side-by-side with one message on expectations. The training also included scenario-based exercises with a focus on the proper completion of TRRs after a scenario. Students completed a TRR for the scenario and received immediate review and feedback from instructors. The CPD aims to complete the 2019 training department-wide by the end of December 2019.

❖ The CPD's internal network (Clearnet) provides guidance for supervisors for reviewing reportable uses of force and TRRs.

❖ The FRU also provides informal training and feedback to reviewing supervisors and CPD members on how to properly complete TRRs and related forms.

As a result of interviews with sergeants and lieutenants in the 6th, 8th, and 11th Districts, the IMT feels that there is a general understanding of the duties among supervisors to review use-of-force incidents. There were also signs posted in the district stations that clarify those responsibilities.

# Use of Force: ¶230

> **230.** *After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").*

## Compliance Progress     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     March 1, 2019     ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements that CPD supervisors who hold at least the rank of lieutenant evaluate incidents (¶230). GO3-02-02 describes the responsibility of the ranked supervisor and addresses the higher-ranking member requirement. The policy states that the investigation of the incident and completion and approval of TRR – Investigation forms (TRR-Is) will be, "completed by a supervisor at least one rank higher than the highest-ranking member using reportable force during the incident or the appropriate exempt-level supervisor." When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph.

For Secondary compliance, as noted previously, the CPD has engaged in a variety of activities to educate members on use of force, including reviewing supervisors' responsibilities (see analysis for ¶229).

# Use of Force: ¶231

> *231. The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.*

## Compliance Progress   (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**      March 1, 2019      ☑ **Met**    ☐ **Missed**

**Preliminary:**      *In Compliance*
**Secondary:**      *Not in Compliance*
**Full:**      *Not in Compliance*

General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report,* dated October 16, 2017, addresses the requirement that a supervisor review all information in the investigatory report, advise a subject of his or her rights, and visually inspect the subject for any injuries. Per the consent-decree requirement regarding the supervisor's interview of the suspect, the policy states that the assigned supervisor will "conduct an investigation into the use of force incident by attempting to interview the subject of any use of force and record the subject's statement regarding the use of force in the space provided on the TRR-I." The policy also specifies the purposes for which an interview will be conducted. Thus, the current policy satisfies the requirements of consent decree ¶231 and the City and the CPD are in Preliminary compliance.

The proposed revisions to G03-02-02 (dated July 8, 2019) leave no doubt as to the purposes of the interview with the insertion of the word "solely." The revised policy now states the following: "the assigned supervisor will conduct an investigation into the use of force incident by attempting to interview the subject of any use of force, solely about the use of force incident." The revised policy also elaborates on what information the approving supervisor should review.

# Use of Force: ¶232

> *232. For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:** March 1, 2019 ☐ **Met** ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements of ¶232. Specifically, the revised policy states that the assigned supervisor will complete the "Lieutenant or Above/Incident Commander Review" section of the TRR-I and will do the following:

❖ "review the portion of the TRR . . . for sufficiency and completeness";

❖ "conduct a supervisory evaluation to determine whether the member's use of force response was in compliance with Department policy and directives"; and

❖ "determine if the member's use of force requires a notification to the Civilian Office of Police Accountability."

When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph.

During the IMT's assessment, it confronted challenges with assessing compliance due to differing terminology for the title supervisors. The consent decree uses the titles "responding supervisor" and "reviewing supervisor," while the CPD and its policies use the titles "reviewing supervisor" and "approving supervisor" for the same respective positions. The CPD acknowledged this confusion and noted that it would align its terminology with these terms of the consent decree.

# Use of Force: ¶233

> ***233.*** *For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          March 1, 2019          ☐ **Met**   ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not in Compliance*
**Full:**              *Not in Compliance*

Consent decree ¶233 requires the CPD supervisor to do three things: (1) provide timely feedback to officers and superiors after a use-of-force incident, (2) provide support or additional training where necessary, and (3) take appropriate action. The current General Order 03-02-02 *Incidents Requiring the Completion of a Tactical Response Report*, dated October 16, 2017, requires notifying COPA, but does not include details regarding supervisor feedback to officers.

The proposed revisions to G03-02-02 (dated July 8, 2019) satisfy both requirements. Specifically, it states that the approving supervisor will:

❖ "if appropriate: provide timely, constructive feedback to the member engaged in the reportable use of force and the reviewing supervisor"; and

❖ "determine if the member's use of force requires a notification to the Civilian Office of Police Accountability (COPA) to obtain a complaint log (CL) number. A notification to COPA is required for all incidents involving the uses of force that may violate the law or Department policy."

The consent decree assigns these responsibilities to the reviewing supervisor, but the revised policy assigns the responsibilities to the approving supervisor. This requires clarification. During this reporting period, the CPD was unable to fulfill the IMT's request to provide data on how many times supervisors have referred cases to COPA.

# Use of Force: ¶234

> *234. CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.*

## Compliance Progress  (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**  March 1, 2019  ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, dated July 8, 2019, address the requirements of ¶234. Specifically, the revised policy states that the assigned supervisor will do the following:

- ❖ "determine if the member's use of force requires a notification to the Civilian Office of Police Accountability (COPA) to obtain a complaint log (CL) number. A notification to COPA is required for all incidents involving the use of deadly force . . . . uses of force that may violate the law or Department policy";

- ❖ "if appropriate: provide timely, constructive feedback to the member engaged in the reportable use of force and the reviewing supervisor"; and

- ❖ "indicate the Department members who were identified in the incident report as being on the scene of the use of force incident or who are reasonably believed to have relevant knowledge or information regarding the reportable use of force incident."

The consent decree specifies that these responsibilities must be carried out by the reviewing supervisor. However, in the proposed policy these responsibilities are to be carried out by the approving supervisor.

# Use of Force: ¶235

> **235.** *All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    March 1, 2019    ☐ **Met**   ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The CPD's current use-of-force policy does not address the time limits for supervisors to complete their review. During interviews with CPD district lieutenants in July 2019, various supervisors provided differing input on the appropriate time to complete the supervisory review. Some noted that reviews should be completed by the end of the tour of duty and others noted that reviews be completed within 24 to 48 hours of the incident. Supervisors generally preferred to finish their review before the end of a tour of duty, but indicated that more time may be needed in exceptional, very involved cases, such as those with multiple officers.

The proposed revisions to the General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report* (dated July 8, 2019), address the requirements of ¶235. Specifically, it states the following: "the investigation of the incident and completion and approval of all TRR-Is will be completed within 48 hours of the use of force incident, unless an extension is approved by the appropriate exempt-level supervisor." When the CPD finalizes this policy, it will be in Preliminary compliance with this paragraph.

To review Full compliance, the IMT plans to focus on complicated multi-officer cases to ascertain whether the CPD is meeting the time limits for supervisory reviews.

# Use of Force: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified several "foundational paragraphs" within the Use of Force section of the consent decree, which include ¶¶160–67, 173, 176–78, 181–87, 197–200, 202–16, and 228. During our first reporting period, we assessed two of these foundational paragraphs, ¶¶160 and 161.

\*\*\*

## Consent Decree ¶160

> **160.** *CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.*

## Compliance Status

It is apparent upon reviewing the CPD's use-of-force policies that the CPD began many reforms before the issuance of the consent decree. The CPD sought and received community input on its use of force policies and practices between 2015 and 2017.

As the IMT looks at the critical importance of community input in guiding the future of the City and the CPD, it acknowledges that the CPD has begun to make changes in its use of force policies at the urging of the community.

While the CPD's community engagement efforts remain a concern for the IMT, we appreciate the CPD's recent efforts to solicit community comments on its proposed Firearm Pointing policy in July 2019. The CPD received more than 260 comments that it is currently reviewing. On an August 29, 2019 conference call with the CPD, however, we queried whether the CPD has policies or practices in place regarding responses to community input. The CPD was unable to provide any process or documentation in this area.

In the early stages of our monitoring efforts, it is important to note the role that the community has played in driving change to date. Community input has been essential, but ensuring community input is solicited in a timely fashion and continuing to meet the demands of the consent decree will be a challenge. We believe it will be critical for the CPD to obtain and respond to community input early in the process, not as the last step.

## Consent Decree ¶161

*¶161 CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of techniques that may include, but are not limited to, the following: a. using time as a tactic by slowing down the pace of an incident; b. employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover; c. continual communication, including exercising persuasion and advice, and providing a warning prior to the use of force; d. requesting assistance from other officers, mental health personnel, or specialized units, as necessary and appropriate; and e. where appropriate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.*

## Compliance Status

De-escalation is a principle that was adopted by the CPD in October 2017, when it revised its use of force policy. The emphasis on the need for de-escalation is reflected in every policy related to use of force, whether it be a policy regarding firearms, Tasers, batons, or oleoresin capsicum (OC) spray.

Within the 2019 use of force scenario-based training, a department member's ability to use de-escalation techniques is put to the test. The ability to use distance, speech, tone, empathy, and other tools to peacefully resolve a situation are emphasized in the training. Officers are trained in tactics to use in difficult situations and in several scenarios that officers are likely to encounter.

Probably the most critical factor in assessing the CPD's commitment to de-escalation is the need to describe the de-escalation strategies used during a given incident in the narrative section of the proposed revision of the TRR. Specifically, when reporting a use-of-force incident, the CPD member must describe in detail what steps he or she used to de-escalate a situation. In law enforcement, what gets measured gets done. Insisting that officers describe in detail what steps they took to de-escalate, rather than just check a box, reinforces to CPD members that de-escalation is a core principle. The IMT recognizes these efforts to date, but we believe that achieving compliance and demonstrating that de-escalation is a core principle remains a work in progress. The IMT will continue working with the Parties to assess compliance holistically.

The CPD should provide more clarity and direction to its CPD members on de-escalation strategies in both its policies and training.

As the CPD finalizes the use of force policy suite, the IMT recommends that the CPD provide more detailed examples of various de-escalation techniques in each policy, rather than rely on the boilerplate language that is at the front end of each policy. The CPD should also continue to explore innovative de-escalation tactics and best practices.

# V. Recruitment, Hiring & Promotions

## Guiding Principles

The IMT will assess compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **249.** *Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

> **250.** *The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

> **251.** *The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

> **252.** *The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

## Summary of Compliance Assessments

There are no deadlines for the Recruitment, Hiring, and Promotions section in the first reporting period. Nonetheless, the IMT has worked to familiarize itself with this topic area and the City's corresponding efforts.

The CPD has recruiting and hiring processes that are intended to identify and process large numbers of police officer candidates on an ongoing basis and to identify and select the best qualified candidates for promotion. CPD personnel have indicated that reforming the promotional processes is one of highest consent-decree-related priorities.[43] The IMT understands that hiring and promotions are both driven by the City's Hiring Plan.[44]

The deadlines to assess the CPD's recruitment, hiring, and promotions processes start in 2020. The consent decree requires the CPD to secure expert services to assess its recruitment and hiring processes to ensure that its policies and practices comply with the law and are transparent by December 31, 2020.[45] It also requires that "within 18 months of the Effective Date, and at least every three years thereafter, the CPD will obtain an independent expert assessment of its promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and practices comply with the law, are transparent," and comply with the consent decree.[46] The consent decree further requires that "within 365 days of the Effective Date, the CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions."[47] While compliance deadlines for this topic area fall outside the first reporting period, the IMT is concerned that promotional-exam processes that precede reforms may further exacerbate officer suspicions and distrust.

The IMT met with the CPD and its human-resources personnel onsite in July 2019. We discussed recruitment, hiring, and promotions processes. We also have established and continue bi-weekly calls in which the IMT and the Parties discuss issues regarding consent-decree requirements.

---

[43] *See* Police Foundation, *Opinions of Officers of the Chicago Police Department on the Upcoming Consent Decree: A Report to the State of Illinois Office of the Attorney General* (July 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/07/Opinions-of-Officers-of-the-Chicago-Police-Department-on-the-Upcoming-Consent-Decree-Final.pdf.

[44] The City's various hiring plans are available on their website. *See* City, *Human Resources*, https://www.chicago.gov/city/en/depts/dhr/supp_info/hiring_plans.html.

[45] *See* ¶258.

[46] ¶261.

[47] ¶264.

# VI. Training

## Guiding Principles

The IMT assessed compliance with the applicable Training paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.

> **266.** CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.

> **267.** CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.

> **268.** The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.

## Summary of Compliance Assessments

In this first reporting period, the IMT assessed the CPD's compliance with five paragraphs of the consent decree within the Training topic area (¶¶320, 323, 336, and 339–340).

The CPD met its deadline for two of the five paragraphs (¶¶320 and 323*) and missed its deadlines for three of the paragraphs (¶¶ 336, 339, and 340).[48] The IMT determined that the CPD achieved Preliminary compliance for ¶320(a) and did not achieve Secondary or Full compliance for any of the five paragraphs.

To address the lack of mandatory annual training, the City and the CPD committed substantial training efforts, even before the effective date of the consent decree. In fact, ¶318 mentions many of these efforts:

> *318. The Parties recognize that CPD has begun to develop and implement an In-Service Training Program for its officers. The Parties acknowledge that CPD has developed a project plan establishing development and implementation of the In-Service Training Program from 2018 through 2019 that includes the following components: a. a list of planned courses, including the status of the development and approval of any new course curricula; b. the dates that CPD officers collectively will start and complete the planned courses; c. the identification of any need for additional instructors, equipment, and training facilities and a schedule for addressing the needs; and d. a list of CPD personnel responsible for overseeing each project plan task.*

During this reporting period, the CPD worked to build and improve its in-service training and field training programs and worked to train all CPD members on the consent decree's requirements. These efforts included meeting with hundreds of officers during standing roll calls. The IMT reviewed various training documents and looks forward to the CPD's progress during the next reporting period.

---

[48] We have placed an asterisk on ¶323, because the City and the CPD did not provide sufficient proof that they met the deadline—which they did—until after the reporting period. Because the IMT believes this was the result of a genuine misunderstanding regarding what evidence the City and the CPD needed to provide to prove compliance, we have included this deadline as met in this report. We cannot, however, find that the City and the CPD met compliance with ¶323, because we did not receive the requisite proof within the reporting period. The City, the CPD, the other relevant entities, the OAG, and the IMT are actively working to clarify the requisite levels of evidence for the next reporting period. *See generally* The City of Chicago's Achievements and Challenges section, above.

# Training: ¶320

*320. The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours by the end of 2018; b. 24 hours by the end of 2019; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year.*

## Compliance Progress   (Reporting Period: March 1, 2019, through August 31, 2019)

**¶320(a) Deadline:**  December 31, 2018  ☑ Met  ☐ Missed

|  | ¶320(a) | ¶320(b – d) |
|---|---|---|
| **Preliminary:** | *In Compliance* | *Not Yet Applicable* |
| **Secondary:** | *Under Assessment* | *Not Yet Applicable* |
| **Full:** | *Under Assessment* | *Not Yet Applicable* |

The City and the CPD met Preliminary compliance by the first deadline in ¶320. The IMT reviewed the CPD Training Oversight Committee (TOC) records, CPD policies, training plans, lesson plans, curricula, logs, and sign-in sheets to determine the compliance status of this paragraph. Special Order 11-10-01, "Training Notification and Attendance Responsibilities," establishes the minimum number of in-service training hours required for 2019, 2020, 2021, and subsequent years.

The CPD did not provide the IMT with a policy that establishes the minimum number of training hours for 2018 as required in ¶320a. However, a Bureau of Organizational Development Education and Training Division memo, dated December 31, 2018, identifies the in-service training courses provided, the number of sworn members who needed in-service training in 2018, and the number and percentage trained as of December 31, 2018. Between 91.5% and 99.1% of personnel who were required to receive the training successfully completed it.

While the 16-hour requirement for 2018 was not established by a written policy, retrospective department records support 16 hours as a baseline training practice. Therefore, the CPD has met the Preliminary requirement for this paragraph. At the end of the reporting period, the IMT was still assessing the 2018 training records for Secondary and Full compliance.

The Secondary and Full compliance for the rest of ¶320 cannot be met until the end of 2021.

# Training: ¶323

***323.*** *As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in person mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training.*

---

## Compliance Progress     (Reporting Period: March 1, 2019, through August 31, 2019)

**¶323(a) Deadline:**          December 31, 2018          ☑ **Met\***          ☐ **Missed**

|  | ¶323(a) | ¶323(b – e) |
|---|---|---|
| **Preliminary:** | *Not in Compliance* | *Not Yet Applicable* |
| **Secondary:** | *Not in Compliance* | *Not Yet Applicable* |
| **Full:** | *Not in Compliance* | *Not Yet Applicable* |

\* As we explain further below, the IMT found that the City met the December 31, 2018 deadline for ¶323(a), but the City and the CPD did not provide the IMT with sufficient evidence until after the reporting period ended.

The CPD undertook an enormous effort to train its entire workforce in a compressed timeframe. There is no doubt that CPD provided training, but to achieve a compliance status, the City and the CPD is also required to provide sufficient evidence that the training met Preliminary, Secondary, and Full compliance. The deadline has an asterisk because the CPD did not sufficiently demonstrate that it had provided at least 16 hours of in person mandatory courses in 2018 until after the reporting period. As a result, we cannot say that we found that the CPD was in any level of compliance at the end of the reporting period. Thus, we will provide a more complete analysis this paragraph in the next monitoring report.

As referenced in ¶320 above, the CPD established the requisite number of training hours for 2019 and following years. The apportionment of hours for 2019, however, does not specifically track ¶323 requirements. The TOC-approved 2019 Training Plan, for example, requires 16 hours of use-of-force training and eight hours of training for either implicit bias, Law Enforcement Medical and Rescue Training (LE-MART), or cardiopulmonary resuscitation (CPR).

The IMT reviewed additional lesson plans, curricula, and other records to assess the content and flow of these training classes. While IMT members attended part of a 16-hour use-of-force in-service training in July 2019, the City did not provide proof of attendance records within the first reporting period. Moreover, the IMT had not yet examined the lesson plans for the 2018 and 2019 mandatory and elective in-service training classes by the end of the reporting period. Therefore, while it appears that the use-of-force in-service classes were in person, the IMT needed more information before the end of the reporting period to assess compliance. The CPD did not provide the requisite evidence that the CPD met the "in person" criteria, and the IMT did not review or confirm that information until after the reporting period ended.[49]

---

[49] The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, At-tachment B at 2.

# Training: ¶336

**336.** *Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    March 30, 2019    ☐ **Met**   ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The IMT reviewed five compliance documents and 10 reference documents to assess compliance with ¶336. The compliance submission materials included three curricula and two Special Orders. The reference materials included three forms, four policies, and three training guides. The IMT submitted review comments to the CPD, followed by explanatory calls with the City, the CPD, and the OAG. At the end of the reporting period, the proposed Special Orders, draft curricula, and training guides—designed to ensure consistency across districts—were still in development.

# Training: ¶339

> **339.** *Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.*

**Compliance Progress**   (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**   May 30, 2019   ☐ **Met**   ☑ **Missed**

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not in Compliance*
**Full:**   *Not in Compliance*

During the first reporting period, the CPD developed an electronic training course to deliver to CPD members through the CPD's eLearning platform. While the IMT and the OAG have reviewed multiple iterations of these materials, the CPD did not reach Preliminary compliance, because the CPD did not complete the final, approved version within the reporting period. (To avoid confusion for current CPD members, however, we note that the IMT has now approved the training and the CPD has released it.)

The CPD created eLearning accounts to provide the IMT and the OAG with access to the platform and training. The IMT and the OAG reviewed the proposed training to ensure that it covers critical consent decree areas and is presented in a format that maximizes students' ability to absorb the training. The IMT and the OAG recommended several content- and format-enhancing revisions. The CPD received and incorporated many of the recommended revisions into an updated draft eLearning course. The IMT and the OAG were evaluating the updated draft at the end of the IMR-1 reporting period.

In addition to creating the eLearning course, the CPD also provided documents that indicate that the CPD has undertaken several additional efforts to educate department members about the ¶339 requirements. According to the CPD, those efforts include roll call briefings, department-wide messaging from the Superintendent, and the Office of Reform Management blog.[50]

---

[50]   City representatives informed the IMT that the CPD's Office of Reform Management maintains an internal blog that provides additional information to the Department about the consent decree and provides answers to frequently asked questions concerning the consent decree.

# Training: ¶340

**340.** *In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    May 30, 2019    ☐ **Met**    ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The IMT reviewed four documents to assess compliance with this paragraph: a report on In-Service Compliance Rates by Bureau; General Message Reference #249723, dated August 15, 2019; Special Order 11-10-01; and General Message Reference #249968, dated August, 26, 2019. The "Report" tracks detectives training attendance. The CPD required supervisors to read the two General Messages to CPD members at roll call for five consecutive days to reach CPD members across shifts and schedules. The Special Order includes "Training Notification and Attendance Responsibilities." The CPD has not yet adopted a policy document or training offering that includes the language specified in 340(a) and (b), or the assurances in 340(c). The IMT will work with the CPD during the upcoming period to establish Preliminary compliance.

# VII. Supervision

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** *Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.*

> **342.** *The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.*

> **343.** *CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.*

> **344.** *Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.*

> **345.** *Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.*

> **346.** *Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate*

*conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.*

## Summary of Compliance Assessments

The consent decree does not include any deadlines for the Supervision section for the first reporting period. Nonetheless, the IMT has worked to familiarize itself with this topic area and the City's corresponding efforts.

Many of the CPD's policies give direction and guidance to CPD supervisors. Our initial reviews of current and draft policies indicate many of them clearly define supervisor duties and responsibilities. In its conversations with the CPD, the IMT has reinforced the importance of establishing accountability at all levels and the importance of adopting policies that will guide accountability and transparency. Supervisors must play an active role in helping the CPD reaching operational compliance. Policy and training are effective ways to inform organizational expectations, but supervisors must accept their roles in ensuring that change is accepted and practiced among officers.

The CPD has begun briefing and training all supervisors on the various elements of the consent decree, encouraging them to ask questions and clearly communicating the importance of establishing compliance at all levels, especially the supervisory level. The CPD has developed training guides for newly promoted supervisors requiring them to shadow supervisors to gain field experience and to appreciate the responsibilities before they assume their new position.

The CPD must ensure that supervisors receive consistent and appropriate training in their management responsibilities. IMT interviews with supervisors have revealed that many supervisors struggle with balancing their on-street duties with administrative responsibilities.

The consent decree requires the CPD to begin implementing a Unity of Command/Span of Control model to help ensure that supervisors have more opportunities to effectively monitor, train, and support the officers they supervise. The CPD has begun those efforts by collecting baseline requirements and analyzing workflow. Thus far, the CPD has focused its analysis on calls for service data, self-initiated assignments, training, proactive policing, community engagement opportunities, and administrative duties. Each of these elements will help address the quantity and quality of work. The goal is to ensure all supervisors may focus upon their squads by reducing the number of officers they supervise during any one shift and allow supervisors to perform the duties and responsibilities associated with their role. The IMT looks forward to the CPD's continued work on these issues.

# VIII. Officer Wellness and Support

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the consent decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *377. In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> *378. The City and CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> *379. The City and CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> *380. The City and CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

## Summary of Compliance Assessments

In this first reporting period, the IMT assessed the CPD's compliance with two paragraphs of the consent decree within the Officer Wellness and Support topic area (¶¶387 and 409).

The CPD missed its deadline for ¶387 and met its deadline for ¶409. The IMT determined that the CPD did not achieve any level of compliance for ¶387 and achieved Preliminary compliance for ¶409.

During this reporting period, the CPD advanced its efforts to comply with the requirements of the Officer Wellness and Support section. Notably, the CPD hosted an Officer Wellness Summit in partnership with the University of Chicago Crime Lab in June and hosts a periodic Superintendent's Speaker Series, which is focused on officer-wellness topics. The CPD also hired seven additional licensed mental health professionals.

# Officer Wellness: ¶387

**387.** *Within 180 days of the Effective Data, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:** August 28, 2019 ☐ **Met** ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT reviewed the CPD's Project Plan for researching, developing, and implementing an eLearning module and decentralized training to comply with ¶387. The IMT notes that the Project Plan did not comply with the August 28, 2019 deadline for developing and implementing this training. Appreciating the importance of legal and executive review of the subject matter at issue, the IMT understands the CPD's extended timeline. However, the CPD has fallen short of meeting even the extended timelines it prescribed in the Project Plan.

During the Officer Wellness bi-weekly call on September 16, 2019, the CPD explained that the content of the eLearning had been sent out on September 10, 2019, for internal review, and that the CPD's timeframe for implementation depended on the timing of those reviews and the extent of the feedback received from reviewers. While the IMT again appreciates the importance of these reviews, with this degree of uncertainty now driving implementation timelines, the IMT is concerned that the CPD and its City partners are not fully appreciating the urgency of meeting this requirement. Over the next reporting period, the IMT expects the CPD to dedicate the resources necessary to at least bring itself on track to meet the deadlines it set forth in the Project Plan.

# Officer Wellness: ¶409

**409.** *CPD has implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.*

## Compliance Progress     (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     March 1, 2019     ✓ Met   ☐ Missed

**Preliminary:**     *In Compliance*
**Secondary:**     *Under Assessment*
**Full:**     *Under Assessment*

The CPD put in place a mandatory program for affected officers and, thus, met Preliminary compliance with ¶409. We highlight that a licensed clinical psychologist directs the Commission on Accreditation for Law Enforcement Agencies (CALEA) qualified program and now oversees a team of 11 other in-house, licensed clinicians who support various training efforts, such as those required by ¶409. It is evident that the CPD, from its executive leadership down, continues to research and develop additional opportunities to address officer wellness concerns. The IMT also notes that the CPD continues its outreach with both academic and law enforcement partners nationwide to advance the state of knowledge around officer wellness and its implications on officer performance. Throughout this reporting period, the IMT also heard feedback from community members about the importance of officer wellness and mental health.

# IX. Accountability and Transparency

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the consent decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police reform and accountability, and OAG and the City know this critical work will continue.*

> *423. The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance*

*with this Agreement; that all investigative findings are sup-ported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*

## Summary of Compliance Assessments

In the first reporting period, the IMT assessed the City's compliance with thirty paragraphs of the consent decree within the Accountability and Transparency topic area, including 10 foundational paragraphs (¶¶425–426, 429, 434, 436, 441–444, 448, 455–457, 461, 478–481, 488, 493, 498, 525–526, 528, 530, 538, 542, 558, 563, and 565).

This section of the consent decree requires actions by various City entities, including the CPD, the Civilian Office of Police Accountability (COPA), and the Office of the Inspector General (OIG). Ultimately, the City bears the responsibility for ensuring compliance. As a result, if a consent decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. We explain, however, the status of each entity's efforts.

The City met its deadlines for three of the paragraphs that had deadlines this reporting period (¶¶538*, 558, and 565), and it missed its deadlines for the other paragraphs.[51] The IMT determined that the City achieved Preliminary compliance for ¶¶538, 558, and 565 and did not achieve Secondary or Full compliance for any of the paragraphs.

During this reporting period, the IMT worked to gain an understanding of the City's complex accountability systems and spent time with the CPD Bureau of Internal Affairs (BIA), COPA, and the OIG. Throughout the reporting period, the IMT reviewed policies, plans, and other documentation, engaging in many hours of discussion about the City's efforts. BIA focused on clarifying policy, achieved a complete re-write and clarification of its *Command Channel Review* policy, and took steps toward clarifying other policies and internal roles and responsibilities. COPA focused on policies, procedures, and training, particularly regarding investigations of officer-involved shootings. The IMT looks forward to continued progress on all the requirements in the Accountability and Transparency section.[52]

---

[51] We have placed an asterisk on ¶538, because the City did not provide sufficient proof that it met the deadline—which it did—until after the reporting period. Because the IMT believes this was the result of a genuine misunderstanding regarding what evidence the City needed to provide to prove compliance, we have included this deadline as met in this report. While we did not receive sufficient evidence that the City and the Police Board met the deadline until after the reporting period, we did receive sufficient evidence that the City and the Police Board met Preliminary compliance before the end of the reporting period. To avoid using asterisks in the future, the City, the CPD, the other relevant entities, the OAG, and the IMT are actively working to clarify the requisite levels of evidence for the next reporting period. *See generally* The City of Chicago's Achievements and Challenges section, above.

[52] The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 2.

## Accountability and Transparency: ¶¶425–26

*425. The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c .the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

*426. As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**¶425 Deadline:**        May 30, 2019              ☐ Met   ☑ Missed

|                  | ¶425                | ¶426                |
|------------------|---------------------|---------------------|
| **Preliminary:** | *Not in Compliance* | *Not in Compliance* |
| **Secondary:**   | *Not in Compliance* | *Not in Compliance* |
| **Full:**        | *Not in Compliance* | *Not in Compliance* |

The IMT reviewed websites and written materials and determined that the CPD's and COPA's guidance for filing complaints lacks sufficient detail to meet Preliminary compliance for ¶¶425–26.

For the CPD, the IMT reviewed a CPD pamphlet regarding how to file a complaint, which includes basic information about how complaints may transition from the CPD to COPA and vice versa. The pamphlet did not have an accompanying plan detailing how the CPD would distribute it, whether it would be produced in languages other than English, whether it would be available digitally, or how CPD members would be trained on its use. The IMT recognizes that a hard copy pamphlet is important for distribution at community meetings and to those who may not be digitally connected, but the CPD must also focus on providing digital communications.

Likewise, the IMT reviewed the CPD's website for information regarding how to file a complaint. The complaint-reporting page is currently in a relatively obscure location on the CPD's website, and instructions for filing a complaint contain little information regarding how the complaint will be addressed or in what timeframe. The IMT searched the CPD's online policies and could not locate a policy that directs employees to assist the public in filing a complaint by phone, email, or in person.

In comparison, the CPD's draft BIA Standard Operating Procedure (SOP) addresses ¶¶425(c) and 425(d) by stating that "BIA will make information and accompanying instructions available to people who speak languages other than English" and "will ensure individuals may submit allegations of misconduct." This section of the SOP does not, however, explain how the CPD will accomplish these tasks.[53]

The IMT also has ongoing concerns regarding the actual complaint process. The CPD should consider developing a robust process to allow community members to

---

[53] While the IMT recognizes that the BIA invested much time, energy, and thought into developing the lengthy draft SOP, many sections of the SOP were taken directly from the consent decree without explaining how the work will be accomplished.

engage in the complaint process by making the CPD website more user-friendly and understandable, especially for its non-English speaking community members.

For COPA, the IMT reviewed COPA's website and determined that it is easy to understand and navigate. The complaint process is clearly explained with a graphic to help people understand COPA's role in the City's overall complaint process. COPA does not post its policies and procedures on its website, but the website provides COPA's *Rules and Regulations*, which provide insight into the complaint process. On the other hand, while COPA lists five options for reporting a complaint (¶425(f)), the explanation of the phone option does not clarify how people might complain on weekends, which may require callers to leave a message or speak to someone who is not a COPA employee. Likewise, the online complaint process, for instance, currently requires complainants to provide and attest to their first name and last name, rather than permitting anonymous complaints.

In the next reporting period, the IMT will continue to assess the CPD's and COPA's ongoing work to address the requirements of ¶¶425–26.

# Accountability and Transparency: ¶436

*436. Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

## Compliance Progress   (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:** May 30, 2019   ☐ **Met**   ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT reviewed the CPD's relevant policy and SOP and determined that the policy fails to meet the requirements of ¶436. Specifically, the IMT reviewed the CPD's General Order 08-01-02, *Specific Responsibilities Regarding Allegations of Misconduct*, which addresses the process of reporting misconduct but does not mention protecting the reporting CPD member against retaliation, as required. The CPD draft BIA SOP attempts to address this requirement by including language from ¶436(c), but the draft SOP does not clarify how the CPD will address retaliation complaints.

On the other hand, the officers that the IMT interviewed about G08-01-02 were aware of the policy, and several came close to directly quoting parts of the policy. Several indicated that they have a duty to immediately report misconduct according to CPD policy and state statute.

# Accountability and Transparency: ¶457

*457. Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress  (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    May 30, 2019    ☐ **Met**  ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The IMT reviewed the CPD's draft BIA SOP, which addresses these requirements, and determined that it lacks sufficient detail to meet compliance with ¶457. Specifically, ¶457 states that the CPD "will create a written policy," "will retain" complaints, and "will transfer" complaints. The draft BIA SOP, in contrast, indicates that the cases listed "may be assigned," but does not specifically address why, when, or how an investigation will be transferred to an Accountability Sergeant.

The IMT suggested that the CPD develop a standalone, public-facing policy for Accountability Sergeants' duties and responsibilities, which should include clear direction regarding the transfer of cases between BIA and a CPD district. The CPD may also need to develop a standalone policy for transfer of cases between BIA and Accountability Sergeants since the transfer decision appears to depend on many factors. It is the IMT's understanding that the CPD agrees with this suggestion to create standalone policies and will proceed accordingly.

## Accountability and Transparency: ¶478

> **478.** *Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding preliminary investigations, including preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

### Compliance Progress  (Reporting Period: March 1, 2019, through August 31, 2019)

| Deadline: | June 29, 2019 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The IMT reviewed all relevant COPA and CPD policies and procedures and determined that they lack sufficient clarity to meet Preliminary compliance with ¶478.

For the CPD, the IMT reviewed the CPD's draft BIA SOP, which includes a *Conduct of the Investigation* section. This section is over 30 pages long and includes a wide range of topics, from investigator conduct and Accountability Sergeants to collecting evidence and preparing photo lineups. This section also includes the affidavit-override process described in the consent decree. The draft BIA SOP also addresses preliminary investigations, including some mention of investigative timelines. The language, however, is vague and lacks specific timelines and investigative responsibilities.

The IMT also interviewed officers during this reporting period. The officers we spoke with did not have a full understanding of the CPD's discipline processes, and many said that they would ask a sergeant they trust to learn about the process if they were involved in an investigation. A public-facing policy that addresses the internal investigative process may alleviate any potential confusion and misinformation among CPD officers.[54]

For COPA, the IMT reviewed several COPA policies, including policy 3.1.4, *Affidavit, Affidavit Override, and Affidavit Override Exception*; policy 3.1.2, *Fact Gathering*; and policy 3.3.1, *Quality Assurance*. First, we found policy 3.1.4 to be clear and concise, with definitions and references to appropriate statutes, ordinances, and

---

[54] The affidavit-override process should very nearly mirror COPA's policy 3.1.4 entitled *Affidavit, Affidavit Override, and Affidavit Override Exception* (see related comments below), which is concise, clearly explains processes, and includes relevant definitions, ordinances, agreements, and references for additional information. The IMT recognizes that there may be some concerns if CPD and COPA policies resemble each other, but this policy—and others that address the same or similar procedures—should be consistent.

collective bargaining agreements. Second, we found that policy 3.1.2 explained expectations for all investigations in a direct manner. While the policy provides expectations for the investigative process, it lacks specific direction for COPA investigators. COPA should consider including a reference to its *Investigations Manual* in this policy. Third, we found that policy 3.3.1 is critical to the expectation of quality investigations.

In addition, the IMT reviewed several COPA policy appendices, which the IMT believes could be included or referenced within the *Fact Gathering* policy.

Finally, the IMT reviewed COPA's *Investigations Manual* and determined that it was a comprehensive investigative guide that focuses primarily on major cases, such as an officer-involved shooting or death. The IMT has concerns, however, regarding how and when COPA uses the *Investigations Manual*, if at all. The IMT will continue to assess COPA's use of the *Investigations Manual* in the following reporting period.

# Accountability and Transparency: ¶479

**479.** *Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:** June 29, 2019 ☐ **Met** ☑ **Missed**

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The City did not meet Preliminary compliance with ¶479 in the first reporting period. First, the IMT did not receive documentation regarding timelines, benchmarks, and goals for the investigative process from the CPD. The CPD referenced, for example, Special Order 08-01-01, *Conduct of the Investigation*, but this policy does not provide specific investigative timelines.

Second, the IMT reviewed COPA's *Investigations Manual*. The manual includes investigative benchmarks. In fact, the opening paragraph sets expectations and discusses the importance of investigative benchmarks and timelines. On the other hand, the manual should give clearer direction for COPA investigators. Likewise, at the end of the reporting period, it was not clear to the IMT how or whether COPA uses the *Investigations Manual*.

Moreover, in late July 2019, COPA submitted policy 3.3.2, *Timeliness and Benchmarks*, for IMT review. While 3.3.2 is clear, it contains open-ended words and phrases, such as "best efforts" and "aims." COPA should include definitions that avoid investigative personnel and managers from following different interpretations of the policy. Policy 3.3.2 also lacks some of the helpful detail from the COPA *Investigations Manual*. COPA should consider, for example, using language and tables from its *Investigations Manual* to provide additional detail for this policy.

## Accountability and Transparency: ¶480

**480.** *Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

### Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

| Deadline: | June 29, 2019 | ☐ Met | ✓ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶480 in the first reporting period. The IMT reviewed the City's relevant draft policy: *City Policy Regarding Procedures for COPA, BIA, and the Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation*. The policy provides clear direction regarding how and when evidence will be forwarded to COPA, BIA, OIG, or the Accountability Sergeants. The policy does not, however, address who makes decisions, how decisions are made, who should conduct reviews, or how reviews should be conducted to ensure that decisions are appropriate. The IMT understands that the City intends to revise this policy.

The IMT did not receive information from the CPD regarding ¶480 requirements. The policy from the City may serve as the basis for the CPD's compliance, but it is important for the CPD to address these requirements in its own policy or refer to the City policy for direction.

In comparison, the IMT reviewed records from COPA. Specifically, the IMT reviewed COPA policy 1.3.8, *Civil and Criminal Complaint Review* (revised in August 2019), which speaks directly to COPA's process to review and consider evidence from civil and criminal litigation.[55]

---

[55] The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 2. As reflected in the Monitoring Plan, the IMT originally assessed ¶¶481 and 482 together. Based on feedback from the Parties, we divided our analysis into separate sections.

# Accountability and Transparency: ¶481

**481.** *The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶481 in the first reporting period. In response to this paragraph, the City provided the IMT with what it described as "correspondence between CPD and COPA since March 1, 2019 regarding requests to reopen investigations concerning incidents that allegedly occurred more than five years before the date that COPA became aware of the allegations." These records included three letters from COPA, requesting the CPD Superintendent to reopen a case, and the Superintendent's three responses. On the face of the letters, two of the Superintendent's responses were within 30 days (2 days and 15 days), but one response took 35 days. These records were not sufficient to establish any level of compliance, did not include requests from the CPD or the OIG, and required follow-up conversations.

The CPD should develop a standalone policy that directs the Superintendent's actions regarding opening an investigation of incidents that allegedly occurred more than five years before the date that COPA, the CPD, or the OIG became aware of the allegations. This policy should specifically direct the Superintendent to respond within 30 days.

The CPD, COPA, and the OIG should also ensure that they have systems in place to track requests and responses to the Superintendent. At the end of the reporting period, the IMT's review of their systems was ongoing. COPA, for example, sent the IMT a 374-page 2018 Employee Handbook. This handbook includes policy 1.3.9, *Re-Open Case Procedure*, which addresses reopening a case for further investigation. By the end of the reporting period, the IMT had not fully reviewed this handbook for compliance with this paragraph, because it was not submitted specifically for compliance review under the requirements of this paragraph. Likewise,

at the end of the reporting period, it was not clear how COPA uses this handbook, if at all. [56]

---

[56]    In the City's written comments, the City "notes that COPA policy 1.3.9 was provided to the IMT for review on August 5, 2019." *See* Attachment B at 2. Specifically, on August 5, 2019, in response to a request from the IMT, COPA emailed members of the IMT 70 documents. One of those documents included a 2018 "Employee Policy Handbook," which includes 1.3.9 on page 171 of 374 pages. In the corresponding cover letter, COPA does not refer to 1.3.9 (although it does refer to other policies in the handbook), nor did it give the IMT reason to believe that the 1.3.9 in the 2018 handbook would apply in 2019. In fact, in the cover letter, COPA suggests the opposite by asserting that "a large portion of these investigative policies [in the Employee Policy Handbook] are under review and thus the better source for our current practice can be found in the draft policies (Item No. 1)." Policy 1.3.9 was not included in the draft policies. The City did not suggest that the IMT should consider this version of 1.3.9 for compliance purposes until after the reporting period. Finally, the City did not provide this document via the agreed-upon delivery methods (i.e., secure load files) until after the end of the reporting period. We do not include this point to contend that the City did not produce this document within the reporting period. Instead, we note that the City and the IMT now have a more reliable production process and line of communication to help prevent this issue in the future.

## Accountability and Transparency: ¶488

*488. In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to participate in the preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

**Compliance Progress**   (Reporting Period: March 1, 2019, through August 31, 2019)

**488(d) Deadline:**   March 31, 2019   ☐ Met   ☑ Missed

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not in Compliance*
**Full:**   *Not in Compliance*

The City did not meet Preliminary compliance with ¶488 in the first reporting period. Overall, the IMT reviewed the CPD BIA's and COPA's relevant policies and noted several concerns, regarding investigative notification, timely responses, scene control, and investigative access.

Moreover, the IMT believes that the CPD and COPA need to better align their policies. While there are circumstances when the CPD needs to prevent COPA from accessing a scene due to legitimate ongoing safety concerns, the policies must ensure that COPA otherwise receives immediate access to the crime scene and is not unduly delayed by untimely notifications. The CPD must not, for example, require COPA investigators to wait outside of a crime scene due to safety considerations that do not warrant their exclusion. The CPD should include in its policy that the CPD will document the arrival of all responders to a scene—including COPA investigators—to account for and ensure requisite participation in the investigation. The CPD and COPA should continue conversations with the Cook County State's Attorney Office to consider roles, responsibilities, and clear communications to develop consistent policies.

Both COPA and the CPD have much work ahead to comply with this paragraph. For COPA, the IMT reviewed COPA's *Major Incident Response* policy and found that it lacked sufficient detail to properly structure a unified, timely response to officer-involved critical incidents. COPA's policy requires clarity regarding the role that COPA expects to fulfill.

Likewise, for the CPD, the IMT reviewed the BIA's General Order 03-02-03, *Firearms Discharge Incidents Involving Sworn Members* policy, and General Order 03-06, *Officer Involved Death Investigation* policy. For these policies to be effective, they must clarify the roles of the officers involved, the responding on-duty sergeants and lieutenants, the Crime Prevention Information Center (CPIC), the OEMC, responding command and executive level officers, and the Detective Bureau.[57] The IMT provided written comments on both policies and discussed them

---

[57] Clarifying these policies may also involve updating the CPD's policies regarding detectives, which currently override the officer-involved-shooting and officer-involved-death policies.

with CPD leadership, raising concerns regarding notification, scene control, access, and responsibilities.[58] By the end of the reporting period, the CPD was in the process of reviewing the IMT's comments and revising both policies.

The CPD and COPA versions of the officer-involved-shooting and officer-involved-death policies should refer to or mirror one another. COPA representatives have expressed concern that COPA may be perceived to lack independence if the COPA policy is too closely aligned with the CPD policy. For investigation integrity, however, the two policies must align to ensure that both agencies understand and adhere to their roles in officer-involved-shooting and officer-involved-death incidents.

The IMT's work on this paragraph is ongoing to ensure that the relevant policies address the unique landscape of these investigations. After completing multiple site visits and reviewing many CPD, BIA, COPA, and other City records, the IMT has identified several areas regarding the City's current compliance status with ¶488 that merit further review. For example, the IMT heard concerns that the CPD's notification system and order of notification may delay CPD and COPA responders to a scene of an officer-involved critical incident. In the reporting period, the IMT did not have the opportunity to raise this concern with CPIC. Moreover, CPIC and the Office of Emergency Management and Communications (OEMC) have critical roles in the notification process, but their roles lack clarity in the CPD policy. The IMT will continue looking into these issues in the coming reporting period.

Leadership from COPA and the CPD's Research and Development department have indicated willingness to revise and update their policies. The IMT believes that both agencies will work together to better align their investigative processes to improve the integrity of officer-involved-shooting and officer-involved-death investigations.

---

[58] The IMT also notes that the CPD's officer-involved-death policy does not include a Sanctity of Life statement, per best practices.

# Accountability and Transparency: ¶493

*493. OAG acknowledges that, in many districts, CPD has designated Accountability Sergeants whose responsibilities include receiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. Within 120 days of the Effective Date, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervising the Accountability Sergeant's investigations ("BIA Lieutenants"). The policy will provide, among other things, a process by which: a. within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a summary of the complaint allegations concerning the involved CPD member; b. within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or corrective action, if any; and c. an immediate supervisor of the involved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative findings, recommended discipline or corrective action, if any, unless the CPD member declines to meet.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

| Deadline: | June 29, 2019 | ☐ Met | ☑ Missed |
|---|---|---|---|

| | |
|---|---|
| Preliminary: | *Not in Compliance* |
| Secondary: | *Not in Compliance* |
| Full: | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶493 in the first reporting period. Paragraph 493 requires that the Accountability Sergeant position have a standalone, public-facing policy that directs the Accountability Sergeants in all aspects of their work, allows department members to understand the work of the Accountability Sergeants, provides clear information to the public, and assists the district and unit commanders who supervise the Accountability Sergeants.

The CPD does not, however, currently have a policy addressing Accountability Sergeants. The IMT thoroughly reviewed the CPD's draft BIA SOP during this reporting period, which addresses Accountability Sergeants' responsibilities throughout. This is not, however, the policy required by the paragraph. Moreover, the IMT found that the job descriptions and responsibilities for Accountability Sergeants in

the draft SOP are unclear. It is the IMT's understanding that the CPD will follow the IMT's recommendation to create a standalone policy.

We must underscore the importance of this policy based on our monitoring efforts in the first reporting period. During various site visits, for example, the IMT heard that Accountability Sergeants experience a high turnover rate across the department. The CPD members reported that often the newest or least-experienced sergeant is assigned to the position of Accountability Sergeant. Less experienced sergeants may not have robust investigative backgrounds and may therefore be less prepared for the role of Accountability Sergeant. The IMT spoke with some Accountability Sergeants and found that many are unclear about their specific responsibilities or how cases are assigned to them.

The IMT also spoke with CPD officers during this reporting period and asked them what they knew about Accountability Sergeants. Many of the officers reported to the IMT that they were not familiar with the role or title of "Accountability Sergeant," nor were they aware of the responsibilities of the position. After the IMT provided a brief description of the responsibilities of Accountability Sergeants, some officers tried to correct the IMT interviewers by referring to these Accountability Sergeants as "CR Sergeants." Many of those interviewed, specifically the most inexperienced officers, were wholly unfamiliar with the concept of Accountability Sergeants or "CR sergeants."

# Accountability and Transparency: ¶498

*498. The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

## Compliance Progress   (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**   March 31, 2019   ☐ **Met**   ☑ **Missed**

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not in Compliance*
**Full:**   *Not in Compliance*

The City did not meet Preliminary compliance with ¶498 in the first reporting period. The IMT reviewed several drafts of the revised policy addressing *Command Channel Review* (Special Order 08-01-03) and worked closely with the CPD throughout that process. While IMT approval of this policy fell outside of the IMR-1 reporting period, the IMT notes that it approved this revised policy after the reporting period, and we will update this section for subsequent reports accordingly.

Through discussions, meetings, and collaboration with the IMT, the CPD developed a new *Command Channel Review* policy that eliminates confusion, beginning with the title of the policy and extending to nearly every aspect of the policy. The new policy clearly addresses the Command Channel Review process. The policy now includes, for example, the Command Channel Bypass, which the CPD added after a suggestion from the IMT. The CPD agreed with the IMT that the Command Channel Bypass should be included in the Command Channel Review process and updated the policy to include reference to this process.

S08-01-03 demonstrates that the CPD can completely revise, revamp, and redevelop a policy in a relatively short period of time. The CPD's work on the new *Command Channel Review* policy is laudable and should serve as a template for future policies for the agency.

# Accountability and Transparency: ¶525

*525. Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    April 30, 2019    ☐ **Met**    ☑ **Missed**

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The City did not meet Preliminary compliance with ¶425 in the first reporting period. This paragraph requires the City to "propose a permanent method of selecting the Chief Administrator of COPA" and to "consider the views and recommendations of community stakeholders" in creating the permanent selection method. During the reporting period, the City indicated that it was in negotiations with the Grassroots Alliance for Police Accountability (GAPA) about a proposed ordinance that contains a permanent method for selecting the COPA Chief Administrator. On August 28, 2019, the City provided the IMT with a one-page memorandum that included an alternative permanent selection process for the COPA Chief Administrator.

This memorandum, however, lacks sufficient specificity. According to the memorandum, a seven-member selection committee will continue to suggest three candidates for the Chief Administrator position to the Mayor until the Mayor selects one of the candidates. The Mayor will appoint five members to the committee and the Chair of the City Council's Committee on Public Safety will appoint two members. The City's memorandum does not detail how the City considered views and recommendations of community stakeholders in the creation of this alternative process. These uncertainties were not resolved by the end of the reporting period, which was two days after the City provided this memorandum.[59]

---

[59]    The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 3.

# Accountability and Transparency: ¶526

> **526.** *Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          August 30, 2019          ☐ Met   ☑ Missed

**Preliminary:**     *Not in Compliance*
**Secondary:**      *Not in Compliance*
**Full:**              *Not in Compliance*

By the end of the reporting period, the IMT did not find sufficient evidence to conclude that the City was in compliance with ¶526. First, the CPD did not provide the IMT with a policy that requires on-boarding training within 180 days of being assigned to the BIA. On August 30, 2019, the City submitted the CPD's BIA *Training Plan* (dated August 29, 2019), which provides a high-level overview of training for new BIA investigators. Some of these training materials appeared to be outdated. The IMT requested additional training lesson plans to conduct a proper evaluation. The IMT notes, however, that the draft BIA SOP includes many aspects of basic BIA training concepts that could be included in the *Training Plan*.

Second, the IMT also reviewed the COPA *Training Plan*, dated July 15, 2019, and determined that the plan provides clear expectations for COPA training. Specifically, three sections of the plan provide expectations for delivery and evaluation of training. Another section, however, does not clarify whether the described training is for onboarding or in-service training. For proper evaluation, the IMT requires more information than it currently had at the end of the reporting period. While the COPA *Training Plan* is well structured, it remains unclear which COPA personnel have received on-boarding or in-service training, as no training rosters or course materials were provided by the end of the reporting period. The IMT attended some COPA training sessions and have documented concerns with the way the course material was presented and with the level of class participation. The IMT will continue to assess in-person training in the next reporting period.[60]

---

[60]   In the City's comments, the City read the IMT's draft report to mean that the IMT attended 77 hours of this training. Attachment B at 3. In the first reporting period, however, the IMT attended 77 hours of CPD and COPA training overall, which included training that was unrelated to this paragraph—such as School Resource Officer training.

# Accountability and Transparency: ¶528

*528.* *The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     August 28, 2019       ☐ **Met**   ☑ **Missed**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The City did not meet Preliminary compliance with ¶528 in the first reporting period. First, on August 30, 2019, the City provided the IMT with the CPD BIA's four-page *Training Plan* (dated August 29, 2019). Based on the *Training Plan*, the IMT cannot assess the requirements in subparagraphs (a) through (r) of ¶528, because it lacks sufficient detail. The City also provided training materials on August 13, 2019, including various PowerPoint presentations. Based on these materials, the

IMT could not determine whether the presentations were used for on-boarding, in-service training, or both.

Second, the IMT reviewed the COPA *Training Plan* (dated July 15, 2019). The overall format of the training plan is acceptable and includes background information about how the training plan was developed and how it should be used. It references, for example, procedural justice (¶528(b)); evidence collection (¶528(c)); objective evidence (¶528(j)); implicit-bias training (¶528(k)); relevant standards of proof (¶528(l)); relevant rules, policies, and protocols (¶528(m)); relevant state and federal law (¶528(n)); relevant CPD *Rules of Conduct* ¶528(o)); the Case Management System (¶528(p)); and the Performance Recognition System (¶528(r)).

While the IMT appreciates COPA's efforts in developing the *Training Plan*, there are some requirements in ¶528 that are not included. For example, the plan does not mention complaint intake (¶528(a)), the consequences of failing to take a complaint (¶528(a)), or the affidavit-override process (¶528(d)), or the Performance Recognition System (¶528(r)). Likewise, regarding techniques for conducting impartial investigations of sexual misconduct (¶528(d)), the plan refers to "DV & SA," which lacks clarity and purpose. Finally, the plan does not provide the number of hours for each training block or which training topics are taught during in-service training and which are taught during on-boarding training.[61]

---

[61] The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 3.

# Accountability and Transparency: ¶530

***530.*** *Within 90 days of the Effective Date, COPA and BIA will create separate initial and in-service training plans.*

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**          May 30, 2019          ☐ **Met**    ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**       *Not in Compliance*
**Full:**                  *Not in Compliance*

The City did not meet Preliminary compliance with ¶530 in the first reporting period. The IMT reviewed COPA's detailed *Training Plan*, but it is unclear what training is provided to newly hired employees through "COPA Academy," as opposed to in-service training.

Likewise, the CPD has much work ahead to develop a comprehensive *BIA Training Plan* for both on-boarding and in-service training. As stated in our comments for ¶528, many of the details included in the draft BIA SOP can be removed from the SOP and developed into training courses.

# Accountability and Transparency: ¶538

**538.** *Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:** May 30, 2019 ☑ Met* ☐ Missed

**Preliminary:** *In Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

\* As we explain further below, the IMT found that the City met the deadline for ¶538, but the City did not provide the IMT with sufficient evidence until after the reporting period ended.

The IMT found that the City was in Preliminary compliance with ¶538 within the first reporting period. The IMT reviewed the Police Board's *Policy Regarding Community Input Received at Police Board Public Meetings* and discussed it with the Police Board Executive Director and the Police Board President. This deadline was met with an asterisk because, as of the end of the reporting period, the City had not provided records to establish that the Police Board created the policy before May 30, 2019. Instead, the IMT only had record that Police Board passed the policy at the board meeting following the May 30, 2019 deadline. The Police Board, however, provided the City with evidence that this policy was created before the May 30, 2019, deadline. Given various document production issues described in the beginning of the report, the City did not provide those records to the IMT.

The policy itself is clear and straightforward, but it was not clear how it held entities, such as the CPD or COPA, accountable for direct action or for responding to community issues or complaints raised during the Police Board's public meetings. The policy states that agencies will use "best efforts" to address concerns. In response, the IMT suggested that this language be strengthened by describing or defining "best efforts" or otherwise by incorporating the other expectations into the policy.[62]

---

[62] The IMT amended this section from a previous version provided to the Parties. *Compare* Attachment B at 3.

# Accountability and Transparency: ¶542

> *542. Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:** May 30, 2019 ☐ **Met** ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City did not meet Preliminary compliance with ¶542 in the first reporting period. On August 30, 2019, the City provided the IMT with the Police Board's one-page *Policy Regarding Training of Police Board Members and Hearing Officers* (August 28, 2019 draft). The IMT found that this policy is not sufficiently comprehensive to provide adequate basic or ongoing training in the complexities of the work that Police Board members or hearing officers are expected to perform.

The IMT recognizes that the topics included in the plan are taken from the consent decree, but suggests that the training policy include more specificity for each block of instruction. To ensure adequate training, for example, the IMT also suggests specifying training delivery methods in the policy, such as in-person or online. For example, the IMT reviewed the Police Board's draft training plan (dated August 26, 2019), which includes a four-hour ride along but only one hour of instruction on CPD policies, procedures, and disciplinary rules and investigations of police conduct. This plan demonstrates the need to have a more specific training policy to meet the needs of the Police Board members and hearing officers.

Thus, the IMT suggests that the Police Board develop a comprehensive training policy that details how the training will provide adequate onboarding instruction that prepares the Police Board members and hearing officers for their duties and ongoing in-service training that provides the most up-to-date, relevant law and procedures. Police Board members, for example, may have tenure for 10 years, so yearly updates on constitutional law and changes or refinements in police procedures are critical to their ability to make decisions in police-discipline cases. The IMT acknowledges that the Police Board is an unpaid volunteer body with complex and time-consuming responsibilities, but a training plan must be sufficiently developed to deliver training in a timely and appropriate manner.[63]

---

[63] The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 4.

# Accountability and Transparency: ¶558

*558. Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

---

## Compliance Progress  (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**  April 30, 2019  ☑ **Met**  ☐ **Missed**

**Preliminary:**  *In Compliance*
**Secondary:**  *Not in Compliance*
**Full:**  *Not in Compliance*

---

The IMT found that the City is in Preliminary compliance with ¶558 within the reporting period and met the deadline. The IMT reviewed the Deputy Inspector General for Public Safety's (Deputy PSIG's) *Policy Manual,* which is a comprehensive policy and procedure manual that provides guidance and direction to investigators, analysts, and employees who are involved in public safety audits and compliance. Specifically, the *Policy Manual* addresses many of the requirements of this paragraph, including the types of audits and investigations that the Deputy PSIG conducts of the CPD, COPA, and the Police Board.

The Deputy PSIG's *Policy Manual* commits to conducting data-driven evaluations, inspections, and reviews and reporting the results at least annually. The *Policy Manual* also requires the Deputy PSIG to make recommendations for improvement to correct deficiencies in the conduct or operations of the CPD, the Police Board, and COPA. Further, the *Policy Manual* requires the Deputy PSIG to conduct

quarterly Community Surveys to help develop project ideas for evaluations and reviews.

Finally, the OIG's website features data about complaint history, outcomes, and trends (found in the "OIG Information Portal" section). The IMT will assess the City's and the Deputy PSIG's efforts to meet Secondary and Full compliance in the next reporting period, as appropriate.[64]

---

[64] The IMT amended this section from a previous version provided to the Parties. *Compare* At-tachment B at 4.

# Accountability and Transparency: ¶563

**563.** *At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

### Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**        February 29, 2020        ☑ **Not Yet Applicable**

The IMT included this paragraph in this reporting period, because the deadline is unclear and may occur any time before February 29, 2020, at the Deputy PSIG's discretion. The IMT understands from discussions with the Deputy PSIG staff members, that they have not yet finalized their annual audit plan. The Deputy PSIG website includes a list of current projects and reports for all completed projects. The IMT looks forward to receiving the Deputy PSIG annual audit plan 60 days before the Deputy PSIG publishes it.[65]

---

[65]    The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, Attachment B at 4.

# Accountability and Transparency: ¶565

*565. At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.*

## Compliance Progress (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**     Quarterly     ☑ **Met**   ☐ **Missed**

**Preliminary:**     *In Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

The IMT found that the City met Preliminary compliance with ¶565 within the reporting period and met the deadline. The IMT recognizes the steps that the required actors have taken steps to improve the communication among the Deputy PSIG, COPA, and the Police Board, but the IMT requires additional documentation to make a full assessment of compliance. The IMT reviewed some documentation of four meetings held to date, but no agendas or meeting minutes were produced from the first two meetings. An agenda for the July 2019 meeting was produced, along with draft meeting minutes from that meeting, but the minutes have not yet been approved by the participants. The City and its entities may be in Full compliance with this paragraph, but the City has not yet provided us with sufficient evidence to establish that compliance.

## Accountability and Transparency: Foundational Paragraphs

As noted in the Monitoring Plan for Year One, the IMT has identified a number of "foundational paragraphs" in the Accountability and Transparency section of the consent decree, which include ¶¶429–30, 434, 441–44, 446, 448, 450–51, 453, 455–56, 459–62, 463–69, 484, 486–87, 497, 499–501, 552, and 561. During our first reporting period, we assessed 10 of these foundational paragraphs, including ¶¶429, 434, 441, 442, 443, 444, 448, 455, 456, and 461.

\*\*\*

### Consent Decree ¶429

> *429. The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

### Compliance Status

The OIG and the Deputy PSIG continue to host a website for CPD members to anonymously report officer misconduct.

### Consent Decree ¶434

> *434. When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

### Compliance Status

The IMT reviewed the CPD's Special Order 08-01-02, *Special Situations Involving Allegations of Misconduct* and the CPD's draft BIA SOP, which address the requirements of this paragraph. The relevant section of S08-01-02 is difficult to locate, and the title of the section does not indicate that it addresses domestic-violence situations involving CPD members. While the Special Order and the SOP direct CPD members to formally notify COPA when such situations arise, the direction is not clear and requires more specifics. The IMT looks forward to further

assessment of the City's compliance efforts toward compliance with ¶434 in the next reporting period.

## Consent Decree ¶441

**441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

### Compliance Status

Compliance with ¶441 will require a City ordinance change that grants COPA jurisdiction "to conduct administrative investigations of allegations of sexual misconduct." The IMT reviewed the draft BIA SOP, which directs the CPD to use its "best efforts" to report sexual misconduct to COPA. Unless a City ordinance is passed, however, it will remain unclear what "best efforts" entails for BIA personnel.[66]

## Consent Decree ¶442

**442.** *The City will ensure COPA has appropriately trained and experienced staff to conduct sexual misconduct investigations.*

### Compliance Status

The IMT reviewed the COPA *Training Plan*, which references instruction for COPA investigators regarding sexual-assault investigations. The *Training Plan* does not, however, indicate the number of hours of training dedicated to this instruction. The IMT will continue to assess whether COPA's training is complete and appropriate.[67]

## Consent Decree ¶443

**443.** *Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree*

---

[66]  The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, At-
tachment B at 4.
[67]  The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, At-
tachment B at 4.

> *that BIA may conduct the administrative investigation into alle-*
> *gations of sexual misconduct when they jointly determine that*
> *doing so avoids unnecessary disruption to the complainant.*

## Compliance Status

The IMT recognizes that compliance with ¶443 will require a City ordinance change. As with ¶441 above, the draft BIA SOP directs the CPD to use its "best efforts" to report sexual misconduct to COPA, but until the ordinance changes, it is not clear what the SOP is specifically instructing BIA personnel to do.[68]

### Consent Decree ¶444

> **444.** *Within ten days of the final disciplinary decision of each*
> *complaint of sexual misconduct against a CPD member alleging*
> *conduct against a non-CPD member, the City will provide the*
> *Deputy PSIG with the complete administrative investigative file,*
> *subject to applicable law. The Deputy PSIG will review and ana-*
> *lyze each administrative investigative file and, on an annual ba-*
> *sis, the Deputy PSIG will publish a report: a. assessing the quality*
> *of the sexual misconduct administrative investigations reviewed;*
> *b. recommending changes in policies and practices to better pre-*
> *vent, detect, or investigate sexual misconduct; and c. providing*
> *aggregate data on the administrative investigations reviewed,*
> *including: i. the volume and nature of allegations investigated,*
> *broken down by investigating agency; ii. the percentage of inves-*
> *tigations referred to the Cook County State's Attorney's Office*
> *("CCSAO") for criminal review; iii. the percentage of investiga-*
> *tions criminally prosecuted; iv. the percentage of investigations*
> *closed after the preliminary investigation; v. the percentage of*
> *investigations closed for lack of a signed complainant affidavit;*
> *and vi. the investigative findings and recommendations, includ-*
> *ing a summary breakdown of discipline recommended for inves-*
> *tigations with sustained findings.*

## Compliance Status

In its review of the draft BIA SOP, the IMT notes that it contains a statement regarding the CPD's responsibility to report each sexual misconduct complaint to the OIG. At the end of the reporting period, the IMT had not yet seen any

---

[68] The IMT amended this section from a previous version provided to the Parties. *See, e.g.*, At-tachment B at 2.

evidence that these complaints are transmitted to the Deputy PSIG in a timely manner. The IMT looks forward to further assessment of the City's compliance efforts toward compliance with ¶444 in the next reporting period.

## Consent Decree ¶448

> **¶448** If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.

### Compliance Status

The IMT reviewed relevant documentation from both COPA and BIA. BIA addresses these requirements within its SOP. While BIA and COPA have begun a productive conversation about these requirements, additional work from both entities is necessary to clearly identify how they will collaborate effectively. The IMT suggests that a CPD policy addressing the requirements of this paragraph be issued as a public-facing, standalone policy to provide information to CPD members and the public. The IMT suggests that this policy also identify all relevant personnel from all entities who will be involved in an internal investigation and disciplinary decision.

## Consent Decree ¶455

> **455.** All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.

### Compliance Status

The IMT reviewed relevant COPA and BIA policies. BIA addresses the "full and fair standard of proof" in its draft SOP. This section provides direction and an explanation of how the standard of proof will be determined. BIA and COPA

should consider making a standalone policy to ensure that all members of the department and the community understand how BIA conducts an investigation.

## Consent Decree ¶456

**456.** *The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

## Compliance Status

In our review of the BIA SOP, we noted that the language in the relevant section is a restatement of this consent decree paragraph. The SOP could benefit from including additional details, such as the standards by which an employee is chosen for an assignment in BIA or as an Accountability Sergeant, any automatic disqualifiers for assignment, and time limits for past disciplinary issues that allow for acceptance into BIA. As written, it appears that the standards are subjective. It is important that the CPD provides a detailed explanation of how it will "ensure" that disciplinary histories are reviewed before employment assignments as well as explain automatic disqualifiers, if any.

## Consent Decree ¶461

**¶461** *Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

## Compliance Status

From the IMT's review of relevant documentation, it is not clear how allegations of verbal abuse will be investigated—preliminarily or otherwise—or what priority these allegations will be given. While this paragraph does not state a timeline, BIA and COPA should consider creating one. The IMT notes its concern with the issues of verbal abuse in light of recent publicity of recorded officer and supervisor interactions with community members.

# X. Data Collection, Analysis & Management

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the consent decree's "Guiding Principles." these principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **566.** *Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> **567.** *In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Summary of Compliance Assessments

In this first reporting period, the IMT assessed the CPD's compliance with one paragraph of the consent decree within the Data Collection, Analysis, and Management topic area (¶569).

The CPD missed its deadline for ¶569. The IMT determined that the CPD did not achieve compliance at any level for ¶569 (Preliminary, Secondary, or Full).

During this reporting period, the IMT worked with the CPD to gain an understanding of the complexity of the CPD's current data collection, analysis, and management efforts. As we noted in the introductory sections of this report, the CPD faces serious data challenges and does not currently have the data resources and systems in place to meet all the demands of the consent decree. The IMT believes that the CPD is in the process of reorganizing several facets of its data management systems, and we look forward to working with the CPD and its continued efforts to improve in this area.

# Data Collection, Analysis & Management: ¶569

***569.*** *CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.*

---

## Compliance Progress    (Reporting Period: March 1, 2019, through August 31, 2019)

**Deadline:**    March 1, 2019    ☐ **Met**    ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In this reporting period, the City and the CPD agree that they did not provide the IMT with sufficient evidence that the CPD has a written or unwritten practice of collecting, tracking, and maintaining all of the documents in ¶569. As a result, we cannot find that the CPD is in compliance with any requirement of this paragraph. After the City and the CPD provides more information in the coming reporting period, we will assess whether the CPD's practices meet Preliminary, Secondary, or Full compliance.

# Conclusion and Looking Ahead to Independent Monitoring Report 2

The IMT has finished its monitoring efforts for the first reporting period (March 1, 2019 through August 31, 2019). The City did not meet many of the consent-decree requirements within the deadlines agreed to by the City and the OAG. The City, its entities, the OAG, and the IMT faced various onboarding and administrative obstacles before establishing consistent and efficient record and data production. The Parties and the IMT continue to work together to receive records, particularly data.

The City, the CPD, and the other relevant City entities have much work ahead, but the IMT is encouraged by the hard work that the City, COPA, the CPD's Office of Reform Management, and many others have demonstrated throughout the reporting period. Since March 1, 2019, the City and the CPD continue to make strides to incorporate the IMT and the OAG into its compliance efforts. We look forward to continued improvement.

The IMT's next semiannual report will cover the reporting period from September 1, 2019, through February 29, 2020. As described in our Monitoring Plan for Year One, we will continue to work with the City and the OAG to address the paragraphs we assessed in the first reporting period, as well as 60 additional paragraphs for the second period.

# Attachment A.
# Office of the Illinois Attorney General Comments



## OFFICE OF THE ATTORNEY GENERAL
### STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

October 30, 2019

<u>Via Email</u>
Margaret A. Hickey
Independent Monitor
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
MHickey@schiffhardin.com

Re:  **Comments on the First Independent Monitoring Report**
     **Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey,

The Office of the Attorney General of Illinois (OAG) appreciates the Independent Monitoring Team's comprehensive assessment of the City of Chicago's (City) and the Chicago Police Department's (CPD) compliance efforts in the first Independent Monitoring Report (Report). In broad brush, the OAG agrees with the Monitoring Team's assessment: that the City and CPD did not meet most of their consent decree deadlines and compliance obligations in the first reporting period. The consent decree gives the parties—the City and the OAG—an opportunity to comment on the Report before it is filed with the Court. The OAG offers these comments on the challenges and opportunities reflected in the Report as we move forward into the next reporting period.

As we begin this multi-year reform effort, we cannot forget why the consent decree exists. As the Police Accountability Task Force noted in 2016, "[r]acism and maltreatment at the hands of police have been consistent complaints from communities of color for decades."[1] Chicago has "a long, sad history of death, false imprisonment, physical and verbal abuse and general discontent about police actions in neighborhoods of color."[2] In its January 2017 report, the U.S. Department of Justice found that people of color experience far more incidents of police abuse, including

---

[1] RECOMMENDATIONS FOR REFORM, POLICE ACCOUNTABILITY TASK FORCE 6 (Apr. 2016), https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf.
[2] *Id.* at 7.

500 South Second Street, Springfield, Illinois 62701 • (217) 782-1090 • TTY: (877) 844-5461 • Fax: (217) 782-7046
100 West Randolph Street, Chicago, Illinois 60601 • (312) 814-3000 • TTY: (800) 964-3013 • Fax: (312) 814-3806
601 South University Ave., Carbondale, IL 62901 • (618) 529-6400 • TTY: (877) 675-9339 • Fax (618) 529-6416 

unreasonable force and race-based verbal abuse, than white residents.[3] And it found that CPD rarely holds officers accountable for misconduct.[4]

The OAG recognizes the City and CPD have implemented important changes in the years since the murder of Laquan McDonald, including revamping use of force policies, increasing training requirements, and improving community policing efforts. The OAG shares many of the Monitoring Team's positive sentiments about the City's and CPD's efforts towards compliance in the first reporting period. In particular, the OAG deeply appreciates the hard work done by CPD's Office of Reform Management in getting this significant effort underway. But there remain significant obstacles to timely and full compliance with the consent decree and, more importantly, to lasting police reform. To achieve reform, the Monitoring Team, in partnership with the community and the parties to the consent decree, will need to provide a clear-eyed assessment of those challenges and concrete recommendations to overcome them.

The implementation of the consent decree is a large and complex project. It requires sustained commitment from the City, CPD, the OAG, the Court and its monitor, and the many communities who have an interest in the process. We are at the very beginning of this undertaking. While there have been challenges in this first reporting period, the OAG is optimistic that the City and CPD can get back on track.

## Challenges to Full and Effective Consent Decree Implementation

The OAG sees several challenges to full and effective consent decree implementation. They include deficits in: (1) ownership of the consent decree across the entire police department and responsible City agencies; (2) resource allocation; (3) transparency; (4) data reliability; and (5) community engagement. The Report identifies many of these challenges, but we take the opportunity to discuss them in further detail because overcoming these challenges will be crucial to achieving sustainable reform.

As a party to the consent decree, the OAG is committed to working collaboratively with the stakeholders of this consent decree—the City, CPD, the Monitoring Team, the Coalition, the unions representing CPD officers, and the public—to ensure lasting police reform. During the first reporting period, the OAG remained in constant communication with the Monitoring Team and the City through calls, emails, bi-weekly subject matter teleconferences, and in-person meetings regarding the City's efforts to comply with the consent decree. The OAG also participated in many trainings, site visits, and meetings, including the Monitoring Team's weeklong site visit with the City and CPD, School Resource Officer trainings, in-service trainings at the Civilian Office of

---

[3] U.S. DEP'T OF JUSTICE CIVIL RIGHTS DIV. & U.S. ATTORNEY'S OFFICE N. DIST. OF ILL., INVESTIGATION OF THE CHICAGO POLICE DEPARTMENT 145 (Jan. 13, 2017), https://www.justice.gov/opa/file/925846/download.
[4] Id. at 8, 46–47.

Police Accountability (COPA), and community meetings hosted by CPD throughout the City. The OAG submitted written comments on dozens of policies, procedures, plans, training materials, and other documents required by the consent decree. The parties to this consent decree have worked together to lay an important foundation for the work ahead, but there remains far more work to do.

### Ownership across the Department and City Agencies

The OAG shares the Monitoring Team's sentiment that assessing compliance with the consent decree requires demonstrated commitment and involvement from the City and CPD leadership. CPD senior leadership must reinforce the message—with conviction, urgency, and frequency— that public safety and reform are mutually reinforcing and can be accomplished simultaneously.

Managing the consent decree requirements necessitates strong administrative functions, and CPD's Office of Reform Management has done a commendable job managing the numerous requirements of the consent decree, especially given the resource constraints identified below. But reform cannot be accomplished on paper or live only in CPD headquarters. It must be felt in the districts and reach the rank-and-file, and it must be a priority in the violent summer months as well as during the rest of the year.

Both the City and CPD could do more to demonstrate that reform will benefit the department, its officers, and the community. At times, the City's and CPD's leaders have seemed to approach the consent decree as an ancillary obligation or burden, rather than an opportunity to transform CPD's relationship with the community it serves. We urge the City and CPD to demonstrate through both words and action that implementing the consent decree is an urgent priority.

### Misallocation of Resources

As described in the Report, the City and CPD missed 38 out of 50 deadlines (or 76%) in the first reporting period and is not in preliminary compliance with 52 out of the 67 (or 78%) consent decree requirements reviewed by the Monitoring Team. Most of these missed deadlines and failed compliance obligations stem from the City's and CPD's failure to allocate resources appropriately.

Policy creation is a critical first step in the implementation of the consent decree. The consent decree establishes a three-step process for reform. First, the City and CPD must revise existing policies and create new policies to comply with the requirements of the consent decree. Second, the City and CPD must train officers on the new and revised policies. And third, only after the City and CPD complete the first two steps can the Monitoring Team begin to assess whether the City and CPD have "operationalized" the policies by putting them in to practice.

We agree with the Monitoring Team's assessment that insufficient staffing at CPD's Research and Development (R&D) Division, which is responsible for researching and drafting policies, is a barrier to timely policy completion. The OAG acknowledges and appreciates the dedication and hard work of the current R&D staff. But there are simply not enough of them to engage in the robust policy revision and creation process that CPD agreed to in the consent decree. This is troubling in light of the dozens of overdue policies required by the consent decree. CPD's policy review process also slows policy creation because CPD subjects each policy to multi-level review before submission to the Monitoring Team, the OAG, and community stakeholders for review. This has resulted in a delay in issuing even the most straightforward new policies and policy revisions. The backlog will only get worse as more deadlines approach.

It appeared throughout the reporting period that R&D's limited staff had capacity to focus on only one policy or group of related policies at a time. For example, CPD submitted draft versions of policies related to anti-discrimination and the public's right to record police officers on July 22, 2019. The Monitoring Team and OAG provided comments and feedback within 30 days. As of this writing, however, R&D has not yet responded to the Monitoring Team or the OAG feedback due to its limited staff and focus on other policies.

In general, the City and CPD have not allocated sufficient resources to allow the individuals working on implementation of the consent decree to succeed. For example, the Office of Community Policing, which has a committed and capable staff, cannot alone undertake the significant community outreach efforts necessary to ensure broad and deep community engagement in CPD's reform efforts. CPD's Education and Training Division is also not equipped with the permanent staff necessary to simultaneously consult on policy development and promptly develop training on new policies.

Additionally, until August 2019, CPD's Force Review Unit (FRU), which is responsible for reviewing and auditing officers' uses of force, was operating at less than 50% percent capacity of its necessary personnel. The staffing shortage was compounded by the FRU's lack of proper technology and adequate physical space to complete necessary reviews. The FRU's slow start is especially concerning because the FRU is about to begin reviewing firearm-pointing incidents, which CPD officers must report under a new policy set to take effect on November 1, 2019.

Again, the OAG acknowledges the hard work and dedication of those tasked with implementing the requirements of the consent decree, but we agree with the Monitoring Team that the City and CPD must dedicate additional resources and staff for efficient implementation.

*Lack of Transparency*

We also agree with the Monitoring Team that the City's ability and willingness to produce information related to consent decree implementation has been a challenge. The consent decree requires the City and CPD to provide answers to inquiries from the Monitor and the OAG. Yet the overwhelming majority of requests the Monitor and the OAG submitted during the first reporting period did not yield a timely or complete response, and the City and CPD supplied most responsive documents at the end of or after the reporting period. The City and CPD recognize this challenge and have been working to respond more promptly. However, it is unclear that the City and CPD have a sufficient strategy to resolve these problems, particularly the bottlenecks in its legal review process.

The sparse responses by CPD and the City prevented the Monitoring Team and the OAG from getting a complete and unvarnished view of the current state of reform efforts. For example, the consent decree requires most misconduct investigations to be complete within 180 days, but the City and CPD have not produced information that would allow the Monitoring Team and the OAG to assess how long misconduct investigations currently take. The lack of information has been particularly troubling at COPA, which has failed to produce even basic information, such as its number of current staff. Similarly, COPA only belatedly supplied the OAG with policies it had revised to comply with the consent decree.

Another concerning challenge in the first reporting period was the City's failure to consistently engage with the OAG and the Monitoring Team in the review of policies, plans, and training materials that COPA and other non-CPD City agencies must create or revise to comply with the consent decree. The consent decree establishes a collaborative process for the Monitoring Team and the OAG to review, comment on, and, if necessary, object to draft policies, plans, and training materials prior to their implementation. It also requires a meaningful opportunity for the public to review and comment on draft policies. This process is meant to improve the City's accountability systems, promote transparency, and provide an avenue for community engagement in the reform process. We urge the City, and COPA in particular, to fully participate in this process in the coming reporting period.

*Data Reliability*

We appreciate the Monitoring Team's recognition of CPD's work to improve its data reliability. We also share the Monitoring Team's concerns about CPD's current data collection, data management, and data systems. The consent decree emphasizes the vital roles reliable data can play in promoting police accountability. CPD utilizes many different systems to collect data—some modern and some antiquated—and currently does little to validate the data it collects. CPD collects and maintains data through over 100 different applications. But CPD has indicated that

data accuracy, redundancies, and/or inefficiencies are often determined on an ad hoc basis. CPD does not currently perform regular evaluations of its data collection systems, including assessing how CPD uses its data systems, how its data is managed, and how its data systems are or should be structured. Engaging in this type of evaluation is critical because, in our observation, CPD does not always structure its data systems in a way that facilitates the collection of useful data.

CPD recognizes these problems and has taken steps to address them, including reorganizing its headquarters unit devoted to data and analytics. It has also contracted to obtain an independent assessment of its information systems. This is essential, and we commend CPD for taking these steps. As CPD increasingly relies on data in the performance of its work and releases more data to the Monitoring Team, the OAG, and the public, it must ensure its data is reliable, and it must be transparent about any weaknesses in its data. This will increase trust inside and outside of CPD.

*Community Engagement*

Finally, we share the Monitoring Team's concerns about CPD's efforts to engage the community during the first reporting period. CPD has a long way to go to build trust, particularly in communities that have disproportionately experienced abusive policing. CPD must make community policing the responsibility of every officer and part of the work of every district and unit, and it must develop strong community partnerships at all levels. These partnerships will help CPD implement problem-solving strategies tailored to the needs of particular communities. For example, CPD has only begun to tackle its sizable challenge to engage youth and to increase positive interactions between officers and young people.

As the Monitoring Team notes, the City and CPD must also provide opportunities for the public to help develop policies, and it must offer opportunities earlier in the review process for the public to comment on them. The City and CPD should also include more community members and organizations in the development and delivery of training. We also echo many of the Monitoring Team's observations about CPD outreach. In particular, we agree that CPD needs to do more to increase community representation at CPD-sponsored meetings and events. We also heard concerns from the public about the lack of sufficient notice for CPD's School Resource Officer meetings, as well as concerns about the representation at those meetings. And we heard, and agree, that CPD could have offered other ways for the community to engage in the consent decree implementation process outside of meetings. At the same time, we are encouraged by the work of the Office of Community Policing to engage the public in district-level planning to reduce crime and solve problems. We look forward to engaging on these issues in the months and years ahead.

### Additional Comments about the Report

We offer a few final thoughts about the Report. Although the OAG agrees with the Monitoring Team's overall assessment of compliance, in some cases we may have a somewhat different view of the steps necessary for the City or CPD to achieve compliance than the Monitoring Team articulated in its Report. For each policy, plan, and training material the City or CPD submitted, the OAG independently reviewed, commented on, and, as necessary, recommended approaches for achieving compliance; the OAG will continue to do so throughout the implementation of the consent decree.

We have also reviewed material related to compliance with other paragraphs of the consent decree. For some requirements, we do not have a sufficiently clear understanding of the methodology the Monitoring Team has used or will use to measure compliance or enough information to make an independent assessment. Moving forward, the parties and the public would benefit from the Monitoring Team more clearly articulating its methodology in advance of any review. In particular, the Monitoring Team should develop a methodology for evaluating CPD's community engagement efforts. The OAG will work with the Monitoring Team and the City to that end as we move into the second reporting period.

### Conclusion

While it is still early in the consent decree implementation process, we also understand that for many Chicagoans, reform is long overdue. Chicago has an unprecedented opportunity to implement comprehensive and lasting police reform and build public trust. We are encouraged in many respects by the City's and CPD's early compliance efforts, but we are also acutely aware that this is the beginning of a very long journey and there is no time to waste. We look forward to working collaboratively with the stakeholders of this consent decree during the next reporting period to overcome the challenges we have identified and to make continued progress on achieving sustainable reform.

For the State of Illinois,

KWAME RAOUL
Attorney General

Respectfully,

Shareese Pryor
Chief, Civil Rights Bureau
Office of the Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601-3175

Alicia Weber
Deputy Bureau Chief, Civil Rights Bureau
Office of the Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601-3175

cc: Tyeesha Dixon and Allan Slagel, Counsel for the City of Chicago (via email)

# Attachment B.
# City of Chicago Comments

City of Chicago's Comments on
First Independent Monitoring Period (IMR-1) Report

Consent Decree Par. 663 provides that the Parties may provide comments on the Independent Monitoring Team's (IMT) draft semiannual reports prior to their final publication. As noted in the IMT's October 23, 2019 draft report, the Independent Monitor was appointed on March 1, 2019, and numerous start-up activities delayed the ability to begin conducting compliance assessments during the first monitoring period. The City appreciates the IMT's extensive efforts in completing its first report on this abbreviated timeframe and looks forward to continuing to work diligently and collaboratively with the IMT on its future compliance assessments.

Below, the City provides comments that are limited to factual discrepancies identified in the draft report.[1] The City respectfully requests that IMT consider these comments in finalizing its report:

Narrative

Page 16:    The draft report states that "[a]ll deadlines are based on the consent decree" and that "IMT did not create deadlines for the first reporting period." However, several of the deadlines in the report are not included in the Consent Decree; rather, they were created in the monitoring plan. *See* Par. 222-235; 569.

Page 29:    The draft report states that the City provided IMT a "significant amount of records" on August 31, the last day of the monitoring period, which made it difficult for IMT to assess these records in the allotted time. However, the City provided a comparatively small number of the 600 records on August 31. As the report notes, IMT was appointed March 1, 2019, and compliance assessments during IMR1 were conducted on a compressed timeframe due to necessary and appropriate start-up tasks. Therefore, the City respectfully submits that it was reasonable for the City to utilize all the allotted time in the monitoring period to provide compliance documents and that it should not be penalized this monitoring period for providing records on the final day of the monitoring period.

Compliance Assessments; Summaries of Compliance Assessments

Par. 142:    The draft report indicates that the deadline for this paragraph was missed. The City understands from correspondence with IMT subsequent to receiving the draft report that IMT has concluded the City met the deadline for this paragraph and will make this adjustment in the final draft of the report.

---

[1] For a fuller discussion of the City's reform efforts prior to and during the first monitoring period, the City defers to its status report filed with the Court on September 3, 2019, pursuant to Consent Decree Par. 680.

1

Par. 323    The draft report concludes that although CPD provided 16 hours of training in 2018, CPD had not achieved any level of compliance with this paragraph during the first monitoring period because IMT had not yet received sufficient evidence that the training was conducted in person, as required by Par. 323. Moving forward, CPD will be sure to more explicitly state which training sessions take place in-person. However, CPD was not aware that the in-person nature of the 2018 trainings was at issue because the training lesson plans CPD provided prior to the end of the reporting period reflect that the 2018 trainings were conducted in person. Specifically, the 16-hour use of force and 8-hour use of force refresher training lesson plans included guidance to instructors on classroom furniture and projector setup, and the Procedural Justice 1, 2, and 3 lesson plans include guidance to course instructors regarding room set up, scenarios/role-play, and table-top exercises. These details would only be necessary for in-person courses.

Page 106:    In the first paragraph, the draft report states that "IMT assessed the CPD's compliance with thirty paragraphs of the consent decree within the Accountability and Transparency topic area" and lists these paragraphs. The City suggests that "CPD's compliance" should be modified to "the City's compliance", as the Accountability and Transparency paragraphs assessed applied to multiple City entities. Similarly, the third paragraph states that "CPD met its deadlines for three of the paragraphs that had deadlines this reporting period." However, Par. 538, 558, and 565 applied to other City entities (specifically, Police Board and the Public Safety Inspector General), not CPD.

Par. 480:    The draft report states that as evidence of compliance with this paragraph, COPA provided "several correspondences between COPA and the CPD, which specifically illustrate a process for re-opening a closed administrative investigation." The City is not aware of the correspondences to which IMT refers. To show compliance with this paragraph, COPA submitted on August 30, 2019 COPA policy 1.3.8, *Civil and Criminal Complaint Review*. As IMT's draft report states, this policy "speaks directly to the procedure to reopen a previously closed case." IMT also suggests that it was not able to review COPA policy 1.3.9, *Re-Open Case Procedure*. The City notes that COPA policy 1.3.9 was provided to the IMT for review on August 5, 2019.

Par. 481:    The draft report states that IMT did not receive information from CPD regarding these requirements. However, CPD submitted a production letter and accompanying documents regarding this requirement on August 30. Specifically, CPD submitted correspondence between CPD and COPA that occurred after March 1, 2019 regarding requests to reopen investigations concerning incidents that allegedly occurred more than five years before the date that COPA became aware of the allegations. Additionally, COPA provided the IMT with its internal tracking document it uses to track whether CPD is timely responding to its requests to reopen such incidents. These documents reflect that COPA, the CPD, and the OIG have "systems in place to track requests to the Superintendent, along with responses and the timing of such responses."

2

Par. 525:   The draft report concludes that the City is not in primary compliance with this paragraph. However, Par. 525 requires that the City "propose a permanent method of selecting the Chief Administrator of COPA." As the IMT's narrative states, the City did propose a selection method, which IMT reviewed. The proposal requires that the Mayor will engage a panel to assist with the selection. To the extent IMT has concluded that the City is not in compliance with the proposal requirement because the selection method does not state how the City "will consider views and recommendations of community stakeholders," Par. 525 does not require the proposal to state this level of detail. Rather, the City is only required to consider the views and recommendations of community stakeholders in *creating* the proposal. The City satisfied this requirement through a robust community engagement process used to formulate the proposal.

Par. 526, 528:   Par. 526 requires BIA and COPA to provide initial on-boarding training for new and existing investigators. Par. 528 provides a list of topics that are to be provided in the training. Both BIA and COPA provide extensive training to their investigators, new and existing. To show compliance, both BIA and COPA submitted their investigator onboarding training materials on August 13 and August 30, respectively. IMT notes in the draft report (p.19) that it attended 77 hours of this training. IMT's narrative does not reflect, however, that the training materials submitted were reviewed; rather, the draft report indicates that the training materials were not provided to IMT. Therefore, to the extent IMT did not have the opportunity to review and/or assess these materials during the first monitoring period, the City respectfully submits that a "not compliant" assessment is inappropriate for this paragraph.

Par. 538:   The draft report noted that Police Board created and submitted a policy to comply with Par. 538. The draft report suggests that the policy further define "best efforts" to hold partner agencies accountable for failing to respond to issues raised during Police Board's public meetings. The City notes that in response to this suggestion, the Police Board has added to the policy the definition of "best efforts" that is set forth in Paragraph 729 of the Consent Decree. Further, as in the draft submitted for IMT review, Item #5 of the policy requires that the following material be posted on the Police Board website prior to the next public meeting: (a) a report of the tracking of community input and responses (if no response is received, this will be noted on the report), and (b) each responding agency's written report of its response to the community input. This reporting and transparency is the mechanism by which partner agencies, such as CPD and COPA, will be held accountable for direct action or for responding to community issues or complaints raised at the meetings. The Police Board is eager to work with the public, media, Mayor, OAG, and the IMT to determine whether the agencies are being responsive to community input and can then take action to hold the agencies accountable, if necessary.

Par. 542:    The draft report states that the City "provided no draft policy that directs expectations for Police Board members." However, the Police Board created a draft policy on May 22, 2019, posted the draft on the Board's website for public review and comment for eight weeks, revised the draft based on public comments, and provided the policy to the Monitor on August 30, 2019 (both the original and revised draft), along with the public comments the Board received.

Further, the City respectfully submits that IMT's narrative appears to conflate the requirements of Par. 542 and Par. 540-541. Par. 542 requires only that the City "create a training policy for Police Board members and hearing officers." The *content* of the training is covered in Par. 540-541, which is not in IMR1. The policy created by the Board in compliance with Par. 542 sets forth requirements as to how often training must take place and what topics must be covered; the policy also includes an accountability mechanism for ensuring that Board members and hearing officers receive the required training. Paragraph 542 does not specify or require the training policy to address curricula, blocks of instructions, and training delivery methods. The City notes that as contemplated by the IMR2 monitoring plan, Police Board is making diligent efforts in these areas as it strives to develop and provide the training required by Paragraphs 540 and 541 and looks forward to submitting this work for review in IMR2.

Par. 558:    The draft report determines that PSIG has not attained secondary compliance with this paragraph. The City respectfully submits that secondary compliance is under assessment. As discussed in a meeting with the IMT, PSIG has instituted the required policy and has published a portion of the underlying work it requires. As noted in IMT's draft report, a portion of the complaint trend information is publicly available on PSIG's website.

Par. 563:    The draft report states that PSIG has not yet created its annual audit plan. However, by the close of the first monitoring period, the draft audit plan was underway but not yet finalized.

Par. 441, 443:    The City interprets the draft report as implying that BIA's draft SOP does not adequately address the requirement of these paragraphs. However, by ordinance, COPA does not currently have jurisdiction to investigate sexual misconduct complaints. Therefore, the BIA cannot provide "a specific direction or decision points" for sexual misconduct investigations to be referred to COPA.

Par. 442:    The IMT's narrative does not reflect that COPA provides two separate blocks of instruction concerning sexual assault and domestic violence. IMT attended some of these trainings, and the training materials provided to IMT on these topics (and the COPA training itinerary) also reflect that these were two separate blocks of instruction.

Independent | Chicago Police
Monitoring Team | Department
| Consent Decree