**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1-17-cv-6260 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CITY OF CHICAGO, | ) | |
| Defendant. | ) | |

**Motion for Leave to Advise the Court of an**
**Arbitration Opinion and Award Involving the FOP and the CPD**

The Fraternal Order of Police Chicago Lodge No. 7, (the "Lodge"), by and through its attorneys files this motion to request permission to advise the court that a labor arbitrator selected by Lodge and the City has issued a decision that involves the Unity of Command and the Span of Control elements of the Consent Decree at Paragraphs 357 to 368 and the implementation schedule for a staffing model. [Doc. 703-1 at 360]. This notice to the Court is being filed pursuant to the court's request that the Lodge advise it of any developments involving the Lodge and the City on issues related to the Consent Decree and the collective bargaining relationship.

Arbitrator George T. Roumell, Jr. on February 26, 2020, issued his Arbitrator's Opinion and Award in Gr. Nos. 129-19-010 and 129-19-013 in which the following issues were presented:

1. Did the Chicago Police Department violate the 2012-2017 CBA as continued when issuing B.O.P. No. 19-0185.2 changing the start times of the three watches for patrol units in the affected Districts? If so, what is the appropriate remedy?

2. Did the Chicago Police Department violate the 2012-2017 CBA as continued when changing the six day off group to a three day off group for Police Officers in District 0006? If so, what is the appropriate remedy.

As to issue one, the arbitrator found there was no contract violation by the CPD's unilateral change of the starting times for the Officers in a large number of police districts. As to issue two, the arbitrator found there was a contract violation and ordered that "006th District shall return to a six day off group forthwith unless a change is otherwise negotiated and agreed to by the Lodge." Arbitrator's Opinion and Award at 39.

For the foregoing reasons, the Lodge requests permission of this court to file this Arbitration Opinion and Award.

Respectfully submitted,

/s/ Joel A. D'Alba_____

Joel A. D'Alba,
Counsel for Fraternal Order of Police
Chicago Lodge No. 7

VOLUNTARY LABOR ARBITRATION TRIBUNAL
Before George T. Roumell, Jr., Arbitrator

*In the Matter of the*
*Arbitration Between:*

CITY OF CHICAGO, CHICAGO
POLICE DEPARTMENT

Gr. Nos. 129-19-010 and 129-19-013

-and-

FRATERNAL ORDER OF POLICE
CHICAGO LODGE NO. 7

## ARBITRATOR'S OPINION AND AWARD

APPEARANCES:

FOR FRATERNAL ORDER OF POLICE
CHICAGO LODGE NO. 7:

FOR CITY OF CHICAGO, CHICAGO:
POLICE DEPARTMENT

ASHER, GITTLER AND D'ALBA BY:
Joel A. D'Alba
Amanda R. Clark, Attorneys

FRANCZEK BY:
David A. Johnson
Jennifer A. Dunn, Attorneys

## Background

The Fraternal Order of Police Chicago Lodge No. 7 is the collective bargaining agent for the non-supervisory, sworn members of the Chicago Police Department. Over the years, the Lodge has entered into a series of Collective Bargaining Agreements with the City of Chicago. The current Collective Bargaining Agreement covers the period from July 1, 2012 to June 30, 2017.

The parties are in negotiations for a successor contract. Article 28, Section 28.2 of the 2012-2017 CBA provides:

**Continuing Effect.**

Notwithstanding any provision of this Article or Agreement to the contrary, this Agreement shall remain in full force and effect after any expiration date while negotiations or Resolution of Impasse Procedure are continuing or a new Agreement or part thereof between the Parties.

Thus, the provisions of the 2012-2017 CBA are currently in effect.

About 5,000 Chicago Police Officers are assigned to the Bureau of Patrol, operating out of 22 Districts throughout the City of Chicago. The Bureau of Patrol is manned in the Districts 24/7 throughout the year with Officers assigned to one of three daily watches.

Prior to January 2019, the designated start time for the first watch was midnight, for the second watch (days) 8 a.m., and for the third watch (afternoons) 4 p.m. (V. III, Tr. 289).[1]

On 20 October 2008, then Superintendent Jody P. Weiss issued D.N. 08-34 with the title "2009 Work Day Schedule Pilot Programs". The Order in part read:

\* \* \*

**II.     GENERAL INFORMATION**

A.      The Fraternal Order of Police, Chicago Lodge 7 (FOP), Police Benevolent & Protective Association (PBPA) Sergeants' Association and PBPA Captains' Association along with the Department have entered into an agreement to pilot compressed work schedules.

B.      The pilot program will become operational effective the 1st period of 2009 : 08 January 2009.

C.      The following programs will be implemented in the following units:
1.      10 hour shifts: **Districts 005 and 020.**
2.      8.5 hour shifts, working 6 days on/3 days off: **Districts 008 and 013.**
3.      8.5 hour shifts, working 4 days on/2 days off: **Districts 014 and 018.**
4.      10 hour shifts, 5th Watch Rapid Response Officers

---

[1] "V" and "Tr." refer to the volume and transcript of the arbitration hearing.

only: **Districts 003, 007, 010, and 015.**

5. 10 hour shifts: **Targeted Response Unit (Unit 253), Area 2 Detective Center (Unit 620) and the Juvenile Intervention and Support Center (JISC, Unit 384).**

D. All members assigned to pilot programs will continue to receive a one half hour lunch period. If the member is required to perform work during this one half hour lunch period, the officer may request overtime compensation.

E. The existing bargaining agreements, under the "Change of Schedule" section, allows the employer the right to adjust the starting time plus or minus two hours from the designated starting times.

\* \* \*

V. **8.5 HOUR WORK SCHEDULE, 4/2 ROTATION CYCLE: DISTRICTS 014 AND 018**

A. The normal tour of duty for the 8.5 hour work shift will be 9 hours with one half hour uncompensated lunch period.

B. The 8.5 hours work schedule WILL NOT apply to the following personnel, who will continue to work the current 8 hour schedule:

1. District Commander's Administrative Staff
2. Personnel assigned to the Community Policing (CAPS)Office
3. Personnel assigned as School Officers
4. Officers with successful bids to desk, lockup, relief and review positions
5. Officers assigned to fixed posts (e.g. Jardine Water Filtration Plant)
6. Captains and Lieutenants
7. Civilians.

C. The designated starting times for the 8.5 hour shifts are: 0700, 1500 and 2200 hours.

| | | | | |
|---|---|---|---|---|
| 1. | 2nd Watch: | 0700hours | Early Cars | 0530 hours |
| | | | Late Cars | 0700 hours |
| 2. | 3rd Watch: | 1500 hours | Early Cars | 1400 hours |
| | | | Late Cars | 1530 hours |
| 3. | 1st Watch: | 2200 hours | Early Cars | 2100 hours |

|  | Late Cars | 2230 hours |

D.    The reporting time for the watch commanders and officers assigned to the desk and lockup are:

    1.    2nd Watch:    0500 hours

    2.    3rd Watch:    1300 hours

    3.    1st Watch:    2100 hours

E.    Personnel will be assigned to one of six day off groups. The designated units will utilize the 61 thru 66 day off group rotation. These new day off groups will be designated on the department operational calendar. Personnel assigned will work four days on with two consecutive days off.

\* \* \*

There were various schedules set forth in the Order, including 8.5 hour shifts working four days and two days off in Districts 014 and 018. The expiration date of the Order was 06 January 2010.

It was represented on the record that subsequently all the Districts with one exception have gone to the 4/2 schedule with designated starting times of 0700, 1530 and 2200. The one exception is the 005th District which is on a 10 hour schedule. The units on the 4/2 schedule had six day off rotating groups, numbers 61 through 66 day.

On 13 November 2019, Fred L. Waller, Chief, Bureau of Patrol, issued B.O.P. No. 19-0185.2 on the subject "Modified Roll Call Procedures", wherein he noted in part:

On 9 January 2020 (1st Police Period) the Bureau of Patrol will implement modified start times for all watches which will allow for continuous coverage as well as more accountability for vehicles and equipment. This will not be a "change of schedule" as contemplated by the collective bargaining agreements and will not require a change of start time greater than the two hours currently agreed upon. This modification will not affect the: 005th District. A brief overview is as follows:

\* \* \*

Roll calls will now consist of a 45-minute block of time during which officers will be briefed by the Watch Operations Lieutenant and SDSC Room personnel, uniform and weapons inspections will be conducted and any additional training will be taught by District-level personnel and supervisors, or members assigned from the Education and Training Division for periodic decentralized training.

There will be a 15-minute time frame at me end of each tour for face-to-face relief and check off where supervisors will conduct a check-off and officers can communicate with members from the previous watch concerning the day's activity — including emerging crime trends, current hot spots or points of special attention, or any other relevant information which would not have previously been passed on.

First Watch will now have their early roll call at 2200 hours and their late roll call at 2300 hours. Duty hours for First Watch members will be 2200-0700 and 2300-0800 (9 hours — 8 ½ hour tour of duty with ½ hour of unpaid lunch). As previously stated, roll calls will be held for the first 45-minutes and checkoff for the final 15 minutes.

Second Watch will hold their roll calls at 0600 and 0700. Duty hours for Second Watch members will be 0600-1500 and 0700-1600, with the same conditions concerning roll call and check off times as those set for First Watch, as noted above. Tours of duty for members assigned to duties within schools will remain unchanged (8 ½ hour day 8 hour tour of duty with ½ hour of unpaid lunch).

Third Watch will hold their early and late roll calls at 1400 and 1500, respectively. Duty hours for Third Watch members will be 1400-2300 and 1500-0000 hours. Members assigned to later-starting Rapid Response beats or personnel assigned to mission (06) duties will begin their tour of duty no later than two hours from the set 1530 hour start time. The purpose of these beats is to provide additional coverage for the switch over between Third and First Watches.

At the current time, district administrative personnel (front office) will not be affected by this modification. District desk personnel will continue to report at 0500, 1330, and 2100 hours, with an overlap with the previous watch. Lunches for District desk personnel will not be granted on the end of the tour of duty, per Bureau of Patrol Special Order 12-05 "District Desk Duties" Section II, B.

\* \* \*

As noted, the change would apply to what was represented as 22 Districts "within the general authority of Chief Waller". The Order did not apply to the 005th District which is on a 10 hour schedule. A visual projection of the comparison with the previous schedule and the

announced new schedule is as follows:

| | Previous Start Times | | New | |
| | Early | Late | Early | Late |
|---|---|---|---|---|
| 1st | 2100-0600 | 2230-0730 | 2200-0700 | 2300-0800 |
| 2nd | 0530-1430 | 0700-1600 | 0000-1500 | 0700-1600 |
| 3rd | 1400-2300 | 1530-0030 | 1400-0230 | 1500-0000 |

The announced schedule went into effect on January 9, 2020.

After advising Lodge representatives of a proposed change in the days off groups for District 006, the Department advised the Lodge that it would reduce the number of day off groups for District 006 from six to three, effective January 9, 2020. This did occur.

The Lodge filed two grievances alleging that the change in the number of day off groups in the 006th District and the start times in the 22 Districts violated the continuing 2012-2017 Collective Bargaining Agreement. Grievance No. 129-19-010/362, filed on 26 November 2009, challenged the change in day off groups in the 006th District and read:

> STATEMENT OF GRIEVANCE:
> The Chicago Police Dept. has announced it will unilaterally implement a new work schedule in the 006th District effective 09 Jan 2020. This schedule eliminates three of the six day off groups that were negotiated and are currently in place. This schedule changes start times that were previously negotiated. The Lodge is currently involved in negotiations for a successor agreement to the current CBA which expired on 30 June 2017, but continues to remain in effect until a successor agreement can be reached. The Lodge is demanding expedited arbitration on the matters and is seeking to have these work schedule changes delayed until a successor agreement is reached.
>
> Contract Section(s) Violated: 4; 20.7; 20.10; 28.2; and work day schedules MOU dated 16 Nov 2009

Grievance No. 129-19-013, filed on 17 December 2019, challenged the change in start times and read:

> STATEMENT OF GRIEVANCE
> The Chicago Police Department announced it will unilaterally implement a change in start times that differs from start times that were

previously negotiated. The Lodge is currently involved in negotiations for a successor agreement to the current CBA which expired on 30 June 2017, but continues to remain in effect until a successor agreement can be reached. The Lodge is demanding expedited arbitration on this matter and is seeking to have these start times changes delayed until a successor agreement is reached.

Contract Section(s) Violated: 4; 20.7; MOU

The grievances were denied.

On December 20, 2019, the Lodge filed an emergency Motion for Temporary Restraining Order seeking to retrain the implementation of the starting times and the change in day off groups in the 006th District in the Circuit Court of Cook County, IL County Department, Chancery Division, Case No. 2019-CH-1470. The Honorable Judge Eve M. Reilly declined to issue a restraining order.

The Lodge took an appeal to the Illinois Appellate Court for the First District, being Case No. 1-20-0066. The Illinois Appellate Court declined to issue a restraining order, but did order that the grievances be arbitrated under the Collective Bargaining Agreement within 21 days of the Court's Order dated January 21, 2020. This arbitration followed with hearings on February 11 and 13, 2020.

## Issues Presented

1.     Did the Chicago Police Department violate the 2012-2017 CBA as continued when issuing B.O.P. No. 19-0185.2 changing the start times of the three watches for patrol units in the affected Districts? If so, what is the appropriate remedy?

2.     Did the Chicago Police Department violate the 2012-2017 CBA as continued when changing the six day off group to a three day off group for Police Officers in District 006? If so, what is the appropriate remedy?

## Applicable Contract Provisions

In addition to the already cited Section 28.2 continuing effect, there are several 2012-2017 contract provisions, including a Memorandum of Understanding and Side Letter attached to the 2012-2017contract, that are relevant, namely:

### ARTICLE IV -MANAGEMENT RIGHTS

The Employer has and will continue to retain the right to operate and manage its affairs in each and every respect. The rights reserved to the sole discretion of the Employer shall include, but not be limited to, rights:

\* \* \*

C.  to set standards for the services to be offered to the public;

D.  to direct the officers of the Department of Police, including the right to assign work and overtime;

\* \* \*

H.  to establish work schedules and to determine the starting and quitting time, and the number of hours to be worked;

\* \* \*

J.  to add, delete or alter methods of operation, equipment or facilities;

\* \* \*

N.  to add, delete or alter policies, procedures, rules and regulations.

Inherent managerial functions, prerogatives and policymaking rights, whether listed above or not, which the Employer has not expressly restricted by a specific provision of this Agreement are not in any way, directly or indirectly, subject to the grievance and arbitration procedures contained herein, provided that no right is exercised contrary to or inconsistent with other terms of this Agreement.

\* \* \*

### Section 20.7 - Change of Schedule.

The Employer's right to assign Officers for duty at any time and at different times during each twenty-eight (28)-day police period remains unrestricted and unchallenged. Watch assignments and designated starting times shall be established and posted for each police period. Watch assignments and designated starting times shall remain in effect for the duration of the twenty-eight (28)-day police period, except for:

A.  in-service training (including individualized training) with a

-8-

maximum of six (6) programs per year for a maximum of eighteen (18) days per year and with seven (7) days' notice to the Officer; or

B.    elective training (elective training are job-related programs the Department makes available to Officers in which the Officer elects to participate); or

C.    mandatory proficiency training for employees receiving D-2 or D-21A pay or otherwise receiving specialist or premium pay because of the position or assignment held, with a maximum of six (6) programs per year, for a maximum of thirty (30) days per year and with seven (7) days' notice to the Officer; or

D.    pre-serving training for promotions; or

E.    court appearances in excess of two (2) consecutive days; or

F.    initial assignment when detailed to the Alternate Response Section.

However, starting times may be adjusted by the Employer: (1) plus or minus two (2) hours from the designated starting times; or (2) for up to seven (7) hours within an Officer's assigned watch for circumstances not known to the Department 48 hours prior to the start of the police period. Provided that where an Officer who has been scheduled to attend in-service training and does not attend because of circumstances beyond the reasonable control of the Employer, the Employer may reschedule said Officer for said in-service training without payment of premium time hereunder.

Any adjustment inconsistent with the above provision, made after the start of the twenty-eight (28)-day police period, will result in payment in accordance with Section 20.2 for the hours worked outside of the Officer's tour of duty scheduled at the beginning of the Officer's twenty-eight (28)-day police period for that period. Shift changes during a police period made voluntarily at the request of an Officer and upon approval of the Employer shall not require additional compensation.

\* \* \*

**Section 20.9 – Day-Off Change.**
Days off assigned on "change day" shall remain unchanged for the duration of each 28-day police period except for:

A.    in-service training (including individualized training) with a maximum of seven (7) programs per year for a maximum of twenty-eight (28) days per year and with seven (7) days' notice

to the Officer; or

B.    elective training (elective training are job-related programs the Department makes available to Officers and in which the Officer elects to participate); or

C.    mandatory proficiency training for employees receiving D-2 or D-2A pay or otherwise receiving specialist or premium pay because of the position or assignment held, with a maximum of twelve (12) programs per year, for a maximum of thirty (30) days per year and with seven (7) days' notice to the Officer; or

D.    pre-service training for promotions.

The Employer's right to assign Officers for duty while on regular day-off status is unrestricted and unchallenged. The Employer agrees, however, that in each such event it will pay the Officer so assigned the optional premium time under Article 20 of the Agreement. ...

\* \* \*

## Section 20.10 – Day-Off Group Assignment.

In the event the Employer determines to change an Officer's day-off group assignment, the Employer shall seek volunteers to satisfy its needs; provided, however, (1) if there are more volunteers than required, the volunteers with the greatest seniority on the watch in the day-off group affected shall be changed, and (2) if there are not sufficient volunteers, the Officers with the lowest seniority on the watch in the day-off group affected shall be changed; provided further, said Officers meet the Employer's needs.

\* \* \*

## Section 28.2 - Continuing Effect.

Notwithstanding any provision of this Article or Agreement to the contrary, this Agreement shall remain in full force and effect after any expiration date while negotiations or Resolution of Impasse Procedure are continuing for a new Agreement or part thereof between the Parties.

\* \* \*

## MEMORANDUM OF UNDERSTANDING FOR WORK DAY SCHEDULES

*As Amended By the Parties on November 13, 2009*

*Amendments To Be Effective Operationally on January 10, 2010*

-10-

With respect to (I) the Work Day Schedule; (II) Impasse Resolution and Ratification Procedures for the Work Day Schedule and its implementation; and (III) the modification of certain provisions of the collective bargaining agreement in order to facilitate and implement the Work Day Schedule, the parties hereby agree as follows:

I.    The Work Day Schedule

* * *

F.    Four-Two Eight and One Half (8 ½) Hour Schedule in Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24 and 25.

    1.    The parties agree to implement a four-two eight and one half (8 ½) hour work schedule for officers assigned or detailed to Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24 and 25. This schedule will have two rotating days off.

    2.    The eight and one half (8 ½) hour schedule will not apply to officers assigned or detailed to the District Commander's administrative staff, Community Policing, CAPS , school duties, fixed posts at the filtration plant or fixed day off groups.

    3.    The starting times for the four-two eight and one half (8 and ½) hour schedule will be 0700; 1500; and 2200.

    4.    This work schedule will remain in effect through the thirteenth police period of the calendar year in which the parties' successor labor agreement to the 2003-2007 current labor agreement expires [e.g., if the successor labor agreement expires on June 30, 2012, then the work schedule will remain in effect through the 2012 thirteenth police period] and is subject to renegotiation upon such expiration with any changes effective no earlier than the first police period of the calendar year following such expiration [e.g., if the successor labor agreement expires on June 30, 2012, then the work schedule is subject to renegotiation beginning July I, 2012, and any changes to the work schedule will become effective no earlier than the 2013 first police period].

* * *

H.    All starting times may be adjusted plus or minus two (2) hours from the designated starting times in accordance with Section 20.7 of the Agreement.

-11-

I.  Officers will initially select their watches and be assigned day off groups. Officers will then select their furloughs.

J.  Furloughs will be selected by unit for the calendar years beginning January 1, 2010 and each January thereafter in accordance with Section 23.2 of the Agreement.

\* \* \*

II.  Ratification, Implementation and Dispute Resolution

\* \* \*

C.  A Joint Labor Management Committee shall continue to meet monthly for the purpose of monitoring, reviewing, ascertaining and making recommendations regarding the pilot programs and work schedules and promptly addressing errors and omissions in the pilot programs and work schedules. The Committee will continue to consist of the Commanding Officer of the Management and Labor Affairs Section and the Lodges' Grievance Committee Chairman (or their designees) and additional persons designated by each party up to a maximum of five (5) persons for each party. At the end of each police period, reports will continue to be presented by both the City and the Lodge to this Committee for the purpose of monitoring and reviewing the pilot programs and work schedules.

D.  The goals of the pilot schedules are to attempt to boost employee productivity, reduce employee stress) reduce medical and IOD absences, reduce automobile accidents, reduce overtime assignments, reduce response time between radio assignments, reduce radio assignments pending, reduce crime, reduce citizen complaints, improve service to the community, and boost employee morale. The parties recognize that implementation of the pilot schedules might not result in measurable improvements in each of these goals.

E.  The Joint Labor: Management Committee will meet promptly upon the request of either party in order ro make recommendations and attempt to reach agreement by negotiations in good faith regarding the pilot schedules' continuation, expansion, modification, or discontinuation. The Committee shall have the authority to continue, modify, expand or terminate any of the pilot schedules by mutual agreement. Any mutual decision to continue, expand, modify, or discontinue pilot schedules by the Committee shall be binding upon the parries, subject to ratification by the parties.

-12-

F.    The pilot programs that are approved and implemented shall remain in effect through the 2010 thirteenth Police period and may thereafter be continued either collectively or individually at the discretion of the Department. If the Department intends to discontinue one: (1) or more pilot programs, the Department will provide the Lodge with written notice of its intent no later than July 1, 2010 and upon request shall promptly meet with the Lodge to discuss the rationale for its decision.

G.    In the event the Lodge disagrees with the rationale for the Department's decision and believes one (1) or more of the pilot programs identified by the Department for discontinuation should be continued beyond the 2010 thirteenth police period, the dispute shall not be submitted to interest arbitration and may only be resolved through the following dispute resolution procedure:

* * *

Chicago Police Department                    Fraternal Order of Police
                                             Chicago Lodge No. 7


*Jody Weis*                                  *Mark P. Donahue*
Jody Weis                                    Mark P. Donahue
Superintendent of Police                     President
Dated: *16 Nov 09*                           Dated: *16 Nov 09*


## Side Letter

January 5, 2010

Commander Donald J. O'Neill
City of Chicago, Dept of Police
Management and Labor Affairs Section
3510 South Michigan Avenue, 4rh Floor
Chicago, IL 60653

### RE: Amendment to Work Schedule Agreement

Dear Cmdr. O'Neill:

The purpose of this letter is to memorialize our agreement to amend the November 16, 2009, Memorandum of Understanding for Work Day Schedules as it pertains to officers working an 8 ½ hour day. Specifically, it is agreed that page 3 sec. E (3) and page 4, section F (3) will be amended from the specified 1500 hour starting time to a 1530 hour starting time for the 3rd watch. This amendment does not alter in

-13-

anyway the Department's right to change the 1530 hours starting time by no more than 2 hours without incurring an extra pay obligation pursuant to section 20.7 of the collective bargaining agreement.

If this letter is an accurate statement of our agreement, please sign your name below to indicate your agreement.

Sincerely,

*William Dougherty*
William Dougherty
First Vice President

AGREED: *Donald O'Neill*
Commander Donald O'Neill
DATE: *5 Jan 2010*

## Discussion

A. ### Gr. No. 129-19-013 – Start Times

The issues should be viewed in a historical context. The language of Section 2.7, "Change of Schedule" appearing in the 2012-2017 CBA first appeared in Section 20.7 in the parties' January 1, 1984 - December 31, 1984 CBA. This language, along with the Management Rights language, has continued through successive collective bargaining agreements between the parties.

Until 1993, the Officers in the Districts were on a rotating schedule. As a result of an interest arbitration, permanent watches were established for Officers with the same continuing Section 20.7. As noted, though not mentioned in the previous CBAs, the designated starting times followed by the Department for the respective watches were 8 a.m., 4 p.m. and midnight prior to January 2019.

For approximately 50 years, the Patrol Bureau had been on a six-two schedule, meaning that Officers would work six days and then have two days off. This schedule had become a

concern to the Lodge on behalf of its members. By 2007 in connection with the upcoming negotiations for the 2007-2012 CBA, the Lodge had a priority to negotiate the limitation of the six-two schedule. As a result, the Lodge established with former Vice President William C. Dougherty and current President Kevin Graham as Co-Chair, a work schedule subcommittee to negotiate with a similar committee formed by the Department a change in work schedules. Among the members of the Lodge committee was Richard Aguilar. Among those representing the Department was Commander Donald O'Neill. At times during the meetings between the Department and Lodge committee members, counsel for both the Department and the Lodge were also present. The committees met numerous times between January 17, 2008 and August 19, 2008, to negotiate concerning various schedules replacing the six-two schedule. There was also a so-called core group which was a smaller group which included Vice President Dougherty, now President Graham and Richard Aguilar for the Lodge and, among others, Commander Donald O'Neill that met in October or later in 2008 and at points in 2009.

Among the schedules discussed was a six-three schedule, a 10 hour schedule, and a four-two schedule with varying day off groups, depending on the schedule.

On August 6, 2008, Commander O'Neill presented several documents setting forth the configuration of the three schedules under discussion, namely, the 10 hour schedule, the six-three schedule and the four-two schedule. As to the four-two schedule, Commander O'Neill presented a document referring to key points of the four-two schedule as to Districts 14 and 18, which in part read:

**Key Points of 4 and 2 Schedule**
**Districts 14 and 18**

**POLICE OFFICERS (9161) and SERGEANTS (9171)**

**When will this 9 hour schedule start?**
The Pilot program will start 1 January 2009 in the 14th and 18th Districts.

**The tour of duty will be an 8 ½ hours per day, with a ½ hour, uncompensated lunch period.**

**How will day off groups be determined?**
There are 6 day off groups for this schedule. The DOG codes are;

Red, Orange Yellow, Green, Blue, Purple or,
41, 42, 43, 44, 45, 46,

**What will be the starting times for the 9 hours watches?**
The following are the starting times for the 9 hour watch:

| | | |
|---|---|---|
| 1st | Watch | 2200 |
| 2nd | Watch | 0700 |
| 3rd | Watch | 1500 |

The starting time may be adjusted by + or - 2 hours.

| | | |
|---|---|---|
| 1st | Watch | 2100 hours to 0600 hours (Early) |
| | | 2230 hours to 0730 hours (Late) |
| 2nd | Watch | 0530 hours to 1430 hours (Early) |
| | | 0700 hours to 1630 hours (Late) |
| 3rd | Watch | 1400 hours to 2300 hours (Early) |
| | | 1530 hours to 0030 hours (Late) |

**What will be the starting times for the Desk and Lockup?**

| | | |
|---|---|---|
| 1st | Watch | 2030 hours to 0500 hours |
| 2nd | Watch | 0500 hours t 1330 hours |
| 3rd | Watch | 1300 hours to 2130 hours |

As a result of the negotiations in 2008 described by William Dougherty, President Kevin Graham and Richard Aguilar as well as Donald O'Neill, a memorandum reflecting the agreement as to a pilot program as to hours of assignment in patrol was signed on September 4, 2008 by Counsel for the Department and for the Lodge. The Memorandum of Understanding reflected the agreement by replacing the 6-2 schedule with a pilot program providing, depending on the

-16-

District, a 10 hour schedule, a six three schedule, and the four-two 8 ½ hour schedule. The Memorandum in part, including the provisions as to the four-two schedule read:

I. The Work Day Schedule

   A. Ten (10) Hour Work Day Schedule for District Rapid Response Cars

      1. The parties agree to pilot a ten (10) hour work schedule in Districts 3, 7, 10 and 15 for Officers assigned to the third watch Rapid Response cars. This will result in a fifth watch. This schedule will be the same as the previously piloted CHA Rotating schedule, except as specifically modified herein.

      2. The starting time for the Rapid Response Cars n the fifth watch will be 1600.

      3. Each participating District shall have at least fifteen (15) Rapid Response car positions which will be filled by the eighty percent (80%)/ twenty percent (20%) bidding process.

   B. Ten (10) Hour Work Schedule in Detective Division Area Two (2)

      1. The parties agree to pilot a ten (10) hour work schedule in Detective Division Area Two (2). The schedule will be the same as the previously piloted CHA Rotating schedule except as specifically modified herein.

      2. The ten (10) hour schedule will not apply to Summary Investigation Detectives, Review Investigation Detectives and Administrative Desk Duty Assignments.

* * *

   F. Four-Two Eight and One half (8 ½) Hour Schedule.

      1. The parties agree co pilot a four-two eight and one half (8 ½) hour work schedule for officers in Districts 14 and 18. This schedule will have two rotating days off.

-17-

2.    The eight and one half (8 ½) hour schedule will not apply to officers assigned to the District Commanders administrative staff, Community Policing, CAPS, school duties, fixed posts at the filtration plane, successful bidders to the Desk, Lockup, and Watch Relief, and Review Officer positions.

3.    The starting times for the four-two eight and one half (8 and ½) hour schedule will be 0700; 1500; and 2200.

G.    All starting times may be adjusted plus or minus two (2) hours from the designated starting times in accordance with Section 20.7 of the Agreement.

\* \* \*

II.    Ratification of Memorandum of Understanding for Work Day Schedule Pilot Programs, Implementation of Pilot Programs and Dispute Resolution

\* \* \*

F.    The pilot programs that are approved and implemented shall remain in effect through the 2009 thirteenth police period and may thereafter be continued either collectively or individually at the discretion of the Department. If the Department intends to discontinue one ( l) or more pilot programs, the Department will provide the Lodge with written notice of its intent no later than ninety (90) calendar days prior to the end date of the 2009 thirteenth police period and upon request shall promptly meet with the Lodge to discuss the rationale for its decision.

\* \* \*

III.    Contract Modifications and Understandings Regarding the Implementation of the Pilot Programs

Notwithstanding any other provision of the collective bargaining agreement for the duration of the pilot programs, the following provisions and understandings shall be in effect:

A.    The normal tour for the ten (10) hour shift will be ten and one half (10 ½) hours, which includes a one half (½) hour uncompensated lunch period. The normal tour for the eight and one half (8 ½) hour shift will be nine (9) hours, which includes a one half (½) hour uncompensated lunch period. The parties agree and understand that if an officer is required to perform work during the one half (½) hour meal period, the officer

will receive overtime compensation in accordance with
the terms of this Agreement.

\* \* \*

The September 4, 2008 Memorandum included the plus or minus two hours provision of 20.4.

What followed was Superintendent Weis' D.N. 08-34 dated 20 October 2008 captioned
"An agreement to pilot compressed work schedules". The Order, as noted, referred to the four-
two schedule and the hours that were set forth in Commander O'Neill's key points and
announced that in the Districts assigned the four-two schedule there would be six day off groups.
The Order also referenced 20.7 by referencing change in schedule and "the right to adjust the
starting time from or minus two hours from the designated starting times".[2]

The September 4, 2008 Memorandum was not attached to the 2007-2012 CBA or any
other CBA between the parties.

Subsequently, the parties negotiated a second Memorandum which was signed by
Superintendent Weis and Lodge President Mark P. Donahue on 16 November 2009 which
Memorandum was attached to the 2007-2012 CBA and was continued attached to the 2012-2017
CBA unchanged. The Memorandum is quoted at pages 126-135 of the 2012-2017 CBA and at
pages 10-13 of this Opinion. Subsequent to the signing of the 16 November 2009 Memorandum,
Commander O'Neill signed the Side Letter dated January 5, 2010 as agreeing with the statement
in that letter that had been sent to him by William Dougherty, which was attached to the 2012-
2017 CBA and is quoted at pages 17-18 of this Opinion. The Memorandum of 16 November
2009 essentially tracks the September 4, 2008 Memorandum except the four-two schedule was
extended to a number of Districts. There is a specific reference to Section 20.7, noting that "all

---

[2] D.N. 08-34 is quoted at pages 3-4 of this Opinion.

-19-

starting times may be adjusted plus or minus two hours from the designated starting time".

As was the case with the September 4, 2008 Memorandum, there was a dispute resolution mechanism in the 2009 Memorandum if the Department decided to discontinue the pilot program in any District. The 2009 Memorandum provided that the pilot program approved and implemented "shall remain in effect through the 2010 thirteenth police period and may thereafter be continued either collectively or individually at the discretion of the Department". There was no mention in either Memorandum as to the six day off groups in the four-two schedule.

The D.N. 08-34 expired in January 2010. As noted, the November 2009 Memorandum continued attached, along with the Side Letter of January 5, 2010, to the 2012-2017 CBA without any changes. It is also noted that the four-two schedule was extended to all Districts except the 005th District which continues on a 10 hour schedule.

As to the dispute resolution provision in both Memoranda, Arbitrator Robert Perkovich on November 10, 2010 issued an opinion and award denying a grievance filed by the Lodge challenging the elimination of the 10 hour day work schedule in two Districts and the six-three schedule in two Districts by the Department, maintaining that the actions of the Department were under the circumstances in good faith.

The above historical recitation sets the stage for the parties' respective positions as to the starting times of watches.

The Lodge takes the position that the starting times for the watches, including the early cars and the late cars, were negotiated; that the Department has never, District-wide, since negotiations in 2008 changed the negotiated start times as was done in this situation. The testimony of William Dougherty echos this point when he was asked:

-20-

> Q    Now, were these early and late start times negotiated with Mr. O'Neill and the others on that committee?
>
> A    They were. They were actually, you know, because of the time changes or the schedule changes caused us to look at the times and we negotiated new time changes. ...
> (V. I, Tr. 39).

Former Vice President Dougherty went on to testify:

> Q    So it's your position that under the plus and minus two hour rule they could not have made the changes without your agreement; is that correct?
>
> A    Correct.
>
> Q    Why is that?
>
> A    Well, because there was something new that we negotiated ...
> (V. I, Tr. 42).

Dougherty emphasized the point that starting times were subject to mutual negotiations. He went on to testify that when there was a request in his view from Commander O'Neill that the Department wanted to change the starting time for the late cars on the 3rd Watch from 1500 to 1530, he and Commander O'Neill negotiated on this point, resulting in the Side Letter of January 5, 2010. (V. I, Tr. 42-43).

The Dougherty testimony was concurred in by both President Graham and Richard Aguilar. All three testified that the plus and minus two hour provision applied to what was referenced as situational situations such as St. Patrick's Day, the Mexican Fiesta and other special events or circumstances that occur in the City that could require Officers to be on duty on different start times.

The Department's position was expressed in the testimony of Commander O'Neill when he testified:

> Q    ... Did the – strike that. Previous to 2008, had the department

ever negotiated designated starting times with the union?

A.    Not that I was aware of.

Q.    So why did the department do it in 2008?

A.    Because there were some conflicts in what people thought the designated starting times were and what --there was a general order that talked about what the designated starting times were, but every month, they would post worksheets that would tell you what car you were assigned to, what anticipated car you were assigned to.

And so a person might be assigned to Beat 1724, which, on days, was an 8:00 start. Was that the point you could move two hours one way or the other? Or you were assigned on the worksheets to the desk with a 6:00 start. Does that mean they could start you as early as 4 and as late as 8?

So this was to clarify that this is the time, the one designated start time that allows you to move two hours.

(V. III, Tr. 251).

Commander O'Neill, after having his attention called to the fact that neither the 2008 nor the 2009 Memoranda made reference to early and late start times, was asked, "Why is that?" After noting that the program in 2008 was a pilot program, Commander O'Neill testified, "There were a lot of balls up in the air, and we didn't know exactly what the impact would be. We knew we were locked into this program for the next year, and we anticipated we might have to change these times". (V. III, Tr. 253).

When asked the same question again as to why the Memoranda did not make reference to early or late starting times, Commander O'Neill testified, "Because it was still fairly new, and we had to designate a start time, but we didn't know how it was going to play out city-wide for the same reason. We might have to adjust those roll call times or start times, but still within the two hours from the designated start time." After so testifying, Commander O'Neill was asked:

Q       Did you have an agreement with the Lodge that the early and

-22-

late start times would be locked in for those three watches as set forth in the Department notice in October 2008?

A    No. The only thing we had agreement on was the designated start time.
(V. III, Tr. 255).

On cross-examination, Commander O'Neill was asked and answered:

Q    Well, you do remember that the starting time before January of 2019 were 8, 4 and midnight, correct?

A    Correct.

Q    They were changed, correct?

A    The designated start time, yes.

Q    And they were changed by agreement, correct?

A    Yes, they were.
(V. III, Tr. 89).

The testimony of President Graham and Richard Aguilar reinforced Vice President Dougherty's testimony as to the Lodge's view that there was an agreement on starting times as to late and early cars.

There are several salient points that surface after reviewing the testimony of those who were involved on either side in the work schedule committee and the core committee meeting.

D.N. 08-34 by its terms expired on 6 January 2010. Though the Order was issued on 20 October 2008, approximately seven weeks after the Memorandum of September 4, 2008, and did reference the starting time for the early and late cars, there was no such mention in the 2008 MOU. The 2008 Memorandum is entitled "Memorandum of Understanding for Work Day Schedule Pilot Program". D.N. 08-34 refers to pilot programs. The November 16, 2009 Memorandum of Understanding attached to the 2007-2012 CBA and now to the 2012-2017 CBA makes no mention of a pilot program. Likewise, the 2009 Memorandum contains no reference to

-23-

early and late starting times.

It may be that the 2009 Memorandum was signed while the D.M. 08-34 Order by its terms may have been still applicable, but that Order expired on 6 January 2010. Yet, the 16 November 2009 Memorandum was not only attached to a contract that continued to 2012, but it was continued into the 2012-2017 CBA without, as noted, starting times for the early and late cars.

These observations bring this Arbitrator to a basic principle of contract interpretation, namely, that an agreement must be construed based on the instrument as a whole, and not from a single word or phrase. *See, Riley Stoker Corp.,* 7 LA 764, 767 (Platt, 1947); *Great Atlantic & Pacific Tea Co.,* 70 LA 1003, 1006 (Horowitz, 1978).

Reading the applicable 2012-2017 CBA as a whole, this Arbitrator beings with Article 4, "Management Rights", that does provide management the right "to establish work schedules and to determine starting and quitting times ...". It is true that Article 4.N does provide "that no right is exercised contrary to or inconsistent with other terms of this agreement".

Then this Arbitrator turns to Article 20, "Hours and Overtime" and in particular Section 20.7, "Change of Schedules". The first statement in Section 20.7 reads, to repeat, "The employer's right to assign officers for duty at any time and at different times during each 28 day police period remains unrestricted and unchallenged". This language is there to be read. After providing for such language, the parties in 20.7 provide, "However, starting times may be adjusted by the employer: (1) plus or minus two (2) hours from the designated starting times; or (2) for up to seven hours within an officer's assigned watch for circumstances not known to the Department 48 hours prior to the start of the police period."

Back to the Memoranda, including the Memorandum attached to the CBA. Both Memoranda incorporate or make reference to the 20.7 plus or minus two hours start time adjustment provision. For that matter, so did D.N. 08-34 as did the January 5, 2010 Side Letter which Letter is also attached to the 2012-2017 CBA. Commander O'Neill acknowledged that the Department did negotiate a designated start time for each of the watches in Patrol Bureau Districts. But he denied, except for the first year of the pilot program, that the starting times for the early and late cars were "locked in".

In addition to reading the contract as a whole and considering the testimony of the Lodge's witnesses along with that of Commander O'Neill, there was the testimony of Lieutenant Donna Rowling who as a Sergeant was a Field Supervisor in the 021st District for seven years and as a Lieutenant between 2017 and 2019, for about a year and one-half worked as a Watch Operations Lieutenant on the second watch in the 006th District, convincing this Arbitrator that she was familiar with field operations in the Districts. (V. III, Tr. 9-10). Lieutenant Rowling testified, based upon her experience, rapid response cars in the Districts do not always correspond to the start times argued by the Lodge. (V. III, Tr. 11). Lieutenant Rowling also testified to the same effect as to mission cars. (V. III, Tr. 32-33). The gist of her testimony as to rapid and mission cars was that they were assigned fluctuating start times within the two hours plus or minus of the designated starting time.

Lieutenant Rowling was shown the A&A sheet from November 6, 2019 for the third watch, 015th District noting that on the third watch the late starting times, according to the Lodge, would be 1530-0030. Yet, the attendance sheets showed a number of Officers on the third watch for November 6, 2019 working 1700 to 0200 which is not in accordance with the late starting

-25-

time claimed by the Lodge, but is within two hours of the designated starting time for the third watch set forth in the January 5, 2010 letter. (V. III, Tr. 70-74). Lieutenant Rowling acknowledged that some of the Officers were rapid response and some were mission cars. (V. III, Tr. 78).

This testimony highlights that there is a variety of assignments in the Districts that are premised on the two hour plus and minus of the designated start time set forth in the Memorandum attached to the CBA. This Arbitrator appreciates the Lodge argued that the language of Section 20.7 refers to "adjust" and that the language of the 2009 Memorandum is "starting time" or what the parties referred to as "designated time". Although an argument, this does not change the result of reading the contract as a whole and, despite the proffered testimony of the Lodge, there is persuasive evidence that the Department is making a variety of assignments based upon the two hour plus or minus provision from the designated time as set forth in 20.7.

This Arbitrator appreciates that for approximately 11 years the Department chose not to across the board, so to speak, change the starting time for the early and late cars. However, when the evidence is established that the Department has utilized the two hours plus and minus in changing start times in the various Districts for a variety of reasons, this Arbitrator is obliged to conclude that the language of the continuing 2012-2017 CBA, including the attached Memorandum of Understanding and the Side Letter, both of which included references to 20.7, establishes that contractually the action of the Department is permitted by the negotiated contract language as it now stands.

In arriving at this conclusion, this Arbitrator considered whether the Lodge has a basis for a past practice argument. With 20.7 being there to be read in conjunction with Article 4.H., plus

-26-

the variety of assignments that have resulted in applying the two plus or minus, this Arbitrator cannot find a basis for a past practice argument. As the City well knows, this Arbitrator is not bashful in concluding that a past practice can trump clear contract language, depending on the parties' mutual actions. *See, City of Chicago (Dept. Of Aviation) and Laborers Local 1092, Gr. No. 53-16-085-001* (Roumell, 2016). In that case, there was no deviation from the parties' practice. Here, there was deviation.

In coming to the conclusion here this Arbitrator accepted the testimony of President Graham that the Lodge did not have knowledge of the changes in the 019th District and for this reason those changes had no influence on this Arbitrator.

The last point to be made is that though the parties cited a number of arbitrator decisions between the parties which this Arbitrator has read, including his own, this Arbitrator concludes that those decisions are not persuasive as they addressed specific and different contract issues than are involved in this dispute.

It is based upon the above analysis that Gr. No. 129-19-013 will be denied by this Arbitrator.

### Grievance No. 129-19-010/362 – Six Day Off Group – 006th District

A number of the points raised by this Arbitrator in discussing the work day schedule arguably are applicable to the issue of the change in day off groups from six to three in the 006th District, which is on the four-two schedule. At an August 6, 2008 meeting of the respective work schedule committees, Commander O'Neill presented key points of the four-two schedule, already quoted at pages 15-16 of this Opinion. As noted, the key points referenced for the four-two schedule a six day off group. D.N. 08-34, as quoted at pages 2-4 of this Opinion, in referring to

the four-two schedule, noted that "personnel will be assigned to one of six days off". However, the September 4, 2008 Memorandum of Understanding made no reference to the number of day off groups in Districts having the four-two schedule. Nor did the 16 November 2009 Memorandum of Understanding attached to the 2007-2012 and 2012-2017 CBAs.

Arguably, the conclusion that can be drawn from the above observation is that, pursuant to management rights, the Department could initiate a pilot program in the 006th District reducing the number of day off groups from six to three. The evidence suggests that the Department is intending to extend this change to the other four-two schedule Districts – meaning all but the 005th District.

With the absence of contract language in the body of the CBA or in the Memorandum attached to the CBA restricting the Department from reducing the number of days off groups, the Department has argued to this Arbitrator that it has a management right to make the change.

The essential argument of the Lodge is that there is a binding past practice between the parties that is enforceable as if written in the contract due to their mutual actions. This Arbitrator has explored this claim.

One of the bases for a past practice analysis is the recognition that, if established, a past practice can be used to amend an existing agreement and create a separate enforceable condition of employment, namely, filling the gap, where an agreement is silent on an employment condition. *See*, Elkouri and Elkouri, How Arbitration Works (8th Ed. 2016) at 12-28. *Also see, Texas-New Mexico Pipeline Co.*, 17 LA 90 (Emery, 1951); *Monarch Rubber Co.*, 44 LA 246 (McCoy, 1965); *National Lead Co.*, 28 LA 470 (Roberts, 1957).

The concept behind analyzing the application of past practice was noted by Arbitrator

-28-

Brian Clauss in a 2011 decision between the parties in *Gr. No. 177-11-001 and 002* whereby at pages 13-14 Arbitrator Clauss wrote in part:

> ... Long-standing past practices can be binding upon the parties, provided certain criteria are met. Elkouri & Elkouri, <u>How Arbitration Works</u>, Sixth Edition, provides a substantive discussion of past practice in Chapter 12, entitled "Custom and Past Practice." Section 12.2 provides in pertinent part:
>
>> When it is asserted 'that a past practice constitutes an implied term of a contract, strong proof of its existence ordinarily will be required. Indeed, many arbitrators have recognized that, 'in the absence of a written agreement 'past practice' to be binding on both Parties, must be (1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both. Parties.
>>
>> Another commonly used formulation requires 'clarity and consistency and acceptability.' The term 'clarity' embraces the element of uniformity. The term 'consistency' involves the element of repetition, and 'acceptability' speaks to a mutuality of the custom or practice. [ citations omitted]
>
> Moreover, "[f]or a past practice to constitute as an implied term of a contract, 'strong proof' of its existence is required."
>
> * * *
>
> ... "A past practice is binding on the parties only when circumstances ensure that it has been understood and accepted by both parties as an implied term of the contract". Moreover, strong evidence of mutual acceptance is particularly necessary when the alleged implied term concerns fundamental management rights "regarding method of operation and direction of the workforce."
>
> An examination of the mutuality of the 0600 start time should be considered in light of the following well-known analysis:
>
>> But there are other practices which are not the result of joint determination at all. They may be mere happenstance, that is, methods that developed without design or deliberation. Or they may be choices by Management in the exercise of managerial discretion as to the convenient methods at the time. In such cases there is no thought of obligations or commitment for the future. Such practices are merely present ways. Not prescribed

-29-

> ways, of doing things .... The law and the policy of collective
> bargaining may well require that the employer inform the Union
> and that he be ready to discuss the matter with it on request. But
> there is no requirement of mutual agreement as a condition
> precedent to a change of practice of this character."
> *Ford Motor Company*, 19 LA 237, 241-2 (1952) (Shulman)
> (Footnotes omitted.)

This Arbitrator believes that the above analysis by Arbitrator Clauss set forth the basic principles

in considering whether in a given situation there is a binding past practice.

Absent anything more than what this Arbitrator has just stated revealed on this record, it

could be argued that there is no binding past practice filling the gap that is binding on the

Department; that the Department's failure to reduce the day off group from six to three in the

four-two schedule Districts in the past was merely a present way than a prescribed way, quoting

Arbitrator Shulman in *Ford Motor Company*, 19 LA 237, 241-242 (1952). But there is more on

this record.

Richard Aguilar, who in 2013 was the Financial Secretary of Lodge No. 7, learned that

the Department was intending "on doing something in the 012th District called squad policing,

squad scheduling". (V. III, Tr. 176). Officer Aguilar on behalf of the Lodge responded with a

letter to then Superintendent Garry McCarthy, with a copy to Commander O'Neill, on September

13, 2013 raising questions about the intention as Officer Aguilar testified, "I do know this letter

started – started the ball rolling as far as having meetings with the Department about what it

actually intended on doing". (V. III, Tr. 177-178). Officer Aguilar acknowledged that the initial

meetings were informational, but then testified, "At some point, the City actually started to listen

to us and take our input. At that point I would – I would consider them negotiations because they

actually implemented some of the things we – they addressed some of our concerns". (V. III, Tr.

178). The record reveals that the squad scheduling program is similar to the Department's

reducing the number of group days from six to three in the 006th District.

After testifying, "And at one point it looked like we actually had an agreement", Officer Aguilar testified that he received a November 1, 2013 letter from Commander O'Neill that began with the sentence, "This letter is to confirm the terms of the Squad Pilot Program to be implemented effective January 5, 2014. The program will entail the following ...". Thereafter, the letter detailed the pilot program for Districts 003, 012 and 024. On the same day, November 1, 2013, Officer Aguilar responded with the following letter to Commander O'Neill seeking to negotiate on the issue of implementing the squad scheduling pilot program, with the letter reading:

November 1, 2013

Commander Donald J. O'Neill
Management and Labor Affairs Section
3510 S. Michigan Ave.
Chicago, IL. 60653

Re:      Squad Scheduling 003rd Dist, 012th Dist, 024th Dist                    **Sent via E-mail**

Dear Commander O'Neill,

When the implementation of a Squad Scheduling Pilot Program in the 012th District became a topic of discussion, it was quite refreshing to see that the Department considered the positions of the Lodge and the 012th District members who were going to be affected by these changes.

Frankly, I was waiting for the proverbial other shoe to drop. The Department did not let me down. The sudden decision to implement this Pilot Program in the 003rd and 024th Districts, without any opportunity for the Lodge to discuss this with our members in those Districts, has put the Lodge in a precarious position.

The Lodge cannot agree with the implementation in any of these Districts at this time. We believe this is a change in working conditions that will require significant modifications to the current collective bargaining agreement. As you are aware, we are currently in the process of negotiating a successor agreement. We will be amenable to any proposals the City and/or Department would care to discuss at those negotiations.

I want our position to be perfectly clear. We will not agree to waive or modify any of the current provisions contained in the current collective bargaining agreement and will do everything we can to protect our member's rights.

Sincerely,

*Richard L. Aguilar*

Richard L. Aguilar
Financial Secretary
Chicago Lodge #7
(V. III, Tr. 178-179).

Based upon his letter of September 13, 2013 and his November 1, 2013 letter, Officer Aguilar testified that he believed the parties ultimately reached an agreement as he testified, "We did. At least, again, I thought we did". (V. III, Tr. 180).

On December 6, 2013, Officer Aguilar sent Commander O'Neill the following letter:

December 6, 2013
Commander Donald J. O'Neill
Management and Labor Affairs Section
3510 S. Michigan Ave.
Chicago, IL. 60653

RE:     BOP Squad Schedule -Pilot Program          **Sent via E-mail**

Dear Commander O'Neill,

This letter will serve to memorialize an agreement between the Fraternal Order of Police Chicago Lodge #7 and the Management and Labor Affairs Section of the Chicago Police Department.

Department Notice D13-15 Bureau of Patrol Squad Schedule -Pilot Program was issued by the Chicago Police Department on November 27, 2013.

Sections II A and B should indicate an end date of 03 January 2015 unless both parties agree to continue or implement the Squad Schedule on a permanent basis.

Section VII A should indicate the Department's Evaluation Committee will at a minimum meet with FOP during the fourth, eighth, and twelfth police periods to discuss any positive or negative results of this pilot program.

Please sign and date this document to indicate your agreement to these additional terms.

Sincerely,

Richard L. Aguilar
Financial Secretary
Chicago Lodge #7

*Richard L. Aguilar 12/06/2013*                   _____
Richard L. Aguilar                                Commander Donald J. O'Neill
Financial Secretary Lodge 7                       Commander MLAS- CPD

Officer Aguilar was not clear whether he received a return copy of the December 6, 2013 letter signed by Commander O'Neill. Commander O'Neill later testified that he did not return the letter. However, Officer Aguilar testified, "I don't have the document signed by O'Neill, but the fact of the matter is the pilot program went forward. The Lodge did not file any grievances. I was the Grievance Chair at the time. I certainly would have been the one to file a grievance and there wasn't a grievance filed because it was done by agreement." (V. III, Tr. 181-182).

Officer Aguilar was asked:

Q     And did the program go forward?

A     Yes, it did.

Q     As agreed upon by the Lodge?

A     Yes.
(V. III, Tr. 182).

Officer Aguilar stated that the reason he sent the December 6, 2013 letter was "requesting the changes for what we had — what we had agreed for and — if not an actual — a signed agreement and what in — in what we thought we had agreed to." (V. III, Tr. 186).

The parties agreed that the Squad Scheduling Pilot Program reduced the scheduled group days off from six to three and was similar to the unity of command concept that Lieutenant

-33-

Rowling testified was the basis for the reduction of the six day off group to three in the 006th
District in 2020.

Officer Aguilar was asked, "How does the agreement on the Bureau of Patrol squads
schedule program differ from your experience with respect to this program that was implemented
on January 9, 2020?" The question referred to the reduction of the days off groups in the 006th
District.

Officer Aguilar answered, "This was by agreement [referring to the squad scheduling
program]."

Near the end of his testimony, Officer Aguilar was asked:

> Q       Between 2008 and 2009 when the parties reached an agreement
>         on the MOUs in January 2020, has the Department ever changed
>         the number of days off groups without agreement with the
>         Union?
>
> A       No.

(V. III, Tr. 197-198).

Commander O'Neill on direct examination, when asked why there was no reference to
the six day off groups in the MOU, replied, "Because that wasn't really part of the agreement".
(V. III, Tr. 261). Commander O'Neill acknowledged that he had numerous conversations with
Officer Aguilar following Officer Aguilar's September 13, 2013 letter. (V. III, Tr. 267).
Commander O'Neill discussed his November 1, 2013 letter to Richard Aguilar which prompted
Officer Aguilar's replying November 1, 2013 letter.

After the November 1, 2013 letters, Commander O'Neill acknowledged that, "We came
up with a different agreement", referring to "we" as the Lodge and the Department. (V. III, Tr.
270). The previous Order on the squad scheduling which Commander O'Neill testified was
because "we had reached an agreement with FOP to go to a different way that everybody would

get this – basically bid for a new day off group by seniority". (V. III, Tr. 271).

Commander O'Neill was asked:

    Q    There was an agreement with respect to what for the Lodge?

    A    How the new day off group would be assigned reducing it to a three days off group and everybody now would be starting from square one. You pick your day off group first, second and third choice by seniority.
    (V. III, Tr. 272).

Commander O'Neill testified there was no signed agreement with the Lodge with respect to the squad pilot program. He acknowledged receiving Officer Aguilar's December 6, 2013 letter. Commander O'Neill testified as follows as to the reason he did not sign the December 6, 2013 letter:

    Because this is not our understanding of what the agreement was, that this wasn't a one year pilot program that was going to end on 3 January 2015. It didn't have an evaluation committee that would meet within the fourth, eighth and twelfth police periods. So – and that's – that's why it wasn't signed.
    (V. III, Tr. 273).

However, after so testifying, Commander O'Neill was asked:

    Q    Now, with respect to the squad policing program, you say you reached – you reached, was there an agreement with the Lodge with respect to how the transition to a three day off group would work?

    A    Yes.
    (V. III, Tr. 274).

Commander O'Neill testified:

    Q    Did you negotiate going from six to three days off groups with the Lodge, with Mr. Aguilar?

    A    No.

    Q    What did you negotiate with Mr. Aguilar on behalf of the FOP?

> A    How they would transition from six day off groups to three day off groups and whether it had to be done before furlough kicks, before – you know, how all that was going to play out.
>
> (V. III, Tr. 275).

By the above testimony, Commander O'Neill was maintaining that the agreement was limited to concerning the transition from six to three days off groups and was not about whether the Department could make a change from six to three days off group.

After so testifying, Commander was asked and answered:

> Q    ... Absent agreement with the Lodge, with Mr. Aguilar, to conduct the transition in this fashion, as set forth in the last paragraph of City Exhibit T4, the November 8th, 2013 document, could you have unilaterally done the transition in that way?
>
> A    I think we could have, but I think it was a lot safer to get their agreement. The cautious path were to say, "Look, these are the only people we're changing. We're changing 61, 63, 65. And so those are the only ones that have to select a new watch," all right?
>
> That's basically what it says. If we recognize a vacancy on another watch, we seek volunteers and go by reverse seniority. ...
>
> (V. III, Tr. 280).

On cross-examination, when asked about Officer Aguilar's December 6, 2013 letter and that he did not sign the letter, Commander O'Neill was asked:

> Q    There were a couple of things in it you didn't agree with, correct?
>
> A    Correct.
>
> Q    But overall, you agreed that there had been an agreement to make these squad change in these Districts, correct?
>
> A    There was an agreement on how we would assign officers new days off groups how officers would get –
>
> Q    Which means they would no longer have six, correct?
>
> A    Correct.
>
> (V. III, Tr. 311).

This Arbitrator has set forth in detail the testimony between Officer Aguilar and Commander O'Neill concerning the squad scheduling and the reducing in that program of six day off groups to three. The two have somewhat of a different version as to what was agreed to. Yet, the fact is the Department ultimately did not unilaterally make the change.

Noting Section 20.10, "Days Off Group Assignment", as to the seniority rights of Officers who were subject to a condensing of days off groups by the Department, the agreement that was reached as to squad scheduling was that there would be bidding by seniority to the remaining three groups.

In this regard, it was brought out on this record that a similar bidding procedure was followed in the 006th District when there was a reduction from six to three day off groups. But this was done without negotiating with the Lodge.

It could be argued that what the Department did in the 006th District day group reduction from six to three is to follow the pattern that was negotiated in connection with the squad scheduling program. And, there is Commander O'Neill's testimony maintaining that he was negotiating a transition that is a right to make the change.

Both points beg the issue. The fact is for 11 years on the 4-2 schedule both the Department and the Lodge had accepted the practice of having six day off groups which was a condition of employment; that the existence of the six-two schedule was not merely a present way utilized by management but rather was the prescribed way by mutual agreement as revealed by the fact that when the Department sought to make a change in the day off groups involving Districts with a 4-2 schedule and was challenged by the Lodge, the Department negotiated which persuades this Arbitrator that the Department, whether it was out of caution or otherwise, that the

-37-

Department had acquiesced to a practice mutually accepted that could only be changed by negotiations. Calling the previous negotiations as dealing with a transition is a distinction that based on careful analysis cannot be sustained. The Department negotiated as part of the change and did not make the final change until there were negotiations and agreement. In fact, the initial Order was rescinded based upon the agreement involving the squad scheduling program. Yes, this Arbitrator recognizes that arguably the issues that were subject to negotiations as to the squad scheduling pilot have been resolved, namely, seniority bidding and days off. However, there could be other issues the Lodge claimed are relevant which could be subject to negotiations as gleaned by this Arbitrator in the Lodge's presentation.

The difference in the situation involving a reduction of days off groups and starting times is that the issue of starting times is controlled by contract language whereas with the day off groups the Department whether taking a cautionary approach or otherwise recognized an obligation to negotiate with the Lodge and reach agreement concerning the day off group because there was a mutually accepted 11 year practice of a six day off group in the 4-2 schedule with the exception of the squad patrolling incident which was negotiated and agreed to.

Having concluded that there was a binding past practice as to days off groups, it is recognized that in order to change a past practice, a change in the practice can, like any other contract, comes about by negotiations and agreement. *See*, Elkouri and Elkouri, How Arbitration Works (8th Ed. 2016) 12-15-17.

There is one principle that should be noted, namely, that if the underlying conditions upon which the past practice was developed no longer exists, then the past practice is no longer binding. *See, BWXT Pantex*, 120 LA 69 (Baroni, 2004).

The underlying change in conditions is the argument that the 006 change off group reduction from the Department's standpoint is part of the concept of unity of command and span of control set forth in the Consent Decree. However, Paragraph 711 of the Consent Decree is there to be read and essentially provides that "nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the unions; ...". The ultimate point is if there is a desire to change the practice as to reducing the number of day off groups, then this should be negotiated and agreed to between the parties through the procedures for negotiating and reaching agreement under the CBA.

Based upon the above analysis, Gr. No. 129-19-010/326 shall be granted and having six day off groups in the 006th District shall be restored forthwith.

As this is a split decision, pursuant to Section 9.8, the fees and expenses of this Arbitrator shall be shared equally by the parties.

## A W A R D

1. Grievance No. 129-19-013 addressing change in start times is denied.

2. Grievance No. 129-19-010/362 is granted and the 006th District shall return to a six day off group forthwith unless a change is otherwise negotiated and agreed to by the Lodge.

3. The fees and expenses of this Arbitrator shall be shared equally by the parties.

GEORGE T. ROUMELL, JR.
Arbitrator

February 26, 2020