**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

## <u>MONITORING PLAN FOR YEAR TWO</u>

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Monitoring Plan for Year Two.

Dated July 3, 2020

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on July 3, 2020, she caused a true and correct copy of the foregoing **Monitoring Plan for Year Two** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com



Independent
Monitoring Team | Chicago Police
Department
Consent Decree

# Monitoring Plan
## *Year Two*

July 3, 2020

## Table of Contents

Introduction ............................................................... 1

    Year Two Priorities ................................................. 2

    Impact of COVID-19 ............................................... 7

Background: The Consent Decree ..................................... 11

Compliance Assessments ................................................ 15

    Year Two Priorities ................................................. 16

    The IMT's Assessments and Deadlines ........................... 20

Conclusion and Looking Ahead .......................................... 25


Attachment 1. Consent Decree Paragraphs in Year Two ...... 27

***

Readers of the electronic pdf may click sections above to jump to the corresponding sections of the report.

# Introduction

As the Independent Monitoring Team (IMT), we assess the City of Chicago's (City's) compliance with the requirements of the Consent Decree. Specifically, we assess how all relevant City entities—including the Chicago Police Department (CPD); the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety; and the Office of Emergency Management and Communications—are complying with the Consent Decree.[1]

This is our Monitoring Plan for Year Two. It includes our projected assessments and tasks for the third and fourth reporting periods of the Consent Decree (March 1, 2020, through June 30, 2021). Our Monitoring Plan for Year Two builds on our Monitoring Plan for Year One.[2] Specifically, in Year Two, the IMT will continue to assess all 230 paragraphs in our Monitoring Plan for Year One in addition to the 287 new paragraphs in this Plan. *See* Figure 2 on page 10 (reporting periods one through four), and Attachment 1 (reporting periods three and four only).

By the end of Year Two, the IMT will have addressed the City's compliance efforts regarding 517 paragraphs, more than 75% of all monitorable paragraphs in the Consent Decree.[3] Our Monitoring Plan for Year Three, which we will file next year, will address *all* monitorable paragraphs in the Consent Decree. In other words, the IMT will address the City's compliance efforts toward all requirements of all paragraphs in the Consent Decree by the end of Year Three. Specifically, the IMT will assess whether the City is on course to reach and maintain full and effective compliance for requirements for one or two years, as required, by the end of Year Five.[4]

As we file this Plan, Chicago and the country continue to be in the midst of a pandemic, an economic crisis, and a social justice movement. There are unprecedented challenges facing our city, our communities, and our first responders. These unique times also present an opportunity for our city to rise to the occasion.

---

[1] The Consent Decree is available on the Office of the Illinois Attorney General's (OAG's) consent-decree website. *See Resources*, CHICAGO POLICE CONSENT DECREE ("Consent Decree Approved by the Court on January 31, 2019"), http://chicagopoliceconsentdecree.org/resources/. We cite the relevant paragraphs of the Consent Decree throughout this Monitoring Plan for Year Two.

[2] The IMT filed the Monitoring Plan for Year One in May 2019, which is available on our website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/.

[3] Many paragraphs in the Consent Decree do not have require the City to make reform efforts—such as, statements of fact and definitions—and, thus, do not require us to monitor compliance. *See, e.g.*, ¶¶1–7 and 722–99.

[4] *See* ¶657 (requiring the IMT to "conduct a comprehensive assessment to determine whether and to what extent the City and CPD are in compliance with [the Consent Decree], whether the outcomes intended by [the Consent Decree] are being achieved, and whether any modifications to [the Consent Decree] are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements."). *See also* ¶¶714–15.

As we summarize in the two corresponding subsections below, this Plan provides the IMT's monitoring priorities in Year Two—which include many requirements regarding the recent calls across the country for police accountability and reform—and the strategy to address the impact of COVID-19 on Consent Decree efforts.

## Year Two Priorities

In this Plan, we identify the IMT's priorities for Year Two, which include (1) missed deadlines from Year One, (2) new deadlines in Year Two, (3) key paragraphs without deadlines in Year One ("foundational paragraphs"), and (4) new foundational paragraphs in Year Two.[5] As we did in Year One, we selected the paragraph requirements for Year Two after extensive discussions with the City and the Office of the Illinois Attorney General's Office (OAG), the Parties to the Consent Decree (Parties).[6]

The IMT and our Community Engagement Team will also continue to prioritize (5) engagement with Chicago communities and build on the work that occurred in Year One, including the IMT's Community Survey.[7] Finally, as explained further below, the IMT will also focus on (6) our recently announced special report regarding the City's and the CPD's response to recent protests and unrest.[8]

On May 25, 2020, the nation watched George Floyd die under the knee of a police officer in Minneapolis, Minnesota. Communities across the country, including Chicago, responded and, in many areas and ways, continue to respond, including with protests and civil unrest. Many of these protests have called for varying forms of increased police accountability and reform. And many of the calls for action include or relate to requirements across the Consent Decree.

Likewise, with the recent protests and unrest, there has also been a rise in related law enforcement activities that span issues covered by the Consent Decree. In addition to establishing our regular assessment efforts, ¶665 of the Consent Decree permits the Independent Monitor to "prepare written reports on any issue or set of issues covered by" the Consent Decree. In accordance with the Consent Decree and its commitment to accountability and transparency, the IMT will prepare a special report on the City's and the CPD's response to the recent protests and civil unrest. In preparing the report, we will seek direct input from a variety of

---

[5]    For more details, see the Year Two Priorities section in the body of this report.

[6]    The IMT also provided the Coalition with an opportunity to review and comment on a draft of this Monitoring Plan on June 10, 2020.

[7]    The IMT completed data collection for our first Community Survey, and we are currently analyzing the results. ¶¶645–51. We will provide the Court and the public with a special report to fully explain the survey results soon—after receiving feedback from the Parties. *See* ¶¶663–65.

[8]    *See Notice Regarding Special Report*, IMT (June 5, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020-06-05-Notice-Regarding-Special-Report.pdf.

sources—including members of Chicago's communities, the CPD, COPA, and other City entities.

Moreover, we recently assessed many of the City's, the CPD's, and other relevant City entities' efforts to meet related requirements in our Independent Monitoring Report 2, which we filed on June 18, 2020.[9] We assessed, for example, the City's efforts on the following requirements (listed in numerical order for each corresponding paragraph):

- Requiring the CPD to "establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies" (¶160);

- Requiring officers "to de-escalate potential and ongoing use of force incidents whenever safe and feasible" (¶161 (listing various techniques));

- Requiring officers, consistent "with CPD's commitment to preventing and reducing the need for force," to "allow individuals to voluntarily comply with lawful orders whenever safe and feasible" (¶162);

- Prohibiting officers "from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct)" (¶163);

- Ensuring that officers immediately request "appropriate medical aid for injured persons or persons who claim they are injured" after "a use of force, once the scene is safe and as soon as practicable" (¶173);

- Requiring officers to "recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force" (¶176);

- Requiring that "CPD officers must generally not use force against a person who is handcuffed or otherwise restrained" (¶177);

- Prohibiting CPD officers "from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized" (¶178);

---

[9]    Our assessments of all the deadlines and requirements from the Consent Decree paragraphs in our Monitoring Plan for Year One are available on our website in Independent Monitoring Report 1 and Independent Monitoring Report 2. *See Reports*, IMT (November 15, 2019, and June 18, 2020, respectively), https://cpdmonitoringteam.com/reports/.

- Requiring officers to "issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so" (¶183);

- Requiring that all "reportable uses of force by CPD members must be reviewed by CPD supervisors" (¶229);

- Requiring the CPD to annually review and approve "a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and [the Consent Decree]" (¶272 (listing training requirements); *see also* ¶334);

- Determining whether "members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program" (¶411); and

- Requiring the City, the CPD, and COPA to "ensure individuals are allowed to submit complaints in multiple ways" (¶411).

In Year Two, we will monitor the City's, the CPD's, and other City entities' ongoing efforts to meet the requirements from Year One. We will also monitor the City's efforts to comply with additional paragraphs, which include the following requirements (listed in numerical order for each corresponding paragraph):

- Displaying arrestee rights prominently and allowing arrestees "to make a phone call as soon as practicable" (¶¶30–31);

- Creating "opportunities to encourage officer, supervisory, and district performance on furthering community partnerships," "effective use of de-escalation," and "implementing community-oriented crime prevention strategies" (¶48; *see also* ¶375).

- Prohibiting "officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description" (¶55; *see also* ¶54);

- Setting the Crisis Intervention Team Program's objectives to include

  o improving the CPD's "competency and capacity to effectively respond to individuals in crisis;"

- o "de-escalating crises to reduce the need to use force against individuals in crisis;"

- o "improving the safety of officers, individuals in crisis, family members, and community members;"

- o "promoting community-oriented solutions to assist individuals in crisis;"

- o "reducing the need for individuals in crisis to have further involvement with the criminal justice system;" and

- o developing, evaluating, and improving the CPD's "crisis intervention-related policies and trainings to better identify and respond to individuals in crisis" (¶88);

- Designing, implementing, and maintaining the "CPD's use of force policies and training, supervision, and accountability systems" so that CPD members

  - o "act at all times in a manner consistent with the sanctity of human life;"

  - o "act at all times with a high degree of ethics, professionalism, and respect for the public;"

  - o "use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible;"

  - o "use sound tactics to eliminate the need to use force or reduce the amount of force that is needed;"

  - o "only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances;"

  - o "only use force for a lawful purpose and not to punish or retaliate;"

  - o "continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary;"

  - o "truthfully and completely report all reportable instances of force used;"

  - o "promptly report any use of force that is excessive or otherwise in violation of policy;"

- o "are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy;" and

- o "act in a manner that promotes trust between CPD and the communities it serves" (¶156; *see also* ¶157);

- Requiring "CPD officers to provide life-saving aid consistent with their [Law Enforcement Medical and Rescue Training] to injured persons as soon as it is safe and feasible to do so until medical professionals arrive" (¶175);

- Requiring officers to "recognize and act upon the duty to intervene on the subject's behalf when another officer is using excessive force" (¶176);

- Requiring that "pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or, when force must be used, to use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and ensure appropriate supervision and accountability" (¶243; *see also*, ¶¶246 (annual use of force training) and 248 (pre-service promotional supervisory training)); and

- Creating a "computerized relational database that will be used to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer," including "all reportable uses of force;" "all arrests by CPD personnel;" "all injuries to and deaths of persons in CPD custody;" "all injuries and deaths resulting from conduct by CPD personnel;" "all vehicle pursuits and traffic collisions involving CPD equipment or personnel;" "all misconduct complaints and investigations involving CPD officers, including the disposition of each allegation;" "all civil or administrative claims initiated against the City or CPD, or CPD officers for job-related conduct;" "all criminal proceedings initiated against a CPD officer, which CPD will require officers to report;" "all instances in which CPD is notified that a court has made a negative credibility determination regarding a CPD officer;" "instances in which CPD learns through the Cook County State's Attorney's Office that an affirmative finding was made during the course of a criminal proceeding that a CPD member was untruthful;" "all instances in which CPD learns through the Cook County State's Attorney Office, the United States Attorney's Office for the Northern District of Illinois, or other prosecutorial authority that prosecution was declined based in whole or in part on concerns about a CPD officer's credibility;" "disciplinary history for all CPD members;" "all violations of CPD's body-worn and in-car camera policies;" "all

awards and commendations received by CPD officers;" "training history;" and "rank, assignment, and transfer history" (¶587).

Our assessments in Year Two will include paragraphs that have deadlines before June 30, 2021, and foundational paragraphs across the consent decree, with the most requirements coming from the Use of Force and Accountability and Transparency sections. We hope that the current national discourse and momentum toward police accountability and reform will inspire the City and its entities to continue the reforms they have made and make faster progress toward the reforms they have yet to implement.

The City and the CPD recently assured the OAG and the IMT that they are working on a plan to catch up on the underlying compliance requirements from the missed deadlines in Year One, which we expect that the City will release soon. In Year One, the City and its relevant entities missed 89 out of 124 deadlines, but they met the underlying deadline requirements for an additional 20 paragraphs before the end of Year One. As a result, the City entered Year Two with *at least* 69 paragraphs behind schedule. If warranted, the IMT will provide an updated Monitoring Plan for Year Two with the federal court (Court) and the Chicago community.[10]

The IMT remains steadfast in its commitment to fairly monitor and assess the City's compliance with the requirements of the Consent Decree and to deliver technical assistance to assist the City when requested.

## Impact of COVID-19

The City's reform efforts were directly affected by the unprecedented impact of COVID-19, including federal court closures; scarce City resources; reassignments and deployments within the CPD; and canceled meetings and visits. For example, most of the staff within the CPD's Office of Constitutional Policing and Reform—the office charged with overseeing CPD's Consent Decree reform efforts—was largely re-deployed to the City's COVID-19 response.[11]

Accordingly, on March 27, 2020, after an unopposed motion by the City, the Court entered an order, extending "all the future obligations and deadlines under the Consent Decree, including those for the City of Chicago, State of Illinois, and Inde-

---

[10] The City and the CPD recently updated their corresponding websites regarding police reform. *See Public Safety Reform*, CITY OF CHICAGO, https://www.chicago.gov/city/en/sites/police-reform/home.html (last visited July 3, 2020), and *Reform*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/reform/ (last visited July 3, 2020).

[11] According to the CPD, the CPD recently interviewed, hired, and trained several new project managers for the Office of Constitutional Policing and Reform. We look forward to working with them.

pendent Monitor, . . . [for] the time period the COVID-19 Executive Order No. 8 issued by the Governor of the State of Illinois remains in effect."[12] Executive Order No. 8 expired on May 29, 2020—64 days after the extension order. As a result, the Parties agreed to extend all deadlines in the Consent Decree by the 64 days that Governor Pritzker's Executive Order was in effect (March 27, 2020 through May 29, 2020).[13]

COVID-19 delayed the review process and ultimate release of our Independent Monitoring Report 2, which detailed our compliance assessments for the second reporting period that ended on February 29, 2020.[14] Because of the delays caused by COVID-19, the Parties and the IMT agreed to extend the third reporting period until December 31, 2020. The Parties and the IMT agreed that this extension would be more efficient than writing a monitoring report for a reporting period that includes a 64-day extension, which is about one-third of the six-month reporting period.

This extension will have the added benefit of making the Consent Decree reporting periods match the calendar year, which is closer to the Parties' original intent. Specifically, reporting periods in Consent Decree Years Three, Four, and Five will now correspond with the start, middle, and end of 2021, 2022, and 2023, rather than corresponding with the March 1, 2019 effective date of the Consent Decree. Reporting periods will then return to a six-month cycle for the fourth monitoring period, which will begin on January 1, 2021, and end on June 30, 2021. We will detail our assessments of the City's compliance efforts in the third and fourth reporting periods in Independent Monitoring Reports 3 and 4, respectively. *See* Figure 1, below.

---

[12]   *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

[13]   Many Consent Decree deadlines are inter-related with other requirements and deadlines. For this reason, the City may prefer that some deadlines do not move the full 64 days. In other instances, an appropriately extended deadline may cause unforeseeable issues that cause the OAG to prefer a further extension. As a result, the IMT may adjust this Monitoring Plan in accordance with the Consent Decree and with the approval of the Parties.

[14]   *See Reports*, IMT (June 18, 2020), https://cpdmonitoringteam.com/reports/.

Figure 1: Reporting Periods for Years One and Two

| Monitoring Plan for Year One | |
|---|---|
| 1st Reporting Period | March 1, 2019 – August 31, 2019<br>(*See* Independent Monitoring Report 1) |
| 2nd Reporting Period | September 1, 2019 – February 29, 2020<br>(*See* Independent Monitoring Report 2) |
| Monitoring Plan for Year Two | |
| 3rd Reporting Period | March 1, 2020 – December 31, 2020<br>(Independent Monitoring Report 3, Spring 2021) |
| 4th Reporting Period | January 1, 2021 – June 30, 2021<br>(Independent Monitoring Report 4, Autumn 2021) |

We thank everyone who has and continues to make significant sacrifices to help protect Chicago's communities in this unprecedented time. This includes the thousands of first responders and essential workers throughout our communities, including healthcare workers, grocery and pharmacy workers, mass-transit workers, delivery drivers, and everyone who has been on the front lines of Chicago's COVID-19 response. Our gratitude also extends to the families of these workers, who have supported them and, in some cases, also risked infection for our community. And we are grateful to Chicago for the robust and continued efforts of the Chicago communities that continue to respond to this pandemic and save lives. We also take this opportunity to express our sincere condolences for everyone who has lost someone during this pandemic.

\*\*\*

Figure 2 on the following page reflects the paragraphs with requirements that the IMT will monitor in Year Two, including which paragraphs the IMT monitored in the first two reporting periods. Attachment 1 at the bottom of this Plan simplifies the same information for Year Two only, the third and fourth reporting periods.

Figure 2: Year Two Paragraphs, by Section and Reporting Period

| Topic Area | First Reporting Period March 1, 2019 – August 31, 2019 | Second Reporting Period September 1, 2019 – February 29, 2020 | Third Reporting Period March 1, 2020 – December 31, 2020 | Fourth Reporting Period January 1, 2021 – June 30, 2021 |
|---|---|---|---|---|
| Community Policing (¶¶8–48) | 13*, 18*, 39*, 40*, 44* (Total = 5) | 13, 14*, 15, 18, 20*, 32*, 39, 40, 42*, 43*, 44, 45*, 46, 47* (Total = 14) | 33*, 34*, 35*, 36*, 37*, 38*, 39, 40, 41*, 42, 43, 44, 45, 46, 47 (Total = 26) | 13, 14, 15, 16*, 17*, 18, 19*, 20, 22*, 23*, 24*, 25, 26*, 27*, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48* (Total = 35) |
| Impartial Policing (¶¶49–82) | 58* (Total = 1) | 53*, 58, 60*, 61*, 63*, 64*, 65*, 66*, 67*, 68*, 69*, 70*, 71*, 72*, 74*, 76* (Total = 16) | 52*, 53, 54*, 55*, 56*, 57*, 58, 60, 61, 62*, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 74, 76, 78*, 79*, 80*, 81*, 82* (Total = 27) | 52, 53, 54, 55, 56, 57, 58, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73*, 74, 75*, 76, 77*, 78, 79, 80, 81, 82 (Total = 30) |
| Crisis Intervention (¶¶83–152) | 142* (Total = 1) | 89*, 91*, 92*, 99*, 107*, 108*, 109*, 110*, 116*, 118*, 120*, 121*, 122*, 123*, 125*, 128*, 129*, 130*, 131*, 132*, 137*, 142, 151* | 87*, 88*, 89, 91, 92, 93*, 94*, 96*, 97*, 99, 102*, 103*, 104*, 105*, 106*, 107, 108, 109, 110, 113*, 114*, 116, 117*, 118, 120, 121, 122, 123, 124*, 125, 128, 129, 130, 131, 132, 133*, 134*, 135*, 136*, 137, 138*, 139*, 140*, 141*, 142, 143*, 144*, 145*, 146*, 147*, 148*, 150*, 151, 152* (Total = 54) | 87, 88, 89, 90*, 91, 92, 93, 94, 96, 97, 99, 100*, 101*, 102, 103, 104, 105, 106, 107, 108, 109, 110, 113, 114, 115*, 116, 117, 118, 119*, 120, 121, 122, 123, 124, 125, 127*, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149*, 150, 151, 152 (Total = 61) |
| Use of Force (¶¶153–248) | 160*, 161*, 168*, 169*, 170*, 188*, 189*, 190*, 191*, 192*, 193*, 218*, 222*, 223*, 224*, 225*, 226*, 227*, 229*, 230*, 231*, 232*, 233*, 234*, 235* (Total = 25) | 160, 161, 162*, 163*, 164*, 165*, 166*, 167*, 168, 169, 170, 173*, 176*, 177*, 178*, 181*, 182*, 183*, 184*, 185*, 186*, 187*, 188, 189, 190, 191, 192, 193, 196*, 197*, 198*, 199*, 200*, 202*, 203*, 204*, 205*, 206*, 207*, 208*, 209*, 210*, 211*, 212*, 213*, 214*, 215*, 216*, 218, 222, 223, 224, 225, 226, 227, 228*, 229, 230, 231, 232, 233, 234, 235 (Total = 63) | 153*, 154*, 156*, 158*, 159*, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171*, 173, 176, 177, 178, 179*, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194*, 195*, 196, 197, 198, 199, 200, 201*, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 218, 219*, 220*, 221*, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 243*, 244*, 245*, 246*, 247* (Total = 81) | 153, 154, 156, 157*, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172*, 173, 174*, 175*, 176, 177, 178, 179, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236*, 237*, 238*, 239*, 240*, 241*, 243, 244, 245, 246, 247, 248* (Total = 92) |
| Recruitment, Hiring, and Promotion (¶¶249–264) | (Total = 0) | 263*, 264* (Total = 2) | 253*, 254*, 255*, 257*, 261*, 263, 264 (Total = 7) | 253, 254, 255, 256*, 257, 258*, 259*, 260*, 261, 262*, 263, 264 (Total = 12) |
| Training (¶¶265–340) | 320*, 323*, 336*, 339*, 340* (Total = 5) | 270*, 271*, 272*, 280*, 284*, 316*, 320, 323, 334*, 336, 339, 340 (Total = 12) | 270, 271, 272, 273*, 274*, 275*, 276*, 277*, 278*, 280, 282*, 283*, 284, 287*, 292*, 294*, 297*, 303*, 313*, 315*, 316, 317*, 319*, 320, 321*, 322*, 323, 328*, 331*, 332*, 333*, 334, 335*, 336, 337*, 338*, 339, 340 (Total = 38) | 270, 271, 272, 273, 274, 275, 276, 277, 278, 279*, 280, 282, 283, 284, 287, 288*, 289*, 290*, 291*, 292, 294, 295*, 296*, 297, 299*, 300*, 303, 304*, 305*, 306*, 307*, 308*, 309*, 310*, 311*, 312*, 313, 314*, 315, 316, 317, 319, 320, 321, 322, 323, 324*, 326*, 327*, 328, 329*, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340 (Total = 61) |
| Supervision (¶¶341–376) | (Total = 0) | 348*, 356*, 360*, 362*, 364*, 368* (Total = 6) | 348, 353*, 354*, 355*, 356, 360, 362, 364, 368, 370*, 371*, 372*, 373*, 374*, 375*, 376* (Total = 16) | 348, 350*, 353, 354, 355, 356, 360, 362, 364, 368, 370, 371, 372, 373, 374, 375, 376 (Total = 17) |
| Officer Wellness and Support (¶¶377–418) | 387*, 409* (Total = 2) | 382*, 383*, 384*, 385*, 386*, 387, 388*, 389*, 391*, 401*, 404*, 406*, 409, 411* (Total = 14) | 382, 383, 384, 385, 386, 387, 388, 389, 390*, 391, 401, 404, 406, 407*, 408*, 409, 410*, 411, 412*, 413*, 414*, 415*, 416*, 417*, 418* (Total = 25) | 381*, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392*, 393*, 394*, 395*, 396*, 397*, 398*, 399*, 400*, 401, 402*, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418 (Total = 36) |
| Accountability and Transparency (¶¶419–565) | 425*, 426*, 429*, 434*, 436*, 441*, 442*, 443*, 444*, 448*, 455*, 456*, 457*, 461*, 478*, 479*, 480*, 481*, 488*, 493*, 498*, 525*, 526*, 528*, 530*, 538*, 542*, 558*, 563*, 565* (Total = 30) | 425, 426, 429, 430*, 431*, 434, 436, 441, 442, 443, 444, 445*, 446*, 448, 450*, 451*, 455, 457, 459*, 460*, 461, 462*, 463*, 464*, 465*, 466*, 467*, 468*, 469*, 475*, 477*, 478, 479, 480, 481, 484*, 486*, 487*, 488, 493, 497*, 498, 499*, 500*, 501*, 504*, 508*, 512*, 514*, 522*, 525, 526, 527*, 528, 529*, 530, 532*, 533*, 538, 540*, 542, 552*, 558, 561*, 563, 565 (Total = 68) | 425, 426, 427*, 428*, 429, 430, 431, 432*, 433*, 434, 435, 436, 437*, 438*, 439*, 441, 442, 443, 444, 445, 446, 447*, 448, 449*, 450, 451, 452*, 453, 454*, 455, 456, 457, 459, 460, 461, 462, 463, 464, 466, 467, 468, 469, 472*, 474*, 475, 476*, 477, 478, 479, 480, 481, 484, 486, 487, 488, 493, 494*, 495*, 496*, 497, 498, 499, 500, 501, 504, 505*, 506*, 507*, 508, 509*, 511*, 512, 514, 522, 523*, 524*, 525, 526, 527, 528, 529, 530, 532, 533, 534, 540, 541*, 542, 545*, 546*, 547*, 548*, 549*, 550*, 551*, 552, 553*, 555*, 556*, 557*, 558, 561, 562*, 563, 565 (Total = 106) | 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440*, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470*, 471*, 472, 473*, 474, 475, 476, 477, 478, 479, 480, 481, 484, 486, 487, 488, 489*, 490*, 491*, 492*, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502*, 504, 505, 506, 507, 508, 509, 511, 512, 513*, 514, 515*, 516*, 517*, 518*, 519*, 522, 523, 524, 525, 526, 527, 528, 529, 530, 532, 533, 534*, 535*, 536*, 537*, 538, 539*, 540, 541, 542, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554*, 555, 556, 557, 558, 559, 561, 562, 563, 565 (Total = 127) |
| Data Collection, Analysis, and Management (¶¶566–609) | 569* (Total = 1) | 569, 576*, 577*, 578*, 579*, 580*, 581*, 582*, 602*, 604*, 606* (Total = 11) | 569, 570*, 571*, 572*, 573*, 574*, 575*, 576, 577, 578, 579, 580, 581, 582, 590*, 596*, 601*, 602, 604, 606, 607*, 608*, 609* (Total = 23) | 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 583*, 584*, 585*, 586*, 587*, 588*, 589*, 590, 591*, 592*, 593*, 594*, 595*, 596, 598*, 601, 602, 603*, 604, 606, 607, 608, 609 (Total = 37) |
| Other | (Total = 0) | 711* (Total = 1) | 677*, 678*, 679*, 683*, 684*, 685*, 686*, 711, 720* (Total = 9) | 677, 678, 679, 683, 684, 685, 686, 711, 720 (Total = 9) |
| TOTAL ¶¶ | 70 | 230 | 413 | 517 |

*Asterisks reflect paragraphs that the IMT assesses for the first time in the corresponding reporting period.

# Background: The Consent Decree

In December 2015, the U.S. Attorney General launched a civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD.[15] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[16]

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[17]

The OAG and the City then sought proposals for an IMT after posting a draft Consent Decree on the Chicago Police Consent Decree website.[18] Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. This Consent Decree provides a unique opportunity for feedback from Chicago communities and local stakeholders. The OAG will oversee and enforce the Consent Decree. *See* ¶694. The Coalition has certain enforcement rights and meets with the IMT at least quarterly. *See* ¶¶709(a) and ¶669, respectively.[19]

---

[15] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPTREPORT.pdf.

[16] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[17] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[18] More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/independent-monitor/. Other resources, such as Consent Decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

[19] *See also Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City

The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed Maggie Hickey, a partner at Schiff Hardin LLP, as the Independent Monitor. As the Independent Monitor, Ms. Hickey oversees the IMT and reports directly to Judge Dow.[20]

Since the beginning of the Consent Decree, there have been several changes at the City and the CPD. For example, the CPD has had several major changes in its leadership. Interim Superintendent Charlie Beck replaced Superintendent Eddie Johnson in November 2019 and led the CPD until April 2020, when current Superintendent David Brown was appointed and sworn in.

Other significant changes at the CPD include a departmental reorganization in January 2020, which divides the agency into two main sections: the Office of Operations and the Office of Constitutional Policing and Reform.[21] These changes, however, were significantly impacted by the City's and the CPD's response to COVID-19.[22]

## The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitors Chief Rodney Monroe, Ret., and Dr. James "Chip" Coldren, Jr. lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with all sectors of

---

of Chicago *Plaintiffs*, ¶9 (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[20] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he will "help facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

[21] *See Organization for Command*, CHICAGO POLICE DEPARTMENT (January 30, 2020), https://home.chicagopolice.org/about/organization-for-command/.

[22] As referenced above, according to the CPD, the CPD recently interviewed, hired, and trained several new project managers for the Office of Constitutional Policing and Reform. We look forward to working with them.

the Chicago community; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Figure 3, below, and our team structure is in Figure 4 on the following page.

Figure 3. Organizational Chart



Figure 4. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |
| Deputy Monitor | | James R. "Chip" Coldren |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Dennis Rosenbaum |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Recruitment, Hiring, and Promotion | | Theron Bowman |
| Training | | Theron Bowman |
| Supervision | | Kathleen O'Toole |
| Officer Wellness and Support | | Kathleen O'Toole |
| Accountability and Transparency | | Harold Medlock |
| Data Collection, Analysis and Management | | Scott Decker |

| Community Engagement Team | | |
|---|---|---|
| Subject Matter Expert, Analyst, and Support Staff | | Tom Christoff |
| Member | | Joe Hoereth |
| Subject Matter Expert | | Meghan Maury |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (also Associate Monitor for Community Policing) | | Stephen Rickman |
| Member | | Sodiqa Williams |
| Community Surveys | | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Attorney | | Derek Barella |
| Attorney | | Kirstie Brenson |
| Officer Wellness and Support | | Brandi Burque |
| Crisis Intervention and Data Collection, Analysis, and Management | | Tom Christoff |
| Attorney | | Meredith DeCarlo |
| Use of Force and Data Collection, Analysis, and Management | | Terry Gainer |
| Attorney | | Ariel Hairston |
| Community Policing and Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Accountability and Transparency | | Laura McElroy |
| Community Policing | | Hildy Saizow |
| Attorney | | Anthony-Ray Sepulveda |
| Supervision and Recruitment, Hiring, and Promotion | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Solomon and Decker | | Tom Christoff |
| Project Manager, Analyst for Evans | | Vivian Elliot |
| Analyst for Rickman and O'Toole | | Tammy Felix |
| Deputy Project Manager, Analyst for Bowman | | Keri Richardson |
| Analyst for Rosenbaum and Medlock | | Christopher Sun |

# Compliance Assessments

In accordance with ¶¶642, 661, and 662, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**.

❖ **Preliminary compliance** refers principally to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and incorporate Consent Decree requirements into policy (¶642). The IMT assesses the development of policies, procedures, rules, and regulations that are designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** refers principally to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT reviews and assesses the City's documentation—including reports, disciplinary records, remands to retraining, follow-up, and even revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, understood by, and important to line, supervisory, and managerial levels of the City and the CPD. The IMT assesses whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performance required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies within day-to-day operations (¶642). Full compliance requires that personnel, sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and oversee officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is

reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These three levels of compliance guide the IMT in its review of all paragraphs in the Consent Decree. The IMT understands, however, that the three compliance levels apply differently to various paragraphs. For example, a paragraph that requires a certain type of training does not necessarily include a policy component. In these instances, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. To reach and sustain Full compliance, however, the City may need to create a policy to ensure that training is provided consistently, as appropriate.

The Consent Decree establishes that the City, the CPD, and other relevant City entities are not in any level of compliance until we find that that they are in a level of compliance. The CPD and other City entities will reach "full and effective compliance" with a requirement once they reach and maintain Full compliance for the requisite length of time required by the Consent Decree—either one or two years. *See* ¶714.

## Year Two Priorities

In Year Two, we will continue our work through the perspective of the Consent Decree's "Guiding Principles."[23] These principles highlight the importance of "fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services." *See* ¶49. As we noted in Independent Monitoring Reports 1 and 2, we have had concerns regarding the CPD's insufficient community engagement strategies and activities. As a result, we will continue to pay close attention to how those strategies evolve and adapt in Year Two, especially given the current public-health crisis. Despite these challenges, we continue to believe that the CPD should strive to engage hard-to-reach populations in safe and creative ways.

Overall, the Monitoring Plan for Year Two includes 517 paragraphs. Figure 5, below, reflects all the paragraphs that the IMT will monitor in Year Two by section.

---

[23] *See* ¶757 ("Guiding Principles" refers to the paragraphs included in the 'Guiding Principles' sections of this Agreement. They are not intended to impose substantive requirements subject to compliance audits or assessments on either of the Parties. 'Guiding Principles' are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements of this Agreement and the overall goals for each section."). The following paragraphs describe these Guiding Principles: ¶¶8–11 (Community Policing), 49–51 (Impartial Policing), 83–86 (Crisis Intervention), 249–52 (Recruitment, Hiring, and Promotions), 265–68 (Training), 341–346 (Supervision), 377–80 (Officer Wellness and Support), 419–23 (Accountability and Transparency), and 566–67 (Data Collection, Analysis, and Management).

**Figure 5: Consent Decree Paragraphs in Year Two**



Moreover, in Year Two, the IMT will prioritize assessing the City's efforts to meet (1) requirements with missed deadlines in Year One, (2) requirements with deadlines in Year Two (before June 30, 2021), (3) requirements in foundational paragraphs that the IMT monitored in Year One, and (4) requirements in additional foundational paragraphs for Year Two.[24] As with most of the paragraphs we addressed in Year One, most of the paragraphs in these two categories contain requirements for the CPD.

This list, however, is not exhaustive. While we will not begin monitoring compliance for some paragraphs until after Year Two, some of these paragraphs require the City and the CPD to take steps *during Year Two* to meet the deadlines that exist *after Year Two*. It is important to note that some paragraphs, such as ¶320, contain multiple deadlines, which we will assess during every reporting period.

For this reason, throughout Year Two, the IMT will review the steps that the City and the CPD take to meet these requirements, regardless of the deadlines or whether those paragraphs are specifically referenced in this Monitoring Plan. In our upcoming Independent Monitoring Reports, we will note data sources, metrics, and measures; identify any barriers toward progress; and provide suggestions and assistance to address those barriers.

## (1) Missed Deadlines in Year One

The Consent Decree and its deadlines became effective on March 1, 2019. More than 100 of the Consent Decree's almost 800 paragraphs contain specific deadlines

---

[24] The IMT's Monitoring Plan for Year One is publicly available on the IMT's website. *See Reports*, IMT (May 30, 2019), https://cpdmonitoringteam.com/reports/. Given the varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

for the City and the CPD. The Parties negotiated and the Court approved all of the deadlines in the Consent Decree, and many of the deadlines are interrelated.

As reflected in Figure 6 below, the City and its relevant entities missed many of the Consent Decree's Year One deadlines.[25]

The underlying requirements of these deadlines, however, continue to impact other requirements in the Consent Decree and the ultimate success of the City's reform efforts. As a result, in Year Two, we will continue to monitor and report on the City's compliance with these underlying requirements.

Figure 6: Consent Decree Paragraphs with Deadlines in Year One

**First Reporting Period Deadlines**

| | |
|---|---|
| Met Deadline | (13) |
| Missed Deadline | (37) |
| Met Underlying Requirement by August 31, 2019 | (+4) (17) |

**Second Reporting Period Deadlines**

| | |
|---|---|
| Met Deadline | (22) |
| Missed Deadline | (52) |
| Met Underlying Requirement by February 29, 2020 | (+4) (26) |

**Year One Deadlines**

| | |
|---|---|
| Met Deadline | (35) |
| Missed Deadline | (89) |
| Met Underlying Requirement by February 29, 2020 | (+20) (55) |
| REMAINING DEADLINE REQUIREMENTS | (34) |

## (2) Paragraphs with Deadlines in Year Two

The Consent Decree also contains paragraphs that have deadlines in Year Two, between March 1, 2020, and February 28, 2021. Thus, we will assess the City's compliance with all of these paragraphs in our corresponding Independent Monitoring Reports for the third and fourth reporting periods (from March 1, 2020, to December 31, 2020, and from January 1, 2021, to June 30, 2021, respectively). These paragraphs are reflected in Figure 7, below.

---

[25] Our reports are available on our website. *See Reports*, IMT, https://cpdmonitoring-team.com/reports/.

Figure 7: Consent Decree Paragraphs with New Deadlines in Year Two[26]

| Topic Area | Third Reporting Period March 1, 2020 – December 31, 2020 | Fourth Reporting Period January 1, 2021 – June 30, 2021 |
|---|---|---|
| Community Policing | 18, 25, 28, 41, 47 | 25, 16, 42, 45 |
| Impartial Policing | 62, 78, 79, 80 | 73, 75, 77, 79, 80 |
| Crisis Intervention | 107, 129, 146, 147, 151 | 101, 107, 110, 122, 129 |
| Use of Force | 159, 243, 244, 245, 246 | 172, 174, 175 |
| Recruitment, Hiring, and Promotion | 261 | 258, 262 |
| Training | 270, 271, 292, 303, 315, 321 | 270, 272, 314, 315, 316, 320, 323, 324, 368 |
| Supervision | 371, 374 | |
| Officer Wellness and Support | 415, 416 | 389, 401, 404, 411 |
| Accountability and Transparency | 438, 439, 445, 494, 523, 540, 546, 547, 548, 549, 550, 551, 543, 553, 555, 558, 561, 562, 565 | 445, 550, 551, 563, 565 |
| Data Collection, Analysis, and Management | 570, 581, 590, 596, 609, | 581, 590, 603 |
| **Approx. Deadlines** | **54** | **40** |

## (3) Foundational Paragraphs from Year One

In addition to addressing paragraphs with deadlines in Year One, after consulting with the Parties, the IMT also identified and monitored many paragraphs without deadlines in Year One. *See* Figure 8, below. These paragraphs involve foundational policy and practice requirements that are fundamental to the success of the Consent Decree. As a result, we will continue to monitor these foundational paragraphs in Year Two.

---

[26]   As referenced above, many Consent Decree deadlines are inter-related with other requirements and deadlines. Given the COVID-19 extension the IMT may adjust this Monitoring Plan in accordance with the Consent Decree and with the approval of the Parties, which may impact the total deadlines in each reporting period.



Figure 8: Foundational Paragraphs in Year One

| Category | Value |
|---|---|
| Community Policing | 0 |
| Impartial Policing | 3 |
| Crisis Intervention | 11 |
| Use of Force | 39 |
| Recruitment, Hiring, and Promotions | 0 |
| Training | 2 |
| Supervision | 1 |
| Officer Wellness and Support | 2 |
| Accountability and Transparency | 40 |
| Data Collection, Analysis & Mgmt. | 3 |
| Other | 1 |
| **Total** | **(101)** |

## (4) Foundational Paragraphs in Year Two

Likewise, after consulting the Parties during the development of this Monitoring Plan, the IMT has identified additional foundational paragraphs for Year Two. *See* Figure 9, below. While these paragraphs do not have specific deadlines, the IMT must begin to monitor the City's efforts toward fulfilling these requirements for the City to reach timely compliance with the Consent Decree.



Figure 9: New Foundational Paragraphs in Year Two

| Category | Value |
|---|---|
| Community Policing | 18 |
| Impartial Policing | 7 |
| Crisis Intervention | 34 |
| Use of Force | 23 |
| Recruitment, Hiring, and Promotions | 6 |
| Training | 43 |
| Supervision | 9 |
| Officer Wellness and Support | 20 |
| Accountability and Transparency | 46 |
| Data Collection, Analysis & Mgmt. | 20 |
| Other | 8 |
| **Total** | **(234)** |

# The IMT's Assessments and Deadlines

In addition to engaging in these efforts, the IMT is bound to several specific and ongoing requirements under the Consent Decree. Figure 10, below, summarizes the Consent Decree's deadlines for the IMT, most of which are ongoing.

The IMT will conduct compliance reviews and data analyses on an ongoing basis throughout the monitoring project. In Year One, we conducted many site-visits to monitor compliance. In Year Two, these efforts will continue. Given COVID-19, however, we will make prudent adjustments and take precautions to protect the

health and safety of everyone involved. Our site visit activities may include, but are not limited to, reviewing on-site records, policies, procedures, training curricula, and various data sources; direct observations of training sessions; interviews; ride-alongs; and meetings, conversations, and discussions with the Parties, personnel, community members, and external stakeholders about specific Consent Decree requirements, progress, and plans to achieve compliance.

Figure 10: Consent Decree Deadlines for the IMT

| ¶s | Requirement | Deadline | Second Reporting Period Deadlines | Met or Missed |
|---|---|---|---|---|
| 172 | Assessment of CPD Data regarding Foot Pursuits | January 21, 2020 | Correspond with policy deadlines | Met (ongoing) |
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Correspond with policy deadlines | Met (ongoing) |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Correspond with plan and training deadlines | Met (ongoing) |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Will occur during each reporting period | Met (ongoing) |
| 645–51 | Community Surveys | 180 Days (and every two years) | August 28, 2019 | Missed |
| 652–55 | Monitoring Plan | 90 Days (and every year) | draft by May 15, 2020 | Met (ongoing) |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing | Met (ongoing) |
| 667 | Coordination with the Office of Inspector General | Ongoing | Ongoing | Met (ongoing) |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly | Met (ongoing) |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly | Met (ongoing) |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing | Met (ongoing) |

## The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academics. These members work together to meaningfully engage Chicago's communities and ensure community participation throughout the monitoring process. The Community En-

gagement Team also works closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community component of compliance with the Consent Decree.

Because of the COVID-19 pandemic, the IMT's Community Engagement Team has begun focusing on connecting with community members virtually, and we hosted our first online chat via video conference on May 21, 2020. We also recently participated in a videoconference meeting with the Mikva Challenge's Youth District Advisory Council. We look forward to connecting with community groups across the city via teleconferences and video conferences during this challenging time.

The IMT's Community Engagement Team's work is important to create sustainable change within the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[27] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[28]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City, the CPD, and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership. These relationships will also be strengthened by transparency and accountability.

The IMT's Community Engagement Team will continue to perform two key tasks regarding the monitoring process: (1) gathering input from Chicago residents about their concerns regarding CPD policies and practices and (2) providing information to the Chicago community regarding the IMT's activities and findings. We recently completed our first citywide survey about the CPD, which gathered opinions from about 1,300 Chicagoans. We will use the results of that survey to guide our community engagement work this year.

Throughout Year Two, we will make contact with many individuals, community leaders, and community-based organizations, relying more on electronic communications and less on face-to-face meetings and encounters. As conditions permit,

---

[27] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

[28] *Id.* at 15.

and if COVID-19 becomes less of a public health threat, the Community Engage-ment Team will again attend in-person community meetings across Chicago, in-cluding meetings with the Coalition, community-based organizations, and CPD beat meetings.

## Get Involved

The IMT's Community Engagement Team works diligently to connect with neigh-borhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages commu-nity members to participate in meetings and to promote these sessions through their networks. We regularly update the Community Involvement section of the IMT website (www.cpdmonitoringteam.com) with details on upcoming commu-nity meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policy. When the CPD modifies or creates applicable policies, the CPD will post them on its website so that community members can provide input: https://home.chicagopolice.org/.

Community members can also do the following:

❖ Attend any of our public or virtual meetings listed on our website;

❖ Complete an input form on our website; and

❖ Reach out to the IMT or members of our Community Engagement Team (*see* below).

## Contact the Independent Monitoring Team

As reflected above, community members can reach out to the entire IMT via email (contact@cpdmonitoringteam.com) and also contact individual members of our Community Engagement Team:

❖ Sodiqa Williams (Sodiqa.Williams@cpdmonitoringteam.com),

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Elena Quintana (Elena.Quitana@cpdmonitoringteam.com).

## Independent Monitoring Reports

The IMT will release two Independent Monitoring Reports during Year Two. As explained above, Year Two will be extended to a 16-month timeframe, due to the COVID-19 delay. Independent Monitoring Report 3 will cover the first ten-month period of Year Two, March 1, 2020, through December 31, 2020, and Independent Monitoring Report 4 will cover the next six-month monitoring period of Year Two, January 1, 2021, through June 30, 2021. These reports will summarize monitoring activities, including data analysis and reviews and audits conducted during the two reporting periods. The reports will also summarize the IMT's determinations of Preliminary, Secondary, and Full compliance for each paragraph reviewed or explain why the IMT was unable to adequately assess a requirement under review.

As with our first two Independent Monitoring Reports, these reports will be comprehensive and will reference specific data and information that we use to make determinations of compliance. The Independent Monitoring Reports will also include relevant data and observations from the Community Engagement Team.

During Year Two, as described above, the IMT will also release at least two special reports. The first special report will be on the IMT's Community Survey, and the second special report will be on the City's and CPD's responses to the recent protests and unrest. *See* ¶665. We will post all our reports on our website: [www.CPD-monitoringteam.com](http://www.CPD-monitoringteam.com).

# Conclusion and Looking Ahead

As this Monitoring Plan outlines, the IMT must focus on a number of immediate and short-term requirements in the Consent Decree during Year Two. The IMT recognizes that, in many areas, these efforts will be toward continuing to build the foundation for sustainable reform. In Year One, the City and its relevant entities struggled with community engagement; reliable data collection, management, and analysis; staffing and resource shortages; and record production. We look forward to monitoring the City's efforts to address these challenges and the challenges that will emerge in Year Two.

As mentioned above, during Year Two, the IMT will also release at least two special reports regarding (1) the IMT's Community Survey and (2) the City's and CPD's responses to the recent protests and unrest. *See* ¶665.

Much of the work required of the City and the CPD during Year Two involves continued internal planning and policy development in each of the ten topic areas in the Consent Decree. After the City and the CPD successfully complete this work, it will naturally lead into unit-specific and entity-wide training. The IMT plans to spend more time monitoring training implementation and progress this year. The IMT will also work closely with the Parties and the State and City leaders to learn, assess, and integrate their goals and visions for the City and the CPD. Our focus on the various topic areas of the Consent Decree may shift over time based on the City's and the CPD's progress regarding the foundational elements of the Consent Decree. The monitoring plans for subsequent years will reflect those shifts.

There are, however, several elements of the IMT's work that will remain consistent over time. The IMT's Community Engagement Team will remain involved with local community-based groups invested in police reform in Chicago. We will disseminate information to community members about the City's progress and collect important information from Chicago residents. Likewise, the IMT will continue to implement and assess community surveys and research, which will also solicit input from CPD members. In the beginning of Year Two, we will focus our efforts to engage community members and hear experiences regarding the recent protests relevant to the IMT's special report. Later this year, we will conduct focus groups aimed at hearing the voices of underserved and hard-to-reach populations who do not typically respond to community surveys in large numbers.

Our principles will continue to lead us throughout the monitoring process: transparent community engagement and participation; independent reviews of police policies and practices; and regular communication among the OAG, the City, the CPD, the Chicago Police Board, COPA, the Office of the Inspector General, the Deputy Inspector General for Public Safety, other relevant City entities, members of the Coalition (¶669), and members of Chicago communities.

We note the limits of this Monitoring Plan. Any plan is subject to change, and that is especially true of a plan developed to address a project as complex and comprehensive as this one. We also recognize that the COVID-19 pandemic has and may continue to present unprecedented challenges, which will make accurate planning more difficult. As a result, we expect that we may need to add to, subtract from, or otherwise modify various aspects of this Monitoring Plan. Nonetheless, this is our best estimate of what we expect to monitor during Year Two. We will publicly report and explain any major changes.

When Judge Dow approved the Consent Decree, he set the stage for the years ahead:

> *The State of Illinois and the City of Chicago have entered into this consent decree with the goal of using it as a vehicle for solving the common problems . . . in a manner that defuses tension, respects differences of opinion, and over time produces a 'lawful, fair, reasonable, and adequate' result for everyone involved.*[29]

The IMT is eager to continue this process in Year Two, and we remain thankful for the opportunity.

---

[29] *See Memorandum Opinion and Order Approving Proposed Consent Decree* (January 31, 2019), 16, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/Order-Approving-Consent-Decree.pdf.

# Attachment 1.
# Consent Decree Paragraphs in Year Two

| Consent Decree Paragraphs in Year Two | | |
|---|---|---|
| **Topic Area** | **Third Reporting Period**<br>March 1, 2020 – December 31, 2020 | **Fourth Reporting Period**<br>January 1, 2021 – June 30, 2021 |
| Community Policing | 13, 14, 15, 18, 20, 25*, 28*, 29*, 30*, 31*, 32, 33*, 34*, 35*, 36*, 37*, 38*, 39, 40, 41*, 42, 43, 44, 45, 46, 47<br>**(Total = 26)** | 13, 14, 15, 16*, 17*, 18, 19*, 20, 22*, 23*, 24*, 25, 26*, 27*, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48*<br>**(Total = 35)** |
| Impartial Policing | 52*, 53, 54*, 55*, 56*, 57*, 58, 60, 61, 62*, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 74, 76, 78*, 79*, 80*, 81*, 82*<br>**(Total = 27)** | 52, 53, 54, 55, 56, 57, 58, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73*, 74, 75*, 76, 77*, 78, 79, 80, 81, 82<br>**(Total = 30)** |
| Crisis Intervention | 87*, 88*, 89, 91, 92, 93*, 94*, 96*, 97*, 99, 102*, 103*, 104*, 105*, 106*, 107, 108, 109, 110, 113*, 114*, 116, 117*, 118, 120, 121, 122, 123, 124*, 125, 128, 129, 130, 131, 132, 133*, 134*, 135*, 136*, 137, 138*, 139*, 140*, 141*, 142, 143*, 144*, 145*, 146*, 147*, 148*, 150*, 151, 152*<br>**(Total = 54)** | 87, 88, 89, 90*, 91, 92, 93, 94, 96, 97, 99, 100*, 101*, 102, 103, 104, 105, 106, 107, 108, 109, 110, 113, 114, 115*, 116, 117, 118, 119*, 120, 121, 122, 123, 124, 125, 127*, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149*, 150, 151, 152<br>**(Total = 61)** |
| Use of Force | 153*, 154*, 156*, 158*, 159*, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171*, 173, 176, 177, 178, 179*, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194*, 195*, 196, 197, 198, 199, 200, 201*, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 218, 219*, 220*, 221*, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 243*, 244*, 245*, 246*, 247*<br>**(Total = 81)** | 153, 154, 156, 157*, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172*, 173, 174*, 175*, 176, 177, 178, 179, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236*, 237*, 238*, 239*, 240*, 241*, 243, 244, 245, 246, 247, 248*<br>**(Total = 92)** |
| Recruitment, Hiring, and Promotion | 253*, 254*, 255*, 257*, 261*, 263, 264<br>**(Total = 7)** | 253, 254, 255, 256*, 257, 258*, 259*, 260*, 261, 262*, 263, 264<br>**(Total = 12)** |
| Training | 270, 271, 272, 273*, 274*, 275*, 276*, 277*, 278*, 280, 282*, 283*, 284, 287*, 292*, 294*, 297*, 303*, 313*, 315*, 316, 317*, 319*, 320, 321*, 322*, 323, 328*, 331*, 332*, 333*, 334, 335*, 336, 337*, 338*, 339, 340<br>**(Total = 38)** | 270, 271, 272, 273, 274, 275, 276, 277, 278, 279*, 280, 282, 283, 284, 287, 288*, 289*, 290*, 291*, 292, 294, 295*, 296*, 297, 299*, 300*, 303, 304*, 305*, 306*, 307*, 308*, 309*, 310*, 311*, 312*, 313, 314*, 315, 316, 317, 319, 320, 321, 322, 323, 324*, 326*, 327*, 328, 329*, 331, 332, 333, 334, 335, 336, 337, 338, 339, 340<br>**(Total = 61)** |
| Supervision | 348, 353*, 354*, 355*, 356, 360, 362, 364, 368, 370*, 371*, 372*, 373*, 374*, 375*, 376*<br>**(Total = 16)** | 348, 350*, 353, 354, 355, 356, 360, 362, 364, 368, 370, 371, 372, 373, 374, 375, 376<br>**(Total = 17)** |
| Officer Wellness and Support | 382, 383, 384, 385, 386, 387, 388, 389, 390*, 391, 401, 404, 406, 407*, 408*, 409, 410*, 411, 412*, 413*, 414*, 415*, 416*, 417*, 418*<br>**(Total = 25)** | 381*, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392*, 393*, 394*, 395*, 396*, 397*, 398*, 399*, 400*, 401, 402*, 404, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418<br>**(Total = 36)** |
| Accountability and Transparency | 425, 426, 427*, 428*, 429, 430, 431, 432*, 433*, 434, 435, 436, 437*, 438*, 439*, 441, 442, 443, 444, 445, 446, 447*, 448, 449*, 450, 451, 452*, 453, 454*, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 472*, 474*, 475, 476*, 477, 478, 479, 480, 481, 484, 486, 487, 488, 493, 494*, 495*, 496*, 497, 498, 499, 500, 501, 504, 505*, 506*, 507*, 508, 509*, 511*, 512, 514, 522, 523*, 524*, 525, 526, 527, 528, 529, 530, 532, 533, 538, 540, 541*, 542, 545*, 546*, 547*, 548*, 549*, 550*, 551*, 552, 553*, 555*, 556*, 557*, 558, 561, 562*, 563, 565<br>**(Total = 106)** | 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436,, 437, 438, 439, 440,* 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470*, 471*, 472, 473*, 474, 475, 476, 477, 478, 479, 480, 481, 484, 486, 487, 488, 489*, 490*, 491*, 492*, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502*, 504, 505, 506, 507, 508, 509, 511, 512, 513*, 514, 515*, 516*, 517*, 518*, 519*, 522, 523, 524, 525, 526, 527, 528, 529, 530, 532, 533, 534*, 535*, 536*, 537*, 538, 539*, 540, 541, 542, 545, 546, 547, 548, 549, 550, 551, 552, 553, 554*, 555, 556, 557, 558, 559, 561, 562, 563, 565<br>**(Total = 127)** |
| Data Collection, Analysis, and Management | 569, 570*, 571*, 572*, 573*, 574*, 575*, 576, 577, 578, 579, 580, 581, 582, 590*, 596*, 601*, 602, <u>604</u>, 606, 607*, 608*, 609*<br>**(Total = 23)** | 569, 570, 571, 572, 573, 574, 575, 576, 577, 578, 579, 580, 581, 582, 583*, 584*, 585*, 586*, 587*, 588*, 589*, 590, 591*, 592*, 593*, 594*, 595*, 596, 598*, 601, 602, 603*, 604, 606, 607, 608, 609<br>**(Total = 37)** |
| Other | 677*, 678*, 679*, 683*, 684*, 685*, 686*, 711, 720*<br>**(Total = 9)** | 677, 678, 679, 683, 684, 685, 686, 711, 720<br>**(Total = 9)** |
| **TOTAL** | 413 | 517 |

*Asterisks reflect paragraphs that the IMT assesses for the first time in the corresponding reporting period.

Independent | Chicago Police
Monitoring Team | Department
Consent Decree