UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-6260 |
| v. | ) | Honorable Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**EMERGENCY COVID-19 MOTION FOR LEAVE TO FILE A MOTION FOR A TEMPORARY RESTRAINING ORDER TO PROTECT CHICAGO POLICE OFFICERS' HEALTH AND SAFETY PURSUANT TO LOCAL RULE 5.6, AND A MOTION FOR LIMITED INTERVENTION, *INSTANTER* AND STATUS REPORT**

As the COVID-19 virus infection rate continues an out-of-control climb from earlier months, the Fraternal Order of Police Chicago Lodge No. 7 ("the Lodge"), by and through its attorneys, files this motion *instanter* pursuant to Local Rule 5.6, for leave to file an emergency motion for a temporary restraining order due to the failure of City of Chicago and the Chicago Police Department ('CPD") to take actions to protect the health and safety of Police Officers and to require the CPD to reduce class attendance in compliance with appropriate social distancing guidelines, to take other sufficient measures to protect the health and safety of Chicago Police Officers and to extend the training time limits in order to allow for training in smaller classes. The Lodge also requests permission of the Court to advise as to the status of this matter since the last order entered by the on November 19, 2020, [Doc. 910]. In support of this motion, and relying on Paras. 2, 6, 272, 274, 281, 319, 343, 377, and 420 of the Consent Decree signed by this Court on January 31, 2019 [Doc. 703-1], the Lodge 7 states as follows:

**COURT ORDER OF NOVEMBER 19, 2020**

This is the second motion before this Court on the issue of the very dangerous spread of the COVID-19 virus. In response to the Lodge's first motion filed on November 12, 2020, [Doc. 905], this Court issued an order which in pertinent part stated:

> Emergency COVID−19 motion to protect wellness of Chicago Police Officers [905] is taken under advisement. Prior to any briefing order, the Court will raise these issues itself and through the Independent Monitoring Team with the parties and CPD officials. Adhering to CDC recommendations and all state and local mandates concerning the protection of the public during the pandemic is <u>critically important</u>. Reports and videotapes showing a lack of adherence to these recommendations and mandates have been a subject of discussion over the past several months, with the Court and the Monitor <u>urging all involved to come into and stay in compliance</u>. If compliance cannot be gained through these informal discussions, the Court will order briefing on this motion. (emphasis added). [Doc. 910]

**STATUS OF COMPLIANCE**

The City has not complied with the Consent Decree provisions that are supplemented by the orders of the state and the city on the number of persons who may attend meetings, including the in-service training classes of the CPD. It has also not complied with its own postings that no more than ten persons should be in a room. <u>Catanzara Declaration</u>, ¶ I. Since the entry of the Court's November 19, 2020, order, representatives of the Lodge have made several attempts to meet with representatives of the Chicago Police Department in an attempt to resolve the issues raised in the Lodge's November 12, 2020 motion. (Doc. 905). Those issues include the dangers of in-service training with more than ten persons in a class room, no mask wearing requirements, and no provision of masks, hand sanitizers or proper cleaning supplies, such as disinfecting wipes. <u>Catanzara Declaration,</u> ¶F, ¶I. These health and safety concerns have not been resolved, and there is no compliance with the Consent Decree's requirements as to health and safety. It is for this reason that the Lodge seeks a temporary restraining order.

As reported in the Lodge's initial motion on this subject, there has been a dramatic increase in the number of COVID 19-cases throughout the City of Chicago for the period between October 3 and November 7: 2,348 cases were reported for the week ending October 3, 2020, and for the week ending November 7, 2020, there were 12,729 cases reported, an increase of 443 percent. *City of Chicago COVID-19 Dashboard* available at, https://www.chicago.gov/city/en/sites/covid-19/home/covid-dashboard.html. Since the week ending November 7, the total number of cases in the City of Chicago continues to increase. This continued increase has dire implications for Officers who are required to take in-service and indoor classroom training where sufficient personal protective equipment is not provided and proper social distancing protections are not followed. More than forty Officers are required to attend some classes, and the Chicago guideline for meeting attendance is 10 persons based on the Official Advisory from the Mayor of the City of Chicago effective November 16, 2020. Exh. A.

This ten person limit has been adopted by the CPD in its headquarters operations. Lodge president John Catanzara has stated in his declaration which is attached that he took a photo of a sign in the headquarters hallway near the Information Services Division, and this sign clearly states: "OCCUPANCY BY MORE THAN 10 PERSONS IS DANGEROUS AND UNLAWFUL Dept. of Buildings City of Chicago." This sign is part of his declaration at paragraph I. Clearly, the CPD has placed the ten-person limit as a safety threshold for some Officers, but not those required to attend the in-service, indoor training sessions.

In fact, two officers have submitted affidavits in support of this motion attesting to the fact that the CPD has conducted in-service, indoor training sessions with numbers of officers far exceeding the 10-person threshold set by the Department. Officer Derrick Knight has attested that he attended an all-day in-service training at Olive-Harvey College on November 11, 2020, where

3

there were approximately 40-50 officers present for the training. Knight Declaration, at ¶¶4-5, 7. According to Officer Knight, the training was held in a room where all of the attendees could not be socially distanced at approximately 6-feet from one another. He had one person sitting directly in front of him for the training at approximately 3-4 away from him. Knight Declaration, at ¶8. Likewise, Officer Sharita Lewis also attested that she attended an all-day in-service training at Olive-Harvey College on November 13, 2020, where there were approximately 52 officers present for the training. Lewis Declaration, at ¶¶4-5, 7. Officer Lewis stated that the training was held in two separate rooms. One room was completely full of attendees and she attended the training in an overflow room. Officer Lewis estimated that there were approximately 20-25 attendees in the room where she was seated. Lewis Declaration, at ¶¶7-8. Importantly, both Officer Knight and Officer Lewis have medical conditions that put them at an increased risk for severe illness and hospitalization if they were to be infected with COVID-19. Knight Declaration, at ¶10; Lewis Declaration, at ¶10. This kind of differential treatment is unwarranted under the Consent Decree's health and safety provisions, and the City is not following the "critically important" admonition of this Court.

The City of Chicago is also not complying with the wellness health and safety obligations of the Consent Decree. This Court has stated on several occasions that its function under the Consent Decree is to serve as a contract enforcer, and this emergency motion requests the Court to take such action to protect the health, welfare and safety of the Officers. To accomplish this, the Lodge requests the Court order an extension in the time limit for completion of in-service training so that smaller class sizes can be held to meet social distancing requirements, and to order the City to provide Officers in each classroom sufficient hand sanitizers, masks and sanitizing wipes for the surfaces that are touched by the Officers throughout the day in the classrooms.

The Lodge seeks intervention, pursuant to Rule 24(a) FRCP, for the limited purpose of protecting the rights of Chicago Police Officers pursuant to the General Duty Clause of the Occupational Health and Safety Act of 1970 and the Para. 2 of the Consent Decree. In support of the intervention request, the Lodge relies on the answer to the complaint that was previously filed as Doc. 51-2 and the complaint which is attached to this motion.

Local Rule 5.6 permits a non-party to participate in a judicial proceeding by permission of the Court. As to the alternative motion to intervene, the Lodge is seeking in this request the same kind of limited intervention that was granted to the union in People Who Care v. Rockford Board of Education, 961 F.2d 1335 (7th Cir. 1992), where the District Court allowed intervention for the union to protect its contract rights long after the consent decree had been issued and approved and after the initial motion to intervene had been denied. Lodge's Reply Brief, [Doc. 81 at 7-9]. [*See* Doc. 81-5 (District Court's June 11, 1991 order in Case No. 89-C-20168, at Para. at 3, granting intervention to union to protect contract rights approximately two years after filing of the complaint and entry of consent decree)]. Here, the Lodge believes that the issues are similar in that the Consent Decree obligates the City to protect the safety and wellness health of Police Officers.

**Likelihood of Success on the Merits - The Consent Decree Requires the City to Protect the Wellness, Health and Safety of its Police Officers**

The Lodge's motion is filed to enforce the officer safety, health and wellness requirements of the Consent Decree. Consent Decree provisions pertain to these broad subject areas and are in need of immediate compliance by the City due to the exponential increase in the virus in Chicago. Pertinent provisions of the Consent Decree include the following:

- Paragraph 2 of the Consent Decree makes it clear "that the City and the CPD must deliver services in a manner that fully complies with the Constitution and laws of the United

States and the State of Illinois." Paragraph 2 also provides that those services must be delivered in a manner that "<u>promotes</u> community and <u>officer safety</u>" (emphasis added). Continuing further, Paragraph 2 states that the Consent Decree "seeks to ensure that Chicago police Officers are provided with the training, resources, and support they need to perform their jobs professionally and safely." [Doc. 703-1, at ¶2]. These requirements of the Consent Decree were regarded by the State and the City as being so important that the parties decided to repeat them, nearly verbatim, in Paragraph 6. [Doc. 703-1, at ¶ 6].

- Paragraph 272 (c) states that the Training Plan will include all CPD training as necessary to fulfill the requirements and goals of this Agreement, which includes Officer safety. [Doc. 703-1 at ¶ 272 (c)].

- Paragraph 274 requires the CPD to develop and approve training curricula, lesson plans, and course materials "that are…in accordance with the law, CPD policy, best practices, and this Agreement", which includes Officer safety. [Doc. 703-1 at ¶ 274.]

- Paragraph 281 states that the City will be responsible for providing appropriate training facilities that offer adequate access <u>to safe and effective training</u>. [Doc. 703-1 at ¶ 281.] (emphasis added).

- Paragraph 319 of the Consent Decree requires the CPD to implement the In-Service Training Program to comport with the Training Plan and the requirements and goals of this Agreement. [Doc. 703-1 at ¶ 319.]

- Paragraph 343 requires that the CPD "have the staffing necessary to promote lawful, safe, effective, and community-centered policing," and to "<u>ensure officer safety</u>." [Doc. 703-1, at ¶ 343]. (emphasis added)

- Paragraph 377 states that the "City and CPD have an obligation to help CPD members cope with the consequences that come from their service to the public." That paragraph recognizes that "psychological and emotional wellness are critical to Officers' health, relationships, job performance, and safety." [Doc. 703-1, at ¶ 377].
- Paragraph 420 recognized that, "A culture of accountability also promotes employee safety and morale and improves the effectiveness of CPD operations." [Doc. 703-1 at ¶ 420].

The Consent Decree unequivocally states that the City and the Chicago Police Department agree to, inter alia, promote Officer safety and to ensure that Officers "are provided with the training, resources and support they need to perform their jobs professionally and safely." [Doc. 703-1 at ¶ 2. The Consent Decree also requires that the City will be responsible for providing appropriate training facilities that offer adequate access to safe and effective training. Consent Decree. [Doc. 703-1 ¶ 281]. The City has ignored this singular paragraph, which is the heart of the City's health and safety obligations under the Consent Decree.

The violations of the Consent Decree, and the City and State orders which supplement it, present at least some likelihood of success on the merits of the Lodge's claims. Mays v. Dart, Case No. 20 cv 2134 slip op. at 20 (7th Cir. Sept. 8, 2020). What amounts to "some" depends on the facts of the case because of the court's sliding scale approach. Eli Lilly and Co. Arla Foods, Inc., 893 F. 3d 375, 381 (7th Cir. 2018). Here the Lodge has demonstrated the City's complete disregard of the Consent Decree's health and safety requirements and the irreparable harm that Officers face.

**OSHA General Duty Clause Prohibits Risky Exposure to COVID-19**

Paragraph 2 of the Consent Decree commits the City and the CPD to deliver services in a manner that "fully complies with the Constitution and laws of the United States and the State of Illinois." Para. 2, Consent Decree. The General Duty Clause of the Occupational Health and Safety Act of 1990 provides that workers are to be free of work place hazards:

7

> Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees. 29 USC 654 Sec.5 (a)(1).

The recognized hazards of COVID-19 exposure are clear from the declaration of Officer Cantore and others. See, Jakstavich Declaration. The Lodge has advised the Department of the COVID-19 hazards by a letter dated October 29, 2020, and expected an immediate response to cure the problems. None has been received, Cantore Declaration, ¶ F, and as late as December 3, 2020, the Lodge president has had a conversation with the Commander of the Management and Labor Affairs Section on this subject in an attempt to reduce the class size to ten Officers for the in-service training, and there has been no resolution of this problem by the CPD. Because there has been no response to the letter, the Lodge believes the violations of the Consent Decree as asserted in this motion should be brought to the immediate attention of this Court. Three Officers died of the virus in April and with the increase of the virus, the risk is even greater now for additional harm to Officers. This is an additional reason that the facts of this case present some likelihood of success on the merits of the case.

**Police Officers Have Been and Will Continue to Be Irreparably Harmed Because In-Service Training is Not being Conducted in a Safe Environment**

As of Monday, November 9, 2020, CPD had recorded 1,243 confirmed Covid-19 cases within the Department, and 1,100 have returned to work. "CPD Campaign Urges Cops to Wear Face Coverings," Chicago Sun-Times, at 9, Nov.10, 2020.In April, three officers died of the virus. Evidence collected by the City of Chicago Department of Public Health shows an alarming increase in the rolling seven-day average of the positivity rate. *City of Chicago COVID Dashboard*, available athttps://www.chicago.gov/city/en/sites/covid-19/home/covid-

dashboard.html. The "test positivity rate" is the number of COVID-19 tests that have come back positive in a given period of time, divided by the total number of daily tests performed over that same period of time. This test shows the growth of new cases as it relates to the growth in testing. Most recent test data shows that between the week ending October 3, 2020, and November 7, 2020, the number of recorded cases grew from 2,348 to 12,729 and the rolling seven-day average of the test positivity rate more than doubled from 4.6 percent to 13 percent. The City as a whole has had at the week ending November 7, 2020, a test positivity rate of 13.3 percent, up from 10.1 percent in the prior week, which presented an increase of 31 percent.

The New York Times reported on December 3, 2020, that the United States on Wednesday recorded its single-worst daily death toll since the pandemic began, and on a day when Covid-19 hospitalizations also hit an all-time high, the pace of loss showed no signs of slowing any time soon. Not since spring, during the pandemic's first peak, were so many deaths reported. The high point then was 2,752 deaths on April 15. On Wednesday it was at least 2,760. These totals show the nature of the irreparable harm from this virus. "Grim Day in U.S. as COVID 19 Deaths and Hospitalization Set Records," (New York Times, Dec. 3, 2020).

Informal reports to the Lodge indicate increases in Officer COVID-19 virus exposure in CPD Districts 007, 008, 015, 017 and 025. A review of the data collected by the Chicago Department of Public Health supports these preliminary reports as follow:

- District 007 - Englewood, zip code 60621, as of the week of November 7, 2020, had a test positivity rate of 10.0 percent and a 39 percent increase in its positive cases. As of the week ending November 28, this zip code had a positivity rate of 12.0 percent and an additional 296 cases since November 3.
- District 008 - Chicago Lawn, zip code 60629, as of the week of November 7, 2020, had a test positivity rate of 26.3 up from 19.6 from the prior week and a 36 percent increase in its positive cases. For the week ending November 28, this zip code had a positivity rating of 20.9 percent and an additional 2,734 cases since November 14.

- District 15 – Austin, zip code 60644, as of the week of November 7, 2020, had a positivity rate of 10.5 percent up from 8.1 in the prior week and a 19 percent increase in its positive cases. For week ending November 28, the positivity rate was 13.7 percent, and the number of positive cases grew by 535 since November 14.
- District 17 – Albany Park, zip code 60625, as of the week of November 7, 2020, had a positivity rate of 11.3 percent up from 9.1 percent in the prior week and a 21 percent increase in its positive cases. For the week ending November 28, the positivity rate was 7.8 percent, and the number of cases grew by 808 since November 14.
- District 25 – Grand Central, zip code 60639, had a positivity rate of 22.6 in the week of November 7, 2020, up from 19.6 percent in the prior week an increase of 38 percent in its positive cases. For the week ending November 28, the positivity rating was 20.2 percent, and the number of cases grew by 2,150 since November 14.

Officers from these Districts and others are assigned to attend the in-service training sessions, and they come to these classes after being exposed to the public on a daily basis with the increased possibility of transmitting the disease.

The Officers attending these classes are potential super spreaders of the virus because the CPD is not taking the necessary precautions that have been issued by the City of Chicago Commissioner of Health. Order No. 2020-9, July 24, 2020, which provides for public health measures to be taken to protect employees and others who come in contact with the operations, and an Official Advisory from the Mayor of the City of Chicago which supplements this order for meetings and gatherings. It limits the attendance to ten persons effective November 16, 2020. Exh. A. Other requirements of Order No. 2020-9 not supplemented or modified by the advisory opinion include:

1. Maintain social distancing on the premises;

2. Provide supplies and accommodations that allow employees to follow handwashing and other sanitation procedures and require employees to follow such procedures at reasonably regular intervals;

3. Self-screening protocol that consists of the following questions:

> (1) Have you had a body temperature over 100 degrees Fahrenheit or have you used a fever reducer in the previous 24 hours to treat a body temperature over 100 degrees Fahrenheit? (2) Do you have a new cough that you cannot attribute to another health condition? (3) Do you have a new sore throat that you cannot attribute to another health condition? (4) Do you have new shortness of breath that you cannot attribute to another health condition?

Although the Order exempts government functions and law enforcement, the exempt persons are encouraged to practice social distancing and take recommended health measures, and these measures are considered to be best practices that supplement and give meaning to the Consent Decree's requirements to provide for a safe and healthy working environment for the Officers.

These practices are not being followed by the City, and Officers have complained to the Lodge that the classroom training protocols are not adequate to protect the health and safety interests of the Officers. The attached declaration of Officer Andrew Cantore demonstrates the nature of the problem. He is aware of Officers who have attended these in-service training classes in which as many as 40 persons have been present and sitting side by side without the required social distancing. Cantore Declaration, ¶ E.

In addition, the necessary sanitation supplies are not provided and face coverings are not required. Officers have contacted the Lodge to report that they have been required to undertake in-service in class training without being provided the best practice personal protective equipment, i.e., masks, hand sanitizers, alcohol based sanitizing wipes and related equipment. Even more important is the lack of a requirement that the Officers wear masks when they attend the classes. Therefore, it is clear that the City is not in compliance with the Paragraph 281 requirement to provide appropriate training facilities that offer adequate access to safe and effective training. [Doc. 703-1 at ¶ 281.]

11

The failure of the City to provide these health and safety materials on a daily basis to the Officers in the in-service training classes constitutes an ongoing and continuing transgression that satisfies the essential elements of the irreparable harm standard. Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills, 589 F. 3d 865, 873 (7th Cir. 2009). The harm from the virus is death and severe illness for some people, and we have already had three Officer deaths from the virus. This is the kind of harm that cannot be prevented or fully rectified by a final judgment after trial. Roland Machine Co. v. Dresser Industries, Inc., 749 F. 2d 380, 386 (7th Cir.1984). Any possible damage award may come too late for those who have succumbed to the virus.

It is for these reasons of irreparable harm that any remedy other than an injunction would be inadequate. The Seventh Circuit has noted the link between these two elements of the injunction standard. Whether there is an adequate remedy at law is often considered together with whether there is irreparable harm. See, e.g., Libertarian Party v. Packard, 741 F.2d 981, 984 (7th Cir. 1984).

**Balancing the Hardships Favors Granting the Injunctive Relief**

Harm to the Officers from COVID -19 exposure is more than serious. It is in fact a matter of life and death for a large number of citizens and has already taken the lives of three Officers. Requiring the CPD and the City to minimize exposure to COVID-19 by reducing the class size for in-service training is an important step to protect the health and safety of the Officers. The City's stake in this matter is quite minimal in that the small classes might mean a delay in completing the training, but throughout our society and country all sorts of functions have been either deferred, delayed or interrupted by this invisible enemy. The cost to the City is quite outweighed by the physical harm to the Officers and their families and others with whom they have contact in the event they contract the virus during one of the training sessions that is packed with Officers in excess of the number ten.

Balancing of the harms involves a "sliding scale" analysis – the greater the movant's likelihood of success on the merits, the less strong a showing the movant must make that the balancing of harms weighs in its favor. Promatek Indus. v. Equitrac Corp., 300 F.3d 808, 811 (7th Cir. 2002) (affirming grant of preliminary injunction); Storck USA, L.P. v. Farley Candy Co., 14 F.3d 311, 314 (7th Cir. 1994) (affirming denial of preliminary injunction). In this COVID -19 case, the harm to the Officers from contracting the disease is definitely much greater than any disruption to the training schedule by requiring the City to conduct smaller classes with appropriate personal protective equipment.

**Public Interest Compels the Protection of Officers with Smaller Classes**

Super spreading Police Officers who have contracted the deadly virus while in an in-service training class create a risk not only to the Officers with whom they work, but also their families and the citizens with whom they have daily contact. For this reason, the public interest requires that an action be taken by this Court to interdict the reckless actions of the City in not following its own ten person mandate for meetings and gatherings. There is no public interest in allowing the City to conduct classes in crowded rooms where there is a chance of persons coming into contact with the virus. So an injunction will only protect the interests of the citizens in mitigating the disease. The primary concern here is to ensure that issuing an injunction will not disserve or harm the public interest. Gateway Eastern Ry. Co. v.Terminal R.R. Assoc. of St. Louis, 35 F.3d 1134, 1139 n.3 (7th Cir. 1994) (affirming grant of preliminary injunction).

## Conclusion

For the foregoing reasons, the Lodge requests this Court to grant leave to file this motion *instanter* and allow the Lodge to intervene in this case for the limited purposes identified herein, so that the Lodge, as a party to this litigation, may seek appropriate protections for the health and

13

safety of Chicago Police Officers and to allow the Lodge to present additional evidence in support of this request for compliance with the health and safety provisions of the Consent Decree. Such protections would include a requirement that the Officers be placed in a proper class size to preserve social distancing, be provided hand sanitizers, face coverings and related personal protection equipment so that they may attend the classes in a safe condition. The Lodge does not object to the need for in-service training but asserts that it must be conducted in a safe manner, and it is not.

> Respectfully submitted,
>
> /s/Joel A. D'Alba
> Joel A. D'Alba
>
> /s/Ryan A. Hagerty
> Ryan A. Hagerty

Joel A. D'Alba - Atty no. 571121
Ryan A. Hagerty – Atty No. 6275065
ASHER, GITTLER & D'ALBA, LTD.
200 W. Jackson Blvd., Suite 720
Chicago, Illinois 60606
(312) 263-1500
jad@ulaw.com
rah@ulaw.com