**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>            Plaintiff,<br><br>     v.<br><br>CITY OF CHICAGO,<br><br>            Defendant. | Case No. 17-cv-6260<br><br>Hon. Robert M. Dow Jr. |

**THE COALITION'S MOTION TO ENFORCE THE CONSENT DECREE
CONCERNING CPD'S EXECUTION OF SEARCH WARRANTS AND HOME RAIDS**

**INTRODUCTION**

The Chicago Police Department's (CPD's) on-going pattern of excessive force, traumatization and abuse of women, children and families, and failure to properly supervise and hold accountable officers in the execution of search warrants and raids of homes in Black and Brown communities violates numerous Consent Decree provisions and requires judicial enforcement.

The Consent Decree is rooted in community demands for justice and accountability for police violence—specifically the widespread demands developed after the City of Chicago was forced to release the video of CPD Officer Jason Van Dyke murdering Laquan McDonald. The City attempted to prevent the public release of that video, which depicted the murder of a Black teenager at the hands of a CPD officer, in an effort to conceal the shooting. Only after the video was made public in late 2015 did the involved CPD officers face any consequences for their actions. The Consent Decree contains provisions crafted to remedy the systemic CPD failures

exemplified by Laquan McDonald's murder and the attempted cover-up.[1] In its 2019 Order approving the entry of the Decree, this Court described it as an "important step forward in the City of Chicago's ongoing efforts to repair the damaged relationship between its police department and members of the community whom the department serves and protects."[2]

Yet, almost two years after the entry of this Consent Decree, the CPD was again caught on tape brutalizing a Black Chicagoan and violating her Fourth Amendment rights. And, once again, the City attempted to obstruct the public release of the video of CPD violence—this time depicting CPD's 2019 raid of Anjanette Young's home.[3] Ms. Young is a Black social worker with no criminal record. Invading her home, CPD officers found her naked, pointed their guns at her, handcuffed her, and refused to heed her insistent, terrified pleas that the officers were in the wrong place.[4] CPD officers were in fact in the wrong place.

The Young video was made public on December 14, 2020, and it was only then that the City placed involved officers on desk duty—despite the fact that Mayor Lori Lightfoot had known

---

[1] *See* Mem. Op. and Order Approving Proposed Consent Decree, Dkt. No. 702 at 2 (summarizing allegations against CPD: "[T]he City's failure to effectively train, supervise, and support law enforcement officers and the City's failure to establish reliable programs to detect and deter officer misconduct and administer effective discipline. . . these failures have created profound mistrust between many Chicago communities and CPD which reached its most recent flashpoint in late November 2015, following the release of a video tape depicting the fatal shooting of Laquan McDonald, a 17 year old African American by a CPD officer.").

[2] *Id.* at 10.

[3] In an echo of the scandal that gave rise to this Consent Decree, the City once again attempted to prevent public dissemination of the incident—denying Freedom of Information Act (FOIA) requests from Ms. Young and CBS2. Then, once Ms. Young received the video through discovery, the City filed an emergency motion to enjoin CBS2 from broadcasting it, which the Court denied. *See* Megan Hickey, *Anjanette Young Incident Fits in with Clear and Distinct Pattern of Wrong Police Raids,* CBS2 NEWS (Dec. 16, 2020), https://chicago.cbslocal.com/2016/12/16/anjanette-young-incident-fits-in-with-clear-and-distinct-pattern-of-wrong-police-raids/; *see also Young v. City of Chicago et al.*, Case No. 19-cv-5312, Dkt. No. 38 (enjoinment motion) (N.D. Ill. Dec. 14, 2020) and Dkt. No. 41 (Court order denying motion to enjoin) (N.D. Ill. Dec. 14, 2020).

[4] *See* Peter Nickeas, *Behind the Mistaken Raid by Chicago Police on an Innocent Social Worker's Home,* CNN (Dec. 20, 2020), https://www.cnn.com/2020/12/19/us/chicago-police-mistaken-raid/index.html.

about the raid since November 2019.[5] While Mayor Lightfoot has described the raid as "wrong" and "unacceptable," City attorneys have simultaneously and vigorously defended the officers' actions in response to Ms. Young's civil rights lawsuit, seeking to dismiss the case altogether.[6]

The horrific violation of Ms. Young's rights during a wrongful raid, and the City's subsequent concealment of its officers' actions, is not an anomaly. As described in Section I, *infra*, it is one egregious example in a series of illegal, violent raids conducted by CPD over past years, for which CPD has failed to hold a single officer to account.

The Coalition attempted to engage the City in negotiations to end CPD's unconscionable home raid practices long before they led to the present political crisis and widespread calls for change.[7] Since August 5, 2020, the Coalition repeatedly requested that the City work with it to negotiate a resolution to CPD's systematic wrongful raids. As has the Illinois Attorney General.

---

[5] *See* Gregory Pratt and John Byrne, *Cops Involved in Anjanette Young Raid Placed on Desk Duty; Lightfoot says Black People Nationwide 'Feel Angry and Feel Violated',* CHI. TRIBUNE (Dec. 21, 2020), https://www.chicagotribune.com/politics/ct-lightfoot-anjanette-young-update-20201221-ufy6kzkh2ng47c5k65yzpwtiq4-story.html; Gregory Pratt, *Mayor Lightfoot was told by staff in November 2019 that Anjanette Young raid was 'pretty bad,'* CHI. TRIBUNE (Dec. 30, 2020), https://www.chicagotribune.com/politics/ct-lightfoot-anjanette-young-raid-emails-20201230-dhnc67ikorawdhm5a2xw7s4x7u-story.html; *see also* City of Chicago Department of the Mayor, Compilation of Emails (hereinafter "Emails") (Dec. 30, 2020), https://www.chicago.gov/content/dam/city/depts/mayor/statementsanddocuments/EMAILS.pdf (On November 11, 2019, Mayor Lightfoot's Deputy Mayor, Susan Lee, emailed the Mayor's Communications Director that she had told the mayor about the raid, referring to it as "a bad incident").

[6] *See* Pratt and Byrne, *Cops Involved in Anjanette Young Raid Placed on Desk Duty, supra* note 5; *see also* Michelle Gallardo, *Chicago's Top Attorney Resigns Amid Botched Police Raid Fallout,* ABC7 (Dec. 20, 2020), https://abc7chicago.com/chicago-police-anjanette-young-mark-flessner-raid/8929408/; Mitchell Arementrot, *Lightfoot, Anjanette Young Meet for 'Very Candid' Conversation about Botched CPD Raid,* Chi. Sun-Times (Dec. 31, 2020), https://chicago.suntimes.com/city-hall/2020/12/31/22208691/anjanette-young-lightfoot-meeting-city-hall-botched-raid-video-chicago-police; *Young v. City of Chicago et al.*, Case No. 19-cv-5312, Dkt. No. 23 (N.D. Ill. Jan. 24, 2020) (Defendants' joint motion to dismiss the case in its entirety for failure to state a claim).

[7] *See* Amanda Vinicky, *Traumatized by Wrongful Police Raid, Anjanette Young Takes Legal Action,* WTTW (Dec. 16, 2020), https://news.wttw.com/2020/12/16/traumatized-wrongful-police-raid-anjanette-young-takes-legal-action; Michelle Gallardo, Eric Horng, and Alexis McAdams*, Chicago City Council Holds Hearing on Botched CPD Raid Tuesday,* ABC7 NEWS (Dec. 22, 2020), https://abc7chicago.com/chicago-police-anjanette-young-mark-flessner-raid/8972264/.

But the City has refused to respond. Instead, it chose to cover up yet another video of CPD abusing a Black Chicagoan to avoid long overdue change.

### COURT INTERVENTION IS REQUIRED TO EFFECTUATE COMPLIANCE

The City's home raid-related violations and its failure to respond to the Coalition's correspondence are consistent with the City's pattern of shirking its Consent Decree obligations, particularly those provisions that most directly impact Black and Brown communities. The City has missed or ignored countless deadlines.[8] Meanwhile, the CPD has continued the very use of force practices that led to the creation of the Consent Decree in the first place. For instance, during the summer of 2020, CPD responded to protesters with brutal force, systematically violating at least twelve provisions of this Consent Decree. CPD officers used unjustified lethal force against protesters in the form of head strikes and retaliated against people recording their actions— including journalists and other bystanders.[9]

The City and CPD have also failed to comply with Consent Decree obligations regarding community engagement. The Independent Monitor recommended that the City and CPD convene "work groups" to meet its community engagement Consent Decree obligations. The work groups were comprised of broad cross sections of Chicagoans who volunteered their time and expertise to work collaboratively with the CPD on policy issues relating to police in schools and use of force.

---

[8] The June 2020 Monitoring Report stated that the City and CPD missed 52 of 74 deadlines, including the mandate that CPD create adequate policies and procedures for use of force, impartial policing, and crisis intervention, and that it revise relevant use of force and accountability policies. *See* Independent Monitoring Report 2, Dkt. No. 844 (N.D. Ill. Jun. 18, 2020), available at https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_06_18-Independent-Monitoring-Report-2-filed.pdf.

[9] *See* Dkt. No. 860 (Order Setting Listening Sessions and Written Comment Period On the City Of Chicago's and the Chicago Police Department's Responses To Protests and Unrest Under the Consent Decree).

CPD unilaterally dismantled the first work group and all but ignored the recommendations of the other.[10]

CPD also continues to engage in racially-disparate policing. The Independent Monitor's statistically representative survey of Chicagoans revealed widespread racial disparities in police interactions and an overall poor opinion of the CPD.[11] According to the survey results, 44% of Black Chicagoans who participated in the poll give CPD a "poor" or "very poor" rating on CPD's use of the appropriate amount of force. Young Black men reported being stopped in a car by the CPD six times more than other groups and reported having a CPD officer point a gun at them in the past year 20 times more than white respondents. Fewer than half of Chicagoans (of all races) rated the CPD as doing a "good" or "very good" job of giving fair treatment to religious minorities (38% of respondents), people with disabilities (48% of respondents), and members of the LGBTQI community (39% of respondents).

CPD's pattern of ignoring Consent Decree mandates, combined with its repeated refusals to accept the Coalition's entreaties to resolve this matter informally, demonstrate that without intervention from this Court, it will continue to violate the Consent Decree and harm Chicago communities—particularly Black and Brown communities. For these reasons and those described in detail below, the Coalition respectfully requests that the Court immediately convene a structured settlement process to remedy the CPD's violation of Consent Decree provisions related to home raid-related violations.

---

[10] *See, e.g.,* Contributor, *A Public Letter to Mayor Lightfoot: A Call for Leadership,* CHI. SUN-TIMES (Oct. 15, 2020), https://chicago.suntimes.com/2020/10/15/21518757/police-reform-use-force-chicago-mayor-lori-lightfoot; *see* Letter from Coalition to City of Chicago, re: "Problems with Working Group on Cops in Schools" (Jul. 17, 2020) (attached hereto as Ex. A).

[11] *See* 2019-20 Community Survey, Dkt. No. 885.

Further, the violations detailed below implicate City Council's obligations regarding the Consent Decree provisions that are relevant to home raids and accountability (outlined below). Thus, the Coalition also requests an order requiring City Council to report to the Court on its progress related to these provisions.

Should these settlement efforts fail, the Coalition respectfully asks that this Court schedule at the earliest possible date an evidentiary hearing regarding the CPD's home raid-related violations of the Consent Decree and the sanctions appropriate to remedy each violation.

## ARGUMENT

### I.   CPD IS SYSTEMICALLY VIOLATING THE CONSENT DECREE BY ITS HOME RAID POLICIES AND PRACTICES.

#### A.  Specific Provisions in the Consent Decree are Relevant Here.

The Consent Decree requires CPD to deliver police services in a manner that (1) fully complies with the Constitution and laws of the United States and the State of Illinois, (2) respects the rights of the people of Chicago, (3) builds trust between officers and the communities they serve, and (4) promotes community and officer safety. In accordance with the Decree, CPD is required to update its policies and practices to reflect its commitments to procedural justice, de-escalation, impartial policing, and community policing. Despite these requirements, the City and CPD's home raid-related policies and practices fail to abide by the following provisions of the Consent Decree.

***Use of Force.*** Paragraph 156 of the Decree mandates that CPD implement use of force policies and training, supervision, and accountability systems that require officers to act in a manner consistent with the sanctity of human life, and with a high degree of ethics, professionalism, and respect for the public. Officers must only use force that is objectively

reasonable, necessary, and proportional in relation to the totality of the circumstances.[12] Further, the Decree requires that officers employ de-escalation techniques to prevent or reduce the need for force.[13] Additionally, CPD must ensure that officers are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law and policy.[14] In practice, as detailed below, officers continue to inflict unreasonable and excessive force when conducting residential raids, engage in unnecessary destruction of real and personal property, and fail to de-escalate force. These violations are particularly egregious because they occur within the sanctity of a home and often in the presence of children and their caregivers.

*Use of Body Cameras.* The Decree's body-camera provisions require officers to activate their cameras during all law enforcement-related activities that occur while on duty, continue recording until the conclusion of the incident, and face mandatory discipline, training, or other remedial action if they do not comply with this policy.[15] However, the CPD has failed to equip many of the units that regularly conduct these raids, such as SWAT and area-wide or city-wide gang and narcotics enforcement teams, with body cameras, while the officers who do have body cameras fail to wear, activate, and properly use them.[16] In the context of this motion, there continue

---

[12] Consent Decree, ¶ 156.

[13] *Id.* ¶¶ 156, 161.

[14] *Id.*

[15] *Id.* ¶¶ 238–39.

[16] *See* Don Babwin, *Lack of Body Cameras Fuels Suspicion in Chicago Shooting,* AP (Aug. 11, 2020), https://apnews.com/article/shootings-police-chicago-crime-u-s-news-428c2fba22b418280ef3c07acf4bc39c; Samah Assad, Christopher Hacker, Dave Savini, *Left in the Dark*, CBS2 News (Nov. 15, 2020), https://storymaps.arcgis.com/stories/3603ef8cc492488c847cffbe03ad0f1d.

to be incidents in which police supervisors instruct officers to turn off their cameras to avoid being recorded during abusive raids.[17]

***Training and Interactions with Youth.*** Contrary to paragraphs 32 and 37(d) of the Decree, which require CPD to adopt policies and training to ensure officers use developmentally appropriate responses to, and in interactions with, youth and children, CPD has failed to train officers to plan raids with the goal of protecting any children at the location and to schedule home raids at times when children are least likely to be present. CPD has also failed to prohibit its officers from pointing guns at and handcuffing children, abusing their family members in their presence, and treating young children as implicated adults during the execution of warrants.

***Community Policing.*** One of the Decree's guiding principles is to integrate community policing practices into all CPD operations.[18] The Decree mandates that CPD work systemically toward achieving strong community partnerships and positive interactions between police and members of the public.[19] CPD's current search warrant execution and investigation practices, which fail to require that officers engage in even the simple step of verifying residential addresses prior to executing a warrant or to ensure against excessive force in the course of warrant execution, traumatize families and particularly young children. This directly undermines community trust in CPD, as well as public perceptions of legitimacy and procedural justice, and breaches the foundational community-oriented philosophy that underlies the Decree.

---

[17] *See, e.g.*, Dave Savini, Michele Youngerman, Samah Assad, *Key Body Camera Footage Missing After Chicago Police Officers Raid Wrong Homes, Point Guns at Children*, CBS2 NEWS (May 4, 2019) https://chicago.cbslocal.com/2019/05/04/key-body-camera-footage-missing-after-chicago-police-officers-raid-wrong-homes-point-guns-at-children/.

[18] Consent Decree ¶ 9.

[19] *Id.* ¶ 8.

*Impartial Policing.* CPD's discriminatory practices with respect to residential raids also contravene the guiding principles of the Decree's directives with respect to Impartial Policing, which require officers to "treat all persons with the courtesy and dignity which is inherently due every person as a human being," and to conduct all operations fairly and without bias.[20] The vast majority of CPD's "negative" raids—those that fail to result in any arrest—target families in Black or Brown neighborhoods. The five neighborhoods with the greatest number of these raids are Englewood, Austin, North Lawndale, Garfield Park, and Humboldt Park—all predominantly Black or Brown and poor.[21] Similarly, the neighborhoods with the highest percentage of negative raids as compared to the total number of executed search warrants are also Black or Brown and poor.[22] The neighborhoods with the lowest number of negative raids are all overwhelmingly white and wealthy.[23]

*Accountability.* The CPD and the City are required to implement a "robust and well-functioning accountability system in which CPD members are held to the highest standards of

---

[20] *Id.* ¶¶ 49-50.

[21] *See* Dave Savini, Samah Assad, Michele Youngerman, *'They Had the Guns Pointed at Me': Another Chicago Family Wrongly Raided, Just 1 Month after Police Created Policy to Stop Bad Raids*, CBS2 NEWS (July 17, 2020), https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-raids/; *see also* Dave Savini, Samah Assad, Michele Youngerman, Rebecca McCann, *[Un]warranted*, CBS2 NEWS (May 18, 2020), https://storymaps.arcgis.com/stories/63ce5770e1ed43bea99d1d8274b94f91 (reporting on CBS 2 data analysis of CPD search warrants data).

[22] *See id.*

[23] The top three neighborhoods with the most search warrants executed are Englewood (96% black population; median household income $24k), Austin (88% black population; median household income $33k), and North Lawndale (90% black population; median household income $25k). In contrast, the neighborhoods with the fewest search warrants executed include Printers Row, Museum Campus, Magnificent Mile, Millennium Park, Edison Park, Grant Park, and Wrigleyville (50% or more white population; median income $95k or more). All of these neighborhoods had zero search warrants executed in the 2016-19 period, as analyzed by CBS. *See* Savini, Assad, Youngerman, McCann, *[Un]warranted*, *supra* note 21.

integrity."[24] The City, and through its Civilian Office of Police Accountability (COPA), is required to "thoroughly, fairly, timely and efficiently" investigate complaints.[25] COPA is required to brief City officials—including members of City Council—when it is unable to complete an investigation within 180 days.[26] Yet, COPA failed to investigate the home raid of Ms. Young's home—and those of several others—in a timely manner. Ms. Young's home was invaded in February 2019 but COPA's investigation was not initiated until November of that year, once a civil lawsuit was filed. The investigation has still not yet been completed, a delay that is far from unusual for the investigative authority.[27] Upon information and belief, despite the existence of extensive video demonstrating that CPD officers who participate in home raids frequently violate numerous CPD policies, COPA has failed to issue any affirmative findings concerning these violations.

Moreover, the City is required to use best efforts to ensure that an independent entity has jurisdiction to conduct administrative investigations of sexual misconduct, which includes behavior "by a CPD member that would likely be construed as lewd, lascivious, (or) inappropriate."[28] City Council must act to pass an ordinance in order to make this jurisdictional change to ensure that COPA has authority to address sexual misconduct, which is beyond its

---

[24] Consent Decree ¶ 420.

[25] *Id.* ¶ 423.

[26] *Id.* ¶ 473.

[27] *See* Gallardo, Horng and McAdams, *Chicago City Council Holds Hearing on Botched CPD Raid Tuesday, supra* note 7; Claudia Morell, *Aldermen Grill Chicago Police Brass and Oversight Leaders about the Botched Anjanette Young Raid*, WBEZ (Dec. 22, 2020), https://www.wbez.org/stories/aldermen-grill-chicago-police-brass-and-oversight-leaders-about-the-botched-anjanette-young-raid/4588439b-cd1f-4dec-8b52-a080da26235c.

[28] Consent Decree ¶ 782.

currently enumerated powers and duties.[29] CPD's treatment of Ms. Young, who was forced to stand unclothed in front of male officers, meets the clear definition of sexual misconduct.

### B. CPD's Home-Raid Policies and Practices Violate these Provisions.

Notwithstanding the existence of a binding Consent Decree and repeated lawsuits challenging CPD execution of home raids, CPD has continued to allow its officers to terrorize children and families in residential raids without fear of consequence, and primarily in Black and Brown communities. According to CPD data obtained by CBS News, CPD conducted over 6,800 residential raids pursuant to warrants between January 2016 and mid-2019.[30] Nearly 3,000, or 43%, of those raids failed to result in an arrest. The top ten neighborhoods with the most search warrants executed are also those with majority Black and/or Latinx populations and are some of the poorest in Chicago.[31] Furthermore, since roughly one-third of all Chicago households include children under 18 years old, a conservative estimate suggests that far more than two thousand children have been victims of CPD home raids in the past three years. Despite the pattern of abuse toward children and their families in these raids, CPD has failed to track, monitor, or hold officers to account for their actions.

***Excessive force and aggression toward children and their families in the execution of search warrants.*** A pattern of cases illustrates that CPD search warrant affiants do little to independently investigate and verify that the address for the intended target provided by the informant is accurate and current, making the homes of innocent families the sites of the kinds of

---

[29] *See* Chicago, Illinois, Municipal Code ch. 2-78-120 (governing COPA's powers and duties), http://www.chicagocopa.org/wp-content/uploads/2016/07/COPA-Ordinance.pdf.

[30] *See* Savini, Assad, Youngerman, McCann, *[Un]warranted*, *supra* note 21.

[31] *See id*.

police violence that the Decree was designed to prevent.[32] Chicago police affiants do not perform basic surveillance or investigation, such as reviewing utility records, verifying that the target is not in jail or prison, or checking investigative databases like Accurint. CPD does not require that officers executing search warrants investigate whether children either live in the residence or are likely to be present during the raid. It does not train its officers on dealing with the presence of children while executing search warrants. And although CPD's search warrant policies include some reasonable provisions, such as requiring independent corroboration of anonymous tips, officers' repeated violations of these requirements demonstrate that the policies are effectively meaningless, because supervisors do nothing to ensure that they are followed. Similarly, although CPD policy generally requires officers to wait a reasonable time after knocking to allow a resident to open the door to their home, case after case documented by news affiliate CBS reveals officers breaking into homes contemporaneously with any knock. In addition, the policies are plainly inadequate on their face, as discussed below.[33]

As a result, officers continue to abuse children and their families in conducting residential raids in the same manner as they did prior to the entry of the Decree. This is made clear not only by the Anjanette Young case, but by the scores of civil lawsuits that have been filed against CPD and its officers in recent years, a number of which are described below.[34]

---

[32] The Decree does not currently include provisions that explicitly address improving the quality of investigations leading to search warrants, a deficit that has perpetuated the patterns of excessive force against families and children documented by the United States Department of Justice. We recommend that the City agree to modify the Decree to remedy this deficiency.

[33] *See Deficiencies in CPD Search Warrant Policy,* discussed in Section IIB, *infra.*

[34] *See* Samah Assad, Dave Savini, *Another Family Files Lawsuit After Chicago Police Raid Wrong Home, Point Guns at 4-Year-Old,* CBS2 News (Jun. 11, 2020), https://chicago.cbslocal.com/2020/06/11/another-family-files-lawsuit-after-chicago-police-raid-wrong-home-point-guns-at-4-year-old/ (describing at least 12 "wrong raid" lawsuits filed in past two years against Chicago police officers).

On January 29, 2015, four years before the Decree was entered, brothers Jaden Fields, Jeremy and Justin Harris (ages eleven, six, and four, respectively), and their cousin Nasir Norman (age eleven) were doing homework and playing video games in the front room of their home. Suddenly, without warning, a team of Chicago police SWAT and plainclothes officers broke into the back door of their apartment, threw flashbang grenades inside, and screamed, cursed, and pointed assault rifles at the children. The search warrant's actual target, Derec Bell, not only did not live in the apartment, but, according to CPD's criminal database (CLEAR)—which the officers had failed to consult—was serving a twenty-year prison sentence 200 miles away.[35]

In 2017, officers executed an invalid search warrant for the wrong apartment and repeatedly pointed guns directly at the Mendez family's five- and nine-year-old children, ordering them to get down on the ground, screaming and using explicit language, while they cried and pleaded for the officers not to shoot their father. Even after learning they were in the wrong apartment, officers continued the search, ultimately finding nothing and making no arrests. The children remain deeply traumatized as a result of the search.[36]

In August 2018, just a few months before the Decree was finalized, an armed SWAT team set off loud flashbang grenades outside the home of Ebony Tate and broke open the front door of her apartment without knocking or presenting a search warrant. The officers pointed assault rifles at Ms. Tate, her four young children, and her 55-year-old mother, and then searched her apartment

---

[35] *See Blassingame v. City of Chicago*, Case No. 19-cv-07287, Dkt. No. 67 (Second Amended Compl.) (N.D. Ill Jun. 19, 2020). For more information on this wrong raid see https://chicago.cbslocal.com/2019/11/05/another-wrong-cpd-raid-blassingame/.

[36] *Mendez v. City of Chicago,* Case No. 18-cv-05560, Dkt. No. 125 (Fourth Amended Compl.) (N.D. Ill. Sept. 26, 2019). For video footage, *see* https://chicago.cbslocal.com/2019/10/03/chicago-police-officers-questioned-on-video-for-lawsuit-about-raiding-wrong-home/.

for over an hour while forcing Ms. Tate and her family to sit on the running board of the SWAT truck in various states of undress.[37] The officers found nothing during the search.

After the fruitless search, one of the officers brought Ms. Tate back into her home and gave her a copy of the search warrant for "Javale Bell" at her address. Tate replied that she had never seen Bell before, prompting another officer to respond, "I guess we got the wrong house." As it turned out, the officers had secured two simultaneous search warrants for two different buildings based on the same information provided by a confidential informant. Though aware of this inconsistent information, the officers pursued and executed duplicate search warrants in disregard of the safety and dignity of Ms. Tate and her family.[38]

In 2019, CPD officers raided a family's home during their four-year-old child's birthday party. The officers pointed guns at the family (including at the four-year-old and his seven-year-old sister), handcuffed the adults, shouted profanity and insults, and left the child's birthday cake on the floor. The actual target of the search warrant had not lived at the residence for five years. The children now suffer from serious emotional distress, including symptoms of PTSD, as a result of the incident.[39]

On February 8, 2019, a month after the entry of the Decree, a team of CPD officers raided Krystal Archie's apartment, where Ms. Archie's fourteen-, eleven-, and seven-year-old children were home. The deeply-disturbing body camera footage shows officers pointing heavy artillery at

---

[37] For video footage of the raid, including an interview with Ms. Tate, *see* https://chicago.cbslocal.com/2020/03/06/sgt-anthony-bruno-body-cams-turned-off-chicago-polcie-during-wrong-raid/.

[38] *See Tate v. City of Chicago,* Case No. 18-cv-7439, 2019 WL 2173802 (N.D. Ill. May 20, 2019).

[39] *See Bures v. City of Chicago,* Case No. 19-cv-02040, Dkt. No. 65 (Second Amended Compl.) (N.D. Ill. Nov. 25, 2019). Video footage of the raid can be viewed at https://chicago.cbslocal.com/2019/03/25/chicago-police-wrong-raid-birthday-party-4-year-old/.

the children's faces and heads as they order them to the floor. The children are sobbing in terror and begging the officers not to shoot them.[40] The officers are seen in the video yelling explicit language, ransacking the family's home, and interrogating the terrified children without a guardian present.[41] Officers made thoughtless and cruel jokes as they rifled through Ms. Archie's home and needlessly damaged the family's personal property. The raid yielded no contraband. The children remain emotionally scarred and traumatized from the incident.[42]

In the early morning hours of March 25, 2019, CPD officers again targeted the wrong address and raided the home of a mother and her three children, who had been sound asleep when CPD burst in. During the raid, Chicago police detained the adults for hours, and handcuffed the family's eight-year-old son and forced him to stand alone outside in freezing rain for over 35 minutes while officers tore through the family's home. Officers used profanity and insults during the search. They also used an explosive device to blow a hole in the family's second floor ceiling, destroyed the family's personal effects, and confiscated the children's possessions. The officers found no contraband and made no arrests. The children suffered serious emotional trauma as a result of the incident.[43]

On February 26, 2020, approximately 15 plain-clothes officers (some wearing "Ninja" masks) broke into Sharon Lyons' home with rifles, flashlights, and machine guns, and without

---

[40] *See* Dave Savini, '*Please Do Not Shoot Me:' Body Camera Shows Chicago Police Officers Interrogating, Pointing Guns at Children During Wrong Raid*, CBS2 NEWS (Feb. 6, 2020)), https://chicago.cbslocal.com/2020/02/06/wrong-raid-chicago-police-guns-pointed-at-children/.

[41] *See id.* for video footage of this deeply disturbing raid.

[42] *See Archie v. City of Chicago*, Case No. 19-cv-04838, Dkt. No. 125 (Third Amended Compl.) (N.D. Ill. Oct. 19, 2020). For video footage, *see* https://chicago.cbslocal.com/2020/02/06/wrong-raid-chicago-police-guns-pointed-at-children/.

[43] *See Wilson v. City of Chicago*, Case No. 19-cv-03550, Dkt. No. 1 (Compl.) (N.D. Ill. May 29, 2019). For video footage, *see* https://chicago.cbslocal.com/2019/05/28/another-family-says-chicago-police-pointed-guns-at-children-during-raid-handcuffed-8-year-old/.

announcing their identity as police. The officers pointed guns in the faces of Ms. Lyons, her three adult sons, and her four-year-old granddaughter. One of Ms. Lyons's adult sons has autism and a learning disability. He cried and became hysterical when the officers pointed guns at him. The search ultimately yielded no arrests and no contraband. The officers left Ms. Lyons' home with a broken door and locks, leaving her family traumatized and vulnerable to crime.[44]

The night of February 27, 2020, another group of mostly plain-clothed officers used a battering ram to break into the home and conduct a night-time raid of an innocent Iraqi American/Latinx family. Officers pointed guns at a 70-year-old grandmother and her 4-year-old granddaughter in her lap, as the grandmother was reciting her night-time prayers before bed. When the little girl's mother, Jasmine Vale, went toward the room to check on her daughter, an officer turned and pointed the barrel of his long gun within a foot of Jasmine's face. The officers cursed and shouted at the family as they held them at gunpoint for ten minutes. As the officers continued to train their guns on the grandmother, mother, and child, other officers ransacked the family's apartment, broke their furniture, and made cruel comments about their home. The officers left the family shaking in fear at about one in the morning, amongst the rubble of their broken belongings and broken front door. The suspect sought in the raid actually resided in California.[45]

***Absence of accountability.*** CPD's patterns of pursuing poorly substantiated search warrants, raiding incorrect residential addresses, engaging in excessive use of force during raids, and effecting property destruction during the execution of warrants are not recent developments;

---

[44] *See Lyons v. City of Chicago*, Case No. 1:20-cv-03412, Dkt. No. 27 (Amended Compl.) (N.D. Ill. Sept. 18, 2020). For video footage, *see* https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-raids/.

[45] *See Vale v. City of Chicago*, Case No. 20-cv-5037, Dkt. No. 37 (Amended Compl.) (N.D. Ill. Dec. 18, 2020). For video footage, *see* https://chicago.cbslocal.com/2020/08/27/family-sues-chicago-police-after-officers-raid-home-in-search-of-suspect-who-actually-lived-in-california/.

they have persisted for decades.[46] CBS News' analysis of CPD data paints a portrait of police impunity. For example, the thirteen officers who authored the largest number of affidavits in support of search warrants that resulted in negative raids between 2016 and 2019 have amassed 448 police misconduct complaints.[47] Of those complaints, 118 (26%) were for illegal searches.[48] Only two of those 118 complaints (less than 2%) were sustained and they resulted in minimal discipline—a single day suspension and a reprimand.[49] The same twelve officers responsible for

---

[46] *See, e.g.*, *Jacobs v. City of Chicago*, 215 F. 3d 758 (7th Cir. 2000) (CPD officers conducted search of apartment in multi-unit building pursuant to a warrant that incorrectly identified the building as a single-family residence; officers detained an apartment resident for three hours during a search of his apartment for alleged drug activity, without having probable cause to know that resident was involved in the drug activity); *Cooper v. Dailey*, 2010 WL 1415986 (N.D. Ill. March 31, 2010) (CPD officers searched an apartment with canine units despite awareness that targets of the search warrant, based on anonymous tip, were not present and the residents did not know anyone by that name); *Draine v. Bauman*, 708 F. Supp. 2d 693 (N.D. Ill. April 16, 2010) (CPD officers broke into a homeowner's residence using a battering ram, ransacked the home and stole numerous items, and left it unlocked after the search, which did not reveal evidence of a crime; the officer procuring the search warrant relied on the statement of an unidentified person, who was in custody in another district, who claimed to have bought drugs for more than a year from a person, whose real name he did not know, and from a house whose address he could not specify); *Leon v. City of Chicago*, 2011 WL 4738532 (N.D. Ill. Oct. 3, 2011) (CPD officers obtained a warrant to search the residence of plaintiff's next-door neighbor, but searched plaintiff's home instead, used a sledgehammer to breach the rear door of plaintiff's residence, drew guns and pointed them at the family's children, and ransacked the apartment before realizing they were in the incorrect home and departing); *Guzman v. City of Chicago*, 689 F. 3d 740 (7th Cir. 2012) (CPD officer failed to call off search once he learned that house was not single-family residence, as described in warrant, in that it contained a real estate office, it was not possible to get to the rest of the house from office, and there was a separate door for the first-floor apartment--where the target of the search lived; officer violated the second-floor resident's Fourth Amendment rights by forcing open the second-floor apartment door with a crowbar, entering with guns drawn, and forcing the pregnant resident, who was not the intended target of the search, to lie down on floor); *Russell, III et al v City of Chicago, et al.,* Case No. 10-cv-00525, Dkt. No. 56 (N.D. Ill, Aug. 18, 2011) (CPD officers raided an apartment, traumatized two teenage boys, shot and killed family dog, and found no record of criminal activity); *see also* David Heinzmann, *Family gets $333,00 for 2009 raid in which cops killed dog*, Chi. Tribune (Aug. 19, 2011), https://www.chicagotribune.com/news/ct-xpm-2011-08-19-ct-met-police-shoot-dog-20110819-story.html.

[47] *See* Samah Assad, *Compilation of CBS 2 data analysis of Chicago Police search warrants,* CBS2 News (Jun. 10, 2020), available at https://chicago.cbslocal.com/wp-content/uploads/sites/15116062/2020/06/6_10-Updated-SW-data-findings.docx (hereinafter, "CBS Data Compilation"); *see also* Savini, Assad, Youngerman, McCann, *[Un]warranted*, *supra* note 21.

[48] *See* CBS Data Compilation, *supra* note 47.

[49] *See id*.

the most negative raids accumulated 87 excessive force complaints.[50] None of the complaints led to any discipline by CPD. To date, CPD has failed to discipline any officer for their conduct during any of the abusive raids that have been reported by CBS and the subject of extensive federal litigation.[51]

Furthermore, as detailed in Section IA, *supra*, COPA is complicit in these failures of police accountability. Long delays in investigations, and failures to investigate altogether, have allowed officers to continue to conduct raids and searches that clearly violate CPD policy. The agency has also prevented public dissemination of information about such misconduct. In Ms. Young's case, it was COPA that requested that she be denied access to the incriminating body camera video via FOIA, citing its on-going "investigation."[52] And while Ms. Young's case is a key example of COPA's deficiencies, it is only emblematic of a larger pattern of failed oversight, which has been well-documented by the Office of the Inspector General (OIG) over the past six months.[53]

---

[50] *See* Dave Savini, Michele Youngerman, Samah Assad, *Attorneys Demand Chicago Police Stop Its 'Abusive' Search Warrant Tactics, Or They'll Take CPD to Federal Court*, CBS2 News (Aug. 6, 2020), https://chicago.cbslocal.com/2020/08/06/attorneys-demand-chicago-police-stop-its-abusive-search-warrant-tactics-or-theyll-take-cpd-to-federal-court/.

[51] *See id.*; *see also* Savini, Assad, Youngerman, McCann, *[Un]warranted*, *supra* note 21.

[52] *See* Emails, *supra* note 5, at 44-46.

[53] *See, e.g.,* OIG, *Evaluation of the Use of the Affidavit Override in Disciplinary Investigation of Chicago Police Department Members* (Dec. 2020), https://igchicago.org/wp-content/uploads/2020/12/OIG-Evaluation-of-the-Use-of-the-Affidavit-Override-in-Disciplinary-Investigations-of-CPD-Members.pdf (finding COPA improperly closed investigations of police misconduct supported by evidence for lack of affidavit); OIG, *Advisory Concerning the Civilian Office of Police Accountability's Practice of Administratively Terminating Disciplinary Investigation*s (Sept. 2020), https://igchicago.org/wp-content/uploads/2020/09/OIG-Advisory-Concerning-COPAs-Practice-of-Administatively-Terminating-Disciplinary-Investigations.pdf (finding COPA regularly misused and misapplied "administrative termination" to conclude disciplinary investigation); OIG, *Review of Compliance with the City of Chicago's Use of Force Incidents* (Sept. 15, 2020), https://igchicago.org/2020/09/15/oig-review-of-compliance-with-the-city-of-chicagos-video-release-policy-for-use-of-force-incidents/ (finding COPA regularly failed to post videos of incidents under investigations within 60 days).

*Deficiencies in CPD's search warrant policy.* In an apparent response to the damning publicity generated by the CBS investigation and repeated civil right lawsuits, CPD revised its search warrant policy in early January 2020 to include language related to the treatment of children and the use of body cameras when executing search warrants.[54] However, these revisions failed to cure the deficiencies in the policies. CPD added a mere 19 words to its warrants policy with respect to police interactions with children, requiring officers in the presence of children to "maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize trauma."[55] The revisions offer vague guidance at best. Significantly, they fail to require or prohibit any particular conduct, such as pointing weapons at young children. Also problematic, the policy has little say about protecting the safety of the people (often children) who are living with or in close proximity to the target of a warrant.

*Deficiencies in CPD's new search warrant training*. The Department also provided an updated search warrant training to officers in January and February 2020. The training also remains inadequate with respect to safeguarding children from unnecessary trauma, and fails to emphasize how critical it is for officers to adhere stringently to the body camera policy.

*CPD's deviations from national best practices regarding officer interaction with children.* CPD's policy regarding youth interactions falls short of best practices advocated by the International Association of Chiefs of Police ("IACP"), and deviates from similar policies adopted by other cities. CPD's deviations are especially significant with respect to circumstances involving

---

[54] Chicago Police Department Special Order S04-19, *Search Warrants* (Jan. 3, 2020), available at http://directives.chicagopolice.org/directives/data/a7a57be2-12a76ce1-24512-a76c-e6f5e256f0ef4e84.pdf?hl=true.

[55] *Id.* at 9.

the arrest of a parent in a child's presence, a situation particularly likely to inflict lasting psychological trauma, as past cases have shown.

The IACP recommends that departments nationwide implement specific policies to improve interagency coordination, officer training, pre-arrest planning, documentation, and follow-up to minimize trauma to children following a parent's arrest.[56] Strategies for Youth, a national policy and training organization focusing on improving interactions between police and youth, recommends that officers utilize a developmentally-appropriate, trauma-informed approach when interacting with children by considering the children's age, the reason for the search or the parent's arrest, and the children's emotional response.[57]

Other major cities are in accord. San Francisco's police department issued a General Order specifically addressing officer interactions with children when arresting a parent, which requires officers to be aware of items that may suggest the presence of children when entering a home and to give parents opportunities to reassure children and explain what is happening.[58] Indianapolis's

---

[56] International Association of Chiefs of Police, *Safeguarding Children of Arrested Parents* 8-18 (August 2014), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/IACP-SafeguardingChildren.pdf. *See also* Connecticut Center for Effective Practice, *A Collaborative Model to Support Children Following a Caregiver's Arrest: Responding to Children of Arrested Parents Together (REACT)*, (September 2012), https://strategiesforyouth.org/sfysite/wp-content/uploads/2014/09/CHDI-Arrest-Protocol-CT-Inst.-for-Mun-Reg-Policy.pdf.

[57] *See* Lisa H. Thurau, *First, Do No Harm: Model Policies for Law Enforcement Agencies When Arresting Parents in the Presence of Children,* USDOJ Office of Justice Programs Diagnostic Center, http://strategiesforyouth.org/sitefiles/wp-content/uploads/2012/09/First_Do_No_Harm_Report.pdf.

[58] San Francisco Police Department General Order, *Children of Arrested Parents* (May 7, 2014), https://www.sanfranciscopolice.org/sites/default/files/2018-11/DGO7.04%20Children%20of%20Arrested%20Parents.pdf (last visited Jan. 13, 2021). Also in California, Fresno's police department created a Children Exposed to Domestic Violence response team, designed to provide services that go beyond those typically provided by patrol, such as developing a connection to the family, identifying needs and providing referrals to services. The Fresno department also implements policies aimed specifically at mitigating the trauma of exposure to parental arrest. *See* A. Rosewater and K. Moore, Addressing Domestic Violence, Child Safety and Well-being: Collaborative Strategies for California Families 28-29 (2010), available at https://www.courts.ca.gov/documents/DVReport2010V3.pdf.

policy outlines a detailed protocol for interacting with social services agencies, like Child Protective Services, at the scene of a search or arrest, and is geared toward minimizing trauma resulting from these types of police interactions.[59] Several police departments use the Responding to Children of Arrested Parents Together (REACT) model, which seeks to minimize traumatic stress in children, provides training and resources for law enforcement, and improves collaboration between law enforcement, mental health, and child welfare systems to more effectively deliver services to children in cases where parents are arrested.[60]

## II. THE COALITION HAS UNDERTAKEN SUBSTANTIAL EFFORTS TO RESOLVE HOME RAID-RELATED CONSENT DECREE VIOLATIONS IN ACCORDANCE WITH ITS ENFORCEMENT AUTHORITY.

### A. The Coalition Retains Enforcement Authority Under the Consent Decree.

The Coalition is comprised of the plaintiff organizations in two lawsuits seeking to end CPD's long-term failure to curtail the widespread violence that police have inflicted on Chicagoans, which especially impacts people of color and people with disabilities. Dkt. 703, ¶ 709(b) (identifying the Coalition founders as the plaintiff organizations in *Campbell v. City of Chicago*, Case No. 17-cv-4467 (N.D. Ill.), which challenged CPD's pattern of use of force under the Fourth Amendment and racially biased policing, and *Communities United v. City of Chicago*, Case No. 17-cv-7151 (N.D. Ill.), which challenged CPD's pattern of use of force under the Fourth

---

[59] Indianapolis Metropolitan Police Department General Order 1.18, Child in Need of Services (CHINS) (Jan. 1, 2007), https://strategiesforyouth.org/sitefiles/wp-content/uploads/2014/10/IMPD.pdf (last visited Jan. 11, 2021).

[60] Manchester Police Department Policy, Chapter 9, Section 12, Mentally Ill or Gravely Disabled Individuals, Crisis Intervention Model Team (CIT), and REACT Model (December 2013), https://strategiesforyouth.org/sitefiles/wp-content/uploads/2014/09/manchester-REACT-policy.pdf (last visited Jan. 11, 2021). For a longer discussion of model practices for law enforcement agencies when arresting parents in the presence of children, *see* Thurau, *First, Do No Harm*, *supra* note 57.

Amendment and sought to end the impact of police violence on people with disabilities and, in particular, at the intersection of race and disability).

In March 2018, the Coalition, the City, and the OAG entered into a Memorandum of Agreement (MOA).[61] The MOA confirmed that the organizational plaintiffs in both lawsuits had formed a Coalition "committed to monitoring, enforcing, and educating the community about the consent decree" being negotiated by the City and OAG (¶ 1); defined how the *Communities United* plaintiffs and the *Campbell* organizational plaintiffs ("Coalition Founders") would propose terms for the consent decree as it was being negotiated (¶¶ 2, 6); and promised that the City and OAG would include terms in their decree to make it enforceable by the Coalition (¶¶ 12-13). In exchange, the organizational plaintiffs dismissed their injunctive claims against the City.[62] Both lawsuits ended soon after with settlements that reflected that the organizational plaintiffs, through the Coalition, had the right to enforce the Consent Decree.[63]

The Coalition met its obligations under the MOA prior to the entry of the final decree. The final Consent Decree, entered on January 31, 2019, included the language negotiated in the MOA granting the Coalition the power to enforce the Consent Decree.[64]

---

[61] *See* MOA, attached as Ex. D to Pl.'s Opp'n to Mot. to Intervene, Dkt. No. 73-1.

[62] *See Communities United v. City of Chicago*, Case No. 17-cv-7151, Dkt. No. 76 (N.D. Ill. 2017) (stipulation of dismissal); *Campbell v. City of Chicago*, Case No. 17-cv-4467, Dkt. No. 197 (N.D. Ill. 2017) (same).

[63] *See Communities United v. City of Chicago*, Case No. 17-cv-7151, Dkt. No. 76-1 (N.D. Ill. 2017) (settling litigation in consideration for Consent Decree enforcement rights); *Campbell v. City of Chicago*, Case No. 17-cv-4467, Dkt. 196 (N.D. Ill. 2017) (same).

[64] *See* Consent Decree ¶¶ 669, 709.

### B. The Coalition and the OAG Provided the City Ample Notice of its Home Raid Violations and Now the Cure Period Has Lapsed.

Pursuant to Consent Decree paragraph 709, the Coalition first provided the City with notice of the CPD home raid-related Consent Decree violations on August 5, 2020. The Coalition expressed a desire to "work together to solve" the documented violations. *See* Ex. B (August 5, 2020 Letter from Coalition to City). In various August and September 2020 calls between counsel for the City and attorneys for the Coalition, the City confirmed receipt of the letter, and stated that a written response would be forthcoming.

On September 25, 2020, the OAG sent a letter to the City requesting that it "comprehensively address the detailed concerns raised by the Coalition," and noted that the OAG "echoes" the Coalition's concerns and is "disturbed by the ongoing and well-documented accounts of CPD raids involving mistaken addresses, incorrect information, excessive force, verbal abuse, pointing guns directly at young children and their parents and accounts of disrespect . . . that disproportionately affect Black, Brown and economically disadvantaged neighborhoods." *See* Ex. C (Sept. 25, 2020 Letter from OAG to City). The OAG similarly asked the City to schedule a time to meet with the Coalition, IMT, and OAG "to discuss the Coalition's detailed proposals." *Id*. The City did not respond. Over a period of months, Coalition counsel made repeated oral inquiries to counsel for the City concerning its intent to respond to and engage with the parties on the issue. Counsel for the City indicated that it preferred to respond in writing before meeting. Months after the 90-day cure period contemplated by the Consent Decree ended, the City has refused to respond in writing, or indeed, in *any* substantive way, to the Coalition's August 2020 letter.

Accordingly, on December 16, 2020, Coalition counsel sent an email to counsel for the City requesting "a firm date by which you will respond and commit to meeting and working with us to implement long overdue remedies to avoid unnecessary additional trauma, injuries, and even

23

deaths inflicted upon Chicago families." *See* Ex. D (Dec. 16, 2020 Email from Craig Futterman to Tyeesha Dixon and Allan Slagel). Another month has passed, and the City has yet to even acknowledge the email. For over five months, the City has ignored multiple requests by the Coalition and OAG to collaborate on a resolution to home raid-related Consent Decree violations. Even when the raid of Ms. Young's home and the City's attempts to prevent the release of the raid video made international headlines, the City refused to engage with the Coalition on this matter.

Given the City's obfuscation and the on-going violations by CPD officers, the Coalition is left with no option but to seek the intervention of this Court.

### III.     THIS COURT MAY USE ITS ENFORCEMENT AUTHORITY TO BRING THE CITY INTO COMPLIANCE.

This Court has broad authority to require that CPD take specific action to effectuate the Consent Decree's terms. Federal courts are not reduced to approving consent decrees and hoping for compliance. "Once entered, that decree may be enforced." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 432 (2004) (upholding the constitutionality of a consent decree governing the operations of a Texas State agency); *see also Shakman v. City of Chicago*, 426 F.3d 925, 931 (7th Cir. 2005) ("A party may not simply ignore a consent decree"); *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004). When a defendant violates a consent decree, "the court has the power to issue any order necessary to enforce the decree, including an order to pay." *Wis. Hosp. Ass'n. v. Reivitz*, 820 F. 2d 863, 868 (7th Cir. 1987).

This Court has discretion to fashion an appropriate remedy to bring the City into compliance through a supplemental order for injunctive relief or contempt proceedings. *See Wis. Hosp. Ass'n*, 820 F.2d at 868; *see also South Suburban Hous. Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999) (recognizing that a district court has "broad discretion to fashion an award" for civil contempt sanctions in action to enforce consent decree pertaining to alleged unfair real estate

practices); *Duran v. Elrod*, 713 F.2d 292, 297 (7th Cir. 1983) (stating that the district court has broad discretionary power in shaping remedy to enforce consent decree in jail conditions case).

At this time, the Coalition merely seeks an expedited process supervised by this Court and involving the City, CPD, and the OAG to determine whether a mutually agreeable resolution of this dispute is feasible. If such a process cannot produce a remedy, however, the Coalition will request that the Court enter an order sanctioning CPD by requiring it to issue and implement policies and processes that are necessary to cure the continuing constitutional violations.

While the Consent Decree's provisions governing use of force and police interactions with the community do not specifically refer to home raids, remedies specific to these policies and practices are necessary to address the violations of the Decree and federal law. Courts overseeing policing consent decrees frequently enter orders requiring defendants to implement policies and procedures that are not explicitly set forth by the consent decree terms, but that nonetheless are necessary in order to effectuate the decree's purpose. *See Floyd v. City of New York*, 959 F. Supp. 2d 668, 688-91 (S.D.N.Y. 2013) (ordering the NYPD to record civilian interactions); *United States v. City of Seattle*, No. C12-1282JLR, 2018 WL 6304761, at *3 (W.D. Wash. Dec. 3, 2018) (court overseeing policing consent decree entered an order to show cause after the department decided to "reinstate an officer who had violated three provisions of the [Seattle Police Department's] use-of-force policies when he punched a handcuffed subject in the face while she was sitting in a patrol car" and where the City rejected a proposed ordinance related to police accountability); *McElrath v. Goodwin*, 713 F.Supp. 299, 305 (E.D. Ark. 1988) (ordering that "a neutral person should conduct a training program as to the use of and the meaning of the Consent Decree . . . [because] [i]t [did] not appear to the court that the training given to the CAPS Officers was adequate").

Courts also retain the right to order sanctions in the form of mandated compliance. Recently, after finding Memphis police violated a consent decree relating to unlawful surveillance, the district court imposed sanctions requiring the police department to: "(1) revise its departmental policies to include a definition of 'political intelligence'; (2) establish a training program . . . ; (3) create an approval process for investigations into unlawful conduct that may incidentally result in the gathering or collection of political intelligence . . . ; (4) create and submit to the Court guidelines for officers on the use of social media searches and social media collators in compliance with the Decree; and (5) submit a periodic list of all search terms entered into social media by MPD officers." *ACLU of Tennessee, Inc. v. City of Memphis*, *Tennessee*, No. 2:17-cv-02120-JPM-jay, 2020 WL 5630418, at *2 (W.D. Tenn. Sept. 21, 2020); *see also Cintron v. Vaughn*, No. 3:69-cv-13578, 2007 WL 4240856, at *1 (D. Conn. Nov. 29, 2007) (adopting sanctions established by special master after police department violated consent decree prohibiting racially discriminatory policing); *United States v. Police Dep't of City of Balt.*, 303 F. Supp. 3d 376, 377 (D. Md. 2018) (while monitoring compliance with consent decree over the Baltimore Police Department, court ordered: "[I]t has become apparent to the Court that acquisition and activation of such a modern technology platform (hardware, software, training and personnel to operate the same) is a critical undertaking of the reform process without which most of the other promised reforms will be impossible. Accordingly, although the topic of technological reform has not yet been the focus of a monthly Subject Matter Conference, it is of such fundamental importance as to warrant immediate and continuing attention by the parties and the Monitor.").

This Court undeniably has the authority to enter an order requiring CPD to comply with the terms of this Consent Decree summarized here, and to end its ongoing, systematic abuse of Chicagoans during home raids. Nevertheless, the Coalition is hopeful that with clear guidance

from the Court, this matter can instead be resolved expeditiously through structured settlement negotiations. Should that process fail, the Coalition reserves the right to modify this motion and request an evidentiary hearing as soon as possible, in accordance with this pleading.

## CONCLUSION

For these reasons, the Coalition respectfully moves this Court to enter and continue this Motion to Enforce and to require the City Defendants—including but not limited to representatives of the Mayor's Office—to participate in structured settlement negotiations before this Court with Coalition Members, their Counsel and the OAG. The Coalition further requests an order requiring City Council to report to the Court on its progress related to the Consent Decree provisions related to home raids, as identified above. Finally, should settlement efforts fail, the Coalition requests that this Court schedule at the earliest possible date an evidentiary hearing regarding CPD's home raid-related violations of the Consent Decree and the sanctions appropriate to remedy each violation.[65]

Respectfully submitted,

 /s/ Sheila A. Bedi                          /s/ Craig B. Futterman
Counsel for the Coalition


Date: January 13, 2021

---

[65] The Coalition reserves the right to request expedited discovery prior to any evidentiary hearing.

Sheila A. Bedi
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Craig B. Futterman
Mandel Legal Aid Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611
futterman@uchicago.edu

Vanessa del Valle
Alexa Van Brunt
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
vanessa.delvalle@law.northwestern.edu
a-vanbrunt@law.northwestern.edu

Nusrat J. Choudhury
Elizabeth Jordan
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
(312) 202-9740
nchoudhury@aclu-il.org
ejordan@aclu-il.org

Amanda Antholt
Equip for Equality
20 N. Michigan Ave., Suite 300
Chicago, IL 60602
amanda@equipforequality.org

**Counsel for the Coalition**