| | |
|---|---|
| **From:** | Craig B. Futterman |
| **To:** | Tyeesha Dixon (tyeesha.dixon@cityofchicago.org); Slagel, Allan T. |
| **Cc:** | Margaret Hickey (MHickey@schiffhardin.com); Joe Ferguson - Inspector General, Chicago (JoeFerguson1@ChicagoInspectorGeneral.org); Pryor, Shareese; Wells, Christopher; Weber, Alicia; awenzloff@atg.state.il.us; Sheila A Bedi; Alexa Van Brunt; Vanessa del Valle; Karen Sheley; Rachel Murphy (RMurphy@aclu-il.org); Elizabeth Jordan; Amanda Anholt |
| **Subject:** | CPD Home Raids |
| **Date:** | Wednesday, August 5, 2020 10:22:08 AM |
| **Attachments:** | 2020.08.05 Coalition Letter re CPD Raids.pdf |

Dear All,

Please see attached letter.

I hope that this is something that we can all work together to solve.

Sincerely,

Craig

Craig B. Futterman
Clinical Professor of Law
University of Chicago Law School
Mandel Legal Aid Clinic
6020 S. University
Chicago, IL 60637
(773)702-9611
futterman@uchicago.edu

This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. Thank you for your cooperation.



THE UNIVERSITY OF
**CHICAGO**
THE LAW SCHOOL

*Edwin F. Mandel Legal Aid Clinic*
6020 South University Avenue | Chicago, Illinois 60637
phone (773) 702-9611, fax (773) 702-2063
e-mail futterman.@uchicago.edu
www.law.uchicago.edu

*Craig B. Futterman
Clinical Professor of Law
Civil Rights: Police Accountability Clinic*

August 5, 2020

Tyeesha Dixon
Deputy Corporation Counsel
Public Safety Reform
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois  60602
Tyeesha.dixon@cityofchicago.org

Allan T. Slagel
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Ste. 2800
Chicago, IL 60601
aslagel@taftlaw.com

   *Re: CPD Home Raids*

Dear Tyeesha and Allan,

   We write this letter on behalf of the Coalition, pursuant to paragraph 709 of the Consent Decree, to remedy the Chicago Police Department's ongoing pattern of excessive force, continued traumatization of children and families, and failures of accountability and supervision in the execution of warrants and raids of family homes in Black and Brown communities—practices that run contrary to the core mission of the Consent Decree.

   As CBS 2 Chicago has documented, CPD regularly raids the wrong homes, fails to investigate information provided by informants to ensure that officers target the correct addresses, and fails to assess whether children reside in the homes or take precautions to avoid traumatizing children. When entering family homes, officers typically break down the door and charge into the living space with guns drawn, startling everyone present. They point their assault rifles and handguns directly at young children and their parents; they handcuff children in front of their parents, and parents in front of their children; they subject family members to excessive and unwarranted force and verbal abuse; and they treat Black and Brown families with a basic lack of respect for their humanity. After taking and breaking personal items, including children's toys, CPD leaves families unprotected, with broken doors and locks, exposed and vulnerable to further violence and theft.

The CPD has refused to track or document, much less analyze, the reasons for negative search warrants ("wrong raids"),[1] including raids in which the target of the raid does not live at the address, thereby ensuring the continuation of its unconstitutional practices. For decades, community members have made misconduct complaints about these incidents, but they are rarely if ever sustained.

The recent killing of Breonna Taylor in a similar raid by police in Louisville and the worldwide protests that have followed dramatize all that is stake—the lives and safety of Black and Brown families. Accordingly, we request that you work with the Coalition, along with the Attorney General and Monitor, to revise policies and training, hold officers accountable for violations, and document and monitor the execution of residential warrants to ensure compliance with the Constitution and Decree.

The Coalition also joins the national call to prohibit no-knock raids in Chicago, because they unjustifiably put the lives of families and police officers at risk and make family homes sites of unnecessary police violence. Family members, awakened and frightened by unannounced armed intruders in the middle of the night, have every right and reason to defend their homes and loved ones. And armed police raiders are equally likely to view those same family members as a threat to their lives. There is no greater recipe for disaster for all involved.

**Relevant Provisions in the Consent Decree**

The City, in the Consent Decree, committed to delivering police services in a manner that (1) fully complies with the Constitution and laws of the United States and the State of Illinois, (2) respects the rights of the people of Chicago, (3) builds trust between officers and the communities they serve, and (4) promotes community and officer safety. In accordance with the Decree, CPD is required to update its policies and practices to reflect its commitments to procedural justice, de-escalation, impartial policing, and community policing.

*Use of Force.* Paragraph 156 of the Decree mandates that CPD implement use of force policies and training, supervision, and accountability systems that require officers to act in a manner consistent with the sanctity of human life, and with a high degree of ethics, professionalism, and respect for the public. Officers must only use force that is objectively reasonable, necessary, and proportional in relation to the totality of the circumstances.[2] Further, the Decree requires that officers must employ de-escalation techniques to prevent or reduce the need for force.[3] In practice, however, officers continue to inflict unreasonable and excessive

---

[1] A negative search warrant is one that fails to result in an arrest upon execution of a raid.
[2] Consent Decree, ¶ 156.
[3] Consent Decree at ¶¶ 156, 161.

force when conducting residential raids, engage in unnecessary destruction of real and personal property, and fail to de-escalate force in the presence of children and their caregivers.

*Use of Body Cameras.* The Decree's body-camera provisions require officers to activate their cameras during all law enforcement-related activities that occur while on duty, continue recording until the conclusion of the incident, and face mandatory discipline, training, or other remedial action if they do not comply with this policy.[4] However, the CPD has failed to equip many of the units that regularly conduct these raids, such as SWAT and area-wide or city-wide gang and narcotics enforcement teams, with body cameras. In addition, the officers who have body cameras fail to wear, activate, and properly use them. Indeed, there continue to be incidents in which police supervisors instruct officers to turn off their cameras to avoid being recorded during negative raids.[5]

*Training and Interactions with Youth.* Contrary to paragraphs 32 and 37(d) of the Decree, which require CPD to adopt policies and training to ensure officers use developmentally appropriate responses to, and interactions with, youth and children, CPD has failed to train officers to plan raids with the goal of protecting any children at the location and to schedule raids at times when children are least likely to be present. CPD has also failed to prohibit its officers from pointing guns at and handcuffing innocent children, abusing their family members in their presence, and treating young children as implicated adults during the execution of search warrants.

*Community Policing.* One of the Decree's guiding principles is to integrate community policing practices into all CPD operations.[6] The Decree mandates that CPD work on a systemic basis toward strong community partnerships and positive interactions between police and members of the public.[7] CPD's current search warrant execution and investigation practices, which fail to require even the simple step of verifying residential addresses prior to executing a search warrant, traumatizes families and particularly young children. This directly undermines community trust in CPD, public perceptions of legitimacy and procedural justice, and breaches the foundational community-oriented philosophy that underlies the Decree.

*Impartial Policing.* CPD's discriminatory practices with respect to residential raids also contravene the guiding principles of the Decree's directives with respect to Impartial Policing, which require officers to "treat all persons with the courtesy and dignity which is inherently due

---

[4] Id. at ¶¶ 238–39.
[5] See, e.g., https://chicago.cbslocal.com/2019/05/04/key-body-camera-footage-missing-after-chicago-police-officers-raid-wrong-homes-point-guns-at-children/.
[6] Id. at ¶ 9.
[7] Id. at ¶ 8.

every person as a human being," and to conduct all operations fairly and without bias.[8] The vast majority of CPD's negative raids target families in Black or Brown neighborhoods. The five neighborhoods with the greatest number of negative raids are Englewood, Austin, North Lawndale, Garfield Park, and Humboldt Park—all predominately Black or Brown, and poor. Similarly, the neighborhoods with the greatest percentage of negative raids as compared to their total number of search warrants are also Black or Brown and poor. The neighborhoods with the lowest number of negative raids are all overwhelmingly white and wealthy.[9]

**CPD's Ongoing Pattern of Abusive Practices in Investigating and Executing Warrants and Interacting with Children**

Notwithstanding the Consent Decree and repeated lawsuits, CPD has allowed its officers to terrorize children and families in residential raids without fear of consequence. According to CPD data obtained by CBS, CPD conducted over 6,800 residential raids pursuant to warrants between January 2016 and mid-2019.[10] Nearly 3,000 of those raids, or 43%, failed to result in an arrest. The top ten neighborhoods with the most search warrants executed are also those with majority Black and/or Latinx populations. These neighborhoods are also some of the poorest in Chicago.[11] Roughly one-third of all Chicago households include children under 18 years old. A conservative estimate indicates that far more than a thousand children have been victims of CPD home raids in the past three years. Despite the pattern of abuse toward children and their families in these raids, CPD has failed to track, monitor, or hold officers to account for their actions.

*Excessive force and aggression toward children and their families in execution of search warrants.* A pattern of cases illustrates that CPD search warrant affiants do little to independently investigate and verify that the address for the intended target provided by the informant is accurate and current, making the homes of innocent families the sites of the kinds of police violence that the Decree was designed to prevent.[12] Chicago police affiants do not perform

---

[8] Id. at ¶¶ 49–50.

[9] The top three neighborhoods with the most search warrants executed are Englewood (96% black population; median household income $24k), Austin (88% black population; median household income $33k), and North Lawndale (90% black population; median household income $25k). In contrast, the neighborhoods with the fewest search warrants executed include Printers Row, Museum Campus, Magnificent Mile, Millennium Park, Edison Park, Grant Park, and Wrigleyville (50% or more white population; median income $95k or more). All of these neighborhoods had zero search warrants executed in the 2016-19 period analyzed by CBS. *See* https://storymaps.arcgis.com/stories/63ce5770e1ed43bea99d1d8274b94f91.

[10] CBS 2 data analysis of Chicago Police search warrants Excel spreadsheet, available at https://storymaps.arcgis.com/stories/63ce5770e1ed43bea99d1d8274b94f91.

[11] See id.

[12] The Decree does not currently include provisions that specifically address improving the quality of investigations leading to search warrants, which has perpetuated the patterns of excessive force against families and children documented by the U.S. Department of Justice. We recommend that the City agree to modify the Decree to remedy this deficiency.

basic surveillance or investigation, such as checking utility records, verifying that the target is not in jail or prison, or checking databases like Accurint. CPD does not require officers executing search warrants to investigate whether children live in the residence or will be present, nor does it train officers on dealing with the presence of children while executing search warrants. And, although CPD's search warrant policies include some reasonable provisions such as requiring independent corroboration of anonymous tips, officers' repeated violations of these requirements demonstrate that the policies are meaningless if supervisors do nothing to ensure that officers follow these policies. Similarly, although CPD policy generally requires officers to wait a reasonable time after knocking to allow a family to open the door, case after case documented by CBS reveals officers breaking into homes virtually contemporaneous with any knock. In addition, the policies are inadequate on their face.[13]

As a result, officers continue to abuse children and their families in residential raids in the same manner as before the Decree. On January 29, 2015, four years before the Decree, brothers Jaden Fields, Jeremy and Justin Harris (ages eleven, six, and four, respectively) and their cousin Nasir Norman (age eleven) were doing homework and playing video games in the front room of their home. Suddenly, without warning, a team of Chicago police SWAT and plainclothes officers broke into the back door of their apartment; threw flashbang grenades inside; and screamed, cursed, and pointed assault rifles at the children. The search warrant's actual target, Derec Bell, not only did not live in the apartment, but, according to CPD's criminal database (which the officers had failed to consult), was serving a twenty-year prison sentence 200 miles away.[14]

In August 2018, just a few months before the Decree was finalized, an armed SWAT team set off loud flashbang grenades outside the home of Ebony Tate and broke open the front door of her apartment without knocking or presenting a search warrant. The officers pointed assault rifles at Ms. Tate, her four young children, and her 55-year-old mother, and then searched her apartment for over an hour while forcing Ms. Tate and her family to sit on the running board of the SWAT truck in various states of undress.[15] The officers found nothing.

After the fruitless search, one of the officers brought Ms. Tate back into her home and gave her a copy of the search warrant for "Javale Bell" at her address. Tate replied that she had never seen Bell before, prompting another officer to respond, "I guess we got the wrong house." As it turned out, the officers had secured two simultaneous search warrants for two different buildings based on the same information provided by a confidential informant. Despite their

---

[13] *See Deficiencies in CPD Search Warrant Policy, infra.*

[14] Blassingame v. City of Chicago, 1:19-cv-07287 (N.D. Ill. Jan. 28, 2020); for more information on this wrong raid see https://chicago.cbslocal.com/2019/11/05/another-wrong-cpd-raid-blassingame/.

[15] For video footage of the raid and an interview with Ms. Tate, see https://chicago.cbslocal.com/2020/03/06/sgt-anthony-bruno-body-cams-turned-off-chicago-polcie-during-wrong-raid/.

awareness of this inconsistent information, the officers pursued and executed duplicate search warrants in disregard of the safety and dignity of Ms. Tate's family.[16]

In Bures, CPD officers raided a family's home during their four-year-old child's birthday party. The officers pointed guns at the family, shouted profanity and insults, and left the child's birthday cake on the floor. In reality, the actual target of the search warrant had not lived at the residence for five years.[17] In Young, officers raided a woman's home and handcuffed her while she was naked, refusing to let her put clothes on—all based on a vague tip with no corroboration of the informant's claims.[18] In Mendez, officers executed an invalid search warrant for the wrong apartment and repeatedly pointed guns directly at the family's five- and nine-year-old children while they cried and pleaded for the officers not to shoot their father.[19]

On February 8, 2019, a month after the entry of the Decree, a team of CPD officers similarly raided Krystal Archie's apartment, ordered Ms. Archie's fourteen-, eleven-, and seven-year-old children to the floor, and pointed assault weapons at their faces and heads. Officers made thoughtless and cruel jokes as they rifled through Ms. Archie's home and needlessly damaged the family's personal property. The raid yielded no contraband whatsoever.[20]

In the early morning hours of March 25, 2019, CPD officers again targeted the wrong address and raided yet another home of a mother and her children who had been sound asleep when CPD burst in. During the raid, Chicago police handcuffed the family's eight-year-old son and forced him to stand alone outside in freezing rain for 35 to 40 minutes while officers tore through the family's home.[21]

On February 26, 2020, around 15 plain-clothes officers (some wearing "Ninja" masks) broke into Sharon Lyons's home with rifles, flashlights, and machine guns, without announcing their identity as police. The officers pointed guns in the faces of Ms. Lyons, her three adult sons, and her four-year-old granddaughter Lillie. One of Ms. Lyons's adult sons is autistic and has a

---

[16] Tate v. City of Chicago, 2019 WL 2173802 (N.D. Ill. May 20, 2019).

[17] Bures v. City of Chicago, 1:19-cv-02040 (N.D. Ill. Mar. 26, 2019). Video footage of the raid can be viewed at https://chicago.cbslocal.com/2019/03/25/chicago-police-wrong-raid-birthday-party-4-year-old/.

[18] Young v. City of Chicago, 1:19-cv-05312 (N.D. Ill. Aug. 6, 2019). For more information on this wrong raid, see https://chicago.cbslocal.com/2019/11/12/innocent-woman-chicago-police-handcuffed-me-while-i-was-naked-during-wrong-raid/.

[19] Mendez v. City of Chicago, 1:18-cv-05560 (N.D. Ill. Aug. 15, 2018). For video footage, see https://chicago.cbslocal.com/2019/10/03/chicago-police-officers-questioned-on-video-for-lawsuit-about-raiding-wrong-home/.

[20] Archie v. City of Chicago, 19-cv-04838 (N.D. Ill. July 19, 2019). For video footage, see https://chicago.cbslocal.com/2019/07/19/wrong-raids-chicago-police-krystal-archie-family-federal-lawsuit/.

[21] Wilson v. City of Chicago, 1: 19-cv-03550 (N.D. Ill. May 29, 2019). For video footage, see https://chicago.cbslocal.com/2019/05/28/another-family-says-chicago-police-pointed-guns-at-children-during-raid-handcuffed-8-year-old/.

learning disability. He cried and became hysterical when the officers pointed guns at him because he did not understand what was happening. The search ultimately yielded no arrests and no contraband. The officers left Ms. Lyons' home with a broken door and locks, leaving her family vulnerable to crime.[22]

A day later, another group of mostly plain-clothed officers used a battering ram to break into the home and conduct a night-time raid of an innocent Iraqi American/Latinx family. Officers pointed guns at a 70-year-old grandmother and her 4-year-old granddaughter in her lap, as the grandmother was reciting her night-time prayers before bed. When the little girl's mother went toward the room to check on her daughter, an officer turned and pointed the barrel of his long gun within a foot of her mother's face. The officers cursed and shouted at the family as they held them at gunpoint for ten minutes. As the officers continued to train their guns on the grandmother, mother, and child, other officers tore apart the family's apartment, broke their furniture, and made nasty comments about their home. The officers left the family shaking in fear around one in the morning amongst the rubble of their broken belongings and broken front door.

*Absence of accountability.* This pattern of poorly substantiated search warrants, raids of incorrect residential addresses, excessive use of force, and property destruction during the execution of warrants is not a recent development; it has been going on for decades.[23] CBS analysis of CPD data paints a portrait of police impunity. For example, the twelve officers who

---

[22] Lyons v. City of Chicago, 1:20-cv-03412 (N.D. Ill. Jun. 11, 2020). For video footage, see https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-raids/.

[23] See, e.g., Jacobs v. City of Chicago, 215 F. 3d 758 (7th Cir. 2000) (CPD officers conducted search of apartment in multi-unit building pursuant to a warrant that incorrectly identified building as a single family residence; officers detained one of the apartment residents for three hours during a search of his apartment for alleged drug activity, without having probable cause to know that resident was involved in the drug activity); Cooper v. Dailey, 2010 WL 1415986 (N.D. Ill. March 31, 2010) (CPD officers searched apartment with canine units despite awareness that targets of the search warrant, based on anonymous tip, were not present and the residents did not know anyone by that name); Draine v. Bauman, 708 F. Supp. 2d 693 (N.D. Ill. April 16, 2010) (CPD officers broke into a homeowner's residence using a battering ram, ransacked the home and stole numerous items, and left it unlocked after the search, which did not reveal evidence of a crime; the officer procuring the search warrant relied on the statement of an unidentified person, who was in custody in another district, who claimed to have bought drugs for more than a year from a person, whose real name he did not know, and from a house whose address he could not specify); Leon v. City of Chicago, 2011 WL 4738532 (N.D. Ill. Oct. 3, 2011) (CPD officers obtained a warrant to search the residence of plaintiff's next-door neighbor, but searched plaintiff's home instead; used a sledgehammer to breach the rear door of plaintiff's residence, drew guns and pointed them at the family's children, and ransacked the apartment before realizing they were in the incorrect home and departing); Guzman v. City of Chicago, 689 F. 3d 740 (7th Cir. 2012) CPD officer failed to call off search, once he learned that house was not single-family residence, as described in warrant, in that it contained a real estate office, it was not possible to get to the rest of the house from office, and there was a separate door for the first-floor apartment (where the target of the search lived); officer violated the second-floor resident's Fourth Amendment rights by forcing open the second-floor apartment door with a crowbar, entering with guns drawn, and forcing the pregnant resident, who was not the intended target of the search, to lie down on the floor).

7

authored the most affidavits in support of the search warrants that resulted in negative raids between 2016 and 2019 amassed 446 misconduct complaints. Of those complaints, 118 were for illegal searches. Only two of those 118 complaints were sustained and resulted in minimal discipline—a single day suspension and a reprimand. The same twelve officers responsible for the most negative raids accumulated 88 brutality complaints. None led to any discipline by CPD. To date, CPD has failed to discipline any officer for their conduct during any of the abusive raids reported by CBS.[24]

*Deficiencies in CPD's search warrant policy.* In an apparent response to the damning publicity generated by the CBS investigation and repeated civil right lawsuits, CPD revised its search warrant policy in early January 2020 to include language related to the treatment of children and the use of body cameras when executing search warrants.[25] However, these revisions fail to cure the deficiencies in the prior policies. CPD added 19 words to its warrants policy with respect to police interactions with children, requiring officers in the presence of children to "maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize trauma."[26] The revisions offer vague guidance at best; they fail to require or prohibit any particular conduct such as refraining from pointing weapons at young children.

*Deficiencies in CPD's new search warrant training.* The Department also provided an updated search warrant training to officers in January and February 2020.[27] While the training is a step in the right direction, it remains inadequate with respect to safeguarding children from unnecessary trauma. The training also fails to emphasize the critical nature of adhering stringently to the body camera policy. Equally problematic, the policy defines "safety" primarily in terms of officer wellness, as opposed to the safety of the people (often children) who are living with or in close proximity to the target of a warrant.

*Failure to measure up to other departments' policies nationwide regarding officer interaction with children.* CPD's policy regarding youth interactions falls short of policies in other cities, as well as those advocated by the International Association of Chiefs of Police (IACP). This is especially the case with respect to circumstances involving the arrest of a parent in a child's presence, a situation particularly likely to inflict lasting psychological trauma.

---

[24] *See* Dave Savini, Samah Assad, Michele Youngerman, *Another Chicago Family Wrongly Raided, just 1 Month after Police Created Policy to Stop Bad Raids*, (July 17, 2020) at https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-raids/; Dave Savini, Samah Assad, Michele Youngerman, Rebecca McCann, [*Un]warranted* (May 18, 2020), at https://storymaps.arcgis.com/stories/63ce5770e1ed43bea99d1d8274b94f91.

[25] Chicago Police Department Special Order S04-19, Search Warrants, Jan. 3, 2020, available at http://directives.chicagopolice.org/directives/data/a7a57be2-12a76ce1-24512-a76c-e6f5e256f0ef4e84.pdf?hl=true.

[26] Id. at 9.

[27] "Chicago Police Departments and Search Warrants in the 21st Century: Protecting You by Training You."

For example, San Francisco's police department issued a General Order specifically addressing officer interactions with children when arresting a parent, which requires officers to be aware of items that may suggest the presence of children when entering a home and give parents opportunities to reassure children and explain what is happening.[28] Indianapolis's policy outlines detailed protocol for potential interactions with social services agencies like Child Protective Services at the scene of a search or arrest, geared toward minimizing trauma resulting from these types of police interactions.[29] In Connecticut, Manchester and Waterbury police use the Responding to Children of Arrested Parents Together (REACT) model, which seeks to minimize traumatic stress in children, provides training and resources for law enforcement, and improves collaboration between law enforcement, mental health, and child welfare systems to more effectively deliver services to children in cases where parents are arrested.[30] The IACP recommends that departments nationwide implement specific policies to improve interagency coordination, officer training, pre-arrest planning, documentation, and follow-up to minimize trauma to children following a parent's arrest.[31] Strategies for Youth, a national policy and training organization focusing on improving interactions between police and youth, recommends that officers utilize a developmentally-appropriate, trauma-informed approach when interacting with children by considering the children's age, the reason for the search or the parent's arrest, and the children's emotional response.[32]

**Necessary Remedies**

CPD has failed to embrace the spirit and guiding principles of the Decree. To remedy this, we demand that CPD ban the use of no-knock warrants. In addition, CPD must:

- o modify its policies, training, and supervisory practices for obtaining and executing residential search warrants;

---

[28] San Francisco Police Department General Order, Children of Arrested Parents (May 7, 2014). Also in California, Fresno's police department created a Children Exposed to Domestic Violence team, designed to provide services that go beyond those typically provided by patrol, such as developing a connection to the family, identifying needs and providing referrals to services. The Fresno department also implements policies aimed specifically at mitigating the trauma of exposure to parental arrest.

[29] Indianapolis Metropolitan Police Department General Order 1.18, Child in Need of Services (CHINS) (Jan. 1, 2007).

[30] Manchester Police Department Policy, Chapter 9, Section 12, Mentally Ill or Gravely Disabled Individuals, Crisis Intervention Model Team (CIT), and REACT Model (December 2013. For a longer discussion of model practices for law enforcement agencies when arresting parents in the presence of children, see Lisa H. Thurau, First, Do No Harm: Model Policies for Law Enforcement Agencies When Arresting Parents in the Presence of Children, USDOJ Office of Justice Programs Diagnostic Center.

[31] International Association of Chiefs of Police Report, Safeguarding Children of Arrested Parents (August 2014). See also Connecticut Center for Effective Practice, A Collaborative Model to Support Children Following a Caregiver's Arrest: Responding to Children of Arrested Parents Together (REACT), September 2012.

[32] Strategies for Youth Protocol Recommendations, available at https://strategiesforyouth.org/sitefiles/wp-content/uploads/2012/09/First_Do_No_Harm_Report.pdf.

o   record and publish additional data about each warrant and its execution;
o   hold officers and supervisors who violate these policies strictly accountable for their conduct, including through discipline and/or termination; and
o   subject these practices to close monitoring by the Independent Monitor, Attorney General, and Coalition.

*Search warrant policy and training.* CPD must modify its search warrant policy and training to improve the accuracy of residential search warrants and raids, ensure developmentally-informed interactions with children to minimize trauma, and increase accountability for officers. We demand that the City immediately begin work with the Coalition to:

(1) Implement best-practices training for officers charged with investigating and executing warrants.

(2) Require affiants to perform limited surveillance of the target address and apartment number in order to verify that the target's address and apartment number provided by the informant are accurate and current.

(3) Prohibit officer affiants from relying solely on informants' representations of the target's address and apartment number and require officers to independently verify and corroborate this information with at least one additional, non-informant source.

(4) Require affiants to use CPD's Accurint account to check the address and apartment number provided by the informant.

(5) Require affiants to report in their applications for search warrants:
    i)   the specific, independent investigation and limited surveillance that the affiant undertook to verify that the address and apartment number given by the informant are accurate and current, and
    ii)  whether the affiant actually verified the address and apartment number given by the informant.

(6) Require supervisory approval of all complaints for search warrants before they are submitted to the State's Attorney and Court.

(7) Before approving a complaint for search warrant, require the CPD unit supervisor to ascertain:
    i)   the specific, independent investigation and limited surveillance that the affiant undertook to verify that the target's address and apartment number given by the informant are accurate and current, and
    ii)  whether the affiant actually verified the target's address and apartment number provided by the informant.

*Interactions with children.* CPD must modify policies to add provisions specifically geared toward safeguarding children from trauma, including the following:

10

(1) Require officers, before presenting an application for a residential search warrant to an issuing judge, to conduct a reasonable investigation to determine whether children reside in the home and when they are least likely to be present and to document this in their application to the judge.

(2) Require officers executing a search warrant to make reasonable efforts to determine *ex ante* whether the subject of the search or arrest has children and whether they will be present.

(3) Require officers responding to a dispatch call to request that the dispatcher inquire and inform whether children are present on the scene.

(4) Require officers, when entering a residence in order to execute a search or arrest warrant, to inquire promptly whether children are in the residence and where they may be found.

(5) Require officers executing a search warrant in a residence where children reside to plan the method of entry in a manner that is least likely to traumatize children. Require officers to select mechanisms of force and developmentally-appropriate language that are least likely to traumatize children physically and psychologically.

(6) Prohibit officers from pointing firearms at, handcuffing, or restraining young children.

(7) Prohibit officers from pointing firearms at, handcuffing, or restraining parents or close relatives of children in the children's presence, barring exceptional circumstances in which there is an imminent risk of death or great bodily harm.

(8) Prohibit officers from cursing, threatening, name-calling, mocking, making jokes and sarcastic comments, using disdainful tones, and using other derogatory or dehumanizing language when executing a residential search warrant, especially in the presence of children.

*Officer training for interactions with children and youth.* We demand that CPD implement a training program for both new recruits and in-service officers specifically geared toward interactions with children, including on the policies highlighted above. This training should educate officers about implementing developmentally-appropriate, trauma-informed approaches for all interactions with children and youth, including tactics for recognizing trauma symptoms and acknowledging the role trauma plays in the lives of children and youths. Training should include members of interagency teams, with the objective of enabling all members of interagency teams who may interact with children to understand the impact of trauma on brain development and behavior; the importance of recognizing and responding appropriately to traumatized behaviors; the practice of de-escalation skills to avoid escalating interactions and traumatizing children, youth and family members; and the ways that history, race and gender affect community perceptions of police in Chicago.

*Policies specifically addressing protocol for officer interaction with children when arresting a parent.* We demand that CPD work with the Coalition to develop and implement a policy that directly address officer interaction with children when arresting a parent. The policy

should be targeted toward minimizing trauma to children resulting from the arrest of the parent. The policy must include the following provisions:

(1) Require officers to employ a developmentally-appropriate, trauma-informed approach when interacting with children while arresting a parent.

(2) Require officers to make the arrest of a parent or caretaker, including handcuffing and questioning, in a location away from the child's sight and hearing, unless doing so would create an imminent threat to the safety of others.

(3) Require officers to give children a chance to speak with arrested parents, give parents the opportunity to explain and reassure their children, or offer children an age-appropriate explanation of what is happening to the parent, , unless doing so would create an imminent threat to the safety of others.

(4) Prohibit officers from interrogating or questioning children during home raids, barring exceptional circumstances in which asking a child a few limited questions is necessary to protect the safety of the people present in the home.

(5) Require officers to make arrangements for the care of dependent children subsequent to the parent's arrest, consistent with the parent's or caretaker's direction, unless officers have probable cause to believe that the children are abused or neglected. If so, officers should call for the assistance of DCFS.

(6) Prohibit officers from leaving the scene of an arrest until children are in the care of an appropriate caregiver. When a child is not present but the arrested parent is responsible for his or her care, the officer must allow the arrested parent to make arrangements for the care of his or her child.

(7) Following a parental arrest, require officers to, where possible, provide referrals to child, family and youth services to help mitigate potential subsequent trauma.

*Policies requiring comprehensive tracking and monitoring of search and arrest warrant data.* CPD must implement rigorous documentation requirements for the execution of search and arrest warrants and maintain a database regarding the same. This will allow for comprehensive and accurate data regarding the reasons for negative search warrants, the officers most frequently involved in negative search warrants, and the geographic areas where negative warrants are most frequently executed. CPD must also report this data to the Monitor to ensure accountability and compliance with the Consent Decree.

(1) Require officers to document and track "negative" search warrants (e.g., that the target was not present or did not reside there) and supervisors to assess and document with the affiant officer the reasons for the negative result.

(2) Require CPD to maintain records of which officers conducted negative warrants, in order to track individual officers and informants with repeated negative warrants and take appropriate remedial and/or disciplinary actions.

(3) Require officers who execute residential search warrants to prepare a damage report prior to departing the premises in order to document all property that officers damaged during

the course of entering and searching the residence. Hold CPD officers accountable for immediately securing the home subsequent to the search and repairing any resulting damage.

(4) Require all officers to wear and activate body cameras when executing a residential search or arrest warrant. All officers conducting law enforcement-related activities or who are reasonably expected to have law enforcement-related contact with civilians must be issued body-worn cameras.[33] There should be no exemptions from the body-worn camera mandate, and there should be strict discipline, including a permanent bar from the participation in the execution of search warrants, for every officer who fails to activate his or her camera before entry or deactivates his or her camera without permission from a supervisor at any point before the end of the entire encounter.

(5) In the event of parental arrest, require officers to provide documentation of the arrestee's children and their subsequent care arrangements in the arrest report. The documentation shall include at minimum: the identity, age, and biographical information of the child involved (whether or not present); any special need (such as medical or mental health conditions); the identities, addresses, and contact information for any actual or potential caregivers; names and contact information of any representatives from child welfare service agencies or other partner organizations involved in the incident; the final placement determination for the child; and any information that indicates the need for follow-up to ensure the child's future safety and well-being.

(6) Improve documentation requirements regarding children. Require officers who conduct a residential search or make an arrest in a residence to note in the incident/arrest report the existence of a child, whether present or not. Require CPD to track and compile data regarding the number of children affected by a parent's arrest and where they were subsequently placed.

(7) Require CPD to provide documents, data, and video footage that relate to the planning and execution of each residential warrant to the Monitor, the Attorney General, and the Coalition to enable them to monitor CPD use of force and treatment of children and their caretakers in CPD raids of people's homes.  Annually, require CPD to map the locations of all executed warrants, including the location of negative warrants.

As is all too clear from the worldwide protests following continued unjustified killings of Black people by police, including the shooting of Breonna Taylor in her home in Louisville following a raid that bears striking similarities to raids in Chicago documented throughout this letter, the costs of doing nothing are unconscionable. Superintendent Brown announced that he recognized ongoing deficiencies in CPD policies, practices, and monitoring that have led to these wrong raids, and welcomed the opportunity to work with the community to improve. Please let us know when we can meet to discuss the implementation of these remedies.

---

[33] See BWC Policy Statement, ACLU (Mar. 6, 2020).

13

Sincerely,

/s/ Craig B. Futterman_____
Mandel Legal Aid Clinic
University of Chicago Law School

/s/ Sheila A. Bedi_____
Bluhm Legal Clinic
Northwestern Pritzker School of Law

/s/ Karen Sheley_____
Director,
ACLU of Illinois Police Practices Project

*On behalf of the Coalition*

Cc:    Maggie Hickey
        Chris Wells
        Shareese Pryor
        Alicia Weber
        Aaron Wenzloff
        Joe Ferguson

14