**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

## INDEPENDENT MONITORING REPORT 3

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Independent Monitoring Report 3.

Dated March 30, 2021

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on March 30, 2021, she caused a true and correct copy of the foregoing **Independent Monitoring Report 3** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com



Independent Monitoring Team | Chicago Police Department Consent Decree

# INDEPENDENT MONITORING REPORT 3

*Reporting Period March 1, 2020, through December 31, 2020*

Report Date: March 30, 2021

# Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[1] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> *2. The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.[2]*

---

[1]   For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[2]   We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Resources*, Chicago Police Consent Decree ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

**Table of Contents**

Executive Summary ............................................................. 1

Roadmap ........................................................................... 14

Introduction ...................................................................... 15

Compliance Activities and Assessments ........................... 20

    I. Community Policing ................................................. 43

    II. Impartial Policing .................................................... 97

    III. Crisis Intervention ................................................ 172

    IV. Use of Force ......................................................... 247

    V. Recruitment, Hiring, & Promotions ...................... 394

    VI. Training ................................................................ 406

    VII. Supervision ......................................................... 459

    VIII. Officer Wellness and Support ............................ 484

    IX. Accountability and Transparency ......................... 528

    X. Data Collection, Analysis & Management ............. 706

    XI. Implementation, Enforcement & Monitoring ...... 750

Conclusion and Looking Ahead to
Independent Monitoring Report 3 ................................... 763

Attachment A.
Office of the Illinois Attorney General Comments ........... 764

Attachment B.
City of Chicago Comments ............................................. 772

***

Readers of the electronic pdf can click sections above to jump to the corresponding sections of the report.

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City's compliance with the requirements of the Consent Decree. Specifically, we assess how all relevant City entities—including the CPD; the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[3] Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports.[4] In July 2020, we filed the Monitoring Plan for Year Two, which outlined the projected monitoring efforts under the Consent Decree for Year Two (March 1, 2020, through December 31, 2020).[5]

This is Independent Monitoring Report 3. Here, we discuss our monitoring efforts during the third reporting period, from March 1, 2020, through December 31, 2020.[6] The report includes, among other things required by the Consent Decree, the following:

- an updated compliance or status assessment from the previous reporting period;

- a compliance or status assessment for each new paragraph we identified for this reporting period in our Monitoring Plan;

- a summary of the principal achievements and challenges facing the City's ability to comply with the Consent Decree; and

- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the Independent Monitoring Team (¶661).

The semiannual reports—of which this is the third—give us the opportunity to update the Court and the public about the City's compliance efforts. The Consent Decree generally prevents the IMT from making any public statements or issuing

---

[3] As a party to the Consent Decree, the City is ultimately responsible for compliance. Unless otherwise specified, our references to the City typically include its relevant entities.

[4] The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Resources*, at https://cpdmonitoringteam.com/reports-and-resources/.

[5] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports*, INDEPENDENT MONITORING TEAM (July 3, 2020), https://cpdmonitoringteam.com/overview/reports-and-resources/. Note that the monitoring period was extended due to COVID-19.

[6] As explained in our Monitoring Plan for Year Two and further below the Office of the Illinois Attorney General and the City of Chicago agreed to extend the third reporting period to December 31, 2021, in response to early COVID-19 shutdowns.

findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of five years, this is the third of at least 10 semiannual Independent Monitoring Reports.[7]

We also note that the Consent Decree is a complex document that resulted from long and substantive negotiations between the City and the OAG. Throughout the reporting period, and in this report, we have aimed to address the nuances of the agreement fairly and accurately.

The monitoring process contains some tensions that we address in both our monitoring efforts and this report. For example, there is—and likely will continue to be—a tension between the City's need to make compliance efforts quickly and the need to ensure that its efforts are effective and sustainable. Because the Consent Decree prioritizes both goals, we do too. We recognize that if the City rushes to meet a deadline by creating a policy without, for example, the requisite community involvement, then that may have the unintended effect of delaying the date the City reaches full compliance if the City must later re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report. *For this reason, we recommend that readers read this report in full and do not take sections of the report out of context.*

We know that many readers will be most interested in learning where the IMT has found the City, the CPD, and the other relevant entities to be in compliance or not in compliance with the Consent Decree. But, in reviewing this report, it is important to keep three things in mind regarding the scope and significance of our compliance assessments.

First, this report represents a snapshot of the City's compliance efforts from March 1, 2020, through December 31, 2020. It does not reflect all of the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after December 31, 2020, and before the date we submit this report. We have not assessed efforts made after December 31, 2020, in this report.

---

[7] We provided a draft of this report to the City and the OAG on January 30, 2021, as required by ¶¶661–65. After identifying versioning issues with the Training section, the IMT provided an updated draft of that section on February 5, 2021. Per ¶663, the OAG and the City then provided written responses on February 12, 2021, and February 15, 2021, respectively. The City provided a response to the updated Training section on February 19, 2021. On March 2, 2021, the IMT provided an updated draft to the Parties. The Parties provided feedback on March 18, 2021, and March 25, 2021, respectively. *See* Attachment A (OAG comments) and Attachment B (City comments).

We will do so in the monitoring report for the fourth reporting period (January 1, 2021, through July 31, 2021).

Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the life of the Consent Decree with the Court; the City and its relevant entities; the OAG; and the public. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or relevant entity has appropriately implemented the reform.

Third, because of the nuances of each specific requirement and level of compliance, the City and its relevant entities must provide the IMT with records and data—in a timely manner—to establish that they have reached each level of compliance during the applicable reporting period.

This point is critical. Under the Consent Decree, the City, the CPD, or other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the IMT is satisfied that the City provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. Even if the City has made significant efforts toward complying with a requirement—which in many cases it has—the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its effort and allowing sufficient time for the IMT to review the information.

To reflect the City's and its relevant entities' progress through the Consent Decree process, we have added more specific categories for each of the three levels of compliance:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced per ¶720, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not finish within a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not yet met a lower level of compliance.

## Major Developments and Challenges Impacting Compliance

This is our third monitoring report, which includes our assessments of the City's and its relevant entities' compliance efforts from March 1, 2020, through December 31, 2020.[8] We filed our second report—which covered the City's compliance efforts from September 1, 2019, through February 29, 2020—on June 18, 2020, while Chicago and the country were in the midst of a pandemic, an economic crisis, a social justice movement, widespread protests, and large-scale unrest. Because the second reporting period covered the City's compliance efforts from August 31, 2019, through November 15, 2019, our second report did not address those events or the corresponding challenges.

In short, the City and its entities faced distinct challenges during the third reporting period. We provide more details in the "The City of Chicago's Principal Achievements and Challenges" section below, but here we note a few of the major changes, challenges, and events that impacted our compliance assessments throughout the third reporting period: COVID-19; protest and unrest; officer injuries, deaths, and suicides; personnel changes; community engagement efforts; record productions; and new citywide units to respond to summer incidents and violent crime.

### COVID-19 Pandemic

The third reporting period was directly impacted by COVID-19. For example, because of the early shutdowns in response to COVID-19, the City and the OAG, collectively the Parties, agreed to extend the third reporting period to December 31, 2020. Likewise, on March 27, 2020, after an unopposed motion by the City, the Court entered an extension order.[9] The extension order stated that "all the future obligations and deadlines under the Consent Decree, including those for the City of Chicago, State of Illinois, and Independent Monitor, [are] extended for the

---

[8] We filed our first report—which coved from March 1, 2019, through August 31, 2019—on November 15, 2019. We filed our second report—which covered from September 1, 2019, through February 29, 2020—on June 18, 2020.

[9] *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

longer of 30 days or the time period the COVID-19 Executive Order No. 8 issued by the Governor of the State of Illinois remains in effect."[10] As a result, the Parties agreed to extend all deadlines in the Consent Decree by the 64 days that Governor J.B. Pritzker's Executive Order was in effect (March 27, 2020, through May 29, 2020).

Despite uncertainties regarding COVID-19, including the likelihood of infection, transmission, or serious harm, many City personnel, first responders, community members, and their families continued to serve Chicago throughout the continuing pandemic. As a result, thousands of people who served Chicago contracted COVID-19, and many lost their lives. We thank these Chicagoans and their families for tireless their service and sacrifices.

COVID-19 has continued to challenge the City; the City's entities, including the CPD and the COPA; and our communities. We have attempted to identify those challenges throughout this report.

Finally, the Parties agreed to adjust the third reporting period to make the Consent Decree's reporting periods match the calendar year, which is closer to the Parties' original intent. Specifically, reporting periods in Consent Decree Years Three, Four, and Five will now correspond with the start, middle, and end of 2021, 2022, and 2023, rather than corresponding with the March 1, 2019 effective date of the Consent Decree. Thus, the fourth monitoring period, which began on January 1, 2021, will end on June 30, 2021, and subsequent reporting periods will follow the usual six-month cycle (January through June or July through December).

## Protests and Unrest

As with many cities across the country, this past summer Chicago experienced a social justice movement with large and sustained protests. During the same period, Chicago also experienced unprecedented unrest. Specifically, on May 25, 2020, the nation watched George Floyd die under the knee of a police officer in Minneapolis, Minnesota. Communities across the country responded with protests and civil unrest. *See, e.g.*, ¶163 and 509 (referring to protected First Amendment activity, including lawful demonstrations and protected speech). Varying levels of protests and unrest continued throughout the reporting period and may continue.

Many of the protests called for varying forms of increased police accountability and reform. And many of these calls for action include or relate to requirements

---

[10]  *Id.*

across the Consent Decree.[11] These and other related Consent Decree requirements have various deadlines throughout the City's implementation of the Consent Decree, as reflected in the Consent Decree and our annual monitoring plans.[12] Our Monitoring Plan for Year Two, included many of the paragraphs related to the increased calls for police accountability and reform.[13] As a result, this report, our third semiannual monitoring report, provides updated assessments on the City's progress toward meeting many of those requirements between March 1, 2020, and December 31, 2020—after George Floyd's death and the protests and unrest that followed.

With the protests and unrest, Chicago experienced a rise in related law enforcement activities that span issues covered by the Consent Decree. On June 5, 2020, in the midst of the protests and unrest in Chicago, the IMT announced that we would prepare a special report on the City's and the CPD's response to the protest and unrest over the summer.[14]

During that review, we sought direct input from a variety of sources—including, but not limited to, members of Chicago's communities, the CPD, the Civilian Office of Police Accountability (COPA), and other City entities—in preparing the report.[15]

---

[11]   *See, e.g.*, ¶¶30–31 (prominently displaying arrestee rights); 48 (community partnerships, effective de-escalation, and community-oriented crime prevention strategies); 54–55 (prohibitions on discrimination based on protected classes); 86 (alternatives to arrest); 126 (crisis intervention training); 156–57 (sanctity of human life; professionalism; de-escalation; tactics to eliminate or reduce the use of force; only using force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; prohibiting the use of force to punish or retaliate; stopping force when it is no longer necessary; truthfully and completely reporting all reportable uses of force; reporting excessive uses of force and violations of policy; accountability for violations; and promoting community trust); 163 (prohibiting the use of force to punish or retaliate against a person engaging in First Amendment activity); 165 (prohibiting deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person); 173 (requesting and rendering medical aid); 175 (duty to intervene when another officer is using excessive force); 178 (prohibition on using carotid artery restraints or chokeholds unless deadly force is authorized); 229 (supervisors review all reportable uses of force); ¶246 (annual use-of-force training); 248 (pre-service promotional supervisory training); 352 (supervisors to enforce expectation that members perform duties consistent with procedural justice, de-escalation, impartial policing, and community policing); 411 (Traumatic Incident Stress Management Program); 587 (database to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer).

[12]   "The City will endeavor to achieve full and effective compliance within five years of the Effective Date [March 1, 2019]." ¶714.

[13]   The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports*, INDEPENDENT MONITORING TEAM (July 3, 2020), https://cpdmonitoringteam.com/overview/reports-and-resources/.

[14]   Paragraph 665 of the Consent Decree permits the Independent Monitor to "prepare written reports on any issue or set of issues covered by" the Consent Decree.

[15]   Under ¶667, the Independent Monitoring Team also coordinated and conferred with the Office of Inspector General for the City of Chicago during the review. The Office of Inspector General has a separate jurisdiction from the IMT, and its corresponding report, which covers

Unlike this monitoring report, the special report will provide more of a gap analysis of the City's efforts toward full and effective compliance with requirements of the Consent Decree that relate to responses to protests and unrest, rather than an assessment of timelines and benchmarks. Because the IMT will be releasing this special report soon after this monitoring report, this report does not address those issues directly.[16]

In addition to these challenges, the City and the CPD had other challenges in the third reporting period, including (1) Personnel Changes, (2) Community Engagement, (3) Record Production, and (4) New Citywide Units.

## Personnel Changes

As referenced in our previous reports, the CPD has had three superintendents since the Consent Decree process began. Changes in leadership and corresponding transitional periods can create logistical and culture challenges that can slow reform. Most recently, in April 2020, after a national search, former Chief of the Dallas Police Department David Brown became the Superintendent, taking over for Interim Superintendent Charlie Beck. Since then, Superintendent Brown has committed to the CPD's efforts toward police reform. In a video posted to the CPD's Reform website, Superintendent Brown notes his commitment to the reforms:

> *Since day one, I've made it clear that we will meet the requirements of the Consent Decree. Compliance is not optional. The Consent Decree builds upon a series of proactive reforms introduced in 2017 and serves as our road map to build and restore trust with our communities; strengthen our commitments to supervision, accountability, and transparency; and provide the best training, equipment, and resources our officers need and deserve.*[17]

The CPD has also faced challenges with other high-level retirements, including First Deputy Superintendent Anthony Riccio in early August 2020, Chicago Police Chief Fred Waller later in August 2020, and First Deputy Superintendent Barbara West in September 2020.

---

from May 29, 2020, through June 7, 2020, is available on its website. *See Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), www.igchicago.org/2021/02/18/report-on-chicagos-response-to-george-floyd-protests-and-unrest/.

[16] The special report will follow the same process as the monitoring reports, including the draft and review periods. *See* ¶665.

[17] *See A Better CPD for Everyone*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/reform/ (last visited March 1, 2021).

## Community Engagement

In the third reporting period, the CPD struggled with community engagement in new ways. In our first two reports, we raised concerns about the CPD's lack of community engagement during its policy development processes. In the third reporting period, the CPD made significant efforts toward community engagement, even after the COVID-19 pandemic started inferring with in-person engagement. With these new efforts, however, the CPD faced new challenges. As detailed further in this report, near the end of the reporting period, the CPD began to use experts and attempt to mitigate issues created by its earlier efforts.

## Record Productions

The City built from the progress that we saw regarding record productions from the second reporting period: We received more records, regarding a wider range of topic areas, and received many records earlier in the reporting period than we did last time. The City and some if its entities also made considerable efforts to avoid large record productions in the last two weeks of the reporting period.

Nonetheless, the City and some of its entities still sent a significant portion of records near the end of the reporting period. Specifically, the City provided about 30% of the records in the last month of the reporting period—25% of which was in the last two weeks of the reporting period. As it did in the first two reporting periods, later productions limit our ability to review the materials and provide necessary follow-up comments and questions to fully understand and verify compliance efforts. We therefore must continue to raise this issue, because future reporting periods (1) will include more requirements, (2) will likely require the production of more records and data for establishing higher levels of compliance, and (3) will be shorter (six months), which will give the CPD less time to produce records.

Further, members of the CPD have acknowledged that they have faced production challenges and have produced records that either do not establish compliance efficiently or do not establish compliance at all. This slows the record production and review processes and may detract from the City and the CPD's meaningful compliance efforts and assessments.

Near the end of the reporting period, the CPD provided plans to the IMT and the OAG to better allocate resources to increase quality control for record productions. The IMT appreciates that the CPD has acknowledged this issue, and we look forward to improvements in future reporting periods.

## New Citywide Units

In the third reporting period and in response to summer violence and unrest, the CPD created two citywide units during this reporting period: the Critical Incident

Response Team (CIRT) and the Community Safety Team (CST). Both teams have significant ramifications for the CPD's compliance with various sections of the Consent Decree, including Community Policing; Impartial Policing; Crisis Intervention; Use of Force; Supervision; Accountability and Transparency; and Data Collection, Analysis, and Management.

The IMT understands that the number of officers in these teams has grown significantly since their inception, which creates a challenge for the CPD to achieve compliance with various Consent Decree requirements, including establishing the requisite unity of command and span of control. In the third reporting period, the City and the CPD provided limited records regarding these two teams. Without clear policies, standard operating procedures, or goals, we continue to have concerns regarding the challenges that these types of teams present and Chicago's history with roving teams. We expect the CPD to consider how communities respond to such teams and how policing strategies affect relationships between officers and the communities they serve. The IMT has and will continue to raise these concerns until the CPD addresses the concerns with the IMT, the OAG, and Chicago's communities, as required.

## Compliance Assessments and Deadlines

At the end of the third reporting period, we assessed 315 paragraphs. As reflected in Summary Figure 1 below, we found that the City achieved at least Preliminary compliance with 154 of these paragraphs.

As explained further below, in the third reporting period, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to the significant unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT, the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs. As a result, in each corresponding section, we also provide compliance status updates for another 96 paragraphs.

Summary Figure 1:        Consent Decree Compliance by December 31, 2021



| | |
|---|---|
| Paragraphs in at least Preliminary compliance | (154) |
| Paragraphs that have not met Preliminary compliance | (120) |
| Paragraphs Under Assessment for Preliminary Compliance | (41) |
| | Total: 315 |
| Paragraphs with Compliance Status Updates | (96) |
| | Total: 411 |

Of course, some paragraphs in the Consent Decree demand more effort to comply with than others do. The number of requirements—and the amount of work required under each requirement—can vary substantially within each paragraph, topic area, and reporting period. Moreover, some of the paragraphs that have requirements in the third reporting period also include requirements that do not apply until later reporting periods. As a result, we have either not assessed or not finished assessing some of the requirements in the paragraphs relevant to the third reporting period.

The City and the OAG also agreed to specific deadlines to ensure that the City was making significant efforts to comply with the Consent Decree in a timely manner. As reflected in Summary Figure 2 below, the IMT determined that the City met 17 of the 43 agreed-upon deadlines in the third report.[18] While the City missed 26 deadlines, the City met underlying requirements of two of those paragraphs before the end of the reporting period.

Summary Figure 2:                                 Deadlines in the Third Report



In sum, the City and the CPD did not meet most of the deadlines and compliance obligations in the third reporting period. At the end of each reporting period, we will continue to update the public in each monitoring report about whether the City has met the deadlines in the corresponding reporting period and whether the City has caught up by achieving the benchmarks of missed deadlines from previous reporting periods.

Summary Figure 3 shows that, of all the Consent Decree paragraphs with deadlines in this third reporting period, we determined that the City reached Preliminary compliance with 121 paragraphs, Secondary compliance for 32 paragraphs, and Full compliance for one paragraph. The City did not reach any level of compliance for 120 paragraphs with deadlines in the third reporting period.

---

[18]   In its comments, the City notes that some deadlines predate the third reporting period. *See* Attachment B. We created the Monitoring Plan for Year One and Year Two through collaboration with the Parties, which required prioritizing the assessment of some paragraphs over others. As a result, some paragraphs with deadlines—such as some that were near the end of Year One—were assessed for the first time in the third reporting period. The Consent Decree does not permit us to ignore these deadlines.

Summary Figure 3:     Compliance Status at the End of the Third Reporting Period
December 31, 2020:
Paragraphs Assessed: 315



Paragraphs in Preliminary Compliance — (121)
Paragraphs in Preliminary and Secondary Compliance — (32)
Paragraphs in Full Compliance — (1)
Paragraphs that are Not in Compliance — (120)
Paragraphs Under Assessment for Preliminary Compliance — (41)

Total: 315

The third reporting period represents the first half of Year Two of the Consent De-
cree. Midway through Year Two of this long-term project, the IMT remains pre-
pared to lean into challenges on the road ahead. In our next semiannual independ-
ent monitoring report, we will continue to assess and report on the paragraphs in
the Monitoring Plan for Year Two.

# Consent Decree Compliance
# by December 31, 2020

Summary Figure 4:           Compliance Status through Three Reporting Periods
                                                             Consent Decree Paragraphs: 313

**First Reporting Period**

Paragraphs with Any Level of Compliance       (13)

Paragraphs with Deadlines that are Not in Compliance       (37)
(*including under assessment*)

Foundational Paragraphs Under Assessment       (65)

**Second Reporting Period**

Paragraphs with Any Level of Compliance       (48)

Paragraphs with Deadlines that are Not in Compliance       (81)
(*including under assessment*)

Foundational Paragraphs Under Assessment       (87)

**Third Reporting Period**

Paragraphs with Any Level of Compliance       (154)

Paragraphs that are Not in Compliance       (120)

Paragraphs Under Assessment for Preliminary Compliance       (41)




Total: 315

Summary Figure 5: Consent Decree Deadlines before December 31, 2020



**First Reporting Period Deadlines** **(March 1, 2019 – August 31, 2019)**

**Second Reporting Period Deadlines** **(September 1, 2019 – February 29, 2020)**

**Third Reporting Period Deadlines** **(March 1, 2020 – December 31, 2020)**

# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the third reporting period required significant attention. As the IMT continues to move forward with its monitoring efforts and as we address additional requirements, the monitoring reports will also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with an **Introduction** section that provides background about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the third reporting period:

❖ An overview of the IMT's assessment process and priorities for the third reporting period, including deadlines and status updates;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the Consent Decree, a summary of relevant compliance efforts, a more specific analysis for each Consent Decree paragraph with a deadline before December 2020, and if applicable, a summary of efforts regarding the corresponding paragraphs that do not have specific deadlines.

Finally, the last section, **Conclusion and Looking Ahead to Independent Monitoring Report 4**, provides concluding remarks and a projection of the upcoming work by the IMT, the OAG, the City, the CPD, COPA, the City Office of Inspector General, the Police Board, and the City's other relevant entities in the third reporting period.

# Introduction

This is the IMT's third semiannual Independent Monitoring Report.[19] The report provides the IMT's monitoring activities and findings for the third reporting period—from March 1, 2020, through December 31, 2020. In July 2020, the IMT outlined its efforts in its public Monitoring Plan for Year Two.[20]

Specifically, consistent with the requirements of the Consent Decree, we address the following information throughout the sections of this report:

❖ The IMT's efforts during the reporting period;

❖ A description of each Consent Decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the principal challenges facing the City's ability to achieve complete compliance with the Consent Decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (January 1, 2021, through June 30, 2021).

This is the third monitoring report of many. Per ¶661 of the Consent Decree, the IMT will continue to issue semiannual reports until the Consent Decree ends— which is after the City has reached full and effective compliance for one to two years. *See* ¶¶693 and 714–15.

---

[19] We provided a draft of this report to the City and the OAG on January 30, 2021, as required by ¶¶661–65. After identifying versioning issues with the Training section, the IMT provided an updated draft of that section on February 5, 2021. Per ¶663, the OAG and the City then provided written responses on February 12, 2021, and February 15, 2021, respectively. The City provided a response to the updated Training section on February 19, 2021. On March 2, 2021, the IMT provided an updated draft to the Parties. The Parties provided feedback on March 18, 2021, and March 25, 2021, respectively. *See* Attachment A (OAG comments) and Attachment B (City comments).

[20] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (July 3, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/07/2020_07_03-Monitoring-Plan-for-Year-Two-filed.pdf. The City filed its third semiannual status report (¶680) with the Court on February 7, 2021 (38 days after the deadline). *See Chicago Police Department Reform Progress Update* (February 7, 2021, https://home.chicagopolice.org/wp-content/uploads/2021/02/CPD-Reform-Status-Report-compressed.pdf.

## Background: The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD.[21] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[22]

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the US Department of Justice's (DOJ's) findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[23]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft Consent Decree on the Chicago Police Consent Decree website.[24] Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, which was the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed

---

[21] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolice consentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPT REPORT.pdf.

[22] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[23] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[24] More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopolice consentdecree.org/independent-monitor/. Other resources, including Consent Decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

Maggie Hickey, a partner in the Schiff Hardin law firm, as the Independent Monitor. Ms. Hickey, as the Independent Monitor, reports directly to Judge Dow.[25]

## The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Intro Figure 6 on the next page, and our team structure is in Intro Figure 7 on the following page.

---

[25] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he "help[s] facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopo-liceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

Intro Figure 6. Organizational Chart



## Intro Figure 7. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| | Independent Monitor | Maggie Hickey |
| | Deputy Monitor | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| | Community Policing | Stephen Rickman |
| | Impartial Policing | Dennis Rosenbaum |
| | Crisis Intervention | Julie Solomon |
| | Use of Force | Paul Evans |
| | Recruitment, Hiring, and Promotion | Theron Bowman |
| | Training | Theron Bowman |
| | Supervision | Kathleen O'Toole |
| | Officer Wellness and Support | Kathleen O'Toole |
| | Accountability and Transparency | Harold Medlock |
| | Data Collection, Analysis and Management | Scott Decker |

| Community Engagement Team | | |
|---|---|---|
| | Subject Matter Expert, Analyst, and Support Staff | Tom Christoff |
| | Member | Joe Hoereth |
| | Subject Matter Expert | Meghan Maury |
| | Member | Laura McElroy |
| | Member | Elena Quintana |
| | Member (and Associate Monitor for Community Policing) | Stephen Rickman |
| | Member | Sodiqa Williams |
| | Community Surveys | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| | Project Director | Laura Kunard |
| | Attorney | Mir Ali |
| | Attorney | Derek Barella |
| | Attorney | Kirstie Brenson |
| | Officer Wellness and Support | Brandi Burque |
| | Crisis Intervention and Data Collection, Analysis, and Management | Tom Christoff |
| | Attorney | Meredith DeCarlo |
| | Use of Force and Data Collection, Analysis, and Management | Terry Gainer |
| | Attorney | Ariel Hairston |
| | Community Policing and Crisis Intervention | Bruce Johnson |
| | Training | Blake McClelland |
| | Accountability and Transparency | Laura McElroy |
| | Analyst | Mariana Oliver |
| | Community Policing | Hildy Saizow |
| | Lead Attorney | Anthony-Ray Sepulveda |
| | Attorney | Kylie Wood |
| | Supervision and Recruitment, Hiring, and Promotion | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| | Analyst for Solomon and Decker | Tom Christoff |
| | Project Manager, Analyst for Evans | Vivian Elliot |
| | Analyst for Rickman and O'Toole | Tammy Felix |
| | Analyst, Independent Monitoring Team Support | Mariana Oliver |
| | Deputy Project Manager, Analyst for Bowman | Keri Richardson |
| | Analyst for Rosenbaum and Medlock | Christopher Sun |

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the third reporting period. We begin by explaining our priorities for the third reporting period that we described in our Monitoring Plan for Year Two. We include an overview of the assessment process and the deadlines within the third reporting period. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the Consent Decree; provide a more specific analysis for each Consent Decree paragraph with a deadline before December 2020; and summarize status updates for other paragraphs.

## Assessing Compliance

Overall, in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years (¶714). We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** refers principally to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** refers principally to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary

records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels of compliance guide the IMT in its review of all paragraphs in the Consent Decree. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the third reporting period. Under the Consent Decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they comply. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

## Third Reporting Period Priorities

We set out our priorities for the third reporting period in our Monitoring Plan for Year Two.[26] Specifically, we prioritized (1) the paragraphs in the Consent Decree

---

[26] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (July 3, 2019), https://cpdmonitoringteam.com/wp-content/uploads/2020/07/2020_07_03-Monitoring-Plan-for-Year-Two-filed.pdf. Given the

with a deadline before December 31, 2020, and (2) the requirements agreed to by the Parties to the Consent Decree (the City and the OAG) and the IMT, regardless of whether the Consent Decree established a deadline for these paragraphs. Most of the paragraphs in these two categories contain requirements for the CPD.

These two categories of priorities, however, do not fully describe all of our efforts in the first three reporting periods. While we monitored the compliance efforts that corresponded with the paragraphs above, some paragraph deadlines fall after the third reporting period but still required the City and its entities to take steps during the third reporting period.[27] Similarly, many of our efforts are ongoing—regardless of deadlines—but are too premature to report here.

Thus, the IMT and the Parties have engaged in compliance and monitoring efforts in addition to those described in this report.

## Paragraphs with Deadlines

In our first three monitoring reports, we have assessed all paragraphs with deadlines before December 31, 2020. All deadlines are based on the Consent Decree. The City and the OAG agreed to these deadlines. The IMT did not—and cannot—unilaterally create or change deadlines for the third reporting period, nor for any other reporting period.

## Paragraphs without Deadlines

Many paragraphs in the Consent Decree do not contain deadlines, but after consulting with the Parties, the IMT began to assess some paragraphs that did not have deadlines in the first and second reporting periods. In Year One, these paragraphs involved foundational policy and practice requirements that are fundamental to the success of the Consent Decree. As a result, in the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

---

varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[27] The Consent Decree contains over 500 paragraphs with requirements, including those with deadlines in the third reporting period. We filed our Monitoring Plan for Year Two on July 3, 2020, per ¶652.

In the third reporting period, we added assessments for additional paragraphs without deadlines. As a result, paragraphs that are not in compliance do not necessarily reflect a missed deadline; we are monitoring compliance with them to match the pace of the five-year goal described in the Consent Decree.

After the IMT submitted the Monitoring Plan for Year Two, but during the third reporting period, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods because of the significant unforeseen challenges in 2020. After the City and its relevant entities provided written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the Consent Decree's requirements, the following subsection details the IMT's methodologies and activities in the third reporting period (March 1, 2020, through December 31, 2020). We summarize many of our efforts in Intro Figure 8 below.

Intro Figure 8: IMT Activities (March 1, 2020 through December 31, 2020)



~12K • Independent Monitoring Team Hours Worked

1 • Independent Monitoring Team Formal (Virtual) Site Visit to Chicago

~200 • Meetings with CPD, COPA, OIG, Police Board, or OEMC

~200 • Conference Calls by Consent Decree Topic Area

>6K • Documents Reviewed

>20 • Meetings with CPD Superintendent(s)

~100 • Meetings with the Parties

At the beginning of the Consent Decree process, the City; the CPD; COPA; the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create constant and open lines of communications.

Building on the efforts made in the first and second reporting periods, these communications continued throughout the third reporting period. The communications included regularly scheduled meetings (¶668) and regular teleconferences for each Consent Decree topic area. Because of COVID-19, our in-person meetings ceased, and we relied more heavily on teleconferences, Zoom, and Microsoft Teams meetings throughout this reporting period. We continued to use secure data-sharing systems. The IMT also continued to provide significant technical assistance (¶656), as requested.

Specifically, we met consistently with the CPD, COPA, the City Office of Inspector General, Police Board, and the OEMC; conducted one (virtual) formal site visit; and reviewed over 6,000 documents, as detailed in the chart above.[28]

A significant portion of our conversations involved discussing our methodologies for assessing the City's compliance with the Consent Decree. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility will ensure that our monitoring efforts continue to meet the letter and spirit of the Consent Decree as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances, particularly during a worldwide pandemic, may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the Consent Decree. We endeavor to supplement our methodologies with additional specificity throughout this report.

After our significant conversations with the Parties about our methodologies and about which paragraphs to include in our Monitoring Plan for Year Two, the City sought additional negotiations after that plan was filed with the Court on July 3, 2020. In November 2020, the City presented the IMT with a proposal to shift over 150 paragraphs from the third reporting period into the fourth reporting period. In additional discussions that included the OAG, the IMT ultimately did not object to postpone the compliance assessments of 94 paragraphs that did not have deadlines before December 31, 2020. Nonetheless, the City, the OAG, and the IMT

---

[28] The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

agreed that the IMT would still provide compliance updates for these 94 para-graphs.

Finally, in addition to making these efforts, the IMT continued to adhere to several specific and ongoing requirements of the Consent Decree. Intro Figure 9, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the third reporting period.

Intro Figure 9:        IMT Deadlines in the Third Reporting Period

| ¶s | Requirement | Deadline | Third Reporting Period Deadlines | Met or Missed |
|---|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines | Met (ongoing) |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines | Met (ongoing) |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Will occur during each reporting period | Met (ongoing) |
| 645–51 | Community Surveys | 180 Days (and every two years) | N/A for Year Two | N/A for Year Two |
| 652–55 | Monitoring Plan and Review Methodology | 90 Days (and every year) | June 3, 2020; draft by November 15, 2020 | Met (ongoing) |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing | Met (ongoing) |
| 667 | Coordination with the Office of Inspector General | Ongoing | Ongoing | Met (ongoing) |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly | Met (ongoing) |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly | Met (ongoing) |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing | Met (ongoing) |

## Community Focus Groups

Per ¶¶645-651, the IMT conducts "reliable, representative, and comprehensive surveys of a broad cross section of members of the Chicago community regarding CPD" every two years. The IMT conducted its first community survey during Year One[29] and will conduct another community survey during Year Three. In Year Two, the IMT decided to conduct community focus groups, which are in addition to the

---

[29] https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

requirements of the Consent Decree. Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we will undertake special studies of Chicago's communities during the years we are not conducting the ¶¶645–51 community surveys.

The first special study comprises a series of focus groups aimed at hearing the voices of young Black and Brown men ages 18–25. Similar to the topics addressed in our community survey, we will engage young men in discussions about their experiences with and opinions of the CPD. We are in the midst of recruiting participants for these focus groups and will share what we learn in an upcoming Special Report.

## The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academic scholars. These members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community component of compliance with the Consent Decree.

The IMT's Community Engagement Team's work is vital to create sustainable change at the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[30] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[31]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships

---

[30] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolice consentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPT-REPORT.pdf.

[31] *Id.* at 15.

based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicago residents about their concerns about CPD policies and practices, and (2) providing information to the Chicago community about the IMT's activities and findings.

One of the most important ways in which the IMT heard community voices during this reporting period was through the public Listening Sessions held by Judge Dow. On August 19 and 20, 2020, Judge Dow and the IMT listened to details from Chicago's communities for the Independent Monitor's special report about the City and CPD's responses to the protests and unrest since the tragic death of George Floyd in Minneapolis.[32] Fifty-eight community members provided oral statements during the public listening sessions, and 24 community members submitted written statements. In addition, the Community Engagement Team conducted in-depth interviews with 17 additional community members to learn about their experiences during the protests and unrest.

We also sought to hear sentiments from a broad range of Chicagoans during this reporting period. In May 2020, for example, we convened a virtual community meeting to explain the Consent Decree and the IMT's and the Coalition's role (¶670). *See* Intro Figure 10, below. Specifically, this meeting was organized by our Community Engagement Team and led by Independent Monitor Maggie Hickey.

---

[32] *See* Transcript of the August 19, 2020 Listening Session, *available at* https://cpdmonitoring-team.com/wp-content/uploads/2020/08/081920Listening-Sessions-FINAL-PROOFED.pdf; *and* Transcript of the August 20, 2020 Listening Session, *available at* https://cpdmonitoring-team.com/wp-content/uploads/2020/08/082020ListeningSession-Day-2-FINAL-PROOFED.pdf. *See also Notice Regarding Special Report* (June 5, 2020), https://cpdmonitoring-team.com/wp-content/uploads/2020/06/2020-06-05-Notice-Regarding-Special-Report.pdf.

Intro Figure 10: IMT Virtual Community Meeting Screen Shot

**Monitoring Team Gathers Community Input Virtually**

 

Members of the Independent Monitoring Team fielded community questions during an hour-and-a-half-long virtual meeting in May 2020. Elena Quintana, Ph.D, and Joe Hoereth, Ph.D, hosted the online discussion. It was designed to keep community members engaged in CPD reform despite COVID-19. The Zoom meeting allowed community members to share their thoughts and concerns about the CPD and its attempt to implement the requirements of the Consent Decree. Dr. Hoereth and Dr. Quintana are members of the Monitor's Community Engagement Team which works to capture community input as part of the team's assessment of City and the CPD's reform efforts. This type of community feedback is critical to ensuring reforms reflect the needs of the community.

We also issued periodic newsletters – in April, August, and November[33] – to update community stakeholders on our monitoring activities, including the results of our first community survey.[34]

Throughout this reporting period, the Community Engagement Team attended many virtual community meetings across Chicago, including meetings with the Coalition (*see* ¶669), community-based organizations, and CPD beat meetings. We summarize some of the Community Engagement Team's efforts in Intro Figure 11 below.

---

[33] The IMT's newsletters are available online. *See, e.g.*, *Help Reform the Chicago Police Department - Community Newsletter*, INDEPENDENT MONITORING TEAM (April 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/05/April-2020_IMTCommunityNewsletter-7.pdf; *Federal Court Listening Sessions – Community Newsletter*, INDEPENDENT MONITORING TEAM (August 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-3-August-2020.pdf; *Independent Monitoring Team Conducts Community Survey – Community Newsletter*, INDEPENDENT MONITORING TEAM (November 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-4-November-2020.pdf.

[34] The IMT's first Community Survey Report is available at https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

Intro Figure 11: IMT Community Engagement Efforts



## Get Involved

The Community Engagement Team works diligently to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/reform/policy-review/.

Community members may also participate in the monitoring process in the following ways:

- ❖ Attend our virtual public meetings listed on our website;
- ❖ Complete an input form on our website; and
- ❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## Contact the Independent Monitoring Team

Community members can reach out to the entire IMT via email (contact@cpdmonitoringteam.com) and also contact individual members of our Community Engagement Team:

❖ Sodiqa Williams (Sodiqa.Williams@cpdmonitoringteam.com),

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Elena Quintana (Elena.Quintana@cpdmonitoringteam.com).

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# The City of Chicago's Principal Achievements and Challenges

In our first two reporting periods, per ¶661, we summarized the "principal challenges or concerns related to the City's achieving full and effective compliance with this Agreement." As we indicated in both the first and second monitoring reports, many of these challenges cannot be resolved quickly and require long-term investments. In this section, we provide updates on these challenges, the City's efforts to address them, and new achievements and challenges that emerged in the third reporting period.

Independent of ¶661's requirement, we also summarize the City's principal challenges—both expected and unexpected—to present an accurate assessment of the City's reform progress. We do not discuss these challenges to provide excuses or levy undue criticism. Instead, we identified various hurdles to compliance for the City, its relevant entities, the OAG, the IMT, and the community, to identify solutions, provide recommendations, plan for improvements, and ultimately, to help the City reach compliance.

With that in mind, in the following subsections, we discuss the City's principal achievements and ongoing challenges. We set them out in the following interrelated areas (presented in the order that is easiest to follow, rather than in the order of the magnitude of each challenge):

❖ Staffing

❖ CPD Policy and Plan Review

❖ CPD's Community Engagement

As explained further below, many of these challenges continued to impact the City's progress during the third reporting period. As a result, the City, its relevant entities, and when applicable, the IMT and the OAG must continue to work through methods of solving or otherwise mitigating these challenges.

## Staffing

During the first two reporting periods, the IMT identified several staffing and resource needs. In late January 2020, Interim Superintendent Charlie Beck made significant changes to the CPD organizational chart, which placed responsibilities for the Consent Decree's reform efforts throughout the CPD's leadership.[35] In both

---

[35] *See News Release - CPD Announces Transformative Organizational Plan to Maximize Resources, Prioritize Reform and Move More than 1,100 Officers Closer To City Streets*, CHICAGO

July and October 2020, Superintendent David Brown made additional changes to the CPD organizational chart. As we noted above, changes in leadership can disrupt efforts toward reform during transition periods and this report reflects that challenge.

Many of the City's and CPD's efforts and achievements in the first two reporting periods continued into the third reporting period. The City Department of Law, along with the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78), continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

We recognize that City and CPD resources are limited. As referenced above, the City and the CPD have already added many resources to their compliance efforts.

In our previous reports, we recommended that the City and the CPD increase resources and staffing to various departments. In response, the CPD increased staffing in the following departments:

❖ **The Research and Development Division.** The Research and Development Division frequently works with the IMT to develop compliance documents and policies. Increases in staffing in this department reduced bottlenecking with limited personnel.

❖ **The Force Review Division.** As discussed further in the Use of Force section below, the Force Review Division is critical to several Consent Decree requirements. The CPD agreed that the workload of this division was greater than the division's capacity and increased staff in the second reporting period.

❖ **The Legal Affairs Division.** The Legal Affairs Division must frequently work with the IMT to provide compliance documents, policies, and efforts. Specifically, the Legal Affairs Division reviews every document that the IMT receives. As a result, despite productive interactions with the personnel in these departments and the quality of their work, high-priority items may continue to become bottlenecked with limited personnel. While staffing continued to be a challenge in the third reporting period, the City and the CPD added personnel, which likely assisted with the noted improvements in compliance productions in the third reporting period.

---

POLICE DEPARTMENT (January 30, 2020), https://home.chicagopolice.org/cpd-announces-new-organization-for-command-plan/ (including organizational charts).

While we understand that ongoing challenges continue based on limited resources and the effects of COVID-19, we reiterate the need for increased resources and staffing in the following departments:

❖ **Education and Training Division.** The CPD's Education and Training Division is, in many ways, at the heart of many Consent Decree requirements. The CPD is one of the largest police departments in the country, and training personnel requires a massive effort. Our discussions with CPD personnel regarding training efforts, records, and plans strongly suggest that the Training Division needs additional support. Likewise, as the City and the CPD continue to move into Preliminary compliance for many paragraphs, the City and the CPD will need to increase training efforts and resources.

❖ **Crisis Intervention Teams.** While many of the requirements regarding Crisis Intervention do not apply until later reporting periods, the Consent Decree requires significant efforts regarding the Crisis Intervention Teams in the immediate future. The CPD has recently added staff to the Crisis Intervention Teams, but several of our meetings and site visits suggest that the Crisis Intervention Teams would still benefit from additional staff.

## CPD Policy and Plan Review

*632. The Parties and the Monitor will work collaboratively and cooperatively to establish and adhere to a schedule that ensures policies and procedures required by this Agreement are reviewed adequately, efficiently, and expeditiously.*

The City and the CPD continued to appropriately focus on developing optimal policies and plans during the third reporting period. Strong policing policies provide the foundation for implementing and sustaining best practices (as defined in ¶730) with transparency and accountability. We are encouraged by the City's, the CPD's, and the other relevant entities' willingness to collaborate with the IMT and the community regarding their policies.

Because of the significant policy review efforts from the City, the CPD, other relevant City entities, and the OAG, it is important to clarify how this process works. The Consent Decree outlines the policy review process in ¶¶626–37 and the plan-review process in ¶¶638–41. Some policies, however, require the CPD to obtain community input while they develop new or revised policies. *See, e.g.*, ¶¶52 and 160. For policy review, the City and the CPD must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have *at least* 30 days to resolve comments. If we are unable

to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to Judge Dow to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

In our first report, we noted that the review process would be more efficient if the City and the CPD consulted more with the IMT while they developed policies. There was much more consultation among the IMT and the Parties during the second reporting period. As a result, the City and the CPD began to develop compliant policies, curricula, and plans with input from the IMT or the OAG.

The IMT spent considerable time during the third reporting period observing the CPD's attempts to gather the required community input on policies during this reporting period (¶52, ¶160). Our detailed observations appear in the "CPD's Community Engagement" section below.

Overall, during the third reporting period, the IMT, the CPD, and the OAG spent significant time working through policies and procedures. In addition to the more than 35 CPD records the IMT reviewed and commented on for the first reporting period, the City submitted more than 60 new CPD records for review and comment in the second reporting period. In the third reporting period, the CPD submitted over 100 new records for review. As with the record productions, the City provided some of these records at or near the end of the reporting period on December 31, 2020. The IMT and the OAG have also provided the City with several "no objection" notices since the end of the reporting period.[36] Intro Figure 12 below details the policies, plans, and curricula that the City and the CPD submitted to the IMT during this reporting period.

**Intro Figure 12: CPD Policies, Plans, and Training Records Reviewed by the IMT and the OAG from March 1, 2020, through December 31, 2020)**

| | |
|---|---|
| 1 | CPS HR Report: Captain and Commander Minimum Qualifications Review and Selection Options Identification |
| 2 | Professional Counseling Division, E06-01 |
| 3 | Professional Counseling Division, BOOD SOP 19-01 |
| 4 | Alcohol Assistance Program documentation |
| 5 | Field Training and Evaluation Program, S11-02 |
| 6 | Field Training and Evaluation Review Board, S11-02-01 |
| 7 | Application for Police Officer (Assigned as Field Training Officer) |
| 8 | Force Review Division Quarterly Reports |

---

[36] ¶¶626–44.

**Intro Figure 12: CPD Policies, Plans, and Training Records Reviewed by the IMT and the OAG from March 1, 2020, through December 31, 2020)**

| | |
|---|---|
| 9 | Employee Assistance Program Training |
| 10 | Body Worn Camera proposed audit designs |
| 11 | Department Training Records Maintenance Program, S11-10 |
| 12 | Training Notification and Attendance Responsibilities, S11-10-01 |
| 13 | Audit Division Standard Operating Procedures |
| 14 | Command Channel Review Unit Directive |
| 15 | School Resource Officer Policy Public Engagement Plan |
| 16 | CPD School Resource Officer 2020 Working Group Proposal |
| 17 | Force Review Board, SOP 2020-002 |
| 18 | Research and Review Documents for Crisis Intervention Team policies |
| 19 | Positional Asphyxia Training Bulleting, ETB 20-01 |
| 20 | Performance Evaluation System Presentation Deck |
| 21 | Crisis Intervention Team Basic Training |
| 22 | Bureau of Internal Affairs Brochure |
| 23 | Bureau of Internal Affairs Training Video Tutorial |
| 24 | Crisis Intervention Team Basic Training Workgroup records |
| 25 | Force Review Division Pattern Report |
| 26 | Foot Pursuit Reviews SOP (2020-001) |
| 27 | Supervisory Responsibilities Matrix |
| 28 | Consent Decree Supervisor Briefing PowerPoint |
| 29 | Officer Wellness Training Instructor Notice of Job Opening Materials |
| 30 | Use of Force Training Instructor Notice of Job Opening Materials |
| 31 | Recruit Training PCD - Course Summary Sheets |
| 32 | Supervisor Pre-Service EAP Training |
| 33 | Chaplains Unit Training Deck: Overview of BOOD SOP 20-01 |
| 34 | FOID Card Eligibility Training Module Course Survey |
| 35 | Peer Support PowerPoint Training Decks |
| 36 | 2020 Peer Support for Public Safety Instructor Training Schedule |
| 37 | 2020 Peer Support for Public Safety Training Schedule |
| 38 | Peer Support for Public Safety Summary of Training Subjects |
| 39 | Peer Support Training and Consultation Program Synopsis |
| 40 | Peer Support Training Consultant Biography |
| 41 | Peer Support Team Manual |
| 42 | CMS Functionalities Explanation: Log number Generation and Retention & Investigator and Supervisor alerts |
| 43 | CPD Annual Report |
| 44 | DAC and Beat Meeting Audit |
| 45 | SRO Principal Feedback |
| 46 | SRO Refresher Training |
| 47 | Community Engagement Framework |
| 48 | CPD Language Access Coordinator |
| 49 | CPD ADA Liaison |
| 50 | Emergency Vehicle Operations - Eluding and Pursuing |
| 51 | Foot Pursuits Review training deck |

Intro Figure 12: CPD Policies, Plans, and Training Records Reviewed by the IMT
and the OAG from March 1, 2020, through December 31, 2020)

| 52 | Professional Counseling Division Weekly Tracking Sheets |
|---|---|
| 53 | Training Experts Materials |
| 54 | Procedural Justice Training - Instructors Recruitment Records |
| 55 | Supervisor Review Audit |
| 56 | Training Needs Assessment for the 2021 Training Plan |
| 57 | Tableau printout re FOID Training |
| 58 | Community Policing Training - Instructors Recruitment Records |
| 59 | BIA Investigators Unit Directive |
| 60 | BIA CMS Storage System Training Tutorial and Transcript |
| 61 | Procedural Justice 3 Training Materials |
| 62 | BIA Conflicts of Interest Unit Directive |
| 63 | Conflicts of Interest Form |
| 64 | Complainant Communication Procedures & Timelines Unit Directive |
| 65 | Complainant Communication Procedures & Timelines Sample Communications |
| 66 | Intro to CMS Lesson Plan, Slide Deck, and Annotated Slide Deck |
| 67 | Electronic Distribution Supplement to BIA Brochure Distribution Plan |
| 68 | 2021 Fourth Amendment training |
| 69 | Field Training Officer 2020 Annual In-Service Refresher Training |
| 70 | Neighborhood Youth Corps (Youth Engagement Efforts) |
| 71 | CPD Wellness knowledge Assessment |
| 72 | Stress Management & Resilience Course Slide Deck |
| 73 | Operational Police Stress Questionnaire |
| 74 | Master Course Syllabus: Stress Management & Resiliency Course and Supplemental Information |
| 75 | Personal Finance Seminar Outline |
| 76 | 2021 Fourth Amendment training |
| 77 | CIT Certified Officers Data Flowchart |
| 78 | Community Policing Mission and Vision, G02-03 |
| 79 | Beat Community Meetings, S02-03-01 |
| 80 | District Strategic Plans, S02-03-02 |
| 81 | Community Concerns, S02-03-03 |
| 82 | Ride Along, S02-03-04 |
| 83 | D.A.R.E. Program, S02-03-06 |
| 84 | G.R.E.A.T. Program, S02-03-07 |
| 85 | Gun-Turn, S02-03-08 |
| 86 | Trespass Affidavit, S02-03-09 |
| 87 | Social Media Outlet: Twitter, S02-03-10 |
| 88 | Officer Friendly, S02-03-11 |
| 89 | Bridging the Divide, S02-03-12 |
| 90 | Community Policing Business Public-Safety Initiative, S02-03-12 |
| 91 | District Advisory Committee, S02-03-14 |
| 92 | BIA Ethics Training Lesson Plan |
| 93 | BIA Ethics Training Slide Deck with Notes |
| 94 | BIA Ethics Training Electronic File containing audio |

Intro Figure 12: CPD Policies, Plans, and Training Records Reviewed by the IMT and the OAG from March 1, 2020, through December 31, 2020)

| 95 | BIA Poster |
|---|---|
| 96 | Officer Wellness in-service - slide deck presentation (financial wellness, resilience and stress management, and physical health training) |
| 97 | Officer Wellness in-service - master syllabus |
| 98 | Officer Wellness in-service - instructor resumes and qualifications |
| 99 | BIA Community Mediation Unit Directive |
| 100 | BIA Introduction to Rules and Regulations Lesson Plan |
| 101 | BIA Introduction to Rules and Regulations Slide Deck (including electronic version with audio) |
| 102 | Sexual Assault Training and Knowledge Test |
| 103 | CIT Advanced Youth Training |
| 104 | Exercise Equipment List |
| 105 | EAP Substance Abuse Hour 4 |
| 106 | BIA Requirements of a Complete Investigative File Unit Directive (formerly titled Elements of a Complete Investigative File Unit Directive) |
| 107 | BIA SPARs Training Lesson Plan and Media Slides |
| 108 | BIA Log Number - Unique Tracking Number Unit Directive |
| 109 | Officer Wellness in-service - slide deck presentation (financial wellness, resilience and stress management, and physical health training) |
| 110 | Community Policing Training |
| 111 | COVID Adjusted CIT Training Plan |
| 112 | Response to Crowds and Civil Disturbances, S03-22, CPD11.301, CPD-11.302 |
| 113 | Coordinated Multiple Arrest Incident Procedures, S06-06 |
| 114 | Reporting the Response to Crowds, Protests, and Civil Disturbances, D20-08 |
| 115 | Traumatic Stress Incident Management Program Directives, E06-03 |
| 116 | 2021 Use of Force Communications Lesson Plan |
| 117 | 2021 Use of Force Procedures Lesson Plan |
| 118 | BIA CMS Log Number Intake Training Lesson Plan |
| 119 | BIA CMS Log Number Intake Training Slide Deck |
| 120 | BIA Supervisory Responsibilities Unit Directive |
| 121 | Assignment of Administrative Log Number Investigations BIA Unit Directive (formerly No. 2019-U005, Initiation, Intake and Assignment of Log Investigations) |
| 122 | Sworn Affidavits and Overrides Unit Directive |
| 123 | Incidents Occurring Five Years Prior to Complaint and Re-Opening Investigations Five Years After Initiation Unit Directive |
| 124 | Interactions with People with Disabilities Training |
| 125 | CIU Organizational Chart |
| 126 | CIU Mission, Organization, and Function of Crisis Intervention Unit |
| 127 | CIU CIT Training Scheduling, Attendance, Eligibility, and Recruitment |
| 128 | CIU Crisis Intervention Plan |
| 129 | CIU District-Level Strategy for Crisis Intervention Team |
| 130 | CIU CIT Officer Implementation Plan |
| 131 | District Level Strategy for CIT Program |

Intro Figure 12: CPD Policies, Plans, and Training Records Reviewed by the IMT and the OAG from March 1, 2020, through December 31, 2020)

| 132 | 2021 Training Plan |
|---|---|
| 133 | Deaf/Hard of Hearing Training Bulletin Task File |
| 134 | Body Worn Cameras Special Order |
| 135 | In-Car Video Systems Special Order |
| 136 | Performance Evaluation System Supporting Documentation |
| 137 | Unity of Command Department Notice |
| 138 | CPAP Quarterly Report SOP |
| 139 | Community Policing Performance Management |
| 140 | In-Service Supervisor Training |
| 141 | BIA Training Unit Directive |
| 142 | Conduct of Investigations, Initial Responsibilities |
| 143 | Administrative Misconduct Investigations Unit Directive |
| 144 | BIA Training Strategy, Implementation, and Execution Plan: BIA Investigator & Accountability Sergeant Required Annual Training |
| 145 | FRD Debriefing Audit Design Matrix |
| 146 | Implementation Directives, Templates |
| 147 | BIA Confidentiality Policy |
| 148 | Draft Annual Carbine Training Lesson Plan |
| 149 | Department Recruitment Selection and Hiring Plan Directive, E05-34 |
| 150 | BIA Staffing and Equipment Needs Plan Annual Assessment |
| 151 | Neighborhood Policing Initiative Training |
| 152 | BIA Photo Room Operations Unit Directive |
| 153 | BIA Training Evaluation Form |
| 154 | TISMP Clinicians Training |
| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) | |

This chart does not include all policies, plans, curricula, or other records that the City has submitted to the IMT during this reporting period. We included only records on which the IMT provided comments, either as required by the Consent Decree or for technical assistance.

## Policy Review for the Civilian Office of Police Accountability and other City entities other than the CPD

In the second reporting period, COPA provided the IMT and the OAG with 27 records for review. As reflected in Intro Figure 13 below, COPA provided the IMT and the OAG with over 40 new records for review and comment in the third reporting period.[37]

---

[37] As reflected in our first report, the IMT provided technical assistance for COPA regarding some of these materials, and others, during the first reporting period.

Intro Figure 13: COPA Policies and Training Records Reviewed by the IMT and the OAG from March 1, 2020, through December 31, 2020

| | |
|---|---|
| 1 | COPA In-Service Training Lesson Plan: Collective Bargaining Agreements: Legal and Investigations |
| 2 | COPA In-Service Training Lesson Plan: Affidavit Override: Investigations |
| 3 | COPA In-Service Training Lesson Plan: Witness Reliability: Legal and Investigations |
| 4 | COPA In-Service Training Lesson Plan: Consent Decree Overview: All Agency |
| 5 | COPA In-Service Training Lesson Plan: Consent Decree Policy: All Agency |
| 6 | COPA In-Service Training Lesson Plan: Lead Homicide Investigation Training: Investigations and Legal |
| 7 | COPA In-Service Training Lesson Plan: 4th Amendment: Legal and Investigations |
| 8 | COPA In-Service Training Lesson Plan: Standards of Proof: Legal and Investigations |
| 9 | COPA In-Service Training Lesson Plan: Implicit Bias |
| 10 | COPA In-Service Training Lesson Plan: Procedural Justice |
| 11 | COPA In-Service Training Lesson Plan: Sexual Assault |
| 12 | COPA In-Service Training Lesson Plan: Jurisdiction |
| 13 | COPA In-Service Training Lesson Plan: Interview and Interrogations Techniques |
| 14 | COPA In-Service Training Lesson Plan: Standards of Proof |
| 15 | COPA In-Service Training Lesson Plan: CMS- Case Management System |
| 16 | COPA In-Service Training Lesson Plan: CPD Lock up Procedures |
| 17 | COPA In-Service Training Lesson Plan: CPD Rules and Directives |
| 18 | COPA In-Service Training Lesson Plan: Use of Force |
| 19 | COPA In-Service Training Lesson Plan: Domestic Violence |
| 20 | COPA In-Service Training Lesson Plan: Evidence Collection |
| 21 | COPA In-Service Training Lesson Plan: Intake |
| 22 | COPA In-Service Training Lesson Plan: Introduction to Officer Involved Shooting/Death Investigations |
| 23 | COPA In-Service Training Lesson Plan: Affidavit Override (COPA Academy Version) |
| 24 | COPA Witness Reliability Lesson Plan: COPA Academy |
| 25 | COPA Witness Reliability Face Sheet: COPA Academy |
| 26 | COPA Witness Reliability Training Case Study |
| 27 | COPA Witness Reliability PowerPoint Content: In-Service (formally general) |
| 28 | COPA In-Service Training Slide Deck: Collective Bargaining Agreements: Legal and Investigations |
| 29 | COPA Lead Homicide Investigator Training Slide Decks |
| 30 | COPA Lead Homicide Investigator Training Face Sheet |
| 31 | COPA In-Service Consent Decree Overview Training Slide Deck |
| 32 | COPA In-Service Affidavit Override Training Slide Deck |
| 33 | COPA Collective Bargaining Face Sheet |
| 34 | COPA Collective Bargaining Slide Deck |
| 35 | COPA Implicit Bias Face Sheet |
| 36 | COPA Implicit Bias Slide Deck |
| 37 | COPA Sexual Assault Face Sheet |

Intro Figure 13:      COPA Policies and Training Records Reviewed by the IMT and the OAG from March 1, 2020, through December 31, 2020

| 38 | COPA Sexual Assault Slide Deck & Chart |
| 39 | COPA Procedural Justice In-Service Training Slide Deck |
| 40 | COPA Procedural Justice In-Service Training Face Sheet |
| 41 | COPA Witness Reliability PowerPoint Content: COPA Academy |
| 42 | COPA Intake Policy |
| 43 | COPA Witness Reliability Face Sheet: In-Service |
| 44 | COPA 2020-2021 Staffing and Equipment Needs Plan and Org Chart |
| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) | |

We look forward to our continued efforts with COPA and to its upcoming community engagement efforts during the fourth reporting period.

As reflected in Intro Figure 14 below, other City entities also produced several materials to the IMT for review.

Intro Figure 14: Other Entity Policies and Training Records Reviewed by the IMT (from September 1, 2019, through February 29, 2020)

| # | Entity | Record |
|---|--------|--------|
| 1 | City of Chicago | Anonymous Reporting Website compliance records |
| 2 | Police Board | Revisions to Police Board Hearing Officer Selection Criteria |
| 3 | Police Board | Section II.D of the Police Board Rules of Procedure |
| 4 | OEMC | Use of Force Training Notice (TNG 19-006) |
| 6 | OEMC | Foot Pursuit Documentation Training Notice (TNG 19-007) |
| 7 | OEMC | Notification Process for Incidents with Officers Pointing a Firearm (GO 19-006) |
| 8 | OEMC | Police Transport Notification (OEMC) |
| 9 | OEMC | CIT Call Auditing Policy |
| 10 | OEMC | Audit and Employee Review of CIT Calls |
| 11 | OEMC | Mental Health Training Policy |
| 12 | OEMC | CIT Program Policy |
| 13 | OEMC | Glossary for OEMC Quarterly Reports |
| 14 | OEMC | Training Guidelines Policy |
| 15 | OEMC | Diversity Training |
| 16 | City of Chicago | Mediation Policy, Complaints Against the CPD |
| 17 | City of Chicago | Mediation Confidentiality Agreement |
| 18 | City of Chicago | Mediation Information Statement |
| 19 | City of Chicago | Consent to Mediation |
| 20 | OEMC | CAD Enhancement--CIT Check Box Training |
| Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) | | |

The Parties continue to disagree about the required review procedures for these entities. We look forward to continuing to work with the Parties to reach a mutually beneficial solution for the review processes of other relevant entities, including the Police Board.

## CPD's Community Engagement

As in the first two reporting periods, we continued to have concerns about the CPD's efforts and approach to engaging the community during the third reporting period. In our first report period, we raised concerns about the CPD's lack of community engagement during its policy development procedures. Those concerns continued through the second reporting period and into the third reporting period. The Coalition also raised significant concerns regarding community engagement to the IMT, the OAG, the City, and the CPD.[38]

We continue to be concerned about how the CPD understands and discerns the differences and nuances among community engagement, community partnerships, community relationships, and community service.

In the third reporting period, the City and the CPD dedicated significant efforts to engaging the community in their policy development. The CPD launched a series of surveys focused on specific policies and also held a series of "Community Focus Groups" in October 2020 to address specific policy topics:

- October 15: Interactions with Religious Communities

- October 19 and 26: Prohibition of Sexual Misconduct

- October 20 and 28: Interactions with Children and Youth

- October 21: Responses to Hate Crimes

- October 22 and 27: Interactions with People with Disabilities

- October 26: Limited English Proficiency / Language Access

---

[38] In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits." *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

We continue to recommend that the CPD establish consistent procedures for garnering community member and community stakeholder input into policy development early and throughout the process.

One of the CPD's efforts to gather such input during this reporting period was the establishment of community working groups focused on CPD policy. Specifically, the CPD made a significant effort during the third reporting period to obtain community input on the revised Use of Force policies, particularly via the Use of Force Working Group. But its effort was not successful in establishing and maintaining "clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies" within the reporting period, as required by ¶160. However, the CPD continues to meet with the Working Group to discuss additional changes to its Use of Force policies—having issued revised versions on December 31, 2020, incorporating recommendations from the Working Group—and we are hopeful that the progress CPD has made will continue in the short and long term.

Despite these efforts, opportunities for community input continue to occur late in the policy development process for most policies under revision and only during public comment phases. When Chicago's community members are allowed only to provide input at the later stages of the policy development process, they are prevented from providing input during the formative stages and, in some instances, effectively prevented from the opportunity of meaningful participation.

The IMT continues to encourage the CPD to think creatively about community engagement efforts. We heard from many community members that the CPD could improve its engagement through small steps, beginning with greeting community members on the street and having a conversation (as one community member said: "It starts with a hello."). The COVID-19 pandemic brings additional challenges to the CPD's community engagement efforts; while the focus groups and working groups mentioned above were held entirely online, only some of the CPD's Chicago Alternative Policing Strategy beat meetings successfully transitioned to an online format. We will continue to monitor and prioritize the City's and the CPD's ongoing efforts in this area.

# I. Community Policing

This is the Community Policing section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago's (the City's) and its relevant entities' Community Policing compliance efforts from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *8. Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> *9. To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> *10. CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> *11. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (the CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the

Office of the Illinois Attorney General (the OAG) and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

During the third reporting period, the City and the CPD made progress toward requirements in the Community Policing section of the Consent Decree, including policy development and implementation, community engagements, and strategic plans. In the third reporting period, the City and the CPD experienced significant challenges regarding Community Policing, including challenges with crime-victim services and arrestee rights. We will cover the details of many of these challenges in our special report. Thus, this section focuses on the City and the CPD's policy development, training, recruitment, and engagement efforts related to Community Policing section.

Specifically, the CPD continued to develop and implement policies that align with various Community Policing requirements. These included over a dozen Community Policing policies: G02-03, *Community Policing Mission and Vision*; S02-03-01, *Beat Community Meetings*; S02-03-02, *District Strategic Plans*; S02-03-03, *Community Concerns and City Services*; S02-03-04, *Ride Along*; S02-03–06, *Drug Abuse Resistance Education (D.A.R.E.) Program*; S02-03–07, *Gang Resistance Education and Training (G.R.E.A.T.) Program*; S02-03-08, *Gun Turn-In Program*; S02-03-09, *Trespass Affidavit*; S02-03-10, *Social Media Outlet*; S02-03-11, *Officer Friendly*; S02-03-12, *Bridging the Divide*; S02-03-13, *Community Policing Business Public Safety Initiative*; and S02-03-14, *District Advisory Committee*.

Despite the COVID-19 pandemic, the CPD also made significant efforts to enhance its community engagement by using virtual platforms to host community meetings, working groups, and focus groups. The CPD fell short, however, in its efforts to reach marginalized populations, as the engagements did not attract a broad cross-section of Chicago residents. The CPD will need to continue its efforts and further refine these engagements to ensure that they are designed to meaningfully capture community members' feedback, including feedback from Chicago residents who experience the most contact with the police. The CPD should also continue to formalize this community dialogue and feedback loop to help the CPD consistently hear and respond to the community's concerns and recommendations.

The CPD also focused a lot of attention on its District Strategic Plans and Bureau Strategic Plans.[39] These strategic plans, however, likely represent only a portion of police strategies. We understand that beyond the Strategic Plans, the CPD implements other crime reduction and problem-solving strategies. For example, this past summer, the CPD launched two citywide teams focused on combatting violent crime, strengthening community relationships, and ensuring the safety of residents during large-scale events and demonstrations: the Community Safety Team (CST) and the Critical Incident Response Team (CIRT).[40] At the end of the third reporting period, the City and the CPD did not provide records showing that command staff received written guidance on how to ensure these strategies are consistent with principles of community policing. Likewise, the written guidance provided on the Strategic Plans do not include methods and direction for ensuring that all district-level and department-wide strategies, like the new citywide teams, are consistent with principles of community policing. As a result, moving forward, the CPD will need to devote additional efforts to developing a process for reviewing its crime reduction and problem-solving strategies beyond these strategic plans.

The CPD also took steps to improve its crime-victim services. *See* ¶29. Specifically, the CPD (1) hired three Victim Assistance Coordinators, (2) trained certain members on crime victims' rights and services and sexual misconduct investigations, (3) received a grant related to crime victim advocacy, and (4) created the Chicago Crime Victim Services Coordinating Council. We recognize that improving crime victim services will continue to require attention to training and resource allocation.

Overall, the IMT assessed the City's compliance with 22 Community Policing paragraphs in the third reporting period (¶¶13–15, 18, 20, 25, 28–32, 34–36, 39, 40, 41, and 43–47). We provide status updates, rather than compliance assessments, for an additional four paragraphs (¶¶33, 37, 38, and 42).

As reflected in Community Policing Figure 1 below, we have determined that the City and the CPD maintained Preliminary compliance for four paragraphs (¶¶15, 18, 43, and 46), met Preliminary compliance for 14 paragraphs (¶¶14, 20, 25, 28–31, 34–36, 39–41, and 47), maintained Secondary compliance for one paragraph

---

[39] *See Community Policing Strategic Plans*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/district-strategic-plans/.

[40] *See CPD Announces Launce of two New Citywide Teams with Focus on Strengthening Community Partnerships*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/wp-content/uploads/2020/07/27-Jul-20-CPD%E2%80%8C-%E2%80%8CAnnounces%E2%80%8C-%E2%80%8CLaunch%E2%80%8C-%E2%80%8Cof%E2%80%8C-%E2%80%8CTwo%E2%80%8C-%E2%80%8CNew%E2%80%8C-%E2%80%8CCitywide%E2%80%8C-%E2%80%8CTeams%E2%80%8C.pdf.

(¶13), and met Secondary compliance for one paragraph (¶44). The City did not reach Preliminary compliance in two paragraphs (¶¶32 and 45).

Community Policing Figure 1: Compliance Status for Community Policing Paragraphs at the End of the Third Reporting Period (December 31, 2020)



In the third report, the City met deadlines for two paragraphs (¶¶18 and 28), but missed the deadline for one other paragraphs (¶41). The City also did not achieve the underlying deadline requirement for that paragraph before the end of the reporting period. *See* Community Policing Figure 2 below. The City did, however, meet Preliminary compliance with the corresponding paragraph (¶41).

Community Policing Figure 2: Total Community Policing Deadlines in the Third Report: 3



# Community Policing: ¶13

*13. In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *In Compliance (FIRST REPORTING PERIOD)*
**Secondary:**          *In Compliance (SECOND REPORTING PERIOD)*
**Full:**          *Under Assessment*

In the third reporting period, the IMT finds that the City and the CPD maintained Preliminary compliance and maintained Secondary compliance for ¶13. The City and the CPD has not yet achieved Full compliance.

In previous reporting periods, the City and the CPD met Preliminary and Secondary compliance, because the CPD developed a plan, including a timeline, for implementing the Community Policing Advisory Panel's (CPAP's) recommendations and demonstrated its ability to track CPAP recommendation implementation efforts.

The CPD's plan to implement CPAP recommendations addresses community partnerships; restorative justice; youth outreach; community policing strategies; annual strategy review and feedback; quarterly reports; community policing staffing and training; selection of Chicago Alternative Policing Strategy (CAPS) officers; coordination of City services; victims' resources; and community policing evaluations. The CPAP plan projects—and included tasks—also overlap with actions that the City and CPD must implement for other Consent Decree paragraphs.

During this reporting period, we continued to assess the CPD's ability to track and evaluate its efforts to implement the CPAP recommendations. Our assessment included reviews of the CPAP's by-laws, progress updates to the CPAP Project Plan, and the CPD's Office of Community Policing CPAP quarterly reports.

In the CPD's most recent quarterly report—which is the CPD's self-report of its progress in implementing the CPAP recommendations—the CPD provided status updates on the 15 overarching projects:

- Youth Outreach: highlights include the Neighborhood Youth Corp summer program and the Summer Youth Leadership Academy.

- Community Partnerships: highlights include the continued recruitment of Beat facilitators.

- Restorative Justice: highlights include the restructuring of the peer-review program.

- District-wide Community Policing Strategies: highlights include developing and submitting fourteen general and special orders for IMT and OAG review.

- Annual Strategy Review and Feedback: highlights include adding significant levels of detail to the District Strategic Plan form.

- CPAP Project Plan: highlights include developments and ongoing updates on the project task plan.

- Community Policing Staffing Assessment: no progress reported.

- Expand CPAP: highlights include drafting the CPAP by-laws, which delineate future roles and responsibilities within CPAP.

- Department-wide Community Policing Training: highlights include training of 50 District Coordinators.

- Selection and Training of Community Policing Officers: highlights include designating Domestic Violence Liaison Officers.

- City Departments Coordination: highlights include fostering connections between Districts and other City agencies through Operation Clean.

- Victim Resources: highlights include training the Domestic Violence Liaison Officers on sexual-assault investigations.

- Community Policing Initiative Evaluation: highlights include meeting monthly with District Commanders to analyze community policing data.

- Interactive Community Policing Database: highlights include continuing efforts to implement the Community Engagement Management System.[41]

---

[41] Chicago Police Department Office of Community Policing, *Quarterly Report for the Community Policing Advisory Panel, 3rd Quarter 2020*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/cpap-quarterly-report/.

In addition to reviewing the by-laws and quarterly reports, we participated in one of the CPAP meetings during this reporting period. Several CPAP members expressed to us a desire to play a more significant role in promoting reforms within the CPD. The CPAP members collectively have expertise regarding police reform and the specific challenges facing the CPD and the communities that the CPD serves. Moving forward, we encourage the CPD to explore more meaningful roles for CPAP members.

Based on the CPD's efforts to regularly update its CPAP Project Plan, capturing progress on implementing recommendations; the CPAP's quarterly reports; and briefings with CPAP members, we conclude that the City and the CPD maintain Preliminary and Secondary compliance with ¶13. Moving forward, we will assess the CPD's (1) efforts to accurately convey status updates and implementation challenges to the CPAP, (2) efforts to implement the remaining recommendations, and ultimately (3) evidence showing that CPD achieved the desired impact of these CPAP recommendations.

# Community Policing: ¶14

**14.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD have met Preliminary compliance with ¶14, because the CPD reviewed and revised all relevant policies that delineate the duties and responsibilities of the Office of Community Policing and the programs and entities under the Office of Community Policing.

To assess compliance, we reviewed the CPD's efforts to review and revise the policies relevant to this paragraph. To review and revise policies and training, the City and the CPD must follow the review process described in ¶¶626–41.

In the third reporting period, the CPD completed their review and revisions of the following policies:

1. G02-03, *Community Policing Mission and Vision* (Effective Date 12/31/20);

2. S02-03-01, *Beat Community Meetings* (Effective Date 12/31/20);

3. S02-03-02, *District Strategic Plans* (Effective Date 12/31/20);

4. S02-03-03, *Community Concerns and City Service Requests* (Effective 12/31/20);

5. S02-03-04, *Ride-Along Program* (Effective Date 12/31/20);

6. S02-03–06, *Drug Abuse Resistance Education (D.A.R.E.) Program* (Effective Date 12/31/20);

7. S02-03–07, *Gang Resistance Education and Training (G.R.E.A.T.) Program* (Effective Date 12/31/20);

8. S02-03-08, *Gun Turn-In Program* (Effective Date 12/31/20);

9. S02-03-09, *Trespass Affidavit Program* (Effective Date 12/31/20);

10. S02-03-10, *Social Media Outlet Twitter* (Effective Date 12/31/20);

11. S02-03-11, *Officer Friendly Program* (Effective Date 12/31/20);

12. S02-03-12, *Bridging the Divide Program* (Effective Date 12/31/20);

13. S02-03-13, *Community Policing Business Public-Safety Initiative* (Effective Date 12/31/20); and

14. S02-03-14, *District Advisory Committee (DAC)* (Effective Date 12/31/20).

These policies represent the core policy suite for the Office of Community Policing and clearly delineate the Office of Community Policing's duties and responsibilities. After several rounds of review, the CPD posted the policies for public comment, finished revising the policies, and published them. Because the CPD finalized those policies before the end of the reporting period, the IMT finds that the City and the CPD met Preliminary compliance. To maintain Preliminary compliance moving forward, the CPD must demonstrate that it meaningfully considered community feedback on these policies.

We also credit the CPD for starting to draft a new directive that, once finalized, should provide guidance for conducting the Office of Community Policing program evaluations. *See* ¶47. Program evaluations will include surveying program participants; reviewing and incorporating helpful feedback; and regular assessments of select programs by the CPD Audit Division. Having such evaluations in place will reflect the CPD's efforts to create effective supervisory practices that are designed to implement the Office of Community Policing written policies.

Looking forward, we will assess the CPD's efforts to train members on these policies, complete the policy review process for the new program evaluation directive, and develop other supervisory practices to ensure these policies are implemented as written. Ultimately, we will assess the CPD's efforts to evaluate the programs covered by the policies to determine whether the Office of Community Policing's duties and responsibilities require additional revision to align with community policing principles, like building trust and improving relationships with the community.

# Community Policing: ¶15

*15. With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will: a. within 180 days of the Effective Date, provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing; b. require CPD's command staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and c. designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district level crime reduction strategies, excluding operational strategies that are determined on a day-to-day or short term basis, to ensure they are community oriented and consistent with the principles of community policing.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***In Compliance (SECOND REPORTING PERIOD)*** |
| **Secondary:** | ***Not in Compliance*** |
| **Full:** | ***Not in Compliance*** |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶15, but they did not achieve Secondary compliance. Overall, the CPD's efforts to comply with ¶15 focus exclusively on the Strategic Plans. We acknowledge the CPD's continued efforts during this reporting period—and throughout the COVID-19 pandemic—to improve the Strategic Plans' development and review process. We particularly appreciate the CPD's improved record keeping of the review process. But we have the same concerns that we noted in our previous report: the Strategic Plans do not reflect attention to the collateral impact of the strategies on the communities the CPD serves, a consideration we believe community members should be appraised of and given an opportunity on which to comment. Furthermore, the correlation between the Strategic Plans and other department-wide and district-level crime reduction strategies remains unknown. We expect that the CPD will pay particular attention to these gaps in future reporting periods, including developing written guidance to address them. Moving forward, we would expect to see crime reduction and problem-solving strategies

that are consistent with the principles of community policing in command-level department-wide meetings such as CompStat, for example.

Specifically, in the previous reporting periods, we assessed the CPD's efforts to refine its district and bureau strategies' development and review process. We noted an improvement in those processes. The CPD develops their District and Bureau Strategic Plans after receiving community members' feedback, which aligns, in part, with community policing principles. However, the Strategic Plans amounted to action-items developed around a set of crime reduction priorities. The Strategic Plans paid little attention to the potential collateral impact on the community of the strategies and the intersection between the district strategies and department-wide strategies.

During this reporting period, we assessed whether the CPD provided command staff with written guidance for reviewing and ensuring that the department-wide and district-level crime reduction strategies are consistent with principles of community policing. We also assessed the CPD's efforts to conduct the reviews in ¶15.

In addition to the CPD's Special Order, S02-03-02, *District Strategic Plans*, the Office of Community Policing developed two standard operating procedures that provide additional guidance on planning, developing, and reviewing District Strategic Plans and Bureau Strategic Plans (*Office of Community Policing Strategic Planning Standard Operating Procedures*).

As reflected in these standard operating procedures, the CPD has made significant changes to the District Strategic Plan and Bureau Strategic Plan development and review process. These changes included the following:

- Aligning strategy development and problem-solving with the community policing SARA (Scanning, Analysis, Response, and Assessment) model;

- Incorporating greater specificity and strategic thinking into the strategy development process;

- Better alignment of the strategy development process with requirements found in ¶45, including directions to allocate personnel and resources to assist strategy implementation and to identify primary contacts for marginalized groups within their district;

- Transitioning the Community Conversations to a virtual platform; and

- Including the Area Deputy Chief and the Chief of Operations in the review and approval process.

According to the CPD's directives covering the Plans' review process, the CPD directs each District Advisory Committee to review and provide feedback on their district's strategies, as required ¶45. We found little evidence, however, that District Advisory Committees reviewed, deliberated, and provided feedback on the Plans. In many instances, the full complement of District Advisory Committees was not in place to conduct reviews.

In addition to these standard operating procedures, as in the previous year, the CPD conducted a series of briefings on methods and guidance for developing and reviewing the District Strategic Plans and Bureau Strategic Plans. The briefings' participants included the District Advisory Committee chairs, CPAP members, and district staff.

We find that the standard operating procedures and briefings provide written guidance that ensure the Strategic Plans are consistent with principles of community policing. They include, for example, instruction on how to engage the community for their input and how to incorporate that input into the Strategic Plans. We note, however, that the standard operating procedures and briefings relate to the Strategic Plans only, and the CPD has not submitted directives that address the universe of command staff developed crime reduction and problem-solving strategies. Furthermore, it is unclear from the records who reviewed the standard operating procedures or who attended the briefings, because the CPD did not provide evidence of either.

We understand that beyond the Strategic Plans, the CPD implements other crime reduction and problem-solving strategies. For example, this past summer, the CPD launched two citywide teams focused on combatting violent crime, strengthening community relationships, and ensuring the safety of residents during large-scale events and demonstrations: the Community Safety Team (CST) and the Critical Incident Response Team (CIRT).[42] However, in the third reporting period, we did not receive records from the CPD showing that command staff received written guidance on how to ensure these strategies are consistent with principles of community policing. The written guidance provided on the Strategic Plans do not include methods and direction for ensuring that all district-level and department-wide strategies, like the new citywide teams, are consistent with principles of community policing.

---

[42] *See CPD Announces Launce of two New Citywide Teams with Focus on Strengthening Community Partnerships*, Chicago Police Department, https://home.chicagopolice.org/wp-content/uploads/2020/07/27-Jul-20-CPD%E2%80%8C-%E2%80%8CAnnounces%E2%80%8C-%E2%80%8CLaunch%E2%80%8C-%E2%80%8Cof%E2%80%8C-%E2%80%8CTwo%E2%80%8C-%E2%80%8CNew%E2%80%8C-%E2%80%8CCitywide%E2%80%8C-%E2%80%8CTeams%E2%80%8C.pdf.

The Strategic Plans' development process is mostly consistent with community policing principles, providing community members an opportunity to voice their opinions on community safety. In the third reporting period, each district hosted two "Community Conversations." Because of the COVID-19 pandemic, the districts held their 2020 Community Conversations virtually and used breakout sessions. Nearly 2,000 community members participated in the Community Conversations, an increase compared to the in-person sessions. We have discussed with the CPD the potential benefits of leveraging virtual community engagements as a more permanent component to its overall engagement efforts.

Despite the increased participation, the Community Conversations did not always reflect the broad cross-section of the community. Based on CPD records, the Community Conversation participants tended to be older and female. Thus, the participants did not always match the demographics of the various districts. Principles of community policing include receiving input from individuals that reflect a broad cross-section of the community. *See* ¶46. Young people—the population group that experiences the most police contact—were generally underrepresented at the Community Conversations. We expect that the CPD will continue to assess how it can continue to improve its methods and guidance to ensure greater engagement with a broad cross-section of the community.

The CPD began developing its 2021 district-wide crime strategies for each of its twenty-two districts during the third reporting period. The IMT has reviewed drafts of the Strategic Plans, but the CPD struggled to finalize reviews and post all of the Strategic Plans before the end of the reporting period.[43] We recognize, however, that there were significant challenges posed by the pandemic in planning and conducting Community Conversations and internal strategy reviews.

The draft Strategic Plans continue to follow a standard format, which include two sections: (1) Problem-Solving on Crime Reduction Priorities and (2) Community Engagement Goals. But the CPD expanded the forms, which now captures more detailed information, including district personnel would be the point of contact for certain activities.

Similarly, the CPD developed Strategic Plans for four bureaus with city-wide responsibilities: the Bureau of Detectives, the Bureau of Organized Crime, the Bureau of Organizational Development, and the Bureau of Internal Affairs. The CPD asserts that the four Bureau Strategic Plans reflect the CPD's efforts to create department-wide crime reduction strategies. Compared to the district plans, the bureau plans are more straightforward, but are not subject to their own distinct com-

---

[43] *See District Strategic Plans*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/office-of-community-policing/district-strategic-plans/.

munity input process. Rather than hosting distinct community engagements to receive community input on each Bureau's strategies, the Bureau Strategic Plans are informed by the feedback received during the districts' Community Conversations.

The IMT received records reflecting the Office of Community Policing's review of the draft Strategic Plans as required by ¶15(c), but we have not received records reflecting any other command staff review of these Strategic Plans, as required by ¶15(b).

In sum, the IMT finds that the City and the CPD maintain Preliminary compliance but have not achieved Secondary compliance because of the lack of: (1) additional written guidance on outreach methods tailored to engage community members who are part of the population groups that have the most police contact; (2) additional written guidance regarding crime reduction and problem-solving strategies beyond that provided for the Strategic Plans; (3) records of command staff review of department-wide and district level strategies; (4) attention to and coordination of the Department-wide and district-level strategies. Moving forward, we expect the CPD to address these gaps.

# Community Policing: ¶18

*18. The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

**Deadline:** Quarterly ✓ **Met** ☐ **Missed**

**Preliminary:** *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The IMT finds that the City has maintained Preliminary compliance with ¶18 but has not met Secondary compliance because the City's records reflecting the meetings and follow-up of identified actions are inadequate.

In the previous reporting period, the City held two "cabinet meetings" to develop strategies for leveraging City resources to address community safety issues. However, because we only had agendas and a summary for one of the meetings, we could not assess the quality of collaboration, resulting action items, and follow-up of action items from earlier meetings.

In the third reporting period, the IMT assessed the City's efforts to engage in quality collaboration with the various departments and sister agencies, paying particular attention to the City's efforts to track and assess the cabinet meetings' progress. We reviewed City records from meetings held in April, July, August, and December 2020, including documents reflecting agency specific initiatives for summer 2020. This also included a progress report.

The purpose of these community safety focused cabinet meetings is to coordinate the delivery of services to best leverage resources and enhance community safety. In the July meeting, the City examined how Chicago could apply New York City's "Mayor's Action Plan for Neighborhood Safety," which exemplified the concept of interagency coordination to address community safety issues. The Plan (1) calls for utilizing a hardship index to help target community resources, (2) builds on existing community nonprofit and private sector resources, and (3) identifies the following guiding principles:

- Engage the "real experts";

- Address the complex roots of crime;

- Prioritize youth;

- Enable and promote social connections;

- Reduce territoriality;

- Expand activity on public property;

- Light the night;

- Invest in dignity;

- Reduce barriers to local commerce; and

- Co-locate activities, community organizations, and service providers.

In the December meeting, the CPD provided updates on crime trends and introduced five strategic pillars:

(1) transformational change through reform;

(2) officer wellness;

(3) growing community policing;

(4) ensuring public safety; and

(5) strengthening investigations.

The meeting also covered specific coordinated efforts by City agencies for improvements in East and West Garfield Park. Attendance at this meeting included the agencies listed in ¶18.

The series of meetings thus far reflect inter-agency coordination to achieve community safety objectives. But in the third reporting period, there appeared to be little follow up on plans and actions presented from one quarterly meeting to another, and the proliferation of plans, projects, and initiatives often do not seem to be well coordinated.

We conclude that the City maintains Preliminary compliance but has not achieved Secondary compliance with ¶18, because it did not provide adequate documentation regarding follow-up actions from one meeting to another. Moving forward, we hope to receive more complete meeting records, including minutes, confirmation of attendees, action items, and updates on responses to prior action items. We plan to observe at least one cabinet meeting in the next reporting period. Ultimately, we will assess the City's efforts to institutionalize these meetings, reviewing whether the City assesses the meetings effectiveness in leveraging City resources to address issues that impact the community's sense of safety, security, and well-being.

# Community Policing: ¶20

**20.** *Within 180 days of the Effective Date, CPD will develop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD met Preliminary compliance with ¶20 because the CPD implemented General Order G04-01, *Preliminary Investigations*, which prohibits the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.

In the previous reporting period, we reviewed G04-01, a policy that relates to many Consent Decree paragraphs, including ¶20. Although the policy incorporated language that addressed ¶20, the CPD had to complete the review process described in ¶¶626–41 to receive Preliminary compliance.

During the third reporting period, the IMT assessed the CPD's efforts to finalize G04-01. Based on our comments and the OAG's comments, the CPD continued revising G04-01 to ensure alignment with the various related Consent Decree paragraphs. None of the outstanding comments addressed ¶20, and we were ultimately satisfied with the policy moving forward in the ¶¶626–41 process. The CPD finalized and posted G04-01 on December 30, 2020.

We conclude that the City and the CPD met Preliminary compliance because the CPD's implemented G04-01 includes language meeting the requirements of ¶20. To maintain Preliminary compliance, the CPD must demonstrate that it meaningfully considered community feedback on G04-01. For Secondary compliance, we will assess the CPD's efforts (1) to train members on this requirement and (2) develop effective supervisory practices to ensure the G04-01 is implemented as written. Ultimately, we will assess whether the CPD effectively implements the policy. As part of that assessment, we will review community members' concerns about their CPD transport experience as it relates to G04-01 and ¶20. This may include reviewing complaints concerning transports and soliciting community feedback regarding their experiences through listening sessions.

# Community Policing: ¶25

> **25.** *CPD will meet with members of the community from each beat and District Advisory Committee members at least once every two months. These community meetings will be scheduled in consultation with the community, be used to identify problems and other areas of concern in the community, and provide an opportunity to discuss responses and solutions through problem-solving tactics and techniques.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD have met Preliminary compliance for ¶25 because the CPD created directives that incorporate ¶25's requirements. The CPD acknowledged, however, that most districts were unable to meet with each District Advisory Committee at least once every two months. As a result, the CPD did meet Secondary compliance.

During the third reporting period, the IMT assessed the CPD's efforts to incorporate ¶25's requirements into a policy. We also reviewed the CPD records reflecting their efforts to meet with community members and the District Advisory Committee members.

The CPD identified Special Order S02-03-01, *Beat Community Meetings*, and Special Order S02-03-14, *District Advisory Committee*, as policies related to ¶25. As part of the ¶¶626–41 review process, the IMT reviewed and commented on both directives. S02-03-01 incorporates this paragraph's requirement related to community member meetings, and S02-03-14 incorporates the same requirement related to District Advisory Committee members. The CPD completed the ¶¶626–41 review process for these policies, including the public comment period, and thus the policies are finalized and effective as of December 30, 2020. To maintain Preliminary compliance, the CPD must demonstrate that it meaningfully considered community feedback on G04-01.

The CPD identified, however, issues with the District Advisory Committee program and the unevenness in Beat meeting execution. Many District Advisory Committees are not staffed according to the District Advisory Committee By-Laws. Furthermore, community reviews of strategies and policies often involve only one District Advisory Committee member rather than the whole District Advisory Committee. The effectiveness of Beat meetings depends, in large part, on the use of

trained facilitators. Further, the CPD acknowledges that most districts have not been meeting with their District Advisory committee members at least six times per year.

We credit the CPD for auditing the District Advisory Committee program and Beat meetings. The auditing reflects the Department's willingness to assess their community engagement reform efforts. We expect the CPD to take steps to address the issues identified in the audit's findings during the next reporting period.

Throughout the third reporting period, the CPD held some Beat meetings and District Advisory Committee meetings. Due to COVID-19, however, the CPD had to transition from in-person meetings to virtual meetings, which posed numerous challenges. For example, the CPD often did not post invites to the wider community, and instead, only forwarded virtual meeting information and invites to certain members. Furthermore, the CPD struggled to compile records that captured the attendance levels and input received during these meetings. The CPD did not provide attendance records or meeting minutes from the District Advisory Committee and Beat meetings held in the third reporting period.

The CPD must continue to refine its community outreach efforts. The participants in the Beat and District Advisory Committee meetings in the third reporting period did not adequately represent the communities' demographics. As we have previously noted, young Black men are often not participants of these meetings, but they have the most contact with police services.[44] We will continue to monitor the CPD's efforts to address this issue and other program issues identified by the CPD's Audit Division.

The IMT finds that the City and the CPD have met Preliminary compliance with ¶25 because the CPD incorporated ¶25's requirements into CPD policies, S02-03-01 and S02-03-14. Moving forward, we will assess the CPD's efforts to address the Audit Division's findings regarding Beat meetings and the District Advisory Committee program. We will also assess the CPD's efforts to train members to ensure S02-03-01 and S02-03-14 are implemented and reflected in practice.

---

[44] *See Community Survey Report (November 2019—February 2020), A Special Report* , INDEPENDENT MONITORING TEAM (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

## Community Policing: ¶28

*28. CPD will, with the assistance of the Office of Community Policing, institute a public awareness campaign to inform the public, at least once a year, about: (a) CPD policies most relevant to police interactions with the public, including, but not limited to: use of force, body worn cameras, and Tasers; (b) steps for filing a complaint against CPD or a CPD member; and (c) the public's rights when stopped, arrested, or interrogated by police. CPD's public awareness campaign may include presentations, trainings, written guides, or web-accessible videos.*

### Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**     December 31, 2020    ☑ **Met**    ☐ **Missed**

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

The IMT finds that the City and the CPD achieved Preliminary compliance for ¶28 by instituting a public awareness program addressing paragraph requirements by the deadline of December 31, 2020.

During the third reporting period, the IMT assessed the CPD's efforts to institute the public awareness campaign, including the CPD's community engagement efforts to discern which policies the community may be most interested in learning about.

In instituting the public awareness campaign, the CPD's Office of Communications and News Affairs partnered with the Chicago Sun-Times to create a social media campaign. Through the partnership, they developed three, two-minute videos that addressed a range of issues including use of force, racial profiling, and police accountability.

The CPD enlisted the contribution of community members to help produce the content for the videos. Specifically, the CPD solicited community stakeholders for their input on topics to include in the script. At the CPD's request, the IMT reviewed the scripts and provided preliminary comments.

The campaign went live on December 11, 2020, posting to the Chicago Sun-Times website, Facebook, Instagram, and newsletters. The Sun-Times also ran advertisements on various social-media applications, television channels, and streaming services. The Sun-Times also targeted messaging to the West and South side zip codes to reach those communities most impacted by policing services. The CPD

briefed us on the campaign's results, stating that the campaign reached a wide range of Chicagoans, including young adults. Specifically, according to the CPD, the Sun-Times campaign reportedly reached over 635,000 people, with the largest group being people 25–34 years old.

The IMT finds that the City and the CPD met Preliminary compliance with ¶28 because it instituted a public awareness campaign before the end of this reporting period. Moving forward, we will assess the CPD's efforts to codify this public awareness campaign process into a policy and to continue the public awareness campaign on a yearly basis. Additionally, we will monitor the CPD's ability to supervise members to ensure this requirement continues. We encourage the CPD to develop a directive outlining the public awareness campaign process and to consider (1) expanding the campaign to use a range of modalities and (2) coordinating with other City departments and agencies in developing future public awareness campaigns.

# Community Policing: ¶29

*29. Fair, unbiased, and respectful interactions between CPD members and victims of crime provide an opportunity to strengthen community trust and foster public confidence in CPD. CPD will continue to require that CPD members interact with victims of crime with courtesy, dignity, and respect. CPD will continue to require that CPD members inform victims of crime of the availability of victim assistance and resources, including providing written notices of victim's rights, when applicable. CPD will also have such victim assistance information readily available on its public website and at all district stations.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶29 because the CPD implemented a revised version of its Special Order 02-01-03, *Crime Victim Assistance*, which incorporates ¶29's requirements. In the third reporting period, the City and the CPD experienced significant challenges regarding crime-victim services. We will cover the details of many of those challenges in our special report. Thus, this section focuses on the City and the CPD's policy development for Preliminary compliance.

During this reporting period, the IMT assessed the CPD's efforts to incorporate ¶29's requirements into a policy and to enhance its crime victims' services.

S02-01-03 is the CPD policy that codifies the requirements of ¶29. The CPD produced drafts of S02-01-03 for our review and comment. After incorporating the OAG's comments and our comments, the CPD continued the ¶¶626–41 review process, finalizing and posting the policy for public comment on December 10, 2021. S02-01-03 became effective as of December 30, 2020.

In addition to posting S02-01-03, the CPD (1) hired three Victim Assistance Coordinators, (2) trained certain members on crime victims' rights and services and sexual misconduct investigations, (3) received a grant related to crime victim advocacy, and (4) created the Chicago Crime Victim Services Coordinating Council. In reviewing the CPD website, the IMT found that most of the crime victims' information was geared towards victims of domestic violence and that accessing that information was not easy or user friendly.

Because the CPD codified ¶29's requirements into S02-01-03, the IMT finds that the City and the CPD met Preliminary compliance. The additional steps that the CPD took this year are encouraging, and we look forward to seeing those efforts result in fair, unbiased, and respectful interactions between CPD members and crime victims.

Moving forward, to maintain Preliminary compliance, the CPD will need to meaningfully consider community feedback on S02-01-03 and make revisions, as appropriate. For further compliance levels, we will assess the CPD's efforts to implement S02-01-03, including training more officers and establishing practices to supervise member's adherence to the policy. Furthermore, we will evaluate the CPD's efforts to make victim-assistance resources and information more readily available, including the CPD's efforts to provide victims with written notices of victim rights.

# Community Policing: ¶30

**30.** *CPD will prominently display signs both in rooms of police stations or other CPD locations that hold arrestees or suspects and near telephones which arrestees or suspects have access to. These signs will state: a. that arrestees and suspects have the right to an attorney; b. that if an arrestee cannot afford an attorney, one may be appointed by the court for free; and c. the telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees.*

---

**Compliance Progress**                          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD met Preliminary compliance with ¶30 because the CPD finalized and posted an updated version of General Order G06-01, *Processing Persons Under Department Control*, which includes language directly addressing the requirements of this paragraph. In the third reporting period, the City and the CPD experienced significant challenges regarding arrestee rights. We will cover the details of many of those challenges in our special report. Thus, this section focuses on the City and the CPD's policy development for Preliminary compliance.

In the previous reporting period, the CPD finalized G06-01, which requires a command staff person to ensure that the arrestee's rights and free legal services signs are prominently posted at holding facilities. The IMT also reviewed the CPD's signs. During the ¶¶626–41 review process for G06-01, we raised concerns about the sign size and visibility. The CPD agreed to take steps to ensure signs are highly visible at holding facilities.

During the third reporting period, the IMT assessed the CPD's efforts to incorporate ¶30's requirements into a policy and whether the CPD developed a procedure to routinely review the signs to ensure the information is current and accurate.

We conclude that the City and the CPD achieved Preliminary compliance because the CPD codified ¶30's requirements into a policy. Moving forward, the IMT will assess the CPD's efforts to develop oversight practices to ensure compliance with this paragraph. Specifically, the IMT suggests that the CPD practices routine inspections to ensure signage remains visible, reviews the sign information to ensure

it is current and accurate, and seeks feedback from arrestees to ensure their awareness of the signage and the corresponding rights.

# Community Policing: ¶31

**31.** *CPD will provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶31 because the CPD finalized and posted an updated version of General Order, G06-01-04, *Arrestee and In-Custody Communications*, which includes language addressing this paragraph. As referenced above, in the third reporting period, the City and the CPD experienced significant challenges regarding arrestee rights. We will cover the details of many of those challenges in our special report. Thus, this section focuses on the City and the CPD's policy development for Preliminary compliance.

During this reporting period, the IMT assessed the CPD's efforts to codify ¶31's requirement into a policy. The CPD submitted G06-01-04 for the ¶¶626–41 review process during the second reporting period. After incorporating feedback from the IMT and the OAG, the CPD finalized and posted an updated G06-01-04 for public comment. The updated G06-01-04 became effective as of February 29, 2020.

Although ¶31 uses the language "as soon as practicable," we are still concerned that the phrase is not objective enough to ensure arrestees can reach their attorneys or family members in a timely manner. To evaluate how Department members are interpreting "as soon as practicable," we will request that the CPD track the time an arrestee is taken into custody and the time that the arrestee is provided access to a phone for a phone call.

Illinois recently amended state law to guarantee people the right to a phone call no later than three hours after arrival at the first place of custody.[45] The IMT is also aware of much local attention to this issue during this reporting period, including

---

[45]    725 ILCS 5/103-3 (effective July 1, 2021).

proposed City legislation,[46] a lawsuit filed by county officials against the City,[47] and a new state law that, at the end of the reporting period, was pending the Governor's signature.[48] The City and the CPD must take any related new laws and ordinances into consideration and may need to revise this policy in the near future.

Because the CPD codified ¶31's requirements into G06-01-04, the City and the CPD have met Preliminary compliance. To maintain Preliminary compliance, the CPD will need to consider community input and any challenges with the existing policy and if warranted, revise the policy. Moving forward, we will assess the CPD's efforts to implement supervisory practices to ensure the policy is up-to-date and implemented as written. Specifically, the IMT will look for the CPD's efforts to train members on the requirement and to evaluate whether members are consistent in their approach to "as soon as practicable" by tracking the timeframe between being taken into custody and being provided access to a phone for a phone call.

---

[46] Paris Schutz, *Alderman, Mayor at Odds Over Phone Calls in Police Custody*, WTTW (December 21, 2020), https://news.wttw.com/2020/12/21/aldermen-mayor-odds-over-phone-calls-police-custody#:~:text=The%20Chicago%20Police%20Department's%20deputy,arresting%20and%20booking%20a%20suspect.&text=Mayor%20Lori%20Lightfoot's%20administration%20has,hours%20of%20being%20in%20custody.

[47] Matthew Hendrickson, *Arrestees denied phone calls, access to lawyers, lawsuit claims*, CHICAGO SUN-TIMES (June 23, 2020), https://chicago.suntimes.com/2020/6/23/21300460/lawsuit-cook-county-public-defender-good-kids-mad-city-black-lives-matter-chicago-police.

[48] Illinois enacted HB 3653 after the third reporting period on February 22, 2021, which is available at the following link: https://www.ilga.gov/legislation/BillStatus.asp?DocTypeID=HB&DocNum=3653&GAID=15&SessionID=108&LegID=120371.

## Community Policing: ¶32

**32.** *Within 180 days of the Effective Date, CPD will review and revise its current policies relating to youth and children and, within 365 days, will revise its training, as necessary, to ensure that CPD provides officers with guidance on developmentally appropriate responses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law.*

Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD have not met Preliminary compliance for ¶32 because the CPD has not completed nor provided a plan for the review and revision process of its current youth and children related policies. However, we acknowledge that the CPD has taken steps towards reforming its youth interactions guidance and practices.

In the last reporting period, the IMT noted that the CPD missed both of ¶32's deadlines by not completing the review and revision process of its youth related policies and trainings. We also noted that the CPD did not develop a plan, including a timeline, for the competition of its review and revision process. But the CPD did complete the ¶¶626–41 review process for Special Order, S06-04, *Processing of Juveniles and Minors Under Department Control*, during last reporting period.

During the third reporting period, we continued to assess the CPD's efforts to review and revise its youth related directives and trainings. Although the CPD has reviewed and revised some of its youth related directives, it remains unclear which CPD directives and trainings the CPD has reviewed, plans to review, or plans to revise. Many of the CPD identified directives and trainings intersect with other Consent Decree paragraphs, likely making the review of these policies and trainings a bit disjointed. Therefore, the CPD should create and submit a plan for the IMT's and the OAG's review that addresses how the CPD plans to comply with ¶32, including a timeline and the delineation of responsibilities related to the timeline.

Nonetheless, in addition to S06-04, the CPD identified the following youth-related directives and forms:

1. General Order G01-01, *Vision, Mission Statement, and Core Values*;
2. General Order G02-03, *Community Policing Mission and Vision*;

3. Special Order S02-03, *Community Partnerships and Engagement Strategy*;
4. Special Order S02-03-01, *Beat Community Meetings*;
5. Special Order S2-03-14, *District Advisory Committee*;
6. Special Order S02-03-06, *Drug Abuse Resistance Education (D.A.R.E.) Program*;
7. Special Order S02-03-07, *Gang Resistance Education and Training (G.R.E.A.T.) Program*;
8. Special Order S02-03-11, *Officer Friendly Program*;
9. Special Order S02-03-12, *Bridging the Divide Program*;
10. General Order G02-01, *Human Rights and Human Resources*;
11. Special Order S04-32, *Cannabis Enforcement*;
12. Special Order S04-01-02, *School Resource Officers and Investigations at Chicago Public Schools*;
13. Special Order S06-04-06, *Juvenile Intervention and Support Center*;
14. Special Order S02-03-05, *Peer Jury Program*;
15. Special Order S02-04-07, *Chicago Recovery Alliance Needle Program*;
16. Special Order S04-14, *Citing Traffic Violations and Attending Traffic Court*;
17. Special Order S04-22, *Municipal Administrative Hearings*; and
18. Department Notice 18-03, *Narcotics Arrest Diversion Program*.

Several of these directives have completed the ¶¶626–41 review process as part of the CPD's efforts to comply with other Consent Decree paragraphs. However, despite being a policy related to ¶32—and thus subject to the ¶¶626–41 review process—the CPD published S04-32 without providing the IMT, the OAG, or the public an opportunity to review and comment. We expect that the CPD will work to move S04-32 through the ¶¶626–41 review process during the next reporting period.

The CPD provided, however, evidence that it is (1) researching best practices related to youth interactions reform and (2) engaging expert groups and agencies for additional policy and training input. But the CPD has not completed the review and revision process, nor provided a plan outlining their review process, including a timeline and assigned responsibilities. As a result, we conclude that the City and the CPD have not achieved Preliminary compliance for ¶32.

Moving forward, we will assess the CPD's efforts to review and revise its youth related directives and training, including reviewing the CPD's plan to complete the review process. We will also assess the CPD's efforts to develop practices to supervise members' implementation of the revised directives and trainings, which may include additional training.

# Community Policing: ¶34

**34.** *CPD will clarify in policy that juveniles in CPD custody have the right to an attorney visitation, regardless of parent or legal guardian permission, even if the juvenile is not going to be interviewed.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This is the first time we have assessed ¶34 for compliance. Some of the CPD's efforts to comply with this paragraph began in previous reporting periods. In the third reporting period, the City and the CPD met Preliminary compliance for ¶34 because the CPD had already finalized its Special Order S06-04, *Processing of Juveniles and Minors under Department Control*, which clarifies juveniles' right to an attorney visitation.

During the third reporting period, we assessed whether the CPD implemented a policy addressing juveniles' right to an attorney visitation. We also began assessing the CPD's efforts to develop practices to ensure members comply with the policy as written. S06-04 includes language regarding juveniles' right to an attorney visitation. The CPD had already completed the ¶¶626–41 review process for S06-04 before the third reporting period. We have not yet received sufficient records to suggest the CPD has implemented safeguards to ensure compliance with this directive. Specifically, we had not seen sufficient records indicating whether members are aware of this specific direction (*i.e.*, training) and that supervisory practices are in place to monitor compliance.

We conclude that the City and the CPD have met Preliminary compliance because the CPD had already implemented an updated version of S06-04 that clarifies that juveniles have a right to an attorney visitation. Moving forward, we will continue to assess the CPD's efforts to train members on this specific direction and to create supervisory practices designed to ensure members are implementing the policy as written.

# Community Policing: ¶35

**35.** *If a juvenile has been arrested CPD will notify the juvenile's parent or guardian as soon as possible. The notification may either be in person or by telephone and will be documented in any relevant reports, along with the identity of the parent or guardian who was notified. Officers will document in the arrest or incident report attempts to notify a parent or guardian. If a juvenile is subsequently interrogated, CPD policy will comply with state law and require, at a minimum, that: a. Juvenile Miranda Warning will be given to juveniles prior to any custodial interrogation; b. the public defender's office may represent and have access to a juvenile during a custodial interrogation, regardless of parent or legal guardian permission; c. CPD officers will make reasonable efforts to ensure a parent or legal guardian is present for a custodial interrogation of a juvenile arrestee under 15 years of age in custody for any felony offense; and d. juveniles in custody for felony offenses and misdemeanor sex offenses under Article 11 of the Illinois Criminal Code will have their custodial interrogation electronically recorded.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This is the first time we have assessed ¶35 for compliance. Some of the CPD's efforts to comply with this paragraph began in previous reporting periods. The IMT finds that the CPD and the City have achieved Preliminary compliance with ¶35 because the CPD already finalized its Special Order S06-04, *Processing of Juveniles and Minors under Department Control*, which codifies ¶35's requirements.

During this reporting period, we assessed whether the CPD implemented a policy addressing the juvenile processing procedures outlined in ¶35. We also began assessing the CPD's efforts to develop practices to ensure members comply with the policy as written. S06-04 codifies the various notification requirements of this paragraph. The CPD had already completed the ¶¶626–41 review process for S06-04 before the third reporting period. We have not yet received sufficient records to suggest the CPD had implemented safeguards to ensure compliance with this directive, which goes to our Secondary compliance assessment. Specifically, we had not seen sufficient records of the practices in place to supervise members' interactions with juveniles once in custody to ensure members are implementing the policy as written.

The City and the CPD have met Preliminary compliance with ¶35 because the CPD had already implemented an updated S06-04 that codifies this paragraph's requirements. Moving forward, we will continue to assess the CPD's efforts to train members on this policy and to create supervisory practices designed to ensure members are implementing the policy as written.

# Community Policing: ¶36

**36.** *When determining whether or not to apply handcuffs or other physical restraints on a juvenile, CPD officers will consider the totality of the circumstances, including, but not limited to, the nature of the incident and the juvenile's age, physical size, actions, and conduct, when known or objectively apparent to a reasonable officer, and whether such restraints are necessary to provide for the safety of the juvenile, the officer, or others.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first time we have assessed ¶36 for compliance. Some of the CPD's efforts to comply with this paragraph began in previous reporting periods. The CPD and the City have achieved Preliminary compliance with ¶36 because the CPD had already finalized its Special Order, S06-04, *Processing of Juveniles and Minors under Department Control*, which codifies this paragraph's requirements.

During this reporting period, the IMT assessed whether the CPD implemented a policy addressing the use of handcuffs and other physical restraints on young people. We also began assessing the CPD's efforts to develop practices to ensure members comply with the policy as written. S06-04 codifies the requirements in this paragraph. The CPD had already completed the ¶¶626–41 review process for S06-04 before the third reporting period. We have not yet received sufficient records to suggest the CPD had implemented safeguards to ensure compliance with this directive, which goes to our Secondary compliance assessment. Specifically, we had not seen sufficient records of the practices in place to supervise members' use of handcuffs or other restraints on juveniles to ensure members are implementing the policy as written.

The City and the CPD have met Preliminary compliance with ¶36 because the CPD had already implemented an updated S06-04 that codifies this paragraph's requirements. Moving forward, we will continue to assess the CPD's efforts to train members on this policy and to create supervisory practices designed to ensure members are implementing the policy as written.

# Community Policing: ¶¶39–40

**39.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools.*

**40.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD met Preliminary compliance for ¶¶39–40, but has not met Secondary compliance. The CPD's Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools* (CPS), codifies the CPD's SRO selection criteria and defines the role of SROs, but outstanding IMT and OAG comments remain.

In the last reporting period, the IMT assessed the CPD's efforts to refine its SRO program. After consulting with relevant stakeholders, the CPD developed a revised

version of S04-01-02, which included SRO screening criteria. The CPD also hosted additional engagements to receive community member feedback, which the IMT observed. We also assessed whether the SROs assigned to CPS met the outlined criteria. We reviewed the policy and provided feedback, noting that the selection criteria's threshold should be higher and that the SROs role should include the triad model.

During the third reporting period, the IMT continued to assess the CPD's efforts to develop and implement (1) screening criteria for SROs (¶39) and (2) a policy that clearly defines the role of SROs (¶40). This assessment included a review of whether the CPD consulted with community stakeholders and considered their input. We also assessed the CPD's efforts to implement the updated policy before the 2020-2021 school year.

After the 2019-2020 school year, and in consultation with CPS and community stakeholders, the CPD revised its SRO selection criteria and program. The proposed changes, as reflected in a revised draft of S04-01-02, align with the suggestions we raised in the previous monitoring report and with national best practices. In response to community concerns, the CPD is seeking assistance from community based organizations to develop alternative strategies to creating safer schools, including those without an assigned SRO.

As part of those efforts, the CPD established an SRO working group, which was ultimately canceled after the CPD received community complaints regarding the participant selection process. Before it was canceled, the working group produced 54 recommendations for the SRO program. The CPD only accepted a handful of the recommendations, which also distressed community stakeholders. Community stakeholders also disliked the expedited review deadlines driven by the Consent Decree requirements and the lack of youth participation.

In addition to the working group, the CPD hosted a focus group to discuss the SRO program. The focus group comprised of 19 community members, CPD personnel, and CPS staff. Many community members do not support having CPD officers in school and believe that funds for the SRO program should instead be allocated to hire more school-based employees who could provide additional mental health and other supportive services. These community members explained that one reason to eliminate the program is because students of color are disproportionately subjected to SRO enforcement actions compared to White students.

However, community members also provided feedback for how the program could improve if it is to continue. Such feedback included additional de-escalation training, greater collaborations between SROs and school personnel, higher disciplinary thresholds, and altering the SROs uniform requirements. In some cases, the CPD had already informally implemented suggested recommendations, including the removal of CPD computer terminals from schools, the restriction of officer access

to the criminal enterprise information system, and streamlined reviews of complaints against SROs.

The CPD and the City have had to reconcile the feedback received from the focus groups with the concerns raised by community members outside of the CPD's targeted community engagement efforts. After George Floyd's death and the subsequent protests and unrest, the CPD and its SRO program came under greater public scrutiny. The CPD received over 20,000 public comments on the SRO policy, including a large number of the comments that called for an end to the SRO program. Chicago City Council eventually voted to continue funding the program with the understanding that each Local School Council would decide whether to participate in the SRO program. Local School Councils were required to vote by August 14, 2020.[49] Fifty-five Local School Councils voted to keep SROs, while 17 voted to remove them from their school. *See* Community Policing Figure 3.

| Community Policing Figure 3 | | | |
|---|---|---|---|
| Summary of Local School Council Voting on School Resource Officer Program | | | |
| District | #Schools Reporting | #Maintaining Program | #Terminating SRO Program |
| District 001 | 2 | 2 | 0 |
| District 002 | 7 | 6 | 1 |
| District 003 | 1 | 1 | 0 |
| District 004 | 4 | 3 | 1 |
| District 005 | 2 | 2 | 0 |
| District 006 | 3 | 3 | 0 |
| District 007 | 2 | 2 | 0 |
| District 008 | 8 | 7 | 1 |
| District 009 | 5 | 3 | 2 |
| District 010 | 3 | 3 | 0 |
| District 011 | 6 | 6 | 0 |
| District 012 | 5 | 3 | 2 |
| District 015 | 3 | 3 | 0 |
| District 016 | 2 | 2 | 0 |
| District 017 | 4 | 2 | 2 |
| District 018 | 1 | 0 | 1 |
| District 019 | 3 | 1 | 2 |
| District 020 | 3 | 1 | 2 |
| District 022 | 3 | 3 | 0 |
| District 024 | 1 | 0 | 1 |
| District 025 | 4 | 3 | 1 |
| Total | 72 | 55 | 17 |

With this community feedback—and in consultation with CPS—the City and the CPD worked diligently to reform the SRO program, including revising S04-02-01,

---

[49] *School Resource Officer Program Information,* CHICAGO PUBLIC SCHOOLS, https://www.cps.edu/about/local-school-councils/school-resource-officer-program-information/.

developing SRO refresher training curriculum (¶42), and agreeing to a new memorandum of understanding between the CPS and the CPD for the 2020-2021 school year (¶44).

In August 2020, the City announced the SRO reforms to "strengthen training, codify best practices, and improve the SRO selection process to build a positive school environment through a truly more holistic and multi-faceted approach to school safety across the district."[50] Specifically, the City committed to the following program changes:

- Prohibiting SRO use of the CPD Criminal Enterprise Information System;

- SRO complaints to be reviewed on a fast track by the Civilian Office of Police Accountability (COPA);

- Higher disciplinary thresholds for SRO candidates;

- Principal interviews of SRO candidates;

- SROs participating as members of school behavioral health teams;

- Specialized training for interactions with LGBTQI and other special populations; and

- Having University of Chicago Crime and Education Lab analyze and report out on racial disparities in school arrests.

The most recent draft of S04-01-02 is a vast improvement. It includes a new selection process, updated selection criteria, additional training requirements, and updates to the SRO roles and responsibilities based in part on the IMT's, the OAG's, and community members' feedback. This revised policy also comports with national standards.

Although the CPD stepped up program recruitment efforts, the CPD received a slightly lower number of applicants for the 2020-2021 school year. While the IMT did not receive the application packets for these applicants, Community Policing Figure 4 below depicts a summary of the number of School Resource Officer applications received in 2019 and in 2020 by District.

---

[50] *Chicago Public Schools Proposes Progressive Reforms to School Resource Officer (SRO) Program Based on Feedback*, CHICAGO PUBLIC SCHOOLS (August 19, 2020), https://www.cps.edu/press-releases/chicago-public-schools-proposes-progressive-reforms-to-school-resource-officer-sro-program-based-on-feedback/.

| Community Policing Figure 4 | | Summary of School Resource Officer Applications | |
|---|---|---|---|
| District | #Schools Reporting | #Applications Received 2019 | #Applications Received 2020 |
| District 001 | 2 | 4 | 4 |
| District 002 | 6 | 12 | 12 |
| District 003 | 1 | 10 | 10 |
| District 004 | 2 | 13 | 7 |
| District 005 | 3 | 12 | 13 |
| District 006 | 3 | 17 | 16 |
| District 007 | 3 | 13 | 15 |
| District 008 | 6 | 10 | 12 |
| District 009 | 3 | 12 | 5 |
| District 010 | 3 | 8 | 6 |
| District 011 | 5 | 12 | 11 |
| District 012 | 3 | 15 | 9 |
| District 013 | - | 3 | - |
| District 014 | - | 9 | - |
| District 015 | 3 | 8 | 6 |
| District 016 | 2 | 10 | 7 |
| District 017 | 2 | 0 | 12 |
| District 018 | - | 6 | - |
| District 019 | 1 | 8 | 6 |
| District 020 | 1 | 6 | 4 |
| District 021 | - | 7 | - |
| District 022 | 3 | 12 | 5 |
| District 025 | 3 | - | 9 |
| Totals | 55 | 207 | 169 |

The City and the CPD achieved Preliminary compliance for ¶¶39–40 but has not met Secondary compliance. While the IMT appreciates the CPD's efforts during the third reporting period, the CPD did not implement the revised S04-01-02 before the 2020-2021 school year. We recognize the investments that the CPD made in re-tooling its SRO program. Although unable to reconcile the varying community stakeholder recommendations, the CPD has taken steps to engage the community on the policy and criteria. As the SRO program continues, it is critical that the CPD continue to engage the community for feedback regarding remaining concerns and alternative safety programming. Moving forward, we will continue to assess the CPD's efforts to finalize S04-01-02 and develop supervisory practices to ensure members implement the policy as written.

# Community Policing: ¶41

*41. CPD will, within 60 days of the completion of the 2019-2020 school year, and on an annual basis thereafter, review and, to the extent necessary, revise its policies and practices regarding officers assigned to work in CPS schools to ensure they are responsive to the needs of the Department, CPS, and its students. This evaluation will include input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders. Any revisions to CPD's policies and procedures regarding officers assigned to schools will be submitted to the Monitor and OAG in accordance with the requirements of Part C of the Implementation, Enforcement, and Monitoring section of this Agreement.*

## Compliance Progress      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** October 19, 2020*    ☐ **Met**   ☑ **Missed**

*Extended from August 17, 2020, due to COVID-19

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD met Preliminary compliance for ¶41 because they have been reviewing Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools* (CPS). The review is ongoing, and therefore the CPD did not complete the review and revision process by October 19, 2020.

During the third reporting period, the IMT assessed the CPD's efforts to incorporate ¶41's review requirement into a policy. The CPD has not yet incorporated the requirement into policy, but it has been engaged in the ¶¶626–41 review process for S04-02-01 since 2019. As part of the CPD's revision process, it has engaged in extensive community engagement and collaboration with CPS. *See* ¶¶39–40 above.

Given the amount of work put into the review and revision process, the IMT finds that the City and the CPD have met Preliminary compliance with ¶41. However, to maintain that status, the CPD must codify this review process into a policy. Moving forward, we will assess the CPD's efforts to incorporate this requirement into policy and then finalize that policy.

# Community Policing: ¶43

*43. The curricula, lesson plans, and course material used in initial training provided before the 2019-2020 school year will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**        *Not in Compliance*
**Full:**             *Not Yet Assessed*

The City and the CPD maintain Preliminary compliance but have not met Secondary compliance for ¶43 because it did not provide an updated version of the initial training in response to our initial comments.

In the previous reporting period, the IMT concluded that the City and the CPD met Preliminary compliance because the CPD provided the initial training materials before the end of 2019. The IMT reviewed those materials and provided comments for the CPD's consideration.

During the third reporting period, the IMT assessed the CPD's efforts to complete the Consent Decree training review process for the initial SRO training in time to implement the updated training before the 2020-2021 school year. The CPD did not, however, provide the IMT with an updated version of the 2020-2021 training materials. Because the CPD did not complete the Consent Decree training review process for the initial training materials before the 2020-2021 school year, the IMT finds that the City and the CPD have not met Secondary compliance. Moving forward, we will assess the CPD's efforts to finalize the revised training for the next school year.

# Community Policing: ¶44

**44.** *Before the 2019-2020 school year begins, CPD will undertake best efforts to enter into a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement.*

**Compliance Progress** (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD achieved Secondary compliance for ¶44 because it took best efforts to enter into a new memorandum of understanding (MOU) with the CPS for the 2020-2021 school year.

During Year One of the Consent Decree, before the 2019–2020 school year, the CPD and the CPS negotiated and implemented a MOU. The 2019 MOU did not completely align with the CPD's Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools,* or national standards. Similarly, the MOU developed during the second reporting period had the same shortcomings and did not incorporate community feedback.

During the third reporting period, the IMT assessed the CPD's efforts to enter into a new MOU with the CPS for the 2020-2021 school year. The CPD and the CPS collaborated to reach an agreement on the third iteration of the MOU since the IMT's monitoring work began.

The 2020-2021 MOU aligns with the revised draft of S04-01-02, national standards, and incorporates community input. The MOU now includes:

- Updated selection assessment and performance metrics of SROs;

- Updated training requirements, including an emphasis on de-escalation techniques;

- Performance evaluations;

- Updated complaint procedures;

- Expanded non-enforcement related SRO roles and responsibilities;

- Regular meetings and procedures for more coordination between CPS and CPD; and

- Prohibition against accessing the CPD criminal enterprise database.

Because of these revisions, the City and the CPD achieved Secondary compliance with ¶44. The 2020-2021 school year MOU addresses the concerns we previously raised regarding alignment with best practices and responsiveness to community feedback. Looking forward, to maintain Secondary compliance, we will assess the CPD's efforts to train members on the MOU (relying on our assessments of ¶¶42–43). We will also assess whether the CPD has implemented effective supervisory practices to ensure CPD members are adhering to the MOU. To the extent that the CPD must restart its efforts to reach a MOU with the CPS, we will assess the CPD's efforts to do so.

# Community Policing: ¶45

**45.** *By January 1, 2020, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to: a. reviewing available district resources and personnel assignments; b. identifying methods to support their district's ability to effectively problem-solve, including collaborating with City departments, services, and sister agencies; and c. identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence.*

---

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | March 4, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from January 1, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

In the third reporting period, the City and the CPD did not met Preliminary compliance with ¶45. The CPD implemented Special Order, S02-03-02, *District Strategic Plans*, and developed a new directive addressing the District Strategic Plans review process, *Office of Community Policing (OCP) District Strategic Plans* Standard Operating Procedure. These directives may be too limited to account for ¶45, however, because they only cover District Strategic Plans.

During this reporting period, the IMT assessed whether the CPD implemented a policy that codifies the annual review outlined in ¶45. We also assessed whether the District Commanders reviewed their district's policing strategies and considered the requisite input from their District Advisory Committees and the Office of Community Policing.

The relevant directives, S02-03-02 and the *Office of Community Policing District Strategic Plans* Standard Operating Procedure, provide guidance on the development and review process of District Strategic Plans, including requirements for District Advisory Committees review and the Office of Community Policing review. In

addition to the new standard operating procedure, the Office of Community Policing expanded the district strategy development form, which the CPD revised to reflect our concerns regarding the lack of attention to staffing and resource considerations. The new form also incorporates the SARA (Scanning, Analysis, Response, and Assessment) community policing problem solving model. However, these directives may be too limited. If districts have other policing strategies (*e.g.*, initiatives and teams), these directives do not contemplate the District Commanders review of those strategies.

Perhaps due to the COVID-19 pandemic and corresponding extension, we have not received records reflecting the District Commanders' review of their districts policing strategies, including the District Strategic Plans.

In reviewing the District Strategic Plans development process, the IMT continues to see the CPD struggle to attract a representative number of young people from marginalized groups and other demographic cohorts that experience high levels of police contact. For the Strategic Plans to be consistent with community policing principles, the CPD must develop methods to extend their community outreach to attract participants that reflect a broad cross section of the community. However, we acknowledge that the CPD is constantly working on evolving their community engagement efforts and did seek to engage the community as part of the Strategic Plans development.

Paragraph 45 also requires the District Commanders to review their district's policing strategies, with input from District Advisory Committee and the Office of Community Policing. We assessed whether the District Commanders received such input. As proscribed in the standard operating procedure, District Advisory Committees, Area Chiefs, District Commanders, and the Office of Community Policing are all involved in the District Strategic Plan review process. We received records reflecting the Office of Community Policing's review of the District Strategic Plans, but we have not received evidence that the District Commander received the Office of Community Policing input on any other district policing strategy.

Relatedly, we have general concerns regarding the unevenness in the implementation of the District Advisory Committee program across districts. According to the CPD, many District Advisory Committees lack the required memberships, and there is little documentation of ongoing District Advisory Committee meetings from each of the 22 districts. Given the CPD's report of the status of District Advisory Committees, we are concerned that they may not be in a position to provide District Commanders with input on district policing strategies. Again, we did not receive records during this reporting period of District Advisory Committees review of any of the District Strategic Plans.

Therefore, in the third reporting period, the City and the CPD did not achieve Preliminary compliance with ¶45, because the CPD's S02-03-02 and *Office of Community Policing District Strategic Plans* Standard Operating Procedure may not sufficiently address this paragraph's requirements as those directives relate to the Strategic Plans process only and not all district policing strategies. We also note that, although the Strategic Plans are developed in collaboration with community members, the CPD should focus efforts on finding methods to reach people from marginalized groups who experience high levels of police contact. Also, the CPD will likely need to address each District Advisory Committees' ability to provide District Commanders with input on district policing strategies. To achieve Preliminary compliance, we will assess the CPD's efforts to address these concerns.

## Community Policing: ¶46

*46. Within 180 days of the Effective Date, and as appropriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross section of the community each district serves.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶46, but did not meet Secondary compliance in the third reporting period. The CPD has not developed methods to effectively engage a broader and more representative group of community members.

In the last reporting period, the IMT assigned Preliminary compliance because the CPD took significant efforts to engage the community in each district about the CPD's policing efforts and strategies. The CPD's approach was multifaceted, soliciting feedback from community members in each district through "Community Conversations," community surveys on CPD policies, policy revision working groups, and ongoing Beat meetings.

This reporting period, we assessed the CPD's efforts to continue to improve and address the concerns that we raised regarding the insufficient targeted outreach, community meeting design, and use of working groups.

During the third reporting period, the CPD adapted its outreach and community engagement to address the obstacles posed by the COVID-19 pandemic. The CPD transitioned to holding its community engagement events on virtual platforms. Despite the limitations posed by COVID-19, the CPD hosted:

- 44 Community Conversation meetings for developing District Strategic Plans and Bureau Strategic Plans;

- 25 working group meetings covering topics like, use of force and school resource officers;

- 19 focus groups covering a range of topics;

- 446 Beat meetings;

- 168 Youth District Advisory Committee meetings;

- 25 District Advisory Committee meetings; and

- 4 Community Policing Advisory Panel meetings.

Using a range of communication, assessment, and data gathering tools, the CPD continues to build a robust community information gathering infrastructure with the aim of having the capacity to engage community members and stakeholders.

As referenced above, the CPD hosted its 44 Community Conversations virtually in 2020. These Community Conversations are an opportunity for district residents to provide input on their district's community-driven crime reduction plan. Each district hosted two meetings: the first to identify crime reduction priorities and community engagement goals and the second to review the draft Strategic Plan. Based on the input received during those meetings, the districts developed a final draft plan to share with their District Advisory Committees and the Office of Community Policing.

The IMT observed several virtual Community Conversations. We saw an improvement in the facilitator effectiveness compared to the second reporting period. However, we also noted a lack of participation from young Chicagoans and other people from marginalized communities most impacted by police services.

We discuss the CPD's efforts to track its community engagements in more detail in ¶47 below, but we note that the CPD continues to struggle with reaching and soliciting input from a broad cross-section of community members, especially groups who have been most adversely impacted by CPD practices. For example, the CPD provided Community Conversations' data, which revealed that (1) nearly half of attendees were 45 years or older, (2) 71 percent female, and (3) only 13 percent Hispanic/Latino. We acknowledge that a preponderance of community participants generally felt that their voices were heard as a result of this process. To help ensure a broader cross-section of the community share that sentiment, the CPD will likely need to employ more specific approaches and methods to solicit and receive input from marginalized groups and others, such as younger community members.

In sum, the City and the CPD maintained Preliminary compliance with ¶46. However, because the CPD has not begun addressing the issue of reaching those marginalized groups that are most impacted by policing services, the CPD did not achieve Secondary compliance in the third reporting period. Moving forward, we will assess the CPD's efforts to engage in that more targeted outreach and further improve its design of community input sessions. We will also monitor stakeholder

and staff training relating to the community engagement processes. Additionally, we will assess the CPD's efforts to enhance the feedback loop, including efforts to respond to community member input. Finally, we encourage the CPD to demonstrate a plan to address the unevenness in the District Advisory Committee program.

# Community Policing: ¶47

**47.** *Within 180 days of the Effective Date, CPD will develop procedures to annually evaluate the effectiveness of the Department's efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any necessary adjustments based on its annual evaluation.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶47 because the Office of Community Policing developed a standard operating procedure governing its performance management assessment process.

In the second reporting period, the IMT assessed the CPD's efforts to codify the ¶47 annual review requirement into a policy or procedure. The CPD had developed a standard operating procedure and shared it with the IMT and the OAG for review and comment. We also assessed the Office of Community Policing's team efforts to measure and assess community engagement data.

During the third reporting period, we continued to assess the CPD's efforts to codify the annual review requirement into a policy or procedure. We also reviewed monthly performance management records and the Office of Community Policing's efforts to empower districts to better track their community policing data.

The CPD revised the Office of Community Policing's performance management standard operating procedure during the third reporting period. The IMT offered a few suggestions for the Office of Community Policing to consider, but generally found that it was a good first step in codifying an evaluation of the effectiveness of the Department's community policing efforts.

As we discussed in the second report, the Office of Community Policing has developed a community engagement performance management system to measure, manage, and report on community-participation data. Specifically, the performance management process tracks police performance by district. The Office of Community Policing tracks foot patrols, crime trends, complaint data, positive community interactions, community engagement activities, and Elucd survey

data.[51] Each month, the CPD performance management group analyzes the data and reports its findings back to districts (two district per meeting) to help inform district-level and City-wide decision making.

During this reporting period, we received more information on the Elucd's sampling and methodology. Elucd is a social-media-based system that uses non-traditional sampling techniques to gauge community perceptions of safety and trust. Elucd's monthly reports include trend analysis and identify data anomalies that require the CPD's interpretation and response.

The CPD continues to review its performance management system for ways to better capture a broader range of community engagement processes including district-level engagement, problem solving, and special events. In addition to this review, we encourage the CPD to assess how to fine tune its evaluation process to ensure that its annual review sufficiently measures the effectiveness of the CPD's efforts and strategies for building community partnerships and using problem-solving techniques aimed at reducing crime and improving quality of life.

Currently, the IMT's understanding of the annual evaluation is that it will happen during the District Strategic Plan development stage. It may make sense to have a more comprehensive evaluation that results in a written report, too. We acknowledge that the Office of Community Policing evaluates community policing efforts monthly, but we encourage the CPD to continue assessing how best to approach this evaluation so that the Department can rely on it to make adjustments to community policing strategies, as needed. As we have discussed throughout the third reporting period, it would be beneficial if the annual evaluation reviewed the different community policing programs, including the District Advisory Committee program, Beat meeting program, and youth programs.

We conclude that the City and the CPD have met Preliminary compliance with ¶47 by finalizing their Office of Community Policing performance management standard operating procedure and their monthly reporting district community policing data. Moving forward, we will assess the CPD's efforts to refine their system and evaluation approach. We will also assess the CPD's efforts to train members to ensure the policy is implemented as written.

---

[51]  *See* ELUCD, https://elucd.com/.

# Community Policing: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report— the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶33, 37, 38, and 42 of the Community Policing section.[52]

\*\*\*

| Consent Decree ¶33 |
|---|

> **33.** *When interacting with youth and children, CPD will, as appropriate and permitted by law, encourage officers to exercise discretion to use alternatives to arrest and alternatives to referral to juvenile court, including, but not limited to: issuing warnings and providing guidance; referral to community services and resources such as mental health, drug treatment, mentoring, and counseling organizations, educational services, and other agencies; station adjustments; and civil citations.*

## Compliance Status

The CPD's primary vehicle for youth diversion is the Juvenile Information and Support Center (JISC), which provides services to youth charged with less serious offenses.[53] JISC is jointly-run by the CPD and the Chicago Department of Family and Support Services (DFSS). The JISC is also a law-enforcement-based diversion program, but many experts believe that diversion programs should occur prior to arrest, as in "no entry" models.[54] The JISC is currently a diversion program serving youth post-arrest, and therefore, it is not an alternative to arrest.

---

[52]    In the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

[53]    The City's Inspector General issued an audit covering JISC operations, which concluded that the JISC maintained poor record keeping, lacked collaboration with community partners, lacked adequate recidivism data collection processes, and lacked alignment with best practices. City of Chicago Office of Inspector General, *Audit of the Chicago Police Department and Department of Family and Support Services' Administration of the Juvenile Intervention and Support Center* (February 2020), https://igchicago.org/wp-content/uploads/2020/02/OIG-JISC-Audit.pdf.

[54]    *See* Karen Tamis and Cymone Fuller, Vera Institute of Justice, *It Takes a Village: Diversion Resources for Police and Families* (June 2016), https://www.vera.org/downloads/publications/it-

The CPD reports to have begun researching best practices in both "deflection" also known as "no entry" (*i.e.*, pre-arrest alternatives) and diversion (*i.e.*, post-arrest alternatives). The CPD also engaged the community through focus groups and a survey for their input on youth related concerns generally as part of its policy review and revision process. We look forward to assessing how the CPD plans to use that input in its efforts to comply with this paragraph.

| Consent Decree ¶37 |
|---|

> *37. Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the philosophy of community policing into its annual in service training for all officers, including supervisors and command staff, by providing training on the following topics: a. an overview of the philosophy and principles of community policing, consistent with this Agreement; b. methods and strategies for establishing and strengthening community partnerships that enable officers to work with communities to set public safety and crime prevention priorities and to create opportunities for positive interactions with all members of the community, including, but not limited to, youth, people of color, women, LGBTQI individuals, religious minorities, immigrants, individuals with limited English proficiency, homeless individuals, and individuals with disabilities; c. problem-solving tactics and techniques; d. information about adolescent development and techniques for positive interactions with youth; and e. effective communication and interpersonal skills.*

## Compliance Status

During the third reporting period, the CPD developed and submitted draft 8-hour Community Policing training materials. The CPD also provided an interactive briefing of the proposed training. The IMT provided extensive comments on the training materials, including a suggestion that the CPD include knowledge tests to assess the members' retention and understanding of the training materials. We also recommended that the CPD incorporate more information about the historical roots of community policing, history of policing in Chicago, and their implications on perceptions and operations. We also encouraged the CPD to provide guidance to members on how to better leverage City services to advance community safety objectives.

---

takes-a-village-report.pdf (infographic: https://www.vera.org/downloads/publications/it-takes-a-village-infographic.pdf); Center for Health & Justice at TASC, *A National Survey of Criminal Justice Diversion Program Initiatives* (December 2013), https://www.centerforhealthand-justice.org/tascblog/Images/documents/Publications/CHJ%20Diversion%20Report_web.pdf.

We continue to push the CPD to incorporate greater emphasis on scenario-based exercises. For example, in this case, emphasizing the importance of applying appropriate interpersonal interactions with community members.

## Consent Decree ¶38

**38.** *Through inter-governmental agreements between CPD and Chicago Public Schools ("CPS"), CPD has assigned officers to work in CPS schools. In the event that CPD and CPS decide to continue this practice, officers assigned to work in CPS schools will be appropriately vetted, trained, and guided by clear policy in order to cultivate relationships of mutual respect and understanding, and foster a safe, supportive, and positive learning environment for students.*

### Compliance Status

As we discuss in our assessment of ¶¶39–40 above, the SRO program will continue during the 2020-2021 school year. The CPD and the CPS made significant progress in the third reporting period in seeking community input about the SRO program. For example, the CPD conducted four focus group sessions and a wrap-up session, focused on identifying improvements for the SRO program. The CPD also hosted an SRO working group, but disbanded the working group for the focus group model after community members raised concerns regarding the working group's participant selection process. In September 2020, the CPS and the CPD entered into a new Intergovernmental Agreement and Memorandum of Understanding for the 2020-2021 school year. Our assessment of this paragraph will also be informed by the City's efforts to comply with ¶¶39–44.

## Community Policing: ¶42

**42.** *CPD officers assigned to work in CPS schools will receive specialized initial and annual refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to: a. school-based legal topics; b. cultural competency; c. problem-solving; d. the use of de-escalation techniques, use of restorative approaches, and available community resources and alternative response options; e. youth development; f. crisis intervention; g. disability and special education issues; and h. methods and strategies that create positive interactions with specific student groups such as those with limited English proficiency, who are LGBTQI, or are experiencing homelessness.*

*The training will be developed and delivered in accordance with the requirements of the Training section of this Agreement.*

## Compliance Status

During the second reporting period, the IMT observed the initial 40-hour training delivered by the National Association of School Resource Officers (NASRO) to CPD SROs and their Sergeants and observed the supplemental CPS training. We also reviewed the training materials and provided extensive feedback.

For the foreseeable future, the CPD and the CPS plan to continue partnering with NASRO for the initial SRO training, which may limit the CPD's ability to alter the training's contents. However, the partnership should not limit the CPD's ability to supplement the training as the CPS does already.

The CPD developed and submitted its SRO refresher training materials during the third reporting period. We provided comments, and the CPD incorporated many of those comments. We especially appreciate the CPD's incorporation of additional attention to de-escalation and implicit bias topics because those were primary areas of concern for many community members.

The training materials are still undergoing the review and revision process. One outstanding concern that we have is the need for a written knowledge test to assess members' understanding and retention of the training's content. We continue to assess the CPD's effort to complete the Consent Decree training review process for both the SRO initial training and SRO refresher training.

# II. Impartial Policing

This is the Impartial Policing section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Impartial Policing compliance efforts from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** *The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.*

> **50.** *In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.*

> **51.** *CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to

various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

In the third reporting period, the City and the CPD made progress in the Impartial Policing section of the Consent Decree. Specifically, the CPD made significant progress in developing and revising policies and trainings regarding Impartial Policing. That progress included engaging the community on certain Impartial Policing subjects and policies, incorporating community and other feedback into specific policies, and finalizing those policies for implementation. The CPD also began assessing how to incorporate Impartial Policing concepts into training. For example, the CPD began reviewing its trainings to determine which ones currently cover Impartial Policing concepts.

The CPD's community engagement is a work in progress. From hosting large meetings to convening smaller focus groups, the CPD continues to adjust its efforts to engage the community as part of its policy and training development process. During this reporting period, the CPD hosted focus groups covering the following Impartial Policing topics: (1) Interactions with People with Disabilities; (2) Interactions with Religious Communities; (3) Interactions with Individuals with Limited English Proficiency; (4) Prohibition of Sexual Assault; and (5) Response to Hate Crimes. The COVID-19 pandemic added a significant hurdle for community engagement. Overall, the CPD was effective with its community engagement for some policies, was less-effective with other policies, and was unable to engage at all with others.

The City and the CPD also made significant efforts in hiring liaisons and coordinators to assist with their language-access services and interactions with people with disabilities. The new personnel have made many recommendations on how the City and the CPD can improve its services to better support community members.

To ensure that the CPD makes further progress toward impartial policing, we recommended increased tracking, community engagement, and transparency. For example, we continue to recommend that the CPD develop additional public dashboards that break down key police decisions, including the demographic characteristics of community members. Officers make many decisions that can be affected by bias and thus result in disparities in enforcement or service delivery. The CPD must be equipped to monitor these decisions as part of the reform process.

In addition to the City and the CPD maintaining existing records, we encourage the City and the CPD to measure what matters to the public—including the desire to be treated in a procedurally just manner. For these reasons, we recommend that the City conduct contact surveys for community members that will allow the City to rigorously evaluate whether the City is achieving the outcomes required by the Consent Decree during the thousands of police-community interactions that occur each month.

In this reporting period, we assessed the City's compliance with 19 of the Consent Decree's Impartial Policing paragraphs (¶¶52, 57, 58, 60, 61, 63–72, 76, and 78–80).[55] We also provide status updates for an additional six paragraphs (¶¶53–56, 62, and 74).

We have determined that the City maintained Preliminary compliance for two paragraphs (¶¶65–66), moved into Preliminary compliance for four paragraphs (¶¶52, 57, 70, and 71), and moved into Secondary compliance for one paragraph (¶67). The City failed to reach Preliminary compliance for the remaining 12 paragraphs assessed (¶¶58, 60, 61, 63–64, 68–69, 72, 76, and 78–80). *See* Impartial Policing Figure 1 below.

Impartial Policing Figure 1:     Compliance Status for Impartial Policing Paragraphs at the End of the Third Reporting Period (December 31, 2020)



The City had two deadlines in the third report. The IMT determined that the City missed the two deadlines (¶¶78 and 79/80). The City also did not achieve the underlying deadline requirement with those paragraphs by the end of the reporting period. *See* Impartial Policing Figure 2 below.

Impartial Policing Figure 2:     Total Impartial Policing Deadlines in the Third Report: 2



---

[55]  Because ¶¶79–82 are interrelated, we assessed their compliance together. Paragraph 82, however, does not contain a substantive requirement for the City. Likewise, ¶81 contains conditional requirements that may never apply and, at the time of this report, do not apply.

## Impartial Policing: ¶52

*52. In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.*

### Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period where we provide a compliance assessment for ¶52. We find that the City and the CPD met Preliminary compliance with this paragraph. Because community engagement is an integral part of the CPD's revision of policies and training across the Impartial Policing section and the Consent Decree, we give it additional attention here.

During this reporting period, we assessed the CPD's efforts to develop written guidance regarding this requirement and to involve qualified CPD personnel in the planning and execution of community engagement tasks. We also assessed the CPD's various community engagement efforts, including specific efforts to engage community members and organizations with relevant knowledge and experience.

In the third reporting period, at the CPD's request, we reviewed several iterations of its community engagement plans. Currently, the CPD's Office of Community Policing manages community engagement activities. The Office of Community Policing personnel are professional, skilled in organizing, and responsive to feedback. We acknowledge that the CPD has pursued a wide variety of community engagement plans over the past two years, including various working groups and committees.

The CPD has been challenged, however, by high levels of turnover in the Office of Community Policing and the Office of Reform Management, which has slowed implementation. The IMT will be mindful of these staffing problems and continue to monitor them in our future reports.

Regarding the CPD's efforts to engage the community for input on Impartial Policing policy and training, the CPD turned its attention to using community surveys and focus groups. As such, our analysis focuses largely on those efforts. In assessing community engagement, we examined (1) outreach; (2) meetings and interactions, problem solving, and decision making; (3) follow-up and sustainability

of partnerships, community policing, and problem-solving activities; and (4) general police-community interactions.

## 1. Outreach

In this reporting period, the IMT sought to understand whether the CPD reached out to community residents, stakeholders, and advocacy groups with relevant knowledge and experience in a proactive, meaningful, and consistent manner.

The CPD's community engagement strategies have evolved and improved significantly over the course of this monitoring project, but there are still gaps that need to be addressed for Impartial Policing. In the last reporting period, we provided an overview and critique of the CPD's initial community engagement efforts involving the "open space technology" meeting format. The CPD provided a general invitation to community members and friends of the CPD, so the protected classes identified in ¶53, including advocates, were not a specific target audience. Furthermore, police officers were overrepresented among attendees.

More recently, the CPD developed a "Short-Term Engagement Plan," which has four components: (1) produce and distribute community education materials; s(2) conduct focus groups on specific topics; (3) administer public surveys; and (4) follow-up with a "share-back" session. This plan of action has focused on the following topics: human rights, response to hate crimes, language access, sexual misconduct, interactions with children and youth, interactions with people with disabilities, interactions with religious communities, and community policing.

This Short-Term Engagement Plan is a work in progress, but the CPD has made a genuine effort at outreach despite the challenges presented by the COVID-19 pandemic. Using social media, targeted community- and faith-based organizations, and district-level events led by Chicago Alternative Policing Strategy officers, the Office of Community Policing sought input from hundreds of groups and individuals.

On September 16, 2020, the CPD posted an invitation for the focus groups and public surveys to help the CPD "review its policies." The CPD sought input from the public as a whole and also invited people with lived experience to participate. The IMT provided feedback on the draft surveys, including suggestions to reword certain questions. We also encouraged the CPD to make a concerted effort to elicit responses from communities with the highest distrust of the CPD.

The CPD made a serious effort to recruit community members to participate in the virtual focus groups. A post-event survey revealed that focus-group participants learned about the focus groups through a variety of sources, including emails, social media, and CPD surveys. The participants were racially and ethnically diverse.

However, males (20% of participants) and youth under 25 years of age (8% of participants)—two groups who are most likely to have interactions with the CPD—were significantly underrepresented. Still, 60% of the focus group participants reported having relevant lived experience on the topics of the focus groups. Unfortunately, people with disabilities of different types were not well-represented in the "interactions with people with disabilities" focus groups. It is critical that the CPD hears from community members from marginalized communities most affected by CPD actions, their representatives, and their service providers.

The CPD also implemented a public awareness campaign during the third reporting period.[56] The public awareness campaign sought to educate the public about CPD policies and practices by answering specific questions raised by the community. The CPD worked with a diverse group of eight community members to develop three, two-minute videos that appeared on the Chicago Sun-Times website. The CPD expressed an interest in reaching protected classes identified in the Consent Decree and hard-to-reach communities that have been disenfranchised.

## 2. Meetings, Interactions, and Problem Solving

Focus groups and community education were the centerpieces of the CPD's community engagement strategy during this reporting period. Coordinating 14 focus groups and seven related surveys was a significant improvement over the Community Conversations held earlier in 2020. Both data collection methods used techniques that are standard among researchers, but there were still some issues, as described below.

Through administering surveys and hosting focus groups, the CPD elected to cover six Consent Decree topics as areas where the CPD's interactions with the community have been problematic in the past: children/youth, hate-crime investigations, police sexual misconduct, people with disabilities, people with limited English proficiency, and religious communities. This is a very good start, but conspicuously absent are focus groups dedicated to two constitutionally protected classes addressed in the Consent Decree: people of color and women. *See* ¶¶53 and 55. There have not been any focus groups on police responses to communities of color, despite strong nationwide movements regarding racial justice. And while the CPD has effectively sought input on gender identity via the Transgender Intersex Gender-Nonconforming (TIGN) working group, the CPD should also address police responses to gender violence and sexual assault. Although women were strongly represented in the focus groups, gender bias in policing was only indirectly addressed with the focus group on police sexual misconduct.

---

[56] *See Ask CPD, Tough questions from Chicagoans, answered by the Chicago Police Department. Stay educated, stay informed and know your rights*, CHICAGO SUN-TIMES (November 13, 2020), www.suntimes.com/askcpd.

In prior community engagement efforts addressing impartial policing topics, the IMT has been critical of the CPD for running the meetings and controlling the conversations. Responding to this feedback, the City hired an outside organization—the Center for Conflict Resolution—to facilitate the focus groups.[57] The Center for Conflict Resolution provided participants with clear explanations of the process and sought to give participants a voice in the dialogue. Overall, the facilitators were very good, and some were excellent.

While CPD staff listened in on the focus group discussions, which may have inhibited some participants, a more serious obstacle to creating an environment in which community members felt safe voicing their opinions and experiences was the CPD's decision to allow CPD officers to serve as focus-group officers. One hate-crime focus group, for example, provided a clear example of how one officer can completely disrupt the discussion. We note that the CPD hosts officer-specific focus groups to gain officers' feedback, and general members of the public do not participate in those groups. Because the CPD has officer focus groups, the public focus groups should be limited to non-CPD community members. Still, most non-CPD participants reported that the current process allowed them to have a voice.

The standard set of questions used by the CPD across all the focus groups was a challenge for some participants. Previously, we had encouraged the CPD to change their line of questioning from specific policy issues to open-ended questions about the problems that occur when the police interact with specific populations defined in the Consent Decree. After the problem has been identified, the CPD can then work with subject-matter experts to extract relevant information for policy development or revisions. Unfortunately, the CPD elected to keep the focus on the policy for the focus groups. Participants were given 10 minutes to write down their answers to various questions about what a perfect policy would look like in the future and "be as specific as possible." This approach felt like a test and put time pressure on the participants to come up with "specific" policy-related answers rather than allowing them to freely talk about their experiences with the CPD in their neighborhoods.

Furthermore, the Center for Conflict Resolution did not allow sufficient time at the end of the "breakout" session for participants to report their big-picture ideas back to the larger group (typically 5–10 minutes). These presentations were often rushed, with pressure to take a survey before the allotted two hours expired.

Beyond the receipt of community feedback, the CPD will need to engage in several key tasks for problem solving and decision making, including proper data analysis and data reporting. Releasing a 400- or 500-page document with comments from everyone who participated in surveys and focus groups helps with transparency,

---

[57] *See* Conflict Resolution, Chicago Center for Conflict Resolution, https://www.ccrchicago.org/ (last visited March 4, 2021).

but it does little in the way of problem solving and decision making. The CPD or its vendor will need to analyze the qualitative data to identity key themes and analyze the quantitative data showing percentages in each topic area. Then, the CPD will need to present these findings in a concise report that is easily digestible. The next phase of problem solving is to engage in a dialogue with the community about the meaning of these findings and their implications for CPD policies. Here, we encourage CPD to bring in community leaders, advocates, and subject-matter experts to have a dialogue about these issues.

Beyond the focus groups, we have recommended working groups as a vehicle for problem solving, but the CPD has struggled with this approach. The TIGN working group, which functions as a community-organized, City-hosted group has been successful in revising policy and engaging in a back-and-forth exchange with the CPD. *See* ¶61. However, we have yet to see working groups for gender violence, people with disabilities, hate crime investigations, youth, religion, or racial bias. Whether the CPD uses working groups or focus groups, we encourage the CPD to pursue a more organized effort to engage persons who are subject-matter experts and advocates for persons in protected classes and those with lived experiences.

Finally, the CPD launched its public awareness campaign in late October, which ran for several weeks. The "Know Your Rights" videos were posted on the Chicago Sun-Times website: [www.suntimes.com/askcpd](www.suntimes.com/askcpd). *See* ¶28. We provided feedback to the CPD on the original plan and the CPD was responsive to many, but not all, of our suggestions. The videos were well done, and some addressed questions posed by the community regarding impartial policing, such as the following: (1) "Are officers allowed to have their body cameras turned off when interacting with citizens? If so, in what situations?" (¶58), and (2) "Why do some officers profile Black and Brown teens based off of their clothes, their hairstyles, or the music they listen to?" (¶53–55). This platform will allow the CPD to answer a number of other questions in the future.

### 3. Follow-up and Sustainability

In this reporting period, the IMT sought to understand whether the CPD's community engagement includes sufficient follow-up and efforts to sustain meaningful partnerships and problem-solving activities with community members. We credit the CPD for its efforts to continue the dialogue with the community. To receive feedback on the focus groups, the CPD invited participants to complete a survey at the end of the session to evaluate their experience and make suggestions for improvement.

On November 25, 2020, the CPD shared that survey data with the IMT. But as noted above, large quantities of raw data, without any analysis or interpretation,

are not very helpful for the IMT's assessment or for the CPD's development and revision of policy and training.[58]

Also, the CPD asked the focus group participants, via survey, whether they would be interested in future working groups on specific topics "tasked with developing recommendations on changes to select CPD Policies and Procedures." But these focus-group members will likely not remain engaged (via share-back sessions) unless the CPD analyzes the existing data and completes the policy review or revisions. As noted earlier, sustainability should be gauged by the CPD's ability to form meaningful partnerships with stakeholders around the topics identified by the CPD and the Consent Decree. Achieving this objective will require a refinement of CPD's current community-engagement framework.

### 4. General Police-Community Interactions

The CPD engages the community every day on the streets of Chicago, and public trust in the CPD is shaped by these encounters. These police-public contacts present many opportunities for the CPD members to make a positive impression on and learn from the community members they serve. As referenced above, to reliably and systematically gather feedback for policy and training purposes, we strongly recommend that the City establish an ongoing contact survey.[59]

\*\*\*

In sum, the CPD met Preliminary compliance because the CPD's Office of Community Policing has made a good-faith effort to implement a community engagement plan along the four dimensions we have used to guide our assessment. There is still work ahead for the City and the CPD to reach Secondary compliance. The CPD will need to add the following to its community engagement process:

- proper analysis of the feedback data,

- accurate reporting of that analysis,

- back-and-forth community dialogue about the policy and training implications of that engagement, and

---

[58] The CPD intends to share the results from the focus group and surveys with the participants during "share-back" sessions after the CPD has received "no objections" from the IMT and the OAG. We do not view this as the proper sequence of events. The CPD should first synthesize the community feedback, incorporate relevant feedback into policy, and share these findings and policy or training changes with the community before submitting the policy or training materials for ¶¶626–41 review.

[59] For more context, see our assessments for ¶¶53–57.

- a summary of how the feedback is incorporated into policies and training materials.

We look forward to the CPD's analysis of survey and focus group data and a summary of how such data informed the CPD's policy and training development. We also encourage the CPD to continue to expand its outreach to protected classes that may have been missed so far.

The City and CPD will achieve Full Compliance when the CPD has created mechanisms for sustained targeted community engagement. This would include a system of performance measurement that will (1) give Chicago communities an ongoing voice in evaluating police services in every police district and (2) provide the CPD with a reliable feedback loop that can be used to shape police behavior, reduce all forms of bias on the street, and ultimately build public trust.

## Impartial Policing: ¶57

**57.** *CPD will continue to prohibit CPD members from posting, displaying, or transmitting content that is disparaging to a person or group based on race, religion, sexual orientation, or any other protected class on personal social media accounts.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec.31, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have met Preliminary compliance with this paragraph because the CPD implemented G09-01-06, *Use of Social Media Outlets*, after completing the ¶¶626–41 review process and engaging community-based organizations for input.[60]

During this reporting period, we assessed the CPD's efforts to (1) ensure a policy captures this paragraph's requirements and (2) engage relevant community-based organizations for their input on the policy.

G09-01-06 is the CPD's social media policy. The IMT reviewed two versions of G09-01-06 during the previous reporting period. We offered suggestions on how the CPD could revise the policy to better align with this paragraph and clarify directions. The CPD addressed our concerns before posting the policy for public input in February 2020.

In August 2019, the CPD sought input from Communities United.[61] Communities United responded with suggested changes regarding First and Fourth Amendment rights. However, the CPD did not incorporate most of Community United's suggested edits, and we saw no evidence of the CPD's response to Communities United feedback. As described above, the feedback loop is an essential component of community engagement.

Because the CPD sought community input and finalized G09-01-06 before the end of the reporting period, we find that the CPD and the City met Preliminary compliance. Moving forward, we will assess the CPD's efforts to reengage Communities United to address their outstanding comments and complete the feedback loop.

---

[60]   It appears that the CPD revised G09-01-06 in October 2020. The CPD did not submit the revised version for ¶¶626–41 review during the third reporting period. While the revisions do not appear to affect compliance with this paragraph, we will review the revised version of the policy according to the ¶¶626–41 review process in the next reporting period.

[61]   *See* ¶709.

For Secondary compliance, we will assess the CPD's efforts to train members on G09-01-06. Such assessment will be intimately linked to compliance with ¶¶72 and 74, where the CPD seeks to integrate impartial policing and procedural justice into its training programs.

# Impartial Policing: ¶58

**58.** *Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec.31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

As in the previous reporting periods, the IMT finds that the City and the CPD have not met Preliminary compliance with ¶58, because the CPD has not provided community members with a meaningful opportunity to provide feedback regarding this paragraph's requirements.

On August 21, 2019, we provided comments regarding the CPD's General Order 02-01, *Human Rights and Human Resources*, which addresses the requirements of this paragraph. Our comments included recommendations for community engagement. In the last reporting period, the CPD began its community engagement strategy with a series of "Community Conversations." While these meetings were organized, the topic of photographing or recording CPD officers was not one of the 14 topics on the agenda.

During this reporting period, we assessed whether the CPD made efforts to engage the community on the requirements of ¶58 specifically. Furthermore, our assessment turns on whether the CPD completed the policy review process required by ¶¶626–41 regarding G02-01.

To date, the CPD has not sought community input regarding the specific requirements of ¶58. Despite our requests, the CPD has not provided records of community meetings, surveys, focus groups, working groups, or other engagement methods where the discussion topics include the issue of photographing or recording CPD officers.

On the other hand, we reviewed records reflecting community input that the CPD received indirectly from a handful of individuals who helped develop the CPD's

public awareness campaign (*see* ¶28). The CPD developed three two-minute videos that appeared on the Chicago Sun-Times website: www.suntimes.com/askcpd. In these videos, three officers answer several questions posed by community members. One of the community members asked, "Am I allowed to film my own interactions with a police officer? And are officers allowed to tell me not to film?" The videos are helpful but do not substitute for feedback regarding the conditions under which officers may be allowed to bypass this prohibition.

Furthermore, we have yet to receive a revised G02-01 that reflects the recommendations that the CPD received from the IMT, the OAG, and members of the community. The lack of community engagement regarding this paragraph's requirements is concerning considering various allegations that some officers took or destroyed community members' phones or cameras during protests and civil unrest in the summer of 2020.

The City and the CPD will not reach Preliminary compliance until the CPD engages the community regarding ¶58 and completes the ¶¶626–41 policy review process for G02-01. Moving forward, we will assess whether the CPD has meaningfully engaged the community regarding ¶58 requirements and completed the policy review process. Thereafter, we will monitor the City and the CPD's efforts to train CPD members on these requirements.

## Impartial Policing: ¶60

**60.** *Within 365 days of the Effective Date, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD have not met Preliminary compliance because the CPD has not developed a policy guiding officers' interactions with members of religious communities. The CPD did, however, significantly improve its community engagement efforts for ¶60.

Before the Consent Decree, the CPD did not have a policy that focused specifically on interactions with members of religious communities. As such, this paragraph requires the CPD to develop a new directive. During the last reporting period, as part of its policy development process, the CPD began engaging the community for its input on CPD interactions with faith-based communities.

Having no policy to review during this reporting period, like the last reporting period, we focused our assessment on the CPD's efforts to engage the community regarding the requirements in ¶60. We reviewed the CPD's outreach methods; meetings and interactions; problem-solving and decision-making efforts; and follow-up.

During this reporting period, the CPD continued its community engagement efforts. Specifically, the CPD developed a public survey titled "Interactions with Religious Communities." We reviewed the draft survey and provided suggestions on how to improve the survey. After reviewing and incorporating some of our suggestions, the CPD administered the survey from September 17, 2020, to October 15, 2020. The survey included, in part, questions regarding individuals' perception of CPD interactions with their religious community and suggestions on how to improve trust between the CPD and the community.

In November, the CPD produced a report summarizing the results of the religious community survey, with bar charts for each question and a list of open-ended comments. The implications for policy, however, were not discussed. We also

acknowledge the detailed report from the Council of Religious Leaders of Metropolitan Chicago, which based on its own five-question survey of its members, provided the CPD with clear feedback on topics the CPD should address in a policy regarding officer interactions with members of religious communities. Those topics included stereotypes of religious people, racism, sexism, and extremism. Their report included recommendations, with particular attention to the need for police officers to show respect regardless of religious symbols, culture, or dress.

In addition to the surveys, on October 15, 2020, the CPD conducted a focus group on the topic of interactions with religious communities.[62] The IMT attended this focus group as observers. Some of the feedback provided by community members during the focus group session included the following:

(1) engaging religious organizations as part of CPD training;

(2) ensuring that the CPD apply its search policies uniformly regardless of whether the officer sees a religious head covering or another form of head covering (*e.g.*, a baseball cap); and

(3) identifying ways for religious organizations and the police to collaborate in support of particular communities during times of persistent or acute violence or other struggles within a community.

The survey, focus group, and outreach to religious organizations are examples of the CPD's progress towards receiving community member feedback regarding officer interactions with religious communities. However, because the CPD did not develop a policy guiding such interactions, we find that the City and the CPD have not met Preliminary compliance. Moving forward, we will assess the City and the CPD's efforts to develop and finalize such a policy. Part of the assessment will include a review of how the CPD relied on community input in developing the policy.

---

[62] For more information about our review of the CPD's focus group methodology, see our assessment of ¶52, above.

## Impartial Policing: ¶61

*61. Within 180 days of the Effective Date, CPD will review and, as necessary, revise its policies guiding CPD members' interactions with transgender, intersex, and gender nonconforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum: a. terms are properly defined; b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual; c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification; d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety; e. absent exigent circumstances, a transgender, intersex, or gender nonconforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose.*

### Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

We find that the City and the CPD have not met Preliminary compliance with ¶61 because the CPD has not yet completed the ¶¶626–41 review process for General Order G02-01-03, *Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals*. The CPD has, however, continued to revise G02-01-03 to further address concerns raised by community members.

During the previous reporting period, we assessed the CPD and the City's community engagement efforts regarding G02-01-03. The CPD had received recommendations from various advocacy and service groups and input from community members during its Community Conversations. We signaled to the City and the CPD that we were interested in reviewing their efforts (1) to respond to recommendations received from major stakeholder groups and (2) to complete the corresponding ¶¶626–41 policy review process.

During this reporting period, the CPD continued to engage the community for input on G02-01-03 and made significant improvements to the policy. In our last report, we criticized the CPD for not being open to input from various community and service organizations. However, the TIGN working group has done an excellent job of supporting the TIGN community and pressing for improvements to G02-01-03. Before the fall of 2019, the City and the CPD were largely unresponsive to recommendations coming from the TIGN and LGBTQI communities. *See* ¶765. In 2020, however, the TIGN working group and the City made significant progress toward revising G02-01-03.

Specifically, the TIGN working group met and reviewed the policy several times and made various recommendations. The CPD has been largely responsive to the TIGN working group's concerns, revising G02-01-03 several times to address issues around housing, standards of treatment, and language used in CPD documents and forms. As a result of this engagement, the current draft of G02-01-03 is taking shape nicely, and the CPD plans to incorporate additional changes addressing concerns raised by the TIGN working group.

The CPD was also able to meaningfully engage with the TIGN working group despite COVID-19. Because of the COVID-19 pandemic, for example, the CPD could not facilitate a detention facilities site visit the TIGN working group requested. To try to satisfy the working group's request safely, the CPD prepared a video for them. Through the video, the TIGN working group learned that CPD members have instructed male and female officers to search different body parts of a TIGN arrestee. The working group strongly objected to this practice, and the CPD agreed to discontinue it.

During the December 11, 2020, TIGN working group meeting, the CPD and the working group discussed a few remaining questions and concerns. They agreed on how CPD officers should document an arrestee's name and gender. The working group continually emphasized the importance of how officers ask about gender identity, encouraging the CPD to ensure officers ask "respectfully, politely, and privately." One participant of the TIGN working group recounted one of their interactions with the CPD where the officers were openly transphobic and disrespectful. The participant described the experience as embarrassing and dehumanizing.

Another issue discussed during the December 11 meeting was housing assignments. Upon the TIGN working group's request, CPD representatives agreed to, if space permitted, house TIGN arrestees based on their preference and perceptions of safety. The TIGN working group members understood that the CPD would rely on the intake assessment regarding the arrestee's physical and mental-health risk factors when making housing assignments.

Clearly, a good policy provides a framework for reform, but it is only the first step. The working group reminded the CPD about the prevalence of transphobic violence in Chicago and nationally and the importance of protecting the TIGN community from police misconduct. To change the police culture around interactions with TIGN and LGBTQI individuals, the CPD will need to develop good training and internal accountability measures.

The CPD invited the working group to participate in the development of training in 2021. The working group hinted that the training should not only focus on respectful treatment (*i.e.*, procedural justice) when interviewing, transporting, or booking TIGN individuals, but should also include reminders of discipline for policy violations and the role of supervisors in monitoring officers' conduct.

Because the CPD has not yet completed the ¶¶626–41 review process for G02-01-03, the City and the CPD have not achieved Preliminary compliance. As we continue assessing the CPD's compliance with this paragraph, we will continue to monitor the Department's efforts to complete the policy review process for G02-01-03. Thereafter, we will assess the CPD's ability to train its officers on the new G02-01-03. Ultimately, we will monitor whether the policy and training positively affect how CPD officers interact with TIGN individuals.

In the future, we may review police reports to ensure members are completing them as prescribed in the revised G02-01-03. Contact surveys of people who have had recent contact with the CPD can help document how CPD officers interact with TIGN individuals. The length of time that someone is held before disengagement and the manner of disengagement will be informative as well. We will also assess whether discipline, coaching, or other interventions occur when members violate G02-01-03.

## Impartial Policing: ¶63

**63.** *Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature.*

**Compliance Progress**        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT finds that the City and the CPD have not met Preliminary compliance with ¶63 because the CPD has not yet completed the required ¶¶626–41 review process for General Order G08-05, *Prohibition of Sexual Misconduct*.

In the last reporting period, we expressed our concerns with the CPD's approach to handling recommendations from various stakeholders. We did not, however, have the opportunity to meaningfully review the policy at the time, and we anticipated that we would have discussions regarding G08-05 moving forward.

During this reporting period, the IMT (1) continued to monitor the CPD's community engagement efforts around this paragraph's requirements and (2) engaged in part of the ¶¶626–41 policy review process for G08-05.

Although the CPD has engaged the community regarding the topic of sexual misconduct by CPD members, it has not yet employed the type of engagement necessary to address the sensitive nature of this topic. In the last reporting period, we highlighted the limitations of the CPD's original "Community Conversations" model. We noted that the model did not provide sufficient time or safe space for community members to thoroughly discuss the issue of sexual misconduct by CPD members. To address those concerns, we encouraged the CPD to develop an alternative community engagement model, like the working-group model. The CPD explained that it would develop a formal working group focused on sexual misconduct by CPD members.

In October 2020, the CPD made a good-faith effort to engage the community by facilitating a focus group focused on police sexual misconduct.[63] Several themes emerged, and many people expressed a lack of trust in the CPD. Specifically, community members expressed their preferences for more transparency, consistency,

---

[63]    For our review of the CPD's focus-group methodology, see our assessment of ¶52, above.

and accountability in the CPD's internal process of responding to sexual misconduct complaints. Community members also commented that the policy should include clear, concrete definitions of misconduct so that complaints are not "swept under the rug." Furthermore, community members want the policy to (1) pay close attention to the survivor by providing mechanisms to report without fear of retaliation and (2) address restorative justice for the survivors, including therapy.[64]

Additionally, the focus-group members conveyed recommendations regarding efforts the CPD can take to account for policy violators. Specifically, the members expressed wanting discipline and penalties for to officers who violate the policy and transparency mechanisms that keep survivors updated on the status of their complaints. Similarly, focus-group members suggested that the CPD publish reports on sexual misconduct broken down by district, beat, and watch, which will help the CPD identify repeat offenders and supervisory oversights. The focus-group members also recommended that, like other professions, the CPD develop a recertification process for its members. Finally, the focus group wanted the CPD to ensure that it would provide its members with quality training on the revised G08-05. We look forward to reviewing the CPD's response to the focus group's recommendations.

The CPD provided us with a draft of G08-05 at the end of the second reporting period. We reviewed the policy and provided feedback during this reporting period. The CPD has been responsive to some recommendations submitted by the IMT and the OAG. At the end of the third reporting period, we had not received the CPD's response to our comments.

Our recommendations included the suggestion that the CPD engage with subject-matter experts and sexual assault advocate organizations in Chicago who already provided recommendations to which the CPD has not responded. The CPD informally interacted with a few local groups but did not continue that dialogue. Likewise, at the end of the third reporting period, the CPD had not responded to all of their feedback.

When the CPD is prepared to restart more targeted engagement with community stakeholders and advocates, we encourage them to begin by generating a list of local experts who should be consulted. On May 22, 2020, we recommended that the CPD seek out the expertise of (1) local organizations that provide services to or advocate for survivors of police misconduct and (2) individuals and organizations that are on the forefront of best practices and evidence-based policing. Similar to our suggestion from Independent Monitoring Report 2, we suggest that the

---

[64] The City, in partnership with the CPD, created a hotline called the Victim Services Advocacy Program (312.743.0174) that allows victims of police sexual misconduct to receive confidential support services.

CPD (1) create a working group that can address both ¶¶62 and 63 and (2) establish a process for continuous dialogue with that working group. The CPD's recently hired Assistant Director of Victim Services could play an important role in this process.

Regarding G08-05's substance, a number of our concerns remain. Specifically, we recommended that G08-05 require the CPD to collect sufficient information about sexual misconduct. Collecting such information will allow the Department or others to identify trends; training needs; gaps in policy and preventative measures; and any shortcomings in transparency and accountability. The CPD's latest version seems to address this concern, but the policy has not yet been finalized.

Nonetheless, we are pleased that the CPD is poised to enhance its efforts to consistently collect relevant data after we identified deficiencies in the current data from investigations. *See* ¶444. We specifically encouraged the CPD to ensure that the data collected captures the nature of the allegations and the victim's demographic characteristics, including race, age, and gender. This would allow the Deputy Inspector General for Public Safety or others to conduct specific analyses, including an analysis of potential biases in police-misconduct incidents.

A recent letter to the IMT from the Deputy Inspector General for Public Safety, dated December 7, 2020, describes serious problems with the CPD's and the Civilian Office of Police Accountability's (COPA's) data regarding sexual-misconduct investigations.[65] At the most fundamental level, the misconduct categories or complaint types are grossly inadequate, and sexual misconduct is not a category. Sexual misconduct may be buried in the catch-all category "Conduct Unbecoming," which includes behavior such as an unkempt uniform. Furthermore, the available data do not allow easy assessment of victim demographics so that one can determine whether sexual misconduct is directed at specific vulnerable populations. The CPD collects only complainant data, but complainants are not always the same person as the victim.

This lack of precise data from both the CPD and COPA constrains both analytic and operational functions. At the analytic level, for example, the Deputy Inspector General for Public Safety cannot look at outcomes, such as the type of discipline administered for sexual-misconduct complaints. At the operational level, it is more difficult for the CPD to look at specific patterns by individual officers that may require intervention or progressive discipline (*e.g.*, repeated use of "sexual communication or behavior by a CPD member that would likely be construed as lewd,

---

[65] City of Chicago Office of Inspector General, *Letter re: Consent Decree Paragraph 444* (December 7, 2020), https://igchicago.org/wp-content/uploads/2020/12/Paragraph-444-Sexual-Misconduct-Administrative-Investigations-Report.pdf.

lascivious, inappropriate or conduct unbecoming of a member" *See* ¶782). *See* ¶782. As such, the CPD will need to improve its data-collection process.

Although those functions may align more with the CPD's ability to hold officers accountable for sexual misconduct, details regarding these improvements should be captured in G08-05. Specifically, the policy should indicate that the CPD will collect specific data about the nature of the offense, including the sexual-misconduct prohibitions outlined in the policy, the location of the incident, and the characteristics of the victims.

Another concern we have with the current draft G08-05 is the lack of guidance regarding the treatment of juvenile victims of sexual misconduct. Juveniles are a vulnerable population, but they also experience higher levels of contact with the CPD. Because juveniles are still developing, they may respond to inquiries differently compared to adults. As such, officers should receive specific guidance on investigating sexual misconduct alleged by juveniles, including more specificity around the reporting process and notification of a parent or guardian.[66]

Furthermore, the policy should also include guidance regarding disciplinary measures for CPD members who violate the policy, including possible suspension and termination. While the CPD references the CPD's general directive covering discipline, we believe that G08-05 would benefit from some preventative or deterrent language, similar to that found in other CPD policies.

A persistent concern raised by various community stakeholders that we have discussed with the CPD is which entity is best situated to handle sexual assault investigations. Some community stakeholders have expressed concerns with allowing the CPD to investigate sexual assault complaints made against CPD members, recommending instead that COPA conduct such investigations. This recommendation relates directly to the requirements of ¶441, which we continue to monitor and discuss later in this report.

Because the CPD has not yet completed the ¶¶626–41 review process regarding G08-05, the City and the CPD have not met Preliminary compliance. Moving forward, to achieve Preliminary compliance, the City and the CPD must address our remaining concerns and complete the ¶¶626–41 policy review process. Furthermore, we expect that the CPD will further engage community members and groups with relevant knowledge and experience as it continues its community engagements relevant to this policy. G08-05 should include additional requirements for better data collection of the types of offenses and the demographics of the survivors, as well as clear accountability measures for policy violations.

---

[66] *See, e.g.*, The International Association of Chiefs of Police, *Juvenile Interview and Interrogation*, (2014), https://www.theiacp.org/resources/document/juvenile-interview-and-interrogation.

After the policy review process is complete, we will monitor the CPD's efforts to develop (1) training strategies reflecting the changes in G08-05 and (2) practices that will facilitate the effective implementation of G08-05.

## Impartial Policing: ¶64

**64.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based group serving LEP communities in Chicago.*

<hr>

**Compliance Progress**       (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD did not meet Preliminary compliance with ¶64 because the CPD's language access policy—Special Order S02-01-05, *Limited English Proficiency*—is still undergoing the policy review process.

During the last reporting period, the IMT reviewed and commented on a draft version of S02-01-05. We also assessed the CPD's community engagement efforts regarding this paragraph.

During this reporting period, we reviewed subsequent iterations of S02-01-05, including the CPD's response to the concerns we raised in the last reporting period. We also assessed the CPD's community engagement efforts specific to the requirements of this paragraph. In addition to a further revised version of S02-01-05, the City and the CPD provided records reflecting, in part, their efforts to review and revise this policy: "CPD Language Access Status and Recommendations Report" (November Status Report), "CPD Language Access Policy and Implementation Plan" (Plan), and the "City's Language Access Coordinator Review of CPD Language Access Policy." The CPD's new Language Access Coordinator's report provides an excellent roadmap of changes that we expect the CPD to incorporate.

We raised several concerns for the CPD to address regarding S02-01-05, and the CPD has already made efforts to address some of those concerns. For example, in

response to our suggestion that the CPD not limit limited-English-proficiency services to incidents involving police reports only, the CPD included broader language that covers police interactions beyond those involving official police reports.

Furthermore, the CPD, with the assistance of its Language Access Coordinator, has taken steps to help ensure community members are aware of the various limited-English-proficiency services available to them. Specifically, in the CPD's Language Access Coordinator preliminary report, the CPD Language Access Coordinator stated that limited-English-proficiency services will include the following:

(1) written communications for community members (*e.g.*, free interpreting services information) and detainees (*e.g.*, access to medical services) in a form that is visibly displayed and translated into predominate languages for the community; and

(2) interpretation services at outreach events as needed.

The current draft limited-English-proficiency policy also requires that district-level personnel "ensure that [the] appropriate Language Assistance Notice (CPD-21.126) is prominently displayed in a public area of the facility," in the three most prominent languages used in the surrounding communities. Importantly, the CPD Language Access Coordinator has recently designed a website for limited-English-proficiency individuals and posted materials in five languages, ranging from feedback and complaint forms to victim assistance.[67]

The CPD has not, however, addressed all of our concerns. For example, we asked the CPD to clarify the process of verifying and certifying that Department Authorized interpreters have the necessary skills and proficiencies. Rather than clarify the process, the CPD opted to remove its references to a certification process in the latest submitted version of S02-01-05. We learned in the CPD's Language Access Coordinator's August Status Report that "[s]taff certification through [their] language vendor is not practicable at this point due to budgetary constraints." While we empathize with the external constraints facing the CPD, ¶64 requires that the CPD have qualified Department-authorized interpreters. Without some process to measure each potential interpreter's ability to proficiently, accurately, and impartially interpret communications, the CPD has no way of assessing whether the candidate is qualified. Such a process—and the member(s) responsible for executing that process—should be delineated in S02-01-05.

Another concern that the CPD has not fully addressed is S02-01-05's broad exceptions to the requirement that the CPD use Department-authorized interpreters. The CPD made some changes, but the changes do not adequately address our concern. We understand providing an exception for imminently dangerous situations,

---

[67] https://home.chicagopolice.org/community-policing-group/language-access/.

but we encourage the CPD to, at least, provide additional guidance to help members understand the risks involved with using a non-Department-authorized interpreter. Specifically, the CPD should inform its members that relying on family members, friends, or bystanders may (1) create a conflict of interest, (2) breach of confidentiality, or (3) result in inadequate interpretation.

In our review of S02-01-05, we also suggested that, to avoid bias, the CPD use independent interpreters when investigating complaints against a CPD member. The CPD's Language Access Coordinator reports agree that the CPD should not use CPD interpreters when investigating complaints against its members. Instead, according to these reports, the CPD should rely on "LanguageLine," which is a City-approved independent online vendor. In response to this concern, the revised draft of S02-01-05 includes language about the availability of a third-party interpretation vendor at the request of a CPD supervisor or an individual with limited English proficiency. However, considering that individuals with limited English proficiency may not know they have this option available to them, the response does not sufficiently address concerns regarding bias.

We also recommended that the CPD take a systematic approach to translating policies into non-English languages. The CPD's Language Access Coordinator has outlined a step-by-step process for translating policies. The CPD Language Access Coordinator's plan is well done, but we encourage the CPD to include in S02-01-05 the ¶67 requirement that the "CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population in Chicago that constitutes 5% or 10,000 individuals, whichever is less."

Based on community feedback, we mentioned in our last monitoring report that the CPD needed to increase officer awareness of and access to the LanguageLine interpretation services phone number, which members can use when Department-authorized interpreters are unavailable. Since then, the CPD's Language Access Coordinator has recommended mandatory eLearning on the LanguageLine and called upon districts to ensure that officers have access to the LanguageLine app "InSight." If officers have access to InSight on their cell phones, they can quickly access the vendor's interpreting services. The CPD can also track members' use of the service. It is our understanding that, to date, only CPD detectives and the Office of Emergency Management and Communications (OEMC) personnel use LanguageLine, not patrol officers. However, the CPD's Language Access Coordinator is initiating a pilot test of the InSight app for patrol officers in two districts. We look forward to the results. In the meantime, we acknowledge that the CPD lists LanguageLine as a resource in S02-01-05.

We will eventually evaluate the CPD's efforts to train its members on providing meaningful access to CPD programs and services for individuals with limited English proficiency. Part of that training must include guidance on how to identify an

individual's language needs. As such, we think the CPD should add additional guidance regarding the Language Identification Card (CPD-21.125), which has the words "I speak" in 38 different languages. We credit CPD's Language Access Coordinator's report for addressing these training and policy requirements. Unfortunately, the draft S02-01-05 provided only minimal guidance about CPD-21.125, noting that members may use it to determine an individual's primary language.

As we continue monitoring the City and the CPD's efforts to provide meaningful access to CPD services for individuals with limited English proficiency, we will look to the CPD's ability to consistently track language access needs data across different units and districts. In other words, access to language services should be based on a needs assessment, which in turn, should be based on good data from the CPD and the OEMC. To ensure the CPD has an adequate system in place to track such data, we encourage the CPD to develop tracking procedures and to incorporate them into S02-01-05.

The CPD must engage community members and community-based organizations with relevant knowledge and experience regarding individuals with limited English proficiency (¶52). We commend the CPD's past efforts to engage the community generally regarding the topic during its Community Conversations series. In our last monitoring report, however, we noted that the series did not provide the type of targeted community input described in ¶52. As a result, we expected to see the CPD engage in more targeted outreach during the third reporting period.

In October 2020, the CPD conducted two focus groups on the language access topic.[68] During the focus-group sessions, community members offered a number of suggestions. From our observations, community members gave particular attention to the need to have officers properly trained on responding to persons with limited English proficiency. They also suggested that the CPD assign more officers who speak other languages to communities with limited English proficiency.

It was apparent to us during these focus group sessions that in addition to special community policing officers, the community wants patrol officers who are willing to talk with them, work with them, and get to know them as people to build trust. Some focus-group members from Spanish-speaking communities, for example, expressed fear of CPD officers, including that some community members are even afraid to call 911 during emergencies. Some focus-group members also expressed concerns that officers do not understand them or their culture, which can lead to problematic interactions. To address this trust issue, community members requested that officers be trained in culture sensitivity and understand the differences between the various Spanish-speaking communities in Chicago. Similarly,

---

[68]   For our review of the CPD's focus group methodology, please see our assessment of ¶52.

focus-group members encouraged the CPD to ensure its members have a better understanding of what it means that Chicago is a "sanctuary city."

The CPD's Language Access Coordinator proposed a variety of mechanisms for community input, including online reviews, working or focus groups, and surveys in the target languages. By the end of the reporting period, however, the CPD did not have a mechanism in place to receive ongoing feedback from communities with limited English proficiency. We look forward to reviewing the CPD's plans of action, and we encourage the CPD to create a working group of experts and advocates for individuals with limited-English-proficiency. In the meantime, we look forward to hearing from the CPD on how the focus group feedback affected the latest revisions to the *Limited English Proficiency* policy.

During this reporting period, the City and CPD have not met Preliminary compliance on this paragraph because S02-01-05 is still undergoing the policy review process. Moving forward, we will assess whether the CPD addresses the community feedback that it has received and our remaining concerns. We will also assess how the CPD incorporates the CPD's Language Access Coordinator's recommendations. In addition, we will monitor the CPD's efforts to engage community members and community-based organizations with knowledge and experience specific to language access.

## Impartial Policing: ¶65

**65.** *Within 180 days of the Effective Date, the City will designate a language access coordinator who will coordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary.*

Compliance Progress      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City maintained Preliminary compliance because the City's Language Access Coordinator continued to work with the CPD's Language Access Coordinator and made recommendations. The City did not, however, meet Secondary compliance regarding this paragraph because the City's Language Access Coordinator has yet to create a robust system of data collection needed to "assess the effectiveness and efficacy of CPD's policies."

While not required by the Consent Decree, the CPD hired its own Language Access Coordinator. We believe that the City's compliance with ¶65 can be achieved, in part, through the work of CPD's Language Access Coordinator, but this work is still in the early stages of development.

During the last reporting period, the City met preliminary compliance by designating the Director of the Office of New Americans as the City's Language Access Coordinator. To determine the next level of compliance, we assessed whether the City's Language Access Coordinator took steps to coordinate with the CPD in the review of the CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. We also assessed the City's Language Access Coordinator's efforts to assess the effectiveness and efficiency of the CPD's policies and make policy recommendations to the Superintendent.

We credit the City's Language Access Coordinator for generating a list of recommendations to assist the CPD, including the hiring of a CPD Language Access Coordinator, the expansion of CPD access to the "LanguageLine" interpretation phone number, and protocols to verify the fluency of in-house interpreters. She has also taken the time to meet with, and provide resources and guidance to, the new CPD

Language Access Coordinator. The City Language Access Coordinator has also included the CPD Language Access Coordinator in the City's quarterly meetings.

However, evaluating the effectiveness and efficiency of the CPD's limited-English-proficiency policies depends on the City's ability to create a system of data collection that will allow the CPD to monitor its efforts to provide individuals with limited English proficiency with timely access to high-quality services.

As referenced above, the CPD took the initiative to hire its own Language Access Coordinator, who is well qualified. In fact, the CPD's Language Access Coordinator is not only proficient in multiple languages, but she also has considerable experience in linguistics, translation, and language-access issues in Chicago.

The CPD's Language Access Coordinator began assessing the CPD's policies and compliance. During this period, we reviewed the CPD's Language Access Coordinator report and recommendations. We credit her for carefully researching the CPD's language-access issues and presenting a critical analysis of the current state of language-access data.

Notably, the CPD's Language Access Coordinator acknowledges a need for robust and standardized data collection across units and entities. The CPD's Language Access Coordinator also assessed multilingual access to the CPD's website, finding that it needed improvement. In addition to identifying language-access issues needing attention, the CPD's Language Access Coordinator provided recommendations for how the CPD can improve its compliance with S02-01-05 and Section 2-40 of the Municipal Code of Chicago. We agree with the CPD's Language Access Coordinator's recommendations and expect that most of her plans will be incorporated into CPD policy and practice.

We commend the CPD's Language Access Coordinator for making specific recommendations to improve CPD's data collection efforts. As noted earlier, to properly assess the effectiveness and efficiency of CPD's policies, the City and the CPD will need to collect and evaluate language-access data. One improvement to the CPD's language-access data collection efforts that we hope to see is an efficient mechanism for officers to report (1) whether language services were needed, (2) for which language the services were needed, (3) whether interpreter services were provided, and (4) if services were provided, by whom. After the CPD develops procedures for language-access data collection, we expect the CPD to incorporate those procedures into S02-01-05. *See* ¶64.

The City and the CPD will have met Secondary compliance regarding this paragraph when (1) a system of data collection on limited-English-proficiency needs has been introduced, including changes to CPD reports and CPD policy, (2) a system for evaluating officer's language fluency has been implemented, and (3) the CPD is able to evaluate progress on using the LanguageLine interpreting service phone number.

Thus, we will continue to assess the Language Access Coordinator's (1) review of CPD's compliance with S02-01-05 and Section 2-40 of the Municipal Code of Chicago and (2) assessment of the effectiveness and efficiency of CPD's policies. Ultimately, we will assess whether the Language Access Coordinator and the CPD's systems and assessments can effectively measure the CPD's policies on an ongoing basis. Finally, we encourage the City's Language Access Coordinator to continue to engage with the CPD's Language Access Coordinator and provide support as needed.

## Impartial Policing: ¶66

**66.** *Within 365 days of the Effective Date, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the OEMC maintained Preliminary compliance with ¶66. They did not meet Secondary compliance, however, because the OEMC may need to update its training to (1) ensure the procedures are consistent with CPD's S02-01-05, which was still undergoing the ¶¶626–41 review process, and (2) be responsive to the data-collection needs that provide the foundation for improved limited-English-proficiency services in Chicago.

During the last reporting period, we found that the City and the OEMC met Preliminary compliance because the OEMC issued its Training Notice No. TNG 19-004, *Limited English Proficiency*, on March 19, 2019. TNG 19-004 is largely consistent with the CPD's current S02-01-05, but revisions to that policy are ongoing.

During this reporting period, we reviewed the current TNG 19-004. We provided the OEMC with comments, which echoed the feedback we provided in the second reporting period. Specifically, we noted that the LanguageLine, to which limited English proficiency callers are referred, does not include Arabic as one of the five languages immediately available by push button, even though it is a language that the CPD must translate its policies into. However, we later learned that Arabic and more than 100 other languages are available on the OEMC interface, but only languages that are most frequently used appear on the first screen. OEMC employees can scroll down the screen to see the other languages.

We did not receive a revised version of TNG 19-004 incorporating our other comments. We expect we will have a chance to review an updated Training Notice once the OEMC revises it to comply with any changes applied to S02-01-05. One change we suggested for TNG 19-004 is more guidance regarding language-access data collection. We acknowledge that LanguageLine collects data on emergency calls, but the OEMC should have a data-collection process for non-emergency calls considering those calls represent the vast majority of calls. The OEMC needs to collect

additional data on limited-English-proficiency calls, so that it can effectively evaluate training-related services and help the CPD assess the demand for different language interpreters. Specifically, the City needs to document the full range of limited-English-proficiency encounters to make full use of the four-factor analysis required by Section 2-40 of the Municipal Code of Chicago.

In sum, the City and the OEMC maintained Preliminary compliance but have not met Secondary compliance. Moving forward, we will assess the OEMC's efforts to update TNG 19-004 to address our comments, changes to S02-01-05, and any feedback that the CPD receives from relevant community stakeholders. After finalizing an updated TNG 19-004, we will assess the OEMC's implementation and evaluation of the training.

## Impartial Policing: ¶67

**67.** *Within 180 days of the Effective Date, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago Municipal Code. CPD will publish translated versions of its language access policy on its website.*

**Compliance Progress**        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶67 by updating and clarifying the CPD's process for translating its language access policy. *See* CPD's *Language Access Policy and Implemental Plan*, which the City produced in November 2020.

In the second reporting period, the City and the CPD achieved Preliminary compliance because the CPD translated its Special Order S02-01-05, *Limited English Proficiency*, into Spanish, Polish, Chinese, and Arabic. However, we noted that the translated policies and documents were not easily accessible to those with limited English proficiency.

During this reporting, the CPD continued the ¶¶626–41 review process for S02-01-05. As such, the CPD did not have an updated draft of S02-01-05 to translate during this period. To assess Secondary compliance, we considered whether the CPD created effective management to implement this paragraph's requirements.

Regarding the effective managerial practices in place to implement this paragraph's requirements, we have now seen empirical documentation to confirm that the languages selected for translations represent all groups that meet the criteria outlined in this paragraph and more. Specifically, the CPD created a practice of assessing languages used in Chicago, broken down by frequency and percent of the total population, to confirm the selection decision. The CPD has gone beyond the required four-factor analysis (as defined in the City's Language Access Coordinator's Language Access Toolkit) using 2019 Census data and some calls for service data to examine language prevalence in Chicago. Although this does not substitute for a full needs assessment, it provides sufficient information for translation purposes.

The City and the CPD maintained Preliminary compliance for having translated the current draft policy during the second reporting period, and they have met Secondary compliance because we received evidence that the CPD created effective managerial practices to implement this requirement. After the CPD finalizes S02-01-05, we will monitor the CPD's efforts to translate and post the revised policy to maintain Secondary compliance. To achieve Full compliance, we will assess the CPD's efforts to institutionalize an effective procedure, including a schedule and system, to review language access data and S02-01-05 revisions to determine whether additional translations are necessary to comply with this paragraph.

# Impartial Policing: ¶68

*68. Before January 1, 2020, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to: a. properly defining terms related to individuals with disabilities and the disability community; b. providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability; c. the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and d. using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance regarding this paragraph because the CPD has not revised its policies for ensuring effective communication and meaningful access to CPD services for individuals with physical, mental, or developmental disabilities.

Similarly, in the second monitoring report, the City and the CPD did not meet Preliminary compliance because the CPD had not begun the ¶¶626–41 review process regarding Special Order S02-01-01, *People with Disabilities*.

During this reporting period, we assessed the CPD's efforts to review and revise its policies that relate to this paragraph, including its efforts to engage community members and community-based organizations with knowledge and experience relevant to this paragraph. We did not receive a draft version of S02-01-01 for review, and we understand that additional CPD policies may address some of the requirements in this paragraph.

The City and the CPD have advanced a number of efforts to meet Preliminary compliance. On August 3, 2020, the CPD hired an Americans with Disabilities Act (ADA) liaison. The CPD advised us that it wanted to hire an ADA Liaison to aid in the policy-revision process. The new ADA Liaison conducted a number of activities in preparation for revisions to CPD policies related to individuals with disabilities. For example, she compared current CPD policies to other large agencies like the New York City Police Department. In her review, the ADA Liaison explained to us that she identified the CPD's current data and data-collection methods regarding ADA-related complaints involving the CPD.

The CPD also made efforts to engage the community. For example, the CPD administered a survey to gain community input regarding police interactions with people with disabilities. Also, throughout October 2020, the CPD engaged in a series of community focus groups on various policing topics, including police interactions with individuals with disabilities. These focus groups were facilitated, in part, by the Center for Conflict Resolution. On October 27, 2020, the IMT attended a virtual focus group, titled "Interacting with People with Disabilities." During this session, individuals voiced concerns about CPD practices regarding individuals with disabilities, such as the lack of training for officers; seeming lack of adherence to federal, state, and local laws regarding individuals with disabilities; and a desire for respect and uniform treatment of individuals regardless of whether a disability is immediately apparent. We encourage the CPD to thoughtfully incorporate the community-member feedback received during these focus groups and related surveys into S02-01-01 and other policies addressing this paragraph.

We commend the CPD for engaging the community. However, we raise the same concerns that we have before regarding the limitations of the focus-group model. We acknowledge that the CPD may receive useful information during focus groups, but it may not provide people with disabilities (*e.g.*, autism, hearing impairment, diabetes, Alzheimer's disease, etc.) a comfortable or effective space to share their experiences with the CPD or the opportunity for their advocates to be heard. We encourage the CPD to continue to refine its community engagement efforts to address this concern.

Because the ¶¶626–41 review process did not occur for any policy regarding this paragraph, the City and the CPD have not met Preliminary compliance. Moving forward, we will review any revised policies addressing this paragraph that the CPD submits to us. We will continue to assess the CPD's efforts to engage relevant disability communities and their advocates. After the CPD finalizes the related policies and practices, we will assess the Department's efforts to train its members on the updated policies.

## Impartial Policing: ¶69

> **69.** *Before January 1, 2020, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including: a. recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes; b. providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions; c. attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and d. recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance during this reporting period because the CPD has not finished developing its training bulletins on interactions with people with disabilities. Despite not being in Preliminary compliance, the CPD still made progress developing relevant training bulletins.

During the last reporting period, we focused our assessment on the CPD's community engagement efforts around the training bulletin. The CPD had begun connecting with certain stakeholder groups and partners.

During this period, we reviewed and commented on several draft training bulletins and monitored the CPD's continued efforts to engage community members and organizations with relevant knowledge and experience.

On November 20, 2020, the CPD produced the following draft training bulletins: (1) People with Disabilities; (2) Autism and Police Response; and (3) Interacting with the Deaf Community. The ADA Liaison was meaningfully involved in the bulletin-development process, providing initial content for the general training bulletin on individuals with disabilities. The draft training bulletins are comprehensive and reflect meaningful input from organizations that advocate for or otherwise support individuals with disabilities. As part of the CPD's efforts to receive input

from community members and organizations with relevant knowledge, the CPD provided the Anixter Center, Access Living, the Chicago Hearing Society, the Chicago Mayor's Office for People with Disabilities, Equip for Equality, and the National Alliance on Mental Illness Chicago an opportunity to review and comment on the draft training bulletins.[69]

We commend the CPD for the steps it has taken to develop the requisite training bulletin, but we signaled to the CPD that the training bulletins may require additional revisions after the CPD finalizes its ¶68 policies. The ¶68 policies guide officers' interactions with individuals with disabilities, and as such, the training bulletins should reflect the most accurate and up-to-date guidance. If feasible, we suggest waiting to finalize the training bulletins until after the policies are finalized.

Because the training bulletins are under development, the City and the CPD did not reach Preliminary compliance. During the next reporting period, we will continue to review updated drafts of the training bulletins and any documentation of community feedback to ensure that the bulletins comply with this paragraph and address the community's concerns. We will then assess the CPD's efforts to implement the training.

---

[69] *See* ANIXTER CENTER, https://anixter.org/; ACCESS LIVING, https://www.accessliving.org/; CHICAGO HEARING SOCIETY, https://chicagohearingsociety.org/; CHICAGO MAYOR'S OFFICE FOR PEOPLE WITH DISABILITIES, https://www.chicago.gov/city/en/depts/mopd.html; EQUIP FOR EQUALITY, https://www.equipforequality.org/; NAMI CHICAGO, https://www.namichicago.org.

## Impartial Policing: ¶70

**70.** *Within 180 days of the Effective Date, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and: a. regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement; b. serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and c. act as a liaison between CPD and individuals with disabilities.*

### Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD have met Preliminary compliance regarding ¶70 because the CPD designated an ADA Liaison.

In the previous reporting period, we monitored the CPD's efforts to select an ADA Liaison. The CPD sought input from members of a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," including Equip for Equality, on the ADA Liaison job description and search process.[70]

During this reporting period, we continued assessing the CPD's efforts to designate a qualified person to fill the ADA Liaison position. And on August 3, 2020, the CPD hired an ADA Liaison. The ADA Liaison is tasked with supporting "meaningful access to CPD programs, services and activities" for individuals with disabilities.[71] As noted in ¶¶68–69, the ADA Liaison has been leading efforts that we anticipate will result in improvements to policies and training regarding communicating and interacting with individuals with disabilities.

After the CPD hired the ADA Liaison, the CPD provided us with the job description and her application package. The ADA Liaison is qualified for the position as a former CPD officer with 27 years of experience, including ADA issues during her ten-

---

[70] *See* EQUIP FOR EQUALITY, https://www.equipforequality.org/.

[71] https://news.wttw.com/2020/08/07/chicago-police-name-first-americans-disabilities-act-compliance-officer.

ure with the CPD. Since her start, the ADA Liaison has developed two recommendation reports, which in part, address the requirements in ¶¶68–70. Each report had a description of the ADA Liaison's activities, which included reviewing CPD policies and procedures, observing ADA training and crisis-intervention training, reviewing litigation, observing community engagement efforts, and researching best practices—including other major police departments' ADA services and recommendations from the International Association of Chiefs of Police, the Department of Justice, Civil Rights Commission, and the Mayor's Office of People with Disabilities.

Based on these activities, the ADA Liaison made recommendations for how the CPD could address ¶¶68 and 69. The ADA Liaison also established a CPD e-mail address (ADACoordinator@chicagopolice.org) to assist in her communication efforts as liaison between the CPD and individuals with disabilities.

The CPD met Preliminary compliance by designating a qualified individual to act as the CPD's ADA Liaison. We find that the ADA Liaison's initial activities align with the requirements outlined in this paragraph. Moving forward, we will assess whether the CPD has codified the ADA Liaison's role in policy and implemented methods that are feasible for assessing the effectiveness and efficiency of policies, trainings, and practices related to police interactions with people with disabilities. Part of that assessment will include reviewing the quality and scope of the ADA Liaison's coordination efforts. Ultimately, we will assess whether the CPD implements the ADA Liaison's recommendations and tracks the effectiveness of those efforts.

# Impartial Policing: ¶71

**71.** *Within 180 days of the Effective Date, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult.*

## Compliance Progress        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We find that the City and the CPD have met Preliminary compliance regarding ¶71, because they implemented a policy addressing the requirements in this paragraph. *See* General Order G04-01, *Preliminary Investigations*.[72]

During the last reporting period, we reviewed revised versions of policies that address ¶71, including G04-01 and General Order G06-01-01, *Field Arrest Procedures*. Both of these policies directly include language required by ¶71.

This reporting period, we continued the review and revision process of G04-01 and G06-01-01 and considered the CPD's community engagement efforts. The CPD posted G04-01 for public comment but did not find any comments that it thought warranted revision to the policy. Because this paragraph is a relatively straightforward requirement, we are satisfied with the CPD's limited method of community engagement. The CPD implemented G04-01 on December 30, 2020.

Although G06-01-01 is still under review, the Department has developed a policy that codifies the requirement that officers notify the OEMC of the start and end of a transport and whether the individual is a juvenile or an adult. Moving forward, we will assess the Department's efforts to train members on these requirements and develop an audit system to check officers' compliance with these requirements. Ultimately, we will assess whether that audit system is effective and whether CPD members are complying with this paragraph.

---

[72]    Effective as of December 30, 2020.

# Impartial Policing: ¶72

**72.** *The Parties recognize that training is a necessary component of impartial policing. CPD will integrate the concept of impartial policing into related CPD training courses when appropriate, including, but not limited to, use of force courses, weapons training courses, and Fourth Amendment subjects courses.*

## Compliance Status

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶72 in the third reporting period.

For both in-service training and special topics training, the CPD is required to integrate impartial policing concepts and policies. The IMT has agreed to use the ADDIE (Analysis, Design, Development, Implementation, and Evaluation) model to assess CPD's training programs.[73] In the absence of additional information about specific training classes, we focus here on elements that are most relevant to impartial policing training in general. For ¶72, Preliminary compliance is judged on the basis of Analysis and Design—*i.e.*, whether the CPD developed training plans for impartial policing that cover the required areas. Secondary compliance focuses on the Development, Implementation, and Evaluation of training. At present, the CPD has yet to achieve Preliminary compliance.

First, the Analysis phase of ADDIE should give attention to the goals of impartial policing training and any needs assessment. Clearly, the goal should be to educate CPD members about the biases and discrimination that exist in policing and teach them specific skills to prevent or minimize these behaviors during encounters with the public. But the CPD must first understand the nature and extent of these biases as expressed by different constitutionally protected classes. As part of the CPD's needs assessment, the CPD will need to do a better job of incorporating input from these communities, including the history of CPD interactions with these groups. The CPD's focus groups are a good start, but the CPD should seek additional input from people of color and women, as well as advocates for other protected classes.

The Design and Development components of ADDIE are about designing the training to achieve the goals and developing the curricula accordingly. Bypassing the

---

[73] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

Analysis phase, over the past few years the CPD has offered a three-part procedural justice training (¶73), which embodies impartial policing and provides a vehicle for increasing public trust in the CPD. Although we had some reservations about this training, the training offered a good introduction to the concepts. The CPD was scheduled to finish procedural justice training by the end of 2020, and nearly all members have completed it. At the end of the reporting period, it was still unclear how the CPD will utilize the expertise of these procedural justice instructors and integrate this material into other trainings, whether they be special classes (¶72) or in-service (¶73). Continued staffing of trainer positions with qualified CPD members is equally important, but this level of planning has yet to be completed.

Before training in these areas, the CPD will need to complete the first task of policy development for impartial policing. Policies have not been developed in certain areas such as disabilities (¶68) or religion (¶60). In other areas, policies have been developed and are at different stages of revision, such as interactions with TIGN individuals (¶61); racial profiling and other biases (¶¶55, 56, and 62); Limited English Proficiency (¶64); and hate crime investigations (¶76). In addition, there are policies in other areas of the Consent Decree that require integration with impartial policing (*e.g.*, Use of Force and Fourth Amendment) and are still being refined.

The Implementation phase of ADDIE is about the quality of training delivery and whether it meets the evidence-based standards of adult education. In this context, the CPD must demonstrate how impartial policing integrated and that the coverage is adequate. The CPD is required to integrate into training not only impartial policing but also the closely related concepts of procedural justice, de-escalation, and community policing for various groups within the CPD, from recruits to supervisors. *See* ¶¶72, 74, 246(d), 266, 272(m), 275, 304, 352(a), and 528. Paragraph 74 lists a range of topics that the CPD needs to cover in its in-service training. Also, training is needed around specific impartial policing policies as noted above.

The CPD should engage more community members in the delivery of training. Such engagement appears to be limited at present. Some classes, such as Procedural Justice III, are completely handled by outside organizations, which can also be problematic if the material is not well integrated into CPD operations.

We acknowledge, however, that the CPD is moving in the right direction with its community engagement plan. Along these lines, the CPD should use working groups, advocates, and subject-matter experts to assist with both the development and delivery of training. During training, CPD members need to hear from community members with lived experience about biases regarding race, gender, age, religion, disability, income, and other categories that involve stereotypes and discrimination in Chicago's policing history. *See* ¶¶52 and 283.

We reviewed the in-service Use of Force and Custodial Escort trainings and are not satisfied with the CPD's efforts to integrate impartial policing and related topics. The amount of time devoted to impartial policing, procedural justice, and crisis de-escalation is very limited, as the focus remains on traditional tasks associated with law enforcement (*e.g.*, how to use firearms, OC spray, batons, Tasers, and hand-cuffs).

To have a positive impact on the community, the CPD must pay more attention to de-escalation and the prevention of force through tactics and interpersonal communication skills than its current efforts. The CPD should not treat these interpersonal skills as merely peripheral add-ons. Rather, the CPD should elevate them to the same status as among the most critical law-enforcement skills. Also, the CPD's classes need to incorporate proven adult education strategies such as modeling, repetitive practice, and individualized feedback. Role play scenarios give officers the opportunity to practice their communication skills. Such scenarios are required by the Consent Decree but seem to be rare in CPD trainings regarding bias or procedural justice skills.

We have also reviewed the CPD's Fourth Amendment Law Review class. The class, designed for instructors, focuses on understanding and applying legal decisions regarding the Fourth Amendment. Overall, we found that this training curriculum provided very comprehensive coverage of Fourth Amendment issues and the legal restrictions on police behavior. Unfortunately, we found very limited evidence that impartial policing has been integrated into these lesson plans—or for that matter, procedural justice, de-escalation, or community policing. The focus of this curriculum is almost exclusively legal analysis of court cases and their application. The CPD should give more attention to (1) the process of applying the law—*i.e.*, conduct guidelines for police interactions with community members when officers stop, question, search, and/or arrest subjects—and (2) the risk of bias in decision making. Public trust of the police is directly impacted by the level of procedural justice exhibited during these interactions, both verbal and nonverbal. The successful execution of these encounters with minimal conflict rests heavily on how people feel they are being treated. Whether someone believes that a search is consensual, for example, is likely to depend on what the officer says to that person and how the officer says it.

The Fourth Amendment training should also include more discussion on bias, both implicit and explicit. Biases can lead to disparities and Fourth Amendment violations, which are not only legally impermissible but destructive to community trust. For example, implicit bias may lead one to believe that people who live in high-crime neighborhoods have a propensity for crime, despite the fact that the vast majority of residents are law-abiding citizens. Likewise, many of the factors that

support "reasonable suspicion" are also subject to race bias, such as "furtive gestures" and "nervous or evasive behaviors." Finally, we did not see any evidence that the CPD will evaluate the students or the class.

We have also reviewed the state-required eight-hour Sexual Assault Training (¶62). Overall, we found the training to be sound and based on scientific evidence about trauma and communication. However, it is delivered as asynchronous online training (which has serious limitations) and includes a brief quiz, which does not substitute for a serious evaluation plan. Also, this training focuses almost exclusively on sexual assault, and does not address other forms of gender violence that may be affected by biased policing.

To help fill this gap, the CPD is planning a new eight-hour training on CPD responses to domestic violence and immigrant victims. The strength of these standalone trainings on sexual assault and domestic violence is that they are not "integrated" with, or subjugated to, the agenda of other topics but rather allotted enough time to explore the topic in greater detail, assuming the training methods are sound.

When we talk about methods of teaching, we must acknowledge that COVID-19 (and the need for social distancing) has forced a shift from in-person to virtual training. As it becomes safer for the CPD to train in-person, the CPD will need to avoid becoming overly dependent on training bulletins and asynchronous online trainings that do not allow for dynamic interactions and skill development. In fact, such methods can be abused as students learn to skip over material and complete an eight-hour training in two hours (as we tested and were able to do). Furthermore, merely posting policies, tips, and pictures for online access will not be sufficient.

For online training, we encourage the CPD to use video-conference technology to facilitate the type of dialogue that is critical to adult learning and to help develop the communication skills required for impartial policing. However, the CPD must keep in mind that these virtual platforms will require instructors with new skill sets around virtual class management. The CPD's training is evolving to include three tiers: (1) non-interactive eLearning, (2) interactive/live eLearning, and (3) small group in-person skills training. The CPD will need to appropriately assign trainings to each tier and ensure the highest quality of instruction. Some trainings may be spread across more than one tier, but we maintain that communication skills will require human interaction at the virtual or in-person levels.

The IMT has requested that the CPD provide a comprehensive list of classes and specific locations in the curricula where impartial policing has been integrated, but we have yet to receive that list. Also, if the CPD is unable to give sufficient time and attention to impartial policing, procedural justice, de-escalation, and community policing when integrated into other classes (the current state of affairs), then we recommend that the CPD develop an additional separate cluster of trainings

regarding these topics. This will likely also help the CPD in its efforts to comply with ¶74. Furthermore, introducing a new set of interconnected trainings will allow the CPD to give appropriate attention to robust scenarios that focus on interpersonal communication skills and allow officers to receive individualized feedback based on their performance. This practice will help officers develop and refine their responses to a wide range of contacts with the public. At this time, the CPD has well-trained procedural justice instructors who could assist in developing a separate training curriculum on interpersonal communication.

Finally, the Evaluation phase of ADDIE is critically important. The CPD's current approach to evaluation is scattered and uneven. Hence, throughout this report we have strongly recommended that the CPD adopt a standardized and rigorous approach to evaluation. Some flexibility in metrics can be allowed as different trainings use different pedagogical methods, but a standard framework should be applied overall. This should include pre- and post-class knowledge tests, quizzes during class to reinforce the right knowledge, and post-training surveys of instructors and content. Whenever possible and appropriate, evaluations should include scenario ratings at the individual level and debriefings.

To achieve Preliminary compliance, the CPD must develop training plans for impartial policing that cover the required areas. Secondary compliance focuses on the Development, Implementation, and Evaluation of training. For Full compliance, the CPD will need to demonstrate that they have sufficiently and effectively incorporated the concept of impartial policing into related CPD training courses. The CPD will need to measure effectiveness, in part, by assessing whether the training changed members' attitudes and behavior prior to leaving the training session and while on the job. That will require contact surveys and data from body-worn cameras to show that officers are interacting with community members in an unbiased manner and that community members feel they are being treated with dignity and respect during encounters with CPD members. *See* ¶¶53-56. As a true learning organization, the CPD will need an evaluation system where survey and test data are quickly analyzed and fed back to Training Division administrators and instructors to allow for immediate adjustments in particular classes and for long-term planning. The IMT will continue to monitor the CPD's efforts to evaluate the content, delivery, and effectiveness of training regarding ¶¶72–74.

# Impartial Policing: ¶76

**76.** *By January 1, 2020, CPD will review and, to the extent necessary, revise its policies and procedures to ensure that allegations and complaints of hate crimes, as defined by federal, state, and local law, are comprehensively investigated.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

We find that the City and the CPD have not met Preliminary compliance for this paragraph because the updated General Order G04-06, *Hate Crimes*, is still undergoing the policy review and revision process.

During the last reporting period, we began the review process of G04-06, providing the CPD with comments regarding the policy's attention to procedural justice and the various roles of investigators and supervisors when responding to hate crimes. We also assessed the CPD's community engagement efforts regarding hate-crime investigations.

During the reporting period, we continued the review process of G04-06, including a review of the CPD's community engagement efforts. Regarding the revisions, the CPD accepted many of the recommendations provided by the IMT and the OAG. For example, the latest version now includes the following:

1) requires investigators to treat all victims in a procedurally just manner,

2) no longer includes vague language about the role of supervisors and where to refer victims for support services,

3) includes some improved legal definitions of hate crime and protected groups, and

4) clarifies the information required for the annual hate crimes report by adding district breakdowns.

We believe G04-06 provides adequate guidance to CPD members regarding the preliminary investigation, reporting, and notification for hate crimes or related incidents motivated by bias or hate. However, substantive OAG comments are outstanding and the CPD must post the policy for public comments. We await the CPD's consideration and responses to those comments.

The CPD took additional steps during this reporting period to collect community input around this paragraph. But it is unclear how the CPD incorporated such input. In the last reporting period, we noted that the CPD planned to convene a stakeholder working group focused on hate and bias crimes, but that has not materialized. In October 2020, the CPD conducted a focus group on hate crimes. The IMT will review how the CPD incorporated the community feedback and whether the input had any implications for G04-06 and related training.

In the next reporting period, we will continue to monitor the CPD's efforts to complete the policy review process. Once the CPD finalizes G04-06, we will assess the CPD's efforts to train its officers on the guidance outlined in the policy.

# Impartial Policing: ¶78

**78.** *Within 180 days following the expiration of each calendar year of the term of this Agreement, CPD will publish an annual report summarizing reported hate crimes and non-criminal incidents motivated by hate during the previous calendar year ("CPD Hate Crime Report"). The CPD Hate Crime Report will provide information regarding the total number of reported hate crimes and non-criminal incidents motivated by hate, organized by type of crime, classification of bias motivation, and disposition of hate crime investigations in each district.*

**Compliance Progress**            (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          August 30, 2020*          ☐ **Met**   ☑ **Missed**
                       *Extended from June 28, 2020, due to COVID-19
**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance during this reporting period, because their Hate Crime Report does not include disposition data. Because the report is incomplete—it does not have dispositional data per ¶78—we cannot conclude that the CPD has met the deadline, despite publishing the report.

To assess Preliminary compliance, we reviewed (1) the report to determine whether it addressed this paragraph's requirements and (2) the type of data that the CPD relied on in developing this report.

In November 2020, the CPD provided us with its first ¶78 report, *Hate Crime in Chicago: 2019 Annual Report*.[74] The CPD published the report on December 30, 2020. The report is well written and well designed with readable and informative tables. It includes clear definitions of hate crime and incidents motivated by hate. The report gives attention to the law, the seriousness of hate crimes, and the steps that community members can take to report these incidents.

The report provides a breakdown of reported incidents by type of crime and type of bias motivation. The CPD also breakdown the type of hate crimes by district. The report displays the number of hate crimes and bias-motivated incidents between 2018 and 2019, showing an increase in incidents in 2019.

---

[74] Chicago Police Department, *Hate Crime in Chicago—2019 Annual Report*, https://home.chicagopolice.org/wp-content/uploads/2021/01/2019_HC_Annual_Report.pdf/.

Regarding the type and quality of data, the IMT reviewed the CPD's Hate Crimes dashboard.[75] We have been informed that the dashboard data provides the framework for the report. Although we have not received access to the live dashboard, we provided the CPD with informal feedback on the dashboard during one of our regularly scheduled meetings. We are mostly satisfied with the data as represented in the dashboard. However, we have four concerns regarding the data and report.

First, the Hate Crime Report does not include any information on the disposition of hate-crime investigations, as required by this paragraph. The report references stiffer penalties by law, but it otherwise does not provide any information about the process and outcome associated with hate-crime allegations. We have been informed that the CPD's Civil Rights Unit, which maintains the database for the Hate Crime Report, only tracks whether the allegations are bona fide hate crimes. We note, however, that the CPD has previously included disposition information in older reports on hate crimes. *See, e.g.,* the CPD's 2011 *Hate Crime Report*.

Second, we have encouraged the CPD to seek community input on the interactive dashboard and *Hate Crime Report*, although that is not required. Such input might make the dashboard more user-friendly and relevant to community members' concerns.

Disposition data is critical information. The public should know whether the Detective Division conducted a follow-up investigation, whether a suspect was identified, whether someone was arrested, whether someone was charged with a hate crime, whether someone was convicted, and whether the investigation remains open. Also, we encourage the CPD to breakdown these dispositions by the protected classes to ensure the public that CPD's decisions and actions do not reflect any bias.

Third, we encourage the CPD to include in the *Hate Crime Report* information regarding hate crimes and bias-motivated incidents against people with disabilities, as these crimes are often overlooked.[76] At present, the categories of bias motivation included in the report are as follows: race, ethnicity, ancestry, religion, sexual orientation, and gender identity. If no incidents of hate crimes against people with disabilities were reported, that should be noted as well.

Fourth, based on community feedback we have received from subject-matter experts, we are concerned that the statistics contained in this report are an underestimate of the true number of hate crimes that occur in Chicago. Granted, for all

---

[75] *Hate Crime in Chicago: Summary and Trends*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/hate-crime-dashboard/.

[76] *See Violent Crime and People with Development Disabilities*, DISABILITY JUSTICE, https://disabilityjustice.org/justice-denied/violent-crime/.

types of crime, there is a substantial percentage that go unreported. But here, our concern is that some percentage of the reported crimes are not appropriately counted as hate crimes. For example, sexual assault can also be based on hate. Robust training regarding the methods, strategies, and techniques for recognizing and responding to hate crimes may address this concern.[77]

Although the CPD published its *Hate Crime Report* during this reporting period, the CPD and the City did not reach Preliminary compliance because the report did not include disposition data. To achieve Preliminary compliance, the CPD will need to draft a revised report that includes dispositional data and ensure the subsequent reports also include dispositional data. We also encourage the CPD to (1) engage community members and organizations with relevant knowledge for input on its hate crime data-collection efforts and the information included in the annual report and (2) include an analysis about hate-motivated incidents against individuals with disabilities.

---

[77] Such training is discussed in ¶77, and we plan to assess ¶77 in the next reporting period.

## Impartial Policing: ¶¶79–82

**79.** *By April 1, 2020, and every year thereafter, CPD will conduct an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ("ANOVs") effectuated by CPD members of persons in specific demographic categories, including race and gender.*

**80.** *Prior to conducting this assessment, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement. Upon completion of the assessment, CPD will identify any modifications to CPD's practices to address the findings in the assessment and develop a timeline for implementation, subject to Monitor review and approval. Upon completion of the assessment, CPD will publish the underlying data, excluding personal identifying information (e.g., name, address, contact information), via a publicly-accessible, web-based data platform.*

**81.** *If at any point, the City's obligations under the August 6, 2015 Investigatory Stop and Protective Pat Down Settlement Agreement ("ACLU Agreement") terminate, CPD will include all stops effectuated by CPD members that were subject to the ACLU Agreement in the assessment required by this Part.*

**82.** *Nothing in this Part will be interpreted to require CPD to analyze statistical data beyond that currently collected and maintained in electronic databases unless otherwise required under this Agreement. In instances in which race or gender data is not maintained in an electronic database, CPD may use geographic data in its assessment. For purposes of this paragraph, information contained solely in a scanned PDF document or other image of a document, and not otherwise collected and maintained in an electronic database, is not considered data maintained in an electronic database.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

**Deadline:** June 3, 2020* ☐ **Met** ☑ **Missed**

*Extended from April 1, 2020, due to COVID-19

|  | ¶79/82 | ¶80/82 |
|---|---|---|
| **Preliminary:** | *Not in Compliance* | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶¶79 or 80, because we could not approve the proposed methodology.[78] They also did not meet the corresponding deadline.[79]

During this reporting period, we assessed the CPD's efforts to conduct an assessment of misdemeanor arrests and administrative notices of violations (ANOVs), including a review of its proposed methodology.[80]

---

[78]    Paragraph 81 does not require a compliance assessment at this time since the ACLU Agreement remains in effect. If, however, the ACLU Agreement is terminated, ¶81 will be activated and the IMT will expect the same data and apply the same standards. Independent of ¶81, the IMT reserves the right to request investigatory stops data to assess outcomes specified in the Consent Decree regarding impartial policing and other reforms.

[79]    In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

[80]    Compliance with ¶82 is based on a single issue: whether the CPD can properly collect and analyze certain data on ANOVs. On January 23, 2020, and during earlier meetings, we provided CPD with feedback on their methodology for assessing misdemeanor arrests and ANOVs. At that time, we expressed our concern about the absence of any plan to analyze data for ANOVs or provide any breakdown by race and gender of the subjects receiving the ANOVs. Consent decree ¶79 requires the CPD to "*conduct an assessment of the relative frequency of all misdemeanor arrests and [ANOVs] effectuated by CPD members of persons in specific demographic categories, including race and gender.*" The CPD has offered the language of ¶82 to justify their position, pointing out that information about race and gender is not currently stored in electronic databases. Although this demographic information is collected by CPD on the ANOV form, it is not scanned by the vendor hired to create the electronic database.

For background, CPD Special Order S04-22, *Municipal Administrative Hearings*, encourages officers to issue ANOVs "in lieu of a physical arrest and detention, when practical" to "improve the quality of life in the neighborhood[s] and reduce citizen[s'] fear of illegal activity." However, CPD officers retain the option of making a physical arrest. Paragraph 79 requires the CPD to document and assess the relative frequency of all ANOVs and misdemeanor arrests by demographic categories, including race and gender. Paragraph 80 provides that the CPD will publish the assessment's underlying data. This annual report is important, as it provides transparency regarding low-level enforcement practices (where officers have the most discretion) and will shed light on any disparities by race, age, and gender.

Before conducting the assessment, the CPD must submit its proposed methodology for our approval. On November 21, 2019, the CPD previewed its methodology for us. During that meeting, we provided preliminary feedback. The CPD then formally submitted its methodology to us on December 24, 2019. We provided written feedback on January 23, 2020. On May 1, 2020, the CPD met with the IMT to discuss the methodology and our feedback, but the CPD did not submit a revised version of the methodology for our approval. We have been informed that a report has been drafted, but it has not been submitted to the IMT.

We acknowledge that the CPD made a good-faith effort to incorporate aspects of our November 2019 feedback into the formal production of their methodology. As a result, the CPD's methodology for assessing misdemeanor arrest data is a good start. The figures and tables are clear and preliminary data illustrate disparities between the demographic groups.

However, the CPD has not addressed all of our concerns. For example, the CPD has not articulated how it will analyze ANOV data. We believe that the CPD should (1) provide a plan for assessing the frequency of ANOVs (including types) and misdemeanor arrests by communities/neighborhoods, districts, and beats; (2) assess the intersection of the demographic variables for misdemeanor arrests; (3) assess the breakdown of arrestee demographics by the seriousness of the charge; (4) assess any relationship between ANOVs and misdemeanor arrests at the individual and neighborhood level; and (5) most importantly, offer a plan and timeline to

---

The IMT maintains that ANOV demographic data are a critical source of information about impartial policing that need to be properly collected and analyzed. Paragraph 82 states that "Nothing in this Part will be interpreted to require CPD to analyze statistical data beyond that currently collected and maintained in electronic databases **unless otherwise required under this Agreement**." (Emphasis added). Many paragraphs of the Consent Decree underscore the importance of impartial policing for all members of society, especially protected classes. *See, e.g.*, ¶¶50, 53, 54, and 55. Without ANOVs data on race, age, and gender, the CPD simply cannot "ensure that its policies and practices prohibit discrimination." ¶53.

eventually automate the collection and electronic storage of ANOVs demographic data (e.g., race, age, and gender).[81]

ANOVs and misdemeanor arrests raise critical issues about constitutionally guaranteed freedoms. Americans have a Fourth Amendment right not to be stopped, questioned, and searched without sufficient justification. Investigatory stops require "reasonable suspicion," and ANOVs require "probable cause" that an ordinance violation has occurred. In terms of impartial policing, these enforcement actions beg the question of unequal treatment. Good data and careful documentation are essential to monitor disparities and look for patterns over time.

During our May 1, 2020 meeting with the CPD, the CPD explained that the ANOV forms completed by CPD members, which include these data, are controlled by the City's Department of Administrative Hearings. According to the CPD, the Department of Administrative Hearings has elected not to scan these data into the electronic file. Although the CPD may not be in a position to request that the Department of Administrative Hearings change their practice, we request that the City work to address the data-collection issue for the reasons stated above. We encourage the new Public Safety Administration to work with the CPD and the Department of Administrative Hearings to develop a plan and timetable for the collection and proper analysis of ANOV demographic data.

The City and the CPD did not meet Preliminary compliance, because we cannot approve the proposed methodology until the CPD revises its methodology or the City and the CPD create a plan to address our remaining comments. Moving forward, we will monitor the City and the CPD's efforts to revise the methodologies for approval. After we approve the methodologies, we will assess the CPD's efforts to conduct the ¶79 assessment and to publish the assessment's underlying data.

---

[81] The CPD relies on ¶82 to justify its exclusion of ANOV demographic information.

# Impartial Policing: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG agreed that certain paragraphs could be assessed in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶53–56, 62, and 74 of the Impartial Policing section.[82]

*** 

| Impartial Policing: ¶¶53–56 |
|---|

*53.* *CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan. 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).*

*54.* *CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner. CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.*

*55.* *CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

---

[82] In the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

*56. CPD will provide guidance, through training and supervision, that reinforces to officers that substitutes or stereotypes for the demographic categories listed above in Paragraph 55, such as manner of dress, mode of transportation, or language ability, is prohibited when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

## Compliance Status

Paragraphs 53 through 56 are at the heart of the Consent Decree. They require that the CPD ensure (through policy, training, supervision, and accountability) that its officers do not engage in bias-based policing, either in their actions or their words. CPD officers are prohibited from discriminating against any constitutionally protected class of people and are expected to treat all people equally. Expressions of bias are prohibited in "routine or spontaneous law enforcement decisions" (¶55); and members are prohibited from using denigrating language (¶54); retaliating (¶53); and using stereotypes about dress, transportation, or language (¶56).

The Consent Decree is designed to achieve these overarching outcomes, so we will be monitoring them throughout the life of the Consent Decree. In the meantime, we can assess Preliminary compliance when we observe that the CPD is engaged in specific remedies to prevent bias-based policing or efforts to measure changes in members' level of bias or impartial policing as a result of these remedies.

During this reporting period, the IMT reviewed drafts of policies relevant to prohibiting bias-based policing:

- G02-01 (*Human Rights and Human Resources*),

- G02-04 (*Prohibition Regarding Racial Profiling and Other Bias Based Policing*), and

- G08-05 (*Prohibition on Retaliation*).

The remaining policies discussed in this assessment were not revised during the third reporting period.

### G02-04 (Prohibition Regarding Racial Profiling and Other Bias Based Policing)

G02-04 is the centerpiece of the CPD's effort to prohibit bias-based policing. The City provided the IMT with a revised draft, dated November 20, 2020, under ¶¶54, 55, 56, and 59. We note that this draft was submitted to IMT in response to the IMT's comments on August 21, 2019—more than 15 months after our review. The recently revised draft has been responsive to several changes recommended by

the IMT, the OAG, and the Coalition. For example, the CPD has included the statement that officers "refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language," as required by ¶54.

But additional changes are needed to make the language more consistent with the Consent Decree. Specifically, when defining "bias-based policing," we have asked the CPD to expand the examples beyond "investigatory stops, stops, and arrests." Given that this entire directive is about the subject of bias, the CPD should make every effort to provide legal clarity to its members so that they fully understand the operational definitions of these terms. The Coalition made a similar request on September 25, 2019, asking that the CPD include a complete list of stereotypes to be avoided in Section II.C, as clearly defined in ¶¶50 and 54. The CPD rejected these requests.

We acknowledge that the CPD has, in this latest draft, added "immigration status" and "homeless status" to the list of groups where discrimination is prohibited, as required by ¶55. However, they did not add "age," as requested. "Age" is listed in ¶¶50 and 53 of the Consent Decree as a protected class. Given that the CPD has a history of problematic interactions with young adults, age should be listed in this directive.

As we noted in 2019, this directive should include reference to relevant ordinances, state, and federal statutes, as the CPD has done with other policies. The CPD has agreed to do this in a future revision as it continues to "re-envision its policies on Human Rights and First Amendment activities." We will await those revisions.

Finally, community engagement is essential in policy development (¶52), so the CPD should identify the policy implications and policy revisions that result from its recent community focus groups and community surveys. In sum, the IMT will be able to approve General Order 02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, when these issues have been addressed.

## G08-05 (Prohibition on Retaliation)

The main purpose of G08-05 is to prohibit retaliation by a CPD member against another member of the CPD or against a member of the public. Paragraph 53 prohibits both discrimination and retaliation against protected classes, consistent with the Illinois Human Rights Act. The IMT reviewed multiple drafts of this policy. In response to feedback, the CPD had made a number of changes to improve the policy. Noteworthy for the public, retaliation is specifically prohibited against a variety of behaviors, including "*protected lawful exercise of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity,*

*or criticizing the Department, a Department member or a member's conduct)*." Filing a complaint or supporting a complaint against a CPD member is also protected. The IMT is satisfied with directive G08-05, *Prohibition on Retaliation*, and has no objection. However, this policy does not entirely satisfy ¶53, which goes beyond retaliation to prohibit discrimination against all protected classes in CPD's "policies and practice." That is a larger agenda better addressed by G02-04.

### S02-01-03 (Crime Victim Assistance)

In October 2020, the CPD revised its Special Order on Crime Victim Assistance in response to our feedback. Overall, the CPD has been responsive to our suggestions that this policy include language about treating victims in a procedurally just manner, among other things. Hence, we have approved the policy. In the future, the City will need to evaluate whether this policy and related training are having a beneficial impact on victims of crime, especially with regard to investigations surrounding gender violence and hate crime.

### G02-01 (Human Rights and Human Resources)

The IMT also reviewed G02-01 and provided a no-objection notice.[83]

In sum, the CPD has made a good-faith effort to ensure that certain policies prohibit discrimination and retaliation. If these policies can be properly translated into training, supervision, and accountability, the CPD will be poised to enhance fair and respectful policing on the job, which will build public trust in the legitimacy of the CPD. Secondary compliance will be intimately linked to compliance with ¶¶72 and 74, which require the CPD to integrate impartial policing and procedural justice into training programs and demonstrate that officers knowledge, attitudes, and behavioral intentions in this domain have improved.

### Measuring What Matters

As we noted in the last report, after policy revisions and training, for Full compliance, the City will need to focus on whether the CPD and the City have created sustainable systems of community engagement, supervision, accountability, auditing, and performance assessment. These systems are characteristic of evidence-based learning organizations and will allow the CPD to monitor the level of bias exhibited and take corrective action as needed. Using integrated (not piecemeal) systems, the IMT and the CPD must be able to ascertain whether the reforms have been impactful and are making a difference in the CPD's organizational culture and

---

[83] The IMT notes, however, the large gap between when the CPD posted G02-01 for public comment in February 2020 and when the CPD posted it in October 2020.

the daily interactions with the public. The CPD is considering a Performance Evaluation System regarding accountability changes, and we hope that the CPD will implement thoughtful, tailored solutions to these systemic problems.

The new Public Safety Administration will be assuming responsibility for the data systems of multiple City agencies, including the CPD. As the Public Safety Administration assesses data management in Chicago, we encourage them to re-envision the measurement of police performance.

The CPD and the Public Safety Administration will need to rethink the metrics by which they evaluate police performance. We have heard many ideas about how to reform the police but few ideas about how to measure success. There is one important and indisputable fact about organizational behavior: What gets measured gets done and will be considered important, and what does not get measured is considered less important throughout the organization. As a good example, the typical disconnect occurs when police executives talk publicly about the importance of "community policing" and "procedural justice" but then, internally, reward officer performance on the basis of the number of stops, arrests, citations, and guns and drugs recovered. Similarly, the CompStat system encourages commanders to focus on crime reduction using traditional metrics, but a broader, more holistic approach to policing is needed.

We have serious ongoing and emerging concerns regarding the CPD's ability to prioritize tracking, monitoring, and implementing impartial policing. As we noted in our last monitoring report, police officers make decisions that may or may not reflect impartial policing. Examples include the decision to stop a car or pedestrian; to treat various community members with respect and dignity; to issue a warning or citation; to conduct a search; to make an arrest; to use some level of force; to thoroughly investigate crimes; or to make a complete and accurate report of the events.

We expressed concern about disparities in CPD actions. Both CPD data and citywide survey data indicate, for example, that young Black males are dramatically over-represented in police stops and use of force and are much more likely to hold more negative views of the CPD than other Chicagoans.[84] Likewise, Black Chicagoans, in general, comprised 77% of all use of force incidents in 2019, but comprise only 29.6% of the Chicago population.[85]

---

[84] *See* The Independent Monitoring Team, *Community Survey Report (November 2019—February 2020), A Special Report by the Independent Monitoring Team* (August 26, 2020), https://cpd-monitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

[85] *See Use of Force Dashboard*, Chicago Police Department, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/; United States Census Bureau, *QuickFacts: Chicago, Illinois*, https://www.census.gov/quickfacts/chicagocityillinois.

Since then, as crime rates increase in Chicago and pressure mounts on the police to reduce crime, we are concerned about the methods of policing used in Black and Latino neighborhoods.[86] A recent lawsuit by a member of the new Community Safety Team, for example, alleges that senior management is pressuring members to increase the number of traffic stops, arrests, and citations to meet quotas. This allegation reflects a strategy to deploy more police officers in high-crime areas—called "hot spots policing"—which can contribute to racial and ethnic disparities in aggressive police actions.

Likewise, our own analysis of 2017 data on police contacts citywide reveals disparities across districts that remain statistically significant even after controlling for the overall crime rate. Data on traffic and investigatory stops reveals similar striking racial disparities. For example, an analysis of 2019 traffic stop data revealed that the CPD stopped 368,332 Black drivers, a rate 5.6 times higher than White drivers.[87] During these stops, the CPD cited Black drivers for violations at a rate lower than White drivers. Similarly, an analysis of the CPD's 2016 investigatory stops data found that Black Chicagoans were more likely than White Chicagoans to be patted down, and this difference remained even when looking only at cases where no enforcement action was taken.[88]

Understanding what CPD actions have transpired in marginalized neighborhoods of color is important, and the CPD data collection must have high integrity. Body-worn camera data is a good example where data collection must be equitable. One of the main reasons for introducing body-worn cameras in Chicago was to ensure transparency and fairness in the way that people are treated by the CPD. However, an analysis of investigatory stops data between 2018 and 2020 revealed that CPD officers are less likely to activate their body-worn cameras when they engage in enforcement activities in select areas on the south and west sides—neighborhoods with predominately Black or Latino populations.[89]

---

[86]  *See* DOJ CIVIL RIGHTS DIVISION AND UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS, *Investigation of Chicago Police Department* (January 23, 2017) at 139, http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

[87]  Chuck Goudie, et al., *Chicago police more likely to stop Black drivers without citing them, data investigation reveals* (September 10, 2020), https://abc7chicago.com/chicago-police-racial-profiling-traffic-stops-department/6416266/.

[88]  Ralph B. Taylor, et al., *Analysis of Chicago Police Department Post-Stop Outcomes during Investigatory Stops July through December 2016 (Period 2): Input to Hon. Arlander Keys' (Ret.) Second First Year Report, Revised Final Technical Report* (March 3, 2018), https://www.chicago.gov/content/dam/city/depts/dol/supp_info/InvestigatorStops2ndReport7116_123116/AppendixA.pdf.

[89]  Samah Assad, Christopher Hacker & Dave Sivini, *Left in the Dark: Tens of thousands of moments were never captured on Chicago Police body cameras. Lax oversight allows it to happen*, CBS 2 CHICAGO INVESTIGATIVE REPORTING (Nov. 15, 2020), https://storymaps.arcgis.com/stories/3603ef8cc492488c847cffbe03ad0f1d.

Regarding impartial policing, the CPD must also monitor enforcement and investigations of gender-based violence, including the intersectionality of gender, race, and immigration status, as well as gender-identity issues.

We have presented some data here on CPD enforcement patterns to illustrate disparities and to communicate another recommendation: Rather than rely on these outside assessments by researchers at universities, the ACLU, the IMT, and other organizations, we encourage the City and the CPD to monitor its own enforcement activity for possible bias and provide a public dashboard on existing disparities for transparency purposes.

One of the key challenges ahead is to find ways to reliably measure the things that matter to the public and create feedback loops that will continuously improve officers' performance on these dimensions. To address procedural justice and de-escalation, as emphasized in the Consent Decree, the City and the CPD will need to create methods and measures to capture these behaviors and create internal feedback loops. For ¶¶53–57, as well as many other paragraphs throughout the Consent Decree, the CPD and the City will need to collect, analyze, and report data on the quality of police services as well as disparities in police actions for protected classes and persons with mental and physical disabilities. Arguably, the most essential data system that is currently missing involves asking community members about how they were treated by CPD officers.

Effective law enforcement requires public trust, which is a byproduct of being treated in a procedurally just manner by officers who make these decisions. Thus, the City should explore the options for developing and sustaining a valid contact survey—managed by an independent agency—that measures procedural justice by all CPD officers during all encounters. This data system, along with body-worn camera data and various police reports, can be used to (1) build a system of performance evaluation for individual officers; (2) build a system of accountability for district and unit commanders; and (3) measure the level of fair and impartial policing exhibited toward constitutionally protected classes of people. By implementing feedback loops for officers and unit heads, the CPD can move toward organizational reform. Inside the organization, this would involve ensuring that the systems of training, supervision, accountability, investigations, auditing, and program evaluation reflect best practices and are evidence-based.

To ensure impartial policing and transparency, we continue to recommend that the CPD develop a public dashboard that provides a breakdown of key police decisions by demographic characteristics of the community member and other defining features of protected classes. We acknowledge that the CPD and the Office of the Inspector General are in the process of building various dashboards based on existing CPD data and Consent Decree requirements. Currently, there are dashboards on Use of Force and Accountability (complaints) but none on CPD stops,

citations, searches, or arrests.[90] Likewise, the CPD produces an annual report and a report on crime trends, but these do not include information that would allow for an assessment of equity or fairness in police services, beginning with response times and ending with investigatory outcomes. We are still waiting for CPD's report on ANOVs and misdemeanor arrests (*see* ¶79 and 80), where police have enormous enforcement discretion that could be influenced by the demographics of the subject or the neighborhood.

Using new data, the CPD recently launched a public sentiment dashboard to show the level of safety and trust in the CPD as reported by Chicago residents, which is available at https://home.chicagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/. The interactive dashboard allows for comparisons of districts and demographic subgroups. As the City acknowledges, this dashboard cannot be used as the only metric for public sentiment regarding the CPD. The dashboard is based on survey data that has particular limitations from the impartial policing perspective. While all surveys have limitations, the surveys, conducted by a private vendor Elucd, are "delivered through local digital ads," which is unlikely to produce a representative sample of residents.[91] While nonprobability samples and web surveys are widely used today, the use of digital ads is used primarily for marketing research. Using this technique, the large majority of Chicago adults will never have the chance to be "sampled," and those who are sampled and complete the survey may be quite different from the general population. Thus, the survey results using this methodology may not represent the views of the neighborhoods and police districts listed in the dashboard, especially people of color and persons from lower-income households. Using Census data for particular zip codes, Elucd has sought

---

[90] The CPD does provide raw data on investigatory stops and arrests, but these large individual incident data files are of little use to the public.

[91] In its comments, the City references research, which it asserts validates Elucd's digital ad-recruited surveys' ability to produce representative, reliable samples. *See* Attachment B. The underlying research cited by the City also, however, echoes some of our concerns. For example, one study specifically notes that "studies that require representative samples . . . may benefit from more intensive engagement with potential participants" than using Facebook and that "it remains difficult to definitely determine the effectiveness of Facebook as a recruiting method for specific types of studies." Louise Thornton *et al.*, *Recruiting for health, medical or psychosocial research using Facebook: Systematic review* (April 27, 2016), at 78, https://www.sciencedirect.com/science/article/pii/S2214782915300166. *See also*, Christopher Whitaker *et al.*, *The Use of Facebook in Recruiting Participants for Health Research Purposes: A Systemic Review* (August 8, 2017), at 8, https://www.jmir.org/2017/8/e290/ (reviewing 35 studies based on social media advertisements, finding limited representative samples and an overrepresentation of young White women with higher levels of education and income.); and Shahmir H. Ali *et al.*, *Social media as a recruitment platform for a nationwide survey of COVID-19 knowledge, beliefs, and practices in the United States: methodology and feasibility analysis* (May 13, 2020), at 7, https://bmcmedresmethodol.biomedcentral.com/articles/10.1186/s12874-020-01011-0 (finding that "the over-representation of Non-Hispanic white women and the corresponding under-representation of men and ethnic/racial minorities, compromised the representativeness of the sample and, consequently, the extent to which findings may be extrapolated to the general U.S. population.").

to mitigate this issue by overweighting certain demographic groups that are under-represented, but this technique is unlikely to solve the problem if the original sample is not representative of those groups.

We recognize that the Elucd survey marks a significant new effort by the City and the CPD to measure community sentiment. The sentiment analysis survey is only one piece of the CPD's broader effort to engage the community, and the CPD has expressed an openness to additional options. We look forward to future discussions with the City, the CPD, Elucd, and other City partners on their plans to receive targeted feedback from Chicago's underrepresented communities that are most impacted by policing. In this context of gathering systematic data at the district level to measure CPD's legitimacy and use of procedural justice, we strongly encourage the City and the CPD to listen to community members who have had a *recent* police contact, which is not the focus of the Elucd survey.[92] The voices from this particular segment of the community are essential, as they are the ones with first-hand, lived experience with the CPD—specifically recent experience that is not distorted by historical events or memory decay. The vast majority of Chicago residents have not interacted with a CPD officer in the past year, and therefore, their knowledge of CPD actions and police services is indirect and potentially inaccurate.

Over the next few years, we strongly encourage the City to collect better data on how CPD officers interact with Chicago residents. The data should include interactions with vulnerable or protected segments of the community and reflect whether procedural justice principles are guiding police actions in all police districts, shifts, and units.

---

[92]  The sentiment analysis survey includes one question asking whether the survey respondent has had any contact with the CPD in the past year, but the nature of the contact is unknown, the time period is too long, and there are no details about how the CPD treated the subject.

## Impartial Policing: ¶62

**62.** *CPD will require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. All officers will receive in-service training every three years to ensure CPD's response to allegations of gender-based violence, including dispatch response, initial officer response, and on-scene and follow-up investigation, is both effective and unbiased.*

### Compliance Status

The IMT has spent considerable time researching the topic of the CPD's response to gender-based violence and consulting with community organizations and subject-matter experts. This has led to several conclusions.

First, while the CPD appropriately sought community input on CPD members' interactions with transgender, intersex, and gender-nonconforming individuals (TIGN) (*see* ¶61), efforts to seek input on other forms of gender violence captured in ¶62 have stalled. Specifically, the CPD indicated they would create a working group but did not follow through, nor did the CPD include any focus groups on this topic.[93] Organizations with extensive knowledge and expertise regarding sexual assault have not been seriously consulted or invited to participate.[94]

Whatever form the community engagement takes, the City and the CPD need to hear from a cross-section of Chicago's specialized organizations that serve different Chicago cultures and are in direct communication with those who have survived gender violence. Organizations that provide clinical or legal services that help victims navigate the criminal justice system, or that help fund victim services, have expertise that can be used to identify gaps in police services and places where changes in policy, training, and practice need to occur.

Second, the CPD does not have a policy on gender-based violence, per se. When the IMT inquired, the CPD presented a list of 29 CPD directives and forms, ranging from *Minors in Need of Medical Care* to *Organization and Functions of the Bureau*

---

[93] The CPD organized focus groups on police sexual misconduct but not on gender violence.

[94] For gender violence, in addition to the TIGN working group and Coalition members, the CPD should consult with recognized groups such as the Illinois Coalition Against Sexual Assault (ICASA), Chicago Alliance Against Sexual Exploitation (CAASE), Resilience, Illinois Coalition Against Domestic Violence, Battered Women's Network, Mujerez Latinas Enaccion, Women's All Points Bulletin, YWCA Chicago, Legal Aid Chicago, Metro family Services, Chicago Foundation for Women, as well as gender violence researchers and lawyers at the University of Illinois at Chicago, Northwestern University, and University of Chicago, to name a few.

*of Detectives*. Sexual assault and domestic violence are unique and serious problems that deserve special attention, as demanded by survivors and community advocates. The wide array of potentially relevant CPD directives is, by itself, evidence of the need to consolidate and extract information of particular importance to these crimes. The unique components of these traumatic events also deserve a unique response. The CPD has acknowledged this reality with its new and planned trainings on the CPD's responses to sexual assault and domestic violence, but there remains a substantial gap in policy to guide this training.

Research informs us that when CPD detectives use procedural justice during interviews with sexual-assault survivors, the survivors are more satisfied with the experience, more likely to cooperate with the investigation, more likely to hold positive views of the CPD, more willing to report future crimes, and more likely to experience greater psychological recovery from the incident.[95] Given the importance of addressing the unique challenges of gender violence, the CPD should have a specific policy that spells out the unique aspects of the preliminary investigation, follow-up investigations, referrals to support services, and required trauma-informed training.

Third, the CPD should review its record keeping and data systems to ensure that gender-based crimes are accurately documented and transparent to the public. For example, the Chicago Alliance Against Sexual Exploitation (CAASE), after analyzing CPD's response to sexual assault from 2010 to 2019, recommended that CPD's portal include fields for report date, arrest date, and investigative unit.[96] In addition, we recommend that the CPD publish a report on the characteristics of these events (*e.g.*, types of sexual assault) and the investigatory outcomes so that everyone can consider the implications for preventative strategies, victim services, justice/deterrence, CPD policy, and CPD training. Transparency and accountability for these investigations are essential for building public trust in the CPD's response to gender-based violence.

The second component of ¶62 is the requirement of in-service training for all officers. The CPD has taken action on several fronts that are noteworthy and promising. In 2020, the Training and Education Division proposed an eight-hour online training titled, *Trauma-informed Responses to Sexual Assault*. This training was developed and approved by the Illinois Law Enforcement Training and Standards Board.

---

[95] Katherine Lorenz, *Reporting Sexual Assault to the Police: Victim Experiences and the Potential for Procedural Justice*, (2017), Doctoral Dissertation, Chicago: Department of Criminology, Law and Justice, University of Illinois at Chicago.

[96] *Too Little Too Late? The CPD's Response to Sex Crimes 2010-2019*, CHICAGO ALLIANCE AGAINST SEXUAL EXPLOITATION (CAASE) (October 2020), https://www.caase.org/cpd-response-sex-crimes/.

Overall, the IMT was satisfied with these training materials, which are based on scientific evidence about trauma and social science research regarding interpersonal communication. However, the training was delivered via an asynchronous online platform—one of the least impactful teaching methods. As we noted earlier, the system enables officers to skip over important videos and lessons during these eight hours. More importantly, this platform does not give officers the opportunity to ask questions, discuss the content, practice the skills, or receive feedback on their performance. Experienced educators and trainers know that students learn how to transfer knowledge into behavior when they have the opportunity to practice their skills in role-playing scenarios and receive individualized feedback. *See* ¶276. In the same way that firing a weapon requires practice to achieve proficiency, interpersonal skills require extensive practice, feedback, and more practice to achieve proficiency.

According to ¶62, the training should be designed to ensure that the CPD's responses are "both effective and unbiased." The CPD can determine effectiveness, in part, by assessing officers' knowledge, attitudes, and behaviors regarding sexual assault investigations before and after the training. Unfortunately, the CPD does not provide a strong evaluation plan for this training. A short quiz is not an acceptable evaluation strategy for assessing the training's effectiveness.

Furthermore, while the content of this training is thorough and appropriate, it is only partially responsive to the requirements of ¶62, which covers (1) policies regarding officers' response to allegations of "sexual assault, sexual abuse, stalking, and domestic violence" and (2) training regarding "gender-based violence." This training focuses almost exclusively on officer responses to sexual assault.

In response to our concern that the eight-hour training does not cover the other types of gender-violence listed in ¶62, the City noted that it recently received a grant from the U.S. Department of Justice, Office of Violence Against Women to improve CPD's "response to domestic violence, sexual assault, and stalking." The grant requires the CPD to develop and implement four key initiatives: (1) gender-based violence response training; (2) policy and training around certifying T and U visas and responding to gender-based violence against immigrants; (3) strangulation data dashboard to help the CPD identify offenders and victims at increased risk of homicide incidents; and (4) educational material in five languages on how to report these crimes, immigrant victim's rights, how to file an order of protection, and relevant CPD policies. To be clear, however, the proposed training is primarily about domestic violence and immigrant victims, with little attention to sexual assault or gender violence overall.

In terms of community engagement, this grant represents a collaborative program, involving the Mayor's office, the CPD, Advocating Against Domestic Violence, the

Heartland Alliance's National Immigrant Justice Center, the National Police Foundation, and a training expert.[97]

In terms of performance metrics, the grant proposal provides a detailed "logic model" that defines the activities, outputs, and outcomes expected from this initiative. But it does not include an evaluation plan for measuring these activities and outcomes. The IMT recommends that the City and the CPD create and implement a plan for collecting data that can be used to evaluate whether the training is making a difference with officers, victims, and offenders, both in terms of effectiveness and fairness.

We acknowledge that the proposed training and related initiatives are directly responsive to ¶62 (as well as ¶¶67 and 68). The IMT looks forward to assessing how well this program is implemented, especially given the level of coordination required and the limited amount of funding available for the subcontractors doing the work. Planning has started, but training is not scheduled to begin until April 2021 and implementation will continue in stages until September 2023.

The City and the CPD will reach Preliminary compliance with ¶62 when the CPD (1) initiates a feasible mechanism to engage stakeholders on gender-based violence and (2) submits either a draft gender-based violence policy or a proposal, with stakeholder support, that clarifies how existing policies provide adequate coverage of CPD member responses to gender-based violence. Secondary compliance will depend on the quality of the training lesson plans and ultimately, the quality of the training itself.

---

[97] The "Network" has 37 member organizations that provide direct services to victims and survivors of domestic violence.

## Impartial Policing: ¶74

*74. Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the concept of impartial policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics: a. CPD's anti-bias and impartial policing policies, including, but not limited to, the policies referenced in this section unless otherwise required; b. refreshers of topics covered in Procedural Justice; c. appropriate use of social media; d. cultural competency training that prepares officers to interact effectively with people from diverse communities including, but not limited to, people of color, LGBTQI individuals, religious minorities, and immigrants; e. recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities; and f. the specific history and racial challenges in the City of Chicago.*

## Compliance Status

Paragraph 74 lists a range of topics that the CPD needs to integrate into its in-service training. We use the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) to assess CPD's training programs. Preliminary compliance is judged on the basis of Analysis and Design—i.e., whether the CPD developed training plans for impartial policing that cover the required areas. Secondary compliance focuses on the Development, Implementation, and Evaluation of training.

As reflected in the analysis of ¶72 above, we have reviewed several trainings relevant to impartial policing. For example, over the past few years the CPD has offered a three-part procedural justice training (¶73), which embodies impartial policing and provides a vehicle for increasing public trust in the CPD. Although we had some reservations about this training, it offered a good introduction to the concepts. The CPD ended the procedural justice training at the end of 2020, at which time nearly all members had completed it.

At the end of the reporting period, it was still unclear how the CPD will utilize the expertise of their procedural justice instructors and integrate this material into other trainings, whether they be special classes (¶72) or in-service (¶74). Continued staffing of these positions with qualified CPD members is equally important,

but this level of planning has yet to be completed. Also, when designing such training, the CPD should consider engaging experienced national trainers who have expertise in implicit bias and de-escalation.

The IMT has requested that the CPD provide a list of classes and specific locations in the curricula where impartial policing has been integrated, but we have yet to receive that list. The CPD's needs assessment will need to do a better job of incorporating input from Chicago's communities and protected classes—including people of color and women—and the corresponding history of CPD interactions with these groups. As we noted earlier, the CPD should engage more community members in the delivery of training.

We acknowledge that the CPD had to shift from in-person to virtual training because of COVID-19 and that additional refinement of methods is necessary. As the ability to do in-person training becomes safer, the CPD's classes need to incorporate proven adult education strategies, such as modeling, repetitive practice, and individualized feedback. As we stressed earlier, role play scenarios give officers the opportunity to practice their communication skills. Such scenarios are required by the Consent Decree but still seem to be rare in CPD trainings regarding bias or procedural justice skills—even before COVID-19. As a result, and as we mentioned earlier, the CPD will need to avoid becoming overly dependent on training bulletins and asynchronous online trainings that do not allow for dynamic interactions and skill development.

As we noted earlier in our assessment of ¶72, to become a true "learning organization," the CPD will need an evaluation system where survey and test data are quickly analyzed and then fed back to Training Division administrators and instructors to allow for immediate adjustments in particular classes and for long-term planning. We will continue to monitor the CPD's efforts to evaluate the content, delivery, and effectiveness of impartial policing training.

# III. Crisis Intervention

This is the Crisis Intervention section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago's (the City's) and its relevant entities' Crisis Intervention compliance efforts in the Crisis Intervention section from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **83.** CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.
>
> **84.** A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.
>
> **85.** CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available com-

*munity-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To achieve these outcomes, the City and CPD will implement the requirements set out below.*

*86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

## Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to

various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

During the third reporting period, the IMT worked with the CPD, the Office of Emergency Management and Communications (OEMC), and the Chicago Council on Mental Health Equity, formerly the Crisis Intervention Advisory Committee, to address issues related to policy, training, and community engagement.

For some reform efforts, the CPD, the OEMC, and the City have made significantly more progress in this period than in previous reporting periods. This includes the development of the crisis intervention data dashboard, the development of policies and procedures, and the staffing of additional sworn officers and civilians dedicated to Crisis Intervention reform efforts. The IMT looks forward to continued progress on all of the requirements in the Crisis Intervention section.

While this section of the Consent Decree requires actions by various City entities and committees, including the CPD, the OEMC, and the Chicago Council on Mental Health Equity (collectively the "Advisory Committee"), the City bears the ultimate responsibility for ensuring compliance. *See* ¶720. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all of those entities have met the corresponding level of compliance. We explain, however, the status of each entity's efforts for each applicable paragraph.

In sum, the IMT assessed the City's compliance with 42 Crisis Intervention paragraphs during this reporting period (¶¶87–89, 91–94, 96–97, 99, 102, 104–08, 110, 113–14, 116–18, 120, 122, 128–42, 147, 150, and 151). We provide status updates, rather than compliance assessments, for an additional 12 paragraphs (¶¶103, 109, 121, 123–25, 143–46, 148, and 152).

We have determined that the City maintained Preliminary compliance for five paragraphs (¶¶99 and 128–31), moved into Preliminary compliance for 12 paragraphs (¶¶97, 105–06, 113–14, 117–18, 133–36, and 141), maintained Secondary compliance for one paragraph (¶142), and achieved Secondary compliance for five paragraphs (¶¶89, 92, 96, 116, and 132). The City failed to reach Preliminary compliance in the remaining 19 paragraphs assessed during the third reporting period (¶¶87–88, 91, 93–4, 102, 104, 107–08, 110, 120, 122, 137–40, 147, and 150–51). *See* Crisis Intervention Figure 1.

Crisis Intervention Figure 1:      Compliance Status for Crisis Intervention
Paragraphs at the End of the Third Reporting Period (December 31, 2020)



The City had four deadlines in the third report. The IMT determined that the City met the deadline for two paragraphs (¶¶89 and 129), but missed the remaining two deadlines (¶¶122 and 151). For the missed deadlines, the City also did not achieve the underlying deadline requirements with those paragraphs (¶¶122 and 151) by the end of the reporting period. *See* Crisis Intervention Figure 2.

Crisis Intervention Figure 2:      Total Crisis Intervention Deadlines
in the Third Report: 4



# Crisis Intervention: ¶87

*87. The Crisis Intervention Team ("CIT") Program will continue to be responsible for CPD's crisis intervention response functions, including, but not limited to: a. developing CIT strategy and initiatives; b. supporting officers in the districts who respond to incidents involving individuals in crisis; c. engaging the community and community stakeholders to raise awareness of the CIT Program and issues involving individuals in crisis; d. coordinating among City agencies that respond to individuals in crisis; e. recruiting officers to apply for CIT training; f. developing and delivering CPD's Basic CIT Training and other CIT training, including Advanced CIT (e.g., youth, veterans) and refresher trainings, in accordance with the requirements of the Training section of this Agreement; g. delivering roll call trainings and mental health awareness initiatives; h. compiling and retaining the reports identified in Part F of this section and collecting and maintaining the appropriate CPD data related to incidents involving individuals in crisis to support and evaluate the effectiveness of the CIT Program and CPD's response to incidents identified as involving individuals in crisis, including identifying any district-level and department wide trends; i. coordinating data and information sharing with OEMC; and j. communicating with and soliciting feedback from crisis intervention-related community stakeholders, Certified CIT Officers, and OEMC call-takers and dispatchers regarding the effectiveness of CPD's CIT Program.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶87. The City and the CPD made significant progress toward compliance with the paragraph by putting some related policies through the policy review process required by ¶¶626–41 (these policies are discussed where applicable in other paragraph assessments below). Because the CPD intends to address some of ¶87 requirements in new standard operating procedures, which have not yet been finalized, the City and the CPD did not reach Preliminary compliance with the paragraph.

Specifically, ¶87 is an overarching paragraph, which encompasses many of the paragraphs found within the Crisis Intervention section. The CPD created directives

and standard operating procedures, which directly inform the CPD members of their responsibilities regarding ¶87's subsections. While the policies associated with these subsections have been finalized, the standard operating procedures have not. Therefore, the CPD has not reached any level of compliance with ¶87.

As a broader note, the IMT's assessments of paragraphs throughout the entire Crisis Intervention section often rely on the inclusion of the Consent Decrees requirements into policies, including standard operating procedures. While our assessment determines that the policies have sufficiently incorporated a paragraph's requirements, we note that the public comment period for these policies yielded few comments and that the standard operating procedures have not been subjected to public comment. Furthermore, the CPD did not provide evidence that public comments were given sufficient consideration and there was no indication of how or whether the comments were incorporated into the final version of the policy. The CPD should consider how public comments and community feedback might not only advance its overall community engagement goals, but also build trust among a wide range of advocacy and treatment providers. Finally, many of the subsections found in ¶87 are outcome-based, and we look forward to receiving data from the CPD to assess the corresponding practices.[98]

---

[98]  In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple policies, directives and standard operating procedures. While we do not disagree with this approach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

## Crisis Intervention: ¶88

**88.** *The CIT Program will serve to meet the objectives of: a. improving CPD's competency and capacity to effectively respond to individuals in crisis; b. de-escalating crises to reduce the need to use force against individuals in crisis; c. improving the safety of officers, individuals in crisis, family members, and community members; d. promoting community-oriented solutions to assist individuals in crisis; e. reducing the need for individuals in crisis to have further involvement with the criminal justice system; and f. developing, evaluating, and improving CPD's crisis intervention-related policies and trainings to better identify and respond to individuals in crisis.*

### Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶88. The City and the CPD made significant progress toward compliance with the paragraph by putting some related policies through the policy review process required by ¶¶626–41 (these policies are discussed where applicable in other paragraph assessments below). Because the CPD intends to address some of ¶88 requirements in new standard operating procedures, which have not yet been finalized, the City and the CPD did not reach Preliminary compliance with the paragraph.

As with ¶87 above, this overarching paragraph also encompasses many of the paragraphs found within the Crisis Intervention section. Additionally, many of the subsections found in ¶88 are outcome-based for which the IMT has not been provided sufficient data to assess. As for progress during the third monitoring period, we note that the CPD has created directives and standard operating procedures, which directly inform CPD members of their responsibilities regarding ¶88's subsections. While the policies associated with these subsections have been finalized—to the CPD's credit—the standard operating procedures have not. Therefore, the CPD has not reached Preliminary compliance with ¶88.

As a broader note, the IMT's assessments of paragraphs throughout the entire Crisis Intervention section often rely on the inclusion of the Consent Decrees requirements into policies, including standard operating procedures. While our assessment determines that the policies have sufficiently incorporated a paragraph's requirements, we note that the public comment period for these policies yielded

few comments and that the standard operating procedures have not been sub-jected to public comment. Furthermore, the CPD did not provide evidence that the CPD public comments were given sufficient consideration and there was no indication how or whether the comments were incorporated into the final version of the policy. The CPD should consider how public comments and community feed-back might not only advance its overall community engagement goals, but also build trust among a wide range of advocacy and treatment providers. Finally, many of the subsections found in ¶87 are outcome-based, and we look forward to re-ceiving data from the CPD to assess the corresponding practices.[99]

---

[99]    In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy re-quirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple poli-cies, directives and standard operating procedures. While we do not disagree with this ap-proach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

# Crisis Intervention: ¶89

**89.** *The CIT Program, through the CIT Coordinator, will annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          December 31, 2020          ☑ **Met**     ☐ **Missed**

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**          *In Compliance* (NEW)
**Full:**          *Under Assessment*

In the third reporting period, the IMT determined that the CPD achieved Preliminary and Secondary compliance with ¶89.

During the third reporting period, the CPD revised its policies related to its Crisis Intervention Team (CIT) Program. As part of these revisions, the requirements of ¶89 were memorialized into Special Order S05-14, *Crisis Intervention Team (CIT) Program* (S05-14). S05-14 created an affirmative duty to review and, where necessary, revise policies on an annual basis. S05-14 further requires coordination with the Chicago Commission for Mental Health Equity when annually reviewing CIT policies. Finally, the policy details the manner and scope of review expected for a comprehensive assessment on an annual basis, which provides a training mechanism for reviewers.

In future reporting periods, the IMT will evaluate whether the CPD's CIT annual policy reviews employ the same comprehensive approach we have seen during the initial revisions and that are reflected in S05-14.

# Crisis Intervention: ¶91

**91.** *Additionally, the City and CPD will ensure that the CIT Program has sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator, and approved by the Chief of the Bureau of Patrol, as needed to carry out the overall objectives and functions of the CIT Program at the district-level, which include, but are not limited to: a. supporting officers in the district with incidents involving individuals in crisis; b. delivering CIT Program-approved roll call trainings and mental health awareness initiatives; c. establishing relationships between the district and local service providers and healthcare agencies; d. referring and, when appropriate, connecting individuals in crisis with local service providers; e. engaging with the community to raise awareness of the CIT Program and issues involving individuals in crisis; and f. providing administrative support to the coordinator of the CIT Program.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶91 in the third reporting period, because its new relevant policies are still under the review process required by ¶¶626–41.

The City and the CPD did, however, make progress toward compliance with ¶91. For example, the CPD made substantial strides towards setting up the district-level resources needed to carry out the overall objectives and functions of the CIT Program. Moreover, the IMT reviewed Special Order SO20-04, *District-Level Strategy for Crisis Intervention Team (CIT) Program*, which provides for a comprehensive approach to identifying district-level needs. Additionally, the CPD created a reliable data collection tool for district-level needs was created by the CPD, ensuring a consistent feedback system. The data collection tool appears capable of allowing the CIT Program Coordinator to aggregate responses across districts in order to identify trends in needs, while also allowing for responsiveness to district-level needs. Finally, the CPD policy S05-14, *Crisis Intervention Team (CIT) Program*, clearly identifies the district-level staff responsible for achieving subsections (a)–(f) of ¶91.

While S05-14 has been reviewed by the Chicago Council on Mental Health Equity and finalized, SO20-04 has not yet been finalized. Upon finalizing all relevant directives and standard operating procedures, the City and the CPD will achieve Preliminary compliance with ¶91.

We note that the public comment period for Directive S05-14 yielded few comments. The CPD did not provide evidence that public comments were given sufficient consideration and there was no indication how or whether the comments were incorporated into the final version of the policy. The CPD should consider how public comments and community feedback might not only advance its overall community engagement goals, but also build trust among a wide range of advocacy and treatment providers.

The IMT appreciates the CPD's thoughtful development of a district-based support system for the CIT Program. The IMT looks forward to working with the CPD to ensure that necessary resources have been directed to the districts in accordance with identified needs and that the district-level personnel have been adequately trained to achieve their goals.[100]

---

[100] In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple policies, directives and standard operating procedures. While we do not disagree with this approach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

# Crisis Intervention: ¶92

**92.** *Certified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT Officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD has met Preliminary and Secondary compliance with ¶92. The CPD has made strides toward establishing the specialized nature of Certified CIT officers during the third reporting period.

In our second report, we noted that, in practice, Certified CIT Officers conformed to the requirements of ¶92 but that these requirements were not memorialized in policy to ensure sustained compliance. In response, the CPD revised Special Order S05-14, *Crisis Intervention Team (CIT) Program*, to explicitly memorialize these requirements. Additionally, Certified CIT Officers have been adequately trained in their responsibilities when responding to calls involving a person in crisis. The OEMC's policies, trainings, and operations also recognize the duty to prioritize Certified CIT Officers for calls involving a person in crisis.

As a result of finalizing S05-14 to require Certified CIT Officers to receive specialize training, retain their standard assignment, take on specialized crisis intervention duties, and are prioritized to calls in the field identified as involving individuals in crisis, the City and the CPD achieved Preliminary and Secondary compliance with ¶92.

# Crisis Intervention: ¶93

**93.** *To be eligible for consideration as a Certified CIT Officer, applicants must have at least 18 months of experience as a CPD officer and no longer be on probationary status. CPD will assess each applicant's fitness to serve as a Certified CIT Officer by considering the applicant's application, performance history, and disciplinary history.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶93 during the third reporting period, because the CPD's corresponding policy—Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*—still under the review process required by ¶¶626–41.

During this reporting period, the IMT reviewed SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which provides draft criteria for assessing applicants' fitness to serve as a CIT officer. It also includes considerations for the applicants' application, including performance history and disciplinary history. However, SO20-02 required further revision to provide sufficient guidance for conducting assessment of CIT applicants.

The IMT looks forward to working with the CPD to revise SO20-02 to ensure the best applicants are being selected for CIT service.[101]

---

[101] In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple policies, directives and standard operating procedures. While we do not disagree with this approach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

## Crisis Intervention: ¶94

**94.** *Under the direction of the CIT Coordinator, supervisors and instructors teaching crisis intervention-related topics will assist in identifying and recruiting qualified officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals in crisis to apply to receive CIT training.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**            *Not in Compliance*
**Secondary:**            *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance with ¶94 in the third reporting period, because the CPD's corresponding policy—Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*—still under the review process required by ¶¶626–41.

During this reporting period, the IMT reviewed SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which includes the requirement for supervisors and instructors teaching crisis-intervention-related topics to assist in identifying and recruiting qualified officers. However, SO20-02 requires further revisions to provide sufficient guidance as to how this process will occur. We look forward to working with the CPD on those revisions.[102]

---

[102]  In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple policies, directives and standard operating procedures. While we do not disagree with this approach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

# Crisis Intervention: ¶96

**96.** *CPD's Basic CIT Training is an in-depth, specialized course that teaches officers how to recognize and effectively respond to individuals in crisis. In addition to the crisis intervention-related topics covered in the training provided to all officers, the Basic CIT Training will address signs and symptoms of individuals in crisis, suicide intervention, community resources, common mental health conditions and psychotropic medications, the effects of drug and alcohol abuse, perspectives of individuals with mental conditions and their family members, the rights of individuals with mental conditions, civil commitment criteria, crisis de-escalation, and scenario-based exercises.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary and Secondary compliance with ¶96.

During this reporting period, the CPD provided the IMT with Special Order S05-14 *Crisis Intervention Team (CIT) Program*, which clearly states the requirement that the CIT Unit is responsible for the development and delivery of the Basic CIT Training. Specifically, the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising CIT curricula, as well as the administration and delivery of the Basic CIT Training. Therefore, the CPD achieved Preliminary compliance with the requirements of ¶96.

Additionally, we reviewed the entirety of the Basic CIT curriculum and observed its delivery in the fall of 2019. Each of the topics required by ¶96 are included in the curriculum and are given sufficient attention during the training. Moreover, the CIT Unit convened a working group comprised of mental health professionals, advocates, and persons with lived experience to review the curricula and provide comments and recommendations. The CIT Unit incorporated that feedback into its revised 40-hour Basic CIT Training while maintaining the topics required by ¶96. The curriculum was also reviewed by the Chicago Council on Mental Health Equity, thereby soliciting an additional level of community input. We therefore find that the CPD has also achieved Secondary compliance with the requirements of ¶96.

While we await a restart of the CPD's ability to conduct the entirety of the 40-hour training (presently, the CPD must wait to do two of the training days in person,

including scenarios), we commend the CIT Unit on taking the steps to ensure their training is comprehensive and consistent with community standards. We recommend, however, that the CPD's consider revising its current methods for evaluating the training. The CPD should invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery. The Chicago Council on Mental Health Equity should then report on their observations to the broader group in order to get further feedback and document as such.

## Crisis Intervention: ¶97

**97.** *CPD's CIT Refresher Training is a specialized, advanced training to further develop and expand Certified CIT Officers' skills in recognizing and appropriately responding to calls for service that involve individuals in crisis. The CIT Refresher Training will include a review of the concepts, techniques, and practices offered in the Basic CIT Training as well as relevant and/or emerging topics in law enforcement responses to individuals in crisis, general and specific to CPD. Additionally, the CIT Refresher Training may cover the content included in the in-service crisis intervention training.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the third reporting period, the CPD provided the IMT with S05-14, *Crisis Intervention Team (CIT) Program*, which clearly states the requirement that the CIT Unit is responsible for the development and delivery of the refresher training. Specifically, the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising Crisis Intervention Team curricula and as well as the administration and delivery of the refresher training. We therefore find the City and the CPD to be in Preliminary compliance with the requirements of ¶97.

Additionally, the IMT has reviewed the entirety of the refresher training curriculum and find that the requirements of ¶97 are included in the curriculum and each is given sufficient attention during the training. The curriculum was also reviewed by the Chicago Council on Mental Health Equity, thereby soliciting community input. While we await the start of the CIT Refresher training, we commend the CIT Unit on taking the steps to ensure their training is comprehensive and consistent with community standards. We are satisfied that the developed directive and planned training meets the criteria for Preliminary compliance, but Secondary compliance requires actual delivery of the training consistent with the training plans we have reviewed. The IMT recommends that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery. The Chicago Council on Mental Health Equity should then report on their observations to the broader group in order to get further feedback and document as such.

Finally, we note that Certified CIT Officers have never received a formal refresher training since receiving their initial training. In some cases, this means that CIT Officers have gone more than 10 years without a refresher training. To ensure that Certified CIT Officers are delivering CIT services in accordance with current best practices, we suggest the CPD prioritize receipt of the refresher training based on the amount of time passed since receiving the initial training.

## Crisis Intervention: ¶99

***99.** Within 365 days of the Effective Date, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**          *Not in Compliance*
**Full:**          *Not Yet Assessed*

The City and CPD had reached Preliminary compliance with the requirements of ¶99 in our last report based on the CPD's development of the refresher training, the high quality of the planned CPD training, and the CPD's efforts to gather input from the Chicago Council on Mental Health Equity. While we maintain our concern with the Chicago Council on Mental Health Equity review processes—particularly for the last review of the CIT refresher training—the CPD maintained Preliminary compliance with ¶99 for this reporting period.

Additionally, the IMT reviewed S05-14, *Crisis Intervention Team (CIT) Program*, which clearly states the requirement that the CIT Unit is responsible for the development and delivery of the refresher training. Specifically, the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising Crisis Intervention Team curricula as well as the administration and delivery of the CIT refresher training.

To comply with ¶99, the CPD must review and revise the CIT Refresher Training as necessary before delivering the training on a triannual basis. Full compliance will rely on the CPD conducting initial and ongoing reviews of the training based on delivery and, where appropriate, developments in best practices. Such reviews should include evaluation of the first iteration of the training (such as officer perceptions and officer learning), as well the perceptions of Chicago Council on Mental Health Equity members who have observed the training. Chicago Council on Mental Health Equity members should report on their observations to the entire Chicago Council on Mental Health Equity membership to provide the CPD with further documented feedback. However, as we note in our previous monitoring report, feedback should be voted on and approved by the entire Chicago Council on Mental Health Equity to ensure that the committee is speaking with one voice.

# Crisis Intervention: ¶102

**102.** *All newly assigned Field Training Officers ("FTOs") and pro-moted Sergeants and Lieutenants will continue to receive the Basic CIT Training. To be considered Certified CIT Officers, FTOs, Sergeants, and Lieutenants must meet the eligibility criteria and training requirements established by the CIT Program and this Agreement.*

Compliance Progress  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary or Secondary compliance with ¶102 during the third reporting period.

In the third monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the training and eligibility requirements required by ¶102. The draft standard operating procedure provides a tiered system for determining the order in which certain officers will receive the 40-hour CIT training and clearly states levels of priority. Newly assigned field training officers and promoted Sergeants and Lieutenants constitute a second-tier priority level, behind officers who volunteer to become Certified CIT officers. The IMT will need to ensure that, in practice, this tiered system does not cause unreasonable delay in training field training officers and newly promoted Sergeants and Lieutenants. We appreciate the CPD's progress toward compliance during this reporting period, but the CPD will not meet Preliminary compliance until they finalize the standard operating procedure.

For Secondary compliance, we consider whether the CPD has developed a system to track whether relevant members have completed the requisite training and that such members have been added to the Certified CIT Officer list.

The CPD produced departmental orders to attend training as well as attendance sheets showing the field training officers, Sergeants, and Lieutenants who attended the 40-hour CIT training. However, those records do not provide evidence that all newly assigned members received the training. Rather, it demonstrates that members of these ranks and titles were a part of the training, which is not assure that each newly assigned member received the training. In the past, we have asked the CPD to provide data indicating the number and percent of field training officers, Sergeants, and Lieutenants who have been trained or still require

training. The CIT Officer Implementation Plan includes some of this data, but not enough to provide insight into whether all newly assigned members have received the training as required by ¶102.

For Full compliance, we will assess whether the field training officers, Sergeants, and Lieutenants who have received the 40-hour training also adhere to eligibility and training criteria established by the CIT Program if they are to be considered Certified CIT Officers for the purposes of dispatch.

# Crisis Intervention: ¶104

**104.** *CPD will develop policies regarding the criteria for ongoing participation as a Certified CIT Officer, consistent with this Agreement.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not met Preliminary compliance with ¶104 during the third reporting period, because the corresponding policy is still under the review process required by ¶¶626–41.

In the third monitoring period, the CPD provided the IMT with a draft of Crisis Intervention Unit Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which identifies criteria for ongoing participation as a Certified CIT Officer. We are concerned that the draft criteria may not be capable of parsing out a meaningful number of officers. We suggest that the CPD conduct an analysis to determine the percentage of officers the draft criteria would render ineligible.

The City and the CPD will achieve Preliminary compliance after finalizing a policy that addresses the requirements of ¶104 after finishing the review process required by ¶¶626–41. Subsequent levels of compliance will be achieved after developing a system to remove officers from daily rosters once the threshold for disqualification is crossed.[103]

---

[103] In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple policies, directives and standard operating procedures. While we do not disagree with this approach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

# Crisis Intervention: ¶105

**105.** *CPD will continue to maintain an up-to-date list of Certified CIT Officers, including their unit of assignment.*

**Compliance Progress**   (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

During the third reporting period, the City and the CPD met Preliminary compliance with ¶105 by finalizing Special order S05-14, *Crisis Intervention Team*.

The CPD provided the IMT with S05-14 this reporting period. S05-14 clearly states that the Training Division is responsible for updating officer training records regarding the completion of Basic, Advanced, and Refresher CIT trainings. Additionally, in September 2020, the CPD provided the IMT with a process flowchart for recording the certification of CIT Officers and ensuring that an up-to-date list is maintained.

Upon completion of the CIT training, the Training Division manually inputs the training records into CPD's CLEAR and eLearning systems. These systems therefore act as the official CPD list. This allows the OEMC to directly pull CIT officer names from CLEAR and allows watch supervisors to identify CIT officers from the eLearning application and send a roster to the OEMC.

While we have asked the CPD and the OEMC to assess the redundancy of this process, we overall find that the City and the CPD have an up-to-date list of Certified CIT Officers, including their unit of assignment. Because the CPD has memorialized the up-to-date list into a policy and has identified the office responsible for ongoing evaluation of eligibility, we find that the City and the CPD have achieved Preliminary compliance with the requirements of ¶105.

S05-14 also notes that the Deputy Chief of the Strategic Initiatives Division is responsible for "inform[ing] OEMC of officers who are out of compliance with the CIT Program eligibility requirements." We have not, however, received the process for how this determination will be made. Secondary compliance will depend on the development of a systems plan to ensure that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR/eLearning systems. Full compliance will then depend on data demonstrating execution of the systems plan and that the system is functioning as intended.

# Crisis Intervention: ¶106

**106.** *CPD will require that, when available, at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis. Certified CIT Officers will continue to be prioritized for dispatch to incidents identified as involving individuals in crisis, as assigned. CPD will review and revise the appropriate policies to ensure that, in situations in which a Certified CIT Officer is not available to respond to a call or incident identified as involving an individual in crisis, the responding officer engages in crisis intervention response techniques, as appropriate and consistent with CPD policy and their training, throughout the incident. Responding officers will document all incidents involving an individual in crisis in a manner consistent with this Agreement.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have met Preliminary compliance, but not Secondary compliance with ¶106. In the third monitoring period, the IMT reviewed S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states the requirements of ¶106. The OEMC directive *Chicago Police Department Crisis Intervention Team* also contains the criteria for Certified CIT Officers to be prioritized for dispatch to incidents involving a person in mental-health crisis when one is available.

S04-20 also includes the requirement to complete a *Crisis Intervention Report* at the conclusion of an incident with a mental-health component, regardless of whether the responding officer is a Certified CIT Officer. We have reviewed the CPD's Crisis Intervention Report template, and it is sufficient to collect the necessary information to allow CPD to evaluate the particular interaction and conduct trend analysis of calls involving a mental health component. As a result of S04-20, we find that the CPD has achieved Preliminary compliance with the requirements of ¶106.

Secondary compliance with ¶106 will depend on a number of factors regarding training. We have spoken with the CPD about each of these factors, and the CPD is taking steps towards the accomplishment. First, we have expressed concerns that the training received by non-CIT officers is insufficient to prepare them for responding to calls involving an individual in crisis. While the CPD certainly has provided some degree of training, the most recent training was delivered as part

of a broader training for use of force and custodial escorts. Connecting crisis response to custodies is potentially dangerous, particularly given that custody should not be the primary desired outcome for calls involving a mental-health component. Rather, officers should be seeking community-based treatment when appropriate over arrest.

The CPD has recently informed the IMT of its plans to provide all officers with the 40-hour Basic CIT Training. We take this opportunity to state that we are in favor of all officers receiving the 40-hour training and have seen this be a positive impact on other agencies. However, the benefit of a specialized response is not simply in that an officer receives training – it is that the officer *volunteers* for the specialized role. The CPD has noted their intention to elevate volunteer CIT officers for priority dispatch, and we agree, but we will need to consult further with the CPD regarding the details of this plan to ensure that the integrity of the specialized nature of its model is maintained.

Another step required for Secondary compliance will be training for all officers in completing the Crisis Intervention Report. Previously, only CIT officers were required to complete the report. This means that the majority of CPD officers are inexperienced in completing the form. Thus, training is necessary to ensure that terms are understood by all officers in a consistent fashion and that the data collected will be reliable to evaluate the incident as well as conduct trend analysis. Finally, CPD will need to ensure that the CIT Unit is provided with a qualified analyst to conduct the analyses discussed above and in our assessment of other paragraphs. We have been informed that the CIT Unit presently does have an analyst, though we have not been provided with any work product nor have we been briefed on the training received by the analyst to prepare them their role in the CIT Unit.

# Crisis Intervention: ¶107

**107.** *Within 180 days of the Effective Date, and quarterly there-after, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis in-tervention services for the particular watch and district.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary com-pliance with ¶107, because one of the two policies has not finished the review process required by ¶¶626–41.

Specifically, the IMT reviewed Special Order SO5-14, *Crisis Intervention Team (CIT) Program*, and Special Order SO20-05, *CIT Officer Implementation Plan*. Taken to-gether, these policies clearly state the responsibility to monitor and evaluate (1) the number of calls for service involving persons in crisis; (2) the timely response by Certified CIT officers; and (3) the strategy, methods, and actions implemented to maintain an appropriate response. Such analyses will allow the CPD to ensure that that the number of Certified CIT Officers on each watch in every district is driven by the demand for crisis-intervention services. S05-14 also identifies the CIT District Operations and Community Support section of the Crisis Intervention Unit as the group responsible for conducting such analyses.[104] While the CPD has final-ized S05-14, the CPD has not finalized SO20-05. After finishing the review process required by ¶¶626–41 and finalizing SO20-05, the City and the CPD will achieve Preliminary compliance with the requirements of ¶107.

To achieve Secondary Compliance, the CPD will need to ensure that the required analysis is being performed by a qualified analyst as required by ¶107. There is an

---

[104] Per SO5-14, "The CIT District, Operations, and Community Support is a branch of the Crisis Intervention Unit that serves to: a. mitigate the frequency and severity of service calls identi-fied as involving individuals in crisis. b. prevent unnecessary incarceration and/or hospitaliza-tion of individuals living with serious mental illness, substance use disorders, or co-occurring disorders; and c. support access to appropriate services for individuals with mental and behav-ioral health needs who encounter law enforcement."

analysist assigned to the CIT Unit, though the IMT is not aware of the analyst's training or preparation to conduct the required analysis.

As referenced above, we continue to encourage the CPD to consider enhancing the types of analyses conducted, including defining the term "timely response" (including a distinction between primary and secondary response) and evaluating how factors such as the number of overall calls for service in a district and watch may impact CIT response rates. The evaluation should also include an assessment of when officers arrived on scene based on their utilization of the on-scene button, as required by CPD policy. Near the end of the monitoring period, the IMT was provided an updated draft of the *Crisis Intervention Plan.* The IMT has since reviewed the newly submitted plan and have provided preliminary comments.

# Crisis Intervention: ¶108

> **108.** *Within 180 days of the Effective Date, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets: a. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and b. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target").*

## Compliance Progress      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD made significant progress toward Preliminary compliance in the third reporting period. In the third monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-05, *CIT Officer Implementation Plan*, which clearly states the requirements of ¶108. The IMT provided a few comments to the CPD regarding Crisis Intervention Unit Special Order SO20-05, but overall, we found that it was thoughtfully developed. Upon finalizing SO20-05, we anticipate that the City and the CPD will be in Preliminary compliance with ¶108.

As we noted in our prior report, the CPD's initial attempt to prepare the *CIT Officer Implementation Plan* had methodological limitations. Some of the implications of the *CIT Officer Implementation Plan*, for example, were not supported by the underlying data. We had many discussions with the CPD during the third reporting period about enhancing the types of analyses. These analyses include clearly defining the term "timely respond" (including a distinction between primary and secondary response) and evaluating how factors—such as, the number of overall calls for service in a district and watch—may impact CIT response rates. The planned evaluation of this data should also include an assessment of when officers arrived on scene based on their utilization of the on-scene button, as required by CPD

policy. Near the end of the monitoring period, the IMT reviewed an updated draft of the *CIT Officer Implementation Plan* and provided comments.

The CIT Unit also retained a data analyst. We have not yet reviewed, however, any of the new data analyst's work product, nor have we been briefed on the training received by the analyst to prepare them for their role in the CIT Unit or under the *CIT Officer Implementation Plan*. We look forward to meeting with the analyst to discuss these issues in more depth in the next reporting period.

# Crisis Intervention: ¶110

> **110.** *Within 180 days of completing the CIT Officer Implementation Plan, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney General ("OAG") regarding the progress the Department has made to meet: (a) the response ratio targets ("Implementation Plan Goals") identified in the Implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG.*

## Compliance Progress       (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          Moving          ☑ **Not Yet Applicable**

**Preliminary:**       *Not in Compliance*
**Secondary:**        *Not Yet Assessed*
**Full:**                  *Not Yet Assessed*

In the third monitoring period, the IMT reviewed a draft of *CIT Officer Implementation Plan*, Crisis Intervention Unit Special Order SO20-05, which clearly states the requirements found within ¶110. The IMT provided comments to the CPD regarding the policy, though overall we found that it was developed in a thoughtful manner. Upon finalizing SO20-05, we anticipate that the City and the CPD will be in Preliminary compliance with ¶110.

As we noted in our prior report, the CPD's initial attempt to prepare the *CIT Officer Implementation Plan* had methodological limitations. Some of the implications of the *CIT Officer Implementation Plan*, for example, were not supported by the underlying data. We had many discussions with the CPD during the third reporting period about enhancing the types of analyses. These analyses include clearly defining the term "timely respond" (including a distinction between primary and secondary response) and evaluating how factors—such as, the number of overall calls for service in a district and watch—may impact CIT response rates. The planned evaluation of this data should also include an assessment of when officers arrived on scene based on their utilization of the on-scene button, as required by CPD policy. Near the end of the monitoring period, the IMT reviewed an updated draft of the *CIT Officer Implementation Plan* and provided comments.

As noted above, the CIT Unit has retained a data analyst. We have not yet reviewed, however, any of the new data analyst's work product, nor have we been

briefed on the training received by the analyst to prepare them for their role in the CIT Unit or under the *CIT Officer Implementation Plan*. We look forward to meeting with the analyst to discuss these issues in more depth in the next reporting period.

# Crisis Intervention: ¶113

> **113.** *CPD will require that responding Certified CIT Officers will take the lead in interacting with individuals in crisis, once on scene, when appropriate and with supervisory approval, if required by CPD policy. If an officer who is not a CIT-Certified Officer has assumed responsibility for the scene, the officer will seek input from the on-scene Certified CIT Officer on strategies for resolving the crisis, when it is safe and practical to do so.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**        *In Compliance* (NEW)
**Secondary:**        *Under Assessment*
**Full:**                *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance with ¶113 in this reporting period. In the third monitoring period, the IMT reviewed S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers assigned to incidents with mental health components will request a Certified CIT-trained officer to assist, if available. We note that CPD policy does not require the Certified CIT Officer to take the lead in interacting with individuals in crisis.

To achieve subsequent levels of compliance, the CPD will need to enhance training for non-CIT officers for calls involving individuals in crisis. As noted above, we have expressed concerns that the training received by non-CIT officers is insufficient to prepare them for responding to calls involving an individual in crisis. While the CPD certainly has provided some degree of training, the most recent training was delivered as part of a broader training regarding use of force and custodial escorts. Connecting the concepts of crisis response to custodial escorts is potentially dangerous, particularly given that custody should not be the primary desired outcome for calls involving a mental-health component. Rather, officers should seek community-based treatment options over arrest, when appropriate.

During this reporting period, the CPD informed the IMT of its plans to provide all officers with the 40-hour Basic CIT Training. The IMT is in favor of all officers receiving the 40-hour training and have seen department-wide CIT training to have a positive impact on other agencies. However, the benefit of a specialized response is not simply in that an officer receives training—it is that the officer *volunteers* for the specialized role. The CPD has also noted their intention to elevate volunteer CIT officers for priority dispatch. The IMT is hopeful about the benefits of that process, but we will need to consult further with the CPD regarding the details of their plan to ensure that the integrity and specialized nature of their model is maintained.

# Crisis Intervention: ¶114

**114.** *Certified CIT Officers will receive ongoing feedback from the CIT Program and unit supervisors regarding their responses to incidents identified as involving individuals in crisis.*

## Compliance Progress      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD met Preliminary compliance with the requirements of ¶114. Specifically, in the third monitoring period, the CPD provided the IMT with a Special Order S05-14, *Crisis Intervention Team (CIT) Program*. S05-14 clearly states that area-level personnel within the CIT Unit will provide advice, guidance, and feedback on incidents involving persons in crisis and follow up on mental and behavioral health-related events beyond the preliminary investigation. We look forward to learning more about the feedback loops and reviewing examples of feedback in future reporting periods.

For subsequent levels of compliance, we will need to ensure that the area-level personnel are in place, have been adequately trained to review incidents, and are able to consistently identify areas for critical feedback. We will then need to ensure that the CIT Unit is using the evaluations as a tool for assessing officers' ongoing participation in the CIT Program, for identifying training needs, and for informing policy revisions. Additionally, we will need to see evidence that unit supervisors (*i.e.*, members' shift sergeant and lieutenant) are providing ongoing feedback after interactions with persons in mental-health crisis. For the IMT to be confident that this is occurring, the CPD will also need to demonstrate that a sufficient number of unit supervisors have received the 40-hour training.

# Crisis Intervention: ¶116

**116.** *The CIT Coordinator will receive initial and refresher professional development training that is adequate in quality, quantity, type, frequency, and scope to prepare the CIT Coordinator to take on the role and responsibilities of the CIT Coordinator, in addition to the Basic CIT training.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**        *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**        *In Compliance* (NEW)
**Full:**                  *Not Yet Assessed*

The CPD maintained Preliminary compliance and achieved Secondary compliance with ¶116 in the third reporting period. In our second report, we noted that the CPD had already achieved Preliminary compliance based on the current CIT Coordinator's training and resume. In December 2020, the IMT reviewed Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which clearly states the initial and professional development training that is required of the CIT Coordinator.

While S05-14 sufficiently memorializes the requirements for the CIT Coordinator, the CPD should continue to assess the scope of training necessary to successfully carry out the responsibilities of the CIT Coordinator role and update the directive as warranted. For instance, while the CIT Coordinator is required to complete the 40-hour basic CIT course, street experience as a CIT officer is not a requirement. This is something that CPD should strongly evaluate as prior training, thorough knowledge, and street experience as a CIT officer are important background components to have if one is going to lead the CIT Unit.

Because the CPD memorialized the requirements for acting as the CIT Coordinator, and the CIT Coordinator in the third reporting period was well-trained and had the requisite background to fulfill the role. Thus, the City and the CPD achieved Secondary compliance with ¶116. Full compliance will depend on the CPD continuing to evaluate the necessary background for the role and ensuring that future Coordinators are as qualified as the current Coordinator.

# Crisis Intervention: ¶117

*117. The responsibilities of the CIT Coordinator will include, at a minimum: a. developing and managing a uniform CIT Program strategy; b. researching and identifying best practices to incorporate into CPD response to individuals in crisis; c. reviewing and, when necessary to meet the requirements of this Agreement, enhancing the CIT training curricula; d. selecting and removing Certified CIT Officers from the CIT Program consistent with the requirements of this Agreement; e. overseeing crisis intervention-related data collection, analysis, and reporting; f. developing and implementing CPD's portion of any Crisis Intervention Plan; g. supervising CIT Program staff; h. participating in the Advisory Committee; i. encouraging the public recognition of the efforts and successes of the CIT Program and individual Certified CIT Officers; and j. regularly communicating and interacting with relevant CPD command staff to recommend improvements to Department crisis intervention-related strategies, staffing and deployment, policies, procedures, and training.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third monitoring period, the IMT reviewed S05-14 *Crisis Intervention Team (CIT) Program*, which clearly states that the CIT Coordinator is responsible for the activities required by ¶117. Additionally, we are confident that the present CIT Coordinator has the knowledge and expertise to accomplish the requirements of ¶117. Therefore, the CPD has achieved Preliminary compliance with this paragraph. However, as noted above, the CPD should continue to evaluate the qualifications for the CIT Coordinator in order to ensure that they are able to carry out the responsibilities in this paragraph, including potentially adding the requirement of street experience as a CIT officer.

For subsequent levels of compliance, the IMT expects the CPD to create a type of "operations manual" so that future CIT Coordinators perform their duties with consistent quality. The IMT has reviewed a number of standard operating procedures which, when combined, would satisfy that operations manual requirement; however, additional revisions are necessary for the standard operating procedures to comprehensively address how the ¶117 requirements are to be carried out.

## Crisis Intervention: ¶118

**118.** *By January 1, 2020, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include: a. the nature of the incident; b. the date, time, and location of the incident; c. the subject's age, gender, and race/ethnicity; d. whether the subject is or claims to be a military veteran, if known; e. the relationship to the subject, if any and if known, of the individual calling for service; f. whether the subject has had previous interactions with CPD, if known; g. whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis; h. the behaviors observed during the incident, including whether the subject used or displayed a weapon; i. the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers; j. the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene; k. the skills, techniques, or equipment used by the responding CPD officers; l. whether a reportable use of force was documented on a Tactical Response Reports ("TRR"), or whatever similar form of documentation CPD may implement, for the incident ; m. a narrative describing the CPD officer's interaction with the subject, when no other CPD report captures a narrative account of the incident; and n. the disposition of the incident, including whether the individual was transported to municipal or community services, transported to a hospital, subject to a voluntary or involuntary commitment, or arrested.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the third reporting period, the City and the CPD achieved Preliminary compliance with ¶118. Specifically, the IMT reviewed a revised version of the *Crisis Intervention Report*, which consistent with the requirements of ¶118, includes data and information about calls with a mental health component. The CPD also provided the IMT with a revised version of S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers must complete a *CIT Report* when they determine that a call has a mental-health component.

The *Crisis Intervention Report* will now be required of all officers, whereas in the past, it had only been required of CIT officers and only in certain situations (*i.e.*, when no other report was completed). Therefore, data on all calls involving a mental-health crisis will now be collected, whereas before only a subset of calls would have associated data.

Subsequent levels of compliance will require the CPD to provide training to all officers regarding when they are required to complete the CIT Report and how to accurately complete the report to ensure, among other things, reliable data collection.

# Crisis Intervention: ¶120

***120.** CPD will collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis. The CIT Program will review the data contained within the submitted CIT Reports, or any similar form of documentation CPD may implement, to evaluate the overall response and effectiveness by CPD officers and identify any district-level and department-wide trends regarding responses to incidents identified as involving individuals in crisis.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

During this reporting period, the CPD made progress toward, but did not meet, Preliminary compliance with ¶120 involving the two data collection and analysis processes. The *CIT Officer Implementation Plan,* which addresses staffing and deployment of Certified CIT officers, has been sufficiently memorialized into a draft standard operating procedure. The CPD also made progress regarding the data within the *Crisis Intervention Report*, which is sufficient to collect the necessary data. Finally, the broader language of ¶120 is contained within Special Order S05-14, *Crisis Intervention Team (CIT) Program*. After finalizing the standard operating procedure through the review process required by ¶626–41, we anticipate that we will find the City and the CPD in Preliminary compliance with the requirements of ¶120. We look forward to continuing to work with the CPD on data analysis in future reporting periods.

Additional compliance levels will depend on the creation of adequate methodologies for reviewing data related to the *CIT Officer Implementation Plan,* as well as data collected from the *Crisis Intervention Report*. Full compliance will depend on the CPD demonstrating that identified district-level and department-wide trends are being comprehensively addressed.[105]

---

[105] In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple poli-

cies, directives and standard operating procedures. While we do not disagree with this ap-
proach, it necessarily requires multiple policies to go through the Consent Decree's review
procedures.

# Crisis Intervention: ¶122

*122. Within 365 days of the Effective Date, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee.*

## Compliance Progress  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**  December 31, 2020  ☐ **Met**  ☑ **Missed**

**Preliminary:**  *Not in Compliance*
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

In the third reporting period, the City did not meet Preliminary compliance with ¶122, but made substantial strides in conducting the scope of evaluation required to complete the *Crisis Intervention Plan*. Although the CPD did not meet the deadline required by ¶122, we believe that their current efforts represent an improvement over the *Crisis Intervention Plan* provided to the IMT during the second monitoring period.

The IMT has reviewed a draft of the City's proposed *Crisis Intervention Plan*, which contains information and feedback from all actors within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. In the draft, each entity identifies its accomplishments within the past year and its goals for the upcoming year.

The IMT has provided comments on the draft *Crisis Intervention Plan*, and we look forward to reviewing a revised version in the next reporting period. The IMT appreciates the City and all its partner agencies for its methodical and comprehensive approach to collecting information to evaluate the City's mental health response system. Although some information may not be available for the first *Crisis Intervention Plan* (for instance, "actual incident information" and "outcomes" (*see also* ¶123) will require sufficient *Crisis Intervention Report* data), the City may supplement this by incorporating additional data collection approaches (for instance, we have suggested that the CPD broaden its attempts to gather information from street-level officers). The IMT appreciates the City's work on the draft *Crisis Intervention Plan*. In accordance with the requirements of ¶122, the City should ensure that the Chicago Council on Mental Health Equity reviews the plan before the City finalizes it.

For their parts, both the CPD and the OEMC have received input on the policy, training, and operations from the Chicago Council on Mental Health Equity. Therefore, the CPD's and the OEMC's achievements for this year and the goals for next year (as listed in the draft *Plan*) have already incorporated feedback from the advisory groups. However, we have requested the OEMC to better identify the research they have conducted regarding best practices. We have not yet received a response regarding their specific research, but look forward to a response in the fourth reporting period.

Additionally, in the third monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly states the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*. We appreciate that the CPD memorialized its responsibilities for the *Crisis Intervention Plan* into a standard operating procedure so that future CIT Coordinators may ensure a consistency. The OEMC also notes their responsibilities to contribute to the *Crisis Intervention Plan* in their draft directive *CPD Crisis Intervention Team*. However, both the CPD standard operating procedure and the OEMC directive require finalization. The *Crisis Intervention Plan* also notes the continuing obligation of the City to create annual *Crisis Intervention Plans*. We look forward to finalization of the *Crisis Intervention Plan*, as well as ongoing evaluations to be included in subsequent years' plans.

# Crisis Intervention ¶128

*128. The City will have a crisis intervention response advisory committee ("Advisory Committee") with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services. The Parties acknowledge that the City has formed the City-wide Mental Health Steering Committee and that the City may draw upon those resources to satisfy the requirements of this Agreement.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance with ¶128, but did not meet Secondary compliance.

The Advisory Committee that is responsive to the requirements of ¶128 has evolved over the course of the monitoring period. Near the beginning of 2020, the Crisis Intervention Advisory Committee evolved into a new committee called the Chicago Committee on Mental Health Equity. The Crisis Intervention Advisory Committee previously focused more narrowly on police responses. The new Chicago Council on Mental Health Equity expands its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely made up of representatives from the Crisis Intervention Advisory Committee, and therefore, the IMT does not have any concerns about the qualifications of Chicago Council on Mental Health Equity members, nor do we have concerns about maintenance of institutional knowledge being transferred to the new committee.

Although a number of factors impacted the ability of the Chicago Council on Mental Health Equity to meet over the past year, the City maintains Preliminary compliance with ¶128 in the third reporting period. First, the COVID-19 pandemic prohibited in-person meetings, which impacted the Chicago Council on Mental Health Equity's productivity. Second, the City paused Chicago Council on Mental Health Equity operations while it took time to determine future steps in light of a ruling from the Illinois Attorney General's Office that the Chicago Council on Mental Health Equity is a public body and must follow the Open Meetings Act. As a result, Chicago Council on Mental Health Equity meetings were not held for several months.

In October 2020, the IMT observed the Chicago Council on Mental Health Equity virtual meeting, where the CPD and the OEMC provided a presentation on their directives. The presentations, however, were at a high level and comments from the Chicago Council on Mental Health Equity were not very robust. In the future, we expect a much deeper assessment of the CPD's and the OEMC's directives from the Chicago Council on Mental Health Equity. Additionally, the IMT still awaits the Chicago Council on Mental Health Equity's bylaws so that we can confirm that the committee's voting processes are consistent with best practices. Specifically, as we noted in our last report, the subcommittee recommendations were not reviewed or voted on by the entire board before being sent to the Office of the Mayor. In a virtual meeting with the IMT, the City shared a draft of the Chicago Council on Mental Health Equity bylaws with the IMT. We look forward to reviewing the final bylaws.

The IMT also recommends that the Chicago Council on Mental Health Equity by-laws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops. For example, at the end of the October Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but no responses were provided by the City. Future meetings require community members to submit comments 24 hours before the meetings. This may, however, deter community input and erode community trust. We believe that the Chicago Council on Mental Health Equity should reconsider this approach.

# Crisis Intervention ¶129

**129.** *The Advisory Committee, at a minimum, will meet quarterly to review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          Quarterly          ☑ Met     ☐ Missed

**Preliminary:**          *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**          *Not in Compliance*
**Full:**          *Not Yet Assessed*

Although a number of factors impacted the ability of the Chicago Council on Mental Health Equity to meet over the past year, the City maintained Preliminary compliance with ¶129 in the third reporting period. First, the COVID-19 pandemic prohibited in-person meetings, thereby impacting the Chicago Council on Mental Health Equity's productivity. Second, the City paused Chicago Council on Mental Health Equity operations while it took time to determine future steps in light of a ruling from the Illinois Attorney General's Office that the Chicago Council on Mental Health Equity is a public body and must follow the Open Meetings Act. As a result, no Chicago Council on Mental Health Equity meetings were held for several months.

In October 2020, the IMT observed the Chicago Council on Mental Health Equity virtual meeting, where the CPD and the OEMC provided a presentation on their directives. The presentations, however, were at a high level and comments from the Chicago Council on Mental Health Equity were not very robust. In the future, we expect a much deeper assessment of the CPD's and the OEMC's directives from the Chicago Council on Mental Health Equity. Additionally, the IMT still awaits the Chicago Council on Mental Health Equity's bylaws so that we can confirm that the committee's voting processes are consistent with best practices. Specifically, as we noted in our last report, the subcommittee recommendations were not reviewed or voted on by the entire board before being sent to the Office of the Mayor. In a virtual meeting with the IMT, the City shared a draft of the Chicago Council on Mental Health Equity bylaws with the IMT. We look forward to reviewing the final bylaws.

The IMT also recommends that the Chicago Council on Mental Health Equity bylaws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops.

For example, at the end of the October Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but no responses were provided by the City. Future meetings require community members to submit comments 24 hours before the meetings. This may, however, deter community input and erode community trust. We believe that the Chicago Council on Mental Health Equity should reconsider this approach.

Because the Chicago Council on Mental Health Equity met in October 2020, and because an upcoming meeting is scheduled for January, the City maintains Preliminary compliance with ¶129. Further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity, as well as updated bylaws to ensure that votes are reflective of the entire committee.

# Crisis Intervention: ¶130

*130. The City will request that the Advisory Committee provide guidance on crisis response-related policies, procedures, and training of City agencies, including CPD and OEMC, and assist the City in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central nonemergency crisis line). The City will further request that in providing the guidance detailed above the Advisory Committee will consider specific strategies for responding to children and youth when they experience a behavioral or mental health crisis.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City maintained Preliminary compliance, but did not meet Secondary compliance, with ¶130 in the third reporting period.

In October 2020, the IMT observed the Chicago Council on Mental Health Equity virtual meeting, where the CPD and the OEMC provided a presentation on their directives. The presentations, however, were at a high level and comments from the Chicago Council on Mental Health Equity were not very robust. In the future, we expect a much deeper assessment of the CPD's and the OEMC's directives from the Chicago Council on Mental Health Equity. Additionally, the IMT still awaits the Chicago Council on Mental Health Equity's bylaws so that we can confirm that the committee's voting processes are consistent with best practices. Specifically, as we noted in our last report, the subcommittee recommendations were not reviewed or voted on by the entire board before being sent to the Office of the Mayor. In a virtual meeting with the IMT, the City shared a draft of the Chicago Council on Mental Health Equity bylaws with the IMT. We look forward to reviewing the final bylaws.

The IMT also recommends that the Chicago Council on Mental Health Equity bylaws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops. For example, at the end of the October Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but no

responses were provided by the City. Future meetings require community members to submit comments 24 hours before the meetings. This may, however, deter community input and erode community trust. We believe that the Chicago Council on Mental Health Equity should reconsider this approach.

The prior iteration of the Crisis Intervention Advisory Committee board provided input on other elements of ¶130. In December of 2019, the Mayor's Office stated that each of the recommendations were to be implemented and the *CIT Plan* provides evidence that some steps are being taken to accomplish the recommendations of the Crisis Intervention Advisory Committee. While this is a commendable start, additional steps are necessary before all recommendations are fully put into place. For instance, we noted in our last report that the City has not provided a long-term plan to implement all of the recommendations.

# Crisis Intervention: ¶131

*131. Within 365 days of the Effective Date, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City maintained Preliminary compliance with ¶131, but did not meet Secondary compliance.

As noted in our second report, the City requested that the Crisis Intervention Advisory Committee (the Advisory Committee that was in place at the beginning of the Consent Decree) provide recommendations on the CPD's and the OEMC's policies, procedures, and training. In addition, the Crisis Intervention Advisory Committee provided recommendations for improving the City's broader mental-health-response system. These recommendations were universally accepted by

the City. In its draft *Crisis Intervention Plan*, the City provided updates on its implementation of some—but not all—of these recommendations. We understand that the City may not include every recommendation in the first *Crisis Intervention Plan*, but we look forward to further discussion between the City and Chicago Council on Mental Health Equity to understand how the entirety of CIAC's recommendations will be addressed.

The City has achieved and maintained Preliminary compliance, but the IMT notes that ¶131 requires a comprehensive response to each of the Advisory Committee's recommendation. Further compliance cannot be achieved until the City describes its decision-making process about each recommendation.

The Chicago Council on Mental Health Equity (which is the most recent iteration of the City's advisory committee) is still a relatively new body and has a broader focus on city-wide crisis-response systems. The IMT interviewed the Committee chair and Committee members and, based on these interviews, determined that the Chicago Council on Mental Health Equity represents a sound opportunity for the City to develop and implement a comprehensive city-wide crisis response system. Going forward, we will continue to assess the Chicago Council on Mental Health Equity's meetings and subcommittee meetings.

The IMT also recommends that the Chicago Council on Mental Health Equity by-laws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops. For example, at the end of the October 2020 Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but no responses were provided by the City. Future meetings require community members to submit comments 24 hours prior to the meeting. This may act to deter community input and erode community trust, and we believe that the Chicago Council on Mental Health Equity should reconsider its approach.

# Crisis Intervention: ¶132

*132. The Advisory Committee will be chaired by the Mayor's Office. The Mayor's Office will invite individuals who have personally experienced a behavioral or mental health crisis, people with experience working with individuals in crisis, and experts with knowledge in law enforcement responses to individuals in crisis. At a minimum, the Mayor's Office will invite individuals from the following groups: first responders; the CIT Coordinator; OEMC; county and city hospitals, health care providers, and mental health professionals; the Cook County State's Attorney's Office; the Cook County Public Defender's Office; at least one academic research entity; community behavioral and mental health professionals; advocacy groups for consumers of behavioral and mental health services; behavioral and mental health service providers; homeless service providers; substance abuse service providers; persons with lived experiences of behavioral or mental health crises; and other similar groups.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Under Assessment* |

The City has maintained Preliminary compliance and has met Secondary compliance with ¶132 in the third reporting period.

In accordance with the requirements of ¶132, the Chicago Council on Mental Health Equity is chaired by a representative from the Mayor's Office. We have interviewed the Chair on several occasions and believe that the Chair has the necessary background, experience, and commitment to the Chicago Council on Mental Health Equity process. Additionally, the Chicago Council on Mental Health Equity membership includes representatives from each of the groups listed in ¶132. Following recommendations from our last report, the Chicago Council on Mental Health Equity gathered a greater representation of persons with lived experience compared with the Crisis Intervention Advisory Committee. As a result, we find that the City met Secondary compliance with ¶132.

To assess Full compliance, we will monitor the City's efforts to finalize the Chicago Council on Mental Health Equity bylaws and evaluate the continuing robust participation from Chicago Council on Mental Health Equity members.

# Crisis Intervention: ¶133

**133.** *CPD policy will provide that a crisis response may be necessary even in situations where there has been an apparent violation of law.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with the requirements of ¶133. In the third monitoring period, the IMT reviewed Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that a crisis intervention response may be necessary even in situations where there has been apparent violation of law. Additionally, the directive provides tips and techniques for recognizing a person who may be in mental-health crisis and includes requirements for responding to such calls for service.

Subsequent levels of compliance will require the CPD to provide adequate training to all officers as to what constitutes a crisis-intervention response, including robust training on involuntary commitment laws, operations, and trauma-informed response. As noted in our assessment of other paragraphs, the most recent training on crisis response was delivered as part of a broader training on the use of force and custodial escorts. Connecting crisis response to arrests and placing people in custody is potentially dangerous, particularly given that custody should not be the primary desired outcome for calls involving a mental-health component.

The CPD has recently informed the IMT of its plans to provide all officers with the 40-hour Basic CIT Training. We take this opportunity to state that we are in favor of all officers receiving the 40-hour training and have seen this be a positive impact on other agencies. However, the benefit of a specialized response is not simply that an officer receives training—it is that the officer *volunteers* for the specialized role. The CPD has noted their intention to elevate volunteer CIT officers for priority dispatch, and we agree, but we will need to consult further with the CPD regarding the details of their plan to ensure that the integrity of the specialized nature of their model is maintained.

# Crisis Intervention: ¶134

**134.** *CPD policy will encourage officers to redirect individuals in crisis to the healthcare system, available community resources, and available alternative response options, where feasible and appropriate.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD achieved Preliminary compliance with the requirements of ¶134. Specifically, the CPD met Preliminary compliance by implementing Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which requires officers responding to a call involving an individual in crisis to provide that individual with a document called the Mental Health Incident Notice. We have reviewed the Mental Health Incident Notice and believe sufficiently directs community members to the healthcare system, available community resources, and available alternative response options.

Subsequent levels of compliance will require the CPD to provide adequate training to all officers about the resources available for persons in mental health crisis. While officers are aware of emergency resources (*i.e.*, hospitals), the CPD will need to ensure that officers are also aware of district-level resources. The CPD's district-level approach, with roll-call trainings to inform officers of the resources within each patrol area, will likely help. This would supplement the agency-wide training about the importance of alternative response options. The regular use of the new *Crisis Intervention Report* will also help us assess disposition trends and the utilization of community-based services.

# Crisis Intervention: ¶135

**135.** *CPD will ensure that the language used in policies, proce-dures, forms, databases, and trainings to communicate about in-cidents involving individuals in crisis is appropriate, respectful, and consistent with industry recognized terminology. CPD will seek input from community stakeholders, including the Advisory Committee, for recommendations to identify appropriate and re-spectful terminology.*

Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the third reporting period, the City and the CPD achieved Preliminary compli-ance ¶135. The CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Pro-gram*, clearly states that language used in the policies, procedures, forms, data-bases, and training materials to communicate about incidents involving individuals in crisis should be appropriate, respectful, and consistent with professional termi-nology. In addition, Special Order S04-20, *Recognizing and Responding to Individ-uals in Crisis*, clearly communicates the CPD's commitment to interacting with in-dividuals in crisis with dignity, respect, and the utmost regard for the preservation of human life and the safety of all persons involved. Under the Procedures section of the directive, officers are instructed that they are required to interact with indi-viduals in crisis with dignity and respect. It is apparent from the policies, proce-dures, forms, databases, and training materials that the CPD is committed to rein-forcing respectful dialogue when discussing persons in crisis.

Subsequent levels of compliance will depend on the CPD providing adequate train-ing to all CPD officers regarding appropriate terminology and respectful communi-cation. In our observations of the 40-hour training for CIT officers, CPD interactions with the Chicago Council on Mental Health Equity, and other meetings with CPD personnel, we have seen the utmost attention toward ensuring officers use appro-priate terminology. We anticipate this attention to terminology will be projected to officers during the actual trainings.

The CPD may achieve Full compliance upon the IMT verifying that discussions be-tween officers and with community members contain appropriate and respectful terminology, including ensuring that the use of terms such as "mentals" are not used by officers or over the radio by CPD members. We look forward to reviewing the CPD's efforts to ensure that respectful language has been incorporated into the broader CPD culture.

# Crisis Intervention: ¶136

**136.** *CPD will develop and implement policies, procedures, and protocols regarding the collection, maintenance, and use of information related to an individual's medical and mental health to facilitate necessary and appropriate communication while adequately protecting an individual's confidentiality. To develop these policies, procedures, and protocols, CPD will seek input from community stakeholders, including the Advisory Committee.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶136. The requirements of ¶136 are incorporated into a number of CPD directives that require collection, maintenance, and use of an individual's medical and mental health information. For example, Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, provides guidance about verbal, behavioral, and environmental cues that may allow an officer to recognize a person in mental health crisis and guidance for officers to collect and use information during the on-scene encounter.

S04-20 also includes the requirement for officers to complete a *Crisis Intervention Report* for all calls involving a mental-health component. The report requires data related to individual cases, but the data will also be used in aggregate to identify overall trends in CPD's mental health response approach. Special Order S05-14, *Crisis Intervention Team (CIT) Program*, clearly identifies the responsible parties for following up on mental and behavioral health-related events and for referring and, when appropriate, connecting individuals in crisis with local service providers. The information collected by the draft *CIT Report* appears capable of assisting area-level resources in conducting such follow-up.

In crafting the policy and the related *Crisis Intervention Report*, the CPD sought the input from community stakeholders and the Chicago Council on Mental Health Equity. Therefore, the CPD has achieved Preliminary compliance with the requirements of ¶136. Subsequent level of compliance will require comprehensive training for officers in completing the *CIT Report*, as well as training for area-level resources on how to conduct such follow-up. However, we credit the CPD for taking the above-referenced steps to date.

# Crisis Intervention: ¶137

**137.** *Within 180 days of the Effective Date, CPD will review and revise its crisis intervention-related policies as necessary to comply with the terms of this Agreement. CPD will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶137. Although the CPD did not meet the timeline in a previous reporting period, and still has not reached Preliminary compliance, the IMT believes that the CPD's process to review and revise its crisis-intervention-related policies has been of higher quality than it may have been if the CPD had solely set out to meet the deadline articulated in this paragraph.

As noted in our assessments of other paragraphs, the CPD has made a good-faith effort to ensure that the requirements of Consent Decree are incorporated into CIT-related policies and that a responsible party is listed for each requirement. Moreover, the CPD has sought and incorporated feedback from the Chicago Council on Mental Health Equity into draft policies. While some CPD directives that fulfill Consent Decree requirements have been published, the CPD intends to enumerate other requirements in standard operating procedures that have not yet been finalized. Once the CPD has finalized each relevant standard operating procedure, we anticipate that the CPD will be in Preliminary compliance with the ¶137. Subsequent levels of compliance will require adequate training of all officers and proof that officers are complying with the relevant CPD directives. We appreciate the CPD's efforts to accomplish the task of policy review in a comprehensive fashion.[106]

---

[106] In its comments, the City asserts that the IMT is applying "a heightened methodology" to this paragraph for Preliminary compliance. Attachment B. We disagree. As with other policy requirements, the City and its entities must memorialize the Consent Decree requirements into policy. The CPD intends to memorialize the requirements of this paragraph into multiple policies, directives and standard operating procedures. While we do not disagree with this approach, it necessarily requires multiple policies to go through the Consent Decree's review procedures.

# Crisis Intervention: ¶138

**138.** *OEMC call-takers will continue to identify calls for service involving an individual known, suspected, or perceived to be in crisis.*

Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *Not in Compliance*
**Secondary:**           *Not Yet Assessed*
**Full:**                    *Not Yet Assessed*

In the third reporting period, the City and the OEMC has made progress toward meeting the requirement of ¶138 but did not achieve Preliminary compliance because the relevant standard operating procedure was not implemented in the third reporting period.

In October 2020, the IMT reviewed an updated draft version of the OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure, which clearly articulates the call-takers' responsibility to identify calls for service involving an individual known, suspected, or perceived to be in crisis. Call-takers are required to complete a series of "CIT triage questions" that help them determine whether a mental health component is known, suspected, or perceived, which would require a CIT response. The draft standard operating procedure also instructs call-takers that if there is any doubt about whether a call includes a possible mental health component, the steps listed in the standard operating procedure "can and should apply." After finalizing the standard operating procedure, we anticipate that the OEMC will be in Preliminary compliance with the requirements of ¶138.

The IMT also notes that OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis. All telecommunicators receive an eight-hour training in crisis intervention and an annual refresher training that includes a module on mental health response (*see* ¶¶142–46). Once the OEMC's standard operating procedure is finalized and incorporated into training, we anticipate that the OEMC will achieve Secondary compliance based on our observations. Although Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing performance reliable data as evidenced by the results of OEMC's ongoing audits), we feel that the OEMC has made strides toward establishing the importance of call-takers being able to identify crisis-related calls.

# Crisis Intervention: ¶139

**139.** *OEMC will continue to code all incidents identified as potentially involving an individual in crisis in a manner that allows for subsequent data analysis necessary for the evaluation of CPD and OEMC responses to individuals in crisis and the development of the plans required by this section of the Agreement.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the OEMC did not meet Preliminary compliance with ¶139 in the third reporting period, because the relevant OEMC standard operating procedure was not finalized in the third reporting period.

In October 2020, the IMT reviewed an updated draft version of OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly identifies the manner in which telecommunicators are required to code incidents by utilizing a "Z-code" to denote a mental health component when closing an event in their computer system. The standard operating procedure also explains how to complete a set of "CIT triage questions" that allow for subsequent data analysis. The IMT has received and reviewed data from the OEMC, and we believe the data is sufficient to conduct the necessary trend analysis required in the development of the *CIT Officer Implementation Plan* and the *Crisis Intervention Plan*. Additionally, the data collected by the OEMC, in coordination with data provided by responding CPD officers, allows the OEMC to conduct the necessary audits of telecommunicators' decision making regarding CIT officer dispatch.

Furthermore, the OEMC telecommunicators have received sufficient training on how to code incidents involving a person in mental-health crisis and on how to complete the CIT triage questions. The IMT has provided comments on the standard operating procedure, but the OEMC did not provide an updated version in the third reporting period. Once finalized and incorporated into training, we anticipate that the OEMC will achieve Preliminary and Secondary compliance with ¶139. Although Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits), we feel that the OEMC has made strides in establishing the importance of coding calls involving person in mental-health crisis.

# Crisis Intervention: ¶140

> **140.** *OEMC police communication dispatchers will continue to prioritize Certified CIT Officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. If a Certified CIT Officer is not available to timely respond, OEMC will continue to dispatch an available officer to avoid compromising response time. OEMC dispatchers will dispatch a Certified CIT Officer, when available, if the responding officer requests assistance from a Certified CIT Officer.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the OEMC did not meet Preliminary compliance with ¶140 because the relevant OEMC standard operating procedure was not finalized in the third reporting period.

In October 2020, the IMT reviewed an updated draft version of OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly states the requirement for telecommunicators to prioritize Certified CIT officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. The standard operating procedure also articulates the requirement to dispatch a non-CIT officer if a CIT officer is not immediately available and the requirement to dispatch a CIT officer if requested by a non-CIT officer. The OEMC telecommunicators receive district and watch information from the CPD watch lieutenants and the CPD CLEAR database about which Certified CIT officers are working on a given shift. *See* ¶141.

If a CIT officer is not immediately available, the OEMC data demonstrates that one will be dispatched as an assist once they become available. Furthermore, the OEMC telecommunicators have received sufficient training in prioritizing Certified CIT officers for dispatch to such incidents. Once finalized and incorporated into training, we anticipate that the OEMC will achieve Preliminary and Secondary compliance based on our observations. Although Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits), we feel that the OEMC has made strides in establishing the importance of dispatching CIT officers for calls involving a mental-health crisis.

# Crisis Intervention: ¶141

**141.** *CPD will provide OEMC with an updated list of current and active Certified CIT Officers and their assignment at least every week. At the beginning of each watch, CPD will continue to identify for OEMC the Certified CIT Officers on duty for each watch and in each district so that OEMC dispatchers know which Certified CIT Officers to prioritize for dispatch to incidents involving an individual known, suspected, or perceived to be in crisis.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD met Preliminary compliance with ¶141 in the third reporting period. To assess Preliminary compliance, the IMT reviewed a process flowchart that demonstrated the two separate ways in which the CPD provides the OEMC with updated lists of current and active Certified CIT Officers and their assignments on a daily basis.

Specifically, data is transmitted by (1) manually inputting training records into CPD's CLEAR and eLearning systems and (2) asking CPD watch supervisors to identify CIT officers from the eLearning application and to send a roster to the OEMC daily for each district and watch.

These requirements are clearly specified in CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*. In addition, the OEMC has access to CPD's data systems, allowing the OEMC to obtain an updated list of all current and active Certified CIT Officers (including their assignments) should they require one. These systems therefore act as the official CPD list. While we have asked the CPD and the OEMC to assess the redundancy of this process, we overall find that the CPD provides the information required by ¶141 to the OEMC. As a result, the City and the CPD have achieved Preliminary compliance.

S05-14 also notes that the Deputy Chief of the Strategic Initiatives Division is responsible for "inform[ing] OEMC of officers who are out of compliance with the CIT Program eligibility requirements." At the end of the third reporting period, we had not received the process for how this determination will be made. Because the CPD has memorialized the up-to-date list into a policy and has identified the office responsible for ongoing evaluation of eligibility, the City achieved Preliminary compliance with the requirements of ¶141. However, we note that, according to the CPD's last updated organizational chart in the reporting period (dated

12/16/20), a Commander oversees the Strategic Initiatives Division, not a Deputy Chief as indicated by the policy. The CPD should resolve this inconsistency.

Secondary compliance will depend on the development of a systems plan to ensure that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems so that the OEMC does not prioritize them for dispatch. Full compliance will then depend on data demonstrating execution of the systems plan and that the system is functioning as intended.

# Crisis Intervention: ¶142

**142.** *Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.*

## Compliance Progress　　　　(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:** *In Compliance* (FIRST REPORTING PERIOD)
**Full:** *Not in Compliance*

In our last report, we noted that the City and the OEMC achieved Preliminary and Secondary compliance with the requirements of ¶142 based on its efforts to ensure that all current active telecommunicators have received mental-health and CIT awareness training. Although we assess the quality of that training elsewhere in this report (*see* ¶¶143–44), the OEMC maintained Secondary compliance in this reporting period based on records demonstrating that all new telecommunicators have received sufficient training before answering calls independently.

The OEMC may achieve Full compliance with this paragraph should the training requirement be memorialized into a finalized policy. In October 2020, the OEMC provided the IMT with a draft version of their *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive the mental health and CIT awareness training. While we commend the OEMC for memorializing the requirements of ¶142 into a policy, the policy must be finalized for the OEMC to be considered in Full compliance.

# Crisis Intervention ¶147

**147.** *OEMC will evaluate all mental health and CIT awareness trainings for telecommunicators on at least an annual basis to ensure that the trainings meet OEMC needs, comply with this Agreement, incorporate best practices, and ensure that the training is effective for personnel and for the individuals in crisis served. OEMC will consider recommendations and feedback from the CIT Coordinator and the Advisory Committee when conducting its evaluation.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the OEMC did not meet Preliminary compliance with ¶146, because the OEMC did not finalize the policy before the end of the reporting period.

To assess Preliminary compliance, the IMT reviewed a draft version of the OEMC's *Mental Health Training* directive. This directive clearly states the requirement for the OEMC to review trainings on an annual basis to ensure that the trainings meet the OEMC's needs, comply with the Consent Decree, and incorporate best practices. The directive also ensures that the training is effective for personnel and for the individuals in crisis served. The policy requires that the OEMC trainings related to crisis intervention be reviewed by the Chicago Council on Mental Health Equity on an annual basis and identifies the person within the OEMC who is responsible for conducting such evaluations. Upon finalizing the directive, we anticipate that the OEMC will achieve Preliminary compliance with the requirements of ¶146.

To achieve Secondary compliance, the OEMC must ensure that the person responsible for conducting the evaluations is qualified to make revisions and has insight into current best practices. The OEMC must also require that recommendations from the Chicago Council on Mental Health Equity will be incorporated into the training, where appropriate. The IMT is aware that the OEMC solicited the Chicago Council on Mental Health Equity feedback during this reporting period, but we have yet to receive documentation indicating how the feedback was incorporated.

Finally, the IMT will assess the effectiveness of the training, which requires a two-pronged approach. First, the OEMC will need to conduct training evaluations to look at how the information was received by telecommunicators (*e.g.*, were the

instructors competent) and whether the training resulted in the desired enhance-ments of knowledge. While the OEMC conducts some training evaluations, we be-lieve that there is room for improvement. The second prong will require evaluation of telecommunicators' actions to confirm that the training is resulting in desired behavior on the OEMC call floor. Currently, the OEMC conducts performance au-dits related to crisis intervention calls. This is a valid measurement of behavior and can inform future training needs. However, we believe that the audit can be more standardized. We have spoken with the OEMC about these issues and believe they are taking concrete steps to make improvements.

# Crisis Intervention ¶150

**150.** *The Parties acknowledge that OEMC currently meets regularly with CPD and the City-wide Mental Health Steering Committee. OEMC will continue to meet regularly with CPD, in addition to appropriate members of the Advisory Committee, including service providers and advocates, to review and assess data and information regarding the identification of, the dispatch of, and response to calls for service involving individuals in crisis by OEMC telecommunicators.*

## Compliance Progress      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the OEMC did not meet Preliminary compliance with ¶150 in the third reporting period, because the OEMC has not incorporated the requirements into policy.

Throughout this reporting period, the OEMC has continued to meet with the CPD and the Chicago Council on Mental Health Equity on a quarterly basis, but the IMT suggests that the OEMC have a more robust involvement in the Chicago Council on Mental Health Equity. For example, while the OEMC has provided overviews of its policies and portions of their eight-hour training to the Chicago Council on Mental Health Equity, the OEMC did not provide advance notice of the presentation, did not to provide the training materials, and did not entertain public comments after the presentation.

The OEMC's regular meetings with the CPD focus on evaluating data to ensure unity in the overall crisis-response system. The IMT is encouraged by these meetings and looks forward to hearing updates from these regular meetings.

In practice, the OEMC accomplishes requirements of ¶150. However, the OEMC has not yet memorialized these requirements into a policy for sustained compliance. The OEMC should develop a standard operating procedure similar to the CPD's standard operating procedure, which memorializes the requirements of ¶150. Once the OEMC develops and finalizes a policy or procedure, we anticipate that the City and the OEMC would achieve Preliminary compliance. Subsequent levels of compliance will depend on the OEMC continuing their regular meetings with the CPD and providing evidence to the IMT that the meetings contribute to the City's overall crisis response approach.

# Crisis Intervention: ¶151

**151.** *Within 180 days of the Effective Date, and annually thereafter, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**         October 30, 2020*         ☐ **Met**   ☑ **Missed**
                *Extended from August 28, 2020, due to COVID-19
**Preliminary:**      *Not in Compliance*
**Secondary:**        *Not Yet Assessed*
**Full:**             *Not Yet Assessed*

In the third reporting period, the City and the OEMC did not meet Preliminary compliance with ¶151 and missed ¶151's deadline.

To assess Preliminary compliance, the IMT reviewed a draft version of the OEMC's corresponding standard operating procedure, *Mental Health Training*. This standard operating procedure states the requirement for the OEMC to review the training on an annual basis and for the Chicago Council on Mental Health Equity recommendations on the training to be incorporated. The draft standard operating procedure falls short, however, of fully incorporating ¶151's requirements, which focuses on intake and dispatch policies. The IMT recommends that the OEMC includes the exact requirement of ¶151 to evaluate those policies on an annual basis into the standard operating procedure. Similar to the process of training review, the OEMC must consider recommendations and feedback provided by the Chicago Council on Mental Health Equity.

The OEMC will achieve Preliminary compliance after incorporating ¶151's requirements into policy. Subsequent levels of compliance for this paragraph will depend on the OEMC's updated training on the compliant policies and protocols. Full compliance will ultimately be tied to the broader system operations (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits) and the review by the Chicago Council on Mental Health Equity, which should document their feedback on the OEMC policies.

# Crisis Intervention: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶103, 109, 121, 123–25, 143–146, 148, and 152 of the Crisis Intervention section.[107]

\*\*\*

| Consent Decree ¶103 |
| --- |

> **103.** The CIT Program staff responsible for the CIT training curriculum will, where it would add to the quality or effectiveness of the training and when feasible and appropriate, encourage and seek the participation of professionals and advocates who work with individuals in crisis, and persons with lived experiences of behavioral or mental health crisis, including those with involvement in the criminal justice system, in developing and delivering CPD CIT trainings.

## Compliance Status

In the third monitoring period, the CPD provided the IMT with a draft version of Crisis Intervention Unit Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶103. However, the standard operating procedure has not yet been finalized.

Additionally, the CIT Unit convened a working group comprised of mental-health professionals, advocates, and people with lived experience to review the 40-hour Basic CIT curricula and to provide comments and recommendations. The CIT Unit incorporated that feedback in its revisions to the 40-hour training. The curriculum was also reviewed by the Chicago Council on Mental Health Equity, thereby adding another layer of input by professionals, advocates, and people with lived experience. The IMT suggests that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the train-

---

[107]  In the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

ing. The Chicago Council on Mental Health Equity should then report on their observations to the full committee in order to get further feedback and document as such.

Finally, the CPD partners with professionals, advocates, and persons with lived experience to deliver the CPD CIT trainings. For example, in the 40-hour Basic CIT Training, various modules are taught by mental health professionals. Moreover, people with lived experience participate in the training sessions through scenarios and participate on panels to share their experiences. Although the Refresher Training has yet to be delivered, the CPD plans for professionals, advocates, and persons with lived experience to contribute to its continued development and delivery.

As part of our overall assessment, we will look to see how the CPD incorporates additional perspectives into the trainings. The CPD has relied heavily on NAMI as their primary partner. While NAMI is critically important to the development and delivery of the training, it is equally important to rely on community-based organizations who are providing on-the-ground treatment services and emergency stabilization of high frequency utilizers of law enforcement services.

## Consent Decree ¶109

> **109.** *The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target by January 1, 2020, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets.*

### Compliance Status

In the third monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-05, *CIT Officer Implementation Plan*, which clearly states the requirements of ¶109. The IMT provided comments to the CPD regarding SO20-05, which was thoughtfully developed.

As we noted in our prior report, the CPD's initial attempt to prepare the CIT Officer Implementation Plan had methodological limitations. Some of the implications of the CIT Officer Implementation Plan were not supported by the underlying data. Throughout this reporting period, we have had many discussions with the CPD about enhancing the types of analyses conducted, including clearly defining the term "timely respond" (including a distinction between primary and secondary response) and evaluating how factors such as the number of overall calls for service in a district and watch may impact CIT response rates. Near the end of the moni-

toring period, the IMT reviewed an updated draft of the CIT Officer Implementation Plan. The IMT has reviewed the updated Plan and have provided our comments.

As noted above, the CIT Unit has retained a data analyst. We have not yet reviewed, however, any of the new data analyst's work product, nor have we been briefed on the training received by the analyst to prepare them for their role in the CIT Unit or under the *CIT Officer Implementation Plan*. We look forward to meeting with the analyst to discuss these issues in more depth in the next reporting period.

## Consent Decree ¶121

> ***121.*** *CPD will identify and assign a sufficient number of data analysts to collect and analyze data related to the CIT Program and CPD's response to incidents involving individuals in crisis.*

### Compliance Status

The CPD has assigned one analyst to the CIT Unit to collect and analyze data regarding the CIT Program and the CPD's response to incidents involving individuals in crisis. The IMT has not yet worked closely with the analyst and is not yet aware on the analyst's training and qualifications for their role in the CIT Unit. The CIT Unit is in the process of integrating district-level resources to collect and analyze district-specific data.

We believe that the CPD has made a reasonable determination as to the number of data analysts needed to collect and analyze data regarding the CIT Program at the broader unit and district levels. However, our compliance assessments will depend on the training of the analysts and on the analysts beginning their operation in the unit and district levels. Based on the quality of this work, the CPD will then need to conduct ongoing assessments to determine if more analysts are necessary for Full compliance.

## Consent Decree ¶123

> ***123.*** *The purpose of the Crisis Intervention Plan will be to evaluate the City's identification of and response to incidents involving individuals in crisis and recommend any changes to staffing and deployment, policy, or training to ensure consistency with CPD and OEMC policy, this Agreement, and best practices. CPD will implement the Crisis Intervention Plan in accordance with the specified timeline for implementation. The Crisis Intervention Plan will: a. report the number, type, and outcome of incidents involving individuals in crisis, the number of Certified CIT Officers available and on duty in each district and on each watch, the*

*percentage of calls for service involving individuals in crisis for which Certified CIT Officers were the first officers to respond to the scene for each watch in every district, and the response times for calls for service involving individuals in crisis for each watch in every district; b. evaluate the CIT Program's compliance with the objectives and functions identified above; c. identify strategies to ensure that CPD has a sufficient number of Certified CIT Officers to meet its response ratio targets for calls for service involving individuals in crisis; d. describe any additional resources, including program staff or equipment, the CIT Program needs to perform its functions; e. identify safety issues and trends regarding interactions between individuals in crisis and officers; f. identify deficiencies and opportunities for improvement in identifying and dispatching calls for service involving individuals in crisis; g. recognize and highlight CIT Program and Certified CIT Officer successes, including successful individual officer performance; h. develop response strategies for repeat calls for service involving individuals who are frequently in crisis; i. recommend any changes to crisis intervention-related strategies, policies, and procedures; j. recommend any changes to CPD and OEMC trainings related to individuals in crisis, including any case studies and teaching scenarios; and k. include a timeline and plan for implementing recommended changes.*

## Compliance Status

During the third reporting period, the City has made substantial strides in conducting the scope of evaluation required of the *Crisis Intervention Plan*. We believe that current efforts represent an improvement over the prior *Crisis Intervention Plan* provided in the last monitoring period. The updated *Crisis Intervention Plan* contains information and feedback from all actors within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. We look forward to the continued work on the City's *Crisis Intervention Plan* in the next reporting period.

Some of the information found in the subsections of ¶123 may not be available for the first *Crisis Intervention Plan*—such as "actual incident information" and "outcomes" will require sufficient *CIT Report* data. Likewise, additional data collection approaches can be incorporated into the *Crisis Intervention Plan*—such as broadening CPD attempts to gather information from street-level officers. However, we believe that the *Crisis Intervention Plan* draft provided to the IMT is a commendable start. For future *CIT Plans*, we will ensure that as information becomes available, it will be incorporated into subsequent plans.

Additionally, in the third monitoring period, the CPD provided the IMT with a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly states the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan.* We appreciate the CPD for memorializing its responsibilities for the *Crisis Intervention Plan* into a standard operating procedure so that future CIT Coordinators may ensure a consistent product. The OEMC also note their responsibilities to contribute to the *Crisis Intervention Plan* in its draft directive, *CPD Crisis Intervention Team*. However, both the CPD standard operating procedure and the OEMC directive require finalization. We therefore look forward to finalization of the present *Crisis Intervention Plan* as well as ongoing evaluations to be included in subsequent annual plans.

## Consent Decree ¶124

> **124.** *The data included in the Crisis Intervention Plan will not include any personal identifying information.*

### Compliance Status

In this monitoring period, the IMT reviewed the City's latest draft of the *Crisis Intervention Plan,* which requires additional revisions. No personal identifying information was included in the draft. In addition, the IMT reviewed a draft version of the CPD Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly states that personal identifying information will not be included in the CPD's portion of the *Crisis Intervention Plan*. At the end of the reporting period, the standard operating procedure had not been finalized. While we appreciate the CPD's efforts to memorialize this requirement for the CPD's portion of the *Crisis Intervention Plan*, we note that other City agencies also contribute to the *Crisis Intervention Plan* and should adopt a similar policy toward compliance with ¶124.

## Consent Decree ¶125

> **125.** *The CIT Coordinator will have CPD's portion of the Crisis Intervention Plan reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the plan's completion.*

### Compliance Status

The CPD has completed its portion of the *Crisis Intervention Plan*. However, as noted above, the overall *Crisis Intervention Plan* requires revision and is not yet finalized. During the third reporting period, the CPD's portion was reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the draft Plan's completion, per ¶125.

In addition, CPD's draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, clearly articulates the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*, including that the CPD portion must be reviewed and approved by the Chief of the Bureau of Patrol. We appreciate the CPD's effort to include this requirement in the policy and we look forward to reviewing future iterations of the *Crisis Intervention Plan*.

## Consent Decree ¶143

> **143.** *The OEMC Training will be at least an eight-hour course taught jointly by qualified OEMC staff and a mental health clinician or advocate.*

### Compliance Status

During the third reporting period, the IMT reviewed a draft version of OEMC's *Mental Health Training* directive, which clearly states the requirements of ¶143. In the first monitoring period, members of the IMT observed the OEMC's delivery of the eight-hour training. The OEMC staff and external instructors (including mental-health clinicians and advocates) were well qualified to deliver their presentations. The external instructors included representatives from NAMI and persons with lived experience.

The OEMC has also incorporated a contingency plan for if and when there are not enough new telecommunicator hires to warrant their own eight-hour training. In such situations, the OEMC sends the new hires to CPD's 40-hour CIT training. Afterwards, the new hire received a two-hour training relevant to telecommunicators. After such training is complete, new telecommunicators are eligible to answer calls independently. *See* ¶142. However, once the OEMC has enough capacity to conduct the eight-hour training, the new hire will be required to attend this as well. The IMT believes this to be a reasonable approach to satisfying the intent of ¶143.

We look forward to the OEMC finalizing and training on this directive. Although Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits), we feel that the OEMC has made strides in establishing the importance of conducting the necessary training.

## Consent Decree ¶144

**144.** *The OEMC Training will cover, at a minimum, the following topics: identification of individuals in crisis; telephonic suicide prevention strategies; crisis and stress management, de-escalation, and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered and shared with the responding officer or Certified CIT Officer when the call-taker suspects that the call involves an individual in crisis; the types of calls that may require the dispatching of a Certified CIT Officer or a coordinated crisis response of first responders reflective of established policy for intake and dispatch; and the procedures for dispatching a Certified CIT Officer.*

### Compliance Status

In October 2020, the IMT reviewed a draft version of OEMC's *Mental Health Training* directive, which clearly requires the topics listed in ¶144 to be included in their training. Additionally, members of the IMT observed the OEMC's delivery of the eight-hour training and confirmed that the training contained each of the necessary components. The training curriculum was also reviewed by members of the Chicago Council on Mental Health Equity. The OEMC staff and outside instructors (including mental health clinicians and advocates) were qualified relative to their presentations, including representatives from NAMI and persons with lived experience.

We await finalization of the OEMC's directive. Our assessments of compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits). However, we feel that the OEMC has made strides in establishing the importance of conducting the necessary training.

## Consent Decree ¶145

**145.** *Any training on mental health and CIT awareness that has already been provided to tele-communicators may fulfill the OEMC Training requirement of this Agreement, if the previously provided training satisfies the criteria for the OEMC Training described in this Agreement.*

### Compliance Status

The requirements of ¶145 are somewhat moot because, rather than relying on previously delivered mental health and CIT awareness training to fulfill the training requirements found in ¶¶142–44, the OEMC has provided the required eight-hour

training as a single training block. Therefore, no prior training is being submitted as evidence of compliance with the OEMC training requirements. Going forward, the IMT will assess the OEMC based on their delivery of the eight-hour training as prescribed in ¶¶142–44.

## Consent Decree ¶146

> **146.** *All tele-communicators will receive at least annual refresher training on mental health and CIT awareness that is adequate to refresh the tele-communicators' skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.*

### Compliance Status

During this reporting period, the IMT reviewed a draft version of OEMC's *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive annual refresher training on mental health and CIT awareness per ¶146. Moreover, the directive identifies the topics to be included in the refresher training, including skills on identifying, dispatching and appropriately responding to calls for service that involve individuals in crisis. However, the directive has not yet been finalized.

The OEMC has also developed and delivered one iteration of the refresher training that members of the IMT observed. Overall, the training we observed was satisfactory, although are awaiting documents from the OEMC sufficient to demonstrate how community stakeholder input (including input from the Chicago Council on Mental Health Equity) was incorporated into the training. We view such documentation to be necessary for Secondary compliance. Additionally, the OEMC should invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery. The Chicago Council on Mental Health Equity should then report on their observations to the broader group to get further feedback and document as such.

The requirement to provide in-service training to all telecommunicators was severely impacted this year by COVID-19 restrictions on the size of gatherings, including gatherings for professional training. Once in person training resumes, the OEMC has committed to ensuring that all telecommunicators receive the necessary training. Once the IMT is able to observe the resumption of the trainings (and once the Preliminary and Secondary compliance requirements noted above are fulfilled), we will assess whether OEMC has fully complied with the requirements of ¶146.

## Consent Decree ¶148

**148.** *OEMC will develop and implement its portion of the Crisis Intervention Plan.*

### Compliance Status

Near the end of the reporting period, the IMT reviewed an updated draft of the City's *Crisis Intervention Plan*. As part of the Plan, the OEMC provided information regarding the previous year's activities and goals for 2021. Overall, we feel the OEMC's portion of the *Crisis Intervention Plan* was done well, but note that the City is in the process of revising the *Plan* based on the IMT's comments.

In the third reporting period, the IMT was not provided been provided evidence that the OEMC has a policy or standard operating procedure that includes the requirement to develop and implement its portion of the *Crisis Intervention Plan* on an annual basis. Similar to CPD's standard operating procedure, the OEMC should develop a standard operating procedure memorializing the requirement of ¶148. Subsequent levels of compliance will depend on the OEMC showing ongoing implementation of the goals as listed in the Plan.

## Consent Decree ¶152

**152.** *OEMC will ensure that the language used in policies, procedures, forms, databases, trainings, and by tele-communicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. OEMC will seek input from the Advisory Committee for recommendations to identify appropriate and respectful terminology.*

### Compliance Status

The OEMC has made a concerted effort to ensure that language used in the policies, procedures, forms, databases, trainings, and by telecommunicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. The IMT reviewed a draft of the OEMC's *Mental Health Training*, which clearly states the requirements of ¶152. Additionally, we have observed members of the OEMC use respectful language. We also anticipate that the OEMC's audits will help to ensure that industry recognized language is used and updated when appropriate.

# IV. Use of Force

This is the Use of Force section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Use of Force compliance efforts from March 1, 2020, through December 31, 2020.

## Objectives[108]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.

> \*\*\*

> **155.** CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.

---

[108] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

## Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (the OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to

various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Use of Force Compliance Assessments

In the third reporting period, the City and the CPD made strides to address the Consent Decree's requirements regarding use of force. This includes their significant effort during the third reporting period to obtain community input on the revised Use of Force policies, particularly via the Use of Force Working Group. Unfortunately, those efforts were not successful in establishing and maintaining "clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies" within the reporting period, as required by ¶160. However, the CPD continues to meet with the Working Group to discuss additional changes to its Use of Force policies—having issued revised versions on December 31, 2020, incorporating recommendations from the Working Group—and we are hopeful that the progress CPD has made will continue in the short and long term.

The CPD has also continued its progress on annual in-service training on use of force for all sworn CPD members, despite the challenges posed by the COVID-19 pandemic and deployments over the summer to respond to protests and unrest. The City and the OAG agreed to extend the deadline for the CPD to complete its 2020 Use of Force in-service training until March 5, 2021.

Finally, the CPD's Force Review Division, which the CPD established in 2017, continues to progress with its staffing capacities, training, review of use of force incidents, detection of patterns and trends, and the recommendations it makes based on its findings related to Tactical Response Reports (TRRs) and firearm pointing incidents.[109] Work remains to ensure that the CPD's data is internally consistent, complete, and reconcilable with that of other City entities, but we commend the Force Review Division for its accomplishments.

Our analysis in this section details how the CPD's efforts related to Use of Force comply, or do not comply, with the Consent Decree and the progress that the City and the CPD are making toward compliance.

In this reporting period, we assessed the City's compliance with 78 of the Consent Decree's Use of Force paragraphs (¶¶153, 154, 156, 158–71, 173, 176–79, 181–

---

[109]   In the second reporting period, the name of the "Force Review Unit" changed to the Force Review Division. The Consent Decree, however, uses the name "Force Review Unit." We use "Force Review Division" throughout this report.

216, 218–27, 229–35, and 244–46). We provide status updates, rather than compliance assessments, for an additional three paragraphs (¶¶228, 243, and 247).

We have determined that the City maintained Preliminary compliance for 12 paragraphs (¶¶167, 173, 176, 185, 189–92, 212, 222, 226, and 231) and moved into Preliminary compliance for 19 paragraphs (¶¶171, 194, 195, 197, 206, 218–20, 223–25, 227, 230, 232–35, 245, and 246). The City maintained Secondary compliance for two paragraphs (¶¶170 and 188), and moved into Secondary compliance for seven paragraphs (¶¶168, 169, 181, 193, 196, 221, and 229). The City's Preliminary compliance for 37 paragraphs was placed Under Assessment (¶¶153, 154, 156, 158–59, 161–66, 177–79, 182–84, 186, 187, 198–205, 207–16, and 244), and the City failed to reach any level of compliance with the remaining assessed paragraph (¶160). *See* Use of Force Figure 1.

Use of Force Figure 1:     Compliance Status for Use of Force Paragraphs
at the End of the Third Reporting Period (December 31, 2020)

Paragraphs in Compliance (Preliminary or Secondary)
Paragraphs that have not met Preliminary compliance
Paragraphs Under Assessment for Preliminary compliance



In the third report, the City had five deadlines. The IMT determined that the City met four deadlines (¶¶192, 245, and 246(2)) and missed the remaining deadline (¶159). The City also did not meet the underlying deadline requirement for that paragraph (¶159) before the end of the reporting period. *See* Use of Force Figure 2. While not reflected in the chart below, the City was under assessment for Preliminary compliance at the end of the reporting period.

Use of Force Figure 2:     Total Use of Force Deadlines
in the Third Report: 5

Met Deadline     (4)
Missed Deadline     (1)

Achieved by December 31, 2020     (+0)     (4)
Remaining Unmet Requirements     (1)

# Use of Force: ¶153

*153. CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶153.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶153's requirements. The use of force by CPD officers is directed by a number of General Orders, also sometimes referred to as the Use of Force policy suite. Those policies include:

- General Order G03-02 *De-escalation, Response to Resistance, and Use of Force,* which "sets forth Department policy regarding sworn members' and detention aides' de-escalation, response to resistance, and use of force."

- General Order G03-02-01 *Response to Resistance and Force Options*

- General Order G03-02-02 *Incidents Requiring the Completion of a Tactical Response Report*

- General Order G03-02-03 *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*

- General Order G03-02-04 *Taser Use Incidents*

- General Order G03-02-05 *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*

- General Order G03-02-06 *Canine Use Incidents*

- General Order G03-02-07 *Baton Use Incidents*

- General Order G03-02-08 *Department Review of Use of Force*

- General Order G03-06 *Firearm Discharge and Office-Involved Death Incident Response and Investigation*

The most recent version of these policies was issued on December 31, 2020, and will become effective April 1, 2021. As required by the Consent Decree, the CPD has sought feedback from the Chicago community regarding its Use of Force policies (e.g., through online public comment, community meetings, and a Use of Force Working Group). The CPD Use of Force policies were reviewed by the Use of Force Working Group, covering topics related to ¶153 (e.g., terminology related to de-escalation, necessary force, and "safe and feasible"). The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which the IMT will continue to monitor moving forward.

The CPD provides Use of Force training to its officers through a variety of delivery modes, including annual in-service training, eLearning, and roll call briefs, to address the requirements of the Consent Decree.

Regarding the City's accountability systems, we believe the CPD needs to pay attention to its Use of Force accountability systems. In particular, it needs to appropriately support the work of the Force Review Division, as well as make clear to all officers that Use of Force requirements of the Consent Decree are the responsibility of every CPD officer. Further, CPD leadership must consistently hold itself and its officers accountable. The IMT appreciates the Force Review Division's work to establish clear policies, SOPs, forms, and processes to hold officers accountable. We also commend the Force Review Division's work to identify patterns and trends related to Use of Force incidents and requirement of plans for either districts or units to address these issues in required debriefings.

# Use of Force: ¶154

*154. CPD adopted revised use of force policies on October 16, 2017 ("October 2017 Policies"). The October 2017 Policies incorporated multiple best practices that were not reflected in CPD's prior use of force policies. Building on these improvements, CPD will maintain the best practices reflected in the October 2017 Policies and make additional improvements to its policies consistent with the terms of this Agreement.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶154.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶154's requirements. The CPD has been in continuous discussion with the IMT, OAG, and the community (including the Use of Force Working Group) on its Use of Force policies during this reporting period and since the Consent Decree took effect. These discussions have revolved around incorporating best practices for Use of Force into policy enhancements. The CPD issued its most recent Use of Force policies on December 31, 2020, following engagement with the IMT, OAG, and community. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward. In addition, the CPD has attained and maintains an Advanced Law Enforcement Accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), indicating compliance with national policy standards, including for use of force.

Moving forward, we will regularly review and discuss the Use of Force policies with the CPD to ensure the CPD maintains best practices and makes additional policy improvements consistent with the Consent Decree, including required community engagement.

# Use of Force: ¶156

*156. CPD's use of force policies and training, supervision, and accountability systems will be designed, implemented, and maintained so that CPD members: a. act at all times in a manner consistent with the sanctity of human life; b. act at all times with a high degree of ethics, professionalism, and respect for the public; c. use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; d. use sound tactics to eliminate the need to use force or reduce the amount of force that is needed; e. only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; f. only use force for a lawful purpose and not to punish or retaliate; g. continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary; h. truthfully and completely report all reportable instances of force used; i. promptly report any use of force that is excessive or otherwise in violation of policy; j. are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy; and k. act in a manner that promotes trust between CPD and the communities it serves.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | ***Under Assessment*** |
| **Secondary:** | ***Not in Compliance*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, the City and the CPD made progress, but remain under assessment for, Preliminary compliance with ¶156.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶156's requirements. As noted for ¶153 and ¶154, the CPD Use of Force policies continue to be reviewed and discussed with the Use of Force Working Group, the IMT, and the OAG. Current CPD Use of Force training for recruits, in-service officers, and supervisors reflect the requirements of ¶156 and mandates of the state of Illinois. We believe that sections a-k of ¶156 continue to require attention in policy, training, supervision and accountability systems, particularly de-escalation and duty to report excessive force.

# Use of Force: ¶158

*158. CPD's use of force policies must comply with applicable law and this Agreement, reflect the objectives described above, and promote trust between CPD and the communities that it serves.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶158.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶158's requirements. The CPD has engaged in extensive discussions surrounding its Use of Force policies over prior reporting periods with the IMT and OAG to ensure the policies comply with applicable law and the Consent Decree. The CPD has adopted recommendations from the IMT and the OAG that reflect the objectives of the Consent Decree.

As required by the Consent Decree and to promote trust between the CPD and the communities that it serves, the CPD has also sought community input on its Use of Force policies through open community meetings, online community input prior to the issuing of revised Use of Force policies, and a Use of Force Working Group. The Use of Force Working Group met extensively from June 2020 to December 2020 and issued over 155 recommendations. During bi-weekly calls, we inquired as to how the online public comments were being incorporated into the work or recommendations of the Working Group. The CPD noted that the public comments were shared with the Working Group and were considered and reviewed by the Working Group. Additionally, we reviewed all the public comments and incorporated them into concerns raised in reviewing policies with the CPD and OAG. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We believe the CPD must be responsive to community concerns about use of force. Trust will not be gained during initial engagement with the community; building trust will take time and consistent dialogue. We believe that, to build trust, the CPD must acknowledge the legitimate concerns raised by the community in their recommendations. The degree to which the CPD listens, and addresses concerns, will determine its ability to engender trust.

# Use of Force: ¶159

> **159.** *CPD will conduct an annual review of its use of force policies consistent with accreditation requirements of the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). In addition, every two years, CPD will conduct a comprehensive review of its use of force policies to assess whether CPD's use of force policies meet the requirements of this Agreement, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law.*

**Compliance Progress**     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**     February 29, 2020     ☐ **Met**     ☑ **Missed**

**Preliminary:**     *Under Assessment*
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶159. The CPD missed the February 29, 2020 deadline to conduct the annual review of its Use of Force policies consistent with CALEA accreditation requirements.[110]

To evaluate Preliminary compliance, we assessed the CPD's review of its Use of Force policies, including how its community engagement efforts inform that review. The CPD conducts an annual review for maintaining its Advanced Law Enforcement Accreditation through the Commission on Accreditation for Law Enforcement Agencies (CALEA). As part of this review, each year the CPD's Research and Development Division (R&D) reviews and compiles appropriate compliance documentation, in coordination with liaisons from appropriate units throughout the department. Specifically, CALEA's Law Enforcement Standards *Chapter 4 – Use*

---

[110] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

*of Force* covers 15 standards (e.g., use of reasonable force, use of deadly force, warning shots, use of authorized less lethal weapons, rendering aid after a use-of-force incident, vascular neck restrictions, chokeholds, reporting uses of force, written use-of-force reports and administrative review, removal from line of duty assignment, analyze reports, and assault on sworn officer analysis). In 2020, the CPD stated that it reviewed each of these use-of-force CALEA requirements in collaboration with other units, such as the Force Review Division, the Education and Training Division (ETD), the Office for Reform Management (ORM), and the Department of Law (DOL). The CPD supplied the IMT and OAG with paperwork submitted to CALEA in 2020, which included the February 28, 2020 Use of Force policies and other related directives, standard operating procedures, Force Review Division annual reports, Case Report – Reasonable Force, Tactical Response Report, Arrest Report, weapon certification reports and inventory logs, training materials, and additional compliance documentation. After obtaining extensive recommendations from the Use of Force Working Group on its Use of Force policies, the CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

During this reporting period, we also began assessing Secondary compliance to determine whether training requirements related to ¶159 are detailed, with attention to de-escalation and adjustments in training based on the findings of CPD's biannual comprehensive review of its Use of Force policies. During the past nine months, the CPD, the IMT, and the OAG discussed elements that are critical for the CPD's review of its Use of Force policies every two years, to meet the requirements of the Consent Decree, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law. The CPD expressed that the CALEA annual accreditation and report will provide a good basis for the comprehensive review. We stressed the need to reflect the concerns of the Consent Decree with particular emphasis on de-escalation. The CPD promised the IMT further opportunity to review and comment on the planned review and report, prior to finalization, anticipated in March 2021. We look forward to further reviewing CPD's plans for the comprehensive Use of Force policies review in the next reporting period.

# Use of Force: ¶160

**160.** *CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not In Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶160.

To evaluate Preliminary compliance, we reviewed the CPD's community engagement efforts related to its Use of Force policies. In assessing community engagement, we examine (1) outreach; (2) meetings, interactions, problem-solving, and decision making; (3) follow-up and sustainability of partnerships, community policing, and collaborative activities; and (4) general police-community interactions regardless of context.

As we described in Independent Monitoring Report 2, the CPD sought community input related to its Use of Force policies in two ways in February 2020. First, the CPD included its Use of Force and officer-involved death policies in the series of citywide Community Conversations that it hosted. Second, the CPD posted the Use of Force policies for public comment on its website for 30 days, beginning February 29, 2020. The CPD has not provided any evidence that it retained or reviewed any comments made during this initial 30-day public comment period, nor any evidence it considered making further revisions to the policies in response to any comments received. The CPD posted these same policies for additional public comment in late May 2020.[111]

Also in February 2020, the City and the CPD began planning for a community working group to provide recommendations on its Use of Force policies.[112] According to the CPD, this was the most involved and in-depth effort ever undertaken by the CPD to engage the community on its policies.

---

[111] The CPD provided comments that it received during this period to the Working Group for the Working Group's review.

[112] The CPD also planned to host an internal Working Group but did not follow through on those plans. Instead, the CPD elicited internal input via a survey.

## A.   Use of Force Working Group Member Selection

Initially, the CPD identified potential members via a survey in which participants could express interest in being a member of the Working Group. According to the CPD, approximately 60 people expressed interest in joining the Working Group. A pool that size, however, was unlikely to yield a group that reflected the diversity of the Chicago community (in terms of location, demographics, lived experience, and other dimensions).

The CPD also sought to partner with the Coalition—a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree" (¶669)—in organizing the Working Group. The CPD provided a list of 20 proposed participants to the Coalition for review. Separate from the CPD's survey, the Coalition identified individuals who were interested in participating in the group. According to the CPD, the Coalition agreed with 6 of the CPD's proposed participants, but recommended replacements for the other 14, which the CPD accepted.

Following the public launch of the Working Group in early June 2020, the City and the CPD were criticized for lack of diversity and representation among the Working Group's membership, so another 11 members were added to the group after its first meeting on June 16, 2020. The first meeting with all of the Working Group members was held June 30, 2020.

## B.   Resources

The community members who participated in the Working Group were all volunteers. Except for a tutorial on Use of Force training at the CPD's Training Academy, the Working Group met virtually due to the COVID-19 pandemic. The CPD provided an online portal to the Working Group to receive and exchange documents.

The CPD's Restorative Justice Director, who was primarily responsible for developing the Working Group and its membership selection process, and the Deputy Chief of the Community Policing Group, who was also involved in the formation of the Working Group, left the CPD around the time that the Working Group started to meet.

Early on, the CPD decided on a "co-chair" model to help lead the Working Group, with one CPD co-chair and one community member co-chair. Shortly before the Working Group's first meeting, the CPD changed its co-chair; according to the CPD, the change "caused some challenges to the planning of meetings and the relationship between the community co-chair and CPD."

The CPD also provided for an Executive Steering Committee (ESC) for the Working Group, which was comprised of the CPD's most senior leadership: the Superintendent, First Deputy Superintendent, and Deputy Superintendent of Constitutional Policing and Reform. The ESC was responsible for reviewing Working Group recommendations, determining whether to accept, modify, or decline the recommendations, and providing written feedback to the Working Group regarding the ESC's decisions. The ESC was supported by an Administrative Lieutenant.

The CPD staffed the Working Group with a Project Manager to assist with the Working Group's administrative needs and to act as a liaison between Working Group members and CPD personnel. Personnel from the CPD's Research and Development Division and Training Division also assisted with the work of the ESC and the Working Group.

The CPD did not budget for additional important resources, such as note takers or a neutral facilitator. A consultant, who was engaged as a technical advisor to assist the City and the CPD and observe the Working Group, secured significant volunteer support to overcome the budget shortfall. The volunteer support included a neutral facilitator, neutral note takers, and an independent subject matter expert in the area of policing. The Working Group did not ultimately seek assistance from the independent expert.

The CPD gave presentations during the Working Group's first couple of meetings about the Consent Decree and the CPD's policies and training.

## C. Process

After its members were selected, the CPD tasked the Working Group with reviewing and providing recommendations on the following nine Use of Force policies, which had been in effect since February 29, 2020, over a period of eight weeks:

1. *Use of Force*, G03-02;

2. *Force Options*, G03-02-01;

3. *Incidents Requiring the Completion of a Tactical Response Report*, G03-02-02;

4. *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, G03-02-03;

5. *Taser Use Incidents*, G03-02-04;

6. *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, G03-02-05;

7. *Canine Use Incidents*, G03-02-06;

8. *Baton Use Incidents*, G03-02-07; and

9. *Firearm Discharge and Officer-Involved Death Incident Response and Investigation*, G03-06.

The CPD planned for the Working Group to have its first meeting in May, but the meeting was postponed until June because of the tragic death of George Floyd. For its first meeting on June 9, the Working Group was split into two groups and met in two separate Racial Healing Circle sessions.

The City and the CPD publicly announced the Working Group via a press release and press conference on June 15, 2020. The press release identified the group's members and organizations with which they were affiliated and stated that the Working Group would "not only review and revise all nine of CPD's Use of Force policies but also work in partnership with our officers to build a better, safer and stronger Department."[113] It does not appear that any other marketing, public relations, or formal public transparency efforts were put into place by the City or the CPD to promote or explain the Working Group.

In addition to the Working Group's regular meetings, which averaged 3 to 4 hours each, group members spent time between meetings reviewing materials and meeting in smaller groups. The Working Group divided into subgroups to address different policy topic areas and had a drafting committee to help present its recommendations to the ESC. The drafting committee also prepared explanations and revised polices for the ESC's review to accompany the Working Group's formal written recommendations. According to the CPD, in an effort to ensure independence in the drafting committee's process, no CPD personnel, apart from the Working Group's co-chair, attended any drafting committee meetings or discussions or had any involvement in the drafting of recommendations.

While the CPD co-chair and personnel from the CPD's Research and Development Division and Training Division attended the Working Group's regular meetings, the process of developing recommendations did not involve collaboration or meaningful dialogue between CPD personnel and the Working Group's members. Similarly, the process put into place for submitting formal written recommendations to the ESC and providing written feedback from the ESC did not appear to contemplate an open back-and-forth with the Working Group members.

The Working Group requested additional time to complete and deliver its recommendations, and sent a letter with that request at the beginning of September

---

[113] *See* Office of the Mayor, *Mayor Lightfoot and CPD Announce Community Working Group to Review Department Use of Force Policies*, CITY OF CHICAGO (June 15, 2020), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2020/june/WorkingGroupUseOfForce.html.

2020. The ESC responded that it would accept recommendations until September 16, 2020, in order to deliver a revised draft to the IMT and the OAG by October 1, 2020. After the IMT and OAG agreed to expedite their review of the revised polices, the ESC gave the Working Group until October 1 to complete its recommendations.

The Working Group made a total of 155 recommendations by October 1, 2020.[114] The ESC agreed to accept five of the recommendations, and provided written feedback to the Working Group explaining its rejection of some of the remaining recommendations. The First Deputy Superintendent and Deputy Superintendent—who was retiring the next day—met with the Working Group for approximately three hours on October 14, 2020, to discuss the ESC's determinations and the Working Group's rejected recommendations.

The following day, October 15, an open letter from Working Group members to Mayor Lightfoot was published in the Chicago Sun-Times.[115] The letter expressed extreme disappointment in the outcome and called the process a sham. We met with the Working Group, the CPD, and the City to try to mediate the disagreement. We then met with the Working Group, the City, the CPD, and the OAG to continue forward.

On November 17, 2020, about 10 of the Working Group's members met with the Deputy Superintendent's replacement, the Project Manager, and representatives from the CPD's Research and Development Division. The Acting Deputy Superintendent apologized to the Working Group and conveyed the CPD's hope that dialogue over the Use of Force policies could continue. The Working Group members agreed, and the CPD worked with the Working Group to make additional substantive revisions to its Use of Force policies over the next several weeks. Those revisions were incorporated into the draft Use of Force polices that the CPD posted for additional public comment in December 2020, and in the further-revised policies that the CPD issued at the end of December with an effective date of April 1, 2021. As of late February 2021, the CPD continues to meet with Working Group members to discuss its recommendations and other proposed revisions. Less than a third of the group's members have participated in the meetings held since October.

While the CPD has attempted to repair its relationship with the Working Group, its missteps along the way—failure to devote sufficient resources and time, errors in

---

[114] *See* Patrick Smith, *CPD Largely Ignores Community Recommendations On When Officers Can Shoot, Taze Or Use Other Force*, WBEZ Chicago (October 14, 2020), https://www.wbez.org/stories/cpd-largely-ignores-community-recommendations-on-when-officers-can-shoot-taze-or-use-other-force/ae115240-8fbf-4da0-8ced-7dd23f4e07f8.

[115] *See* Contributor, *A public letter to Mayor Lightfoot: A call for leadership*, Chicago Sun-Times (October 15, 2020), https://chicago.suntimes.com/2020/10/15/21518757/police-reform-use-force-chicago-mayor-lori-lightfoot.

forming the group, and mishandling of the recommendation-and-feedback process—prevented it from reaching any level of compliance in this reporting period. The CPD has not provided evidence that it had a sufficient plan in place to allow for the Use of Force Working Group to be successful, and it has not formulated a plan to improve its future community engagement efforts.

Nonetheless, we hope that the progress that the CPD began in November continues in the short and long term.

# Use of Force: ¶161

*¶161 CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or re-duce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of tech-niques that may include, but are not limited to, the following: a. using time as a tactic by slowing down the pace of an incident; b. employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover; c. continual com-munication, including exercising persuasion and advice, and providing a warning prior to the use of force; d. requesting assis-tance from other officers, mental health personnel, or special-ized units, as necessary and appropriate; and e. where appropri-ate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but re-main under assessment for, Preliminary compliance with ¶161.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶161's requirements. During this reporting period, the CPD and the Use of Force Working Group discussed de-esca-lation at length when reviewing the Use of Force policy suite. Resulting from these discussions, the CPD issued an updated version of the Use of Force policy suite on December 31, 2020. The updated policies reflect a number of changes related to de-escalation, such as:

- Changed the title of directive G03-02 from *Use of Force* to *De-Escalation, Re-sponse to Resistance, and Use of Force* to further emphasize the importance of de-escalation within the policy.

- Revised G03-02 language for when use of force is authorized and to further define "objectively reasonable" (Section III.B.1) to include these additional fac-

tors to be considered when determining reasonableness: whether de-escalation techniques can be employed or would be effective (d) and the availability of other resources (e).

- Revised G03-02 language for when use of force is authorized and to remove ambiguity related to the definition of "necessary" (Section III.B.2) and defined it as "the minimum amount of force needed to provide for the safety of any person or Department member, stop an attack, make an arrest, bring a person or situation safety under control, or prevent escape."

- Made de-escalation an affirmative obligation of every member of the Department and reflected that obligation in every applicable directive in the policy suite. For example, in G03-02 the CPD revised Section III.C to *require* officers to de-escalate:

  o "Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time."

- Revised the TRR form to require that CPD officers "describe with specificity" (instead of "when applicable") their responses, including force mitigation efforts and specific types and amounts of force used.

- Revised the Tactical Response Report – Review (TRR-R) form to document specific debriefing points for the Department member and Reviewing Supervisor, including those related to the following:

  o De-escalation/Force Mitigation – Communication

  o De-escalation/Force Mitigation – Not Articulated in Narrative

  o De-escalation/Force Mitigation – Positioning/Distance

  o De-escalation/Force Mitigation – Time

  o De-escalation/Force Mitigation – Other

The CPD and the Working Group have yet to resolve issues related to de-escalation and agreed to continue discussion into 2021. Thus, we will continue to assess Preliminary compliance for ¶161 in the fourth reporting period.

For Secondary compliance, we are assessing the quality and completion of instruction to all officers on requirements for de-escalation and ¶161. The annual Use of Force in-service training includes information on force mitigation principles and de-escalation principles, with an emphasis on documenting these actions in the

TRR forms. The 2021 supervisory in-service training lesson plan also emphasizes de-escalation and the importance of providing detailed explanations of force mitigation efforts in documentation. The Force Review Division continues to identify de-escalation as an issue that officers fail to mention sufficiently in their TRR narratives, re-enforcing the importance of annual Use of Force in-service training on these policy requirements and principles. In the next reporting period, we will review efforts by the CPD to train officers on the policy revisions reflected in the December 31, 2020 Use of Force policies. The CPD plans to implement additional eLearning training beginning in February 2021 on these revisions, prior to the Use of Force policy suite becoming effective on April 1, 2021.

Finally, the CPD is in the process of establishing a de-escalation component to the Use of Force Tableau data dashboard for the IMT and OAG. This will aid the IMT in reviewing Full compliance with ¶161. It is also anticipated to include information regarding whether and to what extent officers use de-escalation techniques in connection with use-of-force incidents.

# Use of Force: ¶162

*162. Consistent with CPD's commitment to preventing and reducing the need for force, CPD officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶162.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶162's requirements. CPD General Order G03-02 *De-escalation, Response to Resistance, and Use of Force* describes the requirements of ¶162; specifically, the policy states:

> *Core Principle. The Chicago Police Department seeks to gain the voluntary compliance of persons, when consistent with personal safety. The Department expects its members to develop and display the skills and abilities to act in a manner to eliminate the need to use force and resolve situations without resorting to force. Department members will only resort to the use of force when required under the circumstances to serve a lawful purpose.*

We note that the Working Group believes "safe and feasible" is a vague term and raised this concern on multiple occasions. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

With regard to Secondary and Full compliance, the actions during the protests of 2020 raise issues about training and supervision related to officers allowing individuals to voluntarily comply with lawful orders. We are reviewing whether protestors were warned and given adequate time to respond before CPD officers used force, and we are reviewing the training CPD officers had for handling protests. To address some of issues emanating from protests, the CPD issued Department Notice D20-08 *Reporting the Response to Crowds, Protests and Civil Disturbances* on

November 2, 2020.[116] This notice describes in Section IV.C.6 that supervisors are required to document "whether verbal warnings were given to the crowd, including the number of warnings and the content."

Moving forward, we will continue to assess Preliminary, Secondary, and Full compliance ¶162 and will incorporate findings from our special report the City's and the CPD's responses to protest and unrest in our compliance assessment.

---

[116] D20-08 replaced another policy—S03-22, *Response to Crowds and Civil Disturbances*—which was issued pursuant to ¶631 on August 27, 2020, and rescinded on November 2, 2020.

# Use of Force: ¶163

*163. CPD officers may only use force for a lawful purpose. CPD officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).*

**Compliance Progress**                     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**              *Under Assessment*
**Secondary:**               *Not In Compliance*
**Full:**                     *Not Yet Assessed*

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶163.

To evaluate Preliminary compliance with ¶163, we focused our review on whether the City and the CPD received the requisite community input for G03-02, *De-escalation, Response to Resistance, and Use of Force*, and finalized the policy. The policy issued on December 31, 2020, specifically addresses ¶163 in Section III.B.5, which prohibits using force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights.

The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

Regarding officers using force for retaliation and, more specifically, in response the lawful exercise of First Amendment rights, the Use of Force Working Group and Coalition were critical of the CPD's responses to the protests during this reporting period. The Coalition was involved in many discussions with the IMT, the OAG, and the Court regarding steps the CPD needs to take to protect First Amendment rights. As a result of these conversations, the CPD issued forms and directives to assist in the proper documentation of various aspects of the Consent Decree, including the Use of Force section. Specifically, the CPD issued Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances,* on November 2, 2020, which requires documentation by supervisors of information concerning crowds and the nature of the police response and use of force during

protests.[117] The CPD also issued a training bulletin in August 2020 entitled, *Public Gatherings and the First Amendment*, which addresses crowd issues.

The CPD conducted roll call training on the First Amendment and the responses to protests ahead of the November 2020 elections, which we observed as part of our involvement in the Coalition's move for enforcement. We believe reporting for responses to crowds, protests, and civil disturbance requires further training.

During this reporting period, we also examined data on foot pursuits, which involve fleeing suspects. The CPD issued a training bulletin in 2020 guiding officers on foot pursuits. The CPD's "Foot Pursuits and Use of Force" Tableau dashboard data indicates from March 1, 2020 to December 31, 2020, there were 1,301 foot pursuits, and 382 (29%) resulted in the use of force.

The IMT also reviewed data reported by the Civilian Office of Police Accountability (COPA) on the CPD's response to the protests. As of December 1, 2020, COPA had 147 cases open, 297 referred to the CPD Bureau of Internal Affairs (BIA), five referred to the OIG, and five referred to state/federal law enforcement. There were also four requests from COPA granted to have eight officers relieved of police powers; four more such requests are pending.

Moving forward, we will continue to assess the CPD's progress by reviewing whether adequate training is provided relating to the prohibition of force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights, with special attention to responses to protests. We will also review data and information from the Office of Operational Compliance audit on foot pursuits, the Force Review Division quarterly and annual reports, and our special report the City's and the CPD's responses to protest and unrest.

---

[117]  D20-08 replaced another policy—S03-22, *Response to Crowds and Civil Disturbances*—which was issued pursuant to ¶631 on August 27, 2020, and rescinded on November 2, 2020.

# Use of Force: ¶164

**164.** *CPD officers must only use force when it is objectively rea-sonable, necessary, and proportional under the totality of the cir-cumstances.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but re-main under assessment for, Preliminary compliance with ¶164.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶164's requirements. The CPD dis-cussed and reviewed its Use of Force policies with the IMT, the OAG, and the com-munity via open meetings, solicitation of online community input, and with the Use of Force Working Group. The CPD initially rejected the Use of Force Working Group's recommendations regarding necessary and proportional force, but as a result of continuing discussions with the Use of Force Working Group, the CPD is-sued revised Use of Force policies on December 31, 2020. These policies further defined the term "necessary" as "the minimum amount of force needed to provide for the safety of any person or Department member, stop an attack, make an ar-rest, bring a person or situation under control, or prevent escape." The CPD rede-fined the phrase "sanctity of life" and expanded on de-escalation as an affirmative obligation for every CPD officer. Finally, the CPD strengthened its ban on choke-holds and added in additional definitions and prohibitions related to them.

The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

The CPD plans to deliver eLearning training for the policy changes to all officers in early February 2021. The annual 40-hour Use of Force in-service training will also address changes to the Use of Force policy suite. We will continue to monitor the CPD's progress and completion of these training efforts to assess Secondary com-pliance in the next reporting period, to include the recent revisions in the Use of Force policies.

During the third reporting period, we continued reviewing data related to use-of-force incidents. We engaged in discussions with COPA, which ultimately deter-mines whether officers have used the appropriate level of force, to determine how to obtain data on the number of cases where the allegations specifically deal with

force and resulting findings. We have not found a solution with COPA or the CPD for regularly and easily obtaining this data. In response to a request from the IMT, on December 3, 2020, the BIA reported that there have been five sustained complaints since January 1, 2019. These complaints determined that the CPD member's actions were not objectively reasonable, necessary, and proportional under the totality of the circumstances.

COPA maintains a dashboard that includes the number of cases of alleged excessive force being reviewed. This dashboard portrays data in different time intervals from that of the monitoring periods. The interval most closely aligned with this reporting period is the last six months, which would cover the period May 1, 2020 to October 31, 2020, encompassing the protests. For this period, the overall number of excessive force cases that are pending is 994, covering up to 4 years. The number of number of excessive force cases that are pending for the 6-month period was 399, as of November 30, 2020. In the past 12 months, COPA's dashboard indicates 44 cases of excessive force were sustained, 31 cases were not sustained, 22 cases were unfounded, and 30 cases were exonerated.

# Use of Force: ¶165

> **165.** *CPD officers are prohibited from using deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person. CPD officers are not permitted to use deadly force against a person who is a threat only to himself or herself or to property. CPD officers may only use deadly force as a last resort.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶165.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶165's requirements. On December 31, 2020, the CPD issued revised Use of Force policies. As a result of recommendations from and discussions with the Use of Force Working Group, the CPD further clarified G03-02, *De-escalation, Response to Resistance, and Use of Force,* in the following areas related to ¶165:

- Factors of reasonableness to be considered by officers when evaluating use of force now include whether de-escalation techniques can be employed or would be effective and the availability of other resources (Section III.B.1.d and Section III.B.1.e).

- Defined "necessary" (adding an emphasis on "minimum amount of force") as the "minimum amount of force needed to provide for the safety of any person or Department member, stop an attack, make an arrest, bring a person or situation under control, or prevent escape" (Section III.B.2).

- Requiring Department members to use de-escalation techniques, unless doing so would place a person or member in immediate risk of force, or de-escalation would be clearly ineffective (Section II.C).

The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

The CPD tracks data on CPD officers' levels of force and provides this data to the IMT via the "TRR by Force Level" Tableau dashboard. During this reporting period, the CPD used level 3 force in 59 incidents.

We look forward to assessing the CPD's progress with the Use of Force policies and training.

# Use of Force: ¶166

**166.** *CPD officers are prohibited from using deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm to an officer or another person.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶166.

To evaluate Preliminary compliance with ¶166, we focused our review on whether the City and the CPD received the requisite community input for General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. The CPD and the Use of Force Working Group discussed fleeing subjects and the CPD's potential use of a firearm in those situations. Specifically, the Working Group recommended that even if a person is suspected of having or has possession of a weapon, fleeing alone should not be sufficient to justify an officer's discharge of a firearm at the person. The CPD issued revised Use of Force policies on December 31, 2020, which reflect the requirements of ¶166 for the prohibition of deadly force against a fleeing person in G03-02 Section III.C.4. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

Going forward, we will also assess the CPD's progress in delivering the 2020 Use of Force in-service training and whether the December 31, 2020 revisions to the Use of Force policy suite are appropriately updated in training.

We have reviewed the CPD's "Foot Pursuit and the Use of Force" Tableau dashboard for data relating to this paragraph. During this reporting period, from March 1, 2020, to December 31, 2020, there were a total 28 incidents under the current level 3 classification of deadly force and two under the old level 4 classification of deadly force. There were a total of 30 incidents of deadly force for this period, according to the dashboard. This amounts to approximately 7.7% of all foot pursuits resulting in deadly force. Use of Force Figure 3 details data on foot pursuits with deadly force for prior reporting periods.

**Use of Force Figure 3:** Foot Pursuit Incidents involving Deadly Force

| September 1, 2019 to February 29, 2020 | March 1, 2020 to December 31, 2020 |
|---|---|
| 8 (3% of total foot pursuits) | 30 (8% of total foot pursuits) |

Data provided by COPA indicates that, between January and November 2020, there were two cases that involved firing at a fleeing subject and four cases involving firing at vehicles.

We continue to work with the CPD on a solution to ensure that data related to this paragraph is collected regularly and easily accessible.

# Use of Force: ¶167

**167.** *CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved. CPD will periodically include instruction regarding sound vehicle maneuvers in its in-service training regarding use of force. As appropriate, CPD will provide supplemental training guidance regarding dangerous vehicle maneuvers that should be avoided.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶167 in the third reporting period, but did not reach Secondary compliance.

To assess Secondary compliance in this reporting period, we reviewed CPD's process and policies to identify drivers in need of remedial training and whether such training has occurred, as well as training that was provided to all officers.

The CPD's current policy, S04-07-03 *Traffic Crashes Involving Department Members,* states that if the Unit commanding officer determines that a crash was preventable, they will review the driver's history and determine whether the member would benefit from attending "Peak Performance Driver Training Program" (Section VI.4.d.1 and Section VI.4.d.2). The policy also provides for summary discipline. Further, U02-01 *Department Vehicles,* states in Section E that CPD officers may be held responsible for the consequences of their conduct while operating a department vehicle.

On August 10, 2020, the CPD issued a revised version of General Order G03-03-01, *Emergency Vehicle Operations – Eluding and Pursuing*, under the "extraordinary circumstances" provision of ¶631. The CPD issued additional training guidance to accompany the policy change in the form of a Motor Vehicle Pursuits and Eluding Vehicle Incidents training bulletin and eLearning. The CPD indicates that 98% of officers required to complete the training did so.

The CPD indicates that the Traffic Review Board meets monthly and issues a monthly report that reviews accidents deemed preventable. In order to continue assessing Secondary compliance, we will review any data that supports the CPD's efforts to address poor driving, such as remands to training when necessary. We

will also evaluate whether the CPD has included instruction regarding sound vehicle maneuvers in its in-service training regarding use of force.

During this reporting period, we also reviewed the COPA website and found that, within the last 2 years, they have opened 19 investigations related to motor vehicle issues; those investigations are pending. Overall, a total of 41 cases are pending a determination for motor vehicle issues. In the past 12 months, 2 cases have been sustained due to motor vehicle issues.

We reviewed several reports from the CPD's Audit Division this reporting period relating to vehicle pursuits and vehicle operation, including a *Review of Vehicle Pursuit Data (2017–2019)*, a *Review of Preventable Crashes/Vehicle Damage & Related Punishment*, and *Comparison of Traffic Review Board Procedures and Risk Management Best Practices*. Moving forward, we will monitor how the CPD incorporates the recommendations made in these reports.

# Use of Force: ¶168

*168. Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.*

---

**Compliance Progress**      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**      *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**      *Not Yet Assessed*

In the third reporting period, the City and the CPD maintained Preliminary compliance and reached Secondary compliance with ¶168.

As described in Independent Monitoring Report 2, we began reviewing Secondary compliance for ¶168 during the previous reporting period with a focus of reviewing the development, implementation, and evaluation of training in two areas:

1.    Instruction to CPD members regarding engaging and documenting foot pursuit incidents; and

2.    Instruction to the Office of Emergency Management and Communications (OEMC) and Force Review Division personnel on tracking and analyzing foot pursuit incidents.

During this reporting period, we continued to evaluate Secondary compliance by reviewing additional training sources, paying special attention to comprehension of the foot pursuit notification procedures. With regard to educating all CPD officers on document foot pursuit incidents, the CPD issued the required foot pursuit training bulletin on February 28, 2020, following no-objection notices from the IMT and OAG. As of December 31, 2020, 99% of officers completed the foot pursuit training bulletin eLearning training (described further in ¶170).

Force Review Division personnel track, review, and analyze foot pursuit incidents. Based on input from the IMT and OAG, the Force Review Division created a separate SOP entitled, *Foot Pursuit Reviews,* which governs the process for Force Review Division reviews of foot pursuits (described further in ¶169). The Force Review Division trained all division members on this review protocol in 2020.

The City has achieved Secondary compliance during the third reporting period for ¶168 due to the accomplishments described above and in Independent Monitoring Report 2.

As described in Independent Monitoring Report 2, the OEMC and Force Review Division have appropriate processes in place to capture and track all foot pursuits—both those that result in force and those that do not result in force. During the third reporting period (March 1, 2020, to December 31, 2020), the OEMC and CPD continued to track foot pursuits and reported 1,276 foot pursuits. The CPD also tracked foot pursuits associated with a use of force. *See* Use of Force Figure 4.

Use of Force Figure 4:                                 Number of Foot Pursuits
                                                    Reported by the OEMC and the CPD
                                                    (March 1, 2020 to December 31, 2020)

| | April 1, 2019 to December 31, 2020 | Third Reporting Period (March 1, 2020 to December 31, 2020) |
|---|---|---|
| **Total Foot Pursuits** | **3,523** | **1,301** |
| Total Foot Pursuits with Use of Force | 914 | 383 |
| Total Foot Pursuits with Use of Force, Level 1 | 570 | 200 |
| Total Foot Pursuits with Use of Force, Level 2 | 284 | 152 |
| Total Foot Pursuits with Use of Force, Level 3 | 44 | 28 |
| Total Foot Pursuits with Use of Force, Level 4 | 16 | 3 |

We reviewed available foot pursuit data and notes that the percentage of foot pursuits ending in some level of force for the third reporting period increased from prior periods: 24.4% in the first reporting period, 23.3% in the second reporting period, and 29.4% in the third reporting period to date.[118] Use of Force Figure 5 displays force level comparisons for each reporting period. We will continue to review data on foot pursuits in future reporting periods.

Use of Force Figure 5:          Comparison of Use of Force Levels for Foot Pursuits

| Percentage Foot Pursuits with Use of Force | First Reporting Period (April 1, 2019 to August 31, 2019) | Second Reporting Period (September 1, 2019 to March 30, 2020) | Third Reporting Period (March 1, 2020 to December 31, 2020) |
|---|---|---|---|
| Level 1 | 67.7% | 70.9% | 52.0% |
| Level 2 | 26.0% | 22.9% | 40.0% |
| Level 3 | 4.7% | 2.6% | 7.2% |
| Level 4 | 1.7% | 3.5% | 0.8% |

---

[118]  Foot pursuit data is not available before April 1, 2019.

During this reporting period, the Force Review Division also demonstrated that these tracking processes allowed the CPD to detect and analyze potential concerns and to make qualitative and quantitative assessments. The *FRD Quarterly Report 2020 Q3* began identifying debriefing points for foot pursuit issues, such as partner separation and poor communication.

Further, in August 2020, the CPD Office of Operational Compliance completed its foot pursuit audit. The audit helps CPD to better understand the number of foot pursuits reported by OEMC and the number of instances in which an officer indicated a foot pursuit occurred during a reportable use-of-force incident using a TRR and to determine how often a foot pursuit was recorded during a reportable use-of-force incident. To conduct this audit, the Office of Operational Compliance analyzed data from January 1, 2019, to May 20, 2019, from various units across the CPD, interviewed relevant personnel, and reviewed relevant policies, procedures, and responsibilities. Through this analysis, the CPD confirmed that it is capturing reportable use-of-force incidents from either TRR data or TRR data and OEMC data. Specifically, of 903 foot pursuits for the time period, 200 (22.1%) occurred during a reportable use-of-force incident. Of the 200, 186 were captured in both the OEMC Computer Aided Dispatch (CAD) and CPD TRR data, and 14 were only found in CPD TRR data.

The CPD's Audit Division also conducted a review of foot pursuits. The purpose of this review was to assess the extent to which the CPD is able to identify trends related to foot pursuits initiated and reported by its members from April 1, 2019, to December 31, 2019. On December 30, 2020, the CPD shared the findings of this review with the IMT and OAG in a report "Review of Foot Pursuits Initiated & Reported by Department Members." The report describes data on trends for foot pursuits during the period examined and identifies findings related to documentation, reporting, and tracking of these events. For data on trends, the audit concluded that the Department is able to identify trends related to foot pursuits, but challenges related to data collection remain. We share here some of the noted findings for data on foot pursuit trends:

- The CPD averages around seven foot pursuits a day;

- The average district total of foot pursuits was 86;

- District 11 had the most foot pursuits (572, or 29.8%). This district has also consistently had among the highest numbers of violent crime in recent years;

- July through September saw the most foot pursuits, 40.6%;

- 50% of foot pursuits occurred on the third shift (4 p.m. to 12 a.m.);

- Approximately one quarter of all foot pursuits reported by members are associated with a use of force;

- At least 150 officers cited involvement in a foot pursuit to support a reason for going on the medical list;

- The most common offense associated with foot pursuits was "reckless conduct" at 6.3%.

While identifying trends is essential for understanding foot pursuits and compliance with ¶168, the audit revealed a critical issue related to collection of data. Through detailed narrative searches of documentation of arrests for offenses likely to involve foot pursuits, the audit identified several hundred (590 or 3.6%) foot pursuits that were described in narrative text but not reported to OEMC or noted in a TRR (the two mechanisms that CPD is using to collect data on foot pursuits). Among the five offenses considered, documentation of arrests for "reckless conduct" was most consistently found to describe foot pursuits that had not been reflected in Department data. Further, documentation for 22.5% of non-foot-pursuit-related arrests for this offense described a foot pursuit that had occurred but was not reported. The audit also highlighted that the City's CAD system is not configured to attach member identifying information to reported foot pursuits, which will hinder risk management-focused efforts.

The CPD has made progress for the notification, tracking, and analysis of foot pursuits, as shown by this audit. However, the audit also highlights that additional work remains in this area (e.g., educating department members on reporting requirements for when they engage in a foot pursuit).

In sum, the CPD has made considerable progress toward tracking and analyzing the frequency of foot pursuits and has achieved Secondary compliance for ¶168. We look forward to continuing to monitor the CPD's compliance with this paragraph in the future.

# Use of Force: ¶169

> **169.** *For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary and Secondary compliance with ¶169.

To evaluate Preliminary compliance with ¶169, we focused our review on whether the City and the CPD received the requisite community input for G03-02-08, *Department Review of Use of Force*, and finalized the policy. The community did not raise any concerns or provide recommendations specific to this paragraph during open comment opportunities. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree.

Additionally, as described for ¶168, the Force Review Division created a *Foot Pursuits Review* SOP which outlines the roles, responsibilities, and process for Force Review Division review of foot pursuits. These protocols were previously incorporated in *Force Review Unit Standing Operating Procedure (#2019-002)*; however, based on input from the IMT and OAG, the Force Review Division created a separate SOP to clearly establish written guidelines and procedures to review instances in which a CPD officer engages in a foot pursuit associated with a reportable use-of-force incident. The SOP describes the scope of reviews, prerequisite information required for reviews, review procedures, mandatory reporting requirements for misconduct to COPA, and training requirements for Force Review Division personnel. The SOP also outlines seven questions that Force Review Division reviews will focus on in their reviews, including: partner separation, required communications with OEMC, weapon handling, and whether supervisors became involved. It also covers the manner by which analysis will take place. The CPD shared the draft SOP for compliance review on July 29, 2020. The IMT and the OAG provided comments on August 28, 2020, and August 24, 2020, respectively. The CPD submitted a revised SOP on September 16, 2020. The IMT and the OAG provide no-objection notices on October 21, 2020, and September 30, 2020, respectively. With the issuance of G03-02-08 and the Force Review Division's SOP, we find the City and the CPD in Preliminary compliance for ¶169.

For Secondary compliance, the *Foot Pursuits Review* SOP requires that

> *All members of the Force Review Division receive a minimum of 4 hours of in-service training yearly on foot pursuits based on current Department policy, training standards and any trends identified by an analysis of foot pursuit data. This training will include CPD case studies, and it will be in addition to any other required yearly in-service training on Use of Force.*

During the third reporting period, the Force Review Division created a standardized training addressing the protocols for foot pursuit review. The CPD produced the training PowerPoint and CAD printouts (examples used during the training) on August 19, 2020. The OAG provided comments on September 16, 2020, and we provided a no-objection notice on September 19, 2020. All Force Review Division personnel responsible for conducting Tactical Response Reviews involving foot pursuits completed training on the foot pursuit review SOP in 2020. Thus, the City is in Secondary compliance for ¶169.

To assess Full compliance, we are assessing whether the CPD has sufficiently implemented its foot pursuit review policy, protocols, and training and if the Force Review Division and the CPD are appropriately recommending and acting on tactical, equipment, and training concerns.

The Force Review Division unit has created advisement and debriefing points for the review of foot pursuits, specifically for pursuit communications and pursuit separation. Additionally, proposed revisions to the TRR-R will also include handling of firearms, allowing the Force Review Division to capture further data about foot pursuits involving firearms. During this reporting period, the Force Review Division also demonstrated its ability to detect, analyze, and identify trends and potential concerns related to foot pursuits. The *FRD Quarterly Report 2020 Q3* reviewed a total of 170 TRR reports that involved a foot pursuit. Of those, 17 resulted in Force Review Division recommendations (10 for failure to check the appropriate box, 3 for partner separation, and 4 for radio communications). The report also examined the number of foot pursuits that resulted in a firearm pointing incident and provided data on the number of weapons recovered in foot pursuits where a firearm pointing incident occurred (Use of Force Figure 6).

Use of Force Figure 6:       Analysis of Foot Pursuits from the Force Review Division Third Quarter Report (July 1, 2020 to September 30, 2020)

| | |
|---|---|
| Total Foot Pursuits with Use of Force | 170 |
| Total Foot Pursuits that resulted in a Fire Pointing Incident | 261 |
| Number of Incidents Where Weapons Recovered in Foot Pursuit Incidents Where a Firearm Pointing Occurred | 138 out of 262 times (44.5%) |

In sum, the City has achieved Preliminary and Secondary compliance for ¶169 in this reporting period and has made notable progress towards Full compliance. The Force Review Division is to be commended for identifying broad issues occurring in foot pursuit patterns and trends (e.g., percentage of weapons recovered during pointing incidents and recommendations for training regarding traffic stops). The Force Review Division debriefing notifications to officers and supervisors alike provide feedback on the policy and reinforce that managerial practices are in place to reinforce the policy.

Moving forward, we will continue to assess the CPD's progress on ¶169. We seek to determine whether the CPD is appropriately acting on Force Review Division identified tactical, equipment, and training concerns and recommendations. Additionally, we seek to review foot pursuit data at the district level to analyze training and tactics need at a local district level.

# Use of Force: ¶170

> **170.** *CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**       *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**        *In Compliance* (SECOND REPORTING PERIOD)
**Full:**              *Under Assessment*

In the third reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶170 but did not reach Full compliance.

The CPD achieved Preliminary and Secondary compliance for ¶170 in the second reporting period by developing and issuing the required supplemental foot pursuit training bulletin on February 28, 2020, following no-objection notices from the IMT and OAG.

To evaluate Full compliance with ¶170, we continued to review training attendance records, pre- and post-tests, and evaluations for the training bulletin and the 2020 Use of Force in-service training and by paying special attention to comprehension of the foot pursuit actions by officers and supervisors.

The CPD distributed the foot pursuit training bulletin via eLearning to all Department members in March 2020. Through April 2020, the Department issued multiple notices via the Administrative Message Center (AMC) and roll calls to remind all Department members that they are required to complete the eLearning module. Subsequently in June 2020, the CPD notified IMT and OAG it was seeking to further revise the Foot Pursuit Bulletin to reflect best practices and added language covering foot pursuits with a firearm, providing guidance to officers as to

what factors should be considered and the potential danger of accidental discharge. We commend the CPD for this change. As of December 31, 2020, 99% of Department members completed the foot pursuit training bulletin via eLearning.

We also continued to monitor the CPD's completion of the 2020 Use of Force in-service training, which includes additional training on foot pursuits. The 2020 training describes risks to be considered and sound tactics for foot pursuits, what do to if a pursuit is initiated, supervisory responsibilities, and foot-pursuit data on the Use of Force dashboard. As of December 31, 70% of CPD officers completed the 2020 Use of Force in-service training. Due to the COVID-19 pandemic, the City has received an extension for completing the 2020 Use of Force in-service training, which is to be completed by March 4, 2021.

In sum, in the third reporting period, we continued to assess the CPD's progress with ¶170 and will continue to monitor compliance in the next reporting period, to include completion of the 2020 Use of Force in-service training. Following virtual interviews with Department members this fall, we believe there is a need to further convince rank-and-file officers that separation from and responsibility to one's partner are important concepts. The training bulletin meets the requirements, but interviews with officers continue to demonstrate there has not been the requisite buy-in, particularly with officers who have served for longer periods of time.[119] There is a sense that these concepts go against the culture of the organization and will take reinforcement at all levels of the organization.

---

[119] On March 5, 2021, per ¶172, the IMT "complete[d] an assessment of CPD data and information to determine whether CPD should adopt a foot pursuit policy." Based on that assessment, we recommended that the CPD adopt a foot pursuit policy. It is our understanding that the City, the CPD, and the OAG either agree with or understand the need for a foot pursuit policy.

# Use of Force: ¶171

> **171.** *CPD will provide scenario-based training regarding foot pursuits and the supplemental foot pursuit training bulletin during the first annual use of force training required by this Agreement.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD achieved Preliminary compliance with ¶171.

To evaluate Preliminary compliance, the reviewed the CPD's annual Use of Force training to determine whether it incorporates the supplemental foot pursuit training bulletin and scenario-based training regarding foot pursuits.

In February 2020, the CPD revised the *Foot Pursuit Training Bulletin* ETB18-01. The IMT and OAG had previously approved the prior training bulletin.

The first annual Use of Force training required by this agreement was the 2019 Use of Force training, but that training took place before the issuance of the revised training bulletin. In the 2019 training, instructors engaged the class with questions about what factors needed to be considered before officers engaged in a pursuit, which was not sufficient to meet the requirement of scenario-based training under this paragraph.

The CPD's 2020 Use of Force in-service training, by contrast, involves table-top exercises that build on videos of foot pursuits and explanatory slides, during which officers are expected to engage in dialogue and consider various foot-pursuit scenarios. Due to risk of injury, the officers do not physically engage in foot pursuits during the training. The 2020 training also extensively covers the substance of the revised training bulletin. The 2020 Use of Force in-service training adequately provides for scenario-based training regarding foot pursuits and training on the revised foot pursuit training bulletin.

To assess Secondary compliance, we will evaluate the delivery of the 2020 Use of Force in-service training. Due to the COVID-19 pandemic, the City has received an extension to March 4, 2021, for completing the 2020 Use of Force in-service training.

# Use of Force: ¶173

*173. Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropriate medical aid for injured persons or persons who claim they are injured.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance (SECOND REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶173.

The CPD's most recent Use of Force policy, G03-02 *De-Escalation, Response to Resistance, and Use of Force,* which was issued on December 31, 2020, requires officers to immediately request appropriate medical aid for the injured person, including contacting emergency medical services (EMS) from the Chicago Fire Department via the OEMC.

These requirements have also been stated in CPD's previous Use of Force policy, General Order 03-02, *Use of Force*, effective October 16, 2017.

Further, during this reporting period, the CPD and the community engaged in discussions regarding the provision of medical aid for firearm discharges. As a result of these discussions, the Department agreed to consider two changes to their policy: (1) require that officers provide medical aid consistent with their training and (2) require that officers not interfere with medical aid being provided to a person who is injured. These changes are reflected in G03-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation,* in Section VI.B.1 *Immediate responsibilities for the involved member*:

> *The member(s) involved in a firearm discharge or an officer-involved death incident, if physically capable, will:*
>
> *1. Immediately request medical request medical attention for the injured and as soon as it is safe and feasible to do so, provide lifesaving aid consistent with their department training, including the Law Enforcement Medical and Rescue Training (LEMART), to persons injured by a Department member's use of force until medical professionals arrive on scene.*

> *a. Department members may provide appropriate medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention. This may include providing first aid and/or arranging for transportation to an emergency medical facility.*

> *b. If the scene is safe and the person in custody is secure, Department members will not interfere with emergency medical personnel when providing treatment to injured persons.*

To assess Secondary compliance, we will review whether CPD officers have completed Use of Force training and have been trained on the relevant December 31, 2020 Use of Force policy revisions. The CPD "2020 In-Service Training" Tableau dashboard indicates that as of the end of 2020, 8,000 (71%) officers had completed the 2020 Use of Force training.

# Use of Force: ¶176

**176.** *CPD officers must recognize and act upon the duty to inter-vene on the subject's behalf when another officer is using exces-sive force.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶176.

The Use of Force Working Group recommended that all CPD officers who are present must intervene verbally and physically to stop another officer from engaging in excessive or unnecessary force. Prior policy specified only verbal intervention. On December 31, 2020, the CPD issued revised Use of Force policies, in which G03-02, *De-Escalation, Response to Resistance, and Use of Force*, was revised in Section VII.A.1, based on the Working Group's recommendation:

> *A department member who directly observes a use of force and identifies the force as excessive or otherwise in violation of this directive will, except in extraordinary circumstances, act to inter-vene on the person's behalf. Such action* <u>*may include, but is not limited to, verbally or physically intervening*</u> *to try to stop the vi-olation. If the member is a supervisor, he or she will issue a direct order to stop the violation.*

We look forward to verifying whether an adequate proportion of officers have completed the 2020 Use of Force in-service training in support of Secondary compliance with ¶176 and whether the revisions to G03-02 that an officer may inter-vene verbally or physically to try to stop a violation are updated in training. The CPD will educate Department members of the December 31, 2020 changes to the Use of Force policy suite through eLearning training in February 2021 and in up-coming 40 hours of in-service training. We will also begin assessing Full compliance to determine whether the CPD has sufficiently implemented its policy and training for ¶176. We will review quarterly updates from various sources (Force Review Division, BIA, COPA, and city law department) and TRRs on excessive force cases where officers did not intervene or allegedly failed to intervene. For example, the Force Review Division's third quarter report states that no complaint logs were is-sued for failure to intervene. In discussions with COPA during this reporting period,

we learned that COPA is unable to identify the category "duty to intervene," but COPA members expressed that they are working to resolve this issue.

# Use of Force: ¶177

**177.** *Consistent with CPD policy that force must be objectively reasonable, necessary, and proportional, CPD officers must generally not use force against a person who is handcuffed or otherwise restrained absent circumstances such as when the person's actions must be immediately stopped to prevent injury or escape or when compelled by other law enforcement objectives.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶177.

To evaluate Preliminary compliance with ¶177, we focused our review on whether the City and the CPD received the requisite community input for G03-02-01, *Response to Resistance and Force Options*, and finalized the policy. The community and Use of Force Working Group recommended the prohibition of force against restrained or handcuffed individuals, except when a person's actions must be stopped to prevent an imminent threat of safety to themselves or others.

The CPD's December 31, 2020 revised G03-02-01 policy addresses the Working Group's concern in Section II.G.1, stating:

> Consistent with Department policy that all uses of force must be objectively reasonable, necessary, and proportional, Department members will refrain from using force against a person who is secured and restrained with handcuffs or other restraining devices (e.g., flexible restraining devices), unless the member: 1. must act to prevent injury to the Department member, the restrained person, or another person.

Additionally, the TRR form requires officers to check a box if they used force against someone in restraints and explain their reasons in the narrative portion of the TRR. Further, per ¶218, the use of any force against someone handcuffed or in restraints is a level 2 use-of-force incident, which requires an immediate supervisory response and investigation. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

Going forward, we will monitor progress with ¶177, focusing on progress with the Use of Force policies; training content and completion rates; and whether the CPD has a process that differentiates force against a person who is handcuffed or otherwise restrained, and identifies and forwards those cases COPA.

# Use of Force: ¶178

**178.** *CPD officers are prohibited from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized. CPD officers must not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway or carotid artery restraints as take-down techniques.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *Under Assessment*
**Secondary:** *Not In Compliance*
**Full:** *Not Yet Assessed*

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶178. To evaluate Preliminary compliance with ¶178, we focused our review on whether the City and the CPD received the requisite community input on the Use of Force policies. During this reporting period, the CPD and Use of Force Working Group engaged in extensive discussions over the prohibition of carotid artery restraints or chokeholds. The Working Group recommended and strongly advocated for their strict prohibition. As of the end of the reporting period and the issuance of the revised Use of Force policies on December 31, 2020, the CPD did not accept the Working Group's recommendation. CPD's revised G03-02, *De-Escalation, Response to Resistance, and Use of Force*, however, now includes stronger language about carotid artery restraints or chokeholds not being allowable unless it is an act of last resort to protest against an imminent threat to life and includes further examples of prohibited actions in the neck area. Specifically, the policy states in Section IV.D *Use of Deadly Force, Prohibitions*:

> 2. The Chicago Police Department prohibits its members from using chokeholds or other maneuvers for applying direct pressure on a windpipe or airway, with the sole exception being as an act of last resort, when necessary to protect against an imminent threat to life.

> 3. The Chicago Police Department prohibits its members from using carotid artery restraints, with the sole exception being as an act of last resort, when necessary to protect against an imminent threat to life.

4. The Chicago Police Department prohibits its members from using carotid artery restraints, chokeholds, or other maneuvers for applying direct pressure on a windpipe or airway as a takedown technique or to prevent the destruction of evidence by ingestion.

The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

Going forward, we will continue to monitor the CPD's progress under ¶178. The CPD must reinforce the revisions and additions in policy related to carotid artery restraints or chokeholds in its Use of Force training. We will also review the use of chokeholds, including Force Review Division review of such incidents in quarterly and annual reports (all deadly force incidents, shootings, head strikes, and chokeholds). During this reporting period, the Force Review Division indicated that one complaint log was issued for a chokehold incident, which would be investigated by COPA. COPA provided data indicating that six of its cases involved chokeholds between January and November 2020.

# Use of Force: ¶179

***179.*** *CPD's use of force policies must guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use. CPD's use of force policies must clearly define and describe each force option and the circumstances under which use of such force is appropriate to address potential types of resistance.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶179.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶179's requirements. The CPD continues to seek to engage the community on its Use of Force policies, which guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use. In this reporting period, the Use of Force Working Group raised concerns with the use and prohibitions of Tasers. The CPD and the Working Group agreed to continue discussion about Taser use and Use of Force policies into 2021, which we will continue to monitor moving forward. Further, all parties have agreed that one policy, G03-06 *Officer Involved Deaths and Officer Involved Shootings,* is temporary in nature and will require further input before approval by the IMT and OAG.

# Use of Force: ¶181

**181.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use firearms.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance and reached Secondary compliance with ¶181.

Special Order S11-10, *Department Training Records Maintenance* issued August 14, 2020, and Special Order S11-03-01, *Annual Prescribed Weapon Qualification Program and Taser Recertification* issued January 13, 2016, govern yearly firearm certifications for CPD officers. Section II of S11-03-01 states, in particular:

> *Chicago Police Department mandates that all sworn Department members must qualify with their prescribed duty weapons prior to the end of the fourth police period of the current year.*

On a biweekly Use of Force call on December 17, 2020, the CPD Training Division addressed firearms certification. CPD officers must obtain firearms certification on an annual basis in order to be issued, carry, and use firearms. The CPD generally begins its annual qualification program the first quarter of the year. The Training Division issues matrices via AMC to schedule training for all officers. Officers are required to complete an eLearning module before completing the weapons qualification. To be certified, an officer must successfully complete the eLearning module and then complete a 30-round course of fire, achieving a requirement of at least 70%. If officers fail to meet the 70% threshold upon second attempt, they are required to participate in a seven-and-a-half-hour intensive training session during their next shift. Officers are then afforded an opportunity to re-test. The CPD also stated that when officers seek certification, range personnel inspect their FOID card to ensure they are valid and up to date. Additionally, the Training Division reports officers who are not certified by the end of the fourth quarter for appropriate action. Due to the COVID-19 pandemic, the CPD noted that all state FOID cards with a 2020 expiration were granted an extension of 18 months following the termination of the disaster.[120] The CPD Training Division stated that it tracks firearm training records in the CPD's CLEAR system.

---

[120] *See* ILLINOIS STATE OF POLICE FIREARM SERVICES BUREAU, https://www.ispfsb.com/Public/Faq.aspx.

We find the CPD in Secondary compliance for ¶181, due to having policies and processes in place to determine when certification and training takes place. Moving forward, we will assess Full compliance by auditing firearms certification records for all officers and reviewing the results.

# Use of Force: ¶182

*182. CPD will require officers to consider their surroundings before discharging their firearms and take reasonable precautions to ensure that people other than the target will not be struck.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶182.

To evaluate Preliminary compliance with ¶180, we focused our review on whether the City and the CPD received the requisite community input for G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, and finalized the policy. The community and the Use of Force Working Group provided five recommendations related to this directive. Specifically, the Working Group noted that the following:

> *firing into crowds prohibition does not preclude the discharge of a firearm directed at a specific person who is near or among other people, but the discharge of a firearm in such circumstances is only permitted in the limited circumstances when such force is necessary to prevent death or great bodily harm to the sworn member or to another person, and no reasonable alternative exists. In such circumstances, the discharge of a firearm is permissible only if the member has identified the appropriate target prior to discharging the firearm, has taken precautions to avoid the risk that people other than the target will be struck, and has received appropriate marksmanship training.*[121]

The Working Group also expressed that "safe and feasible" is a vague term and raised this concern on multiple occasions.

We continue to work with the CPD on a solution to ensure that data related to this paragraph is collected regularly and easily accessible. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

---

[121] Use of Force Community Working Group Firearm Use Policy Group Recommendations, August 17, 2020.

We look forward to assessing the CPD's Use of Force training and whether in-service training reflects recent revisions to the Use of Force policies.

# Use of Force: ¶183

***183.*** *CPD will require officers to issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so.*

## Compliance Progress

**Preliminary:**            *Under Assessment*
**Secondary:**              *Not in Compliance*
**Full:**                      *Not Yet Assessed*

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶183.

To evaluate Preliminary compliance with ¶183, we focused our review on whether the City and the CPD received the requisite community input for General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. The community and Use of Force Working Group recommended that officers issue verbal warnings prior to discharging a weapon and recommended that officers identify themselves as law enforcement unless doing so creates imminent risk of death. They also recommended that officers use hand signals or visual cues to provide warnings in event that a person is hearing impaired. The CPD did not incorporate these recommendations in the December 31, 2020 revised Use of Force policies. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing progress with ¶183.

# Use of Force: ¶184

**184.** *When CPD officers discharge firearms, they must continually assess the circumstances that necessitated the discharge and modify their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it (e.g., when a subject is no longer a threat).*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶184.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶184's requirements. During this reporting period, the Use of Force Working Group provided comments related to ¶184. Specifically, the Working Group recommended for G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, that firing into buildings, through doors, windows, or other openings should not be allowed under any circumstances. The Working Group also recommended that officer marksmanship training should reflect this prohibition. While the CPD did not accept this recommendation from the Working Group, it did amend other parts of policy in its issued directive on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing progress with ¶184.

# Use of Force: ¶185

**185.** *CPD will continue to prohibit officers from firing warning shots.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶185.

To evaluate Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training specific to firearms and deadly force. As of December 31, 70% of CPD officers completed the 2020 Use of Force in-service training. Due to the COVID-19 pandemic, the City has received an extension for completing the 2020 Use of Force in-service training, which is to be completed by March 4, 2021.

We reviewed data on firearm discharges from 2019 to October 25, 2020. The CPD reported 90 firearm discharges, to include the nature of the shootings and whether any were characterized as a warning shots. None of the discharges were characterized as a warning shot.

COPA reported one case involving firing a warning shot in July 2020.

Through the end of 2020, the CPD lacked a process to track and examine the nature of firearm discharge incidents and determine the nature of the event. The data reported for 2019 and 2020 were manually captured upon the IMT's request. We continue to work with the CPD on a solution to ensure that data related to this paragraph is collected regularly and easily accessible.

We look forward to verifying whether an adequate proportion of personnel have completed training on this prohibition in support of Secondary compliance with ¶185. We will also begin assessing Full compliance and further examine data on firearm discharges, as there will be an established system for capturing this data effective January 1, 2021.

# Use of Force: ¶186

> **186.** *CPD officers must not fire at moving vehicles when the vehicle is the only force used against the officer or another person, except in extreme circumstances when it is a last resort to preserve human life or prevent great bodily harm to a person, such as when a vehicle is intentionally being used to attack a person or group of people. CPD will continue to instruct officers to avoid positioning themselves or remaining in the path of a moving vehicle, and will provide officers with adequate training to ensure compliance with this instruction.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶186.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶186's requirements. During this reporting period, the Use of Force Working Group provided comments related to ¶186. Specifically, the Working Group provided recommended language for limiting firing at or into motor vehicles and language for prohibiting firing from motor vehicles. While the CPD did not accept the recommendations from the Working Group, it did amend other parts of policy in its issued directive on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

The CPD provided data to IMT on firearm discharges from 2019 to October 25, 2020. The CPD reported 90 firearm discharges, 8 of which were discharges at a moving vehicle. In 2016, two CPD officers were terminated for violating this policy, and in March 2020, the terminations were upheld.[122] A decision of this nature reinforces the policy.

COPA reported four cases involving firing at a vehicle between January and November 2020.

---

[122] *See 2 Chicago police officers fired for shooting at moving car in a 2016 videotaped incident that ended with death of teenager Paul O'Neal,* CHICAGO TRIBUNE (March 20, 2020), https://www.chicagotribune.com/news/criminal-justice/ct-police-officers-fired-oneal-case-20200320-3gv5t2qkjraxzlq3wvcgftgmry-story.html.

We look forward to assessing the CPD's progress with ¶186. We will review progress with the Use of Force policies and the content and attendance for the 2020 Use of Force in-service training.

# Use of Force: ¶187

**187.** *CPD will prohibit officers from firing from a moving vehicle unless such force is necessary to protect against an imminent threat to life or to prevent great bodily harm to the officer or another person.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶187.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶187's requirements. During this reporting period, the Use of Force Working Group provided comments related to ¶187. Specifically, the Working Group provided recommended language for limiting firing at or into motor vehicles and language for prohibiting firing from motor vehicles. While the CPD did not accept the recommendations from the Working Group, it did amend other parts of policy in its issued directive on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

The CPD provided data on firearm discharges from 2019 to October 25, 2020. The CPD reported 90 firearm discharges, 4 of which were discharges from a moving vehicle.

We look forward to assessing the CPD's progress with ¶187. We will review progress with the Use of Force policies and the content and attendance for the 2020 Use of Force in-service training.

# Use of Force: ¶188

*188. By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the third reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶188 and made progress towards Full compliance.

To evaluate Full compliance with ¶188, we examined training attendance records and data for the CPD's 2020 Use of Force in-service training, which includes instruction on the updated Firearm Pointing Incidents Policy (issued October 1, 2019, and effective November 1, 2019), including information on Fourth Amendment case law for unreasonable firearm seizures. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training. Due to the COVID-19 extension, we will continue to assess the City's progress towards completing the 2020 Use of Force training by March 4, 2021 and compliance with ¶188.

It is our expectation that the annual in-service training will constantly evolve to address the issues surrounding ¶188. For example, during this reporting period, the Force Review Division conducted an analysis of firearm pointing incidents and found that pointing incidents most frequently occur during traffic stops. Force Review Division shared this finding with Research and Development and the Training Division and is working collaboratively to enhance training and address this issue in the 2021 Use of Force in-service training.

# Use of Force: ¶189

*189. CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**        *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**          *Under Assessment*
**Full:**               *Not Yet Assessed*

In the third reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶189.

To evaluate Secondary compliance with ¶189, we have been reviewing the development, implementation, and evaluation of training regarding the firearm pointing policy. As noted in Independent Monitoring Report 2, the CPD's annual in-service Use of Force training for 2019 and 2020 provides clear instruction that officers may only point a firearm at a person when objectively reasonable under the totality of the circumstances. The training further states that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. The 2020 lesson plan also includes an example of a pointing incident that was considered unreasonable under the Fourth Amendment. As of December 31, 2020, 70% of Department members have completed the 2020 in-service training. Due to the COVID-19 extension, we will continue to assess the City's progress towards completing the 2020 Use of Force training by March 4, 2021 and Secondary compliance.

For Full compliance, we began assessing whether officers understand the firearm pointing policy. In interviews conducted with officers in 2019 and 2020, all officers and supervisors were aware of the policy, while not all necessarily agree with it. Some supervisors, in particular in quiet districts, were aware of the policy but have not had to execute it with the same frequency as in districts with higher levels of violence. For example, the *FRD Quarterly Report 2020 Q3* states a range of firearm pointing incidents across districts where District 20 had 4 incidents and District 7 had 130 incidents.

In the next reporting period, we will continue to review compliance with this paragraph, including determining whether a sufficient number of officers are trained and whether the officers understand the firearm pointing policy. Of additional

note, during this reporting period, the Use of Force Working Group provided feed-back related to ¶189. The Working Group advocated for firearm pointing incidents be considered a Use of Force requiring completion of a tactical response report (TRR). The CPD agreed that, in this area and other types of similar police responses, they could do a better job of documentation but did not agree that a firearm point-ing incident should result in the filing of a TRR. In future reporting periods, as part of the CPD's biannual review of its Use of Force policies, we will review information and updates on how the CPD is addressing community feedback such as this in its review and update of CPD's Use of Force policies, pursuant to ¶189.

# Use of Force: ¶190

*190. Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**          *Under Assessment*
**Full:**                    *Not Yet Assessed*

In the third reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶190.

To evaluate Secondary compliance for ¶190, we are determining whether a sufficient number of officers are trained in the firearm pointing policy and whether officers understand firearm pointing notification policies and procedures. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training. Due to the COVID-19 extension, we will continue to assess the City's progress towards completing the 2020 Use of Force training by March 4, 2021.

For Full compliance, we began assessing whether officers understand the firearm pointing policy. In interviews conducted with officers in 2019 and 2020, all officers and supervisors were aware of the policy. While some officers did not necessarily agree with it, they all indicated they were aware of it. The CPD's ability to attain Full compliance will continue to depend on its ability to achieve greater compliance with body-worn camera use. Specifically, the *FRD Quarterly Report 2020 Q3* states there were 820 firearm pointing incidents in the third quarter, 131 of which had recommendations regarding body-worn cameras, which impacts Force Review Division's ability to make accurate assessments of the incidents. The Force Review Division has identified officers' inconsistent use of body-worn cameras as a reoccurring problem, which training has addressed in the past and based on Force Review Division recommendation will address in the 2021 in-service training.

In addition, during the previous reporting period, we raised the need to account for all firearm pointing instances that result in a notification to the OEMC. In this third reporting period, we continue to observe incidents when officers point a firearm that the Force Review Division does not review, specifically when an associated Arrest Report or Investigatory Stop Report (ISR) could not be found or did not exist. Specifically, the *FRD Quarterly Report 2020 Q3* states that, of the 820 incidents reported to OEMC, 88 (12.6%) had no Arrest Report or ISR.

In sum, as the CPD continues to seek Secondary compliance, it should ensure sufficient training of officers in the 2020 Use of Force training. While officers appear to be aware and understand the firearm pointing policy, for Full compliance, the CPD needs to address issues raised regarding accounting for all firearm pointing incidents and body-worn-camera issues per ¶190's requirement that

> *The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

We look forward to continuing to monitor the CPD's progress with ¶190.

# Use of Force: ¶191

*191. OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶191.

To evaluate Secondary compliance for ¶191, we are determining whether a sufficient number of Department members are trained in the firearm pointing policy and whether OEMC and supervisors understand firearm pointing notification and review policies and procedures. As noted previously, as of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training. Due to the COVID-19 extension, we will continue to assess the City's progress towards completing the 2020 Use of Force training by March 4, 2021. We will also assess training specific to supervisors.

For Full compliance, we will assess whether the CPD has sufficiently implemented its policy and training, specifically related to OEMC notifications for supervisors, and will assess the requirement for supervisors to promptly review and effectively supervise their personnel. The CPD should consider a process in which supervisors identify and record any issues with firearm pointing incidents shortly after review. The onus of enforcing this directive cannot and should not fall only on the Force Review Division. The CPD must create a process that identifies problems and addresses them immediately, not leaving the identification of problems solely to the Force Review Division's review, which occurs within 30 days of the incident. For example, the Force Review Division may also recommend advisements or debriefings for supervisors who fail to identify areas of failure to comply with policy. The Force Review Division quarterly reports identify the number of pointing incidents occurring in each district and whether there are corresponding high or low rates of debriefings.

We will continue to review the City and the CPD's efforts toward compliance in the next reporting period.

# Use of Force: ¶192

*192. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| Deadline: | Ongoing | ✓ Met | ☐ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶192. The City and the CPD also met the ongoing deadline to complete the required reviews and audits within 30 days of each occurrence in which a CPD officer pointed a firearm at a person in the course of effecting a seizure.[123]

---

[123] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly,

To evaluate Secondary compliance for ¶192, we continued to review CPD's training regarding the firearm pointing incident policy and procedures for the Force Review Division. In 2020, the CPD created a *Firearm Pointing Incident Review In-Service Unit Training* to train Force Review Division staff on the relevant policies that guide firearm pointing. This training will also assist with the assessment and review of whether a pointing incident violated CPD policy or led to an individual and/or pattern of concern that rose to a tactical, equipment, training or policy response that required correction or necessitated a referral for a misconduct investigation. The IMT and the OAG reviewed and commented on the draft training PowerPoint in the prior reporting period. On September 24, 2020, the CPD provided additional training materials for IMT and OAG review and comment, including:

- A revised training PowerPoint slide deck

- *FPI Reviewer Reference Manual* (a supplemental reference guide for Force Review Division pointing reviewers)

- Revised Firearm Pointing Incident Review SOP

On November 25, 2020, the CPD also provided the IMT and OAG with records demonstrating that all members of the Force Review Division who conduct firearm pointing incident reviews have been trained on the review process. We also reviewed documentation identifying the various platforms officers reviewed to complete their training.

We acknowledge and commend the CPD for its established processes and systems for firearm pointing incidents. But we continue to have concerns about approximately 15% of pointing incidents that only receive a cursory review, due to the fact that no ISR or arrest report was submitted. Further, we acknowledge that a small percentage of these cases are forwarded to the Integrity unit. Secondary compliance for ¶192 will depend on the CPD's ability to further analyze the nature of these pointing incidents, categorize them, and make a determination of whether policy was followed. The CPD has indicated its intent to create a Firearm Dashboard in early 2021; the dashboard needs to address this issue or create another process to do so. In light of the lack of referrals to COPA for policy violations (see B. below), it is necessary to examine in detail all aspects of firearm pointing.

To evaluate Full compliance, we will continue to review training, community, and data sources, including footage from body-worn cameras, pointing data, and Force Review Division review schedules and completion records to determine whether

---

periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

the CPD has sufficiently implemented its policy and training. During this reporting period, the Force Review Division made the following progress in the required areas for ¶192:

A. *Complete the review and audit within 30 days of each occurrence.* The Force Review Division was impacted by the COVID-19 pandemic and protests this year with a loss in personnel during summer of 2020. The Force Review Division has since been resourced with more staff, reporting 1 commander, 1 lieutenant, 6 sergeants, and 37 review officers at the end of the third quarter of 2020, as indicated in the *FRD Quarterly Report 2020 Q3*. In the third quarter, a total of 695 firearm pointing incidents occurred, and the Force Review Division reviewed 1014 incidents, which included incidents from previous periods. The Force Review Division completed 592 reviews in under 30 days, 43 reviews in 30-35 days, 14 reviews in 36-40 days, and 31 reviews in more than 40 days. Their median completion time for Firearm Pointing Incident reviews was 18 days, and, by the close of the quarter, the Force Review Division had no backlog of firearm pointing cases. We appreciate the Force Review Division's efforts to timely review incidents under the circumstances.

B. *Identify whether the pointing of the firearm at a person allegedly violated policy*. The Force Review Division reported no policy violations in the first through third quarters of 2020 for firearm pointing incidents. The most common recommendation debriefing point for Force Review Division Firearm Pointing Reviews continued to be related to body-worn camera use. Use of Force Figure 7 below outlines debriefing points for Firearm Pointing Incident Reviews in 2020, as reported by the Force Review Division in its quarterly reports.

Use of Force Figure 7: Force Review Division Firearm Pointing Debriefing Points by Quarter (January 1, 2020 to September 30, 2020)

| | 2020 Quarter 1 (January 1, 2020 – March 31, 2020) | 2020 Quarter 2 (April 1, 2020 – June 30, 2020) | 2020 Quarter 3 (July 1, 2020 – September 30, 2020) |
|---|---|---|---|
| Total Firearm Pointing Incidents Reviewed | 949 | 917 | 820 |
| No Recommendation | 616 | 633 | 668 |
| Non-Review (No ISR or Arrest) | 111 | 158 | 156 |
| Body-Worn Camera Issues | 82 | 44 | 64 |
| Referred to Integrity Unit | 16 | 26 | 14 |
| Policy Violation – COPA | 0 | 0 | 0 |

C. *Identify any patterns and ensure such concerns are addressed*. The Force Review Division identified traffic stops as contributing to the largest amount of firearm pointing incidents. The Force Review Division's recommendation for further training is being incorporated into the 2021 Use of Force in-service

training. The Force Review Division also began tracking weapons recovered during firearm pointing incidents. In the third quarter of 2020, 44.5% of firearm pointing incidents included a weapon recovery, compared to 29.9% of incidents in the second quarter. A total of 306 weapons were recovered in the third quarter.

D. *Identify tactical, equipment, training, or policy concerns and to the extent necessary ensure that the concerns are addressed*. The proposed 2021 Use of Force in-service training lesson plan includes traffic stops as a result of recommendations by the Force Review Division.

E. *Issue written notification of findings, and if applicable, any other appropriate actions taken or required to an immediate supervisor.* The Force Review Division has established a process that effectively puts in place supervisory, managerial, and executive practices that allow the Department to identify, analyze, record, and provide feedback to officers and supervisors. Specifically, the Force Review Division created two materials that it provides to supervisors when it determines supervisor follow-up is necessary. The first is the *FPIR Standardized Recommendation Email,* which notifies supervisors that a Force Review Division review of a firearm pointing incident has been completed and follow-up action is required by the supervisor. The second is the *FPI-Unit Recommendation CLEARNET Help Guide,* which assists supervisors with retrieving and acting upon debriefing recommendations and provides guidance about how to provide confirmation that they acted upon recommendations. Supervisory follow-up on Force Review Division recommendations is important for accountability purposes. The documentation serves the purpose of identifying individual officers but also alerts supervisors of issues related to their subordinates.

F. *Make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy.* As noted earlier in this section, the Force Review Division has established a process that effectively puts in place supervisory, managerial, and executive practices for the review of pointing incidents. The process also provides for referral of cases of misconduct to COPA, though that did not occur in the first three quarters of 2020.

In sum, the City and the CPD completed notable activities for ¶192 during the third reporting period. Further work is still necessary, particularly on the issue of unaddressed firearm pointing incidents and regarding operationalizing firearm pointing reviews and audits (e.g., meeting the 30-day deadline regularly) and efforts by the Department and district level to respond to patterns, trends, and issues identified by the Force Review Division. We look forward to evaluating CPD's progress for this paragraph in the next reporting period.

# Use of Force: ¶193

**193.** *CPD will ensure that the designated unit at the CPD head-quarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**       *In Compliance* (NEW)
**Full:**                    *Not in Compliance*

In the third reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶192.

To evaluate Secondary compliance, we reviewed the Force Review Division's training regarding the firearm pointing incident policy and procedures to ensure all staff have sufficient knowledge and expertise. As we noted in our assessment of ¶192, the Force Review Division has sufficiently trained unit personnel on firearm pointing policies and procedures, and has achieved Secondary compliance for ¶193. We reviewed reports provided by the CPD indicating the dates officers received training on firearm pointing incidents and scope of the training. The 10-hour training includes:

- Firearm Pointing Incident Reference Guide (1 hour);

- Axon and Evidence.com Video Access (1 hour);

- Firearm Pointing Incident Guidance (1 hour);

- OEMC/PCAD Access Instructions (1 hour); and

- Shadowing veteran Force Review Division officer (6 hours).

To evaluate Full compliance, we will continue to review training, community, and data sources to assess the capacities and capabilities of the Force Review Division. The CPD supplied a variety of materials to us for our assessment of Full compliance, including a Hire Certification Form noting the roles performed by various CPD members in the assessment and selection processes of Force Review Division candidates; selection and certification documentation from the Force Review Division Commander for selecting Force Review Division staff; details regarding temporary and full-time assignment of officers to Force Review Division; and the *FRD Staffing and Equipment Needs Assessment* describing the requirements for Force Review Division to complete the unit's assigned responsibilities.

The CPD has expressed that while additional staff and technology resources are needed for the review of use-of-force incidents, we have determined that the Force Review Division is sufficiently staffed and resourced for the review of firearm pointing incidents (with 1 Sergeant and 10 police officers). Meeting these staffing and resources requirements required persistent attention from the Force Review Division and its Commander throughout 2020 and the COVID-19 pandemic. Early on in the pandemic, the Force Review Division struggled with attracting qualified candidates and interviewing qualified candidates. However, that problem appears to have been resolved. Another challenge was that Force Review Division staff was deployed during the summer's civil unrest.[124] The most recent Notice of Job Opportunity (NOJO) posting attracted 38 candidates; the current Force Review Division staffing level is 1 Commander, 1 Lieutenant, 6 Sergeants, and 37 police officers. The Force Review Division's request for a detail of 13 additional personnel is currently pending. Despite these staffing challenges, in the third quarter of 2020, there were 695 firearm pointing incidents, and the Force Review Division reviewed 1,014 firearm pointing incidents, which included pointing events from previous quarters (*FRD Quarterly Report 2020 Q3*).

In sum, the City and the CPD completed notable activities for ¶193 during the second reporting period, resulting in Secondary Compliance. We will continue to assess Operational compliance for ¶193 in future reporting periods, as resource and staffing needs may change over time. We will also continue to assess whether the Force Review Division Pointing Section remains sufficiently staffed to meet the 30-day review goal and other Consent Decree requirements.

---

[124] This not only put a strain on the Force Review Division's resources, but because the Force Review Division is not equipped with body-worn cameras, deploying the Force Review Division also presented a potential risk to the Force Review Division's credibility.

# Use of Force: ¶194

> **194.** *CPD officers will not be required to notify OEMC of the pointing of a firearm at a person when the CPD officer is a SWAT Team Officer responding to a designated SWAT incident, as defined in CPD Special Order S05-05, or an officer assigned to a federal task force during the execution of federal task force duties.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶194.

To evaluate Preliminary compliance with ¶194, we reviewed Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019, which states in Section II.A:

> *Beginning 1 November 2019, whenever a Department member points a firearm at a person while in the performance of his or her duties, the member is required to make the appropriate notification consistent with the procedures and exceptions outlined in this directive.*
>
> *EXCEPTION: The notification requirement does not include:*
>
> *1. Department members assigned as a Special Weapons and Tactics (SWAT) Team member who point a firearm at a person during the course of a designated SWAT incident.*
>
> *2. Department members assigned to a federal task force, as designated by formal agreement between the Department and a federal law enforcement agency, who point a firearm at a person during the execution of the federal task force duties. This exception does not apply to Department members assisting or working in conjunction with a federal task force but who are not officially assigned to the task force or executing federal task force duties.*

We find the City and the CPD in Preliminary compliance with ¶194. During this reporting period, the Use of Force Working Group expressed that firearm pointing incidents should be considered a use of force and should result in a TRR. We have

expressed prior concerns over firearm pointing incidents for which there is no arrest report or ISR. We will continue to monitor these issues in the future as it assesses compliance in future reporting periods.

# Use of Force: ¶195

> **195.** *CPD officers will not be required to notify OEMC of any un-holstering or display of a firearm or having a firearm in a "low ready" position during the course of an investigation, unless the firearm is pointed at a person.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶195.

To evaluate Preliminary compliance with ¶195, we reviewed Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019, which states in Section II.B:

> *Department members are not required to make a notification for any unholstering or display of a firearm or having the firearm in a "ready" position (e.g., low ready, position "SUL") or any other position during the course of an incident, unless the firearm is pointed at a person.*

We find the City and the CPD in Preliminary compliance with ¶195 and will assess Secondary compliance in the next reporting period.

# Use of Force: ¶196

> **196.** *The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. Beginning January 1, 2020, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing these occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding the whether the Monitor's recommendations should be implemented will be resolved by the Court.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**            December 31, 2021       ✓ **Not Yet Applicable**

**Preliminary:**    *In Compliance* (SECOND COMPLIANCE PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**           *Not Yet Assessed*

In the third reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶196.

Paragraph 196—along with a few other paragraphs in the Consent Decree—is written to highlight the IMT's actions or reviews but ultimately relates to City responsibilities. In the prior reporting period, we noted that the City and the CPD have the necessary policies and procedures to collect the requisite information on firearm pointing incidents. Thus, the City and the CPD met Preliminary compliance with ¶196.

To evaluate Secondary compliance, we assessed whether the CPD has developed appropriate training for staff about documenting, recording, and maintaining data related to firearm pointing incidents. Per the *Firearm Pointing Incident Review SOP*, "All members of the FRD [(Force Review Division)] are required to receive a minimum of 8 hours of in-service training yearly on the United States Constitution Fourth Amendment including training on Stop and Frisk, Terry Stops, and Warrantless Searches." As described in detail for ¶192, the CPD has sufficiently trained Force Review Division staff in firearm pointing reviews. The City and CPD have met Secondary compliance for ¶196.

As it began doing in the prior reporting period, the CPD provided the IMT and the OAG with data to conduct a review and analysis of firearm pointing incidents annually. First, on December 31, 2020, the CPD supplied raw data on the number of firearm pointing incidents, indicating those associated with arrest and investigatory stop reports. The CPD is in the process of building a Tableau dashboard to facilitate the IMT and OAG's review of this data, to include data at the district/unit level. The CPD aims to have this dashboard available in the first quarter of 2021. Second, the CPD continued to share quarterly reports (first, second, and third quarters) in 2020, which include details regarding the activities and data for firearm pointing incidents.

The third quarter report states that from July 1, 2020, to September 30, 2020, the CPD generated 695 firearm pointing incident reviews for Force Review Division. The calls for service/incident types that generated the largest amount of firearm pointing incidents were traffic stops (159 incidents, 23%), person with a gun (131 incidents, 19%), street stops (51 incidents, 7%), and foot pursuits (42 incidents, 6%). These are similar trends for incident type from the last reporting period. The report also states of the 695 pointing incidents, 88 (12.6%) did not have an associated ISR or arrest report and were therefore not reviewed. As described in ¶192 and in previous reporting periods, we continue to have concerns about approximately 15% of pointing incidents that only receive a cursory review, due to the fact that no ISR or arrest report was submitted. We also question the need for exceptions in pointing incidents.

The Force Review Division has made notable progress in the last year in its analysis and identification of trends and providing recommendations to the Department for corrective actions.

For example, the Force Review Division identified traffic stops as the single largest reason for pointing incidents and also recommended it be addressed in 2021 training, which the Training and Oversight committee approved. The draft 2021 Use of Force in-service lesson plan submitted during this reporting period addresses traffic stops but does not yet appear to adequately address the nexus between pointing incidents and traffic stops.

Another example is an issue identified by us in the prior reporting period, which the Force Review Division also identified and has monitored: body-worn camera compliance and use. There has been a persistent problem with the proper use of body-worn cameras, specifically regarding activating and terminating their use. This problem appears to remain based on data reported by the Force Review Division for 2020. In the third quarter, of 717 reported incidents, 126 had debriefing points related to body-worn cameras (late activation, no activation, early termination, or other body-worn-camera issue). As a result of this continued trend, the

Force Review Division recommended to the Training and Oversight Committee additional body-worn-camera training, which will be included in the 2021 Use of Force in-service training. The CPD also conducted mandatory eLearning on body-worn cameras during 2020 and reports a 99% completion rate.

In the prior reporting period, the CPD identified compliance issues in District 11, particularly among the tactical teams. The 11th District Executive Officer submitted a Body-Worn Compliance Plan, which included:

1.  Roll-call training on proper use of body-worn cameras;

2.  Tactical team members were issued a copy of S03-14;

3.  An order was discussed;

4.  eLearning module regarding reviews of body-worn-camera footage;

5.  Tactical team sergeants to ensure people in compliance;

6.  Sergeants to look at report weekly;

7.  The Tactical Lieutenant will do random reviews of body-worn-camera footage; and

8.  Tactical Lieutenant will review compliance after 30 days for improvement.

The Commander of the 11th District submitted compliance reports for the months May–September, demonstrating corrective actions to Force Review Division's identified issue.

We recommend the CPD continue identifying districts/units with similar problems and take similar action.

Another issue we identified in the prior reporting period was that saturation teams did not have body-worn cameras. We noted it is essential for specialized units and teams to be issued cameras, given their expected role in working in districts with high rates of violent crime. During this reporting period, we interviewed members of specialized units, and all reported being equipped with body-worn cameras. Additionally, some members of police districts and specialized units supported the use of body-worn cameras and expressed that the cameras support them in their job.

We recommend that, if responding sergeants identify issues like the ones described above in their initial review, they have a means to document the problem.

Force Review Division should not be solely responsible for enforcing the Department's firearm pointing policies, and accountability needs to be present at the district level.

Moving forward, we will continue to assess compliance. The focus will be on evaluating and developing a better understanding of the types of firearm pointing incidents that do not have an associated ISR or arrest report, examining district and unit-level data in the CPD's forthcoming dashboard, and determining whether the CPD is addressing pointing issues.

# Use of Force: ¶197

> **197.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use Tasers.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶197.

To evaluate Preliminary compliance with ¶197, we focused our review on whether the City and the CPD received the requisite community input for Uniform and Property U04-02-02, *Control Devices and Instruments*, issued previously in January 2016, and General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group provided 14 recommendations regarding G03-02-04, none of which related to the certification of Tasers.

U04-02-02 addresses the requirements of ¶197 to require certification of Tasers in Section III, "Taser Devices." Specifically, Section III.B.3 states:

> *Tasers will be carried, handled, tested, and deployed only by members who have completed Department-conducted training and all required certifications and re-certifications on their safe handling and discharging.*

This policy also states that recertification will be "completed annually" (Section III.B.4), District station supervisors will "ensure all available Tasers are issued to sworn members who are trained and certified to use the devices" (Section III.C.1.a), and the CPD members "who have successfully completed training are the only members authorized to wear a Taser holster" (Section III.E.2. NOTE).

Further, Special Order S11-03-01, *Annual Prescribed Weapon Qualification Program and Taser Recertification*, dated January 13, 2016, requires members to be recertified annually, and policy also accounts for documentation (Section IX.B). We find the City and CPD in Preliminary compliance for ¶197.

We look forward to verifying whether an adequate proportion of personnel have completed the 2020 Use of Force in-service training in support of Secondary compliance with ¶197, paying specific attention to education on Taser certification requirements and changes in training as a result of changes in G03-02-04.

# Use of Force: ¶198

**198.** *CPD will instruct officers that Tasers can cause serious injury or death and, as a result, officers should use Tasers only after balancing relevant factors including the threat presented by the subject, the risk of injury if a Taser is used, and the seriousness of the suspected offense. Consistent with this standard, CPD officers should not use Tasers against persons who are reasonably perceived to be non-violent, unarmed, and suspected of low-level offenses, such as property-related misdemeanors, quality of life offenses, moving or traffic violations, or municipal code violations.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶198.

To evaluate Preliminary compliance with ¶198, we focused our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group provided 14 recommendations regarding G03-02-04 and engaged in extensive discussion with the CPD regarding prohibitions of Taser use. Specifically related to ¶198, the Working Group recommended:

- The prohibition Taser use unless the person presents an immediate threat of serious bodily harm to themselves or another person;

- Using Tasers as a last resort, only when necessary, and only in proportion to the threat, actions, and level of resistance offered by the subject; and

- Prohibiting the discharge of a Taser or ECW unless the Department member has exhausted available lesser measures or available lesser measures would not be effective.

The CPD and the Working Group agreed to continue discussion about Taser use into 2021. Thus, we will continue to assess Preliminary compliance for ¶198 in the fourth reporting period.

During this reporting period, the CPD continued to provide data on the number of Taser incidents by year in its public Use of Force dashboard and in a Tableau dashboard for the IMT (TRR by Force Option). See Use of Force Figure 8 for detailed numbers on Taser use. This data shows a notable decline in Taser use, by about two-thirds, since 2015. Additionally, from December 2015 to June 2018, COPA reported seven cases related to Taser use.

Use of Force Figure 8:                                   Taser Incidents, 2015 to 2020

| | Taser Incidents | Percentage of TRRs |
|---|---|---|
| Third Reporting Period (March 1, 2020, to December 31, 2020) | 125 | 3.06% |
| 2020 | 149 | 3.05% |
| 2019 | 203 | 5.03% |
| 2018 | 207 | 5.24% |
| 2017 | 383 | 8.29% |
| 2016 | 474 | 9.82% |
| 2015 | 447 | 7.90% |

# Use of Force: ¶199

**199.** *CPD will clarify in policy that flight alone, without any other basis for reasonable articulable suspicion or probable cause, does not justify use of a Taser against a subject.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶199.

To evaluate Preliminary compliance with ¶199, we focused our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group discussed flight and the use of Tasers. Of the Working Group's 14 recommendations regarding G03-02-04, one pertained to flight or possession of weapon. Specifically, the Working Group recommended that possession of a weapon and flight alone should not be sufficient to justify use of a Taser—the person must present an immediate threat of death or serious injury or harm to another person. The CPD issued a revised policy on December 31, 2020, addressing this recommendation to restricting use of a Taser on a subject whose only action is flight alone (Section II.D.7). The policy states:

> *Fleeing Persons. Tasers will not be used on a subject whose ONLY action is flight alone, without any other basis for establishing reasonable articulable suspicion or probable cause.*

> *NOTE: The use of a Taser on a fleeing person is only authorized when in compliance with Item II-C of this directive.*

The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶199.

# Use of Force: ¶200

> **200.** When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after deployment of a Taser. When safe and feasible to do so, CPD officers will allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Taser, unless doing so would compromise the safety of an officer or another person.

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶200.

To evaluate Preliminary compliance with ¶200, we focused on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. Of the Use of Force Working Group's 14 recommendations regarding G03-02-04, one pertained to de-escalation and use of Tasers. As a result of discussions with the Working Group on this issue, the CPD added language to G03-02-04 regarding de-escalation (Section II.B):

> *De-Escalation. Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time, in accordance with G03-02, "De-escalation, Response to Resistance, and Use of Force."*

As noted for other paragraphs, the Working Group believes "safe and feasible" is a vague term and raised this concern on multiple occasions. While this phrase has been removed from the language regarding de-escalation, it continues to appear in Section III.B and in other related policies, like Section III of General Order G03-02-01, *Response to Resistance and Force Options*.

The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶200.

# Use of Force: ¶201

**201.** *CPD will strongly discourage the use of Tasers in schools and on students. CPD will require officers to consider the totality of the circumstances, including a subject's apparent age, size, and the threat presented, in assessing the reasonableness and necessity of using a Taser in a school.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶201.

To evaluate Preliminary compliance with ¶201, we focused our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. One of the Working Group's 14 recommendations regarding G03-02-04 was to prohibit use of Tasers against children and students in schools, as well as against adults in schools unless necessary to prevent an imminent threat or death or serious bodily harm to themselves or another person.

While the CPD did not accept this recommendations in its issued December 31, 2020 Use of Force policies, the CPD and the Working Group agreed to continue discussion about Taser use into 2021. We will continue to monitor related issues and conversations for ¶201.

We look forward to assessing the CPD's progress with ¶201.

# Use of Force: ¶202

**202.** *CPD officers will treat each application or standard cycle (five seconds) of a Taser as a separate use of force that officers must separately justify as objectively reasonable, necessary, and proportional. CPD will continue to require officers to, when possible, use only one five-second energy cycle and reassess the situation before any additional cycles are given or cartridges are discharged. In determining whether any additional application is necessary, CPD officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶202.To evaluate Preliminary compliance with ¶202, we focused our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. The community and the Use of Force Working Group provided 14 recommendations regarding G03-02-04, none of which covered energy cycle requirements noted in ¶202. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶202. Further, we will review the number of incidents when multiple energy cycle events occur. Although the TRR collects information about multiple energy cycle events, and the CPD dashboard displays the number of incidents involving Taser use, the dashboard does not indicate which of those incidents involve multiple cycle events.

# Use of Force: ¶203

> **203.** *CPD will require that if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the officer has not gained control, officers switch to other force options unless the officer can reasonably justify that continued Taser use was necessary to ensure the safety of the officer or another person, recognizing that prolonged Taser exposure may increase the risk of death or serious injury.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶203.

To evaluate Preliminary compliance with ¶203, we focused our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. The community and the Use of Force Working Group provided 14 recommendations regarding G03-02-04, one of which focused on limiting the number of Taser discharges to no more than two cycles, consistent with national best practice. G03-02-04 limits the use to three, five-second energy cycles. If the member has not gained control at that time, when safe and feasible to do so, the member will switch to other force options unless the member can reasonably justify the continued Taser use to ensure safety of the member or another person (Section III.B.7). The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree and limiting exposure to three cycles. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶203.

# Use of Force: ¶204

*204. CPD officers must: a. determine the necessity, objective rea-sonableness, and proportionality of Taser use based on the total-ity of the circumstances, including the subject's apparent age, size, physical and mental condition, disability, and impairment; b. not use Tasers in drive-stun mode unless the subject is an as-sailant and other force options are not readily available or would otherwise be ineffective; c. when practicable, avoid the use of Tasers when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is elevated above the ground, if the subject is operating or riding any mode of transportation, or if the subject may be less able to catch or protect themselves in a fall; d. not use Tasers in any environment that contains potentially flammable, volatile, or explosive mate-rial; e. not use Tasers on a subject who is at a greater risk of se-rious injury or death from Taser use, including, but not limited to, children, pregnant individuals, and the elderly, unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; f. target the Taser in probe mode at the lower center mass and avoid the head, neck, and genitalia; g. not activate more than one Taser at a time against a subject, unless an officer already attempted to use a Taser against the subject but the probes did not make contact with the subject; and h. keep Tasers in a weak-side holster.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but re-main under assessment for, Preliminary compliance with ¶204.

To evaluate Preliminary compliance with ¶204, we focused our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. As noted in the previous reporting period, G03-02-04 addresses all the requirements of ¶204 in multiple sections (Section C.2.f, Section D, and Section E). The Use of Force Working Group provided 14 recom-mendations regarding G03-02-04, which resulted in a revision to the policy related to de-escalation and fleeing subjects. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree and related recommendations from the Working Group. The CPD and the Working

Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

COPA has jurisdiction over excessive force allegations and reported seven Taser cases pending from 2016–2018. The case portal shows no cases alleging excessive force for this reporting period, March 1, 2020, to December 31, 2020.

We look forward to assessing the CPD's progress with ¶204.

# Use of Force: ¶205

**205.** *CPD officers must request medical aid for a person sub-jected to a Taser application. CPD officers must place any person subjected to a Taser application in a position that does not im-pair respiration, as soon as it is safe and feasible to do so. CPD officers must render life-saving aid to injured persons consistent with their training until medical professionals arrive on scene. Only trained medical personnel may remove Taser probes from a subject.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not In Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but re-main under assessment for, Preliminary compliance with ¶205.

To evaluate Preliminary compliance with ¶205, we focused our review on whether the City and the CPD received the requisite community input for General Order G03-02-04, *Taser Use Incidents*. As noted in the previous reporting period, the pol-icy refers to the post-discharge responsibilities of the discharging member (Section IV.A.1-4) and removing barbs (Section II.D.3), which remain in the December 31, 2020 version. Further, revised General Order 03-02, *De-escalation, Response to Re-sistance, and Use of Force*, notes that CPD members will provide life-saving aid consistent with their training (Section V.B) and that members will not interfere with emergency medical personnel when treating an injured person (Section V.D). G03-02-04 does not include this updated language, and we believe it should be added.

The Use of Force Working Group provided 14 recommendations regarding G03-02-04, none of which covered medical aid. The CPD issued updated Use of Force policies on December 31, 2020, and agreed to continue discussions on the policies with the Use of Force Working Group into 2021.

We look forward to assessing the CPD's progress with ¶205.

# Use of Force: ¶206

**206.** *CPD will conduct Taser inspections on a periodic basis to perform information downloads, ensure Tasers are operable, and perform necessary maintenance or repairs.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD reached Preliminary compliance with ¶206.

To evaluate Preliminary compliance with ¶206, we focused our review on whether the City and the CPD received the requisite community input for Uniform and Property 04-02-02, *Control Devices and Instruments*. The community and the Use of Force Working Group provided recommendations related to General Order 03-02-04, *Taser Use Incidents*, but did not raise concerns or provide recommendations related to the inspection and maintenance of Tasers. Thus, we find the City and the CPD in Preliminary compliance for ¶206.

We look forward to reviewing documentation and training regarding Taser inspections and downloads to assess Secondary compliance.

# Use of Force: ¶207

> **207.** *CPD officers may use OC devices only when such force is objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶207.

To evaluate Preliminary compliance with ¶207, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy. The community and the Use of Force Working Group provided eight recommendations regarding this directive. Specific to ¶207, the Working Group recommended prohibiting the use of OC spray or other chemical agents against a person unless the person presents an immediate threat of bodily harm to another person. The Working Group also suggested amending its policies to state that officers are prohibited from using such chemical agents against passively resisting protestors. On December 31, 2020, the CPD issued revised Use of Force policies, which included further language regarding de-escalation in G03-02-05:

> *Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time, in accordance with G03-02, De-Escalation, Response to Resistance and Use of Force.*

Thus, as result of dialogue with the Use of Force Working Group, the CPD now requires de-escalation in circumstances when officers may consider using OC spray or other chemical agents. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

# Use of Force: ¶208

**208.** *CPD officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶208.

To evaluate Preliminary compliance with ¶208, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy. The community and Use of Force Working Group provided eight recommendations regarding this directive. Specific to ¶208, the Working Group recommended prohibiting the use of OC spray or other chemical agents to disperse crowds and against groups of people that contain any person who does not present an imminent risk of bodily harm to another person. While the CPD did not accept these recommendations, it did issue Department Notice D20-08 *Reporting the Response to Crowds, Protests, and Civil Disturbances* on November 2, 2020, which requires officers to fill out a TRR for deployment of OC spray.[125] The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶208.

---

[125] D20-08 replaced another policy—S03-22, *Response to Crowds and Civil Disturbances*—which was issued pursuant to ¶631 on August 27, 2020, and rescinded on November 2, 2020.

# Use of Force: ¶209

**209.** *When safe and feasible to do so, CPD officers must issue verbal commands and warnings to the subject prior to, during, and after the discharge of an OC device. When safe and feasible to do so, CPD will require officers to allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device, unless doing so would compromise the safety of an officer or another person.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶209.

To evaluate Preliminary compliance with ¶209, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy. The community and Use of Force Working Group provided eight recommendations regarding this directive. Specific to ¶209, the Working Group recommended prohibiting the use of OC spray and other chemical agents against individuals characterized as resistors. It also recommended that the CPD use OC spray as a measure of last resort after all efforts of de-escalation have been exhausted and no lesser means is available. As noted for prior paragraphs, the Working Group believes "safe and feasible" is a vague term and raised this concern on multiple occasions. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

# Use of Force: ¶210

**210.** *Each individual application of an OC device (e.g., each spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶210.

To evaluate Preliminary compliance with ¶210, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy. The community and Use of Force Working Group did not raise concerns or provide recommendations related to the requirement of justifying each application. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

According to the publicly available Use of Force dashboard, there were a total of 302 TRRs indicating use of OC spray between 2015 and 2020.[126] The TRRs per year are as follows: 2015 (104 TRRs), 2016 (42), 2017 (36), 2018 (18), 2019 (38), and 2020 (64). Between 2016 and 2019, the average number of TRRs reporting use of OC spray per year was 35. More analysis is needed, but the near-doubling of OC spray use in 2020 may be attributable to the summer's unrest. There were 38 TRRs submitted in July and August 2020 for OC spray use.

We look forward to assessing the CPD's progress with ¶210, including by reviewing the number of instances when OC device applications are made. Currently the CPD dashboard counts the number of incidents, but it does not count multiple application events.

---

[126] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

# Use of Force: ¶211

***211.*** *CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment).*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶1211.

To evaluate Preliminary compliance with ¶211, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy. The community and the Use of Force Working Group provided eight recommendations regarding this directive. Related to ¶211, the Working Group recommended that all officers who deploy OC spray or other chemical agents be in possession of decontamination and water flushing resources before deploying chemical agents. These recommendations and the requirements of ¶211 are addressed in G03-02-05 in Section IV, *Post-Discharge Responsibilities*, specifically effect mitigation and decontamination (IV.A.2) and requesting medical aid (IV.B.2). The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶211.

# Use of Force: ¶212

> ***212.*** *CPD officers may only use department-issued or approved OC devices.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | ***In Compliance*** (SECOND REPORTING PERIOD) |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶212. The Use of Force Working Group did not raise any concerns related to CPD officers only using department-issued or approved OC devices.

To assess Secondary compliance, we aim to review the CPD's measures to ensure officers are carrying authorized OC devices (e.g., training records and periodic inspections). We did not have access to such records during the third reporting period to conduct this assessment and look forward to receiving them in the next reporting period.

# Use of Force: ¶213

> **213.** *CPD officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶213.

To evaluate Preliminary compliance with ¶213, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents*, and finalized the policy. The community and Use of Force Working Group provided five recommendations regarding this directive. Specific to ¶213, the Working Group recommended more explicit language in the policy regarding prohibition of strikes to the head or neck, except when deadly force is justified. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

According to the publicly available Use of Force dashboard, there were a total of 414 TRRs indicating use of an impact weapon or baton between 2015 and 2020. The TRRs per year are as follows: 2015 (81 TRRs), 2016 (37), 2017 (39), 2018 (41), 2019 (39), and 2020 (177).[127] Between 2016 and 2019, the average number of TRRs reporting use of an impact weapon or baton per year was 39. More analysis is needed, but the more-than-four-fold increase in 2020 may be attributable to the summer's unrest. In 2020, there were 29 TRRs reporting impact weapon or baton use submitted in May, 69 in July, and 45 in August.

We look forward to assessing the CPD's progress with ¶213.

---

[127] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

# Use of Force: ¶214

**214.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after using an impact weapon.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶214.

To evaluate Preliminary compliance with ¶214, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents*, and finalized the policy. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding verbal commands and warnings prior to, during, and after using an impact weapon. As noted for prior paragraphs, the Working Group believes "safe and feasible" is a vague term and raised this concern on multiple occasions. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree. Further, the revised version of G03-02, *De-Escalation, Response to Resistance, and Use of Force*, also addresses this paragraph in Section III.C.2.a, stating that examples of de-escalation techniques include "providing a warning and exercising persuasion and advice prior to the use of force." The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶214.

# Use of Force: ¶215

**215.** *CPD officers must receive training on proper use of an impact weapon before being permitted to carry such weapon.*

### Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶215.

To evaluate Preliminary compliance with ¶215, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents*, and finalized the policy. The community and the Use of Force Working Group provided five recommendations regarding this directive, none of which were related to training. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶215.

# Use of Force: ¶216

> **216.** *CPD officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. CPD officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶216.

To evaluate Preliminary compliance with ¶216, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents*, and finalized the policy. The community and Use of Force Working Group provided five recommendations regarding this directive, none of which were related to rendering aid.

However, per feedback from the IMT and OAG during this reporting period, the CPD updated G03-02, *De-Escalation, Response to Resistance, and Use of Force*, in Section V.B to reflect that Department members will, not may, render medical aid:

> *[A]s soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on the scene.*

This language is not present in G03-02-07 and should be included. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶216.

# Use of Force: ¶218

*218. CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *In Compliance* (NEW)
**Secondary:**          *Under Assessment*
**Full:**          *Not Yet Assessed*

In the third reporting period, the City and the CPD met Preliminary compliance with ¶218.

To evaluate Preliminary compliance with ¶218, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. In the prior reporting period, the CPD changed (on February 29, 2020) the number of levels of force (from four to three), as required by the Consent Decree. This change was important progress towards Preliminary compliance.

In this third reporting, the CPD engaged the community and the Use of Force Working Group in discussions regarding the Use of Force policy suite. The Working Group raised two concerns regarding ¶218, recommending (1) the expansion of reportable use-of-force incidents to include firearm pointing and other actions that are considered intimidating and (2) prohibiting chokeholds under any circumstance. On December 31, 2020, after extensive and ongoing dialogue between the CPD and the Working Group, the CPD issued revised Use of Force policies, including G03-02 *De-Escalation, Response to Resistance, and Use of Force*, that further addresses chokeholds, emphasizing that chokeholds are to only be used as last resort and elaborating on prohibitions. We find the City and CPD in Preliminary compliance with ¶218.

To evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training course, to include the updated three levels of reportable use of force. The sixth hour of the eight-hour training discusses tactical response reports (TRRs), General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and the three new levels of reportable use of force. As of December 31, 2020, 70% of CPD officers have completed the 2020 Use of Force in-service training. Further, the CPD plans to deliver an eLearning on the Use of Force policy changes reflected in the December 31, 2020-issued policies in February 2021. This eLearning will be in addition to the 40 hours of in-service training required for 2021.

Due to the COVID-19 extension, in the next reporting period, we will continue to assess the City's progress towards completing the 2020 Use of Force training by March 4, 2021, and training on revisions to the Use of Force policy suite for Secondary compliance for ¶218. Furthermore, we have identified additional relevant issue areas that we will monitor in future reporting periods for ¶218. First, the civil unrest in Chicago in the summer of 2020 following the death of George Floyd brought to light potential gaps in CPD policy and practice related to reporting uses of force during mass demonstrations and protests. We are preparing a special report on the City's and the CPD's response to these events and further findings and analysis regarding reported or unreported force during mass demonstrations will be included in the next reporting period. We have also engaged in discussions with the CPD and COPA relative to any unreported use-of-force complaints, where there

was no corresponding TRR, for which data was unavailable. The Force Review Division submitted a report dated November 30, 2020, indicating they had generated two complaint logs for officers who failed to report uses of force.

# Use of Force: ¶219

> *219.* *Whenever a CPD member engages in a reportable use of force, the member must complete a TRR, or any similar form of documentation CPD may implement, prior to the end of his or her tour of duty. In addition to completing the TRR, officers must also document the reason for the initial stop, arrest, or other enforcement action per CPD policy. CPD may allow members requiring medical attention a reasonable amount of additional time to complete the required documentation. CPD may allow supervisors to complete the TRR for members who are unable to complete the report due to injury or in other extraordinary circumstances.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶219.

To evaluate Preliminary compliance with ¶219, we reviewed G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses all of the requirements of this paragraph. Additionally, the Use of Force Working Group provided 12 recommendations regarding this directive, some of which the CPD addressed, including clearly stating that the overarching purpose of TRRs is to document, investigation, evaluate, and analyze officer use of force. The policy now states:

> *Tactical Response Reports (TRRs) are used by the Department to: (1) document, investigate, and evaluate reportable use of force incidents where members respond to the actions of a subject, including any force mitigation efforts, or when members use a reportable use of force. A TRR is also completed when a Department member is assaulted or battered by an individual and no response option was used by the member. (2) regularly review citywide and district-level data regarding reportable uses of force to: (a) assess the relative frequency and type of force used by CPD members. (b) identify any patterns, trends, or emerging concerns relative to the use of force incidents reviewed by the Force Review Division. The Force Review Division will review reportable uses of force and recommend specific modifications to*

> *existing policy, procedures, training, tactics, or equipment, consistent with the Department directive titled "Department Review of Use of Force."*

Furthermore, Section IV.B of G03-02-02 details requirements of ¶219 for completing the TRR. Specifically, subsection c.1 states:

> *The involved member will be required to complete the "Narrative" section of the TRR: (1) describing with specificity, the use of force incident, the subject's actions or other circumstances necessitating the force used, and the involved member's response, including force mitigation efforts (e.g., verbal direction/control techniques) and specific types and amount of force used.*

The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree. Thus, we find the City and the CPD in Preliminary compliance for ¶219.

We look forward to verifying whether an adequate proportion of personnel have completed the 2020 Use of Force in-service training in support of Secondary compliance with ¶219.

# Use of Force: ¶220

**220.** *In completing the TRR, or whatever similar documentation CPD may implement, CPD members must include a narrative that describes with specificity the use of force incident, the subject's actions, or other circumstances necessitating the level of force used; and the involved member's response, including de-escalation efforts attempted and the specific types and amounts of force used. The narrative requirement does not apply to CPD members who discharged a firearm in the performance of duty or participated in an officer-involved death in the performance of duty. Any CPD member who observes or is present when another CPD member discharges a firearm or uses other deadly force must complete a written witness statement prior to the end of his or her tour of duty. CPD members will note in their TRRs the existence of any body-worn camera or in-car camera audio or video footage, and whether any such footage was viewed in advance of completing the TRR or any other incident reports. CPD members must complete TRRs, or whatever similar documentation CPD may implement, and other reports related to the incident, truthfully and thoroughly.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶220.

To evaluate Preliminary compliance with ¶220, we reviewedG03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses all of the requirements of this paragraph. Specifically, Section IV.B.1.c, *Completing the Tactical Response Report*, describes details concerning specificity in the TRR narrative section and the need to indicate whether or not body-worn camera or in-car video was viewed in advance of completing the TRR. The exception for not completing the narrative section of the TRR for firearm discharges is also noted in this section. In addition, the CPD's TRR form has a text box under the section "Notifications and Narrative" that requires members to indicate whether body-worn camera or in-car video or other video was viewed before completing the report. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree. Thus, we find the City and the CPD in Preliminary compliance for ¶220.

We look forward to verifying whether an adequate proportion of personnel have completed the 2020 Use of Force in-service training in support of Secondary compliance with ¶220.

# Use of Force: ¶221

> **221.** *Any CPD member who engages in a reportable use of force must immediately report the incident to OEMC. OEMC is required to notify the involved member's immediate supervisor and the Watch Operations Lieutenant of the district of occurrence.*

## Compliance Progress

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary and Secondary compliance with ¶221.

To evaluate Preliminary compliance with ¶221, we reviewed G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, which addresses all of the requirements of this paragraph. Specifically, Section IV.A, *Procedures, Immediate Notifications*, details that members will immediately notify OEMC that he or she has been involved in a reportable use-of-force incident. It further details that OEMC will immediately notify the member's immediate supervisor and watch operations lieutenant of the district of the occurrence. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree. Thus, we find the City and the CPD in Preliminary compliance for ¶221.

These policy requirements have been in effect since October 16, 2017, and the Department has trained on these notification procedures in its annual 2018 and 2019 Use of Force in-service training. Thus, we find the CPD in Secondary compliance for ¶221.

Moving forward, we will assess Full compliance with ¶221. The CPD has established a dashboard to track and report supervisor on-scene responses for TRRs by force level, which we will examine. It is the expectation, based on interviews conducted by the IMT in 2019 and 2020, that officers who use force notify OEMC and that supervisors are notified and respond.

# Use of Force: ¶222

**222.** *A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.*

**Compliance Progress**        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶222 but did not reach Secondary compliance.

To evaluate Secondary compliance with ¶222, we continued reviewing the development, implementation, and evaluation of the eight-hour 2020 Use of Force in-service training course, to include the updated three levels of reportable use of force. The sixth hour of the training discusses tactical response reports (TRRs), G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and the three new levels of reportable use of force. As of December 31, 2020, 70% CPD officers have completed the 2020 Use of Force in-service training.

In addition to the 2020 Use of Force in-service training, the CPD has developed an in-service supervisor refresher course, which it will apply toward the supervisor in-service training hour requirement in 2021. The CPD shared the training materials with the IMT and OAG for review and comment on December 9, 2020. The materials include: In-Service Supervisor Training PowerPoint slide deck, In-Service Supervisor Training lesson plan, a *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)*, and a *TRR Training Worksheet for Supervisors*. The eight-hour supervisory training includes a section (hour seven) on TRR issues, including report writing, use of force, and comments from the audit division and the Force Review Division. Within this section, the training addresses the requirement for supervisors to respond to level 2 and level 3 use-of-force incidents, and to determine if there is a need to respond to a level 1 incident.

In the next reporting period, we will continue to assess the City's progress towards Secondary compliance through its completing the 2020 Use of Force training, providing eLearning training on the revisions to the Use of Force policy suite, and delivering the in-service supervisor refresher course in 2021.

On July 30, 2020, we reviewed the CPD Office of Operational Compliance's *Audit of Supervisory Review of Use of Force Incidents*. The purpose of the audit was to assess the extent to which CPD supervisors are responding to and reviewing use-of-force incidents in accordance with the Consent Decree. The audit examined 9,675 TRRs submitted for incidents occurring from January 1, 2018, to December 31, 2019. While the audit report states that appropriate supervisors responded to and reviewed nearly every use-of-force incident reported between 2018 and 2019, it does not provide data to substantiate how often supervisors responded to level 1, 2, or 3 incidents. It does, however, provide such data for supervisor review of such incidents. Further, upon IMT interviews and discussion with the CPD, it appears unlikely that the CPD or the OEMC have the capacity to determine the average supervisor response time to level 2 or level 3 incidents in order to make an assessment of whether CPD supervisors "immediately" responded to the scene. However, in interviews conducted with both supervisors and officers in 2019 and 2020, it was widely acknowledged that supervisors readily respond to level 2 and level 3 incidents. In addition, the responding supervisor is required to indicate on the TRR whether there was an on-scene supervisor response. In reviewing the Force Review Division quarterly reports and Force Review Division 2019 Annual Report, the Force Review Division does not report lack of supervisory response as an issue. Use of Force Figure 9 below breaks down supervisory response for level 1, 2, and 3 incidents during the reporting period.

Use of Force Figure 9:   Supervisory Response for Use of Force Incidents, by Level (March 1, 2020 to December 31, 2020)

| | Supervisory On-Scene Response | No Supervisory On-Scene Response | Null |
|---|---|---|---|
| Total Use of Force Incidents | 2,382 | 1,061 | 42 |
| Level 1 Incidents | 1,508 | 678 | 24 |
| Level 2 Incidents | 813 | 375 | 16 |
| Level 3 Incidents | 61 | 8 | 2 |

In sum, the CPD has made notable progress for ¶222 and has sought additional training opportunities to reinforce the responsibilities of supervisors through an in-service refresher training for supervisors in 2021. In the next reporting period, we will continue to assess the City's progress towards Secondary and Full compliance to ensure supervisors are properly trained and performing their duties for responding to level 2 and level 3 reported Use of Force.

# Use of Force: ¶223

> ***223.*** *For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness.*

## Compliance Progress       (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶223.

To evaluate Preliminary compliance with ¶223, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the supervisory responsibilities outlined in ¶223. Thus, we find the City and the CPD in Preliminary compliance for ¶223.

To evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewed materials provided for the 2021 in-service supervisor refresher training. The supervisor training details all the requirements of ¶223 and includes 27 PowerPoint slides that outline the responsibilities of all supervisors in the chain of command in dealing with use-of-force incidents—from the responding supervisor and reviewing supervisor to the Force Review Division and the Force Review Board. In addition, the CPD has issued a five-page *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* covering supervisory responsibilities in use-of-force incidents.

Furthermore, on July 31, 2020, the CPD Office of Constitutional Policing and Reform sent a message through the AMC to all units reminding all members of changes pertaining to supervisory responsibilities in the Use of Force policies (which had been revised on February 29, 2020). Specifically related to ¶223, the message describes the responsibilities of the reviewing supervisor for identifying and interviewing available witnesses to the extent reasonably possible.

In addition, we continued to assess supervisor understanding of their reviewing responsibilities, specific to ¶223. The *FRD Quarterly Report 2020 Q3* identified the below, related debriefing points for responding/reviewing supervisors, in order of most to least frequent debriefing point. Failure to request evidence technicians continued to be the most prevalent issue identified by the Force Review Division:

- Evidence Technician Not Requested (50 debriefings)

- Witness Box Issue (40 debriefings)

- TRR Review Deficiency (18 debriefings)

- Policy or Procedure Issue (12 debriefings)

In the next reporting period, we will continue to assess the City's progress with the Use of Force policies, including completing the 2020 Use of Force training by the March 4, 2021 COVID-19 extension and delivering the in-service supervisor refresher course in 2021. We will also monitor the CPD's eLearning training on the Use of Force policy changes reflected in the December 31, 2020-issued policies.

# Use of Force: ¶224

**224.** *In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.*

**Compliance Progress** (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance for ¶224.

To evaluate Preliminary compliance with ¶224 in, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. The CPD made revisions to G03-02-02, adding in details regarding the responsibility of supervisors for identifying and interviewing additional witnesses beyond those that are known and available. The community and the Use of Force Working Group provided recommended changes to the TRR form to require responding supervisors to address efforts to locate witnesses in the narrative section of the TRR. For example, the form should memorialize efforts and results to identify and interview witnesses, observations, or other actions taken that are not already captured in TRR fields. The CPD updated the TRR form to reflect these recommendations. The revised TRR form was issued with the Use of Force policies on December 31, 2020. With these revisions and engagement with the community on issues related to ¶224, we find the City and the CPD in Preliminary compliance.

As described for ¶222, to evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewed materials provided for the 2021 in-service supervisor refresher training. The supervisor responsibilities for ¶224 are covered in both of these trainings. Furthermore, on July 31, 2020, the CPD Office of Constitutional Policing and Reform sent an AMC message to all units reminding all members of changes pertaining to supervisory responsibilities in the Use of Force policies (revised on February 29, 2020). Specifically, the message described the responsibilities of the reviewing supervisor for identifying and interviewing available witnesses, to the extent reasonably possible, with the exception of where COPA receives an administrative notification and responds to the scene.

In the next reporting period, we will continue to assess the City's progress with the Use of Force policies, including completing the 2020 Use of Force training by the March 4, 2021 COVID-19 extension, training on the latest revisions to the Use of Force policies and TRR forms, and delivering the in-service supervisor refresher course in 2021.

# Use of Force: ¶225

**225.** *A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the third reporting period, the City and the CPD met Preliminary compliance with ¶225.

To evaluate Preliminary compliance with ¶225, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy, as required to achieve Preliminary compliance. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding the supervisory responsibilities outlined in ¶225. Additionally, the CPD revised the TRR form to address the requirements of this paragraph. Now, reviewing supervisors must note if they ordered the use of reportable force during an incident, which the prior version of the TRR form did not address. The CPD issued updated Use of Force policies and TRR forms on December 31, 2020, reflecting the requirements of the Consent Decree. Thus, we find the City and the CPD in Preliminary compliance for ¶225.

To evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewed materials provided for the 2021 in-service supervisor refresher training. The supervisor responsibilities for ¶225 are covered in both of these training courses. As noted in Independent Monitoring Report 2, the CPD's 2020 Use of Force in-service training provides instruction on policy updates specific to supervisors. The training course notes the requirement of ¶225:

> *A supervisor who used reportable force or ordered a use of reportable force during a use of force incident will not perform the functions and responsibilities of the reviewing supervisor or approving supervisor for the incident.*

The training course also describes that the watch operations lieutenant or responding exempt-level supervisor will determine the appropriate supervisor to respond. Further, the lesson plan for the forthcoming in-service supervisor refresher training states:

> *A supervisor involved in an incident cannot review or investigate the incident nor are they given the authority to assign another supervisor to do so.*

Furthermore, the CPD has incorporated this requirement in other resources and messages to ensure supervisors are fully aware of their responsibilities for the review and completion of TRRs. It is noted in the CPD's *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* and was addressed in an AMC message sent to all units from Office of Constitutional Policing and Reform on July 31, 2020. In the next reporting period, we will continue to assess the City's progress toward Secondary compliance in completing the 2020 Use of Force training by the March 4, 2021 COVID-19 extension, providing eLearning training on the revisions to the Use of Force policy suite, and delivering the in-service supervisor refresher course in 2021.

We began assessing Full compliance for ¶225 during this reporting period. The Force Review Division reported incidents in which a TRR was approved by an individual of the same rank in its quarterly reports for 2020 (one incident in the first quarter, none in the second quarter, and three in the third quarter). Further, the CPD Office of Operational Compliance's *Audit of Supervisory Review of Use of Force Incidents* found that of the 9,675 TRR incidents that were recorded and submitted on a TRR form in 2018 and 2019, there were only two (less than 0.01%) incidents in which a supervisor used force and then also performed the duties of a responding supervisor for the same incident. This demonstrates that most supervisors understand that aspect of their responsibilities and the requirements of ¶225. Additionally, the CPD supplies regular data on the extent of supervisors using force via the CPD "Use of Force by Department Member Rank" Tableau data dashboard. From January 1, 2019, to December 31, 2020, supervisors used force 675 times, accounting for 7.3% of TRRs. Use of Force Figure 10 provides additional data on supervisor use of force across monitoring periods.

Use of Force Figure 10:        Comparison of Use of Force by Supervisors

|  | Total (January 1, 2019 to December 31, 2020) | 1st Reporting Period (March 1, 2019 to August 31, 2019) | 2nd Reporting Period (September 1, 2019 to February 24, 2020) | 3rd Reporting Period (March 1, 2020 to December 31, 2020) |
|---|---|---|---|---|
| Use of Force (TRR) Total | 9,262 | 2,744 | 2,227 | 3,532 |
| TRR by Supervisor | 675 | 194 | 131 | 297 |
| Percentage of TRR by Supervisor | 7.3% | 7.1% | 5.9% | 8.4% |

# Use of Force: ¶226

**226.** *CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶226 but did not reach Secondary compliance.

To evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewed materials provided for the 2021 in-service supervisor refresher training. The supervisor responsibilities for ¶226 to document information collected and actions taken during the supervisory review are covered in both of these trainings thoroughly as well as in CPD's *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* and *TRR Worksheet for Supervisors*.

In addition, we continued to assess supervisor understanding for completing the supervisory section of the TRR. The Force Review Division Quarterly Reports for the first through third quarters reported the following related debriefing points for responding/reviewing supervisors (Use of Force Figure 11). Failure to request evidence technicians continued to be the most prevalent issue identified by the Force Review Division.

Use of Force Figure 11:    Comparison of Force Review Division Debriefing Points for Reviewing Supervisors

| | 2020 Quarter 1 (January 1, 2020 to March 31, 2020) | 2020 Quarter 2 (April 1, 2020 to June 30, 2020) | 2020 Quarter 3 (July 1, 2020 to September 30, 2020) |
|---|---|---|---|
| Total TRRs Reviewed | 469 | 489 | 717 |
| Evidence Technician Not Requested | 17 | 9 | 50 |
| Witness Box Issues | 10 | 1 | 40 |
| Sergeant Injury Not Documented | 2 | 8 | 15 |
| Narrative Deficiency – Sergeant's Narrative | 4 | 2 | 10 |

| | 2020 Quarter 1 (January 1, 2020 to March 31, 2020) | 2020 Quarter 2 (April 1, 2020 to June 30, 2020) | 2020 Quarter 3 (July 1, 2020 to September 30, 2020) |
|---|---|---|---|
| TRR Approval by Same Rank | 0 | 0 | 3 |

In the next reporting period, we will continue to assess the City's progress in demonstrating supervisors understand their responsibilities for completing the supervisory section of the TRR. We will also assess CPD's completion the 2020 Use of Force training by the March 4, 2021 COVID-19 extension and delivery of the in-service supervisor refresher course in 2021.

# Use of Force: ¶227

**227.** *Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.*

**Compliance Progress**            (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶227.

To evaluate Preliminary compliance with ¶227, we focused on review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding notifications of unreported uses of force. The Working Group and the CPD discussed types and amount of force, and the Working Group urged that firearm pointing and other acts of intimidation be categorized as uses of force. While the CPD and the Working Group did not agree on changes within the policy during this reporting period, they mutually agreed to continue their discussion. The CPD issued updated Use of Force policies on December 31, 2020, reflecting the requirements of the Consent Decree. Furthermore, CPD's *Retaliation Policy* attempts to protect members who may come forward; the policy has specific sections that protect officers who report misconduct. Thus, with these policies, we find the City and the CPD in Preliminary compliance for ¶227.

To evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of training for use-of-force incidents. The CPD's 2020 Use of Force in-service training includes instruction on *Peer Intervention/Duty to Intervene*, addressing all requirements of ¶227. Specifically, the training makes a strong case for the reasons officers must report misconduct and provides details regarding how officers must report such incidents to their supervisors. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

On November 30, 2020, we reviewed a Force Review Division report indicating that there were two occasions that resulted in complaint logs to COPA for members who failed to report force during this reporting period. These were discovered during the Force Review Division's TRR-R review.

Moving forward, we will continue to assess Secondary compliance, to include completion of the Use of Force training, review of our special report the City's and the CPD's responses to protest and unrest and any noted issues related to the extent of unreported force, and review the Force Review Division's ongoing review of supervisory responses and noted debriefing points.

# Use of Force: ¶229

> **229.** *All reportable uses of force by CPD members must be reviewed by CPD supervisors.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**       *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**        *In Compliance* (NEW)
**Full:**              *Not Yet Assessed*

In the third reporting period, the City and the CPD maintained Preliminary compliance and reached Secondary compliance with ¶229.

To evaluate Secondary compliance with ¶229, we reviewed training related supervisory responsibilities. In prior reporting periods, we noted that the CPD has engaged in a variety of activities to educate members on use of force, such as reviewing supervisors' responsibilities; classroom training for supervisors in 2017 on the revised policy and completion and review of TRRs; two-day Use of Force in-service training in 2019; written guidance for supervisors accessible via CPD's internal network (ClearNet); and more. Due to training provided since the policy was in effect in 2017, we find the CPD in Secondary compliance with ¶229. Further, the CPD continues to train CPD members in its 2020 Use of Force in-service training that all reportable uses of force are reviewed by CPD supervisors. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training. During this reporting period, the CPD also began creating the curriculum for the 2021 in-service supervisor refresher training, which covers the requirement and responsibilities for supervisors to review all reportable use-of-force incidents.

Finally, based on interviews with supervisors (sergeants and lieutenants) in 2019 and 2020 and data reported by the Office of Operational Compliance supervisory audit, we believe that CPD supervisors are properly trained in their duties to routinely review all reportable uses of force brought to their attention. Further, the supervisory audit found no instances where a use-of-force incident was not reviewed by a supervisor for 9,660 TRR incidents in 2018 and 2019.

We find that supervisors meet their responsibilities for reviewing reported uses of force and that all officers and supervisors are aware of their responsibility to submit a TRR after using force. The CPD has achieved Secondary Compliance. Paragraph ¶229 emphasizes the duty to report force. We acknowledge that there may be unreported uses of force that must be measured and assessed for this paragraph. In determining whether failure to report is an issue, we will review, among

other sources, our special report the City's and the CPD's responses to protest and unrest in the next reporting period.

# Use of Force: ¶230

**230.** *After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶230.

To evaluate Preliminary compliance with ¶230, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02 and finalized the policy. The community and the Use of Force Working Group did not raise concerns or provide recommendations related to the supervisory responsibilities outlined in ¶230. The CPD issued updated Use of Force policies and TRR forms on December 31, 2020, reflecting the requirements of this paragraph. Thus, we find the City and the CPD in Preliminary compliance for ¶230.

To evaluate Secondary compliance, we continued reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewed materials provided for the 2021 in-service supervisor refresher training. The 2021 supervisory training outline addresses ¶230 in the seventh hour of the training. These requirements are also described in the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)*. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

Furthermore, the CPD Office of Operational Compliance's supervisory audit found only one instance in which a Lieutenant had not reviewed and evaluated a TRR, of the 9,660 TRR incidents that occurred in 2018 and 2019. The incident was identified by the Force Review Division as occurring on September 21, 2019. The Force Review Division notified and advised the Lieutenant that the TRR should have been reviewed and evaluated by a higher-ranking officer. The audit also identified only

39 incidents (0.04%) in which a TRR was reviewed by a member of the same rank as the member who used force.

We also reviewed the Force Review Division's quarterly reports for the first three quarters of 2020. In this review, the Force Review Division reported one incident that did not adhere to the requirements of ¶230 in the first quarter and three incidents in the third quarter. There were no reported incidents for lack of adherence in the second quarter.

In sum, the CPD achieved Preliminary compliance for ¶230 during this reporting period and continues to make important strides in educating CPD officers and supervisors of the requirements of ¶230. Moving forward, we will continue to assess Secondary compliance, to include completion of the in-service training and supervisory in-service training. We will also review our special report the City's and the CPD's responses to protest and unrest, Force Review Division's ongoing review of supervisory responses and noted debriefing points, and a random sample of TRR-Rs.

# Use of Force: ¶231

> **231.** *The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶231 but did not reach Secondary compliance.

To evaluate Secondary compliance with ¶231, we continued to review the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewing materials provided for the 2021 in-service supervisor refresher training. The 2021 supervisory training outline addresses ¶231 in the seventh hour of the training. These requirements are also described in the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)*. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

During the third reporting period, we also reviewed data provided to us via a Tableau data dashboard and the Force Review Division's quarterly reports to determine whether additional training related to ¶231 is needed.

The dashboard indicates there were 1,274 TRRs submitted for level 2 and 3 use-of-force incidents between March 1, 2020, and December 31, 2020, in which 293 had interviews conducted, 810 did not have interviews, 159 were not applicable, and 12 were "null." The *FRD Quarterly Report 2020 Q3* identified narrative deficiencies (13) and no visual inspect (12) as debriefing points for approving supervisors.

Moving forward, we will continue to assess progress with ¶231, to include completion of the in-service training and a review of a random sample of TRRs.

# Use of Force: ¶232

> **232.** *For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020),

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶232.

To evaluate Preliminary compliance with ¶232, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02 and finalized the policy. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding the supervisory responsibilities outlined in ¶232. The CPD issued updated Use of Force policies and TRR forms on December 31, 2020, reflecting the requirements of this paragraph. Thus, we find the City and the CPD in Preliminary compliance for ¶232.

We also began assessing Secondary compliance with ¶232 by reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewing materials provided for the eight-hour 2021 in-service supervisor refresher training. The 2021 supervisory training outline addresses ¶232 in the seventh hour of the training. These requirements are also described in the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)*. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

Further, we reviewed data provided to us on use-of-force incidents referred to COPA (Use of Force Figure 12) and policy compliance decisions for use-of-force incidents (Use of Force Figure 13). A total of 352 TRRs were referred to COPA from March 1, 2020, to December 31, 2020. The Force Review Division review 1,711 TRRs and referred none to COPA.

Use of Force Figure 12: Use of Force Incidents Referred to COPA
(March 1, 2020 to December 31, 2020)

| | |
|---|---|
| Total TRRs | 3,594 |
| TRRs referred to COPA | 352 |
| Total TRR-Is | 3,582 |
| TRR-Is referred to COPA, excluding those referred in TRR | 66 |
| Total TRR-Rs | 1,711 |
| TRR-Rs referred to COPA, excluding those referred in TRR and TRR-I | 0 |

Use of Force Figure 13: TRR Policy Compliance Decisions
(March 1, 2020 to December 31, 2020)

| | |
|---|---|
| Total TRRs | 3,518 |
| Number In Compliance | 3,393 |
| Percentage In Compliance | 96.4% |
| Number Not In Compliance | 49 |
| Percentage Not In Compliance | 1.4% |
| Number Deadly Force | 75 |
| Percentage Deadly Force | 2.1% |

Moving forward, we will continue to assess Secondary compliance, to include completion of the in-service trainings and random analysis of Force Review Division and supervisory data, reports, and recommendations via TRRs, TRR-Is, Force Review Division reports, body-worn camera video, and in-car video.

# Use of Force: ¶233

> **233.** *For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.*

**Compliance Progress**     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶233.

To evaluate Preliminary compliance with ¶233, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02 and finalized the policy. The community and the Use of Force Working Group did not raise concerns or provide recommendations related to the reviewing (investigating) supervisor's responsibilities outlined in ¶233. In addition, the TRR-I form has checkboxes for recommended actions for both the involved members and the reviewing supervisor, specifically "individual debriefing with supervisor," "review streaming video," "review department directives," "review legal/training bulletin," "stress reduction seminar," or "other." The form also has an area for notifying COPA and the complaint log (CL) number, when appropriate.

The CPD issued updated Use of Force policies and TRR forms on December 31, 2020. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

To review Secondary compliance, we are reviewing the development, implementation, and evaluation of the 2020 Use of Force in-service training and reviewing materials provided for the 2021 in-service supervisor refresher training. Requirements related to addressing training opportunities and/or deficiencies are addressed in the 2021 supervisory training outline and in the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)*. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

The CPD Office of Operational Compliance's supervisory audit found that reviewing supervisors documented feedback in only 7.3% of the reviewed TRRs and responding supervisors documented feedback in less than 1% of reviews from 2018 to 2019. The audit noted that supervisors either do not frequently offer feedback regarding use of force to officers under their command or they do not properly document their feedback. Based on these results, we recommend additional training to supervisors regarding the requirement to document feedback as well as appropriate ways to provide feedback.

In the next reporting period, we will continue to assess progress with ¶233. We will monitor progress with the Use of Force policies, completion of the in-service training, and how the CPD responds to the audit results regarding lack of documented feedback in supervisory reviews.

# Use of Force: ¶234

> **234.** *CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶234.

To evaluate Preliminary compliance with ¶234, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding the reviewing (investigating) supervisor's responsibilities for completing the TRR-I form. In addition, the TRR-I form has checkboxes for recommended actions for both the involved members and the reviewing supervisor, specifically, "individual debriefing with supervisor," "review streaming video," "review department directives," "review legal/training bulletin," "stress reduction seminar," or "other." The TRR-I also includes a text box that requires supervisors to document whether they identified units on the scene of the incident. The CPD issued updated Use of Force policies and updated TRR forms on December 31, 2020, reflecting the requirements of this paragraph. Thus, we find the City and the CPD in Preliminary compliance for ¶234.

To review Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training and materials provided for the 2021 in-service supervisor refresher training. While the supervisory training outline addresses some of the duties surrounding the reviewing supervisor, it does not cover constructive feedback and the identities of CPD members on scene who are reasonably believed to have knowledge or information regarding the use

of force. Similarly, the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* addresses some of requirements of ¶234 but does not address constructive feedback and identities of officers. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

As noted for ¶233, the CPD Office of Operational Compliance's supervisory audit identified constructive feedback as something rarely documented in TRR-R or TRR-I forms. Feedback occurred infrequently with both officers and responding supervisors. Based on these results, we recommend the CPD develop training for supervisors on providing constructive feedback.

The CPD is tracking data from TRR-I forms regarding compliance with CPD policy via the CPD's "TRR Policy Compliance Decisions" Tableau data dashboard. This dashboard provides the IMT with data on this subject from January 1, 2019, to present. During this reporting period, there were 3,518 TRRs and 49 (1.4%) were not in compliance.

In the next reporting period, we will continue to assess progress with ¶234. We will monitor progress with the Use of Force policies, the completion of the in-service trainings, and efforts to further educate supervisors in providing constructive feedback.

# Use of Force: ¶235

**235.** *All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the third reporting period, the City and the CPD met Preliminary compliance with ¶235.

To evaluate Preliminary compliance with ¶235, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding reviewing documentation regarding a reportable Use of Force within 48 hours of the incident. In addition, the revised TRR form provides a section for supervisors to request an extension of time if more than 48 hours is needed; it includes the name of the approving supervisor and the completion date and time. The CPD issued updated Use of Force policies and TRR forms on December 31, 2020, reflecting the requirements of this paragraph. Thus, we find the City and the CPD in Preliminary compliance for ¶235.

To review Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training and materials provided for the 2021 in-service supervisor refresher training. The supervisory training outline and the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* address the requirements of ¶235. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training.

The CPD Office of Operational Compliance's supervisory audit found that in 2018 and 2019, 92% of all documented use-of-force incidents were reviewed within 48 hours by district-level supervisors. Additionally, during IMT interviews with supervisors in 2019 and 2020, respondents noted that it is their practice to complete their reports before the end of their tour of duty, and it would be rare to not do so. In the next reporting period, we will continue monitor progress for ¶235.

# Use of Force: ¶244

> **244.** *CPD's training regarding the use of firearms, Tasers, OC devices, impact weapons, and other force options that CPD currently authorizes or may authorize in the future will be consistent with its commitment to de-escalation as a core principle. Any initial training, qualification, or requalification regarding these force options will incorporate scenario-based elements, including scenarios in which officers achieve resolution without employing force. CPD's training regarding these force options will also provide specific guidance to officers regarding required procedures and techniques after each of these force options are used, including procedures and techniques for limiting a subject's injuries.*

## Compliance Progress　　　　(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** 　　*Under Assessment*
**Secondary:** 　　*Not in Compliance*
**Full:** 　　*Not Yet Assessed*

In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶224.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶244's requirements. CPD General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, describes the requirements for Use of Force training:

> At a minimum, Department members will receive annual training on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability.

In addition, Special Order S11-10-01, *Training Notification and Attendance Responsibilities*, issued September 24, 2020, requires Department members to satisfactorily complete minimum in-service training annually, including "use of force training including scenario-based training."

In 2019 and 2020, the CPD provided current CPD officers with in-service Use of Force training. Ninety-six percent of CPD officers completed the 2019 in-service Use of Force training; and as of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training. The CPD's failure to complete the Use of Force training for the 2020 calendar year is due to the COVID-19

pandemic and the necessary steps it took to protect personnel. Due to pandemic, the Department has received an extension for completing this training. Thus, the in-service annual attendance will remain under assessment through March 4, 2021.

Prior to delivery of the 2020 Use of Force training, we reviewed training lesson plans and materials and provided comments. The CPD made adjustments to the 2020 training based on these comments.

The CPD's Use of Force training requirements were a point of discussion between the CPD and the Use of Force Working Group in this reporting period. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

We look forward to assessing the CPD's progress with ¶244.

## Use of Force: ¶245

**245.** *CPD will provide all current CPD officers with in-service use of force training on at least an annual basis, and more frequently when necessitated by developments in applicable law and CPD policy. CPD will coordinate and review all use of force training to ensure quality, consistency, and compliance with federal and state law, CPD policy, and this Agreement.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

| **Deadline:** | December 31, 2019 | ✓ **Met** ☐ **Missed** |
|---|---|---|
| | March 5, 2021 | ✓ **Not Yet Applicable** |

| **Preliminary:** | *In Compliance* (NEW) |
|---|---|
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶245. The City and the CPD also met the deadline to provide the 2019 Use of Force in-service training to a sufficient percentage of officers (at least 95%).

To evaluate Preliminary compliance, we reviewed the CPD's policies that describe the requirements for providing and reviewing all in-service Use of Force training, as required by ¶245.

For this paragraph's requirement to provide all current officers with in-service Use of Force training, General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, issued December 31, 2020, states in Section X, *Use of Force Training*:

> At a minimum, Department members will receive annual train-ing on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability.

For this paragraph's requirement to coordinate and review all Use of Force training to ensure quality, consistency, and compliance, Special Order S11-11, *Training Oversight Committee*, issued August 14, 2020,[128] describes the Department Train-ing Oversight Committee's related duties and responsibilities, which includes re-viewing and overseeing the Department's training program. The committee will focus on assessing the Department's Training Plan, which is "an annual, written

---

[128] A revised version of S11-11—reflecting minor, non-substantive changes—was issued on Janu-ary 22, 2021, after the end of this reporting period.

report which identifies activities and outcomes to be measured by developing a process that provides for the collection, analysis and review of course and instruction evaluations. This process measures the effectiveness of existing training and improve [sic] the quality of future instruction and curriculum." Related to ¶245, S11-11 states in Section III.A.3.a and Section III.A.3.e, the Training and Oversight Committee will focus on assessing the Training Plan to ensure:

> *Consistency with the law, training, Department policy, best practices and the Consent Decree.*
>
> *Inclusion of a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of the Consent Decree.*

Further, S11-11 Section III.A.12 states that the Committee will also focus on:

> *[O]verseeing a process that effectively incorporates material changes in relevant case law, statutes and Department policy into recruit, field, in-service, and pre-service promotional training in a timely and effective manner.*

For Secondary compliance, the CPD has required mandatory Use of Force training since 2018. In 2019, the CPD implemented a 16-hour mandatory training for all members, which 96% of CPD officers completed. In 2020, the CPD provided an 8-hour Use of Force in-service training. The CPD engaged in a comprehensive review process of the 2020 training with the IMT and OAG in the second reporting period. As of December 31, 2020, 70% of Department members have completed the 2020 Use of Force in-service training. Due to pandemic, the Department has received an extension for completing the 2020 training through March 4, 2021.

We look forward to assessing Secondary compliance for ¶245 in the next reporting period as the CPD continues delivery of its 2020 Use of Force in-service training into early 2021.

# Use of Force: ¶246

*246. The annual use of force training will include the following topics: a. CPD policies and Fourth Amendment law governing the use of force; b. proper use of force decision-making that utilizes a critical thinking framework in which officers gather relevant facts; assess the situation, threats, and risks; consider CPD policy; identify options and determine the best course of action; and act, review, and reassess the situation; c. role-playing scenarios and interactive exercises that illustrate proper use of force decision-making; d. ethical decision-making and peer intervention, principles of procedural justice, the role of implicit bias, and strategies for interacting with individuals in crisis; e. de-escalation techniques and tactics to prevent or reduce the need for force, including exercising persuasion and advice, and providing a warning; stabilizing the situation through the use of time, distance, or positioning to isolate and contain a subject; and requesting additional personnel to respond or make use of specialized units or equipment; the proper deployment of CPD-issued or -approved weapons or technologies, including firearms and Tasers; f. use of force reporting, investigation, and review requirements, including documenting reportable use of force incidents; and g. other topics as determined based on the training needs assessment required by this Agreement.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**  December 31, 2019  ✓ **Met**  ☐ **Missed**
December 31, 2020  ✓ **Met**  ☐ **Missed**

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Not In Compliance*
**Full:**  *Not Yet Assessed*

In the third reporting period, the City and the CPD met Preliminary compliance with ¶246. The City and the CPD also met the December 31, 2019 and 2020 deadlines to include the topics required by ¶246 in the CPD's annual Use of Force in-service training.

To evaluate Preliminary compliance, we reviewed the CPD's 2020 in-service Use of Force training curriculum. The eight-hour CPD 2020 Use of Force in-service training covers each requirement of ¶246, specifically:

- 246(a) – The Fourth Amendment is covered in Hour 5.

- 246(b) – Issues of assessing threats and the force continuum are covered in Hour 2, and through scenarios and interactive exercises.

- 246(c) – Scenarios are used throughout the training.

- 246(d) – Procedural justice and implicit bias are covered in Hour 1.

- 246(e) – De-escalation and force mitigation are covered in Hour 2, including instruction on specific de-escalation tactics such as using time, communication, and a zone of safety.

- 246(f) – The review of TRRs, level of force, and duties and responsibilities of supervisors are covered in Hour 6.

- 246(g) – Other topics determined by the Consent Decree are also addressed in the training, including foot pursuits, responsibilities of members and supervisors, and firearm pointing.

The City and the CPD are in Preliminary compliance for ¶246 with the annual 2020 Use of Force in-service training as it addresses every requirement. Secondary compliance will depend on an assessment of training attendance by the pandemic extension deadline of March 4, 2021.

# Use of Force: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶228, 243, and 247 of the Use of Force section.[129]

\*\*\*

| Consent Decree ¶228 |
|---|

> **228.** *Supervisors play a critical role in ensuring that force is used legally, consistent with CPD policy, and in a manner that will promote community confidence in the Department. Supervisor reviews and investigations of uses of force are essential to identify necessary individual and departmental corrective action.*

## Compliance Status

In this reporting period, we reviewed whether the CPD has appropriate policies and procedures regarding supervisory review of use-of-force incidents. As noted in the prior reporting period, it has been the policy of the CPD—as articulated in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*—for supervisors to play a critical role in reviewing uses of force to ensure that force is used legally and consistent with CPD policy, and that necessary corrective actions are taken.

On December 31, 2020, the CPD issued a revised TRR form, which has enhancements to further assist supervisors in conducting their investigations of use of force by requiring supervisors to document in the narrative their efforts to interview and identify witnesses. In addition, the CPD revised the TRR-I form, requiring the Lieutenant or above to address the member's performance and the supervisor's performance (providing six options to address behavior that does not meet standards). The CPD also revised a TRR-R with additional information on debriefing points for supervisors.

---

[129]  In the Monitoring Reports for Year One, we included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

Furthermore, G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, Section VI, *Use of Force Investigation*, describes the investigating supervisor's responsibilities, to include if appropriate:

> *(1) provide timely, constructive feedback to the member engaged in the reportable use of force and the reviewing supervisor.*

> *(2) make recommendations for action by the involved member or the reviewing supervisor (e.g., individualized training, performance coaching, review of Department directives).*

> *(3) document in the "Lieutenant or Above/Incident Commander: Comments" section what actions are recommended, including identifying specific training, when appropriate.*

As noted in the previous reporting period, the Force Review Division has the responsibility of reviewing all level 2 and level 3 use-of-force incidents. It reviews officers' actions and supervisors' responses and offers constructive feedback to officers and supervisors on individual Use of Force instances. The Force Review Division quarterly and annual reports identify instances in which Reviewing and Approving Supervisors' responses were lacking and resulted in a debriefing or an advisement. Supervisors' nonfeasance or malfeasance is brought to their attention to alter and correct behavior. Additionally, the debriefing of officers gives supervisors a formal documented opportunity to correct problems associated with use of force.

CPD data on supervisors' review of compliance with Department policy reports that officers are consistently (90%) in compliance. Furthermore, CPD data reports that since the inception of the Consent Decree in March 2019, 795 (9.1%) of TRRs were referred to COPA, 150 (1.7%) of TRR-Is were referred to COPA, and 0.2% of TRR-Rs were referred to COPA.

In the next reporting period, we will continue to assess the City's progress toward compliance to ensure appropriate policies are in place, supervisors are properly trained, and supervisors are performing their duties for responding to level 2 and level 3 reported use of force.

## Consent Decree ¶243

> **243.** *CPD's pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or,*

> *when force must be used, to use force that is objectively reason-*
> *able, necessary, and proportional under the totality of the cir-*
> *cumstances; and ensure appropriate supervision and accounta-*
> *bility.*

## Compliance Status

The CPD describes in policy the requirements of ¶243 in General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, issued December 31, 2020. Specifically, it states in Section X, *Use of Force Training*:

> *At a minimum, Department members will receive annual train-*
> *ing on the laws and Department policies regulating the use of*
> *force, including, but not limited to, de-escalation, force options,*
> *and appropriate supervision and accountability.*

Further, the CPD has met the CALEA Law Enforcement Standards, Chapter 4 Use of Force, which covers 15 standards, such as use of reasonable force, deadly force, warning shots, use of authorized less-than-lethal weapons, rendering aid after a use-of-force incident, vascular neck restrictions, chokeholds, and reporting force.

Since the beginning of this agreement, the CPD has engaged with the IMT and the OAG in reviewing Use of Force policies, best practice, and training. We have examined training lesson plans and instructors and has made recommendations to ensure the training meets the requirements of ¶243.

The CPD 2020 Use of Force in-service training addresses all of these requirements. As described in ¶¶246 and 247, the 2020 in-service lesson plan outlines de-escalation, force mitigation, and responses to passive and active resistors.

Related to the requirement to ensure appropriate supervision, the CPD 2021 supervisory in-service refresher training provides supervisors with instruction on addressing the supervisory duties for use-of-force incidents. The CPD will begin delivering this training in 2021. Additionally, the CPD developed materials to guide supervisors, including a *Tactical Response Report Training Guide: Slide Deck* and *Tactical Response Report Training Guide: Worksheet.*

For accountability, G03-02-08, *Department Review of Use of Force*, issued December 31, 2020, identifies the duties and responsibilities of the Force Review Division. The Force Review Division is responsible for reviewing all level 2 and level 3 uses of force TRRs and 5% of level 1 TRRs, to ascertain if officers and supervisors performed their duties according to policy. It also reviews whether policy was adhered to in firearm pointing incidents and in foot pursuits that result in force. Any policy violations encountered in the review are referred to COPA. The Force Review Division issues debriefing points for use of force, firearm pointing incidents, and foot

pursuits. These debriefing points are designed to identify areas where supervisors' and officers' performance faults can be identified and remedial action taken.

The CPD has also established a data dashboard allowing the CPD management to access real-time data on use of force by district, which includes data about policy compliance.

The CPD has policies in place for Use of Force training requirements, and the Force Review Division has practices and procedures in place to identify and take remedial action. We believe an ongoing challenge for the CPD is supervision and the need to continue to address poor performance and misconduct for use of force at the district/unit level.

## Consent Decree ¶247

**247.** *CPD will also provide initial training on all of the topics identified above, as well as others, to all recruits as part of its recruit training curriculum.*

### Compliance Status

In this reporting period, the CPD provided a copy of its *Basic Recruit Procedural Manual Rules and Regulations* and a copy of its *Physical Skills Unit Rules & Regulations* to demonstrate that the required topics are covered as part of its recruit curriculum. These materials suggest that the topics identified in ¶246 above are being addressed in recruit training. Moving forward, we will review additional recruit training materials, such as lesson plans and evaluation and testing materials, and observe recruit training in order to assess compliance with this paragraph.

# V. Recruitment, Hiring, & Promotions

This is the Recruiting, Hiring, and Promotions section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' compliance efforts from March 1, 2020, through December 31, 2020, for this section.

## Guiding Principles

The IMT will assess compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **249.** *Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

> **250.** *The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

> **251.** *The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

> **252.** *The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not In Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to

various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

For the Recruitment, Hiring, and Promotions section in the third reporting period, the City and the CPD focused on the Sergeant, Lieutenant, Captain, and Commander ranks. The City made progress toward complying with the requirements of this section by hiring outside consultants who prepared analyses on job descriptions and selection processes and published a report on promotion processes. However, the City still needs to establish clear policies and procedures for recruitment, hiring, and promotions and for updating and reviewing job descriptions.

The City, the CPD, the OAG, and the IMT continue to engage regarding the CPD's recruitment efforts—including the duties, eligibility criteria, knowledge, skills, and abilities for the ranks of Captain and Commander, as well as the City's and the CPD's promotions processes and transparency around those processes. While we understand that the CPD is experiencing hiring challenges, which are shared among other departments nationally, we continue to encourage the City and the CPD to consider creative ways to conduct recruitment.

In the third reporting period, we reviewed compliance with three Recruitment, Hiring, and Promotions paragraphs of the Consent Decree. We determined that the City achieved Preliminary Compliance for one paragraph (¶264) and achieved Secondary Compliance for two paragraphs (¶¶261 and 263). We also provide compliance updates for four paragraphs (¶¶253–55 and 257), each of which will be assessed for compliance in future reporting periods. *See* Recruitment Figure 1.

Recruitment Figure 1:   Compliance Status for Recruitment Hiring and Promotions Paragraphs at the End of the Third Reporting Period (December 31, 2020)



In the third report, there was one deadlines in the Recruitment, Hiring, and Promotion section under review (¶261). The CPD missed the deadline, but achieved the underlying deadline requirement before the end of the reporting period. *See* Recruitment Figure 2. The City also moved into Preliminary and Secondary Compliance for that paragraph (¶261).

Recruitment Figure 2:      Total Recruitment, Hiring, and Promotions Deadlines
in the Third Report: 1



## Recruitment, Hiring, and Promotion: ¶261

*261. Within 18 months of the Effective Date, and at least every three years thereafter, CPD will obtain an independent expert assessment of its promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement. The independent expert will review the existing Hiring Plan, and any relevant collective bargaining agreements in order to conduct the assessment of the Sergeant and Lieutenant promotions processes. The Sergeant and Lieutenant promotions assessment, at a minimum, will identify: a. the processes by which CPD selects candidates for promotion to Sergeant and Lieutenant who possess a core set of competencies, characteristics, and capabilities and, when applicable, who are effective supervisors in compliance with CPD policy and this Agreement; b. methods for consideration of each candidate's disciplinary history in the selection process; c. Department strategies for promoting qualified applicants who reflect a broad cross section of the Chicago community; d. the frequency with which CPD should hold promotional exams; e. opportunities to increase transparency and officer awareness about the promotions process and promotions decisions, including, but not limited to, identifying criteria for promotions; and f. recommendations for any modifications to the current promotions processes, which would enable CPD to address the requirements of this section.*

---

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          November 3, 2020*          ☐ **Met**   ☑ **Missed**
*Extended from September 1, 2020, due to COVID-19
**Preliminary:**          *In Compliance* (NEW)
**Secondary:**          *In Compliance* (NEW)
**Full:**          *Not Yet Assessed*

In the third reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶261. While the CPD missed the corresponding deadline, the CPD achieved these levels of compliance by hiring an independent expert to conduct an analysis required by ¶261.

Specifically, the City selected DCI Consulting as the independent expert to perform the tasks prescribed by ¶261.[130] The City and CPD produced a DCI Consulting Report of its work on December 31, 2020. This 132-page report, *City of Chicago Police Department Sergeant and Lieutenant Promotion Processes: Review, Evaluation, and Recommendations*, clearly addresses each ¶261 requirement. Appendix A indicates the 2014 Hiring Plan and multiple collective bargaining agreements were amongst the myriad of documents reviewed in compiling this report and recommendations.

To reach Full compliance, the City and the CPD must deliberate on and adopt a process through which this assessment will occur every three years as required. This ongoing regular assessment process also should be incorporated into policy.

---

[130]   *See* DCI CONSULTING, https://www.dciconsult.com/.

## Recruitment, Hiring, and Promotion: ¶263

**263.** *Within 365 days of the Effective Date, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement.*

### Compliance Progress · (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the CPD maintained Preliminary compliance and achieved Secondary compliance. To meet these requirements, the City retained an outside consultant, CPS HR Consulting during the second reporting period to prepare a job analysis of the Captain and Commander ranks.[131]

The City and CPD internally and externally published the resulting records:

(1) 9175 Captain Job Description, dated December 2020;

(2) 9752 Commander Job Description, dated December 2020;

(3) Captain Selection Methods; and

(4) Commander Selection Methods.

Full compliance may be achieved by executing the process as designed and creating a feedback loop where opportunities for improvement may be identified and implemented.

---

[131] *See* CPS HR CONSULTING, https://www.cpshr.us/.

## Recruitment, Hiring, and Promotion: ¶264

**264.** *Within 365 days of the Effective Date, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary compliance during this reporting period. To meet these requirements, the City retained an outside consultant, CPS HR, to prepare a job analysis of the Captain and Commander ranks. The City and CPD then issued the following records, which indicate the City and the CPD have developed the requisite strategies to meet Preliminary compliance:

(1) 9175 *Captain Job Description*, dated December 2020;

(2) 9752 *Commander Job Description*, dated Dec 2020;

(3) *Captain Selection Methods*;

(4) *Commander Selection Methods*; and

(5) *Final Strategic Communications Plan: Captain and Commander Promotions* (dated 12/7/20).

The City and the CPD should incorporate the criteria for promotions and promotional decisions into a policy statement. Secondary compliance may be achieved by following this recommendation, fully executing the Strategic Communications Plan, and exhausting efforts to enhance transparency and awareness of the entire Captain and Commander promotions processes.

# Recruitment, Hiring, and Promotions:
# Compliance Updates

As noted in the Introduction of this report, the City of Chicago and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶253–54, 255, and 257 of the Recruitment, Hiring, and Promotions section.[132]

\*\*\*

## Consent Decree ¶253–54

**253.** *The City and CPD will ensure that its recruitment, hiring, and promotion policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws, and the terms of this Agreement.*

**254.** *CPD will provide clear guidance on its policies and procedures for recruiting, hiring, and promoting police officers and will clearly allocate responsibilities for recruitment, hiring, and promotion efforts for each position.*

### Compliance Progress

The City and the CPD made progress toward compliance during this reporting period. We reviewed documents provided by the City and the CPD on July 29, 2020, August 31, 2020, and November 18, 2020. We also reviewed more than 1,500 pages that the City provided on the next-to-final day of the reporting period. Several of the documents contained multiple pages without explanation of the document's context or relevance, and others contained no reference or map to any specific section. These included a draft Employee Resource E05-34, *Department Recruitment Selection and Hiring Plan Directive*, and background material sources:

- CALEA requirements;
- Human Resource Standard Operating Procedure 18-02;
- City of Chicago Consent Decree;
- City of Chicago Police Department Hiring Plan for Sworn Titles;

---

[132] In the Monitoring Reports for Year One, we included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

- City of Chicago Equal Employment Opportunity Policy;
- City of Chicago Website, Greenville PD Policy, Baltimore Policy, and Bartlett PD;
- International Association Chiefs of Police IACP;
- Illinois Law Enforcement Training Standards Board ILETSB POWER test;
- Open Source Legal Brief – Shakman Settlement;[133]
- CPD Medical Section Examination document;
- Inspector General's Office CPD eLearning Training Modules; and
- CPD Policy E01-09, *Drugs, Drug Abuse, and Mandatory Physical and/or Psychological Examinations*.

The materials submitted were intended to demonstrate that the CPD engages in continuous assessment and review of its practices, policies, and recruitment efforts. According to the CPD, the draft Employee Resource E05-34, *Department Recruitment Selection and Hiring Plan*, builds and expands upon the existing Bureau of Organization Development SOP 18-02, *Department Recruitment Plan*, to reflect (1) recent best practice research, applicable laws, roles and responsibilities for recruitment and hiring and (2) the CPD's commitment to attracting, hiring, and promoting qualified candidates. This also supports the CPD's efforts to develop a 21st century professional workforce that reflects the diversity of Chicago's communities consistent with the Guiding Principles. *See* ¶¶249, 250, and 251. Additionally, as noted in ¶252, the City and the CPD must abide by the City of Chicago's Police Department Hiring Plan for Sworn Titles as referenced in the draft E05-34 Department Recruitment Directive.

Throughout this reporting period, we have engaged in regular conversations with the CPD during the Recruitment, Hiring, and Promotion bi-weekly meetings. In these meetings, the CPD highlighted best practices research, recruitment outreach efforts, and community-based and institutional partnerships to secure diverse recruits. The CPD shared efforts to address barriers to recruitment as identified through survey feedback data. The CPD also identified changes to their recruitment practices, such as increasing opportunities for testing and making applicants aware of credit repair services.

In addition, the Office the Mayor, Chicago's Department of Human Resources, and the CPD have developed a working group to develop and implement initiatives to recruit, hire, and retain diverse candidates. We reviewed several documents that reflect the group's ongoing efforts.

---

[133] *See Human Resources - Shakman Settlement*, City of Chicago, https://www.chicago.gov/city/en/depts/dhr/supp_info/shakman_settlement.html.

Moreover, the City's *Comprehensive Plan to Reduce Violence in Chicago*, identifies short- and long-term initiatives to improve workforce management, including recruitment, hiring, retention, and promotion.[134]

### Consent Decree ¶255

**255.** *To further this goal, the City and CPD will publish job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position.*

## Compliance Progress

The City and the CPD made progress toward compliance with this requirement during this reporting period. We reviewed the City's Department of Human Resources website, which includes CPD sworn title codes. While the job descriptions are posted on the site, many of them appear to be outdated and do not include contemporary language mandating key concepts such as de-escalation, impartial policing, and procedural justice—all major reform tenets specified in the Consent Decree.

The City and CPD should ensure the job descriptions are updated and have a periodic review schedule so they will continue to reflect current duties, responsibilities, and minimum qualifications. The City and the CPD may achieve Preliminary compliance when the job descriptions are accurate. The City and the CPD may achieve Secondary compliance by creating a process, memorialized within policy or standard operating procedure, to periodically revise and update CPD sworn job descriptions. The City and the CPD may then achieve Full compliance by systematically adhering to the policy and processes.

---

[134] *See Our City, Our Safety: A Comprehensive Plan to Reduce Violence in Chicago*, CITY OF CHICAGO (2020), https://www.chicago.gov/content/dam/city/sites/public-safety-and-violenc-reduction/pdfs/OurCityOurSafety.pdf.

## Consent Decree ¶257

**257.** *CPD will inform officers of the role of the Office of the Inspector General ("OIG") in overseeing the hiring and promotions processes.*

### Compliance Progress

The CPD and the Office of the Inspector General (the OIG) worked in collaboration to support officer awareness of OIG's role in overseeing the CPD's hiring and promotional processes and informing members about the OIG's Diversity, Equity, Inclusion, and Compliance Section.[135] The officer awareness strategy includes:

1) two scripts introducing the OIG Executive Director of the Office of Inspector General Diversity, Equity, Inclusion Compliance Section and detailing office roles and responsibilities;

2) a video production of the scripted material;

3) an eLearning module that supports, reinforces, and tracks the review of the information presented in the video; and

4) AMC Messages (all member announcements and messages placed on The Wire) alerting CPD members about the eLearning module and mandating completion of the eLearning training module by December 15, 2020.

The eLearning module included the purpose of the module, operational hours of OIG, and multiple options for filing complaints with the OIG. Our review of the Tableau database indicated that 92% of the CPD officers had received this mandated training by December 15, 2020. Secondary compliance requires at least 95% completion, and we anticipate that to be reflected in the next reporting period.

---

[135] *See Diversity, Equity, Inclusion and Compliance*, OFFICE OF THE INSPECTOR GENERAL CITY OF CHICAGO, https://igchicago.org/about-the-office/our-office/deic/.

# VI. Training

This is the Training section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago's (the City's) and its relevant entities' Training compliance efforts from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT assessed compliance with the applicable Training paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** *CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.*

> **266.** *CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.*

> **267.** *CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.*

> **268.** *The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (the CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the

Office of the Illinois Attorney General (the OAG) and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

During the third reporting period, the City and the CPD faced significant challenges efficiently moving toward compliance with training requirements under the Consent Decree due to the COVID-19 pandemic and corresponding precautions and restrictions regarding in-person training. Still, the City and CPD achieved Preliminary Compliance for several paragraphs in the Training section of the Consent Decree during this reporting period.

The City and the CPD also continued to work to address a multitude of issues regarding training and training evaluation. The City, the CPD, the OAG, and the IMT continued discussions, for example, about the important functions of the Training Oversight Committee and the overall goals of recruit and field training officer training, including that all new CPD officers complete their training experiences with the requisite technical skills, tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. The CPD also made progress putting plans and policies in place that articulate, for example, the need to integrate critical policing concepts across courses throughout the life of an officer's training experiences. We urge the CPD to continue to think holistically about training requirements and its short- and long-term training goals.

We also note that the CPD was unable to maximize the utility of its *2020 Training Plan* since the CPD wasn't able to finalize it until after the training began. Finalizing a training plan *before training begins* will maximize its utility and allow the CPD to make informed and strategic modifications to its training when confronted with new unanticipated challenges.

Overall, in the third reporting period, the IMT reviewed compliance with 28 Training paragraphs of the Consent Decree (¶¶270–75, 277–78, 280, 282, 287, 292, 294, 303, 316–17, 319–23, 331–32, 334, 336–37, and 339–40) and provide status updates for another 10 paragraphs (¶¶276, 283–84, 297, 313, 315, 328, 333, 335, and 338). We determined that the City maintained Preliminary compliance for two paragraphs (¶¶270–71), maintained Secondary compliance for one paragraph (¶339), moved into Preliminary Compliance for 14 paragraphs (¶¶272–75, 278, 280, 316–17, 319–23, and 340), and failed to reach Preliminary Compliance for 10 paragraphs (¶¶277, 282, 287, 292, 294, 303, 331–32, and 336–37). One paragraph remains under assessment for Preliminary compliance with on paragraph (¶334). *See* Training Figure 1, below.

Training Figure 1:            Compliance Status for Training Paragraphs
                          at the End of the Third Reporting Period (December 31, 2020)



Paragraphs in Compliance (**Preliminary** or **Secondary**)   (17)
Paragraphs that have not met Preliminary Compliance   (10)
Paragraphs Under Assessment for Preliminary compliance   (1)

In the third report, there are five deadlines in the Training section (¶¶271, 292, 303, 316, and 321). The City met one deadline (¶316), but missed four deadlines (¶¶271, 292, 303, and 321). By the end of the reporting period, the City achieved the underlying requirement for one paragraph (¶321). *See* <u>Training Figure 2</u>. Although not reflected in the chart below, the City also maintained Preliminary compliance with one of those paragraphs ¶271.

Training Figure 2:            Total Training Deadlines in the Third Report: 5



Met Deadline   (1)
Missed Deadline   (4)

Achieved by December 31, 2020   (+1)  (2)
Remaining Unmet Requirements   (3)

# Training: ¶270

**270.** *The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *In Compliance (SECOND REPORTING PERIOD)*
**Secondary:**          *Under Assessment*
**Full:**          *Not Yet Assessed*

In the second reporting period, the City and the CPD achieved Preliminary compliance with ¶270. In the third reporting period, the City and the CPD maintained Preliminary compliance but did not reach Secondary compliance.

To assess Preliminary compliance, the IMT reviewed whether the meeting requirements of ¶270 are written in policy. To assess Secondary compliance, the IMT reviewed whether relevant CPD members are trained on that policy and whether those meetings are occurring.

Specifically, for Preliminary compliance, the CPD's Special Order S11-11, *Training Oversight Committee*, remained in effect, and Section (II)(E) clearly states that the Training Oversight Committee is required to meet monthly.

For Secondary compliance, the IMT reviewed agendas, minutes, attendance logs, and supporting documents from Training Oversight Committee meetings. The IMT received evidence that the Training Oversight Committee met every month in this reporting period except for April. According to the CPD, this was an oversight, and the Training Oversight Committee met in April, and the CPD will provide this evidence in the fourth reporting period.

The IMT will continue to monitor whether the Training Oversight Committee continues to meet monthly and whether deliberations and decisions occur that substantively reflect policy and Consent Decree requirements. As indicated in the

second reporting period, Secondary compliance cannot be achieved without complying with the monthly meeting requirements. The IMT looks forward to continued progress on these requirements in the next reporting period.

# Training: ¶271

***271**. Within 180 days of the Effective Date, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider: a. information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues; b. input from CPD members of all ranks and their respective collective bargaining units, if applicable; c. input from members of the community; d. recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board; e. changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any; f. court decisions and litigation; g. research reflecting the latest in training and law enforcement best practices; h. information obtained from evaluation of training courses, instructors, and FTOs; and i. member reaction to, and satisfaction with, the training they received.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**     October 30, 2020*     ☐ **Met**  ☑ **Missed**
                  *Extended from August 28, 2020, due to COVID-19
**Preliminary:**  *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**    *Not In Compliance*
**Full:**         *Not Yet Assessed*

During this reporting period, the City and the CPD maintained Preliminary compliance with ¶271 from the second reporting period.

To assess Preliminary compliance, the IMT reviewed whether the needs-assessment requirements of ¶271 are written in policy. To assess Secondary compliance, the IMT reviewed whether the annual needs assessment sufficiently meets the requirements with the subsections of ¶271.

To review Preliminary compliance in the second reporting period, the IMT reviewed, among other documents, the CPD's *Training Needs Assessment* and an addendum to the *Needs Assessment* for the *2020 Training Plan*. Based on these records, the City and the CPD met Preliminary compliance. In our last report, we noted that the CPD needed to improve the needs assessment in future iterations by better addressing all subparagraphs of ¶271 and precisely mapping onto the Training Plan. For example, the CPD needed to record and include attendee information to determine the degree of representative community participation.

In the third reporting period, the IMT reviewed the CPD's *Training Needs Assessment for the 2021 Training Plan*, which demonstrates that the Education and Training Division and the Training Oversight Committee identified and considered a wide variety of areas, as required by the subsections of ¶271. The draft *2021 Training Plan* addresses a wide-range of issues, from pre-service supervisor training to use-of-force training. The CPD also requested and received internal feedback regarding both the *2020 Training Plan* and the draft *2021 Training Plan*. The Plan does, however, lack analysis of the information gathered from the requests for information sent to department members and oversight agencies.

The IMT also reviewed multiple drafts of the *Training Needs Assessment Standard Operating Procedures*—having received the latest draft (dated November 25, 2020) on December 11, 2020. Finalizing and implementing the policy should improve the sustainability of this process.

However, the CPD must specifically address each one of the subparagraphs of ¶271 to progress to Secondary compliance, and the CPD must demonstrate consistency in these processes to achieve Full compliance. The IMT will continue to work with the CPD to create processes that are systematic and self-sustaining in the next reporting period.

## Training: ¶272

*272. Within one year of the Effective Date, and on an annual basis thereafter, the Education and Training Division will develop—and the TOC will review and approve—a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will: a. identify training priorities, principles, and broad goals consistent with this Agreement; b. prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan; c. include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement; d. identify subject areas for CPD training; e. determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program; f. develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements; g. determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material; 79 h. address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement; i. identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities; j. determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff; k. develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training; l. develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and m. identify community-based organizations that represent a broad cross section of the city to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community*

*policing, and make efforts to encourage such participation by such organizations.*

---

**Compliance Progress**　　　　(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | May 2, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from February 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (NEW) | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not Yet Assessed* | |

During this reporting period, the City and the CPD met Preliminary compliance with ¶272 after finalizing the *2020 Training Plan*.

In our last report, the IMT noted that the *2020 Training Plan* addressed the requirements of ¶272. The City and the CPD did not meet Preliminary compliance, however, because the *2020 Training Plan* was not finalized by the end of the reporting period. The CPD finalized the *2020 Training Plan* in the third reporting period.

To determine whether the CPD is on track to maintain Preliminary compliance or achieve Secondary compliance, the IMT also reviewed a draft of the *2021 Training Plan*. To meet Secondary compliance, the annual training plans must substantively address every subsection of ¶272.

At the end of the third reporting period, the draft *2021 Training Plan* was fairly comprehensive, but it still does not adequately address the following subparagraphs:

- (f) "develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements";

- (h) "address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement";

- (j) "determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff"; and

- (m) "identify community-based organizations that represent a broad cross section of the city to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community policing, and make efforts to encourage such participation by such organizations."

To achieve Secondary compliance, the above sections must be fully incorporated into the *2021 Training Plan*. We must also note, however, that the purpose of the annual Training Plan is not a paper process, and so far, the CPD has been unable to produce a compliant training plan in a timeline that maximizes its utility. Specifically, in 2020, training already began before the *2020 Training Plan* was finished. We note that, due to the 64-day COVID-19 extension, the 2021 training year will not begin until March 6, 2021, and we hope that the CPD is able to use the extension to get back on schedule. While many unforeseen events in 2020 had a direct impact on training and training plans—including COVID-19 and the corresponding safety precautions and restrictions—having a finalized training plan *before training begins* will allow the CPD to make informed and strategic modifications to its training when confronted with unanticipated challenges.

We look forward to working with the Education and Training Division and the Training Oversight Committee to review the updated versions of the training plan and to get on schedule that helps the CPD meet its training obligations and goals.

# Training: ¶273

> **273.** *With oversight from the TOC, CPD will develop and implement recruit, field, in service, and pre-service promotional training curricula and lesson plans that comport with CPD's Training Plan and that address the requirements and goals of this Agreement.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, we assessed the City's and the CPD's compliance with ¶273 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether CPD policy addresses the promotional training requirements outlined in ¶273. Overall, we appreciate the Training Oversight Committee's efforts to integrate critical elements of the Consent Decree across many training curricula and lesson plans that are consistent with the *2021 Training Plan*. Special Order S11-11, *Training Oversight Committee*, memorializes these efforts in policy. Specifically, section III(A)(5) requires course materials to be "consistent across subjects" and "in accordance with the law, policy, best practices, and the Consent Decree."

Since the first reporting period, we know that the CPD has been making efforts to revise policies to comply with various requirements across the Consent Decree. Moving forward, we look forward to working with the CPD to holistically develop and implement trainings per S11-11 and the Training Oversight Committee's guidance.

# Training: ¶274

**274.** *Under the supervision of the TOC, CPD's Education and Training Division, pursuant to the Training Plan, will develop and approve training curricula, lesson plans, and course materials that are (a) consistent across subjects; (b) of sufficient quality to adequately communicate the intended subject matter to CPD members; and (c) in accordance with the law, CPD policy, best practices, and this Agreement.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, we assessed the City's and the CPD's compliance with ¶274 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the training development and approval process described in ¶274 is enumerated in CPD policy. The IMT reviewed Special Order S11-11, *Training Oversight Committee*, which memorializes the requirements of ¶274.

To meet Secondary compliance, the CPD must demonstrate that training curricula, lesson plans, and course materials are consistent across subjects. While we raised concerns in our assessment of the City's and CPD's compliance with ¶272 above, we appreciate the CPD's efforts and substantial progress toward completing the *2021 Training Plan*. Still, while the draft *2021 Training Plan* does not include any detailed training curricula, lesson plans, or course materials for the 2021 training, it does include an overview of all training and course descriptions approved by the Training Oversight Committee.

In future iterations of the annual training plan, we expect a higher level of specificity for ¶274. The IMT will affirm compliance by in person class attendance; reviewing TOC documents, class curricula, lesson plans, and other course materials; and interacting with instructors, students, Education and Training Division personnel, and others with direct knowledge of ¶274's processes. We look forward to our continued discussions with the Education and Training Division and the Training Oversight Committee about these important training concepts.

# Training: ¶275

**275.** *The TOC will oversee the integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training, including, but not limited to use of force, weapons training, and Fourth Amendment subjects, as appropriate.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, we assessed the City's and the CPD's compliance with ¶275 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the concept-integration requirements of ¶275 are written in a policy. The CPD's Special Order S11-11, *Training Oversight Committee*, articulates these requirements. Specifically, Section III(A)(8) requires the "integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training, including, but not limited to use of force, weapons training, and Fourth Amendment subjects, as appropriate."

To reach Secondary compliance, the CPD must develop and implement all required training curricula and lesson plans that integrate procedural justice, de-escalation, impartial policing, and community policing. Per other Consent Decree requirements, these training materials must also be consistent with the CPD's training plans.

# Training: ¶277

*277. Where it would add to the quality or effectiveness of the training program, the Education and Training Division will seek the assistance of outside expertise, as feasible, practical, and appropriate, either in developing or reviewing CPD curricula and lesson plans, or reviewing pilot versions of CPD courses.*

**Compliance Progress**      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, we assessed the City's and the CPD's compliance with ¶277 for the first time. The City and the CPD did not meet Preliminary compliance, but the IMT appreciates their efforts during this reporting period.

To assess Preliminary compliance, the IMT reviewed whether the expertise requirements of ¶275 are written in policy, including whether the CPD has written policies or plans and standards for its relationships with outside experts.

In Special Order S11-11, *Training Oversight Committee*, Section III(A)(3)(n) requires the Training Oversight Committee to assess training plans to ensure "development of a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities."

Likewise, Section X of the draft *2021 Training Plan* declares the following:

> [T]he Training Division currently has relationships with a wide variety of community organizations, as well as organizations with outside expertise, to assist with curriculum development, review, and instruction. The collaboration is accomplished in one or more of the following ways: a review of existing materials and materials in development, development of new materials and conducting instruction.

The draft *2021 Training Plan* Appendix G further references additional non-CPD participants.

The IMT also reviewed the Education and Training Division's *Community Organizations and Experts* document, which demonstrates that the CPD is actively engaged in recruiting outside experts and community organizations to provide input to its training.

Neither S11-11 nor the draft *2021 Training Plan*, however, address the requirement for outside experts to review of pilot versions of the CPD courses. The CPD documents the names and affiliated organizations of non-CPD experts who participate in some training processes. But S11-11 does not, however, clearly indicate when such people will be involved in developing or reviewing curricula, lesson plans, or pilot versions of the CPD courses, as required by ¶277.

The documents reviewed by the IMT this reporting period demonstrate that the CPD has incorporated input from outside experts on training. But the CPD has not articulated or enacted processes to hire, retain, evaluate, and terminate outside experts, nor has it established a criterion for the selection and retention of outside experts. The IMT recommends that the CPD consider updating S11-11 Section III(A)(3)(n) and the *2021 Training Plan* to include these missing elements. While the CPD may occasionally be meeting the substantive aspects of ¶277, the CPD must outline these steps in a policy or procedure to ensure sustained compliance. The CPD has suggested that it may prefer addressing these requirements in a standard operating procedure. We look forward to continuing to work with the CPD to address the most efficient path forward.

# Training: ¶278

**278.** *The TOC will continue to oversee a process that effectively incorporates material changes in relevant case law, statutes, and CPD policy into recruit, field, in-service, and preservice promotional training in a timely and effective manner.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City's and the CPD's compliance with ¶278 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the procedural requirements of ¶278 will be overseen by the Training Oversight Committee and memorialized in policy. The CPD met Preliminary compliance for ¶278 with Special Order S11-11, *Training Oversight Committee*. Section III(A)(12) of S11-11, specifically, repeats the procedural requirements of ¶278.

To achieve additional levels of compliance, the CPD must produce records reflecting that monthly Training Oversight Committee meetings are occurring to discuss material changes, including agendas, minutes, and other supporting documents. The IMT will also assess whether the Training Oversight Committee deliberations and decisions substantively reflect the requirements of ¶278, including whether the process is timely and effective.

# Training: ¶280

**280.** *CPD will develop, implement, and utilize a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.*

**Compliance Progress**        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with the requirements of ¶280.

To assess Preliminary compliance, the IMT reviewed whether the CPD has developed a centralized electronic system per ¶280 and has reflected that system into a CPD policy or plan. The Education and Training Division, in conjunction with the Information Services Division, advised the IMT that they are working toward integrating a robust software system to accomplish the requirements of ¶280. The CPD anticipates that the software system, Acadis by Envisage, will be fully functional April 2021.[136] Although the new system is mentioned in the draft *2021 Training Plan*, the CPD did not provide substantive details on it by the end of the reporting period. Nonetheless, Special Order S11-11, *Training Oversight Committee,* Section III(A)(3)(m) states the requirement of this paragraph, which meets the policy requirement for Preliminary compliance.

The IMT reviewed communications between the CPD and the software vendor, Envisage, from March 2020 through October 2020, which demonstrate that the CPD is working toward creating a robust centralized electronic system within the Education and Training Division. The IMT also reviewed a slide deck, a video software demonstration, and the instructional guides regarding system functions for users.

In the meantime, the CPD also worked toward laying the foundation for Secondary compliance during this reporting period. As of September 2020, the CPD began scheduling and tracking in-service training. As of November 2020, the CPD was developing the recruit training scheduling software referenced above. As the CPD continues to input historical data and utilize the electronic scheduling and tracking

---

[136]  *See Acadis*, ENVISAGE, https://www.envisagenow.com/acadis/acadis.

system for all other trainings, including recruit training, the CPD will advance toward Full compliance.

# Training: ¶282

**282.** *All CPD training instructors must be appropriately qualified for their instructional roles and use only approved curricula and lesson plans. CPD will actively recruit and retain qualified instructors to ensure that CPD has sufficient qualified instructors to meet the needs of the Department and requirements of the Training Plan.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, we assessed the City and the CPD's compliance with ¶282 for the first time. The City and the CPD did not achieve Preliminary compliance, but the IMT appreciates their progress toward compliance with the requirements of this paragraph.

To assess Preliminary compliance, the IMT reviewed whether the CPD identified and incorporated qualification requirements into its written requirements. The IMT reviewed Notices of Job Opportunities (NOJOs) for several types of instructors, including instructors for officer wellness, community policing, and procedural justice. Most of the NOJOs clearly articulated qualifications for the positions, indicating that the CPD has thought through appropriate qualifications.[137]

Finally, the IMT reviewed Special Order S11-10, *Department Training Records Maintenance Program*, which addresses a few facets of instructor qualifications. Section 2(J), for example, states that "all instructors must receive approval from the Illinois Law Enforcement Training and Standards Board (ILETSB) in order to teach certified ILETSB courses."

While the CPD has made progress, to achieve Preliminary compliance, the CPD must articulate, in a policy or procedure, what qualifications are required for officers to be considered "qualified instructors" per ¶282. The CPD has suggested that it may prefer addressing these requirements in a standard operating procedure.

---

[137] Relatedly, we also reviewed an audit of the Education and Training Division from August 19, 2020. According to this audit, "fewer than half of the members identified by units as instructors that conducted non-ETD training during the period of review are shown to have attended the Department's instructor training[; w]hile 87 percent of non-ETD courses were taught by Department members, 49 percent of the members conducting those sessions had attended the Department's instructor training." (Capitalization modified from the original).

We look forward to continuing to work with the CPD to address the most efficient path forward.

# Training: ¶287

**287.** *Pursuant to its Training Plan, CPD will develop and implement a process that provides for the collection, analysis, and review of course and instructor evaluations to document the effectiveness of existing training and to improve the quality of future instruction and curriculum. This process will include member feedback on the training they have received and analysis of the extent to which such training is reflected in how members perform. The Education and Training Division will consider this information in conducting its annual needs assessment.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City's and the CPD's compliance with ¶287 for the first time. The City and the CPD did not meet Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the CPD has articulated the procedural requirements of ¶287 in policy. During this reporting period, the IMT reviewed Special Order 20-01, *Course and Instructor Evaluation* (S20-01). S20-01 contains all of the requisite language of ¶287 except for requiring an "analysis of the extent to which such training is reflected in how members perform." Such an analysis requires the CPD to implement post-training evaluations that measure the efficacy of that training. In other words, the CPD must demonstrate the degree to which training is having its intended impact on performance, which is critical.

The IMT is encouraged, however, by the fact that such pre- and post-tests are often occurring. In this reporting period, for example, the IMT reviewed documents that demonstrated several pre- and post-tests have been analyzed.

# Training: ¶292

*292. The Education and Training Division will, on an annual basis, report on training to the TOC and the Superintendent. At a minimum, this report will: a. contain a description of each course, including a summary of the subject matter; b. state the duration, date, location, and number of persons by rank who completed the training; c. identify whether the training was part of the recruit, in-service, or pre-service promotional training program; d. state whether the training was centralized or decentralized, and delivered in person or through electronic means; e. list whether the training was mandatory, elective, or remedial; and f. document the members who did not complete required training and any remedial training actions taken.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**   February 29, 2020      ☐ **Met**   ☑ **Missed**
                March 5, 2021*         ☑ **Not Yet Applicable**
                *Extended from December 31, 2020, due to COVID-19
**Preliminary:**   *Not in Compliance*
**Secondary:**     *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the third reporting period, we assessed the City's and the CPD's compliance with ¶292 for the first time. By the end of the reporting period, the CPD did not meet the deadline requirement for ¶292 and did not meet Preliminary compliance.[138]

To assess Preliminary compliance, the IMT reviewed whether the CPD has written the annual requirements of ¶292 in a policy or procedure.

---

[138] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

The CPD has not crafted a policy or a directive mandating the production of this annual report. The IMT reviewed the Education and Training Division's *Annual Activity Report* for calendar year 2019. The report was addressed to the Superintendent but did not include the Training Oversight Committee, as required by ¶292. Likewise, none of the subparagraphs (a–f) are sufficiently addressed in the *Annual Activity Report.*

The IMT looks forward to reviewing the CPD's written policy or directive that enumerates the requirements of ¶292.

# Training: ¶294

*294. CPD will ensure that upon graduation from the Academy, recruits demonstrate a firm grasp of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. In order to do so, CPD will rely on appropriate evaluation tools to measure recruits' skills and qualifications.*

**Compliance Progress**     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, we assessed the City and the CPD's compliance with ¶294 for the first time. Overall, while the City and the CPD made significant progress in the third reporting period, they did not meet Preliminary compliance with ¶294. To assess Preliminary compliance, the IMT reviewed whether the CPD has written the recruit requirements of ¶294 in a policy.

The City and the CPD created documents to reflect recruit training and examination practices, but the policies do not clearly or fully comport with training goals of ¶294.

Specifically, the IMT reviewed a draft of the *2021 Training Plan*, the *Basic Recruit Procedural Manual Rules and Regulations*, and the *Physical Skills Unit Rules and Regulations*, which address some of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills but fail to address evaluation tools.

Under ¶294, the CPD assessed these materials to determine whether they addressed the following three questions:

(1) What are the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing in Chicago?

(2) What evaluative tools does the CPD rely on to assess a recruit's grasp of these skills upon graduation?

(3) What is the validity, efficacy, and propriety of those tools in measuring recruits' skills and qualifications upon graduation?

The draft *2021 Training Plan* establishes the Education and Training Division's Instructional Design and Quality Control Unit as responsible for developing and administering examinations for recruits in training. The CPD is building toward having the necessary infrastructure to train recruits and evaluate knowledge as required by the Consent Decree, but it is unclear whether the training and evaluation is designed specifically to measure the recruits' basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills, as required by this paragraph.

Some requirements, however, are reflected. The *Basic Recruit Procedural Manual*, for example, includes rules regarding basic technical and tactical skills. The *Recruit Manual's* "Rule 6" provides clear expectations that all recruits must maintain physical fitness required by the Illinois Law Enforcement Training and Standards Board. Recruits must pass a physical test (the Peace Officer Wellness Evaluation Report, known as the POWER test) before admission to the recruit class. The POWER test is also administered three times before recruits graduate from the police academy.

The *Recruit Manual* also provides clear guidance on police control tactics that involve de-escalation techniques, and recruits are evaluated on four tactics, including assailant control, resister control, impact weapons, and operational simulation. The *Recruit Manual* also includes communicative expectations for recruits. Recruit Manual "Rule 4. Deportment," lays out clear guidance addressing courtesy, bigotry, addressing staff and other personnel, and conduct unbecoming of an officer. The *Recruit Manual* clearly articulates the CPD's expectations for interactions with not only police officers but also community members.

Likewise, "Rule 7: Academic Standards and Qualifications" clearly articulates expectations related to academic standards and qualifications. Specifically, it includes maintaining a baseline grade-point average, examination procedures, tests, areas of study, and requirements for successful completion. It also articulates the requirements for recruits to complete written examinations, practical assessments, and pass performance evaluations at various points throughout the curriculum.

The IMT also reviewed the *Physical Skills Unit Rules and Regulations*, which addresses control-tactics training and physical skills training. The Physical Skills Unit administers the annual physical fitness exam and manages the Officer Wellness Program. The IMT assessed the *Physical Skills Unit Rules and Regulations* to determine whether the document addresses any of the skills that form the basis for "safe and effective policing," as ¶294 requires. The "Welcome" section clearly expresses the purpose of the CPD Recruit Training Program and includes expectations for basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills.

Notwithstanding the CPD's progress toward establishing policies that guide and examine recruits' knowledge and skills, it is unclear to the IMT whether recruit expectations are geared towards basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills. The material provided by the CPD does not include references to research and objective knowledge that support the CPD's rules and requirements for recruit behavior. The CPD should holistically consider whether they are addressing the specific needs of Chicago. The IMT recommends that the CPD achieve this goal by addressing all recruit requirements in one document. Further, the CPD must demonstrate the validity of its evaluation tools in determining recruits' firm grasp of requisite skills and qualifications upon graduation, as required by ¶294.

# Training: ¶303

*303. FTOs will receive initial and refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum. FTOs will receive refresher training on an annual basis as part of the In-Service Training Program outlined in this Agreement. FTOs will be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of PPOs.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          February 29, 2020          ☐ **Met**   ☑ **Missed**

May 3, 2021*          ☑ **Not Yet Applicable**

*Extended from February 28, 2021, due to COVID-19

**Preliminary:**          *Not in Compliance*

**Secondary:**          *Not Yet Assessed*

**Full:**          *Not Yet Assessed*

In this reporting period, we assessed the City's and the CPD's compliance with ¶303 for the first time. At the end of the third reporting period, the City and the CPD missed the applicable deadline and did not reach Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the CPD has written the requirements of ¶303 in a policy. The IMT did not receive sufficient evidence that field training officers received the requisite initial and refresher training—"adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum"—by February 29, 2020.

For the remainder of 2020, the IMT reviewed the *2020 In-Service FTO Training Curriculum, 2020 Training Plan*, the draft *2021 Training Plan*, the *2020 Annual In-Service FTO Training Curriculum*, the *Pre-Service FTO Lesson Plan on Use of Force and Control Tactics* for field training officers, and a Field Training Officer Panel course description. These documents describe the quantity, scope, and type of field training officer initial (or *pre-service*) and refresher trainings. The documents also include training topics required by ¶303, such as management and mentoring,

community policing, effective problem-solving techniques, ethics, diversity, and field communication.

The training documents do not indicate, however, how recent substantive changes to the recruit training curriculum were or would be addressed. Thus, the CPD has not yet achieved Preliminary compliance with ¶303.

The CPD should consider creating a policy that requires field training officers to be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of recruits. At the end of the third reporting period, the CPD did not have a policy that would create a timeline for field training officers to train officers on substantive changes to the CPD policies or the recruit training curriculum.

# Training: ¶316

*316.* The TOC will annually review the Field Training and Evaluation Program and consider best practices in this area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program.

## Compliance Progress       (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          December 31, 2020        ✓ **Met**    ☐ **Missed**

**Preliminary:**       *In Compliance* (NEW)
**Secondary:**         *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

The City and the CPD met Preliminary compliance with ¶316 during the third reporting period.

To assess Preliminary compliance, the IMT reviewed whether the CPD has written the requirements of ¶316 in a policy. The CPD's Special Order 11-11, *Training Oversight Committee*, establishes the requirements of ¶316.

During the third reporting period, the CPD also made efforts toward Secondary compliance. The IMT reviewed a PowerPoint Presentation from the December 15, 2020 Training Oversight Committee Meeting; the *Field Training and Evaluation Program 2020 Annual Review*; notes from a February 6, 2020 meeting between the CPD's Field Training and Evaluation Section and the New York Police Department's Field Training Section; and notes from a January 24, 2020 meeting between CPD's Field Training and Evaluation Section and representatives from Agency360, a company that developed field training software. We are encouraged by the CPD's progress during this reporting period.[139]

The IMT looks forward to working with the CPD as they endeavor to achieve Secondary compliance. The CPD should focus on documenting that the Field Training and Evaluation Review Board's referrals and recommendations are provided to the Bureau of Patrol and to the Superintendent, as required by ¶316.

---

[139]  *See* AGENCY360, https://agency360.com.

# Training: ¶317

**317.** *Regular in-service training is critical to ensure that CPD officers continue to hone important policing skills and remain up-to-date on changes in the law, CPD policy, technology, community expectations, and developments in best practices. In-service training should, as appropriate, reinforce CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the IMT assessed the City's and the CPD's compliance with ¶317 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the CPD has written the requirements of ¶317 in policy. The CPD's Special Order S11-11, *Training Oversight Committee*, clearly notes the responsibilities of ¶317. Specifically, S11-11 requires the Training Oversight Committee to provide overarching oversight in Section III(A)(5), (7), and (8). These sections state that the Training Oversight Committee must oversee "the development and implementation of recruit, field, in-service, and pre-service promotional training curricula and lesson plans" and "the integration of" important concepts, such as procedural justice and de-escalation across training curricula.

Looking ahead, the CPD should continue to focus on the integration of key concepts into lesson plans and curricula across all training delivery and evaluations to demonstrate ¶317 requirements.

## Training: ¶319

**319.** *CPD will implement the In-Service Training Program to comport with the Training Plan and the requirements and goals of this Agreement.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT assessed the City's and the CPD's compliance with ¶319 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the CPD has written the recruit requirements of ¶319 in policy. The CPD's Special Order S11-11 *Training Oversight Committee* meets this requirement. Specifically, Section III(A)(5), (7), and (8) clearly note the In-Service Training Program must comport with the training plan and the requirements and goals of the Consent Decree.

Looking ahead, the CPD should continue to focus on integrating the In-Service Training Program to comport with the other training plans, including *2021 Training Plan*, and with the requirements of the Consent Decree.

# Training: ¶320

*320. The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours by the end of 2018; b. 24 hours by the end of 2019; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year.*

## Compliance Progress  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**320(b) Deadline:** March 5, 2021*  ☑ **Not Yet Applicable**

*Extended from December 31, 2020, due to COVID-19

|  | ¶320(a) | ¶320(b) | ¶320(c) | ¶320(d) |
|---|---|---|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) | *In Compliance* (SECOND REPORTING PERIOD) | *In Compliance* (NEW) | *Not Yet Applicable* |
| **Secondary:** | *Not In Compliance* | *Not In Compliance* | *Not Yet Applicable* | *Not Yet Applicable* |
| **Full:** | *Not Yet Assessed* | *Not Yet Assessed* | *Not Yet Applicable* | *Not Yet Applicable* |

Paragraph 320 specifies different requirements across many deadlines. In previous reporting periods, the City and the CPD met Preliminary compliance with subsections (a) and (b). In this reporting period, the CPD met Preliminary compliance with subsection (c). The City and the CPD have yet to meet Secondary compliance with any subsection.

To meet Preliminary compliance with each subsection of ¶320, the CPD must reflect each subsections' requirements in CPD policy or other related record.

Paragraph 270 requires the CPD to develop a written annual *Training Plan*. To satisfy the minimum training hour requirements set out in ¶¶320 and 323, the CPD was required to make significant revisions to its *2020 Training Plan* due to adjustments needed for the COVID-19 pandemic. The CPD worked to revise the *Training Plan* in August 2020, and the IMT engaged in several discussions and reviews of the *2020 Training Plan*.

Likewise, the IMT reviewed Special Order S11-10-01, *Training Notification and Attendance Responsibilities*, which establishes the minimum number of in-service training hours required for 2020.

For Secondary compliance, the CPD must provide the requisite trainings, per subsection. Specifically, the City and the CPD will achieve Secondary compliance by

demonstrating at least 95% of eligible personnel achieved the full in-service hour requirement. Full compliance can be achieved after Secondary compliance has been achieved and sustained in all subsections for at least two consecutive reporting periods.

The IMT reviewed and assessed additional CPD documents, including course criteria for additional training that meets the 32-hour training requirement, and the Tableau dashboard for attendance information. The IMT reviewed the Education and Training Division's diverse course offerings, including courses that are mandatory for certain classes of officers, but are optional for other CPD officers, as appropriate. For example, the Annual School Resource Officer Refresher Training is mandatory for SRO sergeants and School Liaison Sergeants, but officers may submit a special request to take the class.

The following chart, Training Figure 3, reflects the training attendance percentages in CDP's Tableau dashboard as of December 31, 2020, regarding the 2020 training requirements of ¶320.

Training Figure 3

| Course Title | Percentage of CPD Officers who Completed the Course |
|---|---|
| Procedural Justice 1 | 99% |
| Procedural Justice 2 | 99% |
| Procedural Justice 3 | 97% |
| LEMART | 79% |
| Use of Force | 70% |
| Custodial Escorts | 72% |

While the CPD made significant progress toward Secondary compliance—and during the COVID-19 pandemic—the CPD will have to address these gaps moving forward.

# Training: ¶321

***321***. *CPD's In-Service Training Program will include specific courses that will be mandatory for every officer in that training year.*

---

**Compliance Progress**                          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          December 31, 2019          ☐ **Met**    ☑ **Missed**

                       March 5, 2021*              ☑ **Not Yet Applicable**

                       *Extended from December 31, 2020, due to COVID-19

**Preliminary:**       *In Compliance* (NEW)
**Secondary:**         *Under Assessment*
**Full:**              *Not Yet Assessed*

---

In the third reporting period, the IMT assessed the City's and the CPD's compliance with ¶321 for the first time. The City and the CPD missed the training deadline for 2019, and due to the COVID-19 extension, the CPD has until March 4, 2021 to meet the next deadline. Thus, by the end of the reporting period, the City and the CPD met Preliminary compliance.

The CPD achieved Preliminary compliance with this paragraph by articulating in its *2020 Training Plan* which courses will be mandatory during its In-Service Training Program. The *2020 Training Plan* states the following:

> [A]ll non-probationary officers who are active duty and available for assignments, including supervisors and command staff, will receive a minimum of 32 hours of training by the end of 2020. At least 24 hours will consist of in-person mandatory courses re-quired for all sworn personnel; the remaining hours can be pro-vided either as mandatory or elective courses to be delivered in person or through eLearning, depending on the member's train-ing history. Elective hours will not be used for the 32 hours of mandated training for 2020. [*See* ¶320.]

The mandatory classes listed in the *2020 Training Plan* include Use of Force; Custodial Escort; Legal Updates; Law Enforcement Medical Rescue Training (LEMART); Procedural Justice 1, 2, and 3; Community Policing; Officer Wellness; Fourth Amendment; and eLearning courses. The IMT reviewed the course materials for Use of Force, Sexual Assault eLearning, and In-Service Supervisor classes.

To achieve Secondary compliance, the CPD must provide documentation that at least 95% of officers required have completed the training. As of December 31, 2020, the CPD has achieved the training attendance percentages reflected in the below chart, Training Figure 4.

Training Figure 4

| Course Title | Percentage of CPD Officers who Completed the Course |
|---|---|
| Procedural Justice 1 | 99% |
| Procedural Justice 2 | 99% |
| Procedural Justice 3 | 97% |
| LEMART | 79% |
| Use of Force | 70% |
| Custodial Escorts | 72% |
| Officer Wellness | 62% |

While the CPD made significant progress toward Secondary compliance—and during the COVID-19 pandemic—the CPD will have to address these gaps moving forward.

# Training: ¶322

**322.** *CPD's In-Service Training Program may also offer specific courses as elective subjects. The elective subjects will be selected and approved by the TOC in accordance with the Training Plan. The TOC will solicit and consider officer requests and will rely on the Education and Training Division's needs assessments when selecting and evaluating elective subjects.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT assessed the City's and the CPD's compliance with ¶322 for the first time, and they met Preliminary compliance.

To meet Preliminary compliance with ¶322, the CPD reflected the requisite procedure for elective courses in CPD policy or similar record. The CPD has achieved Preliminary compliance, based its clear articulation of this paragraph's requirements in Special Order S11-11, *Training Oversight Committee*. Specifically, Section III(A)(11) states the following:

> *[T]he selection and approval will be in accordance with the Training Plan. The Training Oversight Committee will solicit and consider officer requests and will rely on the Training and Support Group needs assessments when selecting and evaluating elective subjects.*

Further compliance levels may be achieved when the CPD provides documentation that (1) distinguishes elective subjects from mandatory courses; (2) demonstrates that elective subjects are selected and approved by the Training Oversight Committee in accordance with each annual training plan; and (3) demonstrates that the Training Oversight Committee solicited and considered officer requests and relied upon Education and Training Division needs assessments when selecting and evaluating the elective subjects.

# Training: ¶323

> **323.** *As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in person mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Deadline:** | March 5, 2021*  ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2020, due to COVID-19 |
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD achieved Preliminary compliance with ¶323.

To meet Preliminary compliance, a CPD policy or similar record must apportion mandatory and elective courses as required by ¶323. The CPD's Special Order S11-10-01, *Training Notification and Attendance Responsibilities*, meets this requirement. S11-10-01 specifies that, in 2020, officers are required to receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the Training Oversight Committee. S11-10-01 also specifies that, in 2021 and every year thereafter, officers are required to receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the Training Oversight Committee. As a result, the CPD has met Preliminary compliance with ¶323.

The CPD may achieve Secondary compliance if course attendance meets or exceeds 95%.

# Training: ¶331

*331. CPD will require that every newly promoted supervisor, except those promoted to the rank of Commander and above, receives mandatory supervisory, management, leadership, and command accountability training, tailored to each level of supervision and command before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.*

## Compliance Progress   (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

In this reporting period, the IMT assessed the City's and the CPD's compliance with ¶331 for the first time, and they did not meet Preliminary compliance.

To meet Preliminary compliance with ¶331, a CPD policy or similar record must reflect the corresponding supervisor training obligations. The CPD's draft *2021 Training Plan* includes proposed pre-service training class schedules for each promotional rank. Specifically, Section IX(D) states the following:

> *The Chicago Police Department requires newly promoted supervisors and Department members selected for an 'assigned as position' to receive mandatory pre-service training.*

While this language may bring the CPD into Preliminary compliance once finalized, the IMT suggests that the CPD adopt a more permanent manner of articulating the requirements of ¶331, such as in a policy.

The IMT also reviewed other CPD records regarding ¶331, including the following course curricula for newly promoted supervisors: the *Captains' Curriculum, Lieutenants' Curriculum, Sergeants' Curriculum,* and *Promotion In-Place Curriculum.* We also reviewed the curriculum for a four-day *Exempt Command Staff Training*.

Secondary compliance requires affirmation of additional training records and alignment of training with the ¶331 requirements for supervisory, management, leadership, and command accountability topics appropriate to each level of supervision. We look forward to the CPD's continued progress on these requirements.

# Training: ¶332

> **332.** *CPD will require that supervisors, upon their first promotion to the rank of Commander or above, receive mandatory supervisory, management, leadership, and command accountability training, tailored to command staff positions within six months of assignment to or assumption of supervisory responsibilities as a member of CPD's command staff.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT assessed the City's and the CPD's compliance with ¶332 for the first time, and they did not meet Preliminary compliance.

To meet Preliminary compliance with ¶332, a CPD policy or similar record must reflect the corresponding supervisor training obligations. The CPD's draft *2021 Training Plan* includes proposed pre-service training class schedules for each promotional rank. Specifically, Section IX(D) states the following:

> *The Chicago Police Department requires newly promoted supervisors and Department members selected for an 'assigned as position' to receive mandatory pre-service training.*

As with ¶331 above, while this language may bring the CPD into Preliminary compliance once the plan is finalized, the IMT suggests that the CPD adopt a more permanent manner of articulating the requirements of ¶332, such as in a policy.

The IMT also reviewed other CPD records regarding ¶332, including an Exempt Command Staff 4-day training and a virtual Exempt Command Staff Training, both of which took place during May 2020.

Secondary compliance requires documentation of training and attendance records and alignment of training with the ¶332 required supervisory, management, leadership, and command accountability topics appropriate to the commander and above level of supervision.

# Training: ¶334

***334.*** *By January 1, 2020, as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to: a. an overview of CPD's department-wide crime reduction strategies; b. specific methods for developing district-level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate principles of community policing in implementing those crime reduction strategies; c. techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias-based profiling and other forms of discriminatory policing; d. de-escalation strategies and the principles of force mitigation; e. intervening on a subject's behalf when observing a use of force that is excessive or otherwise in violation of policy; f. evaluating the completeness, correctness, and sufficiency of written reports; g. monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies; h. understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank; i. evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process; j. CPD and COPA's disciplinary system requirements and available non-punitive corrective action; k. mentoring officers and fostering career development; l. responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA; m. building community partnerships and guiding officers on how to implement this requirement; and n. CPD policy and legal updates.*

## Compliance Progress   (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** March 5, 2021*  ☑ **Not Yet Applicable**
*Extended from December 31, 2020, due to COVID-19

**Preliminary:** *Under Assessment*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

By the end of the third reporting period, the City and the CPD did not achieve Preliminary compliance with ¶334. As we noted in our last report, the City missed the

first deadline in the second reporting period. Given the COVID-19 extension, however, the City has until March 5, 2021, to meet the second deadline.[140]

To meet Preliminary compliance with ¶334, a CPD policy or similar record must reflect the pre-service promotional training obligations of the paragraph. During this reporting period, the IMT reviewed the following documents to assess compliance with this paragraph:

- Pre-Service Captain Training Course Listing, which addresses subparagraphs (f), (h), (i), (l), and (k);

- Exempt Rank/Command Staff training;

- Lieutenant Training;

- Sergeant Training; and

- A draft *Consent Decree Curricular List*, which is a matrix that aligns specific curricula modules with the requirements of ¶334.

The *Consent Decree Curricular List*, along with the pre-service course listings for each rank, indicate that the CPD is moving toward to Preliminary compliance. The *Consent Decree Curricular List* matrix identifies several courses, however, that are not included in the course listings.

The IMT recommends that the CPD review and edit the *Consent Decree Curricular List* matrix course listings under each subparagraph to accurately match each course with the requirements of each subparagraph of ¶334. Each course listing should also have a corresponding course description. Likewise, keywords cited in

---

[140] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

the course descriptions should connect the course content to this paragraph's requirements. The CPD should also ensure consistency across lesson plans and complete course curricula to ¶334 requirements, as noted in the subparagraphs.

Once these issues are resolved, the CPD may achieve Secondary compliance by conducting the pre-service supervisory training courses and achieving 95% or higher attendance by eligible candidates.

# Training: ¶336

**336.** *Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶336.

To meet Preliminary compliance, the CPD must create the corresponding formalized structure for the field training component. In the second and third reporting period, the CPD provided drafts of Bureau of Patrol Special Order 19-06, *Pre-Service Supervisory Field Observation Days in District Law Enforcement for Sergeants and Lieutenants* (BOP 19-06). The IMT and the OAG provided comments to BOP 19-06, but at the end of the reporting period, the CPD had yet to provide a revised draft.

The IMT looks forward to working toward a finalized policy that would provide the City and the CPD with Preliminary compliance for ¶336.

# Training: ¶337

**337.** *CPD will ensure that all supervisors who are active duty and available for assignment also receive in-service training consistent with the requirements of CPD's In-Service Training Program. As part of the In-Service Training Program, supervisors will receive refresher training related to their supervisory duties and training that covers managerial and leadership skills. The in-service training for supervisors may include, but is not limited to, the topics identified above for pre-service promotional training.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD did not achieve Preliminary compliance with ¶337.

To meet Preliminary compliance, the CPD must reflect the supervisor training obligations in ¶337 in policy. The IMT did not receive a final policy that reflects these requirements. The IMT did receive and review, however, the CPD's *In-Service Supervisor Refresher* course and the *2020 In-Service Training*, which was not finalized during this reporting period. The IMT has since submitted comments, and we look forward to working with the CPD to finalize and implement those materials.

Secondary compliance may be achieved when the CPD confirms that the training delivery matches the curricula and lesson plans and that training attendance requirements are met. To that end, the IMT understands that the CPD intends to apply this training toward the supervisor in-service training hour requirement in 2021. *See* ¶320. The IMT reviewed the slide deck and lesson plan for this course, as well as a *TRR Training Guide* and *TRR worksheet*, which is also a part of this course.

# Training: ¶339

**339.** *Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.*

**Compliance Progress**     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary and Secondary compliance with ¶339 in the second reporting period. In the third reporting period, the City and the CPD maintained Preliminary and Secondary compliance.

In the first reporting period, the CPD provided the IMT with a draft eLearning training for ¶339. In the second reporting period, the CPD incorporated feedback from the IMT and the OAG and implemented the training, achieving Preliminary compliance.

Secondary compliance requires confirming that at least 95% of eligible candidates received and completed the requisite training during each applicable reporting period. By the end of the second reporting period, the CPD reported, via its Tableau dashboard, that it had a 97% completion rate for eligible personnel. According to the CPD, at the end of the third reporting period 97% of its eligible personnel completed the training, and as a result, the CPD has maintained Secondary compliance.

Moving forward, for Full compliance, the IMT looks forward to working with the CPD to verify its training and course evaluation data for ¶339.

# Training: ¶340

**340.** *In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During this reporting period, the City and the CPD met Preliminary compliance with ¶340.

To meet Preliminary compliance, the CPD reflected the policy and procedure obligations in ¶340 in a policy. In the third reporting period, the CPD finalized General Order 01-03, *Department Directives System* (G01-03). Sections XII(A)(1–3) address the requirements of ¶340(a) by addressing officer accountability. Section XII(B)(2) addresses ¶340(b) by addressing supervisor accountability. And Section XI describes a process that addresses the requirements of ¶340(c) regarding documentation.

To track whether CPD officers receive and review policies, ¶340(a) and (c), the CPD provides officers with all directives modified during the previous month via eLearning. Officers must then indicate by clicking a "mark as completed" button, testifying that the officer has received and reviewed the listed new or revised directives. The CPD has also created a Tableau dashboard, entitled *Department Directives Dashboard*, to track, monitor, and analyze compliance with ¶340(a) and (c).

The City and the CPD may achieve Secondary compliance by demonstrating at least 95% of eligible personnel attest to reviewing the new or revised policies. The IMT reviewed documents depicting compliance rates for policies issued during this reporting period that indicated more than 96% of members had "received" the directives between March and August. Compliance rates for September and October, however, were below 95%.

# Training: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report— the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶276, 283–84, 297, 313, 315, 328, 333, 335, and 338 for the Training section.[141]

\*\*\*

## Training: ¶276

> **276.** The TOC will oversee continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques—in addition to traditional lecture formats—into training delivery.

### Compliance Status

The CPD has made progress with ¶276's requirements. In CPD Special Order S11-11, *Training Oversight Committee,* for example, Section III(A)(9) notes the requirements of this paragraph.

Additionally, many of the CPD lesson plans and curricula include the integration of adult-learning techniques. The IMT has attended several training courses and observed varying degrees of integration into actual instructional delivery. While the IMT does not observe the universal application of these requirements in every course, we do note continuing development and integration is occurring and the CPD's instructor evaluations also consider these criteria.

While the City and the CPD indicated that their compliance efforts for ¶276 were impacted by the unanticipated challenges of 2020, the IMT looks forward to assessing compliance with this paragraph.

---

[141] In the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

## Training: ¶283

**283.** *As appropriate to accomplish the requirements and goals of this Agreement, CPD will incorporate experts and guest speakers to participate in the development and instruction of relevant courses, as feasible, practical, and appropriate, including, but not limited to: a. CPD members of all ranks; b. members of the community; c. legal and law enforcement professionals, such as judges, prosecutors, and public defenders; d. crime victims; and e. subject matter experts.*

### Compliance Status

Regarding ¶283, the IMT reviewed the CPD's *Needs Assessment* and the draft *2021 Training Plan.* In developing the *Needs Assessment*, the Education and Training Division sought input from CPD members, community members, collective bargaining units, the Force Review Division, the Bureau of Internal Affairs, Legal Affairs Division, Labor Relation Division, and oversight entities, including the Civilian Office of Police Accountability (COPA), the Deputy Public Safety Inspector General (PSIG), and the Police Board.

Likewise, the draft *2021 Training Plan* includes details about planned "Community and Outside Organization Participation."

Moving forward, the IMT looks forward to reviewing CPD policy that reflects the requirements of ¶283.

## Training: ¶284

**284.** *CPD will require that all new and current Education and Training Division instructors and curriculum developers are certified by the Illinois Law Enforcement Training and Standards Board and, as appropriate to their roles, receive initial and annual refresher training on subjects including, but not limited to, effective teaching, adult-learning techniques, and curriculum development. CPD will further require that instructors are trained in the specific subject matter they are assigned to teach and are also cross-trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction. Instructor training will also include peer review.*

### Compliance Status

The CPD made progress toward complying with ¶284. The IMT reviewed documents that list the CPD instructors who have received Illinois Law Enforcement

Training and Standards Board instructor training and additional CPD instructor courses. However, the IMT could not discern from the documents which instructors were certified by the Illinois Law Enforcement Training and Standards Board and whether there are new or current instructors who have not attempted or met instructor training requirements of this paragraph. The IMT looks forward to receiving clarity regarding these issues from the CPD.

Moving forward, the CPD should also incorporate ¶284 into a CPD policy.

## Training: ¶297

**297.** *CPD will require end-of-course training evaluations of recruits that ensure they graduate with the requisite knowledge and skills to engage in policing activities safely, effectively, and lawfully.*

### Compliance Status

While the IMT has received some materials regarding the CPD's efforts toward complying with ¶297, additional information is necessary. Specifically, the IMT reviewed the draft *2021 Training Plan*, the *Basic Recruit Procedure Manual*, and *Physical Skills* documents for recruits. The CPD has not provided, however, a clear policy statement or documentation that substantiates that the CPD conducts an end-of-course skills evaluation, as well as the State knowledge/certification test.

## Training: ¶313

**313.** *CPD will create a mechanism for PPOs to provide confidential feedback regarding their field training, including the extent to which their field training was consistent with what they learned at the Academy; whether their FTOs did or did not provide effective guidance and instruction; and suggestions for changes to recruit training based upon their experience in the Field Training and Evaluation Program.*

### Compliance Status

In the third reporting period, the CPD provided revised training evaluation programs. To achieve Preliminary compliance, however, the CPD must articulate a policy and a mechanism for confidential recruit feedback, as required by ¶313. Rather than creating a new policy, the CPD should consider amending an existing policy to include this requirement.

## Training: ¶315

**315**. *CPD will create a mechanism for FTOs to provide feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training. The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, FTO feedback on a quarterly basis and, as necessary and appropriate, share such feedback with the Training Oversight Committee, FTOs, and FTO supervisors.*

### Compliance Status

The CPD has made progress toward compliance with ¶315. During this reporting period, the IMT reviewed field training officer working group minutes, surveys, and evaluation materials.

The Field Training and Evaluation Section and the Training Division plan to administer surveys during field training officer refresher training on a quarterly basis to ensure all field training officers have the opportunity to provide feedback throughout the year. The Field Training and Evaluation Section also established an email address for continual feedback about the Field Training and Evaluation Program.

While the City and the CPD indicated that their compliance efforts for ¶315 were impacted by the unanticipated challenges of 2020, the IMT looks forward to assessing compliance with this paragraph.

## Training: ¶328

**328.** *CPD will develop and implement a process for addressing non-compliance with training requirements to ensure that all officers who are active duty and available for assignment, including supervisors and command staff, successfully complete all required training programs within the time frames set out in this Agreement.*

### Compliance Status

In the third reporting period, the CPD made progress toward compliance with ¶328. The CPD's Special Order S11-10-01, *Training Notification and Attendance Responsibilities*, addresses the requirements in ¶328 by introducing the Learning Management System, the training notification process, and the "Daily Training Notification Report," which is accessible through the Jaspersoft Reporting Application. The CPD has also developed an electronic training deviation process via the

CLEAR Application that describes training notification, attendance, and appearance responsibilities of Department members.

While the City and the CPD indicated that their compliance efforts for ¶328 were impacted by the unanticipated challenges of 2020, the IMT looks forward to assessing compliance with this paragraph.

## Training: ¶333

> ***333.*** *The amount of pre-service promotional training may differ according to rank and command, but all pre-service promotional training will be adequate in quality, quantity, type, and scope and will cover topics appropriate to the specific rank and command.*

### Compliance Status

Paragraph 333 relates to training requirements across the Training section and the Consent Decree. As a result, by working toward compliance with other training requirements, the CPD has been working toward compliance with ¶333.

As a first step toward specific compliance with ¶333, however, the CPD should memorialize the "quality, quantity, type, and scope" requirements of ¶333 in an appropriate policy for each specific rank and command. To that end, as of the end of the reporting period, the CPD did not provide a draft of a new or revised policy.

## Training: ¶335

> ***335.*** *The pre-service promotional training for new Sergeants and Lieutenants will include a field training component to provide newly promoted supervisors with a better understanding of the requirements of the position to which they have been promoted.*
> *a. The field training component for new Sergeants will consist of two days of shadowing current Sergeants in districts: one day observing the activities of a District Station Supervisor and one day observing the activities of a Field Sergeant. b. The field training component for new Lieutenants will consist of one day of shadowing a current Lieutenant in a district and observing the activities of a Watch Operations Lieutenant.*

### Compliance Status

The IMT has reviewed draft curricula and policies addressing the requirements of ¶335. The CPD also provided the IMT with a briefing presentation regarding these requirements.

The IMT notes, however, that the Pre-Service Sergeant and Lieutenant course listings provided in the draft *2021 Training Plan* do not indicate a field training component. The IMT hopes to see this addition moving forward.

## Training: ¶338

> ***338.*** *Any training course offered as part of a pre-service promotional training, which is also a mandatory In-Service Training Program course, satisfies that mandatory In-Service Training Program requirement. Any other training course completed during a pre-service promotional training will count towards the total amount of training required by the In-Service Training Program requirement.*

## Compliance Status

At the end of the third reporting period, the CPD did not provide documentation that addresses ¶338's specific requirements. While the CPD has provided the IMT with some related briefings and draft documents—and the CPD may occasionally or as a matter of course already follow ¶338 in practice—the CPD needs to reflect ¶338 in a policy or procedure to meet Preliminary compliance.

# VII. Supervision

This is the Supervision section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Supervision compliance efforts from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** *Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.*

> **342.** *The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.*

> **343.** *CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.*

> **344.** *Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.*

**345.** Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

**346.** Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to

various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

The challenges created by events and circumstances during the third reporting period proved particularly consequential for the City's compliance with the Supervision section of the Consent Decree. For example, staffing shortages and redirected deployments—in response to the COVID-19 pandemic, a rise in crime, civil demonstrations, and civil unrest—significantly slowed policy, training, and practice implementation for Supervision requirements. Nonetheless, the IMT remains encouraged by the CPD's commitment to improving Supervision throughout the organization.

The break in momentum in implementation and expansion of the Unity of Command and Span of Control pilot program has been a particularly large setback for the CPD. Given the importance of close and consistent supervision, the CPD's inability to carry this project forward during these past months is significant.

Still, many executive members of the CPD have demonstrated a commitment to ensuring the success and expansion of the Unity of Command and Span of Control pilot program. If this commitment persists, the CPD may regain momentum as Chicago recovers from the setbacks of this past year. And we look forward to continued collaboration as the CPD expands the pilot program across districts.[142]

At the same time, the CPD's dedication and hard work toward building a strong supervisory framework is unsustainable unless the City provides the CPD with meaningful technology solutions that can provide commanders and supervisors with reliable and timely data concerning staffing and supervision. As with other sections of the Consent Decree, the City is unlikely to achieve Full compliance with all Supervision requirements without the tools to track and monitor those requirements.

In sum, we assessed the City's compliance with 14 Supervision paragraphs during the third reporting period (¶¶348, 355–56, 360, 362, 364, 368, and 370–76) and provide status updates for two additional paragraphs (¶¶353–54). We assessed six of these paragraphs in previous reporting periods and found that the City and the CPD met Preliminary compliance for four paragraphs (¶¶348, 360, 364, and 368).

---

[142] After the end of the third reporting period, the CPD expanded the pilot program into two new districts (the 4th and 7th Districts).

In the third reporting period, the City and the CPD maintained Preliminary compliance for those four paragraphs (¶¶348, 360, 364, and 368), but reach any additional levels of compliance during the third reporting period. *See* Supervision Figure 1.

Supervision Figure 1:          Compliance Status for Supervision Paragraphs at the End of the Third Reporting Period (December 31, 2020)




Likewise, the City and the CPD missed two deadlines in the third report (¶¶370 and 371). The City did not achieve either underlying deadline requirement before the end of the reporting period. *See* Supervision Figure 2.

Supervision Figure 2:          Total Supervision Deadlines in the Third Report: 2





## Supervision: ¶348

**348.** *By January 1, 2020, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶348 but did not reach Secondary compliance. Paragraph 348 requires the CPD to clearly articulate supervisory responsibilities in its policies, such as Use of Force or Crisis Intervention policies. As a result, the CPD must create a process of review and revision of policies for supervision responsibilities.

To evaluate Secondary compliance with ¶348, we reviewed, among other things, the CPD's training development, implementation, and evaluation.

In previous reporting periods, we reviewed General Order 01-07, *Supervisory Responsibilities* (G01-07), and corresponding training documents for G01-07. We also reviewed a matrix—*Supervisor Policy Matrix*—that identified all policies regarding supervisory responsibilities required by the Consent Decree. We found that the CPD achieved Preliminary compliance because the CPD had created a process for reviewing and revising the many supervision-related policies to comply with ¶348. We explained that we expected to continue to review policy development and training data related to the policies.[143]

In the third reporting period, the CPD produced additional materials regarding supervisory responsibilities. This included generalized training materials and curricula; attendance tracking sheets; General Order 01-08, *Supervisory Responsibilities*; and a revised version of the *Supervisor Policy Matrix*. The latest *Supervisor Policy Matrix* is an improvement from the previous version. The CPD has not demon-

---

[143] To be clear, the IMT typically requires the full implementation of policies to qualify for any level of compliance. Paragraph 348, however, describes a review and revision process that will be ongoing throughout—and hopefully after—the life of the Consent Decree. Likewise, many related policies, discussed throughout this report, have "Supervision" sections, which we review and consider for Supervision purposes.

strated, however, that it developed a system for tracking supervisory responsibilities in policies and trainings across all areas of the Consent Decree. This information will be necessary to reach Secondary compliance. We look forward to continuing to work with the CPD as they develop and implement this system.

# Supervision: ¶355

> **355.** *Immediate supervisors will be required to document their actions taken with members under their direct command, pursuant to CPD policy, including, but not limited to: a. non-disciplinary or corrective actions, including, but not limited to, those taken pursuant to any internal or external review of the conduct of CPD officers or taken pursuant to the operation of any existing and future automated electronic systems contemplated by Part D of the Data Collection, Analysis, and Management section of this Agreement; b. disciplinary referrals; c. response to incident scenes as required by CPD policy; d. observations of member conduct, as required by CPD policy; and e. reviews and investigations of reportable uses of force and other reports required by CPD policy and this Agreement.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT assessed the City and the CPD's compliance with ¶355 for the first time. The City and the CPD made progress under ¶355 but did not achieve Preliminary compliance.

To evaluate Preliminary compliance with ¶355, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms." We also reviewed data sources relevant to compliance with the requirements of the paragraph and considered available data that is necessary or helpful to identify, verify, and sustain compliance and reform efforts.

The City and the CPD produced a revised draft of General Order G01-08, *Supervisory Responsibilities*, to the IMT on December 18, 2020. While the draft G01-08 shows progress toward Preliminary compliance, the CPD has not yet met Preliminary compliance, because the collaborative revision process for that policy was ongoing at the end of the third reporting period. We look forward to working with the City, the CPD, and the OAG to finalize G01-08.

# Supervision: ¶356

**356.** *As otherwise set out in this Agreement, CPD will ensure that it makes staffing and allocation decisions that provide for: a. the number of patrol field supervisors to ensure span of control and unity of command as required in this Part; b. the number of well-trained, qualified FTOs, as required in Part H of the Training section of this Agreement; c. the number of well-trained, qualified staff to train recruits and officers, as required in Part D of the Training section of this Agreement; d. the number of well-trained, qualified staff to conduct timely misconduct investigations, as required in the Accountability and Transparency section of this Agreement; e. the number of certified CIT Officers, as required in Part D of the Crisis Intervention section of this Agreement; and f. the number of officer assistance and wellness staff as required in the Officer Wellness and Support section of this Agreement.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made strides toward Preliminary compliance with ¶356. The requirements of this paragraph are multifaceted, however, and the City and the CPD have not yet achieved Preliminary compliance.

To evaluate Preliminary compliance with ¶356, we considered, among other things, whether the CPD has a plan to ensure that staffing and allocation decisions comply with the staffing requirements of this paragraph. We considered the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41).

In previous reporting periods, we noted that the CPD was making thoughtful progress toward the requirements contained in this comprehensive paragraph. The CPD deployed additional sergeants to the 6th District to support the Unity of Command and Span of Control pilot program and hired experts to conduct a comprehensive resource allocation study to inform an appropriate department-wide staffing plan. We urged the CPD to closely monitor the evolution of the Unity of Command and Span of Control pilot program to ensure that training initiatives continue and that appropriate attention is given to addressing staffing and capacity needs based on reliable data.

In the third reporting period, despite facing several unanticipated challenges, the CPD made progress toward the requirements in this paragraph. For example, the Professional Counseling Division worked to increase staffing levels to comply with subsection (f) of ¶356. Additionally, the CPD's *Officer Wellness Support Plan* provides a method by which staffing levels can be continually assessed to ensure sufficient staff to meet demands for services. These are significant strides toward compliance, however, to reach Preliminary compliance, the CPD must demonstrate that it has an actionable plan to ensure that all staffing and allocation decisions are made in a manner consistent with all the requirements in ¶356.

# Supervision: ¶360

*360. By January 1, 2020, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.*

## Compliance Progress <span>(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶360, but they did not achieve Secondary compliance during the third reporting period.

In previous reporting periods, we closely followed the implementation of the Unity of Command and Span of Control pilot program launched in the 6th District. We attended a briefing on the plan and visited the 6th District to talk with officers and supervisors participating in the pilot program. After review of the pilot program, we determined that the CPD reached Preliminary compliance with ¶360.

To evaluate Secondary compliance with ¶360, we reviewed the CPD's relevant training development, implementation, expansion, and evaluation of the pilot program. During the third reporting period, we also completed a virtual visit to the 6th District. Supervisors and participants reiterated a general commitment to the pilot program, but expressed frustrations regarding unanticipated challenges, including the COVID-19 pandemic. These unanticipated challenges substantially limited the CPD's ability to focus resources on the pilot program. Separate from these challenges, it also became apparent that the CPD lacked sufficient technological tools to efficiently compile and analyze the data necessary to evaluate the pilot program.

The CPD's Audit Division conducted an assessment to identify and analyze areas of concern regarding operation of the pilot program in the 6th District. The Audit Division identified that the CPD will have to address data collection methods and mechanisms to properly assess compliance with Unity of Command and Span of Control requirements in the Consent Decree.

We agree, and we appreciate the CPD's efforts to identify areas of improvement. We also appreciate the CPD's desire to develop better data collection methods to

not only ensure compliance with the Consent Decree but also to create a system for continual data-driven assessment that will hopefully extend beyond the life of the Consent Decree.

Throughout the third reporting period, we regularly expressed concern that the CPD may not be in a position to expand the pilot program to the extent planned for 2021. Toward the end of the third reporting period, the CPD explained that the upcoming pilot expansion would be limited to only two additional districts—as opposed to four districts, as originally planned.

The CPD developed a staffing model and implemented that model in the Unity of Command pilot program in the 6th District and is in the process of expanding the pilot program to two additional districts. However, it is unclear the extent to which the staffing model will need to be adjusted to address the unique needs of other districts into which the program has not yet been expanded. The paragraph seeks an actionable plan that will lead toward compliance with the Unity of Command and Span of Control objectives set by the Consent Decree. While the CPD is making steps toward an actionable plan, district-by-district, additional planning, implementation, and assessment are necessary.

For these reasons, the CPD has not yet met Secondary compliance with ¶360. Despite the slowed progress, we remain optimistic that the CPD can harness its continued commitment of the program participants throughout the coming reporting periods. We hope to see the CPD successfully expand and implement the program with the necessary technology to evaluate its success.

Close and consistent supervision is foundational across all sections of the Consent Decree. Therefore, the importance of achieving compliance with ¶360 cannot be overstated. We urge the City and the CPD to continue to allocate attention and resources to the successful and sustainable expansion of the Unity of Command and Span of Control pilot program. While doing so, the City and the CPD should keep in mind the unique needs of each district and how expansion of the pilot program in some districts (and the reallocation of resources needed to expand) can affect other districts.

## Supervision: ¶362

**362.** *By January 1, 2020, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

Although the City and the CPD made positive steps toward compliance with ¶362, they did not achieve Preliminary compliance in the third reporting period.

To evaluate Preliminary compliance with ¶362, we reviewed the CPD's relevant polices following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed data sources relevant to compliance, considering available data that is necessary or helpful to identify, verify, and sustain compliance with review. Specifically, we looked at the CPD's system for tracking employee movement and identifying technical and resource barriers for meeting requirements for Unity of Command and Span of Control. We also reviewed the CPD's Audit Division analysis of its Unity of Command and Span of Control pilot project, which identified data-related issues underlying CPD's currently limited ability to evaluate the program.

In previous reporting periods, we visited the 6th District—where the CPD launched the Unity of Command and Span of Control pilot program—and talked with participating officers and supervisors about the pilot program. We learned that the CPD was using a manual process to capture daily data regarding officer-to-supervisor ratios. We urged that the CPD use technology to automate this process and efficiently monitor and assess the pilot program.

As stated in our analysis for ¶360, the CPD's unanticipated challenges in the third reporting period also impacted compliance with ¶362. Notably, however, the CPD implemented a dashboard intended to display data regarding compliance with Span of Control and Unity of Command requirements. This is a step in the right direction, but additional work is required to ensure that the data underlying the dashboard is reliable. For these reasons, the CPD has not achieved Preliminary compliance with this paragraph.

# Supervision: ¶364

**364.** *Beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance, but did not meet Secondary compliance, with ¶364 during the third reporting period.

To evaluate Secondary compliance with ¶364, we reviewed the CPD's relevant training development, implementation, expansion, and evaluation of the CPD's Unity of Command and Span of Control pilot program, which the CPD launched in the 6th District in early 2020.

In previous reporting periods, we closely followed the implementation of the pilot program. The pilot program attempts to achieve a ratio of no more than 10 officers to a sergeant assigned to field units, on each watch, and in each patrol district. Based on this review, we determined the CPD reached Preliminary compliance with ¶364 in the second reporting period.

We cautioned the CPD that, to maintain Preliminary compliance, it must carefully monitor, evaluate, and refine the staffing model to expand the pilot program and meet the requirements of ¶364 across all CPD districts. To do this, the CPD must consider the unique attributes of each district. Additionally, the CPD should be mindful of the effects that expanding the pilot program in some districts might have on other districts.

As noted in ¶¶360 and 362, the CPD made progress with the pilot program. We are also pleased that, during the third reporting period, the City was able to resolve some of the labor issues that were limiting the City and the CPD's ability to expand the pilot program. The CPD will now expand the pilot program into two additional districts, which have sufficient supervisors to meet pilot program requirements. Although the CPD does not have a sufficient number of sergeants to further expand the pilot, we expect that the CPD will provide a projected schedule for expansion when the CPD is able to promote additional sergeants.

# Supervision: ¶368

> **368.** *Beginning 365 days after the Effective Date, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant.*

**Compliance Progress** (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | May 2, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from February 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) | |
| **Secondary:** | *Not In Compliance* | |
| **Full:** | *Not Yet Assessed* | |

During the third reporting period, the City and the CPD maintained Preliminary compliance with ¶368, but they did not meet Secondary compliance.

To evaluate Secondary compliance with ¶368, we reviewed the CPD's relevant policies, as well as records regarding the expansion of the CPD's Unity of Command and Span of Control pilot program. We also continued to follow developments in the 6th District, where the CPD launched the pilot program.

Based on the pilot program, the City and the CPD reached Preliminary compliance with ¶368 in the second reporting period. Due to the delays noted above, the CPD did not reach Secondary compliance in the third reporting period. We are pleased that that labor issues that we referenced in the Independent Monitoring Report 2 have been resolved. We also commend the CPD for continuing to update the IMT regarding staffing and operational challenges that have impeded further expansion of the pilot program. We look forward to continuing to work closely with the CPD as they allocate resources to the expansion of the pilot program.

## Supervision: ¶370

**370.** *CPD's performance evaluation process will identify, support, and recognize members' activity, performance, and conduct through an assessment of specific quantitative and qualitative performance dimensions, which will address, among other things, constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. Although CPD may use quantitative measures in evaluating members to ensure that members are performing their required duties, CPD will not require members to achieve specific numerical thresholds, such as the number of arrests, investigatory stops, or citations. CPD will ensure that its performance evaluation process is consistent with the law and best practices. Within 18 months of the Effective Date, CPD will revise its performance evaluation policies and practices as necessary to meet the requirements of this Agreement.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Deadline:** | November 3, 2020*  ☐ **Met**  ☑ **Missed** |
| | *Extended from September 1, 2020, due to COVID-19 |
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City and the CPD's compliance with ¶370 for the first time. While the City and the CPD made steps toward compliance with ¶370, they did not achieve Preliminary compliance by the deadline or by the end of the third reporting period.

To assess Preliminary compliance with ¶370, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods.

Specifically, the City and the CPD submitted a draft of Department Notice 20-09, *Performance Evaluations System – Pilot Program* (D20-09) and supporting materials for the Performance Evaluations System. The CPD provided the IMT and the OAG with a presentation on the development of the new Performance Evaluation System. At the end of the third reporting period, D20-09 remained in the review process. While the CPD plans to pilot its Performance Evaluation System in 2021, the CPD did not reach Preliminary compliance, because the CPD did not revise its performance evaluation policies and practices.

We look forward to working with the CPD during the next reporting period to revise the Performance Evaluation System materials. We also look forward to evaluating the effectiveness of the Performance Evaluation System pilot in supporting supervisors' ability to counsel, mentor, and hold accountable officers in their command.

# Supervision: ¶371

**371.** *Annual performance evaluations for members of all ranks, excluding the Superintendent, will be based upon work performance completed during a specific rating period and will include a written description of performance dimension expectations; the member's proficiency in fulfilling the specific duties and responsibilities of the assigned position, unit, or team; any areas of particular growth and achievement; and areas where the member requires further support and/or supervision. The evaluation process will provide for support, feedback, communication of expectations, and, when appropriate, corrective actions.*

**Compliance Progress**     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** December 31, 2019  ☐ **Met**   ☑ **Missed**

March 5, 2021*  ☑ **Not Yet Applicable**

*Extended from December 31, 2020, due to COVID-19

**Preliminary:** *Not in Compliance*

**Secondary:** *Not Yet Assessed*

**Full:** *Not Yet Assessed*

In the third reporting period, we assessed the City and the CPD's compliance with ¶371 for the first time. The City and the CPD did not reach Preliminary compliance with ¶371 in the third reporting period, but they have made progress toward implementing a Performance Evaluation System pilot, which aims to satisfy the requirements of this paragraph.

To assess Preliminary compliance with ¶371, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

During the third reporting period, the City and the CPD made progress toward compliance by working towards implementing a Performance Evaluation System. The CPD plans to pilot the Performance Evaluation System in the 6th District in 2021. On December 4, 2020, less than 30 days before the end of the reporting period, the CPD provided its draft Performance Evaluation System policy and handbook. Although the review and revision process is ongoing, based on the versions reviewed in the third reporting period, we believe that the CPD is well-positioned to meet Preliminary compliance during the fourth reporting period.

# Supervision: ¶372

**372.** *CPD will require supervisors of all ranks to conduct timely, accurate, and complete performance evaluations.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City and the CPD's compliance with ¶372 for the first time. The City and the CPD have been thoughtful in developing a Performance Evaluation System to address the requirements set out in ¶372. While we appreciate the efforts by the City and the CPD to date, they have yet to reach Preliminary compliance because the corresponding policy was still under review at the end of the reporting period.

To evaluate Preliminary compliance with ¶372, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

The CPD's efforts to meet the requirements of ¶372 are encapsulated in the CPD's Performance Evaluation System, which the CPD plans to pilot in the 6th District beginning in January 2021. During this reporting period, the CPD provided a presentation on the development of the Performance Evaluation System to the IMT and the OAG. On December 4, 2020, less than 30 days before the end of the reporting period, the CPD provided a draft of Department Notice 20-09, *Performance Evaluations System – Pilot Program* (D20-09), and supporting documents, such as the Performance Evaluation System Handbook. At the end of the reporting period, the review process was ongoing for these materials, and as a result, the CPD did not meet Preliminary compliance with ¶372.

# Supervision: ¶373

*373. Supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT assessed the City and the CPD's compliance with ¶373 for the first time. The City and the CPD made considerable steps toward but did not ultimately meet Preliminary compliance.

To evaluate Preliminary compliance with ¶373, we reviewed, among other things, the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41).

The CPD's efforts to meet the requirements of ¶372 are reflected in the CPD's Performance Evaluation System, which the CPD plans to pilot in the 6th District in 2021. As referenced above, on December 4, 2020, the CPD provided the IMT and the OAG with a presentation regarding the development of the Performance Evaluation System and has begun the review process of draft Department Notice 20-09, *Performance Evaluations System – Pilot Program* (D20-09), and supporting documents, such as the Performance Evaluation System Handbook. At the end of the reporting period, the City, the CPD, the OAG, and the IMT were still working through the collaborative review and revision process outlined in the Consent Decree (¶¶626–641). Because this process continues, the CPD has not yet met Preliminary compliance.

We note that the integrity of the Performance Evaluation System depends on the successful implementation of the Unity of Command and Span of Control staffing structure. As both the Performance Evaluation System pilot and Unity of Command pilot expand across districts, we will pay close attention to the extent to which unity of command requirements are met.

## Supervision: ¶374

*374. In addition to the formal annual performance evaluation, supervisors will meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify opportunities for improvement.*

**Compliance Progress**                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City and the CPD's compliance with ¶374 for the first time. While the City and the CPD made steps toward compliance with ¶374 during the third reporting period, they did not achieve Preliminary compliance.

To assess Preliminary compliance with ¶374, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. Specifically, in the third reporting period, we reviewed drafts of Department Notice 20-02, *Unity of Command and Span of Control—Pilot Program* (D20-02), and the Performance Evaluation System Directive and Handbook. While we appreciate the work that the City and the CPD put into developing these materials, revisions remain outstanding. Therefore, the CPD has not implemented those materials. As a result, the City and the CPD have not met Preliminary compliance. We look forward working with the CPD as they revise and finalize these materials in the fourth reporting period.

# Supervision: ¶375

*375. Supervisors will recognize, when appropriate, formally (e.g., recommendation for commendation) and/or informally (e.g., public and private praise) subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, and/or community policing.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the third reporting period, we assessed the City and the CPD's compliance with ¶375 for the first time. The City and the CPD made considerable steps toward, but did not ultimately meet, Preliminary compliance.

To evaluate Preliminary compliance with ¶375, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41).

The requirements set forth in ¶375 are covered in the CPD's Performance Evaluation System, which the CPD plans to pilot in the 6th District in 2021. On December 4, 2020, less than 30 days before the end of the reporting period, the CPD produced draft Department Notice 20-09, *Performance Evaluations System – Pilot Program* (D20-09) and supporting documents, such as the Performance Evaluation System Handbook.[144] The collaborative review and revision process outlined in the Consent Decree (¶¶626–41) continues for these materials. Because the CPD has yet to implement these materials, the City and the CPD have not yet met Preliminary compliance.

---

[144] The Performance Evaluation System documents are further discussed in ¶¶370–74.

## Supervision: ¶376

**376.** *CPD will maintain records of performance evaluations in the appropriate electronic data tracking system.*

Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**          *Not in Compliance*
**Secondary:**           *Not Yet Assessed*
**Full:**                *Not Yet Assessed*

In the third reporting period, we assessed the City and the CPD's compliance with ¶376 for the first time. The City and the CPD did not meet Preliminary Compliance with ¶376 in the third reporting period.

To evaluate Preliminary compliance with ¶376, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41).

The requirements in ¶376 are addressed in the CPD's Performance Evaluation System, which the IMT received for review on December 4, 2020.[145] At the end of the third reporting period, the materials regarding the Performance Evaluation System remained in the review process outlined in the Consent Decree, and the implementation of the Performance Evaluation System pilot is set to begin in the fourth reporting period.

The CPD has also faced relevant challenges regarding the acquisition or implementation of appropriate technology. During the third reporting period, the CPD provided the IMT with a demonstration of a performance evaluation computer system. However, the new system was not in place at the end of the reporting period. Notwithstanding these issues, the CPD has made efforts to implement some stop-gap solutions that aim to comply with ¶376. Moving forward, we will continue to look for evidence of data integrity, efficiency, and analytical sophistication to determine the extent to which these systems capture the necessary data to support compliance.

---

[145]   The Performance Evaluation System documents are further discussed in ¶¶370–75.

# Supervision: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶353 and 354 of the Supervision section.[146]

<p align="center">***</p>

## Supervision: ¶353

> **353.** *Additionally, effective supervision requires that immediate supervisors will, for members under their direct command: a. respond to, review, and investigate uses of force and other incidents and conduct as required by CPD policy and this Agreement; b. monitor, manage, and coordinate incident response; c. confirm the correctness, sufficiency, and completeness of written reports submitted for review and approval; d. identify any adverse behavior or misconduct and ensure that it is adequately addressed through corrective action, training, or referral for discipline; e. respond appropriately to each complaint of misconduct received, in accordance with CPD's complaint and disciplinary policies; f. review and act upon information regarding at-risk behavior by the members under their direct command, as required by the Data Collection, Analysis, and Management section of this Agreement; g. advise members under their direct command of available training, professional development opportunities, and employee assistance resources; h. conduct annual performance evaluations and meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify areas for improvement; and i. document the performance of their supervisory duties as required by CPD policy and this Agreement using the appropriate records management system, the Performance Recognition System ("PRS"), and/or the EIS.*

---

[146] In the Monitoring Reports for Year One, we included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

## Compliance Status

Despite the challenges presented during the third reporting period, the CPD moved forward with some initiatives directed toward achieving compliance with this paragraph. This includes planning for the upcoming implementation of the Performance Evaluation System pilot in the 6th District and the Officer Support System Plan, which the CPD developed in partnership with the University of Chicago Crime Lab. The CPD provided the IMT and the OAG with a revised version of General Order 01-08, *Supervisory Responsibilities* (G01-08), on December 18, 2020. We look forward to working with the City, the CPD, and the OAG to finalize this policy under the Consent Decree's collaborative review process.

Overall, we are encouraged by the CPD's progress. We note that the requirements of this paragraph are closely related to requirements of various sections of the Consent Decree, including Use of Force; Accountability and Transparency; and Data Collection, Analysis, and Management. In the coming reporting periods, we intend to consider advancements and actions taken under those sections as we assess compliance with the various requirements delineated in ¶353. We recommend that the City and the CPD continue to focus resources on effective and sustainable implementation of such programs, including acquiring and implementing necessary technological solutions to aid in recording, collecting, and analyzing data and performance.

### Supervision: ¶354

> **354.** *During their tour of duty, immediate supervisors in the Bureau of Patrol will spend time interacting with, observing, and overseeing the members under their direct command, including time in the field, consistent with their duty assignment.*

## Compliance Status

The CPD currently requires supervisors to check in with members of their squads on patrol twice per shift. We understand that these interactions are documented by supervisors in handwritten logs.

Unfortunately, we currently lack sufficient information to assess the CPDs compliance with ¶354. We look forward to meeting with supervisors to evaluate how the required check-ins and documentation of those check-ins are applied in practice. We also look forward to engaging with the City and the CPD in the collaborative revision process of General Order 01-08, *Supervisory Responsibilities* (G01-08).

# VIII. Officer Wellness and Support

This is the Officer Wellness and Support section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Officer Wellness and Support compliance efforts from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> ***377.*** *In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> ***378.*** *The City and CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> ***379.*** *The City and CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> ***380.*** *The City and CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

## Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to

various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

Officer Wellness and Support is very important for the CPD and Chicago. Daily duties require protecting the public, protecting members, and upholding the integrity of the profession, all while frequently facing unpredictable, high-stress scenarios, which can be traumatic. These significant challenges can contribute to mental and emotional difficulties, which can—at their worst—lead to devastating outcomes on or off the job. The IMT is sensitive to the fact that CPD members have faced even more challenges in the past reporting period. Since our last report, CPD members have worked demanding hours during the COVID-19 pandemic, including responding to unrest, and increased rates of violent crime. Some CPD members have suffered serious injuries, and the City has lost several CPD members to COVID-19, accidents, and suicide.

The challenges and grief that the CPD members have faced over the past reporting period—and into 2021—underscore the importance of Officer Wellness and Support efforts. Aware of the unique stressors that law enforcement officers face, the IMT has and will continue to monitor the CPD's efforts to provide a supportive environment in which members have and feel able to use supportive resources.

The CPD and other law enforcement agencies are aware of the devastating outcome of officer suicides and the complexity involved with identifying and implementing solutions. The CPD continues to take a holistic view in addressing the challenges that eventually may lead to suicide. With this holistic approach, the CPD is seeking to address officer wellness early and thoroughly.

In the third reporting period, the City and the CPD met significant milestones towards achieving compliance with requirements in the Officer Wellness and Support section of the Consent Decree. Most significantly, the CPD completed the *Officer Wellness Support Plan*, which includes the CPD's programs, training, and services that build on its commitment to employee safety and health. The plan also demonstrates the commitment of the CPD's Professional Counseling Division to provide comprehensive, high-quality clinical services, and trainings to CPD members and their families. Further, to support this plan, the CPD expanded its staff of qualified clinicians and peer counselors, thus meeting the minimum staffing levels required by the Consent Decree.

During this reporting period, the CPD also rolled out advanced trainings on topics regarding Firearm Owners Identification Cards, Peer Support, and Stress Management. The CPD also made progress updating its *Traumatic Incident Stress Management Program Directive*, E06-03, to ensure that CPD personnel receive the necessary contemporaneous support to mitigate the trauma that they may experience in their daily duties.

Still, the City and the CPD have a significant amount of work ahead. For example, the CPD has identified the need to implement software solutions to allow the Professional Counseling Division to efficiently track and report on its activities, identify trends, and manage caseloads. The CPD has not, however, implemented this software. In the meantime, the Professional Counseling Division has used creative work-arounds to ensure that it is capturing additional data, but additional investment in technology will be required to automate its manual-entry systems.

Overall, the IMT assessed the City's compliance with 19 Officer Wellness and Support paragraphs in the third reporting period (¶¶382–89, 391, 401, 404, 406–11, 415 and 418) and provided status updates for six paragraphs (¶¶390, 412–14, and 416–17). We assessed 14 of these paragraphs in previous reporting periods and found that the City and the CPD met Preliminary compliance for six of those paragraphs (¶¶387, 391, 401, 406, 409, and 411).

We have determined that the City and the CPD maintained Preliminary compliance with two paragraphs (¶¶409 and 411), moved into Preliminary compliance for three paragraphs (¶¶388–89 and 418), and met Secondary compliance for nine paragraphs (¶382–87, 391, 401, and 406). The City did not reach Preliminary compliance with four paragraphs (¶¶407–08, 410, 415). One paragraph remains under assessment (¶404). *See* Officer Wellness Figure 1.

Officer Wellness Figure 1:     Compliance Status for Officer Wellness Paragraphs at the End of the Third Reporting Period (December 31, 2020)



Paragraphs in Compliance (**Preliminary** or **Secondary**)     (5)     (9)     (14)
Paragraphs that have not met Preliminary compliance     (4)
Paragraphs Under Assessment for Preliminary compliance     (1)

The City and the CPD had one deadline in the Officer Wellness and Support section, which they did not meet (¶415). The City and the CPD also did not achieve the underlying deadline requirement for this paragraph (¶415) by the end of the reporting period. *See* Officer Wellness Figure 2.



**Officer Wellness Figure 2:** Total Officer Wellness Deadlines in the Third Report: 1

Met Deadline (0)
Missed Deadline (1)

Achieved by December 31, 2020 (0)
Remaining Unmet Requirements (1)

# Officer Wellness and Support: ¶382

**382.** *CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. By September 1, 2019, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Under Assessment* |

The City and CPD met Preliminary and Secondary compliance with ¶382 in the third reporting period.

To evaluate Preliminary compliance with ¶382, we reviewed the CPD's relevant policies and documents to ensure that they were "plainly written, logically organized, and use clearly defined terms" (per ¶626).

For Secondary and Full compliance, we also reviewed other records regarding ¶382, including the *Officer Wellness Support Plan*. We sought to determine whether the *Officer Support Needs Assessment* (*Needs Assessment*) was completed and whether the shortcomings that we identified were adequately addressed in the CPD's subsequent materials and efforts.

In previous reporting periods, we reviewed and provided comments regarding the *Needs Assessment*. We identified areas needing improvement, such as the lack of a vision for the future of the wellness program and the lack of a plan for using technology to advance wellness programs. Despite these concerns, we also recognized that the *Needs Assessment* satisfied the purpose of informing the development of the Officer Support Systems Plan (*see* ¶¶382 and 384), which the CPD retitled as the *Officer Wellness Support Plan*. We suggested that the CPD could either (1) focus on remedying the shortcomings in the *Needs Assessment* or (2) divert those resources toward developing a comprehensive *Officer Wellness Support Plan*. The CPD opted for allocating those resources toward developing an *Officer Wellness Support Plan* that would address some of the shortcomings of the *Needs Assessment*.

In the third reporting period, we reviewed multiple revised versions of the *Officer Wellness Support Plan*. We believe that (1) the CPD sufficiently addressed the concerns we had with the *Needs Assessment* in the new *Officer Wellness Support Plan*; and (2) the *Officer Wellness Support Plan* provides the framework for assessing the ongoing needs specified in ¶382 and for refining or supplementing services to meet changing or increasing demands.

# Officer Wellness and Support: ¶383

***383.*** *The needs assessment should analyze, at a minimum: a. staffing levels in CPD's Professional Counseling Division; b. the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD; c. how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor; d. the professional specialties of CPD's licensed mental health professionals; e. the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services; f. CPD member feedback, through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program; g. similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week; h. guidance available from law enforcement professional associations; i. the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them; j. the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and k. the quality of recruit training related to stress management, officer wellness, and related topics.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the third reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶383 by developing the *Officer Wellness Support Plan*, which builds on the *Needs Assessment* and serves as the foundation for future assessments.

To evaluate Preliminary compliance with ¶383, we reviewed data sources relevant to the requirements of ¶383 and considered whether the CPD had allocated suffi-

cient resources to effectively conduct a needs assessment as outlined by the paragraph. To evaluate Secondary compliance with ¶383, we considered whether the needs assessment was conducted as required by the paragraph.

In previous reporting periods, we noted that the CPD did not complete the *Needs Assessment* in time to meet the deadline for ¶383. In the second reporting period, the compliance determination remained under assessment as we awaited receipt of the *Officer Support Systems Plan* (now the *Officer Wellness Support Plan*). We noted that a key principle of officer-wellness-related reform is a department's commitment to continual assessment and informed revisions of wellness systems and programs.

As discussed in ¶382, above, we reviewed various revisions of the *Officer Wellness Support Plan*. The *Officer Wellness Support Plan* sufficiently addresses the requirements set out for the *Needs Assessment* in ¶383(a)–(k). Specifically, the *Officer Wellness Support Plan* addresses staffing levels; creates a framework for assessing workload; articulates the specializations of CPD's mental health professionals; provides mechanisms for soliciting CPD member feedback; is based on benchmarks from other agencies and industry best practices; and provides for a comprehensive training program, which was developed with local mental-health experts. Despite the positive development of the *Officer Wellness Support Plan*, the CPD remains limited by its technological capabilities.

Because of these restraints, the CPD has not yet provided evidence to demonstrate compliance with subsections (b), (c), and (e) of this paragraph. As a stopgap measure pending the implementation of a software solution, the Professional Counseling Division developed a detailed manual tracking system to collect some data regarding workload, demand, and wait times for services. While less efficient than an automated system, this allows for continual reassessment.

Finally, a comprehensive wellness program should identify and adapt to newly arising challenges faced by members of the CPD. We believe that the *Officer Wellness Support Plan*, as drafted, allows the flexibility for the CPD to adapt to yet-unknown challenges and provides a framework for further identifying gaps or shortcomings toward meeting Full compliance with subsections (a)–(k). The CPD met both Preliminary and Secondary compliance with ¶383 because the CPD conducted an assessment and addressed concerns by developing the *Officer Wellness Support Plan*. The *Plan* addresses requirements (a)–(k) and allows for flexibility to address later-arising issues. To maintain Secondary compliance and later advance to Full compliance, the CPD will need sufficient technology to accurately collect and report data regarding services rendered and monitor the staffing levels of the Professional Counseling Division.

# Officer Wellness and Support: ¶384

**384.** *Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the third reporting period the City and the CPD met both Preliminary and Secondary compliance with ¶384.

To evaluate Preliminary compliance with ¶384, we reviewed, among other things, the *Needs Assessment* and *Officer Wellness Support Plan* (renamed from the Officer Support Systems Plan named in this paragraph). In previous reporting periods, compliance with ¶384 remained under assessment. We worked closely with the CPD's Professional Counseling Division as it integrated the findings of the *Needs Assessment* into the *Officer Wellness Support Plan*. The plan remained incomplete at the end of the second reporting period, but the CPD's approach was thoughtfully poised to develop a strong foundation for its wellness program. To evaluate Secondary compliance, we completed a qualitative review of the *Officer Wellness Support Plan* to assess its ability to prioritize and address the needs identified by the assessment.

In the third reporting period, we followed the Professional Counseling Division's development and revisions of the *Officer Wellness Support Plan*. The resulting *Officer Wellness Support Plan* is in line with emerging best practices. The plan also has clear organizational charts with new, well-qualified, and specialized staff members to support the implementation of the *Officer Wellness Support Plan*. We reviewed and approved revised policies and new training regarding peer support, stress management, and suicide awareness, which were developed in partnership with local experts.

The Officer Wellness Support Plan sufficiently addresses the Needs Assessment requirements of ¶383. The CPD has also made substantial progress in training, providing services, and documenting activities taken in furtherance of the *Officer*

*Wellness Support Plan*. And importantly, the Officer Wellness Support Plan establishes a framework for iterative review and reassessment of the CPD's ability to meet the wellness needs of its members. For these reasons, the CPD has achieved both Preliminary and Secondary compliance with ¶384.

Although the CPD has made notable progress, the CPD faces significant barriers to achieving Full compliance with ¶384. We believe the Professional Counseling Division provides important services to CPD members, and we appreciate the Division's efforts and ongoing commitment to meeting the requirements of the Consent Decree and the CPD's needs. But the CPD will not reach Full compliance if the Professional Counseling Division does not receive the necessary technology to better schedule, track, and report on the Division's activities. This technology is necessary for the Professional Counseling Division to adequately identify trends, emerging needs, and assure appropriate allocation of resources. Fortunately, the Division has identified a software solution and provided the IMT a demonstration of the identified software.

During the next reporting period, we will look for progress in the procurement and implementation of this software and other technology solutions that will allow the Division to capture essential data to inform addition Division efforts.

# Officer Wellness and Support: ¶385

**385.** *As a component of CPD's Officer Support Systems Plan, CPD will develop and implement a communications strategy. The objectives of this communications strategy will be: a. to inform CPD members of the support services available to them; b. to address stigmas, misinformation, or other potential barriers to members using these services; and c. to emphasize that supporting officer wellness is an integral part of CPD's operations.*

## Compliance Progress      (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD Preliminary and Secondary compliance with ¶385.

To evaluate Preliminary compliance, we reviewed whether the CPD had a sufficient plan to develop and implement a communications strategy per ¶385. For Secondary compliance, we reviewed data and gathered information to determine whether the communications strategy, when put into practice, would be sufficient to meet the objectives of ¶385.

In previous reports, we noted that the CPD anticipated meeting the requirements of this paragraph in its *Officer Support Systems Plan*—which is now called the *Officer Support Wellness Plan*.

During the third reporting period, we reviewed the *Officer Wellness Support Plan*. The *Officer Wellness Support Plan* contains a detailed summary of planned and executed communication strategies for both general dissemination of information about services offered by the Professional Counseling Division and more targeted outreach, such as tailored communications for recruits, supervisors, active and retired members, and peer support.

We also reviewed various forms of communications, including roll-call trainings; pre-service and in-service trainings; and posters and brochures. We appreciate the array of communication channels the Professional Counseling Division has used to communicate with members. We are also encouraged by the Professional Counseling Division's comprehensive training and outreach to dispel misinformation.

Based on the program commitments in the *Officer Wellness Support Plan* and the training developed and delivered by the Professional Counseling Division, we find the CPD to have achieved both Preliminary and Secondary compliance with this

paragraph. Reaching Full compliance will require the CPD to demonstrate sustained implementation of its communications strategy. Moving forward, we will look for evidence that the CPD continues to utilize communications effectively to disseminate information, dispel misinformation, and emphasize the CPD's commitment to the wellness of its officers. Additionally, we encourage the CPD to continuously assess its communication strategy and make adjustments where appropriate.

## Officer Wellness and Support: ¶386

**386.** *As part of this communications strategy, CPD will, at a minimum: a. make information about the support services available, on a continuing basis, to members on its internal websites; b. post information, including pamphlets and posters, in each CPD facility in areas frequented by officers; c. issue wallet-sized cards to every CPD member with contact information for the CPD support services available; d. inform and remind members about the CPD support services offered, including providing handouts with contact information, at the annual use of force training required by this Agreement, during Academy training of new recruits, and at in-service trainings relating to stress management and officer wellness; e. provide training to supervisory personnel regarding available CPD officer support services and strategies for communicating with officers about these services in a manner that minimizes any perceived stigma; and f. seek to identify and correct misperceptions among CPD members about receiving counseling services.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and CPD achieved Preliminary and Secondary compliance with ¶386 during the third reporting period.

To evaluate Preliminary and Secondary compliance with ¶386, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also considered the CPD's training development, implementation, and evaluation. We looked at whether the CPD developed a plan to comply with ¶386 and whether the plan would be effective, when implemented.

In previous reports, we noted that the requirements of this paragraph were anticipated to be included as part of the *Officer Support Systems Plan* (now *Officer Support Wellness Plan*).

In the third reporting period, we reviewed the *Officer Wellness Support Plan*, which includes plans for and demonstrates execution of robust strategic communications to in-service members, recruits, retired members, and family members.

We also reviewed materials produced under this initiative, including roll-call train-ing, online resources, suicide awareness and prevention videos, and a Firearm Owner Identification Card eLearning module. All reflect earnest commitment to dissemination of thorough and accurate information regarding wellness services. Therefore, we find the City and the CPD met both Preliminary and Secondary Com-pliance with ¶386 in the third reporting period.

For Full compliance, we will need to see continued outreach and communication and will assess CPD awareness of Professional Counseling Division services. The CPD will need to demonstrate not only that information is being disseminated but also that the communications are effective in informing CPD members.

# Officer Wellness and Support: ¶387

**387.** *Within 180 days of the Effective Date, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**       *In Compliance* (NEW)
**Full:**                 *Under Assessment*

In the second reporting period, the CPD developed a Firearm Owners Identification (FOID) card roll-call training and, therefore, reached Preliminary compliance with ¶387. During the third reporting period, the City and the CPD successfully delivered the training to the vast majority of members and, therefore, met Secondary compliance with ¶387.

To evaluate Secondary compliance with ¶387, we reviewed information to determine whether the roll-call training was sufficient to explain and address the affect that using support service has on FOID card eligibility.

In the second reporting period, we reviewed the CPD's outline for the FOID roll-call training and the CPD's electronic training module, which addressed the effect that accessing support services has on a member's FOID card eligibility. We determined the training was consistent with state law and provided clear information to members regarding FOID card revocation, FOID card reinstatement, and the impact accessing wellness services has on FOID card eligibility. For these reasons, we found that CPD reached Preliminary compliance in the second reporting period.

During the third reporting period, the CPD finalized the FOID card training, and we reviewed the slide decks showing that this training has been incorporated into the CPD's overall wellness programming. Additionally, the CPD provided documentation showing that 99% of eligible employees had received this training as of December 2020. Post-training survey data also tended to show that CPD members found the training to be effective and clear. For these reasons, the CPD has achieved Secondary compliance with ¶387.

Over the next reporting period, we will look to verify that this training continues to be provided as necessary both in-service and to recruits. Additionally, the CPD

should continue to conduct a survey on this topic every couple of years to determine the extent to which training continues to limit the spread of misinformation or address misunderstanding.

# Officer Wellness and Support: ¶388

> **388.** *As a component of the Officer Support Systems Plan, by January 1, 2020, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initiatives implemented in other large departments and incorporate guidance available from law enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶388.

To reach Preliminary compliance with ¶388, the CPD needed to develop a sufficient *Officer Wellness Support Plan* (renamed from the Officer Support Systems Plan as named in this paragraph) that effectively addressed and implemented a Suicide Prevention Initiative. To determine whether the CPD met Preliminary compliance, we considered the *Officer Wellness Support Plan* and supporting documents from the CPD.

In previous reporting periods, we acknowledged that there is currently no "best practice" approach to use as a benchmark to measure the CPD's efforts. *Compare* ¶730. We recognized, however, that the CPD was working toward a holistic approach to address mental health and wellness. While recognizing the CPD's efforts, we found that the CPD had not yet reached Preliminary compliance because no Suicide Prevention Initiative was in place.

In the third reporting period, the CPD worked toward compliance with ¶388 by creating a holistic wellness program, instead of creating a stand-alone Suicide Prevention Initiative. We believe this is an acceptable approach since death by suicide is an enormously complicated outcome, often rooted in factors that are unknown, unknowable, and still poorly understood. If suicide is understood as a final, extreme expression of unmitigated distress, then a program aiming to prevent suicide must necessarily provide a range of services that prevent and address graduated levels of distress far upstream from the point at which suicidal ideation might occur.

As mentioned in earlier paragraphs, we have reviewed various revisions of the *Officer Wellness Support Plan*. On December 30, 2020, the CPD submitted a further revised *Officer Wellness Support Plan* to include language explaining the CPD's holistic approach toward suicide prevention. In addition, we reviewed communications regarding expanded Employee Assistance Program (EAP) services, based upon survey findings reflecting awareness of CPD members of the services offered through the EAP, and a revised *Traumatic Incident Stress Management Plan* directive. These efforts, in combination with the *Officer Wellness Support Plan*, allowed the City and the CPD to reach Preliminary compliance with ¶388. In finding Preliminary compliance, we remain mindful of the gravity and complexity of the task set out in ¶388 and caution that the work of the CPD (and law enforcement agencies across the nation) regarding suicide prevention remain very much in their early stages.

In the fourth reporting period, we will monitor the CPD's implementation, expansion, and review of the services in the Officer Wellness Support Plan. We will also seek feedback from clinicians and CPD members to determine whether the services provided are proactively and reactively meeting the wellness needs of the CPD, its members, and the Chicago community. The CPD should continually assess CPD members' challenges and wellness concerns and strive to meet those needs. The CPD should strive to anticipate and timely address its members wellness and mental health concerns. This will require a feedback loop from members of all ranks to ensure that the Professional Counseling Division and the entire CPD are aware of the mental-health needs of those in the CPD.

# Officer Wellness and Support: ¶389

**389.** *At least annually, the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | May 3, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from February 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (NEW) | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶389, due in large part to the efforts of the Professional Counseling Division Director and staff in maintaining manual records of the metrics required under this paragraph. We urge the City and the CPD to focus efforts on obtaining and implementing technological solutions to maintain Preliminary compliance and achieve additional levels of compliance with this paragraph.

To evaluate Preliminary compliance with ¶389, we considered whether the Professional Counseling Division Director provided a written report to the Superintendent, as required by the paragraph. We reviewed data sources relevant to the requirements of ¶389. We also considered relevant policies and documents that pertain to the annual report and the drafting of that report.

The CPD did not reach Preliminary compliance in past reporting periods because the CPD's ability to satisfy the requirements of the paragraph was stalled by insufficient technology to collect and aggregate necessary data. Instead, the CPD was using manual forms to track clinical work and compose weekly reports. While we appreciated the Professional Counseling Division's interim efforts, we found that this manual method did not allow for analysis of core metrics or data aggregation required by ¶389.

During the third reporting period, we reviewed drafts of the Standard Operating Procedure 19-01 and CPD Directive E06-01 *Professional Counseling Division*. After providing comments and receiving revised drafts, we approved both.

In addition, the Professional Counseling Division revised the manual forms it uses to track clinical work and provided the Superintendent weekly reports that capture snapshot data regarding unit activities, including training and provision of services.[147] These forms are a temporary means of reporting some data to the Superintendent as required by ¶389. This weekly data was used to compile an annual report and was submitted through the chain of command to the Superintendent.

Because of the CPD's adaptive effort to provide weekly reports and the fact that the report due date was extended in response to COVID-19, the City and the CPD reached Preliminary compliance. To maintain Preliminary compliance, however, the CPD must deliver an annual report that contains all data points required by ¶389 following the new upcoming annual deadlines.

As referenced above, including in our assessment of ¶384, the Professional Counseling Division lacks the technology necessary to record services and produce the data required by ¶389. This data includes anonymized data concerning services provided to members—including time for members requesting services to receive services—and data necessary to inform recommendations for policies, training, and resources. Notably, the Professional Counseling Division has identified a software solution that will allow for appropriate, confidential tracking of the Professional Counseling Division's activities from intake through therapy. In the next reporting period, we will be looking for progress in the procurement and implementation of this software and other technology solutions that will enhance efficiency and allow the Division to capture essential data.

---

[147] This data was aggregated to provide an annual review of the clinical work data.

# Officer Wellness and Support: ¶391

**391.** *CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) by January 1, 2020. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***In Compliance*** (SECOND REPORTING PERIOD) |
| **Secondary:** | ***In Compliance*** (NEW) |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶391.

To evaluate Secondary compliance with ¶391, we considered the staffing levels of the Professional Counseling Division, the demand for services, and the types of services provided by the Professional Counseling Division. While the CPD is able to contract with mental-health professionals under the paragraph, we considered whether the CPD had sustainably staffed and developed of the Professional Counseling Division, without the need for contractors.

In the second reporting period, the CPD reached Preliminary compliance by expanding clinical resources and hiring additional clinicians in the Professional Counseling Division. While we were encouraged to see these efforts, we noted that the CPD continued to fall short of staffing models.

During the third reporting period, we reviewed a variety of related materials including the Professional Counseling division weekly reports, CPD Clinical Therapist position postings, the *Officer Wellness Support Plan*, Employee Assistance Program (EAP) Pre-Service materials, and *Traumatic Stress Incident Management Program* materials.

In sum, the CPD achieved Secondary compliance by (1) maintaining staffing levels as required by this paragraph (at least 10 full-time licensed mental health professionals), (2) strategically assigning its clinical workforce, and (3) continually evaluating the staffing levels necessary to meet increasing needs.

The Professional Counseling Division has also outlined a strategic plan in the *Officer Wellness Support Plan* to ensure that the Division is sufficiently staffed, equipped, and trained. For Full compliance, we will review whether staffing levels and assignments are maintained, assessed, and addressed, especially once the necessary software solution is fully implemented.

# Officer Wellness and Support: ¶401

**401.** *CPD currently offers anonymous support groups and pro-grams for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Profes-sional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted prac-tices in the field of addiction treatment (e.g., 12-step addiction treatment program), and that each program is reviewed at least annually by the Director of the Professional Counseling Division.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** May 3, 2021*  ☑ **Not Yet Applicable**
*Extended from February 28, 2021, due to COVID-19
**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

The City and CPD reached Preliminary compliance with ¶401 during the second reporting period. In the third reporting period, they achieved Secondary compli-ance.

To evaluate Secondary compliance with ¶401, we considered (1) whether the CPD has a licensed health professional overseeing anonymous support groups and pro-grams for alcoholism and other addictions and (2) whether the CPD's support group programs adhere to generally accepted practices. To make this determina-tion, we considered available, relevant data to assess the program and the person-nel responsible for the program.

Previously, the CPD increased the staffing of its Employee Assistance Program, adding six substance-use-disorder-treatment counselors who work under the Pro-fessional Counseling Division Director's Supervision. We found that the CPD was in Preliminary compliance as a result of ensuring adequate staffing levels necessary for the support groups and programs required by ¶401.

During the third reporting period, we reviewed the *Officer Wellness Support Plan*, Professional Counseling Division Standard Operating Procedure 19-01, and weekly reports provided by the Professional Counseling Division Director to the Superin-tendent. These documents depict the organization and supervision of substance-use-disorder services and clinicians, training activities relevant to ¶401, and num-bers of members served. Therefore, the CPD has achieved Secondary compliance with this paragraph.

Moving forward, we will look for evidence that the Professional Counseling Division continues to provide substance-use-disorder counseling in accordance with the requirements of ¶401. We will also look for evidence that the Professional Counseling Division Director has completed an annual review of the substance-use-disorder programming and support groups being offered by the CPD.

## Officer Wellness and Support: ¶404

**404.** *CPD will maintain a peer support program, ensuring that: a. a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program; b. Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symptoms and conditions, suicide assessment and prevention, dependency and abuse, and support services available to CPD members; c. Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training; d. CPD offers Peer Support Officers the opportunity to meet at least annually to share successful strategies and identify ways to enhance the program; e. Peer Support Officers receive and comply with a written procedures manual approved by a licensed mental health professional assigned to the Professional Counseling Division; f. Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruitment of volunteers and widespread access to peer support services; and g. the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective management of the program and that preserves the anonymity and confidentiality of members receiving peer support services.*

---

**Compliance Progress**　　　(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2020, due to COVID-19 | |
| **Preliminary:** | *Under Assessment* | |
| **Secondary:** | *Under Assessment* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD made significant progress toward Preliminary and Secondary compliance with ¶404 in the third reporting period. Because some additional evidence is needed, the City and the CPD's efforts for are ¶404 still under assessment.

To evaluate Preliminary compliance with ¶404, we considered whether the CPD has allocated sufficient resources to maintain the peer support program and whether the CPD offers Peer Support Officers the opportunity to meet at least annually to share strategies and enhance the program. We reviewed all accessible data relevant to ¶404 efforts, including records of meetings, and considered other

sources of data, such as communications with CPD members, and any policies developed regarding the peer support program.

In previous reporting periods, we reviewed the Peer Support Training manual, Peer Support Guidelines, a document titled "Expectations and Requirements for a Peer Support Member," and Peer Support Confidentiality Forms. We found that the documents at that time were insufficient to establish compliance with the requirements of ¶404.

In the third reporting period, we reviewed various peer support program materials, including training materials, the peer support organizational chart, and team manual. We have been impressed by CPD's enhancement of its Peer Support Program. Consistent with the aim of the Traumatic Incident Stress Management Program, the Peer Support Program provides for coordinated and comprehensive outreach and service to CPD members experiencing traumatic incidents.

As mentioned above, we also reviewed the peer support program training. The CPD developed this training in partnership with outside subject-matter experts. While the materials demonstrate a substantively strong training, we note that the materials are devoid of training points on alcohol- and substance-use disorders. The CPD has indicated an Alcohol and Drug Counselor attends the training. We look forward to observing the training to get a better picture of this training in action. In addition to the need for assurance that sufficient training is provided on alcohol and substance abuse, the finalization of a peer support program training manual is also holding the CPD back from attaining Secondary compliance. While the CPD has made good progress in documenting its training program, it is important for this good work to be consolidated in a formal manual, specific to peer support.

# Officer Wellness and Support: ¶406

**406.** *By January 1, 2020, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that: a. the purpose of the Chaplains Unit is to: i. support the wellness of CPD members who voluntarily seek consultation with representatives of the Chaplains Unit; ii. make referrals to licensed mental health professionals and other service providers, when appropriate; iii. provide pastoral care to CPD members who voluntarily seek such services; iv. offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and v. provide support in moments of crisis as requested by CPD members. b. when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy. c. representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit.*

## Compliance Progress  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶406 in the third reporting period.

To evaluate Secondary Compliance with ¶406, we reviewed the CPD's training development, implementation, and evaluation. We evaluate training materials using the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment, curriculum design and development, training implementation (or delivery), and training evaluation. To make this assessment we review various documents, including training materials and training instructor qualifications. We also, when possible, observe the trainings.

In the second reporting period, the CPD timely submitted a draft of and subsequently revised its Standard Operating Procedure 20-01 (*Chicago Police Department Chaplains Unit*). The CPD reached Preliminary compliance because the CPD implemented the standard operating procedure—after receiving no objections from the IMT and the OAG—which substantively addressed ¶406 requirements.

In August 2020, the CPD provided Chaplains Unit SOP training materials to the IMT. The IMT and the OAG reviewed the materials and provided feedback. The CPD revised the training materials accordingly, and in November 2020, we provided a no-objection letter to the revised training materials. The CPD also provided documentation demonstrating the chaplains' receipt and review of the training materials. Therefore, the City and the CPD have met Secondary compliance with ¶406.

Moving forward, we will look for evidence that the Chaplains Unit is operating in a manner consistent with the policy and training. The CPD should also regularly assess the extent to which the Chaplains Unit is operating in accordance with the standard operating procedure.

# Officer Wellness and Support: ¶407

**407.** *CPD will continue to require that whenever a CPD member has experienced a duty-related traumatic incident, the member must attend counseling with a licensed mental health professional. The Director of the Professional Counseling Division or his or her designee will be responsible for documenting that a CPD member has attended the mandatory counseling and has completed the requirements of the Traumatic Incident Stress Management Program prior to the member returning to regular duty assignment. CPD will require any CPD member who has experienced a duty-related traumatic incident, unless medically unable to do so, to meet with a licensed mental health professional within seven days of the incident, and will ensure that it has an adequate staff of licensed mental health professionals who can accommodate this timing requirement.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, we assessed the City and the CPD's compliance with ¶407 for the first time. The City and CPD made strides toward, but have not yet reached, Preliminary compliance with ¶407 because the corresponding policy was not finalized in the third reporting period.

To evaluate Preliminary compliance with ¶407, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

In the third reporting period, the CPD revised Directive E06-03, *Traumatic Incident Stress Management Program* (E06-03). We reviewed and ultimately approved the directive after the CPD completed revisions. The revised directive requires that any officer who experiences a duty-related traumatic incident attend counseling with a licensed mental-health practitioner. The Professional Counseling Division Director is responsible for documenting compliance with this requirement. However, at

the end of the reporting period, E06-03 had not yet been through the public comment period. The completion of this process is necessary to achieve Preliminary compliance.[148]

The CPD's ability to track compliance with the Traumatic Incident Stress Management Program could ultimately hinge on the implementation of software support. We understand that until this technology is implemented, the CPD will use existing software, CLEAR, for tracking notification requirements. This software, however, is not useful for tracking the delivery or completion of counseling requirements. As with other paragraphs, the ability to accurately track information regarding this paragraph will be key to the CPD meeting additional levels of compliance.

---

[148] While the CPD received no objections from the IMT and the OAG, the CPD did not post the policy for public comment in the third reporting period. In some sections, we found that the City and the CPD met Preliminary compliance when the CPD posted a policy for public comment within the third reporting period—even if the public comment period continued into the fourth reporting period. *See, e.g.*, Community Policing section. We believe that it is important that the City and the CPD meaningfully consider public comments and revise policies, as warranted. As a result, in these instances, rather than rushing its review within the reporting period, the CPD will have to meaningfully consider the public comments—and make appropriate revisions to that policy—to maintain Preliminary compliance.

# Officer Wellness and Support: ¶408

**408.** *In addition to providing mandatory initial consultations and additional consultations as appropriate or as requested by CPD members, CPD's licensed mental health professionals will follow up with members who have experienced a duty-related traumatic incident within six months to offer additional support services.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City and the CPD's compliance with ¶408 for the first time. The City and the CPD made progress toward, but ultimately did not meet, Preliminary compliance with ¶408 in the third reporting period because the corresponding policy was not finalized in the third reporting period.

To evaluate Preliminary compliance with ¶408, we reviewed, among other things, the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

In the third reporting period, the CPD revised the *Traumatic Incident Stress Management Program* Directive, E06-03, and we approved the revised draft, as discussed in ¶407. The directive addresses the requirements of this paragraph; however, the Directive has not yet been submitted for public comment. Therefore, the City and the CPD have not yet met Preliminary compliance with this paragraph.

Again, we reiterate the CPD's ability to adequately track compliance with the directive may hinge on the implementation of a software solution. To reach additional levels of compliance, the City and the CPD should focus on implementing an effective means of tracking the necessary data.

# Officer Wellness and Support: ¶409

*409. CPD has implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**     *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

While the City and the CPD maintained Preliminary compliance and made progress during the third reporting period, the City and the CPD did not meet Secondary compliance with ¶409.

To evaluate Secondary Compliance with ¶409, we reviewed the CPD's training development, implementation, and evaluation. We evaluate training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment, curriculum design and development, training implementations (or delivery), and training evaluation. To make this assessment, we review various documents including training materials and training instructor qualifications. We also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities in ¶409.

In the first reporting period, the CPD implemented a mandatory, Commission on Accreditation for Law Enforcement Agencies (CALEA) qualified program for officers who have experienced an officer-involved firearm discharge. The program was also directed by a licensed clinical psychologist. For these reasons, the CPD reached and maintained Preliminary compliance with ¶409.

In the third reporting period, we reviewed the *Traumatic Incident Stress Management Program* Directive, E06-03, Traumatic Incident Stress Management Program form, and clinician's training, which address the requirement set out by ¶409: a program for members experiencing an officer-involved firearms discharge. The clinician's training reflects much of what is required under this paragraph, including the identification of a traumatic incident, the role of the supervisor, the responsibilities of the chain of command, referrals to the Professional Counseling Division, and clinical responsibilities. However, the training has not yet been finalized and

submitted to the IMT and the OAG for review. For this reason, we find that the CPD is not yet in Secondary compliance with ¶409.

# Officer Wellness and Support: ¶410

*410. CPD will continue to place any CPD member who has discharged a firearm, excluding training discharges, unintentional discharges, or discharges for the destruction of an animal where no person was injured, on mandatory administrative duty assignment for a minimum period of 30 days. Prior to permitting the member to return to regular field duties, CPD will require the member to (a) complete the Traumatic Incident Stress Management Program and any training determined by CPD to be appropriate; and (b) receive authorization from the First Deputy Superintendent. Authorization to return to regular field duties may be withheld pending the outcome of any administrative or criminal investigation.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, we assessed the City and the CPD's compliance with ¶410 for the first time. The City and CPD made significant advancement toward, but ultimately did not meet Preliminary compliance with ¶410.

To evaluate Preliminary compliance with ¶410, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

As noted in ¶¶407–08, the CPD revised the *Traumatic Incident Stress Management Program* Directive, E06-03, and we provided a no-objection notice to the revised draft during the third reporting period. While we believe the directive addresses the requirements of this paragraph, the CPD did not submit E06-03 for public comment or consider public comments by the end of the third reporting period.[149]

---

[149]  While the CPD received no objections from the IMT and the OAG, the CPD did not post the policy for public comment in the third reporting period. In some sections, we found that the City and the CPD met Preliminary compliance when the CPD posted a policy for public comment within the third reporting period—even if the public comment period continued into the fourth reporting period. *See, e.g.*, Community Policing section. We believe that it is important that the City and the CPD meaningfully consider public comments and revise policies, as warranted. As a result, in these instances, rather than rushing its review within the reporting period, the CPD will have to meaningfully consider the public comments—and make appropriate revisions to that policy—to maintain Preliminary compliance.

Additionally, the CPD's ability to adequately track compliance with the directive may hinge on the implementation of a software solution. This will be important as the CPD seeks to reach additional levels of compliance.

.

# Officer Wellness and Support: ¶411

> **411.** *At least annually, CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**    May 3, 2021*    ☑ **Not Yet Applicable**
*Extended from February 28, 2021, due to COVID-19
**Preliminary:**    *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

In the third reporting period, the City and the CPD maintained Preliminary compliance with ¶411. The City and the CPD are also making progress toward Secondary compliance with ¶411. However, the CPD does not yet have necessary technological solutions to adequately track data necessary to meet Secondary compliance.

To evaluate Secondary Compliance with ¶411, we reviewed the CPD's training development, implementation, and evaluation. We evaluate training materials using as our standard the "ADDIE" model of curriculum development and implementation. We also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities delineated by ¶411. Finally, we looked for the CPD to provide comprehensive data showing the types of traumatic incidents triggering the obligations of ¶411, the services provided in response to traumatic incidents, and completion of the program.

In previous reporting periods, we reviewed a report produced by the CPD's Audit Unit entitled Review of the Traumatic Incident Stress Management Program. This report pointed out, among other things, the number of members who had been referred to and attended the CPD's Traumatic Incident Stress Program in the recent past. We found the CPD in Preliminary compliance because of the assessment and groundwork completed by the CPD.

During this reporting period, we reviewed the *Traumatic Incident Stress Management Program* policy, E06-03. While the IMT and the OAG sent no objections to the policy in December 2020, the CPD did not post E06-03 for public comment by the end of the third reporting period. As a result, the CPD did not finalize or train personnel on E06-03 to reach Secondary compliance.

This reporting period, we also sought from the CPD comprehensive data that clearly (1) identifies duty-related traumatic incidents that trigger the obligations of this paragraph, (2) links the required services to the events in question, and (3)

documents completion. We are satisfied that the CPD is duly documenting duty-related traumatic incidents in the CLEAR system. However, the CPD has not produced documentation to establish that it is linking requisite services to each event or documenting the completion of those services for each event. We understand that the CPD envisions adding new software solution. For compliance, the CPD will need to implement a means to collect and evaluate necessary data.

# Officer Wellness and Support: ¶415

**415.** *By July 1, 2020, and periodically thereafter, CPD will conduct a department-wide equipment and technology audit to determine what equipment is outdated, broken, or otherwise in need of repair or replacement. During each audit, CPD will solicit feedback from representatives of the collective bargaining units representing CPD members.*

---

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**  September 3, 2020*  ☐ **Met**  ☑ **Missed**
*Extended from July 1, 2020, due to COVID-19
**Preliminary:**  *Not in Compliance*
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

In the third reporting period, we assessed the City and the CPD's compliance with ¶415 for the first time. The City and the CPD did not meet Preliminary compliance with ¶415 in the third reporting period or meet the corresponding deadline.

To evaluate Preliminary compliance with ¶415, we sought to review relevant polices and documents created to effectuate and ensure periodic department-wide equipment and technology audits. The City and the CPD did not, however, provide records to demonstrate compliance with this paragraph during the third reporting period. We look forward to working with the City and the CPD in the coming reporting periods as they work toward compliance with this paragraph.

# Officer Wellness and Support: ¶418

> ***418.*** *In order to facilitate physical health and mental well-being, CPD will ensure its members have access to exercise equipment at CPD facilities in geographically dispersed areas throughout the City.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, we assessed the City and the CPD's compliance with ¶418 for the first time, and they met Preliminary compliance with ¶418.

To evaluate Preliminary compliance with ¶418, we reviewed lists provided by the CPD accounting for the exercise equipment in the CPD's possession and listing the location of the equipment. The information provided shows that the CPD has exercise equipment for CPD members spread geographically across Chicago. We therefore find the CPD in Preliminary compliance with this paragraph.

Moving forward, we will determine whether CPD members have sufficient access to the equipment captured in these lists, especially as COVID-19 restrictions lift. We also suggest that the CPD conduct a survey to determine whether the access to equipment in each location meets the demand present in each.

# Officer Wellness and Support: Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶390, 412–14, and 416–17 of the Supervision section.[150]

<p align="center">***</p>

## Officer Wellness and Support: ¶390

> **390.** *CPD currently employs three licensed mental health professionals and a supervising psychologist who serves as the Director of CPD's Professional Counseling Division. CPD offers free counseling services to CPD members through the Professional Counseling Division and through external referrals in certain circumstances. CPD will expand its capacity to provide the counseling services to CPD members as set forth in this Agreement.*

### Compliance Status

The CPD now employs 10 full-time clinicians in the Professional Counseling Division. This enables the Professional Counseling Division to expand its services. In addition to these clinicians, the Professional Counseling Division has a staff of 14 full-time peer support counselors who have training in substance-use-disorder counseling. We commend this staffing. We understand that the past ten months have presented great and unexpected challenges. With this, we will be particularly interested in the CPD's ability to meet a possibly increased demand for wellness services.

We also look forward to observing the implementation of new technology, which may alleviate administrative inefficiencies. We encourage the CPD to continually assess and respond to demands for such services by adjusting staffing levels and seeking necessary expertise to adequately supplement the services available to members.

---

[150] In the Monitoring Reports for Year One, we included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

## Officer Wellness and Support: ¶412

*412. Where it would add to the quality or effectiveness of the training, CPD will involve mental health professionals, as feasible, practical, and appropriate, in developing and reviewing recruit and in-service training on stress management, alcohol and substance abuse, officer wellness, and the support services available to CPD members.*

### Compliance Status

During the third reporting period, the CPD engaged the expertise of several professionals outside of the CPD. These professionals assisted with development of the peer support program and substance-use-disorder counseling. Professionals also assisted the Professional Counseling Division to compile an impressive library of training materials for the services in this paragraph.

We recognize that the Professional Counseling Division clinicians possess a high level of expertise in their fields. However, given the heavy workload of the Professional Counseling Division and the benefits of collaboration with outside professionals, we encourage the CPD to continue to leverage the expertise of others in the field and in the community.

## Officer Wellness and Support: ¶413

*413. CPD will involve experts, such as psychologists and cognitive and behavioral scientists, in developing training on use of force where their expertise would enhance the effectiveness of the training. The training topics that may benefit from such expertise could include: a. peer intervention by fellow officers to stop the use of excessive force; b. the interaction of human perception and threat assessment; and c. de-escalation and defusing techniques, including psychological methods of situation control, verbal control and communication, conflict resolution, and anger management.*

### Compliance Status

During the third reporting period, we reviewed documents reflecting the CPD's engagement of behavioral science experts in developing trainings regarding suicide awareness and prevention; stress management and resilience; and managing grief. We encourage the CPD to continue to involve experts in developing trainings where such involvement is warranted. We look forward to engaging with these experts and observing trainings virtually, as we did during the IMT virtual site-visit, and in-person, once in-person trainings return to pre-COVID-19 levels.

## Officer Wellness and Support: ¶414

**414.** *CPD will ensure that all CPD members are provided in-service training on stress management, alcohol and substance abuse, and officer wellness at least every three years. CPD will include training regarding stress management, alcohol and substance abuse, officer wellness, and support services in the recruit training program.*

### Compliance Status

During the third reporting period, we reviewed records regarding ¶414, such as the Officer Wellness Training curriculum and the Employee Assistance Program Pre-Service Promotional Training curriculum. Despite challenges to in-service training caused by the COVID-19 pandemic and operational diversions, the CPD continues to offer high-quality, professional training regarding stress management, substance abuse, and officer wellness.

## Officer Wellness and Support: ¶416

**416.** *Within 90 days of the completion of the initial audit, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs for repair or replacement of equipment and technology as identified through the needs assessment ("Equipment and Technology Audit Response Plan"). CPD will implement the Equipment and Technology Audit Response Plan in accordance with the specified timeline for implementation.*

### Compliance Status

During the third reporting period, the City and the CPD did not produce documents to demonstrate progress toward compliance with this paragraph.[151] We look forward to working with the City and the CPD in the coming reporting periods as they work toward compliance with this paragraph.

---

[151] *See* ¶415, above.

## Officer Wellness and Support: ¶417

**417.** *As a component of the Equipment and Technology Audit Response Plan, CPD will develop a schedule for future periodic audits. The schedule will specify the time period within which future periodic audits will occur. The time period may vary for different equipment types to account for differences in the expected useful life of different equipment types. CPD will perform the periodic audits in accordance with the schedule.*

### Compliance Status

The CPD's ability to comply with the ¶417 requirements is stalled due to its need to implement a new Inventory Control System.

# IX. Accountability and Transparency

This is the Accountability and Transparency section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (City) and its relevant entities' Accountability and Transparency compliance efforts from March 1, 2020, through December 31, 2020.

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police*

*reform and accountability, and OAG and the City know this critical work will continue.*

**423.** *The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*

## Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City of Chicago and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary of Compliance Assessments

During the third reporting period, the IMT worked to further its understanding of the City's complex accountability systems and spent time with the CPD Bureau of Internal Affairs (BIA), the Civilian Office of Police Accountability (COPA), the Police Board, and the Office of Inspector General (OIG). Throughout the reporting period, the IMT reviewed policies, plans, and other documentation, engaging in many hours of discussion about the City's efforts.

Despite a reporting period that came with unforeseen circumstances and challenges, the City and its entities have made progress toward drafting their relevant policies and materials with the Consent Decree's Guiding Principles in mind. BIA, for example, put in a lot of work to drafting a comprehensive suite of unit directives to guide and direct BIA misconduct investigations. The CPD also substantially revised and finalized its General Order G08-05, *Prohibition on Retaliation*. While the City and the CPD did a lot of work regarding Accountability and Transparency in the third reporting period, resource constraints and the CPD's resistance regarding community input for BIA policies prevented greater progress in this area. To enhance the CPD's efforts toward reform, BIA must embrace the Consent Decree process and seek additional resources, as appropriate.

COPA focused on policies and procedures and, in particular, developed strong training materials. Notably, COPA agreed to and began to implement significant improvements on its community engagement efforts regarding policy development. Specifically, COPA created and engaged with its Community Policy Review Working Group to review and provide feedback on its policies. Since its formation, COPA's Community Policy Review Working Group has reviewed a number of COPA policies that have subsequently been submitted for the IMT's and OAG's review.[152]

---

[152] For more information about COPA's Community Policy Review Working Group, see https://www.chicago.gov/content/dam/city/depts/obm/supp_info/2021Budget/DepartmentResponses2021/60-COPA%202021%20Budget%20Responses.pdf at page 4. COPA's Community Policy Review Working Group was created pursuant to ¶ 4(a) of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/06/2020_01-Stipulation-Regarding-the-Policy-and-Training-Review-Process-for.._.pdf.

The Police Board refined several processes in the third reporting period, including producing new quarterly reports. And the Deputy Inspector General for Public Safety (PSIG) provided the IMT with detailed information on several projects that will provide the IMT and the City with data and information as our monitoring work continues. The IMT looks forward to continued progress on all the requirements in the Accountability and Transparency section.[153]

Furthermore, the IMT notes that there is a disagreement regarding which policies and procedures are subject to review under ¶627. For many paragraphs, the IMT's methodologies require the creation of a written policy or procedure to implement those paragraphs' requirements. The IMT has taken the position that any policy or procedure submitted to demonstrate compliance with those paragraphs is subject to ¶627 review and therefore must also receive no-objection notices from both the IMT and the OAG and be posted for public comment before finalization.[154] In many instances and for many paragraphs, the CPD and other City entities have drafted robust and comprehensive policies. Even so, they have not met Preliminary compliance with all of those policies because they have not yet obtained no-objection notices from both the IMT and the OAG, and they have not engaged the community through the public comment process. This is not to diminish the work

---

[153] In its March 25, 2021 comments to draft IMR3, the OIG expressed dissatisfaction with many of the IMT's compliance assessments for the third reporting period. As an initial matter, the Consent Decree places on the City "the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement." ¶720. To aid the OIG and the City with their compliance efforts, the IMT provided the City with its proposed methodologies for Year Two on November 16, 2020. Since then, the IMT engaged in extensive conversations with the City and the OAG regarding those methodologies. The revised methodologies that the IMT circulated to the City and the OAG on December 29, 2020, contained no changes to the paragraphs that contain requirements for the OIG and the PSIG. Further, the IMT received the vast majority of the OIG's and the PSIG's compliance materials just 20 days before the end of the 10-month reporting period, which left little time for conversation with the City and the OAG about those materials, including about any concerns that the IMT had with further evidence needed to document compliance efforts.

The purpose of the Consent Decree is to ensure that the City's relevant entities, including the OIG and PSIG, have robust policies, trainings, and practices that create systems for constitutional and effective policing, which survive changes in leadership, operational challenges, and even the termination of the Consent Decree. In fourth reporting period, members of the City, the OIG, the PSIG, the OAG, and the IMT have begun to meet to address concerns and paths forward. The IMT is hopeful and confident that it will continue to have a productive relationship with the OIG and PSIG, which will allow the IMT to continue to effectively monitor the City's compliance with both the letter and spirit of the Consent Decree.

[154] This process differs only where the parties have agreed to modify the process, such as with the COPA Stipulation. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

that the CPD and the City have put into their compliance efforts, but rather to explain why that work alone is not always sufficient to demonstrate Preliminary compliance.

This section of the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and the OIG. Ultimately, however, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. We explain, however, the status of each entity's efforts.

Overall, the IMT assessed the City's compliance with 72 Accountability and Transparency paragraphs of the Consent Decree in the third reporting period (¶¶425–28, 431–39, 443–45, 451–52, 457, 460, 462–69, 475, 477–81, 484, 487, 488, 493, 494, 496–98, 504, 512, 522, 523, 525–30, 532, 533, 538, 540, 542, 546–51, 553, 555–58, 561–63, and 565). We also provide a status update for 34 additional paragraphs (¶¶429, 430, 441, 442, 446–50, 453–56, 459, 461, 472, 474, 476, 486, 495, 499–501, 505–09, 511, 514, 524, 541, 545, and 552).

In the first reporting period, the IMT found that the City met Preliminary compliance with three paragraphs (¶¶538, 558, and 565). In the second reporting period, we determined that the City met Preliminary compliance with six additional paragraphs (¶¶498, 525, 532–33, 561, and 563), maintained Preliminary compliance with the two paragraphs (¶¶538 and 558), and met Preliminary and Secondary compliance with one paragraphs (¶565). The City did not meet Full compliance for any of the paragraphs and failed to reach Preliminary compliance with the remaining 20 paragraphs with deadlines in Year One (¶¶425–26, 436, 457, 478–481, 488, 493, 504, 512, 522, 526–530, 540, and 542).

In the third reporting period, we determined that the City met Preliminary compliance with eight additional paragraphs (¶¶437, 530, 548–49, 553, and 555–57), maintained Preliminary compliance with six paragraphs (¶¶525, 532–33, 538, 558, and 561), met Secondary compliance with one paragraph (¶498), and maintained Secondary compliance with one paragraph (¶565). The City also met Full compliance with one paragraph (¶563). The City's efforts toward Preliminary compliance are under assessment for two paragraphs (¶¶438 and 562). The City failed to reach Preliminary compliance with the remaining 53 paragraphs that the IMT assessed for compliance in the third reporting period (¶¶425–28, 431–36, 439, 443–45, 451–52, 457, 460, 462–69, 475, 477–81, 484, 487–88, 493–94, 496-97, 504, 512, 522–23, 526–29, 540, 542, 546–47, and 550–51). *See* Accountability Figure 1 below.

Accountability Figure 1:    Compliance Status for Accountability and Transparency
Paragraphs at the End of the Third Reporting Period (December 31, 2020)



The City had 17 deadlines to report on in the third report (¶¶438–39, 445, 494, 523, 540, 546–49, 550(2), 551(2), 553, 555, and 565). The IMT determined that the City met deadlines for seven paragraphs (¶¶438–39, 548–49, 553, 555, and 565) but missed the remaining 10 new deadlines (¶¶445, 494, 523, 540, 546–47, 550(2), and 551(2)). For paragraphs with missed deadlines, the City did not achieve the underlying deadline requirements before the end of the reporting period. *See* Accountability Figure 2. Although not reflected in the figure below, the City did, however, maintain Preliminary compliance for one paragraph with a missed dead-line (¶561).

Accountability Figure 2:    Accountability and Transparency Deadlines
in the Third Report: 17



## Accountability and Transparency: ¶¶425–26

*425. The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c .the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

*426. As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

Compliance Progress        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | ¶425 | ¶426 |
|---|---|---|---|
| **Preliminary:** | | *Not in Compliance* | *Not in Compliance* |
| | **CPD** | *Not in Compliance* | *Not in Compliance* |
| | **COPA** | *Not in Compliance* | *Not in Compliance*[155] |
| **Secondary:** | | *Not Yet Assessed* | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City did not achieve Preliminary compliance with ¶¶425–26.

To evaluate Preliminary compliance with ¶¶425–26, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[156] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶¶425–26 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts. Because the complaint intake process is important and complicated, the IMT considered whether the City's, the CPD's, and COPA's communications to the public about the complaint intake process are sufficiently clear.

In previous reporting periods, the IMT reviewed websites and policies to determine that neither the CPD nor COPA achieved Preliminary compliance with ¶¶425 and 426. Specifically, the IMT reviewed a draft of the CPD's policy #2019-U005, *Initiation, Intake, and Assignment of Log Investigations* (dated October 25, 2019), which explained how a Log Number is assigned to and used throughout an investigation but did not sufficiently explain that the same Log Number generated at Complaint Intake will follow the case from beginning to end, including any Police Board involvement. BIA also provided the IMT with a brochure to inform the public about the complaint-filing process. We suggested that BIA develop a distribution

---

[155]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[156]  The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

plan for the brochure, along with a means of electronically distributing the brochure. The IMT also reviewed the CPD's and COPA's websites and determined that those websites lacked sufficient detail about the complaint intake process. Ultimately, the IMT suggested that the CPD and COPA each develop comprehensive plans regarding how complaints can be made and how the complaint process works—plans that include specific details about how the CPD and COPA plan to train employees to help the community to understand the complaint process.

In the third reporting period, the CPD and COPA continued to work toward compliance with ¶¶425–426. The CPD has developed several methods for individuals to submit complaints about CPD employees, including through the CPD website, by phone, through third-party representatives, and anonymously. The IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*). That *General Order* directly addresses the provisions of these paragraphs and emphasizes to department employees and to the community the various reporting methods, including how and where to report misconduct and make complaints. The IMT also reviewed the CPD's General Order G08-01, *Complaint and Disciplinary Procedures*, the *BIA Complainant Communication Procedures and Timelines Unit Directive*, the *BIA Investigators Unit Directive and the Accountability Sergeants Unit Directive*, which together address the requirements of ¶425.

The IMT also reviewed revised versions of the *BIA Brochure*, which is now available in multiple languages to instruct non-English-speaking complainants how to file a complaint. BIA has also developed a poster that provides information regarding the filing of complaints. The IMT appreciates BIA's efforts in developing the brochure as required by ¶425.

Furthermore, the IMT reviewed BIA's *Log Number – Unique Tracking Number Unit Directive*, which addresses the requirements of ¶426. It is unclear, however, whether BIA plans to use that *Unit Directive* or to instead incorporate the information from that *Unit Directive* into its other policies.

The IMT also reviewed COPA's relevant policies, *Intake*: 3.1.1, *Timeliness Benchmarks*: 3.3.2,[157] and *Fact Gathering*: 3.1.2, during the third reporting period. Those

---

[157] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy and *Intake* policy. The IMT looks forward to reviewing COPA's further efforts to finalize those policies, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

policies explain that a log number will follow the case through the entire investigative and disciplinary process and address the requirements of ¶425. COPA's *Intake Policy* also incorporates the requirements of ¶426.

Finally, the CPD and COPA have websites that are interconnected and aim to reach non-English-speaking complainants with information about how to file and follow a complaint.

The IMT looks forward to working with the CPD and COPA to revise and finalize their relevant policies in the next reporting period and expects the CPD and COPA to achieve some level of compliance once those policies have been finalized. The IMT also suggests that the CPD consider how it can most effectively use its social media platforms to share information related to ¶¶425 and 426 in future reporting periods.

# Accountability and Transparency: ¶427

> ***427.*** *The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by a third-party representative.*

Compliance Progress        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **CPD** | ***Not in Compliance*** |
| **COPA** | ***Not in Compliance***[158] |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, the City did not meet Preliminary compliance with ¶427.

To evaluate Preliminary compliance with ¶427, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[159] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶427 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which

---

[158] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[159] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

is a strong policy that addresses the requirements of ¶427. G08-01-02 explains how the CPD receives complaints and forwards those complaints to COPA. It also provides complete mailing and physical addresses and a link to COPA's online complaint intake system[160] that complainants can use to make complaints.

The IMT also reviewed COPA's *Intake Policy*: 3.1.1. As drafted, that policy does not comprehensively address the requirements of ¶427.

The IMT looks forward to working with COPA to finalize its *Intake Policy*[161] and to working with the CPD to finalize G08-01-02 in the next reporting period.

---

[160] *See* www.chicagocopa.org.

[161] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶428

*428. When a CPD member becomes aware of an individual who wants to make a complaint regarding a CPD member's conduct, he or she will promptly provide the individual with COPA's contact information and notify a supervisor of the complaint received in the field. CPD will also ensure that, in response to complaints about CPD members, supervisors respond to the scene, document the complaint, and submit it to COPA. If the supervisor allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident complained of, the supervisor will contact his or her immediate supervisor, who will assign another supervisor to immediately document the complaint and submit it to COPA.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶428.

To evaluate Preliminary compliance with ¶428, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

In the third reporting period, the IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which addresses the requirements of ¶428. G08-01-02 explains how the CPD receives complaints and forwards those complaints to COPA. It also provides complete mailing and physical addresses that complainants can use to make complaints. G08-01-02 does not, however, incorporate the requirement that "supervisors respond to the scene" in "response to complaints about CPD members," as required by ¶428. We suggest that the CPD incorporate that requirement into one of its relevant policies.

The IMT looks forward to assessing the CPD's continued efforts toward Preliminary compliance with ¶428 in the next reporting period.

# Accountability and Transparency: ¶431

> **431.** *The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance[162]* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City made progress toward but ultimately did not meet Preliminary compliance with ¶431.

To evaluate Preliminary compliance with ¶431, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[163] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶431 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The IMT recognizes that compliance with ¶431 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, [ ] take all reasonable steps to achieve" the objectives of ¶431, including possibly pursuing changes to collective bargaining agreements or legislation.[164] Notably, in the third

---

[162] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[163] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[164] Additional information about the City's efforts to pursue changes to collective bargaining agreements is provided in our assessment of ¶711 in the Implementation, Enforcement, and Monitoring Section.

reporting period, the City and the Policemen's Benevolent & Protective Association of Illinois (PBPA) Union advanced their bargaining dispute to "interest arbitration." Through this process, both parties presented their positions on various disputed contract proposals to a three-member Interest Arbitration Board, comprised of one appointee from each of the respective parties and a third "neutral" arbitrator. Following the parties' presentations and briefing, the Board issued its decision and award on June 26, 2020. Significantly, the Board's decision confirms the City's right to utilize anonymous complaints as a basis for investigations of alleged officer misconduct, a practice that has been vigorously disputed by the PCBA (and had been disallowed by a prior grievance arbitration decision) and that is required by ¶431. Following the Board's issuance of its decision and award in the PBPA interest arbitration, the PBPA filed a state court lawsuit seeking to have the decision vacated. Regarding the anonymous complaints provision, in particular, the Union argues that the arbitration Board lacks authority to permit the investigation of anonymous complaints because, the Union asserts, Illinois state law precludes the practice. The Union's challenge to the interest arbitration decision remains pending.

In the third reporting period, the IMT reviewed BIA's General Order G08-01, *Complaint and Disciplinary Procedures*, which sufficiently addresses the affidavit override process and exceptions to the affidavit requirement. The IMT also reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which states that Investigators will use best efforts to ensure that the absence of a signed complainant affidavit alone will not preclude an administrative investigation. This addresses the requirement that BIA Investigators and Accountability Sergeants ensure that the absence of a sworn affidavit alone does not preclude an administrative investigation.

For COPA, the IMT reviewed COPA's *Affidavits and Affidavit Overrides* and *Intake* policies which also address ¶431. COPA's *Intake Policy*: 3.1.1 goes beyond the requirements of ¶431 by stating that COPA will not require sworn affidavits to conduct preliminary investigations of complaints without the language of "best efforts."[165] COPA has also developed *Affidavit Override Training Materials* to instruct COPA personnel on the affidavit override process.

The IMT looks forward to working with BIA and COPA to finalize their relevant policies in the next reporting period.

---

[165] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶432

> **432.** *The City and CPD will require that complaints about any CPD member are accepted, documented, submitted to COPA, and investigated even if the complainant could not identify the CPD member's name or other employee-identifying number, including star or badge number.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance*[166] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶432.

To evaluate Preliminary compliance with ¶432, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[167] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶432 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which addresses the requirements of ¶432. After reviewing the IMT's comments on G08-

---

[166] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[167] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

01-02, the CPD provided the IMT with a revised version of that Order and of General Order G08-01, *Complaint and Disciplinary Procedures*, in the final days of the third reporting period. G08-01, G08-01-02, and the accompanying Initiation Report require additional revision before the IMT can approve those records for finalization.

The IMT also reviewed BIA's *Intake Initiation of Log Number Unit Directive* (formerly titled the *Initiation, Intake and Assignment of Log Investigations Unit Directive*), which addresses ¶432. The IMT looks forward to reviewing any public comments that the CPD received regarding that *Unit Directive*.

Finally, the IMT reviewed COPA's *Intake Policy*: 3.1.1, which addresses ¶432.[168] The IMT looks forward to working with COPA to finalize that policy in the next reporting period.

The IMT anticipates that the City may earn some level of compliance for ¶432 once it finalizes its relevant policies.

---

[168] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶433

*433. CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.*

### Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

To evaluate Preliminary compliance with ¶433, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶433 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed the CPD's *Rules and Regulations*. Rule 37 of the CPD's *Rules and Regulations* requires CPD employees to correctly identify themselves by name, star number, and rank when asked. While Rule 37 appears to apply to both sworn and non-sworn CPD employees, the IMT understands that the CPD is drafting a policy to unambiguously incorporate the requirements of ¶433. The IMT looks forward to reviewing that policy and to assessing Preliminary compliance in the next reporting period.

# Accountability and Transparency: ¶434

> **434.** *When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance*[169] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not demonstrate Preliminary compliance with ¶434.

To evaluate Preliminary compliance with ¶434, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[170] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶434 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the CPD's Special Order 08-01-02, *Special Situations Involving Allegations of Misconduct*, and the CPD's draft BIA Standard Operating Procedures (SOP), which addressed investigations involving officer-involved domestic violence in the context of orders of protection against sworn CPD Members. The IMT suggested that the CPD develop a standalone policy

---

[169] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[170] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

that specifically addresses officer-involved domestic-violence investigations or include the investigative direction in a comprehensive BIA Investigator and Accountability Sergeant Investigative Policy. We also suggested that the CPD and COPA develop procedures to ensure that each agency documents administrative notifications of officer-involved domestic violence.

In the third reporting period, the IMT reviewed COPA's *Intake Policy*: 3.1.1.[171] COPA ultimately revised that policy to incorporate the requirements of ¶434 and to take ownership of investigations of officer-involved domestic violence even where BIA is the responding and referring agency. COPA's *Intake Policy* explains that COPA is responsible for investigating sworn and non-sworn CPD-involved domestic violence, sexual misconduct, and abuse of potentially vulnerable people. This effort by COPA to exceed the requirements of ¶434 demonstrates the beginning of a culture shift. While COPA's policies do not bind the CPD, COPA's *Intake Policy* sets forth COPA's expectation that COPA will be the investigating agency for these types of incidents.

The IMT looks forward to working with COPA to finalize its *Intake Policy* and to reviewing records from the CPD regarding ¶434 in the next reporting period.

---

[171] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶435

> **435.** *The City, CPD, and COPA will require that complaints alleging that a CPD member refused to accept a complaint, discouraged the filing of a complaint, or provided false or misleading information about filing a complaint are accepted, documented, and submitted to COPA for investigation and, where appropriate, recommended for discipline.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[172] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City has not yet demonstrated Preliminary compliance with ¶435.

To evaluate Preliminary compliance with ¶435, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[173] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶435 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

---

[172] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[173] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

In the third reporting period, the IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which addresses the requirements of ¶435.

The IMT also reviewed COPA's *Intake Policy*, which addresses ¶435.[174] The IMT looks forward to working with the CPD to finalize G08-01-02 and working with COPA to finalize its *Intake Policy* in the next reporting period. Once those policies are finalized, the IMT anticipates that the City may achieve Preliminary compliance with ¶435.

---

[174] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶436

*436. Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

To evaluate Preliminary compliance with ¶436, the IMT reviewed the CPD's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

In previous reporting periods, the IMT reviewed versions of the CPD's General Orders 08-01-02, *Specific Responsibilities Regarding Allegations of Misconduct*, and 08-05, *Prohibition on Retaliation*. We determined that the CPD had made progress toward, but had not yet met, Preliminary compliance because those General Orders had not yet been finalized. We suggested that the CPD revise G08-05 and G08-01-02 to explicitly include language that encourages CPD members to report misconduct and enumerates additional situations in which retaliation would be prohibited.

In the third reporting period, the IMT reviewed a revised version of the CPD's General Order 08-05, *Prohibition on Retaliation.* G08-05 has been revised to incorporate the IMT's feedback on the Order and incorporates the requirements of ¶436(c). At the end of the third reporting period, the CPD solicited public comments on G08-05 and, following review of those comments, finalized G08-05.

The IMT also reviewed the CPD's General Order G08-01, *Complaint and Disciplinary Procedures*, which is meant to incorporate the requirements of ¶436(a–b). The IMT looks forward to working with the CPD to finalize G08-01 in the next reporting period.

# Accountability and Transparency: ¶437

**437.** *CPD will expressly prohibit all forms of retaliation, intimidation, coercion, or adverse action against any person who reports misconduct or cooperates with an administrative investigation.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶437.

To evaluate Preliminary compliance with ¶437, the IMT has reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶437 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed and offered comments on multiple versions of the CPD's General Order G08-05, *Prohibition on Retaliation*, which addresses the requirements of ¶437. The IMT ultimately indicated to the CPD that it had no objections to G08-05. The CPD has since posted G08-05 for public comment, reviewed those comments, and finalized G08-05.

The IMT appreciates the CPD's collaborative approach to revising G08-05 and looks forward to reviewing the CPD's relevant training materials and efforts toward Secondary compliance in the next reporting period.

# Accountability and Transparency: ¶438

> **438.** OAG acknowledges that the City, CPD, and COPA are working to create an electronic Case Management System ("CMS"). The City, CPD, and COPA will ensure that the CMS maintains accurate data regarding the number, classification, and status of all administrative investigations, from the intake process through the final disciplinary decision, if any, and through any grievance process, arbitration, Police Board proceeding, or appeal relating to the final disciplinary decision (the "final disposition"). CMS will be maintained by appropriate personnel from the City, CPD, and COPA. The CMS will be fully operational by June 30, 2020.

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

| | |
|---|---|
| **Deadline:** | September 1, 2020*   ☑ **Met**   ☐ **Missed** |
| | *Extended from June 30, 2020, due to COVID-19 |
| **Preliminary:** | *Under Assessment* |
| **CPD** | *Under Assessment* |
| **COPA** | *Under Assessment[175]* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City, the CPD, and COPA have not yet met Preliminary compliance with ¶438 and it remains under assessment. While the CPD and COPA did not achieve compliance, they made strides toward Preliminary compliance. The CPD and COPA also met the deadline for ¶438 because the Case Management System (CMS) was fully operational by September 1, 2020, as required by that paragraph.

To evaluate Preliminary compliance with ¶438, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[176] which details applicable consultation, resolution,

---

[175] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[176] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but,

workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶438 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The CPD and COPA have developed and operationalized their electronic CMS, which has replaced the previous CLEAR system. The IMT understands that each new administrative investigation and complaint is logged in the CMS and tracked with a unique Log Number, which follows the complaint from its entry in the CMS through to the conclusion—including through any grievance process, arbitration, and Police Board proceeding to the final disposition. During the IMT's October 2020 virtual site visit, BIA provided the IMT with an operational overview of the CMS and demonstrated to the IMT how the Log Number attaches to a particular case through the investigation and disciplinary process through to the conclusion.

The CPD has also developed a CMS User Guide for its BIA Investigators and Accountability Sergeants, and the CMS Application has an automatic Log Number generation feature. Both of these developments demonstrate the CPD's commitment to compliance with ¶438.

In addition, the CPD has developed policies and trainings that specifically cover the CMS, including BIA's (1) *Introduction to CMS Lesson Plan and Slide Deck*, (2) *Command Channel Review (CCR) and CMS Training Materials*, (3) *CMS Log Number Intake Training Materials*, (4) *Intake Initiation of Log Number Unit Directive*, (5) *Assignment of Administrative Log Number Unit Directive*, and (6) *Log Number – Unique Tracking Number Unit Directive*. Those policies and training materials go a long way toward ensuring that BIA Investigators, Accountability Sergeants, and Command Staff understand their roles and responsibilities in the complaint investigation and disciplinary process. While the CPD continues to revise its training materials, the CPD's efforts have demonstrated that the CPD is determined to provide consistent training to ensure that all users navigate and use the CMS system correctly. We suggest that the CPD develop a training for all members of the CPD to familiarize the department with the CMS and to foster trust and transparency among CPD members.

In the third reporting period, COPA provided the IMT with an overview of the CMS as it relates to COPA. This overview demonstrated the CMS process from the initiation of a complaint or investigation to the conclusion of the disciplinary process. This process is the same for COPA as it is for BIA. The IMT also reviewed and offered comments on COPA's CMS Training Materials.

---

among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

We look forward to (1) reviewing a revised draft of COPA's CMS Training Materials, including the relevant Lesson Plan and Slide Deck, and (2) to working with the CPD to finalize its CMS and Log Number-related policies and training materials in the next reporting period.

# Accountability and Transparency: ¶439

*439. The City and CPD will ensure that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person. By June 30, 2020, the City will also ensure complainants and their representatives are able to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

| | |
|---|---|
| **Deadline:** | September 1, 2020*   ☑ **Met**  ☐ **Missed** |
| | *Extended from June 30, 2020, due to COVID-19 |
| **Preliminary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance*[177] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City, the CPD, and COPA did not meet Preliminary compliance with ¶439.

To evaluate Preliminary compliance with ¶439, the IMT has reviewed the City's, and the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶439 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The CPD and COPA have developed and operationalized their electronic CMS, which replaced the previous CLEAR system. The IMT understands that each new administrative investigation and complaint is logged in the CMS and tracked with a unique Log Number, which follows the complaint from its entry in the CMS through to the conclusion—including through any grievance process, arbitration, and Police Board proceeding to the final disposition. During the IMT's October

---

[177] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

2020 virtual site visit, BIA provided the IMT with an operational overview of the CMS and demonstrated to the IMT how the Log Number attaches to a particular case through the investigation and disciplinary process through to the conclusion.

The CPD has also developed a number of policies and training materials that are relevant to ¶439, including BIA's *Introduction to CMS Training for BIA Investigators and Accountability Sergeants*, *Complainant Communication Procedures and Time-lines Unit Directive*, *Initiation Intake of Log Number Unit Directive*, and *Assignment of Administrative Log Number Investigations Unit Directive*. Those policies and training materials, when finalized, will demonstrate the CPD's commitment to en-suring that BIA Investigators, Accountability Sergeants, and Command Staff ensure their roles and responsibilities in the complaint investigation and disciplinary pro-cess. BIA's *Complainant Communication Procedures and Timelines Unit Directive*, while not yet finalized, specifically addresses the requirement that complainants must be able to track complaints online.

The IMT reviewed COPA's *Intake Policy*: 3.1.1, which COPA submitted as evidence of its compliance efforts in the third reporting period.[178] After the IMT suggested that COPA revise that policy to more fully incorporate the requirements of ¶439, COPA provided the IMT with a revised *Intake Policy* that sufficiently addresses this paragraph. The IMT anticipates that COPA will receive some level compliance for ¶439 once its *Intake Policy* has been finalized. We suggest that COPA provide the IMT with documentation that complainants can track their complaints in the next reporting period.

The IMT looks forward to working with COPA to finalize its *Intake Policy* and to working with the CPD to finalize its relevant policies in the next reporting period.

---

[178] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Pe-riod, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶443

> **443.** *Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[179] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City, the CPD, and COPA did not meet Preliminary compliance with ¶443.

To evaluate Preliminary compliance with ¶443, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[180] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶443 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The IMT recognizes that compliance with ¶443 will require a City ordinance change. In previous reporting periods, the IMT reviewed the draft BIA SOP, which directed the CPD to use its "best efforts" (as defined in ¶729) to report sexual misconduct to COPA and was insufficient to demonstrate compliance with ¶443. The

---

[179] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[180] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

IMT also reviewed a memo from COPA (dated February 28, 2020) regarding COPA's efforts to meet compliance with ¶443. The memo describes a working group that COPA is leading, which consists of members of its Special Victims Squad, the CPD, and the Cook County State's Attorney's Office (CCSAO).

In the third reporting period, the IMT reviewed notes from an October 19, 2020 meeting among representatives of COPA, the CCSAO, and the CPD. Those notes suggest the possibility of a memorandum of understanding or agreement regarding how those entities should conduct administrative and criminal investigations of sexual misconduct cases. Regardless of whether those entities reach an agreement, it is critical for COPA and the CPD to develop their own policies regarding their specific responsibilities regarding sexual misconduct investigations. Those policies should reflect the results of the agreement amongst the CPD, COPA, and the CCSAO. While the CPD cannot require COPA to adhere to CPD policies, and COPA cannot require the CPD to adhere to COPA policies, those policies will survive current leadership, form the basis for consistent investigations, and set expectations for any memorandum of understanding or agreement.

It is concerning that the CPD, COPA, and the CCSAO have met only once regarding ¶443 in the first three reporting periods, and toward the end of the third reporting period at that. Furthermore, that meeting appears to have addressed only some of the important issues regarding ¶¶441–43, leaving others unaddressed due to time constraints.

The IMT suggests that COPA and BIA make greater efforts toward compliance with ¶443 in the next reporting period.

# Accountability and Transparency: ¶444

***444.*** *Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report: a. assessing the quality of the sexual misconduct administrative investigations reviewed; b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and c. providing aggregate data on the administrative investigations reviewed, including: i. the volume and nature of allegations investigated, broken down by investigating agency; ii. the percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review; iii. the percentage of investigations criminally prosecuted; iv. the percentage of investigations closed after the Preliminary investigation; v. the percentage of investigations closed for lack of a signed complainant affidavit; and vi. the investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (NEW)[181] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶444.

---

[181] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶444, the IMT reviewed the City's, the CPD's, COPA's, and the Deputy PSIG's policies following the policy process described in the Consent Decree (¶¶626–41),[182] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶444 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the BIA SOP, which contained a statement regarding the CPD's responsibility to report each sexual misconduct complaint to the OIG. The IMT also reviewed a COPA memo (dated February 28, 2020), which indicated that COPA provided the Deputy PSIG with documentation of four sexual misconduct investigations on December 13, 2019. The memo did not specify whether these four investigative files were delivered to the Deputy PSIG within 10 days of the final disciplinary decisions, as required by ¶444.

In the third reporting period, the IMT reviewed a December 7, 2020 memorandum from the Deputy PSIG regarding the City's efforts toward compliance with ¶444. That memorandum explains that the PSIG requested information about the sexual misconduct cases that BIA and COPA closed in 2019. Rather than provide the PSIG with the complete investigative file for its relevant cases, BIA provided the PSIG with a list of 15 cases. Later in the year, BIA provided the PSIG with nine complete investigative files from 2019 and 2020, three of which were for cases that were previously unidentified. BIA also identified two additional cases that were closed in 2019. The PSIG's memorandum states that, in the third reporting period, COPA did not provide the Deputy PSIG with any information regarding sexual misconduct as required by ¶444.

The PSIG's memorandum is helpful to the IMT to determine the current process for ¶444 and to identify serious flaws in the Case Management System (CMS) and the consistent classification system that BIA and COPA use to investigate cases involving sexual misconduct. It appears that it is difficult for BIA and COPA to determine the exact number of sexual misconduct cases because some sexual misconduct allegations could be included in other types of investigations. The IMT understands that the PSIG has serious concerns that these flaws prevent the PSIG report from including all sexual assault misconduct cases.

---

[182] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

The IMT also reviewed the PSIG's report regarding ¶444. To compile its report, PSIG gathered cases meeting the parameters of ¶444 and ultimately identified twenty cases in its report. Those 20 cases provide a good overview of the sexual misconduct cases that the PSIG reviewed. PSIG's report also identifies concerning trends of BIA and COPA practices, including closing cases when the CPD member separates from the department (whether through resignation, retirement, or some other way), closing investigations when an affidavit was not obtained but an affidavit override could have been sought, and one instance where BIA failed identify that the accused individual was a CPD employee. The PSIG's report finds that both BIA and COPA investigations of sexual misconduct lack the necessary documentation to conduct a comprehensive assessment of the overall quality of sexual misconduct investigations. The report provides BIA and COPA with a list of recommendations for improvement. The IMT appreciates PSIG's efforts in analyzing the relevant information for ¶444 and reporting that information and analysis. Finally, the IMT reviewed the OIG's Public Safety Section Policies Manual, which incorporates the requirements of ¶444.

In the next reporting period, the IMT looks forward to reviewing COPA's and BIA's relevant policies to assess Preliminary compliance with ¶444 and to evaluating whether PSIG has trained its relevant staff on the requirements of ¶444.

# Accountability and Transparency: ¶445

*445. The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process.*

## Compliance Progress  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** Quarterly  ☐ **Met**  ☑ **Missed**

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the third reporting period, the IMT determined that the City has not met Preliminary compliance with ¶445.

To evaluate Preliminary compliance with ¶445, the IMT reviewed the City's policies following the policy process described in the Consent Decree (¶¶626–41). The IMT also reviewed data sources relevant to compliance with the requirements of ¶445 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed COPA Policy 1.3.8, *Civil and Criminal Complaint Review*, which explains that COPA will begin the complaint intake process once it receives information that suggests misconduct. The City had not, however, provided the IMT with a policy or plan that complies with the requirement that the City "share information on at least a quarterly basis" with the Cook County State's Attorney's Office, the United States Attorney's Office, the Cook County Public Defender's Office, and the Federal Defender's Office. We suggested that the City develop a policy that requires notification of the proper authorities of any affirmative judicial findings that a CPD member was untruthful according to the requirements of this paragraph. COPA should further refine 1.3.8 to ensure that the proper authorities are notified according to this paragraph.

In the third reporting period, the City has attempted to incorporate the requirements of ¶445 into COPA's *Intake Policy*. While it is difficult for one City agency to

take sole responsibility for this paragraph, the IMT commends COPA for including ¶445 in its relevant policy. That policy, however, suggests that COPA is not required to provide information to the partner agencies mentioned in ¶445. While COPA cannot force its partners—who are not subject to the Consent Decree—to abide by ¶445, COPA can and should be clear in its policy that it will provide information to those partner agencies as ¶445 requires. Perhaps with COPA's leadership and commitment to following the requirements of ¶445, the partner agencies will follow COPA's lead. For COPA and the City to demonstrate Preliminary compliance with ¶445, COPA must revise and finalize its *Intake Policy*.[183]

The IMT also reviewed correspondence between the City and the Cook County State's Attorney's Office (CCSAO) and the United States Attorney's Office regarding a proposed memorandum of understanding regarding the requirements of ¶445. The IMT appreciates the City's continued efforts toward compliance with this paragraph, and suggests that the City also engage the Cook County Public Defender's Office and the Federal Defender's Office as required by ¶445.

The IMT looks forward to working with COPA to finalize its *Intake Policy* and to reviewing the City's ongoing efforts toward ¶445 in the next reporting period.

---

[183] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶451

***451.*** *A CPD member who reviews audio or video evidence for purposes of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶451.

To evaluate Preliminary compliance with ¶451, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[184] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶451 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the CPD provided the IMT with its Special Order S03-14, *Body Worn Cameras*. S03-14 requires officers to "annotate" on reports when body worn camera footage was recorded during an incident. The Special Order, however, does not require officers to document whether they reviewed the evidence in the incident report. Therefore, S03-14 is insufficient to demonstrate Preliminary compliance with ¶451.

The IMT suggests that the CPD revise S03-14 to more fully incorporate the requirements of ¶451.

---

[184] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶452

*452. Consistent with the applicable collective bargaining agreements, CPD will require members to cooperate with administrative investigations, including appearing for an administrative interview when requested by COPA, BIA, or an Accountability Sergeant and will provide all requested documents and evidence under the CPD member's custody and control.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶452.

To evaluate Preliminary compliance with ¶452, the IMT has reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶452 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed the CPD's General Order G08-01, *Complaint and Disciplinary Procedures*, which generally addresses ¶452 but does not require CPD members to appear for administrative interviews and to provide all requested documents and evidence under the CPD member's custody and control. Instead, G08-01 appears to consider what will happen to an employee if that employee does not participate in the interview. G08-01 alone is insufficient to meet compliance with ¶452.

The IMT looks forward to reviewing a revised draft of G08-01 in the next reporting period.

# Accountability and Transparency: ¶457

*457. Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT determined that the City and the CPD have not met Preliminary compliance with ¶457 in the third reporting period.

To evaluate Preliminary compliance with ¶457, the IMT reviewed the City's and the CPD's policies following the policy process described in the Consent Decree (¶¶626–41). The IMT also reviewed data sources relevant to compliance with the requirements of ¶457 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the CPD's BIA *Accountability Sergeant Unit Directive*, which addresses the circumstances when the BIA will transfer investigations to Accountability Sergeants, including those required by ¶457. That *Unit Directive* alone was not sufficient to meet Preliminary compliance with ¶457. We suggested that BIA incorporate the remaining requirements of ¶457 in a BIA Investigators or a BIA Supervisors policy, as well as draft a comprehensive administrative investigative policy that provides guidance about when and in what types of situations the BIA will retain and investigate complaints itself.

In the third reporting period, the IMT reviewed multiple versions of BIA's *Assignment of Administrative Log Number Investigations Unit Directive* (formerly *Initiation, Intake, and Assignment of Log Investigations Unit Directive*). That *Unit Directive* addresses the requirements of ¶457 but appears to contain information that is duplicative of other BIA unit directives. Furthermore, the *Unit Directive* remains vague as related to various Consent Decree requirements.

The IMT looks forward to working with the CPD to revise and finalize its relevant directives in the next reporting period.

# Accountability and Transparency: ¶460

*460. Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the Preliminary investigation.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance*[185] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the CPD and COPA made progress toward but ultimately did not meet Preliminary compliance with ¶460.

To evaluate Preliminary compliance with ¶460, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[186] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶460 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

---

[185] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[186] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

In previous reporting periods, the IMT reviewed COPA policy 3.1.2, *Fact Gathering*, which partially addresses ¶460. The IMT suggested that COPA revise its policy to be clearer and more comprehensive.

In the third reporting period, the IMT reviewed BIA's *Complainant Communication Procedures and Timelines Unit Directive*, which addresses ¶460 and explains the responsibilities of the BIA Analytical Section as related to preliminary investigations. The IMT also reviewed BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, which emphasizes the importance of collecting all evidence and entering that information into the digital Case Management System (CMS). Furthermore, BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides Unit Directive* defines the term "objective verifiable evidence" and directs BIA Investigators and Accountability Sergeants to take all reasonable steps in their preliminary investigations to discover all objective verifiable evidence. The IMT and the OAG have provided BIA with no-objection notices for its *Complainant Communication Procedures and Timelines Unit Directive* and its *Conduct of Investigation: Initial Responsibilities Unit Directive*, and appreciates BIA's hard work in drafting those comprehensive directives. Those policies must, however, be posted for public comment and be finalized before they will be considered sufficient for Preliminary compliance.

Finally, the IMT reviewed COPA's *Intake Policy*: 3.1.1, which required revision to fully address ¶460.[187] The IMT understands that COPA plans to revise its *Fact Gathering*: 3.1.2 policy to more comprehensively incorporate the requirements of ¶460 in the next reporting period.

The IMT looks forward to working with BIA to finalize its relevant policies and to reviewing a revised version of COPA's relevant policies in the next reporting period.

---

[187] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶462

*462. A signed complainant affidavit will not be required to conduct a Preliminary investigation.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance*[188] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City made progress toward but ultimately did not meet Preliminary compliance with ¶462.

To evaluate Preliminary compliance with ¶462, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[189] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶462 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed COPA Policy 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* (dated August 1, 2019). This policy addressed many of the requirements of ¶462, but did not include language that clarifies that a "signed complainant affidavit will not be required to conduct a Preliminary Investigation."

In the third reporting period, the IMT reviewed BIA's *Complainant Communication Procedures and Timelines Unit Directive*, which states clearly that a sworn affidavit

---

[188] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[189] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

is not required to conduct a preliminary investigation. The IMT also reviewed BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, which reinforces the requirements of ¶462. Furthermore, BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides Unit Directive* addresses the requirement that the CPD ensure that BIA Investigators understand that a sworn, signed complainant affidavit is not required to conduct a preliminary investigation. The IMT and the OAG have provided BIA with no-objection notices for its *Complainant Communication Procedures and Timelines Unit Directive* and its *Conduct of Investigation: Initial Responsibilities Unit Directive*, and appreciates BIA's hard work in drafting those comprehensive directives. Those policies must, however, be posted for public comment and be finalized before they will be considered sufficient for Preliminary compliance.

Finally, the IMT reviewed COPA's *Intake Policy*: 3.1.1, which addresses ¶462.[190] The IMT looks forward to working with COPA to finalize that policy in the next reporting period.

The IMT anticipates that the City may achieve some level of compliance with ¶462 once the City has finalized its relevant policies.

---

[190] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶463

**463.** *The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status. a. If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the Preliminary investigation is sufficient to continue the investigation. b. If the Preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA. c. The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is necessary and appropriate, and in the interests of justice, for the investigation to continue.*

### Compliance Progress        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance*[191] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City did not meet Preliminary compliance with ¶463.

---

[191] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶463, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[192] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶463 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which includes the proper procedure for obtaining an affidavit override as required by ¶463. The IMT also reviewed COPA Policy 3.1.4, *Affidavits, Affidavit Overrides, Exceptions to Affidavit Requirement* (dated August 1, 2019), which addresses many of ¶463's requirements. The IMT suggested that the BIA and COPA work together to ensure that their policies are more compatible to avoid confusion.

In the third reporting period, the IMT reviewed BIA's *Complainant Communication Procedures and Timelines Unit Directive*, BIA's *Investigative Timelines and Benchmarks Unit Directive*, and BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, all of which address the requirements of ¶463 and have received no-objection notices from the IMT and the OAG. These unit directives, however, must be posted for public comment and finalized before they can demonstrate Preliminary compliance.

The IMT also reviewed the *BIA Investigators Unit Directive* and appreciates BIA's efforts in drafting that unit directive. The IMT has not yet approved that *Unit Directive* and looks forward to working with BIA to revise that *Unit Directive* in the next reporting period. Furthermore, BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides Unit Directive* addresses in multiple ways the requirement that the CPD ensure that BIA Investigators understand that a signed complainant affidavit is not required to conduct a preliminary investigation, including a requirement for the BIA Chief to evaluate evidence and seek affidavit overrides. This *Unit Directive* also defines the term "objective verifiable evidence" and directs BIA Investigators and Accountability Sergeants to take all reasonable steps in their preliminary investigations to discover all objective verifiable evidence.

---

[192] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

The City did not provide the IMT with any additional information regarding COPA's efforts toward compliance with ¶463 in the third reporting period. The IMT looks forward to working with the CPD and COPA to revise their relevant policies in the next reporting period.

# Accountability and Transparency: ¶464

*464. In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will: a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices; b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible; c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate; d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded; e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so; f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated; g. as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and h. identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance[193]* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

[193] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the third reporting period, the CPD made progress toward Preliminary compliance with ¶464 but the City ultimately did not demonstrate Preliminary compliance with that paragraph.

To evaluate Preliminary compliance with ¶464, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[194] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶464 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which successfully incorporates the requirements of ¶464(a), (b), (c), and (f), and COPA Policy 3.1.2, *Fact Gathering*, which addresses several of the requirements of ¶464 but does not provide the in-depth direction that this paragraph requires.

In the third reporting period, the IMT reviewed BIA's *Investigative Timelines and Benchmarks Unit Directive*, which, along with the *Accountability Sergeants Unit Directive*, incorporates the requirements of ¶464, except for subparagraphs (d) and (g). The IMT also reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which completely and thoroughly addresses ¶464 and its subparagraphs. That *Unit Directive* is well written and comprehensive. The IMT looks forward to working with BIA to finalize that *Unit Directive*.

The IMT also reviewed COPA's *Disciplinary Recommendations* policy, which incorporates ¶464(g). The IMT was not provided with revised versions of COPA's *Fact Gathering* policy or *Interviews* 3.1.2(b) policy in the third reporting period. Both of those policies are relevant to COPA's compliance with ¶464.

The IMT looks forward to reviewing the City's efforts toward compliance with ¶464 in the next reporting period.

---

[194] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶465

*465. When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will: a. ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law; b. ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed; c. ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage; d. note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview; e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and f. audio record all CPD member in-person interviews.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance[195]* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the CPD demonstrated strong progress toward Preliminary compliance with ¶465. The City, however, did not meet Preliminary compliance with ¶465.

---

[195] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶465, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[196] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶465 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed COPA's policies 3.1.2, *Fact Gathering*, and 3.1.2(b), *COPA Interviews*, which incorporate the requirements of ¶465.

In the third reporting period, the IMT reviewed BIA's *In-Service Training Plan*, which references the requirements of ¶465. The IMT also reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which completely and thoroughly addresses ¶465 and its subparagraphs. That *Unit Directive* is well written, comprehensive, and demonstrates BIA's dedication to developing a thoughtful policy for ¶465.

The IMT looks forward to working with BIA to finalize that *Unit Directive* and working with COPA to revise its policies in the next reporting period.

---

[196] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶466

> **466.** When assessing credibility, COPA, BIA, and the districts will: a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[197] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the CPD and COPA did not meet Preliminary compliance with ¶466.

To evaluate Preliminary compliance with ¶466, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[198] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶466 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

---

[197] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[198] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

In previous reporting periods, the IMT reviewed COPA's policy 3.1.2, *Fact Gathering*, and the BIA's *Accountability Sergeants Unit Directive*, which were a good start to addressing the requirements of ¶466.

In the third reporting period, the IMT reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which addresses most of ¶466, but does not address ¶466(b). That *Unit Directive* is well written and comprehensive and received a no-objection notice from the IMT. In order to finalize the *Unit Directive*, however, BIA must resolve the OAG's outstanding comments on the *Unit Directive* and post the *Unit Directive* for public comment. The IMT looks forward to working with BIA to finalize that *Unit Directive* and suggests that BIA incorporate ¶466(b) into its policies.

The IMT suggests that COPA further address the requirements of ¶466 in comprehensive administrative investigative policies.

The IMT looks forward to reviewing revised versions of BIA's and COPA's relevant policies in the next reporting period.

## Accountability and Transparency: ¶467

> ***467.*** *For each allegation associated with a misconduct investigation, COPA, BIA, or the districts will explicitly identify and recommend one of the following findings: a. "Sustained," where it is determined the allegation is supported by a preponderance of the evidence; b. "Not Sustained," where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence; c. "Unfounded," where it is determined, by clear and convincing evidence, that an allegation is false or not factual; or d. "Exonerated," where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| Preliminary: | | *Not in Compliance* |
|---|---|---|
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[199] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City did not meet Preliminary compliance with ¶467.

To evaluate Preliminary compliance with ¶467, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[200] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of

---

[199]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[200]  The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

¶467 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed COPA Policy 3.1.3, *Final Summary Report* (dated March 1, 2019), which addresses the requirements of ¶467 by appropriately defining each of the categories of investigative findings.

In the third reporting period, the IMT reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which completely and thoroughly addresses ¶467 and its subparagraphs. That *Unit Directive* is well written and comprehensive. The IMT looks forward to working with BIA to finalize that *Unit Directive* in the next reporting period.

In the final days of the reporting period, the CPD provided the IMT with a revised version of the *Administrative Summary Report* form. This form is much improved from the previous version that the IMT reviewed. The IMT also reviewed a revised draft of BIA's *Administrative Summary Report Unit Directive*, which addresses the requirements of ¶467. The IMT looks forward to working with the CPD to finalize that *Unit Directive* in the next reporting period.

On December 16, 2020, COPA provided the IMT with a document entitled *Summary Report of Investigation*, which appears to summarize the investigation of a complaint. It is unclear whether the *Summary Report of Investigation* is a revised version of COPA's *Final Summary Report* document (also referred to as the *Administrative Summary Report*), or whether it serves a separate purpose. The IMT suggests that COPA consider revising its *Final Summary Report* policy (3.1.3) to clarify the purposes of COPA's various reports. Furthermore, COPA did not provide the IMT with a revised version of the *Final Summary Report* policy in the third reporting period. Revising that policy is a necessary step toward Preliminary compliance with ¶467.

The IMT has not reviewed any additional information regarding COPA's efforts toward compliance with ¶467.

# Accountability and Transparency: ¶468

*468. COPA, BIA, and the districts will ensure that investigators do not: a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member; b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations; c. close an administrative investigation solely because of findings in a related criminal proceedings; d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct; e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | CPD | *Not in Compliance* |
| | COPA | *Not in Compliance*[201] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶468.

To evaluate Preliminary compliance with ¶468, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent

---

[201] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

Decree (¶¶626–41),[202] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶468 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the draft BIA SOP and COPA's Investigations Manual, both of which incorporated many of the requirements of ¶468. The IMT suggested that BIA develop a comprehensive administrative investigative policy to incorporate the requirements of ¶468, and that COPA incorporate ¶468 into its policy 3.1.2, *Fact Gathering*, or a more comprehensive investigative policy.

In the third reporting period, the IMT reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which completely and thoroughly addresses ¶468 and its subparagraphs. That *Unit Directive* is well written and comprehensive. In order to be considered for Preliminary compliance, however, the *Unit Directive* must be posted for public comment and finalized. The IMT looks forward to working with BIA to finalize this *Unit Directive*.

The IMT did not receive any information regarding COPA's efforts toward compliance with ¶468 in the third reporting period. While, in previous reporting periods, COPA provided the IMT with its *Interviews*: 3.1.2(b) policy, COPA did not revise and resubmit that policy during the third reporting period. The IMT looks forward to reviewing COPA's relevant policies in the next reporting period.

---

[202] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶469

***469.*** *The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following: a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest; b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation; c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.*

| Compliance Progress | | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | CPD | *Not in Compliance* |
| | COPA | *In Compliance* (NEW)[203] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

---

[203] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the third reporting period, the City did not meet Preliminary compliance with ¶469.

To evaluate Preliminary compliance with ¶469, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[204] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶469 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the BIA's *Log Number Investigation Conflict Certification Form*, which was a good start toward addressing the requirements of ¶469. The IMT suggested that the BIA draft a standalone directive or policy that provides context and emphasizes the importance of the form. The IMT also suggested that COPA develop a directive or policy that incorporates the requirements of ¶469.

In the third reporting period, the IMT reviewed multiple versions of BIA's *Conflicts of Interest Unit Directive*, which provides a good foundation with which to address the requirements of ¶469. While that directive has been revised to more clearly explain the actions and expectations regarding conflict-of-interest certifications in the Command Channel Review process, it still contains language that is confusing and appears contradictory. The IMT also reviewed the *BIA Investigators Unit Directive*, which also addresses ¶469. Finally, the IMT reviewed BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, which instructs BIA Investigators and Accountability Sergeants to complete a *Conflict of Interest Statement Form* and the associated process upon being assigned to an investigation. BIA also provided the IMT with a November 12, 2020 email advising the CPD's command staff that a conflict-of-interest component is now a required part of the command channel review process. While it is useful for the IMT to know that appropriate personnel are now aware of the conflict-of-interest requirement, BIA must revise all of its relevant policies to incorporate that conflict-of-interest process in order to meet Preliminary compliance. The IMT looks forward to working with BIA to revise and finalize its relevant policies in the next reporting period.

---

[204] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

COPA provided the IMT with its 2017 policy entitled *Conflict of Interest and Recusal*. Although the policy is four years old, it includes the requirements of paragraph ¶469. The IMT suggests that COPA revise that policy to conform to the standards and format of COPA's current policies.

The IMT looks forward to continuing to assess the City's compliance with ¶469 in the next reporting period.

# Accountability and Transparency: ¶475

> **475.** *The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.*

**Compliance Progress**            (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[205] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶475.

To evaluate Preliminary compliance with ¶475, the IMT has reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[206] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶475 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The IMT recognizes that compliance with ¶475 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶475, including possibly pursuing

---

[205] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[206] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

changes to collective bargaining agreements or legislation. For additional details on the collective bargaining efforts see our analysis for ¶711.[207]

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which requires Accountability Sergeants to use best efforts to not reveal the identities of a complainant to the involved CPD member before the member's interrogation. The IMT suggested that the CPD include the requirements of this paragraph in the BIA Investigator policy and reference the requirements in a comprehensive administrative investigative policy. While this paragraph does not explicitly address COPA, the IMT also suggested that COPA include the requirement of this paragraph in its investigative policy.

In the third reporting period, the IMT reviewed the *BIA Investigators Unit Directive*, which specifically addresses the importance of protecting the identities of complainant before the CPD's employee's interview or interrogation. The IMT has not yet provided BIA with a no-objection notice for that policy, and looks forward to working with BIA to revise the policy in the next reporting period. The IMT also reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which also incorporates ¶475. The IMT looks forward to working with BIA to revise that policy based on the OAG's outstanding comments to the policy. Once both policies have been approved and have been posted for public comment, it is likely that BIA will achieve some level of compliance with ¶475.

The IMT looks forward to working with BIA to finalize its relevant policies and to reviewing COPA's relevant policies in the next reporting period.

---

[207] Additional information about the City's efforts to pursue changes to collective bargaining agreements is provided in our assessment of ¶711 in the Implementation, Enforcement, and Monitoring Section.

# Accountability and Transparency: ¶477

> **477.** *The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[208] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶477.

To evaluate Preliminary compliance with ¶477, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[209] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶477 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The IMT recognizes that compliance with ¶477 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶477, including possibly pursuing changes to collective bargaining agreements or legislation.[210]

---

[208] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[209] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[210] Additional information about the City's efforts to pursue changes to collective bargaining agreements is provided in our assessment of ¶711 in the Implementation, Enforcement, and Monitoring Section.

In previous reporting periods, the IMT suggested that COPA incorporate the requirements of ¶477 into its policy 3.1.2, *Fact Gathering*, or a more comprehensive investigative policy. We also suggested that the BIA incorporate the requirements of ¶477 into an administrative investigative policy.

In the third reporting period, the IMT reviewed the CPD's relevant polices, including (1) the *BIA Investigators Unit Directive*; (2) the *Accountability Sergeant Unit Directive*; (3) *Complainant Communication Procedures and Timelines Unit Directive*; (4) *BIA Investigative Timelines and Benchmarks*; (5) General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct*; (6) *Conflicts of Interest Unit Directive*; (7) *Elements of a Complete Investigative File Unit Directive*; (8) *Assignment of Administrative Log Number Investigations Unit Directive*; and (9) *Intake Initiation of Log Number BIA Unit Directive*. Those policies have been drafted or revised to address ¶477 and other requirements of the Consent Decree.

The IMT did not receive any evidence of COPA's efforts toward compliance with ¶477 in the third reporting period. In the next reporting period, we look forward to working with the City to finalize BIA's policies and to reviewing COPA's relevant policies.

# Accountability and Transparency: ¶478

**478.** *Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding Preliminary investigations, including Preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

**Compliance Progress**         (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[211] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The IMT determined that the City, the CPD, and COPA have not met Preliminary compliance with ¶478 in the third reporting period.

To evaluate Preliminary compliance with ¶478, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41).[212] The IMT also reviewed data sources relevant to compliance with the requirements of ¶478 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT noted that, while BIA has the basic material available to develop a preliminary administrative investigative process for BIA investigators and Accountability Sergeants, BIA had not yet developed or provided the IMT with a policy that describes BIA's preliminary investigative process or procedure. The IMT also reviewed COPA policy 3.1.4, *Affidavits and Affidavit Overrides*, which sufficiently covered ¶478's requirements regarding affidavit overrides but did not include ¶478's requirements regarding preliminary investigations and anonymous complaints. The IMT suggested that COPA work to develop a comprehensive investigation manual or policy.

---

[211] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[212] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

In the third reporting period, the IMT reviewed a number of the CPD's relevant policies, including (1) the *BIA Investigators Unit Directive*; (2) *Complainant Communication Procedures and Timelines Unit Directive*; (3) *BIA Investigative Timelines and Benchmarks Unit Directive*; (4) General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (formerly titled *Specific Responsibilities Regarding Allegations of Misconduct*); (5) *Conflicts of Interest Unit Directive*; (6) *Elements of a Complete Investigative File Unit Directive*; (7) *Assignment of Administrative Log Number Investigations Unit Directive*; and (8) *Intake Initiation of Log Number Unit Directive*. Those policies, once revised and finalized, should address the requirements of ¶478.

The City has not provided the IMT with any information regarding COPA's efforts toward compliance with ¶478 in this reporting period. The IMT looks forward to reviewing COPA's relevant policies and to working with the CPD to finalize its policies in the next reporting period.

# Accountability and Transparency: ¶479

**479.** *Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance[213]* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶479 in the third reporting period.

To evaluate Preliminary compliance with ¶479, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[214] which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶479 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT did not receive any information regarding the CPD's efforts toward compliance with ¶479. The IMT reviewed multiple versions of COPA's policy 3.3.2, *Timeliness Benchmark* and suggested that COPA marry 3.3.2 with its Investigator Manual to ensure that 3.3.2 is as detailed and effective as it can be.

In the third reporting period, the IMT reviewed the CPD's *BIA Investigative Timelines and Benchmarks Unit Directive*, which provides details regarding the specific timelines and benchmarks for internal investigations. The directive is clear about the CPD's expectations for investigative performance and reporting, and it addresses the responsibilities for BIA Investigators, Accountability Sergeants, and BIA

---

[213] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[214] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

Lieutenants. The CPD has also provided the following policies to the IMT, all of which support the CPD's efforts toward compliance with ¶479: (1) the *BIA Investigators Unit Directive*; (2) *Complainant Communication Procedures and Timelines Unit Directive*; (3) General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (formerly titled *Specific Responsibilities Regarding Allegations of Misconduct*); (4) *Conflicts of Interest Unit Directive*; (5) *Elements of a Complete Investigative File Unit Directive*; (6) *Assignment of Administrative Log Number Investigations Unit Directive*; and (7) *Intake Initiation of Log Number Unit Directive*. Those policies, once revised and finalized, will go a long way toward addressing the requirements of ¶479.

The IMT also reviewed a revised version of COPA's *Recommendations Regarding Department Member Duties and Powers*: 3.2.2 policy (3.2.2). This policy is comprehensive and specifically addresses situations where an officer's law enforcement powers might be revoked or reinstated. The policy, however, addresses only a small part of its objective: comprehensive and timely investigations of complaints.

The IMT looks forward to working with COPA and the CPD to revise their relevant policies in the next reporting period.

## Accountability and Transparency: ¶480

**480.** *Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[215] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, neither the CPD nor COPA met Preliminary compliance with ¶480.

To evaluate Preliminary compliance with ¶480, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[216] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶480 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the City's relevant draft policy, *City Policy Regarding Procedures for COPA, BIA, and the Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation*. This policy provided clear direction regarding how and when evidence will be forwarded to COPA, BIA, OIG, or the Accountability Sergeants, but did not address important

---

[215] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[216] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

details like who makes decisions, how decisions are made, who should conduct reviews, or how reviews should be conducted to ensure that decisions are appropriate. The IMT also reviewed multiple drafts of COPA's policy 1.3.8, *Civil and Criminal Complaint Review*, which incorporated the requirements of ¶480. We suggested that COPA work toward Preliminary compliance by soliciting the requisite community input, adjusting 1.3.8 accordingly, and finalizing the policy. The CPD did not submit any information regarding its compliance efforts for ¶480 in previous reporting periods.

In the third reporting period, BIA provided the IMT with a letter that it had previously provided to the IMT in the second reporting period explaining that the City was working toward a policy for ¶480 but that any such policy had not been finalized. It appears that the City did not make any progress toward the completion of that policy in the third reporting period.

The IMT did not receive any additional information regarding the City's efforts toward compliance with ¶480. The IMT looks forward to working with the City, the CPD, and COPA on their efforts toward compliance in the next reporting period.

# Accountability and Transparency: ¶481

> **481.** *The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **OIG** | *In Compliance* (NEW)[217] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶481.

To evaluate Preliminary compliance with ¶481, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[218] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶481 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed data from COPA and correspondence between the CPD and COPA, which showed that, since the effective date of

---

[217] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[218] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the Consent Decree, the CPD Superintendent has responded to all COPA's five-year authorization requests within 30 days of the request. Neither of these records, however, were sufficient to establish compliance. We suggested (1) that COPA develop a policy that directs COPA employees in the process of requesting authorization to investigate these incidents and that explains COPA's process to the public and (2) that the CPD develop a policy that directs the Superintendent's actions as required by ¶481. We also suggested that the CPD, COPA, and the OIG ensure that they have systems in place to track requests to and responses from the Superintendent.

In the third reporting period, the IMT reviewed General Order G08-01, *Complaint and Disciplinary Procedures*, which directs the Superintendent to respond, within 30 days, to requests to open a previously closed case, as required by ¶481. Additionally, the IMT reviewed BIA's *Incidents Occurring Five Years Prior to Complaint and Re-Opening Investigations Five Years After Initiation Unit Directive*. The IMT and the OAG have not yet approved that *Unit Directive*, and the IMT looks forward to working with BIA to revise and finalize that *Unit Directive*.

The IMT also reviewed Section C of the OIG's Investigations Section Manual, which explains the correct procedure for requesting the CPD Superintendent to reopen an investigation pursuant to ¶481. The OIG also provided the IMT with documentation of one such request and the CPD's response to demonstrate how the process works.

As in previous reporting periods, the IMT suggests that COPA develop a policy that explains the process for requesting that the Superintendent authorize the opening of "an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations," and explaining that the Superintendent, under ¶481, must respond within 30 days. Any such policy should include details about what will occur when a case is partially reopened and the notification process for any results from a partially reopened case. Generally, examples of the process that is currently in place are insufficient to demonstrate Preliminary compliance with ¶481.

The IMT looks forward to working with the CPD to finalize G08-01 and to reviewing other policies regarding ¶481 in the next reporting period. The IMT also looks forward to reviewing evidence that the OIG has trained its relevant staff on the requirements of ¶481 in the next reporting period.

## Accountability and Transparency: ¶484

> **484.** *If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[219] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the CPD and COPA did not meet Preliminary compliance with ¶484.

To evaluate Preliminary compliance with ¶484, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[220] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶484 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which directs the Accountability Sergeant to notify the BIA Lieutenant if evidence of criminal activity is discovered during an administrative investigation. However, this *Unit Directive* does not provide guidance to or requirements

---

[219] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[220] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

for BIA Lieutenants regarding further notification to the BIA Chief or the COPA Chief as required by ¶484.

In the third reporting period, the IMT reviewed the *BIA Investigators Unit Directive*, which requires BIA Investigators to determine whether additional misconduct beyond the scope of the original complaint has been fully documented, classified, and investigated. This *Unit Directive* does not, however, specifically address criminal behavior and the proper notification process. The IMT has not yet approved the *BIA Investigators Unit Directive* and looks forward to working with BIA to revise this directive in the next reporting period. The IMT also reviewed BIA's *Intake Initiation of Log Number Unit Directive* (formerly titled the *Initiation, Intake and Assignment of Log Investigations Unit Directive*), which addresses ¶484 as related to BIA Supervisors, but does not address this paragraph with regard to BIA Investigators or Accountability Sergeants.

COPA provided the IMT with its *Intake Policy*: 3.1.1.[221] On the IMT's suggestion, COPA revised this policy to incorporate the requirements of ¶484. The IMT expects that COPA will meet some level of compliance once its *Intake Policy* has been finalized.

The IMT looks forward to working with BIA and COPA to revise their relevant policies in the next reporting period.

---

[221] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶487

> **487.** *Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance*[222] |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶487.

To evaluate Preliminary compliance with ¶487, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[223] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶487 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed BIA's *Requirements of a Complete Investigative File Unit Directive* (previously titled *Elements of a Complete Investigative File Unit Directive*), which addresses the requirements of ¶487. This *Unit Directive* directs BIA Investigators and Accountability Sergeants to consider all rel-

---

[222] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[223] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

evant factors in statements involving CPD employees, witnesses, and complainants. That *Unit Directive* is a good example of BIA's ability to draft a good, comprehensive policy where one did not exist before and to provide clear, concise information to those involved in the investigation, as well as to others in the department and the community. Once BIA posts the *Unit Directive* for public comment, it is likely that BIA will achieve some level of compliance with this paragraph.

We look forward to working with BIA to finalize its *Unit Directive* and to reviewing COPA's relevant policies in the next reporting period.

## Accountability and Transparency: ¶488

*488. In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to participate in the Preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. the Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance*[224] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶488. As in previous reporting periods, the IMT recognizes that some of the challenges prohibiting compliance are currently outside of the CPD's and COPA's control.

To evaluate Preliminary compliance with ¶488, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[225] which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶488 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed COPA policy 3.1.10, *Major Incident Responses*, and suggested that COPA revise the policy to address COPA's investigative process and the investigative relationship between the CPD and COPA, including COPA's responsibility for responding to and investigating officer-involved shooting and death cases. The IMT also reviewed the CPD's *Incident Scene Management Card*; General Order G03-02-03, *Firearm Discharge*; and General Order G03-06, *Officer-Involved Death.* The IMT provided no-objections to the two General Orders *as temporary policies*, pending resolution of issues related to the Police and Community Relations Improvement Act (PCRIA), 20 ILCS 727/, and future community input. The IMT recognizes that the PCRIA question is a complex issue. The CPD's General Orders G03-02-03 and G03-06 are temporary procedures that allow

---

[224] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[225] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

for proper investigation until a more permanent solution is identified and agreed upon by stakeholders.

In the third reporting period, the CPD provided the IMT with a revised version of its *Incident Scene Management Card*. The IMT remains concerned that the information included on the *Card* is basic and of the type that CPD supervisors and command staff should know without the aid of a card.

On December 26, 2020, in the last week of the reporting period, the City provided the IMT with a two-page *Memorandum of Agreement Between COPA and the CPD* (MOA). The City, the CPD, and COPA first agreed to draft and enter into a MOA following the January 15, 2020 IMT Site Visit as a temporary solution to address notification, response, investigation, and other relevant issues regarding officer-involved shootings and deaths. The IMT expected those entities to promptly enter into that MOA and then proceed with developing and drafting policies regarding the extensive requirements of ¶488 by the end of the reporting period. To further that objective, the IMT made several suggestions, including that those policies should direct the actions of the CPD and COPA individually while also referring to each agency's responsibilities regarding officer-involved shootings and deaths. Rather than making substantial progress on these important issues, the CPD and COPA have not provided the IMT with any draft policies for ¶488. Instead, the entities have drafted a MOA that neither reflects the current working relationship between the CPD and COPA nor provides sufficient detail about how the MOA will be implemented.

For example, the MOA states that COPA will be "immediately and contemporaneously" notified of officer-involved shootings or deaths. However, the IMT received documentation during this reporting period which shows that, in practice, CPD personnel receive notification of those incidents up to an hour before COPA receives notification. When the IMT raised this issue with the CPD and COPA, those entities stated that notification may occur more promptly in practice than what is shown by official documentation, which raises concerns about the CPD's and COPA's documentation and record-keeping processes. Furthermore, the language of the MOA suggests that the CPD has granted COPA permission to engage in officer-involved shooting and death investigations, whereas ¶488 clearly requires COPA's investigation of those incidents.

Given the importance of ¶488 and the PCRIA issue, the IMT is disappointed that the City's efforts on this issue seem to have slowed.

In the next reporting period, the IMT looks forward to learning about how the City continues to work toward a more permanent solution and compliance with ¶488.

# Accountability and Transparency: ¶493

***493.*** *OAG acknowledges that, in many districts, CPD has desig-*
*nated Accountability Sergeants whose responsibilities include re-*
*ceiving, processing, and investigating complaints made against*
*CPD members, which are referred to the districts by BIA. Within*
*120 days of the Effective Date, CPD will develop a policy outlining*
*the responsibilities of Accountability Sergeants, their respective*
*Commanders, and the BIA Lieutenants responsible for supervis-*
*ing the Accountability Sergeant's investigations ("BIA Lieuten-*
*ants"). The policy will provide, among other things, a process by*
*which: a. within 72 hours of receiving a complaint from BIA for*
*investigation, an immediate supervisor will be provided a sum-*
*mary of the complaint allegations concerning the involved CPD*
*member; b. within seven days of the final disciplinary decision,*
*the Commander and an immediate supervisor will be provided*
*with the investigative findings, recommended discipline or cor-*
*rective action, if any; and c. an immediate supervisor of the in-*
*volved CPD member and the Accountability Sergeant will meet*
*with the involved CPD member regarding the investigative find-*
*ings, recommended discipline or corrective action, if any, unless*
*the CPD member declines to meet.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶493.

To evaluate Preliminary compliance with ¶493, the IMT has reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶493 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the CPD's *Accountability Sergeants Unit Directive*, which incorporated the requirements of ¶493. That *Unit Directive* showed that the CPD had made strong progress toward Preliminary compliance, but had not yet achieved Preliminary compliance because the CPD had

not yet submitted the *Unit Directive* for community engagement or public comment.

In the third reporting period, BIA provided the IMT with a memorandum regarding *Accountability Sergeant Selection* and an *Accountability Sergeant Task Sheet*. While these records were useful for the IMT to review, it is not clear how they address the requirements of ¶493.

The CPD did not post the *Accountability Sergeants Unit Directive* for public comment or finalize that policy as required by the Consent Decree. While the *Accountability Sergeants Unit Directive* is a robust and focused directive that addresses the requirements of ¶493, the CPD will not meet Preliminary compliance with ¶493 until it has solicited public comments on and finalized the *Unit Directive*.

The IMT looks forward to reviewing the results of the public comment process for the *Accountability Sergeants Unit Directive* and working with BIA to finalize that *Unit Directive* in the next reporting period.

## Accountability and Transparency: ¶494

**494.** *CPD will require that: a. investigations completed by Accountability Sergeants are held to the same investigative standards as those completed by BIA; b. beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose primary responsibility is receiving, processing, and investigating complaints against CPD members; c. before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review; d. each Accountability Sergeant is provided with the name of and contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work; e. BIA Lieutenants provide regular case-related and overall performance feedback to each of the Accountability Sergeants and his or her respective District Commander; f. BIA Lieutenants review and approve all of the Accountability Sergeant's proposed investigative findings and disciplinary recommendations; g. all Accountability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS; h. all Accountability Sergeants have access to BIA policies, directives, protocols, and training materials; and i. all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.*

### Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          January 1, 2020          ☐ **Met**  ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT found that the CPD did not achieve Preliminary compliance with ¶494.

To evaluate Preliminary compliance with ¶494, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41),[226] which details applicable consultation, resolution, workout, and public comment

---

[226] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶494 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In prior reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which addresses each requirement of ¶494 in sufficient detail. This *Unit Directive* also clarifies the expectations of Accountability Sergeants with regard to the quality of their investigations, how they are selected to serve, their job description, the support that they can expect to receive from the BIA, and the training that they will receive. We determined that the CPD was in a good position to reach some level of compliance in the third reporting period.

In the third reporting period, BIA provided the IMT with a memorandum regarding *Accountability Sergeant Selection* and an *Accountability Sergeant Task Sheet*. The CPD did not, however, post the *Accountability Sergeants Unit Directive* for public comment or finalize that policy as required by the Consent Decree. While the *Accountability Sergeants Unit Directive* is a robust and focused directive that addresses the requirements of ¶494, the CPD will not meet Preliminary compliance with ¶494 until it has solicited public comments on and finalized the *Unit Directive*.

The IMT also reviewed BIA's *Training Unit Directive*, which commits to providing the same training to Accountability Sergeants and BIA investigative staff. That *Unit Directive* further demonstrates BIA's commitment to ¶494(j).

The IMT looks forward to reviewing the results of the public comment process for the *Accountability Sergeants Unit Directive* and working with BIA to finalize that *Unit Directive* in the next reporting period.

# Accountability and Transparency: ¶496

> **496.** *The City and CPD will ensure that interfering with an administrative investigation, including being untruthful in an investigation into misconduct or colluding with other individuals to undermine such an investigation, or intentionally withholding requested evidence or information from an investigator, will result in disciplinary action and/or criminal prosecution based on the seriousness of the conduct.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶496.

To evaluate Preliminary compliance with ¶496, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41),[227] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶496 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In the third reporting period, the IMT reviewed the CPD's General Order G08-01, *Complaint and Disciplinary Procedures*, which generally addresses ¶496. G08-01 specifically states that employees may be disciplined, including by termination from the department, but does not state that employees may face criminal charges for intentionally working to undermine an administrative investigation or for colluding with others to do so. The IMT suggests that the CPD more comprehensively incorporate the requirements of ¶496 into its policies.

---

[227] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

The IMT looks forward to reviewing the CPD's efforts toward compliance with ¶496 in the next reporting period.

# Accountability and Transparency: ¶497

> **497.** *COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this agreement.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | CPD | *Not in Compliance* |
| | COPA | *Not in Compliance*[228] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶497.

To evaluate Preliminary compliance with ¶497, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[229] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶497 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The City has not provided the IMT with information regarding the CPD's and COPA's efforts toward compliance with ¶497. As in previous reporting periods, the IMT suggests that BIA develop a policy that incorporates the requirements of ¶497. That policy should direct BIA members to acknowledge in writing that they have not attempted to influence any person involved in an internal investigation in which they are involved, including as the subject of the investigation, a witness, or

---

[228] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[229] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

otherwise. Similarly, the member should acknowledge in writing that they will not discuss internal investigations in which they are involved.

The IMT also suggests that COPA develop a similar policy and form that addresses collusion and witness contamination.

The IMT looks forward to reviewing the City's relevant policies in the next reporting period.

# Accountability and Transparency: ¶498

**498.** *The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD achieved Secondary compliance with ¶498.

To evaluate Secondary compliance with ¶498, the IMT reviewed the City's and the CPD's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[230] model of curriculum development and implementation as our evaluation standard. This model typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In prior reporting periods, the IMT reviewed and approved the CPD's Special Order S08-01-03, *Command Channel Review* (CCR), as well as the BIA's related training materials, which were sufficient to demonstrate Preliminary compliance with ¶498.

BIA has continued to work to develop policies and training materials regarding the Command Channel Review (CCR) process. In the third reporting period, BIA created its *CCR Unit Directive* that addresses the role of the Advocate Section in the CCR process and further enhances and explains the CCR process. The IMT has offered comments and feedback on that directive and looks forward to working with BIA to revise and finalize that directive in future reporting periods.

In the third reporting period, the IMT also reviewed BIA's *CCR Lesson Plan and Slide Deck for Exempt Members*. The IMT and the OAG provided BIA with written comments on BIA's CCR Training Materials, and BIA worked with the IMT and the OAG

---

[230] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

to revise those Training Materials. After reviewing revised versions, the IMT and the OAG both indicated to BIA that they had no objections to the CCR Training Materials. BIA has since trained nearly all of its Command Staff on the CCR and Case Management (CMS) process, and has provided sufficient documentation of that training to the IMT to meet Secondary compliance with ¶498. Furthermore, BIA has diligently revised its CCR policies and provided training updates to its Command Staff.

We look forward to continuing to work with BIA on ¶498 as it continues its compliance efforts.

# Accountability and Transparency: ¶504

> ***504.*** *As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the City, the CPD, and COPA did not meet Preliminary compliance with ¶504.

To evaluate Preliminary compliance with ¶504, the IMT reviewed the CPD's and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[231] which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶504 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed COPA's policy 3.1.3, *Final Summary Report*, and an example of an Administrative Summary Report provided by the CPD. Neither of these documents were sufficient to demonstrate Preliminary compliance with ¶504. We suggested that the CPD and COPA develop policies that provide additional details around the use of the *Administrative Summary Report*, including who has access to the report, when those people have access to the report, how the report is used, and other relevant information.

In the third reporting period, the IMT reviewed BIA's *Administrative Summary Report Unit Directive*, which directs the Department Advocate to send completed *Administrative Summary Reports* to the involved CPD employee within 30 days of the final disposition, and to the reporting party within 60 days of that final dispo-

---

[231] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

sition. The *Unit Directive* also incorporates ¶504's requirement that the *Administrative Summary Report* be provided to the involved CPD member's District or Unit Commander and immediate supervisor. The CPD will not meet Preliminary compliance, however, until the *Unit Directive* has been finalized.

The IMT also reviewed COPA's *Timeliness Benchmarks* policy, which addresses ¶504. Neither the IMT nor the OAG approved of that policy in the third reporting period, however. COPA will not meet Preliminary compliance until that policy has been approved and finalized.[232]

The IMT looks forward to working with BIA and COPA to finalize their relevant policies in the next reporting period.

---

[232] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶512

> ***512.*** *The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.*

## Compliance Progress  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance[233]* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶512 in the third reporting period.

To evaluate Preliminary compliance with ¶512, the IMT reviewed the City's, the CPD's, and COPA's policies using the policy process described in the Consent Decree (¶¶626–41),[234] which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶512 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

---

[233] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[234] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

In previous reporting periods, the IMT reviewed documents that demonstrated progress toward a city-wide mediation policy that will apply to the CPD and COPA. The documents suggested a detailed approach to mediation, but the mediation proposal had not yet been presented to the City for its approval and implementation. We suggested that, once the mediation policy is approved, the CPD and COPA should develop their own internal policies to direct the agencies to follow the city-wide mediation policy.

In the third reporting period, the IMT reviewed the BIA's *Community Mediation Unit Directive*. That *Unit Directive* lists criteria to be used to determine whether a complaint or investigation is eligible for mediation, but appears to give the BIA Chief discretion as to which complaints or investigations are mediated. To improve trust and transparency in the CPD and in the community, BIA should consider revising the *Unit Directive* to create a formal process that BIA will use to review complaints or investigations for eligibility for mediation. Furthermore, the *Unit Directive* does not address the topics of efficiency, transparency, procedural justice, restorative justice, or public trust. Nor does the *Unit Directive* provide information or details on the various steps in the mediation process, the methods of communication with complainants and CPD members, and the complainants' and CPD members' opportunity to participate in the mediation. The IMT looks forward to working with the CPD to revise the *Unit Directive* in the next reporting period.

Finally, the City provided the IMT with information and records demonstrating that the City has selected a vendor to assist in developing the Mediation Program that is required by ¶¶511 and 512. Those records included a *Community Engagement Plan*, *Mediation Support Services*, and *Mediation Notes*. The *Mediation Support Services* record appears to be a proposal for the scope of the vendor's work. The *Community Engagement Plan* appears to be an educational presentation to accompany the *Mediation Support Services* record. Finally, the *Mediation Notes* document a February 5, 2020 meeting between COPA, the CPD, and the City; much of that document is redacted, so it is difficult to determine the depth of the discussion at that meeting. The IMT appreciates the City's efforts toward developing its Mediation Program and looks forward to reviewing the progress that the City makes in the next reporting period.

# Accountability and Transparency: ¶522

> **522.** Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.

**Compliance Progress**　　　　　　　(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **CPD BIA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **COPA** | *Not Yet Assessed* |
| **CPD BIA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (NEW)[235] |
| **Full:** | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶522 in the third reporting period.

To evaluate Preliminary compliance with ¶522, the IMT reviewed whether COPA, the Deputy PSIG, and BIA created separate staffing and equipment-needs plans. To evaluate Secondary compliance with ¶522, the IMT reviewed COPA's, the Deputy PSIG's, and BIA's separate staffing and equipment-needs plans for completeness and sufficiency.

In previous reporting periods, the IMT reviewed documents from BIA that demonstrated that BIA is working on a Staffing and Equipment Needs Assessment, but that this assessment was in its early stages. We suggested that BIA consider focusing its efforts on investing in technology to digitize records for the future. The IMT also reviewed COPA's *Staffing and Equipment Needs Overview* and the accompanying *COPA Staffing Model* spreadsheet, which appeared to provide raw data to

---

[235] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

support the Overview. Those documents were not specific enough to constitute a "plan" under ¶522. Finally, the IMT reviewed the Deputy PSIG's *Staffing and Needs Assessment Plan*, which was thorough, comprehensive, and sufficiently detailed to meet the Deputy PSIG's responsibilities for Preliminary compliance with ¶522. We suggested that the Deputy PSIG provide a timeline for implementation to demonstrate completeness and sufficiency and consider tying any timeline to the Deputy PSIG's budget requests.

In the third reporting period, the City provided the IMT with a BIA Equipment Request submitted to Director of the CPD Information Services (dated August 14, 2020) and a BIA Staffing Assessment submitted to First Deputy Superintendent (dated September 30, 2020). These documents appear to be yearly budget and staffing requests rather than the result of a comprehensive equipment and technology needs assessment for the future of BIA, as is required by ¶522. The IMT also reviewed a document titled *Staffing and Equipment Needs Plan Annual Assessment*, which contained very little detail regarding specific personnel and equipment needs and the anticipated costs of those needs. The IMT suggests that BIA consider its technology needs—including laptops and electronic storage of all investigative files, attachments, and exhibits—rather than focusing on obtaining additional file cabinets and external hard drives. BIA will not meet Preliminary compliance with ¶522 until it develops a full needs assessment for future operations.

The IMT also reviewed the OIG Budget Request for FY2021, which details the PSIG's needs based on the *Staffing and Needs Assessment Plan* that the IMT reviewed in the second reporting period. The Budget Request provides sufficient detail to verify that the OIG is using its staffing and equipment needs assessment to make budget requests. The PSIG continues to demonstrate Preliminary compliance with ¶522 and, given the sufficiency of its *Staffing and Needs Assessment Plan* and Budget Request, has demonstrated Secondary compliance. To meet full compliance with ¶522, the PSIG will need to demonstrate that it has implemented its *Staffing and Needs Assessment Plan.*

The IMT also reviewed COPA's Staffing and Equipment Needs Plan for 2020 and 2021 (dated December 2020). That Plan provides a current staffing profile in place after COPA's recent reorganization to better facilitate work with its current staff. The Plan connects each senior leadership position to COPA's staffing needs recommendations and explains how those senior leadership positions contribute to a more productive workflow. Furthermore, the Plan provides insight into the impact of the COVID-19 pandemic on COPA's operations, including how COPA adjusted and reorganized to adapt to the virtual environment. COPA's quick adaptation permitted it to respond to the civil unrest and related challenges following the tragic death of George Floyd in May 2020, allowing COPA to react to a large influx of

complaints. Finally, the Plan restates COPA's long-term staffing needs, as determined by COPA's consultant in the previous monitoring period and explains that COPA requires additional personnel for optimal performance. COPA followed the City's guidelines for budget requests and did not ultimately request additional personnel during the budget process. It is clear that COPA continues to use its consultant's recommendations to better organize its management structure. COPA's Plan provides information about the costs of fully staffing the agency and about equipment and space needs for its personnel. Therefore, COPA meets Preliminary compliance with ¶522.

The IMT looks forward to reviewing comprehensive needs assessments from the City in future reporting periods.

# Accountability and Transparency: ¶523

*523. On an annual basis, COPA, the Deputy PSIG, and BIA will review and revise, if needed, each entity's respective staffing and equipment-needs plans.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| Deadline: | December 31, 2019 | ☐ Met | ☑ Missed |
| | March 5, 2021* | ☑ Not Yet Applicable | |

*Extended from December 31, 2020, due to COVID-19

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **CPD BIA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **COPA** | *Not Yet Assessed* |
| **CPD BIA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (NEW)[236] |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City did not meet Preliminary compliance with ¶523.[237] The City also did not meet the December 31, 2019 deadline.

---

[236] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[237] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

To evaluate Preliminary compliance with ¶523, the IMT sought to determine whether COPA, the Deputy PSIG, and BIA have created separate staffing and equipment needs plans. To evaluate Secondary compliance with ¶523, the IMT reviewed COPA's, the Deputy PSIG's, and BIA's staffing and equipment needs plans for completeness and sufficiency.

In the third reporting period, the City provided the IMT with a BIA Equipment Request submitted to Director of the CPD Information Services (dated August 14, 2020) and a BIA Staffing Assessment submitted to First Deputy Superintendent (dated September 30, 2020). These documents appear to be yearly budget and staffing requests rather than the result of a comprehensive equipment and technology needs assessment for the future of BIA. While this correspondence suggests that BIA has reviewed its staffing and equipment-needs plans, the IMT has not received any information regarding whether BIA has revised those plans. The IMT also reviewed a document titled *Staffing and Equipment Needs Plan Annual Assessment*, which contained very little detail regarding specific personnel and equipment needs and the anticipated costs of those needs. The IMT suggests that BIA consider its technology needs—including laptops and electronic storage of all investigative files, attachments, and exhibits—rather than focusing on obtaining additional file cabinets and external hard drives. The IMT looks forward to reviewing a revised staffing and needs assessment for BIA in the next reporting period.

The Deputy PSIG provided the IMT with its *OIG Budget Request for FY2021*. That request details the Deputy PSIG's needs based on the Deputy PSIG's initial staffing and needs assessment from the second reporting period. The request demonstrates that OIG uses its staffing and needs assessment to make budget requests. The Deputy PSIG also provided the IMT with a *Staffing and Equipment Needs Assessment* to demonstrate that it has reviewed and revised the needs assessment as required by ¶523. The IMT has determined that the Deputy PSIG has demonstrated Preliminary compliance with ¶523 and, given the sufficiency of its *Staffing and Needs Assessment Plan* and Budget Request, has demonstrated Secondary compliance. To meet full compliance with ¶523, the PSIG will need to demonstrate that it has implemented its *Staffing and Needs Assessment Plan* and continues to do so on an annual basis*.*

The IMT also reviewed COPA's Staffing and Equipment Needs Plan for 2020 and 2021 (dated December 2020). That Plan provides a current staffing profile in place after COPA's recent reorganization to better facilitate work with its current staff. The Plan connects each senior leadership position to COPA's staffing needs recommendations and explains how those senior leadership positions contribute to a more productive workflow. Furthermore, the Plan provides insight into the impact of the COVID-19 pandemic on COPA's operations, including how COPA adjusted and reorganized to adapt to the virtual environment. COPA's quick adaptation permitted it to respond to the civil unrest and related challenges following the tragic

death of George Floyd in May 2020, allowing COPA to react to a large influx of complaints. Finally, the Plan restates COPA's long-term staffing needs, as determined by COPA's consultant in the previous monitoring period and explains that COPA requires additional personnel for optimal performance. COPA followed the City's guidelines for budget requests and did not ultimately request additional personnel during the budget process. It is clear that COPA continues to use its consultant's recommendations to better organize its management structure. COPA's Plan provides information about the costs of fully staffing the agency and about equipment and space needs for its personnel. Because COPA has reviewed and revised its staffing and equipment needs plan, COPA meets Preliminary compliance with ¶523.

The IMT looks forward to reviewing additional documents from the CPD in the next reporting period to establish Preliminary compliance for the City.

## Accountability and Transparency: ¶525

**525.** *Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City did not meet Secondary compliance with ¶525 in the third reporting period.

To evaluate Secondary compliance with ¶538, the IMT reviewed the City's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[238] model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In previous reporting periods, the City indicated that it was in negotiations with the Grassroots Alliance for Police Accountability (GAPA) about a proposed ordinance that contains a permanent process for selecting the COPA Chief Administrator. The City also produced COPA's *Selection Method for Chief Administrator of COPA*, which included information about the original process for selection of the COPA Chief Administrator, the proposed new selection process, and a potential future process with GAPA described above. COPA's *Selection Method for Chief Administrator of COPA* was sufficient to demonstrate Preliminary compliance with ¶525.

In the third reporting period, the City did not provide the IMT with any information regarding its efforts toward Secondary compliance with ¶525. The IMT looks forward to reviewing relevant records from the City regarding its commitment to training on COPA's *Selection Method* or otherwise ensuring that its relevant personnel understand and are prepared to comply with ¶525.

---

[238] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

# Accountability and Transparency: ¶526

> ***526.*** *Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD BIA** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW)[239] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City did not meet Preliminary compliance with ¶526.

To evaluate Preliminary compliance with ¶526, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[240] which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶526 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed BIA's *Training Plan*, *Investigator and Accountability Sergeant Basic Training Course Description*, and *Training Schedule* and found those documents to be consistent with, but not sufficient to demonstrate compliance with ¶526. We suggested that BIA provide a policy or other document that sets the expectation that BIA will deliver the training required by ¶526 within 180 days of the Investigator or Accountability Sergeant being assigned to BIA. We also suggested that BIA provide documentation sufficient to confirm or set the expectation that existing BIA personnel have received the training required

---

[239] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[240] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

by ¶526. The IMT also reviewed COPA's *Training and Professional Department Training Plan*, which was comprehensive and provided a good understanding of how COPA developed its training. While COPA's *Training Plan* sufficiently set expectations for new hire orientation and for COPA Academy as required by ¶526, it did not require that COPA train its new hires within 180 days of being hired or require that current personnel be trained within 120 days.

In the third reporting period, the IMT reviewed multiple versions of COPA's Training and Professional Development Department Training Plan. That Training Plan is comprehensive and addresses all aspects of new-hire, COPA Academy, and In-Service training. The IMT provided COPA with written comments on the Training Plan. In response, COPA revised the Training Plan to address the IMT's suggestions. The IMT is satisfied that COPA's Training Plan addresses the requirements of ¶526.

The IMT also reviewed BIA's *Training Strategy, Implementation, and Execution Plan for BIA Investigator & Accountability Sergeant Required Annual Training* and *BIA Investigator and Accountability Sergeant On-Boarding Training Course Schedule and Course Description*. Those materials are comprehensive and demonstrate the enormous efforts that BIA's Training Staff have made during this reporting period. As written, however, those materials do not fully address ¶526. Furthermore, those materials envision that the CPD Homicide and Sexual Assault Units will act as instructors for those trainings; the IMT has serious concerns with that approach and suggests instead that BIA engage external subject matter experts. The IMT looks forward to reviewing BIA's relevant lesson plans in the next reporting period.

Finally, the IMT reviewed a CPD class roster for a 24-hour block of instruction entitled *BIA Investigators and Accountability Sergeants Conducting Log Number Investigations Training*. While the IMT appreciates the opportunity to review the class roster, the class roster does not include sufficient detail about which paragraphs the training attempts to cover. The IMT looks forward to learning more about this training and reviewing the underlying training materials.

The IMT also suggests that BIA and COPA provide documentation that their existing personnel have received training consistent with ¶526.

# Accountability and Transparency: ¶527

**527.** *Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.*

**Compliance Progress**                          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance* |
| | **CPD BIA** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW)[241] |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶527 in the third reporting period.

To evaluate Preliminary compliance with ¶527, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[242] which details applicable consultation, resolution, workout, and public comment periods.

In previous reporting periods, the IMT reviewed BIA's comprehensive basic training plan for new BIA Investigators and suggested that BIA provide information about BIA's plans regarding the eight hours of annual, comprehensive in-service training required by ¶527. The IMT also reviewed COPA's in-service training course catalogue, which was comprehensive but did not explain that all investigation staff members must complete at least eight hours of training annually.

In the third reporting period, the IMT reviewed a revised version of BIA's in-service training plan. The BIA did not provide the revised version of the training plan to the IMT until at least 10 months after the IMT had provided comments on the previous version. The revised training plan now states that the "annual training will consist of no less than eight (8) hours of comprehensive, in-service training." Additionally, BIA has started to provide CMS/CCR training to its command staff. While the IMT has indicated that it does not have any objections to the in-service training

---

[241]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[242]   *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

plan at this time, BIA will need to revise its training plan to address the OAG's feedback. Once BIA has done so and finalized the training plan, the CPD may achieve some level of compliance with this paragraph.

The IMT also reviewed BIA's *Training Unit Directive*, which explains that the training required by ¶527 must be provided to BIA personnel. That *Unit Directive* has not yet been approved by the IMT and the OAG, however, and will need to be approved and posted for public comment before demonstrating Preliminary compliance.

The IMT also reviewed multiple drafts of COPA's *Training Plan*. In response to the IMT's feedback, COPA revised the *Training Plan*, which now states that COPA will provide at least eight hours of annual in-service training. The IMT is satisfied that COPA's *Training Plan* addresses the requirements of ¶527 and demonstrates Preliminary compliance with that paragraph. COPA has also provided the IMT with a number of lesson plans and slide decks for various training blocks of instruction. COPA has started to train its employees on some of those topics, including *Collective Bargaining Agreements* and *Affidavit Overrides*. Furthermore, on December 23, 2020, COPA provided the IMT with a spreadsheet that contains detailed information about twelve COPA training blocks of instruction that COPA staff attended starting in February 2020 and throughout the rest of 2020. That spreadsheet shows that at least 73 of COPA's staff members received at least eight hours of training in 2020, and several others received seven and a half hours of training in 2020. The spreadsheet does not, however, indicate which staff members are investigative staff.

The IMT looks forward to assessing the City's continued efforts toward compliance in the next reporting period.

# Accountability and Transparency: ¶528

***528.*** *The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | ***Not in Compliance*** |
| | **CPD BIA** | ***Not in Compliance*** |
| | **COPA** | ***In Compliance*** (SECOND REPORTING PERIOD) [243] |
| **Secondary:** | | ***Not Yet Assessed*** |
| | **CPD BIA** | ***Not Yet Assessed*** |
| | **COPA** | ***Under Assessment*** |
| **Full:** | | ***Not Yet Assessed*** |

---

[243] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance.

The City did not meet Preliminary compliance with ¶528 in the third reporting period.

To evaluate Preliminary compliance with ¶528, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[244] which details applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with ¶528, the IMT determined whether COPA and BIA have the requisite initial and annual in-service training curriculum.

In previous reporting periods, the IMT reviewed COPA's *Training and Professional Department Training Plan* (dated February 5, 2020), which was comprehensive. The IMT found that COPA's relevant training materials met and even exceeded the requirements of ¶528. BIA's training materials, however, fell short of those requirements. The IMT reviewed the *BIA Investigator and Accountability Sergeant Basic Training Course Description*, which clarifies that Accountability Sergeants and BIA Investigators will receive the same initial and in-service training on policies, directives, protocols, and other training materials. Many of the topics required by ¶528 were missing from the *BIA Investigator and Accountability Sergeant Basic Training Course Description* and the *BIA Basic Training Schedule*. The IMT suggested that BIA produce an in-service training plan for BIA Investigators and Accountability Sergeants.

In the third reporting period, BIA provided the IMT with a revised version of its *In-Service Training Plan*, as well as some topical lesson plans that address ¶528. The IMT reviewed BIA's (1) *CMS Log Number Intake Training Materials*, (2) *Introduction to CMS Training Materials*, (3) *BIA Investigator and Accountability Sergeant Training Materials*, (4) *CCR Training Materials*, (5) and *Introduction to Rules and Regulations Training Materials*. Those materials address the requirements of ¶528(a), (m), (o), and (p). The IMT suggests that BIA review COPA's *Sexual Assault Training Materials* and *Implicit Bias Training Materials* rather than creating new trainings on those subjects.

The IMT also reviewed the *BIA Investigator and Accountability Sergeant On-Boarding Training Course Schedule Course Schedule* and *Course Description*. Those materials are comprehensive and demonstrate the enormous efforts that BIA's Training Staff have made during this reporting period. As written, however, those materials do not address many of the topics required by ¶528. The IMT looks forward to reviewing BIA's relevant lesson plans in the next reporting period.

BIA's *Training Strategy, Implementation, and Execution Plan for BIA Investigator & Accountability Sergeant Required Annual Training*, also reviewed by the IMT in the

---

[244] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

third reporting period, appears to direct the BIA Training Unit in its work. That Plan, however, appears to conflict with the *BIA In-Service Training Plan* previously provided to the IMT for review and the *BIA Training Unit Directive*. Each of those records presents important components of a comprehensive In-Service Training Plan, but, as written, the three documents are confusing.

COPA provided the IMT with a revised version of its *Training and Professional Development Department Training Plan* in the third reporting period. That Training Plan continues to be comprehensive. Furthermore, COPA has developed and provided to the IMT a number of in-service training materials that have been designed to address ¶528. Specifically, the IMT has reviewed COPA's (1) *Intake Training Materials*, (2) *Procedural Justice Refresher Course Materials*, (3) *Sexual Assault Training: Understanding the Neurobiology of Trauma and Applying Trauma Informed Investigative Techniques Training Materials*, (4) *Witness Reliability Assessment in Police Misconduct Investigations Training Materials*, (5) *Implicit Bias Training Materials*, (6) *CPD Rules and Regulations Training Materials*, (7) *Fourth Amendment in Police Misconduct Investigations In-Service Refresher Training Materials*, (8) *CMS – Case Management System Training Materials*, (9) *Collective Bargaining Agreement Training Materials*, and (10) *Affidavit Override Training Materials*. Collectively, those Training Materials address ¶528(a), (b), (d), (e), (i), (j), (k), (m), (n), (o), (p), and (q). The IMT also appreciated the opportunity to observe COPA's Collective Bargaining Agreement training. We look forward to working with COPA to finalize its training materials.

During the third reporting period, COPA delivered a 90-minute in-service training block of the *Intake Process* over the course of several class sessions to approximately 58 COPA personnel. COPA also delivered a 60-minute in-service training block on the domestic violence investigative process to approximately 84 COPA personnel and 4 optional COPA personnel; a 60-minute in-service training block on the *CPD Rules and Regulations* to approximately 93 COPA personnel and 4 optional COPA personnel; a 60-minute in-service training block on the *Case Management System* to approximately 57 COPA personnel; and a training block on *Collective Bargaining Agreements* to approximately 74 COPA personnel.

The IMT recognizes that many of the training topics required by ¶528 are complex and will require significant time and resources to ensure that BIA Investigators, COPA Investigators, and Accountability Sergeants have a comprehensive understanding of the material. These topics largely involve new processes, procedures, directives, and technology. Additionally, many of the topics will require the CPD and COPA to engage subject matter experts to sufficiently develop and deliver the trainings. The IMT looks forward to working with the CPD and COPA in their efforts toward compliance with ¶528 in the next reporting period.

# Accountability and Transparency: ¶529

***529.*** *Within 180 days of the Effective Date, CPD will begin provid-*
*ing training to all CPD members on the terms of this Agreement*
*and COPA's and CPD's revised or new policies related to adminis-*
*trative investigations and discipline. To the extent appropriate*
*and necessary based upon a CPD member's duties, and contact*
*with members of the public and/or individuals in custody, this*
*training will include instruction on: a. identifying and reporting*
*misconduct, the consequences for failing to report misconduct,*
*and the consequences for retaliating against a person for report-*
*ing misconduct or participating in an investigation; b. use of the*
*City's anonymous reporting website; c. for CPD supervisors: i. the*
*proper initiation of the intake process, including providing*
*COPA's contact information and the consequences for failing to*
*initiate the intake process; and ii. techniques for turning the ini-*
*tiation of a complaint into a positive police-community member*
*interaction.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with
¶529.

To evaluate Preliminary compliance with ¶529, the IMT reviewed the City's and
the CPD's policies following the policy process described in the Consent Decree
(¶¶626–41), which details applicable consultation, resolution, workout, and public
comment periods. The IMT also reviewed data sources relevant to compliance
with the requirements of ¶529 and considered all available data that the IMT con-
siders necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed an agenda of a BIA Education and
Training Division meeting (dated January 30, 2020), which demonstrated that the
meeting took place and that the meeting participants discussed items related to
¶529. The CPD also provided the IMT with a letter (dated February 18, 2020) that
demonstrated that the CPD is working toward Preliminary compliance with ¶529.
The IMT suggested that the CPD provide the IMT with drafts of its relevant policies
and training materials in the third reporting period.

In the third reporting period, BIA provided *Command Channel Review (CCR) and Case Management System (CMS)* training to its command staff members who are involved in the CCR process. BIA has also started to develop other training courses including *Introduction to Rules and Regulations*, *CMS Log Number Intake*, *Investigative Practices*, *Ethics*, and the *Summary Punishment and Automated Report Process*. The IMT also reviewed BIA's *Training Unit Directive*, which states the requirements of ¶529. Even so, Preliminary compliance with ¶529 will require a comprehensive training plan that explains who receives the required raining blocks, along with an explanation of why certain groups of CPD employees must receive a specific training while others do not. That plan should include specific details about lesson plans, which should be finalized by the IMT, OAG, and the CPD before the CPD offering those trainings. Finally, BIA should consider collaborating with the CPD's Training Unit to determine how and when specific training should begin. It may make sense to offer some of these training sessions on an electronic training platform to allow greater access to those trainings.

The IMT also reviewed the CPD's *2020 Supervisor In-Service Training* materials, which the CPD provided to the IMT as evidence of compliance with ¶529, among other paragraphs. The IMT suggests that the CPD revise that training to make consistent the slide deck and lesson plan for the training; to incorporate information about G08-05, *Prohibition on Retaliation*; and to ensure that the amount of time set for the training is sufficient to comprehensively cover the material that CPD intends to include in the training. Because the expectations and standards for the behavior of CPD officers begin with the front-line supervisors, the CPD's supervisory training materials are especially important.

BIA has not yet met Preliminary compliance with ¶529. The IMT looks forward to working with BIA to revise and finalize its training materials in the next reporting period.

## Accountability and Transparency: ¶530

*530. Within 90 days of the Effective Date, COPA and BIA will create separate initial and in-service training plans.*

**Compliance Progress**        (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW) |
| | **CPD BIA** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD BIA** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW)[245] |
| **Full:** | | *Not Yet Assessed* |

In the third reporting period, the IMT determined that COPA and BIA met Preliminary compliance with ¶530.

To evaluate Preliminary compliance with ¶530, the IMT reviewed whether COPA and the CPD have allocated sufficient resources to create separate initial and in-service training plans. To evaluate Secondary compliance with ¶530, the IMT reviewed whether COPA's and the CPD's training plans are sufficient.

In previous reporting periods, the IMT reviewed COPA's *Training and Professional Development Training Plan* and found it to be comprehensive. While the IMT believed that COPA met their portion of the requirements under ¶530, the IMT ultimately noted that COPA's compliance with ¶530 was still "under assessment," because the Parties disagree whether the Training Plan requires OAG approval.[246] The IMT also reviewed the *BIA Investigator and Accountability Sergeant Course Description*. The IMT found that Course Description to be comprehensive and relevant to the work that BIA Investigators and Accountability Sergeants are expected to do and suggested that BIA instructors develop content for the courses described in that Course Description.

In the third reporting period, the IMT reviewed BIA's In-Service Training Plan, the BIA Investigator and Accountability Sergeant On-Boarding Training Schedule and

---

[245] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[246] *Compare* ¶638 *with* the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

Course Description, and COPA's *Training and Professional Development Department Training Plan*.

BIA's *In-Service Training Plan* provides detailed information about the required annual in-service training. The IMT has also previously reviewed BIA's *Initial Training Plan*.

The IMT also reviewed the *BIA Investigator and Accountability Sergeant On-Boarding Training Course Schedule Course Schedule* and *Course Description*. Those materials are comprehensive and demonstrate the enormous efforts that BIA's Training Staff have made during this reporting period. BIA's *BIA Investigator and Accountability Sergeant On-Boarding Training Schedule and Course Description* provide a good overview of the training expectations for new BIA Investigators and Accountability Sergeants. As written, however, those materials do not address many of the topics required by ¶528, and the *On-Boarding Materials* are inconsistent with BIA's *Training Unit Directive*. It is important that BIA maintain consistency across the various plans and policies that it develops. Furthermore, those materials envision that the CPD Homicide and Sexual Assault Units will act as instructors for those trainings; the IMT has serious concerns with that approach and suggests instead that BIA engage external subject matter experts. While BIA's plans require revision, BIA has achieved Preliminary compliance with ¶530 by creating initial and in-service training plans because it has demonstrated that the CPD has allocated sufficient resources to create separate initial and in-service training plans. The IMT looks forward to reviewing those plans for sufficiency and working with BIA to revise those plans in future reporting periods.

BIA's *Training Strategy, Implementation, and Execution Plan for BIA Investigator & Accountability Sergeant Required Annual Training*, also reviewed by the IMT in the third reporting period, appears to direct the BIA Training Unit in its work. That Plan, however, appears to conflict with the *BIA In-Service Training Plan* previously provided to the IMT for review and the *BIA Training Unit Directive*. Each of those records presents important components of a comprehensive In-Service Training Plan, but, as written, the three documents are confusing.

COPA's *Training and Professional Development Department Training Plan* is comprehensive and includes details about new hire, COPA Academy, and in-service training. The IMT suggests that COPA revise its *Training Plan* to include additional information regarding how COPA will provide the training to its in-service personnel. COPA has also developed a number of in-service training courses that are relevant to related Consent Decree paragraphs. COPA has created initial and in-service training plans as required by ¶530, and thus has met Preliminary compliance with this paragraph because COPA has demonstrated that it has allocated sufficient resources to create separate initial and in-service training plans. Furthermore, because both the IMT and the OAG have approved COPA's Training Plan as

sufficient, COPA has demonstrated Secondary compliance with ¶530. The IMT looks forward to working with COPA to finalize its training plan in future reporting periods.

# Accountability and Transparency: ¶532

*532. Within 180 days of the Effective Date, the City will draft selection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judgment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public review and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance (SECOND REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City and the Police Board did not meet Secondary compliance with ¶532.

To evaluate Secondary compliance with ¶532, the IMT reviewed the City's and the Police Board's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[247] model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In previous reporting periods, the IMT reviewed the *Police Board Member Selection Criteria* (dated September 18, 2019) and determined that the City and the Police Board met Preliminary compliance with ¶532 by the Consent Decree deadline.

In the third reporting period, the Police Board continues to meet Preliminary compliance with ¶532. The IMT has not been provided with any evidence of the Police

---

[247] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

Board's training efforts regarding ¶532 and looks forward to reviewing those materials in the next reporting period.

The IMT also notes that Full compliance will require the Police Board to demonstrate that it has sufficiently implemented its relevant policies and trainings, which may mean that the IMT cannot assess Full compliance with this paragraph until the Police Board experiences a vacancy in its Member position and works to fill that vacancy.

# Accountability and Transparency: ¶533

*533. Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the City and the Police Board did not meet Secondary compliance with ¶533.

To evaluate Secondary compliance with ¶533, the IMT reviewed the City's and the Police Board's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[248] model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In previous reporting periods, the IMT reviewed the *Police Board Hearing Officer Selection Criteria* (dated December 10, 2019) and determined that the City and the Police Board met Preliminary compliance with ¶533, but that the Police Board had missed the Consent Decree deadline for Preliminary compliance.

In the third reporting period, the IMT did not receive any evidence of the Police Board's training efforts regarding ¶533, as required for Secondary compliance. The IMT also notes that the Police Board experienced a vacancy in its Hearing Officer position in the third reporting period, which provides the IMT with an opportunity to evaluate the Police Board's efforts to fill that vacancy and demonstrate Full compliance with ¶533 in the next reporting period.

---

[248]   ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

# Accountability and Transparency: ¶538

> **538.** *Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City maintained Preliminary compliance with ¶538. The IMT was unable, however, to determine that the City met Secondary compliance.

To evaluate Secondary compliance with ¶538, the IMT reviewed the City's and the Police Board's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[249] model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In previous reporting periods, the IMT found that the City was in Preliminary compliance with ¶538 based on the City's relevant policy, *Policy Regarding Community Input Received at Police Board Public Meetings*, which was created before the May 30, 2019, deadline. The IMT reviewed transcripts from several Police Board meetings that occurred in 2019 and 2020, but was unable to determine whether the City had met Secondary compliance based on that information.

In the third reporting period, the IMT received a variety of documents demonstrating that the Police Board, the CPD, COPA, and the Deputy PSIG had responded to a number of community concerns in writing. Those documents were helpful and provided the IMT with context regarding the City's efforts toward compliance with ¶538. That documentation alone, however, was insufficient to demonstrate that

---

[249]   ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

the City and its relevant entities had trained their relevant personnel on the City's *Policy Regarding Community Input Received at Police Board Public Meetings*.

To demonstrate Secondary compliance, the City must show that its relevant personnel understand the obligations of ¶538 in a way that ensures continued adherence to those requirements. It is important for the relevant City entities to document those obligations and requirements in writing, for example, with a written training plan that sets forth the expectations of ¶538 and of the City's *Policy Regarding Community Input Received at Police Board Public Meetings*.

We look forward to reviewing documentation of training efforts for ¶538 in the next reporting period.

# Accountability and Transparency: ¶540

*540. Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| Deadline: | October 30, 2020* | ☐ Met | ☑ Missed |
|---|---|---|---|

*Extended from August 28, 2020, due to COVID-19

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City has not yet met Preliminary compliance with ¶540.

To evaluate Preliminary compliance with ¶540, the IMT reviewed the City's and the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. The IMT also reviewed data sources relevant to compliance with the requirements of ¶540 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

While the City did not provide the IMT with sufficient evidence of Preliminary compliance during previous reporting periods, the IMT noted that discussions with the Police Board demonstrated that the Police Board was actively working toward compliance with ¶540. We suggested that the City develop initial and annual Police Board training materials in the third reporting period.

In the third reporting period, the Police Board experienced unforeseen circumstanced unrelated to the COVID-19 pandemic or the civil unrest that followed the tragic death of George Floyd. The IMT recognizes that those unforeseen circumstances may have hampered the Police Board's ability to make progress toward compliance with its Consent Decree requirements, including ¶540. Nonetheless, in the third reporting period, the Police Board engaged Jones Day to develop and provide trainings at no cost to the Police Board. As a result of that partnership, Police Board members have participated in two training sessions: *Training on Police Boards in Other Major U.S. Cities* and *Training on the CPD Consent Decree*. Both

training blocks of instruction were well received by Police Board Members, and the IMT found both blocks of instruction to be thorough. While neither block of instruction applies directly to ¶540, the Police Board and Jones Day determined that it was necessary to develop and provide those trainings to develop a baseline of information before creating the lesson plans required by ¶540.

The IMT anticipates that the Police Board's training partnership will allow the Police Board to provide quality training without any reliance on the CPD. Furthermore, the IMT suggests that the Police Board consider engaging the vendors who produced COPA's *Procedural Justice Training Materials*. Finally, the IMT commends the Police Board for its innovative approach to developing training for its members, and recognizes Jones Day for its willingness to partner with the City and the Police Board. The IMT looks forward to reviewing the Police Board's forthcoming ¶540 training materials in the next reporting period.

# Accountability and Transparency: ¶542

*542. Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

## Compliance Progress

(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City did not meet Preliminary compliance with ¶542 in the third reporting period.

To evaluate Preliminary compliance with ¶542, the IMT reviewed the City's and the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.

In previous reporting periods, the IMT reviewed the Police Board's one-page *Policy Regarding Training of Police Board Members and Hearing Officers*, which was not sufficiently comprehensive to provide adequate basic or ongoing training in the complexities of the work that Police Board members or hearing officers are expected to perform. We suggested that the Police Board develop a comprehensive training policy that details how the training will provide (1) adequate onboarding instruction that prepares the Police Board members and hearing officers for their duties; (2) in-service instruction on the most up-to-date, relevant law and procedures; and (3) expectations of and for new board members and hearing officers, including information about COPA.

In the third reporting period, the City experienced unforeseen circumstances unrelated to the COVID-19 pandemic or the civil unrest that followed the tragic death of George Floyd. The IMT recognizes that those unforeseen circumstances may have hampered the Police Board's ability to make progress toward compliance with its Consent Decree requirements, including ¶542. Nonetheless, in the third reporting period, the Police Board provided the IMT with a letter from its Executive Director explaining that the Police Board is actively working toward developing the training materials as required by ¶542. The IMT understands that the Police Board will provide those training materials, when developed, to the IMT for feedback in advance of any scheduled training.

We look forward to reviewing the training materials that the Police Board develops in the next reporting period.

# Accountability and Transparency: ¶546

***546.** Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). The purpose of the CPD Annual Report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes. The CPD Annual Report will further provide information regarding the City's implementation and status of this Agreement. The CPD Annual Report will not include any specific information or data by law that may not be disclosed. Subject to applicable law, the CPD Annual Report will provide data and program updates analyzing: a. community engagement and problem-solving policing efforts, identifying successes, challenges, and recommendations for future improvement; b. stop, search, and arrest data and any analysis of that data that was undertaken; c. use-of-force data and associated analyses; d. CPD responses to requests for service from individuals in crisis; e. initiatives that CPD has implemented for officer assistance and support; f. recruitment efforts, challenges, and successes; and g. in-service and supplemental recruit training..*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | August 30, 2020* | ☐ **Met**  ☑ **Missed** |
| | *Extended from June 28, 2020, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

In the third reporting period, the IMT determined that the City and the CPD did not meet Preliminary compliance with ¶546.

To evaluate Preliminary compliance with ¶546, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also determined whether the CPD has developed the annual report within 180 days following the expiration of each calendar year, and whether that annual report is sufficient, accurate, and complete per ¶546.

In the third reporting period, the IMT reviewed the *2019 CPD Annual Report*. Typically, police departments use their annual reports to highlight their accomplishments and to identify any issues or difficulties that it faced or continues to face in its partnership with the community. The *2019 CPD Annual Report*, however, does not take that typical approach. Instead, the *Annual Report* included information about its organizational command, but did not include information about some of the units that may be most interesting to the community, including the Force Review Unit, BIA, Training, and Crisis Intervention Team (CIT). The *Annual Report* also discussed the CPD's operational excellence, but failed to identify any challenges to that operational organization. Finally, the *Annual Report* extensively reported various crime statistics across 35 pages, but only dedicated one page to the work that the CPD does in and with the community, entitled "Community Trust." The IMT suggests that the CPD place the same emphasis on engaging the community and on building trust that it has placed on reporting and policing crime.

The IMT looks forward to working more closely with the City to develop the CPD's *2020 Annual Report* in the next reporting period.

# Accountability and Transparency: ¶547

**547.** *CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends. CPD will include information about any such trends in the CPD Annual Report.*

## Compliance Progress            (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | | |
|---|---|---|---|
| **Deadline:** | August 30, 2020* | ☐ **Met** | ☑ **Missed** |
| | *Extended from June 28, 2020, due to COVID-19 | | |
| **Preliminary:** | *Not in Compliance* | | |
| **Secondary:** | *Not Yet Assessed* | | |
| **Full:** | *Not Yet Assessed* | | |

In the third reporting period, the IMT determined that the CPD did not meet Preliminary compliance with ¶547.

To evaluate Preliminary compliance with ¶547, the IMT has reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶547 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The CPD provided the IMT with its *2019 Annual Report* to demonstrate compliance with ¶547. The *Annual Report*, however, does not contain information regarding trends in reportable uses of force as required by ¶547. Among other things, the Annual Report lacks information about officer demographics, injuries to the subject or officer involved in the use of force, de-escalation techniques, peaceful resolutions, time or day of the week, and numbers of officers involved in specific cases. These types of trend analyses will help the CPD to determine whether they have the proper number of CIT-trained officers staffed and deployed. It would also be helpful for the CPD to provide this information to the community, who may be able to make recommendations to the CPD regarding how and why certain neighborhoods or communities experience officer uses of force with greater frequencies.

The IMT also reviewed the CPD's *Tactical Response Reports* (TRRs), which provided detailed statistical information, but did not include a user-friendly way to connect the subjects involved in the use of force to the specific type of force and to the specific unit in question.

Generally, it is difficult to identify trends from the available information. It would be especially helpful for the CPD and the community to understand how many reportable uses of force are initiated by officers rather than result from calls for service, and how many reportable uses of force result in a complaint. This information, among other types of information, should be included in the CPD's *Annual Reports* in the future.

In future reporting periods, the IMT suggests that the CPD consult with the IMT in advance of drafting its *Annual Reports*.

## Accountability and Transparency: ¶548

*548. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). The CPD Annual Litigation Report will not include any specific information or data that may not be disclosed pursuant to applicable law. Subject to applicable law, the CPD Annual Litigation Report will address: a. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and information that either (i) the lawsuit was concluded by final order and all opportunities for appellate review were exhausted, or (ii) any judgment was satisfied during the prior calendar year. This list will include civil lawsuits handled by the City's Department of Law's ("DOL's") Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. b. for each case identified in (a) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. the date the trial court entered the final order; iv. a list of the parties at the time the final order was entered; v. the nature of the order (e.g., dismissal with prejudice, summary judgment for plaintiff(s)/defendant(s), judgment of not liable, judgment of liable); vi. the amount of the compensatory and punitive damages awarded (if applicable); and vii. the amount of attorney's fees and costs awarded (if applicable). c. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and a settlement was reached (including approval by City Council, if applicable) during the prior calendar year. This list will include civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. d. for each case identified in (c) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. a list of the parties at the time the case was settled; iv. the amount of the settlement; and v. the amount of settlement allocated to attorney's fees and costs (if known). e. the amount of attorney's fees paid by the City during the prior calendar year to outside counsel engaged to defend the City and/or one or more current or former CPD members in civil lawsuits handled by DOL's Federal Civil Rights Division, as well as*

*such lawsuits handled by DOL's Tort's Division if the complaint seeks relief associated with a vehicle pursuit, only. This amount will be presented in the aggregate. f. for all individually named defendants in the cases identified in (a) and (c) above, the status (e.g., pending with BIA/COPA/OIG or charges sustained, not sustained, unfounded, or exonerated by BIA/COPA/OIG) of any administrative investigation(s) by BIA, COPA, or OIG at the time the trial court entered its final order or the settlement was reached. g. the disposition of any felony criminal prosecutions of current or former CPD members from the previous year. h. the number of pending civil lawsuits that seek to hold the City responsible for one or more current or former CPD members that the City is defending. This number will include civil lawsuits handled by the Department of Law's Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle only.*

---

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| **Deadline:** | September 15, 2020* | ✓ Met | ☐ Missed |

*Extended from June 28, 2020, due to COVID-19

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

In the third reporting period, the IMT determined that the City and the CPD met Preliminary compliance with ¶548.

To evaluate Preliminary compliance with ¶548, the IMT reviewed the City's and the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also determined whether the CPD has developed the annual litigation report within 180 days following the expiration of each calendar year, and whether that annual report is sufficient, accurate, and complete per ¶548.

The IMT reviewed the City's *2019 Annual Litigation Report*, which is thorough and comprehensive, providing significant detail to the reader. The City published its *Report* on September 15, 2020, consistent with the Consent Decree deadline. The City has since revised the *Report* to correct minor errors in the included data.

The *Report* explains the total amount of fees paid to outside counsel to defend the CPD in active, pending, and closed civil rights, vehicle pursuits, and torts cases. That information is presented as a total dollar number and references the tables

to the *Report* for a breakdown of costs by individual cases each year. Those tables are clear and understandable, and list individual cases and any verdict or settlement in those cases, including details about officers involved in those cases and any costs to the City in terms of awards and damages.

The *Report* clarifies that, while the cases included in the *Report* may have been settled during 2019, some of those cases were filed in years earlier than 2019. The IMT suggests that the CPD require the CPD command staff to review the *Report*, and that the CPD present the information included in the *Report* to every CPD member to aide in the CPD's efforts to change the culture of the department. The *Report* should also be a resource to the CPD to understand trends and identify problems with training, culture, and employees who may require additional training or remedial behavioral changes.

The IMT expects that this report will be published on an annual basis as required, which will help the City and the CPD to reach additional levels of compliance.

# Accountability and Transparency: ¶549

> **549.** *As part of the CPD Annual Litigation Report, the City will analyze the data and trends collected, and include a risk analysis and resulting recommendations.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | | |
|---|---|---|---|
| **Deadline:** | September 15, 2020* | ✓ Met | ☐ Missed |

*Extended from June 28, 2020, due to COVID-19

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the third reporting period, the IMT determined that the City and the CPD met Preliminary compliance with ¶549.

To evaluate Preliminary compliance with ¶549, the IMT has sought to determine whether the CPD has developed an annual litigation report that is sufficient, accurate, and complete. The IMT also reviewed data sources relevant to compliance with the requirements of ¶549 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

The IMT reviewed the City's *2019 Annual Litigation Report*, which is thorough and comprehensive, providing significant detail to the reader. The City published its *Report* on September 15, 2020, and therefore met the Consent Decree deadline. The City has since revised the *Report* to correct minor errors in the included data.

The *Report* includes risk assessment and analysis as required by ¶549 and explains the limitations of that assessment. The *Report* also explains that illegal searches and seizures, false arrests, malicious prosecutions, extended detentions, and misconduct leading to the reversal of a conviction are civil rights issues that the CPD should address in its basic training, as well as in intensive in-service training. Furthermore, the *Report* identifies excessive force and vehicle pursuits as particularly problematic for the CPD, which indicates that CPD leadership should consider implementing enhanced training and higher expectations for department members. It is critical that the CPD leadership focus on improving training and creating a culture of higher expectations for officer behavior.

The IMT expects that this report will be published on an annual basis, which will help the City and the CPD to reach additional levels of compliance.

## Accountability and Transparency: ¶550

*550. By April 2020, CPD and COPA will electronically publish quarterly and annual reports that will include, at a minimum, the following: a. aggregate data on the classification of allegations, self-reported complainant demographic information, and complaints received from anonymous or third party complainants; b. aggregate data on complaints received from the public, specified by district or unit of assignment and subcategorized by classification of allegations; c. aggregate data on the processing of investigations, including: i. The average time from the receipt of the complaint by COPA, BIA, or the district to the next or initial contact with the complainant or his or her representative; ii. the average time from the investigative findings and recommendations to the final disciplinary decision; iii. the average time from the investigative findings and recommendations to a final disposition; and iv. the number of investigations closed based on the absence of a complainant affidavit, including the number of attempts (if any) to obtain an override affidavit in the absence of a signed complainant affidavit; d. aggregate data on the outcomes of administrative investigations, including the number of sustained, not sustained, exonerated, and unfounded allegations; the number of sustained allegations resulting in a non-disciplinary outcome; and the number resulting in disciplinary charges; e. aggregate data on discipline, including the number of investigations resulting in written reprimand, suspension, demotion, and termination; f. aggregate data on grievance proceedings arising from misconduct investigations, including: the number of cases grieved; the number of cases that proceeded before the Police Board; the number of cases that proceeded to arbitration; and the number of cases that were settled prior to a full evidentiary hearing, whether before the Police Board or in arbitration; g. aggregate data on outcomes of misconduct investigations by classification of allegations, broken down by self-reported race, gender, and age of the complainant and the CPD member; h. aggregate data on (i) the number of CPD members who have been the subject of more than two completed misconduct investigations in the previous 12 months, and (ii) the number of CPD members who have had more than one sustained allegation of misconduct in the previous 12 months, including the number of sustained allegations; i. aggregate data on CPD members who have been the subject, in the previous 12 months, of more than two complaints in the following classifications of alle-*

*gations, regardless of the outcome of those complaint investigations: i. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; ii. allegations of excessive force; and iii. allegations of unlawful stops, searches and arrests; j. the disposition of misdemeanor criminal prosecutions of current CPD members.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

| **Deadline:** | June 2, 2020* | ☐ **Met** | ✓ **Missed** |
|---|---|---|---|
| | Quarterly | ☐ **Met** | ✓ **Missed** |
| | Annually | ✓ **Not Yet Applicable** | |
| | *Extended from March 2, 2020, due to COVID-19 | | |
| **Preliminary:** | | *Not in Compliance* | |
| | **CPD BIA** | *Not in Compliance* | |
| | **COPA** | *Not in Compliance[250]* | |
| **Secondary:** | | *Not Yet Assessed* | |
| **Full:** | | *Not Yet Assessed* | |

In the third reporting period, the IMT determined that the City did not meet Preliminary compliance with ¶550.

To evaluate Preliminary compliance with ¶550, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[251] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also sought to determine whether the CPD and COPA have developed quarterly and annual reports that are sufficient, accurate, and complete per ¶550.

---

[250] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[251] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

COPA provided the IMT with its *2019 Annual Report* and its *First Quarter 2020 Quarterly Report*. Both reports contain useful formatting, tables, and narratives that explain the various topics contained in the reports. Additionally, COPA has provided the IMT with a spreadsheet that demonstrates its data collection efforts for future quarterly and annual reports. Finally, COPA provided the IMT with an internal memorandum from COPA's Director of Information Systems to the Chief Administrator of COPA. That memorandum explains the status of each category of information required by ¶550 and explains COPA's plan to develop the data required by ¶550(c)(i) and (c)(iv). The IMT looks forward to reviewing COPA's quarterly and annual reports in future reporting periods, including the data required by ¶550(c)(i) and (c)(iv). To demonstrate Preliminary compliance, however, COPA must develop a policy that includes the requirements of ¶550.

In the third reporting period, the CPD provided the IMT with a BIA *Quarterly Report for the Second Quarter of 2020*. That report provides a good overview of the relevant time period, addresses many of the requirements of ¶550, and provides necessary details about complaints and investigations. Three relevant topics were not included in the *Quarterly Report* due to technology reporting issues. The IMT expects that those topics will be included in future reports. Furthermore, we suggest that BIA develop a protocol or directive to require the publication of the required reports on a quarterly and annual basis continuing beyond the life of the Consent Decree. That protocol or directive should outline the information to be included in the report and an expected production time following the end of each quarter or year.

The IMT looks forward to reviewing additional reports from the CPD in future reporting periods and to working with the CPD to receive those reports closer in time to the end of each quarter.

# Accountability and Transparency: ¶551

**551.** *BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** Quarterly    ☐ **Met**   ☑ **Missed**

Annually    ☐ **Met**   ☑ **Missed**

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the third reporting period, the IMT determined that BIA did not meet Preliminary compliance with ¶551.

To evaluate Preliminary compliance with ¶551, the IMT has reviewed BIA's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶551 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

BIA provided the IMT with its *Quarterly Report for the Second Quarter of 2020*. That report provides a good overview of the relevant time period and discusses the requirements of ¶551 in narrative form. While the report does not specifically address the number of investigations conducted by districts or units, it provides information generally about the districts' and units' investigations. To demonstrate Preliminary compliance, however, BIA must provide the IMT with a policy or written directive that incorporates the requirements of ¶551.

The IMT looks forward to reviewing BIA's relevant policies and BIA's quarterly and annual reports in future reporting periods.

# Accountability and Transparency: ¶553

*553. Beginning in 2020, CPD will audit, on at least an annual basis, the investigation and disciplinary process involving complaints investigated by BIA and the districts to ensure that the investigations are conducted in accordance with BIA policies and this Agreement. The audits will include completed investigations and the recommendations of discipline. CPD will make public any of the audit findings, ensuring that any personally identifiable information is redacted.*

| Compliance Progress | (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020) |
|---|---|

**Deadline:**  December 31, 2020  ☑ **Met**  ☐ **Missed**

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

In the third reporting period, the IMT determined that the CPD met Preliminary compliance with ¶553, because the CPD's Audit Division completed its annual report, CD-553-2020, *Review of Data on Investigations Into Allegations Made Against Department Members* (2019). As a result, the City and the CPD also met the corresponding deadline.[252]

Moving forward, the CPD will need to continue the annual audits in accordance with ¶553. To ensure sustained compliance, the CPD will need to memorialize ¶553's requirements into policy. While the CPD has developed a number of directives and procedures to serve as a baseline for the CPD's audits of the investigation and disciplinary process, the CPD has not yet developed a policy or procedure to direct the process of conducting those annual or quarterly audits, as required to demonstrate Preliminary compliance with ¶553.[253]

---

[252] In its comments, the City notes that it "believes at least preliminary compliance is warranted for this paragraph," because "[a]pplying a policy methodology for preliminary compliance is not consistent with the IMT's applied methodology for reports." Addendum B. We disagree that policy methodology is inconsistent with other IMT methodologies for similar requirements, and we believe that the CPD could have created policy compliant with ¶553 and the corresponding audit. Nonetheless, we agree that the CPD's Audit Division's first report was timely and reflects an important step forward for the Accountability and Transparency section.

[253] We note that the CPD website lists information about complaints going back to 2012. That information, however, is difficult to locate and suggests that the CPD received several thousands of complaints in the past year. Furthermore, the website appears to only refer to complaints that BIA investigates or is assigned, rather than the total number of complaints that

have been lodged against CPD members. The IMT suggests including the total number of complaints on the BIA website—including those complaints that COPA investigates—to foster transparency with the community.

## Accountability and Transparency: ¶555

*555. On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following: a. the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation; b. the date of the Police Board hearing over which the hearing officer presided; c. the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board; d. the average time between the filing of disciplinary charges with the Police Board and the first day of hearing; e. the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision; f. the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision; g. the date of the alleged misconduct; h. the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and i. whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.*

### Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** December 31, 2020[254]  ☑ **Met**  ☐ **Missed**

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the third reporting period, the IMT determined that the Police Board met Preliminary compliance with ¶555.[255]

---

[254] In its comments, the City notes that it believes that this paragraph is subject to the COVID-19 extension. *See* Attachment B. While the City has a right to this extension, the City, the OAG, and the IMT agreed that some recurring deadlines, such as those in ¶555, should remain the same. Since the Police Board met the deadline, it does not matter whether the Police Board had 64 additional days. We also recommend that Police Board continue to meet this requirement during each calendar year, and we look forward to resolving this issue moving forward.

[255] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide

To evaluate Preliminary compliance with ¶555, the IMT reviewed the Police Board's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶555 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the Police Board website and the 2017 and 2018 *Police Board Annual Reports*. We found the website and reports to be well organized and easy to understand.

 In the third reporting period, the IMT reviewed the Police Board website and the *2019 Annual Report*. We determined that the Police Board has met Preliminary compliance with ¶555. The Police Board website contains a *Police Discipline* webpage, which includes detailed information as required by ¶555(a), (b), (c), (g), and (i). The webpage also links to a spreadsheet key that provides the reader with detailed explanations for each column of information contained in the Police Board's comprehensive data spreadsheet.

The *2019 Annual Report* and the Police Board's newly developed *Quarterly Report* include the information required by ¶555(d), (e), (f), (h). The *Annual Report* also includes additional information, such as information about the 2019 CPD Superintendent Selection Process, the Police Board's operations and governance, and how cases reach the Police Board and how the Police Board reaches its decisions. The Police Board's new *Quarterly Report* includes the requirements of ¶555 and is easy to read and understand. Furthermore, the Police Board now produced monthly reports that give a good snapshot of the work that the Police Board engages in on a monthly basis. The Police Board's *Quarterly* and *Monthly Reports* demonstrate that the Police Board is committed to transparency and to meeting and exceeding the requirements of the Consent Decree. Finally, the Police Board's relevant reports are easy to locate on the Police Board website, providing the reader with easy access to all of the required data and information about Police Board activities.

---

a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

The IMT looks forward to continuing to review the Police Board's relevant reports going forward to determine whether the Police Board has allocated sufficient resources to develop and publish the relevant data on an annual basis, and whether those annual publications sufficiently capture case-specific and aggregate data about Police Board decisions in order to evaluate additional levels of compliance with ¶555.

# Accountability and Transparency: ¶556

**556.** *The Deputy PSIG will conduct periodic analysis and evalua-tions, and perform audits and reviews as authorized by Munici-pal Code of Chicago § 2-56-230.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the Deputy PSIG met Pre-liminary compliance with ¶556. While the IMT is confident that the Deputy PSIG is performing its audits and reviews as authorized by Municipal Code of Chicago § 2-56-230, the IMT has not yet reviewed sufficient materials to make assessments of Secondary and Full compliance for this paragraph.

To evaluate Preliminary compliance with ¶556, the IMT reviewed the Deputy PSIG's policies following the policy process described in the Consent Decree (¶¶626–41),[256] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶556 and considered all available data that the IMT considers necessary or helpful to iden-tify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the *Inspector General Public Safety Policy Manual* (dated August 14, 2019), which identifies the Deputy PSIG's mission as being dedicated to public safety oversight per Municipal Code of Chi-cago §§ 2-56-210 and 2-56-230. This includes inspection, evaluation, and review of the policies and programs of the CPD and COPA to enhance effectiveness, in-crease public safety, to protect civil liberties and civil rights, and to ensure CPD accountability.

In the third reporting period, the Deputy PSIG provided the IMT with a number of records to establish Preliminary compliance with ¶556, including PSIG's (1) the *2019 Annual Report*, which includes detailed information and recommendations

---

[256] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but, among other things, gives the OAG and the IMT a shorter timeframe for review of COPA poli-cies and training materials.

on the various audits and reviews that PSIG conducted throughout the years; (2) first three *Quarterly Reports* for 2020; (3) *Evaluation of the CPD's Post-Firearm Discharge Policy*; (4) *Review of Compliance with the City of Chicago's Video Release Policy for Use of Force Incidents*; (5) *Recommendations to Inform and Improve Disciplinary Investigations Conducted by COPA*; (6) *Review of the CPD's Management and Production of Records*; and (7) *Recommendations to Inform and Improve Disciplinary Investigations Conducted by COPA and BIA*. The IMT understands that PSIG has a number of in-progress projects, including (1) *Litigation Data Analysis*, (2) Disciplinary Process and Outcomes, (3) *Qualitative Analysis of the CPD's Disciplinary Process for Fairness*, (4) *Consistency and Implementation Procedures*, and (5) *Recurring Periodic Reports Assessing Data Trends in Sustained Findings and Subsequent Disciplinary Actions*.

Furthermore, the IMT reviewed the Deputy PSIG's *Public Safety 2020 Audit Plan*, which identified 15 audit projects in three categories: CPD Operational Competence, Discipline and Accountability, and Constitutional Policing. The *2020 Audit Plan* prioritizes projects that are most critical to CPD operations and to accountability. The IMT also reviewed the Deputy PSIG's *2021 Outlook on Police Oversight and Accountability* (dated October 31, 2020) (the "*2021 Audit Plan*"),[257] which outlines projects that the PSIG completed from its *2020 Audit Plan*[258] and projects that PSIG did not plan but ultimately deemed a priority, such as the OIG's joint inquiry with the IMT into the City's response to the protests and civil unrest following the tragic death of George Floyd. The Deputy PSIG's *2021 Audit Plan* proposes 24 different audit or review projects. By providing the IMT with its *2020* and *2021 Audit Plans*, the Deputy PSIG has demonstrated Preliminary compliance with ¶556.

The IMT looks forward to assessing the Deputy PSIG's efforts toward Secondary compliance, including by reviewing documentation of the Deputy PSIG's relevant training efforts, in the next reporting period.

---

[257] The Deputy PSIG's *2021 Outlook on Police Oversight and Accountability* is available at https://igchicago.org/wp-content/uploads/2020/10/OIG-Public-Safety-Draft-2021-Outlook-on-Police-Oversight-and-Accountability.pdf.

[258] The Deputy PSIG's 2020 Audit Plan is available at https://igchicago.org/2020/02/27/oig-2020-public-safety-project-plan/.

# Accountability and Transparency: ¶557

**557.** *The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.*

## Compliance Progress
(Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the IMT determined that the Deputy PSIG demonstrated Preliminary compliance with ¶557. While the IMT is confident that the Deputy PSIG is conducting its audits and reviews pursuant to the *Association of Inspectors General Principles and Standards for Offices of Inspector General* (also known as the "Green Book"), the IMT has not yet reviewed sufficient materials to make assessments of Secondary and Full compliance for this paragraph.

To evaluate Preliminary compliance with ¶557, the IMT reviewed the Deputy PSIG's relevant policies and documents following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶557 and considered all available data that the IMT considers necessary or helpful to identify, verify, and sustain reform efforts.

In previous reporting periods, the IMT reviewed the *Inspector General Public Safety Policy Manual* (dated August. 14, 2019), which sets the standards that the Deputy PSIG will use to complete its inspections, evaluations, and reviews in a manner that comports with the Green Book. The IMT also reviewed the Green Book, which sets standards for the Offices of Inspector General and includes Quality Standards for the Offices of Inspector General, Quality Standards for Investigations, and Quality Standards for Inspections, Evaluations, and Reviews.

In the third reporting period, the IMT reviewed the Deputy PSIG's *2020 Audit Plan* and draft *2021 Audit Plan*. Both *Audit Plans* are consistent with the Green Book. Furthermore, the IMT worked with the PSIG to conduct a joint inquiry into the City's response to the protests and civil unrest following the tragic death of George Floyd. That joint inquiry gave the IMT the opportunity to observe the PSIG's methods of interviewing, data collection, and analysis, which appeared to comport with the Green Book.

The IMT also reviewed a letter from the Association of Inspectors General (AIG) dated May 20, 2020. That letter details a Peer Review Team review of the OIG and concludes that the Investigations and APR sections of the OIG comply with the major standards set by the Green Book. The AIG letter finds that the OIG operates at a high level of performance and morale and demonstrates the OIG's continued commitment to the standards of ¶557.

The IMT has determined that the PSIG has met Preliminary compliance with ¶557 and looks forward to reviewing future audits and reports to determine additional levels of compliance.

# Accountability and Transparency: ¶558

*558. Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

## Compliance Progress     (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

In the third reporting period, the IMT determined that the Deputy PSIG maintained Preliminary compliance but did not meet Secondary compliance with ¶558.

To evaluate Secondary compliance with ¶558, the IMT reviewed the City's and the Deputy PSIG's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[259] model of curriculum development and implementation as our evaluation standard. This model typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In previous reporting periods, the IMT reviewed the Deputy PSIG's Policy Manual and found the Deputy PSIG to be in Preliminary compliance with ¶558. The IMT also reviewed the Deputy PSIG's *Public Safety Section 2020 Vision, Priorities, and*

---

[259]   ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

*Projects* Report[260] and a memorandum provided by the Associate General Counsel of the Office of the Inspector General. These records described the Deputy PSIG's plans for the projects referenced in ¶558(a), (b), (c), (e), and (f). The IMT found that the records themselves were insufficient to satisfy the requirements of ¶558, but that the records show that the Deputy PSIG is actively working toward meeting those requirements.

In the third reporting period, the Deputy PSIG provided the IMT with its draft *2021 Audit Plan* for review and comment 60 days before publishing the plan. The IMT also reviewed multiple records regarding the Deputy PSIG's efforts toward compliance with ¶558, including the PSIG's (1) the *2019 Annual Report*,[261] which includes detailed information and recommendations on the various audits and reviews that PSIG conducted throughout the years; (2) first three *Quarterly Reports* for 2020; (3) *Evaluation of the CPD's Post-Firearm Discharge Policy*; (4) *Review of Compliance with the City of Chicago's Video Release Policy for Use of Force Incidents*; (5) *Recommendations to Inform and Improve Disciplinary Investigations Conducted by COPA*; (6) *Review of the CPD's Management and Production of Records*; and (7) *Recommendations to Inform and Improve Disciplinary Investigations Conducted by COPA and BIA.*

The IMT understands that PSIG has a number of in-progress projects, including (1) *Litigation Data Analysis*, (2) Disciplinary Process and Outcomes, (3) *Qualitative Analysis of the CPD's Disciplinary Process for Fairness*, (4) *Consistency and Implementation Procedures*, and (5) *Recurring Periodic Reports Assessing Data Trends in Sustained Findings and Subsequent Disciplinary Actions*. The IMT understands that the PSIG has undertaken reviews and audits consistent with ¶558(a), (b), (c), (d), and (e) in 2020 and plans to engage in a review or audit related to ¶558(f) in 2021. For secondary compliance, however, the Deputy PSIG must show both that it has developed training related to the requirements of ¶558 and that it has trained its relevant personnel.

The IMT looks forward to reviewing the Deputy PSIG's relevant training materials in the next reporting period.

---

[260] The Deputy PSIG's *Public Safety Section 2020 Vision, Priorities, and Projects* Report is available at https://igchicago.org/wp-content/uploads/2020/02/2020-Public-Safety-Project-Plan.pdf.

[261] The Deputy PSIG's *2019 Annual Report* is available at https://igchicago.org/wp-content/uploads/2020/05/Public-Safety-Annual-Report-2019.pdf.

# Accountability and Transparency: ¶561

> **561.** *The Deputy PSIG will hire a full-time staff member responsible for diversity and inclusion issues, who will have specific authority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.*

## Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:**          March 5, 2021*          ☑ **Not Yet Applicable**
                       *Extended from December 31, 2020, due to COVID-19[262]
**Preliminary:**       *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**         *Not in Compliance*
**Full:**              *Not Yet Assessed*

In the third reporting period, the IMT determined that the Deputy PSIG maintained Preliminary compliance but did not meet Secondary compliance with ¶561.[263]

To evaluate Secondary compliance with ¶561, the IMT reviewed the City's and the Deputy PSIG's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[264] model of curriculum development and implementation as our evaluation standard. This model typically incorporates the following elements: training needs assessment, curriculum design,

---

[262] In its comments, the City notes that it believes that this paragraph is subject to the COVID-19 extension. *See* Attachment B. Per the Court's order, the City has a right to this extension. We note, however, that the City, the OAG, and the IMT agreed that some paragraphs with recurring deadlines, including this paragraph, should remain the original cadence. We look forward to resolving this issue with the Parties in the fourth reporting period.

[263] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

[264] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

curriculum development, training implementation (training delivery), and training evaluation.

In previous reporting periods, the Deputy PSIG hired a qualified Diversity and Inclusion Officer, and the IMT reviewed the job description for that role.

In the third reporting period, the IMT reviewed the OIG's 2021 Plan, which explains the OIG's commitment to diversity, equity, and inclusion across the OIG's many functions and reports. The IMT was not, however, provided with any reports containing the Deputy PSIG's findings and analysis regarding diversity and inclusion issues, as required by ¶561. Nor was the IMT provided with any information about the Deputy PSIG's efforts to train its relevant personnel on the requirements of ¶561, as required for Secondary compliance.

The IMT looks forward to reviewing the Deputy PSIG's relevant training materials and relevant reports in future reporting periods.

# Accountability and Transparency: ¶562

> **562.** *The Deputy PSIG will provide all staff members with com-prehensive initial onboarding training and annual in-service training. The Deputy PSIG will create initial and in-service train-ing plans and submit these plans to the Monitor and OAG for re-view and comment.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ✓ **Not Yet Applicable** |
| | *Extended from December 31, 2020, due to COVID-19[265] | |
| **Preliminary:** | *Under Assessment* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

In the third reporting period, the IMT reviewed the Deputy PSIG's efforts toward Preliminary compliance with ¶562, which remains under assessment.[266]

To evaluate Preliminary compliance with ¶562, the IMT reviewed the Deputy PSIG's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms." The IMT also reviewed data sources relevant to compliance with the requirements of ¶562 and consid-ered all available data that the IMT considers necessary or helpful to identify, ver-ify, and sustain reform efforts.

---

[265] In its comments, the City notes that it believes that this paragraph is subject to the COVID-19 extension. *See* Attachment B. Per the Court's order, the City has a right to this extension. We note, however, that the City, the OAG, and the IMT agreed that some paragraphs with recur-ring deadlines, including this paragraph, should remain the original cadence. We look forward to resolving this issue with the Parties in the fourth reporting period.

[266] In its comments, the City asserts that "frequency requirements (*e.g.*, annually, quarterly, reg-ularly) do not impose additional deadline requirements." *See* Attachment B. We believe, how-ever, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that max-imizes efficiency within the language of the Consent Decree (*e.g.*, annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding para-graph (*e.g.*, annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

To demonstrate Preliminary compliance, the Deputy PSIG must develop comprehensive training plans as well as comprehensive training materials. In the third reporting period, the City and the Deputy PSIG provided the IMT with the *Public Safety Section Onboarding and In-Service Training Plan* and associated materials. The Deputy PSIG has worked hard to develop these comprehensive training blocks of instruction. The IMT provided comments on those training materials and, in response, received additional information from the PSIG regarding its trainings. The PSIG has since provided the IMT with an on-boarding training plan that includes specific courses to be provided to new PSIG employees during their first two weeks of employment. While the PSIG's in-service training plan sets expectations for internal training and includes instructor qualifications, it is only two paragraphs long and lacks the level of detail included in the PSIG's on-boarding training plan. Furthermore, some of the training blocks of instruction, as provided to the IMT, consist only of slide decks without accompanying lesson plans. Lesson plans are important documentation to ensure that the PSIG's training remains robust and consistent—despite changes in training staff or changes in leadership.

The IMT looks forward to reviewing those additional materials in its efforts to assess Preliminary compliance in the next reporting period.

# Accountability and Transparency: ¶563

***563.** At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

In the third reporting period, the IMT determined that the Deputy PSIG met Secondary and Full compliance with ¶563.

In previous reporting periods, the Deputy PSIG demonstrated Preliminary compliance by providing the IMT with its *Public Safety Section 2020 Vision, Priorities, and Projects* Report.[267] That report contained details information and outlined *Audit Plans* for critical topics.

To evaluate Secondary compliance with ¶563, the IMT looked to determine whether the Deputy PSIG continued to provide the Monitor with a draft of its *Audit Plan* and received comments, as required. To evaluate Full compliance with ¶563, the IMT reviewed the Deputy PSIG's *Audit Plan* to determine whether it was sufficient.

In the third reporting period, the Deputy PSIG provided the IMT with its draft *OIG Public Safety Section 2021 Outlook on Police Oversight and Accountability* ("*2021 Audit Plan*")[268] for review and comment 60 days before publishing the plan. By providing the IMT with its *Audit Plan* consistent with ¶563 for two years in a row, the Deputy PSIG has demonstrated that it regularly produced an annual *Audit Plan* that directs the PSIG's work for the following 12 months. The Deputy PSIG's *2021 Audit Plan* follows the same format as its *2020 Audit Plan* and is sufficient by the standards set by the *Association of Inspectors' Quality Standards for Inspections, Evaluations, and Reviews* (the "Green Book"). Therefore, the Deputy PSIG's *2021 Audit Plan* is sufficient to demonstrate Secondary and Full compliance with ¶563.

---

[267] The Deputy PSIG's *Public Safety Section 2020 Vision, Priorities, and Projects* Report is available at https://igchicago.org/wp-content/uploads/2020/02/2020-Public-Safety-Project-Plan.pdf.

[268] The draft *OIG Public Safety Section 2021 Outlook on Police Oversight and Accountability* ("*2021 Audit Plan*") is available at https://igchicago.org/wp-content/uploads/2020/10/OIG-Public-Safety-Draft-2021-Outlook-on-Police-Oversight-and-Accountability.pdf. The final version of the 2021 Audit Plan is available at https://igchicago.org/wp-content/uploads/2021/01/Public-Safety-2021-Outlook-on-Police-Oversight-and-Accountability.pdf.

Additionally, the IMT reviewed the OIG's *Quarterly Reports*, published each quarter during the first three quarters of 2020. Those *Reports* provide updates on planned projects and audits, as well as information about unanticipated projects that the PSIG undertook and completed.

We look forward to reviewing and assessing the Deputy PSIG's *2022 Audit Plan* for Preliminary, Secondary, and Full compliance in future reporting periods.

# Accountability and Transparency: ¶565

*565. At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.*

## Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadline:** Quarterly    ☑ **Met**    ☐ **Missed**

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **COPA** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Police Board** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **COPA** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Police Board** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the third reporting period, the IMT determined that the City did not meet Full compliance with ¶565.

To evaluate Full compliance with ¶565, the IMT determined whether the meetings between COPA, the Deputy PSIG, and the President of the Police Board sufficiently included the requisite coordination, and whether any recommendations that resulted from those meetings followed the requisite processes.

In previous reporting periods, the IMT reviewed minutes of quarterly meetings between the Police Board President, COPA, and the Deputy PSIG to determine that the City had met Preliminary and Secondary compliance with ¶565.

In the third reporting period, the Police Board provided the IMT with meeting minutes from five quarterly meetings of the Police Board, the PSIG, and COPA. Those meetings did not result in any recommendations for changes in policy or rules for the CPD. The IMT also reviewed correspondence from the City between

the Mayor, the President of the Police Board, the Inspector General, and the CPD Superintendent regarding the requirements of ¶565. In that correspondence, the Mayor instructs the Police Board President and the Inspector General to inform the CPD Superintendent of any recommendations for changes to CPD policies or procedures.

While the City's ¶565 meetings appear to sufficiently include the required coordination, as is necessary for Full compliance with this paragraph, the meetings have not yet resulted in recommendations for changes in policy or rules for the CPD. Therefore, the IMT has not yet had the opportunity to evaluate whether any recommendations follow the required processes, which is also a necessary component of Full compliance with this paragraph.

Furthermore, as a matter of best practice, we suggest that the PSIG, the Police Board, and COPA work together to enter into a memorandum of agreement that memorializes the entities' ¶565 process. The IMT is confident that the current leadership of those entities will continue to fulfil their obligations under ¶565. One of the goals of the Consent Decree, however, is to ensure robust, accountable institutions that survive the current leadership of the City's relevant entities. A memorandum of agreement is one way to ensure that the entities' current practices continue into the future.

We look forward to evaluating the City's progress toward Full compliance in the next reporting period.

# Accountability and Transparency: Compliance Updates

As noted in the Introduction of this report, the City of Chicago and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶429–430, 441–42, 446–450, 453–56, 459, 461, 472, 474, 476, 486, 495, 499–501, 505–509, 511, 514, 524, 541, 545, and 552 of the Accountability and Transparency section.[269]

\*\*\*

| Accountability and Transparency: ¶429 |
|---|

> **429.** *The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

## Compliance Status

As in previous reporting periods, the OIG and the Deputy PSIG continue to host a website for CPD members to anonymously report officer misconduct.[270] The City provided the IMT with various materials related to the *OIG Anonymous Reporting Website* in the third reporting period. In April 2020, the IMT provided the City with feedback on the *OIG Website* and the City's other compliance materials, including a strong suggestion that the City develop a system or directive that allows officers to report misconduct to that *Website* and then to receive proof, such as a reporting code number or similar designation, of that report so that the officers can remain anonymous for as long as possible while complying with CPD Rules 21 and 22.

Unfortunately, without that change or a similar change to the reporting website, CPD members who anonymously report misconduct are in direct conflict with CPD

---

[269] In the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

[270] That website is available at https://igchicago.org/contact-us/report-fraud-waste-abuse/fraud-or-corruption-report-form/.

policy and with this paragraph. The CPD has also not developed a policy or directive that would protect an anonymously reporting employee's identity during an internal investigation, including while that employee provides statements or participates in interviews. Rather than revising its relevant materials in light of this feedback, the City resubmitted those materials, unchanged, to the IMT in the final days of the reporting period as evidence of compliance with ¶429. The IMT looks forward to reviewing revised materials in the next reporting period.

In the third reporting period, the IMT reviewed BIA's *Introduction to Rules and Regulations Training Materials*, which address the requirements of ¶429. The IMT suggests that the CPD incorporate ¶429 into a written policy or procedure. The CPD also provided the IMT with a 2019 memorandum that documents the CPD's 2019 efforts to distribute to CPD members a "CPD Member Hotline Brochure" and a CPD Hotline streaming video. In addition, the CPD provided the IMT with an electronic information sheet that contained a message from the CPD Superintendent regarding the OIG's Anonymous Reporting Website. That message reminds employees about Rules 21 and 22 and about their duty to report misconduct.

The CPD will not make meaningful progress toward compliance with ¶429 until there is a way for CPD members to report misconduct while adhering to Rules 21 and 22. The IMT strongly suggests that the CPD develop a policy or procedure that addresses the requirements of ¶429.

## Accountability and Transparency: ¶430

> **430.** COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.

### Compliance Status

In the third reporting period, the IMT reviewed COPA's Intake Policy, which addresses the requirements of ¶430. As of the end of the third reporting period, that policy had not yet been approved or finalized.[271] The IMT looks forward to working with COPA to finalize that policy in the next reporting period.

---

[271] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶441

**441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

### Compliance Status

Compliance with ¶441 will require a City ordinance change that grants COPA jurisdiction "to conduct administrative investigations of allegations of sexual misconduct."

In previous reporting periods, the IMT reviewed a February 28, 2020 memorandum from COPA, which included updates on COPA's efforts to properly train investigative personnel in sexual assault investigations, including trainings regarding interviewing victims of sexual assault. COPA's Special Victims Squad, the CPD, and the Cook County State's Attorney's Office have developed a working group to improve the investigative and notification process among the agencies. That memorandum demonstrated that COPA has started to work with the Cook County State's Attorney's Office.

In the third reporting period, the IMT reviewed notes from an October 19, 2020 meeting among representatives of COPA, the Cook County State's Attorney's Office, and the CPD. Those notes suggest the possibility of a memorandum of understanding or agreement regarding how those entities should conduct administrative and criminal investigations of sexual misconduct cases. Regardless of whether those entities reach an agreement, it is critical for COPA and the CPD to develop their own policies regarding their specific responsibilities regarding sexual misconduct investigations. Those policies should reflect the results of the agreement amongst the CPD, COPA, and the Cook County State's Attorney's Office. While the CPD cannot require COPA to adhere to CPD policies, and COPA cannot require the CPD to adhere to COPA policies, those policies will survive current leadership, form the basis for consistent investigations, and set expectations for any memorandum of understanding or agreement.

It is concerning that the CPD, COPA, and the Cook County State's Attorney's Office have met only once regarding ¶441 in the first three reporting periods, and toward the end of the third reporting period at that. Furthermore, that meeting appears to have addressed only some of the important issues regarding ¶¶441 and 443, leaving others unaddressed due to time constraints.

The IMT suggests that COPA and the CPD make greater efforts toward compliance with ¶441 in the next reporting period.

## Accountability and Transparency: ¶442

*442. The City will ensure COPA has appropriately trained and experienced staff to conduct sexual misconduct investigations.*

### Compliance Status

In previous reporting periods, the IMT reviewed COPA's Training Plan and a memo from COPA regarding training for COPA's Special Victims Squad. The IMT suggested that COPA develop a training curriculum to address ¶442.

In the third reporting period, the IMT reviewed COPA's training materials titled *Sexual Assault Training: Understanding the Neurobiology of Trauma and Applying Trauma-Informed Investigative Techniques*. Those training materials are comprehensive and instruct students on both the logical progression of a sexual assault investigation and also the effects that a sexual assault crime has on the victim's emotional and psychological well-being, in the context of an unavoidably invasive interview and investigation. COPA has demonstrated Preliminary compliance with ¶442. The IMT looks forward to observing COPA's trainings in future reporting periods.

## Accountability and Transparency: ¶446

*446. In the course of investigating a complaint, the City, CPD, and COPA will ensure: a. within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation. b. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.*

### Compliance Status

In previous reporting periods, the IMT reviewed an example of an *Administrative Summary Report*. The IMT also reviewed and commented on COPA Policy 3.3.2, *Timeliness Benchmarks* (dated August 1, 2019), which includes specific direction to comply with some requirements of this paragraph. The IMT recommended that the City and the CPD develop a policy or directive that specifically addresses ¶446.

In the third reporting period, the IMT reviewed BIA's *Complainant Communications and Procedures Unit Directive*, which addresses ¶446(b). The IMT also reviewed BIA's *Assignment of Log Number Investigations Unit Directive*, which requires that the BIA Intake Section contact complainants within five days of receipt of the log number from COPA. That directive, however, does not require the BIA Intake Section to provide complainants with information about whether BIA or COPA will investigate the complaint or with the log number to track the case. BIA's *Timelines and Benchmarks Unit Directive* states that BIA Investigators and Accountability Sergeants will contact complainants within seven days of the case assignment to provide complainants with the log number and the investigator's contact information. The IMT understands that BIA's seven-day requirement will take place within five business days as required by ¶446(a), and encourages the CPD to include consistent wording regarding ¶446(a) across its relevant directives. The IMT also reviewed BIA's *Administrative Summary Report Unit Directive*, which addresses ¶446(b) by requiring the BIA Department Advocate to ensure that the reporting party will receive the *Administrative Summary Report* within 60 days of final decision. The IMT suggests that BIA also incorporate ¶446(b) into its *Timelines and Benchmarks Unit Directive*.

The IMT also reviewed COPA's policy 3.3.2, *Timeliness Benchmarks*, which states that, within five days, the complainant will receive written notice of receipt as required by ¶446(a). COPA revised its *Timeliness Benchmarks Policy* to require that the *Final Summary Report* (also known as an *Administrative Summary Report*) be provided to the complainant within 60 days of the final disciplinary decision, as required by ¶446(b).[272] The IMT looks forward to reviewing policies from the CPD and COPA that address all of the requirements of ¶446.

## Accountability and Transparency: ¶447

> **447.** *The City and CPD will require that all COPA and BIA personnel and Accountability Sergeants communicate with complainants and involved CPD members in a professional and respectful manner.*

### Compliance Status

In previous reporting periods, BIA provided the IMT with its *Accountability Sergeants Unit Directive*, which states that Accountability Sergeants will communicate

---

[272] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

with complainants and involved CPD members in a professional and respectful manner.

In the third reporting period, the IMT reviewed and offered comments on BIA's *Complainant Communications Procedures and Timelines Unit Directive*, which requires respectful and professional communication with complainants. The IMT also reviewed the *BIA Investigator Unit Directive*, which requires that BIA Investigators treat CPD employees in the same respectful and professional manner as they are required to treat civilians. Finally, the IMT reviewed BIA's *Administrative Misconduct Investigation Unit Directive* and BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, both of which specifically address the requirements of ¶447. While the IMT and the OAG have provided BIA with no-objection notices on some of these *Unit Directives*, BIA must publish the directives for public comment and finalize them in order to demonstrate Preliminary compliance with this paragraph.

The IMT also reviewed COPA's *Intake Policy*, which addresses ¶447.[273] The IMT looks forward to working with BIA and COPA to revise and finalize their relevant policies in the next reporting period.

## Accountability and Transparency: ¶448

> **¶448** *If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

### Compliance Status

In previous reporting periods, the IMT reviewed relevant documentation from both COPA and the BIA, including BIA's *Accountability Sergeants Unit Directive*,

---

[273] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

which meets the requirements of this paragraph, and COPA Policy 3.3.2, *Timeliness Benchmarks*, which specifically directs COPA to comply with ¶448.

In the third reporting period, the IMT reviewed the CPD's *BIA Investigators Unit Directive* and BIA's *Log Number – Unique Tracking Number Unit Directive*, both of which incorporate the requirements of ¶448. The IMT also reviewed a revised version of COPA's *Timeliness Benchmarks* policy, which exceeds the requirements of ¶448 by requiring notification to the Mayor, the CPD Superintendent, the Chairman of City Council, and the complainant.[274] The IMT looks forward to working with the CPD to finalize those directives in the next reporting period.

## Accountability and Transparency: ¶449

> **449.** *The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.*

### Compliance Status

In the third reporting period, the City and the CPD provided the IMT with BIA's *Complainant Communications Procedures and Timelines Unit Directive* (dated October 9, 2010). The IMT looks forward to working with the CPD to revise and finalize that *Unit Directive* in the next reporting period. The IMT also reviewed BIA's *Introduction to Rules and Regulations Training Materials*, which reference the requirements of ¶449 and show that BIA is working to ensure that its Investigators and that Accountability Sergeants are aware of this requirement.

The IMT also notes that the requirements of ¶449 are addressed in BIA's *Rules and Regulations Lesson Plan and Slide Deck*, which demonstrates that BIA is working to ensure that BIA Investigators and Accountability Sergeants are aware of ¶449.

---

[274] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶450

**450.** *CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum: a. CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant; b. such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and c. once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings: i. any investigative files; ii. any reports (except for reports about the incident authored by the CPD member); or iii. any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).*

### Compliance Status

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeant Unit Directive*, which incorporates some of the requirements of ¶450, but does not include the in-depth direction and detail that ¶450 requires.

In the third reporting period, the IMT reviewed BIA's *Administrative Misconduct Investigations Unit Directive*, which addresses ¶450 and its subparagraphs completely. The IMT appreciates that BIA has transitioned to accessible, digital investigative notices and forms. Neither the IMT nor the OAG have approved that *Unit Directive* yet. The IMT looks forward to working with BIA to revise and finalize that *Unit Directive* and suggests that BIA incorporate the requirements of ¶450 into the *BIA Investigators Unit Directive*.

## Accountability and Transparency: ¶453

> **453.** *If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.*

### Compliance Status

BIA's *Accountability Sergeants Unit Directive* states that if an Accountability Sergeant identifies serious allegations (as defined by the *Unit Directive*), then the Accountability Sergeant will notify the BIA Lieutenant. That *Unit Directive* does not, however, require the Accountability Sergeant to continue to investigate the administrative charges as required by ¶453. The IMT did not receive any information about COPA's efforts toward compliance with ¶453 in the third reporting period.

## Accountability and Transparency: ¶454

> **454.** *COPA, BIA, and the districts will conduct objective, comprehensive, and timely investigations of complaints.*

### Compliance Status

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which directs Accountability Sergeants to conduct objective, comprehensive, and timely investigations of complaints.

In the third reporting period, the IMT reviewed a number of CPD policies that address the requirements of ¶454, including the *BIA Investigators Unit Directive*; BIA's *Investigative Timelines and Benchmarks Unit Directive*; General Order 08-01-02*, Initiation and Assignment of Investigations into Allegations of Misconduct*; BIA's *Accountability Sergeants Unit Directive*; General Order G08-01, *Complaint and Disciplinary Procedures*; BIA's *Elements of a Complete Investigative File Unit Directive*; BIA's *Investigative Timelines and Benchmarks Unit Directive*, and BIA's *Administrative Misconduct Investigations Unit Directive*.

The IMT also reviewed COPA's policies titled *Fact Gathering*, *Timelines and Benchmarks*, *Quality Assurance*, and *Intake*, all of which address the requirements of ¶454. Furthermore, the IMT reviewed COPA's revised *Recommendations Regarding Department Member Duties and Powers* policy, which requires comprehensive and timely investigations of complaints and addresses revocation and reinstatement of officer law enforcement powers.

The IMT looks forward to working with BIA and COPA to finalize their policies in the next reporting period.

## Accountability and Transparency: ¶455

**455.** *All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.*

### Compliance Status

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which states that investigations are held to the "appropriate standard of proof under BIA Policy." The IMT suggested that the BIA and COPA develop the definition for "appropriate standard of proof" together to promote consistency and incorporate this definition into administrative investigative policies.

The IMT has not received any additional information regarding compliance with ¶455 in the third reporting period. BIA's *Administrative Misconduct Investigations Unit Directive* requires that investigative findings be "based on the appropriate standard of proof." Neither the IMT nor the OAG have approved that *Unit Directive* yet. The IMT looks forward to working with BIA to revise and finalize that *Unit Directive*, and to working with COPA to develop a "clearly delineated" standard of proof in the next reporting period.

## Accountability and Transparency: ¶456

**456.** *The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

### Compliance Status

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which includes standards that would disqualify candidates from serving as Accountability Sergeants. The IMT suggested that BIA review the qualifications of current Accountability Sergeants and consider revising to raise the standards in the policy.

In the third reporting period, the IMT reviewed the CPD's *BIA Investigators Unit Directive*, which also addresses ¶456. As with the *Accountability Sergeant Unit Directive*, the *BIA Investigators Unit Directive* should be revised to set higher standards and more stringent criteria for those who will fill the role of BIA Investigators.

The IMT has not yet approved the *BIA Investigators Unit Directive* and looks forward to working with BIA to revise and finalize that *Unit Directive* in the next reporting period. The IMT did not receive any information about COPA's efforts toward compliance with ¶456 in the third reporting period.

## Accountability and Transparency: ¶459

> **459.** *Within 30 days of receiving an allegation: a. COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and b. if potential misconduct is alleged, COPA, BIA, or the district will initiate a Preliminary investigation into the complaint.*

### Compliance Status

In previous reporting periods, the IMT reviewed COPA Policy 3.3.2, *Timeliness Benchmarks* (dated August 1, 2019), which addresses ¶459.

In the third reporting period, the IMT reviewed multiple versions of BIA's *Complainant Communication Procedures and Timelines Unit Directive*, which addresses ¶459(a) and (b). The IMT also reviewed a revised version of COPA's *Timeliness Benchmarks* policy, which addresses the requirements of ¶459.[275] Finally, the IMT reviewed BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, which provides an overview of the requirements of ¶459 and reinforces BIA Investigators' and Accountability Sergeants' responsibilities for preliminary investigations.

The IMT looks forward to working with BIA and COPA to revise and finalize their relevant policies in the next reporting period.

---

[275] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶461

*¶461 Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

### Compliance Status

In previous reporting periods, the IMT suggested that that COPA incorporate ¶461 into its policy 3.1.2, *Fact Gathering*, and that BIA incorporate the requirements of ¶461 into an administrative investigative policy. The IMT also reviewed the CPD's Special Order S08-01-08, *Non-disciplinary Intervention Program*, and suggested that the CPD revise the Special Order to comply with this paragraph.

In the third reporting period, the IMT reviewed multiple versions of COPA's *Intake Policy*, which ultimately incorporated the requirements of ¶461 to address complaints of verbal abuse and anonymous complaints.[276] That policy also states that COPA will conduct a preliminary investigation of anonymous complaints to determine whether it is appropriate to continue the investigation in accordance with law and the applicable collective bargaining agreements at the time that the allegation is made.

The IMT also reviewed BIA's *Conduct of Investigation: Initial Responsibilities Unit Directive*, which requires that verbal abuse and anonymous complaints be preliminarily investigated in the same manner as misconduct investigations are investigated. Once BIA has finalized that policy, the IMT expects that BIA will achieve Preliminary compliance with this paragraph.

---

[276] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Intake Policy*. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶472

> **472.** *The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.*

### Compliance Status

In previous reporting periods, the IMT reviewed the BIA's *Accountability Sergeant Unit Directive* (dated February 13, 2020), which directs Accountability Sergeants to arrive at investigative findings and recommendations within 90 days of the initiation of an investigation. The *Unit Directive* also requires that any request for extension of time must be made and approved in writing by the District Commander.

In the third reporting period, the IMT reviewed the *BIA Investigators Unit Directive* and the *BIA Investigative Timelines and Benchmarks Unit Directive*, both of which address ¶472. The IMT looks forward to working with the CPD to finalize those directives in the next reporting period.

## Accountability and Transparency: ¶474

> **474.** *CPD will ensure that if BIA does not arrive at the investigative findings and recommendations within 180 days, or an Accountability Sergeant does not arrive at the investigative findings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complainant or complainant representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Accountability Sergeant will update such notice every 90 days until the administrative investigation is completed.*

### Compliance Status

In previous reporting periods, the IMT reviewed the BIA's *Accountability Sergeant Unit Directive* (dated February 13, 2020), which directs Accountability Sergeants to arrive at investigative findings and recommendations within 90 days of the initiation of an investigation. The *Unit Directive* also requires that any request for extension of time must be made and approved in writing by the District Commander.

In the third reporting period, the IMT reviewed the *BIA Investigators Unit Directive*, the *Complainant Communications and Timelines Unit Directive*, and the *BIA Investigative Timelines and Benchmarks Unit Directive*, all of which address ¶474, including in the context of specific job responsibilities, the responsibility to maintain communication with complainants and employees, and the responsibility to ensure that the required timelines are met. By including these requirements in multiple directives, the CPD and BIA have demonstrated their commitment to ensure that they meet the requirements of ¶474. The IMT looks forward to working with the CPD to finalize those directives in the next reporting period.

## Accountability and Transparency: ¶476

> **476.** *The City, CPD, and COPA will require that COPA and BIA supervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.*

### Compliance Status

Both the *BIA Investigators Unit Directive* and the A*ccountability Sergeants Unit Directive* address the requirements of ¶476. Both directives provide specific directions and expectations to BIA Lieutenants and Sergeants who supervise BIA Investigators, to BIA Lieutenants who oversee Accountability Sergeants, and to District Commanders who oversee Accountability Sergeants. These directives provide BIA Investigators and Accountability Sergeants with the expectation of direct interaction and supervision from those to whom they report.

COPA's relevant policy, *Timeliness Benchmarks*, specifically addresses ¶476, explains how files are assigned, and details supervisors' knowledge of the caseloads of individual investigators.[277]

We look forward to working with BIA and COPA to revise and finalize their relevant policies in the next reporting period.

---

[277] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶486

***486.*** *The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include: a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will include all available identifying information for anyone who refuses to provide a statement; b. documentation of each interview conducted and the recording of those interviews, if available; c. the names of all CPD members who have been identified as witnesses to the alleged misconduct; d. COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members; e. in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed and written credibility findings; f. if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current; g. all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and h. an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.*

### Compliance Status

In previous reporting periods, the IMT reviewed COPA Policy 3.1.9, *File Maintenance* (dated August 1, 2019), which provided a good description of COPA's file maintenance policy and procedure but did not address all of ¶486's requirements.

In the third reporting period, the IMT reviewed BIA's *Requirements of a Complete Investigative File Unit Directive* (previously titled *Elements of a Complete Investigative File Unit Directive*), which concisely and comprehensively addresses the re-

quirements of ¶486. In that *Unit Directive*, as in other directives that BIA has developed in this reporting period, BIA demonstrated its ability to develop a policy that is clear and provides excellent information to those involved in an investigation, as well as others in the CPD and in the community. BIA's *Administrative Misconduct Investigations Unit Directive* also addresses the requirements of ¶486, except for subparagraph (d).

The IMT looks forward to working with BIA and COPA to revise and finalize their relevant policies in the next reporting period.

## Accountability and Transparency: ¶495

*495. Supervisory reviews of investigations will be conducted as follows: (a) Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant: (i) the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof; (ii) BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever a higher ranking officer orders additional investigation, it will be documented in writing. (b) all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively: (i) COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof; (ii) the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever COPA and BIA orders additional investigation, the request and resulting investigation will be documented in writing.*

### Compliance Status

In previous reporting periods, the IMT reviewed the BIA's *Accountability Sergeants Unit Directive*, which incorporates the requirements of ¶495(a) by requiring that the Accountability Sergeants' chain of command ensure that investigations are completed and reviewed for thoroughness, accuracy, and timeliness. That directive explains how Accountability Sergeants' work is forwarded, reviewed, and returned if additional investigative or administrative work is required.

In the third reporting period, the CPD provided the IMT with the *BIA Investigator Unit Directive*. That directive requires that complete investigations will be forwarded through the investigator's chain of supervision or command to the Deputy

Chief of BIA, but it does not include the BIA Chief or require a finding that an investigation be complete, meet the requirements of law, or be supported by the appropriate standard of proof. The IMT suggests that BIA revise this directive to more comprehensively address the requirements of ¶495.

The IMT has not received any additional documentation of COPA's compliance efforts with ¶495. The IMT looks forward to reviewing additional policies from BIA and COPA regarding ¶495 in the next reporting period.

## Accountability and Transparency: ¶499

> **499.** *When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include: a. a description of the CPD members and individuals involved in the alleged misconduct; b. the date, time, and location of the alleged misconduct; c. a description of the allegations and applicable policies; d. a narrative summary of the alleged misconduct; e. a narrative summary of the investigation; and f. the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended.*

### Compliance Status

In previous reporting periods, the City provided the IMT with one example of an *Administrative Summary Report*, which included some of the information that ¶499 requires but did not include enough of a narrative summary of the misconduct or investigative findings. We suggested that the City develop a policy or directive to direct completion of the *Administrative Summary Report*.

In the third reporting period, the IMT reviewed BIA's *Administrative Summary Report Unit Directive* and *Administrative Summary Report Form*. The *Unit Directive* addresses all of the requirements of ¶499 and sets specific expectations for *Administrative Summary Reports* for BIA Investigators and the chain of command. Many of the requirements of ¶499 also apply to Accountability Sergeants. Accordingly, the IMT suggests that BIA incorporate the requirements of ¶499 regarding Accountability Sergeants and their responsibilities with regard to the *Administrative Summary Report Form* into one of its policies.

The *Administrative Summary Report Form* includes definitions for the dispositions of cases, ensuring that the reader of the report understands exactly what the disposition of the case means. The *Unit Directive* explains the responsibilities of the Department Advocate. The *Unit Directive* also explains that some of the information contained in the *Administrative Summary Report Form* may be redacted;

this explanation is useful so that department members and members of the community understand that redaction may be required by legislation. Furthermore, the *Unit Directive* explains that the *Administrative Summary Report Form* will be distributed electronically and provides a timeline for that distribution. The IMT looks forward to working with the CPD to finalize the *Unit Directive*.

In the final days of the reporting period, the CPD provided the IMT with a revised version of the *Administrative Summary Report Form*. That form is much improved from the previous version that the IMT reviewed. It is concise, provides the necessary information, and provides an explanation of the case that will be easy for someone who is not involved in the investigation to understand. Furthermore, it appears that the format of the *Administrative Summary Report* form will enable it to be stored electronically.

On December 16, 2020, COPA provided the IMT with a document entitled *Summary Report of Investigation*. This report appears to summarize the investigation of a complaint. It is unclear whether the *Summary Report of Investigation* is a revised version of COPA's *Final Summary Report* document or whether it serves a separate purpose. The IMT did not received a revised version of COPA's *Final Summary Report*: 3.1.3 policy in the third reporting period. The IMT suggests that COPA consider revising its *Final Summary Report*: 3.1.3 policy to clarify the purposes of COPA's various reports. In future reporting periods, the IMT suggests that COPA finalize its relevant policy before compiling and submitting various related forms for review.

## Accountability and Transparency: ¶500

> **500.** *For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.*

### Compliance Status

In previous reporting periods, the City provided the IMT with one example of an *Administrative Summary Report Form*, which included a "Date of Incident" field but not a "Date of Report" field. We suggested that the City develop a policy or directive to direct completion of the *Administrative Summary Report Form*.

In the third reporting period, the IMT reviewed BIA's *Administrative Summary Report Unit Directive* and *Administrative Summary Report Form*. The *Unit Directive* requires that the *Administrative Summary Report Form* be completed and posted on the CPD's website within 60 days of final disposition. The IMT looks forward to working with the CPD to finalize the *Unit Directive*.

The IMT reviewed COPA's *Timeliness Benchmarks* policy, which addresses ¶500.[278]

## Accountability and Transparency: ¶501

**501.** *Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.*

### Compliance Status

In previous reporting periods, the City provided the IMT with one example of an *Administrative Summary Report Form*, which did not satisfy the requirements of ¶501.

In the third reporting period, the IMT reviewed BIA's *Administrative Summary Report Unit Directive* and *Administrative Summary Report Form*. The *Unit Directive* requires that the *Administrative Summary Report Form* be completed and posted on the CPD's website within 60 days of final disposition. The IMT looks forward to working with the CPD to finalize the *Unit Directive*.

The City did not provide the IMT with any additional information regarding COPA's efforts toward compliance with ¶501 in the third reporting period.

---

[278] Since the end of the third reporting period, both the IMT and the OAG have provided COPA with no-objection notices for COPA's *Timeliness Benchmarks* policy. The IMT looks forward to reviewing COPA's further efforts to finalize the policy, including the results of COPA's Community Comment Period, as required by ¶8 of the Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

## Accountability and Transparency: ¶505

> **505.** *The CMS will have the following capacities: a. maintain accurate and reliable data regarding the number, nature, and status of all complaints and administrative notifications, from the intake process to final disposition; b. identify the status of administrative investigations; c. identify caseloads for investigators; and d. maintain all documents and investigative materials—including audio and video—in a digital format, accessible via the CMS.*

### Compliance Status

In the third reporting period, the CPD provided the IMT with its *Command Channel Review and Case Management System* training materials to demonstrate compliance with ¶505. While those training materials demonstrate that the CPD understands what ¶505 requires, the materials themselves do not address the requirements of ¶505. The IMT looks forward to reviewing a written policy or procedure regarding ¶505 in the next reporting period.

## Accountability and Transparency: ¶506

> **506.** *COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.*

### Compliance Status

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which states that Accountability Sergeants will have access to the Case Management System (CMS) to undertake their responsibilities.

In the third reporting period, the IMT reviewed the *BIA Investigators Unit Directive*, which specifically states that BIA Case Management Supervisors are responsible for ensuring that BIA Investigators have access to the CMS and are trained in its use. Additionally, BIA has developed Command Channel Review and CMS training materials.

COPA has provided the IMT with its policy 3.1.6, *Employee Use of CLEAR and COLUMN CMS Systems* and 3.1.6.A, *Employee Agreement Regarding the Use of CLEAR and COLUMN CMS Systems*. 3.1.6 states that the CMS is used for official investigations, but does not clarify which COPA employees are authorized to access the CMS and CLEAR. The *Employee Agreement* requires employees who are authorized to use CMS and CLEAR to sign the agreement before obtaining access to the CMS.

The IMT looks forward to working with COPA and the CPD to revise their relevant policies in the next reporting period.

## Accountability and Transparency: ¶507

> **507.** *Administrative investigative files will be electronically preserved within the CMS.*

### Compliance Status

The City and the CPD did not provide the IMT with any information about their compliance efforts for ¶507. The IMT understands that most CPD investigative files, and in some cases entire files, are electronically preserved within the CMS and looks forward to reviewing a policy that requires this preservation in CMS in the next reporting period.

## Accountability and Transparency: ¶508

> **508.** *The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.*

### Compliance Status

The IMT recognizes that compliance with ¶508 requires the City to undertake "best efforts." Per ¶729, this means that the City must, "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶508.[279]

In previous reporting periods, the IMT reviewed COPA Policy 3.1.9, *File Maintenance* (dated August 1, 2019), which provided a good description of COPA's file maintenance policy and procedure.

The IMT has not received any updated information regarding the CPD's and COPA's efforts toward compliance with ¶508 in the third reporting period. It may make sense for the CPD to address ¶508 in BIA's *Requirements of a Complete Investigative File Unit Directive* (previously titled *Elements of a Complete Investigative File Unit Directive*).

---

[279] Additional information about the City's efforts to pursue changes to collective bargaining agreements is provided in our assessment of ¶711 in the Implementation, Enforcement, and Monitoring Section.

The IMT looks forward to reviewing the CPD's and COPA's relevant policies in the next reporting period, including the BIA's plans for transitioning to electronic files in the future.

## Accountability and Transparency: ¶509

> **509.** *For each complaint, the CMS will separately track, and have capacity to conduct searches and generate reports sufficient to identify and analyze trends relating to, at a minimum, the following: a. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; b. allegations of unlawful stop, search, citation, or arrest practices; c. allegations of excessive force; d. allegations of misconduct arising during an interaction with individuals in crisis; e. allegations of retaliation against non-CPD members; f. allegations of conduct alleged to have occurred in retaliation for engaging in First Amendment protected activities, such as lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct; g. allegations of officer-involved gender-based violence, domestic violence, or sexual misconduct; h. allegations of CPD member substance and/or alcohol abuse; and i. the self-reported demographic information of complainants, including race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age.*

### Compliance Status

The CPD did not provide the IMT with any information about their compliance efforts for ¶509. COPA provided the IMT with a variety of information regarding the CMS, which appears to have the capability to produce the information required by ¶509. COPA currently does not track the complainant's religion, sexual orientation, and physical or mental disabilities as required by ¶509(i). The IMT looks forward to reviewing COPA's ability to track that information in the CMS in future reporting periods.

For the CPD, the IMT understands that the queries required for actual production of reports regarding the information required by ¶509 have not yet been developed. The IMT suggests that BIA produce the relevant information through normal periodic queries (perhaps monthly), which would allow the CPD to identify trends or behaviors in particular districts or units and to develop immediate training or disciplinary strategies. Quick implementation of those strategies may allow the

CPD to reduce the potential for harm to officers and to the public; reduce corruption, complaints, and lawsuits; and in some cases, save lives. The IMT also suggests that BIA develop a written protocol to ensure that any information produced pursuant to ¶509 is reviewed in the normal course of duties by command staff.

## Accountability and Transparency: ¶511

*511. In order to develop a new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant, the City will solicit public input, through community engagement efforts, regarding the methods by which mediation will most effectively build trust between community members and police and foster mutual respect.*

### Compliance Status

In the third reporting period, the City provided the IMT with information and records demonstrating that the City has selected a vendor to assist in developing the Mediation Program that is required by ¶¶511–12. Those records included a *Community Engagement Plan*, *Mediation Support Services*, and *Mediation Notes*. The *Mediation Support Services* record appears to be a proposal for the scope of the vendor's work. The *Community Engagement Plan* appears to be an educational presentation to accompany the *Mediation Support Services* record. Finally, the *Mediation Notes* document a February 5, 2020 meeting between COPA, the CPD, and the City; much of that document is redacted, so it is difficult to determine the depth of the discussion at that meeting. The IMT appreciates the City's efforts toward developing its Mediation Program.

## Accountability and Transparency: ¶514

*514. The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.*

### Compliance Status

The IMT recognizes that compliance with ¶514 requires the City to undertake "best efforts." Per ¶729, this means that the City must, "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶514.[280]

---

[280] Additional information about the City's efforts to pursue changes to collective bargaining agreements is provided in our assessment of ¶711 in the Implementation, Enforcement, and Monitoring Section.

In the third reporting period, the IMT reviewed BIA's *Rules and Regulations Training Lesson Plan* and *Summary Punishment and Automated Reports (SPAR) Training Materials*. While those materials reference ¶514, they do not sufficiently incorporate the requirements of ¶514. Nor does BIA's *Command Channel Review* policy address ¶514. The IMT suggests that BIA more thoroughly incorporate ¶514 into its relevant policies before proceeding with incorporating ¶514 into additional training materials. The IMT also reviewed COPA's *Disciplinary Recommendations* policy: 3.2.1, which is greatly improved from the previous version that the IMT reviewed and which addresses ¶514.

<div style="background:#1F6FC4;color:white;padding:4px">

## Accountability and Transparency: ¶524

</div>

> **524.** *BIA's staffing and equipment-needs plans will include the investigation staffing and equipment needs of the districts.*

### Compliance Status

BIA provided the IMT with a document titled *Staffing and Equipment Needs Plan Annual Assessment*, but it was not clear whether that document was meant to be BIA's 2021 staffing and equipment needs plan or, instead, a policy or rubric to direct that plan. That document did not include specific details about the investigation staffing and equipment needs of the districts as required by ¶524.

<div style="background:#1F6FC4;color:white;padding:4px">

## Accountability and Transparency: ¶541

</div>

> **541.** *The trainings [referenced in ¶540] will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures, and disciplinary rules.*

### Compliance Status

In the third reporting period, the Police Board engaged Jones Day to develop and provide trainings at no cost to the Police Board. As a result of that partnership, Police Board members have participated in two training sessions: *Training on Police Boards in Other Major U.S. Cities* and *Training on the CPD Consent Decree*. Both training blocks of instruction were well received by Police Board Members, and the IMT found both blocks of instruction to be thorough. The IMT anticipates that the Police Board's training partnership will allow the Police Board to provide quality training relying solely on the CPD. Furthermore, the IMT suggests that the Police Board consider engaging the vendors who produced COPA's *Procedural Justice Training Materials*. Finally, the IMT commends the Police Board for its innovative approach to developing training for its members, and recognizes Jones Day for its willingness to partner with the City and the Police Board. The IMT looks forward

to reviewing the Police Board's forthcoming ¶541 training materials in the next reporting period.

## Accountability and Transparency: ¶545

> **545.** *To the extent permissible by law, within 60 days of its implementation, each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent.*

### Compliance Status

In the third reporting period, the CPD did not provide the IMT with any information regarding its efforts toward compliance with ¶545. The IMT looks forward to reviewing the CPD's relevant policy in the next reporting period.

## Accountability and Transparency: ¶552

> **552.** *For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.*

### Compliance Status

The IMT continues to suggest that the CPD develop a policy or directive that addresses the requirements of ¶552 and explains how the data is made available to department members, whether the data is available to the public, and how department members' identities or identifying information will be handled. Furthermore, the IMT suggests that the CPD assign some level of responsibility to command staff members to review the information produced pursuant to ¶552 and work with appropriate units to rectify inappropriate behaviors and tactics and to encourage good tactics and behavior.

# X. Data Collection, Analysis & Management

This is the Data Collection, Analysis, and Management section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Community Policing compliance efforts from March 1, 2020, through December 31, 2020, for this section of the Consent Decree.

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **566.** *Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> **567.** *In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

## Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the third reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

Finally, as noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the

Office of the Illinois Attorney General (OAG) and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.

## Summary Compliance Assessments

During the third reporting period, the IMT continued to work with the CPD to address issues regarding data collection, analysis, management, and evaluation, as well how data will be used to inform the Early Intervention System, which will soon be comprised of two new systems: the Officer Support System and the Talent Management System.

The IMT also continued to review the CPD's data collection tools and auditing mechanism for uses of force. The CPD made significant strides with its publicly available Use of Force Dashboard, achieving Preliminary compliance with the relevant paragraphs of the Consent Decree assessed below.

While we believe the CPD has made initial progress regarding its reform efforts, more work is needed. For example, random audits of body-worn camera footage continue to be a challenge for the CPD. The IMT looks forward to continued progress on all the requirements in the Data Collection, Analysis, and Management section.

In this reporting period, we assessed the City's compliance with 18 of the Consent Decree's Data Collection, Analysis, and Management paragraphs (¶¶569, 570, 574–82, 590, 596, 601, 602, 604, 606, and 609). We provide status updates, rather than compliance assessments, for an additional five paragraphs (¶¶571–73 and 607–08).

We have determined that the City moved into Preliminary compliance for nine paragraphs (¶¶570, 574, 577–82, and 601). The City did not achieve Secondary or Full compliance for any paragraphs and failed to reach any level of compliance with the remaining 9 paragraphs (¶¶569, 575, 576, 590, 596, 602, 604, 606, and 609). *See* Data Figure 1 below.

Data Figure 1:   Compliance Status for Data Collection, Analysis, and Management Paragraphs at the End of the Third Reporting Period (December 31, 2020)



In the third report, the City had three deadlines in the Data Collection, Analysis, and Management section (¶¶570(2) and 609). The IMT determined that the City met one deadline (¶570(1)) and missed two deadlines (¶¶570(1) and 609). For the missed deadlines, the City achieved the underlying deadline requirement by the end of the reporting period. *See* Data Figure 2 below.

Data Figure 2:          Total Data Collection, Analysis, and Management Deadlines
in the Third Report: 3



## Data Collection, Analysis & Management: ¶569

*569. CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.*

### Compliance Progress    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the third reporting period, the CPD has made significant strides in memorializing the requirements of ¶569 into various directives, but has not yet achieved Preliminary compliance.

To evaluate Preliminary compliance, the IMT identified and reviewed each element of ¶569 and the corresponding CPD directive requiring their collection process, including the following policies:

- *Tactical Response Report (TRR)*: G03-02-02
- *Tactical Response Investigation Report (TRR-I)*: G03-02-08
- *Tactical Response Report Review (TRR-R)*: G03-02-08
- *Arrest Report*: G06-01-01 and G03-02-02
- *Case Incident Report: Field Reporting Manual*, S04-13-06, D20-03, and G03-02-02

- *Investigatory Stop Report*: S04-13-09
- *Administrative Case Files*: G08-01
- *Body-Worn Camera*: S03-14
- *In-Car Camera*: S03-05
- *Third-Party Recordings*: G03-02-02
- *Witness Interviews*: G03-02-02
- *Officer Interviews*: G03-02-02

For each of the required ¶569 elements, the CPD possesses a data collection tool to collect relevant information necessary to conduct a comprehensive investigation into uses of force and to conduct audits to identify trends in force use and reporting. In December 2020, the IMT reviewed a CPD presentation that included screenshots of all relevant data collection tools, as well as details about linking variables that the CPD may use to connect data across systems. However, for some data collection tools (namely the TRR, TRR-I, and TRR-R), the tool and associated directives are still under assessment by the IMT and additional revisions may be forthcoming. Therefore, while we appreciate the CPD's work to date, the CPD has not yet achieved Preliminary compliance.

In our last report, we noted data issues that called into question the reliability of data points found in ¶569. During this reporting period, additional data issues have emerged. For instance, the IMT has discovered that the interpretations of force definitions are inconsistent across the CPD; the Force Review Division's (FRD's) definition is different from the definition used by others who track and analyze Use of Force data, including those who manage the data dashboard. The CPD must be consistent in how definitions are interpreted, and the IMT will continue to review these issues in future reports. Additionally, in our last report, we noted inconsistencies between Bureau of Internal Affairs (BIA) and Civilian Office of Police Accountability (COPA) accountability data. These issues have remained. For instance, the dashboards provided by BIA and COPA only show what each respective entity is investigating – not the total number of administrative complaints and investigations.

For some required ¶569 elements, we note that the CPD officers' adherence to the requirements of policy remains lacking. For instance, the Force Review Division's Third Quarter report indicates that in 6.7% of force events audited, officers did not activate their Body Worn Cameras. Overall, there were 126 deficiencies related to Body Worn Cameras out of the 717 force events audited (17.6%). Deficiencies included not activating the BWC, late activation, early termination, or other issues. Additionally, in 28.7% of events audited, officers did not describe the force mitigation efforts they took during the event, as required. In order to "track" the elements as ¶569 requires, the CPD's data must be reliable.

In order to resolve these issues, the CPD must conduct regular audits and employ a broad training approach to ensure officers and supervisors are familiar with their reporting requirements and are coding items appropriately. We note, however, that the CPD has taken positive steps in a number of areas. For instance, the FRD has made numerous recommendations to command staff to improve the information and data captured by TRRs, including improvements in describing the de-escalation tactics employed, re-enrolling the entire department in the BWC eLearning module, and providing TRR training for all supervisors. Additionally, the Audit Division made recommendations about updating the TRR to better capture elements of force events and to improve the electronic reporting system to enable appropriate review. These are positive steps that move toward improving the quality of data necessary for full compliance with the requirements of ¶569. When audits identify deficiencies, updated training should be provided and, where necessary, officers should begin to be held accountable when they are impeding the data collection efforts by turning in deficient reports and failing to activate their BWCs.

## Data Collection, Analysis & Management: ¶570

*570. The City will ensure that reasonably available documents related to reportable uses of force that are or become subject to misconduct complaints or investigations are promptly provided to the appropriate investigative entity (e.g., COPA, BIA). The City will ensure that any reasonably available documents related to reportable uses of force subject to misconduct complaints or investigations, except for open confidential investigations, are accessible in the CMS the City is working to create, or in any similar electronic system, by June 30, 2020. Within seven days of the receipt of a misconduct complaint or the initiation of an administrative investigation, whichever occurs first, the City will identify any available reportable use of force documentation associated with the incident and ensure such documentation is accessible via the CMS or similar system. By June 30, 2020, whenever a reportable use of force incident becomes the subject of a misconduct investigation, COPA will notify CPD via the CMS within three days of the initiation of the investigation.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Deadlines:**          September 1, 2020*     ☑ **Met**   ☐ **Missed**
                        *Extended from June 30, 2020, due to COVID-19
                        September 1, 2020*     ☐ **Met**   ☑ **Missed**
                        *Extended from June 30, 2020, due to COVID-19

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

The City achieved Preliminary compliance with ¶570 during the third monitoring period. The City also met one of the two deadlines for ¶570 in the reporting period.

To evaluate Preliminary compliance with ¶570, we focused our review on the operation of CPD's Case Management System (CMS). The CMS was fully operational by September 1, 2020, as required by the Consent Decree. The CMS allows for tracking of administrative investigations and corresponding documents, videos, and other information. Of particular relevance to ¶570 is the availability of documents related to use of force in the CMS. The IMT has reviewed CPD's policies and training material related to the CMS, and has received a technical demonstration of the CMS's capabilities. Although we defer to the assessments found in the Ac-

countability and Transparency section of this report regarding the overall opera-
tion of the CMS, we note that the CMS is capable of uploading, accessing, and
maintaining force related documents (including relevant video files) for cases in-
volving allegations of inappropriate use of force.

While the CMS is presently capable of accomplishing the goals of ¶570, the
broader system is still being built-out. Therefore, certain elements have not being
written into the system's operating code and this will be necessary for additional
levels of compliance. For instance, we will look to ensure that the system code
memorialize the CPD unit or position who will be responsible for providing rele-
vant evidence to COPA. Further, while COPA may be notifying the "CPD via the CMS
within three days of the initiation of the investigation" and may have done so be-
fore September 1, 2020, we did not receive evidence within the third reporting
period. We look forward to verifying that process moving forward.

In addition to finalizing the code, additional levels of compliance will require an
audit of the CMS for allegations of inappropriate force to ensure (1) the records
are contained within CMS and (2) the records were requested and uploaded within
the timelines set out in ¶570. We look forward to working with CPD on developing
such an audit.

## Data Collection, Analysis & Management: ¶574

***574.*** *A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected regarding each level 2 reportable use of force incident, a representative sample of level 1 reportable use of force, and incidents involving accidental firearms discharges and animal destructions with no human injuries to ensure: a. CPD members completely and thoroughly reported the reason for the initial stop, arrest, or other enforcement action, the type and amount of force used, the subject's actions or other circumstances necessitating the level of force used, and all efforts to de-escalate the situation; b. the district-level supervisory review, investigation, and policy compliance determinations regarding the incident were thorough, complete, objective, and consistent with CPD policy; c. any tactical, equipment, or policy concerns are identified and, to the extent necessary, addressed; and d. any patterns related to use of force incidents are identified and, to the extent necessary, addressed.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | ***In Compliance*** (NEW) |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the third reporting period, the City and the CPD reached Preliminary compliance with ¶574.

To evaluate Preliminary compliance, we focused our review on the CPD's policies relating to the requirements of ¶574. Responsive to ¶574, CPD's Force Review Division (FRD) is responsible for conducting the types of analysis required by this paragraph. The role of the FRD has been sufficiently memorialized within the most recently revised version of CPD Directive G03-02-08 *Department Review of Use of Force*. Based on the December 31, 2020 issuance of G03-02-08 and the FRD's standard operating procedure (SOP) (see below), we find CPD to be in Preliminary Compliance with the requirements of ¶574.

We have reviewed the FRD's SOP, which provides clear instruction on how to conduct the required audits, including the points of review described in ¶574(a–d). Furthermore, FRD members have received sufficient training to carry out the tasks in accordance with the SOP, thereby satisfying the training element of our criteria for Secondary compliance. The training provided to FRD members is discussed in more detail in our status update for ¶575.

The FRD continues to audit the force types listed in ¶574 in order to identify trends consistent with subsections (a) through (d). However, as of December 24, 2020, the FRD was experiencing a backlog of approximately 450 cases pending assignment as well as 41 Pointing of a Firearm cases pending assignment. The timely identification of trends is necessary for the CPD to improve its overall approach; we recommend the CPD provide the FRD with the resources necessary to work through the backlog. Ensuring FRD has the personnel necessary to conduct their reviews directly impacts the other elements of our criteria for Secondary compliance, which is that the City has created the requisite positions to accomplish the paragraph's requirements and staffed those positions with qualified personnel. FRD does not meet Secondary compliance because it does not currently have sufficient resources and personnel. We provide more information regarding FRD staffing and resources in our status update of ¶575.

The FRD uses a tiered approach to conducting its audits. The first tier evaluates individual deficiencies based on officers' TRRs and supervisors' investigations and reviews of the force events. These identified deficiencies are then forwarded to the involved officer as a learning opportunity. In its second tier of review, the FRD identifies concerns at the unit level as compared with other units. These concerns are then forwarded to the District Commander for remediation. Lastly, the FRD's third tier aims to identify department-wide trends and may provide recommendations to the Education and Training Division or to the Research and Development Division to address the identified issues.

The FRD's quarterly reports detail the manner in which the FRD identifies meaningful trends and provides responsive recommendations. For example, a prior recommendation from the FRD stemmed from identifying one district with significantly higher level of BWC deficiencies than other districts. In response, the District formulated and implemented an action plan and the initial results indicate that the deficiencies have decreased in that district. Additionally, based on a pattern identified by the FRD of pointing firearms during traffic stops, the Training Oversight Committee recommended including a scenario involving traffic stops in the 2021 Use of Force in-service training.

Overall, we remain appreciative of the FRD and its work product to date. Members of the FRD are provided clear instruction on their tasks, have demonstrated an ability to evaluate force events with a critical eye, and have made meaningful recommendations for improving the department.

## Data Collection, Analysis & Management: ¶575

**575.** *CPD recently established a Force Review Unit ("FRU") and tasked the FRU with certain responsibilities described in the preceding paragraph. CPD will ensure that the FRU or any other unit tasked with these responsibilities has sufficient resources to perform them. CPD will ensure that the FRU or any other unit tasked with these responsibilities is staffed with CPD members, whether sworn or civilian, with sufficient experience, rank, knowledge, and expertise to: effectively analyze and assess CPD's use of force practices and related reporting and review procedures; conduct trend analysis based on use of force data; identify tactical, equipment, training, or policy concerns based on analysis of use of force incidents and data; and develop recommendations regarding modifications to tactics, equipment, training, or policy as necessary to address identified practices or trends relating to the use of force.*

### Compliance Progress                  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶575.

In our assessment of ¶575, we note that the work of the FRD[281] is of high quality, but it is experiencing a backlog of cases. This backlog is due in part to the FRD operating under capacity and not having "sufficient resources" to perform their responsibilities. For instance, as of December 2020, the FRD is comprised of forty-two CPD officers including one Commander, one Lieutenant, seven Sergeants, and 33 officers. At the end of the third reporting period, the FRD was awaiting the assignment of 13 additional officers to assist with the workload of required reviews. The IMT also notes that those thirteen members will not bring FRD up to their full allotment of personnel. Additionally, the FRD is prevented from posting another Notice of Job Opportunity until the thirteen officers are assigned. This administrative hurdle has implications for the current FRD backlog and its ability to provide officer and organizational feedback in a timely manner.

---

[281]  We note that while this paragraph refers to the CPD's "Force Review Unit," it is currently referred to as the "Force Review Division (FRD)," and performs the same functions.

The officers currently assigned to the FRD have been selected and trained in accordance with the requirements of ¶575. For instance, when considering prospective FRD candidates, the CPD ensures that the candidates have been an officer for at least five years, pass a pre-test, and are proficient in Microsoft Word, CLEAR, CLEARnet, Hot Desk, and other department databases and computer systems. The candidates' record must be clear of sustained allegations of inappropriate force incidents within the past five years. These requirements are graded on a pass/fail basis. Additionally, the FRD prefers candidates who come from patrol with recent street experience. The FRD then ranks candidate officers based on the evaluation criteria and selects those most qualified.

Given these steps, we are comfortable that the officers currently assigned to the FRD have "sufficient experience, rank, knowledge, and expertise" to conduct the evaluation process and that future officers may be reliably selected based on the evaluation criteria.

Training requirements for all members of the FRD are outlined in *the Force Review Division's Standard Operating Procedure* (SOP 2020-001), which includes an annual refresher training on the CPD's use of force policies, use of force law, and best practices in force review. As detailed in the FRD's Q2 2020 Report, officers newly assigned to FRD received a total of fourteen hours of training, including courses related to reviewing cases involving the pointing of a firearm, accessing CPD case reports and other documents, and shadowing veteran FRD members.[282]

Additionally, FRD members had been receiving monthly training sessions, which have included topics related to "use of force policy, use of force law, tactics, report writing, force review best practices, and any additions or revisions to Department Directives that may affect the Force Review Division's operations." *See* FRD's Q2 2020 Report. Additionally, FRD members will watch presentations on "individual use of force incident reviews and lessons learned" from review officers. *See* FRD's Q2 2020 Report. These training sessions and presentations promote the FRD's mission of "creating a culture in which unit members learn from past experience and apply that practical knowledge to future work." *See* FRD's Q2 2020 Report.[2]

Unfortunately, due to the COVID-19 pandemic limiting in-person meetings and the inability of CPD to conduct the monthly training sessions virtually, no monthly training has occurred since February 2020. However, the FRD reports that one-on-one conversations are conducted in order to cover some of these topics. Once the FRD returns to holding group monthly trainings, we will provide updates to this element of training.

---

[282] *See Force Review Division Quarterly Report 2020 Q2*, Chicago Police Department, https://home.chicagopolice.org/wp-content/uploads/2020/10/Force-Review-Division-Quarterly-Report-Q2-2020.pdf.

Although we believe FRD officers have been sufficiently trained, Preliminary compliance is dependent on the FRD's staffing levels. Without sufficient resources to conduct the important work of the FRD, no amount of training will allow CPD to accomplish the goals of ¶575. Therefore, ¶575 must first be evaluated through a jobs-methodology lens (i.e., does the CPD have sufficient personnel to carry out the tasks). The IMT looks forward to working with FRD to resolve these issues and will provide updates on this issue in our next report.

# Data Collection, Analysis & Management: ¶576

*576. CPD will conduct random audits of body-worn and in-car camera recordings of incidents that involved civilian interactions to assess whether CPD officers are complying with CPD policy. CPD will take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City did not meet Preliminary compliance with ¶576.

The CPD is addressing the requirements of ¶576 through two different approaches, both of which provide important evaluative elements: (1) through daily supervisor audits of BWC footage and (2) through periodic BWC audits by CPD's Audit Division. The first approach of conducting daily supervisor audits of BWC footage has the benefit of allowing Watch Operations Lieutenants (WOLs) to monitor the type and quality of interactions occurring within their District on their watch. As a supervisory tool, we believe this is an important approach.

In our second report, we noted that the CPD was conducting a pilot test in the 19th District in which the WOL audits of BWC footage are standardized by a software application that randomly choses the footage for WOLs to review. Outside of the 19th District, however, WOL audits of BWC suffer from a number of methodological and operational deficiencies that are not reflective of the intent of ¶576. The IMT had expected the pilot test to be expanded to other districts during this reporting period, but it has not. While the more standardized approach continues to be utilized in the 19th District, the CPD reports that expanding the AXON software across other districts is prohibitively expensive. The IMT understands this concern, though notes that the problems with reviews in other districts remain – namely that supervisors can selectively choose which videos to review, leading to issues of generalizability of findings to all community interaction types. Should the CPD ultimately determine that expanding the pilot program is not possible, they will need to create a sufficient selection methodology. The IMT is concerned that the random audit of BWC footage, as conducted by supervisors, has reached a standstill and that no further progress is being made.

The second approach is housed in the CPD's Audit Division, which plans to "conduct a series of [BWC] audits that would provide an overview of the extent to which BWC recordings exist, offer insights on which incident types have been reviewed, and help inform the feasibility of conducting thematic audits" (per the CPD's Draft Audit Plan). The Audit Division also plans to conduct an assessment of in-car camera videos, satisfying the second audit requirement of ¶576. The IMT looks forward to working with CPD to finalize the Draft Audit Plan and to refine their auditing approaches.

# Data Collection, Analysis & Management: ¶577

**577.** *CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member.*

## Compliance Progress (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD reached Preliminary compliance with ¶577.

To evaluate Preliminary compliance, we focused our review on the CPD's policies relating to the requirements of ¶577. The role of the Force Review Board (FRB) has been sufficiently memorialized within the most recently revised version of the CPD Directive G03-02-08, *Department Review of Use of Force*. Based on the December 31, 2020 issuance of G03-02-08, we find the CPD to be in Preliminary compliance with the requirements of ¶577.

In the third reporting period, the IMT reviewed an updated draft SOP for the operation of the FRB (SOP 2020-002, *Force Review Board*), which acts as a training tool for the FRB employees. This SOP is designed to provide a step-by-step process for all FRB reviews and includes the requirements of ¶577. The IMT and OAG provided comments on the draft SOP, which were then largely incorporated into the document. The CPD did not, however, incorporate the IMT's suggestion to conduct reviews of deadly force using a decision-point approach. The CPD indicated that they would provide a response to this suggestion under a separate cover but has not done so to date. As the revised SOP contained most of the IMT's recommendations, however, we provided a no-objection letter, with the caveat that the CPD had still not provided us a reason for not evaluating deadly force using a decision-point analysis. We still await such an explanation, and we have not been provided evidence that the FRB SOP has been finalized.

Subsequent compliance levels will depend on CPD finalizing the SOP in order to provide a comprehensive training mechanism for FRB proceedings. Following that, the IMT looks forward to an invitation to sit in on FRB proceedings (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

## Data Collection, Analysis & Management: ¶578

*578. For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to: a. evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and b. if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public.*

### Compliance Progress                 (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD reached Preliminary compliance with ¶578.

To evaluate Preliminary compliance, we focused our review on the CPD's policies relating to the requirements of ¶578. The role of the FRB has been sufficiently memorialized within the most recently revised version of CPD Directive G03-02-08, *Department Review of Use of Force*. Based on the December 31, 2020 issuance of G03-02-08, we find CPD to be in Preliminary compliance with the requirements of ¶578.

In the third reporting period, the IMT reviewed an updated draft SOP for the operation of the FRB (SOP 2020-002, *Force Review Board*) which acts as a training tool for the FRB employees. This SOP is designed to provide a step-by-step process for all FRB reviews and includes the requirements of ¶578. The IMT and the OAG provided comments on the draft SOP, which were then largely incorporated into the document. The CPD did not, however, incorporate the IMT's suggestion to conduct reviews of deadly force using a decision-point approach. The CPD indicated they would provide a response to this suggestion under a separate cover but has not done so to date. As the revised SOP contained most of the IMT's recommendations, we provided a no-objection letter in November 2020, with the caveat that the CPD had still not provided us a reason for not evaluating deadly force using a decision-point analysis. We still await such an explanation, and we have not been provided evidence that the FRB SOP has been finalized.

Subsequent compliance levels will depend on the CPD finalizing the SOP in order to provide a comprehensive training mechanism for FRB proceedings. Following

that, the IMT looks forward to an invitation to sit in on FRB proceedings (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

# Data Collection, Analysis & Management: ¶579

**579.** *The FRB will be chaired by the Superintendent, or his or her designee, and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB.*

---

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD reached Preliminary compliance with ¶579.

To evaluate Preliminary compliance, we focused our review on the CPD's policies relating to the requirements of ¶579. The role of the FRB has been sufficiently memorialized within the most recently revised version of CPD Directive G03-02-08 *Department Review of Use of* Force. Based on the December 31, 2020 issuance of G03-02-08, we find CPD to be in Preliminary compliance with the requirements of ¶579.

In August 2020, the IMT reviewed an updated draft SOP for the operation of the FRB (SOP 2020-002, *Force Review Board*) which acts as a training tool for the FRB employees, as it is designed to provide a step-by-step process for all FRB reviews, including the requirements of ¶579. The IMT and the OAG provided comments on the draft SOP, which were then largely incorporated into the document. The CPD did not, however, incorporate the IMT's suggestion to conduct reviews of deadly force using a decision-point approach. The CPD indicated they would provide a response to this suggestion under separate cover but has not done so to-date. As the revised SOP contained most of the IMT's recommendations, we provided a no-objection letter in November 2020, with the caveat that the CPD had still not provided us a reason for not evaluating deadly force using a decision-point analysis. We still await such an explanation and we have not been provided evidence that the FRB SOP has been finalized.

Subsequent compliance levels will depend on the CPD finalizing the SOP to provide a comprehensive training mechanism for FRB proceedings. Following that, the IMT

looks forward to an invitation to sit in on FRB proceedings (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

## Data Collection, Analysis & Management: ¶580

**580.** *The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. Within 30 days after its review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD reached Preliminary compliance with ¶580.

To evaluate Preliminary compliance, we focused our review on the CPD's policies relating to the requirements of ¶580. The role of the FRB has been sufficiently memorialized within the most recently revised version of CPD Directive G03-02-08 *Department Review of Use of* Force. Based on the December 31, 2020 issuance of G03-02-08, we find CPD to be in Preliminary compliance with the requirements of ¶580.

In August 2020, the IMT reviewed an updated draft SOP for the operation of the FRB (SOP 2020-002, *Force Review Board*) which acts as a training tool for the FRB employees, as it is designed to provide a step-by-step process for all FRB reviews, including the requirements of ¶580. The IMT and the OAG provided comments on the draft SOP, which were then largely incorporated into the document. The CPD did not, however, incorporate the IMT's suggestion to conduct reviews of deadly force using a decision-point approach. The CPD indicated they would provide a response to this suggestion under separate cover but has not done so to-date. As the revised SOP contained most of the IMT's recommendations, we provided a no-objection letter in November 2020, with the caveat that the CPD had still not provided us a reason for not evaluating deadly force using a decision-point analysis. We still await such an explanation and we have not been provided evidence that the FRB SOP has been finalized.

Subsequent compliance levels will depend on the CPD finalizing the SOP in order to provide a comprehensive training mechanism for FRB proceedings. Following that, the IMT looks forward to an invitation to sit in on FRB proceedings (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

# Data Collection, Analysis & Management: ¶581

**581.** *Beginning within 180 days of the Effective Date, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform.*

**Compliance Progress**  (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶581. The City and the CPD also met the monthly deadline to publish data as required by this paragraph.

To evaluate Preliminary compliance with ¶581, in December of 2020, the IMT reviewed a draft of the CPD's public Use of Force Dashboard[283] that had been updated in response to comments and recommendations received from the IMT and the OAG. Many of the recommendations from the IMT were incorporated into the dashboard. While the IMT believes that additional steps may improve the interactive functions of the dashboard (for example, sub-group comparisons across all tabs), the CPD has published a publicly available, web-based data platform to inform community members about CPD uses of force.

Additionally, CPD's Use of Force Dashboard allows users to download the data, fulfilling ¶581's requirement to include incident-level data. Based on recommendations from the IMT, the CPD expanded their initial list of incident-level data points to provide information on the officer using force, subject actions, and other elements.

The CPD achieved Preliminary compliance with the requirements of ¶581. However, at its basic level, the publication of the Dashboard is for the benefit of community members; therefore, subsequent levels of compliance will depend largely on the CPD ensuring that users find the dashboard to be functional and user-friendly.

For Secondary compliance, we would expect CPD to put in place mechanisms for collecting community feedback, including creating online dashboard tutorials and providing an avenue for community member feedback regarding the Dashboard.

---

[283] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

Should the CPD receive actionable feedback or find themes in the feedback received, Full compliance would depend on the CPD modifying the Dashboard or providing a list of Frequently Asked Questions to help community members navigate the Dashboard.

## Data Collection, Analysis & Management: ¶582

*582. The publicly accessible, web-based data platform will enable visitors to: a. identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level; b. identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and c. review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City met Preliminary compliance with ¶582.

To evaluate Preliminary compliance with ¶581, in December of 2020, the IMT reviewed a draft of the CPD's public Use of Force Dashboard[284] that had been updated in response to comments and recommendations received from the IMT and the OAG. Many of the recommendations from the IMT were incorporated into the dashboard. The updated Dashboard enables community members to see use of force incident frequencies, demographic information, and the type of force used at the citywide, district, neighborhood, and ward levels. The dashboard utilizes a number of graphs, charts, and other data visualizations to make the information readily understandable. While the IMT believes that additional steps may improve the interactive functions of the dashboard (for example, sub-group comparisons across all tabs), the minimum requirements of ¶582 are captured in the updated dashboard.

The CPD achieved Preliminary compliance with the requirements of ¶582. However, at its basic level, the publication of the Dashboard is for the benefit of community members; therefore, subsequent levels of compliance will depend largely on the CPD ensuring that users find the dashboard to be functional and user-friendly.

---

[284] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

For Secondary compliance, we would expect CPD to put in place mechanisms for collecting community feedback, including creating online dashboard tutorials and providing an avenue for community member feedback regarding the Dashboard. Should the CPD receive actionable feedback or find themes in the feedback received, Full compliance would depend on the CPD modifying the Dashboard or providing a list of Frequently Asked Questions to help community members navigate the Dashboard.

## Data Collection, Analysis & Management: ¶590

**590.** *CPD will require unit commanding officers to review the automated electronic system data regarding all officers who are transferred to their command within 14 days of the transfer. CPD will require supervisors to conduct monthly reviews of the automated electronic system data regarding officers under their direct command. The purpose of these reviews will be for supervisors to identify and address patterns of behavior by officers under their direct command that are indicative of a future instance of at-risk behavior. CPD will also require supervisors to review the automated electronic system data together with officers under their direct command during the annual performance evaluation process.*

**Compliance Progress**       (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

While the CPD made some progress toward compliance during the third reporting period, the CPD did not achieve Preliminary compliance with ¶590. The CPD also missed its deadline for supervisors to conduct monthly reviews as required by this paragraph.

In previous reporting periods, CPD utilized a program called the Performance Recognition System (PRS) to provide supervisors access to the types of information necessary to conduct the reviews of officers required under ¶590. However, the PRS was problematic in that it did not allow supervisors immediate access to the underlying documents reflected in the data. For example, while supervisors could see that an officer had participated in a use of force incident, the PRS did not identify the use of force case information nor did it allow immediate access to the *Tactical Response Report* (TRR). Thus, supervisors were required to take additional steps to view the underlying information associated with the use of force event. The number of steps required of a supervisor to gather a fulsome picture of an officer's performance history acted as a deterrent to supervisors gaining that crucial understanding.

In the third reporting period, the CPD has begun transitioning to a different system called the Talent Management System. The CPD provided a demonstration of the Talent Management System to the IMT during this reporting period; the system resolves the tediousness of the assessment that was required when using the PRS. For instance, the Talent Management System puts all of the officer's information

in a single location and provides direct links to the underlying documents, thereby allowing for a seamless review of a particular event. Although the IMT was encouraged by the preliminary demonstration, the CPD is still in the process of fine-tuning the system and plans to make the system available to all members sometime in 2021. The IMT appreciates the CPD's positive steps toward meaningful compliance.

However, Preliminary compliance with this paragraph goes beyond merely having the system necessary to conduct the reviews in place and functional. To meet the compliance levels, the IMT recommends that the CPD create a policy or procedure to require supervisors to conduct these reviews, and sufficiently train supervisors in conducting these reviews. *See also* ¶594. Although the CPD currently has a policy related to the *Performance Recognition System* (E05-02), it does not include the precise requirements of ¶590 and, upon the implementation of the *Talent Management System*, will become moot. The IMT looks forward to assessing the CPD's updated policies and training with regard to the implementation of the *Talent Management System*.

## Data Collection, Analysis & Management: ¶596

**596.** *CPD will conduct annual audits of the automated electronic system. The audits will: a. assess the overall effectiveness of the automated electronic system and the support and interventions prompted by the system; b. assess whether and to what extent supervisors are completing monthly reviews of the automated electronic system information regarding officers under their direct command; c. assess whether and to what extent CPD is providing interventions and support in a timely manner; d. assess whether the interventions and support provided are appropriate and effective; and e. identify any recommended changes to improve the effectiveness of the automated electronic system.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Deadline:** | March 5, 2021* ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2020, due to COVID-19 |
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶596.[285]

The CPD is utilizing two separate systems to accomplish the goals of the Early Intervention System (EIS) section of the Consent Decree (*see* ¶604). The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view

---

[285] In its comments, the City asserts that "frequency requirements (*e.g.,* annually, quarterly, regularly) do not impose additional deadline requirements." *See* Attachment B. We believe, however, that it is important to report on the City's compliance with the frequency requirements under the Consent Decree. This will provide the public with transparency regarding the City's progress over the course of the Consent Decree. When the Consent Decree does not provide a precise frequency, the City and the City's relevant entities have the flexibility to identify and meet the recurring requirements in accordance with best practices, policies, practices, and community feedback. Ultimately, the City and its entities can advocate for a cadence that maximizes efficiency within the language of the Consent Decree (*e.g.,* annually, quarterly, regularly, periodically, ongoing). For the purposes of this report, we have kept frequency requirements that provide clear frequency requirements within the context of each corresponding paragraph (*e.g.,* annually). Moving forward, we welcome additional conversations with the City, its entities, and the OAG to further narrow these requiring requirements for additional clarity for the City, its entities, and Chicago's communities.

officer performance metrics in a centralized location. The requirements of ¶596 apply to both systems.

As discussed in our compliance assessment of ¶590 above, the CPD is transitioning to a new system called the Talent Management System for supervisory review of officers. However, the Talent Management System has not yet been fully implemented; therefore, the CPD cannot conduct the annual audits of this system as required by ¶596.

Additionally, the CPD is still in the process of implementing the Officer Support System and is currently pilot testing the system in the 5th District. To provide the CPD sufficient time to launch the Officer Support System, the IMT will provide a more comprehensive compliance assessment of paragraphs related solely to the Officer Support System in our next report. In addition, without a sufficient data timeline and a wider implementation, the CPD cannot conduct the annual audits of this system as required by ¶596.

As part of their implementation process for both systems, the CPD should incorporate the audit requirements into formal policy, identify the individuals responsible for conducting such audits, provide the IMT with a methodology for conducting the audits, and provide annual reports detailing the findings of the audits.

## Data Collection, Analysis & Management: ¶601

**601.** *CPD will continue to solicit input and feedback from representatives of its collective bargaining units during the development and implementation of the EIS.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

**Preliminary:**        *In Compliance* (NEW)
**Secondary:**         *Not Yet Assessed*
**Full:**                   *Not Yet Assessed*

In the third reporting period, the City met Preliminary compliance with ¶601.

To evaluate Preliminary compliance, we focused our review on documentation that the CPD provided us in November 2020. The documentation demonstrates the CPD's communications soliciting input and feedback from collective bargaining units during the development and implementation of the Officer Support System. The documents show that bargaining units for each rank were invited to introductory and developmental meetings related to the Officer Support System. Additionally, the documents provide evidence that members of the bargaining units attended and actively participated in at least some of the meetings during the Officer Support System development. Based on the evidence provided, the CPD has achieved Preliminary compliance with the requirements of ¶601.

As the Officer Support System is currently being pilot tested, future opportunities for engaging collective bargaining units exist and will inform our assessments moving forward. The CPD should ensure the findings from the pilot test (as well as any resulting proposed modifications) are shared with the bargaining units in order to continue soliciting input and feedback. We look forward to working with the CPD on how it involves bargaining units throughout the entire development and implementation process.

# Data Collection, Analysis & Management: ¶602

*602. Prior to beginning the phased implementation of the EIS, CPD will develop and implement new or revised policies and procedures for using the EIS and, if applicable, the updated PRS and information obtained from them. The policies and procedures will address data storage, data retrieval, data analysis, reporting, pattern identification, supervisory use, intervention and support options and procedures, documentation and audits, access to the system, and confidentiality of personally identifiable information.*

## Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶602 in the third reporting period.

The CPD is utilizing two separate systems to accomplish the goals of the EIS section of the Consent Decree (*see* ¶604). The first system is the Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System which allows for supervisors to view officer performance metrics in a centralized location. The requirements of this paragraph apply to both systems.

Prior to beginning the phased implementation of the Officer Support System, CPD developed Department Notice D20-04 (*Officer Support System – Pilot Program*) for the pilot testing in the 5th District. However, a draft of this directive was not provided to the IMT and we were not provided an opportunity to give feedback on the directive prior to the phased implementation as required by this paragraph. Moreover, the directive does not contain all the requirements of ¶602, and the CPD will need to further revise the directive prior to expanding their pilot testing to other districts or before implementing the system department-wide.

Additionally, training for supervisors in the 5th District has only focused on how to navigate the Officer Support System as opposed to techniques for assessing the validity of work items (i.e., when a member is identified as being at a higher risk for an adverse event), evaluating a member's work history in response to a work item, and determining an appropriate intervention. The CPD notes that after the 5th District pilot program, listening sessions will be conducted with supervisors to gather input on their experiences with reviewing the information and determining

appropriate interventions. This will ultimately inform the training techniques discussed above.

The CPD's current policy related to the Performance Recognition System is E05-02 *Performance Recognition System*. However, as noted above, the CPD is transitioning to the Talent Management System and needs to update this policy prior to completing that transition. Updated training on the Talent Management System will also be required.

Paragraph 602 requires the development of policies and procedures <u>prior to</u> the phased implementation of the Officer Support System (including pilot testing; *see* ¶603). While the CPD created D20-04 *Officer Support System (OSS) – Pilot Program* during this reporting period, it is not sufficient to satisfy the requirements of ¶602, was not submitted for IMT review, and did not have comprehensive accompanying training. Additionally, while we have made recommendations for E05-02, the transition to the Talent Management System largely rendered those recommendations moot, and the CPD should have provided an updated version of E05-02 to the IMT prior to beginning the pilot test.

The pilot test in the 5th District is undoubtedly providing valuable insight to the CPD, given the relatively new system. However, while the current pilot test addresses the foundation of the Officer Support System, it does not appear to contain all of the elements required by the Consent Decree. Therefore, in learning from the 5th District pilot test, we recommend that the CPD adjust the Officer Support System as necessary and begin a second pilot test phase in other districts before beginning the full implementation department wide. Prior to this second pilot test phase, we expect the CPD to provide the IMT with updated policies consistent with the requirements of ¶602 and to provide comprehensive training to assess the entire system before engaging in a department-wide rollout.

## Data Collection, Analysis & Management: ¶604

**604.** *Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by no later than January 1, 2020.*

Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶604 in the third reporting period.

The CPD is in the process of transitioning to the Talent Management System as a replacement for the PRS identified in ¶604. During this reporting period, the IMT received a technical demonstration of the Talent Management System and concluded that the system represents an improvement over the PRS. Although the IMT was encouraged with the preliminary demonstration, the CPD is still in the process of fine-tuning the system and plans to make the system available to all officers sometime in 2021. While the January 1, 2020 deadline to "enhance [PRS's] effectiveness, usability, and accuracy" was not met in the second reporting period, the quality of the enhancement by transitioning to Talent Management System has been a larger priority for our evaluation.

As allowed by ¶604, the CPD is using a combination of the Officer Support System and Talent Management System to achieve "the functions required of the automated electronic system described [in the EIS section of the Consent Decree]." As indicated in our assessment of various paragraphs above, the IMT believes that the CPD is well on their way to achieving those required functions. However, additional work related to policy and training are necessary before the CPD will achieve a level of compliance.

## Data Collection, Analysis & Management: ¶606

*606. Within 365 days of the Effective Date, CPD will conduct an assessment of CPD's current information collection mechanisms and data management technology to identify: a. what data CPD currently collects and what additional data is required to be collected to comply with this Agreement; b. the manner of collection (e.g., electronic or paper) c. the frequency with which each type of data is updated; d. the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected; e. what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members; f. redundancies or inefficiencies among the applications and systems currently in use; and g. the extent to which the applications and systems currently in use interact with one another effectively.*

### Compliance Progress          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶606.

In our second report, we noted that the CPD had issued a Master Consulting Agreement to solicit proposals for conducting the assessment contemplated in ¶606, and we noted that the analyses included in the Agreement were comprehensive and reflected serious thought into the goals for the assessment. In October 2020, however, the CPD informed us that they were retracting the Agreement prior to hiring anyone in order to take a more measured approach. In large part, this is due to CPD's recognition that many pieces of the analysis required by ¶606 are related to the various data platforms used by the CPD. Instead of focusing on improving each individual data platform, the CPD will be taking a broader approach.

In our conversations with the CPD, as well as through our own observations, it is clear that one of the biggest challenges with the CPD's data collection is the need to utilize a number of different platforms when documenting a single event. For instance, the CPD provided an example involving an incident resulting in arrest and officer use for force incident. In that example, the CPD noted that the call information would be captured in the Computer-Aided Dispatch (CAD) system, the In-

cident Case Report would be captured in the Automated Incident Reporting Application (AIRA) system, the arrest report would be documented in the CLEAR system, and the *Tactical Response Report* (TRR) would be captured in the CLEARnet system.

The CPD has already identified some of the problems with its data management and believes that addressing operational systems is a primary concern. The CPD expressed that any assessment by an outside group conducted under ¶606 would either: (a) include piece-meal recommendations for each data platform (which does not solve the problem associated with different platforms); or (b) recommend consolidation of data platforms (which CPD is now planning to do). An assessment which recommends consolidation of data platforms would necessarily need to be repeated to ensure that the consolidated platform continues to meet the requirements of the Consent Decree.

The IMT understands the CPD's position that resolving the challenges of using multiple data platforms to collect required data is of the highest priority. Thus, the CPD will focus on accomplishing the requirements of subsections (f) and (g). The IMT will not, however, ignore the requirements of subsections (a) though (e) while the CPD is focused on (f) and (g). In evaluating each section of the Consent Decree, the IMT reviews the data being collected, the manner of collection, the frequency of data updates, the quality control mechanisms in place, and the associated software. Therefore, the CPD is receiving continuous feedback to improve their data collection while they focus on consolidating applications.

Until a complete assessment contemplated by ¶606 is completed, the CPD will not be in compliance with the requirements of this paragraph. However, the CPD's approach to resolving the issues with its data platforms as a first step is understandable. As the CPD is partially approaching the requirement of ¶606, we would also expect to see a corresponding partial approach to ¶607 (see below), which includes developing a plan for resolving the issue, including a timeline. For future reports, we will assess the CPD's plan as well as their progress toward consolidating systems. Looking ahead, Full compliance will require a comprehensive assessment to ensure that all systems are functioning appropriately.

# Data Collection, Analysis & Management: ¶609

**609.** *On an annual basis, to improve the accuracy, reliability, and efficiency of its data collection, CPD will review and, as necessary, revise departmental forms relating to: use of force, arrests, interactions with individuals in crisis, and the disciplinary process.*

---

**Compliance Progress**          (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

| | | | |
|---|---|---|---|
| **Deadline:** | December 31, 2019 | ☐ **Met** | ☑ **Missed** |
| | March 5, 2021* | ☑ **Not Yet Applicable** | |

*Extended from December 31, 2020, due to COVID-19

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not Yet Assessed*
**Full:**     *Not Yet Assessed*

In the third reporting period, the City and the CPD did not meet Preliminary compliance with ¶609, and missed the December 31, 2019 deadline to review and revise its forms consistent with ¶609's requirements.

As they related to the Consent Decree sections on Use of Force and Crisis Intervention, the CPD has extensively reviewed and revised the forms related to use of force (TRR) and interactions with individuals in crisis (CIT Report). Both the TRR and the CIT Report have been revised in accordance with IMT comments. However, the IMT has not determined whether forms related to arrests and disciplinary processes have recently been revised. Additionally, the CPD has not yet revised its policy to require the annual review of arrest and disciplinary forms. Memorializing the requirements of ¶609 into CPD policy is necessary for the CPD to achieve Preliminary compliance. For subsequent levels of compliance, we will consult with the CPD regarding a documented standardized process for conducting such reviews and revisions, thereby acting as a training mechanism for form review. Finally, the IMT looks forward to evaluating whether forms have been revised as necessary to meet the requirements of the Consent Decree.

# Data Collection, Analysis & Management:
# Compliance Updates

As noted in the Introduction of this report, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to various unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT—which are also referenced in the Introduction of this report—the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs, including ¶¶571–73 and 608 of the Data Collection, Analysis & Management section.[286]

\*\*\*

## Consent Decree ¶571

*571. CPD must have an electronic system that accurately and reliably tracks all data derived from reportable use of force incidents, including: a. the response by CPD members during the incident, including the type(s) of force used; b. the date, time, location, and district of the incident; c. whether a foot or vehicle pursuit occurred that is associated with the incident; d. the actual or, if unavailable, perceived race, ethnicity, age, and gender of the subject; e. the name, watch, employee number, and unit and beat of assignment of any CPD member(s) who used force; f. CPD units identified in the incident report as being on the scene of the use of force incident; g. whether the incident occurred during an officer-initiated contact or a call for service; h. the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used; i. the subject's actions that led to the CPD member's use of force; j. whether the CPD member perceived that the subject possessed a weapon and, if so, what type(s); k. whether the subject possessed a weapon and, if so, what type(s); l. whether reportable force was used against a subject that was handcuffed or otherwise in physical restraints; m. any injuries sustained by CPD members; n. any injuries sustained or alleged by the subject(s) and any medical treatment that was offered or performed on the*

---

[286] In the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

*scene of the incident; o. for each weapon discharged by an officer, including firearms, Tasers, and OC devices, the number of discharges per weapon; and p. whether the subject was charged with an offense and, if so, which offense(s).*

## Compliance Update

After a use of force event, officers are required to complete a Tactical Response Report (TRR) which contains the requirements of ¶571. The IMT, however, is in the process of working with the CPD to enhance the form. After the TRR is completed, the data is entered into the Automated Tactical Response Report (A-TRR) application, where it is stored in the CLEARnet system. The database is then used to generate the Use of Force Dashboard (*see* ¶¶581 and 582). The CPD therefore has a system and database consistent with the requirements of ¶571. Additionally, the FRD acts as an audit mechanism for the data being entered into the A-TRR, ensuring that officers are reliably documenting the force event.

Although CPD officers have been trained on completing prior versions of the TRR, the force documentation and review process has undergone numerous changes as a result of Consent Decree requirements. Thus, we expect the CPD to provide updated training to all members on completing the TRR to ensure that the data system is being filled with reliable data. Such training will be necessary for Secondary compliance, with Full compliance depending on ongoing data auditing and reliable tracking related to ¶¶ 572, 581, and 582. Additionally, we commend the CPD for developing supervisory training in this area (as we are not aware of any prior supervisory training on reviewing TRRs in a standardized way), including the following:

- an in-service supervisor refresher course for 2021 that addresses TRR issues, including report writing, use of force, and comments from the audit division and the FRD (*see, e.g.*, ¶222 above); and

- a *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* and a *TRR Training Worksheet for Supervisors*.

## Consent Decree ¶572

*572.* CPD will regularly review citywide and district-level data regarding reportable uses of force to: a. assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status; and b. identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice.

## Compliance Update

As evidenced by our assessments of ¶571 and ¶581, the CPD collects and maintains sufficient data to conduct the types of analysis required by ¶572. However, the IMT has not been provided with sufficient policy documentation that memorializes the "regular review" required by ¶572 and that clearly identifies the responsible entity for conducting such reviews. The CPD has also failed to provide the IMT with sufficient training documentation detailing how such reviews will be conducted. Although the Force Review Division's (FRD's) SOP (2020-001, *Force Review Division Standard Operating Procedure*) contains elements of overall force data evaluation, it does not contain the specific requirements of ¶572. Should the FRD have primary responsibility for conducting the ¶572 reviews, the SOP must be updated to memorialize the particular requirements.

As required by ¶573, we are still awaiting a methodology for the regular review as described in ¶572. Assuming a qualified analyst within the CPD is tasked with conducting the review, we would consider this methodology to satisfy the training element of ¶572. Upon receipt of the methodology, the IMT will provide comments and suggestions as necessary to ensure the methodology is reflective of the review required by ¶572. In doing so, the IMT will also ensure that the methodology comports with published, peer-reviewed methodologies and the broader Consent Decree.

## Consent Decree ¶573

*573. Prior to conducting the initial assessment required by Paragraph 572, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement.*

### Compliance Update

The IMT is still awaiting the CPD's methodology for the assessment required by ¶573. Upon receipt of the methodology, the IMT will provide comments and suggestions as necessary to ensure the methodology is reflective of the review required by ¶572. In doing so, the IMT will also ensure that the methodology comports with published, peer-reviewed methodologies and the broader consent decree.

## Consent Decree ¶607

*607. Within 90 days of completion of the assessment described in the preceding paragraph, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified to enhance CPD's information collection mechanisms and data management technology ("Data Systems Plan"). CPD will implement the Data Systems Plan in accordance with the specified timeline for implementation.*

### Compliance Progress                    (Reporting Period: Mar. 1, 2020, through Dec. 31, 2020)

Paragraph 607 is a moving deadline, which did not apply in the third reporting period. *See* ¶606. As noted in our assessment of ¶606, the CPD's consolidation of data systems has taken priority over a broader assessment of information collection mechanisms and data management technology. However, in response to ¶607, the IMT expects to see a detailed plan from the CPD for resolving the issue, including a timeline. We then expect the CPD to execute a broader assessment as required and a corresponding broader plan for implementation.

## Consent Decree ¶608

> **608.** *CPD will continue to maintain an Information Systems Development Group ("ISDG"). The ISDG will continue to be chaired by the Chief of the Bureau of Technical Services or other high-ranking member of CPD's command staff. The ISDG will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; conducting criminal investigation and processing juvenile offenders; initiating and conducting investigations of organized crime; overseeing the administrative aspects of CPD; managing data, technology, and information systems; coordinating and exercising supervision over disciplinary matters; administering training; providing legal advice; developing and publishing department policies and procedures; and overseeing and coordinating CPD's budget and fiscal responsibilities. The ISDG will be responsible for: a. ensuring implementation of the Data Systems Plan; b. ensuring CPD's information collection mechanisms and data management technologies are in the best long-term interests of the Department for improving operations and management consistent with the terms of this Agreement; and c. recommending strategies to promote the development, sharing, and reporting of relevant information to the Superintendent, the public, the FRB, COPA, BIA, and OIG.*

### Compliance Update

It is the IMT's understanding that the Information Systems Development Group (ISDG) is no longer meeting and was disbanded prior to the approval of the Consent Decree. From conversations with the Parties, we understand that the intent of this paragraph is to ensure that the responsibilities found in subsections (a) through (c) are assigned to a group that can incorporate the feedback of "personnel from various units of the Department" as listed in ¶608. At the time of the Consent Decree negotiations, the ISDG was the natural choice for the unit that should be responsible. As ISDG is no longer meeting, the responsibilities of ¶608 have largely fallen to the Commander of the Strategic Initiatives Division. The IMT looks forward to learning more about the Commander's approach to achieving compliance.

Although we do not believe that the ISDG needs to reconvene, we do believe that the CPD will need to recreate the input process reflective in the ISDG. This may be accomplished by holding regular meetings with individuals within the Strategic Initiatives Division, memorializing some of the requirements of ¶608 as part of those

regular meetings, and memorializing a standard process for when and how representatives from other units will provide necessary input. This input process is especially important for ensuring the long-term interests of the CPD for improving operations and management. We look forward to discussing this issue further with CPD.

# XI. Implementation, Enforcement & Monitoring

This is the last section of the Independent Monitoring Team's (IMT's) third semi-annual Independent Monitoring Report. It includes our status updates for the City of Chicago's (City's) and its relevant entities' efforts from March 1, 2020, through December 31, 2020, regarding the implementation, enforcement, and monitoring obligations of the Consent Decree.

As we identified in our Monitoring Plan for Year Two, the City has certain obligations that fall outside of the 10 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 10 topic areas of the Consent Decree. For this reason, the IMT is providing updates on the City's efforts under the following paragraphs: ¶¶677–79, 683–86, 711, and 720.

## Consent Decree ¶677–68

> **677.** The City and CPD agree to hire, retain, or reassign current City or CPD employees to form a unit with the knowledge, skills, and abilities necessary to facilitate compliance with this Agreement.

> **678.** At a minimum, CPD will designate personnel to be responsible for: a. coordinating the City's and CPD's compliance and implementation activities; b. facilitating the provision of data, documents, materials, and access to the City's and CPD's personnel to the Monitor and OAG, as needed; c. ensuring that all data, documents, and records are maintained as provided in this Agreement; and d. assisting in assigning implementation and compliance related tasks to CPD personnel, as directed by the Superintendent or the Superintendent's designee.

### Status

The City and the Chicago Police Department (CPD) have made strides toward garnering the resources necessary to achieve compliance with the Consent Decree. The City and the CPD have designated the following entities to be responsible for the following provisions of ¶678:

678(a): the CPD's Office of Reform Management and the City's Department of Law;

678(b) and (c): the CPD's Office of Legal Affairs and the City's Department of Law; and

678(d): the CPD's Office of Reform Management.

Overall, personnel from the City, the CPD, and other relevant City entities have been helpful to the IMT. These representatives frequently arrange communications and help the IMT navigate the complexity of the City entities.

We have, however, had a few specific concerns about the lack of consistent staffing levels in the Office of Reform Management and the high level of turnover in the year and a half since the Consent Decree began. The Office of Reform Management is located within the CPD's Office of Constitutional Policing and Reform and works closely with the CPD's Office of Legal Affairs and the City's Department of Law. The personnel in these groups have much of the "knowledge, skills, and abilities necessary to facilitate compliance with this Agreement." The City's Department of Law provides many of the project management functions for the relevant city entities—the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC). The Office of Reform Management provides many of these project management functions for the CPD.

Since the beginning of the Consent Decree, we have had concerns regarding a lack of direct participation from CPD Command staff in reform activities. It is unclear to the IMT, for example, whether Command staff regularly reviews policy revisions or training curricula before they are submitted to the IMT and the Office of the Illinois Attorney General (OAG) for review. CPD leadership does not seem to be a part of the "unit" described above. The parties recognize that the CPD's leadership—from sergeants up to the Superintendent—must consistently and intentionally participate in reform to achieve compliance with the Consent Decree more expeditiously.

We also note our concern with the staffing in a few other units within the CPD that are crucial drivers of Consent Decree compliance. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the following key departments: the Research and Development Division, the Force Review Division, the Legal Affairs Division, the Training Division, the Crisis Intervention Team, and the Office of Reform Management.

Further, during the first two reporting periods, we identified several additional staffing and resource needs. In late January 2020, Interim Superintendent Charlie Beck made significant changes to the CPD organizational chart, which placed re-

sponsibilities for the Consent Decree's reform efforts throughout the CPD's leadership.[287] In both July and October 2020, after Superintendent David Brown had taken over for Interim Beck, he made additional changes to the CPD organizational chart. As we noted earlier, changes in leadership can disrupt efforts toward reform during transition periods and this report reflects those challenges.

Many of the City's and CPD's efforts and achievements in the first two reporting periods continued into the third reporting period. The City Department of Law, along with the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78), continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

We recognize that the City's and the CPD's resources are limited. As referenced above, the City and the CPD have already added many resources to their compliance efforts.

In our first report, we recommended that the City and the CPD increase resources and staffing to various departments. In response, the CPD increased staffing in the following departments:

❖ **The Research and Development Division.** The Research and Development Division frequently works with the IMT to develop compliance documents and policies. As a result, increases in staffing in this department reduced bottlenecking with limited personnel.

❖ **The Force Review Division.** As discussed further in the Use of Force section above the Force Review Division is critical to several Consent Decree requirements. The CPD agreed that the workload of this department was greater than the department's capacity and increased staff in the second reporting period.

Before COVID-19, many of these staffing increases had begun to make the City's compliance efforts more efficient. While we understand that ongoing challenges continue based on limited resources and staff and the effects of COVID-19, we reiterate the need for the City and the CPD to devote increased resources and staffing to the Legal Affairs Division, the Training Division, and Crisis Intervention.

---

[287] *See News Release - CPD Announces Transformative Organizational Plan to Maximize Resources, Prioritize Reform and Move More than 1,100 Officers Closer To City Streets*, CHICAGO POLICE DEPARTMENT (January 30, 2020), https://home.chicagopolice.org/cpd-announces-new-organization-for-command-plan/ (including organizational charts).

## Consent Decree ¶679

> **679.** *The City and CPD agree to collect and maintain all data and records necessary to document compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable compliance reviews and audits.*

### Compliance Status

As we have noted in our previous Independent Monitoring Reports and in the Data Collection, Analysis, and Management section of this report, the City and the CPD are not currently collecting and maintaining "all data and records necessary to document compliance with this Agreement." This is due, in part, to pervasive data systems challenges. We need complete and verifiable data to assess compliance across all areas of the Consent Decree. The research, analysis, and data collection under the Consent Decree and best practices are demanding. To effectively identify and resolve existing and upcoming challenges, the City and the CPD must maintain, track, and analyze the data. To meet these challenges, the City, the CPD, and the OAG continue to engage in data discussions for each topic area. Based on these discussions, there is universal agreement that the CPD has a long way to go to meet the data requirements of the Consent Decree.

The CPD still does not have a consistent system for auditing and validating its data systems or correcting and upgrading those systems based on regular audits. While the CPD may be maintaining, assessing, and correcting data system problems regularly, it is not doing so based on a regular audit process.

In short, the CPD does not currently have the data resources and systems in place to meet the demands of the Consent Decree. We are aware that the CPD is in the process of assessing and reorganizing several facets of its data management systems and hope that the reorganization is effective. We will continue to work with the City and the CPD to ensure that these efforts continue.

## Consent Decree ¶680

**680.** *Beginning with the Monitor's first report filed with the Court, and for each subsequent semiannual report by the Monitor, the City agrees to file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement.*

## Compliance Status

The City filed the status reports required by ¶680 before the IMT issued its monitoring reports for the first two reporting periods. The City filed its first semiannual status report with the Court on September 3, 2019,[288] and its second semiannual status report with the Court on March 5, 2020 (five days after the deadline).[289] The City's status reports assess its progress implementing the requirements of the Consent Decree and address topics including staffing, resources, and departmental reorganization; documents and data production; policy revisions; and community engagement.

The City filed its third semiannual status report on February 7, 2021.[290] As with the IMT's semiannual reports, the City's reports will likely become longer and more detailed over time. The City has shown the IMT that it is taking this obligation seriously by providing the IMT with a draft of the status report in January 2021.

---

[288] *See The City of Chicago's Semiannual Status Report*, City of Chicago (September 3, 2019), https://home.chicagopolice.org/wp-content/uploads/2020/06/Citys-First-Status-Report-IMR-1-2019-.pdf.

[289] *See The City of Chicago's Amended Second Semiannual Status Report*, City of Chicago (March 5, 2020), https://home.chicagopolice.org/wp-content/uploads/2020/06/5-March-2020-City-of-Chicago-Consent-Decree-Status-Report-Amended.pdf.

[290] *See Chicago Police Department Reform Progress Update*, City of Chicago (February 7, 2021), https://home.chicagopolice.org/wp-content/uploads/2021/02/CPD-Reform-Status-Report-compressed.pdf.

## Consent Decree ¶683

**683.** *CPD will notify the Monitor as soon as practicable, and in any case within 24 hours, of any officer-involved shootings, any death of a person in CPD custody, or any arrest of a CPD member. In the event a CPD member is arrested by a law enforcement agency other than CPD, CPD will notify the Monitor as soon as practicable, and in any case within 24 hours of receiving notice of the arrest. The Monitor will cooperate with the City to obtain access to people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.*

### Compliance Status

Since the beginning of the monitoring process, the CPD has consistently notified the IMT of any officer-involved shootings, any death of a person in CPD custody, and any arrest of a CPD member within 24 hours after the event through its Crime Prevention and Information Center (CPIC) email notification system.

As of the date of this report, three members of the IMT are subscribed to the CPIC notification system and receive emails about these events automatically. The IMT and the City have provided access to City personnel and facilities across entities and has allowed members of the IMT to observe and learn more about officer-involved shooting scenes and processes.

## Consent Decree ¶684

**684.** *The City and CPD will ensure that the Monitor has prompt access to all City and CPD documents and data related to the Agreement that the monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any communications, documents, or data to which access is limited or precluded by court order, or protected by the work product doctrine or the attorney-client privilege (collectively, "privilege").*

### Compliance Status

The City and the CPD have made many efforts to provide the IMT with access to documents and data relevant to the Consent Decree.

As noted in our first two monitoring reports, we had significant concerns regarding document and data productions, as a significant number of materials would arrive at or near the end of the reporting period. While this challenge continued in the

third reporting period, the City and its relevant entities made significant improvements. Further, near the end of the reporting period, the City and the CPD shared plans to improve the quality of their document and data productions. We welcome and look forward to those developments.

Further, early in the Consent Decree, the IMT and the OAG began to have concerns regarding how promptly the City and some of the City's relevant entities respond to requests for information. In the third reporting period, the City, the CPD, the OAG, and IMT dedicated significant time toward addressing these concerns and improving the request and production procedures.

Still, the IMT seeks consistent access to certain existing CPD data systems, such as CLEARNet and Evidence.com. We look forward to working with the City and the CPD to resolve the access issues and hope for more timely responses to our requests for information in future reporting periods.

## Consent Decree ¶¶685 and 686

**685.** *Privilege may not be used to prevent the Monitor from observing training sessions, disciplinary hearings, or other CPD, COPA, or Police Board activities or proceedings that do not involve the provision or receipt of legal advice. The City is not required to provide the Monitor with access to documents or data that is privileged. Should the City or CPD decline to provide the Monitor with access to communications, documents, or data based on privilege, the City or CPD will inform the Monitor and OAG that documents or data are being withheld on the basis of privilege which may, but need not be, in the form of a privilege log. If the Monitor or OAG objects to an assertion of privilege, the Monitor or OAG may challenge the propriety of the privilege assertion before the Court.*

\*\*\*

**686.** *In coordination with the City's legal counsel, OAG and its consultants and agents will have access to all City and CPD personnel, facilities, training, documents, and data related to this Agreement, except any documents or data protected by privilege. OAG and its consultants and agents will coordinate with the City's legal counsel to access personnel, facilities, training, documents, and data in a reasonable manner that is consistent with OAG's right to seek enforcement of this Agreement and that minimizes interference with daily operations. The City is not required to provide the Monitor with access to communications, documents, or data that is privileged. Should the City or CPD decline to provide OAG with access to documents or data based on privilege, the City or CPD will inform OAG that that documents or data are being withheld on this basis, which may, but need not be, in the form of a privilege log. If OAG objects to a privilege assertion by the City or CPD, OAG may challenge the propriety of the privilege assertion before the Court.*

### Compliance Status

We do not believe that the City has deliberately used privilege to prevent us from accessing events (such as training sessions or meetings), documents, data, or communications "that do not involve the provision or receipt of legal advice" per ¶685. While we have concerns that some materials are being withheld as a matter of course, we have noted significant improvements regarding the willingness to share confidential information with the IMT on a timely basis.

The CPD has recently updated its draft policies and procedures regarding IMT access. While we continue to have some concerns regarding the specific language in certain sections of those policies and procedures, we recognize that these policies are important to incorporating compliance and reform into the CPD's procedures and look forward to finalizing those policies and procedures.

Further, since the beginning of the Consent Decree, there have also been access issues and disputes between the OAG and the City. While there continue to be challenges at the end of the third reporting period, we believe that the City and the OAG, collectively the Parties, are making progress toward resolving those issues.

## Consent Decree ¶711

> **711.** *Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.*

### Compliance Status

As explained in previous Monitoring Reports, the City is a party to collective bargaining relationships with four labor unions representing sworn police officers:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains (collectively, the "Unions").

Paragraph 711 of the Consent Decree harmonizes the City's statutory bargaining obligations with the officers' exclusive representatives (the Unions), on the one hand, and the City's Consent Decree obligations, on the other. In so doing, Paragraph 711 adopts the following key tenets:

- As a threshold matter, the Consent Decree is not intended to alter collective bargaining agreements or to impair or conflict with the collective bargaining rights of the Unions;

- Likewise, the Consent Decree does not obligate the City (or the Unions) to violate the terms of their collective bargaining agreements, or to violate or waive any bargaining rights or obligations;

- Nevertheless, in recognition of the fact that the City's agreements with the Unions can and will directly impact its compliance with various provisions in the Consent Decree, the Consent Decree obligates the City to "use its best efforts" in the collective bargaining process "to secure modifications" to its collective bargaining agreements covering sworn officers that are consistent with the terms of the Consent Decree or to the extent necessary to implement the provisions of the Consent Decree.

The City's most recent collective bargaining agreements with the Unions have expired. Over the last several years—beginning before the start of the Consent Decree—the City has been engaged in negotiations with the Unions for successor agreements. While negotiations continue, the City applies the provisions of the expired agreements.

To monitor compliance with ¶711, the City, the IMT, and the OAG met on a near-monthly basis throughout the first, second, and third reporting periods to discuss updates on the City's efforts to negotiate successor labor agreements with each of the Unions. The Independent Monitor also met with the new FOP President during this reporting period. *See* ¶671.

During these meetings, the City provided access to members of its bargaining committee. These members explained the City's various proposals, consistent with the Consent Decree, which the City made to the Unions to modify terms in the expired labor agreements. Among its proposals, the City has sought to modify the process for receiving and investigating complaints of officer misconduct, including allowing for the investigation of complaints that are anonymous or not backed by a sworn affidavit. *See, e.g.*, ¶¶421, 425, 427, 431, 461, 462, 475, 477, 508, and 514. The City also has proposed changes to retain disciplinary records indefinitely, rather than for five years. *See* ¶508.

However, the Unions have consistently rejected these proposed changes. As a result of the parties' continuing disputes on these and other proposed contract

terms, the City has yet to secure an agreed settlement for a successor labor agreement with any of the Unions. Nevertheless, the City has made varying degrees of progress with the separate Unions since the last Monitoring Report.

With the PBPA, in particular, the last Monitoring Report explained that the City and the Union advanced their bargaining dispute to "interest arbitration." Through this process, both parties presented their positions on various disputed contract proposals to a three-member Interest Arbitration Board, comprised of one appointee from each of the respective parties and a third "neutral" arbitrator. Following the parties' presentations and briefing, the Board issued its decision and award on June 26, 2020. Significantly, the Board's decision accepts the City's position with respect to several disputed contract proposals that have direct impact on Consent Decree provisions. Most notably, the decision confirms the City's right to use anonymous complaints as a basis for investigations of alleged officer misconduct, a practice that has been vigorously disputed by the Unions (and had been disallowed by a prior grievance arbitration decision).

The Board's decision likewise accepts the City's position regarding the retention of disciplinary records. The Union's position was that these records must be purged five years after the date of the underlying incident. However, the Board's decision permits the City to retain these records indefinitely, provided that "non-sustained files" are not used for purposes of determining promotions or in making assignments.

After the Board issued its decision and award in the PBPA interest arbitration, the Union filed a state court lawsuit seeking to have the decision vacated. Regarding the anonymous complaints provision, in particular, the Union argues that the arbitration Board lacks authority to permit the investigation of anonymous complaints because, according to the Union, Illinois state law precludes the practice. The Union's state court challenge to the interest arbitration decision remains pending.

The City's progress with the FOP has been slower. The City's last labor agreement with the FOP expired on June 30, 2017. The City has been bargaining with the FOP for a successor agreement, off and on, since July 2017. On November 22, 2017, the Union requested mediation, and on October 25, 2019, the Union demanded compulsory interest arbitration. The Parties have not yet selected an interest arbitrator, but rather have continued to meet sporadically (largely without success).

FOP bargaining over this past year has been particularly slow and delayed, at least somewhat, by the election of new FOP leadership in mid-2020. The City met with the new Union leadership and bargaining team on several occasions during the third and fourth quarters of 2020, but there appears to be no reasonable prospect of an agreed settlement in the near term.

Rather, the FOP and the City continue to litigate various issues that implicate the City's obligations under the Consent Decree in proceedings before the Illinois Labor Relations Board (ILRB). One such matter involves the use of body-worn cameras, including the City's right to implement a policy requiring body cameras and to discipline officers based on camera recordings. The dispute originated in 2018 but has been held in abeyance at the ILRB while the parties have attempted (unsuccessfully) to resolve it in bargaining. The matter is now active again at the ILRB, and the parties expect a decision from the Labor Board during the first half of 2021.

At the same time, the FOP has pursued multiple petitions for declaratory relief before the ILRB's General Counsel. One concerns the City's proposal (similar to its proposal to the PBPA) to allow for investigation of anonymous complaints of officer misconduct. The others concern "point and report" requirements and the scope of the contractual grievance process.

In October 2020, the ILRB General Counsel issued "declaratory rulings" on the FOP's petitions, finding the following: (1) the City's bargaining proposals to eliminate the affidavit requirement for complaint register investigations of non-criminal conduct and to eliminate the obligation to inform officers of a complainant's name before interrogation are permissive subjects of bargaining (meaning that because they are not mandatory subjects, the FOP can refuse even to discuss the City's proposals to change these terms), but the City's proposal for the indefinite retention of disciplinary records is a mandatory subject of bargaining; (2) the Union's proposal to narrow the "point and report" policy is not subject to a bargaining obligation, but disciplinary issues surrounding the policy, such as the penalty for failure to report and the use of collected information, can be bargained separately to address employees' concerns; and (3) the City's bargaining proposals to remove certain discipline from the contractual grievance process are permissive subjects of bargaining and its proposal regarding the non-binding nature of safety-related arbitral decisions is a mandatory subject of bargaining. The parties continue to assess any further actions in response to these divided declaratory rulings.

This ongoing litigation, in various forums, impacts the parties' bargaining progress and whether the City's efforts to modify the collective bargaining agreements to comport with the language and provisions of the Consent Decree will be successful. Moving forward, we will continue to monitor and report on the City's efforts to secure modifications consistent with the Consent Decree and that do not compromise the collective-bargaining process or any rights in that process.

## Consent Decree ¶720

**720.** *At all times, the City will bear the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement.*

### Compliance Status

To reach compliance with the Consent Decree, the City and the CPD must provide the IMT with sufficient evidence that they are making reforms. The CPD must also show that it has appropriate procedures that will effectuate timely and sustainable compliance.

We believe that the City understands that it holds the burden of demonstrating compliance with the Consent Decree. In fact, we believe that the City and many of its relevant entities have taken increased ownership over this obligation through large unilateral productions of compliance records. Since the City and its entities have started making these productions, the number of OAG and IMT requests for information has decreased. While there continue to be challenges with the City meeting the remaining requests for productions, there has been a notable improvement over previous reporting periods.

# Conclusion and Looking Ahead to Independent Monitoring Report 3

We have concluded our monitoring efforts for the third reporting period (March 1, 2020, through December 31, 2020). The City met additional Consent Decree requirements during this reporting period while facing a number of challenges, including the COVID-19 pandemic; sustained protests throughout the Chicago; civil unrest; rising violent-crime rates; and many leadership changes. Despite existing and emerging challenges, the Parties and the IMT continue to work together to improve policies, training, and practices.

In the near future, we will release several reports to reflect additional Consent Decree efforts, challenges, and achievements. These will include the following reports:

- The IMT's Special Report regarding the City's and the CPD's Responses to Protests and Unrest;

- The IMT's Special Report on its Year Two Community Focus Groups; and

- The IMT's Monitoring Plan for Year Three (January 1, 2022, through December 31, 2022).

We continue to remain encouraged by the city- and nation-wide attention to police reform, and we are hopeful that the reform efforts by many members of the City; the CPD; COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; and the OEMC will continue and increase. Significant and sustained efforts are necessary to achieve the goals of the Consent Decree.

The IMT's next semiannual report, Independent Monitoring Report 4, will cover the reporting period from January 1, 2021, through June 30, 2021. As with previous reports, we will continue to work with the City and the OAG to address the paragraphs we assessed in the first, second, and third reporting periods.

# Attachment A.
# Office of the Illinois Attorney General
# Comments
# March 18, 2021



# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

March 18, 2021

**SENT VIA EMAIL**

Margaret A. Hickey
Independent Monitor
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
***Via Email*** ([MHickey@schiffhardin.com](mailto:MHickey@schiffhardin.com))

**Re:    Comments on the Third Independent Monitoring Report**
       **Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the Third Monitoring Report (Third Report) before it is filed with the Court. The Third Report covers an extraordinary time period in the history of Chicago—one marked by the COVID-19 pandemic and a nationwide outcry for racial justice sparked by police misconduct. Both of these experiences confirm that the Chicago Police Department (CPD) is not close to where it needs to be on the long path to reform.

Prior to the onset of the COVID-19 pandemic, the City and CPD were significantly behind schedule in implementing their Consent Decree obligations. The pandemic compounded these pre-existing delays. Despite a 64-day extension for certain Consent Decree deadlines covering the duration of Governor J.B. Pritzker's "stay at home" orders, CPD has not kept pace with required reforms. OAG acknowledges the COVID-19 pandemic posed unanticipated challenges, but it is essential that CPD redouble its compliance efforts to make up for time lost both before and during the pandemic.

CPD's response to the protests over George Floyd's death also epitomized entrenched problems in its practices and culture. Whether through visibly refusing to comply with public

500 South Second Street, Springfield, Illinois 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • Fax: (217) 782-7046
100 West Randolph Street, Chicago, Illinois 60601 • (312) 814-3000 • TTY: (312) 814-3374 • Fax: (312) 814-3806
1001 East Main, Carbondale, Illinois 62901 • (618) 529-6400 • TTY: (618) 529-6403 • Fax: (618) 529-6416

health precautions like wearing masks, obscuring badge numbers and nameplates, or using excessive force, a significant number of CPD officers (though not all) took actions that were openly hostile to the culture of accountability required by the Consent Decree. This must change. For the third year of the Consent Decree, which began on March 1, 2021, OAG urges the City and CPD to take concrete steps to change culture, prioritize de-escalation, hold officers and supervisors accountable, accept community feedback, and begin to build community trust in CPD.

Below are OAG's comments on the City's compliance efforts in the Third Monitoring Period. First, OAG summarizes the City's major compliance efforts in each area of the Consent Decree. Second, OAG outlines three key obstacles that the City and CPD must overcome to achieve Consent Decree compliance.

### Summary of the City's Compliance Efforts[1]

#### Areas with Continuing Challenges
*(1) Impartial Policing; (2) Accountability and Transparency; and (3) Data Collection, Analysis, and Management*

Although the Consent Decree went into effect two years ago, CPD has yet to develop or improve policies regarding officer interaction with some of Chicago's most vulnerable communities. These critical policies are fundamental to the **Impartial Policing** section. As the U.S Department of Justice reported in 2017, CPD has a pattern and practice of using force against, and failing to provide constitutional police services to, members of constitutionally protected classes.[2] Although OAG acknowledges CPD's efforts to seek community feedback via virtual focus groups, CPD failed to collect input from all of the most targeted communities, and had not incorporated much of the input it received into its policies and trainings. CPD failed to complete nearly all of the required Impartial Policing policies this reporting period, including on such important issues as prohibition against sexual misconduct and interactions with persons with disabilities. In the coming monitoring period, OAG urges CPD to focus its attention on catching up in these important areas and to proactively seek and incorporate diverse community input.

The City and CPD continue to remain out of compliance regarding most **Accountability and Transparency** requirements. The Third Report accurately assesses and characterizes CPD's efforts in this section. The slow pace of these efforts is concerning in light of the issues with accountability identified in the recent report by the City's Inspector General, such as evidence of CPD officers obscuring their identifying information and not complying with body-worn camera policies when responding to protests this summer.[3] Nonetheless, although CPD has met some level

---

[1] The Consent Decree is divided into 10 subject matter areas: (1) Community Policing; (2) Impartial Policing; (3) Crisis Intervention; (4) Use of Force; (5) Recruitment, Hiring, and Promotion; (6) Training; (7) Supervision; (8) Officer Wellness and Support; (9) Accountability and Transparency; and (10) Data Collection, Analysis, and Management.

[2] Department of Justice Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (Jan. 13, 2017) at 18, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPTREPORT.pdf.

[3] *See generally* City of Chicago Office of the Inspector General, *Report on Chicago's Response to George Floyd Protests and Unrest* (Feb. 2021), *available at* https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf.

of compliance with only 9% of the paragraphs for which it was assessed (or 5 out of 57 paragraphs), OAG would be remiss not to commend the leadership and staff of CPD's Bureau of Internal Affairs (BIA) for their dedication, quality work product, and commitment to the guiding principles of the Accountability and Transparency section of the Consent Decree. BIA proactively and collaboratively engaged with OAG and IMT during bi-weekly meetings and was receptive to recommendations and feedback. As the IMT noted in the Third Report, CPD is very close to being in preliminary compliance with several Accountability and Transparency requirements.

The Civilian Office of Police Accountability (COPA) struggled this reporting period to reach preliminary compliance with most of its obligations. In the Third Report, COPA was found in some level of compliance with only 20% of the paragraphs for which it was assessed (or 8 out of 40 paragraphs). That said, COPA's recent changes to its organizational chart and reorganization of staff have helped and will benefit COPA's operations and efforts to comply with the Consent Decree moving forward. OAG encourages COPA to adopt a more collaborative approach to receiving recommendations and feedback from OAG; COPA's seeming reluctance to proactively engage with OAG on Consent Decree requirements serves only to delay its compliance. OAG looks forward to working with COPA to reach preliminary compliance with more Consent Decree requirements in the next reporting period.

Finally, as noted in previous reporting periods, the City and CPD continue to fall behind on the **Data Collection, Analysis, and Management** requirements of the Consent Decree. While there has been progress made toward meeting requirements in this section in a few key areas (e.g., the public-facing use of force dashboard and increased staffing in the Force Review Division), overall, the City and CPD have placed this overarching work on the backburner. Data collection and analysis is critical to informing reform efforts across CPD, but CPD did not communicate with IMT and OAG regarding overall progress on this section during the reporting period. The City and CPD must prioritize the Data section during the upcoming periods to ensure that CPD catches up on the numerous missed deadlines.

### Areas with Mixed Progress
*(1) Community Policing; (2) Use of Force; and (3) Supervision*

CPD's primary focus for **Community Policing** was to draft and publish directives and Standard Operating Procedures (SOPs) that codify many of the requirements of the Consent Decree, enabling CPD to reach preliminary compliance for the first time for multiple paragraphs. This marks significant progress and will allow CPD to move forward with rigorous training and implementation of these policies to ensure that officers' and supervisors' conduct adheres to the principles of community policing. CPD also successfully instituted a public awareness campaign. That said, CPD did not complete or provide a plan for reviewing or revising its policies relating to youth and children. This failure has immediate and ongoing consequences; there are numerous allegations of officers traumatizing and pointing guns at children during "wrong raids" at homes in Chicago.[4] CPD's community working group on School Resource Officers also raised serious concerns, including a lack of student engagement. CPD also has failed to take steps to ensure that

---

[4] *See, e.g.*, *Samah Assad, Dave Savini, Another Family Files Lawsuit After Chicago Police Raid Wrong Home, Point Guns at 4-Year-Old*, CBS2 NEWS, Jun. 11, 2020, https://chicago.cbslocal.com/2020/06/11/anotherfamily-files-lawsuit-after-chicago-police-raid-wrong-home-point-guns-at-4-year-old/.

its crime reduction strategies are consistent with the principles of community policing. For example, OAG is concerned that CPD launched two citywide teams focused on combatting violent crime this summer, the Community Safety Team (CST) and the Critical Incident Response Team (CIRT), without sufficient regard for community policing principles. In the next monitoring period, OAG urges CPD to address these issues and develop effective in-service community policing trainings so that the philosophy of community policing extends to all parts of CPD, and is not relegated exclusively to the programs run by the Office of Community Policing.

CPD made some progress in the **Use of Force** section, but continued to resist reform and community feedback. In the spring, CPD published a revised Use of Force policy suite for its officers and for public comment. The Force Review Division (FRD) finalized most of its SOPs, increased its staffing levels, and began to catch up with its backlog of reviews. In an important move towards transparency, the FRD also began publishing its quarterly reports on CPD's website.[5] But, in the summer and fall, CPD failed to give meaningful consideration to the dozens of policy recommendations offered by its community working group on use of force, despite touting the group's formation publicly. Pressure from the Coalition, community groups, the media, IMT, and OAG compelled CPD to reconsider its position, but this reconsideration came too late for CPD to reach meaningful compliance in this reporting period and caused community members to doubt CPD's expressed commitment to reform. Additionally, CPD must use all of its data tracking, including FRD data and the Use of Force Dashboard, to identify and fix unit-wide, district-wide, or department-wide problems. OAG looks forward to seeing continued collaboration between CPD and the Use of Force Working Group and CPD's increased use of data to identify trends, improve supervision, and increase accountability. Finally, CPD's lack of use of force documentation and excessive force against protestors during the summer of 2020 is deeply troubling. CPD must use the failures identified in the recent report by the City's Inspector General and IMT's upcoming special report to inform its policies and practices on use of force and accountability.

CPD also showed mixed progress in the **Supervision** section. CPD has worked hard to roll out a new staffing and supervision pilot program in one district, but has yet to collect sufficient data to allow IMT and OAG to meaningfully assess progress or compliance. OAG is also concerned that CPD does not have overall staffing or supervisor numbers to implement this model citywide. Additionally, CPD hired an outside consultant to evaluate its performance evaluation system. While OAG commends this step, the length and scope of this pilot project will delay CPD's implementation of better performance evaluations in the rest of CPD's districts. Finally, while CPD continued to make efforts to update its general Supervisory Responsibilities policy, it will need to develop a clear process for tracking, recording, and measuring its progress for the Consent Decree's long-term supervision requirements.

**Areas with Progress:**
*(1) Crisis Intervention; (2) Recruitment, Hiring, and Promotion; (3) Training; and (4) Officer Wellness and Support*

CPD continues to invest significant time in developing policies incorporating requirements of the **Crisis Intervention** section of the Consent Decree. CPD has also developed SOPs, directives, and trainings to enact policy changes. In the coming monitoring period, CPD should continue

---

[5] *See* https://home.chicagopolice.org/reform/reports-and-resources/     .

to work with the Chicago Commission for Mental Health Equity and the public to receive and incorporate feedback on new directives, policies, trainings, and SOPs. CPD should also finalize and adopt SOPs after incorporating relevant feedback. Going forward, CPD must allow adequate time for public comment on new SOPs and directives, and provide sufficient data to assess outcomes. Further, CPD must provide sufficient evidence and explanation of how it incorporated underlying data, feedback, and research into various directives, plans, policies, and SOPs.

CPD has also made progress in the **Recruitment, Hiring, and Promotion** section of the Consent Decree. For example, CPD finalized its Captain and Commander job descriptions and is working to increase the transparency of its selection methods and processes. OAG encourages CPD to build officer trust in its processes by paying particular attention to transparency surrounding not just policies, but practices in the promotions processes. Additionally, CPD worked closely with the City's Inspector General to inform officers of its role in overseeing hiring and promotions and rolled out its training to more than 90% of its officers. OAG looks forward to hearing how CPD is evaluating its efforts to recruit and hire from a broad cross section of Chicago and how CPD will increase its outreach in diverse Chicago communities.

The mitigation efforts surrounding COVID-19 particularly affected CPD's progress towards compliance in the **Training** section of the Consent Decree. At times, CPD had to halt training altogether and was slow to ramp up again as the Education and Training Division navigated capacity limits in rooms, limitations and safety precautions for in-person training, and how to give remote training or modified in-person scenarios. While CPD still has a long road to meet Consent Decree requirements in this section, CPD has worked to meet the demands of the moment, despite unprecedented challenges. That said, CPD has not yet implemented all of these changes in the classroom. Further, CPD must improve its methods of tracking supervisory training requirements and whether trainings are tailored to each supervisory rank. CPD also has significant work to do in incorporating impartial policing principles, de-escalation strategies, and community and expert feedback into its training programs. OAG looks forward to seeing progress towards compliance in the Training section.

The Professional Counseling Division (PCD) is comprised of dedicated, experienced, and competent staff. PCD has made significant strides since the effective date of the Consent Decree. However, and as the IMT highlights in the Third Report, additional compliance with many provisions of the **Officer Wellness and Support** section of the Consent Decree requires that CPD procure technological software that will enable PCD to schedule, track, report on, and analyze its activities. In addition, while it is clear that PCD staff are dedicated to the spirit of the Consent Decree, CPD must make a more concerted effort to educate and train PCD staff on the Officer Wellness and Support requirements of the Consent Decree and documenting its compliance efforts.

## Challenges to Full and Effective Consent Decree Implementation

### Community Trust

Building community trust lies at the heart of the Consent Decree, but throughout the Third Monitoring period, as in the prior two monitoring periods, CPD failed to build relationships with or accept feedback from the people it serves. CPD did not listen to its own community working

groups in revising its policies regarding use of force[6] and school resource officers. CPD's response to a national movement protesting police brutality resulted in 526 complaints to COPA and BIA about excessive force and other unlawful police practices.[7] In the summer, CPD started the Community Safety Team and Critical Incident Response Team without adherence to the community policing principles that the Consent Decree requires. Unsurprisingly, IMT's community survey revealed that Chicagoans had drastically different opinions about CPD depending on their race, ethnicity, and age.[8] Compliance with the Consent Decree requires both the commitment to implement the required policies, trainings, and practices step-by-step and the vision to change culture and embrace reform.

## Long-Delayed Development of Critical Policies

In terms of policy development required by the Consent Decree, the City and CPD remain far behind. OAG appreciates that CPD's Research and Development Division, the Office of Community Policing, and the Bureau of Internal Affairs have worked hard to revise or develop some required policies, but OAG is particularly concerned that the following critical policies and plans remain incomplete:

- Permitting members of the public to record police officers performing their duties in a public place;
- Interactions with members of religious communities;
- Interactions with transgender, intersex, and gender nonconforming individuals;
- Effective communication and meaningful access to police services for individuals with physical, mental, or developmental disabilities;
- Prohibition against sexual misconduct by CPD members;
- Interactions with people with limited ability to speak, read, write, or understand English;
- Requirements for comprehensively investigating hate crimes;
- Officer-involved shootings and deaths;
- Policies relating to youth and children; and
- Department-wide crime reduction strategies.

In the coming year, the City and CPD must focus on policy development, listen to and incorporate community input from people with lived experiences with CPD, and commit to implementing the policies they promised to develop or revise under the Consent Decree.

---

[6] Patrick Smith, *CPD Largely Ignores Community Recommendations on When Officers Can Shoot, Taze or Use Other Force*, WBEZ, Oct 14, 2020, *available at* https://www.wbez.org/stories/cpd-largely-ignores-community-recommendations-on-when-officers-can-shoot-taze-or-use-other-force/ae115240-8fbf-4da0-8ced-7dd23f4e07f8.

[7] Civilian Office of Police Accountability, *Protest Related Complaints May 29, 2020 – December 31, 2020*, *available at* http://www.chicagocopa.org/wp-content/uploads/2021/01/Protest-Related-Complaints-Report-5-29-to-12-31.pdf.

[8] *See* Chicago Police Department Consent Decree Independent Monitoring Team, *Community Survey Report (November 2019-February 2020): A Special Report by the Independent Monitoring Team*, (Aug. 26, 2020), *available at* https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

**Lack of Robust, Uniform Data Collection Practices**

Finally, CPD must collect more data in a more efficient way, not only to allow IMT to assess compliance with the Consent Decree, but also for CPD's own improvement in developing crime-reduction strategies, identifying trends and concerns in use of force incidents, providing fair and accurate performance assessments, and measuring the effectiveness of accountability and supervisory mechanisms. The CPD and the City did not have a sufficient scale of data collection for requirements of the Consent Decree across several sections, e.g., use of force documentation, the timeframe in which arrestees are given phone calls, and data regarding when officers timely respond to crisis intervention team incidents. CPD must collect more and better data and make its numerous data systems function together.

## Conclusion

The Consent Decree requires not just a tremendous amount of work from the City and CPD. It also requires the City and CPD to embrace difficult change and work to build community trust. The OAG looks forward to working collaboratively with the City, CPD, the IMT, the Coalition, and other community stakeholders of this Consent Decree during the next monitoring period to overcome the challenges the OAG has identified and to increase progress on achieving sustainable reform.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: s/Mary J. Grieb
Mary J. Grieb
Deputy Bureau Chief, Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 11th Flr.
Chicago, Illinois 60601
Phone: 312-814-3877
Email: MGrieb@atg.state.il.us

cc: Tyeesha Dixon and Allan Slagel, Counsel for the City of Chicago; Dana O'Malley, General Counsel for the Chicago Police Department (via email)

# Attachment B.
# City of Chicago Comments
# March 25, 2021



<div align="center">

**City of Chicago's Comments to**
**<u>Third Independent Monitoring Period (IMR3) Report</u>**

</div>

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following comments to the Independent Monitoring Team's (IMT) March 1, 2021 draft *Independent Monitoring Report 3* ("IMR3 Report"). The City looks forward to continued compliance progress in the next monitoring period.

<div align="center">

**<u>Summary of the City's Increased Compliance Progress</u>**

</div>

The data in the IMR3 Report reflects that **the City has achieved some compliance with more than 55 percent** of the 276 paragraphs IMT has thus far evaluated for compliance **(153 out of 276)**.[1] The City has thus **increased the number of paragraphs with some compliance by 150%** since the last monitoring last period (61 paragraphs in IMR2; 153 in IMR3).

The Consent Decree mandates a minimum five years before full compliance with the Consent Decree can be reached. *See* Consent Decree Par. 714. Properly implementing all the reforms in the Consent Decree will take longer, based on the experiences of other large metropolitan cities and police departments with consent decrees (*e.g.,* Los Angeles, New Orleans, Seattle). This means that *less than two years* into a *minimum* five-year process, the City had already demonstrated some compliance with *over 27 percent* (153 out of ~550)[2] of the total assessable Consent Decree requirements—despite 2020's unprecedented challenges of a global viral pandemic and nationwide protests:



Consent Decree Paragraphs Assessment Status

---

[1] The City notes some minor discrepancies in the summary chart of the March 1, 2021, IMR3 Report draft. The numbers in this comment are based on the City's count of the underlying raw data. Specifically, the City counted that the IMT had evaluated 276 paragraphs and determined the City demonstrated some level of compliance with 153 paragraphs; an additional 41 remained under IMT assessment, so no compliance status had yet been determined.

[2] The number of assessable paragraphs (approximately 550) is based on the City's calculation. IMT has not yet reported this figure.



Thus, while the City and the Chicago Police Department (CPD) still have a long and challenging road ahead to fully implement long-term, sustainable, durable reforms, the IMR3 report reflects that the City and CPD have made measurable progress toward that end. The City has demonstrated a consistently upward trajectory toward achieving compliance with the overall Consent Decree—the most comprehensive policing consent decree of its kind.

Further, as reflected in the IMT's assessment narratives, the City has ***demonstrated some progress on nearly 100 percent of the paragraphs evaluated for compliance***, even where compliance has not yet been achieved. And, in many places, as reflected in some of the IMT's assessment narratives, the City and CPD have gone beyond the Consent Decree requirements in order to create sustainable and effective change. This was achieved during the same time period when the City and CPD were cooperating with two parallel inquiries, one of which IMT conducted, into CPD's response to the summer 2020 civil unrest. These inquiries required the City and CPD to facilitate more than 50 personnel interviews and the collection and production of thousands of documents.

The City acknowledges the areas that remain out of compliance and commits to continuing to work diligently toward the systemic change the Consent Decree contemplates. The City looks forward to continuing to work alongside the IMT, OAG, and community to implement the transformational change needed to make CPD a better department.

### IMR3 Achievements and Efforts to Accelerate Compliance

Despite the unique challenges experienced in 2020, CPD redoubled efforts to accelerate reform progress during IMR3. The Department instituted new processes and devoted additional resources to accelerate the pace of work on reform activity throughout the Department, while simultaneously making a concerted effort to more consistently and meaningfully include community, IMT, OAG, and other important stakeholder input during the development of these important changes.

Among numerous other CPD achievements, these efforts during IMR3 culminated in:

- More than 100 total revised policies and standard-operating procedures

- Implementation of a 32-hour Department-wide mandatory in-service training program, and modification or creation of more than 350 hours of classroom training curriculum

- Department units adding or backfilling 42 positions across the Department either wholly or partially dedicated to reform projects, and allocating an additional 57 sworn members to the Training Division to serve as instructors or instructor supervisors



- Creation of 36 data dashboards audits, and public reports—including public dashboards providing use of force and disciplinary investigation data
- Implementing process efficiencies that led to a 93 percent increase in the number of compliance submissions provided for IMT to conduct assessments.

Other examples of significant achievements the City accomplished in IMR3 included:

- The Civilian Office of Police Accountability's (COPA) creation, staffing, and engagement of a 19-member Community Policy Review Working Group comprised of community leaders and subject-matter experts in areas including police accountability, social justice, ethics, law, and mental health

- COPA's approval and implementation of approved training curricula.

Due to the above, and many other concerted efforts to prioritize reform, as reflected in the IMR3 report, the City and CPD increased the number of paragraphs with some compliance by 150 percent **even though the number of paragraphs evaluated increased by only 94 percent** since IMR2 (142 in IMR2; 276 in IMR3):



For example:

- The Office of the Inspector General (OIG) and Public Safety Inspector General (PSIG) achieved some compliance on 100 percent of paragraphs evaluated.

- Even with a 57 percent increase in the number of paragraphs evaluated, the City and CPD achieved some compliance on 90 percent of paragraphs evaluated in the Community Policing Section.

- Even with an 80 percent increase in the number of paragraphs evaluated, the City and CPD achieved some compliance on more than 80 percent of paragraphs evaluated in the Officer Wellness section.



### Deadlines Calculations

The Consent Decree can only be terminated if the City can show that it "sustained compliance with all material requirements" of the Consent Decree (Consent Decree Par. 717). The City's ultimate compliance with the Consent Decree therefore is determined by whether the City has adequately implemented the requirement through policy, training, and in operational practice (Consent Decree Par. 642), not deadline compliance. Therefore, the City and CPD have necessarily focused reform efforts on progressing toward sustained compliance and effecting systemic change, rather than strict deadline compliance.

Still, the City and CPD acknowledge that for a limited number of paragraphs, the deadlines are one benchmark the Consent Decree prescribes. Therefore, the City will continue to endeavor to meet deadline compliance when doing so will not interfere with or hinder long-term, sustainable reform. The City and CPD are focused on creating lasting reforms that do not lead to rushed results that prevent effective change or delay ultimate compliance.

The City provides the following global comments regarding the IMR3 Report's deadlines calculations:

***Dates not in IMR3***.  Throughout the report, IMT makes determinations about whether we met or missed deadlines for dates that did not fall in IMR-3 (*e.g.*, 12/31/19 or 2/29/20). However, the report states that IMT is assessing whether the City met deadlines "*in the third reporting period*". Per IMT's deadlines calculations, the following paragraphs did not have deadlines in IMR3: **Paragraphs 292, 246, 303, 321, 371, 609, 494, 523**.

***Application of COVID extension***. As IMT acknowledges, the Court granted the City a global 64-day extension for all deadlines that ran on or after March 27, 2020, due to the significant impact of COVID-19. However, in a number of assessments IMT does not acknowledge or apply the 64-day extension: **Paragraphs 292, 334, 523, 555, 561, 562, 596.**

***No deadline exists***. The City maintains its previously stated position that frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements. This is particularly true where the IMT has indicated a deadline such as "ongoing", and no specified date or metric is provided such that IMT or the City can assess whether a deadline was missed. *See, e.g.*, **Paragraphs 25, 80, 150, 192, 159**.

### Methodologies

The City respectfully disagrees with a number of the compliance methodologies identified in the report. As noted in prior correspondence, many of the methodologies add substantive requirements beyond the Consent Decree's legal requirements. Others do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.



However, as noted in the City's prior responses to the IMT's proposed methodologies, the City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics. Keeping with the spirit of Consent Decree Paragraphs 655 and 717, the City intends to continue engaging in ongoing dialogue with IMT to clearly define and align on the methodologies that will be applied for each assessment. The City therefore reserves the right to provide responses or objections to the compliance methodologies identified in the IMR3 Report, or the application of any methodology to a specific Consent Decree requirement.

The City appreciates the extensive amount of work and careful thought and consideration IMT put into the assessments, particularly the recommendations IMT has made to more effectively implement the Consent Decree and, in some places, go beyond the requirements of the Consent Decree. The City embraces that the Consent Decree is a floor, not a ceiling, on reform efforts. The IMT's perspective, experience, and recommendations have been valuable in advancing police reform in Chicago. The City looks forward to the continued engagement with IMT as we continue to move forward to progress reform.

### Comments on Specific Assessments

The City's below comments follow the order of sequence in the draft report:

1) **Paragraphs 53-57**

The draft report mischaracterizes Elucd's surveying methodologies and CPD's intended use of Elucd data, which is not to supplant all other public sentiment tools and data in the City, but to create a cost-effective and scalable tool to provide the City and CPD neighborhood-level measurements every month, enabling intra-city comparisons and trend analysis. As explained in more detail below, certain statements in the draft report are inaccurate.

*Online Surveying*. IMT's draft report states that "[w]hile nonprobability samples and web surveys are widely used today, the use of digital ads to recruit community members is not a method used by most survey researchers who conduct social science or community research (it is used primarily for marketing research)." However, online surveys are a widely used resource for gleaning a snapshot of public opinion, and they are one of many tools CPD has available to engage with the public. Professional organizations, such as the American Association for Public Opinion Research (AAPOR) and leading survey organizations, such as the Pew Research Center, have done extensive research into online surveys over the past decade and found that they can be a valuable tool for public opinion research.

Below are examples of recent academic research validating the types of methods that Elucd surveys employ, including research reflecting that digital ad-recruited surveys produce representative, reliable samples, including people that are often hard-to-reach:[3]

---

[3] *See also*: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2101458; https://www.jmir.org/2019/8/e14021/; https://www.jmir.org/2019/3/e11206/; https://www.jmir.org/2014/9/e198/; https://mental.jmir.org/2020/10/e18762.

 **CHICAGO**

- https://journals.sagepub.com/doi/full/10.1177/0049124119882477, *What's to Like? Facebook as a Tool for Survey Data Collection* (SAGE, Nov. 14, 2019) ("Our results show that this data collection approach yields data that are broadly consistent with gold standard probability samples at the national level and open up rich opportunities for granular targeting of a variety of hard-to-reach populations.")

- https://www.jmir.org/2017/8/e290/, *The Use of Facebook in Recruiting Participants for Health Research Purposes: A Systematic Review* (Journal of Medical Internet Research, 2017) ("There is growing evidence to suggest that Facebook is a useful recruitment tool and its use, therefore, should be considered when implementing future health research. When compared with traditional recruitment methods (print, radio, television, and email), benefits include reduced costs, shorter recruitment periods, better representation, and improved participant selection in young and hard to reach demographics.")

- https://www.sciencedirect.com/science/article/pii/S2214782915300166, *Recruiting for health, medical or psychosocial research using Facebook: Systematic review (Elsevier, 2016)* ("110 unique studies that used Facebook as a recruitment source were included in the review… Among studies that examined the representativeness of their sample, the majority concluded (86%) their Facebook-recruited samples were similarly representative of samples recruited via traditional methods. These results indicate that Facebook is an effective and cost-efficient recruitment method.")

- https://bmcmedresmethodol.biomedcentral.com/articles/10.1186/s12874-020-01011-0, *Social media as a recruitment platform for a nationwide online survey of COVID-19 knowledge, beliefs, and practices in the United States: methodology and feasibility analysis* (BMC Medical Research Methodology, May 13, 2020) ("This study has two aims 1) describe the methodology used to recruit a nationwide sample of adults residing in the United States (U.S.) to participate in a survey on COVID-19 knowledge, beliefs, and practices, and 2) outline the preliminary findings related to recruitment, challenges using social media as a recruitment platform, and strategies used to address these challenges… The social media advertisement campaign was an effective and efficient strategy to collect large scale, nationwide data on COVID-19 within a short time period.").

Further, online polls have supplanted phone polls in popularity in part because it is no longer true that most people can be reached for a phone survey. *See* https://www.pewresearch.org/fact-tank/2019/02/27/response-rates-in-telephone-surveys-have-resumed-their-decline/, *Response rates in telephone surveys have resumed their decline* (Pew Research Center, Feb. 27, 2019). Accordingly, online surveys using non-probability samples are widely used and accepted throughout the survey research industry and have been commonplace for more than a decade. For example, of the 4,133 presidential election polls compiled by FiveThirtyEight during the 2020 election cycle, 3,270 (79.1%) were conducted partially or entirely online. As discussed in more detail below, online polls also allow for access to hard-to-reach populations who are difficult to reach through more traditional survey methods



The research reflects that Elucd's surveying techniques are valid for the purpose for which they are being used. The City and Elucd acknowledge all survey methodologies have unique strengths and trade-offs, and online polls are no different. However, the City's use of Elucd surveys is not designed to be at the exclusion of other research methods. Rather, Elucd surveys are designed to be a cost-effective and scalable tool to provide the City and CPD neighborhood-level measurements every month, enabling intra-city comparisons and trend analysis.

***Sampling***. IMT's draft report states that IMT has "concerns about the survey data" because Elucd's surveys are "unlikely to produce a representative sample of residents." The report also states:

- "there is considerable doubt about whether the survey results using this methodology represent the views of the neighborhoods and police districts listed in the dashboard, especially people of color and persons from lower-income households";

- "those who are sampled and complete the survey will be quite different from the general population"; and

- "[u]sing Census data for particular zip codes, Elucd has sought to correct this problem by overweighting certain demographic groups that are under-represented, but this technique is unlikely".

These statements are inaccurate. Elucd collects anonymous survey responses from residents through digital (*e.g.*, mobile- and web-based) advertisements on the websites and social media platforms people visit every day. Elucd has been collecting data in Chicago since late 2017. In 2020 alone, 17,866 Chicago residents completed an Elucd survey that asked them their opinions about the Chicago Police Department.

Elucd has reach into upward of 90% of Internet users, and can target ads on millions of websites and popular platforms like Facebook and Instagram. Unlike typical digital advertisements, Elucd's ads invite residents to answer a short survey about their city. The advertisements and the corresponding surveys are delivered in a variety of languages, depending on what language a device is set to — e.g., English, Spanish, Chinese (Simplified), Korean, or Russian. Across all major demographics, the makeup of the population of smartphone users very closely matches the population in general, making this method an effective way of reaching all corners of a city's population. Elucd uses the annually updated U.S. Census American Community Survey data to set response targets for each geographic area based on five different variables: (i) race; (ii) age; (iii) sex; (iv) education level; and (v) household income.

The surveys are also completely anonymous, unless the respondent voluntarily chooses to share their email address for follow-on research. Based on self-reported demographic data collected in the survey instrument, Elucd tracks the demographic representativeness of the responses it receives in real-time and adjusts its advertising bidding and targeting strategy to obtain a sample that more accurately matches the demographics of the part of the city being measured. The result is a diverse sample which, when weighted to match Census-based



demographic benchmarks, creates a measurement of local opinion about key issues. The AAPOR cites weighing a responding sample to match the population is commonly used method to address bias. *See* https://www.aapor.org/Education-Resources/Election-Polling-Resources/Online-Panels.aspx, *Online Panels* (American Association for Public Opinion Research).

Multiple papers also reflect that generally, ad-recruited surveys can be used with hard-to-reach populations who cannot be effectively or efficiently reached through more traditional survey methods:

- https://pubmed.ncbi.nlm.nih.gov/31599739/, *Youth Study Recruitment Using Paid Advertising on Instagram, Snapchat, and Facebook: Cross-Sectional Survey Study* (JMIR, Oct. 9, 2010)
- https://onlinelibrary.wiley.com/doi/full/10.1002/mpr.1421, *Recruitment of mental health survey participants using Internet advertising: content, characteristics and cost* effectiveness (International Journal of Methods in Psychiatric Research, Feb. 24, 2014)

- https://www.sciencedirect.com/science/article/abs/pii/S1499404612005040, *Facebook Is an Effective Strategy to Recruit Low-income Women to Online Nutrition Education* (Journal of Nutrition Education and Behavior, 2013)

- https://www.researchprotocols.org/2014/3/e48?utm_source=TrendMD&utm_medium=cpc&utm_campaign=JMIR_TrendMD_0, *Social Networking Versus Facebook Advertising to Recruit Survey Respondents: A Quasi-Experimental Study* (JMIR, 2014).

### 2) **Paragraphs 87, 88, 91, 93, 94, 104, 120, 137**

The City believes preliminary compliance has been achieved. IMT's assessments for these paragraphs utilize an inconsistent application of IMT's established methodology for assessing policy compliance as applied in other sections of the Consent Decree. The City did not have advance notice that a heightened methodology would be applied for policy compliance for these paragraphs.

Specifically, CPD incorporated the requirements of these paragraphs into CPD department directive S05-14, *Crisis Intervention Team Program*. CPD complied with all required elements of the policy process and provided extensive written evidence of same:

- Following extensive review and comment, both the IMT and OAG provided written notices of no-objection prior to CPD finalizing the policy.

- Neither IMT nor OAG's notices of no-objection provide any indication that the policy was insufficient for preliminary compliance with these paragraphs, as is the standard in IMT and OAG's written correspondence with the City regarding policy

8



compliance.

- Upon receiving the notices of no-objection, CPD subsequently posted the policy for community input and published the order, completing all the requisite steps for policy compliance.

- IMT's evaluations do not assert or explain why the directive fails to capture the requirements of the paragraphs. Some of the assessments do not acknowledge that CPD incorporated the requirements of the paragraphs into directive S05-14 (*see, e.g.*, Paragraphs 93, 104, 120, 137).

- The Consent Decree does not require CPD to respond to public comments. Still, in this instance, CPD went above and beyond the general requirements and held a special public meeting of the Chicago Council on Mental Health Equity (CCHME) to obtain additional feedback, and additionally provided public notice of the public comment period through the CCHME.

The City and CPD acknowledge that additional written guidance, *e.g.*, standard operating procedures, is needed to train relevant members on how to implement the policy requirements for future levels of compliance. The report does not explain, however, why the directive is not sufficient for preliminary compliance and a heightened requirement of additionally creating standard operating procedures is being applied for preliminary compliance with these paragraphs. *Compare* Paragraphs 577-580 (assessing preliminary compliance based on policy and evaluating standard operating procedures as additional explanatory guidance relevant for secondary compliance).

### 3) **Paragraph 160**

CPD provides the following corrections and clarifications:

***CWG Membership***. The draft report states that CPD sought input from the Coalition about the Use of Force Policy Community Working Group's (CWG) membership. However, CPD allowed the Coalition to co-Chair the CWG. Therefore, the original membership in the group was co-determined by the Coalition. As IMT notes, numerous members of the public gave feedback that the original group membership was not diverse enough to reflect the Chicago communities. Therefore, the City expanded the membership to address this concern.

***ESC Engagement Process***. The draft report states that the process for submitting formal recommendations to the Executive Steering Committee (ESC) did not appear to contemplate an open back-and-forth with the Working Group members. However, prior to the group starting, CPD and the Coalition collaborated on and ultimately agreed upon a proposal, memorialized in writing, stating that once the ESC provided written feedback to the CWG recommendations, the CWG co-chairs, along with other CWG members of their choosing, could request to meet with the ESC to discuss recommendations that were not accepted. Selection of the 10 CWG members continuing to meet with the CPD during November and December was determined by the



community (Coalition) co-Chair and was representative of a cohort of the most active participants from the CWG's drafting committee.

The CWG also had the ability to invite the ESC into their meeting at any point during their review process. During the first meeting, however, a vote was taken by the CWG to invite the Superintendent and ESC into their meeting later in the process. The CWG therefore made the decision not to include CPD leadership in the CWG sessions, which CPD respected and obliged. Toward the end of the CWG, the co-Chairs made an executive decision to invite the ESC to their meeting. At the co-Chairs' request, CWG members were asked to provide with questions in advance of the meeting and provide them to the co-Chair. Upon receiving the invitation, the ESC attended the meeting and took questions from and engaged with CWG members for a significant portion of the meeting.

Despite early challenges during the formation of the CWG, CWG members maintained the ability to provide recommendations to CPD on revisions or changes to CPD use of force policies throughout the WG process. Though the timeframe of the CWG was set out at the beginning, CPD allowed the CWG two extensions to continue the group, at the group's request. CPD encouraged the CWG to provide recommendations along the way so CPD would have adequate time to respond to them and engage, but the CWG opted to provide all recommendations toward the end of the process. The CWG also opted to provide their recommendations in the form of extensive redlines of the policies, which CPD did not request or anticipate. Nonetheless, CPD provided written responses to each CWG recommendation despite having a compressed about of time to do so. This was an unforeseen circumstance that CPD will account for in future processes.

***Acceptance of Recommendations***. Consistent with the language of the Consent Decree, and verbal guidance provided by IMT members throughout the process, acceptance of recommendations is not a requirement for compliance so long as CPD provides explanation for declining the recommendation. CPD has provided written feedback to all CWG recommendations and continued to engage with the CWG on providing feedback on recommendations and making further changes to the policies based on CWG input.

### 4) <u>Paragraph 383</u>

The City believes full compliance has been achieved. The IMT's assessment reflects that the requirements of the paragraphs have been fulfilled, and this paragraph does not contain a recurrence requirement.

### 5) <u>Paragraphs 444, 481, 522, 523, 556, 557, 558, 561, 562, 563</u>

*Please see* the attachment from the Office of the Inspector General (OIG).

### 6) <u>Assessments of Bureau of Internal Affairs (BIA) and Civilian Office of Police Accountability (COPA)</u>

In a number of assessments, CPD and COPA were denied preliminary compliance despite IMT's determination that the relevant BIA unit or COPA directives sufficiently covered



the requirements of the paragraph. This may be due to a difference in the City and IMT's interpretations regarding which BIA unit-level SOPs require IMT/OAG pre-implementation review and a public comment period, and in the case of COPA, interpretation of the Stipulation governing policy review. The City looks forward to discussing with IMT the basis for the denial of preliminary compliance in these instances such that compliance can be demonstrated in the future.

In addition, the City demonstrated operational capability of a new Case Management System. However, the report evaluates "no compliance" for this extensive effort due to a lack of policies. Creating a policy related to the Case Management System is simply not feasible without first building out the system. Therefore, policy development is more appropriate for full compliance, rather than preliminary compliance.

*Please also see* the attachment from COPA.

### 7) <u>Paragraph 553</u>

The City believes at least preliminary compliance is warranted for this paragraph. IMT's assessment reflects that CPD submitted the required report. Applying a policy methodology for preliminary compliance is not consistent with IMT's applied methodology for reports.

### 8) <u>Paragraph 569</u>

The City believes preliminary compliance has been demonstrated. CPD submitted a Resource Summary identifying the various existing policies that address the sub-requirements of Par. 569. IMT's assessment acknowledges the existence of these policies, but does not explain which of the requirements of Par. 569 are not addressed in current policy, such that preliminary compliance has not been achieved.

### 9) <u>Paragraph 570</u>

The City believes the deadline has been met and preliminary compliance has been demonstrated, based on IMT's assessment. Regarding the deadline assessment, as indicated in IMT's assessment and consistent with IMT's other deadline assessments, COPA and CPD complied with the deadline deliverables required in the paragraph. Regarding preliminary compliance, unlike many other requirements in the Consent Decree, creating a policy related to the Case Management System is not feasible without first building out the system. Therefore, policy development is more appropriate for full compliance, rather than preliminary compliance.

COPA Attachment



March 19, 2020

Maggie Hickey, Independent Monitor
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606

Re: <u>Independent Monitor's Report 3 (IMR3)</u>

Dear Ms. Hickey:

Thank you for your (and your team's) continued efforts to provide constructive assistance and feedback in support of our compliance efforts throughout the third reporting period. As I think you would agree, COPA made significant progress toward achieving compliance with Consent Decree mandates. Amid the extraordinary challenges of 2020, COPA achieved notable successes in several important areas.

Among our accomplishments during the reporting period was the creation, staffing, and engagement of a nineteen-member Community Policy Review Working Group (Policy Group) comprised of community leaders and subject-matter experts in areas including police accountability, social justice, ethics, law, and mental health. The Policy Group reviewed, discussed, and improved numerous Consent Decree-mandated policies. The wholly new and untried process was a notable success, enhancing policy development and providing recommendations that we incorporated into virtually all final documents submitted for your approval. For example, the Policy Group reviewed and enriched the six Consent Decree-mandated policies addressing investigative and intake processes, which COPA submitted prior to the end of the reporting period and were fully approved prior to publication of IMR3. I respectfully request that IMR3 indicate COPA's compliance with the related mandates; if not, we look forward to your crediting those efforts in the next reporting period. Building public trust is critical to COPA's success and recognition of our current status would support confidence in COPA and its commitment to Consent Decree compliance.

In this reporting period, we also fast-tracked training related efforts, completing and implementing our approved training curriculum. As a result, COPA achieved at least preliminary compliance with each of the five training-specific mandates. Finally, as you indicate in IMR3 ¶522, facing pandemic related obstacles during last summer's civil protests, COPA effectively organized staff, from senior leadership to administrative personnel throughout its operations to receive, triage, and properly investigate the unprecedented influx of complaints.

Please note that while the pace of our compliance efforts is accelerating, successful completion of certain processes may require additional time and guidance. For example, while valuable Policy Group input will enable an improved revision process in the future, the informed discussion and effective resolution of issues requires the time-intensive commitment and effort of many participants. And although we believe we demonstrated operational capabilities on several CMS-related requirements in IMR3, we were not able to obtain preliminary compliance on these mandates in this report. Further clarification from and consultation with your Team will enable our continuing efforts to demonstrate compliance in this area.

March 19, 2020
Ms. Maggie Hickey
Page 2 of 2

Finally, I think it necessary to note my disagreement with certain comments Office of the Attorney General (OAG) staff submitted regarding IMR3. While we appreciate OAG staff's noting our successful staff re-organization to enhance Consent Decree compliance efforts as well as our intake of 526 protest-related complaints during the review period, we are concerned that inaccurate inferences may be drawn from certain statements.

For example, we take strong exception to any assertion or implication that COPA was uncollaborative with OAG staff. As you know, we frequently confer with OAG staff about compliance and training initiatives, regularly incorporate their comments into policies and training material, and welcome their attendance at our training sessions. OAG staff participates in all standing calls with COPA and IMT. COPA also provides written responses to all OAG staff comments to acknowledge appreciation of their feedback and collaboration. We also sometimes ask OAG staff to explain objections to draft policy terms. While OAG staff appear to view our requests for clarification as suspicious and uncooperative, we commonly seek dialogue to better understand and appropriately address their concerns. We recognize that effective "collaboration" is a process that includes working together to raise questions, seek clarity, and engage in meaningful dialogue in order to achieve resolution.

We believe the recent three-party policy review discussions and resolution offers an excellent example of collaboration. COPA was able to respond quickly once OAG staff explained why it sought to shift certain compliance responsibilities to COPA and clarified concerns about certain revised policy terms. Shortly after the initial discussion, you convened a second call in which we resolved all issues in a fifteen-minute conversation. COPA sent OAG staff a draft of a slightly revised policy the next day. They gave final approval within two business days thereafter and your Team approved the agreed final terms the following day. Synthesis was fully realized in less than a week.

We appreciate your participation in the three-party process and strongly believe that your Team was instrumental in enabling prompt resolution of the simple issues. We think the three parties' path to agreement was the very definition of a "collaborative process." I hope that our actions demonstrated COPA's ongoing commitment to work in good faith with all parties. We share a dedication to achieving the most positive outcome for our communities and look forward to working together with confidence and clarity in future reporting periods.

Again, thank you for your continued cooperation and assistance. The Independent Monitoring Team's recognition of COPA's continuing efforts and progress reinforces our unwavering commitment to both Consent Decree compliance and serving the needs of our community.

Respectfully,

Sydney R. Roberts
Chief Administrator
Civilian Office of Police Accountability

OIG Attachment



JOSEPH M. FERGUSON
INSPECTOR GENERAL

CITY OF CHICAGO
OFFICE OF INSPECTOR GENERAL
740 NORTH SEDGWICK STREET, SUITE 200
CHICAGO, ILLINOIS 60654
TELEPHONE: (773) 478-7799
FAX: (773) 478-3949

VIA DOCUMENT PRODUCTION PLATFORM

March 25, 2021

Margaret A. Hickey
Independent Monitor
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606

Dear Ms. Hickey:

The City of Chicago Office of Inspector General (OIG) submits the following comments on the draft of the third Independent Monitoring Report (IMR3) dated March 2, 2021. OIG thanks the Independent Monitoring Team (IMT) for the opportunity to comment on this draft.

In addition to its comments on specific assessments in IMR3 below, OIG provides two global comments with respect to the process leading up to the issuance of IMR3. First, on October 27, 2020, OIG submitted a four-page letter to the Independent Monitor. *See* MONITOR00139629-32 (Exhibit A). This letter memorialized a meeting on October 8, 2020 with IMT's designated Accountability and Transparency members, Associate Monitor Harold Medlock and Analyst Christopher Sun. At this meeting, OIG's Public Safety section (PSIG) detailed the materials it planned to submit to evidence compliance on the paragraphs under review in IMR3. Mr. Medlock and Mr. Sun in turn represented the level of compliance the submission of those materials would achieve. That October 8 meeting was the culmination of several monthly meetings between PSIG and Mr. Medlock and Mr. Sun at which PSIG's various IMR3 compliance submissions were discussed.

The October 27 letter was prepared in an effort to ensure that OIG and IMT were in agreement on expectations for IMR3 assessments. Accordingly, the letter asked the IMT to: "Please let OIG know as soon as possible if any portion of this letter does not accurately reflect the position of IMT." MONITOR00139632. The letter was contemporaneously produced to the Office of the Attorney General (OAG). No response was received to the letter, nor are OIG's efforts to reach agreement on IMR3 compliance expectations reflected in the IMR3 draft. Accordingly, as discussed with IMT, OIG believes it is in the best interests of all involved that there be monthly meetings to discuss and review OIG's consent decree obligations and respectfully requests the Monitor herself actively participate in these discussions and the evaluation of the compliance requirements and submissions by OIG.

Margaret A. Hickey                                                                                      March 25, 2021

Second, IMT transmitted its final IMR3 methodologies to OIG on December 29, 2020—two days before the end of the reporting period. While OIG recognizes that this process is permitted by paragraph 655, during IMR3, PSIG was unaware of certain of the IMT's expectations despite its best efforts at cooperative engagement. IMT stated that providing the methodologies shortly before the end of the reporting period should not be a concern to the City because "the IMT has been transparent regarding expectations and has made itself available to address any questions or concerns since the Consent Decree began." *IMT's Reply to the Parties' Comments to the Proposed Methodologies* at 2 (Dec. 29, 2020). As described above, PSIG undertook efforts to ascertain detail regarding IMT's contemplated compliance methodologies (*see Consent Decree* ¶ 655) and IMT's expectations regarding documentation needed for compliance assessments and sought confirmation of those methodologies and expectations. As a consequence, OIG has disagreements and concerns with certain of methodologies and compliance assessments reflected in the draft of IMR3. Moreover, despite OIG's efforts to engage the IMT to come to agreement on what was necessary to achieve full compliance on its applicable paragraphs, many unfortunately are reported as "Not Yet Assessed." Accordingly, OIG respectfully requests that for future monitoring periods the IMT work more closely with OIG to align on appropriate methodologies and assessments to avoid future misunderstandings.

OIG submits the following comments regarding specific compliance assessments:

**Paragraph 444**: PSIG respectfully disagrees with IMT's assessment that it has only met preliminary compliance for this paragraph. PSIG's position is that the evidence submitted and the reported evaluation of those materials by the IMT in IMR3 support full compliance with paragraph 444.

In support of full compliance, PSIG submitted the following materials: PSIG's policy regarding review of closed complaints of sexual misconduct against CPD members, *see* MONITOR00214220 & n.29; PSIG's training presentation materials regarding paragraph 444, *see* MONITOR00214597-98; and an 11-page report analyzing closed disciplinary sexual misconduct cases against CPD members, *see* MONITOR00214138-48.

In the IMR3 draft, IMT praises PSIG's paragraph 444 report as "identif[ying] concerning trends of BIA and COPA practices." The IMR3 draft further states that "IMT appreciates PSIG's efforts in analyzing the relevant information for [paragraph] 444 and reporting that information and analysis." The IMR3 draft finds no deficiencies and suggests no changes to PSIG's report. Furthermore, the IMR3 draft itself relies on PSIG's paragraph 444 report in order to assess CPD and COPA's sexual misconduct data collection efforts as "grossly inadequate" in an entirely separate section of the IMR3 draft. *IMR3 Draft Report* ¶ 63. Moreover, the IMT found that PSIG's policy adequately "incorporate[d] the requirements of [paragraph] 444." Nonetheless, the IMR3 draft only assesses PSIG to be in preliminary compliance with paragraph 444, because PSIG had not submitted evidence that it "had trained its relevant staff on the requirements of paragraph 444."

Margaret A. Hickey                                                                                      March 25, 2021

PSIG fully complied with paragraph 444's plain language by analyzing the relevant closed cases and publishing the required report. The paragraph only requires that PSIG "review and analyze" closed sexual misconduct files and "publish a report." PSIG did precisely that. Moreover, by the consent decree's provision, training is not strictly required for every paragraph. Instead it is only required "as necessary" or "as appropriate." *Consent Decree* ¶¶ 642, 661. Indeed, IMT itself has recognized that there are "many paragraphs that do not include . . . training elements." *IMR2 Report* at 3 (June 18, 2020). In fact, for other paragraphs which primarily require the production of an annual report, IMT does not require training for secondary compliance. For instance, paragraph 548 requires that the City produce an annual litigation report. In the IMR3 draft, the City was found in preliminary compliance with that paragraph. However, in order to reach higher levels of compliance, there is no mention of any training requirement. That approach should apply here, too, because—like paragraph 548— paragraph 444 primarily requires PSIG to generate an annual report.

Finally, the notion of a separate and discrete training requirement for paragraph 444 is inapplicable to PSIG. PSIG is regularly engaged, pursuant to its enabling ordinance, in reviewing closed disciplinary cases and generating reports. As PSIG's other produced materials amply demonstrate, PSIG's employees are trained to do so. Additional, specialized training in order to complete the one subcategory of closed case reviews to which paragraph 444 specifically speaks under these circumstances is unnecessary.

However, PSIG did submit evidence that its training makes specific mention of paragraph 444's requirements "as necessary to fulfill [its] responsibilities pursuant to the [paragraph]." *Consent Decree* ¶ 642(b); *see* MONITOR00214597-98. Moreover, the report itself is the best evidence of PSIG's training efforts. If PSIG were falling short on training its "relevant personnel *as necessary to fulfill their responsibilities* pursuant to the requirement," it would be evident when PSIG's personnel were unable to fulfill those responsibilities by producing a competent report. *Consent Decree* ¶ 642(b) (emphasis added). Finally, PSIG's October 27 letter made clear that PSIG intended only submit a report to meet paragraph 444's requirements, a position with which the IMT agreed at the time. Accordingly, PSIG should be assessed to be in full compliance with this paragraph.

**Paragraph 481**: PSIG respectfully disagrees with IMT's assessment that OIG has only met preliminary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 481. In support, OIG submitted OIG's policy[1] regarding "five-year letters" from its Investigations section manual, *see* MONITOR00214151-53; the only five-year letter OIG generated during the period under assessment, *see* MONITOR00063775; and the Superintendent's response to that five-year letter, *see* MONITOR00106665.

---

[1] OIG's Investigations Section—not its Public Safety section—is responsible for investigating police misconduct and therefore for generating five-year letters.

Margaret A. Hickey                                                                                          March 25, 2021

In the IMR3 draft, IMT found OIG in preliminary compliance with paragraph 481, but "Not Yet Assessed" for secondary and full compliance. The IMR3 draft, however, acknowledges that OIG's manual "explains the correct procedure for requesting the CPD Superintendent . . . reopen an investigation pursuant to ¶ 481." And the IMR3 draft notes that OIG "provided the IMT with documentation of one such request and the CPD's response to demonstrate how the process works." The IMR3 draft concludes that "IMT . . . looks forward to reviewing evidence that PSIG has trained its relevant staff on the requirements of ¶ 481 in the next reporting period."

The IMR3 draft misunderstands OIG's IMR3 submission. OIG did not submit a single five-year letter in order "to demonstrate how the process works." Instead, as explained in its submission, OIG submitted its letter and the Superintendent's timely response for the "*only* . . . case necessitating the submission of a request to the Superintendent . . . for authorization to investigate allegations of misconduct more than five years old." MONITOR002145150 (emphasis added). In other words, 100% compliance.

For reasons like those articulated in response to paragraph 444, OIG should not be required to provide additional evidence that OIG has trained its staff on the requirements of paragraph 481. The best evidence that OIG has adequately trained its staff is that the process was followed during the period under assessment.

Finally, PSIG's October 27 letter set forth what OIG intended to submit to meet paragraph 481's requirements. In sum, OIG should be assessed in full compliance with this paragraph.

**Paragraph 522:** PSIG respectfully disagrees with IMT's assessment that it has only met secondary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 522. In support, PSIG submitted its staffing and equipment needs plans. *See* MONITOR00041655-68. In IMR3, in order to show compliance with this and paragraph 523, PSIG also submitted a memorandum describing how it had used its staffing and equipment needs plans to formulate its FY 2021 budget request. *See* MONITOR00214155-62.

The IMR3 draft assesses PSIG to be in secondary compliance with this paragraph. In the IMR3 draft, IMT lauds PSIG's staffing and equipment needs plans as "thorough, comprehensive, and sufficiently detailed." IMT wrote that "given the sufficiency of" PSIG's staffing and equipment needs plans and its FY 2021 budget request, PSIG had "demonstrated Secondary compliance." The IMR3 draft continues that "[t]o meet full compliance with ¶ 522, the PSIG will need to demonstrate that it has implemented its *Staffing and Needs Assessment Plan*."

However, paragraph 522 only requires PSIG to "create . . . staffing and equipment needs plans." PSIG has created "thorough" and "comprehensive" plans. That should fulfill full compliance with this paragraph. Though PSIG has undertaken significant efforts to implement its plans, as its IMR3 submission demonstrates, PSIG is not required to implement in full its staffing and equipment needs plans to reach full compliance with paragraph 522. By the plain

Margaret A. Hickey                                                    March 25, 2021

language of the paragraph, only CPD is required to implement its staffing and equipment needs plans to comply with paragraph 522.

In addition, as set forth in PSIG's October 27 letter, the IMT's position, as stated ,in the October 8 meeting, is that it is "the City's responsibility to ensure that OIG is budgeted in accordance with its staffing and equipment-needs plan and [that] OIG would not be held responsible if the City did not fulfill OIG's entire budget request." MONITOR00139630. In sum, PSIG should be assessed in full compliance with this paragraph.

**Paragraph 523:** PSIG respectfully disagrees with IMT's assessment that it has only met secondary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 523. Accordingly, it is disappointed that IMT did not fully assess its compliance with paragraph 523.

In support of full compliance with this paragraph, PSIG submitted its staffing and equipment needs plans. *See* MONITOR00041655-68. In IMR3, to evidence compliance with this and paragraph 522, PSIG submitted a memorandum describing how it had used its staffing and equipment needs plans to formulate its FY 2021 budget request. *See* MONITOR00214155-62.

The IMR3 draft assesses PSIG at secondary compliance with this paragraph "given the sufficiency" of its staffing and equipment needs plan and FY 2021 budget request. However, "[t]o meet full compliance" with paragraph 523, "PSIG will need to demonstrate that it has implemented its *Staffing and Needs Assessment Plan* and continues to do so on an annual basis."

The plain language of paragraph 523, however, only requires PSIG review its staffing and equipment needs plans on an annual basis and revise it *as needed*. It says nothing about implementing that plan, much less on an annual basis. IMT's full compliance methodology for this paragraph, as stated in the IMR3 draft, is the same as the IMT's full compliance methodology for paragraph 522, despite the two paragraphs requiring different things.

PSIG has fully complied with paragraph 523's requirements. PSIG "review[ed]" its staffing and equipment-needs plan during the FY 2021 budget process and determined there was no need for revision and thus requested the identified needs in full in its budget request.[2] The paragraph requires nothing further and thus PSIG should be found in full compliance; moreover, PSIG respectfully requests the IMT's IMR4 methodologies specify what obligations any other City entities may have in order for the City as a whole to meet full compliance with this paragraph.

---

[2] Contrary to the IMR3 Draft Report, PSIG did not produce to IMT an "updated" staffing and equipment needs plan during IMR3. Instead, it reviewed its existing staffing and equipment needs plan, as required.

Margaret A. Hickey                                                    March 25, 2021

**Paragraph 556:** PSIG respectfully disagrees with IMT's assessment that it has only met preliminary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 556.

In support of full compliance with this paragraph, PSIG submitted its section manual, *see* MONITOR00214169-228; its annual report, *see* MONITOR00214229-54; and OIG's quarterly reports for the first three quarters of 2020, *see* MONITOR00214255-416. PSIG also submitted a memo referencing five published Public Safety section products and describing three in-process projects. *See* MONITOR00214164-68. Additionally, as described in PSIG's submitted memorandum on paragraph 556, PSIG submitted its section manual, containing its policy on compliance with its ordinance, *see, e.g.*, MONITOR00214173, -84, -93-94, as well as training materials regarding compliance with its ordinance, *see, e.g.*, MONITOR00214586-87, -93.

The IMR3 draft finds PSIG only to be in preliminary compliance with this paragraph. While acknowledging the reports submitted by PSIG, the IMR3 draft contends that these are not "sufficient materials" to make assessments of secondary or full compliance. Instead, the IMR3 draft states that it "looks forward" to "reviewing documentation of . . . PSIG's relevant training efforts" for secondary compliance.

The IMT's assessment is inconsistent with the discussions between it and PSIG, as reflected in PSIG's October 27 letter. PSIG understood that the IMR3 submission described above would "fulfill, *at a minimum*, secondary compliance with paragraph 556." MONITOR00139630 (emphasis added). The paragraph requires PSIG to "conduct periodic analysis and evaluations, and perform audits and reviews" as authorized by the Municipal Code of Chicago. PSIG provided documentation—in the form of reports of actual analyses, evaluations, audits, and reviews—that it is doing just that. Moreover, PSIG did provide documentation of its "relevant training efforts." In addition to the documents identified above which specifically reference PSIG's enabling ordinance, all the training documents submitted in connection with PSIG's training plan relate to training on its ordinance-mandated functions. Moreover, the IMT never advised PSIG that any other materials related to training, such as dates or attendance lists, would be required to assess PSIG's compliance. Finally, as with above paragraphs, the best evidence of the effectiveness of PSIG's training is the quality of the reports it produced. In sum, PSIG should be assessed to be in full compliance with paragraph 556.

**Paragraph 557:** PSIG respectfully disagrees with IMT's assessment that it has only met preliminary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 557.

In support of full compliance with this paragraph, PSIG submitted a Management and an Opinion letter from the Association of Inspectors General, *see* MONITOR00214420-32; PSIG's manual, containing its policy on Green Book compliance and provisions implementing Green Book standards, *see* MONITOR00214173, -192-216; PSIG's training materials on Green Book compliance, *see* MONITOR00214505-516, -688-755, -780-799; and a number of reports which were produced in compliance with Green Book standards, *see* MONITOR00214418. PSIG

Margaret A. Hickey                                                March 25, 2021

proposed in its October 27 letter and in its IMR3 submission that "IMT may wish to review two to three project files corresponding to published Public Safety section products" in order to assess the extent to which those files are maintained in compliance with the Green Book. MONITOR00139630; *see* MONITOR00214419. PSIG remains amenable to such a review if the IMT so desires. The IMR3 draft appears to reference such a review when it states that the IMT "looks forward to reviewing future audits and reports to determine additional levels of compliance." PSIG would request the IMT identify as promptly as possible the materials it requires to assess PSIG's compliance under this paragraph.

The IMT acknowledged some of the materials that PSIG submitted, namely PSIG's policies, its project plans, and the letters from the Association of Inspectors General. The IMT also noted that the joint inquiry into the protests and unrest following the death of George Floyd allowed it to "observe the PSIG's methods of interviewing, data collection, and analysis, which appeared to comport with the Green Book." IMT did not, however, comment on the most direct evidence of PSIG's Green Book compliance: its published reports.

PSIG is in full compliance with paragraph 557 because it is conducting its audits and reviews in compliance with the Green Book, as evidenced by PSIG's submission of Green Book-compliant reports and its offer to produce whole project files to IMT. To the extent IMT's assessment creates any ambiguity around whether OIG is in anything less than full compliance with the Green Book, that lack of clarity threatens reputational injury to the entire OIG operation which, by its own regulatory practice preceding the existence of the consent decree and the IMT, subjects itself to an external, independent peer review of its operations as meeting Green Book standards. That history and professional standing and certification was an underpinning to the confidence in and reliance on OIG by the Justice Department Civil Rights Division and the Police Accountability Task Force. IMT has identified no additional criteria for full compliance. In sum, PSIG should be found in full compliance with paragraph 557.

**Paragraph 558:** PSIG respectfully disagrees with IMT's assessment that it has only met preliminary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 558.

In support of full compliance with this paragraph, PSIG submitted the policies mandated by paragraph 558, which are found both in PSIG's section manual, *see* MONITOR00214177-78, -88, -94 & n.12, as well as in its annual audit plan, separately submitted under paragraph 563, *see* MONITOR00139634, -42-44. PSIG submitted a memorandum describing various ongoing or planned projects that demonstrate implementation of the policy required by paragraph 558. PSIG also submitted its annual report which contains analysis specifically relevant to paragraph 558(a). *See* MONITOR00214247-48. PSIG informed the IMT that up-to-date information about complaints against CPD members is available through OIG's website in further fulfillment of the requirements of paragraph 558(a). *See* MONITOR00214434-35. PSIG submitted its quarterly reports which contain summaries of reviews which satisfy paragraph 558(d). *See* MONITOR00214255-416. PSIG also submitted *Advisory Concerning COPA's Practice of Administratively Terminating Disciplinary Investigations*, which is further relevant to paragraph

558(d). *See* MONITOR00214437-61. Finally, PSIG submitted its training materials on the requirements of paragraph 558. *See* MONITOR00214593-94.

The IMR3 draft found PSIG "under assessment" for secondary compliance. After reviewing the submitted materials, the IMR3 Draft Report contended that PSIG had "described . . . plans for the projects referenced in ¶ 558(a), (b), (c), (e), and (f)" but described those as "insufficient to satisfy the requirements of ¶ 558." The IMR3 Draft Report also noted that PSIG had "undertaken reviews and audits consistent with ¶558(a), (b), (c), (d), and (e)." The IMT concluded that "[f]or secondary compliance . . . PSIG must show both that it has developed training related to the requirements of ¶558 and that it has trained it relevant personnel."

Initially, it appears the IMT misunderstands PSIG's submission as to paragraphs 558(a), (b), and 558(d). Those materials describe the status of full-scale projects which are well underway, not mere "plans for projects." Additionally, as described above but unacknowledged by the IMR3 draft, PSIG submitted training materials on the requirements of paragraph 558. *See* MONITOR00214593-94. Most fundamentally, paragraph 558 requires the development of policies and PSIG submitted the policies it has developed on the requirements of paragraph 558 and evidence of their implementation.

**Paragraph 562**: PSIG respectfully disagrees with IMT's assessment that it has not even met preliminary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support secondary compliance with paragraph 562.

In support, PSIG submitted its training plan and training materials for review and comment to the IMT and Office of Attorney General (OAG). *See* MONITOR0013062O–131051. In response, the IMT sent a list of formal comments on the training plan (Exhibit B), as did OAG (Exhibit C). PSIG revised its training plan and materials in light of these comments and resubmitted them. *See* MONITOR00214463-00215176. Additionally, PSIG produced its section manual, which contains a training policy. *See* MONITOR000214182-83.

The IMR3 draft finds PSIG to be "under assessment" for preliminary compliance. The IMR3 draft states that "comprehensive training plans as well as comprehensive training materials" are required for preliminary compliance. The Report notes that PSIG's on-boarding training plan "includes specific courses" while its "in-service training plan" is "only two paragraphs long and lacks the level of detail included in . . . PSIG's on-boarding training plan." The only other critique directed at PSIG's training materials is that "some of the training blocks of instruction . . . consist only of slide decks without accompanying lesson plans." The IMR3 draft says that lesson plans are important because they "ensure that PSIG's training remains robust and consistent—despite changes in training staff or changes in leadership." The IMR3 draft does not address PSIG's submitted training policy, which serves that end.

The IMR3 draft's statement that "comprehensive training materials" are required for preliminary compliance is inconsistent with the IMR3 methodologies. Those methodologies state that "applicable training plans, reports, evaluations, and materials, including

presentations, videos, images, handouts, bulletins, and electronic-learning modules" are assessment sources for the training methodology, which is the assessment methodology for *secondary* compliance. *Updated Methodologies* ¶ 562 (Dec. 29, 2020). Thus, the comprehensiveness of PSIG's training materials should not be considered in evaluating preliminary compliance.

By the IMR3 methodologies, PSIG's training plan and section manual are sufficient for preliminary compliance. Most importantly, both IMT and OAG were able to comment on the training plan and PSIG incorporated those comments into the final training plan. Any additional requirements for PSIG's training plan to reach preliminary compliance should have been included in those comments. For PSIG's in-service training, a number of courses are currently under development and PSIG is not able to provide, for instance, the length of the course or the qualifications of the instructors. However, PSIG's training plan is sufficiently detailed as to PSIG's *plan* (as required) for future in-service training courses. Nor is it "only two paragraphs long" as the IMR3 draft perplexingly (and misleadingly) states—it stretches for a page-and-a-half and consists of over two dozen planned courses and training opportunities. The ability to provide further detail (such as the length and instructor for every contemplated course) would likely attain a higher level of compliance because it would indicate that PSIG was "carrying out [those trainings] in practice." *Consent Decree* ¶ 641(c) (defining *full* compliance).

In addition to the plan and policy manual which satisfy preliminary compliance, PSIG's training materials qualify it for secondary compliance. PSIG produced hundreds of pages of slide presentations for the courses identified in its plan. IMT and OAG had the opportunity to comment on these materials in order to suggest changes. Both entities submitted comments on the training plan and materials. IMT's sole complaint about the training materials is that they do not include lesson plans. IMT's comments on PSIG's training plan "suggest[ed]" that it develop lesson plans, but did not indicate that the lack of lesson plans would be so critical as to hold PSIG back from compliance. Exhibit B at 1. Nor are lesson plans specified in the IMR3 training methodologies as a necessary piece of training documentation. Moreover, they are not required by the consent decree. Finally, lesson plans are unnecessary here given the highly detailed content of PSIG's slide presentations. It is the content in the slide presentations that "ensure[s] . . . PSIG's training remains robust and consistent." Lesson plans would likely end up largely duplicative of the content contained in the slide presentations. In sum, PSIG should qualify for secondary compliance for paragraph 561.

**Paragraph 565**: PSIG respectfully disagrees with IMT's assessment that it has only met secondary compliance for this paragraph. PSIG's position is that the evidence it submitted and IMT's evaluation of those materials support full compliance with paragraph 565.

In support of full compliance with this paragraph, the Police Board produced meeting minutes from the quarterly meetings of the Police Board, COPA, and PSIG. The City also produced correspondence from the Mayor advising the Police Board, COPA, and PSIG of the requirements of paragraph 565.

Margaret A. Hickey                                                      March 25, 2021

The IMR3 draft finds PSIG in secondary compliance.  The IMR3 draft states that the quarterly meeting "appear to sufficiently include the required coordination, as is necessary for Full compliance with this paragraph."  However, because the meetings have not yet provided the Superintendent with any recommendations, "IMT has not yet had the opportunity to evaluate whether any recommendations follow the required processes, which is also a necessary component of Full compliance with this paragraph."  Furthermore, "as a matter of best practice," the IMR3 draft "suggest[s]" that PSIG, Police Board, and COPA "enter into a memorandum of agreement that memorializes" their quarterly meetings.

The IMT's position that the production of a recommendation from the quarterly meetings is required for full compliance is unsupported by the actual text and runs contrary to the language of the paragraph, which positions recommendations as optional—not mandatory—outputs from the quarterly meetings.  Moreover, PSIG is unlikely to make a joint recommendation with either Police Board or COPA, entities over which it exercises oversight jurisdiction.  *See* MCC § 2-56-230(b). PSIG's proper role, therefore, is not to collaborate with those entities in order to make formal recommendations, but rather to oversee their own operations.

PSIG finds the discussions with COPA and the Police Board valuable and intends to continue to follow the federal court order by which it is bound. A memorandum of agreement, however, is unnecessary and not required by the consent decree.

In sum, PSIG engages in everything the paragraph requires: meeting quarterly with the Police Board and COPA.  PSIG should be assessed to be in full compliance with this paragraph.

*** 

Thank you for your consideration of these comments.   We appreciate your attention to the issues we highlighted specifically relating to OIG in the context of the larger monitoring enterprise. OIG believes many of these are discreet and capable of clarification and amicable resolution. Moreover, such resolution may offer precedential guidance to inform the greater whole, for which there are shared responsibilities for both IMT and OIG. We look forward to working through these concerns.  Please do not hesitate to reach out should you have any questions or issues to discuss.

Respectfully,

Joe Ferguson                                    Deborah Witzburg
Inspector General                               Deputy Inspector General for Public Safety

cc: Office of the Attorney General, State of Illinois (*via document production platform*)

OIG Exhibits



CITY OF CHICAGO
OFFICE OF INSPECTOR GENERAL
740 NORTH SEDGWICK STREET, SUITE 200
CHICAGO, ILLINOIS 60654
TELEPHONE: (773) 478-7799
FAX: (773) 478-3949

JOSEPH M. FERGUSON
INSPECTOR GENERAL

## VIA ELECTRONIC MAIL

October 27, 2020

Margaret A. Hickey, Independent Monitor
233 S. Wacker Dr., Ste. 7100
Chicago, IL 60606

Re: Office of Inspector General Compliance with the Consent Decree

Dear Ms. Hickey:

I write to confirm the Independent Monitoring Team's (IMT) position regarding the Office of Inspector General's (OIG) plan to demonstrate compliance with the provisions of the consent decree entered in *Illinois v. Chicago* that are under review in the IMR3 reporting period.  On Thursday, October 8, 2020, representatives from OIG discussed with IMT members Harold Medlock and Christopher Sun the following paragraphs for which IMT will assess OIG's compliance in IMR3:

**Paragraph 444:**  For IMR3, OIG intends to submit a report on complaints of sexual misconduct committed by CPD members against non-CPD members investigated by COPA and BIA where a "final disciplinary decision" was rendered in 2019.  As recognized by IMT in the IMR2 report (at pg. 361), COPA and BIA have not been providing OIG with "complete administrative investigative file[s]" within ten days of the "final disciplinary decision" on such complaints. Nonetheless, OIG has gathered cases meeting the parameters of paragraph 444 and will submit a report analyzing those cases.

IMT stated this submission would fulfill, at a minimum, preliminary compliance with paragraph 444.

**Paragraph 481:**  For IMR3, OIG intends to submit the policy contained in its Investigations manual regarding OIG tracking of requests to the Superintendent for "authorization to open an investigation concerning incident that allegedly occurred more than five years before the date" that OIG "became aware of the allegations."  OIG has produced to IMT its only five-year request to the Superintendent to date since the

effective date of the consent decree and his response. OIG will continue to submit any requests and responses, and will and will submit to IMT a memorandum referring to those requests by Bates number and describing any instances where the Superintendent failed to respond within 30 days.

IMT stated this submission would fulfill, at a minimum, preliminary compliance with paragraph 481. It is OIG's position that, to the extent that paragraph 481 imposes a compliance obligation on OIG, OIG is in full operational compliance; OIG has instituted a policy regarding the tracking of requests to the Superintendent, and has received a response within 30 days for all of the requests which have been made since the effective date of the consent decree.

Paragraphs 522 and 523: OIG has previously completed a staffing and equipment-needs plan. The plan was produced to the IMT on February 27, 2020. *See* MONITOR00041655 - 41668. For IMR3, OIG intends to submit a memorandum describing the City of Chicago's budget process, how OIG participates in that process, and how OIG's FY 2021 budget request reflected the needs identified in the staffing and equipment-needs plan.

OIG was previously found to be in preliminary compliance with paragraph 522. *See* IMR2 Report at 331-32 & n.150. IMT stated the proposed IMR3 submission would fulfill, at a minimum, preliminary compliance with paragraph 523. IMT additionally stated it is the City's responsibility to ensure OIG is budgeted in accordance with its staffing and equipment-needs plan and OIG would not be held responsible if the City did not fulfill OIG's entire budget request.

Paragraph 556: For IMR3, OIG intends to submit materials to IMT demonstrating how we "conduct periodic analysis and evaluations, and perform audits and reviews as authorized by" the Municipal Code of Chicago § 2-56-230. Specifically, we will submit the following documents: (1) OIG's 2019 annual report; (2) OIG's quarterly reports for the first three quarters of 2020; (3) reports and other Public Safety section products completed this year which fulfill the mandates of OIG's ordinance; (4) training materials on OIG's ordinance; (5) policies implementing OIG's ordinance in the Public Safety section policy manual; and (6) updates on projects which are underway, but not yet completed, which fulfill specific mandates of OIG's ordinance.

IMT stated this submission would fulfill, at a minimum, secondary compliance with paragraph 556. OIG's position is that OIG is in full operational compliance with paragraph 556, which is simply a restatement of the Public Safety section's enabling ordinance.

**Paragraph 557:**  OIG intends to submit materials to IMT demonstrating how OIG's "audits and reviews are conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General" ("the Green Book"). Specifically, we will submit the following documents: (1) the most recent "peer review" letters issued to OIG by the Association of Inspectors General; (2) policies implementing Green Book standards in the Public Safety section policy manual; (3) training materials on Green Book standards; and (4) examples of reviews, audits, and other Public Safety section products which are conducted in accordance with Green Book standards.

IMT stated this submission would fulfill, at a minimum, preliminary compliance with paragraph 557. OIG's position is that OIG is in full operational compliance with paragraph 557. OIG suggests that, in addition to the materials described above, the IMT may wish to review two to three project files corresponding to published Public Safety section products.

**Paragraph 558:**  OIG intends to submit materials evidencing OIG's "data-driven reviews and audits" which "measure the effectiveness of the City and CPD's accountability practices."  Specifically, we will submit the following documents: (1) Public Safety section products which meet the obligations of paragraph 558 and its subparagraphs; and (2) updates on projects which are underway, but not yet completed, which fulfill the specific mandates of paragraph 558 and its subparagraphs.

IMT previously found OIG in preliminary compliance with paragraph 558 in IMR2 and IMT stated this submission would fulfill, at a minimum, preliminary compliance with paragraph 558 in IMR3. OIG's position is that, with the publication of several specific products required by paragraph 558, OIG has substantially exceeded preliminary compliance and has reached, at a minimum, secondary compliance.

**Paragraph 562:**  OIG submitted its "comprehensive initial on-boarding training and annual in-service training" plan to IMT and the Office of the Illinois Attorney General on October 7, 2020.  *See* MONITOR00130620–131045.

IMT is reviewing this submission for compliance. OIG's position is that this submission, which includes underlying training materials, substantially exceeds the requirements of preliminary compliance and demonstrates, at a minimum, secondary compliance.

Based on OIG's October 8 call with IMT, these are the only consent decree paragraphs for which the IMT has affirmatively stated expected compliance deliverables from OIG for IMR3. While IMT could not rule out the possibility of additional provisions for OIG compliance in IMR3, IMT did not identify any as of our October 8 meeting. IMT

confirmed that if there were any additional paragraphs for which OIG was to be evaluated, they would be contained in the methodology document that IMT will provide the City by [x date].

This letter reflects OIG's understanding of IMT's position on the level of compliance attained by OIG's proposed IMR3 submissions. Please let OIG know as soon as possible if any portion of this letter does not accurately reflect the position of IMT. Unless OIG receives notice otherwise, it will submit only the materials reflected in this letter to demonstrate compliance in IMR3. This letter does not to constitute agreement with IMT's assessments of preliminary compliance, and OIG expressly reserves the right to assert in IMR3 or in the future, where stated in this letter and elsewhere, that materials submitted demonstrate secondary or operational compliance.

Please do not hesitate to contact me with any questions or if you would like to discuss the issues identified in this letter further.

Respectfully,

Deborah Witzburg
Deputy Inspector General for Public Safety
Office of Inspector General

cc:     Joseph Ferguson, Inspector General
        Brian Dunn, General Counsel, OIG
        Nathaniel Wackman, Associate General Counsel for Public Safety, OIG
        Harold Medlock, Associate Monitor, IMT

# Independent Monitoring Team | Chicago Police Department Consent Decree

| | |
|---|---|
| **TO:** | City of Chicago Law Department c/o Tyeesha Dixon |
| **CC:** | policereform@atg.state.il.us |
| **FROM:** | Maggie Hickey, Rodney Monroe, Harold Medlock, and the Independent Monitoring Team |
| **RE:** | Review of PSIG Training Materials |
| **DATE:** | November 5, 2020 |

On October 7, 2020, the City of Chicago (City) and the Deputy Public Safety Inspector General (PSIG) provided the Independent Monitoring Team (IMT) with the Public Safety Section Onboarding and In-Service Training Plan and associated materials ("Training Materials"). Our comments on the Training Materials are included in the attached chart.

We appreciate the work that the PSIG has put into developing these Training Materials. Our comments generally suggest that the PSIG include additional information about each block of instruction in the Training Materials and identify areas where the Training Materials should be revised for consistency. Additionally, we suggest that the PSIG develop lesson plans and instructor notes for each block of instruction.

Please note that these comments may be subject to change based on information that the IMT receives during future collaboration. Please let us know how you would like to move forward to resolve our comments.

*** 

If you have any questions or concerns, please contact the Independent Monitor Maggie Hickey at MHickey@schiffhardin.com or 312.258.5572.

## PSIG Training Materials Comments

| | Provision | Comments |
|---|---|---|
| 1. | General | Consider clarifying whether each block of instruction is for on-boarding training or in-service training. |
| 2. | General | We suggest revising to include, for each block of instruction, the number of hours allocated to that block of instruction, the titles and qualifications of the instructors, and how frequently the training will be offered. |
| 3. | General | As drafted, only some of the blocks of instruction contain training objectives. We recommend including training objectives for each block of instruction. |
| 4. | General | In the training plan, consider clarifying the order in which the blocks of instruction are presented to students or new employees. For example, it may make sense to present the "History and Overview of the IG Function" and "Principles and Standards for Offices of Inspector General" training blocks earlier in the on-boarding training process. |



**OFFICE OF THE ATTORNEY GENERAL**
STATE OF ILLINOIS

**KWAME RAOUL**
 ATTORNEY GENERAL

<div align="center">October 20, 2020</div>

<u>**SENT VIA ELECTRONIC MAIL & SHAREPOINT**</u>

City of Chicago Law Department
c/o Tyeesha Dixon
121 North LaSalle Street, Suite 600
Chicago, Illinois 60602
E-mail: Tyeesha.Dixon@CityofChicago.org

**Re:**     **Comments on PSIG Training Plan**
          **Consent Decree,** *Illinois v. Chicago*, **17-cv-6260 (N.D. Ill.)**

Dear Ms. Dixon,

Pursuant to Paragraph 638 of the Consent Decree, the Deputy Public Safety Inspector General ("PSIG") submitted to the Office of the Illinois Attorney General ("OAG") on October 7, 2020 a draft Public Safety Section Onboarding and In-Service Training Plan and associated PowerPoint slides [**MONITOR00130620-131045**] towards compliance with Paragraph 562 of the Consent Decree.

As an initial matter, the PSIG Training Plan does not comply with Paragraph 562 of the Consent Decree because it fails to outline a plan for providing PSIG employees with "comprehensive" initial and annual in-service training. It also fails to identify a timetable for implementing the plan as must be developed pursuant to Paragraph 639 of the Consent Decree.

OAG's comments on the PSIG Training Plan are as follows:

*Comments:*

1. On-boarding training: The only discussion of CPD, COPA, and the Police Board---the entities that are the subjects of PSIG's mission---can be found in a one-hour overview of PSIG that is intended for all new OIG employees. Please supplement the on-boarding training to include a more robust and comprehensive overview of CPD, COPA, and the Police Board, including each entity's jurisdiction, structure, and relevant rules (e.g., CPD Rules 14, 21, and 22), policies, and procedures. Many if not all of the topics listed under "Internal Trainings" in the "In-Service Training" section of the Training Plan would be appropriate for on-boarding training.

2. In-service training: Please supplement the in-service training plan to include the full schedule of the annual in-service training. For each course listed in the annual schedule, please include the course length, course instructor, and the lesson plan and/or power point slides.

3. Please also include in the PSIG Training Plan any plan for community engagement or outreach for development or delivery of particular trainings.

Please incorporate these changes into the PSIG Training Plan and resubmit the production to the IMT and OAG for final concurrence. Should PSIG disagree with any of OAG's requested changes, please contact our office and the IMT as soon as possible so that we may attempt to resolve any disagreements

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: */s/ Alicia Weber*
Deputy Bureau Chief, Civil Rights Bureau
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Phone: (312) 814-5093
E-mail: aweber@atg.state.il.us

Cc: Maggie Hickey, Rodney Monroe, Harold Medlock, Independent Monitoring Team

Independent | Chicago Police
Monitoring Team | Department
| Consent Decree