**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| STATE OF ILLINOIS, | |
| Plaintiff, | Case No. 17-cv-6260 |
| v. | Hon. Robert M. Dow Jr. |
| CITY OF CHICAGO, | |
| Defendant. | |

**PLAINTIFF'S RESPONSE IN SUPPORT OF THE COALITION'S**
**MOTION TO ENFORCE THE CONSENT DECREE**

Date: June 11, 2021

KWAME RAOUL
Attorney General of Illinois

Christopher G. Wells
*Chief, Public Interest Division*
Amy Meek
*Bureau Chief, Civil Rights Bureau*
Mary Grieb
*Deputy Bureau Chief, Civil Rights Bureau*
Stefanie L. Steines
*Senior Assistant Attorney General*
Hannah Y. Jurowicz
Aaron P. Wenzloff
*Assistant Attorneys General*
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, IL 60601

**INTRODUCTION**

The Coalition's motion to enforce the Consent Decree describes a disturbing pattern of search warrant incidents where Chicago police officers unreasonably pointed firearms at children; unreasonably handcuffed them; forced adults and children to stand naked or partially dressed; forced children to sit outside in the cold and rain without coats or to lie face down for lengthy periods; cursed at children; used flashbang grenades in homes with young children; broke down doors without allowing the occupants to voluntarily comply with an order to open the door; interrogated children without providing a Juvenile *Miranda* Warning; and failed to record their law enforcement activities on body-worn cameras until the end of the incident. ECF No. 702, Consent Decree ("Consent Decree").

The City of Chicago ("City") argues that this Court lacks the power to address these serious allegations because the term "search warrant" does not appear in the Consent Decree. This simplistic argument is wrong; it inverts the scope of the Consent Decree in derogation of the Decree's expansive terms. The Decree does not exhaustively list every law enforcement activity or specific location where its reforms apply. Rather, by design, the Consent Decree mandates broad reforms across the Chicago Police Department ("CPD")—for all officers, for all law enforcement activities, in all contexts—except where the Decree expressly states otherwise.[1] Just as the Decree does not contain the terms "traffic stop" or "protest," but surely applies in those contexts, likewise, there are no exceptions for search warrant incidents.

This Court has the power to enforce the Consent Decree's provisions addressing officer misconduct in all contexts, including the execution of search warrants. In all circumstances, the

---

[1] *See, e.g.,* Consent Decree, ¶ 15(c) (requiring the review of crime reduction strategies for consistency with the principles of community policing, but "*excluding operational strategies that are determined on a day-to-day or short term basis*") (emphasis added).

1

Consent Decree requires CPD officers to treat people with respect, *see* Consent Decree, ¶¶ 54, 156, 346(c); not use derogatory language, *id.* at ¶ 54; not unreasonably apply handcuffs to children, *id.* at ¶ 36; not unreasonably point firearms at people, *id.* at ¶ 189; allow individuals to voluntarily comply with lawful orders whenever safe and feasible, *id.* at ¶ 162; give Juvenile *Miranda* Warnings before custodial interrogations of children, *id.* at ¶ 35; only use force when it is objectively reasonable, necessary, and proportional, *id.* at ¶ 164; and record their law enforcement related activities until the conclusion of every incident, *id.* at ¶ 238.

The connection between these provisions and CPD's search warrant practices is not hypothetical. The final version of the Consent Decree included requirements regarding firearm-pointing only after a high-profile media report in August 2018 described CPD officers pointing firearms at children ***during the execution of a faulty search warrant.***[2] Now, the City asks to retroactively narrow the scope of these bargained-for provisions by misreading an exception into the Consent Decree that does not exist. The City's argument is wrong and must be rejected.

Finally, the City also misstates the law of remedies under consent decrees, which gives federal courts the equitable power to construct flexible remedies to ensure the terms of a consent decree are followed. The Office of the Attorney General ("OAG") therefore respectfully requests that the Court: (1) hold that officers' conduct during the execution of search warrants is not categorically exempt from the Consent Decree; (2) order CPD to submit its search warrant policy and related trainings for review under Paragraphs 627 and 641 of the Consent Decree within seven

---

[2] Dave Savini, *CPD Officers Raid Wrong Home, Point Guns at 9-Year-Old Boy; 'My Life Flashed Before My Eyes,'* CBS2 Chicago (Aug. 14, 2018), https://chicago.cbslocal.com/2018/08/14/chicago-police-cpd-raid-wrong-home-point-guns-at-9-year-old-boy-peter-mendez/. *See also* ECF No. 98 at ¶¶ 5–8 (noting that the parties publicly released a draft consent decree on July 27, 2018, but requesting a partial lift of the stay of proceedings to allow the parties to litigate "whether CPD officers should be required to record instances in which they point a firearm at a person") (filed Aug. 29, 2018); ECF No. 101 at ¶ 3 (requesting reinstatement of stay because the parties "have reached agreement on the issue of whether CPD will require officers to record instances in which they point a firearm at a person") (filed Sept. 5, 2018).

days after entering this order; and (3) exercise its inherent discretion to order the Coalition, the parties, and the Independent Monitoring Team ("IMT") to engage in structured settlement negotiations regarding CPD's latest search warrant policy.

## BACKGROUND

On August 5, 2020, the Coalition sent the City a pre-enforcement notice to meet and confer to resolve its concerns about CPD officers violating a range of Consent Decree paragraphs in the context of executing search warrants on residential homes, including: unreasonably pointing firearms at children; unreasonably handcuffing children or their parents; breaking down doors without knocking or less than thirty seconds after knocking; using flashbang grenades where young children were present; engaging in unreasonable uses of force; cursing at occupants of homes being searched; wrongly forcing people to stand naked or in the rain without coats, or lie face down; interrogating children without first notifying a parent or guardian or administering a juvenile *Miranda* warning; and other conduct in violation of CPD policies and Consent Decree requirements related to procedural justice, de-escalation, use of force, community policing, and impartial policing. ECF No. 924, Coalition's Motion to Enforce the Consent Decree ("Mot.") at 23 (citing ECF No. 924-2 (the "Coalition Letter")); *see also* Consent Decree, ¶¶ 695, 709.

On September 25, 2020, the OAG sent a letter echoing the Coalition's concerns and recounting its own attempts to ask CPD to address policies and trainings occurring in the context of search warrant executions—particularly those involving disturbing interactions with children and youth. Mot. at 23 (citing the "OAG Letter," ECF No. 924-3 at 1–2). The OAG Letter identified dozens of Consent Decree paragraphs implicated by the incidents described in the Coalition's Letter and in news reports about botched home raids. ECF No. 924-3 at 1–4. The OAG Letter further requested the City meet with the Coalition, IMT, and OAG to resolve these issues. *Id.* at 4.

The City essentially ignored both letters. *See* Mot. at 23. Over the following months, the Coalition repeatedly orally requested a substantive response, and on December 16, 2020, the Coalition sent the City a written request for a firm date by which it would respond. Mot. at 23–34 (citing ECF No. 924-4). In the face of continued silence, on January 13, 2021, the Coalition filed its motion to enforce the Consent Decree. ECF No. 924. The Coalition requests that this Court "immediately convene a structured settlement process" to address CPD's search warrant policies, training, and practices. *Id*. at 5.

On March 3, 2021, CPD released a revised draft of its search warrant policy and posted the draft for public comment. ECF No. 933, 933-1. Both the OAG and the IMT submitted comments on the draft policy, and CPD received hundreds of public comments.[3] Finally, on May 14, 2021, CPD released a revised, interim search warrant policy.[4] The revised policy failed to incorporate the majority of the IMT's and the OAG's recommendations.

## LEGAL STANDARD

"From the standpoint of interpretation, a consent decree is a contract, but from the standpoint of remedy it is an equitable decree." *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (Posner, J.). The threshold issue of the Coalition's motion is therefore a question of law: whether the Consent Decree's terms apply to police conduct during search warrants. If the Consent Decree applies, then the Court must determine whether, as the Coalition's motion alleges, CPD's conduct violates the Consent Decree—a question of fact the City seeks leave to develop after the

---

[3] *See* Exhibit 1, OAG Comments on Draft Policy; Exhibit 2, IMT Comments on Draft Policy; Exhibit 3, CPD Response to FOIA Request for Public Comments (redacted by OAG to remove names). The IMT's written comments pertained to CPD's publicly released draft policy and are therefore not subject to Paragraph 672 of the Consent Decree, regardless of whether the Court accepts the City's position that the Consent Decree is inapplicable to search warrants.
[4] *See* Exhibit 4, Special Order S04-19: Search Warrants (eff. May 28, 2021).

scope is settled.[5] ECF No. 932, Resp. in Opp. to the Coalition's Motion to Enforce the Consent Decree ("Opp.") at 8, n.1. The Court has the power to issue supplemental orders to determine whether a violation has occurred. *See, e.g.*, *United States v. City of Northlake, Ill.*, 942 F.2d 1164, 1170 (7th Cir. 1991) (remanding to order discovery on whether a police department's oral interview process violated consent decree against discriminatory hiring, even though "oral interviews" were not explicitly referenced in the agreement). Finally, if the Court finds that CPD's conduct may be violating the Consent Decree, the Court has discretion to fashion an equitable remedy and grant the Coalition's requested relief in a supplemental order. *Cook*, 192 F.3d at 695.

As a consent decree is "essentially a contract for purposes of construction," principles of state contract law apply in a dispute regarding its scope. *Northlake*, 942 F.2d at 1167. Under Illinois law, the "primary objective in construing a contract is to give effect to the intent of the parties, which is best shown by the language of the contract itself." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021) (cleaned up). "All portions of a contract should be construed as a whole, viewing each part in light of the others." *Id.* (cleaned up). Accordingly, courts should "give meaning to every provision of the contract and avoid rendering any provisions superfluous." *Id.*

## ARGUMENT

### I.    The misconduct by CPD officers described in the Coalition's motion is within the scope of the Consent Decree.

This Court has authority to order the parties to attempt to resolve the Coalition's and OAG's concerns under Paragraphs 695 and 709 because the conduct at issue violates specific provisions of the Consent Decree. The Consent Decree's broad requirements neither carve out particular law enforcement activities, nor waive compliance obligations based on the specific

---

[5] The OAG believes that the Coalition's motion provides sufficient evidence to show that CPD's practices are inconsistent with numerous Consent Decree requirements and respectfully requests leave to address any new arguments, facts, or evidence that the City may present on the issue.

context of the activity. Rather, by design, the Consent Decree's relevant provisions are applicable to all law enforcement activities, in all contexts. *See, e.g.*, Consent Decree, ¶¶ 37(d), 156, 161. If the Consent Decree's relevant requirements were "intended to have limited effect, it could easily have said so"—it did not. *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 152–53 (3d Cir. 1985) (district court erred in summarily dismissing enforcement claim as outside consent decree's scope where the agreement used a broadly applicable term with no limiting language). The City's cramped construction of the Consent Decree impermissibly attempts to impose an exemption for a specific category of law enforcement activity that has no basis in the text.

### A.    How officers conduct themselves when executing search warrants is within the scope of the Consent Decree.

Under the Consent Decree, the City has committed to ensuring that CPD serves "all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety." Consent Decree, ¶ 6. To achieve this purpose, the Consent Decree's explicit requirements for use of force, interactions with children, impartial policing, procedural justice, supervision, accountability, and data collection apply to all police conduct, regardless of where it occurs.

The Coalition's motion (*see* Mot. at 8–18) details disturbing examples of police conduct that violate substantive requirements of the Consent Decree, including the paragraphs below:

- treating people with respect (¶¶ 54, 156, 346(c));
- not using derogatory language or intentionally denigrating an individual (¶ 54);
- not unreasonably handcuffing children (¶ 36);
- giving Juvenile *Miranda* Warnings before interrogating children (¶ 35);
- interacting with children in a developmentally appropriate manner (¶¶ 32, 37(d));
- providing reasonable accommodations to individuals with disabilities (¶ 68);
- not unreasonably pointing firearms at people (¶ 189);
- allowing individuals to voluntarily comply with lawful orders whenever safe and feasible (¶¶ 153, 156, 162);

- using de-escalation and time as a tactic to prevent or reduce the need for force whenever safe and feasible (¶¶ 153, 156, 161–62);
- using objectively reasonable, necessary, and proportional force (¶¶ 153, 156, 164);
- recording law-enforcement activities until the conclusion of every incident (¶ 238);
- truthfully and completely reporting all reportable instances of force (¶ 156(h));
- promptly identifying and responding to unreasonable or unnecessary force (¶ 153);
- collecting, tracking, and maintaining use of force and misconduct data to promote accountability and transparency and to assess whether CPD policies, training, tactics, and practices meet the goals of the Consent Decree, reflect best practices, and prevent or reduce the need to use force (¶¶ 153, 157, 568–69).[6]

The court's "primary objective" in construing these requirements must be "to give effect to the intent of the parties . . . shown by the language of the contract itself." *Block*, 984 F.3d at 1217 (cleaned up). These substantive obligations must also be understood in the context of the Consent Decree's express goals and guiding principles. *See* Consent Decree ¶ 757 (requiring same). For example, Paragraphs 157–59 require that CPD review and revise its policies, training, tactics, and practices to "meet the goals of [the Consent Decree], reflect best practices, and prevent or reduce the need to use force." Similarly, Paragraphs 272(c), 272(h) and 319 require CPD to create a training plan and develop and implement training curricula that "fulfill" and "comport with" the "goals of [the Consent Decree]."

The Coalition and the OAG have the right to seek enforcement where "the City and CPD have failed to comply with *any* provision of this Agreement." *Id.* at ¶ 694 (emphasis added). The Coalition's enforcement motion identifies material provisions (*see, e.g.*, ¶¶ 32, 37(d), 156, 161, 238–39) that must be interpreted in the context of the Consent Decree's goals and guiding principles (*see, e.g.*, ¶¶ 6, 420, 423). Mot. at 8–10. The Coalition's motion identifies conduct that conflicts with these provisions. Furthermore, as the City notes, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one

---

[6] To illustrate the express language of these requirements, and aid in the review of their scope, the OAG has attached as Exhibit 5 the text of these paragraphs.

of the parties to it." Opp. at 2 (citations omitted). "Like any document, a consent decree must be read as a whole." *All. to End Repression v. City of Chicago*, 742 F.2d 1007, 1011 (7th Cir. 1984).

For example, the Consent Decree requires that "CPD's use of force policies and training, supervision, and accountability systems will be designed, implemented, and maintained" to ensure that officers "act at all times" in a manner that respects the "sanctity of human life" and "with a high degree of ethics, professionalism, and respect for the public." Consent Decree, ¶ 156. The plain meaning of "at all times" is clear: there is no exclusion for when officers execute search warrants. *See, e.g.*, *Brobst*, 761 F.2d at 152 (district court erred in ruling that consent decree was inapplicable where, by its terms, it applied to "any establishment" at which employer operated).

Likewise, CPD's failure to properly safeguard children from trauma during home raids, as detailed in the motion (Mot. at 8, 11–16), is squarely subject to Consent Decree Paragraphs 32 and 37(d), which require CPD to review and revise its policies and training to provide officers with developmentally appropriate responses to interactions with children. Again, there is no exception for when police traumatize children in their own homes in the course of executing a search warrant.

CPD's wrongful raid of the Mendez home, which occurred in 2017 and the details of which were publicly reported as the parties were finalizing the Consent Decree in August 2018, provides a stark illustration of conduct that clashes with the Consent Decree's requirements. Officers broke into the family's home without knocking or attempting to allow them to voluntarily comply with orders, unreasonably pointed their firearms at a kindergartener and a nine-year-old, and screamed profanities. Mot. at 13.[7] Despite learning they were in the wrong home, officers continued the search, rifling through toys and clothes while the children cried and pleaded for officers not to kill their handcuffed father laying prone on the floor. *Id.* An officer involved later claimed that he

---

[7] *See also* Savini *supra* note 2.

8

lacked the resources and training to ensure that the search warrant was carried out correctly.[8] The Consent Decree prohibits all of this conduct: unreasonably pointing firearms, failing to allow voluntary compliance, screaming profanities, traumatizing children, and providing insufficient training. *See, e.g.*, Consent Decree, ¶¶ 32, 37, 54, 56, 72, 153, 156, 162, 246.

The Consent Decree's mandated trainings will instruct officers to avoid such abuses. *See id.* at 32, 37(d), 72, 188, 243, 245–46, 275. In particular, Paragraphs 72 and 275 of the Consent Decree require CPD to revise its trainings on "Fourth Amendment subjects"—which necessarily include search warrant incidents—to integrate concepts of impartial policing, procedural justice, de-escalation, and community policing. *See Kentucky v. King*, 563 U.S. 452, 459 (2011) (a "basic principle of Fourth Amendment law" is the warrant requirement for searches and seizures inside a home) (cleaned up). Because such trainings must be submitted for review and approval by the OAG and the IMT, *see* Consent Decree, ¶ 641, the IMT and the OAG have already reviewed and commented on at least one of CPD's Fourth Amendment courses. ECF No. 942, IMR-3 Report at 145.

In sum, because the identified Consent Decree provisions direct CPD officers' conduct in all law enforcement activities, CPD's search warrant policies, training, and practices are also within the Decree's purview and must be submitted for review under Paragraphs 627 and 641.

B.     **The City's simplistic approach is contrary to contract interpretation principles and would lead to absurd results.**

The City's reliance on the lack of explicit reference to "home raids" or "search warrants" in the Consent Decree is misplaced and contrary to law. Courts have rejected attempts to apply a blinkered approach to narrow a negotiated consent decree's purpose and language. In *United States*

---

[8] *See* Dave Savini, *Chicago Police Officers Reveal Major Missteps As They're Questioned on Video For Lawsuit About Raiding Wrong Home*, CBS2 Chicago (Oct. 3, 2019), https://chicago.cbslocal.com/2019/10/03/chicago-police-officers-questioned-on-video-for-lawsuit-about-raiding-wrong-home/.

*v. City of Northlake, Ill.*, 942 F.2d 1164, 1165 (7th Cir. 1991), the Seventh Circuit reversed and remanded the district court's denial of an enforcement motion. Because that consent decree was entered into to "achieve broadly the goal of fair and non-discriminatory hiring in municipal employment," the "government's challenge to the oral interview procedures used in testing police applicants [fell] entirely and comfortably within the scope of the consent decree," even though the context of oral interviews was not specifically mentioned in the decree. *Id.* at 1168.

Similarly, in *Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019), the Ninth Circuit held that the district court's enforcement order did not modify the consent decree, despite the government's argument that the consent decree made "no mention of [specific] words." 934 F.3d at 913–15 ("emphatically disagree[ing]" with the appellant's "cramped understanding" of the consent decree). There, the district court required the Department of Homeland Security to hold minors in "safe and sanitary" facilities and to treat minors with "dignity, respect, and special concern." *Id.* at 911. Based on these broad provisions, the court ordered Border Patrol to provide minors with soap, towels, showers, dry clothes, toothbrushes, and adequate sleeping conditions, even though the consent decree did not include those specific terms. *Id.* at 913–14. The Ninth Circuit rejected the argument that the enforcement order improperly modified consent decree. *Id.* at 916.

The recent interpretation of the scope of the Seattle Police Department's consent decree is also instructive. In *United States v. City of Seattle*, 2019 WL 2191871 (W.D. Wash. May 21, 2019), the district court held that, "although the Consent Decree contains no explicit mandate concerning the arbitration process," "any provision that implicates officer discipline related to use-of-force inherently implicates all three of the Consent Decree's purposes," which are to ensure that police services are delivered in a manner that "(1) fully complies with the Constitution and laws of the United States, (2) ensures public and officer safety, and (3) promotes public confidence in the SPD

10

and its officers." *Id*. at *3. As the court explained, arguing that the enforcement was outside the scope of the Consent Decree just because it "did not expressly mandate changes to…specific terms…misapprehends" the disputed process's "intersection with the Consent Decree[.]" *Id*.

Ignoring what *is* in the Consent Decree, the City focuses exclusively on what is *not*. The City's entire argument depends on the observation that the words "search warrant" or "home raid" do not appear in the text. Opp. at 1–2. This tunnel vision tactic ignores well-established law requiring courts to construe contracts as a whole, would lead to absurd results, and would undermine the enforcement rights provided under Paragraphs 695 and 709 of the Consent Decree. *Block*, 984 F.3d at 1217 ("All portions of a contract should be construed as a whole, viewing each part in light of the others" to "avoid rendering any provisions superfluous") (cleaned up). CPD's conduct in executing search warrants implicates numerous, substantive provisions of the Consent Decree. For that reason, the Coalition's enforcement motion is properly before this Court, and the City's hyper-textual attempt to limit the scope of the Consent Decree is contrary to the law.

Additionally, the City's strained interpretation would lead to absurd results. The Consent Decree does not contain the words "protest," "alleyway," or "traffic stop." but it would be absurd to argue Consent Decree mandates do not apply in those contexts. Notably, the City has already implicitly acknowledged that the Consent Decree grants the IMT authority to investigate police conduct during the 2020 summer protests even though the words "protest" and "civil unrest" appear nowhere in the text of the Consent Decree. *See* ECF No. 839 ("Since the May 25, 2020 tragic death of George Floyd…Chicago is experiencing a rise in First Amendment activity, civil unrest, and *related law enforcement activities that span issues covered by the Consent Decree*.") (emphasis added).

Indeed, CPD's latest search warrant policy belies the pretense that Consent Decree

requirements are wholly inapplicable in the search warrant context. For example, Section II explicitly adopts several Consent Decree goals and requirements as core principles, Section IX invokes the Consent Decree's requirement on handcuffing juveniles nearly verbatim, and the body-worn camera requirements closely tie to Paragraphs 236–239 of the Consent Decree.[9]

Finally, a ruling that search warrants are categorically excluded from the scope of the Consent Decree would invite additional litigation. ECF No. 1, Compl. ¶2; Consent Decree, ¶ 5. As the Seventh Circuit has warned, to make a party "file a new lawsuit to remedy allegedly illegal conduct already embraced by a consent decree would serve as a disincentive to civil rights plaintiffs contemplating whether or not to enter into such a decree." *Northlake*, 942 F.2d at 1168. It would also "undermine[] the purpose of a consent decree in the first instance—namely, to avoid protracted litigation by entering into a court-supervised agreement that resolves the dispute…and guarantees the viability of the agreement under the watchful eye of the judge[.]" *Id*. Requiring a new suit to apply the Consent Decree's reforms in the context of search warrants would frustrate the broad purpose and related requirements of the Decree, undermine the Court's enforcement authority, and discourage civil rights plaintiffs from entering into consent decrees in the future.

The City's categorical carveout of police conduct while searching people's homes lacks any basis in the four corners of the Consent Decree and would lead to absurd results that threaten the very purpose of the Consent Decree. Just as in *Northlake*, *Flores*, and *Seattle*, this Court should reject the City's cramped interpretation of the Consent Decree.

---

[9] *See* Exhibit 4, Special Order S04-19, at Sec. II.A-B (requiring officers to act in accordance with the Constitution, including the Fourth Amendment, and comply with the law; use de-escalation to prevent or reduce the need for force; and treat all persons with dignity and respect); *id.* at Sec. IX.E.3.b (incorporating the Consent Decree requirement that, when determining whether to handcuff juveniles, "officers will consider the totality of the circumstances, including, but not limited to, the nature of the incident and the juvenile's age, physical size, actions, and conduct . . . and whether such restraints are necessary to provide for the safety of the juvenile, the officer, or others"); *compare id.* at Sec. IX.E.3.b with Consent Decree ¶ 36; *see also id.* at Sec. IC.C.2 (implicating Consent Decree, ¶¶ 236–39).

## II.    The Court has broad discretion to enforce the Consent Decree through its equitable powers.

### A.    The Coalition's requested relief comports with the Consent Decree's enforcement provisions and is within the Court's equitable discretion.

The Court has broad discretion to order the parties to make a good faith effort to discuss and resolve the concerns raised in the Coalition's motion—a reasonable pre-enforcement step anticipated in Paragraph 695 of the Consent Decree. In line with Paragraph 695, the Court need not rule now on whether any Consent Decree violations have occurred, but may continue this fact-intensive question until after the parties, the Coalition, and the IMT have met and conferred and submitted a report to the Court on their progress.

As the Supreme Court has held, where "a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *see also Kansas v. Nebraska*, 574 U.S. 445, 455 (2015) (courts "may invoke equitable principles, so long as consistent with the [negotiated agreement] itself, to devise fair…solutions to the [parties'] disputes and provide effective relief for their violations") (cleaned up). Accordingly, the Seventh Circuit has held that if a consent decree "is violated, the injured party must ask the court for an equitable remedy." *Cook*, 192 F.3d at 695. The "remedy might be a contempt judgment, but more commonly…is a supplementary order…designed to make the party whole for [its] loss." *Id*. (internal citations omitted).

Courts are well within their authority to impose equitable remedies and direct parties to strive for compliance with negotiated consent decrees. For example, in *Northlake*, the Seventh Circuit remanded for discovery and a hearing on whether the municipality's oral interview criteria for police applicants violated the consent decree, even though the consent decree did not contain

an admission of liability. *Northlake*, 942 F.2d at 1165. Recently in Seattle, when the district court found the City of Seattle out of compliance with the negotiated consent decree's accountability provisions, it used its equitable discretion to require the parties, with assistance from the Monitor and Community Police Commission, to formulate a methodology for assessing accountability and submit a plan for how the City might achieve compliance. *Seattle*, 2019 WL 2191871, at *1, 7.

While parties are free to "cabin the district court's equitable discretion by stipulating the remedies for breach," when the "decree does not specify the consequences of a breach," the remedies are "referred to the district court's equitable discretion." *Cook*, 192 F.3d at 698. Here, the parties did not cabin the Court's ability to fashion equitable remedies, and the City cites no authority for its contention that the Court's enforcement powers are strictly limited. Opp. at 4–5. To the contrary, Paragraphs 629–31, 694–95, and 709 provide for enforcement through the Court, but do not restrict the potential remedies.

In sum, this Court should exercise its enforcement discretion to grant the Coalition's modest request for a structured settlement process and, consistent with Paragraph 695, order the parties to attempt to resolve the concerns about the numerous Consent Decree requirements raised in the Coalition's motion. Far from straying from "the spirit or purpose of the Consent Decree," Opp. at 4, this resolution is within this Court's equitable discretion and would conform with Paragraph 695's requirement of good faith negotiations.

**B.    The Court should require CPD to submit its search warrant policies and trainings for review under Paragraphs 627 and 641.**

At a minimum, CPD should be required to submit its search warrant policy and related trainings to the IMT and OAG for review and comment under Paragraphs 627 and 641, just as it has been doing for over two years with other policies and trainings concerning a variety of law

enforcement activities that have touchpoints with the Consent Decree.[10] Absent such a review, and judicial oversight, the same problems with search warrants will likely recur,[11] considering that CPD recently rejected over 75% of the recommendations that the IMT and OAG submitted during CPD's public comment period for its search warrant policy, including recommendations that would have ensured the policy was consistent with the Consent Decree.[12]

The time to address concerns about these troubling practices is now. *See Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985) ("When an equity decree affects other people besides the parties to it, the judge must take account of the interest of those people—the public interest—in his decision whether to grant or deny equitable relief.").

## CONCLUSION

The OAG respectfully requests that the Court: (1) hold that officers' conduct during the execution of search warrants is not categorically exempt from the Consent Decree; (2) order CPD to submit its search warrant policy and related trainings for review under Paragraphs 627 and 641 of the Consent Decree within seven days after entering this order; and (3) exercise its inherent discretion to order the Coalition, the parties, and the IMT to engage in structured settlement negotiations regarding CPD's latest search warrant policy.

---

[10] CPD has submitted several such policies and trainings to the IMT and OAG under Paragraphs 627 or 641. For example, CPD submitted General Order G02-02, "First Amendment Rights" for review and comment because it was related to Paragraph 163 (a prohibition against the use of force solely for retaliation against First Amendment activity), even though the policy governed topics much broader than the use of force during First Amendment activity. CPD also submitted training related to the Fourth Amendment because it implicated Paragraphs 72, 275, and 320–323. Similarly, CPD submitted a "Motor Vehicle Pursuits and Eluding Vehicle Incidents" training bulletin because it implicated Paragraph 167 (requirement for periodic instruction regarding sound or dangerous vehicle maneuvers), even though "vehicle maneuvers" was only one topic the bulletin covered.
[11] *See* Dave Savini, *Chicago Police 'Community Safety Team' Accused of Botched Raid After Officials Promised Reforms*, CBS2 Chicago (May 26, 2021) (describing a wrong home raid occurring on March 14, 2021), https://chicago.cbslocal.com/2021/05/26/chicago-police-community-safety-team-accused-of-botched-raid-after-officials-promised-reforms.
[12] *See* Exhibit 1, OAG Comments on Draft Policy; Exhibit 2, IMT Comments on Draft Policy.

Date: June 11, 2021

Respectfully submitted,

By: /s/ Hannah Jurowicz
    /s/ Aaron Wenzloff
    *Assistant Attorneys General*

Christopher G. Wells
*Chief, Public Interest Division*
Amy Meek
*Chief, Civil Rights Bureau*
Mary Grieb
*Deputy Chief, Civil Rights Bureau*
Stefanie L. Steines
*Senior Assistant Attorney General*
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, IL 60604
(312) 814-3000