# Exhibit 1



**OFFICE OF THE ATTORNEY GENERAL**
STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

March 18, 2021

**SENT VIA EMAIL**

City of Chicago Law Department
c/o Tyeesha Dixon
121 North LaSalle Street, Suite 600
Chicago, Illinois 60602
E-mail: Tyeesha.Dixon@CityofChicago.org

**Re:** Comments on Special Order S04-19, "Search Warrants"

Dear Ms. Dixon,

Pursuant to the public comment process provided by the Chicago Police Department ("CPD"), the Illinois Office of the Attorney General ("OAG") offers these public comments on the draft directive "Special Order S04-19: Search Warrants" that the City published on March 3, 2021. The OAG provides the enclosed comments to the draft directive both as the plaintiff in *State of Illinois v. City of Chicago,* 17-cv-6260 (N.D. Ill.), and on behalf of the People of the State of Illinois, as the chief legal advocate for the health and well-being of Illinois residents.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: /s/ *Mary J. Grieb*
Deputy Bureau Chief, Civil Rights Bureau
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Phone: (312) 814-3877
E-mail: MGrieb@atg.state.il.us

I. **Introduction**

The right to be secure in one's home is at the core of the Fourth Amendment. There is no more violent invasion of that right than for police officers to wrongfully break into a home and hold a family, including young children, at gunpoint. Yet, such wrongful search warrant raids have occurred in a shocking pattern across Chicago in recent years. The available evidence suggests that such wrong raids occur more frequently in predominantly Black and Brown neighborhoods;[1] involve disturbing displays of firearms toward children, the elderly, and the vulnerable;[2] include callous and unprofessional conduct by officers;[3] sometimes include unnecessary or unreasonable uses of handcuffs on children and others;[4] and have largely gone untracked and without discipline for those officers involved.[5]

The documented problems with mistaken and unlawful executions of search warrants, aggressive forcible-entry home raids, and the use of "no-knock" raids are consistent with serious concerns documented around the country.[6] In particular, multiple studies show that aggressive forcible-entry raids and no-knock search warrants are disproportionately used against persons of color and most frequently for low-level drug crimes.[7] No-knock warrants are especially dangerous for both officers and civilians. Between 2010 and 2016, at least ninety-four people died during the execution of no-knock search warrants, thirteen of whom were police officers.[8] Of the 81 civilian deaths associated with no-knock raids during that period, half were members of minority groups.[9]

---

[1] *See* Dave Savini, *et al.*, *Chicago Police 'Illegal, Violent' Raids Violate Consent Decree, Attorneys Say, Forcing City Back to Federal Court*, CBS 2 Chicago, January 13, 2021, https://chicago.cbslocal.com/2021/01/13/chicago-police-illegal-violent-raids-violate-consent-decree-attorneys-say-forcing-city-back-to-federal-court/ (noting that the majority of victims of dozens of "wrong raids" uncovered by CBS were persons of color); *see also* Dave Savini, *et al. 'They Had The Guns Pointed At Me;' Another Chicago Family Wrongly Raided, Just 1 Month After Police Created Policy To Stop Bad Raids*, CBS 2 Chicago, undated, https://chicago.cbslocal.com/they-had-the-guns-pointed-at-me-another-chicago-family-wrongly-raided-just-1-month-after-police-created-policy-to-stop-bad-raids/ (analysis of police data found Black and Latino neighborhoods were disproportionately targeted in search warrants).
[2] *See* Motion to Enforce the Consent Decree Concerning CPD's Execution of Search Warrants & Home Raids at 12–18, *Illinois v. City of Chicago*, 1:17-cv-06260, ECF No. 924 (Jan. 13, 2021) (hereinafter Motion to Enforce) (describing numerous civil suits against City of Chicago involving wrong raids).
[3] CNN, *Behind the Mistaken Raid By Chicago Police On An Innocent Social Worker's Home*, December 19, 2020, https://news.wttw.com/2020/12/19/behind-mistaken-raid-chicago-police-anjanette-young.
[4] Motion to Enforce, *supra* note 2, at 12–18.
[5] *Id.*
[6] *See* Kevin Sack, Door-Busting Drug Raids Leave a Trail of Blood, N.Y. TIMES (Mar. 18, 2017), https://www.nytimes.com/interactive/2017/03/18/us/forced-entry-warrant-drug-raid.html (describing the dangers of no-knock raids for civilians and officers in cases across the United States).
[7] *See* American Civil Liberties Union, *War Comes Home: The Excessive Militarization Of American Policing*, at 33 (2014) (survey of police tactics in 20 cities found that 42% of those subjected to SWAT search warrant raids were Black and 12% were Hispanic.); *see also* Jonathan Mummolo, *Militarization fails to enhance police safety or reduce crime but may harm police reputation*, at 115(37) PNAS 9181-9186 (2018), https://www.pnas.org/content/pnas/early/2018/08/14/1805161115.full.pdf (deployments in Maryland were more heavily concentrated in minority neighborhoods, even after adjusting for crime rates).
[8] Kevin Sack, *supra* note 6.
[9] *Id.*

Moreover, there are several studies that find aggressive forcible-entry raids and no-knock warrants are not effective in protecting public safety.[10]

Given these concerns, the Council on Criminal Justice's Task Force on Policing issued recommendations in January 2021 that police departments prohibit or severely restrict the use of no-knock warrants and institute robust controls for all search warrants to protect officers from entering the wrong premises or injuring innocent people.[11] These same reforms are needed here in Chicago.

OAG appreciates that the City and CPD have taken the first steps towards updating the Department's search warrant policy, and welcomes the opportunity to offer public comments on the draft directive. This draft marks an improvement, including by institutionalizing key principles of the Consent Decree.[12] However, it still lacks key guidelines and criteria necessary to ensure the safe, consistent, and lawful use of search warrants. In addition to comments about the process for revising this directive (Section II), OAG's comments below (Section III) include specific recommendations to:

- Ban "no-knock" search warrants or provide clearer limits on their approval and, at minimum, limit the use of such warrants when children are present;
- Require consideration of de-escalation techniques when executing search warrants;
- Clarify the definition of a "wrong raid";
- Document damage caused by the execution of search warrants and work with residents to fix the damage and secure the home;
- Require more consideration of vulnerable populations in pre-planning sessions and greater protections for them during the execution of warrants;
- Require more training on interactions with children for any officers executing warrants;
- Require more robust data collection related to search warrants, particularly those involving children;
- Improve data collection for SWAT involvement in the execution of search warrants;
- Require the use of body-worn cameras by SWAT team members during the execution of search warrants;
- Require review of body-worn camera footage from wrong raids;
- Enhance reporting requirements related to wrong raids; and
- Delineate responsibilities of higher-ranking officers during search warrant execution.

These requested modifications are derived from the requirements of the Consent Decree, state and federal law, and best practices found in research, from law enforcement experts, and from other

---

[10] Task Force on Policing, Council on Criminal Justice, *No-Knock Warrants and Police Raids*, at 2 (2021), https://assets.foleon.com/eu-west-2/uploads-7e3kk3/41697/pdf_-_no_knock_warrants.afc61934d317.pdf.
[11] *Id.* at 1. The Task Force on Policing, an independent task force established by the Council on Criminal Justice in 2020, is comprised of a diverse panel of law enforcement and civil rights leaders, researchers, and others for the purpose of identifying policies and practices most likely to reduce violent encounters between officers and the public and improve the fairness and effectiveness of American policing. *See* https://policing.counciloncj.org/about-us.
[12] Search Warrant Directive, Section II.A.

jurisdictions. CPD's finalized search warrant directive must incorporate meaningful community engagement, comply with the Consent Decree and the law, and derive from evidence, research, and best practices. The current draft directive does not meet those standards.

## II. Comments on the Process

As a preliminary matter, OAG notes that the draft search warrant directive, Special Order S04-19, "Search Warrants," implicates many provisions of the Consent Decree, both directly and indirectly. Indeed, in September 2020, the OAG wrote to urge the City to follow these requirements and address specific concerns about CPD's search warrant policies and practices.[13] Despite the City's failure to seek input from OAG and the Independent Monitor through the Consent Decree's review process regarding the new directive, the OAG reserves the right to seek further information regarding the policies, trainings, and practices associated with the execution of search warrants, and, if necessary, to pursue enforcement proceedings related to any such policy, training, or practice if not in compliance with any Consent Decree requirement.

Moving forward, CPD and the City must seek additional community feedback about its search warrant policies and practices. CPD and the City must carefully review all public comments regarding the draft directive and implement changes that are reflective of the public's interest in safe, lawful search warrant practices that are free from discrimination and excessive force, and allow the City to hold officers who violate the directive accountable. CPD must do so to affirm continued public participation in improving its policies and procedures.

Beyond the public comment period, CPD must also seek robust community engagement to ensure that the lived experiences of Chicagoans most impacted by these law enforcement tools inform the revised directive.[14] OAG agrees with Superintendent David Brown that the work of CPD "should reflect the values of the people who live" in Chicago.[15] OAG strongly encourages CPD to embrace community engagement and not repeat the mistakes of its community working groups on use of force and school resource officer policies. As CPD strives to embody the Consent Decree's guiding

---

[13] Motion to Enforce, *supra* note 2, at Exhibit C (ECF No. 924-3).
[14] Numerous paragraphs of the Consent Decree require CPD to obtain input from community members or other stakeholders on matters related to this search warrant directive. *See, e.g.*, Consent Decree, ¶¶ 45, 46, 52, 160, 633, and 648(e). Additionally, best practices in policing call for law enforcement to rely on robust community engagement when drafting or revising department policies. *See, e.g.*, Megan Quattlebaum, Tracey Meares, and Tom Tyler, *et al.*, The Justice Collaboratory at Yale Law School, *Principles of Procedurally Just Policing*, 13–15 (2018) (describing principles of procedurally just policing as requiring departments to solicit community input when revising policies and to subject policies likely to substantially impact community members to intense public review).
[15] Press Release, Office of the Mayor, *Mayor Lightfoot and Superintendent Brown Announce Sweeping Changes to CPD's Search Warrant Policy*, March 3, 2021, available at https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2021/march/ChangesCPDSearchWarrantPolicy.html.

principles,[16] fulfill the Decree's requirements for officer conduct and supervision,[17] and incorporate data-driven accountability and officer support,[18] CPD must work with the Coalition, the Independent Monitor, the OAG, and the community at large to address ongoing concerns related to search warrant practices and procedures.

### III. Requested Modifications

OAG provides below a list of requested modifications to the draft search warrant directive that will advance the requirements of the Consent Decree, the law, and best practices.

### A. The Revised Search Warrant Policy Must Adopt Stronger Guidelines Related to No-Knock Warrants, De-Escalation, and Use of Force.

CPD and the City should adopt clear requirements that minimize the potential for seeking and executing search warrants on the wrong premises or causing injury (including trauma) to residents or officers when executing search warrants, including the adoption of de-escalation practices. CPD and the City should also either ban or impose further limitations on the use of "no-knock" warrants, which are inherently dangerous.

1. **Ban "no-knock" search warrants, or provide clearer limits on their approval**. "No-knock" search warrants are dangerous for both officers and the public.[19] Moreover, research shows no relationship between police raids and reduced crime.[20] To be clear, eliminating the use of no-knock warrants would not prohibit officers from entering a home in exigent circumstances (as defined by law) without a warrant or without knocking.[21] But, eliminating the use of "no-knock" warrants will likely enhance police legitimacy, prevent the misuse of force, and increase officer safety.[22] A growing number of jurisdictions have banned "no-knock" warrants.[23] CPD should, too.

---

[16] *See, e.g.,* Consent Decree, ¶¶ 6, 10, 49, 51, 250, 265-68, 293, 298, 317.
[17] *See, e.g.*, Consent Decree, ¶¶ 32, 35, 36, 54, 153, 156, 162, 164, 176, 189, 237-39, 271-72, 334, 341-46, 352-53, 369.
[18] *See, e.g.,* Consent Decree, ¶¶ 355, 544, 547, 561, 566-69, 576, 583, 588.
[19] *See* Task Force on Policing, *supra* note 10 at 1.
[20] *Id.* at 3 ("…there is no reason to believe that banning [no-knock] search warrants will have either a positive or negative direct impact on public safety. While it is likely that more evidence will be destroyed as a result of minimizing forcible and unannounced warrant executions, the potential gains to public safety and justice are relatively small. By contrast, the risks of serious injury or death to occupants, and the resulting impact on police legitimacy, are large and outweigh the downsides.").
[21] Peter G. Berris and Michael A. Foster, *"No-Knock" Warrants and Other Law Enforcement Identification Considerations*, Cong. Res. Serv. LSB10499, 3 (June 23, 2020) https://crsreports.congress.gov/product/pdf/LSB/LSB10499 (describing exigent circumstances exception to the common-law knock-and-announce rule).
[22] Task Force on Policing, *supra* note 10 at 3.
[23] For example, Oregon, Florida, and Virginia have banned "no-knock" warrants. *See* Nathan Diller, *Virginia Becomes Third Start To Ban No-Knock Search Warrants*, NPR, Oct. 29, 2020, available at https://www.npr.org/local/305/2020/10/29/929108657/virginia-becomes-third-state-to-ban-no-knock-search-warrants. Thirteen other states have laws explicitly permitting no-knock warrants, and the remaining states issue such warrants based on a judge's discretion. *See* Candice Norwood, *The war on drugs gave rise to 'no-knock' warrants. Breonna Taylor's death could*

At a minimum, if CPD does not outright ban "no-knock" warrants," it must provide clearer limits on how their approval. CPD should amend Section IV.D.1.a-b of the draft directive to reconcile the permissible uses and approvals for "no-knock" warrants, which include: (1) approval of "no-knock" warrants by bureau chiefs; [24] (2) judicial approval of "no-knock" warrants;[25] and (3) legislative restrictions on the use of "no-knock" warrants.[26] For example, state law only allows for a "no-knock" warrant upon a showing of "specific facts" that demonstrate narrow, exigent circumstances. If CPD does not ban no-knock warrants, then CPD should amend the directive to permit the use of "no-knock" warrants only after officers have evaluated and documented whether less intrusive options are unavailable or a judge concludes the requesting member has sufficiently considered less restrictive methods. The better practice, however, would be to ban "no-knock" warrants entirely. Finally, CPD should likewise prohibit so-called "quick knock" warrants,[27] because they pose many of the same risks as "no-knock" warrants.[28]

2. **Require officers to avoid entry into homes while they are occupied and to use de-escalation techniques when encountering individuals.** CPD should modify the draft directive to require officers to use pre-warrant service planning sessions to avoid executing search warrants on premises that are occupied, absent exigent circumstances that imminently threaten the physical safety of members of the public or police.[29] Similarly, CPD should modify the draft directive to prohibit the use of nighttime raids except in emergency circumstances, as these raids pose a heightened risk of harm to occupants and officers.[30] CPD should also require use of a threat assessment matrix when planning for and executing

---

*end them*, PBS, June 12, 2020, available at https://www.pbs.org/newshour/politics/the-war-on-drugs-gave-rise-to-no-knock-warrants-breonna-taylors-death-could-end-them.

[24] The draft directive curtails the use of "no-knock" warrants and requires that a bureau chief personally review and approve the "no-knock" warrant. The draft directive does not prescribe any guidance for this approval beyond whether "there is a reasonable suspicion that knocking and announcing would be dangerous to the life or safety of the officers serving the warrant or other persons." Draft Search Warrant Directive, Section IV.D.1.a-b.

[25] The draft directive directs that a "judge may authorize a 'no-knock' search warrant when there is a reasonable suspicion that knocking and announcing would be dangerous to the life or safety of the officers serving the warrant or another person." Draft Search Warrant Directive, Section IV.D.2.

[26] New Illinois legislation requires limiting the use of "no-knock" warrants to situations in which an officer reasonably believes that if notice were given, a weapon would be used or that notice would result in imminent danger to destruction of evidence. Public Act 101-0652 (enacted Feb. 22, 2021) (amending 725 ILCS 5/108-8).

[27] In *United States v. Banks*, 540 U.S. 31, 38 (2003), the Supreme Court upheld the right of officers to forcibly enter a home 15 to 20 seconds after announcing their presence, creating the category of so-called "quick knock" warrants.

[28] Task Force on Policing, *supra* note 10 at 1 ("Quick-knock warrants pose many of same risks as no-knock warrants, particularly when conducted in the middle of the night, and therefore should also be prohibited.").

[29] *Id.* at 3 ("Law enforcement should avoid entry into homes or businesses while they are occupied, instead employing covert surveillance to discern safe times to enter. Doing so will reduce risk of evidence destruction and harm to officers and occupants.").

[30] *Id.* ("Nighttime raids involving standard knock warrants should be restricted to emergency exigent circumstances associated with the immediate threat to the well-being of innocent parties.")

search warrants on residential homes to account for the degree of danger to officers and civilians in carrying out a search warrant.[31]

CPD should also amend Section IX.A.8 and other sections of the draft directive to mandate that the search team use de-escalation techniques to avoid unnecessary or unreasonable uses of force, especially in the presence of vulnerable populations. In some instances, the draft directive may require an increased and unnecessary use of force; for example, the draft directive requires use of a canine team when the focus of the warrant is narcotics.[32]

3. **Clarify the definition of "wrong raid."** CPD and the City should further clarify the definition of wrong raids in Section X of the draft directive to require more stringent review of whether a Department member conducted a sufficient investigation to verify the complaint for search warrant before its execution. Additional clarity in the definition of "wrong raid" will facilitate accountability for Department members who violate this directive. Finally, Department members must leave the premises of a wrong raid location as soon as possible and provide victim support services for individuals subjected to a wrong raid.[33]

4. **Document damage from execution of search warrants.** In Sections II and IX.E-F, CPD should require members who execute a residential warrant to prepare a damage report before leaving the home, photograph and document all property damaged, work with residents to make arrangements for the prompt repair or replacement of damaged property, and ensure that any damage that threatens the security of the home (such as broken doors or windows) be repaired within a set time period of the conclusion of the raid.[34]

In addition to the cited best practices, many Consent Decree requirements mandate the above recommended changes. Paragraph 156 of the Consent Decree requires that CPD's use of force policies and training, supervision, and accountability systems ensure that CPD members use "sound tactics" to eliminate or reduce the amount of force needed; use de-escalation "to prevent or reduce the need for force whenever safe and reasonable;"[35] "continually assess the situation and modify the use of force as circumstances change;" and act "with a high degree of ethics, professionalism, and respect for the public" "in a manner that promotes trust between CPD and the communities it

---

[31] *Id.*; *see also* Detroit's Directive 202.3: Search Warrants and Execution at 6.1 ("Before executing any search warrant absent exigent circumstances, members shall complete the DPD746 Search & Arrest Warrant Risk Assessment Matrix Form (RAM) and follow all instructions herein. This form provides a risk assessment of the execution of any search warrant through a scoring system."), available at https://detroitmi.gov/sites/detroitmi.localhost/files/2020-12/Search%20Warrants%20%26%20Execution%20Directive%20202.3.pdf;
[32] Draft Search Warrant Directive, Section IX.A.7.
[33] The draft directive defines wrong raids and requires Department members to notify supervisors if they become aware of any wrong raid. Draft Search Warrant Directive, Section II.J.
[34] Task Force on Policing, *supra* note 10 at 3 ("When officers execute a search warrant and do not identify contraband or arrest an individual at the premises, the police department should compensate the owner and/or occupants of the home for any damage done unless subsequent discovery confirms criminal activity. To facilitate that restoration, officers should be required to video record the condition of the premise[s] prior to and after the search.")
[35] *See also* Consent Decree, ¶ 161 (adopting de-escalation as a core principle and requiring de-escalation techniques).

serves" and respects "the sanctity of human life." Adopting OAG's recommended changes would be consistent with CPD's commitment to the principles of the Consent Decree.

### B. The Draft Directive Must Include More Guidelines for Officer Interactions with Youth and Vulnerable Populations.

CPD must revise the draft directive to incorporate more guidelines to protect children and vulnerable populations during and after the execution of search warrants. Such revisions should consider and incorporate national best practices advocated for by law enforcement experts and social service organizations.[36] These include, for example:

5. **Limit use of "no-knock" warrants when children are present.** CPD and the City should add limitations to Section IV.D of the draft directive to eliminate the use of "no-knock" warrants when children are known to be present. The draft directive does not currently impose any limitations on the execution of search warrants, especially "no-knock" warrants, based on the presence of vulnerable populations, particularly children.[37]

6. **Require more consideration of vulnerable populations in pre-planning sessions.** CPD and the City should clarify the pre-warrant service planning session dictated in Section IX.A.1 of the draft directive to safeguard vulnerable populations, especially children. CPD should also dictate how Department members will accommodate children during every execution of a search warrant.[38] This should include a detailed explanation of how the proposed warrant execution will use tactics that minimize trauma and damage to property and persons, including a plan for children and other vulnerable people (including, but not limited to people who may be elderly, pregnant, experiencing mental health issues, living with a disability, or who are not proficient in English).[39] Required protections for vulnerable populations may also include restrictions on pointing firearms, requiring officers to inquire whether children are present, whether the person being arrested is the primary caregiver, and requiring social workers or mental health professionals to be present or available

---

[36] *See* Int'l Assoc. of Chiefs of Police, *Safeguarding Children of Arrested Parents* (August 2014), available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/IACP-SafeguardingChildren.pdf; *see also* Connecticut Center for Effective Practice, *A Collaborative Model to Support Children Following a Caregiver's Arrest: Responding to Children of Arrested Parents Together (REACT)*, (September 2012), https://strategiesforyouth.org/sfysite/wp-content/uploads/2014/09/CHDI-Arrest-Protocol-CT-Inst.-for-Mun-Reg-Policy.pdf.

[37] The draft directive permits the use of "no-knock" warrants to instances when "knocking and announcing would be dangerous to the life or safety of the officers serving the warrant or another person" and "the search warrant is personally reviewed and approved by the submitting Department member's bureau chief." Draft Search Warrant Directive, Section IV.D.1.a-b.

[38] The draft directive requires that a search team supervisor conduct a planning session with search team members assigned to participate in serving the warrant to ensure search team member familiarity with occupants of the premises to be searched, "paying special attention to potentially vulnerable person (e.g., children, elderly, persons with disabilities, people with limited English proficiency)." Search Warrant Directive, Section IX.A.1.c.

[39] *See, e.g.,* CCEP, *A Collaborative Model to Support Children Following a Caregiver's Arrest*, *supra* note 36, at 28–31 (listing policy recommendations).

for assistance.[40] The Consent Decree requires these revisions; CPD agreed to enact policies requiring Department members to interact with children in a developmentally appropriate way,[41] provide reasonable accommodations to individuals with disabilities,[42] and interact with all individuals with dignity and courtesy.[43]

The necessary changes described above are also consistent with recent Illinois legislation requiring officers executing a search warrant to ensure "steps were taken in planning the search to ensure accuracy and plan for children or other vulnerable people on-site."[44] Moreover, these recommended changes are increasingly prevalent in other jurisdictions because of the inherent, inescapable danger and trauma the execution of warrants poses to children.[45]

7. **Require greater protections for vulnerable populations during the execution of warrants**. In Section IX.C, CPD should require the team supervisor to ensure that, before entering the search location, the safety precautions identified in the plan are in place (including the presence of a translator, if necessary). In Section IX.D, CPD should require the supervisor to ensure that the members executing the search verify throughout the raid whether children or other vulnerable persons are present. If children are present, a team member should be required to call OEMC to inform operators about the presence of children. Officers should also ask any person being arrested if he or she is the primary caregiver for any children and ensure that measures are taken to provide for the child's care.[46] Consistent with Paragraph 36 of the Consent Decree, the policy should clearly forbid members from restraining juveniles unless doing so is necessary for the safety of the juvenile, officers, or others.

8. **Require more training on interactions with children for members executing warrants.** The directive should mandate specialized training for CPD members participating in executing search warrants where children or vulnerable populations may be present. This language is in addition to Section IX.E.3's recognition of additional protections to prevent

---

[40] *See, e.g., id.* at 16–22 (surveying jurisdictions that implement similar procedures); *see also* Lisa H. Thurau, *First, Do No Harm: Model Policies for Law Enforcement Agencies When Arresting Parents in the Presence of Children*, U.S. Dep't of Justice's Office of Justice Programs Diagnostic Center, at 12-16, http://strategiesforyouth.org/sitefiles/wp-content/uploads/2012/09/First_Do_No_Harm_Report.pdf
[41] Consent Decree, ¶ 32.
[42] Consent Decree, ¶ 68.
[43] Consent Decree, ¶ 49.
[44] Public Act 101-0652 (enacted Feb. 22, 2021) (amending 725 ILCS 5/108-8 to add subsection (c)(2)).
[45] *See, e.g.,* Detroit Police Dep't Directive 202.3, *supra* note 31 at 6.3 ("Should there be any children present or signs of children at the scene, there shall be no execution of any search warrant unless approved by the chief of Police or his designee. Surveillance shall confirm the children have left the premises before any execution of the search warrant"), https://detroitmi.gov/sites/detroitmi.localhost/files/2020-12/Search%20Warrants%20%26%20Execution%20Directive%20202.3.pdf; Massachusetts recently banned the use of "no-knock" warrants when there are children or adults over the age of 65 in the intended location. *Governor Baker Signs Police Reform Legislation*, Press Release, Dec. 31, 2020, https://www.mass.gov/news/governor-baker-signs-police-reform-legislation.
[46] *See, e.g.,* IACP, *Safeguarding Children of Arrested Parents*, *supra* note 36 at 21.

trauma or danger to those children.[47] This training should be developed with community input and, at a minimum, include sessions on child development and impact of trauma and use of force on children.

These recommendations are necessary to bring the directive into compliance with Consent Decree requirements, Illinois law, and best practices to protect children and youth.

### C. The Revised Search Warrant Policy Must Require the Collection of Key Data.

Consistent with the Consent Decree and best practices regarding data collection, CPD should amend the draft directive to require more collection of data related to execution of search warrants. More robust search warrant-related data practices will provide important data that CPD can use for self-examination and further improvement of practices and policies.

9. **Require more data collection related to search warrants**. CPD should amend Section X of the directive to require collection of more data regarding execution of search warrants. This data should include, but is not limited to: the race of individuals whose homes are searched;[48] items or contraband recovered; use of force, including pointing of firearms; arrest data; reliability of all three types of informants (John Doe, Unregistered Confidential Informant, and Registered Confidential Informant); complaints to COPA and BIA; the presence of children; the actions taken to protect the well-being of any children whose primary caregiver is arrested; and importantly, wrong raids.[49]

10. **Require more data collection related to search warrants involving children**. CPD and the City should amend Section IX.D.f to require that data provided to OEMC regarding firearm-pointing incidents includes whether firearm pointing occurred in the presence of children. CPD and the City should also amend Section IX.F to require that post-search warrant reports include whether children were present for execution of the search warrant and what action was taken during the execution of the warrant to protect children.[50]

---

[47] Search Warrant Directive Section IX.E.3 requires that upon securing the premises during execution of a search warrant, "[i]f children are present, Department members will maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize the trauma following a search warrant being served."

[48] The Baltimore Consent Decree requires the Baltimore Police Department to "ensure that it is collecting and analyzing Stop, Search, and Arrest data in a manner that allows for a determination of the nature and scope of demographic disparities in Stop, Search, and Arrest practices." *U.S. v. Police Dep't of Baltimore City,* 1:17-cv-99-JKB, ¶ 82 (D. Md., Jan. 12, 2017). Best practices also recommends data collection for all enforcement actions, including demographic action. Barry Friedman, *et al.*, *Changing the Law to Change Policing: First Steps,* NYU School of Law Policing Project, at 2, available at https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5ee14bcd7489b64e5d1c5bc1/1591823310572/Change+to+Change+FINAL.pdf.

[49] The proposed federal George Floyd Justice in Policing Act of 2021 would require states receiving certain federal funding to provide data to the Department of Justice surrounding incidents of use of force including the race, age, disability, English language proficiency, and housing status of the target of an officer's use of force. It would also require documentation of the type of use of force, justification for the use of force, and any attempted de-escalation measures. "Programs to Collect Data on Law Enforcement Activities: Overview and Issues," C.R.S., March 11, 2021, at 3, https://fas.org/sgp/crs/misc/R46443.pdf.

[50] *See* Thurau, *supra* note 40 at 18.

11. **Require review of body-worn camera footage from wrong raids.** In Section X, CPD should include directions for how it will review footage from body worn cameras, especially in wrong raids. These directions should include who will review the footage, require consideration of public release, and use of footage in development of remediation efforts following wrong raids.[51]

12. **Improve data collection for SWAT involvement in execution of search warrants.** The City and CPD should amend Section IV.D to reconsider the exclusion of data collection practices for firearm pointing by SWAT team members and/or the requirement that SWAT team members execute all "no-knock" warrants.[52] The directive currently requires that OEMC receive notification of all firearm-pointing incidents that occur while serving a search warrant, except for those by SWAT team members.[53] However, the directive also prescribes that only SWAT teams will serve "no-knock" warrants.[54] "No-knock" warrants inherently increase the likelihood of use of force and the development of dangerous environments to officers and those at the searched premises. Wholesale exemption of SWAT members from firearm pointing data capturing requirements coupled with the requirement that only SWAT members may execute "no-knock" warrants will not ensure accurate data regarding firearm pointing and may result in continued traumatizing of children if SWAT members point firearms at them.[55]

13. **Require use of body-worn cameras by SWAT team members during the execution of search warrants.** Section IV.D.3 of the directive should explicitly require that SWAT team members executing warrants wear and activate body worn cameras.[56]

---

[51] California requires release of body-worn camera recordings from "critical incidents" (incidents involving discharge of a firearm or force resulting in death or bodily injury) within 45 days of the recorded incident, subject to privacy and investigation-related considerations. California Assembly Bill 748, approved Sept. 30, 2018, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180AB748. Best practices in several states require retention and public accessibility of footage captured by body-worn cameras with enhanced considerations for incidents involving use of force. *See, e.g.,* Att'y General Law Enforcement Directive No. 2018-1, State of New Jersey (Feb. 26, 2018), https://nj.gov/oag/newsreleases18/AG-Directive-2018-1_Signed.pdf (requiring the presumption of public availability of footage captured by officer body-worn cameras for instances involving deadly force); *see also* Megan Quattlebaum, Tracey Meares, and Tom Tyler, *et al.*, *supra* note 14 at 22 (suggesting "film recorded by [body-worn cameras] … should be treated as 'public records,' which the public has a presumptive right to access.")

[52] Best practices suggest requiring agencies to maintain and report data on all SWAT deployments. Friedman, *et al.*, *supra* note 48 at 4.

[53] Search Warrant Directive, Section IX.D.1.f.

[54] Search Warrant Directive, Section IV.D.4.

[55] The ACLU recommends quarterly reporting of SWAT team deployment including the address of the location of the deployment, any use of force, and any recovered evidence. The ACLU also recommends that the states should ensure that an agency is responsible for oversight and monitoring of SWAT activity. ACLU, *supra* note 7 at 41.

[56] Members of the Orlando Police Department's SWAT team must wear and use body worn cameras. Tess Sheets *Orlando SWAT To Wear Body Cameras in Policy Reversal*, GovTech (June 13, 2019), https://www.govtech.com/public-safety/Orlando-SWAT-to-Wear-Body-Cameras-in-Policy-Reversal.html. The ACLU recommends that the requirement of SWAT officers to wear body cameras "would create a public record of SWAT deployments and serve as a check against unnecessarily aggressive tactics." ACLU, *supra* note 7 at 41.

14. **Enhance reporting requirements related to wrong raids.** CPD should amend Section II.K of the directive to prescribe a timeline for reporting wrong raids to supervisors and for supervisor action. Section II.K should also require immediate reporting of wrong raids to OEMC. The Section should also include disclosure requirements and timelines for reporting wrong raids to the City and any disclosure to the public.[57]

These proposed revisions to the draft directive are consistent with CPD's commitment to robust data collection and transparency in the Consent Decree. Collection of search warrant and arrest data is vital for increasing transparency under Paragraph 544 of the Consent Decree and enabling CPD to continually improve its practices and support its officers. Also, Paragraphs 567-569 require CPD to collect and maintain the data and records necessary to evaluate accurately its use of force practices and to facilitate transparency and accountability regarding those practices. "Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing."[58] Further, Paragraph 572(a) requires CPD to "regularly review citywide and district-level data regarding reportable uses of force to: assess the relative frequency and type of force used by CPD members against specific demographic categories, including race or ethnicity."[59] Paragraph 572(b) requires CPD to use this data to "identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice."[60]

OAG appreciates that the draft directive imposes some important enhancements to data related to search warrants, including requiring all Department members participating in the execution of any search warrant to wear and activate body worn cameras in accordance with Department directives and relevant laws.[61] OAG also appreciates that the draft directive requires more data collection related to wrong-raids, which will enhance transparency and avoid future instances of wrong raids.[62] Nonetheless, it is critical to adopt OAG's recommendations to ensure the directive is more consistent with the requirements of the law and best practices.

---

[57] The City of Ferguson Consent Decree requires the Ferguson Police Department to "make body-worn and in-camera recordings publicly available to the maximum extent allowable under [state] law and consistent with individual privacy rights." *U.S. v. City of Ferguson,* 4:16-cv-180-CDP, ¶ 249 (E.D. Mo., Apr. 19, 2016). *See also* Section I.B.12 of the "Rules and Regulations of the Chicago Police Department" requiring that "the Department must communicate accurate and factual accounts of occurrences of public interest." *Rules and Regulations of the Chicago Police Dept*, Chicago Police Dep't (Apr. 16, 2015).
[58] Consent Decree, ¶ 566 ("CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.").
[59] Consent Decree, ¶ 572(a).
[60] Consent Decree, ¶ 572(b).
[61] Search Warrant Directive, Section IV.D.3.a and IX.D.1.a. Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10-1 *et seq.*; *see also* Consent Decree, ¶¶ 236-242.
[62] The Directive prescribes "after-action review for search warrants identified as wrong raids" and presentation of this information to the Superintendent for review and follow-up action. Search Warrant Directive, Section II.K.

### D. The Revised Directive Should Clarify Responsibilities for Supervisors.

OAG appreciates that the draft directive requires the presence of higher-ranking officers during the preparation for and execution of search warrants. This presence can ensure proper and safe execution of search warrants. OAG has one recommendation to improve supervisors' roles in warrant executions.

15. **Delineate responsibilities of supervisors during search warrant execution.** CPD should include directions for sergeants, lieutenants, and other commanding officers in Sections II.C and D for their management of the premises of a search warrant execution to ensure clear delineation of duties.[63] For example, the directive should dictate whether the lieutenant or sergeant is responsible for overseeing the search warrant premises and documenting use of force or firearm pointing incidents. This change would ensure consistency with Paragraph 353 of the Consent Decree's mandate that immediate supervisors will, for members under their direct command "monitor, manage, and coordinate incident response."

Adequate supervision ensures that CPD performs execution of search warrants in a manner that is consistent with its own policies and training and the Consent Decree.[64]

### E. Additional Best Practices

The City and CPD should also consider other best practices related to search warrant execution, which include:

- considering alternatives to arrest and execution of warrants, especially for non-violent offenses;[65]
- using mental health professionals and/or social workers to assist police with execution of search warrants;[66]
- considering whether the target of a search warrant, or those on the premises, have known mental health concerns; and
- requiring the presence of paramedics and/or EMS at the scene of search warrants.[67]

---

[63] The draft directive requires the presence of a sworn Department member of the rank of lieutenant or above for the full duration of service of the search warrant. The Directive also requires that a sworn member of the rank of sergeant or above oversee all pre-service requirements and be present and remain on scene for the full duration of service of the search warrant. Draft Search Warrant Directive, Section II.C-D.

[64] Consent Decree, ¶ 352 (Stating that "[e]ffective supervision requires … that members under their command perform their duties in a manner that complies with federal and state law, CPD policy, and [the Consent Decree]," act consistently with the "principles of procedural justice, de-escalation, impartial policing, and community policing," and "engage the community and promote public trust and safety.")

[65] For example, the Baltimore police issue criminal citations for low-level offenses. *Daily Critical Issues Report*, *July 13, 2020,* Police Executive Research Forum, July 13, 2020, https://www.policeforum.org/index.php?option=com_content&view=article&id=642:criticalissuesjuly13&catid=20:site-content.

[66] Fabiola Cineas, *The policing reforms in the Breonna Taylor settlement, explained*, VOX, Sept. 17, 2020, https://www.vox.com/21439994/breonna-taylor-settlement-policing-reforms-explained.

[67] *Id.*

IV. **Conclusion and Next Steps**

The draft directive reflects that CPD and the City are taking important steps to begin ensuring that search warrant policies and practices protect the safety of all involved. Various Consent Decree paragraphs require the aforementioned enhancements and edits, which will also bring CPD and the City closer to best practices from across the nation.

In order to build trust with the community, CPD must seek and incorporate robust community engagement as it revises this draft directive. OAG looks forward to the opportunity for continued dialogue and input regarding this critical issue.