**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

**Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020)**

The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached *Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020).*

Dated July 20, 2021

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that, on July 20, 2021, she caused a true and correct copy of the foregoing **Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protests and Unrest under the Consent Decree (May 2020 – November 2020)** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

<div style="margin-left: 50%;">

/s/Margaret A. Hickey      

Margaret A. Hickey

Schiff Hardin LLP

233 S. Wacker Drive, Suite 7100

Chicago, IL 60606

Telephone: (312) 258-5500

Facsimile: (312) 258-5600

mhickey@schiffhardin.com

</div>

**Independent
Monitoring Team** | Chicago Police
Department
Consent Decree

# The City of Chicago's and
# The Chicago Police Department's
# Responses to Protests and Unrest
# under the Consent Decree

## (May 2020 – November 2020)

Report Date: July 20, 2021

*A Special Report by the Independent Monitoring Team*

# Monitoring under the Consent Decree

In August 2017, the Office of the Illinois Attorney General sued the City of Chicago in federal court regarding civil rights abuses by the Chicago Police Department, which led to a Consent Decree, effective March 1, 2019. On March 1, 2019, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which assesses the City's compliance with the Consent Decree's requirements.[1]

The overall purpose of the Consent Decree, as provided by ¶2, has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[2]

---

[1]    For more information on the Consent Decree and the Independent Monitoring Team, see the Appendix A below. More information is also available on the Independent Monitoring Team's website (https://cpdmonitoringteam.com/) and on the Office of the Illinois Attorney General's Consent Decree website (http://chicagopoliceconsentdecree.org/about/).

[2]    We cite the relevant paragraphs of the Consent Decree throughout this report. The Consent Decree is available on the Independent Monitoring Team's website: https://cpdmonitoring-team.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Chicago Police Consent Decree Resources*, www.chicagopoliceconsentdecree.org/resources/.

## Table of Contents

Executive Summary .................................................................1

    IMT's Recommendations ......................................................... 24

Scope and Methodology ....................................................25

Summary of Major Events ................................................36

    The Consent Decree ............................................................... 36

    Chicago's History with Crowds, Protests, and Unrest ......................... 37

    Chicago 2020 - Leading up to Protests and Unrest ............................ 39

    Protests and Unrest in 2020 ..................................................... 42

Analysis ...........................................................................109

    Planning and Preparation ....................................................... 110

    Policies ............................................................................. 145

    Training............................................................................. 178

    Accountability and Transparency .............................................. 200

Conclusion and Looking Ahead .........................................220

Appendix A: The Independent Monitoring Team ............................... 222

Appendix B: List of Special Report Figures ..................................... 228

Appendix C: The Crime Prevention and Information Center Anticipated Demonstrations (June 2020) .................................................... 230

Appendix D: Listening Session Transcripts August 19, 2020 ............... 236

Appendix E: Listening Session Transcripts August 20, 2020 ............... 325

Attachment 1.
Office of the Illinois Attorney General Comments July 16, 2021 ...................... 428

Attachment 2.
City of Chicago Comments July 16, 2021 ............................................. 451

# Executive Summary

This report addresses the City of Chicago's (City's) and the Chicago Police Department's (CPD's) response to protests and unrest under the Consent Decree. Specifically, this report focuses on the City's and the CPD's response to events between May 2020 and November 2020. During this review we heard from many City and CPD personnel, and members of Chicago's communities, including people who participated in protests. We greatly appreciate the cooperation that we received from members of the City, the CPD, and Chicago's communities. We understand the challenges facing each person during COVID-19, which makes us even more grateful for the significant number of people who cooperated with this review. We heard many differing opinions, accounts, and perspectives—many of which were in direct opposition. Most accounts, however, reflected that the City and the CPD were not prepared for the scale of protests and unrest that occurred.[3]

To adequately assess the City's and the CPD's responses, we sought to understand the various locations, timelines, sizes, and scope of the protests, unrest, and other challenges facing Chicago. According to many City and CPD personnel and members of Chicago's communities, the vast majority of protests and people participating in protests have been peaceful, and protests typically occurred (and continue to occur) without destruction of property, arrests, or physical conflict between police, protesters, or others. Between May and November 2020, there were also significant, likely unprecedented, levels of unrest. We heard from many officers, City personnel, and other Chicagoans that they feared for their lives and the lives of their friends and families during some of the unrest. And we also heard from protesters that they feared for their safety and lives when they saw how some officers responded to First Amendment protected activity. As demonstrated in and out of Chicago since May 2020, to protect safety and rights of people in Chicago—including the First Amendment right to protest—the City and the CPD

---

[3]    In this report, we use the words "protest" and "unrest" to refer to broad categories of conduct. Because individuals within the same crowd can be engaging in different conduct, we use more specific language to describe specific conduct, when applicable, such as marching, chanting, vandalizing, or looting. In general, we use the term "protest" to refer to protected First Amendment speech and speech that may not be protected but is nonetheless non-violent toward people or property. Examples of "protests" include demonstrations, marches, pickets, chants, and civil disobedience. *See, e.g.*, Chicago Municipal Code § 10-8-334(a) ("Public Assembly"). Protests may be intended to disrupt traffic, businesses, communities, or City personnel, including police. In general, we use the word "unrest" to refer to groups of people who are engaging in unlawful activity, such as threats, throwing projectiles, assaults, batteries, looting, arson, and destruction of property. *See, e.g.*, 720 ILCS 5/25-1 ("Mob action"); 720 ILCS 25-4 ("Looting by individuals"). For additional discussion and guidance regarding protected and unprotected speech, see the American Civil Liberties Union of Illinois's guide, *Know Your Right to Protest in Chicago* (May 2015), which is available at https://www.aclu-il.org/sites/default/files/know_your_right_to_protest_in_chicago.pdf.

must sufficiently plan and prepare for protests and other gatherings, while accounting for the potential for unrest caused by individuals seeking to do or incite violence or from improper responses from officers, or both.

This report provides (1) a summary of major events; (2) our analysis of the City's and the CPD's ongoing efforts and challenges regarding planning and preparation, policies, training, and accountability and transparency; and (3) our corresponding recommendations for how the City and the CPD can simultaneously move toward compliance under the Consent Decree and better prepare for responding to protests and potential unrest. In this executive summary, we provide an overview of (1) the timeline of protests, unrest, and other events in 2020; (2) Chicago protests and unrest during the COVID-19 pandemic and other challenges; and (3) our analysis and recommendations.[4]

## TIMELINE OF PROTESTS, UNREST, AND OTHER EVENTS IN 2020

On May 25, 2020, then-Minneapolis police officer Derek Chauvin murdered George Floyd by pinning him to the ground with his knees for more than nine minutes.[5] People across Chicago, the country, and the world responded with large, sustained, and record-breaking protests and movements regarding policing and social and racial justice.[6] In May and June 2020, the District of Columbia and 24

---

[4]    We provided drafts of this report to the City and the Office of the Illinois Attorney General's Office, collectively the Parties, on June 11, 2021, per ¶¶661–65. After receiving preliminary feedback from the City and the OAG, the IMT provided an updated draft to the Parties on July 8, 2021. The Parties both provided written feedback on July 16, 2021, which are attached to this report. *See* Attachment 1 (OAG comments) and Attachment 2 (City comments).

[5]    Derek Chauvin was convicted of second-degree unintentional murder, third-degree murder, and second-degree manslaughter on April 20, 2021. *See* Laurel Wamsley, *Derek Chauvin Found Guilty of George Floyd's Murder*, NPR (April 20, 2021), https://www.npr.org/sections/trial-over-killing-of-george-floyd/2021/04/20/987177911/court-says-jury-has-reached-verdict-in-derek-chauvins-murder-trial.

[6]    *See, e.g.*, Suyin Haynes, *As Protesters Shine a Spotlight on Racial Injustice in America, the Reckoning Is Going Global*, TIME MAGAZINE (June 11, 2020), https://time.com/5851879/racial-injustice-protests-europe/; *How George Floyd's death reverberates around the world*, ECONOMIST (July 8, 2020), https://www.economist.com/international/2020/06/08/how-george-floyds-death-reverberates-around-the-world; Katy Watson, *Brazil's Racial Reckoning: 'Black Lives Matter Here, too'*, BBC NEWS (July 25, 2020), https://www.bbc.com/news/world-latin-america-53484698; Larry Buchanan, Quoctrung Bui, and Jugal Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, THE NEW YORK TIMES (July 3, 2020) (citing four polls), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html. Estimates on participation vary. According to the Armed Conflict Location & Event Data Project (ACLED), for example, there were more than 10,600 demonstration events across the US between May 24, 2020, and August 22, 2020. *See US Crisis Monitor Releases Full Data for Summer 2020*, ACLED (August 31, 2020), https://acleddata.com/2020/08/31/us-crisis-monitor-releases-full-data-for-summer-2020/. Many of the protests called for various changes in the name of social and racial justice, including increased police accountability and reform

---

states, including Illinois, called in the National Guard.[7] During the same period, about 80 municipalities, including the City of Chicago, instituted curfews.[8] Chicago—and many other cities—experienced unprecedented unrest. While the totals and nexus are contested and difficult to measure, many people were killed nationwide in or during protests, counter protests, and unrest.[9]

Protests continued in Chicago in varying sizes and intensity throughout 2020 and into 2021, often with thousands of participants.[10] The specific events that sparked nationwide protests and unrest—which occurred outside of Chicago—appeared to evolve into protests and unrest in Chicago that related directly to the CPD, including Chicago's own history with racial and social injustice, police misconduct and excessive uses of force, and the responses to protests and unrest.[11] Chicago also experienced protests—and in some cases unrest—in response to local policing in 2020, such as the following:

---

for daily policing and responses to protests. Many of these calls for action included or related to requirements across the Consent Decree.

[7] *See* Alexandra Sternlicht, *Over 4,400 Arrests, 62,000 National Guard Troops Deployed: George Floyd Protests By the Numbers*, FORBES (June 2, 2020), https://www.forbes.com/sites/alexandrasternlicht/2020/06/02/over-4400-arrests-62000-national-guard-troops-deployed-george-floyd-protests-by-the-numbers/?sh=e8cf228d4fe1.

[8] *See* Jack Arnholz, Ivan Pereira, and Christina Carrega, *US protests map shows where curfews and National Guard are active*, ABC NEWS (June 4, 2020), https://abcnews.go.com/US/locations-george-floyd-protests-curfews-national-guard-deployments/story?id=70997568.

[9] *See, e.g.*, Lois Beckett, *At least 25 Americans were killed during protests and political unrest in 2020*, THE GUARDIAN (October 31, 2020), https://www.theguardian.com/world/2020/oct/31/americans-killed-protests-political-unrest-acled; Todd Lighty, Gary Marx, Christy Gutowski, and William Lee, *Chicago's 2020 unrest: A Tribune investigation documents the scope of the damage and its lingering impact on neighborhoods, businesses*, CHICAGO TRIBUNE (June 2, 2021) ("The Tribune found that 15 people were shot and killed in crimes tied to the unrest. Most of the homicides occurred Sunday, May 31 — the height of the destruction. In addition, at least 53 people were shot and wounded during one of the most turbulent periods in Chicago history."), https://www.chicagotribune.com/investigations/ct-chicago-2020-looting-unrest-damage-george-floyd-police-killing-20210602-olbvgmfylna3jarumzonp5zkqe-htmlstory.html.

[10] *See, e.g.*, *Dozens Gather in Chicago to Protest Killing of Daunte Wright*, AP NEWS (April 13, 2021), https://apnews.com/article/breonna-taylor-death-of-daunte-wright-laquan-mcdonald-shootings-police-5f4b6ce0f5703e32c975c2219235e231; Evelyn Holmes, *Chicago protest Logan Square: After thousands march for justice in Adam Toledo CPD killing, police prepared for more rallies*, ABC7 EYEWITNESS NEWS (April 17, 2021), https://abc7chicago.com/adam-toledo-logan-square-protest-chicago-park/10522103/.

[11] *See, e.g.*, *Chicago's summer of looting and unrest and how the city is still reeling*, CHICAGO TRIBUNE (October 6, 2020), https://www.chicagotribune.com/news/breaking/ct-cb-george-floyd-fallout-impact-chicago-20201006-lknddggmch5emjiefplywhcaeou-story.html; *Jon Burge and Chicago's legacy of police torture*, CHICAGO TRIBUNE (September 19, 2018), https://www.chicagotribune.com/news/ct-jon-burge-chicago-police-torture-timeline-20180919-htmlstory.html; Chicago Police Accountability Task Force, *Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities they Serve, Report* (April 2016) https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf.

- The officer-involved shooting of Latrell Allen in Chicago on August 9, 2020.[12]
- The officer-involved shooting of Miguel Vega in Chicago on August 31, 2020.[13]
- The officer-involved shooting of Marc Nevarez in Chicago on October 23, 2020.[14]

Protests also continued to emerge in Chicago in response to national events, which included the following:

- the shooting and killing of Rayshard Brooks in Atlanta, Georgia, on June 12, 2020;[15]
- the shooting of Jacob Blake in Kenosha, Wisconsin, on August 23, 2020;[16]
- the charging decision regarding the shooting and killing of Breonna Taylor in Louisville, Kentucky, on September 23, 2020;[17] and
- the shooting and killing of Walter Wallace Jr. in Philadelphia, Pennsylvania, on October 26, 2020.

The City also saw other large-scale protests, demonstrations, or crowds.[18] Some were unrelated to racial justice or policing, such as Mexican Independence Day

---

[12] *See* Liz Nagy, *Protestors say that Latrell Allen bond is unjust, call for police budget to be slashed by 75%*, ABC7 EYEWITNESS NEWS (August 14, 2020), https://abc7chicago.com/protestors-say-latrell-allens-%241m-bond-is-unjust-without-cpd-body-cam-footage/6371332/.

[13] *See* Madeline Buckley, *Marchers demand justice for Miguel Vega: 'My family waits for the Chicago Police Department to show their face and speak to us,'* CHICAGO TRIBUNE (September 5, 2020), https://www.chicagotribune.com/news/breaking/ct-pilsen-protest-miguel-vega-20200906-2y3avvtshjehpd5jlsyq55f7b4-story.html.

[14] *See* Evelyn Holmes, *Protesters say deadly force was unnecessary in Little Village police shooting; COPA investigating*, ABC7 EYEWITNESS NEWS (October 24, 2020), https://abc7chicago.com/chicago-police-shooting-little-village-news-marc-nevarez/7299560/.

[15] *See* Toluse Olorunnipa, Jon Silman, Maura Ewing, and Kevin Williams, *Third consecutive weekend of anti-racism protests expands to suburbs, as 'Blue Lives Matter' demonstrators push back*, WASHINGTON POST (June 13, 2020) ("The third weekend of protests in Chicago turned to a side of the city that rarely gets people marching in the street: Jefferson Park, a neighborhood located on the far north-west side of the city known primarily as a bedroom community populated by many police, firefighters and blue-collar workers. Hundreds of demonstrators showed up with signs Saturday for the first time, surprising many of the residents."), https://www.washingtonpost.com/politics/third-consecutive-weekend-of-anti-racism-protests-expands-to-suburbs-as-blue-lives-matter-demonstrators-push-back/2020/06/13/81ef674a-ada7-11ea-94d2-d7bc43b26bf9_story.html.

[16] *See Timeline: The Jacob Blake Shooting and the Unrest That Followed*, NBC CHICAGO (August 27, 2020), https://www.nbcchicago.com/news/local/timeline-the-jacob-blake-shooting-and-the-unrest-that-followed/2329811/.

[17] *See* CBS 2 Chicago Staff, *Live Updates: Breonna Taylor Protests in Chicago,* CBS NEWS CHICAGO (September 23, 2020), https://chicago.cbslocal.com/2020/09/23/live-updates-breonna-taylor-protests-in-chicago/.

[18] *See, e.g.,* Michelle Gallardo, *'Reclaim Pride': Thousands march on Chicago's North Side to amplify Black, trans voices*, ABC7 EYEWITNESS NEWS (June 28, 2020), https://abc7chicago.com/pride-2020-reclaim-march-chicago-amrch-today-trans/6278094/; *Chicago Protests: Juneteenth Celebrations, Pritzker Plans to Make State Holiday*, NBC CHICAGO (June 20, 2020),

and protests against COVID-19 precautions and lockdowns.[19] Chicago also braced for other large-scale protests during and after the 2020 presidential election. While tensions were high—and the City, the CPD, and Chicago's communities publicly prepared—there were large peaceful crowds, sometimes celebratory, and there were comparatively few police contacts with protesters or crowds.

Since then, large-scale protests have continued nationally and in Chicago.[20] The country has also continued to experience unrest. The world watched, for example, as the U.S. Capitol was overrun on January 6, 2021, demonstrating the stakes involved with insufficient planning and preparation for protests and the potential for unrest with large crowds.[21]

## CHICAGO PROTESTS AND UNREST DURING THE COVID-19 PANDEMIC AND OTHER CHALLENGES

There were many unique aspects to the protests and unrest that followed the murder of George Floyd, including the impact of COVID-19, corresponding lockdowns and mask mandates, and the widespread use of public and private social-media applications. Ultimately, the City and the CPD must protect all people in Chicago and their rights, including their First Amendment rights in a content-neutral and consistent manner.[22] This also requires utilizing available resources to protect the

---

https://www.nbcchicago.com/news/local/chicago-protests-juneteenth-celebrations-pritzker-plans-to-make-state-holiday/2292809/.

[19] *See, e.g.*, Sam Kelly and Carly Behm, *City closes streets in downtown, Little Village amid Mexican Independence Day celebrations*, CHICAGO SUN-TIMES (September 16, 2020), https://chicago.suntimes.com/2020/9/15/21439232/mexican-independence-day-traffic-street-closures-downtown.

[20] *See, e.g.*, Liz Nagy, *Chicago 'Back the Blue' rally in Jefferson Park draws hundreds of supporters, counter-protestors*, ABC7 EYEWITNESS NEWS (September 16, 2020) https://abc7chicago.com/back-the-blue-rally-chicago-police-department-black-lives-matter/6427076; Jesse Kirsch and Liz Nagy, *Adam Toledo shooting: Logan Square march, rally calls for police reform after release of video showing teen killed by CPD*, ABC7 EYEWITNESS NEWS (April 16, 2021), https://abc7chicago.com/adam-toledo-video-chicago-police-shooting-protest/10518968/; Madeline Kenney, *Justice for Anthony Alvarez rally met by counter protesters in Jefferson Park*, CHICAGO SUN-TIMES (May 29, 2021), https://chicago.suntimes.com/metro-state/2021/5/29/22460135/justice-for-anthony-alvarez-rally-met-by-counter-protesters-in-jefferson-park.

[21] *See, e.g.*, *Statement of Inspector General Michael A. Bolton United States Capitol Police Office of Inspector General*, COMMITTEE ON HOUSE ADMINISTRATION UNITED STATES HOUSE OF REPRESENTATIVES (April 15, 2021), https://docs.house.gov/meetings/HA/HA00/20210415/111443/HHRG-117-HA00-Wstate-BoltonM-20210415.pdf.

[22] *See, e.g.*, ¶¶2, 6 ("In this Agreement, the City commits to ensuring that police services are delivered to all of the people of Chicago in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of all of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. The City also commits to providing CPD members with the resources

right to peaceful assembly; the safety of the protesters, counter-protesters, and non-protesters, and the right to move freely on the public way.[23] Efficient responses to protests and potential unrest are also required to ensure that the City and the CPD can simultaneously allocate sufficient resources to other critical services throughout Chicago.[24] As a result, the City, the CPD, and other City entities had an obligation to respond effectively and proportionately in spite of countless and unprecedented challenges.

These challenges included the following:

- Large, widespread, and often simultaneous First Amendment activity and demonstrations, including counter demonstrations;[25]

- Lack of typical coordinated organization and permit procedures for planned protests (due to the City's restriction on issuing permits due to COVID-19), making it more difficult to identify planned protests or to accurately anticipate the turnout for each protest and the corresponding response required;

- A rise in protests organized without the City's and the CPD's knowledge and a rise in protests spontaneously growing in size or changing in purpose;

- Widespread use of public and private social-media, causing protests to grow unpredictably and, in some cases, contributing to the spread of false information (*e.g.*, false claims of military arsenals and impersonating officials);[26]

---

and support they need, including improved training, supervision, and wellness resources."), 7, 51, and 163.

[23] *See, e.g.*, Donald Morrison, *Cars Have Hit Protesters More than 100 Times This Year*, WALL STREET JOURNAL (October 25, 2020), https://www.wsj.com/articles/cars-have-hit-protesters-more-than-100-times-this-year-11603645201; Laurel Wamsley and Bobby Allyn, *Neo-Nazi Who Killed Charlottesville Protester Is Sentenced to Life in Prison*, NPR (June 28, 2019), https://www.npr.org/2019/06/28/736915323/neo-nazi-who-killed-charlottesville-protester-is-sentenced-to-life-in-prison.

[24] *See, e.g.*, ¶¶2 and 6–7.

[25] *See, e.g.*, Jonathon Berlin and Kori Rumore, *How the weekend unfolded: Timeline of Chicago protests, looting and unrest*, CHICAGO TRIBUNE (June 1, 2020), https://www.chicagotribune.com/news/breaking/ct-viz-george-floyd-protest-chicago-timeline-20200531-lfkd7p6ejbennfezhxk2u5kkmm-story.html; Sun-Times Staff, *Chicago protests of George Floyd death, looting and aftermath live blog: June 2, 2020,* CHICAGO SUN-TIMES (June 2, 2020), https://chicago.suntimes.com/news/2020/6/2/21278084/chicago-protests-looting-george-floyd-live-blog.

[26] *See, e.g.*, Lourdes Duarte, *How police, experts say crowds used social media to coordinate looting in Chicago,* WGN 9 (August 10, 2020), https://wgntv.com/news/wgn-investigates/how-police-experts-say-crowds-used-social-media-to-coordinate-looting-in-chicago/; Sarah E. Needleman and Sebastian Herrera, *Social Media Becomes Battleground Over Days of Street Protests*, THE WALL STREET JOURNAL (June 1, 2020), https://www.wsj.com/articles/social-media-becomes-battleground-over-days-of-street-protests-11591018647.

- People seeking to co-opt protests and create unrest, including various disruptive tactics, and an increased difficulty in differentiating between protesters and people committing violence because of the increased anonymity from widespread mask use;[27]

- Unrest, including premeditated crimes, crimes of opportunity, looting, arson, use of explosives, motor-vehicle thefts, driving vehicles into buildings, destruction and theft of police property (including body-worn cameras, radios, badges, Tasers, vehicles, and firearms), interfering with radio transmissions, and general damage to private and public property—including grocery stores and pharmacies—and armed vigilantism;[28]

- Various criminal activity, including homicides, bomb threats, robberies, and increased rates of violent crime, including shootings and assaults on police officers;[29]

---

[27] *See, e.g., Homeland Threat Assessment*, U.S. DEPARTMENT OF HOMELAND SECURITY (October 2020) ("Exploitation of Lawful and Protected Speech and Protests. During the course of developing the HTA we began to see a new, alarming trend of exploitation of lawful protests causing violence, death, and destruction in American communities. This anti-government, anti-authority and anarchist violent extremism was identified by DHS in September 2019 when we published our Strategic Framework for Countering Terrorism and Targeted Violence. As the date of publication of this HTA, we have seen over 100 days of violence and destruction in our cities. The co-opting of lawful protests led to destruction of government property and have turned deadly."),   https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf.

[28] According to the CPD, between May 29, 2020, and June 2, 2020, for example, there was over $700,000 in damage to CPD vehicles, including 19 totaled vehicles, with a replacement cost of over $1,400,000. *See also Looting & Civil Unrest Videos*, CHICAGO POLICE DEPARTMENT YOUTUBE PAGE,   https://www.youtube.com/playlist?list=PLni-cuMjWzIDUJVUecBCDXWw1UGTPOAS2; Chicago Digital Team, *Illinois man faces federal charges after he allegedly brought explosives to protests in Chicago, Minneapolis*, ABC7 EYEWITNESS NEWS (June 2, 2020), https://abc7chicago.com/matthew-rupert-chicago-protests-riot-minneapolis/6227294/; Manny Ramos, *Small businesses hit by looting reflect on night of chaos: 'It was kind of like 'The Purge''*, CHICAGO SUN-TIMES (May 24, 2021), https://chicago.suntimes.com/2021/5/24/22442221/protests-chicago-george-floyd-anniversary-small-businesses-looting-reflect-night-of-chaos-purge.

[29] According to the CPD, "2020 was a year of unprecedented violence against Department members" and, aside "from the many officers who were seriously injured during violent confrontations" in response to protests and unrest, "there were seventy-nine (79) police officers shot or shot at over the course of the year." *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2, 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 15. *See, e.g.*, Tom Schober, Sam Charles, and Matthew Hendrickson, *18 murders in 24 hours: Inside the most violent day in 60 years in Chicago*, CHICAGO SUN-TIMES (June 8, 2020), https://chicago.suntimes.com/crime/2020/6/8/21281998/chicago-deadliest-day-violence-murder-history-police-crime; Elvia Malaga, *A year later, families mourn relatives killed during violent weekend post-George Floyd protests*, CHICAGO SUN-TIMES (May 24, 2021), https://chicago.suntimes.com/2021/5/24/22419771/protest-george-floyd-homicide-looting-tommie-gatewood-darius-maurice-jelks-jaquawn-newman-2020; Paige Fry, *Lootings spread into neighborhoods as Chicago sees one of its most violent weekends with more than 80 shot*,

- Officer deaths (including from suicides and accidents), injuries (including from shootings, attempted stabbings, car accidents, and projectiles), over 3,200 COVID-19 cases,[30] doxing,[31] and sustained verbal abuse toward officers, including racial, gendered, and homophobic slurs, among others;[32]

- An unprecedented number of complaints to the Civilian Office of Police Accountability (COPA) and videos of officers disregarding policies, including not wearing COVID-19 preventative masks; covering identifying information (including badge numbers and name tags); using excessive force; using racial, gendered, and homophobic slurs, among others;[33] and

- A spike in calls for service and shutdowns of various City services (in addition to COVID-19 shutdowns), including distributing City food, providing public transportation, and administering COVID-19 testing sites.[34]

As reflected in Executive Summary Figure 1, in response to records in the Police Computer Aided Dispatch System, the City and the Office of Emergency Management and Communications provided information detailing the following number of calls for service labeled "PRTST" (protest), "LOOT" or "RIOT." While there were significant challenges capturing data during many events, as detailed throughout this report, this figure still helps illustrate some of the widespread and ongoing challenges facing Chicago.[35]

---

CHICAGO TRIBUNE (June 1, 2020), https://www.chicagotribune.com/news/breaking/ct-overnight-chicago-violence-looting-20200601-pdenxuvjefbszferfmvjkiqm5y-story.html.

[30] *See* Patrick Smith, *Chicago Police Turn Down City-Provided COVID-19 Vaccine*, WBEZ CHICAGO (May 3, 2021), https://www.wbez.org/stories/chicago-police-turn-down-city-provided-covid-19-vaccine/9909c907-37bb-4dc5-adb0-feb7f3278c94.

[31] Merriam Webster defines "doxing" as "publicly identifying or publishing private information about (someone) especially as a form of punishment or revenge" (https://www.merriam-webster.com/dictionary/dox). In response to requests for information, the City and the CPD provided a few examples of doxing against CPD officers, such as repeated online posts of an officers' home address, and internal messages and guidance regarding doxing.

[32] *See, e.g., Chicago Police Department*, OFFICER DOWN MEMORIAL PAGE, https://www.odmp.org/agency/657-chicago-police-department-illinois; Tom Schuba, *Video Shows Cops Fatally Shoot Man Who Stabbed Officer*, CHICAGO SUN-TIMES (October 1, 2020), https://chicago.suntimes.com/crime/2020/10/1/21497997/police-shooting-video-shaon-jermy-ochea-warner-copa; Luke Wilusz, Tom Schuba, and Jermaine Nolen, *2 Chicago Police Officers, Suspect Wounded in West Side Shootout*, CHICAGO SUN-TIMES (August 30, 2020), https://chicago.suntimes.com/crime/2020/8/30/21407345/chicago-police-officers-suspect-shot-homan-square-west-side-polk-spaulding.

[33] *See Protest Related Information*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY, https://www.chicagocopa.org/data-cases/protest-related-information/.

[34] *See, e.g.*, Amanda Vinicky, *Chicago Public Schools Suspends Free Meals Due to Unrest*, WTTW NEWS (June 1, 2020), https://news.wttw.com/2020/06/01/chicago-public-schools-suspends-free-meals-due-unrest.

[35] We provide a list of all figures in this report in Appendix B (List of Special Report Figures).

Executive Summary Figure 1.
OEMC - Police Computer Aided Dispatch System (PCAD) Reports
(Provided November 20, 2020)
(May 29, 2020 – June 2, 2020; July 17, 2020; August 9, 2020; August 10, 2020; August 15, 2020; and August 16, 2020)

| PCAD Events ("PRTST") | PCAD Events ("LOOT" OR "RIOT") | Date | Approx. Number of the 22 Districts with Events |
|---|---|---|---|
| 2 | 0 | Friday, May 29, 2020 | 1 |
| 17 | 14 | Saturday, May 30, 2020 | 14 |
| 20 | 1,439 | Sunday, May 31, 2020 | 22 |
| 14 | 1,027 | Monday, June 1, 2020 | 22 |
| 0 | 262 | Tuesday, June 2, 2020 | 22 |
| 5 | 0 | Friday, July 17, 2020 | 4 |
| 2 | 2 | Sunday, August 9, 2020 | 4 |
| 2 | 358 | Monday, August 10, 2020 | 18 |
| 7 | 1 | Saturday, August 15, 2020 | 6 |
| 4 | 1 | Sunday, August 16, 2020 | 3 |

Moreover, many of these events occurred while the City and the CPD responded to or dealt with unrelated challenges and tragedies, including those related to COVID-19, such as hospitalizations, unemployment, increased needs for public food distributions, and hospital and personal protective equipment shortages.[36] There were also ongoing COVID-19 infections, illnesses, and deaths, including for essential workers and City personnel.[37]

---

[36]  *See, e.g., Chicago Area Unemployment Statistics*, U.S. Bureau of Labor Statistics (May 14, 2021), https://data.bls.gov/timeseries/LAUMT171698000000003?amp%253bdata_tool=XGtable&output_view=data&include_graphs=true. *See also Police Board Statement on the Death of Thomas Johnson*, Chicago Police Board (April 14, 2020), https://www.chicago.gov/city/en/depts/cpb/provdrs/police_discipline/news/2020/april/police-board-statement-on-the-death-of-thomas-johnson.html; *CPD Releases 2020 Crime Numbers Showing Steep Increase in Shootings, Murders*, NBC5 Chicago (January 1, 2021), https://www.nbcchicago.com/news/local/chicago-polices-2020-crime-numbers-show-steep-increase-in-shootings-murders/2406120/; David Abrams et al., *Crime in Major U.S. Cities*, University of Pennsylvania, https://citycrimestats.com/covid/.

[37]  *See, e.g., Fallen Officers From the COVID-19 Pandemic*, Officer Down Memorial Page (May 28, 2021), https://www.odmp.org/search/incident/covid-19; CBS 2 Chicago Staff, *Memorial Service Held For CFD Paramedic Robert Truevillian, Third Active Duty CFD member To Die Of COVID-19*, CBS Chicago (December 28, 2020), https://chicago.cbslocal.com/2020/12/28/memorial-service-underway-for-cfd-paramedic-robert-truevillian-third-active-duty-cfd-member-to-die-of-covid-19/; Patrick Smith, *Chicago Police Turn Down City-Provided COVID-19 Vaccine*, WBEZ Chicago (May 3, 2021), https://www.wbez.org/stories/chicago-police-turn-down-city-provided-covid-19-vaccine/9909c907-37bb-4dc5-adb0-feb7f3278c94. *See also* Christy Gutowski, John Kielman, and Jonathon Berlin, *COVID-19's toll on Illinois' health care field: A memorial to 45 of those who died*, Chicago Tribune (September 20, 2020) ("More than 100 professionals working in the health care field have died in Illinois since COVID-19 began its deadly march through the state this past spring, according to public health officials, who said the exact figure is likely higher. They include nurses, doctors, medical assistants, technicians, therapists and other support staff who clean rooms, serve food and provide security."), https://www.chicagotribune.com/coronavirus/ct-cb-health-care-workers-who-died-of-covid-20200918-wl2e6ilfo5fxlnn3eoxddwq4dy-htmlstory.html.

Chicago also faced additional challenges that were harder to detect and measure, including the emotional toll of COVID-19, then-unknown likelihoods of transmission or vulnerabilities, and corresponding indefinite isolation, job-loss, unemployment, lack of income, resource shortages, and risk of personal, familial, and social exposure, serious illness, hospitalization, and death. Some officers, City personnel, and hospital personnel, for example, moved out of their homes to prevent infecting to their families or households.[38]

However, infection rates were trending downward at the end of May and the City was in the process of phasing businesses back after lockdowns.[39] As a result, many businesses were bringing back employees and restocking inventory during the first weekend of unrest.

Executive Summary Figure 2. Daily case, hospitalization, and death rates and daily cases, hospitalizations, and deaths for Chicago (March 2020, through December 2020)[40]



---

38   *See* Nancy Loo, *Chicago reserves nearly 300 downtown hotel rooms for first responders*, WGN9 (March 31, 2020), https://wgntv.com/news/coronavirus/chicago-reserves-nearly-300-downtown-hotel-rooms-for-first-responders/.

39   *See* Ill. Exec. Order No. 2020-38 (May 29, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-38.aspx.

40   *COVID Dashboard*, CITY OF CHICAGO, https://www.chicago.gov/city/en/sites/covid-19/home/covid-dashboard.html.

But during the unrest and transportation closures in May and June 2020, there were interruptions to testing locations, hospital services, emergency rooms, immediate-care clinics, and pharmacies.[41] In response, the City and the CPD coordinated additional security for mobile pharmacies throughout Chicago.[42] We also heard about victims of crime and possibly police violence who were sent to the hospital and unable to see their families for indefinite periods due to COVID-19 precautions. We also heard from people who were arrested, confined, and released without charges and potentially exposed to COVID-19 for hours without contact with their families, friends, or attorneys.

COVID-19 and vaccine distribution continues to challenge Chicago's communities and City resources into 2021. And increases in violent crime—including increases in carjackings, shootings, and homicides—have continued to impact Chicago.[43]

The City and the CPD have also continued to face challenges. Since May 2020, the City and the CPD have experienced significant turnover. The CPD, specifically, has faced challenges with retirements, including the First Deputy Superintendent in early August 2020, the Chief of Operations in August 2020, and the next First Deputy Superintendent in September 2020.[44] Likewise, the position of the City's Deputy Mayor for Public Safety was vacant for over seven months (October 2020 to

---

[41] *See, e.g.*, Lisa Schenker, *Chicago hospitals cancel appointments after weekend unrest*, Chicago Tribune (June 1, 2020) ("The medical shutdowns come as many hospitals are trying to restart outpatient services and elective surgeries after many of those services were paused because of COVID-19."), https://www.chicagotribune.com/business/ct-biz-hospitals-cancellations-protests-floyd-chicago-20200601-o6hsftrwgzcydcewxdgmgzspae-story.html; Lisa Schenker, *'It's catastrophic': Chicago-area patients struggle to get medications as pharmacies close amid George Floyd unrest*, Chicago Tribune (June 3, 2020) ("The closures have made it difficult for many area residents with diabetes, heart problems, mental health disorders and drug addictions to get their medications."), https://www.chicagotribune.com/business/ct-biz-chicago-south-side-pharmacy-closures-george-floyd-20200604-rztbtppqnvfuhb6nnxe4qo2ui4-story.html. *See also* David Roeder, *Walgreens spends $35 million to reopen looted Chicago stores*, Chicago Sun-Times (October 7, 2020), https://chicago.suntimes.com/business/2020/10/7/21506607/walgreens-looting-reopen-chicago-stores-mobile-health-covid-testing-chatham.

[42] *See, e.g.*, Lynn Sweet and Brett Chase, *With residents desperate for prescriptions, Lightfoot, Duckworth push for looted pharmacies to reopen*, Chicago Sun-Times (June 2, 2020), https://chicago.suntimes.com/politics/2020/6/2/21278704/chicago-looting-pharmacies-walgreens-cvs-walmart-lori-lightfoot-tammy-duckworth-prescription.

[43] *See* Megan Hickey, *A Violent Trend: Increasing Numbers of Children Killed by Gun Violence in Chicago*, CBS Chicago (April 19, 2021), https://chicago.cbslocal.com/2021/04/19/chicago-children-killed-gun-violence/; Jermaine Nolen and David Struett, *Murders, carjackings spike in 1st 3 months of 2021, although overall crime down from last year, police say*, Chicago Sun-Times (April 1, 2021), https://chicago.suntimes.com/crime/2021/4/1/22361767/chicago-police-department-crime-statistics-march-2021.

[44] *See* Frank Main and Fran Spielman, *In Chicago, other cities, more cops are calling it quits, retiring amid anti-police backlash*, Chicago Sun-Times (January 15, 2021) ("In Chicago, 560 officers retired in 2020 . . . about 15% more cops retiring than during the previous year, when the num-

May 2021).[45] And in May 2021, the COPA Chief Administrator and the Mayor's Chief of Staff resigned.[46]

Even without the extraordinary challenges from the COVID-19 pandemic, there is no quick fix to the policing challenges that the City, the CPD, and Chicago's communities faced in 2020. While we believe that the City and the CPD are now better positioned to respond to large-scale protests and the potential for unrest, much more work is needed. The City and the CPD must better position themselves to protect First Amendment speech; limit uses of force and violence toward people and property; and simultaneously, keep resources available to continue to serve all people of Chicago by helping to prevent crime and respond to calls for service.

Further, the City and the CPD cannot succeed without the trust and confidence of Chicago's communities. Chicago's communities are needed to, among other things, identify, prevent, and solve crimes; recruit and encourage qualified officers who are sincerely committed toward community, impartial, constitutional, and procedurally just policing; and to communicate their concerns and needs. Likewise, reform and progress must have buy-in from all levels of the CPD to create a culture that allows for reform and adherence to, adaptation with, and even leading of national best practices.

To this end, the City and the CPD have much work ahead. We heard from many community members who expressed new fears, frustrations, confusion, pain, and anger regarding their experiences with officers during protests. We heard from community members who participated in protests—some for the first time—who

---

ber of retirements rose by nearly 30%."), https://chicago.sun-times.com/2021/1/15/22229584/police-retirements-backlash-chicago-new-york-minneap-olis-john-catanzara-fop-michael-lappe. *See also* Fran Spielman, *Midterm correction, COVID-19 fatigue or mass exodus? Lightfoot's revolving door keeps spinning,* CHICAGO SUN-TIMES (May 9, 2021), https://chicago.suntimes.com/city-hall/2021/5/9/22425232/chicago-mayor-lorilight-foot-administration-turnover-mid-term-cabinet.

[45] *See* Frank Main and Fran Spielman, *Lightfoot's top advisor for public safety to resign after just a year in job, sources say*, CHICAGO SUN-TIMES (October 1, 2020), https://chicago.sun-times.com/city-hall/2020/10/1/21497406/susan-lee-lori-lightfoot-public-safety-deputy-mayor-resign; *Mayor Lori Lightfoot Names Celia Meza as City's Top Attorney, Fills Two Other Key City Hall Vacancies*, CBS CHICAGO (May 5, 2021), https://chicago.cbslo-cal.com/2021/05/05/celia-meza-appointed-chicago-corporation-counsel-law-department-mayor-lori-lightfoot/. *See also* Fran Spielman, *Midterm correction, COVID-19 fatigue or mass exodus? Lightfoot's revolving door keeps spinning*, CHICAGO SUN-TIMES (May 9, 2021), https://chicago.suntimes.com/city-hall/2021/5/9/22425232/chicago-mayor-lorilightfoot-ad-ministration-turnover-mid-term-cabinet.

[46] *See* Fran Spielman and Manny Ramos, *Police oversight agency chief resigns*, CHICAGO SUN-TIMES (May 5, 2020), https://chicago.suntimes.com/news/2021/5/5/22421458/sydney-roberts-re-signs-chicago-police-oversight-shootings-copa-civilian-office-accountability; A.D. Quig, *Light-foot replaces chief of staff, names new chief operating officer*, CRAIN'S CHICAGO BUSINESS (May 24, 2021), https://www.chicagobusiness.com/government/lightfoot-replaces-chief-staff-names-new-chief-operating-officer.

said that officers were verbally abusive toward them; pushed and shoved them; tackled them to the ground; pushed them down stairs; pulled their hair; struck them with batons, fists, or other nearby objects; hit them after they were "kettled" with nowhere to go or after being handcuffed; and sprayed them with pepper spray (OC spray) without reason.[47] Some reported needing medical care for their injuries or for the injuries of their families or friends—including injuries to heads, wrists, arms, knees, legs, eyes, faces, ribs, and noses. Many described having continued trauma from their experiences. Many also expressed fear and anxiety that unmasked officers potentially exposed them to COVID-19, including after officers took their masks during or after arrest. Several people also said that they were arrested, held for hours without being able to communicate with their family members, friends, or attorneys, and ultimately released without charges. Many people reported seeing CPD officers with their name plates and badge numbers covered. They also reported confusion about directions coming from the City, including the implementation of curfews, the discontinuation of service on Chicago Transit Authority trains and buses, and the raising of downtown bridges. And many community members expressed fear of retaliation from the CPD if they submitted formal complaints—or even exhibited reluctance to talk about their experiences with specific detail for that reason.

## ANALYSIS AND RECOMMENDATIONS

In short, the City, like many other cities, was unprepared for the level of sustained protests and unrest downtown and throughout its neighborhoods, starting at the end of May 2020.[48] While the City and the CPD regularly plan, prepare, and respond to large crowds and events, the City's and the CPD's standard approach regarding protests and unrest was inadequate for responding to quickly evolving mass movements—often fueled by social media—during a pandemic and corresponding stay-at-home orders, economic crises, unemployment, and resource

---

[47] The word "kettling" is often used to refer to different police actions, but in general, refers to "police action of surrounding a crowd of people in order to restrict them from moving or escaping." *On Kettling*, MERRIAM-WEBSTER, https://www.merriam-webster.com/words-at-play/kettling-police-tactic-history-meaning-usage. Some protesters also said that they believed officers used tear gas and rubber bullets. According to the CPD, the CPD did not have or use flash-bang grenades, bean bag rounds, rubber bullets, or tear gas. *See, e.g.*, *Report on the 2020 Protests & Civil Unrest*, MAJOR CITIES CHIEFS ASSOCIATION, INTELLIGENCE COMMANDERS GROUP (October 2020), https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf. Some CPD personnel said that the CPD does not carry this equipment and would not have been able to use the equipment even if officers thought that it would have been warranted.

[48] *See, e.g.*, Zoe Todd, *Handling of Public Protests a 'Stress Test' for Police Reform*, PBS FRONTLINE (September 18, 2020), https://www.pbs.org/wgbh/frontline/article/protests-trial-police-reform/; *see also* Kim Barker, Mike Baker, and Ali Watkins, *In City After City, Police Mishandled Black Lives Matter Protests*, THE NEW YORK TIMES (March 20, 2021), https://www.nytimes.com/2021/03/20/us/protests-policing-george-floyd.html.

shortages. The City and the CPD had not dedicated sufficient attention or resources toward responding to protests and potential unrest since Chicago hosted the North Atlantic Treaty Organization (NATO) Summit in 2012.

As a result, the City, the CPD, and other City entities had to improvise, creating foreseeable issues—such as the difficulties of deploying mass numbers of officers to various critical locations within and outside of their districts. Many officers were deployed without their equipment, including radios, body-worn cameras, or protective gear and also without provisions for their basic needs, such as transportation or access to rest periods, restrooms, food, or water. The CPD, for example, repeatedly and indefinitely put all officers on 12-hour days, without days off throughout 2020. And since then, in response to protests, violence, and potential protests and unrest, the CPD has continued to put officers on 12-hour days and reduced days off during certain periods.[49]

Thus, even if the City and the CPD had predicted the level of protests and unrest after the death of George Floyd on May 25, 2020, the City and the CPD did not have the policies, reporting practices, training, equipment, data analysis, community engagement, or inter-agency coordination required to respond effectively. In other words, to respond to these foreseeable and unforeseeable challenges, the City and the CPD would have needed to allocate resources to large-scale and sustained protests and unrest *well in advance* of George Floyd's murder. For example, the CPD's lack of a staffed, trained, and equipped mobile-field-force team—similar to what existed in Chicago for the 2012 NATO Summit—left the CPD significantly unprepared during the summer of 2020.[50]

Without sufficient planning or preparation, many City personnel, officers, and local partners went beyond what would have been required of them if the City and the CPD had been better prepared and had sought to meet the moment with sufficient guidance, training, or guarantees of support. Many conducted themselves professionally and admirably under abnormally stressful circumstances. Likewise, large groups of Chicago communities came together—during the relatively early

[49] *See, e.g.*, Mugo Odigwe, *CPD Ending Daily Downtown Deployment With 12 Hour Days, Will No Longer Cancel Days Off*, CBS CHICAGO (June 1, 2021), https://chicago.cbslocal.com/2021/06/01/cpd-ending-daily-downtown-deployment-with-12-hour-days-will-no-longer-cancel-days-off/.

[50] Mobile Field Force teams are specifically trained for crowd management and for deterring, mitigating, and de-escalating violent individuals in crowds and maximizing the safety of officers, protesters, and bystanders. Properly trained, equipped, and certified Mobile Field Force teams can prevent untrained officers from using tactics that may further escalate tensions or unrest. In 2020, the CPD created the Critical Incident Response Team and Community Safety Teams and allocated some crowd management responsibilities to those teams. The IMT, the OAG, and others have continued to raise questions regarding these teams, and our recommendations regarding a Mobile Field Force are distinct from the broader set of functions and required training that the CPD has assigned to the Critical Incident Response Team and Community Safety teams.

and uncertain stages of a worldwide pandemic—to clean, rebuild, and shield their communities. We heard of and witnessed experiences of incredible bravery by sworn and non-sworn personnel, including City personnel who worked tireless nights, officers and other first responders who rushed toward danger to help others, and people who went out of their way to de-escalate conflicts between community members and community members and police.

But there were other consequences for the City and the CPD's lack of preparation. Some officers engaged in various levels of misconduct and excessive force, many instances of which are still under investigation by the CPD's Bureau of Internal Affairs (BIA) and by the Civilian Office of Police Accountability (COPA).[51] There were instances of widespread unrest, which included homicides, shootings, and serious injuries to community members and police officers; hundreds of arrests; and millions of dollars in property damage.[52] There was also an increase in violent crime and destruction of public and private property—including pharmacies, grocery stores, and local businesses.[53] Although the numbers are disputed—and may have been overstated—at least some people who joined or encouraged unrest and violence appeared to have traveled to Chicago for that purpose.[54]

---

[51] *See All Protest related Complaints by District of Incident*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (January 4, 2021), http://www.chicagocopa.org/wp-content/uploads/2021/01/Protest-Complaints-District-Heatmap-1.png; *Chicago Police the Target of 520 Complaints Since May*, NBC CHICAGO (November 13, 2020), https://www.nbcchicago.com/news/local/chicago-politics/chicago-police-the-target-of-520-complaints-since-may/2370843/.

[52] *See, e.g.*, Todd Lighty, Gary Marx, Christy Gutowski, and William Lee, *Chicago's 2020 unrest: A Tribune investigation documents the scope of the damage and its lingering impact on neighborhoods, businesses*, CHICAGO TRIBUNE (June 2, 2021), https://www.chicagotribune.com/investigations/ct-chicago-2020-looting-unrest-damage-george-floyd-police-killing-20210602-olbvgmfylna3jarumzonp5zkqe-htmlstory.html.

[53] *See, e.g.*, *Man Who Set Fire to Chicago Police Vehicle During Civil Unrest Pleads Guilty In Federal Court*, THE UNITED STATES ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ILLINOIS (April 8, 2021), https://www.justice.gov/usao-ndil/pr/man-who-set-fire-chicago-police-vehicle-during-civil-unrest-pleads-guilty-federal-court; *Federal Judge Convicts Man of Conspiring to Steal Cash From Chicago ATM*, THE UNITED STATES ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ILLINOIS (February 17, 2021), https://www.justice.gov/usao-ndil/pr/federal-judge-convicts-man-conspiring-steal-cash-chicago-atm; *Man Charged in Federal Court With Illegally Possessing Loaded Gun After Allegedly Looting Downtown Chicago Store*, THE UNITED STATES ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ILLINOIS (August 28, 2020), https://www.justice.gov/usao-ndil/pr/man-charged-federal-court-illegally-possessing-loaded-gun-after-allegedly-looting; *Two Men Charged in Federal Court With Looting Pharmacies in Chicago*, THE UNITED STATES ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ILLINOIS (August 26, 2020), https://www.justice.gov/usao-ndil/pr/two-men-charged-federal-court-looting-pharmacies-chicago-0; *Chicago Man Arrested on Federal Arson Charge for Allegedly Setting Fire to Chicago Police Vehicle*, THE UNITED STATES ATTORNEY'S OFFICE, NORTHERN DISTRICT OF ILLINOIS (June 2, 2020), https://www.justice.gov/usao-ndil/pr/chicago-man-arrested-federal-arson-charge-allegedly-setting-fire-chicago-police-vehicle.

[54] *See, e.g.*, Lauren FitzPatrick, *Outside agitators? Few arrested in Chicago after George Floyd's death came from elsewhere* (July 4, 2020) ("About three of every four people arrested in the period around the protests and looting – 1,847 – gave the police Chicago addresses, and 230

According to various community members, during the spike in calls for service, many calls went unanswered.[55] Chicago communities also experienced a spike in violent crime in the first weekend of protests and unrest, with 85 people shot, resulting in 24 deaths.[56] Due to COVID-19 precautions, we heard that some people with injuries and victims of crime either turned down medical care that they would have otherwise sought or risked indefinite separation from their families and friends in seeking treatment, causing additional uncertainty and stress. Cities across the country had over one-billion dollars in claims from the destruction of property—on top of economic losses from COVID-19 and corresponding shut-downs and other precautions.[57] The total immediate and long-term costs from the

---

more were from the suburbs . . . 40 people . . . were from out of state . . . . [and] no ZIP code was provided in the data obtained under the state's public records law for the remaining 371, which included juveniles."), https://chicago.suntimes.com/2020/7/4/21312969/outside-agitators-george-floyd-chicago-looting-matthew-rupert; *Federal Criminal Complaint Charges Illinois Man With Traveling To Minnesota To Riot, Possession of Explosive Devices*, The United States Attorney's Office, District of Minnesota (June 1, 2020) (referring to alleged conduct in Minneapolis and Chicago), https://www.justice.gov/usao-mn/pr/federal-criminal-complaint-charges-illinois-man-traveling-minnesota-riot-possession; Jessica Villagomez, *6 out-of-town protesters arrested near Chicago Mayor Lori Lightfoot's home where protesting has been effectively banned*, Chicago Tribune (August 23, 2020), https://www.chicagotribune.com/news/breaking/ct-lightfoot-arrests-20200823-ofbclfdylzbtrd6fci7u5wn3va-story.html; *Federal Indictment Charges Three Individuals With Setting Fire to Chicago Transit Authority Van*, The United States Attorney's Office, Northern District of Illinois (February 25, 2021), https://www.justice.gov/usao-ndil/pr/federal-indictment-charges-three-individuals-setting-fire-chicago-transit-authority-van; *Two Individuals Charged in Federal Court With Illegally Possessing Loaded Handguns in Downtown Chicago*, The United States Attorney's Office, Northern District of Illinois (June 2, 2020) https://www.justice.gov/usao-ndil/pr/two-individuals-charged-federal-court-illegally-possessing-loaded-handguns-downtown.

[55] On December 18, 2020, in response to a request from June 10, 2020, the City and the OEMC said the following:
"OEMC does not have data or documentation responsive to the IMT's requests specifically isolating lawful demonstrations or unrest, other supporting law enforcement entities, or events not responded to. Additionally, while there may have been individuals who called 911 but were unable to get through, OEMC would not have information on such instances. Any calls that OEMC receives which require a dispatch receive a dispatch."

[56] *See, e.g., 85 shot, 24 fatally, over Chicago's most violent weekend of 2020*, Chicago Sun-Times (June 1, 2020), https://chicago.suntimes.com/2020/6/1/21275944/chicago-weekend-shootings-most-violent-weekend-2020-may-29-june-1.

[57] Notably, such estimates include insurance claims, rather than actual damage, and thus, may both under- and over-inclusive, as some claims may be inaccurate and not all damage was insured. *See, e.g.*, Jennifer A. Kingson, *Exclusive: $1 billion-plus riot damage is most expensive in insurance history*, Axios (September 16, 2020), https://www.axios.com/riots-cost-property-damage-276c9bcc-a455-4067-b06a-66f9db4cea9c.html. *See also Facts + Statistics: Civil Disorders*, Insurance Information Institute ("A preliminary estimate of insured losses from [Property Claim Services] which is still subject to further evaluation, would be more than $1 billion, marking it as the costliest civil disorder in U.S. history."), https://www.iii.org/fact-statistic/facts-statistics-civil-disorders; Tim McNicholas, *2 Months After looting and Unrest, Many Chicago Businesses Still Need Help Rebuilding*, CBS Chicago (August 3, 2020), https://chicago.cbslocal.com/2020/08/03/2-months-after-looting-and-unrest-many-chicago-businesses-still-need-

---

destruction of property remains unclear, and it is unclear how many businesses and corresponding jobs will not return.[58] The City also spent hundreds of millions of dollars on overtime.[59]

The City may also have spent a considerable amount to settle protest-related lawsuits. For example, the City settled a lawsuit brought by the Chicago Freedom School, in which it claimed the City issued an "illegal" cease and desist order because the Chicago Freedom School fed and helped protesters trapped downtown in May 2020.[60] The City later rescinded the cease and desist order.[61] The financial terms of that settlement are not public.

---

[58] help-rebuilding/. There may also have even been increased COVID-19 infection rates. *See* Randall Valentine, Dawn Valentine, and Jimmie Valentine, *Relationship of George Floyd protests to increases in COVID-19 cases using event study methodology*, J. PUBLIC HEALTH (OXF) (August 5, 2020) (finding a positive and significant infection growth rate in six of eight cities), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7454741/. *See also* Gregory Neyman and William Dalsey, *Black Lives Matter protests and COVID-19 cases: relationship in two databases*, J. PUBLIC HEALTH (OXF) (November 20, 2020) (finding a statistically significant increase in case rates across 326 counties, participating in 868 protests, but the increase was "small in magnitude and likely due to limitations of significantly different population sizes in comparators"), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7717330/. *Compare* David Lazer, et al., *The State of the Nation: A 50-State COVID-19 Survey Report #10: The Pandemic and the Protests*, NATIONAL SCIENCE FOUNDATION (August 10, 2020), https://kateto.net/covid19/COVID19%20CONSORTIUM%20REPORT%2010%20PROTEST%20AUGUST%202020.pdf.

[58] *See, e.g.,* Todd Lighty, Gary Marx, Christy Gutowski, and William Lee, *Chicago's 2020 unrest: A Tribune investigation documents the scope of the damage and its lingering impact on neighborhoods, businesses*, CHICAGO TRIBUNE (June 2, 2021), https://www.chicagotribune.com/investigations/ct-chicago-2020-looting-unrest-damage-george-floyd-police-killing-20210602-olbvgmfylna3jarumzonp5zkqe-htmlstory.html; Ally Marotti and Alexia Elejalde-Ruiz, *Chicago's black-owned businesses face uphill battle to rebuild, even with outpouring of support after George Floyd death*, CHICAGO TRIBUNE (June 5, 2020), https://www.chicagotribune.com/business/ct-biz-black-owned-chicago-businesses-george-floyd-20200605-5e574nbq6fay-pcuvw62hwgk7r4-story.html.

[59] *See* Gregory Pratt, *Chicago spent $367 million on overtime in 2020, double what Mayor Lori Lightfoot budgeted*, CHICAGO TRIBUNE (February 11, 2021), https://www.chicagotribune.com/politics/ct-chicago-budget-overtime-20210211-ugjefdxggnhrjoz73ehktfx6fy-story.html.

[60] *See* Justin Lawrence, *City Settles Chicago Freedom School Lawsuit After Group Was Cited For Offering Food To Protesters Trapped Downtown*, BLOCK CLUB CHICAGO (July 4, 2020), https://blockclubchicago.org/2020/07/04/city-settles-chicago-freedom-school-lawsuit-after-group-was-cited-for-offering-food-to-protesters-trapped-downtown/.

[61] *License Order*, CITY OF CHICAGO DEPARTMENT OF BUSINESS AFFAIRS AND CONSUMER PROTECTION (July 3, 2020), https://chicagofreedomschool.org/app/uploads/2020/07/Chicago-Freedom-School-rescind-CD-SIGNED.pdf.

In another example, the City paid $115,000 to settle two lawsuits alleging that CPD officers used excessive force during the protests.[62]

Other lawsuits are pending. Sixty plaintiffs, for example, filed a lawsuit in November 2020, alleging police abuses.[63] Two other people filed a lawsuit, alleging excessive force, in May 2021.[64] And in December 2020 and June 2021, there were lawsuits filed regarding events at the Brickyard Mall on May 31, 2020.[65]

An accounting of how much the lack of preparation cost and how much long-term damage was caused will continue to develop, and a full accounting may never be possible. On the one hand, despite a spike in shootings, homicides, and shootings at police, there were only a few officer-involved shootings during unrest. On the other hand, as reflected in Executive Summary Figure 3, there was a spike in firearm pointing circumstances that occurred between May 31 and June 2, 2020, and for reasons detailed throughout this report, there was often no body-worn camera footage to review. Likewise, given the many reporting and tracking challenges, the actual number of use of force incidents may be unknowable, including how often personal OC spray was used.

---

[62] *See* Heather Cherone, *City Pays $115K to Settle 2 Lawsuits Alleging Excessive Force During Protests*, WTTW NEWS (January 19, 2021), https://news.wttw.com/2021/01/19/city-pays-115k-settle-2-lawsuits-alleging-excessive-force-during-protests.

[63] *See* Jeremy Gorner, *Dozens file federal suit alleging Chicago police abused this year's protests over the death of George Floyd*, CHICAGO TRIBUNE (November 19, 2020), https://www.chicagotribune.com/news/criminal-justice/ct-chicago-police-protesters-federal-lawsuit-20201119-dldtv7hw45ekxgisifvojtm6l4-story.html.

[64] *See* Chuck Goudie, Barb Markoff, Christine Tressel, and Ross Weidner, *Federal lawsuits allege brutality against protesters by Chicago police*, ABC7 EYEWITNESS NEWS (May 26, 2021), https://abc7chicago.com/federal-lawsuits-allege-brutality-against-protesters-by-chicago-police/10700074/.

[65] *See Read the lawsuit filed against Chicago, police officers in Brickyard Mall arrest*, CHICAGO TRIBUNE (December 23, 2020), https://www.chicagotribune.com/news/ct-brickyard-mall-arrest-lawsuit-20201223-iztt7surbze63aaon7m5cf4obq-htmlstory.html; Jason Meisner, *In fallout from last year's unrest, man pleads guilty to breaking into pharmacies; trio sue alleging police brutality at another looting scene*, CHICAGO TRIBUNE (June 1, 2021), https://www.chicagotribune.com/news/criminal-justice/ct-chicago-unrest-looting-guilty-plea-police-brutality-lawsuit-20210601-dah6u32p3rgpjnxxanbwnnfuci-story.html.

Executive Summary Figure 3.
CPD Force Revision Division: Firearm Pointing Incidents (2020)[66]



Compliance with many of the Consent Decree requirements regarding, among others, community engagement, policy development, training, uses of force, accountability, and officer-wellness practices under development would have put the City and the CPD in a better position to respond to the protests and unrest.[67]

Specifically, with compliant policies, plans, training across levels, reporting, community engagement, and specific inter-entity agreements, the City and the CPD could better respond to large, sustained protests and predict, identify, prevent, and mitigate unrest. This would allow the City and the CPD to efficiently (1) build trust with Chicago's communities; (2) improve communications with Chicago's communities; (3) close the window for opportunists who might take advantage of or contribute to unrest; (4) protect businesses to allow them to continue to provide Chicago's communities with goods and services, including groceries and pharmaceuticals; and (5) allocate public resources and services to Chicago's communities, including public transit, education, food delivery, and crime prevention.

Throughout our review, and as reflected in this report, the IMT identified various issues with the City's and the CPD's responses to First Amendment activity. We recommended that the City and the CPD address many issues immediately, rather than waiting for this report. Since then, the City and the CPD have made deliberate efforts to improve their responses to protests and unrest through additional planning; purchasing and allocating equipment; developing and revising policies;

---

[66]  *Chicago Police Department Force Review Division 2020 Year-End Report*, CHICAGO POLICE DEPARTMENT (April 28, 2021), https://home.chicagopolice.org/wp-content/uploads/FRD-2020-Year-End-Report.pdf.

[67]  *See, e.g.*, ¶266 ("CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.").

providing refresher and revised training; and improving supervision. We understand that other City entities and partners have also continued to meet to identify ways to improve.

For example, the City, the CPD, the OAG, and the Coalition (which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[68]) met several times and continue to review and revise CPD policies regarding responses to crowds; mass arrests and corresponding reporting; and responses to First Amendment activity. These discussions began after the Coalition filed a Notice of Intent to Initiate Enforcement Proceedings in July 2020.[69] Since then, the CPD has also conducted additional roll-call, eLearning, and in-person trainings, including crowd management techniques and mobile-field-force concepts. As of this report, the City, the City's entities, the OAG, the Coalition, and the IMT are still meeting regularly to resolve First Amendment and Use of Force policy concerns.[70]

We reiterate our recommendations and provide additional recommendations throughout this report, including a summary list at the end of this Executive Summary. *See* IMT's Recommendations. In short, as demonstrated by the list below, the City and the CPD needed more effective plans, policies, trainings, and practices to adequately respond to large-scale protests and unrest:

- Prioritizing better data collection, analysis, and management to better inform reform efforts, priorities, and resource allocation;

- Better intelligence gathering and clear channels of internal, external, and community communication before, during, and after planned *and unplanned* events;

---

[68] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[69] Counsel for the Coalition, *Response to the Second Independent Monitor's Report and Notice of the Coalition's Intent to Initiate Enforcement Proceedings* (July 23, 2020), Case: 1:17-cv-06260, Document #:855, United States District Court for the Northern District of Illinois, Eastern Division.

[70] Separately, starting in June 2020, the CPD and the Use of Force Community Working Group convened to discuss the CPD's Use of Force policies. The last meeting was on June 16, 2021. These meetings relate to several Consent Decree requirements. For example, the CPD must "establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies." ¶160. We provided an assessment of the CPD's relevant efforts through December 31, 2020, in our last monitoring report, concluding that the City and the CPD fell short of meeting a level of compliance. *See Independent Monitoring Report 3*, INDEPENDENT MONITORING TEAM (March 30, 2021), https://cpdmonitoringteam.com/overview/reports-and-resources/third-semi-annual-independent-monitoring-report/. We will provide an updated assessment for the City and the CPD's efforts through June 30, 2021, in our next report, Independent Monitoring Report 4.

- Better inter- and intra-agency planning, training, and equipment acquisition and distribution for planned and unplanned events;

- A more effective command-and-control structure that provides for clear levels of responsibilities and proper documentation of decisions, operational actions, and results, including deployments, uses of force, injuries, property damage, officer wellness, and logistics.

- A more prompt and efficient deployment of personnel, including from external partners with clear command and control and rules of engagement;

- Continued development of CPD leadership;

- Formal, structured, and well-trained specialized, equipped, and certified mobile-field-force teams as rapid deployment units;

- Updated policies, forms, training, and supervision for First Amendment activity and crowd management for all responding officers and personnel, including the ability to differentiate between protected First Amendment and unlawful activity, to protect the former and prevent, mitigate, and deter the latter;

- Clear communications with community members, including protesters, and protest organizers regarding policies; time, place, and manner restrictions; and enforcement actions, including dispersal orders;[71] and

- Better support for officer safety and wellness through sufficient equipment, food and water, supplies, support, mental-health services, and rest.

At the time of this report, the City and the CPD continue to meet with members of Chicago's communities and with the Office of the Illinois Attorney General (OAG), the IMT, and the federal court to address many of these issues. As referenced above, the City and the CPD also continue to meet with the Coalition regarding the City's and the CPD's First Amendment policies and practices.[72]

---

[71]  *See, e.g., Know Your Right to Protest in Chicago*, AMERICAN CIVIL LIBERTIES UNION (ACLU) OF ILLINOIS (May 2015), https://www.aclu-il.org/sites/default/files/know_your_right_to_protest_in_chicago.pdf.

[72]  The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits." ¶705. *See also* ¶669; *Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf. Specifically, the *Campbell* plaintiffs are represented by Northwestern Pritzker School of Law's MacArthur Justice Center; the University of Chicago Law School's Mandel Legal Aid Clinic; Shiller Preyar LLC; Samuels &

Of course, our review does not end with this Special Report, and there are still questions regarding what the City and the CPD have done, or plan to do, to better respond to protests and unrest. While we do not provide compliance assessments in this report, we will continue to do so in our semiannual reports until the City and the CPD reach full and effective compliance with the Consent Decree's requirements.[73] Our next Independent Monitoring Report, the fourth, will cover the City and the CPD's efforts through June 30, 2021. This review and analysis of the CPD's practices has and will continue to inform the IMT's recommendations and assessments for CPD policies, trainings, supervision, and practices under the Consent Decree.

Because the City's and the CPD's work to come into compliance with the Consent Decree is ongoing, in many ways, this Special Report provides a gap analysis of where the City is and where it needs to go to move closer toward full and effective compliance with the Consent Decree's requirements. This report is not a blanket disapproval or approval of the City's and the CPD's responses to recent protests and unrest. Instead, in this report, we refer to the relevant Consent Decree requirements and make recommendations for what the City and the CPD should do to reach full and effective compliance with the Consent Decree.[74] To this end, the City and the CPD must take ownership over the required reforms, honestly identify strengths and weaknesses, and adapt to the needs of Chicago's communities.

We are encouraged that the CPD did its own after-action review and After Action Report—covering the CPD's response to Civil Unrest between May 29, 2020, and June 12, 2020. In that report, the CPD acknowledges many of the areas that require improvement. The After Action Report states that the CPD "continues to deliberately implement certain policies, procedures, and systems that can safely, lawfully, and effectively facilitate future responses to both planned and unplanned

---

Associates, Ltd.; Karchmar & Lambert, P.C.; Action Injury; and Cleary Gottlieb Steen & Hamilton, and the *Campbell* plaintiffs include 411 Movement for Pierre Loury; Black Lives Matter Chicago; Blocks Together; Brighton Park Neighborhood Council, Chicago Urban League; Justice for Families—Black Lives Matter Chicago; Network 49; The Illinois State Conference of the NAACP, Chicago Westside Branch; Women's All Point Bulletin; and Chicago Urban League. Likewise, the *Communities United* plaintiffs are represented by the American Civil Liberties Union (ACLU) of Illinois; Equip for Equality; and Munger, Tolles & Olson LLP, and the *Communities United* plaintiffs include Communities United, Community Renewal Society, ONE Northside, and Next Steps, NFP.

73    Our latest compliance assessments are in our Independent Monitoring Report 3. *See Independent Monitoring Report 3*, INDEPENDENT MONITORING TEAM (March 30, 2021), https://cpd-monitoringteam.com/overview/reports-and-resources/third-semi-annual-independent-monitoring-report/.

74    *See* ¶693. As cited throughout the report, we note that our recommendations are in line with the best practices recommended by many other agencies and after-action reports regarding responses to protests and unrest in 2020.

protests."[75] The CPD further acknowledged that the CPD "must be as prepared to respond to large-scale, unplanned incidents . . . [which] is best accomplished through a deliberate, continuous cycle of improvement incorporating training, policy revisions, and regular preparedness drills."[76]

We agree, and as detailed in this report, we believe that the City and the CPD can and must make immediate, deliberate, and transparent efforts—in compliance with the Consent Decree—to better protect and serve and to be accountable to Chicago's communities.[77] We also believe that the City and the CPD should make many of their efforts transparent to help remedy the trust that may have been harmed, both with the public and City personnel, and to ensure that, in improving their ability to respond, the City and the CPD do not ignore either constitutional policing or concerns about over-policing and over-militarized responses, detached from communities, that inspired so many people to take to the streets.

---

[75]  *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 2–3.

[76]  *Id.* at 5.

[77]  In the City's response to this report and our recommendations, the CPD reports having made many relevant efforts. *See* Attachment B. We look forward to reporting on the City's and the CPD's efforts and assessing compliance with the Consent Decree requirements in upcoming reporting periods and corresponding monitoring reports. We will report on the relevant evidence we have received through June 30, 2021, in our next report, Independent Monitoring Report 4.

# IMT's Recommendations

## Planning and Preparation

- Expand planning operations across all internal and external entities and partners by, among others, (1) establishing a multi-facet planning team, (2) modifying current planning template, and (3) conducting tabletop exercises for command personnel (¶704)

- Enhance intelligence gathering and dissemination capabilities by, among other things, (1) tracking national and international events that may impact Chicago, (2) improving social-media engagement, (3) conducting formal meetings with protest organizers and community stakeholders, and (4) engaging with Chicago's communities, stakeholders, and experts regarding the City's and the CPD's policing efforts and strategies (¶46)

- Continue New Forms of Community Engagement by, among other things, (1) clearly communicating time, place and manner restrictions; (2) conducting community-sentiment assessments; (3) engaging with community review of and comment on policies and training; (4) creating and maintaining community and business safety plans; (5) improving victim services (¶¶10, 49, 52, 115, 160, 511, 546)

- Create, train, and equip specialized Mobile Field Force Teams, with certified members, across all CPD areas (¶¶265–68)

- Better prepare for department-wide officer wellness and support, including providing and tracking body-worn cameras, protective equipment, transportation, hydration, food, facilities, and relief (¶¶, 236–41, 381–86)

- Conduct a feasibility study regarding the acquisition, prioritization, allocation, and tracking of resources for officer wellness and responding to protests and unrest (¶¶377, 379)

## Policies

- Update and Develop Standard Operating Procedures for initiating Emergency Operations Center and Forward Command Posts, establishing clear roles and responsibilities for all levels of command (¶¶341–46, 354)

- Update and develop CPD policies, with an enhanced focus on (1) Use of Force, including mass arrests (¶¶153, 158–216, 218–19, 243–48, and 509), (2) First Amendment-related policies (¶208), (3) core policing values regarding ethical policing practices and a commitment to fair, unbiased and respectful interactions (¶¶54, 152, and 163); and (4) accountability (¶¶626, *et al.*)

## Training

- Develop training programs for leadership, commanders, and supervisors as teams on Mobile Field Force operations and rules of engagement (¶¶265–68)

- Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray (¶¶265–68)

- Provide refresher training on (1) the people's right to record officers (¶58), (2) uniform requirements (¶347, 351, 433), (3) respectful interactions (¶¶52, 54, 56), (4) providing and requesting medical aid (¶173), and (5) arrestee rights (¶¶30–31, 35, 71)

## Accountability and Transparency

- Improve reporting and Improve reporting and documentation on uses of force, arrest, deployments, dispersals, officer wellness and safety, all injuries, and use of OC spray (¶566–67, 438, 528, 567, 581–82)

- Increase transparency regarding discipline, including decisions to relieve or not relieve officers of police powers (¶567)

- Address personnel needs across accountability systems, including COPA investigators, CPD Force Review Division, BIA, and CPD supervisor ratios (¶¶343, 356, 521, 575, 700)

- Allocate sufficient City and CPD resources to review and analyze data, including tagging and auditing body-worn-camera video footage (¶¶352–53, 576, 700)

- Continue to review and increase methods of transparency with Chicago's communities, regarding crime-reduction strategies, officer-involved shootings, and other police activities (¶¶10, 12, 17, 54, 334)

- Create After Action procedures—including body-worn camera review and opportunities for community engagement—after each operations plan (¶¶8–10, 347–51)

The CPD should also address the City of Chicago Office of the Inspector General's findings:
(1) Address breakdowns in mass-arrest processes, (2) Improve use-of-force reporting, and (3) Fill gaps in policies

# Scope and Methodology

As protests and unrest began in Chicago in 2020, related law-enforcement activities also increased, including contacts, tactics, and other practices and topics covered by the Consent Decree. This included uses of force—including the uses of impact weapons (*e.g.,* batons), oleoresin capsicum (OC) spray (also known as "pepper spray")—foot pursuits, and individual and mass arrests. The rise in policing activity provided a nearly six-month stress test for the City's and the CPD's practices across the 10 topic areas of the Consent Decree.[78]

## Scope Figure 1: Consent Decree Topics

(1) Community Policing
(2) Impartial Policing
(3) Crisis Intervention
(4) Use of Force
(5) Recruitment, Hiring, and Promotions

(6) Training
(7) Supervision
(8) Officer Wellness and Support
(9) Accountability and Transparency
(10) Data Collection, Analysis, and Management

On June 5, 2020, during ongoing protests and unrest in Chicago—and amid growing concerns regarding the City of Chicago's (City's) and the Chicago Police Department's (CPD's) response to protests and unrest—the IMT announced that we would prepare this report.[79] To promote transparency under the Consent Decree, the IMT focused this Special Report on the City's and the CPD's responses to these events, including First Amendment activity, unrest, and related law-enforcement responses. While the City and the CPD continue to respond to large protests,

---

[78] *See, e.g.,* ¶¶30–31 (prominently displaying arrestee rights); 48 (community partnerships, effective de-escalation, and community-oriented crime prevention strategies); 54–55 (prohibitions on discrimination based on protected classes); 86 (alternatives to arrest); 126 (crisis intervention training); 156–57 (sanctity of human life; professionalism; de-escalation; tactics to eliminate or reduce the use of force; only using force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; prohibiting the use of force to punish or retaliate; stopping force when it is no longer necessary; truthfully and completely reporting all reportable uses of force; reporting excessive uses of force and violations of policy; accountability for violations; and promoting community trust); 163 (prohibiting the use of force to punish or retaliate against a person engaging in First Amendment activity); 165 (prohibiting deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person); 173 (requesting and rendering medical aid); 175 (duty to intervene when another officer is using excessive force); 178 (prohibition on using carotid artery restraints or chokeholds unless deadly force is authorized); 229 (supervisors review all reportable uses of force); 246 (annual use-of-force training); 248 (pre-service promotional supervisory training); 352 (supervisors to enforce expectation that members perform duties consistent with procedural justice, de-escalation, impartial policing, and community policing); 411 (Traumatic Incident Stress Management Program); 587 (database to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer).

[79] *See, e.g.,* ¶643. *See Notice Regarding Special Report* (June 5, 2020), https://cpdmonitoring-team.com/wp-content/uploads/2020/06/2020-06-05-Notice-Regarding-Special-Report.pdf.

crowds, and potential unrest in 2021, this review focuses on the major events from May 2020 through November 2020.[80]

Under ¶667, the Independent Monitoring Team also coordinated and conferred with the Office of the Inspector General for the City of Chicago (Inspector General's Office or OIG) in connection with this Special Report. The Inspector General Office's corresponding report, which covers May 29 through June 7, 2020, is available here.[81] As reflected in their report, the Inspector General's Office and the IMT focused on different areas:

> In recognition of their different sources and scopes of authority and jurisdiction, and in the interest of avoiding the duplication of efforts, OIG and the IMT undertook fact gathering jointly but are issuing separate reports with different areas of focus. OIG's report is issued pursuant to its City-spanning jurisdiction and mandate to, among other things, promote effectiveness and integrity in City operations, and the mandate of its Public Safety section to study policies, practices, programs, and training specific to CPD and Chicago's police accountability agencies. . . . The IMT's report arises from its duties to monitor compliance with the terms of the consent decree, and therefore focuses on topics covered by the consent decree.[82]

The Inspector General made findings regarding (1) breakdowns in mass-arrest processes, (2) use-of-force reporting, and (3) gaps in policies:

First, the Inspector General's Office found breakdowns in the CPD's mass-arrest processes, including failure to arrest some offenders, unsubstantiated detention, release of some arrestees without charges, risks to officer safety, and risks to arrestee safety.[83]

Second, the Inspector General's Office found problems with the CPD's use of force reporting, including the CPD's failure to fulfill use-of-force reporting obligations and failing to provide clear and consistent guidance to officers on reporting obligations.[84]

---

[80] *See e.g.,* Tara Molina, *Sunday Night Was 'A Disaster': Large Crowds Bring 'Massive Chaos and Mayhem' To The Loop At End of July 4th Celebrations,* CBS2 CHICAGO (July 6, 2021), https://chicago.cbslocal.com/2021/07/06/the-loop-crowds/; Diane Pathieu, Ravi Baichwal, and Rob Elgas, *Thousands protest in downtown Chicago over Israel-Palestine conflict,* ABC7 EYEWITNESS NEWS (May 12, 2021), https://abc7chicago.com/israel-palestine-and-conflict/10618870/.

[81] *Report on Chicago's Response to George Floyd Protests and Unrest,* OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf.

[82] *Id.* at 7–8.

[83] *Id.* at 66–93.

[84] *Id.* at 94–117.

Third, the Inspector General's Office found gaps in the CPD's policies, including those governing mass arrests, the oversight and review of uses of force, body-worn camera non-compliance, and violations of uniform policy, specifically obscured identifiers.[85]

In their report, the Inspector General's Office focused on many aspects and details of the early protests and unrest, including for example, decisions to raise bridges.[86] We do not duplicate those efforts here, and instead, refer readers to the Inspector General's Report in full. We provide some details regarding the same days of protests and unrest to provide context to later events and efforts, our analysis, and recommendations.

As detailed below, to review the City's and the CPD's responses to the events of last year, the IMT reviewed thousands of records, including reports, body-worn camera videos, and emails. As explained further below, combined, the IMT and the Inspector General's Office also conducted over 100 interviews. The vast majority of these interviews were conducted via video conferencing due to COVID-19. This included interviews with members of the public, including people who participated in protests, and representatives from the City, its entities, and other government partners. We also sought to corroborate statements from these interviews from various sources, and throughout this report, we site to public information when possible.

Overall, the IMT made over 70 requests (many of which included sub-requests), including requests for policies, training, emails, audio, video, and data. In response, the City provided over 10,000 records. Similar to our data requests for our Consent Decree monitoring efforts, the IMT experienced challenges receiving some records from the City. Still, we received a great deal of records from the

---

[85] *Id.* at 118–26.

[86] The Inspector General's Office also recently released, among others, reports addressing the City's video release policy (September 2020), the CPD's and COPA's disciplinary grievance procedures (May 2021). *See Review of Compliance with the City of Chicago's Video Release Policy for Use-Of-Force Incidents*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (September 2020), https://igchicago.org/wp-content/uploads/2020/09/OIG-Review-of-Compliance-with-the-City-of-Chicagos-Video-Release-Policy-for-Use-of-Force-Incidents.pdf; *Evaluation of the Use of the Affidavit Override in Disciplinary Investigations of Chicago Police Department Members*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (December 2020), https://igchicago.org/wp-content/uploads/2020/12/OIG-Evaluation-of-the-Use-of-the-Affi-davit-Override-in-Disciplinary-Investigations-of-CPD-Members.pdf; *Review of the Disciplinary Grievance Procedure for Chicago Police Department Members*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (May 2021), https://igchicago.org/2021/05/20/review-of-the-discipli-nary-grievance-procedure-for-chicago-police-department-members/.

CPD—in addition to our general Consent Decree compliance records. Some records, however, were delayed. The emails we requested, for example, were received many months after our request.

## Community Interviews, Listening Sessions, and Other Community Input

The IMT hears from community members throughout our monitoring efforts. The IMT made additional efforts during this review to hear from community members regarding their experiences with the City and the CPD's responses to protests and unrest. The IMT's Community Engagement Team conducted interviews with community members and advocates to learn about their experiences during the protests and unrest.

Judge Robert Dow Jr also hosted two days of listening sessions, where 58 community members provided oral statements and 24 community members submitted written statements.[87] The full transcripts are available as Appendix D and Appendix E, below.

We must note that many community members expressed reluctance to participate in interviews, with many referring to a fear of retaliation from the CPD. There were also a significant number of people who registered to participate during the Listening Sessions, but ultimately did not appear. Overall, the IMT appreciates all of the experiences that community members shared, which was critical for our review. We thank all those willing to share their experiences with Judge Dow and with us.

In addition to the IMT's regular meetings with the Coalition—consistent with ¶669 of the Consent Decree—the IMT received input from the Coalition on the community's perspective on the events and issues discussed in this report via numerous meetings and related correspondence between the IMT, the City, the CPD, the OAG, and the Coalition.[88]

---

[87] One of the most important ways in which the IMT heard community voices during our review was through the public Listening Sessions held by Judge Dow. *See Transcript of the August 19, 2020 Listening Session* (August 19, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/081920Listening-Sessions-FINAL-PROOFED.pdf; and *Transcript of the August 20, 2020 Listening Session* (August 20, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/082020ListeningSession-Day-2-FINALPROOFED.pdf.

[88] *See, e.g.,* Coalition's *Notice of Filing Written Comments on the Response of the City of Chicago to the Protests since the Death of George Floyd* (Aug. 20, 2020), *Illinois v. City of Chicago*, No. 17-cv-6260, Docket No. 864. These included more than a dozen settlement conferences, most held by the Court, since July 23, 2020, when the Coalition filed its *Response to Second Independent Monitor's Report and Notice of the Coalition's Intent to Initiate Enforcement Proceedings*, Docket No. 855.

Scope Figure 2. The Coalition
(*Campbell* Plaintiffs and *Communities United* Plaintiffs)

| The Coalition (¶669) | |
| --- | --- |
| *Campbell* Plaintiffs | *Communities United* Plaintiffs |
| 411 Movement for Pierre Loury<br>Black Lives Matter Chicago<br>Blocks Together<br>Brighton Park Neighborhood Council<br>Chicago Urban League<br>Justice for Families—<br>Black Lives Matter Chicago<br>Network 49<br>The Illinois State Conference of the NAACP,<br>Chicago Westside Branch<br>Women's All Point Bulletin<br>Chicago Urban League | Communities United<br>Community Renewal Society<br>ONE Northside<br>Next Steps, NFP |
| *Represented by*<br><br>MacArthur Justice Center,<br>Northwestern Pritzker School of Law<br><br>Mandel Legal Aid Clinic,<br>the University of Chicago Law School<br><br>Shiller Preyar LLC<br><br>Samuels & Associates, Ltd.<br><br>Karchmar & Lambert, P.C.<br><br>Action Injury<br><br>Cleary Gottlieb Steen & Hamilton | *Represented by*<br><br>American Civil Liberties Union (ACLU)<br>of Illinois<br><br>Equip for Equality<br><br>Munger, Tolles & Olson LLP |

Issues of high priority to the Coalition have included (1) transparency and public accountability by way of this Special Report and the Listening Sessions held by the Court; and (2) improvements to the CPD's policies regarding First Amendment activities, crowds, and uses of force, including with respect to effective communication with and respectful treatment of protesters, alternatives to arrest, restrictions on use of batons and OC spray, and adequate reporting of and accountability for policy violations. We expect our conversations with the Coalition on issues related to the Special Report to continue moving forward.

## Interviews of City, CPD, and Other Government Personnel

During this review, we sought direct input from a variety of sources. This included members of Chicago's communities, including people who participated in protests, and representatives from the City and its entities, including the CPD's senior leadership, supervisors, and officers, as well as representatives from BIA, the Force

Review Division, Special Operations, the Crime Prevention and Information Center (CPIC); the Office of Emergency Management Communications (OEMC); COPA; and the Chicago Fire Department. We also received the Office of the Inspector General's notes from interviews of representatives from additional local entities, such as the Chicago Department of Transportation, the Cook County State's Attorney's Office, the Chicago Transit Authority, and the Illinois Emergency Management Agency.

Overall, the IMT and the Inspector General's Office conducted many interviews together and separately, resulting in over 100 interviews of community members, including the following:

- the Mayor;
- the Mayor's Chief of Staff;
- CPD Superintendent;
- CPD First Deputy Superintendent;
- CPD Chief of Operations;
- CPD Chief of Staff to the Superintendent;
- CPD Deputy Chiefs, including Deputy Chief's for each Area;
- CPD Commanders, including District Commanders;
- CPD sergeants;
- CPD officers;
- non-sworn CPD personnel; and
- representatives of collective bargaining units.

Given various organizational changes, at the time of the interview, many of these people were new to their positions or have since left those positions.

The IMT also interviewed representatives from other City agencies, including COPA and the Chicago Fire Department.

## CPD Policy, Plan, and Training Review

As described in our monitoring reports, throughout this review, the City, the OAG, and the IMT continued to the policy, plan, and training development, review, and revision process under the Consent Decree.[89] In addition to these reviews, as referenced in our Analysis section, we also reviewed additional policies, plans, and training specific to this report.

---

[89]   The Consent Decree outlines the policy review process in ¶¶626–37 and the plan and training review processes in ¶¶638–41. Some policies require the CPD to obtain community input while they develop new or revised policies. *See, e.g.*, ¶¶52 and 160. For policy review, the City and the CPD must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then

## Publicly Available Images, Reports, and Other Information

The IMT also reviewed a robust sampling of publicly available information, including press releases, news stories, and social-media posts, including videos, and photos. Social media posts from protesters and community members were incredibly helpful and gave an otherwise unavailable perspective to events. There were, of course, challenges. We tried to avoid crediting misinformation—such as accounts posting images and videos from other cities or time periods while falsely attributing the images to the 2020 protests and unrest in Chicago. Still, many posts, images, and videos were verifiable and helpful.

When applicable, we cite to publicly available information throughout this report. Many of these sources include references to a broader set of assertions, criticisms, or viewpoints, which are sometimes conflicting or even opposing one another. We do not address many of the assertions or viewpoints in these articles, reports, or datasets, nor do we cite sources as to adopt the position of all matters asserted. Instead, we include citations to public articles, reports, and data sets for specific references, examples, or illustrations of larger and ongoing dialogue and dialectic.

This also included various research and review of various after-action reports from around the country, such as the following:

- Baltimore, Maryland[90]
- Charleston, South Carolina[91]

---

have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have *at least* 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to Judge Dow to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

[90]  *See* Jonathan Links, Katie O'Conor, and Lauren Sauer, *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, Johns Hopkins University (December 4, 2015), https://mayor.baltimorecity.gov/news/press-releases/2015-12-11-johns-hopkins-university-after-action-report-documents-0.

[91]  *See Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 3031, 2020 Protests/Riots, Preliminary Report*, City of Charleston, SC (September, 2020), https://www.charleston-sc.gov/strengthening-charleston-preliminary-report; *Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 30-31, 2020 Protests/Riots, Final Report*, City of Charleston, SC (February 2021), https://www.charleston-sc.gov/DocumentCenter/View/28718/Strengthening-Charleston-Final-Report.

- Cleveland, Ohio[92]
- Dallas, Texas[93]
- Las Vegas, Nevada[94]
- Los Angeles, California[95]
- Portland, Oregon[96]
- Raleigh, North Carolina[97]

Various cities and police departments also received external reviews of their responses to protests and unrest:

- Denver, Colorado[98]
- Los Angeles, California[99]
- New York, New York[100]

---

[92] *See May 30 Civil Unrest After-Action Review,* CITY OF CLEVELAND, OH (December 2020), https://ewscripps.brightspotcdn.com/42/d8/9b2886474d6294744b57ec11e0b4/cdp-after-action-review-10.pdf.

[93] *See* Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020,* DALLAS POLICE DEPARTMENT (August 14, 2020), https://dfw.cbslocal.com/wp-content/uploads/sites/15909545/2020/08/Final-After-Action-Report-1.pdf.

[94] *See Protest and Civil Disorder Incidents, After-Action Report, May 29-June 13, 2020,* LAS VEGAS METROPOLITAN POLICE DEPARTMENT.

[95] *See Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT (April 13, 2020), https://ca-times.brightspotcdn.com/e7/24/ca83ff824f019d7e0b54eeadca04/2020-after-action-report.pdf. *See also A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020,* NATIONAL POLICE FOUNDATION (April 2021), https://www.policefoundation.org/publication/a-crisis-of-trust-a-national-police-foundation-report-to-the-los-angeles-board-of-police-commissioners-on-the-los-angeles-police-department-response-to-first-amendment-assemblies-and-protests-occurri/.

[96] *See Plaintiff's Notice of Fifth Periodic Compliance Assessment Report, United States of America v. The City of Portland, D. Or. Case no. 3:12-cv-02265-SI* (February 10, 2021), https://assets.documentcloud.org/documents/20476946/dojcompliancereport21121.pdf.

[97] *See After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020,* RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020), https://cityofraleigh0drupal.blob.core.usgovcloudapi.net/drupal-prod/COR23/2020RPDAfterActionReview.pdf.

[98] *See* Nicholas Mitchell, *The Police Response to the 2020 George Floyd Protests in Denver, and Independent Review,* DENVER OFFICE OF THE INDEPENDENT MONITOR, https://www.denvergov.org/files/assets/public/independent-monitor/documents/2020gfpreport_oim.pdf.

[99] *See* Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 74; *Read the full report on the L.A.P.D.'s response to the George Floyd protests,* THE NEW YORK TIMES (March 11, 2021), https://www.nytimes.com/interactive/2021/03/11/us/lapd-george-floyd-protests-report.html).

[100] *See Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd,* NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL (July 10, 2020), https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

- Philadelphia, Pennsylvania[101]
- Portland, Oregon[102]
- Raleigh, North Carolina[103]

## Body Worn Camera, POD Cameras, and Radio Transmission

The IMT reviewed video footage and radio transmissions of protests, unrest, and the CPD's responses, and the resulting interactions between CPD officers and community members. After protests continued throughout 2020, members of the IMT viewed the City's and CPD's responses to protests live at the Office of Emergency Management and Communications (OEMC) and the Crime Prevention and Information Center (CPIC) on select dates.

We also observed body-worn-camera footage.[104] For CPD video, the IMT used the CPD's body-worn-camera database (Evidence.com) to view footage. The CPD's videos ranged in duration, with most clips being between five and 30 minutes, although some lasted hours. In general, many videos were of high visual and audio quality, allowing the IMT to reliably observe each event through the footage.

Unfortunately, the IMT was unable to consistently identify body-worn-camera footage related to a particular protest.[105] As explained further in this report, many events, including use-of-force incidents, were not appropriately logged with event numbers. Even when searching for body-worn-camera footage specifically related to a use-of-force event (as opposed to a broader protest event), the ability to locate and view the footage in the system was inconsistent. Additionally, while the body-worn-camera videos stored on Evidence.com have the potential to be tagged as a "Protest/Demonstration Video," the CPD rarely tagged them as such. Although it is unclear when the tag designation became available, a review of Evidence.com reveals that only 105 videos in the CPD's video catalogue, with the first tag occurring on February 19, 2020, and the last occurring on April 21, 2021.

---

[101] *See* Benjamin Carleton, et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN (December 2020), https://www.cna.org/CNA_files/PDF/IAA-2020-U-028506-Final.pdf.

[102] *See Plaintiff's Notice of Fifth Periodic Compliance Assessment Report, United States of America v. The City of Portland, D. Or. Case no. 3:12-cv-02265-SI* (February 10, 2021).

[103] *See After-Action Recommendations for the Raleigh Police Department, May 30-31, 2020 Protests*, 21CP SOLUTIONS (November 2020), https://wwwcache.wral.com/asset/news/local/2020/11/10/19379608/20201110CMORaleighPoliceDepartment-External_Consultants Report-DMID1-5oth0r9xw.pdf.

[104] The IMT also received body-worn-camera footage from the Cook County Sheriff's Office, which supported the City's response to protests and unrest.

[105] While the Office of the Inspector General for the City of Chicago identified body-worn-camera footage by focusing on RD numbers and event numbers related to arrests from May 29 to June 7, the IMT took a broader approach, in which we selected from a larger pool of videos from a longer date range.

To further complicate this review, many officers were not deployed with body-worn cameras, due to the deployment strategy employed by the CPD, which required officers to report to a central mobilization center without first retrieving their equipment—including their radios and body-worn cameras—from their districts. The CPD used this centralized mobilization center from about June 2 through about June 16.

Given these limitations, the IMT focused on reviewing video from protests and unrest on May 28–31, July 17, August 10, and August 15.[106] The IMT relied on the videos' thumbnail image to identify videos that were most likely to contain crowd-control events. For instance, where thumbnails displayed, for example, large crowds or officers in helmets, chest protectors, or elbow, forearm, and shin guards, or large crowds, the IMT would conduct an initial review to verify that the video actually depicted CPD interactions as part of a protest or crowd-control event.[107] Upon verification, the IMT included the videos for assessment.

Many of the protests lasted hours and involved separate concentrations of groups throughout the city. Although tagging deficiencies limited our ability to truly randomly select videos from all areas in Chicago on all days, part of our selection approach was designed to ensure a diverse sample of videos based on time and location. On the other hand, given the occurrences within a particular video, the IMT would at times select other body-worn-camera videos from the same event. This allowed us to better understand particular interactions from different vantage points for more in-depth review.

When reviewing videos, the IMT evaluated several different dynamics involving officer and community member communication, officer and community member tactics, uses of force, communications with crowds, and communication between officers. Of particular importance to our review was capturing the communication and physical interactions between officers and community members. Body-worn-camera videos often capture full conversations, including the tone of certain phrases.

In part, we used concepts of procedural justice to inform our assessment of communication and interactions defined by the Consent Decree. *See* ¶777.[108] For uses of force, we noted when it occurred and the type of force used, and in instances

---

[106] Because there were few confrontations or complaints regarding the City or the CPD's response to protests in Chicago around the federal election in November 2020, we prioritized reviewing body-worn camera footage on the other dates.

[107] The CPD's "battle dress uniform (BDU)" is described in policy U04-01 Uniform and Appearance Standards, which may be found here: http://directives.chicagopolice.org/directives/data/a7a57b9b-1562d157-70d15-62d1-a0e04429f1379599.html.

[108] *See, e.g.,* Tom R. Tyler, *Procedural Justice, Legitimacy, and the Effective Rule of Law*, CRIME AND JUSTICE, Vol 30, 283–357 (2003). Consent decree ¶777 tracks closely with the prevailing academic definitions of procedural justice.

where we felt the use of force was concerning, we forwarded those instances to COPA for further investigation. Finally, we used current training, policies, and best practices (per ¶730) to assess officer tactics, including their responses to tactics by members of crowds that are sometimes designed to provoke confrontations with officers.

# Summary of Major Events

This section provides a summary of major events in approximate chronological order. We begin with a brief history of major events in Chicago leading into 2020, and then provide an overview and sampling of major events in 2020. This summary is not a comprehensive account of any specific event, but focuses on the City's and the CPD's general responses to events around the key dates of May 25–31, July 27, August 10–11, August 15, and November 7, 2020.

## The Consent Decree

The protests and unrest that occurred in 2020 did not occur in a vacuum—either in the U.S. or in Chicago. Many cities have experienced their own challenges with police misconduct and issues created by a lack of transparency and accountability. In Chicago, it is important to understand the recent procedural history that led to the Consent Decree and the City and the CPD's focus on the COVID-19 pandemic and summer crime leading into the protests and unrest.

In its 2017 report, the U.S. Department of Justice (DOJ) found that "the impact of CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[109] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[110]

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD.[111] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[112]

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the DOJ's findings and recommendations. The case was assigned to federal Judge Robert Dow, Jr., who along with the OAG, sought input

---

[109]  DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, http://chicagopolicecon-sentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPTREPORT.pdf.

[110]  *Id.* at 15.

[111]  *Id.* at 4.

[112]  *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017). Collectively, the plaintiffs of these two lawsuits are known in the Consent Decree as "the Coalition," *see* ¶669.

from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) also entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')," which "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[113]

On January 31, 2019, Judge Dow approved and signed a modified version of the Consent Decree, effective March 1, 2019.[114]

## Chicago's History with Crowds, Protests, and Unrest

The City and the CPD respond to many protests every year in Chicago. According to some CPD personnel, for example, the 1st and 18th Districts (Downtown) regularly respond to protests—often multiple protests per week, especially in the summer months—and support frequent events with large crowds. The City and the CPD also regularly respond to many typical and large events without major incident or notoriety.[115]

The City and the CPD have responded to many high-profile protests, crowd events, and unrest. Review Figure 1, below, provides some examples.

---

[113]  *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf. Collectively, the plaintiffs of these two lawsuits are known in the Consent Decree as "the Coalition," *see* ¶669

[114]  More information on the IMT is available in Appendix A.

[115]  *See, e.g., Cultural Affairs and Special Events*, CITY OF CHICAGO, https://www.chicago.gov/city/en/depts/dca/supp_info/events.html.

Review Figure 1.
Past City and CPD responses to large gatherings, protests, or unrest

| | |
|---|---|
| July 1966 | "Chicago West Side Riots" |
| April 1968 | "Chicago Riots" after the murder of Martin Luther King, Jr. |
| August 1968 | Democratic National Convention |
| June 1992 | Chicago Bulls Championship |
| May 2012 | North Atlantic Treaty Organization (NATO) Summit |
| June 2013 | Chicago Blackhawks Championship |
| November 2015 | Video release of Laquan McDonald's murder |
| November 2016 | Chicago Cubs Championship |
| October 2018 | Officer Jason Van Dyke verdict/conviction |

Chicago has also had more recent large-scale protests regarding police misconduct and accountability. For example, there were relatively recent protests and crowds regarding the following events in Chicago:

- The release of the video of the murder of Laquan McDonald by officer Jason Van Dyke on November 24, 2015[116]
- The second-degree murder conviction of Jason Van Dyke on October 5, 2018[117]

Chicago's history with protests, unrest, and corresponding City and CPD responses may have added a unique dynamic, tone, and tenor to the Chicago's 2020 protests.

---

[116] *See* Nausheen Husain, *Laquan McDonald timeline: The shooting, the video, the verdict and the sentencing*, CHICAGO TRIBUNE (January 18, 2019), https://www.chicagotribune.com/news/laquan-mcdonald/ct-graphics-laquan-mcdonald-officers-fired-timeline-html-story.html.

[117] Don Babwin and Michael Tarm, *Chicago Verdict Comes 4 Years After Laquan McDonald's Death*, AP NEWS (October 6, 2018), https://apnews.com/article/shootings-jason-van-dyke-us-news-ap-top-news-chicago-fdc50b61df4e47bfb8c97ae1149d9c89.

## Chicago 2020 - Leading up to Protests and Unrest

Leading up to the end of May 2020, much of the City's and the CPD's attention was on COVID-19, the plans for re-opening after the Stay at Home order ended, curbing violence, and preparing for the expectation of increased violence in the summer months. Overall, COVID-19 impacted everyone in Chicago and worldwide. Despite the many uncertainties regarding COVID-19 in the beginning of 2020—including the likelihood of infection, transmission, or serious harm—many City personnel, first responders, medical workers, essential workers, community members, and their families continued to serve Chicago throughout the continuing pandemic. As a result, thousands of people who served Chicago contracted COVID-19, and many lost their lives.

The CPD was also transitioning to new leadership. As referenced in our previous reports, the CPD has had three superintendents since the Consent Decree process began. Most recently, in April 2020, after a national search, former Chief of the Dallas Police Department David Brown became the Superintendent, taking over for Interim Superintendent Charlie Beck.[118]

As with many other states and cities, Illinois and the City began to take various precautions against the COVID-19 pandemic. Illinois Executive Orders regarding the COVID-19 pandemic response included, for example, the following:

- Executive Order Number 4 – prohibiting large gatherings of 1,000 or more

- Executive Order Number 5 and 6 – closing all public and private K-12 schools for educational purposes, except for schools operated by the Illinois Department of Juvenile Justice, the Illinois State Board of Education, or the Illinois Department of Human Services

- Executive Order Number 7 – Prohibiting gatherings of 50 or more people and suspending on-premises consumption for bars and restaurants

- Executive Order 10 – "STAY AT HOME – All individuals must stay at home, with exceptions for essential activities, essential government functions, and essential businesses and operations. All non-essential business and operations must

---

[118] *See* Fran Spielman and Frank Main, *City war on coronavirus puts selection of Chicago's new top cop on hold*, CHICAGO SUN-TIMES (July 20, 2020), https://chicago.suntimes.com/coronavirus/2020/3/24/21192685/coronavirus-chicago-police-superintendent-search-delayed.

cease, aside from Minimum Basic Operations. Business can continue with em-
ployees working from home. Local government units across the state must halt
all evictions, and gatherings of more than 10 people are prohibited."[119]

Throughout the pandemic, the CPD enforced many of the COVID-19 restrictions.[120]
The City and the CPD also received various corresponding criticisms regarding the
enforcement strategies, disparities, and compliance rates among officers.[121]

The CPD also issued General Messages, via its internal communication system, to
remind officers to wear personal protective equipment (PPE). On April 1, 2020, for
example, the CPD provided the following General Message referencing a video re-
garding personal protective equipment:

> **TO BE READ AT ROLL CALL FOR 7 CONSECUTIVE DAYS** *Department
> members are advised that Streaming Video V055, "Personal Protective
> Equipment Demonstration" is available for viewing. The video includes
> the procedure to property don and doff items contained in the Personal
> Protective Equipment (PPE) kits. Department members can find this
> video posted under the 'Streaming Videos' tab on The Wire homepage.*

The City and the CPD continued to take and enforce COVID-19 precautions and
restrictions throughout 2020, including responding to protests against those re-
strictions.[122]

---

[119] *See Executive and Administrative Orders*, ILLINOIS.GOV, https://www2.illinois.gov/govern-
ment/executive-orders.

[120] *See, e.g.*, Grace Wong, *5 Chicago restaurants and bars cited and 2 parties shut down for coro-
navirus violations after weekend sweep*, CHICAGO TRIBUNE (December 23, 2020),
https://www.chicagotribune.com/coronavirus/ct-coronavirus-violations-chicago-restaurants-
shut-down-20201223-v5v7ludhurakzh7h4lc5judvay-story.html; *see also* David Struett and
Mitch Dudek, *City shuts down 300-person party in Wicker Park, other businesses for 'egre-
giously' violating COVID-19 restrictions*, CHICAGO SUN-TIMES (November 30, 2020),
https://www.chicagotribune.com/news/criminal-justice/ct-chicago-police-covid-gathering-vi-
olation-20210205-xzozrkyu4be3no6nntrgj5cw5y-story.html.

[121] *See, e.g.*, Pascal Sabino, *ACLU, Police Union Call On Lightfoot To Stop Citywide Checkpoints To
Remind People Of Coronavirus Rules*, THE BLOCK CLUB (April 20, 2020), https://blockclubchi-
cago.org/2020/04/20/aclu-police-union-call-on-lightfoot-to-end-citywide-checkpoints-to-re-
mind-people-of-coronavirus-rules/; Jeremy Gorner, *Chicago police issued more dispersal or-
ders on West Side in early days of stay-at-home order than other parts of the city, including the
lakefront*, CHICAGO TRIBUNE (April 24, 2020), https://www.chicagotribune.com/coronavirus/ct-
coronavirus-chicago-police-dispersals-20200424-vzv7qi72zfd25c4rxkquc5xtge-story.html;

[122] *See, e.g.*, Nancy Loo and Kelly Davis, *Protesters rally against Illinois stay-at-home order in Chi-
cago Loop*, WGN9 (May 1, 2020), https://wgntv.com/news/chicago-news/protest-against-illi-
nois-stay-at-home-order-planned-in-chicago-loop-today/.

Leading into Memorial Day weekend 2020, there were still countless closings and cancellations.[123] The City was preparing, however, to phase out restrictions.

Review Figure 2.
City of Chicago's phased re-opening (May 15, 2020)[124]



Concurrently, Chicago may have been experiencing a general drop in crime, but also a rise in shootings and homicides, including shootings of children.[125] Memorial Day 2020 weekend, for example, saw a spike in shootings.[126] In preparation for anticipated summer violence in Chicago, the City and the CPD set up the Summer Operations Center.[127]

---

[123] *See* Katherine Rosenberg-Douglas, *Running list of Chicago-area closings and cancellations because of coronavirus,* CHICAGO TRIBUNE (May 4, 2020), https://www.chicagotribune.com/coronavirus/ct-cb-coronavirus-chicago-illinois-cancellations-closings-20200304-xsy3xn6grndu3hq7eyihpkznwi-story.html.

[124] *Reopening Chicago*, CITY OF CHICAGO, https://www.chicago.gov/city/en/sites/covid-19/home/reopening-chicago.html.

[125] *See, e.g., Tracking Chicago Shooting Victims,* CHICAGO TRIBUNE (comparing multiple years), https://www.chicagotribune.com/data/ct-shooting-victims-map-charts-htmlstory.html.

[126] *See* Jeremy Gorner, *Chicago sees another spike in shootings, with most killings in first 3 months of year since 2017,* CHICAGO TRIBUNE (April 1, 2021), https://www.chicagotribune.com/news/criminal-justice/ct-prem-chicago-crime-first-quarter-2021-20210401-dprv6a7aj5g47m3vc74ovhlvaq-story.html.

[127] *See City Launching New Summer Operations Center Ahead of Memorial Day Weekend,* CBS CHICAGO (May 22, 2020), https://chicago.cbslocal.com/2020/05/22/city-launching-new-summer-operations-center-ahead-of-memorial-day-weekend/.

## Protests and Unrest in 2020

This section presents an overview and sampling of the events that unfolded, along with the City's and the CPD's responses around the key dates of May 25–31, July 27, August 10–11, August 15, and November 7, 2020. It is not a definitive, detailed, complete history of everything that took place on those dates, but rather a sampling of what happened according to the data sources we consulted while conducting this review. Many of the details are from City and CPD personnel, who provided accounts of events, their actions, and the actions of their supervisors, subordinates, and peers. We note that we received conflicting or imprecise accounts of timelines. In many cases, we have included such conflicts to demonstrate the differing perspectives and chaotic nature of events. For relevant days, we also provide feedback we heard from Chicago's communities. Finally, we provide summaries of relevant reviews of body-worn camera footage.

Throughout the report we also refer to Chicago neighborhoods and CPD areas and districts, as reflected in Review Figure 3 on the following page.

Review Figure 3: Chicago Police Department Area Boundaries Map[128]



128 *Police Area Boundaries*, WTTW NEWS, https://news.wttw.com/sites/default/files/article/file-attachments/CPD-Area-Map.pdf.

To place what was happening in Chicago into some context, we also reference a sampling of what was happening in other cities—particularly as events began to escalate. Again, this section is not a complete recounting of all events, but rather provides some touchpoints from across the country.

# Monday, May 25, 2020 (12:00 am to 11:59 pm)

## Minneapolis, Minnesota

George Floyd was murdered in police custody soon after 8:00 pm on Monday, May 25, 2020. Several bystanders filmed the murder with their cell phones, and some observers begged for Floyd's life as he repeated, "I can't breathe." Then-officer Derek Chauvin pinned Floyd on the ground with his knees for over nine minutes, killing him.[129] George Floyd's murder was preceded by other high-profile killings of Black people in 2020, including Ahmaud Arbery in Georgia and Breonna Taylor in Kentucky.[130]

## Chicago

Nearing the end of May, much of the City's and the CPD's efforts were focused on the upcoming Memorial Day holiday and the potential for summer violence. The City, the CPD, and other City entities were also opening the Summer Operations Center at the OEMC, which aimed to coordinate responses to summer violence across City entities.[131]

Likewise, as reflected below, while the City anticipated potentially beginning to reopen, the City and the CPD continued to enforce COVID-19 restrictions, including social distancing and limiting gatherings.

---

[129] *See* Evan Hill et al., *How George Floyd Was Killed in Police Custody*, The New York Times (May 31, 2020), https://www.nytimes.com/2020/05/31/us/george-floyd-investigation.html. Nicholas Bogel-Burroughs, *Prosecutor in Derek Chauvin trial makes closing argument: 'This wasn't policing, this was murder.'*, The New York Times (April 19, 2021), https://www.nytimes.com/2021/04/19/us/prosecution-closing-argument-derek-chauvin-trial.html#:~:text=Chauvin%20knelt%20on%20Mr.,Schleicher%20said.

[130] *See, e.g.*, Richard Fausset, Michael Levenson, and Sarah Mervosh, *Ahmaud Arbery Shooting: A Timeline of the Case*, The New York Times (April 29, 2021), https://www.nytimes.com/article/ahmaud-arbery-timeline.html?searchResultPosition=10; *Breonna Taylor: What Happened on the Night of her Death?*, BBC News (October 8, 2020), https://www.bbc.com/news/world-us-canada-54210448.

[131] *See* Mayor's Press Office, *City Launches All-Hands-On-Deck Strategy to Ensure Safe and Healthy Celebrations for Memorial Day Weekend*, City of Chicago Office of the Mayor (May 22, 2020), https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2020/may/MemorialDayWeekendSafety.html.

CASE: 1:17-cv-06260 Document #: 964 Filed: 07/20/21 Page 50 of 464 PageID #:10206

Review Figure 4. Chicago Mayor Tweets (May 25, 2020)



# TUESDAY, MAY 26, 2020 (12:00 AM TO 11:59 PM)

## Minneapolis, Minnesota

Protests began in Minneapolis, and crowds clashed with Minneapolis Police Department officers.[132] Some people damaged police vehicles and focused on the precinct where the four officers involved with George Floyd's death were assigned.[133] The Minneapolis Chief of Police fired the four officers involved and called for the Federal Bureau of Investigation to open an investigation.[134]

Review Figure 5. Minnesota Mayor Tweet (May 26, 2020)



## Chicago

The day after George Floyd's murder, there was a previously planned protest at CPD Headquarters in the evening.[135] The demonstration was originally planned to protest the City and the CPD's alleged disparate enforcement of COVID-19 precautions and included participation by local celebrities. The protest remained peaceful, and some protesters expressed "solidarity with the people in Minneapolis that are grieving."[136]

The City did not mention George Floyd's murder in any official tweets, but rather remained focused on the COVID-19 pandemic and Memorial Day holiday safety. As Chicago prepared to reopen in early June, with the specific date yet to be an-

---

[132]  *See* MPR News Staff, *Tear gas, chaos, rain: Protests rage after man dies in Mpls. Police custody*, MPR NEWS (May 26, 2020), https://www.mprnews.org/story/2020/05/26/protesters-rally-to-call-for-justice-for-man-who-died-in-mpls-police-incident.

[133]  *See* Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, THE NEW YORK TIMES (March 28, 2021), https://www.nytimes.com/article/george-floyd-protests-timeline.html.

[134]  *See* Matt Furber, John Eligon, and Audra D.S. Burch, *Minneapolis Police, Long Accused of Racism, Face Wrath of Wounded City*, THE NEW YORK TIMES (May 27, 2020), https://www.nytimes.com/2020/05/27/us/minneapolis-police.html.

[135]  *See Protest Held In Chicago After Death of George Floyd During Arrest By Minneapolis Police*, CBS CHICAGO (May 26, 2020), https://chicago.cbslocal.com/2020/05/26/protest-held-in-chicago-after-death-of-george-floyd-during-arrest-by-minneapolis-police/.

[136]  *Id*.

nounced, the City released industry-specific guidelines for certain industry businesses, employees, and customers.[137] The City expected more than 130,000 Chicagoans to return to work, as industries included childcare, food service, hotel and accommodations, retail, and transportation, among others.[138]

Review Figure 6. Chicago Mayor Tweet (Tuesday, May 26, 2020)



# WEDNESDAY, MAY 27, 2020 (12:00 AM TO 11:59 PM)

## Minneapolis, Minnesota, and Other Cities

In Minneapolis, Protests continued and escalated into incidents of unrest, with escalating unrest, looting, and one person shot to death.[139] One person was shot and

---

[137] *See, e.g., Mayor Lightfoot and Local Industry Working Groups Release Industry Guidelines for Phase Three Reopening in Chicago*, CITY OF CHICAGO OFFICE OF THE MAYOR (May 26, 2020), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2020/May/Mayor%20Lightfoot%20and%20Local%20Industry%20Working%20Groups%20Release%20Industry%20Guidelines%20for%20Phase%20Three%20Reopening%20in%20Chicago.pdf.

[138] *Id.*

[139] *See* MPR News Staff, *'Unbelievable devastation': 1 dead as Floyd protests boil over again*, MPR NEWS (May 28, 2020), https://www.mprnews.org/story/2020/05/27/violence-near-south-minneapolis-police-precinct-continues-a-second-day.

killed by a store owner amid the unrest.[140] There were also various fires, including burning cars and buildings, which continued into morning, as fire crews worked to put out the fires.[141] Protesters also gathered outside Derek Chauvin's home in suburban Minneapolis.[142]

Protests began to occur around the country. In Memphis, for example, people rallied outside a police station.[143] In Los Angeles, there were large protests that escalated, with some protesters blocking a major freeway.[144] In New York City, there were demonstrations and marches to protest the killing of George Floyd, Breonna Taylor, and Ahmaud Arbery.[145]

## Chicago

As protests began to occur in cities throughout the country, CPD supervisors took varying approaches to prepare their teams. At least one supervisor emailed their officers as early as Wednesday or Thursday to make sure that the officers knew about potential crowd formations and were prepared with their equipment if they needed to respond. Many other supervisors, however, said that they did not prepare for any unusual levels of protest or the potential for unrest.

COPA representatives reported beginning to hear about and prepare for potential unrest in Chicago.

---

[140] *See* Associated Press, *At least 11 killed during U.S. protests seeking justice for George Floyd, many of them African Americans*, KTLA5 (June 2, 2020), https://ktla.com/news/nation-world/at-least-11-killed-during-u-s-protests-seeking-justice-for-george-floyd-many-of-them-african-americans/.

[141] *See Crews respond to roughly 30 fires overnight in* Minneapolis, KSTP 5 EYEWITNESS NEWS (May 28, 2020), https://kstp.com/news/multiple-fires-burn-overnight-following-violence-and-looting-in-minneapolis/5743398.

[142] *See, e.g.*, Mary Divine, *Six George Floyd protestors arrested at fired Minneapolis police officer's Oakdale home*, TWIN CITIES PIONEER PRESS (May 28, 2020), https://www.twincities.com/2020/05/28/george-floyd-protesters-arrested-at-oakdale-home-belonging-to-minneapolis-police-officer/.

[143] *See Protests Continue to Rage After Death of George Floyd*, THE NEW YORK TIMES (May 28, 2020), https://www.nytimes.com/2020/05/28/us/george-floyd-national-guard.html.

[144] *See* Matthew Ormseth, Richard Winton, and Jessica Perez, *Protesters, law enforcement clash in downtown L.A. during protest over George Floyd's death*, LOS ANGELES TIMES (May 27, 2020), https://www.latimes.com/california/story/2020-05-27/protestors-block-the-101-freeway.

[145] *See* Giulia McDonnell Nieto del Rio, John Eligon, and Adeel Hassan, *A Timeline of What Has Happened in the Year Since George Floyd's Death*, THE NEW YORK TIMES (May 25, 2021), https://www.nytimes.com/2021/05/25/us/george-floyd-protests-unrest-events-timeline.html.

Review Figure 7. Chicago Mayor Tweet (Wednesday, May 27, 2020)



# THURSDAY, MAY 28, 2020 (12:00 AM TO 11:59 PM)

## Minneapolis, Minnesota, and Other Cities

Protests continued to grow and unrest continued to escalate in Minneapolis.[146] People overran the Minneapolis Police Department's Third Precinct and set it on fire.[147] A nearby pawn shop was also burned down.[148] A few months later, in July 2020, a body was found in the wreckage, and the medical examiner's report said that the cause of death was "probable inhalation of products of combustion and thermal injury from an intentional building fire" and was being considered a homicide.[149]

The Minnesota Governor declared a state of emergency and called in the National Guard.[150] The Minnesota Governor said, "The situation in Minneapolis is no longer,

---

[146] *See, e.g., Self-Described Member of "Boogaloo Bois" Charged with Riot*, THE UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF MINNESOTA (October 23, 2020), https://www.justice.gov/usao-mn/pr/self-described-member-boogaloo-bois-charged-riot; *Four Indicted In Minneapolis Police Third Precinct Arson*, THE UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF MINNESOTA (August 25, 2020), https://www.justice.gov/usao-mn/pr/four-indicted-minneapolis-police-third-precinct-arson.

[147] *See, e.g.*, Azi Paybarah, *Burning of Police Station After George Floyd's Death Draws 4-Year Sentence*, THE NEW YORK TIMES (April 28, 2021), https://www.nytimes.com/2021/04/28/us/minneapolis-police-fire-dylan-shakespeare-robinson.html; *St. Paul Man Sentenced to Prison, $12 Million In Restitution For Minneapolis Police Third Precinct Arson*, THE UNITED STATES ATTORNEY'S OFFICE DISTRICT OF MINNESOTA (May 13, 2021) (noting that two co-conspirators had yet to be sentenced after pleaded guilty to one count each of conspiracy to commit arson), https://www.justice.gov/usao-mn/pr/st-paul-man-sentenced-prison-12-million-restitution-minneapolis-police-third-precinct-0.

[148] *See Rochester Man Charged with Arson of Minneapolis Pawn Shop*, THE UNITED STATES ATTORNEY'S OFFICE DISTRICT OF MINNESOTA (June 15, 2020), https://www.justice.gov/usao-mn/pr/rochester-man-charged-arson-minneapolis-pawn-shop.

[149] *See Medical examiner identifies body found in burned pawn shop in Minneapolis*, KSTP 5 EYEWITNESS NEWS (October 20, 2020), https://kstp.com/news/hennepin-county-medical-examiner-identifies-body-found-in-burned-pawn-shop-in-minneapolis/5900493/.

[150] *See Governor Walz Signs Executive Order Activating National Guard to Protect the People of Minnesota, Order will help maintain safety in wake of George Floyd's death*, OFFICE OF GOVERNOR TIM WALZ AND LT. GOVERNOR PEGGY FLANAGAN (May 28, 2020), https://mn.gov/governor/news/?id=1055-433799. *See also Emergency Executive Order 20-64, Activating the Minnesota National Guard and Declaring a Peacetime Emergency to Provide Safety and Protection*

in any way, about the murder of George Floyd. It is about attacking civil society, instilling fear and disrupting our great cities."[151]

Protests began or continued throughout many cities and escalated into unrest in others. In Louisville, Kentucky, seven people were shot amid protests related to the no-knock warrant police killing of Breonna Taylor.[152] The protest, like others around the country, began with a peaceful march, but escalated into unrest after dark.[153] Many vehicles, buildings, and other property sustained damage, and police released tear gas and fired paintballs at crowds.[154]

## Chicago

On Thursday, May 28, 2020, the Mayor and the Chicago Department of Public Health announced a plan to reopen on Wednesday, June 3, 2020, by moving into phase three of the city's reopening plan.[155] Specifically, the plan called for "cautiously" reopening Chicago and included various limitations, including physical distancing, face coverings, and limiting non-business gatherings to 10 or fewer people. Other City services, such as parks and libraries, were to begin reopening on Monday, June 8.

There was also an anticipated protest that occurred in the Englewood neighborhood (the CPD's 7th District) in the late afternoon. The flyer distributed on social media featured a photo of George Floyd and the text "Justice for George Floyd Protest Today @4pm 68th & Halsted #Revolution Nothing Less Minneapolis, LA, Chicago, IL CHICAGO PLEASE SHARE!!!" Some people in the crowd wore "BA Speaks: Revolution Nothing Else" t-shirts. The protest appeared relatively uneventful with protesters primarily staying on the sidewalks until the CPD arrested one person. During the arrest, the crowd chanted "Let him go" and began crowding the area where the arrest was taking place. After removing the arrestee, the scene

---

*to the People of Minneapolis, St. Paul, and Surrounding Communities*, STATE OF MINNESOTA EXECUTIVE DEPARTMENT (May 28, 2020), https://www.leg.mn.gov/archive/execorders/20-64.pdf.

[151] *See* Giulia McDonnel Nieto del Rio, John Eligon, and Adeel Hassan, *A Timeline of What Has Happened in the Year Since George Floyd's Death*, THE NEW YORK TIMES (May 25, 2021).

[152] *See* Brakkton Booker, *7 Shot at Louisville Protest Calling For Justice for Breonna Taylor*, NPR WBEZ CHICAGO (May 29, 2020), https://www.npr.org/2020/05/29/864775688/7-shot-at-louisville-protests-calling-for-justice-for-breonna-taylor.

[153] *Id.*

[154] *See* Mandy McLaren et al., *'No justice, no peace': 7 people shot amid downtown Louisville protests for Breonna Taylor*, LOUISVILLE COURIER JOURNAL (May 28, 2020), https://www.courier-journal.com/story/news/2020/05/28/breonna-taylor-shooting-protesters-rally-downtown-louisville/5280279002/.

[155] *See Mayor Lightfoot and CDPH Announce Chicago Ready to Begin Reopening Cautiously on Wednesday, June 3, 2020, Chicago to move to Phase three of "Protecting Chicago" reopening framework*, CITY OF CHICAGO OFFICE OF THE MAYOR (May 28, 2020), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2020/May/ReopeningJune3.pdf.

appeared to remain somewhat tense, though officers and community members eventually separated.

The same day, the City and the CPD began looking into an online threat to a CPD building, the sixth district station:

Review Figure 8. Social Media Threat to Burn Down the CPD's 6th District Station (May 28, 2020)



There was a meeting, entitled "Weekend Pre-Planning Meeting," scheduled for 2:30 PM with high-ranking personnel of the CPD regarding concerns about what could happen in Chicago given what was occurring in Minneapolis.

According to some representatives, CPD leadership considered whether to add additional officer support and cancel officers' regularly scheduled day off. The CPD also released a required training for all sworn officers, meant to remind officers about the dangers of positional asphyxia, in light of George Floyd's death.[156] A similar required training had been issued in January 2020.[157] The CPD updated it in May and sent it out again via the CPD's eLearning system on May 29.

## Body Worn Camera and Radio Review: May 28, 2020

Videos from May 28, 2020, depicted many interactions between police officers and people in the crowd. One officer, in the middle of a crowd and a scuffle, tells people to "get back." The officer then touches a person who had a skateboard on the chest. The person with the skateboard tells the officer not to touch them, and the officer responds, "Yeah, yeah, whatever."

---

[156] Chicago Police Department Education and Training Division. "A Knowledge Resource for Members of the Chicago Police Department, Positional Asphyxia" (Release Date: January 2020; Revised Date: May 2020). The CPD's "Knowledge Resource" required training defines positional asphyxia as "Positional asphyxia is a death that occurs when a person's body position interferes with their ability to breathe. It can occur when the person's chest is restricted from expanding properly or the position of the person's head obstructs their airway. In all cases, the person is unable to correct the lethal position, whether they are placed or inadvertently place themselves in that position."

[157] Chicago Police Department Education and Training Division. "A Knowledge Resource for Members of the Chicago Police Department, Positional Asphyxia" (Release Date: January 2020).

In the same video, a different person tells an officer "Don't touch me." We saw an example of officers disengaging from a person as well. At one point, an officer went into the crowd alone and tried to grab a person by their backpack straps but was unsuccessful. Other officers said, "It's not worth it," as the officer started to chase the person who got away. The officer eventually stops the chase. Later in the video, a person with a megaphone says to the crowd, "We need to calm down." The video depicts members of the crowd moving through the streets and blocking traffic with car horns honking.

## FRIDAY, MAY 29, 2020 (12:00 AM TO 11:59 PM)

### Minneapolis, Minnesota, and Other Cities

On Friday, protests and unrest continued to escalate across the country. The Minneapolis Governor called for an end of looting and arson, and former Minneapolis police officer Derek Chauvin was arrested and charged with murder.[158]

### Review Figure 9. Minnesota Governor Tweet (May 29, 2020)



In Atlanta, Georgia hundreds of protesters took to the streets, marching and chanting "Quit your jobs" at police. People set a police car on fire, broke into the CNN headquarters building, and interrupted traffic on the interstate highway running through downtown Atlanta.[159]

---

[158] *See Former MPD Officer Derek Chauvin In Custody, Charged With Murder In George Floyd's Death*, CBS MINNESOTA (May 29, 2020), https://minnesota.cbslocal.com/2020/05/29/derek-chauvin-arrested-george-floyd-death-minneapolis-police-officer/.

[159] *See* Associated Press, *Protests over George Floyd's death break out in NYC, all over country*, NJ.COM (May 29, 2020), https://www.nj.com/crime/2020/05/protests-over-george-floyds-death-break-out-in-nyc-all-over-country.html.

In Oakland, California, a federal officer who was providing security at a federal courthouse during a protest was shot and killed in a drive-by shooting.[160]

The same day, President Donald Trump tweeted, "[W]hen the looting starts, the shooting starts."

Review Figure 10. President Tweet (Friday, May 29, 2020)



## Chicago

Friday morning, the CPD met internally to prepare for potential protests and then met with personnel from the Mayor's Office. The Crime Prevention and Information Center (CPIC) sent out a notice regarding the potential looting of Target stores and the Water Tower Place in downtown Chicago.

Separately, because some commanders had only been in their positions for a few months, some commanders intended to use Saturday's protest as a learning opportunity, placing all Area 3 Commanders (Districts 001, 012, 018, 019, 020, and 024) on the response team. As would become important, some of these commanders responded to protests and unrest on Friday night, as well as on Saturday.

The CPD also made plans to conduct roll-call trainings over the weekend—starting Friday night—to address the potential for unanticipated protests, the importance of de-escalation, and officer safety. The CPD again released the May 2020 updated version of the required training for all sworn officers, as a reminder to officers about the dangers of positional asphyxia, in light of George Floyd's death.[161]

---

[160] *See* Associated Press, *At least 11 killed during U.S. protests seeking justice for George Floyd, many of them African Americans*, KTLA 5 NEWS (June 2, 2020), https://ktla.com/news/nation-world/at-least-11-killed-during-u-s-protests-seeking-justice-for-george-floyd-many-of-them-african-americans/.

[161] Chicago Police Department Education and Training Division. "A Knowledge Resource for Members of the Chicago Police Department, Positional Asphyxia" (Release Date: January 2020; Revised Date: May 2020).

Review Figure 11 below summarizes the anticipated demonstrations that the CPD anticipated for the day.[162]

Review Figure 11: CPIC Anticipated Demonstrations for May 29, 2020

| Police District | Cause(s) |
|---|---|
| 7th | "#JusticeforGeorgeFloyd" |
| 1st | "Justice for George Floyd" |
| 1st | "We Deserve to Live: We Need Revolution #GeorgeFloyd" |

On Friday night, protests occurred in the downtown area—in the 1st and 18th Districts, as anticipated. The CPD had not received much information about the protests in advance. According to CPD personnel, they did not have information to expect a large turnout, and the CPD did not have a specific plan in place to respond to the protest, relying instead on a standard protest response.

Around 5:00 PM, a small group of about 30 protesters marched on Michigan Avenue. According to CPD personnel who responded to the protest, an unexpected number of people began to join the protest and promote the event online. The CPD deployed a bike team, as well as its different Area teams in response to the growing crowd.

About an hour into the protest, a group of about 50 protesters began marching toward the Eisenhower Expressway, before being blocked by a CPD bike-line.

Around 7:30 PM, a group of about 100 protesters were near the intersection of State and Ohio in front of a line of CPD officers. Some people in the group were able to break through the CPD police line, and officers kept those people separated from those who remained on the initial side.

Around 8:30 PM, some protesters convened outside the Metropolitan Correctional Center (71 W. Van Buren St., Chicago, IL 60605). Around 10:00 PM, social media posts claimed that the CPD was "holding [them] downtown" and were "threatening to beat unarmed protestors with clubs." Near midnight, protesters marched near and around Trump Tower (401 N. Wabash Ave., Chicago, IL 60601), as officers blocked access to the building with a heavy police car presence. According to some footage, some people appear to have attempted to rush the building and were cut off by officers.

---

[162] According to CPD representatives, before the City stopped granting permits for protests, the CPD gathered its lists of anticipated protests or events through permits and monitoring social media.

Also, near midnight, some people began shoving and clashing with police near the intersection of Michigan Avenue and Monroe Street. At one point, some people in the crowd broke windows at several businesses.

Recognizing that unrest may continue on Saturday, the CPD canceled regular days off for Area teams and instructed them to report to McCormick Place by 2:00 PM for deployment into the 1st and 18th Districts.

Some officers estimated that there were about two hundred people participated in a protest in the 1st District on Friday night. The protest began peacefully, but some officers remarked that the tenor of the crowd changed over the course of the evening. They said that it appeared to them that peaceful protesters began to leave and the people who stayed appeared more likely to throw projectiles, damage property, break building windows, slash police vehicle tires, and in some cases injure officers. These officers added that they also believed additional groups of people arrived who were not attempting to protest, but came to attack police and damage and steal property.

On Friday night, some CPD areas were asked to send officers downtown to assist with the CPD's response to the protests and unrest. According to some CPD personnel, these officers were sent in teams and instructed to report to specific intersections and to announce their arrival on the radio. Some CPD command staff said that they self-deployed downtown that night, along with some officers on their special teams.

The CPD made arrests on Friday night into the early hours of Saturday morning. Some officers and command staff members we spoke to said that there was consistent confusion throughout the night about who was "in charge" or acting as the "incident commander."

Some CPD command staff had the sense the events of Friday night were an exception and that Saturday would be back to "normal." Other CPD command staff thought that the CPD had responded to Friday's protests and unrest in an organized manner. Several officers commented that they felt lucky to have escaped Friday night without more issues than they experienced, that they were close to losing control, and that they had a bad feeling about what was to come on Saturday, May 30.

## Body Worn Camera and Radio Review – May 29, 2020

Our review of body-worn-camera video revealed a variety of interactions between CPD officers and the public. In some videos, officers ignore the protesters completely. In one video, for example, officers walk alongside protesters who were staying on the sidewalk. The officers keep to themselves and did not respond to the protesters. In another video, protesters yell, "Let us through," as officers form

a bike line. The officers do not respond or engage, and the protesters later walk in a different direction. Several additional videos depicted little or no communication with the protesters, with CPD officers largely ignoring protestors as protesters shout at them.

We also observed instances when officers offered helpful communication. This included one video in which an officer points protesters in a direction they are allowed to continue marching. There is another video in which police are walking behind a group of people marching, encouraging them to disperse without additional incident.

There were also many examples of officers communicating disrespectfully and using force. In one video, for example, a group of protesters who seem frustrated approach a group of officers. At the same time, a CPD officer in a white shirt is engaging in an argument with a protester. Shortly thereafter, a crowd of people gathers around the officers. People in the crowd and officers begin pushing and shoving each other, and some items are thrown at the officers. The incident grows and the crowd gets larger. The pushing and shoving intensifies with officers having batons in their hands. Officers try to arrest one person as officers push and shove the person with their batons.

In another video, people attempt to shove past officers holding a bike line, shouting at them. Officers and the people in the crowd begin to shove each other. About two minutes later, a group of officers can be seen charging at the people as the crowd disperses. In that incident, while pushing and shoving is occurring, one officer can be seen pushing and nearly tackling a person who appears to be standing by observing the incident. About two minutes later, officers are seen making an arrest.

Another video depicts officers pushing and shoving people after a commotion breaks out and then throwing and tossing bikes, and another video depicts officers tackling some people amidst a commotion of pushing and shoving between people in the crowd and officers.

## City Data from May 29, 2020

The figures below reflect data that the IMT received from the City regarding May 29, 2020. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence.

Review Figure 12. Police Computer Aided Dispatch System (May 29, 2020)

| | |
|---|---|
| **Total Protests** | 2 |
| **Total Districts** | 1 |
| | (001) |
| | |
| **Total "Riot"/Looting** | 0 |
| **Total Districts** | 0 |
| | |
| **Total** | 2 |
| **Total Districts** | 1 |

Review Figure 13.
Daily City-Wide Statistics from the City and the CPD (Friday, May 29, 2020)

| | |
|---|---|
| **Arrests for Disorderly Conduct** | 0 |
| **Arrests for Civil Unrest** | 0 |
| **Arrests for Looting** | 0 |
| **Arrest for firearms** | 0 |
| **Total** | 0 |
| | |
| **Complaints Filed Against Officers**[163] | 15 |
| | |
| **Call for Service** | 12,338 |
| **Homicides** | 4 |
| **Shooting Incidents** | 14 |
| **Guns Recovered** | 46 |
| **Officers Injured on Duty (claims)** | 0 |
| | |
| **Destroyed Vehicles** | 0 |
| **Lost/Stolen Police Equipment** | 0 |

---

[163] This number reflects the number of complaints that were filed against officers on May 29, 2020, rather than the number of complaints regarding an incident on May 29, 2020. *Compare All Complaint Intake, May 29, 2020 – June 11, 2020*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA) (June 17, 2020), http://www.chicagocopa.org/wp-content/uploads/2020/06/All-Complaints-Report-5-29-to-6-11-v4.pdf.

# SATURDAY, MAY 30, 2020 (12:00 AM TO 11:59 PM)

## Minneapolis, Minnesota, and Other Cities

On Saturday, May 30, protests and unrest continued in cities across the country.[164] Officials imposed curfews in Los Angeles, California; Philadelphia, Pennsylvania; Miami, Florida; and Washington, DC; among others, and the governors of eight states activated National Guard troops, with mixed success in quelling unrest and violence.[165] In Washington, DC, when a crowd of protesters gathered outside the White House, the Secret Service locked down the building and moved President Trump to a safe location.[166]

## Chicago

### Review Figure 14. CPIC Anticipated Demonstrations (May 30, 2020)

| Police District | Cause(s) |
|---|---|
| 1st | "MMAMV (Millions March Against mandatory Vaccines)" |
| 1st | "National Day of Protest" |
| 1st & 3rd | Various, including "Juste 4 George Floyd – Stop Police Crimes – Free Them All Caravan" (Car Caravan) |
| 2nd | "Call to Action to Stop the Gun Violence" |

On May 30, protests, unrest, and arrests continued to occur downtown from Friday night into early Saturday morning. Many officers reported not having the resources

---

[164] *See e.g., Fiery Clashes Erupt Between Police and Protesters Over George Floyd Death*, THE NEW YORK TIMES (May 30, 2020), https://www.nytimes.com/2020/05/30/us/minneapolis-floyd-protests.html; Riya Bhattacharjee et al., *Cities impose curfews, National Guard mobilizes as U.S. faces another night of unrest after George Floyd killing*, CNBC (June 1, 2020), https://www.cnbc.com/2020/05/30/protests-and-rioting-erupt-in-cities-across-the-us-as-anger-boils-after-the-killing-of-george-floyd.html; Suzanne Nuyen and Jason Slotkin, *Grief, Outrage Over George Floyd Spread Further*, NPR (May 31, 2020), https://www.npr.org/2020/05/31/866279321/la-county-under-state-of-emergency-amid-saturdays-george-floyd-protests; Tim Sullivan and Stephen Groves, *Protests over police killings rage in dozens of US cities*, PBS WTTW (May 31, 2020), https://www.pbs.org/newshour/nation/protests-over-police-killings-rage-in-dozens-of-us-cities; Nicole Chavez, Jason Hanna, Dakin Andone, and Madeline Holcombe, *Protesters break curfew on another night of fury and frustrations over George Floyd's killing*, CNN (May 31, 2020), https://www.cnn.com/2020/05/30/us/george-floyd-protests-saturday/index.html; Jemima McEvoy, *14 Days of Protests, 19 Dead*, FORBES (June 8, 2020), https://www.forbes.com/sites/jemimamcevoy/2020/06/08/14-days-of-protests-19-dead/?sh=5aabdedf4de4.

[165] *See* footnote above.

[166] *See* Peter Baker and Maggie Haberman, *As Protests and Violence Spill Over, Trump Shrinks Back*, THE NEW YORK TIMES (May 31, 2020), https://www.nytimes.com/2020/05/31/us/politics/trump-protests-george-floyd.html.

that they needed to respond to the crowds, lacking shields and helmets as violence and unrest continued throughout the night.

At about 3:00 AM, the CPD called for mass-arrest procedures to be implemented downtown and repeated that call around 4:00 AM. During these mass arrests, many CPD officers did not report uses of force on Tactical Response Reports or mass arrest cards. Officers simply handed over arrestees to transport drivers without completing the required paperwork. One officer reported that he visited three different lockup locations to find the person he arrested to complete the corresponding paperwork.

According to some CPD personnel, sufficient mass-arrest kits were not readily available. Other CPD personnel sought out mass-arrest kits that were in storage, left over from NATO in 2012, and drove around downtown, distributing mass-arrest kits and shields to any officers they could find. Some officers told us that some of these mass-arrest kits contained materials that no longer worked, such as expired zip ties and pens. CPD personnel reported that personnel went to stores to buy the equipment with their own money.

Some CPD officers also said that they received implicit and sometimes explicit directions from their supervisors to not make arrests—to avoid taking needed officers off the line to process arrestees or evidence. Other CPD officers said that they were instructed or instructed others to go to the detention facility to follow up on their arrests.

Reflecting on the early morning hours of May 30, some CPD officers said that it would have helped to have more officers and expressed frustration that additional officers were not made available downtown. According to some CPD personnel, the CPD did not have enough appropriate vehicles at the time to transport enough officers to where they needed. The CPD utilized Chicago Transit Authority vehicles and rented vehicles from outside of Chicago, eventually renting about 130 vehicles between May 30 and June 30. In some cases, officers told us they had to drive out of state to pick up equipment or rental vans.

Officers told us that the protesters in the early morning hours of May 30 were particularly confrontational, showing no interest in working with police to move the crowds safely and close down traffic safely. They reported widespread destruction of property, which some officers attributed to "anarchists" and others attributed to "opportunists." Some officers we spoke with also noted that some people on the streets that night seemed to be people who lived nearby and came out to observe what was happening. Some officers also noted that they had interactions with people who they believed were intoxicated.

As the early morning hours approached, CPD attempted to prepare for the day by, in part, adding resources to the originally scheduled protest response for Districts

1 and 18, including adding foot and tactical officers, videographers, legal officers, prisoner vans, and juvenile-arrest processing teams.

A "CPD Update" meeting took place on Saturday, May 30, 2020, from about 12:15 PM to 12:45 PM with representatives from the City and the CPD to "discuss and strategize re: protests for the weekend."

Many officers told us that they were unclear about who was "in charge" of the CPD's responses to the protests and unrest. Later that day, the City began converting the Summer Operations Center at OEMC into an Emergency Operations Center to track, manage, and direct City, CPD, and local, state, and federal resources. The Emergency Operations Center would include representatives from the Mayor's Office, the Illinois State Police, the Illinois National Guard, the Office of the Emergency Management and Communications, the Chicago Fire Department, and Streets and Sanitation. The CPD began to staff the Summer Operations Center with some personnel who had experience with crowd management from NATO in 2012.

Before the Emergency Operations Center coming online, however, many officers were deployed without a plan or direction. Many City and CPD personnel told us that, once they received word of what was occurring downtown, they rushed to work and many officers self-deployed.

On Saturday, the City and the CPD did not, however, have mechanisms in place to sufficiently track or direct deployments, personnel, or resources. We heard from CPD personnel across levels that there was a lack of direction throughout the day on Saturday, May 30. Some CPD leadership told us that they were sent to a location downtown, but there was no one there to provide further instruction when they arrived.

In response, some supervisors and officers who responded downtown pushed crowds in various directions, and unsuccessfully, chased people who were looting from store to store. Others said that, without direction, they directed officers with them to not engage with crowds to avoid risking injuries to people in the crowd and themselves. As a result, they had their teams pull away from conflicts.

The CPD's Incident Action Plan indicated a potential protest start time of 2:00 PM or 6:00 PM. Some CPD personnel said that there were already protesters in Federal Plaza by mid-morning, and other CPD personnel said that, by noon, there were already "10-1s" calls over the radio—which are calls for officer down or in need of immediate assistance. We heard that, by 1:30 PM, there were already hundreds of people at Federal Plaza, and before the CPD could fully deploy and prepare, there were thousands.

Because this was a planned protest, the CPD had deployed a Special Munitions Team, a Cut Team,[167] a legal officer, and other resources that the CPD typically has available for planned protests. While some officers were caught off guard without equipment on Friday, many had equipment on Saturday, such as helmets, because they were aware of what happened on Friday night.

In short, people showed up in large numbers hours earlier than expected, well in advance of the planned 2:00 PM start time. There was also a car caravan on the streets nearby. The crowd grew quickly and appeared to have been well over a thousand people. While the CPD appears to have initially been allowing protesters to march, with officers walking in the crowds with the protesters, scuffles between the CPD and people in the crowd began occurring very early on. Multiple videos depicting the clashes downtown were posted to social media, such as physical confrontations near 55 W. Monroe.

In addition to the protest and unrest downtown on Saturday, protests and unrest also occurred in many districts, including the 1st, 6th, 7th, 12th, and 18th Districts. As early as Saturday morning, for example, there were reports of wide-scale looting of retail locations in the 6th District, which continued throughout much of Saturday.

---

[167] A "cut team" is a group of officers who have equipment to cut through chains when protesters chain. *See, e.g.*, Brady Slater, *Pipeline protesters shut down Duluth bank by locking themselves to entrances*, FORUM NEWS SERVICE (January 13, 2018), https://www.twincities.com/2018/01/13/pipeline-protesters-shut-down-duluth-bank-by-locking-themselves-to-entrances/.

Review Figure 15. "For Floyd" Graffiti (May 31, 2020)



Shortly after the downtown protest began, officers and crowds were engaged in violent clashes, which became chaotic. People on bicycles and in vehicles used those bicycles and vehicles to block traffic. Officers repeatedly called for help over the radio. As officers called for help, other officers and command staff self-deployed to provide additional support downtown.

Separately, chaos was occurring in the 18th District. Trump Tower, which was and is a frequent target of protest activity, was surrounded by people. Mounted police were also stationed near Trump Tower. At about 3:00 PM, all previously un-deployed SWAT personnel were asked to deploy to the downtown area. Those SWAT personnel were told that use of oleoresin capsicum (OC) spray (also known as "pepper spray") had been authorized by the Superintendent, although there was confusion from some officers about whether that authorization was for general use of OC spray or whether each discrete incident required its own authorization for OC spray. OC spray was ultimately deployed in the 1st and 18th Districts on Saturday.

Large crowds also arrived at Trump Tower from the 1st District, on the south side of the river, with protesters also congregating on the north side of the Wabash Bridge next to Trump Tower. According to officers, members of the crowd became

violent, with some people jumping on, smashing the windows out of, and spray painting police vehicles. CPD officers began pushing the entire crowd back, away from Trump Tower, forcing people south onto and across the Wabash Bridge onto East Wacker. We heard from people on the bridge that they did not hear any dispersal orders from the police, that they were surrounded by people and officers with nowhere to go, and that it appeared to them that officers callously used excessive force with their batons and fists.

The Illinois State Police also deployed officers to assist the CPD at Trump Tower and at the Wrigley Building.

At the Wacker and Wabash intersection, officers reported that people pushed a CPD police van, rocking it back and forth, with officers in the vehicle. The vehicle was surrounded by people on all sides. According to some CPD personnel, a non-sworn CPD employee went through the crowd, coordinated with the Chicago Fire Department, and helped the officers get out of the crowd.

According to some CPD officers, the CPD issued a dispersal order on the Wabash Bridge. Many protesters, however, said that they did not hear a dispersal order. Likewise, some officers on the radio could be heard asking why the CPD did not use a long-range acoustic device (LRAD) to give the dispersal order. As officers attempted to disperse the crowd, some people in the crowd threw objects, and some officers used their batons on people in the crowd. After about 30 minutes, the CPD cleared the Wabash Bridge of people.

The CPD began to conduct mass arrests. As we noted above, many officers did not have mass arrest kits with them for use, nor had they been trained on the mass-arrest procedure. This resulted in a number of people being arrested without documentation of the charge or the arresting officer.

Downtown, confrontations between CPD officers and people in the crowd continued. At one point, people in the crowd appeared to drag a CPD officer on the ground, as others threw objects at officers and officers shoved people back. Separately, another officer was dragged on the ground as others hit the officer in the head. About an hour later, someone in the crowd set a CPD squad car on fire at State and Lake. In another instance, a CPD vehicle drove away from a crowd with someone on the hood of the vehicle.

After discussions with the Mayor's Office and the CPD, the Chicago Transit Authority suspended bus service in the loop after two buses got stuck in the crowds, which the CPD helped get out. Some protesters said that shutting down transit trapped them downtown.

The CPD's radios were also interrupted by hackers.[168] Throughout the weekend and into Monday, hackers intermittently interrupted radios, such as with music or false reports, hindering effective communication among public safety telecommunicators and officers.

By 6:00 PM, Chicago Transit Authority suspended all stops to the downtown area. At about 7:00 PM, looting began to occur in the 1st and 18th Districts, which continued well into Sunday morning. Officers described a pattern in which people in the crowd would attack businesses and begin looting and when officers intervened, the crowd would begin to attack the police.

In our conversations with representatives from multiple City entities, City personnel told us that the Mayor decided to raise certain downtown bridges, which proved to be a challenge. Due to COVID-19 shutdowns, the Chicago Department of Transportation had not been raising bridges on its usual summer schedule (*e.g.*, to allow boats to pass). Chicago also recently had high rates of rainfall and flooding, which had damaged some bridge mechanics.[169] City representatives worked to coordinated with the Chicago Transit Authority to reroute public transportation. Around 7:45 PM, some people began posting online that they were unable to get out of downtown.

Many officers said that they did not know that the bridges were going to be raised, and some teams of officers were split up as some were caught on each side. WE heard that the 18th District tactical teams were stuck south of the river, unable to easily return to Trump Tower, where unrest was occurring. Some officers reported that a warning was given when the bridges were raised, but the officers were in the process of holding demonstrators back from the bridge at that point and could not leave the line. We also heard that one police wagon was damaged because it was stuck on a bridge when that bridge raised.

At about 8:15 PM, via a press conference and social media, the Mayor's Office announced that a curfew would be enacted for 9:00 PM. At 8:40 PM, Mayor Lightfoot's Twitter account (@chicagosmayor) announced the curfew. Some community members said that they did not find out about the curfew until after 9:00 PM. Around 8:50 PM, officers began to be placed into police lines, and at around 9:10 PM, officers began to enforce the curfew and advance the line toward the crowd, attempting to push crowds away.

---

[168] *See* Frank Main, *Chicago police officers' radios crackled with rogue messages during weekend of chaos*, CHICAGO SUN-TIMES (June 2, 2020), https://chicago.sun-times.com/2020/6/1/21277567/chicago-officers-radios-rogue-messages-anti-cop-music-pro-cop-slogans-during-george-floyd-protests.

[169] *See* Mike Janssen et al., *Flooding spreads across Chicagoland as storms bring twice May's average in a few days*, WGN9 (May 17, 2020), https://wgntv.com/weather/flash-flood-warning-issued-for-large-part-of-chicago-area-cook-county/.

Review Figure 16. Mayor Tweet regarding Curfew (May 30, 2020)



Looting was reported at several stores in the Loop and Michigan Avenue. Some online posts referred to the scene as "a chaotic mess," and that CPD officers were "pursuing an aggressive strategy across the city." Looting and destruction of property continued downtown into the night.

As before, some officers described chasing crowds around the City all night. This caused the officers to repeatedly clear people who were destroying or looting property out of the same buildings: as officers left a secured building to protect another building, people would return to the now unsecured building. Some officers said that they did not believe that it would have been safe to leave some officers at the secured buildings. Many members of the CPD said that they would have been better off securing one area, rather than chasing the crowds in an attempt to save all of the buildings.

In the evening hours of Saturday into the early morning hours of Sunday, the civil unrest continued and evolved into widespread looting. Some officers reported that, by Saturday evening, many officers on the street appeared demoralized and anguished. Many officers we spoke to told us that they were exhausted, dehydrated and had not eaten much for close to 18 hours. Many remarked that the downtown area looked like a battlefield and compared it to war scenes. After Saturday night, some remarked that it "could have been worse" if officers had not shown the level of restraint that they did. Some officers described Saturday as the worst day in decades for the CPD.

Some officers who were downtown expressed frustration that officers in other districts were told that they needed to stay in their districts and that they could not deploy downtown. Some said that they knew of officers who wanted to help, but were told that they could not leave their districts.

Some CPD personnel reported that the CPD decided to indefinitely move all officers to 12-hour shifts, canceling regular days off, effective May 31. This would eventually increase the number of resources that were available to respond to protests and civil unrest, but the additional personnel took time to roll out.

## Community Experiences and Reflections from May 30, 2021

The quotes and summaries below are samples of experiences from community members regarding events on Monday, May 30, 2020.

> . . . . THE PEACEFULNESS WAS DISRUPTED WHEN CPD SHOWED UP, READY TO VIOLENTLY FIGHT US. IT FELT LIKE WE WERE ENEMIES AND THEY WERE A MILITARY FORCE SENT TO ELIMINATE US. AT AROUND 4:30 PM, I MADE MY WAY TO STATE AND MADISON, WHERE THERE WAS A HEAVY POLICE PRESENCE AT THE INTERSECTION. THEY ALL, IN RIOT GEAR, CIRCLED AROUND A CPD VEHICLE USED TO TRANSPORT ARRESTEES, FACING PROTESTERS WITH THEIR BATONS IN HAND. I WAS WALKING EAST ON MADISON, WHERE I CAME TO SEE TWO OFFICERS WHO DID NOT HAVE THEIR BADGE NUMBERS OR NAME TAGS ON. THEY ALSO DID NOT HAVE THEIR BODY CAMERAS UNDER UNIFORM. I APPROACHED AND ASKED IF THEY COULD IDENTIFY THEIR BADGE NUMBER OR WHICH PRECINCT THEY WERE FROM. ONE LAUGHED AT ME, WHILE THE OTHER RAISED HIS BATON AT ME TO BACK UP. ONE TOLD ME TO "F" OFF AND ANOTHER SPIT IN MY DIRECTION. . . . AT 6:18 PM, I MADE MY WAY NORTH ON STATE STREET AND RANDOLPH AFTER WHAT SEEMED TO BE 100 OFFICERS BEGAN TO MOVE NORTH BEHIND ME WITH THEIR BATONS OUT. WHEN I MADE IT SLIGHTLY NORTH OF THE INTERSECTION, THEY RAN TOWARDS US AND BEGAN HITTING AND ARRESTING EVERYONE IN SIGHT. I RECORDED AS A WOMAN WAS ARRESTED BY TWO OFFICERS FROM BEHIND, ONE BEING A WHITE-SHIRT POLICE OFFICER. SHE WAS NOT FACING THEM, SHE WAS LOOKING DOWN ON HER PHONE WHEN THEY PULLED HER TO THE GROUND BY HER PONYTAIL FROM BEHIND. THEN THEY FLIPPED HER OVER ONTO THE GROUND FACING HER DOWN BY THE PONYTAIL ONCE AGAIN. THREE MORE OFFICERS RAN OVER. ONE KICKED HER ON THE RIGHT HIP. THROUGHOUT THE SUMMER, I EXPERIENCED MUCH MORE DISRESPECT AND ABUSE FROM CPD OFFICERS AT OTHER PROTESTS, INCLUDING BEING TOLD -- INCLUDING BEING SEXUALLY HARASSED AND SAYING, QUOTE, "NICE SHORT-SHORTS, [HOMOPHOBIC SLUR]," QUOTE, BY AN OFFICER IN A PASSING CPD VEHICLE WHILE I WAS ON THE SIDEWALK. AS A LEGAL PROFESSIONAL, I CANNOT SEE HOW THE CITY IS PROUD OF THE SUPPOSED PROFESSIONALISM OF CPD. CPD ATTEMPTS TO JUSTIFY THESE RESPONSES BY MENTIONING THE DESTRUCTION OF PRIVATE PARTY. BUT WHAT I REMEMBER FROM MY FIRST YEAR OF LAW SCHOOL IS THAT THE LAW VALUES PERSONAL RIGHTS OVER PROPERTY RIGHTS. THESE DEADLY AND VIOLENT RESPONSES FROM OFFICERS ARE UNJUSTIFIED. . . . [170]

*** 

---

[170] Listening Session, August 19, 2020, at 79–80.

> *. . . . HE PINNED ME UP AGAINST THE PROTESTERS BEHIND ME UNTIL I COULDN'T TALK. AND THEN AT THAT POINT I COULDN'T BREATH[E] ANYMORE, AND I COULDN'T KEEP MY FEET UNDERNEATH ME, THE CROWD WAS MOVING SO MUCH, AND MY KNEES GAVE OUT. SO HE WAS PRESSING THE BATON AGAINST MY NECK SO HARD THAT I COULDN'T FALL TO MY KNEES. I WAS HANGING BY HIS BATON. WHEN I STARTED TO GO COMPLETELY LIMP, ANOTHER PROTESTER CALLED HIM OFF, SAID, SHE IS CHOKING, SHE CAN'T BREATHE, SHE CAN'T BREATHE, TAKE OFF YOUR BATON. I THINK THAT PROTESTER SAVED MY LIFE THAT DAY. . . .[171]*

\*\*\*

> *AS THE SITUATION STARTED TO ESCALATE, WE WATCHED THEM PUSH THE LINE BACK. AND THEY SINGLED OUT A WOMAN WHO HAD BEEN YELLING QUITE LOUDLY ON MY RIGHT. AND AS THEY WERE PUSHING US BACK, PUSHING US BACK, WE CLIMBED UP ON THE CEMENT PLANTERS THAT WERE THERE IN THE PLAZA THAT GROUPS OF PEOPLE WERE STANDING ON. AND THEY SINGLED HER OUT SPECIFICALLY, AND THEY KIND OF MANHANDLED HER, PHYSICALLY. [W]RAPPED THEIR ARMS AROUND HER. AND I WATCHED HER, REALLY, BE THROWN TO THE GROUND. AND WHEN SHE ROSE HER HANDS WERE BLOODIED AND DIRTIED, AS WELL AS HER KNEES.[172]*

\*\*\*

> *AT THIS POINT, THE POLICE REACHED US, AND I WAS BEATEN WITH A BATON ON MY BACK. I ESTIMATE THE OFFICER BEAT ME FOR 15 TO 30 SECONDS. I CAN'T SAY FOR SURE BECAUSE I WAS FOCUSED ON BLOCKING THE YOUNG WOMAN WHO WAS COVERING HER HEAD AS AN OFFICER REACHED AROUND ME TO BEAT HER. I ALSO FOCUSED ON THE UNIQUENESS OF MY SCREAMS. THIS WAS THE FIRST TIME I HEARD MYSELF MAKE A SOUND I COULD ONLY DESCRIBE AS A COMBINATION OF SHOCK, FEAR, AND GURGLING PAIN. WHEN THE OFFICERS STOPPED BEATING ME, HE SAID: GET THE "F" OUT OF HERE. THIS WAS THE FIRST TIME AN OFFICER TOLD ME I COULDN'T BE IN THAT LOCATION. I FROZE FOR A MOMENT AND SAID "NO" BECAUSE I WAS HELPING THE YOUNG WOMAN LOOK FOR HER PHONE THAT FELL OUT OF HER HAND AS SHE COVERED HER HEAD FROM THE BEATING. THE OFFICER WHO BEAT ME, AND ANOTHER, BEGAN SHOUTING AT THE TWO OF US. SO I SAID: OKAY, BUT TELL US WHERE TO GO SO WE DON'T GET BEATEN AGAIN. THERE IS NOWHERE TO GO.[173]*

\*\*\*

> *AT THIS POINT, POLICE OFFICERS BEGAN CHARGING US FROM ALL SIDES, SHOVING US WITH THEIR BATONS. A YOUNG WOMAN FELL TO THE GROUND AND WAS GETTING TRAMPLED BY THE GROUP. I STOPPED TO HELP HER BEFORE I WAS ABLE TO PULL HER – AND BEFORE I WAS ABLE TO PULL HER UP, I FELT A PUSH FROM A POLICE OFFICER. THIS OFFICER REPEATEDLY SHOVED ME EXTREMELY FORCEFULLY WITH HIS BATON, WHICH HE WAS HOLDING HORIZONTALLY WITH BOTH HIS HANDS, HITTING ME IN THE FACE AND CHEST. HE PUSHED ME ABOUT 20 FEET DOWN STATE STREET UNTIL HE CAUSED ME TO FALL TO THE GROUND, KNOCKING MY GLASSES OFF AND BREAKING MY CAMERA, WHICH I WAS HOLDING IN MY HAND. THIS INTERACTION LEFT A LARGE, DARK PURPLE BRUISE ON MY RIGHT ARM THAT LASTED FOR WEEKS AFTER THE PROTEST. AFTER GETTING HELPED UP BY OTHER PROTESTERS, I COULDN'T SEE WHERE MY WIFE WAS. DISTRAUGHT, I WENT TO TRY AND FIND HER. I WAS CONFRONTED BY THE SAME OFFICER THAT SLAMMED ME TO THE GROUND AND SAID TO HIM: PLEASE, MY WIFE IS OVER THERE, POINTING*

---

[171]  Listening Session, August 20, 2020, at 159.
[172]  Listening Session, August 19, 2020, at 30.
[173]  Listening Session, August 20, 2020, at 125.

> *TO THE CORNER OF STATE AND KINZIE. THIS OFFICER THEN SHOVED ME AGAIN, STRIKING ME IN THE FACE THREE TIMES WITH HIS BATON AND SAID: I DON'T CARE, YOU SHOULDN'T HAVE COME HERE, YOU "F-ER," BUT SAID THE WORD.*[174]

\*\*\*

> *WHILE I WITNESSED SEVERAL ACTS OF MINOR CIVIL DISOBEDIENCE, THERE WAS NOTHING I WITNESSED IN THE CROWD AROUND ME THAT COULD HAVE JUSTIFIED WHAT CAME NEXT. AF-TER MARCHING IN THE STREETS FOR SEVERAL BLOCKS, WITHOUT INCIDENT, NEAR THE INTER-SECTION OF JACKSON AND DEARBORN, A BATTALION OF 20 TO 40 CPD OFFICERS IN FULL RIOT GEAR MARCHED THROUGH THE GROUP OF PROTESTERS TO ENGAGE IN WHAT I NOW KNOW IS CALLED KETTLING. AFTER SECTIONING US OFF FROM THE LARGER MARCH AHEAD OF US, THEY BLOCKED THE INTERSECTION AND FORMED A CIRCLE. THIS IS WHEN TENSIONS ESCALATED.*[175]

\*\*\*

> *THE POLICE WERE ANTAGONIZING US AND BEATING US WITH THEIR BATONS AND GRABBING PEOPLE AND SHOVING THEM TO THE GROUND AND ALSO BEATING THEM UNTIL THEY WERE BLEEDING. I HAD TO WATCH AS MY PARTNER, WHO WAS TRYING TO PROTECT ME, HAD A BATON SHOVED IN THEIR FACE BY A POLICE OFFICER WHO WOULD NOT LET UP. AND FROM THERE, I HAD TO PUT MY BODY IN FRONT OF THE POLICE AND MY PARTNER SO THAT THEY WERE OKAY. AFTER THAT INCIDENT, WE HAD TO RUN AND GET AWAY BECAUSE THEY KEPT HITTING US, SHOOTING FLARES INTO THE AIR AND THROWING SMOKE BOMBS AND TEAR GAS INTO THE CROWD WHEN THE NATIONAL GUARD CAME. AND WE HAD TO RUN AWAY AND FIND AN AREA TO ESCAPE BECAUSE ALL THE BRIDGES WERE LIFTED WHEN THE CURFEW WAS ENACTED AT LEAST 20 MINUTES BEFORE POLICE STARTED ATTACKING US.*[176]

\*\*\*

> *SO ON MAY 30TH I WENT TO PEACEFULLY PROTEST THE MURDER OF GEORGE FLOYD, AND TO PUT MYSELF BETWEEN BLACK PEOPLE AND THE POLICE BECAUSE I BELIEVE THAT BLACK LIVES MATTER. IN THE AFTERNOON, I ENDED UP ON THE WABASH BRIDGE. THE POLICE FORMED A LINE AND HAD HORSES BEHIND THEM. AND THEY DID NOT CALL TO DISPERSE AT THAT TIME. I WAS BETWEEN THE POLICE AND SOME BLACK PEOPLE THAT I DIDN'T KNOW. AND THE POLICE – THERE WAS AN OFFICER PUSHING INTO MY CHEST HORIZONTALLY WITH A BATON LIKE THIS, AND HE WAS PUSHING ME VERY, VERY HARD. AND I WAS AFRAID OF STUMBLING. I WAS TRYING TO HOLD MY GROUND, BUT I WASN'T FIGHTING. I NEVER RAISED MY VOICE. AND I WAS AFRAID THAT I WAS GOING TO FALL ON THE GROUND AND GET TRAMPLED BECAUSE THE POLICE WERE ADVANCING, BUT ALSO BECAUSE OF HOW MUCH IT HURT TO HAVE THE BATON PUSHED INTO MY RIBCAGE AND MY CHEST. I ASKED HIM TO STOP AND HE WOULDN'T. HE KEPT SHOVING ME. SO I PUT MY HANDS UP. I THOUGHT HE WOULD STOP IF I WAS PROTECTING MYSELF, BUT HE SHOVED THE BATON INTO THE FINGERS OF MY BONE AND WAS PUSHING WITH HIS BODY WEIGHT. AND SO I SCREAMED AND I SAID, "STOP. PLEASE STOP." SO HE GAVE ME A LOOK, AND HE JUMPED TO A PERSON NEXT TO ME, WHICH WAS A BLACK PERSON AND STARTED SHOV-ING HIM EVEN HARDER. AND I SAID, "STOP. STOP. PLEASE STOP." AND THE POLICE OFFICER NEXT TO HIM LOOKED AT ME AND SAID, "YOU WANT TO BE IN IT. NOW YOU'RE IN IT." AND HE GRABBED ME BY MY NECK AND HE LIFTED ME UP, AND I FLEW. I WENT AIRBORNE BY MY NECK.*

---

[174] *Id.* at 168–69.
[175] Listening Session, August 19, 2020, at 81.
[176] Listening Session, August 20, 2020, at 116–117.

> *He dragged me backwards so quickly that my shoe flew off and my hat flew off. He dragged me down the street through horse poop so hard that my back was scraped up and bleeding. And then two other officers jumped on me and I was screaming, "Stop. You got me. You got me. You won." They put me in zip ties. I sat on the curb of the Trump Tower for three hours. They – this is when the bridge went up. I sat on a sheriff's bus for three hours. They took us to Belmont and Western, didn't let us in, had no females. Didn't tell the females that we were there, to process us. I was in zip ties for six hours, very tight. They told us if we didn't want to be arrested, we shouldn't have burned the city down. None of us had been involved in any burning or looting or anything. Then I was in jail for the night. My name cleared at 3:00, I had no warrants, at 3:00 in the morning. They wouldn't let me out until 8:00. To this day I have no idea if I have been charged with anything. They said it would be disorderly[] conduct. It was terrifying. It was brutal. It was traumatic. And it was uncalled for.*[177]

\*\*\*

> *The first was on the big protest to protest George Floyd's murder on May 30th downtown. I was working as a marshal, and I was going to help somebody who had had their pants ripped open by CPD, who were surrounded by six or seven cops. And I went to go help this person put their pants on and I was shoved in the chest with a baton, shoved to the ground and I hit my neck and back, among other things, among being screamed at and not really given any orders or directions, just being screamed at.*[178]

\*\*\*

> *On May 30th, police in riot gear chased protestors through the streets in multiple locations and times, grabbing and beating people at random with fists and batons. A young teenager was seized and beaten by police for no reason on the Wabash bridge. [Legal observers (LOs)] saw police drive cars through crowds. And one of the LOs was beaten. and arrested.*[179]

\*\*\*

> *On May 30th I attended protests as a legal observer with the NLG. On that day, I witnessed CPD officers attack protesters with a viciousness and a disregard for human life that I have not seen since witnessing Afghan police officers attack suspected Taliban members. I was at Trump Tower when CPD attempted to push protesters off of the Wabash bridge. I was in the very front of the protesters, wearing a legal observer hat. Officers are pushing us back with batons and protesters behind us were pushing us forward. To my left, CPD dragged a young woman to the ground and began kicking her and beating her with a baton. Another protester attempted to shield her and got the same treatment.*[180]

\*\*\*

---

[177] Listening Session, August 19, 2020, at 39–41.
[178] *Id.* at 51.
[179] *Id.* at 68.
[180] Listening Session, August 20, 2020, at 142.

> *I ATTEMPTED TO GET THEIR NAMES TO SEND TO THE MASS DEFENSE COMMITTEE, WHICH PROVIDES FREE LEGAL REPRESENTATION TO ARRESTED PROTESTERS. WHILE TRYING TO GET THE NAMES OF THE PEOPLE BEING ASSAULTED BY THE CPD, AN OFFICER HIT ME IN THE THROAT WITH HIS BATON. AS HE ATTEMPTED TO DO SO AGAIN, I PUT MY ARM UP TO BLOCK IT. AFTER THAT, A NUMBER OF OFFICERS BEGAN HITTING ME IN THE HEAD WITH A BATON. OTHER OFFICERS GRABBED ME FROM BEHIND, RIPPED ME OVER A CONCRETE BARRIER, WHERE THEY CONTINUED TO BEAT ME. TWO OTHER PROTESTERS ATTEMPTED TO STOP THE CPD FROM BEATING ME AND WAS BEATEN AS WELL. I'M UNSURE OF HOW LONG I WAS KICKED, PUNCHED AND HIT WITH BATONS. AFTER THE BEATING, I WAS UNABLE TO SIT OR MOVE FOR A WEEK WITHOUT EXTREME PAIN.[181]*

\*\*\*

> *AND, THEN, ULTIMATELY, I WOULD JUST LIKE TO SAY THAT THE DECISION ON THE PART OF THE MAYOR TO SHUT DOWN THE TRAINS THAT DAY -- THIS WAS A PROTEST THAT WAS SET TO GO FROM 2:00 TIL 5:00. IT TRAPPED A LOT PEOPLE, MYSELF INCLUDED, IN THE DOWNTOWN AREA. SO I SAW, AS I TRIED TO FIGURE OUT HOW I WAS GOING TO GET HOME, PEOPLE WANDERING AIMLESSLY, RUNNING INTO GROUPS OF POLICE OFFICERS THAT WERE ALSO SEEMING TO BE LOOKING FOR PROTESTERS. IT WAS A VERY UNSAFE FEELING AS THE POLICE WERE THERE. ANYTIME I TURNED ON A STREET AND SAW POLICE, I WENT THE OTHER WAY, BECAUSE I HAD A SIGN. I WAS OBVIOUSLY PART OF THE PROTEST. THE ONLY PEOPLE I SAW WERE EITHER PART OF THE PROTEST OR POLICE.[182]*

## Body Worn Camera and Radio Review – May 30, 2020

Videos from Saturday, May 30, depict a wide range of verbal and physical interactions between people in the crowd and officers. One body-worn-camera video from the early morning hours depict protesters yelling, "Fuck y'all," at CPD officers, and officers responding with, "Be safe." Several other videos depict officers ignoring protesters and not verbally responding at all to the questions they ask.

Other videos depicted physical confrontations between people and officers. Many videos depict a crowd of officers and people who are pushing and shoving. In one video, an officer's body-worn camera falls off, as officers continue to push and shove people amidst commotion. In another video, an officer aggressively pushes, tackles, and fights with people on the ground and makes arrests.

At around 3:00 AM, a video shows officers running toward a commotion between people and officers. The officers push, shove, and pull people, using batons to push them back. One officer makes an arrest. In another video, an officer can be seen grabbing something from someone, and officers and people then begin pushing and shoving.

In one interaction that occurred in the early morning hours, officers are seen pushing back against people using bikes, people in the crowd disperse, and the officers

---

[181] *Id.* at 142–43.
[182] *Id.* at 185.

draw their batons. Later, officers can be seen throwing bikes, pushing and shoving individuals, and dragging one individual. As one officer tries to restrain a woman on the ground, other officers yell, "Pick her up." The officer continues to drag the woman a couple of feet before trying to pick her up.

Another body-worn-camera video depicts an interaction in which officers are seen carrying a woman who is saying she needs some water. It sounds likes she tells officers that she is pregnant. Officers don't respond to her pleas for water and push her into a large CPD vehicle ("wagon") before shutting the door on her. Officers place the handcuffed woman into the wagon with two other men, who do not appear to be handcuffed. Officers also don't offer masks to any individuals placed into the wagon. Later in the video, the officer later mocks the woman. A few minutes later, the officer brings another man to the wagon. As the wagon door opens, the woman continues to say that she can't breathe, that she needs water, and that she is pregnant. An officer says, "Why are you here then?" And officers tell her that she has to wait. The woman then says, "Get me some water, bitch." The officer steps into the wagon, and grabs the woman and moves her to the back. His complete actions are unclear from the video, but the others in the wagon respond with shock and ask the officer if his camera is on. Outside the wagon, officers continue to mock the woman who says she's pregnant and needs water. Throughout this video, officers continue to bring people to the wagon. All of the people in wagon appear to be people of color, primarily Black people. Many minutes later, a different officer eventually brings water to the woman and allows her to drink.

The same video shows an officer walking with a young White male, who is handcuffed. A different officer asks whether he is going to put him in the wagon. The officer with the young White male says, "I'm just separating him from his group. . . . He says that he's going to leave." The officer walks him down the street away from the CPD wagon.

Another video provides an example of the types of verbal interactions between officers, people in the crowd, and arrestees. As the CPD officer is seen cuffing the individual, he says the following:

**Officer**:       "Where the fuck are you from?"

**Arrestee**:       "Aurora. I want justice. I have the right to freedom to protest and assembly."

**Officer**:       "Give me your hands and shut the fuck up. All night you've been fucking things up."

**Arrestee**:       "I want justice."

| *Officer*: | "You're going to get it. All of it. Tonight." |
|---|---|
| *Arrestee*: | "That's really tight." [Presumably referring to the handcuffs] |
| *Officer*: | "Shut the fuck up, asshole." |

## City Data from May 30, 2020

The figures below reflect data that the IMT received from the City for May 30, 2020. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence. Nonetheless, the tables demonstrate that the City and the CPD's challenges were significant and widespread.

### Review Figure 17. Police Computer Aided Dispatch System (May 30, 2020)

| **Total Protests** | 17 |
|---|---|
| **Total Districts** | 11 |
| | (001, 006, 007, 009, 010, 011, 014, 016, 018, 019, 022) |
| | |
| **Total "Riot"/Looting** | 14 (1+13) |
| **Total Districts** | (001, 008, 012, 014, 018, 019, 024) |
| | |
| **Total** | 31 |
| **Total Districts** | 14 |

### Review Figure 18.
### Daily City-Wide Statistics from the City and the CPD (Saturday, May 30, 2020)

| **Arrests for Disorderly Conduct** | 377 |
|---|---|
| **Arrests for Civil Unrest** | 0 |
| **Arrests for Looting** | 0 |
| **Arrest for firearms** | 16 |
| **Other** | 101 |
| **Total** | 494 |
| | |
| **Complaints Filed Against Officers**[183] | 9 |
| | |
| **Call for Service** | 21,471 |
| **Homicides** | 9 |

---

[183] This number reflects the number of complaints that were filed against officers on May 30, 2020, rather than the number of complaints regarding an incident on May 30, 2020. *Compare All Complaint Intake, May 29, 2020 – June 11, 2020*, COPA (June 17, 2020), http://www.chicagocopa.org/wp-content/uploads/2020/06/All-Complaints-Report-5-29-to-6-11-v4.pdf.

| | |
|---|---|
| **Shooting Incidents** | 18 |
| **Guns Recovered** | 34 |
| **Officers Injured on Duty (claims)** | 85 |
| | |
| **Destroyed Vehicles** | 0 |
| **Lost/Stolen Police Equipment** | 0 |
| **Looted/Damaged Buildings** | 86 |

## SUNDAY, MAY 31, 2020 (12:00 AM TO 11:59 PM)

### Other Cities

Large-scale protests and incidents of unrest continued on Sunday, May 31, throughout the US.[184] In Washington, DC, for example, some people attacked cars, breaking car windows and turning cars over.[185]

Demonstrations also occurred in cities outside of the U.S., such as Vancouver, British Columbia, where thousands gathered in support of George Floyd.[186]

### Chicago

The unrest, looting, and arrests that began on Saturday, May 30, continued downtown until well after sunrise. Some officers said that they continued to chase people who were looting past 6:00 AM.

There were also anticipated protests for Sunday, May 31.

Review Figure 19. CPIC Anticipated Demonstrations (May 31, 2021)

| Police District | Cause |
|---|---|
| 1st | "Pritzkerville – Protest Against Mass Eviction" |
| 1st | "Chicago Solidarity with George Floyd and Breonna Taylor" |
| 1st | "Black Lives matter – Chicago Protest" |
| 1st | "Chicago Solidarity with George Floyd and Breonna Taylor" |

The Emergency Operations Center continued to take shape throughout Sunday. Once activated, the Emergency Operations Center would operate 24-hours during

---

[184] *See* Giulia McDonnell Nieto del Rio, John Eligon, and Adeel Haasan, *A Timeline of What Has Happened in the Year Since George Floyd's Death*, THE NEW YORK TIMES (May 25, 2021).

[185] *See, e.g.*, *Looking back at fiery George Floyd protests*, ARKANSAS DEMOCRAT-GAZETTE (April 25, 2021), https://www.arkansasonline.com/news/2021/apr/25/looking-back-at-fiery-george-floyd-protests/.

[186] *Id.*

the continued response. The Emergency Operations Center determined large resources allocations.

Mayor Lightfoot had requested the assistance of the Illinois National Guard and the curfew from the previous day remained in effect. We heard that there were challenges determining how the City and the CPD could and should use the National Guard, and what the rules of engagement should be. Ultimately, the National Guard to set up perimeters around downtown to free up more CPD officers to deploy to the neighborhoods.

Reeling from two days of unrest, by Sunday the CPD still did not have a clear system for how to organize platoons or how to distribute and track resources, including radios. There was continued widespread confusion about deployments.

Officers from each district—mostly third-watch officers and officers returning from their days off—were sent to Guaranteed Rate Field and deployed to respond to areas that needed additional resources. There was some confusion and disagreement regarding whether all districts should deploy officers to Guaranteed Rate Field, rather than staying in their districts. Ultimately, certain districts were permitted to keep their officers—such as "Tier 1" designated districts, which have the highest levels of violent crime (the 6th, 7th, 8th, 10th, 11th, and 15th Districts). Nonetheless, on Sunday and a few days after, some of these districts continued to send officers to Guaranteed Rate Field, only to have officers return to each district.

Some officers were taken from the north side and redeployed to the south side, and vice versa. Often, officers were redeployed to districts with which they were not familiar, even when their own districts had requested additional resources. Many remarked that the redeployment strategy caused unnecessary delays and resulted in longer days for officers.

The National Guard and other non-CPD resources limited access to the downtown area by blocking roads. Some CPD personnel speculated that the downtown area received less attention on Sunday because most stores were looted already—as opposed to any response by the City, the CPD, or outside partners.

Unrest began spread to Chicago's neighborhoods. By 10:00 AM, looting began to occur across several districts in Chicago's neighborhoods. For instance, looting occurred at a number of stores on 47th Street (between Michigan Ave. and Martin Luther King Dr.).

One community member noted that officers were just "standing there" as people looted a liquor store, a clothing store, and other businesses. The same community member also commented on a protest near 53rd and Lake Park. The person re-

ported officers and community members began assaulting each other, with officers using batons and community members using bottles, skateboards, and other improvised weapons.

Protests also continued in other areas of the City, including in the 1st and 18th Districts and near the Mayor's home in the 14th District. Significant protest activity continued to occur in the downtown area. For instance, protesters held a die-in during the late afternoon at Daley Plaza while another protest occurred peacefully at Trump Tower.

On Sunday afternoon, Metra commuter rail suspended access to downtown. The bridges remained raised and at about 6:30 PM, the Chicago Transit Authority suspended its service on all bus routes and rail lines in and out of the Loop. The City's Department of Streets and Sanitation, Department of Water Management, and Chicago Police Department issued a joint statement about the limited access to the loop, noting that "only employees whose businesses are located within the designated boundaries, individuals who reside in the surrounding area and residents engaged in essential activities as defined in the Municipal Code" would be allowed inside the boundaries of Division Street from Lake Shore Drive and North Halsted Street; North Halsted from Division Street to Milwaukee Avenue and Grand Avenue; Milwaukee Avenue from Grand Avenue to Kinzie Street; Canal Street from Kinzie Street to 26th Street; and 26th Street from Canal Street to Lake Shore Drive.[187]

We heard that many Chicago neighborhoods did not experience protests on Sunday and only experienced unrest, including property destruction, looting, and arson. According to many CPD personnel, the CPD focused on protecting the retail corridors in each district. There were also reports of vigilantes and escalating gang conflicts.[188] We heard from CPD supervisors that officers were responding to these incidents, having vigilantes stand down, and having community contacts de-escalate tensions. We also heard, however, that, during some attempts, there were shots fired at police during attempted interventions.

Many commanders described requesting more resources, which were either slow to arrive or unavailable as many districts were in the same position. Personnel in

---

[187] *See* Chicago Tribune Staff, *George Floyd fallout: Here's what happened May 31 in the Chicago area*, CHICAGO TRIBUNE (May 31, 2020), https://www.chicagotribune.com/news/breaking/ct-george-floyd-chicago-protests-20200531-qghf4l7ysjgl3etxqu3jv6oq6a-story.html.

[188] *See, e.g.*, Elvia Malagón and Sam Charles, *Trouble follows some residents' plan to guard their neighborhoods after unrest*, CHICAGO SUN-TIMES (June 2, 2020), https://chicago.sun-times.com/2020/6/2/21278543/little-village-pilsen-trouble-follows-residents-plan-neighborhoods-unrest-protest-floyd; Bob Chiarito, *Bridgeporters Say Bat-Wielding Vigilantes Are Terrorizing Peaceful Protesters, Neighbors*, BLOCK CLUB CHICAGO (June 4, 2020), https://blockclub-chicago.org/2020/06/04/bridgeporters-say-bat-wielding-vigilantes-are-terrorizing-peaceful-protesters-neighbors/.

the Emergency Operations Center consistently confirmed that the demand for re-
sources outpaced the supply.

## Community Experiences and Reflections from May 31, 2021

The quotes and summaries below are samples of experiences from community
members regarding events on Sunday, May 31, 2020.

> *On May 31st, we observed a team of SWAT officers exit their vehicle, pepper spray [legal observers (LOs)] and about seven demonstrators without saying a word, and then return to the vehicle and drive away. In Grant Park, dozens of officers in riot gear attacked a crowd of protesters causing many injuries and stole bikes from protesters. CPD targeted the LOs with pepper spray as LOs gathered to get arrestee information, and intentionally knocked an LO's notebook from their hands and blocked them from retrieving it.[189]*

\*\*\*

> *At the protest on May 31st, I witnessed an officer deliberately hit a teenage girl in the face with his baton, visibly shattering the bridge of her nose.[190]*

## Body Worn Camera and Radio Review – May 31, 2020

The videos we reviewed from May 31 depicted interactions between officers and
the public, and also between officers who noted confusion regarding the City and
the CPD's plan or lack of plans in the response.

One video, for example, shows a long interaction in an intersection, in which CPD
officers are lined up and holding a line. There is looting happening nearby, but the
officers hold the line. About 45 minutes into the video, one officer says "[Lightfoot]
should have deployed National Guard earlier. She just deployed them. But they
aren't going to come out now with a command plan." Shortly after that statement,
the officers move to the other side of the street.

In another video, an officer in a white shirt approaches a group of officers and says,
"Don't [inaudible] and then lead us back here so there needs to some fucking lead-
ership here and there's zero… It's a safety issue… We need to go. So be ready to
go and be ready to walk backwards."

Many other videos depict officers using disrespectful and foul language toward
community members. For example, as a car drives past a group of officers, one
says, "Get the fuck outta here, man."

---

[189] Listening Session, August 19, 2020, at 69.
[190] Listening Session, August 20, 2020, at 140.

In another video, as an officer makes an arrest, the following interaction occurs:

*Officer*: "You were crying back there. I got it on body cam. We can go back to the station and watch it. I'll put that shit on YouTube."

*Arrestee*: "It's easy to talk shit when I'm in cuffs."

*Officer*: "You weren't in cuffs back there. I threw your ass to the ground, and you cried. You one pussy ass bitch. Big ass bitch."

One video shows a retail store being looted as three officers and one supervisor watch from the nearby intersection. A community member approaches them and says, "It is sick." An officer responds, "It's embarrassing, but… destroy your own community." Another community member, who may be the owner of the store, approaches the officers, and an officer says, "You've got insurance right? I hate that this is happening to you and everything, but they destroying their own community. This is what they think is tough. It's embarrassing." A bit later in the video, an officer says, "There's more people coming. They think they're something. They all need they ass whooped. It's embarrassing. Talk to your people."

## City Data from May 31, 2020

The figures below reflect data that the IMT received from the City. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence. Nonetheless, the tables demonstrate that the City and the CPD's challenges continued to be significant and widespread.

### Review Figure 20. Police Computer Aided Dispatch System (May 31, 2020)

| | |
|---|---|
| **Total Protests** | 20 |
| **Total Districts** | 10 |
| | (001, 002, 005, 009, 012, 016, 017, 018, 019, 020) |
| | |
| **Total "Riot"/Looting** | 1,439 (10 + 1,429) |
| **Total Districts** | 23 |
| | (001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 014, 015, 016, 017, 018, 019, 020, 022, 024, 025) |
| | |
| **Total** | 1,463 |
| **Total Districts** | 23 |

Review Figure 21.

Daily City-Wide Statistics from the City and the CPD (Sunday, May 31, 2020)

| | |
|---|---|
| **Arrests for Disorderly Conduct** | 465 |
| **Arrests for Civil Unrest** | 0 |
| **Arrests for Looting** | 0 |
| **Arrest for firearms** | 48 |
| **Other** | 201 |
| **Total** | 714 |
| | |
| **Complaints Filed Against Officers[191]** | 21 |
| | |
| **Call for Service** | 65,256 |
| **Homicides** | 18 |
| **Shooting Incidents** | 52 |
| **Guns Recovered** | 68 |
| **Officers Injured on Duty (claims)** | 83 |

# MONDAY, JUNE 1, 2020 (12:00 AM TO 11:59 PM)

## Other Cities

Tensions remained high in many cities into Monday, June 1. Demonstrators who gathered near the White House were cleared out of Lafayette Square by officers and National Guard who used tear gas and flash-bang explosions.[192]

Looting continued in New York City, where a nightly curfew was put in place,[193] and in Philadelphia, demonstrators marched onto a highway and were trapped by police at the front and back of the march, resulting in violent clashes involving pepper spray and tear gas.[194]

---

[191] This number reflects the number of complaints that were filed against officers on May 31, 2020, rather than the number of complaints regarding an incident on May 31, 2020. *Compare All Complaint Intake, May 29, 2020 – June 11, 2020*, COPA (June 17, 2020), http://www.chica-gocopa.org/wp-content/uploads/2020/06/All-Complaints-Report-5-29-to-6-11-v4.pdf.

[192] *See* Katie Rogers, *Protesters Dispersed With Tear Gas So Trump Could Pose at Church*, THE NEW YORK TIMES (June 1, 2020), https://www.nytimes.com/2020/06/01/us/politics/trump-st-johns-church-bible.html.

[193] *Id.*

[194] See Christoph Koettl et al., *How the Philadelphia Police Tear-Gassed a Group of Trapped Pro-testers*, THE NEW YORK TIMES (June 25, 2020), https://www.ny-times.com/video/us/100000007174941/philadelphia-tear-gas-george-floyd-protests.html.

## Chicago

As some protests and looting persisted during the early hours of Monday, June 1, 13 CPD officers lounged in the burglarized office of U.S. Congressman Bobby Rush, located on the south side. Starting at around 1:00 AM, security camera video shows the officers sleeping and eating popcorn.[195]

On Monday, the Governor issued a "Gubernatorial Disaster Proclamation" for nine counties, including Cook County.[196]

By Monday, June 1, 2020, the CPD began to establish a forward command post for each Area. These forward command posts tracked available and deployed officers and resources. The forward command posts also communicated on the radio between district commanders and central command.

### Review Figure 22. Chicago Mayor Tweet



**Mayor Lori Lightfoot** ✔ @chicagosmayor · Jun 1, 2020

THIS MORNING: Mayor Lightfoot will be joining Chicago Police, Fire, Emergency Management, and other city agencies to provide an update. Watch it live here at 10 AM.

💬 169      🔁 87      ♡ 714

On Monday, protests continued across several neighborhoods.[197]

## Community Experiences and Reflections from June 1, 2021

The quotes and summaries below are samples of experiences from community members regarding events on Monday, June 1, 2020.

> As I THOUGHT ABOUT HOW TO FILL THIS TIME, I CONSIDERED WHAT I MIGHT SAY THAT COULD MAKE YOU UNDERSTAND. I COULD TALK ABOUT HOW THEY BEAT MY KNEES AS I TRIED TO RUN TOWARDS SOMEONE WHO WAS BEING BEATEN WORSE THAN ME, CAUSING ME TO FALL AND TAKING MY CANE FROM ME. I COULD TELL YOU HOW THREE OF THEM DUG THEIR BOOTS INTO MY SHOULDERS AND KNEE AND SCREAMED THREATS MASKLESSLY IN MY FACE. I COULD TALK ABOUT HOW OFFICERS HELD MY PARTNER DOWN IN A FETAL POSITION AND BEAT HIS GENITALS AND HIS LEG UNTIL HIS PHONE IN HIS POCKET BENT AND HIS SHIN SPLIT OPEN. I COULD TELL

---

[195] Grace Hauck, *During George Floyd protests, 13 Chicago cops lounged in a congressman's office and ate his popcorn*, USA TODAY (June 11, 2020), https://www.usatoday.com/story/news/nation/2020/06/11/chicago-police-lounged-bobby-rushs-burglarized-office-amid-looting/5343896002/.

[196] *Gubernatorial Disaster Proclamation*, STATE OF ILLINOIS EXECUTIVE DEPARTMENT (June 1, 2020), https://www2.illinois.gov/sites/gov/Documents/DisasterProc-6-1-2020.pdf.

[197] *See, e.g.*, WGN Web Desk, *Chicago George Floyd protests: WGN updates from June 1*, WGN9 (June 1, 2020), https://wgntv.com/news/george-floyd/chicago-unrest-george-floyd-june-1/.

> *YOU ABOUT HOW I WAS CLUBBED ON THE HEAD FROM BEHIND, GLASSES SHATTERING INTO MY SKULL BONE, AND AN OFFICER IN FRONT OF ME YELLED: THAT'S WHAT YOU GET. HAVE YOU EVER WONDERED WHAT IT FEELS LIKE TO PULL GLASS SHARDS OUT OF YOUR OWN HEAD, TO SEE YOUR BEST FRIEND SCREAMING AND SOBBING AND KNOW THERE IS NOTHING YOU COULD DO TO MAKE HER SAFE? HAVE YOU EVER THOUGHT YOUR PARTNER MIGHT BE DEAD? BECAUSE I COULD TELL YOU ABOUT THAT.[198]*

\*\*\*

> *I WAS CAUGHT AT THE UPTOWN AT THE WILSON RED LINE STOP. I WAS ONE OF ABOUT SEVEN OR EIGHT WHITE PEOPLE. THERE WERE ABOUT 40 OR 50 BLACK PEOPLE. THERE WERE ABOUT 150 RIOT COPS. WHEN THE CLOCK STRUCK 9:00, THE RIOT COPS. CHARGED US. THERE WAS NO ORDER OF DISPERSAL. THERE WAS JUST MAYHEM. INSTANTLY. I REMEMBER CROUCHING OVER A 60-YEAR-OLD BLACK MAN WHO THEY WERE KICKING AND BEATING WITH A BATON, MAYBE FOUR OR FIVE COPS AT A TIME BEATING THIS MAN. AND WHEN I WENT OVER BY HIM, THEY HIT ME ON THE BACK OF MY NECK, MY BACK AND MY LEGS, AND THERE WAS ANOTHER BLACK MAN NEXT TO HIM WHO KEPT SAYING, "I DIDN'T DO ANYTHING WRONG. I DIDN'T DO ANYTHING WRONG," OVER AND OVER AGAIN.[199]*

\*\*\*

> *ALSO ON THE 1ST OF JUNE IN HYDE PARK -- I THINK IT WAS THE 1ST OF JUNE -- I ATTENDED A VERY PEACEFUL PROTEST, ORGANIZED BY SOME YOUNG PEOPLE, I AM NOT SURE WHO THEY ACTUALLY WERE. AS THE PROTEST DISPERSED, POLICE BEGAN PUSHING PEOPLE TOWARDS THE LAKE, AND MOST FOLKS HAD THEIR CARS WEST. AND PEOPLE COULDN'T GET BACK TO THEIR CARS. THERE WAS A VERY TENSE STAND OFF WHEN AN OFFICER BRANDISHED A RIFLE AT THE CROWD. EVENTUALLY WE WERE ABLE TO GET THROUGH AND GET TO WHERE OUR CARS WERE PARKED, WHERE SOME PEOPLE WERE COMING OUT LOOTING AN ULTA, WE STOPPED TO GET THEIR NAME AND INFORMATION, YOU KNOW, TO PASS ON TO THEIR FAMILY. AND POLICE BE-GAN PUSHING ME, MY FRIENDS AND MY FAMILY AGAINST THE WALL WITH BATONS. AND THEN HITTING US WITH THE BATONS, WHICH RESULTED IN MY FRIENDS COMING IN TO STAND BE-TWEEN ME AND THE OFFICERS AND MY FAMILY, PARTICULARLY, CHILDREN. THEY WERE BEATEN REPEATEDLY WITH BATONS, LAID ON THE GROUND, JUST COVERING THEMSELVES BEING HIT BY BATONS REPEATEDLY. AT SOME POINT AN OFFICER PUT HIS KNEE ON MY FRIEND'S NECK, THE SAME WAY THAT GEORGE FLOYD WAS KILLED. ANOTHER FRIEND, SHE PROTECTED HIM, SEEING THAT, JUST DOVE ONTO HIS BODY AND TOOK A LOT OF THOSE BATON HITS FOR HIM. AT LEAST FIVE OF MY FRIENDS WERE BADLY BRUISED WITH BATON MARKS AND THEN THROWN IN JAIL FOR THAT THAT DAY. . . . I -- THE HARDEST WAS DURING THE PROTEST IN HYDE PARK. I WAS THROWN TO THE GROUND. MY RIBS WERE CRACKED AND I STOOD IN FRONT OF AN OFFICER WHOSE SLEEVE WAS COVERED IN MY FRIEND'S BLOOD. THIS OFFICER WAS SAYING HOW HE WANTED TO PROTECT ME. HE WANTED TO PROTECT US. WHO STOOD THERE WHILE OTHER OFFICERS BEAT AND BRUTALIZED FOLKS.[200]*

---

[198]  Listening Session, August 20, 2020, 100.
[199]  Listening Session, August 19, 2020, at 51–52.
[200]  Listening Session, August 20, 2020, at 180–2.

## City Data from June 1, 2020

The figures below reflect data that the IMT received from the City regarding June 1, 2020. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence. Nonetheless, the tables demonstrate that the City and the CPD's challenges continued to be significant and widespread.

Review Figure 23. Police Computer Aided Dispatch System (June 1, 2020)

| | |
|---|---|
| **Total Protests** | 14 |
| **Total Districts** | 8 |
| | (002, 003, 008, 011, 018, 019, 020, 024) |
| **Total "Riot"/Looting** | 1,027 (3+1,024) |
| **Total Districts** | (001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 014, 015, 016, 017, 018, 019, 020, 022, 024, 025, 031) |
| **Total** | 1,041 |
| **Total Districts** | 23 |

Review Figure 24.
Daily City-Wide Statistics from the City and the CPD (Monday, June 1, 2020)

| | |
|---|---|
| **Arrests for Disorderly Conduct** | 200 |
| **Arrests for Civil Unrest** | 0 |
| **Arrests for Looting** | 0 |
| **Arrest for firearms** | 51 |
| **Other** | 162 |
| **Total** | 413 |
| **Complaints Filed Against Officers**[201] | 69 |
| **Homicides** | 4 |
| **Shooting Incidents** | 25 |
| **Guns Recovered** | 77 |
| **Officers Injured on Duty (claims)** | 25 |

---

[201] This number reflects the number of complaints that were filed against officers on June 1, 2020, rather than the number of complaints regarding an incident on June 1, 2020. *Compare All Complaint Intake, May 29, 2020 – June 11, 2020*, COPA (June 17, 2020), http://www.chicagocopa.org/wp-content/uploads/2020/06/All-Complaints-Report-5-29-to-6-11-v4.pdf.

## JUNE AND EARLY JULY 2020

In June, Chicago remained on alert, but overall, protests continued, and unrest subsided.[202] The CPD revised its Incident Action Plan on June 2. Some public transportation resumed in the Loop on June 3.[203] Also on June 3, the CPD issued a message to all officers reminding them to enforce the curfew that was still in effect. The Commissioner of Health's Second Amended and Reissued Order (No. 2020-3), which reiterated facets of the Governor's stay-at-home order, expired on June 3.[204] On June 4, the CPD issued two department-wide reminders regarding mass arrest procedures. On June 6, the City announced that it had hired three private security firms for $1.2 million to protect "local retail shops, grocery stores and pharmacies that community members rely on every single day."[205] The citywide curfew was lifted on June 7, 2020. Later that day, Chicago Transit Authority rail and bus service resumed to the downtown area and Lake Shore Drive, I-90/94 and I-290 were open, and all bridges in the Loop were lowered.

Throughout early June, the Mayor's Twitter feed included the City's recovery from the looting and violence, highlighting examples of neighborhood residents cleaning up and encouraging people to support their local businesses as Chicago continued to remove COVID-19 restrictions.

---

[202] *See, e.g.*, Mauricio Peña, *Police Order Little Village Businesses To Close Tuesday*, BLOCK CLUB CHICAGO (June 2, 2020), https://blockclubchicago.org/2020/06/02/police-order-little-village-businesses-to-close-their-doors-tuesday/.

[203] *See* Sun-Times Wire, *CTA Service resumes, bypassing stops in the Loop*, CHICAGO SUN-TIMES (June 3, 2020), https://chicago.suntimes.com/2020/6/3/21278975/cta-service-resumes-bypassing-stops-in-the-loop.

[204] *Order of the Commissioner of Health of the City of Chicago No. 2020-3 – Second Amended and Reissued (Applying Governor's Stay-at-Home Executive Order)*, CHICAGO DEPARTMENT OF PUBLIC HEALTH (May 29, 2020), https://www.chicago.gov/content/dam/city/depts/cdph/HealthProtectionandResponse/CDPH%20Order%202020-3%20-%20Lakefront%20closure%20SECOND%20AMENDED%20AND%20RE-ISSUED%20v3.pdf.

[205] Gregory Pratt, *In wake of looting, Chicago to spend $1.2 million on private security firms to help protect businesses*, CHICAGO TRIBUNE (June 6, 2020), https://www.chicagotribune.com/news/breaking/ct-chicago-hires-private-security-firms-20200606-6d75fp7srzaz3hiltdnaqrko6u-story.html.

Review Figure 25. Mayor Tweets (June 2, 2020)



**Mayor Lori E. Lightfoot** ✔ @chicagosmayor · Jun 2, 2020                 •••

The men and women of the Dept. of Streets and Sanitation are working around the clock to clean up damage in communities around Chicago, like right here in East Garfield Park. Thanks to the City workers and many volunteers who continue to step up to serve our neighborhoods.





**Mayor Lori Lightfoot** ✔ @chicagosmayor · Jun 2, 2020                 •••

I'm seeing the power of neighborly love across our city. This Roseland group who helped pick up debris in their neighborhood is the embodiment of these values.



  💬 103    🔁 106    ♡ 830    ▽        ⬆



**Mayor Lori Lightfoot** ✔ @chicagosmayor · Jun 2, 2020                 •••

After meeting with small businesses and community leaders hardest hit, it's more clear than ever that we must continue as planned the cautious reopening of our city tomorrow.

Later in June, the CPD spent time reviewing what happened in May. On June 16, 2020, the CPD held an "After Action Review" meeting at McCormick Place, near entry Gate 41, from 8:00 AM to 12:30 PM. The email invitation read, "Tomorrow, we will conduct our civil unrest after action review for exempt staff." The CPD also prepared for meetings with the Mayor, holding an internal meeting entitled "Prep for Mayor's Meeting" on June 22, 2020, from 4:30 PM to 5:30 PM. Some CPD leadership also attended an "FBI Briefing" on June 30, 2020, addressing "Cases being worked which resulted from recent civil unrest and progress, IE Arsons, pharmacy, burglaries, bank burglaries, felons in possession, etc."

As reflected in Appendix C below, many protests continued throughout June 2020.

## Community Experiences and Reflections from June 2020

The quotes and summaries below are samples of experiences from community members regarding unspecified dates in June 2020.

> *I WAS ALSO REALLY SURPRISED AT THE RELATIVELY FEW POLICE WHO WORE MASKS, ESPECIALLY GIVEN JUST THE DEGREE TO WHICH WE, OUR CITY AND OUR STATE, ARE SUFFERING FROM THE PANDEMIC. I WAS PLEASANTLY SURPRISED THAT I ALMOST NEVER SAW PROTESTERS WITHOUT MASKS. I WAS VERY DISAPPOINTED THAT I, IN THE FIRST WEEK OR SO OF THE PROTESTS, I ALMOST NEVER SAW POLICE MASKS. AS THEY CONTINUED, I DID SEE SOME WITH MASKS, BUT I WOULD ESTIMATE MAYBE 10 PERCENT OF POLICE WHO WERE WEARING MASKS. AND THESE ARE FROM PEOPLE WHO ARE SUPPOSED TO BE KEEPING US SAFE AND THEY WERE PUTTING OUR HEALTH AT RISK.[206]*

\*\*\*

> *. . . .MOST OF THE TIME THAT I WAS INVOLVED IN THE PROTESTS, I PERSONALLY DID NOT FEEL UNSAFE. THE TIMES THAT I FELT MOST UNSAFE WERE THE TIMES I WAS AROUND THE POLICE. WHEN I WAS AROUND POLICE WEARING RIOT GEAR, WHEN I WAS AROUND POLICE WHO HAD HELMETS ON, FACE SHIELDS DOWN, THAT WAS WHEN, TO ME PERSONALLY, THE PROTESTS FELT MOST UNSAFE. I NEVER FELT UNSAFE AROUND ANY OF THE OTHER PROTESTERS, BUT WHEN THERE WAS THIS MILITARIZED RESPONSE FROM THE POLICE, I FELT LIKE ANYTHING BAD COULD HAPPEN AT ANY PARTICULAR MOMENT AND IT WAS REALLY NERVE WRACKING.[207]*

## City Data from June 2020

The figures below reflect data that the IMT received from the City for June 2 and June 3. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview

---

[206] Listening Sessions, August 19, 2020, at 33.
[207] *Id.* at 33–34.

evidence. Nonetheless, the tables demonstrate that the City and the CPD's challenges continued to be significant and widespread.

### Review Figure 26. Police Computer Aided Dispatch System (June 2, 2020)

| | |
|---|---|
| **Total Protests** | 0 |
| **Total Districts** | 0 |
| | |
| **Total "Riot"/Looting** | 262 |
| **Total Districts** | 22 |
| | (001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 014, 015, 016, 017, 018, 019, 020, 022, 024, 025) |
| | |
| **Total** | 262 |
| **Total Districts** | 22 |

### Review Figure 27.
### Daily City-Wide Statistics from the City and the CPD
### (Tuesday, June 2, 2020, and Wednesday, June 3, 2020)

| | Tuesday, June 2, 2020 | Wednesday, June 3, 2020 |
|---|---|---|
| **Arrests for Disorderly Conduct** | 67 | 11 |
| **Arrests for Civil Unrest** | 0 | 0 |
| **Arrests for Looting** | 0 | 0 |
| **Arrest for firearms** | 53 | 40 |
| **Other** | 123 | 104 |
| **Total** | 253 | 155 |
| | | |
| **Complaints Filed Against Officers**[208] | 69 | 67 |
| | | |
| **Homicides** | 2 | 2 |
| **Shooting Incidents** | 24 | 13 |
| **Guns Recovered** | 85 | 48 |
| **Officers Injured on Duty (claims)** | 12 | 10 |

---

[208] This number reflects the number of complaints that were filed against officers on June 2 and 3, 2020, rather than the number of complaints regarding an incident on June 2 and 3, 2020. *Compare All Complaint Intake, May 29, 2020 – June 11, 2020*, COPA (June 17, 2020), http://www.chicagocopa.org/wp-content/uploads/2020/06/All-Complaints-Report-5-29-to-6-11-v4.pdf.

## FRIDAY, JULY 17, 2020 (12:00 AM TO 11:59 PM)

Protests continued in Chicago in July 2020.[209] Notably, on July 17, 2020, the CPIC anticipated a protest at 5:00 PM at Buckingham Fountain (301 S Columbus Drive, Chicago, IL 60605).

A large group of protesters began gathering at Buckingham Fountain around 4:00 PM, although social-media posts indicate that the protest was supposed to begin at 5:00 PM. While at Buckingham Fountain, there were dance performances, musical performances, and speeches. At about 6:15 PM, protesters began to move south toward Grant Park and the Columbus Statue. It appeared as though different groups met up at the Columbus statue, combining into one large group. One social media post indicated that police were already positioned at the statue, though at some point, people surrounded the statue without CPD intervention.

People continued to surround the statue. Some people in the crowd began spray painting the statue and attempting to pull the statue down using ropes. Officers began their push toward the statue and used OC spray on people in the crowd, causing the people to retreat and allowing CPD officers to gain control over the statue. While around the statue and officers, some people began chanting at police, and others threw water bottles, fireworks, and other projectiles at officers. Additional officers arrived and grabbed people's bikes. Some officers used additional uses of force, including OC spray and baton impact strikes. People in the crowd began to disperse. Multiple social-media posts indicated that some officers taunted people as they dispersed. One social-media post, for example, commented on officers spitting on community members as they left. At about 8:30 PM, social-media posts indicated that things had calmed down.

The skirmish at the Columbus statue in Grant Park resulted in about a dozen arrests and serious injuries to both people in the crowd and CPD officers. By the end of the evening, about 18 officers were injured, many protesters were injured, and five people were treated at area hospitals.[210]

---

[209] *See* Chris Hush, *Marches, Protests Take Place Throughout Chicago on Fourth of July*, NBC CHICAGO (July 4, 2020), https://www.nbcchicago.com/news/local/hundreds-take-to-streets-of-chicago-for-protests-on-fourth-of-july/2299873/.

[210] Alice Yin, *Grant Park prompts standoff with police, arrests and rebuke of mayor*, CHICAGO TRIBUNE (July 18, 2020), https://www.chicagotribune.com/news/breaking/ct-chicago-police-christopher-columbus-protest-20200718-ea62bmy6ujgh7cbeofrpwbakse-story.html. *See also* Mitchell Armentrout, *Activists, officials slam Chicago police for alleged brutality in Columbus statue standoff*, CHICAGO SUN-TIMES (July 18, 2020), https://chicago.suntimes.com/2020/7/18/21329669/chicago-columbus-statue-protest-miracle-boyd-police-officer-punch-activist.

The following day, hundreds of people gathered near Mayor Lightfoot's home to protest how the police handled the demonstration in Grant Park.[211]

## Community Experiences and Reflections from July 17, 2020

The quotes and summaries below are samples of experiences from community members regarding events on Sunday, May 31, 2020.

> *AND ON JULY 17TH DURING THE COLUMBUS STATUE PROTEST, I WAS ESPECIALLY SURPRISED WHEN I WAS BEATEN BY THE CHICAGO POLICE WITHOUT ORDERS TO DISPERSE, WITHOUT A WARNING, AND WITHOUT A ROUTE TO DISPERSE INTO. I WAS STANDING WITH OTHER BIKE SECURITY VOLUNTEERS FORMING A BARRIER BETWEEN A PIECE OF PROPERTY AND THE PEOPLE THEY ARE SWORN TO. PROTECT.[212]*

\*\*\*

> *THEN THE COP WHO HAD JUST SHOVED ME TO THE GROUND FORCIBLY PULLED ME UP. HE GRABBED MY LEFT BICEP AND FORCEFULLY PULLED ME TO MY FEET. I TURNED TO GET MY BEARINGS AND PUT MY HANDS IN THE AIR. WHEN ANOTHER OFFICER IN A DARK UNIFORM ABOUT 20 FEET FROM ME SPRAYED A RUST-COLORED LIQUID AT THE RIGHT SIDE OF MY FACE, BURNING BOTH MY EYES, MY CHEEK, AND MOST NOTABLY THE INSIDE OF MY EAR, WHICH WAS VERY, VERY PAINFUL. I TURNED AWAY AND STARTED WALKING UP THE HILL WITH A WET MASK COVERING MY MOUTH AND MY NOSE AND PEPPER SPRAY IN MY EYES. I WAS DISORIENTED AND TRYING TO FEND OFF THE PANIC, TRYING TO BREATHE. I WAS HEADED TO THE STREET AWAY FROM THE STATUE WHEN I REALIZED I WAS ABOUT 10 FEET AWAY FROM ANOTHER POLICE OFFICER. AND HE WAS STANDING AT THE TOP OF A HILL YELLING RIGHT AT ME. MOSTLY BLINDED, PARTIALLY DEAF, AND STRUGGLING TO BREATHE, IT WAS TOO LATE WHEN I REALIZED THE COP WAS TELLING ME TO BACK UP, AND HE PUSHED ME HARD IN THE CHEST. I WAS VERY CONFUSED BECAUSE WASN'T THE POINT OF MACING ME TO GET ME TO LEAVE?[213]*

\*\*\*

> *ON THAT DAY, CPD DID WHAT IT DOES BEST. THEY PROTECTED PROPERTY OVER PEOPLE. CPD BEAT AND BRUTALIZED BLACK, BROWN, AND INDIGENOUS BODIES IN ORDER TO PROTECT A STATUE OF A RAPIST, A TYRANT, A MASS MURDERER. THAT'S WHAT CPD PROTECTED. CPD DOES NOT AND DO NOT PROTECT THE PEOPLE OF CHICAGO. THE PEOPLE OF CHICAGO HAVE TO PROTECT THEMSELVES FROM CPD. CPD ALREADY HAD RECLAIMED GROUND BY THE STATUE WHEN THEY FURTHER TERRORIZED PROTESTERS. I WAS FORCED TO WATCH A FELLOW PROTESTER, A FRIEND, BE BEATEN RIGHT IN FRONT OF ME. HIS HANDS WERE IN THE AIR. HE WASN'T RESISTING. CPD STILL BEAT HIM. THEY LEFT BRUISES ON HIS BACK. HIS KNEE WAS SO BLOODY, THE BLOOD SOAKED THROUGH HIS PANT LEG. THEN THEY ADVANCED. AN OFFICER DUG HIS BATON INTO MY CHEST, IGNORING MY CRIES THAT HE WAS TOUCHING MY CHEST, HE WAS TOUCHING MY BREAST. HIS SOLUTION FOR THAT WAS TO SHOVE HIS BATON AGAINST MY GUT BEFORE PROCEEDING TO SHOVE IT INTO MY CHEST ONCE AGAIN. I FELT HIS FIST PUSH INTO MY BREASTS; I FELT HIS BATON PRESS INTO MY BREASTS. THEN THEY HOSED US DOWN WITH PEPPER SPRAY AS IF WE WERE RABID DOGS, WHEN IN FACT THEY WERE. CPD PEPPER SPRAYED*

---

[211] *Id.*

[212] Listening Session, August 19, 2020, at 57.

[213] *Id.* at 61.

> *PROTESTERS, MEDICS, LEGAL OBSERVERS DURING A PANDEMIC THAT TARGETS (INAUDIBLE). OFFICERS WEREN'T EVEN WEARING MASKS. I AM 22 YEARS OLD AND I NOW KNOW THE SHAPE AND COLOR OF A POLICE CAN OF PEPPER SPRAY. AN OFFICER SPRAYED US FROM 3 FEET IN FRONT OF US. WE WERE CHOKING ON THE POISON IN THE AIR. PEOPLE WERE WRITHING IN THE PAIN. I COULDN'T HELP THEM. CPD REFUSED TO LET US HELP THEM. WE WERE TRIPPING OVER EACH OTHER AND OURSELVES. TRYING TO GET AWAY FROM THEM.[214]*

<div align="center">✳✳✳</div>

> *WHILE WATCHING POLICE FLOOD THE GREEN LEADING UP TO THE STATUE, WITH NO AUDIBLE CALL FOR DISPERSAL, AND NO OPPORTUNITY TO DO SO, UNPROTECTED CHICAGOANS WERE MET WITH A SEA OF SWINGING BATONS. SCREAMS OF HELP CAME FROM THE CROWD. PEOPLE WERE CLIMBING ON TOP OF EACH OTHER TRYING TO FIND A WAY OUT. SOMEONE, PULLED OUT BY PROTESTERS, BLEEDING FROM THEIR HEAD SO BADLY THAT THEY COULD NOT STAND. THEY WERE COVERED IN BLOOD. I SAW ORANGE MACE STREAMING UP FROM THE CROWD LIKE FOUNTAINS. MY HUSBAND AND I RAN TO THE CONCRETE BARRIER ON THE SOUTH SIDE OF THE STATUE. WE WERE ASSISTING INJURED PEOPLE TRYING TO DISPERSE. MY HUSBAND ATTENDED TO ONE PERSON WHO WAS MACED SO BADLY THEY COULD NOT WALK OR SEE. HE PUT HIM ON HIS BACK AND CARRIED HIM TO SAFETY AWAY FROM POLICE. THERE WAS AN OFFICER APPROX-IMATELY TWO FEET IN FRONT OF ME WEARING NO PROTECTIVE MASK. I SAID: I AM JUST TRYING TO GET PEOPLE OUT OF HERE SAFELY. HE SAID NOTHING AND MACED ME DIRECTLY IN MY FACE. I COULD FEEL THE MACE SOAKING THE FRONT OF MY BODY COMPLETELY. HE THEN BEAT ME REPEATEDLY WITH HIS BATON, HITTING IT ON MY LEFT ARM AND BACK MULTIPLE TIMES WITH ENOUGH FORCE TO DRAW BLOOD. THE OFFICER THEN MACED ME AGAIN ON THE LEFT SIDE OF MY FACE, SOAKING THE SIDE OF MY BODY.[215]*

<div align="center">✳✳✳</div>

> *I WAS AT THE PROTEST IN GRANT PARK ON JULY 17TH, WHERE I SAW CPD'S BRUTALITY FIRSTHAND. LIKE MANY OTHERS HAVE SAID, I SAW THEM HIT A PROTESTER IN THE HEAD, AND I SAW THE BLOOD RUNNING DOWN HIS FACE FROM HIS TEMPLE. I SAW THEM SPRAYING PRO-TESTERS WITHOUT WARNING WITH AN UNKNOWN SUBSTANCE FROM HOSES, AND IMMEDI-ATELY AFTER, EVERYONE IN THE VICINITY WAS COUGHING AND CRYING AND THROWING UP. AND THIS IS ALL DURING AN AIRBORNE RESPIRATORY PANDEMIC. I SAW THEM PUSH DOWN INDIVIDUAL PROTESTERS AND RIP THEIR BIKES OUT OF THEIR HANDS. I SAW THEM BEAT PEOPLE WHO WERE TRYING TO RUN AWAY FROM THEM. EVEN WHEN THEY WERE LOOKING RIGHT AT PEOPLE IN CLEAR NEED OF MEDICAL ASSISTANCE, CPD OFFERED NONE.[216]*

<div align="center">✳✳✳</div>

> *ON JULY 17TH, I WITNESSED CPD PEPPER SPRAY AN ADULT EDUCATOR CONTINUOUSLY UNTIL SHE BEGAN TO GO INTO SHOCK. MOMENTS LATER, OFFICERS LAUGHED AS THEY PEPPER SPRAYED ME AT ONE-FOOT RANGE, STOLE MY BIKE, BEAT ME TO THE GROUND AND HIT ME REPEATEDLY IN THE FACE AND BODY.[217]*

---

[214] *Id.* at 65–66.
[215] Listening Session, August 20, 2020, at 132.
[216] *Id.* at 137–38.
[217] *Id.* at 140.

\*\*\*

> I WAS ALSO THERE ON THE 17TH, WHERE MY SON WAS PEPPER SPRAYED BADLY. MY NEPHEW HAD HIS TOOTH BROKEN BY COP WITH A BATON. THERE WAS NO OPPORTUNITY FOR FOLKS TO DISPERSE. THE ORDERS TO DISPERSE OVER THESE PAST TWO PROTESTS, I'VE WITNESSED OFFICERS DOING NOTHING TO PROTECT AND SERVE, BUT TO BRUTALIZE, AND WHO SEEMED TO, AS I HEARD ANOTHER PERSON TESTIFY TODAY, TO SMILE, SEEMED TO ENJOY BRUTALIZING CHICAGOANS.[218]

\*\*\*

> AT GRANT PARK, POLICE BRUTALIZED OUR CROWD OF PROTESTERS. I WAS PERSONALLY PEPPER SPRAYED AND TEAR GASSED. THE BURNING CONTINUED FOR HOURS ALL OVER MY BODY. OVER AND OVER I COULD SEE CHICAGOANS WHO COULD NOT SEE, WHO COULD NOT BREATHE. I COULDN'T SPRAY WATER INTO PEOPLE'S EYES FAST ENOUGH TO SOOTHE THE BURNING, AND EVERYWHERE I LOOKED, PEOPLE WERE CALLING FOR MEDICS. AT THE FRONT OF MY LINE WERE PEOPLE WITH BIKES. COPS STOLE THE BIKES AND THREW THESE BIKES TO THE GROUND AND WERE PURPOSELY BREAKING THEM. AS I LEFT, I SAW PILES OF BIKES TWISTED AND STOLEN, WHICH TOOK AWAY PEOPLE'S PRIMARY FORM OF TRANSPORTATION, ONLY BECAUSE THEY WERE USED TO PROTECT US FROM THE VIOLENCE WE KNEW THE POLICE WERE ABOUT TO BRING UPON US IF THEY GOT THROUGH THE LINE OF BIKES. AND WE WERE CORRECT. THE POLICE PEPPER SPRAYED US, TEAR GASSED US, AND BEAT US WITH BATONS. THEY POINTED TO PEOPLE IN THE CROWD. I SAW OUR PROTECTIVE LINE, AND THEY WERE MARKING THEIR PERCEIVED LEADERS TO LATER TARGET FOR VIOLENCE OR ARREST. I SAW ONE MEDIC -- AND AT EVERY PROTEST MEDICS ARE CLEARLY MARKED AS SUCH -- WITH BLOOD STREAMING FROM THEIR HEAD DUE TO A BATON STRIKE. I ALSO SAW AT LEAST ONE OTHER INDIVIDUAL WITH BLOOD STREAMING FROM THEIR HEAD. . . . THEY BEAT PEOPLE WHO TRIPPED AS THEY WERE WALKING UP THE HILL. THEY BEAT PEOPLE AS THEY WERE TRYING TO STEP BACKWARD OVER A STONE WALL. AND, AGAIN, WE WERE RETREATING. WE WERE LEAVING THE PARK AND THIS WAS NOT ENOUGH FOR THE POLICE. THEY WERE INFLICTING PURPOSEFUL, UNNECESSARY VIOLENCE AGAINST INJURED PROTESTERS. THIS WAS NOT IN THE INTEREST OF ANYONE'S SAFETY. THIS WAS IN THE INTEREST OF A STATUE ON PUBLIC LAND, IN FACT ON UNCEDED NATIVE AMERICAN LAND, WHICH WE HAD EVERY CONSTITUTIONAL RIGHT TO PROTEST.[219]

\*\*\*

> EVEN AS PROTESTERS TRIED TO DISPERSE, CPD KEPT ON HITTING WITH BATONS. THE MAJORITY OF THE FACES I SAW WITH BLOODY HEADS WERE BLACK. AS WE RAN AWAY, WE WERE GASSED, WHICH MADE IT HARD TO BREATHE. I CHOKED ON THICK CHEMICALS THAT WERE BURNING IN MY EYES. MOMENTS LATER THEY BEGAN TO AGGRESSIVELY SPRAY EVERYONE IN THE FACE WITH MACE IN FRONT OF ME, INCLUDING ONE OF MY CLOSE FRIENDS. A MIXTURE OF MACE AND TEAR GAS MADE IT INCREASINGLY DIFFICULT TO BREATHE AND SEE, AND I WITNESSED THEM STEAL PROTEST MARSHALS' BIKES AND THROW THEM AT YOUTH ACTIVISTS.[220]

\*\*\*

---

> I WON'T FORGET THE FRENZIED STARE-DOWN AS A WHITE SHIRT PULLED A KNIFE OUT TO SLASH BIKE TIRES AND HIS CLEAR FRUSTRATION THAT PROTESTERS WERE THE ONES WHO HAD TO DE-ESCALATE THE SITUATION. I WON'T FORGET THE TINGE OF REGRET IN THEIR EYES AS THEY RE-ALIZED HOW MUCH SPRAY THEY DEPLOYED, CHOKING ON SPRAY ONLY TO LOOK AND SEE HOW MUCH THEY MADE US SUFFER, AND BANNED BY THE GENEVA CONVENTION. WE WEREN'T PREPARED. LAUGHING THROUGH THEIR COUGHS. . . . I HAVE A HARD TIME SLEEPING. I HAVE A HARD TIME WORKING AND FOCUSING. I KEEP THINKING BACK TO THEIR LOOKS OF ABSOLUTE VITRIOL, THE SEARING GAS ON MY SKIN. THEY DON'T SEE AS HUMAN MUCH LESS AS SOMEONE TO PROTECT. OR SERVE. MY MOUTH AND THROAT WERE FULL OF ULCERS, WORRYING THAT THEY WILL KILL AND LIE THE SAME WAY THEY DID FROM FRED HAMPTON TO LAQUAN MCDON-ALD. AT LEAST RAHM COULD ACKNOWLEDGE, AFTER YEARS OF PUSHING, HOW RACIST CPD IS.[221]

\*\*\*

> THESE GUYS WANTED VIOLENCE AND THEY WANTED BLOOD AND THEY GOT THAT PRETTY SOON. YOU CAN SEE THE SCAR ON MY HEAD. THIS IS THE SCAR THAT I GOT FROM A BATON TO THE HEAD FROM THE CPD. IT WAS THE SAME GUY WHO GRABBED ME BY THE NECK. AND I GUESS HE HAD SOMETHING TO PROVE. WHEN I GOT HIT BY THE BATON. IN THE HEAD, I COULDN'T SEE ANYTHING. BLOOD COVERED MY EYES AND FACE. I WAS RUSHED BACK BY UN-KNOWN PEOPLE, HELPED BY STRANGERS, AND MY HEAD GOT WRAPPED. I THEN GOT BACK TO MY TRUCK AND DROVE ALL OF THE WAY TO WISCONSIN. THIS KIND OF VIOLENCE IS INSANE BECAUSE IT IS HAPPENING TO GOOD CITIZENS.[222]

\*\*\*

> AS THEY JUMPED OVER THE BARRICADE, THEY JUST STARTED INDISCRIMINATELY BEATING PEO-PLE. MY EIGHT-YEAR-OLD NIECE GOT PEPPER SPRAYED. THEY WATCHED POLICE JUST START PUNCHING PEOPLE IN THE FACE. WE ALL WATCHED THEM JUST PUNCHING PEOPLE IN THE FACE FOR NO REASON, JUST FOR BEING THERE, FOR PRACTICING THEIR RIGHTS. WE STAYED JUST A LITTLE WHILE LONGER BECAUSE WE COULDN'T GET OUT BECAUSE THE POLICE WERE FORCING US BACK AND PEPPER SPRAYING PEOPLE AS THEY WERE TRYING TO ESCAPE. MY NIECE HAS HAD A HARD TIME SLEEPING. THEY ARE SEVERELY TRAUMATIZED. THEY CRY EVERY TIME THEY SEE A COP NOW. I DIDN'T THINK THAT OUR -- IT WAS A NICE RALLY. IT WAS A GOOD TIME AND THEN THE POLICE VIOLENCE JUST REALLY MADE THAT A HARD THING.[223]

\*\*\*

> [W]HILE IN THE FRONT LINES, I GOT HIT IN THE HEAD WITH A BATON WHEN I WAS TRYING TO GET A POLICE OFFICER TO STOP HITTING SOMEBODY ON THE GROUND. A NUMBER OF POLICE OFFICERS WERE DRAGGING ANOTHER PERSON BY THEIR HAIR. THEIR HAIR WAS GETTING RIPPED OUT.[224]

\*\*\*

---

[221] *Id.* at 35.
[222] *Id.* at 38.
[223] *Id.* at 42.
[224] *Id.* at 54–55.

> *AND IN THE MIDDLE OF THIS CHAOS CAUSED BY THE POLICE I SAW THAT, DESPITE ME GETTING INJURIES AND FEELING ALMOST, LIKE, ALMOST BREAKING DOWN AFTER ALL THE STRAIN OF, I DON'T KNOW WHAT, THERE WERE MOMENTS WHERE THE POLICE DIDN'T EVEN TRY TO ATTACK ME BECAUSE THEY SAW ME AS A SMALL WHITE WOMAN. THEY ATTACKED MEN. THEY ATTACKED MEN OF COLOR. THEY ATTACKED BLACK MEN. THEY ATTACKED WHITE PEOPLE TOO, BUT YOU COULD SEE THE BIAS IN ACTION WHEN I WAS THERE IN THE FRONT LINES AND I WAS SELECTIVELY SEEN.[225]*

\*\*\*

> *DURING A BLACK INDIGENOUS SOLIDARITY RALLY, I WITNESSED A CPD OFFICER GRAB A WOMAN'S BIKE AND PULL IT AWAY FROM HER. AS HE PULLED IT, SHE FELL TO THE GROUND, AND HE STARTED PEPPER SPRAYING HER AS SHE LAID ON THE GROUND. I RAN OVER TO HELP HER -- HELP PULL HER UP AND PULL HER AWAY FROM THE ATTACK, AND WHEN I GOT TO HER, HE STARTED SPRAYING ME TOO. I TURNED TO RUN, AND AS I WAS RUNNING AWAY FROM HIM, I FELT HIS BATON CRACK DOWN ON MY HEAD. SO TO BE CLEAR, AFTER HE FINISHED PEPPER SPRAYING THE WOMAN WHO WAS LAYING ON THE GROUND, HE HIT ME OVER THE HEAD AS I WAS RUNNING AWAY FROM HIM. RIGHT AWAY I LOST THE ABILITY TO HEAR ANYTHING. I LOST MY BALANCE. MY HEAD STARTED BLEEDING PROFUSELY. MY CLOTHES WERE IMMEDIATELY SOAKED IN BLOOD. . . . EVENTUALLY I WAS TOLD THAT I HAD BEEN WRONGFULLY DETAINED, AND I WAS FREE TO GO. AND I IMMEDIATELY WENT TO THE HOSPITAL TO GET STAPLES IN MY HEAD FROM THE BATON INJURY.[226]*

\*\*\*

> *THINGS BROKE INTO CHAOS AS SOON AS THE PEOPLE IN BROWN UNIFORMS CAME. I HEARD NO ORDER OF DISPERSAL, AND THERE WAS NO WARNING OF GAS. THEY SPRAYED A BROWN CHEM-ICAL AGENT IN THE AIR AND OUR LINE BROKE. PEOPLE STARTED RUNNING, (UNINTELLIGIBLE) ASSISTING THEM. THE POLICE GAVE NO EXIT PLAN. INSTEAD, THEY CAUSED CHAOS. I WATCHED OFFICERS BEAT PEOPLE WITH BATONS UNTIL THEY LET GO OF THEIR BIKES AND THE POLICE TOOK THEM AWAY. NONE OF THE BIKES WERE ABANDONED WILLINGLY. . . . NOTHING THE POLICE ENDURED MATCHED WHAT THEY UNLEASHED. IT WAS WILDLY UNJUST, AND I HOPE THE COURT TAKES THAT INTO ACCOUNT.[227]*

\*\*\*

> *WHEN THE PROTESTERS ATTEMPTED TO PASS THE STATUE, CPD TOOK BATONS AND BEGAN BEATING DOZENS OF PROTESTERS ATTEMPTING TO PASS THE STATUE. THEY THEN BEGAN TO THROW BICYCLES AT PROTESTERS AND STEAL THE BICYCLES OF SAFETY MARSHALS. I SAW DOZ-ENS OF PROTESTERS, MAINLY BLACK, WITH BLOODY FACE INJURIES FLEEING FROM THE STATUE. AS THIS HAPPENED, CHEMICALS BEGAN TO FILL THE AIR, MAKING MY EYES WATER AND MY LUNGS IRRITATED. WE WERE FORCED TO RUN BACKWARDS UP THE HILL AND THEN BACK DOWN TO THE MAIN STREET. AS WE STARTED WALKING BACK TO THE FOUNTAIN, CPD WAS LINED ON EITHER SIDE OF THE ROAD. I WAS ALSO INFORMED THAT MY FRIEND, WHO ALSO ATTENDED THE PROTEST, WAS SEVERELY MACED AFTER HAVING A BICYCLE THROWN AT HER FACE.[228]*

---

[225] *Id.* at 104.
[226] *Id.* at 105–06.
[227] Listening Session, August 20, 2020, at 109–10.
[228] *Id.* at 111–12.

***

> *THE POLICE -- YOU COULD TELL HE WAS HIGH ON ADRENALINE, SO I KNEW THAT IF I TOUCHED HIS HANDS, THAT WOULD BE, FOR SOME WAY IT WOULD BE AN ACT OF VIOLENCE ON MY END. SO TO STOP THE PUNCHING, I THREW MY BODY OVER HIS FACE -- WELL, OVER THE PERSON ON THE FLOOR'S FACE. I EXPECTED THE BLOWS ON MY BACK, BUT THEN THE POLICE OFFICER'S PARTNER CAME FROM THE OTHER SIDE AND WHACKED ME IN THE HEAD WITH A -- I WISH IT WAS A BATON, IT WAS A POLE HE FOUND ON THE FLOOR. AND THEN I LOOKED UP AND THAT SAME POLICE OFFICER WAS WHACKING PEOPLE JUST WITH THAT POLE HE FOUND ON THE FLOOR. IT WAS LIKE FROM -- IT WAS FROM A SIGN.[229]*

***

> *AGAIN, LIKE I MENTIONED, I HAVE MY CAMERA ON ME WHENEVER I GO TO PROTESTS, AND I WAS ABLE TO DOCUMENT ALL OF THESE THINGS THAT OCCURRED. I WAS ABLE TO SEE THAT THE POLICE WERE ATTACKING OTHER PEOPLE. THEY WERE ATTACKING MY FRIENDS. I SAW POLICE TEARGASSING OTHER PEOPLE IN THEIR FACE, NOT EVEN TWO FEET AWAY FROM THEM. AS I WAS DOCUMENTING, I HAD POLICE COME AND KETTLE AROUND US. THERE WAS A POLICE OFFICER THAT WHIPPED OUT THEIR BATON AND STARTED YELLING, "GET BACK BEFORE I BEAT THE FUCK OUT OF YOU."[230]*

***

> *WITHOUT WARNING, A POLICE OFFICER SHOVED ME TO THE GROUND AND BEAT ME REPEAT-EDLY ON MY BACK AND RIBS WITH A BATON. I TUCKED MY HEAD BENEATH MY ARMS AND DIDN'T FIGHT BACK. I DON'T REMEMBER MUCH FROM THIS MOMENT BECAUSE ALL I COULD FEEL WAS BLINDING PAIN FROM BEING HIT OVER AND OVER WITH A BATON. AFTER SOME TIME, OTHERS HELPED SEPARATE ME FROM THE OFFICERS. POLICE CONTINUED TO BEAT AND GAS OTHER PEO-PLE. MANY PEOPLE, INCLUDING MANY YOUNG PEOPLE, WERE SCREAMING OUT FOR MEDICAL ATTENTION, BUT POLICE DID NOTHING TO HELP THEM.[231]*

***

> *IT WAS REPORTED BY CPD AND MEDIA THAT CIVILIANS WERE USING BROKEN-OFF PARTS OF BANNERS AS WEAPONS. THE ONLY PEOPLE I SAW DO THIS WERE POLICE OFFICERS. I SAW AN OFFICER PICK UP A PIECE OF PVC PIPE AND SWING IT AT A LINE OF PEOPLE WITH INTERLINKED ARMS, WHILE THESE PEOPLE BACKED AWAY FROM THE THREATENING OFFICER. THE OFFICER THEN THREW THE PIPE AT THE LEGS OF THESE RETREATING PEOPLE.[232]*

***

> *I WITNESSED PEOPLE SCREAMING AND CRYING WITH SWOLLEN APPENDAGES, CRACKED SKULLS, BLOOD STREAMING DOWN THEIR FACES AND ACCUMULATING ALL THEIR CLOTHES. THERE WAS*

---

[229] *Id.* at 114.
[230] *Id.* at 117.
[231] *Id.* at 122.
[232] *Id.* at 127–28.

*COUGHING AND VOMITING FROM THE CHEMICALS RELEASED IN THE AREA, AND I WAS DUMB-FOUNDED BY THE LEVEL OF FORCE EXHIBITED AGAINST THE PEOPLE THE POLICE CLAIM TO SERVE AND PROTECT.[233]*

\*\*\*

*IMMEDIATELY I HEARD SCREAMING AND CALLS FOR HELP AS POLICE IN RIOT GEAR WITH BATONS SURGED TOWARDS THE STATUE. I WALKED MY BIKE TO A LINE OF BIKE MARSHALS STANDING, UNMOVING, NOT GIVEN OFFICIAL CALLS TO DISPERSE. WE WERE TRYING TO SLOW A GROUP OF POLICE ABOUT TO BEAT PROTESTERS. I WAS TARGETED BY A WHITE-SHIRT OFFICER ABOUT TWICE MY SIZE. HE WAS UN-GLOVED, UNMASKED, AND HE PICKED ME UP BY THE THROAT, LIFTED ME OFF THE GROUND AND THREW ME. I WAS CHOKE-SLAMMED BY A POLICE OFFICER ACTING LOOK A PROFESSIONAL WRESTLER FIGHTING TO THE AUDIENCE.[234]*

\*\*\*

*I WATCHED MULTIPLE INDIVIDUALS GET BEAT WITH BATONS DIRECTLY TO THEIR HEAD, FACE, CHEST, ARMS, NEARLY EVERYWHERE ON THEIR BODY FOR NEARLY STANDING IN THE MIDDLE OF THE COMMOTION. I WATCHED PEOPLE I LOVE GET THAT, HAPPEN TO THEM TOO. NONE OF THE PROTESTERS I SAW WERE FIGHTING THE OFFICERS, EVEN WHILE THEY WERE BEING BEATEN AND PROVOKED. I COULD NOT COUNT THE NUMBER OF PROTESTERS AFFECTED BY THE CHEMICAL WEAPON SPRAYED THAT EVENING. I ALSO WAS AFFECTED BY THE SPRAYS THEY WERE USING. IT FELT LIKE SHARP AND STINGING OBJECTS WERE STUCK IN MY THROAT, AND I COUGHED SO HARD I ALMOST VOMITED. THIS HAPPENED TO ME MULTIPLE TIMES THAT NIGHT. I SAW PROTESTERS HAVING ASTHMA AND PANIC ATTACKS FROM THE SPRAY, IN ADDITION TO THE DEBILITATING IN-JURIES FROM BEING BEATEN WITH BATONS, BIKES, AND EVEN PVC PIPES.[235]*

\*\*\*

*AFTER ABOUT 20 MINUTES, SUDDENLY MULTIPLE VANS PULLED UP RIGHT BEHIND THE OFFIC-ERS. DOZENS MORE COPS IN FULL RIOT GEAR CAME OUT, INCLUDING A COUPLE IN WHITE SHIRTS. WITHIN A MINUTE OF ARRIVING, THEY BEGAN DISTRIBUTING CANS OF PEPPER SPRAY. SOME OF THEM (UNINTELLIGIBLE) ALL THE CANNISTERS AND YELLED OUT A WARNING. WE STARTED CHANTING: DON'T DO IT. DON'T DO IT. THOSE WERE THE LAST WORDS OUT OF MY MOUTH BEFORE MY FRIENDS AND I WERE ASSAULTED BY CPD. THEY GAVE US NO WARNING WHATSOEVER. THEY DIDN'T ASK US TO MOVE. THEY DIDN'T ASK US TO LEAVE. THEY DIDN'T TELL US THAT WE NEEDED TO DISPERSE OR ELSE THEY'D ATTACK. THERE WAS NO OPPORTUNITY FOR COMPLIANCE. THEY DIDN'T CARE ABOUT OUR SAFETY, OUR HEALTH, OR OUR WELL-BEING. THEY DIDN'T WANT US TO DISPERSE, OR THEY WOULDN'T HAVE BEEN BLOCKING THE EXIT. THEY WANTED TO HURT US.[236]*

\*\*\*

*AT NO POINT DID I PROVOKE OR PROVIDE PRETEXT FOR SUCH FORCE TO BE APPLIED AGAINST MYSELF BEYOND THE THIN PRETENSE OF DISOBEYED ORDER. (INAUDIBLE). ANY ONE OF THE*

---

[233] *Id.* at 147.
[234] *Id.* at 149.
[235] *Id.* at 155–56.
[236] *Id.* at 163–64.

> *METHODS APPLIED AGAINST ME COULD HAVE BEEN EFFECTIVE ALONE. HAVING SPRAYED CHEM-*
> *ICALS -- ILLEGAL ON A BATTLEFIELD -- INTO MY EYES, I VERY REASONABLY COULD HAVE ALREADY*
> *BEEN CONSIDERED NEUTRALIZED. HURLING ME TO THE GROUND WAS, SHALL WE SAY, REDUN-*
> *DANT, AND THE BATONING SPITEFUL. MY INTERACTION ILLUSTRATES THE EAGERNESS ON THE*
> *PART OF POLICE TO USE FORCE NOT ONLY AS A METHOD OF DETAINING THOSE SUSPECTED OF*
> *COMMITTING A CRIME, BUT AS A PUNITIVE MEASURE ALONE.[237]*

\*\*\*

> *SHORTLY AFTER, I WITNESSED A DIFFERENT OFFICER STANDING WITH A FEW COPS TO THE RIGHT*
> *OF MY ASSAILANT, SPRAYING A RED CAN OVER AND INTO THE CROWD I WAS A PART OF. I WAS*
> *VERY SUDDENLY OVERCOME WITH A BURNING SENSATION IN MY EYES, WHICH QUICKLY SPREAD*
> *TO MY NOSE, THROAT, AND THE REST OF MY BODY. WITHIN MINUTES THE PAIN FROM GETTING*
> *STRUCK IN MY WRISTS WAS NOW SECONDARY TO THE BURNING SENSATION CONSUMING MY*
> *BODY. THE BURNING IN MY NOSE AND THROAT CAUSED ME TO TAKE OFF MY MASK, AND BEING*
> *THAT WE ARE IN THE MIDST OF A PANDEMIC, THIS WAS A TREMENDOUS RISK FOR THOSE*
> *AROUND ME, BUT THE POLICE GAVE ME NO CHOICE. I WAILED FOR HELP FOR A MEDIC I HAD*
> *NO WAY OF GETTING TO. BUT THE ONLY ONES IN EYESHOT WERE SURROUNDED BY POLICE OF-*
> *FICERS THAT HAD PROVEN DISTRUSTFUL TO ME.[238]*

\*\*\*

> *AND SO I WAS RECORDING A GUY BEING ARRESTED BY THE POLICE, AND THE POLICE WERE*
> *DRAGGING HIM AWAY AND I WAS WALKING TOWARDS HIM, LIKE, TRYING TO GET HIM TO SAY*
> *HIS LAST NAME SO THAT HE COULD GET LEGAL HELP, AND TWO POLICE OFFICERS WALKED UP*
> *TO ME AND ONE OF THEM PUNCHED ME. AND MY PHONE HIT ME IN THE MOUTH AND MY*
> *TOOTH WAS KNOCKED OUT. I HAD TO GET A ROOT CANAL AND STILL TODAY -- JUST YESTERDAY,*
> *I FINALLY RECEIVED MY FINAL DENTAL WORK.[239]*

## Body Worn Camera and Radio Review – July 17, 2020

The videos we reviewed of the events at the Columbus statue depicted a confusing and volatile scene.

Other videos depict respectful interactions between officers and reporters, in which officers direct reporters where to go. In another instance, a community member, who appears to be a reporter, is on the pathway. An officer told her to move, and she asked why. The officer said, "Because you're going to get hurt." A supervisor then said to the officer, "Push her the fuck back."

One video shows the following interaction between an officer and a person who says they are a reporter:

---

[237] *Id.* at 173–74.

[238] *Id.* at 10–20.

[239] *Id.* at 18–25.

> **Officer:** *"Hey you with maroon pants. Get out of here. You were part of that bullshit, get out of here."*
>
> **Person:** *"I'm a reporter."*
>
> **Officer:** *"Let's go, get out of here."*

We reviewed videos in which officers seem to be strategizing about how to handle the rapidly unfolding situation. For example, in one video we saw CPD supervisors in white shirts gather together to clarify what to do. One supervisor said, "Everybody's gotta have their body camera on. Anybody who has an arrest, probably going to have to break off [inaudible], make sure they articulate proper language and proper charges... Later on, we can talk about that TRR shit 'cause there's going to be a whole bunch of them, it's not going to be a mass TRR." In another video, an officer says, "Need some police officers to walk along with that crowd so that they don't cause any problems." Later in the same video, we heard an officer say, "No plan. We have no plan right now squad," and another officer reply, "No, this is the plan right here." In videos later that evening, we heard an officer say "10-1 Columbus and Roosevelt. We need all officers." As some in the crowd began to attempt to take down the Columbus statue, there is an audible radio transmission of someone saying: "Body cams on. Make sure you have your body cams on."

Some people in the crowd said things like: "Who do you protect? Who do you serve?" "Pigs go home," "Quit your job," and "Fuck 12."

At one point, an officer said, "Hey watch out, they're throwing rocks." Officers nearby formed a line with their bikes. Another officer said, "Fall back, we're going to get the guys with the helmets." Among the skirmish that began to break out, one officer said, "I want to hit this mother fucker right here." Soon after, an officer said, "Get your helmets on. Get your fucking helmets on." In another video, an officer says, "You want to grab that mother fucker?"

The videos we reviewed also depicted many instances of officers using force, including baton strikes and punches. For example, one video shows an officer jogging into the crowd. He then appears to turn toward someone, then grabs and starts punching the person. In another instance, an officer gets into a tug-of-war with someone over a bike, and then appears to throw the bike at the person. The person gets upset, begins walking towards the officer and stops. Then the officer walks toward the person, further closing the gap between them, and shoves the person. There was also footage of an officer swinging his baton like a baseball bat. We also saw officers using OC spray against people in the crowd, and we also saw officers getting sprayed with OC spray, either by fellow officers or by members of the crowd.

Review Figure 28. Police Computer Aided Dispatch System (July 17, 2020)

| | |
|---|---|
| **Total Protests** | 5 |
| **Total Districts** | 4 |
| | (001, 002, 008, 024) |
| | |
| **Total "Riot"/Looting** | 0 |
| **Total Districts** | 0 |
| | |
| **Total** | 5 |
| **Total Districts** | 4 |

## JULY AND AUGUST 2020

Throughout the remainder of July and early August, Chicago continued to have protests in various locations in Chicago, and CPD officers received several reminders about the requirements to wear masks due to the COVID-19 pandemic. For example, the CPD sent out one "Masking Requirement" message on July 24, 2020, at about 2:02 PM, that read as follows:

> *The health of our members, their families, and their co-workers is of the utmost importance to the Department. In order to help minimize the spread of Covid-19, the Department requires that all members wear a surgical mask or cloth face covering in any area or under conditions in which the member cannot maintain 6 feet of social distancing from other persons. The requirement to wear a mask/cloth covering applies to interactions with both the public and other Department members. The requirement to wear a mask/cloth covering extends to all locations including Department vehicles, all City of Chicago facilities, residential buildings, commercial buildings, public areas, and private property. The Department recognizes the difficulties of wearing mask/cloth covering under certain conditions, including high temperatures and physical exertion, but continues to stress the masking requirements for the well-being of our members. Be advised that additional items of PPE (surgical masks, gloves) are available at the Equipment and Supply Section. Department members should request additional PPE items from their immediate supervisor. Stay Safe, Stay Healthy, and Take Care of One Another.*

The CPD sent another, similar General Message to remind officers of the "Masking Requirement," on August 4, 2020, at 3:16 PM.

## SUNDAY, AUGUST 9, 2020 (12:00 AM TO 11:59 PM)

On August 9th, an officer-involved shooting occurred around the 5700 block of South Racine Avenue, in the Englewood neighborhood, at about 2:30 PM. Following a pursuit by the CPD Community Safety Team, 20-year-old Latrell Allen was shot by police.[240] After the officer-involved shooting, there appears to have been two primary drivers of community members' subsequent looting in the downtown area. First, on-scene rumors and social media posts included a number of incorrect statements: that the individual shot by CPD officers was 15 years old, that the individual was shot 15 times, and that the individual had died as a result of the officer involved shooting. None of these statements were true, as evidenced by the records released by COPA from its investigation.[241]

Second, officers and community members clashed at the scene of the shooting. Social media posts showing video of the scene reveal a large contingent of police officers. Officers allegedly took a cell phone away from someone who had recorded the shooting.[242] Later, the commander for the 7th District ordered officers to clear the block.

As a result of the officer-involved shooting and neighborhood clashes, social media posts appeared online instructing people that looting would occur that evening. One such post read:

> ATTENTION ATTENTION LOTTING START AT 12am tonight...WE WILL NOT BE **** UP THE SOUTH SIDE EAST SIDE OR WEST SIDE DOWNTOWN AREA AND UP NORTH AREA ONLY BRING YA TOOLS SKI MASK AND GLOVES.[243]

---

[240] *See* Paige Fry et al., *Police shooting of Englewood man reignites political debate and looting as Mag Mile trashed, 13 cops injured, 2 people shot*, CHICAGO TRIBUNE (August 10, 2020), https://www.chicagotribune.com/news/breaking/ct-chicago-downtown-looting-20200810-3zwa3b7zzrc5vdyb4qjqywrjvu-story.html; Tom Schuba and Sam Charles, *Man shot by police in Englewood charged with attempted murder*, CHICAGO SUN-TIMES (August 10, 2020), https://chicago.suntimes.com/crime/2020/8/10/21362712/cpd-police-shooting-englewood-downtown-looting-latrell-allen.

[241] *See Case Portal Log # 2020-3647*, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (August 9, 2020), https://www.chicagocopa.org/case/2020-3647/.

[242] *See* Mark Guarino, Tim Elfrink, and Teo Armus, *Looters smash business windows along Chicago's Magnificent Mile after police-involved shooting*, THE WASHINGTON POST (August 10, 2020), https://www.washingtonpost.com/nation/2020/08/10/chicago-looters-riot-magnificent-mile/.

[243] Jessica D'Onofrio et al., *Chicago looting devastates Michigan Avenue, Loop, Gold Coast; More than 100 arrested, police say*, ABC7 EYEWITNESS NEWS (August 10, 2020), https://abc7chicago.com/chicago-looting-michigan-avenue-gold-coast-violence/6363471/. *See also* Jon Siedel, *'Lets get ready to steal': Feds charge Chicago man with inciting a riot in August*, CHICAGO SUN-TIMES (March 2, 2021), https://chicago.suntimes.com/2021/3/2/22309825/chicago-man-charged-inciting-riot-august-2020.

At 11:07 PM, the OEMC notified the CPD that that looting would occur at 87th and the Dan Ryan, the location of a shopping center. Shortly thereafter, a caravan of cars headed downtown where looting began near midnight.

## City Data from August 9, 2020

The figures below reflect data that the IMT received from the City for August 9, 2020. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence.

Review Figure 29. Police Computer Aided Dispatch System (August 9, 2020)

| | |
|---|---|
| **Total Protests** | 2 |
| **Total Districts** | 2 |
| | (004, 019) |
| | |
| **Total "Riot"/Looting** | 2 |
| **Total Districts** | (001, 006) |
| | |
| **Total** | 4 |
| **Total Districts** | 4 |

# MONDAY, AUGUST 10, 2020 (12:00 AM TO 11:59 PM)

After midnight, people began looting in the downtown area, near North Michigan Avenue. Looting spread out and included other locations along Michigan Avenue and surrounding blocks. Some people threw rocks and other projectiles at police officers and squad cars. Chicago police officers also exchanged gunfire with people in the crowd.[244]

As a result, the City raised bridges into the downtown area and about 100 people were arrested throughout the night and morning.[245]

Mayor Lightfoot put out a statement:

---

[244] *See* Bob Chiarito and Kelly Bauer, *Widespread Looting And Gunfire Rock Downtown After Police Shoot Man: 'We Are Waking Up In Shock'*, BLOCK CLUB CHICAGO (August 10, 2020), https://blockclubchicago.org/2020/08/10/widespread-looting-shootings-on-mag-mile-downtown/.

[245] *See* Julie Bosman, Christine Hauser, and Johnny Diaz, *Chicago Police Arrest More Than 100 People After Looting Batters Downtown*, THE NEW YORK TIMES (August 10, 2020), https://www.nytimes.com/2020/08/10/us/shooting-chicago-looting.html.

*Access to the downtown area will be temporarily restricted . . . . from 8 p.m. – 6 a.m. The restricted access to the downtown area is NOT a curfew. All residents, essential workers and employees whose businesses are located downtown will have access at all times.*

Review Figure 30. Mayor Tweets (August 10, 2020)



While there did not appear to be city-wide looting that evening, looting was reported in Streeterville, North Michigan Avenue, State Street in the Loop, and Old Town.[246] There were also protests later that day.[247] Protests continued in Chicago

---

[246] *See* CBS 2 Chicago Staff, *Ronald McDonald House Near Lurie Children's Hospital Was Among Looters' Targets*, CBS Chicago (August 11, 2020), https://chicago.cbslocal.com/2020/08/11/ronald-mcdonald-house-near-lurie-childrens-hospital-was-among-looters-targets/.

[247] *See, e.g.,* Paige Fry, *Black Lives Matter protest: 'We don't need police. We need care.'*, Chicago Tribune (August 10, 2020), https://www.chicagotribune.com/news/breaking/ct-chicago-

throughout the week, including at the University of Chicago Hospital in connection with the officer-involved shooting.[248]

## Body Worn Camera and Radio Review – August 10, 2020

The videos we reviewed depict interactions between people and officers downtown and on Magnificent Mile, as some people are looting stores shortly after midnight. In one video, officers are arriving as looting occurs at Saks Fifth Avenue. As officers arrest a woman, she says, "I ain't stole nothing. Y'all can check my bank accounts." The arresting officer says, "She's got a shitload of money on her" while checking arrestee's pockets. The arrestee says, "Check my bank accounts," and indicates she has $1,500 cash on her and says, "That's my money." The arresting officer responds, "Yeah, I know—you're going to get it back."

In another video, two officers stop a car and approach the stopped car. All occupants in the car appeared to be Black. After a passenger repeatedly asked why they have been detained, Officer 1 shouts, "Let me talk!" The passenger asks if the officer's body-worn camera is on, and the officer says, "Yes." The passenger says, "One second," and pulls out a cell phone. Officer 2 grabs the cell phone away. The passenger asks, "Can we get a white shirt?" Officer 1 continues shouting and says, "Tell your boy to stop talking over me. I'm explaining it." The passenger asks, "Am I being racially profiled?" Officer 2 says, "No you're not!" After officers gather and examine identification, Officer 1 hands the IDs back and tells them they can leave. A passenger says, "Thank you, have a wonderful night."

Another video shows the following interaction:

> **John Doe:** *"Can I ask you a question, though?"*
>
> **Officer:** *"No." [Walks in the other direction.]*
>
> *John Doe gets attention of an officer in a white shirt [supervisor] who walks over.*
>
> **John Doe***: "Can I ask you a question?" "What's going on?"* [Holding up cell phone.]
>
> *Supervisor throws up hands in a shrug and starts walking away.*

---

downtown-looting-black-lives-matter-protest-20200811-lvejnsexhbgtjfixcgioih7dn4-story.html.

248 *See, e.g.,* Manny Ramos, *Activists want charges dropped against man shot by police*, CHICAGO SUN-TIMES (August 14, 2020), https://chicago.suntimes.com/news/2020/8/14/21369740/latrell-allen-police-shooting-chicago-looting-hyde-park-defund-rally-march; *Residents and protestors clash at rally in Englewood*, CHICAGO TRIBUNE (August 11, 2020), https://www.chicagotribune.com/news/ct-viz-englewood-police-shooting-protest-20200812-al3sgjfyyzeyxi6x6t2fk4qesy-photogallery.html.

**John Doe:** *"I'm just asking a question, though."*

**Supervisor:** *"Trying to answer."*

**John Doe:** *"I'm just wondering why everyone's so disgusted with the cops."*

**Supervisor:** *"You've seen the same as me."*

**John Doe:** *"You don't have to be so rude, though."*

*Supervisor, holding a baton in front and across his body, walks toward person, says something inaudible.*

**John Doe:** *"What's your name, bro? My name's [John Doe]."*

*Supervisor and John Doe. shake hands.*

**John Doe (still holding up phone):** *"No need for attitude because I'm not one of these people"*

**Supervisor [gestures]:** *"I can have an attitude if I want! It's a free country!"*

**John Doe:** *"There's no need to be so mean. You don't know how to talk to people."*

**Supervisor:** *"Come to me when there ain't a bunch of savages out here lootin.' Right now, I'm obviously agitated. Stop calling me bro. We're not bros. I don't even know you. Come to me on a normal day and I'll talk to you like a person."*

**John Doe:** *"It is a normal day—you're a sergeant. It's a part of the job, bro."*

**Supervisor:** *"No it's not, stop calling me bro. Dealing with savages ain't a part of my job."*

**John Doe:** *"I'm a grammar schoolteacher."*

**A different officer speaking to John Doe:** *"Just get out of here, you're obviously part of the problem."*

The radio traffic also demonstrated the chaotic nature of events:

- *"More resources to address a crowd on State Street"*

- *"Every available unit to go to Wabash & Grand for a 10-1"*

- *"Report of gun inside Bloomingdale over radio at Wabash and Ontario"*

- *"Subject shot at Wabash and Ontario"*

- *"Huge crowd at Walton and Rush"*

- *"Looting at Walgreens on Ontario"*

- *"Need a car at Gucci"*

- *"A lot of cars pulling up at the Apple Store; they're going in and out of the Apple store"*

In another video, an officer's reacts to all that was happening:

> *"I've never seen anything like this. It's embarrassing. We need the National Guard."*

## City Data from August 10, 2020

The figure below reflects data that the IMT received from the City regarding August 10, 2020. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence. Nonetheless, the table demonstrate that the City and the CPD's challenges were significant and widespread.

Review Figure 31. Police Computer Aided Dispatch System (August 10, 2020)

| | |
|---|---|
| **Total Protests** | 2 |
| **Total Districts** | 1 |
| | (001) |
| | |
| **Total "Riot"/Looting** | 358 (1+357) |
| **Total Districts** | 18 |
| | (001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 014, 015, 018) |
| | |
| **Total** | 360 |
| **Total Districts** | 18 |

# SATURDAY, AUGUST 15, 2020 (12:00 AM TO 11:59 PM)

On August 15, 2020, two separate protests occurred in Chicago. One protest was anticipated to occur on the Dan Ryan Expressway. The Illinois State Police was aware of this protest, and while the Illinois State Police would not allow protesters onto the Expressway, they ensured the organizer of the protest that they would try to ensure the safety of any protesters who made it onto the Expressway. The

CPD put in place a contingency plan that would allow protesters to march on the streets of Chicago, ending up downtown at Grant Park. Ultimately, protestors did not make it onto the Expressway, and the protest proceeded on the route that the CPD had secured. Protestors marched through Chicago, arrived at Grant Park, and disbanded without major incident.

Another planned protest began at the Cloud Gate Sculpture (also known as "the Bean") in Millennium Park around 4:00 PM. Social media posts indicate that the protesters were demanding that CPD be taken out of Chicago Public Schools, that the U.S. Immigration and Customs Enforcement (ICE) Citizens Academy be cancelled, that funds be reallocated toward learning and community centers, and that universities cut ties with ICE. Police were present at the beginning of the protest but appeared to remain at a distance from the protesters without intervention. Officers who had been assigned to the first protest responded to the second protest. Eventually, protesters left Millennium Park and began marching toward Wacker and Michigan.

The Wabash Bridge was raised, and the CPD stationed officers on the east side of the Wacker and Michigan intersection, and at Trump Tower on Wabash Avenue. Police were staged to block access to Lake Shore Drive from Wacker, though protesters appear to have faced off against officers, demanding access and creating their own line of bikes.

Ultimately, some officers and some people in the crowd clashed, including fights over umbrellas and bikes. Some people threw projectiles, and members of the crowd traveled eastbound. CPD officers prevented people from accessing Lake Shore Drive, at which point additional violent encounters occurred between some people and the CPD, and the CPD made some arrests. People then traveled southward to Randolph, then westbound. According to some CPD personnel, as members of the crowd moved westbound, the CPD gave dispersal orders and the crowd dispersed. According to early estimates, about 17 people were arrested by the end of the day, and about 17 officers were injured.[249]

## Community Experiences and Reflections from August 15, 2020

The quotes and summaries below are samples experiences from community members regarding events on Saturday, August 15, 2020.

---

[249] *See, e.g.*, Chris Sweda, *Protests turn violent in downtown Chicago*, CHICAGO TRIBUNE (August 15, 2020), https://www.chicagotribune.com/news/ct-viz-violent-protests-chicago-police-photos-20200816-zu6mpcrtqjgwlluvk7ek662yba-photogallery.html; John Garcia and Cate Cauguiran, *Chicago police, protesters clash in Loop, dozens arrested and several hurt*, ABC7 EYEWITNESS NEWS (August 16, 2020), https://abc7chicago.com/chicago-protest-dan-ryan-expressway-protests-today/6371985/.

> ON AUGUST 15TH, I WAS AN [LEGAL OBSERVER (LO)] AT A PROTEST DOWNTOWN. CPD RE-SPONDED WITH HUNDREDS OF POLICE IN RIOT GEAR TO A RELATIVELY SMALL MARCH, COM-POSED MAINLY OF BLACK AND LATIN YOUNG PEOPLE. POLICE USED PEPPER SPRAY ON PROTEST-ERS, LOS, AND MEDICS. CPD WAS YELLING "FORWARD MARCH," AS THEY REPEATEDLY AD-VANCED ON THE GROUP FROM MICHIGAN AND WACKER TO LASALLE AND ADAMS. CPD RUSHED THE CROWD REPEATEDLY AND ATTACKED THE MEDICS. AFTER DRIVING THE PEOPLE ONTO LASALLE, CPD BLOCKED ADAMS AND MONROE AND BEGAN BEATING AND ARRESTING PEOPLE WHO HAD NOT OUTRUN THE RUSHING LINE OF RIOT POLICE. I NEVER HEARD ANY DIS-PERSAL ORDERS ISSUED, AND CPD DID NOT LET ME AND TWO OTHER ATTORNEY LOS LEAVE UPON OUR REQUEST. WE WERE DETAINED FOR 10 TO 15 MINUTES IN THE KETTLE. CPD IN-SISTED THAT WE EMPTY OUR BAGS AND LEAVE OUR PROPERTY BEHIND BEFORE THEY PERMIT-TED US TO LEAVE. AND THEY SEIZED A GREEN HAT THAT A LEGAL OBSERVER HAD. LOS OB-SERVED THAT SUPERINTENDENT BROWN WAS PRESENT ON LASALLE WHILE THE KETTLE WAS IN EFFECT.[250]

\*\*\*

> AND ON AUGUST 15TH, NEARLY A MONTH AFTER THE DISPLAY OF POLICE OFFICER BRUTALITY, POLICE IN RIOT GEAR ONCE AGAIN GASSED AND SEVERELY INJURED CIVILIANS. IS THIS WHO YOU WANT IN YOUR SCHOOLS? YOU CANNOT REFORM YOUR WAY OUT OF THIS. BLACK LIVES MAT-TER. DEFUND CPD. DECOLONIZE CHICAGO.[251]

\*\*\*

> ON SATURDAY, AUGUST 15TH, A FEW DAYS AGO, WHILE I WAS RIDING MY BIKE ALONGSIDE A YOUTH-LED PROTEST IN THE LOOP WHO WERE SPEAKING OUT AGAINST POLICE BRUTALITY, I WAS SURPRISED AND ATTACKED FROM BEHIND, BEATEN OFF MY BIKE AND TO THE GROUND BY SEVERAL GROWN MEN IN RIOT GEAR WITH BATONS AND VIOLENTLY ARRESTED. VERY FEW WORE MASKS. MY BIKE WAS STOLEN AND MY BACKPACK WAS DESTROYED. RATHER THAN BE-ING READ MY RIGHTS, SEVERAL COPS SHOUTED IN MY FACE WITHOUT MASKS, "YOU LOST." I SPENT THE NIGHT LOCKED UP ENDURING FURTHER TERROR, DEHUMANIZATION, AND THE DE-NIAL OF BASIC HUMAN RIGHTS. DURING THE 14 HOURS I WAS DETAINED -- 12 OF WHICH WERE DOCUMENTED BY THE POLICE -- I WAS CAGED BY -- WITH SEVERAL WONDERFUL PEOPLE WHO HAD EXPERIENCED SIMILAR SYSTEMATIC TERROR AND VIOLENCE BY THE CPD, INCLUDING NURSES, JOURNALISTS, AND VERY YOUNG ORGANIZERS.[252]

\*\*\*

> ON AUGUST 15, 2020, I ATTENDED A PROTEST DOWNTOWN IN THE LOOP. WHILE WE WERE MARCHING, I OVERHEARD SOMEBODY SAY THAT THE POLICE WERE GOING TO START TEARGAS-SING FOLKS, SO WE ALL STARTED RUNNING, BUT TO NO AVAIL. WE ENDED UP BEING KETTLED IN AS THE POLICE STARTED TEARGASSING THE CROWD AND STARTED BEATING PEOPLE WITH THEIR BATONS AND STICKS, AND STUFF. AND I WAS HIT IN MY BACK WITH A BATON, LIKE, FOUR TIMES. AND I WAS TEARGASSED. LUCKILY THE TEAR GAS DIDN'T MAKE IT INTO MY EYES, BUT I HAVE PERMANENT MARKS AND DISCOLORATION ON MY ARM AND MY LEGS FROM THE TEAR GAS TOUCHING MY SKIN. AS I WAS TRYING TO RUN, I SAW THE POLICE RAM A MAN SO HARD DOWN ON THE CONCRETE THAT HIS FOREHEAD STARTED GASHING BLOOD. AND I WAS HOPING

---

[250] Listening Session, August 19, 2020, at 69–70.
[251] *Id.* at 67.
[252] *Id.* at 71–72.

> *THAT SEEING HIM BLEEDING WOULD BE ENOUGH TO MAKE THEM STOP ATTACKING THIS MAN, BUT THEY PROCEEDED TO HAUL HIM UP AND STARTING HITTING HIM SOME MORE WITH HIS BATONS BEFORE THEY ARRESTED HIM. SO WE WERE EVENTUALLY ALL KETTLED IN UNTIL THE POLICE STARTED GOING "BAG CHECK" AND LETTING PEOPLE OUT. AND THEY DIDN'T REALLY LET EVERYBODY OUT BECAUSE THEY WERE SPECIFICALLY LOOKING FOR PEOPLE TO ARREST. I WAS ONE OF THE LUCKY ONES THAT GOT OUT. BUT AS I WAS PUSHED OUT OF THE SCENE, THEY CLOSED IT OFF, AND, LIKE, I WATCHED HELPLESSLY AS FIVE OF MY FRIENDS WERE WRONGLY BEATEN AND DETAINED.[253]*

\*\*\*

> *ALL THAT PALES IN COMPARISON TO WHAT I SAW LAST SATURDAY, AUGUST 15TH. IN THE MOST HEINOUS ACT OF (UNINTELLIGIBLE) VIOLENCE THAT I'VE WITNESSED IN 29 YEARS OF LIFE, I WATCHED CPD OFFICERS CLEAR OUT MEDIA BEFORE ATTACKING INJURED PEOPLE BEING TREATED BY MEDICS ON THE SIDEWALK. THE CPD KICKED PEOPLE AND MEDICS, HIT THEM WITH BATONS AND DESTROYED MEDICAL SUPPLIES. CPD OFFICERS HIT ME, SHOVED ME AND CALLED ME A PUSSY FOR POINTING OUT THE PEOPLE WHO THEY WERE ASSAULTING WERE INJURED. I WAS WEARING A NLG LEGAL OBSERVER HAT THAT DAY AS WELL.[254]*

\*\*\*

> *SOON AFTER I WITNESSED PEPPER SPRAY DEPLOYED WITHIN INCHES OF PROTESTERS' FACES. IT'S DIFFICULT TO DESCRIBE THE FEELING OF SEEING PROTESTERS BEING PEPPER SPRAYED BY CPD, BUT I BECAME EXTREMELY FEARFUL FOR MY SAFETY. NOT AT THE HANDS OF THE PROTESTERS, BUT AT THE HANDS OF THE CHICAGO POLICE DEPARTMENT. I WITNESSED YOUNG PEOPLE STUMBLE INTO THE MIDDLE OF THE INTERACTION, BLINDED BY PEPPER SPRAY, WRITHING IN PAIN, PANIC AND CONFUSION, RIPPING THEIR MASKS OFF TO BREATHE AND SCREAMING IN AGONY. THE USE OF PEPPER SPRAY IN THE MIDST OF A RESPIRATORY PANDEMIC SEEMS LIKE AN EXTREMELY CRUEL AND CALLOUS RESPONSE TO A GROUP OF YOUNG PEOPLE JUST TRYING TO MAKE THEIR VOICES HEARD. WITH THE SMELL OF PEPPER SPRAY FRESH IN MY NOSTRILS, I LEFT THE AREA. I'D LIKE TO MAKE CLEAR THAT THE VIOLENT POLICE RESPONSE TO THIS PEACEFUL PROTEST WAS COMPLETELY UNWARRANTED. THE PROTESTERS WERE SIMPLY EXERCISING THEIR FIRST AMENDMENT RIGHT TO FREE SPEECH AND ASSEMBLY. THE POLICE VIOLATED THAT RIGHT BY BEATING AND PEPPER SPRAYING US. CPD CLEARLY DID NOT HAVE SAFETY OF ANYONE IN MIND.[255]*

## Body Worn Camera and Radio Review – August 15, 2020

Videos from this date show peaceful protests without incident, as well as violent confrontations. In one video, police form a bike line as protesters gather in the streets. Officers follow protesters down the streets as they march, and the protest carries on without disturbance.

Another video shows people approaching a police line. Officers yell, "Get back," as they grab and throw the people's umbrellas. One person gets into a shoving and

---

[253] Listening Session, August 20, 2020, at 119–20.
[254] *Id.* at 143–44.
[255] *Id.* at 161–62.

tugging match with an officer over the umbrellas. Another person continues to approach the bike line and gets into a shoving match with the police involving bikes. An officer yells, "Hold the line," while protesters put their hands up and say, "Hands up don't shoot."

One video depicts a protester with a skateboard; he is holding the skateboard to his chest and an officer knocks him down. Later in the same video, we see a woman pick up her bike and swing it toward an officer. There is a tug-of-war with the bike, and eventually the officer takes it away.

In another video, the crowd appears to be standing around and waiting. There is no communication as to why the officers are not letting the protesters walk. There is no talking between officers and protesters, as everyone appears to just be waiting. One officer says, "That black dude on the skateboard. He's been swinging that thing all day." One person in the crowd says, "If you're under 18, go to the front." Another voice says, "Black and Brown Units to the Front." A few minutes later, someone begins yelling loudly, and others in the crowd say, "Be peaceful."

## City Data from August 15 and 16, 2020

The figure below reflects data that the IMT received from the City. It is important to note that much of this data reflects citywide information that is not necessarily tied to protest or unrest. Given various challenges regarding reporting and data collection and management, some of the information appears to be internally inconsistent and contrary to consistent video, audio, and interview evidence.

Review Figure 32. Police Computer Aided Dispatch System
(Saturday, August 15, 2020, and Sunday, August 16, 2020)

|  | Saturday, August 15, 2020 | Sunday, August 16, 2020 |
|---|---|---|
| Total Protests | 7 | 4 |
| Total Districts | 5 | 2 |
|  | (001, 002, 010, 011, 019) | (001, 011) |
|  |  |  |
| Total "Riot"/Looting | 1 (0+1) | 1 (0+1) |
| Total Districts | (006) | (006) |
|  |  |  |
| Total | 7 | 5 |
| Total Districts | 6 | 3 |

## THE REST OF AUGUST, SEPTEMBER, AND OCTOBER 2020

Throughout August, September, and October, the City and the CPD reflected on what took place between May and July, holding meetings and conducting preparedness drills. CPD leadership also continued to remind their officers to wear masks.

On August 27, the City and CPD held a "Public Safety Hearing Prep" meeting from 5:00 PM to 6:00 PM. On August 28, 2020, the CPD issued an Updated Operational Plan/Mobilization Plan. On September 8, some CPD leadership participated in a "Thursday Drill – Prep" meeting in the Superintendent's Conference room from 1:00 PM to 2:00 PM.

Throughout September and October, the CPD issued four reminders about its "Masking Requirement" (on September 4, 11, and 23 and October 2). The October 2 reminder added additional supervisor requirements (reflected in bold below):

General Message: "Masking Requirement" (October 2, 2020): 16:59

> *The Department requires that all members wear a surgical mask or cloth face covering in any area or under conditions in which the member cannot maintain 6 feet of social distancing from other persons. The requirement to wear a mask/cloth covering applies to all interactions with the public. The requirement extends to and includes wearing in public areas, private property, buildings and vehicles. Department members can request addition[al] PPE items (Surgical Masks and gloves) from their immediate supervisor. **Supervisors will take the necessary corrective action to ensure that this requirement is strictly adhered to.** Help minimize the spread of COVID-19. Stay safe and be well. TO BE READ AT ROLL CALL FOR SEVEN (7) CONSECUTIVE DAYS.*

(Emphasis added).

## NOVEMBER 2020

Anticipating protests and preparing for unrest ahead of the November 3, 2020 Presidential election, the CPD implemented roll-call training regarding First Amendment activity and proper use of batons for each shift in all of its 22 Districts. The CPD prepared roll-call training as part of the ongoing discussions it had with the Coalition, the OAG, and the IMT since May. The IMT attended and observed roll-call training sessions on a variety of shifts in 15 Districts. The roll-call training was originally delivered in person, but due to inconsistencies in messaging, the CPD quickly produced a training video addressing First Amendment issues and proper baton use to be shown at roll call instead.

On November 4, the day after the election, hundreds of demonstrators gathered downtown to encourage election officials to "count every vote."[256] The large crowd marched on Michigan Avenue, but did not reach Trump Tower because the Wabash Avenue bridge was raised.[257]

On November 7, as the vote counting dragged on and the nation waited for the election results, several news outlets projected that Joseph Biden, Jr. would ultimately be the winner. Crowds again converged downtown, resulting in street closures, re-routed Chicago Transit Authority buses, and a large police presence. Crowds also gathered at Union Park, Wrigley Field, and on North Halsted Street.[258] The crowds were largely celebratory and dissipated without major incident.

---

[256] *See* Ben Pope, *Chicago protest: Hundreds gather downtown urging that every vote be counted*, CHICAGO SUN-TIMES (November 4, 2020), https://chicago.suntimes.com/2020/11/4/21550300/chicago-protest-election-day-trump-biden-hundreds-gather-downtown-urging-that-every-vote-be-counted.

[257] *Id.*

[258] *See* WGN Web Desk and Associated Press, *Live Blog: Crowds gather in Chicago's streets as Biden wins race for president*, WGN9 (November 7, 2020), https://wgntv.com/news/politics/live-blog-count-drags-on-as-biden-nears-victory/.

# Analysis

This section provides the Independent Monitoring Team's (IMT's) analysis of the City and the CPD's responses to the protests and unrest from May 2020 through November 2020. We have broken our assessment into four topics of assessment and corresponding recommendations:

1. PLANNING AND PREPARATION;

2. POLICIES;

3. TRAINING; and

4. ACCOUNTABILITY AND TRANSPARENCY.

Like the sections of the Consent Decree, these topics are interrelated and include various subsections.

In general, the quality of the City's and the CPD's planning and preparation had a direct impact on the state of existing resource allocation and command and control, in the short term, and existing resources, policies, training, and overall crowd-management competence in the long term. And the effectiveness of all of those actions directly impact the pressures on the City's accountability mechanisms. As a result of this interdependence, the City's and the CPD's successes and failures within each topic will have positive and negative effects across the City's and CPD's entire response.

Overall, the City and the CPD did not anticipate the level of protests and unrest in 2020, and even if they had anticipated large-scale protests and unrest after George Floyd's death on May 25, 2021, they would not have been able to adequately prepare for what transpired. The City and the CPD must continue to work to improve their ability to respond to protests and unrest.

# Planning and Preparation

## IMT's Recommendations: Planning and Preparation

- Expand planning operations cross all internal and external entities and partners by, among others, (1) establishing a multi-facet planning team, (2) modifying current planning template, and (3) conducting tabletop exercises for command personnel (¶704)

- Enhance intelligence gathering and dissemination capabilities by, among other things, (1) tracking national and international events that may impact Chicago, (2) improving social-media engagement, (3) conducting formal meetings with protest organizers and community stakeholders, and (4) engaging with Chicago's communities, stakeholders, and experts regarding the City's and the CPD's policing efforts and strategies (¶46)

- Continue New Forms of Community Engagement by, among other things, (1) clearly communicating time, place and manner restrictions; (2) conducting community-sentiment assessments; (3) engaging with community review of and comment on policies and training; (4) creating and maintaining community and business safety plans; (5) improving victim services (¶¶10, 49, 52, 115, 160, 511, 546)

- Create, train, and equip specialized Mobile Field Force Teams, with certified members, across all CPD areas

- Better prepare for department-wide officer wellness and support, including providing and tracking protective equipment, transportation, hydration, food, facilities, and relief (¶¶381–86)

- Conduct a feasibility study regarding the acquisition, prioritization, allocation, and tracking of resources for officer wellness and responding to protests and unrest (¶¶377, 379)

The importance of planning and preparing for large events cannot be overstated. Careful planning helps identify resources, needs, risks, options, and contingencies. Without adequate planning or preparation, personnel are placed in situations they are untrained for. As a result, existing training is inapplicable, policies can be forgotten, reporting can falter, and many of the efforts, progress, and reforms from efforts by the City and CPD personnel and communities can be undermined.

According to records provided by the City and the CPD, the City and the CPD did not create an operations plan for the vast majority of even the known protests in 2020 and, at the beginning of May 2020, did not have an effective plan for responding to unplanned protests. To the extent unwritten plans existed within each district or area, the CPD mainly relied on a boilerplate template for capturing very generic information and did not train its supervisors or officers—or City partners—

on how to effectuate those plans. Without planning or training, the City and the CPD—and their personnel—were forced to make up the plan as they went along through trial and error. As a result, there were inconsistencies across supervisors and districts, and the risk that many of the lessons learned were the wrong ones.

As detailed below, we believe that increased planning and preparation across and throughout City entities would allow the City and the CPD to more effectively and efficiently respond to protests and prevent the existence or spread of unrest. This would, in turn, better protect Chicagoans, personnel, essential services, businesses, and resources—reducing the need for as large and extended deployments of City personnel as occurred in 2020.

As reflected in Analysis Figure 1 below, the CPD has acknowledged that the weaknesses in their planning and preparedness outweighed their strengths.

Analysis Figure 1. CPD After Action Report (May 20, 2020, through June 12, 2020)

### CPD After Action Report: "Planning and Preparedness"

| Strengths | (1) Individual and collective experience |
| | (2) Unified command center |
| | (3) Open-minded leaders |
| | |
| Weaknesses | (1) Outdated, inflexible, and inefficient mass-mobilization plans |
| | (2) Uncoordinated approach to securing the city's retail corridors |
| | (3) Reactive, ad hoc approach to emergency mobilization without training |
| | (4) Too few body-worn cameras and antiquated protective equipment |
| | (5) Equipment-related barriers to communication and transportation |
| | (6) Department members were exhausted, stressed, and over-burdened[259] |

This lack of planning and preparation was reflected across our interviews with representatives from the City and the CPD. We also heard CPD officers express such concerns in several of the body-worn-camera videos, such as the following quotes:

> Don't [inaudible] and then lead us back here so there needs to be some fucking leadership here and there's zero… It's a safety issue… We need to go. So be ready to go and be ready to walk backwards.

> \*\*\*

> . . . Should have deployed the National Guard earlier. She just deployed them. But they aren't going to come out now with a command plan.

> \*\*\*

---

[259] See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020, CHICAGO POLICE DEPARTMENT (February 2021) at 5 (citing Major Cities Chiefs Association at 27, note 1).

> *This whole city is on fire again. The department doesn't know what they are doing. Why didn't they raise the bridges earlier? This has been going on for hours.*

As a result of the lack of sufficient planning and preparation, the City and the CPD could not avoid the emergency circumstances that led them to believe deploying all officers was necessary. As a result, personnel in the Bureau of Internal Affairs, the Force Review Division, and Reform Management were deployed, leaving their critical duties understaffed and under-resourced—walking back or delaying much of what the City and the CPD have worked to create under the Consent Decree.

Over the course of the summer, the City and the CPD made significant efforts to improve their planning and preparation for protests—planned and unplanned—and unrest. As reflected in other sections, this planning continued to be largely reactive, as policies, training, and tracking continued to present issues as the City and the CPD responded to events.

This was demonstrated in the City's and the CPD's preparations for potential unrest during the 2020 election, which never occurred.

## (1) PLANNING WITHIN AND ACROSS CITY ENTITIES AND PARTNERS

### IMT's Recommendation

- Expand planning operations cross all internal and external entities and partners by, among others, (1) establishing a multi-facet planning team, (2) modifying current planning template, and (3) conduct tabletop exercises for command personnel (¶704)[260]

As reflected above, the City and the CPD did not sufficiently plan or prepare for the size, scope, and sustained level of protests and unrest. After the murder of

---

[260] *See also* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, JOHNS HOPKINS UNIVERSITY, (December 4, 2015) at 27, 49; *May 30 Civil Unrest After-Action Review*, CITY OF CLEVELAND, OH (December 2020) 30–31; Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT (August 14, 2020) at 21–22, 36; Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 74; *After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020*, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020) at 33–34, Nicholas Mitchell, *The Police Response to the 2020 George Floyd Protests in Denver, and Independent Review*, DENVER OFFICE OF THE INDEPENDENT MONITOR, at 54–55; Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN (December 2020) at 79–81, 83.

George Floyd, there were a few City and CPD preparation meetings regarding the potential for large protests and the potential for unrest.[261] Everyone that we spoke to who was in those meetings, however, said that they ultimately did not believe that unrest would occur in Chicago. The opinion of many people was that, historically, Chicago has not experienced unrest from events that occurred outside of Chicago, so it was unlikely to occur here.

As a result, the City and the CPD ultimately prepared for Saturday's large downtown protest as they would for other large downtown protests.[262] We also heard from some CPD personnel that the CPD has done well over the last few decades in managing large peaceful protests without major incident or unrest. Some of the officers we interviewed said that their supervisors expressed confidence, or overconfidence, believing that the CPD is "good at" crowd control because Chicago experiences many large protests without issue.

According to the CPD's After Action Report, the CPD usually prepares for weeks for a planned large-scale event:

> In advance of these gatherings, the Department typically spends weeks planning and preparing alongside its local, state, and federal partners, to best ensure public safety and the protection of Constitutional rights. Previous to the 2020 Events, this often involved working directly with event organizers to ensure their safety and that of attendees by, for example, organizing routes and providing crowd control.[263]

This plan was clearly insufficient, but was also limited to one protest and in one location. The plan also did not have an effective and flexible plan for rapidly increasing responses to unrest.[264] We heard from many supervisors that they received the plan Saturday, May 30, 2020, after the protest and unrest was well under way, that plan was over a hundred pages long, and that it was unhelpful.

---

[261] This was unclear until relatively far into our review. Originally, in response to a request for records of such meetings, ("List of all preparatory meetings for CPD members responding to lawful demonstrations or unrest from May 1, 2020, through June 30, 2020)"), the CPD's Office of Operations responded that they did not have responsive records. These meetings were ultimately identified from individual interviews and emails that the City provided in January 2021.

[262] The only deviation we heard was from some CPD command staff who, due to their inexperience with protest response, requested additional resources and participation to learn from experience of how to respond to a "typical protest."

[263] See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020, CHICAGO POLICE DEPARTMENT (February 2021).

[264] "For example, the Department's response to large-scale emergencies has long been based on two plans: "Plan Red" (using available on-duty personnel in phases) and "Plan Blue" (requiring, among other things, the recall of off-duty personnel). In the event the Department activated a "Plan Blue," off-duty personnel would be notified via radio and television announcements.

We also heard from many CPD representatives—from line officers to executives—that the CPD does not have a plan for responding to unrest—and further, that such plans do not exist. This perspective misses, however, how effective proper planning and preparation can be at preventing unlawful activity and unrest in the first place. It is always challenging to prove negatives—such as all of the crime and unrest that does not occur when a city and a department are prepared. But we heard from many members of the community that they joined protests after witnessing or hearing about what they believed to be excessive force from officers against protesters. We also witnessed and heard from many people that much of the unrest was from opportunists who decided to participate in looting or destruction of property once it appeared that the City and the CPD were not prepared to stop them.

While the chaos inherent in unrest is decidedly different from typical protests, the City's existing response was to have officers respond to "10-1s," or "officer needs assistance" calls. But given the volume of "10-1s"—along with many other confounding challenges, such as the radio issues described further below—officers responded without direction or in an organized manner. Teams were formed and deployed without coordinated training, which led to more officers engaging in individualized decision-making and responses, outside of best practices and engaging crowds individually, which then required another uncoordinated response to rescue them.

The City and the CPD did not have specific plans that were tailored for the unique circumstances of 2020—COVID-19 and stressed resources; no City-issued permits; unprecedented turnout; car caravans; fluid protests often influenced in real time by social media; and no centralized location. Unlike what was expected, the large protests and unrest began Friday night, May 29, 2020, continued early on Saturday morning, and continued for days. We heard from City personnel and many CPD officers—some with decades of experience—that they had never seen the level of unrest in their careers, with many adding that there was nothing the City or the CPD could have done to fully prepare. However, without those plans, the City and the CPD had to divert other preparations—namely the Summer Operations Center—and appeared to resort to old plans, based on the experiences of a few supervisors—that were designed to respond to one location, such as the plans for the 2012 NATO Summit.

---

But with a modern, 'leveled' response, Department members can better anticipate whether their days off might be cancelled, hours extended, or areas of deployment shifted. Similarly, consistent 'levels' will enable the Department to scale an otherwise-consistent emergency response (whether localized or citywide) to any given incident." *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 11 (citing *Special Response Plans*, General Order G05-02 § II (December 7, 2017)).

Most notably, the City and the CPD created a single, unrehearsed central mobilization center that pulled officers from across the City—without their usual radios or body-worn cameras—to one location. Officers were then deployed in various places, sometimes with new officers and supervisors and to unfamiliar locations or to locations that they passed to get to the deployment center. These logistics were the most chaotic in the early days of the protests and unrest—when an organized and efficient response was needed the most. In those early days, resources such as radios, shields, and OC spray were handed out without tracking; officers were paired without familiarity; and there were limited resources for transportation, food, hydration, or bathroom facilities.

Moreover, in addition to potentially dangerous logistical issues and inefficiencies, by using the mobilization center to deploy officers throughout Chicago, officers were often placed in communities that they were unfamiliar with, both geographically and personally. This can create various issues, but also loses the benefit of having officers deploy to locations where they know the area, including potential vulnerabilities, and the people, allowing officers to potential gain valuable information or even better de-escalate tensions with known community members. We recognize that the City and the CPD were facing an unprecedented challenge, but it is under such circumstances that community policing principles and foundations become more—not less—important.

To be clear, we understand that there may have been disagreements regarding the central mobilization center at the time, but a decision needed to be made—and without better planning and preparation, there was no decision that could have been made in the moment without significant tradeoffs. As days went on, centralizing resources became more efficient, and the CPD learned how to make the best of the mobilization center, including allowing officers from districts with high needs to stay within their districts. The City and the CPD also made deliberate efforts to improve tracking and documentation.

In the CPD's After Action Report, the CPD referenced the recent work with City entities to provide for a more coordinated, City-wide response:

> To this end, the Department collaborated in the aftermath of the Events with public safety, infrastructure, transportation, regulatory, and other city agencies to develop a 'leveled' response plan. The levels and related responses are as follows:
>
> **Level 0:** Daily Business - a steady state
>
> **Level 1:** Partial Response - a localized response
>
> **Level 2:** Full Response - a citywide response
>
> **Level 3:** Sustained Response - a continuing response
>
> **Level 4:** Mutual Aid/State Resource - a collaborative response[265]

This leveled response plan reflects a vast improvement and accounts for the potential need to scale responses up or down. As reflected above, the City and the CPD developed this plan after facing Chicago-specific challenges May 20, 2020, through June 12, 2020. These plans were not developed with input from the IMT, and the IMT strongly recommends that the City and the CPD continue to review and improve this leveled plan with input from experts on the NIMS ICS model, if the City and the CPD have not done so already.

Given the differences in general and crowd-specific responsibilities, internal structures, and many other variables, the City entities were better able to respond. Representatives from the Chicago Fire Department, for example, said that, given the typical shift schedule, it was able to ramp up deployments and respond to fires and provide medical needs throughout Chicago. In fact, they said that, given the lack of typical traffic due to COVID-19 precautions, personnel were able to move around the City more easily than usual. These representatives acknowledged, however, that unlike the CPD, crowds were not openly hostile to their presence or intentionally obstructing their ability to put out fires or provide medical services. The City should consider such institutional differences, regularly share information

---

[265] "These levels were designed to be 'activated' in advance of planned events and as unanticipated emergencies unfold. The Department will continue to collaborate with local, state, and federal partners to implement the necessary collaborative response that large planned gatherings demand. But the city's response to any forthcoming, unanticipated emergency situation requiring a large-scale response will rest largely on the Department and OEMC, as both operate each second of every day. The Department has since shared a video outlining and explaining this 'leveled' plan with its members." *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, Chicago Police Department (February 2021) at 11–12.

across entities, and clarify or revise roles accordingly, particularly as the City experiences high turnover.

On the other hand, with the lack of planning, the widespread nature of protests, and the lack of permits or advance notice, City personnel frequently were not asked to have emergency management services on standby for many protests—nor is it clear that such services would have been available for all crowds at the height of the protests. This was also true for several other key units and personnel, such as the CPD's limited pool of Legal Officers.

Over time, the City was able to better utilize City resources to, for example, navigate traffic, protect businesses, and free up CPD officers and other CPD personnel to more efficiently respond to needs. These decisions, however, will always have costs, not only on potential freedoms, but on, among other things, essential services, livelihoods, and commuters. As a result, we recommend that, as the City and the CPD, continue to evaluate these plans, they incorporate community feedback, concerns, recommendations, and general input.

The CPD's After Action Report acknowledged the need to include the City's "business and retail partners in conversations as unplanned, emergency incidents of civil unrest unfold—particularly regarding asset allocation, short-term infrastructure changes, and post-incident investigative collaboration."[266]

> To ensure our city's retail corridors are protected in the event of future unplanned, large-scale incidents of civil unrest, the Department worked with the Chicago Department of Transportation ("CDOT"), the Department of Water management ("DWM"), and the Department of Streets and Sanitation ("DSS") to formalize is collaborative approach to allocating, deploying, and mobilizing resources to retail corridors as a means of securing them and thereby mitigating any adverse impact. CDOT, DWM, and DSS resources were strategically positioned in neighborhoods throughout the city to deter organized criminal activity while facilitating the city's ability to rapidly and efficiently enact closures. Individuals from these agencies had direct access to the Command Post enabling them to monitor retail corridors and quickly report criminal activity.

> Department leaders recognized that District Commanders have a unique, localized understanding of community concerns, neighborhood economic lifelines, and any businesses that may be vulnerable during incidents of civil unrest. As such, the Department tasked its District Commanders with obtaining input from their community partners and identifying those specific businesses and retailers in their districts. Our retail corridor protection plans now reflect this input. These plans

---

[266] *See id.* at 12.

> *include information for operational purposes (e.g., how to enact clo-*
> *sures) along with a detailed list of key points of interest (e.g., public*
> *transit, historical and cultural monuments, etc.) and contact infor-*
> *mation for businesses, local chambers of commerce, and other key*
> *community partners.*[267]

This outreach is important, and the IMT recommends that the City make such out-reach a formalized part of its multi-facet planning team and template.

Finally, for any inter- and intra-entity plans, the City, the CPD, and local, state, and federal partners will need to conduct table-top exercises to ensure that personnel are capable of carrying out the plans.

Moreover, while we did hear of assistance from outside federal, state, and local partners, the City and the CPD did not provide substantial information regarding how those partners specifically fit into its plans. The original utilization of outside partners appeared to be nearly entirely ad hoc. There was limited, if any, knowledge of how to utilize the National Guard, including whether the National Guard could or should address criminal activity that occurred in their presence. In response to a request for applicable inter-agency agreements, the City and the CPD provided a series of specific agreements with agencies on tangential or unre-lated issues. Moreover, some relevant agencies did not appear to have agreements at all. This explains, for example, why some representatives told us that there was a rush to develop rules of engagement for the Illinois National Guard on Saturday, May 30, 2020. These agreements can serve to formalize expectations and enable key personnel to focus on the emergencies at hand, rather than jurisdictions or responsibilities.

Even assuming that the City and the CPD could not have predicted or prepared for the level of unrest at the end of May and beginning of June, the City and the CPD continued to approach most known protests without detailed plans. The CPD did not, for example, have an operations plan for the Grant Park protest on July 17, 2020.[268] We heard from some officers that the CPD was able to deploy additional officers to the location because those officers were working other non-protest re-lated assignments throughout Chicago.

In some ways this reflects the fact that the City and the CPD leadership must ad-dress multiple issues at once, and many officers were still placed nearby and could respond timelier than in May. Nonetheless, to the extent this was the "plan" for increasing the response, the CPD again placed itself in a position of having to de-ploy officers on an ad hoc basis.

---

[267]  *See id.* at 12–13.

[268]  In response to a request for operations plans, the CPD responded, in part, that the CPD's Spe-cial Events Unit did not create an operations plan for July 17, 2020.

It is true that if the CPD had more officers assigned to the protest that an unrelated incident could have arisen elsewhere in the City, which the CPD would have then been less capable of responding to. But this emphasizes the need for planning and preparation, as the City and the CPD will be better able to identify and address resource needs, including a qualified, well-trained, and equipped Mobile Field Force team, as discussed further below.

We also heard from some CPD personnel, for example, that different CPD areas and districts already had plans to secure specific locations and business corridors in the event of an emergency, but that those plans were not readily known or rehearsed. As a result, many officers said that they felt always behind and constantly responding to calls for service, rather than preventing or deterring crime.

The IMT understands that, since May 2020, the City and the CPD have conducted several practice drills throughout the City.[269] And we also witnessed improvements with planning and preparation for the 2020 national election, including with partners, such as the National Guard.

## (2) INTELLIGENCE AND COMMUNICATION

### IMT's Recommendation

- Enhance intelligence gathering and dissemination capabilities by, among other things, (1) tracking national and international events that may impact Chicago, (2) improving social-media engagement, (3) conducting formal meetings with protest organizers and community stakeholders, and (4) engaging with Chicago's communities, stakeholders, and experts regarding the City's and the CPD's policing efforts and strategies (¶46)[270]

---

[269] "Officers relying upon in the Department's new citywide, 'leveled' response to civil unrest and revised Emergency Mobilization Plans ("EMP") need to know these plans, policies, and procedures in advance of any future spontaneous implementation. . . . . The Department relies on its field supervisors and police officers alike to implement plans, policies, and procedures. Going forward, operational efficacy demands prompt training on changes to long-standing plans such as the new 'leveled' response and revised EMPs. As a result, Department leaders need to communicate to field supervisors and police officers the many considerations underlying the Department's response. Using the EMPs, the Department and intragovernmental partners conducted three practice drills, testing the Department's downtown and neighborhood-specific, and retail corridor responses. These drills offered Department leaders, field supervisors, and police officers alike a tangible view of the practical implications of EMP implementation. In addition, the drills assisted the Department in refining the already-revised EMPs." *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 19.

[270] *See* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, JOHNS HOPKINS UNIVERSITY (December 4, 2015) at 62; *Protest and Civil Disorder Incidents, After-Action Report, May 29-June 13, 2020,* LAS VEGAS METROPOLITAN POLICE DEPARTMENT, at 25,

To be effective, plans must be based on accurate information from reliable sources. That information must then be shared to and from the top. Some CPD officials indicated that they had intelligence that protests would take place in Chicago, but others said that Chicago protests came as a surprise. Some CPD officials indicated that they had heard about protests in other cities—like Minneapolis—and others said they had not. Ultimately, as with many other cities and police departments throughout the country, the City of Chicago and the CPD did not anticipate the level of protests or unrest that occurred after George Floyd's death. As a result, many officers heard "10-1s" and self-deployed Friday and Saturday, May 30 and 31, 2020. The City and the CPD continued to struggle with receiving, vetting, and sharing information, as protests and unrest spread throughout Chicago. The City and the CPD personnel told us, however, that they began to adjust to the "new normal," as some representatives described.

The CPD further summarized its strengths and weaknesses regarding communications as follows:

Analysis Figure 2. CPD After Action Report (May 20, 2020, through June 12, 2020)

### CPD After Action Report: "Communications"

| Strengths | (1) Community Partnerships |
| | (2) Existing SDSCs [(Strategic Decision Support Centers)] and ATCs [(Area Technology Centers)] |
| Weaknesses | (1) Information held in silos was not disseminated to field supervisors |
| | (2) Business and retail community vulnerable to property crime |
| | (3) Investigation units overwhelmed by widespread criminal activity Department members were exhausted, stressed, and over-burdened[271] |

As we know from City and CPD emails, leading into the weekend at the end of May 2020, there were discussions regarding the weekend protests and the potential for unrest. In interviews, however, City and CPD personnel offered various explanations for why the City and CPD believed the existing intelligence did not warrant more resources, which included the following:

- Some CPD personnel believed that unrest was unlikely because Chicago does not frequently experience the extent of large-scale protests or unrest that was

---

31; Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 74; *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020,* NATIONAL POLICE FOUNDATION (April 2021), at 73, 79, 80, 83; *After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020,* RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020), at 13, 49.

[271] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020,* CHICAGO POLICE DEPARTMENT (February 2021) at 22.

occurring in other cities in response to police actions that occur outside of Chicago.

- Some City and CPD personnel said that efforts were being focused on limiting the spread of COVID-19 from other large gatherings, helping businesses to safely reopen after extended shutdowns, and responding to and reducing rises in violent crime.

- Some City and CPD personnel said that there was a gap in intelligence regarding anticipated turnout and organization because the City was not issuing permits for large gatherings due to COVID-19.

- Some City and CPD personnel said that many of the protests either did not have the typical organizational structure as typical protests, had organizers that the City and the CPD did not know the new organizers to establish preliminary contacts and coordination, or the organizers were hostile or otherwise unwilling to communicate with the City or the CPD.

- Some City and CPD personnel said that the City and the CPD were not effectively monitoring social media, where many protests—or even unrest—appeared to have been communicated before and during protests.

Even after the unrest on Friday night and Saturday morning, however, some members of CPD command staff—perhaps hopeful—believed that the worst was over, and information regarding those challenges was not consistently shared across the CPD.

The CPD recently described its process and its struggles in May and June of 2020:

> The process of distilling and sharing information relevant to criminal and/or national security investigations is typically referred to as the "intelligence cycle." It is widely understood as a six-phase process: (1) requirements, (2) planning and direction; (3) collection; (4) processing and exploitation; (5) analysis and production; and (6) dissemination. Like any other law enforcement agency, the Department receives a tremendous amount of incoming information from various sources. These sources include, but are not limited to, calls-for-service, community conversations, and information submitted to CPDTip.org.

> Strategic Decision Support Centers ("SDSC") within each police district use this and other information to provide real-time, tactical analytic support to Department members while assisting with the strategic analysis of broader crime trends. Area Technology Centers ("ATC") similarly use this information to support long-term criminal investigations conducted by BOD.

> *But the Department recognizes that SDSCs and ATCs were largely un-*
> *derutilized during the Events. Each lacked a formal role within the over-*
> *all Command Post structure, so personnel assigned to them—with spe-*
> *cialized training in emerging technologies and live access to POD cam-*
> *eras—contributed only extemporaneous intelligence products to De-*
> *partment leaders.*[272]

Based on a review of City and CPD records, the City and the CPD had reliable information suggesting a high likelihood of wide-scale protests and potential unrest in Chicago. In fact, the CPD and CPIC shared various circumstances that suggested a high risk, and the City and CPD executives met to address this likelihood. While information gathering must be improved to better collect details regarding when, where, and how such protests will occur, the City and the CPD must also better utilize the information they have. For example, the City and the CPD knew that stores were shutting down in Chicago based on information that those businesses had regarding the potential for unrest. This information, however, did not appear to be utilized in the City or CPD's planning for the events at the end of May 2020.

According to the CPD, it continues to make efforts to improve information gathering and communication. The CPD said, for example, that it started to "actively evaluate the process by which information is received, interpreted, processed, and disseminated," which is an ongoing, "cross-programmatic effort involving various units" and "local, state, and federal partners."[273] CPD representatives also indicated that it began to create a social media team, along with policies and procedures and trainings. We have not, however, seen any of these materials.

## (3) COMMUNITY ENGAGEMENT

### IMT's Recommendation

- Continue New Forms of Community Engagement by, among other things, (1) clearly communicating time, place and manner restrictions; (2) conducting community-sentiment assessments; (3) engaging with community review of and comment on policies and training; (4) creating and maintaining community and business safety plans; (5) victim services (¶¶10, 49, 52, 115, 160, 511, 546)[274]

---

[272] *See id.* at 22.

[273] *See id.*

[274] *See Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 30-31, 2020 Protests/Riots, Final Report,* CITY OF CHARLESTON, SC (February 2021) at 59; Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020,* DALLAS POLICE DEPARTMENT (August 14, 2020) at 40; *Protest and Civil Disorder Incidents, After-Action Report, May 29-June 13, 2020,* Las Vegas Metropolitan Police Department, 53–54; *Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT (April 13, 2020) at 119–20; *A Crisis of Trust, a National Police Foundation Report to the Los*

As reflected in the many Consent Decree requirements, community engagement is critical to policing. In addition, the CPD must enhance intelligence and community engagement efforts. Various reports have indicated that many people participated in protests for the first time. As a result, the City and the CPD did not have existing relationships with many of the people who participated in or organized protests. Further, many of the people who were inspired to protest for the first time, did so because of frustration, anger, and pain regarding policing in the U.S. and resisted any actual or appearance of cooperation with police.

According to the CPD's After Action Report, the CPD attempted to reach out to community members after George Floyd's death on Monday, May 25, 2020, and before the protests and unrest at the end of May 2020:

> In the lead up to the first days of the Events and throughout, the Department reached out to event organizers but struggled to establish an on-going dialogue. Similarly, about 60 percent of major city law enforcement agencies reported to the MCCA that a lack of protest organizer cooperation was "the most significant challenge with respect to managing protest-related incidents."[275]

Nonetheless, we also heard from many CPD personnel—particularly those responding in the districts—that some of the best intelligence regarding unrest came from community members, including protesters, who believed that violence was occurring or was about to occur at a location.

We heard from members of the CPD that it was and continues to be a challenge to respond to protests with protesters and protest organizers who refuse to work with any members of the City or the CPD. The CPD representative said, however, that the CPD must continue to try. While necessary, however, it is not sufficient.

Further, the CPD has acknowledged the need to improve on community interactions before and during protest activity:

> The Department must also better facilitate communication between Department leaders and law-abiding, peaceful individuals engaged in First Amendment-protected activities even when event organizers cannot (or refuse to) be identified. This is integral to the on-going

---

Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020, NATIONAL POLICE FOUNDATION (April 2021) at 83; After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020) at 48; Benjamin Carleton et al., Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020, CNA AND MONTGOMERY MCCRACKEN (December 2020) at 84–85, 90.

[275] See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020, CHICAGO POLICE DEPARTMENT (February 2021).

*transparency the Department owes to the individuals whom they serve. . . . Similarly, the Department recognized in the aftermath of the Events the importance of facilitating direct communication between members assigned to the Bureau of Detectives ("BOD") and partners in the business and retail community to most efficiently investigate felony looting, burglary, property damage, and other crimes when they are, in fact, committed during large-scale incidents of civil unrest.*[276]

While such outreach is necessary and important for each protest and event, it is in many respects, too late and too isolated. Even the most well-meaning, compassionate, and resilient members of the CPD's community policing team will not be able to build sufficient community trust when preparing for or responding protests. Rather than select outreach for or during protest activity, community's sentiments are more likely to be driven by the vast majority of the CPD's daily interactions with Chicago's communities. If these interactions are or appear to be significantly detached from the principles of procedural justice and community policing, then the CPD will continue to struggle.

In 2020, the CPD continued to track and encourage positive community interactions. Specifically, the Office of Community Policing developed a community engagement performance management system to measure, manage, and report on community-participation data. Specifically, the performance management process tracks police performance by district. The Office of Community Policing tracks foot patrols, crime trends, complaint data, positive community interactions, and community engagement activities. Each month, the CPD performance management group analyzes the data and reports its findings back to districts (two districts per meeting) to help inform district-level and City-wide decision making.

While this may be a step in the right direction, we have expressed concerns that there are issues and inherent limitations with self-reporting. The CPD will need to demonstrate a more overarching plan to incorporate community feedback on officer interactions across Chicago's communities, especially those communities that have the most police interactions.

To this end, the City and the CPD began to use new community-sentiment-survey data (Elucd survey).[277] This Elucd survey marks a significant new effort by the City and the CPD to measure community sentiment.[278] We further understand that the

---

[276] *See id.* at 7.

[277] *See* ELUCD, https://elucd.com/. *See Chicago Police Sentiment Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/.

[278] In our Independent Monitoring Report 3, we outlined reasons for why we believe additional measures are necessary to receive input from Chicago's underrepresented communities that are most impacted by policing. In this context of gathering systematic data at the district level to measure CPD's legitimacy and use of procedural justice, we have strongly encourage the City and the CPD to listen to community members who have had a *recent* police contact, which

sentiment analysis survey is only one piece of the CPD's broader effort to engage the community, and the CPD has expressed an openness to additional options. Over the next few years, we strongly encourage the City to collect better data on how CPD officers interact with Chicago residents. The data should include interactions with vulnerable or protected segments of the community and reflect whether procedural justice principles are guiding police actions in all police districts, shifts, and units.

The City and the CPD must also improve information sharing across entities. We heard from several City personnel from different entities that their level of anticipation of large protests and unrest differed from the CPD, based on their own community networks and intelligence. While there are reasons for some entities to communicate differently, there is a concern that, for example, COPA was preparing for a likelihood of increased police interactions and complaints, while the CPD was not.

The City and the CPD must also regain the trust of victims of crime. We heard from people, for example, who suffered or whose friends or family suffered serious injuries, but did not receive follow-up from the CPD.[279] The businesses, employees, and customers whose businesses, stores, and pharmacies were destroyed—some of which were attached to residences.[280] Over the course of the summer, the City

---

is not the focus of the Elucd survey. (The sentiment analysis survey includes one question asking whether the survey respondent has had any contact with the CPD in the past year, but the nature of the contact is unknown, the time period is too long, and there are no details about how the CPD treated the subject.) The voices from this particular segment of the community are essential, as they are the ones with first-hand, lived experience with the CPD—specifically recent experience that is not distorted by historical events or memory decay. The vast majority of Chicago residents have not interacted with a CPD officer in the past year, and therefore, their knowledge of CPD actions and police services is indirect and potentially inaccurate.

[279]   *Cf., e.g.*, ¶29 ("Fair, unbiased, and respectful interactions between CPD members and victims of crime provide an opportunity to strengthen community trust and foster public confidence in CPD. CPD will continue to require that CPD members interact with victims of crime with courtesy, dignity, and respect. CPD will continue to require that CPD members inform victims of crime of the availability of victim assistance and resources, including providing written notices of victim's rights, when applicable. CPD will also have such victim assistance information readily available on its public website and at all district stations."). As we reported in Independent Monitoring Report 3, the CPD implemented a revised version of Special Order S02-01-03, *Crime Victim Assistance* (although additional community engagement was necessary) and the CPD (1) hired three Victim Assistance Coordinators, (2) trained certain members on crime victims' rights and services and sexual misconduct investigations, (3) received a grant related to crime victim advocacy, and (4) created the Chicago Crime Victim Services Coordinating Council.

[280]   *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 6–7 ("To proactively support those same businesses and retailers, the Department must look to how it interfaces with those businesses and other city agencies and determine a better, more effective means of offering resources and information designed to withstand any future incidents of civil unrest.").

and the CPD made deliberate efforts to increase communications with businesses regarding risks:

> *To this end, the Department has created physical fliers, videos, and social media content as a means of disseminating essential information related to on-going patterns, investigations, and/or public safety threats to the community.*
>
> *One such flier offered a few steps that businesses can take to proactively prepare for large-scale civil unrest. For example, the Department informed business owners how to sign up for "ChiBiz Alerts," which is a text-based alert system created and operated by OEMC. ChiBiz Alerts sends out emergency communications citywide or to businesses located within a particular geographical area. To date, at least 9,059 businesses have signed-up to receive these alerts. Similarly, business owners were informed how to join Chicago's Public and Private Partnership Initiative ("CP3"). CP3 partners have access to an array of resource documents regarding general security measures and emergency planning.*[281]

Given the amount of widespread unrest—along with, among other things, the unfamiliarity with mass-arrest procedures or effective body-worn-camera usage, tagging, or review—the CPD also heavily relied on community input to identify suspects from the unrest:

> *In addition, the Department established a Looting Task Force to coordinate investigations related to burglary, looting, vandalism, and related property crimes that occur during civil unrest. This task force has released countless pictures and videos of potential suspects to the public through the local media. Community cooperation (including thousands of incoming tips) has enabled the team to arrest a substantial number of individuals, most of whom the United States Attorney's Office ("USAO") and CCSAO have since charged with various felony offenses.*[282]

---

[281] *See id.* at 23–24.
[282] *See id.*

## (4) MOBILE FIELD FORCE TEAM

### IMT's Recommendations

- Create, train, and equip specialized Mobile Field Force Teams, with certified members, across CPD areas[283]

Perhaps most notable from the IMT's review of the CPD's response to protest and unrest was the lack of formalized and effectively trained Mobile Field Force teams across the CPD. While some CPD officers had received Mobile Field Force training for the 2012 NATO summit, many of those officers were in different roles, and there were no existing teams that were trained as a unit.

The CPD has experienced and continues to experience significant turnover, with retirements, transfers, promotions, and other reassignments. Many officers were not around for the 2012 NATO summit. Moreover, unlike the 2012 NATO summit, the protests and unrest in 2020 were spread throughout Chicago, rather than being in one centralized downtown location. And with the City not issuing permits during COVID-19, many of the protests were relatively unplanned and did not permit the CPD to train any officers on a specific event, with specific routes, security points, or contingencies. After NATO, the CPD's coordinated and trained Mobile Field Force efforts were not maintained, which hampered the CPD's ability to deploy a significant number of officers with sufficient training or equipment.

The CPD describes Mobile Field Force teams as follows:

> Mobile Field Force ("MFF") units are large contingents of police officers, field supervisors, and Department leaders assembled to provide rapid, organized, and disciplined response to civil unrest. They consist of formally-structured, modular 'platoons' and 'squads' trained to perform a variety of specialized policing functions (e.g., crowd control, perimeter maintenance, traffic control, facility security, custodial escort) in an effort to maintain order and preserve peace amid civil unrest.

> Notably, the Department was lauded following the 2012 NATO Conference for the efficacy with which it employed MFF units as a means of protecting peaceful protestors from agitators, inciters, and wrongdoers. But the 2012 NATO Conference took place nearly a decade ago.

---

[283] See Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 30-31, 2020 Protests/Riots, Final Report, CITY OF CHARLESTON, SC (February 2021) at 60; May 30 Civil Unrest After-Action Review, CITY OF CLEVELAND, OH (December 2020) at 26–27; Reneé Hail, Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020, DALLAS POLICE DEPARTMENT (August 14, 2020) at 38; After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020) at 12.

*Many Department members upon whom the city relied during related demonstrations have since moved to different roles or retired.*

*As a result, the Department could not reliably rest on experience alone to guide police officers and field supervisors through this summer's civil unrest. Officers were either unfamiliar with or unprepared to employ MFF-specific tactics, techniques, and strategies. In addition, field supervisors could not immediately mobilize the coordinated, cross-functional response demanded by the many unique circumstances underlying the Events.* [284]

Further, as detailed above, the level of protest and unrest in 2020 was unprecedented. Most officers were not previously expected or trained to respond to such protests and unrest, much less do so for such extended periods. Because mobile field force teams typically include specialized skills and training, the CPD did not provide recruit training that adequately prepared officers for what they were asked to do during the protests and unrest. Many of the officers did not have crowd-management experience or training. Many of those who received relevant training for NATO in 2012 had not received ongoing or structured training, and much of their specialized equipment had been phased out over the years.

According to CPD leadership, the CPD provided mobile field force training to officers in the Critical Response Team in 2020. We heard from officers of the Critical Response Team, however, that they had not received Mobile Field Force training—adding that they did not believe that mobile field force training would have helped with the level of unrest that the CPD experienced in 2020.

As a result, officers with little familiarity with Mobile Field Force training and tactics were required to respond protests and unrest throughout 2020. Officers were repeatedly placed in positions without sufficient training or equipment. Many of the results were predictable, including a lack of effective and coordinated uses of force when appropriate and necessary and increases in individualized and ineffective uses of force by officers acting outside of their police line or alone. As such attempts proved to be ineffective or even escalatory, protests and unrest continued and spread throughout Chicago. In turn, the CPD was required to deploy additional officers without necessary training and with similar results. This was particularly in the beginning of the protests and unrest, before officers attempted to learn from trial, error, and correction.

This was reflected in many interviews of officers of all levels and experience and community members. Officers who had any experience with forming police lines attempted to teach or remind officers of how to work as a unit, squad or platoon in the actual engagements with protesters. One of the main factors of having a

---

[284] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, Chicago Police Department (February 2021) at 19–20.

well-trained and equipped Mobile Field Force Team is to show unity, coordination, and operational efficiency. This can deter crime in itself and allow officers to minimize the use of force necessary to make arrests, increasing the safety to the person arrested, the officers, and members of the crowd. Such efficiency can also deter others from engaging in unlawful activity. Mobile Field Force units would normally train as units knowing all facets of their training and knowing what tactics are effective in various situations. In addition, properly equipped officers on Mobile Field Force teams have a level of protection from various actions, such as from various projectiles. Mobile Field Force equipment prevents officers from having to always respond with force in order to protect themselves.

While Mobile Field Force units may be authorized and capable of using more force than an individual officer, properly trained, equipped, and certified Mobile Field Force units allow the CPD to use force in a more effective, organized, and targeted manner, which results in less use of force overall. We also watched video of officers leaving their police lines to chase people who they believed committed a crime, such as throwing projectiles. We heard from officers that this often resulted in other officers needing to rescue officers who left the line. To do so, officers needed to use force on people who were either intentionally or unintentionally interfering officers from getting to the officer or officers in need.

In our review of many videos, there did not seem to be a coherent plan about how to respond when officers were having projectiles thrown at them, leaving many officers in harm's way. In many of the videos, we saw people being physically aggressive with officers, throwing projectiles (including rocks, glass, bricks, fireworks, and other explosives, among other items), while others actively pushed back against clear directions from officers. One officer's body-worn-camera footage included repeated questioning about decision-making involving the use of officers to form a human barricade, as well as maintaining a position when taking projectiles with no plan to retreat from or advance on the people who were throwing or launching the projectiles. We also reviewed several videos where officers appeared to advance, narrowing the spatial gap between the officers and the crowd, but gave the crowd no prior or subsequent instruction that would justify the officers getting closer (*i.e.*, communicating the need for the crowd to move back).

In other instances, officer spacing gaps on police lines became so wide as to render the line moot. In one instance, officers faced one line of people while other people freely walked behind them, leading to officer safety issues. People in the crowd may have interpreted the officers' line formation as an authoritative posture rather than a tactical move with any practical application, thereby potentially escalating an already agitated crowd.

To adequately respond to protests and unrest, City and CPD personnel must be aware of and able to identify potential dangers and tactics. In several videos, we

observed people in crowds employing tactics to confront officers, such as steering crowds to certain locations, bringing weapons and devices to harm officers or people in the crowd, leaving weapons along march routes, using banners and umbrellas to hide criminal activity or deflect OC spray, and creating barriers or human chains to break police lines or prevent officers from breaking up the crowds. People also used bikes as barriers and, similar to umbrellas, these often became a flashpoint for officers who were seen attempting to remove the bikes. Several videos we reviewed contained incidents of officers engaged in a tug-of-war with a bike. In one video we observed from July 17, 2020, an officer removed bikes in and around the Columbus Statue. We also observed a few videos where people appeared to use bikes as weapons against police.

We also saw apparent sophisticated tactics being used by people in the crowd, including the use of flags, banners, hand signals, and verbal chains. For instance, as an example of the verbal chains, we observed members of the crowd giving direction to people who appeared to be assigned with specific tasks. In one video, people could be heard saying "If you're under 18, go to the front" and "Black and Brown units to the front." The directions were then repeated down the line of people in the crowd. These tactics were purposeful and indicated an organized element within the broader crowd.

In an effective response, however, the City and the CPD must be able to identify tactics of individuals in the crowd to incite violence or an excessive response from the police. The City and the CPD must also know how to respond to such tactics to protect officers, bystanders, and people exercising their First Amendment rights.

As part of that effective response, the City and the CPD must be able to differentiate between lawful protests, civil disobedience, violent conduct from individuals, and violent conduct from crowds. There were trends when the CPD appeared to take an all-or-nothing approach, having no officers prepared to respond to violence or unrest at or nearby a crowd or having all officers with batons in hand without being needed. During our review of video, there were times when officers had their batons in their hands even when the crowd was docile or, in several instances, when officers were not near a crowd at all. Officers would often walk toward crowds with them. While batons are understandably a first defense in crowd-management situations, there are strategies to ensure that officers' preparations to protect themselves or others do not inadvertently—or advertently—escalate tensions with members of the crowds or act to intimidate people exercising their First Amendment rights.

As the protests continued over the summer, members of the IMT personally observed an increase in preparation for protests that allowed CPD personnel to cre-

ate and maintain distances and de-escalate—or at least avoid escalation—of tensions, while keeping officers and members of the crowd safe. This included, for example, having multiple teams readily available.

In short, when non-Mobile Field Force teams act as Mobile Field Force teams, more people are likely to get hurt, and officers are more likely to use or feel the need to use more serious uses of force. Under the Consent Decree, officers are required to report excessive uses of force (*see, e.g.,* ¶176), officers in a non-Mobile Field Force team are less likely to be able to determine in chaos whether force is excessive, particularly if they were unable to witness the events that immediately proceeded the use of force.[285] It is perhaps unsurprising then that we heard from officers that their platoons or squads chose not to engage with people around them and, instead, attempted to just get through the events safely.

According to the CPD's After Action Report, there were significant consequences to officers on the front lines:

> There were a number of individual incidents where field supervisors and police officers found themselves targeted by assailants wielding various projectiles (e.g., frozen water-bottles, aluminum cans, bricks, rocks). As a result, there were a number of officers seriously injured. These injuries included, but were not limited to, broken bones, lacerations, burns, and abrasions.[286]

To address this issue, the CPD created the Critical Incident Response Team (CIRT) and Community Safety Teams:

> Members assigned to CIRT often respond first when a police presence becomes necessary at large-scale, lawful gatherings and demonstrations. As such, field supervisors and police officers assigned to those units primarily responsible for responding to large gatherings (e.g., 001st District, 018th District, [Critical Incident Response Team], [Community Safety Team], Tactical Teams, etc.) have since begun to attend eight-hour 'refresher' trainings on MFF policies and tactics. In addition,

---

[285] On December 31, 2020, the CPD issued revised Use of Force policies, in which G03-02, *De-Escalation, Response to Resistance, and Use of Force*, was revised in Section VII.A.1, based on the Working Group's recommendation:
*A department member who directly observes a use of force and identifies the force as excessive or otherwise in violation of this directive will, except in extraordinary circumstances, act to intervene on the person's behalf. Such action <u>may include, but is not limited to, verbally or physically intervening</u> to try to stop the violation. If the member is a supervisor, he or she will issue a direct order to stop the violation.*

[286] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 14.

*the Education and Training Division started providing MFF-specific 're-*
*fresher' training department-wide on July 23, 2020. To date, over 1,300*
*Department members have received this refresher training.*[287]

As we referenced in Independent Monitoring Report 3, we received little infor-
mation regarding the Critical Incident Response Team or the Community Safety
Team at the time, including membership, qualifications, trainings, policies, or pro-
cedures. This continues to be true at the time of this report. Without clear policies,
standard operating procedures, or goals—including those for the City's future re-
sponses to protests or unrest—we continue to have concerns regarding the chal-
lenges that these types of teams present and Chicago's troubling history with rov-
ing teams.[288]

Still, we support the creation of properly trained, equipped, and certified Mobile
Field Force teams. On the other hand, while refresher training may have been a
necessary stop-gap measure as the CPD continued to respond to protests and un-
rest, such refresher trainings are not sufficient. In comparison, the City and the
CPD prepared extensively for the 2012 NATO Summit, going beyond refresher
trainings, including in-person drills and exercises. We heard from officers who
went through the training and responded to the NATO Summit that the training
was more intense and demanding than the event. In comparison, we heard from
a few Critical Incident Response Team officers that the training they received was
provided after the fact, was not helpful, did not qualify as "Mobile Field Force"
training, and that they would continue to respond to any unrest using the instincts
and lessons that they learned after hours in the field.

The CPD has said that, by April 15, 2021, it will establish a Domestic Preparedness
Unit within the Education and Training Division to develop and offer training spe-
cific to large-scale events, including First Amendment protected demonstrations
and wide-spread criminal activity.[289]

---

[287] *See id.* at 19–20.

[288] As we noted in Independent Monitoring Report 3, both teams have significant ramifications
for the CPD's compliance with various sections of the Consent Decree, including Community
Policing; Impartial Policing; Crisis Intervention; Use of Force; Supervision; Accountability and
Transparency; and Data Collection, Analysis, and Management. The IMT understands that the
number of officers in these teams has grown significantly since their inception, which creates
a challenge for the CPD to achieve compliance with various Consent Decree requirements,
including establishing the requisite unity of command and span of control. We expect the CPD
to consider how communities respond to such teams and how policing strategies affect rela-
tionships between officers and the communities they serve. The IMT has and will continue to
raise these concerns until the CPD addresses the concerns with the IMT, the OAG, and Chi-
cago's communities, as required.

[289] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between
May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 19–20.

As of the date of this report, we have not received additional details regarding the start of the Domestic Preparedness Unit or its training materials. Best practices on this training, however, exist and have been shown to be effective. While the CPD should use the newly gained experience of its officers to inform its training and policies, we recommend that the CPD revisit this training and ensure that trainers undergo the Office of Domestic Preparedness Mobile Field Force Training Train the Training programs to ensure that new generations of Mobile Field Force teams are not trained based on potentially false lessons from isolated experiences. The Office of Domestic Preparedness Mobile Field Force standardized training should inform the CPD's leadership and supervision of Mobile Field Force officers and tactics, such as OC spray. This training is critical for maintaining control of Mobile Field Force units and providing safety to officers and the public.

Such training requires identifying and addressing resource limitations. To be effective, Mobile Field Force officers must be properly equipped. Furthermore, while it is important for the City and the CPD to be transparent about the Critical Incident Response Team and Community Safety Team with the IMT and the OAG, it is perhaps more urgent to be transparent with the public regarding the use of Mobile Field Force teams. Specifically, the CPD should educate members of the public, community organizers, and protesters regarding the existence of the Mobile Field Force team, its purpose, and the reason its members are equipped with such gear.

The Mobile Field Force gear, for example, protects officers from violent members of the crowd, such as certain projectiles. In addition to safety, this also allows officers to more easily maintain composure and effectively isolate and separate assailants. In comparison, officers who face a hostile crowd without being fully equipped may be more likely to risk attempting to use force or arrest a hostile person in the crowd after being hit with a projectile, triggering a fight or flight response. Mobile Field Force equipment—and training—enable officers to not overreact and, instead, take deliberate measures to target assailants and de-escalate—rather than escalate—tensions. Such awareness and training must occur before, during, and after unrest to best protect officers, protesters, and the public.

In short, the CPD must create a cadre of well-trained and equipped Mobile Field Force teams under appropriately trained leadership. Such teams should be predetermined and should train together under the Mobile Field Force structure of unity of action and command, ensuring that officers do not respond independently or employ force without command authorization. The City and the CPD must also do a realistic and meaningful cost-benefit analysis regarding the need to provide meaningful Mobile Field Force training to additional officers. If all officers will be required to deploy to crowds and unrest, then the City and the CPD should prepare them to do so. While it may be ideal to prepare and train officers as a unit, Mobile Field Force teams will still work better with officers who have been trained separately, than not at all.

## (5) OFFICER WELLNESS AND SUPPORT PROCEDURES

### IMT's Recommendation

▪ Better prepare for department-wide officer wellness and support, including providing and tracking protective equipment, transportation, hydration, food, facilities, and relief (¶¶381–86)[290]

As reflected above, the City and the CPD did not have a plan to deploy most sworn officers until it was necessary to do so. Once officers were deployed, they were put on 12 hour shifts with canceled days off for an indefinite period. Officers were put into circumstances, often dangerous, without sufficient training or guidance. On top of these challenges, the CPD struggled to provide sufficient breaks, food, water, and rest. While overworked and under-rested, officers faced passionate crowds, often openly critical of police, in general, and the CPD, in particular. The City and the CPD asked officers to preserve professionalism and serve and protect while often receiving slurs, threats, doxing, and physical attacks. In addition to response to crowds and unrest, other officers needed to address typical police responsibilities, including rises in violent crime, where they are required to make quick assessments and decisions. We heard from many officers that they believe officers' ability to make these decisions was negatively impacted by their lack of rest and physical and mental fatigue.

In August 2020, COPA also identified officer wellness issues as directly relating to officer conduct:

> Several COPA investigations have highlighted the excessive number of hours and shifts worked during the protests. While there was an overwhelming public safety interest in maintaining a law enforcement

---

[290] *See* Jonathan Links, Katie O'Conor, and Lauren Sauer, *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, JOHNS HOPKINS UNIVERSITY (December 4, 2015) at 64–67; *Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 30-31, 2020 Protests/Riots, Final Report*, CITY OF CHARLESTON, SC (February 2021) at 59–60; *May 30 Civil Unrest After-Action Review*, CITY OF CLEVELAND, OH (December 2020) at 27, 32, 34, 36–38; Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT (August 14, 2020) at 42–44; *Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT (April 13, 2020) at 116; Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 73; *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020*, NATIONAL POLICE FOUNDATION (April 2021) at 81; *After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020*, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020) at 23–25; Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN (December 2020) at 83–84.

> *presence on the street during the protests, in many instances, lack of sleep, stress, and other similar factors directly influenced member conduct.*

To date, some officers are still under investigation for varying levels of misconduct, and according to the CPD, a few have been relieved of police powers for protest related conduct. There also appears to be an increase in officer retirements, including many high-level positions.[291] And tragically, the CPD has struggled with officer suicides before 2020, which continued in 2020 and have continued into 2021.

In the CPD's After Action Report,

> *Whether a Department member's days off may be cancelled, hours extended, or area of deployment shifted invariably impacts his or her mental, emotional, and physical well-being. The Department relies on its field supervisors and police officers to make instinctual, split-second decisions and going forward, it cannot allow things like exhaustion and stress to impact decision-making.*[292]

While the number of hours, shifts, and canceled days off continued throughout 2020—and into 2021—the CPD eventually adjusted deployment plans to ensure that officers had at least one day off a week. Nonetheless, such extended shifts and canceled days off put significant stresses on officers and their families. This may have been especially true during COVID-19, as we heard that many families with first responders, and other essential workers, struggled to address child and parental care and closed schools.

The CPD has committed to improving the amount of notice that officers receive before canceled days off and extended shifts.

> *The Department intends to better communicate with its members as far in advance as possible when they should anticipate disruptions to their personal lives as a result of large-scale, planned events and key holidays (e.g., Memorial Day, Father's Day, Independent Day, and Labor Day). This is, of course, in addition to the Department's on-going commitment to better support members as they navigate the unique*

---

[291] *See, e.g.*, Frank Main and Fran Spielman, *Chicago police retirements this year already top all of 2018, could end up among highest ever*, CHICAGO SUN-TIMES (June 18, 2021), https://chicago.suntimes.com/2021/1/15/22229584/police-retirements-backlash-chicago-new-york-minneapolis-john-catanzara-fop-michael-lappe; Fran Spielman, *Midterm correction, COVID-19 fatigue or mass exodus? Lightfoot's revolving door keeps spinning*, CHICAGO SUN-TIMES (May 9, 2021), https://chicago.suntimes.com/city-hall/2021/5/9/22425232/chicago-mayor-lorilightfoot-administration-turnover-mid-term-cabinet.

[292] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 16, https://home.chicagopolice.org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf.

> *demands of policing and its impact on mental, emotional, and physical*
> *health and well-being.*[293]

We have heard from officers, however, that this issue pre-existed the protests and unrest in 2020 and has continued in 2021.

The CPD further acknowledged the need for plans and preparation for unplanned events or for scaling up the response to planned events:

> *But with a modern, 'leveled' response, Department members can bet-*
> *ter anticipate whether their days off might be cancelled, hours ex-*
> *tended, or areas of deployment shifted. Similarly, consistent 'levels'*
> *will enable the Department to scale an otherwise-consistent emer-*
> *gency response (whether localized or citywide) to any given incident.*[294]

Commanders told us that the CPD made Employee Assistance Program personnel available to officers. Many acknowledged the importance of the program, but added that more needed to be done—because more always needs to be done.

As reflected in the CPD's policies and training, most CPD officers are not typically assigned to handle large-scale protests or unrest. All officers, however, were called on to do so in 2020 and for extended periods, often for 12 hour days with no or limited days off.

---

[293] *See id.*

[294] *See id.* at 11 (citing *Special Response Plans*, General Order G05-02 § II (December 7, 2017)).

## (6) RESOURCES

### IMT's Recommendations

- Conduct a feasibility study regarding the acquisition, prioritization, allocation, and tracking of resources for officer wellness and responding to protests and unrest (¶¶377, 379)[295]

The Consent Decree requires, among other things, equipping CPD officers "in a manner that enables them to do their jobs as safely as reasonably possible" (¶379). CPD must also "ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement" (¶379). The CPD must also conduct periodic "department-wide equipment and technology audit[s] to determine what equipment is outdated, broken, or otherwise in need of repair or replacement" (¶415).

Inadequate resources and misallocation of existing resources severely hindered the City and the CPD's ability to effectively respond to protests and unrest. Better planning would have better addressed the City and the CPD's ability to allocate existing resources. For example, the CPD did not utilize its existing radios or body-worn cameras efficiently, often requiring officers to respond with neither.

But even with proper planning, the City and the CPD likely would have still struggled with the challenges caused by a lack of necessary resources, such as effective radios. And as with the need to do preparations and trainings weeks—if not months—in advance of George Floyd's death, the City and the CPD would have

---

[295] *See* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, Johns Hopkins University (December 4, 2015) at 14, 17, 31–32; *Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 30-31, 2020 Protests/Riots*, *Final Report*, CITY OF CHARLESTON, SC (February 2021) at 58–60; *May 30 Civil Unrest After-Action Review*, CITY OF CLEVELAND, OH (December 2020), 27, 30–31; Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT (August 14, 2020), at 17–19, 22–23, 27, 32, 38; *Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT (April 13, 2020), at 104–108, 112, 116; Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 73; *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020*, NATIONAL POLICE FOUNDATION (April 2021), at 78–79; *After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020*, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT (September 15, 2020), at 12–14, 25–26; Nicholas Mitchell, *The Police Response to the 2020 George Floyd Protests in Denver, and Independent Review*, DENVER OFFICE OF THE INDEPENDENT MONITOR, at 55; Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN (December 2020), at 80–85, 88.

needed to acquire resources before May 25, 2020. Many supply chains were impacted by COVID-19, and by the time the CPD realized its need, the demand for specialized police equipment had risen across the country.

For example, as referenced above, the CPD did not have a fully staffed and trained mobile-field-force team at the start of the 2020 protests and unrest. During the 2012 NATO Summit, in comparison, the CPD fully equipped thousands of officers with Mobile Field Force equipment. Since then, the CPD allowed its supply of Mobile Field Force equipment to dwindle over the years. The CPD did not employ a system to track or reassign equipment as officers retired or transferred out of patrol. As a result, many of the corresponding equipment was gone or deteriorated and existing supply was insufficient. Still, at the end of May 2020, the CPD had to rely on mass arrests kits left over from the NATO Summit, some of which included expired markers and zip ties. The CPD was fortunate that it had recently taken inventory and had a few personnel who knew where those materials were. Even if all of the equipment was in good condition, however, it would not have been enough for what was needed.

If the CPD did not have sufficient resources for specialized teams to conduct crowd management, it definitely did not have sufficient resources for the emergency deployment of all officers. As a result, the City and the CPD had to identify needs for such a large deployment after beginning the deployment.

This required a rush to purchase necessary materials. According to CPD responses to requests, for example, between May and June 30, 2020, the CPD also purchased about 400 water bottles, 10,000 gloves, 1,000 black markers, 250 face shields for helmets, 15 fire extinguishers, 12,500 flex cuffs, 30 helmets, 10 HydroStorm Backpacks, 4,000 hand wipes, 500 batons, 103 "riot shields," and 12,000 surgical masks. Some costs are reflected in Analysis Figure 3, below.

Analysis Figure 3. CPD Purchases between May 25, 2020, and June 10, 2020

| | |
|---|---|
| Emergency Purchase of cable tie for flex cuffs | $226.44 |
| Heavy duty long black cable ties and cuff cutters | $1,698.20 |
| Gas masks and filters | $23,119.28 |
| OC Spray | $16,308.00 |
| OC Spray + Freight Charges | $16,087.49 |
| Tent Rentals | $1,482.68 |
| Rental of 140 Passenger Vans (seat 12 to 15 people) | $286,124.00 |
| **Total** | $345,046.09 |

The CPD also relied on donations, including over 56,000 snacks, 68,000 bottles of hydration, over 360 bags of ice, nearly 2,000 hand wipes and gloves, coolers, tents, generators, and fans. In the CPD's After Action Report, the CPD notes that it has also received additional donations:

> In addition, the Chicago Police Memorial Foundation ("CPMF") gener-ously acquired and donated 1,650 ballistic helmets to front-line field supervisors and police officers, upgraded to include Kevlar protection and laser beam reflectors across the affixed face shield as part of its 'Helmets for Heroes' initiative. These helmets will undoubtedly protect field supervisors and police officers from blunt trauma, allowing them to stand confidently between law-abiding, peaceful demonstrators and those few hostile assailants willing to do harm to others.[296]

## Body Worn Cameras

The Consent Decree specifies many requirements regarding the CPD's use of body-worn cameras. *See, e.g.*, ¶¶237 and 239. Body-worn cameras are a critical tool for securing public trust, securing evidence, and increasing accountability. As the CPD acknowledged in their After Action Report, body-worn cameras "allow for in-creased transparency, create digital evidence, protect Department members from false complaints, and offer a fair and impartial documentation of events for all of the parties involved."[297] In the initial and ongoing response to protests and unrest, the CPD had several challenges with body-worn cameras.

In the initial response to unrest at the end of May 2020, with very minimal excep-tions, the CPD deployed all sworn officers, including officers in Reform manage-ment, Force Review Division, and the Bureau of Internal Affairs. Because these of-ficers are not typically in patrol, they are not equipped with body-worn cameras. In the CPD's After Action Report, the CPD acknowledged its challenges with equip-ping officers with body-worn cameras.

> [At] the time of the Events, BWCs were largely assigned to field units (i.e., patrol) and not to each of roughly 13,000 sworn officers in various roles throughout the Department due to cost. Thus, as this was a de-partment-wide response, many field supervisors and police officers witnessed criminal activity and made arrests for which no BWC video exists.[298]

---

[296] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 14 ("The helmets previously purchased by police officers during the academy needed to be upgraded."), https://home.chicagopolice.org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf.
[297] *See id.*
[298] *See id.*

Moreover, by creating an ad hoc central mobilization location, officers who deployed from that location did not have access to their typical body-worn cameras from their districts. The CPD continued to have issues with body-worn cameras after creating the Critical Incident Response Team and the Community Engagement Team. Some of the officers assigned to these teams came from specialized units without body-worn cameras, and began working on the teams without receiving body-worn cameras. This issue became known after the officer-involved shooting in District 7 on August 9, 2020, because the officers involved were not wearing body-worn cameras.[299] According to CPD, there were at least 5,676 officers who responded to protests and unrest between May 1, 2020, and August 12, 2020, without body-worn cameras. We also heard from some officers with body-worn cameras that supervisors instructed them to not have the cameras on the entire time while responding to crowds during 12-hour shifts to preserve battery life—which was often limited from having been insufficiently charged.

These challenges, however, continued after the central mobilization center. As referenced above, the CPD created the Critical Incident Response Team and the Community Safety Team to respond to any ongoing protests and unrest over the summer of 2020. Some of these officers, however, did not have body-worn cameras. In fact, it wasn't until after the officer-involved shooting on August 9, 2020, when members of the Critical Incident Response Team did not have body-worn cameras, which led to another round of unrest, that the CPD addressed the issue.

On November 20, 2020, the CPD notified the IMT that "the Strategic Initiatives Division has provided the Community Safety Teams (CST) and the Critical Incident Response Team (CIRT) with Body Worn Cameras." In the CPD's After Action Report, the CPD asserted that everyone "assigned to patrol duties-including those on the Critical Incident Response Team ("CIRT") and Community Safety Teams ("CST")-has been assigned a BWC" and officers "mass transit and traffic sections have also recently been assigned BWCs."[300]

Without sufficient body-worn cameras in place, there is less evidence of criminal activity or officer misconduct and the City and the CPD is unable to evaluate officer performances. It is paramount to provide officers who perform patrol functions. Officers who do not have body-worn cameras should only be deployed to assignments which do not require enforcement actions. The CPD has not yet provided the IMT with sufficient proof that all officers with patrol duties have been assigned

---

[299] *See* Samah Assad and Christopher Hacker, *City Promises All Officers Will Wear Body Cameras By 2021 After Officers Without Cameras Shoot Man in Englewood*, CBS Chicago (August 11, 2020), https://chicago.cbslocal.com/2020/08/11/city-promises-all-officers-will-wear-body-cameras-by-2021-after-officers-without-cameras-shoot-man-in-englewood/. *See also Case Portal Log# 2020-3647*, Civilian Office of Police Accountability (Posted September 29, 2020), https://www.chicagocopa.org/case/2020-3647/.

[300] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, Chicago Police Department (February 2021) at 14.

a body-worn camera. Moving forward in additional reporting periods, we look forward to receiving records of and reporting on equipment developments and corresponding existing audits and plans moving forward.

## Radios and Other Communication Devices

The CPD also had significant challenges with radios that were interrupted and a lack of equipment to effectively communicate with crowds. In the CPD's After Action Report, the CPD addressed the significance of the CPD's inability to use effective radio communication:

> A radio is, debatably, one of the most essential pieces of equipment that a police officer carries on a day-to-day basis. It is the primary means by which police officers are dispatched to calls and—perhaps more importantly—how they make emergency pleas for help. Following the civil unrest, Department leaders acknowledged a few ways which radio communications could be improved. Department members do not own the radios that they carry.

The CPD has indicated that they have and continue to work to resolve this problem:

> [T]he Department acquired additional Motorola 8000 series radios to make available at each of the five police areas and twenty-two districts when off-duty officers are deployed. Similarly, the Department began the process of upgrading to a secure, modernized radio system to ensure that the intensity of a given situation and/or rogue transmissions do not comprise a member's ability to communicate effectively.

There were also significant challenges communicating with members of the crowd, which is imperative for successful crowd management and limiting uses of force.

> . . . Department leaders—many of whom watched the civil unrest unfold live from OEMC—could not effectively communicate their POD observations to field supervisors or officers because of radio communication challenges. Crowd noise alone precluded effective back-and-forth radio communication. Rogue transmissions over police radio frequencies interrupted on-going emergencies. At the same time, Department members unfortunately found themselves mobilized for so many consecutive hours that their radio batteries died in the field.

> Similarly, field-deployed Department leaders and mid-level supervisors could not communicate effectively with the many law-abiding, peaceful individuals engaged in First Amendment-protected activities. It was simply too loud to open and facilitate an effective transparent dialogue

> *about individual incidents, arrests, and/or decisions being made by De-*
> *partment leaders.*[301]

In response to this challenge, the CPD acquired additional radios and bullhorns:

> *In order to facilitate communication between Department leaders and*
> *the many law-abiding peaceful individuals engaged in First Amend-*
> *ment-protected activities, the Department recognized an urgent need*
> *to acquire megaphones (i.e., bullhorns). These hand-held devices al-*
> *lowed Department leaders and mid-level supervisors to communicate*
> *with residents and police officers alike about what exactly was hap-*
> *pening at any given time.*[302]

We have some concerns that these methods of communication are still not effec-
tive for large scale events, and we recommend that the City and the CPD continue
to assess whether additional resources are necessary.

## Mobile Field Force Equipment and OC Spray

While officers have some of the equipment needed to respond, including helmets
and personal OC spray devices. During initial protests and unrest, many officers
responded without sufficient protective equipment, including helmets. This was
dangerous and likely resulted in otherwise avoidable officer injuries. Further, the
CPD did not have additional equipment—such as shields or OC spray canisters—
readily available for organized distribution. In the first weekend, we heard that this
equipment was handed out after events already rose to a level of an emergency
and without tracking. While we hear that additional OC spray canisters were only
handed out to supervisors, there was no way to show this outside of the memories
of a few people who were rushing around to deliver materials to any officers they
could find.

There also does not appear to have been a tracking mechanism for renewing per-
sonal OC spray canisters. This is a particular concern since we heard that there was
a lot of confusion regarding the use of personal OC spray. CPD leadership said that
the OC spray is a liquid substance that can target one individual at a time and that
officers need the Superintendent's approval before using OC spray on a crowd.[303]

---

[301] *See id.* at 15.
[302] *See id.* at 15–16.
[303] *See, e.g.,* ¶¶208 ("CPD officers may only use OC devices for crowd dispersal when such force
is necessary, objectively reasonable, and proportional to the threat presented to public safety.
CPD will continue to require that the Superintendent or his or her designee provides authori-
zation before OC devices are used for noncompliant groups, crowds, or an individual taking
part in a group or crowd.") and 210 ("Each individual application of an OC device (e.g., each
spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, nec-
essary, and proportional under the totality of the circumstances, and consistent with the ob-
jectives above.").

Nonetheless, there appears to have been significant confusion regarding some officers misconception that they could use their individual OC spray canisters on multiple individuals at a time—as opposed to larger OC spray canisters from munitions teams for the purpose of the use on crowds—without Superintendent approval. On October 28, 2020, for example, in response to a request for a "list of all officer requests for personal OC spray—and the corresponding dates of those requests—from May 25, 2020, through August 31, 2020," the CPD responded that "there are no records responsive to this request."

While officers may be justified in using individual OC spray on multiple assailants, the lack of tracking individual OC spray distribution and refills was a significant missed opportunity. If the CPD had done so, the CPD could compare officers reporting on the use of OC spray and their requests for renewals to ensure that OC spray was properly reported and potentially review the reports and corresponding body-worn-camera footage and evidence to determine whether OC spray was being used according to CPD policy.

\*\*\*

While the City and the CPD had yet to provide compliance records by the end of the last reporting period (December 31, 2020), the CPD reported that they have made progress on increasing the City and CPD's ability to better utilize existing equipment and obtain additional equipment to respond to protests, prevent unrest, and respond to unrest. This includes better Mobile Field Force equipment, improved radio communications, crowd communication devices, and upgraded helmets.

Specifically, the CPD has reported that it has improved the security of its radios and added body-worn cameras to transportation and special teams. For example, in the CPD's After Action Report, the CPD asserted that everyone "assigned to patrol duties-including those on the Critical Incident Response Team ("CIRT") and Community Safety Teams ("CST")-has been assigned a BWC" and officers "mass transit and traffic sections have also recently been assigned BWCs."[304] Moving forward in additional reporting periods, we look forward to receiving records of and reporting on equipment developments and corresponding existing audits and plans moving forward.[305]

---

[304] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 14.

[305] *See id.* at 15–16 ("Even when Department members could receive information, various obstacles inhibited their ability to move around the central business district efficiently. Squad cars were destroyed (and often set ablaze) with an astounding, unanticipated frequency on the first few days and nights. This vandalism rendered the vehicles functionally useless. Similarly, when more Department members are working at a particular time (during, for example, twelve-hour

shifts and/or cancelled days off) the Department simply lacked sufficient fleet capacity to pro-vide all working officers with sufficient transportation. . . . Department leaders also recognized the urgent need to identify alternate means of transportation for officers when more officers are working than squad cars are available. As a result, the Department assessed and developed a plan ensuring that each officer could be transported by relying on rented passenger vans and Chicago Transit Authority ('CTA') buses. These alternate means of transportation mobilized small teams quickly and efficiently transported large platoons to pre-identified, 'fixed' foot posts.").

## Policies

### IMT's Recommendations: Policies

- Update and Develop Standard Operating Procedures for initiating Emergency Operations Center and Forward Command Posts, establishing clear roles and responsibilities for all levels of command (¶¶341–46, 354)

- Update and develop CPD policies, with an enhanced focus on (1) Use of Force, including mass arrests (¶¶153, 158–216, 218–19, 243–48, and 509), (2) First Amendment-related policies (¶208), (3) core policing values regarding ethical policing practices and a commitment to fair, unbiased and respectful interactions (¶¶54, 152, and 163); and (4) accountability (¶¶626, *et al.*)

Effective policies should serve as the foundation for providing the City and the CPD, including command staff, supervisors, and officers, with their responsibilities and expectations. While this is always true, it is particularly important during crises. Policies should reflect the institutional knowledge and wisdom of past experiences, so that leaders and personnel do not need to reinvent known solutions or repeat mistakes. As reflected in Analysis Figure 4 below, the CPD has acknowledged that there were gaps in its policies and procedures at the start of the 2020 protests and unrest. The City and the CPD now have the opportunity to capture the lessons learned into its policies and procedures to better address similar circumstances if they occur in 2021, in the next decade, or in the next generation. This process should include the lessons learned across all levels of City and the CPD personnel, as well as receive input from the Chicago's communities they serve.

Analysis Figure 4. CPD After Action Report (May 20, 2020, through June 12, 2020)

### CPD After Action Report: "Command and Control"

| Strengths | (1) Existing Summer Operations Center ("SOC") |
| | (2) Intergovernmental relationships |
| | (3) Investment in technology |
| | |
| Weaknesses | (1) Outdated, ad hoc incident management policies and procedures |
| | (2) Inefficient method of tracking Department members and resources |
| | (3) Department leaders lacked recent training on NIMS/ICS[306] |

---

[306] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 17.

# (1) COMMAND POSTS, ROLES AND RESPONSIBILITIES

## IMT's Recommendations

- Update and Develop Standard Operating Procedures for initiating Emergency Operations Center and Forward Command Posts, establishing clear roles and responsibilities for all levels of command (¶¶341–46, 354)[307]

The success of the City and the CPD's policies start at the top. Based on the records we received—or rather lack thereof—the City and the CPD did not have sufficient policies delineating clear duties and responsibilities for personnel to respond to widespread protests and unrest.[308] The City and the CPD relied on the experience of its personnel, and while many personnel admirably worked to meet the moment, the City and the CPD must have processes that are not reliant on any one individual or set of individuals.

As referenced above, the Summer Operations Center was converted into the Emergency Operations Center to track, manage, and direct City, CPD, and local, state,

---

[307] *See* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, JOHNS HOPKINS UNIVERSITY (December 4, 2015), 14, 17, 31–32; *Strengthening Charleston: Assessment of the Charleston Police Department Response to the May 30-31, 2020 Protests/Riots, Final Report*, CITY OF CHARLESTON, SC, 58–60 (February 2021); *May 30 Civil Unrest After-Action Review*, CITY OF CLEVELAND, OH, 27, 30–31 (December 2020); Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT, 17–19, 22–23, 27, 32, 38 (August 14, 2020); *Safe LA Civil Unrest, 2020 After Action Report*, LOS ANGELES POLICE DEPARTMENT, 104–108, 112, 116 (April 13, 2020); Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 73; *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020*, NATIONAL POLICE FOUNDATION, 78–79 (April 2021); *After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020*, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT, 12–14, 25–26 (September 15, 2020); Nicholas Mitchell, *The Police Response to the 2020 George Floyd Protests in Denver, and Independent Review*, DENVER OFFICE OF THE INDEPENDENT MONITOR, 55; Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN, 80–85, 88 (December 2020).

[308] The CPD has noted that some of the Emergency Operations Center practices are in CPD directives, such as Forward Command Post concepts in G05-05, *Critical Incident response Program* (December 7, 2017) and updated roles responsibilities in the recent revision to G02-02, *First Amendment Rights* (April 13, 2021). We agree that the CPD's policies do reference relevant aspects of its response to protests and unrest, and the City and the CPD have made and continue to make deliberate efforts to improve relevant policies, such as G02-02. Our recommendation, however, is for the City's entities, including the CPD, to better develop or update specific standard operating procedures for responding to protests and unrest and to enumerate the lessons learned in 2020, better reflect best practices, and maintain institutional knowledge.

and federal resources.[309] The Emergency Operations Center included representa-
tives from the Chicago Police Department, Mayor's Office, the Illinois State Police,
the Illinois National Guard, the Office of the Emergency Management and Com-
munications, the Chicago Fire Department, and Streets and Sanitation. The Oper-
ations Center also had the ability to monitor various Observation Device cameras.

Throughout the weekend at the end of May 2020 and until Monday, June 2, 2020,
several locations were identified as incident command locations. This made it dif-
ficult for the CPD to establish and communicate incident command, as there was
an overall lack of knowledge about who was acting as the incident commander
and where the command center was that weekend. Specifically, in our interviews
with officers, many supervisors were identified as possibly being in charge on Sat-
urday, May 30, and Sunday, May 31, from commanders to deputy chiefs. Similarly,
many officers referred to different locations as the "command center": the Sum-
mer Operations Center (SOC) at OEMC, the Emergency Operations Center, CPD
Public Safety Headquarters, and Guaranteed Rate Field.

The CPD acknowledged the importance of following the National Incident Man-
agement System and unified Incident Command System framework:

> [The] Department has long recognized the value of a systematic, pro-
> active approach consistent with the National Incident Management
> System ("NIMS"), which follows a unified Incident Command System
> ("ICS") framework. Under NIMS/ICS, the highest-ranking on-site De-
> partment member, responsible for the Department's overall response,
> takes on the role of "Incident Commander." This individual typically
> takes control at a Forward Command Post ("FCP"), a secure location
> established by the first field supervisor on-scene—typically located just
> outside the immediate vicinity of a critical incident. . . . However, the
> Department faced a unique challenge in that Department leaders and
> key members lacked recent, up-to-date training or practice on
> NIMS/ICS policies and procedures.[310]

---

[309] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between
May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 5–6 ("Department
leaders manage the incident from a FCP until a full-scale Operations Center ('OC') is estab-
lished at the Office of Emergency Management and Communications ('OEMC'). But earlier this
summer, the Department had, for the first time, established a Summer Operations Center
('SOC') at OEMC—which enabled a coordinated, proactive response to violent crime by the
city's public safety, regulatory, infrastructure, and other agencies. In turn, the Department was
able to quickly transition the existing SOC to a full-scale OC at the onset of the large-scale,
unprecedented civil unrest. As a result, Department leaders could more efficiently manage
available resources (and resolve incoming resource requests) from the same centralized loca-
tion where they were ultimately making command-level decisions." (citing *Critical Incident Re-
sponse Program*, General Order G05-03 § II-A-1 (December 7, 2017)).
[310] *See id.* (citing *Critical Incident Response Program*, General Order G05-03 § II-A-1 (December 7,
2017)).

## (2) CPD POLICIES

IMT's Recommendation

- Update and develop CPD policies, with an enhanced focus on (1) Use of Force, including mass arrests (¶¶153, 158–216, 218–19, 243–48, and 509), (2) First Amendment-related policies (¶208), (3) core policing values regarding ethical policing practices and a commitment to fair, unbiased and respectful interactions (¶¶54, 152, and 163); and (4) accountability (¶¶626, *et al.*)[311]

As an extension to the lack of planning and preparation for large scale protests and unrest, the CPD did not have sufficient policies on how to respond to large crowds, much less large and sustained protests or unrest. Policies should be developed or revised which address critical issues such as planning process, intelligence gathering and dissemination, roles and responsibilities, rules of engagement, mass arrest, uses of force, and other critical elements of managing protest and special events.

CPD Directives are available on the CPD's website: http://directives.chicagopolice.org/directives/. The CPD also generally invites public comment via email:

> "General questions or suggestions about Department directives and the Department Directive System can be directed to the [CPD's] Research and Development Division's email address at RandD@chicagopolice.org."[312]

---

[311] *See* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, JOHNS HOPKINS UNIVERSITY, 60–61 (December 4, 2015); *May 30 Civil Unrest After-Action Review*, CITY OF CLEVELAND, OH, 27, 30, 36 (December 2020); Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT, 24, 26, 41–42, 45 (August 14, 2020); *Protest and Civil Disorder Incidents, After-Action Report, May 29-June 13, 2020*, LAS VEGAS METROPOLITAN POLICE DEPARTMENT, 43–48; *Safe LA Civil Unrest, 2020 After Action Report*, LOS ANGELES POLICE DEPARTMENT, 111 (April 13, 2020); Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 67–68; *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020*, NATIONAL POLICE FOUNDATION, 73–78 (April 2021); *After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020*, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT, 14–15, 21–22, 26, 35, 37–38 (September 15, 2020); Nicholas Mitchell, *The Police Response to the 2020 George Floyd Protests in Denver, and Independent Review*, DENVER OFFICE OF THE INDEPENDENT MONITOR, 53–54; Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN, 81–82, 86–88, 90–91 (December 2020).

[312] *Department Directives System, General Order G01-03*, CHICAGO POLICE DEPARTMENT (May 5, 2020), http://directives.chicagopolice.org/directives/data/a7a57be2-12da4413-45c12-da48-e53050843037d784.pdf?ownapi=1.

Because of the increased deployments, community contacts, and sporadic nature of events, many of the CPD's policies applied to the CPD's response to protests and unrest.[313] The City and the CPD have updated many of these policies through the Consent Decree review process, such as those related to Use of Force. This process includes input from the IMT, the Office of the Illinois Attorney General, and Chicago's communities. *See, e.g.*, ¶¶52, 160, and 627, *et al*. Many others are still undergoing the review process. The CPD also, however, amended some of these policies after identifying issues during the protests and unrest, after their after-action report, during requests for records and interviews with the IMT and the City of Chicago Inspector General, and from community feedback, including feedback from the Coalition.[314] Analysis Figure 5, below, provides a non-comprehensive summary of the CPD's relevant policies in May 2020, recent changes, and ongoing development.

---

[313] CPD policies include "**General Orders (GO)**" ("directives that establish critical policies directly related to the core values and functions of the Department or the broad organizational policies and key practices relating to those core values"), "**Special Orders (SO)**" ("directives that establish protocols and procedures concerning specific Department functions, operations, programs, or processes"), "**Employee Resources (ER)**" ("directives that pertain to administrative functions, employment requirements, operations, programs, or processes"), "**Uniform and Property (UP)**" ("Directives pertain to uniforms and equipment, both Department and personal, and Department facilities, property, and vehicles"), and "**Department Notices (DN)**" (directives that are anticipated to be reviewed or revised soon after publication or directives with a limited duration that: a. establish procedures and assign duties to Department personnel for a single event or circumstance; or b. introduce pilot programs or involve only a limited geographic scope or selected personnel; or c. provide listings, calendars, or other information of general interest." *Department Directives System, General Order G01-03*, CHICAGO POLICE DEPARTMENT (May 5, 2020). Although not reflected here, the CPD also has "**Unit-Level Directives**," which are "official written documents issued in the name of a command staff member or unit commanding officer establishing or communicating specific processes, functions, or information within the issuing unit and/or in units below the issuing unit as defined in the Department directive titled 'Department Organization for Command," "can only direct the activities of those units and members under the command of the issuing authority," and are superseded by "Department directives, regardless of classification." *Id*.

[314] On July 23, 2020, the Coalition filed a *Notice of the Coalition's Intent to Initiate Enforcement Proceedings* after which Judge Dow, the IMT, the Parties, and the Coalition began discussions about protest-related policies. *See* pages 6 and 20 of the Executive Summary for further information.

Analysis Figure 5.
CPD Policies Related to Crowd Response from May 2020 to Present

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| **CPD Policies Regarding Responding to Crowds, First Amendment Activity, and Unrest** | | | |
| *The First Amendment and Police Actions,* G02-02 (April 19, 2012) <br><br> *Other Police Action Which May Impact First Amendment Conduct,* G02-02-02 (April 19, 2012) | *The First Amendment,* G02-02 (April 13, 2021) <br><br> *The First Amendment and Police Actions,* S02-02 (April 13, 2021) | • Defines First Amendment assembly <br><br> • Describes crowd management techniques <br><br> • Outlines requirements and responsibilities for issuing crowd dispersal orders, including reporting requirements <br><br> • Added procedures and reporting requirements regarding dispersal orders <br><br> • G02-02-02 discontinued and the material it covers incorporated into G02-02 | Ongoing review with the IMT, the OAG, and the Coalition |
| *Investigations Directed at First Amendment-Related Information,* G02-02-01 (April 19, 2012) | *Not revised* | *None* | *Not submitted for policy review* |
| *Critical Incident Response Program,* G05-03 (December 7, 2017) | *Not revised* | *None* | *Not submitted for policy review* |
| *[Did not exist]* | *Response to Crowds and Civil Disturbances,* S03-22 (August 27, 2020) <br><br> ICS-11 Incident Check-In, CPD-11.301 form (August 2020), and <br><br> Incident Response, CPD-11.302 form (August 2020) <br><br> ** <br><br> *Reporting the Response to Crowds, Protests, and Civil Disturbances,* D20-08 (November 2, 2020), <br><br> ICS-211 Incident Check-In, CPD11.301 form (October 2020) | *NEW POLICY* <br><br> • Introduced two new forms for supervisors to complete when CPD deploys officers as squads or platoons: (1) the Incident Check-In must be filled out before deployment to track resources and personnel and (2) the Incident Response form must be completed when Department members formed into squads physically respond to a crowd's actions or inactions in response to verbal directions (e.g., with baton "port arms push" or "stunning"). | Under annual CPD review per ¶159 and subject to community input per ¶160 |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | ICS-211 Incident Response, CPD11.302 (Revised January 2021) ** | • Clarifies that Tactical Responses Reports are still required for individual uses of force<br><br>• Describes in Section IV.C.6 that supervisors are required to document "whether verbal warnings were given to the crowd, including the number of warnings and the content." | |
| *Department Response to the Coronavirus Disease 2019 (COVID-19), S04-09 (April 30, 2020)* | *Department Response to the Coronavirus Disease 2019 (COVID-19) - Revised 29 January 2021, S04-09 (January 29, 2021)*<br><br>*COVID-19 PPE Kit Replacement Report, CPD-21.251 (March 2020)* | • Specifies that CPD personnel (officers and other CPD personnel who perform a critical function) must go through prescreening, conduct regular self-monitoring, wear PPE, and social distance after being exposed to an individual with COVID-19 within 48 hours before that individual began to fell ill or exhibit symptoms<br><br>• Encourages CPD personnel to get tested for COVID-19 five to seven days after a known close contact exposure<br><br>• Adds the following language: "Department members are required to wear a surgical mask or face covering when a member cannot maintain 6 feet of social distancing from other persons. The surgical mask or face covering applies to all interactions with the public and other Department members and extends to all locations including Department vehicles, all City of Chicago facilities, private property, common or public areas, and residential and commercial buildings." | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | • Requires, "when practical and available" that "an arrestee claiming to have COVID-19" or an arrestee "contaminated with COVID-19 will be requested to wear a surgical mask, face cover, or PPE to contain the contamination"<br><br>• Adds additional reporting requirements for CPD personnel who come within 6 feet of someone with COVID-19 for 15 minutes or more within 24 hours, specifying that CPD personnel will "NOT identify the source individual"<br><br>• Specifies the use of benefit, medical, or unpaid status for officers who are exposed to COVID-19 and work-from-home options | |
| *Emergency Action Plans for Department Facilities,*<br>S05-07<br>(November 12, 2015) | *Emergency Action Plans for Department Facilities,*<br>S05-07<br>(August 26, 2020) | • Updates CPD facility emergency action procedures and responsibilities. Specifically designates that, in the event of an evacuation, if the sector sergeant is absent, OEMC should assign a field sergeant and notify the district station supervisor to man traffic-control sites<br><br>• Updates the authority to implement and terminate a building evacuation under an emergency evacuation plan for a Department facility. The First Deputy Superintendent has the authority to order an evacuation of the Public Safety Headquarters Building. The Deputy Chief, Criminal Networks Group has the authority to order an evacuation of the Homan Square Police facility. The appropriate area | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | • deputy chief of Office Operations has authority to evacuate an area center or the South Loop Complex<br><br>• For drills and training, the Inspection Division will complete a report to the inspected facility's responsible Bureau Chief or highest ranking member | |
| *Emergency Action Plans*, S05-07 (November 12, 2015) | *Emergency Action Plans*, S05-07 (August 26, 2020) | • Updates emergency plans for Area Centers, District Facilities, and other CPD facilities (*non-public*) | *Not submitted for policy review* |
| *Mass Arrest Procedures*, S06-06 (September 27, 2018)<br><br>*Mass Arrest Card*, CPD-11.433 (September 2018) | *Not Revised* | *None* | *Coordinated Multiple Arrest Incident Procedures*, S06-06 (October 1, 2020)<br><br>*Multiple Arrest Card*, CPD-11.433 (August 2020) |
| *Large Street Gatherings*, D19-03 (May 24, 2019) | *Not revised* | *None* | *Not submitted for review* |
| **Other CPD Policies related to Responding to Crowds, First Amendment Activity, and Unrest** | | | |
| *Use of Force*, G03-02 (February 29, 2020)<br><br>• Establishes Department policies on response to resistance, and use of force | *De-Escalation, Response to Resistance, and Use of Force*, G03-02 (April 15, 2021) | • Changed the title of directive G03-02 from *Use of Force* to *De-Escalation, Response to Resistance, and Use of Force* to further emphasize the importance of de-escalation within the policy<br><br>• Replaces term "subject" with "person"<br><br>• Revised G03-02 language for when use of force is authorized and to further define "objectively reasonable" (Section III.B.1) to include these additional factors to be considered when determining reasonableness: whether de-escalation | Under annual CPD review per ¶159 and subject to community input per ¶160 |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | techniques can be employed or would be effective (d) and the availability of other resources (e). | |
| | | • Revised G03-02 language for when use of force is authorized and to remove ambiguity related to the definition of "necessary" (Section III.B.2) and defined it as "the minimum amount of force needed to provide for the safety of any person or Department member, stop an attack, make an arrest, bring a person or situation safety under control, or prevent escape." | |
| | | • Made de-escalation an affirmative obligation of every CPD officer and reflected that obligation in every applicable directive in the policy suite. For example, in G03-02 the CPD revised Section III.C to *require* officers to de-escalate: "Department members are required to use de-escalation techniques to prevent or reduce the need for force, unless doing so would place a person or a Department member in immediate risk of harm, or de-escalation techniques would be clearly ineffective under the circumstances at the time." | |
| | | • Details the concept of the sanctity of human life | |
| | | • Establishes that Department members will use the minimum amount of force needed and continually assess the necessity of the use of force | |
| | | • Requires officers to use de-escalation tactics to prevent | |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | or reduce the need for force, unless doing so places someone, including a Department officer, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances | |
| | | • Sets out expectations that officers will act in such a way that eliminates the need to use force. Force should only be used when required under the circumstances to serve a lawful purpose | |
| | | • Adds de-escalation techniques and other resources as factors to consider in determining whether force is objectively reasonable | |
| | | • Prohibits chokeholds, other maneuvers for applying direct pressure on a windpipe or airway, and carotid artery restraints with the sole exception being as an act of last resort when necessary to protect against an imminent threat to life | |
| | | • Requires officers to provide life-saving aid to injured persons for use of force incidents until medical professionals arrive on scene and prohibits interference with emergency medical personnel providing treatment | |
| *Force Options*, G03-02-01 (February 29, 2020) | *Response to Resistance and Force Options*, G03-02-01 (April 15, 2021) | • Replaces term "subject" with "person" <br><br> • Details the concept of the sanctity of human life <br><br> • Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a | Under annual CPD review per ¶159 and subject to community input per ¶160 |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | CPD officer, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances | |
| | | • Requires officers to consider individualized factors in assessing situations, such as: age, disability, and physical condition (including known or suspected mental health conditions), the risk posed by the person, and whether the person is restrained, injured, or in crisis | |
| | | • Requires officers, when safe and feasible, to consider whether noncompliance with lawful verbal direction is due to age, limited English proficiency or other language barriers, a medical condition, disability, behavioral health crisis, or drug or alcohol use | |
| | | • "Consistent with Department policy that all uses of force must be objectively reasonable, necessary, and proportional, Department members will refrain from using force against a person who is secured and restrained with handcuffs or other restraining devices (e.g., flexible restraining devices), unless the member: 1. must act to prevent injury to the Department member, the restrained person, or another person." | |
| *Incidents Requiring the Completion of a Tactical Response Report,* G03-02-02 (February 20, 2020) | *Incidents Requiring the Completion of a Tactical Response Report,* G03-02-02 (April 15, 2021)<br><br>Tactical Response Report, CPD-11.377 (December 2020) | • Details how Tactical Response Reports (TRRs) are used: to document, investigate, and evaluate reportable use of force incidents, as well as incidents where an officer was assaulted or battered and no response option was used; to regularly | Under annual CPD review per ¶159 and subject to community input per ¶160 |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | *Tactical Response Report - Investigation form* CPD-11.377-I (December 2020) | review city and district-level data on reportable uses of force (including frequency and type of fore used; patterns, trends, and emerging concerns)<br><br>• Revised the TRR form to require that CPD officers "describe with specificity" (instead of "when applicable") their responses, including force mitigation efforts and specific types and amounts of force used.<br><br>• Revised the Tactical Response Report – Review (TRR-R) form to document specific debriefing points for the officer and reviewing supervisor, including those related to the following: Communication, Not Articulated in Narrative, Positioning/Distance, Time, and Other | |
| *Firearm Discharge Incidents- Authorized Use and Post-Discharge Administrative Procedures*, G03-02-03 (February 29, 2020) | *Firearm Discharge Incidents- Authorized Use and Post-Discharge Administrative Procedures*, G03-02-03 (April 15, 2021) | • Details the concept of the sanctity of human life<br><br>• Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a CPD officer, in immediate | Under annual CPD review per ¶159 and subject to community input per ¶160[315] |

---

[315] In the third reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶183. To evaluate Preliminary compliance with ¶183, we focused our review on whether the City and the CPD received the requisite community input for General Order 03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. The community and Use of Force Working Group recommended that officers issue verbal warnings prior to discharging a weapon and recommended that officers identify themselves as law enforcement unless doing so creates imminent risk of death. They also recommended that officers use hand signals or visual cues to provide warnings in event that a person is hearing impaired. The CPD did not incorporate these recommendations in the December 31, 2020 revised Use of Force policies. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021, which we will continue to monitor moving forward.

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | risk of harm, or de-escalation is clearly ineffective under the circumstances<br><br>• Specifies that the topics covered in post-firearm discharge training may include de-escalation, trauma-informed techniques, and implicit bias | |
| *Taser Use Incidents*, G03-02-04 (February 29, 2020) | *by Taser Use Incidents*, G03-02-04 (April 15, 2021) | • Details the concept of the sanctity of human life Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a CPD officer, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances<br><br>• Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a CPD officer, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances | Under annual CPD review per ¶159 and subject to community input per ¶160 |
| *Oleoresin Capsicum (OC) Devices And Other Chemical Agent Use Incidents*, G03-02-05 (February 29, 2020) | *Oleoresin Capsicum (OC) Devices And Other Chemical Agent Use Incidents*, G03-02-05 (April 15, 2021) | • Details the concept of the sanctity of human life<br><br>• Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a CPD officers, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances | Under annual CPD review per ¶159 and subject to community input per ¶160 |
| *Canine Use Incidents*, G03-02-06 (February 29, 2020) | *Canine Use Incidents*, G03-02-06 (April 15, 2021) | • Details the concept of the sanctity of human life<br><br>• Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a | Under annual CPD review per ¶159 and subject to community input per ¶160 |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | CPD officers, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances<br><br>• Prohibits the use of CPD canine teams in response to crowds, protests, or civil disturbances | |
| *Baton Use Incidents*, G03-02-07 (February 29, 2020) | *Baton Use Incidents*, G03-02-07 (April 15, 2021) | • Details the concept of the sanctity of human life Requires officers to use de-escalation tactics to prevent or reduce the need for force, unless doing so places someone, including a CPD officers, in immediate risk of harm, or de-escalation is clearly ineffective under the circumstances | Under annual CPD review per ¶159 and subject to community input per ¶160 |
| *Department Review of Use of Force*, G03-02-08 (February 29, 2020) | *Department Review of Use of Force*, G03-02-08 (January 27, 2021) | • "[I]ntroduces the use of the CLEARNET: Tactical Response Report (TRR) application for units to document the required individual follow-up actions and finalize the TRR."<br><br>• Specifies Force Review Board review "firearm discharge incidents or uses of force that cause the death of any person, contain an incident briefing of the facts and review of the incident by the Commander, Incident Response Team, or designee, and any other appropriate Department members designated by the Superintendent"<br><br>• Specifies Force Review Board review "for all other Level 3 reportable uses of force, contain an incident briefing of the facts and review of the incident by the Commander, Force Review Division, or designee, and | Under annual CPD review per ¶159 and subject to community input per ¶160 |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | any other appropriate Department members designated by the Superintendent" | |
| | | • Notes that a COPA representatives will be invited to the incident briefing | |
| | | • Provides responsibilities for the Commander, Force Review Division, at the conclusion of a Force Review Board review of incident, including ensuring that recommended training for involved members is coordinated with the Training and Support Group, that Complaint and Disciplinary procedures are followed when an obvious policy violation requiring discipline has occurred and a Log Number has not been obtained at the district level, and that the review of the Force Review Board is documented within thirty days of the review incident. | |
| | | • Provides responsibilities for the unit commanding officers who receive a unit-level or Department-wide recommendation from the Force Review Board | |
| *[Did not exist]* | *Foot Pursuits*, G03-07 (May 26, 2021 – Effective June 11, 2021) | *NEW POLICY*[316] | Under ongoing review with the City, the CPD, the OAG, the IMT and ¶172 and subject to community input per ¶¶160 and 627, *et al.* |
| *Restraining Devices*, G06-01-02 (December 8, 2017) | *Not revised* | *None* | *Not submitted for review* |

---

[316]  *See News Release - Chicago Police Department Announces New Foot Pursuit Policy*, CHICAGO POLICE DEPARTMENT (May 26, 2021), https://home.chicagopolice.org/wp-content/uploads/26-May-21-Foot-Pursuit-Policy-1.pdf.

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| • Outlines policy and procedures related to physical restraint of persons in custody<br><br>• Authorizes use of flex cuffs, handcuffs, and leg irons<br><br>• Provides general guidelines for use of restraining devices<br><br>• Continues policy for use of leg irons during arrestee transfers<br><br>• Outlines policy related to custodial and transport searches | | | |
| *Canine Teams*,<br>S03-04-01<br>(July 24, 2014)<br>• Outlines procedures for canine team duties, responsibilities, and capabilities<br><br>• Outlines responsibilities for requesting canine teams and for a canine handler after a canine bites or inflicts injury | *Canine Teams*,<br>S03-04-01<br>(November 3, 2020) | • States, "Department canine teams will not be used in response to crowds, protests, or civil disturbances." | *Not submitted for policy review* |
| *Helicopter Support for Department Operations*,<br>S03-04-02<br>(May 30, 2014)<br>• Provides information on helicopter support capabilities for Department operations<br><br>• Provides information on procedures for requesting CPD, CFD, or USCG helicopters | *Not revised* | *Not Applicable* | *Not submitted for policy review* |
| *Crime Prevention and Information Center (CPIC)*,<br>S03-04-04<br>(November 30, 2017)<br>• Clarifies CPIC requirements to notify COPA | *Not revised* | *Not Applicable* | *Not submitted for policy review* |
| *Fire and Arson Incidents*,<br>S04-03-12<br>(September 19, 2014)<br>• Clarifies Arson Section responsibilities | *Not revised* | *Not Applicable* | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| • Clarifies reporting requirements | | | |
| *Illinois Law Enforcement Alarm System*, S05-10 (June 2, 2017)<br><br>• Outlines procedures for requesting a response through ILEAS and responding to requests for services from ILEAS<br><br>• Establishes responsibilities, notifications, and approval for ILEAS requests and responses | *Not revised* | *Not Applicable* | *Not submitted for policy review* |
| *Body Worn Cameras*, S03-14 (April 30, 2018)<br><br>• Discontinues the use of Body Worn Camera Video Audit Report<br><br>• Introduces use of Body Worn Camera Video Review and Videos Viewed Report(s) | *Not Revised* | *Not Applicable* | *Body Worn Cameras* (Draft), S03-14 (November 25, 2020)<br><br>*Body Worn Cameras* (Draft), S03-14 (April 28, 2021) |
| *Potential Cost Recovery Incidents – City of Chicago*, S03-15 (November 20, 2015)<br><br>• Establishes procedures to identify any incident where the City or Department has incurred expenses and might recover its cost (for personnel and equipment use or damaged property) | *Not revised* | *Not Applicable* | *Not submitted for policy review* |
| *Detention Facilities General Procedures and Responsibilities*, S06-01-02 (September 9, 2019) | *Detention Facilities General Procedures and Responsibilities*, S06-01-02 (August 17, 2020) | • Requires that the Annual Lockup Inspection Summary report (CPD-21.976) and Lockup Facility Weekly Inspection Reports (CPD-21.974) are submitted electronically to the Inspections Division by February 28 of each year | *Not submitted for policy review* |
| *Processing Property Under Department Control*, S07-01 (October 15, 2015) | *Processing Property Under Department Control*, April 27, 2021 (October 15, 2015) | • Updates procedures for collecting and inventorying bomb or arson evidence, suspect incendiary devices, and flammable chemicals or liquids (such as gasoline) | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| *Emergency Service Agencies,* S12-04 (July 1, 1989) | *Emergency Service Agencies,* S12-04 (August 19, 2020) | • Updated list of agencies and services to "inform[] members of various agencies within the City of Chicago that provide services at the scene of major fires, natural and human-caused disasters, civil disorders, and similar emergencies" | *Not submitted for policy review* |
| *Removal Process for D-2, and D-3 Positions,* E05-06-01 (March 12, 2019) | *Removal Process for D-2, D-2A, and D-3 Positions,* E05-06-01 (September 11, 2020)<br><br>*Notice of Hearing Before the Review Board* form, CPD-12.151 (August 2020) | • Updating process with the *Notice of Hearing Before the Review Board* form, CPD-12.151 (August 2020) | *Not submitted for policy review* |
| *Application for Police Officer (Assigned As Special Weapons and Tactics Team Member),* E05-15 (December 24, 2019) | *Application for Police Officer (Assigned As Special Weapons and Tactics Team Member),* E05-15 (September 24, 2020) | • Soliciting internet applications Police Officer (Assigned as Special Weapons and Tactics Team Member) | *Not submitted for policy review* |
| *Application for Explosives Technician I, Title Code 9158,* E05-20 (February 11, 2015) | *Application for Explosives Technician I, Title Code 9158,* E05-20 (April 9, 2021) | • Updates duties, eligibility, and training for Explosive Technician I position | *Not submitted for policy review* |
| *Application for Sergeant (Assigned As Special Weapons and Tactics Team Member),* E05-25 (December 24, 2019) | *Application for Sergeant (Assigned As Special Weapons and Tactics Team Member),* E05-25 (September 24, 2020) | • Soliciting internet applications for Sergeant are accepted until Friday<br><br>• Clarifies how to access the application on The Wire page<br><br>• Candidates will return the properly completed and signed original forms to the Employment Section of Human Resources | *Not submitted for policy review* |
| *Application for Police Legal Officer II (Legal Affairs Division),* E05-30 (May 16, 2014) | *Application for Police Legal Officer II (Legal Affairs Division),* E05-30 (May 11, 2020)<br><br>*Application for Police Legal Officer II (Legal Affairs Division),* E05-30 (June 1, 2020) | • Updates duties for the Legal Officer II, including the duty to "attend[]protests and demonstrations to provide legal advice to officers and exempt members"; "participate[] in meetings addressing compliance with consent decree requirements"; | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | "prepare contracts, memoranda of understanding (MOUs), and inter-governmental agreements (IGAs)"; and "respond to Freedom of Information Act (FOIA) appeals."<br><br>• Updates the eligibility for the Legal Officer II position to include two years of active duty status as a Sergeant of Police<br><br>• Identified updated application deadline | |
| *Traumatic Incident Stress Management Program,*<br>E06-03<br>(November 22, 2017) | *Traumatic Incident Stress Management Program,*<br>E06-03<br>(February 25, 2021) | • Introduces the Traumatic Incident Stress Management Program CLEAR application, which includes a new referral process<br><br>• Adds responsibility for the watch operations lieutenant<br><br>• Discontinues the Traumatic Incident Stress Management Program CLEAR application<br><br>• Recognizes that policing may introduce emotional or psychological impacts on officers that are unique to policing<br><br>• Establishes the Traumatic Incident Stress Management as a way for officers to process traumatic events<br><br>• Referral to the Program is only for on-duty incidents<br><br>• The Program is part of the Professional Counseling Division and is overseen by a licensed mental health professional | Subject to compliance review under ¶627, *et al.* |
| *Department Approved Weapons and Ammunition,*<br>U04-02<br>(February 29, 2020) | *Department Approved Weapons and Ammunition,*<br>U04-02<br>(May 7, 2021) | • Added Executive Director, Office of Constitutional Policing and Reform | Subject to compliance review under ¶627, *et al.* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| *Police Carbine Operator Program*, U04-02-05 (March 8, 2019) | *Police Carbine Operator Program*, U04-02-05 (January 1, 2021) | • For personally owned duty carbines, complete rifles must be manufactured by FN America, LLC (among others previously approved) | *Not submitted for policy review* |
| *Respirator Program*, U04-03 (April 20, 2012) | *Respirator Program*, U04-03 (September 17, 2020) | • Provides responsibility to CPD's Training and Support Group | *Not submitted for policy review* |
| *Department-Issued Restraining Devices*, U01-07 (February 29, 2012) | *Not revised* | *Not Applicable* | *Not submitted for policy review* |
| *Uniform and Appearance Standards*, U04-01 (March 11, 2020) | *Uniform and Appearance Standards*, U04-01 (April 27, 2021) | • Updates Uniform and Personal Equipment Policy Committee membership to include Chief, Bureau Patrol, Deputy Chief, Office of Constitutional Policing and Reform, Deputy Chief, Special Operations Group, Deputy Chief, Training and Support Group, and Commander, Labor Relations Division<br><br>• The Chief of Bureau Patrol will serve as chairperson of the committee | *Not submitted for policy review* |
| *Prescribed Uniform and Equipment Items*, U04-01-01 (July 15, 2019) | *Prescribed Uniform and Equipment Items*, U04-01-01 (May 7, 2021) | • The Executive Director of the Office of Constitutional Policing and Reform may authorize the use of additional weapons/ammunition by specialized Department units.<br><br>• The Executive Director of the Office of Constitutional Policing and Reform will designate district stations and any other police facilities to be equipped with a ballistic clearing station | *Not submitted for policy review* |
| *Helmet - General Duty, Vehicular, and Riot*, U06-01-31 (August 26, 2019) | *Helmet - General Duty, Vehicular, and Riot*, U06-01-31 (November 4, 2020) | • Requires all sworn personnel to own and maintain the appropriate prescribed helmets listed in the directive. These helmets are designed | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | to work with all body armor and gas masks | |
| *Riot Control Kit*, U06-03-05 (February 12, 2012)<br><br>• Designates required items in riot control kit, as well as options items<br><br>• Describes the kit items, including materials and build | *Not Applicable* | *Not Applicable* | *Not submitted for policy review* |
| *BDU, SWAT*, U06-03-07 (December 12, 2013)<br><br>• Describes the design and accessories of BDU and SWAT uniforms | *Not Applicable* | *Not Applicable* | *Not submitted for policy review* |
| *Rules and Regulations of the Chicago Police Department*, DEPARTMENT GUIDES AND MANUALS (April 16, 2015)<br><br>• Sets out the regulations for the governance of the Department<br><br>• Sets out regulations for establishing Department goals<br><br>• Sets out regulations for establishing Department members' goals<br><br>• Sets out regulations establishing member duties<br><br>• Sets out Department rules of conduct<br><br>• Sets out Department penalties<br><br>• Sets out Department medical separations<br><br>• Sets out Department suspension for legal inability to carry a firearm<br><br>• Sets out Department Rules of Procedures | *Not Applicable* | *Not Applicable* | *Not submitted for policy review* |

During the course of our review into the City's and the CPD's responses to the recent protests and unrest—including requests for records and various lines of interview questions—the CPD identified that there was insufficient reporting and documentation during the CPD's responses. The IMT provided technical assistance to the CPD to aid in the development of new required reporting forms to address this issue.

In fact, during the initial protests and unrest—with outdated policies and reporting requirements—one commander took it upon themselves to use the federal Incident Command System-204 Sector/Group Assignment List form to track

- Arrests

- Team posts, deployment, command, personnel assigned, and duties

- Control Operations

- Map of the District

- Personnel Injuries

- Uses of Force and associated injuries.[317] ¶

On August 27, 2020, the City and the CPD informally provided the IMT with a new temporary policy—*Response to Crowds and Civil Disturbances* (S03-22)—and corresponding forms—Incident Check-In (CPD-11.301) and Incident Response (CPD-11.302); Administrative Message Center (AMC) notice; and a training bulletin referenced in S03-22, dated August 2016. The City of Chicago (City) and the Chicago Police Department (CPD) issued Special Order 03-22, *Response to Crowds and Civil Disturbances* (S03-22), under ¶631 of the Consent Decree. Paragraph 631 permits the CPD to issue a temporary policy or procedure when "extraordinary circumstances demand an immediate revision or clarification."

While the informal production referenced that the City would formally produce the records to the IMT and the OAG for review and comment, the IMT provided

---

[317] The Federal Incident Command System is part of the National Incident Management System (NIMS), which "guides all levels of government, nongovernmental organizations and the private sector to work together to prevent, protect against, mitigate, respond to and recover from incidents." *National Incident Management System*, FEDERAL INCIDENT COMMAND SYSTEM, https://www.fema.gov/emergency-managers/nims. NIMS is part of the Federal Emergency Management Agency (FEMA), which is part of the U.S. Department of Homeland Security. The "204 Sector/Group Assignment List" is a tool within the Incident Command System that aids responding agencies in tracking their resources and activities when responding to a critical incident. *See Assignment List (ICS 204)*, FEDERAL INCIDENT COMMAND SYSTEM, https://emilms.fema.gov/IS201/assets/ICS%20Forms%20204.pdf

preliminary feedback.[318] We recognized that the City and the CPD were facing extraordinary circumstances, but reporting uses of force and other critical actions by the CPD are fundamental to compliance with the Consent Decree, accountability, and public trust. It was and is imperative that the CPD gets this right. The CPD must, among other things, ensure that officers "report and document" reportable uses of force, including when officers use force in concert, as required under ¶218.[319] The City, the CPD, the OAG, the Coalition, and the IMT met with Judge Dow in efforts to revise the policy as soon as possible.[320]

We appreciated that the CPD took many of the IMT's suggestions into account (although not all) by making the following revisions:

- Creating a policy to provide guidance on the new Check-In and Incident Response forms.

---

[318] According to the production, the CPD issued S03-22 on August 27, 2020, under ¶631 of the Consent Decree, which permits the CPD to issue a temporary policy or procedure when "extraordinary circumstances demand an immediate revision or clarification." We note, however, that ¶631 requires the CPD to provide "prompt notice of the temporary policy or procedure" to the IMT and the Office of the Illinois Attorney General (OAG), and it is our understanding that the OAG did not receive notice on or before August 27, 2020. The IMT also did not have a chance to review the final policy before it was issued.

[319] Paragraph 218 of the Consent Decree defines "reportable uses of force" as follows: CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.

[320] On July 23, 2020, the Coalition filed a *Notice of the Coalition's Intent to Initiate Enforcement Proceedings* after which Judge Dow, the IMT, the Parties, and the Coalition began discussions about protest-related policies. *See* pages 6, 20, and 126 of this report for further information.

- Separating the Incident Check-In and Incident Response forms to allow the CPD to more clearly and accurately account for multiple events throughout the officers' shift.

- Adding definitions to terms, which are generally in line with FEMA's Center for Domestic Preparedness Field Force Operations Training (although some key terms still lack clarity).[321]

- Forwarding the Incident Check-In forms to the Incident Commander before deployment to better track and monitor deployments.

On Friday, August 28, 2020, during discussions between the City, the Coalition, and the IMT, the Coalition raised several concerns regarding S03-22, citing that the policy's wording was confusing. Still, the IMT and the OAG provided written comments on August 31, 2020, recommending additional changes.

Through ongoing discussions between the IMT and the Coalition and the IMT and the City, the CPD agreed to clarify the appropriate uses of batons during the Critical Incident Response Team roll call on Saturday, August 29, 2020—before responding to protests over Labor Day Weekend.[322] The IMT observed the roll-call training, which was for about 70 to 80 CPD officers, including supervisors. The CPD instructed officers that a baton strike to the head is considered deadly force and provided instructions on the appropriate use of the baton as a "controlled shove" with two hands on the baton, rather than a strike.

At the time, the City, the CPD, and the Coalition understood that they would need to continue to work through potential changes and clarifications to the CPD's responses to protests in policy, training, and practice. And we made several recommendations to the CPD to further improve the policy and forms.

About a month later, on October 2—in response to feedback from the IMT, the OAG, and the Coalition—the City and the CPD informally produced a second draft of S03-22 and a revised draft of Special Order 06-06, *Coordinated Multiple Arrest Incident Procedures* (S06-06), both dated October 1, 2020. The City and the CPD requested feedback by October 7, 2020, five days after the production. On October

---

[321] *See* Federal Emergency Management Agency, Center for Domestic Preparedness, Field Force Operations training, which is a "three-day Field Force Operations (FFO) course provides law enforcement and security officers with instruction in protest types and actions, legal considerations, responsibilities of mobile field force teams, and crowd-control methods. The course culminates with a series of hands-on activities that allow responders to practice all of the learned skills (baton-holding positions, mass-arrest procedures, and riot-control formations) in a realistic context" (https://cdp.dhs.gov/training/course/PER-200).

[322] *See, e.g.*, Steven Grave, *Downtown Protest Ends Peacefully After Police Block March From Shutting Down Magnificent Mile*, CBS Chicago (August 29, 2020), https://chicago.cbslocal.com/2020/08/29/dueling-protests-planned-saturday-evening-on-magnificent-mile/.

7, 2020, the IMT replied via email that the October 1, 2020 drafts of S03-22 and S06-06 did not address many of the comments from the IMT, the OAG, or the Coalition. In response, the CPD indicated that it would redo the policies.

About two weeks later, on Friday, October 22, the City and the CPD informally produced a third draft of S03-22, dated October 21, requesting feedback on Monday, October 26. The CPD also included written responses to comments from Judge Dow, the IMT, the OAG, and the Coalition. We did not—and still have not—received an updated draft of S06-06, *Coordinated Multiple Arrest Incident Procedures*.

Superintendent Brown acknowledged these efforts in response to the Inspector General's Office's report:

> *These events occurred during a time when the Department was working to revise its use of force orders to comply with the Consent Decree. Often as a result of amending one order, other orders are affected, and such was the case here. The amendments made to the order on Tactical Response Reports were not reflected in the mass arrest order and vice versa, which caused ambiguity. Once such ambiguities were identified, the Department worked swiftly to mitigate. For example, in response to one such issue, as noted in the [Office of the Inspector General for the City of Chicago's] Report, the Department issued S03-22, in consultation with the Consent Decree's Independent Team (IMT). While this happened after the events in the Report, it is an example of the efforts taken by the Department.[323]*

We agree that the CPD's policies are interrelated—and consistently advocated for the City and the CPD to take a holistic approach to reform since the beginning of the Consent Decree process. We do not, however, believe that the mass-arrest procedure difficulties were a result of the TRR reforms. Neither the existing mass-arrest procedures nor the reformed TRR procedures were consistently followed for responses to protests and mass unrest in May and early June. We do, however, acknowledge that the CPD identified the issue during our review, interview questions, and records requests. The CPD also attempted to resolve the issues by creating emergency policy changes and then worked and continue to work with the IMT, the OAG, and the Coalition to improve those policies. We look forward to receiving a revised draft of the mass-arrest procedures for the Consent Decree review process.

---

[323] CPD Superintendent David O. Brown, *Re: Report on Chicago's Response to George Floyd Protests and Unrest*, CHICAGO POLICE DEPARTMENT (February 11, 2021), https://igchicago.org/wp-content/uploads/2021/02/CPD-Response-to-OIG-Report-on-Civil-Unrest.pdf.

Likewise, the CPD recently recognized in its After Action Report that the mass-arrest procedures are not well-suited for large scale protests or unrest:

> At times, Department members found themselves making a relatively significant number of arrests while a continued police presence was necessary to ensure public safety. In those instances, the Incident Commander or highest-ranking, on-scene member of the Bureau of Patrol had the capability of declaring a "mass arrest" incident.

> The Department has a substantial written procedure governing mass arrest incidents[] that works in theory but, during the Events, broke down in practice. This appeared attributable in part to the chaotic nature and unprecedented geographic scope of the Events. For example, Department members effecting arrests were required to complete "Mass Arrest Cards"—duplicate paper forms capturing limited information including, but not limited to, probable cause for arrest and the transporting unit's information.

> But many Department members lacked familiarity with formal mass arrest policies and processes as a result of limited (if any) involvement with actual, tangible applications of the procedure; not all incidents at which multiple arrests are effected are mass arrest incidents. Nor were many duplicate mass arrest forms immediately available during the Events where widespread criminal activity was occurring.

> As a result, many of the individuals arrested during the Events were either released without charging ("RWOC") or had charges filed against them dropped by prosecutors because the arresting officer or officers could not be identified. These individuals may have been involved in serious, criminal wrongdoing (e.g., looting, arson, violence, etc.) during the Events and may never be held accountable as a result.[324]

Likewise, according to the Office of Inspector General for the City of Chicago: "Breakdowns in the mass arrest process resulted in CPD's failure to arrest some offenders, the release of some arrestees without charges, and risks to officer and arrestee safety."[325]

In anticipation of potential protests and unrest leading up to and after the federal election, the OAG, the Coalition, and the IMT provided comments to the updated

---

[324] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 9–10.

[325] *See Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021) at 8–9.

policy at the beginning of the following week, noting that additional discussions would need to occur after the election.[326]

Overall, we believed that the City and the CPD need to re-assess expectations for issuing a sound policy—and for sufficient training on that policy—before the election.[327] We were willing to meet, as soon as possible, with the CPD command personnel who are responsible for developing, implementing, and training on these policies. We further noted that our original understanding of S03-22, as reflected in the "Purpose" Section of the August 27, 2020 policy, was that the CPD created S03-22 to ensure that the CPD appropriately documented coordinated uses of force in response to demonstrations and civil disturbances. As a result, in the IMT's feedback on August 31, 2020, we stated that we believed that S03-22 included either too much information, by going beyond the purpose of the special order, or not enough information, by not matching the title of the policy: *Response to Crowds and Civil Disturbances*. We note that the CPD chose to update S03-22 to match its name, rather than the original purpose. As a result, the October 1, 2020 draft of S03-22 is twice as long (from 5 to 10 pages), and the October 21, 2020 draft of S03-22 is even longer (13 pages).

We also noted that the City and the CPD have intended to expedite the process under ¶631, but we feared that circumventing the typical Consent Decree review process has caused, rather than prevented, delay. The IMT's review would have benefited, for example, from additional information regarding the reasons behind the changes—or lack of changes—along with the policy task files and sources or external policies that the CPD considered when developing S03-22 and S06-06, if any. Likewise, the entire process would have benefited from community engagement. By either receiving community input—or at least considering that audience more deliberately—the CPD would have likely identified and avoided aspects of the policies that create confusion or unnecessary issues.

We agreed, however, that it was paramount that the City developed and revised policies, training, and practices regarding its responses to demonstrations and civil disturbances that align with best practices and the Consent Decree as soon as possible. But the revisions to the second and third drafts of S03-22, however, created new issues that we believed the City of Chicago and the CPD needed to address before implementing a new policy, even under ¶631.

Specifically, we were concerned that the City and the CPD were trying to both change too much and not enough before the election—which provided limited

---

[326] While we did have a draft of S06-06 on October 7, 2020, we expected to receive a revised draft of S06-06 with the revised draft of S03-22.

[327] The IMT understands the CPD—along with many other police departments and entities—anticipated large demonstrations and unrest near the November election.

time to train officers on the changes. In fact, we believed that aspects of the October 21 version of S03-22 and the October 1, 2020 version of S06-06 **created** "extraordinary circumstances [that] demand an immediate revision or clarification," rather than resolving extraordinary circumstances.

Ultimately, the City, the CPD, the OAG, the Coalition, and the IMT were able to identify agreements, discuss disagreements, and compromise on the latest version for S03-022. We continue, however, to have concerns regarding the CPD's ability to comply with the reporting obligations in the Consent Decree. Paragraph 219 requires that officers complete a "TRR, *or any similar form of documentation CPD may implement*, prior to the end of his or her tour of duty." While S03-22 adds two forms when responding to crowds and civil disturbances (CPD-11.301 and CPD-11.302), officers' obligations to report and document all reportable uses of force continue. (The IMT would also appreciate further clarity regarding the intended data collection and review procedures for the new forms. *See, e.g.*, ¶¶571–72.

Further, to the extent that much of the crowd responsibilities are now within specialized teams—including the Critical Incident Response Team—the IMT continues to recommend that the City and the CPD develop public policies to clearly guide those practices and provide further procedures for transparency of requirements and expectations to its officers.

In addition to the many policies that continue to be developed, revised, and reviewed under the Consent Decree—which we will report on after the fourth reporting period in Independent Monitoring Report 4—the City and the CPD also amended several CPD policies under community pressures to address police practices:

There were also several policies that were related to the CPD's response, some of which are reflected in Analysis Figure 6 below, along with a non-comprehensive summary of recent changes and ongoing development.

Analysis Figure 6.
CPD Policies Related to Crowd Response from May 2020 to Present

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| *Emergency Vehicles Operations – Eluding and Pursuing* G03-03-01 (April 9, 2019) | *Emergency Vehicles Operations – Eluding and Pursuing* G03-03-01 (August 15, 2020) | • Increased restrictions on vehicle pursuits<br><br>• Created CLEAR Eluding Vehicle Incident Report application | According to the City, G03-03-01 is not subject to ¶627 policy review, but provided the implemented policy and corresponding training to the IMT and the OAG under ¶631 ("extraordinary circumstances"). The IMT and the OAG provided comments and recommendations for both. |
| *Search Warrants*, S04-19 (January 3, 2020) | *Search Warrants*, S04-19 (May 28, 2021) | • States commitment to treat all persons with courtesy, dignity, and respect<br><br>• References requirement to use de-escalation techniques to prevent or reduce the need for force<br><br>• Mandates that where forcible entry is required, officers use only the amount necessary to gain entry and make every effort to leave the premise in the same condition as originally found<br><br>• Requires various heightened levels of supervisor review and approval for various classifications of search warrants<br><br>• Requires the presence of a female officer during the service of the search warrant<br><br>• Requires a critical incident after-action review for search warrants identified as wrong raids<br><br>• Prohibits the use of "no-knock" search warrants except in certain circumstances, and mandates that only the SWAT Team will | The City disagrees with the OAG and the Coalition regarding whether the CPD's *Search Warrant* policy falls under the Consent Decree. The City, the OAG, and the Coalition have filed briefs with Judge Dow on the issue. |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | • serve no-knock search warrants | |
| | | • Introduces search warrant development requirements for affiants to verify and corroborate information via an independent investigation | |
| | | • Introduces additional measures to protect or minimize trauma to potentially vulnerable persons who may be occupants of or present at the location, including children | |
| *Responding to Incidents Involving Citizenship Status*, S06-14-03 (March 25, 2020) | *Responding to Incidents Involving Citizenship Status*, S06-14-03 (February 23, 2021) | • Updated in accordance with "Welcoming City Ordinance," removing exception for when the CPD can transfer someone to federal custody for violating civil immigration law | *Not submitted for policy review* |
| *Impoundment of Vehicles for Municipal Code Violations*, S07-03-05 (March 31, 2020) | *Impoundment of Vehicles for Municipal Code Violations*, S07-03-05 (September 19, 2020) | • Updates amendments to Municipal Code of Chicago | *Not submitted for policy review* |
| *Information Systems Development Group*, S09-01-01 (November 28, 2018) | *Information Systems Development Group*, S09-01-01 (February 23, 2021) | • Updates membership and responsibilities for the Information Systems Development Group, including Public Safety Administration personnel to include: Bureau Chief of Crime Control Strategies or designee, General Counsel to the Superintendent, Managing Deputy Director of Information Technology, Public Safety Administration, Deputy Chief of Training and Support Group, the Director of Research Development (serving as the Secretary), and the Deputy Chief of the Bureau of Crime Control Strategies. The group will also include designees from: | *Information Systems Development Group*, S09-01-01 (May 5, 2021 Draft) |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | Office of the First Superintendent, Executive Director Office of Constitutional Policing Reform, Bureau Patrol Chief, Bureau of Detectives Chief, Bureau of Counterterrorism Chief, Bureau of Internal Affairs Chief, Office of Community Policing Commander, and Labor Relations Division Commander.<br><br>• The ISDG will meet quarterly<br><br>• A quorum is the Chairperson or Vice-Chairperson and seven other members | |
| *Medical Policy,*<br>E03-01<br>(April 1, 1998) | *Medical Policy,*<br>E03-01<br>(February 11, 2021) | • Requires all sworn officers in Ambulatory Recuperation status to complete e-Learning training within the required timeframe<br><br>• All Department officers (sworn) in Ambulatory Recuperation status will complete an e-learning training. They may access this training online from home, or at the nearest Department facility. | *Not submitted for policy review* |
| *Narcotics Arrest Diversion Program,*<br>D18-03<br>(January 24, 2020) | *Narcotics Arrest Diversion Program,*<br>D18-03<br>(August 3, 2020)<br><br>*Narcotics Arrest Diversion Program,*<br>D18-03<br>(February 24, 2021)<br><br>*Narcotics Arrest Diversion Program,*<br>D18-03<br>(March 29, 2021) | • Expands Narcotics Arrest Diversion Program to the 001, 006, 007, 008, and 012 Districts<br><br>• Updates edibility factors for the narcotics Arrest Diversion Program<br><br>• Introduces the Narcotics Arrest Diversion Program to the 001st and 0012th Districts<br><br>• Continues the Narcotics Arrest Diversion Program for the 006th, 007th, and 008th Districts | *Not submitted for policy review* |

| Policy in May 2020 | Revised Policy or Policies | Major Changes | Under Policy Review |
|---|---|---|---|
| | | • An officer making an arrest for possession of a controlled substance of one gram or less, possession of hypodermic syringes and needles, or possession of drug-related items within the boundaries of the 001st and 012th Districts (among others), should screen the arrestee for eligibility into the Narcotics Arrest Diversion Program. | |
| | | • An arrestee will be eligible for participation in the Narcotics Arrest Diversion Program ONLY when the arrest occurred within the geographic boundaries of the 001st and 012th Districts (among others); when the arrestee is present in the 001st and 012th Districts (among others) while a counselor is available. | |
| | | • When arresting an offender that meets the criteria established in this directive, an arresting officer will transport the arrestee to the 001st and 012th Districts (among others) for processing | |

Overall, the City and the CPD must continue to improve and update these policies and procedures under the Consent Decree.[328] And there continues to be ongoing discussions with the City, the CPD, the OAG, the Coalition, the IMT, and federal court to improve these policies.

---

[328] *See, e.g.*, 725 ILCS 5/103-3 (effective July 1, 2021).

# Training

## IMT's Recommendations: Training

- Develop training programs for leadership, commanders, and supervisors as teams on Mobile Field Force operations and rules of engagement (¶¶265–68)

- Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray (¶¶265–68)

- Provide refresher training on (1) the people's right to record officers (¶58), (2) uniform requirements (¶347, 351, 433), (3) respectful interactions (¶52, 54, 56), (4) providing and requesting medical aid (¶173), and (5) arrestee rights (¶¶30–31, 35, 71)

While reviewing and revising the City's and the CPD's policies is important and necessary, the City and the CPD must inform personnel of their policies and provide effective training to enable personnel to follow those policies.

As reflected in Analysis Figure 7 below, the CPD acknowledged training concerns in its After Action Report. The CPD did have recruitment and in-service training that touched upon crowd management tactics, including guidance on appropriate uses of batons and prohibitions on improper baton use. This type of infrequent training is not sufficient to ensure personnel have the skills, knowledge, and abilities to respond effectively and efficiently. We heard several commanders say that they had to provide on-the-scene training to officers just before and even during deployments into critical situations.

Analysis Figure 7. CPD After Action Report (May 20, 2020, through June 12, 2020)

### CPD After Action Report: "Training"

| Strengths | (1) In-service training |
| | (2) Knowledgeable leaders |
| | (3) Decentralized training |
| Weaknesses | (1) Insufficient field force training and lack of regular practice drills |
| | (2) Officers inexperienced with civil unrest of this scale |
| | (3) Co-occurring lawful demonstrations and criminal activity[329] |

---

[329] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020,* Chicago Police Department (February 2021) at 19.

# (1) COMMAND AND SUPERVISOR TRAINING

## IMT's Recommendations

- Develop training programs for leadership, commanders, and supervisors as teams on Mobile Field Force operations and rules of engagement (¶¶265–68)[330]

The CPD acknowledged that CPD "leaders and key members lacked recent, up-to-date training or practice on NIMS/ICS policies and procedures," which impacted the City and CPD's ability to manage Emergency Operations Center as efficiently and effectively as possible.[331]

> The Department is committed to better equipping supervisors with the training, tools, and resources necessary to hold roll calls in which information is shared, standards are enforced, and the Department's principles are proactively fostered. This starts with a deliberate effort to identify best practices and provide in-service training to Department leaders on how to hold effective roll calls.[332]

The National Incident Management System defines the more comprehensive approach guiding the community, all levels of government, non-governmental organizations, and the private sector. The primary focus is to create a seamless partnership to prevent, protect against, mitigate, respond to, and recover from the effects of incidents. We recommend that the City and the CPD provide National Incident Management System (NIMS) training, including Incident Command System Series 100-700 for leadership and Incident Command System Series 100-400 for supervisors.

---

[330] *See* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015,* JOHNS HOPKINS UNIVERSITY, 61 (December 4, 2015); *May 30 Civil Unrest After-Action Review,* CITY OF CLEVELAND, OH, 27, 29 (December 2020); Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020,* DALLAS POLICE DEPARTMENT, 17, 19, 32–33, 41–42 (August 14, 2020); *Protest and Civil Disorder Incidents, After-Action Report, May 29-June 13, 2020,* LAS VEGAS METROPOLITAN POLICE DEPARTMENT, 26; *Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT, 104 (April 13, 2020); Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 72–74; *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020,* NATIONAL POLICE FOUNDATION, 74, 78–79 (April 2021).

[331] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020,* CHICAGO POLICE DEPARTMENT (February 2021) at 5–6 (citing *Critical Incident Response Program,* General Order G05-03 § II-A-1 (December 7, 2017)).

[332] *See id.* at 9.

In addition to specially equipped and trained Mobile Field Force teams, this training will help the City and the CPD ensure that leadership, commanders, and supervisors are trained on options during protests, uses of equipment, squad formations, mass-arrest procedures, and rules of engagement.

Many commanders were candid with the challenges they faced in 2020—particularly at the end of May. Overall, command personnel were proud of their officers and believed that many officers under their command responded admirably. Many command staff were also candid, however, about the fact that they felt unprepared to supervise the officers responding to the unrest. Many commanders, for example, were relatively new to their positions and did not have experience leading responses to large-scale protests, even fewer had experience with unrest, and none had any experience with the level of unrest that occurred.

We heard, for example, that several relatively new commanders intended to respond to the protest downtown on Saturday, May 30, as a training opportunity. But the lack of an established command and control operations plan, left many commanders having to fend for themselves without any clear operational guidance from the Emergency Operations Center or from their supervisors. As a result, there was no clear birds-eye view guidance for officers in the field or the ability to strategically move officers and resources. In fact, many responding command staff, supervisors, and officers described going from place to place downtown, trying to collect officers, form police lines, and respond to the nearest 10-1 all day and all night, until the unrest subsided—at least for a few hours until starting again.

With the lack of sufficient planning and training, the various communications challenges, and the repeated calls of officer assistance, many command staff and supervisors rushed into action without an organized plan or sufficient training. The choice to put some of the most experienced command staff in the field may have helped improve the CPD's responses in the specific areas where they were deployed. But as a city-wide operation, many officers said that they went without leadership, making many of their own judgment calls in the moment. Weeks and even months later, many members of command staff, supervisors, and officers gave different answers regarding who the incident commander was at various times when the protests and unrest started at the end of May, and others didn't know.

In a response to a request for the "schedule and whereabouts for all commanders and higher ranks from May 29, 2020, through June 1, 2020," the CPD responded that "there is no documentation that would be responsive to this request beyond any answers provided by the referenced individuals in interviews conducted by the IMT and Office of the Inspector General." In their interviews, however, many officers struggled to describe more than generalities about where they were deployed

and what their overall mission was—often describing the days as blending to-gether and the most chaotic experiences of their careers.

The absence of this documentation is a clear indicator of a flawed Command and Control System. Without it, the CPD could not to fully command and control vari-ous operational incidents with a clear understanding of who, what, where, or how field decisions were to be made. Further, the lack of documentation complicated efforts to conduct an effective and comprehensive after action report.

The City's and the CPD's original response to the beginning of the protests and growing unrest was largely to react to events as they occurred. The City and the CPD's inability to effectively maintain control over any particular area allowed op-portunists to continue attempts to destroy and loot property. Many CPD personnel from all levels of the organization expressed a sincere frustration with wanting to do better but not being able to do so that first weekend.

Eventually, days into the protests and unrest in May 2020, the CPD activated the Emergency Operations Center and Area Command Posts, which according to the CPD's After Action Report, "allowed Department leaders to more efficiently man-age available resources and resolve incoming resource requests" and "prevented a duplication of effort among field supervisors and individuals at the OC who re-port to the Incident Commander."[333] These command post scribes, however, were filled by officers without training, who had to learn in the heat of the moment. Naturally, there was a learning curve, which meant that, for example, many deci-sions, deployments, and resources were not tracked. As protests continued throughout the summer, the City and the CPD made deliberate efforts to improve tracking of personnel, incident locations, posts, communications, and equipment by sharing databases and standardized spreadsheets across relevant City entities.

The supervision challenges continued, however, after the CPD activated the cen-tral mobilization center. Some officers said that, even after officers were placed into more organized squads and platoons, there were many challenges in moving officers to where they were needed and without further instruction. Several offic-ers were not equipped with radios, body-worn cameras, or protective gear. Trans-portation was also limited, which led to some officers being dropped off at various locations. This system left many squads and platoons stranded and unable to be re-deployed to other critical areas in a timely fashion. In some instances, platoons were dropped off at certain locations with no directions regarding their mission or how to accomplish it. Without clear instruction otherwise, officers were then left to their discretion on the levels of force to use to, for example, secure their loca-tion.

---

[333] *See id.* at 17.

While the City and the CPD made some improvements throughout the summer, there were also continued struggles. For example, on July 17, 2020, at the protest at Grant Park, there was a contingent of the crowd that was captured on City cameras appearing to prepare to attack the police by using umbrellas for coverage to change into matching clothes and masks and distribute projectiles. These members of the crowd then marched toward the statue to confront the officers.

Some supervisors and officers reported that they did not receive notice of a potential attack on officers or members of the crowd until after police started to call in for 10-1s. We also heard concerns from officers that they did not agree with leadership decisions throughout the City's and CPD's response to unrest.

While many City and CPD personnel admirably did their best to rise to challenges, often taking initiative as individuals, the City and the CPD must provide sufficient command and supervisor training to enable personnel to better respond to protests and unrest as coordinated teams.

## (2) CPD Recruit and In-Service Training

### IMT's Recommendations

- Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray (¶¶265–68)[334]

As discussed in the Planning and Preparation section above—particularly in the Mobile Field Force subsection—the CPD did not have sufficient recruit or in-service training that would have allowed the CPD to effectively use all of the officers it used for Mobile Field Force.[335] Moreover, putting aside the recent and necessary revisions to relevant policies, the CPD did not have sufficient training on existing

---

[334] *See* Jonathan Links et al., *Recommendations for Enhancing Baltimore City's Preparedness and Response to Mass Demonstration Events, Based on a Review and Analysis of the Events of April 2015*, Johns Hopkins University, 65–66 (December 4, 2015); *A Crisis of Trust, a National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27-June 7, 2020*, National Police Foundation, 83 (April 2021); Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA and Montgomery McCracken, 84, 87, 89 (December 2020).

[335] ¶293 ("A solid foundation of recruit training is important for equipping new police officers with the skills, knowledge, and values to police fairly, safely, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement."). The IMT will assess the City and the CPD's compliance with ¶293 in Year Three of the Consent Decree. *See also* ¶317 ("Regular in-service training is critical to ensure that CPD officers continue to hone important policing skills and remain up-to-date on changes in the law, CPD policy, technology, community expectations, and developments in best practices. In-service training should, as appropriate, reinforce CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.").

policies, such as the appropriate use of and prohibitions on certain uses of batons and OC spray. All officers—including those who are not part of Mobile Field Force teams—should continue to receive recruit and in-service training on the various concepts and policies for crowd management.

Officers were not, however, entirely without training, and the CPD did provide training before the protests and unrest, send modified trainings and reminders during the unrest, and have since provided additional trainings as the protests have continued.

In a response to requests for relevant training, the CPD provided the following:

*Recruit Training*

- Control tactics, including

    o Handcuffing Introduction,

    o Handcuffing Standing/Kneeling/Prone,

    o Impact Weapon Introduction,

    o Impact Weapon – Closed Mode Strikes, Open Mode Strikes, Open Mode Drills, Multiple Subjects, Disadvantage[] Positions, Review, Drills, and Test

    o OC Introduction, Drills, and Exposure

    o Half-Face Respiratory (April 13, 2020)

*In-Service Training*

- Crowd Control and Behavior Refresher 2019 (August/November/December)

- Crowd Control and Behavior Refresher 2019 (August/July)

- Crowd Control and Behavior supervisor in-service training presentation and lesson plan (dated June 2019)

- Crowd Control and Behavior recruit training lesson plan and training presentations (revised August 2017)

- Crowd Control Operations training bulletin

- Crowd Control and Behavior recruit training lesson plan and training presentations (revised February 2014)

Many of these trainings included critical information. For example, the CPD's recruit training regarding impact weapons provides the following guidance on baton use:

> Trainees ARE NEVER TRAINED TO USE THE BATON as a lethal force instrument. Striking areas of the head, neck and spine are prohibited.

After updating these trainings based on new or revised policies, these trainings should continue to be provided to officers in recruit and in-service training.

Still, most recruit and in-service training is not hands on or scenario-based. Further, as referenced in the CPD's After Action Report, the CPD's recruit training exposed officers to Mobile Field Force and mass-arrest procedures, but "newer [CPD] members (including those brought on during a dramatic hiring push started in late 2016) did not experience the same tangible application of those tactics, policies, and procedures as . . . officers were deployed to, for example, the 2012 NATO Conference"—"before some of the [CPD] members working during this unprecedented, large-scale civil unrest were on the job or in the senior leadership positions."[336] As a result, the CPD agrees that it "is essential that the [CPD] commit to ensuring all necessary field units receive updated field force training moving forward."[337]

To compensate and address several emerging issues, the CPD sent out several messages to all officers throughout 2020. This included, for example, messages regarding the following:

- *Mandatory Review of Use of Force Policies* (Thursday, May 28, 2020):

  > In light of recent developments in Minneapolis, Minnesota District Commanders will ensure their Watch Operations Lieutenants on all watches review CPD Use of Force policies and training materials during roll call. . . .

- *Uniform and Appearance Standards* (Tuesday, June 2, 2020)

  > Sworn members are reminded that the unit assignment designator and nameplate will be positioned so that it will be clearly visible. The combined nameplate/unit designator will be worn on the uniform outer garment[](except rainwear). The prescribed stars will be clearly

---

[336] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 5–6 (citing *Critical Incident Response Program*, General Order G05-03 § II-A-1 (December 7, 2017)).

[337] *See id.* at 5–6 (citing *Critical Incident Response Program*, General Order G05-03 § II-A-1 (December 7, 2017)).

> *visible and positioned on the left breast of the uniform outer garment. . . .*

- *Body Worn Camera Reminder* (Wednesday, June 3, 2020)

   > *Department members will activate the system to event mode at the beginning of an incident and will record the entire incident for all law enforcement related activities . . . [which] include but are not limited to: arrests, any encounter with the public that becomes adversarial after the initial contact, arrestee transport and any other instances when enforcing the law. . . .*

- *Uniform and Appearance Standards* (Thursday, June 4, 2020)

   > *All sworn members when attired in uniform will wear the prescribed star, name tag, unit designator, and rank insignia on their outer-most garment and in view to the public. . . . All supervisors have the responsibility and authority to ensure that uniform standards are strictly adhered to by both sworn and uniformed civilian members. Appropriate action will be taken when members fail to meet standards. . . .*

As reflected in the sample above, the CPD often repeated general messages with stronger verbiage and reference to supervisor authority and potential penalties.

In August 2020, COPA notified the CPD regarding several concerning patterns from complaints and its ongoing investigations. This included, for example, the following:

- *Excessive baton use was the most prevalent form of unnecessary use of force alleged in protest-related complaints. Members who COPA has interviewed regarding these complaints seemed to lack clarity regarding [CPD] directives on proper baton use.*

As reflected in the CPD Policies subsection above, the CPD also made specific efforts to train on new relevant policies or changes to policies. For example, between October 31 and November 9, 2020, the CPD provided a *First Amendment and Public Gatherings* roll-call training. The CPD ultimately transitioned this in-person training to a video to ensure consistency across roll calls. Among other things, this training included the First Amendment; relevant CPD policies, including the *Human Rights and Human Resources* policy; and explained the new CPD forms, ICS-211 Incident Check-In form (CPD-11.301) and Incident Response form (CPD-11.302) Forms; and clarified that Tactical Reponses Reports (TRRs) are still required for individual reportable use of force incidents during a crowd, protest, or civil disturbance response.

The training also specified that CPD officers

- "will not use batons to intentionally strike a person in the head or neck except when deadly force is justified."

- "ANY DEPLOYMENT OF OC SPRAY ONTO A CROWD AND NOT DIRECTLY AT AN ASSAILANT IS ONLY PERMITTED IF MEMBER HAS RECEIVED PERMISSION FROM THE SUPERINTENDENT"

- "Department Members will activate BWCs when taking law enforcement action such as issuing a dispersal order, using force, or making an arrest."

- "Department members are prohibited from concealing identifying parts of the prescribed uniform or wearing unauthorized uniform items or equipment consistent with the Department directive titled 'Uniform and Appearance Standards.'"

- "As required by Department protocols to prevent the spread of COVID-19, personnel will wear a mask, face covering, or face shield under any condition in which a member cannot maintain 6 feet of social distancing from other persons. The requirement to wear a mask, face covering, or face shield applies to all interactions with the public. The requirement extends to and includes wearing in public areas, private property, buildings, and vehicles."

Analysis Figure 8.
Select Slides from *First Amendment and Public Gatherings* – Roll Call Training (October and November 2020)

**INTERACTING WITH THE PUBLIC DURING A RESPONSE TO CROWDS, PROTESTS, OR CIVIL DISTURBANCES**

✳ Act, speak, and conduct themselves in a professional manner, recognizing their obligation to safeguard life and property, and maintain a courteous, professional attitude in all contacts with the public consistent with the Department directive titled "Human Rights and Human Resources"

✳ Treat all persons with the courtesy and dignity which is inherently due every person as a human being

✳ When a dispersal order is given, provide adequate dispersal routes and clearly identify and announce the routes to disperse and the requirement to leave the area

✳ Not disrupt, interfere with, harass, or discriminate against any person engaged in First Amendment conduct for the purpose of punishing, retaliating, or preventing the person from exercising his or her First Amendment rights consistent with the Department directive titled "The First Amendment and Police Actions"



**INTERACTING WITH THE PUBLIC DURING A RESPONSE TO CROWDS, PROTESTS, OR CIVIL DISTURBANCES**

✳ Not prevent members of the public from recording Department members on the public way performing their duties in a public place consistent with the Department directive titled "Body Worn Cameras" and Illinois Compiled Statutes (720 ILCS 5/14-2(e)).

✳ Request the appropriate medical aid for any injured person and, when it is safe and feasible to do so, may provide the appropriate medical care consistent with the member's training, consistent with the Department directive titled "Preliminary Investigations"

✳ Deescalate to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. When it is safe and feasible to do so, provide a warning prior to the use of any reportable force and allow individuals to voluntarily comply with lawful verbal direction.

✳ Act to intervene on the subject's behalf when the Department member directly observes a use of force and identifies the force as excessive or otherwise in violation of Department policy, consistent with the Department directive titled "Use of Force"



**REMINDERS**

✳ **The public can video record us.** They may record Department members on the public way performing their duties in a public place consistent with the Department directive titled "Body Worn Camera" and Illinois Compiled Statutes (720 ILCS 5/14-2(e)

✳ Department members made aware of a "doxing" incident or other threats against a Department member will notify a supervisor who, when necessary, will follow the procedures outlined in the Department directive titled "Protection of Department Members"

✳ Constitutional policing is smart policing. It is respectful policing. It is policing that places at the forefront the dignity and rights of individuals but upholds the duties and obligations of the police to serve, protect and enforce the law.

    ✳ Police have a range of appropriate responses available for any given scenario

    ✳ Any police action must be reasonable based upon the facts and circumstances

    ✳ If in doubt, ask questions and seek guidance

✳ When appropriate and lawful, seize and inventory property consistent with the Department directive titled "Processing Property Under Department Control"



The CPD continues to roll out relevant training materials. In April 2021, for example, the CPD sent officers a "Pocket Guide to [Field Force Operations (FFO)] Formations" (dated March 2021) and a "Checklist for (FFO) Platoon Leaders." Later that month, the CPD provided a video roll-call training on Mass Arrest Procedures for seven consecutive days.

In response to the Inspector General's Office's report, CPD Superintendent Brown wrote that "While the Department had not engaged in formal training on mass arrest procedures for some time before the events of 2020, several units, including those in BIA, took it upon themselves to do roll-call training for members as these events unfolded in order to reinforce the requirements of the mass arrest and use of force orders."[338] We appreciate and heard from many CPD personnel who worked hard to mitigate the circumstances the City and the CPD found themselves in, but more deliberate district-wide training is necessary. Moreover, the IMT, the OAG, and the Coalition have shared with the CPD that there continue to be concerns with the CPD's mass arrest policy, procedures, and forms, and we do not believe that training on the existing process will be sufficient to meet the requirement of the Consent Decree.

As reflected in the Independent Monitoring Report 3, the CPD faced significant challenges with providing adequate training during COVID-19. The CPD relied heavily on roll-call trainings for new policies or major changes. While roll-call trainings are helpful to widely distribute new information, the CPD needed and still needs thorough in person training and drills to effectively ensure relevant units and officers could effectively follow the CPD's plans and policies for crowd management. The CPD noted concerns about over reliance on roll-call trainings in its After Action Report:

> Unfortunately, the chaotic nature of the Events often kept Department members from leading roll calls with Department members in advance of their deployments to a given area. Instead, these Department members geared up and responded to the Events as soon as practicable; a well-intentioned but ultimately ineffective decision. This precluded Department leaders from communicating specific plans (and their underlying rationales) with those field supervisors and/or Department members ultimately expected to execute them . . . . There is an overarching concern among Department leadership regarding how roll calls are conducted in each district and various specialized units. Roll call is the most direct opportunity for Department leaders—namely Sergeants, Lieutenants, Captains, and Commanders—to cultivate a specific culture within and among their chain of command.

---

[338] CPD Superintendent David O. Brown, *Re: Report on Chicago's Response to George Floyd Protests and Unrest*, CHICAGO POLICE DEPARTMENT (February 11, 2021).

> *However, roll calls often differ in length, breadth, and scope depending on the individual leading the briefing. As a result, the Department often sees rumors, speculation, and an insular distrust among its membership rather than a sincere understanding of its higher-level decision-making and strategy.*[339]

In Independent Monitoring Report 4, we will also provide updates on the CPD's relevant Use of Force training, which should incorporate the recent revisions to the Use of Force policies through a variety of delivery modes, including annual in-service training, eLearning, and roll call briefs, to address the requirements of the Consent Decree.[340]

- *De-escalation, Response to Resistance, and Use of Force*, General Order G03-02*, which "sets forth Department policy regarding sworn members' and detention aides' de-escalation, response to resistance, and use of force."

- *Response to Resistance and Force Options*, General Order G03-02-01

- *Incidents Requiring the Completion of a Tactical Response Report*, General Order G03-02-02

- *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, General Order G03-02-03

- *Taser Use Incidents*, General Order G03-02-04

- *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, General Order G03-02-05

- *Canine Use Incidents*, General Order G03-02-06

- *Baton Use Incidents*, General Order G03-02-07

- *Department Review of Use of Force*, General Order G03-02-08

- *Firearm Discharge and Office-Involved Death Incident Response and Investigation*, General Order G03-06

---

[339] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 8–9.

[340] As reflected in Independent Monitoring Report 3, as of December 31, 2020, 70% of CPD officers had completed the 2020 Use of Force in-service training. Further, the CPD plans to deliver an eLearning on the Use of Force policy changes reflected in the December 31, 2020-issued policies in February 2021. This eLearning will be in addition to the 40 hours of in-service training required for 2021.

These trainings should be prioritized to account for the various findings and concerns raised by the City, the CPD, COPA, the Inspector General's Office, the IMT, and members of Chicago's communities.

## (3) REFRESHER TRAINING

### IMT's Recommendation

- Provide refresher training on (1) the people's right to record officers (¶58), (2) uniform requirements (¶347, 351, 433), (3) respectful interactions (¶52, 54, 56), (4) providing and requesting medical aid (¶173), and (5) arrestee rights (¶¶30–31, 35, 71)

As discussed above, the large protests and unrest occurred in Chicago about four days after the murder of George Floyd over 400 miles away. The CPD would not have been able to adequately train all officers who were ultimately required to respond to protests and crowds in that time. The most comparable training occurred about eight years earlier in preparation for the 2012 NATO Summit, which was, in comparison, in an isolated location. The City and the CPD cannot control or predict when the next national or local event will occur.

As a result, the City and the CPD must implement refresher training in case another event occurs eight years or a few months from now. Refresher training on these critical skills must occur in addition to regular in-service training, referenced above, that should be provided at regular intervals based on the likelihood of certain units and officers needing to respond to large crowds. Specifically, this refresher training should occur soon and reflect some of the policies and training that already exist, but that some officers appeared to continue to not follow during 2020 deployments. The City and the CPD should also, however, review, update, and revise these trainings to address any gaps in the previous trainings and maximize their long-term effectiveness.

### The people's right to record officers (¶58)[341]

The importance of police department's acknowledgment *and protection* of people's right to safely record officers during their duties has had a long and important history in the United States and in Chicago. In fact, it was bystander video that led to the international awareness of George Floyd's murder.

---

[341] *See, e.g.,* ¶58 ("*Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*").

During our review of body-worn camera footage, we observed multiple officers take issue with being recorded. One officer, for example, appeared to strike the phone out of a community member's hand because the person was filming the interaction.

In the third reporting period, the CPD still needed to receive additional community input on its corresponding policy, *Human Rights and Human Resources*, General Order G02-01. As we said in Independent Monitoring Report 3, "The lack of community engagement regarding this paragraph's requirements is concerning considering various allegations that some officers took or destroyed community members' phones or cameras during protests and civil unrest in the summer of 2020."

Since then, the CPD has also submitted its related policy, *Body Worn Camera*, for Consent Decree review, which will also need to undergo significant community engagement to ensure that CPD's practices of recording and allowing others to record officer interactions with the community reflects the community's priorities and helps build and sustain trust.

## Uniform requirements

As referenced above, there were many issues with officers not complying with uniform requirements. This includes, for example, the dangers associated with not wearing helmets. But there were also many instances—including those demonstrated by images and videos of officers covering their badges and nametags during protests and unrest.[342]

In the CPD's After Action Report, the CPD acknowledged that there were policy violations by officers:

> [S]ome Department members were observed during the Events with their names and/or badges removed from their uniforms or otherwise obscured in violation of Department policy. This could have been avoided had supervisors, per that same Department policy, "inspect[ed] uniformed members at . . . roll call."[343]

In addition to the damage caused to community trust by willful violations of policies, as discussed further the Accountability section below, the coverings negatively impacted investigations of officer misconduct.

---

[342] *Compare, e.g.,* ¶433 ("CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.").

[343] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 8 (citing *Uniform and Appearance Standards*, Uniform and Property U04-01 § II-A-3 (March 11, 2020)).

Furthermore, since the beginning of COVID-19, and corresponding mask and social distance requirements, many officers continued not wearing masks when interacting with colleagues and community members. In some circumstances, the lack of masks was somewhat understandable—as officers struggled to respond to large-scale unrest, immediate dangers, and serious communication challenges associated with unreliable radio communications and loud noises of the chaos around them. We also heard from officers who expressed frustration about having to respond to large crowds that were not following social distance guidelines and people in the crowds who were either not wearing masks, not wearing masks correctly, or intentionally not following social-distance protocols by getting into officers' faces.

Still, none of this justifies the increased risk of infection that officers who chose not to wear masks placed on colleagues, arrestees, essential workers who needed to be moving throughout Chicago, or other community members who were completely uninvolved but had interactions with exposed persons downstream. Furthermore, the CPD was largely responsible for enforcing COVID-19 precautions, including social distancing and mask wearing. For many, officers' refusal to wear masks themselves suggested that these officers believed that the rules that they enforce on others do not apply to them, and these choices by individual officers reflected on the entire CPD.

There were also officers who appeared to have chosen to cover their badges and nameplates and also not wear a mask. This suggests that the officers were less concerned about protecting their identity and safety from doxing—as many suggested—and more concerned about escalating tensions with members of the crowd and an implicit threat of impropriety regarding misconduct.

The CPD has sent several department-wide messages about masking and personal protective equipment throughout the pandemic, and we did view images of protest response where the rate of officers wearing masks appeared to increase. Still, there continued to be many officers who refused to wear masks, and as of the date of this report, we are only aware of one officer who was disciplined for this refusal to wear a body-worn camera and for covering a badge.[344] In addition to the accountability section below, we recommend that additional training regarding uniform rules, the reasons for the rules, and the penalties for violating the rules—including examples of such discipline—would be helpful and welcomed by officers who have followed and continue to follow those rules and by community members who witnessed officers ignore them.

---

[344] Unlike other officers who covered both badges and name plates, the officer who received a reprimand was wearing a name plate.

## Respectful interactions (¶52, 54, 56)

During this review, we heard from many community members who witnessed CPD officers use aggressive, mocking, and inappropriate language toward protesters.[345] We also saw video of officers using such language toward people during various interactions. It appeared that many protesters and people engaging in unrest were being intentionally disrespectful and hostile toward officers (with chants and slogans like "fuck the police," "fuck 12," "kill the police," and "ACAB," meaning "all cops are bastards"). People do, however, have First Amendment rights to use, among other things, disrespectful language, and officers must maintain professionalism in response to all protected speech. To do this, the City and the CPD must acknowledge the challenges and establish expectations and fully equip, train, and prepare, and provide sufficient supports for officers to respond to all protected speech with professionalism. Such preparation can help ensure that officers are equipped to respond to protests in a way that may de-escalate tensions, build trust, and prevent officers from losing community trust—and in the least, does not escalate tensions.[346]

In evaluating the level of respect during communications, officers and community members often mirrored one another during the interaction. Many interactions from the body-worn-camera footage demonstrate respectful engagement between officers and community members—although some interactions would end abruptly with disrespectful language. Given the sometimes abrupt start or stop of footage, it was often difficult to determine whether the officers or community members were setting the tone of the interactions. Either way, when community members appeared to be disrespectful and confrontational, officers often replied in a disrespectful and confrontational way. Similarly, when community members appeared more willing to respectfully engage, officers appeared more willing to engage respectfully.

On the other hand, we also heard concerning language between officers that suggested some officers may be more willing to start disrespectful interactions with people in crowds—or worse. The review of body-worn-camera videos provided insight into how some CPD officers viewed community members who were taking part in the protests, rallies, or other events, particularly during "down times,"

---

[345] ¶54 ("CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner. . . .").

[346] *See, e.g.*, ¶163 ("CPD officers may only use force for a lawful purpose. CPD officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).").

when the public was not within hearing range. In a number of instances, CPD officers made disparaging remarks about community members. For instance, officers said things such as the following:

> *Somethin' gonna happen tonight.*

> *I wanna hit this mother fucker right here.*

> *There's more people coming. They think they're something. They all need they ass whooped. It's embarrassing.*

In other instances, we heard common references to community members as "animals" and "savages," particularly when referencing people who were looting or participating in violence.

Although community members may not hear this language, the language is nonetheless concerning because it may reveal how some CPD officers view some members of the communities they serve. While we are unable to draw direct links from comments made about community members to actions taken against community members, it is nevertheless concerning that such language could reflect a culture that can have dangerous repercussions.

There was no shortage of disrespectful communication found within the videos we reviewed. Based on the aggregate of the videos, it appeared that many protesters were attempting to elicit emotional responses from officers, often through disrespectful chants and direct statements targeting specific officers. We saw some people call officers derogatory, racist, and sexist terms. Such statements were often made in officers' faces, as well as from a distance as protesters were walking by. We also saw some protesters identifying officers by name, looking the officer up online, and then making derogatory comments about the specific officer. It should be noted, however, these tactics have been used for years. Many departments train officers on how to endure and respond to these types of tactics through training and supervisory oversight, monitoring officers' behaviors during these encounters.

Some officers appeared willing to taunt community members, often with similarly derogatory language. At times, the taunts appeared to be in response to community member statements. In other occasions, some officers appeared to be taunting people without prompt. For instance, during one mass arrest for looting, officers were having a respectful interaction with the individuals being arrested. However, one officer then appeared to provoke one arrestee with the following exchange:

> **Officer:** *"Look at that stare though. Why are you staring at me?"*
>
> **Arrestee:** *"Stop talking to me."*
>
> **Officer:** *Ok, so what's going to happen after? I'm not gonna stop talking and then your ride's going to come and you're going to go to jail."*
>
> **Arrestee:** *"Then I'll get back out."*
>
> *[Pause]*
>
> **Officer:** *"You were crying back there. I got it on body cam. We can go back to the station and watch it. I'll put that shit up on YouTube."*
>
> **Arrestee:** *"It's easy to talk shit when I'm in cuffs."*
>
> **Officer:** *"You weren't in cuffs back there. I threw your ass to the ground, and you cried . . . You one big pussy ass bitch. Big ass bitch."*

Other exchanges contained similar disrespectful language. For instance, during one arrest, a woman yelled, "He did not hit you with a brick." A supervisor assisting with the arrest yelled back at her, pointing with a baton, "Shut up, bitch," to which the woman retorted, "Your mama's a pig." Later in that interaction, the woman walked alongside officers as they were escorting the arrestee and was told by another officer: "You want to get locked up? Get back! Get the fuck back you little shit."

These types of exchanges do little to demonstrate the professionalism of the CPD. As noted above, there was relative parity between officers and the public in terms of respectful/disrespectful actions. It is therefore likely that the derogatory language was the result of the situation and may have been influenced by protester actions. However, officers should be expected to maintain their composure even when faced with contemptuous individuals or crowds. In addition to the planning for officer wellness and support, additional training and enhanced monitoring by supervisors is likely necessary to ensure officers understand expectations and benefits regarding respectful interactions—along with the long-term harms that can be caused by disrespectful interactions.

Moreover, it was clear from some body-worn-camera footage that some officers knew how to conduct respectful interactions, even when facing hostile crowds and potentially dangerous circumstances. In several videos, CPD officers spoke with community members and potential crowd organizers respectfully and productively. In many of these instances, the officers were supervisors, indicating that leadership was interested in hearing community voices. While such interactions had mixed results, we were encouraged to see officers attempting to do their part to de-escalate tensions and protect protesters and other community members.

We look forward to reviewing CPD training and attendance records that aim to ensure that such interactions become the norm.

## Providing and requesting medical aid (¶173)

According to CPD records and interviews of CPD personnel, there were instances when officers provided critical medical aid to people injured during protests and unrest, including shooting victims. However, the IMT reviewed many videos where CPD officers' responded to protests and unrest and did not render or request medical aid for injured protesters or people who had received uses of force.[347] As demonstrated in many of the same videos, it is likely that many people who received uses of force from officers did not want to or would have been unwilling to receive aid from the CPD.

Nonetheless, the CPD's *De-Escalation, Response to Resistance, and Use of Force* policy, G03-02, requires officers to immediately request medical aid for the injured person, including contacting emergency medical services (EMS) from the Chicago Fire Department via the OEMC. Likewise, the *Firearm Discharge and Officer-Involved Death Incident Response and Investigation* and *Immediate responsibilities for the involved member*, require officers to do the following:

> 1. *Immediately request medical request medical attention for the injured and as soon as it is safe and feasible to do so, provide lifesaving aid consistent with their department training, including the Law Enforcement Medical and Rescue Training (LE-MART), to persons injured by a Department member's use of force until medical professionals arrive on scene.*
>
>    *a. Department members may provide appropriate medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention. This may include providing first aid and/or arranging for transportation to an emergency medical facility.*

---

[347] *See, e.g.,* ¶¶173 ("Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropriate medical aid for injured persons or persons who claim they are injured.") and 211 ("CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment.").

> *b. If the scene is safe and the person in custody is secure, De-partment members will not interfere with emergency medical personnel when providing treatment to injured persons.*

As reflected most recently in Independent Monitoring Report 3, we have yet to receive sufficient evidence of training compliance of officers on these policies.

## Arrestee rights (¶¶30–31, 35, 71)

As reflected above, the CPD had significant challenges with arrests, including mass arrests. As with many issues throughout this report, many of the challenges re-garding arrestee rights were caused by a lack of sufficient planning. We heard, for example, that there were significant organizational challenges around mass ar-rests, including how to conduct and process arrests. We heard that in some cir-cumstances, the CPD did not have all crucial personnel available, such as videog-raphers to take pictures of injuries before and after stages of processing. According to the CPD, mass arrest issues, for example, were caused in large part by an unfa-miliarity with existing policies—that is, a lack of training:

> *The Department has a substantial written procedure governing mass arrest incidents[] that works in theory but, during the Events, broke down in practice. This appeared attributable in part to the chaotic na-ture and unprecedented geographic scope of the Events. For example, Department members effecting arrests were required to complete "Mass Arrest Cards"—duplicate paper forms capturing limited infor-mation including, but not limited to, probable cause for arrest and the transporting unit's information.*

> *But many Department members lacked familiarity with formal mass arrest policies and processes as a result of limited (if any) involvement with actual, tangible applications of the procedure; not all incidents at which multiple arrests are effected are mass arrest incidents. Nor were many duplicate mass arrest forms immediately available during the Events where widespread criminal activity was occurring.*

> *As a result, many of the individuals arrested during the Events were either released without charging ("RWOC") or had charges filed against them dropped by prosecutors because the arresting officer or officers could not be identified. These individuals may have been in-volved in serious, criminal wrongdoing (e.g., looting, arson, violence, etc.) during the Events and may never be held accountable as a re-sult.*[348]

---

[348]  *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, Chicago Police Department (February 2021) at 9–10.

Similarly, constitutional, department, and local rules regarding arrestee rights were in place when the protests and unrest began.[349] However, we heard of challenges, for example, with arrestees receiving access to their attorneys or families.[350]

We also heard from the CPD that there were significant challenges with transporting and securing arrestees in May and June 2020. There were, for example, closures of certain CPD locations due to COVID-19 outbreaks, and additional logistical challenges with any attempts to follow COVID-19 precautions. CPD representatives said that people accused the CPD of intentionally punishing arrestees by moving them to different locations, lying about where arrestees were, and keeping arrestees from their attorneys. These representatives said, however, that the reality was that there were significant challenges handling the increase of arrestees that the CPD locations were unprepared for.

Illinois recently amended state law to guarantee people the right to a phone call no later than three hours after arrival at the first place of custody.[351] The IMT is

---

[349] As reflected in Independent Monitoring Report 3, we believe additional improvements should be made to relevant CPD policies. For example, we believe that the *Arrestee and In-Custody Communications* policy, G06-01-04, should be more specific than "as soon as practicable" to ensure arrestees can reach their attorneys or families in a specified and timely manner. We have requested that the CPD track the times that arrestees are taken into custody and when arrestees are provided with their phone call. We will look forward to reviewing this data. Further, the CPD has implemented *Processing of Juveniles and Minors under Department Control* policy, S06-04, which codifies ¶35's requirements. At the end of the third reporting period (December 31, 2020), however, we had not yet received sufficient records of the practices in place to supervise officers' interactions with juveniles once in custody.

[350] *Cf., e.g.*, ¶¶31 ("CPD will provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody.") and 35 ("If a juvenile has been arrested CPD will notify the juvenile's parent or guardian as soon as possible. The notification may either be in person or by telephone and will be documented in any relevant reports, along with the identity of the parent or guardian who was notified. Officers will document in the arrest or incident report attempts to notify a parent or guardian. If a juvenile is subsequently interrogated, CPD policy will comply with state law and require, at a minimum, that: a. Juvenile Miranda Warning will be given to juveniles prior to any custodial interrogation; b. the public defender's office may represent and have access to a juvenile during a custodial interrogation, regardless of parent or legal guardian permission; c. CPD officers will make reasonable efforts to ensure a parent or legal guardian is present for a custodial interrogation of a juvenile arrestee under 15 years of age in custody for any felony offense; and d. juveniles in custody for felony offenses and misdemeanor sex offenses under Article 11 of the Illinois Criminal Code will have their custodial interrogation electronically recorded.").

[351] 725 ILCS 5/103-3 (effective July 1, 2021).

also aware of much local attention to this issue during this reporting period, in-cluding proposed City legislation,[352] a lawsuit filed by county officials against the City,[353] and a new state law.[354]

As the City and the CPD revise policies and procedures, they must also train offic-ers and personnel to ensure the law and the corresponding policies are followed.

---

[352] *See* Paris Schutz, *Alderman, Mayor at Odds Over Phone Calls in Police Custody*, WTTW News (December 21, 2020), https://news.wttw.com/2020/12/21/aldermen-mayor-odds-over-phone-calls-police-custody#:~:text=The%20Chicago%20Police%20Department's%20dep-uty,arresting%20and%20booking%20a%20suspect.&text=Mayor%20Lori%20Light-foot's%20administration%20has,hours%20of%20being%20in%20custody.

[353] *See* Matthew Hendrickson, *Arrestees denied phone calls, access to lawyers, lawsuit claims*, CHICAGO SUN-TIMES (June 23, 2020), https://chicago.suntimes.com/2020/6/23/21300460/law-suit-cook-county-public-defender-good-kids-mad-city-black-lives-matter-chicago-police.

[354] *See* Public Act 101-0652 (February 22, 2021), https://www.ilga.gov/legislation/publi-cacts/101/PDF/101-0652.pdf.

# Accountability and Transparency

## IMT's Recommendations – Accountability and Transparency

- Improve reporting and documentation on uses of force, arrest, deployments, dispersals, officer wellness and safety, all injuries, and use of OC spray (¶566–67, 438, 528, 567, 581–82)

- Increase transparency regarding discipline, including decisions to relieve or not relieve officers of police powers (¶567)

- Address personnel needs across accountability systems, including COPA investigators, CPD Force Review Division, BIA, and CPD supervisor ratios (¶¶343, 356, 521, 575, 700)

- Allocate sufficient City and CPD resources to review and analyze data, including tagging and auditing body-worn-camera video footage (¶¶352–53, 576, 700)

- Continue to review and increase methods of transparency with Chicago's communities, regarding crime-reduction strategies, officer-involved shootings, and other police activities (¶¶10, 12, 17, 54, 334)

- Create After Action procedures—including body-worn camera review and opportunities for community engagement—after each operations plan (¶¶8–10, 347–51)

The importance of and need for accountability and transparency are reflected throughout this report, from the distrust of or anger toward national and local policing to the spike in allegations of violent crime and officer misconduct. As reflected in the Consent Decree: "Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence" (¶419). Without consistent and transparent incentives for personnel to follow policies and training, the City and the CPD will continue to struggle with community trust.

While the City's and the CPD's planning and preparation were insufficient, the City and the CPD did have some policies and training in place to respond to large crowds. Those policies—particularly policies that had been reinforced through training—needed and continue to need supervision and enforcement. This en-

forcement should include recognition of officers who followed policies and appropriate accountability for those who did not.[355] Further, the City and the CPD should make additional efforts to increase transparency and clarity regarding discipline.

In the CPD's After Action Report, the CPD acknowledged the challenges associated with accountability, particularly the issues regarding the efficient review of complaints.

Analysis Figure 9. CPD After Action Report (May 20, 2020, through June 12, 2020)

**CPD After Action Report: "Accountability"**

| | | |
|---|---|---|
| Strengths | (1) | Collaboration with the Civilian Office of Police Accountability |
| | (2) | Bureau of Internal Affairs members detailed to field operations |
| | (3) | Prompt review of objective, verifiable evidence |
| | | |
| Weaknesses | (1) | Reactive, rather than proactive, supervision and accountability |
| | (2) | Inability to efficiently identify and analyze event-related complaints |
| | (3) | Length of time for disposition of complaints[356] |

We have some concerns regarding the strengths the CPD identified above.

First, we agree that the CPD did collaborate with COPA, and CPD and COPA continue to work on addressing the logistical challenges of their jurisdictions. COPA did provide additional resources to attempt to address the spike in complaints, but were still limited by resource challenges and by the CPD's lack of planning, such as a lack of body-worn cameras in the field.

Second, the CPD responded with an all-hands-on deck approach, putting officers without body-worn cameras in the field, including members of the Bureau of Internal Affairs, the Force Review Division, and the Reform Management Group. In addition to delaying supervisor review and reform efforts, this also created separate issues. For example, some officers who are responsible for holding officers accountable for not wearing body-worn cameras during patrol duties were being required to engage in patrol duties without body-worn cameras. Further, while it may be advisable to send Bureau of Internal Affairs investigators to observe officer conduct, the CPD should not deploy Bureau of Internal Affairs Officers to conduct tasks unrelated to their position. In response to the Inspector General's Office's

---

[355] *See, e.g.,* ¶48 ("CPD will create opportunities to highlight, reward, and encourage officer, supervisory, and district performance on furthering community partnerships, engaging in problem-solving techniques, effective use of de-escalation, exemplary and effective supervision, and implementing community-oriented crime prevention strategies.").

[356] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020,* Chicago Police Department (February 2021) at 8.

report, CPD Superintendent Brown wrote that the deployment of key accountability personnel did not lead to a breakdown in oversight.[357] Specifically, he wrote:

> While members of BIA and the Force Review Division (FRD) were deployed, they were deployed to assignments which were generally removed from the direct interactions between officers and members of the public. First, some members of BIA were assigned to transport vehicles which are typically parked away from the heart of the interactions between officers and the public, and the BIA Sergeants were required to stay with the transport vehicles. Second, members of BIA and FRD were deployed to secure Public Safety Headquarters (PSHQ) in response to threats by protestors and looters to enter and burn down the building. PSHQ has a large footprint, over one square block, and required significant manpower to secure. The Department took steps to keep these members back from the front line of interactions with the public. Moreover, even if members of BIA and FRD were later assigned to review an incident that they personally witnessed, there are steps that members can and must take to identify this conflict and recuse themselves from an investigation or review. Upon notification of a conflict the investigation or review would be immediately reassigned to another member.[358]

While such measures may be necessary during emergency circumstances, it is more of a demonstration that the planning and preparation was insufficient than it is a strength to rely on in the future. To the extent that many City and CPD personnel deserve recognition for putting themselves in positions to help mitigate crises, we agree. But the City and the CPD should enable its personnel and officers to achieve success by better preparing them for roles and responsibilities that match their training, equipment, and specialties within the City and the CPD.

Third, while the CPD may have reviewed objective, verifiable evidence, the amount of objective, verifiable evidence was diminished by the challenges regarding data collection and management, as detailed in this report and below.

---

[357] CPD Superintendent David O. Brown, *Re: Report on Chicago's Response to George Floyd Protests and Unrest*, CHICAGO POLICE DEPARTMENT (February 11, 2021).

[358] *Id*.

# (1) REPORTING

## IMT's Recommendation

▪ Improve reporting and documentation on uses of force, arrest, deployments, dispersals, officer wellness and safety, all injuries, and use of OC spray (¶¶566–67, 438, 528, 567, 581–82)[359]

According to the City and the CPD, there were significant delays in producing records for this review because information was not consistently captured, managed, or accessible.

The Consent Decree includes many reporting requirements.[360] This includes reporting requirements that the City and the CPD have created or improved since the Consent Decree began, such as the requirement to report the pointing of firearms and Tactical Response Reports.[361]

When an officer engages in a reportable use of force, the Consent Decree requires officers to "complete a [Tactical Response Report], or any similar form of documentation." During our interviews, however, CPD officers said that when the protests and mass arrests began on Friday night and Saturday (May 29 and 30, 2020), officers were told that they did not have to report uses of force when responding to crowds and that all relevant information would be on a mass arrest card.[362]

---

[359] *See* Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT, 36–37, 40, 42 (August 14, 2020); *Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT, 108, 112 (April 13, 2020).

[360] *See, e.g.,* ¶¶218 ("CPD members must report and document any reportable use of force."), 219 ("Whenever a CPD member engages in a reportable use of force, the member must complete a TRR, or any similar form of documentation CPD may implement, prior to the end of his or her tour of duty. In addition to completing the TRR, officers must also document the reason for the initial stop, arrest, or other enforcement action per CPD policy. . . ."), and 221 ("Any CPD member who engages in a reportable use of force must immediately report the incident to OEMC. OEMC is required to notify the involved member's immediate supervisor and the Watch Operations Lieutenant of the district of occurrence.").

[361] In the third reporting period, for example, the City and the CPD received the requisite community input for G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*, and finalized the policy. In the second reporting period, the CPD changed (on February 29, 2020) the number of levels of force (from four to three), as required by the Consent Decree. On December 31, 2020, after extensive and ongoing dialogue between the CPD and the Working Group, the CPD issued revised Use of Force policies, including G03-02 *De-Escalation, Response to Resistance, and Use of Force*, that further addresses chokeholds, emphasizing that chokeholds are to only be used as last resort and elaborating on prohibitions.

[362] *See Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021) at 8–9 ("During the events at issue, CPD did not fulfill its force reporting obligations and did not provide clear and consistent guidance to officers on reporting obligations.").

This is not true, and likely occurred because of the unfamiliarity with the mass-arrest procedures, which according to the CPD, had not been used in years. What is more, even if the mass-arrest cards were sufficient, the CPD did not have enough mass-arrests cards distributed for all officers who engaged in a reportable use of force to fill out, and not all reportable uses of force led to an arrest or appeared to be unrelated to the force necessary to secure an arrest. We reviewed one video, for example, in which multiple officers appeared to have an individual under control, and as officers were bringing him out of the crowd, a supervisor was seen appearing to strike the individual near the head with a baton despite the individual putting his hands up in a protective manner. Still, in other instances, officers appeared to excessively push community members without consideration for objects or persons behind the community members which may have caused them to fall, potentially creating a situation in which the community may have been unnecessarily injured.[363]

Further, according to the CPD's After Action Report, "it was determined that the completion of mass arrest cards was not feasible, [CPD] leaders informed members to document similar information verbally on their Body Worn Cameras."[364] In response to the Inspector General's Office's report, CPD Superintendent Brown wrote that "as time went on there was a directive from the First Deputy Superintendent to the Area Deputy Chiefs that a Body Worn Camera (BWC)-equipped officer should partner with a BIA mass arrest Sergeant for all transports as a stop gap measure to ensure that necessary information to effectuate the arrest was received by the arresting officers."[365] But many officers did not have body-worn cameras and much of the video was not tagged for review. Further, even if it was tagged for review, in the CPD's After Action Report, the CPD acknowledges that "it remained tremendously burdensome for processing officers to review hours of BWC footage for the purposes of identifying, among other things, the complainant officer, appropriate charges, and/or the time and location of arrest."[366]

In response, the CPD "intends to thoroughly review its mass arrest procedures in light of the challenges faced during the Events," which "remains an on-going process involving multiple cross-functional working groups."[367] As reflected in the Policy section above, the CPD sent the IMT, the OAG, and the Coalition a draft of those

---

[363] We note that the IMT cannot conduct an investigation into any particular event or interaction. Rather, for these instances (in addition to other instances concerning interactions described here), we have forwarded them on to COPA for their review and potential investigation.

[364] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 10.

[365] CPD Superintendent David O. Brown, *Re: Report on Chicago's Response to George Floyd Protests and Unrest*, CHICAGO POLICE DEPARTMENT (February 11, 2021).

[366] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 10.

[367] *See id.*

revisions, but after receiving feedback in October 2020, the CPD has yet to submit a revised version.

As a result, the CPD's Force Review Division could not review all reportable uses of force. Combined with the body-worn camera issues above, there simply is no reliable way to get a full accounting of all uses of force. The Force Review Division submitted a report dated November 30, 2020, indicating they had generated two complaint logs for officers who failed to report uses of force. Given resource limitations, the Force Review Division was still backlogged from officer conduct during the protests and unrest.[368] According to CPD representatives, the Force Review Division caught up on that backlog in 2021.

The challenges from reporting are reflected in many of the responses to requests. For example, the CPD could not account for where many officers were deployed, including commanders. Moreover, according to the CPD responses to requests, there were no arrests for unlawful assembly. The CPD also reported that between (May 1, 2020, and June 30, 2020) there were only four foot pursuits related to citywide demonstrations and unrest-related foot pursuits, two on May 31, 2020, and two on June 2, 2020. These were "determined based on identified demonstration and unrest related arrest RD numbers." Likewise, because the CPD's records of injured arrestees were based on completed Tactical Response Reports—which were not consistently completed—the CPD did not have record of any injured arrestees between the start of the protests and unrest at the end of May and June 10, 2020.[369]

Following George Floyd's murder, COPA anticipated potential unrest in Chicago. Specifically, COPA's public information unit tracked demonstrations and civil unrest that occurred in other parts of the country and, anticipating that this unrest would occur in Chicago, proactively contacted aldermen and other stakeholders to let

---

[368] On September 9, 2020, in response to a request for "Records reflecting that CPD has or will analyze data regarding the number of arrests, uses of force, deployments, injuries, and resource needs from the protests and unrest between May 28, 2020, and June 2, 2020," the CPD's Force Review Division responded that, as of August 13, 2020, there "were 173 Tactical Response Reports (TRRs) generated city-wide between May 28, 2020, and June 2, 2020." Further, a "total of 138 of these TRRs, or 80%, were subject to review by the Force Review Division," "the Force Review Division has completed reviews on 107 of these TRRs," and "31 are in the process of being reviewed." The Force Review Division added that it "does not maintain or analyze data on all injuries," but reviews "reported uses of force which result in a subject injury or complaint of injury," which is "contained within the TRRs being reviewed by the Force Review Division for this time period."

[369] The City and the CPD provided records reflecting the amount of arrests, which were incomplete, as demonstrated by the Inspector General's Office's report and corresponding analysis. *See Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021) at 77, https://igchicago.org/2021/02/18/report-on-chicagos-response-to-george-floyd-protests-and-unrest/.

them know that COPA would be fully operational the weekend of May 30. Moreover, according to COPA personnel, in May 2020, most COPA personnel had transitioned to working remotely due to COVID-19. COPA's intelligence and preparation paid dividends and allowed COPA personnel to quickly and efficiently transition into a 24-hour response.

As Chicago began to experience unrest and demonstrations, COPA instituted daily leadership briefings. Each day, COPA's Complaint Intake Unit reviewed new complaints to determine which ones involved particularly egregious allegations that were likely to be supported by sufficient evidence to reach a conclusion. COPA formed a new investigations squad to lead the investigation of those cases, and COPA's Public Information Unit helped investigate complaints from incidents captured on social media.

COPA and the CPD's Bureau of Internal Affairs worked collaboratively on information-gathering for complaints that arose out of the protest activity and unrest at the end of May and early June. As detailed further below, however, it was difficult to identify some officers who were the subject of complaints or potential witnesses because, among other reasons, officers had been redeployed out of their assigned districts without access to their body-worn cameras. When footage was available, some officers and witnesses could not be readily identified because of the limitations of the footage, officers covering identifying information, or officers borrowing other officers' gear. In response, the Bureau of Internal Affairs helped COPA identify some officers by suggesting research methods and providing contact information of CPD personnel who could potentially assist with COPA's identification efforts.

On July 17, 2020, COPA implemented the same plan and process that it had used at the end of May. As complaints came in, COPA's Complaint Intake Unit triaged them, made notations in the Case Management System, and assigned complaints to a special investigations unit or to General Investigations. Because this was a smaller protest that resulted in fewer complaints than those at the end of May, COPA did not require as much assistance from the Bureau of Internal Affairs.

Despite these efforts, COPA, the Bureau of Internal Affairs, and the Force Review Division faced many challenges in investigation complaints. In August 2020, COPA reached out to the CPD Superintendent to raise several concerns that impeded their investigations, which included the following:

▪ *Tactical Reponses Reports (TRRs) were not completed in the vast majority of use of force incidents. Not only does this present an accountability concern from COPA's perspective, it also creates a compliance concern for the [CPD]. The absence of such important documentation regarding the use of force renders the [CPD's] Force Review Unit unable to evaluate ongoing compliance with use of force directives. Furthermore,*

the lack of TRRs leaves supervisory [CPD] members unable to evaluate the conduct of members under their command.

- *Attendance and Assignment Sheets were used inconsistently. In many instances, hand-written [forms] provide the only documentation of members assigned to work a particular shift and/or area, creating challenges in identifying members involved in several use of force incidents as well as officer safety issues.*

- *There was often insufficient time for BWCs to be re-charged between shifts, leaving members with non-functional equipment during encounters with civilians that, according to [CPD] directives, should have been captured.*

- *Inconsistent recordkeeping relative to BWC footage uploaded to* Evidence.com*, exacerbated by already inadequate documentation . . . compounded challenges related to incident and member identification in the investigation of misconduct complaints.*

- *Obstruction of members' names and/or star numbers was prevalent and impeded identification of accused and involved members.*

- *Officers' sharing of equipment (such as riot helmets) impeded identification efforts by COPA and the [CPD].*

- *Identification of accused and involved members has presented the largest investigative challenge in protest - related cases. Although many of these incidents were captured on video and have been widely circulated in both social and traditional media, members have not come forward to identify themselves or their fellow members in any of these investigations.*[370]

Further, in its report, the Inspector General's Office identified four "critical challenges to the appropriate management of allegations of police misconduct" that were caused by "the way in which CPD responded to the protests and unrest":

- *First, breakdowns in mass arrest processing and documentation undermined any efforts to systematically identify relevant reports and BWC footage, and CPD failed to retain any copies of a significant volume of mass arrests records.*

- *Second, CPD's emergency deployment of all available members compromised the members responsible for reviewing uses of force and conducting internal investigations by risking the involvement of those members in the very events they would be responsible for examining. Meanwhile, deficits in training and policy clarity meant that some of those events were never processed for examination in the first place.*

- *Third, there was widespread non-compliance with CPD's policy requiring the use of BWCs; during much of the time at issue, CPD members who were working outside of their regular schedules deployed to the field directly from Guaranteed Rate Field, ra-*

---

[370] (Emphasis added).

*ther than from their stations, and BWCs were not available to them. As a result, countless interactions between CPD members and members of the public were not capture on BWCs.*

- *Finally, there were widespread complaints—and evidence—of CPD members obscuring their badge numbers and nameplates while deployed during the protests and unrest.[371]*

In response to the Inspector General's Office's report, the CPD explained some short-term measures that were put in place to address some of the issues described by that report.[372] The CPD should continue to work and report on more permanent measures to address the Inspector General's Office's findings.

## (2) POLICY VIOLATIONS AND DISCIPLINE

### IMT's Recommendation

- Increase transparency regarding discipline, including decisions to relieve or not relieve officers of police powers (¶567)[373]

During the protests and unrest in 2020, there were many viral videos of apparent officer misconduct. Some of these videos were of CPD officers. In response to some of these videos and reports, the City and the CPD relieved some officers of their police powers, pending investigations. This included, for example, the following incidents:

- Officer who "flipped off" protesters, and

- Officer who used a homophobic slur.[374]

[371] *See Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021) at 9–10.
[372] CPD Superintendent David O. Brown, *Re: Report on Chicago's Response to George Floyd Protests and Unrest*, CHICAGO POLICE DEPARTMENT (February 11, 2021), https://igchicago.org/wp-content/uploads/2021/02/CPD-Response-to-OIG-Report-on-Civil-Unrest.pdf.
[373] *See Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL (July 10, 2020) at 40–44.
[374] *See, e.g., Chicago Officer Who Flipped Off Protesters Relieved of Police Powers*, NBC CHICAGO (June 10, 2020), https://www.nbcchicago.com/news/local/chicago-police-officer-who-flipped-off-protesters-relieved-of-police-powers/2287340/; *Chicago Police Officer Stripped of Powers After Being Heard Using Homophobic Slur During Unrest Downtown*, CBS CHICAGO (June 10, 2020), https://chicago.cbslocal.com/2020/06/10/chicago-police-officer-stripped-of-powers-after-being-heard-using-homophobic-slur-during-unrest-downtown/.

Seventeen officers who were caught on video in U.S. Representative Bobby Rush's Office were also suspended.[375]

We heard from multiple officers and community members who were troubled by this discipline. While many people agreed that the officers should have been relieved of their police powers, some officers, for example, felt that relieving officers of police powers is usually reserved for the most serious and fireable offenses.[376] Some community members who agreed that these officers should have been relieved of their police powers also noted that they would rather have seen the CPD relieve the police powers of officers who committed more serious offenses, such as excessive uses of force against protesters.[377]

The Coalition has also repeatedly raised concerns that the existing standards for relieving police powers are insufficient. While there continues to be serious disagreement between the Coalition and the CPD on this issue, the IMT, the OAG, the City, the CPD, and the Coalition continue to meet with Judge Dow to resolve this dispute and ideally reach a resolution that best serves Chicago.

Regardless of relieving police powers, officers have due process rights and the City and its entities must follow the accountability procedures under the corresponding laws, bargaining agreements, and Consent Decree requirements.[378] COPA recently released various reports on protest-related complaints in 2020. *See* Analysis Figure 10 and Analysis Figure 11, below. COPA also clarified the methodology for considering whether a complaint was "protest related":

> *Designation and location of a complaint as "protest" related is based upon contextual information provided by the complainant. The number of complaints may exceed the number of incidents of misconduct as some incidents may be the subject of a complaint by more than one party. Numbers are adjusted as COPA identifies duplicate complaints resulting from a single incident. Further information and questions*

---

[375] *See, e.g.*, Fran Spielman, *Union: CPD suspended 17 officers, supervisors who lounged in congressman's burglarized office*, CHICAGO SUN-TIMES (January 14, 2021), https://chicago.suntimes.com/city-hall/2021/1/14/22231310/bobby-rush-office-chicago-police-sleeping-popcorn-riots-suspensions-fop-union.

[376] *See, e.g.*, Patrick Smith and Chip Mitchell, *Cops Say Condemnation After Chaos Is Unfair And Misplaces The Blame*, WBEZ CHICAGO (June 13, 2020), https://www.wbez.org/stories/cops-say-condemnation-after-chaos-is-unfair-and-misplaces-the-blame/634b76cd-82c3-4f62-aa81-4be40bc045ef.

[377] As referenced above, in August 2020, COPA sent a letter noting that "[i]dentification of accused and involved members has presented the largest investigative challenge in protest - related cases," and "[a]lthough many of these incidents were captured on video and have been widely circulated in both social and traditional media, members have not come forward to identify themselves or their fellow members in any of these investigations."

[378] *See, e.g.*, ¶711.

*may be directed to COPA Public Affairs at (312)746-0168 or COPA-Pub-licAffairs@chicagocopa.org.*[379]

Analysis Figure 10. COPA Figure on All Protest Related Complaints by District of Incident from May 29, 2020 – December 31, 2020[380]



**ALL PROTEST RELATED COMPLAINTS BY DISTRICT OF INCIDENT**
**MAY 29, 2020 - DECEMBER 31, 2020**

| DISTRICT | # of Protest Related Complaints |
|---|---|
| 1st - Central | 96 |
| 18th - Near North | 74 |
| 19th - Town Hall | 23 |
| 2nd - Wentworth | 17 |
| 9th - Deering | 11 |
| 11th - Harrison | 10 |
| 12th - Near West | 10 |
| 14th - Shakespeare | 10 |
| 10th - Ogden | 9 |
| 8th - Chicago Lawn | 8 |
| 25th - Grand Central | 7 |
| 4th - South Chicago | 5 |
| 15th - Austin | 5 |
| 6th - Gresham | 4 |
| 7th - Englewood | 4 |
| 3rd - Grand Crossing | 3 |
| 16th - Jefferson Park | 3 |
| 22nd - Morgan Park | 3 |
| 5th - Calumet | 2 |
| 17th - Albany Park | 2 |
| 24th - Rogers Park | 2 |
| 20th - Lincoln | 1 |

\* For further information regarding data depicted, please see Note on Protest Home Page.
\*\* District location numbers are represented by information given when the complaints are filed. Location data will be updated as determined.
Report date: 1/4/21

---

379  *Protest Related Information*, COPA, https://www.chicagocopa.org/data-cases/protest-related-information/.

380  *All Protest related Complaints by District of Incident*, COPA (January 4, 2021), http://www.chicagocopa.org/wp-content/uploads/2021/01/Protest-Complaints-District-Heatmap-1.png.

Analysis Figure 11. COPA – Protest Related Complaints
(May 29, 2020 – December 31, 2020)[381]



[381] *Protest Related Complaints, May 29, 2020 – December 31, 2020*, COPA (January 4, 2021),
http://www.chicagocopa.org/wp-content/uploads/2021/01/Protest-Related-Complaints-Report-5-29-to-12-31.pdf.

As reflected above, there are concerns that these complaints are both over and under-inclusive. As COPA references, some of these complaints may be duplicates of the same incident. Some percentage of the complaints may also be false or misleading. On the other hand, based on various activities we witnessed in videos, there may also have been instances where people chose not to file a complaint because they are actively against and would not want to participate in the City's institutions. There may have also been circumstances where people who were engaging in criminal activity when they may have been the victims of excessive force chose not to file a complaint, because they did not want to bring attention to their own conduct. Separately, we heard during the Listening Sessions, many people said that they did not file a formal compliant regarding excessive force, because they feared retaliation.

As discussed further in the sections below, these are additional reasons why it is important that the City and the CPD ensure officers have body-worn cameras and conduct proactive audits of footage of such events. This would allow the City and CPD to better ensure accountability for excessive force and work toward building trust in the City's institutions and would help reduce fears of retaliation.

Based on existing complaints, COPA provided made updated statistics public, as of January 4, 2021:

**PENDING INVESTIGATIONS**
- 144 Open protest related investigations

**CLOSED INVESTIGATIONS**
- 89 Administrative Closure Disposition
- 3 Investigation Closed at COPA

**REFERRALS**
- 290 CPD Bureau of Internal Affairs
- 5 Referred to the Office of the Inspector General
- 5 Referred to State/Federal Law Enforcement

**AFFIDAVIT OVERRIDE REQUEST**
- 5 Submitted to CPD Bureau of Internal Affairs – 5 Approved

**COPA RECOMMENDATIONS – MODIFIED DUTY OR RELIEF OF POLICE POWER**
- 8 Recommendations
  - 4 Requests have been granted – 8 Officers relieved of police power.
  - 4 Request pending review/Officer identifications.[382]

---

[382] *Protest Investigation Information*, COPA (January 4, 2021), https://www.chicagocopa.org/data-cases/protest-related-information/.

Separately, in September 2020, the CPD provided data about discipline regarding officer misconduct through August 12, 2020. There were no sustained Compliant Registers in Case Final status for complaints that were filed or allegations occurred within May 1, 2020, and June 30, 2020. There were two cases with sustained findings, and there were eight Summary Punishment Action Reports: four noted violations without disciplinary action (including three for failure to provide police service or assistance during protests and one for crashing a rental vehicle in a crowded area during the unrest) and four reprimands (including one for failure to secure a radio during a foot pursuit of someone who had allegedly fired shots; one for leaving a post during protests without permission; one for hitting a fence, causing damage to the passenger-side of a CPD vehicle, during the unrest; and one for failing to wear a body-worn camera or star on an outer garment—although wore a nameplate).

These investigations and discipline, however, are not widely known. Many community members we hear from do not believe any officers have been disciplined for protest-related misconduct. While these community members may find that existing discipline is insufficient, it is in the CPD's best interest to share discipline information, not only for officer's awareness but also for building community trust. Chicago's police accountability systems are complex. To that end, the Office of Inspector General for the City of Chicago recently released flowcharts for the CPD's disciplinary process, which provides a helpful overall picture of police discipline in Chicago.[383]

The CPD's accountability mechanisms continue to be high priorities for all parties within and under the Consent Decree. And as reflected in Independent Monitoring Report 3, much work remains to be done. One major effort toward such transparency, however, has been COPA's efforts to increase community engagement—including through its policy development process—and the Bureau of Internal Affairs' efforts to create public-facing policies, which should provide additional transparency for officers and the public.

In our next report, we will report on the progress of the City and the CPD to meet compliance with Consent Decree requirements through June 30, 2021.

---

[383] *See Chicago Police Department Disciplinary Process Overview*, OFFICE OF INSPECTOR GENERAL CITY OF CHICAGO, https://igchicago.org/about-the-office/our-office/public-safety-section/cpd-disciplinary-process-overview/. *See also A Guide to the Disciplinary Process for Chicago Police Department Members*, OFFICE OF INSPECTOR GENERAL CITY OF CHICAGO (last updated April 2021), https://igchicago.org/wp-content/uploads/2021/05/5102-Final_Long-form-discipline-flowcharts.pdf.

# (3) PROVIDE SUFFICIENT PERSONNEL FOR ACCOUNTABILITY SYSTEMS

## IMT's Recommendation

- Address personnel needs across accountability systems, including COPA investigators, CPD Force Review Division, BIA, and CPD supervisor ratios (¶¶343, 356, 521, 575, 700)[384]

As we have detailed in each of our Independent Monitoring Reports, a consistent challenge for the City and the CPD—as is the case for many city governments—is having enough personnel for key functions.

When the CPD created the Force Review Division, for example, it was understaffed. The CPD needs to appropriately support the work of the Force Review Division, as well as make clear to all officers that Use of Force requirements of the Consent Decree are the responsibility of every CPD officer.[385] The IMT has appreciated the Force Review Division's work to establish clear policies, standard operating procedures, forms, and processes to hold officers accountable. We also commended the Force Review Division's work to identify patterns and trends related to Use of Force incidents and requirement of plans for either districts or units to address these issues in required debriefings. The City and the CPD then made deliberate efforts to add personnel to the Force Review Division.

Since then, however, the City and the CPD continue to add responsibilities to the Force Review Division, such as reviewing firearm pointing and foot pursuits. We agree that these reviews are important and should help the CPD become a better police department. On the other hand, this will only be true if the Force Review Unit has enough personnel to do meaningful, timely, and consistent reviews. Similarly, we have reported on the various personnel challenges for the CPD's supervisor-to-officer ratio and COPA, which continues to need additional investigators and other personnel.[386]

These staffing shortages were highlighted by the unprecedented protests, unrest, and misconduct complaints.

In theory, when a police department has sound policies, training, recruitment practices, and fair, reliable, and speedy accountability mechanisms, complaints, and findings will decrease per capita. But the City and the CPD will never have a

---

[384] *See e.g., Safe LA Civil Unrest, 2020 After Action Report,* LOS ANGELES POLICE DEPARTMENT, 119 (April 13, 2020).

[385] *See, e.g.,* ¶153.

[386] *See, e.g.,* ¶359.

sufficient accountability system if it does not have sufficient personnel to supervise, review, and investigate officer conduct.

## (4) REVIEW AND ANALYZE DATA

### IMT's Recommendation

▪ Allocate sufficient City and CPD resources to review and analyze data, including tagging and auditing body-worn-camera video footage (¶¶352–53, 576, 700)[387]

As referenced above, a significant challenge for this review was the lack of collected, managed, and readily available information. Information regarding arrests, mass arrests, deployments, and complaints were difficult to track. When we did receive information, it was often difficult to process, such as in unsearchable lists of pdfs or buried within emails. In some cases, we never received the information, such as certain City or Police Observation Device camera video. According to the City, this information was too burdensome to review and provide. In response, the IMT said that we would still be interested in receiving video that the City or the CPD has already identified and reviewed for the purposes of, for example, gathering information or identifying suspects or conducting after-action reviews. We did not receive responsive records.

In some ways, not receiving information or data is just as, if not more concerning than, what the data may have shown. To best serve Chicago's communities, the City and the CPD must be efficient learning organizations. This requires the City and the CPD to collect, manage, and analyze such information for themselves. Consent Decree oversight is not intended to create permanent oversight to replace the City and CPD's own self-assessments. In fact, the goal is for the City and the CPD to adopt policies and practices that put them in the best position to perpetually grow and adapt to the needs of their communities through constitutional and effective policing.

As with many gaps in policies and training, the City and the CPD's data issues could not have been solved within a week and, in many ways, addressing the data-collection issue may be more challenging than implementing policy or training changes to acquire the right systems and personnel that can use those systems. As the Consent Decree acknowledges, putting proper data collection and analysis systems in place will take time. Still, these efforts must be prioritized now if they are to be accomplished. Analyzing this data is critical to not only informing the City and the CPD on where its policies and training should be, but also on potentially informing and even leading national best practices for policing. As we have seen

---

[387] *See, e.g.*, Reneé Hail, *Dallas Police Department After Action Report George Floyd Protest May 29, 2020 Thru June 1, 2020*, DALLAS POLICE DEPARTMENT, 44 (August 14, 2020).

throughout 2020, without sufficient data and internal analysis, the City and the CPD are left to reforms that are "reactive" and based on external review and critique, rather than thoughtful internal analysis. Further, with limited data, such external analysis may consist of anecdotes rather than trends. When significant issues are raised to City and CPD leadership, they may seem like new issues, when an accurate accounting of data may have actually shown that the issue has existed for years, if not longer. To address, eventually get ahead of such issues, and reach full and effective compliance with the Consent Decree, the City and the CPD must improve its data collection, management, and analysis—and in many cases, do so transparently and with community engagement.

## (5) TRANSPARENCY

### IMT's Recommendation

- Continue to review and increase methods of transparency with Chicago's communities, regarding crime-reduction strategies, officer-involved shootings, and other police activities (¶¶10, 12, 17, 54, 334)[388]

The Consent Decree requires demanding reforms from the City and the CPD. Likewise, this report has identified several areas for improvement under those requirements. As reflected above, this includes, for example, revising policies and training materials; providing resources, such as body-worn cameras and data systems; and addressing officer wellness concerns and providing support, especially during critical events and incidents.

While progress has been slow—and prone to mistakes and powerful disagreements—the City and the CPD have increased transparency and community engagement around policies, training materials, and existing data. The Consent Decree requires that the City and the CPD go much further.

During the Consent Decree process, the CPD has appeared to resist some of the community engagement required by the Consent Decree. What is more, many of CPD-specific complaints during the protests and unrest related to crime reduction strategies before, during, and after George Floyd's murder; officer-involved shootings; foot-pursuits; search warrants; and investigatory stops. Most of these incidents have involved special teams, including the new Critical Incident Response

---

[388] *See, e.g.*, Gerald Chaleff, *An Independent Examination Of The Los Angeles Police Department 2020 Protest Response* (March 10, 2021), at 67; *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL, 35–40 (July 10, 2020); Benjamin Carleton et al., *Philadelphia Police Department's Response to Demonstrations and Civil Unrest May 30-June 15, 2020*, CNA AND MONTGOMERY MCCRACKEN, 89–90 (December 2020).

Team and Community Safety teams, which continue to grow and operate with limited transparency.

The City and the CPD have provided additional records regarding the Crisis Intervention Team and the Community Safety Teams, for which we will report on soon in Independent Monitoring Report 4. But there continue to be unanswered questions. And if we do not know the answer—the court appointed monitor of the Consent Decree—then members of Chicago's communities are even farther in the dark about CPD's most recent strategies, their costs or their benefits.

As reported in Independent Monitoring Report 3, there was still notable improvement in 2020 regarding community engagement—particularly for policies. It may be because some key personnel have been empowered to increase community engagement or because others have begun to see its inherent value.

In the beginning of the protests and unrest, there was a clear disconnect between the protests and unrest that many members of the community anticipated and what many members of the CPD anticipated. Much of that anger and frustration toward the CPD continued after the protests and unrest in many other cities dissipated.

Significant portions of Chicagoans felt significantly angry to destroy parts of their own communities. And in August 2020, many people looted and destroyed property again—this time likely in direct response to police activity in Chicago. Specifically, this round of unrest was likely in response to—at least in part—an officer-involved shooting and subsequent information that was spread across the internet, much of which was false. But even after the CPD worked to correct the record, suspicions continued because the officers involved did not have body-worn cameras.

During interviews, many members of leadership from the City and the CPD acknowledged that they needed to do better at building trust by communicating quick, accurate, and reliable information. We also witnessed, for example, a rise in social-media communications and regular public engagements. The CPD also began more consistently preparing and releasing video presentations of events and incidents, such as the Grant Park events on July 17, 2020. This transparency is important. The City and the CPD must guard their reputations, as any false or misleading statement can have a long-lasting impact on Chicagoan's trust. And the City and the CPD must work even harder to win the trust back from those who lost it during the protests and unrest.

## (6) AFTER-ACTION PROCEDURES

### IMT's Recommendation

- Create After Action procedures—including body-worn camera review and opportunities for community engagement—after each operations plan (¶¶8–10, 347–51)[389]

In response to the Inspector General's Office's report, CPD Superintendent Brown noted that after-action reviews for city-wide protests and unrest should be of "**all** city agencies," and not just the CPD.[390] We agree that, for the City and the CPD to successfully respond to protests and unrest, City entities need to have a unified approach. Naturally, the CPD had and will have a central role in responding to protests and unrest. As the entities responsible, it is critical that the City and the CPD create the practice of developing city-wide after-action reviews and incorporating lessons across entities and partners. Unfortunately, until the City and the CPD improve on police reporting, data collection, and analysis, such reviews will be lacking.

That said, those data issues are unlikely to change without buy-in from the leadership of many City entities. To help determine the best allocation of resources and priorities, we recommend that the City and the CPD create policies to require operational plans for known protests, to conduct consistent after-action reviews after those events, and to make those after-action reviews public.

In the CPD's After Action Report, the CPD described the value of such reviews:

> Evidence-based decision-making can eliminate many of the inefficiencies, redundancies, and avoidable costs associated with a reactive, ad hoc approach to incidents of civil unrest.[391]

We believe that, for the most part, the City and the CPD have demonstrated that they are more capable of responding to protests and unrest than they were in the beginning of 2020. As reflected by the Inspector General's Office's findings and our recommendations, there is more work to be done to address known weaknesses and challenges. But as the world learned with COVID-19, the City and the CPD must be able to learn from new and unforeseeable challenges. This is best

---

[389] *See After Action Report - George Floyd Protests and Response May 30, 2020 - June 7, 2020*, RALEIGH POLICE DEPARTMENT CHIEF'S OFFICE - OFFICE OF PROFESSIONAL STANDARDS INSPECTIONS UNIT, 43–45, 47–48 (September 15, 2020).

[390] CPD Superintendent David O. Brown, *Re: Report on Chicago's Response to George Floyd Protests and Unrest*, CHICAGO POLICE DEPARTMENT (February 11, 2021).

[391] *See After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 2020*, CHICAGO POLICE DEPARTMENT (February 2021) at 12–13.

achieved by deliberate efforts to learn and grow from the entities and personnel directly responding to those challenges.

# Conclusion and Looking Ahead

Chicago was unable to predict the level of protests and unrest in the summer of 2020. Even if the City and the CPD had predicted the level of protests and unrest after the death of George Floyd on May 25, 2020, the City and the CPD did not have the policies, reporting practices, training, equipment, community engage-ment, or inter-agency coordination required to respond timely and efficiently. Po-lice departments that do not have policies and trainings that follow best practices can put officers in positions that are less likely to lead to positive outcomes. Bad and even tragic outcomes should be avoided, in and of themselves, but as we have seen, they can also be a catalyst for protests and unrest locally, nationally, and even internationally.

The City of Chicago and the Chicago Police Department must comply with the U.S. Constitution; the State of Illinois Constitution; federal, state, and local laws; and the Consent Decree. The CPD must respond to protests and unrest in a content neutral way. While this report does not speak to the viewpoints or ideologies of those who participated in protests and unrest, we must note that the protests and unrest were largely regarding the CPD and policing in general. As a result, the City and the CPD would benefit from continued efforts to comply with the Consent Decree, putting itself in the best position to "deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illi-nois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety" (¶2).

In other words, as the City and the CPD work toward reforms and improving ac-countability and trust under the Consent Decree, the City and the CPD will, in turn, lower the likelihood of unrest regarding policing. As Mayor Lori Lightfoot and Su-perintendent David Brown have repeatedly said, "While we remain committed to fulfilling the requirements outlined in the Consent Decree, we have been clear that the Consent Decree is merely a baseline, not the ceiling, when it comes to police reform."[392] It is our hope that this report provides the City and the CPD with infor-mation and recommendations that they use to improve policing in Chicago and

---

[392] *Joint Statement from Mayor Lori E. Lightfoot and CPD Superintendent David O. Brown on the Independent Monitoring Team's Second Semiannual Report*, CITY OF CHICAGO OFFICE OF THE MAYOR (June 18, 2020), https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room /Press%20Releases/2020/June/StatementLightfootBrownConsentDecree.pdf. Nonetheless, the baselines set by the Consent Decree are substantial—and in many ways, themselves un-precedented. For example, many states, cities, and police departments responded to George Floyd, Breonna Taylor, Rayshard Brooks, Jacob Blake, and other high-profile incidents, with re-formed policies and practices that were already in place in Chicago, which continue to be mon-itored under the Consent Decree. *See, e.g.*, Campaign Zero, *Compare Cities*, #8CANTWAIT (find-ing that Chicago meets 7 of the 8 reforms, with one reform under review, "restricts shooting at moving vehicles"), https://8cantwait.org/compare/.

better ensure the protection of the rights and safety of personnel, officers, pro-
testers, and all community members.

While the City and the CPD have been behind in their reform efforts, and this re-
port demonstrates many improvements are needed, we have seen tangible im-
provements in the City's policies, training, and practices regarding responding to
protests during this review.[393] These improvements have occurred with the in-
volvement and efforts of both police and community members working together.
It is our hope that the City and its entities will continue the reforms they have
made and make more expedient progress on the reforms they have yet to make.

---

[393] *See Reports and Resources*, INDEPENDENT MONITORING TEAM, https://cpdmonitoring-
team.com/overview/reports-and-resources/.

# Appendix A:
# The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's eight Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Appendix A, Figure 1 on the next page, and our team structure is in Appendix A, Figure 2 on the following page.

Appendix A, Figure 1. Independent Monitoring Team Organizational Chart



## Appendix A, Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| | Independent Monitor | Maggie Hickey |
| | Deputy Monitor | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| | Community Policing | Stephen Rickman |
| | Impartial Policing | Dennis Rosenbaum |
| | Crisis Intervention | Julie Solomon |
| | Use of Force | Paul Evans |
| | Recruitment, Hiring, and Promotion | Theron Bowman |
| | Training | Theron Bowman |
| | Supervision | Kathleen O'Toole |
| | Officer Wellness and Support | Kathleen O'Toole |
| | Accountability and Transparency | Harold Medlock |
| | Data Collection, Analysis and Management | Scott Decker |

| Community Engagement Team | | |
|---|---|---|
| | Subject Matter Expert, Analyst, and Support Staff | Tom Christoff |
| | Member | Joe Hoereth |
| | Subject Matter Expert | Meghan Maury |
| | Member | Laura McElroy |
| | Member | Elena Quintana |
| | Member (and Associate Monitor for Community Policing) | Stephen Rickman |
| | Member | Sodiqa Williams |
| | Community Surveys | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| | Project Director | Laura Kunard |
| | Attorney | Mir Ali |
| | Attorney | Derek Barella |
| | Attorney | Kirstie Brenson |
| | Officer Wellness and Support | Brandi Burque |
| | Crisis Intervention and Data Collection, Analysis, and Management | Tom Christoff |
| | Attorney | Meredith DeCarlo |
| | Use of Force and Data Collection, Analysis, and Management | Terry Gainer |
| | Attorney | Ariel Hairston |
| | Community Policing and Crisis Intervention | Bruce Johnson |
| | Training | Blake McClelland |
| | Accountability and Transparency | Laura McElroy |
| | Analyst | Mariana Oliver |
| | Community Policing | Hildy Saizow |
| | Lead Attorney | Anthony-Ray Sepulveda |
| | Attorney | Kylie Wood |
| | Supervision and Recruitment, Hiring, and Promotion | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| | Analyst for Solomon and Decker | Tom Christoff |
| | Project Manager, Analyst for Evans | Vivian Elliot |
| | Analyst for Rickman and O'Toole | Tammy Felix |
| | Analyst, Independent Monitoring Team Support | Mariana Oliver |
| | Deputy Project Manager, Analyst for Bowman | Keri Richardson |
| | Analyst for Rosenbaum and Medlock | Christopher Sun |

# FREQUENTLY ASKED QUESTIONS FROM THE COMMUNITY

Throughout the first reporting period, the IMT received many questions from the community. We list the most frequently asked questions and our corresponding answers below.

## What is a Consent Decree?

A Consent Decree is a court-approved settlement that resolves a legal dispute between parties. This Consent Decree requires the CPD and the City to reform training, policies, and practices in many important areas, such as use of force, community policing, impartial policing, training, accountability, officer wellness, and data and information systems. The goal is to ensure that the CPD performs constitutional and effective policing that keeps both community members and officers safe and restores the community's trust in the CPD (¶2).[394] Federal judge Robert M. Dow, Jr. was appointed to oversee the Consent Decree. He chose the Independent Monitor and oversees the work of the Independent Monitoring Team. The Independent Monitoring Team will assess the CPD's and the City's compliance with the Consent Decree. The Consent Decree will be in effect for at least five years so that the CPD can develop, implement, and sustain the training, policies, and practices that the Consent Decree requires.[395]

## Why is Chicago under the Consent Decree?

In August 2017, the Office of the Attorney General for the State of Illinois (OAG) sued the City, alleging that the CPD had violated the U.S. Constitution, the Illinois Constitution, and federal and state laws. The OAG's complaint pointed to reviews of the CPD's policing practices over the last fifty years, including a 2017 report by the U.S. Department of Justice (DOJ). According to the DOJ report, the CPD engaged in a repeated pattern and practice of using excessive force and racially discriminatory policing practices.[396] The City did not accept the OAG's allegations but agreed to enter a Consent Decree with the OAG.

---

[394] The final Consent Decree is available on the Chicago Police Consent Decree Website. *See Consent Decree* (January 31, 2019), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf.

[395] To learn more about the Consent Decree, visit the Office of the Attorney General's Consent Decree website: http://chicagopoliceconsentdecree.org/.

[396] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017), http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

## Who is on the IMT?

We have assembled a team of recognized leaders and innovators in police reform from across the country. They have experience as police chiefs, academic scholars, and attorneys and have a wide range of expertise that covers every aspect of the Consent Decree from use of force and impartial policing to the training and supervision of police officers. We also have a Community Engagement Team that organizes meetings and serves as the outreach arm. Members of the Community Engagement Team meet with residents, stakeholders, and activists to ensure that the community has a voice in this process.

## What is the IMT doing?

The Independent Monitoring Team observes and assesses how the CPD is making progress and complying with the Consent Decree's requirements. Throughout the process, the IMT collects and analyzes data to measure the City's and the CPD's progress. The Independent Monitoring Team's Community Engagement Team also gathers community input and feedback about the CPD's and the City's progress from a broad range of people and organizations. The Independent Monitoring Team will also develop and release public reports on its monitoring activities, such as this report. We will make all reports available on the Reports section of our website (https://cpdmonitoringteam.com/).

## How can I get involved?

The Community Engagement Team works hard to connect with neighborhoods, community groups, religious organizations, activists, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

Community members can provide input on CPD policy. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/.

Community members can also do the following:

❖ Attend any of our public meetings listed on our website;
❖ Complete an input form on our website; and
❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## How can I contact the IMT?

Community members can reach out to the entire IMT via email (contact@cpdmonitoringteam.com) and also contact individual members of our Community Engagement Team:

❖ Sodiqa Williams (Sodiqa.Williams@cpdmonitoringteam.com),

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Elena Quintana (Elena.Quitana@cpdmonitoringteam.com).

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# Appendix B:
# List of Special Report Figures

Executive Summary Figure 1.  OEMC - Police Computer Aided Dispatch System (PCAD) Reports (Provided November 20, 2020) (May 29, 2020 – June 2, 2020; July 17, 2020; August 9, 2020; August 10, 2020; August 15, 2020; and August 16, 2020)...................................................................9

Executive Summary Figure 2. Daily case, hospitalization, and death rates and daily cases, hospitalizations, and deaths for Chicago  (March 2020, through December 2020) ......................10

Executive Summary Figure 3.  CPD Force Revision Division: Firearm Pointing Incidents (2020) .....19


Scope Figure 1: Consent Decree Topics.......................................................................................25

Scope Figure 2. The Coalition  (*Campbell* Plaintiffs and *Communities United* Plaintiffs)...............29


Review Figure 1. Past City and CPD responses to large gatherings, protests, or unrest.................38

Review Figure 2. City of Chicago's phased re-opening (May 15, 2020) ...........................................41

Review Figure 3: Chicago Police Department Area Boundaries Map ...........................................43

Review Figure 4. Chicago Mayor Tweets (May 25, 2020) ..............................................................45

Review Figure 5. Minnesota Mayor Tweet (May 26, 2020) ...........................................................46

Review Figure 6. Chicago Mayor Tweet (Tuesday, May 26, 2020) ...................................................47

Review Figure 7. Chicago Mayor Tweet (Wednesday, May 27, 2020) ............................................49

Review Figure 8.
Social Media Threat to Burn Down the CPD's 6th District Station  (May 28, 2020) .......................51

Review Figure 9. Minnesota Governor Tweet (May 29, 2020) ......................................................52

Review Figure 10. President Tweet (Friday, May 29, 2020) ..........................................................53

Review Figure 11: CPIC Anticipated Demonstrations for May 29, 2020 ...........................................54

Review Figure 12. Police Computer Aided Dispatch System (May 29, 2020) .................................57

Review Figure 13. Daily City-Wide Statistics from the City and the CPD (Friday, May 29, 2020) ....57

Review Figure 14. CPIC Anticipated Demonstrations (May 30, 2020) ............................................58

Review Figure 15. "For Floyd" Graffiti (May 31, 2020) .................................................................62

Review Figure 16. Mayor Tweet regarding Curfew (May 30, 2020)................................................65

Review Figure 17. Police Computer Aided Dispatch System (May 30, 2020) .................................72

Review Figure 18. Daily City-Wide Statistics from the City and the CPD (Saturday, May 30, 2020) 72

Review Figure 19. CPIC Anticipated Demonstrations (May 31, 2021) ............................................73

Review Figure 20. Police Computer Aided Dispatch System (May 31, 2020) .................................77

Review Figure 21.  Daily City-Wide Statistics from the City and the CPD (Sunday, May 31, 2020)..78

Review Figure 22. Chicago Mayor Tweet........................................................................................79

Review Figure 23. Police Computer Aided Dispatch System (June 1, 2020) ...................................81

Review Figure 24.  Daily City-Wide Statistics from the City and the CPD (Monday, June 1, 2020)..81

Review Figure 25. Mayor Tweets (June 2, 2020) ...........................................................83

Review Figure 26. Police Computer Aided Dispatch System (June 2, 2020) ....................85

Review Figure 27. Daily City-Wide Statistics from the City and the CPD  (Tuesday, June 2, 2020, and Wednesday, June 3, 2020) ...........................................................................................85

Review Figure 28. Police Computer Aided Dispatch System (July 17, 2020) ..................96

Review Figure 29. Police Computer Aided Dispatch System (August 9, 2020) ...............98

Review Figure 30. Mayor Tweets (August 10, 2020) .....................................................99

Review Figure 31. Police Computer Aided Dispatch System (August 10, 2020) ...........102

Review Figure 32. Police Computer Aided Dispatch System  (Saturday, August 15, 2020, and Sunday, August 16, 2020) ...........................................................................................106


Analysis Figure 1. CPD After Action Report (May 20, 2020, through June 12, 2020) ...................111

Analysis Figure 2. CPD After Action Report (May 20, 2020, through June 12, 2020) ...................120

Analysis Figure 3. CPD Purchases between May 25, 2020, and June 10, 2020 ............................138

Analysis Figure 4. CPD After Action Report (May 20, 2020, through June 12, 2020) ...................145

Analysis Figure 5. CPD Policies Related to Crowd Response from May 2020 to Present..............150

Analysis Figure 6. CPD Policies Related to Crowd Response from May 2020 to Present..............174

Analysis Figure 7. CPD After Action Report (May 20, 2020, through June 12, 2020) ...................178

Analysis Figure 8.  Select Slides from *First Amendment and Public Gatherings* – Roll Call Training (October and November 2020) ...........................................................................................187

Analysis Figure 9. CPD After Action Report (May 20, 2020, through June 12, 2020) ...................201

Analysis Figure 10. COPA Figure on All Protest Related Complaints by District of Incident from May 29, 2020 – December 31, 2020 ...........................................................................................210

Analysis Figure 11. COPA – Protest Related Complaints  (May 29, 2020 – December 31, 2020)...211


Appendix A, Figure 1. Independent Monitoring Team Organizational Chart ..............................223

Appendix A, Figure 2. Independent Monitoring Team Members ................................................224

# Appendix C:
# The Crime Prevention and Information Center Anticipated Demonstrations (June 2020)

| Date | District(s) | Cause(s) |
|---|---|---|
| Monday, June 1 | 001 | "ICE / BLM Protest" |
| Monday, June 1 | 001 | "I Can't Breath" |
| Monday, June 1 | 002 | "Free Malcolm Now |
| Monday, June 1 | 001 | "We Demand for the Release of All Protestors, We Demand Justice" |
| Monday, June 1 | 018 | "We Demand for the Release of All Protestors, We Demand Justice" |
| Monday, June 1 | 019 | "Peaceful Protest for George Floyd – North Side" |
| Tuesday, June 2 | 001, 002 | "The Faith Community Cannot Be Silent" |
| Tuesday, June 2 | 002 | "Police Accountability in Minneapolis and Chicago" |
| Tuesday, June 2 | 011 | "Peaceful Solidarity March" |
| Tuesday, June 2 | 012 | "Honk for Justice - West Town" |
| Tuesday, June 2 | 019 | "Free Erica Kadel" |
| Tuesday, June 2 | 019 | "We Demand Justice, We Demand Accountability" |
| Wednesday, June 3 | 002 | "Chicago: Justice for George Floyd Car Caravan Day of Action (Part 2) " |
| Wednesday, June 3 | 010 | "Latinx Community in Solidarity for Black Lives" |
| Wednesday, June 3 | 014 | "Chicago: Justice for George Floyd Car Caravan Day of Action (Part 1) " |
| Thursday, June 4 | 001 | "Re-Open Illinois" |
| Thursday, June 4 | 002 | "CPD Out of CPS Rally and March" |
| Thursday, June 4 | 006 | "Let's work to heal our community; as a community" |
| Thursday, June 4 | 006 | "The Faces of Pain" |
| Thursday, June 4 | 008 | "Midway for Black Lives Matter" |
| Thursday, June 4 | 012 | "Powerful Message of No More Against Systemic Racism" |
| Thursday, June 4 | 018 | "CPS Community Protest: Defund CPD Now" |
| Thursday, June 4 | 020 | "Honk for Justice Chicago in Uptown" |
| Thursday, June 4 | 022 | "Their Fight is our Fight" |
| Thursday, June 4 | 025 | "No Means No! Sexual Harassment Brought to You By Target" |
| Friday, June 5 | 002, 003, 007, 008, 009, 010, 011 | "Black and Brown Unity: Car Parade" |
| Friday, June 5 | 004 | "Community Altar Memorial Wall - Brown and Black Unity" |

| Friday, June 5 | 004 | "SE Youth For Black Lives Matter" |
|---|---|---|
| Friday, June 5 | 008 | "Southwest Side Peace March" |
| Friday, June 5 | 010 | "Unity March on 26th Street" |
| Friday, June 5 | 012 | "FOP New Leadership Will Not Change 'Racist'" |
| Friday, June 5 | 012 | "Black Jews for Black Lives: Shabbat Gathering with Kol Or |
| Friday, June 5 | 012 | "Defund CPD: Fund Black Lives" |
| Friday, June 5 | 012, 015 | "Why We!! Black Lives Matter" |
| Friday, June 5 | 019 | "Say Her Name: Breonna Taylor" |
| Friday, June 5 | 024 | "Honk for Justice Chicago in West Ridge" |
| Friday, June 5 | 001, 002, 011, 018, 026 | "El Grito Unito For Black Lives Matter" |
| Saturday, June 6 | 007 | "United Against Racism & Public Violence" |
| Saturday, June 6 | 008 | "Ashburn for Black Lives Matter & Justice Reform" |
| Saturday, June 6 | 009 | "Youth Led Black and Brown Unity March: Justice for George Floyd" |
| Saturday, June 6 | 012 | "Justice for George Floyd, Trump/Pence Out Now" |
| Saturday, June 6 | 012 | "Chicago March of Justice" |
| Saturday, June 6 | 012 | "Union Contingent for #JusticeForGeorgeFloyd" |
| Saturday, June 6 | 012 | "Census Drive-By Parade" |
| Saturday, June 6 | 014 | "Solidarity Vigil for Black Lives" |
| Saturday, June 6 | 014 | "Humboldt Park Unity for BLM" |
| Saturday, June 6 | 015 | "Westside March for Peace, Equity, and Justice" |
| Saturday, June 6 | 016 | "Walk to Recognize Racism" |
| Saturday, June 6 | 018 | "Storm Ohio Street Beach" |
| Saturday, June 6 | 022 | "Prayer Service for Racial Justice" |
| Saturday, June 6 | 025 | "Peaceful Protest March in Hermosa" |
| Sunday, June 7 | 001 | "March for Justice" |
| Sunday, June 7 | 002 | "Protest for George Floyd and against UCPD" |
| Sunday, June 7 | 004 | "Candlelight Vigil 4 George Floyd" |
| Sunday, June 7 | 006 | "Chatham Peace Walk & Food Giveaway" |
| Sunday, June 7 | 012 | "Kids for Change" |
| Sunday, June 7 | 012 | "Campaign against owner of Nini's Deli" |
| Sunday, June 7 | 014 | "Interfaith Gathering for Black Lives" |
| Sunday, June 7 | 014 | "Faith Community Walk in Prayer" |
| Sunday, June 7 | 015, 025 | "Peaceful Protest for Justice in the Wrongful Death of George Floyd" |
| Sunday, June 7 | 019 | "Honk for Justice Chicago - Lincoln Square" |
| Sunday, June 7 | 019 | "Lincoln Square Standing with Black Lives Matter - Safe Protest" |
| Sunday, June 7 | 022 | "Peaceful Protest Through Mt. Greenwood/Beverly/Morgan Park #BLM" |
| Sunday, June 7 | 025 | "Black Lives Matter" |
| Monday, June 8 | 001 | "Press Conference and Front-Line Worker Speak Out" |
| Monday, June 8 | 010 | "Public Defenders March for Black Lives" |

| Monday, June 8 | 010 | "Together We Rise - Black and Brown Unity Rally" |
|---|---|---|
| Monday, June 8 | 024 | "In Rememberance of George Floyd and Many Other African Americans" |
| Tuesday, June 9 | 001, 019 | "Car Caravan For Essential Workers" |
| Tuesday, June 9 | 006 | "Blackout Townhall Meeting" |
| Friday, June 12 | 001 | "Chicago Mothers Speak!" |
| Friday, June 12 | 001 | "Hospitality Worker Car Caravan for Black Lives" |
| Friday, June 12 | 001 | "Stop the Murder, Stop the Torture: Free Them All - CPAC Now!" |
| Friday, June 12 | 002 | "Muslims for Abolition Rally" |
| Friday, June 12 | 002 | "March Against UCPD, Stand with our Community" |
| Friday, June 12 | 010, 011 | "In the Spirit of King" |
| Friday, June 12 | 012, 018 | "The March for America's Future" |
| Friday, June 12 | 016 | "Portage and Jefferson Parks Unite for Black Lives" |
| Friday, June 12 | 019 | "End Northside Racism: Demand Tunney & Alderpeople Support CPAC" |
| Saturday, June 13 | 001 | "Peaceful Protest Matters" |
| Saturday, June 13 | 001 | "End Institutional Racism & Murder by Police - Nothing Less" |
| Saturday, June 13 | 001 | "Defund CPD Now March for Black lives and direct action against CPD" |
| Saturday, June 13 | 002 | "Kids Non-Violent Protest Against Racism" |
| Saturday, June 13 | 003 | "Defund UCPD Breakfast Rally" |
| Saturday, June 13 | 004 | "One Voice Black Love Rally" |
| Saturday, June 13 | 010 | "Support Survivors: Defund the Carceral System" |
| Saturday, June 13 | 010, 011, 012 | "Dog Peace Walk" |
| Saturday, June 13 | 011 | "All Black Everything Pre-Juneteenth Community Celebration" |
| Saturday, June 13 | 011, 015 | "Walk the Walk" |
| Saturday, June 13 | 016 | "Justice for George Floyd + Breonna Taylor, Defund CPD: NW Side" |
| Saturday, June 13 | 016, 025 | "Black Lives Matter" |
| Saturday, June 13 | 020 | "Pride Is Protest: Andersonville #BLM Sidewalk Chalk Action" |
| Saturday, June 13 | 022 | "Mount Greenwood Rally & March" |
| Saturday, June 13 | 025 | "March for Black Lives" |
| Sunday, June 14 | 001 | "March for Change" |
| Sunday, June 14 | 001, 005 | "CPD Ran Over a 16 Y.O. Girl" |
| Sunday, June 14 | 002 | "Take Back Bronzeville" |
| Sunday, June 14 | 003 | "Graduates March #CopsOutCPS #DefundPolice" |
| Sunday, June 14 | 004 | "East Side BLM Solidarity March" |
| Sunday, June 14 | 012 | "Justice in June: Black and Brown Youth Led Unity March" |
| Sunday, June 14 | 014 | "Chicago Coffee Community Stands with Black Lives Matter" |
| Sunday, June 14 | 019 | "Boy Bye #BunkerBirthday for Trump" |

| Sunday, June 14 | 019 | "Drag March for Change" |
|---|---|---|
| Sunday, June 14 | 020 | "Unity Rally" |
| Monday, June 15 | 010 | "Rabbi On Location: Free Them All" |
| Monday, June 15 | 017 | "March: The 39th Ward demands Samantha Nugent support CPAC & BLM" |
| Monday, June 15 | 018 | "Protest Against Repression in Ukraine" |
| Monday, June 15 | 020 | "Honk for Justice - Uptown" |
| Wednesday, June 17 | 001 | "Tell City Council - We Demand CPAC Now" |
| Wednesday, June 17 | 002 | "#JUSTICEFORTOYIN" |
| Wednesday, June 17 | 014 | "Honk for Justice - Logan Square" |
| Wednesday, June 17 | 019 | "True Peace March" |
| Thursday, June 18 | 001 | "F*@k That Colonizer" |
| Thursday, June 18 | 010 | "Defund the Cook County Jail" |
| Thursday, June 18 | 017 | "Honk for Justice - Lincoln Square" |
| Friday, June 19 | 001 | "March For Us 2020" |
| Friday, June 19 | 001 | "Rabbi DEMANDS Chicago PAINT Michigan Ave BLM" |
| Friday, June 19 | 001 | "Juneteenth" |
| Friday, June 19 | 001 | "Black Lives Matter" |
| Friday, June 19 | 001 | "Chicago Peace and Equality Juneteenth March" |
| Friday, June 19 | 001, 002 | "Black Unity March" |
| Friday, June 19 | 001, 002 | "Juneteenth Drive for Justice" |
| Friday, June 19 | 002 | "June 19" |
| Friday, June 19 | 002 | "Juneteenth: A Call to Action, Holding Our Heathcare System Accountable" |
| Friday, June 19 | 002 | "Juneteenth Celebration ReBuild Black WallStreet Car Parade" |
| Friday, June 19 | 002, 003 | "Chicago Black Artists Union Juneteenth March" |
| Friday, June 19 | 003, 004, 006, 011, 018 | "Juneteenth Car Parade" |
| Friday, June 19 | 004 | "A.W.A.R.E. CommUNITY Rally" |
| Friday, June 19 | 005 | "Juneteenth Celebration Car Parade" |
| Friday, June 19 | 005, 011 | "Juneteenth Holiday Celebration & Black Culture Week Kick-Off" |
| Friday, June 19 | 007 | "Juneteenth: In Defense of Black Lives" |
| Friday, June 19 | 007 | "Defund Police and Defend Black Lives" |
| Friday, June 19 | 007 | "Roll n Peace 5 - A Juneteenth Celebration" |
| Friday, June 19 | 011 | "Juneteenth Celebration Car Parade" |
| Friday, June 19 | 012 | "Juneteenth Downtown March" |
| Friday, June 19 | 012 | "Trump/Pence #OutNOW" |
| Friday, June 19 | 016 | "Juneteenth Caravan - NW Side" |
| Friday, June 19 | 018 | "DePaul University Charwells Workers' March" |
| Friday, June 19 | 018 | "Black Lives Matter" |
| Friday, June 19 | 018, 019 | "Honk for Justice - Lincoln Park" |

| | | |
|---|---|---|
| Saturday, June 20 | 001 | "Shift Chicago March/Gathering" |
| Saturday, June 20 | 002, 003 | "Nurses for Racial Justice-Chicago" |
| Saturday, June 20 | 001 | "Close the Camps #BLM" |
| Saturday, June 20 | 001 | "March For Reform" |
| Saturday, June 20 | 001 | "Protest Trump's KKKampaign Rally" |
| Saturday, June 20 | 003 | "Free-ish Fest - 2 till Auntie Lori Fine Us" |
| Saturday, June 20 | 008 | "Rally Prayer, Action & Justice" |
| Saturday, June 20 | 011 | "Juneteenth Car Parade" |
| Saturday, June 20 | 012 | "Black Rides for Black Lives" |
| Saturday, June 20 | 018 | "Father's Day Weekend Protest We Are Not Thugs" |
| Saturday, June 20 | 018 | "End Chicago Nightlife Racism" |
| Saturday, June 20 | 019 | "Montrose Beach Kick Back" |
| Saturday, June 20 | 020 | "Express Yourself and Protest - Chalk up Lincoln Square" |
| Saturday, June 20 | 024 | "Black Rides for Black Lives: A Solidarity Bike Ride" |
| Saturday, June 20 | 024 | "Honk for Justice - Rogers Park" |
| Sunday, June 21 | 001, 002 | "Men that Pray Prayer Walk" |
| Sunday, June 21 | 010 | "Father's Day March for Cook County Inmates" |
| Sunday, June 21 | 014, 018, 019 | "Chicago Musician March for Equality & Change" |
| Sunday, June 21 | 024 | "Honk for Justice - West Ridge" |
| Monday, June 22 | 001 | "Chicago Reparations Committee Demonstration at City Hall, Chicago 2020" |
| Monday, June 22 | 002 | "Chase pull up and Shutdown" |
| Monday, June 22 | 015 | "Justice for Mekhi & Amaria! Community Call to Action! " |
| Monday, June 22 | 020 | "Honk for Justice – UpTown" |
| Wednesday, June 24 | 001 | "Silent Protest in Honor of Oluwatoyin Salau" |
| Wednesday, June 24 | 001 | "Black Lives Matter: Educational Equity or Else" |
| Wednesday, June 24 | 001 | "Protest U.S. Immigration Enforcement" |
| Wednesday, June 24 | 001, 024 | "West RP Car Caravan to BLM Rally: Educational Equity or Else" |
| Wednesday, June 24 | 014 | "Honk for Justice - Logan Square" |
| Thursday, June 25 | 019 | "Honk for Justice - Lincoln Square" |
| Thursday, June 25 | 019 | "Uptown: 46th Ward March for Cappleman to Meet BLM's Demands" |
| Thursday, June 25 | 020 | "Edgewater/Andersonville March for Osterman to Meet BLM's Demands" |
| Saturday, June 27 | 001 | "Health Care Justice" |
| Saturday, June 27 | 002 | "BLM Stop the violence - take back our streets from killers" |
| Saturday, June 27 | 004 | "SE Chicago in solidarity with Black Lives Matter: March & Rally" |
| Saturday, June 27 | 012 | "Protest in Motion" |
| Saturday, June 27 | 012 | "Black Rides for Black Lives (Bike Ride)" |
| Saturday, June 27 | 012 | "Honoring our Transcestors" |
| Saturday, June 27 | 018 | "DePaul Student Abolitionists Campus Protest" |

| | | |
|---|---|---|
| Saturday, June 27 | 022 | "National Day of Action - End Child Detention Centers and Keep Families Together" |
| Saturday, June 27 | 024 | "Protest Amazon and Whole Foods in Support of Workers Losing Hazard Pay" |
| Saturday, June 27 | 024 | "Honk for Justice - Rogers Park" |
| Sunday, June 28 | 001 | "Forgotten Victims of Drug Induced Homicide Peaceful Rally" |
| Sunday, June 28 | 001 | "A Ride for Unity (Bike Ride)" |
| Sunday, June 28 | 001 | "#REVOKEtheVOTE We Demand the Removal of CPD from CPS" |
| Sunday, June 28 | 009 | "Asian American Christians for Black Lives and Dignity" |
| Sunday, June 28 | 015 | "Austin Healing & Peace Circle" |
| Sunday, June 28 | 019 | "Libertarians at Black Trans Lives Matter March" |
| Sunday, June 28 | 019 | "Pride Without Prejudice Reclaiming Pride March" |
| Sunday, June 28 | 019 | "No Hate Skate & Bike Pride Parade" |
| Sunday, June 28 | 024 | "Honk for Justice - West Ridge" |
| Sunday, June 28 | 025 | "Peace March LaFollette Park" |
| Monday, June 29 | 020 | "Honk for Justice – Uptown" |
| Monday, June 29 | 024 | "Honk for Justice - West Ridge" |
| Tuesday, June 30 | 002 | "We Walk for Her March 2020: Missing Black & Brown Girls & Women" |
| Tuesday, June 30 | 012 | "Honk for Justice - West Town" |
| Tuesday, June 30 | 018 | "Pritzkerville: 24-Hour Tent City for Housing Justice in Illinois" |
| Tuesday, June 30 | 020, 024 | "We Keep Us Safe: Protest Against Discrimination in Edgewater" |
| Wednesday, July 1 | 014 | "Honk for Justice - Logan Square" |
| Wednesday, July 1 | Citywide | "Chase Bank Citywide Boycott" |
| Thursday, July 2 | 001 | "Shutdown Chicago BLC Protest" |
| Thursday, July 2 | 006 | "Protest for All Black Lives - Demand Killings of All Black Lives to Stop!" |
| Thursday, July 2 | 019 | "Honk for Justice - Lincoln Square" |
| Saturday, July 4 | Undisclosed location | "No Brakes - #DefendBlackLives #DefundThePolice" |

# Appendix D:
# Listening Session Transcripts
# August 19, 2020

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3      STATE OF ILLINOIS,               )  Docket No. 17 CV 6260
                                         )
 4                      Plaintiff,       )  Chicago, Illinois
                                         )  August 19, 2020
 5             vs.                       )  1:02 p.m.
                                         )
 6      CITY OF CHICAGO,                 )
                                         )
 7                      Defendant.       )

 8      TRANSCRIPT OF PROCEEDINGS - INDEPENDENT MONITOR LISTENING
                                  SESSIONS
 9            BEFORE THE HONORABLE ROBERT M. DOW, JR.

10      APPEARANCES:

11      Independent Monitor:    MS. MAGGIE HICKEY

12      Deputy Monitor:       CHIEF (RET.) RODNEY MONROE

13      Inspector General
        City of Chicago:      MR. JOSEPH M. FERGUSON
14

15

16

17

18

19

20

21

22
        Court Reporter:       KRISTIN M. ASHENHURST, CSR, RDR, CRR
23                            Official Court Reporter
                              219 S. Dearborn Street, Room 2304-A
24                            Chicago, IL 60604
                              (312) 818-6549
25                            kristin_ashenhurst@ilnd.uscourts.gov
```

1      (The following listening session proceedings were held via

2      telephonic and videoconference.)

3            THE CLERK:  Okay.  This is 17 civil 6260.  State of

4      Illinois versus the City of Chicago.

5            THE COURT:  Okay.  Thank you, Carolyn.

6            Good afternoon, everybody.  Welcome to this special

7      session of court in case No. 17 Civil 6260, State of Illinois

8      versus City of Chicago.

9            I am going to stop there for just one second to make

10     sure that everything is -- everybody can hear and see this.  So

11     if there's anybody in the chat room right now who can't hear or

12     see, please speak up and we'll be able to remedy that.

13           Okay.  Sound good.  So today and tomorrow are

14     opportunities for members of the community to speak, and so I

15     will keep my introductory remarks very short.  We have tried

16     our best to model these sessions on the fairness hearings that

17     were held in 2018, but some modifications clearly have been

18     necessary due to the pandemic, most obviously because this is a

19     remote proceeding.

20           I want to first thank the monitoring team and the

21     clerk's office team in this District Court for their expert

22     help in making this possible with the technology, as well as

23     the sign language service, the captioning service, and the

24     court reporter.

25           I also want to take a quick moment to introduce the

1    people you see on your screens this afternoon.  One is the

2    Independent Monitor Maggie Hickey.  Another is the Inspector

3    General Joe Ferguson.  And another is the Deputy Monitor Rodney

4    Monroe.  So in addition to myself, those are the faces you will

5    see all day, and you will also see the sign language

6    interpreter.  And, again, we are very grateful for the

7    assistance of our interpreter.

8         These listening sessions and the accompanying written

9    comment period arise out of the Independent Monitor's

10   invocation of her authority to prepare special reports on

11   issues that are covered by the consent decree.  The report she

12   is currently preparing focuses on the response of the City of

13   Chicago and the Chicago Police Department to the rise in First

14   Amendment activity, civil unrest, and related law enforcement

15   activity over the past few months.

16        As with the fairness hearings, it is important that

17   all of those who wish to be heard have the opportunity.  And

18   because we cannot accommodate all of those who wish to speak,

19   written comments are welcome and they're due by tomorrow at

20   4:30 p.m.  And the procedures for written comments are spelled

21   out in some detail both on the court docket and also on the

22   Monitor's website.  And we certainly appreciate everyone's time

23   and input on these important issues.

24        To be sure that everyone is clear on how we'll be

25   proceeding today, I am going to ask the Monitor, Ms. Hickey, to

1    briefly summarize the ground rules for the platform that we are

2    using.

3              So Maggie?

4              MS. HICKEY:  Thank you, your Honor.  I want to thank

5    everybody for their participation, and a special thank you to

6    Judge Dow, his team, the Inspector General Joe Ferguson and his

7    team, and my team for working very hard to facilitate the

8    virtual listening sessions that will take place today and

9    tomorrow.

10             We had over 540 registrants sign up for these Zoom

11   listening sessions, and the speakers for those listening

12   sessions were randomly selected from that group.  To maximize

13   our connection and to increase efficiency, only the people who

14   are scheduled to appear or to speak are on the Zoom meeting.

15   The public may view each session live on YouTube and there will

16   be a slight 20-second delay.  The YouTube links for today and

17   for tomorrow are available on the Independent Monitoring Team's

18   website, cpdmonitoringteam.com.

19             Our website also includes a link to live transcription

20   which is available during the session.  The Court's listening

21   session order is also available on our website, which provides

22   instructions on how to file any written comments that anyone in

23   Chicago would like to make.

24             For the speakers on today's meeting, you will not have

25   the ability to turn on your microphone or camera until Judge

1    Dow calls your name and speaker number.  And let me correct

2    that.  He is only going to call the speaker number.  You should

3    have received your speaker number via email last Friday, August

4    17th.

5            When the Court calls your number, the meeting host

6    will make you a Zoom panelist to begin speaking.  For those of

7    you on a computer, Zoom will automatically log you in and out.

8    You may see a brief blank screen, and then you will be prompted

9    to turn on your camera and microphone.  You will have to turn

10   those on yourself.  For those of you via telephone, your line

11   will be unmuted.

12           We have also provided visual cues for speakers that

13   are on Zoom.  There will be a list -- a timer box, and that is

14   green to start, and then yellow means you have 30 seconds left,

15   and red means you are out of time.

16           For people calling into the meeting telephonically, we

17   will also provide a verbal 30-second warning.  For those

18   speakers, keep an eye on the chat function as the IMT might

19   send messages through that service, too, if necessary.  That's

20   for the telephone participants.

21           If you are not available when the judge calls your

22   number, you will be moved to the end of today's speaker list,

23   and the Judge will then again call your number, if time

24   permits.  If you have any logistical questions during the

25   session, please contact

1    listeningsessions@CPDmonitoringteam.com.  Let me repeat that

2    again.  Listeningsessions, with an S, @CPDmonitoringteam.com,

3    which is also listed on the IG's website.

4         Finally, these hearings are for the community to have

5    a direct voice with the Court.  The Independent Monitoring Team

6    and the Inspector General's Office will continue to want to

7    hear from the community on an ongoing basis.  Thank you again

8    for your patience and your understanding as we use a virtual

9    platform during this very unprecedented time in history.

10        Thank you, your Honor.

11        THE COURT:  Great.  Thank you very much.  And, again,

12   thank you to your team.  I know a tremendous amount of work has

13   gone into making this possible, and I do appreciate it.

14        I also wanted to start at the outset by asking the

15   Inspector General, Mr. Ferguson, if he had anything he would

16   like to say at the outset of the proceeding.

17        MR. FERGUSON:  Yes, Judge.  Thank you.  One quick note

18   before turning to the important business of hearing from all of

19   the people who are gathered for this purpose.  These

20   court-hosted listening sessions are just one of several avenues

21   for community input and the expression of lived experience to

22   inform this joint inquiry on which we'll be publicly reporting.

23        Today's listening sessions are by their nature both

24   public and part of the official record of the court proceedings

25   pursuant to the authority of the consent decree.

1          If for whatever reason anyone speaking, listening, or

2     watching today wishes further opportunity to provide feedback,

3     input or expression of experience, or wishes to provide it to

4     the IMT or OIG in a less public setting or format, please be

5     aware that there are opportunities to do so, including doing so

6     anonymously, and we strongly encourage and hope that you do so.

7     For those purposes, the ID information can be found at

8     www.cpdmonitoringteam.com.  And the Inspector General's

9     information can be found at www.igChicago.org.

10          Thanks, Judge.

11          THE COURT:  Okay.  Thank you very much as well.  So

12    just a couple more words about the order in which we'll proceed

13    today.  So we'll first hear today from counsel for the Attorney

14    General and the City and the Coalition, and then we'll have 45

15    individual speakers today.  And each will have an opportunity

16    to speak for three minutes.

17          Tomorrow the lawyers will not be speaking, so we'll

18    move right into the members of the public and so we'll be able

19    to accommodate 50 individuals tomorrow.  I would ask that out

20    of respect for all speakers, each speaker kindly finish their

21    remarks at the three-minute time frame.  And as I said before,

22    it is my understanding that each speaker has been given a

23    number and that there may have been some changes due to

24    cancellations and substitutions.

25          And so I would ask that you all excuse the informality

1    of using numbers and not names.  I am just afraid that I would

2    get confused enough times with substitutions and the challenge

3    of keeping this speaker list exactly current.  So I am going to

4    use numbers for the clarity of the record today.  But I know we

5    would appreciate it if each person can introduce themselves at

6    the beginning of their remarks.

7            So thank you all again for your participation.  It is

8    my understanding that the first person on today's list is

9    Ms. Pryor from the Office of the Attorney General.  If that's

10   correct, I will turn the floor over to Ms. Pryor.

11           MS. PRYOR:  Good afternoon, your Honor.  My name is

12   Shareese Pryor and I am the Chief of the Civil Rights Bureau at

13   the Illinois Attorney General's office.  Our office represents

14   the State of Illinois, the parties to this case, and the

15   parties to the consent decree.  On behalf of the two attorneys

16   who worked to enforce the consent decree, thank you for the

17   opportunity to speak briefly on the important topic of the

18   Chicago Police Department's response to protesters.

19           The stories of police inflicting abuse on members of

20   the community that they are supposed to serve and protect are

21   not new in Chicago.  Those abuses were the very impetus of the

22   2019 consent decree invoked by the City and the Illinois

23   Attorney General on behalf of the State, and the provisions of

24   which the CPD is required to implement and follow.

25           In recent months, protesters in Chicago have taken to

1    the streets to express their righteous indignation over the

2    horrific killings of George Floyd and Breonna Taylor, as well

3    as to make other calls for social justice reform.

4           Many of the demonstrators were at protests to speak

5    out against systemic racism and abuses of force by members of

6    the CPD, particularly against people living in the Chicago

7    Black community.

8           We have been deeply disturbed by the reports from the

9    coalition of community groups participating in the consent

10   decree process and other community members about the brutal

11   treatment of protesters by some CPD officers.

12          We are concerned by reports of CPD officers using

13   excessive force, which in some cases resulted in serious

14   injuries, confiscating or destroying protesters' personal

15   property including cell phones and cameras, failing to or

16   refusing to provide medical care, and denying protesters access

17   to counsel.

18          If these accounts are accurate, these officers'

19   actions in response to the protesters violate multiple

20   provisions of the consent decree.  These include requirements

21   that prohibit officers from unjustifiably using impact weapons

22   or other means of physical force, retaliating against First

23   Amendment expression, speaking to civilians in a degrading and

24   dehumanizing manner, and using race, gender, and sexual

25   orientation as a basis for the law enforcement decision.

1    The consent decree also requires officers to allow

2    civilians to record them in the course of their law enforcement

3    duties, provide and arrange for medical care when a person has

4    been injured by an officer, and allow arrestees to prompt

5    access to counsel.  The consent decree further requires CPD to

6    adopt a community policing model for law enforcement and to

7    ensure its crime reduction strategies are consistent with the

8    principles of community policing.

9    The department's efforts to engage community members

10   will mean little if it's simultaneously violating those same

11   community members' rights.  Police officers have a difficult

12   job to do, which is more stressful during periods of civil

13   unrest.  We commend the CPD officers who have shown restraint

14   even as they or their fellow officers have been assaulted.

15   We acknowledge that many CPD officers do this work

16   honorably and consistent with the requirements of the consent

17   decree.  But for those who do not, CPD must not accept this

18   conduct -- misconduct and the attorney general will not

19   tolerate consent decree violations identified by the Monitor In

20   the special report.  Rather, our office is committed to

21   enforcing the consent decree.

22   We thank the coalition for bringing these important

23   issues forward, the Monitor for her special report, and your

24   Honor for holding these hearings.  We also appreciate those who

25   will share their experiences today and tomorrow as we work

1    together to build a police department that has the trust of all

2    the communities it serves.

3           THE COURT:  Thank you very much.  I appreciate it.  My

4    understanding is that the attorneys for the City will speak

5    next.  And I'm just not sure which one.  So whoever it is,

6    please step forward.

7           MS. BABBITT:  Good afternoon, your Honor.  It's

8    Elizabeth Babbitt.  I will be speaking on behalf of the City of

9    Chicago this afternoon.

10          I would like to begin by saying we, the City,

11   understand the frustration and the concerns about the current

12   pace of implementing the reforms that are required by the

13   consent decree.  As we all know, the challenges of implementing

14   these reforms has proven especially difficult in the landscape

15   of the ongoing pandemic, which, as you know, has significantly

16   impacted CPD.

17          The City and CPD acknowledge that we have fallen

18   behind on meeting some of the established deadlines of the

19   consent decree, but we are 100 percent committed to sustainable

20   and lasting reform.  We also understand there have been

21   concerns related to the protests and looting in the aftermath

22   of George Floyd's death.

23          We are also proud of our officers who maintain

24   professionalism and calm under circumstances of high duress and

25   conflict.  The City and CPD are fully cooperating with the

1    Independent Monitor's investigation into those protests and the

2    City and CPD's response to them.

3         We are keenly interested in hearing the commentary

4    today and incorporating the feedback into our ongoing work to

5    ensure consent decree compliance.  And I would like to

6    underscore, as officials with the CPD did last week at the city

7    council hearing, that while we are behind on some deadlines on

8    the consent decree, on others we are closer.

9         In the most recent report from the Monitor, for many

10   of the paragraphs cited, we are just a step or two away from

11   achieving a level of compliance.  There is momentum, real

12   momentum in the CPD to get policies, training, and community

13   engagement in a timely manner.

14        While I don't have time to go over everything that has

15   been done, let me name a few of the accomplishments.  First,

16   CPD has revised 12 of its use-of-force policies in February.

17   One significant addition to that was that chokeholds are now

18   clearly prohibited unless deadly force is authorized by

19   officers.

20        At the direction of Mayor Lightfoot, the CPD has

21   implemented safeguards for sworn and civilian personnel, whose

22   primary responsibilities are focused on reform and consent

23   decree compliance.  From deployments to critical incidents,

24   mass gatherings, or civil unrest, this is particularly

25   relevant, I believe, to today's discussions.

13

1      We are also currently improving our process for

2  community engagement through a new framework with the goal of

3  educating members of the public on each policy within the

4  consent decree and gaining feedback on those ideas.

5  Eventually, this will evolve into a task force with a

6  responsibility for ongoing community engagement.

7      We have also launched a force review division within

8  CPD which is responsible for reviewing use-of-force incidents,

9  including foot pursuits and the pointing of a firearm.  We have

10  also increased the amount of annual in-service training for all

11  active sworn officers.  We've launched public data dashboards

12  and made significant progress toward the mayor's 90-day reform

13  initiatives introduced in early June.  So while we recognize

14  that there is much work to be done, we are moving in the right

15  direction.

16      The City and CPD's responses to the protests and

17  looting are of great concern to us, and we appreciate the

18  opportunity to participate in these listening sessions.  We are

19  here to listen and ultimately to act.

20      THE COURT:  Okay.  Thank you very much.  I appreciate

21  your comments.

22      My understanding is that there are maybe two lawyers

23  from the coalition who are going to speak.  So I invite the two

24  of you to sort that out and go ahead and give your comments at

25  this time.  Thank you.

1    MS. BEDI:  Good afternoon, your Honor.  I am Sheila

2    Bedi, one of the lawyers who represent the Campbell Coalition.

3    And those organizations include Black Lives Matter Chicago, the

4    Brighton Park Neighborhood Council, the Chicago Urban League,

5    Justice for Families, the 411 movement for Pierre Loury,

6    Network 49, the Chicago West Side Branch of the NAACP and the

7    Women's All Points Bulletin.

8         Your Honor, Independent Monitor Hickey, Inspector

9    General Ferguson, during this proceedings, assuming that the

10   tech and the logistics cooperate, you're going to hear from

11   Chicagoans who have been part of what has been called the

12   largest social justice movement in the history of the world,

13   and they were proud to play that role.  People took to the

14   street lifting up George Floyd's name to protest law

15   enforcement brutality, violence, and racism.  And they will

16   describe how Chicago police officers responded to protesters

17   with brutality, violence, and racism.

18        CPD's protest response revealed its propensity to

19   engage in the exact behavior that inspired these global

20   protests.  People from all walks of life and backgrounds will

21   be here as they were during the protest.  And they will

22   describe how CPD officers systematically abused their

23   authority, used lethal force, sprayed them with chemical

24   restraints that cause excruciating pain, unlawfully detained

25   them, and mocked those who were bloody, crying out in pain, and

1    begging CPD to recognize their humanity.

2            Now, these violations have been widely publicized, and

3    in their response, the City of Chicago shirks responsibility

4    and issues blame.  It has defended the use of lethal force by

5    characterizing protesters as aggressors.  But this blame game

6    misses a fundamental point.  This, and indeed the Constitution

7    itself, protect the people against the power of the police.

8            It sets the standard for police response, standards

9    which must be followed even when protesters are expressing

10   disdain for the police, especially when the protesters are

11   expressing disdain for the police.  And instead of upholding

12   the rule of law, the PD has subverted the requirements of this

13   consent decree.  The CPD mocks the requirements of this federal

14   consent court order.

15           Now, the stories you will hear today, tomorrow, and

16   through written testimony, represent just a small fraction of

17   those brutalized by the Chicago Police Department during the

18   2020 protests, and a smaller portion still of those who have

19   been brutalized by CPD throughout history, and it is history

20   just as surely as the present that we speak to today.

21           We know well that lawlessness, racism, violence, and

22   corruption has a long history in our city.  In 1919, there were

23   uprisings on Chicago streets and CPD acted with brute force to

24   quell them.  In a report commissioned by city officials in

25   1920, the City of Chicago admitted that in response to those

1    uprisings, police lashed out and targeted Black Chicagoans.

2         Because of the CPD's violent reaction to the 1919

3    uprisings, the after-action report then called for, and I

4    quote, "a house cleaning of the Chicago Police Department." 100

5    years later, we have a different uprising, but the exact same

6    Chicago Police Department in need of a housecleaning.

7         Spikes of CPD violence, racism, and lawlessness can be

8    plotted along a timeline from 1919 until the present.  This

9    decree only exists because five years ago, Chicagoans took

10   their demands for justice from the street to the city council

11   in the names of Laquan McDonald, Rekia Boyd, and so many other

12   Black and Brown people killed or brutalized by the Chicago

13   Police Department in recent history.

14        This consent decree could be, and it should be, an

15   antidote to the poison of police lawlessness that has infected

16   Chicago for well over 100 years, but it has failed.  CPD

17   officers regularly flaunt its most basic.  CPD officers refuse

18   to wear body cameras.  They use slurs and hate speech.  They

19   refuse to accurately report uses of force.  And in the absence

20   of decisive, immediate action, the summer of 2020 will be

21   remembered as just one more spike, one more wave, one more peak

22   on the deadly timeline of CPD's failure to make Black lives

23   matter.

24        Or this summer could go down in history as a turning

25   point and a time of transformation.  The transformation will

1    require two things.  One, meaningfully implementing the consent

2    decree terms.  And, two, consistent with the people's consent

3    decree, amending the decree to include additional terms, terms

4    that curb police power to arrest and harm, and that will

5    include immediately removing from the streets Chicago Police.

6    Department officers who brutalize protesters.

7            I want to thank each of you for your time, your

8    attention, for reciting this critically important platform and

9    all you have invested in this process.

10           THE COURT:  Thank you very much for your comments.

11   I'm sorry.  Again, each time I have to mute -- unmute myself.

12   But thank you.  So it's my understanding, Ms. Sheley, are you

13   next?

14           MS. SHELEY:  Yes, Judge.  Good afternoon.  I am Karen

15   Sheley from the ACLU in Illinois.  Judge Dow, Ms. Hickey,

16   Mr. Ferguson, thank you for arranging these hearings and

17   allowing me to speak on behalf of my clients, Communities

18   United, Community Renewal Society, One North Side, Next Steps

19   and the ACLU of Illinois, all members of the coalition who have

20   the right to enforce the consent decree.

21           The consent decree is a commitment that the police

22   department will take community concerns into account when

23   forming policies.  Abandon the mentality, lift up the sanctity

24   of life, hold officers accountable for misconduct, and actively

25   work to eliminate harmful and unnecessary police contacts.

1      After nearly a year and a half, the City has missed 70

2   percent of its deadlines to meet the promise of the consent

3   decree, and has failed to provide any feasible plan for getting

4   back on track.  So this summer -- this summer, the fulfillment

5   of the promise seems very, very far away.  My clients are

6   living with the consequences of that stalled start.  The

7   Monitor has found the City out of compliance with community

8   outreach requirements and then making plans to address

9   community safety concerns.  We're seeing on the streets and on

10  our phones officers who violate the decree's restrictions on

11  use of force, and it's happening against protesters.  You will

12  hear many of those stories today.

13      In neighborhoods, people have been frightened and

14  harmed by the militarized presence of officers who during a

15  pandemic too often refuse to wear masks when interacting with

16  the public.  My clients look at the City's actions this year.

17  They look at the excessive force, raising bridges, shutting

18  down transportation, and they feel they're losing their rights,

19  not gaining them, under the decree.

20      You rightly cautioned us as the decree was entered

21  that it is not a panacea or a magic wand, but people are losing

22  faith in the promise.  My hope is that the monitor and

23  inspector general's report will acknowledge the violations of

24  the decree that we've all seen and identify remedies that the

25  City will adopt, that we'll need more to instill confidence in

1    the decree.

2           We need a dialogue between the CPD, the City, the AG's

3    office, and the coalition.  We need answers from the City about

4    how it will meet its deadlines, and we need accountability for

5    the violations of the decree that are happening in front of us.

6           Judge, for all of this, we need your help and the

7    power of the Court.  We are counting on that power to ensure

8    that in this generation, the promise of change for the

9    department is finally kept.  Thank you, Judge, for arranging

10   these hearings.  And I want to thank all of the people who plan

11   to speak today and tomorrow.

12          THE COURT:  Okay.  Thank you as well.  I really

13   appreciate all the comments from counsel today.  So I thank

14   you.

15          With that, we are going to move to the first member of

16   the public, and so speaker No. 1, you will be admitted into the

17   speaker's room now, and we'll await your comments.  So thank

18   you.

19          MS. HICKEY:  Your Honor, I am checking to see what is

20   happening.

21          THE COURT:  Thank you.  My technological capabilities

22   may not be as good as yours and the host's, so I appreciate

23   your checking on that.  Thank you.

24          MS. HICKEY:  Your Honor, I would suggest that we move

25   to speaker number two.  I don't think it's a technological

20

1    thing.  I think perhaps speaker one has been unable to join yet

2    and we'll then move speaker No. 1 to the end of the queue so

3    they will have an opportunity to speak at the end.

4         THE COURT:  Okay.  Very well.  So, if we could admit,

5    then, speaker No. 2 into the participant room, that would be

6    appreciated.  Thank you.

7         MS. FRAADE:  Hi.  Hello.  My name is Rachel Fraade.  I

8    am a social worker here in Chicago and I was present at the

9    Decolonize Chicago protest at Buckingham Fountain and later

10   moving on to Grant Park.  At Grant Park, police brutalized our

11   crowd of protesters.  I was personally pepper sprayed and tear

12   gassed.  The burning continued for hours all over my body.

13   Over and over I could see Chicagoans who could not see, who

14   could not breathe.  I couldn't spray water into people's eyes

15   fast enough to soothe the burning, and everywhere I looked,

16   people were calling for medics.  At the front of my line were

17   people with bikes.  Cops stole the bikes and threw these bikes

18   to the ground and were purposely breaking them.  As I left, I

19   saw piles of bikes twisted and stolen, which took away people's

20   primary form of transportation, only because they were used to

21   protect us from the violence we knew the police were about to

22   bring upon us if they got through the line of bikes.

23         And we were correct.  The police pepper sprayed us,

24   tear gassed us, and beat us with batons.  They pointed to

25   people in the crowd.  I saw our protective line, and they were

1    marking their perceived leaders to later target for violence or

2    arrest.  I saw one medic -- and at every protest medics are

3    clearly marked as such -- with blood streaming from their head

4    due to a baton strike.  I also saw at least one other

5    individual with blood streaming from their head.  I saw people

6    who could barely move, who could barely see because they had

7    been pepper sprayed so badly.  When I was tear gassed, I had

8    mucous streaming from my nose and my mouth. I could not stop

9    coughing even through my mask.  And all of this was in quarters

10   we were enclosed into in the middle of a pandemic that is

11   spread through respiratory droplets, so the police

12   substantially increased all of our risk of contracting

13   potentially deadly COVID-19.

14           Eventually, we retreated.  And if you have ever been

15   in Grant Park, you know that the way out is over a hill and

16   over a stone wall.  Cops pushed us up this hill and over a

17   stone wall as we walked backwards.  We were facing them in

18   order to make sure we could protect ourselves.  So we were

19   walking backwards up a hill and over a stone wall after we had

20   been beaten, pepper sprayed and tear gassed, and otherwise

21   traumatized, and they were beating us even more because we

22   weren't moving fast enough.

23           They beat people who tripped as they were walking up

24   the hill.  They beat people as they were trying to step

25   backward over a stone wall.  And, again, we were retreating.

1    We were leaving the park and this was not enough for the

2    police.  They were inflicting purposeful, unnecessary violence

3    against injured protesters.  This was not in the interest of

4    anyone's safety.  This was in the interest of a statue on

5    public land, in fact on unceded Native American land, which we

6    had every constitutional right to protest.

7         When we left Grant Park they continued to chase us

8    with pepper spray and threats, and for blocks afterwards,

9    despite our visible injuries as we were fleeing.  Police were

10   beating people who could not see where they were going because

11   of the tear gas in their eyes.  Their eyes were swollen, tears

12   streaming down their faces, clearly and visibly unable to see

13   and walk quickly, and yet they walked behind them with batons.

14   I was simultaneously fleeing, bringing others along in my arms,

15   and spraying water into our eyes because the police would not

16   stop beating us.

17        THE COURT:  Thank you very much for your comments.  I

18   do appreciate it.  I can't actually see the red markers, but I

19   think we are ready to move on to speaker No. 3, please.

20        MR. LEWIS:  Hello, your Honor, and all other

21   listeners.  I am Djimon Lewis, a college student at Illinois

22   State University, and I was at the protest on July 17th at

23   Buckingham Fountain, and then moving up the street to the

24   Columbus statue.  And I came there in support of Black Lives

25   Matter to protest a facist statue commemorating Benito

1   Mussolini on unceded land.

2          By the time we left the fountain and marched up the

3   street, there was a considerable police presence, but

4   everything was peaceful as we intended.  Then we got to the

5   statue and immediately we were met with forceful resistance.

6   Cops were shoving and pushing people that were in the front

7   line back.

8          I saw multiple cops grab objects and push protesters

9   and try to hit them with it.  The first thing I remember seeing

10  in detail that really kind of traumatized me was I saw an

11  officer literally grab a protester, push him down the hill, and

12  then they started shoving people on the hill without warning.

13         I saw another police officer tackle a protester who

14  was (unintelligible) another protester, as they tried to take

15  the statue from peaceful protesters.  And I saw the person who

16  had gotten tackled beaten in their head with a baton until they

17  were bleeding profusely.  And the officer did not remove

18  himself until after the person was clearly incapacitated.  And

19  no other officers removed that officer, either.

20         Within seconds of that incident, from my advantage

21  point, because I had moved, I was shoved back to a vantage

22  point on the hill to create space because I was not with any

23  other protester that could protect me.  I did not know anybody.

24  I saw an officer try to punch a person with a bike in the face,

25  while trying to grab the bike from them, and then pepper

1    spraying them directly in the face.

2              Once they pepper sprayed the person directly in the

3    face, they grabbed their bike, hit them with it, and then

4    tossed the bike into another pile of bikes, effectively

5    breaking it and taking their property.  The next thing I saw

6    from my vantage point before I was forced to flee because of

7    tear gas and forced to flee the scene with other protestors

8    back and up and over the hill, I saw an officer taunting

9    protesters with his badge number and name covered, repeatedly

10   calling protesters expletives and using foul language.

11             I was increasingly getting scared of the situation

12   because it looked so brutal.  There were multiple people

13   suffering from wounds, bleeding profusely from their noses and

14   their heads, getting beat indiscriminately with batons, and I

15   felt the need to try to create a space, a barrier between

16   myself and the other police officers with the other protesters

17   who were also being teargassed and beaten.

18             I saw another person who -- I actually saw this person

19   on the way to safely leaving the area; they were getting their

20   heads wrapped.  And that was just among the things I have seen.

21             THE COURT:  Thank you for your comments.  I really

22   appreciate it.

23             I think we're ready to move to the fourth speaker

24   then, please.

25             MS. KAFURA:  My name is Cailie Kafura.  I use she/her

1    pronouns.  I am 27 years old.  I am with Rising Tide Chicago

2    and I work as a nanny.

3           On July 17th, young folks from across Chicago arrived

4    at the Columbus statue to make a change that the City of

5    Chicago was too racist to make themselves:  To remove a statue

6    of a colonizer who committed genocide and enslaved people.

7    What followed was nothing less than an atrocity as the Chicago

8    Police Department, who pretends to protect and serve the people

9    of this city, unleashed violence that has left our entire

10   community traumatized.

11          CPD used batons to repeatedly beat folks to the point

12   where blood was pouring down the faces of my friends and their

13   shirts changed color.  Medics providing urgent first aid to

14   people were also beaten or dragged away from the severely

15   injured by the police.

16          Friends of mine were teargassed and pepper sprayed at

17   point blank until they were burned, blinded, and throwing up.

18   Some were left to sit in jail while experiencing this

19   excruciating pain without any medical attention whatsoever.

20          CPD ripped bikes from the hands of people who depended

21   on them as their only means to get them to work, and then used

22   them as weapons against those very same people.  Some folks who

23   tried to document these abuses faced retaliation in the form of

24   being punched and shoved by CPD.  The police who did not beat

25   anyone stood by and grimaced as their colleagues broke many

26

1    laws that they're supposedly supposed to uphold.

2         This is why we say that there are no good cops.

3    Adding absolute injury -- adding insult to injury, numerous

4    people who were arrested went missing in the system as the

5    police refused them phone calls, food, water, medical

6    attention, and did not even fill out paperwork for hours so we

7    could not find our friends and family.

8         A reminder that the Chicago Police Department unleased

9    all of this violence on to their own Chicagoans --

10   (unintelligble due to audio breaking up) -- all to protect a

11   statue of a colonizer.  All of my friends are still traumatized

12   from that day and all of the countless days that CPD and Lori

13   Lightfoot have been collaborating on kettling, trapping,

14   beating, macing, and dehumanizing us on the streets of Chicago.

15   Young Black and Brown folks are being brutalized for literally

16   protesting police brutality.

17        The actions of the police and the City should

18   demonstrate to you all exactly why we need far more than

19   reform.  We need you all to actually listen, actually act,

20   defund and abolish CPD because blue lives murder and Black

21   lives fucking matter.

22        THE COURT:  Thank you for your comments.

23        We can move on to speaker 5, please.

24        MS. SALEH:  Hello.  Can you hear me?

25        THE COURT:  Yes, we can.  Thank you.

27

1        MS. SALEH:  I apologize.  I am having some technical

2  issues.  Good afternoon, your Honor, and everyone present to

3  give their testimony in this historical moment of power for

4  Black and Brown youth organizers.

5        My name is Mariam Saleh.  My pronouns are she and her.

6  I'm a 24-year-old Palestinian organizer speaking on behalf of

7  the Black Lives Community Coalition.  It is a new group founded

8  by my friend Ken Davis that focuses on empowering and

9  protecting Black and Brown communities throughout Lake County

10  through policy, training, change and community.

11        I am a Palestinian Muslim with refugee parents, and

12  I've been involved my entire life in liberation work and have

13  spent the last six years in Chicago organizing with groups such

14  as VJPSOT, Chicago Rights, and various others.  The parallels

15  of genocide and systemic oppression against Black people in

16  America, particularly at the hands of law enforcement, and

17  Palestinians under Israeli occupation are disturbingly similar.

18        On Friday, July 17th, I attended the rally for Black

19  and Indigenous Solidarity to stand against police brutality on

20  both local and national levels.  When I arrived, the crowd was

21  gathered around the Buckingham Fountain.  As we walked toward

22  the statue, CPD arrived in riot gear guarding the statue in

23  masses.  I was in front of the crowd when the violence of the

24  police erupted.  Without warning, CPD began to strike dozens of

25  peaceful protesters in the head and all over their bodies with

28

1    batons to the point of severe injury.  Even as protesters tried

2    to disperse, CPD kept on hitting with batons. The majority of

3    the faces I saw with bloody heads were Black.

4           As we ran away, we were gassed, which made it hard to

5    breathe.  I choked on thick chemicals that were burning in my

6    eyes.  Moments later they began to aggressively spray everyone

7    in the face with mace in front of me, including one of my close

8    friends.  A mixture of mace and tear gas made it increasingly

9    difficult to breathe and see, and I witnessed them steal

10   protest marshals' bikes and throw them at youth activists.

11          In 2018 the American Public Health Association

12   revealed that police brutality is an epidemic at this time.

13   The military provides police with close to $800 million

14   annually, and this continues the oppression towards the Black

15   and Brown community.  Outside of this protest, my experiences

16   with law enforcement include militarized police presences in

17   many public areas, as well as sexual harassment from CPD in

18   those spaces, and as well as on-the-ground protesting.

19          My experiences at the rally were not the first time I

20   have witnessed this disproportionate violence at the hands of

21   the authorities.  However, since that Friday, my mental health

22   has drastically declined as it was a re-traumatizing

23   experience.  The excessive funding given to CPD makes it

24   further unlikely to get help.  We know that crime is not

25   committed out of a vacuum.  It is imperative that we fund

29

1    social institutions to prevent crime.

2            $95 million should not be given to fund the cop

3    academy in Garfield Park.  Already that's a hotspot for law

4    enforcement.  That money needs to be redistributed to Black and

5    Brown communities where over 54 schools and 6 mental health

6    facilities were closed under Rahm's administration.  We need to

7    abolish policing systems and defund the police to stop the

8    cycle of crime and invest in the communities themselves

9    instead.

10           Thank you for allowing me this opportunity to speak.

11           THE COURT:  Thank you very much for participating.  I

12   think we are up to Speaker No. 6, so if that person can be

13   admitted to the room.

14       (Pause in proceedings.)

15           MS. SHEMANSKI:  Hello.  My name is Aimee Shemanski. I

16   am a resident of the 46th Ward in Chicago, and I have heard a

17   lot of people talk about the protest in later July. I would

18   actually like to talk about earlier on, my experience on

19   May 30th. So very -- I think one of the first ones.

20           My partner and I, we arrived near the river at about

21   5:00, 5:30, and things were still mostly peaceful, but somewhat

22   rowdy. And between about 5:30 and 6:30, there was steadily

23   escalate -- there was a steady escalation of really just

24   sentiments.  And at every step of the way, it was CPD that

25   would kind of instigate this escalation.

1      We were near the front of the line, directly face to
2  face with officers.  And I noticed to my left a tall, white
3  gentleman in, like, a black zip-up that seemed to actually know
4  the officers. He wasn't -- he didn't seem to be part of the
5  protest, and he was actually leaning forward and chatting with
6  the officers, which was quite difficult to do with the volume.
7  And they were doing everything they could to incite panic, but
8  this man really stood out to me because he later dropped, like,
9  a smoke bomb, and it was, like, yellow-colored.  It was just
10 like a cheap thing from any roadside stand that you could get
11 in Indiana, and it was really designed to incite panic.

12      As the situation started to escalate, we watched them
13 push the line back.  And they singled out a woman who had been
14 yelling quite loudly on my right.  And as they were pushing us
15 back, pushing us back, we climbed up on the cement planters
16 that were there in the plaza that groups of people were
17 standing on.  And they singled her out specifically, and they
18 kind of manhandled her, physically. wrapped their arms around
19 her.  And I watched her, really, be thrown to the ground. And
20 when she rose her hands were bloodied and dirtied, as well as
21 her knees.

22      We moved on.  They started to funnel us up the street.
23 And as we went up the street, we were following one of the
24 leaders, one of the organizers of the protest, and we could
25 hear it escalating behind us. And as we heard shouting and

31

1    then, like, a loud crash, we decided to duck out through an

2    alley.  And at the end, we -- I heard, like, three loud pop,

3    pop, pop.

4         And I grew up with guns around. It sounded like

5    gunshots. I believe they were nonlethal rubber bullets because

6    I didn't see anything about protesters being actually shot in

7    the news. And it continued to escalate from there over the rest

8    of the night, but absolute terror in that moment. People

9    shouted about shots being fired and just ran.

10        Thank you.

11        THE COURT:  Thank you very much for your comments.

12        I think we're up to No. 7 now, please.

13        MS. HICKEY:  Your Honor, if you want to move on to No.

14   8, it does not appear that No. 7 is on the line or in the

15   queue. We will add them to the end.

16        THE COURT:  Thank you.  I am just looking at my

17   attendance list too, and I'm seeing the same. So we'll go ahead

18   and skip over No. 7 for the moment and move on to speaker No.

19   8, please.

20        (Pause.)

21        MS. HICKEY:  Your Honor, we are going to have to move

22   to No. 9.

23        THE COURT:  Okay. Thank you.  So we're up to No. 9,

24   and we'll leave 1, 7, and 8 in the queue for the end of the

25   proceeding today.

1          MS. HICKEY:  Your Honor, if you want to move to

2    No. 10, I know No. 10 is ready. I am sorry.  I'm only looking

3    down because I am trying to monitor the speakers in the queue.

4          THE COURT:  I appreciate that.  And I am also trying

5    to keep track of where to pick up again when we get through the

6    45th for today. So we'll move on to speaker No. 10, please.

7          MS. HICKEY:  And I am doing the same, your Honor, so I

8    can help cue you at the end.

9          THE COURT:  Wonderful. Thank you. Thank you very much.

10         MR. MICHAEL KAISER-NYMAN:  Hi. Thanks for letting me

11   speak at this session. Thanks for holding this session.

12         I went to a number of protests in -- mostly in the two

13   weeks or so directly after George Floyd's murder, and wanted to

14   share a few things that I experienced and that I saw there.

15         Some of the protests I went to were in the downtown

16   area, some were on the north side, and some were on the south

17   side. And kind of reflecting on my experience, one of the first

18   really shocking things, or maybe not so shocking for some of

19   us, is just the dramatically different police response at these

20   events.

21         One of the events I went to on the north side was in a

22   relatively affluent white neighborhood.  And there were -- I am

23   not a professional at this, there were maybe 1,000, 2,000

24   people there, and I saw five officers the entire time I was

25   there. And that was a really nice change from the protests that

1    I had been at downtown and on the south side, where at times it

2    felt like there were more police officers than protesters.

3              And, you know, as somebody who doesn't face a lot of

4    police in my day-to-day life, this was a really stark,

5    personal, eye-opening experience about the different ways that

6    people experience police presence depending on where they live

7    and their race.

8              I was also really surprised at the relatively few

9    police who wore masks, especially given just the degree to

10   which we, our city and our state, are suffering from the

11   pandemic. I was pleasantly surprised that I almost never saw

12   protesters without masks. I was very disappointed that I, in

13   the first week or so of the protests, I almost never saw police

14   masks. As they continued, I did see some with masks, but I

15   would estimate maybe 10 percent of police who were wearing

16   masks.  And these are from people who are supposed to be

17   keeping us safe and they were putting our health at risk.

18             Most of the time that I was involved in the protests,

19   I personally did not feel unsafe. The times that I felt most

20   unsafe were the times I was around the police. When I was

21   around police wearing riot gear, when I was around police who

22   had helmets on, face shields down, that was when, to me

23   personally, the protests felt most unsafe.  I never felt unsafe

24   around any of the other protesters, but when there was this

25   militarized response from the police, I felt like anything bad

1   could happen at any particular moment and it was really nerve

2   wracking.

3           The only time that I felt like there was a real,

4   immediate, present possibility of violence and danger was at a

5   protest that was ending around -- around sunset.  And as the

6   protest was concluding, some of the protests -- what seemed

7   like organizers were encouraging us to move along more quickly.

8   And then I realized it was because we were getting close to the

9   curfew time. And as the protest was wrapping up (no audio)...

10          MS. HICKEY:  It appears, your Honor, that Michael

11  Kaiser-Nyman's internet went out, but he was also out of time.

12  So we can move on to the next speaker, No. 11.

13          THE COURT:  Very well. Thank you.  So if we could

14  admit speaker 11, please.

15          MR. EUGENIO:  I am J. Michael Eugenio.  I use he/they

16  pronouns.  I am (inaudible) mixed and I work at a community

17  non-profit in Woodlawn. On July 17th at the Black and

18  Indigenous Solidarity rally, I won't ever forget the look on

19  their faces, the gleeful rage and vitriol as they ripped the

20  mask off my friends' faces to pepper spray them.  She had to

21  quarantine after that for fear of exposure because, obviously,

22  we later found out they sprayed before it was authorized over

23  the scanner.

24          I won't forget the callous cheers in which they hit a

25  stranger in the head with a baton and then ripped her bike

275

1   away -- she had put herself between a police officer and a

2   baton because they were targeting Black youth because there was

3   someone recording them beating someone else.  They then threw

4   the bike onto another protester, and looking back at us with a

5   wink as another officer picked up the bike to stomp on it

6   before adding it to the growing pile.  The pile of bikes has

7   yet to be returned to protesters.

8           I won't forget the frenzied stare-down as a white

9   shirt pulled a knife out to slash bike tires and his clear

10  frustration that protesters were the ones who had to

11  de-escalate the situation.  I won't forget the tinge of regret

12  in their eyes as they realized how much spray they deployed,

13  choking on spray only to look and see how much they made us

14  suffer, and banned by the Geneva Convention. We weren't

15  prepared.  Laughing through their coughs.

16          I especially won't forget a few faces, blank faces of

17  the cops as they stood behind fearful and in awe of what their

18  fellow officers were capable of.  Just last week that same

19  disaffected disdain I saw on the grin of a white-shirt officer,

20  no badge, no body cam, as they tried to rush through a barrier

21  to get to the young Black organizer rallying against CPD's

22  shooting a Black youth and giving him a million dollars bail.

23  That officer was clearly frustrated when officers protected the

24  protesters, though just the next day they illegally chased,

25  kettled, sprayed, beat, threatened with the barrel of a rifle,

1    arrested, and sexually harassed many of those same organizers.

2         And earlier that week, some of those young Black women

3    later joking with their abusers. All of these people were

4    expressing their First Amendment rights, standing in public

5    parks and streets protesting that systemic abuse, police

6    brutality, the lack of compassion and the lack of

7    accountability.

8         I have a hard time sleeping. I have a hard time

9    working and focusing.  I keep thinking back to their looks of

10   absolute vitriol, the searing gas on my skin.  They don't see

11   as human much less as someone to protect. or serve.  My mouth

12   and throat were full of ulcers, worrying that they will kill

13   and lie the same way they did from Fred Hampton to Laquan

14   McDonald.  At least Rahm could acknowledge, after years of.

15   pushing, how racist CPD is.

16        How long will it take Lori to make that

17   acknowledgment?  How many will have to suffer?  How long will

18   she continue to value property over people?  It makes me sorry

19   to be a Chicagoan. It shows me there is absolutely nothing to

20   reform the system.

21        Much of what I have described and I have seen and

22   heard about so, so much more goes against the extremely

23   incremental. consent decree.  Even if we met all of its

24   measures, I don't think we'll be safe right now.  I keep on

25   because. I know how much more others have suffered.  We must

1    defund and abolish CPD. There's -- there's no saving it.  We

2    must protect Black lives.  We should be building the city we

3    wish to save, not wasting our time reacting to its oppression.

4    Thank you.

5              THE COURT:  Okay. Thank you for your comments.

6              I think we are up to No. 12 now.  Is that right?

7              MS. HICKEY:  That's correct, your Honor.

8              MR. GEORGE:  Hello. Thank you, your Honor.  Thank you

9    everyone and thank you everyone present. My name is Landon

10   George. I use he pronouns. I am a farmer and musician. I lost

11   my job as a musician in North Carolina. What I did was I came

12   up to Wisconsin to start work on farm.

13             While in Wisconsin, we sell our produce at farmers'

14   markets in Chicago, so I would frequent the city every weekend,

15   usually Friday through Sunday.  I was in Chicago, and I heard

16   about the rally that was going on at the Buckingham Fountain on

17   the 17th of July. I appeared at this rally.  What I saw was

18   atrocious and it is making me shake just thinking about it.

19             We started at Buckingham Fountain. Everybody was

20   getting ready, getting excited, talking about justice.  But

21   when we moved to Grant Park to -- (audio breaking up) -- the

22   entire mass of the movement, they were pushing us up. It felt

23   being -- like I said, I am a farm worker and it literally felt

24   like I was kettled and pushed by these cops who were heavily

25   armed and in riot gear.

When we got to the monument of Columbus, the first
thing I saw was cops grabbing people's bikes, throwing them
against the ground, throwing them at the people who owned the
bikes.  (Audio breaking up) -- forced them -- I had to stop
(inaudible) -- on the ground (inaudible).  The cop grabbed my
neck and threw me to the ground. Why did you do that?  The next
thing I know we're at the protest.  Everybody stands up around
us. The police (inaudible) and literally the blood (inaudible).

These guys wanted violence and they wanted blood and
they got that pretty soon.  You can see the scar on my head.
This is the scar that I got from a baton to the head from the
CPD. It was the same guy who grabbed me by the neck. And I
guess he had something to prove. When I got hit by the baton.
in the head, I couldn't see anything.  Blood covered my eyes
and face.  I was rushed back by unknown people, helped by
strangers, and my head got wrapped. I then got back to my truck
and drove all of the way to Wisconsin. This kind of violence is
insane because it is happening to good citizens. I don't know
what else to say, but we have to defund this.

THE COURT:  Thank you for your comments. I am sorry we
didn't catch them all, but we caught as many as we could.  But
thank you.

I think we're to No. 13, please.

(Pause.)

MS. WISE:  Hi, everyone. Can you hear me?

1          THE COURT:  Yes, we can hear you.  Thank you.

2          MS. WISE:  Okay.  Hi. Thank you for having me. My name

3     is Jeannine Wise.  I am 45 years old.  I live in Chicago and I

4     am a chef and a culinary instructor. I just wanted to note that

5     it was very traumatizing to hear from the attorneys from the

6     City defending the CPD.  That was very painful.

7          So on May 30th I went to peacefully protest the murder

8     of George Floyd, and to put myself between Black people and the

9     police because I believe that Black lives matter. In the

10     afternoon, I ended up on the Wabash bridge. The police formed a

11     line and had horses behind them.  And they did not call to

12     disperse at that time.

13          I was between the police and some Black people that I

14     didn't know. And the police -- there was an officer pushing

15     into my chest horizontally with a baton like this, and he was

16     pushing me very, very hard. And I was afraid of stumbling. I

17     was trying to hold my ground, but I wasn't fighting.  I never

18     raised my voice. And I was afraid that I was going to fall on

19     the ground and get trampled because the police were advancing,

20     but also because of how much it hurt to have the baton pushed

21     into my ribcage and my chest.

22          I asked him to stop and he wouldn't.  He kept shoving

23     me. So I put my hands up. I thought he would stop if I was

24     protecting myself, but he shoved the baton into the fingers of

25     my bone and was pushing with his body weight. And so I screamed

1    and I said, "Stop. Please stop." So he gave me a look, and he

2    jumped to a person next to me, which was a Black person and

3    started shoving him even harder. And I said, "Stop. Stop.

4    Please stop."

5            And the police officer next to him looked at me and

6    said, "You want to be in it. Now you're in it." And he

7    grabbed me by my neck and he lifted me up, and I flew. I went

8    airborne by my neck. He dragged me backwards so quickly that my

9    shoe flew off and my hat flew off. He dragged me down the

10   street through horse poop so hard that my back was scraped up

11   and bleeding. And then two other officers jumped on me and I

12   was screaming, "Stop. You got me. You got me. You won."

13           They put me in zip ties. I sat on the curb of the

14   Trump Tower for three hours. They -- this is when the bridge

15   went up. I sat on a sheriff's bus for three hours. They took us

16   to Belmont and Western, didn't let us in, had no females.

17   Didn't tell the females that we were there, to process us. I

18   was in zip ties for six hours, very tight.

19           They told us if we didn't want to be arrested, we

20   shouldn't have burned the city down. None of us had been

21   involved in any burning or looting or anything. Then I was in

22   jail for the night. My name cleared at 3:00, I had no warrants,

23   at 3:00 in the morning. They wouldn't let me out until 8:00.

24   To this day I have no idea if I have been charged with

25   anything. They said it would be disorderly. conduct. It was

1    terrifying.  It was brutal. It was traumatic.  And it was
2    uncalled for.

3          Thank you for your time. Thank you for hearing me.

4          THE COURT:  Thank you for your participation. I
5    appreciate it.

6          I think we are at No. 14.

7          And just so everybody knows, at 3 o'clock we are going
8    to take a break for 15 minutes. We are going to switch court
9    reporters at that time, and so we'll keep going until then in
10   the speaker queue. And we are at No. 14. So if 14 could be
11   brought in as a participant, please.

12         MS. HICKEY:  Your Honor, my understanding is that 14
13   is not in the queue, so we are going to go to No. 15, who is
14   ready.  And we'll add 14 to the end and recall them, if they
15   possibly then have a better internet connection.

16         THE COURT:  Okay.  Very good. So we are up to No. 15,
17   then.

18         MS. HICKEY:  Correct, your Honor.

19         MS. POCHEL:  Hi.  My name is Janie Pochel. I am from
20   Chicago. I live in Albany Park. I was at the July 17th rally,
21   the solidarity rally. As we got to the statue, I saw the police
22   just started beating people, to me it seemed like for no
23   reason.

24         As people started -- as the police started coming on
25   there was a hill -- I was with children. I work with the youth

1    group, so I was with kids. The youngest one was eight. She was

2    up on the hill on Roosevelt.  And that's where a lot of the

3    young people, a lot of the disabled people, people trying to

4    run from the police violence were being pushed onto the street

5    towards Lakeshore Drive because they were -- they were, like,

6    kettling us into that area.

7            As they jumped over the barricade, they just started

8    indiscriminately beating people.  My eight-year-old niece got

9    pepper sprayed. They watched police just start punching people

10   in the face.  We all watched them just punching people in the

11   face for no reason, just for being there, for practicing their

12   rights.

13          We stayed just a little while longer because we

14   couldn't get out because the police were forcing us back and

15   pepper spraying people as they were trying to escape.  My niece

16   has had a hard time sleeping. They are severely traumatized.

17   They cry every time they see a cop now. I didn't think that

18   our -- it was a nice rally.  It was a good time and then the

19   police violence just really made that a hard thing.

20          And even before that, on May 30th, the police were

21   pulling people's masks off. After that, they just, you know, at

22   the July 17th, I was with other kids. Some of them had asthma.

23   And it was the same thing that we have heard over and over

24   again. The police were just beating people for basically no

25   reason.  And, yeah, that's all. That's all I have to say. Thank

1    you.

2              THE COURT:  Thank you, very much.

3              No. 16, I believe.  I think I see that she is in the

4    queue here. So we can go ahead with No. 16, please.

5              MS. SCOTT:  Hello.  My name is Caroline Scott.  I am

6    24 years old and I use she/her pronouns, and I attended the

7    July 17th solidarity rally at Buckingham Fountain and the

8    subsequent. march to Grant Park.

9              When we approached the Columbus statue, I saw hordes

10   of police cars coming. I was facing Lake Shore Drive. So they

11   asked for white people to come to the front. So I joined a

12   front line with white protesters, many of whom had bikes.

13             Initially, some CPD officers came up to us; none of

14   them were wearing masks. They were in full riot gear. They saw

15   us. They turned around to another side. Then a few minutes

16   later they came back. And at the line of white people there was

17   one Black man who was not with the line.  When they came back

18   and saw this line of white people, they went for the Black man

19   at the end of the line. They grabbed him. He jumped back when

20   they grabbed at him for simply standing, you know, with the

21   protestors.  You know, he jumped back. They grabbed him. There

22   were three officers on him, pulled him to the ground face down

23   and then arrested him and took him away.  In a line of white

24   people, they went after the one Black man.

25             After that, officers -- a couple of officers stayed

1    with us, and then most of the action was coming from the other

2    side. At that point, I started to feel the tear gas, even

3    though it was coming from about probably about 100 feet away.

4    You know, breathing became more difficult. My eyes started to

5    burn.

6           Then I saw a cop teargas three people about six feet

7    away from me. At that point, the tear gas became very

8    aggressive.  I couldn't breathe.  None of us could breathe. We

9    all needed to back up.  We were coughing. We had to take off

10   our masks.  Like I said earlier, no police were wearing masks.

11   We needed to share water. All of this was extremely dangerous

12   given the conditions of the pandemic, but we could not breathe.

13   My skin was burning.  My eyes were burning.  And we had to

14   recover.  And then at that point, we started to push back.

15          And there was no verbal warning from police at all of

16   any of their activity. When we were pushing back, I was waiting

17   for one of my friends who I was with who had a bike and her

18   bike was damaged. I was waiting for her to join us. I had a

19   police officer scream at me to walk faster. Eventually we were,

20   you know, pushed back up against the -- going up the hill.

21          But, again, I will note that there was no verbal

22   indication from CPD officers. It was organizers telling us to

23   back up and organizing us to back up.  Whereas, police officers

24   were simply approaching.

25          When I joined other people as we moved back, I saw so

245

1   many people who were bloody and beaten.  Once we got back onto

2   the street, police did start kettling, and at that point me and

3   the people who I was with, we left.

4          When we got home, I was washing my mouth out with this

5   red poison for about five minutes.  I took a shower the next

6   day when I woke up, my arms were still burning.  And I was

7   still spitting out poison from my mouth.  And that was my

8   experience while exercising my constitutional right to protest.

9          THE COURT:  Thank you very much for your comments. I

10  appreciate it.

11         MS. HICKEY:  Your Honor, at this time No. 17 and 18

12  are not in the queue. So if you want to go to No. 19.

13         THE COURT:  Very good. Thank you. I am starting to

14  track the same way you are, so I appreciate you

15  double-checking. We'll go on to No. 19, please. Thank you.

16         MS. PULLEY:  Hi. Thank you for having these public

17  hearings. I was at the -- I was also at many of the protests

18  that have happened over the course of the last three months.

19  And I'm going to limit my comments to discussing what I

20  personally experienced at the July 17th protest.

21         I was at the protest along with thousands of other

22  Chicagoans.  I was standing at the perimeter of the action in

23  an attempt to take pictures and video. I was shoved to the

24  ground and pushed into the people standing in front me by CPD.

25  I was kicked, shoved, and beaten while simultaneously being

1    yelled at by CPD to move.

2         To provide a fuller picture of the situation that I

3    was exactly in, and to understand the scope of the physical

4    impossibilities, I will describe to you very briefly the

5    parameters.  I was leaning against the concrete wall.  And in

6    front of me were thousands of people. The Chicago police then

7    jumped over this wall yelling at us to move where we had

8    nowhere to go and then proceeded to shove us to the ground,

9    kick us, and beat us.

10        Under no just society was this reasonable, nor was it

11   in keeping with our supposed constitutionally protected rights

12   to freedom of assembly, to petition the government for redress

13   of grievances, and protecting our freedom of speech, all of

14   which are found in the First Amendment to the Constitution.

15        When I was finally able to get up, I witnessed the

16   police spraying unknown chemical agents of varying colors --

17   they were yellow and they were white -- directly into people's

18   faces. I saw one person's entirely formerly white shirt dyed

19   red because of the gashing wounds that were bleeding profusely

20   out of his head.

21        I saw people collapsed on the ground unable to get up

22   because they were being beaten by a baton.  I then could not

23   breathe because I started inhaling the toxic chemical agents in

24   the air and had to grab strangers who were next to me in order

25   to stabilize myself.

1      CPD is under the consent decree, but they do not
2  believe that it is real and that it has any effect on their
3  operating. Their behavior has increased in violence, continuing
4  the unconstitutional pattern and practice of racist behavior
5  that prompted the consent decree in the first place and that
6  were found in the report by the Department of Justice.  There
7  has been zero change to their behavior.
8      And I implore the Court to understand that even during
9  the consent decree, CPD violence has increased, not decreased.
10  If this occurred in any other country, this would produce deep
11  condemnation and scorn for the country's populations, and
12  nothing has been produced out of that because the story of what
13  we are experiencing is not being told.
14      During this consent decree, there has been no
15  consequence for CPD for the brutality, for these violations of
16  our human rights, and we must then ask, is this consent decree
17  going to be a cover for an illusion of change, or is it going
18  to actually produce change felt on ground by everyday people in
19  Chicago?
20      How many of us have to die?  How many of us have to be
21  beaten?  How many of us have to be tortured?  How many of us
22  have to be ignored before change occurs?  How many of us will
23  be unable to breathe like George Floyd, like so many of us who
24  were pepper sprayed and couldn't breathe at the protest?  How
25  many of us will continue to have to relive this trauma again

1    and again because this fight is not about a choice?  It is

2    about our actual lives. It's about survival.

3         We will continue to be beaten while we are trying to

4    save our lives, but will the Court intervene?  Now is the time

5    for the Court to intervene and be on the side of justice.

6    History is watching our actions closely and will be taking

7    extreme lessons with every step and misstep that is taken in

8    this moment.

9         THE COURT:  Thank you very much.

10        I think No. 20 is in the queue, so I think we can

11   please admit No. 20 to the participant list.

12        We do not actually. I think I saw No. 20's name in

13   there earlier, but I don't see it now.

14        MR. GUILLORY:  I am sorry.  My name is Kobi Guillory.

15   I am with the Chicago Alliance against Racism and Political

16   Suppression and Black Lives Matter Chicago. I was assaulted by

17   CPD twice over the past few months.  The first time was on

18   May 30th at the protest downtown. I was with a large crowd that

19   was kettled into a bridge near Trump Tower.

20        For those who don't know, kettling is when the police

21   barricade a crowd into a very small area and make that area

22   smaller and smaller and smaller, and during that time they give

23   these dispersal orders, but they make it impossible for people

24   to disperse. So that just gives them a chance to brutalize and

25   make mass arrests on protesters.

1       And personally, I was hit with batons multiple times
2   over the course of four hours when it was impossible for me to
3   leave that area.

4       People were being shoved. People were being hit with
5   batons in the head. I saw one person get pepper sprayed by the
6   police. Police were making threats to us, verbal threats. Their
7   badge numbers were covered.  Many were not wearing face masks.
8   And I had marks on my forearms and on my stomach for days after
9   that, after that event.

10      And then on July 17th, I was teargassed at Grant Park,
11  and it was like many people are describing.  I couldn't see.  I
12  couldn't breathe. The tear gas was in my throat. It was burning
13  my arms. My shirt was soaked, my facemask was soaked, and so I
14  was completely discombobulated.

15      And while I was standing there unable to see what was
16  going on, unable to breathe, a police officer shoved me to the
17  ground with a baton and threatened to hit me with it. And the
18  people who helped me were the medics. And I do want to also add
19  that the medics were targeted by CPD as well. People who are
20  identified -- who identify themselves visibly as people who are
21  there to help people, who are there to help keep people safe,
22  were also being targeted by CPD, were also teargassed, also
23  beaten, and also had their bikes stolen by CPD.

24      And one thing that other people have mentioned as well
25  is that all of this is happening during a pandemic. When we

750

1    have had to listen to the City say for months that there is no

2    money for protective equipment for nurses, there's no money for

3    masks for everyone, there's no money to pay for people's

4    housing during one of the worst economic crises we have seen

5    since the Great Depression, but they have money to pay officers

6    overtime so they can brutalize protesters. They have money for

7    tear gas, but there is no money to keep people safe from this

8    virus that is killing predominantly or disproportionately Black

9    and Brown people.

10        So one of the things that was said by the CPD -- I

11   mean by the City's lawyers at the start of this is we need to

12   build trust between the communities and the officers or

13   whatever.  And quite frankly, with all due respect, I think

14   that's bullshit. I think what we need to do is listen to what

15   the people are actually saying. The people are demanding that

16   CPD be defunded. That are demanding CPAC so that we can hold

17   these people responsible for what they are doing to us.

18        The people know how we are going to end this trauma,

19   so we need to listen to the people.  You all need to listen to

20   the people. because the problem is that we don't have the

21   control over the police. We don't have control over our own

22   communities, and that's what we need. We need control. We don't

23   just need to be providing little pieces of info a minute at a

24   time. We need to control the situation. Thank you.

25        THE COURT:  Thank you.  Thank you for your comments.

1           I don't see No. 21.

2           MS. HICKEY:  That's correct, your Honor.  We want to

3    move to No. 22.

4           THE COURT:  I see 22 and 23 in the queue, though.  So

5    if we could please move on to 22 and 23.

6           MS. BAILE:  Hello, can you hear me?  Hello.  My name is

7    Charlotte Baile.  I am 24.  I am a white Jewish woman who works

8    as a restaurant worker and a professional artist.  I have three

9    counts of police brutality that I would like to speak to.

10          The first was on the big protest to protest George

11   Floyd's murder on March 30th downtown.  I was working as a

12   marshal, and I was going to help somebody who had had their

13   pants ripped open by CPD, who were surrounded by six or seven

14   cops.  And I went to go help this person put their pants on and

15   I was shoved in the chest with a baton, shoved to the ground

16   and I hit my neck and back, among other things, among being

17   screamed at and not really given any orders or directions, just

18   being screamed at.

19          The second was on June 1st, I was caught at the Uptown

20   at the Wilson Red Line stop.  I was one of about seven or eight

21   white people.  There were about 40 or 50 Black people.  There

22   were about 150 riot cops.

23          When the clock struck 9:00, the riot cops. charged us.

24   There was no order of dispersal.  There was just mayhem.

25   instantly.  I remember crouching over a 60-year-old Black man

1  who they were kicking and beating with a baton, maybe four or

2  five cops at a time beating this man. And when I went over by

3  him, they hit me on the back of my neck, my back and my legs,

4  and there was another Black man next to him who kept saying, "I

5  didn't do anything wrong. I didn't do anything wrong," over and

6  over again.

7          Later, I would find my friend who had been beaten over

8  the head multiple times and had her glasses broken into her

9  scalp and I had to pick glass shards out of her head before she

10  went to the hospital for a concussion.  We found our other

11  friend who had been beaten so badly he couldn't walk and had a

12  gash on his leg that would not stop bleeding, and he passed out

13  from blood loss into my arms before he went to the hospital.

14          And finally, I want to talk about July 17th. I was at

15  the protest in order to support solidarity, and also to put my

16  body between CPD and Black and Brown protesters.  And I was

17  gassed three separate times, which had an immediate effect on

18  me.  My throat closed up immediately. There was no coughing. It

19  was -- my throat closed instantly. and I began to choke and

20  cough in order to start breathing again.  And I couldn't.

21          And I had to crawl on the ground and grab people's

22  legs in order for them to carry me to the medic encampment

23  which then got gassed. After I got out of the medical

24  encampment that got gassed, I pulled contacts from somebody's

25  eyes who had been pepper sprayed in the face and then I turned

1    around and saw somebody bleeding from the eyes because they had

2    been pepper sprayed so badly.

3           I cannot ever forget these events. This trauma will

4    never go away.  And I have only started experiencing this two

5    months ago. This is a drop in the ocean to what other people

6    have happen to them every single day.

7           Thank you so much for your time.

8           THE COURT:  Before you go, can I ask your name and

9    what number you were?  I am sorry.  It sounds like that might

10   have been No. 24.

11      (No audible response from the speaker.)

12          MS. HICKEY:  I believe she was No. 22 and her name was

13   Charlotte Baile. It's the wrong name under 22 that you have on

14   your list, your Honor.  I apologize.

15          And I believe No. 23 is ready.

16          THE COURT:  Okay. Very good. Thank you.

17          So No. 23 then. Thank you.

18          No. 23.

19          MS. WILLIAMS:  Hi. My name is Katie Williams. I am 37

20   years old. I am a farmer and I am a student.

21          I'm going to speak mostly about my experiences at the

22   protest on July 17th that ended up at Grant Park.  I showed up

23   to that protest in, like, a silk tank top, some cotton shorts,

24   with a backpack with a book in it.  I had no intention -- I had

25   no idea what was going to go on. I didn't know where the police

1   were. I didn't know what the protesters were planning on doing,

2   and I wasn't prepared to protect myself in any way from

3   anybody.

4           It became obvious that the protesters were going to be

5   able to get to the statues when they began to throw cans of

6   water at the police. The police obviously weren't going to be

7   able to stand there anymore and things were definitely going to

8   get violent at that point.  So when the police left -- left the

9   statue and left it to the protesters, I was on the front line

10  of the line of bikes that formed so that the people who were

11  inside trying to take down the statue were protected, or were

12  at least distanced from the police.

13          Everybody on the line, everybody on the outside,

14  everybody that was facing the police, everybody that was facing

15  all of the police violence that day had done nothing wrong.

16  They hadn't thrown a single can of water. They had not thrown a

17  firework. None of them even knew what was going on.  I can

18  promise you that.

19          Everyone next to me was wearing cotton. They brought

20  their bike.  It's the most important thing probably to them in

21  the week. They just had silly little backpacks on. They were

22  just out there trying to convince the City that standing behind

23  a genocidal rapist is not the sort of symbol we want in the

24  middle of our city.

25          So, anyway, while in the front lines, I got hit in the

1   head with a baton when I was trying to get a police officer to

2   stop hitting somebody on the ground. A number of police

3   officers were dragging another person by their hair.  Their

4   hair was getting ripped out. Again, I just tried to ask the

5   police officers to stop. They shoved me.  I got hit again, that

6   time across the chest. I got dragged by the police. through --

7   they tried to steal my bicycle.  I held onto my bicycle harder

8   than they thought I was able to which made them very angry and

9   made a number of them jump on top of me and try to hit me and

10  get the bike from me.

11         The most painful thing was holding onto the bicycle --

12  well, the two things were the police hitting me with the baton.

13  I still can't -- I don't have full movement of this wrist and

14  hand from where they struck me with the baton.  And then the

15  pepper spray which burned my skin for over 24 hours.

16         So I mean, I guess nobody has talked about so far the

17  fact that the protesters did throw water cans. at the police

18  and this is what -- oh, I've got to go, but I just have to say

19  they were mad at those protesters and they didn't care to seek

20  any sort of justice for them through any sort of means.  And

21  instead, they decided to beat their way through them, through a

22  bunch of peaceful protesters.

23         THE COURT:  Thank you for your comments.

24         MS. HICKEY:  Your Honor --

25         THE COURT:  By my count -- I don't see 24, but we're

1     on -- 25 through 28 I do see. Is that what you have, Maggie?

2               MS. HICKEY:  That's correct, your Honor.

3               THE COURT:  So if we can move through 25, 26, 27 and

4     28, and then we'll see where we stand with respect to the

5     3 o'clock break. Okay. So thank you.

6               MS. HICKEY:  Thank you, your Honor.

7               MR. KARL:  Hello, everyone. Thank you.  My name is

8     Elliott Karl. I am 30 years old, a fourth generation Chicagoan.

9     A recent master's of public policy graduate from the University

10    of Chicago. I have been active in the movement for Black lives

11    since 2015, mostly serving in security roles where I seek to

12    protect peaceful protestors from the police and the conflicts

13    that can arise between the two of them. I am trained in

14    de-escalation and self-defense only.

15              Two years ago I returned to Chicago from Oakland,

16    California. In California, I often saw officers intimidate and

17    invoke conflict with protesters, especially when it involved

18    racism. and police violence.  And that's not a surprise. to me.

19              I have, however, been really surprised on how things

20    have rolled out in my home city, and especially on May 30th and

21    July 17th.

22              You see, on May 30th, I was surprised to see a 6-foot,

23    250-pound man, white police officer squeeze his way between a

24    building and crowd of people and crack a baton on the head of a

25    five-foot five woman of color.  I was surprised to see how

1    blood squirts from someone's head with every heartbeat. I was

2    surprised because it didn't need to happen and no one was made

3    more safe.

4         I was later surprised when they shut down public

5    transportation. and raised bridges.  I was surprised it took me

6    almost two hours running from gangs of police officers downtown

7    to get back to my bike. so that I could get home.  I was

8    surprised because it didn't have to happen.

9         I was surprised because officers routinely pushed

10   their bodies up against me in the security roles.  They

11   whispered into my ear telling me to be smart, watch out, get a

12   real job, and so much more violent, homophobic things. And

13   these are fellow civil servants who are confused about what

14   commitment to community looks like.

15        And on July 17th during the Columbus statue protest, I

16   was especially surprised when I was beaten by the Chicago

17   police without orders to disperse, without a warning, and

18   without a route to disperse into. I was standing with other

19   bike security volunteers forming a barrier between a piece of

20   property and the people they are sworn to. protect.

21        I was surprised when the mob rushed us -- the mob of

22   cops rushed us.  We couldn't move our bikes fast enough. I was

23   surprised when they ran with clubs drawn in their hands, our

24   hands in the air. I watched groups of police officers, five

25   people deep, beat people who were in fetal positions under

1    their bikes.

2          I was surprised when I was sprayed with pepper spray

3    in the eyes from two feat away. I was blinded.  I couldn't see.

4    I couldn't get away fast enough or I would have complied.  I

5    would have complied. I couldn't get away. We couldn't get away.

6    There was no amount of washing that would get the burn off of

7    my body five hours later.

8          I am surprised by the PTSD. I am surprised by how long

9    it took the bruises to heal.  I am surprised that we were not

10   able to keep us safer, although we tried and we tried.

11         I am a white man. I am a civil servant.  And I am only

12   sometimes treated like a BLM protester.  But this is a movement

13   being lead by Black and Brown youth. And if this could happen

14   to someone like me, what will happen to them?  Who is keeping

15   them safe?  It is not the police.

16         I will not be surprised again.  We must defund and

17   abolish the Chicago Police Department.  Thank you.

18         THE COURT:  Thank you.  We have No. 26, then, please.

19         MR. ANDERSON:  Hi.  I am Tim Anderson. I am a white

20   man in my late 30s. I do analytics consulting for a living.

21         I attended the rally on July 17th in solidarity with

22   the Black and Indigenous youth organizers. The events began

23   with joyful performances. When I arrived at the Columbus statue

24   with my bike, people had surrounded the statue and there were

25   no police. I stopped on the hedge-covered hill leading up to

1   Roosevelt Road. Four minutes later, I noticed a young organizer
2   on Roosevelt.  An officer had knocked out her front teeth and
3   her face was bloodied.

4   Minutes later, a mob of officers rushed down the hill.
5   I froze, expecting professionalism.  Those around the statue
6   linked arms for safety.  I slowly and calmly moved towards the
7   officers and stopped, wanting to remain safely. but unsure how.
8   The officers' angry taunts immediately escalated into
9   indiscriminate use of shoves, batons, and pepper spray. For the
10  moment I was spared as officers rushed to join in beating
11  someone who they had knocked to the ground and dragged away
12  from the base of the statue.

13  Suddenly an officer shoved me.  I moved closer to the
14  street but was soon confronted by another. Seconds later, he
15  pushed me. I flew backward receiving bruises and abrasions on
16  me knees and arms, and he threw my bike into the street. I
17  collected it and spent the next half hour observing more
18  abuses, including the arrest of a legal observer and the
19  confiscation of hundreds of bikes.

20  My heart raced from the trauma for hours. I will be
21  all right, but not all Chicagoans are.  A few years ago, I and
22  many of my fellow professionals watched as President Obama
23  highlighted young community organizers. Later we marched with
24  the March for Our Lives in solidarity with Black and Brown
25  youth fighting gun violence, police disinvestment in their

1    communities.  Their stakes are much higher than mine.

2          Last Saturday, I saw images of many of those same

3    young organizers, including one who led community outreach for

4    Mayor Lightfoot, run for their lives from a police riot and

5    kettling tactics led by Superintendent Brown clad in riot gear.

6    They seemed to placate the presence of the Chicagoland Chamber

7    of Commerce and other property management who invoked white

8    flight earlier in the week if the mayor would not support them.

9          The next morning, CPD released a PR campaign

10   criminalizing the protesters' exercise of First Amendment

11   rights in efforts to protect each other in contrast to a failed

12   action earlier in the day. These are tragic repetitions of

13   racist processes foundational to policing and won't be

14   corrected until local budgets get federal relief and

15   communities take control of the police. Thank you.

16          THE COURT:  Thank you very much.

17          I think we are at No. 27, please.

18          MS. BRAUN:  Hello. My name is -- can you all hear me?

19          THE COURT:  Yes, we can. Thank you.

20          MS. BRAUN:  Yeah. Okay. My name is Carly Ann Braun. I

21   am 27 years old. I use (inaudible) she/her pronouns. The first

22   incident of police assault I want to talk about happened in

23   Grant Park on July 17, 2020, in the late afternoon, early

24   evening. I was linked with another protester and a cop shoved

25   me to the ground. From the ground I saw my friend, who was

1　clearly marked as a medic, likewise shoved down.

2　　　Then the cop who had just shoved me to the ground

3　forcibly pulled me up. He grabbed my left bicep and forcefully

4　pulled me to my feet.  I turned to get my bearings and put my

5　hands in the air. When another officer in a dark uniform about

6　20 feet from me sprayed a rust-colored liquid at the right side

7　of my face, burning both my eyes, my cheek, and most notably

8　the inside of my ear, which was very, very painful.

9　　　I turned away and started walking up the hill with a

10　wet mask covering my mouth and my nose and pepper spray in my

11　eyes. I was disoriented and trying to fend off the panic,

12　trying to breathe. I was headed to the street away from the

13　statue when I realized I was about 10 feet away from another

14　police officer.  And he was standing at the top of a hill

15　yelling right at me.  Mostly blinded, partially deaf, and

16　struggling to breathe, it was too late when I realized the cop

17　was telling me to back up, and he pushed me hard in the chest.

18　I was very confused because wasn't the point of macing me to

19　get me to leave?

20　　　When I didn't move fast enough, the officer pushed me

21　again in the chest, this time seemingly as hard as he could. It

22　was such a hard push I rolled down the hill. Luckily my friends

23　found me, washed my eyes, washed my face, and I could see well

24　enough to watch as we retreated with blue helmeted police

25　officers spraying people all around me.

1    As my friends and I were leaving, I was shocked by the

2    attitude of the police officers. As a white person who is

3    generally treated with a lot respect from police officers,

4    these police officers were extremely emotionally escalated and

5    behaved unprofessionally in a way that I could never behave in

6    my job without receiving serious reprimand.

7    I remember seeing one particularly cruel officer

8    telling us that we were stupid.  And he very notably had a

9    Black-and-blue-striped band stretched across his badge covering

10   his ID number.

11   Secondly, on August 16th I attended a protest at

12   McKinley Park at 2:00 p.m.  At the end of the beautiful

13   family-friendly rally, we marched on to Western, where police

14   swarmed around us. One officer in a white shirt was yelling at

15   people to get off the street.  He grabbed a guy right next to

16   me by the elbows, put him in handcuffs saying, "You just walked

17   right past me. You're getting cuffed," and put him in the back

18   of a police car.

19   I was incredibly shaken by these experiences because

20   my whole life until now I was told that police were supposed to

21   keep me safe, but now I know that they are perfectly willing to

22   violate my constitutional rights and meet me and other

23   protestors with excessive force and escalate violence.

24   THE COURT:  Thank you very much.

25   I think No. 28 is in the queue as well. So if we could

63

1    please move on to No. 28.

2         MR. GRAHAM:  Hello. Thank you for this opportunity to

3    speak. And thank you for the many people sharing their

4    harrowing stories with you.

5         My name is Rick Graham and I am here representing the

6    Northwest-Siders for Racial Equity and Justice. Our mission is

7    to educate, engage and mobilize northwest city residents, city

8    and suburbs alike, in order to ensure rapid and full

9    implementation of the Chicago police consent decree and build

10   equity and wide avenues for community. voices and policing.

11   Our purpose is to ensure that police operations are grounded in

12   racial equity and that the police are just in their conduct,

13   and that's difficult right now.

14        As a community-based organization, we work directly

15   with the northwest-side citizens and civics who report back to

16   our communities on district progress. We will also coordinate

17   with other local groups across the city, learning, sharing our

18   findings, and lending our voices when needed, all with the goal

19   of ensuring that progress being made by CPD on the consent

20   decree is comprehensive in scope, citywide in its reach, and

21   most critically is equitable toward all communities.

22        To the last point, there was a march in my northwest.

23   side in support of the murder of George Floyd and in support of

24   the Black Lives Matter movement. CPD officers were on hand, and

25   over a thousand people. marched.  The officers were not

1    carrying any batons in their hands.  There were no helmets, no

2    shields at their arms.  Some smiled.  Most responded when

3    greeted.  And I can't help contrast our experience of policing

4    with what I have seen on the news, what you are hearing today,

5    and doubtless will hear from others in other communities over

6    these two days.

7           At the very least, Northwest-Siders for Racial Equity

8    and Justice expect that the monitors of this decree and the

9    Court will not allow this moment to pass. We expect that

10   whatever enforcement options that exist in the decree will be

11   exercised to ensure that changes are made, that all voices are

12   heard, and that people across this city can experience policing

13   that is fair and equitable and police officers will both serve

14   and protect in a just manner.

15          We expect this decree to result in operational

16   policies that are written, built into officer training, and

17   enforced to promote racial equity. And we expect a citywide

18   citizen-led oversight process that will be codified in law in

19   order to survive changes in leadership.

20          Thank you.

21          THE COURT:  Thank you very much for your comments.

22          By my count, we are -- of the next five, we only have

23   No. 30 in the attendee list at the moment. Do you have the

24   same, Maggie?

25          MS. HICKEY:  I do. No. 30 is ready. I do not see

1   No. 29. I haven't counted ahead as fast as your Honor.  I'm

2   going through it.

3             THE COURT:  We'll move on to No. 30 if we can, please,

4   and we'll keep putting the other folks who we're skipping into

5   the queue for the second call.

6             So Speaker No. 30 can go ahead, please.

7             Hello, can you hear me?

8             THE COURT:  Yes.  Thank you.

9             MS. ANTUNEZ:  My name is Adriana Antunez.  I'm a

10  resident of Chicago, a college student, and a trained advocate

11  for survivors. Let's get into it. We came together on July 17th

12  in solidarity with Black, Brown, Indigenous folks who are being

13  brutalized by CPD and oppressed by the racist system we live

14  under. It's a righteous act of protest to tear down symbols of

15  genocide and white supremacy, especially since our mayor

16  refused to listen to the people of Chicago.

17            On that day, CPD did what it does best. They protected

18  property over people. CPD beat and brutalized Black, Brown, and

19  Indigenous bodies in order to protect a statue of a rapist, a

20  tyrant, a mass murderer.  That's what CPD protected. CPD does

21  not and do not protect the people of Chicago.  The people of

22  Chicago have to protect themselves from CPD.

23            CPD already had reclaimed ground by the statue when

24  they further terrorized protesters.  I was forced to watch a

25  fellow protester, a friend, be beaten right in front of me.

1    His hands were in the air.  He wasn't resisting.  CPD still

2    beat him. They left bruises on his back.  His knee was so

3    bloody, the blood soaked through his pant leg.

4            Then they advanced.  An officer dug his baton into my

5    chest, ignoring my cries that he was touching my chest, he was

6    touching my breast.  His solution for that was to shove his

7    baton against my gut before proceeding to shove it into my

8    chest once again.  I felt his fist push into my breasts; I felt

9    his baton press into my breasts.  Then they hosed us down with

10   pepper spray as if we were rabid dogs, when in fact they were.

11   CPD pepper sprayed protesters, medics, legal observers during a

12   pandemic that targets (inaudible).  Officers weren't even

13   wearing masks.

14           I am 22 years old and I now know the shape and color

15   of a police can of pepper spray.  An officer sprayed us from

16   3 feet in front of us.  We were choking on the poison in the

17   air. People were writhing in the pain. I couldn't help them.

18   CPD refused to let us help them. We were tripping over each

19   other and ourselves. trying to get away from them.

20           We were forced by CPD to jump over concrete barriers.

21   We were shoved by CPD, and when we fell due to their force,

22   they towered over us and shouted at us to keep moving.

23           I am five-foot two, 105 pounds. CPD left bruises on my

24   breasts. I had to walk around for days with bruises on my

25   breast.  The pain of being pepper sprayed lasted over five

1    hours despite the multiple showers I took. I threw up in the

2    shower due to being gassed. It was only after the pain subsided

3    from being pepper sprayed that I noticed bruises on my legs,

4    how my knees were scratched in trying to get away from them.

5         And on August 15th, nearly a month after the display

6    of police officer brutality, police in riot gear once again

7    gassed and severely injured civilians. Is this who you want in

8    your schools?  You cannot reform your way out of this. Black

9    lives matter.  Defund CPD. Decolonize Chicago.

10        And to the lawyers of the city that stated that we

11   have to get along with these pigs who beat and brutalize young

12   people, screw you. Fuck 12. I yield my time.

13        THE COURT:  Okay. Thank you.

14        Maggie, I don't know if you have cross-checked me, but

15   I am up to 35 as the next one I see in the participant list.

16        MS. HICKEY:  That's what I see your Honor.

17        THE COURT:  Then let's admit participant 35 into the

18   participant room please.

19        MR. DICOLA:  Can you hear me, your Honor?

20        THE COURT:  Yes.  Thank you.  We can.

21        MR. DICOLA:  Good afternoon, your Honor.  My name is

22   Joseph DiCola, and I am a legal-aid attorney in Chicago and a

23   member of National Lawyers Guild.  And -- I work part-time at

24   the NLG in Chicago as the legal observer administrator.

25        Legal observers, or LOs, are typically lawyers, law

1   students, or legal workers.  Legal observers are volunteers who
2   have completed an attorney-supervised training to observe the
3   activities of law enforcement in relation to demonstrators
4   exercising their First Amendment rights. This includes
5   documenting any arrests, use of force, intimidating display of
6   force, denial of access to public space, and any other behavior
7   that tends to restrict demonstrators' ability to. express their
8   political views.
9          When the arrests occur, LOs gather names and contact
10  information to allow attorneys and loved ones to follow up with
11  CPD about the arrest. LOs sometimes serve as witnesses in the
12  criminal or civil proceedings that arise from arrests and
13  excessive force at protests.
14         We wear bright green hats that say Lawyer National
15  Guilt Observers.  NLG Chicago LOs have observed in all about 60
16  protests since May 30th.  LOs have observed CPD using force not
17  in self-defense.  And I will also note that the majority of
18  officers refused to wear masks to prevent the spread of
19  COVID-19.
20         On May 30th, police in riot gear chased protestors
21  through the streets in multiple locations and times, grabbing
22  and beating people at random with fists and batons.  A young
23  teenager was seized and beaten by police for no reason on the
24  Wabash bridge. LOs saw police drive cars through crowds.  And
25  one of the LOs was beaten. and arrested.

1    On May 31st, we observed a team of SWAT officers exit

2    their vehicle, pepper spray LOs and about seven demonstrators

3    without saying a word, and then return to the vehicle and drive

4    away.  In Grant Park, dozens of officers in riot gear attacked

5    a crowd of protesters causing many injuries and stole bikes

6    from protesters. CPD targeted the LOs with pepper spray as LOs

7    gathered to get arrestee information, and intentionally knocked

8    an LO's notebook from their hands and blocked them from

9    retrieving it.

10   On July 18th in front of the mayor's house, CPD

11   officers drove a vehicle onto the sidewalk, striking

12   demonstrators, bending a bicycle in half, and dislodging a

13   trash can bolted to the ground.

14   On August 15th, I was an LO at a protest downtown.

15   CPD responded with hundreds of police in riot gear to a

16   relatively small march, composed mainly of Black and Latin

17   young people. Police used pepper spray on protesters, LOs, and

18   medics. CPD was yelling "forward march," as they repeatedly

19   advanced on the group from Michigan and Wacker to LaSalle and

20   Adams.

21   CPD rushed the crowd repeatedly and attacked the

22   medics.  After driving the people onto LaSalle, CPD blocked

23   Adams and Monroe and began beating and arresting people who had

24   not outrun the rushing line of riot police. I never heard any

25   dispersal orders issued, and CPD did not let me and two other

1   attorney LOs leave upon our request.

2          We were detained for 10 to 15 minutes in the kettle.

3   CPD insisted that we empty our bags and leave our property

4   behind before they permitted us to leave.  And they seized a

5   green hat that a legal observer had.  LOs observed that

6   Superintendent Brown was present on LaSalle while the kettle

7   was in effect.

8          Our LOs' experiences demonstrate the City's pattern of

9   disregarding the consent decree and the First Amendment rights

10  of protesters.  Based on the oppression LOs have witnessed, CPD

11  wishes to silence protesters' critiquing of the police budget

12  and the institution of policing.  Thank you very much, your

13  Honor.

14         THE COURT:  Okay.  Thank you, sir.

15         Let's see.  Let's do one more speaker, and then we'll

16  do the break because I see the next court reporter has walked

17  into the courtroom to set up her equipment.  And it takes a bit

18  of time to shift gears here, so we will do one more before the

19  break.

20         I didn't see speaker 36 in the list here, but I do see

21  speaker 37. So let's move on to 37, please, and then we'll take

22  the break.  Okay?

23      (Slight pause.)

24         Now that I look, I thought I saw 37 -- go ahead.

25         MS. BALL:  Okay. Good afternoon, your Honor.  Thank

71

1  you everyone for being here today. My name is Lizzy Ball. I am

2  speaking as a private citizen and resident of Chicago, 26th

3  Ward.

4         When I first signed up to speak at this session a long

5  week ago, I had planned to talk about how as a social worker

6  and a mental healthcare provider, I have witnessed the toll of

7  police terror on our communities, especially on Black and

8  indigenous people, people of color, LBGTQ people, and people

9  with disabilities, whom CPD routinely target, harm, and

10 terrorize.  However, I now can speak firsthand to the horrors

11 of police brutality. Please take care that what I am about to

12 say is disturbing.

13        On Saturday, August 15th, a few days ago, while I was

14 riding my bike alongside a youth-led protest in the Loop who

15 were speaking out against police brutality, I was surprised and

16 attacked from behind, beaten off my bike and to the ground by

17 several grown men in riot gear with batons and violently

18 arrested. Very few wore masks.  My bike was stolen and my

19 backpack was destroyed. Rather than being read my rights,

20 several cops shouted in my face without masks, "You lost."

21        I spent the night locked up enduring further terror,

22 dehumanization, and the denial of basic human rights. During

23 the 14 hours I was detained -- 12 of which were documented by

24 the police -- I was caged by -- with several wonderful people

25 who had experienced similar systematic terror and violence by

1    the CPD, including nurses, journalists, and very young

2    organizers.

3         We were covered in pepper spray. Unable to socially

4    distance, bruised, battered, and yet we remained strong by

5    supporting each other. I trust my community to protect me. I do

6    not and never will trust the police to protect me or my loved

7    ones.  "You lost," the cop yelled.  This is not a game for

8    communities who live in terror and trauma from the police.

9         We can all see clear as day that CPD has no intent of

10   honoring any consent decree or any letter of the law.  We must

11   stop this overfunded, unchecked violent gang immediately. We

12   must take action against this violence. I say this from a place

13   of love.  The healing begins only by condemning and defunding.

14   CPD.  Thank you.  And free Mohawk.

15        THE COURT:  Thank you very much. So we will resume at

16   3:15. And by my count, we have 15 people out of the first 37

17   who were skipped over, so we'll go starting with No. 38.  We'll

18   finish up to 45.  And then we'll just recall, kind of as if we

19   were in a status call, set of status hearings, we'll just

20   recall the cases one after the other. And hopefully those

21   individuals who were skipped over earlier today will be on the

22   line starting at 3:15 and we'll march through until everybody

23   has been given a second opportunity today.

24        So with that I thank everybody for your attention and

25   your patience.  And right at 3:15 we'll start up again. So

1    thank you, everybody.

2         (Recess taken from 3:00 to 3:15 P.M.)

1    THE COURT:  Okay.  Good afternoon, everybody.  I just

2    want to confirm with the Monitor that she is ready to

3    proceed.

4         I can see you.  Are you ready to proceed?

5         MS. HICKEY:  I am ready, your Honor.  I believe we

6    are on No. 38.

7         THE COURT:  Okay.  Very good.

8         And Inspector General Ferguson, are you there too?

9         MR. FERGUSON:  I am.

10    THE COURT:  Okay.  Excellent.  And you're ready to

11   proceed as well?

12        MR. FERGUSON:  Yes, I am.  Thank you, Judge.

13        THE COURT:  Okay.  Wonderful.  Before we proceed, I

14   just -- I am not a producer of social media at all.  I don't

15   know how to Tweet, I don't know how to post, but I know many

16   people do.  And I just want to remind everybody that this is an

17   official court proceeding, and the rules about recording court

18   proceedings apply.  So I just want to remind everybody of that,

19   and that's not permitted because this is a court proceeding.

20        And with that, my recollection, and I think you just

21   said this, is we're up to 38; is that right?

22        MS. HICKEY:  That's correct, your Honor, No. 38.

23        THE COURT:  Okay.  Very good.  And I see that person

24   is in the queue here.  So if we could move on to Speaker

25   No. 38, that would be most appreciated.  Thank you.

1         MS. CARBON: Good afternoon.  Can everyone hear me?

2         THE COURT:  Yes, thank you, we can hear you fine.

3  Thank you very much.

4         MS. CARBON:  Thank you very much.  Your Honor, I wish

5  to thank you, Ms. Hickey, the Independent Monitoring Team, and

6  all the people behind the scenes working for this opportunity

7  to allow me to participate in this listening session.

8         My name is Suzanne Carbon.  I live in the 39th Ward.

9  I am a private citizen.  Hearing the testimonies today of those

10  violated by those who should be protecting them is

11  heartbreaking.

12         I approach this opportunity to address those in power

13  to offer some practical solutions.  In reading through the

14  consent decree, the PBPA lieutenant contract, and the

15  monitoring plans, I was struck again and again by the lack of

16  accountability and consequences for misconduct and lack of

17  implementation.  The current system is clearly broken, which we

18  all know.  What I'd like to do is offer two ideas that may help

19  bolster accountability and would help rebuild community trust.

20         One:  Today, when CPD police officers are sued, they

21  do not pay anything from their own pockets to resolve the

22  claims.  I believe this financial -- financial insulation from

23  accountability of the consequences of their actions is due to

24  indemnification.  Chicago and other cities and counties across

25  the country have these -- I'm having a hard time with the

1    word -- indemnification policies, which means the city pays

2    defense attorneys, costs, and any settlements or judgments that

3    arise from officer actions on the job.

4           While the agreement with Chicago and the CPD include

5    some exceptions for willful or egregious misbehavior, it has

6    really been the general rule not to indemnify -- it has been

7    the general rule not -- the exception to indemnify officers,

8    even though there is reasonable basis to decline to do so.

9           Since the city allocates the money to the department

10   during the annual budgeting process, coverage comes from

11   central funds.  This central fund then picks up and fights the

12   tab for misconduct that, really, you and me, the taxpayers,

13   pick up -- pay for.

14          In doing some research, I see the residents have

15   bankrolled about 500 million in payouts, which, by the way, is

16   about what our budget shortfall is.  This arrangement fails to

17   achieve any kind of deterrence goals or accountability for

18   officers.

19          I suggest a better remedy for accountability would be

20   for police officers to carry professional liability insurance.

21   The city would pay the basic insurance premium, but an

22   officer's premium would increase due to lawsuits or other risky

23   behavior, making the officer responsible for paying the

24   difference.  This approach would allow plaintiffs to recover

25   damages when their rights were violated, and these payoffs

1    would have financial consequences for the officer, making them
2    have skin-in-the-game and some accountability.  Since the PBPA
3    contracts and political pressures often make it very difficult
4    to fire officers, incorporating internal financial pressures
5    might convince poorly performing officers they should choose a
6    different line of work.
7            Further, I implore the monitoring team to consider
8    having Chicago and its municipal liability insurers consider
9    conditioning immunity on the CPD adopting the consent decree
10   reforms you're working so hard to implement.  A benefit for CPD
11   on this approach could be a reduced premiums for adoption and
12   measured decreases in your consent benchmarks.  Additionally,
13   this data could be used to inform training, policies,
14   supervision and disciplinary decisions moving forward.
15           Lastly, I think another way to incentivize internal
16   compliance would be to make police testimony inadmissible in
17   court without body camera footage to support assertions.  Video
18   footage camera provides complete, concrete evidence of a police
19   encounter without relying entirely on the police report and the
20   officer's memory to help -- and it would help defense lawyers
21   understand all the details of a police encounter and possibly
22   clear up any discrepancies in favor of their client.
23           I hope video-recorded -- I hope video, recorded from
24   police body cameras, are also being used to train new and
25   existing officers on how -- what to do -- on what to do and not

1    to do during difficult encounters with the public.

2              I thank you for your time, and I yield my time if I

3    have any remaining.

4              THE COURT:  Great.  Thank you very much.  I

5    appreciate it.

6              MS. CARBON:  Thank you.

7              THE COURT: In looking at the list here, I think the

8    next speaker who is in the queue here is No. 41.

9              Is that what you have as well, Maggie?

10             MS. HICKEY:  That's correct, your Honor.

11             THE COURT:  Okay.  Very good.  So if we could have

12   Speaker No. 41, please.

13             MR. RODRIGUEZ:  Good afternoon, your Honor.  My name

14   is Cruz Rodriguez, and I am a second year law student at Loyola

15   University Chicago School of Law.

16             I was a participant in what started off as a peaceful

17   protest on Saturday, May 30th, in response to the murder of

18   George Floyd.  The peacefulness was disrupted when CPD showed

19   up, ready to violently fight us.  It felt like we were enemies

20   and they were a military force sent to eliminate us.

21             At around 4:30 PM, I made my way to State and

22   Madison, where there was a heavy police presence at the

23   intersection.  They all, in riot gear, circled around a CPD

24   vehicle used to transport arrestees, facing protesters with

25   their batons in hand. I was walking east on Madison, where I

1    came to see two officers who did not have their badge numbers

2    or name tags on.  They also did not have their body cameras

3    under uniform.  I approached and asked if they could identify

4    their badge number or which precinct they were from.  One

5    laughed at me, while the other raised his baton at me to back

6    up.  One told me to "F" off and another spit in my direction.

7            At the same intersection at 4:37 PM, I witnessed two

8    white-shirt police officers and three blue-uniformed ones run

9    over to a stagnant car on the southwest side at the

10   intersection.  I was in front of the vehicle recording.  I

11   heard one officer tell the young Latino girl who was driving to

12   turn off her vehicle.  Four seconds later, he reached into her

13   window, opened her car door and pulled her out of the vehicle

14   from her left wrist.  He immediately put his hands under her

15   shoulders and pulled her arms up very aggressively, arresting

16   her.  This all happened in a time span of 20 seconds from the

17   time he ran up to the vehicle.  And she was a 17-year-old

18   minor.

19           At 6:18 PM, I made my way north on State Street and

20   Randolph after what seemed to be 100 officers began to move

21   north behind me with their batons out.  When I made it slightly

22   north of the intersection, they ran towards us and began

23   hitting and arresting everyone in sight.  I recorded as a woman

24   was arrested by two officers from behind, one being a

25   white-shirt police officer.  She was not facing them, she was

1    looking down on her phone when they pulled her to the ground by

2    her ponytail from behind.  Then they flipped her over onto the

3    ground facing her down by the ponytail once again.  Three more

4    officers ran over.  One kicked her on the right hip.

5           Throughout the summer, I experienced much more

6    disrespect and abuse from CPD officers at other protests,

7    including being told -- including being sexually harassed and

8    saying, quote, "Nice short-shorts, faggot," end quote, by an

9    officer in a passing CPD vehicle while I was on the sidewalk.

10          As a legal professional, I cannot see how the city is

11   proud of the supposed professionalism of CPD.  CPD attempts to

12   justify these responses by mentioning the destruction of

13   private party.  But what I remember from my first year of law

14   school is that the law values personal rights over property

15   rights.  These deadly and violent responses from officers are

16   unjustified.

17          And that's all I have for today.  Thank you for your

18   time, your Honor.

19          THE COURT:  Thank you for yours as well.

20          I think the other two I see in the queue here are 43

21   and 45.  Is that right?  Is that what you have as well?

22          MS. HICKEY:  That's correct, your Honor.

23          THE COURT:  Okay, great.  So we can move on to

24   No. 43, please.

25          MR. MICHAEL:  Hi.  Thank you, your Honor.  My name is

1   Cody Michael.  I'm a resident of the Buena Park neighborhood
2   here in Chicago, Illinois.

3          On May 30th of this year, I was attending one of the
4   many protests in downtown Chicago.  My friend, Kyle Ryan, a
5   fellow Buena Park resident, attended with me.

6          While I witnessed several acts of minor civil
7   disobedience, there was nothing I witnessed in the crowd around
8   me that could have justified what came next.  After marching in
9   the streets for several blocks, without incident, near the
10  intersection of Jackson and Dearborn, a battalion of 20 to 40
11  CPD officers in full riot gear marched through the group of
12  protesters to engage in what I now know is called kettling.
13  After sectioning us off from the larger march ahead of us, they
14  blocked the intersection and formed a circle.  This is when
15  tensions escalated.

16         There was a young woman of color standing right next
17  to us who was fully exercising her right to free speech with an
18  officer who was staring her down.  After a protester on the
19  other side of the intersection threw a water bottle into the
20  middle of the police circle, with seemingly no other
21  provocation, this officer, who I now know was Officer Hector
22  Morales, Badge No. 13068, proceeded to beat this woman right in
23  front of our eyes.  She was young, maybe 5'3", 120 pounds
24  soaking wet.  My friend, Mr. Ryan, jumped in to defend the girl
25  and put his body between them.  He was met with several billy

1    club hits and got pushed over a Divvy bike that was left in the
2    streets, probably because our mayor ordered them shut down.
3         After watching Officer Morales beat this woman and
4    take down my best friend, he then turned towards me, club
5    raised.  I will never forget the look of rage in his eyes as he
6    turned towards me.  By the way, I was raised I stand, don't
7    sit, in the face of injustice.  I'll fully admit, I dropped my
8    protest sign and ran towards him at this point, and I paid the
9    price for it.  Officer Morales proceeded to beat me so hard his
10   club broke.  This attack happened at exactly 3:32 PM.  I know
11   this because the attack that broke his baton also destroyed my
12   wristwatch.
13        After Officer Morales broke his baton on me, he was
14   whisked away into the crowd of CPD, and the situation
15   de-escalated.  The woman, Mr. Ryan, and myself were neither
16   arrested for whatever conduct justified our beating, nor were
17   we offered any medical attention.
18        I would also like to note the majority of the CPD
19   officers I witnessed were not wearing face masks at this
20   protest and most of the others I attended.  I also witnessed
21   numerous officers with covered badge numbers and without body
22   cams or had their body cams turned off when they were obviously
23   on duty.
24        Mr. Ryan and I sustained minor injuries, and I'm glad
25   to report that we are okay.  I know, and I've heard today, that

1  most people of color are not so lucky.  I'm not here to suggest
2  this for myself, I'm here because the City of Chicago deserves
3  better.  I refuse, as a resident of this city and this country,
4  to have my tax dollars fund my own beating in the street and
5  the systemic beating and murder of Black people and other
6  minorities.  I do not believe that any amount of reforms, all
7  of which have been tried and so far have failed in every city
8  and town that has even attempted, are sufficient for the CPD.
9  I believe that the CPD should be dismantled and rebuilt from
10 the ground up, the majority of their multibillion-dollar budget
11 redistributed to alternative, nonviolent solutions and
12 community investment.  Lori Lightfoot and CPD leadership have
13 proven to me, far beyond a reasonable doubt, that they are
14 incapable of serving and protecting our great city.  Thank you.
15          THE COURT:  Thank you very much.
16          I think the only one speaker left in the queue is
17 No. 45.  And then I'm going to go back through, just to make
18 sure that nobody else has come back from the prior ones who
19 were skipped over.  So if we could go to No. 45, please.
20          MS. CAMPANELLI:  Thank you, Judge Dow.  Can everybody
21 hear me?
22          THE COURT:  Yes, we can.  Thank you.
23          MS. CAMPANELLI:  Thank you so much, Judge Dow, and
24 all of you, for allowing me a few minutes today.
25          So the core of any reform is to rebuild the trust

1    that has been lost between the CPD and the community it serves.
2    We don't trust the police because of how they treat the people
3    they arrest.  Those arrested are routinely denied access to a
4    phone and denied access to counsel.  They're isolated and
5    intimidated.

6              As the public defender of Cook County, I believe that
7    the grandest gesture that Chicago police could make to restore
8    this trust that we keep talking about is one of the simplest:
9    Give those arrested access to a phone within an hour of arrest.

10             So since 1963, Illinois law has guaranteed that those
11   arrested shall be allowed access to a phone to make a
12   reasonable number of phone calls within a reasonable amount of
13   time after arrest.  This isn't happening, Judge.  Since April
14   of 2018, I have had a police station representation unit to go
15   to the police stations whenever there is a request.  We're
16   getting calls only for about one percent of those arrested.
17   And when we show up, after being called, my lawyers get the
18   runaround.  They're obstructed by the police.  They're told the
19   client has been moved.  They're told he was never there.  All
20   false claims by the police.  Because of COVID, my lawyers could
21   not physically go to the police stations, so I asked the
22   Chicago police, with the help from the Independent Monitor and
23   the Inspector General, to allow phone contact between my
24   lawyers and those who called us for help.  Chicago police would
25   not agree to allow phone communication, unless those arrested

1    first signed a waiver that absolved the police for not

2    providing a private setting for an attorney-client phone call.

3            We've been collecting data since 2018, and I have

4    been keeping score.  The overwhelming number of those arrested

5    never get a phone call.  And for those who do, it generally

6    takes five hours before they do.  Yet, even with these dismal

7    numbers, judge, in two years, we've visited 2,054 clients and

8    walked out uncharged 367.  That's 18 percent of those we

9    visited who never should have been arrested at all.

10           If phone access were provided to everyone within an

11   hour of arrest, trust would return.  Communities would know

12   that the Chicago police treat people humanely and that they

13   care about their rights.  Suspicion would be replaced by

14   cooperation.  Instead, we are met with antagonism, deception,

15   and trickery.

16           Over the past two-and-a-half years, we have gotten

17   every excuse from Chicago police obstructing access to our

18   clients.  The most common are:  He is not in custody; we don't

19   know where he is; he is at a different police station; he is

20   not under arrest, so you can't see him; we don't acknowledge

21   your Declaration of Rights form; it's our policy not to allow

22   you to see the client until he is processed; or, he didn't ask

23   for a lawyer.

24           All these statements, Judge, are simply Chicago

25   police denying my clients access to their Fifth Amendment

1   rights.  And certainly this has continued during the protest.

2          So police play with our lives.  And they complain,

3   then, that they don't get cooperation.  Well, why should people

4   cooperate?  Instead of raising bridges, we need to lower them.

5   Instead of cornering and trapping protesters, we need to march

6   with them.  Why are they fighting so hard against this, Judge?

7   Why do they intimidate people, ask yourself, instead of

8   treating people with dignity?  It would bring a lot of trust.

9          I am asking you to look at this consent decree and

10  change the language, by the way, which is currently, "when

11  practicable," which doesn't comply with the Illinois law.

12  Thank you.

13         THE COURT:  Thank you very much as well.

14         Let me go back, then, just to make sure because I

15  know we said at the beginning that we would go back in order.

16  So I'm just going to read off the numbers, and if any of these

17  speakers are present, I'll pause a few seconds and see if

18  anybody raises a virtual hand to jump in.

19         So we skipped No. 1.  My list says Jennifer Tagler.

20         No. 7, No. 8, No. 9, No. 14, No. 17, 18, 21, 24, 29,

21  31, 32, 33, 34, 36, 39, 40, 42, and 44.

22         I have not seen the attendee list change at all in

23  the time I've been reading that, so it appears that no one else

24  has come into the queue.

25         Can I ask the Monitors, is your list the same as

1    mine?

2             MS. HICKEY:  Yes, your Honor.

3             THE COURT:  Okay, very well.  Well, as I said at the

4    beginning, we will have a similar process tomorrow, except the

5    lawyers won't get the first half hour.  So we will start with

6    Speaker No. 1 on the Thursday list at 1:00 o'clock, and we'll

7    follow the same format as we did today.

8             I do want to thank, and I know I speak with the

9    thanks also of the Monitor and the Inspector General, everyone

10   for participating today.  And I do invite all of those, either

11   who did not get a speaking slot, or for some reason were unable

12   to appear at the speaking slot they did get, to submit written

13   comments.  And I'm certain that you could submit any other

14   information you may have, too.  A lot of people have mentioned

15   videos, what they may have taken with their phone, or

16   otherwise.  I'm sure if you have that type of information as

17   well, you can submit that to the Monitor and/or the Inspector

18   General.  I know both have also talked about the different ways

19   you can do that.  And so we encourage everybody to come forward

20   with their stories and their information.  The more complete

21   the information that is received, the better job we can do of

22   documenting it, and it will all be reflected in the Monitor's

23   Report.

24            Before we end for the day, let me just ask both the

25   Monitor and the Inspector General whether they have any

1    additional comments they want to make?

2            MS. HICKEY:  I have nothing, your Honor.  I just

3    wanted to thank everyone for sharing their experience with us.

4            MR. FERGUSON:  And the same for me.

5            THE COURT:  Okay, very well.  Well, the court will be

6    in recess until 1:00 PM tomorrow, and we will call the case

7    promptly at 1:00.

8            Thank you very much, everybody, and have a good

9    night.

10           MS. HICKEY:  Thank you, your Honor.

11                        *   *   *   *   *

12                    C E R T I F I C A T E

13           We certify that the foregoing is a correct

14   transcript from the record of proceedings in the above-entitled

15   matter.

16

17       /s/ *KRISTIN M. ASHENHURST, CSR, RDR, CRR*
         _____

18

19       /s/ *SANDRA M. MULLIN, CSR, RMR, FCRR*    August 25, 2020
         _____  _____
20                Official Court Reporters              Date
              United States District Court
21            Northern District of Illinois
                   Eastern Division
22

23

24

25

# Appendix E:
# Listening Session Transcripts
# August 20, 2020

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   STATE OF ILLINOIS,        )
                               )   Docket No. 17 CV 6260
 4            Plaintiff,       )
                               )
 5        vs.                  )
                               )   Chicago, Illinois
 6   CITY OF CHICAGO,          )   August 20, 2020
                               )   1:00 PM
 7            Defendant.       )

 8   TRANSCRIPT OF PROCEEDINGS - INDEPENDENT MONITOR LISTENING
                            SESSIONS
 9        BEFORE THE HONORABLE ROBERT M. DOW, JR.

10
     APPEARANCES:
11

12   Independent Monitor:      MS. MAGGIE HICKEY

13
     Deputy Monitor:           CHIEF (RET.) RODNEY MONROE
14

15   Inspector General
     City of Chicago:          MR. JOSEPH M. FERGUSON
16

17

18

19

20   Court Reporter:           SANDRA M. MULLIN, CSR, RMR, FCRR
                                Official Court Reporter
21                              219 S. Dearborn Street, Room 2260
                                Chicago, Illinois  60604
22                              (312) 554-8244
                                sandra_mullin@ilnd.uscourts.gov
23

24

25
```

1    (The following listening session proceedings were held via

2    telephonic and videoconference.)

3        THE CLERK:  Okay.  17 Civil 6260, State of Illinois

4    versus the City of Chicago.

5        THE COURT:  Okay.  Thank you, Carolyn.

6        Good afternoon, everybody.  Welcome to the second day

7    of this special session of court in State of Illinois versus

8    City of Chicago.

9        Today will be another opportunity for members of the

10   community to speak, so I will keep my remarks very short.  You

11   may notice today that I'm not wearing a mask because I have

12   changed the venue into my office.  It's really for my own

13   convenience of not having to wear a mask, since I have to speak

14   a lot in the next four hours, and also my court reporters don't

15   also have to wear a mask.  And I'm sure they can do their job

16   better if they don't have to wear a mask.  So that's why I'm in

17   back here in my chambers without a mask.  But other than that,

18   we will try to proceed today in exactly the same fashion we did

19   yesterday.

20       And, again, I give my great thanks to the folks who

21   put this together, both from the monitoring team and also from

22   the clerk's office of our district court, that we have a great

23   technology platform.  We have the help of our sign language

24   interpreters, our captioning service, and court reporters for

25   today's proceeding, and I want to thank everybody for all their

1   great effort in pulling this together.  We have tried our best

2   to model these sessions on the fairness hearings that were held

3   in October of 2018.  And I think yesterday, technologically,

4   this went very smoothly.  So I thank everybody.

5           I want to take a quick moment to introduce the

6   individuals whom you will see on your screen for the entire

7   afternoon.  The Independent Monitor, Maggie Hickey, the

8   Inspector General, Joe Ferguson, and the Deputy Monitor Rodney

9   Monroe.  So I want to thank them.

10          And, of course, you'll be able to see our sign

11  language interpreters all day too.  And I know it's a very

12  arduous task for them to go an hour and a half or two hours at

13  a time, so I thank them.

14          These listening sessions and the accompanying written

15  comment period arise out of the Independent Monitor's

16  invocation of her authority to prepare special reports on

17  issues that are covered by the consent decree.  The report that

18  she is currently preparing focuses on the response of the

19  Chicago Police Department and the City of Chicago to the rise

20  in First Amendment activity, the civil unrest, and the related

21  law enforcement activities over the past few months.

22          As with the fairness hearings, it is important that

23  we hear from everybody who would like to be heard in this

24  process.  We're only able to accommodate approximately 100

25  people between these two days to give oral comments, but we

1   invite written comments from anybody who is interested in
2   providing them.  The deadline for that is 4:30 today.  And the
3   procedures for providing the comments are available both on the
4   docket of this case and also on the Monitor's website.

5           To make sure that everyone is clear on how we're
6   going to proceed today, especially technologically, I am going
7   to ask the Monitor to please briefly summarize the mechanics
8   and the ground rules for today on the platform.  And I do also
9   want to remind everybody that this is an on-the-record federal
10  court proceeding, and the rules that apply in our district to
11  court proceedings apply today, including those that prohibit
12  recording and picture taking.  I would just ask that everyone
13  kindly respect those rules.

14          So if I could ask the Monitor, if you could, again,
15  lay out the framework for today, that would be very helpful.
16  Thank you.

17          MS. HICKEY:  Thank you, your Honor, I am happy to do
18  that.  I want to thank everyone in advance for their
19  participation, and I want to offer a special thank you to Judge
20  Dow's team, Inspector General Ferguson's team, and my own team,
21  for working and facilitating this virtual listening session.

22          We had over 540 registered to sign up for these Zoom
23  listening sessions, and the speakers for the listening sessions
24  were randomly selected from that group.  To maximize our
25  connection and to increase efficiency, only the people who are

1    scheduled to appear or speak are on the Zoom meeting.  The

2    public may view each session live on YouTube with a slight

3    delay, about 20 seconds.  The YouTube links for today are

4    available on the Independent Monitoring team's website,

5    cpdmonitoringteam.com.  I'll repeat that,

6    cpdmonitoringteam.com.  Our website also includes a link to

7    live transcription, which is available during the session.  The

8    court's listening session order is also available on our

9    website, which provides instructions on how to file written

10   comments.

11            For the speakers on today's call, you will not have

12   the ability to turn on your microphone or camera until Judge

13   Dow calls your number.  He will only be calling the number, for

14   efficiency sake, and also because there have been some movement

15   of names.  So only your number will be called.  You should have

16   received your speaker number via e-mail last Friday,

17   August 17th.

18            When the court calls your number, the meeting host

19   will make you a Zoom panelist to begin speaking.  For those of

20   you on a computer, Zoom will automatically log you in and out,

21   you may see your screen switch, and then you will be prompted

22   to turn on your camera and microphone and begin speaking.  For

23   those of you on telephone, your line will be un-muted after the

24   judge calls your number.

25            You will also be provided a visual cue.  The speakers

1    will see green to start, yellow means you have 30 seconds left,

2    and red means you are out of time.  For people who call into

3    the meeting, we will provide a virtual 30-second warning.  For

4    those speakers, please also keep an eye on the chat function,

5    as the IMT may send messages through that service, if

6    necessary.

7            If you are not available when the court calls your

8    number, you will be moved to the end of the list for today, and

9    the court will call your number again at the end of the day.

10           If you have any logistical questions during the

11   session, please contact this e-mail:  Listeningsessions -- with

12   an s -- @cpdmonitoringteam.com, which is also listed on the

13   IMT's website.

14           Finally, these hearings are for the community to have

15   a direct voice with the court.  The Independent Monitoring Team

16   and the Inspector General's office, though, do want to hear

17   from the community on a continuing basis.

18           Thank you again for your patience and your

19   understanding as we use a virtual platform during this

20   unprecedented time.

21           Thank you, your Honor.

22           THE COURT:  Okay.  Thank you very much.  And I also

23   wanted, again, to offer the Inspector General a moment to say

24   anything that he would like at the beginning of the proceeding.

25           So, Mr. Ferguson, anything you would like to say.

1        MR. FERGUSON:  Thank you, Judge.  Very briefly, and

2    working off of where Maggie's remarks ended, just one other

3    quick note before turning to the important business of hearing

4    from everyone who is in the queue and signed up.  These

5    court-hosted listening sessions are just one of several avenues

6    for community input and the expression of lived experience to

7    inform this joint inquiry on which we will be publicly

8    reporting.  Today's listening sessions are, by their nature,

9    both public and part of the official record of the court

10   proceedings being conducted pursuant to the authority of the

11   consent decree.  So if for whatever reason anyone who is

12   speaking, listening or watching today wishes further

13   opportunity to provide feedback, input or articulate their

14   particular experiences, or wishes to provide it to the IMT or

15   to the Inspector General's office in a less public setting or

16   format, please be aware that there are opportunities to do so,

17   including doing so anonymously.  And we strongly encourage you

18   to do so.

19       For those purposes, the IMT's contact information,

20   again, is www.cpdmonitoringteam.com.  And the Inspector

21   General's office contact information is found at

22   www.igchicago.org.

23       Thank you, Judge.

24       THE COURT:  Okay.  Thank you.  So I would like to

25   commend our speakers yesterday for adhering to the time limits,

1    and I'd just like to again ask for, out of respect for all
2    speakers, that every speaker please conclude their remarks at
3    the three-minute mark.
4              And I just want to also advise everybody that, as we
5    did yesterday, we will take a 15-minute break at 3:00 o'clock,
6    which will allow the court reporters to switch out.  And it
7    takes them a few minutes to uninstall one set of equipment and
8    install the other set.  So that will be our only break for
9    today.
10             And the monitor and I will try to help each other out
11   again by trying to confirm who is in the speaker queue and who
12   is not so we can proceed efficiently.
13             And, with that, I believe we're ready to start with
14   Speaker 1 for today, but I do not see that speaker in the
15   queue.
16             Maggie, do you see that speaker in the queue?
17             MS. HICKEY:  I am double checking.  I do not, your
18   Honor, but I will still call out No. 1 in case they may have
19   registered under, you know, somebody else's e-mail or their,
20   you know, partner's, or something.  So if we --
21             THE COURT:  Sure.  That makes good sense.
22             MS. HICKEY:  Yes.
23             THE COURT:  Okay.  So if Speaker No. 1 could proceed,
24   that would be great -- a great thing to do, so please start.
25             MS. HICKEY:  It does appear that Speaker 1 is not

1    present, so let's go to Speaker No. 2.

2            THE COURT:  Okay.  Speaker No. 2 I see is in the

3    queue, so we can go on to Speaker No. 2, please.

4            MR. TORRES:  Hello.  I am Speaker No. 2 in the queue.

5    Can everyone hear me okay?

6            THE COURT:  Yes, thank you very much.

7            MR. TORRES:  Thank you.  Hi, my name is Seth, and I

8    use he/him or they/them pronouns.  I am a 24-year-old

9    transgender Latino person.  I work as a theatrical lighting

10   designer and a live event Zoom specialist.

11           On July 27th in Grant Park, I was with a group of

12   protesters demanding the removal of all racist statues,

13   including Columbus, as well as the demand to pass CPAC, reduce

14   CPD budget by at least 75 percent, and return the stolen land

15   we were on to Indigenous people.

16           I became an impromptu medic.  Usually people with

17   some kind of medical training sign up in advance, bring

18   first-aid supplies, and coordinate to treat anyone injured.

19   There weren't enough medics for everyone injured.  I've had

20   extensive first-aid training, and I had some first-aid supplies

21   on me, so I started helping people.

22           For about an hour, I circled the outside of the

23   protest to catch anyone injured.  The air was thick with pepper

24   spray, and at times it was hard to see and breath.  It was

25   chaos with everyone running around and trying to avoid being

1   beaten by the police.

2          In that time, I watched the police hit at least five

3   people in the head or neck with their batons and hit so many

4   more in the leg, arm, back and chest.  I watched the police

5   spray multiple people directly in the face with pepper spray.

6          When we started to retreat, there was still many

7   people who -- injured people who needed help.  The police had

8   formed a perimeter around the statue, so I thought it was safe

9   to keep treating people where I was.  I was so focused on

10  helping people who were bleeding and blinded, but I didn't see

11  the police continue pushing forward.  My friend kept saying:

12  Seth, we've got to go.  And I look up to see the police

13  continuing to move towards us and using their batons to beat

14  people and pepper spray, those around injured, and the medics

15  trying to help them.

16         At that time, everyone was at least 500 feet away

17  from the statue, and I was at least a thousand feet away.

18  There was no reason to continue pushing forward and hurting

19  people after we had clearly moved away and had no intention of

20  going back towards the statue.

21         Every time I watched a police officer hit someone or

22  spray someone in the face, I just kept thinking to myself that

23  these officers do not think we are people.  I feel a trauma

24  around that night.  I'm grateful I walked away physically

25  unharmed, but I still get flashbacks on watching the police

1  hurt those who were already injured and the medics who

2  volunteered to help.  We hadn't done anything to deserve this.

3  I never saw a protester harm a police officer in any way.  I

4  never felt less cared about, less protected, and less safe than

5  I did that night.  I will never feel safe around a Chicago

6  police officer again because I know that those officers do not

7  care about me as a person.  Their actions prove it.  No one who

8  says they protect and serve and then turns around to beat and

9  pepper spray people can expect me to believe them.

10             Thank you for your time, your Honor.

11             THE COURT:  I thank you for your time as well.

12             If we could move on, I don't see No. 3 in the queue,

13  but let's find out if No. 3 is actually present.

14             MS. HICKEY:  I do not believe they are, your Honor.

15  If you want to move on to the next number.

16             THE COURT:  Okay.  So Speaker No. 4 could be let into

17  the participation room, please.

18             OLIVIA:  Hi, can you hear me?

19             THE COURT:  Yes, we can.  Thank you.

20             OLIVIA:  Excellent.  I'm Olivia Lopattlsad

21  (phonetic), she/they pronouns.  I'm a 23-year-old artist, and

22  I'm here to discuss the police brutality I experienced while I

23  protested police brutality, specifically on the night of

24  June 1st in Uptown.  I will also preface by saying that I often

25  walk with a cane as a result of a 30-foot-fall I survived three

1    years ago.  And I say this not for you to offer me more

2    sympathy as a disabled person, but because I want everyone

3    listening to understand that CPD did what they did to me as I

4    screamed and clutched my cane.

5            As I thought about how to fill this time, I

6    considered what I might say that could make you understand.  I

7    could talk about how they beat my knees as I tried to run

8    towards someone who was being beaten worse than me, causing me

9    to fall and taking my cane from me.

10           I could tell you how three of them dug their boots

11   into my shoulders and knee and screamed threats masklessly in

12   my face.

13           I could talk about how officers held my partner down

14   in a fetal position and beat his genitals and his leg until his

15   phone in his pocket bent and his shin split open.

16           I could tell you about how I was clubbed on the head

17   from behind, glasses shattering into my skull bone, and an

18   officer in front of me yelled:  That's what you get.  Have you

19   ever wondered what it feels like to pull glass shards out of

20   your own head, to see your best friend screaming and sobbing

21   and know there is nothing you could do to make her safe?  Have

22   you ever thought your partner might be dead?  Because I could

23   tell you about that.

24           I could talk about all the ways in which CPD broke

25   their own rules in order to prey on their citizens, emboldened

1    by an unconstitutional emergency curfew -- thank you Lori

2    Lightfoot -- that made our active protest de facto illegal.

3              But ultimately what I need you to understand, because

4    I didn't understand it until I experienced it, is that police

5    have a monopoly on violence.  They dress in gear designed for

6    warfare, and at their disposal are weapons banned in warfare.

7    And on a whim, they may use unbridled amounts of violence

8    against you.  This is not a felony for them, it is rarely even

9    a citation, it is their job.  It is a probable felony for you

10   to defend yourself against them.  That means that, if and when

11   an officer decides to attack you, no matter who you are or what

12   you have done, that officer has 100 percent jurisdiction over

13   your body, your pain, and your survival.

14             That night, my partner and I were both hospitalized.

15   I would be treated for my head wound and diagnosed with a

16   concussion, and he wouldn't stop steadily bleeding until they

17   stitched him up four hours later.  We weren't arrested.  They

18   weren't interested in actually enforcing the curfew, rather,

19   they waited for curfew so they would have an excuse to beat us.

20             Countless times since that night I have looked at my

21   partner brutalized, traumatized, unable to walk, and I reflect

22   on the fact that, if it had not been for our simultaneous

23   beating, if I had seen him being brutalized, there is not one

24   thing in the world I would not have done to make that stop.  I

25   promise you that, in order to keep him from being harmed, I

1    would have done anything, and I would absolutely be in jail

2    right now.  It's something I haven't stopped thinking about

3    since that night.

4         When it comes down to it, we are legally bound to

5    watch the police slaughter anyone they see fit.  To intervene

6    is literally illegal.  I defy anyone to look me in the eye and

7    claim that they would defer to the judgment of a stranger

8    beating their loved one to death.

9         Thank you for your time.

10        THE COURT:  Thank you.

11        I think we have Speaker No. 5 is in the queue,

12   please.

13        MS. LEYVA:  Hello, can you hear me?

14        THE COURT:  Yes, we can.

15        MS. LEYVA: Hi, my name is Jailene, and I'm from

16   Chicago.  I am here today to share what I witnessed and

17   experienced on July 17th.  Before this call, and even before

18   registering, I felt anxious, and my hands began to tremble at

19   the memory of the police brutalizing members of my community.

20        The police (unintelligible) on people and sprayed

21   them directly in the face.  I personally could not breathe and

22   was constantly gagging and crying so badly that most of the

23   people tried to comfort me in the middle of the police

24   brutalizing everybody.

25        I saw the police trample people with their own bikes.

1  I saw one young black man being assaulted with his own bike

2  after being pushed to the ground, his legs were caught

3  underneath his bike, and he was helpless.  And, yet, the police

4  pushed the bike onto his body and kept trying to beat him.

5         I also saw a young man of color bleeding profusely

6  after being hit by the police.  His head, face, entirely, and

7  glasses were -- and his shirt, too, were completely covered in

8  blood, and he was still bleeding as the police continued to

9  attack him.  No, they did not pull him aside for medical

10  attention.  Like, they just kept beating him and pulling his

11  shirt, and even ripping it.

12         I saw a person on the ground ask me for my help and

13  for water.  They begged for comfort and reassurance as they

14  were being beaten by the police.  At another point, the police

15  moved together to another side, but one of the officers looked

16  so enraged by just, like, our right to protest that he

17  disobeyed this collective decision and went back just to lunge

18  at a protester.

19         A dear friend of mine was also attacked by the

20  police.  Her bike was taken.  But before her bike was taken,

21  she was beat by it.  She was stuck underneath the bike as well.

22  And she actually had to spend a lot of time on her own to

23  recover physically and emotionally from this event.

24         Although I am a Latina, I know that I have a

25  privilege.  So when all of this was happening I tried -- gave

1   my white privilege to help people out.  And in the middle of

2   this chaos caused by the police I saw that, despite me getting

3   injuries and feeling almost, like, almost breaking down after

4   all the strain of, I don't know what, there were moments where

5   the police didn't even try to attack me because they saw me as

6   a small white woman.  They attacked men.  They attacked men of

7   color.  They attacked black men.  They attacked white people

8   too, but you could see the bias in action when I was there in

9   the front lines and I was selectively seen.

10          After the police finally took control of the Columbus

11  statue and pushed everyone out brutally, I saw one police

12  officer take off his hat and (unintelligible) as though this

13  were some type of game where, I don't know, we were some

14  criminals, or some thugs, or something, and not there as our

15  civil, like, right to protest.  They even cheered and started,

16  like, joking with each other and laughing despite multiple

17  people sustaining so many injuries that medics -- the few

18  medics that we had could not keep up with how many people were

19  being injured.

20          And even as we were moving back to Grant Park, just

21  to continue with the general protest and march, the police, we

22  were all walking away because the police told us to.  And one

23  of the people that stayed back to make sure everyone left

24  safely was taken by the police.  And so it doesn't even matter

25  if we, like, left or not, the police were still harassing us,

1    they were still yelling at us.  They still tried to intimidate

2    people.  And even though this person asked for the help of

3    white people when they were taken, the police didn't care.

4            And I know that there was people there that were

5    minors, there was high schoolers there, there was young college

6    students, there was members of the community who tried to,

7    like, help each other out because nobody, nobody that I saw

8    there ever tried to reach out for the police, that were helping

9    us.

10           We held each other.  We hugged each other.  We

11   communicated sometimes as strangers to make sure that we got

12   home safe because the police were not the ones to talk to,

13   especially considering that they made people bleed, they stole

14   their bikes, they crushed their bodies under the tires and

15   under bikes.

16           And so I, as a community member, would like to see

17   the police defunded by at least 75 percent because they did not

18   keep the community safe.  They prefer to beat on people and

19   spray them directly in the face over a statue that does not

20   take kindly over human life.

21           Thank you for your time.

22           THE COURT:  Thank you for your time as well.

23           Speaker No. 6 in the queue?

24           MS. HICKEY:  I don't believe so, your Honor.  We will

25   also call seven, who I don't see in the queue, but I know eight

1  is.  But just in case there is a phone number, we will call
2  No. 6 and then No. 7.
3        THE COURT:  Okay.  Thank you.  So if No. 6 does not
4  sound like is available at this time, we will skip to No. 7.
5  Is No. 7 available?
6        Okay.  Maybe we will move on to No. 8, then, please.
7        AMBER:  Can everyone hear me?
8        THE COURT:  Yes, we can.  Thank you.
9        AMBER:  My name is Amber, she/her, I'm black, I'm
10  26-years-old, and I work in a research center at the University
11  of Chicago.  I have been to a number of protests this summer
12  where I have seen CPD officers initiate attacks and use
13  unprovoked violence against protesters.  Today I'll focus my
14  comments on an incident that happened to me, specifically on
15  July 17th at Grant Park.  During a Black Indigenous Solidarity
16  Rally, I witnessed a CPD officer grab a woman's bike and pull
17  it away from her.  As he pulled it, she fell to the ground, and
18  he started pepper spraying her as she laid on the ground.  I
19  ran over to help her -- help pull her up and pull her away from
20  the attack, and when I got to her, he started spraying me too.
21  I turned to run, and as I was running away from him, I felt his
22  baton crack down on my head.  So to be clear, after he finished
23  pepper spraying the woman who was laying on the ground, he hit
24  me over the head as I was running away from him.  Right away I
25  lost the ability to hear anything.  I lost my balance.  My head

1  started bleeding profusely.  My clothes were immediately soaked
2  in blood.

3          Later that day, at that same event, I was detained by
4  CPD officers.  They put zip ties on me, first so loosely that
5  my hands slipped out of them, and they accused me of breaking
6  out of them.  So then they put them on so tightly that they
7  were cutting into my wrists and left bruises around my wrists
8  for days, actually.  I repeatedly asked officers why I was
9  being arrested.  I never got an answer.  I asked officers
10  repeatedly to please loosen the zip ties because they were
11  causing extreme pain, and one officer told me verbatim:  That's
12  too bad, you shouldn't have been protesting.

13          Eventually I was told that I had been wrongfully
14  detained, and I was free to go.  And I immediately went to the
15  hospital to get staples in my head from the baton injury.

16          I just want to say that swinging a baton at the head
17  of unarmed, fleeing young people doesn't feel like public
18  safety to me, it feels like terrorism.  Refusing to loosen zip
19  ties from around someone's wrist because they shouldn't have
20  been protesting doesn't feel like protection, it feels like
21  political repression.  Pepper spraying a woman who is laying on
22  the ground does not feel like doing your job, it feels
23  personal, and it feels completely barbaric.

24          I was -- that was sincerely the most horrific thing
25  that I ever experienced.  Outside of the physical pain I was

1    in, I was completely terrified the entire time.  I'm still

2    traumatized.  I never did anything wrong.  I never posed a

3    threat to any officer, and, yet, I still experienced this level

4    of violence and complete disregard for my safety and my life.

5    And beyond the disregard for my life, it's clear to me, after

6    the experiences that I had this summer, that these officers are

7    completely blood-thirsty and sadistic, and they are eager to

8    inflict this cruelty towards anyone who dares to speak out

9    against them, especially Indigenous people.

10            We cannot train this away.  We have to defund this

11   racist, murderist, torturist police department, abolish the

12   police and rethink public safety entirely.  Thank you.

13            THE COURT:  Thank you for your comments.  I

14   appreciate it.

15            Speaker No. 9, please.

16            MS. HAYDEN:  Hi.  Can everybody hear me?

17            THE COURT:  Yes, we can, thank you.

18            MS. HAYDEN:  Wonderful.  My name is Megan Hayden.  I

19   am white, 25 years old, my pronouns are they/them.  My bike is

20   my primary transportation.

21            On July 17th, I was bike-marshalling for the first

22   time.  Bike marshals are used to facilitate a protest and

23   create a barrier between protesters and the police when needed.

24            I'm going to jump to the moment when things

25   escalated.  So fireworks were thrown by protesters.  The police

1    were pushed back from the statue.  Another marshal and I threw

2    down our bikes and ran towards what appeared to be like a

3    growing skirmish.  I saw three officers dragging and beating a

4    man who was bleeding from the head.  I approached with my hands

5    open, yelling to get them to stop.  A hand grabbed the front of

6    my shirt, and I was thrown out of the way by an officer, and

7    then I watched them take the man away.

8            And then shortly after, I was -- my attention was

9    sort of pulled to the right where the police were surrounded

10   around a tree, like up a hill and around some trees, to try to

11   surround us, and then we rushed to create a bike line.  Once

12   the line was established, we were harassed by an especially

13   irate officer who was threatening a protester with a baton.  I

14   got hit because I put my hand to shield them.  I saw the same

15   officer threatening protesters with jail time.  He was clearly

16   bothered by people's disrespect and took it out with

17   aggression.

18           I continually de-escalated officers from retaliating

19   at protesters who were insulting them.  There was some friendly

20   banter with one officer.  He even told me I was doing a good

21   job.  I wish I told him that he needed to do a better job at

22   de-escalating his co-worker.  It's not my job to make sure his

23   fellow officer keeps his cool.

24           Things broke into chaos as soon as the people in

25   brown uniforms came.  I heard no order of dispersal, and there

1    was no warning of gas.  They sprayed a brown chemical agent in

2    the air and our line broke.  People started running,

3    (unintelligible) assisting them.  The police gave no exit plan.

4    Instead, they caused chaos.  I watched officers beat people

5    with batons until they let go of their bikes and the police

6    took them away.  None of the bikes were abandoned willingly.

7         I was helping people move away from the gas and was

8    aware of an officer nearby using pepper spray indiscriminantly.

9    His actions were uncontrolled and erratic.  A protester near me

10   held up their umbrella to shield us.  One officer grabbed the

11   umbrella, while the other sprayed us.  I was sprayed in the

12   face from less than two feet away.  In pain and shock, I let go

13   of my bike to shield my eyes.  After someone flushed my eyes, I

14   tried to find my bike.  It's my primary form of transportation.

15   Another protester managed to get the frame back, but the front

16   wheel had been ripped off by a police officer.

17        I had bruises for days afterwards, and the burning

18   lasted well past 24 hours.  Sometimes I still have trouble

19   sleeping, getting all -- angry -- getting angry all over again.

20        Nothing the police endured matched what they

21   unleashed.  It was wildly unjust, and I hope the court takes

22   that into account.

23        Thank you for your time.

24        THE COURT:  Thank you for your time as well.

25        Speaker No. 10, please.

1      MS. DAVIS:  Hello.  Hi.  Can you hear me okay?

2      THE COURT:  Yes, we can.  Thank you.

3      MS. DAVIS:  Hi everybody.  My name is Kimberly Davis.

4  She/her/hers.  I am a 24-year-old black woman and organizer.  I

5  am the founder of the abolition focus group Black Lives

6  Coalition Lake County, which focuses on policy change,

7  antiracism education and community engagement.  I am currently

8  studying clinical social work at the University of Chicago.

9      On July 17, 2020, I attended the decolonized

10  Zhigaagoong protest to show local and national solidarity

11  against police brutality.  When I arrived at the Buckingham

12  Fountain, protesters were gathered, waiting for further

13  instruction.  Shortly after, the protest began to move uphill

14  and then downhill towards the Columbus statue.  As we

15  approached, I saw CPD in riot gear circled around the statue,

16  blocking it from protesters.  As we approached, I saw -- as we

17  continued, popping sounds filled the air, and I began to see

18  thick black and grey smoke and sparks of red.

19      When the protesters attempted to pass the statue, CPD

20  took batons and began beating dozens of protesters attempting

21  to pass the statue.  They then began to throw bicycles at

22  protesters and steal the bicycles of safety marshals.  I saw

23  dozens of protesters, mainly black, with bloody face injuries

24  fleeing from the statue.

25      As this happened, chemicals began to fill the air,

1    making my eyes water and my lungs irritated.  We were forced to

2    run backwards up the hill and then back down to the main

3    street.  As we started walking back to the fountain, CPD was

4    lined on either side of the road.  I was also informed that my

5    friend, who also attended the protest, was severely maced after

6    having a bicycle thrown at her face.

7              Every day I bear witness to the genocide of my

8    people.  I have attended over a dozen protests in the last two

9    months, and I know what I have witnessed has changed my

10   psychological well-being forever.

11             By doing this work, I am reminded of the damage White

12   Supremacy has done to myself and the Black and Brown people of

13   this nation.  Every day I live with the ongoing fear that I

14   will die at the hands of police brutality.  This fear stays

15   with me on the streets that I march in, the home that I live

16   in, and in the future I see for myself and my people.  As steps

17   are not taken towards defunding and abolishing the police, we

18   sacrifice the well-being of our youth and future generations to

19   come.

20             As long as there is air in my lungs, I will use every

21   last breath I have to fight against this system and what it has

22   done to my people.

23             Thank you for your time, your Honor.

24             THE COURT:  Thank you very much for your comments.  I

25   do appreciate them.

1          Let's see, I don't see No. 11, Speaker No. 11, in the

2     queue, but we'll make a call out and see if Speaker No. 11 is

3     present.

4          MS. HICKEY:  I believe you can move on, your Honor.

5          THE COURT:  Okay.  I do see the next several speakers

6     in the queue, so Speaker No. 12, please?

7          Okay.  How about No. 13?

8          Oh, there is No. 12.

9          MR. RAFAEL: Hi, my name is Luis Rafael.  I attended

10    the Black and Indigenous Solidarity Rally.  And for full

11    disclosure, I just want to say that I usually don't participate

12    in protests.  I'm an introvert.  I feel left out when I don't

13    chant along, so that day, I went because it was, like, just a

14    very peaceful protest.  It was endorsed by, like, the Chicago

15    Teachers Union.  And the reason I mostly went was because, in

16    the past, I seen that it's usually about 60, 70, even 100

17    police officers in riot gear, but not one paramedic in site.

18    And that, to me, is very alarming, especially because of the

19    brutality that we've been noticing nationwide, not just in our

20    city.

21         With prior knowledge from an EMT course at Malcolm X,

22    I went in as just a medic in incognito mode.  And it wasn't

23    until when I saw that a police officer was beating a person on

24    the floor, it was -- I believe it was a person who was

25    Caucasian because usually they're the ones on the bikes under

1    the title of marshal.  They put themselves in front of the
2    people and the police.  So the police threw the person on the
3    floor and (unintelligible) punching them in the face, which
4    then -- so I jumped off from my EMT course two years ago to
5    pursue philosophy and public policy.  So at that point I told
6    the police officer, hey, there is no need to -- there is no
7    need to keep on punching the person in the face.  If you have
8    to arrest him, if you must, arrest him, but please stop
9    punching him.  The police -- you could tell he was high on
10   adrenaline, so I knew that if I touched his hands, that would
11   be, for some way it would be an act of violence on my end.  So
12   to stop the punching, I threw my body over his face -- well,
13   over the person on the floor's face.  I expected the blows on
14   my back, but then the police officer's partner came from the
15   other side and whacked me in the head with a -- I wish it was a
16   baton, it was a pole he found on the floor.  And then I looked
17   up and that same police officer was whacking people just with
18   that pole he found on the floor.  It was like from -- it was
19   from a sign.
20            So I just -- I told him, I said:  Hey, man, at this
21   point, you know, you're no longer serving the people, you're no
22   longer protecting the people, now you're terrorizing them.
23   Look at yourself.  And then he saw the blood gushing down.  And
24   I said:  Actually, can I get your badge number?  Because I knew
25   that he saw the blood, and he got scared, he started walking

1    back.  And then he kept on turning around so I wouldn't see his

2    badge number, which, at that point, the blood started gushing

3    down my glasses so I couldn't see any longer.  And I'm very

4    blessed and grateful that there was a lot of other medics who

5    were there as volunteers.

6          And that's what I saw, just a lack of the city

7    sending out medics.  And, yeah, I saw a lack of accountability

8    for police.  And I think even doctors have a more strict --

9    well, if doctors keep on making mistakes, like their license

10   will get revoked.  But there is no such thing with police.

11   There is no one there holding them accountable.

12         So the only thing that, if I can, if I may ask is

13   that we take a look at the need of exchange of power and defund

14   police.  And, actually, just prevent violence by sending -- or

15   creating, like, a crisis response team where you have, like,

16   sociologists go and attend situations.  And, again, fund our

17   schools.  The ones here in the south side of Englewood, which

18   is where I live, they're very underfunded.  And this is where

19   we would like to see the money go, rather than police who are

20   just reacting to situations like this one.

21         THE COURT:  Thank you for your comments, sir.  I

22   appreciate it.

23         Speaker No. 13, please.

24         MS. OWA:  Hello, can you hear me?

25         THE COURT:  Yes, I can hear you.  I'm sorry, yes, I

1   was muted myself.  I apologize.  Yes, we can hear you.  Thank

2   you.

3           MS. OWA:  My name is Ashabi Owa.  I am an organizer

4   and artist in Chicago.  My pronouns are she/they.  I'm

5   currently about to start at Loyola University in Clinical

6   Mental Health Counseling Program.  And I would just like to

7   talk about my experiences on May 30th, as well as July 17th.

8           The protest May 30th, was, again, a peaceful one.  It

9   only started to escalate when the police got notice that they

10  were able to use brute force against protesters.  I, amongst

11  several other people, were in the crowd trying to make sure

12  that other people that were hurt (unintelligible) were staying

13  safe.  Whenever I go to protests, if I'm not organizing them

14  myself, I usually try to document everything.  And at the

15  protest of May 30th, I was present with my partner and their

16  other partner, and we were there being present, trying to make

17  sure that people were staying safe.  I had to step away and

18  make sure that the people who were protecting us were able to

19  do that.  Those people happened to be white.  They were not the

20  police.  The police were antagonizing us and beating us with

21  their batons and grabbing people and shoving them to the ground

22  and also beating them until they were bleeding.  I had to watch

23  as my partner, who was trying to protect me, had a baton shoved

24  in their face by a police officer who would not let up.  And

25  from there, I had to put my body in front of the police and my

1    partner so that they were okay.

2           After that incident, we had to run and get away

3    because they kept hitting us, shooting flares into the air and

4    throwing smoke bombs and tear gas into the crowd when the

5    National Guard came.  And we had to run away and find an area

6    to escape because all the bridges were lifted when the curfew

7    was enacted at least 20 minutes before police started attacking

8    us.

9           That was the incident on the 30th, and I'd like to

10   continue with the incident on July 17th at Grant Park.

11          That protest, again, started very peacefully.  There

12   was no antagonation from us.  We were first at Buckingham

13   Fountain, and then we walked towards Grant Park.  From there,

14   police officers started grabbing umbrellas, started shredding

15   banners, started attacking protesters with batons and tear gas.

16   Again, like I mentioned, I have my camera on me whenever I go

17   to protests, and I was able to document all of these things

18   that occurred.  I was able to see that the police were

19   attacking other people.  They were attacking my friends.  I saw

20   police teargassing other people in their face, not even two

21   feet away from them.  As I was documenting, I had police come

22   and kettle around us.  There was a police officer that whipped

23   out their baton and started yelling, "Get back before I beat

24   the fuck out of you."  From there, one other protester, who is

25   an organizer, came and started recording them, and that was the

1  incident that led to them calming down.

2       Me, as a black woman, I usually don't feel safe

3  coming to protests because I'm fully aware that police don't

4  look out for me and take care of me.  And the only time I felt

5  safe was when I was around people of community.  The police

6  officers were not there to take care of me or make sure that I

7  was okay, they just came after blood and came to attack people.

8       At one point I was standing, watching this man who

9  was on the ground kneeling, with his fist in the air, and the

10  police started to move forward.  As I was trying to see why

11  this man was kneeling on the ground, I walked around, and I saw

12  that he had a gash in his head, and he was bleeding profusely,

13  from his head down to his pants.  There was blood, and he

14  wouldn't get up off the ground until police started to stop.

15  At that point, I had to call a medic to make sure this person

16  stopped blooding off from his head, and, from there, police

17  officers started teargassing us and making sure that we were

18  being pushed away back to Buckingham Fountain.  From this

19  moment forward, I didn't realize that I was also teargassed,

20  and the moment I realized that was when I started crying after

21  seeing one of my friends who came to see if I was okay.

22       I think something that is reiterated in a lot of

23  these conversations is that police are here to protect us.

24  There is no reason for us to be at these protests in fear for

25  our lives when we're just here to make sure our voices are

1  being heard, our demands are being met.

2          It's very clear the money that's being to allocated

3  CPD is not being used to protect the people that are paying

4  their taxes and paying their bills and paying the communities

5  to make sure that we're okay.  It's very clear that CPD needs

6  to be defunded and that all of those funds would be allocated

7  towards schools and underfunded areas in Chicago.

8          That's all I have to say.  Thank you so much for your

9  time.

10          THE COURT:  Thank you for yours.  I appreciate it.

11          If we could move on to Speaker No. 14, please.

12          MS. JACKSON:  Hello.  Can everybody hear me?

13          THE COURT:  Yes, we can.  Thank you.

14          MS. JACKSON:  Hello, my name is India Jackson.

15  She/hers.  I am a black, 19-year-old college student from the

16  south side of Chicago, and I am with an organization called

17  GoodKids MadCity.  I am going to try my best to keep this short

18  and concise.

19          On August 15, 2020, I attended a protest downtown in

20  the loop.  While we were marching, I overheard somebody say

21  that the police were going to start teargassing folks, so we

22  all started running, but to no avail.  We ended up being

23  kettled in as the police started teargassing the crowd and

24  started beating people with their batons and sticks, and stuff.

25  And I was hit in my back with a baton, like, four times.  And I

1    was teargassed.  Luckily the tear gas didn't make it into my
2    eyes, but I have permanent marks and discoloration on my arm
3    and my legs from the tear gas touching my skin.

4            As I was trying to run, I saw the police ram a man so
5    hard down on the concrete that his forehead started gashing
6    blood.  And I was hoping that seeing him bleeding would be
7    enough to make them stop attacking this man, but they proceeded
8    to haul him up and starting hitting him some more with his
9    batons before they arrested him.

10           So we were eventually all kettled in until the police
11   started going "bag check" and letting people out.  And they
12   didn't really let everybody out because they were specifically
13   looking for people to arrest.  I was one of the lucky ones that
14   got out.  But as I was pushed out of the scene, they closed it
15   off, and, like, I watched helplessly as five of my friends were
16   wrongly beaten and detained.

17           I hope that people can see this and see that this is
18   a perfect example of (audio breaking up) CPD because at this
19   point they are being paid (unintelligible) color, and that's
20   not right.  They are being paid, and we need money for
21   resources.

22           That's all I have to say.  Thank you for your time,
23   your Honor.

24           THE COURT:  Thank you very much for yours.

25           Let's see, we can move on to No. 15, then, please.

1          SPEAKER KERSTETTER:  Hello.  Can you hear me?

2          THE COURT:  Yes, we can.  Thank you.

3          MS. KERSTETTER:  Okay.  Thank you.  Hello.  My name

4     is River Kerstetter.  I am 28-years-old, and I am an Indigenous

5     artist and teacher living in Chicago.  My pronouns are she/her.

6          On July 17th, I attended the Black Indigenous

7     Solidarity Rally in Grant Park to show solidarity with my Black

8     and Indigenous sibling, working for an end to structural racism

9     and police brutality and to protest the statue of Christopher

10    Columbus, a racist and violent man who represents hundreds of

11    years of genocide slavery and white supremacy.

12          When the crowd arrived at the statue, police

13    surrounded us, leaving us with no way to leave.  I joined other

14    protesters in linking arms in order to protect more vulnerable

15    people from potential violence.  Many police officers were not

16    wearing masks and many were laughing or openly cursing at

17    protesters.  Soon after surrounding us, police began to shove

18    and teargas people without warning or explanation.  I'd like to

19    remind all those listening that tear gas is banned in war by

20    the 1925 Geneva Convention, but for some reason police are

21    allowed to use it on protesters.

22          At some point, I asked a nearby officer:  Why are you

23    hurting us?  To which he responded:  Because you're not

24    listening.  This is how this works.

25          This comment was very alarming to me because the

1    police were telling us to move but left us no way to leave, and
2    I couldn't see how our presence could justify such
3    disproportionate violence.

4         Without warning, a police officer shoved me to the
5    ground and beat me repeatedly on my back and ribs with a baton.
6    I tucked my head beneath my arms and didn't fight back.  I
7    don't remember much from this moment because all I could feel
8    was blinding pain from being hit over and over with a baton.

9         After some time, others helped separate me from the
10   officers.  Police continued to beat and gas other people.  Many
11   people, including many young people, were screaming out for
12   medical attention, but police did nothing to help them.

13        When we tried to leave, officers let my friend pass,
14   but told me I would have to go another way, although it was
15   unclear as to why.  Because my friend is white and I am
16   Indigenous, I couldn't help but wonder if the officer was
17   treating us differently because of the color of our skin.

18        Eventually, the police did let me pass, and my friend
19   and I went home.  I was left with a large bruise on my back,
20   cuts on my legs and sharp pain in my ribs.  These injuries and
21   memories of the violence I witnessed made it extremely
22   difficult for me to sleep and go about my days for several
23   weeks.

24        Later, on July 27th, my doctor diagnosed me with a
25   bruised rib.  As I'm speaking today, almost a month later, my

1    rib is still in pain.  Many of my friends who attended the

2    protest that day were also hurt, gassed and traumatized by

3    police.

4            I am horrified at how violent the police acted

5    towards protesters that day and how they have hurt many other

6    protesters recently.  I was left with a bruised rib, but I know

7    that Black Chicagoans and other people of color are treated far

8    worse by Chicago police every day.

9            I feel that the Chicago police abuse their power, and

10   our city would be much safer for everyone if we defunded the

11   police and fund things that actually keep us safe, such as

12   housing, healthcare, education and food for all.

13           Thank you, your Honor.

14           THE COURT:  Thank you very much for your comments.  I

15   appreciate it.

16           I do not see 16 or 17 in the queue, but let me ask if

17   No. 16 is available to speak now.

18           MS. HICKEY:  I believe you are correct, your Honor.

19   And if you want to just call out 17, and then we can move to

20   18.

21           THE COURT:  All right.  How about, is 17 available to

22   speak now?

23           Okay.  It appears that Speaker No. 18 is in the

24   queue, so if we could move on to Speaker 18, please.

25           MS. ARTIS:  Hello.

1  THE COURT:  Hi.

2  MS. ARTIS:  Sorry, do you hear an echo at all?

3  THE COURT:  I did, but now I just hear you.

4  MS. ARTIS:  Okay, great.  My name is Elizia.  I am a

5  resident of Chicago, here to talk about my experiences this

6  spring.

7  On Saturday, May 30, 2020, I chose to protest the

8  lack of humanity afforded to Black individuals when they

9  encounter the police.  That Saturday was not my first or last

10  protest in this vein, as I am a Black woman with a Black

11  mother, father, and brother, hoping to raise a Black child.

12  My encounter with the Chicago Police Department took

13  place at roughly 6:30 PM.  I say roughly because my first

14  correspondence with friends about the incident began at

15  6:45 p.m.  It took us at least ten minutes to run to our car

16  safely from where the incident took place, the intersection of

17  North State and West Kinzie, in the patio section of the

18  restaurant called the Public House.

19  CPD blocked off State and Kinzie in front of us, and

20  they were encroaching on State and Hubbard behind us.  While

21  witnessing minor spats in which protesters yelled at the

22  police, I was under the impression that we were being let

23  through the police line to meet up with other protesters

24  approaching from the west on Kinzie.  This was not the case.

25  As we moved towards our friends and peers, the police

1    used shields and batons to push people back.  This is when I

2    saw a young man pushed to the ground by a police officer and

3    beaten while he used his hand to try to shield his face.  Since

4    the surrounding officers were not trying to stop this from

5    happening, I shouted:  You can't do that.  Simultaneously, a

6    younger woman next to me threw a dirt clod from the Public

7    House patio in the police's direction.  I want to make this

8    very clear, not at them, and not even a symbol of something

9    like that would ever cause an armed officer to say that they

10   feared for their lives.

11       Three officers approached us while, due to poor crowd

12   control, a small group of protesters also fled toward us.  The

13   protesters knocked over the young woman next to me.  As more

14   protesters and police approached, I chose to cover her body so

15   she would not get trampled.  At this point, the police reached

16   us, and I was beaten with a baton on my back.  I estimate the

17   officer beat me for 15 to 30 seconds.  I can't say for sure

18   because I was focused on blocking the young woman who was

19   covering her head as an officer reached around me to beat her.

20   I also focused on the uniqueness of my screams.  This was the

21   first time I heard myself make a sound I could only describe as

22   a combination of shock, fear, and gurgling pain.

23       When the officers stopped beating me, he said:  Get

24   the "F" out of here.  This was the first time an officer told

25   me I couldn't be in that location.  I froze for a moment and

1     said "no" because I was helping the young woman look for her

2     phone that fell out of her hand as she covered her head from

3     the beating.  The officer who beat me, and another, began

4     shouting at the two of us.  So I said:  Okay, but tell us where

5     to go so we don't get beaten again.  There is no where to go.

6              The police slowly rearranged the human-made barricade

7     around the mayhem to let us out.  My husband and I then ran

8     through a series of alleyways to avoid the many police

9     barricades.

10             Thank you for your time.

11             THE COURT:  Thank you very much for your comments.

12             I think we can move on to No. 19, then, please.

13             MS. GALLO:  Hello.  Can you hear me all right?

14             THE COURT:  Yes, we can.  Thank you.

15             MS. GALLO:  Good.  My name is Stephanie Gallo.  I am

16    a Master's nursing student and EMT.  I am a volunteer street

17    medic for Chicago Action Medical and attended the July 17,

18    2020, Black and Indigenous Solidarity Rally as a medic.  I did

19    not see any city or publicly funded medical group there.  All

20    the medics I know of are volunteers.  My statements do not

21    represent Chicago Action Medical or any other organization.

22             For the past decade, I have worked as a wilderness

23    EMT in some of the wildest and most extreme regions of our

24    earth.  I have seen and treated grizzly bear attacks, sea lion

25    bites, jellyfish stings, extreme heat and extreme cold

1    injuries.  I have saved near-drowning victims.  None of those

2    incidents echo in my mind as much as the violent police

3    brutality and subsequent civilian injuries I witnessed on

4    July 17, 2020, at the Indigenous People's Rally in Chicago.

5            I will not be comparing these police actions to

6    anything I have seen in nature because they are incredibly

7    unnatural and inhuman actions.  I saw one police officer bounce

8    from foot to foot and wave their arms and baton around, mocking

9    protesters.  I saw police officers spray peaceful people with

10   sensory-crippling sprays and hit their hands to rip away their

11   bicycles.  The police then shoved and threw people.  The police

12   were not being judicious in who they chose to brutalize.  The

13   police were targeting every single person they encountered,

14   even my fellow medics.  I saw people beg for police to stop

15   touching them and hurting them and to leave them alone.

16           At one point, I was assisting a woman self-administer

17   her inhaler for her asthma that was exacerbated by the

18   chemicals the police were spraying.  I looked up to see a line

19   of six police with helmets on and batons out walking towards

20   us.  I turned to my fellow medic and said:  I'd really like to

21   not get beat up today.  He agreed, and we grabbed this woman

22   under her shoulders and helped her to an area away from the

23   oncoming police.

24           It was reported by CPD and media that civilians were

25   using broken-off parts of banners as weapons.  The only people

1    I saw do this were police officers.  I saw an officer pick up a
2    piece of PVC pipe and swing it at a line of people with
3    interlinked arms, while these people backed away from the
4    threatening officer.  The officer then threw the pipe at the
5    legs of these retreating people.

6          As I treated patients, clouds of sensory-crippling
7    sprays rained down on me.  On that evening, I could feel the
8    burning effects on my skin, in my nose and eyes for hours
9    afterwards.  We ran out of water we were using to flush
10   chemicals out of the eyes of those that the police sprayed.

11         I have attended multiple protests in Chicago as a
12   civilian and a medic.  And as you already know, my observations
13   are not an island.  This is a part of a pattern of brutality on
14   civilians at the hands of the Chicago Police Department.  The
15   City of Chicago and the Chicago Police Department has failed
16   the people and will continue to fail the people if drastic
17   changes are not made right now.  Thank you for your time.

18         THE COURT:  Thank you very much for your time.

19         I think we're on to No. 20; is that right?

20         MS. HICKEY:  Yes, your Honor, that's correct.  And I

21   believe No. 20 is ready in the queue.

22         MS. REYNOLDS-TYLER:  Can you hear me?

23         THE COURT:  Yes, we can.  Thank you.

24         MS. REYNOLDS-TYLER:  Thank you.  My name is Trina

25   Reynolds-Tyler, and my pronouns are she/they, and I'm 27 years

1    old.  I'm a Chicago native and a recent graduate of the
2    University of Chicago here at School of Public Policy.  I am a
3    data analyst and an organizer.

4            On May 30th, minutes after I arrived downtown, I saw
5    police attempting to illegally arrest friends of mine.  The
6    police were shoving the crowd who was peacefully marching down
7    the street.  This peaceful march was met with police shoving
8    and pulling people into them in an attempt to disrupt the
9    protests and arrest them.  While they were not successful, many
10   people were bruised and stepped on, including myself.  As soon
11   as the police began to engage with people, everyone began to
12   scream, and the order that existed before police had arrived
13   dissipated.  People were confused and began to swarm.  Police
14   contributed to a vortex of chaos and escalation.

15           As I approached a bridge near the Trump Tower, I
16   realized that we had been kettled.  Hundreds were surrounded by
17   police officers.  This felt incredibly unsafe.  Not only
18   because the police were closing in on us, but also because
19   there was little room for space to protect ourselves from
20   COVID-19.  At that point, many people started sitting on the
21   bridge, unsure of where to go next.

22           I noticed the officers began to ready themselves to
23   move because they positioned their batons across their bodies
24   and formed a stronger line.  Officers began to synchronicity
25   say "move," while pushing the people who were already packed

1    like sardines on the bridge.  People were screaming for them to

2    stop, yelling that they couldn't breathe and demanding that --

3    to let people through.

4            It felt like I was in the middle of a rugby scrum,

5    squeezed between people and often being lifted off of the

6    ground because the pressure of my body was so intense.  I

7    repeatedly told officers stop pushing because someone behind me

8    was having trouble breathing and was laying on the ground.  I

9    repeatedly told officers to stop pushing because they were

10   hurting me.  An officer hit my leg with a baton multiple times

11   during an arrest of someone beside me who was dragged in, head

12   first, and thrown across the police line by police officers.

13   Because of the police pushing, I was separated from the people

14   that I came with, the people who would keep me safe.

15           On that day, police participated in reckless

16   endangerment.  They put the lives of so many people in

17   jeopardy, while -- who were protesting, practicing their First

18   Amendment right to protest.  Police presence escalated tensions

19   and created a dangerous space for everyone near or around the

20   protest.  They did not report the force that they used.  My

21   friend, through FOIA request and footage, has confirmed that

22   the police do not always submit tactical response reports when

23   they use force, and thus TRRs are not an accurate measurement

24   of the use of force and abuse of power.

25           When police are in proximity to people, situations

1    become violent.  The data generation -- generating process or

2    the data that we use to determine that police are doing a

3    better job is flawed.  I know people who have been stopped and

4    searched without receiving records of that search, seen

5    complaints of violence by police where TRRs were only generated

6    after being called out, and body cameras that police -- where

7    police officers have the discretion about whether or not they

8    turn them on.

9             We need to reduce the power of police and have first

10   responders that are rooted in care.

11            Thank you.

12            THE COURT:  Thank you very much.

13            I don't see Speaker 21 in the queue, but I'll ask if

14   Speaker 21 is available.

15            MS. HICKEY:  I don't believe so, your Honor.  I

16   believe No. 22 is ready, though, so if you want to call No. 22.

17            THE COURT:  Speaker No. 22, then, please.  Thank you.

18            MS. DELANEY:  Hello.  Can you hear me?

19            THE COURT:  Yes, we can.  Thank you.

20            MS. DELANEY:  Thank you so much.  Hello, my name is

21   Erin Delaney, she/her.  I am a labor organizer.  I will focus

22   today on one of the instances of police violence I have

23   experienced over the past few months in Chicago.

24            On July 17th, I was attacked by a Chicago police

25   officer while on Roosevelt Boulevard.  I attended the march

1    that day which led Chicagoans to the Columbus statue.  While

2    watching police flood the green leading up to the statue, with

3    no audible call for dispersal, and no opportunity to do so,

4    unprotected Chicagoans were met with a sea of swinging batons.

5    Screams of help came from the crowd.  People were climbing on

6    top of each other trying to find a way out.  Someone, pulled

7    out by protesters, bleeding from their head so badly that they

8    could not stand.  They were covered in blood.  I saw orange

9    Mace streaming up from the crowd like fountains.

10          My husband and I ran to the concrete barrier on the

11   south side of the statue.  We were assisting injured people

12   trying to disperse.  My husband attended to one person who was

13   maced so badly they could not walk or see.  He put him on his

14   back and carried him to safety away from police.  There was an

15   officer approximately two feet in front of me wearing no

16   protective mask.  I said:  I am just trying to get people out

17   of here safely.  He said nothing and maced me directly in my

18   face.  I could feel the Mace soaking the front of my body

19   completely.  He then beat me repeatedly with his baton, hitting

20   it on my left arm and back multiple times with enough force to

21   draw blood.  The officer then maced me again on the left side

22   of my face, soaking the side of my body.

23          My husband returned to pull me away from the peace

24   officer who was beating his wife.  Fortunately -- I'm sorry, my

25   husband was maced as well.  The officer tore his bike from his

1  hands and whipped his baton at his head.  Fortunately, the bike

2  got in the way of the officer's swing and only a small cut was

3  left on my husband's forehead.  His bike was confiscated.  I

4  could not see.  I pulled my mask off.  This was the only time I

5  had to remove my mask at a protest.  I struggled to breathe.  I

6  have severe asthma.  I was not only incapable but afraid of

7  destroying my only inhaler by contaminating it with Mace.  The

8  burning was unbearable.  I was shaking uncontrollably.  I

9  remember stumbling, my bike still in my hands, just screaming

10  down the street.  My husband pulled me along.  I cried out for

11  water.  While surrounded by officers sworn to protect and

12  serve, only volunteer medics came to my aid.  The burning did

13  not subside for days.  The injuries on my arm and back are

14  still healing.

15          I would like to remind the judge that I pay the

16  salary of the man who saw it fit, who without a word, maced me,

17  beat me, and then maced me again.

18          The Chicago Police Department should have been

19  disbanded a century ago when they murdered labor organizers at

20  Haymarket, decades ago when Jon Burge's torture became public

21  knowledge, the day after Rekia Boyd was murdered.  I am

22  appalled by Lori Lightfoot's obviously clouded judgment in

23  respect to the wildly irresponsible police force.  The thin

24  blue line is choking the life out of the city.

25          Free Mohawk Johnson, who remains incarcerated at Cook

1    County Jail after his bail has been paid and dismantle CPD.

2              Thank you for your time today.

3              THE COURT:  Thank you for your comments.

4              Speaker No. 23, please.

5              MS. NOEL:  Hello, your Honor.  Can you hear me?

6              THE COURT:  Yes, we can hear you.  Thank you.

7              MS. NOEL:  Thank you, your Honor.  I say this in

8    honor of:  I am Rekia Boyd.  I watched it.  The criminals, the

9    froth, and the cowards.  Men who have no right to be police

10   officers and women unnecessarily wielding military weapons.  We

11   have pictures of cops with no masks during the COVID pandemic

12   that has been devastating the community from which they work.

13   And they have had massive COVID infection rates at CPD and at

14   least three confirmed deaths.

15             I saw women who weren't protesting.  Mia Wright,

16   Tnika Tate, Kim Woods, snatched out of their car, and a cop put

17   his knee on Mia's neck, which can only be described as a pure

18   act of terrorism and a hate crime after the George Floyd

19   incident.  They totaled Tnika's car with their baton.  And to

20   add insult to injury and further harm, they charged Mia

21   criminally, an innocent young woman.

22             I absolutely do believe Mayor Lightfoot sacrificed

23   the south and west sides, and I expect full economic recovery

24   by next election, or you, your Honor, should hold her solely

25   responsible for all of the consent decree violations.

1      Additionally, I am disappointed in both Kim Fox and

2  the mayor in their handling of violent police action versus

3  looting and other rebellious violence.  Therefore, Womens' All

4  Points Bulletin, WAPB, as a Campbell plaintiff and coalition

5  member with the power to enforce the consent decree orally

6  moves this court to:

7      One:  Use your inherent power to launch federal

8  investigations under DOJ law against the officers who violated

9  both the consent decree and the constitutional rights of our

10  constituents, citizens and protect them federally -- I'm sorry,

11  and prosecute them federally.

12      Two:  Order a line-item budget of the police and fire

13  department budgets, under the CD's transparency paragraphs to

14  uncover waste and inefficiency.

15      Three:  To recognize the community working groups and

16  order a one-on-one meeting with the MOU stakeholders in regards

17  to the inclusion of community working groups and policy

18  creation, improvements, monitoring and guiding principles of

19  enforcement.

20      Four:  To order CPD to provide the data necessary to

21  assist each working group in writing policy that can be

22  statistically measured for improvement.

23      We have recommendations.  We have specifically

24  recommended to the Chicago Police Department the enactment of

25  two successful programs that include Crisis Assessment Cars and

1    Oregon's CAHOOTS Program.  We would like to submit these

2    programs' successes for your approval to include in the consent

3    decree.  Please let us know if we need to move the court in

4    writing, or our oral motions will suffice.

5          And I have one question for you, your Honor.  Can you

6    have two police safety unions in one city?

7          THE COURT:  That question I'll have to take under

8    advisement because I don't have the answer off the top of my

9    head.

10         I thank you for your comments, and I think it would

11   be helpful, actually, if there is specific things you want to

12   put them in writing.  I mean, obviously there will be a

13   transcript of this proceeding, but there may need to be some

14   background and some context for your request that would be more

15   than you could possibly do in three minutes.  So it would be

16   helpful if you wanted to put anything in writing that would be

17   in the nature of a specific request for relief.  Okay?

18         MS. NOEL:  Yes, sir.  Thank you, your Honor.

19         THE COURT:  Okay.  Thank you very much for your

20   comments.

21         I do not see Speaker 24 in the queue specifically,

22   but that doesn't mean Speaker 24 is not available.  So if

23   Speaker 24 is available, this will be your time.

24         MS. HICKEY:  Your Honor, I do not believe Speaker

25   No. 24 is available, or online, so if we could move to 25.

1    THE COURT:  Okay.  Speaker No. 25, then, please.
2  Thank you.
3    MS. HIYAMA:  Hello, can you hear me?
4    THE COURT:  Yes, we can.  Thank you.
5    MS. HIYAMA:  Hi, my name is Clare Hiyama.  I use
6  she/her pronouns.  I'm 26, and I'm a health educator living in
7  Ravinswood Chicago.  And when schools are in person and in
8  session, I teach all over the city.
9    As a Chicago resident, it has pained me greatly to
10 see the gulf between what we would expect as public servants
11 and what we are actually experiencing at the hands of the
12 Chicago Police Department.  I have been and continue to be
13 appalled at the actions of CPD over the last three months.
14 They have terrorized many people in the city for decades.  And
15 in recent months, they have shown no willingness to change or
16 to take responsibility for their actions.  Even in the face of
17 overwhelming video evidence of their violence, they have not
18 been able to admit that their actions have been excessive.
19    I was at the protest in Grant Park on July 17th,
20 where I saw CPD's brutality firsthand.  Like many others have
21 said, I saw them hit a protester in the head, and I saw the
22 blood running down his face from his temple.  I saw them
23 spraying protesters without warning with an unknown substance
24 from hoses, and immediately after, everyone in the vicinity was
25 coughing and crying and throwing up.  And this is all during an

airborne respiratory pandemic.  I saw them push down individual
protesters and rip their bikes out of their hands.  I saw them
beat people who were trying to run away from them.  Even when
they were looking right at people in clear need of medical
assistance, CPD offered none.  Only later did I see a video of
them beating the friend I attended with.  We had gotten
separated in the chaos that night.  And that was really hard to
watch.

One of the things that showed me the most that night
was the way that the officers on the scene laughed at us.  When
we begged them to leave people alone, they laughed.  When we
were walking away from the scene, they were mocking us.  It
felt like they view Chicagoans who are fighting for justice as
enemies, and they treat us that way.

I was there that night because I believe the city
needs to invest in marginalized communities through healthcare,
housing, mental health services, help fund schools, and to diet
us from punitive carceral systems of control.

What I saw that night reaffirmed my belief that CPD
cannot create or uphold public safety and that we must defund
them.

As a culture, we think that it's really important to
have police to protect us, but I, as a young white-passing
woman would be so reluctant to call upon them because of the
risks that that would entail.  Not only of how they might treat

1    me, but also of how they might treat people in my neighborhood

2    if they came in response to a call.

3            As a health educator, I often get questions from my

4    students about what they should do if they experience sexual

5    violence.  And it's one of the most emotionally difficult parts

6    of my job.  I wish I could tell them there are people that you

7    could call who would come quickly, who would treat you with

8    respect, who would keep you physically and emotionally safe and

9    who would help you get long-term support, but I feel it would

10   be completely irresponsible as an educator to tell them that

11   CPD are those people.  The possible costs are too great.

12           Thank you for your time.

13           THE COURT:  Thank you for your comments.

14           I don't see Speaker 26 in the queue, but if

15   Speaker 26 is available, please go ahead.

16           MS. HICKEY:  I believe you can move on, your Honor,

17   to No. 27.

18           THE COURT:  Okay.  Speaker 27, then, please.

19           MR. JOYNT:  Hello, can you hear me?

20           THE COURT:  Yes, we can.  Thank you.

21           MR. JOYNT:  Great.  Hello, my name is Matthew Joynt,

22   and I am a 36-year-old film composer, artist, small business

23   owner and resident of Chicago.  I'm white, and I use he/him

24   pronouns.

25           For the last six years, I've regularly engaged in

1   public protest against policing.  During that time, I've
2   witnessed and experienced a dramatic increase in police
3   brutality, including extensive retaliatory use of lethal force
4   against BLM and the movement to defund CPD.  This summer has
5   been no exception.

6          At the protest on May 31st, I witnessed an officer
7   deliberately hit a teenage girl in the face with his baton,
8   visibly shattering the bridge of her nose.

9          On June 2nd, I witnessed a young protester ask CPD
10  Officer Andrew Gorlewski, Badge No. 7804:  Don't you care about
11  my black life?  Won't you even think about why we're here?"  He
12  responded:  I don't care about black lives, and I will not
13  think about it.

14         On July 17th, I witnessed CPD pepper spray an adult
15  educator continuously until she began to go into shock.
16  Moments later, officers laughed as they pepper sprayed me at
17  one-foot range, stole my bike, beat me to the ground and hit me
18  repeatedly in the face and body.

19         Since the approval of the consent decree, the 2019
20  federal mandate allegedly designed to bring reform,
21  de-escalation training and accountability to the hellish
22  policing practices witnessed by the DOJ in Chicago, we've been
23  met with nothing but the opposite.  This is because this is not
24  an issue of police reform or a few bad apples.  The entire
25  institution of policing from the time of its inception in this

1  country as slave patrol to the present is a racist project

2  designed to protect the power, property and capital of white

3  people.  But we fail to address our shameful legacies of

4  community disinvestment, segregation, planned impoverishment

5  and the ongoing criminalization of our Black and Brown

6  neighbors, whose ancestors were kidnaped into slavery and

7  exploited to build this country on stolen, Indigenous land.

8          If we want to talk about looting, let's start with

9  white people.  If we want to talk about public safety, let's

10  establish a civilian police accountability counsel and defund

11  the police by 75 percent, investing instead in non-carceral

12  social services, education and mental health.

13          As one protest sign recently read:  The safest

14  communities don't have the most police, they have the most

15  resources, which is why we will continue to be in the streets

16  even in the face of the police intimidating us, lying about us,

17  doxing us online, beating us, arresting us, kettling us,

18  stealing from us, mocking us and smearing us in the press until

19  we see the resourcing of Black and Brown communities and the

20  defunding of the violent, ineffectual and racist system called

21  the police.  Thank you.

22          THE COURT: Thank you, sir. Our next speaker is

23  No. 28, please.

24          MR. DRAKE: Hello.  Can everybody hear me?

25          THE COURT:  Yes, we can.  Thank you.

1    MR. DRAKE:  Thank you.  Good afternoon.  I want to

2    begin by saying that, if the city was half as committed to the

3    consent decree as the attorney represented to this court

4    yesterday, then in the words of the late Senator Abe Bernicoff,

5    we wouldn't have gestapo tactics in the streets of Chicago.

6         My name is Michael Drake.  I'm a 2020 graduate of the

7    UIC JM Law School, where I graduated in the top ten percent of

8    my class.  I'm also a veteran.  I deployed to Afghanistan as an

9    infantryman with the 2nd Cavalry Regiment from 2010, 2011.  I

10   bring up my service to fully contextualize what I say next:

11        CPD's use of force against peaceful protesters has

12   horrified me.

13        On May 30th I attended protests as a legal observer

14   with the NLG.  On that day, I witnessed CPD officers attack

15   protesters with a viciousness and a disregard for human life

16   that I have not seen since witnessing Afghan police officers

17   attack suspected Taliban members.  I was at Trump Tower when

18   CPD attempted to push protesters off of the Wabash bridge.  I

19   was in the very front of the protesters, wearing a legal

20   observer hat.  Officers are pushing us back with batons and

21   protesters behind us were pushing us forward.  To my left, CPD

22   dragged a young woman to the ground and began kicking her and

23   beating her with a baton.  Another protester attempted to

24   shield her and got the same treatment.

25        I attempted to get their names to send to the Mass

1    Defense Committee, which provides free legal representation to
2    arrested protesters.  While trying to get the names of the
3    people being assaulted by the CPD, an officer hit me in the
4    throat with his baton.  As he attempted to do so again, I put
5    my arm up to block it.  After that, a number of officers began
6    hitting me in the head with a baton.  Other officers grabbed me
7    from behind, ripped me over a concrete barrier, where they
8    continued to beat me.  Two other protesters attempted to stop
9    the CPD from beating me and was beaten as well.  I'm unsure of
10   how long I was kicked, punched and hit with batons.  After the
11   beating, I was unable to sit or move for a week without extreme
12   pain.
13           I was arrested and taken to the 18th Precinct where I
14   was held without charge in a urine-soaked cell for over
15   12 hours.  Multiple attorneys and recent law grads were unable
16   to ascertain my location for hours.  No one in jail was given
17   any informational or allowed any phone call until after NLG
18   attorneys managed to find me, figure out where I was and send
19   me legal representation.
20           All that pales in comparison to what I saw last
21   Saturday, August 15th.  In the most heinous act of
22   (unintelligible) violence that I've witnessed in 29 years of
23   life, I watched CPD officers clear out media before attacking
24   injured people being treated by medics on the sidewalk.  The
25   CPD kicked people and medics, hit them with batons and

1  destroyed medical supplies.  CPD officers hit me, shoved me and
2  called me a pussy for pointing out the people who they were
3  assaulting were injured.  I was wearing a NLG legal observer
4  hat that day as well.

5      CPD's behavior last Saturday was barbaric.  If our
6  country followed any international human rights allegation,
7  that act alone would have violated multiple human rights
8  treatment.  If that act occurred during international conflict,
9  it would have violated the Geneva Convention.  But none of
10 that, nor the consent decree, stopped CPD.

11     After that act, the CPD only became more aggressive.
12 They kettled protesters (unintelligible) exit.  They ran into
13 kettled crowds while screaming and banging the sides of their
14 batons.  It was textbook psychological warfare.

15     CPD removed all legal observers from the area and
16 prevented medical aid while they did God knows what to two
17 unlucky protesters who did not manage to escape who were
18 primarily young Black and Brown people.

19     The CPD is the (unintelligible) of the junta, and the
20 city thanks them for it.  I imagine some officers already
21 (unintelligible) their awards of valor due to rogue acts of
22 beating teenagers senseless.  The city blames agitators and
23 umbrellas for the August 16th violence.  However, those that
24 were there know what happened, and no enhanced suspected edited
25 video submitted by the CPD can (unintelligible) what they did

1   that day.

2           As I address this honorable court, CPD has not been

3   made to answer to the crimes.  I doubt they will and never have

4   been.  Regardless, I urge the honorable court to require the

5   CPD to follow the consent decree which requires, amongst other

6   things, proportional use of force.  Thank you.

7           THE COURT:  Thank you for your comments.

8           I do not see 29, 30, or 31 in the attendee's queue.

9           Maggie, do you see any of the next three?

10          MS. HICKEY:  No, your Honor.  I believe you've now

11  called them, and No. 32 is ready.

12          THE COURT:  Okay.  So we can go ahead and move to 32

13  then, please.

14          MS. MULLEN:  Hi.  Can you hear me?

15          THE COURT:  Yes, we can.  Thank you.

16          MS. MULLEN:  All right.  One second.  Good afternoon

17  and thank you for the opportunity to speak.  My name is

18  Margaret Mullen, and I am a 24-year-old DePaul graduate,

19  Chicago native and daughter of two Chicago police officers.  My

20  mother retired as a Sergeant from the First District, and my

21  father was shot in the line of duty when I was six months old,

22  catastrophically injuring him and initiating me into the

23  Chicago Police Memorial Foundation and Gold Star family

24  communities.

25          As a person who has grown up within the police

1  community, I have an intimate understanding of how the police
2  think, what they talk about, how they spend their time, and I
3  detest the fact that the police venerate the people in their
4  circle and demonize the people outside of it.  While
5  protesting, I rarely identify myself as a Gold Star family
6  member.  But when I did, I watched officers soften their glares
7  and listen to me.  It is unacceptable that the subjugation of
8  the Black body is so normalized that, until I identified myself
9  as a Gold Star member, the police would not consider what I had
10 to say.  The police should treat every community member with
11 the same respect that they treat those in their circle.
12        On May 31st and July 17th, I bore witness to the way
13 the people I was taught would keep me safe attacked my peers,
14 brutalized young people and blatantly lied to the public about
15 their actions afterwards.
16        On May 31st, we openly denounced looting in every
17 intersection where we rallied while we watched people break
18 into stores and run across intersections with cash registers
19 and other goods.  There was a clear distinction between those
20 participating in the protest and those who were looting.  And
21 it is important to note that, until we reached downtown Hyde
22 Park, there was not a single officer to be seen.
23        When the protest disbanded around 7:00 PM at 53rd and
24 Lake Park, there was a rush of approximately 15 squad cars that
25 arrived in riot gear and started a police line blocking people

1    from heading west to make it back home before curfew.

2          On July 17th, I participated in the decolonized

3    Zhigaagoong march from Buckingham Fountain to Grant Park.  I

4    witnessed police officers get trapped inside the area taken

5    over by protesters.  I saw the look of terror on their face

6    when they realized they were circled, and they were allowed to

7    walk out without a scratch.  Ten minutes later, they beat young

8    people silly.  I witnessed people screaming and crying with

9    swollen appendages, cracked skulls, blood streaming down their

10   faces and accumulating all their clothes.  There was coughing

11   and vomiting from the chemicals released in the area, and I was

12   dumbfounded by the level of force exhibited against the people

13   the police claim to serve and protect.

14         With all of these experiences being hurtful and

15   traumatic, the absolute worse part of the July 17th experience

16   was Superintendent Brown's press conference the following day.

17   I watched as Super Brown blatantly lied to the public regarding

18   what prompted the violence on July 17th.  He presented a video

19   claiming to be evidence of protesters taking apart a banner

20   with pre-sharpened PVC to jab and throw at the police.  What I

21   saw was the police pull the banner apart in order to hit the

22   people behind the banner with their batons.  The moment I saw

23   Superintendent Brown lie to the public, any remainder of good

24   faith in our leaders was destroyed.

25         There is a bridge that must be built between the

1    police and the community they serve.  With public servants like

2    Super Brown and Mayor Lightfoot, publicly demonizing protesters

3    to maintain a good public image, the people of Chicago are

4    going to continue to suffer.  How are we serving and protecting

5    the community when we lie to the public?

6              Judge Dow and Monitor Hickey, the people of Chicago

7    need you to step in.  CPD is not upholding the standards set by

8    the consent decree, and it is actively hurting people.  I am

9    hurting.  My life was fundamentally altered because of the

10   violence against the police, and for far too long we have

11   accepted excuses from our leaders and scapegoated the actions

12   of individuals like Jason Van Dyke, rather than acknowledge the

13   role that police have played in protecting property and the

14   suppression of Black and Brown people.

15             I believe that meeting 100 percent of the milestones

16   set by the consent decree is a start, but only by defunding CPD

17   by a minimum of 75 percent will we be able to treat the root

18   causes of crime instead of relying on a reactionary system that

19   hurts people every day.  Thank you.

20             THE COURT:  Thank you for your comments.

21             I think Speaker No. 33, I believe, is -- I think I

22   saw.  Well, I'm not sure.  Is Speaker No. 33 in the queue,

23   please?

24             MS. HICKEY:  Your Honor, I don't believe Speaker 33

25   is.  I, like yourself, mistakenly thought they were.  But if

1  you want to call 33 and 34, I do not believe they have signed
2  on.  But No. 35 is ready.
3          THE COURT:  Okay.  Well, let's do one more call for
4  33 and 34.
5          Okay.  Let's try No. 35, then, please.
6          THE COURT:  I think you may be on mute.  I think
7  we're getting there.  I think you still may be -- there we go.
8          MR. JAWORSKI:  Can you hear me?
9          THE COURT:  We can hear you now.  Thank you.
10         MR. JAWORSKI: Okay. Thank you so much, your Honor.
11  My name is David Jaworski.  My pronouns are he/him.  I'm 29,
12  and I live on the north side of Chicago.
13         On July 17th, I attended the Black Indigenous
14  Solidarity Rally at Buckingham Fountain.  Afterwards, we
15  started marching and ended up at the Columbus statue.
16  Immediately I heard screaming and calls for help as police in
17  riot gear with batons surged towards the statue.  I walked my
18  bike to a line of bike marshals standing, unmoving, not given
19  official calls to disperse.  We were trying to slow a group of
20  police about to beat protesters.  I was targeted by a
21  white-shirt officer about twice my size.  He was un-gloved,
22  unmasked, and he picked me up by the throat, lifted me off the
23  ground and threw me.  I was choke-slammed by a police officer
24  acting look a professional wrestler fighting to the audience.
25  I got back on my feet and got ahold on my bike as he tried to

steal it from me.  During the scuffle, I was being trampled and
lost my left shoe.  I was shoved again and fell onto a bike.
My foot caught between the spokes.  I was shoved and trampled
again while on the ground and my pinky toe snapped between
those spokes.  Panicked and injured, I had to pull myself and
my bike from the officers and hobbled away.  Had I not been
wearing my helmet, I would have likely been concussed from
being thrown so many times.  I was separated from my two
friends that I went with and began calling them so we could
leave.  However, police had everyone surrounded so it would
have been impossible anyway.

After ten minutes, I found one of my friends and told
them about my foot.  Concerned, they offered to take me to the
paramedics.  The ambulances were parked on Columbus near the
Roosevelt entry section, next to all the cop cars, beyond the
line of armed police, brutalizing protesters, making it
impossible to get proper medical care, even if one could trust
those that were standing with the very people beating them.

I finally got through to my second friend who had got
swept up and was standing with protesters on the south side of
the statue, beyond the police that had just beaten me.  My
friend had sounded scared and did not want to be there but also
was not about to leave the people by their side opened and more
harm.  I lost contact with that friend and saw a red-orange
cloud in the area.  Everyone around me started coughing, and I

1   heard calls for medic every ten seconds.  They were coughing,

2   and they had to take off their mask because they had been

3   pepper sprayed.  I found out my friend was hit on their arms

4   with a baton until they could no longer hold their bike.  Their

5   bike was stolen from them, and they were pepper sprayed, their

6   whole body burned, and that it soaked into their genitals for

7   hours afterwards.  My bike was broken, my friend's stolen, and

8   had we not been able to get a ride from another friend, I would

9   have had to walk the five miles home on a swollen injured foot.

10          I am testifying today because I believe my story

11  should be heard.  I am a peaceful person that was attacked by a

12  violent, uncaring organization.  I lost already scarce work

13  because of my injury and possible exposure to COVID.

14          My story and identity are now known to the police and

15  their supporters who released the name and addresses of people

16  who already have suffered trauma at the hands of the CPD.  We

17  saw this on their Twitter account on the 15th of August.  My

18  friend, who is an organizer had to -- I had to move them

19  because they were doxxed and people had showed up to their

20  home, faces covered, trying to attack them and terrorize them.

21  We feel scared and vulnerable from the very people designated

22  to serve and protect us, but they don't care.

23          Thank you, your Honor.

24          THE COURT:  Thank you.

25          If I'm right, No. 36 was already a cancellation at

1    the beginning; is that right?

2              MS. HICKEY:  I believe so, your Honor.

3              THE COURT:  Okay.  So we're on to Speaker No. 37,

4    please.

5              MR. MERCADO:  Hello, your Honor.  Hello, everyone.

6    My name is Juan Mercado.  I use he/him pronouns, and I am a

7    Latino person of color.  I am currently employed by Howe

8    Corporation as an inside sales coordinator.  I do not represent

9    them with these statements.

10             I was at the decolonized rally and march on

11   July 17th, along with my partner, which began at Buckingham

12   Fountain and made its way to the Columbus statue.  We were

13   there in solidarity with the Black and Indigenous organizers,

14   demanding to defund CPD, get police out of CPS, and amongst

15   other demands.

16             I will focus my testimony on what I witnessed at the

17   Columbus statue.  And I also want to point out that there is a

18   video of, you know, things being thrown at officers.  I heard

19   rumors that there was rocks and frozen water bottles.  I can

20   confirm that I personally did not see anything of the sort.

21   And, even so, police dispersed from the statue and were safe

22   and then returned.  And, here, as protesters were finally

23   surrounding the statue, police were on our perimeter at this

24   point, and they were up on the street, they were in the

25   walkway.  For a while, everyone was just standing around,

1  including police.  And then at some point CPD made multiple

2  attempts to try and get through the crowd and get to the

3  statute.  They used the batons and their Mace to beat and spray

4  anyone in their path, and, you know, against unarmed protesters

5  who were of no physical threat to them.  In one specific

6  instance, I recall two officers laying on top of a gentleman

7  who was lying on the ground.  They were on top of him.  And

8  knowing that people have suffocated when police have been on

9  top of them and died, I yelled at them to get off of him.  At

10  that time, one police officer stood up, walked toward me and

11  yelled something at me.  I believe he said:  What you're doing

12  is wrong, as he proceeded to hit me with his baton on my left

13  arm.  And then I backed up, and I got caught up with someone's

14  bike.  And as I'm frantically trying to get uncaught, you know,

15  we're afraid that we're going to get hit again, that we're

16  going to get sprayed, I see two more officers get on top of the

17  man lying now in a fetal position on the ground and all of them

18  started to beat him with the batons.

19          Finally, once I got relief, I began tending to people

20  who were maced, or sprayed, giving them eye flushes.  Many of

21  them were screaming in agony, gagging, coughing.  And a couple

22  of them mentioned that the police sprayed them directly into

23  their eyes, targeting their eyes.

24          You know, at this point it felt like a battle zone.

25  It felt -- it was scary to see.  I couldn't believe what I was

1    seeing with my own eyes.  It wasn't on a phone screen.

2           Anyway, eventually the police rallied back onto the

3    street and later, once more police arrived, and I believe

4    National Guard, or people in olive fatigues, they finally

5    rushed the crowd one last time, breaking through, using their

6    Mace again and using their batons.

7           And I just want to say that was not a display of the

8    police protecting people, this was a display of police

9    protecting inanimate objects.  And it's clear to me now that we

10   do need to defund CPD and reinvest in communities.  There were

11   so many cops there from different districts that those

12   resources can be better used to serve our communities.  And

13   that's all I have to say.  Thank you for your time.

14          THE COURT:  Thank you for your time.

15          I don't see No. 38 in the queue, but I do see Speaker

16   No. 39.  So if we could move on to Speaker No. 39, please.

17          MR. HOLDAHL:  Hi.  Can everyone hear me okay?

18          THE COURT:  Yes, we can.  Thank you.

19          MR. HOLDAHL: Hi, my name is Val Holdahl.  I'm white,

20   I use they/them pronouns, and I am 28 years old.  I have

21   participated in community organizing for the last four years,

22   one of my primary roles being in direct action setting serving

23   as a street medic.  I was trained in 2017 as a street medic by

24   a collective called Chicago Action Medical.  I'm speaking on

25   behalf of myself as a voluntary street medic and protester and

1   someone who has personally experienced and witnessed harm by

2   CPD.  My statements do not represent Chicago Action Medical the

3   Street Med Org, or any organization.  Although I do voice my

4   support on behalf of the 2018 Black Lives Matter Chicago

5   consent decree and any Black Indigenous people of color,

6   community members who reinforce their complaints regarding the

7   violent, physical and emotional harm caused by Chicago Police

8   Officers and their department.

9        Although there are several incidences I could speak

10  on, I will be focusing on July 17, 2020, the Black and

11  Indigenous People's Rally held at Buckingham Fountain.

12       When we began marching, there were already dozens of

13  fully armored officers waiting for our arrival with batons,

14  multiple types of guns harnessed on their bodies and chemical

15  devices that released toxic sprays.  Crowds began to gather

16  around the statue.  Police lined up surrounding everyone with

17  their bikes and blocking off most paths to exit.  You may

18  recognize this tactic as kettling.  Protesters were

19  non-violently attempting to protect the most vulnerable people,

20  and they were met with brutal force by the police for doing so.

21       This led to the dozens of people getting pushed down

22  or off their bikes, having their bikes taken, destroyed or

23  stolen and used as weapons by the police to knock down more

24  bystanders.  I watched multiple individuals get beat with

25  batons directly to their head, face, chest, arms, nearly

everywhere on their body for nearly standing in the middle of
the commotion. I watched people I love get that, happen to
them too. None of the protesters I saw were fighting the
officers, even while they were being beaten and provoked. I
could not count the number of protesters affected by the
chemical weapon sprayed that evening. I also was affected by
the sprays they were using. It felt like sharp and stinging
objects were stuck in my throat, and I coughed so hard I almost
vomited. This happened to me multiple times that night. I saw
protesters having asthma and panic attacks from the spray, in
addition to the debilitating injuries from being beaten with
batons, bikes, and even PVC pipes. Along with the other
medics, I spent most of the time rinsing protesters' red and
inflamed eyes out with water to delete the effects of the
chemical weapons. I continued to see bloody head injuries,
contusions, raw abrasions to skin and numerous other injury.

Later in the evening, there was jail support
organized at 51st and Wentworth and Division and Laramie
precincts. The detained individuals were not provided medical
care and were held for hours with chemical spray burning on
their skin and their eyes. My partner was one of those
detained. It destroyed her glasses, and she couldn't see for
hours on top of the damage to her eyes.

One protester even had a seizure while under arrest
and being detained and was transported to a hospital, only for

1  the care of that seizure, not to address the intense bodily

2  harm caused that evening by the police officers.  The police

3  department demanded this protester's return to the precinct

4  after becoming stabilized from the seizure.

5       I hope that by sharing what I have witnessed due to a

6  very small insight to only a few of the times I have seen

7  police brutality against protesters, this is not even including

8  the ongoing police brutality against Black and Brown lives,

9  people experiencing homelessness and people with disabilities

10  that I've seen as a bystander.  I have seen the use -- police

11  use protests and demonstrations as an excuse to bully,

12  intimidate and abuse people exercising their First Amendment

13  rights because protesters are seen as quote-unquote

14  "resisting."

15       Since I don't have the time to go over other events

16  where I have seen lethal force against protesters by police, I

17  will just say the dates:  May 30, June 1st, August 9th and

18  15th, all within 2020.  And none of these officers were wearing

19  masks or even practicing COVID-19 precautions.

20       Police should be prohibited from harassing and

21  trolling the families and communities of people murdered by the

22  police.  The police need to be held accountable for their

23  actions.  They need to be removed from protests, and the police

24  department budget needs to be reallocated because their

25  presence promotes the opposite of feeling protected.  They want

1    to instill scare, and they know that.  Even you all know that,

2    and so do the political leaders of Chicago.  Yes, that includes

3    Lori Lightfoot.  Thank you.

4             THE COURT:  Thank you for your comments.

5             We have Speaker No. 40, then, please.

6             MS. BETZEL:  Can everyone hear me?

7             THE COURT:  Yes, we can.  Thank you.

8             MS. BETZEL:  Thank you.  My name is Alex Betzel.  My

9    pronouns are she/her/hers.  I'm white, I'm 30 years old, and

10   I'm a fundraiser at WTTW Channel 11 and classical WFMT 98.7.

11            On May 30th, at about 2:00 PM, I rode my bike down to

12   Daley Plaza to join the protests there against the pattern of

13   police brutality by the Chicago Police Department, as well as

14   the brutal death of George Floyd and Breonna Taylor.

15            I got off my bike and started to March with the other

16   protesters, and at about 4:00 o'clock, we started to approach

17   the Trump Tower.  That is when police began to push into the

18   crowd.  I turned, and I started to walk away from the police,

19   and at that time one officer ripped my bike out of my hand and

20   another threw me on the ground.  They trailered back into the

21   crowd of protesters, and over about the next hours they

22   continued to push into the protesters.

23            I was on the front line of protesters, and at that

24   time Officer Angelo Gallegos pressed his baton horizontally

25   against my chest and also my neck.  I turned my head so the

1   baton wouldn't be directly against my windpipe, and he

2   continued to push.  He pinned me up against the protesters

3   behind me until I couldn't talk.  And then at that point I

4   couldn't breath anymore, and I couldn't keep my feet underneath

5   me, the crowd was moving so much, and my knees gave out.  So he

6   was pressing the baton against my neck so hard that I couldn't

7   fall to my knees.  I was hanging by his baton.

8           When I started to go completely limp, another

9   protester called him off, said, she is choking, she can't

10  breathe, she can't breathe, take off your baton.  I think that

11  protester saved my life that day.

12          Later that day, I also watched the police swing their

13  batons and hit protesters in the head, the neck, the shoulders

14  the face.  Mainly protesters of color.  I watched groups of six

15  or seven officers target individual, unarmed protesters and

16  chase them down, tackle them, beat them with their batons and

17  arrest them.

18          For the next couple of days, my throat hurt so bad.

19  It hurt to talk and cough.  I had pain in my neck for almost

20  two months following that protest, and I still have trouble

21  focusing at work because of the intrusive memories and the

22  rising sense of panic.  I am seeking additional therapy for the

23  emotional trauma, and it haunts me to this day.

24          Thank you for your time.

25          THE COURT:  Thank you for your comments.  We can move

1   on to Speaker No. 41, then, please.  I think you're on mute.

2              MR. HANNIGAN: Okay.  How about now?

3              THE COURT:  Much better.  Thank you.

4              MR. HANNIGAN: All right.  Thank you.  Sorry about

5   that.

6              THE COURT:  That's okay.

7              MR. HANNIGAN:  Hello, my name is Matt Hannigan.  I'm

8   a resident of Chicago, Illinois.  Thank you for this

9   opportunity to speak.  I attended a demonstration which began

10  at Millennium Park on Saturday, August 15th and would like to

11  relay my observations.

12             Once the group of demonstrators convened at Michigan

13  and Wacker, the police quickly surrounded us on the east, west

14  and south, while the north side of the intersection was blocked

15  by a raised drawbridge and a large truck, essentially trapping

16  us.  It was immediately apparent that the police, who

17  outnumbered the protesters by a factor of at least 2-to-1,

18  would not be treating us as the peaceful protesters that we

19  were.  The officers arrived clad in helmets, visors, batons and

20  armed with pepper spray.  Despite the ongoing pandemic, very

21  few officers wore face masks.

22             Not long after the police surrounded the protesters,

23  I witnessed a ranking officer in his 50s or 60s in white

24  short-sleeve shirt and black vest walk from the west side of

25  the intersection to the east.  Instead of simply walking around

1    the perimeter, he chose to walk through the group, clearly as

2    an act of intimidation.  I saw him violently shove a young

3    woman out of his way for no reason other than to assert his

4    dominance over the crowd.  The officer could have easily walked

5    behind the large truck parked at the base of the bridge, a path

6    that would have been clear of my protesters.  I would like to

7    stress the importance of this.  His use of unwarranted violence

8    was extreme and completely unnecessary and ultimately

9    avoidable.

10         A few minutes later, I saw protesters take out

11   umbrellas.  The police violently ripped their umbrellas out of

12   many of the protesters' hands and then began hitting them with

13   their batons.  I would like to make clear that the umbrellas

14   were not used in any sort of menacing, threatening manner.  I

15   witnessed unarmed protesters wearing nothing but regular

16   clothing get beat on the head and arms by Chicago police

17   officers in full protective gear.  How can it be a crime to

18   carry an umbrella?

19         Soon after I witnessed pepper spray deployed within

20   inches of protesters' faces.  It's difficult to describe the

21   feeling of seeing protesters being pepper sprayed by CPD, but I

22   became extremely fearful for my safety.  Not at the hands of

23   the protesters, but at the hands of the Chicago Police

24   Department.  I witnessed young people stumble into the middle

25   of the interaction, blinded by pepper spray, writhing in pain,

1  panic and confusion, ripping their masks off to breathe and

2  screaming in agony.  The use of pepper spray in the midst of a

3  respiratory pandemic seems like an extremely cruel and callous

4  response to a group of young people just trying to make their

5  voices heard.  With the smell of pepper spray fresh in my

6  nostrils, I left the area.

7          I'd like to make clear that the violent police

8  response to this peaceful protest was completely unwarranted.

9  The protesters were simply exercising their First Amendment

10  right to free speech and assembly.  The police violated that

11  right by beating and pepper spraying us.  CPD clearly did not

12  have safety of anyone in mind.

13          Thank you very much.

14          THE COURT:  Thank you.  Let's see, we have about ten

15  minutes until we're going to take the midafternoon break, so

16  let's move on to Speaker 42, then, please.

17          MS. ZELDIN:  Hi.  Can you hear me?

18          THE COURT:  Yes, we can.  Thank you.

19          MS. ZELDIN:  Thank you, your Honor.  My name is Wendy

20  Zeldin.  My pronouns are she/they.  I am 35 years old.  I'm a

21  parent of an eight-year-old CPS student, and I manage a

22  farmer's market on the south side.

23          On July 17th I attended the Black and Indigenous

24  Solidarity Rally at Buckingham Fountain.  I marched to the

25  southern edge of Grant Park with a handful of my friends.  We

1   were hopeful and energetic.  I was happy to be out supporting
2   the incredibly youth activists and was inspired by the kindness
3   and generosity that I saw around me.  Complete strangers
4   offered me snacks, water, hand sanitizer as we walked.  I felt
5   encouraged and optimistic.
6           Where at first police were surrounding the Columbus
7   statue, they quickly retreated to the outskirts of the park.
8   My friends and I were also near the park edge, where we stood
9   chanting and cheers, peacefully exercising our First Amendment
10  rights.  The police were blocking the one (unintelligible) exit
11  by us, just sort of Roosevelt.  They stood there for about
12  20 minutes, casually chatting and leaning against their bikes.
13  I remember looking at their riot gear and thinking it was so
14  ridiculous that they'd come with batons and helmets dressed for
15  a battle.  I had on overalls and a crop top, which I would have
16  never worn, had I known what was coming.
17          After about 20 minutes, suddenly multiple vans pulled
18  up right behind the officers.  Dozens more cops in full riot
19  gear came out, including a couple in white shirts.  Within a
20  minute of arriving, they began distributing cans of pepper
21  spray.  Some of them (unintelligible) all the cannisters and
22  yelled out a warning.  We started chanting:  Don't do it.
23  Don't do it.  Those were the last words out of my mouth before
24  my friends and I were assaulted by CPD.  They gave us no
25  warning whatsoever.  They didn't ask us to move.  They didn't

1    ask us to leave.  They didn't tell us that we needed to

2    disperse or else they'd attack.  There was no opportunity for

3    compliance.  They didn't care about our safety, our health, or

4    our well-being.  They didn't want us to disperse, or they

5    wouldn't have been blocking the exit.  They wanted to hurt us.

6    They sprayed the chemicals directly toward my face.  I ducked

7    and squatted down, immediately blinded and coughing profusely,

8    wanting to get my face away from other people because I am

9    terrified of contracting COVID.  The cops sprayed more straight

10   onto the back my head, also the nape of my neck.  My skin was

11   on fire, and I couldn't breath.  I knew I needed to run away

12   and get fresh air, but as I tried to stand up to leave, they

13   sprayed me again.  I had no idea where any of my friends were.

14   I couldn't see.  I just heard batons cracking and people

15   screaming on all sides of me.

16          (Audio breaking up) trying to escape, and strangers

17   pulled me away and flushed my eyes out.  When I could

18   eventually see, the scene was horrific.  Officers were

19   brutalizing protesters with their batons and bikes.  A young

20   man walked by me with blood pouring out of his mouth, running

21   down all over his shirt.  It took me hours to clean the

22   chemicals off of my clothing, my skin and my hair.

23          I went to sleep crying, my body still searing from

24   the spray.  I had to be up for work at 5:00 AM.  I ran the

25   farmer's market the next day with my hands, my neck, and my

1    knees still on fire.  It took a whole 24 hours for the pain and

2    burning to stop.  I was covered in bruises on my ribs and my

3    back.  I use a birth control that makes it so that I don't

4    menstruate.  But after that night, I was bleeding for days.  A

5    nurse friend of mine told me it was potentially triggered by

6    the chemicals, but most likely it was a result of the extreme

7    trauma and stress.  I have experienced disassociation, extreme

8    anxiety and nightmares regularly since this event.

9          CPD assaulted me for doing nothing more than standing

10   in a park peacefully chanting with my friends, exercising my

11   right to protest, and I will never forget this.  I am fully

12   aware that this experience is nothing compared to what so many

13   Black and Brown people encounter regularly from the CPD.  This

14   corrupt institution must be defunded, and those resources must

15   be reallocated to social workers, mental health specialists and

16   non-partial justice practitioners who will truly serve and

17   protect us.  Thank you very much.

18         THE COURT:  Thank you for your comments.

19         I don't see Speaker 43, but I do see Speaker 44.  I

20   don't see 45, but I do see 46.  So, let's see, if we can move

21   to Speakers 44 and 46, and then we'll take the break after

22   that.

23         So if Speaker No. 44 is available, that will be

24   great.

25         MS. FLORES:  Hello.  Can you hear me?

1          THE COURT:  Yes, we can.  Thank you.

2          MS. FLORES:  My name is Patricia Flores.  My pronouns

3    are she/her, and I'm 26, and I'm white.  I have volunteered to

4    speak at this hearing today because I am deeply concerned about

5    how CPD has handled the recent protests.  I have attended

6    various protests.  The following will focus on my experience on

7    May 30th and July 17th.

8          I have been shoved, hit and had to inhale pepper

9    spray from CPD officers who most often have their badge numbers

10   covered.  I have seen protesters with head wounds gushing

11   blood.  I have seen them have their bikes stolen, and I have

12   seen them kettled by cops, as well as trampled and beaten with

13   batons.

14         I left most of May 30th and July 17th protests with

15   bruises on my torso and calves from police hands and batons.

16         Although the role of police officers is supposed to

17   be to serve and protect, they have shown at protests that they

18   are only there to serve and protect their fellow officers.

19         They unite to unleash violence on people protesting

20   police violence.  They watch out for each other, but they do

21   not care for protesters at all.  They treat us not as people

22   but as an inconvenience.

23         The way CPD has responded has only proven they cannot

24   be trusted to keep us safe, as they repeatedly reign violence.

25         The fact that I have seen no officers stand up to

1    their colleagues in order to stop this violence, there is a

2    violent and corrupt nature of CPD as a whole.  The violence CPD

3    has unleashed on protesters would be criminally punishable if

4    anyone without their uniform did it, and I do not believe

5    officers deserve to be exempt simply because they're officers.

6              CPD has shown us that they cannot be trusted over and

7    over again.  They have harmed our communities immensely in a

8    time of great need, and I find their actions to be grotesque

9    and despicable.

10             I cannot forget the violence I have seen and

11   experienced on May 30th and July 17th.  The memories weigh

12   heavily on my mind, as I am sure it does on the other

13   protesters' minds.

14             I do not want to leave today without mentioning that

15   the violence from CPD during these protests will also have very

16   negative mental health impacts on all who attended.

17             CPD has mentally and physically harmed the people

18   they are supposed to protect.  They need to be held

19   accountable, and they need to be defunded.  Thank you.

20             THE COURT:  Thank you.

21             I think our final speaker before the break, then,

22   will be Speaker No. 46.

23             MR. CRAIG:  Can you all hear me?

24             THE COURT:  Yes, we can.  Thank you.

25             MR. CRAIG:  Thank you for giving me a chance to speak

1   today.  My name is Kyle, I'm a resident of Chicago.  I'm here
2   today to share my concern for the severe and unwarranted police
3   violence I have witnessed during the Saturday, May 30th protest
4   against systemic racism, police brutality in downtown Chicago.

5           At around 6:30 PM, my wife and I were standing at the
6   intersection of north State Street and west Kinzie Street.  We
7   were standing in front of the Public House Restaurant, when a
8   line of Chicago police officers passed us on foot going west on
9   Kinzie.  At this point, a protester said something to the group
10  of officers that I was unable to hear.  An officer who had
11  already walked past us broke off with a group of officers, then
12  turned around and walked back about 10 to 15 feet east towards
13  the protester and began beating him with his club.  Another
14  officer then stepped in and also started hitting the protester.
15  The two officers continued hitting the protester, even when he
16  was on the ground, tucking his head into his chest and covering
17  his head with his arms in an attempt to block their blows.
18  Shocked protesters then began telling the officers to stop this
19  brutality.

20          At this point, police officers began charging us from
21  all sides, shoving us with their batons.  A young woman fell to
22  the ground and was getting trampled by the group.  I stopped to
23  help her before I was able to pull her -- and before I was able
24  to pull her up, I felt a push from a police officer.  This
25  officer repeatedly shoved me extremely forcefully with his

1    baton, which he was holding horizontally with both his hands,

2    hitting me in the face and chest.  He pushed me about 20 feet

3    down State Street until he caused me to fall to the ground,

4    knocking my glasses off and breaking my camera, which I was

5    holding in my hand.  This interaction left a large, dark purple

6    bruise on my right arm that lasted for weeks after the protest.

7            After getting helped up by other protesters, I

8    couldn't see where my wife was.  Distraught, I went to try and

9    find her.  I was confronted by the same officer that slammed me

10   to the ground and said to him:  Please, my wife is over there,

11   pointing to the corner of State and Kinzie.  This officer then

12   shoved me again, striking me in the face three times with his

13   baton and said:  I don't care, you shouldn't have come here,

14   you "F-er," but said the word.

15           A few seconds later, I reunited with my wife who had

16   been struck repeatedly on her back by police.  By this time,

17   huge crowds of officers were now coming towards protesters from

18   all streets in all directions and tear gas was being deployed.

19   At this point, we left downtown, running through alleyways to

20   escape from the officers' barricades.  I'd also like to note

21   that neither my wife nor I ever heard any warning from police

22   that we needed to disperse.  One second we were standing there

23   and the next second getting hit with batons.

24           Thank you for your time, your Honor.

25           THE COURT:  Thank you for your comments.

1          And I want to thank everybody, this first session,

2     for comments.  We're going to take a break until 3:15 to allow

3     the court reporters to switch out, and then, when we pick up,

4     it will be Speaker No. 47 is where we'll pick up for the second

5     session today.  So, again, thank you all for your attention,

6     and we'll resume at 3:15.

7          (Recess from 3:00 p.m. to 3:15 p.m.)

1          THE COURT:  Good afternoon, everybody.  Thank you for

2   your patience.  I've tried to go through with the Monitor

3   during the break to make sure that we do not miss anybody.  So

4   we'll pick up with Nos. 47 through 60, and then we'll go back

5   and make another pass through those who were skipped over

6   previously to see if anyone has gotten back on the line here.

7   So with that, I think -- I don't see 47, 48 or 49 in the queue,

8   but if any of those folks is in the queue if they could please

9   speak up now.  If not, I think we'll move to No. 50, please.

10          MS. HICKEY:  I believe, your Honor, No. 50 was a phone

11   number which seems to have dropped off.  So maybe they'll call

12   back in and we'll recall the numbers at the end.  Maybe they

13   dropped off at the break and they will be calling back in.

14          THE COURT:  Okay.  That will be fine.  And as I said,

15   we'll make another sweep here after we get to 60.  So I don't

16   see No. 51 but I do see No. 52, so if No. 52 could be admitted

17   into the participant space, and then we will hear from No. 52.

18          I think you're still on mute.

19          MR. SAKER KUNKEL:  Good afternoon, your Honor, members

20   of the court.  My name is Samuel Saker Kunkel.  I use he/him

21   and they/them pronouns and I work as a maker and repair person

22   of orchestral stringed instruments.  Thank you for the

23   opportunity to address you directly.

24          I would like to use my time to describe my personal

25   experience with the excessively brutal and zealously applied

1    crowd control tactics by the Chicago Police Department on

2    July 17th, 2020.  The purpose of today's action was to rally

3    for solidarity with the Black and Indigenous citizens of our

4    city, who are among the most marginalized ethnic groups in

5    America both historically and critically.  Today's chronology

6    already being a well-established part of the public record, I

7    will deal only with the actions taken directly on my own

8    person.  The exact order of events is cloudy somewhat, so

9    please bear with me.

10         With the largest part of the group dispersing, I found

11   myself unsure of what to do until I observed a women in

12   indigenous dress resolutely standing her ground with her arms

13   raised.  In the spirit of solidarity, I chose to take a

14   position beside her.  Having already witnessed the making and

15   the pawning of other protesters, I felt obliged to offer what

16   protection my presence could possibly offer.

17         It was then that the small group of protesters,

18   perhaps 15, I found myself among was approached by officers.

19   After a single, half-mumbled order to move back went

20   unacknowledged, we were rushed by a phalanx of police using

21   batons to shove and grapple.

22         In the midst of this clash, I was dealt a burst of

23   mace by an officer.  The effects were rapid.  I tasted a harsh,

24   metallic bitterness and my eyes began to burn fiercely,

25   reflexively clamping shut.  The effects were disorienting and

173

1   debilitating per design.  Off balance and unaware of my

2   surroundings, I was shoved to the ground, and upon landing

3   dealt two blows of the baton by an officer.  I was unable to

4   see, much less menace.

5          Collecting myself as best as I was able, I pulled the

6   closest person to me from the melee and began to retreat,

7   feeling a sense of shame and cowardice at being so easily

8   rebuffed, matched only by gratitude for my co-dissident

9   flushing my eyes of chemicals outlawed for use in war by the

10  Geneva Convention.

11         It was not until after I had reached the half mile to

12  the safety of the medical tent at Buckingham Fountain that I

13  was able to assess my injuries.  A few scrapes from falling.  A

14  growing bruise on my right kneecap from the second club strike,

15  and a nasty, deep cut on my left shin from the first, bleeding

16  profusely.  My wounds were not as bad as some, but we're not

17  here to compare scars, we're here to assess the behavior of

18  people who so callously applied such brutality.  At no point

19  did I provoke or provide pretext for such force to be applied

20  against myself beyond the thin pretense of disobeyed order.

21  (inaudible).

22         Any one of the methods applied against me could have

23  been effective alone.  Having sprayed chemicals -- illegal on a

24  battlefield -- into my eyes, I very reasonably could have

25  already been considered neutralized.  Hurling me to the ground

1   was, shall we say, redundant, and the batoning spiteful.  My

2   interaction illustrates the eagerness on the part of police to

3   use force not only as a method of detaining those suspected of

4   committing a crime, but as a punitive measure alone.

5         This Court does not need me to outline how these

6   practices subvert due process and cheat the Court and the

7   citizenry, or how presumption of innocence becomes moot when

8   the police add to their already overladen list of

9   responsibilities, the role of the judge, jury, and all too

10  often executioner.

11        I want to end by saying that police are the only group

12  in America who possess a legal pretense to use violence against

13  those who they identify as their political adversaries.  A

14  privilege actively defended by politicians, a powerful union,

15  and popular mythology.  Thank you for your time.

16        THE COURT:  Thank you for yours.  I do not see speaker

17  53.  I saw speaker 54 before the break, but I don't think that

18  person has returned yet.  So I think we're on to speaker

19  No. 56, please.

20        MR. BAIRE:  Hello, can you hear me?

21        THE COURT:  Yes, we can.  Thank you.

22        MR. BAIRE:  Hi.  Thank you, your Honor.  Thank you,

23  everyone.  My name is Max Baire, and I'm a

24  Puerto Rican-Lebanese resident of Chicago's north side.  On

25  July 17, 2020, I attended the solidarity rally in Grant Park in

375

1    Chicago.  When I first arrived at the park to stand in

2    solidarity with Chicagoland defenders, it was a peaceful scene.

3    It was hot out and I was tired from a long week of work, but my

4    spirits were lifted because of the immense outpouring of love

5    and energy coming from the Black and Indigenous demonstrators.

6    We were angry, yes, and we were protesting.  But we were also

7    singing and dancing and using this moment to celebrate just

8    what it is what we're fighting for.

9         But, you know, as we heard already, what began as a

10   peaceful protest eventually turned into a violent one.

11   Violence that was initiated, agitated, and exacerbated by the

12   Chicago Police Department.  We started at Buckingham Fountain

13   and eventually made our way to the Christopher Columbus statue

14   near the intersection of Columbus and Roosevelt.  I walked

15   myself and my bicycle along with the group and decided to

16   integrate my bike with the marshals who were keeping us safe.

17        I positioned myself in a row of other cyclists around

18   the Columbus monument, and we interlocked the axles of our

19   bikes together to form a barrier protecting less-shielded

20   demonstrators.  At one point, we were knocked over by the

21   police, and I became pinned between my bike and another.

22   Eventually I had gotten up and we formed another barrier.

23        When one officer had enough of us, he had briefly

24   asked us to make a hole.  A difficult order to follow taking

25   into account the sheer volume of people.  When the officer

1    didn't immediately get his way, he attempted to rip my bike

2    from my hands.  I didn't let go and he began to club my wrists

3    with his baton.  An action he appeared to take pleasure in

4    judging from the smile on his face.  Two strikes on my left

5    wrist and a third on my right.  On the third blow I was

6    reminded of a formerly broken wrist bone and I let go for fear

7    of re-breaking it.  So he had ripped the bike from my hands,

8    and once it was in his possession, I witnessed him toss it

9    behind him and that was the last I ever saw my bike.

10         Shortly after, I witnessed a different officer

11   standing with a few cops to the right of my assailant, spraying

12   a red can over and into the crowd I was a part of.  I was very

13   suddenly overcome with a burning sensation in my eyes, which

14   quickly spread to my nose, throat, and the rest of my body.

15         Within minutes the pain from getting struck in my

16   wrists was now secondary to the burning sensation consuming my

17   body.  The burning in my nose and throat caused me to take off

18   my mask, and being that we are in the midst of a pandemic, this

19   was a tremendous risk for those around me, but the police gave

20   me no choice.  I wailed for help for a medic I had no way of

21   getting to.  But the only ones in eyeshot were surrounded by

22   police officers that had proven distrustful to me.

23   Fortunately, my fellow demonstrators helped me as best they

24   could.  I couldn't see through the chemical in my eyes, so a

25   kind stranger in the crowd had to guide me back to the fountain

1    where I would eventually regroup with my friends.

2            That was the longest half-mile I ever walked, and the

3    pain only intensified all over my body.  It was impossible not

4    to notice that the police did nothing to help the people who

5    were in pain, myself included, they were protecting property.

6    When I eventually regrouped with my friends, we were able to

7    recruit another to give us a ride from our park to our homes.

8    With my bike stolen and my friend's bike broken by the police,

9    this was our only option of getting home without walking or

10   taking the train.  A situation many had to endure after

11   suffering similar or even worse acts of violence.

12           When I eventually made it home, I spent several hours

13   in the shower and an ice bath to get this chemical burning off

14   my body.  The following day, after another shower, the burning

15   was manageable.  But then the pain in my wrist came into

16   clearer focus.  My right index finger was actually bruised as

17   well and appeared infected, and I couldn't bend it without

18   tremendous pain.  I also had welts on my wrist from the baton

19   strikes.  These marks are still visible all over my body over a

20   month later, but the emotional and mental trauma lingers as

21   well.

22           The Chicago Police Department failed the people of

23   Chicago on July 17th of 2020, as they have done before and

24   continue to do.  They failed to keep us safe; rather they

25   actively endangered the lives of people protesting the very

1    injustices that they commit.

2          THE COURT:  Thank you.  Thank you for your comments.

3          MR. BAIRE:  Thank you.

4          I think speaker No. 57 is in the queue, though, so

5    we'll please admit speaker 57.

6          MS. HICKEY:  Your Honor, if after 57 you want to go

7    back to 56, I believe 56 is in the room.  So we'll let 57 go

8    and then go back to 56.

9          THE COURT:  Okay.  Very good.

10         MS. SUTTLE:  Hello.  Can you hear me?

11         THE COURT:  There we go.  Yes, now we can hear you.

12         MS. SUTTLE:  So good afternoon, your Honor, and others

13   who have joined us today for day two of this Federal Court

14   Listening Session.  My name is La'Rie Suttle.  I'm 24 years

15   old.  I use she/her/hers pronouns, and I'm working with the

16   City of Chicago and members in the Chicago community on the use

17   of force policy for the Chicago Police Department.

18         I think that it is important to state that the things

19   that I'm about to say are a reflection of my own views and

20   experiences, not the use of force task force as a whole.  This

21   task force was created June 15, 2020, and so far this year I've

22   only attended two protests in the Bronzeville community, both

23   of which were peaceful, thank God.

24         But last month in July, I decided to attend a press

25   conference for a young community organizer named Miracle Boyd

1    after watching the video that went viral on the web of an

2    officer knocking her cell phone to the ground and punching her

3    in the face, knocking out some of her teeth and walking away.

4         In the viral video, I saw a lot of things taking place

5    between blue-shirt officers and protesters, but what stood out

6    to me was the white-shirt officers watching and allowing

7    whatever took place to go on.  So as a member of the use of

8    force task force, I immediately raised an issue in our group.

9    I asked to review three legal bulletins from the Office of

10   Legal Affairs on police protesters encounters, use of force,

11   and the First Amendment and the modified consent decree.

12        Additionally, I also reviewed eight general orders,

13   which I will physically include in my written statement due

14   August 28th by 4:30 p.m.  But if this is not true I will follow

15   up with the appropriate parties following this listening

16   session.  But the general orders relate to the duties,

17   responsibilities, procedures, and investigations involving use

18   of force in general, but specifically in terms of the First

19   Amendment.

20        Currently, I don't have the authority to tell you more

21   about that, if there is a violation or not.  But I do want to

22   state on the record that I am growing deep concern for how the

23   Chicago Police Department trains officers to handle situations

24   involving use of force in general.  But specifically encounters

25   with protesters, as well as internal and external

1    accountability and transparency measures involving situations

2    with use of force in general, but especially with police and

3    protesters.

4         So I thank you for allowing me the opportunity to

5    speak on the record today.  And moving forward, I pray that

6    this police department doesn't miss an opportunity to

7    effectively and constitutionally police.  With that, I will

8    hold back and thank you for your time.

9         THE COURT:  Thank you very much.  I appreciate it.

10        I think speaker 56 was the previous person who spoke

11   was Max Baire, that's what I have here.  So it looks to me just

12   from the queue that I -- that nobody up through 60 is in the

13   queue, but I think I see some names in the queue that were

14   amongst the original group from the morning.  So I'm going to

15   start back at the top of the list here and I see speaker No. 3

16   is now in the cue.  So if speaker No. 3 -- it's Delaney Coe is

17   the name I have here.  That would be great.  Thank you.

18        MS. HICKEY:  I believe a person will be speaking on

19   behalf of Delaney Coe.  Mike, if you will admit No. 3.

20        THE COURT:  That is correct.  Thank you.

21        MS. TENDAJI:  I was there on May 30th, downtown where

22   I saw protesters being kettled repeatedly by the police, being

23   teargassed.  I saw protesters also being beaten with batons.

24   Also on the 1st of June in Hyde Park -- I think it was the 1st

25   of June -- I attended a very peaceful protest, organized by

1    some young people, I am not sure who they actually were.

2         As the protest dispersed, police began pushing people

3    towards the lake, and most folks had their cars west. And

4    people couldn't get back to their cars. There was a very tense

5    stand off when an officer brandished a rifle at the crowd.

6         Eventually we were able to get through and get to

7    where our cars were parked, where some people were coming out

8    looting an Ulta, we stopped to get their name and information,

9    you know, to pass on to their family. And police began pushing

10   me, my friends and my family against the wall with batons. And

11   then hitting us with the batons, which resulted in my friends

12   coming in to stand between me and the officers and my family,

13   particularly, children. They were beaten repeatedly with

14   batons, laid on the ground, just covering themselves being hit

15   by batons repeatedly.

16        At some point an officer put his knee on my friend's

17   neck, the same way that George Floyd was killed. Another

18   friend, she protected him, seeing that, just dove onto his body

19   and took a lot of those baton hits for him.

20        At least five of my friends were badly bruised with

21   baton marks and then thrown in jail for that that day.

22        Since then, I know as well a good friend in Black

23   Lives Matter Chicago was beaten badly at a protest on Belmont.

24   That person is disabled and walks with a cane. I was also

25   there on the 17th, where my son was pepper sprayed badly. My

1    nephew had his tooth broken by cop with a baton.  There was no

2    opportunity for folks to disperse.  The orders to disperse over

3    these past two protests, I've witnessed officers doing nothing

4    to protect and serve, but to brutalize, and who seemed to, as I

5    heard another person testify today, to smile, seemed to enjoy

6    brutalizing Chicagoans.

7         I -- the hardest was during the protest in Hyde Park.

8    I was thrown to the ground.  My ribs were cracked and I stood

9    in front of an officer whose sleeve was covered in my friend's

10   blood.  This officer was saying how he wanted to protect me.

11   He wanted to protect us.  Who stood there while other officers

12   beat and brutalized folks.  I just left town this weekend to

13   return to find out that once again, young people, my nephew

14   included, young folks who have been in my house, 17-year-olds

15   who were pepper sprayed, and kettled, and beaten by police

16   again.  This was during the consent decree, so it's clear to me

17   that the Chicago Police Department is not taking anything

18   seriously about mandates to protect or serve or to follow the

19   actual law that they are sworn to uphold.  Their intention is

20   clearly brutality and dehumanizing Chicagoans who don't believe

21   that they should be receiving over $4 million a day.

22        THE COURT:  Thank you for your comments.

23        Let's see.  I think I see speaker No. 7, I think, is

24   in the queue now, so perhaps we can admit speaker No. 7,

25   please.

1          MS. MACLAUCHLIN:  Hello.

2          THE COURT:  Hi.

3          MS. MACLAUCHLIN:  Hi.  Thank you for the time.  My

4    name is Claire Maclauchlin.  I am a 38-year-old mother of two.

5    I work in publishing and I live in Avondale.  On Saturday, May

6    30th, I attended the protest against police brutality at Daley

7    Plaza.  This was my first time attending a protest in Chicago,

8    although I attended many protests in my former hometown of New

9    York City.

10          At first, the protest felt like many others I had

11   attended.  There was a sense of joint purpose and community,

12   albeit masked.  My fellow protesters and I chanted.  We held

13   signs.  I saw families with children, and I had, in fact,

14   considered bringing my sons to this protest.  I had brought

15   them to others in the past.  But my sister had been to a

16   peaceful protest in Oakland, California, the previous day where

17   the crowd was set upon by the police and pepper sprayed, so I

18   left the kids at home and instead brought remedies for pepper

19   spray.

20          So, again, it was largely a peaceful protest, albeit

21   one that was about police brutality and a little bit negative

22   towards the police, some of the chants, et cetera, but, again,

23   that is our right to use our words to express displeasure about

24   the people who are supposed to be serving us and who we pay.

25          When the police appeared on the scene, the mood

1   immediately shifted.  They were dressed in riot gear.  The

2   majority of them were maskless.  They had batons in their hands

3   already, although, again, we were protesting peacefully.

4         I think the worst thing that I had seen up to then was

5   somebody spray painting on the sidewalk.  I don't think a baton

6   is the answer.  So, yes, batons in hand, zip ties in hand, they

7   began setting up barricades and boundaries that were arbitrary.

8   They sort of created a circle in the middle of one street to

9   reroute us.

10        Being that it's the middle of a pandemic, there really

11  wasn't anybody on the street, other than the protesters.  Every

12  car I saw was a car that was part of the protest, honking with

13  signs in solidarity.  The protest didn't seem to be stopping

14  anybody going about their day, but the police were not treating

15  us like we were allowed to be there.

16        I saw police knocking signs out of people's hands.

17  One young man was sitting on his car with a phone in his hand.

18  I saw a police officer come and knock that out of his hands.

19  So, yes, they created discord and chaos instead of allowing us

20  to march peacefully.

21        At one point, I'm not sure what happened, there was a

22  loud bang.  People were running in panic.  I was almost

23  trampled.  I was lucky to get behind a column.  As the woman

24  before me mentioned, she had a disabled friend with a cane.  I

25  saw a disabled woman with a cane who was luckily able to get

1    behind a column as well.

2          And, then, ultimately, I would just like to say that

3    the decision on the part of the mayor to shut down the trains

4    that day -- this was a protest that was set to go from 2:00

5    til 5:00.  It trapped a lot people, myself included, in the

6    downtown area.  So I saw, as I tried to figure out how I was

7    going to get home, people wandering aimlessly, running into

8    groups of police officers that were also seeming to be looking

9    for protesters.  It was a very unsafe feeling as the police

10   were there.  Anytime I turned on a street and saw police, I

11   went the other way, because I had a sign.  I was obviously part

12   of the protest.  The only people I saw were either part of the

13   protest or police.

14          I just -- we pay them to protect and serve us, and

15   that is not what they are doing.  And major change is needed.

16   I'm shaking thinking about this experience, but also just sort

17   of the response that there has been to the protest, sort of the

18   tone, the reporting on the protest.  People are out here

19   saying, "A change needs to be made," and instead of the police

20   sitting down and talking to the people, they are attacking

21   them.  And I just -- it boggles my mind.  That's all.  Thank

22   you for your time.

23          THE COURT:  Thank you for your comments.

24          I think speaker No. 33, I think, is in the queue now.

25   If we could go to speaker No. 33, please.

1          MS. BOYD:  Hello?

2          THE COURT:  Yes, hi, we can hear you.

3          MS. MIRACLE BOYD:  Hi.  This is Miracle Boyd.  I'm a

4    youth member of Good Kids/Mad City on the south side of

5    Chicago.  I'm here to talk about what happened on the night of

6    June 17th.  I was attending the decolonizing police and Chicago

7    protesting rally, and I was (inaudible) approached by a police

8    officer for recording a man being arrested.

9          At first I was moving away, because I had heard that

10   they were, like, trying to, like, tear down the statue.  So I

11   decided to leave because I had been out there for a long while.

12   But I heard my friend crying, and so I went over to help.  And

13   I started a video of what was going on.  And as our video was

14   going on, I saw a white woman being beat with batons by two

15   police officers on the two.  They had a bike stand on top of

16   her.  I see a guy who was beaten at first with a baton had his

17   head busted open and blood was gushing from his head.

18         And so I was recording a guy being arrested by the

19   police, and the police were dragging him away and I was walking

20   towards him, like, trying to get him to say his last name so

21   that he could get legal help, and two police officers walked up

22   to me and one of them punched me.  And my phone hit me in the

23   mouth and my tooth was knocked out.  I had to get a root canal

24   and still today -- just yesterday, I finally received my final

25   dental work.

1          I have been distraught ever since the event happen.  I

2    haven't been able to eat correctly.  Every time I see police

3    now, I have some sort of fear that they'll, like, try to harm

4    me again or whatever, something like that.

5          But the events that happened that night were truly

6    traumatizing.  I have never experienced something so horrific

7    like that, and just to be assaulted by one member of the

8    biggest union in America, it was like a slap in the face

9    because I am a youth organizer, and this is what we fight for,

10   so...

11         There were a lot of these incidents transpired, and,

12   you know, I'm not really excited about what happened.  I wasn't

13   even calling for officers to be arrested, but to have

14   restorative justice circle with me because I focus on

15   restorative justice in my community, and I believe that jail is

16   a place for no one.

17         Also, the fact that this cop who was talking to me, he

18   also assaulted a Muslim woman before in the year of 2012.  When

19   I found out who he was, I did my research myself, and also

20   found out that he uses force more than 96 percent of other

21   officers, so I want to highlight what is happening and the type

22   of people who the Chicago Police Department are hiring, you

23   know, to deal with civilians.  And all of the protests have not

24   been peaceful at times, but I don't think that protesters

25   should ever be attacked by police.  And like I said, it was a

1    slap in the face that I was harassed by police and, you know
2    physically attacked and this is now something I have to deal
3    with.

4         And afterwards I was receiving death threats on social
5    media, and a lot of pain has been coming my way.  That is all I
6    wanted to say.  Thank you for hearing me, your Honor.

7         THE COURT:  Thank you for your comments, and I really
8    thank everybody for their comments.

9         I am looking in the queue right now, and Maggie maybe
10   you can help me, but I don't see anybody in the queue right now
11   who has not spoken.  But if I am mistaken, if there's anybody
12   who needs to be admitted into the queue, I think this would be
13   the time because I think we have gone through the entire list.
14   Do you see anybody who I've missed Maggie?

15        MS. HICKEY:  I have not seen anybody else, your Honor,
16   and I am just checking with my IT team here to see if there's
17   anyone else, but I believe everybody that is in the queue has
18   had an opportunity to speak, and all of the rest that had
19   signed up for various reasons, I'm sure, were unable to join us
20   today.

21        THE COURT:  Okay.  Very well.  I want to again thank
22   everybody and remind everybody of what both the Inspector
23   General and the Monitor said, which is this was not the only
24   way to participate.

25        We have written comments that I will be happy to

1    receive on my docket, and I'm sure both the Inspector General

2    and the Monitor will be happy to receive your comments in all

3    sorts of different ways, whatever is most comfortable for you,

4    I think, is really what the touchstone is for submitting your

5    views.  And I know the Monitor is hard at work with her team

6    and there will be a report at the end of this.  This is just

7    part of the information gathering, so, again, with gratitude to

8    our clerk's office, and all of the IT folks of the Monitoring

9    team and her law firm for setting this up.

10              I have nothing further to add for today, but I did

11   want to give both the Monitor and the Inspector General an

12   opportunity to say any final words they want to say.  So I will

13   turn to you first, Maggie.

14              MS. HICKEY:  Thank you very much, your Honor.  I would

15   just like to say thank you to everyone who participated today

16   and lent their voice and allowed us to hear what was happening

17   in our city.  Again, thank you very much for sharing your

18   story.

19              THE COURT:  And Joe, any final words from the

20   Inspector General's Office?

21              INSPECTOR GENERAL FERGUSON:  I echo that.  I

22   appreciate everyone's willingness to step into the space and

23   step in it in such a public way.  If there is more to be said

24   or anyone watching has more that they want to say, again, the

25   Monitor's website or the IG's website.  Thank you.

1          THE COURT:  Okay.  Very well.  Thank you, everybody.
2    I also want to make a special thanks to the interpreters who
3    are still going and the court reporters who are still going as
4    well.  Those are very hard jobs and it's very intense to do
5    this for this period of time, and you all are magnificent and I
6    thank you for your help.  So thank you, everybody.  And this
7    session is in recess.
8          MS. HICKEY:  Thank you.
9        (Proceedings concluded at 3:48 P.M.)
10                    * * * * * * * * * *
11                 C E R T I F I C A T E
12      We certify that the foregoing is a correct transcript from
13    the record of proceedings in the above-entitled matter.
14
15    /s/ SANDRA M. MULLIN, CSR RMR, FCRR
16
17    /s/KRISTIN M. ASHENHURST, CSR, RDR, CRR      August 25, 2020
                                                        Date
18        Federal Official Court Reporters
          United States District Court
19        Northern District of Illinois
             Eastern Division
20
21
22
23
24
25

# Attachment 1.
# Office of the Illinois Attorney General
# Comments
# July 16, 2021



**OFFICE OF THE ATTORNEY GENERAL**
STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

July 16, 2021

Margaret A. Hickey
Independent Monitor
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Via Email (MHickey@schiffhardin.com)

Re:   **Independent Monitoring Team's Special Report,** *The City of Chicago's and The Chicago Police Department's Response to Protests and Unrest in Year Two of the Consent Decree* **(May 2020 – November 2020) (the "Special Report")**

Dear Ms. Hickey:

The Special Report details numerous disturbing incidents of misconduct, disrespectful behavior, and excessive force by Chicago Police Department ("CPD") officers in response to protests and civil unrest in Chicago from May to November 2020. Details of these incidents, compiled by the Independent Monitoring Team ("IMT") based on hundreds of hours of video footage, interviews, and community testimony, plainly reveal the consequences of the City's and CPD's delayed implementation of the Consent Decree.[1] Moreover, the Special Report finds that the City's and CPD's ability to hold officers accountable for these incidents has fallen far short of the Consent Decree's requirements, due to insufficient documentation, widespread misconduct, and understaffed and opaque systems of accountability. As a result, any attempt to fully document problems or hold officers accountable will be inherently incomplete because of CPD's failure to consistently follow body-worn camera and reporting requirements during these critical events.[2]

---

[1] In the most recent reporting period, "the City and the CPD did not meet most of the deadlines and compliance obligations." Independent Monitoring Report 3 (Amended), *State of Illinois v. City of Chicago,* 17-cv-6260, ECF No. 942 (Apr. 8, 2021), at 10.
[2] Special Report at 34.

500 SOUTH SECOND STREET, SPRINGFIELD, ILLINOIS 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • FAX: (217) 782-7046
100 WEST RANDOLPH STREET, CHICAGO, ILLINOIS 60601 • (312) 814-3000 • TTY: (312) 814-3374 • FAX: (312) 814-3806
1001 EAST MAIN, CARBONDALE, ILLINOIS 62901 • (618) 529-6400 • TTY: (618) 529-6403 • FAX: (618) 529-6416

Statements from community members about CPD's response to racial justice protests in 2020, provided during the listening sessions hosted by Judge Dow, demonstrate the harmful impact CPD's response had on these mostly peaceful protesters. These incidents further eroded CPD's ability to build trust with the community it serves, one of the core commitments of the Consent Decree.

> **I estimate the officer beat me for 15 to 30 seconds. I can't say for sure because I was focused on blocking the young woman who was covering her head as an officer reached around me to beat her. I also focused on the uniqueness of my screams. This was the first time I heard myself make a sound I could only describe as a combination of shock, fear, and gurgling pain**.[3]
> ~ Community Member

> **The CPD kicked people and medics, hit them with batons and destroyed medical supplies. CPD officers hit me, shoved me and called me a p**** for pointing out the people who they were assaulting were injured…. After that act, the CPD only became more aggressive. They kettled protesters . . . . They ran into kettled crowds while screaming and banging the sides of their batons. It was textbook psychological warfare.**[4] ~ Community Member

OAG acknowledges and appreciates the IMT's efforts and attention to the sensitive nature of the events underlying the Special Report. OAG offers the following comments regarding the Special Report's findings and recommendations.

## Findings: Systemic Failures in CPD's Response to Demonstrations

1. *Lack of Accountability*. As the Special Report and the February 2021 report from the City of Chicago Office of Inspector General ("OIG Report") make clear, the City's and CPD's failure to reform accountability systems as required by the Consent Decree had widespread consequences during the 2020 protests. Patterns of disturbing and pervasive officer misconduct include the findings that:[5]

   - Officers obscured their nameplates and badges during demonstrations;[6]

---

[3] Community Listening Session Day 2 (Aug. 20, 2020) Transcript at 125:15-22, [*hereinafter* "Transcript Day 2"].

[4] *Id.* at 143:24-144:3, 144:11-14. Kettling "involves officers surrounding protesters to corral them before making arrests." Wyatte Grantham-Phillips, Tyler J. Davis, Nick Coltrain, "What is Kettling? Here's a look into the usage and history of the controversial police tactic," USA TODAY, June 25, 2020, available at https://www.usatoday.com/story/news/nation/2020/06/24/kettling-controversial-police-tactic-black-lives-matter-protests/3248681001/.

[5] *See e.g.,* Community Listening Session Day 1 (Aug. 19, 2020), Transcript at 25:11-15 [*hereinafter* "Transcript Day 1"], describing police pulling medics away from bleeding protesters; *see also Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), at 37 [*hereinafter* "OIG Report"], noting "Protesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They described seeing CPD members tackle, punch, and use batons to strike peaceful protesters in the head and neck."

[6] Special Report at 8, 193-94, 209; OIG Report at 123-26. One community member described seeing "an officer taunting protesters with his badge number and name covered, repeatedly calling protesters expletives and using foul language." *See e.g.,* Transcript Day 1 at 24:2-10.

- Officers failed to document, or insufficiently documented, uses of force;[7]
- CPD's mass arrest procedures precluded effective discipline and accountability;[8] and
- CPD failed to track the distribution of OC spray canisters to officers.[9]

These actions significantly impaired efforts to achieve meaningful accountability. As a result, the Special Report notes few examples of officer discipline, including only one instance related to an officer refusing to wear a body-worn camera[10] and one instance where an officer was stripped of his police powers.[11]

As outlined in the Special Report, these failures in CPD's documentation and accountability systems violate numerous provisions of the Consent Decree.[12]

2. ***Unnecessary Uses of Force and Failure to Use De-escalation***. The Special Report and community member statements illustrate widespread improper uses of force by officers, as well as dangerous officer escalation tactics that violate the Consent Decree, including:

- Advancing on docile crowds with batons in hand;[13]
- Punching protesters;[14]
- Swinging batons to strike protesters in the head;[15]
- Indiscriminately using OC spray (pepper spray), including on children;[16]
- Using protesters' bikes as weapons;[17]
- Kettling crowds and then hitting people who could not escape;[18] and
- Injuring people and not providing or requesting the medical aid needed to treat their injuries.[19]

---

[7] Special Report at 205-06.

[8] OIG Report at 118.

[9] Special Report at 145-46.

[10] *Id.* at 94.

[11] *Id.* at 211.

[12] For example, the Consent Decree requires that the City, CPD, and Civilian Office of Police Accountability ("COPA") maintain an electronic case management system that allows for tracking and analyzing allegations of retaliation against individuals engaged in First Amendment activity, ¶ 509(f);  requires that nearly all uses of force are documented, justified, and reviewed by a supervisor, ¶¶ 218-235;  and requires CPD to mandate that officers provide their name and star number to any member of the public upon request, ¶ 433.

[13] Special Report at 133.

[14] *Id.* at p. 98. *See also* Transcript Day 1 at 42:7-12.

[15] Special Report at 98. *See also* Transcript Day 1 at 38:11-12; *see e.g.,* Transcript Day 2 at 155:24-156:2. *See also* OIG Report at 37, noting "Protesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They described seeing CPD members tackle, punch, and use batons to strike peaceful protesters in the head and neck."

[16] Transcript Day 1 at 42:8-9; Transcript Day 2 at 110:1-2.

[17] Special Report at 98, a video showing an officer in a "bike tug-of-war with a protest and then appear[ing] to throw the bike at the person [the officer] was tugging with." *See also id.* at 89, "Officers grabbed people's bikes away from them." *See also* Transcript Day 1 at 24:2-8; Transcript Day 2 at 103:1-4.

[18] "Kettling" refers to a tactic whereby officers surround a group and contain it in a small area with little or no opportunity to leave. Special Report at 12, 132-33; Transcript Day 1 at 42:3-6. *Id.* at 45:1-3.

[19] Special Report at 198.

These actions are contrary to the Consent Decree's requirements governing use of force by officers,[20] which specifically prohibit officers from using force to retaliate against protesters engaging in protected First Amendment activity,[21] and require CPD to use de-escalation techniques and allow individuals to voluntarily comply with orders so as to prevent or reduce the need to use force at all.[22]

3. ***Biased and Disrespectful Policing***. Unbiased and respectful policing are at the core of the Consent Decree, which requires CPD officers to "interact with all members of the public in an unbiased, fair, and respectful manner" and "refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language."[23] Yet instances of officers using inappropriate, disrespectful, and derogatory language towards community members, frequently coupled with force, permeate the Special Report, including:

- Officers handcuffing, restraining and detaining, aggressively pushing, swearing at, and refusing a request for water from an apparently pregnant woman;[24]
- Officers swearing at reporters and treating them disrespectfully;[25]
- Officers regularly swearing at and speaking disrespectfully to protesters, including:
  - An officer telling a protester "Shut the f*** up, a**hole."[26]
  - An officer telling an arrestee "… I threw your a** to the ground, and you cried. You one p**** a** b****. Big a** b****."[27]
  - An officer saying to a protester "… Dealing with savages ain't a part of my job."[28]
  - An officer saying to a protester "Get back before I beat the f*** out of you."[29]

As one protester testified, "… the officers on the scene laughed at us [w]hen we begged them to leave people alone … It felt like they view Chicagoans who are fighting for justice as enemies, and they treat us that way."[30] These widely documented interactions indicate that the mindset and attitude that many police adopted during the protests were deeply harmful to CPD's ability to effectively and respectfully protect the City and its communities.

---

[20] *See,* Consent Decree ¶¶ 153, 164.
[21] *Id.* ¶ 163.
[22] *Id.* ¶ 162. *See also id.* ¶¶ 207-09, requiring officers to issue verbal commands and warnings to the subject "prior to, during, and after the discharge of an OC device" and "allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device."
[23] *See, e.g.*, *id.* ¶¶ 51-2, 54.
[24] Special Report at 73.
[25] *Id.* at 97.
[26] *Id.* at 74.
[27] *Id.* at 79.
[28] *Id.* at 104.
[29] Transcript Day 2 at 117:23-24.
[30] *See id.* at 137:19-1:38:14.

**Recommendations**

1. ***Accountability & Discipline***. OAG concurs with IMT's recommendation that the City and CPD must take action now to hold officers accountable for failures to comply with policies, such as those requiring use of body-worn cameras, mandating respectful behavior, and governing uses of force.[31] Accountability is a central requirement of the Consent Decree and is essential to ensuring legitimacy and community confidence.[32] Unfortunately, the City's and CPD's failures to properly document and report uses of force and other required data have further hampered their ability to conduct the thorough and timely investigations required by the Consent Decree.[33] To address this moving forward, CPD must take corrective action to enforce officers' compliance with policies regarding body-worn cameras and display of badges and nameplates, and implement robust training to emphasize that officers who fail to comply with these policies will face progressive discipline.[34] As the Special Report notes, community members and the Coalition have also raised concerns that CPD's existing standards for relieving police powers are insufficient to ensure accountability.[35] OAG looks forward to further discussion with the IMT, the City, and the Coalition regarding CPD's accountability systems.

2. ***Policy Development***. As CPD has acknowledged, the 2020 protests revealed gaps in a number of CPD policies and procedures.[36] OAG appreciates the revisions that CPD has made to date and agrees with the IMT that further policy revisions are necessary on topics including use of force, mass arrests, First Amendment-related procedures, respectful and unbiased policing practices, and accountability. The City and CPD must continue to prioritize policy development under the Consent Decree; as noted in the Special Report, past efforts by the City and CPD to circumvent the typical Consent Decree revision process have resulted in new problems and delays.[37] Finally, CPD must solicit and incorporate meaningful community input, such as the recommendations of the Use of Force Working Group, into these policy revisions.[38]

3. ***Training and Data***. Once these revised policies and procedures are finalized, CPD and the City must also ensure that officers receive adequate training, including for future large-scale demonstrations, and that the data collected is tracked and analyzed as required by the Consent Decree. For example, CPD must ensure that trainings cover appropriate crowd-

---

[31] Special Report at 202-03.

[32] See, e.g., Consent Decree ¶ 419.

[33] Special Report p. 205-10. The City has not met any level of compliance for 53 of the 72 accountability related Consent Decree Paragraphs. Independent Monitoring Report 3 at 533.

[34] See, e.g., Consent Decree ¶ 238(i) (officers who knowingly fail to comply with the body-worn camera policy may be subject to progressive discipline and training), ¶ 433 (requiring officers to provide identifying information such as star numbers to any member of the public), ¶ 576 (requiring CPD to randomly audit body-worn camera recordings of civilian interactions to assess officers' compliance with policy and to "take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice"), and ¶ 587(o) (requiring CPD's automated electronic data system to include "all violations" of CPD's body-worn camera policies).

[35] Special Report at 211-12.

[36] Id. at 148.

[37] Id. at 174.

[38] Id. at 160, footnote 319.

control techniques and discourage kettling.[39] Kettling violates the de-escalation techniques required by the Consent Decree, because crowds kettled by officers cannot physically comply with dispersal orders. CPD should train officers on updated use of force and de-escalation policies as soon as possible.

4. ***Community Engagement and Information Gathering***. In order to rebuild community trust, CPD must prioritize Paragraph 46 of the Consent Decree, which requires CPD to "solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies." The Special Report suggests that some of these engagement practices, such as meetings with community groups or social media monitoring, also offer information-gathering opportunities for CPD.[40] Nonetheless, the purpose of Paragraph 46 is to require CPD to gather feedback about its own policing efforts, not to surveil or gather intelligence about community groups. As the Special Report notes, the IMT and OAG have not received any materials from CPD regarding its social media engagement and information-gathering teams.[41] OAG is concerned, however, about emerging reports suggesting that CPD employed its 2020 Summer Operations Center to surveil community groups on social media and collect intelligence about political demonstrations – allegedly leading to the City issuing a cease and desist order against the Chicago Freedom School for feeding and helping protesters.[42] Any surveillance action by CPD requires exceedingly close scrutiny to protect constitutional rights and comply with Consent Decree requirements, and should not be mistaken for required community engagement.

5. ***Mobile Field Force Training***. OAG agrees with the IMT's concern regarding roving teams: "[w]ithout clear policies, standard operating procedures, or goals—including those for the City's future responses to protests or unrest—we continue to have concerns regarding the challenges that these types of teams present and Chicago's troubling history with roving teams."[43] The Special Report recommends that CPD explore the creation of Mobile Field Force Teams to respond to future mass demonstrations – but only if such teams are properly trained, certified, equipped and transparent to the public.[44] Given the IMT's and OAG's ongoing concerns regarding the implementation of CPD's Critical Incident Response Team and Community Safety Teams,[45] OAG will closely monitor any CPD efforts to create or expand new citywide teams.

---

[39] In addition to the readily surmisable concerns associated with a tactic aimed at trapping individuals, experts also argue that kettling can increase tensions and likely result in more use of force. Grantham-Phillips, "What is Kettling? Here's a look into the usage and history of the controversial police tactic."

[40] Special Report at 113.

[41] *Id.* at 125. CPD and the City has blocked the release of CPD records related to its social media monitoring programs. Madeline Buckley, Gregory Pratt, "ACLU files suit against CPD seeking records on beefed-up social media monitoring following protests and looting last year," CHICAGO TRIBUNE (July 15, 2021), available at https://www.chicagotribune.com/news/breaking/ct-aclu-lawsuit-cpd-social-media-20210715-okvvhabuazhqhaz5phakssloza-story.html.

[42] Jim Daley, "Surveilling Dissent," SOUTH SIDE WEEKLY (July 7, 2021), available at https://southsideweekly.com/surveilling-dissent/.

[43] Special Report at 135.

[44] *Id.* at 135-37.

[45] *Id.*

OAG acknowledges the efforts made to date by the City and CPD to address issues raised in the Special Report, and urges the City and CPD to engage the community as it works towards not only compliance with the Consent Decree, but also building trust with Chicago residents. OAG looks forward to continuing discussions with the City, the IMT, and the Coalition regarding these matters.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: */s/ Rebekah Newman*
Rebekah Newman
Assistant Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Phone: (312) 814-6141
E-mail: Rebekah.Newman@illinois.gov

*/s/ Mary J. Grieb*
Mary J. Grieb
Deputy Bureau Chief, Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 11th Floor
Chicago, Illinois 60601
(312) 814-3877
Email: Mary.Grieb@illinois.gov

cc: Tyeesha Dixon, Allan Slagel, Counsel for the City of Chicago (via email)

# Attachment 2.
# City of Chicago Comments
# July 16, 2021

**City of Chicago's Comments on IMT Special Report**
*July 16, 2021*

Pursuant to Consent Decree Paragraphs 663 and 665, the City provides the below comments to the Independent Monitor Team's ("IMT") July 8, 2021, draft report titled, *The City of Chicago's and the Chicago Police Department's Response to Protests and Unrest in Year Two of the Consent Decree* (the "Special Report").

The City does not concede any of the facts, findings, or conclusions in the Special Report. Nothing in this response, or the City's lack of a specific response, should be deemed an admission by the City of any wrongdoing or liability.

The City notes that IMT's July 8 draft includes numerous selected quotations from individuals who offered public comments at the listening sessions conducted before Judge Dow on August 19-20, 2020. As indicated in IMT's report, these remarks were not offered in the form of sworn testimony, and the speakers were not subject to questioning or cross-examination. The truth and accuracy of such accounts therefore have not been verified. The City notes that these remarks do not alone offer a complete picture of relevant events.

The City submits the attached comments from the Chicago Police Department ("CPD") (Attachment A).

# ATTACHMENT A



**Lori E. Lightfoot**
Mayor

**Department of Police · City of Chicago**
3510 S. Michigan Avenue · Chicago, Illinois 60653

**David O. Brown**
Superintendent of Police

July 16, 2021

 The Chicago Police Department ("Department") submits the following response to the Independent Monitor Team's ("IMT") report titled *The City of Chicago's and the Chicago Police Department's Response to Protests and Unrest in Year Two of the Consent Decree* (the "Special Report")

# I.   Introduction

 2020 was an unparalleled year not only in Chicago but across the globe. In a year that began with a global pandemic that impacted the lives of every person and required the shut-down of major cities to help stem the spread of COVID-19, a deadly virus. A year that saw food shortages, unprecedented deaths, and blanket unemployment across major portions of the economy. A year that saw wide-spread large protests and civil unrest that presented a nation-wide law enforcement challenge in every major city across the United States. Unrest that included calculated and organized attacks on the police and fellow protestors attempting to peaceably exercise their First Amendment rights. In a year that included so many unmatched events one thing remained constant, the members of the Chicago Police Department (the "Department") stepped up to serve the residents of and visitors to the City of Chicago. As the Independent Monitor Team ("IMT") points out in its report titled *The City of Chicago's and the Chicago Police Department's Response to Protests and Unrest in Year Two of the Consent Decree* (the "Special Report") this service was not without its flaws and the Department can and must improve. However, what should also be noted is the selfless service of these members. At a time when so many others had the opportunity to quarantine and isolate to protect themselves and their families, these officers stepped forward at risk to both themselves and their loved ones to answer the call from the City.

 While most people who will read the IMT's Special Report will think about what they saw on television and in media reports about the events of May 29-June 1, July 17, August 10 and August 15, the members of the Department will think about what they lived. They will remember their attempts to protect those who wanted to express their First Amendment rights, the people they walked along-side for miles to ensure no car drove into them, to ensure their rights were protected. They will remember those who expressed their gratitude for the work the officers did and the conversations they had with perfect strangers. They will unfortunately also remember the days and nights when they had things thrown at them and terrible things yelled at them. The officers at the Columbus statue will remember the organized mob they faced there, a group that to date law enforcement (state and federal) have been unable to identify. There is a tendency to focus on the few that responded to residents in a way they should not have or those that may have violated the rules. These should be considered the exception and not the rule. What should not be lost are the officers who worked without days off, over twelve hours a day to quell a riot and how what they did was in service to the City and its residents.

The IMT's Special Report critically examines the responses of the City of Chicago (the "City") and the Department to the protests and unrest beginning at the end of May 2020 through November 2020. The Special Report breaks IMT's analysis into four main categories and provides corresponding recommendations to improve the City and the Department's operations and procedures. The four areas IMT examines in the Special Report are (i) planning and preparation, (ii) policies, (iii) training and (iv) accountability and transparency.

Throughout the Special Report the IMT recounts situations that occurred throughout the city which involved Chicago Police Department members. The Department does not admit that the factual scenarios recounted throughout the report occurred as they are a summary and not a complete and accurate statement of the incidents from all perspectives. Additionally, these factual scenarios are the IMT's interpretation of a snapshot in time and do not include the events both before and after. Nothing in this response shall be deemed an admission by the Department or City to any wrongdoing by members. That said, the Department has made great strides to improve its response to large protests and civil unrest. Throughout the last year the Department has worked with the IMT, the OAG and members of the Coalition to address concerns to the Department's response last year and to make changes to its policies, training, preparedness and accountability. This has been done to not only move towards compliance with the Consent Decree but to be a better organization as it serves the residents of this city and its many visitors.

## II.  Planning and Preparation

IMT issued six recommendations related to the City and Department's planning and preparations to respond to protests and civil unrest. Each of these recommendations is addressed separately below.

**Response to Recommendation 1 - Expand planning operations cross all internal and external entities and partners by, among others,**

**(1) Establish a multi-Facet Planning Team**

It is important to note that the Department has used the National Incident Management System ("NIMS") for all planning and resource coordination since the 2012 NATO Summit, and it has made significant improvements to its multi-fact planning teams since the 2020 civil unrest. In 2020, the Department established the "Special Events" "Multi-Faceted Planning Team" that consists of internal Department command staff and members from the Bureaus of Patrol (specifically the affected District and Area command), Counterterrorism and Special Operations (Intelligence, SWAT, Canine, Bomb Squad, Helo, Marine etc.), Detectives and Internal Affairs and other specialty resources including Public Information Officers, videographers and Legal Officers as needed. In 2020, the Department recognized that a component was missing from the "Special Events" team and, in response, added the Office of Community Policing to planning. The Department's external planning team partners ("City Partners") consist of:

- Office of Emergency Management and Communications ("OEMC"),
- Traffic Management Authority ("TMA"),
- Chicago Fire Department ("CFD"),
- traditional and emergency medical services,

2

- the Deputy Mayor for Public Safety,
- the Mayor's Office Department of Cultural Affairs and Special Events,
- Illinois State Police ("ISP"),
- Illinois Law Enforcement Alarm System (ILEAS)and Mutual Aid Box Alarm System ("MABAS") when possible,
- Chicago Transit Authority ("CTA"),
- Business Affairs and Consumer Protection ("BACP"),
- The Chicago Department of Transportation ("CDOT"),
- Streets and Sanitation,
- Water Department,
- Department of Bridges,
- Chicago Public Schools,
- Weather Service,
- Aldermanic Ward Offices

The Department has also included community outreach workers as part of the planning process for certain events which occur in the communities that these outreach workers serve. Prior to 2020, when protests and potential unrest coincided with other preplanned large-scale events like sporting and entertainment events, those entities are invited in the planning or made aware of the results of those planning meetings. Normally the planning meetings would take place in person in a collective meeting environment, but during 2020 the meetings were largely hosted over virtual meeting platforms for required social distancing.

As mentioned above, since the unrest in the summer of 2020, the Department has expanded its internal planning resources to include the Office of Community Policing ("OCP"). OCP played a significant role in the planning and preparation in 2020 as it relates to protest demonstrations and other nontraditional community and or culturally relevant incidents. The relationships that OCP fostered both before and after 2020's civil unrest have been beneficial in providing a communications conduit to organizers and others who are looking to express themselves and want to do so peacefully.

**(2) Modifying Current Planning Template**

The Department along with its City Partners continue to evaluate, refine and implement improvements to our event planning processes. We recognize that each event is unique and must be looked at individually from a whole of government approach to create an "All Hazards" comprehensive public safety plan. The goal of such a plan is to effectively and efficiently allocate resources (personnel and equipment), and coordinate the sharing of information and intelligence amongst all planning partners.

**(3) Conducting Tabletop Exercises for Command Personnel**

The Department has partnered with its public safety partners to plan and execute Complex Coordinated Terrorist Attack simulations and tabletop drills at all major Sports and Entertainment Venues as well as at several retail corridors and high-rise office buildings within the Central Business District over the past several years. CFD has conducted NIMS familiarization workshops and tabletop exercises for supervisory personnel including the ranks of Sergeant, Lieutenant, Captain and all Exempts

at the Chicago Fire Training Academy. However, that training stopped as the Department was restructured and in leadership transition throughout the Command Staff ranks because of both Command Staff (Exempt) turnover in 2019 and the impact of the COVID-19 pandemic in 2020. In the fourth quarter of 2020, The Department began to conduct numerous tabletop exercises covering the new Emergency Mobilization Plan ("EMP"). The EMP was developed during and with input from the after-action debriefings of the George Floyd Protest, Civil Unrest, and Looting incidents of 2020. The EMP is a detailed and layered All Hazards mobilization plan with increasing levels of response utilizing all available city resources to prevent, deter, mitigate, and recover from any situation including protection and mitigation at retail corridors throughout the City not just in the Central Business District. Lastly the Department, OEMC and CFD each recognizing the need for an updated City-wide emergency response plan across all agencies contracted in 2019 with a private entity to evaluate current policy, procedures, internal response and mobilization processes, operational plans, and orders of each agency and to develop a comprehensive plan for emergency response for the City. That private entity is tasked with hosting two tabletop exercises evaluating current response plans in an All Hazards threat environment and develop an all agency City-wide response plan. The first City-wide tabletop was executed on June 9, 2021 with multiple scenarios and multiple Exempt and non-exempt supervisory role players and staff from the Department, CFD and OEMC as well as other City agencies. The evaluations from that exercise are still being tabulated but they should provide insight as to core competency as well as recommendation for improvements in training, equipment and personnel. The second exercise is expected to be completed by the end of 2021.

**Response to Recommendation 2: Enhance intelligence gathering and dissemination capabilities by, among other things:**

  **(1) Tracking National and International Events that May Impact Chicago:**

Recognizing that Chicago is representative of the global community, Department members have and will continue to analyze local, national and international events and act accordingly based on any verifiable, credible threat intelligence it receives or generates whether through electronic or human intelligence sources. The Department has improved its Open-Source media analysis capabilities by investing in advanced training for select personnel. The Department partnered with Federal agencies to develop this program and continues to work with these partners to improve its analysis capabilities. The Department will continue to invest in its analytical personnel by providing them with increased opportunities through inter-agency and taskforce assignments to enhance their skillsets to identify, produce, and disseminate analytical intelligence products to the Department that can be acted upon with an increased degree of accuracy. The Department also has improved its intelligence gathering and information sharing with regional municipalities, states agencies and federal counterparts across the country. These relationships will increase the Department's intelligence gathering and analysis abilities far into the future.

  **(2) Identifying Potential Protest Groups**[1]**:**

---

[1] The Special Report lists "identifying potential protest groups" twice, in both subsections as (2) and (4) of IMT's recommendation for Intelligence and Communication. Special Report p. 108, Sec. 2(2) and (4).

The Department strives to identify all organized protest and demonstration groups in advance of any advertised, planned, or (where possible) spontaneous events. When feasible, the Department contacts known or repeat event organizers in advance of any such event to establish a rapport and to ensure the safety of all in attendance, including possible counter-protesters. The Department supervisor in charge of the protest or demonstration always attempts to speak privately with an organizer to understand the goal(s) of the protest or demonstration and, where possible, to facilitate a peaceful outcome for the safety of all involved. The lawful expression and exercise of First Amendment-related activities is paramount and those rights go hand-in-hand with providing a safe environment for all.

### (3) Conducting Formal Meetings with Protest Organizers and Community Stakeholders:

The Department also attempts to host formal meetings with protest groups and community organizers to foster communication and trust-building prior to any protest, march, or demonstration. These meetings help in planning a safe event, as well as managing resource allocation. Active listening is key to building and earning trust and can be the best way to ensure the safety of all involved. The Department will continue to make every effort, as it did in 2020, to host meetings with known groups and demonstration organizers.

OCP has been at the forefront of creating and building trust in this area. Not all interactions have been successful, particularly when the goal of the organizers is to protest the existence of police in the first instance, but the Department intends to build on those interactions in order to reach common ground. The Department understands that some demonstrators and organizers feel their credibility will suffer if they engage in conversations with the Department, but the Department will continue to attempt to bridge those divides and use every means at its disposal to build trust and foster continuing dialogue and community engagement.

### (4) Improving Social Media Engagement:

The Department has trained a select group of personnel in open-source social media analysis. The personnel receive extensive training and undergo random screening to ensure the integrity of the program. The program is under constant review for possible improvements in personnel selection, training and equipment. The Department will continue to invest in its analytical personnel by providing them with increased opportunities through inter-agency and taskforce assignments to enhance their ability to identify, produce and disseminate analytical intelligence products that can be acted on with an increased degree of accuracy.

**Response to Recommendation 3: Continue New Forms of Community Engagement by, among other things, (1) clearly communicating time, place and manner restrictions; (2) conducting community-sentiment assessments; (3) engaging with community review of and comment on policies and training; (4) creating and maintaining community and business safety plans; (5) improving victim services**

### (1) Clearly Communicating Time, Place and Manner Restrictions

As a preliminary matter it should be noted that during the incidents of civil unrest, OCP actively met with organizers and participants in order to gain timely insight of demonstrator's intentions

including but not limited to routes and protest plans which assisted in mitigating misunderstandings and confusion. In addition to establishing clear lines of communication, OCP functioned as an on-scene conduit to respond to the immediate concerns of demonstrators in order to deescalate tensions. That said, the Department needs to do better. The issue of communications during the course of a protest or civil unrest has been raised over the past year and the Department has worked with the IMT, OAG and Coalition to clarify its procedures in the First Amendment Directive G02-02. To this end, the Department is exploring the ability to alert participants of a protest or unrest via emergency alert on their cell phone of a dispersal order or restrictions. These alerts would be geocoded to specific locations, such as streets or intersections, to limit the alert only to individuals involved in the protest or unrest. The Department is currently working with the Office of Emergency Management and Communications (OEMC) to provide this alert.

Moreover, recognizing that many people who protested in 2020 came for the first time, OCP is actively working to engage community and advocacy organizations that led and organized protest or rallies in 2020. Through this outreach, OCP hopes to establish new relationships that will hopefully lead to an ability to have open communication, or at least awareness, of a planned protest or rally and the opportunity to provide any support.

### (2) Conducting Community-Sentiment Assessments

Since 2017, the Department has partnered with Elucd, a survey and research company that collects and analyzes average trust and safety scores among residents. The surveys ask residents to rate how safe they feel in their communities and how much they trust the police. Additionally, the surveys invite respondents to provide open-ended feedback about what they identify as their top crime concerns and community engagement recommendations. These responses, along with the average score numbers, are provided monthly to the Department. OCP has allowed district commanders direct access to the information so they can review it and adjust their crime fighting and community engagement strategies as needed.

In another step towards transparency, the Department recently made the sentiment scores available to the public on the Department webpage and can be found here:

https://home.chicagopolice.org/statistics-data/data-dashboards/sentiment-dashboard/

### (3) Engaging With Community Review of and Comment on Policies and Training

OCP began to engage more robustly with communities on various policies, including many high-profile policies like use of force and other impartial policing policies. In June 2020, shortly after the beginning of the civil unrest, the Department launched a community working group to review and provide recommendations on its use of force policies. Despite some initial challenges, the Department continued to meet with the working group for over a year, with the last meeting held in mid-June 2021. From these conversations, the Department implemented many changes and revisions to the policies to incorporate suggestions and recommendations discussed during the working group.

Additionally, in the fall of 2020, OCP led focus groups open to the public on the following policies:

- Response to Hate Crimes
- Limited English Proficiency / Language Access
- Prohibition of Sexual Misconduct
- Interactions with Children and Youth
- Interactions with People with Disabilities
- Interactions with Religious Communities

Over 200 people from the community participated in these focus groups and provided feedback to the Department on ways to improve or revise the policies. Public surveys were also made available to the public which garnered over 3,000 responses collectively. In 2021, OCP has continued to work to incorporate community feedback into those policies, including engaging with communities on the draft policies as available before finalizing.

In May 2021, OCP launched a comprehensive engagement plan on the Department's new foot pursuit policy. The engagement plan includes public comment on the policy, a public input form, community conversations open to the public, and deliberative dialogues that community and advocacy groups are invited to sign up for. The engagement runs through the middle of July.

Finally, OCP has begun the development of a long-term and comprehensive engagement plan on all policies requiring community input. The plan will provide a clear roadmap for how the Department will engage with diverse communities around each policy and training.

Though not directly tied to policy, OCP has begun the development of a crisis response plan that can be implemented following an incident of police violence or excessive force either in Chicago or another city. The response plan will be trauma-informed and used as a means of healing between police and communities following an unfortunate incident that may create harm, distrust, or trauma within the community or police department. Though related to use of force, the plan will not specifically engage on use of force policy and will be geared towards community healing and building. OCP is working with the Office of Equity & Racial Justice in the Mayor's Office and community organizations to develop the plan.

### (4) Creating and Maintaining Community and Business Safety Plans

After the initial civil unrest in May-June 2020, OCP participated with the Department of Business Affairs and Consumer Protection ("BACP") in hosting and briefing local Chambers of Commerce of the "Whole of Government" neighborhood protection plans for retail and business corridors. These briefings allowed for local business to address concerns and created clearer lines of communications.

Also, in 2020 OCP in conjunction with all (22) districts conducted 43 community input meetings with communities from across the city centered around gathering community input on crime priorities and community engagement priorities. These conversations helped to support each district's creation of a District Strategic Plan. These meetings allowed communities across the city to inform crime enforcement and community engagement decisions made at their district level.

The overall attendance from 2019 to 2020 increased 135% for the first set of meetings and 22% for the second set of meetings (2019 first set of meetings: 840 attendees and 2020 first set of meetings: 2,004 attendees; 2019 second set of meetings: 990 attendees and 2020 second set of meetings: 1,210 attendees)

A post meeting survey completed by participants related that over 90% of the participants either agreed or strongly agreed to the statement, "I felt the process allowed my voice to be heard".

These 43 meetings and the community input that was given went to directly informing each of the (22) district's strategic plans for 2021. Additionally, to maintain transparency and increase community trust, each of the (22) district strategic plans are posted online on the Department's page underneath the "Community" tab.

Following the civil unrest during the summer of 2020, The Office of Community Policing working in conjunction with the Department research and development published Special Order S02-03-13 *Community Policing Business Public-Safety Initiative* (which was implemented on 31 August 2020). The order is a district-level community problem-solving initiative to address public safety issues involving businesses within each district, including the assignment of Business Liaison Officers.

OCP additionally provided further guidance following civil unrest to business liaison officers in each district. The business liaison officer was tasked with being the point of contact in every district for any instances related to protests, civil unrest or looting within their business corridors. Additionally, they would work in conjunction with the district's Strategic Decision Support Center ("SDSC" room) to identify any potential for civil unrest within their business corridors. They were tasked with keeping an hourly log of events as follows:

1. Incidents occurring at businesses and around the business corridors.
2. Intelligence gathered that may alert to looting or other criminal activity on and near businesses. Events such as vehicles gathering or staging.
3. Phone calls fielded from business owners as well as phone calls made to business owners. Example: at 1030hrs spoke to John Doe, a manager at ABC foods who was concerned with a large group gathering. OEMC notified, officers responded and coded the event
4. Log events of stolen rental vehicles, thefts from car dealership, panel trucks or vehicles that may facilitate criminal activity, including RD#s.

### (5) Victim Services

In 2020, OCP expanded its victim services to begin including victims of non-fatal gun crimes. Three Crime Victim Advocates were hired to launch the Crime Victim Services pilot. The pilot remains ongoing and OCP is continually evaluating it to determine next steps on expansion.

Further, OCP is currently hiring for three additional Domestic Violence Advocates. These civilian positions will support victims and survivors of gender-based violence in connecting with

8

supportive resources, investigation follow ups, and other needs the victim or survivor may have.

OCP recently expanded its Civil Rights Unit to include new community liaisons focused on specific affinity populations throughout the City. This includes 6 LGBTQ+ liaison, an Immigrant Outreach Liaison Officer, a Homeless Outreach Liaison Officer, and a Religious Minorities Liaison Officer. Additionally, each districts community policing office now has an Affinity Liaison Officer that is dedicated to engaging with and supporting historically marginalized and minority communities within that district. Through this expansion, OCP hopes to increase its ability to engage with communities that have historically had more challenges and less trust with police and begin to re-establish those relationships in a more positive way.

### Response to Recommendation 4: Create, train, and equip specialized Mobile Field Force Teams across all CPD Areas

The Department agrees that it is important to create, train and equip Mobile Field Force Teams city-wide and has taken steps to implement this recommendation. In its After Action Report, the Department acknowledged the importance of Mobile Field Force ("MFF") training. Prior to the 2012 NATO summit the Department implemented this training and employed Mobile Field Force units as a means of protecting peaceful protestors from agitators, inciters, and wrongdoers. The Department failed to continue this training after NATO and nine years later when civil unrest came to Chicago it was left underprepared.

Since the summer of 2020, the Department has implemented a Mobile Field Force Training program for the Critical Incident Response Team ("CIRT") and Community Safety Teams ("CST"). Members assigned to CIRT often respond first when a police presence becomes necessary at large-scale, lawful gatherings and demonstrations. As such, field supervisors and police officers assigned to those units (e.g., 001st District, 018th District, CIRT, CST, Tactical Teams, etc.) primarily responsible for responding to large gatherings have since begun to attend eight-hour 'refresher' trainings on MFF policies and tactics. In addition, the Education and Training Division started providing MFF-specific 'refresher' training department-wide on July 23, 2020. In addition to what is set forth in this section, the Department refers to its response to Recommendation 1 in the Training Section below.

### Response to Recommendation 5: Better prepare for department-wide officer wellness and support, including providing and tracking protective equipment, transportation, hydration, food, facilities, and relief (¶¶381–86)

Since the civil unrest of 2020, the Department has implemented a new software system to document, keep track of, and assure follow ups to traumatic incidents, such as officer involved shootings. Supervisors enter the officer(s) info into the system and provide information such as time and date of incident, type of trauma, date officers were notified of being placed into the Traumatic Incident Stress Management Program ("TISMP"), and date of initial debriefing. The software automatically notifies officers who have been placed into the TISMP program of policy and procedures regarding mandatory trauma debriefings. The assigned clinician to each incident maintains information of the status of the offices as date placed into code 48 and date released.

Moreover, to assure 24-hour response to officers in need the Professional Counselling Service

has expanded office hours during extended deployments. During these times, the EAP building is open from 0800 until 2230.  Throughout these times operations are as follows:

- The building will be open as a cooling center;
- Seven alcohol and drug use meeting will be held each day. Four meetings will be on Zoom and three will be in person. Officers will be able to join the meetings from any location or join the live ones at the EAP office;
- One officer will be readily available to address any emergencies/crises including walk-ins;
- Peer Support members will address roll calls on a rotating basis; and
- On call clinicians will be available 24/7 to respond in person to any crises/needs.

**Response to Recommendation 6: Conduct a feasibility study regarding the acquisition, prioritization, allocation, and tracking of resources for officer wellness and responding to protests and unrest (¶¶377, 379)**

The IMT correctly points out the Department's lack of resources at the beginning of the Civil Unrest and the necessity to purchase a number of items to attempt to aid the officers who were working tirelessly to respond to the unrest.  The IMT focuses its analysis primarily on three items: BWC, radios and mobile field force equipment and OC spray.  Since the unrest of 2020, the Department has taken steps to increase its supplies and it moves into a position of better preparedness.

First, since the civil unrest last year the Office of Public Safety Administration ("OPSA") has deployed over 1,100 BWCs to a variety of units.  As set forth in the chart below, BWCs have been distributed as follows:

| Unit | # of BWCs |
| --- | --- |
| CST | 308 |
| CIRT | 288 |
| CIT | 15 |
| Mass Transit | 205 |
| Traffic | 44 |
| SWAT | 28 |
| Counter Terrorism | 40 |
| Summer Mobile | 60 |
| Central Detention | 24 |
| Area 1 Detectives | 24 |
| Area 2 Detectives | 24 |
| Area 3 Detectives | 24 |
| Area 4 Detectives | 24 |
| Area 5 Detectives | 24 |
| -------------------------------------- | |
| Total | 1,132 BWCs |

Moreover, by the end of July 2021, the Department intends to have BWCs deployed at the following locations for the use of the officers assigned to these locations: Public Safety Headquarters, Homan Square and the Training Academy. In addition, OPSA is including Body Worn Cameras on the battery truck that is deployed during long protests and civil unrest to provide additional BWCs if necessary. The details of this battery truck have not been finalized yet.

As discussed during interviews conducted by the IMT, the Department is in the midst of a multi-year contract that provides for the upgrade of police radios. At the end of this contract the Department will have fully transitioned to those updated radios.

## III.   Policies

The Special Report makes two broad recommendations for changes to the Department policy regarding the response to protests and civil unrest. The Department provides the following comments in response to those general recommendations, which can be found on page 137 of the Special Report.

**Response to Recommendation 1: Create Standard Operating Procedures for initiating Emergency Operations Center and Forward Command Posts, establishing clear roles and responsibilities for all levels of command**

While the IMT recommends the creation of Standard Operating Procedures it should be noted that portions of an Emergency Operations Center are already set forth in the Department's directives. For example, directive G05-03, *Critical Incident Response Program* (December 7, 2017), defines and explains the concept of establishing a "forward command post". The forward command post is defined as follows: "A secure location near the exterior of the structure or outside the protected area designated by the first supervisor on-scene not assigned to a contact team and assigned by the field lieutenant/watch operations lieutenant of the district of occurrence. The Forward Command Post is used to support the protected area and causality collection point." Directive G05-03 provides direction for the establishment of the "Forward Command Post" for critical incidents, hazardous material incidents, and active criminal threat situations.

The Special Report also references Department directive S05-07-01, *Emergency Action Plans,* and cites the updating of Department emergency plans for all Department facilities. Clear roles for several levels of command have been identified in the recently revised and published directive G02-02, *First Amendment Rights* (April 13, 2021). This directive, which is referenced in the Special Report, defines and provides operational circumstances for when a "Field Commander" and "Incident Commander" designation would be appropriate during a First Amendment response. The directive describes the Field Commander as "[t]he highest ranking on-scene Department member who reports directly to the overall incident commander and is responsible for the Department's on-scene response to the incident". It defines the incident commander as "[t]he designated Department member who is responsible for the Department's overall response to the incident."

**Response to Recommendation 2: Update and develop CPD policies, with an enhanced focus on (1) Use of Force, including mass arrests, (2) First Amendment-related policies, (3) core policing values regarding ethical policing practices and a commitment to fair, unbiased and respectful interactions; and (4) accountability.**

11

### (1) Use of Force

The Department's Research and Development Division has recently published a suite of updated use of force directives that received no objection from the Office of Attorney General. These directives are:

- G03-02, *De-Escalation, Response to Resistance, and Use Of Force*;
- G03-02-01, *Response to Resistance and Force Options*;
- G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report;*
- G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures;*
- G03-02-04, *Taser Use Incidents*;
- G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*;
- G03-02-06, *Canine Use Incidents*;
- G03-02-07, *Baton Use Incidents*; and
- G03-02-08, *Department Review of Use of Force*.

These directives were positively mentioned in the Special Report's side-by-side chart analysis and are in effect during the Department's response to protests and unrest. Currently, the Department's mass arrest procedures are outlined in directive S06-06, *Mass Arrest Procedures* (September 27, 2018). Directive S06-06 delineates Department members' responsibilities and provides procedures for classified mass arrest circumstances.

### (2) First Amendment

The Department recently published two directives—G02-02, *First Amendment Rights* (Apr. 13, 2021) and D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances* (Nov. 02, 2020)—that address the Department's response to First Amendment activities. As the Special Report notes, the following significant changes have been implemented through the revised version of Directive G02-02: the definition of First Amendment assembly, a description of crowd management techniques; revised and defined procedures for crowd dispersal orders with reporting requirements, and an outline of crowd management procedures. Similarly, Directive D20-08 implemented the following significant changes: definitions of a "squad" and "platoon;" the introduction of an "officer line formation" that can act as a "static human barrier or can be mobile to move, channel, or disperse a crowd;" and the introduction of the Incident Response Form (CPD-11.302) to document the formation of "squads" as a result of a crowd's actions.

### (3) Core policing values regarding ethical policing practices reflect a commitment to fair, unbiased, and respectful interactions with the public

The Special Report also recommends that the Department directives ensure that core policing values regarding ethical policing practices reflect a commitment to fair, unbiased, and respectful interactions with the public. The Department has published multiple directives that address the core policing values. For example, in the recently published suite of use of force directives, each of the directives contains the "sanctity of life" definition, which reads as follows:

12

The Department's highest priority is the sanctity of human life. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity, regardless of race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, immigration status, homeless status, source of income, credit history, criminal record, criminal history, or incarceration status. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.

In addition, Directive G04-01, *Preliminary Investigations* (Dec. 30, 2020), contains the following in its policy statement:

Fair, unbiased, and respectful interactions during calls for service and preliminary investigations provide an opportunity to strengthen community trust and foster public confidence in the Department. Department members will act, speak, and conduct themselves in a professional manner, recognizing their obligation to safeguard life and property, and maintain a courteous, professional attitude in all interactions with the public.

Similarly, Directive G01-01, *Vision, Mission Statement, and Core Values"* (May 21, 2019), the Department emphasizes the following core values: professionalism, integrity, courage, dedication and respect. The Directive also includes the following definition of respect:

Respect means that we treat each other and the communities we serve as we would like to be treated: with compassion and dignity. Within the Department, we strive to ensure all members are supported and empowered, regardless of rank or position. Outside of the Department, we strive to partner with the communities we serve through transparency, accountability, and building mutual trust. We recognize that the respect we owe to our communities is not conditional, and we recognize that respect as a value must permeate every police action we undertake.

Several directives, including G02-02, *Community Policing Mission and Vision* (Dec. 31, 2020); G04-01, *Preliminary Investigation* (Dec. 30, 2020); and G01-09, *Supervisory Responsibilities"* (May 10, 2021) include a section regarding procedural justice and legitimacy. These three directives have the procedural justice and legitimacy language as follows:

The Department continues its commitment to establish procedures consistent with the concepts of Procedural Justice and Legitimacy, with the goal of strengthening the relationship with the community and ultimately improving officer safety and efficiency. The concept of Procedural Justice and Legitimacy consists of the following four principles: giving others a voice (listening), fair and transparent decision making based on the facts, respectful treatment, and trustworthiness.

**(4) Accountability**

13

Finally, the Special Report recommends that the Department create directives that reflect accountability for Department members. Here again, the Department has published multiple directives that address holding Department members accountable for their behaviors. For example, directive G01-09, *Supervisory Responsibilities* (May 10, 2021), contains an entire section titled "Accountability." Some language included in the "Accountability" section reads as follows:

> Department supervisors are responsible for holding Department members under their command accountable for their actions and have a duty to report allegations of misconduct. As such, Department supervisors will identify any adverse behavior or misconduct and ensure that it is adequately addressed through employee assistance resources, corrective action, timely and appropriate training, or referral for discipline.

Additionally, Directive G03-02, *De-Escalation, Response to Resistance, and Use of Force* (Apr. 15, 2021), includes a specific section on "Accountability," which provides:

> All Department members are obligated to ensure compliance by themselves and other members with Department regulations, policies, and the law. Consistent with the Department directive titled *Complaint and Disciplinary Procedures,* Department members will be held accountable for using force that violates law, this directive, or other Department policy. Reminder: Department members are reminded that discipline, up to and including separation from the Department, may be administered for any misconduct or violation of policy.

Directive G01-01, *Vision, Mission Statement, and Core Values* (May 21, 2019), also emphasizes accountability through its language regarding the essential value of respect:

> Respect means that we treat each other and the communities we serve as we would like to be treated: with compassion and dignity. Within the Department, we strive to ensure all members are supported and empowered, regardless of rank or position. Outside of the Department, we strive to partner with the communities we serve through transparency, accountability, and building mutual trust. We recognize that the respect we owe to our communities is not conditional, and we recognize that respect as a value must permeate every police action we undertake.

The Department is continuing to build on the recent success above to further refine Department policies related to the response to crowds, protests, and unrest. For example, the Department is currently reviewing and revising S06-06, *Mass Arrest Procedures* (issued September 27, 2018), to ensure the directive is consistent with current operational structure, provides clear direction to Department members on their roles during a mass arrest incident, and reflects the core principles and practices identified in the recent revisions (April 15, 2021) to the use of force suite of policies.

Moreover, the Department continues to engage IMT, OAG, the Coalition, and the Court to refine the Department's response to First Amendment activities. This dialogue has led to additional revisions to G02-02, *First Amendment Rights* (April 13, 2021), which are aimed at addressing the expectations of the community and the concerns over protecting First Amendment rights. This work will strengthen the

14

Department's policies on the response to protests and reaffirm the Department's commitment to accountability during responses to First Amendment activities.

The Department also continues to engage IMT and OAG on accountability issues and the Department's complaint and disciplinary structure. These discussions will result in significant revisions to the following accountability polices: G08-01, *Complaint and Disciplinary Procedures* and G08-01-02, *Initiations and Assignment of Investigations into Allegations of Misconduct*. The policy revisions will not only strengthen the Department's overall accountability process, but also bolster the structure for reporting and identifying misconduct, including within the context of the Department's response to First Amendment activities.

Finally, in response to IMT's recommendation on policy revisions to ensure the Department values core policing principles, the Department will continue to build on the existing policies in G01-01, *Vision, Mission, and Core Values*. The Department continues to review and revise, through the procedures outlined in the Consent Decree, policies associated with impartial policing, equitable treatment, and courteous and dignified treatment. In particular, the Department will revise G02-01, *Human Rights and Human Resources*, and G02-04, *Prohibition on Racial Profiling and Other Biased-Based Policing*, to clarify the prohibitions on discrimination, bias-based policing, and retaliation and to reinforce the Department's commitment to dignified, equitable, and respectful treatment of the public by all Department members in all circumstances, including First Amendment activities.

## IV.   Training

**Response to Recommendation 1: "Develop training programs for leadership, commanders, and supervisors as teams on Mobile Field Force operations and rules of engagement."**

In April 2021, the Academy implemented a 2-hour "Field Force Operations for Leaders" course for senior executive service and command staff members. The goal of this training is to provide senior executive service and command staff members of the Chicago Police Department with instruction on the effective field force operation and overall police response to crowds, protests, or civil disturbances. At the conclusion of this class, participants are able to:

- o  identify considerations related to the First Amendment and public gatherings;
- o  identify considerations related to the Fourth Amendment and public gatherings;
- o  identify specific responsibilities of the designated exempt-level member related to public gatherings and reportable uses of force;
- o  explain the components of a successful Mobile Field Force (MFF) deployment;
- o  identify the composition of Mobile Field Forces (MFF) based on the Miami Model; and
- o  recall crowd control tactics used to control civil action/disorder.

**Response to Recommendation 2: Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray.**

The Department has offered the 8-hour Crowd Control and Management course annually since 2018

which includes training on use of batons in a First Amendment setting. In 2021, a new 16-hour Advanced Field Force Operations course was developed and is being implemented, with Critical Incident Response Teams, Community Safety Teams, Detail Unit, and Bureau of Patrol Tactical Teams scheduled to attend starting in April. The Department further developed a training projection to accommodate training the remainder of available sworn members in the 8-hour Crowd Control and Management Course in 2021.

In the Special Report, the IMT states that "most recruit and in-service training is not hands-on or scenario-based." (Special Report, p. 169.) This paragraph describes the fact that Department members with less seniority do not have the same field experiences as veteran officers who were part of events that involved the tangible application of tactics, policies, and procedures, such as NATO. This is not representative of the amount of hands-on or scenario-based training members receive in training, such as:

- The 7-hour recruit training on Crowd Control and Behavior includes 2 hours on team tactics application;
- The 8-hour in-service Crowd Control and Behavior course includes 4 hours of formation drills and activities; and
- The 16-hour in-service Advanced Field Force Operations course includes 8 hours of formation drills and activities and a scenario.

**Response to Recommendation 3: Provide refresher training on (1) the people's right to record officers, (2) uniform requirements, (3) respectful interactions, (4) providing and requesting medical aid, and arrestee rights."**

The Department has implemented regular training via eLearning and streaming video and developed training bulletins to promote the regular reinforcement of policy and procedures regarding the right to record officers, uniform requirements, respectful interactions, providing and requesting medical aid, and arrestee rights. More specifically, in 2020 and 2021, the Department added several in-service course offerings providing instruction on the people's right to record officers, uniform requirements, respectful interactions, providing and requesting medical aid, and arrestee rights. All sworn personnel were enrolled in eLearning training on foot pursuits, body worn cameras, de-escalation, response to resistance, and use of force, in addition to weapons discipline-focused courses such as firearms qualifications and MK9 OC spray. Streaming videos and training bulletins, which are important training tools to ensure Department members have regular review of key concepts, techniques and practices offered in in-service training, also were provided in these subject matter areas. Further, in 2020 and 2021, the Department delivered regular refresher training via streaming videos on topics such as crowd control, the First Amendment and public gatherings, and mass arrests. The Department posted messages on its Administrative Message Center, available on the Department's intranet site, reminding members of various refresher training resources, with direction that the reminder consistently be announced in roll calls to inform members. The following is a summary of portions of trainings that are directly responsive to one or more of IMT's recommendations in this section of the Special Report:

- **Foot Pursuit eLearning:** "Once the scene is safe and as soon as practical, request appropriate medical aid when an individual is injured, complains of injury, or requests medical attention. Department members may provide appropriate medical care consistent with the member's training."

- "REMINDER: For use of force incidents resulting from a foot pursuit, as soon as it is safe and feasible to do so, members will provide life-saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical…"
- **Orientation to De-Escalation, Response to Resistance, and Use of Force eLearning**: The section "Medical Attention" was revised to include existing policy that provides in relevant part, "for use of force incidents involving Department members, as soon as it is safe and feasible to do so, members will provide life-saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on scene. If the scene is safe and the person in custody is secure, Department members will not interfere with emergency medical personnel when providing treatment to injured persons. "Duty to Intervene" added to eLearningG03-02-06 - Department now prohibits the use of canines in response to crowds, protests, or civil disturbances. An Exempt-level incident commander will respond to canine deployments as a use of force.
- **Body Worn Cameras eLearning:** Illinois law allows the public to record on-duty officers in public or when officer has no reasonable expectation of privacy. Violation of law may constitute disciplinary actions and criminal penalties.
- **MK9 OC Spray eLearning**: If the subject appears to be in physical distress beyond the expected discomfort, complains of injury or makes you aware of a pre-existing medical condition, request the appropriate medical aid, including EMS (CFD).
- **Firearms Qualification eLearning:**
  - The Department's highest priority is the sanctity of life of human life. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.
  - Once the scene is safe and as soon as practical, immediately request emergency medical services for an injured person through OEMC.
  - Sworn members may provide medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention.
  - Treat all injured persons with dignity and respect.

**V316 Crowd Control Formations Streaming Video was shown to the Department with required viewing on the following dates:**

> 8 June 2020 - 11 June 2020
> 31 Oct 2020
> 26 Apr 2021 - 29 April 2021
> 31 May 2021 - 3 June 2021

**V402 First Amendment and Public Gatherings Streaming Video**  (including recording on the public way, rendering aid, treating persons with courtesy and dignity, uniform requirements (i.e. identifiers, BWC, and COVID-safety face masks) **was shown to the Department with required viewing on the following dates:**

> 02-09 Nov 2020
> 19-22 April 2021
> 14-17 June 2021

17

**V417 Mass Arrest Procedures Streaming Video was shown to the Department with required viewing on the following dates:**

- o   17-23 April 2021

**Training Bulletins**

- **ETB 20-06 Public Gatherings and First Amendment** – Topics include recording on the public way, rendering aid, treating everyone with courtesy and dignity, uniform (identifiers, body worn camera, and Covid masks)
- **ETB 17-03 Body Worn Camera –** "The Department's community relations strategy includes building and fostering collaborative relationships through positive engagements and public trust. All interactions with the public are opportunities to enhance the perception of the police and build public trust. Audio and visual recordings from the body worn camera can improve the quality and reliability of investigations and increase transparency."
- **ETB 17-05 Taser CEW** – "The sanctity of human life is the Department's highest priority. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.  Taser discharge and request emergency medical services (EMS) if the person has been exposed to electricity, the probes penetrated their skin, or the person appears to be in any physical distress or complains of injury. Department members are prohibited from removing Taser barbs embedded in a person's flesh."
- **ETB 17-04 Expandable Baton** – "The sanctity of human life is the Department's highest priority. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved. ...upon gaining control of the person request emergency services if the person appears to be in physical distress, complains of injury, or has sustained a strike to the head or neck from a baton."
- **ETB 16-01 Principles of Force Mitigation** – "The sanctity of human life is the Department's highest priority. The concept of the sanctity of human life is the belief that all human beings are to be perceived and treated as persons of inherent worth and dignity. Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved."

## V.   Accountability

In the Special Report, IMT makes six recommendations that relate to the Department's accountability for Officers.  Each of those specific recommendations will be addressed below. In its introductory section on Accountability, IMT states, "This enforcement should include recognition of officers who followed policies and appropriate accountability for those who did not." (Special Report 184-185) In response, the Department notes that Bureau of Internal Affairs ("BIA") coordinated with the Awards and Recognition Section to establish the compliments@chicagopolice.org email address and a Department monitored compliment form for the public. A link to the Department compliment form was added to BIA's public-facing website (next to the "submit a complaint" link) in May, 2021.

The Awards and Recognition Section will process these compliments in accordance with established procedure so that they appear in a department member's complimentary history. In addition, BIA has reached out to the Civilian Office of Police Accountability ("COPA") to ensure that compliments received via COPA's online form are forwarded to the Awards and Recognition Section for proper processing. BIA currently awaits response from COPA.

**Response to Recommendation 1: Improve reporting and documentation on uses of force, arrest, deployments, dispersals, officer wellness and safety, all injuries, and use of OC spray**

As a preliminary matter the Department refers to the section above in the policy response that addresses the Department's documentation of use of force. This overlaps with the Department's response to the accountability recommendation herein. During a mass arrest situation BIA ensures that BWC-equipped officers are assigned to each BIA Sergeant deployed to oversee a mass arrest incident. BIA continues to coordinate with forward command of each Area Deputy Chief when appropriate to ensure the presence of a BWC-equipped officer. Additionally, Central Detention van drivers have been issued BWCs. As for reminding officers about uniform requirements, The Office of Constitutional Policing and Reform issued 5 AMC Messages regarding Uniform and Appearance Standards during 2020 (#256716-June 2, 2020; #256717-June 2, 2020; #256767-June 4, 2020; #260794 –September 2, 2020, #262130-November, 5, 2020). Further the IMT states in its Special Report that members failed to self-report in any event related to civil unrest. This is not correct. Officers depicted on video in a significant incident did self-identify to BIA. (Incident at the office of Congressman Rush)

**Response to Recommendation 2: Increase transparency regarding discipline, including decisions to strip or not strip officers of police powers (¶410, 567)**

As a preliminary matter, IMT's reference to Paragraph 410 is unclear, as that paragraph references administrative duty assignments after discharging a firearm, which is not a disciplinary process. It has no application to relieving officers of their police powers. "Stripping" is an informal term for relieving an officer of police powers. Relief of powers is a non-disciplinary process based on the authority of the Superintendent. (*See* Special Report 198) As to the officers that "flipped off" protestors and the officer that used "a homophobic slur," as described on page 193 of the Special Report, a full review of the incidents indicated that these officers acted unprofessionally in response to actions by members of the public that could be considered provocation. Those officers were temporarily relieved of their police powers, which provided a respite from additional near-in-time encounters with the public.

BIA has made improvement in transparency efforts in 2021. This year, BIA created the first-ever Quarterly Report in compliance with paragraphs 550 and 551 of the Consent Decree. BIA also included a comprehensive explanation of its structure, its jurisdiction over the Department's investigations, and the entire complaint process. The format of BIA's Quarterly Report was well-received by IMT and OAG. The Quarter 2 and Quarter 3 reports for 2020 were published to BIA's public-facing website in March and April, 2021, respectively. Final revisions for the Quarter 4 2020 report are underway. Additionally, BIA has updated the Accountability Dashboard, electronically published Administrative Summary Reports, and distributed informational brochures/posters regarding the complaint process.

**Response to Recommendation 3: Address personnel needs across accountability systems, including COPA investigators, CPD Force Review Division, BIA, and CPD supervisor ratios (¶¶343, 356, 521, 575, 700)**

The Department agrees with this recommendation and will strive to incorporate it in light of various manpower shortages and requirements or staff Department-wide.

**Response to Recommendation 4: Allocate sufficient City and CPD resources to review and analyze data, including tagging and auditing body-worn-camera video footage (¶¶352–53, 576, 700)**

BIA's CMS has undergone continuous improvement in 2021 to support the ability to review complaint data.

**Response to Recommendation 5: Continue to review and increase methods of transparency with Chicago's communities, regarding crime-reduction strategies, officer-involved shootings, and other police activities (¶¶10, 12, 17, 54, 334)**

The Department refers to its response to Recommendation 3 in the Planning section above wherein it addresses the steps taken by OCP to increase transparency with community members.

**Response to Recommendation 6: Create After Action procedures—including body-worn camera review and opportunities for community engagement—after each operations plan (¶¶8–10, 347–51)**

The Department continues to consider how to incorporate a city-wide after-action review and will take into consider the IMT's recommendations as it moves forward.

The Department appreciates the opportunity to respond to the Special Report and looks forward to its continued collaboration with the IMT as it moves forward with further reforms.

Independent
Monitoring Team | Chicago Police
Department
Consent Decree