**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ILLINOIS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-cv-6260** |
| **CITY OF CHICAGO,** | **Judge Robert M. Dow, Jr.** |
| **Defendant.** | |

<u>**INDEPENDENT MONITORING REPORT 3**</u>

 The Independent Monitor Margaret A. Hickey and the Independent Monitoring Team submit the attached Independent Monitoring Report 4.

Dated October 8, 2021

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL  60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on October 8, 2021, she caused a true and correct copy of the foregoing **Independent Monitoring Report 4** to be filed electronically with the Court's CM/ECF system, which caused an electronic copy of this filing to be served on counsel of record.

/s/Margaret A. Hickey
Margaret A. Hickey
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
mhickey@schiffhardin.com



Independent Monitoring Team | Chicago Police Department Consent Decree

# INDEPENDENT MONITORING REPORT 4

*Reporting Period January 1, 2021 through June 30, 2021*

Report Date: October 8, 2021

## Monitoring Under the Consent Decree

In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago (City) in federal court regarding civil rights abuses by the Chicago Police Department (CPD). The lawsuit led to a Consent Decree, effective March 1, 2019.[1] The same day, the federal court appointed Maggie Hickey as the Independent Monitor. Ms. Hickey leads the Independent Monitoring Team, which monitors the City of Chicago's progress in meeting the Consent Decree's requirements.

Paragraph 2 of the Consent Decree sets out its overall purpose, which has guided and will continue to guide our monitoring efforts:

> **2.** *The State, the City, and the Chicago Police Department . . . are committed to constitutional and effective law enforcement. In furtherance of this commitment, the Parties enter into this Agreement to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety. In addition, this Agreement seeks to ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely. This Agreement requires changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management.*[2]

---

[1]     For more information on the Consent Decree, see the Background section below. More information is also available on the Independent Monitoring Team's website (cpdmonitoringteam.com/) and on the Illinois Attorney General Office's Consent Decree website (chicagopoliceconsentdecree.org/about/).

[2]     We cite the relevant paragraphs of the Consent Decree throughout this Independent Monitoring Report. The Consent Decree is available on the Independent Monitoring Team's website: cpdmonitoringteam.com/wp-content/uploads/2020/08/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. *See also Resources*, CHICAGO POLICE CONSENT DECREE ("Consent Decree Approved by the Court on January 31, 2019"), chicagopoliceconsentdecree.org/resources/.

## Table of Contents

Executive Summary ...........................................................................1

Roadmap .........................................................................................12

Introduction ...................................................................................13

Compliance Activities and Assessments .......................................18

    I. Community Policing ............................................................41

    II. Impartial Policing ...........................................................107

    III. Crisis Intervention ........................................................173

    IV. Use of Force ..................................................................267

    V. Recruitment, Hiring & Promotions ..................................409

    VI. Training .........................................................................433

    VII. Supervision ..................................................................548

    VIII. Officer Wellness and Support......................................587

    IX. Accountability and Transparency....................................656

    X. Data Collection, Analysis & Management........................880

    XI. Implementation, Enforcement & Monitoring .................944

Conclusion and Looking Ahead to
 Independent Monitoring Report 5 .............................................955

Attachment A:
Office of the Illinois Attorney General Comments .......................956

Attachment B:
City of Chicago Comments............................................................963

***
Readers of the electronic pdf can click sections above to jump to the corresponding sections of the report.

# Executive Summary

As the Independent Monitoring Team (IMT), we assess the City's compliance with the requirements of the Consent Decree. Specifically, we assess how all relevant City entities—including the CPD; the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC)—are complying with the Consent Decree.[3] Each year, we file a Monitoring Plan that sets out what we will assess during the year, and we file two semiannual Independent Monitoring Reports.[4] In July 2020, we filed the Monitoring Plan for Year Two, which outlined the projected monitoring efforts under the Consent Decree for Year Two (March 1, 2020, through June 30, 2021).[5]

This is Independent Monitoring Report 4. Here, we discuss our monitoring efforts during the fourth reporting period, from January 1, 2021, through June 30, 2021.[6] The report includes, among other things required by the Consent Decree, the following:

- an updated compliance or status assessment from the previous reporting period;

- a compliance or status assessment for each new paragraph we identified for this reporting period in our Monitoring Plan;

- a summary of the principal achievements and challenges facing the City's ability to comply with the Consent Decree; and

- an updated projection of upcoming work for the City, the Office of the Illinois Attorney General (OAG), and the Independent Monitoring Team (¶661).

The semiannual reports—of which this is the fourth—give us the opportunity to update the Court and the public about the City's compliance efforts. The Consent Decree generally prevents the IMT from making any public statements or issuing

---

[3] As a party to the Consent Decree, the City is ultimately responsible for compliance. Unless otherwise specified, our references to the City typically include its relevant entities.

[4] The Independent Monitoring Plans and Reports are available on the IMT's website. *See Reports and Resources*, at https://cpdmonitoringteam.com/reports-and-resources/.

[5] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports*, INDEPENDENT MONITORING TEAM (July 3, 2020), https://cpdmonitoringteam.com/overview/reports-and-resources/. Note that the monitoring period was extended due to COVID-19.

[6] As explained in our Monitoring Plan for Year Two and further below the Office of the Illinois Attorney General and the City of Chicago agreed to extend the third reporting period to December 31, 2021, in response to early COVID-19 shutdowns.

findings regarding any non-public information or materials outside of these reports (*see* ¶672). Because the Consent Decree will be in effect for a minimum of five years, this is the fourth of at least 10 semiannual Independent Monitoring Reports.[7]

We also note that the Consent Decree is a complex document that resulted from long and substantive negotiations between the City and the OAG. Throughout the reporting period, and in this report, we have aimed to address the nuances of the agreement fairly and accurately.

The monitoring process contains some tensions that we address in both our monitoring efforts and this report. For example, there is—and likely will continue to be—a tension between the City's need to make compliance efforts quickly and the need to ensure that its efforts are effective and sustainable. Because the Consent Decree prioritizes both goals, we do too. We recognize that if the City rushes to meet a deadline by creating a policy without, for example, the requisite community involvement, then that may have the unintended effect of delaying the date the City reaches full compliance if the City must later re-engage the community, re-draft the policy, and potentially re-train personnel. We have attempted to address this tension in our analysis for each relevant paragraph in this report.

We know that many readers will be most interested in learning where the IMT has found the City, the CPD, and the other relevant entities to be in compliance or not in compliance with the requirements of the Consent Decree. But in reviewing this report, it is important to keep three things in mind regarding the scope and significance of our compliance assessments.

First, this report represents a snapshot of the City's compliance efforts from January 1, 2021, through June 30, 2021. It does not reflect all of the efforts of the City, the CPD, or the other relevant City entities to date. While we report on the compliance efforts within defined reporting periods (¶661), we stress that work is ongoing by the City, its relevant entities, the OAG, the IMT, and Chicago's communities. In many cases, relevant City entities have continued to develop policies and train personnel after June 30, 2021, and before the date we submit this report. We have not assessed efforts made after June 30, 2021, in this report. We will do so

---

[7]  We provided a draft of this report to the City and the OAG on January 30, 2021, as required by ¶¶661–65. After identifying versioning issues with the Training section, the IMT provided an updated draft of that section on February 5, 2021. Per ¶663, the OAG and the City then provided written responses on February 12, 2021, and February 15, 2021, respectively. The City provided a response to the updated Training section on February 19, 2021. On March 2, 2021, the IMT provided an updated draft to the Parties. The Parties provided feedback on March 18, 2021, and March 25, 2021, respectively. *See* Attachment A (OAG comments) and Attachment B (City comments).

in the monitoring report for the fifth reporting period (July 1, 2021, through December 31, 2021).

Second, we assess compliance at three levels: (1) Preliminary, (2) Secondary, and (3) Full. The Consent Decree requires the City and its entities to reach Full compliance and maintain that compliance for one to two years. *See* ¶¶714–15. These compliance levels allow us to share our assessments of the City's progress throughout the life of the Consent Decree with the Court; the City and its relevant entities; the OAG; and the public. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the reform in practice. There are, however, many paragraphs that do not include policy or training elements. In those circumstances, the three levels may follow a different trajectory, such as (1) whether the City or its relevant entities have established the framework and resources to achieve the reform, (2) whether the City or relevant entities have effectively communicated the reform to relevant personnel, and (3) whether the City or relevant entity has appropriately implemented the reform.

Third, because of the nuances of each specific requirement and level of compliance, the City and its relevant entities must provide the IMT with records and data—in a timely manner—to establish that they have reached each level of compliance during the applicable reporting period.

Under the Consent Decree, the City, the CPD, or other relevant entities are not in compliance with any of the requirements of the Consent Decree until the IMT is satisfied that the City provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. Even if the City has made significant efforts toward complying with a requirement—which in many cases it has—the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its effort and allowing sufficient time for the IMT and the OAG to review the information.

To reflect the City's and its relevant entities' progress through the Consent Decree process, we have added more specific categories for each of the three levels of compliance (Preliminary, Secondary, or Full):

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced per ¶720, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not finish within a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not yet met a lower level of compliance.

## Major Developments and Challenges Impacting Compliance

As we file this report, Chicago mourns for Officer Ella French, a young CPD officer who was tragically killed in the line of duty. Her partner, Officer Carlos Yanez, Jr., who was seriously injured and remains on a path to recovery. We thank all CPD officers for their service and sacrifice, and we extend our sincere condolences and gratitude to those who have continued to serve and sacrifice, including their friends and families, during the ongoing challenges facing Chicago.

Some of the challenges we have seen in previous reporting periods—such as the COVID-19 pandemic—continued during the fourth reporting period. Despite uncertainties regarding COVID-19, including the likelihood of infection, transmission, or serious harm, many City personnel, first responders, community members, and their families continue to serve Chicago. And while we are still in the midst of a pandemic that continues to take lives, many communities across the country and in Chicago are also experiencing devastating levels of violent crime, including shootings and homicides.

This subsection provides an overview of how some developments and challenges that have impacted the City's and the City's entities' compliance levels through the fourth reporting period. We provide more details in the "The City of Chicago's Principal Achievements and Challenges" section below, but here we note a few of the major changes, challenges, and events that impacted our compliance assessments throughout the fourth reporting period: the continued COVID-19 pandemic; personnel changes; community engagement efforts; data challenges; record productions; and redirecting resources to create citywide units to respond to incidents and violent crime.

### COVID-19 Pandemic

COVID-19 has continued to challenge the City; the City's entities, including the CPD and the COPA; and our communities. Throughout this report, we have attempted to identify where those challenges have impacted compliance levels the most, such as increasing the costs and time required to provide training.

## Personnel Changes

As referenced in our previous reports, the CPD has had three superintendents since the Consent Decree process began. Changes in leadership and corresponding transitional periods can create logistical and culture challenges that can slow reform. During this reporting period—from January through June—363 officers have left the Chicago Police Department, including Deputy Chief of CPD's Bureau of Crime Control. In all, more Chicago police officers retired between January and June of 2021 than retired in all of 2018.

As many cities across the country struggle with recruitment and retention, the IMT is concerned about the high number of vacancies, which ultimately impact officer safety, community safety, and the CPD's ability to meet the unity of command and span of control requirements set out in the Consent Decree (*see* ¶¶356–68). We are similarly concerned with some resignations of key CPD civilians during this reporting period, who are crucial to the City's ability to appropriately collect, audit, analyze, and report valid and reliable data.

## Community Engagement

As in the third reporting period, the CPD continued to struggle with community engagement during the fourth reporting period. In our first three reports, we raised concerns about the CPD's lack of community engagement during its policy development processes. In the third reporting period, the CPD made significant efforts toward community engagement, even after the COVID-19 pandemic started inferring with in-person engagement. While the CPD has made some strides toward meaningful, sustained community engagement, there is more work to be done (*see* our analysis of ¶160 in the Use of Force section).

## Data Challenges

During this reporting period, the City brought to our attention some serious data challenges at the CPD. Specifically, the IMT was alerted to the fact that there are serious issues of data quality regarding foot pursuits. Specifically, the way in which foot pursuit data were captured led to incorrect reporting. This continues to raise a number of concerns, not only with the CPD's foot pursuit training, and practices, but with the data collection, management, and analysis that is critical to ensuring transparency and informing policing policy, training, and practices for the safety of CPD officers and communities.

The data issues around foot pursuits are related to a larger set of issues around the CPD's temporary foot pursuit policy that began when the IMT formally recommended that the CPD adopt a foot pursuit policy in March 2021 (*see* ¶172). In April 2021, the City invoked ¶631, which allows for the City to issue a temporary policy

if "extraordinary circumstances demand." We note that foot pursuits were included as a major concern in the U.S. Department of Justice's civil rights investigation's findings in 2017 that led to the Consent Decree.

In short, the IMT and the OAG engaged in countless discussions with the City and the CPD on its temporary *Foot Pursuit* policy during May and June, which have continued into the fifth reporting period. These discussions were intended to reach an approved, final policy on foot pursuits by the Consent Decree deadline of September 3, 2021. Amid these discussions, the CPD disabled its foot pursuit data dashboard and notified the IMT that the data feeding the dashboard was likely inaccurate.

Throughout this reporting period, the IMT repeatedly requested the City and the CPD provide an explanation regarding what transpired with the foot pursuit dashboard data, including what led to the data issues, whether the data issues have been corrected, and what efforts the City and the CPD have made to correct the data that has been provided to the IMT in previous reporting periods and reported on in previous reports. To date, we still do not have many of these answers, and have only received partial explanations regarding the scope of the data issues and plans ahead.

The CPD's data issues remain unresolved, and the *Foot Pursuit* policy remains unsatisfactory to the OAG, the IMT, and many in Chicago's communities.[8] The City and the CPD did not meet their deadline for adopting a foot pursuit policy by September 3, 2021 (which is in the fifth reporting period).[9] It is also likely that these data issues will not be resolved soon. The OAG and the IMT are currently working with the CPD to address issues and concerns within the policy. It is our hope that the CPD works quickly to finalize a revised version of the *Foot Pursuit* policy that incorporates the Consent Decree's requirements, best practices, and feedback from officers and Chicago's communities.

With an improved policy in place, the City and the CPD can then better collect, manage, and analyze data to review and revise the *Foot Pursuit* policy, as necessary, to ensure that the policy and the corresponding training and practices are data driven.

Moreover, the IMT remains concerned that the Strategic Initiatives Division (also known as SID) is understaffed. This division is crucial to the City's and the CPD's successful reform endeavors, as it performs many of the CPD's data and analytics

---

[8]   We note here that the City's and the CPD's original deadline for adopting a foot pursuit policy, per ¶172, was July 1, 2021; taking into account the stipulation to extend some Consent Decree deadlines due to the COVID-19 pandemic, the City's and the CPD's deadline became September 3, 2021.

[9]   This finding will be formally reflected in our next Independent Monitoring Report, which will cover July 1, 2021 through December 31, 2021.

efforts. The CPD's highest-ranking data scientist left the department in January 2021 and has not yet been replaced by an equally qualified data scientist. The Strategic Initiatives Division is currently overseen by a sworn Commander. As the City and the CPD move into Secondary compliance for some paragraphs, and look toward eventual Full compliance, they will need to drastically increase their data collection, management, and analytical capabilities to document their operational successes. See our assessment of ¶606 for a fulsome discussion of the IMT's concerns about the CPD's data deficiencies and challenges.

## Record Productions

The City built on the progress that we saw regarding record productions from the third reporting period: We received more records, regarding a wider range of topic areas. The City and some if its entities also made considerable efforts to avoid large record productions in the last two weeks of the reporting period.

Nonetheless, the City and some of its entities still sent a significant portion of records near the end of the reporting period. Again, the City provided over 30% of the records in the last month of the reporting period—and over 20% of which were in the last two weeks of the reporting period. As it did in the first three reporting periods, later productions limit our ability to review the materials and provide necessary follow-up comments and questions to fully understand and verify compliance efforts. We therefore must continue to raise this issue, because future reporting periods (1) will include more requirements and (2) will likely require the production of more records and data for establishing higher levels of compliance.

Further, members of the CPD have acknowledged that they have faced production challenges and have produced records that either do not establish compliance efficiently or do not establish compliance at all. This slows the record production and review processes and may detract from the City and the CPD's meaningful compliance efforts and assessments.

Near the end of the reporting period, the City and many of its entities provided lists of its productions or planned productions. This demonstrated noticeable improvements, including the entities' intentional efforts to provide organized productions to prove compliance by paragraph. We appreciate these improvements and are hopeful that it will continue to facilitate efficient productions, corresponding productions, and future compliance efforts.

## Citywide Units

In the fourth reporting period, the CPD continued its implementation and expansion of two citywide units that were created during the third reporting period: the Critical Incident Response Team (CIRT) and the Community Safety Team (CST), which are roving teams, unattached to a geographic area like a district or a beat. Both teams have significant ramifications for the CPD's compliance with various sections of the Consent Decree, including Community Policing; Impartial Policing; Crisis Intervention; Use of Force; Supervision; Accountability and Transparency; and Data Collection, Analysis, and Management.

The IMT understands that the number of officers in these teams has grown significantly since their inception, which creates challenges for the CPD to achieve compliance with various Consent Decree requirements, including establishing the requisite unity of command and span of control (*see* ¶¶357–68). In the fourth reporting period, the City and the CPD provided some records regarding these two teams. In the fifth reporting period, the CPD has made additional changes to the Community Safety Team, which we will reporting on in our next report. We expect the CPD to consider how communities respond to such teams and how policing strategies affect relationships between officers and the communities they serve. The IMT has and will continue to raise these concerns until the CPD addresses the concerns with the IMT, the OAG, and Chicago's communities, as required.

# Compliance Assessments and Deadlines

At the end of the fourth reporting period, we assessed 507 paragraphs and provided status updates for 12 additional paragraphs (519 paragraphs total). We provided assessments for 192 additional paragraphs from our assessments in Independent Monitoring Report 3.[10]

At the end of the fourth reporting period, the City reached Preliminary compliance with 182 paragraphs, Secondary compliance for 65 paragraphs, and Full compliance for 19 paragraphs. The City did not reach any level of compliance for 215 paragraphs and remained under assessment for Preliminary compliance for an additional 26 paragraphs. As reflected in Executive Summary Figure 1 below, we found that the City achieved at least Preliminary compliance with 266 of these paragraphs.

---

[10] In the third reporting period, the City and its relevant entities requested that certain paragraphs be assessed in future reporting periods due to the significant unforeseen challenges in 2020. After providing written justifications to the OAG and the IMT, the OAG did not object to the IMT assessing certain paragraphs in future monitoring periods. For transparency, the City, the OAG, and the IMT agreed that the IMT would still provide compliance updates for these paragraphs.



Executive Summary Figure 1: Consent Decree Compliance by June 30, 2021

Of course, the number of requirements—and the amount of work required under each requirement—can vary substantially within each paragraph, topic area, and reporting period. And some requirements demand more than others. Moreover, some of the paragraphs that have requirements in the fourth reporting period also include requirements that do not apply until later reporting periods. As a result, we have either not assessed or not finished assessing some of the requirements in the paragraphs relevant to the fourth reporting period.

The City and the OAG also agreed to specific deadlines to ensure that the City was making significant efforts to comply with the Consent Decree in a timely manner. The IMT determined that the City met 26 of the 51 agreed-upon deadlines in the fourth report. While the City missed 25 deadlines, the City met underlying requirements of two of those paragraphs before the end of the reporting period. At the end of each reporting period, we will continue to update the Court and the public in each monitoring report about whether the City has met the deadlines in the corresponding reporting period and whether the City has caught up by achieving the benchmarks of missed deadlines from previous reporting periods.

As we enter the Year Three of the Consent Decree, however, our focus will naturally shift from preliminary deadlines to measurements of effective and sustained practices. By the end of Year Three of the Consent Decree, we will report on the City's efforts to comply with all requirements and monitorable paragraphs in the Consent Decree.

---

[11] This includes two Impartial Policing paragraphs, ¶¶79–82, which did not contain requirements in the fourth reporting period. Specifically, while interrelated with the requirements of ¶¶79 and 80, ¶82 does not contain a substantive requirement for the City, and ¶81 contains conditional requirements that may never apply and did not apply in the fourth reporting period.

# Consent Decree Compliance
# by June 30, 2021

### Executive Summary Figure 2: Compliance Status through Three Reporting Periods
### Consent Decree Paragraphs: 313

**First Reporting Period**



Paragraphs w/ Any Level of Compliance (13)
Paragraphs w/ Deadlines Not in Compliance (37)
(*including under assessment*)
Foundational Paragraphs Under Assessment (65)

Total: 115

**Second Reporting Period**



Paragraphs w, Any Level of Compliance (48)
Paragraphs w/ Deadlines Not in Compliance (81)
(*including under assessment*)
Foundational Paragraphs Under Assessment (87)

Total: 216

**Third Reporting Period**



Paragraphs w/ Any Level of Compliance (154)
Paragraphs Not in Compliance (120)
Paragraphs under Assessment for Preliminary Comp. (41)

Total: 315

**Fourth Reporting Period**



Paragraphs w/ Any Level of Compliance (266)
Paragraphs Not in Compliance (215)
Paragraphs under Assessment for Preliminary Comp. (26)

Total: 507

Executive Summary Figure 3:    Consent Decree Deadlines before June 30, 2021



**First Reporting Period Deadlines (50)**            **(March 1, 2019 – August 31, 2019)**

Met Deadline (13)
Missed Deadline (37)

Achieved by August 31, 2019 (+4) (17)
Remaining Unmet Requirements (33)

**Second Reporting Period Deadlines (74)**          **(September 1, 2019 – February 29, 2020)**

Met Deadline (22)
Missed Deadline (52)

Achieved by February 29, 2020 (+4) (26)
Remaining Unmet Requirements (48)

**Third Reporting Period Deadlines (43)**           **(March 1, 2020 – December 31, 2020)**

Met Deadline (17)
Missed Deadline (26)

Achieved by December 31, 2020 (+2) (19)
Remaining Unmet Requirement (24)

**Fourth Reporting Period Deadlines (51)**          **(January 1, 2021 – June 30, 2021)**

Met Deadline (26)
Missed Deadline (25)

Achieved by June 30, 2021 (+2) (28)
Remaining Unmet Requirement (23)

# Roadmap

We wrote this report to be as accessible and readable as possible. This report is long because the compliance efforts in the fourth reporting period required significant attention. As the IMT continues to move forward with its monitoring efforts and as we address additional requirements, the monitoring reports will also continue to grow in length. For this reason, we have provided the following roadmap to help readers understand what they can expect from each section of this report.

We begin this report with an **Introduction** section that provides background about the Consent Decree and the IMT. This section will help those who have not read or would like to reacquaint themselves with the background information from our previous reports and Monitoring Plans.

The next section, **Compliance Activities and Assessments**, provides the following information regarding the fourth reporting period:

❖ An overview of the IMT's assessment process and priorities for the fourth reporting period, including deadlines and status updates;

❖ A summary of the IMT's activities;

❖ A summary of the City's achievements and challenges; and

❖ For each topic of the Consent Decree, a summary of relevant compliance efforts, a more specific analysis for each Consent Decree paragraph with a deadline before June 2021, and if applicable, a summary of efforts regarding the corresponding paragraphs that do not have specific deadlines.

Finally, the last section, **Conclusion and Looking Ahead to Independent Monitoring Report 4**, provides concluding remarks and a projection of the upcoming work by the IMT, the OAG, the City, the CPD, COPA, the City Office of Inspector General, the Police Board, and the City's other relevant entities in the fifth reporting period.

# Introduction

This is the IMT's fourth semiannual Independent Monitoring Report.[12] The report provides the IMT's monitoring activities and findings for the fourth reporting period—from January 1, 2021, through June 30, 2021. In July 2020, the IMT outlined its efforts in its public Monitoring Plan for Year Two.[13]

Specifically, consistent with the requirements of the Consent Decree, we address the following information throughout the sections of this report:

❖ The IMT's efforts during the reporting period;

❖ A description of each Consent Decree requirement that applied during the reporting period;

❖ The IMT's compliance findings for each corresponding requirement;

❖ A summary of the City's principal achievements and the challenges facing the City's ability to achieve complete compliance with the Consent Decree;

❖ The IMT's corresponding recommendations regarding the City's future efforts to achieve compliance; and

❖ A projection of the IMT's, the OAG's, and the City's upcoming work during the next reporting period (July 1, 2021 through December 31, 2021).

This is the fourth monitoring report of many. Per ¶661 of the Consent Decree, the IMT will continue to issue semiannual reports until the Consent Decree ends—which is after the City has reached full and effective compliance for one to two years. *See* ¶¶693 and 714–15.

---

[12] We provided a draft of this report to the City and the OAG on January 30, 2021, as required by ¶¶661–65. After identifying versioning issues with the Training section, the IMT provided an updated draft of that section on February 5, 2021. Per ¶663, the OAG and the City then provided written responses on February 12, 2021, and February 15, 2021, respectively. The City provided a response to the updated Training section on February 19, 2021. On March 2, 2021, the IMT provided an updated draft to the Parties. The Parties provided feedback on March 18, 2021, and March 25, 2021, respectively. *See* Attachment A (OAG comments) and Attachment B (City comments).

[13] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (July 3, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/07/2020_07_03-Monitoring-Plan-for-Year-Two-filed.pdf. The City filed its third semiannual status report (¶680) with the Court on February 7, 2021 (38 days after the deadline). *See Chicago Police Department Reform Progress Update* (February 7, 2021, https://home.chicagopolice.org/wp-content/uploads/2021/02/CPD-Reform-Status-Report-compressed.pdf.

# Background: The Chicago Police Consent Decree

In December 2015, the U.S. Attorney General launched a broad civil rights investigation into the CPD's policing practices. The U.S. Department of Justice released the results of its investigation in January 2017, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD.[14] Two separate class-action lawsuits followed: *Campbell v. City of Chicago* and *Communities United v. City of Chicago*.[15]

In August 2017, the OAG sued the City in federal court, seeking a Consent Decree that would address the US Department of Justice's (DOJ's) findings and recommendations. The case was assigned to federal Judge Robert M. Dow, Jr. The OAG then sought input from community members and Chicago police officers and negotiated the Consent Decree with the City.

In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits."[16]

The OAG and the City then sought proposals for an Independent Monitoring Team (IMT) after posting a draft Consent Decree on the Chicago Police Consent Decree website.[17] Judge Dow approved and signed a modified version of the Consent Decree on January 31, 2019. The Consent Decree requires action by the CPD and many other City entities. On March 1, 2019, which was the effective date of the Consent Decree, and after a competitive selection process, Judge Dow appointed

---

[14] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopolice consentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-PO-LICE-DEPTREPORT.pdf.

[15] *See Campbell v. Chicago*, N.D. Ill. Case No. 17-cv-4467 (June 14, 2017), and *Communities United v. Chicago*, N.D. Ill. Case No. 17-cv-7151 (October 4, 2017).

[16] *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[17] More information about the IMT selection process is available on this website, which the OAG maintains. *See Independent Monitor*, CHICAGO POLICE CONSENT DECREE, http://chicagopolice consentdecree.org/independent-monitor/. Other resources, including Consent Decree documents, court filings, and reports, are also available on this website. *See Resources*, CHICAGO POLICE CONSENT DECREE, http://chicagopoliceconsentdecree.org/resources/.

Maggie Hickey, a partner in the Schiff Hardin law firm, as the Independent Monitor. Ms. Hickey, as the Independent Monitor, reports directly to Judge Dow.[18]

## The Independent Monitoring Team

As the IMT, we (1) monitor the City's, the CPD's, and other relevant City entities' progress in meeting the Consent Decree's requirements and (2) offer assistance to the City, the CPD, and other relevant City entities to implement the changes that the Consent Decree requires.

Monitor Maggie Hickey and Deputy Monitor Chief Rodney Monroe, Ret., lead the IMT. The IMT's nine Associate Monitors, in turn, oversee the 10 topic areas of the Consent Decree. Our legal team, analysts, subject matter experts, Community Engagement Team, and community survey staff provide support in several ways: by reaching out to and engaging with Chicago communities; by providing general administrative support; and by collecting and analyzing policies, procedures, laws, and data, including conducting observations and interviews and writing reports.

Our full organizational chart is in Introduction Figure 1 on the next page, and our team structure is in Introduction Figure 2 on the following page.

---

[18] Judge Dow also appointed Judge David H. Coar, Ret., as a special master. As special master, Judge Coar is not a member of the IMT, but he "help[s] facilitate dialogue and assist the [OAG], the City, and other stakeholders in resolving issues that could delay progress toward implementation of the consent decree." About, CHICAGO POLICE CONSENT DECREE, http://chicagopo-liceconsentdecree.org/about/. As the special master, Judge Coar also reports directly to Judge Dow.

Introduction Figure 1. Organizational Chart[19]



---

[19]    Near the end of the fourth reporting period, Associate Monitors Kathleen O'Toole (Supervision and Officer Wellness and Support) and Scott Decker (Data Collection, Analysis, and Management) left the Independent Monitoring Team. Chief Noble Wray (ret.) is now the Associate Monitor for Supervision; Chief Cassandra Deck-Brown (ret.) is now the Associate Monitor for Officer Wellness and Support; and Dr. Tom Christoff is now the Associate Monitor for Data Collection, Analysis, and Management. *See Associate Monitors*, INDEPENDENT MONITORING TEAM, https://cpdmonitoringteam.com/about-us/associate-monitors/.

## Introduction Figure 2. Independent Monitoring Team Members

| Monitoring Team Leadership | | |
|---|---|---|
| Independent Monitor | | Maggie Hickey |
| Deputy Monitor | | Rodney Monroe |

| Associate Monitors | | |
|---|---|---|
| Community Policing | | Stephen Rickman |
| Impartial Policing | | Dennis Rosenbaum |
| Crisis Intervention | | Julie Solomon |
| Use of Force | | Paul Evans |
| Training; Recruitment, Hiring Promotion | | Theron Bowman |
| Supervision; Officer Wellness & Support | | Kathleen O'Toole |
| Accountability & Transparency | | Harold Medlock |
| Data Collection, Analysis & Management | | Tom Christoff |

| Community Engagement Team | | |
|---|---|---|
| Member | | Joe Hoereth |
| Member | | Laura McElroy |
| Member | | Elena Quintana |
| Member (and Associate Monitor for Community Policing) | | Stephen Rickman |
| Member | | Sodiqa Williams |
| Community Surveys | | Joe Hoereth & Other Experts |

| Subject Matter Experts and Legal Team | | |
|---|---|---|
| Project Director | | Laura Kunard |
| Attorney, Recruitment, Hiring, & Promotions; Training | | Mir Ali |
| Attorney | | Derek Barella |
| Attorney, Supervision | | Alex Becker |
| Officer Wellness & Support | | Brandi Burque |
| Attorney, Use of Force; Data Collection, Analysis & Management | | Meredith DeCarlo |
| Use of Force; Data Collection, Analysis & Management | | Terry Gainer |
| Attorney, Community Policing; Impartial Policing | | Ariel Hairston |
| Attorney, Crisis Intervention | | Brian Hamilton |
| Community Policing; Crisis Intervention | | Bruce Johnson |
| Training | | Blake McClelland |
| Attorney, Officer Wellness and Support | | Sarah Oligmueller |
| Community Policing | | Hildy Saizow |
| Lead Attorney | | Anthony-Ray Sepulveda |
| Attorney, Supervision; Officer Wellness; Accountability & Transparency | | Kylie Wood |
| Supervision; Recruitment, Hiring & Promotions | | Tom Woodmansee |

| Monitoring Team Support | | |
|---|---|---|
| Analyst for Accountability & Transparency | | Bridgette Bryson |
| Analyst for Officer Wellness & Support | | Jessica Dockstader |
| Project Manager, Analyst for Use of Force | | Vivian Elliot |
| Analyst for Community Policing | | Tammy Felix |
| Analyst for Data Collection, Analysis & Management | | Shelby Hickman |
| Analyst for Supervision | | Monique Jenkins |
| Analyst, Independent Monitoring Team Support | | Mariana Oliver |
| Deputy Project Manager, Analyst for Training and Recruitment | | Keri Richardson |
| Analyst for Crisis Intervention | | Gentry Schaffer |
| Analyst for Impartial Policing; Accountability & Transparency | | Christopher Sun |

# Compliance Activities and Assessments

This section provides an overview of compliance efforts for the fourth reporting period. We begin by explaining our priorities for the fourth reporting period that we described in our Monitoring Plan for Year Two. We include an overview of the assessment process and the deadlines within the fourth reporting period. We then provide summaries for the period, including summaries of our activities and of the City's achievements and challenges. Finally, we summarize the relevant compliance efforts for each topic area of the Consent Decree; provide a more specific analysis for each Consent Decree paragraph with a deadline before June 2021; and summarize status updates for other paragraphs.

## Assessing Compliance

Overall, in accordance with ¶¶661–62 and 642, the IMT assesses how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: **(1) Preliminary compliance**, **(2) Secondary compliance**, and **(3) Full compliance**. The CPD and other City entities will not be "in compliance" with a requirement until they reach Full compliance for the requisite length of time required by the Consent Decree—either one or two years (¶714). We will assess the City's compliance on all appropriate levels for the paragraphs presented in this report.

❖ **Preliminary compliance** refers principally to the development of acceptable policies and procedures that conform to best practices (as defined in ¶730) and to the incorporation of requirements into policy (¶642). The IMT will assess the development of policies, procedures, rules, and regulations reasonably designed to achieve compliance. To attain Preliminary compliance, the City must have policies and procedures designed to guide officers, City employees, supervisors, and managers performing the tasks outlined in the Consent Decree. These policies and procedures must include appropriate enforcement and accountability mechanisms, reflect the Consent Decree's requirements, comply with best practices for effective policing policy, and demonstrate the City and its relevant entities' ability to build effective training and compliance.

❖ **Secondary compliance** refers principally to the development and implementation of acceptable and professional training strategies (¶642). Those strategies must convey the changes in policies and procedures that were established when we determined Preliminary compliance. Secondary compliance also refers to creating effective supervisory, managerial, and executive practices designed to implement policies and procedures as written (¶730). The IMT will review and assess the City's documentation—including reports, disciplinary

records, remands to retraining, follow-up, and revisions to policies, as necessary—to ensure that the policies developed in the first stage of compliance are known to, are understood by, and are important to line, supervisory, and managerial levels of the City and the CPD. The IMT will be guided by the ADDIE model of curriculum development to assess training and will consider whether there are training, supervision, audit, and inspection procedures and protocols designed to achieve, maintain, and monitor the performances required by the Consent Decree.

❖ **Full compliance** refers to adherence to policies within day-to-day operations (¶642). Full compliance requires that personnel, including sergeants, lieutenants, captains, command staff, and relevant City personnel routinely hold each other accountable for compliance. In other words, the City must "own" and enforce its policies and training. The IMT will assess whether the City's day-to-day operations follow directives, policies, and training requirements. When measuring Full compliance, we will note whether supervisors notice, correct, and supervise officer behavior and whether appropriate corrections occur in the routine course of business. In this phase, we will review whether compliance is reflected in routine business documents, demonstrating that reforms are being institutionalized. In addition, we will determine whether all levels of the chain of command ensure consistent and transparent compliance.

These levels of compliance guide the IMT in its review of all paragraphs in the Consent Decree. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Throughout this report, we provide our compliance assessments and descriptions of the status of current compliance based on efforts within the fourth reporting period. Under the Consent Decree, the City, the CPD, and other relevant City entities are not in any level of compliance until we find that they comply. As a result, a finding that the City is not in compliance with a requirement does not mean that the City has not made efforts—even significant efforts—to achieve compliance toward that requirement.

## Fourth Reporting Period Priorities

We set out our priorities for the fourth reporting period in our Monitoring Plan for Year Two.[20] Specifically, we prioritized (1) the paragraphs in the Consent Decree

---

[20] The IMT's Monitoring Plan for Year Two is available on the IMT's website. *See Reports and Resources*, INDEPENDENT MONITORING TEAM (July 3, 2019), https://cpdmonitoringteam.com/wp-content/uploads/2020/07/2020_07_03-Monitoring-Plan-for-Year-Two-filed.pdf. Given the

with a deadline before June 30, 2021, and (2) the requirements agreed to by the Parties to the Consent Decree (the City and the OAG) and the IMT, regardless of whether the Consent Decree established a deadline for these paragraphs. Most of the paragraphs in these two categories contain requirements for the CPD.

These two categories of priorities, however, do not fully describe all of our efforts in the first four reporting periods. While we monitored the compliance efforts that corresponded with the paragraphs above, some paragraph deadlines fall after the fourth reporting period but still required the City and its entities to take steps during the fourth reporting period.[21] Similarly, many of our efforts are ongoing—regardless of deadlines—but are too premature to report here.

Thus, the IMT and the Parties have engaged in compliance and monitoring efforts in addition to those described in this report.

## Paragraphs with Deadlines

In our first four monitoring reports, we have assessed all paragraphs with deadlines before June 30, 2021. All deadlines are determined by the Consent Decree. The City and the OAG agreed to these deadlines. The IMT did not—and cannot—unilaterally create or change deadlines for the fourth reporting period, nor for any other reporting period.

## Paragraphs without Deadlines

Many paragraphs in the Consent Decree do not contain deadlines, but after consulting with the Parties, the IMT assesses paragraphs that did not have deadlines in prior reporting periods. In Year One, these paragraphs involved foundational policy and practice requirements that are fundamental to the success of the Consent Decree. As a result, in the Monitoring Reports for Year One, the IMT included compliance updates for "Foundational Paragraphs." Because the City is now in its second year under the Consent Decree, moving forward, most paragraphs in each monitoring report will receive a compliance assessment.

In the fourth reporting period, we added assessments for additional paragraphs without deadlines. As a result, paragraphs that are not in compliance do not necessarily reflect a missed deadline. We are monitoring compliance with those paragraphs to match the pace of the five-year goal described in the Consent Decree.

---

varying workloads of separate departments and personnel, the City and its relevant entities may make compliance efforts earlier than anticipated. When appropriate, we may also assess those efforts in our monitoring reports earlier than anticipated.

[21] The Consent Decree contains over 500 paragraphs with requirements, including those with deadlines in the third reporting period. We filed our Monitoring Plan for Year Two on July 3, 2020, per ¶652.

# The IMT's Methodologies during the Reporting Period

While most of this report addresses the City's efforts to meet the Consent Decree's requirements, the following subsection details the IMT's methodologies and activities in the fourth reporting period (January 1, 2021, through June 30, 2021).

In the fourth reporting period, we continued to meet regularly with representatives from the City, the City's relevant entities, the OAG, and members of Chicago's communities. This included weekly meetings with the CPD, settlement conferences, virtual site visits, and regular meetings with the Superintendent.

At the beginning of the Consent Decree process, the City; the CPD; COPA; the Chicago Police Board; the City Office of Inspector General, including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC) worked to create constant and open lines of communications.

Building on the efforts made in the previous reporting periods, these communications continued throughout the fourth reporting period. The communications included regularly scheduled meetings (¶668) and regular teleconferences for each Consent Decree topic area. Because of COVID-19, our teleconferences, Zoom, and Teams meetings continued throughout this reporting period. We continued to use secure data-sharing systems.

Specifically, we met consistently with the CPD, COPA, the City Office of Inspector General, the Police Board, and the OEMC; conducted one (virtual) formal site visit; and reviewed thousands of documents.[22]

A significant portion of our conversations involved discussing our methodologies for assessing the City's compliance with the Consent Decree. For the IMT, these discussions highlighted the importance of maintaining flexibility in our methodologies throughout the monitoring process. This flexibility will ensure that our monitoring efforts continue to meet the letter and spirit of the Consent Decree, as the Parties and the IMT develop necessary information, learn from previous efforts, and identify unanticipated hurdles. *See, e.g.*, ¶717. Changed circumstances, particularly during a worldwide pandemic, may require the IMT to consider fewer, more, or alternative sources of information. As a result, our methodologies may adjust based on ongoing consultation with the Parties, as we continue to identify and consider new information and data that is relevant to the Consent Decree. We endeavor to supplement our methodologies with additional specificity throughout this report.

---

[22] The OAG has engaged in much of the same work and provided separate feedback to the City and the CPD.

Finally, in addition to making these efforts, the IMT continued to adhere to several specific and ongoing requirements of the Consent Decree. Introduction Figure 3, below, summarizes our compliance with the Consent Decree's deadlines for the IMT in the fourth reporting period.

Introduction Figure 3:          IMT Deadlines in the Fourth Reporting Period

| ¶s | Requirement | Deadline | Fourth Reporting Period Deadlines | Met or Missed |
|---|---|---|---|---|
| 627–37 | Review of CPD Policies and Procedures | Various, Ongoing | Corresponds with policy deadlines | Met (ongoing) |
| 638–41 | Review of Implementation Plans and Training Materials | Various, Ongoing | Corresponds with plan and training deadlines | Met (ongoing) |
| 642–44 | Compliance Reviews and Audits | Various, Ongoing | Occur during each reporting period | Met (ongoing) |
| 652–55 | Review Methodology | 45 Days (and every year) | May 16, 2021 | Met (ongoing) |
| 656 | Technical Assistance and Recommendations | Ongoing | Ongoing | Met (ongoing) |
| 668 | Maintain Regular Contact with the Parties | Ongoing | Monthly | Met (ongoing) |
| 669 | Monitor will Participate in Meetings with the Coalition | Quarterly | Quarterly | Met (ongoing) |
| 670–71 | Communication with the Parties, Collective Bargaining Representatives, and the Public | Ongoing | Ongoing | Met (ongoing) |

# Community Focus Groups

Per ¶¶645–46, IMT conducts "reliable, representative, and comprehensive" survey of a broad cross-section of members of the Chicago community regarding CPD" every other year. Accordingly, the IMT conducted a large scale probability sample survey in Year One of the Consent Decree. The survey included the responses of over 1,000 Chicagoans, as a well as an additional group of over 350 young Black men, age 18–25, which is the population subgroup with the most frequent contact with the CPD. Results of this survey were summarized in the IMT's Community Survey Report, filed in August 2020.[23] We will conduct another community survey in Year Three.

Because the IMT believes that hearing community voices consistently throughout the monitoring process is crucial, we will undertake special studies of Chicago's

---

[23]  *See, e.g.*, *Independent Monitor Conducts Community Survey*, INDEPENDENT MONITORING TEAM (August 26, 2020), Independent Monitor Conducts Community Survey (cpdmonitoring-team.com).

communities during the years we are not conducting the ¶¶645–51 community surveys.

The IMT's first special study is a series of focus groups with Black and Latino males and females first to help provide context and deeper understanding of the survey results, which indicated that young Black men, and to a lesser extent Latino men, reported experiencing police using force at much higher rates than the survey respondents in general.[24] Of particular interest for further study was that they indicated having had a gun pointed at them at extremely disproportionate rates (19 times more often).

Between December 2020 and June 2021, the IMT conducted focus groups with over 100 participating Black and Latino males between the ages of 15 and 35. Focus groups with women of color began in March 2021 and are ongoing.

Once data collection is complete, the IMT will produce a public special report on our findings from the focus groups. Some common themes and sentiments, however, are apparent from a preliminary review of focus group data from the young Black and Latino male focus groups. To a great extent the focus groups confirmed the results of the surveys. However, the focus groups provide a deeper understanding of the roots of such perceptions, many of them rooted in specific examples of negative experiences, but also in the participants' associations of CPD officers with general themes of corrupt actions, overly aggressive behavior, and having slow or no responses when called. Many respondents also indicated that they feel nervous around police, feel fear of the police, and feel unsafe in their presence.

Nearly all focus group participants indicated that they do not trust or only somewhat trust the police to treat them with respect or to respond in a fair manner. While some participants indicated there may be some "bad apples" among officers, the mistrust was directed to officers in general or the CPD as a whole. For many participants, this distrust was rooted in accounts of their own negative experience with officers.

---

[24] *See, e.g., Community Survey*, Independent Monitoring Team (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf. In our survey report, we chose to refer to particular groups consistently, such as Black Chicagoans, Latino Chicagoans, and White Chicagoans. We concluded that these terms most accurately account for the targeted population for the survey: Chicagoans. We recognized that there are other commonly used terms, such as "African Americans," but we concluded that Black Chicagoans is a more inclusive term because it focuses on presence in Chicago rather than nationality. Likewise, we understand that some people may prefer "Latinx" or "Hispanic" to "Latino." For the purposes of the survey, we followed the Consent Decree and the United States Census Bureau. *See* ¶4; *About Race*, US Census Bureau. US Census Bureau (last revised, October 16, 2020), https://www.census.gov/topics/population/race/about.html.

Over two-thirds of participants who discussed a question about gun pointing indicated they had experienced an officer point a gun at or witnessed an officer pointing a gun at someone else, some of whom referenced more than one such incident. Many respondents felt the pointing was unnecessary, expressing that they thought officers were either demonstrating authority or displaying a false sense of fear during the incident.

The IMT looks forward to completing our conversations with focus group participants, analyzing the data, and producing our special report on what we learn.

## The IMT's Community Engagement Team Activities

The IMT's Community Engagement Team plays a critical role by monitoring levels of trust and sentiment among the stakeholders to the Consent Decree – the members of Chicago's communities. The IMT's Community Engagement Team includes experienced Chicago community members, experts in police-community relations, lawyers, and academic scholars. These members work together to meaningfully engage Chicago's communities and ensure that community members participate throughout the monitoring process. The Community Engagement Team also works closely with the Monitor, Deputy Monitors, and Associate Monitors to assess the community components of compliance with the Consent Decree.

The IMT's Community Engagement Team's work is vital to create sustainable change at the City and the CPD and to measure compliance with specific policy, training, and procedural changes required by the Consent Decree. The City and the CPD do not function effectively when they lack trust from the communities they serve. In its 2017 report, the DOJ found that the impacts of the "CPD's pattern or practice of unreasonable force fall heaviest on predominantly black and Latino neighborhoods."[25] The DOJ also found that people in many neighborhoods in Chicago lack confidence that "their police force cares about them and has not abandoned them, regardless of where they live or the color of their skin."[26]

Effective policing requires both (1) procedural and cultural change and (2) improved relationships between the City and the CPD and the communities they serve. The Community Engagement Team encourages improved relationships based on respect, trust, and partnership and emphasizes how relationships may be strengthened by transparency and accountability.

---

[25] DOJ Civil Rights Division and United States Attorney's Office Northern District of Illinois, *Investigation of Chicago Police Department* (January 13, 2017) at 4, *available at* http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/01/DOJ-INVESTIGATION-OF-CHICAGO-POLICE-DEPT-REPORT.pdf.

[26] *Id.* at 15.

The IMT's Community Engagement Team performs two key tasks regarding the Consent Decree monitoring process: (1) gathering input from Chicago residents about their concerns about CPD policies and practices, and (2) providing information to the Chicago community about the IMT's activities and findings.

We sought to hear sentiments from a broad range of Chicagoans during this reporting period. In February 2021, for example, we convened a virtual community meeting to gather community input about the CPD's community policing efforts. *See* Introduction Figure 4, below. Specifically, this meeting was organized by our Community Engagement Team, led by Independent Monitor Maggie Hickey, and featured CET member Sodiqa Williams, and Associate Monitor for Community Policing Stephen Rickman.

Introduction Figure 4: IMT Virtual Community Meeting Flyer (February 17, 2021)



We also issued periodic newsletters—in February, March, May, and June—to update community stakeholders on our monitoring activities.[27] *See* Introduction Figure 5, below.

---

[27] The IMT's newsletters are available online. *See, e.g., Help Reform the Chicago Police Department - Community Newsletter*, INDEPENDENT MONITORING TEAM (April 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/05/April-2020_IMTCommunityNewsletter-7.pdf; *Federal Court Listening Sessions – Community Newsletter*, INDEPENDENT MONITORING TEAM (August 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-3-August-2020.pdf; *Independent Monitoring Team Conducts Community Survey – Community Newsletter*, INDEPENDENT MONITORING TEAM (November 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/12/IMT-Newsletter-Issue-4-November-2020.pdf.

Introduction Figure 5: IMT Virtual Newsletter



Throughout this reporting period, the Community Engagement Team attended many virtual community meetings across Chicago, including meetings with the Coalition (*see* ¶669) and community-based organizations. We summarize some of the Community Engagement Team's efforts in Introduction Figure 6 below.

Introduction Figure 6: IMT Community Engagement Efforts



## Get Involved

The Community Engagement Team works to connect with neighborhoods, community groups, religious organizations, activists, advocates, and residents across the city. The Community Engagement Team encourages community members to participate in meetings and to promote these sessions through their social and other networks. We regularly update the Community Involvement section of the IMT website with details on upcoming community meetings and events. If your neighborhood or community group would like to invite a Community Engagement Team member to a meeting, please email us at contact@cpdmonitoringteam.com or fill out a feedback form on our website (https://cpdmonitoringteam.com/feedback-form/).

We encourage community members to provide input on CPD policies. When the CPD modifies or creates applicable policies, it will post them on its website so that community members can provide input: https://home.chicagopolice.org/reform/policy-review/.

Community members may also participate in the monitoring process in the following ways:

❖ Attend our virtual public meetings listed on our website;
❖ Complete an input form on our website; and
❖ Reach out to the IMT or members of our Community Engagement Team (see below).

## Contact the Independent Monitoring Team

Community members can reach out to the entire IMT via email (contact@cpdmonitoringteam.com) and also contact individual members of our Community Engagement Team:

❖ Sodiqa Williams (Sodiqa.Williams@cpdmonitoringteam.com),

❖ Joe Hoereth (Joe.Hoereth@cpdmonitoringteam.com), and

❖ Elena Quintana (Elena.Quintana@cpdmonitoringteam.com).

Learn more at the Contact Us page on our website (https://cpdmonitoringteam.com/contact-us/).

Community members can also use the Feedback Form on our website to provide input (https://cpdmonitoringteam.com/feedback-form/).

# The City of Chicago's Principal Achievements and Challenges

In our first three reporting periods, per ¶661, we summarized the "principal challenges or concerns related to the City's achieving full and effective compliance with this Agreement." As we indicated in our previous monitoring reports, many of these challenges cannot be resolved quickly and require long-term investments. In this section, we provide updates on these challenges, the City's efforts to address them, and new achievements and challenges that emerged in the fourth reporting period. We do not discuss these challenges to provide excuses or levy undue criticism. Instead, we identified various hurdles to compliance for the City, its relevant entities, the OAG, the IMT, and the community, to identify solutions, provide recommendations, plan for improvements, and ultimately, to help the City reach compliance.

The City's achievements during the fourth monitoring period include reaching the conclusion of negotiations with the Fraternal Order of Police (FOP), the city's largest police union, toward a new contract. The deal, which was announced in July of 2021, and approved by the City Council in September 2021, was the culmination of four years of negotiations and comprises an eight-year deal—retroactive to 2017 and ending in 2025. The deal includes back pay for officers as well as new accountability requirements. The IMT looks forward to reviewing the finalized contract.[28]

Another achievement during this reporting period is overall progress in the Crisis Intervention section. For nearly all paragraphs within the Crisis Intervention section, the City and CPD demonstrated continued progress towards achieving compliance. For example, the OEMC finalized policies containing the Consent Decree's requirements, which memorialized practices that the IMT expects will improve overall operations. Moreover, the CPD began delivering its CIT officer refresher training. This was a critical accomplishment because a significant number of CIT officers had not received a refresher training since they received the Basic 40 hour CIT training several years ago.

With that in mind, in the following subsections, we discuss the City's principal achievements and ongoing challenges. We set them out in the following interrelated areas (presented in the order that is easiest to follow, rather than in the order of the magnitude of each challenge):

---

[28]   *See* ¶711.

❖ Staffing and Resources

❖ CPD Policy and Plan Review

❖ CPD's Community Engagement and Trust Building

As explained further below, many of these challenges continued to impact the City's progress during the fourth reporting period. As a result, the City, its relevant entities, and when applicable, the IMT and the OAG must continue to work through methods of solving or otherwise mitigating these challenges.

## Staffing and Resources

As we mentioned above, one of the City's principal achievements was reaching a contract deal with the Fraternal Order of Police (FOP), which represents the majority of CPD officers. Challenges with staffing, however, continue to exist and grow—especially among the ranks of sergeant and lieutenant, which affect the City and the CPD's ability to achieve the required unity of command and span of control (*see* ¶¶357–68).

During the first three reporting periods, the IMT identified several staffing and resource needs, in addition to the need for additional sworn supervisors. Due in part to the shortage of supervisors and a reported need to "diversity the ranks," in July Superintendent David Brown reinstated the controversial merit promotion system, a practice that was discontinued in 2019.

Many of the City's and CPD's efforts and achievements in the first three reporting periods continued into the fourth reporting period. The City Department of Law, along with the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78), continued to be fully engaged in the monitoring process. The City and the CPD also maintained channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

We recognize that City and CPD resources are limited. As referenced above, the City and the CPD have already added many resources to their compliance efforts.

In our previous reports, we recommended that the City and the CPD increase resources and staffing to various departments. In response, the CPD increased staffing in, among other divisions, the Research and Development Division, the Force Review Division, and the Legal Affairs Division.[29] As the Consent Decree process

---

[29] The Research and Development Division frequently works with the IMT to develop compliance documents and policies. Increases in staffing in this department can reduce bottlenecking with limited personnel. As discussed further in the Use of Force section below, the Force Review

continues, the City and the CPD must continue to ensure that such divisions are sufficiently staffed.

While we understand that ongoing challenges continue based on limited re-sources, we reiterate the need for increased resources and staffing and the Con-sent Decree's requirement for the City to "hire, retain, or reassign current City or CPD employees to form a unit with the appropriate knowledge, skills, and abilities necessary to facilitate compliance with this agreement." In the fourth reporting period, we have seen the need for increased resources and staffing in the following areas (*see* ¶¶677–78):

❖ **Education and Training Division.** The CPD's Education and Training Division is, in many ways, at the heart of many Consent Decree requirements. The CPD is one of the largest police departments in the country, and training personnel requires a massive effort. Our discussions with CPD personnel regarding train-ing efforts, records, and plans strongly suggest that the Training Division needs additional support. Likewise, as the City and the CPD continue to move into Preliminary compliance for many paragraphs, the City and the CPD will need to increase training efforts and resources.

❖ **Crisis Intervention Teams.** While many of the requirements regarding Crisis Intervention do not apply until later reporting periods, the Consent Decree re-quires significant efforts regarding the Crisis Intervention Teams in the imme-diate future. The CPD has recently added staff to the Crisis Intervention Teams, but several of our meetings and site visits suggest that the Crisis Intervention Teams would still benefit from additional staff.

❖ **Strategic Initiatives Division.** This division is crucial to the City's and the CPD's successful reform endeavors, as it performs many of the CPD's data and ana-lytics efforts. As the City and the CPD move into Secondary compliance for some paragraphs, and look toward eventual Full compliance, they will need to drastically increase their data collection, management, and analytical capabil-ities to document their operational successes. See our assessment of ¶606 for a fulsome discussion of the IMT's concerns about the CPD's data deficiencies and challenges.

❖ **The Audit Division**. This division is crucial to the City's and the CPD's ability to sustain reforms and change culture over the long term. The Audit Division aims to provide quality, independent and objective assessments of the operations, processes, and internal controls within the CPD. The division also aims to

---

Division is critical to several Consent Decree requirements. The Legal Affairs Division must fre-quently work with the IMT to provide compliance documents, policies, and efforts. Specifically, the Legal Affairs Division reviews every document that the IMT receives.

demonstrate compliance with the Consent Decree and it currently under-staffed.

## CPD Policy, Plan, and Training Review

> *632. The Parties and the Monitor will work collaboratively and cooperatively to establish and adhere to a schedule that ensures policies and procedures required by this Agreement are reviewed adequately, efficiently, and expeditiously.*

The City and the CPD continued to appropriately focus on developing optimal policies and plans during the fourth reporting period. Strong policing policies provide the foundation for implementing and sustaining best practices (as defined in ¶730) with transparency and accountability. We are encouraged by the City's, the CPD's, and the other relevant entities' willingness to collaborate with the IMT and the community regarding their policies.

Because of the significant policy review efforts from the City, the CPD, other relevant City entities, and the OAG, it is important to clarify how this process works. The Consent Decree outlines the policy review process in ¶¶626–37 and the plan-review process in ¶¶638–41. Some policies, however, require the CPD to obtain community input while they develop new or revised policies. *See, e.g.*, ¶¶52 and 160. For policy review, the City and the CPD must consult with the IMT and the OAG to develop the necessary policy or revision. The City and the CPD must then provide the IMT with the new or revised policy at least 30 days before the policy is scheduled to go into effect (¶¶627–28). The IMT and the OAG then have 30 days to comment, with a possible 15-day extension (¶¶627–28). The City, the CPD, the OAG, and the IMT then have *at least* 30 days to resolve comments. If we are unable to come to a timely agreement, an entity may submit a formal objection, which triggers a "workout period" (¶630). The entities then have an additional 30 days to resolve the issue before one of the Parties brings the issue to Judge Dow to resolve (¶630). On the other hand, when the IMT and the OAG provide a "no objection" notice, then when applicable, the City and the CPD will post the new or revised policy for public comment for a minimum of 15 days (¶633). The entities will then review and consider the public comments and agree to any changes before the City and the CPD finalize the policy (¶633).

In our first report, we noted that the review process would be more efficient if the City and the CPD consulted more with the IMT while they developed policies. There was much more consultation among the IMT and the Parties during the second reporting period. As a result, the City and the CPD began to develop compliant policies, curricula, and plans with input from the IMT or the OAG.

The IMT spent considerable time during the fourth reporting period observing the CPD's attempts to gather the required community input on policies during this reporting period (*see, e.g.*, ¶¶52 and ¶160). Our detailed observations appear in the CPD's Community Engagement section below.

Overall, during the fourth reporting period, the IMT, the CPD, and the OAG spent significant time working through policies and procedures. In addition to the more than 35 CPD records the IMT reviewed and commented on for the first reporting period, the City submitted more than 60 new CPD records for review and comment in the second reporting period. In the third reporting period, the CPD submitted over 100 new records for review. In the fourth reporting period, the CPD provided over 90 new records to review. As with the record productions, the City provided some of these records at or near the end of the reporting period on June 30, 2021. The IMT and the OAG have also provided the City with several "no objection" notices since the end of the reporting period.[30] Introduction Figure 7 below details a sample of CPD policies, plans, and curricula that the City and the CPD submitted to the IMT during this reporting period.

Introduction Figure 7:

Sample of CPD Policies, Plans, and Training Records Reviewed by the IMT and the OAG from January 1, 2021, through June 30, 2021

| | |
|---|---|
| 1 | 2021 In-Service Wellness Training |
| 2 | 2021 Training Plan |
| 3 | 2021 Two-Day De-Escalation, Response to Resistance, and Use of Force Training |
| 4 | Annual Crisis Intervention Team Policy Review |
| 5 | Annual In-Service Field Training Officer 2020 Refresher Training |
| 6 | Baton Use Incidents, G03-02-07 |
| 7 | BIA Case Management System Unit Directive |
| 8 | BIA In-Service Training - Complaint Initiation Lesson Plan |
| 9 | BIA In-Service Training - Complaint Initiation Slide Deck |
| 10 | BIA In-Service Training - Procedural Justice and Log Number Investigations |
| 11 | BIA Investigators Unit Directive |
| 12 | BIA Onboard and Annual Training Scenarios |
| 13 | BIA Onboard Training - Advocate Section Overview Lesson Plan |
| 14 | BIA Onboard Training - Advocate Section Overview Slide Deck |
| 15 | BIA Onboard Training - CMS Case Investigative Console Lesson Plan |
| 16 | BIA Onboard Training - CMS Case Investigative Console Slide Deck |
| 17 | BIA Onboard Training - Findings, Recommendations & Effective Log Closings |
| 18 | BIA Onboard Training - Intake & Case Assignment Process |
| 19 | BIA Onboard Training - Interview, Question & Answer Techniques Overview |
| 20 | BIA Onboard Training - Conducting Log Number Investigations |
| 21 | BIA Photo Room Operations Unit Directive |
| 22 | BIA Requirements of a Complete Investigative File Unit Directive |

---

[30]    ¶¶626–44.

**Sample of CPD Policies, Plans, and Training Records Reviewed by the IMT and the OAG from January 1, 2021, through June 30, 2021**

| | |
|---|---|
| 23 | BIA SOP: Advocate Section Command Channel Review |
| 24 | BIA SOP: Conduct of Investigation, Initial Responsibilities |
| 25 | BIA Training Evaluation Form |
| 26 | BIA Training Unit Directive |
| 27 | BIA Unit Directive Initiation of Log Numbers in the Case Management System |
| 28 | BIA Unit Directive: Incidents Occurring Five Years Prior to Complaint and Re-Opening Investigations Five Years After Initiation |
| 29 | Body Worn Cameras Special Order |
| 30 | Canine Use Incidents, G03-02-06 |
| 31 | Crisis Intervention Team Basic Training |
| 32 | Crisis Intervention Coordinator SOP |
| 33 | Crisis Intervention Recruit Training Curriculum |
| 34 | Criminal Intelligence Unit Crisis Intervention Officer Implementation Plan |
| 35 | Criminal Intelligence Unit Crisis Intervention Training Scheduling, Attendance, Eligibility, and Recruitment |
| 36 | Criminal Intelligence Unit Crisis Intervention Plan |
| 37 | Criminal Intelligence Unit District-Level Strategy for Crisis Intervention Team |
| 38 | Criminal Intelligence Unit Mission, Organization, and Function of Crisis Intervention Unit |
| 39 | Community Policing In-Service Training (Part 1 and 2) |
| 40 | Community Policing Mission and Vision |
| 41 | Conflict of Interest Unit Directive |
| 42 | Department Recruitment Selection and Hiring Plan Directive, E05-34 |
| 43 | Department Review of Use of Force, G03-02-08 |
| 44 | Department Training Records Maintenance Program, S11-10 |
| 45 | District Strategic Plans |
| 46 | Documenting Log Number Investigations and Post-Investigation Procedures (S08-01-04) |
| 47 | Annual Carbine Training Lesson Plan |
| 48 | General Order G02-01, Protection of Human Rights |
| 49 | General Order G03-06, Firearms Discharge and Officer-Involved Death Incident Response and Investigation |
| 50 | Emotional Intelligence for Supervisors Pre-Service Training |
| 51 | ETD Pre-Service Supervisory Training Special Order |
| 52 | Field Training and Evaluation Program, S11-02 |
| 53 | Firearms Discharge Incidents Involving Department Members, G03-02-03 |
| 54 | Firearms Recertification Deficiency Notifications |
| 55 | First Aid Kit Order, LEMART Policy (U06-02-23) |
| 56 | Foot Pursuits |
| 57 | Force Options, G03-02-01 |
| 58 | Hate Crimes and Related Incidents Motivated by Bias or Hate |
| 59 | Hate Crimes eLearning |
| 60 | Incidents Requiring the Completion of a Tactical Response Report, G03-02-02 |
| 61 | Information Systems Development Group Policy |

Sample of CPD Policies, Plans, and Training Records Reviewed
by the IMT and the OAG from January 1, 2021, through June 30, 2021

| | |
|---|---|
| 62 | Initiation and Assignment of Investigations into Allegations of Misconduct |
| 63 | Interactions with People with Disabilities |
| 64 | Interactions with Religious Communities Policy |
| 65 | Interactions with Youth |
| 66 | Juvenile Processing Training (recruits) |
| 67 | Limited English Proficiency Policy |
| 68 | Neighborhood Policing Initiative Pilot Program |
| 69 | Neighborhood Policing Initiative Training |
| 70 | Non-disciplinary Intervention Program, S08-01-08 |
| 71 | Officer Support System Pilot Program |
| 72 | Officer Support System Supervisor Training |
| 73 | Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents, G03-02-05 |
| 74 | Peer Support PowerPoint Training Decks |
| 75 | Performance Evaluation System eLearning |
| 76 | Performance Evaluation System Pilot Training |
| 77 | Performance Recognition System |
| 78 | Processing Juveniles eLearning and Bulletin (all members) |
| 79 | Recruit Evaluation |
| 80 | Recruit Training PCD - Course Summary Sheets |
| 81 | Recruit Use of Force Training (Force Options Suite) |
| 82 | Return to Service Officer Directive |
| 83 | School Resource Officers and Investigations at CPS Policy |
| 84 | Training Oversight Committee S11-11 |
| 85 | School Resource Officer Refresher Training |
| 86 | Supervisory Responsibilities General Order |
| 87 | Taser Use Incidents, G03-02-04 |
| 88 | The Community Policing Office |
| 89 | The First Amendment and Police Actions |
| 90 | Traumatic Stress Incident Management Clinicians Training |
| 91 | Training Notification and Attendance Responsibilities, S11-10-01 |
| 92 | Traumatic Stress Incident Management Program Directives |
| 93 | Unity of Command Department Notice |
| 94 | Use of Force, G03-02 |
| 95 | Wellness Communications Strategy |
| | Key: General Order (G); Special Order (S); Standard Operating Procedure (SOP); Uniform and Property (U) |

## Policy Review for the Civilian Office of Police Accountability and other City entities other than the CPD

In the second reporting period, COPA provided the IMT and the OAG with 27 records for review, and in the third reporting period, COPA provided 40 new records for review. As reflected in Introduction Figure 8 below, COPA provided the IMT and the OAG with over 10 new records for review and comment in the fourth reporting period.[31]

Introduction Figure 8:

Sample of COPA Policies and Training Records Reviewed by the IMT and the OAG from January 1, 2021, through June 30, 2021

| | |
|---|---|
| 1 | 3.1.1, Intake Policy |
| 2 | 3.1.2(b), COPA Interviews |
| 3 | 3.1.2, Fact Gathering |
| 4 | 3.1.3, Final Summary Report |
| 5 | 3.1.2(b), COPA Interviews |
| 6 | 3.1.6, COPA Employee Use of CLEAR and Columns CMS Systems Policy |
| 7 | Disciplinary and Remedial Recommendations Policy |
| 8 | Equipment and Apparel Policy |
| 9 | In-Service Training Lesson Plan: Procedural Justice |
| 10 | Procedural Justice In-Service Training Face Sheet |
| 11 | Procedural Justice In-Service Training Slide Deck |
| 12 | Quality Assurance Policy |
| 13 | COPA Timeliness Policy |

We look forward to our continued efforts with COPA and to its upcoming community engagement efforts during the fifth reporting period.

As reflected in Introduction Figure 9 below, other City entities also produced several materials to the IMT for review.

Introduction Figure 9

Sample of other Entity Policies and Training Records Reviewed by the IMT from January 1, 2021, through June 30, 2021)

| # | Entity | Record |
|---|---|---|
| 1 | City | Crisis Intervention Plan |
| 2 | Police Board | Police Board Training Plan |
| 3 | OEMC | Crisis Intervention Team Call Auditing Policy |
| 4 | OEMC | Crisis Intervention Team Program Policy |
| 6 | OEMC | Mental Health Training Policy |

---

[31]   As reflected in our first report, the IMT provided technical assistance for COPA regarding some of these materials, and others, during the first reporting period.

## CPD's Community Engagement and Trust Building

As in the first three reporting periods, we continued to have concerns about the CPD's efforts and approach to engaging the community. Since the first reporting period, we have raised concerns about the CPD's dearth of community engagement during its policy development procedures, as well as its lack of an overarching community engagement strategy. Those concerns continued throughout the fourth reporting period.

During this reporting period, however, we saw some improvement (*see* ¶160) and appreciate the CPD's efforts to reach communities in new ways, including holding "deliberative dialogue" sessions about the CPD's interim foot pursuit policy. The Coalition (*see* ¶669), however, also continued to raise significant concerns regarding community engagement to the IMT, the OAG, the City, and the CPD.[32] Several high profile tragedies during this reporting period underscored the importance of the City's and the CPD's efforts to build and repair trust with communities affected by police shootings.[33] *See our discussion of the CPD's foot pursuit policy in ¶172 for more information about the CPD's community engagement efforts around foot pursuits.*

We continue to recommend that the CPD establish consistent, sustainable procedures for garnering community member and community stakeholder input into policy development early and throughout the process.

One of the CPD's efforts to gather such input during this reporting period was the continuation of the community Use of Force Working Group, which was focused on CPD use of force policies. As we detailed in our last report, the CPD began consulting with the Use of Force Working Group in June 2020 and while the IMT thought the CPD's community engagement efforts throughout 2020 were inadequate, the processes and engagement improved somewhat during this reporting period as the CPD continued its discussions with the Working Group in the first half of 2021.

---

[32] In March 2018, the Parties to the Consent Decree (the OAG and the City) entered into a Memorandum of Agreement with a "broad-based community coalition committed to monitoring, enforcing, and educating the community about the Consent Decree ('the Coalition')." The Coalition "includes the plaintiffs in the *Campbell* and *Communities United* lawsuits." *See Memorandum of Agreement Between the Office of the Illinois Attorney General and the City of Chicago and* Campbell v. City of Chicago *Plaintiffs and* Communities United v. City of Chicago *Plaintiffs* (March 20, 2018), http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/05/Executed_MOA.pdf.

[33] *See, e.g.*, Jesse Howe and Andy Boyle, *A detailed timeline of the Adam Toledo shooting*, CHICAGO SUN-TIMES (April 26, 2021), https://chicago.suntimes.com/news/2021/4/26/22386140/adam-toledo-shooting-timeline-video-police-cpd-little-village; Zoe Christen Jones, *Videos show police fatally shooting Anthony Alvarez in Chicago*, CBS NEWS (April 29, 2021), https://www.cbsnews.com/news/anthony-alvarez-body-cam-footage/.

The City and the CPD hosted the final meeting of the Use of Force Working Group in June 2021; the IMT met with the Use of Force Working Group in July 2021 and received a follow up letter from them in August 2021. The Use of Force Working Group expressed that they do not believe that "the City was open to real, meaningful community engagement and input through this process" and noted, for example, that the City was not forthcoming with information and in did not provide documents in a timely enough manner to enable the members of the Working Group sufficient time to prepare for fulsome discussions of the material. There will be some substantive changes as a result of discussions between the CPD and Use of Force Working Group, but those changes will likely not be reflected in policy and training until 2022.

While we appreciate the CPD's continued engagement with the Use of Force Working Group, its efforts were not successful in establishing and maintaining "clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies" within the reporting period, as required by ¶160.

Despite these efforts, opportunities for community input continue to occur late in the policy development process for many policies under revision and only during public comment phases. When Chicago's community members are allowed only to provide input at the later stages of the policy development process, they are prevented from providing input during the formative stages and, in some instances, effectively prevented from the opportunity of meaningful participation. What's more, it is still unclear to us whether and how community comments and feedback is incorporated back into policies under revision; we do not have a clear understanding of CPD's process for meaningfully considering community input, even two years into the Consent Decree process.

Another high-profile incident—the wrongful execution of a search warrant on Anjanette Young in 2019—also underscored the criticality of the City's and the CPD's efforts to build back trust within Chicago's communities.[34] The controversial video of the incident became public in late December 2020, prompting the City to release a revised CPD search warrant policy in May 2021.[35] The CPD sought public comment on the policy by posting it on its website in March 2021. This incident was investigated by multiple entities, including the City's Inspector General, who

---

[34] *See, e.g., 'You Have the Wrong Place:' Body Camera Video Shows Moments Police Handcuff Innocent, Naked Woman During Wrong Raid*, CBS CHICAGO (December 17, 2020), https://chicago.cbslocal.com/2020/12/17/you-have-the-wrong-place-body-camera-video-shows-moments-police-handcuff-innocent-naked-woman-during-wrong-raid/.

[35] *See, e.g.,* David Struett, *Chicago unveils new search warrant policy in attempt to fix issues that led to wrongful raid of Anjanette Young's home*, CHICAGO SUN-TIMES (May 14, 2021), https://chicago.suntimes.com/crime/2021/5/14/22436761/chicago-police-search-warrant-policy-anjanette-young.

made many recommendations for the CPD's execution of search warrants.[36] Whether the CPD's search warrant executions are directly subject to the requirements of the Consent Decree (*see* ¶¶54, 509, 546, and 550) remains an issue.

We continue to be concerned about how the CPD understands and discerns the differences and nuances among community engagement, community partnerships, community relationships, community policing, and community service. It is unclear to us, for example, how the CPD proposes to merge its existing Chicago Alternative Policing Strategy (CAPS) with its newer Neighborhood Policing Initiative (NPI).[37] Moreover, it is also unclear how these programs align with or complement the CPD's other community-focused efforts such as district-level Community Policing Strategic Plans[38] or the activities of the Community Safety Team,[39] members of which are required to proactively engage with community members regularly. Furthermore, the CPD has yet to clearly articulate how all of these programs support an overall philosophy of community policing (*see* ¶¶8–11).

The IMT continues to encourage the CPD to think creatively about meaningful and sustainable community engagement efforts. We heard from many community members that the CPD could improve its engagement through small steps, beginning with greeting community members on the street and having a respectful conversation (as one community member said, "It starts with a hello."). The COVID-19 pandemic continued to bring additional challenges to the CPD's community engagement efforts; while the efforts mentioned above were held entirely online, only some of the CPD's Chicago Alternative Policing Strategy beat meetings were consistently successfully held online. We will continue to monitor and prioritize the City's and the CPD's ongoing efforts in this area.

---

[36] *See* CBS 2 Chicago Staff, *Inspector General's Office Completes Probe Of Anjanette Young Rade And Its Fallout*, CBS Chicago (October 7, 2021), https://chicago.cbslocal.com/2021/10/07/an-janette-young-inspector-general-investigation-joseph-ferguson-misconduct-lightfoot-admin-istration/. *See also Urgent Recommendations on the Chicago Police Department's Search Warrant Policies*, Office of the Inspector General for the City of Chicago (January 22, 2021), https://igchicago.org/2021/01/22/urgent-recommendations-on-the-chicago-police-depart-ments-search-warrant-policies/.

[37] *See How CAPS Works*, Chicago Police Department, https://home.chicagopolice.org/community-policing-group/how-caps-works/; Zac Clingenpeel, *Neighborhood Policing Initiative program expands to Grand Crossing, Englewood and Gresham districts*, Chicago Sun-Times (May 7, 2021), https://chicago.suntimes.com/2021/5/7/22424992/neighborhood-policing-initiative-program-expands-grand-crossing-englewood-and-gresham-districts

[38] *See District Strategic Plan*, Chicago Police Department, https://home.chicagopolice.org/com-munity-policing-group/district-strategic-plans/.

[39] *See* ABC 7 Chicago Digital Team, *Chicago police announce teams to build community partner-ships, handle large events*, ABC 7 Eyewitness News (July 27, 2020), https://abc7chi-cago.com/chicago-crime-police-department-superintendent-david-brown/6336746/.

# I. Community Policing

The following is the Community Policing section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago's (the City's) and its relevant entities' Community Policing compliance efforts from January 1, 2021, through June 30, 2021.

## Guiding Principles

The IMT assessed whether the City complied with applicable Community Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **8.** *Strong community partnerships and frequent positive interactions between police and members of the public make policing safer and more effective, and increase public confidence in law enforcement. Moreover, these partnerships allow police to effectively engage with the public in problem-solving techniques, which include the proactive identification and analysis of issues in order to develop solutions and evaluate outcomes.*

> **9.** *To build and promote public trust and confidence in CPD and ensure constitutional and effective policing, officer and public safety, and sustainability of reforms, the City and CPD will integrate a community policing philosophy into CPD operations that promotes organizational strategies that support the systematic use of community partnerships and problem-solving techniques.*

> **10.** *CPD will ensure that its community policing philosophy is a core component of its provision of police services, crime reduction strategies and tactics, training, management, resource deployment, and accountability systems. All CPD members will be responsible for furthering this philosophy and employing the principles of community policing, which include trust and legitimacy; community engagement; community partnerships; problem-solving; and the collaboration of CPD, City agencies, and members of the community to promote public safety.*

> **11.** *The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (the CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training rather than to create a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its actions.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the City's evidence, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the City's evidence, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the City's evidence, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance, or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

During the fourth reporting period, the City and the CPD made progress toward implementing requirements in the Community Policing section of the Consent Decree. Their progress included developing a policy framework for the CPD Neighborhood Policing Initiative, assigning District Coordination Officers to facilitate partnerships with community stakeholders, and refining community engagement efforts and programs.

The City and the CPD also experienced significant challenges in implementing many other Community Policing requirements, including engaging a broad cross-section of communities for feedback on policing practices and strategies, maintaining sufficient District Advisory Committee participation, and finalizing its policies regarding police interactions with Chicago's youth population. Still having to mitigate the impact of the COVID-19 pandemic, the CPD continued leveraging virtual platforms to host community meetings, working groups, and focus groups. The CPD continues to fall short in its efforts to reach marginalized populations, as these engagements have not attracted a broad cross-section of Chicago residents. The CPD will need to continue its efforts and further refine these engagements to ensure that the engagements meaningfully capture community members' feedback, including feedback from Chicago residents who experience the most contact with the police. The CPD should also continue to formalize this community dialogue and feedback loop to help the CPD consistently hear and respond to the community's concerns and recommendations.

The CPD continues to focus a lot of attention on its District Strategic Plans and Bureau Strategic Plans.[40] These strategic plans, however, likely represent only a portion of police strategies. We understand that the CPD implements other crime reduction and problem-solving strategies beyond the Strategic Plans, which seem disjointed from the strategic planning process. It is unclear how all of the strategies work together and whether the CPD has a system in place to review and evaluate all of its strategies to ensure they reflect principles of community policing and work together to achieve the CPD's community policing goals.

Furthermore, like the last reporting period, the City and the CPD did not provide records showing that command staff received written guidance on how to ensure the Community Safety Team (also known as the "CST") and the Critical Incident Response Team (also known as "CIRT") are consistent with principles of community policing.[41] The CPD did refine its strategic plans' form to include a field for

---

[40] *See Community Policing Strategic Plans*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/district-strategic-plans/.

[41] *See CPD Announces Launce of two New Citywide Teams with Focus on Strengthening Community Partnerships*, CHICAGO POLICE DEPARTMENT (JULY 27, 2020), https://home.chicagopolice.org/34700-2/.

members to address how the new citywide teams affect the other strategies within the plan. Still, we are not confident that such effort will result in a meaningful review of those teams' and different strategies' adherence to community policing principles. Therefore, the CPD will need to devote additional efforts to develop a process for reviewing each crime-reduction and problem-solving strategies beyond these strategic plans. We also encourage the City to consider how it can better understand how these CPD strategies overlap with the City's overall goal of promoting a safer Chicago. *See* ¶18.

Overall, the IMT assessed the City's compliance with 35 Community Policing paragraphs in the fourth reporting period (¶¶13–20 and 22–48). The City and the CPD maintained Preliminary compliance for 16 paragraphs (¶¶18–20, 25, 28, 29, 31, 34–36, 39–41, 43, 46, and 47), met Preliminary compliance for nine paragraphs (¶¶22–24, 26, 27, 37, 38, 45, and 48), maintained Secondary compliance two paragraphs (¶¶13 and 44), and met Secondary compliance for three paragraphs (¶¶14, 15, and 30). The City did not reach Preliminary compliance in the five other paragraphs (¶¶16, 17, 32, 33, and 42). *See* Community Policing Figure 1 below.

Community Policing Figure 1:       Compliance Progress for Community Policing
Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



In the fourth reporting period, the City had four deadlines in the Community Policing section, which it missed. *See* ¶¶16, 18, 25, and 45. *See* Community Policing Figure 2 below.

Community Policing Figure 2:       Total Community Policing Deadlines
in the Fourth Report: 4



# Community Policing: ¶13

*13. In 2017, the Superintendent accepted CPAP's recommendations, and CPD began to implement some of the recommendations, namely, the creation of the Office of Community Policing, which reports directly to the Superintendent and is responsible for overseeing the implementation of CPD's community policing efforts. CPD will, within 90 days of the Effective Date, develop a plan, including a timeline, for implementing CPAP's recommendations, consistent with the requirements set forth in this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with the requirements of ¶13. The City and the CPD have not yet achieved Full compliance.

In previous reporting periods, the City and the CPD met Preliminary and Secondary compliance, because the CPD developed a plan, including a timeline, for implementing the Community Policing Advisory Panel's (CPAP's) recommendations and demonstrated its ability to track the implementation efforts for the CPAP recommendations. Through a review of the CPAP's by-laws, CPAP Project Plan progress updates, and the CPAP quarterly reports, we assessed the CPD's ability to track and evaluate its efforts to implement the remaining CPAP recommendations.

The CPD's plan to implement CPAP recommendations covers the following:

(1)   community partnerships;
(2)   restorative justice;
(3)   youth outreach;
(4)   community policing strategies;
(5)   annual strategy review and feedback;
(6)   quarterly reports;
(7)   community policing staffing and training;
(8)   selection of Chicago Alternative Policing Strategy (CAPS) officers;
(9)   coordination of City services;
(10)  victims' resources; and
(11)  community policing evaluations.

The *CPAP Project Plan*—and included tasks—overlap with actions that the City and the CPD must implement for other Consent Decree paragraphs.

During this reporting period, we assessed the CPD's efforts to (1) accurately convey status updates and implementation challenges to the CPAP; (2) implement remaining recommendations, and (3) develop an evaluation process that would allow the CPD to assess whether it has achieved the desired impact of the CPAP recommendations. We reviewed the 2020 Fourth Quarter CPAP Quarterly and 2021 First Quarter CPAP Quarterly Reports, CPAP meeting agendas, and the CPD's updated CPAP Project Plan.

The CPD also provided us with highlights of activities tracked and monitored through this reporting period. These efforts build upon CPD activities in previous reporting periods:

- District-wide Community Policing Strategies: developed *the Neighborhood Policing Initiative* (D21-03) policy and launched a pilot program for this initiative.

- Restorative Justice: revised the *Peer-Jury Manual*.

- Youth Outreach: facilitated the Neighborhood Youth Corp summer program and the Summer Youth Leadership Academy.

- Victim Resources: revised a related policy to authorize the use of translation contractors.

- Annual Strategy Review and Feedback: finalized and published District strategic plans.

- CPAP Project Plan: ongoing updates to the project task plan.

- Interactive Community Policing Database: continued efforts to implement the Community Engagement Management System.[42]

We acknowledge the CPD's continued efforts to monitor and track its implementation of CPAP recommendations. However, the CPD will need to demonstrate that it has developed a process to evaluate the effectiveness of such efforts to meet the CPAP's recommendations and desired outcomes. Such evaluation will likely be tied to the CPD's efforts to comply with ¶47. That paragraph requires the CPD to annually evaluate its efforts to build community partnerships and use problem-

---

[42] *See* CPD Office of Community Policing, *Quarterly Report for the Community Policing Advisory Panel, 3rd Quarter 2020*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/cpap-quarterly-report/.

solving techniques to reduce crime and improve quality of life. Many of those efforts align with CPAP recommendations. *See* our analysis of the CPD's efforts regarding ¶47 below.

Moving forward, to maintain Secondary compliance, we will continue assessing the CPD's efforts to (1) convey accurate status updates and implementation challenges to the CPAP recommendations and (2) implement the remaining recommendations. For Full compliance, we will monitor the CPD's efforts to evaluate whether the CPD's implementation of each CPAP recommendation is in accordance with its plan and the Consent Decree.

# Community Policing: ¶14

*14. Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise all relevant policies to clearly delineate the duties and responsibilities of the Office of Community Policing and any other offices or entities that report to the Office of Community Policing.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶14. The City and the CPD reached Secondary compliance because the CPD trained members of the Office of Community Policing on the various policy changes made as part of this paragraph's requisite review.

In the previous reporting period, we monitored the CPD's efforts to review and revise various policies relevant to this paragraph. The CPD completed policy revisions under the Consent Decree process (*see* ¶¶626–41), finalizing 14 directives that clearly delineate the duties and responsibilities of the Office of Community Policing (also known as the "OCP").

During this reporting period, to assess Secondary compliance, we monitored the CPD's efforts to address concerns regarding the supervisory oversight required to implement the 14 directives. For example, Special Order S02-03-14, *District Advisory Committee*, provides for regular meetings between District personnel and their District Advisory Committee. Still, the CPD's Audit Division concluded in the previous reporting period that not all of the District Advisory Committees are operational. We observed the CPD's efforts to determine the best solutions to ensure S02-03-14 was being implemented. We also reviewed the CPD's *Community Policing Biennial Policy Review* policy which guides the Office of Community Policing's review of its policies to ensure they achieve the CPD's desired outcomes. The CPD also submitted training materials developed and delivered by the Office of Community Policing to each district's community policing office and the Community Policing Sergeants.

We acknowledge that the Office of Community Policing plays a significant role in assisting the whole CPD in implementing community policing requirements that

span the Consent Decree, including reviewing district- and City-wide crime reduction strategies and managing an array of other community policing-related programming.[43]

Since the Office of Community Policing provided each district's community office and the Community Policing Sergeants with an overview of the Office of Community Policing policy suite changes, we conclude that the CPD provided relevant members with training regarding these policies. Regarding the requirements of this paragraph, we believe the training reflects the CPD's efforts to supervise and ensure relevant members are aware of the policy changes to ensure they are implemented.

Because the Office of Community Policing provided records reflecting its efforts to train relevant members on the policy suite changes, we find that the CPD and the City have moved into Secondary compliance. To maintain Secondary compliance, we will assess the CPD's efforts to address issues with the implementation of various Office of Community Policing programs. To the extent those Office of Community Policing programs relate to other Consent Decree requirements, like the District Advisory Committee program and ¶25, we will generally rely on those assessments to inform our evaluation of this paragraph. Moving forward, we will assess the CPD's efforts to evaluate its policies to determine whether the CPD's evaluation process, as outlined in the *Community Policing Biennial Policy Review* procedure, is effective at ensuring the policies are implemented. Our assessment for Full compliance will likely overlap with our assessment of the CPD's effort to comply with ¶47.

---

[43] We note that many of those efforts align with other Consent Decree requirements. Therefore, we assess the CPD's efforts to supervise its compliance with those requirements in our review of the specific paragraph. For example, the *District Advisory Committee* policy, S02-03-04, relates to the requirements of ¶25. We will assess the CPD's specific efforts to oversee effective implementation of that directive in our assessment of ¶25.

# Community Policing: ¶15

*15. With the assistance of the Office of the Community Policing, CPD will ensure its command staff develops crime reduction and problem-solving strategies that are consistent with the principles of community policing. To achieve this outcome, CPD will: a. within 180 days of the Effective Date, provide CPD's command staff methods and guidance, in writing, for ensuring that department-wide and district-level crime reduction strategies are consistent with the principles of community policing; b. require CPD's command staff to review department-wide and district-level crime reduction strategies implemented under their command, as appropriate, in order to ensure they incorporate problem-solving techniques and are consistent with the principles of community policing; and c. designate the Deputy Chief of the Office of Community Policing to review and provide written feedback on implemented department-wide and district level crime reduction strategies, excluding operational strategies that are determined on a day-to-day or short term basis, to ensure they are community oriented and consistent with the principles of community policing.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance and achieved Secondary compliance with this paragraph. The CPD provided records reflecting an improved internal process for reviewing the Bureau Strategic Plans and District Strategic Plans.

In the previous reporting period, we assessed whether the CPD provided command staff with the requisite written guidance for reviewing and ensuring that department-wide and district-level crime reduction strategies are consistent with community policing. We also assessed the CPD's efforts to conduct the reviews required in this paragraph.

In this reporting period, we reviewed records reflecting the CPD's efforts to review the Bureau Strategic Plans and District Strategic Plans. The CPD continues to focus its compliance efforts for this paragraph on these strategy development processes. As referenced in our other reports, district-level strategies and department-wide strategies likely include strategies not contemplated in the Bureau Strategic Plans and District Strategic Plans.

For example, in our third monitoring report, we discussed how the Community Safety Teams (also known as the CSTs) and the Critical Incident Response Team (also known as CIRT) are crime reduction, problem-solving strategies that the CPD did not subject to ¶15 review. In June of 2021, the CPD provided a standard operating procedure for each of these teams, including guidance regarding how they can engage in community policing. But the CPD did not provide any records reflecting the ¶15 review of these standard operating procedures to ensure they reflect principles of community policing. Relatedly, we have not received records reflecting ¶15 review of crime reduction, problem-solving strategies beyond these teams and the Strategic Plans. We look forward to reviewing those records when they become available.

The strategic planning templates now include fields to incorporate a description of City-wide strategies such as the Community Safety Teams and the Critical Incident Response Team. Providing a field to describe how the Community Safety Team and Critical Incident Response Team affect the Strategic Plans is not the same, however, as ¶15 review of the Community Safety Teams and the Critical Incident Response Team as standalone strategies.

Despite the limited records reflecting ¶15 review of strategies not articulated in the Plans, we reviewed the finalized Bureau Strategic Plans and a sample of the finalized District Strategic Plans. These finalized Plans reflect changes that the CPD implemented in the strategies development and review process, including the following:

- Aligning strategy development and problem-solving with the community policing "Scanning, Analysis, Response, and Assessment (SARA)" model;[44]

- Incorporating greater specificity and strategic thinking into the strategy development process;

- Aligning the process with the ¶45 process requirements, including directions to allocate personnel and resources to assist strategy implementation and identify primary contacts for marginalized groups within their district;

- Transitioning the Community Conversations to a virtual platform; and

- Including the Deputy Chief and the Chief of Operations in the review and approval process.

---

[44] *See The SARA Model*, Arizona State University Center for Problem-Oriented Policing, https://popcenter.asu.edu/content/sara-model-0.

The more detailed strategies planning template also identifies resourcing and key activities. The IMT recognizes the CPD's effort to improve the strategy development and internal review processes. Still, we remain concerned that the review process is not effectively addressing inconsistencies between the Strategic Plans development process and community policing principles. For example, throughout the Strategic Plan development process, the CPD has struggled to engage a broad cross-section of community members for their input on these strategies. Engaging a broad cross-section of community feedback and seeking input from communities with the most police contact are ways to garner public trust, a critical component of community policing. The CPD's ability to effectively evaluate these strategies' impact on crime reduction and enhancing community trust may depend on its efforts to provide updated written guidance regarding the reviews outlined here.

The IMT concludes that the City and the CPD have achieved Secondary compliance because the CPD continues to refine its crime reduction and strategy review process. To maintain Secondary compliance, the CPD should provide records reflecting the CPD's efforts to engage in ¶15 review when developing other crime reduction strategies and problem-solving techniques, like the Community Safety Teams and the Critical Incident Response Team. Furthermore, we will assess the CPD's efforts to evaluate and refine its processes to ensure that they result in strategies consistent with community policing. For example, the lack of input from a broad cross-section of the community during the District Strategic Plan and Bureau Strategic Plans' development process leads us to believe that the written guidance may not provide sufficient guidance on how the CPD can reach populations with the most police contact. Full compliance depends on the CPD's ability to effectively review the department-wide and district-level strategies to ensure they align with principles of community policing, demonstrating an ability to refine the review process and written guidance as needed.

# Community Policing: ¶16

**16.** *CPD Bureau of Patrol Area Deputy Chiefs and District Commanders will regularly review district efforts and strategies for building community partnerships and using problem-solving techniques.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** Regularly □ **Met** ☑ **Missed**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

This is the first reporting period we have assessed the City's and the CPD's efforts to comply with ¶16. We find that the City and the CPD did not meet Preliminary compliance with this paragraph because the CPD has not fully codified the requisite reviews into an implemented policy. Specifically, the CPD's Special Order S02-03-02, *District Strategic Plans*, is still under ¶¶626–41 for other Consent Decree paragraphs.[45]

To assess Preliminary compliance, we monitored the CPD's efforts to codify the reviews outlined in this paragraph into policy. The CPD believes that S02-03-02 incorporates this requirement. S02-03-02 provides that District Commanders and the Deputy Area Chiefs will review and approve District Strategic Plans. This process was outlined in a version of S02-03-02 that the CPD finalized. We note, however, that we previously reviewed S02-03-02 as it related to other Consent Decree paragraphs, not ¶16. The CPD resubmitted S02-03-02 for review, and the revisions seem to include language regarding this paragraph's requirements. However, we have concerns that the policy does not provide sufficient guidance that will help facilitate meaningful reviews of each district's community partnerships.

We also reviewed finalized District Strategic Plans. But we did not receive sufficient records during this period to assess whether that review process effectively determines whether the district efforts and strategies build community partnerships and use problem-solving techniques. A policy that meaningfully guides this review should reflect an understanding that community partnerships are dynamic, likely requiring a review more frequent than the one outlined in the directives guiding the annual Strategic Plan process.

---

[45] During this reporting period, the City and the CPD resubmitted S02-03-02 for our review with respect to ¶¶17 and 45, not ¶16. To ensure the IMT has an opportunity to review the policy as it relates to this paragraph, we ask that the CPD clarify whether the CPD believes S02-03-002 addresses ¶16.

While the CPD is working to incorporate this paragraph's review process into policy, we acknowledge that the CPD does work to build community partnerships. However, the CPD has struggled to document its process for creating and sustaining community partnerships. We have observed information sharing at the district level and sometimes even resource sharing between districts and community partners. We encourage the CPD to consider and codify how best to collect data regarding these partnerships so that the review described in this paragraph is meaningful.

In sum, the City and the CPD did not meet Preliminary compliance because ¶16's requirements have not been codified into policy. Moving forward, we will monitor the CPD's efforts to finalize a policy that incorporates this paragraph's requirements, including guidance regarding what data the Deputy Chief and District Commander should be reviewing, how regularly they should be reviewing, and how to document the review. For Secondary compliance, we will assess whether the CPD's process includes sufficient supervisory oversight to ensure the review process effectively determines whether each district's efforts and strategies are effective at building community partnerships and using problem-solving techniques.

# Community Policing: ¶17

**17.** *The overall effectiveness of CPD's department-wide and district-level crime reduction strategies will be determined by a reduction in crime and not by the number of arrests, stops, or citations*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance*** |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

This is the first reporting period where we assessed the City's and the CPD's efforts to comply with ¶17. The City and the CPD did not meet Preliminary compliance with ¶17, because the directives that the CPD asserts incorporate the requirements of this paragraph do not provide members with sufficient guidance.

To assess Preliminary compliance, we monitored the CPD's efforts to incorporate this paragraph's requirement into policy, including guidance regarding the process by which the CPD would assess the effectiveness of the strategies. The City and the CPD provided several directives, asserting that they incorporate this paragraph's requirements: General Order G01-01 *Vision, Mission Statement, and Core Values*; Special Order S02-03-02, *District Strategic Plans*; special operating procedure (SOP) Community Safety Teams, and SOP Critical Incident Response Team. Although these various policies include the language found ¶17, none provide the process for which the CPD will accomplish this requirement.

The City and the CPD did not meet Preliminary compliance with this paragraph because it did not incorporate a process by which the CPD can assess the effectiveness of its strategies to determine whether there has been any corresponding reduction in crime. Moving forward, we will assess the CPD's efforts to include in policy such a process. Thereafter, we will assess the CPD's efforts to conduct such assessments based on appropriate data.

# Community Policing: ¶18

*18. The City will establish and coordinate regular meetings, at minimum quarterly, with representatives from City departments, sister agencies, and CPD to collaborate on developing strategies for leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety, security and well-being. The City departments and agencies will include, but not be limited to, the Department of Streets and Sanitation, the Department of Buildings, the Chicago Fire Department, the Department of Business Affairs and Consumer Protection, the Department of Planning and Development, the Office of Emergency Management and Communication People with Disabilities, the Department of Public Health, the Department of Family and Support Services, the Chicago Public Schools, the Chicago Housing Authority, and the Chicago Park District. If after two years the City concludes that less frequent meetings would be more effective, it may propose an alternative schedule subject to Monitor approval.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| Deadline: | Quarterly | | ☐ Met | ☑ Missed |
|---|---|---|---|---|

**Preliminary:** *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The City maintained Preliminary compliance with this paragraph. However, the City did not achieve Secondary compliance or the corresponding deadline during this reporting period, because we did not receive any records showing that these meetings involve quality collaboration on developing strategies for leveraging City resources, including a review of actions assigned, actions taken, and progress made.

In the previous reporting period, the IMT assessed the City's efforts to engage in quality collaboration with the various departments and sister agencies, paying particular attention to the City's efforts to track and evaluate the cabinet meetings' progress. During this reporting period, we assessed the same.

The City held a cabinet meeting on March 29, 2021, which the IMT observed. However, we did not receive any additional documentation regarding this meeting or any other meetings that would allow us an opportunity to assess how the agencies are tracking their progress in leveraging City resources to effectively and comprehensively address issues that impact the community's sense of safety.

During the March cabinet meeting, we observed attendees discuss various efforts that their agencies took to promote community safety. The agencies sought to engage collaboratively. For example, the cabinet members identified a Chicago neighborhood where they hoped to focus a concentration of City services ranging from environmental improvements to services for high-risk families and summer jobs. Agencies like the CPD and the CPS described what activities they engaged in in the area. We noticed that most of the agencies present meaningfully participated in the discussions.

Although the discussions focused on the cabinet members' collaborative efforts to impact the community's sense of safety, we did not observe much of any discussion regarding action items discussed in prior meetings or status updates regarding efforts raised in previous meetings.

The City maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance because we did not receive any meeting documentation, including minutes, attendee lists, action items that demonstrated the cabinet members' efforts to follow up on actions discussed during previous meetings. We cannot assess the quality of these meetings without such records. Simply holding the meetings with no plan to track progress will make it difficult for the cabinet to effectively and comprehensively address issues that impact the community's sense of safety, security, and well-being. Furthermore, we will ultimately assess whether the City has established an evaluation process by which it can assess whether the strategies indeed effectively and comprehensively address the community's sense of safety. Such evaluation will likely need to include some assessment regarding the community's sense of safety, security, and well-being.

# Community Policing: ¶19

**19.** *CPD will ensure that officers are provided with information regarding the communities they serve, including their assets and challenges, community groups and leaders, and business, residential, and demographic profiles.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that we are assessing the City and the CPD's efforts to comply with this paragraph. The City and the CPD met Preliminary compliance with this paragraph because it incorporated this paragraph's requirements into policy, providing that the District Community Policing Office is responsible for ensuring district personnel receives the information outlined in this paragraph.

During this reporting period, we assessed the CPD's efforts to incorporate this paragraph's requirement into policy. We reviewed the CPD's Special Order S02-03, *The Community Policing Office*, and Department Notice D21-03 Neighborhood Policing Initiative Pilot Program. The directives address the requirements articulated in this paragraph, and the CPD finalized both directives on the last day of the reporting period. We also reviewed the CPD's standard operating procedure regarding the Community Policing District Resource Guide, which provides more guidance regarding how the Office of Community Policing will collect community information.

According to the CPD, they will equip officers with information about the areas they serve by developing and maintaining resource guides that contain pertinent community information. The CPD hopes that the resource guides will help officers connect community members to City- and community-based services. Information sharing and referral resources are an important element to the CPD's community policing efforts and are an integral part of both the emerging District Community Policing Offices and the Department's Neighborhood Policing Initiative.

Because the CPD finalized S02-03 and D21-03 and developed a process by which the Office of Community Policing can collect and distribute community information, the City and the CPD met Preliminary compliance with this paragraph. In the next reporting period, we will assess whether the CPD seeks input from community stakeholders in developing and revising the district resource guides. We will also monitor whether the district members are receiving or accessing the guides. We encourage the CPD to consider how it plans to track and assess the

usefulness of the district guides, determine which resources officers most often refer community members to, and which are not as active.

# Community Policing: ¶20

**20.** *Within 180 days of the Effective Date, CPD will develop and institute a policy prohibiting the transport of individuals with the intent to display or leave them in locations where known rivals or enemies live or congregate.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance for this paragraph but did not meet Secondary compliance because we did not receive evidence of the CPD's supervisory oversight practices used to ensure the policy is implemented as written. Furthermore, the CPD did not provide any related data about juvenile transports for the IMT to assess the CPD's adherence to the relevant policy.

In the previous reporting period, the CPD achieved Preliminary compliance by finalizing its Preliminary Investigations directive (G04-01), which incorporated this paragraph's requirements. During this reporting period, we assessed the CPD's efforts to train members on this requirement and the CPD's efforts to develop supervisory oversight practices to ensure G04-01 is implemented as written.

During this reporting period, we reviewed the CPD's 2021 Two-Day De-Escalation, Response to Resistance, and Use of Force training. The CPD included some guidance regarding this paragraph's requirements. The training materials cover various Consent Decree topics, and while the IMT believes the CPD can make further improvements to strengthen the training, we provided a no-objection so that the CPD could train its members as soon as possible. We did not receive, however, records indicating that members received the approved training. Furthermore, we did not receive evidence that the CPD has developed supervisory practices to ensure policy implementation.

In sum, the CPD and the City maintained Preliminary compliance but did not achieve Secondary compliance for this paragraph. Moving forward, we will assess the CPD's efforts to ensure officers understand and implement this requirement. We will also assess the CPD's data collection efforts related to this requirement to evaluate how the CPD tracks transports to ensure members comply with this requirement.

# Community Policing: ¶22

**22.** *CPD will encourage and create opportunities for CPD members to participate in community activities and have positive interactions with the community, including those that extend beyond the context of law enforcement duties.*

**Compliance Progress**　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that we are assessing the City and CPD's efforts to comply with this paragraph. The City and the CPD met Preliminary compliance with this paragraph because the CPD codified mechanisms and programming to ensure members have opportunities to participate in community activities and have positive interactions with the community.

During this reporting period, we assessed the CPD's efforts to incorporate this paragraph's requirement into policy. We reviewed the *Vision, Mission Statement, and Core Values* policy (G02-03), the *Community Policing Office* policy (S02-03), the *Neighborhood Policing Initiative* (NPI) policy (D21-03), and the Northwestern University preliminary study of the NPI program. We also interviewed several District Commanders regarding their community engagement efforts.

The IMT recognizes that the CPD has continuously offered programming to increase positive interactions with community members. Programs such as "Officer Friendly," "D.A.R.E.," and a range of other youth programs have for many years been community offerings by the CPD. Positive interactions between police and community members are critical to achieving an effective community policing strategy, and therefore the CPD should expand these opportunities for positive community engagement. A core strategy for the CPD to expand non-enforcement and positive community interactions is implementing the Neighborhood Policing Initiative, a program designed to enhance public safety and equitable policing. The CPD piloted the NPI in two Districts and later expanded to other Districts. Eventually, NPI will be department wide.

According to Northwestern University's preliminary evaluation of the NPI, the NPI is achieving important objectives. The evaluation states that the NPI "shows positive changes such as greater police visibility, more attention to community concerns, and most importantly, more meaningful interactions between residents and police officers." The evaluation suggests that the CPD may improve the NPI by:

- Shifting resources to increase staffing levels of officers in the program;

- Increasing consistency by keeping officers with the program and not pulled out to resume other calls;

- Increasing resources and compensating community ambassadors; and

- Defining the "community ambassador" roles more clearly.

The IMT is encouraged by the progress made in implementing the NPI department-wide and the NPI's potential to significantly enhance the quantities and quality of CPD's positive interactions with community members. Because the CPD incorporated this paragraph's requirements into policy and began expanding the NPI to more districts, the City and the CPD met Preliminary compliance. Moving forward, the IMT will monitor the CPD's efforts to expand the NPI to the rest of the CPD districts and address concerns raised in the Northwestern University preliminary evaluation report. We will also assess the CPD's efforts to train NPI personnel and develop other supervisory practices to ensure the relevant written guidance is implemented as written.

# Community Policing: ¶23

**23.** *CPD has established and will continue and build upon a variety of community partnerships and engagement strategies designed to encourage positive community interactions, such as Bridging the Divide, Officer Friendly, and youth mentorship and engagement programs.*

---

### Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first period that we are assessing the City and the CPD's efforts to comply with this paragraph. The City and the CPD met Preliminary compliance with this paragraph because it codified this paragraph's requirements into CPD policy: *Community Policing Office* (S02-03), *Vision, Mission Statement, and Core Values* (G02-03), and *Neighborhood Policing Initiative (NPI)* (D21-03).

To assess Preliminary compliance, we monitored the CPD's efforts to codify this paragraph's requirements into policy. During the reporting period, we reviewed G02-03, D21-03, and S02-03. We also reviewed Northwestern University's preliminary report on the effectiveness of the NPI program and interviewed certain District commanders regarding their community engagement efforts.

In previous reporting periods, the CPD updated 14 policies relating to community partnerships and programming, including programs like "Officer Friendly," "D.A.R.E," and "Bridging the Divide." The CPD's goal for these programs and others is, in part, to provide opportunities for CPD members to have positive interactions with community members. The implementation of NPI, including the hiring and training of Neighborhood Coordination Officers, will likely provide the CPD with greater opportunities to expand their work with community-based organizations to address community safety concerns. The Office of Community Policing also includes liaisons who will work with special populations to expand collaboration and partnership opportunities further.

However, we note that the CPD does not yet have a system or written guidance describing all of the partnerships and collaborations that already exist at the District-level. In interviews with District Commanders, they note that outreach and ongoing work with the community occur regularly, but we cannot confirm that or assess the quality of those relationships without additional records. Maintaining such records can aid the CPD in its efforts to evaluate the effectiveness of various programs and partnerships.

In sum, the City and CPD met Preliminary compliance with this paragraph as it developed and finalized policies that incorporate this paragraph's requirements. Moving forward, we will assess the CPD's efforts to document its coordinated efforts to build relationships with community partners, including ongoing outreach efforts. We will also assess the CPD's efforts to ensure members central to the implementation of these requirements receive adequate training. Furthermore, we will assess the CPD's efforts to collect and document data regarding its collaborative work and partnerships with community organizations, groups, and community members.

# Community Policing: ¶24

*24. Each district will identify and maintain collaborative partnerships with community stakeholders to serve the specific needs of the community. District representatives will meet, as appropriate, with residential, business, religious, civic, educational, youth, and other community-based groups to proactively maintain these relationships and identify and address community problems and needs.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

The City and the CPD met Preliminary compliance with this paragraph by providing language in the *Community Policing Office* policy (S02-03), the *Neighborhood Policing Initiative (NPI)* department notice (D21-03), and the *Vision, Mission Statement, and Core Values* policy (G02-03) that requires collaborative partnerships to serve specific needs of the community.

During this reporting period, we assessed the CPD's efforts to codify this paragraph's requirement into policy. We reviewed G02-03, S02-03, D21-03, and Northwestern University's preliminary report on NPI and conducted interviews with several District Commanders. These directives include roles for both District Coordination Officers and Community Ambassadors. The Community Ambassadors are CPD selected volunteers who are "local residents and leaders representing a wide spectrum of neighborhood groups, organizations, and interests." The Ambassadors will work with officers to increase officers' understanding of community issues, stakeholders, and other community dynamics. Most importantly, they will facilitate the partnership building and dialogue between the CPD and these community groups.

The City and the CPD met Preliminary compliance with this paragraph by incorporating guidance specific to this paragraph into S02-03, D21-03, and G02-03. Moving forward, we will assess the CPD's efforts to train members and develop appropriate supervision for these teams to ensure this paragraph's requirements are implemented into practice.

# Community Policing: ¶25

*25. CPD will meet with members of the community from each beat and District Advisory Committee members at least once every two months. These community meetings will be scheduled in consultation with the community, be used to identify problems and other areas of concern in the community, and provide an opportunity to discuss responses and solutions through problem-solving tactics and techniques.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**        Every Two Months        ☐ **Met**   ☑ **Missed**

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**          *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶25 because the CPD previously created directives that incorporate this paragraph's requirements. The City and the CPD did not meet Secondary compliance during this reporting period because many districts are not yet in a position to meet with their District Advisory Committee every two months.

In the previous reporting period, we assessed the CPD's effort to codify this paragraph's requirements into policy. We also reviewed a CPD Audit of District Beat Meetings and the District Advisory Committees (or DACs) that highlighted the following issues:

- District Advisory Committees are not adequately staffed according to their by-laws;

- District Advisory Committee membership does not reflect the demographics of communities they serve;

- District Advisory Committees often do not provide documentation of decision-making processes;

- District Advisory Committee members have received minimal training;

- Districts are not holding Beat Meetings for the required number of times; and

- Districts lack Beat facilitators for many Beat Meetings.

During this reporting period, we received updates during our regular calls with the CPD regarding its efforts to address these issues. We also reviewed records reflecting the CPD's efforts to improve the District Advisory Committee program and the various Beat and District Advisory Committee meetings that the CPD held in 2021. We acknowledge those efforts and continue to monitor their effectiveness at addressing the programmatic gaps identified in the CPD's audit report. Due to the COVID-19 public health emergency, the CPD held most meetings virtually, but participation was often limited to those invited, which limited participation. However, many districts did not have the resources in place to consistently meet with their District Advisory Committee. And we could not observe any of the District Advisory Committee meetings during this reporting period.

District Advisory Committees and Beat Meetings are key components to a successful CPD community policing strategy and play an integral role in addressing important Consent Decree requirements. District Advisory Committees, for example, review their District's Strategic Plans and provide input on important policies. Regularly scheduled and facilitated Beat Meetings also provides a space for community members to raise concerns about community safety issues that are affecting their neighborhoods. Considering the importance of these community engagements, the CPD must prioritize addressing the gaps identified in the CPD's Audit report as soon as possible.

In sum, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance during this reporting period because the records do not reflect supervisory practices sufficient to address the audit's findings, and many districts are not yet in a position to meet with these groups every two months. Secondary compliance depends on the CPD's ability to use its supervisory practices to ensure this paragraph's requirements are implemented. Moving forward, we will continue to assess the CPD's efforts to address the issues identified in the Audit. We will also monitor the CPD's efforts to hold their Beat Meetings and District Advisory Committee meetings in-person and virtually.

# Community Policing: ¶26

*26. CPD's Office of Community Policing will designate CPD members, as needed, to serve as points of contact for organizations to assist with access to police services, including those serving communities that have experienced previous challenges with access to police services, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, homeless individuals, and survivors of sexual assault and domestic violence. The designated CPD members will provide feedback to the Deputy Chief of the Office of Community Policing about the issues or potential policy recommendations raised by community-based organizations or the community to improve access to police services.*

## Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that we are assessing the City and the CPD's efforts to comply with this paragraph. The City and the CPD met Preliminary compliance with this paragraph because it codified ¶26's requirements into Special Order S02-03, *Community Policing Office*.

To assess Preliminary compliance, we monitored the CPD's efforts to codify this paragraph's requirement into CPD policy. We reviewed CPD's Special Order S02-03, *Community Policing Office*, which identifies roles and responsibilities for CPD members who will assist community members access police services and includes the requirement that these "points of contact" or "liaisons" will engage with organizations to assist in providing services to the community. We also reviewed the CPD's *Neighborhood Policing Initiative (NPI)* department notice (D21-03). We also discussed the CPD's efforts to implement the NPI. We reviewed the CPD's Office of Community Policing Civil Rights Unit Liaison Proposal. The CPD is provided liaison position descriptions and a proposed training curriculum for them.

According to the CPD, it will take a two-tier approach to this paragraph's requirements, providing Citywide liaisons that will serve as 1) points of contacts for the affinity groups stipulated in ¶26 and 2) will provide District-level liaison officers assigned to lead their District's in conducting outreach and organizing engagements to build strong relationships with their assigned affinity group. Key efforts activities planned include:

- Serve as a point of contact between CPD and members of affinity groups in the community;

- Identify chronic conditions, concerns, and challenges of members of these affinity groups, and work with them on finding solutions; and

- Recommend and provide feedback to district commanders, City-wide liaisons, and CPD command.

The CPD reports that staffing these positions is underway and that training for these assignments is planned.

We conclude that because the CPD incorporated this paragraph's requirements into S02-03, providing the roles and responsibilities of these "points of contacts," the City and the CPD met Preliminary compliance. Moving forward, we will assess the CPD's efforts to staff these roles, train the selected members on their responsibilities, and develop supervisory practices that ensure the policy is implemented as written.

# Community Policing: ¶27

*27. CPD will facilitate relationships with youth by establishing regular meetings to serve as opportunities to provide input to CPD about the issues affecting their lives and their communities. CPD will partner with community-based organizations to identify strategies to include participants that represent a racially, geographically, and socio-economically diverse cross-section of Chicago youth, including, but not limited to, at-risk youth and youth who have been arrested, incarcerated, or otherwise involved in the criminal or juvenile legal systems.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**      *Not Yet Assessed*
**Full:**           *Not Yet Assessed*

This is the first period that we are assessing the City and the CPD's efforts to comply with this paragraph. The City and the CPD met Preliminary compliance because CPD's General Order G02-03, *Vision, Mission Statement, and Core Values,* incorporates this requirement into its guidance.

During this reporting period, we assessed the CPD's efforts to incorporate this paragraph's requirements into policy. We reviewed multiple versions of G02-03. In response to our concerns that the draft G02-03 did not provide enough specificity regarding procedures for regular meetings with at-risk youth groups and youth advisory groups, the CPD revised G02-03 to clarify those procedures. We recognize the CPD's effort and progress in restructuring processes and services for youth who come into contact with the CPD; however, rethinking these processes needs to include mechanisms for ongoing dialogue between CPD, youth, and youth-serving agencies.

We conclude that the CPD and the City met Preliminary compliance with this paragraph. Moving forward, we will assess the CPD's efforts to develop supervisory practices to ensure the G02-03 is implemented as written. We will also assess the CPD's efforts to evaluate the effectiveness of its efforts to facilitate relationships with Chicago youth.

# Community Policing: ¶28

**28.** *CPD will, with the assistance of the Office of Community Po-licing, institute a public awareness campaign to inform the pub-lic, at least once a year, about: (a) CPD policies most relevant to police interactions with the public, including, but not limited to: use of force, body-worn cameras, and Tasers; (b) steps for filing a complaint against CPD or a CPD member; and (c) the public's rights when stopped, arrested, or interrogated by police. CPD's public awareness campaign may include presentations, train-ings, written guides, or web-accessible videos.*

---

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | December 31, 2021* | ✓ **Not Yet Applicable** |

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance because the directive that the CPD asserts incorporates this paragraph's requirements, a standard operating procedure titled *Public Awareness Campaign*, is still in the Consent Decree review process.

In the previous reporting period, the City and the CPD met Preliminary compliance because the CPD ran a public awareness campaign before the end of the reporting period. During this reporting period, we assessed the CPD's efforts to codify the annual campaign process into policy. The CPD must institute another campaign before the end of this year, and the CPD has begun developing the campaign.

Specifically, the CPD's Office of Communications and News Affairs partnered with a graduate-level advertising class at DePaul University to create a campaign that uses a wider range of modalities as suggested by the IMT. Through the partnership, the graduate students developed four possible campaigns that addressed a range of issues, including police use of force, police accountability, and community mem-bers' rights when police stop, question, or arrest a person. The CPD and a repre-sentative of the Civilian Office of Police Accountability reviewed and selected one of the campaigns entitled, "Know Your Rights." The selected campaign will use so-cial media, local media, billboards on local roadways, buildings, and potentially public transportation to inform community members. The graduate students sug-gested that the CPD partner with the Chicago Transit Authority to share campaign topics on bus shelters and trains. These ads would include a Quick Response (QR) code to link readers to the CPD website that will have more in-depth information

on the campaign topics. The selected campaign also calls for the CPD to use bill-boards Citywide, focusing more heavily on the West and Southside zip codes to reach those communities with the most interactions with police. The CPD intends to institute the campaign during the next reporting period, which is consistent with the Consent Decree requirement to complete the campaign at least once a year. We commend the CPD for involving other City departments and organizations, like DePaul University, to create a new campaign and inviting a representative of the Civilian Office of Police Accountability to help select the campaign. However, we want to reiterate the importance of keeping community members involved in this process too. Prioritizing community engagement will help ensure the campaign reflects the values and concerns of the community as well.

The IMT acknowledges that the CPD has taken the steps towards codifying the public awareness campaign into a policy by drafting a directive that addresses objectives, desired outcomes, roles and responsibilities, and procedures. That policy, a standard operating procedure titled *Public Awareness Campaign*, is still in the ¶¶626–41 review and approval process.

The City and the CPD maintained Preliminary compliance with ¶28 but did not meet Secondary compliance. Moving forward, we will continue assessing the CPD's ongoing efforts to finalize the *Public Awareness Campaign* standard operating procedure. We will also monitor its efforts to finalize and execute the second public awareness campaign before the end of the fifth reporting period. Additionally, we will monitor the CPD's ability to supervise members to ensure this requirement continues annually. Ultimately, we will monitor the CPD's efforts to assess its public awareness campaign metrics to determine effectiveness.

# Community Policing: ¶29

*29. Fair, unbiased, and respectful interactions between CPD members and victims of crime provide an opportunity to strengthen community trust and foster public confidence in CPD. CPD will continue to require that CPD members interact with victims of crime with courtesy, dignity, and respect. CPD will continue to require that CPD members inform victims of crime of the availability of victim assistance and resources, including providing written notices of victim's rights, when applicable. CPD will also have such victim assistance information readily available on its public website and at all district stations.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The CPD and the City maintained Preliminary compliance with this paragraph but did not achieve Secondary compliance because we continue to assess the CPD's efforts to implement supervisory practices to ensure each district has adequate support to comply with this paragraph.

In the previous reporting period, the CPD hired three coordinators, received a grant to hire crime victim advocates, and created the Crime Victims Services Coordinating Council. We also reviewed the CPD's Crime Victim Assistance policy, S02-01-03. During this reporting period, the CPD hired additional staff and began developing training to implement the Crime Victim Assistance policy. But we did not receive records reflecting the CPD's efforts to finalize S02-01-03—although the current version of S02-01-03 became effective on December 30, 2020.

In sum, the City and the CPD maintained Preliminary compliance but did not achieve Secondary compliance during this reporting period. Moving forward, the IMT will monitor the CPD's efforts to ensure each district has the resources needed to inform crime victims of available resources, complete the development of the training curriculum, and initiate staff training.

# Community Policing: ¶30

**30.** *CPD will prominently display signs both in rooms of police stations or other CPD locations that hold arrestees or suspects and near telephones which arrestees or suspects have access to. These signs will state: a. that arrestees and suspects have the right to an attorney; b. that if an arrestee cannot afford an attorney, one may be appointed by the court for free; and c. the telephone numbers for the Cook County Public Defender, and any other organization appointed by the Cook County Circuit Court to represent arrestees.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance and met Secondary compliance. While the CPD did not provide evidence during this period of the CPD's efforts to develop oversight practice to ensure compliance with this paragraph's requirements, we did a spot check of eight districts and found that the CPD had prominently displayed the requisite signs.

In the previous reporting period, the City and the CPD met Preliminary compliance because CPD's General Order G06-01, *Processing Persons Under Department Control,* incorporated this paragraph's requirements. We also received reassurances from the CPD that it would take steps to ensure the signs are highly visible at holding facilities.

During this reporting period, between June 18 and June 23, 2021, the IMT made on-site observations of the signage required by ¶30. In all eight Districts (1, 4, 6, 16, 17, 18, 19, and 20), we observed signage in locations that hold arrestees or suspects. The signs clearly stated the information outlined in this paragraph and appeared in multiple languages, including Spanish, English, Polish, and Mandarin. The signs may also serve a dual purpose. Not only can they provide arrestees and suspects with information, but they may also provide officers with a regular reminder of arrestee rights. Officer awareness of arrestee rights aligns with one of our Special Report recommendations that the CPD aims to provide officers with refresher training on arrestee rights and related topics.[46]

---

[46] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree,* INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

In sum, the City and CPD maintained Preliminary and met Secondary compliance with this paragraph. Moving forward, we will monitor the CPD's effort to develop supervisory practices that will ensure G06-01 is implemented as written, ensuring prominence and accuracy of signage. To help demonstrate Full compliance with ¶30, District Commanders could annually review signage in their station and certify in writing compliance with this paragraph—this is just one approach the CPD may consider. The CPD may also want to consider surveying a sampling of arrestees to confirm awareness of signage.

# Community Policing: ¶31

**31.** *CPD will provide arrestees access to a phone and the ability to make a phone call as soon as practicable upon being taken into custody.*

**Compliance Progress**　　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶31 but did not achieve Secondary compliance.

The City and the CPD met Preliminary compliance in the third reporting period by codifying ¶31's requirements into General Order, G06-01-04, *Arrestee and In-Custody Communications*.

To assess Secondary compliance in this reporting period, the IMT monitored the CPD's efforts to implement supervisory practices to ensure the policy is up-to-date and implemented as written. However, the City and the CPD did not provide the IMT with evidence that they put together supervisory practices to ensure consistent implementation of G06-01-04. Specifically, the CPD has not implemented procedures to track the time between when an arrestee is taken into custody and when the arrestee is provided access to a telephone.

The IMT is concerned by the lack of attention given to ensuring proper implementation of General Order G06-01-04, which requires timely telephone access for arrestees. Illinois recently amended state law to guarantee an arrestee the right to a telephone call within three hours after arrival at the first place of custody.[47] This issue continues to be a subject of community concern, debated by City officials and community stakeholders.

The City and the CPD maintained Preliminary compliance with ¶31 but failed to achieve Secondary compliance. Moving forward, the IMT looks forward to reviewing the CPD's efforts to train and provide specific guidance concerning timeframes and processes for allowing arrestees access to telephones. To reach Secondary compliance, the CPD must demonstrate supervisory oversight and devise ways to track the time between when an arrestee is taken into custody and when the arrestee is provided access to a telephone.

---

[47]　725 ILCS 5/103-3 (effective July 1, 2021).

# Community Policing: ¶32

*32. Within 180 days of the Effective Date, CPD will review and revise its current policies relating to youth and children and, within 365 days, will revise its training, as necessary, to ensure that CPD provides officers with guidance on developmentally appropriate responses to, and interactions with, youth and children, consistent with the provisions of this Agreement and as permitted by law.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not achieved Preliminary compliance for ¶32, but we acknowledge the investment of time and resources to develop a comprehensive approach to CPD interactions with youth, including deflection and diversion policy guidance.

In the third reporting period, the CPD developed, updated, and finalized up to 18 general orders, special orders, and directives relating to youth interaction. However, the CPD did not complete its work on the core policy covering CPD Interactions with Youth (G02-05) and thus did not meet Preliminary compliance.

During the fourth reporting period, the IMT continued to assess the CPD's efforts to review and revise its youth-related directives and trainings. We reviewed initial drafts of the Interactions with Youth Policy (G02-05) and the Mayor's office briefing regarding Chicago's youth deflection, diversion, and reform efforts.

The IMT acknowledges the challenge and difficulties in finalizing the core policy covering CPD interactions with youth. The City and the CPD conducted extensive peer agency research, some community engagement to garner input from young residents, their parents, and community stakeholders, and engagement with outside consultants to develop a new model for police interactions with youth. The emerging model will ultimately guide officers in making decisions to determine when to deflect a youth after a police interaction and avoid arrest, when to arrest and refer for services in place of prosecution, and when to move forward without deflection or diversion.

The City and the CPD are making progress in broadening services for referred youth, including greater use of community-based service agencies, a reorganized

Juvenile Intervention and Support Center incorporating a more robust case management system, and stronger management controls in response to issues raised in a 2020 Inspector General audit.

However, the City and the CPD did not meet Preliminary compliance with ¶32. For the next reporting period, the IMT looks forward to reviewing and finalizing the Interactions with Youth Policy (G02-05) and to assessing CPD's efforts to update officer trainings to include the new policy requirements and guidance on this policy.

# Community Policing: ¶33

*33. When interacting with youth and children, CPD will, as appropriate and permitted by law, encourage officers to exercise discretion to use alternatives to arrest and alternatives to referral to juvenile court, including, but not limited to: issuing warnings and providing guidance; referral to community services and resources such as mental health, drug treatment, mentoring, and counseling organizations, educational services, and other agencies; station adjustments; and civil citations*

## Compliance Progress                  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶33. The IMT acknowledges CPD's continued work to reflect the requirements of this paragraph in its Interactions with Youth Policy (G02-05).

In the last reporting period, the IMT provided a Compliance Status for ¶33 but did not conduct a complete assessment due to the COVID-19 pandemic. The CPD began researching best practices in both "deflection," also known as "no entry" (*i.e.*, pre-arrest alternatives) and diversion (*i.e.*, post-arrest alternatives) in the third reporting period. The CPD also engaged the community through focus groups and a survey for their input on youth-related concerns generally as part of its policy review and revision process.

During the fourth reporting period, the IMT assessed the CPD's efforts to determine the best guidance regarding alternatives to arrest options. The IMT reviewed drafts of the Interactions with Youth Policy (G02-05) and the Mayor's Briefing on Chicago's youth deflection, diversion, and reform efforts.

The IMT understands the challenges in implementing the requirements of this paragraph, including potential legal and administrative barriers. This added discretion for patrol officers will require more supervisory monitoring. Also, this policy will require officer training once approved and enacted. The IMT raised a concern about ensuring parents of youth deflected are notified of the contact and are provided access to youth services. The CPD should also track youth contacts in a way to capture deflection and diversions.

The City and the CPD did not achieve Preliminary compliance for this paragraph. Moving forward, the IMT will assess how deflection guidance is incorporated into

the Interactions with Youth Policy (G02-05) and CPD's efforts to begin developing the requisite training needed for implementation.

# Community Policing: ¶34

**34.** *CPD will clarify in policy that juveniles in CPD custody have the right to an attorney visitation, regardless of parent or legal guardian permission, even if the juvenile is not going to be interviewed.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶34 during the fourth reporting period but did not meet Secondary compliance.

In the third reporting period, the CPD met Preliminary compliance because the CPD had already finalized its Special Order S06-04, *Processing of Juveniles and Minors under Department Control*, which clarifies juveniles' right to an attorney visitation.

To assess Secondary compliance, the IMT monitored the CPD's efforts to train members on this specific direction and to create supervisory practices designed to ensure members are implementing the policy as written. During this reporting period, the IMT reviewed S06-04, e-learning modules covering juvenile processing, and signage notifying juveniles of their right to an attorney regardless of parental consent.

The CPD submitted the requisite training materials to the S06-04 policy but did so at the end of the reporting period. This did not allow enough time to review, make possible revisions, and deliver to the field.

Therefore, the CPD did not meet Secondary compliance with ¶34 but maintained Preliminary compliance. Moving forward, the IMT will review the CPD training materials and the delivery of those materials. The IMT suggests that the CPD implement a supervisory monitoring system to ensure that juveniles are aware of their right to an attorney regardless of parental consent and to document this oversight and compliance with ¶34.

# Community Policing: ¶35

**35.** *If a juvenile has been arrested CPD will notify the juvenile's parent or guardian as soon as possible. The notification may either be in person or by telephone and will be documented in any relevant reports, along with the identity of the parent or guardian who was notified. Officers will document in the arrest or incident report attempts to notify a parent or guardian. If a juvenile is subsequently interrogated, CPD policy will comply with state law and require, at a minimum, that: a. Juvenile Miranda Warning will be given to juveniles before any custodial interrogation; b. the public defender's office may represent and have access to a juvenile during a custodial interrogation, regardless of parent or legal guardian permission; c. CPD officers will make reasonable efforts to ensure a parent or legal guardian is present for a custodial interrogation of a juvenile arrestee under 15 years of age in custody for any felony offense; and d. juveniles in custody for felony offenses and misdemeanor sex offenses under Article 11 of the Illinois Criminal Code will have their custodial interrogation electronically recorded.*

## Compliance Progress           (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶35 but did not achieve Secondary compliance.

In the third reporting period, the CPD achieved Preliminary compliance by finalizing its Special Order S06-04, *Processing of Juveniles and Minors under Department Control*, which codifies this paragraph's requirements.

During this reporting period, the IMT assessed the CPD's efforts to finalize and deliver training to CPD members. The CPD did not provide the IMT with any additional documentation regarding this paragraph. Thus, there is insufficient evidence that CPD has finalized and delivered training.

The IMT understands that the CPD is developing training bulletins, e-learning components, and other training materials to support the implementation of these requirements. The *Processing of Juveniles and Minors Under Department Control* policy (S06-04) requires very specific guidance for processing youth that is reinforced by supervisors and is internally assessed for compliance.

The City and the CPD maintained Preliminary compliance but did not meet Secondary compliance with this paragraph in the fourth reporting period. To achieve Secondary compliance, the CPD needs to finalize training materials and deliver training to CPD members. The IMT suggests that the CPD also develop assessment tools to determine ongoing compliance with this policy directive.

# Community Policing: ¶36

*36. When determining whether or not to apply handcuffs or other physical restraints on a juvenile, CPD officers will consider the totality of the circumstances, including, but not limited to, the nature of the incident and the juvenile's age, physical size, actions, and conduct, when known or objectively apparent to a reasonable officer, and whether such restraints are necessary to provide for the safety of the juvenile, the officer, or others.*

---

**Compliance Progress**                  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance but did not meet Secondary compliance for ¶36.

In the third reporting period, the City and the CPD met Preliminary compliance with ¶36 by implementing an updated *Processing of Juveniles and Minors Under Department Control Policy* (S06-04), which codifies this paragraph's requirements.

During the fourth reporting period, the IMT assessed the CPD's efforts to train members on this policy and to create supervisory practices designed to ensure members are implementing the policy as written. During this period, the CPD did not provide the IMT with any records regarding this paragraph. The CPD did not complete the training materials or deliver training to CPD members.

The IMT understands that CPD is nearing completion of training bulletins and e-learning materials covering the requirements of this paragraph. These requirements may also be addressed or referenced in the *Interactions with Youth* policy (G02-05) and the corresponding training.

The City and the CPD did not achieve Secondary compliance for the paragraph because they did not finalize the training materials or deliver training to CPD members. To meet Secondary compliance, the CPD should finalize and deliver the relevant training materials, implement the necessary supervisory mechanisms to ensure compliance, and begin developing assessment processes to document implementation. The IMT looks forward to reviewing the relevant training materials in the next reporting period.

# Community Policing: ¶37

*37. Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the philosophy of community policing into its annual in service training for all officers, including supervisors and command staff, by providing training on the following topics: a. an overview of the philosophy and principles of community policing, consistent with this Agreement; b. methods and strategies for establishing and strengthening community partnerships that enable officers to work with communities to set public safety and crime prevention priorities and to create opportunities for positive interactions with all members of the community, including, but not limited to, youth, people of color, women, LGBTQI individuals, religious minorities, immigrants, individuals with limited English proficiency, homeless individuals, and individuals with disabilities; c. problem-solving tactics and techniques; d. information about adolescent development and techniques for positive interactions with youth; and e. effective communication and interpersonal skills.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD met Preliminary compliance with ¶37 in the fourth reporting period. Our assessment during this monitoring period is the first IMT assessment of this paragraph due to the COVID-19 pandemic.

During the fourth reporting period, the IMT reviewed the Community Oriented Policing (COP) In-service training curriculum and reviewed the court-approved suite of community policing training from the Seattle, New Orleans, and Albuquerque police departments.

The CPD completed work on developing and finalizing the COP training after producing and revising several iterations based on OAG and IMT feedback. The approved training includes elements covering:

- Overview of COP principles, including historical perspectives of police/community relations;
- Importance of forming community partnerships and collaborations;
- The S.A.R.A. model;
- Adolescent development and positive interactions with youth; and
- De-escalation and communication skills.

The training will employ some scenario-based methods and will be evaluated for officer knowledge retention and understanding.

The City and the CPD achieved Preliminary compliance with the requirements of this paragraph. Moving forward, the CPD should finalize the COP in-service training, conduct a rigorous evaluation of its training, implement improvements based on those assessments, and provide significant oversight to ensure officer behavior is reflective of this training.

# Community Policing: ¶38

*38. Through inter-governmental agreements between CPD and Chicago Public Schools ("CPS"), CPD has assigned officers to work in CPS schools. In the event that CPD and CPS decide to continue this practice, officers assigned to work in CPS schools will be appropriately vetted, trained, and guided by clear policy in order to cultivate relationships of mutual respect and understanding, and foster a safe, supportive, and positive learning environment for students.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and CPD achieved Preliminary compliance with this paragraph by engaging in two cycles of inter-governmental agreement (IGA/MOU) negotiations between CPD and CPS, which require CPD officers assigned to CPS schools to be vetted, trained, and guided by clear policy. This represents the IMT's first assessment of this paragraph due to the COVID-19 pandemic.

During the fourth reporting period, the IMT reviewed IGA/MOUs for the past two years and the CPD's CPS Whole School Safety Plan (SRO 01-02). In previous reporting periods, the CPD, in conjunction with CPS, re-engineered the selections ad vetting process for SROs. The selection is no longer arbitrary but consultative and extends beyond the District Commander. This CPD and CPS hoped to fully implement the new vetting process before this coming school year. Officers interested still submit forms that include background with youth experience and a statement of interest in working with youth. Before selection, the candidates may now be interviewed by principals who share any thoughts or concerns. The vetting is now more competitive and requires a higher disciplinary threshold for the assignment. The CPD will again rely on the National Association of School Resource Officers (NASRO) coupled with a CPS supplement to train new SROs and conduct the SRO refresher in-service training.

The City and the CPD met Preliminary compliance by revising the School Resource Policy (S04-01-02) and by negotiating IGA/MOUs that require officers to be vetted, trained, and guided by clear policy. Because this year represents the first opportunity for the CPD to implement policy changes and new requirements, the IMT suggests that the CPD carefully document the selection and vetting process.

# Community Policing: ¶¶39–40

**39.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop and implement screening criteria to ensure that all officers assigned to work in CPS schools have the qualifications, skills, and abilities necessary to work safely and effectively with students, parents and guardians, and school personnel. Only CPD officers who satisfy the screening criteria will be assigned to work in CPS schools.*

**40.** *Before the 2019-2020 school year begins, in consultation with CPS and considering input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders, CPD will develop a policy that clearly defines the role of officers assigned to work in CPS schools. This policy will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year. The policy will reflect best practices and will include, but not be limited to: a. the duties, responsibilities, and appropriate actions of officers assigned to work in CPS schools and school personnel, including an express prohibition on the administration of school discipline by CPD officers; b. selection criteria for officers assigned to work in CPS schools; c. the requirement that officers assigned to work in CPS school receive initial and refresher training; and d. the collection, analysis, and use of data regarding CPD activities in CPS schools.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶¶39–40 despite not providing a finalized version of the CPD's School Resource Officer and Investigations Policy (S04-01-02). The City and the CPD did not meet Secondary compliance.

In the previous reporting period, the City and the CPD met Preliminary compliance by codifying ¶¶39–40's requirements into the CPD's Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools (CPS)*,

but outstanding IMT and OAG comments were not addressed. The CPD agreed to address the additional comments.

During the fourth reporting period, the IMT continued to assess the CPD's efforts to develop and implement (1) screening criteria for SROs (¶39) and (2) a policy that clearly defines the role of SROs (¶40). This assessment included a review of whether the CPD consulted with community stakeholders and considered their input.

The IMT reviewed revisions of the draft SRO policy (S04-01-02), the CPD/CPS intergovernmental agreements, CPS annual reports, and CPS "Whole School Safety Plan." Additionally, the IMT observed SRO community focus groups. The CPD has developed an SRO in-service refresher training that captures most policy revisions and other considerations. However, the CPD did not provide the IMT evidence that SRO trainings and the National Association of School Resource Officers (NASRO) trainings for new officers were implemented during this reporting period. According to the CPD, however, it plans to provide SROs with part of the refresher training (8 hours) before the start of the 2021-2022 school year, completing the second part of the training (8 hours) later in the school year.

The draft SRO policy (S04-01-02) represents vast improvements over previous iterations. This policy will be subject to possibly frequent change given the annual requirement for review by the IMT and the changing community sentiments. The current version now includes:

- New selection process
- Updated selection criteria
- Additional training requirements
- Updated roles and responsibilities
- Streamed line complaint policy

Early on, the CPD sought community input on the SRO policy and program, including conducting a series of focus groups and establishing an SRO working group. After receiving community complaints about the working group's participation process, the CPD hosted a new series of SRO focus groups comprised of 19 community members, CPD personnel, and CPD staff. This outreach effort produced another set of recommendations, most of which emphasized non-enforcement roles. Public interest in the SRO program was evident last year when the CPD received 20,000 comments on the draft SRO policy posted to its website. A majority of the comments called for the elimination of the program in its entirety. Local School Councils, however, voted to keep SROs with 55 votes for SROs and 17 votes against SROs.

During this reporting period, CPS advanced the concept of the "Whole School Safety Plan" with the support of the CPD. This Plan allows for each school to consider the reduction or elimination of the SRO program. At the start of the school year, the CPD raised issues with having only one SRO in a school.[48] It is our understanding that the City and the CPD were able to resolve this issue. We hope that this experience will better inform future procedures and discussions between the CPD, the Chicago Public Schools, and Chicago's communities.

The City and the CPD maintained Preliminary compliance with ¶¶39–40 but did not meet Secondary compliance. To achieve Secondary compliance, the CPD should complete the trainings for returning and newly appointed SROs. *See* ¶42. The IMT recommends that these trainings will take place during the next reporting period. The IMT recognizes the dynamic aspects in determining SRO roles in schools given the community interest in examining school safety options. As community stakeholders, parents, and school officials revisit school safety approaches, policies and their corresponding trainings may also change. The IMT looks forward to assessing how the CPD consults with school officials.

---

[48] *See, e.g., Some CPS schools could start year with 2 officers despite votes to reduce police presence; decision on CPD contract delay*, CHICAGO TRIBUNE (August 24, 2021), https://www.chicagotribune.com/news/breaking/ct-chicago-public-schools-school-resource-officer-program-20210824-a2e35yopababthtwdpzn73ygbu-story.html; *Some cops to stay in schools that voted them out until CPS finalize contract with police department*, CHICAGO SUN TIMES (August 23, 2021), https://chicago.suntimes.com/education/2021/8/23/22638459/cpd-cps-police-public-schools-cops-jadine-chou.

## Community Policing: ¶41

**41.** *CPD will, within 60 days of the completion of the 2019-2020 school year, and on an annual basis thereafter, review and, to the extent necessary, revise its policies and practices regarding officers assigned to work in CPS schools to ensure they are responsive to the needs of the Department, CPS, and its students. This evaluation will include input from CPD members, including officers assigned to work in CPS schools, school personnel, families, students, and community stakeholders. Any revisions to CPD's policies and procedures regarding officers assigned to schools will be submitted to the Monitor and OAG in accordance with the requirements of Part C of the Implementation, Enforcement, and Monitoring section of this Agreement.*

**Compliance Progress**     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | October 19, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from August 17, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD maintained Preliminary compliance with ¶41 but have not yet achieved Secondary compliance.

In the third reporting period, the City and the CPD achieved Preliminary compliance by putting a substantial amount of work into the review and revision process for Special Order S04-01-02, *School Resource Officers (SROs) and Investigations at Chicago Public Schools (CPS)*.

During the fourth reporting period, the IMT reviewed the SRO policy (S04-01-02), CPS's "Whole School Security Safety Plan," and IGA/MOUs between CPS and the CPD. Additionally, the IMT observed SRO focus groups.

The current iteration of the SRO policy reflects substantial change, and the CPD continues to make revisions addressing IMT and OAG concerns regarding data collection and program evaluations. The IMT understands the changing nature of the considerations shaping this policy and anticipates additional changes in the coming reporting periods. The CPD should finalize its revisions but should also be prepared to make additional changes based on ongoing community stakeholder and community member input. Schools are being called upon to "reimagine" school safety, which could lead to different roles, responsibilities, and processes in providing safety in schools. Future roles of the SROs will likely evolve based on the whole school safety planning approach.

The City and the CPD maintained Preliminary compliance with ¶41 in the fourth reporting period. To meet Secondary compliance, the CPD should finalize this iteration of the SRO policy and implement trainings that align with any additional policy changes. *See* ¶42. The CPD should also work closely with CPS to anticipate potential changes to the policy as schools consider the different and more customized school safety options.

# Community Policing: ¶42

**42.** *CPD officers assigned to work in CPS schools will receive specialized initial and annual refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to: a. school-based legal topics; b. cultural competency; c. problem-solving; d. the use of de-escalation techniques, use of restorative approaches, and available community resources and alternative response options; e. youth development; f. crisis intervention; g. disability and special education issues; and h. methods and strategies that create positive interactions with specific student groups such as those with limited English proficiency, who are LGBTQI, or are experiencing homelessness.*

*The training will be developed and delivered in accordance with the requirements of the Training section of this Agreement.*

---

**Compliance Progress**    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**    December 31, 2022    ☑ Not Yet Applicable

**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not Yet Assessed*
**Full:**    *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance with ¶42 but have demonstrated significant progress in nearly completing the review of the draft curriculum and scheduling training before the 2021-2022 school year. Due to the COVID-19 pandemic, this represents the first IMT assessment for this paragraph.

During the fourth reporting period, the IMT reviewed drafts of SRO in-service training curricula, community input on SRO training, the 40-hour National Association of School Resource Officers (NASRO) training, the CPS supplemental training curricula, and the draft SRO policy (S04-01-02).

The CPD invested significant time and effort to develop drafts of this curriculum, which incorporates best practices, elements of the industry-standard NASRO training, community input, and requirements of ¶42. Community perspectives primarily focused on having more meaningful non-enforcement contacts, accountability, and de-escalation, and mediation training. The NASRO training serves as the basis for much of the refresher training, which stresses the triad model where SROs provide counseling/mentorship, instruction on "street law" and safety tips, and school-safety functions when required. The refresher training also covers CPS components and the specific requirements from the IGA/MOU for SROs between the

CPD and CPS, including restorative justice. The CPD plans to provide SROs with part of the refresher training (eight hours) before the start of the 2021–2022 school year, completing the second part of the training (eight hours) later in the school year.

Although the City and the CPD did not meet Preliminary compliance with ¶42, they made substantial progress toward finalizing the SRO refresher training. The IMT anticipates that the CPD will soon finalize the SRO refresher training curriculum and will deliver that training to SRO officers, in part, before and during this school year. Moving forward, the IMT suggests that the CPD establish a process to ensure annualized updates of this training based on evaluative materials and ongoing community stakeholder input.

# Community Policing: ¶43

*43. The curricula, lesson plans, and course material used in initial training provided before the 2019-2020 school year will be reviewed by the Monitor by the end of 2019. Any suggested revisions by the Monitor that are adopted by CPD will be implemented by CPD before the 2020-2021 school year.*

## Compliance Progress             (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**        *Not in Compliance*
**Full:**             *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶43 but did not achieve Secondary compliance because they did not finalize the SRO refresher training curriculum.

During the third reporting period, the IMT assessed the CPD's efforts to complete the Consent Decree training review process for the initial SRO training in time to implement the updated training before the 2020-2021 school year. The CPD, however, did not provide the updated version before the end of the third reporting period.

In the fourth reporting period, the IMT reviewed the last iteration of the SRO training and the 40-hour National Association of School Resource Officers (NASRO) training, from which much of the SRO training is drawn from. The IMT also observed community focus groups regarding SROs.

The IMT provided the CPD with feedback on the revised curriculum materials, but the CPD was unable to finalize the curriculum during this reporting period. Therefore, the City and the CPD maintained Preliminary compliance with ¶43 but did not meet Secondary compliance. The IMT acknowledges the CPD's efforts to finalize this training curriculum.

The CPD draft materials aligned with concepts from the 40-hour NASRO training, community considerations, and previous IMT concerns. The IMT looks forward to reviewing a finalized version of this training and anticipates that the training will be delivered in the next reporting period. The IMT suggests that the CPD establishes an annualized process for the review and update of this curriculum.

# Community Policing: ¶44

*44. Before the 2019-2020 school year begins, CPD will undertake best efforts to enter into a memorandum of understanding with CPS, to clearly delineate authority and specify procedures for CPD officer interactions with students while on school grounds, consistent with the law, best practices, and this Agreement.*

---

## Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

The City and the CPD maintained Preliminary and Secondary compliance with ¶44 during the fourth reporting period. The IMT will continue assessing Full compliance with this paragraph in the next reporting period.

In previous reporting periods, the CPD and CPS developed IGA/MOUs for the SRO program. The most recent IGA/MOU was finalized but not executed by the end of the last reporting period and is expected to apply for the upcoming 2021-2022 school year. The most recent IGA/MOU reflects the extensive changes in policy and community input. Highlights include:

- Updated selection processes;
- SRO prohibition against using Criminal Justice Enterprise system used to enter student names into a gang database;
- Updated and more streamlined procedures to handle complaints against SROs involving a centralized intake and a specially assigned unit at the Civilian Office of Police Accountability; and
- Expanded non-Enforcement roles for SROs.

During the fourth reporting period, the IMT reviewed current and past IGA/MOU agreements, the draft SRO policy (S04-01-02), and community input on SRO roles and responsibilities. To determine Secondary compliance, the IMT assessed the CPD's efforts to delineate authority and procedures for SRO interactions with students.

The IMT concludes that the City and the CPD maintained Preliminary and Secondary compliance with ¶44. The CPD and CPS have produced IGA/MOUs for two consecutive years that reflect current policy and other considerations. The most recent iteration greatly reflects community stakeholder input and concerns. The IMT understands the dynamic nature of the SRO programs and anticipates further changes that may require updates to the IGA/MOU.

In the next reporting period, the IMT will assess for Full compliance, which can be achieved by the CPD and CPS demonstrating a consistent and annualized effort to update the agreement to reflect changing community sentiments, feedback on program performance, and other considerations.

## Community Policing: ¶45

*45. By January 1, 2020, and annually thereafter, District Commanders will review their district's policing strategies, with input from the District Advisory Committees and the Office of Community Policing, to ensure the strategies are consistent with the principles of community policing. This review will include, but not be limited to: a. reviewing available district resources and personnel assignments; b. identifying methods to support their district's ability to effectively problem-solve, including collaborating with City departments, services, and sister agencies; and c. identifying district-level CPD members, as needed, to assist members of the community with access to police and City services, including community members who have experienced previous challenges, such as LGBTQI individuals, religious minorities, immigrants, individuals with disabilities, individuals in crisis, homeless individuals, and survivors of sexual assault and domestic violence.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          March 6, 2021*          ☐ **Met**  ☑ **Missed**
                       *Extended from January 1, 2021, due to COVID-19
**Preliminary:**       *In Compliance* (NEW)
**Secondary:**         *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

The City and the CPD met Preliminary compliance with ¶45 in the fourth reporting period. Although the CPD did not meet the March 6, 2021, deadline, the Department did engage in its district strategies review process before the end of the reporting period.

During the previous reporting period, the CPD implemented Special Order, S02-03-02, *District Strategic Plans*, and developed a new directive addressing the District Strategic Plans review process, *Office of Community Policing (OCP) District Strategic Plans* standard operating procedure. However, the CPD did not meet Preliminary compliance in the third reporting period because those directives only covered District Strategic Plans and were thus too limited to account for ¶45.

To determine Preliminary compliance, the IMT assessed the CPD's efforts to include this paragraph's requirements into policy. During the fourth reporting period, the IMT reviewed the *District Strategic Plans* policy (S02-03-02), the *Community Policing Office* policy (S02-03), and Strategic Planning Quarterly reports. The IMT has concerns about the CPD's failure to timely provide documentation of

these processes, which makes it challenging to include a full review of these processes as part of the IMT assessments. We strongly encourage the CPD to make more timely submissions in future reporting periods.

Nonetheless, the 2021 Plans are much richer in detail and reflect greater customization by district, which is a marked improvement over the prior year's Plans. The CPD expanded the district development forms significantly to address early concerns about the lack of attention given to staffing resourcing considerations.

The IMT still has some concerns regarding the strategy development and the review process. In the posted strategies for public review, the IMT believes that there is little connection between the recommended actions, actions taken, and status from one report to another. The lack of information limits residents' ability to form judgments about CPD's progress in addressing crime priorities, engagement goals, lessons learned, and persistent safety-related issues.

The strategy review process remains problematic because the community input underrepresents the populations experiencing the most police contact as reported by the CPD in the prior reporting period. The current format only allows for limited analysis and understanding of the community safety issues facing a given community. The CPD should consider an engagement model successfully used by CPS to formulate school safety plans employing community-based organizations to manage the engagement process, which includes listening sessions, deliberative discussions, resulting in community recommendations.

As noted in the previous reporting period, a CPD audit revealed serious issues with the operations of the District Advisory Committee (or DAC) program. Many District Advisory Committees did not meet membership requirements, and the composition of District Advisory Committees generally failed to reflect the communities they represent. District Advisory Committees are an important element in the strategy review process, and the fact that many are dysfunctional invalidate their review role. The CPD began making efforts to address these issues, but significant work remains.

The City and the CPD are in Preliminary compliance with ¶45 as a result of finalizing policies regarding the requirements of this paragraph. The Office of Community Policing policy (S02-03) was finalized and provides language requiring officers to be assigned in each District to assist members of community groups who experience challenges in their contacts with the CPD. Additionally, the District Strategic Planning policy (S02-03) was finalized during the last reporting period and covers the strategic planning process. Together these policies provide the necessary framework for this paragraph.

Moving forward, the IMT recommends that the CPD continue to refine its strategy development process to demonstrate a greater connection between plans from

year to year and revamp its community engagement processes. The CPD should consider approaches employed by CPS in soliciting community input by involving community-based organizations for school safety planning. Lastly, the IMT suggests that the CPD complete their reorganization of the District Advisory Committee program to include greater consultation with community stakeholders.

## Community Policing: ¶46

*46. Within 180 days of the Effective Date, and as appropriate thereafter, CPD will solicit, consider, and respond to input, feedback, and recommendations from the community in each district about its policing efforts and strategies. Such practices may include, but are not limited to, direct surveys, community meetings, beat community meetings, and engagement through social media. CPD will identify strategies for soliciting input from individuals that reflect a broad cross-section of the community each district serves.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶46 but did not achieve Secondary compliance in the fourth reporting period.

In the second reporting period, the CPD reached Preliminary compliance because they took significant efforts to engage the community in each district around the CPD's policing efforts and strategies. The CPD's approach was multifaceted, soliciting feedback from community members in each district through "Community Conversations," community surveys on CPD policies, policy revision working groups, and ongoing Beat meetings. Preliminary compliance was maintained in the third reporting period, but Secondary compliance was not achieved because the CPD has not developed methods to effectively engage a broader and more representative group of community members.

During this reporting period, the IMT assessed the CPD's efforts to improve and address the concerns that we raised regarding the insufficient targeted outreach, community meeting design, and use of working groups.

The IMT reviewed the 2020 4th Quarter Performance Report, the 2021 1st Quarter Performance Report, and the corresponding Office of Community Policing feedback. Additionally, the IMT reviewed 2021 Bureau and District-wide strategies and interviewed four district commanders and an area commander.

The CPD's engagement efforts in the previous reporting period included community input for 2021 strategies. The CPD conducted 44 "Community Conversations," 25 working groups, and 19 focus groups covering a range of topics, including the SRO and Use of Force policies and trainings. These meetings were held virtually due to the COVID-19 pandemic. The planning cycle calls for a community meeting

to be held in the prior year, which results in no CPD Community Conversations in this reporting period.

The CPD continued to hold virtual Beat meetings and District Advisory Committee meetings during this reporting period, but these meetings did not occur routinely.

The IMT commends the CPD's efforts to find the most effective and efficient ways to capture community input on strategy development, CPD policies and training, and ongoing CPD practices. Current engagement tools include the following:

- Elucd: A social media web-based survey system that uses non-traditional sampling techniques to gauge community perceptions of trust and safety;

- Community Conversations: Community meetings opened to all District residents to come together to discuss trust-building crime reduction priorities and ways to address them;

- Working Groups: Select group community members supported by CPD staff to work through policy and other significant issues throughout a series of meetings, resulting in a set of recommendations.

- Focus Groups: Select group of community members supported by CPD staff holding sessions on more specific aspects of CPD policy, training, and operations issues;

- Listening Sessions: Where residents are encouraged to share experiences about their interactions with CPD members and views on CPD policies, strategies, tactics, and trainings;

- Deliberative Discussions: Where the CPD meets with select community stakeholders to learn their perspective and respond to these stakeholders; and

- Ongoing but increasingly expanding uses of social media platforms.

During the fourth reporting period, the CPD continued to evaluate their community engagement approaches, including strategy development and broadening participation to generate more informed input. The CPD provided more documentation on the strategy review process and notes from select District Advisory Committee meetings. However, the strategic development and review process remains incomplete without fully operational DACs that review and provide input to the District-wide strategies. The CPD did provide evidence that they are addressing issues about District Advisory Committee operations, including re-working bylaws,

and developing District Advisory Committee member recruiting strategies that will populate these committees with members more representative of the communities they serve. In addition to these efforts, we encourage the CPD to consider additional methods of community engagement, like developing a recent police interactions survey for civilians to provide input regarding their recent experience with officers.

In sum, the City and the CPD maintained Preliminary compliance with this paragraph. However, they did not achieve Secondary compliance due to incomplete review processes and a lack of sufficient input from marginalized groups in the development process. Moving forward, the IMT recommends that the CPD fully staffs District Advisory Committees with representative membership operating under finalized by-laws. Further refinements to the strategy development process may improve community conversations, but we encourage the CPD to consider using other available engagement tools, such as social media and recent police interactions surveys.[49]

---

[49] After the fourth reporting period, the City and the CPD presented information regarding their partnership with an independent vendor to develop a pilot program for police-contact surveys. This survey could prove instrumental to various Consent Decree requirements and CPD operations. We are greatly encouraged by that presentation and look forward to reviewing and reporting on its continued development and implementation. .

# Community Policing: ¶47

***47.*** *Within 180 days of the Effective Date, CPD will develop pro-cedures to annually evaluate the effectiveness of the Depart-ment's efforts and strategies for building community partner-ships and using problem-solving techniques aimed at reducing crime and improving quality of life. CPD will determine any nec-essary adjustments based on its annual evaluation.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | December 31, 2021 | ✓ **Not Yet Applicable** |

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶47 in the fourth reporting period but did not achieve Secondary compliance.

During the last reporting period, the City and the CPD met Preliminary compliance with ¶47 by finalizing their Office of Community Policing performance manage-ment standard operating procedure and their monthly reporting district commu-nity policing data. The CPD initiated the Community Engagement Management System (also known as CEMS) to track positive interactions, community activities, and Elucd.[50] The data gathered for each District serves as the basis for a monthly discussion, focusing on two districts. The data helps the CPD better understand the trends in community policing, disseminate community policing best practices, and identify additional opportunities for the Office of Community Policing to bet-ter support the District's community policing efforts.

In the fourth reporting period, the IMT reviewed the Community Engagement Management System meeting notes that the CPD produced. The CPD did not use data variations to inform any needed adjustments in resource allocations, policing strategies, and tactics. Further, as noted in prior reports, the Community Engage-ment Management System alone does not adequately capture partnership activity and development.

A review of the meeting notes revealed variation in the level of detail provided from meeting to meeting. CPD participation often only included officers at the ser-

---

[50] Elucd is a web-based survey approach that gauges public sentiments regarding trust and com-munity safety. *See* ELUCD, https://elucd.com/.

geant level. At times, the meeting notes lacked a series of action steps to be recommended to District commands as a result of the data review. The reviews do not cover partnership activities and development as required by ¶47.

The IMT is also concerned about the sole reliance on Elucd to measure community sentiments regarding perceptions of trust and community safety. These are core measures that drive much discussion in the monthly meetings. The web-based methodology may not capture true community sentiments and may need to be supplemented with other methodologies, including more traditional kinds of surveys and focus groups that may better pinpoint the sources of change in sentiments and perceptions. Specifically, we encourage the CPD to consider administering surveys to civilians who have had recent contact with the police to gather their input with respect to the interaction.

The IMT concludes that the City and CPD, while maintaining Preliminary compliance with this paragraph, did not achieve Secondary compliance. The CPD did not demonstrate the tracking and evaluation of existing and developing partnerships and did not demonstrate the linking of performance data to informed changes in policing strategies and tactics, including any changes in resource allocations. Moving forward, IMT suggests that the CPD includes partnership-related activity and development in their monthly reporting. Also, the CPD should use clearer evidence that the data reported is used to inform the CPD in decisions to adjust strategies, tactics, and resource allocations. Furthermore, the CPD should consider other evaluation tools that may help them determine the effectiveness of their strategies and techniques, like recent contact surveys.[51]

---

[51] After the fourth reporting period, the City and the CPD presented information regarding their partnership with an independent vendor to develop a pilot program for police-contact surveys. This survey could prove instrumental to various Consent Decree requirements and CPD operations. We are greatly encouraged by that presentation and look forward to reviewing and reporting on its continued development and implementation.

# Community Policing: ¶48

*48. CPD will create opportunities to highlight, reward, and encourage officer, supervisory, and district performance on furthering community partnerships, engaging in problem-solving techniques, effective use of de-escalation, exemplary and effective supervision, and implementing community-oriented crime prevention strategies.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance with ¶48 in the fourth reporting period. This reporting period is the first time that IMT is assessing the City and CPD's efforts to comply with this paragraph.

To assess Preliminary compliance, the IMT reviewed drafts and final versions of the *Community Mission, Vision* policy (G02-03) and the *Community Policing Office* policy (S02-03), including this paragraph's requirements.

The IMT is encouraged by the codification of ¶48's requirements but is seeking further evidence of how these requirements can be consistently and effectively implemented. There should be enough incentives and positive reinforcement of exemplary community policing officer behavior to help transform into a community policing department and the re-engineering of CPD culture.

The IMT concludes that the City and the CPD met Preliminary compliance with this paragraph. Moving forward, the IMT recommends that the CPD include more detailed guidance on identifying officer behavior, actions deserving of rewards, and the nature of those rewards. We also suggest that the CPD evaluate after one year of having a reward matrix in place to assess the impact of this awards-based policing.

# II. Impartial Policing

This is the Impartial Policing section of the Independent Monitoring Team's (IMT's) fourth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Impartial Policing compliance efforts from January 1, 2021, through June 30, 2021.

## Guiding Principles

The IMT assessed compliance with applicable Impartial Policing paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **49.** The Parties agree that policing fairly, with courtesy and dignity, and without bias is central to promoting broad community engagement, fostering public confidence in CPD, and building partnerships between law enforcement and members of the Chicago community that support the effective delivery of police services.

> **50.** In conducting its activities, CPD will provide police services to all members of the public without bias and will treat all persons with the courtesy and dignity which is inherently due every person as a human being without reference to stereotype based on race, color, ethnicity, religion, homeless status, national origin, immigration status, gender identity or expression, sexual orientation, socio-economic class, age, disability, incarceration status, or criminal history.

> **51.** CPD will ensure its members have clear policy, training, and supervisory direction in order to provide police services in a manner that promotes community trust of its policing efforts and ensures equal protection of the law to all individuals.

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are complying. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

In the fourth reporting period, the City and the CPD made progress in the Impartial Policing section of the Consent Decree but still struggled to overcome challenges related to community engagement and data analysis. The CPD's coordinators who focus on language access and interactions with people with disabilities continue to impress us. They have done extensive strategic planning and have had significant and positive influence on relevant policies and practices. The CPD continues to develop hate crimes reports that are formatted well and easily digestible (although the reports do not include sufficient data on the disposition of hate crime investigations). The CPD also made progress in developing a hate crimes policy and finalized its policy regarding interactions with transgender, intersex, and gender-nonconforming individuals.

Many challenges remain as the City and the CPD make efforts to comply with Impartial Policing requirements. One challenge is the staffing levels needed to achieve compliance with these requirements. Many of these requirements are best achieved by staff members who have strong data analytic and research skills, but it appears that the CPD has struggled to obtain and maintain sufficient personnel dedicated to data collection, management, and analysis. Furthermore, how the City and the CPD capture, manage, and evaluate data remains a hurdle they must surpass to ensure their compliance efforts result in the sort of meaningful reform contemplated in the Consent Decree and needed throughout the City. Finally, the CPD's efforts to integrate impartial policing concepts into its training remain a work in progress. We continue to stress the importance of providing officers with an opportunity to practice the interpersonal skills central to effective impartial policing.

The CPD's community engagement is still a work in progress. In this reporting period, we continued to stress the importance of follow-up and analysis of community feedback. Considering how much time and effort community members offer to provide input and feedback on how CPD can improve its practices, the CPD should follow up after receiving the feedback to analyze how the CPD used such input to inform policy and training revisions.

As we discussed in the last report, we continue to recommend that the CPD develop additional public dashboards that break down critical police decisions, including the demographic characteristics of community members. Officers make many decisions that can be subject to bias and can result in disparities in enforcement or service delivery. The CPD must be equipped to monitor these decisions as part of the reform process. This effort should include prioritizing the misdemeanor arrests and administrative notices of violations assessment.

In addition to maintaining existing records, we encourage the City and the CPD to measure what matters to the public—including the desire to be treated in a procedurally just manner. For these reasons, we continue to recommend that the City conduct contact surveys for community members that will allow the City to rigorously evaluate whether the City is achieving the outcomes required by the Consent Decree during the thousands of police-community interactions that occur each month.[52]

In this fourth reporting period, we assessed the City's compliance with 30 of the Consent Decree's Impartial Policing paragraphs (¶¶52–58, 60–82)—with two paragraphs containing conditional requirements that did not apply (¶81–82).[53] The City maintained Preliminary compliance for six paragraphs (¶¶52, 57, 65–66, and 70–71), moved into Preliminary compliance for three paragraphs (¶¶61, 73, and 76), and maintained Secondary compliance for one paragraph (¶67). The City failed to reach Preliminary compliance for 18 paragraphs assessed (¶¶53–56, 58, 60, 62–64, 68–69, 72, 74–75, and 77–80). *See* Impartial Policing Figure 1 below.

**Impartial Policing Figure 1: Compliance Progress for Impartial Policing Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)**



The City had four deadlines in the fourth reporting period. The City met one deadline (¶73) and missed the other two deadlines (¶¶75 and 79). For the missed deadlines, the City also did not achieve the underlying deadline requirements by the end of the reporting period. *See* Impartial Policing Figure 2 below.

**Impartial Policing Figure 2:** **Total Impartial Policing Deadlines in the Fourth Reporting Period: 3**



---

52  After the fourth reporting period, the City and the CPD presented information regarding their partnership with an independent vendor to develop a pilot program for police-contact surveys. This survey could prove instrumental to various Consent Decree requirements and CPD operations. We are greatly encouraged by that presentation and look forward to reviewing and reporting on its continued development and implementation.

53  Specifically, because ¶¶79–82 are interrelated, we assessed their compliance together. Paragraph 82, however, does not contain a substantive requirement for the City. Likewise, ¶81 contains conditional requirements that may never apply and, at the time of this report, do not apply.

## Impartial Policing: ¶52

**52.** *In developing or revising policies and training referenced in this section, CPD will seek input from members of the community and community-based organizations with relevant knowledge and experience through community engagement efforts.*

**Compliance Progress**        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have maintained Preliminary compliance for ¶52. The City and the CPD failed to meet Secondary compliance as they did not provide any records reflecting their efforts to refine their community engagement processes to ensure the CPD is meaningfully considering community input. We continue to emphasize the importance of community engagement in policy development and training and the need for the City and the CPD to create mechanisms for continued engagement with constitutionally protected classes and their advocates. In prior reports, we have acknowledged the CPD's effort to engage certain segments of the community, but we have also underscored the limitations of these efforts and the need to engage a cross-section of community members and organizations with relevant knowledge and experience.

During this reporting period, we assessed the CPD's efforts to involve qualified CPD personnel in planning and executing community engagement tasks. We also assessed the CPD's efforts to engage community members and organizations with relevant knowledge and experience regarding impartial policing.

In terms of personnel, we previously noted that the offices responsible for community engagement–the Office of Community Policing and the Office of Reform Management–have experienced considerable turnover, which slowed community engagement implementation. The CPD has made some progress in staffing these Offices' management teams with individuals sufficiently qualified to refine and address the CPD's community engagement needs. However, we recognize that the various Consent Decree community engagement requirements, which vary in scope and staffing levels, continue to pose logistical hurdles to the CPD's abilities to effectively and meaningfully engage the community in the type of community engagement specific to this paragraph. We encourage the CPD to strengthen these Offices and support their managers by (i) giving the Offices the latitude and authority to engage at all levels and (ii) staffing these Offices with enough personnel to stabilize and institutionalize the various elements of community engagement as required by the Consent Decree. The CPD has made some effort to strengthen

community engagement efforts, approving the Office of Community Policing's request to hire four individuals to work on community engagement.

Another personnel issue that we hope the CPD will address may help foster community trust. We recommend additional engagement by high-ranking members of the CPD in sensitive areas where CPD has struggled to build trust with community advocates (For example, see ¶62 on gender-based violence).

To assess community engagement, the IMT continues to examine several dimensions: (1) outreach; (2) meetings, interactions, and problem-solving; (3) follow-up and sustainability of partnerships, community policing, and problem-solving activities; and (4) general police-community interactions regardless of context. During this reporting period, the CPD's community engagement on Impartial Policing topics was limited because the CPD focused its attention on other important areas, like foot pursuits. For a more detailed discussion of the CPD's efforts to establish these methods, please refer to our third monitoring report. We also discuss the CPD's community engagement efforts related to the specific policy and training requirements of this Section in our current assessment of paragraphs where ¶52 would apply.

## 1. Outreach

While CPD did considerable outreach in the last reporting period, they did not provide us with any records to document outreach during this reporting period. To a large extent, this period was spent reviewing prior outreach efforts. Some informal dialogue occurred with specific groups, which we discuss later in this report under relevant paragraphs.

## 2. Meetings, Interactions, and Problem Solving

In this reporting period, CPD has held meetings with Access Living to review the disability policy (¶68). Efforts to engage the gender-based violence community advocates have stalled (*see* ¶62 for details). And while the CPD has effectively sought input on gender identity via the Transgender Intersex Gender-Nonconforming (TIGN) working group, the CPD will need to directly address police responses to gender-based violence and relevant policy issues.

In terms of problem-solving, in our last report, we noted that the CPD or its vendor had failed to analyze the qualitative data to identify key themes and analyze the quantitative data showing percentages in each topic area. During this reporting period, CPD identified community feedback themes for particular topics, as discussed in this report, but other areas need additional work. Finally, we continue to encourage CPD to bring in community leaders, advocates, and subject-matter experts to have a dialogue about these issues.

We continue to encourage the CPD to create working groups that can oversee progress on specific topics or multiple topics in the Impartial Policing section. Although the CPD's efforts to engage working groups have varied in terms of success and sustainability, we believe that model stands the best chance of ensuring the CPD engages in the type of community engagement contemplated in this paragraph. Sending policy and training materials to specific organizations for review and comment is another viable model of engagement if it is appropriately handled and includes appropriate follow-up. However, this approach must be applied properly (*see* ¶62 for an example).

Whether the CPD uses working groups or some other engagement model, we continue to encourage the CPD to pursue ¶52 community engagement in a more organized effort to ensure the CPD can meaningfully consider input from subject-matter experts and advocates.

### 3. Follow-up and Sustainability

The IMT continues to assess whether the CPD's community engagement includes sufficient follow-up and efforts to sustain meaningful partnerships and problem-solving activities with community members. The CPD has started this process by analyzing data received from surveys and focus groups. However, as we noted previously, the CPD often provides us with large quantities of qualitative and quantitative data, without any effort to make sense of it. Identifying the emergent themes helps make sense of some of that data, but simply identifying the theme is not sufficient follow-up.

In responding to our feedback on various Impartial Policing policies and training, the CPD will provide a record summarizing emergent themes from focus groups sessions. We encourage the CPD to build upon that process by analyzing and interpreting how the themes will affect policy and training development. Providing the community with that analysis will likely help build transparency and trust.

One way the CPD can follow up with community members who participate in the type of community engagement required by this paragraph is to prepare a series of brief public reports that describe emerging themes from different topics and how the CPD plans to address each one. The report should specify where in policy (*i.e.,* policy title, number, and pinpoint the change) or training the CPD addressed or plans to address the theme. The CPD could share the report with the participants before making them public as part of the CPD's "share-back" process.

Regarding sustainability, we continue to monitor the CPD's ability to form meaningful partnerships with stakeholders around the topics identified by the CPD and the Consent Decree. This will require the CPD to refine and institutionalize its community engagement framework. For certain topics, this will likely require working

groups, and for other topics, CPD may pursue other mechanisms of community engagement.

## 4. General Police-Community Interactions

Paragraph 52 requires that CPD "…seek input from members of the community and community organizations with relevant knowledge and experience..." On a typical day, CPD officers respond to roughly 8,000 calls for service from Chicago residents and engage in numerous proactive engagements with other residents. Each of these individuals who have interacted with a CPD officer has "relevant experience." Using a banking analogy, each of these events results in either the withdrawal or deposit of goodwill and public confidence into CPD's "community trust fund." In other words, these police-public contacts present many opportunities for the CPD members to make a positive impression on and learn from the community members they serve. As such, the IMT will continue to recommend that the City seek to reliably and systematically gather feedback for policy and training purposes by outsourcing and sustaining a valid contact survey.[54] With this wealth of data, CPD can begin to engage relevant SMEs and community organizations in developing or refining policy and training.

\*\*\*

In sum, the CPD maintained Preliminary compliance but failed to reach Secondary compliance because the CPD did not provide evidence that it incorporated the following into its community engagement process: (1) thorough analysis and reporting of the feedback data, with policy implications described and (2) evidence that change to policy and training were made to reflect this community feedback.

The City and CPD will achieve Full Compliance when the CPD creates mechanisms for sustained, targeted community engagement. Which should include a system of performance measurement that will (1) give Chicago communities an ongoing voice in evaluating police services in every police district and (2) provide the CPD with a reliable feedback loop that it can use to shape police behavior, reduce all forms of bias on the street, and ultimately build public trust. This would include an expansion of community engagement to protected classes that may have been missed so far.

---

[54] For additional context, see our assessments for ¶¶53–57, below.

# Impartial Policing: ¶53

**53.** *CPD will, consistent with this Agreement, ensure that its policies and practices prohibit discrimination on the basis of any protected class under federal, state, and local law, including race, color, sex, gender identity, age, religion, disability, national origin, ancestry, sexual orientation, marital status, parental status, military status, source of income, credit history, criminal record, or criminal history. CPD's policies and practices will prohibit retaliation consistent with Section 6-101 of the Illinois Human Rights Act (eff. Jan. 1, 2015) and Section 2-160-100 of the Municipal Code of Chicago (amended Oct. 11, 2017).*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance. Paragraphs 53 through 56 are at the heart of the Consent Decree. They require that the CPD ensures (through policy, training, supervision, and accountability) that its officers do not engage in bias-based policing, either in their actions or their words. CPD officers are prohibited from discriminating against any constitutionally protected classes of people and are expected to treat all people equally. Expressions of bias are prohibited in "routine or spontaneous law enforcement decisions" (¶55); denigrating language (¶54); retaliation (¶53); and using stereotypes about dress, transportation, or language (¶56).

Because Consent Decree is designed to achieve these overarching outcomes, we will be monitoring them throughout the life of the Consent Decree. This is the first monitoring report assessing the City and the CPD's compliance with these paragraphs. In previous reporting periods, we reviewed several policies that the CPD asserted incorporate requirements in ¶¶53–56 or otherwise relate to those paragraphs:

General Order G08-05, *Prohibition on Retaliation* (eff. December 30, 2020). The primary purpose of G08-05 is to prohibit retaliation by a CPD member against another CPD member or a member of the public. Paragraph 53 prohibits both discrimination and retaliation against protected classes, consistent with the Illinois Human Rights Act. The City and the CPD completed the ¶¶626–41 review process for G08-05, which became effective during the previous reporting period.

Special Order S02-01-03, *Crime Victim Assistance* (eff. December 30, 2020). The primary purpose of S02-01-03 is to provide CPD members with guidance regarding

service and assistance to victims of crime. The CPD revised the policy through the review process to include language about treating victims in a procedurally just manner, among other things. Many community organizations have expertise and knowledge related to victim assistance, including organizations focused on gender-based violence. Continual engagement with community originations and members to inform policy changes will help ensure this policy is responsive to new developments. The City and the CPD completed the ¶¶626–41 review process for G08-05, which became effective during the previous reporting period.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by paragraph 52.

During this reporting period, we began reviewing revised versions of CPD policies that they assert incorporate these paragraphs' requirements:

- Paragraphs 53 and 54: G02-01, *Protection of Human Rights*

- Paragraphs 55 and 56: G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*.

Given the timing of the CPD's submission of G02-02 and G02-04, these policies did not complete the ¶¶626–41 review process. But we can discuss some of the remaining concerns that we have with these policies.

Regarding G02-01, we acknowledge that the CPD has worked to address our comments. We continue, however, to have some concerns regarding the scope of the language in the policy. Furthermore, it does not alone reflect all of the requirements in ¶53. Specifically, G02-01 does not provide the mechanism for which the CPD will ensure that the CPD's various policies and practices prohibit discrimination.

Regarding G02-04, it is the centerpiece of the CPD's effort to prohibit bias-based policing. The recently revised draft of G02-04 addresses several changes recommended by the IMT, the OAG, and the Coalition. For example, the latest draft provides that members must "refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language," as required by ¶54.

However, the draft needs additional changes to ensure greater alignment with the Consent Decree and best practices. Specifically, the CPD should revise G02-04 to provide officers with enough guidance to ensure they understand that spontaneous law enforcement decisions include more than just investigatory stops, traffic stops, and arrests. Such decisions could consist of searches—the CPD should make every effort to provide legal clarity to its members so that they fully understand

the operational definitions of these terms. As the Coalition has requested in previous reporting periods, G02-04 should identify stereotypes to clarify that officers should not use them as the basis for law enforcement decisions. The CPD has not incorporated this suggestion.

Another concern that remains is the CPD's position that age should not be included as a factor upon which biases can be based in G02-04. The Consent Decree requires the CPD to prohibit discrimination based on any protected class, including age. G02-04 covers racial and other bias-based policing, and we see no reason for the CPD not to include age in this policy, especially considering the CPD's history of interacting with young adults and how it has affected young adults' perception of the CPD as documented in the IMT's *Community Survey*.[55]

Finally, the CPD has yet to meaningfully engage in the type of community engagement contemplated in ¶52. Specifically, the CPD needs to identify the policy implications and policy revisions resulting from their community focus groups and community surveys on the topics related to G02-04. Furthermore, ¶52 requires the CPD to seek input from community members and community organizations with relevant knowledge and experience in developing this specific policy. The CPD will need to engage those with relevant knowledge and experience and respond to their feedback in a way that ensures the ¶52 process is meaningful.

In addition to G02-01 and G02-04, we reviewed the CPD's revised Special Order S04-19 *Search Warrants*, although the CPD did not provide S04-19 to support compliance with these paragraphs or for ¶¶626–41 review. Whether S04-19 is subject to ¶¶626–41 review is an issue before the Court for resolution. We provided extensive comments on March 18, 2021, and highlight here a few that relate specifically to Impartial Policing. First, given the CPD's handling of certain search warrants, some of which received extensive public and media criticism, such as the raid of Anjanette Young's home, this policy could benefit significantly from ¶52 engagement. However, the CPD has yet to seek such input.

Next, assessing whether the CPD's practices and policies around search warrants align with ¶¶53 and 54 requires that the CPD track and measure how members are effectuating the searches. Local investigative reporters and their team of researchers have carefully documented large racial disparities in search warrants executed by the CPD and how it took them more than a year to obtain these data from CPD via FOIA. The CPD should consider how best to gather, analyze, and make basic data about search warrants publicly available. And part of that process

---

[55] *See Community Survey Report (November 2019—February 2020), A Special Report by the Independent Monitoring Team* (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

should be incorporated into policy, including S04-19, to ensure that responding officers and supervisors gather critical information.

The City and the CPD did not meet Preliminary compliance with ¶¶53–56 because they have not completed the ¶¶626–41 review process for G02-01 and G02-04. Moving forward, we will continue to engage in the review process to ensure the CPD has policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts to (i) incorporate these requirements into training, (ii) engage in specific remedies to prevent bias-based policing, and (iii) measure changes in members' level of bias or impartial policing as a result of these remedies. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making.

*Measuring What Matters*

After policy revisions and training, for Full compliance, the City and CPD will need to focus on creating sustainable systems of community engagement, supervision, accountability, auditing, and performance assessment that are characteristic of evidence-based learning organizations. These systems will need to include methods to monitor the level of bias exhibited and take corrective action as needed. Using integrated (not piecemeal) systems, the IMT and the CPD must be able to ascertain whether the reforms have been impactful and are making a difference in the CPD's organizational culture and the daily interactions with the public. We recognize that CPD is currently planning pilot programs for "Performance Evaluations" and "Officer Support Systems (OSS)," and we look forward to seeing whether they will contain the metrics needed for Impartial Policing. Apparently, the new Public Safety Administration (PSA) will be assuming responsibility for data systems throughout City agencies, including the CPD. We have asked the CPD and PSA to participate in a virtual site visit on Impartial Policing performance measurement on several occasions, but they have not made themselves available.

The CPD and the PSA will need to rethink the metrics by which they evaluate police performance. We continue to emphasize the importance of measurement for organizational performance: What gets measured gets done and will be considered important. CompStat is a good example, but the metrics used to hold commanders accountable should be expanded.

We continue to have concerns regarding the CPD's willingness to prioritize tracking, monitoring, and implementing impartial policing. As we noted in each prior report, police officers make decisions that may or may not reflect impartial policing, including the decision to stop a car or pedestrian; to treat various community members with respect and dignity; to issue a warning or citation; to conduct a search; to make an arrest; to use some level of force; to thoroughly investigate crimes, or to make a complete and accurate report of the events.

Previously, we have reported dramatic racial disparities in stopping and using force against Blacks in Chicago, especially young Black males. We have also expressed concern about the various methods of policing in Black and Latino neighborhoods to control crime and the pressure on officers to make traffic stops, arrests, citations, drug seizures, and execute search warrants of homes.[56] The massive disparities in these metrics directly result from aggressive hot spots policing, which often has significant adverse effects on communities of color. To compensate for these concerns about enforcement, CPD has introduced a new system that requires officers to document their positive encounters with the public and produce district reports on these contacts. However, CPD's new reporting system, called Positive Community Interactions (PCI), can easily be abused. For example, we have heard reports of officers waving to someone on the sidewalk as they drive by and then reporting it as a PCI event. Consequently, the PCI system has not been shown to be a valid system that encourages genuine positive and fair interactions with the public. Also, CPD reported to us that community members in hot spot enforcement areas were happy to be stopped but not ticketed. There is a wealth of survey data in many cities to contradict that statement. They would prefer not to be stopped in the first place.

IMT wishes to underscore the fact that disparities in treatment do not go unnoticed by the general public. The IMT's citywide *Community Survey* revealed that Chicagoans do not feel that CPD is treating all segments of the community fairly. There are large differences in the percentage who feel that CPD is doing a "good" or "very good" job of treating these groups fairly: White Chicagoans (77%), Asian or Pacific Islander Chicagoans (47%), Latinos Chicagoans (35%), Native American Chicagoans (33%), Black Chicagoans (24%), LGBTQI members (39%), religious minorities (38%), people with disabilities (44%), people with mental health conditions (29%), and people experiencing homelessness (26%).[57] Thus, with the exception of perceptions of how the CPD treat White Chicagoans, the majority of Chica-

---

[56] *See, e.g.*, *Community Survey*, INDEPENDENT MONITORING TEAM (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf. In our survey report, we chose to refer to particular groups consistently, such as Black Chicagoans, Latino Chicagoans, and White Chicagoans. We concluded that these terms most accurately account for the targeted population for the survey: Chicagoans. We recognized that there are other commonly used terms, such as "African Americans," but we concluded that Black Chicagoans is a more inclusive term because it focuses on presence in Chicago rather than nationality. Likewise, we understand that some people may prefer "Latinx" or "Hispanic" to "Latino." For the purposes of the survey, we followed the Consent Decree and the United States Census Bureau. *See* ¶4; *About Race*, US Census Bureau. US Census Bureau (last revised, October 16, 2020), https://www.census.gov/topics/population/race/about.html.

[57] In other words, 77% of all Chicagoans felt that CPD does a "good" or "very good" job of treating White Chicagoans fairly, but for example, only 24% of Chicagoans feel that CPD does a "good" or "very good" job of treating Blacks fairly. *See Community Survey*, INDEPENDENT MONITORING TEAM (August 26, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/08/2020_08_26-Community-Survey-Filed.pdf.

goans did not give a positive fairness rating for how the CPD treats any of the constitutionally protected classes or marginalized groups mentioned in the Consent Decree.

In light of these and other findings, we encourage the City and CPD to monitor its own enforcement activity for possible bias and provide a public dashboard on existing disparities for transparency purposes. And based on other findings, we continue to encourage the CPD to monitor enforcement and investigations of gender-based violence, including the intersectionality of gender, race, and immigration status, as well as gender identity issues.

We continue to recommend that the City and CPD find ways to reliably measure the things that matter to the public (i.e., procedural justice) and create feedback loops that will continuously improve officers' performance on these dimensions. For ¶¶53–57, as well as many other paragraphs throughout the Consent Decree, the CPD and the City will need to collect, analyze, and report data on the quality of police services as well as disparities in police actions for protected classes and persons with mental and physical disabilities.

There are two fundamental ways to measure police performance in the field: Reviewing body-worn camera footage and asking community members about their experiences with the CPD. The analysis of body-worn camera data is a topic covered elsewhere in this report. For Impartial Policing, the essential data system that is currently missing involves asking community members about how they were treated by CPD officers.

Effective law enforcement requires public trust, which is a byproduct of being treated in a procedurally just manner by officers who make these decisions. Thus, we continue to strongly recommend that the City and the CPD explore the options for developing and sustaining a valid contact survey, managed by an independent agency, that measures procedural justice by all CPD officers during all encounters. This data system, along with body-worn camera data and various police reports, can be used to (1) build a system of performance evaluation for individual officers; (2) build a system of accountability for district and unit commanders; and (3) measure the level of fair and impartial policing exhibited toward constitutionally protected classes of people. With feedback loops for officers and unit heads, the CPD can take a big step down the road of organizational reform. Inside the organization, this would involve ensuring that the systems of training, supervision, accountability, investigations, auditing, and program evaluation reflect best practices and are evidence-based.

As we noted in our last report, the CPD launched a public sentiment dashboard that purports to show the level of safety and trust in the CPD reported by Chicago

residents.[58] However, we have expressed serious reservations about the survey data on which this dashboard is built. The surveys, conducted by a private vendor Elucd, are "delivered through local digital ads," which is unlikely to produce a representative sample of residents. Using this technique, the large majority of Chicago adults will never have the chance to be "sampled," and those who are sampled and complete the survey will be quite different from the general population. Thus, there is considerable doubt about whether the survey results using this methodology represent the views of the neighborhoods and police districts listed in the dashboard, especially people of color and persons from lower-income households.

After a lengthy discussion between the IMT, Elucd managers, CPD, and City officials regarding the merits of Elucd's ad-based surveys, the City of Chicago elected to write a strongly worded critique of IMT's concerns.[59] The City cited a series of research publications that they claim support their position that Facebook ads can be used to recruit a representative sample of neighborhood residents. However, when the IMT carefully reviewed these studies, we found that, contrary to the City's and Elucd's claims, the research literature supports IMT's concern about the validity of this survey recruitment approach.[60] In sum, the direct criticisms of IMT by the City in the production letter are unfounded. There were no inaccuracies in our reporting or mischaracterization of Elucd's methods. Our concerns about - samples leading to inaccurate characterizations of the Chicago Police Department are supported by the survey literature provided by Elucd.

We acknowledge that the sentiment analysis survey is only one piece of the CPD's broader effort to engage the community, but the continued promotion of this dashboard, when the findings could be very misleading, is not recommended. If

---

[58]  *See Chicago Police Sentiment Dashboard*, Chicago Police Department, https://home.chicago police.org/statistics-data/data-dashboards/sentiment-dashboard/.

[59]  *See Independent Monitor Report 3*, INDEPENDENT MONITORING TEAM (March 30, 2021), https://cpdmonitoringteam.com/wp-content/uploads/2021/04/2021_03_30-Independent-Monitoring-Report-3-amended-filed.pdf.

[60]  For example, as noted in a national survey: "*the over-representation of Non-Hispanic white women and the corresponding under-representation of men and ethnic/racial minorities, compromised the representativeness of the sample and, consequently, the extent to which findings may be extrapolated to the general U.S. population.*" Ali et al, *Social media as a recruitment platform for a nationwide online survey of COVID-19 knowledge, beliefs, and practices in the United States: methodology and feasibility analysis*, BMC MEDICAL RESEARCH METHODOLOGY 20:116 (May 13, 2020). Specifically, when compared to a 2018-19 Census Bureau estimates of the U.S. Adult population, the real biases in the national sample dramatically *underrepresented* youth ages 18-29, people of color, and people with a high-school degree or below. *Id*. Furthermore, the ad-based survey dramatically *overrepresented* White people and females by margins of up to 32%. In another large study, after reviewing 110 studies using Facebook for recruitment, caution that "*studies that require representative samples . . . may benefit from more intensive engagement with potential participants*" rather than Facebook. Thornton et al, *Recruiting for health, medical or psychosocial research using Facebook: Systematic review*, INTERNET INTERVENTIONS, VOLUME 4, PART 1, 72–81 (May 2016).

the City and CPD are genuinely interested in gathering systematic data at the district, shift, and unit levels to measure CPD's legitimacy and use of procedural justice, we strongly encourage them to begin listening to community members who have had *recent police contact*. Such data can be collected at the district, shift, unit, and individual officer levels to assess whether procedural justice principles are guiding police actions on the streets of Chicago.

Finally, in the interest of impartial policing and transparency, we continue to recommend that the CPD develop a public dashboard that provides a breakdown of key police decisions by demographic characteristics of the community member and other defining features of protected classes. We acknowledge that the CPD and the City Office of Inspector General are in the process of building various dashboards, and we encourage them to expand this work to CPD Stops, Citations, Searches, or Arrests. This could include ANOVs and misdemeanor arrests, where police have enormous enforcement discretion that could be influenced by the demographics of the subject or the neighborhood.

*Proper Data Analytics Staffing*

CPD will be unable to "measure what matters" to the organization or to the public without proper staffing. CPD appears to be grossly understaffed with individuals who have critical data analytic and research skills, thus dramatically restricting CPD's ability to produce hard evidence regarding its performance. Furthermore, the few individuals within the CPD who are tasked with data production are overwhelmed with the volume of requests both internally and externally.

These individuals, whether you call them researchers, data analysts, or data scientists, need to have at least a bachelor's degree in data science or computer science and preferably graduate-level training (Masters or Ph.D.) that includes considerable coursework in data applications and visualization (e.g., SQL, Tableau, Python, R, Excel, SAS, SPSS), research methods, statistics, program evaluation, survey research, and related topics. These individuals are not only essential for the proper collection, analysis, and reporting of data required by the Consent Decree, but they are essential if CPD seeks to become a respected data-driven learning organization.

In today's virtual, transparent world, the CPD must be able to quickly generate reports on crime and evaluate the agency's responsiveness to various segments of the community, ranging from sexual assault victims to hate crime victims to persons facing a mental health crisis. This would include public-facing dashboards. But working with data - cleaning it, organizing it, running statistical analyses, and properly presenting it on virtual platforms - requires special analytic skills.

The IMT has emphasized many other areas where data science is needed within the CPD. For example, CPD needs to develop a comprehensive training evaluation

program that will provide immediate feedback and reports to the Training Division regarding the quality and impact of instruction for hundreds of classes. This requires special research and data analytic skills.

CPD also needs to provide adequate support for supervisors and officers and increase accountability for their actions, including complete and accurate data on early warning signs for officers at risk of more serious problems. These data systems require special data analytic skills, even when the development of software is outsourced.

CPD also needs to audit its organizational performance across a wide array of indicators from response time to use of force to officer misconduct, which requires special analytic skills. Importantly, CPD's auditors and data scientists should not simply serve at the back end of the organization - compiling data from existing reports – they should also be at the front end helping to design new systems of measurement that are currently absent in CPD's accountability systems. Data scientists are needed to help visualize the future with complex digital data.[61]

In sum, CPD should carefully examine its capacity to visual, collect, clean, organize, analyze, and report good data, both for reform purposes and future organizational performance. To achieve this goal, CPD should consider the employment of additional civilians with college and graduate school degrees that include training in data design, analysis, and reporting. Assigning police officers to these positions who do not have the proper training or experience is problematic. Unfortunately, only about 7% of CPD's current workforce is civilian. That statistic can be compared to other large cities, such as Los Angeles, where more than 30% of the workforce is civilian.

---

[61] *See, e.g.*, Jen DuBois, *The Role of Data Analysts in 2020 and Beyond,* Quanthub (February 3, 2020) (discussing the growing role of data analysts and data scientists in the private sector), https://quanthub.com/data-analysts/.

## Impartial Policing: ¶54

**54.** *CPD will continue to require that all CPD members interact with all members of the public in an unbiased, fair, and respectful manner. CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶54 because the policy that codifies this paragraph's requirement is still under ¶¶626–41 review. Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

During this reporting period, we began reviewing the revised version of CPD's G02-01 Protection of Human Rights, which it asserts incorporate this paragraph's requirements. Given the timing of the CPD's submission of G02-01, this policy is still in the ¶¶626–41 review process. We acknowledge that the CPD has worked to address our earlier comments to G02-01. We continue, however, to have some concerns regarding the scope of the language in the policy.[62]

The City and the CPD did not meet Preliminary compliance with ¶52 because they have not completed the ¶¶626–41 review process for G02-01. Moving forward, we will continue to engage in the review process to ensure the CPD has policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts (i) to incorporate these requirements into training, (ii) to engage in specific remedies to prevent bias-based policing, and (iii) to measure changes in members' level of bias or impartial policing as a result of these remedies. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making.

---

[62] Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

## Impartial Policing: ¶55

**55.** *CPD will prohibit officers from using race, ethnicity, color, national origin, ancestry, religion, disability, gender, gender identity, sexual orientation, immigration status, homeless status, marital status, parental status, military discharge status, financial status, or lawful source of income when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶55 because the policy that codifies this paragraph's requirement is still under ¶¶626–41 review. Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

During this reporting period, we began reviewing the revised version of CPD's G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, which it asserts incorporates this paragraph's requirements. Given the timing of the CPD's submission of G02-01, this policy is still in the ¶¶626–41 review process.[63]

The City and the CPD did not meet Preliminary compliance with ¶55 because they have not completed the ¶¶626–41 review process for G02-04. Moving forward, we will continue to engage in the review process to ensure the CPD has policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts to (i) incorporate these requirements into training, (ii) engage in specific remedies to prevent bias-based policing, and (iii) measure changes in members' level of bias or impartial policing as a result of these remedies. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making.

---

[63] Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

## Impartial Policing: ¶56

> **56.** *CPD will provide guidance, through training and supervision, that reinforces to officers that substitutes or stereotypes for the demographic categories listed above in Paragraph 55, such as manner of dress, mode of transportation, or language ability, is prohibited when making routine or spontaneous law enforcement decisions, except when such information is part of a specific subject description.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance for ¶55 because the policy that codifies this paragraph's requirement is still under ¶¶626–41 review. Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

To assess Preliminary compliance, we evaluated the CPD's efforts to codify the requirements of these paragraphs into policy (pursuant to the ¶¶626–41 review process) and engage the community as required by ¶52.

During this reporting period, we began reviewing the revised version of CPD's G02-04, *Prohibition Regarding Racial Profiling and Other Biased-Based Policing*, which it asserts incorporates this paragraph's requirements. Given the timing of the CPD's submission of G02-01, this policy is still in the ¶¶626–41 review process.[64]

The City and the CPD did not meet Preliminary compliance with ¶55 because they have not completed the ¶¶626–41 review process for G02-04. Moving forward, we will continue to engage in the review process to ensure the CPD has policies that incorporate the requirements of these paragraphs. In assessing Secondary compliance, we will evaluate the CPD's efforts to (i) incorporate these requirements into training, (ii) engage in specific remedies to prevent bias-based policing, and (iii) measure changes in members' level of bias or impartial policing as a result of these remedies. Assessing Full compliance will ultimately turn on the CPD's ability to measure what matters and document improvements in officers' street-level behavior and decision making.

---

[64] Please refer to ¶53 for an expanded analysis of the way we plan to assess the City and CPD's efforts to comply with ¶¶53–56.

# Impartial Policing: ¶57

**57.** *CPD will continue to prohibit CPD members from posting, displaying, or transmitting content that is disparaging to a person or group based on race, religion, sexual orientation, or any other protected class on personal social media accounts.*

## Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance but have not met Secondary compliance because they did not submit any records reflecting the CPD's efforts (i) to complete a feedback loop with certain community organizations or (ii) to train members on G09-01-06, *Use of Social Media Outlet*.

In the previous reporting period, the CPD completed the ¶¶626–41 review process for G09-01-06, the CPD's social media policy. We also acknowledged that the CPD sought input from Communities United, but the CPD did not incorporate many of their suggested edits.

Because the City and the CPD did not submit any records this period reflecting their efforts to comply with this paragraph, we cannot assess whether they moved into Secondary compliance during this period. To maintain Preliminary compliance, the CPD must submit records reflecting its efforts to comply with ¶52 in developing G09-01-06. For Secondary compliance, we will evaluate the CPD's efforts to train members on the G09-01-06. The training assessment will be linked to compliance with ¶¶72 and 74 and will require ¶52 community engagement.

## Impartial Policing: ¶58

> **58.** *Within 90 days of the Effective Date, CPD will clarify in policy that CPD officers will permit members of the public to photograph and record CPD officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy. The policy will also provide that officers may take reasonable action to maintain safety and control, secure crime scenes and accident sites, protect the integrity and confidentiality of investigations, and protect the safety of officers or others.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not met Preliminary compliance with ¶58, because the CPD has not provided community members with a meaningful opportunity to provide feedback regarding this paragraph's requirements and the relevant policies are still under ¶¶626–41 review.

In earlier reporting periods, we reviewed G02-01, *Human Rights and Human Resources,* and recommended some form of community engagement in the policy review process. *See* ¶52. The CPD did not produce records reflecting such engagement.

During this reporting period, we assessed the CPD's efforts to engage the community as required by ¶52 and otherwise complete the ¶¶626–41 process for the policies that they view incorporate this paragraph's requirements. The CPD did not provide any records reflecting ¶52 engagement with respect to the specific requirements in this paragraph, and we have no information to suggest the CPD has engagement the community for this input. The CPD provided a revised version of G02-01, addressing, in part, the feedback we provided on August 19, 2019. The CPD also provided its Special Order S03-14, *Body Worn Cameras*, for our review and sought to incorporate this paragraph's requirements into that policy too.

To achieve Preliminary compliance, the CPD must engage the community as required by ¶52 regarding ¶58's requirements and complete the ¶¶626–41 policy review process for G02-01 and S03-14. Moving forward, we will assess Secondary compliance based on the CPD's efforts to train officers on these requirements and ensure the policies are implemented in practice.

## Impartial Policing: ¶60

**60.** *Within 365 days of the Effective Date, CPD will develop and implement a policy guiding officers' interactions with members of religious communities. The policy will include, but not be limited to, instruction on interacting and searching individuals with garments or coverings of religious significance.*

### Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| Preliminary: | *Not in Compliance* |
| Secondary: | *Not in Compliance* |
| Full: | *Not Yet Assessed* |

The IMT finds that the City and the CPD have not met Preliminary compliance because the CPD's new policy, G02-01-05, *Religious Interactions*, has not completed the ¶¶626–41 policy review process.

Before the Consent Decree, the CPD did not have a policy that focused specifically on interactions with members of religious communities, including the proper methods for conducting pat-downs, searches, and arrests. As such, this paragraph required the CPD to develop a new directive. In the previous reporting period, we assessed the CPD's effort to engage faith-based community members and organizations in the development of G02-01-05. We acknowledged in our previous report the CPD's robust engagement efforts on the topic of police interactions with members of religious communities. The CPD conducted surveys, focus groups, and directly engaged with religious organizations. However, the CPD did not summarize or synthesize the findings in a way that articulated their impact on G02-01-05.

During this reporting period, we assessed the CPD's efforts to meaningfully review community member feedback as part of its efforts to develop G02-01-05. We also reviewed the CPD's draft G02-01-05. We offered recommendations for how the CPD could provide members with greater clarity regarding religious clothing. We appreciate the CPD's efforts to incorporate our feedback regarding religious clothing, but we did not receive any records reflecting how the CPD relied on the survey results to inform policy changes.

To achieve Preliminary compliance, the City and CPD must complete the ¶¶626–41 review process. Moving forward, we will assess the CPD's efforts to train its members on the new policy and ensure adequate supervisory oversight is in place to ensure the policy is implemented into practice.

## Impartial Policing: ¶61

*61. Within 180 days of the Effective Date, CPD will review and, as necessary, revise its policies guiding CPD members' interactions with transgender, intersex, and gender nonconforming individuals, including protocols for arrests, pat downs and searches, transportation, and detention, in order to ensure that, at a minimum: a. terms are properly defined; b. CPD members address individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual; c. CPD members refer to individuals in documentation by the name and gender identity as expressed or clarified by the individual, in addition to the information provided on the individual's government-issued identification; d. where same-sex pat downs or searches are required by law or CPD policy, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card, except when a pat down is immediately necessary and waiting for an officer of the same gender would compromise officer or public safety; e. absent exigent circumstances, a transgender, intersex, or gender nonconforming individual is not transported or detained with individuals of a different gender, and that when determining the gender of that individual, CPD members will respect the gender identity as expressed or clarified by the individual and not rely on proof of the individual's gender identity, such as an identification card; and f. CPD members are prohibited from inquiring about intimate details of an individual's anatomy, or medical history, except as necessary to serve a valid law enforcement purpose.*

### Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD met Preliminary compliance with ¶61 because the CPD has completed the ¶¶626–41 review process for General Order G02-01-03, *Interactions with Transgender, Intersex, and Gender Nonconforming (TIGN) Individuals* and meaningfully engaged with community-based organizations with relevant knowledge and experience in revising the policy. *See* ¶52.

In the previous reporting periods, we assessed the CPD's efforts to engage community members and organizations with relevant knowledge for input on G02-01-

03 policy revisions. The CPD made significant improvements to the policy based on its community engagement efforts.

During this reporting period, the IMT continued monitoring the CPD's revisions to G02-01-03 and evaluating the CPD's community engagement and responsiveness to community feedback. *See* ¶52. The policy now incorporates many of the preferences of the transgender community with regard to pat-downs, searches, naming, report writing, transportation, and detention.

We observed TIGN Working Group sessions and reviewed drafts of G02-01-03 submitted by the CPD. After the TIGN Working Group and the CPD agreed on the final draft policy language and the CPD incorporated final recommendations from the IMT and the OAG, the policy continued on in the ¶¶626–41 process. The CPD posted G02-01-03 for public comment but did not make any revisions based on those comments. The final revised version of G02-01-03 became effective on the last day of the reporting period. As the TIGN working group noted, "We are hopeful that – if properly implemented and actually followed – this policy will reduce instances of officer harassment of transgender and gender-non-conforming individuals, make those people safer, and possibly lead to creating trust of police by those communities."

Over the past two years, the community engagement process around G02-01-03 has been exemplary, and we encourage the CPD to use that process as a model for its efforts to comply with ¶52. The CPD and TIGN Working group engaged in difficult conversations, overcame obstacles, listened to each other, and ultimately found common ground.

In sum, the City and the CPD met Preliminary compliance, but this is only the first step in the reform process. To change police culture around the LGBTQI community, the CPD will need to develop good training and internal accountability measures ensuring that the policy is implemented in practice. *See* ¶765. The TIGN Working Group expressed a desire to continue providing feedback as the CPD develops training related to this policy, and the CPD has agreed to this arrangement. We look forward to following these developments as we move forward in assessing Secondary compliance. Furthermore, we will assess the CPD's ability to train its officers once the training materials are finalized. Part of our review of the training materials will involve assessing the quality of training evaluations. As part of our Secondary compliance assessment, we will seek updates from the CPD regarding any changes in practices related to G02-01-03 and the related General Order G06-01-01, *Field Arrest Procedures*. The IMT will also monitor the CPD's supervisory oversight methods (e.g., discipline, coaching, other interventions) employed to ensure the policy is implemented as written.

Ultimately, for Full Compliance, we will monitor whether the policy and training have been sufficiently implemented such that the CPD can demonstrate a positive

impact on how CPD officers interact with TIGN individuals. Measuring the impact of the policy and training may involve a review of (i) police reports to ensure that CPD members are completing them as proscribed in G02-01-03 and (ii) contact survey responses from people who have had recent contact with a CPD officer.

## Impartial Policing: ¶62

> **62.** *CPD will require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. All officers will receive in-service training every three years to ensure CPD's response to allegations of gender-based violence, including dispatch response, initial officer response, and on-scene and follow-up investigation, is both effective and unbiased.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** December 31, 2022  ☑ **Not Yet Applicable**

**Preliminary:**  *Not in Compliance*
**Secondary:**  *Not Yet Assessed*
**Full:**  *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance because the only record provided reflecting their efforts to comply with this paragraph, Special Order S11-10, *Department Training Records Maintenance*, has not completed the ¶¶626–41 review process.

In the previous reporting period, we provided a status update regarding the CPD's efforts to comply with this paragraph. We noted the CPD's efforts to engage some groups in its policy development process, but those groups were focused on issues specific to transgender individuals. We acknowledged that the CPD does not have a policy on gender-based violence, per se. Instead, the CPD has dozens of directives and forms related to the topic. We recommended consolidating and extracting information of particular importance to these crimes into a single directive. The CPD also provided an eight-hour online training titled, *Trauma-informed Response to Sexual Assault.* We found the course's content was thorough and based on scientific evidence about trauma and social science research regarding interpersonal skills, but we raised concerns regarding the training methods and lack of strong evaluation tools.

During this reporting period, the CPD provided for our review a draft S11-10, which incorporates the requirement that officers receive in-service training every three years covering the CPD's response to gender-based violence. We did not receive any training materials for review during this reporting period, nor did we receive CPD records reflecting the CPD's efforts to engage community members and community-based organizations with relevant experience in developing the in-service training. *See* ¶52.

Community engagement continues to be the main stumbling block to the CPD's compliance with this paragraph. In the previous reporting period, the CPD indicated that they would create a working group to allow organizations with knowledge and expertise to have a voice in this reform process, but the CPD did not follow through, nor did they conduct any focus groups on this topic.

A delay in engaging the community on the topic of gender-based violence can have serious consequences, as reflected in reports of CPD's street-level behavior. For example, the CPD is investigating one of its detective's handling of a case involving a 10-year-old girl who was the victim of multiple sexual assaults. Five men have been accused of assaulting this girl, but a report notes that the initial CPD detective on the case did not work with prosecutors to bring felony charges against any of them. According to the report, despite having a DNA match with a registered sex offender, the CPD did not arrest any of the accused until the media got involved months later.[65]

Gender-based violence includes the grave crimes of sexual assault and domestic violence, but it reaches beyond these crimes to encompass commercial sex, human trafficking, and the adultification of young Black girls.[66] Many outstanding organizations in Chicago have advocated for changes in CPD policies, training, and accountability around officers' response to gender-based violence, but they have expressed extreme disappointment in the response they have received.[67] According to our discussions with members of these groups, they have prepared various reports with recommendations over many years that the CPD has not acknowledged.

On June 5, the CPD sent 20 policies to gender-based violence organizations, requesting that they provide their feedback by June 21, with no guidance. In addition to nuanced policy language discussions, we think it would be fruitful for the CPD

---

[65] *See* Dave Savini, *10-Year-Old Girl Sexually Assaulted By Five Men – Police Admit To Mishandling The Case, Leaving Offenders Free*, CBS News (March 16, 2021), https://chicago.cbslocal.com/2021/03/16/suspects-arrested-at-large-10-year-old-girl-sexual-assault-chicago-police/.

[66] Adultification bias is a form of racial prejudice where adults view some children as less innocent and more mature than other children of the same age. This bias can lead police and other adults to hold Black children accountable for actions that are viewed differently when White children are involved. *See, e.g.*, *Adultification Bias*, Georgetown Law, Center on Poverty and Inequality, https://genderjusticeandopportunity.georgetown.edu/adultification-bias/.

[67] Respected organizations that focus, in part, on gender violence include the Illinois Coalition Against Sexual Assault (ICASA), Chicago Alliance Against Sexual Exploitation (CAASE), Resilience, Illinois Coalition Against Domestic Violence, Battered Women's Network, Mujeres Latinas en Acción, Women's All Points Bulletin, YWCA Chicago, Legal Aid Chicago, Metropolitan Family Services, Chicago Foundation for Women, and gender violence researchers and lawyers at the University of Illinois at Chicago, Northwestern University, and University of Chicago.

to allow community members and community-based organizations to define the gender-based violence problem related to the CPD's responsiveness.

The City and the CPD's approach and responses to gender-based violence are evolving. Recently, the Mayor organized a gender-based advisory council. That group may help the City re-envision responses to gender-based violence, but it is unclear how the council will be assisting the CPD in its efforts to comply with this paragraph, if at all. The City reported during the third reporting period that it received a grant from the U.S. Department of Justice, Office of Violence Against Women (OVAW) that includes proposed training on domestic violence and immigrant victims. If the CPD plans to rely on that training to satisfy this paragraph's requirements, then the CPD must seek input from community members and organizations with relevant experience and knowledge during the development of that training.

At times, the City and the CPD's efforts to re-envision its responses to gender-based violence seem to be at odds with certain community advocates. According to advocacy groups, the City needs to take additional steps to ensure local gender-based violence advocates play a significant role in developing the policies and trainings around this topic. The City and the CPD assert that they are taking steps to reconcile relations with local gender-based violence advocates to ensure their significant role in these reforms efforts. We continue to monitor these efforts closely, acknowledging that some organizations are hesitant to continue engagements with the CPD on this topic. [68]

According to local advocates who have reviewed the domestic violence training, the training materials do not adequately address the needs of survivors and should not be implemented without the engagement of local domestic violence experts. [69] Training under this paragraph must be developed or revised with input from community members and community-based organizations with relevant knowledge and experience. *See* ¶52. Community leaders have indicated a willingness to work with the CPD, but only if the CPD can be very clear about their intentions and their desire to bring about real change in training and accountability through best practices. They also expect the CPD to be represented by at least one representative who has the decision-making authority. Chicago community advocates include individuals who have been on the cutting edge of gender-based violence research and practice for decades, and the CPD could benefit greatly from their input.

---

[68] The Network Advocating Against Domestic Violence has 37 member organizations that provide direct services to victims and survivors of domestic violence. The Network shared with the IMT that it decided against joining any working group on the topic, reporting that in its experience, the CPD has not provided a meaningful opportunity for the groups to provide input on the topic.

[69] The project is currently dependent on partners that are not based in Chicago and that do not have the same knowledge and experienced with the CPD as local gender-based advocates.

If the CPD had a special unit comprised of officers and civilians with specialized knowledge and skills focused solely on sexual assault, sexual abuse, stalking, and domestic violence, such a unit may ensure that the voices of local gender-based violence local experts are heard. Relatedly, such a unit may help ensure the CPD's compliance with this paragraph. Such a unit will likely help ensure the CPD can effectively investigate crimes of gender-based violence. The CPD is unique among larger police departments in that it does not have a sex crimes unit.[70] Recent news coverage suggests that some community members are advocating for a dedicated sexual assault investigative team.[71] CAASE and other organizations have similarly requested that the CPD appoint a "single point of contact" to oversee the CPD's approach to these investigations.

Furthermore, we reiterate our recommendation from the last report that the CPD consolidate and extract information from their directives and forms of particular relevance to these crimes into a single directive. The CPD could benefit from having a specific policy that articulates the unique aspects of the preliminary investigation, follow-up investigations, referrals to support services, and required trauma-informed training. We acknowledge that multiple policies relevant to gender-based violence may be necessary to address different aspects of policing, but a general policy can establish an overarching framework that defines the goals for CPD responses to gender-based violence, clarify the severity and distinctiveness of these crimes, and underscore the need to respond to survivors in a sensitive way. We believe it will be quite difficult for the CPD to "require that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence" (¶62) if the policies do not provide clear and concise direction given that the guidance spans over 20 directives and forms. In developing the general policy, we encourage the CPD to take a suggestion from Chicago gender-based violence advocates by adopting the *Response-to-Sexual-Assault-Report Review Checklist* developed by the International Association of Chiefs of Police (IACP).[72]

---

[70]  The CPD has a Special Investigations Unit (SIU) that investigates allegations of sexual assault/abuse for children under the age of 13 and domestic cases with victims under the age of 18. *See Special Investigations Unit*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/about/specialized-units/special-investigations-unit-siu/.

[71]  *See, e.g.*, 'I'm Not Hiding:' Sexual Assault Survivor Calls for Changes to Way Chicago Police Handle Cases, NBC CHICAGO (July 12, 2021), https://www.nbcchicago.com/news/local/im-not-hiding-sexual-assault-survivor-calls-for-changes-to-way-chicago-police-handle-cases/2552820/.

[72]  International Association of Chiefs of Police (IACP) offers five checklists for reports on gender-based violence. *See Response to Sexual Assault Report Review Checklist*, INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, https://www.theiacp.org/resources/document/response-to-sexual-assault-report-review-checklist.

Ultimately, the CPD will need to evaluate whether the training is effectively guiding CPD members' response to allegations of gender-based violence. As such, we recommend that the CPD create and implement a plan for collecting data that it can use to evaluate whether the training is making a difference with officers, victims, and offenders, both in terms of fairness and effectiveness. Elements of this data collection plan will likely provide helpful information to include in a general order regarding the CPD's response to gender-based violence. To aid in developing the plan, we recommend the CPD engage the Chicago Alliance Against Sexual Exploitation (CAASE), as CAASE has previously made specific recommendations for data collection around sexual assault.[73]

To promote transparency, enhance legitimacy, and build public trust, we also recommended that CPD publish an annual report on the characteristics of these events (*e.g.*, types of sexual assault) and the investigatory outcomes so that everyone may consider the implications for preventative strategies, victim services, justice/deterrence, CPD policy, and CPD training. To ensure consistency in the reported data, the CPD should ensure that the data have been properly cleaned, checked for accuracy, and fully described in user dictionaries.

The City and the CPD did not achieve Preliminary compliance because the policy codifying the training requirement, S11-10, has not completed the ¶¶626–41 review process, we have not received records reflecting the CPD's efforts to engage community members and organizations in developing the training, and we have not reviewed any additional training materials guiding the CPD's response to gender-based violence. To achieve Preliminary compliance with ¶62, we will assess the CPD's efforts to develop a feasible mechanism to engage stakeholders on gender-based violence and the CPD's proposal, with stakeholder support, that clarifies how the CPD will ensure that officers comply with CPD policies related to officer response to allegations of sexual assault, sexual abuse, stalking, and domestic violence. As we recommended, we believe that an overarching policy on the topics will be necessary to ensure CPD officers are complying with policies regarding gender-based violence.

Secondary compliance will depend on the quality of the training lesson plans, the level of community engagement in developing the training, and the quality of the training delivered.

---

[73] *See Too Little Too Late? The CPD's Response to Sex Crimes 2010–2019*, Chicago Alliance Against Sexual Exploitation (October 2020), https://www.caase.org/cpd-response-sex-crimes/.

## Impartial Policing: ¶63

**63.** *Within 180 days of the Effective Date, CPD will develop and implement a policy that prohibits sexual misconduct by CPD members. The policy will be consistent with best practices and applicable law and will provide definitions of various types of sexual offenses, including those that are not criminal in nature.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not met Preliminary compliance with ¶63 because the CPD has not yet completed the required ¶¶626–41 review process for General Order G08-05, *Prohibition of Sexual Misconduct,* and did not provide any records reflecting its efforts to comply with this paragraph.

In the last reporting period, we monitored the CPD's efforts to engage community members and organizations for their input in developing G08-05. The CPD conducted a focus group on police misconduct where several themes emerged, including a lack of trust in the CPD generally. The focus group also provided recommendations regarding accountability issues like discipline and information sharing with the public. While these efforts are a good start, we noted that the CPD needs to seek the input of (1) local organizations that provide services to or advocate for survivors of police misconduct and (2) individuals and organizations that are at the forefront of best practices and evidence-based policing. CPD expressed intentions to develop a formal working group, but this plan has not materialized, and some advocacy groups have refused to work with CPD at this level because of the CPD's lack of response to their previously submitted recommendations.

During this reporting period, we hoped to assess the CPD's efforts to comply with ¶52 in developing G08-05 and to complete the ¶¶626–41 policy review process. The City and CPD did not provide any records reflecting their efforts to comply with this paragraph, and therefore they have not met Preliminary compliance. Moving forward, we expect that the CPD will further engage groups with relevant knowledge and experience and include in G08-05 additional requirements for better data collection about the types of offenses and types of victims of sexual misconduct, as we reported in the third monitoring report. After the policy review process is complete, we will monitor the CPD's efforts to develop (1) training strategies reflecting the changes in G08-05 and (2) practices that will facilitate the effective implementation of G08-05.

## Impartial Policing: ¶64

**64.** *Within 180 days of the Effective Date, CPD will review and, to the extent necessary, revise its language access policy to provide meaningful access to CPD programs and services for individuals who have a limited ability to speak, read, write, or understand English. CPD will ensure that its language access policy provides timely and meaningful access to police services for individuals with limited English proficiency ("LEP"). CPD will also require that qualified and Department-authorized interpreters are used in accordance with CPD policy, including for the provision of Miranda warnings. CPD will publish its language access policy on its website and, consistent with the requirements of Paragraph 28 of the Community Policing section of this Agreement, make the policy available to community-based group serving LEP communities in Chicago.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶64 because the CPD's language access policy, Special Order S02-01-05, *Limited English Proficiency*, is still undergoing the ¶¶626–41 review process.

During the previous reporting periods, the IMT has reviewed and commented on drafts of S02-01-05 and monitored the CPD's efforts to engage in targeted community engagement for input on revising the policy. We also reviewed the City's Language Access Coordinator's actions and the CPD's Language Access Coordinator's status reports, recommendations, and implementation plans. Those records reflect an excellent roadmap of changes that we hoped the CPD would incorporate in the next iteration of S02-01-05.

In this reporting period, we continued to assess the CPD's effort to engage community members and organizations with relevant experience as it revised S02-01-05 and the CPD's effort to finalize the policy following ¶¶626–41. We reviewed another draft of S02-01-05 and documents reflecting the CPD's community engagement efforts. After reviewing S02-01-05, we received the CPD's Language Access Coordinator's Language Access Plan, which reflects discussions between the CPD's Language Access Coordinator and the City's Language Access Coordinator.

Throughout the various reviews of S02-01-05, we note significant improvements to the policy. However, a few significant concerns remain unresolved. First is the

lack of analysis by CPD of the received community feedback. Although we saw summaries of the themes that emerged from the focus groups and community surveys, the CPD did not provide an analysis of how these themes were used, if at all, to inform the latest revisions to S02-01-05. It is unclear to us whether any of the communities' recommendations or input influence S02-01-05's development.

For example, community members expressed wanting the CPD to ensure "officers do not make limited English proficiency persons sign forms they do not under-stand." They also want officers to use "visual aids that can be used for language assistance" and "have cards to give to people with their rights and relevant infor-mation printed in commonly used languages."[74] Community members consistently asked that CPD members receive language proficiency and cultural diversity train-ing. The CPD should seriously consider the inclusion of this input into S02-01-05. Unless the CPD meaningfully engages the community, such that community mem-bers can see their input reflected in marked changes, community members may become discouraged from continuing to provide feedback.

Furthermore, the CPD must seek input from community members and organiza-tions with relevant knowledge and experience to develop S01-02-05. The working group model, like the one used for the TIGN Policy, can provide a mechanism for the CPD to comply with the requirements of ¶52 as it relates to S02-01-05.

The other remaining concern that we have with S02-01-05 is the CPD's lack of a verification and certification process for Department-Authorized interpreters. These processes are necessary to ensure Department-Authorized interpreted are qualified, meaning they have the skills and proficiencies needed to provide inter-pretations. We understand that the CPD's efforts to assess language proficiency are a work in progress. However, S02-01-05 provides for a "non-certified" "multi-lingual Department member," rather than requiring a "Department-authorized in-terpreter." The paragraph requires that the CPD ensures qualified and Depart-ment-authorized interpreters are used, and therefore the current draft of S02-01-05 does not align with the requirement. And as the primary language interpreters for the CPD, members should be properly vetted before they can serve as Depart-ment-authorized interpreters. Relying on the claims of the CPD members that they have certain language proficiencies is insufficient. The CPD's LAC is poised with her extensive expertise to begin the process of proficiency assessment, but the CPD has yet to move forward with this work.

We are impressed by the services that LanguageLine Solutions can provide, but note that the CPD's policy is designed to use them as a backup service provider to Department members. We have previously recommended that the CPD increase

---

[74]   We acknowledge that CPD currently uses the Language Identification Card (CPD-21.125), which has the words "I speak" in 38 different languages, although additional instruction would be helpful to LEP individuals.

officer awareness of and access to the LanguageLine interpretation services phone number, which members can use when Department-authorized interpreters are unavailable. The CPD's LAC has recommended mandatory e-learning on Language-Line and called upon districts to make sure that officers have access to the Lan-guageLine app "InSight." If officers have access to InSight on their cell phones, they can quickly access the vendor's interpreting services. The CPD can also track mem-bers' use of the service. In May, the IMT observed a webinar by LanguageLine staff.

The CPD's LAC was preparing to initiate a pilot test of LanguageLine's InSight app for patrol officers in two districts, but the CPD decided to begin a Citywide rollout of LanguageLine in all districts immediately. Because the Department-authorized interpreter certification process may take some time to develop, the CPD has in-formed the IMT that it would like to change S02-01-05 to indicate that Language-Line would be the primary service and the CPD interpreters serve as the backup. We have not seen a revised version of S02-01-05 reflecting that suggested change. However, the Citywide rollout began in mid-June and is clearly a large-scale, labor-intensive initiative. At present, the CPD's LAC is working around the clock on train-ing in each District with the support of LanguageLine personnel to give CPD mem-bers some instruction on the revised policy, tips on how to work with LEP individ-uals, and instructions on how to download and use the InSight app on their CPD phones. We have some concerns regarding training officers on using LanguageLine when S02-01-05 is still under the review and revision process. We encourage the CPD to ensure it has the resources necessary to minimize any issues regarding such a quick rollout without the benefit of a pilot test.

The LanguageLine initiative and the data it will generate should help inform the CPD's needs assessment. The City's and the CPD's ability to provide meaningful access to CPD services for individuals with limited English proficiency will depend, in part, on their ability to track language access needs data across different units and districts. In other words, access to language services should be based on a needs assessment, which in turn, should be based on good data from the CPD and the Office of Emergency Management and Communications. Thus, we continue to encourage the CPD to develop tracking procedures and incorporate them in S02-01-05.

The City and the CPD have not met Preliminary compliance with this paragraph because S02-01-05 is still undergoing the policy review process. We will continue to monitor the CPD's effort to seek input from community members and organiza-tions with relevant experience and knowledge in revision S02-01-05. Evidence of such engagement should include an analysis of how the CPD used community in-put to inform S02-01-05 policy revisions. We will also assess the CPD's efforts to finalize S02-01-05 according to the ¶¶626–41 review process. Once S02-01-05 is finalized and implemented, we will monitor the CPD's efforts to train its members

in how to provide community members with meaningful access to the City's limited English proficiency programs and services. Moving forward, we will review the CPD's process of verifying and certifying that Department-Authorized interpreters have the necessary skills and proficiencies and evaluate the CPD's success with the Citywide rollout of LanguageLine's InSight application.

## Impartial Policing: ¶65

> **65.** *Within 180 days of the Effective Date, the City will designate a language access coordinator who will coordinate with CPD and review CPD's compliance with its language access policy and Section 2-40 of the Municipal Code of Chicago. The City's language access coordinator will assess the effectiveness and efficiency of CPD's policies on an ongoing basis and will report to the Superintendent or his or her designee any recommendations to revise policy, if necessary.*

### Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City has maintained Preliminary compliance but has yet to achieve Secondary compliance because the LACs have yet to establish a system of review to "assess the effectiveness and efficacy of CPD's policies on an ongoing basis."

During the previous reporting period, we credited the City's and the CPD's Language Access Coordinators (LACs) for developing a working relationship, although it appears that CPD's LAC will take a lead role in many of the tasks needed to achieve compliance with ¶65. CPD's LAC has offered a number of proposals to enhance the CPD's responsiveness to the needs of individuals with limited English proficiency and has already improved drafts of the CPD's language access policy (S02-01-05), which is still under ¶¶626–41. Furthermore, the CPD's LAC has developed a website geared towards individuals with limited English proficiency and posted materials, ranging from feedback and complaint forms to victim assistance, in five different languages.[75]

In this reporting period, the CPD and the City began the process of developing standard operating procedures for both LACs. These standard operating procedures should clarify the roles and responsibilities relevant to this paragraph and other related Consent Decree requirements. In the meantime, the responsibilities of the CPD's LAC are delineated in S02-01-05.[76]

---

[75] *See Language Access Policy of the Chicago Police Department*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/community-policing-group/language-access/.

[76] The language access policy indicates that CPD's LAC is expect to "establish a monitoring program to ensure compliance with the LEP policy, including the: implementation of the policy; assignment, and use of multilingual Department members; and necessity of translating Department forms, publications, and distribution materials."

The CPD's LAC also developed a Language Access Plan, reviewed by the City's LAC, that examines current CPD provisions of language access services as a means for the LAC to examine how the policies and trainings are translating in practice. The Language Access Plan also provides goals and objectives for the CPD to meet the demands of Chicago residents who have limited English proficiency. The Language Access Plan does not, however, provide the process of data collection and the metrics by which the CPD's LAC will assess the effectiveness and efficacy of the CPD's policies.

The City and the CPD maintained Preliminary compliance. In assessing Secondary compliance, we will monitor the CPD's efforts to develop a system of data collection to assess LEP needs and services, including changes to CPD reports and CPD policy.[77] This system is necessary to LAC's ability to evaluate the CPD's compliance with S02-01-05 and Section 4-40 of the Municipal Code of Chicago and to assess the effectiveness and efficiency of CPD's policies as they relate to the provision of timely access to high-quality LEP services.

---

[77] For example, the CPD should require officers to report whether (1) language services were needed, (2) for which language the services were needed, (3) whether interpreter services were provided, and (4) if so, by whom. After the CPD develops procedures for language access data collection, we expect the CPD to incorporate those procedures into S02-01-05. *See* ¶64.

## Impartial Policing: ¶66

**66.** *Within 365 days of the Effective Date, OEMC will provide training to its police communication supervisors, call-takers, and dispatchers (collectively, "tele-communicators") that is adequate in quality, quantity, type, and scope, and that addresses procedures consistent with CPD policy for responding to calls requiring language access services.*

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the OEMC maintained Preliminary compliance with this paragraph. They did not achieve Secondary compliance because the OEMC may need to update its training to ensure the procedures (1) are consistent with the CPD's S02-01-05, which is still undergoing the ¶¶626–41 review process, and (2) are responsive to the data collection needs that provide the foundation for improved limited English Proficiency services in Chicago.

During the previous reporting period, we assess the OEMC's efforts to review and revise its Training Notice No. TNG 19-004, *Limited English Proficiency*. The OEMC did not provide a revised version addressing our remaining concerns.

During this reporting period, we planned to assess OEMC's efforts to address our earlier comments, but we did not receive a revised version of TNG 19-004. One of our main concerns is the need for TNG 19-004 to provide more guidance regarding language access data collection. We acknowledge that LanguageLine collects data on emergency calls, but the OEMC should have a data collection process for non-emergency calls considering those calls represent the vast majority of calls for assistance. Furthermore, our understanding is that LanguageLine is unable to distinguish calls handled by the police dispatchers, fire dispatchers, and medical dispatchers at OEMC. We encourage the OEMC to have a plan for resolving this gap prior to the next round of revisions on TNG 19-004. Collecting additional data on LEP calls will help the OEMC effectively evaluate its training-related services and help the CPD assess the demand for interpreters.

The City and the OEMC maintained Preliminary compliance but have not met Secondary compliance. Moving forward, we will assess the OEMC's efforts to update TNG 19-004 to address our comments, changes to S02-01-05, and any feedback that the CPD receives from relevant community stakeholders. After finalizing an updated TNG 19-004, we will assess the OEMC's implementation and evaluation of the training using the ADDIE model.

## Impartial Policing: ¶67

**67.** *Within 180 days of the Effective Date, and as necessary thereafter, CPD will translate its language access policy into any non-English language spoken by a limited or non-English proficient population that constitutes 5% or 10,000 individuals, whichever is less, in Chicago, as outlined in Section 2-40-020 of the Chicago Municipal Code. CPD will publish translated versions of its language access policy on its website.*

### Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Full:**     *Not Yet Assessed*

The City and the CPD maintained Secondary compliance with this paragraph because the CPD's Language Access Plan sufficiently provides for a schedule and system to consistently review language access data to determine whether additional translations are necessary and to make revisions as needed to Special Order S02-01-05, *Limited English Proficiency*. The City and the CPD have not met Full compliance because we have not had an opportunity to assess whether the day-to-day operations and supervisory oversight is sufficient to determine that the translations' review schedule and system of review for S02-01-05 have been institutionalized. We have not had that opportunity because there have been no opportunities for the CPD to put the review process in practice considering that S02-01-05 is still under ¶¶626–41 review.

In previous reporting periods, the City and the CPD met Preliminary compliance because the CPD translated its Special Order S02-01-05 into Spanish, Polish, Chinese, and Arabic. In the third reporting period, the City and the CPD met Secondary compliance by providing evidence that it has the managerial practices in place to confirm that the languages selected for translations represent all groups that meet the criteria outlined in this paragraph.

In this reporting period, we could not assess the CPD's efforts to translate the revised version of S02-01-05 because the policy is still under the ¶¶626–41. The outstanding issues regarding S02-01-05 do not relate to this paragraph specifically.

The CPD approved its Language Access Coordinator's *Language Access Plan* during this reporting period. The Plan outlines an annual schedule and system to review language access data to determine if additional translations are needed. We continue to acknowledge that the CPD relies on empirical documentation to confirm that the languages selected for translations represent all groups that meet the criteria outlined in this paragraph and more. Specifically, the CPD created a practice

of assessing languages used in Chicago, broken down by frequency and percent of the total population, to confirm the selection decision. Furthermore, the CPD continues to post on its website S02-01-05 in these languages.

CPD has maintained Secondary compliance and has made good efforts to begin the process of institutionalizing the translations review and revision process. However, we will need to continue our assessment to determine whether the record of those operations reflects a consistent adherence to the process. Since we have not assessed the CPD's efforts through the full annual review process, as the Plan was only finalized this reporting period, we cannot yet say the City and CPD have reached Full compliance. Moving forward, we will continue to monitor the CPD's efforts to adhere to the translation and review process outlined in the Language Access Plan, including the CPD's efforts to translate S02-01-05 once it is finalized.

## Impartial Policing: ¶68

**68.** *Before January 1, 2020, CPD will review and, to the extent necessary, revise its policies and practices for ensuring effective communication and meaningful access to CPD programs, services, and activities for individuals with physical, mental, or developmental disabilities. These policies will identify specific procedures and responsibilities applicable to circumstances in which CPD officers encounter persons with intellectual or developmental disabilities, autism, dementia, blindness, deafness, hearing loss, and mobility disabilities, including, but not limited to: a. properly defining terms related to individuals with disabilities and the disability community; b. providing reasonable accommodations, to the extent safe and feasible, in order to facilitate CPD officer encounters with individuals with a disability; c. the arrest and transport of individuals with disabilities or who require the assistance of ambulatory devices; and d. using qualified and Department-authorized interpreters, consistent with CPD policy, to communicate with people who are deaf, hard of hearing, or who have a speech impairment, including for the provision of Miranda warnings.*

### Compliance Progress   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance regarding this paragraph because the CPD has not finished revising its policies for ensuring effective communication and meaningful access to CPD services for individuals with physical, mental, or developmental disabilities.

In the second and third monitoring reports, the City and the CPD did not meet Preliminary compliance because the CPD had not begun the ¶¶626–41 review process regarding Special Order S02-01-01, *People with Disabilities*.

During this reporting period, we assessed the CPD's efforts to review and revise its policies that relate to this paragraph, including its efforts to engage community members and community-based organizations with knowledge and experience relevant to this paragraph. On March 18, 2021, the CPD produced a draft policy *People with Disabilities,* S02-01-01, for consultation review under ¶627 along with community input on the policy based on two community surveys from CPD's Office of Community Policing as well as two focus groups, in partnership with the Center

for Conflict Resolution. The CPD provided a sampling of unaltered responses categorized by theme.

Based on IMT's review of the various iterations of S02-01-01, the policy mostly aligns with many of the requirements in this paragraph. However, we believe the language regarding interpreters for Deaf and hard of Hearing is vague and could use additional refinement to ensure the policy aligns with the paragraph. In addition, the CPD's Americans with Disabilities Act (ADA) Coordinator collected and synthesized feedback from the community as CPD developed and revised this policy during this reporting period. However, it is currently unclear how feedback from certain community sources was used and integrated into the draft policy. Furthermore, the IMT is unclear on the sampling methods used and representativeness of the sample for feedback that CPD produced as it was not the entire population of comments.

The City and the CPD did not meet Preliminary because S02-01-01 is still under ¶¶626–41. Moving forward, we will assess the CPD's efforts to finalize S02-01-01. We will also continue to assess the CPD's efforts to engage relevant disability communities and their advocates, considering the concerns we raised in the previous monitoring report regarding the limitations to the focus group model. After the CPD finalizes S02-01-01 and any other policies related to this paragraph, we will assess the CPD's efforts to train its members on the updated policies, including the extent to which training aligns with the CPD's efforts to comply with ¶69.

## Impartial Policing: ¶69

> **69.** *Before January 1, 2020, CPD will develop a training bulletin that provides CPD members guidance on interactions with people with disabilities, including: a. recognizing and responding to conduct or behavior that is related to an individual's disability, including qualifying medical conditions such as Alzheimer's disease and diabetes; b. providing effective communication and minimizing barriers to communication, including by incorporating sign language and other modes of communication used by people who are deaf, hard of hearing, or who have a speech impairment during police-community interactions; c. attending to the specific needs of individuals with disabilities, such as mobility devices, prosthetics, and service animals; and d. recognizing and responding to identified abuse, neglect, or exploitation of individuals with disabilities, including making any notifications required by CPD policy or the law.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance during this reporting period because the CPD has not finished developing its training bulletins on interactions with people with disabilities. Despite not being in Preliminary compliance, the CPD continues to make progress in developing relevant training bulletins.

During the last reporting period, the CPD produced the following draft training bulletins: (1) *People with Disabilities*; (2) *Autism and Police Response*; and (3) *Interacting with the Deaf Community*. The ADA Liaison was meaningfully involved in the bulletin-development process, providing initial content for the general training bulletin on individuals with disabilities. However, the guiding policies for these training bulletins, most notably Special Order S02-01-01, *People with Disabilities,* had not been finalized, and the IMT could not assess if these bulletins aligned with S02-01-01. Notwithstanding, we provide substantive comments on S02-01-01.

During this period, we received draft training bulletins and the following new bulletins: *What is a Service Animal?*; *Understanding Diabetes, A Law Enforcement Perspective*; and *Alzheimer's Disease and Related Dementias*. We also monitored the CPD's continued efforts to engage community members and organizations with relevant knowledge and experience in developing and revising the relevant training bulletins.

We commend the CPD for the steps it has taken to develop the requisite training bulletin, but we explained to the CPD that the training bulletins need to align with final CPD policies related to individuals with disabilities. Since S02-01-01, which guides officers' interactions with individuals with disabilities, is still under review, the training bulletins should not move forward for finalization until they can reflect the most accurate and up-to-date guidance.

The City and the CPD did not reach Preliminary compliance because the training bulletins cannot complete the ¶¶626–41 review process until S02-01-01 is finalized. Moving forward, we will continue to review updated drafts of the training bulletins and any documentation of community feedback to ensure that the bulletins comply with this paragraph and address the community's concerns. We will then assess the CPD's efforts to implement the training.

## Impartial Policing: ¶70

> **70.** *Within 180 days of the Effective Date, CPD will designate at least one member as an Americans with Disabilities Act ("ADA") liaison who will coordinate CPD's efforts to comply with the ADA and: a. regularly review the effectiveness and efficiency of CPD's policies and training as they relate to individuals with disabilities and report to the Superintendent, or his or her designee, any recommended revisions, if necessary, to ensure compliance with the law and this Agreement; b. serve as a resource to assist CPD members in providing meaningful access to police services for individuals with disabilities; and c. act as a liaison between CPD and individuals with disabilities.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance regarding ¶70 because the CPD designated an ADA Liaison in the last reporting period. However, the CPD did not meet Secondary Compliance for the fourth reporting period.

In previous reporting periods, we assessed the CPD's efforts to designate an ADA Liaison. We acknowledged that the designated ADA Liaison is qualified for the role, having 27 years of police experience, including experience with ADA issues while at the CPD.

During this reporting period, we assessed the CPD's efforts to integrate the ADA Liaison into CPD processes and practices specific to this paragraph as well as CPD policies that codify the role of the ADA Liaison. The CPD provided S02-01-01 and two standard operating procedures covering the ADA Liaison's role and responsibilities.

The ADA Liaison has provided meaningful and thoughtful input and recommendations to the CPD on issues related to individuals with disabilities. She has been responsible for the content of the training bulletins mentioned in ¶69 as well as providing strategic direction on topics related to individuals with disabilities. For example, current efforts include a strategic plan for how the CPD can understand and respect individuals with disabilities when they are exercising their First Amendment rights. This includes short- and long-term strategies to better communicate with particular impairments in hearing or sight.

Recent drafts of S02-01-01 include the ADA Liaison's direct contact information (ADACoordinator@chicagopolice.org). Considering the Liaison's role to "serve as a resource to assist CPD members," we continue to recommend that the CPD include examples in S02-01-01 of how officers and command staff can use the Liaison can as they engage with individuals with disabilities.

In mid-June, the CPD produced standard operating procedures that sought to codify the role or responsibilities of the ADA Liaison as required in this paragraph. We believe that the standard operating procedures require additional refinement to ensure they fully reflect the requirements of this paragraph. For example, the procedures regarding the Liaison's report and recommendations do not provide sufficient guidance regarding how frequently the Liaison will provide such reports. The procedures could also add clarity regarding evaluating relevant CPD training and the data analysis of force in disabilities cases. Once the CPD and the IMT have an opportunity to discuss our concerns with these standard operating procedures, we look forward to reviewing revised versions.

The City and the CPD maintained Preliminary compliance because the ADA Liaison's activities and efforts align with the requirements outlined in this paragraph. Moving forward, for Secondary compliance, we will assess the CPD's effort to finalize the relevant policies and procedures codifying the ADA Liaison's role and responsibilities. We will also assess the CPD's effort to implement supervisory oversight to ensure that the policies and procedures are implemented and effective.

## Impartial Policing: ¶71

**71.** *Within 180 days of the Effective Date, CPD will develop a policy for transporting arrested or detained individuals that requires CPD officers to notify OEMC of the start and end of a transport and whether the individual is a juvenile or adult.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance regarding ¶71 because the CPD implemented a policy addressing the requirements in this paragraph. *See* General Order G04-01, *Preliminary Investigations* (effective December 30, 2020).

During previous reporting periods, we assessed the CPD's efforts to review and revise G04-01 and related policies that reinforce the requirements of this paragraph. Because this paragraph is a relatively straightforward requirement, we were satisfied with the CPD's limited method of community engagement.

In this reporting period, we planned to assess the CPD's efforts to train officers on this requirement and develop supervisory practices to ensure G04-01 is implemented as written. However, the City and the CPD did not provide any records reflecting their efforts to train officers on this requirement.

The City and the CPD maintained Preliminary compliance because the implemented G04-01 codifies the requirement that officers notify the OEMC of the start and end of a transport and whether the individual is a juvenile or an adult. Moving forward, for Secondary Compliance, we will assess the CPD's efforts to train members on these requirements. For Full Compliance, we will assess whether the CPD has sufficiently implemented the requirement by evaluating the CPD's efforts to assess whether officers are complying with the requirements of ¶71 and adjust policy and training to address any concerns regarding their effectiveness.

## Impartial Policing: ¶72

*72. The Parties recognize that training is a necessary component of impartial policing. CPD will integrate the concept of impartial policing into related CPD training courses when appropriate, including, but not limited to, use of force courses, weapons training courses, and Fourth Amendment subjects courses.*

### Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶72 during the fourth reporting period because the CPD did not provide a training plan describing its efforts to incorporate the concept of impartial policing into related CPD training courses.

In previous reporting periods, we assessed the CPD's efforts to review its training courses to determine which ones are related to impartial policing and create a plan to integrate the concept of impartial policing into those related courses. We noted that the policies in the Impartial Policing section should be finalized before the CPD can integrate the concepts into related training. In our last report, we noted that we would use the ADDIE (Analysis, Design, Development, Implementation, and Evaluation) model to assess the CPD's training programs.

During this reporting period, as discussed in our last report, we focused our assessment on the CPD's efforts to develop a training plan for impartial policing that describes the CPD's plan to incorporate impartial policing into its training. This plan would serve as a tool that the CPD could rely on in the Analysis phase of ADDIE. Here, the Analysis phase is the time for the CPD to consider its goals for impartial policing training and to conduct needs assessments. The CPD did not provide us with a training plan focused on its efforts to integrate impartial policing concepts into relevant policy.

However, the CPD did submit a standard order, Training and Support Group S.O. 16-03, *Preparation, Submission, Approval, and Use of Instructional Course Lesson*. S.O. 16-03 provides, in part, that when developing or updating an instructional lesson plan, the curriculum designer from the Instructional Design and Quality Control Section must "ensure that the lesson plans appropriately integrate the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training course." S.O. 16-03 incorporates the requirements into policy, but that is not the same as a plan describing the CPD's goal for impartial policing integration into policy or the current policies that require such integration.

Furthermore, S.O. 16-03 does not provide sufficient guidance regarding what "integration of impartial policing concepts" entails. As we have discussed in our reviews of the various training materials that CPD has provided asserting that they incorporate impartial policing concepts, meaningful integration of such concepts requires an opportunity for officers to practice how to engage in the particular skill or training topic in a manner consistent with impartial policing.

The CPD also provided a draft Special Order S11-10, *Department Training*, to support its efforts to comply with this paragraph. The relevant policy in S11-10 provides that all required Department training will reflect the CPD's commitment to the guiding principles of procedural justice, de-escalation, impartial policing, and community policing. We have no issue with this language but note that "reflect[ing] a commitment to the guiding principle of impartial policing" is not the same as integrating the concept of impartial policing. Still, S11-10 does not provide a plan for how the CPD will review and revise relevant training to ensure it incorporates impartial policing concepts.

We have yet to review related CPD training materials that meaningfully integrate the concept of impartial policing. In most cases, the amount of time devoted to impartial policing, procedural justice, and de-escalation has been very limited. More attention must be paid to de-escalation and the prevention of force and the development of trust through interpersonal communication skills. These skill-sets must be front and center rather than treated as peripheral add-ons.

We also note generally that the CPD training could benefit from incorporating proven adult education strategies such as modeling, repetitive practice, and individualized feedback. Role-play scenarios give officers the opportunity to practice their communication skills. This concern goes towards the Development and Implementation phase of the ADDIE model. Without first addressing the Analysis phase, the CPD will likely continue having difficulties developing training materials that meaningfully incorporate the concept of impartial policing. We recommend that the CPD take the time to (i) reflect on their pedagogical strategy for integration of impartial policing and de-escalation, (ii) identify the flaws in their current approach, and (iii) consider alternative strategies.

To achieve successful integration of the concept of impartial policing into related CPD training, we strongly recommend that the CPD engage with experts on procedural justice, de-escalation, bias, and special needs for their assistance. Experts will likely help the CPD navigate a complicated training scheme to ensure the concept of impartial policing is effectively integrated into CPD's trainings that span multiple subjects. Currently, the CPD training model silos in-service and special trainings by particular units of training (*e.g.*, firearms, use of force, driving, community policing, etc.), with different sergeants overseeing each type of training.

Impartial policing training experts could help the CPD guide each sergeant and instructor about key impartial policing topics (*e.g.*, procedural justice) that would allow them to integrate those topics into their training materials seamlessly.

Notwithstanding the assistance of impartial policing experts, integrating the concept can be very difficult to achieve, especially if course instructors lack knowledge on the subject, are not dedicated to impartial policing, and are not experienced in teaching difficult or uncomfortable subjects. Therefore, we encourage the CPD to make a concerted effort to retain the core of their procedural justice trainers. These trainers can help co-teach the related trainings and, ideally, partake in a larger effort to create a higher standard of teaching at CPD.

Similar to instructor development, the CPD could benefit from devoting sufficient resources to ensure that the virtual trainings are thoughtful and well developed. As we have discussed before, we discourage the CPD from becoming overly dependent on training bulletins and asynchronous online trainings that do not allow for dynamic interactions and skill development. For virtual trainings, we encourage the CPD to use video-conference technology to facilitate the dialogue, which is critical to adult learning and to help develop the communication skills required for impartial policing.

The City and the CPD did not achieve Preliminary compliance because the CPD did not develop a training plan describing the CPD's process of integrating impartial policing across a variety of courses. The CPD should base such a training plan on a needs assessment that includes input from protected classes and their advocates regarding any potential training gaps. Moving forward, we will assess the CPD's focus on the Development, Implementation, and Evaluation phases of training. Ultimately, successful integration may require a commitment of additional resources to the Training Division regarding instructor development and additional guidance regarding training on impartial policing.

Full compliance will depend on the CPD's ability to demonstrate that it sufficiently and effectively incorporated the concept of impartial policing into related CPD training courses. In other words, the CPD will need to measure effectiveness, in part, by assessing the quality of the training delivered, changes in members' attitudes and behavior prior to leaving the training session, and changes in behavior while on the job. The CPD will need an evaluation system where it or its partners can quickly analyze survey and test data and quickly feed the analysis back to Training Division administrators and instructors to allow for immediate adjustments in particular classes and for long-term planning.

## Impartial Policing: ¶73

**73.** *The Parties acknowledge that CPD has developed, with the aid of subject-matter experts, a three-part course called Procedural Justice, which covers certain impartial policing subjects including the principles of procedural justice, the importance of police legitimacy, and the existence of and methods for minimizing the impact of implicit bias. By the end of the year 2020, all officers, including supervisors, will complete the Procedural Justice course.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|

**Deadline:** March 5, 2021*  ☑ Met  ☐ Missed
*Extended from December 31, 2021, due to COVID-19

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD met Preliminary compliance with this paragraph because it ensured that all officers, including supervisors, completed the Procedural Justice course.

This is the first time that we are reporting on this paragraph. To assess Preliminary compliance, we assessed the CPD's efforts to ensure its members completed the training. We also reviewed the materials and observed classes to assess the quality of its content.

From 2018 to early 2021, the CPD offered a three-part procedural justice training as part of the CPD's in-service program. The course embodied concepts of impartial policing. Based on our review of the materials, we found that the procedural justice training offered a strong introduction to the concepts for all officers. We observed the procedural justice training, and Parts I and II were taught largely by CPD instructors who exhibited a solid understanding of how procedural justice can be applied to police work. The CPD out-sourced Part III's instruction to the Anti-Defamation League (ADL) Midwest. The ADL provided a solid 4-module training on implicit bias and strategies for managing it to 11,500 officers. The training incorporated multiple methods of instruction delivery, including interactive presentations and three scenarios. Surveys of the participants by independent researchers yielded positive overall evaluations of the ADL training by CPD members, although some officers would prefer the use of situations more closely linked to everyday police work. In terms of efficacy, the ADL training showed some positive short-term effects on officers' beliefs and motivation to manage bias, but these effects seemed to disappear over time, leading the authors to recommend follow-up re-

fresher trainings to help sustain these outcomes. They also recommend bias training at all ranks to ensure anti-bias support throughout the organization. We note again that bias is a difficult subject to discuss and that the CPD must focus efforts on mitigating a culture of denial of bias.

Based on this work, the IMT finds that the City and the CPD met Preliminary compliance. Unfortunately, the three-part procedural justice training is complete, and the CPD has no plans to continue this type of coursework in the near future, except to train officers who were absent during the initial training times. Furthermore, the well-trained procedural justice instructors have dispersed, some remaining in the Training Division, while others were reassigned to other CPD units. Moving forward, we will assess the CPD's efforts to use the foundation established with this Procedural Justice course as it works to comply with ¶¶72 and 74. We encourage the CPD to retain a core set of highly skilled procedural justice trainers (and others with expertise in de-escalation, cultural competency and related topics) who can provide specific trainings on interpersonal communication skills and the appropriate police responses to constitutionally protected classes (*see* ¶74 assessment for more details).

## Impartial Policing: ¶74

**74.** *Consistent with the requirements set forth in the Training section of this Agreement, CPD will incorporate the concept of impartial policing into its annual in-service training for all officers, including supervisors and command staff, by providing training on the following topics: a. CPD's anti-bias and impartial policing policies, including, but not limited to, the policies referenced in this section unless otherwise required; b. refreshers of topics covered in Procedural Justice; c. appropriate use of social media; d. cultural competency training that prepares officers to interact effectively with people from diverse communities including, but not limited to, people of color, LGBTQI individuals, religious minorities, and immigrants; e. recognizing when a person has a physical, intellectual, developmental or mental disability, including protocols for providing timely and meaningful access to police services for individuals with disabilities; and f. the specific history and racial challenges in the City of Chicago.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with this paragraph because the CPD has not codified the paragraph's requirements into policy.

In the previous reporting period, we reviewed the CPD's efforts to comply with this paragraph, noting that we will use the ADDIE model (Analysis, Design, Development, Implementation, and Evaluation) to assess CPD's training programs. Preliminary compliance is judged on the basis of Analysis and Design—i.e., whether the CPD developed a training plan for the required in-service impartial policing training. Secondary compliance focuses on the Development, Implementation, and Evaluation phases of training.

During the reporting period, the CPD submitted a draft version of Special Order S11-10, *Department Training*, reflecting its efforts to codify ¶74's requirements. However, the S11-10 does not describe the topics that the annual in-service impartial policing training will cover. Furthermore, S11-10 is still under ¶¶626–41.

As we discussed in our assessment of ¶72, the CPD's efforts to incorporate the concept of impartial policing into its trainings have been insufficient. As such, we continue to recommend that the CPD develop a standalone course on interpersonal communication and impartial policing, incorporating the topics described in

this paragraph. In our view, developing a course dedicated to impartial policing principles and interpersonal communication skills will allow CPD members to (1) receive an introductory refresher on the critical importance of interpersonal skills developed in the procedural justice training courses; (2) practice perishable "hard" communication skills; and (3) understand the needs of vulnerable and constitutionally protected classes and how to respond appropriately to them. In addition to developing the course, we recommend that the CPD retain its best trainers with expertise in procedural justice, de-escalation, and bias, and recruit others from the CPD and the community who are knowledgeable on cultural diversity issues to lead the instruction of this standalone training.

As the CPD focuses on the Analysis phase of its efforts to comply with this paragraph, we note that it is not too early for the CPD to consider training methods. CPD training should incorporate proven adult education strategies such as modeling, repetitive practice, and individualized feedback. And we discourage the CPD from becoming overly dependent on training bulletins and asynchronous online trainings that do not allow for dynamic interactions and the refinement of interpersonal skills.

The work required to develop quality in-service impartial policing training for the whole Department likely necessitates that the Training Division be equipped with not simply state-of-the-art technology but a sufficient number of trainers with specific educational backgrounds, skills, and commitment to impartial policing and de-escalation training.

The IMT will continue to monitor the CPD's efforts to codify the requirements of this paragraph into policy; assess the current status of its in-service training coverage of impartial policing concepts, noting where the current training falls short of the CPD's goals regarding impartial policing; and develop training materials that provide guidance on the topics outlined in this paragraph.

## Impartial Policing: ¶75

*75. OEMC currently provides diversity awareness training to all new telecommunicators which, among other things, addresses the existence of and methods for minimizing the impact of implicit bias. OEMC will continue to provide training on this topic to all new tele-communicators and, beginning in 2020, will provide all tele-communicators with refresher training every two years on this topic that is adequate in quantity, quality, type, and scope.*

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | | |
|---|---|---|---|
| **Deadline:** | March 5, 2021* | ☐ **Met** | ☑ **Missed** |
| | *Extended from December 31, 2021, due to COVID-19 | | |
| **Preliminary:** | *Not in Compliance* | | |
| **Secondary:** | *Not Yet Assessed* | | |
| **Full:** | *Not Yet Assessed* | | |

This is the first time that the IMT has assessed the City's and the OEMC's compliance with ¶75. The City did not reach Preliminary compliance. However, in the third reporting period, the Office of Emergency Management and Communications (OEMC) provided the IMT with a draft of their Diversity Awareness Training.

During this reporting period, we assessed the OEMC's efforts to codify this paragraph's requirements into policy. We also continued consulting with the OEMC regarding its Diversity Awareness Training. We discussed our additional feedback on a further revised version of the training in March of 2021.

The Mayor's Office of Equity and Racial Justice, in collaboration with OEMC, developed the PowerPoint slides for this newest iteration of the Training. The Training focuses on implicit bias and is titled "*Introduction to Inclusion and Bias: Building an Inclusive Organizational Culture.*" The Training's objectives are to provide tele-communicators with an understanding of the concepts of inclusion and implicit bias in the workplace. The Training provides a strong theoretical overview of these concepts and provides suggestions about how leaders can help create an inclusive, diverse organizational culture.

We provided the OEMC with several recommendations regarding the Training. First, the training needs to provide telecommunicators with more practical "take-aways." Employees need to know how this abstract information about bias, stereotypes, and inclusion can be applied to their current job as dispatchers or call takers. The training should help OEMC staff understand how biases may manifest and interfere with the job of a telecommunicator and ways to mitigate such interference. Second, we noted that the training should also cover possible biases against

callers and police officers, not just limited circumstances regarding workplace culture. Third, ¶75 requires that the Training address "methods for minimizing the impact of implicit bias." The Training devotes a limited amount of time to a list of several general methods to mitigate the effects of one's own biases. This is a critical part of the Training. We recommend that the OEMC and the Mayor's Office of Equity and Racial Justice expand on the list to provide members with more guidance. Fourth, OEMC should develop and use assessment tools, like surveys, to evaluate the effectiveness of the training and to identify areas where the training can be improved. Fifth, since the training is for telecommunicators and not managers, we recommend that the OEMC remove or de-emphasize the attention given to leadership.

According to the OEMC, it plans to invite someone from the Mayor's Office of Equity and Racial Justice to deliver the training. The IMT and OEMC also discussed having the class co-taught by someone from OEMC. Using an OEMC employee who understands the day-to-day work of telecommunicators can help translate abstract concepts about bias and inclusion into practical applications.

In June of 2021, the OEMC submitted a Diversity Awareness and Implicit Bias Training Program standard operating procedure to memorialize the requirements of ¶75. We provided the OEMC with some feedback so it could refine the standard operating procedure to ensure it reflects the requirements in this paragraph and officer clear guidance.

The City and the OEMC did not meet Preliminary Compliance because they did not finalize a directive codifying this paragraph's requirements during this reporting period. Moving forward, we will assess the OEMC's efforts to address our concerns regarding the Training materials and the related standard operation procedure. We will then assess the OEMC's efforts to ensure all tele-communicators receive the Training and refresher training.

# Impartial Policing: ¶76

**76.** *By January 1, 2020, CPD will review and, to the extent neces-*
*sary, revise its policies and procedures to ensure that allegations*
*and complaints of hate crimes, as defined by federal, state, and*
*local law, are comprehensively investigated.*

## Compliance Progress <span style="float:right">(Reporting Period: Jan. 1, 2021, through June 30, 2021)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

We find that the City and the CPD have met Preliminary compliance for this para-
graph because the CPD finalized General Order G04-06, *Hate Crimes*, before the
end of the reporting period.

In previous reporting periods, we reviewed G04-06 and the CPD's community en-
gagement efforts regarding G04-06. We noted that G04-06 adequately addressed
our earlier comments and provided guidance regarding the preliminary investiga-
tion, reporting, and notification of hate crimes.

During this reporting period, we reviewed another version of G04-06 addressing
comments from the Illinois Office of the Attorney General (OAG). By Spring of
2021, the IMT and the OAG agreed that G04-06 could proceed in the ¶¶626–41
review process. The CPD submitted the policy for public comment on April 2, 2021,
and finalized the policy. G04-06 became effective on June 22, 2021.

The CPD engaged a focus group in October 2020 and conducted a community sur-
vey on the topic of hate crimes. The CPD's analysis of their hate crime survey was
enlightening. For example, more than six in 10 victims who reported a hate crime
incident to the CPD responded that they did not receive any follow-up from the
CPD. That result may account for the fact that a nearly identical majority of the
respondents who reported being victims of a hate crime (61.6%) responded that
they were not satisfied with how the CPD handled their case. Thus, we recom-
mended that the CPD take additional steps to direct supervisors to review whether
CPD detectives are conducting follow-up investigations of hate crimes in a timely
manner.

The SOP sought to address that concern and the concerns raised by the OAG in a
standard operating procedure titled *Hate Crimes – Responses, Reporting, Investi-
gating and Outreach*. The SOP provides more clarity regarding the parallel investi-
gations of these sorts of crimes – something IMT had requested. It also provides
that supervisors must ensure complete and timely investigations, a request made
by community members.

The City and the CPD achieved Preliminary compliance because they reviewed, revised, and finalized the CPD's policy regarding allegations and complaints of hate crimes before the end of the reporting period. To maintain Preliminary compliance, the IMT expects that the CPD will provide additional records demonstrating how the community feedback informed G04-06's revision process. Moving forward, we will assess the CPD's efforts to train its officers on the guidance provided in G04-06 and the related standard operating procedures. Assessing Secondary compliance will overlap with our assessment of ¶77.

## Impartial Policing: ¶77

**77.** *CPD will ensure that all officers receive in-service training every two years on methods, strategies, and techniques for recognizing and responding to hate crimes, including CPD's procedures for processing reports and complaints.*

### Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | December 31, 2022 | ☑ **Not Yet Applicable** |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first time that the IMT has assessed the City and the CPD's efforts to comply with this paragraph. The City and the CPD have not met Preliminary compliance because the directive that the CPD asserts codifies the requirements is still under ¶¶626–41 review.

During this reporting period, we assessed the CPD's efforts to codify this paragraph's requirements into policy. The CPD submitted a draft Special Order S11-10, *Department* Training, which provides that officers will receive in-service training every two years on topics regarding hate crimes. We note that S11-10 does not provide the same level of specificity articulated in this paragraph and recommend that the CPD reconcile that inconsistency.

The CPD also provided its Hate Crimes Refresher eLearning Training. However, we did not receive any records reflecting the CPD's efforts to engage community members and organizations with relevant knowledge and experience in developing the training materials. *See* ¶52. This targeted engagement must occur during the Training's development stage. We look forward to reviewing records reflecting that engagement once available.

We also reviewed the Refresher Training and provided our comments detailing several concerns. First, we reiterated our concerns regarding the CPD's reliance on certain types of eLearning models. Ideally, officers will receive in-person instruction, but if the training is virtual, we recommend highly interactive models rather than asynchronous online trainings. Asynchronous trainings limit the Department's ability to teach the interpersonal skills needed to interact compassionately and respectfully with victims and other community members. We will continue to assess the CPD's efforts to address our concerns.

The City and the CPD did not meet Preliminary Compliance for ¶77 because the policy codifying its requirements remains under review. We will continue to assess

the CPD's efforts to comply with the community engagement requirements of ¶52 as it revises the Refresher Training. For Secondary Compliance, we will assess the CPD's efforts to develop quality training that is both interactive and followed-up with evaluation tools.

## Impartial Policing: ¶78

**78.** *Within 180 days following the expiration of each calendar year of the term of this Agreement, CPD will publish an annual report summarizing reported hate crimes and non-criminal incidents motivated by hate during the previous calendar year ("CPD Hate Crime Report"). The CPD Hate Crime Report will provide information regarding the total number of reported hate crimes and non-criminal incidents motivated by hate, organized by type of crime, classification of bias motivation, and disposition of hate crime investigations in each district.*

**Compliance Progress**                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | August 30, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from June 28, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD did not meet Preliminary compliance during this reporting period. Although the CPD prepared its *Hate Crime in Chicago: 2020 Annual Report*, the 2020 Report does not include important disposition data as required by ¶78.[78]

In the previous reporting period, we acknowledged that the 2019 Annual Report was well written and well designed with colorful and informative tables. It included clear definitions of hate crime and incidents motivated by hate. The 2019 Report gave attention to the law, the seriousness of hate crimes, and the steps that community members can take to report these incidents. It provided a breakdown of reported incidents by type of crime, type of bias motivation, and district. However, the CPD did not meet Preliminary compliance because the 2019 Report lacked a meaningful assessment of disposition data.

To assess Preliminary compliance, again, the IMT reviewed the 2020 Report to determine whether it addressed this paragraph's requirements and the quality of data that the CPD used to develop the 2020 Report.

Similar to our concerns raised regarding the CPD's 2019 Report, the 2020 Report does not include important information regarding the disposition of hate crime investigations. Like the 2019 Report, the only disposition data included in the the 2020 Report is whether the hate crime incident was "Bona Fide," "Undetermined," or "Unfounded." However, the public would appreciate additional disposition

---

[78] As reflected in the City's comments, we will assess whether the City and the CPD met this deadline in the fifth reporting period.

data, like whether the CPD conducted a follow-up investigation; whether a suspect was identified, arrested, charged with a hate crime and convicted; and whether the investigation remains open. Also, we continue to encourage the CPD to break down these dispositions by the protected classes to ensure the public that CPD's decisions and actions do not reflect any bias.

In sum, the City and CPD did not reach Preliminary compliance because the published 2020 Report does not include important data on the disposition of hate crime investigations. To achieve Preliminary compliance, the CPD will need to draft a revised Report that includes dispositional data and ensure the subsequent reports also include dispositional data. Furthermore, we encourage the CPD to engage community members and organizations with relevant knowledge who can provide feedback regarding the hate crimes data collection efforts and the information included in the annual report and dashboard.

# Impartial Policing: ¶¶79–82

**79.** *By April 1, 2020, and every year thereafter, CPD will conduct an assessment of the relative frequency of all misdemeanor arrests and administrative notices of violation ("ANOVs") effectuated by CPD members of persons in specific demographic categories, including race and gender.*

**80.** *Prior to conducting this assessment, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement. Upon completion of the assessment, CPD will identify any modifications to CPD's practices to address the findings in the assessment and develop a timeline for implementation, subject to Monitor review and approval. Upon completion of the assessment, CPD will publish the underlying data, excluding personal identifying information (e.g., name, address, contact information), via a publicly accessible, web-based data platform.*

**81.** *If at any point, the City's obligations under the August 6, 2015 Investigatory Stop and Protective Pat Down Settlement Agreement ("ACLU Agreement") terminate, CPD will include all stops effectuated by CPD members that were subject to the ACLU Agreement in the assessment required by this Part.*

**82.** *Nothing in this Part will be interpreted to require CPD to analyze statistical data beyond that currently collected and maintained in electronic databases unless otherwise required under this Agreement. In instances in which race or gender data is not maintained in an electronic database, CPD may use geographic data in its assessment. For purposes of this paragraph, information contained solely in a scanned PDF document or other image of a document, and not otherwise collected and maintained in an electronic database, is not considered data maintained in an electronic database.*

## Compliance Progress   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| Deadline: | June 3, 2021* | ☐ Met | ☑ Missed |
|-----------|---------------|-------|----------|
| | *Extended from April 1, 2021, due to COVID-19 | | |
| | ¶¶79/82 | ¶¶80/82 | |
| Preliminary: | *Not in Compliance* | *Not in Compliance* | |
| Secondary: | *Not Yet Assessed* | *Not Yet Assessed* | |
| Full: | *Not Yet Assessed* | *Not Yet Assessed* | |

The City and the CPD did not meet Preliminary compliance for ¶¶79 or 80 because we could not approve the proposed methodology and no report was prepared.[79]

In previous reporting periods, we monitored the CPD's efforts to assess misdemeanor arrest and administrative notices of violations (ANOVs), focusing mostly on the CPD's proposed methodologies. We did not approve the CPD's methodology.

During this reporting period, we inquired about the CPD's efforts to revise the methodology based on our earlier feedback. The City and the CPD did not provide any records reflecting their efforts to comply with these requirements.

We have been informed that the report on misdemeanor arrests and ANOVs was drafted over a year ago (absent IMT approved methodology) but that CPD administrators were unhappy with the large racial disparities present in the findings. After internal disagreements about the best path forward, the CPD decided to outsource this project. The IMT will assess the qualifications and independence of any outside organization hired by the City to perform the functions required by ¶¶79–82.

This annual report is important as it provides transparency regarding low-level enforcement practices (where officers have the most discretion) and will shed light on disparities by race, age, and gender. ANOVs and misdemeanor arrests raise critical issues about constitutionally guaranteed freedoms. Americans have a Fourth Amendment right not to be stopped, questioned, and searched without sufficient justification. Within the context of impartial policing, these enforcement actions can lead to unequal treatment. Good data and careful documentation are essential to monitor disparities and identify patterns over time.

In sum, the City and the CPD did not meet Preliminary compliance with these paragraphs because we could not approve the proposed methodology, as CPD did not

---

[79] Paragraph 81 does not require a compliance assessment at this time since the ACLU Agreement remains in effect. If, however, the ACLU Agreement is terminated, ¶81 will be activated and IMT will expect the same data and apply the same standards. Independent of ¶81, the IMT reserves the right to request investigatory stops data to assess outcomes specified in the Consent Decree regarding impartial policing and other reforms.

revise it to address our concerns, nor has the CPD developed a plan to address the remaining concerns, including a plan and timeline to eventually automate the collection and electronic storage of ANOVs demographic data (*e.g.*, race, age, and gender). Moving forward, we will monitor the CPD's efforts to revise its methodology for approval. After we approve the methodology, we will assess the CPD's efforts to conduct the ¶79 assessment and publish the findings.

# III. Crisis Intervention

This is the Crisis Intervention section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago's (the City's) and its relevant entities' Crisis Intervention compliance efforts in the Crisis Intervention section from January 1, 2021, through June 30, 2021.

## Guiding Principles

The IMT assessed compliance with applicable Crisis Intervention paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *83. CPD officers often serve as first responders to individuals experiencing a behavioral or mental health crisis. These individuals may exhibit symptoms of known, suspected, or perceived behavioral or mental health conditions, including, but not limited to, mental illness, intellectual or developmental disabilities, or co-occurring conditions such as substance use disorders. The Parties acknowledge that having a mental illness, an intellectual or developmental disability, or co-occurring condition does not mean an individual necessarily is in crisis, or that having a behavioral or mental health condition would necessarily be the reason for any crisis that requires police involvement. However, it may need to be considered or warrant heightened sensitivity to ensure an appropriate response. Therefore, individuals in the groups listed above will be collectively referred to as "individuals in crisis" for the purposes of this Agreement.*

> *84. A person may be a suspected individual in crisis based on a number of factors, including, but not limited to, self-reporting; information provided by witnesses, family members, or individuals requesting service; CPD's previous knowledge of the individual; or an officer's direct observation.*

> *85. CPD officers will interact with individuals in crisis with dignity and respect. The use of trauma-informed crisis intervention techniques to respond appropriately to individuals in crisis will help CPD officers reduce the need to use force, improve safety in police interactions with individuals in crisis, promote the connection of individuals in crisis to the healthcare and available com-*

*munity-based service systems, and decrease unnecessary criminal justice involvement for individuals in crisis. CPD will allow officers sufficient time and resources to use appropriate crisis intervention techniques, including de-escalation techniques, to respond to and resolve incidents involving individuals in crisis. To achieve these outcomes, the City and CPD will implement the requirements set out below.*

*86. The City and CPD are committed to exploring diversion programs, resources, and alternatives to arrest for individuals in crisis.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

During the fourth reporting period, the IMT worked with the CPD, the Office of Emergency Management and Communication (OEMC), and the Chicago Council on Mental Health Equity (also known as CCMHE) to address issues related to policy, training, and community engagement.

For nearly all paragraphs within the Crisis Intervention section, the City and the CPD demonstrated continued progress towards achieving compliance. For example, the OEMC finalized policies containing the Consent Decree's requirements, which memorialized practices that the IMT expects will improve overall operations. Moreover, the CPD began delivering its CIT officer refresher training. This was a critical accomplishment because a significant number of CIT officers had not received a refresher training since they received the Basic 40 hour CIT training several years ago.

However, in other areas additional work is necessary for the City and the CPD to achieve additional levels compliance. For example, despite taking positive steps, the CPD has yet to finalize numerous policies under the Consent Decree review process, the finalization of which is required for Preliminary compliance. In addition, both the CPD and the City have not provided a finalized CIT Officer Implementation Plan or a finalized Crisis Intervention Plan. The City and the CPD did, however, make significant progress in the fourth reporting period towards these goals. The IMT anticipates that these plans will be completed within the next monitoring period.

In sum, during this reporting period the IMT assessed the City's compliance with 61 Crisis Intervention paragraphs: ¶¶87–94, 96–97, 99–110, 113–125, and 127–52.

We have determined that the City maintained Preliminary compliance for 16 paragraphs (¶¶105–06, 113-14, 117–18, 128–31, 133–36, 138, and 141), moved into Preliminary compliance for eight paragraphs (¶¶119, 121, and 146–51), maintained Secondary compliance for five paragraphs (¶¶89, 92, 96, 116, and 132), achieved Secondary compliance for eight paragraphs (¶¶90, 97, 99, 139–40, 143–44, and 152), and achieved full compliance for two paragraphs (¶¶142 and 145). The City failed to reach Preliminary compliance in the remaining 22 paragraphs assessed during the fourth reporting period (¶¶87–88, 91, 93–4, 100–04, 107–10, 115, 120, 122–25, 127, and 137). *See* Crisis Intervention Figure 1.

Crisis Intervention Figure 1:        Compliance Progress for Crisis Intervention Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



The City had four deadlines in the fourth reporting period. The IMT determined that the City met the deadline for two paragraphs (¶¶129 and 150), but missed the remaining two deadlines (¶¶107 and 122). *See* Crisis Intervention Figure 2.

Crisis Intervention Figure 2:



## Crisis Intervention: ¶87

**87.** *The Crisis Intervention Team ("CIT") Program will continue to be responsible for CPD's crisis intervention response functions, including, but not limited to: a. developing CIT strategy and initiatives; b. supporting officers in the districts who respond to incidents involving individuals in crisis; c. engaging the community and community stakeholders to raise awareness of the CIT Program and issues involving individuals in crisis; d. coordinating among City agencies that respond to individuals in crisis; e. recruiting officers to apply for CIT training; f. developing and delivering CPD's Basic CIT Training and other CIT training, including Advanced CIT (e.g., youth, veterans) and refresher trainings, in accordance with the requirements of the Training section of this Agreement; g. delivering roll call trainings and mental health awareness initiatives; h. compiling and retaining the reports identified in Part F of this section and collecting and maintaining the appropriate CPD data related to incidents involving individuals in crisis to support and evaluate the effectiveness of the CIT Program and CPD's response to incidents identified as involving individuals in crisis, including identifying any district-level and department wide trends; i. coordinating data and information sharing with OEMC; and j. communicating with and soliciting feedback from crisis intervention-related community stakeholders, Certified CIT Officers, and OEMC call-takers and dispatchers regarding the effectiveness of CPD's CIT Program.*

**Compliance Progress**      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not achieve any level of compliance with ¶87.

As noted in the last report, the City and the CPD made significant progress toward compliance with ¶87 by putting some related policies through the policy review process required by ¶¶626–41 (these policies are discussed where applicable in separate paragraph assessments below). However, several standard operating procedures designed to memorialize the specific requirements of ¶87 were not finalized during the fourth reporting period. During the third reporting period, we provided the CPD with recommended revisions to the CPD's standard operating procedures, several of which were not adequately revised. We discuss these inadequate revisions in more detail below.

We note that ¶87 is an overarching paragraph and compliance levels for this paragraph affect compliance for several other paragraphs in the Crisis Intervention section. To achieve Preliminary compliance with ¶87, the City and the CPD must develop and finalize policies that incorporate ¶87's requirements. While the CPD significantly improved several standard operating procedures intended to address ¶87, several of these standard operating procedures were not finalized through the Consent Decree process during the fourth reporting period. Therefore the City and the CPD did not achieve Preliminary compliance under ¶87.

Going forward, Secondary compliance will require comprehensive training for Area-level CIT District, Operations, and Community (CIT DOCS) Sergeants who are responsible for nearly all of ¶87's requirements. The IMT was focused on Preliminary compliance during the fourth monitoring period, and so the City and the CPD did not provide records demonstrating comprehensive training with a consistent approach across the CIT DOCS Sergeants. The IMT understands that the City and the CPD are prepared to produce these records during the next reporting period, and we look forward to reviewing the same.

Finally, we reiterate our recommendation that the CPD expand the community input process for directives and SOPs related to crisis response. Our prior assessment noted that while we determined policies were sufficient for Preliminary compliance, the public comment period for these policies yielded few comments and the SOPs had not been subjected to public comment at all. We found no evidence that public comments were given sufficient consideration and it was unclear how the comments were incorporated into the final version of the policy, if at all. We maintain that the CPD should consider how public comments and community feedback might not only advance its overall community engagement goals, but also build trust among a wide range of advocacy and treatment providers.

# Crisis Intervention: ¶88

**88.** *The CIT Program will serve to meet the objectives of: a. improving CPD's competency and capacity to effectively respond to individuals in crisis; b. de-escalating crises to reduce the need to use force against individuals in crisis; c. improving the safety of officers, individuals in crisis, family members, and community members; d. promoting community-oriented solutions to assist individuals in crisis; e. reducing the need for individuals in crisis to have further involvement with the criminal justice system; and f. developing, evaluating, and improving CPD's crisis intervention-related policies and trainings to better identify and respond to individuals in crisis.*

## Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not meet any level of compliance with ¶88.

As noted in our last report, the City and the CPD made significant progress toward compliance with ¶88 by putting some related policies through the policy review process required by ¶¶626–41 (these policies are discussed where applicable in separate paragraph assessments below). However, several SOPs designed to memorialize the specific requirements of ¶88 were not finalized during the fourth monitoring period. During the third monitoring period, we provided the CPD with recommended revisions to the CPD's SOPs, several of which were not adequately revised. We discuss these inadequate revisions in more detail below.

The text of ¶88 mostly relates to outcome-based metrics, which are tied to the successful implementation of other paragraphs in the Crisis Intervention section. At present, the data dashboards that the CPD has developed relate to particular paragraphs (*e.g.*, ¶108 relates to the CIT response rates). The CPD should also focus on developing valid measures of ¶88's concepts, which require both answers to complex research questions and a more-exact approach in measuring progress related to ¶88. Initial data from the CIT Report will ultimately be useful in the development process. In addition, as with ¶87 above, we reiterate our recommendation that the CPD expand the community input process for crisis response directives and SOPs.

Moving forward, to achieve Secondary compliance with this paragraph, the CPD will need to develop metrics that, when tracked, will adequately demonstrate the

CPD's success under ¶88. Further assessment levels will require an assessment of those developed metrics. We look forward to discussing the CPD's approaches to measurement during the next monitoring period.

# Crisis Intervention: ¶89

> **89.** *The CIT Program, through the CIT Coordinator, will annually review and, if necessary, revise its policies and practices to ensure the program's compliance with the objectives and functions of the CIT Program.*

---

**Compliance Progress**    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**    December 31, 2021    ☑ **Not Yet Applicable**

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Full:**    *Not Yet Assessed*

During the fourth monitoring period, the CPD maintained Preliminary and Secondary compliance with ¶89.

In our last report, we noted that the CPD had revised Special Order S05-14, *Crisis Intervention Team (CIT) Program*, to include the requirements of ¶89. Additionally, the policy details the manner and scope of review expected for a comprehensive assessment on an annual basis, which provides a training mechanism for reviewers.

Much of the CIT Program's operation is contained within SOPs that are presently under review, therefore the CPD's annual review for these SOPs has not been completed. Similarly, the directives' annual review was not required to be completed within this monitoring period. In the next monitoring period, the IMT will determine whether (1) directives and SOPs are placed on the same review schedule, as SOPs support the directives and (2) whether the reviews (and potential revisions) occurred in a manner consistent with the process identified in the Consent Decree. Should the CPD review both SOPs and directives in accordance with Consent Decree requirements, we would find the CPD to have substantially complied with the requirements of this paragraph so long as a more-robust public comment period also occurs. A feedback loop should be in this public comment period such that the CPD provides feedback regarding why the community's comments were or were not incorporated.

# Crisis Intervention: ¶90

**90.** *The City and CPD will ensure that the CIT Program is provided with: a. the resources and access to data and information necessary to fulfill the objectives and functions of the CIT Program; and b. a qualified, centralized staff, including supervisors, officers, and civilian employees, that is necessary to oversee the department-wide operation of the CIT Program, carry out the overall mission of the CIT Program, and perform the objectives and functions of the CIT Program.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

During the fourth monitoring period, the City and the CPD met both Preliminary and Secondary compliance with ¶90.

The elements of ¶90 are found in Special Order S05-14 (*Crisis Intervention Team (CIT) Program*), which the Chicago Council on Mental Health Equity both reviewed and approved before the fourth monitoring period. As discussed in other paragraphs (*e.g.,* ¶91), SOPs related to the CPD's district-level approach provide more detail regarding the CPD's specific approaches. However, for ¶90, S05-14 adequately memorializes the necessary dedication of centralized resources.

We have also seen evidence that the centralized roles have been filled by qualified staff. For instance, the IMT was impressed with the CIT Program's core-training team. Additionally, the CIT Program retained a data analyst who proved capable of accessing, cleaning, and analyzing data related to the objectives and functions of the CIT Program.[80]

Full compliance with ¶90 will require the CPD to demonstrate they are capable of reliably assessing whether the objectives and functions of the CIT Program are being met and manage the department-wide operation accordingly. This will require sufficient operational data that was not available during the fourth monitoring period. Going forward, we look forward to working with CPD on collecting the necessary data and conducting the corresponding analyses.

---

[80] After the fourth reporting period, the CIT Program's data analyst resigned. Moving forward, the City and the CPD will need to fill the position.

# Crisis Intervention: ¶91

*91. Additionally, the City and CPD will ensure that the CIT Program has sufficient, dedicated district-level resources, consistent with the needs of each district identified by the District Commander and the CIT Coordinator, and approved by the Chief of the Bureau of Patrol, as needed to carry out the overall objectives and functions of the CIT Program at the district-level, which include, but are not limited to: a. supporting officers in the district with incidents involving individuals in crisis; b. delivering CIT Program-approved roll call trainings and mental health awareness initiatives; c. establishing relationships between the district and local service providers and healthcare agencies; d. referring and, when appropriate, connecting individuals in crisis with local service providers; e. engaging with the community to raise awareness of the CIT Program and issues involving individuals in crisis; and f. providing administrative support to the coordinator of the CIT Program.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not meet any level of compliance with ¶91.

During the fourth monitoring period, the CPD provided a revised draft version of Special Order SO20-04, *District-Level Strategy for Crisis Intervention Team (CIT)* Program. While the revised version of SO20-04 incorporated several of our recommendations, other revisions are necessary before it can be finalized.

While we await a finalized version of SO20-04, we note that CPD has taken significant steps in developing the CIT District Operations and Community Support (CIT DOCS) resources. There has been much improvement. For example, as we noted in our last report, the CPD created a data collection tool that will allow the CIT Program Coordinator to document district-level needs and identify trends across Districts and Areas, but the CPD will still need to deliver the necessary training to its CIT DOCS personnel. According to the CPD, CIT DOCS Sergeants have been trained, and the CPD will be providing evidence of that training in the next reporting period.

Moving forward, the CPD needs to finalize SO20-04 in order to achieve Preliminary compliance. For Secondary compliance, the CPD will need to provide evidence that

district-level personnel are adequately trained and that district commanders understand the appropriate assessment of the CIT district needs.

# Crisis Intervention: ¶92

**92.** *Certified CIT Officers are officers who receive specialized training in responding to individuals in crisis. Certified CIT Officers retain their standard assignment and duties but may also take on specialized crisis intervention duties and are prioritized to respond to calls in the field identified as involving individuals in crisis, as assigned.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶92.

As noted in our last report, the CPD has memorialized the Crisis Intervention Team in Special Order S05-14, *Crisis Intervention Team (CIT) Program*. Additionally, the CIT Program has adequately trained Certified CIT Officers based on our review of training material and observation of past CIT basic training. Through policy and training, we are confident that the CPD has reinforced the importance of Certified CIT Officers responding to individuals in crisis.

While we are satisfied with how the CPD has historically viewed the specialized nature of the Certified CIT Officers, recent developments provide a cause for some concern. The CPD appears to be incorporating elements of a mandated model of crisis intervention, where all patrol officers are provided the 40-hour CIT basic curriculum. Several agencies across the nation use a train-all model, though the model has potential shortcomings when an advanced specialized response is not incorporated into the overall model. Primarily, a train-all model negates the specialized nature of the Certified CIT Officers, who by design have volunteered for the CIT based on their affinity towards serving those living with mental-health conditions and have the demonstrated skill set to perform the duties of a specialized response. In communities where a "train all" model has been deployed, it is best practice to elevate a specialized cadre of volunteer officers with demonstrated skill set to respond to higher level calls for service involving a mental-health component.

The CPD provided us with a CIT training model that includes three tiers: (1) volunteer officers; (2) recently promoted sergeants, lieutenants, and field training officers; and (3) mandatorily-assigned officers. The latter group (mandatorily assigned officers) drive our concerns because the mandatory nature of their assignment suggests they may lack the same proactive desire and skill set as volunteer officers

to serve the mental health community. In addition, we have some concerns that the CIT training model considers officers voluntary unless they explicitly opt out after training. We understand that the City and the CPD may be open to improving this process and to increased transparency around the existence and use of mandatorily-assigned officers. We look forward to continued discussions and development in the next reporting period.

While the CPD has maintained Primary and Secondary compliance for ¶92, we strongly suggest that the CPD ensure the following to keep this tiered model's fidelity to a specialized response: (1) the CPD should require mandated officers to "opt in" as a volunteer officer as opposed to "opt out" and (2) the CPD should avoid listing those mandated officers who do not opt in to be a specialized response so that these officers do not count toward required response ratios. The IMT will be considering these factors to reach higher levels of compliance.

# Crisis Intervention: ¶93

**93.** *To be eligible for consideration as a Certified CIT Officer, applicants must have at least 18 months of experience as a CPD officer and no longer be on probationary status. CPD will assess each applicant's fitness to serve as a Certified CIT Officer by considering the applicant's application, performance history, and disciplinary history.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

During the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶93.

In the last monitoring period, the CPD provided the IMT with Special Order SO20-02 *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, though the Special Order required further revisions on the guidance for assessing the CIT applicants.

As part of their revision process, the CPD proposed that officers be deemed ineligible to become a Certified CIT officer if they (1) have received a sustained misconduct complaint within the preceding 12 months which resulted in a suspension of more than seven days or (2) have three or more sustained misconduct complaints resulting in suspension within the past five years.

As a preliminary matter, we have noted that these eligibility thresholds are low. The CPD informed us that few officers, based on these thresholds, would be ineligible for the CIT service. Given the position's importance, we suggested that the CPD revise their criteria to be confident that the CIT applicants have a desirable background. While the CPD provided us with a revised version of SO20-02 during this monitoring period, the ineligibility criteria had not been revised in any way.

The City and the CPD have not met Preliminary compliance with ¶93, because the collaborative revision process for SO20-02 was ongoing at the end of the third monitoring period.

# Crisis Intervention: ¶94

**94.** *Under the direction of the CIT Coordinator, supervisors and instructors teaching crisis intervention-related topics will assist in identifying and recruiting qualified officers with apparent or demonstrated skills and abilities in crisis de-escalation and interacting with individuals in crisis to apply to receive CIT training.*

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶94.

To evaluate Preliminary compliance with ¶94, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements such as requiring that policies be "plainly written, logically organized, and use clearly defined terms," and policies and procedures be submitted to the IMT and OAG to allow the parties to engage in a collaborative revision process.

During this monitoring period, the CPD provided us with Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, which sufficiently contains the requirements of ¶94. While the requirements for this paragraph are satisfactorily memorialized within the Special Order, deficiencies related to other paragraphs prevent SO20-02 from being finalized. Upon resolution of those concerns with SO20-02, we will find that the CPD has met Preliminary compliance with the requirements of ¶94.

## Crisis Intervention: ¶96

**96.** *CPD's Basic CIT Training is an in-depth, specialized course that teaches officers how to recognize and effectively respond to individuals in crisis. In addition to the crisis intervention-related topics covered in the training provided to all officers, the Basic CIT Training will address signs and symptoms of individuals in crisis, suicide intervention, community resources, common mental health conditions and psychotropic medications, the effects of drug and alcohol abuse, perspectives of individuals with mental conditions and their family members, the rights of individuals with mental conditions, civil commitment criteria, crisis de-escalation, and scenario-based exercises.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶96.

In the previous reporting period, the CPD provided Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the CIT curricula, as well as the administration and delivery of the Basic CIT Training. To assess Preliminary compliance, the IMT reviewed whether the requirements of ¶96 are written in policy. The IMT reviewed whether the relevant CPD personnel are trained on that policy and whether those meetings are occurring.

We observed the CPD's CIT Training and the training revision process in the previous reporting period. We found that ¶96's required topics were included in the curriculum and were given sufficient attention during the training. Moreover, the CIT Unit conducted outreach to community stakeholders in order to gather comments and recommendations for improving the training. Overall, we found these efforts to be consistent with ¶96's requirements.

The CPD has restarted its efforts to provide the CIT Basic 40-hour training. In the next monitoring period, the IMT will observe the updated training to verify that delivery is in-line with the approved lesson plans and presentation material. Absent significant issues with training delivery, we expect the CPD will reach Full compliance with the requirements of this paragraph in the next monitoring period. However, we reiterate that the CPD should invite members of the Chicago Council

on Mental Health Equity to observe the training and make recommendations for training improvement.

# Crisis Intervention: ¶97

**97.** *CPD's CIT Refresher Training is a specialized, advanced training to further develop and expand Certified CIT Officers' skills in recognizing and appropriately responding to calls for service that involve individuals in crisis. The CIT Refresher Training will include a review of the concepts, techniques, and practices offered in the Basic CIT Training as well as relevant and/or emerging topics in law enforcement responses to individuals in crisis, general and specific to CPD. Additionally, the CIT Refresher Training may cover the content included in the in-service crisis intervention training.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**   *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**         *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶97.

As noted in our last report, the CPD finalized Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the Crisis Intervention Team curricula, as well as the administration and delivery of the refresher training.

The CPD began delivering the refresher training and the IMT will observe the training in the next monitoring period. The refresher training curriculum includes the requirements of ¶97 and the lesson plans we reviewed indicate that each requirement is given sufficient attention during the training. The curriculum was also reviewed by the Chicago Council on Mental Health Equity, thereby soliciting community input. As a result of initiating the training, we find the CPD has achieved Secondary compliance.

Full compliance with the requirements of ¶97 will require the CPD to train all Certified CIT Officers, while also collecting meaningful feedback from both officers and non-CPD personnel. In our last report, we recommended that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery and to provide feedback to the CPD regarding the same. We maintain that recommendation for this reporting period. The community's feedback, combined with officer feedback, would be an invaluable tool for the next 3-year iteration of refresher training.

Last, significant number of years that have passed since "certified" officers were originally trained suggests more of a training model than a specialized program model. We strongly suggest the CPD prioritize officers to receive the refresher training based on when they received the 40-hour basic training. For instance, a data dashboard shown to the IMT indicates a fairly significant percentage of "Certified" CIT officers were trained more than 8 years ago and have not received any formal refresher training since. This lack of formal refresher training results in a diluted, non-best practice model. This means that officers are unable to refresh their skills while still being considered a specialized response. The CPD should triage officers by how recently they have received training, such that those officers with the most outdated training on crisis response will receive the refresher training first. This will help ensure that the CIT officers' training reflects the recent advances in knowledge, best practices, and community expectations. The IMT will continue to assess the CPD's process for ensuring best practices are followed in prioritization of refresher training.

## Crisis Intervention: ¶99

**99.** *Within 365 days of the Effective Date, the CIT Program staff, in coordination with the Education and Training Division will develop the CIT Refresher Training. The CIT Program staff will review and revise the CIT Refresher Training as necessary to ensure that Certified CIT Officers receive up-to-date training. The CIT Program will seek input from the Advisory Committee in the development of the refresher training.*

**Compliance Progress**                 (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶99.

As noted in our last report, the CPD has Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that the Crisis Intervention Team Training Section is responsible for developing, reviewing, and revising the Crisis Intervention Team curricula and delivering the refresher training.

The CPD began delivering the refresher training during this reporting period. The IMT will observe this training in the next monitoring period. To evaluate Secondary compliance with ¶99, the IMT confirmed that the Chicago Council on Mental Health Equity reviewed the curriculum, thereby soliciting community input. The CPD has achieved Secondary compliance through initiating the refresher training.

Full compliance with the requirements of ¶99 will require CPD to train all Certified CIT Officers and collect meaningful feedback from officers as well as non-CPD personnel. In our last report, we recommended that the CPD invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery with an opportunity to provide feedback to the CPD. We maintain that recommendation for this report since this feedback, combined with officer feedback, would be an invaluable tool when planning the next 3-year iteration of refresher training.

Last, the fact that a significant number of years that have passed since "certified" officers were originally trained suggests more of a training model than a specialized program model. We strongly suggest the CPD prioritize officers to receive the refresher training based on when they received the 40-hour basic training. For instance, a data dashboard shown to the IMT indicates a fairly significant percentage of Certified CIT officers were trained more than 8 years ago and have not received

any formal refresher training since. This lack of formal refresher training results in a diluted, non-best practice model. This means that officers are unable to refresh their skills while still being considered a specialized response. The CPD should tri-age officers by how recently they have received training, such that those officers with the most outdated training on crisis response will receive the refresher train-ing first. This will help ensure that CIT officers' training reflects the recent advances in knowledge, best practices, and community expectations. The IMT will continue to assess the CPD's process for ensuring best practices are followed in prioritiza-tion of refresher training.

# Crisis Intervention: ¶100

> **100.** *All Certified CIT Officers who completed the Basic CIT Training before the development of the CIT Refresher Training must complete their first CIT Refresher Training within four years of the date that the CIT Refresher Training is developed. All Certified CIT Officers who complete Basic CIT Training on or after the date that the CIT Refresher Training is developed must complete their first CIT Refresher Training within three years of receiving the Basic CIT Training.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**     Moving     ☑ **Not Yet Applicable**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

During the fourth monitoring period, the City and the CPD did not meet any level of compliance ¶100.

In the fourth monitoring period, the IMT reviewed a revised draft version of the Crisis Intervention Unit (CIU) Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶100. However, SO20-02 was not finalized during the monitoring period and additional revisions related to other paragraphs are necessary before finalization. In order to achieve Preliminary compliance with ¶100, the CPD will need to make the necessary revisions and finalize SO20-02.

The draft version of SO20-02 indicates that the CPD will establish an electronic CIT certification expiration date. Upon that date, the CIT officer will have needed to receive the CIT refresher training to avoid being removed from the Certified CIT Officers list prioritized for dispatch. To achieve Secondary compliance, the CPD will need to demonstrate a functioning system for assigning this expiration date. The IMT notes that a functioning system should help remind officers that their expiration date is approaching.[81]

---

[81]   In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120. The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the current version of S05-14, we do not believe that the current version sufficiently addresses

these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

# Crisis Intervention: ¶101

**101.** *Certified CIT Officers who fail to complete the CIT Refresher Training within three years of taking their most recently required CIT Training, whether the Basic CIT Training or a prior CIT Refresher Training, will be deemed out of compliance with the CIT Program's CIT Refresher Training requirement. CPD will confirm on a quarterly basis that Certified CIT Officers remain in compliance with the CIT Refresher Training requirement. Any Certified CIT Officer found to be out of compliance during the quarterly review may not continue to be identified by CPD as a Certified CIT Officer and may not continue to be prioritized to respond to calls for service involving individuals in crisis. Each quarter, CPD will inform OEMC of officers who are out of compliance with the CIT Refresher Training requirement. An officer out of compliance with the CIT Refresher Training requirement must complete the most recently offered version of the CIT Refresher Training before CPD may resume identifying the officer as a Certified CIT Officer and before OEMC may resume prioritizing that officer to respond in the field to calls involving individuals in crisis.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          Quarterly                    ☑ **Not Yet Applicable**

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not in Compliance*
**Full:**          *Not in Compliance*

During the fourth monitoring period, the City and the CPD did not meet any level of compliance ¶101.

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶101. However, SO20-02 was not finalized during the monitoring period and additional revisions related to other paragraphs are necessary before finalization. In order to achieve Preliminary compliance with ¶101, CPD will need to make the necessary revisions and finalize SO20-02.

The draft version of SO20-02 indicates that CPD will establish an electronic CIT certification expiration date. Upon that date, the CIT officer will have needed to receive the CIT Refresher training or else will be removed from the list of Certified CIT Officers prioritized for dispatch. To achieve Secondary compliance, CPD will

need to demonstrate that their system for assigning this date is functioning and can help remind officers that their expiration date is approaching.[82]

---

[82] In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120. The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the current version of S05-14, we do not believe that the current version sufficiently addresses these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

# Crisis Intervention: ¶102

**102.** *All newly assigned Field Training Officers ("FTOs") and pro-moted Sergeants and Lieutenants will continue to receive the Basic CIT Training. To be considered Certified CIT Officers, FTOs, Sergeants, and Lieutenants must meet the eligibility criteria and training requirements established by the CIT Program and this Agreement.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶102.

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶102. However, SO20-02 was not finalized during the monitoring period and additional revisions related to other paragraphs are necessary before finalization. In order to achieve Preliminary compliance with ¶102, the CPD should make the necessary revisions and finalize SO20-02.

We note that the CPD is apparently training all newly-assigned Field Training Officers and promoted Sergeants and Lieutenants, despite needing to finalize SO20-02. Additionally, the CPD has made progress on developing its new CIT dashboard, which includes data specific to ¶102. The IMT presently does not have access to this dashboard. The IMT's review of this dashboard will be an important part to future compliance assessments with Consent Decree requirements.

# Crisis Intervention: ¶103

*103. The CIT Program staff responsible for the CIT training curriculum will, where it would add to the quality or effectiveness of the training and when feasible and appropriate, encourage and seek the participation of professionals and advocates who work with individuals in crisis, and persons with lived experiences of behavioral or mental health crisis, including those with involvement in the criminal justice system, in developing and delivering CPD CIT trainings.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶103.

In the fourth monitoring period, the IMT reviewed a revised draft version of Crisis Intervention Unit Special Order SO20-02, *CIT Training Scheduling, Attendance, Eligibility, and Recruitment*, which memorializes the requirements of ¶103. However, SO20-02 was not finalized during the monitoring period and additional revisions related to other paragraphs are necessary before finalization. In order to achieve Preliminary compliance with ¶103, the CPD will need to make the necessary revisions and finalize SO20-02.

The CPD has made significant progress toward compliance with ¶103, but it still needs to finalize SO20-02. As noted in our prior report, the CPD has incorporated the input of mental health professionals, stakeholders, and people with lived experience into the development and delivery of the CIT Basic 40-hour training and Refresher training. The CPD has convened a working group to review curricula and provide feedback on training. Additionally, professionals and people with lived experience are involved in the CIT trainings as both instructors and participants. Had S20-02 been finalized during the monitoring period, the IMT would have found the CPD to have already achieved Secondary compliance based on its efforts to-date.

For Full compliance, we will continue to assess how the CPD incorporates the input of professionals and people with lived experience. As part of this, we will assess how the CPD has furthered its outreach to include additional perspectives.[83]

---

[83]   In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120.

The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the current version of S05-14, we do not believe that the current version sufficiently addresses these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

# Crisis Intervention: ¶104

**104.** *CPD will develop policies regarding the criteria for ongoing participation as a Certified CIT Officer, consistent with this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶104.

In last monitoring period, the CPD provided the IMT with Special Order SO20-02, *CIT Training Schedule, Attendance, Eligibility, and Recruitment*, though the Special Order required further revision to provide sufficient guidance for conducting assessment of the CIT applicants.

As part of their revision process, the CPD proposed that officers be ineligible for the CIT service if they (1) have received a sustained misconduct complaint within the preceding 12 months which resulted in a suspension of more than seven days or (2) have three or more sustained misconduct complaints resulting in suspension within the past five years.

As a general matter, these thresholds for eligibility are low. CPD representatives informed us that very few officers would be ineligible for the CIT service based on these thresholds. We therefore suggested the CPD revise their criteria in order to be confident that the CIT applicants have a desirable background given the importance of the position. During this monitoring period, the CPD provided the IMT with a revised version of SO20-02, but the ineligibility criteria had not been revised in any way.

The City and the CPD have not met Preliminary compliance with ¶104, because the collaborative revision process for SO20-02 was ongoing at the end of the fourth monitoring period.

# Crisis Intervention: ¶105

**105.** *CPD will continue to maintain an up-to-date list of Certified CIT Officers, including their unit of assignment.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

During the fourth monitoring period, the CPD maintained Preliminary compliance with ¶105.

The CPD has Special Order S05-14, *Crisis Intervention Team Program*, which clearly states that the Training Division is responsible for updating officer training records regarding the completion of Basic, Advanced, and Refresher CIT trainings. The CPD and the OEMC also continue to utilize a multiple approaches for informing the OEMC telecommunicators which CPD members are CIT certified. For example, the OEMC personnel can access the roster of CIT officers available on a per-shift basis. Additionally, watch supervisors can provide a list of CIT officers to the OEMC utilizing a separate dataset.

In our last report, we noted that Secondary compliance would depend on the development of a systems plan to ensure that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR/eLearning systems. In response, the CPD provided SO20-02 which indicates that the CPD will establish an electronic CIT certification expiration date. Upon that date, the CIT officer will have needed to receive the CIT Refresher training to avoid being removed from the list of Certified CIT Officers prioritized for dispatch. Additionally, SO20-02 states that the Commander – CIT Program Coordinator or designee is responsible for disqualifying members who meet other ineligibility criteria. However, SO20-02 has not been finalized.

To achieve Secondary compliance, the CPD will need to finalize SO20-02 and demonstrate that it is capable of identifying and removing ineligible officers from the list of Certified CIT officers. Full compliance will then depend on data demonstrating full operation of the system.

# Crisis Intervention: ¶106

**106.** *CPD will require that, when available, at least one Certified CIT Officer will respond to any incident identified as involving an individual in crisis. Certified CIT Officers will continue to be prioritized for dispatch to incidents identified as involving individuals in crisis, as assigned. CPD will review and revise the appropriate policies to ensure that, in situations in which a Certified CIT Officer is not available to respond to a call or incident identified as involving an individual in crisis, the responding officer engages in crisis intervention response techniques, as appropriate and consistent with CPD policy and their training, throughout the incident. Responding officers will document all incidents involving an individual in crisis in a manner consistent with this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the City and the CPD maintained Preliminary compliance with ¶106.

In the previous reporting period, we noted that the CPD possessed sufficient directives containing the requirements of ¶106 (*e.g.*, S04-20, *Recognizing and Responding to Individuals in Crisis*) as well as possessed a comprehensive Crisis Intervention Report for documenting incidents involving an individual in mental health crisis.

CPD officers have not received the training components necessary to achieve Secondary compliance with ¶106. For instance, non-CIT officers have not received updated training on responding to calls involving people in mental health crisis. This will be necessary if they are to "engage[] in crisis intervention response techniques." Furthermore, not all officers within the CPD have been trained on completing the Crisis Intervention Report, making the reliability of any crisis intervention data unreliable given the historical infrequency of the CPD members completing the prior form. The training on completing the Crisis Intervention Report should ensure that all officers consistently understand its terms. In addition, Full compliance cannot be achieved unless the CPD is able to collect reliable data to evaluate the incident and conduct trend analysis. Assessing the frequency of non-CIT officers requesting a CIT officer's response may also be informative in meeting the requirement of this paragraph, which requires that, when available, at least

one Certified CIT Officer will respond to any incident identified as involving an in-dividual in crisis.[84]

---

[84] In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120. The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the current version of S05-14, we do not believe that the current version sufficiently addresses these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

# Crisis Intervention: ¶107

**107.** *Within 180 days of the Effective Date, and quarterly there-after, CPD will collect and analyze the number of calls for service identified as involving individuals in crisis for every watch in each district to evaluate the number of Certified CIT Officers needed to timely respond. The number of Certified CIT Officers on each watch in every district will be driven by the demand for crisis in-tervention services for the particular watch and district.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|

**Deadline:** Quarterly     ☐ **Met** ☑ **Missed**

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

During the fourth monitoring period, the CPD did not achieve any level of compli-ance with ¶107.

During this monitoring period, the CPD provided a revised draft of Special Order SO20-05, (*CIT Officer Implementation Plan*). However, the SOP has not been final-ized and additional revisions are necessary to achieve Preliminary compliance. For example, we have requested the CPD define the term "timely respond" in order to determine the number of CIT officers needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶107.

As noted in our prior report, the CPD has retained an analyst to conduct the anal-yses required by ¶107.[85] Presently, the CIT Unit analyst is creating a statistical model to determine the demand for crisis intervention services. However, we have not yet received a comprehensive explanation of the analyst's metrics (including the model's variables). This will be a necessary component for Secondary compli-ance. For the moment, the CPD could perform simpler assessments which would provide a preliminary understanding of whether current CIT deployment is reflec-tive of the demand for services. For instance, if 5% of all CIT calls occur in a district, we should expect (roughly) 5% of all CIT officers to be in that same district. This is

---

[85]   Based on our discussions with the analyst, we believe the data analyst was well qualified to conduct the necessary evaluations. After the fourth reporting period, the CIT Program's data analyst resigned. Moving forward, the City and the CPD will need to fill the position.

a straightforward analysis and would provide a good foundational set of data to inform "demand for services."[86]

---

[86] In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120. The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the current version of S05-14, we do not believe that the current version sufficiently addresses these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

# Crisis Intervention: ¶108

***108.*** *Within 180 days of the Effective Date, CPD will develop an implementation plan ("CIT Officer Implementation Plan") based on, at a minimum, its analysis of the demand for crisis intervention services for each watch in each district. The CIT Officer Implementation Plan will identify the number of Certified CIT Officers necessary, absent extraordinary circumstances, to meet the following response ratio targets: a. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 50% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("initial response ratio target"); and b. a sufficient number of Certified CIT Officers to ensure that Certified CIT Officers are available on every watch in each district to timely respond to at least 75% of the calls for service identified as involving individuals in crisis, absent extraordinary circumstances ("second response ratio target").*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth monitoring period, the CPD did not achieve any level of compliance with ¶108.

During this monitoring period, the CPD provided a revised draft of Special Order SO20-05, (*CIT Officer Implementation Plan*). However, the SOP has not been finalized and additional revisions are necessary to achieve Preliminary compliance. For example, we have requested that the CPD define the term "timely respond" in order to determine the number of CIT officers needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶108.

As noted in our prior report, the CPD has retained an analyst to conduct the analyses required by ¶108. Presently, the CIT Unit analyst is creating a statistical model to determine the demand for crisis intervention services.[87] However, we have not yet received a comprehensive methodology (including the model's variables). This

---

[87] Based on our discussions with the analyst, we believe the analyst was well qualified to conduct the necessary evaluations. After the fourth reporting period, the CIT Program's data analyst resigned. Moving forward, the City and the CPD will need to fill the position.

will be a necessary component for Secondary compliance. However, for the moment, the CPD could perform simpler assessments which would provide a preliminary understanding of whether current CIT deployment is reflective of the demand for services. For instance, if 5% of all CIT calls occur in a district, we should expect (roughly) 5% of all CIT officers to be in that same district. This is a straightforward analysis and would provide a good foundational set of data to inform "demand for services."

# Crisis Intervention: ¶109

**109.** *The CIT Officer Implementation Plan will further identify the steps that are necessary to meet and maintain the initial response ratio target by January 1, 2020, and the second response ratio target by January 1, 2022 and the strategies, methods, and actions CPD will implement to make progress to timely achieve and maintain these response ratio targets.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          January 1, 2022          ☑ **Not Yet Applicable**

**Preliminary:**       *Not in Compliance*
**Secondary:**        *Not in Compliance*
**Full:**             *Not in Compliance*

In the fourth monitoring period, the CPD did not achieve any level of compliance with ¶109.

During this monitoring period, the CPD provided a revised draft of Special Order SO20-05, (*CIT Officer Implementation Plan*). However, the SOP has not been finalized and additional revisions are necessary to achieve Preliminary compliance. For example, we have requested the CPD define the term "timely respond" in order to determine the number of CIT needed in a particular district and watch. Upon the necessary revisions, the CPD will be in Preliminary compliance with ¶109.

As noted in our prior report, the CPD has retained an analyst to conduct the underlying analyses necessary to determine the necessary steps to achieve the Initial Response Ratio Target (IRRT) and the Second Response Ratio Target (SRRT). Presently, the CIT Unit analyst is creating a statistical model to determine the demand for crisis intervention services, thereby informing the steps required by ¶109.[88] However, we have not yet received a comprehensive methodology (including the model's variables). This will be a necessary component for Secondary compliance. However, for the moment, the CPD could perform simpler assessments which would provide a preliminary understanding of whether current CIT deployment is reflective of the demand for services. For instance, if 5% of all CIT calls occur in a district, we should expect (roughly) 5% of all CIT officers to be in that same district. This is a straightforward analysis and would provide a good foundational set of

---

[88] Based on our discussions with the analyst, we believe the analyst was well qualified to conduct the necessary evaluations. After the fourth reporting period, the CIT Program's data analyst resigned. Moving forward, the City and the CPD will need to fill the position.

data to inform "demand for services" and subsequently the steps necessary to achieve the IRRT and SRRT.

# Crisis Intervention: ¶110

*110. Within 180 days of completing the CIT Officer Implementation Plan, and annually thereafter, CPD will submit a report to the Monitor and the Office of the Attorney General ("OAG") regarding the progress the Department has made to meet: (a) the response ratio targets ("Implementation Plan Goals") identified in the Implementation Plan and (b) the number of Certified CIT Officers identified as necessary to achieve the response ratio targets. The Monitor and OAG will have 30 days to respond in writing to CPD's progress report. The Monitor and CPD will publish CPD's report and the Monitor's and OAG's response, if any, within in 45 days of the date CPD submitted the progress report to the Monitor and OAG.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|

**Deadline:** Moving ☑ **Not Yet Applicable**

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶110.

In the fourth monitoring period, the IMT reviewed an updated version of Crisis Intervention Unit Special Order SO20-05, *CIT Officer Implementation Plan*, which made progress in meeting ¶110's requirements.

Overall, to meet Preliminary compliance we strongly suggest that the CPD clarify what is considered a "timely" response to service calls involving an individual in crisis, as subsequent compliance assessments will depend on this term's definition. We have also shared other concerns regarding SO20-05, *CIT Officer Implementation Plan,* with the City and the CPD, and we look forward to resolving those issues soon.

Moving forward, once the CPD achieves Preliminary compliance, then Secondary compliance will depend on the CPD providing a comprehensive initial report to the IMT and OAG by the end of the next monitoring period.

# Crisis Intervention: ¶113

> ***113.*** *CPD will require that responding Certified CIT Officers will take the lead in interacting with individuals in crisis, once on scene, when appropriate and with supervisory approval, if required by CPD policy. If an officer who is not a CIT-Certified Officer has assumed responsibility for the scene, the officer will seek input from the on-scene Certified CIT Officer on strategies for resolving the crisis, when it is safe and practical to do so.*

## Compliance Progress                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *Under Assessment*
**Full:**              *Not Yet Assessed*

In the fourth monitoring period, the CPD maintained Preliminary compliance with ¶113.

The CPD has S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers assigned to incidents with mental-health components will request a Certified CIT-trained officer to assist, if available. We note that the CPD policy does not require the Certified CIT Officer to take the lead in interacting with individuals in crisis.

During the fourth monitoring period, the CPD provided us with two sets of training material: (1) *Recognizing and Responding to Individuals in Crisis* and (2) the *CIT eLearning on Recognizing and Responding to Individuals in Crisis*. For both of these trainings, we issued a no-objection notice and believe both trainings provide sufficient guidance on members' responsibilities under ¶113. While the recruit training is provided to all new officers, the refresher eLearning training has not yet been provided to all current officers—although it is our understanding that the CPD intends to do so and will provide evidence of attendance. However, we believe the content of the current training represents a dramatic improvement when compared to the CPD's prior mental-health training in modules related to Use of Force and Custodial Escorts. Upon providing the improved training to officers, we believe the CPD will be in Secondary compliance with the requirements of ¶113. Full compliance will depend on data demonstrating officers are in-fact seeking input from CIT officers when appropriate.

# Crisis Intervention: ¶114

**114.** *Certified CIT Officers will receive ongoing feedback from the CIT Program and unit supervisors regarding their responses to incidents identified as involving individuals in crisis.*

## Compliance Progress　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the CPD maintained Preliminary compliance with the requirements of ¶114.

The CPD's Special Order S05-14, *Crisis Intervention Team (CIT) Program*, states that area-level personnel within the CIT Unit will provide advice, guidance, and feedback on incidents involving people in crisis and follow up on mental and behavioral health-related events beyond the preliminary investigation.

However, the IMT has yet to receive sufficient evidence that area-level personnel are in place, have been adequately trained to review incidents, and are able to consistently identify areas for critical feedback. To achieve Secondary compliance, the CPD will need to provide evidence that area-level personnel have received training on reviewing incidents and providing feedback to the Certified CIT Officers (as well as providing feedback to the CIT Program in general). For Full compliance, the CPD will need to show that it is completing the necessary reviews and that personnel, training, and policy trends are being identified and addressed as appropriate.

Additionally, we will need to assess evidence that unit supervisors (*i.e.*, members' shift sergeant and lieutenant) are providing ongoing feedback after interactions with people in mental-health crisis. For the IMT to be confident that this is occurring, the CPD will also need to demonstrate that a sufficient number of unit supervisors have received the 40-hour training. Furthermore, unit supervisors should be provided refresher training on the responsibilities found in ¶114. While the eLearning training being provided to all CPD officers includes a detailed review of relevant policy changes, the training provided no supervisor-specific training on the process of reviewing reports and evaluating officer responses to calls involving a person in mental health crisis (*see* ¶119).

# Crisis Intervention: ¶115

> **115.** *CPD has designated and will maintain a Certified CIT Officer, at the rank of Lieutenant or above, with the sole responsibility to act as a Crisis Intervention Team Program Coordinator ("CIT Coordinator"). The CIT Coordinator will work to increase the effectiveness of CPD's CIT Program, improve CPD's responses to incidents involving individuals in crisis, and facilitate community engagement between CPD and crisis intervention-related stakeholders.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the CPD did not meet any level of compliance with ¶115.

During this reporting period, the CPD produced SO21-01, *CIT Program Coordinator*, which addressed most of ¶115's requirements. However, the CPD must make several revisions to SO21-01 to reach Preliminary compliance. For example, SO21-01 lists three topics the CIT Program Coordinator should annually review with the Deputy Chief, Training, and Support Group. We suggest that the CPD add a fourth topic to read as follows: "Observation and review of evaluations for these trainings to inform recommendations." The IMT looks forward to receiving the further revised SO21-01 that incorporates the IMT's prior comments.[89]

---

[89] In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120. The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the current version of S05-14, we do not believe that the current version sufficiently addresses these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

# Crisis Intervention: ¶116

> **116.** *The CIT Coordinator will receive initial and refresher professional development training that is adequate in quality, quantity, type, frequency, and scope to prepare the CIT Coordinator to take on the role and responsibilities of the CIT Coordinator, in addition to the Basic CIT training.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the CPD maintained Preliminary and Secondary compliance with ¶116.

As noted in our prior report, the requirements of ¶116 are sufficiently memorialized in Special Order S05-14, *Crisis Intervention Team (CIT) Program*, and the present CIT Coordinator has both adequate training and the requisite background to fulfill the role. However, we noted in our last report that Full compliance would depend on ongoing evaluation of the minimum training and professional background standards for the CIT Coordinators. For example, we noted during the last monitoring period the importance of any potential CIT Program Coordinator having on-the-street experience as part of his or her Crisis Intervention Training. This represents one area where the background standards could be enhanced.

# Crisis Intervention: ¶117

*117. The responsibilities of the CIT Coordinator will include, at a minimum: a. developing and managing a uniform CIT Program strategy; b. researching and identifying best practices to incorporate into CPD response to individuals in crisis; c. reviewing and, when necessary to meet the requirements of this Agreement, enhancing the CIT training curricula; d. selecting and removing Certified CIT Officers from the CIT Program consistent with the requirements of this Agreement; e. overseeing crisis intervention-related data collection, analysis, and reporting; f. developing and implementing CPD's portion of any Crisis Intervention Plan; g. supervising CIT Program staff; h. participating in the Advisory Committee; i. encouraging the public recognition of the efforts and successes of the CIT Program and individual Certified CIT Officers; and j. regularly communicating and interacting with relevant CPD command staff to recommend improvements to Department crisis intervention-related strategies, staffing and deployment, policies, procedures, and training.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fourth monitoring period, the CPD maintained Preliminary compliance with ¶117. In our prior report, we noted that S05-14 (*Crisis Intervention Team (CIT) Program*) clearly states that the CIT Coordinator is responsible for the activities required by ¶117, thereby achieving Preliminary compliance. However, we noted that the CIT Coordinator is operating without a comprehensive operations manual for how the Coordinator is expected to execute their duties. We stated that the compilation of SOPs related to the CIT Unit would resolve the issue, thereby achieving Secondary compliance. As described in other assessments with this Section, several SOPs require further revision before they can be approved. Upon approval of all SOPs, we will find the CPD to in Secondary compliance.

## Crisis Intervention: ¶118

**118.** *By January 1, 2020, CPD will require that, after responding to an incident involving an individual in crisis, the assigned CPD officer completes a CIT Report, or any similar form of documentation CPD may implement. The CIT Report, or similar documentation, at a minimum, will include: a. the nature of the incident; b. the date, time, and location of the incident; c. the subject's age, gender, and race/ethnicity; d. whether the subject is or claims to be a military veteran, if known; e. the relationship to the subject, if any and if known, of the individual calling for service; f. whether the subject has had previous interactions with CPD, if known; g. whether the subject is observed or reported to be experiencing symptoms of a mental illness, intellectual or developmental disability, co-occurring condition such as a substance use disorder, or other crisis; h. the behaviors observed during the incident, including whether the subject used or displayed a weapon; i. the name(s) and star (i.e., badge) number(s) of the assigned CPD officer(s) and whether any of the assigned officers are Certified CIT Officers; j. the name(s) and star (i.e., badge) number(s) of any supervisor responding to the scene; k. the skills, techniques, or equipment used by the responding CPD officers; l. whether a reportable use of force was documented on a Tactical Response Reports ("TRR"), or whatever similar form of documentation CPD may implement, for the incident ; m. a narrative describing the CPD officer's interaction with the subject, when no other CPD report captures a narrative account of the incident; and n. the disposition of the incident, including whether the individual was transported to municipal or community services, transported to a hospital, subject to a voluntary or involuntary commitment, or arrested.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶118.

The IMT reviewed an eLearning that the CPD created, which addresses policy changes. These changes include those in S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that officers must complete a CIT Report when they determine that a call for service has a mental-health component. While noting areas for improvement, the IMT submitted a no-objection on the eLearning.

The CIT Report will now be required of all officers, whereas in the past it had only been required of CIT officers in certain situations (*i.e.*, when no other report was completed).

Secondary compliance will be achieved once 95% of officers have received and passed the eLearning. Subsequent levels of compliance will require operational integrity that 95% of officers are completing the CIT Report, thereby informing reliable data collection.

# Crisis Intervention: ¶119

**119.** *CPD will require that a supervisory member reviews and approves completed CIT Reports, or any similar form of documentation CPD may implement to document incidents involving an individual in crisis, before submitting them to the CIT Program.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶119.

The CPD enacted S04-20, *Recognizing and Responding to Individuals in Crisis*, which clearly states that supervisors will "review and if appropriate, approve the completed Crisis Intervention (CIT) Report submitted for their approval." The IMT notes that ¶119 requires approval, not just "if appropriate," and this requirement will be considered in subsequent compliance assessments.

The IMT reviewed the CPD's eLearning, which addresses the IMT's recommended policy changes, including policy changes resulting from ¶119. The IMT submitted a no-objection on the eLearning because it provided a comprehensive overview of the policy changes. However, we also noted that the eLearning covers little information specific to supervisors, including how they are expected to conduct the reviews required by ¶119.

Secondary compliance will be partially achieved once 95% of the CPD officers and supervisors have received and passed the eLearning. However, supervisors will still require training on how to conduct the reviews for the CPD to achieve Secondary compliance. Full compliance will require operational integrity that CIT reports are indeed being reviewed and approved before they are submitted to the CIT Unit.

# Crisis Intervention: ¶120

**120.** *CPD will collect, analyze, and report data regarding the number and types of incidents involving individuals in crisis and responses of CPD officers to such events to assess staffing and deployment of Certified CIT Officers and department-wide responses to individuals in crisis. The CIT Program will review the data contained within the submitted CIT Reports, or any similar form of documentation CPD may implement, to evaluate the overall response and effectiveness by CPD officers and identify any district-level and department-wide trends regarding responses to incidents identified as involving individuals in crisis.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the CPD did not achieve any level of compliance with ¶120.

The requirements of ¶120 are found in several directives and forms which, when viewed together, largely memorializes the CPD's responsibilities for collecting, analyzing, and reporting data. However, the CIT Officer Implementation Plan (SO20-05), which affects several paragraphs including ¶120, does not yet define a "timely" response.

Once SO20-05 has been finalized, Preliminary compliance will have been achieved. Moving forward, Secondary compliance with ¶120 will require adequate methodologies for reviewing data related to the *CIT Officer Implementation Plan*, as well as data collected from the *Crisis Intervention Report*. As part of this, the CPD will need to verify the integrity, reliability, and comprehensiveness of the data collected from the Crisis Intervention Report. Based on conversations with the CPD, we are aware that the Crisis Intervention Reports were relatively rare documents given the number of crisis calls. The CPD will need to ensure that officers are completing them as required by policy. Full compliance will require the CPD to demonstrate that district-level and department-wide trends are (1) being identified and (2) being comprehensively addressed.[90]

---

[90]   In the City's comments to an earlier draft of this report, the City references a letter it produced seven days before the end of the reporting period, which posits that an updated draft of S05-14, *Crisis Intervention Team (CIT) Program*, addresses ¶¶100–01, 103, 106–07, 115, and 120. The updated draft of S05-14, however, was not finalized by the end of the reporting period. While the City and the CPD have reached levels of compliance in other paragraphs for the

current version of S05-14, we do not believe that the current version sufficiently addresses these paragraphs. We look forward to reporting on whether a revised draft of S05-14 will demonstrate any additional levels of compliance. *See* Attachment B.

## Crisis Intervention: ¶121

> **121.** *CPD will identify and assign a sufficient number of data analysts to collect and analyze data related to the CIT Program and CPD's response to incidents involving individuals in crisis.*

**Compliance Progress**                   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the CPD achieved Preliminary compliance with ¶121.

The CPD has assigned one analyst to the CIT Unit to collect and analyze data regarding the CIT Program and the CPD's response to incidents involving individuals in crisis.[91] While the IMT has not yet worked closely with the analyst, we have reviewed the analyst's credentials and have been on several phone calls that support her qualifications and ability to review and address data-integrity issues. The CIT Unit is in the process of integrating district-level resources to collect and analyze district-specific data, including the requirement that officers complete the CIT report on all calls involving a mental health component. The data contained in this report will be instrumental to the overall CIT program.

At this time, the CPD has determined that one analyst is sufficient to accomplish the requirements of ¶121. However, our compliance assessments will depend on the finalizing the CIT dashboard and integrating the data from the unit and district levels. Based on the quality of this work, the CPD will then need to conduct ongoing assessments to determine if more analysts are necessary for Full compliance.

---

[91] After the fourth reporting period, the CIT Program's data analyst resigned. Moving forward, the City and the CPD will need to fill the position.

# Crisis Intervention: ¶122

**122.** *Within 365 days of the Effective Date, and on an annual basis thereafter, the City will publish a written Crisis Intervention Plan. The development of the Crisis Intervention Plan will be based on the regular review of aggregate data and a sample of incidents conducted by CPD and OEMC. The CIT Coordinator will consider quantitative crisis-intervention data, qualitative data on officers' and community members' perception of the effectiveness of the CIT Program, CPD member feedback regarding crisis intervention-related training, actual incident information, staffing and deployment analysis of available Certified CIT officers, research reflecting the latest in best practices for police responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee. OEMC will consider the response to, identification of, and dispatch of calls for service involving individuals in crisis by OEMC tele-communicators, research reflecting the latest in best practices for tele-communicator responses to individuals in crisis, and any feedback and recommendations from the Advisory Committee.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | May 3, 2021* | ☐ Met   ☑ Missed |
| | *Extended from February 28, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not in Compliance* | |

During the fourth monitoring period, the City did not reach any level of compliance with ¶122.

In the fourth reporting period, the City produced their revised 2021 *Crisis Intervention Plan* on the last day of the reporting period. This revised plan is still under review. The City produced the first version of the 2021 *Crisis Intervention Plan* in December 2020 and the IMT provided comments in February 2021. The revised version of the 2021 *Crisis Intervention Plan* was not resubmitted back to the IMT until June 30, 2021, half way through the reporting year. Going forward, the IMT encourages the City to provide more timely submissions of this annual report.

As a result, the current version of the *Crisis Intervention Plan* does not include information that occurred between December 2020 and July 2021. Because it is midway through the year, it may be more appropriate at this time to complete a "progress update" report, which would include updated information, along with a plan for the remainder of 2021.

Despite these shortcomings, it is important to note that the City has made substantial strides in the scope of its evaluation and in the transparency of data included in the most recent version of the *Crisis Intervention Plan*. Although the City did not meet the deadline required by ¶122, we believe that their current efforts continue to represent a significant improvement over the *Crisis Intervention Plan* that was provided to the IMT earlier in the reporting period. One such improvement is that the City incorporated information on primary and secondary CIT officer response, which provides more transparency on response ratio requirements. The report also identifies deficiencies in officers hitting the "on scene" key, which makes it difficult to reliably assess when a CIT officer arrives on scene, whether that arrival is primary or secondary, and how long into the call arrival occurs. Finally, the report breaks down response ratios by CIT officers across districts and watches. Public trust relies on transparency, even when deficiencies are present.

The City's proposed *Crisis Intervention Plan* contains information and feedback from all actors within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. In the draft, each entity identifies its accomplishments, which have been substantial.

The *Crisis Intervention Plan* also thoroughly defines the robust community programs established to improve responses to the citizens of Chicago. For example, there is considerable attention placed on services provided to individuals who are homeless and those living with or affected by mental and behavioral health conditions. Services including team-based care, trauma-informed care, co-responder, non-law enforcement models, multi-disciplinary-team responses, and robust data analysis are all included in the Crisis Intervention Plan. The scope of work identified in the *Crisis Intervention Plan* outlines efforts the CPD, the OEMC and the Chicago Council on Mental Health Equity are making to improve responses to people in mental and behavioral health crisis. These efforts include the Crisis Intervention Team Program, identifying and responding to service calls involving a mental health component. Chicago Council on Mental Health Equity's robust work is also included in the report, and it is commendable.

The IMT appreciates the City and its partner agencies for their methodical and comprehensive approach to collecting information to evaluate the City's mental health response system.

In the previous monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly identifies the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*. We appreciate that the CPD memorialized its responsibilities for the *Crisis Intervention Plan* into a standard operating procedure such that future CIT Coordi-

nators may ensure consistency. The OEMC also notes their responsibilities to contribute to the *Crisis Intervention Plan* in its finalized directive *CPD Crisis Intervention Team*. However, the CPD standard operating procedure has yet to be finalized and enacted. The *Crisis Intervention Plan* also notes the City's continuing obligation to create annual Crisis Intervention Plans. We look forward to the *Crisis Intervention Plan's* finalization, as well as ongoing evaluations to be included in subsequent years' plans.

# Crisis Intervention: ¶123

*123. The purpose of the Crisis Intervention Plan will be to evaluate the City's identification of and response to incidents involving individuals in crisis and recommend any changes to staffing and deployment, policy, or training to ensure consistency with CPD and OEMC policy, this Agreement, and best practices. CPD will implement the Crisis Intervention Plan in accordance with the specified timeline for implementation. The Crisis Intervention Plan will: a. report the number, type, and outcome of incidents involving individuals in crisis, the number of Certified CIT Officers available and on duty in each district and on each watch, the percentage of calls for service involving individuals in crisis for which Certified CIT Officers were the first officers to respond to the scene for each watch in every district, and the response times for calls for service involving individuals in crisis for each watch in every district; b. evaluate the CIT Program's compliance with the objectives and functions identified above; c. identify strategies to ensure that CPD has a sufficient number of Certified CIT Officers to meet its response ratio targets for calls for service involving individuals in crisis; d. describe any additional resources, including program staff or equipment, the CIT Program needs to perform its functions; e. identify safety issues and trends regarding interactions between individuals in crisis and officers; f. identify deficiencies and opportunities for improvement in identifying and dispatching calls for service involving individuals in crisis; g. recognize and highlight CIT Program and Certified CIT Officer successes, including successful individual officer performance; h. develop response strategies for repeat calls for service involving individuals who are frequently in crisis; i. recommend any changes to crisis intervention-related strategies, policies, and procedures; j. recommend any changes to CPD and OEMC trainings related to individuals in crisis, including any case studies and teaching scenarios; and k. include a timeline and plan for implementing recommended changes.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not in Compliance*

In the fourth monitoring period, the CPD and City did not achieve any level of compliance with ¶123.

In the fourth reporting period, the City produced their revised 2021 *Crisis Intervention Plan* on the last day of the reporting period. This revised plan is still under review. The City produced the first version of the 2021 *Crisis Intervention Plan* in December 2020 and the IMT provided comments on the same in February 2021. The revised version of the 2021 *Crisis Intervention Plan* was not resubmitted back to the IMT until June 30, 2021, half way through the reporting year. Going forward, the IMT encourages the City to provide more timely submissions of this annual report.

As a result, the current version of the *Crisis Intervention Plan* does not include information that occurred between December 2020 and July 2021. Because it is midway through the year, it may be more appropriate at this time to complete a "progress update" report, which would include updated information, along with a plan for the remainder of 2021.

Despite these shortcomings, it is important to note that the City has made substantial strides in the scope of its evaluation and in the transparency of data included in the most recent version of the *Crisis Intervention Plan*. We believe that the City's current efforts continue to represent a significant improvement over the *Crisis Intervention Plan* that was provided to the IMT earlier in the reporting period. One such improvement is that the City has incorporated information on primary and secondary CIT officer response, which provides more transparency on response ratio requirements. The report also identifies deficiencies in officers hitting the "on scene" key, which makes it difficult to reliably assess when a CIT officer arrives on scene, whether that arrival is primary or secondary, and how long into the call arrival occurs. Finally, the report breaks down response ratios by CIT officers across districts and watches. Public trust relies on transparency, even when deficiencies are present.

The City's proposed *Crisis Intervention Plan* contains information and feedback from all actors within the City's crisis response system, including the CPD, the Chicago Council on Mental Health Equity, the Chicago Fire Department, the OEMC, and the Chicago Department of Public Health. In the draft, each entity identifies its accomplishments, which have been substantial.

The *Crisis Intervention Plan* also thoroughly defines the robust community programs established to improve responses to the citizens of Chicago. For example, there is considerable attention placed on services provided to individuals who are homeless and those living with or affected by mental and behavioral health conditions. Services including team-based care, trauma-informed care, co-responder, non-law enforcement models, multi-disciplinary-team responses, and robust data analysis are all included in the *Crisis Intervention Plan*. The scope of work identified in the *Crisis Intervention Plan* outlines efforts the CPD, the OEMC and the Chicago Council on Mental Health Equity are making to improve responses to people in

mental and behavioral health crisis. These efforts include the Crisis Intervention Program, identifying and responding to service calls involving a mental health component. Chicago Council on Mental Health Equity's robust work is also included in the report, and it is commendable.

The IMT appreciates the City and its partner agencies for their methodical and comprehensive approach to collecting information to evaluate the City's mental health response system.

In the previous monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly identifies the steps necessary to complete the CPD's portion of the *Crisis Intervention Plan*. We appreciate that the CPD memorialized its responsibilities for the *Crisis Intervention Plan* into a standard operating procedure such that future CIT Coordinators may ensure a consistency. The OEMC also notes their responsibilities to contribute to the *Crisis Intervention Plan* in its finalized directive *CPD Crisis Intervention Team*. However, the CPD standard operating procedure has yet to be finalized and enacted. The *Crisis Intervention Plan* also notes the continuing obligation of the City to create annual *Crisis Intervention Plans*. We look forward to finalization of the *Crisis Intervention Plan*, as well as ongoing evaluations to be included in subsequent years' plans.

# Crisis Intervention: ¶124

**124.** *The data included in the Crisis Intervention Plan will not include any personal identifying information.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

During the fourth monitoring period, the City and CPD did not meet any level of compliance ¶124.

During the monitoring period, the CPD provided us with SOP20-03, *Crisis Intervention Plan*, which includes the provision of ¶124. However, we were provided the standard operating procedure late in the monitoring period and because of such lateness, the IMT was unable to provide a no-objection notice for the standard operating procedure, though one will be provided early in the next monitoring period. The OAG has issued a no-objection letter for SOP20-03 and we expect the CPD to achieve Preliminary compliance with ¶124 upon finalization of the standard operating procedure.[92]

The CPD and the City also provided the IMT with a revised draft version of the *Crisis Intervention Plan*. While we discuss further revisions being necessary in other assessments of paragraphs within the Crisis Intervention section of the Consent Decree, we note that the requirements of ¶124 appear to have been adhered to with the current draft version. The *Crisis Intervention Plan* draft does not contain any identifying information and upon finalizing the Plan, we believe the City and CPD will achieve Secondary and Full compliance with this paragraph.

---

[92] We understand that the City and the CPD may not intend to post the standard operating procedure for public comment, but that the City and the CPD may be willing to include the requirement into a public facing policy per ¶627.

# Crisis Intervention: ¶125

**125.** *The CIT Coordinator will have CPD's portion of the Crisis Intervention Plan reviewed and approved by the Chief of the Bureau of Patrol within 60 days of the plan's completion.*

## Compliance Progress                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth monitoring period, the CPD and the City did not meet any level of compliance with ¶125.

In the previous monitoring period, the IMT reviewed a draft version of Crisis Intervention Unit Special Order SO20-03, *Crisis Intervention Plan*, which clearly states the requirement for the CPD's portion of the Crisis Intervention Plan to be reviewed and approved by the Chief of the Bureau of Patrol. However, while we saw some evidence of this occurring in practice, the CPD standard operating procedure has yet to be finalized and enacted. The SOP must be finalized for Preliminary compliance, with Secondary and Full compliance depending on ongoing evidence that the CPD's portion was indeed reviewed and approved by the Chief of the Bureau of Patrol.

# Crisis Intervention: ¶127

**127.** *All new recruits will receive training that is adequate in quantity, quality, and scope regarding responding to individuals in crisis. It will include, but not be limited to, training on the subjects identified above.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth monitoring period, the CPD did not meet any level of compliance with ¶127.

While the CPD has made commendable efforts enhancing its recruit training (see below), the CPD has not yet provided with any policy that satisfactorily memorializes ¶127's requirements. The CPD has S05-14, *Crisis Intervention Team (CIT) Program*, but that directive, in relevant part, only states that the Crisis Intervention Team Training Section (CITTS) will "provid[e] expertise and support to the Training Division with recruit….training." This does not sufficiently identify the "quantity, quality, and scope" of training recruits will receive, including the subjects identified by ¶126. The requirements of ¶127 will need to be memorialized for Preliminary compliance. At the end of the reporting period, the CPD provided an updated draft of S05-14, which was still under the review process at the end of the reporting period. We look forward to reporting on whether the updated version of S05-14 demonstrates compliance with ¶127 in the fifth reporting period.

In the fourth reporting period, the CPD submitted recruit training related to responding to individuals in crisis. Overall, the content of the training was well done, but there is still room for improvement. For example, the IMT recommends that the recruit training's scenario-based training emphasize scenarios that end in de-escalation without the use of force, which is how most service calls conclude. For Secondary compliance, we recommend that the CPD provide the recruit training to the Chicago Council on Mental Health Equity and receive feedback so as to ensure the training has the benefit of the committee's collective wisdom. Future compliance will hinge on demonstration that training has been delivered and that recruit feedback is incorporated into future training material.

# Crisis Intervention ¶128

> **128.** *The City will have a crisis intervention response advisory committee ("Advisory Committee") with subject matter expertise and experience that will assist in identifying problems and developing solutions and interventions designed to improve outcomes for individuals in crisis who require City services. The Parties acknowledge that the City has formed the City-wide Mental Health Steering Committee and that the City may draw upon those resources to satisfy the requirements of this Agreement.*

### Compliance Progress   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the City maintained Preliminary compliance with ¶128.

The Advisory Committee that is responsive to the requirements of ¶128 has evolved over the course of the Consent Decree process. Near the beginning of 2020, the Crisis Intervention Advisory Committee evolved into a new committee called the Chicago Committee on Mental Health Equity. The Crisis Intervention Advisory Committee previously narrowly focused on police responses. The new Chicago Council on Mental Health Equity expands its mission to the City's broader crisis response systems. The Chicago Council on Mental Health Equity is largely comprised of representatives from the Crisis Intervention Advisory Committee, and therefore the IMT does not have any concerns about the qualifications of Chicago Council on Mental Health Equity members. Nor do we have concerns about the maintenance of institutional knowledge being transferred to the new committee.

Although a number of factors impacted the ability of the Chicago Council on Mental Health Equity to meet over the past year, the City maintains Preliminary compliance with ¶128 in the fourth reporting period. First, the COVID-19 pandemic prohibited in-person meetings, which impacted the Chicago Council on Mental Health Equity's productivity. Second, the City paused Chicago Council on Mental Health Equity operations while it determined future steps in light of a decision from the Illinois Attorney General's Office that the Chicago Council on Mental Health Equity is a public body and must follow the Open Meetings Act. As a result, Chicago Council on Mental Health Equity meetings did not occur for several months.

In October 2020, the IMT observed the Chicago Council on Mental Health Equity virtual meeting, where the CPD and the OEMC provided a presentation on their directives. The presentations, however, were at a high level and comments from the Chicago Council on Mental Health Equity were not very robust. In the future, we expect a much deeper assessment of the CPD's and the OEMC's directives from the Chicago Council on Mental Health Equity. The IMT also still awaits the Chicago Council on Mental Health Equity's bylaws to confirm that the committee's voting processes are consistent with best practices. Specifically, as we noted in our last report, the subcommittee recommendations were not reviewed or voted on by the entire board before being sent to the Office of the Mayor. In a virtual meeting with the IMT, the City shared a draft of the Chicago Council on Mental Health Equity bylaws with the IMT. These draft bylaws were also sent to the Chicago Council on Mental Health Equity for review, and a portion of that virtual meeting was dedicated to comments addressing the bylaws. Options for feedback were also given for Chicago Council on Mental Health Equity members who could not be present at the meeting. These are important steps for inclusion of feedback, making the process transparent and giving participants a voice.

The IMT also recommends that the Chicago Council on Mental Health Equity bylaws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops. For example, at the end of the October Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments but the City did not respond to these comments. Future meetings now require community members to submit comments 24 hours before the meetings start. This may, however, deter community input and erode community trust, therefore the Chicago Council on Mental Health Equity should reconsider this approach. The IMT has shared this feedback directly with the city in a meeting called by the city to discuss the draft bylaws. However, the draft bylaws were formally produced to the IMT June 24, 2021, a mere six days before the last day of the reporting period. The bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback. The IMT has submitted formal comments back to the city, and we look forward to reviewing the final draft of the bylaws.

It is important to note that the IMT has observed many subcommittee meetings and have found them to be well run, thoughtful, inclusive of dialogue and feedback, and demonstrates commitment by dedicated experts to transform the mental and behavioral health system in Chicago.

# Crisis Intervention ¶129

**129.** *The Advisory Committee, at a minimum, will meet quarterly to review and recommend improvements to the City's overall response to individuals in crisis, with consideration to areas such as coordinated crisis response; data collection and evaluation; community engagement and awareness; service outreach and prevention; and the CIT Program.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**     Quarterly     ☑ Met   ☐ Missed

**Preliminary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**          *Not Yet Assessed*

In the fourth monitoring period, the City maintained Preliminary compliance with ¶129.

A number of factors impacted the ability of the Chicago Council on Mental Health Equity to meet over the past year. First, the COVID-19 pandemic prohibited in-person meetings, thereby impacting the Chicago Council on Mental Health Equity's productivity. Second, the City paused Chicago Council on Mental Health Equity's operations while it took time to determine future steps in light of a ruling from the Illinois Attorney General's Office that the Chicago Council on Mental Health Equity is a public body and must follow the Open Meetings Act. As a result, no Chicago Council on Mental Health Equity meetings were held for several months.

In October 2020, the IMT observed the Chicago Council on Mental Health Equity virtual meeting, where the CPD and the OEMC provided a presentation on their directives. The presentations, however, were at a high level and comments from the Chicago Council on Mental Health Equity were not very robust. In the fourth reporting period, the OEMC dedicated additional time to review newly developed directives. This is an important step and we commend the OEMC for this work. Feedback from the Chicago Council on Mental Health Equity should be documented in writing, with feedback about what is or is not incorporated into revisions, building trust in the process. IMT would expect documentation supporting this.

In the future, we expect adequate time dedicated to achieve transparent review and assessment of the CPD's and the OEMC's directives from the Chicago Council on Mental Health Equity. Additionally, the IMT still awaits the Chicago Council on Mental Health Equity's bylaws so that we can confirm that the committee's voting processes are consistent with best practices. Specifically, as we noted in our last

report, the subcommittee recommendations were not reviewed or voted on by the entire board before being sent to the Office of the Mayor. In a virtual meeting with the IMT, the City shared a draft of the Chicago Council on Mental Health Equity bylaws with the IMT. In addition, the draft bylaws were sent to the Chicago Council on Mental Health Equity for review and a portion of a virtual meeting was dedicated to comments on the bylaws. Options for feedback were also given for Chicago Council on Mental Health Equity members who could not be present at the meeting. These are important steps for inclusion of feedback, making the process transparent and giving participants voice.

The IMT also recommends that the Chicago Council on Mental Health Equity by-laws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops. For example, at the end of the October Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but the City did not respond to these comments. Future meetings now require community members to submit comments 24 hours before the meetings. This may, however, deter community input and erode community trust. We believe that the Chicago Council on Mental Health Equity should reconsider this approach. The IMT has shared this feedback directly with the city in a meeting called by the city to discuss the draft bylaws. However, the draft bylaws were formally produced to the IMT on June 24, 2021, a mere six days before the end of the reporting period. The bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback. The IMT has submitted formal comments back to the city, and we look forward to reviewing the final draft of the bylaws.

Going forward, further levels of compliance will depend on substantive reviews by the Chicago Council on Mental Health Equity, as well as updated bylaws to ensure that votes are reflective of the entire committee.

# Crisis Intervention: ¶130

**130.** *The City will request that the Advisory Committee provide guidance on crisis response-related policies, procedures, and training of City agencies, including CPD and OEMC, and assist the City in developing and expanding current strategies for responding to individuals in crisis, including reducing the need for police-involved responses to individuals in crisis and developing municipal and community resources, such as pre- and post-arrest diversion resources and alternative response options (like drop-off centers, mobile crisis teams, a central nonemergency crisis line). The City will further request that in providing the guidance detailed above the Advisory Committee will consider specific strategies for responding to children and youth when they experience a behavioral or mental health crisis.*

## Compliance Progress · (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance (SECOND REPORTING PERIOD)* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City maintained Preliminary compliance with ¶130.

In the previous reporting period, the IMT observed the Chicago Council on Mental Health Equity virtual meeting, where the CPD and the OEMC provided a presentation on their directives. The presentations, however, were at a high level and comments from the Chicago Council on Mental Health Equity were not robust. In the fourth reporting period, the OEMC dedicated additional time to review newly developed directives. This is an important step and the OEMC should be commended for this. Feedback provided by the Chicago Council on Mental Health Equity should be documented in writing, with feedback about what is or is not incorporated into revisions, building trust in the process, adequate time dedicated to achieving transparent review.

The draft bylaws were formally produced to the IMT on June 26, 2021. The bylaws still contained restrictive language regarding community member opportunity to ask questions or give feedback, however, the draft bylaws did change provisions to require recommendations to be voted on by the full committee. This is a substantial improvement toward full transparency and inclusion.

The IMT also recommends that the Chicago Council on Mental Health Equity bylaws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seeming shortage of feedback

loops. For example, at the end of the October Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but no responses were provided by the City. Future meetings require community members to submit comments 24 hours before the meetings. This may, however, deter community input and erode community trust. We believe that the Chicago Council on Mental Health Equity should reconsider this approach.

## Crisis Intervention: ¶131

*131. Within 365 days of the Effective Date, the City will request that the Advisory Committee identify and evaluate in writing any opportunities to develop or enhance crisis response-related policies, procedures, and training of City agencies, including CPD, OEMC, and the Chicago Fire Department, and increase municipal and community resources and alternative response options, including rapid-access clinics, drop-off centers, mobile crisis teams, a central non-emergency crisis line, other pre- and post-arrest diversion efforts, and strategies targeted at children and youth. The City will also request that the Advisory Committee identify and evaluate the steps necessary to develop non-criminal justice responses to individuals in crisis, including, but not limited to, a behavioral health unit to provide alternative non-criminal justice responses to individuals in crisis. In evaluating potential community resources and strategies, the Advisory Committee will identify challenges and opportunities for improvement, if any, and make recommendations. The City will address the feedback and recommendations identified by the Advisory Committee, including identifying recommendations that it will adopt, and the plan for implementation, in the Crisis Intervention Plan. The City will respond to each of the recommendations made by the Advisory Committee. The response will include a description of the actions that CPD has taken or plans to take with respect to the issues raised in the recommendations. If the City declines to implement a recommendation, it will explain the reason(s) for declining.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City maintained Preliminary compliance with ¶131.

As noted in our third report, the City requested that the Crisis Intervention Advisory Committee (the Advisory Committee that was in place at the beginning of the Consent Decree, which later evolved into the Chicago Council on Mental Health Equity, *see* analysis for ¶128 above) provide recommendations on the CPD's and the OEMC's policies, procedures, and training. In addition, the Crisis Intervention Advisory Committee provided recommendations for improving the City's broader mental-health-response system. These recommendations were universally accepted by the City. In its draft *Crisis Intervention Plan*, the City provided updates

on its implementation of some—but not all—of these recommendations. We understand that the City may not include every recommendation in the first *Crisis Intervention Plan*, but we look forward to further discussion between the City and Chicago Council on Mental Health Equity to understand how the entirety of CIAC's recommendations will be addressed.

The City has achieved and maintained Preliminary compliance, but the IMT notes that ¶131 requires a comprehensive response to each of the Advisory Committee's recommendation. Further compliance cannot be achieved until the City describes its decision-making process about each recommendation.

The Chicago Council on Mental Health Equity, which is the most recent iteration of the City's advisory committee, is still a relatively new body and has a broader focus on city-wide crisis-response systems. The IMT has observed each of the Chicago Council on Mental Health Equity virtual meetings during the fourth reporting period, and maintains that the Chicago Council on Mental Health Equity represents a sound opportunity for the City to develop and implement a comprehensive city-wide crisis response system. There is robust leadership by the city in this effort, with dedicated experts from the field leading subcommittee work. There is still some confusion by newer members about their role and function, but this is not surprising based on the newest iteration and expansion of the advisory committee. In addition, the City is still navigating the function of the open meetings act, and it is expected that there will be a learning curve on both of these fronts. Going forward, we will continue to assess the Chicago Council on Mental Health Equity meetings and subcommittee meetings, along with direct input from the subcommittee chairs.

The IMT also recommends that the Chicago Council on Mental Health Equity by-laws include provisions for meaningful community engagement. We are concerned about the quality of interactions and the seemingly lack of feedback loops. For example, at the end of the October 2020 Chicago Council on Mental Health Equity meeting, non-members were allotted three minutes to make comments, but the City did not respond to these comments. Future meetings require community members to submit comments 24 hours prior to the meeting. This may act to deter community input and erode community trust, and we believe that the Chicago Council on Mental Health Equity should reconsider its approach. The IMT has shared this feedback directly with the city in a meeting called by the city to discuss the draft bylaws. We believe the city is on the right path thoughtfully considering complicated issues while taking important steps to be inclusive in their revision process. We look forward to reviewing the final draft of the bylaws.

# Crisis Intervention: ¶132

*132. The Advisory Committee will be chaired by the Mayor's Office. The Mayor's Office will invite individuals who have personally experienced a behavioral or mental health crisis, people with experience working with individuals in crisis, and experts with knowledge in law enforcement responses to individuals in crisis. At a minimum, the Mayor's Office will invite individuals from the following groups: first responders; the CIT Coordinator; OEMC; county and city hospitals, health care providers, and mental health professionals; the Cook County State's Attorney's Office; the Cook County Public Defender's Office; at least one academic research entity; community behavioral and mental health professionals; advocacy groups for consumers of behavioral and mental health services; behavioral and mental health service providers; homeless service providers; substance abuse service providers; persons with lived experiences of behavioral or mental health crises; and other similar groups.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fourth monitoring period, the City maintained Preliminary and Secondary compliance with ¶132.

In accordance with the requirements of ¶132, the Chicago Council on Mental Health Equity is chaired by a representative from the Mayor's Office of Public Safety and a Deputy Commissioner of Behavioral Health. We have interviewed the Chair from the Mayor's Office on several occasions and believe that she has the necessary background, experience, and commitment to the Chicago Council on Mental Health Equity process. The IMT has also observed the Deputy Commissioner of Behavioral Health present to and interact with members of the Chicago Council on Mental Health Equity's full and subcommittee meetings. The IMT found that he also has the necessary background, experience, and commitment to the Chicago Council on Mental Health Equity process. Additionally, the Chicago Council on Mental Health Equity membership includes representatives from each of the groups listed in ¶132. Following recommendations from our last report, the Chicago Council on Mental Health Equity gathered a greater representation of people with lived experience compared with the Crisis Intervention Advisory Committee. However, active participation continues to be low, and the City should consider additional ways to improve participation of people with lived experience.

To assess Full compliance, we will monitor the City's efforts to finalize the Chicago Council on Mental Health Equity's bylaws and evaluate the continuing robust participation from the Chicago Council on Mental Health Equity members.

# Crisis Intervention: ¶133

*133. CPD policy will provide that a crisis response may be necessary even in situations where there has been an apparent violation of law.*

## Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not Yet Assessed*
**Full:**               *Not Yet Assessed*

In the fourth monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶133.

The CPD has Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which states that a crisis intervention response may be necessary even in situations where there has been apparent violation of law. Additionally, the directive provides tips and techniques for recognizing a person who may be in mental-health crisis and includes requirements for responding to such calls for service.

While the policy contains some concepts related to recognizing mental health conditions and call response, the training components necessary to achieve Secondary compliance have yet to be delivered. For example, non-CIT officers have not received updated training on responding to calls involving people in mental health crisis. This will be necessary if they are to "provide a crisis response." The CPD has made strides in strengthening the content of crisis response in their revised 2021 annual in-service training (De-escalation, Response to Resistance, and Use of Force), but the training has not yet been received by all officers.

Full compliance with the requirements of ¶133 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the Crisis Intervention Report (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once the CPD delivers the training necessary for Secondary compliance.

# Crisis Intervention: ¶134

**134.** *CPD policy will encourage officers to redirect individuals in crisis to the healthcare system, available community resources, and available alternative response options, where feasible and appropriate.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the fourth monitoring period, the City and the CPD maintained Preliminary compliance with the requirements of ¶134.

The CPD has Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, which requires officers responding to a call involving an individual in crisis to provide that individual with the document "Mental Health Incident Notice." We have reviewed the Mental Health Incident Notice and believe it sufficiently directs community members to the healthcare system, available community resources, and available alternative response options.

However, while the policy contains the requirements of ¶134 and the CPD has a responsive data collection tool, the training components necessary to achieve Secondary compliance have yet to be delivered. For instance, non-CIT officers have not received updated training on the mental health system, nor have they received training on "available alternate response options." Such training will be necessary for Secondary compliance with ¶134.

Full compliance with the requirements of ¶134 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of the Crisis Intervention Report (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once CPD delivers the training necessary for Secondary compliance.

# Crisis Intervention: ¶135

> **135.** *CPD will ensure that the language used in policies, procedures, forms, databases, and trainings to communicate about incidents involving individuals in crisis is appropriate, respectful, and consistent with industry recognized terminology. CPD will seek input from community stakeholders, including the Advisory Committee, for recommendations to identify appropriate and respectful terminology.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶135.

The CPD has Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which states that language used in the policies, procedures, forms, databases, and training materials to communicate about incidents involving individuals in crisis should be appropriate, respectful, and consistent with professional terminology. In addition, Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, clearly communicates the CPD's commitment to interacting with individuals in crisis with dignity, respect, and the utmost regard for the preservation of human life and the safety of all persons involved. Under the "Procedures" section of the directive, officers are instructed that they are required to interact with individuals in crisis with dignity and respect. Finally, the CPD policies and trainings have been reviewed by members of the Chicago Council on Mental Health Equity, thereby accomplishing the second part of ¶135. It is apparent from the policies, procedures, forms, databases, and training materials that we have reviewed that the CPD is committed to reinforcing respectful dialogue when discussing people in crisis.

However, the CPD has not provided updated training on using appropriate and respectful communication when interacting with people in mental health crisis. Although we believe that the CPD has certainly taken sufficient steps to ensure that respectful language is used in policies, procedures, and databases, updated training will ensure that members use respectful language on forms and when "communicat[ing] about individuals in crisis." Such training will be necessary for Secondary compliance.

Full compliance with the requirements of ¶135 will require reliable data on calls involving people in mental health crisis. This will require consistent completion of

the Crisis Intervention Report (*see* ¶118) and will require an audit of crisis calls once reliable data is available. We will assess this in future monitoring periods once the CPD delivers the training necessary for Secondary compliance.

# Crisis Intervention: ¶136

**136.** *CPD will develop and implement policies, procedures, and protocols regarding the collection, maintenance, and use of information related to an individual's medical and mental health to facilitate necessary and appropriate communication while adequately protecting an individual's confidentiality. To develop these policies, procedures, and protocols, CPD will seek input from community stakeholders, including the Advisory Committee.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶136.

The requirements of ¶136 remain incorporated into a number of the CPD directives that require collection, maintenance, and use of an individual's medical and mental health information. For example, Special Order S04-20, *Recognizing and Responding to Individuals in Crisis*, provides guidance about verbal, behavioral, and environmental cues that may allow an officer to recognize a person in mental health crisis and guidance for officers to collect and use information during the on-scene encounter.

S04-20 also includes the requirement for officers to complete a *Crisis Intervention Report* for all calls involving a mental-health component. The report requires data related to individual cases but the data will also be used in aggregate to identify overall trends in the CPD's mental health response approach. Special Order S05-14, *Crisis Intervention Team (CIT) Program*, clearly identifies the responsible parties for following up on mental and behavioral health-related events and for referring and, when appropriate, connecting individuals in crisis with local service providers. The information collected by the draft *CIT Report* appears capable of assisting area-level resources in conducting such follow up.

In crafting the policy and the related *Crisis Intervention Report*, the CPD sought input from community stakeholders and the Chicago Council on Mental Health Equity. Therefore, the CPD has achieved Preliminary compliance with the requirements of ¶136. Subsequent levels of compliance will require comprehensive training for officers in completing the *CIT Report*, as well as training for area-level resources on how to conduct such follow-up. However, we credit the CPD for taking the above-referenced steps to date.

# Crisis Intervention: ¶137

**137.** *Within 180 days of the Effective Date, CPD will review and revise its crisis intervention-related policies as necessary to comply with the terms of this Agreement. CPD will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD did not meet any level of compliance with ¶137.

As noted in our assessments of other paragraphs, the CPD has made a good-faith effort to ensure that the Consent Decree's requirements are incorporated into CIT-related policies and that a responsible party is listed for each requirement. Moreover, the CPD has sought and incorporated feedback from the Chicago Council on Mental Health Equity into draft policies. While some CPD directives that fulfill Consent Decree requirements have been published, the CPD intends to enumerate other requirements in standard operating procedures that have not yet been finalized.

Once the CPD has finalized each relevant standard operating procedure, we anticipate that the CPD will be in Preliminary compliance with the ¶137. Subsequent levels of compliance will require adequately training 95% of all officers and proof that those officers are complying with the CPD's relevant directives. We appreciate the CPD's efforts to accomplish the task of policy review in a comprehensive fashion. For future annual revisions, the IMT recommends that both the Directives and the SOP's are reviewed at the same time.

# Crisis Intervention: ¶138

> **138.** *OEMC call-takers will continue to identify calls for service involving an individual known, suspected, or perceived to be in crisis.*

**Compliance Progress**     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

In the fourth reporting period, the City and the OEMC achieved Preliminary compliance with ¶138.

In October 2020, the IMT reviewed an updated draft version of the OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure, which clearly articulates the call-takers' responsibility to identify calls for service involving an individual known, suspected, or perceived to be in crisis. Call-takers are required to complete a series of "CIT triage questions" that help them determine whether a mental health component is known, suspected, or perceived, which would require a CIT response. The standard operating procedure also instructs call-takers that if there is any doubt about whether a call includes a possible mental health component, the steps listed in the standard operating procedure "can and should apply."

The IMT also notes that the OEMC telecommunicators have received sufficient training on how to identify calls involving an individual known, suspected, or perceived to be in crisis. All telecommunicators receive an eight-hour training in crisis intervention and an annual refresher training that includes a module on mental health response (*see* ¶¶142–46). Once the IMT observes training, thereby ensuring that the new standard operating procedure is incorporated into training, we anticipate that the OEMC will achieve Secondary compliance based on our observations. Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing performance and reliable data as evidenced by the results of OEMC's ongoing audits), but the OEMC has made strides toward establishing the importance of call-takers being able to identify crisis-related calls.

# Crisis Intervention: ¶139

> **139.** *OEMC will continue to code all incidents identified as potentially involving an individual in crisis in a manner that allows for subsequent data analysis necessary for the evaluation of CPD and OEMC responses to individuals in crisis and the development of the plans required by this section of the Agreement.*

## Compliance Progress

(Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the OEMC achieved Preliminary and Secondary compliance with ¶139.

In October 2020, the IMT reviewed an updated draft version of the OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly identifies the manner in which telecommunicators are required to code incidents by utilizing a "Z-code" to denote a mental health component when closing an event in their computer system. The standard operating procedure also explains how to complete a set of "CIT triage questions" that allow for subsequent data analysis. The IMT has received and reviewed data from the OEMC, and we believe the data is sufficient to conduct the necessary trend analysis required in the development of the *CIT Officer Implementation Plan* and the *Crisis Intervention Plan*. Additionally, the data collected by the OEMC, in coordination with data provided by responding CPD officers, allows the OEMC to conduct the necessary audits of telecommunicators' decision making regarding CIT officer dispatch.

The OEMC telecommunicators have also received sufficient training on how to code incidents involving a person in a mental-health crisis and on how to complete the CIT triage questions. Because the SOP has been enacted and incorporated into training, the OEMC has achieved Preliminary and Secondary compliance with ¶139. Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits), but we feel that the OEMC has made strides in establishing the importance of coding calls involving person in mental-health crisis.

As discussed in calls with the OEMC, the IMT strongly recommends that the OEMC improve the manner in which the "weapons present" triage question captures data.

# Crisis Intervention: ¶140

> **140.** *OEMC police communication dispatchers will continue to prioritize Certified CIT Officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. If a Certified CIT Officer is not available to timely respond, OEMC will continue to dispatch an available officer to avoid compromising response time. OEMC dispatchers will dispatch a Certified CIT Officer, when available, if the responding officer requests assistance from a Certified CIT Officer.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the OEMC achieved Preliminary and Secondary compliance with ¶140.

In October 2020, the IMT reviewed an updated draft version of OEMC's *Chicago Police Department Crisis Intervention Team Program* standard operating procedure. The standard operating procedure clearly states the requirement for telecommunicators to prioritize Certified CIT officers for dispatch to incidents that involve an individual known, suspected, or perceived to be in crisis. The standard operating procedure also articulates the requirement to dispatch a non-CIT officer if a CIT officer is not immediately available and the requirement to dispatch a CIT officer if requested by a non-CIT officer. The OEMC telecommunicators receive district and watch information from the CPD watch lieutenants and the CPD CLEAR database about which Certified CIT officers are working on a given shift. (*See* ¶141.)

If a CIT officer is not immediately available, the OEMC data demonstrates that one will be dispatched as an assist when that CIT officer becomes available. The OEMC telecommunicators have also received sufficient training in prioritizing Certified CIT officers for dispatch to such incidents. Therefore, the OEMC achieved Preliminary and Secondary compliance based on our observations. Although Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits), we feel that the OEMC has made strides in establishing the importance of dispatching CIT officers for calls involving a mental-health crisis.

# Crisis Intervention: ¶141

**141.** *CPD will provide OEMC with an updated list of current and active Certified CIT Officers and their assignment at least every week. At the beginning of each watch, CPD will continue to identify for OEMC the Certified CIT Officers on duty for each watch and in each district so that OEMC dispatchers know which Certified CIT Officers to prioritize for dispatch to incidents involving an individual known, suspected, or perceived to be in crisis.*

**Compliance Progress**     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD maintained Preliminary compliance with ¶141.

The CPD has Special Order S05-14, *Crisis Intervention Team (CIT) Program*, which contains the requirements of ¶141 as they relate to the CPD responsibilities. In addition, the OEMC has access to the CPD's data systems, allowing the OEMC to obtain an updated list of all current and active Certified CIT Officers (including their assignments) should they require one. The combination of these systems therefore act as the CPD's official list.

To assess Preliminary compliance, the IMT reviewed a process flowchart that demonstrated the two separate ways in which the CPD provides the OEMC with updated lists of current and active Certified CIT Officers and their assignments on a daily basis.

Specifically, data is transmitted by (1) manually inputting training records into the CPD's CLEAR and eLearning systems and (2) asking the CPD watch supervisors to identify the CIT officers from the eLearning application and to send a roster to the OEMC daily for each district and watch.

These requirements are clearly specified in the CPD's S05-14, *Crisis Intervention Team (CIT) Program*.

However, the CPD has yet to develop a systematic plan to ensure that officers who violate the eligibility criteria or who allow their training to lapse are undesignated in the CLEAR and eLearning systems and are not prioritized for dispatch. For instance, the CPD might create an automatic notification of ineligibility based on the number of days lapsed since their last training. Additionally, for those who exceed the ineligibility thresholds discussed in ¶¶93 and 104, the CPD should create a

policy that requires personnel to crosscheck the CIT roster against any sustained finding to determine whether the finding renders the officer ineligible.

While S05-14 notes that the Deputy Chief of the Strategic Initiatives Division[93] is responsible for "inform[ing] OEMC of officers who are out of compliance with the CIT Program eligibility requirements," this does not constitute a systematic plan because it provides no significant guidance on what, precisely, the Deputy Chief is supposed to do. Secondary compliance with ¶141 will depend on CPD's ability to develop such a plan. Full compliance will then depend on demonstration of the system's success should a CIT officer become ineligible.

---

[93] According to the CPD's last updated organizational chart in the reporting period (dated 12/16/20), a Commander oversees the Strategic Initiatives Division, not a Deputy Chief as indicated by the policy. The CPD should resolve this inconsistency.

# Crisis Intervention: ¶142

**142.** *Within 90 days of the Effective Date, OEMC will ensure that all current active tele-communicators have received mental health and CIT awareness training ("OEMC Training"). OEMC will provide the OEMC Training to new tele-communicators before tele-communicators complete their training and begin answering calls independently.*

**Compliance Progress**　　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Full:** | *In Compliance* (NEW) |

During the fourth monitoring period, the City and OEMC achieved Full compliance with ¶142.

The City and the OEMC achieved Preliminary and Secondary compliance with the requirements of ¶142 based on its demonstration that all current active telecommunicators have received mental-health and CIT awareness training. The OEMC has also memorialized this requirement into a policy, which clearly states the requirement for all telecommunicators to receive the mental health and CIT awareness training. The efforts by the OEMC to ensure policy, training, and operational compliance for this paragraph are commendable. Moving forward, the IMT will continue to audit OEMC member training records to ensure that the requirements of ¶142 continue to be fulfilled.

# Crisis Intervention: ¶143

**143.** *The OEMC Training will be at least an eight-hour course taught jointly by qualified OEMC staff and a mental health clinician or advocate.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**   *In Compliance* (NEW)
**Secondary:**   *In Compliance* (NEW)
**Full:**   *Not Yet Assessed*

During the fourth reporting period, the City achieved Preliminary and Secondary compliance with ¶143.

The OEMC finalized their *Mental Health Training* directive, which clearly states the requirements of ¶143. In the first monitoring period, members of the IMT observed the OEMC's delivery of the eight-hour training. The OEMC staff and external instructors (including mental-health clinicians and advocates) were well qualified to deliver their presentations. The external instructors included representatives from the National Alliance on Mental Illness and from people with lived experience.

The OEMC has also incorporated a contingency plan for if and when there are not enough new telecommunicators hired to warrant their own eight-hour training. In such situations, the OEMC sends the new hires to CPD's 40-hour CIT training. Afterwards, the new hire receives a two-hour training relevant to telecommunicators. When this training is complete, new telecommunicators are eligible to answer calls independently. (*See* ¶142.) However, once the OEMC has enough capacity to conduct the eight-hour training, the new hire will also be required to attend this training. The IMT believes this is a reasonable approach to satisfying the intent of ¶143.

Therefore, OEMC has achieved Preliminary and Secondary compliance. Although Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits), we feel that the OEMC has made strides.

# Crisis Intervention: ¶144

**144.** *The OEMC Training will cover, at a minimum, the following topics: identification of individuals in crisis; telephonic suicide prevention strategies; crisis and stress management, de-escalation, and scenario-based exercises; interactions with individuals with mental illness; information that should be gathered and shared with the responding officer or Certified CIT Officer when the call-taker suspects that the call involves an individual in crisis; the types of calls that may require the dispatching of a Certified CIT Officer or a coordinated crisis response of first responders reflective of established policy for intake and dispatch; and the procedures for dispatching a Certified CIT Officer.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the OEMC achieved Preliminary and Secondary compliance with ¶144.

In the fourth reporting period, OEMC's *Mental Health Training* directive was finalized, which clearly requires the topics listed in ¶144 to be included in their training. Additionally, members of the IMT observed the OEMC's delivery of the eight-hour training and confirmed that the training contained each of the necessary components. The training curriculum was also reviewed by members of the Chicago Council on Mental Health Equity. The OEMC staff and outside instructors (including mental health clinicians and advocates) were qualified relative to their presentations, including representatives from NAMI and people with lived experience.

Therefore, OEMC has met Preliminary and Secondary compliance. Our assessments of Full compliance will ultimately be tied to the broader system operation (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits). However, we feel that the OEMC has made strides in establishing the importance of conducting the necessary training.

# Crisis Intervention: ¶145

**145.** *Any training on mental health and CIT awareness that has already been provided to tele-communicators may fulfill the OEMC Training requirement of this Agreement, if the previously provided training satisfies the criteria for the OEMC Training described in this Agreement.*

**Compliance Progress**                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

The City and the OEMC have met Full compliance with ¶145 because they are not intending to submit previous training as evidence of compliance with the OEMC's training requirements. Going forward, the IMT will assess the OEMC based on their delivery of the eight-hour training as prescribed in ¶¶142–44.

In other words, the requirements of ¶145 are somewhat moot because, rather than relying on previously delivered mental health and CIT awareness training to fulfill the training requirements found in ¶¶142–44, the OEMC has provided the required eight-hour training as a single training block. To maintain compliance with ¶145, the City and the OEMC will have to follow through and provide the requisite training.

## Crisis Intervention: ¶146

> **146.** *All tele-communicators will receive at least annual refresher training on mental health and CIT awareness that is adequate to refresh the tele-communicators' skills on identifying, dispatching, and appropriately responding to calls for service that involve individuals in crisis.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**  December 31, 2021  ☑ **Not Yet Applicable**

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

During the fourth monitoring period, the City achieved Preliminary compliance with ¶146.

The OEMC finalized the *Mental Health Training* directive, which clearly states the requirement for all telecommunicators to receive annual refresher training on mental health and CIT awareness per ¶146. Moreover, the directive identifies the topics to be included in the refresher training, including skills on identifying, dispatching and appropriately responding to calls for service that involve individuals in crisis.

The OEMC has also developed and delivered one iteration of the refresher training that members of the IMT observed. Overall, the training we observed was satisfactory, although are awaiting documents from the OEMC sufficient to demonstrate how community stakeholder input (including input from the Chicago Council on Mental Health Equity) was incorporated into the training. We view such documentation to be necessary for Secondary compliance. Additionally, the OEMC should invite members of the Chicago Council on Mental Health Equity and other community representatives to observe the training's delivery. The Chicago Council on Mental Health Equity should then report on their observations to the broader group to get further feedback and document as such.

The requirement to provide in-service training to all telecommunicators was severely impacted this year by COVID-19 restrictions on the size of gatherings, including gatherings for professional training. Once in-person training resumes, the OEMC has committed to ensuring that all telecommunicators receive the necessary training. Once the IMT is able to observe the trainings, and Chicago Council on Mental Health Equity and community stakeholder input is demonstrated, we will assess whether OEMC has fully complied with the requirements of ¶146.

# Crisis Intervention: ¶147

**147.** *OEMC will evaluate all mental health and CIT awareness trainings for telecommunicators on at least an annual basis to ensure that the trainings meet OEMC needs, comply with this Agreement, incorporate best practices, and ensure that the training is effective for personnel and for the individuals in crisis served. OEMC will consider recommendations and feedback from the CIT Coordinator and the Advisory Committee when conducting its evaluation.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** December 31, 2021 ☑ **Not Yet Applicable**

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the OEMC met Preliminary compliance with ¶146.

The OEMC directive *Mental Health Training* clearly states the requirement for the OEMC to review trainings on an annual basis to ensure that the trainings meet the OEMC's needs, comply with the Consent Decree, and incorporate best practices. The directive also ensures that the training is effective for personnel and for the individuals in crisis served. The policy requires that the OEMC trainings related to crisis intervention be reviewed by the Chicago Council on Mental Health Equity on an annual basis and identifies the person within the OEMC who is responsible for conducting such evaluations.

To achieve Secondary compliance, the OEMC must ensure that the person responsible for conducting the evaluations is qualified to make revisions and has insight into current best practices. The OEMC must also require that recommendations from the Chicago Council on Mental Health Equity will be incorporated into the training, where appropriate. The IMT has yet to receive documentation indicating how Chicago Council on Mental Health Equity feedback was incorporated.

Finally, the IMT will assess the effectiveness of the training, which requires a two-pronged approach. First, the OEMC should conduct training evaluations to look at how the information was received by telecommunicators (*e.g.*, were the instructors competent) and whether the training resulted in the desired knowledge enhancements. The OEMC already conducts limited training evaluations, but there is room for improvement. The second prong will requires evaluating the telecommunicators' actions to confirm that the training is resulting in desired behavior on the

OEMC call floor. Currently, the OEMC conducts performance audits related to crisis intervention calls. This is a valid measurement of behavior and can inform future training needs. The OEMC made important strides in standardizing the audits, and we look forward to working with the OEMC as trends begin to emerge.

# Crisis Intervention: ¶148

> ***148.*** *OEMC will develop and implement its portion of the Crisis Intervention Plan.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**  *In Compliance* (NEW)
**Secondary:**  *Not in Compliance*
**Full:**  *Not Yet Assessed*

In the fourth monitoring period, the OEMC achieved Preliminary compliance with ¶148.

On the last day of the reporting period, the IMT received an updated draft of the City's *Crisis Intervention Plan*. As part of the Plan, the OEMC provided information regarding the previous year's activities and goals for 2021. Overall, we feel the OEMC's portion of the *Crisis Intervention Plan* was done well, but note that the revised plan is currently under review. Please see limitations in ¶¶122 and 123.

In the fourth reporting period, the OEMC finalized its policy that includes the requirement to develop and implement its portion of the *Crisis Intervention Plan* on an annual basis. Subsequent levels of compliance will depend on the OEMC showing ongoing implementation of the goals as listed in the Plan.

# Crisis Intervention: ¶149

**149.** *OEMC supervisors, on an ongoing basis, will audit and provide feedback to calltakers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis.*

**Compliance Progress**　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the OEMC met Preliminary compliance with ¶149.

During this monitoring period, the OEMC finalized its *Crisis Intervention Program* policy, which includes the requirement to audit and provide feedback to call takers and dispatchers regarding their ability to identify, dispatch, and respond appropriately to calls for service involving individuals in crisis.

Moreover, the OEMC has taken important steps to standardizing their audit protocols and are requiring 10 calls involving a mental health component to be audited daily. As part of this, the OEMC provided the IMT with a revised version of their SOP titled *Mental Health Event Audit*. While we felt the revised policy mostly aligned with the requirements of ¶149 for Preliminary compliance, there was still room for improvement if it will also be provided as a training tool. For instance, we recommended the OEMC maintain consistency between the information reflected in the *Mental Health Event Audit* policy and its corresponding spreadsheets. This includes ensuring that all data elements identified in the policy are captured in the respective spreadsheet. Similarly, the IMT recommended that all spreadsheet columns match those identified in the *Mental Health Event Audit* policy. Last, we suggested that the OEMC merge data sets that are repeated across the spreadsheets, as doing so could avoid confusion. Upon revision of the policy, we believe it will provide sufficient guidance to act as a training tool for supervisors, thereby satisfying criteria for Secondary compliance. Subsequent levels of compliance will depend on IMT reviewing OEMC's audit results and the underlying cases.

# Crisis Intervention: ¶150

**150.** *The Parties acknowledge that OEMC currently meets regularly with CPD and the City-wide Mental Health Steering Committee. OEMC will continue to meet regularly with CPD, in addition to appropriate members of the Advisory Committee, including service providers and advocates, to review and assess data and information regarding the identification of, the dispatch of, and response to calls for service involving individuals in crisis by OEMC telecommunicators.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|

**Deadline:** Regularly ✓ Met ☐ Missed

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

In the fourth monitoring period, the City and the OEMC met Preliminary compliance with ¶150.

Throughout this reporting period, the OEMC has continued to meet on a quarterly basis with the CPD and the Chicago Council on Mental Health Equity. The IMT recommended in the last reporting period that the OEMC have a more robust involvement in the Chicago Council on Mental Health Equity. For example, while the OEMC has provided overviews of its policies and portions of their eight-hour training to the Chicago Council on Mental Health Equity, the OEMC did not provide advanced notice of the presentation, did not provide the training materials, and did not entertain public comments after the presentation. To the OEMC's credit, they have now assigned a staff representative to participate in the Chicago Council on Mental Health Equity. The IMT looks forward to seeing a more active presence by the OEMC.

The OEMC's regular meetings with the CPD focus on evaluating data to ensure unity in the overall crisis-response system. The IMT is encouraged by these meetings and looks forward to receiving regular updates on the same.

Subsequent levels of compliance will depend on the OEMC continuing their regular meetings with the CPD, having more active engagement with the Chicago Council on Mental Health Equity, and providing evidence to the IMT that the meetings contribute to the City's overall crisis response approach.

# Crisis Intervention: ¶151

**151.** *Within 180 days of the Effective Date, and annually thereafter, OEMC will review and revise its intake and dispatch policies and protocols as necessary to meet the requirements of this Agreement. OEMC will consider any recommendations or feedback provided by the Advisory Committee when revising its policies.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | October 1, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from August 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (NEW) | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not Yet Assessed* | |

In the fourth reporting period, the City and the OEMC met Preliminary compliance with ¶151.

The OEMC finalized its directive *Mental Health Training*. This standard operating procedure states the requirement for the OEMC to review the training on an annual basis and for the Chicago Council on Mental Health Equity recommendations on the training to be incorporated. But the standard operating procedure falls short of fully incorporating the requirements of ¶151, which focuses on intake and dispatch policies. The IMT recommends that the OEMC includes the exact requirement of ¶151 to evaluate those policies on an annual basis into the standard operating procedure. Similar to the process of training review, the OEMC must consider recommendations and feedback provided by the Chicago Council on Mental Health Equity, and moving forward, it is expected that this will occur. Subsequent levels of compliance for this paragraph will depend on the OEMC's updated training on the compliant policies and protocols.

Full compliance will ultimately be tied to the broader system operations (*i.e.*, ongoing reliable performance data as evidenced by the results of the OEMC's ongoing audits) and the review by the Chicago Council on Mental Health Equity, which should document their feedback on the OEMC policies.

# Crisis Intervention: ¶152

***152.*** *OEMC will ensure that the language used in policies, procedures, forms, databases, trainings, and by tele-communicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. OEMC will seek input from the Advisory Committee for recommendations to identify appropriate and respectful terminology.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City achieved both Preliminary and Secondary compliance with ¶152.

The OEMC has made a concerted effort to ensure that language used in the policies, procedures, forms, databases, trainings, and by telecommunicators to communicate about calls involving individuals in crisis is appropriate, respectful, and consistent with industry-recognized terminology. The OEMC's *Mental Health Training*, which clearly states the requirements of ¶152, was finalized in this reporting period. Additionally, we have observed members of the OEMC using respectful language and this has been reinforced in trainings we have observed. Therefore, the OEMC has met Preliminary and Secondary compliance with this paragraph. For Full compliance, we anticipate that results from the OEMC's audits will help to ensure that industry-recognized language is used and updated when appropriate. We will work with OEMC in the next monitoring period to verify this.

# IV. Use of Force

This is the Use of Force section of the Independent Monitoring Team's (IMT's) fourth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Use of Force compliance efforts from January 1, 2021, through June 30, 2021.

## Objectives[94]

The IMT assessed compliance with applicable Use of Force paragraphs in accordance with the Consent Decree's corresponding objectives:

> **153.** *CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

> \*\*\*

> **155.** *CPD officers have the authority to use force, but that authority is limited by the law and Department policy. The provisions of this Agreement seek to facilitate compliance with the law and Department policy regarding the use of force to reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances.*

---

[94] The Use of Force section of the Consent Decree includes "objectives" rather than "guiding principles."

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (the OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Use of Force Compliance Assessments

In the fourth reporting period, the City and the CPD made progress to address the Consent Decree's requirements regarding the Use of Force section.

The City and the CPD continued to struggle to "establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies," per ¶160. The CPD's efforts to implement meaningful community engagement around use of force issues has been uneven at best. IMT believes that the CPD's community engagement needs to work toward processes that establish lasting, sustainable partnerships in order to achieve Preliminary compliance.

The City and the CPD did, however, make progress in the Use of Force section by reflecting many of the Consent Decree requirements in policies and training. While the City and the CPD have appropriately dedicated significant attention to policy and training efforts, there appears to be significant work ahead to appropriately collect, manage, and analyze data related to the Use of Force section, among others. *See* ¶¶168 and 606. As a result, the City and the CPD may be successfully putting the necessary reforms into writing via policy revisions, but for the foreseeable future, will be unable to sufficiently demonstrate whether the CPD's practices have improved. This will, in turn, prevent the City and the CPD from becoming a true learning agency, capable of reviewing and revising policies and training in a way that is data driven and specific to the needs of Chicago's communities and officers.

In this reporting period, we assessed the City's compliance with 92 of the Consent Decree's Use of Force paragraphs (¶¶153–54, 156, 158–71, 173, 176–79, 181–216, 218–27, 228–35, and 243–48).

At the end of the fourth reporting period, the City maintained Preliminary compliance for 22 paragraphs (¶¶167, 191, 206, 212, 218–27, 229–35, and 245) and achieved Preliminary compliance for 22 paragraphs (¶¶153, 157–59, 161–62, 174, 177–78, 182, 200–03, 207, 209–11, 213–15, and 228). The City maintained Secondary compliance for five paragraphs (¶¶169, 181, 188, 193, and 196), and achieved Secondary compliance for 18 paragraphs (¶¶154, 164–65, 173, 175–76, 183–87, 189–90, 192, 194, 195, 197, and 246). The City also achieved Full compliance for one paragraph (¶170). The City's Preliminary compliance for 18 paragraphs remained under assessment at the end of the fourth reporting period (¶¶156, 163, 166, 171–72, 179, 198–99, 204, 208, 236–40, 243, and 244), and the City failed to reach any level of compliance with the remaining six paragraphs (¶¶160, 168, 205, 216, 247, and 248). This includes the fact that the City also lost at least one level compliance with three paragraphs (¶¶171, 221, and 229). *See* Use of Force Figure 1 below.

**Use of Force Figure 1:**         **Compliance Status for Use of Force Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)**



The City had six deadlines in the fourth reporting period. The City met four deadlines (¶¶172, 192, and 245–46) and missed the other two deadlines (¶¶174–75). The City achieved the underlying deadline requirements with those missed deadlines before the end of the reporting period. *See* Use of Force Figure 2 below.

**Use of Force Figure 2:**         **Total Use of Force Deadlines in the Fourth Report: 6**



# Use of Force: ¶153

*153. CPD's use of force policies, as well as its training, supervision, and accountability systems, must ensure that: CPD officers use force in accordance with federal law, state law, and the requirements of this Agreement; CPD officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; when using force, CPD officers only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and any use of unreasonable or unnecessary force is promptly identified and responded to appropriately.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶153.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶153's requirements. As described in the third reporting period, the use of force by CPD officers is directed by a number of General Orders, also sometimes referred to as the Use of Force policy suite. The most recent version of these policies was issued on December 31, 2020 and became effective April 15, 2021. The CPD shared these policies with the IMT and OAG on March 24, 2021 for review and comment, which the IMT noted it reviewed in our last report and had no further comment on as the CPD continued to seek community input on the policies. On June 25, 2021, the CPD also shared additional documentation to demonstrate compliance with ¶153, which included AMC messages announcing the revised policies, eLearning on the policies, and materials from activities with the Use of Force Working Group in 2021.

As required by the Consent Decree, the CPD has sought feedback from the Chicago community regarding its Use of Force policies (*e.g.*, through online public comment, community meetings, and a Use of Force Working Group). The CPD Use of Force policies were reviewed by the Use of Force Working Group, covering topics related to ¶153 (*e.g.*, terminology related to de-escalation, necessary force, and "safe and feasible"). While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the IMT's assessment of ¶160. The CPD continued to engage the Working Group in dialogue regarding the Use of Force policies from February 2021 and through the end of this reporting

period. Thus, the IMT finds the City and CPD in Preliminary compliance with ¶153. Further, the CPD shared its proposed community engagement strategy with the IMT on June 25, 2021, which will allow CPD to solicit and gather community feedback on Use of Force policies on a continual basis. The CPD proposes to use a variety of mechanisms, to include ongoing community listening sessions, indefinite public comment opportunity, sharing and review of changes in policy with the community. The IMT will continue to monitor the CPD's community engagement efforts related to Use of Force policies in future monitoring periods.

For Secondary compliance, on March 24, 2021, the CPD shared with the IMT and OAG its revised annual Use of Force In-Service Training curriculum, renamed to *De-Escalation, Response to Resistance, and Use of Force*. The IMT reviewed the revised training materials and believe they reflect improvements from its prior review. However, we noted that the training materials could be further refined to ensure students are engaged and learning the communication skills necessary to impartial policing. The IMT provided also provided feedback regarding training evaluation and assessment tools, and recommended extending the length of the training to maintain high-quality delivery and execution and to ensure that participants' communication skills have been enhanced. This is particularly relevant to ¶153 for the application of de-escalation.

Furthermore, in reviewing Secondary compliance, the IMT believes the CPD needs to pay attention to its Use of Force supervision and accountability requirements and systems. In particular, as noted in the prior reporting period, the City needs to appropriately support the work of the Force Review Division (FRD), as well as make clear to all officers that Use of Force requirements of the Consent Decree are the responsibility of every CPD officer. The IMT has expressed to the City and CPD in this reporting period that accountability and supervision must include supervisors being made aware complaints or compliance issues for the officers they oversee. The FRD is in the process of developing a dashboard for all district and supervisory personnel to see data and information about deficiencies in Use of Force policy compliance via the review of tactical response reports (TRRs). This will allow supervisors to filter and easily identify all FRD debriefing points and training recommendations, city-wide, by district or by unit, and by officers who have had two or more debriefing points. The goal of this tool is to help and empower supervisors to identify patterns and trends within their own units, including those related to de-escalation and Use of Force. Having this information in place and proper training for supervisors for using this tool is critical for Secondary compliance for ¶153.

Moving forward, the IMT looks to assess Secondary and Full compliance of ¶153. The IMT will review the FRD dashboard for supervisors and monitor the department's efforts to launch the dashboard (e.g., train supervisors on its utility and provide guidance or policies on expectations for its use) in the next reporting period.

# Use of Force: ¶154

*154. CPD adopted revised use of force policies on October 16, 2017 ("October 2017 Policies"). The October 2017 Policies incorporated multiple best practices that were not reflected in CPD's prior use of force policies. Building on these improvements, CPD will maintain the best practices reflected in the October 2017 Policies and make additional improvements to its policies consistent with the terms of this Agreement.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance for ¶154.

As stated in the prior reporting period, to evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶154's requirements. The CPD has been in continuous discussion with the IMT, OAG, and the community (including the Use of Force Working Group) on its Use of Force policies during this reporting period and since the Consent Decree took effect. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. These discussions have revolved around incorporating best practices for Use of Force into policy enhancements. The CPD issued its most recent Use of Force policies on December 31, 2020, which became effective April 15, 2021. The CPD shared these policies with the IMT and OAG on March 24, 2021, for review and comment, which the IMT noted it reviewed in our last report and had no further comment on as the CPD continued to seek community input on the policies. During the first half of 2021, the CPD continued to engage the Working Group and community in dialogue regarding these policies.

In addition, the CPD has attained and maintains an Advanced Law Enforcement Accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), indicating compliance with national policy standards, including for use of force.

Finally, the CPD issued a temporary foot pursuit policy on May 26, 2021, and is seeking community, IMT, and OAG input. Foot pursuits account for a significant portion of use of force incidents and, thus, relates to ¶154.[95]

Due to these accomplishments in policies and CALEA accreditation, the IMT finds the City and CPD in Preliminary compliance with ¶154.

To evaluate Secondary compliance, the IMT reviewed CPD's 2020 Use of Force training sources and completion. The CPD has incorporated revisions to the Use of Force policy suite into its 2020 Use of Force in-service training. Furthermore, during this reporting period, the CPD created and issued a temporary emergency Foot Pursuit Policy, modeled on existing best practice. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. With the incorporation of updated Use of Force policies and completion of training, the IMT finds the CPD and City in Secondary compliance with ¶154.

Moving forward, we will regularly review Preliminary compliance and discuss the Use of Force policies with the CPD to ensure the CPD maintains best practices and makes additional policy improvements consistent with the Consent Decree, including required community engagement. We will also continue to review Secondary compliance yearly, requiring the department to meet the aforementioned criteria for ¶154.

---

[95] Based on the COVID-19 extension, the CPD had until September 2021—which is in the fifth reporting period—to adopt a permanent foot pursuit policy that was approved by the OAG and IMT.

# Use of Force: ¶156

*156. CPD's use of force policies and training, supervision, and accountability systems will be designed, implemented, and maintained so that CPD members: a. act at all times in a manner consistent with the sanctity of human life; b. act at all times with a high degree of ethics, professionalism, and respect for the public; c. use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible; d. use sound tactics to eliminate the need to use force or reduce the amount of force that is needed; e. only use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; f. only use force for a lawful purpose and not to punish or retaliate; g. continually assess the situation and modify the use of force as circumstances change and in ways that are consistent with officer safety, including stopping the use of force when it is no longer necessary; h. truthfully and completely report all reportable instances of force used; i. promptly report any use of force that is excessive or otherwise in violation of policy; j. are held accountable, consistent with complaint and disciplinary policies, for use of force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances, or that otherwise violates law or policy; and k. act in a manner that promotes trust between CPD and the communities it serves.*

## Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

At the end of the fourth reporting period, the City and the CPD remain under assessment with ¶156. Paragraph 156 addresses many sections of the Consent Decree, including short and long term efforts. While the City and the CPD made significant compliance efforts with Use of Force policies and training since the start of the Consent Decree, many related policies—including those related to training, supervision, and accountability systems—remain works in progress.

In the fourth reporting period, we continued to review the CPD's Use of Force policies and community engagement efforts related to ¶156's requirements. During this reporting period, the CPD continued dialogue with the Use of Force Working Group on these requirements and as a result noted that it plans to make further revisions to the April 15, 2021 version of G03-02 *De-escalation, Response to Resistance, and Use of Force* policy to continue its commitment to dignified respectful treatment. These changes are anticipated to be effective in early 2022.

Regarding training, current CPD Use of Force training for recruits and in-service officers reflect the requirements of ¶156 and mandates of the State of Illinois. However, as described for ¶153, the IMT believes the CPD needs to pay additional attention to its Use of Force supervision and accountability requirements and systems. In particular, the IMT has expressed to the City and CPD in this reporting period that accountability and supervision must include supervisors being made aware of complaints or compliance issues for the officers they oversee. The FRD is in the process of developing a dashboard for all district and supervisory personnel to see data and information about deficiencies in Use of Force policy compliance via the review of tactical response reports (TRRs). This will allow supervisors to filter and easily identify all FRD debriefing points and training recommendations, city-wide, by district or by unit, and by officers who have had two or more debriefing points. The goal of this tool is to help and empower supervisors to identify patterns and trends within their own units, including those related to Use of Force. Having this information in place and proper training for supervisors of their roles and responsibilities and for using this tool is critical for Secondary compliance for ¶156.

Ultimately, as tracked across sections of the Consent Decree, the City and the CPD will need to improve its data collection, management, and analysis efforts to demonstrate compliance with ¶156. As a result, it is likely that the City and the CPD may not reach Full compliance with ¶156 until late in the Consent Decree process.

# Use of Force: ¶157

> **157.** *CPD will collect and analyze information on the use of force by CPD members, including whether and to what extent CPD members use de-escalation techniques in connection with use of force incidents. CPD will use this information to assess whether its policies, training, tactics, and practices meet the goals of this Agreement, reflect best practices, and prevent or reduce the need to use force.*

## Compliance Progress　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶157.

To assess Preliminary compliance, the IMT reviewed data collected by the CPD, and specifically, the FRD, which they have reported on in both the quarterly reports and annual reports.[96] In addition, the CPD has created a Use of Force dashboard that allows for public accessibility of information contained on TRRs.[97] Furthermore, the CPD has analyzed and utilized its use of force data to understand and address tactical issues, such as officers leaving Tasers on the ground after interactions, and to address training issues, such as officers failing to use their body-worn cameras appropriately.

Furthermore, the FRD has not only updated the TRR and the TRR-R to allow for tracking and identifying officers' use of de-escalation tactics, but also produced guides that provide guidance for officers about how to document de-escalation appropriately.

The IMT appreciates the CPD's focus on de-escalation during this reporting period. The FRD made a total of 334 recommendations in Q1 of 2021 addressing TRRs that did not include sufficient information or did not include information on each and every de-escalation box checked. CPD is also to be commended for the proposed Supervisory dashboard which will make helpful data available directly to supervisors. IMT looks forward to OOC review of FRD recommendations and the ability of supervisors to drill down to the geographic beat level. Moreover, the CPD's Use of Force dashboard, which presents force data over time, indicates that during this

---

[96]　The CPD Force Review Division's reports are available online. *See Reports & Resources*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/reform/reports-and-resources/.

[97]　*See Use of Force Dashboard, 2015-Present*, CHICAGO POLICE DEPARTMENT, https://home.chicagop-olice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

reporting period (January 1, 2021 – June 30, 2021) the total number of TRRs was 1,559, which—when compared to last year—is a 68.69% reduction in reported use of force.

For Secondary compliance, the IMT expects the utility of the use of force dashboard to improve for supervisors. As we note in ¶156, the dashboard should enable supervisors to access data at the unit and beat level and empower supervisors to identify patterns and trends within their own units, including those related to Use of Force. The IMT also awaits the audit unit's recommendations for the FRD.

In sum, the IMT finds the City and the CPD met Preliminary compliance with ¶157, and is making notable progress towards Secondary compliance by continuing to work on improvements to the use of force dashboard. Moving forward, the IMT looks to assess Secondary and Full compliance of ¶157. The IMT will review the FRD dashboard for supervisors and training provided to supervisors.

# Use of Force: ¶158

**158.** *CPD's use of force policies must comply with applicable law and this Agreement, reflect the objectives described above, and promote trust between CPD and the communities that it serves.*

**Compliance Progress** <span>(Reporting Period: Jan. 1, 2021, through June 30, 2021)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance for ¶158.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶158's requirements. As described in the third reporting period, the CPD has engaged in multiple discussions surrounding its Use of Force policies over prior reporting periods with the IMT and OAG to ensure the policies comply with applicable law and the Consent Decree. The CPD has adopted recommendations from the IMT and the OAG that reflect the objectives of the Consent Decree.

As required by the Consent Decree and to promote trust between the CPD and the communities that it serves, the CPD has also sought community input on its Use of Force policies through open community meetings, online community input prior to the issuing of revised Use of Force policies, and a Use of Force Working Group.

Following poor engagement and response to Use of Force Working Group's recommendations in 2020, the CPD engaged in continuous dialogue with the working group from February 2021 through the end of this reporting period. As a result of these discussions, the CPD made changes to Use of Force policies. Some of the changes implemented have exceeded the requirements of the Consent Decree, for example requiring officers to de-escalate when safe and feasible, requiring officers to physically intervene when another officer is using excessive force, requiring officers not interfere when medical aid being rendered, and defining the level of force that is appropriate as "minimum." While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these efforts to date, the IMT finds the City and CPD in Preliminary compliance with ¶158.

Moving forward, the IMT will continue to monitor the CPD's efforts to build trust with community it serves with regard to its Use of Force policies. While the IMT believes that the CPD has been responsive to some requested policy changes by

the community, we believe community engagement must include the CPD being accountable for providing feedback and good faith policy changes, where justified. The IMT believes the current level of engagement did not encompass enough of the community members, and views existing efforts as a first step. The IMT looks forward to seeing the CPD's future community engagement efforts as it implements it multi-method approach to long-term continuous community engagement regarding use of force. Additionally in the next reporting period, the IMT will review Secondary compliance with ¶158 by assessing whether CPD training complies with applicable law and the Consent Decree, promotes use of force behavior that promotes trust with the community, and whether training reflects input/changes from community feedback on the UOF policies.

# Use of Force: ¶159

**159.** *CPD will conduct an annual review of its use of force policies consistent with accreditation requirements of the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). In addition, every two years, CPD will conduct a comprehensive review of its use of force policies to assess whether CPD's use of force policies meet the requirements of this Agreement, incorporate best practices, address observed trends and practices, as necessary, and reflect developments in applicable law.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|

**Deadline:** December 31, 2021 ☑ **Not Yet Applicable**
December 31, 2021 ☑ **Not Yet Applicable**

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶159. As stated in the third reporting period, the CPD missed the February 29, 2020 deadline to conduct the annual review of its Use of Force policies consistent with CALEA accreditation requirements.

To evaluate Preliminary compliance, we assessed the CPD's review of its Use of Force policies, including how its community engagement efforts inform that review. As noted in our last report, the CPD conducts an annual review for maintaining its Advanced Law Enforcement Accreditation through the Commission on Accreditation for Law Enforcement Agencies (CALEA). As part of this review, each year the CPD's Research and Development Division (R&D) reviews and compiles appropriate compliance documentation, in coordination with liaisons from appropriate units throughout the department. Specifically, CALEA's Law Enforcement Standards *Chapter 4 – Use of Force* covers 15 standards (*e.g.*, use of reasonable force, use of deadly force, warning shots, use of authorized less lethal weapons, rendering aid after a use-of-force incident, vascular neck restrictions, chokeholds, reporting uses of force, written use-of-force reports and administrative review, removal from line of duty assignment, analyze reports, and assault on sworn officer analysis).

During this reporting period, we also continued assessing Secondary compliance to determine whether training requirements related to ¶159 are detailed, with attention to de-escalation and adjustments in training based on the findings of CPD's biannual comprehensive review of its Use of Force policies.

The IMT and OAG also discussed and reviewed CPD's plans for its annual Use of Force report, which is intended to fulfill the biannual comprehensive review and CALEA compliance requirements of ¶159 moving forward. The annual report will analyze data, training, trends, and patterns with CPD Use of Force, to inform executive management decisions. In April 2021, the CPD briefed the IMT and OAG on its plans for the report format, which the CPD is modeling after peer agencies (e.g., Los Angeles, California). It will include written analysis and statistical snapshots for a variety of Use of Force areas, such as policy development and engagement, use of force incidents, the Force Review Board, the Force Review Division, training, investigations and review, and more. The CPD will use department data and information for developing the report, as well as other outside data (e.g., COPA), as it is available. The first annual report is anticipated for the year of 2021.

In sum, the City and CPD reached Preliminary compliance with ¶159 this reporting period and the IMT looks for to further reviewing the annual report outline and report in the next reporting period to assess further compliance with ¶159.

# Use of Force: ¶160

**160.** *CPD will establish and maintain clear channels through which community members can provide input regarding CPD's use of force policies and propose revisions or additions to those policies. CPD will regularly review the input received, including during the biennial review process.*

## Compliance Progress　　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD did not meet Preliminary compliance with ¶160.

To evaluate Preliminary compliance, we continued to review the CPD's community engagement efforts related to its Use of Force policies, including its new foot pursuit policy. In assessing community engagement, we examine (1) outreach; (2) meetings and interactions and problem-solving and decision making; (3) follow-up and sustainability of partnerships, trust, community policing, and problem-solving activities; and (4) general police-community interactions regardless of context.

The CPD has been in continuous discussion with the IMT, the OAG, and the community (including the Use of Force Working Group) on its Use of Force policies during this reporting period and since the Consent Decree took effect. As we detailed in our last report, the CPD began consulting with the Use of Force Working Group in June 2020 and while the IMT thought the CPD's community engagement efforts with the Use of Force Working Group in 2020 were inadequate, the processes and engagement improved somewhat during this reporting period as the CPD continued its discussions with the Working Group in the first half of 2021. There will be some substantive changes as a result of discussions between the CPD and Working Group, but those changes will likely not be reflected in policy and training until 2022.

The IMT believes that the CPD's community engagement needs to work toward processes that establish lasting, sustainable partnerships in order to gain Preliminary compliance. The experience of participating on the Working Group, which had its final meeting on June 16, 2021, did not meet the expectations of many who participated. In fact, in the IMT's debrief with Working Group members, they told the IMT that they didn't build trust with the CPD and that they didn't feel that the CPD was transparent. The Working Group did not feel that their feedback was taken seriously, and noted that the CPD often shared documents at the last minute, preventing members to participate in policy development, or offer real-time

feedback on policies. In written feedback, members of the Working Group stated the following:

- *"We do not believe that the City was open to real, meaningful community engagement and input through this process."*

- *"Despite rejecting the great majority of recommendations put forth by the Working Group in both the 2020 and 2021 sessions, representatives for the City seem to believe that simply meeting with members of the community made its community engagement efforts meaningful. To the contrary, expending community resources, time, and energy to meet once a week for a year without an intention or willingness to meet policy changes has made members of the community more skeptical that police department leadership is ready to make the changes that the Consent Decree requires."*

- *"Many community members continue to believe that the working group model is a good one, leading to informed input and accountability week after week. However, for the working group model to be successful, the City must become more flexible and willing to apply the feedback it receives. Merely listening to feedback is not success."*

- *"In short, the working group left the experience frustrated by the City's approach. As stated above, the working group model is one worth saving, but the City must be pushed to seriously engage with the community's core recommendations. Anything less should result in a failing grade on community engagement."*

During this reporting period, the CPD shared its plan for broader and ongoing community engagement for the Use of Force policies moving forward, to include ongoing community listening sessions, indefinite public comment opportunities, sharing and reviewing of changes in policy with the community. We are encouraged by the CPD's willingness to review, discuss, and adopt community recommendations on matters that are substantive and to continue to consider new avenues of community engagement, but remain concerned that two years into the reform process, the City and the CPD still do not have a sustainable plan in place to come into compliance with this paragraph.

One opportunity for the CPD to solicit meaningful feedback on a Use of Force policy during this reporting period was regarding the CPD's interim *Foot Pursuit* policy. The City and the CPD enacted an interim *Foot Pursuit* policy per ¶631, after receiving feedback from the IMT and the OAG in May 2021. The City, the CPD, the OAG, and the IMT met to further discuss the draft and corresponding comments during settlement conferences on May 12 and May 19, 2021. The City published an interim policy on May 26, 2021, with an effective date of June 11, 2021.

On June 2, 2021, as one of its planned ways of increasing community engagement, the CPD conducted a webinar on its new interim *Foot Pursuit* policy. Also in June 2021, the CPD conducted "deliberative dialogues" with community organizations in June, including the Streeterville Neighborhood Advocates, Lawndale Christian Legal Center, NAACP, Moms of CPD, the Illinois Latino Agenda, and the Coalition.

On June 16, 2021, the City and the CPD submitted a revised Interim General Order G03-01, *Foot Pursuits,* to the IMT for review. Included with the policy were materials the CPD reviewed in drafting the policy, materials related to training and feedback from department members, and materials related to CPD's community engagement efforts regarding the interim policy.

We note that this draft policy did not include feedback from the community, though the CPD sought community feedback on this draft policy via four avenues:

(1) Public comment via the CPD website, where the draft policy was available for review and public comment using a fillable text box that says "Add your thoughts, comments and suggestions below,"

(2) Public input form via the CPD website that captures anonymous feedback to questions around the foot pursuit policy,

(3) Two virtual community webinars during which the general public could provide input on the foot pursuit policy, and

(4) A series of Deliberative Dialogues, which were community meetings held on Zoom during which the CPD invites community groups and organizations met with members of the CPD to hear an overview of the foot pursuit policy and discuss insight and feedback around ways to improve the policy. It is not entirely clear to the IMT how the CPD has ensured that it conducted "Deliberative Dialogues" in a cross-section of Chicago's communities or how it will reach people and family members most affected by CPD's foot pursuits. While we appreciate the CPD's efforts to seek community participants by advertising the events on its website,[98] we are uncertain about whether a cross-section of communities participated.

Moreover, we encourage the CPD to meaningfully consider the public comments put forward by the Coalition (*see* ¶669) during a recent press conference and in a recent letter.[99] In the next iteration of this policy, the IMT would like to see the

---

[98] *See* "CPD Foot Pursuit Deliberative Dialogue Sign-Up," accessible at https://www.research.net/r/CPDFPDDSignUp

[99] *See* Paige Fry, "Coalition of activists and lawyers call draft of Chicago police foot-pursuit policy a disappointment," CHICAGO TRIBUNE, 6/9/21. We also note that the ACLU sent feedback on the CPD's foot pursuit policy just after this reporting period ended, on July 15, 2021. We encourage the CPD to consider that feedback as well.

feedback received via all avenues and how the CPD incorporated it into this policy. We believe community members with lived experience will lend a unique and valuable perspective.

Finally, after the fourth reporting period, the City and the CPD presented information regarding the developing a pilot program for police-contact surveys through an independent vendor. While these efforts may still be in their infancy, the survey could prove instrumental to various Consent Decree requirements and CPD operations, including the City and the CPD's compliance efforts regarding ¶160. We are greatly encouraged by the prospect of this program, and we look forward reviewing and reporting on its continued development and implementation

The IMT looks forward to observing and reviewing the expanded community engagement efforts in the next reporting period in its review of Preliminary compliance with ¶160.

# Use of Force: ¶161

*¶161 CPD recently adopted de-escalation as a core principle. CPD officers must use de-escalation techniques to prevent or re-duce the need for force whenever safe and feasible. CPD officers are required to de-escalate potential and ongoing use of force incidents whenever safe and feasible through the use of tech-niques that may include, but are not limited to, the following: a. using time as a tactic by slowing down the pace of an incident; b. employing tactical positioning and re-positioning to isolate and contain a subject, to create distance between an officer and a potential threat, or to utilize barriers or cover; c. continual com-munication, including exercising persuasion and advice, and providing a warning prior to the use of force; d. requesting assis-tance from other officers, mental health personnel, or special-ized units, as necessary and appropriate; and e. where appropri-ate, use trauma-informed communication techniques, including acknowledging confusion or mistrust, or using a respectful tone.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary compli-ance with ¶161 and remains under assessment for Secondary compliance.

To evaluate Preliminary compliance, we continued to review the CPD's Use of Force policies and community engagement efforts related to ¶161's requirements. As described in our last report, the CPD engaged with Use of Force Working Group on de-escalation, which resulted in policy changes including: requiring de-escala-tion as an affirmative obligation. The CPD has also revised its Tactical Response Report (TRR) and TRR-Review (TRR-R) forms to gather more information on de-escalation. The CPD also included details in G03-02-03, *Firearm Discharge Inci-dents-Authorized Use and Post Discharge Administrative Procedures*, regarding de-escalation that further sets conditions on required de-escalation and instances when de-escalation techniques would be clearly ineffective.

Following poor engagement with the Use of Force Working Group in 2020, the CPD committed to engaging the working group in continuous dialogue into 2021. The CPD and working group met from February 2021 through the end of this reporting period. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of

these discussions, the CPD shared with the IMT that will make additional changes to the April 15, 2021 G03-02 *De-escalation, Response to Resistance, and Use of Force* policy to reaffirm the affirmative duty to de-escalate, which will be effective in January 2022.

As a result of these efforts to date, the IMT finds the City and the CPD in Preliminary compliance with ¶161.

For Secondary compliance, we are assessing the quality and completion of instruction to all CPD members on requirements for de-escalation and ¶161. As noted in the last reporting period, the 2020 annual Use of Force in-service training includes information on force mitigation principles and de-escalation principles, with an emphasis on documenting these actions in the TRR forms. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training.

The most significant de-briefing point of the Force Review Division continues to be a failure to document de-escalation in the narrative of the TRR, re-enforcing the importance of annual Use of Force in-service training on these policy requirements, in addition to training on any updates made to de-escalation policies. As the CPD moves into its 2021 annual in-service *De-Escalation, Response to Resistance, and Use of Force* training, the IMT reminds the CPD of the feedback it provided on the revised draft training materials in May 2021. Specifically that the training could be further refined to ensure students are engaged and learning the communication skills necessary to de-escalation and impartial policing.

In addition to annual Use of Force training for all department members, the 2021 supervisory in-service training lesson plan also emphasizes de-escalation and the importance of providing detailed explanations of force mitigation efforts in documentation, but this training has not yet taken place.

Finally, the CPD is in the process of establishing a de-escalation component to the Use of Force Tableau data dashboard for the IMT and OAG. This will aid the IMT in reviewing Full compliance with ¶161. It is also anticipated to include information regarding whether and to what extent members use de-escalation techniques in connection with use-of-force incidents.

# Use of Force: ¶162

*162. Consistent with CPD's commitment to preventing and reducing the need for force, CPD officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶162.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶162's requirements.

In our last report, we noted concerns about CPD actions during the protests of 2020 related to officers allowing individuals to voluntarily comply with lawful orders. The IMT *Special Report Regarding the City of Chicago's and the Chicago Police Department's Responses to Protest and Unrest* (released in July 2021) and OIG *Report on Chicago's Response to George Floyd Protests and Unrest* (release February 2021) both address the shortcomings of the CPD during the 2020 protests, including the need to provide warnings, document warnings and provide protestors with instructions on how to proceed when unlawful assemblies are declared.[100] The CPD addresses related reporting requirements in its updated Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances* (effective November 20, 2020) and requisite forms.

Also in our last report, we reviewed CPD General Order G03-02 *De-escalation, Response to Resistance, and Use of Force*, which describes the requirements of ¶162. Specifically, the policy states:

> *Core Principle. The Chicago Police Department seeks to gain the voluntary compliance of persons, when consistent with personal*

---

[100] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree,* INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf; *Report on Chicago's Response to George Floyd Protests and Unrest ,* OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/2021/02/18/oig-finds-that-chicagos-response-to-george-floyd-protests-and-unrest-included-breakdowns-in-the-mass-arrest-process-unfulfilled-use-of-force-reporting-obligations-and-operational-structure/.

*safety. The Department expects its members to develop and display the skills and abilities to act in a manner to eliminate the need to use force and resolve situations without resorting to force. Department members will only resort to the use of force when required under the circumstances to serve a lawful purpose.*

We noted that the Working Group believed "safe and feasible" was a vague term and raised this concern on multiple occasions. The CPD issued updated Use of Force policies on December 31, 2020. In this reporting period, the CPD continued to engage the Working Group, resulting in policy changes including requiring de-escalation when safe and feasible as mentioned protests and First Amendment policy stress the need for superiors to employ de-escalation. As a result of these efforts, the IMT finds the CPD in Preliminary compliance with ¶162.

Moving forward, we will continue to assess Secondary compliance with ¶162 through its Use of Force training, including reviewing whether in-service and supervisory training adequately address First Amendment rights and protests.

# Use of Force: ¶163

*163. CPD officers may only use force for a lawful purpose. CPD officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).*

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶163.

To evaluate Preliminary compliance with ¶163, we focused our review on whether the City and the CPD received the requisite community input for G03-02, *De-escalation, Response to Resistance, and Use of Force*, and finalized the policy. As noted in our last report, the policy issued on December 31, 2020, specifically addresses ¶163 in Section III.B.5, which prohibits using force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights. The CPD also issued forms and directives to assist in the proper documentation of various aspects of the Consent Decree, including the Use of Force section.

In the last reporting period, we also discussed criticism of the CPD using force for retaliation and, more specifically, in response the lawful exercise of First Amendment rights during protests in 2020. In our recently released IMT *Special Report Regarding the City of Chicago's and the Chicago Police Department's Responses to Protest and Unrest,* we note the shortcomings in prior CPD policies related to retaliation during protests, which the CPD has addressed in its latest Use of Force policies, effective April 15, 2021, and Department Notice D20-08, *Reporting the Response to Crowds, Protests, and Civil Disturbances,* effective November 2, 2020, which requires documentation by supervisors of information concerning crowds and the nature of the police response and use of force during protests.[101] During this reporting period, the CPD also issued an interim foot pursuit policy G03-07, *Foot Pursuits,* which addresses retaliation. The foot pursuit policy addresses when it is appropriate to pursue a subject and when not, based on best practices. The CPD shared and discussed this policy with department members through focus

---

[101] D20-08 replaced another policy—S03-22, *Response to Crowds and Civil Disturbances*—which was issued pursuant to ¶631 on August 27, 2020, and rescinded on November 2, 2020.

groups, with the Use of Force Working Group, and is engaging in further community dialogue this summer to obtain input from the community on the policy. Per the Consent Decree, the CPD has until September to produce a permanent foot pursuit policy. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. The IMT appreciates the CPD's efforts regarding the foot pursuit policy, seeking officer and community input, and creating e-learning training on the policy. Given the temporary nature of the foot pursuit policy and the need for further community engagement, the City and CPD remain under assessment with ¶163 in this reporting period.

Moving forward, we will continue to assess the CPD's progress with compliance with ¶163 by reviewing completion of the foot pursuit policy and whether adequate training is provided relating to the prohibition of force as punishment, retaliation, or in response to the lawful exercise of First Amendment rights, with special attention to responses to protests.

# Use of Force: ¶164

**164.** *CPD officers must only use force when it is objectively reasonable, necessary, and proportional under the totality of the circumstances.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *In Compliance* (NEW)
**Full:**            *Not Yet Assessed*

In the fourth reporting period, the City and the CPD met Preliminary and Secondary compliance with ¶164.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶164's requirements. As noted in the prior reporting period, CPD discussed and reviewed its Use of Force policies with the IMT, the OAG, and the community via open meetings, solicitation of online community input, and with the Use of Force Working Group. The CPD initially rejected the Use of Force Working Group's recommendations regarding necessary and proportional force, but as a result of continuing discussions with the Use of Force Working Group, the CPD issued revised Use of Force policies on December 31, 2020, which went into effect on April 15, 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

These policies further defined the term "necessary" as "the minimum amount of force needed to provide for the safety of any person or Department member, stop an attack, make an arrest, bring a person or situation under control, or prevent escape." The CPD also expanded the definition of "objectively reasonable" to include a member considering "whether de-escalation techniques can be employed or would be effective" and "the availability of other resources." Finally, related to the policies further emphasize the requirement to use de-escalation techniques. The above revisions to the use of force policy will be required training for recruits and for the 2021 use of force in-service training.

As a result of these policy changes and continued dialogue with the community in this reporting period, the City and CPD has achieved Preliminary compliance. The 2020 In Service training covered the conditions when force may be utilized, and as a result, the CPD is in Secondary compliance.

To maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear

channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training.

# Use of Force: ¶165

> **165.** *CPD officers are prohibited from using deadly force except in circumstances where there is an imminent threat of death or great bodily harm to an officer or another person. CPD officers are not permitted to use deadly force against a person who is a threat only to himself or herself or to property. CPD officers may only use deadly force as a last resort.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance with ¶165.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶165's requirements. As stated in our last report, on December 31, 2020, the CPD issued revised Use of Force policies, which became effective April 15, 2021. Reflected in these policies, as a result of recommendations from and discussions with the Use of Force Working Group, the CPD clarified requirements of deadly force and de-escalation in G03-02, *De-escalation, Response to Resistance, and Use of Force.* While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

The specific requirements of this paragraph are reflected in GO3-02, Section IV, "Use of Deadly Force: Necessary to Prevent Death or Great Bodily Harm" at Subsection C. "Last Resort," which states, "The use of deadly force is a last resort that is permissible only when necessary to protect against an imminent threat to life or to prevent great bodily harm to the member or another person." Further, Section D. "Prohibitions" states that "Department members will not use deadly force b. against a person who is only a threat to himself, herself, or property." This language has been in place since February 2020 and was covered by 2020 In-Service training which had attendance greater than 95% and is in Secondary compliance.

As a result of these policy changes, continued dialogue with the community in this reporting period, and training, the City and the CPD have achieved Preliminary and Secondary compliance.

To maintain Preliminary compliance, the City and the CPD must continue to review and revise its Use of Force policies, including establishing and maintaining clear

channels for community input. To maintain Secondary compliance, the City and the CPD must, as appropriate, develop, revise, and provide corresponding training.

# Use of Force: ¶166

***166.** CPD officers are prohibited from using deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm to an officer or another person.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *Under Assessment*
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶166.

As described in our last report, wo evaluate Preliminary compliance with ¶166, we have focused our review on whether the City and the CPD received the requisite community input for G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*. Last year and into this reporting period, the CPD engaged the Use of Force Working Group is discussions regarding non-lethal force on fleeing subjects and foot pursuits. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. The CPD moved language regarding these prohibitions into General Order G03-02, *De-escalation,* Response *to Resistance, and Use of Force,* which now indicates deadly force will not be used against a fleeing person unless the person poses an imminent threat (Section IV.D.1.a). The CPD issued revised Use of Force policies on December 31, 2020, which went into effective on April 15, 2021.

Further for Preliminary compliance and related to fleeing subjects, during this monitoring period, as required by ¶172, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy based on our assessment of CPD data and information. Because of our recommendation, the CPD is required to adopt a foot pursuit policy by September 3, 2021. On May 26, 2021, the CPD issued a temporary policy G03-07, *Foot Pursuits*, which will became effective June 11, 2021. The IMT noted multiple concerns in written comments to the City and CPD regarding the temporary, draft policy. Since then the CPD has worked with the IMT and OAG to revise its policy, which includes prohibitions against deadly force against fleeing suspect in Section VI.B.8. The department is currently obtaining department and community input on this policy, which is necessary for Preliminary compliance of ¶166. See ¶172 for more detail on the development of the foot pursuit policy.

Going forward, the IMT will assess Preliminary compliance with ¶166 through the completion of the foot pursuit policy. We will also assess Secondary compliance by

reviewing CPD's progress in delivering the 2020 Use of Force in-service training and training on the foot pursuit policy.

# Use of Force: ¶167

> **167.** *CPD officers will operate their vehicles in a manner that is consistent with CPD policy and training and with the foremost regard for the safety of all persons involved. CPD will periodically include instruction regarding sound vehicle maneuvers in its in-service training regarding use of force. As appropriate, CPD will provide supplemental training guidance regarding dangerous vehicle maneuvers that should be avoided.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The CPD maintained Preliminary compliance with ¶167 in the fourth reporting period, but did not reach Secondary compliance.

As described in the prior reporting period, to assess Secondary compliance in this reporting period, we reviewed CPD's process and policies to identify drivers in need of remedial training and whether such training has occurred, as well as training that was provided to all officers.

During this reporting period, on May 3, 2021, the IMT observed CPD's Monthly Traffic Accident Review. This is a monthly meeting of the Traffic Review Board to review traffic accidents. To meet the goals of the Consent Decree and maintain workload of case reviews, the CPD recently expanded individuals on the board to include staff from administrative and patrol functions. The May session included an incident review of vehicle pursuits and serious accidents resulting in tows, to include a group review of available body-worn camera video.

In reviewing CPD's related traffic policies for ¶167, the Traffic Review Board addressed the issues required by the Consent Decree, including reviewing the length of pursuit, speed of pursuit, road conditions, reason for pursuit, and whether the supervisor become involve in the incident. For each review, the Board determined whether the officer was in or not in compliance with policy. During this meeting, a number of officers were referred for remedial training, and reprimands were issued particularly for supervisors who failed to engage within three minutes. The IMT notes that the CPD has appropriate policies, practices, and processes for holding officers accountability to violations with policy for vehicular operations.

The IMT also reviewed CPD's 2021 in-service training curriculum which includes instruction (module 4) on how to conduct a motor vehicle stop and a portion on vehicular eluding and pursuit.

During this reporting period, we also reviewed data on CPD motor vehicle accidents on the COPA website and found that in recent months 19 cases have been exonerated, 6 cases have been sustained, 5 cases have not been sustained, and 3 cases were unfounded. For cases that are closed, the IMT is unable to identify the nature of the policy violation.

To achieve Secondary compliance, the CPD must periodically include traffic safety in its training. The IMT will continue its review of such training (i.e., 2021 in-service use of force training and remedial training) in the next reporting period. For Full compliance, the IMT will examine data and information from the CPD related to the frequency of car accidents, number of officers not announcing vehicular chases, and remedial actions and disciplinary outcomes.

# Use of Force: ¶168

*168. Starting no later than January 1, 2019, CPD will track and analyze the frequency with which CPD officers engage in foot pursuits of persons attempting to evade arrest or detention by fleeing on foot, regardless of whether the foot pursuit is associated with a reportable use of force incident. CPD will track foot pursuits associated with reportable use of force incidents through TRRs or any similar form of documentation CPD may implement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD failed to maintain Preliminary or Secondary compliance due to the fact that the data required by this paragraph has not been captured and analyzed correctly. The IMT's assessment of compliance with ¶168 depends upon valid and reliable data, but the City's failure to capture and analyze data correctly results in a loss of both Preliminary and Secondary compliance. In prior reporting periods, the IMT has assessed that City and the CPD had met Preliminary and Secondary compliance for this paragraph's requirements based on the fact that the OEMC has processes in place that capture foot pursuits; that the CPD's FRD reviews all TRRs that are foot pursuit-related and result in the use of force; and that the FRD's tracking and analysis of pursuits was sound.

During this reporting period, however, the IMT was alerted to the fact that there are serious issues of data quality regarding foot pursuits. Specifically, the way in which foot pursuit data were captured may be incorrect. This continues to raise a number of concerns for us – we are concerned with not only the higher percentage of uses of force during foot pursuits, but also the serious data quality issues within the City.

The IMT repeatedly requested the City and the CPD to provide an explanation regarding what transpired, what led to the data issues, whether they have been corrected, and requested details on the City's attempt to correct the data that has been provided to the IMT in previous reporting periods and reported on in previous reports, but has received no response.

Moving forward, the IMT will reevaluate the paragraph in light of the data issues explained above, and will pay specific attention to: (1) the manner in which the OEMC counts officers participating in foot pursuits, and whether it counts multiple officers on a single pursuit as multiple pursuits, resulting in a larger total number

of foot pursuits, causing a skewing of the actual number of foot pursuits resulting in uses of force; and (2) the data compiled by the CPD's FRD, that the IMT reviews regarding uses of force as noted in TRRs. The IMT will be closely monitoring the situation and reviewing their progress continuously as the CPD moves toward its final Foot Pursuit policy in September.

# Use of Force: ¶169

*169. For foot pursuits associated with reportable use of force incidents, by January 1, 2020, CPD will review all associated foot pursuits at the headquarters level to identify any tactical, equipment, or training concerns.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Full:**  *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶169.

As noted in our last report, to assess Full compliance, we are assessing whether the CPD has sufficiently implemented its foot pursuit review policy, protocols, and training and if the Force Review Division and the CPD are appropriately recommending and acting on tactical, equipment, and training concerns. During this reporting period, the FRD and the OOC submitted reports that identify tactical and training concerns related to foot pursuits, in particular districts with high percentages of chases.

During this reporting period and pursuant of ¶172, on March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy. The CPD is required to adopt a foot pursuit policy by September 3, 2021, and will thus need to make subsequent tactical and training revisions. See ¶172 for more detail on the development of the foot pursuit policy.

In the next reporting period, the IMT will continue to assess the CPD's progress on ¶169 as it completes its foot pursuit policy. We seek to determine whether the policy is completed with appropriate IMT, OAG, and community input; whether training reflects the new policy; and if the CPD is appropriately acting on FRD identified tactical, equipment, and training concerns and recommendations. Additionally, we seek to review foot pursuit data at the district level to analyze training and tactics need at a local district level.

# Use of Force: ¶170

> **170.** *CPD recently issued a foot pursuit training bulletin. By July 1, 2019, CPD will develop and issue a supplemental foot pursuit training bulletin that reflects best practices from foot pursuit policies in other jurisdictions. The supplemental training bulletin will be subject to review and approval by the Monitor and OAG. The supplemental training bulletin will: a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit; b. provide guidance to officers regarding radio communications during a foot pursuit; c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit; d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶170 and reached Full compliance. However, due the IMT recommendation that the CPD adopt a foot pursuit policy (see ¶172), the City's ongoing policy, training, and implementation efforts regarding foot pursuits—including data collection, management, and analysis efforts—are ongoing. We will continue to measure these efforts under other paragraphs.

More specifically, the City, the CPD, the OAG, and the IMT had and continue to have many discussions regarding the ongoing compliance efforts regarding CPD foot pursuits. The 2019 Training Bulletin is not sufficient for these ongoing efforts—particularly as the City and the CPD continue to develop the *Foot Pursuit* policy and corresponding training, which will differ from the *Training Bulletin*. As a result, this paragraph is considered a one-time requirement—although ¶170 will continue to inform how the CPD should instruct officers regarding foot pursuits. Specifically, CPD's new foot pursuit policy will need to include requirements a–e from ¶170:

> *a. identify risks and tactical factors officers should consider prior to initiating and during the course of a foot pursuit;*

*b. provide guidance to officers regarding radio communications during a foot pursuit;*

*c. instruct officers to avoid, to the extent practical, separating from other officers in the course of a foot pursuit;*

*d. provide guidance on circumstances when alternatives to a foot pursuit may be appropriate; and*

*e. inform officers that they must follow supervisors' instructions in the course of a foot pursuit, including instructions to alter tactics or discontinue the pursuit.*

In the next reporting period, the IMT will continue to assess the CPD's progress on ¶170 as it completes its *Foot Pursuit* policy and develops corresponding training and data collection mechanisms.

# Use of Force: ¶171

> **171.** *CPD will provide scenario-based training regarding foot pursuits and the supplemental foot pursuit training bulletin during the first annual use of force training required by this Agreement.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Under Assessment* (NEW: LOST COMPLIANCE)
**Secondary:** *Under Assessment*
**Full:** *Under Assessment*

In the third reporting period, the IMT recommended that the CPD adopt a foot pursuit policy (*see* ¶172). At the end of the fourth reporting period, the City and CPD are now under assessment for Preliminary compliance with ¶171.

On May 26, 2021, the CPD issued a temporary emergency policy (citing ¶631), G03-07, *Foot Pursuits*, after limited consultation and input from the IMT, OAG, and community. The new policy will require further consultation with each of these stakeholders. Additionally, to evaluate Preliminary compliance, the CPD's annual Use of Force training will need to re-enforce any new requirements or restrictions for foot pursuits through scenario-based training.

In the next reporting period, the IMT will continue to assess the CPD's progress on ¶171 as it completes its foot pursuit policy.

# Use of Force: ¶172

> **172.** *By no later than January 1, 2021, the Monitor will complete an assessment of CPD data and information to determine whether CPD should adopt a foot pursuit policy. If the Monitor recommends that CPD should adopt a foot pursuit policy, CPD will adopt a foot pursuit policy no later than July 1, 2021. Any foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 6, 2021* | ☑ **Met**  ☐ **Missed** |
| | *Extended from January 1, 2021, due to COVID-19 | |
| **Deadline:** | September 3, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from July 1, 2021, due to COVID-19 | |
| **Preliminary:** | *Under Assessment* | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not in Compliance* | |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶172.

On March 5, 2021, the IMT recommended that the CPD adopt a foot pursuit policy based on our assessment of CPD data and information of foot pursuit incidents (see prior monitoring reports). Because of our recommendation, the CPD was required to adopt a foot pursuit policy by September 3, 2021, and "[a]ny foot pursuit policy adopted by CPD will be subject to review and approval by the Monitor and OAG."

On May 4, 2021, following agreements during a settlement conference on May 3, 2021, the City and CPD submitted a draft of G03-07, *Foot Pursuits* (May 3, 2021), to IMT and OAG for review. However, on May 26, 2021, prior to appropriate input from the IMT, the City and the CPD bypassed the Consent Decree's policy review schedule (¶¶172 and 627, et al.) and issued a "temporary policy" before the summer, citing ¶631. The policy went into effect on June 11, 2021.

On May 10, 2021, the IMT noted multiple concerns in written comments to the City and CPD regarding the temporary, draft policy. The draft did not provide clear expectations for CPD officers and supervisors, allow the CPD to enforce such expectations, or provide the public with notice on the CPD's expected practices and procedures. Furthermore, the City and CPD did not receive community input on the policy, which it find necessary in order to receive compliance under the Consent Decree.

Since then the CPD has worked with the IMT and OAG to revise its interim policy, which became effective on June 11, 2021. Despite the policy being temporary it incorporates best practices and is modeled on after other peer agencies (e.g., Baltimore, Maryland).

The CPD is also currently obtaining department and community input on this policy, which is necessary for Preliminary compliance of ¶172. On June 2, 2021, the CPD conducted a public webinar on its new temporary foot pursuit policy. In addition in June 2021, CPD conducted "deliberative dialogues" with community organizations, such as the Streeterville Neighborhood Advocates, Lawndale Christian Legal Center, NAACP, Moms of CPD, the Illinois Latino Agenda, and the Coalition. The CPD is to be commended for reaching out to groups for feedback who have been past critics of the CPD. While the IMT thought the CPD's community engagement efforts with the Use of Force Working Group in 2020 were poor, we are pleased with the CPD's willingness to review, discuss, and adopt community recommendations on matters that are substantive.

Moving forward, the IMT will continue to review CPD's efforts to finalize its foot pursuit policy and its effort to engage the community through its development.

# Use of Force: ¶173

*173. Following a use of force, once the scene is safe and as soon as practicable, CPD officers must immediately request appropriate medical aid for injured persons or persons who claim they are injured.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶173.

As described in our last report, to assess Secondary compliance, we are reviewing whether CPD officers have completed Use of Force training and have been trained on the Use of Force policy revisions (policy effective April 15, 2021) related to the request of medical aid for injured persons following a Use of Force incident.

As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. With adequate training completed, the IMT finds the City and CPD in Secondary compliance with ¶173.

# Use of Force: ¶174

> **174.** *Before January 1, 2021, CPD will ensure that all CPD officers receive Law Enforcement Medical and Rescue Training ("LE-MART"). The LEMART training provided to CPD officers will incorporate scenario-based elements. Before January 1, 2021, CPD will equip all CPD officers engaged in patrol activities who have completed LEMART training with an individual first aid kit ("IFAK") (as defined in current CPD policy, U06-02-23).*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 6, 2021* | ☐ **Met**   ☑ **Missed** |
| | *Extended from January 1, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (NEW) | |
| **Secondary:** | *Under Assessment* | |
| **Full:** | *Not in Compliance* | |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶174. However, the CPD failed to meet the extended March 5, 2021 deadline.[102]

In the last reporting period, on December 9, 2020, the CPD provided the IMT and OAG with documentation on its LEMART training, including the lesson plan, PowerPoint presentation, scenario check lists, skills sheet, and illustrated list of medical equipment. The CPD provided further materials to the IMT and OAG on April 23, 2021, to demonstrate training progress and compliance with ¶174.

To assess Preliminary compliance, the IMT reviewed CPD policy requiring LEMART training for all CPD members. The IMT reviewed Uniform and Property Specification U06-02-23 *Individual First Aid Kit (IFAK) and Mini First Aid Kit (MFAK)*, effective March 21, 2020, which notes that only Department members who have successfully completed the "**required** Chicago Police Department's LEMART course" are authorized to carry the IFAK and MFAK pouch (emphasis added). The policy also states the type, color, make and model of equipment that officers must wear or must be available to LEMART trained officers. Further, the policy describes how officers will carry the IFAK or MFAK and how/when to replace used, damaged, or expired equipment. The CPD has the necessary policies in place, but did not make that change until after the close of the monitoring period.

---

[102] *See Order Regarding the Extension of Consent Decree Obligation Deadlines* (March 27, 2020), https://cpdmonitoringteam.com/wp-content/uploads/2020/04/2020_03_27-Order-Regarding-the-Extension-of-Consent-Decree-Obligation-De....pdf.

Since the CPD had already begun its significant training on LEMART, the IMT has assessed this paragraph to be in Preliminary compliance by adjusting our method-ologies – essentially considering training as evidence of Preliminary compliance and policy as evidence of Secondary compliance.

To assess training, the IMT reviewed LEMART course materials, observed a live course, and reviewed training attendance and equipment records to determine whether the CPD has sufficiently provided LEMART training and the number and percentage of officers who have under-gone training and received kits. On April 29, 2021, the IMT observed the CPD's eight-hour LEMART training. The IMT found the training to be hands on training on medical techniques. The training included three live stressful scenarios with officers being required to respond and apply the various medical techniques that were taught earlier in the course. Instructors did their best to make scenarios as stressful and realistic as possible, but were operat-ing within limited physical space in the training academy. The instructor-to-student ratio was low, allowing for interaction and engagement.

During the training, all officers logged into the website to verify their attendance of the training and confirm they received their distributed IFAK kits at the end of the course. Additionally, as of June 30, 2021, the 97% of CPD members completed LEMART training. While the CPD provided pdfs of spreadsheet data related to the issuance of IFAKs, the IMT cannot determine how many department members are issued IFAK kits. The spreadsheet data show that many officers have **not** been is-sued kits.

In sum, the City and the CPD made notable progress this reporting period with ¶174 by achieving Preliminary compliance. In the next reporting period, IMT looks forward to reviewing Secondary compliance to determine whether the CPD has sufficiently implemented LEMART policy and completed training IFAK distribution requirements.

# Use of Force: ¶175

> **175.** *Starting January 1, 2021, in use of force incidents involving CPD officers, CPD will require CPD officers to provide life-saving aid consistent with their LEMART training to injured persons as soon as it is safe and feasible to do so until medical professionals arrive on scene. CPD will replenish IFAKs, and the contents thereof, used by CPD officers as necessary to ensure officers have the equipment necessary to render aid consistent with their LE-MART training. Subsequent to January 1, 2021, CPD will ensure that any officer regularly engaged in patrol activities who has no prior LEMART training receives LEMART training within one year of beginning his or her regular patrol activities.*

**Compliance Progress**     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**     March 6, 2021*     ☐ **Met**  ☑ **Missed**
            *Extended from January 1, 2021, due to COVID-19
**Preliminary:**     *In Compliance* (NEW)
**Secondary:**     *In Compliance* (NEW)
**Full:**     *Not in Compliance*

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance with ¶175.

To assess Preliminary compliance, the IMT reviewed CPD policy requiring officers to provide life-saving aid consistent with LEMART training, regarding replenishing IFAKs, and ensuring that any officer regularly engaged in patrol activities receive LEMART training within one year of beginning patrol activities. General Order G03-02, *De-Escalation, Response to Resistance, and Use of Force*, noted that CPD members are required to provide medical aid in Section V.B:

> *For use of force incidents involving Department members, as soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on scene.*

This requirement is also re-enforced in GO3-06, *Firearm Discharge and Officer-Involved Death Incident Response and Investigation,* for the involved member, reviewing supervisor, and responding CPD members.

However, the requirements regarding replenishing IFAKs and receiving LEMART training within one year of beginning patrol duties are not documented in CPD policy.

To assess Secondary compliance, the IMT reviewed LEMART course materials, observed a live course, and reviewed training attendance and equipment records to determine whether officers are appropriately trained on the requirements of ¶175. Related to rendering aid, the in-service Use of Force training and LEMART training both educate officers on this requirement.

For training regarding replenishing IFAKs, the CPD provided a variety of documents on April 23, 2021, as evidence that it trains its officers on how to replenish IFAKs, including LEMART training slides that describe the equipment exchange policy and procedure and an image of CPD's Training Division website, which includes links to a guide explaining how to acquire replacement medical equipment for used or damaged items from the MFAK and a downloadable pre-printed "to/from" request form to make such a request. The IMT also observed the LEMART training on April 29, 2021, where instructors advised members how to replenish their equipment and the associated forms. Further, the CPD provided documentation showing that officers submitted requests for replacing equipment.

Finally for training of recruits, during this reporting period, the CPD provided the IMT and the OAG with a spreadsheet showing that all recruits were trained in LEMART in 2020 and noted that all recruits receive LEMART training. Thus, the CPD meet the requirement of receiving this training prior to beginning patrol activities.

In sum, during this reporting period, the City and the CPD has achieved Preliminary and Secondary compliance with ¶175. Moving forward, to assess Full compliance, the IMT will assess the provision of life saving aid during incidents.

# Use of Force: ¶176

**176.** *CPD officers must recognize and act upon the duty to inter-vene on the subject's behalf when another officer is using excessive force.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not in Compliance*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶176.

As noted in our last report, the CPD engaged the Use of Force Working Group on the requirements of this paragraph, which resulted in a change in G03-02, *De-Escalation, Response to Resistance, and Use of Force*. Previously the policy only specified verbal intervention. It now states that an officer may verbally or physically intervene to stop another officer from engaging in excessive or unnecessary force. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

To evaluate Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training specific to the duty to intervene. This requirement is covered within the training. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Thus, the IMT finds the City and CPD in Secondary compliance with ¶176.

We look forward to whether the revisions to G03-02 that an officer may intervene verbally or physically to try to stop a violation are updated in CPD's 2021 in-service training and CPD's efforts to implement ¶176 into practice.

# Use of Force: ¶177

*177. Consistent with CPD policy that force must be objectively reasonable, necessary, and proportional, CPD officers must generally not use force against a person who is handcuffed or otherwise restrained absent circumstances such as when the person's actions must be immediately stopped to prevent injury or escape or when compelled by other law enforcement objectives.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶177.

To evaluate Preliminary compliance with ¶177, as stated in our last report, we focused our review on whether the City and the CPD received the requisite community input for G03-02-01, *Response to Resistance and Force Options*, and finalized the policy. Based on feedback from the community, the CPD's December 31, 2020 revised G03-02-01 policy clarifies the "necessary" aspect of use of force by clarifying the "minimum amount force."

Going forward, we will continue to monitor Secondary compliance with ¶177, focusing on whether the CPD has trained on policy revisions in the next annual Use of Force training. The CPD will also need to provide training on de-escalation before use of force on restrained individuals. For Full compliance, the CPD needs to identify by TRR, the number and nature of these cases so the IMT can inspect to see if justification is in the narrative.

# Use of Force: ¶178

> **178.** *CPD officers are prohibited from using carotid artery restraints or chokeholds (or other maneuvers for applying direct pressure on a windpipe or airway, i.e., the front of the neck, with the intention of reducing the intake of air) unless deadly force is authorized. CPD officers must not use chokeholds or other maneuvers for intentionally putting pressure on a person's airway or carotid artery restraints as take-down techniques.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶178.

As noted in our last report, to evaluate Preliminary compliance with ¶178, we have focused our review on whether the City and the CPD received the requisite community input on the Use of Force policies. During the prior reporting period, the CPD and Use of Force Working Group engaged in extensive discussions over the prohibition of carotid artery restraints or choke-holds. The Working Group recommended and strongly advocated for their strict prohibition. The CPD did not accept the Working Group's recommendation. However, the CPD's revised G03-02, *De-Escalation, Response to Resistance, and Use of Force,* effective April 15, 2021, includes stronger language about carotid artery restraints or chokeholds not being allowable unless it is an act of last resort when necessary to protect against an imminent threat to life and includes further examples of prohibited actions in the neck area.

During this reporting period, the City and CPD continued to engage the Working Group in dialogue regarding the Use of Force policies. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. Further, on February 22, 2021, the Governor of Illinois signed House Bill 3653, *Police and Criminal Justice Reform Bill,* into law as Public Act 101-0652 (Safety, Accountability, Fairness and Equity – Today, SAFE-T Act), which expanded the prohibition of chokeholds to include any restraint above the shoulders that risks asphyxiation, unless deadly force is justified.

Going forward, we will continue to monitor the CPD's progress under ¶178. The CPD must reinforce the revisions and additions in policy related to carotid artery restraints or chokeholds in its Use of Force training. We will also review the use of

chokeholds, including Force Review Division review of such incidents in quarterly and annual reports (all deadly force incidents, shootings, head strikes, and choke-holds).

# Use of Force: ¶179

**179.** *CPD's use of force policies must guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use. CPD's use of force policies must clearly define and describe each force option and the circumstances under which use of such force is appropriate to address potential types of resistance.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶179.

As noted in our last report, to evaluate Preliminary compliance, we have reviewed the CPD's Use of Force policies and community engagement efforts related to ¶179's requirements. In 2020 and through this reporting period, the CPD continued to engage the community on its Use of Force policies, which guide officers on all force techniques, technologies, and weapons that CPD officers are authorized to use.

In the last reporting period, the Use of Force Working Group raised concerns with the use and prohibitions of Tasers and OC Spray. The CPD and the Working Group continued discussion regarding Tasers and OC Spray during reporting period, and also provide input on the department's temporary foot pursuit policy. Due to ongoing dialogue regarding these force options, the CPD remains under assessment with ¶179. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

Moving forward, the IMT will continue to assess CPD's community engagement efforts related to the force options requirements of ¶179.

# Use of Force: ¶181

> **181.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use firearms.*

**Compliance Progress**                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶181.

To assess Full compliance, the IMT attempted to audit firearms certification records for all officers and review the results of those records. The CPD did not provide sufficient materials and records to complete this audit during this reporting period. On June 2, 2021, the CPD provided the IMT and OAG *Training Deficiency Notification* reports for the years 2019 through February 2021 to demonstrate training actions for those that do not meet firearm certification requirements. However, this documentation does not allow the IMT to properly assess and determine whether only officers who are *certified* are issued, carry, and use firearms. The IMT has requested records of firearm certification for CPD members and documentation demonstrating that when officer attend firearms qualification they have an FOID card.

Moving forward, we look forward to assessing Full compliance upon receipt of firearm certification records for all officers.

# Use of Force: ¶182

**182.** *CPD will require officers to consider their surroundings before discharging their firearms and take reasonable precautions to ensure that people other than the target will not be struck.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶182 and remains under assessment for Secondary compliance.

As noted in our last report, to assess Preliminary compliance with ¶182, we focused our review on whether the City and the CPD received the requisite community input on its Use of Force policies. CPD's General Order G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures*, includes specific language in Section III, meeting the requirements of ¶182 regarding the condition on the discharge of a firearm. Preliminary compliance was not achieved in the last reporting period due to the community and the Use of Force Working Group providing multiple recommendations related to the requirements of this paragraph, which remained under discussion at the end of the last reporting period.

During this reporting period, the City and CPD continued to engage the Working Group in dialogue regarding issues and feedback related to the requirements of ¶182 and made changes to its policy as a result. While the CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. This includes increasing the emphasis on the officer's affirmative duty to de-escalate, establishing a minimum amount of force standard by refining necessary, strengthening an officer's assessment of the situation to include identification of vulnerable populations, and strengthening the considerations when responding to noncompliance to verbal directions. Additionally, the CPD demonstrated it has a process in place to capture data related to the conditions under which an officer discharges his/her firearm via the TRR-I form, which is completed by the street deputy.

The IMT believes the most recent policies, effective April 15, 2021, which reflect the previously described changes, and due to its open dialogue discussions with the Working Group in the first half of 2021, the CPD has sufficiently covered the requirements of the Consent Decree. The IMT finds the CPD in Preliminary compliance with ¶182.

Relevant training for ¶182, such as supervisor training, remained under review at the end of the fourth reporting period. We look forward to assessing the CPD's Use of Force training and whether in-service training reflects recent revisions to the Use of Force policies.

# Use of Force: ¶183

**183.** *CPD will require officers to issue a verbal warning prior to the use of any reportable force, including the use of firearms, when it is safe and feasible to do so.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance with ¶183.

As noted in our last report, to evaluate Preliminary compliance with ¶183, we focused our review on whether the City and the CPD received the requisite community input for its Use of Force policies. In 2020, the community and Use of Force Working Group recommended that officers issue verbal warnings prior to discharging a weapon and recommended that officers identify themselves as law enforcement unless doing so creates imminent risk of death. They also recommended that officers use hand signals or visual cues to provide warnings in event that a person is hearing impaired. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021.

During this reporting period, the CPD continued to engage the Working Group and community in dialogue regarding the Use of Force policies and its recommendations. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. While specific recommendations from the community relevant to this paragraph were not incorporated into the latest policies, effective April 15, 2021, the CPD actively discussed with the Working Group their feedback and concerns and made a number of other policy changes as a result. Further, in Section III.A of G03-02-01, *Response to Resistance and Force Options,* details policy requirements for continual communication to include, emphasizing the use of verbal control techniques to avoid or minimize confrontations prior to, during, and after the use of physical force, in addition the requirement of providing a warning prior to the use of physical force. Finally, Section III.C of General Order G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures* also clearly specifies that a sworn member, when safe and feasible, will "issue a verbal warning prior to, during, and after the discharge of a firearm or use of force."

Due to its continued discussions with the Working Group in the first half of 2021 and existing language in the latest policies, the IMT finds the CPD in Preliminary compliance with ¶183.

To evaluate Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training specific to issuing verbal warnings. This requirement is covered within the training. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Thus, the IMT finds the City and CPD in Secondary compliance with ¶183.

Going forward, we will continue to monitor Secondary compliance with ¶183, focusing on whether the CPD has trained on policy revisions in the next annual Use of Force training.

# Use of Force: ¶184

**184.** *When CPD officers discharge firearms, they must continually assess the circumstances that necessitated the discharge and modify their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it (e.g., when a subject is no longer a threat).*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance with ¶184.

As noted in our last report, to evaluate Preliminary compliance with ¶184, we focused our review on whether the City and the CPD received the requisite community input for its Use of Force policies. In 2020, the community and Use of Force Working Group recommended that firing into buildings, through doors, windows, or other openings should not be allowed under any circumstances. The Working Group also recommended that officer marksmanship training should reflect this prohibition. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021.

During this reporting period, the CPD continued to engage the Working Group and community in dialogue regarding the Use of Force policies and its recommendations. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. While specific recommendations from the community relevant to this paragraph were not incorporated into the latest policies, effective April 15, 2021, the CPD actively discussed with the Working Group their feedback and concerns and made a number of other policy changes as a result. Further, Section II.E-F of G03-02-01, *Response to Resistance and Force Options,* details policy requirements of ¶184 for members to continually assess situations and modify force.

Due to its continued discussions with the Working Group in the first half of 2021 and existing language in the latest policies, the IMT finds the CPD in Preliminary compliance with ¶184.

To evaluate Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training specific to continually assessing the circumstances that necessitate the discharge of a firearm. This

requirement is covered within the training. As of March 4, 2021, 96% of CPD offic-
ers completed the 2020 Use of Force in-service training. Thus, the IMT finds the
City and CPD in Secondary compliance with ¶184.

Going forward, we will continue to monitor Secondary compliance with ¶184, fo-
cusing on whether the CPD has trained on policy revisions in the next annual Use
of Force training.

# Use of Force: ¶185

**185.** *CPD will continue to prohibit officers from firing warning shots.*

---

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and reached Secondary compliance with ¶185.

To evaluate Secondary compliance, as noted in our last report, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training and recruit force options training specific to firearms and deadly force. Both trainings cover instruction on the requirements of ¶185. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Due to the COVID-19 pandemic, the City received an extension for completing the 2020 Use of Force in-service training, which was to be completed by March 4, 2021.

During this reporting period, as a result of feedback from the IMT to develop a process to track data related to level 3 reportable use of force incidents, the CPD established a process to track and examine the nature of firearm discharge incidents and determine the nature of the event via the TRR-I form. The form now includes a supplemental section which request details regarding type of force used, a listing of other TRRs for the incident, and other aspects of the incident, including whether or not a warning shot was fired.

With adequate training completed and a process in place to track Use of Force incidents where a warning shot was fired, the IMT finds the City and CPD in Secondary compliance with ¶185.

We look forward to assessing Full compliance and further examining data on firearm discharges, as new data related to firing warning shots is captured via the TRR-I form and reviewed by FRD.

# Use of Force: ¶186

**186.** *CPD officers must not fire at moving vehicles when the vehicle is the only force used against the officer or another person, except in extreme circumstances when it is a last resort to preserve human life or prevent great bodily harm to a person, such as when a vehicle is intentionally being used to attack a person or group of people. CPD will continue to instruct officers to avoid positioning themselves or remaining in the path of a moving vehicle, and will provide officers with adequate training to ensure compliance with this instruction.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance with ¶186.

As noted in our last report, to evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶186's requirements. Last year the Use of Force Working Group provided comments related to ¶186. Specifically, the Working Group provided recommended language for limiting firing at or into motor vehicles. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021.

During this reporting period, the CPD demonstrated its commitment to actively engage the Working Group and community in dialogue regarding the Use of Force policies and its recommendations. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. While specific recommendations from the community relevant to this paragraph were not incorporated into the latest policies, effective April 15, 2021, the CPD actively discussed with the Working Group their feedback and concerns and made a number of other policy changes as a result. Section II.D.6 of G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures,* details policy requirements of ¶186 prohibiting firing at or into a moving vehicle.

Due to its open dialogue discussions with the Working Group in the first half of 2021 and existing language in the latest policies, the IMT finds the CPD in Preliminary compliance with ¶186.

To evaluate Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training and recruit force options training specific to firearms and deadly force. Both trainings cover instruction on the requirements of ¶186. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Due to the COVID-19 pandemic, the City received an extension for completing the 2020 Use of Force in-service training, which was to be completed by March 4, 2021.

Finally, during this reporting period, as a result of feedback from the IMT to develop a process to track data related to level 3 reportable use of force incidents, the CPD established a process to track and examine the nature of firearm discharge incidents and determine the nature of the event via the TRR-I form. The form now includes a supplemental section which request details regarding type of force used, a listing of other TRRs for the incident, and other aspects of the incident, including whether or not a firearm was discharged at or into a moving motor vehicle. During this reporting period, the CPD's use of force dashboard indicates 25 firearm discharges. COPA data for the past year indicates 7 sustained cases relative to officer firearm discharges, but the IMT is unable to determine the nature of the violations.

In discussion with the FRD during this reporting period, the IMT recommended the inclusion of deadly force statistics in the FRD's quarterly reports and the CPD agreed to do so. Moving forward, the IMT will monitor the FRD's quarterly reports for that information, noting whether any such incidents were related to moving vehicles.

With adequate training completed and a process in place to track firearm discharges, the IMT finds the City and CPD in Secondary compliance with ¶186.

We look forward to assessing Full compliance and further examining data and information regarding firearm discharges, including new data that is captured via the TRR-I form and reviewed by FRD, as well as data from COPA on cases involving firearms discharges and motor vehicles.

# Use of Force: ¶187

**187.** *CPD will prohibit officers from firing from a moving vehicle unless such force is necessary to protect against an imminent threat to life or to prevent great bodily harm to the officer or another person.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary and Secondary compliance with ¶187.

As noted in our last report, to evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶187's requirements. Last year the Use of Force Working Group provided comments related to ¶187. Specifically, the Working Group provided recommended language for prohibiting firing from motor vehicles. The CPD and the Working Group agreed to continue discussion about the Use of Force policies into 2021.

During this reporting period, the CPD demonstrated its commitment to actively engage the Working Group and community in dialogue regarding the Use of Force policies and its recommendations. While specific recommendations from the community relevant to this paragraph were not incorporated into the latest policies, effective April 15, 2021, the CPD actively discussed with the Working Group their feedback and concerns and made a number of other policy changes as a result. Section II.D.7 of G03-02-03, *Firearm Discharge Incidents – Authorized Use and Post-Discharge Administrative Procedures,* details policy requirements of ¶187 prohibiting firing from a moving vehicle.

Due to its open dialogue discussions with the Working Group in the first half of 2021 and existing language in the latest policies, the IMT finds the CPD in Preliminary compliance with ¶187. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

To evaluate Secondary compliance, we reviewed the development, implementation, and evaluation of the 2020 Use of Force in-service training and recruit force options training specific to firearms and deadly force. Both trainings cover instruction on the requirements of ¶187. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Due to the COVID-19 pandemic,

the City received an extension for completing the 2020 Use of Force in-service training, which was to be completed by March 4, 2021.

Finally, during this reporting period, as a result of feedback from the IMT to develop a process to track data related to level 3 reportable use of force incidents, the CPD established a process to track and examine the nature of firearm discharge incidents and determine the nature of the event via the TRR-I form. The form now includes a supplemental section which request details regarding type of force used, a listing of other TRRs for the incident, and other aspects of the incident, including whether or not a firearm was discharged from a moving motor vehicle.

With adequate training completed and a process in place to track firearm discharges, the IMT finds the City and CPD in Secondary compliance with ¶187. Further, the IMT has reviewed the CPD's Use of Force Dashboard, which indicates 25 firearm discharges for this reporting period. The IMT also reviewed the shooting cases concluded by COPA for the last year and found there were 7 cases that were sustained for shootings but the IMT was unable to determine exact nature of the violations. We look forward to assessing Full compliance and further examining data and information regarding firearm discharges, including new data that is captured via the TRR-I form and reviewed by FRD, as well as data from COPA on cases involving firearms discharges and motor vehicles.

# Use of Force: ¶188

> **188.** *By January 1, 2019, CPD will develop a training bulletin that provides guidance on weapons discipline, including circumstances in which officers should and should not point a firearm at a person. CPD will incorporate training regarding pointing of a firearm in the annual use of force training required by this Agreement in 2019.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance with ¶188 and made progress towards Full compliance.

As described in our last report, to evaluate Full compliance with ¶188, the IMT is examining training attendance records and data for the CPD's 2020 Use of Force in-service training, which includes instruction on the updated Firearm Pointing Incidents Policy (issued October 1, 2019, and effective November 1, 2019), including information on Fourth Amendment case law for unreasonable firearm seizures. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Additionally, during this reporting period, the CPD advised that it is determining a process to sufficiently track and analyze all pointing incidents, including those not documented in ISRs or arrest reports. IMT awaits plans and information on and resulting from this process to assess Full compliance of ¶188 in forthcoming reporting periods.

# Use of Force: ¶189

> **189.** *CPD will clarify in policy that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. CPD will also clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of the circumstances.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and reached Secondary compliance with ¶189.

As noted in prior reporting periods, to evaluate Secondary compliance with ¶189, we have been reviewing the development, implementation, and evaluation of training regarding the firearm pointing policy. The CPD's annual in-service Use of Force training for 2019 and 2020 provides clear instruction that officers may only point a firearm at a person when objectively reasonable under the totality of the circumstances. The training further states that when a CPD officer points a firearm at a person to detain the person, an investigatory stop or an arrest has occurred, which must be documented. The 2020 lesson plan also includes an example of a pointing incident that was considered unreasonable un-der the Fourth Amendment. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training.

CPD's in-service training appropriately covers the requirements of ¶189, and the CPD has trained a sufficient number of CPD personnel. As a result, the City and the CPD in Secondary compliance with ¶189.

For Full compliance, we are assessing whether officers understand the firearm pointing policy. To do so, the IMT plans to review a sample of all firearm pointing incidents. However, as noted in prior reporting periods, the IMT has raised the need for the CPD to account for all firearm pointing instances that result in a noti-fication to the OEMC. Currently, not all pointing incidents are not received because they do not have an associated investigatory stop or arrest report. The FRD re-ported approximately 16% of incidents meet this criteria.[103] The IMT has discussed

---

[103] *Force Review Division 2021 Q1 Report*, CHICAGO POLICE DEPARTMENT (May 11, 2021), https://home.chicagopolice.org/wp-content/uploads/Q1-2021.pdf.

this issue at length with the CPD and is pleased that the CPD is currently formulating a plan to address this issue and review all firearm pointing incidents.

In sum, the City and the CPD met Secondary compliance with ¶189 this reporting period. Moving forward, the IMT will continue to assess whether officers understand the firearm pointing policy and the resolution of currently undocumented pointing incidents.

# Use of Force: ¶190

> **190.** *Beginning July 1, 2019, CPD officers will, at a minimum, promptly after the incident is concluded, notify OEMC of investigatory stop or arrest occurrences in which a CPD officer points a firearm at a person in the course of effecting the seizure. The notification will identify which CPD beat(s) pointed a firearm at a person in the course of effecting the seizure. The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and reached Secondary compliance with ¶190.

As noted in prior reporting periods, to evaluate Secondary compliance with ¶189, we are determining whether a sufficient number of officers are trained in the firearm pointing policy. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. CPD's in-service training appropriate covers the requirements of ¶190 and the CPD has trained a sufficient number of CPD personnel, thus, the IMT finds the City and the CPD in Secondary compliance with ¶190.

For Full compliance, we have been assessing whether officers understand the firearm pointing policy. According to the CPD's Firearm Pointing dashboard, shared with the IMT on June 16, 2021, during the fourth monitoring period (January 1, 2021 to June 30, 2021), CPD had a total of 1,367 total beat notifications, and 1,175 firearm pointing incidents.[104]

The CPD's ability to attain Full compliance will continue to depend on its ability to account for all firearm pointing incidents and achieve greater compliance with body-worn camera use. The IMT continues to observe incidents when officers point a firearm that the FRD does not review, specifically when an associated Arrest Report or Investigatory Stop Report (ISR) could not be found or did not exist.

---

[104] The number of firearm pointing incidents regardless of beat notifications. If members from two different beats point firearms, it is counted as one incident. This number is used when calculating weapon recoveries in order to prevent over counting.

The *Force Review Division 2021 Q1 Report* states that approximately 16% of incidents have no Arrest Report or ISR.

Additionally, the *Force Review Division 2020 Year-End Report* states that of the 2,528 pointing incidents reviewed in 2020, 91.4 percent had reviewable body-worn-camera video. Available body-worn-camera footage for pointing incidents is steadily improving since the beginning of 2021. *See* Use of Force Figure 3.

Use of Force Figure 3:
Available Body Worn Camera Footage for Firearm Pointing Incidents

| Quarter 1, 2020 | Quarter 2, 2020 | Quarter 3, 2020 | Quarter 4, 2020 | Quarter 1, 2021 |
|---|---|---|---|---|
| 93.6% | 82.4%[105] | 98.0% | 95.1% | 98.9% |

While available body-worn-camera footage for pointing incidents is improving, body-worn-camera issues continue to account for a large percent of FRD recommendations. In 2020, body-worn-camera usage recommendations accounted for 83.3 percent of all recommendations made.

In sum, the City and the CPD met Secondary compliance with ¶190 in this fourth reporting period. For Full compliance, while officers appear to be aware and understand the firearm pointing policy, for Full compliance, the CPD needs to address issues raised regarding accounting for all firearm pointing incidents and body-worn-camera issues per ¶190's requirement that

> The City will ensure that OEMC data recording each such notification is electronically linked with CPD reports and body-worn camera recordings associated with the incident, and all are retained and readily accessible to the supervisor of each CPD beat(s) identified in the notification.

We look forward to continuing to monitor the CPD's progress with ¶190.

---

[105]  In the second quarter of 2020, only 82.4% of firearm pointing incidents had reviewable body worn camera video, which the CPD attributes to the first few days of civil unrest (May 31–June 3, 2020) when many officers deployed to sites that were not their normal unit of assignment, resulting officers in not being equipped with cameras.

# Use of Force: ¶191

> **191.** *OEMC will notify an immediate supervisor of the identified beat(s) each time the pointing of a firearm is reported. Notified CPD supervisors will ensure that the investigatory stop or arrest documentation and the OEMC recordation of the pointing of a firearm are promptly reviewed in accordance with CPD policy. CPD supervisors will effectively supervise the CPD members under their command consistent with their obligations set forth in the Supervision section of this Agreement.*

Compliance Progress                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and made progress toward Secondary compliance with ¶191.

As noted in our last report, to evaluate Secondary compliance for ¶191, we are determining whether a sufficient number of CPD members are trained in the firearm pointing policy and whether OEMC and supervisors understand firearm pointing notification and review policies and procedures. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training.

However, training is still needed for supervisors for their roles and responsibilities for pointing incidents and disciplinary action should an officer violate policy. The FRD has reported that in only 5 percent of pointing incidents warranting action supervisors are proactively taking action. CPD has yet to complete its 2021 supervisor training.

Further, during this reporting period, the CPD revised its body-worn camera policy, Special Order S03-14. Since body-worn-camera use remains to be a major issue identified by the FRD for firearm-pointing incidents. The IMT believes further training will be required for officers and supervisors, and necessary for compliance ¶191.[106]

---

[106] We continue acknowledge and commend the CPD for its established processes, systems, and new dashboard for firearm-pointing incidents. But we continue to have concerns about approximately 16% of pointing incidents that only receive a cursory review, due to the fact that no ISR or arrest report was submitted. Further, we acknowledge that a small percentage of these cases are forwarded to the Integrity Unit. The CPD will need to further analyze the nature of these pointing incidents, categorize them, and make a determination of whether policy was followed. The FRD's 2021 Q1 Report notes that "The Department is in the early stages of formulating a plan to review all Firearm Pointing Incidents. This will include the approximately

For Full compliance, as noted in our last report, we will assess whether the CPD has sufficiently implemented its policy and training, specifically related to OEMC notifications for supervisors, and will assess the requirement for supervisors to promptly review and effectively supervise their personnel. The CPD should consider a process in which supervisors identify and record any issues with firearm pointing incidents shortly after review. The onus of enforcing this directive cannot and should not fall only on the Force Review Division. The CPD has instructed front line supervisors responding to pointing incidents to address the IMT's concerns and make an assessment of whether there is a need for further actions or clarifications, either within policy or within training. While the IMT appreciates instructing supervisors to review pointing incidents immediately -- the CPD requires supervisors to make notes of the incidents on their management logs, which are pen-and-paper documents – we are concerned about how those management logs may aggregated to produce meaningful data.

Per recommendation of the IMT in the past reporting period, the FRD is in the process of creating a dashboard that identifies use of force, including firearm pointing, advisements, debriefing points, and recommendations by district and officer. This dashboard will allow supervisors to identify and proactively address beats with officers who do not comply with the firearm pointing policy.

We will continue to review the City and the CPD's efforts toward compliance in the next reporting period.

---

16% of FPIs that are not reviewed because they do not have an associated investigatory stop or arrest report." The IMT looks forward to learning more about this plan.

# Use of Force: ¶192

*192. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure. The review and audit will be completed within 30 days of each such occurrence. This review and audit will: a. identify whether the pointing of the firearm at a person allegedly violated CPD policy; b. identify any patterns in such occurrences and, to the extent necessary, ensure that any concerns are addressed; and c. identify any tactical, equipment, training, or policy concerns and, to the extent necessary, ensure that the concerns are addressed. The designated unit at the CPD headquarters level will, where applicable, make appropriate referrals for misconduct investigations or other corrective actions for alleged violations of CPD policy. At the completion of each review and audit, the designated unit at the CPD headquarters level will issue a written notification of its findings and, if applicable, any other appropriate actions taken or required to an immediate supervisor as described above.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**     Ongoing              ☑ Met    ☐ Missed

**Preliminary:**   *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**    *In Compliance* (NEW)
**Full:**          *Not in Compliance*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶192. The City and the CPD also met the ongoing deadline to complete the required reviews and audits within 30 days of each occurrence in which a CPD officer pointed a firearm at a person in the course of effecting a seizure.

To evaluate Secondary compliance for ¶192, we continued to review CPD's training regarding the firearm pointing incident policy and procedures for the Force Review Division. As noted in the prior reporting period, in 2020, the CPD created a *Firearm Pointing Incident Review In-Service Unit Training* to train Force Review Division staff on the relevant policies that guide firearm pointing. The CPD has also provided the IMT and OAG with records in the last reporting period demonstrating that all members of the Force Review Division who conduct firearm pointing incident reviews have been trained on the review process. We reviewed documentation identifying the various platforms officers reviewed to complete their training.

During this reporting period, on June 16, 2021, the CPD shared its Firearm Pointing Dashboard, which provides data on pointing incidents according to a number of factors such as: month, district, assignment type, reviewed, event types, arrests, TRRs, ISRs, body-worn cameras, training recommendations, and weapons recovered.

We continue acknowledge and commend the CPD for its established processes, systems, and new dashboard for firearm pointing incidents. But we continue to have concerns about approximately 16% of pointing incidents that only receive a cursory review, due to the fact that no ISR or arrest report was submitted. Further, we acknowledge that a small percentage of these cases are forwarded to the Integrity unit. Full compliance for ¶192 will depend on the CPD's ability to further analyze the nature of these pointing incidents, categorize them, and make a determination of whether policy was followed. The FRD's 2021 Q1 Report notes that "The Department is in the early stages of formulating a plan to review all Firearm Pointing Incidents. This will include the approximately 16% of FPIs that are not reviewed because they do not have an associated investigatory stop or arrest report." The IMT looks forward to learning more about this plan.

To evaluate Full compliance, we will continue to review training, community, and data sources, including footage from body-worn cameras, pointing data, and Force Review Division review schedules and completion records to determine whether the CPD has sufficiently implemented its policy and training. During this reporting period, the Force Review Division made the following progress in the required areas for ¶192:

A. *Complete the review and audit within 30 days of each occurrence.* The FRD reported in its 2020 annual report and 2021 Q1 report meeting the 30 day deadline for all firearm pointing incident reviews.

B. *Identify whether the pointing of the firearm at a person allegedly violated policy*. There were no incidents of any Pointing Policy violations by either district personnel or FRD personnel in 2020. In the first quarter of 2021, the CPD reported two referrals to COPA for policy violations made by the Force Review Division. The most common recommendation debriefing point for Force Review Division Firearm Pointing Reviews continued to be related to body-worn camera use.

C. *Identify any patterns and ensure such concerns are addressed*. The Force Review Division in its 2020 annual report, reported the 7th district as having the most firearm pointing incidents and recommendations for training. This is a noteworthy statistics because only 14.6 percent of the incidents resulted in FRD recommendations. The Force Review Divisions also identified a pattern in March of 2020 within the 011th District related to compliance with the CPD's

body-worn camera policy (Special Order S03-14). Compliance within this district continues to be an issue, which the Force Review Division continues to monitor and work on with the District Commander.

D. *Identify tactical, equipment, training, or policy concerns and to the extent necessary ensure that the concerns are addressed*. Traffic stops continue to be the primary event type for firearm pointing incidents (23% in 2020). The proposed 2021 Use of Force in-service training lesson plan includes traffic stops as a result of recommendations by the Force Review Division.

In sum, the City and the CPD completed notable activities for ¶192 during the fourth reporting period. Further work is still necessary, particularly on the issue of unaddressed firearm pointing incidents and efforts by the CPD and district level to respond to patterns, trends, and issues identified by the Force Review Division. The IMT looks forward to the establishment of the Supervisory dashboard that will supply front line supervisors with FRD data. In particular it will be interesting to see how pointing data, which is collected by beat as opposed to by officer, is included. We look forward to evaluating CPD's progress for this paragraph in the next reporting period.

# Use of Force: ¶193

**193.** *CPD will ensure that the designated unit at the CPD head-quarters level responsible for performing the duties required by this Part has sufficient resources to perform them, including staff with sufficient experience, rank, knowledge, and expertise.*

## Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**       *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**       *In Compliance* (THIRD REPORTING PERIOD)
**Full:**       *Not in Compliance*

In the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance, and made progress towards Full compliance with ¶193.

Related to ongoing Secondary compliance, the FRD continued to demonstrate its commitment to ensuring its staff have sufficient knowledge and expertise through continued in-service training. The FRD reported that in the first quarter of 2021, FRD staff completed 40 hours of FRD-specific in-service training. This is in addition to the 40-hour yearly training required for all CPD officers. Topics include, Control Tactics, Tasers, Vehicle Stops and Occupant Control, Tactical Room Entry, VirTra Simulator Training, Crisis Intervention Training; and Law Review (Fourth Amendment, terry stops, use of force, deadly force).

To evaluate Full compliance, we continued to review training, community, and data sources to assess the capacities and capabilities of the Force Review Division. In this reporting period, the CPD supplied additional materials to us for our assessment of Full compliance, including a notice of job opportunity (NOJO), NOJO qualifications, resumes, hiring certification forms, interview materials, assignment request for FRD staff, and personnel authorization transfers. At the end of the first quarter of 2021, the Force Review Division included 1 lieutenant, 8 sergeants, and 43 review officers. During our virtual site visit in April and May, 2021 we understood that the FRD was understaffed by at least 13 officers.

In sum, the City and the CPD completed notable activities for ¶193 during the fourth reporting period, resulting in progress towards Full compliance. We will continue to assess Full compliance for ¶193 in the next reporting period. We will continually monitor FRD training and whether FRD pointing unit has sufficient personnel to address their workload and consistently meet the 30-day completion period, as well as review a number of pointing incidents to determine whether policy has been complied with and accurately categorized.

# Use of Force: ¶194

**194.** *CPD officers will not be required to notify OEMC of the pointing of a firearm at a person when the CPD officer is a SWAT Team Officer responding to a designated SWAT incident, as defined in CPD Special Order S05-05, or an officer assigned to a federal task force during the execution of federal task force duties.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶194.

To evaluate Preliminary compliance in the prior reporting period, we reviewed Department Order D19-01, *Firearm Pointing Incidents* (effective November 1, 2019).

During this reporting period, to evaluate Secondary compliance with ¶194, we reviewed the development, implementation, and evaluation of training regarding the firearm pointing policy. The CPD's annual in-service Use of Force training for 2019 and 2020 provides instruction that officers are not required to notify OEMC of a pointing incident when the officers is a SWAT Team Officer responding to a designated SWAT incident or an officer assigned to a federal task force. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Thus, the IMT finds the City and the CPD in Secondary compliance with ¶194.

Moving forward, the IMT will assess Full compliance with ¶194 to determine whether the CPD has sufficiently implemented its policy and training, including if such notifications are tracked and if these exemptions result in complaints. The IMT notes that it has expressed prior concerns over firearm pointing incidents for which there is no arrest report or ISR. We will continue to monitor this issue in the future as we assess compliance in future reporting periods.

# Use of Force: ¶195

**195.** *CPD officers will not be required to notify OEMC of any unholstering or display of a firearm or having a firearm in a "low ready" position during the course of an investigation, unless the firearm is pointed at a person.*

**Compliance Progress**　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and met Secondary compliance with ¶195.

To evaluate Preliminary compliance in the prior reporting period, we reviewed Department Order D19-01, *Firearm Pointing Incidents*, effective November 1, 2019.

During this reporting period, to evaluate Secondary compliance with ¶195, we reviewed the development, implementation, and evaluation of training regarding the firearm pointing policy. The CPD's annual in-service Use of Force training for 2019 and 2020 provides instruction that officers are not required to notify of any unholstering or display of a firearm or having a "low ready" position during the course of an investigation, unless the firearm is pointed at a person. As of March 4, 2021, 96% of CPD officers completed the 2020 Use of Force in-service training. Thus, the IMT finds the City and the CPD in Secondary compliance with ¶195.

Moving forward, the IMT will assess Full compliance with ¶195 to determine whether the CPD has sufficiently implemented its policy and training, including if such notifications are tracked and if these exemptions result in complaints. The IMT notes that it has expressed prior concerns over firearm pointing incidents for which there is no arrest report or ISR. We will continue to monitor this issue in the future as we assess compliance in future reporting periods.

# Use of Force: ¶196

> **196.** *The City will ensure that all documentation and recordation of investigatory stop or arrest occurrences in which a CPD member points a firearm at a person, including OEMC data, is maintained in a manner that allows the Monitor, CPD, and OAG to review and analyze such occurrences. Beginning January 1, 2020, the Monitor will analyze these occurrences on an annual basis to assess whether changes to CPD policy, training, practice, or supervision are necessary, and to recommend any changes to the process of documenting, reviewing, and analyzing these occurrences. CPD will either adopt the Monitor's recommendations or respond in writing within 30 days. Any dispute regarding the whether the Monitor's recommendations should be implemented will be resolved by the Court.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          December 31, 2021          ☑ **Not Yet Applicable**

**Preliminary:**   *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**   *In Compliance* (THIRD REPORTING PERIOD)
**Full:**   *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and Secondary compliance with ¶196.

Paragraph 196—along with a few other paragraphs in the Consent Decree—is written to highlight the IMT's actions or reviews but ultimately relates to City responsibilities. In prior reporting periods, we noted that the City and the CPD have the necessary policies and procedures to collect the requisite information on firearm pointing incidents. Thus, the City and the CPD maintain Preliminary compliance with ¶196. As we have noted in ¶192, the CPD has sufficiently trained Force Review Division staff in firearm pointing reviews. Thus, the City and the CPD maintain Secondary compliance for ¶196.

Throughout this reporting period, the IMT engaged in many discussions with the CPD and the OAG regarding the CPD's collection and maintenance of data in dashboards. As noted in other paragraphs in this section, the IMT recommends revisions to the dashboards to include detailed data at the beat level, allowing for identification of geographic areas with high levels of firearm pointing incidents. Capturing and analyzing data at the beat level will enable the CPD to identify patterns and trends that may be rectified through, for example, training or increased supervisor engagement.

The first quarter FRD report for 2021 states that from January 1, 2021, to March 31, 2021, the CPD generated 576 firearm pointing incident reviews for Force Review Division. The calls for service/incident types that generated the largest amount of firearm pointing incidents were traffic stops (197 incidents, 23%), followed by person with a gun (105 incidents, 19%). These are similar trends for incident type from previous reporting periods. The report also states of the 694 pointing incidents, 111 (16%) did not have an associated ISR or arrest report and were therefore not reviewed.[107]

We also note that the CPD is planning to conduct an audit to assess the effectiveness of debriefings conducted by district supervisors. We looks forward to reviewing the outcome of the audit in a future reporting period.

---

[107] As referenced above, we continue acknowledge and commend the CPD for its established processes, systems, and new dashboard for firearm pointing incidents. But we continue to have concerns about approximately 16% of pointing incidents that only receive a cursory review, due to the fact that no ISR or arrest report was submitted. Further, we acknowledge that a small percentage of these cases are forwarded to the Integrity Unit. The CPD will need to further analyze the nature of these pointing incidents, categorize them, and make a determination of whether policy was followed. The FRD's 2021 Q1 Report notes that "The Department is in the early stages of formulating a plan to review all Firearm Pointing Incidents. This will include the approximately 16% of FPIs that are not reviewed because they do not have an associated investigatory stop or arrest report." The IMT looks forward to learning more about this plan.

# Use of Force: ¶197

**197.** *CPD will continue to require that only officers who are currently certified may be issued, carry, and use Tasers.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance with ¶197.

To meet Preliminary compliance with ¶197 in the prior reporting period, the CPD demonstrated that it has appropriate policies in place to reflect the requirements of the Consent Decree, with the following policies: Uniform and Property U04-02-02, *Control Devices and Instruments*, General Order 03-02-04, *Taser Use Incidents*, and Special Order S11-03-01, *Annual Prescribed Weapon Qualification Program and Taser Recertification*.

To evaluate Secondary compliance with ¶197, we reviewed whether an adequate proportion of personnel have completed the 2020 Use of Force in-service training, paying specific attention to education on Taser certification requirements and changes in training as a result of changes in policies due to dialogue with the Use of Force Working Group through 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

As a result of discussions, the CPD has issued proposed changes to the Taser policy, General Order 03-02-04, *Taser Use Incidents.* Section III.B, entitled *Authorized Manner of Use* subsections 1 and 2 include the exact language required by this paragraph. To assess Secondary compliance, we reviewed the CPD's Taser eLearning course, which officers must take prior to actual certification on Tasers, addresses this this issue.

# Use of Force: ¶198

**198.** *CPD will instruct officers that Tasers can cause serious injury or death and, as a result, officers should use Tasers only after balancing relevant factors including the threat presented by the subject, the risk of injury if a Taser is used, and the seriousness of the suspected offense. Consistent with this standard, CPD officers should not use Tasers against persons who are reasonably perceived to be non-violent, unarmed, and suspected of low-level offenses, such as property-related misdemeanors, quality of life offenses, moving or traffic violations, or municipal code violations.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶198.

To evaluate Preliminary compliance with ¶198, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group continued discussions through June 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these discussions, the CPD noted it will be making a number of changes to G03-02-04, which include the following specifically related to ¶198:

• Reaffirming the commitment to sanctity of life by removing references to Taser as a "less-lethal weapon,"

• Establishing a more restrictive standard on the use of Tasers against active resistors,

• Adding new restrictions on the use of Tasers (related to fleeing persons, for pain compliance, or for persons with weapons), and

• Clarifying the Taser use assessment to include vulnerable populations.

We will continue to assess Preliminary compliance for ¶198 in the fifth reporting period, seeking the issuance of a revised G03-04-02 to reflect these policy changes resulting from community engagement with the working group.

# Use of Force: ¶199

**199.** *CPD will clarify in policy that flight alone, without any other basis for reasonable articulable suspicion or probable cause, does not justify use of a Taser against a subject.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶199.

To evaluate Preliminary compliance with ¶199, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group continued discussions through June 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these discussions, the CPD noted it will be making a number of changes to G03-02-04, which includes adding new restrictions on the use of Tasers against fleeing persons (Section II.D). Specifically, the policy removed reference that Taser will not be use without any other basis for establishing reasonable articulable suspicion or probable cause. The policy will now state:

> *Tasers will not be used on a person whose ONLY action is flight alone.*

> *NOTE: The use of a Taser on a fleeing person is only authorized when in compliance with Item II-C of this directive.*

We will continue to assess Preliminary compliance for ¶199 in the fifth reporting period, seeking the issuance of a revised G03-04-02 to reflect these policy changes resulting from community engagement with the working group.

# Use of Force: ¶200

**200.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after deployment of a Taser. When safe and feasible to do so, CPD officers will allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Taser, unless doing so would compromise the safety of an officer or another person.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶200.

To evaluate Preliminary compliance with ¶200, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group continued discussions through June 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

As a result of discussions, the CPD has issued proposed changes to the Taser policy, General Order 03-02-04, *Taser Use Incidents.* Section III.B, entitled *Authorized Manner of Use* subsections 1 and 2 include the exact language required by this paragraph.

The CPD remains under assessment for Secondary compliance as the CPD seeks to provide sufficient training on the requirements of ¶200.

# Use of Force: ¶201

> **201.** *CPD will strongly discourage the use of Tasers in schools and on students. CPD will require officers to consider the totality of the circumstances, including a subject's apparent age, size, and the threat presented, in assessing the reasonableness and necessity of using a Taser in a school.*

## Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶201.

To evaluate Preliminary compliance with ¶201, we reviewed whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group continued discussions through June 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these discussions, the CPD noted it will be making a number of changes to G03-02-04, which includes establishing a more restrictive standard on the use of Tasers against active resistors (Section II.D.1), which applies to Taser use in schools and on students.

The CPD engaged in robust discussions with the Use of Force Working Group and made some alterations to the current draft of the policy. The latest draft of GO 03-02-04 (dated June 1, 2021) addresses "active resisters" but makes no changes to the language in "E. Restrictions 1. Use in Schools," which states, "Tasers will not be used in a school or on students, unless the Department member asses the reasonableness and necessity of the Taser use based on the totality of the circumstances, including the subject's apparent age, size, and the threat presented, and determines that Taser discharge is immediately necessary."

To maintain Preliminary compliance, the CPD should also clearly "strongly discourage" the use of Tasers in schools and on students in the *School Resource Officer* policy, which has not yet been finalized. To obtain Secondary compliance, the CPD will need to provide sufficient training on these relevant policies.

# Use of Force: ¶202

**202.** *CPD officers will treat each application or standard cycle (five seconds) of a Taser as a separate use of force that officers must separately justify as objectively reasonable, necessary, and proportional. CPD will continue to require officers to, when possible, use only one five-second energy cycle and reassess the situation before any additional cycles are given or cartridges are discharged. In determining whether any additional application is necessary, CPD officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the CPD achieved Preliminary compliance with ¶202. To evaluate Preliminary compliance with ¶202, we focused our review on General Order G03-02-04, *Taser Use Incidents*, which became effective on April 15, 2021, on whether the City and the CPD received the requisite community input on this policy.

Section II.F of G03-02-04 clearly states that officers must "Justify Separate Uses of Force. An initial Taser application and each subsequent application of Taser energy (either re-energizing a discharged cartridge with the ARC switch or discharging a second cartridge) must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force."

The Use of Force Working Group continued to meet and discuss Taser issues throughout this reporting period and offered some suggestions to G03-02-04, but none that addressed the language in "Justify Separate Uses of Force." While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

We look forward to assessing the CPD's continued progress with ¶202. For Secondary compliance the CPD must include the new policy in its 2021 annual use of force training, and demonstrate its ability to identify TRRs with multiple applications and the IMT will review the number of incidents when multiple energy cycle events occur. Although the TRR collects information about multiple energy cycle events, and the CPD dashboard displays the number of incidents involving Taser

use, the dashboard does not indicate which of those incidents involve multiple cycle events.

# Use of Force: ¶203

> **203.** *CPD will require that if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the officer has not gained control, officers switch to other force options unless the officer can reasonably justify that continued Taser use was necessary to ensure the safety of the officer or another person, recognizing that prolonged Taser exposure may increase the risk of death or serious injury.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the CPD achieved Preliminary compliance. To evaluate Preliminary compliance with ¶203, we focused our review on General Order G03-02-04, *Taser Use Incidents*, which became effective on April 15, 2021, on whether the City and the CPD received the requisite community input on this policy.

Section III.B.7. of G03-02-04 clearly states that "if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the member has not gained control of the subject, switch to other force options unless the member can reasonably justify that continued Taser use was necessary to ensure the safety of the member or another person," echoing the language and requirements of ¶203. The policy also includes a "NOTE," which states "Prolonged Taser exposure under certain circumstances may increase the risk of serious injury or death."

The Use of Force Working Group continued to meet and discuss Taser issues throughout this reporting period and offered some suggestions to G03-02-04, and suggested that the CPD limit its Taser discharges to two cycles, which falls under the language in III.B.7 regarding multiple energy cycles. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

We look forward to assessing the CPD's continued progress with ¶203. For Secondary compliance, the CPD must include the new policy in its 2021 annual use of force training, and demonstrate its ability to identify TRRs with multiple applications and the IMT will review the number of incidents when multiple energy cycle events occur. Although the TRR collects information about multiple energy cycle

events, and the CPD dashboard displays the number of incidents involving Taser use, the dashboard does not indicate which of those incidents involve multiple cycle events.

# Use of Force: ¶204

*204. CPD officers must: a. determine the necessity, objective reasonableness, and proportionality of Taser use based on the totality of the circumstances, including the subject's apparent age, size, physical and mental condition, disability, and impairment; b. not use Tasers in drive-stun mode unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; c. when practicable, avoid the use of Tasers when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is elevated above the ground, if the subject is operating or riding any mode of transportation, or if the subject may be less able to catch or protect themselves in a fall; d. not use Tasers in any environment that contains potentially flammable, volatile, or explosive material; e. not use Tasers on a subject who is at a greater risk of serious injury or death from Taser use, including, but not limited to, children, pregnant individuals, and the elderly, unless the subject is an assailant and other force options are not readily available or would otherwise be ineffective; f. target the Taser in probe mode at the lower center mass and avoid the head, neck, and genitalia; g. not activate more than one Taser at a time against a subject, unless an officer already attempted to use a Taser against the subject but the probes did not make contact with the subject; and h. keep Tasers in a weak-side holster.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶204.

To evaluate Preliminary compliance with ¶204, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents*. The community and Use of Force Working Group continued discussions through June 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these discussions, the CPD noted it will be making a number of changes to G03-02-04, which includes strengthening the prohibited acts when targeting a person's body during Taser use (Section III.B.3). Specifically, the policy will state:

> *Department members will target the person's lower center mass and are prohibited from intentionally targeting the person's head, neck, chest, or genitalia.*

We will continue to assess Preliminary compliance for ¶204 in the fifth reporting period, seeking the issuance of a revised G03-04-02 to reflect these policy changes resulting from community engagement with the working group.

# Use of Force: ¶205

> **205.** *CPD officers must request medical aid for a person subjected to a Taser application. CPD officers must place any person subjected to a Taser application in a position that does not impair respiration, as soon as it is safe and feasible to do so. CPD officers must render life-saving aid to injured persons consistent with their training until medical professionals arrive on scene. Only trained medical personnel may remove Taser probes from a subject.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but did not achieve Preliminary compliance with ¶205.

To evaluate Preliminary compliance with ¶205, we continued to focus our review on whether the City and the CPD received the requisite community input for General Order 03-02-04, *Taser Use Incidents* and finalized the policy. The community and Use of Force Working Group continued discussions through June 2021. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. As a result of these discussions, the CPD made some alterations to the current draft of the policy. The latest draft of GO 03-02-04 (dated June 1, 2021) states:

> *REMINDER: For use of force incidents including Taser discharges, as soon as it is safe and feasible to do so, Department members will provide life-saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on scene" (emphasis added).*

We will continue to assess Preliminary compliance for ¶205 in the fifth reporting period, seeking the finalization and issuance of revised G03-02 and G03-04-02 to reflect these policy changes resulting from community engagement with the working group.

# Use of Force: ¶206

**206.** *CPD will conduct Taser inspections on a periodic basis to perform information downloads, ensure Tasers are operable, and perform necessary maintenance or repairs.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Not Yet Assessed*
**Full:**    *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶206. The IMT notes that Uniform and Property 04-02-02, *Control Devices and Instruments* clearly states that "District commanders/unit commanding officers will ensure that Taser inspections are conducted on a quarterly basis. During inspections, district commanders/unit commanding officers will ensure: a. a Taser discharge data report is downloaded for each Taser assigned to the unit. b. a Taser Data Reconciliation Report (CPD-21. 969) is completed. c. Tasers assigned to the unit are operational and any Tasers requiring maintenance or repairs are hand-carried during 2nd watch by a sworn member to the Taser Repair Center," and contains a "NOTE," which states, "If necessary, Taser inspections can be conducted more often."

The community Use of Force Working Group, which continued to meet throughout this reporting period, provided recommendations related to General Order 03-02-04, *Taser Use Incidents*, but did not raise concerns or provide recommendations related to the inspection and maintenance of Tasers. Thus, the City and the CPD maintained Preliminary compliance for ¶206. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

We look forward to reviewing documentation and training regarding Taser inspections and downloads to assess Secondary compliance.

# Use of Force: ¶207

> **207.** *CPD officers may use OC devices only when such force is objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶207.

To evaluate Preliminary compliance with ¶207, we focused our review on G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021 and on whether the City and the CPD received the requisite community input for the policy. The policy addresses all of the requirements of ¶207, but we note that the City, the CPD, the OAG, community Use of Force Working Group, and the IMT continued to discuss the CPD's use of OC spray throughout this reporting period, particularly as it relates to First Amendment activity. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

The IMT also notes that both our Special Report and the OIG's *Report on Chicago's Response to George Floyd Protests and Unrest* discuss the CPD's use of OC spray in First Amendment circumstances, and indicate the need for more extensive training on the use of OC spray and the proper reporting of its use. [108] To achieve Secondary compliance, the CPD must review and improve its training on OC spray.

---

[108]  *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf; *Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/2021/02/18/oig-finds-that-chicagos-response-to-george-floyd-protests-and-unrest-included-breakdowns-in-the-mass-arrest-process-unfulfilled-use-of-force-report-ing-obligations-and-operational-structure/.

# Use of Force: ¶208

> **208.** *CPD officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety. CPD will continue to require that the Superintendent or his or her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.*

Compliance Progress               (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶208. To evaluate Preliminary compliance with ¶208, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy.

Throughout this reporting period, the Use of Force Working Group, the Coalition, the Parties and the IMT continued to engage in discussions regarding the use of OC spray in First Amendment situations. Those conversations continue. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. On April 13, 2021 the CPD issued an updated policy G02-02 *First Amendment Rights*, but it does not mention the use of OC spray in that context.

On April 15, 2021 CPD's revised G03-02-05 *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, became effective. Sections II.C.3 and 4 state:

> *3.     A Personal OC device is an authorized force option against passive resisters only under the following conditions: a. Occupants of a motor vehicle who are passively resisting arrest only after obtaining authorization from an on-scene supervisor the rank of sergeant or above. b. Noncompliant groups, crowds, or an individual taking part in a group or crowd and only after obtaining authorization from the Superintendent or his or her designee.*

> *4.     Special weapons that dispense the Capsaicin II powder agent or larger volumes of chemical agents are authorized force*

> *options against active and passive resistors that are part of a noncompliant groups, crowds, or an individual taking part in a group or crowd only under the following conditions: a. when the chemical agent is used only for area saturation, and b. only after obtaining authorization from the Superintendent or his or her designee."*

The IMT notes that our Special Report discusses the CPD's use of OC spray in First Amendment crowd circumstances, and indicates the need for additional training on its use. [109] We continue to recommend that the CPD "Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray."

We look forward to assessing the CPD's continued progress with ¶208.

---

[109] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, Independent Monitoring Team (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Use of Force: ¶209

*209. When safe and feasible to do so, CPD officers must issue verbal commands and warnings to the subject prior to, during, and after the discharge of an OC device. When safe and feasible to do so, CPD will require officers to allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use an OC device, unless doing so would compromise the safety of an officer or another person.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶209. To assess compliance, the IMT reviewed G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, which became effective on April 15, 2021, during this reporting period. Section III.A. 1 and 2 articulate the requirements of ¶209:

> *III.    CONDITIONS ON THE USE OF PERSONAL OC DEVICES OR OTHER CHEMICAL AGENTS*

> *A.    Authorized Manner of Use. When it is safe and feasible to do so, a member who is discharging a Personal OC device or other chemical agent will:*

> *1.    give verbal commands and warnings prior to, during, and after discharge, including informing other Department members on the scene of the discharge.*

> *2.    allow a subject a reasonable amount of time to comply with a warning prior to using or continuing to use a Personal OC device or other chemical agent, unless doing so would compromise the safety of a Department member or another person.*

Throughout this reporting period, the Use of Force Working Group, the Coalition, the Parties, and the IMT continued to engage in discussions regarding the use of OC spray in First Amendment situations. Those conversations continue. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. On April 13, 2021 the CPD issued an updated policy G02-02 *First Amendment Rights*, but it does not mention the use of OC spray in that context.

Moreover, the IMT notes that our Special Report[110] discusses the CPD's use of OC spray in First Amendment crowd circumstances, and indicates the need for additional training on its use. We continue to recommend that the CPD "Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray."

We look forward to assessing the CPD's continued progress with the requirements of ¶209 in future reporting periods.

---

[110] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Use of Force: ¶210

> **210.** *Each individual application of an OC device (e.g., each spray of an officer's personal OC device) by a CPD officer must be objectively reasonable, necessary, and proportional under the totality of the circumstances, and consistent with the objectives above.*

## Compliance Progress                 (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶210. To evaluate Preliminary compliance with ¶210, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy.

The community and Use of Force Working Group did not raise concerns or provide recommendations related to the requirement of justifying each application. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group continued discussion about the Use of Force policies into 2021, throughout this reporting period. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

G03-02-05, which became effective on April 15, 2021 states the requirements of this paragraph in II.C: "When Use is Authorized. Department members' use of Personal OC devices or other chemical agents must be objectively reasonable, necessary, and proportional to the threat, actions, and level of resistance offered by a subject, under the totality of the circumstances" and II.E.: "Justify Separate Uses of Force. An initial application of a Personal OC device or other chemical agent and each subsequent application must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force."

According to the publicly available Use of Force dashboard, the TRRs indicating use of OC spray between 2017 and the first half of 2021[111] are as follows: 2017 (36), 2018 (18), 2019 (38), 2020 (64), and January – June 2021 (9).

---

[111] *See Use of Force Dashboard*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/statistics-data/data-dashboards/use-of-force-dashboard/.

We look forward to assessing the CPD's progress with ¶210, including by reviewing the number of instances when multiple OC device applications are made. Currently the CPD dashboard counts the number of incidents, but it does not count multiple application events. Finally, we note that our Special Report[112] discusses the CPD's use of OC spray in First Amendment crowd circumstances, and indicates the need for additional training on its use. We continue to recommend that the CPD "Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray." We also look forward to reviewing TRR documentation for multiple application events in future reporting periods.

---

[112] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Use of Force: ¶211

> **211.** *CPD officers must assist subjects exposed to application of an OC device with decontamination and flushing when it is safe and feasible to do so. CPD officers must request the appropriate medical aid for a subject after the discharge of an OC device if the subject appears to be in any physical distress, or complains of injury or aggravation of a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment).*

## Compliance Progress                     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶211. To assess Preliminary compliance with ¶211, we focused our review on whether the City and the CPD received the requisite community input for G03-02-05, *Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents*, and finalized the policy.

The community and Use of Force Working Group did not raise concerns or provide recommendations related to the requirement of requesting medical aid. The CPD issued updated Use of Force policies on December 31, 2020. The CPD and the Working Group continued discussion about the Use of Force policies into 2021, throughout this reporting period. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

G03-02-05, which became effective on April 15, 2021 states the requirements of this paragraph in IV.B.2., which states that an officer discharging OC spray "will… request the appropriate medical aid, including contacting emergency medical services (EMS) from the Chicago Fire Department, if the subject appears to be in any physical distress or complains of injury or aggravation of a known pre-existing medical condition (e.g., asthma, emphysema, bronchitis, or a heart ailment)."

Finally, we note that our Special Report discusses the CPD's use of OC spray and indicates the need for additional training on its use.[113] We continue to recommend that the CPD "Provide adequate training for all officers on new or revised policies,

---

[113] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

including use of force, de-escalation, batons, and personal OC spray." We also look forward to reviewing TRR documentation for multiple application events in future reporting periods.

# Use of Force: ¶212

> **212.** *CPD officers may only use department-issued or approved OC devices.*

---

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

---

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶212. The Use of Force Working Group raised many concerns about the CPD's use of OC spray. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. CPD policy U04-02-02 *Control Devices and Instruments* states: "Department members are not approved to carry or use any type of personal OC device different from that which is prescribed" in Section IV.C.

To assess Secondary compliance, we aim to review the CPD's measures to ensure officers are carrying authorized OC devices (*e.g.*, training records and periodic inspections at roll call). We did not have access to such records during the fourth reporting period to conduct this assessment and look forward to receiving them in the next reporting period.

# Use of Force: ¶213

> **213.** *CPD officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**      *Not in Compliance*
**Full:**      *Not Yet Assessed*

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶213. To evaluate Preliminary compliance with ¶213, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents*, and finalized the policy. The community Use of Force Working Group and the CPD continued discussions throughout this reporting period and there was no disagreement on the fact that head and neck strikes are considered the employment of deadly force. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

The updated policy G03-02-07 went into effect on April 15, 2021 and states, "Head and Neck Strikes. Members will not use batons to intentionally strike a subject in the head or neck except when deadly force is justified" in Section II.D.1.

Finally, we note that our Special Report discusses the CPD's use of batons and indicates the need for additional training on their use.[114] We continue to recommend that the CPD "Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray."

We look forward to assessing the CPD's progress with ¶213.

---

[114] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Use of Force: ¶214

**214.** *When safe and feasible to do so, CPD officers must give verbal commands and warnings prior to, during, and after using an impact weapon.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶214. To evaluate Preliminary compliance with ¶214, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents*, and finalized the policy. The community Use of Force Working Group and the CPD continued discussions throughout this reporting period about baton use and verbal warnings. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

The updated policy G03-02-07 went into effect on April 15, 2021 and states, "Authorized Manner of Use. When it is safe and feasible to do so, a member who is utilizing a baton will: 1. give verbal commands and warnings prior to, during, and after use, including informing other Department members on the scene of the use. 2. allow a subject a reasonable amount of time to comply with a warning prior to using or continuing the use of a baton, unless doing so would compromise the safety of an officer or another person" in section III.A.1 and 2.

Finally, we note that our Special Report[115] discusses the CPD's use of batons and indicates the need for additional training on their use. We continue to recommend that the CPD "Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray."

We look forward to assessing the CPD's progress with ¶214 in future reporting periods.

---

[115] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Use of Force: ¶215

**215.** *CPD officers must receive training on proper use of an impact weapon before being permitted to carry such weapon.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶215.

To evaluate Preliminary compliance with ¶215, we focused our review on whether the City and the CPD received the requisite community input for relevant policies and finalized those policy. The community and the Use of Force Working Group, which continued to meet throughout this reporting period, provided five recommendations regarding this directive, none of which were related to training. The CPD issued updated Use of Force policies on December 31, 2020, most of which became effective on April 15, 2021:

- G03-02-07 *Baton Use Incidents* states "Department members will refer to the Department directive titled "Control Devices and Instruments" for specific procedures on baton protocols including training, assignment, manner of carry, and accountability"; and

- U04-02-02 *Control Devices and Instruments* states "Batons, including wooden and expandable batons, will be carried, handled, and deployed only by Department members who have completed Department-conducted training on their safe handling and use."

To assess Secondary compliance, we reviewed the CPD's ongoing baton training program, which is noted in U04-02-02 *Control Devices and Instruments* in Section V.C.2.g which states, "Sworn Department members hired on or after 27 September 2004 have received expandable baton training during recruit training at the Training Division." The CPD remains under assessment for Secondary compliance.

Finally, we note that our Special Report discusses the CPD's use of batons and indicates the need for additional training on their use. We recommend that the CPD "Provide adequate training for all officers on new or revised policies, including use of force, de-escalation, batons, and personal OC spray" (page 24). The scope of appropriate training on baton use depends in part on the City's and the CPD's responses to crowds, such as the use of trained and certified Mobile Field Force teams. We look forward to receiving more information on how the City and the

CPD intend to respond to our recommendations and prepare and respond to crowds.

We look forward to assessing the CPD's progress with ¶215 as we continue these discussions with the City, the CPD, the OAG, and members of Chicago's communities.

# Use of Force: ¶216

> **216.** *CPD officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object. CPD officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, did not achieve Preliminary compliance with ¶216.

To evaluate Preliminary compliance with ¶216, we focused our review on whether the City and the CPD received the requisite community input for G03-02-07, *Baton Use Incidents* (effective date April 15, 2021), and finalized the policy. The community and Use of Force Working Group continued to discuss issues of baton use throughout this reporting period, but didn't provide recommendations regarding rendering aid. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

CPD's main use of force policy, G03-02, *De-Escalation, Response to Resistance, and Use of Force*, in Section V.B states that Department members *will*, not may, render medical aid:

> *[A]s soon as it is safe and feasible to do so, members will provide life saving aid consistent with their Department training, including the Law Enforcement Medical and Rescue Training (LEMART) training, to injured persons until medical professionals arrive on the scene.*

This language is not present in G03-02-07 *Baton Use Incidents* (effective date April 15, 2021) and should be included. We look forward to assessing the CPD's progress with ¶216.

# Use of Force: ¶218

*218. CPD members must report and document any reportable use of force. Beginning January 1, 2019, a reportable use of force will be defined as any use of force by a CPD member included in any of the following three levels: a. A level 1 reportable use of force is the use of any force by a CPD member to overcome the active resistance of a subject that does not rise to a level 2 or level 3 reportable use of force. This would include force that is reasonably expected to cause pain or an injury, but does not result in injury or complaint of injury. The following techniques are level 1 reportable uses of force when applied in response to active resistance: pressure point compliance techniques; joint manipulation techniques; wristlocks; armbars; and any leg sweep, weaponless defense techniques, or takedown that does not result in injury or complaint of injury. It is not a reportable use of force for a CPD member to escort, touch, or handcuff a person with no or minimal resistance. b. A level 2 reportable use of force is the use of any force by a CPD member that includes use of a less-lethal weapon or that causes an injury or results in a complaint of an injury, but that does not rise to a level 3 reportable use of force. Force options in this level include: discharge of an OC device; discharge of a Taser; impact weapon strikes to any part of the body other than the head or neck; use of impact munitions; any physical apprehension by a canine; any reportable use of force against a handcuffed subject; and any leg sweep, weaponless defense technique, or takedown resulting in an injury or complaint of injury. c. A level 3 reportable use of force is when a CPD member does any of the following: uses any force that constitutes deadly force, such as discharging a firearm or using an impact weapon to strike a person's head or neck; uses a chokehold or other maneuver for intentionally putting pressure on a person's airway or carotid artery; uses any force that causes the death of any person; or uses any force that causes injury to any person resulting in admission to a hospital.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

During the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶218. The levels of force outlined in this paragraph are echoed in

the CPD's General Order G03-02-02 *Incidents Requiring the Completion of a Tactical Response Report* (effective date April 15, 2021). Moreover, the CPD and the Use of Force Working Group have been in discussions regarding this paragraph throughout this reporting period. The IMT will monitor any future changes to levels of force. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

To assess Secondary compliance, the IMT will review in-service training during 2021, especially in light of the documented failures to report uses of force as outlined in both the OIG and IMT reports on the 2020 protests.

# Use of Force: ¶219

*219. Whenever a CPD member engages in a reportable use of force, the member must complete a TRR, or any similar form of documentation CPD may implement, prior to the end of his or her tour of duty. In addition to completing the TRR, officers must also document the reason for the initial stop, arrest, or other enforcement action per CPD policy. CPD may allow members requiring medical attention a reasonable amount of additional time to complete the required documentation. CPD may allow supervisors to complete the TRR for members who are unable to complete the report due to injury or in other extraordinary circumstances.*

## Compliance Progress                     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**     *Not in Compliance*
**Full:**              *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶219. To assess compliance, the IMT reviewed relevant policies and training. The IMT appreciates the CPD's efforts to continue to adapt the TRR to the department's needs and to the requirements of the Consent Decree. For example, during this reporting period the CPD added a "force mitigation" check box to the TRR along with required narrative documentation (*see* ¶220).

CPD officers continue to struggle with appropriate use of force reporting, however. The FRD's 2020 Annual Report indicates 227 deficiencies in use of force reporting and the FRD's 1st 2021 quarterly report indicates 74 deficiencies in use of force reporting.

To achieve Secondary compliance, the CPD must provide further in-service training in 2021. Training will need to focus on the problems and issues identified in OIG's and the IMT's reports regarding the City's and the CPD's responses to the protests of 2020, which documented the failure of officers to fulfill reporting responsibilities. We look forward to assessing the CPD's continued progress with ¶219.

# Use of Force: ¶220

> **220.** *In completing the TRR, or whatever similar documentation CPD may implement, CPD members must include a narrative that describes with specificity the use of force incident, the subject's actions, or other circumstances necessitating the level of force used; and the involved member's response, including de-escalation efforts attempted and the specific types and amounts of force used. The narrative requirement does not apply to CPD members who discharged a firearm in the performance of duty or participated in an officer-involved death in the performance of duty. Any CPD member who observes or is present when another CPD member discharges a firearm or uses other deadly force must complete a written witness statement prior to the end of his or her tour of duty. CPD members will note in their TRRs the existence of any body-worn camera or in-car camera audio or video footage, and whether any such footage was viewed in advance of completing the TRR or any other incident reports. CPD members must complete TRRs, or whatever similar documentation CPD may implement, and other reports related to the incident, truthfully and thoroughly.*

## Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶220. To assess compliance, the IMT reviewed CPD's TRR and appreciate that the CPD has updated the TRR to capture more information on de-escalation techniques and a detailed narrative that addresses each and every de-escalation box checked.

The FRD's annual 2020 report emphasizes (p.31) the importance of its work on "Force Mitigation-not articulated," and notes that more than 22% of all de-briefing points were for this issue. The report states that "The Force Review Division holds Members to a high standard with respect to this debriefing point in that if Members fail to describe even one force mitigation effort (but describes the others) that Member still receives a debriefing." The CPD and the FRD are to be commended for this effort to insist members capture in the narrative all their efforts to de-escalate. In addition to making recommendations for officers to improve documentation of de-escalation, there also continues to be high numbers in narrative deficiencies.

To achieve Secondary compliance, the CPD must engage in further training on proper completion of TRRs. We look forward to assessing the CPD's progress with the requirements of ¶220.

# Use of Force: ¶221

**221.** *Any CPD member who engages in a reportable use of force must immediately report the incident to OEMC. OEMC is required to notify the involved member's immediate supervisor and the Watch Operations Lieutenant of the district of occurrence.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶221, but failed to maintain Secondary compliance. Given the force reporting failures as documented in both the IMT's and OIG's reports on the City's responses to the protests of 2020, officers and supervisors are in need of additional training in this area. The CPD has taken some steps to address force reporting procedures in discussions with the IMT, the OAG, and the Use of Force Working Group, but the IMT believes training is necessary for improvement. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. We look forward to assessing additional training efforts for Secondary compliance in future reporting periods.

# Use of Force: ¶222

**222.** *A CPD supervisor will immediately respond to the scene when a level 2 or level 3 reportable use of force occurs ("responding supervisor"). CPD supervisors may, at their discretion, respond to the scene when a level 1 reportable use of force occurs, but they are not required to do so.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶222 but did not achieve Secondary compliance as the planned in-service supervisor refresher training course has not yet been delivered. We look forward to assessing the CPD's progress on these requirements in future reporting periods.

# Use of Force: ¶223

> **223.** *For level 2 and level 3 reportable use of force incidents, the duties of the responding supervisor will include, at a minimum: a. identifying known available witnesses to the use of force to the extent reasonably possible and documenting their identities and statements in a written report, except in incidents for which the Civilian Office of Police Accountability ("COPA") receives administrative notifications and responds to the scene; b. coordinating with COPA, as appropriate; c. gathering and preserving evidence related to the use of force; d. requesting the assignment of an evidence technician to photograph persons involved in the incident, including any injuries sustained; e. ensuring that members and subjects receive appropriate medical care; f. making notifications as required by CPD policy; and g. reviewing reports regarding the incident for legibility and completeness.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶223 based on the language in CPD policy G03-02-02, *Incidents Requiring the Completion of a Tactical Response Report.*

The 2020 Annual Use of Force report addresses recurring issues related to this paragraph, specifically noting the number of debriefings FRD provided to officers for deficiencies:

- Evidence Technician Not Requested (141 debriefings)

- Witness Box Issue (92 debriefings)

In addition, the FRD's first quarter report for 2021 notes that failure to notify evidence technicians continues to be an issue, with 93 debriefings. In order to achieve Secondary compliance, further supervisory training is necessary.

# Use of Force: ¶224

**224.** *In addition, for level 2 and level 3 reportable use of force incidents involving an injury or complaint of injury for which COPA does not have jurisdiction, the responding supervisor will undertake reasonable efforts to identify and interview additional witnesses beyond those that are known and available.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶224.

The 2020 FRD's 2020 annual report identifies an issue with the requirement to locate witnesses: responding supervisors were debriefed for 92 times. The report attributes the failures to a lack of knowledge due to pandemic and civil unrest issues. Training is required to address this issue to achieve Secondary compliance. The IMT looks forward to reviewing attendance records for the in-service supervisory training in the next reporting period.

# Use of Force: ¶225

**225.** *A supervisor who used force or ordered force to be used during a reportable use of force incident will not perform the duties assigned to the responding supervisor for that incident.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Under Assessment*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶225 based on policy that clearly articulates the requirements of this paragraph and the updates to the TRR.

The 2020 Annual Use of Force report, however, indicates that 39 instances or 1.37% of time, the TRR was approved/reviewed by a member involved (p. 33). Similarly, the FRD's 1st quarter report of 2021 acknowledges issues with validators in the new TRR forms. A resultant manual search of this issue resulted in the identification of 28 de-briefings related to the reviewing supervisor completing a review for a member of the same rank. The 2020 Annual Use of Force report correctly acknowledges the need for more supervisory in-service and pre-promotional training on this issue, as it is critical to community trust (p.IV).

To achieve Secondary compliance, the CPD must conduct sufficient training on this issue in 2021. We look forward to reviewing training curricula and records in the next reporting period.

# Use of Force: ¶226

> **226.** *CPD will continue to require the responding supervisor to document information collected and actions taken in performing his or her investigatory duties in the supervisor's portion of the TRR, or in any other similar form of documentation CPD may implement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**       *Under Assessment*
**Full:**            *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶226 but did not achieve Secondary compliance. The 2020 Annual Use of Force Report identifies some continuing issues, noting 49 instances of reviewing supervisor deficiencies and 43 instances of narrative deficiencies. In 2020, the FRD issued recommendations and advisements in 6.9% of their reviews (43 recommendations and 372 advisements).

Secondary compliance will depend on supervisors completing in service training for 2021. The materials we reviewed for the in-service training cover the subject matter and provides a number of aides, including the TRR Worksheet, Force Review Division Recommendations (TRR Training for Supervisors) and 2020 TRR Training Guide.

## Use of Force: ¶227

**227.** *Any CPD member who becomes aware of information indicating that a reportable use of force occurred but was not reported must immediately notify his or her supervisor.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶227. To assess compliance, the IMT reviewed relevant policies, for example General Order G03-02 *De-escalation, Response to Resistance, and Use of Force*, which includes language responsive to this paragraph's requirements under Section VII. Duty to Intervene and Report A.2., stating "Consistent with the Department directive titled "Complaint and Disciplinary Procedures," any Department member who observes misconduct or becomes aware of information alleging misconduct, including an identified excessive use of force, a reportable use of force incident that was not reported, or a use of force that is otherwise in violation of this directive, will immediately notify his or her supervisor."

To assess Secondary compliance, the IMT will review curricula and attendance documentation at supervisory in service 2021 training, seeking appropriate emphasis on the requirements of this paragraph, including appropriate reporting mechanisms – the TRR and the ICS-211 form used during large crowd events (*see* Special Order S03-22 *Responses to Crowds and Civil Disturbances*, effective August 27, 2020 at I.B.).

We also note that additional training is necessary for officers on this issue, as both the IMT's Special Report and the OIG's report on the protests indicate that unreported use of force was a significant issue.[116] The OIG notes, "CPD did not fulfill its reporting obligations with respect to its use of force and lacked clear and consistent policy guidance for its members on their reporting obligations. In a mass arrest context, this gave way to confusion that contributed to non-compliance.

---

[116] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf; *Report on Chicago's Response to George Floyd Protests and Unrest*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/2021/02/18/oig-finds-that-chicagos-response-to-george-floyd-protests-and-unrest-included-breakdowns-in-the-mass-arrest-process-unfulfilled-use-of-force-reporting-obligations-and-operational-structure/.

CPD also lacks an authoritative record of uses of force deployed during the protests and unrest."[117]

We look forward to reviewing training strategies for Secondary compliance in future reporting periods.

---

[117] *See Report on Chicago's Response to George Floyd Protests and Unrest* , OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/2021/02/18/oig-finds-that-chicagos-response-to-george-floyd-protests-and-unrest-included-breakdowns-in-the-mass-arrest-process-unfulfilled-use-of-force-reporting-obligations-and-operational-structure/.

# Use of Force: ¶228

**228.** *Supervisors play a critical role in ensuring that force is used legally, consistent with CPD policy, and in a manner that will promote community confidence in the Department. Supervisor reviews and investigations of uses of force are essential to identify necessary individual and departmental corrective action.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| Preliminary: | *In Compliance* (NEW) |
| Secondary: | *Not in Compliance* |
| Full: | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary compliance with ¶228. To assess compliance, as we have done in previous reporting periods, we reviewed whether the CPD has appropriate policies and procedures regarding supervisory review of use-of-force incidents. As noted in the previous reporting periods, it has been the policy of the CPD—as articulated in General Order 03-02-02, *Incidents Requiring the Completion of a Tactical Response Report*—for supervisors to play a critical role in reviewing uses of force to ensure that force is used legally and consistent with CPD policy, and that necessary corrective actions are taken.

The FRD's 2020 Annual Report rightly recognizes the need for front line supervisors to address issues and the value the department places on supervision: "it demonstrates accountability and an attempt to improve members' knowledge and skills." The IMT continues to emphasize the need for supervisors on the front line to address issues regarding force. The FRD cannot and should not be the primary enforcer of Use of Force policies. The immediate action of supervisors to address issues in the districts is essential to good supervision. The FRD's first Quarterly Report of 2021 notes that "the FRD identified 44 instances during the first quarter in which field supervisors addressed at least one deficiency or field training opportunity prior to the TRR being flagged for review by the FRD. This calculates to a rate of 5.3%. This is the same rate as observed in 2020."

While we are encouraged by this improvement, the IMT believes that more training is needed for the CPD to reach Secondary compliance, which we did not occur for supervisors in the fourth reporting period. We look forward to reviewing such training in future reporting periods.

# Use of Force: ¶229

> **229.** *All reportable uses of force by CPD members must be reviewed by CPD supervisors.*

---

**Compliance Progress**            (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**    *Not in Compliance* (NEW: LOST COMPLIANCE)
**Full:**    *Not Yet Assessed*

---

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶229, but failed to maintain Secondary compliance. To assess compliance, the IMT reviewed relevant policies and training.

The protests of 2020 saw significant increases in use of batons and OC Spray. Both the IMT's Special Report and the OIG's report address the extent of unreported force. The CPD must emphasize and clarify the role of supervisors, as they set the tone for reporting, especially when supervisors are present on the front lines.[118]

The CPD, the IMT, the OAG, and the Coalition have engaged in discussions throughout this reporting period to address these issues in policy with regard to First Amendment activity, but ultimately it will be supervisors who insist that force be reported in both protest situations and in day-to-day interactions. It is clear to the IMT that the CPD needs additional training on these issues. We look forward to reviewing such training in future reporting periods.

---

[118] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf; *Report on Chicago's Response to George Floyd Protests and Unrest* , OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (February 18, 2021), https://igchicago.org/2021/02/18/oig-finds-that-chicagos-response-to-george-floyd-protests-and-unrest-included-breakdowns-in-the-mass-arrest-process-unfulfilled-use-of-force-reporting-obligations-and-operational-structure/.

# Use of Force: ¶230

**230.** *After a reportable use of force has occurred, required TRRs have been completed, and, in the case of level 2 and level 3 incidents, a responding supervisor has documented any investigatory information collected, the incident will be reviewed and evaluated by a CPD supervisor at least the rank of Lieutenant, and in all instances at least one rank level above that of the highest-ranking member who engaged in the reportable use of force, or by a command staff member, when designated ("reviewing supervisor").*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶230, but did not achieve Secondary compliance. To assess compliance, the IMT reviewed relevant polity and training.

In order to attain Secondary compliance, the CPD needs to provide Supervisory in-service refresher training and provide documentation of requisite attendance numbers. As indicated in our last report, the requirements of ¶230 are covered in hour 7 of the training and various guides.

We also note that the 2020 FRD Annual Report indicates 4 incidents in which a TRR was approved or reviewed by officer of same rank. We look forward to the CPD's progress with the requirements of this paragraph.

# Use of Force: ¶231

*231. The reviewing supervisor will conduct an investigation into the reportable use of force incident by reviewing all information reasonably available regarding the incident, including written reports, video or audio recordings, and, in the case of level 2 and level 3 reportable use of force incidents, witness statements, photographs (if available), and other evidence or information collected by the responding supervisor. After advising the subject of his or her right not to answer questions and other applicable rights, and only if the subject voluntarily consents to an interview, the reviewing supervisor will interview the subject solely about the reportable use of force. In addition, the reviewing supervisor will visually inspect the subject and document any injuries observed.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance but did not yet achieve Secondary compliance with ¶231. To assess compliance, the IMT reviewed relevant policies and training materials.

During this reporting period, the CPD has added requirements to the TRRs, requiring officers to address de-escalation issues via check-boxes and by including narratives. These changes will need to be addressed in 2021 in-service supervisory refresher training. To achieve Secondary compliance, the IMT will review attendance records of supervisors who attend the training.

We also note that the FRD 2020 Annual Report notes that they conducted debriefings for officers on the following issues:

- Missing Miranda warnings (14 times)

- No visual inspection of the subject ( 21 times)

- Deficiencies in the written narrative (32 times)

We look forward to assessing the CPD's progress with these requirements during future reporting periods.

# Use of Force: ¶232

> **232.** *For all reportable uses of force, the reviewing supervisor will determine, based on the information reviewed, if the use of force requires a notification to COPA and will assess whether the use of force was in compliance with CPD policy (except for incidents involving deadly force or an officer-involved death). The reviewing supervisor will also review the TRR, or any similar form of documentation CPD may implement, for sufficiency and completeness.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶232, but did not achieve Secondary compliance.

To evaluate Preliminary compliance with ¶232, we focused our review on whether the City and the CPD received the requisite community input for G03-02-02 and finalized the policy. The community and the Use of Force Working Group did not raise any specific concerns or provide specific recommendations regarding the supervisory responsibilities outlined in ¶232. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. The CPD issued updated Use of Force policies and TRR forms in the previous reporting period and they became effective during this reporting period. They reflect the requirements of this paragraph. Thus, we find the City and the CPD in Preliminary compliance for ¶232.

We also continued assessing Secondary compliance with ¶232 by reviewing materials provided for the eight-hour 2021 in-service supervisor refresher training, which has not yet occurred. The 2021 supervisory training outline addresses ¶232 in the seventh hour of the training. These requirements are also described in the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)*. As of December 31, 2020, 70% of CPD members have completed the 2020 Use of Force in-service training.

Further, we reviewed data provided to us on use-of-force incidents referred to COPA (Use of Force Figure 4) and policy compliance decisions for use-of-force incidents (Use of Force Figure 5). A total of 196 TRRs were referred to COPA from January 2021 to June 2021. The Force Review Division review 1,562 TRRs and referred none to COPA.

Use of Force Figure 4:          Use of Force Incidents Referred to COPA
(January 1, 2021 to June 30, 2021)

| | |
|---|---|
| Total TRRs | 1,565 |
| TRRs referred to COPA | 196 |
| Total TRR-Is | 1,562 |
| TRR-Is referred to COPA, excluding those referred in TRR | 82 |
| TRR-Rs referred to COPA, excluding those referred in TRR and TRR-I | 0 |

Use of Force Figure 4:          TRR Policy Compliance Decisions
(January 1, 2021 to June 30, 2021)

| | |
|---|---|
| Total TRRs | 1,562 |
| Number In Compliance | 1,485 |
| Percentage In Compliance | 95.1% |
| Number Not In Compliance | 45 |
| Percentage Not In Compliance | 2.9% |

We also note that the 2020 FRD Annual Report points out that within Reviewing Supervisors Debriefing Points, there were 36 occasions for policy and procedure issues and 45 instances in which responding officers made the policy determinations rather than the reviewing Lieutenant, which further indicates the need for more training.

Moving forward, we will continue to assess Secondary compliance, to include completion of the in-service trainings and random analysis of Force Review Division and supervisory data, reports, and recommendations via TRRs, TRR-Is, Force Review Division reports, body-worn camera video, and in-car video.

# Use of Force: ¶233

*233. For all reportable use of force incidents, the reviewing supervisor will: provide timely, constructive feedback, where appropriate, to the officer who engaged in the reportable use of force, the officer's supervisor, or both; recommend additional training and/or support as necessary based on the incident; take appropriate action, including referring uses of force that may violate law or CPD policy to COPA.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance (THIRD REPORTING PERIOD)* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶233, but did not achieve Secondary compliance. To assess compliance, the IMT reviewed TRRs, TRR-Is, and TRR-Rs. As noted above in our analysis of ¶231, the CPD has made changes to the TRR suite of forms during this reporting period, so additional training is necessary.

We look forward to assessing Secondary compliance and will review the supervisory refresher training during 2021, and in particular we will monitor the new requirement of supervisors providing feedback to officers who use force.

# Use of Force: ¶234

> **234.** *CPD will continue to require the reviewing supervisor to document in a Tactical Response Report – Investigation ("TRR-I"), or in any other similar form of documentation CPD may implement, his or her detailed assessment of compliance with CPD policy, any constructive feedback, and any required or recommended action. In addition, the reviewing supervisor will include in the TRR-I or in any other similar form of documentation CPD may implement, the identities of CPD members on scene during the incident who are reasonably believed to have relevant knowledge or information regarding the reportable use of force.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶234. To assess compliance, the IMT reviewed the TRR-I form, which was revised in April 2021 and provides boxes to include documentation on "constructive feedback" including noting supervisor review streamline video, review department directives, and individual debriefing with supervisor. One section of TRR also addresses Units on scene (for the Lieutenants to fill out) and continues to include a section that addresses compliance with department policy.

Additional changes to CPD use of force policies and department forms necessitates that 2021 Supervisory refresher address these issues before the CPD will achieve Secondary compliance. We look forward to reviewing training materials for supervisors and lesson plans that were identified and projected for 2020 but not completed due to the COVID-19 pandemic. We look forward to the CPD's progress on the requirements of this paragraph.

# Use of Force: ¶235

**235.** *All district-level supervisory review documentation regarding a reportable use of force incident must be completed within 48 hours of the incident, unless an extension is approved by a command staff member.*

**Compliance Progress**    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Under Assessment*
**Full:**    *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶235.

To evaluate Preliminary compliance with ¶235, we focused our review on relevant policies and forms. The community Use of Force Working Group, which met throughout this reporting period, did not raise any specific concerns or provide specific recommendations regarding reviewing documentation regarding a reportable Use of Force within 48 hours of the incident. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160. In addition, the revised TRR form provides a section for supervisors to request an extension of time if more than 48 hours is needed. It includes the name of the approving supervisor and the completion date and time. The CPD's updated Use of Force policies and TRR forms became effective on April 15, 2021, and reflect the requirements of this paragraph. Thus, we find the City and the CPD in Preliminary compliance for ¶235.

To review Secondary compliance, we reviewed the development, implementation, and evaluation of the materials provided for the 2021 in-service supervisor refresher training, which has not yet occurred. The supervisory training outline and the *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* address the requirements of ¶235.

We note that the FRD 2021 Q1 report describes 16 occasions in which investigations and completing TRRs went beyond 48 hours without the requisite approval. In the next reporting period, we will continue monitor progress for ¶235.

# Use of Force: ¶236

**236.** *CPD will continue to develop, implement, and maintain a system of video recording officers' encounters with the public with body-worn cameras. The use of body-worn cameras will be designed to increase officer accountability, improve trust and CPD legitimacy in the community, and augment CPD's records of law enforcement-related activities.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the requirements of ¶236 for the first time in the fourth reporting period and the City and the CPD have not yet achieved Preliminary compliance. To assess compliance, the IMT reviewed Special Order 3-14 *Body Worn Cameras* (dated March 29, 2021). Given the impact of body worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

The successful implementation, tracking, and supervision of the CPD's body-worn camera program has experienced challenges. Some officers that the IMT spoke to told us they are strong supporters of body-worn cameras and feel that body-worn cameras provide backup and support with their encounters with the public. On the other hand, the 2020 Annual Force Review Division's (FRD) report notes 416 instances of improper body-worn camera use. Further, the FRD has recommended repeatedly further e-learning and in service training on body-worn cameras and the Training Oversight Committee has been responsive.

The CPD's utilize progressive discipline may have impact on officers who repeatedly neglect their body-worn-camera requirements. The CPD had been awaiting a decision from the Illinois Labor Relations Board regarding its ability to impose discipline. The decision arrived just after the monitoring period ended. Moving forward, we look forward to reviewing an up-dated version of SO3-14 that clearly incorporates the Labor Board's decision.

# Use of Force: ¶237

> **236.** *CPD will continue to require all officers assigned to patrol field duties to wear body-worn cameras and microphones with which to record law-enforcement related activities as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act (50 ILCS 706/10-1 et seq.), with limited exceptions, including, but not limited to, when requested by a victim or witness of a crime, or interacting with a confidential informant. CPD will develop and implement a written policy delineating the circumstances when officers will not be equipped with body-worn cameras.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the requirements of ¶237 for the first time in the fourth reporting period and the City and the CPD have not yet achieved Preliminary compliance. To assess compliance, the IMT reviewed Special Order 03-14 *Body Worn Cameras*. Given the impact of body worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input.

Further, this paragraph requires the City and the CPD to develop and implement a policy that delineates "when officers will *not* be equipped with body-worn cameras" (emphasis added). The current policy is unclear as to who is required to wear a body worn camera, how it is assigned and documented, and whether officers who are not regularly "assigned to patrol field duties" are assigned to patrol field duties in special circumstances, such as protest or unrest situations are required to equip with body-worn cameras.

While the CPD continues to address failures to properly use body-worn cameras in both eLearning and in annual in-service training, the IMT notes that our Special Report[119] discusses the CPD's use of body-worn cameras in First Amendment circumstances, and indicates the need for providing and tracking body-worn cameras. We also note that the problem of improper use of body-worn cameras persists, as the 2020 Annual Force Review Division's report notes 416 instances of improper body-worn camera use.

---

[119] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, Independent Monitoring Team (July 20, 2021), https://cpdmonitoring-team.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Use of Force: ¶238

*236. CPD will continue to maintain a policy regarding body-worn camera video and audio recording that will require officers to record their law-enforcement related activities, and that will ensure the recordings are retained in compliance with the Department's Forms Retention Schedule (CPD-11.717) and the Illinois Law Enforcement Officer-Worn Body Camera Act. At a minimum, CPD's body-worn camera policy will: a. clearly state which officers are required to use body-worn cameras and under which circumstances; b. require officers, subject to limited exceptions specified in writing, to activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while on duty, and to continue recording until the conclusion of the incident(s); c. require officers to articulate in writing or on camera their reason(s) for failing to record an activity that CPD policy otherwise requires to be recorded; d. require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible; e. address relevant privacy considerations, including restrictions on recording inside a home, and the need to protect witnesses, victims, and children; f. establish a download and retention protocol; g. require periodic random review of officers' videos for compliance with CPD policy and training purposes; h. require that the reviewing supervisor review videos of incidents involving reportable uses of force by a subordinate; and i. specify that officers who knowingly fail to comply with the policy may be subject to progressive discipline, training, or other remedial action.*

## Compliance Progress <span>(Reporting Period: Jan. 1, 2021, through June 30, 2021)</span>

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶238. To assess compliance, the IMT reviewed Special Order 3-14 *Body Worn Cameras*, which addresses the requirements in a-i. Given the impact of body worn cameras on community trust, the City and the CPD will not reach Preliminary compliance until they gather community input. We look forward to assessing the requirements of this paragraph in future reporting periods.

# Use of Force: ¶239

> **239.** *CPD officers must comply with the body-worn camera policy. CPD will impose progressive discipline, training, or other remedial action on officers who do not comply with the body-worn camera policy, as permitted by applicable law.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶239.

To assess compliance with this paragraph, the IMT reviewed Special Order 3-14, *Body Worn Cameras*. The current draft of that policy includes the word "knowingly" before "fails to comply," in section II.F, which is not in keeping with the requirements of this paragraph. Moreover, the CPD had been awaiting a decision from the Illinois Labor Relations Board regarding its ability to impose discipline. The decision arrived just after the monitoring period ended. Moving forward, we look forward to reviewing an updated version of SO3-14 that clearly incorporates the Labor Board's decision.

# Use of Force: ¶240

***240.*** *Any CPD officer required to wear a body-worn camera must: a. visually and physically inspect the body-worn camera and ensure that it is the member's assigned camera, fully charged, and operational at the beginning of each tour of duty; and b. notify a supervisor as soon as practical if, at any time, the member's assigned body-worn camera becomes inoperable (including when either or both of the audio or video recording functions is inoperable) or is damaged.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *Under Assessment*
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

In this reporting period, the City and the CPD made progress toward, but remain under assessment for Preliminary compliance with ¶240.

To assess compliance with these requirements for the first time, the IMT reviewed a draft of CPD policy SO3-14 *Body Worn Cameras* and offered comments. SO3-14 contains language responsive to this requirement, tracking closely with the language of this paragraph and clearly articulating, for example, that damaged cameras will be replaced promptly in order to ensure that officers have properly functioning cameras. The CPD remains under assessment, however, because SO3-14 was not finalized and issued during this reporting period.

We look forward to reviewing the finalized policy in the next reporting period.

# Use of Force: ¶241

**241.** *CPD will ensure that any CPD officer who reports an inoperable or damaged body-worn camera is promptly provided with a temporary or replacement body-worn camera, which will in no event be later than the beginning of the member's next tour of duty.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶241.

To assess compliance with these requirements for the first time, the IMT reviewed a draft of CPD policy SO3-14 *Body Worn Cameras* and offered comments. SO3-14 contains language responsive to this requirement in Section B.7.b., which places responsibility on officers to report any time a body worn camera becomes damaged or inoperable. Section VII.2.c requires officers be provided with replacement cameras no later than the next shift. The CPD remains under assessment, however, because SO3-14 was not finalized and issued during this reporting period.

We look forward to reviewing the finalized policy in the next reporting period.

# Use of Force: ¶243

> **243.** *CPD's pre-service and in-service training must provide officers with knowledge of policies and laws regulating the use of force; equip officers with tactics and skills, including de-escalation techniques, to prevent or reduce the need to use force or, when force must be used, to use force that is objectively reasonable, necessary, and proportional under the totality of the circumstances; and ensure appropriate supervision and accountability.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶243.

To assess compliance, the IMT reviewed relevant policy. The CPD describes in policy the requirements of ¶243 in General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, issued December 31, 2020. Specifically, it states in Section X, *Use of Force Training*:

> At a minimum, Department members will receive annual training on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability.

Throughout this reporting period, the CPD engaged in lengthy discussions with the Use of Force Working Group, the IMT, and the OAG surrounding the big picture use of force issues required by this paragraph and the need for de-escalation. The CPD has responded to those discussions by increasing the required documentation of de-escalation techniques used in TRRs and TRR-Rs. The CPD also recently changed its use of force policy to *require* de-escalation when it is safe and feasible. It has also amended its criteria for use of force with, further elaboration of the minimum amount of force. We appreciate the CPD's progress on the issue of de-escalation.

The CPD has also established a use-of-force data dashboard allowing the CPD management to access real-time data on use of force by district, which includes data about policy compliance.

The CPD has policies in place for Use of Force training requirements, and the Force Review Division has practices and procedures in place to identify and take remedial action. We believe an ongoing challenge for the CPD is supervision and the need to continue to address poor performance and misconduct for use of force at the district/unit level. The CPD must equip its supervisors with knowledge, skills, and expectations about how to relate to their officers about use of force issues. To achieve Preliminary compliance, the CPD must make progress toward the requirement of this paragraph to "ensure appropriate supervision and accountability." We believe the dashboard currently under development for supervisors will be helpful.

# Use of Force: ¶244

> **244.** *CPD's training regarding the use of firearms, Tasers, OC devices, impact weapons, and other force options that CPD currently authorizes or may authorize in the future will be consistent with its commitment to de-escalation as a core principle. Any initial training, qualification, or requalification regarding these force options will incorporate scenario-based elements, including scenarios in which officers achieve resolution without employing force. CPD's training regarding these force options will also provide specific guidance to officers regarding required procedures and techniques after each of these force options are used, including procedures and techniques for limiting a subject's injuries.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward, but remain under assessment for, Preliminary compliance with ¶244.

To evaluate Preliminary compliance, we reviewed the CPD's Use of Force policies and community engagement efforts related to ¶244's requirements. CPD General Order G03-02, *De-escalation, Response to Resistance, and Use of Force*, describes the requirements for Use of Force training:

> At a minimum, Department members will receive annual training on the laws and Department policies regulating the use of force, including, but not limited to, de-escalation, force options, and appropriate supervision and accountability.

We note that many of the CPD's use of force policies are undergoing revisions. Throughout this reporting period, the IMT has observed the discussions between the CPD and the Use of Force Working Group , which encompassed training requirements and the CPD's emphasis on and commitment to de-escalation, resulting in de-escalation being "required" for all uses of force where safe and feasible.

The IMT is aware that the CPD is designing and including scenarios in use of force training, including eLearning, that provide officers to use and practice their de-escalation skills. We look forward to continued review of policies and training curricula in the next reporting period.

# Use of Force: ¶245

**245.** *CPD will provide all current CPD officers with in-service use of force training on at least an annual basis, and more frequently when necessitated by developments in applicable law and CPD policy. CPD will coordinate and review all use of force training to ensure quality, consistency, and compliance with federal and state law, CPD policy, and this Agreement.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**    March 5, 2021*    ☑ **Met**    ☐ **Missed**
*Extended from December 31, 2021, due to COVID-19
**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Under Assessment*
**Full:**    *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶245, but remains under assessment for Secondary compliance.

In our last monitoring report, we noted that, in 2020, the CPD provided an eight-hour Use of Force in-service training. At the end of the third reporting period, December 31, 2020, 70% of the CPD officers had completed the 2020 Use of Force in-service training. Due to COVID-19, the CPD had until March 5, 2021, to provide the training to 95% of officers. By March 5, 2021, the CPD provided about 96% of its officers with this in-service training.

In the fourth reporting period, we have continued to review the Use of Force policies. The CPD continued to engage with the Use of Force Working Group during the fourth reporting period to discuss changes to policies. These and other policies—including the development of the new policy regarding foot pursuits—as well as state law, have undergone significant changes. As a result, the CPD must carefully develop, revise, and provide the next annual in-service use of force training and the supervisory refresher training. We look forward to assessing the training curricula in the next reporting period to ensure that it reflects all recent changes.

# Use of Force: ¶246

*246. The annual use of force training will include the following topics: a. CPD policies and Fourth Amendment law governing the use of force; b. proper use of force decision-making that utilizes a critical thinking framework in which officers gather relevant facts; assess the situation, threats, and risks; consider CPD policy; identify options and determine the best course of action; and act, review, and reassess the situation; c. role-playing scenarios and interactive exercises that illustrate proper use of force decision-making; d. ethical decision-making and peer intervention, principles of procedural justice, the role of implicit bias, and strategies for interacting with individuals in crisis; e. de-escalation techniques and tactics to prevent or reduce the need for force, including exercising persuasion and advice, and providing a warning; stabilizing the situation through the use of time, distance, or positioning to isolate and contain a subject; and requesting additional personnel to respond or make use of specialized units or equipment; the proper deployment of CPD-issued or -approved weapons or technologies, including firearms and Tasers; f. use of force reporting, investigation, and review requirements, including documenting reportable use of force incidents; and g. other topics as determined based on the training needs assessment required by this Agreement.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☑ **Met** ☐ **Missed** |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *In Compliance* (NEW) | |
| **Full:** | *Not Yet Assessed* | |

In this reporting period, the City and the CPD maintained Preliminary compliance and achieved Secondary compliance.

In our last monitoring report, we noted that, in 2020, the CPD provided an eight-hour Use of Force in-service training. At the end of the third reporting period, December 31, 2020, 70% of the CPD officers had completed the 2020 Use of Force in-service training. Due to COVID-19, the CPD had until March 5, 2021, to provide the training to 95% of officers. By March 5, 2021, the CPD provided about 96% of its officers with this in-service training. Because this annual in-service training curricula addressed the subsections of ¶246—broken down by the hour of instruction—the City and the CPD achieved Secondary compliance.

# Use of Force: ¶247

*247. CPD will also provide initial training on all of the topics iden-tified above, as well as others, to all recruits as part of its recruit training curriculum.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

This is the first reporting period where we have provided an assessment for ¶247. The City and the CPD made progress toward, but ultimately did not achieve, Pre-liminary compliance with ¶247.

Specifically, at the end of the fourth reporting period, the CPD had not yet finalized the *Recruit Use of Force* training under the Consent Decree process.

# Use of Force: ¶248

> **248.** *Supervisors of all ranks, as part of their initial pre-service promotional training and other identified supervisory training, will receive training on the following: a. conducting use of force reviews or investigations appropriate to their rank; b. strategies for effectively directing officers in de-escalation principles and acting to intervene on the subject's behalf when any use of force is observed that is excessive or otherwise in violation of policy; and c. supporting officers who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In this reporting period, the City and the CPD have not yet achieved Preliminary compliance with ¶248.

To achieve Preliminary compliance, the City and the CPD will need to reflect ¶248's training requirements into policy, which did not occur before the end of the fourth reporting period.

Still, we reviewed documentation of training for supervisors conducted at the academy in January 2021, which identified responsibilities of both responding and reviewing supervisors and provided guidance for supervisors in properly addressing the requirements. That training was conducted in preparation for department-wide in-service training for supervisors, which has not yet occurred in 2021.

Likewise, for Secondary compliance with this paragraph, the CPD must update the training to reflect recent changes to Use of Force policies that were effective on April 15, 2021, such as requiring officers to de-escalate, and changes resulting from the CPD's engagement with the Use of Force Working Group throughout this reporting period. The Use of Force Working Group and the CPD engaged in discussions about Taser use and foot pursuits, for example, and resulting changes to policy must be reflected in upcoming training. While CPD's community engagement efforts have improved since when the Consent Decree began, it continues to be an area that CPD struggles with and needs much more work as described in the assessment of ¶160.

# V. Recruitment, Hiring, & Promotions

This is the Recruiting, Hiring, and Promotions section of the Independent Monitoring Team's (IMT's) fourth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' compliance efforts from January 1, 2021, through June 30, 2021, for this section.

## Guiding Principles

The IMT will assess compliance with the Recruitment, Hiring, and Promotions paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **249.** *Having a department that recruits, hires, and promotes officers who are qualified to meet the increasingly complex needs of law enforcement and that reflects a broad cross section of the Chicago community in which it serves is critical to accomplishing the following goals: running a professional police force; building community trust and confidence; increasing legitimacy and acceptance of CPD's supervision and accountability systems; and reducing perceptions of bias.*

> **250.** *The provisions of this Agreement are designed to ensure that CPD attracts, hires, retains, and promotes individuals who are equipped to perform their jobs safely, effectively, and in accordance with the law, CPD policy, and the terms of this Agreement. Further, this Agreement is designed to ensure that CPD promotes individuals who are capable of: providing effective supervision; guiding officers under their command on lawful, safe, and effective policing; and holding officers accountable for misconduct.*

> **251.** *The City and CPD's recruitment, hiring, and promotions policies and practices will show a commitment to attracting, hiring, and promoting qualified candidates at all ranks that reflect a broad cross section of the Chicago community the Department serves.*

> **252.** *The Parties acknowledge that the City and CPD are currently subject to the City of Chicago Police Department Hiring Plan for Sworn Titles ("Hiring Plan"), dated May 14, 2014, which may be subject to change in the future.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

For the Recruitment, Hiring, and Promotions section in the fourth reporting period, the City and the CPD focused on developing policies to govern the CPD's recruitment, hiring, and promotions processes, identifying the entities and roles of those involved in these processes, and increasing transparency regarding these processes. Completing the policy development process is crucial. Without sound policies, the City and the CPD cannot achieve further progress toward compliance with the requirements of this section.

The City made progress toward complying with the requirements of this section by mandating and conducting training on the role of the Office of the Inspector General in overseeing the hiring and promotions process, achieving Secondary compliance with ¶257. However, the City still needs to establish and implement clear policies and procedures for recruitment, hiring, and promotions, for implementing recommendations from outside consultants, and for updating and reviewing job descriptions.

Throughout this reporting period, the City, the CPD, the OAG, and the IMT continued to engage in discussions regarding the CPD's recruitment efforts for various positions; for hiring and promotional examinations; job descriptions and qualifications; and transparency and awareness around corresponding processes. While hiring continues to be a challenge in 2021, we encourage the CPD to continue developing and implementing plans and policies to improve recruiting across its ranks.

In the fourth reporting period, we reviewed compliance with 12 Recruitment, Hiring, and Promotions paragraphs of the Consent Decree. We determined the City maintained Preliminary compliance for one paragraph (¶264), maintained Secondary compliance for one paragraph (¶261), and achieved Secondary compliance for one paragraph (¶257). The City remained under assessment for Preliminary compliance with one paragraph (¶263) and did not reach any level of compliance with the remaining eight paragraphs (¶¶253–56, 258–60, and 262). *See* Recruitment Figure 1 below.

Recruitment Figure 1: Compliance Progress for Recruitment, Hiring & Promotions Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)

Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance

Paragraphs that have not met Preliminary compliance

Paragraphs Under Assessment for Preliminary compliance



The City had two deadlines in the fourth reporting period (¶¶258 and 262), which it missed. The City achieved the underlying deadline requirement for one paragraph (¶262) by the end of the reporting period. *See* Recruitment Figure 2 below.

Recruitment Figure 2:



Recruitment, Hiring & Promotion Deadlines in the Fourth Report: 2

## Recruitment, Hiring, and Promotion: ¶253

**253.** *The City and CPD will ensure that its recruitment, hiring, and promotion policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws, and the terms of this Agreement.*

### Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has not met Preliminary compliance on this paragraph.

In the third reporting period, the CPD produced multiple documents and, during meetings, highlighted best-practices research, recruitment outreach efforts, and community-based and institutional partnerships to secure diverse recruits. The CPD shared efforts to address barriers to recruitment as identified through survey feedback data. The CPD also identified numerous changes in recruitment practices such as increasing opportunities for testing and assisting applicants with knowledge of credit repair. The IMT recognized the CPD's efforts towards compliance but did not provide a compliance assessment under this paragraph in Independent Monitoring Report 3.

During this reporting period, the CPD submitted the *Department Recruitment, Selection, and Hiring Plan* policy (E05-34) as evidence of its compliance with ¶¶253 and 254, and the IMT provided comments recommending that the CPD conform the policy to be consistent with the US Equal Employment Opportunity Commission's guidelines and the Americans with Disabilities Act (42 USCA § 12112). The purpose of the policy is to ensure that the CPD is committed to attracting and hiring, qualified candidates for the Police Officer position reflect an ethnically, racially, and gender diverse cross-section of the communities that the Department serves.

E05-34 describes the processes for recruitment, selection, and hiring for the Police Officer position and informs CPD members of the responsibilities of those employees in the recruitment, selection, and hiring process. The policy language clearly indicates the CPD's commitment to the recruiting and selection requirements of this paragraph.

On the other hand, while E05-34 declares: "The City of Chicago is an Equal Employment Opportunity employer and is committed to providing equal opportunity or treatment in its recruitment, hiring, performance evaluations, promotions, demotions, transfers, discipline, terminations, and in all other employment practices

and decisions," it does not substantively address how the CPD's "policies and practices are lawful, fair, and consistent with best practices, anti-discrimination laws," as required by ¶253. We have also not received records of any other written materials that explain how the CPD will meet this end either. Therefore, the CPD has not met Preliminary compliance due to not having a substantive policy on promotional process requirements. Preliminary compliance can be demonstrated by adding substantive policy that explains how the CPD will meet the requirements of this paragraph.

# Recruitment, Hiring, and Promotion: ¶254

*254. CPD will provide clear guidance on its policies and procedures for recruiting, hiring, and promoting police officers and will clearly allocate responsibilities for recruitment, hiring, and promotion efforts for each position.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has not met Preliminary compliance on this paragraph.

During the previous reporting period, the CPD produced multiple documents and, during meetings, highlighted best-practices research, recruitment outreach efforts, and community based and institutional partnerships to secure diverse recruits. The CPD shared efforts to address barriers to recruitment, as identified through survey feedback data. The CPD also identified numerous changes in recruitment practices, such as increasing opportunities for testing and assisting applicants with knowledge of credit repair. The IMT recognized the CPD's efforts towards compliance but did not provide a compliance assessment under this paragraph in Independent Monitoring Report 3.

During this reporting period, the CPD submitted the *Department Recruitment, Selection, and Hiring Plan* policy (E05-34) as evidence of its compliance with ¶¶253 and 254. However, the purpose of this policy is to ensure that the CPD is committed to attracting and hiring, qualified officers that reflect an ethnically, racially, and gender diverse cross-section of the communities that the CPD serves.

E05-34 describes the processes for recruitment, selection, and hiring for the Police Officer position and informs CPD personnel and candidates of their responsibilities during that process. The policy language clearly indicates the CPD's commitment to the recruiting and selection requirements of this paragraph.

While E05-34 declares: "The City of Chicago is an Equal Employment Opportunity employer and is committed to providing equal opportunity or treatment in its recruitment, hiring, performance evaluations, promotions, demotions, transfers, discipline, terminations, and in all other employment practices and decisions," it does not provide policy guidance on implementing the policy or demonstrate how the CPD provides clear guidance on its policies or allocates responsibilities, as required by ¶254. Therefore, CPD has not met Preliminary compliance due to no substantive policy guidance or allocation of responsibilities on promotional process requirements.

Preliminary compliance can be demonstrated by adding policy guidance, direction, and allocation of responsibilities on the promotions component of this paragraph that is consistent with ¶254 requirements.

## Recruitment, Hiring, and Promotion: ¶255

**255.** *To further this goal, the City and CPD will publish job descriptions for each sworn member title code, specifying the current duties, responsibilities, and minimum qualifications for each position.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not met Preliminary compliance with this paragraph.

The City and the CPD made progress toward compliance with this requirement during the previous reporting period. At that time, we reviewed the City's Department of Human Resources website, which includes the CPD sworn title codes. While the job descriptions were posted on the website, many of them appeared to be outdated and did not include contemporary language, mandating key concepts such as de-escalation, impartial policing, and procedural justice—all major reform tenets specified in the Consent Decree.

As we did in the previous reporting period, we compared the job descriptions submitted as compliance proofs with the job descriptions published online.[120] The IMT observed that the job descriptions that were posted online had effective dates that were older than, and in some cases significantly different from, the versions provided as proofs. For example, 9015 Police Legal Advisor shows April 2021 as an apparent effective or version date. The online version of that same job description during the fourth reporting period, however, was dated October, 1991. Skills and abilities also vary considerably between the two versions.

The CPD submitted an undated document to substantiate a Class Specification Quadrennial Review Project: Process. Survey templates for each sworn classification were also provided. There is no way to ascertain who or where this document was published, to whom it applies, or if it describes an aspirational or completed process. As with most Preliminary compliance requirements, IMT suggests defining and memorializing this process in a policy to ensure its perpetual adoption.

---

[120] *See Police Job Specifications*, Chicago police Department, https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html.

## Recruitment, Hiring, and Promotion: ¶256

**256.** *The City and CPD will continue to review any hiring and promotional exams to ensure they are fair, validated, and properly administered.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

We assessed compliance with ¶256 for the first time during this reporting period. The City and the CPD did not meet Preliminary compliance.

To meet Preliminary compliance, the City and the CPD must have developed written guidance to ensure fairness, validity, and proper administration of promotional exams.

The City and the CPD have submitted extensive documentation for ¶256. While not including sufficient written guidance, the proofs demonstrate that the City, in particular, has set in motion numerous processes to meet ¶256 requirements. The standards and processes delineated in the Department of Human Resources *Testing Division Pre-Employment Test Guidelines* (January 2021) are especially relevant to these requirements. For example, the "Pre-employment Test Guidelines Step 2: Test Type and Method - (What kind of test should be used?)," states the following:

> *The Testing Manager and/or Testing Specialists will explore the suitability of different test types (i.e., written job-knowledge test, skills assessment) to assess the required KSAs. Factors such as test utility, validity, reliability, adverse impact, number of candidates, availability of Subject Matter Experts, and practical constraints will be considered when choosing a test mode.*

A policy construct that simply requires an initial validation process is insufficient to meet ¶256 requirements. The Department of Human Resources addresses this one way in "Step 5 Test Results, Scoring, Notifications," mandating:

> *Test results are analyzed by the Testing Specialists and/or Testing Manager. Descriptive statistics are run on the results and inconsistencies in the pattern of test results are noted. The Testing Specialists and/or Testing Manager may follow up with a subject matter expert to verify the answer to one or more test questions. Based on the analysis and feedback from the SMEs, one or more items may be removed from a test if it is determined that the*

> *question was unclear, either due to the way the question was worded, or because SMEs decide that there is no one true answer to the question. If one or more items is removed from a test, candidates' test results will be rescored.*

While the Department of Human Resources has instituted policies that reach ¶256 imperatives, the Department of Human Resources policies do not apply to either testing provided by external consultants nor those constructed and administered in house by the CPD. External vendors are governed by a Master Consulting Agreement ("MCA") regulated by a process specified by the City of Chicago Department of Procurement Services. Neither the existing MCAs nor the Department of Procurement Services guiding policies were produced before the end of this reporting period. The validation information for sworn titles is not held by the Department of Human Resources and was not submitted during this reporting period.

According to records produced by the City, the Department of Human Resources and the CPD are working with a vendor to conduct job analyses, develop exams, and train CPD and Public Safety Administration personnel on how to fairly administer the exams for some sworn titles and have plans to validate the hiring processes for the existing titles in the future with the help of a testing vendor. To meet Preliminary compliance with ¶256, the City and the CPD must develop in a written policy, budget, or official guidance to solidify the City and the CPD's strategy for sustained compliance with ¶256.

## Recruitment, Hiring, and Promotion: ¶257

**257.** *CPD will inform officers of the role of the Office of the Inspector General ("OIG") in overseeing the hiring and promotions processes.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary and Secondary compliance with ¶257 in the fourth reporting period.

During the previous reporting period, we provided a status update for ¶257. The CPD and the Office of the Inspector General ("OIG") worked in collaboration to support officer awareness of the OIG's role in overseeing the CPD's hiring and promotional processes and informing members about the OIG's Diversity, Equity, Inclusion, and Compliance Section.[121]

The officer awareness strategy included:

1) two scripts introducing the OIG Executive Director of the Office of Inspector General Diversity, Equity, Inclusion Compliance Section and detailing office roles and responsibilities;

2) a video production of the scripted material;

3) an eLearning module that supported, reinforced, and tracked the review of the information presented in the video; and

4) AMC Messages (all member announcements and messages placed on The Wire) alerting CPD members about the eLearning module and mandating completion of the eLearning training module by December 15, 2020.

The eLearning module included the purpose of the module, the OIG's operational hours, and multiple options for filing complaints with the OIG. Our review of the Tableau database indicated that 92% of the CPD officers had received this mandated training by December 15, 2020.

During this reporting period, the City and the CPD produced 8 additional documents to demonstrate compliance. These documents include Special Order S11-

---

[121] *See Diversity, Equity, Inclusion and Compliance*, OFFICE OF THE INSPECTOR GENERAL CITY OF CHICAGO, https://igchicago.org/about-the-office/our-office/deic/.

10, which mandates that "the Deputy Chief, Training and Support Group, or designee will advise all Department members on the role of the Office of Inspector General in overseeing the hiring and promotions process." The documents also substantiated that 98% of department members had received the mandated training by April 7, 2021. These documents bring the City and the CPD into Preliminary and Secondary compliance with this paragraph.

## Recruitment, Hiring, and Promotion: ¶258

> **258.** *By December 31, 2020, and at least every three years thereafter, CPD will assess its recruitment and hiring processes to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☐ Met  ☑ Missed |
| | *Extended from December 31, 2020, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD have not achieved Preliminary compliance with this paragraph.

To demonstrate compliance with ¶258, the CPD submitted a draft Assessment Scope from a third-party expert. This document's purpose is to demonstrate efforts toward achieving compliance with ¶258. The IMT commends the City and the CPD for its strategic approach to addressing these requirements. As such, IMT recommends the City and the CPD consider the following amendments or additions:

- The Current State Review discovery and visioning sessions should include diverse CPD officers, supervisors, and rank and union representatives who are interested in achieving ¶258 requirements.

- The City and the CPD should review data analytics, management, and accountability systems to ensure optimal designation of responsibility and results.

- Analysis of hiring and promotion processes should include selection, transfers, and assignments into specialized units.

- Alignment of institutional capacity and systems with ¶¶253, 254, and 256 compliance requirements.

Preliminary compliance requires a CPD policy to regularly assess recruitment and hiring processes in accordance to ¶¶258 and 259 requirements. Secondary compliance requires that the assessment is conducted in accordance with the policy. Full compliance requires that CPD institutionalize its method of regularly assessing recruitment and hiring processes in accordance with requirements every three years.

## Recruitment, Hiring, and Promotion: ¶259

*259. The recruitment and hiring assessment will identify and consider: a. the core set of characteristics and capabilities of qualified recruits; b. methods for consideration of discriminatory or biased behavior by the applicant against a member of a protected class in hiring decisions; c. barriers and challenges to successfully completing the recruit application process; d. Department strategies for attracting and hiring qualified applicants that reflect a broad cross section of the Chicago community; e. input, which could consider surveys, from successful and unsuccessful applicants, recruits and other CPD members, community members, community-based organizations, legal and law enforcement professionals, and internal and external subject matter experts regarding the strengths and weaknesses of the recruitment and hiring processes; f. recommendations for any modifications to the current recruitment and hiring processes that would enable CPD to satisfy the requirements of this section; and g. a plan for implementing any recommended modifications with a timeline for implementation.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not achieved Preliminary compliance with this paragraph.

Preliminary compliance requires a CPD policy to regularly assess recruitment and hiring processes in accordance to ¶¶258 and 259 requirements. To demonstrate compliance with ¶259, the CPD submitted a draft Assessment Scope from a third-party expert.[122]

We recommend that the CPD incorporate the amendments and additions to proposed efforts, as explained in the above assessment for ¶258. Additionally, the CPD's recruitment and hiring assessment policy must address the specific require-

---

[122] After the end of the reporting period, the City and the CPD also submitted additional compliance records, including the following: *Core Characteristics of Qualified Recruits* and *Methods on Screening Discriminatory or Biased Behavior by Applicant against a Member of a Protected Class*. We will continue to consult with the City, the CPD, and the OAG regarding these materials and will assess them for compliance in the next reporting period.

ments listed in the subparagraphs ¶259. Because the CPD did not provide the documents and document packages within the fourth reporting period, the CPD has not met Preliminary compliance for ¶259.

## Recruitment, Hiring, and Promotion: ¶260

**260.** *CPD will implement the plan above in Paragraph 259 in accordance with the specified timeline for implementation.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** Moving ☑ **Not Yet Applicable**

**Preliminary:** *Not in Compliance*
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

The City and the CPD have not submitted compliance proofs for ¶260 before the end of the fourth reporting period. As a result, the City and the CPD have not reached any level of compliance with ¶260.

# Recruitment, Hiring, and Promotion: ¶261

**261.** *Within 18 months of the Effective Date, and at least every three years thereafter, CPD will obtain an independent expert assessment of its promotions processes for the ranks of Sergeant and Lieutenant to ensure that its policies and practices comply with the law, are transparent, and are consistent with this Agreement. The independent expert will review the existing Hiring Plan, and any relevant collective bargaining agreements in order to conduct the assessment of the Sergeant and Lieutenant promotions processes. The Sergeant and Lieutenant promotions assessment, at a minimum, will identify: a. the processes by which CPD selects candidates for promotion to Sergeant and Lieutenant who possess a core set of competencies, characteristics, and capabilities and, when applicable, who are effective supervisors in compliance with CPD policy and this Agreement; b. methods for consideration of each candidate's disciplinary history in the selection process; c. Department strategies for promoting qualified applicants who reflect a broad cross section of the Chicago community; d. the frequency with which CPD should hold promotional exams; e. opportunities to increase transparency and officer awareness about the promotions process and promotions decisions, including, but not limited to, identifying criteria for promotions; and f. recommendations for any modifications to the current promotions processes, which would enable CPD to address the requirements of this section.*

---

**Compliance Progress**    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Deadline:** | November 3, 2023*   ☑ **Not Yet Applicable** |
| | *Extended from September 1, 2023, due to COVID-19 |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD have maintained Preliminary and Secondary compliance with ¶261.

During the previous reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶261. The City and the CPD achieved these levels of compliance by hiring an independent expert to conduct the analysis required by ¶261.

Specifically, the City selected DCI Consulting as the independent expert to perform the tasks prescribed by ¶261.[123] The City and the CPD also produced DCI's Consulting Report. This 132-page report, *City of Chicago Police Department Sergeant and Lieutenant Promotion Processes: Review, Evaluation, and Recommendations* (dated December 30, 2020), clearly addresses each ¶261 requirement. Appendix A indicates the 2014 Hiring Plan and multiple collective bargaining agreements were amongst the myriad of documents reviewed in compiling the report and recommendations.

During this reporting period, the CPD anticipated submitting a Scope Statement (DCI Recommendations), but ultimately, did not submit it by the end of the reporting period. Nevertheless, because ¶261 has a three-year period requirement, the City and the CPD have maintained Preliminary and Secondary compliance.

To reach Full compliance, the City and the CPD must deliberate on and adopt a process through which this assessment will occur every three years as required. CPD must sufficiently implement a method of regularly assessing its promotions processes for specified ranks (at least every three years). This recurring assessment process also should be incorporated into policy to ensure that the process is sustained.

---

[123] *See* DCI CONSULTING, https://www.dciconsult.com/.

## Recruitment, Hiring, and Promotion: ¶262

**262.** *Within 60 days of the completion of the independent expert's promotions assessment, CPD will develop an implementation plan to respond to any recommendations identified in the assessment, including any recommended modifications to the promotions processes and a timeline for implementation. Upon completion, CPD will share the results of the assessment and its implementation plan with the Monitor for review and approval. Within 60 days of receiving the Monitor's approval, CPD will begin to implement the plan.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | | |
|---|---|---|---|
| **Deadline:** | Moving (February 28, 2021) | ☐ Met | ☑ Missed |
| **Deadline:** | Moving | ☑ Not Yet Applicable | |

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

At the end of the fourth reporting period, the City and the CPD did not achieved Preliminary compliance with ¶262.

During the previous reporting period, the City selected DCI Consulting as the independent expert to perform the tasks prescribed by ¶261.[124] The City and the CPD produced a DCI Consulting Report of its work. This extensive report, *City of Chicago Police Department Sergeant and Lieutenant Promotion Processes: Review, Evaluation, and Recommendations* (dated December 30, 2020), clearly addresses each ¶261 requirement.

Paragraph 262 requires that the City and the CPD develop an implementation plan within 60 days of the completion of the independent expert's promotions assessment. The CPD must also construct that plan along with an implementation timeline, and then fully implement the plan. Because the independent expert completed the promotions assessment on December 30, 2020, the City and the CPD had until February 28, 2021, to develop the plan. On the last day of the fourth reporting period, the City provided records regarding ¶262, including a status update of the implementation of the independent expert's recommendations.

These documents included an initial project timeline and seven proofs associated with recommendations from the DCI assessment. These proofs are primarily responsive to DCI recommendations 21 and 22, which address additional efforts to

---

[124] *See* DCI Consulting, https://www.dciconsult.com/.

attract diverse recruits and mentorship programs. The CPD also submitted an email message providing written affirmation that the City testing vendor, IO Solutions, agrees to complete recommendations 3, 6, 7, 9, 10, 15, and 32, which address eligibility criteria, process development changes, reporting on job content, and providing performance feedback to candidates.

The key elements of a plan generally include visioning, detailed goals and objectives, action plans, and scorecards that allow progress to be tracked. The documents produced by the City and the CPD show that efforts have been undertaken to act upon the DCI recommendations. Actions and reactions are to varying degrees chronicled in the production documents. A table contained within the cover memo has a column labeled "City Implementation Plan." It describes actions the City anticipates taking while a column labeled "Status," appears to document action taken. Status entries from recommendations 1, 2, 12, 13, 14, 16, and 17 refer to a March 29th meeting for which the CPD did not provide minutes or any other substantiation.

In short, the documents submitted do not amount to a cohesive plan. One of the DCI report Summary Evaluation Results says, "There are several departments and groups with responsibilities for the process. As a result, ultimate ownership, responsibility for oversight, and methods of checks and balances are not always clear." Lines of responsibility for creating and managing this required plan are similarly blurred.

Preliminary compliance simply requires the CPD to develop policy that binds the organization to create an implementation plan from independent assessment recommendations. No such policy was provided by the end of the reporting period. Secondary compliance requires development of the implementation plan. Full compliance requires full implementation of the plan. IMT looks forward to working with the City and the CPD as it perfects this required plan.

## Recruitment, Hiring, and Promotion: ¶263

> **263.** *Within 365 days of the Effective Date, CPD will identify and publish, both internally and externally, for the ranks of Captain and Commander, the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates who are effective supervisors in compliance with CPD policy and this Agreement.*

### Compliance Progress                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

During the previous reporting period, the City and the CPD demonstrated Preliminary and Secondary compliance with this paragraph after retaining an outside consultant, CPS HR Consulting, during the second reporting period to prepare a job analysis of the Captain and Commander ranks.[125]

The City and the CPD internally and externally published the resulting records:

(1) 9175 Captain Job Description, dated December 2020;

(2) 9752 Commander Job Description, dated December 2020;

(3) Captain Selection Methods; and

(4) Commander Selection Methods.

During this reporting period, the City and the CPD produced updated Captain and Commander job descriptions and selection methods. They did not produce a feedback loop.

The updated Captain job description has a revision date of February 8, 2021. The Captain job description produced for ¶255 is dated April 2021. The latter Captain job description does not contain the additions made in the February 2021 job description. Furthermore, the Captain job description posted online is dated November 23, 2020 and differs from both of the 2021 descriptions.[126] With variations of the same position description existing in multiple locations, it is unclear how the

---

[125] *See* CPS HR CONSULTING, https://www.cpshr.us/.
[126] *See* *Class Title: Captain*, CITY OF CHICAGO, https://www.chicago.gov/content/dam/city/depts/dhr/supp_info/JobSpecifications/Police/9175_Captain-JD_DEC_2020_Final.pdf

City and the CPD have determined the duties, eligibility criteria, knowledge, skills, and abilities considered to select qualified candidates.

Preliminary compliance includes CPD demonstrating that it has allocated sufficient resources to identify the requisite criteria. Having multiple versions of a job description cast doubt on whether sufficient time and resources have been allocated to meet this requirement. Secondary compliance adds the requirement to publish revised job descriptions. The April 2021 Captain job description produced and submitted by CPD is not a revision of the February 2021 job description. The IMT needs clarification on the final job description and how the process of publishing job descriptions internally and externally will be systematically managed to ensure consistency.

Finally, as stated in our last report, Full compliance will require that CPD execute the process as designed and create a feedback loop where opportunities for improvement may be identified and implemented.

## Recruitment, Hiring, and Promotion: ¶264

**264.** *Within 365 days of the Effective Date, CPD will develop strategies to increase transparency and awareness about the promotions process for the ranks of Captain and Commander, including, but not limited to, criteria for promotions and promotion decisions.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have maintained Preliminary compliance with this paragraph.

The City and the CPD achieved Preliminary compliance during the previous reporting period. To meet these requirements, the City retained an outside consultant, CPS HR, to prepare a job analysis of the Captain and Commander ranks. The City and the CPD then issued the following records, which indicate the City and the CPD have developed the requisite strategies to meet Preliminary compliance:

(1) 9175 *Captain Job Description*, dated December 2020;

(2) 9752 *Commander Job Description*, dated Dec 2020;

(3) *Captain Selection Methods*;

(4) *Commander Selection Methods*; and

(5) *Final Strategic Communications Plan: Captain and Commander Promotions* (dated 12/7/20).

During this reporting period, the City and the CPD produced updated Captain and Commander job descriptions and selection methods. These documents alone are insufficient to meet the threshold of Secondary compliance. The City and the CPD should incorporate the criteria for promotions and promotional decisions into a policy statement. Secondary compliance may be achieved by following this recommendation, fully executing the Strategic Communications Plan, and exhausting efforts to enhance transparency and awareness of the entire Captain and Commander promotions processes.

# VI. Training

This is the Training section of the Independent Monitoring Team's (IMT's) fourth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago's (the City's) and its relevant entities' Training compliance efforts from January 1, 2021, through June 30, 2021, for this section.

## Guiding Principles

The IMT assessed compliance with the applicable Training paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **265.** *CPD will enhance its recruit training, field training, in-service training, and preservice promotional training so that they are sufficient in duration and scope to prepare officers to comply with CPD directives consistently, effectively, and in accordance with the law, CPD policy, best practices, and this Agreement.*

> **266.** *CPD training will reflect its commitment to procedural justice, de-escalation, impartial policing, and community policing.*

> **267.** *CPD training will convey CPD's expectations that officers perform their jobs diligently and safely, and have an understanding of, and commitment to, the constitutional rights of the individuals they encounter.*

> **268.** *The training required under this Agreement is set out in this section and, for specific topic areas, in the Community Policing, Impartial Policing, Crisis Intervention, Use of Force, Officer Wellness and Support, and Accountability and Transparency sections.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (the CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

During the fourth reporting period, the City and the CPD continued to work to address a multitude of issues regarding training and training evaluation. The City, the CPD, the OAG, and the IMT continued discussions, for example, about the important functions of the Training Oversight Committee (TOC) and the Education and Training Division; training education and evaluation requirements; and the importance of CPD personnel being aware of and understanding the requirements of the Consent Decree. We are concerned, however, about some missteps that caused the CPD to lose Preliminary compliance with ¶270, a critical paragraph that outlines the important role of the TOC, which should drive quality control for all CPD training.

During this reporting period, the CPD also provided data indicating the completion percentages for its 2020 training courses and submitted its 2021 Training Plan for review. As a result, the City and the CPD achieved or maintained Preliminary compliance for several paragraphs in the Training section. As we have noted before, we encourage the CPD to produce a finalized training plan *before* training begins so as to allow the CPD to make informed and strategic modifications to its training when confronted with unanticipated challenges.

The CPD provided the IMT with proposed drafts of S11-1, *Department Training Records Maintenance Program*; Special Order S11-10-01, *Training Notification and Attendance Responsibilities*; and Special Order S11-11, *Training Oversight Committee*. These training directives are currently under assessment by the IMT and the OAG, and once they are finalized, the CPD should achieve Preliminary compliance under additional Training paragraphs of the Consent Decree. We appreciate the CPD's continued progress on critical policies related to training and record keeping.

Overall, in the fourth reporting period, the IMT reviewed compliance with 61 Training paragraphs of the Consent Decree (¶¶270–80, 282–84, 287–92, 294–97, 299, 300, 303–317, 319–324, 326–29, and 331–40). At the end of the reporting period, the City maintained Preliminary compliance for 15 paragraphs (¶¶271–75, 278, 280, 316–17, 319, 321, 323, 328, and 339–40), met Preliminary compliance with 15 paragraphs (¶¶276, 283, 291, 294, 299, 305–07, 315, 331–32, and 335–38), met Secondary compliance for two paragraphs (¶¶320 and 322), remained under assessment for Preliminary compliance with one paragraph (¶279), and failed to reach Preliminary compliance for 28 paragraphs (¶¶270, 277, 282, 284, 287–90, 292, 295–97, 300, 303, 304, 308–14, 324, 326–27, 329, and 333–34). The City also lost Preliminary compliance with one paragraph (¶270). *See* Training Figure 1 below.

Training Figure 1:               Compliance Progress for Training
Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



The City had seven deadlines in the fourth reporting period (¶¶272, 292, 303, 316, 320–21, and 323). The City met six deadlines (¶¶272, 292, 316, 320–321, and 323) and missed the other deadline (¶¶303). The City did not achieve the underlying deadline requirements with the misse deadlines before the end of the reporting period. *See* Training Figure 2 below.

Training Figure 2:             Total Training Deadlines
in the Fourth Report: 7



# Training: ¶270

**270.** *The TOC, or other similarly-structured oversight entity, will continue to review and oversee the Department's training program and will be chaired by the First Deputy Superintendent, or other high-ranking member of CPD's command staff. The TOC will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; administering training; providing legal advice; coordinating and exercising supervision over disciplinary matters; managing data, technology, and information systems; overseeing and coordinating the community relations strategy; and reviewing reportable use of force incidents. It will meet at least once a month and continue to record meeting minutes.*

## Compliance Progress                  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* (NEW: LOST COMPLIANCE) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD reached Preliminary compliance with ¶270 in the second reporting period. However, the January 22, 2021 version of S11-11 does not mandate that the Training Oversight Committee meet monthly at a minimum, as required by this paragraph. Therefore, the City and the CPD are unable to maintain Preliminary compliance or achieve Secondary compliance with ¶270. Proposed *Training Oversight Committee* policy (S11-11), issued May 13, 2021, has the requisite language for compliance. Section (II)(E) of that policy clearly states that the Training Oversight Committee is required to meet monthly.

To assess Secondary compliance, we reviewed Training Oversight Committee minutes for meetings held during this reporting period. The City and the CPD only provided, however, the meeting minutes for the first four months of the reporting period (January 2021 through April 2021). For this reason, we did not receive sufficient information to find that the City and the CPD met Secondary compliance.

Further, the minutes that we reviewed reflect that additional work is necessary. One of the meetings contained only one action item approval of minutes. Another meeting noted the need for better compliance with the CPD's body-worn camera policy requirements, but offered no guidance or commitment to address the concern. Moreover, Section II(D) of S11-11 requires that "[a]ll designees appearing on committee members behalf must be of exempt rank." It appears that this policy requirement was not met in three of the four meetings for which minutes were provided and reviewed.

Full compliance will require that all of the previous points be met, that meeting attendance and frequency requirements are met, substantive deliberations occur, and evidence shows training actions are authorized and driven by Training Oversight Committee decisions.

# Training: ¶271

*271. Within 180 days of the Effective Date, and on an annual basis thereafter, CPD's Education and Training Division will, under the supervision of the TOC, conduct a needs assessment, which will, among other things identify and consider: a. information collected from use of force reviews, discipline and civilian complaints, and reports of officer safety issues; b. input from CPD members of all ranks and their respective collective bargaining units, if applicable; c. input from members of the community; d. recommendations from CPD oversight entities, including, but not limited to COPA, the Deputy Inspector General for Public Safety ("Deputy PSIG"), and the Police Board; e. changes in the law, to the Illinois Law Enforcement Training and Standards Board requirements, and to CPD policy, if any; f. court decisions and litigation; g. research reflecting the latest in training and law enforcement best practices; h. information obtained from evaluation of training courses, instructors, and FTOs; and i. member reaction to, and satisfaction with, the training they received.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | October 30, 2021* | ✓ **Not Yet Applicable** |
| | *Extended from August 28, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) | |
| **Secondary:** | *Not in Compliance* | |
| **Full:** | *Not in Compliance* | |

The City and the CPD have maintained Preliminary compliance since the second reporting period.

In the previous reporting period, the IMT reviewed the CPD's *Training Needs Assessment for the 2021 Training Plan*, which demonstrates that the Education and Training Division and the Training Oversight Committee identified and considered a wide variety of areas, as required by the subsections of ¶271. The draft *2021 Training Plan* addressed a wide-range of issues, from pre-service supervisor training to use-of-force training. The Plan lacked analyses, however, of the information gathered from the requests for information sent to CPD members and oversight agencies. During the previous reporting period, the IMT also reviewed multiple drafts of the *Training Needs Assessment Standard Operating Procedures*, which was not finalized before the end of the third reporting period.

In this reporting period, the City and the CPD maintained Preliminary compliance with this paragraph. The CPD also provided the *2021 Training Plan*, which contained a "Needs Assessment" chapter. According to that chapter, the Training Plan incorporates recommendations from the CPD's Bureau of Internal Affairs, the CPD's Force Review Division, the CPD's Labor Relations Division, the CPD's Legal Affairs Division, the CPD's Research and Development Unit, the CPD's the Training Oversight Committee, collective bargaining units, the Civilian Office of Police Accountability (COPA), the Deputy Inspector General for Public Safety, the Police Board, mandates from the Consent Decree, Federal and Illinois statutes, Illinois Law Enforcement Training and Standards Board, CALEA, and the most frequent responses from CPD officers, supervisors, and personnel for its training offerings. The CPD's mandatory training was selected based legal requirements, Consent Decree mandates, and topics identified via the needs assessment. It lists training needs identified and maps them to courses, course components, eLearning and training bulletins.

Documentation of the information gathering efforts from the entities enumerated in subparagraphs (a)-(i) is absent. The Needs Assessment chapter of the Training Plan identifies input sources and the results therefrom but offers no substantive proof nor details of the deliberative process of how the various inputs were considered in rendering the derived courses. Achieving Secondary compliance requires documentation related to information gathering efforts relevant to this paragraph.

Full compliance will require CPD allocate sufficient resources to conduct ongoing annual needs assessments. These ongoing assessments must consider the variety of required inputs and demonstrate consistency in systematically executing its processes.

## Training: ¶272

*272. Within one year of the Effective Date, and on an annual basis thereafter, the Education and Training Division will develop—and the TOC will review and approve—a written Training Plan for CPD's recruit, field, in-service, and pre-service promotional training to ensure that CPD members are trained to safely, effectively, and lawfully carry out their duties in accordance with the law, CPD policy, best practices, and this Agreement. CPD will implement the Training Plan in accordance with the specified timeline for implementation. The Training Plan will: a. identify training priorities, principles, and broad goals consistent with this Agreement; b. prioritize the needs identified during the needs assessment and identify those needs that will be addressed by the plan; c. include a plan and schedule for delivering all CPD training as necessary to fulfill the requirements and goals of this Agreement; d. identify subject areas for CPD training; e. determine the mandatory and elective courses, consistent with this Agreement, to be provided as part of the In-Service Training Program; f. develop a plan to inform officers about the In-Service Training Program, its course offerings, and its requirements; g. determine which aspects of the In-Service Training Program can be delivered in a decentralized manner, including e-learning, and which training requires more intensive, centralized delivery, to ensure effective delivery and comprehension of the material; 79 h. address any needed modification of the Field Training and Evaluation Program to fulfill the requirements and goals of this Agreement; i. identify necessary training resources including, but not limited to, instructors, curricula, equipment, and training facilities; j. determine the content, consistent with this Agreement, to be provided as part of pre-service promotional training for Sergeants, Lieutenants, Captains, and command staff; k. develop a plan to implement and utilize a centralized electronic system for scheduling and tracking all CPD training; l. develop a plan to implement and utilize a system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities; and m. identify community-based organizations that represent a broad cross section of the city to participate, as feasible, practical, and appropriate, in the development and delivery of the curriculum regarding subjects including, but not limited to, procedural justice, de-escalation, impartial policing, and community*

*policing, and make efforts to encourage such participation by such organizations.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** May 3, 2021*  ☑ Met  ☐ Missed
*Extended from February 28, 2021, due to COVID-19

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

At the end of the last reporting period, the draft *2021 Training Plan* was fairly comprehensive, but it did not adequately address subparagraphs (f) (h), (j), and (m) of ¶272.

As we stated in the previous assessment, achieving Secondary compliance will require the above sections to be fully incorporated into the *Training Plan*. The CPD should produce a finalized training plan *before training begins* so as to allow the CPD to make informed and strategic modifications to its training when confronted with unanticipated challenges. Additionally, paragraph 37 of the *2021 Training Plan* states that the Training Oversight Committee approved the *2021 Training Plan* revisions on April, 23 2021. This was not, however, reflected in Training Oversight Committee minutes that were submitted during the fourth reporting period.

Full compliance requires that the CPD allocate sufficient resources to develop, review, and approve the training plan, as required; that these processes are sufficiently ensuring that the CPD members are trained; and that the Training Plan is systematically executed.

# Training: ¶273

**273.** *With oversight from the TOC, CPD will develop and implement recruit, field, in service, and pre-service promotional training curricula and lesson plans that comport with CPD's Training Plan and that address the requirements and goals of this Agreement.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

During the previous reporting period, we reviewed the *Training Oversight Committee* policy (S11-11), which memorialized the committee's efforts to integrate critical elements of the Consent Decree across different training curricula and lessons plans. We found that the CPD achieved Preliminary compliance because the CPD required course materials to be "consistent across subjects" and "in accordance with the law, policy, best practice, and the Consent Decree." We expressed that we will be continuing to evaluate the CPD's implementation of training per S11-11 and the guidance from the Training Oversight Committee.

In assessing compliance with this paragraph during the current reporting period, we sought proofs of continued application of a controlling policy, minutes from Training Oversight Committee's meetings that depict Training Oversight Committee oversight of curriculum development and implementation, and that the training curricula and lesson plans comport with CPD's Training Plan and address Consent Decree requirements.

While S11-11 continues to control, we only received the first four months of meeting minutes for the reporting period. Section 5 of the monthly meeting minutes captured Training Oversight Committee discussions related to ¶273 requirements. However, insufficient documents were produced to assess the extent to which the training curricula and lesson plans comport with CPD's Training Plan and address Consent Decree requirements. Typically, lesson plans and curricula allow for this assessment. No evaluative or follow-up documents were produced that demonstrate that the CPD has sufficiently developed, implemented, and delivered training in alignment with requirements. Secondary compliance required these post-policy proofs. Finally, Full compliance requires CPD to systematically and sustainably comply with ¶273 requirements.

# Training: ¶274

**274.** *Under the supervision of the TOC, CPD's Education and Training Division, pursuant to the Training Plan, will develop and approve training curricula, lesson plans, and course materials that are (a) consistent across subjects; (b) of sufficient quality to adequately communicate the intended subject matter to CPD members; and (c) in accordance with the law, CPD policy, best practices, and this Agreement.*

Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**        *Not in Compliance*
**Full:**             *Not in Compliance*

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

During the previous reporting period, we reviewed whether the training development and approval process described in ¶274 is reflected in CPD policy. We found that the CPD achieved Preliminary compliance because the *Training Oversight Committee* policy (S11-11) memorialized the requirements of ¶274. The City and the CPD must demonstrate that the training curricula, lesson plans, and course materials are consistent across subjects to meet Secondary compliance. The IMT also noted that in future iterations of the annual training plan, the CPD will need to demonstrate a higher level of specificity to the ¶274 requirements.

In assessing compliance with this paragraph during the current reporting period, we sought proofs of continued application of a controlling policy, minutes from Training Oversight Committees meetings that depict Training Oversight Committee supervision of the Education and Training Division's curriculum, lesson plan and course material development and approval, and that the course materials are "(a) consistent across subjects; (b) of sufficient quality to adequately communicate the intended subject matter to CPD members; and (c) in accordance with the law, CPD policy, best practices, and this Agreement."

While S11-11 continues to control, we only received the first four months of meeting minutes for the reporting period. Section 5 of the monthly meeting minutes captured Training Oversight Committee discussions related to ¶274 requirements. However, insufficient documents were produced to assess the extent to which the training curricula, lesson plans, and course materials comport with CPD's Training Plan and address Consent Decree requirements. Typically, actual lesson plans, curricula, and course materials allow this assessment. No evaluative or follow-up documents were included in the ¶274 production documents that demonstrate that

the Education and Training Division has sufficiently developed and approved training in alignment with requirements. These proofs are necessary to achieve Secondary compliance. Finally, Full compliance requires CPD to systematically comply with and sustain ¶274 requirements.

# Training: ¶275

**275.** *The TOC will oversee the integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training, including, but not limited to use of force, weapons training, and Fourth Amendment subjects, as appropriate.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**    *Not in Compliance*
**Full:**    *Not in Compliance*

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

During the previous reporting period, the CPD produced the *Training Oversight Committee* policy (S11-11). This included Section III(A)(8), which requires the "integration of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training." We found that the CPD achieved Preliminary compliance because S11-11 articulates the requirements of ¶275. We explained that the City and the CPD will need to develop and implement all required training curricula and lesson plans that integrate procedural justice, de-escalation, and impartial policing, and community policing to reach Secondary compliance.

In assessing compliance with this paragraph during the current reporting period, we sought proofs of continued application of a controlling policy, curricula, lesson plans and course material that sufficiently integrate of the concepts of procedural justice, de-escalation, impartial policing, and community policing into CPD training and minutes from Training Oversight Committee meetings that depict Training Oversight Committee oversight.

While S11-11 and the Training Plan continue to control, we only received the first four months of meeting minutes for the fourth reporting period. Section 5 of the monthly meeting minutes captured Training Oversight Committee discussions related to ¶275 requirements. For example, the February 19, 2021 minutes specifically state that "*Procedural justice, de-escalation, and implicit bias principles are reinforced*." The Training Plan addresses this challenge as well. According to Section VII(A) of the Training Plan:

> *In January of 2020, the Training and Support Group updated the Standardized Lesson Plan CPD 63.120 to include the guiding principles as a mandatory field, which requires an explanation of*

*how the lesson plan incorporates principles of community polic-*
*ing, de-escalation, impartial policing, and procedural justice.*
*Each newly developed lesson plan will highlight throughout the*
*course the relationship between these key concepts and co tent*
*that is covered for their particular curriculum. As recruit curricu-*
*lum or other existing in-service courses are reviewed for currency*
*and relevance of content, the materials will be revised to ensure*
*guiding principles are integrated throughout the instruction.*

Nevertheless, insufficient documents were produced to assess the extent to which the training curricula, lesson plans, and course materials comport with ¶275 requirements. No evaluative content was produced. Typically, actual lesson plans, curricula, and course materials allow for this assessment. Secondary compliance requires these post-policy proofs.

Full compliance requires CPD to systematically comply with and sustain ¶275 requirements.

# Training: ¶276

> ***276.*** *The TOC will oversee continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques—in addition to traditional lecture formats—into training delivery.*

## Compliance Progress

(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD achieved Preliminary compliance during this reporting period.

In the last reporting period, we provided a status update for ¶276. We acknowledged that many of the CPD lesson plans and curricula included the integration of adult-learning techniques and that the continuing development was occurring.

During the current reporting period, we evaluated the *2021 Training Plan* and Training Directives S11-10, S11-10-01 and S11-11 as compliance proofs. S11-11 III.A(9) commits the Training Oversight Committee to "overseeing the continued development and integration of instructional strategies that incorporate active learning methods such as problem-solving, scenario-based activities, and adult learning techniques-in addition to traditional lecture formats—into training delivery."

According to Section VII(A) of the Training Plan:

> *The Training and Support Group (TSG) is committed to enhancing its recruit, in-service, and pre-service field and promotional training. The TSG incorporates the following active learning methods into training: problem-solving, tabletop exercises, scenario-based activities, and other adult learning techniques.*

While policy and the Training Plan clearly outline the expectation of ¶276 compliance, Secondary compliance has not been met. Proofs of compliance should include Training Oversight Committee review criteria and plans that ensure integration and delivery of instructional strategies into course instruction.

Full compliance requires CPD to fully develop a systematic method for the Training Oversight Committee to sustain regular instructional strategies review and oversight following ¶276 requirements.

# Training: ¶277

**277.** *Where it would add to the quality or effectiveness of the training program, the Education and Training Division will seek the assistance of outside expertise, as feasible, practical, and appropriate, either in developing or reviewing CPD curricula and lesson plans, or reviewing pilot versions of CPD courses.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

During the previous reporting period, the CPD produced the *Training Oversight Committee* policy (S11-11). We found that the CPD did not achieve Preliminary compliance because neither S11-11 nor the draft *2021 Training Plan* addressed the requirement for outside experts to review of pilot versions of the CPD courses. Additionally, the S11-11 did not clearly indicate when such people will be involved in developing or reviewing curricula, lesson plans, or pilot versions of the CPD courses, as required by ¶277. We recommended that the CPD consider updating S11-11 and the *2021 Training Plan* to include these missing elements.

In assessing compliance for the current reporting period, we reviewed Training Directives S-11-10 and S11-11. S-11-10 Section (IV)(A)3 of proposed draft S11-10 tracks ¶277 language and would meet the requirements for Preliminary compliance. However, it was not been finalized and approved by the end of the reporting period. Training Plan Appendix G references additional non-CPD resource personnel. Therefore, Preliminary compliance is not met.

As IMT discussed in our last report, Appendix G establishes that the CPD has sought and procured the assistance of several outside "experts." Appendix G displays their name, organization affiliation, role, course/topic, and the CPD submitter. No documents are included in the submission that establishes any of the names as "experts," the procurement or selection process or the extent of their contribution to each course. As we cited in our last report, CPD has not articulated or enacted processes to hire, retain, evaluate, and terminate outside experts, nor has it established a criterion for the selection and retention of outside experts. As suggested in our last report, the CPD should include these steps in the controlling policy in order to reach Secondary compliance.

Full compliance can be attained when CPD has implemented a plan to continue to receive SME assistance and standards to evaluate SME contributions for impact on training program quality and effectiveness.

# Training: ¶278

**278.** *The TOC will continue to oversee a process that effectively incorporates material changes in relevant case law, statutes, and CPD policy into recruit, field, in-service, and preservice promotional training in a timely and effective manner.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**  *Not in Compliance*
**Full:**  *Not in Compliance*

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

During the previous reporting period, the CPD produced Special Order S11-11, *Training Oversight Committee*. We found that the CPD achieved Preliminary compliance because Special Order S11-11 Section lll(A)(12) repeats the procedural requirements of ¶278. We explained that the CPD must produce records reflecting that monthly Training Oversight Committee meetings are occurring to discuss material changes, including agendas, minutes, and other supporting documents, in order to achieve additional levels of compliance.

The CPD has maintained Preliminary compliance during this reporting period as well. The CPD submitted, and IMT assessed, Training Oversight Committee meeting minutes from January through April 2021 and the *2021 Training Plan*. A review of the minutes revealed no discussion of either an act or process of incorporating material changes in relevant case law, statutes, and the CPD policy into recruit, field, in-service, and preservice promotional training. No produced documents included plans, policies or procedures that described the ¶278 mandated "process." Therefore, the City and the CPD did not achieve Secondary compliance.

Full compliance can be achieved after Secondary compliance if Training Oversight Committee sustains oversight of process for incorporating material changes in case law, statutes, and the CPD policy into training in accordance with requirements.

# Training: ¶279

**279.** *All training materials disseminated to CPD members and displayed at CPD facilities will reflect current CPD policy.*

<span style="color:blue">**Compliance Progress**</span> <span style="color:blue">(Reporting Period: Jan. 1, 2021, through June 30, 2021)</span>

**Preliminary:** *Under Assessment*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

We assessed the City and the CPD's compliance with ¶279 for the first time this reporting period. At the end of the fourth reporting period, the City and the CPD remained under assessment for Preliminary compliance.

To demonstrate compliance with this paragraph, the CPD submitted proposed draft Special Order S11-10 (issued on May 14, 2021). S11-10 Section V(A) mirrors the language from ¶279. Section V(C) further elaborates:

> *Exempt command staff members responsible for the management of a Department facility will ensure that all training materials displayed at the CPD facility under their command reflect the content of current Department directives.*

Both Sections V(A) and V(C) are proposed additions to S11-10 that were not approved as of the end of the reporting period.

In May 2021, the City also indicated that G01-03, *Department Directives* System, supports compliance with ¶279. The relevant section of G01-03 reads as follows:

> *The commanding officer, Training Division, will ensure that all training materials disseminated to Department members and displayed at the Training Division reflect the content of current Department directives.*

The City and the CPD had previously provided G01-03 for compliance with other Consent Decree requirements. As a result, the City and the CPD received no-objection notices from the IMT and the OAG for G01-03 under separate paragraphs. This does not follow the usual Consent Decree process, and the relevant language in the draft of S11-10 also creates additional responsibilities for exempt command staff who are responsible for the management of CPD facilities. Still, G01-03 provides additional clarity regarding the CPD's efforts to comply with ¶279. For this reason, the City and the CPD's compliance efforts for Preliminary compliance remained under assessment for ¶279.

To demonstrate Secondary compliance, the CPD must establish a process to ensure that training materials disseminated to CPD members and displayed at every CPD facility reflect current CPD policy. While some document control may be ascertained with the requirement that the Graphic Arts and Print Shop, Public Safety Administration, ensures the production of all training materials reflect TSG approved content, and additional auditing or site inspection process should be considered for Secondary compliance.

# Training: ¶280

*280. CPD will develop, implement, and utilize a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶280. During the previous reporting period, the CPD produced Special Order S11-11, *Training Oversight Committee*. The Education and Training Division, in conjunction with the Information Services Division, advised the IMT that they are working toward integrating a robust software system to accomplish the requirements of ¶280. We found that the CPD achieved Preliminary compliance because Special Order S11-11, *Training Oversight Committee*, Section III(A)(3)(m) states the requirement of ¶280. We reviewed communications between the CPD and the software vendor, Envisage, from March 2020 through October 2020, which demonstrated that the CPD is working toward creating a robust centralized electronic system within the Education and Training Division. We noted that for the CPD to achieve further compliance, they must continue to input historical data and utilize the electronic scheduling and tracking system for all other trainings, including recruit training.

For this reporting period, the IMT reviewed the following documents to assess compliance:

- Current and proposed Training Directives S11-10, S11-10-01, and S11-11

- January-March 2021 meeting notes and communications with Envisage, the vendor that is installing the Acadis software

- A demonstration video conducted by Envisage, demonstrating the capabilities of Acadis as relevant to the Field Training and Evaluation Program

- A spreadsheet created by Envisage illustrating how the capabilities of Acadis align with Consent Decree paragraphs

Draft S11-10-01 (issued May 6, 2021), Section II, describes the Learning Management System (LMS) as a computerized system used to schedule training for CPD personnel and track training notifications and attendance. It does not yet apply because it did not receive final approval by the end of this reporting period.

The language in the existing S11-10 policy meets requirements.[127] Previously, Special Order S11-11, *Training Oversight Committee,* Section III(A)(3)(m) was applied to Preliminary compliance. Because the system is no longer in the planning and development stages, S11-10, Section V (issued January 22, 2021) is currently the controlling policy.

The proofs clearly show that the Acadis LMS has the capabilities required by ¶280. The documents produced chronicle the development status for in-service, recruit, and field training applications. Whether the system currently fully operates in the manner required by ¶280 is unclear. Notes recorded in the minutes of a March 5, 2021 IST/Envisage Project Status meeting accentuate this concern.

Further, relative to API integration, "The project team noted that further delays in receiving feedback on the API integration with Clarity's LMS scheduler might force Envisage to postpone its delivery until a later release." Relative to scheduling future in-service classes in Acadis, "The group confirmed that CPD's new leadership team had not yet had an opportunity to evaluate an earlier decision not to schedule future In-Service classes in Acadis." These points raise concerns about the status of Full implementation. Secondary compliance requires the CPD to use a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training. The CPD has developed policies for the Education and Training Division to use the system as required. Full compliance requires CPD's continuous and ongoing use of a centralized electronic system for scheduling and tracking all CPD training and the Education and Training Division effectively plans and manages training schedules and instructor assignments for all training using this system.

These notes cast doubt on whether Acadis is being used for all CPD training, as required. There is no production document certifying that Acadis' capabilities are being fully used to comply with ¶280. Therefore, neither Secondary nor Full compliance requirements are met.

---

[127] During our discussions with the City and CPD, we noted that revised version of S11-10 should clarify that a centralized electronic system must be used to schedule and track *all* CPD training. It is our understanding that the City and the CPD have agreed to make this clarification.

# Training: ¶282

**282.** *All CPD training instructors must be appropriately qualified for their instructional roles and use only approved curricula and lesson plans. CPD will actively recruit and retain qualified instructors to ensure that CPD has sufficient qualified instructors to meet the needs of the Department and requirements of the Training Plan.*

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

During the previous reporting period, the CPD produced Special Order S11-10, *Department Training Records Maintenance Program*, which addressed a few facets of instructor qualifications. For example, Section 2(J) of the special order states that "all instructors must receive approval from the Illinois Law Enforcement Training and Standards Board (ILETSB) in order to teach certified ILETSB courses." The CPD also submitted Notices of Job Opportunities (NOJOs) for several types of instructors, including instructors for officer wellness, community policing, and procedural justice. We found that the CPD did not achieve Preliminary compliance because the IMT did not find that the CPD clearly articulated what qualifications are required for officers to be considered "qualified instructors." We explained that the CPD has made progress as they work to address the Consent Decree requirements in the most efficient path forward.

To assess compliance during the current reporting period, we reviewed the *2021 Training Plan*; current and draft Training Directives S11-10, S11-10-01, and S11-11; and FRD Decentralized Instructor Training.

The Training Plan contains several sections that provide instructor training resources. They include the following:

Section VI. F. Career Development and Officer Wellness

*The Instructor Development Unit conducts initial and refresher training on effective teaching methods, adult learning techniques, curriculum development, and other tools and skills to enhance instructor training knowledge and delivery.*

Section VII. Goals and Priorities

> *Develop a system to evaluate training effectiveness, identify areas that need reinforcement, and to improve the quality of future curricula and instruction.*

VII. A. Instructor Training, VII. B. Training Evaluation
IX. E. Instructor training
XII. Training Resources

A revised draft S11-10 Section (II)(J) has requisite Policy Methodology language for Preliminary compliance, because it mirrors the language in ¶282. Furthermore, this policy has not been finally approved as of end of the fourth reporting period. Therefore, Preliminary compliance is not met.

While CPD provides a myriad of instructor training resources, it has not spelled out in policy what "appropriately qualified" entails. The CPD provides an instructor training class on how to construct proper lesson plans. Secondary compliance requires report or instructor credential review, as an audit during the last reporting period showed that fewer than half of CPD's instructors had attended the CPD's instructor training.

As stated in our last report, the CPD must have a strategy to determine and review appropriate instructor qualifications and ensure they use only approved lesson plans and curricula; the CPD has instructor recruiting and retention strategy to ensure there are sufficient qualified instructors to meet CPD needs and Training Plan requirements; this policy or procedure should include required qualifications for instructors.

Full compliance requires CPD systematically determine and review appropriate instructor qualifications and ensures instructors use only approved lesson plans and curricula. The CPD's periodically refined instructor recruiting and retention strategy must ensure there are sufficient qualified instructors to meet CPD needs and Training Plan requirements.

# Training: ¶283

**283.** *As appropriate to accomplish the requirements and goals of this Agreement, CPD will incorporate experts and guest speakers to participate in the development and instruction of relevant courses, as feasible, practical, and appropriate, including, but not limited to: a. CPD members of all ranks; b. members of the community; c. legal and law enforcement professionals, such as judges, prosecutors, and public defenders; d. crime victims; and e. subject matter experts.*

---

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

In the last reporting period, we provided a status update for ¶283. We acknowledged that the Education and Training Division sought input from CPD members, community members, collective bargaining units, the Force Review Division, the Bureau of Internal Affairs, Legal Affairs Division, Labor Relation Division, oversight entities, including the Civilian Office of Police Accountability (COPA), the Deputy Public Safety Inspector General (PSIG), and the Police Board in developing the needs assessment.

The City and the CPD has now met Preliminary compliance with this paragraph. To assess this paragraph for the fourth reporting period, we reviewed the *2021 Training Plan* (Appendix G); Training Directives S11-10, S11-10-01, and S11-11; and FRD Decentralized Instructor Training. Training directive S11-10 Section IV(A)(3) has the requisite language for Preliminary compliance.

Training Plan Appendix G references additional non-CPD resource personnel. Appendix G establishes that the CPD has sought and procured the assistance of several outside "experts" and guest speakers. Appendix G displays their name, organization affiliation, role, course/topic, and the CPD submitter. No documents are included in the submission that establishes the evaluation process used to determine the appropriate "experts," the procurement or selection process or the extent of their contribution to each course. CPD has not articulated or enacted processes to hire, retain, evaluate, and terminate outside experts and guests, nor has it established a criterion for the selection and retention of the same. The CPD should include these steps in the controlling policy to reach Secondary compliance. Full compliance will require that the CPD sufficiently evaluate and acquire experts

and guests to initially and periodically develop and instruct courses in accordance with requirements.

# Training: ¶284

*284. CPD will require that all new and current Education and Training Division instructors and curriculum developers are certified by the Illinois Law Enforcement Training and Standards Board and, as appropriate to their roles, receive initial and annual refresher training on subjects including, but not limited to, effective teaching, adult-learning techniques, and curriculum development. CPD will further require that instructors are trained in the specific subject matter they are assigned to teach and are also cross-trained in other related subjects so that they are equipped to deliver effective interdisciplinary instruction. Instructor training will also include peer review.*

## Compliance Progress            (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance during this reporting period.

During the last reporting period, we reviewed documents that list the CPD instructors who have received Illinois Law Enforcement Training and Standards Board (ILETSB) instructor training and additional CPD instructor courses. However, we could not discern from the documents which instructors were certified by the Illinois Law Enforcement Training and Standards Board and whether there are new or current instructors who have not attempted or met instructor training requirements of this paragraph.

During this reporting period, the CPD did incorporate ¶284 language into draft policy S11-10 Sections II(J) and III(F)(4). Because this policy was proposed and not finalized as of the end of the fourth reporting period, the City and CPD have not achieved Preliminary compliance. The City and the CPD did not provide additional or clarifying productions for Secondary compliance. These documents are required to attest to Secondary compliance status which includes implementing a plan to ensure all instructors are ILETSB certified. Full compliance will require Secondary compliance status and all instructors certified according to ¶284 standards on an ongoing basis.

# Training: ¶287

**287.** *Pursuant to its Training Plan, CPD will develop and implement a process that provides for the collection, analysis, and review of course and instructor evaluations to document the effectiveness of existing training and to improve the quality of future instruction and curriculum. This process will include member feedback on the training they have received and analysis of the extent to which such training is reflected in how members perform. The Education and Training Division will consider this information in conducting its annual needs assessment.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In the previous reporting period, we assessed the City's and the CPD's compliance with ¶287 for the first time. We noted that Special Order 20-01, *Course and Instructor Evaluation* (S20-01), contained all of the requisite language of ¶287 except for requiring an "analysis of the extent to which such training is reflected in how members perform."

During this fourth reporting period, the City and the CPD provided the *2021 Training Plan* and current and draft Training Directives S11-10, S11-10-01, and S11-11 for proof of compliance.

The Purpose section of the Training Plan indicates:

> The Training Plan supports the measurement of training outcomes and effectiveness that helps improve the quality of future instruction and curriculum by identifying training activities that provide for the collection, analysis and review of course and instructor evaluations." Draft S11-10 IV(A)(7)(a) states "[t]he Needs Assessment Report is an annual, written report which identifies data collection and analysis pertaining to use of force reviews, discipline and civilian complaints, officer safety issues, <u>input from Department members and collective bargaining units, members of the community, recommendations</u>

> *from Department oversight entities, research of law enforcement best practices and changes in law, Department policy, Illinois Law Enforcement Training Standards Board requirements, and evaluations of training courses, instructors, and Field Training Officers.*[128]

Although some attempt is made to craft the necessary language into a policy statement, none of the documents produced contained the requisite language for Preliminary compliance.

---

[128]   The draft of S11-11 III(A)(1)(a) (issued May 13, 2021) uses essentially the same language.

# Training: ¶288

***288.** The Education and Training Division will develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

The City's and the CPD's compliance with ¶287 is undergoing its initial assessment during this reporting period. The CPD did not attain Preliminary compliance during this review period.

The CPD provided the following compliance proofs for this paragraph:

- Acadis meeting notes pertaining to warehousing evaluations and reviews

- Training Oversight Committee minutes

During this review period, we reviewed the submissions for plans and controlling policies for the Education and Training Division to develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs. These records indicate that the Acadis LMS has the capacity to provide a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials." However, no controlling policies substantiating Preliminary compliance were submitted. Moving forward, the IMT looks forward to reviewing CPD policy that reflects the requirements of ¶288.

To assess Secondary compliance, we will review policy, procedure, plans, and processes to determine whether the Education and Training Division has established a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs. Full compliance can be demon-

strated when the Education and Training Division has fully developed and implemented a process that maintain audits, reviews, assessments, or evaluates the sufficiency or effectiveness of the training programs.

# Training: ¶289

> **289.** *CPD will develop and implement testing policies and procedures to ensure that any member testing that is administered is reliable and fair. To achieve this purpose, both knowledge-based and performance-based tests will be designed, developed, administered, and scored according to best practices. All tests will assess the knowledge and skills required for successful job performance and will align with the materials delivered in training.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

This is the first time we have assessed the City and the CPD's compliance with ¶289. Ultimately, they did not reach Preliminary compliance.

To assess Preliminary compliance, we expects to review CPD policy, procedure, plans and processes that develop testing policies and procedures consistent with the requirements of the paragraph. The CPD did not produce any compliance proofs for this paragraph by the submission deadline. As a result, Preliminary compliance is not achieved.

For Secondary compliance assessment IMT expects to review policy, procedure, plans and process and testing materials. This review would allow IMT to determine if CPD has established a process to ensure that testing that is administered is reliable and fair, and uses both knowledge-based and performance-based tests that are designed, developed, administered, and scored according to best practices; that all tests are designed to assess the knowledge and skills required for successful job performance and align with the materials delivered in training. The IMT looks forward to working with CPD in the next reporting period to receive and assess compliance documents.

# Training: ¶290

**290.** *CPD will develop, implement, and utilize a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. This system will, at a minimum: a. maintain training records for each member of the Department; b. record the course description, duration, curriculum, date, location, and the members who completed the training; and c. identify members who did not complete required training and describe remedial training actions that were taken.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *Not in Compliance*
**Secondary:**     *Not in Compliance*
**Full:**     *Not Yet Assessed*

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In the fourth reporting period, we assessed the City and the CPD's compliance with ¶290 for the first time. They did not meet Preliminary compliance.

We reviewed proposed draft policy S11-10 (issued May 14, 2021), the Training Plan, and Acadis meeting notes. The notes indicate the Acadis LMS has the capacity to provide a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials." Additionally, draft S11-10 Section VI(A)(B) has some of the required ¶290 language but fails to address the following:

> This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. . . .

> *This system will, at a minimum: a. maintain training records for each member of the Department; b. record the course description, duration, curriculum, date, location, and the members who completed the training; and c. identify members who did not complete required training and describe remedial training actions that were taken. . . .*

Preliminary compliance requires these missing policy requirements.

We also reviewed the submissions for plans and controlling policies for the Education and Training Division to develop and implement a process to maintain audits, reviews, assessments, or evaluations of the sufficiency or effectiveness of the training programs. The notes indicate the Acadis LMS has the capacity to provide a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. Acquisition and implementation of this technology is a major step forward for CPD and should facilitate compliance with this and several other paragraphs.

Secondary compliance can be demonstrated by meeting Preliminary compliance then depicting the system's deployment and usage as consistent with 290 requirements. Full compliance can then be demonstrated by adopting 290 requirements into the systematic Education and Training Division workflow processes for consecutive review periods and on an ongoing basis.

# Training: ¶291

> **291.** *The Education and Training Division will document all training provided to or received by CPD members, whether required or not. Members will sign an acknowledgement of attendance or digitally acknowledge completion of training.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did achieve Preliminary compliance during this reporting period. During this reporting period, we assessed the CPD's compliance with ¶291 for the first time.

In January 2021, the CPD implemented S11-10-01, *Training Notification and Attendance Responsibilities*. At the end of the fourth reporting period, the CPD was undergoing additional revisions to S11-10-01, but the January 2021 version is sufficient to achieve Preliminary compliance. To maintain Preliminary compliance, the forthcoming version of S11-10-01 must sufficiently address the requirements of ¶291.

The CPD also submitted Acadis meeting notes as proofs of compliance with ¶291. The notes indicate the Acadis LMS has the capacity to provide a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members, including curricula, lesson plans, training delivered, member feedback, assessments, and other training materials. Acquisition and implementation of this technology is a major step forward for CPD and should facilitate compliance with this and several other paragraphs.

We anticipate training, attendance, and other records documents in subsequent reporting periods to assess Secondary compliance. This review will determine if CPD has sufficiently established a process to document all CPD training. In our assessment for Full compliance, we expects to review policy, procedure, training records, and training attendance records to determine if CPD is sufficiently documenting all CPD training in accordance with paragraph requirements.

# Training: ¶292

> ***292***. *The Education and Training Division will, on an annual basis, report on training to the TOC and the Superintendent. At a minimum, this report will: a. contain a description of each course, including a summary of the subject matter; b. state the duration, date, location, and number of persons by rank who completed the training; c. identify whether the training was part of the recruit, in-service, or pre-service promotional training program; d. state whether the training was centralized or decentralized, and delivered in person or through electronic means; e. list whether the training was mandatory, elective, or remedial; and f. document the members who did not complete required training and any remedial training actions taken.*

**Compliance Progress**　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | | |
|---|---|---|---|
| **Deadline:** | May 3, 2021* | ✓ Met | ☐ Missed |
| | *Extended from February 28, 2021, due to COVID-19 | | |
| **Preliminary:** | *Not in Compliance* | | |
| **Secondary:** | *Not in Compliance* | | |
| **Full:** | *Not Yet Assessed* | | |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In the third reporting period, we assessed the City and the CPD's compliance with ¶292 for the first time. The CPD had not crafted a policy or a directive mandating the production of this annual report. The IMT reviewed the Education and Training Division's *Annual Activity Report* for calendar year 2019. The report was addressed to the Superintendent but did not include the Training Oversight Committee, as required by ¶292. Likewise, none of the subparagraphs (a–f) were sufficiently addressed in the *Annual Activity Report.*

The City and the CPD have not reached Preliminary compliance with this paragraph. We commend them for their efforts to organize the large volume of information required to demonstrate compliance with this paragraph. During this reporting period, the IMT reviewed current and draft Training Directives S11-10 and S11-11, Training Oversight Committee minutes, a transmittal letter to the Superintendent and the *2020 Annual Training Report* to assess compliance. The report was presented to the Training Oversight Committee and the Superintendent by the extended deadline. While the draft S11-10 Section IV(A)(7)(c) has the required language for Preliminary compliance, however, this draft policy has not yet been finally approved. Draft S11-11 further binds the Training Oversight Committee to review the report.

Paragraph 292(b) requires that training dates be documented. While the Streaming Video schedule is easily discernible, dates or even date ranges for most of the courses in the *Annual Report* are not provided. Secondary compliance will require that the City and the CPD adhere to this and other requirements in ¶292.

# Training: ¶294

> **294.** *CPD will ensure that upon graduation from the Academy, recruits demonstrate a firm grasp of the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing. In order to do so, CPD will rely on appropriate evaluation tools to measure recruits' skills and qualifications.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have achieved Preliminary compliance during this reporting period.

In the previous reporting period, we assessed the City and the CPD's compliance with ¶294 for the first time.

In the third reporting period, the IMT reviewed several documents that to varying degrees provided some insight into these questions. Those documents included the draft *2021 Training Plan*, the Basic Recruit Procedural Manual, and the Physical Skills Unit Rules and Regulations. The IMT found that "notwithstanding the CPD's progress toward establishing policies that guide and examine recruits' knowledge and skills, it is unclear to the IMT whether recruit expectations are geared towards basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills. The material provided by the CPD did not include references to research and objective knowledge that support the CPD's rules and requirements for recruit behavior. The CPD should holistically consider whether they are addressing the specific needs of Chicago. The IMT recommended that the CPD achieve this goal by addressing all recruit requirements in one document. Further, the CPD must demonstrate the validity of its evaluation tools in determining recruits' firm grasp of requisite skills and qualifications upon graduation, as required by ¶294."

Under ¶294, the IMT assessed produced materials to determine whether they addressed the following three questions:

(1) What are the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing in Chicago?

(2) What evaluative tools does the CPD rely on to assess a recruit's grasp of these skills upon graduation?

(3) What is the validity, efficacy, and propriety of those tools in measuring recruits' skills and qualifications upon graduation?

The submissions this reporting period demonstrate that state rules and regulations dictate the basic technical and tactical skills, critical thinking, problem-solving, and interpersonal skills that form the basis for safe and effective policing in Chicago. The CPD submittals also demonstrate that written and practical exercises are used for evaluative purposes. The only remaining question is the validity, efficacy, and propriety of those tools in measuring recruits' skills and qualifications upon graduation.

Specifically, to assess compliance in this reporting period, the IMT examined the *2021 Basic Recruit Procedural Manual*, *Physical Skills Rules and Regulations Manual*, TSG S.O. 21-05 *Recruit Evaluations*, Exam Analysis Recruit Class 20-4A, Exam Questions Statistical Data 3 Sample Questions, Exam Totals Recruit Class 20-4A, Evaluation Form (Assailant Control Test, Impact Weapon Test, Resister Control Test, Crime Scene Ident. Final, Crimes In Progress, Crises Intervention, Integrated (#1-#5, #6A, #7, #8), BAO Worksheet, BAO Proficiency Exam, Recruit Inspection), 50 ILCS 705 Illinois Police Training Act, 50 ILCS 71 O PO Firearm Training Act, Section 1720 Physical Fitness Standards (Appendix A), Section 1720 Firearm Qualification Course-of-Fire, Section 1720.20 Minimum Requirements of the Trainee, Section 1720.30 School Standard and Requirements, and Section 1730.20 Officer's Responsibilities.

The documents produced clearly show that academy exam minimum scores are essentially established by state rules, as are many of the practical examination procedures. What is less clear is the validity of the instruments the academy uses to conduct the testing and what rules apply when test items don't perform well. The CPD submitted a standard test item analysis report on an exam that measured median and mean scores, standard deviation, high and low scores, response frequencies, point-biserial, and a reliability coefficient. Typically, a point-biserial of .15 or higher means the item is performing well and properly discriminating higher from lower performing students. Good items are usually .25 or higher. Negative point-biserials indicate a more significant problem with the item. Nonetheless, while this document shows a median test score of 88.80 on a 100 point scale, more than 60% of the questions have a point-biserials below .15. A valid testing instrument not only establishes a valid minimum passing score but it also has been established as an adequate tool for accurately measuring skills, qualification, and performance in that particular area.

The City and the CPD have achieved Preliminary compliance with this paragraph. The CPD has written the recruit requirements of ¶294 into policy TSG S.O. 21-05. Secondary compliance requires CPD to demonstrate the validity of its evaluation tools in determining recruits' firm grasp of requisite skills and qualifications upon

graduation, as required by ¶294. Full compliance can be achieved with sustained Secondary compliance and demonstrating that ongoing test item analyses and maintenance to ensure validity is maintained.

# Training: ¶295

**295.** *The Parties acknowledge that CPD, through its Recruit Curriculum Working Group, revised and updated the content and delivery of its recruit training curriculum in 2017. CPD will further modify the amount, content, and delivery of its recruit training to comport with its Training Plan and the requirements and goals of this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment during this reporting period. The City and the CPD did not achieve Preliminary compliance during this reporting period.

To demonstrate Preliminary compliance, we sought to review policy, procedure, training curricula, plans, and delivery modifying recruit training. CPD submitted the *2021 Training Plan* to demonstrate compliance with this paragraph.

The IMT reviewed the Training Plan. Training Plan Appendix B displays the 2020 Basic Recruit Curriculum Matrix. It indicates recruit training module and hours but otherwise is nonresponsive to ¶295 requirements. We could not identify any other segment of the Training Plan that in any way addresses ¶295 requirements. Consequently, Preliminary compliance is not demonstrated.

Secondary compliance will require CPD establish a verifiable process to modify recruit training. Policies, procedures, training curricula, plans, and delivery are among the document proofs CPD may submit. In assessing Full compliance, we will determine if CPD has sufficiently modified recruit training to align with requirements to training plan and ¶295 mandates.

# Training: ¶296

**296.** *CPD will ensure that the Academy is sufficiently staffed to effectively train recruits. CPD will further ensure that, except in extraordinary circumstances, courses are scheduled with sufficient advance time for instructors to be notified of the class and to properly prepare and deliver quality instruction.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment during this reporting period. The City and the CPD did not achieve Preliminary compliance.

To demonstrate Preliminary compliance, we sought to review policy, procedure, processes, staffing levels, training schedules, materials for instructors. CPD did not submit any documents or plans for ensuring adequate staffing levels in the academy to demonstrate Preliminary compliance with this paragraph. Therefore, Preliminary compliance is not achieved.

Assessing Secondary compliance requires reviewing policy, procedure, processes, staffing levels, training schedules, materials for instructors and other submissions to determine if the CPD has established a process to ensure adequate academy staffing levels. Full compliance can be achieved if policy, procedure, processes, staffing levels, training schedules, materials for instructors, communication/notification and other materials submitted demonstrate that the CPD maintains sufficient academy staffing levels and courses are scheduled with sufficient advance time in accordance with ¶296 requirements.

# Training: ¶297

**297.** *CPD will require end-of-course training evaluations of recruits that ensure they graduate with the requisite knowledge and skills to engage in policing activities safely, effectively, and lawfully.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In the previous reporting period, the IMT reviewed the draft *2021 Training Plan*, the *Basic Recruit Procedure Manual*, and *Physical Skills* documents for recruits. The IMT noted that the CPD had not provided a clear policy statement or documentation that substantiated that the CPD conducts an end-of-course skills evaluation.

To assess compliance in this reporting period, the IMT examined the *2021 Basic Recruit Procedural Manual*, *Physical Skills Rules and Regulations Manual*, TSG S.O. 21-05 Recruit Evaluations, Exam Analysis Recruit Class 20-4A, Exam Questions Statistical Data- 3 Sample Questions, Exam Totals Recruit Class 20-4A, Evaluation Form (Assailant Control Test, Impact Weapon Test, Resister Control Test, Crime Scene Ident Final, Crimes In Progress, Crises Intervention, Integrated (#1-#5, #6A, #7, #8), BAO Worksheet, BAO Proficiency Exam, Recruit Inspection), 50 ILCS 705 Illinois Police Training Act, 50 ILCS 71 O PO Firearm Training Act, Section 1720 Physical Fitness Standards (Appendix A), Section 1720 Firearm Qualification Course-of-Fire, Section 1720.20 Minimum Requirements of the Trainee, Section 1720.30 School Standard and Requirements, and Section 1730.20 Officer's Responsibilities.

The documents produced clearly show that academy exam minimum scores are essentially established by state rules as are many of the practical examination procedures. Multiple exams are administered throughout the academy process. Scores are compiled and averaged. According to the basic Recruit Procedural Manual Rules and Regulations 7-1, "All Recruits are required to achieve a cumulative academic average of 70% for the academic examinations throughout the training program." According to 7-17, State Comprehensive Certification Examination, "Recruits who successfully complete their training and maintain an acceptable notebook are required to take and pass a State Certification Examination. This comprehensive examination will only be administered to Recruits who have been certified by the Deputy Chief of the Training and Support Group as having met all of the

requirements and have successfully passed the Basic Recruit Course with an average minimum score of 70%."

The CPD has not provided, however, a clear policy statement or documentation that substantiates that the CPD conducts an end-of-course skills evaluation, as well as the State knowledge/certification test. That policy is required to demonstrate Preliminary compliance with this paragraph. Secondary compliance requires constructing and administering a validated end-of-course knowledge and skills evaluation to ensure they can police safely, effectively, and lawfully. Full compliance can be achieved when end-of-course evaluations demonstrate efficacy in identifying recruits with the requisite knowledge and skills to engage in policing activities.

# Training: ¶299

> **299.** *CPD will revise, as necessary and appropriate, the Field Training and Evaluation Program to comport with CPD's Training Plan and this Agreement.*

## Compliance Progress　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**　　*In Compliance* (NEW)
**Secondary:**　　*Not in Compliance*
**Full:**　　*Not in Compliance*

This paragraph is undergoing its initial assessment during this reporting period. Preliminary compliance is achieved.

To demonstrate Preliminary compliance, we sought to review policy, procedure, plans and other submissions for reviewing and revising the Field Training and Evaluation Program. CPD submitted the following documents or plans for reviewing and revising the Field Training and Evaluation Program to demonstrate Preliminary compliance with this paragraph.

- Documentation of any revisions of the Field Training and Evaluation Program to comport with Training Plan;

- Training Plan's section on Field Training Officer/Probationary Police Officer Surveys;

- 2020 Annual Field Training and Evaluation Program Training Oversight Committee Report;

- *Field Training and Evaluation Program*, S11-02

S11-02 Section VI(F) states that "Periodic revisions to the Field Training and Evaluation Program will be made based on the CPD's annual Needs Assessment Report, the CPD Training Plan, the Annual Training Summary Report, and recommendations from the Training Oversight Committee." This policy statement brings the CPD into Preliminary compliance with this paragraph. While this policy declares revisions will occur, it does not articulate the process through which revisions will systematically occur.

According to the *2021 Training Plan* Section VII(A), "The Field Training and Evaluation Program (FTEP) made modifications in 2020 and will continue to evaluate efficacy in 2021." It documents the following changes were made:

- Department directives S11-02 Field Training and Evaluation Program was divided into two separate orders: S11-02, *Field Training and Evaluation Program*, and S11-02-01, *Field Training Evaluation Review Board*.

- Surveys of Field Training Officers were conducted to provide feedback regarding the quality of the Field Training and Evaluation Program and surveys were conducted with Probationary Police Officers to receive confidential feedback regarding their training. The online surveys were started in 2020 in Qi for Probationary Police Officer Feedback.

- The Field Training and Evaluation Program had a Tableau Dashboard created to assist them in tracking Daily Observation Reports for each Probationary Police Officer.

- The Bureau of Patrol also provided direction to District Commanders regarding Field Training Officer to Probationary Police Officer 1:1 ratios.

Assessing Secondary compliance requires reviewing policy, procedure, plans, and other submissions to determine if CPD has established a process to review and revise the Field Training and Evaluation Program as necessary. Production documents clearly indicate that revisions were made based upon inputs from Field Training Officer and Probationary Police Officer surveys, the Bureau of Patrol and Field Training Evaluation Review Board actions. CPD should fully develop and document this process and include it in S11-02 or another appropriate controlling policy. Secondary compliance is close but not yet achieved.

Full compliance can be achieved if policy, procedure, plans, training plans, and other Field Training program documents demonstrate that the CPD has sufficiently and systematically reviewed and revised Field training and evaluation program in accordance with ¶299 requirements.

# Training: ¶300

***300.*** *The Field Training and Evaluation Program will follow recruit training and be at least 12 weeks in duration and include at least three training cycles. The Field Training and Evaluation Program will not designate probationary police officers ("PPOs") as "field qualified," as defined by this Agreement, until they have successfully completed the entire program.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not meet Preliminary compliance with ¶300. However, the CPD has made significant progress in advancing towards Preliminary compliance

To meet Preliminary compliance, CPD must have established a policy to memorialize the requirements of ¶300. Additionally, the CPD must demonstrate that the policy, procedure, processes, and measures are clearly documented. The IMT reviewed Special Order S11-02 *Field Training and Evaluation Program* but is awaiting a Field Training and Evaluation Standard Operating Procedure which establishes the essential process and measurable requirements for Field Qualification.

CPD submitted a draft Special Order S11-02 *Field Training and Evaluation Program* to the IMT during this rating period. The policy's effective date is May 27, 2021. Section III delineates the field-qualified officer, which is aligned with the requirements of ¶300. Special Order S11-02 states that an officer is field-qualified until after the probationary police officer has completed all cycles required in the Field Training and Evaluation Program. Section VIII. A. 2. Also memorializes the 12 week requirement, including 3 training cycles. The procedural requirements are not contained within the policy.

Significant progress has been made and the CPD is moving towards Preliminary compliance. The IMT awaits review of the additional standard operating procedure. Upon review, the CPD may meet Preliminary compliance if the information in the documents clearly articulates CPD's methods and measures for obtaining Field Qualification.

To meet Secondary compliance, the CPD must demonstrate that it has implemented the approved policy, directive, and standard operating procedure. The

Field Training and Evaluation Program training records should correspond with policy and procedural requirements. Full compliance is met when consecutive and ongoing periods of Secondary compliance are sustained.

# Training: ¶303

> ***303***. *FTOs will receive initial and refresher training that is adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum. FTOs will receive refresher training on an annual basis as part of the In-Service Training Program outlined in this Agreement. FTOs will be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of PPOs.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**    May 3, 2021*     ☐ **Met**   ☑ **Missed**
            *Extended from February 28, 2021, due to COVID-19
**Preliminary:**    *Not in Compliance*
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

The City and the CPD have not met Preliminary compliance with this paragraph.

In the previous reporting period, we assessed the City's and the CPD's compliance with ¶303 for the first time. At the end of the previous reporting period, the City and the CPD missed the applicable deadline and did not reach Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the CPD has incorporated the requirements of ¶303 into a written policy. The IMT did not receive sufficient evidence that field training officers received the requisite initial and refresher training—"adequate in quality, quantity, scope, and type, and that addresses subjects including, but not limited to management and mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum"—in the third reporting period.

To demonstrate compliance with ¶303, the City and the CPD provided the draft *2021 Training Plan*; draft Training Directives S11-10, S11-10-01, and S11-11; and the Refresher Revised Lesson Plan. S11-10 Section III(F)(2) mandates annual Field Training Officer in-service training. The IMT also assessed Special Order S11-02, *Field Training and Evaluation Program (FTEP),* that the CPD submitted this rating period. Section VIII.B.1 includes a portion of ¶303 requirement that "FTOs will receive initial and refresher training including, but not limited to management and

mentoring, community policing, effective problem-solving techniques, ethics, diversity, field communication, and any recent substantive changes made to the recruit training curriculum." Unfortunately, the Field Training and Evaluation Program policy does not clearly articulate that initial and refresher training, including courses mentioned in the policy, should be adequate in quality, quantity, scope, and type.

Special Order S11-02 Field Training and Evaluation Program Section VIII.B.2 addresses the IMT's concern provided in the last monitoring report that highlights the absence of any policy that ensures Field Training Officers will be promptly notified of any substantive changes to policies and practices that affect their roles as mentors and trainers of Probationary Police Officers. S11-02 Field Training and Evaluation Program Section VIII.B.2 states that the Deputy Chief, Training and Support Group, will ensure that Field Training Officers are notified of any changes or revision to the Field Training and Evaluation Manual.

Preliminary compliance is not met due to the failure to fully and accurately track ¶303 language as a policy statement. Additionally, no section of the lesson plan appears to address recent substantive changes made to the recruit training curriculum, as would be required for Secondary compliance. Full compliance can be achieved when Field Training Officers routinely receive required initial and refresher training and the CPD has fully incorporated all requirements of ¶303.

# Training: ¶304

**304.** *FTOs will be required to maintain and demonstrate their proficiency in managing and mentoring PPOs, as well as modeling and teaching, by their example, procedural justice, de-escalation, impartial policing, and community policing. The Education and Training Division will maintain documentation of the training of FTOs. The Bureau of Patrol will maintain documentation of the evaluations of FTOs.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD did not achieve Preliminary compliance this reporting period.

To meet Preliminary compliance, the CPD must demonstrate that its plans and policies for evaluating Field Training Officer proficiency in managing and mentoring Probationary Police Officers aligns with ¶304 requirements. The plans and policies must also adequately provide instructions to teach key principles and maintain documentation of Field Training Officer training and evaluation.

The IMT assessed Special Order S11-02, *Field Training and Evaluation Program (FTEP)*. Upon review, Section VIII(B)(2)(b)-(c) of the Field Training and Evaluation Program policy memorializes some of the requirements in ¶304 by stipulating that Field Training Officers mentor assigned Probationary Police Officers and teach by example, emphasizing procedural justice, de-escalation, impartial policing, and community policing. However, there was no clear language requiring the Bureau of Patrols to maintain documentation of the evaluations of Field Training Officers.

Although there is no clear policy statement that requires the Bureau of Patrol to maintain documentation of the evaluations of Field Training Officers, Special Order S11-02 Section IX.C requires the submission of all post-field-qualified evaluations to the Bureau of Patrol. Additionally, Special Order S11-02 Section VIII(I)(7) highlights the duties and responsibilities of the Bureau of Patrol within the Field Training and Evaluation Program, which includes checking for concerning comments of Field Training Officer performance and sharing feedback with the Training and Support Group, the Training Oversight Committee and as necessary to Field Training Officers and Field Training Officer supervisors.

On the other hand, the CPD clearly memorializes in Special Order S11-02 Section VIII(J)(1) the requirement that the Education and Training Division will maintain documentation of the training of Field Training Officers.

We recommend that the CPD use clear and concise policy language that aligns with ¶304 requirements. Specifically, Special Order S11-02 should be amended to clearly state, "The Bureau of Patrol will maintain documentation of the evaluations of FTOs." There also is no requirement that Field Training Officers maintain and demonstrate their proficiency in managing and mentoring Probationary Police Officers, which is also necessary for Preliminary compliance.

Preliminary compliance also entails review of relevant training plans. The CPD submitted a revised *2021 Training Plan*. The Field Training and Evaluation section of the *2021 Training Plan* does not include any of the missing policy language absent from Special Order S11-02. Therefore, the CPD did not meet Preliminary compliance.

Preliminary compliance can be achieved once Special Order S11-02 is revised or another policy created or amended to incorporate the full scope of the requirements in ¶304, and the corresponding Standard Operating for how CPD plans to implement the requirements of this paragraph are aligned with this chapter requirements.

Looking ahead, to meet Secondary compliance, the CPD must demonstrate that it has sufficiently taken steps to evaluate Field Training Officer proficiency in managing and mentoring Probationary Police Officers, and maintain documentation of Field Training Officer training and evaluation. Full compliance requires sustained Secondary compliance.

# Training: ¶305

> **305.** *CPD will revise the Field Training and Evaluation Program to ensure that no more than one PPO is assigned to an FTO during each training cycle. The City will provide CPD with the necessary support and resources to designate a sufficient number of FTOs to meet the requirements of this Agreement. Officers performing FTO duties in a temporary capacity are considered FTOs under this Agreement so long as they meet the requirements set forth for FTOs in this Agreement, except for the selection requirements.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The CPD achieved Preliminary compliance with ¶305.

The IMT reviewed the following documents to evaluate compliance:

- *2021 Training Plan*

- Special Order S11-02 Field Training and Evaluation Program

- Acadis Learning Management System documentation

- Field Training Officer to Probationary Police Officer one-to-one ratio reports

- Training Directives

The *2021 Training Plan* Section VII(A) includes a Field *Training and Evaluation Program Modifications* subsection. This section lists four separate options that the CPD can utilize to ensure that the Field Training Officer and Probationary Police Officer ratio will remain one-to-one. The *2021 Training Plan* also includes an oversight function by instructing Watch Operations Lieutenants to notify the Field Training and Evaluation Section if a Probationary Police Officer is without their assigned Field Training Officer for more than two days. Additionally, CPD submitted a draft Special Order S11-02 Field Training and Evaluation Program to the IMT during this rating period. The policy's effective date is May 27, 2021. Section VII(C) memorializes the same process and requires "Act Ups" to have first completed initial Field Training Officer training and any later refresher training.

The *2021 Training Plan* Section VII(A) also lists the intention of the Field training and Evaluation Section to collaborate with Envisage to customize the Acadis® Readiness Suite to ensure that the CPD training records will be housed in the same electronic system. IMT also reviewed a document created by Envisage to illustrate how the capabilities of Acadis align with Consent Decree paragraphs. Under the "Training" tab is the following language:

> *Acadis facilitates every element of the training section of the Consent Decree. Training Plans, Training Development and Delivery, Instructor Selection and Development, Training Evaluation, Training Records, Recruit Training, Field Training and Evaluation Program, In-Service Training Program, Supervisory Training, and Training on the Consent Decree. Acadis provides CPD a "centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training." Acadis provides a centralized electronic file system for assessing the content and delivery of all CPD training, including training provided by outside instructors or non-CPD entities. This system will allow the Education and Training Division to electronically track and maintain complete and accurate records of all training provided to CPD members.*

Based on the above language, the Acadis® Readiness Suite appears sufficient to track all of the elements required under the Field Training and Evaluation Program. Specifically, the Acadis® Readiness Suite can facilitate all of the tracking and data requirements of the Field Training and Evaluation Program.

The Training Directives incorporate the requirements of this paragraph to demonstrate Preliminary compliance. CPD submitted three Training Directives, including Special Order S11-10 *Department Training,* Special Order S11-10-01 *Training Notification and Attendance Responsibilities*, and Special Order S11-11 Training Oversight Committee. The IMT reviewed these directives to determine whether the requirements of this paragraph are memorialized in the policies. These policies support operating a comprehensive training program, which allows the requirements of this Field Training and Evaluation Program paragraph to be implemented.

The Field Training Officer to Probationary Police Officer one-to-one ratio reports included assignments from the Bureau of Patrol, listing a schedule of Field Training Officers and Probationary Police Officers to demonstrate that the Bureau of Patrol is administering a concrete process to ensure the one-to-one ratio is consistently applied.

To meet Secondary compliance, all corresponding field training program documentation, including but not limited to, policies, lesson plans, and training plans must

demonstrate that all revisions are completed and implemented. Full compliance can be demonstrated when 1:1 Probationary Police Officer/Field Training Officer ratio sustained through consecutive training cycles and requirements of this paragraph are fully implemented.

# Training: ¶306

> **306.** *CPD will ensure that PPOs in the Field Training and Evaluation Program train with different FTOs during each of their training cycles.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**    *Not in Compliance*
**Full:**    *Not Yet Assessed*

This paragraph is undergoing its initial assessment during this reporting period. The City and the CPD have met Preliminary compliance.

IMT reviewed the following documents:

- Document illustrating that Probationary Police Officers have different Field Training Officers each cycle

- Acadis Learning Management System Field Training Officer Demo Video

- *Field Training and Evaluation Program* policy, S11-02

The CPD also submitted a "To-From-Subject" Bureau of Patrol order to illustrate the requirement that Probationary Police Officers have different Field Training Officers each cycle. The document is a scheduling directive for the month of April 2021 and provides a list of a Field Training Officer and their assigned Probationary Police Officer. The IMT reviewed the document for duplicative assignments; there were none.

Special Order S11-02 *Field Training and Evaluation Program* Section VIII(A)(3) mandates Probationary Police Officers will train with a different Field Training Officer during each training cycle, which is sufficient to achieve Preliminary compliance. However, despite this mandate, we did not receive a policy or standard operating procedure that detailed how this result will be methodologically achieved.

To achieve Secondary compliance, CPD must adopt and implement procedures that ensure compliance with this paragraph's requirements. The Field Training and Evaluation Program documentation must support and corroborate compliance actions. Full compliance requires sustained Secondary compliance.

Looking ahead, the IMT will review policies, processes, and training records to determine if CPD has sufficiently taken steps to evaluate Field Training Officer proficiency in managing and mentoring Probationary Police Officers, and maintain documentation of Field Training Officer training and evaluation.

# Training: ¶307

**307.** *CPD will ensure that PPOs awaiting assignment to an FTO will not be placed on assignments in the field without adequate supervision. CPD will track and document all instances of PPOs placed in field assignments prior to starting the Field Training and Evaluation Program.*

**Compliance Progress**                 (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**        *In Compliance* (NEW)
**Secondary:**         *Not in Compliance*
**Full:**                  *Not Yet Assessed*

This paragraph is undergoing its initial assessment during this reporting period. The City and the CPD met Preliminary compliance in this rating period.

To evaluate compliance, the IMT reviewed the following documents:

- Acadis® Learning Management System
- Special Order S11-02 Field Training and Evaluation Program

Special Order S11-02 *Field Training and Evaluation Program* includes language in Section VI.D., which details the process the Training and Support Group will employ to ensure that Probationary Police Officers awaiting assignment to an Field Training Officer will not be placed on assignments in the field without adequate supervision. Section VI.D. states:

> *The Training and Support Group will monitor and document all field assignments prior to PPOs starting the FTEP in the appropriate Department form, e.g. the Supervisor's Management Log (CPD 11.455) or the ICS-211 Incident Check-In (CPD 11.301). PPOs will not be placed on assignments in the Field without adequate supervision.*

The Acadis® Learning Management System has the capability to track and document all instances of Probationary Police Officers placed in field assignments prior to starting the Field Training and Evaluation Program. The Acadis Learning Management System document states:

> *Acadis provides CPD a centralized electronic system for scheduling and tracking all CPD training to allow the Education and Training Division to effectively plan and manage training schedules and instructor assignments for all training.*

To complete its compliance review, we expected to review a Field Training and Evaluation Standard Operating Procedure, and a Bureau of Patrol Directive to District Commanders and Area Deputy Chiefs reinforcing responsibilities of Supervisors when Probationary Police Officer has no Field Training Officer. Those documents were not received by the end of the reporting period.

To meet Secondary compliance, the CPD must demonstrate that the Field Training and Evaluation Program revisions are completed and implemented. An SOP and policy detailing methods and processes to achieve and sustain ¶307 requirements is needed. Sustained Secondary compliance will result in Full compliance.

# Training: ¶308

*308. The Field Training and Evaluation Program will continue to require that FTOs document PPO progress and performance each day in the Daily Observation Report, at the end of each of the first two cycles in the Cycle Summary Report, at the end of the third cycle in the Final Summary Report and, if necessary, at the end of any additional cycles in the Remedial Summary Report. FTOs will identify and document in those reports areas for PPO improvement.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**   *Not in Compliance*
**Secondary:**   *Not Yet Assessed*
**Full:**   *Not Yet Assessed*

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

To evaluate Preliminary compliance, the IMT sought to review all policies, training plans, and observation reports to ensure that Field Training Officers document Probationary Police Officers progress and performance as specified in the paragraph.

The IMT reviewed the following document submissions for proof of compliance:

- Acadis® Learning Management System
- Special Order S11-02 *Field Training and Evaluation Program*

As stated previously in this report, the Acadis® System document states that the System can facilitate every section of the training section of this agreement. IMT suggests that the CPD details how all forms and documents currently utilized under the Field Training and Evaluation Program will be integrated into Acadis®, if applicable.

Special Order S11-02 *Field Training and Evaluation Program* includes Section VIII.B.2.(e)-(h) and Section VIII.B.3. They delineate the process in which a Field Training Officer will utilize either a Daily Observation Report, Cycle Summary Report, Final Summary Report, or Remedial Summary Report. Except it does not require Field Training Officers identify and document in those repots areas for Probationary Police Officer improvement. With the exception of the last sentence in ¶308, Special Order S11-02 otherwise would meet the policy requirements of this paragraph.

Field Training Reports including Daily Summary Reports, Cycle Summary Report, Final Summary Reports and Remedial Summary Reports if applicable were not submitted by the end of the reporting period. The Field Training and Evaluation Standard Operating Procedure also has not been provided. The IMT cannot complete its review for Secondary compliance until it receives and assesses these documents.

Looking ahead, the CPD will meet Secondary compliance once it demonstrates that the Field Training Officer training on Special Order S11-02 is completed and a full training cycle is completed.

# Training: ¶309

**309.** *In each Cycle Summary Report, the FTO will assess whether the PPO should progress to the next cycle of training based on the PPO's performance and compliance with the Field Training and Evaluation Program standards.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed all produced policies, training plan, and observation reports to ensure that each Cycle Summary Report meets the requisite requirements of this paragraph.

The IMT reviewed the following documents:

- Special Order S11-02 *Field Training and Evaluation Program*
- Acadis® Learning Management System

Special Order S11-02 includes Section VIII(B)(1)(6) incorporates the IMT suggestion that the policy should address the specific training and progression of Probationary Police Officers as explained in ¶¶309–311. Section VIII(B)(2)(e)-(f) highlights that each Field Training Officer must evaluate the performance of the Probationary Police Officer using the Daily Observation Report except the last day of each cycle, when the Field Training Officer should utilize the Cycle Summary Report.

Although the policy instructs the Field Training Officer to document performance every day, it is unclear from the policy whether the Field Training Officer must make a determination to advance the Probationary Police Officer to the next cycle within the Cycle Summary Report. CPD must clearly prescribe the Cycle Summary Report contents and the information the Report should capture.

Assessment of Secondary compliance will require IMT review Field Training Reports, i.e. Cycle Summary reports, which were not submitted by the end of this reporting period. The City and the CPD will meet Secondary compliance when Field Training Officer training on policy is finalized and a full training cycle has completed with ¶309 required documentation. Full compliance can be realized when Field Training Officer training on policy and methodology is completed and multiple consecutive training cycles meeting these requirements are successfully completed.

# Training: ¶310

**310.** *A PPO must be deemed "field qualified" in order to complete the Field Training and Evaluation Program. For a PPO to be deemed "field qualified," all end-of-cycle reports must be completed by the FTO and reviewed and approved by the necessary supervisors.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD has not achieved Preliminary compliance.

To achieve Preliminary compliance, the CPD must demonstrate that plans and policies exist memorializing the requirement of this paragraph delineating Probationary Police Officers to be "field qualified" before completing the Field Training and Evaluation Program.

The CPD submitted for review Special Order S11-02, Section VIII(B)(1)(6). The policy does not incorporate the IMT suggestion that it should address the specific training and progression of Probationary Police Officers as explained in ¶309-¶311. There is no clearly defined process in which a Field Training Officer deems a Probationary Police Officer "field-qualified." Moreover, there is no reference to which supervisors are necessary to review and approve the Field Training Officer recommendation that a Probationary Police Officer become "field-qualified."

S11-02 does delineate what occurs when a Probationary Police Officer is not deemed "field-qualified," which is an important, but incomplete, procedure. The IMT recommends clearly defining how the Daily Observation Reports, Cycle Summary Reports, and Final Summary Reports should be assessed by Field Training Officers to make uniform recommendations to deem a Probationary Police Officer as "field-qualified" in the Field Training and Evaluation Program Standard Operating Procedures. Aligned with this thinking, the Remedial Summary Reports should also contain a uniform rubric to ensure that Probationary Police Officers are consistently deemed "field-qualified" through evaluation by the Field Training Officers and necessary supervisors.

To advance its Preliminary and Secondary compliance assessments, the IMT must review Field Training and Evaluation Program-related materials including Field Training Reports, including but not limited to, Cycle Summary Reports and Daily

Observation Reports. CPD must also provide finalized Field Training Officer and su-
pervisors training on policy, and training records demonstrating that 95% of eligi-
ble CPD members have been trained for at least a full training cycle. Full compli-
ance can be achieved when multiple consecutive training cycles meeting these re-
quirements are successfully completed.

# Training: ¶311

> ***311.*** *FTOs may recommend specific remedial field or classroom training for a PPO. Any recommendation for remedial training will be provided as promptly as possible to the necessary supervisors and must be documented in the PPO's training record, including, but not limited to, the Final Summary Report or Remedial Summary Report. Recommendations for remedial training must be reviewed by the necessary supervisors and, if approved, recommended training must be completed by the PPO before the PPO completes the Field Training and Evaluation Program.*

## Compliance Progress           (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

To meet Preliminary compliance, the CPD must demonstrate that its policies and plans ensure remedial training is provided promptly and is documented as required in the paragraph. The IMT assessed Special Order S11-02, Field Training and Evaluation Program, to determine Preliminary compliance with this paragraph.

The CPD submitted for review Special Order S11-02, Section VIII(B)1(6). The policy does not incorporate the IMT suggestion that it should address the specific training and progression of Probationary Police Officers as explained in ¶309–11. Section VIII.6(c) includes a 7-day requirement, if feasible, in which a Field Training Officer must notify the sergeant and designated district lieutenant when the Field Training Officer has not met the criteria to be deemed "field-qualified." Within the 7-day window, the Field Training Officer must also request that the Field Training and Review Board review the Probationary Police Officer's performance.

The policy details that the seven-day requirement allows the Bureau of Patrol the ability to allocate the proper resources to ensure the Probationary Police Officer is included in the next field-training cycle. The IMT agrees with the CPD's reasoning and has no objection to the seven-day requirement.

To advance our review for Preliminary and Secondary compliance, the CPD must also submit documents for requesting remedial training, and remedial training forms.

Secondary compliance additionally requires the CPD demonstrate that Field Training Officer and supervisors training on applicable policy is completed and all ¶311 requirements are met and maintained for a full training cycle. Full compliance may be demonstrated by multiple consecutive periods of sustained Secondary compliance.

# Training: ¶312

> **312.** *The Field Training and Evaluation Review Board, or other entity with similar responsibilities, will review a PPO's performance at the request of an assigned FTO or supervisor and have the power to recommend separation, re-training by the Academy, or additional field training. A request for review by the Board must be made, and the Board must convene, if a PPO is not deemed "field qualified" at the end of any remedial training cycle. The Field Training and Evaluation Review Board will provide all such referrals and recommendations for action to the Chief of the Bureau of Patrol.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

To demonstrate compliance with this paragraph, the CPD provided documents from Review Board deliberations, two Remedial Training Notifications, S11-02, and S11-02-01, *Field Training Evaluation Review Board*.

S11-02-01 Section (II)(B) grants the Field Training and Evaluation Review Board oversight of the FTEP. S11-02-01 Section (II)(C) states, "If a commanding officer requests a performance review of a PPO under his or her command, a Review Board may be convened to determine whether the PPO is adequately performing the functions of his or her assignment." ¶312 declares the Board "will" review a PPO's performance at the request…" Section V(F) grants the Board power to recommend separation, extension, or retraining. Section III(B) requires the Board "automatically convene if the recruit fails to become field-qualified after both his or her 1st and 2nd remedial cycles." ¶312 requires the Board convene "if a PPO is not deemed *field qualified* at the end of any remedial training cycle." S11-02-01 conflicts with ¶312 as explained above.

Review Board documents reflect concerns with Probationary Police Officer performance as documented by Field Training Officers and the Bureau of Patrol supervisors and commanders. Documents establish Review Board deliberations and decisions that are then forwarded through the Chief of the Bureau of Patrol to the Superintendent. The documents demonstrate that the CPD is meeting the requirements of this paragraph except the guiding policy directive is inconsistent with language required by this paragraph.

To meet Preliminary compliance, the CPD's plans and policies must require that the Field Training and Evaluation Review Board review a Probationary Police Officer's performance as required in this paragraph. Looking ahead to Secondary compliance, the CPD must demonstrate that Field Training Officer, supervisors and Field Training and Evaluation Program Review Board training on policy is finalized and this paragraph's requirements achieved for a full recruit training cycle. Full compliance can be ascertained when Field Training Officer, supervisors and Field Training and Evaluation Program Review Board training on policy and methodology is completed and multiple consecutive training cycles meeting these requirements are successfully completed.

# Training: ¶313

**313.** *CPD will create a mechanism for PPOs to provide confidential feedback regarding their field training, including the extent to which their field training was consistent with what they learned at the Academy; whether their FTOs did or did not provide effective guidance and instruction; and suggestions for changes to recruit training based upon their experience in the Field Training and Evaluation Program.*

**Compliance Progress**           (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In the previous reporting period, the CPD made progress toward compliance with ¶313. The CPD provided revised training evaluation programs but had not articulated a policy and a mechanism for confidential recruit feedback, as required by ¶313, to achieve Preliminary compliance.

During the current reporting period, the City and the CPD made further progress but still have not articulated a policy and a mechanism for confidential recruit feedback, as required by ¶313, to achieve Preliminary compliance.

The City and the CPD submitted for IMT review quarterly Probationary Police Officer surveys, the Field Training and Evaluation Program directive, *2021 Training Plan* and Training directives S11-10 *Department Training*, S11-10-01 *Training Notification and Attendance Responsibilities*, S11-02 Field Training and Evaluation Program, and S11-11 Training Oversight Committee. Policy S11-02, Section VIII(8) displays some the language required in this paragraph but fails to reach the threshold required for Preliminary compliance. The surveys demonstrate CPD's requirement that all Probationary Police Officers will critique the Field Training and Evaluation Program at the end of each training cycle and will be submitted to the Field Training and Evaluation Section confidentially.

The *2021 Training Plan* Section VII(A) *Field Training and Evaluation Program Modifications* includes the following:

> *Surveys of Field Training Officers were conducted to provide feedback regarding the quality of the Field Training and Evalua-*

> *tion Program and surveys were conducted with Probationary Police Officers (PPO) to receive confidential feedback regarding their training. The online surveys were started in 2020 in Q1 for PPO Feedback. . . The FTEP plans to utilize the results of surveys to PPOs and FTOs to make necessary adjustments to improve recruit, field, and FTO training.*

The IMT also reviewed Quarterly Probationary Police Officer Survey Responses to determine whether the surveys are aligned with the requirements of this paragraph, including whether the Surveys cover the extent to which their field training was consistent with what they learned at the Academy; whether their Field Training Officers did or did not provide effective guidance and instruction; and suggestions for changes to recruit training based upon their experience.

The Survey report only presents the most common responses extracted from the complete survey results and does not include any of the survey questions necessary to demonstrate Preliminary compliance. The IMT suggests submitting the Survey itself, in addition to the Survey responses.

Secondary compliance can be demonstrated by completion of Field Training Officer, supervisors and recruit training or orientation on policy and completion of a full recruit training cycle. The IMT will assess policy, training plans, Field Training and Evaluation Program-related materials, and data collection instruments rate Secondary compliance with the requirements of this paragraph. Multiple consecutive periods of sustained Secondary compliance will qualify for Full compliance.

# Training: ¶314

***314.** The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, aggregate PPO feedback on a quarterly basis; document their responses, including the rationale behind any responsive action taken or decision to take no action; and share such feedback with the TOC and, as necessary, FTOs and FTO supervisors.*

Compliance Progress                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

For this reporting period, to demonstrate compliance with this paragraph, the City and the CPD submitted *Training Directives*, the *2021 Quarter 1 Field Training Officer/PTO Survey Responses for May Training Oversight Committee* report, and the *2021 Training Plan*.

To meet Preliminary compliance with this paragraph, the City and the CPD must demonstrate that it has plans and policies to aggregate Probationary Police Officer feedback on a quarterly basis and document their responses as specified in this paragraph.

S11-02 Section VIII.A.8, tasks Probationary Police Officers with critiquing the Field Training and Evaluation Program by completing the Field Training and Evaluation Program Critique Survey and forwarding it directly and confidentially to the Field Training and Evaluation Section, Bureau of Patrol. Section VIII.I.7 further requires the Field Training and Evaluation Section, Bureau of Patrol to conduct and maintain documentation of the Field training and Evaluation Program Critique Survey, check for concerning comments on Field Training Officer performance, and share feedback with the Training Oversight Committee, and as necessary Field Training Officers and Field Training Officer supervisors. This policy fails to require quarterly aggregation and evaluation of the survey. It also fails to require including in its responses the rationale behind any responsive action taken or decision to take no action. It does not bind the Education and Training Division to comply with ¶314. These omissions alone keep the City and the CPD from attaining Preliminary compliance with the paragraph.

The Quarterly survey responses are meant to provide aggregate feedback to the Bureau of Patrol and serve as a mechanism for Probationary Police Officers to provide feedback regarding the Field Training and Evaluation Program.

The IMT also reviewed the *2021 Training Plan*. The *2021 Training Plan* Section VII(A), *Field Training and Evaluation Program Modifications,* does not include any of the required language for this paragraph.

To reach Secondary compliance status, the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy must be completed and a full recruit training cycle completed. Full compliance requires that the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy is completed; Probationary Police Officer feedback is reviewed, documented, and shared as specified in this agreement; and multiple consecutive full recruit training cycles are successfully completed meeting ¶314 requirements.

# Training: ¶315

**315**. *CPD will create a mechanism for FTOs to provide feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to FTO training, the PPO evaluation process, and recruit training. The Education and Training Division and Bureau of Patrol will review, consistent with their scope of responsibility within the Field Training and Evaluation Program, FTO feedback on a quarterly basis and, as necessary and appropriate, share such feedback with the Training Oversight Committee, FTOs, and FTO supervisors.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD has achieved Preliminary compliance during this reporting period.

In the previous reporting period, the CPD made progress toward compliance with ¶315. The IMT reviewed field training officer working group minutes, surveys, and evaluation materials. The Field Training and Evaluation Section established an email address for continual feedback about the Field Training and Evaluation Program in addition to preparing to conduct quarterly surveys.

For this reporting period, to demonstrate compliance with this paragraph, the City and the CPD produced Q2 2020 Field Training Officer surveys, Q1 2021 Quarterly Field Training Officer surveys, Field Training and Evaluation Program directive, Training Directives and the *2021 Training Plan*. The Quarterly surveys consist of 18 questions. These questions serve as a mechanism for Field Training Officers to provide feedback regarding the quality of the Field Training and Evaluation Program, including suggestions for changes to Field Training Officer and recruit training. There are no questions that directly solicit feedback regarding the Probationary Police Officer evaluation process. S11-02 Item VIII-J-6, tasks the Training and Support Group with conducting Field Training Officer surveys and sharing Field Training Officer feedback quarterly with the Training Oversight Committee, Field Training Officers and Field Training Officer supervisors, as required by ¶315. This policy brings the City and the CPD into Preliminary compliance with the paragraph. Staff must be trained on the policy.

Several additional proofs are required to demonstrate Secondary compliance. CPD produced just two quarterly surveys. More substantive questions soliciting feedback on Probationary Police Officer evaluations are needed. Field Training Officer

surveys from each previous and contiguous quarter are needed to demonstrate the quarterly feedback is captured as required. Proofs that the Education and Training Division and the Bureau of Patrol have reviewed each quarter's feedback and shared, as appropriate with the Training Oversight Committee, Field Training Officers and Field Training Officer supervisors. Full compliance can be demonstrated by the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy is completed and multiple consecutive full recruit training cycles successful completed as required.

# Training: ¶316

**316.** *The TOC will annually review the Field Training and Evaluation Program and consider best practices in this area as well as feedback and recommendations from FTOs and PPOs. Additionally, the TOC will review referrals and recommendations by the Field Training and Evaluation Review Board to the Bureau of Patrol. Based on this information, the TOC will recommend to the Superintendent the implementation of any appropriate changes to policies or procedures related to the Field Training and Evaluation Program.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | | |
|---|---|---|---|
| **Deadline:** | May 3, 2021* | ☑ Met | ☐ Missed |
| | *Extended from February 28, 2021, due to COVID-19 | | |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) | | |
| **Secondary:** | *Not in Compliance* | | |
| **Full:** | *Not Yet Assessed* | | |

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

The City and the CPD met Preliminary compliance with ¶316 during the third reporting period. The CPD's Special Order 11-11, *Training Oversight Committee*, established the Preliminary compliance requirements of ¶316.

During the previous reporting period, the CPD also made efforts toward Secondary compliance. The IMT reviewed a PowerPoint Presentation from the December 15, 2020 Training Oversight Committee Meeting; the *Field Training and Evaluation Program 2020 Annual Review*; notes from a February 6, 2020 meeting between the CPD's Field Training and Evaluation Section and the New York Police Department's Field Training Section; and notes from a January 24, 2020 meeting between CPD's Field Training and Evaluation Section and representatives from Agency360, a company that developed field training software.

This reporting period, the City and the CPD maintained Preliminary compliance with this paragraph, but did not meet Secondary compliance within this reporting period.

The CPD submitted a revised S11-02 Field Training and Evaluation Program policy, effective May 27, 2021. The IMT reviewed the policy to determine whether the CPD incorporated the IMT's recommendation to document the Field Training and Evaluation Review Board's referrals and recommendations that are provided to the

Bureau of Patrol and to the Superintendent, as required. There was, however, no reference to IMT's recommendation.

Some additional documents may assist in fully assessing Secondary compliance. The anticipated Field Training and Evaluation Standard Operating Procedure and the Field Training and Evaluation Program Directive was not submitted before the end of this reporting period. Upon review, the IMT will continue to assess for Secondary compliance and looks forward to working with the City and the CPD to achieve Secondary compliance with ¶316. Secondary assessment will include annual reviews and recommendations provided to the Superintendent. Field Training and Evaluation Program Review Board, the Education and Training Division, the Bureau of Patrol, Field Training Officers, Field Training Officer supervisors, and Training Oversight Committee training or orientation on policy must be completed and a full annual training cycle completed. The CPD must produce documentation substantiating the referrals and recommendations received. Full compliance will require sustained Secondary compliance over multiple training cycles.

# Training: ¶317

**317.** *Regular in-service training is critical to ensure that CPD officers continue to hone important policing skills and remain up-to-date on changes in the law, CPD policy, technology, community expectations, and developments in best practices. In-service training should, as appropriate, reinforce CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the previous reporting period, we assessed the City's and the CPD's compliance with ¶317 for the first time, and they met Preliminary compliance.

To assess Preliminary compliance, the IMT reviewed whether the CPD has written the requirements of ¶317 in policy. The CPD's Special Order S11-11, *Training Oversight Committee*, clearly notes the responsibilities of ¶317. Specifically, S11-11 requires the Training Oversight Committee to provide overarching oversight in Section III(A)(5), (7), and (8). These sections state that the Training Oversight Committee must oversee "the development and implementation of recruit, field, in-service, and pre-service promotional training curricula and lesson plans" and "the integration of" important concepts, such as procedural justice and de-escalation across training curricula. S11-11 was issued 13 May 2021 and became effective the same date, allowing continued Preliminary compliance with this paragraph.

During this reporting period, the CPD produced a Response to IMT/OAG comments on 30 Dec 2020 carbine training, 2021 Officer Wellness In-Service Course, the 2021 Use of Force In-Service course and the draft *2021 Training Plan* to demonstrate compliance with this paragraph. Principles of procedural justice, de-escalation and other important concepts are infused into the Carbine Operator training,

The initial review of the CPD's response to the IMT's and the OAG's comments on December 30, 2020 carbine training did not align with the goal of this paragraph, nor did it address the IMT comments. The IMT recommended that the training include meaningful instruction on the requirements of this paragraph to include more than instructors emphasizing the CPD's commitment to impartial policing during all segments of live-fire drills that may include target assessment and discrimination." In response, the CPD added an additional instructor's note. The note includes a requirement to state that decision making in live-fire should not be made based on race, color, or any other protected class category. The instructors

note is not sufficient as it wasn't clear whether the training included scenario-based elements within live-fire drills that consider impartial decision-making.

Upon review of the updated carbine training lesson plan, the CPD adequately incorporated all of the IMT's and the OAG's recommendations in its responses to the IMT's and the OAG's comments on the March 10, 2021 carbine training. The Carbine lesson plan introduces procedural justice as a functional, life-saving technique and as a tool to protect the lives of everyone. The guiding principles of the Carbine training includes applying procedural justice in all encounters with the community, regardless of the type of encounter. The course also includes a refresher training on de-escalation techniques and force mitigation, and examples and scenarios regarding community policing and impartial policing activities and strategies.

The IMT also reviewed the 2021 In-Service Officer Wellness Training and has no objections to the training. Included in the guiding principles as a key component is the assertion that when officers are physically and mentally healthy, they will be better able to implement the requirements if this paragraph.

The *2021 Training Plan* satisfies the requirements of this paragraph. Section VII. *Goals and Priorities*, Section IX(A) *Courses Section*, and Section IX(B) 2021 *Mandatory In-Service Training Program*, includes instruction to reinforce the CPD's commitment to procedural justice, de-escalation, impartial policing, and community policing.

To meet Secondary compliance, the CPD must demonstrate that training lesson plans and curricula across all appropriate in-service training and evaluations demonstrate requirements of this paragraph. The IMT has not reviewed all lesson plans and curricula for Secondary compliance. The CPD is making substantial progress in moving the CPD towards Secondary compliance and the IMT looks forward to assisting the CPD meet its goals.

# Training: ¶319

**319.** *CPD will implement the In-Service Training Program to comport with the Training Plan and the requirements and goals of this Agreement.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

During the previous reporting period, the CPD produced Special Order S11-11 Training Oversight Committee, which noted that the In-Service Training Program must comport with the training plan and the requirements and goals of the Consent Decree. We found that the CPD achieved Preliminary compliance because the CPD has written the recruit requirements of ¶319 into policy, specifically in Section III(A)(5), (7), and (8). We noted that the CPD should continue to focus on integrating the In-Service Training Program to comport with the other training plans, including the *2021 Training Plan*, and the requirements of the Consent Decree to achieve further compliance.

During the current reporting period, CPD sustained Preliminary compliance but did not meet Secondary compliance. However, the CPD has been making progress in integrating the In-Service Training Program to comport with the *2021 Training Plan*, and with the requirements of the Consent Decree.

To achieve Secondary compliance, the In-Service training courses must be consistent with the Training Plan and Training Needs Assessment. Instructors must be qualified, lesson plans must be acceptable and include elements of procedural justice, de-escalation, community policing and impartial policing. This paragraph is a "health check" on the entire Training Program operation. As such, attendance requirements of 95% must also be met.

CPD has submitted four lesson plans in this reporting period out of 17 courses/lesson plans listed in the *2021 Training Plan*. The courses are either mandatory, specialized civilian and elective courses. Of the lesson plans submitted, the 2021 Officer Wellness In-Service Course, and the 2021 Carbine Training sufficiently include elements of procedural justice and the other requirements of ¶317. The Community Policing In-Service addressed all IMT concerns upon revision, including a revised lesson plan and updated pre-and-post-test survey created to measure officer changes in knowledge and attitude. *See* ¶320, below.

In this reporting period, the CPD provided a "Needs Assessment" chapter in the *2021 Training Plan*. The Needs Assessment section of the *2021 Training Plan* incorporates recommendations from various entities (See ¶271). In this reporting period, the Needs Assessment chapter of the Training Plan identifies input sources and the results therefrom but offers no substantive proof nor details of the deliberative process of how the various inputs were considered in rendering the derived courses. Achieving Secondary compliance requires documentation related to information gathering efforts relevant to ¶271.

The CPD continues to move towards Secondary compliance. Key document proofs include submission of all 2021 lesson plans, instructor selection and attendance documentation. We look forward to further integration of the In-Service Training Program to comport with the *2021 Training Plan*. For Full compliance, training delivery and evaluations must also be assessed and comport with these requirements.

# Training: ¶320

*320. The In-Service Training Program will require that all non-probationary police officers who are active duty and available for assignment, including supervisors and command staff, receive, at a minimum, the following amount of in-service training each year: a. 16 hours by the end of 2018; b. 24 hours by the end of 2019; c. 32 hours by the end of 2020; and d. 40 hours by the end of 2021, and in each subsequent year.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** March 5, 2021*  ☑ **Met**  ☐ **Missed**
*Extended from December 31, 2021, due to COVID-19
**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance during this reporting period and achieved Secondary compliance for ¶320.

Paragraph 320 specifies different requirements across many deadlines. In previous reporting periods, the City and the CPD met Preliminary compliance with subsections (a), (b), and (c). IMT reviewed and assessed CPD documents, including Special Order S11-10-01, Training Notification and Attendance Responsibilities, and course criteria for additional training that met the 32-hour training requirement, and the Tableau dashboard for attendance information.

In the current reporting period, the CPD met Preliminary and Secondary compliance with subsection (d).

During the current reporting period, the 32-hour requirement was extended to March 5, 2021 due to the COVID-19 pandemic. The CPD achieved Secondary compliance by demonstrating at least 95% of eligible personnel met the full in-service hour requirement.

IMT reviewed and assessed additional CPD documents, including course criteria for additional training that meets the 40-hour training requirement. IMT reviewed the Officer Wellness In-Service course materials, the Use of Force In-Service course materials, and updated Community Policing and Carbine training materials based on IMT feedback previously submitted to the CPD. We also reviewed the *2021 Training Plan* and Training Directives.

We had no objections to the Officer Wellness Training materials. The Use of Force training has been renamed to *De-escalation Response to Resistance, and Use of*

*Force.* The Community Policing In-service training addressed all IMT comments, including a revised lesson plan and updated pre-and post-test surveys created to measure officer changes in knowledge and attitude. The surveys included 9 identical questions in both the pre-and post-survey that gathered information on officer ideals regarding the community policing philosophy.

The course evaluation includes 11 questions that ask officers whether the curriculum was helpful in understanding community policing, among other questions that are rated on a Likert scale.

IMT reviewed all documents submitted and determined that IMT/OAG comments were incorporated into all of the updated documents listed above.

Tableau records indicate the following training was successfully completed:

| Training | Org Segment | Completion % |
|---|---|---|
| Custodial Escort | All | 96 |
| | Districts Only | 97 |
| LEMART | All | 86 |
| | Districts Only | 97 |
| Officer Wellness and Resiliency | All | 95 |
| | Districts Only | 96 |
| Procedural Justice 2 | All | 100 |
| | Districts Only | 100 |
| Procedural Justice 3 | All | 98 |
| | Districts Only | 99 |
| Trauma Informed Response to Sexual Assault (TIRSA) I | All | 99 |
| | Districts Only | 99 |
| TIRSA II | All | 98 |
| | Districts Only | 99 |
| Use of Force | All | 96 |
| | Districts Only | 97 |

Although the LEMART training failed to reach the required floor of 95% completed, overall 95.4% (10,739/11,248) of eligible participants successfully completed in-service training by the deadline date.

Looking ahead, the City and the CPD may achieve Full compliance when Secondary compliance has been demonstrated and sustained for at least two consecutive reporting periods.

# Training: ¶321

**321**. *CPD's In-Service Training Program will include specific courses that will be mandatory for every officer in that training year.*

---

**Compliance Progress**                 (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**         March 5, 2021*                    ☑ **Met**    ☐ **Missed**
                      *Extended from December 31, 2021, due to COVID-19
**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**        *Not in Compliance*
**Full:**             *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with this paragraph by articulating in its *2021 Training Plan*, which courses will be mandatory during its In-Service Training Program. The City and the CPD have not, however, reached Secondary compliance.

In the previous reporting period, the CPD had achieved Preliminary compliance with ¶321 for the first time. The CPD produced the 2020 training plan, which listed Use of Force; Custodial Escort; Legal Updates; Law Enforcement Medical Rescue Training (LEMART); Procedural Justice 1, 2, and 3; Community Policing; Officer Wellness; Fourth Amendment; and eLearning courses as mandatory courses. We found that the CPD achieved Preliminary compliance because their 2020 Training Plan articulated which courses will be mandatory during the In-Service Training Program. Because the specific course listings will change every year in accordance with this paragraph, CPD may meet Preliminary compliance during one reporting period, but later lose its Preliminary compliance status.

In the current reporting period, CPD has submitted its updated training records to meet the 40-hour requirement for 2021, The *2021 Training Plan* states the following:

> [A]ll non-probationary officers who are active duty and available for assignments, including supervisors and command staff, will receive a minimum of 40 hours of training by the end of 2021. At least 24 hours will consist of in-person mandatory courses required for all sworn personnel; the remaining hours can be provided either as mandatory or elective courses to be delivered in person or through eLearning. [*See* ¶320.]

The mandatory classes listed in the *2021 Training Plan* include Use of Force; Community Policing; Officer Wellness; Law Enforcement Medical Rescue Training (LEMART); and eLearning modules including the Fourth Amendment, Legal Updates,

Social Media, Critical Incident Response, Annual Mandatory Ethics, Recognizing and Responding to Individuals in Crisis, Psychology of Domestic Violence, Hate Crime Investigation and Law Update, Accountability and Transparency.

We reviewed the *2021 Training Plan* and recommended that the CPD articulate the reasons why certain courses are mandatory for all officers. However, the re-submitted CPD *2021 Training Plan* did not include any justification for course selection. There is added language to Section IX that was not apparent in the 2020 Training Plan and states "[w]hen the Training and Support Group proposes courses to the Training Oversight Committee, it indicates whether the training is mandatory or elective and provides justification."

Our guidance on its training methodology states that the IMT relies upon the "ADDIE model" of curriculum development and implementation as IMT's evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

The needs assessment report should provide justification for specific course selection. The Needs Assessment chapter of the Training Plan indicates that the "CPD's mandatory training was selected based legal requirements, Consent Decree mandates, and topics identified via the needs assessment. Topics mentioned in the needs assessment were prioritized in the following manner; oversight entities, force reviews, safety issues, complaints, and frequent responses for the 2021 Training Plan."

The CPD maintained Preliminary compliance with this paragraph in this reporting period but due to only 86% of the department being trained in LEMART by the 5 March 2021 deadline, did not meet Secondary compliance. The percentage was insufficient, because ¶321 looks more closely at each required course instead of the composite average as that is used to assess compliance with ¶320.

Looking ahead, to reach Secondary compliance in accordance with the IMT's updated methodology, CPD will need to submit all training records for the 2021 course list including lesson plans for IMT review, and training attendance records to demonstrate that at least 95% of all eligible personnel attending each required training. Full compliance can be achieved when Secondary compliance has been sustained for at least two consecutive reporting periods.

# Training: ¶322

***322.*** *CPD's In-Service Training Program may also offer specific courses as elective subjects. The elective subjects will be selected and approved by the TOC in accordance with the Training Plan. The TOC will solicit and consider officer requests and will rely on the Education and Training Division's needs assessments when selecting and evaluating elective subjects.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the current reporting period, CPD maintained Preliminary compliance and achieved Secondary compliance with ¶322.

The *2021 Training Plan* became effective on March 5, 2021. To meet Secondary compliance, CPD must provide documentation that (1) distinguishes elective subjects from mandatory courses; (2) demonstrates that elective subjects are selected and approved by the Training Oversight Committee in accordance with each annual training plan; and (3) demonstrates that the Training Oversight Committee solicited and considered officer requests and relied upon Education and Training Division needs assessments when selecting and evaluating the elective subjects.

During the previous reporting periods, the CPD produced Special Order S11-11, Training Oversight Committee. The Special Order stated that the Training Oversight Committee will solicit and consider officer requests and will rely on the Training and Support Group needs assessments when selecting and evaluating elective subjects. We found that the CPD achieved Preliminary compliance because Special Order S11-11 articulated the requirements of ¶322.

The *2021 Training Plan* Section IX.A. distinguishes elective subjects from mandatory courses. Sections V.A. and V.B. indicates requirements 2 and 3 are met. Section VIII. Articulates the inclusion of member input as part of the needs assessment process. Training Oversight Committee April 2021 minutes affirm the Training Oversight Committee's vote to approve the 2021 CIT eLearning module, one of the elective courses. S11-11 III.A.3.g. partially reinforces the Training Oversight Committee's role in adhering to these requirements.

To demonstrate Full compliance, CPD must additionally provide primary proofs of compliance with officer input requirements. The CPD must furthermore demonstrate they have fully implemented and established a full process that aligns with requirements of ¶322.

# Training: ¶323

> **323.** *As part of the In-Service Training Program, mandatory and elective courses will be apportioned as follows: a. in 2018, CPD will require that each officer receive at least 16 hours of in person mandatory courses; b. in 2019, CPD will require that each officer receive at least 16 hours of in person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; c. in 2020, CPD will require that each officer receive at least 24 hours of in-person mandatory courses, with the remaining 8 hours to be provided either as mandatory or elective courses, as determined by the TOC; d. starting in 2021, and every year thereafter, CPD will require that each officer receive at least 24 hours of in-person mandatory courses with the remaining 16 hours to be provided either as mandatory or elective courses, as determined by the TOC; and e. this Agreement does not require CPD to provide more than 40 hours of annual department-wide in-service training.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☑ Met ☐ Missed |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *In Compliance (THIRD REPORTING PERIOD)* | |
| **Secondary:** | *Under Assessment* | |
| **Full:** | *Not Yet Assessed* | |

The City and the CPD maintained Preliminary compliance during this reporting period.

During the previous reporting period, the City and the CPD achieved Preliminary compliance with ¶323. The CPD submitted various records regarding continuing compliance for this paragraph during this reporting period. The *2021 Training Plan*, Section IX., in particular, provides the policy language that is essential for Preliminary compliance. Course proofs substantiate curricula for these courses have been built and provided.

The CPD may achieve Secondary compliance if course attendance meets or exceeds 95%. That cannot yet be established this reporting period. Full implementation of ¶323 requirements will result in Full compliance.

# Training: ¶324

**324.** *Various sections of this Agreement contain in-service training requirements which require CPD to provide some or all of its members with training on specific topics. CPD retains the discretion to determine the sequencing, scheduling, and location of such training, unless otherwise specified by this Agreement, provided that: all in-service training identified herein will begin no later than the 2021 calendar year; is adequate in quantity, quality, type, and scope; and is consistent with the terms of this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2022* | ☑ **Not Yet Applicable** |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

The sole document proof provided by CPD during this reporting period is the *2021 Training Plan*. The Plan does not by policy adopt or incorporate the requirements of ¶324.

Secondary compliance requires training lesson plans, instructor selections, training schedules and curricula across all in-service training demonstrate requirements. Full compliance can be achieved when CPD has fully implemented the requirements of the paragraph and training delivery has been initiated within the specified timeline and conditions.

# Training: ¶326

**326.** *Training provided through the In-Service Training Program may take place at the Academy or in a decentralized manner, including at the district or unit level, so long as the training is: a. developed by the Education and Training Division; b. reviewed by the TOC and approved by the Education and Training Division before training is delivered; and c. taught by instructors pursuant to the requirements provided above Part D of this section.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

The sole document proof provided by CPD during this reporting period is the *2021 Training Plan*. The Plan does not by policy adopt nor incorporate the requirements of ¶326.

Secondary compliance requires CPD to sufficiently take steps to provide training following requirements of ¶326. Full compliance can be achieved when CPD has fully implemented the requirements of the paragraph and training delivery has been initiated within the specified timeline and conditions.

# Training: ¶327

***327.*** *Courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person may be provided through e-learning or other electronic means, so long as they are reviewed and approved by the TOC and are consistent with this Agreement. In considering e-learning courses for approval, the TOC will ensure that instructional objectives can be sufficiently achieved through e-learning. Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

To demonstrate compliance with ¶327, CPD submitted eLearning on use of force policy changes. ¶327 requires the following proofs:

| ¶327 Requirement | Met by CPD? |
|---|---|
| ¶327 requirements written into policy | Not provided |
| List of courses offered by CPD to fulfill the portion of the In-Service Training Program not required to be delivered in person | Not provided |
| Reviewed and approved by the Training Oversight Committee (Training Oversight Committee minutes) | Not provided |
| Consistent with CD requirements | Not provided |
| Training Oversight Committee ensures that instructional objectives can be sufficiently achieved (Training Oversight Committee minutes) | Not provided |
| Following the completion of any e-learning course provided as part of the In-Service Training Program, CPD will test participants on their comprehension of the underlying subject matter. (Curriculum or actual exams) | Use of force test provided. Others not provided. |

As the above table shows, the document proofs required to demonstrate compliance with ¶327 are largely not provided. As a result, neither Preliminary nor Secondary compliance is met. Full compliance is not assessed this reporting period.

# Training: ¶328

**328.** *CPD will develop and implement a process for addressing non-compliance with training requirements to ensure that all officers who are active duty and available for assignment, including supervisors and command staff, successfully complete all required training programs within the time frames set out in this Agreement.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (NEW)
**Secondary:**       *Not in Compliance*
**Full:**                *Not in Compliance*

The City and the CPD achieved Preliminary compliance during this reporting period.

In the last reporting period, we provided a status update for ¶328. We explained that the CPD made progress toward compliance with ¶328. We noted that the CPD had introduced the Learning Management System, the training notification process, thee training notification report, and the electronic training deviation process into Special Order S11-10-02.

During the current reporting period, the CPD provided the following documents to demonstrate Preliminary and Secondary compliance with this paragraph:

- Training Deviations Dashboard

- AMC Messages referring to Training Deviations

- Training Directives S11-10, S11-10-01, and S11-11

Section VI of policy S11-10-01 titled "Training Deviations," establishes a process for addressing non-compliance with training requirements. Submitted documents substantiating the process has been implemented include a snapshot of TSG training deviation dashboard and AMC messages on "Training Deviation Procedures," "Reminder to Update Furlough, Watch and Day off Assignments," and "Continuation of In-Service Training."

To further substantiate that the process is fully implemented to meet Secondary and eventually Full compliance, CPD must submit additional documents described in S11-10-01, including training deviation investigation, investigation results, and final approvals (VI.E.2 and VI.F). The number of training deviation investigations must approximate the number of personnel who did not attend required training.

# Training: ¶329

***329.*** *Officers, including supervisors and command staff, returning to active duty after taking a leave of absence of a year or more must complete all mandatory training content required as part of the In-Service Training Program that was missed during the previous three years, in addition to the mandatory courses required in the current year. a. At a minimum: i. officers must complete training on the content required in Part F of the Use of Force section of this Agreement before returning to assignment; and ii. officers must complete training on all other mandatory content required during the previous three years within the first full year of resumed active duty. b. Where the same mandatory content has been updated or required multiple times during the period of inactivity, officers are only required to take the most recent offering. The training required in this paragraph will count towards the total amount of training required by the In-Service Training Program.*

## Compliance Progress            (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *Not in Compliance*
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

This paragraph is undergoing its initial assessment this reporting period. The City and the CPD have not met Preliminary compliance.

CPD submitted the following documents as proofs of compliance with this paragraph:

- RSO Directive E04-05, *Returning Service Officer*

- Training Directives

The RSO Directive tracks the language required in this paragraph except for in i. that requires, "i. officers must complete training on the content required in Part F of the Use of Force section of this Agreement *before returning to assignment*;…" However, E04-05 V.C. says, "the following courses are required *in the current year* of their return: 2. Use of Force Training." This section of the controlling policy is not consistent with ¶329's requirements. As a result, the City and the CPD have not met Preliminary compliance.

Secondary compliance can be achieved after Preliminary compliance by substantiating that the process enumerated in the policy has been implemented. Full compliance is demonstrated when the process is implemented and managed, and records indicate training and time requirements are met. No additional proofs of Secondary or Full compliance were submitted, therefore neither were assessed during this reporting period.

# Training: ¶331

*331. CPD will require that every newly promoted supervisor, except those promoted to the rank of Commander and above, receives mandatory supervisory, management, leadership, and command accountability training, tailored to each level of supervision and command before assignment to a supervisory rank or assumption of supervisory responsibilities associated with a particular supervisory rank.*

**Compliance Progress**                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**      *Not in Compliance*
**Full:**           *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting period.

To meet Preliminary compliance with ¶331, a CPD policy or similar record must reflect the corresponding supervisor training obligations.

During the previous reporting period, we assessed the City's and the CPD's compliance with ¶331 for the first time, and they did not meet Preliminary compliance.

During the current reporting period, CPD submitted the following documents as proofs of compliance with this paragraph:

- *2021 Training Plan*

- Training Directives (S11-10, S11-10-01, and S11-11)

The updated *2021 Training Plan* includes proposed pre-service training class schedules for each promotional rank.

The IMT reviewed updated draft training directives including Special Order S11-10 *Department Training*, Special Order S11-10-01 *Training Notification and attendance responsibilities*, and Special Order S11-11 *Training Oversight Committee.*

S11-10 Item III F. 1. on page 2 states:

> *Specific responsibilities and assignments within the Department require specialized mandatory in-service training. This training includes, but is not limited to:*

> *1. annual supervisor and command staff training, including training on supervisory duties, managerial and leadership skills, and other topics identified in supervisor pre-service training;"*

When combined with Training Plan Section X.D., "*The Chicago Police Department requires newly promoted supervisors and Department members selected for an 'assigned as position' to receive mandatory pre-service training*," CPD meets Preliminary compliance with this paragraph.

CPD does not meet Secondary compliance because proofs that demonstrate or substantiate that the preservice training meets ¶331 requirements to be "tailored to each level of supervision and command" are not provided. Full compliance is not assessed but can be attained when the preservice training has been fully implemented and institutionalized as specified in this paragraph.

# Training: ¶332

> **332.** *CPD will require that supervisors, upon their first promotion to the rank of Commander or above, receive mandatory supervisory, management, leadership, and command accountability training, tailored to command staff positions within six months of assignment to or assumption of supervisory responsibilities as a member of CPD's command staff.*

## Compliance Progress       (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

During the previous reporting period, we assessed the City's and the CPD's compliance with ¶332 for the first time, and they did not meet Preliminary compliance. To meet Preliminary compliance with ¶332, a CPD policy or similar record must reflect the corresponding supervisor training obligations.

During the current reporting period, CPD submitted the following documents as proofs of compliance with this paragraph:

- *2021 Training Plan*

- Training Directives (S11-10, S11-10-01, and S11-11)

The updated *2021 Training Plan* includes proposed pre-service training class schedules for each promotional rank.

The IMT reviewed updated draft training directives including Special Order S11-10 *Department Training*, Special Order S11-10-01 *Training Notification and attendance responsibilities*, and Special Order S11-11 *Training Oversight Committee*.

S11-10 Item III F. 1. on page 2 indicates:

> "*Specific responsibilities and assignments within the Department require specialized mandatory inservice training. This training includes, but is not limited to:*
>
> *1. annual supervisor and command staff training, including training on supervisory duties, managerial and leadership skills, and other topics identified in supervisor pre-service training;*"

Combined with Training Plan Section X.D., "*The Chicago Police Department requires newly promoted supervisors and Department members selected for an 'assigned as position' to receive mandatory pre-service training*." A footnote further elaborates on the time requirements:

> *First time Exempt Rank (Commander and above) receive training within 6 months of assignment.*

CPD meets Preliminary compliance with this paragraph.

CPD failed to achieve Secondary compliance because CPD not provide proofs that demonstrate or substantiate that the pre-service training meets ¶332 requirement that the training be tailored to command staff positions. Full compliance is not yet assessed but can be attained when the pre-service training has been fully implemented within the specified time and institutionalized as specified in this paragraph.

# Training: ¶333

> **333.** *The amount of pre-service promotional training may differ according to rank and command, but all pre-service promotional training will be adequate in quality, quantity, type, and scope and will cover topics appropriate to the specific rank and command.*

---

**Compliance Progress**　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In the previous reporting period, the CPD made progress toward compliance with ¶333 but did not provide a draft of a new or revised policy to achieve Preliminary compliance. IMT stated that compliance includes memorializing the "quality, quantity, type, and scope" requirements of ¶333.

In the current reporting period, the CPD still did not meet Preliminary compliance. CPD updated its *2021 Training Plan* and provided the following Sections of the 2021 draft Training Plan as proof of compliance with the "quality, quantity, type, and scope" requirements of this paragraph.

- Section V. Training Oversight Committee

- Section X. Schedule for Delivery of Training

- Section X. (d) Pre-Service and Pre-Service Promotional Training

- Appendix C.

Section V. Training Oversight Committee highlights the role of the Training Oversight Committee as the governing body for developing department training through membership from throughout the CPD to provide a diverse set of skills and expertise. The Training Oversight Committee reviews training documents for consistency and quality.

Section X. Schedule for Delivery of Training lists the quantity of trainings for each rank by promotion date; however, Section X (D) on Pre-Service and Pre-Service Promotional Training states, "The number per class will be determined per Department needs, budgeted vacancies and priorities." These situations, such as a

budget deficit, may preclude the CPD from providing adequate training in quantity and type.

Appendix C includes detailed course schedules for all sergeants, lieutenants, and captains, and also includes pre-service sergeant and lieutenant training course listings as well as training court listings for exempts and command staff.

While it can be inferred from these paragraphs that the CPD is creating its pre-service promotional training in accordance with the "quality, quantity, type, and scope" requirements of ¶333, the IMT guidance on appropriate methodology to prove compliance states that the requirements of the paragraph are written into policy or a similar document. There is no language that expressly states the intention of the CPD to provide adequate training in quality, quantity, type, and scope that will cover topics appropriate to the specific rank and command. Therefore, Preliminary compliance is not achieved.

To meet Secondary compliance, we will need to determine whether the CPD has taken significant steps to deliver the training in accordance with this paragraph and after review and finalization of the *2021 Training Plan*, curriculum and curriculum development process. The CPD has made significant progress in detailing, for example, the curriculum development process in forming a Training Oversight Committee and including diverse membership and completing needs assessments to drive new training. Training plans, attendance records and lesson plans will all have to demonstrate CPD adherence to ¶333 requirements. The IMT looks forward to further review of these documents and processes.

Looking ahead, the IMT suggests memorializing the requirements of this paragraph and documenting the steps taken to determine the quality, quantity, type, and scope" requirements of this paragraph. Full compliance can be achieved when CPD has fully implemented a process to ensure training is delivered meeting the conditions specified in this paragraph.

# Training: ¶334

***334.*** *By January 1, 2020, as appropriate and tailored to the specific rank and command, pre-service promotional training will include, but not be limited to: a. an overview of CPD's department-wide crime reduction strategies; b. specific methods for developing district-level crime reduction strategies that are consistent with the principles of community policing, and tools and techniques on how best to communicate with officers on how to incorporate principles of community policing in implementing those crime reduction strategies; c. techniques for effectively guiding and directing officers and promoting effective and ethical police practices, including detecting and addressing bias-based profiling and other forms of discriminatory policing; d. de-escalation strategies and the principles of force mitigation; e. intervening on a subject's behalf when observing a use of force that is excessive or otherwise in violation of policy; f. evaluating the completeness, correctness, and sufficiency of written reports; g. monitoring, reviewing, and investigating uses of force to ensure consistency with CPD policies; h. understanding the function and proper use of supervisory tools, such as Early Intervention System ("EIS") and body-worn cameras, at each rank; i. evaluating officer performance, informally and formally as part of CPD's annual performance evaluation process; j. CPD and COPA's disciplinary system requirements and available non-punitive corrective action; k. mentoring officers and fostering career development; l. responding to allegations of officer misconduct, including, but not limited to, excessive force and racial discrimination, for purposes of documenting the complaint and reporting it to COPA; m. building community partnerships and guiding officers on how to implement this requirement; and n. CPD policy and legal updates.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD did not achieve Preliminary compliance during this reporting period.

In this reporting period, we reviewed the following training documents to move towards Secondary compliance:

- Emotional Intelligence for Supervisors

- Pre-Service Sergeant Tactical Response Reports and Investigations

- Pre-Service Lieutenant and Above Tactical Response Reports and Investigations

- OCIC Street Deputy and Officer Involved Shootings (OIS)

- Crime Scene OIS Practical Sergeant

- Crime Scene OIS Practical Lieutenant

In the last reporting period, the CPD made significant progress towards gaining Preliminary compliance. The IMT recommended that the CPD review and edit the *Consent Decree Curricular List* matrix course listings under each subparagraph to accurately match each course with the requirements of each subparagraph of ¶334. It is unclear whether the Consent Decree Curricular List Matrix has been updated to include course listings under each subparagraph. Once IMT reviews the updated Curricular List Matrix and finds that that the courses match the requirements, the City and the CPD will meet Preliminary compliance with ¶334.

The City and the CPD did not meet Preliminary compliance as these requirements have not been incorporated into Department policy.

The *Emotional Intelligence for Supervisors* pre-service training course was specifically developed for first-line supervisors who are also sergeants and lieutenants and addresses the requirements of ¶334 subparagraphs (c) and (k).

The Emotional Intelligence course includes techniques for guiding and directing supervisors through a class exercise that instructs officers to identify positive coping strategies and includes a class discussion. The lesson plan also fosters career development by identifying how supervisors can successfully manage techniques to increase emotional intelligence. However, part of ¶334(c) also requires the training to instruct officers on strategies that build emotional intelligence through detecting and address bias-based profiling and other forms of discriminatory policing. Neither the lesson plan nor the PowerPoint reviewed includes materials on bias. IMT suggests updating the Emotional Intelligence for Supervisors course to include the requisite information. If there is a separate training applied to ¶334 (c), we suggests referring broadly to the importance of building emotional intelligence by detecting bias and addressing bias-based profiling within the course PowerPoint and naming the specific course where further information on the topic can be attained.

The *Pre-Service Sergeant Tactical Response Reports and Investigations* course provides practical learning applications, such as completing the supervisory section of a Tactical Response Report, or analyzing and reviewing reports. This course also provides an overview of supervisory responsibilities in reporting uses of force, recognizing different levels of force, as well as reviewing the CPD's policies against retaliation. IMT reviewed training materials provided by CPD to assess compliance with ¶334.

The course's learning objectives, which are included at the beginning of the lesson plan, do not include any objective on detecting and addressing bias-based profiling or any other form of discriminatory policing as required by ¶334(c). Additionally, the class breakdown provided lists the training topics that are disseminated in the lesson plan. It does not list any bias-based training topics, but lists the following 5 topics covered in the lesson plan: 1. Retaliation, 2. Use of Force, 3. De-escalation, 4. Tactical Response Reports, and 5. Officer involved shootings. Further, the word "bias" is used only once in the course PowerPoint on page 18.

Additionally, the "CPD's Ethical Expectations" section of the lesson plan includes overarching ethical expectations, such as prohibitions on abusing authority or impairing the public's trust. However, there is no explicit discussion on discriminatory policing through an ethical lens or any scenarios regarding discriminatory practices.

The information included regarding mentoring officers is also insufficient to meet the requirements of ¶334(k). Members are trained on techniques to improve de-escalation outcomes with their subordinates by utilizing roll call training as a mentoring tool. However, the instruction on mentorship is limited in scope and does not include any instruction to mentor officers on bias-free policing or how to handle situations that include racial profiling.

The Pre-Service Lieutenant and Above Tactical Response Reports (TRR) and Investigations also does not address ¶334(c) or ¶334(k) as presented by CPD. The information is limited in scope and does not integrate the guiding principles listed in the lesson plan throughout the course materials. On the other hand, the course materials do address the requirements of ¶334(f). The lesson plan alerts supervisors on completing the Lieutenant portion of the TRR and when to return the report if it isn't complete, correct, sufficient, or contains any inconsistencies.

Further, impartiality is presented as a principle required to supervise officers, or mentees, equally without preferential treatment to one mentee over the other as

a supervisor. The instruction should be geared towards mentoring officers to be impartial in their contact with the community.[129]

The *OCIC Street Deputy and Officer Involved Shootings (OIS) Response Team* training course is provided to pre-service supervisors. This training course adequately addresses the requirements of ¶334(g). IMT reviewed course materials to determine whether the CPD's training ensures officers monitor review and investigate uses of force to ensure consistency with CPD policies as required by ¶334(g). The course delineates which level rank responds to officer involved shootings depending on the circumstances, and investigation responsibilities of command personnel, among other departmental responsibilities when responding to scenes of officer involved shootings. The course highlights procedures from eleven different CPD policies that ensure proper procedure when handling an officer involved shooting.

*Crime Scene Processing and Protection: Practical Lt. Pre-Service* course and the *Crime Scene Processing and Protection: Practical Sergeants Pre-Service* course materials are very similar in scope and meet the requirements of ¶334(g). The lesson plans thoroughly cite each policy section in the "Student Performance Objectives" section of the lesson plan. Practical scenario-based learning activities are provided to illustrate policy requirements cited in the lesson plan. For example, a performance objective includes a scenario where the students participate in a crime scene. Students must process and protect the crime scene, interact with role players- such as the media and distraught family members and gather the needed information for reports according to CPD policy.

Training materials for the Sergeant and Lieutenant courses include a Scenario Worksheet and Scenario Objectives Worksheet. As a part of the guiding principles, procedural justice should be a concept that is explicitly illustrated through the provided scenarios. In the training materials, procedural justice is limited to a scenario where the family member "does not attempt to breach the crime scene." The officers are instructed to be nice and courteous; however, procedural justice is more complex than being polite and courteous. The training should be amended to also include scenarios to apply procedural justice during "hands-on situations where control tactics may apply."

After review of the lesson plans, we concludes that all the lesson plans align with subsections ¶334(d)–(g). However, as stated previously, none of the six lesson

---

[129] Instructor notes are not aligned with CPD values. Derogatory words are used in the lesson plan such as "that's lame'" on lesson plan page 6. Inappropriate phrases like "kissing cousins'" are also on page 6. The instructor notes also relay to officers that mentoring a young officer requires a different skillset than mentoring an older officer but do not identify the tools necessary to do so in the PowerPoint. The course materials include challenges and benefits to mentoring, but are not stratified by age.

plans provided demonstrate compliance with this Paragraph explicitly address biased policing or profiling. IMT recommends expanding some of the scenarios in the lesson plans to address discriminatory policing and profiling as required by ¶334(c). IMT also suggests ensuring that the guiding principles are reflected in training plans.

Additionally, the course listings in Appendix C of the *2021 Training Plan* do not include all of the courses that IMT reviewed during this reporting period. For example, the *Pre-Service Sergeant Tactical Response Reports and Investigation* course is an 8-hour course; however, the only Tactical Response Reports course listed in Appendix C is a 1-hour eLearning course. Further, there was no updated *Consent Decree Curricular List* for IMT to review in this reporting period.

The CPD may achieve Secondary compliance by conducting the pre-service supervisory training courses and achieving 95% or higher attendance by eligible candidates. Due to promotions in March, some supervisors did not receive the Exempt Rank/Command Staff training[130] until April 2021 missing the March 5th deadline. However, after the March 5th deadline, over 95% of all Exempt Rank/Command Staff have received the Exempt Rank/Command Staff training.

---

[130] Course name changed to OCIC Street Deputy and Officer Involved Shooting (OIS) Critical Incident Response Team (CIRT).

# Training: ¶335

> ***335.*** *The pre-service promotional training for new Sergeants and Lieutenants will include a field training component to provide newly promoted supervisors with a better understanding of the requirements of the position to which they have been promoted. a. The field training component for new Sergeants will consist of two days of shadowing current Sergeants in districts: one day observing the activities of a District Station Supervisor and one day observing the activities of a Field Sergeant. b. The field training component for new Lieutenants will consist of one day of shadowing a current Lieutenant in a district and observing the activities of a Watch Operations Lieutenant.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (NEW)
**Secondary:**       *Not in Compliance*
**Full:**            *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting period.

During the previous reporting period, the City and the CPD made some progress towards compliance with ¶335 by producing draft curricula and policies. The CPD also provided the IMT with a briefing presentation regarding these requirements. However, the Pre-Service Sergeant and Lieutenant course listings provided in the draft *2021 Training Plan* did not contain a field training component, which is required for compliance.

During the current reporting period, the City and the CPD met Preliminary compliance with ¶335. To meet Preliminary compliance, the CPD needed to develop a curricula and policies addressing the requirements of ¶335. Bureau of Patrol SO 21-06 Section II. A. outlines the scope of the policy, which includes the intention to familiarize new supervisors with the duties and responsibilities of the position. Section III. C. and III. D meet the requirements of ¶335 subparagraphs (a) and (b), memorializing in policy the field observation components for sergeants and lieutenants.

In the current reporting period, the CPD submitted a revised policy *SO 21-06,* and Pre-Service Supervisory Field Observation Training District Law Enforcement for Sergeants and Lieutenants. We requested an update to policy to reflect a process in which District Commanders could select among qualified sergeants and lieutenants for promotion. We also requested a mechanism to be memorialized that would detail record keeping requirements of selected rank. *The Bureau of Patrol*

*SO 21-06, Section IV. E.* incorporates the IMT's recommendations and has detailed a process for documenting selected candidates on a Watch Incident Log.

We also suggested that the CPD consider raising the standard for an acceptable disciplinary record to ensure that lieutenant and sergeant candidates meet the criteria for selection. However, the CPD has not updated the policy to reflect IMT suggestions. However, the policy states the baseline requirements for Preliminary compliance. Therefore, CPD has met Preliminary compliance.

In the previous monitoring period, we requested that the *2021 Training Plan* include a field training component. IMT reviewed the updated *2021 Training Plan* Appendix C, and both the lieutenants and sergeants complete field observation training in the course listings.

To reach Secondary compliance, we will review whether the CPD has begun the implementation process to fulfill paragraph requirements. Full compliance will require Secondary compliance and, upon final review of the *2021 Training Plan* training schedules and attendance records, training attendance by at least 95% of eligible CPD members.

# Training: ¶336

**336.** *Within 30 days of the Effective Date, CPD will develop a formalized structure for the field training component to ensure consistency across districts. This structure will include a process for selecting which supervisors will be shadowed and guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD policy and this Agreement.*

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

To meet Preliminary compliance, the CPD must create the corresponding formalized structure for the field training component. During the previous reporting period, the City and the CPD did not meet Preliminary compliance with ¶336. In the second and third reporting period, the CPD provided drafts of Bureau of Patrol Special Order 19-06, Pre-Service Supervisory Field Observation Days in District Law Enforcement for Sergeants and Lieutenants (BOP 19-06). The IMT and the OAG provided comments to BOP 19-06, but at the end of the reporting period, the CPD had yet to provide a revised draft.

During the current reporting period, we received a revised draft of the Bureau of Patrol Special Order 19-06, *Pre-Service Supervisory Field Observation Days in District Law Enforcement for Sergeants and Lieutenants*. IMT reviewed the policy to determine whether it includes the required corresponding formalized structure for the field training component.

Section III. A. through Section C of the revised policy includes the process for selecting which supervisors will be shadowed. Before the end of the monitoring period, the IMT suggested that the CPD consider raising the standard for an acceptable disciplinary record to ensure that lieutenant and sergeant candidates meet the criteria for selection. CPD has not updated the policy to reflect IMT suggestions. However, the policy states the baseline requirements for Preliminary compliance. Therefore, CPD has met Preliminary compliance.

Looking forward, to meet Secondary compliance, the IMT will need to review guidance materials to ensure that the topics and information regarding supervisor responsibilities covered during the field training component are consistent with CPD

policy and this Agreement. Full compliance can be achieved when CPD has fully implemented, institutionalized Secondary compliance and has established a full process that aligns with requirements of ¶336.

# Training: ¶337

***337.** CPD will ensure that all supervisors who are active duty and available for assignment also receive in-service training consistent with the requirements of CPD's In-Service Training Program. As part of the In-Service Training Program, supervisors will receive refresher training related to their supervisory duties and training that covers managerial and leadership skills. The in-service training for supervisors may include, but is not limited to, the topics identified above for pre-service promotional training.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**     *Not in Compliance*
**Full:**          *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance during this reporting period.

During the previous reporting period, the City and the CPD did not achieve Preliminary compliance with ¶337. To meet Preliminary compliance, the CPD must incorporate the supervisor training obligations from ¶337 into policy. The IMT did not receive a final policy that reflects these requirements. The IMT did receive and review, however, the CPD's In-Service Supervisor Refresher course and the 2020 In-Service Training, which was not finalized during the previous reporting period.

During the current reporting period, CPD met Preliminary compliance with ¶337. The CPD sufficiently incorporated the supervisor training obligations from ¶337 in Section III. D. of Special Order S11-10-01 *Training Notification and Attendance Responsibilities*. Specifically, Special Order S11-10 *Department Training* Section III. F. 1 includes the following statement regarding refresher training for annual supervisor and command staff:

> *Training includes annual supervisor and command staff training, including training on supervisory duties, managerial and leadership skills, and other topics identified in supervisor pre-service training.*

Special Order S11-10-01 has an effective date of March 31, 2021.

To meet Secondary compliance, CPD must demonstrate that training has been delivered and training requirements are met. To that end, the IMT reviewed the curricula and lesson plans in the third reporting period and submitted comments to CPD. IMT recommended updating the *2021 Training Plan* to mirror Special Order

S11-10-01, which includes the requirements contained in ¶337. Section IX. E. in the *2021 Training Plan* draft has been updated to reflect the requirements of this paragraph.

IMT also continued to work with the CPD to finalize and implement the 2021 In-Service Supervisor Refresher course materials. IMT reviewed the current draft of the *2021 Training Plan*, Section E. *Specialized Mandatory Courses*, to determine whether the Annual Supervisor Refresher Training course description includes training related to supervisory duties and training that covers managerial and leadership skills, including topics identified for a separate Pre-Service Promotional Training. These two courses should include training so that new and existing supervisors are being trained on the same materials each year.

The Annual Supervisor Refresher Training course description reads as follows:

> *The 2021 Annual Supervisor Training will consist of topics related to supervisory duties, managerial and leadership skills. This mandatory in-service training consists of topics identified from a variety of sources, including but not limited to, Training Oversight Committee (TOC) training priorities, training feedback (focus groups, surveys, etc.), Consent Decree items (¶334, ¶ 335), Auditing Division Reports and exempt command staff.*

IMT has reviewed the *2021 Training Plan* and the Training Directives which demonstrate Preliminary compliance with ¶337. However, we still has not received an updated and finalized Annual Supervisor Refresher Training.

Once training has been delivered and training requirements are met, CPD will achieve Secondary compliance. Full compliance can be achieved once CPD has fully implemented and has institutionalized a full process that aligns with requirements of paragraph.

# Training: ¶338

> **338.** *Any training course offered as part of a pre-service promotional training, which is also a mandatory In-Service Training Program course, satisfies that mandatory In-Service Training Program requirement. Any other training course completed during a pre-service promotional training will count towards the total amount of training required by the In-Service Training Program requirement.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD achieved Preliminary compliance during this reporting period.

During the previous reporting period, the City and the CPD made some progress to-wards compliance with ¶338 but did not provide documentation that addresses ¶338 specific requirements by the end of the reporting period. Specifically, CPD had not incorporated ¶338 requirements in a policy or procedure to meet Preliminary compliance.

In the current reporting period, the City and the CPD met Preliminary compliance with ¶ 338. IMT reviewed the draft *2021 Training Plan* to determine whether the Plan includes the training course requirements. Section X.D. *Pre-Service and Pre-Service Promotional Training* highlight the necessary language to meet Preliminary compliance with ¶338.

Section X. D. *Pre-Service and Pre-Service Promotional Training* has been updated to differentiate the portions of Pre-Service and Promotional Training that will be applied to the mandatory in-service requirements (¶320 and ¶323). The *2021 Training Plan* states the following:

> *The 40-hour In-Service Training Program will be the same for all Sworn Department members to gain compliance with para-graphs 320 and 323. Any pre-service promotional training will be above and beyond the 40-hour requirement.*

To meet Secondary compliance, we will need to review training documents as provided in the CPD's centralized electronic system that schedules and tracks all CPD training, and the delivery method for trainings referenced in this paragraph to de-

termine whether the CPD has taken sufficient steps to deliver the training accord-ing to the conditions specified in the paragraph as it relates to other relevant par-agraphs in the Consent Decree. Full compliance can be achieved when CPD has fully implemented and institutionalized a full process that aligns with require-ments of paragraph.

# Training: ¶339

**339.** *Within 90 days of the Effective Date, CPD will require that all members who are active duty and available for assignment are provided with training on the requirements of this Agreement, together with its goals, implementation process, and timelines.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECONDARY REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance but failed to continue meeting objective Secondary compliance requirements.

The City and the CPD reached Preliminary and Secondary compliance with ¶339 in the second reporting period. In the third reporting period, the City and the CPD maintained Preliminary and Secondary compliance. In the first reporting period, CPD provided IMT with a draft eLearning training for ¶339. In the second reporting period, CPD incorporated feedback from IMT and OAG and implemented the training, achieving Preliminary compliance. By the end of the second reporting period, CPD reported, via its Tableau dashboard, that it had a 97% completion rate for eligible personnel, which met the 95% requirement for Secondary compliance.

During the current reporting period, CPD continued to provide access to available Tableau records. According to those records, the following percentage of personnel reviewed the monthly updates, as required:

| Month | Compliance Percentage |
|---|---|
| January 2021 | 99 |
| February 2021 | 99 |
| March 2021 | 98 |
| April 2021 | 98 |
| May 2021 | 94 |
| June 2021 | 78 |

According to policy G01-03 IX(B)(3)(b), "The monthly Department directives eLearning module will be completed within twenty-eight days of dissemination." Therefore, May 2021 numbers reflect directives issued in May that should have been reviewed within 28 days of issuance, or not later than 28 June 2021. Clearly, the May compliance percentage barely missed the threshold. Directives issued by June 30 should be reviewed by 28 July 2021, a date which extends into the next reporting period.

Secondary compliance requires at least 95% of eligible personnel review the monthly policy updates issued through May. Full compliance is achievable when CPD has fully implemented and institutionalized a full process that aligns with ¶339 requirements.

# Training: ¶340

**340.** *In connection with issuing a policy or procedure pursuant to this Agreement, CPD will ensure that: a. all relevant CPD members review their responsibilities pursuant to the policy or procedure, including the requirements that each member is held accountable for their compliance and is required to report violations of policy; b. supervisors of all ranks are informed that they will be held accountable for identifying and responding to policy or procedure violations by members under their direct command; and c. CPD can document that each relevant CPD officer or other employee has received and reviewed the policy.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance during this reporting period. They have not, however, reached Secondary compliance.

During the third reporting period, the City and the CPD reached Preliminary compliance with ¶340. The CPD finalized General Order 01-03, Department Directives System (G01-03), which addresses the requirements of ¶340(a)-(c). The CPD also implemented eLearning to provide all officers with directives and track whether CPD officers receive and review the policies. The CPD also created a Tableau dashboard, entitled Department Directives Dashboard, to track, monitor, and analyze compliance with ¶340(a) and (c). Secondary compliance requires 95% of eligible personnel to attest to reviewing the new or revised policies. The CPD documents stated that 96% of members had "received" the directives between March and August 2020, but compliance rates for September and October 2020 were below 95%.

According to policy G01-03 IX.B.3(b), "The monthly Department directives eLearning module will be completed within twenty-eight days of dissemination." During the current reporting period, CPD continued to provide access to available Tableau records. According to those records, the following percentage of personnel reviewed the monthly updates, as required:

| Month | Compliance Percentage |
|---|---|
| January 2021 | 99 |
| February 2021 | 99 |
| March 2021 | 98 |
| April 2021 | 98 |

| Month | Compliance Percentage |
|:---:|:---:|
| May 2021 | 94 |
| June 2021 | 78 |

According to policy G01-03 IX(B)(3)(b), "The monthly Department directives eLearning module will be completed within twenty-eight days of dissemination." Therefore, May 2021 numbers reflect directives issued in May that should have been reviewed within 28 days of issuance, or not later than 28 June 2021. Clearly, the May compliance percentage barely missed the threshold. Directives issued by June 30 should be reviewed by 28 July 2021, a date which extends into the next reporting period.

Secondary compliance requires at least 95% of eligible personnel review the monthly policy updates. That number was not achieved for directives issued in May. Full compliance is achievable when CPD has fully implemented and institutionalized a full process that aligns with ¶340 requirements.

# VII. Supervision

This is the Supervision section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Supervision compliance efforts from January 1, 2021, through June 30, 2021.

## Guiding Principles

The IMT will assess compliance with the Supervision paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **341.** *Effective supervisors, who lead by example and actively engage with the subordinates under their direct command, play a critical role in ensuring lawful, safe, effective, and community-centered policing. To achieve this outcome, the Parties agree to the requirements set out below.*

> **342.** *The provisions of this Agreement are designed to ensure that CPD supervisors provide the effective supervision necessary for members to perform their duties lawfully, safely, and effectively and for members to improve and grow professionally. Further, the provisions of this Agreement are designed to allow supervisors to spend time monitoring and training members under their direct command so as to provide adequate opportunities to prevent, promptly identify, and promptly correct adverse officer behavior. This meaningful supervision will facilitate the establishment and re-enforcement of a culture of community policing, community and officer safety, and accountability throughout the Department.*

> **343.** *CPD should have the staffing necessary to promote lawful, safe, effective, and community-centered policing; provide effective supervision; ensure officer safety and accountability; and implement the terms of this Agreement.*

> **344.** *Immediate supervisors of all ranks are responsible for supervising, managing, and overseeing, as appropriate, the day-to-day work activities of members under their direct command.*

**345.** Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.

**346.** Effective supervisors will: a. engage in activities and conduct that support the mission and goals of the Department, including those set forth in this Agreement; b. model appropriate conduct, including abiding by high standards of integrity and adhering to the United States Constitution and other laws, CPD policy, and the terms of this Agreement; and c. consistently demonstrate professionalism, courtesy, and respect towards all people with whom they interact.

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

The City and the CPD took three large steps toward compliance with various Supervision paragraphs during the fourth reporting period. First, they finalized the *Supervisory Responsibilities* policy (G01-09). This directive establishes a home-base for supervisors, providing a hub for resources and information regarding supervisors' responsibilities under CPD policies. G01-09 is a practical tool that provides an appendix of and links to associated policies. It also reiterates the CPD's commitment to developing a culture dedicated to the principles of procedural justice, community policing, and de-escalation. The policy requires supervisors to provide guidance and mentoring to officers under their command, and clearly identifies supervisors' day-to-day responsibilities.

Second, the CPD expanded the Unity of Command and Span of Control pilot program from one district (the 6th District) to three districts (the 4th, 6th, and 7th districts). We appreciate the CPD's desire to begin implementing the Unity of Command and Span of Control principals department-wide. However, the implementation of the program has faced challenges. During the fourth reporting period, we learned from officers in the three pilot districts that staffing shortages have prevented these districts from consistently meeting the 10-to-1 officers-to-supervisors ratio required by the Consent Decree. We also learned that officers are not being consistently overseen by the same supervisors as envisioned by the pilot program. While officers in these districts recognize the value of the principles behind the Unity of Command and Span of Control pilot program, they also voiced frustrations related to the staffing shortages which have not only hampered compliance with the pilot program, but created situations in which understaffing has diminished officer safety. These issues should be meaningfully addressed before efforts are made to expand the program into additional districts—while we hope to see continued progress with the pilot program, expansion of a pilot program which suffers many fundamental flaws will not ultimately allow the CPD to reach additional levels of compliance.

Finally, the CPD has made great efforts in developing the *Performance Evaluations Systems Pilot Program* policy (D21-03), and supporting materials. We are encouraged by the progress toward and attention paid to this program. This still-developing system will create opportunities for ongoing feedback and mentorship between officers and their supervisors.[131] In addition to providing a pathway toward identifying members who may need assistance to reach desired performance lev-

---

[131] During the fourth reporting period, the CPD provided documentation that provides insight into the currently-used evaluations systems. This documentation demonstrates that the still-developing Performance Evaluations Systems program will be a marked improvement, creating an evaluations system that emphasizes important areas such as constitutional policing, community policing, problem-solving, and de-escalation.

els, the system will help identify exemplary members and assist in better leveraging their skills. This pilot program is set to soon launch in the same three districts in which the Unity of Command and Span of Control program is being piloted: the 4th, 6th, and 7th districts.

Notably, the CPD has built the Performance Evaluations System Pilot Program on an assumption that the Unity of Command and Span of Control program is being consistently followed in these three districts. As a result, it is plausible that the difficulties in fulfilling the goals of the Unity of Command and Span of Control program will cause difficulties in achieving the goals of the Performance Evaluations System pilot program.

Moving forward, the City and the CPD will need to critically review the Unity of Command and Span of Control pilot program and evaluate what changes can be made to reach the goals set out by their program and the Consent Decree. Thought should be given as to not only how the CPD can reach these goals in the pilot program, but also eventually expand the program department-wide. Thoughtful analysis will be aided by the City and the CPD implementing and utilizing appropriate dashboards and data systems to track compliance with the pilot program and identify areas of continued improvement.

In sum, we assessed the City's and the CPD's compliance with 17 paragraphs during the fourth reporting period (¶¶348, 350, 353–56, 360, 362, 364, 368, 370–76). In the fourth reporting period, the City and the CPD maintained Preliminary compliance for four paragraphs (¶¶348, 360, 364, and 368) and reached Preliminary compliance with four additional paragraphs (¶¶350 and 353–55). *See* Supervision Figure 1 below. The City did not reach Preliminary compliance with the remaining nine paragraphs (¶¶356, 362, and 370–76).

Supervision Figure 1:  Compliance Status for Supervision Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



Paragraphs in Preliminary, Secondary, or Full Compliance (8)
Paragraphs that have not met Preliminary compliance (9)
Paragraphs Under Assessment for Preliminary compliance (0)

The City had one Supervision deadline in the fourth reporting period (¶368), which it met. *See* Supervision Figure 2 below.

Supervision Figure 2:  Supervision Deadline in the Fourth Report: 1



Met Deadline (1)
Missed Deadline (0)

# Supervision: ¶348

***348.*** *By January 1, 2020, CPD will review and, as necessary, revise its policies for supervision to ensure that such policies set out clear responsibilities for supervisors to comply with the requirements of this Agreement. CPD will inform all supervisors of their specific duties and responsibilities that are required by CPD policies, including this Agreement.*

## Compliance Progress <span style="float:right">(Reporting Period: Jan. 1, 2021, through June 30, 2021)</span>

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶348 but have not yet reached Secondary compliance.

In previous reporting periods, we reviewed iterations of the CPD's *Supervisory Responsibilities* policy, corresponding training documents, and other documents related to this paragraph, such as training tracking sheets and the *Supervisory Policy Matrix*.[132] The City and the CPD reached Preliminary compliance in the second reporting period. They did not reach additional levels of compliance in the third reporting period, because the CPD still needed to develop a tracking system for policies and trainings regarding supervisory responsibilities.

To maintain Preliminary compliance with ¶348, we considered whether the CPD reviewed and revised relevant CPD policies and finalized changes as outlined in the Consent Decree (¶¶626–41). To evaluate Secondary compliance with ¶348, we reviewed, among other things, the CPD's training development, implementation, and evaluation.

During this reporting period—in February 2021—the CPD submitted a revised version of the *Supervisory Responsibilities* (G01-09). After receiving no-objection notices from both the IMT and the OAG in March 2021, the CPD submitted the policy for public comment and finalized it in May 2021.

This policy addresses many concerns we identified in previous reporting periods. G01-09 establishes a strong foundation for supervisors and provides their responsibilities under CPD policies, including those responsive to the Consent Decree. It calls on supervisors to commit to the principles of procedural justice, community

---

[132] Early versions of the *Supervisory Responsibilities* General Order were numbered G01-07 and G01-08. The finalized version of the policy, which was submitted this reporting period, is G01-09. For consistency, we refer to the *Supervisory Responsibilities* General Order as G01-09 throughout this report.

policing, and de-escalation. The policy also sets an expectation that supervisors encourage and guide personnel with those principles in mind.

G01-09 is also a practical tool for supervisors. It provides an appendix of, and links to, associated policies. With this, the policy can serve as a hub for supervisors to quickly find relevant CPD policies.

The City and the CPD have maintained Preliminary compliance with ¶348 by carefully revising, improving, and finalizing G01-09. In the next reporting period, and for the CPD to reach subsequent levels of compliance, we hope to see that the CPD has a system for tracking supervisory responsibilities and trainings across all areas of the Consent Decree. We also hope to review supervisory logs that capture supervisor's actions that demonstrate compliance with the policies that outline expectations and responsibilities of supervisors.

## Supervision: ¶350

**350.** *CPD will regularly inform its members, including supervisors, of available training, professional development opportunities, and employee assistance resources.*

**Compliance Progress**            (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶350 for the first time in the fourth reporting period. The City and the CPD reached Preliminary compliance.

To assess Preliminary compliance with ¶350, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We expect the CPD to develop an effective channel for informing members of training and professional development opportunities, as well as available employee-assistance resources.

In the fourth reporting period, the CPD submitted and the IMT reviewed several documents regarding ¶350. The CPD's 2020 Annual Training Report (March 2021), for example, identifies several training requirements and opportunities provided to all CPD members, including officers and supervisors. Several of the trainings were mandatory under the Consent Decree and others were electives. In total, CPD members were required to complete 32 hours of mandatory in-service training in 2020.

At least 95% of the CPD officers received their 32 hours of in-service training. This level of completion is evidence of a robust communication and notification system, which ensured members were aware of their training requirements and additional opportunities for training. Additionally, the CPD provided an updated draft of S11-10-01, *Training Notification and Attendance Responsibilities*, during the fourth reporting period. This policy sets out in-service training notification processes as well as expectations for attending trainings and steps to be followed when trainings are missed. Further, the Performance Evaluations System pilot program sets out expectations that supervisors will assist in the professional development of members under their command.[133]

The CPD's policies and strategies—such as G01-09, which requires supervisors to advice members of available training, professional development opportunities,

---

[133]  For additional discussion of the Performance Evaluations System pilot program, see our assessments of ¶¶370–76.

and employee assistance resources, and the Wellness Communications Strategy[134]—set out a robust network of communication expectations. This in conjunction with the fact that a high percentage of officers completed their in-service training requirements (demonstrating at least anecdotally that these policies and strategies could be effective) allow us to find the City and the CPD to be in Preliminary compliance with ¶350. Next reporting period we hope to see that notification systems are employed in a manner consistent with the various directives that touch on notifying members of training, professional development opportunities, and employee assistance resources. More specifically, we would like to review data demonstrating how the notification systems work and their effectiveness in disseminating information.

---

[134] The Wellness Communications Strategy is discussed further in Section VIII. Officer Wellness and Support.

# Supervision: ¶353

*353. Additionally, effective supervision requires that immediate supervisors will, for members under their direct command: a. respond to, review, and investigate uses of force and other incidents and conduct as required by CPD policy and this Agreement; b. monitor, manage, and coordinate incident response; c. confirm the correctness, sufficiency, and completeness of written reports submitted for review and approval; d. identify any adverse behavior or misconduct and ensure that it is adequately addressed through corrective action, training, or referral for discipline; e. respond appropriately to each complaint of misconduct received, in accordance with CPD's complaint and disciplinary policies; f. review and act upon information regarding at-risk behavior by the members under their direct command, as required by the Data Collection, Analysis, and Management section of this Agreement; g. advise members under their direct command of available training, professional development opportunities, and employee assistance resources; h. conduct annual performance evaluations and meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify areas for improvement; and i. document the performance of their supervisory duties as required by CPD policy and this Agreement using the appropriate records management system, the Performance Recognition System ("PRS"), and/or the EIS.*

---

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶353. This reporting period, the CPD reached Preliminary compliance with this paragraph.

To evaluate Preliminary Compliance with ¶353, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. The CPD's policies should be realistic and inclusive to effectively address supervisory responsibilities across its broad spectrum of administration and operations.

---

In the third reporting period, we provided a status update for ¶353. We recognized that the CPD took steps toward compliance with this paragraph, including but not limited to working toward implementing the Performance Evaluations System pilot program and the Officer Support System Plan. We explained that the requirements of ¶353 are closely related to requirements of paragraphs across various sections of the Consent Decree and that we would consider advancements and actions taken under various sections as we assess compliance with the various requirements set out in this paragraph. We recommended that the City and the CPD focus on acquiring and implementing technology solutions to help record, collect, and analyze data regarding supervisory responsibilities such as response to scene, investigations, performance evaluations, referrals to employee assistance resources, and more.

CPD supervisors carry the tremendous responsibility of, among other things, providing effective leadership, displaying professionalism, and holding themselves and others accountable in the performance of their duties. Supervisors must, in turn, have the proper guidance and training to effectively and properly fulfill their responsibilities. Throughout the third and fourth reporting periods, the CPD put great effort into developing, drafting, and revising the *Supervisory Responsibilities* policy (G01-09).[135] This policy provides the guidance and direction necessary for supervisors to know and understand the extent of their duties and responsibilities. The IMT and the OAG submitted no-objection notices to G01-09 in March 2021, and the CPD subsequently submitted the policy for public comment and finalized the policy.

G01-09 reflects ¶353 requirements.[136] It outlines expectations of supervisors and provides guidance on how supervisors should comport with their various responsibilities, such as responding to scenes, investigating uses of force, and reviewing and approving various reports. G01-09 will serve as the foundation for supervisors to be trained and held accountable for executing their responsibilities.

G01-09 also requires supervisors to provide guidance, mentoring, and direction to officers, including supporting officers with their performance and identifying areas for improvement. Under the policy, supervisors must ensure officers are afforded training, professional development opportunities, and employee assistance services and resources. This includes conducting annual performance evaluations and regularly meeting with members under their direct command.

---

[135] Early versions of the *Supervisory Responsibilities* General Order were numbered G01-07 and G01-08. The finalized version of the policy, which was submitted this reporting period is G01-09. For consistency, we refer to the *Supervisory Responsibilities* General Order as G01-09 throughout this report.

[136] We also discuss details of G01-09 in our assessment of ¶348.

This reporting period, the CPD also worked to develop the Performance Evaluations System pilot program.[137] While the directive for the pilot program remains under revision process, the IMT is encouraged by the development of the program. The draft sets out clear expectations for members and creates avenues for officers to gain invaluable insights and mentoring from superiors.

The CPD reached Preliminary compliance with this paragraph with the finalization of G01-09. And their efforts are bolstered by the ongoing development of the Performance Evaluations System pilot program.

In future reporting periods we will look for the finalization of the Performance Evaluations System pilot program directive and hope to attend trainings on these directives in upcoming reporting periods. Additionally, we understand that the CPD supervisors currently utilize a "Supervisor Log" to capture their daily work. We hope to review examples of these logs along with the paperwork related to the new Performance Evaluations System pilot.

---

[137] For additional discussion of the Performance Evaluations System pilot program, see our assessments of ¶¶370–76.

# Supervision: ¶354

**354.** *During their tour of duty, immediate supervisors in the Bureau of Patrol will spend time interacting with, observing, and overseeing the members under their direct command, including time in the field, consistent with their duty assignment.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶354, and they reached Preliminary compliance with this paragraph.

To assess Preliminary compliance, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

In the third reporting period, we provided a status update for ¶354. We explained our understanding of requirements placed on supervisors to check in with members of their squads on patrol, but we lacked sufficient information to provide detailed assessment of progress with the requirements of this paragraph.

During the fourth reporting period, the CPD finalized the *Supervisory Responsibilities* policy, G01-09.[138] This policy clearly defines supervisor's day-to-day responsibilities. G01-09 directs supervisors to "spend time interacting with, observing, and overseeing the members under their direct command, including time in the field, consistent with their duty assignment." The policy further holds supervisors accountable "for the performance of subordinate members directly observed or under their direct command regarding Department directives."

Given the above, we find that G01-09 addresses the requirements of ¶354, and therefore, the CPD has reached Preliminary compliance with this paragraph. Next reporting period, we look forward to observing trainings for supervisors regarding capturing feedback they provide to members, and reviewing logs kept relating to the requirements of this paragraph. We encourage the CPD to maintain efforts aimed to acquire and implement technology systems that will allow for efficient and accurate capture of this information.

---

[138]   We provide additional details about G01-09 in our assessment of ¶¶348 and 353.

# Supervision: ¶355

*355. Immediate supervisors will be required to document their actions taken with members under their direct command, pursuant to CPD policy, including, but not limited to: a. non-disciplinary or corrective actions, including, but not limited to, those taken pursuant to any internal or external review of the conduct of CPD officers or taken pursuant to the operation of any existing and future automated electronic systems contemplated by Part D of the Data Collection, Analysis, and Management section of this Agreement; b. disciplinary referrals; c. response to incident scenes as required by CPD policy; d. observations of member conduct, as required by CPD policy; and e. reviews and investigations of reportable uses of force and other reports required by CPD policy and this Agreement.*

## Compliance Progress                  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶355.

In previous reporting periods, we reviewed draft versions of the *Supervisory Responsibilities* policy.[139] The collaborative process used to review and revise such documents was ongoing at the end of the third reporting period. For that reason, the City and the CPD had not yet achieved Preliminary compliance.

To evaluate Preliminary compliance with ¶355, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

In the fourth reporting period, the CPD revised, posted for public comment, and finalized *Supervisory Responsibilities*, G01-09.[140] This policy references all elements of ¶355 by outlining supervisors' duties, including responding to various incident scenes, reviewing and investigating reports of uses of force and other reports. Section IV.C. of G01-09, entitled "Accountability," states:

---

[139]  The CPD produced earlier drafts of the *Supervisory Responsibilities* General Order as G01-07 and G01-08. For consistency refer to this General Order as G01-09 throughout this report.

[140]  We provide additional details regarding G01-09 in our assessments of ¶¶348 and 353–54.

> *[S]upervisors are responsible for holding Department members under their command accountable for their actions and have the duty to report allegations of misconduct. As such Department supervisors will: (a) identify any adverse behavior or misconduct and ensure that it is adequately addressed through employee assistance resources, corrective action, timely and appropriate training, or referral for discipline.*

With the careful revisions and finalization of G01-09, the CPD reached Preliminary compliance with ¶355. In the next reporting period we will look for evidence that the CPD has trained supervisors to comply with relevant portions of G01-09, and review data sources to determine whether supervisors are consistently and appropriately engaging with those under their command to comply with ¶355.

## Supervision: ¶356

> **356.** *As otherwise set out in this Agreement, CPD will ensure that it makes staffing and allocation decisions that provide for: a. the number of patrol field supervisors to ensure span of control and unity of command as required in this Part; b. the number of well-trained, qualified FTOs, as required in Part H of the Training section of this Agreement; c. the number of well-trained, qualified staff to train recruits and officers, as required in Part D of the Training section of this Agreement; d. the number of well-trained, qualified staff to conduct timely misconduct investigations, as required in the Accountability and Transparency section of this Agreement; e. the number of certified CIT Officers, as required in Part D of the Crisis Intervention section of this Agreement; and f. the number of officer assistance and wellness staff as required in the Officer Wellness and Support section of this Agreement.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach any level of compliance with ¶356 during the fourth reporting period.

To evaluate Preliminary compliance with ¶356, we considered, among other things, whether the CPD developed a plan to ensure that staffing and allocation decisions comply with the staffing requirements of this paragraph. We also considered the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41). We also considered data sources provided by the City and the CPD—such as information gathered from virtual site visits—that are relevant to the requirements of this paragraph.

In previous reporting periods we recognized that the CPD took steps toward compliance with subsections of ¶356. For example, they increased the staffing levels of the Professional Counseling Division to comply with subsection (f). Despite these efforts, the City and the CPD did not reach Preliminary compliance because, by the end of the reporting period, the CPD had not yet demonstrated that it had an actionable plan to meet all staffing requirements set out in ¶356.

The CPD expanded the Unity of Command and Span of Control pilot program to two additional districts. The program was initially piloted in the 6th district and, in the fourth reporting period, the CPD expanded the pilot program into the 4th and

7th districts, as well. In addition to expanding the pilot program, the CPD updated the *Unity of Command and Span of Control Schedule - Pilot Program* policy, D20-02, in April 2021. The policy defines both unity of command and span of control and explains how it is designed to afford consistency within patrol areas and create manageable officer-to-sergeant ratios. Still, the CPD continues to face challenges that prevent reaching Preliminary compliance with ¶356.

Through virtual site visits conducted with several officers and sergeants from the 4th, 6th, and 7th districts, we learned that unity-of-command and span-of-control efforts have not played out on the ground as D20-02 directs. Many members were supportive of unity-of-command and span-of-control concepts that the pilot program intends to achieve. Many of these officers believed that, if properly staffed, the program could benefit the CPD and Chicago communities it serves.

However, officers consistently described a continued and significant shortage of personnel, including both officers and sergeants. This shortage has prevented compliance with principals set out in the pilot program. These frustrations were captured in and reiterated by the Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control pilot program.[141]

The most notable obstacle for gaining compliance with this paragraph is the absence of a comprehensive staffing study. Although the City and the CPD have made efforts to engage staffing experts to assist in developing a staffing plan, the plan had not been developed—or at least, had not been submitted for review by the end of the fourth reporting period.

Still, we note the CPD has made progress toward other ¶356 requirements. For example, the CPD has made progress toward finalizing the *Field Training and Evaluation Program* Special Order, S11-02, which requires a one to one ratio of Field Training Officers to Probationary Police Officers, and has increased the number of clinicians in the Professional Counseling Division, to name a few.[142]

To reach Preliminary compliance with ¶356, the CPD must demonstrate an actionable plan to ensure that all staffing and allocation decisions are made in a manner consistent with all the requirements of ¶356. To do this, the CPD will need to complete a comprehensive staffing study to inform a realistic and effective staffing

---

[141]  We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, this assessment does not reflect any findings of that audit. We will provide relevant updates to our assessments, as appropriate, in Independent Monitoring Report 5.

[142]  For additional information regarding the staffing of the Professional Counseling Division, refer to our assessment of ¶391 in the Officer Wellness and Support section of this report. For additional information regarding S11-02, refer to our Training section.

plan. We look forward to receiving this information and continuing to consult with the CPD and the City as they undertake these efforts.

# Supervision: ¶360

**360.** *By January 1, 2020, CPD will develop a staffing model to achieve the principles of unity of command and span of control. CPD's staffing model will identify methods to implement unity of command and a span of control ratio of no more than ten officers to one Sergeant for all field units on each watch in each of CPD's patrol districts. To achieve this objective, CPD will maintain, at a minimum, one Sergeant for each sector.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶360 during the second reporting period. They did not reach additional levels of compliance with ¶360 during the fourth reporting period.

The City and the CPD reached Preliminary compliance with ¶360 in the second reporting period by launching the Unity of Command and Span of Control pilot program in the 6th district. They maintained Preliminary compliance but did not reach further levels of compliance with ¶360 in the third reporting period. We recognized that the CPD faced unanticipated challenges during the third reporting period—including the COVID-19 pandemic—that limited the CPD's ability to allocate sufficient attention toward the pilot program. We also emphasized that the staffing model would need to be critically reviewed to appropriately adjust the model to address the unique needs of the districts into which the pilot program has not yet been expanded. Despite this, we commended the efforts of the CPD's Audit Division, which conducted an assessment, identified areas of improvement, and expressed a continued optimism for the pilot program moving forward.

During the fourth reporting period, the CPD expanded the Unity of Command and Span of Control pilot program from the 6th District into the 4th and 7th districts. In May 2021, the CPD submitted a revised *Unity of Command and Span of Control Schedule – Pilot Program* policy D20-02. At the end of the reporting period, the policy remained in the collaborative revision and review process outlined in ¶¶626–41.

Since beginning the pilot in the second reporting period, however, the CPD has struggled to identify a sustainable path toward full, department-wide compliance with ¶360. Three critical areas pose a challenge to the CPD's maintaining Preliminary compliance and achieving Secondary compliance: (1) the CPD must continue developing and instituting an optimal staffing model to allow for a more consistent

staffing of the pilot districts; (2) the CPD must enhance their tracking, data, and auditing systems to monitor staffing assignments and levels; and (3) the CPD must establish the Evaluation Committee, which the IMT believes is central to providing the oversight the Unity of Command and Span of Control pilot program needs to effectively expand.

As described in our assessment of ¶356, during the fourth reporting period, we conducted a virtual site visit with sergeants and officers assigned to the pilot program. Members were generally supportive of the program and its intention of bringing consistency in resources and building a team environment. But they also shared frustrations with not being able to properly and consistently staff their beats with the same personnel, as envisioned by the pilot program. A variety of factors appear to be causing this inconsistent staffing, such as a near-weekly detailing of officers and sergeants to other assignments, both within their districts and outside of their districts. These frustrations were also captured in and reiterated by the Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control Pilot project.[143]

These continued staff shortages demonstrate that the Unity of Command and Span of Control pilot program is not working as planned. While creating a plan or policy that requires the staffing model outlined by ¶360 is necessary, the plan or policy must allow the CPD to "*achieve* the principle of unity of command and span of control." The Unity of Command and Span of Control program has been in place for two reporting periods and is now in multiple districts, yet none of those districts have reached or maintained the staffing levels required by ¶360. This suggests that the plan or policy is either not realistic or is not being properly supported by necessary resources. We encourage the CPD to dedicate attention and resources to either ensuring that the pilot districts are properly staffed or adjusting the pilot program so that it is realistic and provides guidance to allow for future compliance with ¶360 and other related paragraphs. If issues identified with the pilot program are not addressed, the City and the CPD could lose Preliminary compliance with this paragraph.

Given the challenges identified above, the City and the CPD did not reach Secondary compliance with ¶360. We urge the City and the CPD to assess the Unity of Command and Span of Control pilot program in the upcoming period. The City and the CPD must then begin to make adjustments to ensure that the program leads

---

[143] We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, this assessment does not reflect any findings of that audit. We will provide relevant updates to our assessments, as appropriate, in Independent Monitoring Report 5.

to the successful implementation of the requirements in the pilot districts and, ultimately, in all districts.

# Supervision: ¶362

**362.** *By January 1, 2020, CPD will develop a system and protocols to allow the Department to assess, both long-term and on a day-to-day basis, whether field units on each watch in each patrol district meet the requirements for unity of command and span of control.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD did not reach Preliminary compliance with ¶362 in the fourth reporting period.

To evaluate Preliminary compliance with ¶362, we reviewed the CPD's relevant policies following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also considered data sources, such as information and insights of officers gathered during virtual site visits and audit results, which was necessary or helpful to identify, verify, and sustain compliance with review.

The City and the CPD did not reach any level of compliance with ¶362 in previous reporting periods. As with ¶360, compliance with ¶362 was likely slowed by unanticipated challenges that the City and the CPD faced during the third reporting period. Despite this, the CPD implemented a dashboard intended to display data regarding compliance with Unity of Command and Span of Control requirements. By the end of the third reporting period, more work was still needed to ensure data reliability.

As mentioned in our assessment of ¶¶356 and 360, we conducted virtual site visits with officers in the three districts with the Unity of Command and Span of Control pilot program (4th, 6th, and 7th) to hear their thoughts and observations concerning the implementation and management of the pilot program.

Officers expressed that the pilot program concepts allowed for building strong teams that work consistently with one another, better support one another, and better leverage each other's strengths. Many sergeants expressed a belief that the pilot program concepts provide the benefit of working with the same team members on a regular basis, which allow them to better engage, guide, and set expectations for their officers and full team.

But the pilot program is not being implemented on the ground in accordance with the program policy or its concepts. One sergeant stated they have yet to have the same officers for any full week period. And some sergeants have, at times, struggled to fill each beat car during shifts.

The CPD's own audit—along with this feedback—demonstrate that field units on each watch, in each district, are not meeting the requirements for unity of command and span of control.[144]

In our last report, we noted that the CPD implemented a dashboard intended to display data regarding compliance with the Unity of Command and Span of Control requirements. In this reporting period, however, the CPD did not provide us additional information regarding this dashboard or data coming out of this dashboard. Therefore, the City and the CPD still have not reached Preliminary compliance. Similarly, we reiterate our suggestion from the third reporting period: the CPD should work to ensure that data underlying the dashboard is up to date and reliable.

---

[144] We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, this assessment does not reflect any findings of that audit. We will provide relevant updates to our assessments, as appropriate, in Independent Monitoring Report 5.

## Supervision: ¶364

> **364.** *Beginning no later than January 31, 2020, CPD will begin to implement a staffing model to achieve unity of command and a span of control ratio of no more than ten officers to one Sergeant assigned to field units on each watch in each patrol district.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶364 during the Second reporting period. The City and the CPD have not yet reached Secondary compliance with this paragraph.

To evaluate Secondary compliance with ¶364, we reviewed the CPD's relevant training development, implementation, expansion, and evaluation of the CPD's Unity of Command and Span of Control pilot program, which the CPD launched in the 6th District in early 2020. As the CPD expands the pilot program into additional districts, we are looking for effective and consistent implementation of the staffing model, ensuring that the staffing levels comport with the 10 to 1 requirements from ¶364.

In previous reporting periods, we followed the creation and implementation of the Unity of Command and Span of Control pilot program, which seeks to achieve a ratio of no more than 10 officers to 1 sergeant. Based on the creation and launch of the pilot program in the 6th District, which occurred during the second reporting period, we granted Preliminary compliance with ¶364. We cautioned in the third reporting period that maintenance of Preliminary compliance required careful monitoring, evaluating, and refining of the staffing model to effectively expand the pilot program in all districts.

During the fourth reporting period, the CPD conducted a survey with the officers and sergeants assigned to the pilot districts. This survey showed limited staffing to be among officers' top concerns related to the Unity of Command and Span of Control pilot program.[145]

---

[145] We understand that an additional audit was completed related to the Unity of Command and Span of Control pilot program during the fourth reporting period. The City and the CPD did not, however, produce this audit before the close of the reporting period. Therefore, this assessment does not reflect any findings of that audit. We will provide relevant updates to our assessments, as appropriate, in Independent Monitoring Report 5.

This is consistent with what we learned during the virtual site visit we conducted.[146] During that visit, officers expressed major concerns with staffing. Many officers stated they have the same sergeant only about half of the time—which runs contrary to the consistent staffing envisioned by the program.

In the second reporting period, we found that the CPD reached Preliminary compliance by creating the Unity of Command and Span of Control pilot program. However, since then, it has become evident that the CPD either is not committed to following the program as outlined or does not have the resources to follow through with the program as outlined. Either way, the difficulties the pilot districts have faced in following the pilot program, as written, suggests that the pilot program may not be an effective roadmap for compliance with ¶364. The City and the CPD must address these issues to maintain Preliminary compliance and eventually reach Secondary compliance.

Given these challenges, the City and the CPD have not reached Secondary compliance with this paragraph. In sum, we urge the City and the CPD to focus necessary resources to address issues related to the Unity of Command and Span of Control pilot program so that the program can eventually be responsibly expanded to other districts.

---

[146] We provide additional detail regarding information gathered during our site visit in our assessments of the City and the CPD's efforts regarding ¶¶356, 360, and 362.

# Supervision: ¶368

**368.** *Beginning 365 days after the Effective Date, and annually thereafter, the Monitor will review and assess CPD's progress toward achieving unity of command and a span of control ratio of no more than ten officers to one Sergeant.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** May 3, 2021*     ☑ Met   ☐ Missed
*Extended from February 28, 2021, due to COVID-19
**Preliminary:** *In Compliance (SECOND REPORTING PERIOD)*
**Secondary:** *Not in Compliance*
**Full:** *Not in Compliance*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance but did not reach additional levels of compliance. The City and the CPD met the corresponding deadline by providing the IMT with sufficient information to make this assessment. On the other hand, the information provided demonstrates that the City and the CPD have a long way to go to achieve the unity of command and span of control ratio of no more than 10 officers to one Sergeant. To maintain Preliminary compliance in future reporting periods, the City and the CPD must devote efforts to compiling and maintaining reliable data regarding efforts aimed at compliance with Unity of Command and Span of Control principles outlined in the Consent Decree.

To evaluate Secondary compliance with ¶368, we reviewed the CPD's relevant policies, as well as records regarding the expansion of the CPD's Unity of Command and Span of Control pilot program. Also, to determine whether the CPD met the annual requirement of this paragraph, we considered whether the City and the CPD provided us with sufficient data to assess their progress toward achieving the unity of command and span of control ratio of ten officers to one sergeant.

The City and the CPD reached Preliminary compliance with ¶368 in the second reporting period by launching the Unity of Command and Span of control pilot program. They maintained Preliminary compliance in the third reporting period but did not reach subsequent levels of compliance. We did, however, commend the CPD for keeping the IMT apprised regarding staffing and operational challenges.

As discussed in ¶¶360 and 362, we conducted a virtual site visit in the fourth reporting period. During that visit, we heard that the staffing ratio called for by these paragraphs are not being met. There seems to be a staffing shortage caused by various factors that is preventing the CPD from complying with this ratio. These shortages are not only causing frustrations among officers in the districts in which

the Unity of Command and Span of Control pilot program is being piloted (4th, 6th, and 7th), but seem to have also caused unsafe situations for officers in those districts. The Audit Division's Summary of challenges facing the expanded Unity of Command and Span of Control Pilot project reiterated the frustrations and concerns we heard from officers.

As discussed in ¶364, we have not received data from the dashboard implemented to track compliance with the Unity of Command and Span of control principles. Without this data, we cannot fully assess the extent to which the CPD is or is not achieving the unity of command and span of control staffing ratio in the pilot districts (although anecdotal evidence suggests the CPD is not achieving this ratio). Therefore, the CPD did not meet the annual requirement for this paragraph. Similarly, the CPD has not reached Secondary compliance with this paragraph. In order to reach Secondary compliance, and maintain Preliminary compliance in upcoming reporting periods the CPD will need to provide us with various data sources so that we can assess, using quantitative data, the CPD's compliance with this paragraph. These data sources include dispatch activity reports, rosters, sergeant staffing reports, CPD budgets and forecasts, and other similar data.

# Supervision: ¶370

*370. CPD's performance evaluation process will identify, support, and recognize members' activity, performance, and conduct through an assessment of specific quantitative and qualitative performance dimensions, which will address, among other things, constitutional policing, community policing, problem-solving, and the effective use of de-escalation or specialized training. Although CPD may use quantitative measures in evaluating members to ensure that members are performing their required duties, CPD will not require members to achieve specific numerical thresholds, such as the number of arrests, investigatory stops, or citations. CPD will ensure that its performance evaluation process is consistent with the law and best practices. Within 18 months of the Effective Date, CPD will revise its performance evaluation policies and practices as necessary to meet the requirements of this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD made great progress toward compliance with ¶370, but they have not yet reached Preliminary compliance.

To assess Preliminary compliance with ¶370, we reviewed the CPD's relevant policies (D21-03) and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

In the third reporting period, the City and the CPD made steps toward compliance with ¶370, but did not reach Preliminary compliance. They submitted a draft of the *Performance Evaluations System – Pilot Program* policy (D21-03) and supporting materials for collaborative review.[147] However, D21-03 remained in the review process at the close of the third reporting period.

In the fourth reporting period, the CPD submitted and the IMT reviewed various documents associated with the currently-used evaluation system: *Performance*

---

[147] Earlier versions of this directive were produced under D02-09. For consistency and to avoid confusion, we will refer to all versions of this policy as D21-03 throughout this report. However, we noted that the CPD produced another, separate directive during this reporting period under the same number (D21-03). The CPD will need to address this duplicative numbering in subsequent revisions of the directives.

*Evaluations of All Sworn Department Members Below the Rank of Superintendent* policy (E05-01), *Performance Recognition System* policy (E05-02), and the 2018 Performance Evaluation Reference Guide.[148] We appreciate that the CPD is continuing to evaluate members under these policies, but we note that this existing evaluation system does not sufficiently emphasize the elements contemplated by the Consent Decree, such as constitutional policing, community policing, problem solving, and effective de-escalation. Still, these documents provide a helpful backdrop against which we can compare the CPD's latest efforts toward reforming of performance evaluations.

The CPD's efforts toward reform in this area are captured in the *Performance Evaluations System-Pilot Program* policy (D21-03). During the fourth reporting period, the CPD revised D21-03, the first draft of which was submitted at the end of the third reporting period. The Performance Evaluations System pilot program outlined in D21-03 will be piloted in the 4th, 6th, and 7th districts—the same districts in which the Unity of Command and Span of Control program is being piloted. D21-03 incorporates specific quantitative and qualitative performance dimensions, allowing for the capturing of members' activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation.

In addition to the revised policy, the CPD revised the Performance Evaluation Reference Guide to serve as a resource for members being evaluated and those conducting evaluations. The Reference Guide also clearly describes the various dimensions and provides guidance on how to capture the associated work. The CPD provided demonstrations of the electronic system along with sample performance submissions.

We submitted a no-objection notice regarding revised D21-03 on June 3, 2021. However, the policy was not submitted for public comment and finalized by the end of the reporting period.[149] For this reason, the CPD has not yet reached Preliminary compliance. We look forward to working with the CPD as they finalize D21-03 and begin training on the Performance Evaluations System pilot program.

---

[148] These earlier created evaluation system documents remain in effect in districts that are not part of the D21-03 pilot program.

[149] On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

## Supervision: ¶371

> **371.** *Annual performance evaluations for members of all ranks, excluding the Superintendent, will be based upon work performance completed during a specific rating period and will include a written description of performance dimension expectations; the member's proficiency in fulfilling the specific duties and responsibilities of the assigned position, unit, or team; any areas of particular growth and achievement; and areas where the member requires further support and/or supervision. The evaluation process will provide for support, feedback, communication of expectations, and, when appropriate, corrective actions.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          December 31, 2021      ☑ **Not Yet Applicable**

**Preliminary:**       *Not in Compliance*
**Secondary:**        *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance with ¶371 during the fourth reporting period. However, they made great strides toward compliance, and we are encouraged by the thoroughness and thoughtfulness of the efforts undertaken during this reporting period.

To assess Preliminary compliance with ¶371, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed provided data sources relevant to compliance with the paragraph's requirements.

In the third reporting period, we evaluated the CPD's compliance with ¶371 for the first time and found that the City and the CPD did not reach Preliminary compliance. Still, we noted that the Performance Evaluations System pilot program— which was in the planning stages—marked progress toward the requirements of the paragraph.

In the fourth reporting period, the CPD continued to work towards finalizing the *Performance Evaluations System – Pilot Program* policy (D21-03). This directive is a step toward compliance with this and several other paragraphs (¶¶370–76). The CPD provided a revised D21-03 on May 13, 2021, and after review, we submitted a no-objection notice on June 3, 2021. The OAG submitted a no-objection notice on June 2, 2021. The CPD has also submitted training materials and other supporting materials related to the pilot program.

Under D21-03, the Performance Evaluations Systems program will be piloted in the 4th, 6th, and 7th districts. D21-03 incorporates specific quantitative and qualitative performance dimensions allowing for the capturing of members activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation. The directive focuses on assessing overall performances for all sworn members, provides opportunities to recognize achievements and progress, and highlights goal-setting opportunities. The evaluation period of members of the pilot districts began June 16, 2021. Evaluation periods are one year in duration.

The CPD also submitted the *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* policy (E05-01), and the *Performance Recognition System* policy (E05-02). The CPD issued E05-01 on July 20, 2018, and E05-02 on February 21, 2012. The CPD submitted these policies toward compliance for ¶¶371–76.

We appreciate that the CPD had performance-evaluation systems in place before the Consent Decree and its corresponding requirements. And we believe the CPD's submissions provide helpful insights into where performance evaluations stood and continue to stand before implementing the Performance Evaluation Systems program. Most importantly, these submissions show the great improvement the *Performance Evaluations System* policy is over the previous evaluation systems used by the CPD. These old policies, E05-01 and E05-02, set forth general guidelines—addressing the requirement to perform the evaluations along with capturing other perfunctory requirements. The policies do not, however, provide the specificity included in D21-03, which incorporates specific quantitative and qualitative performance dimensions allowing for the capturing of members activities associated with constitutional policing, community policing, problem-solving, and the effective use of de-escalation.

With the drafting and revision of D21-03, along with the creation and ongoing revision of supporting materials, the CPD has made great strides toward compliance with this paragraph. However, as noted in our assessment of ¶370, D21-03 had not been submitted for public comment or been finalized by the end of the fourth reporting period.[150] Therefore, the CPD and the City have not yet met Preliminary compliance with this paragraph.

---

[150] On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

## Supervision: ¶372

**372.** *CPD will require supervisors of all ranks to conduct timely, accurate, and complete performance evaluations.*

**Compliance Progress**      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD made progress toward, but did not ultimately reach Preliminary compliance with ¶372 during the fourth reporting period.

To evaluate Preliminary compliance with ¶372, we reviewed among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements, including that policies must be "plainly written, logically organized, and use clearly defined terms."

In the third reporting period, we assessed the CPD's compliance with ¶372 for the first time. At the close of the reporting period, the Performance Evaluations System pilot program and materials—which aims to address the requirements of ¶372—remained in the collaborative review process. Therefore the CPD did not reach Preliminary compliance.

In the fourth reporting period, the CPD revised the *Performance Evaluations System – Pilot Program* policy (D21-03), as discussed in our assessments of ¶¶370-71. The CPD also produced *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* policy (E05-01), and *Performance Recognition System* policy (E05-02), issued July 20, 2018 and February 21, 2012, respectively.

The CPD also submitted samples of 2020 performance evaluation summaries and their currently-enacted performance evaluation policies. These documents set forth requirements for supervisors of all ranks to conduct timely, accurate, and complete performance evaluations. These policies, however, do not reflect the same quality and content that is contemplated by Consent Decree paragraphs related to performance evaluation—and addressed by the revised D21-03. Therefore, the CPD has not reached Preliminary compliance with ¶372.

We look forward to monitoring the CPD's implementation of D21-03 in the pilot districts in the upcoming reporting period.

# Supervision: ¶373

**373.** *Supervisors may only conduct a performance evaluation of members they have directly supervised and observed during the specific rating period.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

Although the City and the CPD made strides toward compliance with ¶373, they did not ultimately reach compliance by the end of the fourth reporting period.

To evaluate Preliminary compliance with ¶373, we reviewed among other things, the CPD's relevant policies and materials following the process described in the Consent Decree (¶¶626–41).

In the third reporting period, we assessed the City and the CPD's compliance with ¶373 for the first time. The CPD's Performance Evaluations System pilot program and materials remained under review at the close of the period, therefore they did not reach Preliminary compliance. We emphasized that the integrity of the Performance Evaluations System depends upon the successful implementation of the Unity of Command and Span of Control staffing structure, as ¶373 requires that Supervisors completing performance evaluations have first-hand knowledge of the members being evaluated.

As discussed in our assessments of the City's and the CPD's compliance efforts with ¶¶370–72, the CPD submitted a revised *Performance Evaluation System – Pilot Program* policy (D21-03), and we submitted a no-objection notice to this revised draft policy. This policy clearly requires that supervisors limit their review to sworn members who have been assigned under their command for at least thirty days before the evaluation. This differs from the current policy (E05-01). For example, under Section IV.J. of E05-01, where a unit member has been supervised by several different supervisors, the supervisors are able to confer with each other in evaluating that member, and there is no specified length of time for which supervisors must have overseen the officer they are evaluating.

We commend the CPD's efforts in rethinking, upgrading, and revising their performance evaluations programs, as demonstrated by D21-03. Because D21-03 had not been submitted for public comment and finalized by the end of the reporting

period, however, the CPD did not reach Preliminary compliance.[151] We look forward to working with the CPD as they finalize D21-03, and provide training on and evaluate the pilot program.

---

[151] On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

# Supervision: ¶374

> **374.** *In addition to the formal annual performance evaluation, supervisors will meet with members under their direct command on an ongoing basis as necessary to provide guidance, mentoring, direction, and support to the members regarding their performance and to identify opportunities for improvement.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City and the CPD did not reach Preliminary compliance with ¶374 during the fourth reporting period.

To assess Preliminary compliance with ¶374, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed data sources relevant to compliance with ¶374 requirements.

In previous reporting periods, we reviewed drafts of the *Unity of Command and Span of Control—Pilot Program* policy (D20-02), and the *Performance Evaluation System Directive* and *Handbook*. These materials marked progress toward compliance with ¶374. But, because the materials remained in the collaborative revision process and had not been finalized or implemented, the City and the CPD did not reach Preliminary compliance with this paragraph.

The draft *Performance Evaluations System – Pilot Program* policy (D21-03), which we also discussed in our assessments of ¶¶370–73, moves the CPD toward Preliminary compliance with ¶374. For example, Section V.B. of D21-03 notes the following:

> [T]he assessment of a member's job performance is an ongoing process and the annual performance evaluation is not the only time during the year that supervisors should discuss performance issues with Department members. Ongoing coaching and feedback provide supervisors with opportunities throughout the year . . . .

While the IMT and the OAG submitted no-objection notices to the revised draft D21-03, the directive was not finalized by the end of the reporting period.

Similar to our discussion in our assessment of ¶373, we note that the previous policies provided by the CPD demonstrate that D21-03 will be a great improvement. For example, the current policy, *Performance Evaluations of all Sworn Department Members Below the Rank of Superintendent* (E05-01), only requires the evaluator to provide job-performance feedback to members at the conclusion of an evaluation period. We commend the CPD's efforts to codify the requirement that supervisors provide informal and ongoing feedback to members under their command.

Because the CPD had not yet submitted D21-03 for public comment or finalized the policy, they did not reach Preliminary compliance. We are hopeful that the CPD will be able to finalize D21-03 and provide training on the pilot program in the upcoming reporting period.

## Supervision: ¶375

> **375.** *Supervisors will recognize, when appropriate, formally (e.g., recommendation for commendation) and/or informally (e.g., public and private praise) subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, and/or community policing.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The CPD and the City made progress toward but did not reach Preliminary compliance with ¶375.

In previous reporting periods, we reviewed the Performance Evaluations System program materials. The CPD was planning to pilot the program in the District. At the close of the third reporting period, the materials remained in the review and revision process. Therefore, although the City and the CPD made progress toward Preliminary compliance, they did not reach Preliminary compliance.

To evaluate Preliminary compliance with ¶375, we reviewed, among other things, the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626–41).

As discussed in our assessments of ¶¶370-374, the CPD revised draft of the *Performance Evaluations System – Pilot Program* (D21-03) in this reporting period. We submitted a no-objection notice to the revised draft D21-03 on June 3, 2021. The OAG also submitted a no-objection notice to D21-03. The CPD also produced the currently operative policy, *Performance Evaluations of All Sworn Department Members Below the Rank of Superintendent* (E05-01). This directive remains in place for members who are not in the Performance Evaluations System pilot program—currently D21-03 is being piloted in the 4th, 6th, and 7th Districts only.

D21-03 demonstrates a marked improvement over the existing policy, E05-01, regarding the requirement in ¶375: supervisors recognizing subordinate members who demonstrate a commitment to procedural justice, de-escalation, impartial policing, or community policing. While E05-01 references recognizing exceptional performance by members and rewarding the same with commendations and other forms of recognition, D21-03 specifically outlines the requisite dimensions on which officers will be assessed. And one of those enumerated dimensions is "Respect for People and Public Trust." Core competencies of this dimension include respect, community policing, procedural justice, and impartial policing.

These specified dimensions not only give guidance to the supervisors who are conducting evaluations but also help solidify that the CPD values these various dimensions.

We are encouraged by the CPD's efforts in drafting and revising D21-03, as well as their efforts in creating training and other supporting materials related to the pilot program. While the CPD had not yet reached Preliminary compliance with ¶375 by the end of the reporting period because the policy needed to be submitted for public comment and finalized,[152] we look forward to continued efforts on finalizing and implementing the pilot program.

---

[152] On July 9, 2021, after the close of the fourth reporting, the CPD posted D21-03 for public comment.

# Supervision: ¶376

**376.** *CPD will maintain records of performance evaluations in the appropriate electronic data tracking system.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

During the fourth reporting period, the City and the CPD made advancements under ¶376 but did not yet reach Preliminary compliance.

To evaluate Preliminary compliance with ¶376, we reviewed, among other things, the CPD's relevant records and submitted information to determine whether the CPD had acquired and implemented an appropriate computer system to track data required by the paragraph. We also looked to review any related policies, following the process described in the Consent Decree (¶¶626–41).

Previously, in the third reporting period, the City and the CPD made steps toward compliance with ¶376 requirements. The CPD's Performance Evaluation System—a program that remained in the review and revision process at the close of the third reporting period—addresses the requirements set out in this paragraph. However, we noted that beyond the development and implementation of the Performance Evaluations System, the CPD must also focus on the acquisition or implementation of appropriate technology which will be key to compliance with ¶376's record-maintenance requirements.

During this reporting period, the CPD provided the IMT and the OAG with live demonstrations of the Performance Evaluations Electronic System. The system is used to create and store performance evaluations. We look forward to the system going live and being utilized in the Performance Evaluations System pilot program.

Because the Performance Evaluations Electronic System is not yet fully implemented, the CPD has not yet reached Preliminary compliance. We look forward to this system going live alongside the Performance Evaluations System pilot program in upcoming reporting periods.

# VIII. Officer Wellness and Support

This is the Officer Wellness and Support section of the Independent Monitoring Team's (IMT's) third semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Officer Wellness and Support compliance efforts from January 1, 2021, through June 30, 2021.

## Guiding Principles

The IMT assessed compliance with applicable Officer Wellness and Support paragraphs in accordance with the Consent Decree's "Guiding Principles." These guidelines "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **377.** *In fulfilling their duties, CPD members expose themselves to significant danger, high stress, and a wide spectrum of human tragedy. There is growing recognition that psychological and emotional wellness are critical to officers' health, relationships, job performance, and safety. The City and the CPD have an obligation to help CPD members cope with the consequences that come from their service to the public.*

> **378.** *The City and the CPD's obligation to CPD members includes providing adequate support systems to treat members experiencing mental health, substance abuse, and other emotional challenges.*

> **379.** *The City and the CPD's obligation to CPD members also includes equipping them in a manner that enables them to do their jobs as safely as reasonably possible. CPD will ensure that the safety of its members is not jeopardized by equipment and technology that is outdated, broken, or in need of repair or replacement.*

> **380.** *The City and the CPD will implement the following requirements in order to achieve a healthy, effective, and constitutionally compliant police force.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the CPD, and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

Officer Wellness and Support is an ever important section of the Consent Decree. Officers face significant stress in the field, where they often "expose themselves to significant danger, high stress, and a wide spectrum of human tragedy." ¶377. The mental and physical health of officers is crucial to ensuring that they can present their best selves as they fulfill their day-to-day responsibilities. With this in mind, the City and the CPD must continue to focus efforts on ensuring that officers are provided quality services that tend to officers' physical and mental health.

Since the start of the Consent Decree, the City and the CPD have increased the officer-wellness resources available to members. Currently the Professional Counseling Division (also known as "PCD") is staffed with 13 clinicians who provide a variety of supports to officers through various programs. These clinicians are diverse, well qualified, and have a breadth of unique experiences—all of which creates a robust team able to address a variety of needs. In addition to the clinicians, at the end of the fourth reporting period, there were 187 Peer Support members, five drug and alcohol counselors, and six Chaplains who serve CPD officers.

In addition to increasing staffing resources of the Employee Assistance Program (EAP), the City and the CPD have invested time and attention to developing various policies that have and will continue to guide the CPD toward compliance with many requirements found in the Officer Wellness and Support section of the Consent Decree. For example, during this reporting period, the CPD revised the *Officer Wellness Support Plan*, and we submitted a no objection notice to that plan at the beginning of this reporting period. This document sets out expectations for officer wellness and support which, when followed, will promote the development of and training on officer wellness initiatives. It also identifies numerous external referral resources, and sets parameters for various programs such as drug and alcohol addiction support meetings.

Also finalized in the fourth reporting period, the *Traumatic Incident Stress Management Program* directive (E06-03) delineates a mandatory program for officers who face various potentially-traumatic incidents in their line of work. This program provides early support to mitigate the effects of experiencing such incidents.

These polices combined with previously finalized policies, such as the *Professional Counseling Division* policy (E06-01), and the Standard Operative Procedure 19-01 (SOP 19-01), create a solid foundation on which the CPD and the Professional Counseling Division can continue to build officer support services.

With these policies in place, the CPD is turning toward training on and implementing these polices. This requires training and actions in compliance with the policies and expectations that the CPD has set for itself. In the fourth reporting period, the

CPD provided its 2021 In-Service Officer Wellness Training materials. In creating this training, the CPD partnered with several outside professionals. We hope to continue to see this caliber in training materials moving forward.

We also reviewed the Professional Counseling Division's *Communication Strategy*. The strategy focuses on mitigating misinformation about mental health and policing. It aims to promote wellness services available within the CPD. The Professional Counseling Division provided evidence that they are acting on this *Communication Strategy*, through various means including using department email, social media, and posting materials in various locations throughout the department.

To continue to move forward in providing appropriate wellness services to officers, and to continue to reach additional levels of compliance with Consent Decree requirements focused on Officer Wellness and Support, the City and the CPD must obtain and implement appropriate technology solutions. Such systems are needed to accurately track the provision of services and obtain honest feedback from officers who utilize those services. Without the ability to track such items, the CPD lacks the ability to empirically assess its successes and identify areas of improvement related to providing officer support services. While the Professional Counseling Division continues to make efforts to assess the wellness and support services provided—as seen in the Professional Counseling Division's *2021 Annual Report to the Superintendent*—the report cannot be bolstered with data regarding services because the Professional Counseling Division does not have the appropriate tools to collect and meaningfully analyze that data.

Overall, the IMT assessed the City's compliance with 36 Officer Wellness and Support paragraphs in the fourth reporting period (¶¶381–402, 404, and 406–18). We assessed 19 of these paragraphs in previous reporting periods. In the fourth reporting period, the City and the CPD maintained compliance with four paragraphs (¶¶388, 409, 411, and 418), reached Preliminary compliance for 17 paragraphs (¶¶381, 390, 392–400, 402, 404, 407–08, 410, and 414), maintained Secondary compliance with nine paragraphs (¶¶382–87, 391, 401, and 406), reached Secondary compliance for four paragraphs (¶¶381, 390, and 392–93), remained under assessment for Preliminary compliance for two paragraphs (¶¶412–13), and failed to reach Preliminary compliance with four paragraphs (¶¶389 and 415–17). This includes the City falling out of Preliminary compliance with one paragraph (¶389). *See* Officer Wellness Figure 1 below.

Officer Wellness Figure 1:    Compliance Status for Officer Wellness Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



Paragraphs in **Preliminary**, **Secondary**, or **Full** Compliance   (17)  (13) (30)
Paragraphs that have not met Preliminary compliance   (4)
Paragraphs Under Assessment for Preliminary compliance   (2)

The City also had six deadlines in the fourth reporting period (¶¶389, 401, 404, 411, and 415–16). The City met one of the deadlines (¶404) and missed the five deadlines (¶¶389, 401, 411, and 415–16). The City also did not achieve any of the underlying deadline requirements by the end of the fourth reporting period. *See* Officer Wellness Figure 2 below.

Officer Wellness Figure 2:               Total Officer Wellness Deadlines in the Third Report: 6



# Officer Wellness and Support: ¶381

> **381.** *CPD will provide its members with a range of support services that comport with mental health professional standards and that seek to minimize the risk of harm from stress, trauma, alcohol and substance abuse, and mental illness. These support services will include: readily accessible confidential counseling services with both internal and external referrals; peer support; traumatic incident debriefings and crisis counseling; and stress management and officer wellness training.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶381 for the first time in the fourth reporting period. The City and the CPD have reached both Preliminary and Secondary compliance with ¶381.

To assess Preliminary compliance with ¶381, we reviewed the CPD's relevant policies and records following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance with ¶381, the IMT reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶381. We considered whether the staff is sufficiently trained to provide the services required by the paragraph.

The requirements of ¶381 are incorporated into the *Professional Counseling Division* policy (E06-01) which was finalized during the third reporting period. E06-01 describes the services the Professional Counseling Division provides for active and retired members, and their families. These services include a variety of programs: Alcohol and Substance Use Program, Peer Support Programs, Traumatic Incident Stress Management Program, and Employee Assistance Program (EAP). E06-01 covers both (a) how members can access Professional Counseling Division services (through general counseling, referrals, or crisis intervention); and (b) the timelines within which members will receive the sought-after services (non-emergency general counseling sessions are held within two weeks of a member's request, and emergency counseling sessions are held within 24 hours of a request).

Under E06-01, the EAP will offer initial recruit training and in-service training to all CPD members at least every three years. The recruit and in-service training will include stress management, alcohol and substance use, officer wellness, and other support services.

E06-01 is bolstered by the CPD's *Officer Wellness Support Plan*, for which we submitted a no-objection notice on January 13, 2021.[153] In addition, the CPD's Standard Operating Procedure 19-01 (SOP 19-01) provides overall guidelines for the operation of the various programs administered by Professional Counseling Division. SOP 19-01 establishes an on-call system to handle emergency deployment of on-call clinicians and peer support personnel for critical incidents, as well as intake and screening processes. It also provides guidance on the development of treatment plans.

This reporting period, we also reviewed the credentials and biographies of the Professional Counseling Division clinicians. These show that the clinicians are qualified and have a breadth of experience and training.

The combination of E06-01, the *Officer Wellness Support Plan*, and SOP 19-01 establish a robust foundation for providing CPD members with a range of services contemplated by ¶381. Therefore, the CPD has reached Preliminary compliance with this paragraph. Additionally, we have seen that the CPD has incorporated the various substantive requirements of ¶381 in trainings and programs: E06-01 aims to cover topics such as stress management and alcohol and substance use, and by staffing the Professional Counseling Division with several well-qualified clinicians, the CPD has positioned itself to provide these services as contemplated by E06-01. By the end of the reporting period, three of the five drug and alcohol counselors had completed a state certification—which required completion of trainings. The remaining two were in the process of completing their certification. The Professional Counseling Division's clinicians, as evidenced by the biographies and their ongoing certifications, have the necessary training and credentials as well as a breadth of experience providing the services contemplated by E06-01 and ¶381. Because of this, the City and the CPD reached Secondary compliance.

Moving forward, we look forward to continuing to receive information regarding the array of services provided to CPD members, including services focused on stress management and alcohol and substance abuse. We will look for the City and the CPD to develop a protocol and system that ensures services provided are regularly assessed and adapted. Such tracking and evaluation of services will likely require the implementation of a technology solution.

---

[153] During the third reporting period, the CPD submitted various revised drafts of the Officer Wellness Support Plan. The revised draft to which we submitted a no-objection notice was submitted late December 2020.

# Officer Wellness and Support: ¶382

> **382.** *CPD currently offers clinical counseling services, programs regarding alcoholism and other addictions, and a peer support program to help CPD members cope with the psychological and personal toll their jobs can impose. By September 1, 2019, CPD will complete a needs assessment to determine what additional resources are necessary to ensure the support services available to CPD members comport with best practices and mental health professional standards.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD reached Preliminary and Secondary compliance with ¶382 during the third reporting period. During the fourth reporting period the City and the CPD made steps toward, but did not reach Full compliance with this paragraph.

To assess Full compliance with ¶382, we considered data sources necessary or helpful to identify and verify sustained compliance and reform efforts relevant to the requirements of the paragraph. Specifically, we looked for evidence that the CPD was following steps set out in the *Officer Wellness Support Plan* to continually assess the CPD's members' needs for programming and services to help cope with the psychological and personal challenges presented by the profession. We also reviewed the Professional Counseling Division's 2021 Annual Report to the Superintendent, reviewing the Professional Counseling Division's needs and recommendations to enhance the Professional Counseling Division's support for members. We have and will continue to look for the City and the CPD's responses to these identified needs and recommendations.

In previous reporting periods, we reviewed the CPD's *Officer Support Needs Assessment* (*Needs Assessment*) and multiple revised versions of the *Officer Wellness Support Plan*. After completion of the *Needs Assessment*, we provided feedback regarding potential shortcomings of the assessment. In the place of redoing the assessment, the CPD addressed our concerns by creating a robust *Officer Wellness Support Plan*.

The *Officer Wellness Support Plan*, among other things, provides a framework for assessing *ongoing* needs specified in ¶382—the concept of ongoing assessment of the needs specified in the paragraph as opposed to a singular, redone needs assessment was encouraging as it demonstrated a desire to continue to self-evaluate, and an appropriate manner to address the underlying goals of this paragraph

in an efficient manner. By completing the *Needs Assessment* and addressing additional concerns via the *Officer Wellness Support Plan*, the CPD reached both Preliminary and Secondary compliance.

The *Officer Wellness Support Plan* was designed as a support to the required needs assessment; it provides the framework for a system that will allow the CPD to continually assess and improve its provision of wellness services. While we appreciate the robust *Officer Wellness Support Plan* set out by the CPD, this should be a living document. The CPD should continue to assess, update, and implement the *Officer Wellness Support Plan*, and since this document was used to cure shortcomings of the *Needs Assessment* we are looking for evidence that the CPD will adapt the *Officer Wellness Support Plan* as necessary.

To do this effectively, the City and the CPD must identify resources that are still needed to support officers. We hope the CPD will implement a system to accurately and efficiently track the provision and use of wellness services, and continue to survey members. This will allow the City and the CPD to identify and meet the needs of their officers. Additionally, we hope to see updated timelines for plans to address the member needs identified by these data sources.

Although the 2021 Annual Report to the Superintendent shows a degree of assessment of services provided by the Professional Counseling Division and provides insight into their outstanding needs, the City and the CPD have more work to do to ensure that the *Officer Wellness Support Plan* robustly supplements the initially conducted needs assessment. Therefore, they have not yet reached Full compliance with this paragraph.

# Officer Wellness and Support: ¶383

*383.* The needs assessment should analyze, at a minimum: a. staffing levels in CPD's Professional Counseling Division; b. the current workload of the licensed mental health professionals and drug and alcohol counselors employed by CPD; c. how long it takes CPD members requesting counseling services to be seen by a licensed mental health professional or drug and alcohol counselor; d. the professional specialties of CPD's licensed mental health professionals; e. the frequency and reasons for referrals of CPD members to clinical service providers external to CPD and the quality of those services; f. CPD member feedback, through statistically valid surveys that ensure anonymity to participants consistent with established Professional Counseling Division guidelines, regarding the scope and nature of the support services needs of CPD members and the quality and availability of services and programs currently provided through the Employee Assistance Program; g. similar mental health services offered in other large departments, including the ratio of licensed mental health professionals to sworn officers and the number of counseling hours provided per counselor per week; h. guidance available from law enforcement professional associations; i. the frequency and adequacy of CPD's communications to CPD members regarding the support services available to them; j. the frequency, quality, and demand for in-service trainings related to stress management, officer wellness, and related topics; and k. the quality of recruit training related to stress management, officer wellness, and related topics.

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

Because of the Professional Counseling Division's efforts to manually track the supply and demand of services they provide, the City and the CPD maintained Preliminary and Secondary compliance with ¶383. The City and the CPD did not reach Full compliance with this paragraph because they have not provided the Professional Counseling Division with a sufficient technological solution to digitally track, assess, or respond to data related to wellness services.

To assess Full compliance with ¶383 we considered whether each subparagraph of ¶383 has been sufficiently assessed, and whether the CPD has the technology

necessary to accurately collect and report data regarding the Professional Counseling Division's services, staffing, and consumption of those services. The CPD should be striving to reach a point at which they are able to continually assess and adapt the services Professional Counseling Division provides to better meet the needs of CPD members.

In previous reporting periods, the City and the CPD achieved Preliminary and Secondary compliance with ¶383 by developing the *Officer Wellness Support Plan*, which built upon the *Needs Assessment*. The *Officer Wellness Support Plan* created a framework for future assessments of the CPD's wellness-related needs. However, because the CPD remained limited by technological capabilities, we found that the CPD had not yet provided evidence demonstrating compliance with subsections (b), (c), and (e) of ¶383. We explained that the CPD would need to acquire or implement technology that could accurately collect and report data regarding the services rendered and monitor staffing levels of the Professional Counseling Division.

As was the case in the third reporting period, a lack of a technological solution to track the provision and use officer wellness services prevents the City and the CPD from reaching additional levels of compliance with ¶383—and several other paragraphs in the Officer Wellness section. The Professional Counseling Division continues to utilize stopgap measures to track use and provision of services; the Professional Counseling Division also compiled and submitted the 2021 Report to the Superintendent based on anecdotal evidence. But these efforts—while through no fault of the Professional Counseling Division—are not sufficient means to reliably collect and analyze data on services provided. With this, many subsections of this paragraph remain unaddressed. For example, we have not received a data-backed review and assessment of the current workload of clinicians as contemplated by (b), nor have we received such review and assessment for how long it takes members requesting services to receive those services as contemplated by (c). We understand that discussion within the City and the CPD continue regarding the acquisition and implementation of technological solutions.

The continued labor of the Professional Counseling Division to manually track information regarding the supply and demand of services and make assessments based upon that information allow the City and the CPD to remain in Secondary compliance with this paragraph. However, Full compliance will not be reached until the City and the CPD have sufficient methods for tracking, analyzing, and responding to various data points regarding officer wellness services.

# Officer Wellness and Support: ¶384

**384.** *Within 60 days of the completion of the needs assessment, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified through the needs assessment required by the immediately preceding paragraph ("Officer Support Systems Plan"). CPD will implement the Officer Support Systems Plan in accordance with the specified timeline for implementation.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD did not reach Full compliance with ¶384 during the fourth reporting period.

To evaluate Full compliance with ¶384, we reviewed data relevant to determining whether the CPD has implemented the *Officer Wellness Support Plan*, and whether the CPD is adequately and appropriate using technology to sustainably and accurately track Professional Counseling Division services and consumption of those services and identify trends and emerging wellness needs of members so that the CPD can then allocate resources appropriately.

In earlier reporting periods, the CPD completed the *Needs Assessment* and then developed and revised the *Officer Wellness Support Plan*, which incorporated the findings of the *Needs Assessment* and addressed feedback we provided regarding the *Needs Assessment*. The *Officer Wellness Support Plan* provides a framework for iterative review and assessment of the CPD's ability to meet the wellness needs of its members. It was finalized in the third reporting period allowing the City and the CPD reach both Preliminary and Secondary compliance with ¶384. In the third Independent Monitoring Report, we explained that the CPD would not reach Full compliance until the Professional Counseling Division receive the technology to more efficiently and accurately schedule, track, and report on the Divisions activities.

The *Officer Wellness Support Plan* included timelines for which various services would be provided, trainings would occur, budgets would be developed, and technology would be implemented. Still, the City and the CPD have not acquired or implemented the necessary technology to allow the Professional Counseling Division to track the provision of services. Without this, the Professional Counseling Division is unable to track the provision and use of services. A lack of such data not only makes it difficult to track whether the timelines set out by the Professional

Counseling Division are being followed, but it also makes development of future well-informed plans unattainable. We urge the City and the CPD to prioritize the acquisition of necessary technology solutions so the Professional Counseling Division can accurately, reliably, and efficiently collect and analyze data.

Moving forward we expect the City and the CPD will provide updated timelines. This will provide clear expectations for the CPD and allow us to monitor their progress against their department-set expectations. We will also look at future annual reports, which should—once technology solutions are obtained—contain empirical data, to determine the ways in which the Professional Counseling Division is meeting member needs and the ways in which the Professional Counseling Division can adapt to better serve members.

Because the Professional Counseling Division does not have the necessary technology to track and assess data to determine compliance with this paragraph, the City and the CPD have not reached Full compliance.

# Officer Wellness and Support: ¶385

*385. As a component of CPD's Officer Support Systems Plan, CPD will develop and implement a communications strategy. The objectives of this communications strategy will be: a. to inform CPD members of the support services available to them; b. to address stigmas, misinformation, or other potential barriers to members using these services; and c. to emphasize that supporting officer wellness is an integral part of CPD's operations.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

The City and the CPD reached Preliminary and Secondary compliance with ¶385 during the third reporting period. Their compliance with this paragraph remained under assessment at the close of the fourth reporting period.

To evaluate Full Compliance with ¶385, we considered whether the CPD has implemented and sustained implementation of a communications strategy to effectively disseminate information, dispel information, and emphasize the CPD's commitment to wellness. We also considered the extent to which the CPD is continuously assessing its communications strategy and making appropriate adjustments.

In previous reporting periods, we reviewed the CPD's plan to develop and implement a communications strategy that would fulfill all requirements of ¶385, and then considered data relevant to determining whether the plan, when implemented, met the objectives of the paragraph. We found that the *Officer Wellness Support Plan* included sufficient communications strategies for both general dissemination of information regarding Professional Counseling Division services and targeted outreach. Therefore, the City and the CPD reached Preliminary and Secondary compliance with ¶385.

During the fourth reporting period, the CPD submitted a *Communications Strategy* in support of the *Officer Wellness Support Plan*. The goals of the strategy include mitigating misinformation surrounding mental health and policing, promoting services available within the CPD, encouraging physical health and wellness, and tailoring outreach to various demographics within the CPD. The intention is to make information about support services available to members on a continuing basis.

The *Communications Strategy* calls for posting information via pamphlets and posters in each CPD facility in areas frequented by all members. The CPD provided several examples of the literature distribution throughout the department. The

IMT visited several locations and were able to locate various postings, pamphlets, and other literature throughout department facilities.

The CPD also submitted evidence of various other means for communicating Professional Counseling Division services, such as the Administrative Message Center, Department email, CPD website, and social media. Additionally, the CPD intends on releasing Video Biographies of interviews with clinicians, peer support leaders, and drug and alcohol counselors.

We commend the varied, extensive, and continued efforts to disseminate information that emphasizes member wellness, works to dispel misinformation, and informs members of wellness services available to them. These efforts are great steps toward reaching Full compliance with ¶385. Full compliance with this paragraph should take the shape of an implemented strategy that is focused on (a) informing members of the support services available to them; (b) addressing any stigmas, misinformation, or other identified barriers that prevent members from utilizing these services; and (c) emphasizing the CPD's commitment to supporting officer wellness.

Because Full compliance requires demonstration of sustained efforts under the *Communication Strategy*, the IMT will look for evidence that the CPD is assessing the effectiveness of the *Communications Strategy* and making adjustments as needed. For example, we provided feedback to the CPD regarding the *Communications Strategy* evidence, suggesting that they develop protocols regarding who is responsible for replenishing, replacing, and tracking outstanding postings to ensure that the posted information remains up-to-date, and in a form accessible to members. In the upcoming reporting period, we hope to see the CPD making these types of efforts to maintain a robust communications strategy. In addition, we will look for evidence that the communications are addressing stigmas and misinformation, and continuing to express the CPD's commitment to supporting officer wellness; surveying members will be a useful tool in the CPD's self-assessment regarding the effectiveness of their communications in dispelling or addressing misinformation or stigmas. Evidence of prolonged efforts under the communications strategy—and following their communications strategy which sets out a plan through 2022—will allow the City and the CPD to reach Full compliance.

## Officer Wellness and Support: ¶386

**386.** *As part of this communications strategy, CPD will, at a minimum: a. make information about the support services available, on a continuing basis, to members on its internal websites; b. post information, including pamphlets and posters, in each CPD facility in areas frequented by officers; c. issue wallet-sized cards to every CPD member with contact information for the CPD support services available; d. inform and remind members about the CPD support services offered, including providing handouts with contact information, at the annual use of force training required by this Agreement, during Academy training of new recruits, and at in-service trainings relating to stress management and officer wellness; e. provide training to supervisory personnel regarding available CPD officer support services and strategies for communicating with officers about these services in a manner that minimizes any perceived stigma; and f. seek to identify and correct misperceptions among CPD members about receiving counseling services.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Under Assessment* |

The City and the CPD made steps toward, but did not reach Full compliance with ¶386 during the fourth reporting period.

To evaluate Full Compliance with ¶386, we looked for evidence of continued outreach and communications related to wellness services. The communications should increase and maintain members' awareness of services provided by the Professional Counseling Division. We also looked for qualitative and quantitative data necessary to assess members' of all ranks awareness of Professional Counseling Division services and determine whether members are aware of how to access desired information regarding these services.

The CPD's Communications Strategy provides for continuous information sharing regarding the support services available to members To help ensure that officer wellness remains an integral part of CPD operations, both the Communications Strategy and Officer Wellness Support Plan require the distribution of informational materials during annual use of force training, training of new recruits, and during yearly in-service training relating to stress management and officer wellness for all sworn members.

In previous reporting periods, we reviewed the CPD's communications strategy set out in the *Officer Wellness Support Plan*. We also reviewed materials produced pursuant to the communications strategy, and found that the communication materials reflected an earnest commitment to disseminating robust and accurate information regarding the CPD's wellness services. With this, the City and the CPD reached Preliminary and Secondary compliance with ¶386.

During the fourth reporting period, the CPD produced evidence of some of the communication strategies used to disseminate information regarding wellness resources available to members, and per the strategy, the Professional Counseling Division will continue pushing out program and contact information through various means. After reviewing the evidence of communications posted and provided to members, we reminded the CPD of the importance of keeping posted information updated and replenished on a regular basis.

The Communications Strategy includes outreach to retirees seeking their assistance in serving as mentors and peer support members. Additionally, the Professional Counseling Division has distributed wallet size cards throughout the department, and Professional Counseling Division staff pass out these cards during various interactions, such roll calls, scenes of incidents, and other chance encounters with members.

We commend the Professional Counseling Division's outreach under the communications strategy. Full compliance with this and several paragraphs throughout the Consent Decree seeks to determine that systems that are implements pursuant to the provisions of the Consent Decree are set up in a manner that promotes longevity of those systems. Therefore, we will continue to collect evidence of ongoing compliance with this paragraph and the Communications Strategy set out by the CPD. Continued efforts under the Communications Strategy as well as adaptations of that Strategy when needed will allow the City and the CPD to reach Full compliance with ¶386. Additionally, to reach Full compliance, the City and the CPD will need to produce evidence that their efforts under this paragraph are effective in actually providing the information to members. While some of the subsections of this paragraph require specific communication steps be taken, other subsections, such as (e), which requires provision of training to supervisory personnel, and (f), which requires the CPD to identify and correct misperceptions among members about counseling services, will require the CPD to assess the topics and issues that need to be addressed and subsequently address those issues via clear and effective communications.

# Officer Wellness and Support: ¶387

**387.** *Within 180 days of the Effective Date, CPD will develop and implement a roll call training to explain and address the effects on Firearm Owners Identification ("FOID") card eligibility, if any, when a CPD member seeks or receives CPD support services, including, but not limited to, counseling and mental health treatment.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD maintained Preliminary and Secondary compliance, but did not did not reach Full compliance with ¶387 during the fourth reporting period.

In the fourth reporting period, to evaluate Full Compliance with ¶387, we sought to review a variety of data sources to determine whether the CPD continued to provide the FOID card training as necessary to ensure members and recruits are aware of the effects support services has on FOID card eligibility.

In previous reporting periods, the CPD developed a Firearm Owners Identification (FOID) card roll-call training that was consistent with state law and provided clear information to members regarding the effects, if any, that accessing support services has on a member's FOID card eligibility. In the third reporting period, the CPD provided documentation showing that 99% of eligible employees had received the training, and post-training survey data which tended to show that CPD members found the training helpful. At the close of the third reporting period, we expressed that the CPD should provide evidence that the FOID card training continues to be implemented such that misinformation and misunderstandings related to the effects support services can have on FOID card eligibility.

During the fourth reporting period, the CPD did not produce any documentation under this paragraph. However, they did produce their *Communication Strategy* under other paragraphs. The *Communication Strategy* lists the methods the FOID-related messaging will be delivered, such as via push alerts and CPD email. We appreciate this planning, but to demonstrate Full compliance the CPD will need to provide additional evidence that this plan is being followed and members are thereby being provided information regarding FOID card eligibility. The CPD will need to demonstrate that these communications are occurring consistently to reach Full compliance. Because the CPD has not yet demonstrated this, they have not reached Full compliance with this paragraph.

## Officer Wellness and Support: ¶388

> ***388.*** *As a component of the Officer Support Systems Plan, by January 1, 2020, CPD will develop and implement a comprehensive suicide prevention initiative ("Suicide Prevention Initiative"). In designing the Suicide Prevention Initiative, CPD will examine similar initiatives implemented in other large departments and incorporate guidance available from law enforcement professional associations. The Suicide Prevention Initiative will be overseen by a licensed mental health professional working in conjunction with a command staff member.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary Compliance with ¶388 in the third reporting period. They did not reach additional levels of compliance with ¶388 during the fourth reporting period.

To evaluate Secondary compliance with ¶388, we reviewed data sources and considered community input, including feedback from clinicians and the CPD members to determine whether the services provided by the CPD are proactively and reactively meeting the wellness needs of members. We sought to determine whether the communication strategy set out in the *Officer Wellness Support Plan* is sufficient to meet the objectives of ¶388. We also sought to determine the extent to which the CPD has evaluated the success and shortcomings of the implementation of the *Officer Wellness Support Plan* and other wellness services programs in order to provide the holistic support to address wellness concerns that are believed to contribute to the complicated outcome of suicide.

In previous reporting periods, we acknowledged that there is currently no "best practice" approach to use as a benchmark to measure the CPD's efforts related to suicide prevention. Recognizing this, the CPD worked to create a holistic wellness program to address the underlying concerns of ¶388. This holistic approach takes the place of a stand-alone Suicide Prevention initiative, which is appropriate since death by suicide is a complicated outcome rooted in factors still poorly understood. In the third reporting period we reviewed a variety of CPD documents including the *Officer Wellness Support Plan*, communications regarding expanded Employee Assistance Program services, and drafts of the *Traumatic Incident Stress Management Plan* directive. Based on these combined efforts, the CPD reached Preliminary compliance with ¶388.

Because the City and the CPD have chosen to reach the objectives of ¶388 by implementing a more holistic program that focuses on addressing stressors that may contribute to the tragic outcome of suicide, it is important that the CPD develop the means to assess the stressors and wellness needs of members in real time. An effective holistic wellness program will require that the City and the CPD develop a means for gathering reliable data about the supply and demand of wellness programs. They should also regularly solicit feedback from members to assess how the CPD can better implement a holistic wellness program aimed at preventing suicide.

In the fourth reporting period, the CPD submitted the Professional Counseling Division's *2021 Report to the Superintendent*. This report was based largely on anecdotal evidence, since the City and the CPD have not yet acquired and implemented a technology solution to reliably track data regarding Professional Counseling Division services. This report presented findings from focus groups of officers. Some officers expressed concern that the wellness supports available to officers are not equivalent to the amount of stress that officers face, and that officers would like more opportunities to participate in wellness programming. We recognize that this focus group was a small sample size, but given the unavailability of other data regarding the consumption and provision of services, this demonstrates that there is more to be done in order for the CPD to reach its goal of implementing a holistic program to address the underlying concerns of ¶388.

With this, the City and the CPD have not yet reached Secondary compliance with ¶388. Moving forward we hope to continue to see feedback loops between members and the Professional Counseling Division to identify areas of improvement or holes in services provided. We also hope to learn more about the CPD's post-mortem assessment process in the horrific incident of officer death by suicide. We will then look for efforts to address the information the Professional Counseling Division is receiving from these sources. Additionally, the CPD should focus on implementing a technology solution that will allow it to empirically assess the provision and consumption of services. This will allow the CPD to monitor all plans related to and necessary for providing comprehensive services that address the goal of suicide prevention. We look forward to continuing to work with the City and the CPD as they progress toward additional levels of compliance with ¶388.

## Officer Wellness and Support: ¶389

*389. At least annually, the Director of the Professional Counseling Division will provide a written report to the Superintendent, through his or her chain of command, that includes anonymized data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This report will also contain resource, training, and policy recommendations necessary to ensure that the support services available to CPD members reasonably address their identified needs and comply with the Officer Support Systems Plan.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** May 3, 2021* ☐ **Met** ☑ **Missed**
*Extended from February 28, 2021, due to COVID-19

**Preliminary:** *Not in Compliance* (NEW: LOST COMPLIANCE)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD achieved Preliminary compliance with ¶389 during the third reporting period, largely due to the Professional Counseling Division's manual efforts to create weekly reports, which were provided to the Superintendent. When finding the City and the CPD in Preliminary compliance, we stressed the importance of obtaining a technology solution so that accurate data on all points required by the paragraph could be obtained. The City and the CPD have not acquired, implemented, or provided evidence of significant progress toward obtaining any such technology. Therefore, they have fallen out of Preliminary compliance with ¶389.

In the third reporting period, we found that the City and the CPD met Preliminary compliance with ¶389, thanks largely to the efforts of the Professional Counseling Division Director and staff who maintained manual records of the metrics required under this paragraph. While we commended these manual efforts we stressed that the City and the CPD must focus on obtaining and implementing technological solutions that will allow for automated, accurate data collection to maintain Preliminary compliance and reach subsequent levels of compliance. We noted that maintenance of Preliminary compliance required an annual report containing all data points required under ¶389—such as anonymized data regarding services provided to members—by the new annual deadlines (May 3, 2021, in this reporting period).

Maintaining Preliminary compliance requires that a written report be provided annually to the Superintendent which incorporates all of the data outlined by ¶389.

In the fourth reporting period, on June 24, 2021, the CPD provided the Professional Counseling Division's *2021 Report to the Superintendent* submitted to the Superintendent. The report details the current state of Professional Counseling Division's officer wellness initiatives, identifying all services and resources provided by the Professional Counseling Division. It also makes strategic recommendations to improve delivery of services to all members. Recommendations relate to officer wellness policy development, response to traumatic incidents, an anti-stigma pledge for leadership, hiring additional personnel, selection of a third-party vendor, expansion of peer support services, and financial planning.

The Report does not, however, provide data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This data is not included because the City and the CPD have not yet acquired and implemented appropriate solutions to allow for the accurate and efficient collection of such data. While the Professional Counseling Division creates weekly reports, those reports were not utilized to compile an annual data set—this could be due to the manual labor that would be required. If that is the case, it underlines the importance of obtaining an adequate technology solution.

Future and additional compliance with this paragraph requires that a technology solution be acquired and provided to the Professional Counseling Division so that an annual report can be created which addresses all requirements outlined in ¶389. Without it, the otherwise timely and thorough efforts of the Professional Counseling Division are undermined. While the recommendations the Professional Counseling Division makes in the annual report are valid and based on anecdotal evidence, evidence-based recommendations and honest evaluation of services provided by the Professional Counseling Division are impeded by a lack of technological solutions.

Because the City and the CPD have not yet acquired or implemented the technology necessary to collect and report on data as required by this paragraph, they have fallen out of Preliminary compliance with ¶389.[154]

---

[154] Although this is an annual requirement, the City and the CPD need not wait an entire calendar year to submit another report which could allow them to reach compliance levels. Instead, the City and the CPD could regain compliance by completing and submitting during the fifth reporting period an interim report which covers all data points required by ¶389.

# Officer Wellness and Support: ¶390

> **390.** *CPD currently employs three licensed mental health professionals and a supervising psychologist who serves as the Director of CPD's Professional Counseling Division. CPD offers free counseling services to CPD members through the Professional Counseling Division and through external referrals in certain circumstances. CPD will expand its capacity to provide the counseling services to CPD members as set forth in this Agreement.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶390. The City and the CPD reached Preliminary and Secondary compliance with this paragraph during the fourth reporting period.

To assess Preliminary compliance with ¶390, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. These paragraphs delineate various requirements such as requiring that policies be "plainly written, logically organized, and use clearly defined terms," and policies and procedures be submitted to the IMT and OAG to allow the parties to engage in a collaborative revision process. To evaluate Secondary compliance with ¶390, we reviewed records sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶390. We also considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as necessary to fulfill the requirements of the paragraph and the Consent Decree.

In the third reporting period, we provided a status update for ¶390. We noted that the CPD had increased their staffing levels—adding clinicians and peer support counselors who were trained to provide substance-use-disorder counseling. This increased staffing allowed the Professional Counseling Division to expand its services.

In the fourth reporting period, we reviewed several documents relating to the CPD's compliance with ¶390. These documents, such as the *2021 Report to the Superintendent*, show that the Professional Counseling Division had a staff of 13 clinicians at the close of the fourth reporting period.

The Professional Counseling Division promoted one clinician to Assistant Director to focus on strategic initiatives. Currently, the Professional Counseling Division has assigned each of its 13 clinicians to 2-3 districts. The goal with assigning clinicians to districts is to allow for members and clinicians to become more familiar with one another, making debriefings and development of comprehensive treatment plans more tailored to members. As captured in the *Officer Wellness Support Plan*, the Professional Counseling Division's optimal goal is to increase its clinicians to 22.[155]

The *Officer Wellness Support Plan* also discusses the revamping and expansion of the Peer Support Program, which has increased the number of peer support members to 187.[156] The Plan describes peer support members' duties as providing support to all police officers and their family in incidences such as: death of a family member, friend, or peer, as well as marital, child, or job-related incidents or difficulties.

The *Officer Wellness Support Plan* demonstrates critical consideration of Professional Counseling Division staffing and resource needs, and documents such as the Professional Counseling Division Standard Operating Procedure 19-01 (SOP 19-01) and directive E06-01 demonstrate efforts to ensure those resources are utilized appropriately. With this, the City and the CPD reached Preliminary compliance with this paragraph. In addition, the Professional Counseling Division has hired additional, qualified clinicians to better address the needs of CPD members.[157] With this, the City and the CPD reached Secondary compliance.

Reaching Secondary compliance does not mean that the CPD and City should not continue to assess the wellness needs of members and the staffing and resources needed to address those needs. Full compliance will require a finding that the City and the CPD have sufficiently expanded the Department's capacity to provide counseling services to CPD members. To reach Full compliance the City and the CPD will not only need to implement data solutions to track and assess member's wellness needs and use of Professional Counseling Division services, but they will also need to respond to this data appropriately.

---

[155] The *Officer Wellness Support Plan* was completed by the CPD and submitted to us for review during the third reporting period.

[156] We note that the August 2018 EAP Gap Analysis and Implementation Roadmap indicated that, at that time, there were more than 200 peer support members. We look forward to learning more from the CPD regarding the optimal number of peer support members. Such a determination will likely require the implementation of a data tracking system.

[157] We reviewed the biographies of the clinicians which demonstrated that the clinicians have an array of training and experiences. This allows the Professional Counseling Division to provide well-rounded services to members.

## Officer Wellness and Support: ¶391

> **391.** *CPD will initially increase the staffing level in its Professional Counseling Division to at least ten full-time licensed mental health professionals (or a combination of full- and part-time licensed mental health professionals capable of providing an equivalent amount of weekly clinical therapy hours) by January 1, 2020. CPD may contract with licensed mental health professionals external to CPD on an interim basis while CPD completes the process for creating these new positions and hiring individuals to fill them. Additional changes to staffing levels will be made consistent with the results of the needs assessment and Officer Support Systems Plan.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

During the fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance, however they did not reach Full compliance.

To assess Full compliance with ¶391, we considered various data points including documents provided by the CPD relevant to compliance, information gathered from site visits, and conversations with members. For Full compliance with this paragraph, the CPD must maintain appropriate staffing levels, and demonstrate a continued ability to assess and address staffing and resources needs as informed by a fully implemented software solution that adequately tracks necessary data. The long-term objective is for the CPD by which it can and will evaluate the wellness needs of members to ensure that the supply of services is addressing those needs.

Previously, in the second reporting period, the City and the CPD reached Preliminary compliance by hiring additional clinicians and expanding the resources of the Professional Counseling Division. They achieved Secondary compliance in the third reporting period by maintaining staffing levels required by ¶391, and strategically assigning its clinical workforce. The *Officer Wellness Support Plan* seeks to ensure that the Professional Counseling Division remains sufficiently staffed, equipped, and trained. It also developed the framework for continual assessment of needs and services provided to meet those needs.

Review of the *Officer Wellness Support Plan* and the *2021 Report to the Superintendent* shows that the Professional Counseling Division had increased the number of clinicians to 13 by the close of the fourth reporting period. Both documents

recommend increasing the number of clinicians to 22. The Professional Counseling Division also submitted evidence of the number of other personnel providing wellness services to CPD members: 187 peer support members, 5 drug and alcohol counselors, and 6 Chaplains.[158]

These numbers indicate a dedication to providing wellness services to CPD members. However, the CPD will not reach Full compliance with this paragraph until it has obtained and implemented technology necessary to capture data regarding support services provided to CPD members, how long it takes CPD members requesting counseling services to receive them, and other metrics related to the quality and availability of these services. This data will allow the CPD to continually assess current staffing levels and make changes as necessary to meet the needs of officers. Therefore, we find that the City and the CPD maintained Preliminary and Secondary compliance with ¶391, but has not reached Full compliance.

---

[158] We note that the August 2018 EAP Gap Analysis and Implementation Roadmap indicated that, at that time, there were more than 200 peer support members. We look forward to learning more from the CPD regarding the optimal number of peer support members. Such a determination will likely require the implementation of a data tracking system.

# Officer Wellness and Support: ¶392

**392.** *CPD will ensure that its staff of licensed mental health professionals includes individuals with specialized training in one or more of each of the following subjects: posttraumatic stress disorder, domestic violence, alcohol and substance abuse, anger management, depression, and anxiety.*

## Compliance Progress　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**　*In Compliance* (NEW)
**Secondary:**　*In Compliance* (NEW)
**Full:**　*Not Yet Assessed*

We assessed the City and the CPD's compliance with ¶392 for the first time this reporting period. The City and the CPD reached Preliminary and Secondary compliance.

To assess Preliminary compliance with ¶392, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. To assess Secondary compliance, we reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities required by ¶392. We also considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as necessary to fulfill the requirements of the paragraph and Consent Decree.

The CPD's *Officer Wellness Support Plan*, submitted during the third reporting period, identifies all services, programs, and resources being provided by Professional Counseling Division staff. The CPD's Standard Operating Procedure 19-01 (SOP 19-01) directs that the Professional Counseling Division should be staffed with individuals with specialized training as required by ¶392. Into the fourth reporting period, the Professional Counseling Division continued to staff licensed clinicians and certified counselors who provided services to address posttraumatic stress disorder, domestic violence, alcohol and substance abuse, anger management, depression, and anxiety. Currently, Professional Counseling Division has 13 licensed clinicians, and 5 drug and alcohol counselors on staff. The IMT reviewed staff biographies which identify their areas of expertise and experience.

With the *Officer Wellness Support Plan* and SOP 19-01, which require ¶392-compliant staffing, the City and the CPD reached Preliminary compliance. By staffing the Professional Counseling Division with well qualified and widely trained clinicians, the City and the CPD reached Secondary compliance with ¶392.

We look forward to monitoring the staffing of the Professional Counseling Division and receiving updates regarding ongoing training that Professional Counseling Division clinicians receive.

# Officer Wellness and Support: ¶393

> **393.** *In order to provide support services that are culturally appropriate, sensitive to differing circumstances, and attentive to the issues facing all CPD members, including, but not limited to, women, people of color, religious minorities, and LGBTQI individuals, CPD will ensure that: a. the licensed mental health professionals and counselors employed by CPD are trained and equipped to provide services in a manner respectful of these diverse experiences and perspectives; b. CPD members receiving services have the opportunity to provide feedback regarding whether such services are culturally appropriate and adapted to diverse experiences and perspectives; and c. appropriate corrective action is taken to the extent necessary based on feedback received.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶393 for the first time this reporting period. We find that the CPD reached Preliminary compliance with this paragraph during the fourth reporting period.

To assess Preliminary compliance with ¶393, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data, such as Professional Counseling Division clinicians' biographies, which is relevant to compliance with the requirements of this paragraph. To assess Secondary compliance, we considered whether the CPD has qualified and diverse personnel who are trained to address the wellness needs and concerns of a diverse population.

During the fourth reporting period, we reviewed several documents and reports to gather an understanding of CPD efforts in providing support services that are culturally appropriate, sensitive to differing circumstances, and attentive to the issues facing all CPD members as required by ¶393. The CPD's *Officer Wellness Support Plan*, includes information regarding Professional Counseling Division staff. This staff is diverse, including women, people of color, and religious minorities. The experiences of staff members are also diverse. They have experience working with a variety of populations, including military, first responders, leaders, individuals with co-occurring substance-use disorders, and members of the LGBTQI community.

Additionally, in accordance with the *Officer Wellness Support Plan*, the Professional Counseling Division has established various support groups, such as the following: COVID-19 positive department members, Divorce support group, Black Female Law Enforcement members, Law Enforcement with children who have disabilities, and Military Veterans support group. These groups were developed based on results of surveys of command staff, rank and file, and in-service seminars.

The *Officer Wellness Support Plan* sets out expectations which, when followed, promote the training and development of officer wellness initiatives that are sensitive to the diversity found within the CPD and the community at large. Because of this, we find that the CPD has reached Preliminary compliance with ¶393.

This reporting period, we also reviewed the biographies of the Professional Counseling Division clinicians. The clinicians are not only diverse, but they have experience with and training regarding working with diverse populations such as working with various religious groups and members of the LGBTQI community. Additionally, the CPD provided evidence that they receive feedback related to support services by conducting various focus groups. Some of this feedback touched on topics of diversity within Professional Counseling Division services as shown in the *2021 Annual Report to the Superintendent*. With this, the CPD reached Secondary compliance.

Moving forward, we look forward to receiving information from the CPD regarding the training that support services staff receive regarding diversity awareness and providing services to CPD members who are diverse just as is the population of Chicago. Additionally, literature and posts regarding wellness services should reflect the diversity found within the CPD. Also, reaching Full compliance with this paragraph will require that a feedback loop be created which specifically asks about whether services are addressing the needs of all members of the CPD. In assessing full compliance, it would be helpful for use to receive from the CPD information regarding how, specifically, feedback related to diversity is solicited as well of evidence that the CPD monitors and appropriately responds to this type of feedback.

# Officer Wellness and Support: ¶394

**394.** *CPD will offer members referrals for counseling services by external clinical service providers, including, but not limited to, private therapists, specialists, outside agencies, or hospitals, when a member requires specialized counseling that is beyond the training and expertise of CPD's licensed mental health professionals or certified counselors.*

## Compliance Progress                 (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶394 for the first time this reporting period. The CPD reached Preliminary compliance in the fourth reporting period.

To assess Preliminary compliance with ¶394, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

In assessing compliance with ¶394 this reporting period, we reviewed the CPD's Professional Counseling Division Standard Operating Procedure 19-01 (SOP 19-01), *2021 Annual Report to the Superintendent*, and *Officer Wellness Support Plan*. SOP 19-01, identifies the process for making referrals to outside resources. When clinicians or counselors determine that the needs of a client cannot be met by the Professional Counseling Division, they are to confer with the Director of the Professional Counseling Division or the on-call clinician to determine the best course of treatment, including possible referral to an available EAP-evaluated outside resource. This process is designed to ensure the continuation of effective treatment services to address members' needs.

The *Officer Wellness Support Plan* identifies an expansive list of referral resources, including the NAMI Chicago helpline that contains over 650 resources for individuals and families. The Professional Counseling Division intends to continue expanding this catalogue after fully vetting potential providers to ensure quality of care and confirm alignment with current member insurance coverage.

Finally, the *2021 Annual Report to Superintendent* makes a recommendation for the selection of a third-party vendor for expansion of counseling services available to members. If implemented, this recommendation could reduce the case load of

current Professional Counseling Division staff, ultimately helping the Professional Counseling Division to provide the thorough and appropriate services they are capable of providing. If this recommendation is adopted, the Professional Counseling Division would develop a strategy regarding who and when members should be referred to a third-party provider. But, to develop the best-possible strategy, the CPD should make informed decisions based on data. This requires the CPD obtain and implement a technology solution that will allow the Professional Counseling Division to reliably and efficiently capture and analyze sources of data to better assess internal and external needs.

Because CPD has addressed referral to third-party vendors in the *Officer Wellness Support Plan*, the *2021 Report to the Superintendent*, and SOP 19-01, we find that they have reached Preliminary compliance. Notably, the CPD will not be able to advance to Secondary compliance without data that allows the CPD and us to assess the frequency and efficacy of outside referrals. We also will look for information regarding why and when outside referrals will be made. We look forward to working with the CPD as they obtain and implement necessary technology solutions so that they can better serve members.

# Officer Wellness and Support: ¶395

***395.** CPD will ensure that CPD members have access to: a. non-emergency, generalized counseling sessions with CPD's licensed mental health professionals within two weeks of a member's request; and b. generalized emergency counseling by CPD's licensed mental health professionals within 24 hours of a member's request.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶395 for the first time this reporting period, and we found they reached Preliminary compliance with this paragraph.

To assess Preliminary compliance with ¶395, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

The CPD has finalized the *Professional Counseling Division* directive (E06-01) and Standard Operating Procedure 19-01 (SOP 19-01). Both documents establish an on-call system whereby a licensed clinician will be available twenty-four hours a day to respond to all crises and traumatic incidents. Both E06-01 and SOP 19-01 note that non-emergency, general counseling sessions with EAP licensed mental health professionals will be held within two weeks of a member's request. Emergency counseling sessions will be conducted within 24 hours of the request.

Based on E06-01 and SOP 19-01, the City and the CPD achieved Preliminary compliance with ¶395. During the next reporting period, the IMT looks forward to reviewing various forms of documentation supporting timely efforts to accommodate members' need for services.

# Officer Wellness and Support: ¶396

> **396.** *CPD will continue to ensure that any mental health counseling services provided to CPD members remain confidential in accordance with state law, federal law, and current CPD policy.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶396 for the first time this reporting period, and found that they reached Preliminary compliance with this paragraph.

To assess Preliminary compliance with ¶396, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods.

In December 2020, CPD finalized the *Professional Counseling Division* directive (E06-01) and Standard Operating Procedure 19-01 (SOP 19-01). Both documents stress privacy and confidentiality. For example, E06-01, IV. A. states:

> *Any active Department member (sworn or civilian), their immediate family, or retired Department individuals can avail themselves of the services of the PCD. The services provided are covered by the confidentiality policy unless exceptions are imposed by law or by ethical constraints mandated in the regulations of professional counseling organizations.*

Similarly, SOP 19-01 calls for confidentiality, requiring that all contacts with Professional Counseling Division staff, peer support officers, and external EAP providers remain confidential.

Based on E06-01 and SOP 19-01, Preliminary compliance with ¶396 is achieved. Next reporting period we will look for training and systems designed to ensure confidentiality as it is outlined by E06-01 and SOP 19-01. We will pay particular attention to how the Professional Counseling Division communicates the confidentiality requirement to staff and members.

# Officer Wellness and Support: ¶397

**397.** *CPD will continue to ensure that licensed mental health professionals employed by the Professional Counseling Division do not participate in fitness for duty evaluations, which will be conducted exclusively by third-party licensed mental health professionals.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶397 for the first time this reporting period, and we found that they have reached Preliminary compliance with this paragraph.

To assess Preliminary compliance with ¶397, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

The requirements of ¶397 are addressed by Directive E06-01, *Professional Counseling Division* (E06-01), which the City and the CPD finalized in December 2020. The directive, prohibits Professional Counseling Division members from participating in evaluations—Section III.F. states, "Licensed mental health professionals employed by the EAP will not participate in fitness for duty evaluations. These will be conducted exclusively by third-party licensed mental health professionals."

Because E06-01 includes instructions covering ¶397's requirements, the City and the CPD are in Preliminary compliance with this paragraph. In future reporting periods, we look forward to reviewing data which shows that the Professional Counseling Division is, in fact, not involved in fitness for duty evaluations. To provide this data, the City and the CPD will need to ensure that the Professional Counseling Division has an adequate technological solution(s) in place to collect such data.

# Officer Wellness and Support: ¶398

**398.** *CPD currently employs five drug and alcohol counselors, all of whom are sworn CPD officers operating under the supervision of the Director of the Professional Counseling Division. These counselors provide free counseling for alcohol and substance abuse. CPD will continue to offer counseling services to CPD members for alcohol and substance abuse.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶398 for the first time this reporting period; they reached Preliminary compliance with this paragraph.

To assess Preliminary compliance with ¶398, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph.

During the fourth reporting period, to assess compliance with ¶398, we reviewed the biographies and certifications of the five drug and alcohol counselors. All counselors remain as sworn officers under the supervision of the Professional Counseling Division. We also looked at the *Professional Counseling Division* directive (E06-01) which was issued in December 2020. E06-01 requires Professional Counseling Division counselors to hold regularly scheduled anonymous meetings, support groups, and programs for members, their families and retired members. Further, the policy requires the Director to conduct a review of each program and ensure they are adhering to generally accepted practices in the field of addiction and treatment.

Standard Operating Procedure 19-01 (SOP 19-01)—finalized in December 2020—also supports ¶398 compliance. It requires that all drug and alcohol counselors will have education and/or experience with the theories and practices of addiction and treatment and will be certified by the State of Illinois as certified drug and alcohol counselors. Currently three of the five counselors have received their certification. The other two counselors are in the process of receiving their certification.

Beyond reviewing documents, we also met virtually with Professional Counseling Division staff, including the drug and alcohol counselors. The counselors described

various support groups—including alcohol and substance use support groups—that they facilitate for CPD members and their family members.

The CPD reached Preliminary compliance with ¶398 by including direction in SOP 19-01 and E06-01 regarding the provision of alcohol and substance abuse counseling and programing.

In future reporting periods, we will monitor the progress of the two remaining Professional Counseling Division members who are in the process of obtaining their drug and alcohol counseling certification. More generally, we will look for continual training of clinicians in areas related to substance and alcohol abuse.

# Officer Wellness and Support: ¶399

**399.** *CPD will ensure the number of drug and alcohol counselors available, either on staff or through referrals, meets the needs of CPD members consistent with the needs assessment and the Officer Support System Plan.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶399 for the first time this reporting period. The City and the CPD reached Preliminary compliance with this paragraph.

To assess Preliminary compliance with ¶399, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. We also reviewed various data relevant to compliance with the requirements of this paragraph, including records that show whether the CPD has qualified personnel fulfilling the responsibilities required by ¶399. We considered whether the CPD has allocated sufficient resources to create, staff, fill, and maintain positions with qualified personnel as required by this paragraph.

As mentioned in our assessment of ¶398, we reviewed the biographies of all drug and alcohol counselors during the fourth reporting period. We paid particular attention to the counselors' experience and qualifications for administering the program. The CPD has staffed the program with a diverse group of counselors who facilitate a variety of programs, sessions, and outreach for members and their families.

Further the *Professional Counseling Division* directive (E06-01), sets requirements for counselors to submit weekly tracking sheets that track their activities and deployed resources. The directive also makes counselors responsible for the portion of supervisory training that focuses upon employee impairment due to alcoholism or other addictions. The goal of this training is to help supervisors identify members in need of their services.

Additionally, the *Officer Wellness Support Plan* identifies the number and frequency of meetings that drug and alcohol counselors must conduct. Meetings are offered everyday including weekends, and there are multiple meetings some days—totaling ten meetings per week. Two of these meetings are reserved for officers only and one of these meetings is for women only.

Because the City and the CPD have created guidance through E06-01 and the *Officer Wellness Support Plan* for frequent provision of alcohol and substance use-related services, as well as guidance for tracking activities, we find that the CPD has reached Preliminary compliance with this paragraph.

We emphasize that the *2021 Annual Report to the Superintendent* demonstrated that the Professional Counseling Division has made extensive efforts to assess and address the growing needs of department members. The Professional Counseling Division continues to conduct surveys and monthly assessments and created a communications strategy. These are all viable options for continuing to assess the needs of members. However, in order to collect sufficient and reliable data that can be used to assess the extent to which services are meeting the needs of members, the City and the CPD must focus efforts on obtaining and implementing a much needed technology solution. Doing so will not only help the CPD reach compliance with this and other paragraphs, but it will allow the City and the CPD to continue to self-assess the services provided and the members' needs beyond the life of the Consent Decree.

Moving forward, we will look for data analyses related to the supply and demand for substance and alcohol use counseling. This will allow the Professional Counseling Division to ensure that there are a sufficient number of certified counselors able to meet the needs of members. Additionally, we encourage the Professional Counseling Division to continue to consider the needs of diverse members related to alcohol and substance use services. Eventual Full compliance with this paragraph will require that the CPD regularly assess officer needs and the capacity to provide services and then demonstrate that the CPD is reacting to the data collected and the lessons that data teaches, such that the needs of members are being met.

# Officer Wellness and Support: ¶400

**400.** *CPD will ensure that its drug and alcohol counselors are certified in Illinois as Certified Alcohol and Other Drug Abuse Counselors.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶400 for the first time this reporting period. The City and the CPD reached Preliminary compliance.

To assess Preliminary compliance with ¶400, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods.

Section V.B. of the *Professional Counseling Division* directive (E06-01) states:

> *The Director, Professional Counseling Division, will ensure that all EAP licensed mental health professionals and counselors are current with their continuing education standards, licensure, and certifications necessary for Mental Health Clinicians and Alcohol and Other Drug Counselors as mandated by State of Illinois professional standards.*

This addresses the requirements of ¶400, and therefore the City and the CPD have met Preliminary compliance with this paragraph.

In the fourth reporting period, the CPD produced the state certifications for three of the drug and alcohol counselors. At the close of the fourth reporting period, the remaining two counselors were in various stages of obtaining their state certification. During the next reporting period, the IMT will continue to monitor the progress of the remaining two counselors as they work toward obtain their certifications. We welcome evidence of ongoing training related to substance abuse.

# Officer Wellness and Support: ¶401

*401. CPD currently offers anonymous support groups and pro-grams for alcoholism and other addictions. CPD will ensure that a licensed mental health professional assigned to the Profes-sional Counseling Division oversees any such programs offered by CPD, that the programs adhere to generally accepted prac-tices in the field of addiction treatment (e.g., 12-step addiction treatment program), and that each program is reviewed at least annually by the Director of the Professional Counseling Division.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** May 5, 2021*          ☐ **Met**   ☑ **Missed**
*Extended from February 28, 2021, due to COVID-19

**Preliminary:**  *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Full:**  *Not in Compliance*

During the Fourth reporting period, the City and the CPD maintained Preliminary and Secondary compliance but did not reach Full compliance with ¶401.

To evaluate Full compliance with ¶401, we sought to determine whether the Pro-fessional Counseling Division Director is completing annual reviews of substance use disorder services as called for by the paragraph. To make this determination we reviewed a variety of data sources relevant to compliance including document submissions of the City and the CPD, and communications with members and Pro-fessional Counseling Division clinicians and staff.

In previous reporting periods, the City and the CPD reached Preliminary and Sec-ondary compliance with ¶401. Initially, the CPD increased staffing of its Employee Assistance Program, adding several substance-use-disorder-treatment counselors. This increased staffing provided capacity for the Professional Counseling Division to work toward fulfillment of the paragraph's requirements. The CPD reached Sec-ondary compliance in the third reporting period by demonstrating the organiza-tion and supervision of substance-use-disorder services and clinicians, and the number of members utilizing these services.

In the fourth reporting period, the IMT conducted a virtual site visit and met with several drug and alcohol counselors. During the visit the counselors shared infor-mation regarding the various support groups they facilitate, including the princi-ples applied within those groups. These support groups and programs remain un-der the supervision of a licensed clinician.

We also reviewed the Professional Counseling Division's *2021 Report to the Superintendent*. While this report noted that the Professional Counseling Division has five full time counselors in the Alcohol and Substance Use Unit, it did not contain a specific review of anonymous support groups and programs for alcoholism and other addictions provided by the Professional Counseling Division. We note that the *Professional Counseling Division* directive (E06-01) sets a requirement for the Director to annually conduct a review of each program and ensure they are adhering to generally accepted practices in the field of addiction treatment. We have not yet had the opportunity to review one of these annual reviews.

A complete and thorough review of programs required by this paragraph and other programs provided by the Professional Counseling Division necessitate that the City and the CPD provide the Professional Counseling Division with a technology solution that will allow the Professional Counseling Division to reliably and efficiently collect and review data. Because we have not yet seen an annual review of the alcohol and substance abuse programs, and because the CPD does not yet have the necessary technology to fully review these and other programs, the CPD has not yet reached Full compliance with ¶401.

# Officer Wellness and Support: ¶402

*402. CPD will train all supervisors regarding recognizing signs and symptoms of alcoholism and substance abuse, how to recommend available support services to CPD members experiencing alcoholism and substance abuse issues, and their obligations under CPD policy to report members exhibiting signs of alcohol or drug impairment.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City and the CPD's compliance with ¶402 for the first time this reporting period and found that they reached Preliminary compliance.

To assess Preliminary compliance with ¶402, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods.

Both the CPD's Standard Operating Procedure SOP 19-01 and *Professional Counseling Division* directive (E06-01) require that supervisors be trained regarding the signs and symptoms of alcohol and substance abuse. It also requires that supervisors be trained on recommending appropriate support services and report members exhibiting signs of impairment. With this, the City and the CPD have reached Preliminary compliance with ¶402.

To reach Secondary compliance, the City and the CPD should develop training for supervisors providing guidance on fulfilling these obligations. Full compliance will require that evidence of training completion be provided as well as development of a plan for continued training on these topics.

## Officer Wellness and Support: ¶404

*404. CPD will maintain a peer support program, ensuring that: a. a licensed mental health professional assigned to the Professional Counseling Division oversees and adequately manages the program; b. Peer Support Officers receive initial training in stress management, grief management, officer wellness, obligations and limitations regarding confidentiality and privacy, communication skills, common psychological symptoms and conditions, suicide assessment and prevention, dependency and abuse, and support services available to CPD members; c. Peer Support Officers are trained to recommend the services offered by the Professional Counseling Division in situations that are beyond the scope of their training; d. CPD offers Peer Support Officers the opportunity to meet at least annually to share successful strategies and identify ways to enhance the program; e. Peer Support Officers receive and comply with a written procedures manual approved by a licensed mental health professional assigned to the Professional Counseling Division; f. Peer Support Officers are offered sufficient non-monetary incentives and recognition to ensure broad recruitment of volunteers and widespread access to peer support services; and g. the scope and quantity of peer support services provided to CPD members are identified in a manner that facilitates effective management of the program and that preserves the anonymity and confidentiality of members receiving peer support services.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|

**Deadline:** March 5, 2021*     ☑ **Met**    ☐ **Missed**
*Extended from February 28, 2021, due to COVID-19

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

During the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶404. They also made progress toward Secondary compliance with this paragraph during the fourth reporting period. Finally, they met the March 5, 2021 deadline because they provided evidence that the Peer Support Officers held a meeting as required by the paragraph.

To evaluate Preliminary compliance with ¶404, we considered whether the CPD has allocated sufficient resources to maintain the peer support program and whether the CPD offers Peer Support Officers the opportunity to meet at least annually to share strategies and enhance the program. We reviewed all accessible

data relevant to ¶404 efforts, including records of meetings, and considered other sources of data, such as communications with CPD members, and any policies developed regarding the peer support program. To evaluate Secondary compliance we considered the CPD's training development, implementation, and evaluation relevant to the various requirement of this paragraph, as well as other data sources showing implementation of programs or actions specified in relevant policies that direct compliance with the various subsections of this paragraph.

In previous reporting periods, the City and the CPD's compliance with ¶404 remained under assessment. We reviewed various peer support program materials and commended steps taken to enhance the Peer Support Program. The program training materials were substantively strong, but we noted that the training lacked discussion of substance use disorders. The CPD indicated that a drug and alcohol counselor attended the program training, and we expressed an intention to observe the training in action to gain a better understanding into how this topic is integrated and discussed in the training. We also noted that the peer support program training manual still needed to be finalized as of the end of the third reporting period.

We reviewed several documents relating to CPD's Peer Support Program during the fourth reporting period. First the *Professional Counseling Division* directive (E06-01)—finalized in December 2020—identifies the responsibilities of Peer Support Officers. It also specifies that the Professional Counseling Division director oversees the daily operation of the Peer Support Officers. E06-01 also outlines the training that all Peer Support Officers must receive. In addition to E06-01, the CPD's Professional Counseling Division SOP 19-01 (SOP 19-01) reiterates requirements and expectations related to the peer support program. For example, to become a Peer Support Officers, the member must undergo an application, disciplinary background, and interview as part of the selection process. It emphasizes that all Peer Support Officer must complete initial and refresher trainings, and all clarifies that Peer Support Officers are subject to removal from the role at any time.

During the fourth reporting period, the Professional Counseling Division also submitted documentation showing that CPD approved an award for Peer Support leadership, and held meetings with Peer Support members in 2020 and 2021. These documents demonstrate efforts in accord with the requirements of ¶404(f) and (d).

Related specifically to the requirements of ¶404(b) and (c), the CPD submitted revised Peer Support final Training materials in February 2021. The training materials covered a variety of topics, including stress management, understanding suicide, and an overview of the peer support program and benefits. We submitted a no-objection notice to these materials on March 10, 2021. We did not receive data to

show that the peer support training was provided during the fourth reporting period.

Because E06-01 and SOP 19-01 address the requirements of ¶404, creating a framework under which the CPD can reach compliance with all subsections, the City and the CPD have reached Preliminary compliance with this paragraph. The City and the CPD have also made progress toward, but not yet reached Secondary compliance with ¶404. To reach Secondary compliance, the City and the CPD will need to provide the Peer Support Training and submit documents showing the provision and completion of that training. Additionally, to comply with the requirements of subsection (g), the City and the CPD will need to implement a technology solution to track and assess scope and quantity of the peer support services provided to CPD members while also ensuring anonymity and confidentiality of members utilizing those services.

# Officer Wellness and Support: ¶406

*406. By January 1, 2020, CPD will develop and adopt a standard operating procedure ("SOP") outlining the roles and responsibilities of the Chaplains Unit. The Chaplains Unit SOP will identify that: a. the purpose of the Chaplains Unit is to: i. support the wellness of CPD members who voluntarily seek consultation with representatives of the Chaplains Unit; ii. make referrals to licensed mental health professionals and other service providers, when appropriate; iii. provide pastoral care to CPD members who voluntarily seek such services; iv. offer voluntary preventive programs for the purposes of supporting, encouraging, and affirming CPD members in their professional and family lives; and v. provide support in moments of crisis as requested by CPD members. b. when acting in the official capacity of a CPD Chaplain, representatives of the Chaplains Unit will refrain from actions or statements that are inconsistent with CPD policy. c. representatives of the Chaplains Unit, including CPD members and non-CPD members, will receive training regarding the roles and responsibilities of the Chaplains Unit.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | *Not in Compliance* |

The City and the CPD reached Preliminary compliance with ¶406 in the second reporting period and Secondary compliance in the third reporting period. The City and the CPD did not reach additional levels of compliance during the fourth reporting period.

To evaluate Full compliance with ¶406, we sought to determine whether the CPD had sufficiently implemented its policy and training resulting in the Chaplains Unit operating in a manner consistent with those materials. Additionally, we looked for evidence that the CPD implemented mechanisms to regularly assess whether the Chaplains Unit is operating in accordance with SOP 20-01 and whether adjustments should be made to the Chaplains Unit or SOP 20-01.

In previous reporting periods, the City and the CPD reached Preliminary and Secondary compliance with ¶406. In the second reporting period, the CPD revised and finalize the Chaplains Unit Standard Operating Procedure 20-01 (SOP 20-01). And in the third reporting period, the CPD submitted and revised the Chaplains Unit SOP training materials along with documentation demonstrating the chaplains' review of the training materials.

During the fourth reporting period, we did not receive data necessary to assess the Chaplains Unit operations. Receiving information sufficient to show that the Chaplains Unit is operating as provided for in ¶406, as outlined in SOP 20-01, and in accordance with the training provided to the chaplains is necessary in order for the City and the CPD to realize Full compliance. Therefore, the City and the CPD did not reach Full compliance.

# Officer Wellness and Support: ¶407

> **407.** *CPD will continue to require that whenever a CPD member has experienced a duty-related traumatic incident, the member must attend counseling with a licensed mental health professional. The Director of the Professional Counseling Division or his or her designee will be responsible for documenting that a CPD member has attended the mandatory counseling and has completed the requirements of the Traumatic Incident Stress Management Program prior to the member returning to regular duty assignment. CPD will require any CPD member who has experienced a duty-related traumatic incident, unless medically unable to do so, to meet with a licensed mental health professional within seven days of the incident, and will ensure that it has an adequate staff of licensed mental health professionals who can accommodate this timing requirement.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶407 during the fourth reporting period.

To evaluate Preliminary compliance with ¶407, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree. To assess Secondary compliance with this paragraph we reviewed the CPD's training development, implementation, and evaluation (¶268).

We assessed the City and the CPD's compliance with ¶407 for the first time in the third reporting period. They did not reach Preliminary compliance by the end of the third reporting period because the *Traumatic Incident Stress Management Program* directive (E06-03) was not finalized at the end of the reporting period—it still needed to be subjected to public comment. We encouraged the CPD to meaningfully engage with the public comments received not only in relation to E06-03, but all directives posted for comment. And, aside from the need for public comment on the directive, we cautioned that the CPD's ability to track compliance with E06-03 could ultimately hinge on the implementation of adequate and dependable software.

Directive E06-03 was submitted for public comment. Thereafter, the CPD finalized and issued E06-03 in February 2021. In addition to issuing the new policy CPD also issued the Traumatic Incident Stress Management Notification form (CPD-62-480).

The policy identifies the types of incidents for which members are referred to the Traumatic Incident Stress Management Program. Examples of incidents include certain discharges of firearms, on-duty traffic crashes involving serious personal injury, other serious personal injury incidents, other bodily harm or death incidents, or other police incidents or action which may result in a member experiencing emotional or psychological distress.

Referrals to the Traumatic Incident Stress Management Program derive only from on-duty incidents. E06-03 sets forth the notification and referral process to be followed by on scene supervisors and watch operations lieutenants. Further, the policy makes clear that referral to Traumatic Incident Stress Management Program does not indicate that the referred member has any symptoms of traumatic incident related stress.

The policy requires that Traumatic Incident Stress Management Program referred members contact the Professional Counseling Division within 24 hours of the referral notification in order to schedule the initial debriefing session. This session is to be held within 72 hours of the traumatic incident.

Additionally, the Professional Counseling Division's responsibilities within the Traumatic Incident Stress Management Program are clearly described within E06-03. Responsibilities include documenting referred members attendance, documenting completion of the program, and providing notification of such to referred members' commanding officers. The policy also requires the Professional Counseling Division to conduct six-month follow-ups with referred members to ensure members are aware of additional support services.

In February 2021, the CPD submitted for review Traumatic Incident Stress Management Program clinicians' training materials. We provided comments on the training materials on March 3, 2021. We look forward to receiving further revised Traumatic Incident Stress Management Program clinicians' training materials and continuing to work through the collaborative review and revision process in future reporting periods.

With the submission for public comment and finalization of E06-03, the CPD reached Preliminary compliance with ¶407. Because the CPD has not yet finalized or provided the Traumatic Incident Stress Management Program clinicians' training, the CPD had not yet reached Secondary compliance with this paragraph.

# Officer Wellness and Support: ¶408

> **408.** *In addition to providing mandatory initial consultations and additional consultations as appropriate or as requested by CPD members, CPD's licensed mental health professionals will follow up with members who have experienced a duty-related traumatic incident within six months to offer additional support services.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the fourth reporting period, the City and the CPD reached Preliminary compliance with ¶408.

To evaluate Preliminary compliance with ¶408, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods.

We assessed the City and the CPD's compliance with ¶408 for the first time in the third reporting period. They did not reach Preliminary compliance by the end of the third reporting period because the relevant *Traumatic Incident Stress Management Program* directive (E06-03) had not yet been subjected to public comment as required by ¶641. As with ¶407, we reiterated that the CPD would need to implement an appropriate technology solution to accurately and efficiently track incident dates and ¶408 required clinician follow up in order to reach additional levels of compliance.

The *Traumatic Incident Stress Management Program* directive (E06-03), was submitted for public comment and finalized by the CPD in the fourth reporting period. E06-03 requires that Professional Counseling Division personnel follow up with members released from the Traumatic Incident Stress Management Program within six months to offer additional support services. With this, the City and the CPD reached Preliminary compliance with ¶408.

In February 2021, the CPD submitted for review Traumatic Incident Stress Management Program clinicians' training materials. We provided comments on the training materials on March 3, 2021. We look forward to receiving further revised Traumatic Incident Stress Management Program clinicians' training materials and continuing to work through the collaborative review and revision process in future reporting periods. Completion of training materials and proof that the training was

provided will be necessary for the City and the CPD to reach Secondary compliance with this paragraph.

## Officer Wellness and Support: ¶409

> **409.** *CPD has implemented a mandatory program for members who have experienced an officer-involved firearms discharge that consists of peer group discussions and other components. CPD will ensure that this program is overseen by a licensed mental health professional assigned to the Professional Counseling Division, reflects best practices, and comports with CPD's use of force policies and training.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD maintained Preliminary compliance with ¶409 during the fourth reporting period, but they have not yet reached Secondary compliance.

To evaluate Secondary Compliance with ¶409, we evaluate training materials using as our standard the "ADDIE" model of curriculum development and implementation. This model typically incorporates the following elements: training needs assessment, curriculum design and development, training implementations (or delivery), and training evaluation. To make this assessment, we review various documents including training materials.

The City and the CPD reached Preliminary compliance with ¶409 in the first reporting period because the implemented a mandatory, Commission on Accreditation for Law Enforcement Agencies (CALEA) qualified program for officers who have experienced an officer-involved firearm discharge. In the third reporting period we reviewed E06-03, *Traumatic Incident Stress Management Program*, and related forms and clinicians' training. But the clinicians' training had not yet been finalized.

After undergoing revisions and a public comment period the *Traumatic Incident Stress Management Program* directive (E06-03) was issued February 2021. Referral to the Traumatic Incident Stress Management Program can occur for several incidents, including member firearm discharges. The program is a component of the Professional Counseling Division and is overseen by a licensed mental health professional. With the finalization of this policy, the CPD maintained Preliminary compliance with ¶409.

In February 2021, the CPD submitted Traumatic Incident Stress Management Program clinicians' training materials for review. We provided comments on the train-

ing materials on March 3, 2021. We look forward to receiving further revised Traumatic Incident Stress Management Program clinicians' training materials and continuing to work through the collaborative review and revision process in future reporting periods. Completion of training materials and proof that the training was provided will be necessary for the City and the CPD to reach Secondary compliance with this paragraph.

# Officer Wellness and Support: ¶410

> **410.** *CPD will continue to place any CPD member who has discharged a firearm, excluding training discharges, unintentional discharges, or discharges for the destruction of an animal where no person was injured, on mandatory administrative duty assignment for a minimum period of 30 days. Prior to permitting the member to return to regular field duties, CPD will require the member to (a) complete the Traumatic Incident Stress Management Program and any training determined by CPD to be appropriate; and (b) receive authorization from the First Deputy Superintendent. Authorization to return to regular field duties may be withheld pending the outcome of any administrative or criminal investigation.*

## Compliance Progress　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD reached Preliminary compliance with ¶410 during the fourth reporting period. They have not yet reached Secondary compliance.

To evaluate Preliminary compliance with ¶410, we reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with this paragraph, we reviewed the data sources relevant to compliance with the paragraph. We paid particular attention to the City and the CPD's acquisition or implementation of a technological solution that allows for reliable data tracking now and in the future.

We evaluated the City and the CPD's compliance with ¶410 for the first time in the third reporting period. In that period, we reviewed CPD's revised *Traumatic Incident Stress Management Program* directive (E06-03). We provided a no-objection notice to the revised directive, but by the close of the reporting period, the CPD had not yet submitted E06-03 for public comment as required. As noted in our assessments of ¶407-08, we also reiterated that additional levels of compliance would likely hinge on the CPD's implementation of a technology solution that will allow it to adequately track compliance with E06-03, which embodies the requirements of ¶410.

During this reporting period the CPD submitted the *Traumatic Incident Stress Management Program* directive (E06-03), for public comment. Thereafter, E06-03 was issued February 2021. This directive clearly defines the types of firearm discharges

that mandate Traumatic Incident Stress Management Program referral. In addition, E06-03 requires the Professional Counseling Division to notify the Office of First Deputy Superintendent when a member who was referred to the Traumatic Incident Stress Management Program due to a firearm discharge is released from the program. The policy also requires members who have discharged a firearm to respond consistent with another CPD directive G03-02-03, *Firearm Discharge Incidents - Authorized Use and Post-Discharge Administrative Procedures.*

The CPD reached Preliminary compliance with ¶410 with the finalization of E06-03. Moving forward, to reach Secondary compliance, the City and the CPD must be able to effectively and accurately track CPD unit's and member's compliance with this directive. To do so, the CPD will need to implement a technological solution that allows for data collection and analysis, and ensures that the timing requirements set out by E06-03. We look forward to working with the CPD as they acquire and implement such a solution in future reporting periods.

# Officer Wellness and Support: ¶411

> **411.** *At least annually, CPD will determine whether members who have experienced a duty-related traumatic incident have attended the mandatory counseling sessions and have completed the Traumatic Incident Stress Management Program.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**    May 3, 2021*     ☐ Met    ☑ Missed
*Extended from February 28, 2021, due to COVID-19

**Preliminary:**   *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**   *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance but did not reach Secondary compliance during the fourth reporting period. They also missed the annual deadline of May 2, 2021.

To evaluate Secondary Compliance with ¶411, we reviewed the CPD's training development, implementation, and evaluation. We evaluate training materials using as our standard the "ADDIE" model of curriculum development and implementation. We also reviewed records that are sufficient to show that the CPD has qualified personnel fulfilling the responsibilities delineated by ¶411.

In previous reporting periods, the City and the CPD reached and maintained Preliminary compliance with ¶411. In the second reporting period we reviewed a CPD Audit Unit report providing a review of the Traumatic Incident Stress Management Program. Among other data points, the report provided numbers regarding members who had been referred to and attended the Traumatic Incident Stress Management Program. In the Third reporting period we reviewed the *Traumatic Incident Stress Management Program* directive (E06-03). Although we provided a no-objection notice, E06-03 was not finalized by the end of the reporting period because it still needed to undergo public comment as required by ¶641.

Section VII. of E06-03 requires the Audit Division to "conduct an annual assessment to determine the extent to which members who experience traumatic incidents are referred to the Traumatic Stress Incident Management Program and the extent to which referred members attend the mandatory debriefing session(s), complete the Traumatic Incident Stress Management Program, and receive follow-up communication and support services." We appreciate the incorporation of ¶411's requirements into E06-03. With this, the CPD maintained Preliminary compliance.

No annual assessment was provided to the IMT by the close of the fourth reporting period. To reach Secondary compliance the City and the CPD will need to provide evidence of an annual review that meets the requirements of ¶411. To appropriately assess member compliance with Traumatic Incident Stress Management Program, the City and the CPD must implement a technology solution that will allow for reliable and efficient tracking of compliance ¶411. Additionally, the City and the CPD will need to train personnel to appropriately analyze data on program compliance which will then inform the annual review and report. We look forward to working with the CPD as they move toward Secondary compliance during the next reporting period.

# Officer Wellness and Support: ¶412

*412. Where it would add to the quality or effectiveness of the training, CPD will involve mental health professionals, as feasible, practical, and appropriate, in developing and reviewing recruit and in-service training on stress management, alcohol and substance abuse, officer wellness, and the support services available to CPD members.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶412. After making significant progress, the City and the CPD remain under assessment for Preliminary compliance with this paragraph at the end of the fourth reporting period.

To evaluate Preliminary compliance with ¶412, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods.

In the third reporting period, we provided a status update for ¶412. We reported that the CPD had engaged the expertise of several professionals outside of the CPD who assisted with the development of a variety of programs and materials including, but not limited to, the peer support program and Professional Counseling Division training materials. We recognized that the Professional Counseling Division clinicians have a depth of expertise in their fields, but also have a heavy workload. Therefore we encouraged the CPD to continue to leverage expertise of individuals in the field and community.

In the fourth reporting period, the CPD revised Special Order S11-10, *Department Training*, which states "[t]o add quality and effectiveness to the development of training, the Training and Support Group will seek assistance of outside expertise, when feasible, practical, and appropriate, either in developing curricula and lesson plans or reviewing pilot versions of Department training." Mental health professionals are included among the list of outside experts that may be called upon. At the end of the reporting period, S11-10 was still under the Consent Decree review process—although the IMT did provide a no-objection notice.

The CPD also drafted and revised 2021 In-Service Officer Wellness Training materials including a curriculum and lesson plans. We submitted a no-objection notice

to these materials. The CPD partnered with several outside professionals in the development and delivery of training. The various topics of training included Stress Management through Yoga for First Responders, Law Enforcement Resilience Training, Financial Wellness, and Managing Health Risk to Police Officers. Each of these training topics complied with the requirements of ¶412. The training curriculum also directs members to other internal and external resources available.

In February 2021, CPD produced *EAP Recruit Training* curriculum and lesson plans. The training topics included discussion on the Professional Counseling Division's EAP program, Peer Support Program, Alcohol and Substance Abuse, and other mental-health concerns affecting law enforcement. The block of instruction was presented by a Professional Counseling Division licensed professional.

With the CPD's involvement of outside experts in developing these training materials, the CPD has made significant progress toward Preliminary compliance. In future reporting periods, we will look for evidence that the S11-10 is finalized and that trainings have been delivered to members. And ultimately, we hope to see evidence that the CPD consistently involves outside consultants where appropriate to develop and deliver in-service trainings and resource materials.

## Officer Wellness and Support: ¶413

> **413.** *CPD will involve experts, such as psychologists and cognitive and behavioral scientists, in developing training on use of force where their expertise would enhance the effectiveness of the training. The training topics that may benefit from such expertise could include: a. peer intervention by fellow officers to stop the use of excessive force; b. the interaction of human perception and threat assessment; and c. de-escalation and defusing techniques, including psychological methods of situation control, verbal control and communication, conflict resolution, and anger management.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶413. After making significant progress, the City and the CPD remain under assessment for Preliminary compliance with this paragraph at the end of the fourth reporting period.

To evaluate Preliminary compliance with ¶413, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods.

In the third reporting period, we provided a status update for ¶413. We reported that we had reviewed documents reflecting the CPD's engagement of behavioral science experts in developing a variety of trainings.

In the fourth reporting period, in addition to reviewing revisions to Special Order S11-10, *Department Training*, as discussed in ¶412, above, we reviewed the City and the CPD's 2021 Training Plan. This plan identifies several in-service training courses which together help satisfy the 40-hour training requirement. Among these trainings are De-Escalation training, Crisis Intervention Training, and other Use of Force curriculum. The training plan demonstrates that these training curriculums were created with assistance and input of outside experts and consultants. In some instances these trainings are to be provided by outside experts.

We also reviewed the Community Organizations and Experts, Appendix G. to the 2021 Training Plan, which lists all experts and consultants who provide the Training Division with assistance in the development, review, and delivery of trainings.

The CPD has made progress toward Preliminary compliance with ¶413. In future reporting periods, we will look for evidence that the S11-10 is finalized. To reach Secondary compliance, the City and the CPD will need to provide evidence that the trainings implicated by ¶413 have been delivered to members.

# Officer Wellness and Support: ¶414

> **414.** *CPD will ensure that all CPD members are provided in-service training on stress management, alcohol and substance abuse, and officer wellness at least every three years. CPD will include training regarding stress management, alcohol and substance abuse, officer wellness, and support services in the recruit training program.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Under Assessment* |
| **Full:** | *Not in Compliance* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶414. During the fourth reporting period, the City and the CPD reached Preliminary compliance with this paragraph. Secondary compliance with ¶414 remained under assessment at the close of the fourth reporting period.

To evaluate Preliminary compliance with ¶414, the IMT reviewed the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods. We also reviewed training materials that demonstrate the development of programs relevant to compliance with ¶414. To evaluate Secondary compliance with ¶414, the IMT reviewed the CPD's training development, implementation, and evaluation (¶286).

In the third reporting period, we provided a status update for ¶414. During the third reporting period we reviewed records relevant to ¶414 including curriculums for Officer Wellness Training and the Employee Assistance Program Pre-Service Promotional Training.

Section V.C. of the *Professional Counseling Division* directive (E06-01)*,* requires the EAP to offer "initial recruit training and provide in-service training to all Department members at least every three years. The initial recruit training and in-service training will include stress management, alcohol-use and substance-use, officer wellness, and other support services." With this, the City and the CPD reached Preliminary compliance with ¶414.

During the fourth reporting period, the CPD submitted and revised 2021 In-Service Wellness Training materials. In June 2021, we submitted a no-objection notice to those materials. The in-service wellness training covered various topics: financial wellness, mitigating health risks to officers, and stress management through Yoga.

This training began in June 2021. Next reporting period, we look forward to receiving evidence that all officers received this training during 2021.

In addition, in February 2021, the CPD submitted Employee Assistance Program (EAP) Recruit Training Course Summary Sheets. While these summaries suggest that this training might align with the requirements of ¶414, we notified the CPD that we would like to review the lesson plans and training materials associated with the summary sheets to ensure that the training covers all requirements of ¶414. We await these materials.

Because we await the EAP Recruit Training Course materials, and proof that these trainings have been delivered to all members of the CPD, the City and the CPD's Secondary compliance with this paragraph remains Under Assessment.

# Officer Wellness and Support: ¶415

**415.** *By July 1, 2020, and periodically thereafter, CPD will conduct a department-wide equipment and technology audit to determine what equipment is outdated, broken, or otherwise in need of repair or replacement. During each audit, CPD will solicit feedback from representatives of the collective bargaining units representing CPD members.*

---

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** Ongoing  ☐ Met  ☑ Missed

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

We assessed compliance with ¶415 for the first time during the fourth reporting period. The City and the CPD have not yet reached Preliminary compliance with this paragraph. Additionally, the City and the CPD have not met the deadline of ¶415 because they did not submit evidence of a department-wide audit that met all requirements specified in the paragraph.

To evaluate Preliminary compliance with ¶415, the IMT sought to review the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626–41), which outlines applicable consultation, resolution, workout, and public comments periods. Specifically, we looked for the City and the CPD to develop a policy requiring periodic audits and specifying how and when the audits should be completed to adequately identify the current state of technology in CPD's possession and provide sufficient details to allow the CPD to quickly determine what technology or equipment is outdated, broken, or otherwise in need of repair or replacement.

We evaluated the City and the CPD's compliance with ¶415 for the first time in the third reporting period. The City and the CPD did not provide records to demonstrate compliance with the paragraph during that reporting period, and therefore they did not reach any level of compliance.

We have not received evidence from the City or the CPD that a policy has been created to direct the completion of period audits as required by ¶415. Because of this the City and the CPD have not yet reached Preliminary compliance.

Additionally, we note that ¶415 calls for equipment and technology audits to be conducted "periodically." When the City and the CPD draft a policy to guide compliance with this paragraph, they should include a timing requirement that guides

the frequency of these audits. Once this policy is finalized, we will look for the CPD to meet its own deadlines for completing the department-wide equipment and technology audits.

Despite the lack of a policy, during this reporting period, the City and the CPD submitted an Equipment and Technology Audit, dated March 19, 2021. While we appreciate the efforts in completing this audit, it does not fully address the requirements of ¶415. It does not provide a full and clear picture of (1) the equipment and technology in the CPD's possession; (2) the state of that equipment and technology; or (3) any recommendations for addressing any identified concerns or problems with CPD's equipment or technology. Additionally, there was no indication that the FOP was consulted in the completion of this audit.

Because to the CPD did not submit a policy that guides compliance with ¶415, the City and the CPD did not reach Preliminary compliance. And they did not meet the deadline because the Equipment and Technology Audit submitted did not include all requirements set out in ¶415.

# Officer Wellness and Support: ¶416

**416.** *Within 90 days of the completion of the initial audit, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs for repair or replacement of equipment and technology as identified through the needs assessment ("Equipment and Technology Audit Response Plan"). CPD will implement the Equipment and Technology Audit Response Plan in accordance with the specified timeline for implementation.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**       February 3, 2021*       ☐ **Met**   ☑ **Missed**
                    *Extended from December 1, 2020, due to COVID-19
**Preliminary:**    *Not in Compliance*
**Secondary:**      *Not Yet Assessed*
**Full:**           *Not Yet Assessed*

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶416. They did not reach Preliminary compliance, and did not meet the deadline imposed by the paragraph.

To evaluate Preliminary compliance with ¶416, the IMT sought to review the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods. We also sought to review data sources relevant to compliance with ¶416.

In the third reporting period, we provided a status update for ¶416. We reported that, as of the end of the third reporting period, the City and the CPD had not yet produced documents that demonstrated compliance with the paragraph.

As noted in our assessment of ¶415, the City and the CPD have not completed a sufficient technology and equipment audit. Without an adequate audit, the City and the CPD are unable to reach compliance with ¶416. We note that, although the City and the CPD completed an audit—one which did not satisfy ¶415—they did not produce any additional documentation to show that the CPD developed an Equipment and Technology Audit Response plan to address the issues identified in the audit. Because of this the City and the CPD have not reached Preliminary compliance with ¶416.

# Officer Wellness and Support: ¶417

> **417.** *As a component of the Equipment and Technology Audit Response Plan, CPD will develop a schedule for future periodic audits. The schedule will specify the time period within which future periodic audits will occur. The time period may vary for different equipment types to account for differences in the expected useful life of different equipment types. CPD will perform the periodic audits in accordance with the schedule.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This reporting period marks the first time we have assessed the City and the CPD's compliance with ¶417. They did not reach Preliminary compliance with this paragraph by the end of the fourth reporting period.

To evaluate Preliminary compliance with ¶417, the IMT sought to review the CPD's relevant policies and documents following the process described in the Consent Decree (¶¶626-641), which outlines applicable consultation, resolution, workout, and public comments periods. We also sought to review data sources relevant to compliance with ¶417.

In the third reporting period, we provided a status update for ¶417. We reported that the City and the CPD's ability to comply with the paragraph was stalled because it needed to implement a new Inventory Control System.

As mentioned in our assessment of ¶¶415–16, the City and the CPD have not developed a policy to guide the process or procedures—including a schedule—for engaging in periodic audits of technology and equipment. Because of this the City and the CPD did not reach Preliminary compliance.

# Officer Wellness and Support: ¶418

**418.** *In order to facilitate physical health and mental well-being, CPD will ensure its members have access to exercise equipment at CPD facilities in geographically dispersed areas throughout the City.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not in Compliance*
**Full:** *Not Yet Assessed*

The City and the CPD maintained Preliminary compliance with ¶418, but did not reach additional levels of compliance during this reporting period.

To evaluate Secondary compliance with ¶418 we reviewed various data sources to determine whether the City has conducted a survey to ensure that equipment is dispersed throughout the city such that it meets the demand present in each location.

We first evaluated the City and the CPD's compliance with ¶418 in the third reporting period. We reviewed information the CPD provided which accounted for the exercise equipment possessed by the CPD and the location of that equipment. Based on that information we found that the CPD reached Preliminary compliance.

During the fourth reporting period, we did not receive any documentation from the City or the CPD that demonstrate additional compliance with ¶418. In future reporting periods we will look for evidence that the City has conducted a survey to ensure the exercise equipment is dispersed throughout the city such that it meets the demands present in each location. Additionally, future equipment audits should report on the condition of this equipment.

# IX. Accountability and Transparency

This is the Accountability and Transparency section of the Independent Monitoring Team's (IMT's) fourth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (City) and its relevant entities' Accountability and Transparency compliance efforts from January 1, 2021, through June 30, 2021.

## Guiding Principles

The IMT assessed compliance with applicable Accountability and Transparency paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> *419. Holding public servants accountable when they violate law or policy is essential to ensuring legitimacy and community confidence.*

> *420. A robust and well-functioning accountability system in which CPD members are held to the highest standards of integrity is critical to CPD's legitimacy and is a priority of CPD. A culture of accountability also promotes employee safety and morale, and improves the effectiveness of CPD operations. Organizational justice also plays an important role in ensuring that CPD members have confidence in the legitimacy of the system that holds them accountable.*

> *421. In order to foster public trust and receive critically important community feedback, and promote confidence in CPD, the City and CPD will ensure the process for submitting and pursuing complaints that allege violations of CPD policy or the law by CPD members is open and accessible for all individuals who wish to file complaints.*

> *422. Meaningful community involvement is imperative to CPD accountability and transparency. Nothing in this Agreement should be construed as limiting or impeding community participation in CPD's accountability system, including the creation and participation of a community safety oversight board. OAG and the City acknowledge the significant work many of Chicago's community organizations have undertaken and are continuing to undertake, including work alongside CPD, in the area of police*

*reform and accountability, and OAG and the City know this critical work will continue.*

**423.** *The City, CPD, and COPA will ensure that all complaints of misconduct, whether from internal or external sources, are thoroughly, fairly, timely, and efficiently investigated in accordance with this Agreement; that all investigative findings are supported by the appropriate standard of proof and documented in writing; and that all CPD members who commit misconduct are held accountable pursuant to a disciplinary system that is fair, timely and consistent, and provides due process.*

# Assessing Compliance

In accordance with ¶¶661–62 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance. *See* ¶720. Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the Office of the Illinois Attorney General (OAG) with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

# Summary of Compliance Assessments

The Accountability and Transparency section of the Consent Decree requires actions by various City entities, including the CPD Bureau of Internal Affairs (BIA), the Civilian Office of Police Accountability (COPA), the Police Board, and the Office of Inspector General (OIG). Ultimately, however, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, the City will not meet Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. In this section, however, we include the status of each entity's efforts.

During the fourth reporting period, the CPD, the CPD BIA, COPA, the Police Board, and the OIG continued to work toward compliance with the Consent Decree. Throughout the reporting period, the IMT reviewed policies, plans, and other documentation and engaged in many hours of discussion with City representatives regarding their efforts related to the Accountability and Transparency section.

## The Chicago Police Department and Bureau of Internal Affairs

Late in third reporting period and early into the fourth reporting period, BIA realigned its focus to better address the requirements of the Consent Decree through policies and unit directives. We recognize that it is important for consistent leadership and management within BIA, and continue to be impressed with the knowledge, leadership, and engagement of BIA personnel. The CPD also assigned an analyst to BIA, which has helped BIA to develop data for better management and reports. BIA and COPA have also developed and maintained working relationships, which has greatly reduced jurisdictional issues and increased communications.

In the third month of this reporting period, the City and BIA produced several new and revised unit directives and department policies. Unfortunately, this delayed start—including not meeting with the IMT for the first six weeks of the reporting period—prevented the CPD and its Bureau of Internal Affairs (BIA) from meeting additional levels of compliance before the end of the fourth reporting period. The City and BIA produced several revised versions of the unit directives and department policies, which did not leave sufficient time to implement the policies. Still, BIA also continued to develop its training plans and curriculum to address the requirements of the Consent Decree, which we also anticipate will continue to develop and improve in the fifth reporting period.

Throughout this reporting period, there was also disagreement regarding whether these policies—particularly those that enumerate Consent Decree requirements—must also be posted for public comment. We continue to believe that it is critical for policies that are meant to comply with the Accountability and Transparency

section are provided to the public and to CPD officers. We are hopeful that we will be able to resolve this issue, and with a resolution, we anticipate that many of these BIA policies will be finalized in the next reporting period.

## The Chicago Office of Police Accountability

In the fourth reporting period, COPA continued making the progress that it began in the third reporting period. As a result, rather than minimally checking boxes, COPA developed a clear plan to holistically revise its policies and procedures, incorporating Consent Decree requirements. COPA also continued working with the COPA Community Policy Review Working Group of about twenty volunteers from across the Chicago community to review COPA draft policies and documents related to the Consent Decree. The group meet regularly with COPA personnel to provide feedback and recommendations. This resulted in policies and procedures that provide detailed direction to its personnel to meet Consent Decree requirements and optimize COPA's practices. COPA also provided the IMT with a production schedule for the policies it intended to produce for multiple reporting periods. COPA also maintained the bi-weekly meeting schedule throughout the fourth reporting period and continued to provide open dialogue and opportunities for the IMT and the OAG to discuss questions or concerns regarding the various COPA compliance efforts and productions.

During the fourth reporting period, COPA also continued to improve its training program for its staff and developed or improved several new training blocks of instruction. COPA also engaged outside subject-matter experts to develop and present topic specific instruction. Additionally, COPA provided training in-person and virtually to its staff and developed an electronic attendance record, which automatically records the attendance of its staff.

## The Police Board

The Police Board continues to fulfill its requirements of the Consent Decree. During this reporting period, the Police Board has made progress in nearly every aspect of the Consent Decree paragraphs for which it is responsible. The leadership and engagement of the Police Board and the Executive Director in every aspect of the requirements is evident in the document productions and the phone conferences with the IMT.

## The Office of the Inspector General – City of Chicago

In addition, the OIG and the Deputy Inspector General for Public Safety (PSIG) achieved Full compliance for its responsibilities across relevant paragraphs and met all corresponding deadlines.

***

In the fourth reporting period, the IMT examined and assessed the City's compliance efforts with 128 Accountability and Transparency paragraphs (¶¶425–457, 459–81, 484, 486, 487–02, 504–09, 511–19, 522–30, 532–541, 545–63, and 565) with one paragraph under assessment at the end of the reporting period (¶542). This includes the 34 paragraphs that the IMT provided status updates but not compliance assessments in previous reporting periods (¶¶429–30, 441–42, 446–50, 453–56, 459, 461, 472, 474, 476, 486, 495, 499–501, 505–09, 511, 514, 524, 541, 545, and 552).

At the end of the fourth reporting period, the City maintained Preliminary compliance with eight paragraphs (¶¶437, 525, 530, 532, 548–49, 553, and 555), met Preliminary compliance with five additional paragraphs (¶¶430–31, 470, 473, and 477), maintained Secondary compliance with one paragraph (¶498), met Secondary compliance with two paragraphs (¶442 and 511), maintained Full compliance with one paragraph (¶563), and met Full compliance with 15 paragraphs (¶¶533–39, 554, 556–559, 561–62, and 565). The City failed to reach Preliminary compliance with the remaining 92 paragraphs (¶¶425–28, 432–36, 438–41, 443–57, 459–69, 471–72, 474–76, 478–81, 484, 486–97, 499–02, 504–09, 512–19, 522–24, 526–29, 545–47, and 550–52) and four paragraphs remained under assessment for Preliminary compliance at the end of the fourth reporting period (¶¶429 and 540–42). *See* Accountability Figure 1 below.

Accountability Figure 1:    Compliance Progress for Accountability & Transparency Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



The City had 12 deadlines in the fourth reporting period (¶¶445, 448, 523, 550(2), 551(2), 558, 561–63, and 565). The City met nine deadlines (¶¶550(2), 551(2), 558, 561 – 63, and 565) and missed three deadlines (¶¶445, 448, and 523) For the missed deadlines, the City did not achieve any of the underlying deadline requirements before the end of the reporting period. *See* Accountability Figure 2 below.

Accountability Figure 2:    Total Accountability &Transparency Deadlines in the Fourth Report: 12



## Accountability and Transparency: ¶¶425–26

*425. The City, CPD, and COPA will ensure individuals are allowed to submit complaints in multiple ways, including: in person to COPA or at a CPD district station, by telephone, online, anonymously, and through third party representatives. To ensure broad and easy access to its complaint system, within 90 days of the Effective Date: a. the City, CPD, and COPA will make the process for filing a complaint widely available to the public, including in-person, by telephone, and online; b. the City, CPD, and COPA will make the process for filing a complaint available electronically; c .the City, CPD, and COPA will make information on filing a complaint and accompanying instructions accessible to people who speak languages other than English and will provide telephonic language interpretation services consistent with the City's and CPD's existing limited English proficiency policies and this Agreement; d. the City, CPD, and COPA will ensure individuals may submit allegations of misconduct, regardless of whether the individual is a member or perceived member of an identifiable group, based upon, but not limited to: race, ethnicity, color, national origin, ancestry, religion, disability status, gender, gender identity, sexual orientation, marital status, parental status, military discharge status, financial status, or lawful source of income; e. the City, CPD, and COPA will continue to ensure that members of the public may make complaints via telephone using free 24-hour services, including by calling 311 and being given the option to leave a voicemail for COPA or speak to a CPD supervisor, and will clearly display this information on their respective websites and other appropriate City and CPD printed materials; f. the City, CPD, and COPA will ensure that instructions for submitting complaints are available via telephone, on-line, and in-person; and g. the City and CPD will ensure that complaint filing information is prominently displayed on CPD website's homepage, including by linking to COPA's online complaint form.*

*426. As part of the COPA's system for processing non-confidential complaints and administrative notifications (the "intake process"), each complaint and administrative notification will be assigned a unique tracking number. This unique tracking number will be linked with all phases of the investigation and disciplinary process, through the final disposition.*

| Compliance Progress | | (Reporting Period: January 1, 2021, through June 30, 2021) | |
|---|---|---|---|
| | | ¶425 | ¶426 |
| **Preliminary:** | | *Not in Compliance* | *Not in Compliance*[159] |
| | **CPD** | *Not in Compliance* | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* | *Not Yet Assessed* |

In the fourth reporting period, the City did not achieve Preliminary compliance with ¶¶425–26. The City, the CPD, and COPA made significant progress toward Preliminary compliance with these paragraphs. While COPA finalized its policy—and while BIA's corresponding policies incorporate the requirements—BIA had not yet implemented the policy at the end of the fourth reporting period. For this reason, the City has not yet reached compliance with ¶425 and ¶426.

To evaluate Preliminary compliance with ¶¶425–26, the IMT has reviewed CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41).[160]

In the previous reporting period, the City did not achieve Preliminary compliance with ¶¶425–26. The IMT reviewed a draft of the CPD's General Order G08-01-02, Initiation and Assignment of Investigations into Allegations of Misconduct (previously titled Specific Responsibilities Regarding Allegations of Misconduct). That General Order directly addresses the provisions of these paragraphs and emphasizes to department employees and to the community the various reporting methods, including how and where to report misconduct and make complaints. However, we recommended revisions to the policy based on our review. The IMT also reviewed the CPD's General Order G08-01, Complaint and Disciplinary Procedures, the BIA *Complainant Communication Procedures and Timelines* Unit Directive, the *BIA Investigators* Unit Directive and the *Accountability Sergeants* Unit Directive, which together address the requirements of ¶425. In previous reporting periods,

---

[159] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[160] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

the IMT also reviewed websites and policies to determine that neither the CPD nor COPA achieved Preliminary compliance with ¶¶425 and 426.

In the fourth reporting period, the CPD and COPA continued to work toward compliance with ¶¶425–26. The IMT reviewed the CPD's General Order G08-01, *Complaint and Disciplinary Procedures* and the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*).[161] G08-01-02 directly addresses many of the provisions of these paragraphs and emphasizes to department employees and to the community the various reporting methods, including how and where to report misconduct and make complaints.

The IMT also reviewed G08-01-03, *Conflict of Interest,* for review under ¶426. G08-01-03 is a thorough and complete directive that addresses conflicts of interest in internal investigations. The CPD submitted this towards compliance with ¶426. This directive will meet the requirements of ¶426 once it has been submitted for public review and comment.

We also reviewed the *BIA Intake, Initiation of Log Numbers in the Case Management System* policy; BIA's training materials, *Log Number Investigations Training*, *Complaint Initiation Process - BIA Investigators & Accountability Sergeants Annual Training*, including several training scenarios. The IMT looks forward to viewing the actual presentation of these scenarios to determine whether they meet the requirements of any Consent Decree paragraphs.

The IMT also reviewed COPA's relevant policies, specifically *Intake*, 3.1.1, during the fourth reporting period. This policy is complete and well written as it meets the requirements of ¶425. This policy was reviewed and commented on by the COPA's Community Policy Review Working Group and finalized. COPA's *Intake Policy* also incorporates the requirements of ¶426 and states clearly that the Log Number assigned to the investigation will remain with the investigation to its conclusion.

The IMT looks forward to working with the CPD to revise and finalize their relevant policies, including G08-01 *Complaint and Disciplinary Procedures*, in the next reporting period. We expect that the CPD will achieve some level of compliance once those policies have been finalized. We also look forward to reviewing COPA's training materials in the next reporting period.

---

[161] After reviewing both G08-01 and G08-01-02, and based on conversations with BIA, the IMT understands that G08-01 is the foundational directive for BIA suite of directives addressing administrative investigations and discipline, which raises a question for the IMT of whether the requirements of G08-01 could be more fully addressed in G08-01. This question does not keep BIA from compliance as long as the requirements of ¶425–26 are addressed in policy, but BIA should keep this in mind as the policies move toward completion.

# Accountability and Transparency: ¶427

> **427.** *The City and CPD will ensure all complaints are accepted, documented, submitted to COPA, and investigated in accordance with this Agreement and the applicable collective bargaining agreement, whether submitted: by a CPD member or a member of the public; verbally or in writing; in person, by telephone, online, or by a complainant anonymously; or by a third-party representative.*

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June. 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[162] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City did not meet Preliminary compliance with ¶427. The City, the CPD, and COPA made significant progress toward Preliminary compliance with these paragraphs. While COPA finalized its policy—and while BIA's corresponding policies incorporate the requirements—BIA had not yet implemented the policy at the end of the fourth reporting period. For this reason, the City has not yet reached compliance with ¶427.

To evaluate Preliminary compliance with ¶¶425–26, the IMT has reviewed CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41).[163]

In the previous reporting period, the City did not meet Preliminary compliance with ¶427. We reviewed the CPD's draft General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which is a strong policy

---

[162] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[163] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

that addressed requirements of ¶427. The IMT also reviewed COPA's *Intake Policy*, 3.1.1. As drafted in the previous reporting period, that policy did not comprehensively address the requirements of ¶427.

In the fourth reporting period, the IMT reviewed a revised version of the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which addresses the requirements of ¶427. G08-01-02 explains how the CPD receives complaints and forwards those complaints to COPA. It also provides complete mailing and physical addresses and a link to COPA's online complaint intake system that complainants can use to make complaints.[164]

The IMT also reviewed *BIA Complaint Initiation Process – BIA Investigators & Accountability Sergeants Annual Training*, parts of which appropriately address ¶427.

The IMT also reviewed COPA's *Intake Policy*: 3.1.1, which completely fulfills the requirements of ¶427. This policy was reviewed and commented on by COPA's Community Policy Review Working Group and finalized. This policy not only lists the methods in which complaints are accepted and documented, but also provides specific information in how each of the methods are accessed.

We look forward to reviewing the CPD's and COPA's continued efforts to meet compliance with this paragraph.

---

[164] *See Complaints*, Civilian Office of Police Accountability, https://www.chicagocopa.org/complaints/.

## Accountability and Transparency: ¶428

> *428. When a CPD member becomes aware of an individual who wants to make a complaint regarding a CPD member's conduct, he or she will promptly provide the individual with COPA's contact information and notify a supervisor of the complaint received in the field. CPD will also ensure that, in response to complaints about CPD members, supervisors respond to the scene, document the complaint, and submit it to COPA. If the supervisor allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident complained of, the supervisor will contact his or her immediate supervisor, who will assign another supervisor to immediately document the complaint and submit it to COPA.*

**Compliance Progress**                   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶428.

In the previous reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶428. The IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which sought to address the requirements of ¶428. However, G08-01-02 did not incorporate the requirement that "supervisors respond to the scene" in "response to complaints about CPD members," as required by ¶428.

In the fourth reporting period, we reviewed the CPD's revised General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled, *Specific Responsibilities Regarding Allegations of Misconduct*). The revised policy addresses the requirements of ¶428 in detail and specifically explains the duties and responsibilities of the CPD member and supervisor. At the end of the fourth reporting period, however, the CPD had not yet implemented the policy under the Consent Decree review process.

BIA also made efforts toward Secondary compliance this reporting period by providing the CPD's *Log Number Investigations Training* for review.

The IMT looks forward to assessing the CPD's continued efforts toward Preliminary and Secondary compliance with ¶428 and the IMT specifically looks forward to receiving the final versions of G08-01-02 and *Log Number Investigations Training*.

# Accountability and Transparency: ¶429

> ***429.*** *The City will continue to ensure that a website is made available to CPD members to anonymously report officer misconduct ("anonymous reporting website") and will internally disseminate information regarding the anonymous reporting website to all CPD members. Reports made on the anonymous reporting website will not relieve CPD members of their duties under CPD Rules of Conduct 21 and 22.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. At the end of the fourth reporting period, the City and the CPD remain under assessment for ¶429.

To evaluate Preliminary compliance with ¶429, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[165] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

As in previous reporting periods, the OIG continues to host a website for CPD members to anonymously report officer misconduct.[166] However, the CPD had also not developed a policy or directive that would protect an anonymously reporting employee's identity during an internal investigation, including while that employee provides statements or participates in interviews.

---

[165] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

[166] *See Online Complaint Form*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO, https://igchicago.org/contact-us/report-fraud-waste-abuse/fraud-or-corruption-report-form/. *See also File an Anonymous Complaint (OIG)*, CHICAGO POLICE DEPARTMENT, https://home.chicagopolice.org/services/file-an-anonymous-complaint/.

The City provided the IMT with various materials related to the OIG's online complaint website.[167] Unfortunately, without further adjustment, CPD personnel who anonymously report misconduct are in direct conflict with the CPD policy.

CPD Rules of Conduct 21 and 22 are as follows:

> *Rule 21*
>
> *Failure to report promptly to the Department any information concerning any crime or other unlawful action.*
>
> *Rule 22*
>
> *Failure to report to the Department any violation of Rules and Regulations or any other improper conduct which is contrary to the policy, orders or directives of the Department.*

In the fourth reporting period, the IMT reviewed G08-01, *Complaint and Disciplinary Procedures*, a portion of which is directed to the requirements of ¶429. The policy, however, does not provide CPD personnel with sufficient clarity regarding anonymous reports by CPD personnel, including any protections regarding the identity of the complainant throughout an internal investigation.

The IMT understands that this process may be less ambiguous in practice, but if that is true, CPD's policies should better clarify for officers how they may provide anonymous reports and comply with Rules 21 and 22. This issue must be reconciled to provide for anonymous reporting while clearly adhering to the CPD rules. The IMT looks forward to reviewing revised materials in the next reporting period.

---

[167] *See also File an Anonymous Complaint (OIG)*, Chicago Police Department, https://home.chicagopolice.org/services/file-an-anonymous-complaint/.

## Accountability and Transparency: ¶430

> ***430.*** *COPA will ensure that individuals who submit electronic complaints receive a copy of the information contained in the complaint via electronic mail, if an electronic mail address is provided, upon submission.*

### Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. In our last monitoring report, we provided a status update. In the fourth reporting period, the City and COPA achieved Preliminary compliance with the requirements of ¶430.

In the previous reporting period, the IMT reviewed COPA's *Intake Policy*, which addresses the requirements of ¶430. However, as of the end of the third reporting period, that policy had not yet been approved or finalized.

In the fourth reporting period, the IMT reviewed COPA's 3.1.1 revised *Intake Policy*, which addresses the requirements of ¶430. Specifically, COPA's *Intake Policy* enumerates that an electronic copy of the complaint will be provided to a complainant who files an online complaint via email from COPA. COPA also received feedback on this policy from COPA's Community Policy Review Working Group and finalized.

The IMT looks forward to reviewing COPA training materials in the next reporting period.

# Accountability and Transparency: ¶431

> **431.** *The City and CPD will undertake best efforts to ensure that the absence of a signed complainant affidavit alone will not pre-clude an administrative investigation.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[168] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City achieved Preliminary compliance with ¶431.

Compliance with ¶431 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶431.

In the previous reporting period, the City made progress toward but ultimately did not meet Preliminary compliance with ¶431.

In the fourth reporting period, we provided COPA with a no-objection notice for its COPA's *Intake Policy*. COPA also developed the *Affidavit Override Training Materials* to instruct COPA personnel on the affidavit override process.

We also reviewed BIA's General Order G08-01, *Complaint and Disciplinary Procedures*, which sufficiently addresses the affidavit-override process and exceptions to the affidavit requirement. BIA's *Investigators Accountability Sergeants Annual Training* plan; and several training scenarios. We look forward to viewing these scenarios when they are presented to BIA personnel.

While BIA's policies are ongoing, the City and the CPD made significant efforts to modify the process for receiving and investigating complaints of officer misconduct, including allowing for the investigation of complaints that are anonymous or not backed by a sworn affidavit. *See* Analysis for ¶711. We will continue to monitor

---

[168] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

these efforts moving forward, including any requisite changes to CPD or COPA pol-
icies to reflect changes in the reporting process.

# Accountability and Transparency: ¶432

**432.** *The City and CPD will require that complaints about any CPD member are accepted, documented, submitted to COPA, and investigated even if the complainant could not identify the CPD member's name or other employee-identifying number, including star or badge number.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[169] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City made progress toward both Preliminary and Secondary compliance, but ultimately, did not meet Preliminary compliance with ¶432. Specifically, while COPA implemented a compliant policy in the fourth reporting period, BIA had not yet finalized its corresponding policy.

To evaluate Preliminary compliance with ¶434, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41).[170]

In previous reporting periods, the City did not meet Preliminary compliance with ¶432. Specifically, the IMT reviewed draft General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct (*previously titled *Specific Responsibilities Regarding Allegations of Misconduct*) and BIA's draft Intake Initiation of Log Number Unit Directive (formerly titled the Initiation, Intake and Assignment of Log Investigations Unit Directive) and recommended revisions to better align with the requirements of this paragraph.

In the fourth reporting period, the IMT reviewed a revised CPD General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which addresses the requirements of ¶432. The IMT also reviewed BIA's *Initiation*

---

[169] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*of Log Numbers in the Case Management System Unit Directive* policy and *Complaint Initiation Process – Annual Training*, and *Log Number Investigations Training* materials.

Finally, the IMT reviewed COPA's *Intake Policy*: 3.1.1, which was reviewed, commented on by COPA's Community Policy Review Working Group, and finalized This policy meets the requirements of this paragraph.

The IMT looks forward to reporting on BIA's finalized policies in the next reporting period.

## Accountability and Transparency: ¶433

**433.** *CPD will require that officers provide their name and star number, or in the case of non-sworn members other employee-identifying number, to any member of the public, upon request.*

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not meet Preliminary compliance with the requirements of ¶433 during the fourth reporting period.

To evaluate Preliminary compliance with ¶433, the IMT has reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

In the previous reporting period, the City and the CPD did not meet preliminary compliance with this paragraph. The IMT reviewed the CPD's *Rules and Regulations*. Rule 37 of the CPD's Rules and Regulations requires CPD employees to correctly identify themselves by name, star number, and rank when asked. While Rule 37 appears to apply to both sworn and non-sworn CPD employees, the CPD was also drafting a policy to unambiguously incorporate the requirements of ¶433.

In the fourth reporting period, the IMT reviewed BIA's G08-01, *Complaint and Disciplinary Procedures*, and G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct*. BIA contends that these policies address the requirements of ¶433, but the IMT does not find any specific reference to this paragraph's requirements. As we noted in previous reports, Rule 37 continues to appear to apply to both sworn and non-sworn CPD employees, but the CPD intends to draft a policy to unambiguously incorporate the requirements of ¶433. The CPD did not provide a draft of such policy in the fourth reporting period.

Providing clear policies and training on the requirement of ¶433 is critical.[171] The IMT looks forward to reviewing a policy which unambiguously incorporate the requirements of ¶433, which would put the City and the CPD in Preliminary compliance.

---

[171] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021) (IMT recommendation to "Provide refresher training on . . . the people's right to record officers uniform requirements"),

https://cpdmonitoringteam.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Accountability and Transparency: ¶434

**434.** *When CPD responds to or investigates incidents involving allegations of officer involved domestic violence, CPD will ensure that COPA is provided an administrative notification. COPA will initiate the intake process and investigate all such allegations in accordance with this Agreement.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[172] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City made progress toward both Preliminary compliance, but ultimately, did not meet Preliminary compliance with ¶432. Specifically, while COPA implemented a compliant policy in the fourth reporting period, BIA had not yet finalized its corresponding policy.

To evaluate Preliminary compliance with ¶434, the IMT has reviewed CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41).[173]

In previous reporting periods, the City did not demonstrate Preliminary compliance with ¶434. The IMT reviewed the CPD's Special Order 08-01-02, *Special Situations Involving Allegations of Misconduct*, and the CPD's draft BIA *Standard Operating Procedures* (SOP). The IMT suggested that the CPD develop a standalone policy that specifically includes the investigative direction in a comprehensive BIA Investigator and Accountability Sergeant Investigative Policy.

In the fourth reporting period, the IMT reviewed BIA's *Complaint and Disciplinary Procedures* directive, G08-01, which makes reference to complaint investigations but did not speak to or explain how a Domestic Violence Case will be investigated.

---

[172] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT also reviewed two training scenarios presented by BIA, and we reiterate our request observe BIA trainings.

In the fourth reporting period, COPA finalized the *Intake Policy*, 3.1.1, a portion of which addresses—and exceeds—the requirements of ¶434. Notably, in 3.1.1, COPA provided thorough information to its investigators, staff, and the community and helpfully explain the types of investigations for which it is responsible. This policy was also reviewed and commented on by COPA's Community Policy Review Working Group.

The IMT looks forward to working with BIA to address its corresponding policies and with working with COPA, as COPA continues to develop and provide its corresponding training.

# Accountability and Transparency: ¶435

**435.** *The City, CPD, and COPA will require that complaints alleging that a CPD member refused to accept a complaint, discouraged the filing of a complaint, or provided false or misleading information about filing a complaint are accepted, documented, and submitted to COPA for investigation and, where appropriate, recommended for discipline.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[174] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City made progress toward both Preliminary compliance, but ultimately, did not meet Preliminary compliance with ¶435. Specifically, while COPA implemented a compliant policy in the fourth reporting period, BIA had not yet finalized its corresponding policy.

To evaluate Preliminary compliance with ¶435, the IMT has reviewed CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41).[175]

In the third reporting period, the City did not meet Preliminary compliance with this paragraph as the policies mentioned below had not been finalized by either BIA or COPA.

In the fourth reporting period, the IMT reviewed the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (previously titled *Specific Responsibilities Regarding Allegations of Misconduct*), which addresses the requirements of ¶435. The IMT also reviewed *Complaint Initiation Process - BIA Investigators & Accountability Sergeants Annual Training*, parts of which address the requirements of ¶435.

---

[174] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT also reviewed COPA's *Intake Policy*, which addresses ¶435 and was finalized after COPA's Community Policy Review Working Group reviewed and commented on the policy.

The IMT anticipates that CPD will meet Preliminary compliance after G08-01-02 receives public review and comment. We look forward to working with BIA and COPA as they also move toward Secondary compliance in the next reporting period.

# Accountability and Transparency: ¶436

*436. Within 90 days of the Effective Date, CPD will ensure that there are adequate policies and practices in place to encourage and protect CPD members who report potential misconduct by other CPD members. Such policies will provide, at a minimum: a. that CPD members promptly report any misconduct of which they are aware to a supervisor; b. that the supervisor document such alleged misconduct and promptly report it to COPA; and c. that all forms of retaliation, interference, intimidation, and coercion against a CPD member who reports misconduct or cooperates with an investigation of misconduct, are strictly prohibited.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not meet Preliminary compliance with the requirements of ¶436, as policies were not finalized by the end of the reporting period.

In previous reporting periods, the IMT reviewed versions of the CPD's General Orders 08-01-02, *Specific Responsibilities Regarding Allegations of Misconduct*, and 08-05, *Prohibition on Retaliation*. We determined that the CPD had made progress toward, but had not met Preliminary compliance because those General Orders had not yet been finalized. We suggested that the CPD revise G08-01-02 and G08-05 to explicitly include language that encourages CPD personnel to report misconduct and include more details regarding prohibited retaliation. The IMT provided a no-objection notice to G08-05 in November of 2020.

In the fourth reporting period, the IMT reviewed a revised version of the CPD's General Order G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (formerly *Specific Responsibilities Regarding Allegations of Misconduct*). This policy seeks to address ¶436 and, in one section, even goes further by using the word "immediately" rather than "promptly." The IMT also reviewed G08-01, *Complaint and Discovery Procedures*, throughout the reporting period with noted inclusion of ¶436(b) requirements of "promptly report any misconduct of which they are aware to a supervisor."

At the end of the reporting period, G08-01-02 was still undergoing revisions, and the CPD has since provided an updated draft. We believe the CPD is on track to reach Preliminary compliance in the next reporting period.

# Accountability and Transparency: ¶437

***437.*** *CPD will expressly prohibit all forms of retaliation, intimidation, coercion, or adverse action against any person who reports misconduct or cooperates with an administrative investigation.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**  *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**   *Not in Compliance*
**Full:**     *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶437 by having a finalized policy addressing this paragraph and made progress towards Secondary compliance via training documents submitted in the fourth reporting period.

In the second reporting period, the City and the CPD met Preliminary compliance by finalizing General Order G08-05, *Prohibition on Retaliation*, through the Consent Decree process, including posting the policy for and considering public comment.

During the fourth reporting period, the IMT reviewed BIA's *Complaint Initiation Process - BIA Investigators & Accountability Sergeants Annual Training,* which addresses the in-service training requirement for this paragraph. At the end of the reporting period, the IMT had not yet received BIA's corresponding on-boarding training for ¶437. We look forward to continuing the development and review process as BIA moves toward Secondary compliance for ¶437.

## Accountability and Transparency: ¶438

> **438.** *OAG acknowledges that the City, CPD, and COPA are work-ing to create an electronic Case Management System ("CMS"). The City, CPD, and COPA will ensure that the CMS maintains ac-curate data regarding the number, classification, and status of all administrative investigations, from the intake process through the final disciplinary decision, if any, and through any grievance process, arbitration, Police Board proceeding, or ap-peal relating to the final disciplinary decision (the "final disposi-tion"). CMS will be maintained by appropriate personnel from the City, CPD, and COPA. The CMS will be fully operational by June 30, 2020.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[176] |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD have not met Preliminary com-pliance with ¶438. While COPA has met the corresponding policy requirement, the CPD did not—although the CPD did make significant progress.

In the previous reporting period, the City did not meet Preliminary compliance with this paragraph, as both the CPD and COPA did not have finalized policies. COPA did provide the IMT with an overview of the Case Management System (CMS) as it relates to COPA. This overview demonstrated the CMS process from the initiation of a complaint or investigation to the conclusion of the disciplinary process. This process is the same for COPA as it is for BIA.

During the fourth reporting period, the IMT reviewed COPA's, *Clear and Column CMS Systems*, 3.1.6, which fully addresses the requirement of ¶438. This policy was reviewed and commented on by COPA's Community Policy Review Working Group.

---

[176] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring com-pliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

Also during the fourth reporting period, BIA indicated to the IMT that the CMS is developed enough so that BIA can create an operating policy to guide its use, much as COPA has done with its COPA 3.1.6. Meanwhile, BIA conducted *CMS Investigative Console-Conducting Investigations* training. While the lesson plan addresses many of the requirements of ¶438, the lesson plan does not specify that the CMS/Log number will follow the case through to an arbitration, Police Board hearing, or Appeal to the final disposition. BIA has also developed its *CMS Updates and Enhancements Annual Training*, which, in part, addresses the training component of this paragraph for in-service training.

The CPD also developed a *CMS User Guide* for its BIA Investigators and Accountability Sergeants, and the CMS Application has an automatic Log Number generation feature. Both of these developments demonstrated the CPD's commitment to compliance with ¶438.

In addition, the CPD has developed policies and trainings that specifically cover the CMS, including BIA's (1) Introduction to CMS Lesson Plan and Slide Deck, (2) Command Channel Review (CCR) and CMS Training Materials, (3) CMS Log Number Intake Training Materials, (4) Intake Initiation of Log Number Unit Directive, (5) Assignment of Administrative Log Number Unit Directive, and (6) Log Number – Unique Tracking Number Unit Directive. Those policies and training materials go a long way toward ensuring that BIA Investigators, Accountability Sergeants, and Command Staff understand their roles and responsibilities in the complaint investigation and disciplinary process.

We look forward to (1) reviewing COPA's training materials and (2) to working with the CPD to finalize its CMS and Log Number-related policies and training materials in the next reporting period.

# Accountability and Transparency: ¶439

*439. The City and CPD will ensure that complainants and their representatives are able to track non-confidential unique tracking numbers from the intake process through final disposition via telephone and in person. By June 30, 2020, the City will also ensure complainants and their representatives are able to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | ***Not in Compliance***[177] |
| **CPD** | ***Not in Compliance*** |
| **COPA** | ***In Compliance*** (NEW) |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

In the fourth reporting period, the City did not meet Preliminary compliance with ¶439. While COPA implemented its corresponding policy, BIA had not yet implemented its policy at the end of the fourth reporting period. BIA did, however, make progress toward Preliminary and Secondary compliance by providing revised policies and training materials. In the third reporting period, the IMT determined that the City, CPD, and COPA did not meet Preliminary compliance with ¶439 as they did not have finalized policies for this paragraph.

In the fourth reporting period, the IMT reviewed BIA's *Initiation and Assignment of Investigations into Allegations of Misconduct* policy, G08-01-02. This policy includes the information on how and where to track investigations. BIA's *Policies and Communications Techniques Onboard and Annual Training* also addresses ¶439 in part. At the end of the fourth reporting period, BIA had not yet finished the Consent Decree's review process.

The IMT also reviewed COPA's *Clear and Column CMS Systems* policy, 3.1.6, which details that a unique tracking number will follow an investigation from beginning to end of the investigation. COPA finalized this policy after the COPA Community

---

[177] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

Policy Review Working Groups reviewed and commented on it. COPA also developed an *Employee Agreement regarding Use of CLEAR and COLUMN CMS Systems* form that employees must agree to and sign before receiving access to the system.

The IMT looks forward to assessing COPA's training efforts, as COPA works toward Secondary compliance. We also look forward to the City and the CPD achieving Preliminary compliance after finalizing its corresponding policy under the Consent Decree review process.

## Accountability and Transparency: ¶440

**440.** *The City, CPD, and COPA will ensure that all non-confidential complaints are processed by COPA as follows: a. all non-confidential complaints of alleged misconduct received by CPD, including BIA and CPD supervisors, are documented and submitted to COPA within 24 hours of receipt; b. all complaints of alleged misconduct submitted to the anonymous reporting website and all non-confidential complaints of alleged misconduct received by the OIG will be submitted to COPA by the end of the next business day after the complaint was received; c. upon receipt of a complaint, COPA will promptly assign the complaint a unique tracking number, make an initial determination of the classification(s) of the alleged misconduct, and will either retain the complaint for investigation or transfer the complaint to BIA for investigation; d. COPA, pursuant to its ordinance and this Agreement, will have the jurisdiction to conduct administrative investigations of all allegations of misconduct that involve: i. excessive force; ii. domestic violence; iii. improper search or seizure of individuals or property; iv. coercion; v. verbal abuse as defined under Municipal Code of Chicago, § 2-78-100, including any unwelcome sexual advances or requests for sexual favors; or vi. unlawful denial of access to counsel. e. COPA, pursuant to its ordinance and this Agreement, will receive immediate administrative notification of and have jurisdiction to conduct administrative investigations of all incidents, including those in which no allegation of misconduct has been made, involving: i. firearm discharges by CPD officers that could potentially strike an individual ("officer-involved shooting"); ii. Taser or stun gun discharges by CPD officers that result in death or serious bodily injury; iii. any person who dies or sustains serious bodily injury while in CPD custody, or as a result of CPD actions; iv. "officer-involved deaths," as that term is defined in 50 ILCS 727/1-5; and v. other weapons discharges and other uses of CPD-issued equipment as a weapon that results in death or serious bodily injury, at the COPA Chief Administrator's discretion; f. the City, CPD, and COPA will ensure that all allegations are recorded and classified appropriately, even if the complainant does not accurately characterize the alleged misconduct; g. if BIA or district personnel conducting investigations into misconduct identify allegations of misconduct that are within COPA's administrative investigative jurisdiction as defined herein, the investigator will promptly notify COPA; and h. if a complaint contains multiple allegations of misconduct,*

> *one or more of which falls within COPA's administrative investigation jurisdiction as defined herein, COPA will have the right of first refusal to conduct an administrative investigation of the entire complaint.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[178] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (NEW) |

The City did not meet Preliminary compliance with the requirements of ¶440 during the fourth reporting period. This is the first period for which IMT assessed the City's compliance with the requirements of ¶440.

During the fourth reporting period, the IMT reviewed COPA policy 3.1.1, *Intake* Policy, Section III Jurisdictional Decisions, and COPA draft ordinance 2-78-120. COPA 3.1.1 seeks to address the requirements of ¶440(c), (e), (f), and (h), while draft ordinance 2-78-120 seeks to address the requirements of ¶440(d), and (e).

The IMT also reviewed BIA documents to assess compliance with ¶440(a), (f), and (g). While three separate BIA directives address ¶440(a) and (f), several subparagraphs remain unaddressed. Specifically, the draft G08-01-02 *Initiation and Assignment of Investigations into Allegations of Misconduct*, dated March 22, 2021, addresses ¶¶440(a) and (f), but does not address ¶440(g), as stated. BIA Unit Directive *Initiation of Log Numbers in the Case Management System*, dated March 26, 2021, Section II.A and III.A.2 address ¶440(a). Finally, the BIA Unit Directive *Assignment of Administrative Log Number Investigations* also addresses the re-

---

[178] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

quirements of ¶440(f) in Section IV.A.5. We note that BIA Unit Directive *Assignment of Administrative Log Number Investigations* is still in draft form, and we look forward to the CPD finalizing the policy through the Consent Decree review process.

During this period, the IMT also assessed the Office of the Inspector General (OIG) for compliance with ¶440(b). The OIG produced a supplement to its *Investigations Manual*, containing OIG's policies regarding submission of complaints of misconduct to COPA, as well as training materials regarding the process for submitting complaints of alleged misconduct to COPA. In addition, the IMT reviewed OIG's attendance records for the training on the process of submitting alleged misconduct complaints to COPA.

Overall, the City has not reached Preliminary compliance with all of the requirements of ¶440 at this time. The IMT looks forward to working with the City, the CPD, and COPA to revise and finalize their relevant policies in the next reporting period to ensure that all non-confidential complaints are processed by COPA as outlined in ¶440. We also look forward to reviewing their corresponding trainings.

# Accountability and Transparency: ¶441

**441.** *The City will undertake best efforts to ensure that COPA has jurisdiction to conduct administrative investigations of allegations of sexual misconduct, as defined by this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. At the end of the fourth reporting period, the City made progress toward, but ultimately has not reached Preliminary compliance with ¶441.

In previous reporting periods, the IMT reviewed a February 28, 2020 memorandum from COPA, which included updates on COPA's efforts to properly train investigative personnel in sexual assault investigations, including trainings regarding interviewing victims of sexual assault. COPA's Special Victims Squad, the CPD, and the Cook County State's Attorney's Office have developed a working group to improve the investigative and notification process among the agencies. That memorandum demonstrated that COPA started to work with the Cook County State's Attorney's Office.

Specifically, in the third reporting period, the IMT reviewed notes from an October 19, 2020 meeting among representatives of COPA, the Cook County State's Attorney's Office, and the CPD. Those notes suggest the possibility of a memorandum of understanding or agreement regarding how those entities should conduct administrative and criminal investigations of sexual misconduct cases. Regardless of whether those entities reach an agreement, however, it is critical for COPA and the CPD to develop their own policies regarding their specific responsibilities regarding sexual misconduct investigations. Those policies should reflect the results of the agreement amongst the CPD, COPA, and the Cook County State's Attorney's Office. While the CPD cannot require COPA to adhere to CPD policies, and COPA cannot require the CPD to adhere to COPA policies, those policies will survive current leadership, form the basis for consistent investigations, and set expectations for any memorandum of understanding or agreement.

At the end of the fourth reporting period, on June 30, 2021, the City provided a draft City Ordinance change to 2-78-100, including COPA's jurisdiction of sexual-misconduct complaints. Based on the records we have received to date, however, it appears that the City, its entities, and partners have more issues to address regarding the logistics of ¶¶441 and 443. Further, COPA has a forthcoming policy

that will address ¶441, and we look forward to reviewing that policy. The IMT anticipates that COPA and the CPD make greater progress toward compliance with ¶441 in the next reporting period.

# Accountability and Transparency: ¶442

**442.** *The City will ensure COPA has appropriately trained and experienced staff to conduct sexual misconduct investigations.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *In Compliance* (NEW)
**Full:** *Not Yet Assessed*

This is the first reporting period that the IMT assessed compliance for this paragraph. The IMT provided a status update in previous reporting periods. In the fourth reporting period, the City and COPA met Preliminary and Secondary compliance with ¶442.

In the previous reporting period, the IMT provided a status update for ¶442, which included COPA's Training Plan and a memo from COPA regarding training for COPA's Special Victims Squad. The IMT suggested that COPA develop a training curriculum to address ¶442.

Since then, COPA has developed a comprehensive lesson plan related to ¶442, *Sexual Assault Training: Understanding the Neurobiology of Trauma and Applying Trauma Informed Investigative Techniques*. The lesson plan is accompanied by a presentation that provides the instructor and the students with a logical progression through the mechanics of sexual-misconduct investigations.

In addition, in this reporting period, COPA produced its in-service training spreadsheet that includes a comprehensive account of trainings provided including the sexual assault training, and associated attendees. COPA held a training on December 14, 2020, which included content related to requirements of this paragraph, and provided associated attendance records to the IMT for this training

The IMT looks forward to assessing COPA's efforts toward Full compliance with ¶442.

## Accountability and Transparency: ¶443

> **443.** Consistent with COPA's jurisdiction, after conferring about the details of a particular criminal sexual misconduct investigation involving a CPD member, COPA and BIA may jointly agree that BIA may conduct the administrative investigation into allegations of sexual misconduct when they jointly determine that doing so avoids unnecessary disruption to the complainant.

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[179] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City did not meet Preliminary compliance with ¶443. COPA and BIA did not finalize a corresponding written guidance following the Consent Decree review process.

In the third reporting period, the IMT determined that the City, the CPD, and COPA did not meet Preliminary compliance with ¶443, as they did not have requisite policy or policies.

At the fourth reporting period, the City provided an unsigned draft *Memorandum of Understanding regarding Joint Sexual Misconduct Investigations*, dated June 30, 2021. Because this memorandum was delivered at the end of the fourth reporting period, additional details and discussions between the IMT, the City, and the OAG are necessary to ensure that the memorandum is sufficient for Preliminary compliance with ¶443.

It is our understanding that the City, COPA, and the CPD are also undergoing additional efforts in the fifth reporting period that will significantly impact compliance efforts with ¶443. We look forward to assessing those efforts in the next monitoring report.

---

[179] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

# Accountability and Transparency: ¶444

***444.*** *Within ten days of the final disciplinary decision of each complaint of sexual misconduct against a CPD member alleging conduct against a non-CPD member, the City will provide the Deputy PSIG with the complete administrative investigative file, subject to applicable law. The Deputy PSIG will review and analyze each administrative investigative file and, on an annual basis, the Deputy PSIG will publish a report: a. assessing the quality of the sexual misconduct administrative investigations reviewed; b. recommending changes in policies and practices to better prevent, detect, or investigate sexual misconduct; and c. providing aggregate data on the administrative investigations reviewed, including: i. the volume and nature of allegations investigated, broken down by investigating agency; ii. the percentage of investigations referred to the Cook County State's Attorney's Office ("CCSAO") for criminal review; iii. the percentage of investigations criminally prosecuted; iv. the percentage of investigations closed after the Preliminary investigation; v. the percentage of investigations closed for lack of a signed complainant affidavit; and vi. the investigative findings and recommendations, including a summary breakdown of discipline recommended for investigations with sustained findings.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[180] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not Yet Assessed* |
| **Deputy PSIG** | *In Compliance* (NEW) |

---

[180] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the fourth reporting period, the City did not meet Preliminary compliance with ¶444. While the Deputy PSIG met Full compliance, neither the CPD nor COPA achieved Preliminary compliance.

In previous reporting periods, BIA and COPA did not meet Preliminary compliance, because they did not implement requisite policies. They did, however, providing memorandums and standard operating procedures that provided statements regarding reporting of sexual misconduct complaints.

This period, the IMT reviewed the Deputy PSIG's *General Policy Manual* and *Annual Report*.[181] Section III.C. of the *General Policy Manual* addresses the requirements of ¶444(a) and (b). And pages 9–14 of the *Annual Report* address ¶444(c). The report also details the issues that PSIG experienced to simply gather the required data and notes that PSIG does not believe it received all of the data due to reporting deficiencies of both BIA and COPA. The analysis and conclusions are thorough and compelling, with recommendations for improvement for BIA and COPA. This is an excellent report that sets the groundwork for the CPD and COPA to begin to properly and uniformly classify sexual-misconduct cases in a manner that is easily searchable for patterns of behavior and conduct of its employees.

The IMT also reviewed PSIG's training materials regarding Sexual Assault Investigations, including modules entitled *Understanding the Neurobiology of Trauma and Applying Trauma-Informed Investigative Techniques*; *Resilience, Virtual Sexual Assault Crisis Intervention Training*, and *Trauma Informed Investigative Techniques*. These blocks of instruction are represented by excellent PowerPoint presentations. We also understand that these materials did not include lesson plans, because as PSIG indicates, these blocks of instruction are developed and delivered by outside vendors who consider their lesson plans proprietary. These blocks of instruction are thorough and provide PSIG investigators with information that they need to fulfill their investigation obligations under ¶444. Further, the instruction provides meaningful insight into the emotional trauma that victims experience, beyond the physical trauma, that may affect victim statements or memories. Finally, the IMT reviewed PSIG's virtual *Sexual Assault Crisis Intervention Training*, which is delivered over a half day period to the same students.

Because PSIG has a policy in place to address the requirements of ¶444, has developed and delivered training to the appropriate personnel, and prepared a thorough first report as required, PSIG has demonstrated Full compliance.

---

[181] *See Report on Investigations of Sexual Misconduct Allegations against Chicago Police Department Members*, Office of the Inspector General for the City of Chicago (June 4, 2021), https://igchicago.org/2021/06/04/report-on-investigations-of-sexual-misconduct-allegations-against-chicago-police-department-members/.

In the next reporting period, the IMT looks forward to reviewing COPA's and BIA's relevant policies to assess their Preliminary compliance with ¶444.

## Accountability and Transparency: ¶445

**445.** *The City will use best efforts to initiate and undertake a process with the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office to share information on at least a quarterly basis regarding any affirmative judicial findings made during the course of criminal proceedings that a CPD member was untruthful, including any findings made at suppression hearings. Upon receipt of information from the CCSAO, United States Attorney's Office, Cook County Public Defender's Office, and the Federal Defender's Office that may suggest misconduct COPA will initiate the intake process.*

### Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          Quarterly                    ☐ **Met**  ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

In the fourth reporting period, the City did not reach Preliminary compliance with ¶445 or the corresponding quarterly deadline.

In the previous reporting period, the City has not achieved Preliminary compliance with ¶445 and missed the quarterly deadline for this paragraph. In previous reporting periods, the IMT reviewed COPA Policy 1.3.8, *Civil and Criminal Complaint Review*, which explains that COPA will begin the complaint intake process once it receives information that suggests misconduct. The City has attempted to incorporate the requirements of ¶445 into COPA's Intake Policy, even though it is difficult for one City agency to take sole responsibility for this paragraph.

During the fourth reporting period, the IMT reviewed COPA's *Intake Policy*, 3.1.1. COPA committed to the requirements of ¶445 by requiring that it will initiate the complaint registration process to those agencies listed in the *Intake Policy* involving a CPD member's untruthfulness during an administrative investigation. The Intake policy should, however, use the word "must" rather than "may," making the information sharing a requirement, rather than discretionary.

While COPA has made progress, the City must take a more holistic approach to demonstrate best efforts toward the requirements of ¶445.

# Accountability and Transparency: ¶446

> *446. In the course of investigating a complaint, the City, CPD, and COPA will ensure: a. within five business days of receipt of a non-confidential complaint COPA or BIA will send non-anonymous complainants or their representatives a written notice of receipt. The notice will include the unique tracking number assigned to the complaint. The notice will advise the complainant or his or her representative whether BIA or COPA will be investigating the complaint, and how the complainant or his or her representative may inquire about the status of the investigation. The notice will not contain any language discouraging participation in the investigation. b. within 60 days of the final disciplinary decision the complainant will be provided a copy of the Administrative Summary Report.*

## Compliance Progress　　　　(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[182] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. The City did not meet Preliminary compliance during the fourth reporting period. While COPA finalized its corresponding policy, BIA's policies were not implemented before the end of the fourth reporting period.

During the fourth reporting period, the IMT reviewed BIA's *Initiation and Assignment of Investigations into Allegations of Misconduct* policy, G08-01-02, and *Assignment of Administrative Log Number Investigations* Unit Directive. , which partially address sub paragraph ¶446(a). While these policies seek to address ¶446(a), neither policy addresses ¶446(b).

To address ¶446(b), BIA developed the *Administrative Summary Report* policy, which requires that the BIA Department Advocate will ensure the reporting party will receive the Administrative Summary Report within 60 days of final decision.

---

[182] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

Separately, we also reviewed COPA's *Timeliness Benchmarks* policy, 3.2.2, COPA, which addresses ¶446(a) and (b). After receiving feedback from the Community Policy Review Working Group, and finishing the review process, COPA finalized the policy.

We look forward to working with the CPD to revise relevant policies in the next reporting period, and reviewing the CPD's and COPA's efforts toward Secondary compliance.

## Accountability and Transparency: ¶447

> ***447.*** *The City and CPD will require that all COPA and BIA person-nel and Accountability Sergeants communicate with complain-ants and involved CPD members in a professional and respectful manner.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[183] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. During the fourth reporting period, the City has not met Preliminary compliance. While the CPD made significant progress towards Preliminary and Secondary compliance, it has not yet implemented a corresponding policy. COPA did, however, finalize its corresponding policy.

BIA has sought to address the requirements of ¶447 in several directives and training materials, including the following: *Complaint and Disciplinary Investigators and Investigations*, S08-01, and *Conduct of Investigation: Initial Responsibilities*. We anticipate that the CPD will meet Preliminary compliance when it finalizes the policy after receiving public feedback and revised accordingly.

BIA has also made efforts toward Secondary compliance and provided training materials related to this paragraph. Specifically, BIA addresses the onboarding and in-service training requirements of ¶447 in their *Complaint Initiation Process-BIA Investigators and Accountability Sergeants Annual Training*, in the *BIA Investigators and Accountability Sergeants Annual Training: Procedural Justice and Log Number Investigations*; and in the *BIA Policies and Communications Techniques Onboard and Annual Training*. Additionally, BIA includes training on ¶447 in their two day *Log Number Investigations Training*. These trainings, however, should incorporate any applicable changes to the corresponding policies after the CPD receives public feedback.

---

[183] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT also reviewed COPA's *Intake* policy, 3.1.1, which elaborates on the requirements of ¶447, requiring staff to be transparent and to remain calm and objective when working with complainants. This policy finalized after it was reviewed and commented on by the COPA Community Policy Review Working Group. The IMT looks forward to reviewing COPA's training materials in the next reporting period.

# Accountability and Transparency: ¶448

**448.** *If COPA, BIA, or the district does not arrive at the investigative findings and recommendations within 180 days, COPA, BIA or an Accountability Sergeant will, thereafter, periodically, but not less than once every 60 days, attempt contact with the complainant or his or her representative to provide status updates until the investigative findings and recommendations are issued. Such contacts will be documented in the administrative investigative file. By 2020, this requirement will be satisfied by providing complainants and their representatives the ability to track the status of non-confidential unique tracking numbers from the intake process through final disposition online.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☐ Met  ☑ Missed |
| | *Extended from March 6, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance*[184] | |
| **CPD** | *Not in Compliance* | |
| **COPA** | *In Compliance* (NEW) | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

This is the first reporting period that the IMT assessed compliance for this paragraph. In the fourth reporting period, the City did not meet Preliminary compliance with ¶448 by not having finalized policies for all entities related to this paragraph. While COPA finalized its corresponding policy, BIA has not do so by the end of the fourth reporting period.

In the fourth reporting period for CPD, IMT reviewed *Complaint and Disciplinary Investigators and Investigations*, S08-01 (dated March 24, 2021). While Section VII.D.19 addresses ¶448, the policy requires revision. In addition, we also reviewed BIA's *Policies and Communications Techniques Onboard and Annual Training*. As with the policy, however, these materials also require further revision.

---

[184] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the fourth reporting period, after receiving no-objection notices from the IMT, the OAG—and community feedback—COPA finalized *Timeliness Benchmarks* policy, 3.2.2. As in the earlier draft, the final policy addresses ¶448 and goes further to notify the Mayor, the CPD Superintendent, Chairman of City Council Public Safety Committee, and the complainant. These efforts reflect the values of the Accountability and Transparency paragraphs.

The IMT looks forward to working with the CPD, as it continues to work towards Preliminary compliance, and with COPA, as it begins working towards Secondary compliance.

## Accountability and Transparency: ¶449

> **449.** *The City and CPD will notify the complainant in writing if an officer elects to file a labor grievance relating to any discipline imposed as a result of the complainant's complaint. Upon reaching the final disposition, the City and CPD will advise the complainant in writing of the final disposition.*

**Compliance Progress**     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. In the fourth reporting period, the City and the CPD made progress toward Preliminary and Secondary compliance, but ultimately did not meet Preliminary compliance with ¶449 due to a lack of a finalized policy related to this paragraph.

In the fourth reporting period, the IMT reviewed *Documenting Log Number Investigations and Post Investigation Procedures*, S08-01-04, which addresses ¶449 verbatim. Upon receiving public review and comment on this policy and finalizing for compliance review, the IMT looks forward to working with the CPD to revise and finalize that *Unit Directive* in the next reporting period.

The IMT also notes that the requirements of ¶449 are also addressed in BIA's *Rules and Regulations Lesson Plan and Slide Deck*, which demonstrates that BIA is working to ensure that BIA Investigators and Accountability Sergeants are aware of ¶449.

## Accountability and Transparency: ¶450

*450. CPD will develop and implement policies to ensure that a CPD member who is alleged to be involved in misconduct (the "involved member") receives notice that he or she is under administrative investigation. The policies will provide, at a minimum: a. CPD members under investigation will not receive such notice of confidential investigations, but will receive notice prior to being formally interviewed by COPA, BIA, or an Accountability Sergeant; b. such notice will comport with due process and the law, and will describe the nature of the complaint made against the involved member, and the involved member's rights, but will not contain any information that is part of a confidential investigation; and c. once a CPD member has been notified or otherwise becomes aware that he or she is the subject of an administrative investigation, the CPD member will not review the following documents and evidence related to an incident under administrative investigation, until notified by BIA that he or she is permitted to do so, or as may be required to testify as a witness in criminal or civil proceedings: i. any investigative files; ii. any reports (except for reports about the incident authored by the CPD member); or iii. any other evidence, from any source, including body and dashboard camera footage (except as permitted for purposes of completing incident reports or other documentation).*

### Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. The City and the CPD did not meet Preliminary compliance with ¶450.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeant* Unit Directive, which incorporates some of the requirements of ¶450, but does not include the in-depth direction and detail that ¶450 requires. The IMT also previously reviewed BIA's *Administrative Misconduct Investigations* Unit Directive, which addresses ¶450 and its subparagraphs. The IMT appreciates that BIA has transitioned to accessible, digital investigative notices and forms. The IMT provided no-objection notice for these policies. The policies, must however, still go through the public comment period, and the CPD must review any comments and revise, as appropriate.

Separately, in the fourth reporting period, the IMT reviewed COPA's *interviews-Chicago Police Department Members* policy, 3.1.2(b). Although this subparagraph is not a requirement of COPA, the IMT recognizes that COPA is providing specific direction to its investigators that the CPD personnel under investigation are subject to the requirements of this subparagraph. By including the requirements of this subparagraph in COPA 3.1.2(b), COPA is making best efforts to ensure the integrity of an administrative investigation.

The IMT looks forward to the City's continued effort to meet the requirements of this paragraph.

# Accountability and Transparency: ¶451

**451.** *A CPD member who reviews audio or video evidence for purposes of completing an incident report will document in writing that he or she reviewed the evidence in each relevant incident report.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not meet Preliminary compliance with ¶451.

In the previous reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶451 by not having finalized policies that meet the requirements of this paragraph. The CPD provided the IMT with its Special Order S03-14, *Body Worn Cameras*. S03-14 requires officers to "annotate" on reports when body worn camera footage was recorded during an incident. The Special Order, however, did not require officers to document whether they reviewed the evidence in the incident report. Therefore, S03-14 was insufficient to demonstrate Preliminary compliance with ¶451 in previous reporting periods.

In the fourth reporting period, the CPD revised S03-14, but it still does not require officers to document in an incident report whether they reviewed the evidence. Therefore, the current draft of S03-14—even if it were finalized—would be insufficient to demonstrate Preliminary compliance with ¶451.

S03-14 is critical to many requirements across the Consent Decree, and we look forward to continuing to work with the City, the CPD, and the OAG to revise and finalize the policy.

# Accountability and Transparency: ¶452

*452. Consistent with the applicable collective bargaining agreements, CPD will require members to cooperate with administrative investigations, including appearing for an administrative interview when requested by COPA, BIA, or an Accountability Sergeant and will provide all requested documents and evidence under the CPD member's custody and control.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD made progress toward but ultimately did not meet Preliminary compliance with ¶452 by not having a finalized policy that meets all the requirements of this paragraph.

In the previous reporting period, the City and the CPD did not meet Preliminary compliance with ¶452. The IMT reviewed the CPD's General Order G08-01, *Complaint and Disciplinary Procedures*, which generally addresses ¶452 but does not require CPD members to appear for administrative interviews and to provide all requested documents and evidence under the CPD member's custody and control. As a result, G08-01 alone was insufficient to meet compliance with ¶452.

In the fourth reporting period, the IMT reviewed the CPD's revised General Order G08-01, *Complaint and Disciplinary Procedures*, which addresses ¶452 and is explicit in its expectations for personnel to cooperate with an investigation.

The CPD also made progress toward Secondary compliance by providing the *BIA Log Number Investigations* training. This training, however, requires further revisions to be in compliance with ¶452.

The IMT anticipates that the CPD will meet Preliminary compliance after finalizing the policy under the Consent Decree review process.

# Accountability and Transparency: ¶453

> **453.** *If a criminal investigation of a CPD member's conduct has commenced, COPA, BIA, or the Accountability Sergeant will continue the administrative investigation, absent specific circumstances that would jeopardize the criminal investigation. In such circumstances, the determination to postpone the administrative investigation, along with the rationale for doing so, will be documented by COPA, BIA or the district in writing.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[185] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. The IMT has determined that the City has not yet reached Preliminary compliance with ¶453. Neither COPA nor BIA had finalized their corresponding policies by the end of the fourth reporting period.

In previous reporting periods, the IMT did not receive any information about CPD's or COPA's efforts toward compliance with ¶453.

During the fourth reporting period, the IMT reviewed COPA's *Fact Gathering and the Investigative Process* policy, 3.1.2., which addresses ¶453. By the end of the reporting period, COPA's Community Policy Review Working Group reviewed and provided feedback on COPA 3.1.2, COPA incorporated their recommendations into this and other COPA policies, , following the Stipulation process. To finalize 3.1.2, COPA must post the policy for public comment.

In the fourth reporting period, BIA did not submit any compliance records for ¶453.

The IMT looks forward to working with BIA on relevant policies, and to reviewing COPA's training materials, as they work toward Secondary compliance.

---

[185] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

# Accountability and Transparency: ¶454

***454.** COPA, BIA, and the districts will conduct objective, comprehensive, and timely investigations of complaints.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | ***Not in Compliance*[186]** |
| **CPD** | ***Not in Compliance*** |
| **COPA** | ***In Compliance*** (NEW) |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

This is the first reporting period that the IMT assessed compliance for this paragraph. The City did not reach Preliminary compliance with ¶454 by the end of the fourth reporting period. While COPA finalized its corresponding policy, BIA had not.

In the fourth reporting period, the IMT reviewed the *Recommendations Regarding Department Member Duties and Power*, which references the basic requirements of ¶454. The IMT also reviewed COPA's *Fact Gathering and the Investigative Process* policy, 3.1.2, which addresses ¶454 directly and in conjunction with the other directives demonstrates COPA's commitment and determination to fulfill the requirements of ¶454. These policies were reviewed and commented on by the COPA Community Policy Review Working Group and finalized by the end of the fourth reporting period.

For the CPD, BIA provided several policies, including G08-01, *Complaint and Disciplinary Procedures*. G08-01 contains good wording related to ¶454, but does not specifically state that BIA and the Districts/Accountability Sergeants will conduct objective, comprehensive, and timely investigations of complaints. For Secondary compliance, BIA also provided its *Conducting Log Number Investigations BIA Onboarding Training Lesson Plan*, which refers to ¶454 but requires more specificity to meet the requirements of ¶454.

The IMT looks forward to working with BIA to finalize a compliant policy for ¶454 and to working with COPA on their training documents in the coming period.

---

[186] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

# Accountability and Transparency: ¶455

> **455.** *All investigative findings will be based on the appropriate standard of proof. This standard will be clearly delineated in COPA and BIA policies, training, and procedures.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[187] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. The City did not reach Preliminary compliance by the end of the fourth reporting period. While COPA finalized its corresponding policy in the fourth reporting period, CPD's BIA had not. BIA did, however, make progress toward Preliminary and Secondary compliance by providing draft policies and training materials during the reporting period.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which states that investigations are held to the "appropriate standard of proof under BIA Policy." However, the IMT suggested that BIA and COPA develop the definition for "appropriate standard of proof" together to promote consistency and incorporate this definition into administrative investigative policies. The IMT did not receive any additional information regarding compliance with ¶455 in the third reporting period.

In the fourth reporting period, the IMT reviewed COPA's *Final Summary Report*, 3.1.3, which defines the appropriate standard of proof and reinforces the requirement of ¶455. The COPA Community Working Group reviewed and provided feedback on this policy. COPA, in turn, incorporated that feedback into the policy and finalized the policy under the Stipulation.

BIA's *Complaint and Disciplinary Procedures*, G08-01, however, does not explain what the appropriate standard of proof is. In comparison, BIA also provided its

---

[187] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*Findings, Recommendations and Effective Log Number Closings Training*, which appears to meet the training requirements of ¶455.[188] BIA should consider adding the information from the training into its policy. We look forward to future versions of BIA directives and the CPD policies that include these definitions to reduce or eliminate confusion or misunderstanding.

In the next reporting period, the IMT looks forward to working with BIA on its corresponding policy and related training materials and with COPA on its corresponding training.

---

[188] BIA's *Legal Updates-Due Process Annual Training* includes well-presented information and provides a good description of due process, just cause and how the investigative process must adhere to CPD policies.

## Accountability and Transparency: ¶456

*456. The City will ensure that the disciplinary histories of current and former CPD members are reviewed prior to employment with COPA, or assignment within BIA or as an Accountability Sergeant.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[189] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. In the fourth reporting period, the City did not meet Preliminary compliance with ¶456.

To evaluate Preliminary compliance with ¶456, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[190] which details applicable consultation, resolution, workout, and public comment periods.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants Unit Directive*, which included standards that would disqualify candidates from serving as Accountability Sergeants. The IMT suggested that BIA review the qualifications of current Accountability Sergeants and consider revising to raise the standards in the policy.

In the fourth reporting period, the IMT reviewed a revised version of the CPD's *BIA Investigators Unit Directive*. BIA has done a very good job with this directive in enhancing the selection process while adhering to traditional CPD requirements

---

[189] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[190] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

of previous versions of the directive. The selection process is now more rigorous with additional review and interviews. The BIA Chief's role is more thoroughly explained and is provides more discretion to the BIA Chief in disqualifying a candidate due to disciplinary history. While these criteria do not exactly address the concerns of IMT and OAG, the policy significantly strengthens the selection process. The IMT believes that most BIA Investigators and Accountability Sergeants exceed these standards and the IMT looks forward to continued analysis of the selection process for both positions to allow BIA to further raise the standards to meet the current BIA and Accountability Sergeant workforce. This paragraph will meet Preliminary compliance when it is finalized after any appropriate revisions from public review and comment.[191]

The IMT's continues to maintain the position that BIA Investigators should be held to an even higher standard than those of the Accountability Sergeant and the BIA Investigators Unit Directive provides the ability to have higher standards. An issue that continues to frustrate the future of the Accountability Sergeant, however, is that the position does not appear to be a sufficiently desired position within the CPD districts and units to which they are assigned. Many Accountability Sergeants are required to serve in a variety of responsibilities, including serving as shift supervisors. Accountability Sergeants are not issued a laptop to allow them to work from any location but must "hunt" for an available computer in the district offices to properly complete their investigative assignments. Some Accountability Sergeants have also shared with the IMT that this can create confidentiality issues as they are often working from computer terminals that can be seen by passerby. It is critical that Accountability Sergeants be provided to the tools, the time, and the space to properly do their work and to make the position more desirable to those potential candidates.

---

[191] In addition, the IMT reviewed a Memorandum from the Deputy Commissioner, Human Resources Board, City of Chicago (dated 6.19.21) to the Acting Commissioner. According to the memorandum, when a current or former CPD member is selected for hire by COPA, the Human Resources department will contact the Records Section of BIA to request a copy of the applicant's disciplinary file.

# Accountability and Transparency: ¶457

*457. Within 90 days of the Effective Date, CPD will create a written policy regarding the circumstances under which BIA will retain and investigate complaints itself and under which BIA will transfer complaints to a CPD district for investigation. The policy will include as factors in that decision: consideration of the involved CPD member's complaint and disciplinary history and the seriousness of the alleged misconduct. It will be designed to ensure that all investigations are completed in a timely and thorough manner and in compliance with this Agreement.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the CPD have not achieved Preliminary compliance with ¶457 in the fourth reporting period.

The IMT reviewed various CPD policy and training documents in the fourth reporting period. For example, BIA's *Complaint and Disciplinary Investigators and Investigations* policy, S08-01, and *Assignment of Administrative Log Number Investigations* Unit Directive seek to address the requirements of ¶457. Specifically, while S08-01 provides details on the responsibilities of BIA Investigations, the Unit Directive provides specific details and responsibilities for BIA Investigators and Accountability Sergeants.

The CPD also made efforts toward Secondary compliance. BIA's *Intake and Case Assignment Process On-Boarding* training seeks to address ¶528(a) and addresses parts of ¶457, but additional work is necessary.

The City and the CPD will reach Preliminary compliance once BIA finalizes its corresponding policies after making any appropriate changes following public review and comment.

# Accountability and Transparency: ¶459

**459.** *Within 30 days of receiving an allegation: a. COPA and BIA will assess the allegation to determine whether the complainant has alleged potential misconduct; and b. if potential misconduct is alleged, COPA, BIA, or the district will initiate a Preliminary investigation into the complaint.*

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[192] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. The City did not meet Preliminary compliance during this period. While COPA met finalized its corresponding policy and the CPD made progress toward finalizing its policy, the CPD did not do so before the end of the reporting period.

The IMT reviewed several relevant policies during the fourth reporting period. Most relevantly, BIA's *Complainant Communications and Timelines* policy seeks to address the requirements in ¶459. At the end of the fourth reporting period, however, BIA had not yet posted the policy for public review and comment. BIA also submitted its *Policies and Communications Techniques Onboard and Annual Training* is an oversimplification of ¶459, especially considering this lesson plan will be presented to new investigators and accountability sergeants.

COPA's *Timeliness Benchmarks Jurisdictional Decisions, Triage and Preliminary Investigation* policy, 3.2.2, addresses both subparagraphs of ¶459. COPA finalized this policy after receiving feedback from the COPA Community Policy Review Working Group, no-objection notices from the IMT and the OAG, and posting for public comment.

---

[192] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

# Accountability and Transparency: ¶460

> **460.** *Preliminary investigations will take all reasonable steps to discover any and all objective verifiable evidence relevant to the complaint or administrative notification through the identification, retention, review, and analysis of all available evidence, including, but not limited to: all time-sensitive evidence, audio and video evidence, physical evidence, arrest reports, photographic evidence, GPS records, computer data, and witness interviews. All reasonable steps will be taken to preserve relevant evidence identified during the Preliminary investigation.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[193] |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City made progress toward but ultimately did not meet Preliminary compliance with ¶460. COPA finalized its corresponding policy, but BIA did not in this reporting period.

In previous reporting periods, the IMT reviewed directives from BIA and COPA related to this paragraph and made corresponding recommendations. Because the policies were not finalized, the CPD and COPA did not meet Preliminary compliance in previous reporting periods.

During the fourth reporting period, BIA made progress toward compliance and provided drafts of several relevant policy and training documents, including BIA's *Conduct of Investigation: Sworn Affidavits and Sworn Affidavit Overrides* policy. This policy defines Objective Verifiable Evidence more than adequately addresses the requirement of ensuring that BIA Investigators and Accountability Sergeants recognize their responsibility to discover and collect evidence during a preliminary investigation. This policy, combined with the *Complainant Communication Procedures and Timelines* policy, *Conduct of Investigations: Initial Responsibilities* policy, and *Intake Initiation of Log Number* policy—ensures that the BIA Investigator and

---

[193] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

Accountability Sergeant have the directives to fulfill the requirements of this paragraph. These policies will meet Preliminary compliance when BIA finalizes them under the Consent Decree review process.

COPA's *Fact Gathering and the Investigative Process* policy, 3.1.2, addresses ¶460 and further explains what is expected to comply with the requirements of the paragraph, including the placing the expectation of a sense of urgency on its investigators to gather evidence and identify witnesses quickly. The COPA Community Policy Review Working Group reviewed COPA 3.1.2 and provided feedback to COPA, which further strengthened and enhanced this policy.

The IMT looks forward to working with BIA and COPA as they move toward compliance levels with ¶460.

# Accountability and Transparency: ¶461

*¶461 Allegations of misconduct based on verbal abuse will be preliminarily investigated to determine whether it is appropriate to continue the investigation. Anonymously submitted misconduct allegations will be preliminarily investigated to determine whether it is appropriate to continue the investigation, in accordance with the applicable collective bargaining agreements in effect at the time of the allegation is made.*

## Compliance Progress            (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[194] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not in Compliance* |

This is the first reporting period that the IMT assessed compliance for this paragraph. During the fourth reporting period, the City did not reach Preliminary compliance with ¶461. While COPA finalized its corresponding policy, and BIA made progress toward its policy development, BIA did not finalize its policy by the end of the fourth reporting period.

Specifically, during the fourth reporting period, the IMT reviewed BIA's *Assignment of Administrative Log Number Investigations* Unit Directive, which partially addresses this paragraph but does not include how allegations of verbal abuse complaints are addressed. The IMT also reviewed BIA's *Investigative Practices Annual Training*, which seeks to address the annual training for the paragraph.

COPA's *Intake* policy, 3.1.1, addresses this paragraph verbatim and provides direction to COPA personnel. This policy was reviewed and commented on by the COPA Community Policy Review Working Group. COPA also indicated that its COPA 3.1.2 *Fact Gathering* policy, 3.1.2., also addresses the requirements of ¶461, which is unclear. While the *Intake* policy addresses this paragraph for Preliminary compliance, the IMT hopes that COPA will reconcile 3.1.2 to more explicitly align with this paragraph, as well for policy consistency across the organization.

---

[194] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

## Accountability and Transparency: ¶462

> **462.** *A signed complainant affidavit will not be required to conduct a Preliminary investigation.*

---

**Compliance Progress**                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[195] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

---

In the fourth reporting period, the City made progress toward but ultimately did not meet Preliminary compliance with ¶462. While COPA finalized its corresponding policy in this period, and BIA made progress toward its policy development, BIA did not finalize its policy by the end of the fourth reporting period. The City did not meet Preliminary compliance with this paragraph in previous reporting periods for similar reasons.

BIA produced a draft *Conduct of Investigation; Sworn Affidavits and Sworn Affidavit Overrides* policy. This draft directly defines "Objective Verifiable Evidence" and directs the BIA Investigators and Accountability Sergeants that a preliminary investigation will take all reasonable steps to discover all objective verifiable evidence. This directive—combined with the *Complainant Communication Procedures and Timelines*, *Conduct of Investigations: Initial Responsibilities*, and *The Assignment of Log Number Investigations*—ensures that the BIA Investigator and Accountability Sergeant understand the requirements of this paragraph. We anticipate that the City and the CPD will reach Preliminary compliance after finalizing these policies following the Consent Decree review process.

COPA's *Intake* policy, 3.1.1, addresses this paragraph. This policy was reviewed and commented on by the COPA Community Policy Review Working Group, which further strengthened and enhanced this policy. COPA finalized the police after receiving no-objection notices from the IMT and the OAG and after posting for public comment.

---

[195] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

## Accountability and Transparency: ¶463

**463.** *The City, CPD, and COPA will ensure that, within 30 days of receiving a complaint, COPA, BIA, and Accountability Sergeants initiate and make reasonable attempts to secure a signed complainant affidavit, including in-person visits, phone calls, and other methods. Such attempts will reasonably accommodate the complainant's disability status, language proficiency, and incarceration status. a. If COPA, BIA, or the Accountability Sergeant is unable to obtain a signed complainant affidavit despite having made reasonable attempts to do so, COPA or BIA (for investigations conducted by both BIA and Accountability Sergeants) will assess whether the evidence collected in the Preliminary investigation is sufficient to continue the investigation. b. If the Preliminary investigation reveals objective verifiable evidence suggesting it is necessary and appropriate for the investigation to continue, BIA (for investigations conducted by BIA and Accountability Sergeants) will seek written approval for an override affidavit executed by the Chief Administrator of COPA, and COPA (for investigations conducted by COPA) will seek written approval for an override affidavit executed by the Chief of BIA. c. The Chief Administrator of COPA or the Chief of BIA will provide an override affidavit if there is objective verifiable evidence suggesting it is necessary and appropriate, and in the interests of justice, for the investigation to continue.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[196] |
| CPD | *Not in Compliance* |
| COPA | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City did not meet Preliminary compliance with ¶463. While BIA made progress toward its policy development, BIA did not finalize its policy by the end of the fourth reporting period.

---

[196] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

We reviewed BIA's *Conduct of Investigation; Sworn Affidavits and Sworn Affidavit Overrides* policy, which seeks to address ¶463(a)(b) and (c) and directs the BIA Investigators to ensure that a signed affidavit is secured or that they document the efforts made to secure the affidavit and to seek an affidavit override through the affidavit-override process. This directive also requires the BIA Chief to evaluate all evidence and seek an affidavit override through COPA. This directive—combined with the *Complainant Communication Procedures and Timelines* policy, the *Conduct of Investigations: Initial Responsibilities*, and *The Assignment of Log Number Investigations*—ensures that the BIA Investigator and the Accountability Sergeant will understand the requirements of this paragraph. We anticipate that the City and the CPD will reach Preliminary compliance after finalizing these policies following the Consent Decree review process.

We also reviewed BIA training documents during the reporting period, including BIA's *In-Service Training Lesson Plan Investigative Practices*, *Investigative Practices Annual Training*, and *Policies and Communications Techniques Onboard and Annual Training*. We look forward to continuing to work with BIA as they pursue Preliminary and Secondary compliance.

The IMT appreciates the work BIA to work towards Preliminary compliance and looks forward to working with BIA and COPA on Preliminary compliance during the next reporting period.

## Accountability and Transparency: ¶464

***464.*** *In the course of conducting thorough and complete misconduct investigations, COPA, BIA, and the districts will: a. take all reasonable steps to promptly identify, collect, and consider all relevant circumstantial, direct, and physical evidence, including officer-recorded audio or video taken with body-worn cameras or other recording devices; b. take all reasonable steps to locate and interview all witnesses as soon as feasible, including non-CPD member witnesses, and attempt to interview any complainant or witness in-person at a time and place that is convenient and accessible for the complainant or witness, when feasible; c. determine whether there are any other open administrative investigations involving the same involved member, and monitor or combine the investigation(s), as appropriate; d. audio record non-CPD member interviews subject to the interviewee's consent, or promptly prepare summaries of interviews when the interview is not recorded; e. take all reasonable steps to identify the involved and witness CPD member(s) if the complainant was unable do so; f. determine if there may have been additional misconduct beyond that initially alleged. COPA, BIA, or the district will take all reasonable steps to ensure that such identified misconduct is fully and fairly documented, classified, and investigated; g. as applicable, consider a CPD member's behavior based on the available training records and disciplinary history, including complaints in which allegations were not sustained, as permitted by law and any applicable collective bargaining agreement; and h. identify and take into account known relevant evidence gathered in parallel criminal investigation or criminal or civil litigation, if available.*

| Compliance Progress | | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[197] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City made progress toward Preliminary compliance with ¶464 but ultimately did not reach Preliminary compliance with that paragraph by not having finalized policies related to the requirements of this paragraph.

In the fourth reporting period, the IMT reviewed BIA's *Administrative Misconduct Investigations* Unit Directive, which completely and thoroughly addresses every subparagraph of ¶464 for BIA and the Accountability Sergeants. This is a well written directive and—together with the BIA's *Investigator and Accountability Sergeants* policy—addresses requirements of the paragraph. BIA also seeks to address other requirements in its *Photo Room Operations* policy and in its *Conduct of Investigation: Initial Responsibilities* policy address 464(b). We anticipate that the City and the CPD will reach Preliminary compliance after finalizing these policies following the Consent Decree review process.

BIA also developed a very good training scenario as written, and we look forward to seeing the training scenario presented. BIA also provided its *Investigative Practices Annual Training* to address ¶464(a).

COPA's *Fact Gathering and the Investigative Process*, 3.1.2, which provides excellent detail, expectations, and requirements of the COPA Investigative Process to COPA Investigators. While Section III addresses the majority of ¶464 (except ¶464(g)), this process provides much more detail for the investigative process than is required by ¶464. COPA appears to have used ¶464 as an outline for Section III, Investigative Process, and added detail to ensure the COPA Investigator consider and utilize every available resource and documentation to complete a thorough investigation. The COPA Community Policy Review Working Group reviewed this policy and provided feedback that further enhances this policy, but COPA needs to post this policy for public comment. Paragraph 464(g) is addressed in COPA's draft *Disciplinary and Remedial Recommendations* policy, 3.2.1, which states that a CPD

---

[197] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

member's disciplinary history may only be used as permitted by applicable collective bargaining agreements. We are not aware of this policy being finalized before the fourth reporting period, but COPA satisfied its Preliminary compliance obligations by addressing all subparagraphs being met, in policies.

The IMT looks forward to reviewing the City's ongoing efforts toward Preliminary compliance with ¶464 in the next reporting period.

# Accountability and Transparency: ¶465

*465. When conducting an administrative interview of any CPD member, COPA, BIA, and the districts will: a. ask the identity of other persons with whom he or she has communicated regarding the incident in question, and the date, time, place, and content of such communication, subject to any evidentiary privilege recognized under Illinois or federal law; b. ask whether he or she has reviewed any audio or video footage of the incident in question, and, if so, the date, time, and place the video or audio was reviewed; c. ask whether he or she is aware of any media or social media coverage of the incident in question, and, if so, the content and source of such known media coverage; d. note on the record of the interview anytime the CPD member seeks or obtains information from his or her legal or union representative, as well as the length of any "off the record" discussion between the CPD member and his or her legal or union representative and ensure that the CPD member's counsel or representative does nothing to disrupt or interfere with the interview; e. document, and make part of the investigative file, all requests made on behalf of a CPD member to reschedule an interview; and f. audio record all CPD member in-person interviews.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[198] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City demonstrated progress toward Preliminary compliance with ¶465 but did not meet Compliance by the end of the period. While BIA and COPA made progress toward its policy development, BIA and COPA did not finalize their policies by the end of the fourth reporting period.

In the fourth reporting period, BIA's draft *Administrative Misconduct Investigation* Unit Directive thoroughly addresses ¶465. This directive is well written and logical

---

[198] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

in its presentation and leaves no doubt that BIA has given much thought into its development. We anticipate that the City and the CPD will reach Preliminary compliance after finalizing these policies following the Consent Decree review process.

COPA addresses every requirement of ¶465 in COPA 3.1.2(b), *COPA Interviews-Chicago Police Department Members*. The requirements of this paragraph are stated verbatim and in an order in the directive that follow the natural progression of the CPD member interview process. This directive is well written and provides the COPA investigator the proper direction to conduct the interview while maintaining the rights of the CPD member and following legislation. The COPA Community Policy Review Working Group reviewed COPA 3.1.2(b) and provided feedback to COPA which further strengthened and enhanced this policy. COPA did not, however, finalize the policy before the end of the reporting period.

The IMT looks forward to working with BIA to finalize that Unit Directive and working with COPA as it works to finalize its policy and works toward Secondary compliance.

# Accountability and Transparency: ¶466

> **466.** *When assessing credibility, COPA, BIA, and the districts will: a. make credibility determinations of statements made by complainants, involved CPD members, and witnesses based on independent, unbiased, and credible evidence, taking into account any known record or final determination of deception or untruthfulness in legal proceedings, administrative investigations, or other investigations; and b. critically evaluate all statements, like any other evidence, giving no automatic preference to, or discounting, any statement solely due to its source, including statements made by CPD members.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[199] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the CPD demonstrated progress toward Preliminary compliance with ¶466. While COPA finalized its corresponding policy, and BIA made progress toward its policy development, BIA did not finalize its policy by the end of the fourth reporting period.

In the previous reporting period, the IMT reviewed the BIA's *Administrative Misconduct Investigations Unit Directive* for ¶466. This Unit Directive, however, was not posted, however, for public comment, and was not finalized under the Consent Decree process in the fourth reporting period.

COPA's *Final Summary Report* addresses ¶¶466(a) and (b) in detail and exceeds the requirements of this paragraph. COPA 3.1.3 provides expectations of the investigator to provide sufficient detailed statements and, in the Analysis Section, to critically review and make recommendations based upon the credibility and reliability of statements. COPA 3.1.3 was also included in *Witness Reliability In-Service Training* in January 2021.

---

[199] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT looks forward to working with BIA to finalize the policy to meet Preliminary compliance with this paragraph and working with COPA on Secondary compliance of this paragraph.

# Accountability and Transparency: ¶467

***467.*** *For each allegation associated with a misconduct investigation, COPA, BIA, or the districts will explicitly identify and recommend one of the following findings: a. "Sustained," where it is determined the allegation is supported by a preponderance of the evidence; b. "Not Sustained," where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence; c. "Unfounded," where it is determined, by clear and convincing evidence, that an allegation is false or not factual; or d. "Exonerated," where it is determined, by clear and convincing evidence, that the conduct described in the allegation occurred but is lawful and proper.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[200] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the CPD demonstrated progress toward Preliminary compliance with ¶467. While COPA finalized its corresponding policy, and BIA made progress toward its policy development, BIA did not finalize its policy by the end of the fourth reporting period.

BIA's draft *Administrative Summary Report* is the result of several drafts and many conversations between BIA and the IMT. While the process may appear slow moving, there are aspects to this policy and the resulting *Administrative Summary Report* form that are excellent. The BIA Chief led her team to develop a directive and a form that are easily read and understood by CPD personnel and members of the community, while addressing many Consent Decree requirements. The *Administrative Summary Report* form is much improved from the version CPD is currently using. The new form is concise and provides necessary information and an explanation of the case that a person who was not involved in the investigation can

---

[200] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

quickly review and understand. The revised form also includes the definitions for the four categories of findings at the top of the form for quick reference.

The IMT also reviewed G08-01, *Complaint and Discovery Procedures*, which was submitted to meet requirements of this paragraph. Sections of the directive look to address this paragraph, but it does not direct the findings to be applied to each allegation of a complaint, as required by ¶467. We made recommended revisions to more closely align with this paragraph.

At the end of the fourth reporting period, however, *Administrative Summary Report* still under revision, including adding the four categories of findings on the *Administrative Summary Report* form into the *Administrative Summary Report* policy. It is unfortunate that we did not receive a revised *Administrative Summary Report* policy and form earlier in the fourth reporting period, because the remaining revisions will likely be relatively easy to address, and we anticipate that the CPD and the City will move into Preliminary compliance soon.

BIA also submitted training records toward Secondary compliance. Some of these materials include helpful guidance regarding ¶467's requirements, but additional changes are necessary, such as the development of an on-boarding lesson plan.

COPA's 3.1.3 *Final Summary Report*, 3.1.3, clearly meets the requirements of ¶467. The COPA Community Policy Review Working Group reviewed COPA 3.1.2(b) and provided feedback to COPA which further strengthened and enhanced this policy. COPA was also able to finalize the policy before the end of the fourth reporting period following the Stipulation.

We look forward to reviewing the CPD's and COPA's continued efforts to meet compliance with this paragraph.

# Accountability and Transparency: ¶468

***468.*** *COPA, BIA, and the districts will ensure that investigators do not: a. ask leading questions that suggest legal justifications for the CPD member's conduct during interviews of witnesses, complainants, or the involved CPD member; b. make statements that could discourage a CPD member or non-CPD member witness from providing a full account of the specific allegations; c. close an administrative investigation solely because of findings in a related criminal proceedings; d. consider findings in a related criminal investigation to solely determine whether a CPD member engaged in misconduct; e. disregard a witness's statement solely because the witness has some connection to either the complainant or the CPD member or because the witness or complainant has a criminal history; or f. close an investigation solely because the complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an administrative investigation. If the complainant is unable or unwilling to provide information beyond the initial complaint, the administrative investigation will continue based on the available evidence in accordance with this Agreement, applicable law, and any applicable collective bargaining agreements.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[201] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City did not reach Preliminary compliance with ¶468, because the CPD and COPA have not finalized their corresponding policy.

---

[201] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the fourth reporting period, BIA submitted its *Administrative Misconduct Investigation*, which is very thorough and fully addresses every subparagraph and requirement of ¶468, but has yet to be presented for public comment or finalized under the Consent Decree review process.

For Secondary compliance, BIA submitted its in-service training materials, but we have not received on-board training.

In the fourth reporting period, COPA made significant progress with *COPA interviews - Chicago Police Department Members*, 3.1.2(b), which addresses ¶468(a), *Fact Gathering and the Investigative Process*, 3.1.2, which addresses ¶468. COPA included the requirements of this paragraph into the investigative process at the appropriate place for investigators to understand the fundamental requirements for interviewing CPD members and members of the public. The COPA Community Policy Review Working Group also reviewed these policies and provided feedback to COPA. COPA had not yet finalized these policies at the end of the fourth reporting period.

The IMT looks forward to working with both entities to attain Preliminary compliance with this paragraph in future reporting periods.

## Accountability and Transparency: ¶469

***469.*** *The City, COPA, and CPD recognize the negative impact of actual bias or the appearance of bias on the legitimacy of administrative investigations. For that reason, conflicts of interest in administrative investigations will be identified and prohibited. The City, COPA, and CPD will ensure the following: a. COPA, BIA, and district personnel will not be assigned to conduct any investigation that could create a conflict of interest; b. an investigation may not be conducted by any supervisor or CPD member who allegedly authorized, engaged in conduct that led to, witnessed, or otherwise allegedly participated in the incident giving rise to the complaint, or who has a conflict of interest as defined by CPD policy or this Agreement. No such person may participate in making any disciplinary recommendations with respect to the investigation; c. no CPD member who has an external business relationship or close personal relationship with an involved CPD member or witness in an administrative investigation will conduct or review the administrative investigation. No such person may participate in making any disciplinary recommendations with respect to the misconduct investigation including in the determination of any applicable grievance or appeal arising from any discipline; and d. no CPD member will participate in making any disciplinary decisions or recommendations with respect to any person to whom he or she directly reports to in his or her chain of command. In cases where CPD is unable to meet this requirement, the investigation must be transferred to OIG.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[202] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

---

[202] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the fourth reporting period, the City did not yet achieve Preliminary compliance with ¶469 because the CPD had not yet finalized its corresponding policies.

COPA reached Preliminary Compliance with this paragraph in the previous reporting period. COPA has not yet updated its 1.1.3 *Conflict of Interest* policy, 1.1.3, from 2017. Despite reaching Preliminary compliance with this paragraph, the IMT still recommends that COPA reviews and updates this policy in the context of all other policy reform efforts to ensure policy alignment across policies.

In the fourth reporting period, BIA developed and produced two separate policies related to this paragraph. Both documents provide specific information involving a most important topic for internal/administrative investigations and provide a level of detail that is important to not only the investigator, but to the chain of command who is involved in determining the accuracy and completeness of the investigative packet and any discipline that might be involved. G08-01-03 provides a complete overview of the conflict-of-interest issue and the *Conflict Certification Form* provides a consistent format for every person involved to certify that they do not have a conflict of interest in the investigation or disciplinary decision. These documents are the result of many hours of collaboration between BIA and the IMT, and BIA has done a remarkable job in producing a group of documents that accurately describes the issue on multiple levels, ensuring that the entire process is transparent and provides a level of accountability that should promote trust of the CPD and the community. We anticipate that the CPD—and the City—will move into at least Preliminary compliance in the next reporting period.

BIA has also developed several blocks of instruction that promote complete understanding of those involved in internal/administrative investigations and those who are the subject of the internal/administrative investigations.

The IMT looks forward to continuing to assess Preliminary and Secondary compliance with ¶469 in the next reporting period.

# Accountability and Transparency: ¶470

> **470.** *The City will ensure that COPA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief Administrator of COPA, or his or her designee, who must provide a short explanation of the reason(s) for granting or denying the extension.*

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. In the fourth reporting period, the City and COPA achieved Preliminary compliance with this paragraph by having a finalized policy related to this paragraph

To evaluate Preliminary compliance with ¶470, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[203] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

During this reporting period, reviewed COPA 3.2.2, *Timeliness Benchmarks*, and Section V.A.B completely address the requirements of ¶470. The COPA Community Policy Review Working Group reviewed COPA 3.1.2(b) and provided feedback to COPA, which further strengthened and enhanced this policy. COPA meets Preliminary compliance.

The IMT looks forward to reviewing COPA's training efforts to fulfill Secondary compliance with this paragraph.

---

[203]  The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶471

**471.** *The City and CPD will ensure that BIA arrives at the investigative findings and recommendations within 180 days of the initiation of the investigation. Any request for an extension of time must be approved in writing by the Chief of BIA or his or her designee.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period in which the IMT assessed compliance for this paragraph. In the fourth reporting period, the City and the CPD have not achieved Preliminary compliance with this paragraph.

To evaluate Preliminary compliance with ¶471, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[204] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

In this reporting period, the IMT reviewed S08-01, *Complaint and Disciplinary Investigators and Investigations* (dated March 24, 2021). Section IX.G addresses the requirements of this paragraph and further states that notification of the reason for the delayed completion of an investigation must be provided within five days of the stated deadline. S08-01 requires additional work, however, and must be posted for public review and comment to be used for Preliminary compliance.

The IMT also reviewed BIA Unit Directive: *Case Management System* (dated May 18, 2021), which seeks to address ¶471. The directive explains how CMS investigations are color-coded to ensure that an Accountability Sergeant or a BIA Investigator can quickly reference where the case investigation status stands in the 180-day time period. This section explains how CMS supports the requirements of these paragraphs but does not specifically direct action to meet the requirements.

---

[204] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Lastly, the IMT reviewed the BIA *Legal Updates-Due Process Annual Training* (dated November 13, 2020). The Annual Training addresses the requirements of this paragraph, but no lesson plan information regarding on-boarding training was provided to the IMT.

The IMT looks forward to working with the CPD to finalize policies to review for Preliminary compliance with this paragraph and the training materials and delivery for Secondary compliance.

# Accountability and Transparency: ¶472

> **472.** *The City and CPD will ensure that the districts arrive at the investigative findings and recommendations within 90 days of the initiation of an investigation. Any request for an extension of time must be approved in writing by the appropriate District Commander.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed compliance for this paragraph. The City and the CPD have not achieved Preliminary compliance with this paragraph in this reporting period.

To evaluate Preliminary compliance with ¶472, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[205] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

We reviewed S08-01 *Complaint and Disciplinary Investigators and Investigations* (dated March 24, 2021). While Section IX.H addresses the requirements of this paragraph, SO8-01 requires additional work by BIA before it receives a no-objection notice for this paragraph. The IMT looks forward to reviewing an updated version of S08-01 in the next reporting period.

The IMT also reviewed BIA Unit Directive: *Case Management System* (dated May 18, 2021), which seeks to partially addresses ¶471. The directive explains how the CMS investigations are color coded to ensure that an Accountability Sergeant or a BIA Investigator can quickly reference where the case investigation status stands in the 180-day time period. This section explains how CMS supports the requirements of these paragraphs but does not specifically direct action to meet the requirements.

---

[205] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Lastly, the IMT reviewed the BIA *Legal Updates-Due Process Annual Training* (dated November 13, 2020), which seeks to addresses the requirements of this paragraph, but no lesson plan information regarding on-boarding training was provided to the IMT.

The IMT looks forward to reviewing finalized policies for Preliminary compliance with this paragraph and reviewing the training materials and delivery for Secondary compliance.

# Accountability and Transparency: ¶473

*473. The City will ensure that if COPA does not arrive at the investigative findings and recommendations within 180 days, the Chief Administrator of COPA, or his or her designee, will notify, within five days after the end of the 180-day period, the Mayor or his or her designee, the Superintendent, the Chairman of the City Council Committee on Public Safety, the complainant or his or her representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons the administrative investigation has not concluded within 180 days. COPA will update such notice every 180 days until the administrative investigation is completed.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

This is the first reporting period that the IMT assessed compliance for this paragraph. In the fourth reporting period, the City and COPA have achieved Preliminary compliance with this paragraph by having a finalized policy related to this paragraph.

To evaluate Preliminary compliance with ¶473, the OAG, the City, and the IMT have agreed to a stipulation for review of COPA policies and training materials. The IMT has reviewed COPA's policies following a review process that mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

For this reporting period, the IMT reviewed COPA 3.2.2 *Timeliness Benchmarks*; Section V of the policy completely address the requirements of ¶470. The COPA Community Policy Review Working Group reviewed COPA 3.1.2(b) and provided feedback to COPA, which further strengthened and enhanced this policy. COPA meets Preliminary compliance for this paragraph.

The IMT looks forward to reviewing COPA's efforts regarding training for this paragraph in future reporting periods.

# Accountability and Transparency: ¶474

> **474.** *CPD will ensure that if BIA does not arrive at the investigative findings and recommendations within 180 days, or an Accountability Sergeant does not arrive at the investigative findings and recommendations within 90 days, BIA will notify, within five days of the end of the designated timeframe, the complainant or complainant representative, and the involved CPD member, or his or her counsel (unless such notification would compromise the integrity of the investigation). Such notification will include the reasons for the inability to complete the administrative investigation within the designated timeframe. BIA or the Accountability Sergeant will update such notice every 90 days until the administrative investigation is completed.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**     *Not in Compliance*
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

This is the first reporting period that the IMT assessed compliance for this paragraph. In the fourth reporting period, the City and the CPD did not achieve Preliminary compliance with this paragraph by not having a finalized policy related to this paragraph.

In this reporting period, the IMT reviewed S08-01, *Complaint and Disciplinary Investigators and Investigations* (dated March 24, 2021). While section IX.F addresses the requirements of this paragraph, SO8-01 requires additional work by BIA before IMT considers a no-objection notice for this paragraph. The IMT anticipates that S08-01 will be finalized in the next reporting period.

In addition, the IMT reviewed BIA *Legal Updates-Due Process Annual Training* (dated November 13, 2020), which seeks to address these requirements. The IMT also reviewed BIA *Policies and Communications Techniques Onboard and Annual Training* (dated October 29, 2020), which does not provide sufficient detail sufficient detail to satisfy the on boarding training requirements for ¶474. The IMT suggests BIA use the information from their *Legal Updates-Due Process* training, to satisfy the onboarding component and further enhance the importance for Annual Training.

The IMT looks forward to the CPD's progress toward Preliminary compliance toward the requirements of this paragraph in future reporting periods.

# Accountability and Transparency: ¶475

**475.** *The City and CPD will undertake best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[206] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City, the CPD, and COPA made progress toward but did not meet Preliminary compliance with ¶475 by not having finalized policies related to this paragraph.[207] The City did not meet Preliminary compliance for the same reason in previous reporting periods.

In this reporting period, the IMT reviewed BIA's S08-01 *Complaint and Disciplinary Investigators and Investigations* (dated March 24, 2021). While S08-01, Section VII.D.15 addresses the requirements of this paragraph, the policy still requires additional work by BIA before it receives a no-objection notice for this paragraph. In addition, BIA has indicated it is working toward a final version of *Administrative Misconduct Investigations*, which also addresses the requirements of ¶475. We reviewed an earlier draft of BIA's *Administrative Misconduct Investigations* directive (dated October 30, 2020), and addresses these requirements in Section X.B. This is a very thorough directive and fully addresses every subparagraph and requirement of ¶475. The IMT looks forward to reviewing finalized versions of these policies in the next reporting period.

---

[206] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[207] Paragraph 475 requires the City to undertake "best efforts to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation." Per ¶729, "best efforts" mean that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives. As a result, ¶475 requires the City, the CPD, and COPA to demonstrate those best efforts, which in accordance with the methodologies, require creating policies, training, and practices that demonstrate those best efforts "to ensure that the identities of complainants are not revealed to the involved CPD member prior to the CPD member's interrogation."

During this reporting period, we also reviewed COPA 3.1.2(b), *COPA Interviews-Chicago Police Department Members*, and notes that the requirements of this paragraph are mentioned in Section I.G. The COPA Community Policy Review Working Group reviewed COPA 3.1.2(b) and provided feedback to COPA, which further strengthened and enhanced this policy. This policy has not yet been presented for final public comment.

The City, the CPD, and COPA will likely achieve Preliminary compliance when these policies are finalized.

# Accountability and Transparency: ¶476

**476.** *The City, CPD, and COPA will require that COPA and BIA supervisors regularly communicate with the investigators under their supervision, including Accountability Sergeants, to evaluate the progress of administrative investigations.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[208] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed this paragraph. In the fourth reporting period, the City made progress toward but ultimately did not achieve Preliminary compliance with ¶476. While COPA achieved Preliminary compliance for this paragraph in this reporting period with a finalized policy, the CPD did not.

The IMT reviewed BIA's S08-01 *Complaint and Disciplinary Investigators and Investigations* (dated March 24, 2021) in which Section VII.B addresses the responsibilities of the BIA supervising lieutenant for the Accountability Sergeants and specifically, VII.B.3 addresses the requirements of this paragraph. While SO8-01 provides guidance regarding the requirements of this paragraph, the policy itself requires additional work by BIA before it receives a no-objection notice for this paragraph. The IMT looks forward to reviewing a finalized version of BIA's S08-01 in the next reporting period.

We also reviewed COPA's 3.2.2 *Timeliness Benchmarks*. Section III.B and C of which address the requirements of ¶476. The COPA Community Policy Review Working Group reviewed COPA 3.1.2(b) and provided feedback to COPA, which further strengthened and enhanced this policy. COPA has achieved Preliminary compliance with these requirements.

---

[208] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT looks forward to the CPD's progress in finalizing policies to assess Preliminary compliance and with COPA's progress on relevant training in the next reporting period.

# Accountability and Transparency: ¶477

> **477.** *The City and CPD will undertake best efforts to ensure that all complaints, including anonymous complaints, can be the subject of a misconduct investigation.*

**Compliance Progress**   (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (NEW)[209] |
| | **CPD** | *In Compliance* (NEW) |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City met Preliminary compliance with ¶477. The IMT recognizes that compliance with ¶477 requires the City to undertake "best efforts." Per ¶729, this means that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives of ¶477, including possibly pursuing changes to collective bargaining agreements or legislation.[210]

In the fourth reporting period, the IMT reviewed BIA G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct* (dated March 22, 2021), which seeks to address the requirements of this paragraph. In addition, in BIA's *Administrative Misconduct Investigation* directive (dated May 3, 2021), Section X.IV.B.'s "Note" addresses the requirements of this paragraph. The IMT issued a no-objection letter for this policy, but it still needs public review and comment to achieve Preliminary compliance.

The IMT also reviewed COPA's *Anonymous Complaint Guidance*, which addresses the requirements of ¶477.

While these policies haven't been finalized yet, the City and the CPD made significant efforts to modify the process for receiving and investigating complaints of officer misconduct, including allowing for the investigation of complaints that are

---

[209] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[210] Additional information about the City's efforts to pursue changes to collective bargaining agreements is provided in our assessment of ¶711 in the Implementation, Enforcement, and Monitoring Section.

anonymous or not backed by a sworn affidavit. *See* Analysis for ¶711. We will continue to monitor these efforts moving forward, including any requisite changes to CPD or COPA policies to reflect changes in the reporting process.

# Accountability and Transparency: ¶478

> **478.** *Within 120 days of the Effective Date, CPD and COPA will each review and revise its policies regarding Preliminary investigations, including Preliminary investigations of anonymous complaints, and the process for seeking an override affidavit in the absence of a signed complainant affidavit.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[211] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City and the CPD did not achieve Preliminary compliance with ¶478 in the fourth reporting period. COPA achieved Preliminary compliance with this paragraph in the fourth reporting period.

In the fourth reporting period, IMT acknowledges that BIA has been developing a suite of general orders, special orders, and unit directives that address the requirements of this paragraph, such as the following:

- G08-01, *Complaint and Disciplinary Procedures*;

- G08-01-02, *Initiation and Assignment of Investigations into Allegations of Misconduct*;

- G08-01-03, *Conflict of Interest*;

- G08-05, *Prohibition of Retaliation*;

- *Initiation of Log Numbers in the CMS*;

- *Assignment of Log Number*;

- S08-01, Complaint *and Disciplinary Investigators and Investigations*;

---

[211] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

- *Complaint Communications Procedures and Timelines*;

- *Conduct of the Investigation: Sworn Affidavit and Affidavit Overrides*;

- *Conduct of the Investigation: Initial Responsibilities, Administrative Misconduct Investigation*;

- *Photo Room Operations*; and

- *BIA Investigative Timelines and Benchmarks.*

This list of general orders, special orders, and unit directives is not exhaustive, as BIA is developing additional documents to address every phase of internal administrative investigations. Each of the requirements of this paragraph are addressed in one or more of these general orders, special orders, or unit directives; often specifically to address the circumstances of a particular document and cross referenced to other documents.

With these efforts to develop a suite of policies, BIA is attempting to ensure that the requirements of this and related paragraphs are properly addressed. Some of these policies have received no-objection notices from the IMT in previous reporting periods, including the *BIA Timelines and Benchmarks* Unit Directive and the *Administrative Misconduct Investigations*, which addresses anonymous complaints. BIA continues it works on other directives, such as the *Conduct of the Investigation: Sworn Affidavit and Affidavit Overrides* Unit Directive. The IMT anticipates that the remaining policies relevant to the requirements of this paragraph will be finalized in the next reporting period.

In addition, BIA developed the *Investigative Practices Annual Training* (dated November 4, 2020), which seeks to address these requirements for annual training and includes a good explanation on the collective bargaining agreements' impact on the anonymous complaint process. We appreciate BIA's significant and measured progress on these requirements and looks forward to reviewing additional in-service and onboarding lesson plans to address the appropriate directives in the next reporting period.

COPA also made significant progress during this reporting period. The IMT reviewed and provided no-objection notices for several revised and updated investigative policies COPA policies and materials, including the following:

- *Conflict of Interest*;

- *Intake*;

- *Fact Gathering*;

- *COPA Interviews-CPD Members*;

- *Final Summary Report*;

- *Clear and Column CMS*;

- *Disciplinary and Remedial Recommendations*;

- *Recommendations Regarding Department Member Duties and Powers*;

- *Quality Assurance*; and

- *Timeliness Benchmarks*.

Most of these policies received feedback from the COPA Community Policy Review Working Group. As a result, COPA achieved Preliminary compliance during this reporting period.

The IMT looks forward to working with the CPD to finalize relevant policies and begin Secondary compliance assessments for both the CPD and COPA in the next reporting period.

# Accountability and Transparency: ¶479

**479.** *Within 120 days of the Effective Date, CPD and COPA will each adopt or review and, to the extent necessary, revise its policy establishing investigative timelines, benchmarks, and goals by which the progress of investigations will be measured.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[212] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶479 in the fourth reporting period. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

In the fourth reporting period, we reviewed CPD's BIA policy *Investigative Timelines and Benchmarks* (dated October 19, 2020), which addresses the requirements of this paragraph. IMT reviewed this directive in December 2020 and provided a no-objection notice for the directive. This paragraph will meet Preliminary compliance upon public review and comment.

The IMT also reviewed COPA's policy 3.2.2, *Timeliness Benchmarks*, which addresses this paragraph completely. The COPA Community Policy Review Working Group reviewed and provided feedback to COPA on this policy, which further strengthened and enhanced this policy. COPA has achieved Preliminary compliance.

The IMT looks forward to reviewing both COPA and the CPD's efforts regarding training on these policies in the next reporting period.

---

[212] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

# Accountability and Transparency: ¶480

**480.** *Within 120 days of the Effective Date, the City, CPD, and COPA will each develop a policy establishing procedures for COPA, BIA, and Accountability Sergeant's review and consideration of evidence from civil and criminal litigation.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[213] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, neither the CPD nor COPA met Preliminary compliance with ¶480.

As stated in our last report, the only data point by which the IMT has to assess this paragraph is a letter (dated February 13, 2020) from BIA to the IMT indicating that work was "underway" by the City of Chicago Department of Law on a draft of a policy entitled "City Policy Regarding Procedures for COPA, BIA and the Accountability Sergeant's Review and Consideration of Evidence from Civil and Criminal Litigation" and has not yet been finalized. It is disappointing that apparently no progress has been made since February 13, 2020. This paragraph is a priority of the Consent Decree and it appears to not be considered a priority of the City. The IMT did not receive any additional information regarding COPA's efforts toward compliance with ¶480 during this reporting period.

The IMT looks forward to working with the City, the CPD, and COPA on their efforts toward compliance in the next reporting period.

---

[213] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

## Accountability and Transparency: ¶481

> **481.** *The City, CPD, and COPA will ensure that if CPD, COPA, or the OIG requests the Superintendent's authorization to open an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations, the Superintendent will respond within 30 days.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[214] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **OIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **OIG** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **OIG** | *In Compliance* (NEW) |

In the fourth reporting period, the City has not met Preliminary compliance with ¶481. While the OIG achieved Full compliance, the CPD and COPA did not achieve Preliminary compliance.

In the third reporting period, we received correspondence between the CPD and COPA, which demonstrated that, since the effective date of the Consent Decree, the CPD Superintendent has responded to each of COPA's five-year authorization requests within 30 days of the request. This correspondence, however, was not sufficient to establish compliance. In the third reporting period, the IMT reviewed CPD's General Order G08-01, *Complaint and Disciplinary Procedures*, which directs the Superintendent to respond, within 30 days, to requests to open a previously closed case, as required by ¶481. The IMT also reviewed the OIG's *Investigations*

---

[214] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*Section Manual*, which explains the correct procedure for requesting the CPD Superintendent to reopen an investigation pursuant to ¶481, which met Preliminary compliance with this paragraph.

In the fourth reporting period, the IMT reviewed an updated draft of BIA's G08-01 *Complaint and Disciplinary Procedures* (dated March 22, 2021), and determined that Section VII.A.2 addresses the requirements of this paragraph. In addition, the IMT reviewed an updated draft of BIA Unit Directive, *Incidents occurring Five Years Prior to Complaint and Reopening Investigations Five Years After Initiation* (dated March 26, 2021). The second draft of this policy addresses the concerns of the IMT noted on the first draft, which we reviewed in the last reporting period. This policy, in conjunction with G08-01, provides clear direction and expectations of the requirements of ¶481.

We note that comments on the first draft in early January 2021, but did not receive the second draft (dated March 26, 2021) until May 14, 2021. BIA and the City continue to submit documents for review and comment at the end of each reporting period, which leaves BIA and the City little time to address any concerns that that the IMT and OAG may have. BIA will meet Preliminary compliance based upon the BIA Unit Directive mentioned above and G08-01 when both are finalized through the Consent Decree review process, including public comment.

As in previous reporting periods, COPA contended that it has no responsibility for this paragraph. The IMT suggests that COPA develop a policy that explains the process for requesting that the Superintendent authorize the opening of "an investigation concerning incidents that allegedly occurred more than five years before the date that COPA, CPD, or the OIG became aware of the allegations," and explaining that the Superintendent, under ¶481, must respond within 30 days. Any such policy should include details about what will occur when a case is partially reopened and the notification process for any results from a partially reopened case. Generally, examples of the process that is currently in place are insufficient to demonstrate Preliminary compliance with ¶481.

The IMT looks forward to working with the CPD to finalize G08-01 and to reviewing other policies regarding ¶481 in the next reporting period.

## Accountability and Transparency: ¶484

> **484.** *If at any time during the intake or investigation of a complaint, COPA, BIA, or Accountability Sergeants find evidence indicating criminal conduct by any CPD member, the Chief Administrator of COPA or Chief of BIA will refer the investigation to the appropriate prosecuting agency.*

**Compliance Progress**      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[215] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City did not achieve Preliminary compliance. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

During this reporting period, the IMT reviewed BIA's Initiation of Log Numbers in the Case Management System (dated March 26, 2021), which seeks to address this paragraph. Additionally this directive refers to another BIA Directive *Criminal Misconduct Investigations* which the IMT has not yet reviewed. We do look forward to reviewing the specific procedures that provide complete details of a criminal investigation. The IMT provided a no-objection notice for the *Initiation of Log Numbers in the Case Management System*. When this paragraph is presented for public review and comment it will meet Preliminary compliance.

The IMT reviewed COPA's *Intake Policy* (3.1.1) during the prior reporting period. At the IMT's suggestion, COPA revised this policy to incorporate the requirements of ¶484, and IMT provided a no-objection notice for this policy during the fourth reporting period. In this reporting period, the IMT reviewed COPA's 3.1.2, *Fact Gathering and the Investigative Process*, which seeks to address the requirements of the paragraph leaving no doubt about the actions expected of COPA in circumstances involving criminal conduct by CPD members. The COPA Community Policy Review Working Group reviewed this policy and provided feedback to COPA which

---

[215] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

was incorporated into this and other COPA policies. With these efforts, COPA has achieved Preliminary compliance.

The IMT looks forward to working with BIA to revise its relevant policies in the next reporting period and COPA on training for this paragraph.

## Accountability and Transparency: ¶486

***486.*** *The City, CPD, and COPA will ensure that CPD and COPA maintain thorough and complete administrative investigative files. Such administrative investigative files will include: a. documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the alleged misconduct. In situations in which there are no known witnesses, the file will specifically state this fact. In situations in which witnesses were present but circumstances prevented the investigator from collecting information from those witnesses, the investigative file will state the reasons why. The investigative file also will include all available identifying information for anyone who refuses to provide a statement; b. documentation of each interview conducted and the recording of those interviews, if available; c. the names of all CPD members who have been identified as witnesses to the alleged misconduct; d. COPA's, BIA's, or the district's narrative description and evaluation of the alleged misconduct, based on its review of the evidence gathered, including a determination of whether the CPD member's actions appear to be within CPD policy, procedure, regulations, orders, or other standards of conduct required of CPD members; e. in cases where material inconsistencies exist between complainant, CPD member, and witness statements, explicit identification of the inconsistencies, including a description of the evidence reviewed and written credibility findings; f. if a CPD member deployed a weapon, documentation of whether the CPD member's certification and training for the weapon were current; g. all CPD member original statements, as well as any amendments or clarifications to the original statement, and any subsequent statements; and h. an explicit identification of each allegation and the recommended finding for each allegation of misconduct in an investigation.*

| Compliance Progress | | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[216] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed this paragraph. In the fourth reporting period, the City, CPD, and COPA made progress toward but ultimately did not achieve Preliminary compliance with ¶486. In short, the relevant policies have not yet been finalized under the Consent Decree or Stipulation processes.

During this reporting period, the IMT reviewed several CPD BIA policies, including *Requirements of a Compete Investigative File Directive* (dated February 24, 2021), which seeks to addresses this paragraph. In fact, Section III.A.7 of this directive goes far beyond addressing this paragraph by detailing types of evidence and describing how it will be entered into the investigative file. This is an excellent example of the directive developer reading ¶486 completely and ensuring the requirements of such an important CPD directive. This directive leaves no question regarding what is to be included in an investigative file. This is an excellent directive and the IMT provided a no-objection notice. The IMT anticipates that BIA will achieve Preliminary compliance with this paragraph upon public review and comment of relevant policies.

In addition, the IMT reviewed *Photo Room Operations* (dated May 10, 2021). The *Photo Room Operations* directive alone does not address the requirements of ¶486, but it is important that the directive includes the requirement of this paragraph concerning one method of identifying CPD members. BIA does not designate *Photo Room Operations* as addressing, or partially addressing, the requirements of this paragraph.

The IMT also reviewed BIA's *Administrative Misconduct Investigations* policy, which fully addresses the requirements of this paragraph with the exception of subparagraph 486(d). This directive serves to further strenghen and address the requirements of ¶486. The exclusion of ¶486(d) may be an oversight on the part of the developers of the directive.

---

[216] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT also reviewed BIA's *Findings, Recommendations and Effective Log Number Closings* training (dated October 23, 2020) in which on page 7, slide 14 offers a reference and provides a high level overview of the witness portions of ¶486 but does not provide the necessary level of detail required for the requirements of ¶486 to include proper documentation of interviews, CPD officer involvement, evidence collected and how all serve together to provide a complete investigative file. The instructor notes simply state "describe," "explain," "discuss." A lesson plan should provide detailed information regarding what is behind these words. BIA has made no further attempt to address the concerns or comments of the training with the IMT or the OAG.[217]

For COPA in this reporting period, the IMT received notice that COPA has a forthcoming *Investigative File Maintenance* policy that will address the requirements of ¶486. The IMT looks forward to reviewing the policy in the next reporting period.

The IMT looks forward to continued policy work from the City on this paragraph in the next reporting period.

---

[217] We also reviewed BIA's *Legal Updates-Due Process Annual Training* (dated November 13, 2020), which references ¶486.

## Accountability and Transparency: ¶487

> **487.** *Investigators will consider all original statements, and any subsequent statements, including amended or modified statements, for purposes of determining whether a CPD member willfully made a false statement about a fact material to the incident under investigation.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[218] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City did not meet Preliminary compliance with ¶487.

To assess compliance in this reporting period, the IMT reviewed BIA's policy *Requirements of a Complete Investigative File Directive* (dated February 24, 2021) page 3, A.8.NOTE of which addresses this paragraph more thoroughly than this paragraph requires. We anticipate that BIA will meet Preliminary compliance when the policy is finalized after the policy has been presented for public review and comment.

In addition, the IMT reviewed BIA's *Administrative Misconduct Investigations* directive (dated May 3, 2021) in which Section IX.D addresses the requirements of this paragraph, using the paragraph's wording verbatim.

The IMT also reviewed COPA's 3.1.2 *Fact Gathering and the Investigative Process*, in which page 5, Section III, 11 addresses ¶487, but has not yet been presented for public comment. COPA incorporated this paragraph into the investigative process at the appropriate place for consideration of the overall fact finding process. The COPA CPR Working Group reviewed this policy and provided feedback to COPA.

We look forward reviewing BIA's finalized *Unit Directive* and to reviewing COPA's relevant policies in the next reporting period.

---

[218] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

## Accountability and Transparency: ¶488

*488. In addition to the general investigative requirements established in this Agreement, with respect to the investigation of officer-involved shootings and deaths, the City and CPD will ensure that: a. COPA investigators be provided the opportunity to participate in the Preliminary assessment during the immediate aftermath of an officer-involved shooting or death to the same extent as any CPD member or any other law enforcement agency investigating the incident; b. The Chief Administrator of COPA, or his or her designee, is present for the first viewing by CPD of available video or audio material related to the incident and when any audio or video material is collected and preserved at or near the scene from CPD or third-party surveillance systems. i. the requirements of subparagraph (b), above, will not apply if: (1) the Chief Administrator of COPA, or his or her designee, has been informed of the incident and is not available; and (2) COPA is not on scene and there is a public safety need to review or listen to certain available audio or video prior to the COPA arrival on scene. c. there is written documentation identifying each CPD member who viewed video evidence or listened to audio evidence at the scene; d. within 30 days of the Effective Date, CPD issues a policy providing that: i. involved and witness CPD members do not discuss the facts relating to the incident with any witness until interviewed by COPA, except to the extent necessary to ensure public safety, as instructed by counsel in relation to civil or criminal proceedings, or participating in CPD officer wellness programs; ii. COPA may extend the prohibition on discussion to the extent necessary to preserve the integrity of the investigation; and iii. in no event may this prohibition extend beyond the final disciplinary decision, if any. e. involved and witness CPD members will be separated, transported separately from the scene, and monitored to avoid contact or communications relating to the incident until released by the responding supervisor at or above the rank of Commander; f. administrative interviews of involved and witness CPD members will be audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private; and g. investigators will not delay interviewing involved and witness CPD members, and will conduct such interviews as soon as feasible, consistent with any applicable collective bargaining agreement. Investigators will document, and make part of the administrative investigative file, all*

*requests made on behalf of involved or witness CPD members to reschedule an interview.*

| Compliance Progress | | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[219] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City did not meet Preliminary compliance with ¶488. As in previous reporting periods, the IMT recognizes that some of the challenges prohibiting compliance are currently outside of the CPD's and COPA's control.

As in previous reporting periods, the IMT recognizes that some of the challenges prohibiting compliance are currently outside of the CPD's and COPA's control. In previous reporting periods, the IMT reviewed COPA policy 3.1.10, *Major Incident Responses*, and suggested that COPA revise the policy to address COPA's investigative process and the investigative relationship between the CPD and COPA, including COPA's responsibility for responding to and investigating officer-involved shooting and death cases. In the third reporting period, the CPD provided the IMT with a revised version of its *Incident Scene Management Card*. The City, the CPD, and COPA first agreed to draft and enter into a MOA following the January 15, 2020 IMT Site Visit as a temporary solution to address notification, response, investigation, and other relevant issues regarding officer-involved shootings and deaths. On December 26, 2020, in the last week of the third reporting period, the City provided the IMT with a two-page *Memorandum of Agreement between COPA and the CPD* (MOA).

On the final day of the fourth reporting period (June 30, 2021), the City submitted the Illinois State Police, Division of Criminal Investigation, "CPD Officer Involved Death Investigation Proposal," which is somewhat related to the requirements of ¶488. In the IMT's view, this proposal does not negate the need for a specific directive stating the specific responsibilities of CPD and COPA in an OIS or OID. This proposal does not meet the requirements of ¶¶488–492, as it is only a proposal. Further, the proposal appears to greatly minimize COPA, and the administrative

---

[219] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

investigations for which COPA is responsible, by actually limiting COPA more than the current process does. The involvement of the CPD Investigative Response Team in the Illinois State Police Public Integrity Task Force may be the only or best option based upon Illinois statute, but the IMT strongly suggests that the City read this proposal carefully before moving forward to an agreement. Any agreement with any outside agency does not relieve the City of the CPD from its obligations in the Consent Decree.

While the CPD implemented G03-06, *Firearms Discharge and Officer Involved Death Incident Response and Investigation*, G03-06 was only intended as a temporary, emergency policy, and it was not intended to fully comply with the Consent Decree requirements. On June 25, 2021, the City produced an updated suite of directives, including G03-06 and related community engagement. The suite is designed to more closely align with requirements of ¶¶488–92. We look forward to reporting on additional progress in the next monitoring report, as the policy development and review process continues in the fifth reporting period.

In this reporting period, the IMT reviewed COPA policies that address ¶488(d)(i-iii), including COPA's 3.1.2(b) *COPA Interviews-Chicago Police Department Members,* which on Page 3, in Section I.F.1, addresses ¶488(d)(i-iii) from the COPA perspective of the OIS investigation. Even though ¶488(d) is primarily directed toward the CPD, COPA included the requirements of this subparagraph for the COPA investigators' perspective to clarify their responsibilities in the OIS investigation. This subsection is very important to the OIS investigation and contributes to the integrity of the investigation.

In the next reporting period, the IMT looks forward to learning more about how the City is working or plans to work toward compliance with ¶488.

# Accountability and Transparency: ¶489

**489.** *The City recognizes that officer-involved shootings are traumatic incidents. The City and CPD are committed to treating all impacted with dignity and respect.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

This is the first reporting period in which the IMT assessed this paragraph; the City did not achieve compliance with ¶489.

To evaluate Preliminary compliance with ¶489, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[220] which detail applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

The City submitted the Illinois State Police, Division of Criminal Investigation, "CPD Officer Involved Death Investigation Proposal," on June 30, 2021, the final day of the fourth reporting period. *See* our analysis of ¶488 above As with the other related paragraphs, ¶489 is critically important. The IMT is not aware of any relevant discussion that has occurred between the City, CPD, or COPA during the fourth reporting period.

On June 25, 2021, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented under the requisite Consent Decree process. We look forward to reporting on additional progress in the next monitoring report, as the policy development and review process continues in the fifth reporting period.

---

[220] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

## Accountability and Transparency: ¶490

> **490.** *The City and CPD are committed to ensuring their actions do not unreasonably impede access to information for families of the injured and deceased.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed this paragraph. The City did not achieve Preliminary compliance with ¶490.

To evaluate Preliminary compliance with ¶490, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[221] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

The City submitted the Illinois State Police, Division of Criminal Investigation, "CPD Officer Involved Death Investigation Proposal," on June 30, 2021, the final day of the fourth reporting period. *See* our analysis of ¶488 above. As with the other related paragraphs, ¶490 is critically important. The IMT is not aware of any relevant discussion that has occurred between the City, CPD, or COPA during the fourth reporting period.

On June 25, 2021, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented under the requisite Consent Decree process. We look forward to reporting on additional progress in the next monitoring report, as the policy development and review process continues in the fifth reporting period.

---

[221] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶491

**491.** *In addition to the investigative requirements set forth in this Agreement, with respect to officer-involved shootings and officer-involved deaths, the City and CPD will ensure that CPD members act in a manner that is consistent with CPD's commitment to the principle of the sanctity of life, and will treat the deceased with respect, including the prompt screening from public view or covering of the deceased and, following timely evidence collection procedures, removal of the deceased.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed this paragraph; the City did not achieve Preliminary compliance with ¶491.

To evaluate Preliminary compliance with ¶491, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[222] which details applicable consultation, resolution, workout, and public comment periods.

The City submitted the Illinois State Police, Division of Criminal Investigation, "CPD Officer Involved Death Investigation Proposal," on June 30, 2021, the final day of the fourth reporting period. *See* our analysis of ¶488 above. As with the other related paragraphs, ¶491 is critically important. The IMT is not aware of any relevant discussion that has occurred between the City, CPD, or COPA during the fourth reporting period.

On June 25, 2021, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented under the requisite Consent Decree process. We look forward to reporting on additional progress in the next monitoring report, as the policy development and review process continues in the fifth reporting period.

---

[222]  The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

## Accountability and Transparency: ¶492

> **492.** *Criminal investigations into the actions of any CPD member relating to any "officer-involved death" will comply with the Police and Community Relations Improvement Act, 50 ILCS 727/1-1 et seq. ("PCRIA"). The City will use best efforts to ensure that a "law enforcement agency," as that term is defined under PCRIA, will conduct such investigations. The "law enforcement agency" conducting criminal investigations into the actions of any CPD member relating to any "officer-involved death" will have substantial experience and expertise in criminal homicide investigations.*

### Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period that the IMT assessed this paragraph; the City did not achieve Preliminary compliance with ¶492.

To evaluate Preliminary compliance with ¶492, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[223] which details applicable consultation, resolution, workout, and public comment periods.

The City submitted the Illinois State Police, Division of Criminal Investigation, "CPD Officer Involved Death Investigation Proposal," on June 30, 2021, the final day of the fourth reporting period. *See* our analysis of ¶488 above. As with the other related paragraphs, ¶491 is critically important. The IMT is not aware of any relevant discussion that has occurred between the City, CPD, or COPA during the fourth reporting period.

On June 25, 2021, the City produced an updated suite of directives. The suite is designed to more closely align with requirements of ¶¶488–92, but they were not submitted in time to be implemented under the requisite Consent Decree process. We look forward to reporting on additional progress in the next monitoring report,

---

[223] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

as the policy development and review process continues in the fifth reporting period.

# Accountability and Transparency: ¶493

***493.*** *OAG acknowledges that, in many districts, CPD has desig-nated Accountability Sergeants whose responsibilities include re-ceiving, processing, and investigating complaints made against CPD members, which are referred to the districts by BIA. Within 120 days of the Effective Date, CPD will develop a policy outlining the responsibilities of Accountability Sergeants, their respective Commanders, and the BIA Lieutenants responsible for supervis-ing the Accountability Sergeant's investigations ("BIA Lieuten-ants"). The policy will provide, among other things, a process by which: a. within 72 hours of receiving a complaint from BIA for investigation, an immediate supervisor will be provided a sum-mary of the complaint allegations concerning the involved CPD member; b. within seven days of the final disciplinary decision, the Commander and an immediate supervisor will be provided with the investigative findings, recommended discipline or cor-rective action, if any; and c. an immediate supervisor of the in-volved CPD member and the Accountability Sergeant will meet with the involved CPD member regarding the investigative find-ings, recommended discipline or corrective action, if any, unless the CPD member declines to meet.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not achieve Preliminary compliance with ¶493.

To evaluate Preliminary compliance with ¶493, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Con-sent Decree (¶¶626–41),[224] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires poli-cies to be "plainly written, logically organized, and use clearly defined terms."

---

[224] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA poli-cies and training materials.

In previous reporting periods, the IMT reviewed the CPD's *Accountability Sergeants* Unit Directive. That Unit Directive showed that the CPD had made strong progress toward Preliminary compliance, but had not yet achieved Preliminary compliance because the CPD had not yet submitted the Unit Directive for community engagement or public comment.

In June 2021, the IMT learned that *Accountability Sergeants* Unit Directive had in fact been formalized for use. Late in fourth reporting period, the City produced a summary of BIA productions. In this summary, BIA indicates that the *Accountability Sergeant* Unit Directive is pending final production, and IMT now anticipates reviewing this directive early in the next reporting period.

The IMT is concerned that a directive that received a no-objection notice from the IMT in the last reporting period is still in final production and has not yet been produced. In speaking with several Accountability Sergeants during the May 2021 site visit, the IMT learned that the Accountability Sergeants were not aware of the directive.

During the fourth reporting period, the IMT also reviewed several drafts of BIA's S08-01 *Complaint and Disciplinary Investigators and Investigations*, which includes many of the responsibilities and requirements of the *Accountability Sergeants* directive. The March 24, 2021, draft of S08-01 addresses the requirements of ¶493(b) and (c), but required revisions to fully address ¶493(a). This important directive should be quickly revised and implemented under the Consent Decree process.

The IMT looks forward to reviewing the results of the public comment process for the *Accountability Sergeants* Unit Directive and reviewing the finalized version in the next reporting period.

# Accountability and Transparency: ¶494

**494.** *CPD will require that: a. investigations completed by Accountability Sergeants are held to the same investigative standards as those completed by BIA; b. beginning in 2020, and by January 31, 2022, each District Commander designates at least two Accountability Sergeants who will report to the District Commander, and whose primary responsibility is receiving, processing, and investigating complaints against CPD members; c. before a Sergeant is designated an Accountability Sergeant, his or her name will be provided by his or her District Commander to BIA for BIA's review; d. each Accountability Sergeant is provided with the name of and contact information for the BIA Lieutenant responsible for reviewing the Accountability Sergeant's work; e. BIA Lieutenants provide regular case-related and overall performance feedback to each of the Accountability Sergeants and his or her respective District Commander; f. BIA Lieutenants review and approve all of the Accountability Sergeant's proposed investigative findings and disciplinary recommendations; g. all Accountability Sergeants and BIA Lieutenants have access to the PRS or any system replacing the PRS; h. all Accountability Sergeants have access to BIA policies, directives, protocols, and training materials; and i. all Accountability Sergeants receive the initial and in-service training provided to BIA investigators as provided for in this Agreement.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | April 4, 2022* | ☑ **Not Yet Applicable** |
| | *Extended from January 31, 2022, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

In the fourth reporting period, the CPD did not achieve Preliminary compliance with ¶494.

In previous reporting periods, the IMT reviewed BIA's *Accountability Sergeants* Unit Directive, which addresses each requirement of ¶494 in sufficient detail. In the third reporting period, BIA provided the IMT with a memorandum regarding *Accountability Sergeant Selection* and an *Accountability Sergeant Task Sheet*. The CPD did not, however, post the *Accountability Sergeants* Unit Directive for public comment or finalize that policy as required by the Consent Decree.

In the fourth reporting period, BIA developed and produced S08-01, *Complaint and Disciplinary Investigators and Investigations* (draft dated March 24, 2021), which addresses every requirement of ¶494. The IMT anticipates that BIA will revise this policy and submit for IMT review in the next reporting period.

In June 2021, the IMT learned that *Accountability Sergeants* Unit Directive had in fact been formalized for use. Late in fourth reporting period, the City produced a BIA a summary of BIA productions. In this summary, BIA indicates that the *Accountability Sergeant* Unit Directive is pending final production, and IMT now anticipates reviewing this directive early in the next reporting period.

The IMT looks forward to reviewing the results of the public comment process for the *Accountability Sergeants* Unit Directive and working with BIA to finalize that Unit Directive in the next reporting period.

# Accountability and Transparency: ¶495

***495.*** *Supervisory reviews of investigations will be conducted as follows: (a) Accountability Sergeants will forward the administrative investigative file through his or her chain of command to the BIA Lieutenant: (i) the Accountability Sergeant's chain of command will ensure that the proposed investigative findings and recommendations are complete, meet the requirements of law, CPD policy, and this Agreement, and that findings are supported by the appropriate standard of proof; (ii) BIA Lieutenants will review the proposed investigative findings and recommendations for accuracy and completeness, and will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever a higher ranking officer orders additional investigation, it will be documented in writing. (b) all investigations conducted by COPA or BIA, once complete, will be forwarded through the investigator's chain of supervision/command to the Chief Administrator of COPA or the Chief of BIA, respectively: (i) COPA and BIA will each ensure that their respective administrative investigative files are complete, meet the requirements of law, COPA and CPD policy, and this Agreement; and that findings are supported by the appropriate standard of proof; (ii) the Chief Administrator or the Chief of BIA, or his or her designee, will order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (iii) whenever COPA and BIA orders additional investigation, the request and resulting investigation will be documented in writing.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[225] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

---

[225]  As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

This is the first reporting period for which the IMT assessed compliance with this paragraph. The City did not achieve Preliminary compliance with this paragraph.

During this reporting period, the IMT reviewed BIA's a draft of S08-01, *Complaint and Disciplinary Investigators and Investigations* (dated March 24, 2021), which could address requirements of ¶495.a.i,ii, b.ii,iii. S08-01 is a comprehensive directive which addresses the responsibilities of the Accountability Sergeant, the BIA Case Management Supervisor, the BIA Lieutenant, and the District Commander to whom the Accountability Sergeant is assigned. While it is a somewhat confusing process for an Accountability Sergeant to be responsible to two separate Chains of Command, BIA has done a good job detailing the reporting structure for Accountability Sergeants clearly in S08-01. During the past eighteen months, BIA has developed several directives or standard operating procedures that have attempted to capture this reporting process and have arrived at S08-01, which provides specificity to this and other related Consent Decree paragraphs.

In addition, BIA's Unit Directive, *Requirements of a Complete Investigative File*, (draft dated March 24, 2021) details the requirements of an administrative investigative file. The IMT anticipates that BIA will revise this policy and submit for IMT review in the next reporting period.

For this reporting period, IMT reviewed COPA's 3.1.3 *Final Summary Report*, which addresses ¶495(b), i-iii and provides references to other COPA policies for further clarification and direction. This subparagraph meets Preliminary compliance but needs to be revised to address every subparagraph's requirements.

# Accountability and Transparency: ¶496

> **496.** *The City and CPD will ensure that interfering with an administrative investigation, including being untruthful in an investigation into misconduct or colluding with other individuals to undermine such an investigation, or intentionally withholding requested evidence or information from an investigator, will result in disciplinary action and/or criminal prosecution based on the seriousness of the conduct.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[226] |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City, the CPD, and COPA did not achieve Preliminary compliance with ¶496 by not having finalized policies related to this paragraph.

In this reporting period, the IMT reviewed the CPD's G08-01, *Complaint and Disciplinary Procedures* (draft dated March 22, 2021), which partially addresses the requirements of this paragraph, but does not include the statement that the interference may result in disciplinary action or criminal prosecution based on the seriousness of the conduct.

We also reviewed COPA's 3.1.2 *Fact Gathering and the Investigative Process*, which in Section IV.A specifically states the requirements of this paragraph and further states that COPA members are prohibited from engaging in the prohibited activities and the potential consequences for such behavior or activities, but has not yet been presented for public comment. The requirements of ¶496 are placed in the Quality Assurance section of this policy and are positioned to ensure integrity of the investigation. The COPA Community Policy Review Working Group reviewed the policy and provided feedback to COPA. With those efforts, COPA has achieved Preliminary compliance.

---

[226] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

The IMT looks forward to reviewing the CPD's efforts toward compliance with ¶496 in the next reporting period.

# Accountability and Transparency: ¶497

**497.** *COPA and CPD will review and revise, as necessary, the policies governing COPA and CPD to ensure the processes for prevention of CPD member collusion and witness contamination comply with the terms of this agreement.*

**Compliance Progress**           (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[227] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City, the CPD, and COPA did not achieve Preliminary compliance with ¶497 by not having finalized policies related to this paragraph.

In the third reporting period, the City did not meet Preliminary compliance with ¶497, because we had not received information regarding the CPD's and COPA's efforts toward compliance with ¶497.

In this reporting period, the IMT reviewed CPD's G08-01 *Complaint and Disciplinary Procedures*(draft dated March 22, 2021), which on Page 5, in Section IV.D.6 partially addresses this paragraph, but does include the reference to witness contamination in this section. The IMT suggests that BIA include the reference to witness contamination in this section to comply with this paragraph. G08-01 has the framework of a good department directive and the IMT anticipates that G08-01 will include the suggestions of the IMT and OAG in its next draft and will be finalized early in the next reporting period.

In this reporting period, the IMT also reviewed COPA's 3.1.2 *Fact Gathering and the Investigative Process*, which in Section IV.A.1 specifically directs that the Investigations Section or the COPA Policy, Research and Analysis Division will conduct periodic reviews to ensure the integrity of Department member collusion and witness contamination do not occur, but has not yet been presented for public comment. This policy not only states that COPA will ensure that misconduct does not

---

[227] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

occur, but also directs the proper oversight to conduct reviews of investigations. The COPA Community Policy Review Working Group reviewed this policy and provided feedback to COPA.

The IMT looks forward to reviewing the City's relevant policies in the next reporting period.

# Accountability and Transparency: ¶498

> **498.** *The City and CPD will ensure that any command channel review conducted is complete within 30 days. Within 30 days of the Effective Date, CPD may draft a policy that provides, for the most serious administrative investigations, the circumstances under which up to 45 days will be provided for command channel review. The draft policy will be provided to the Monitor for review and approval.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**       *In Compliance* (THIRD REPORTING PERIOD)
**Full:**            *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Secondary compliance with ¶498 by continuing with training based on the finalized policy related to this paragraph.

In prior reporting periods, the IMT reviewed and approved the CPD's Special Order S08-01-03, *Command Channel Review (CCR)*, as well as the BIA's related training materials—including lesson plans and slide decks—which were sufficient to demonstrate Preliminary compliance and Secondary compliance with ¶498.

In this reporting period, BIA maintained Secondary compliance due to its policy and continued training of the appropriate CPD command staff and officers who are required to engage in the Command Channel Review process based upon the CCR Training, the Advocate Section Overview On-Boarding Training and the CCR Attendance Records for onboarding and in-service training requirements. This is an excellent example of specific training blocks of instruction addressing both onboarding and in-service training.

To further strengthen the Command Channel Review process, BIA's S08-01 *Complaint and Disciplinary Investigators and Investigations* (draft dated March 24, 2021) Section XI., includes the Command Channel Review in the process for the Conduct of Log Number Investigations. This is an important reference and reminder for BIA Investigators and Accountability Sergeants.

We look forward to BIA's continued compliance efforts on ¶498.

## Accountability and Transparency: ¶499

> **499.** *When COPA, BIA, or the investigating district has arrived at the investigative findings and recommendations, it will promptly finalize a summary report ("Administrative Summary Report"). The Administrative Summary Report will include: a. a description of the CPD members and individuals involved in the alleged misconduct; b. the date, time, and location of the alleged misconduct; c. a description of the allegations and applicable policies; d. a narrative summary of the alleged misconduct; e. a narrative summary of the investigation; and f. the investigating body's findings and conclusions for each allegation of misconduct, including any discipline recommended.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[228] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

This is the first reporting period the IMT has assessed compliance for this paragraph. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

In this reporting period, the IMT reviewed A*dministrative Summary Report (ASR)* packet and letter (dated May 19, 2021), which includes a final ASR directive, examples of redacted Administrative Summary Reports, and a screenshot of the updated BIA webpage depicting the ASR Summary page and training materials. We provided a no-objection notice for this directive early in the fourth reporting period, but the CPD has not posted the directive for public comment.

---

[228] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In addition, the IMT reviewed S08-01-04 *Documenting Log Number Investigations and Post Investigation Procedures* (dated May 12, 2021). The ASR and all supporting documents and forms are addressed in the ASR. The IMT is unclear why BIA chooses to address that process again in this directive; the IMT suggests that this policy simply refer the reader to the ASR directive and forms rather than leave the reader to determine if this is a separate process since it is addressed in this directive.

In this reporting period, the IMT also reviewed COPA's 3.1.3, *Final Summary Report (FSR)*, which addresses ¶499(a–f) in detail. This directive provides the COPA Investigator a proper guideline for completing the final summary report; the COPA Supervisor and Chain of Command a guide to ensure the final summary reports are completed in a consistent format; and the CPD members involved and the public with specific detail in what they can expect from a COPA final summary report. COPA 3.1.3 *Final Summary Report* was reviewed by the COPA Community Working Group which provided specific feedback and recommendations which COPA included in this draft.

The IMT looks forward to working with the CPD and COPA on this paragraph to examine further compliance and progress in future reporting periods.

# Accountability and Transparency: ¶500

> **500.** *For all misconduct investigations, BIA or COPA will publish the Administrative Summary Report within 60 days of the final disciplinary decision.*

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[229] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed compliance with ¶500 for the first time in the fourth reporting period. The City and the CPD did not reach Preliminary compliance, but COPA achieved Preliminary compliance with ¶500.

In the fourth reporting period, we reviewed the CPD's Administrative Summary Report (ASR) packet which included examples of redacted Administrative Summary Reports, and a screenshot of the updated BIA webpage depicting the ASR Summary page. We also received, reviewed, and ultimately submitted a no-objection letter for the ASR directive. The CPD has not yet posted this policy for public comment.

In addition, we reviewed draft directive *Documenting Log Number Investigations and Post Investigation Procedures* (S08-01-04). This directive seems duplicative of the materials provided in the ASR packet. We suggest that S08-01-04 simply refer the reader to the ASR directive and forms rather than leave the reader to determine if S08-01-04 outlines a separate process distinct from that outlined in the ASR directive and packet materials. Because S08-01-04 remained in the review and revision process at the close of the fourth reporting period and the ASR directive has not been posted for public comment, the CPD did not reach Preliminary compliance.

---

[229] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the fourth reporting period, COPA submitted its policy *Final Summary Report (FSR)* (COPA 3.1.3)*.,* This policy addresses the requirements of this paragraph, providing the COPA Investigator a proper guideline for completing the final summary report, the COPA Supervisor and Chain of Command a guide to ensure the final summary reports are completed in a consistent format; the CPD members involved and the public with specific detail in what they can expect from a COPA final summary report. COPA 3.1.3 Final Summary Report was reviewed by the COPA Community Working Group which provided specific feedback and recommendations which COPA included in this draft. Meets Preliminary compliance.

The IMT looks forward to working with the CPD and COPA on this paragraph to examine further compliance and progress on this paragraph.

# Accountability and Transparency: ¶501

**501.** *Within 60 days of the final disposition, the City will publish: the charges filed and the discipline recommended; the written decision(s), if any, related to the final disposition; and the discipline imposed. When available, the City will publish the date on which the discipline is scheduled to be imposed.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The fourth reporting period marks the first time we've assessed compliance with ¶501. The City did not achieve Preliminary compliance.

While we have reviewed COPA and BIA materials that relate to ¶501, we understand that the City is directly responsible for the policy and corresponding compliance efforts for this paragraph. We have not yet received a draft of this policy, but we look forward to future collaboration on this effort and reviewing corresponding proofs of compliance.

# Accountability and Transparency: ¶502

> **502.** *Information contained in the Administrative Summary Report that is legally exempt from disclosure for privacy or other purposes will be redacted prior to electronic publication.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[230] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed compliance with ¶502 for the first time in the fourth reporting period. COPA achieved Preliminary compliance, but the City and the CPD did not.

To evaluate Preliminary compliance with ¶502, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[231] which details applicable consultation, resolution, workout, and public comment periods.

For this reporting period, the CPD submitted BIA's draft *Administrative Summary* directive. This directive addresses the requirement of this paragraph. Before this policy can be finalized and allow BIA to reach Preliminary compliance, BIA will need to post the directive for public comment.

In the fourth reporting period, COPA provided its policy *Final Summary Report* (COPA 3.1.3). This policy meets the requirements of ¶502, and the policy was reviewed and commented on by the COPA Community Work Group. With this, COPA met Preliminary compliance with ¶502.

The IMT looks forward to working with the CPD and COPA on continued compliance with this paragraph in future reporting periods.

---

[230] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[231] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶504

> **504.** *As soon as feasible, but by no later than January 2020, upon arriving at the final disciplinary decision, CPD and COPA will ensure that the Administrative Summary Report is provided to the involved CPD member and the Department. CPD will ensure that the Administrative Summary Report is provided to the involved CPD member's District or Unit Commander and immediate supervisor.*

**Compliance Progress**     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[232] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

At the end of the fourth reporting period, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

In previous reporting periods, we reviewed COPA's policy 3.1.3, *Final Summary Report*, and an example of an Administrative Summary Report provided by the CPD. Neither of these documents were sufficient to demonstrate Preliminary compliance with ¶504. In the third reporting period, the IMT reviewed BIA's *Administrative Summary Report* Unit Directive, which incorporated the requirements of ¶504 but was not finalized by the end of the third reporting period

In the fourth reporting period we reviewed BIA draft directive *Documenting Log Number Investigations and Post Investigation Procedures* (S08-01-04). This policy was produced late in the fourth reporting period. While the directive aims to address the requirements of ¶504, but the directive remains in the collaborative review and revision process.

COPA also made efforts under ¶504 in the fourth reporting period. We reviewed COPA's policy *Timeliness Benchmarks, Conclusion of Investigation* (COPA 3.2.2).

---

[232]   As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

This policy addresses the requirements of ¶504. With this policy, COPA met Preliminary compliance with ¶504 after finalizing the policy under the requisite process.

The IMT looks forward to working with BIA and COPA as they continue to work toward compliance with this paragraph.

# Accountability and Transparency: ¶505

**505.** *The CMS will have the following capacities: a. maintain accurate and reliable data regarding the number, nature, and status of all complaints and administrative notifications, from the intake process to final disposition; b. identify the status of administrative investigations; c. identify caseloads for investigators; and d. maintain all documents and investigative materials—including audio and video—in a digital format, accessible via the CMS.*

## Compliance Progress
(Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[233] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed compliance with ¶504 for the first time in the fourth reporting period. COPA reached Preliminary compliance. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

To evaluate Preliminary compliance with ¶504, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[234] which details applicable consultation, resolution, workout, and public comment periods.

In the fourth reporting period, we reviewed the BIA's draft Unit Directive, *Case Management System*. The draft directive addresses all subparagraphs of ¶505. At the close of the fourth reporting period, this directive remained in the collaborative review and revision process. We look forward to continued collaboration in the next reporting period. As with other policies that are intended to meet compliance, the CPD will also need to post this directive for public comment.

---

[233] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[234] *See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

Additionally, in the fourth reporting period, in May 2021 we conducted a site visit with the CPD BIA and COPA. During this meeting we discussed the current status of the Case Management System (CMS). The CPD and COPA provided information and examples of how the requirements of ¶504 and its subparagraphs are being met. We have no doubt that these requirements are addressed in the current CMS and are satisfied that the CPD and BIA are utilizing the system appropriately.

Additionally, in the fourth reporting period, in May 2021 we conducted a site visit with BIA, CPD, and COPA. During this meeting we discussed the current status of the Case Management System (CMS). The CPD and COPA provided information and examples of how the requirements of ¶504 and its subparagraphs are being met. We have no doubt that these requirements are addressed in the current CMS and are satisfied that CPD and BIA are utilizing the system appropriately.

Notably, BIA also incorporated CMS in the draft *Log Number Investigations* Training materials, and provided us with their draft training *CMS Investigative Console-Conducting Investigations.* These lesson plans do not address the subparagraphs of this paragraph. When revising the training materials, it would be helpful if BIA provided specific reference to ¶505 (a)–(c).

BIA also indicated that it is developing a *Case Management System* Unit Directive. This directive should be ready for IMT review in the next reporting period. In normal circumstances, it is unusual that a system or a program would be implemented and operational with training provided before a policy or directive is developed and implemented. But in this case the CPD was adamant that the CMS should be operational with enough time to address any issues before a policy was developed. We agreed with the CPD's request to develop the system before policy development. We anticipate that this *Case Management System* Unit Directive will be submitted for review in the fifth reporting period.

We also reviewed the CMS Onboarding lesson plan, a Case Management System presentation, and Case Investigative Console training plan. Both address the onboarding requirements of this paragraph.

Related to COPA's efforts under ¶505, we reviewed COPA's policy *Clear and Column CMS Systems* (COPA 3.1.6). The policy fully addresses the requirements of ¶505 and its subparagraphs. This policy was reviewed and commented on by the COPA Community Work Group. With this, COPA met Preliminary compliance with ¶505.

The IMT looks forward to working with the CPD and COPA on CMS policy and operations in future reporting periods.

# Accountability and Transparency: ¶506

**506.** *COPA, BIA, and the Accountability Sergeants will have access to the CMS as necessary to undertake their respective duties.*

---

**Compliance Progress** (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[235] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed compliance with ¶506 for the first time in the fourth reporting period. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

To evaluate Preliminary compliance with ¶506, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[236] which details applicable consultation, resolution, workout, and public comment periods.

In the fourth reporting period, we reviewed BIA's draft Unit Directive, *Case Management System*. This policy notes that Command Staff, auditing, and technology personnel have permissions to access the CMS and provides the process for granting permissions. The policy also outlines the process for audit to ensure the integrity of the access to the system. This directive was provided at the end of the fourth reporting period and therefore remains in the collaborative review and revisions process. We look forward to working with BIA as they revise and finalize the draft directive.

We also reviewed BIA's draft *Complaint and Disciplinary Investigators and Investigations* policy (S08-01). This policy directs the BIA Lieutenant to ensure that Accountability Sergeants have access to the CMS and are trained in its use. We also reviewed the BIA's draft *Log Number Investigations* training materials, and the

---

[235] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[236] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

*CMS Investigative Console-Conducting Investigations* training materials. The lesson plans are a step toward training on the requirements of ¶506.

Moving into the fifth reporting period, we anticipate that BIA will continue to revise and potentially finalize S08-01. Doing so would likely move BIA into Preliminary compliance with ¶506.

Related to COPA's efforts under ¶506, we reviewed COPA's *Clear and Column CMS Systems* policy (COPA 3.1.6). This policy describes how the employees will have access to the systems and provides information regarding the auditing of the systems to ensure accountability of the COPA employees. This policy was reviewed and commented on by the COPA Community Work Group. With this, COPA reached Preliminary compliance with ¶506.

The IMT looks forward to continued work on this paragraph for both the CPD and COPA in future reporting periods.

# Accountability and Transparency: ¶507

**507.** *Administrative investigative files will be electronically preserved within the CMS.*

**Compliance Progress**      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[237] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed compliance with ¶507 for the first time in the fourth reporting period. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

To evaluate Preliminary compliance with ¶507, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[238] which details applicable consultation, resolution, workout, and public comment periods.

In the fourth reporting period, we reviewed BIA's draft Unit Directive, *Case Management System* and the draft directive *Documenting Log Number Investigations and Post Investigation Procedures* (S08-01-04). These policies were produced late in the fourth reporting period, and therefore, remain in the collaborative review and revision process. As a result, BIA has not reached Preliminary compliance.

We look forward to working with BIA on these policies and anticipate that they will reach Preliminary compliance if they timely revise and finalize the directives.

Also in the fourth reporting period, we reviewed COPA's draft policy *Clear and Column CMS Systems* (COPA 3.1.6). This policy addresses the requirements of ¶507 by providing direction regarding accessing and using the system. It also addresses concerns of misuse and abuse of the CMS system. COPA 3.1.6 was reviewed and

---

[237] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[238] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

commented on by the COPA Community Working Group. Therefore, the policy allowed COPA to move into Preliminary compliance with ¶507.

We look forward to reviewing the CPD's and COPA's continued efforts to meet compliance with this paragraph.

.

# Accountability and Transparency: ¶508

> **508.** *The City and CPD will undertake best efforts to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[239] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed compliance with ¶508 for the first time in the fourth reporting period. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

To evaluate Preliminary compliance with ¶508, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[240] which details applicable consultation, resolution, workout, and public comment periods.[241]

Related to the CPD's efforts under ¶508 in the fourth reporting period, we reviewed BIA's draft Unit Directive, *Case Management System*. This draft directive

---

[239] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[240] *See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago,* Case No. 1:17-cv-06260 (Jan. 30, 2020).

[241] Paragraph 508 requires the City and the CPD to undertake "best efforts." Per ¶729, "best efforts" mean that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives. As a result, ¶514 requires the City, COPA, and the CPD to demonstrate those best efforts, which in accordance with the methodologies, require creating policies, training, and practices that demonstrate those best efforts "to ensure that all administrative investigation files, disciplinary history card entries, COPA and BIA disciplinary records, and any other disciplinary record or summary of such record, are retained electronically, and indefinitely, for purposes of historical trend analysis, non-disciplinary EIS, and public transparency."

addresses the requirements of ¶508, but because it was produced late in the reporting period, the directive remains in the collaborative review and revision process. We look forward to working with BIA as they revise and finalize the directive in the fifth reporting period.

In the fourth reporting period, COPA provided its *Clear and Column CMS Systems* policy (COPA 3.1.6).The policy describes and directs how administrative investigative files, discipline history cards, and other investigative files and histories are, and will be, retained by COPA. Additionally, COPA 3.1.6 was reviewed and commented on by the COPA Community Policy Review Working Group. With this the directive moves COPA into Preliminary compliance with ¶508.

The IMT looks forward to working with the CPD to finalize policies related to this paragraph and training with COPA in the next reporting period.

# Accountability and Transparency: ¶509

***509.*** *For each complaint, the CMS will separately track, and have capacity to conduct searches and generate reports sufficient to identify and analyze trends relating to, at a minimum, the following: a. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; b. allegations of unlawful stop, search, citation, or arrest practices; c. allegations of excessive force; d. allegations of misconduct arising during an interaction with individuals in crisis; e. allegations of retaliation against non-CPD members; f. allegations of conduct alleged to have occurred in retaliation for engaging in First Amendment protected activities, such as lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct; g. allegations of officer-involved gender-based violence, domestic violence, or sexual misconduct; h. allegations of CPD member substance and/or alcohol abuse; and i. the self-reported demographic information of complainants, including race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age.*

---

**Compliance Progress**          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[242] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed compliance with ¶509 for the first time in the fourth reporting period. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

---

[242] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

To evaluate Preliminary compliance with ¶509, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[243] which details applicable consultation, resolution, workout, and public comment periods.

In the fourth reporting period we reviewed a draft of BIA's Unit Directive *Case Management System*. This draft policy addresses the requirements of ¶509. But at the end of the fourth of the reporting period, the draft directive remained in the collaborative review and revision process. We look forward to working with BIA as they revise and finalize this directive.

Also during the fourth reporting period, in May 2021, we conducted a site visit, meeting with BIA, CPD, and COPA. At this meeting we discussed the current status of the Case Management System. The CPD and COPA provided information and examples of how the requirements of ¶509 and its subparagraphs are being met. We do not doubt that ¶509's requirements are being met by the current CMS, and we are satisfied that the CPD and BIA are utilizing the system appropriately. Of note, BIA also indicated that it is developing a *Case Management System* Unit Directive which should be ready for review in the next reporting period.

In normal circumstances it is unusual that a system or a program would be implemented and operational with training provided before a policy or directive is developed and implemented. But in this case, the CPD was adamant that the CMS should be operational with enough time to address any issues before a policy was developed. We agreed to the CPD's request to develop the system before policy development, and we anticipate that the *Case Management System* Unit Directive will be produced early in the fifth reporting period.

Additionally, BIA is providing training regarding ¶509 in the Log Number Investigations Training. However, this training still needs to be improved before it will be sufficient to demonstrate steps toward compliance with ¶509.

Related to COPA's efforts, we reviewed the Clear and Column CMS Systems policy (COPA 3.1.6) in the fourth reporting period. This policy describes how the CMS will assign a unique tracking number and track searches to general reports to identify and analyze trends as required by ¶509. This policy provides a detailed description and expectation of how the CMS system should operate and how information should be input into the system so that it can generate reports to assist COPA in identifying trends of misconduct on an individual or department level. This policy allows COPA to meet Preliminary compliance.

---

[243] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

The IMT looks forward to reviewing the CPD's and COPA's continued efforts to meet compliance with this paragraph.[244]

---

[244] *See also Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021) (IMT recommendation to "Update and develop CPD policies, with an enhanced focus on . . . Use of Force, including mass arrests"), https://cpdmonitoringteam.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Accountability and Transparency: ¶511

> **511.** *In order to develop a new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant, the City will solicit public input, through community engagement efforts, regarding the methods by which mediation will most effectively build trust between community members and police and foster mutual respect.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Under Assessment* |

We assessed compliance with ¶511 for the first time in the fourth reporting period. The City reached Preliminary and Secondary compliance with this paragraph.

The City provided records to demonstrate compliance with ¶511 in the third reporting period. Specifically, in 2020, the City engaged an outside expert to assist with its community engagement efforts for ¶511. The City provided the experts qualifications; a summary report of the project (*City of Chicago Mediation Project - Summary of Phase I – Research and Analysis and Overview of Initial Steps Taken in Phase II*, dated December 7, 2020; and notes regarding community feedback from learnings sessions between April 2020 and August 2020.

To reach Full compliance with ¶511, the City must demonstrate that it has incorporated this public input, as appropriate, in the development of the "new mediation policy governing the resolution of disciplinary actions by the agreement of the CPD member and non-CPD member complainant." *See also* ¶512, below.

# Accountability and Transparency: ¶512

*512. The City will ensure that within 365 days of the Effective Date, COPA and BIA have developed parallel policies regarding the mediation of misconduct complaints by non-CPD members. The policies will govern mediation of misconduct complaints involving non-CPD member complainants. The policies will specify, at a minimum, (a) the criteria for determining incidents eligible for resolution through mediation; (b) the goals of mediation, including efficiency, transparency, procedural justice, restorative justice, and strengthening public trust; (c) the steps in the mediation process; and (d) methods of communication with complainants regarding the mediation process and the opportunity to participate. Items (a) through (d) above will be consistent between the CPD and COPA mediation policies.*

| Compliance Progress | | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[245] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The City did not meet Preliminary compliance with ¶512 in the fourth reporting period, as the relevant policies are still in development.

To evaluate Preliminary compliance with ¶512, the IMT reviewed the City's, the CPD's, and COPA's policies using the policy process described in the Consent Decree (¶¶626–41),[246] which details applicable consultation, resolution, workout, and public comment periods.

In the third reporting period, we reviewed BIA's *Community Mediation* Unit Directive. That Unit Directive lists criteria to be used to determine whether a complaint or investigation is eligible for mediation, but it also gives the BIA Chief discretion as to which complaints or investigations will be mediated. We pointed out

---

[245] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[246] *See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

that the directive did not provide information on the various steps of the mediation process, nor did it address the topics of efficiency, transparency, procedural justice, restorative justice, or public trust.

In the third, the CPD provided its mediation policy, *Complaints Against the Chicago Police Department* (Mediation Policy). The Mediation Policy is a 90-day Pilot Program intended to address ¶512. We provided comments on the Mediation Policy early in the fourth reporting period, but have not received any response from the CPD regarding this policy, nor are we aware of any additional policy development work under ¶512. As we stated in the third report, the draft Mediation Policy does not address the issues of efficiency, transparency, procedural justice, restorative justice, or strengthening the public trust. The directive does not provide information or details regarding the steps in the mediation process, the methods of communication with complainants and the opportunity to participate, nor does it address these issues as they relate to CPD employees. As a result, the CPD has not reached Preliminary compliance with ¶512.

We did not receive any documentation to demonstrate COPA's compliance efforts under ¶512. Accordingly, COPA did not reach any level of compliance.

It is our understanding that the City is also working a city-wide policy for ¶512. We look forward to working further with the City, the CPD, and COPA on their efforts under this paragraph.

# Accountability and Transparency: ¶513

> **513.** *COPA and CPD will ensure that the recommended level of discipline for findings is consistently applied in a fair, thorough, and timely fashion, based on the nature of the misconduct. COPA and CPD will also ensure that mitigating and aggravating factors are identified, consistently applied, and documented.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[247] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed compliance with ¶513 for the first time in the fourth reporting period. The City, and the CPD are not in Preliminary compliance with this paragraph, but COPA achieved Preliminary compliance.

To evaluate Preliminary compliance with ¶513, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[248] which details applicable consultation, resolution, workout, and public comment periods.

In the fourth reporting period, BIA provided its draft *Command Channel Review* Unit Directive. This directive partially addresses the requirements of ¶513 by stating the findings for a recommended level of discipline will be consistently applied in a fair, thorough, and timely fashion. This policy, however, was not finalized under the Consent Decree process before the end of the reporting period.

Also in the fourth reporting period, COPA provided its policy, *Disciplinary and Remedial Recommendations* (COPA 3.2.1). This policy addresses the requirements of ¶513 completely and even includes a table of potential mitigating and aggravating factors to assist COPA investigators with determining the proper level of discipline. The policy is thorough and well written; it provides the COPA investigator with little

---

[247] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[248] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

doubt regarding such an important part of the administrative investigation process. COPA 3.1.6 was reviewed and commented on by the COPA Community Policy Review Working Group. With this, COPA reached Preliminary compliance with ¶513.

The IMT looks forward to working the CPD and COPA as they continue efforts to reach compliance with this paragraph.

# Accountability and Transparency: ¶514

**514.** *The City, COPA, and CPD will use best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member.*

**Compliance Progress**        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[249] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed compliance with ¶514 for the first time in the fourth reporting period. Ultimately, the City did not achieve Preliminary compliance with this paragraph. While COPA finalized its corresponding policy under the requisite review process, the CPD did not.

To evaluate Preliminary compliance with ¶514, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[250] which details applicable consultation, resolution, workout, and public comment periods.

CPD's BIA did not provide sufficient documentation supporting efforts toward compliance with ¶514 in this period. BIA provided onboard and annual training scenarios, which relate to ¶514, but as BIA acknowledges, additional efforts are necessary.[251]

---

[249] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[250] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

[251] Paragraph 514 requires the City, COPA, and the CPD to use "best efforts to ensure that the level of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member." Per ¶729, "best efforts" mean that the City must "in good faith, . . . take all reasonable steps to achieve" the objectives. As a result, ¶514 requires the City, COPA, and the CPD to demonstrate those best efforts, which in accordance with the methodologies, require creating policies, training, and practices that demonstrate those best efforts "to ensure that the level

COPA provided the IMT its policy, *Disciplinary and Remedial Recommendations* (COPA 3.2.1) in the fourth reporting period. The policy addresses the requirements of ¶514; it contains a section entitled Equity and Consistency which addresses consistent application of discipline standard. The policy provides the COPA investigator valuable direction to ensure discipline is applied without regard to race and/or the CPD location where the employee works. Further, COPA 3.2.1 was reviewed and commented on by the COPA Community Policy Review Working Group. Therefore, COPA reached Preliminary compliance with this paragraph.

We look forward to future submissions from the CPD on this paragraph and to work with COPA as they develop and implement training for this paragraph.

---

of discipline recommended for sustained findings is applied consistently across CPD districts and without regard for the race of the complainant or the race of the involved CPD member."

# Accountability and Transparency: ¶515

**515.** *All disciplinary decisions and discipline imposed will be documented in writing, maintained in the administrative investigative file and the CPD member's disciplinary history, and reported within the CMS consistent with CPD policy and this Agreement.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed compliance with ¶515 for the first time in the fourth reporting period. The City and the CPD did not reach Preliminary compliance.

To evaluate Preliminary compliance with ¶515, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[252] which details applicable consultation, resolution, workout, and public comment periods.

Related to the CPD's efforts under ¶515, we were provided and reviewed BIA's draft *Documenting Log Number Investigations and Post Investigation Procedures* directive (S08-01-04). While the draft touches on requirements presented in ¶515, the directive requires extensive revisions. We look forward to engaging in the collaborative process until the draft directive is finalized.

The IMT looks forward to working with the CPD and COPA as they continue to work toward compliance with this paragraph.

---

[252] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

# Accountability and Transparency: ¶516

***516.*** *Each sustained finding contained within a CPD member's disciplinary history will be considered for the purposes of recommending discipline for a subsequent sustained finding for a period of up to five years after the date of the incident or the date on which the violation is discovered, whichever is later.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | ***Not in Compliance***[253] |
| **CPD** | ***Not in Compliance*** |
| **COPA** | ***In Compliance*** (NEW) |
| **Secondary:** | ***Not Yet Assessed*** |
| **Full:** | ***Not Yet Assessed*** |

We assessed the City's compliance with ¶516 for the first time in the fourth reporting period. COPA reached Preliminary compliance, but the CPD—and therefore the City—did not reach any level of compliance with this paragraph.

To evaluate Preliminary compliance with ¶516, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[254] which details applicable consultation, resolution, workout, and public comment periods.

The BIA did not provide any evidence of compliance efforts related to ¶516 and, therefore, did not reach Preliminary compliance.

COPA provided the IMT with a draft of its policy, *Disciplinary and Remedial Recommendations* (COPA 3.2.1). This policy includes verbatim the requirements of ¶516. It leaves the COPA investigator valuable direction in ensuring that discipline is applied without regard to race and/or the CPD location where the employee works. COPA 3.2.1 was reviewed and commented on by the COPA Community Policy Review Working Group. Therefore, the policy allowed COPA to meet Preliminary compliance with ¶516.

---

[253] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[254] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

# Accountability and Transparency: ¶517

> **517.** *The City, CPD, and COPA will ensure that findings of "Sustained – Violation Noted, No Disciplinary Action": a. may not be used in any investigation in which the conduct resulted in injury to any person; and b. will only be used for investigations that warrant a sustained finding, but were a result of unintentional violations of policy or law.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[255] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (NEW) |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

The fourth reporting period marks the first time we assessed the CPD's and COPA's compliance with ¶517. The City did not reach Preliminary compliance, but COPA achieved Preliminary compliance.

To evaluate Preliminary compliance with ¶517, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[256] which details applicable consultation, resolution, workout, and public comment periods.

The CPD's BIA did not provide any evidence of compliance with ¶517 in this reporting period. Therefore, they did not reach Preliminary compliance.

COPA, however, provided their *Disciplinary and Remedial Recommendations* policy (COPA 3.2.1), which directly addresses the requirements of ¶517.

The IMT looks forward to working with the CPD and COPA as they continue to work toward compliance with this paragraph.

---

[255] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[256] *See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

# Accountability and Transparency: ¶518

**518.** *CPD will provide the required notice regarding disciplinary matters to the Illinois Law Enforcement Training and Standards Board, including when an officer resigns while a misconduct investigation or disciplinary charges are pending.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City's compliance with ¶518 for the first time in the fourth reporting period. The City did not reach Preliminary compliance.

To evaluate Preliminary compliance with ¶518, the IMT reviewed the CPD's policies following the policy process described in the Consent Decree (¶¶626–41),[257] which details applicable consultation, resolution, workout, and public comment periods.

In this reporting period, the IMT reviewed BIA's draft directive *Documenting Log Number Investigations and Post Investigation Procedures* (S08-01-04), dated May 12, 2021. After reviewing of this draft directive, we believe much remains to be addressed to assure that the directive covers the required listed in ¶518. As such, BIA did not reach Preliminary compliance.

We expect that revisions of S08-01-04 will continue into the fifth reporting period, and we look forward to continuing to work with BIA through this process.

---

[257] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

## Accountability and Transparency: ¶519

*519. The failure to complete an administrative investigation within the timeframes set forth in this Agreement will not invalidate, impair, or otherwise negatively impact CPD's ability to issue discipline for sustained findings.*

### Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The fourth reporting period marked the first time the IMT assessed the City's compliance with ¶519. The City did not reach Preliminary compliance with this paragraph.

The City did not provide any evidence regarding its compliance with ¶519 in the fourth reporting period. Therefore, they did not reach Preliminary compliance. The IMT understands that the City did not believe that ¶519 required a policy, but does not have any concerns about putting ¶519 into policy. We look forward to reviewing the draft of that policy, and future discussions with the City and the OAG regarding the City's efforts to comply with ¶519.

# Accountability and Transparency: ¶522

**522.** *Within 365 days of the Effective Date, COPA, the Deputy PSIG, and BIA will create separate staffing and equipment-needs plans. Such plans will include analyses setting forth the basis for the plans' staffing requirements and equipment needs assessments. CPD will implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[258] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (NEW) |
| **Deputy PSIG** | *In Compliance* (NEW) |

Previously, COPA reached Preliminary compliance with ¶522 and the Deputy PSIG reached Preliminary compliance and Secondary compliance with ¶522. But because BIA did not reach Preliminary compliance, the City did not reach Preliminary compliance. In the fourth reporting period, Deputy PSIG maintained Preliminary and Secondary compliance and met Full compliance, and COPA maintained Preliminary compliance and met Secondary and Full compliance. The CPD did not reach Preliminary compliance, and therefore, the City did not reach Preliminary compliance with ¶522.

In the third reporting period, we reviewed the Deputy PSIG's *OIG Budget Request FY2021*. This demonstrated that the OIG uses its staffing and needs assessment to make budget requests. We also reviewed PSIG's *Staffing and Equipment Needs As-*

---

[258] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

*sessment*, which demonstrated that the OIG reviewed and revised the needs assessment as required by ¶522. With this, we found that the PSIG demonstrated Preliminary and Secondary compliance with the paragraph.

In the third reporting period, the CPD also provided the *Staffing and Equipment Needs Plan Annual Assessment*, but it contained little detail regarding specific personnel and equipment needs. As a result, BIA did not reach Preliminary compliance.

COPA also provided its *Staffing and Equipment Needs Plan* for 2020 and 2021 in the third reporting period. We found that their plans demonstrated quick adaptation to challenges, which allowed COPA to adjust and appropriately respond to challenges. We found that COPA reached Preliminary compliance because it reviewed and revised its *Staffing and Equipment Needs Plan*.

Since then, the City, the PSIG, the IMT, and the OAG, discussed COPA's and PSIG's path toward compliance with ¶¶522 and 523. Based on these discussions, the Parties and the IMT agree that PSIG's and COPA's ongoing compliance efforts will be monitored with ¶523. Paragraph 522, however, requires the CPD to "implement the staffing and equipment-needs plans in accordance with the specified timeline for implementation."

As a result, the PSIG and COPA have met Full compliance with ¶522, but the CPD—and therefore, the City—remain short of Preliminary compliance.

# Accountability and Transparency: ¶523

*523. On an annual basis, COPA, the Deputy PSIG, and BIA will review and revise, if needed, each entity's respective staffing and equipment-needs plans.*

**Compliance Progress**                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☐ Met  ☑ Missed |
| | *Extended from December 31, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance*[259] | |
| **CPD** | *Not in Compliance* | |
| **COPA** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Secondary:** | *Not Yet Assessed* | |
| **CPD** | *Not Yet Assessed* | |
| **COPA** | *Not Yet Assessed* | |
| **Deputy PSIG** | *In Compliance* (THIRD REPORTING PERIOD) | |
| **Full:** | *Not Yet Assessed* | |
| **CPD** | *Not Yet Assessed* | |
| **COPA** | *Not Yet Assessed* | |
| **Deputy PSIG** | *In Compliance* (NEW) | |

In the fourth reporting period, the City did not reach Preliminary compliance with ¶523. Specifically, COPA remained at Preliminary compliance, the Deputy PSIG remained at Secondary compliance, and the CPD remained without Preliminary compliance.[260]

Because the staffing needs plans are created on an annual basis, no assessment is required during the fourth reporting period. We will assess ¶523 again in the fifth reporting period. The IMT looks forward to reviewing comprehensive needs assessments from the City in future reporting periods.

---

[259] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[260] As explained in our last report, BIA lacked a comprehensive equipment and technology needs assessment as required by ¶523.

# Accountability and Transparency: ¶524

**524.** *BIA's staffing and equipment-needs plans will include the investigation staffing and equipment needs of the districts.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

We assessed compliance with ¶524 for the first time in the fourth reporting period. The City and the CPD have not yet reached compliance with ¶524.

In the third reporting period, BIA provided the IMT with their *Staffing and Equipment Needs Plan Annual Assessment*. At the close of the third reporting period, we provided a status update and pointed out that the *Staffing and Equipment Needs Plan Annual Assessment* did not include specific details about the investigation staffing and equipment needs of the districts as required by ¶524. But because Staffing Needs Plans are created on an annual basis, there were no additional efforts related to ¶524 for us to assess in the fourth reporting period. We look forward to receiving and reviewing a comprehensive needs assessments from the City and BIA in the upcoming reporting period.

# Accountability and Transparency: ¶525

**525.** *Within 60 days of the Effective Date, the City will propose a permanent method of selecting the Chief Administrator of COPA. In creating the permanent selection method for COPA's Chief Administrator, the City will consider the views and recommendations of community stakeholders.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

The City met Preliminary compliance with ¶525 in the second reporting period. The City did not reach additional levels of compliance in the fourth reporting period.

In the third reporting period, the City did not provide the IMT with any information regarding its efforts toward Secondary compliance with ¶525.

In the fourth reporting period, the COPA Chief resigned. The IMT understands that the City is working to replace the COPA Chief by following the *Selection Method for Chief Administrator of COPA*, which was submitted to the IMT for review in the second reporting period and was the basis for the City's achieving Preliminary compliance. But we did not receive additional documentation in the fourth reporting period demonstrating Secondary compliance with this paragraph. We look forward to receiving additional information in the next reporting period regarding the screening and hiring process used to fill the COPA Chief vacancy.

## Accountability and Transparency: ¶526

> **526.** Within 180 days of being assigned to BIA or being hired by COPA, all new BIA personnel and COPA employees will receive initial on-boarding training that is adequate in quality, quantity, scope, and type. Within 120 days of the Effective Date, COPA and BIA will verify that all existing personnel received training that is consistent with this Agreement.

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[261] |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not Yet Assessed* |
| | **CPD** | *Not Yet Assessed* |
| | **COPA** | *In Compliance* (NEW) |
| **Full:** | | *Not Yet Assessed* |

In the fourth reporting period, the City did not meet Preliminary or Secondary compliance with ¶526 in entirety; however, COPA maintained Preliminary compliance and achieved Secondary compliance in this reporting period.

To evaluate Preliminary compliance with ¶526, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[262] which details applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with ¶526, the IMT reviewed the City's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[263] model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

---

[261] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[262] See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago, Case No. 1:17-cv-06260 (Jan. 30, 2020).

[263] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

In previous reporting periods, the IMT reviewed BIA's *Training Plan*, Investigator and Accountability Sergeant Basic Training Course Description, and Training Schedule. We found those documents to be consistent with, but not sufficient to demonstrate compliance with ¶526. In the third reporting period, the IMT reviewed multiple versions of COPA's *Training and Professional Development Department* Training Plan. Ultimately, this training plan allowed COPA to reach Preliminary compliance.

We will focus our analysis first on BIA's efforts in the fourth reporting period. During this period, we reviewed a draft of BIA Unit Directive, *Training Unit.* This draft was provided to the IMT at the very end of the reporting period. We believe the requirements of ¶526 are addressed by this draft directive, and we look forward to continuing discussions with BIA regarding this important directive and collaborating with BIA as they work to finalize the directive. Because this directive remains in the collaborative review and revision process and has not been finalized, BIA did not reach Preliminary compliance by the close of the fourth reporting period.

Also during the fourth reporting period, we reviewed BIA's comprehensive On Boarding Training Plan and Course Description for BIA Investigators and Accountability Sergeants. This training, however, requires revisions. For example, we expressed concern to BIA that even the title of this two day training—"Conducting Log Number Investigations"—is confusing, because conducting log number investigations is only a small part of the training's lesson plan. BIA asserted that the lesson plan title is intended to provide an overall view of the work conducted by the BIA investigator and Accountability Sergeants, and a following three days of training will provide the BIA Investigator and Accountability Sergeants with in-depth information about their work responsibilities. We believe that this approach wastes two days of training time to provide an overview when the later-required three days of onboarding training is insufficient time to provide the necessary information to the BIA investigator and Accountability Sergeants. In short, we do not agree that BIA should continue to provide this two-day overview training, and should, instead, reallocate that time to more productive training plans. But if BIA chooses to continue to provide the two-day overview training, it should extend the later training to ensure there is sufficient time for meaningful onboarding training.

We also virtually observed an Overview training on April 28, 2021. We were impressed with the BIA instructors who were knowledgeable, interactive, engaged, and passionate about their work. Each engaged with, and assisted students individually. While the IMT is impressed with their instructional methods, much more work is required to adequately address ¶526. On April 28, 2021, the IMT reviewed three hours of Day 2 of the Overview Training virtually. The trainers presented the material as a team and both encouraged and required class interaction during the training by asking questions of the material covered during Day 1 of the training

and challenged the class of 20 students' knowledge. The training team spent approximately 45 minutes reviewing the material from Day 1, which was a good review, but also took an additional 45 minutes from the day 2 instructional time.

COPA made strides toward compliance with ¶526, and ultimately reached Secondary compliance in the fourth reporting period. COPA provided a *Training and Professional Development Department Training Plan* in the third reporting period. This training plan was comprehensive and that included all aspects of new hire, COPA Academy, and In-Service training. Notably, however, we provided COPA with comments on the Training in September 2020. To date, COPA has not provided revision or a response to the IMT comments. While many of the comments from the IMT were minor or simply sought additional information, we would appreciate these comments to be addressed.

Toward the end of the fourth reporting period, COPA submitted training academy attendance records for *New Hire Onboarding Orientation* training. These documents showed that fifteen new trainees attended and completed this 29.5 hour on-boarding training class. Each new employee/student signed and certified their attendance for each of the 22 blocks of instruction—there was 100% attendance for these instruction blocks. COPA also provided an individual course roster for the *New Hire Orientation* that occurred March 5, 2021. These documents demonstrate that COPA has developed an excellent method for recording the attendance of its employees for its Onboarding training. Their method captures the necessary information to verify that the attendance requirement of ¶526 is being complied with.

Also worth note, this orientation training included training in Implicit Bias[264] and Procedural Justice.[265] COPA's onboarding training covers a breadth of topics and provides an overview of job requirements for a new employee to begin working. With this COPA has met Secondary compliance.

In the upcoming reporting periods, we suggest that BIA continue to develop policies regarding this paragraph and COPA begin efforts to document Full compliance with this paragraph.

---

[264] Training on implicit bias addresses the requirements of ¶528(k). See the assessment of ¶528 for more discussion on this topic.

[265] Training on Procedural Justice addresses the requirements of ¶528(b). See our assessment of ¶528 for more discussion on this topic.

## Accountability and Transparency: ¶527

**527.** *Within 180 days of the Effective Date, COPA and BIA will begin providing all investigation staff members with at least eight hours of annual, comprehensive, in-service training.*

| Compliance Progress | (Reporting Period: Jan. 1, 2021, through June 30, 2021) |
|---|---|
| **Preliminary:** | *Not in Compliance*[266] |
| CPD | *Not in Compliance* |
| COPA | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

COPA reached Preliminary compliance with ¶527 in the third reporting period. In the fourth reporting period, COPA maintained Preliminary compliance but no additional compliance levels were reached by COPA or BIA in the fourth reporting period.

To evaluate Preliminary compliance with ¶527, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[267] which details applicable consultation, resolution, workout, and public comment periods.

In previous reporting periods, the IMT reviewed BIA's comprehensive basic training plan for new BIA Investigators and suggested that BIA provide information about BIA's plans regarding the eight hours of annual, comprehensive in-service training required by ¶527. In the third reporting period, the IMT reviewed a revised version of BIA's in-service training plan. The IMT also reviewed multiple drafts of COPA's *Training Plan*. By the close of the third reporting period, we believed that COPA's *Training Plan* addressed the requirements of ¶527 and demonstrated Preliminary compliance.

In the fourth reporting period, we reviewed a draft of BIA Unit Directive, *Training Unit*. The draft addressed the requirements of ¶527. We look forward to additional

---

[266] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

[267] *See also Stipulation Regarding the Policy and Training Review Process for COPA*, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

discussion with BIA regarding this important directive and working with BIA as they finalize the directive and thereby move toward Preliminary compliance.

Also in the fourth reporting period, BIA provided us with its annual training plan, for which we provided comments. We understand that BIA is still revising the training, and in the interim, BIA is only providing the two-hour CMS/CCR training to Command Staff, which falls short of the eight-hour requirement.

COPA made efforts under ¶527 in the fourth reporting period. COPA began in-service training, including *Collective Bargaining Agreement and Affidavits Override* training, for its employees. COPA has developed several training blocks of instruction that meet the subparagraphs of ¶528, as discussed below. We submitted no-objection notices to several of these training blocks. With this, COPA has clearly excelled at developing a comprehensive in-service training plan and many quality blocks of instruction.

Also notable, in December, 2020, COPA provided a Training Spreadsheet that provides detailed information regarding the twelve COPA training blocks of instruction that were delivered and attended by the entire COPA staff beginning in February 2020 and throughout the calendar year 2020. Much of the training was delivered on a virtual platform and IMT members attended many of these to audit the training. The Training provided was outstanding and we observed with excellent class participation. The training followed the lesson plans and the instructors were very comfortable with the subject matter.

The IMT looks forward to assessing the City's continued efforts toward compliance in the next reporting period.

# Accountability and Transparency: ¶528

***528.*** *The initial and annual in-service training for COPA and BIA investigators will include instruction in: a. how to properly handle complaint intake, and the consequences for failing to take complaints; b. best practices in procedural justice, including techniques for communicating with complainants and members of the public; c. the collection of objective verifiable evidence; d. the process for seeking an override affidavit in the absence of a signed complainant affidavit; e. for COPA investigators, techniques for conducting impartial investigations of domestic violence and sexual misconduct; f. for BIA investigators, techniques for conducting impartial investigations of sexual misconduct; g. investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management; h. the challenges of law enforcement administrative investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation; i. properly weighing the credibility of witnesses against CPD members; j. using objective evidence to identify and resolve inconsistent statements; k. implicit bias; l. the proper application of the relevant standards of proof; m. relevant COPA and CPD rules, policies, and protocols including the requirements of this Agreement; n. relevant state and federal law; o. relevant CPD Rules of Conduct, including Rules 14, 21, and 22; p. the CMS; q. the applicable collective bargaining agreements; and r. how to access and use the PRS or information available on the PRS.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance*[268] |
| **CPD** | *Not in Compliance* |
| **COPA** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **CPD** | *Not Yet Assessed* |
| **COPA** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

---

[268] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

In the second reporting period, COPA reached Preliminary compliance with ¶528. In the fourth reporting period, COPA maintained Preliminary compliance, but neither COPA nor BIA reached any additional levels of compliance with ¶528 in the fourth reporting period.

To evaluate Preliminary compliance with ¶528, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[269] which details applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance with ¶528, the IMT reviewed the City's training development, implementation, and evaluation (¶286). The IMT evaluates training materials using the "ADDIE"[270] model of curriculum development and implementation as our evaluation standard, which typically incorporates the following elements: training needs assessment, curriculum design, curriculum development, training implementation (training delivery), and training evaluation.

In the third reporting period, the City did not meet Preliminary compliance in entirety with ¶528. COPA, however, reached Preliminary compliance with this paragraph. We had reviewed COPA's *Training and Professional Department Training Plan* (dated February 5, 2020) and found it to be comprehensive. The training materials met and even exceeded the requirements of ¶528. In the same reporting period, BIA also provided us with a revised version of its *In-Service Training Plan*.

In the fourth reporting, we reviewed a revised draft of the BIA Unit Directive, *BIA Training*. Currently, the BIA *Training Plan* requires 40 hours of training with the *Unit Training Directive* requires at least 21 hours. It is our understanding that BIA intends to expand the onboarding training to 40 hours.

Beyond this, the two day initial training currently offered does not meet the requirements of ¶528. While it is good that BIA lists the requirements of all of the ¶528 subparagraphs in the *Accountability Sergeants* directive and the *BIA Investigators* directive, merely listing the requirements is not akin to actually developing training lesson plans and providing that developed training, which is required by the paragraph. Specifically, the *Training Unit* directive states that BIA Investigators and Accountability Sergeants will receive at least 8 hours of comprehensive annual in service training which meets the requirement in principle for in-service training of ¶528. This draft directive was produced toward the end of the fourth reporting period. Accordingly, the collaborative review and revision process remained ongoing at the close of the fourth reporting period. We look forward to working with BIA to further refine the Unit Directive, *Training Unit* in the fifth reporting period.

---

[269] *See also* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020).

[270] ADDIE stands for "Analysis, Design, Development, Implementation, and Evaluation."

In addition, we reviewed a third revised draft of BIA Investigators Directive. The directive commits BIA to providing the initial and in-service training components of 528. But this directive alone does not allow BIA to reach compliance with ¶528. In addition to this Investigators Directive BIA must develop the training plans and lesson plans.

We also reviewed a draft of BIA's *Intake and Case Assignment Process On Board* lesson plan (dated October 29, 2020). This draft plan is yet another step toward compliance with ¶528. However, we note that neither it nor another documents submitted by BIA address the consequences for failing to take a complaint.

Also in the fourth reporting period, we reviewed the Case Management System (CMS) Investigative Console-Conducting Investigations lesson plan, and the CMS Log Number Intake lesson plan. While the CMS Investigation Console-Conducting Investigations lesson plan addresses requirements of ¶528, the CMS Log Number Intake lesson plan will need further revision before it will be sufficient to assist in reaching compliance with ¶528.

Relating to ¶528(h), we also review BIA's *Interviews, Questions & Answer Techniques* lesson plan. While it is a step toward meeting the requirements of ¶528(h), the lesson plan does not speak directly to the challenges of the administrative investigation versus a standard police investigation. Upon revision, the lesson plan should discuss challenges such as the code of silence, and the potential loss of position, rank, or job.

While BIA does not meet Preliminary compliance for ¶528, it is clear they have done much work in developing training for both onboarding and in-service blocks of instruction. The BIA Training Unit is comprised of dedicated and experienced BIA Investigators, and BIA leadership should be recognized for their hard work. Moving into the fifth reporting period, we suggest the BIA take the comments and suggestions provided by the IMT and OAG for these blocks of instruction and refine them. The IMT looks forward to working with BIA during the next reporting period to bring these and other training blocks into compliance.

Separately, COPA also produced several training lesson plans for IMT review and audit during the fourth reporting period. For example, we reviewed the *Witness Reliability* Training which was delivered virtually to at least 74 COPA employees. The trainer followed the lesson plan and the objectives of the training were met. COPA has included a short quiz in the lesson plan to gauge trainees' understanding of the material presented. This block of instruction was a step toward Secondary compliance but not sufficient to reach Secondary compliance because it relates only to the requirements of ¶528(i).

The IMT audited the COPA's Procedural Justice In-Service Training on January 15, 2021. The training was substantive and the instructor engaged well with the class.

Later in the reporting period, we also reviewed the updated Procedural Justice In-Service Lesson plan and slide deck. The updated plan meets the training standards set by the COPA Training Unit. It is well developed and presented and, accordingly, we provided a no-objection notice to the lesson plan. Still, we note that this training addresses only the requirements listed in ¶528(b).

Moving toward compliance with the requirements listed in ¶528(o) and ¶528(k), COPA also provided a revised *CPD Rules and Directives/COPA Academy* lesson plan and *Implicit Bias: The Science of Justice* lesson plan. Both of these lesson plans are substantively strong and contain clear instructor notes. We submitted no-objection notices to both.

We continue to recognize that many of the training topics required by ¶528 are complex and require significant time and resources to ensure that BIA Investigators, COPA Investigators, and Accountability Sergeants have a comprehensive understanding of the material. These topics largely involve new processes, procedures, directives, and technology. Additionally, many of the topics will require the CPD and COPA to engage subject matter experts to sufficiently develop and deliver the trainings. We are encouraged by the efforts undertaken during the fourth reporting period, and we look forward to working with the CPD and COPA in their efforts toward compliance with ¶528 in the next reporting period.

# Accountability and Transparency: ¶529

***529.** Within 180 days of the Effective Date, CPD will begin providing training to all CPD members on the terms of this Agreement and COPA's and CPD's revised or new policies related to administrative investigations and discipline. To the extent appropriate and necessary based upon a CPD member's duties, and contact with members of the public and/or individuals in custody, this training will include instruction on: a. identifying and reporting misconduct, the consequences for failing to report misconduct, and the consequences for retaliating against a person for reporting misconduct or participating in an investigation; b. use of the City's anonymous reporting website; c. for CPD supervisors: i. the proper initiation of the intake process, including providing COPA's contact information and the consequences for failing to initiate the intake process; and ii. techniques for turning the initiation of a complaint into a positive police-community member interaction.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City did not reach Preliminary compliance with ¶529 by the end of the reporting period.

In previous reporting periods, the IMT reviewed an agenda of a BIA Education and Training Division meeting (dated January 30, 2020), which demonstrated that the meeting took place and that meeting participants discussed items related to ¶529. In the third reporting period, BIA provided Command Channel Review (CCR) and Case Management System (CMS) training to its command staff members who are involved in the CCR process. BIA has also started to develop other training courses including Introduction to Rules and Regulations, CMS Log Number Intake, Investigative Practices, Ethics, and the Summary Punishment and Automated Report Process. The IMT also reviewed BIA's Training Unit Directive, which states the requirements of ¶529.

In this reporting period, we reviewed the second draft of BIA Unit Directive, *Training Unit*, dated May 12, 2021. Section IV. Based upon BIA's response to IMT comments from Draft 1, Section VI does not meet the requirements of ¶529. We appreciate BIA's efforts in revising the directive. But the draft directive does not yet meet the requirements of ¶529. We commend BIA for assisting the Training Unit

in preparing lesson plans and presenting training. Despite the fact that the directive references department wide training, it does not commit the department to train its members as stated in ¶529. It is unfortunate that, two years into the Consent Decree, this training still has not occurred. As a result, the CPD has not meet Preliminary compliance with ¶529.

## Accountability and Transparency: ¶530

**530.** *Within 90 days of the Effective Date, COPA and BIA will create separate initial and in-service training plans.*

**Compliance Progress**                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Preliminary:** | | *In Compliance* (THIRD REPORTING PERIOD)[271] |
| | **CPD** | *In Compliance* (THIRD REPORTING PERIOD) |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | | *Not in Compliance* |
| | **CPD** | *Not in Compliance* |
| | **COPA** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Full:** | | *Not Yet Assessed* |

Previously, in the third reporting period, COPA and BIA reached Preliminary compliance with ¶530. In addition, COPA also reached Secondary compliance. No additional levels of compliance were reached for ¶530 in the fourth reporting period.

In previous reporting periods, the IMT reviewed COPA's T*raining and Professional Development Training Plan*, the BIA's *In-Service Training Plan*, and Investigator and Accountability Sergeant On-Boarding Training Schedule and Course Description. We found that BIA reached Preliminary compliance by creating initial and in-service training plans because it demonstrated the CPD allocated sufficient resources to create separate initial and in-service training plans. We found that COPA reached both Preliminary and Secondary compliance because both the IMT and the OAG approved COPA's Training Plan as sufficient.

To evaluate BIA's Secondary compliance with ¶530, the IMT reviewed whether COPA's and the CPD's training plans, where available, are sufficient.

BIA met Preliminary compliance with ¶530 with COPA in Secondary compliance

By the end of the fourth reporting period, we were awaiting receiving revisions to the BIA *Investigators' and Accountability Sergeant's Annual Training Plan.* We provided minor comments to the draft training plan, but BIA has not yet provided any further response or comment to our suggestions. Relatedly, the IMT does not

---

[271] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

know the status of the training plan. We look forward to working with BIA as they resolve the outstanding training plan revisions in the fifth reporting period.

Also in this reporting period, COPA maintained Secondary compliance by developing and providing training according to its' *In-Service and Onboarding Training Plans*.

## Accountability and Transparency: ¶532

*532. Within 180 days of the Effective Date, the City will draft selection criteria for Police Board members with the objective of identifying individuals who possess sufficient experience, judgment, and impartiality to perform the duties of members of the Police Board. Selection criteria may include prior work in law or law enforcement, and service with Chicago-based community and non-profit organizations. The draft selection criteria will be published on the Police Board's website for a period of 30 days for public review and comment. Following the 30-day public review and comment period, the City will provide the draft criteria to OAG for review and comment. The final selection criteria will be published and maintained on the Police Board's website. The City will ensure that the selection criteria are the basis for future selection of Police Board members.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**       *Not in Compliance*
**Full:**                 *Not Yet Assessed*

The City and the Police Board met Preliminary compliance with ¶532 in the second reporting period. They did not reach subsequent levels of compliance with ¶532 in the fourth reporting period.

In the second reporting period, we reviewed the *Police Board Member Selection Criteria* (dated September 18, 2019) and determined that the City and the Police Board met Preliminary compliance with ¶532 by the Consent Decree deadline.

And in the third reporting period, we determined that the City had not met Secondary compliance with this paragraph because we had not received additional evidence of compliance.

This reporting period, the City maintained Preliminary compliance with ¶532. However, we still have not received additional evidence of compliance. For additional levels of compliance, the City will need to demonstrate that it has created the process for properly applying the selection criteria should a vacancy on the Police Board occur.

## Accountability and Transparency: ¶533

> ***533.*** *Within 180 days of the Effective Date, the Police Board will submit selection criteria for Police Board hearing officers to the Monitor and OAG for review and comment. The criteria will be drafted to help identify individuals who possess sufficient competence, impartiality, and legal expertise to serve as hearing officers. The selection criteria will be published on the Police Board's website. The City and the Police Board will ensure that the selection criteria are the basis for future selection of Police Board hearing officers.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

Previously, in the second reporting period, the City and the Police Board met Preliminary compliance with ¶533. In the fourth reporting period, they met Secondary and Full compliance with ¶533.

In the second reporting period, the City and the Police Board reached Preliminary compliance with ¶533 with the *Police Board Hearing Officer Selection Criteria*, dated December 10, 2019

To evaluate Secondary compliance with ¶533, we considered whether the *Police Board Hearing Officer Selection Criteria*—which enabled the City and Police Board to reach Preliminary compliance with ¶533—had been sufficiently disseminated and educated on so as to ensure that the *Police Board Hearing Officer Selection Criteria* would be appropriately followed. We then looked for evidence that the City and the Police Board follow the selection criteria set forth to assess Full compliance with ¶533.

In the third reporting period, the Police Board experienced a Police Board Hearing Officer vacancy. As a result, the Police Board conducted a search and hiring process for a new Police Board Hearing Officer following the *Police Board Hearing Officer Selection Criteria*. Throughout the hiring process, the Police Board provided monthly updates to the IMT and OAG, demonstrating their adherence to the selection criteria. For example, the selection process included interviews by the Hearing Officer Search Committee and interviews of the final three candidates (of 26 applicants) by the full Police Board.

In March 2021, Police Board submitted documents supporting its work in selecting two new Police Board Hearing. We reviewed the Report on the Selection Process

which detailed how and where the Hearing Officer Position Announcement and Advertisement was publicized, the process for submitting an application form, resume, and a writing sample. The Police Board also provided the written application questions and responses for the two appointed Hearing Officers, the interview questions for the first and second round of interviews and the interview questions for candidate references. We ascertained that the final candidates' references, resumes, and writing samples were vetted according to policy. Finally, the Police Board presented and unanimously voted to hire the final two candidates during the Police Board meeting on January 21, 2021.

The process of hiring the Police Board Hearing Officers showed that the Police Board followed its selection criteria as set out in previous reporting periods. This resulted in a thorough vetting and hiring process. With this, the City and Police Board demonstrated both Secondary and Full compliance.

In future reporting periods, we will continue to look for evidence that the Police Board and the City are following their *Police Board Hearing Officer Selection Criteria*, as needed. We request that the Police Board notify the IMT of any future Police Board vacancies that arise during the life of the Consent Decree.

# Accountability and Transparency: ¶534

***534.*** *In any disciplinary action requiring the vote of the Police Board, the City will ensure: a. a hearing officer will preside over the disciplinary proceedings; and b. disciplinary hearings will be videotaped in their entirety.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

We assessed the City's compliance with ¶534 for the first time in the fourth reporting period. In the fourth reporting period, the City achieved Preliminary, Secondary, and Full compliance with this paragraph.

To assess Preliminary compliance we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

In May 2021, the Police Board produced to the IMT several documents including, (1) Section 2-8-030 of the Municipal Code of Chicago, which authorizes hearing officers to preside over Police Board disciplinary hearings and requires the hearing officers to conduct disciplinary hearings in accordance with the provisions of the Code and the Board's Rules of Procedure; (2) the Police Board's *Rules of Procedure*, which among other things, requires each disciplinary case to be assigned to a hearing officer and mandates that the hearing be video recorded in its entirety; and (3) links to video recordings disciplinary hearings for the three most recent cases decided by the Police Board.

We reviewed all of these documents. They show that the Police Board not only has policies in place instructing compliance with ¶534, but the Board is following those procedures, acting in accordance with ¶534's mandate. With this the Police Board has achieved Full compliance for this paragraph.

## Accountability and Transparency: ¶535

*535. Prior to any vote by the Police Board following any disciplinary hearing, the City will ensure: a. all Police Board members are required to watch and certify that they have watched the videotape of the entire evidentiary hearing; b. all Police Board members are provided copies of the complete record, including demonstrative exhibits; c. hearing officers will prepare a written report that sets forth evidence presented at the hearing: (i) in support of the charges filed; (ii) in defense or mitigation; and (iii) in rebuttal, including evidence and aggravation, if any; the hearing officer's report will also include information relating to witness credibility; d. the Police Board may, at its discretion, ask a hearing officer to additionally prepare a written report and recommendation that sets forth findings of fact and conclusions of law, including any findings relating to witness credibility; e. the parties before the Police Board will have 14 days to review the hearing officer's report, and recommendation, and file any written objections; and f. all Police Board members will review de novo the hearing officer's report and any recommendation, and the parties' written objections to the same.*

### Compliance Progress        (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

The fourth reporting period marked the first period in which we assessed compliance with ¶535. The City achieved all levels of compliance with this paragraph.

To assess Preliminary compliance we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess Full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

In May 2021, we received the Police Board's *Rules of Procedures*, dated February 18, 2021. Sections III.G and III.H address ¶535's subsections (a) and (c)–(f). And, addressing the requirement of ¶353(b), the Police Board provided written transcript, which included exhibits, showing that Police Board members receive complete records for review before a Police Board vote. These documents demonstrate

not only that polices are in place but that the Police Board is following their poli-
cies. Therefore, the City reached Full compliance.

# Accountability and Transparency: ¶536

**536.** *As part of the Police Board proceedings, the parties to the Police Board case (the Superintendent and the involved CPD member) will be given access to the CPD member's complete disciplinary file and will have the opportunity to move for entry into the record of proceedings any relevant aspect of the CPD member's disciplinary file, as permitted by law and any applicable collective bargaining agreements.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

We assessed the City's compliance with ¶536 for the first time in the fourth reporting period. We found that the City has achieved all levels of compliance.

To assess Preliminary compliance we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

We received a copy of the Police Board *Rules of Procedure* on May 6, 2021. Various sections of the Rules of Procedures address the requirements of ¶536. Specifically, Section III.D, Section J.10 and Appendix A (*Respondents Complete Disciplinary File*) work together to ensure that parties in a Police Board case are provided access to CPD member's disciplinary files and are able to move to enter into the proceeding records any relevant aspects of a CPD member's disciplinary file. With this, the Police Board reached Full compliance with ¶536.

# Accountability and Transparency: ¶537

***537.*** *All regular meetings convened by the Police Board that are open to the public will be attended by the CPD Superintendent or his or her designee; the Chief Administrator of COPA or his or her designee; the Deputy PSIG or his or her designee; and the Chief of BIA or his or her designee.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

In the fourth reporting period, the City achieved Full compliance with ¶537. The fourth reporting period is the first period during which the IMT assessed the City's compliance with ¶537.

During the fourth reporting period, the IMT attended virtually or by phone, the Police Board meetings. In each meeting, the Police Superintendent or designee, the COPA Chief Administrator or designee, the Deputy PSIG or designee and the BIA Chief of designee have attended the Police Board meetings. In very few meetings were the respective heads not in attendance. During this fourth reporting period, every meeting was in a virtual setting. Based on attendance at Policy Board Meetings, each entity is in Full compliance with the requirements of ¶537.

The IMT acknowledges the PSIG for its additional efforts at ensuring compliance. The Office of Inspector General Public Safety Section Policies Manual, dated April 19, 2021, includes a policy that ensures attendance of the PSIG at the Police Board meetings. The PSIG is the only entity that currently has a policy directing the attendance of the PSIG at the Police Board meetings. We recommend that CPD and COPA also put into policy the attendance of their designees at the Police Board meetings.

# Accountability and Transparency: ¶538

***538.*** *Within 90 days of the Effective Date, the City will create a policy for collecting, documenting, classifying, tracking, and responding to community input received during the Police Board's regular community meetings. The policy will outline the methods for: (a) directing community input to the appropriate responding entity, agency, or office; and (b) documenting and making public, all responses to community input.*

## Compliance Progress    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

The City reached Preliminary compliance with ¶538 in the first reporting period. The City reached Secondary and Full compliance with the requirements of ¶538 during the fourth reporting period.

To assess Preliminary compliance we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training.

In previous reporting periods, the Police Board adopted a *Policy Regarding the Attendance of and Participation by the Public at Board Meetings* (Participation Policy) and Response Policy. Working together, these two policies provide an excellent framework to address the requirements of ¶538. The Participation Policy governs the requirements for speakers who require some immediate action on the part of CPD, COPA, or the Police Board and the Response Policy directs the expectations of response or action from the CPD, COPA, or the Police Board.

We virtually attended several of the Police Board meetings during the third and fourth reporting periods. The CPD, COPA, and Police Board representatives present at the meetings regularly assume responsibility for a concerns or issues raised. And the actions or responses resulting from these meetings are normally posted in accordance with the Response Policy. Additionally, we reviewed some of the Police Board's meeting minutes and documentation noting its response to community input received at various meetings. All of this information is posed on the Police Board's website as required by the Response Policy.

With the above efforts, the Police Board met the requirements of ¶538—satisfying Secondary and Full compliance. They not only developed clear and concise polices that provide clear direction as to who community input should be documented and addressed, but they have demonstrated that the policies are being acted upon in a proper and effective manner.

# Accountability and Transparency: ¶539

**539.** *The Police Board will make best efforts to streamline discovery efforts in all pending proceedings.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

This is the first reporting period the IMT assessed this paragraph. In the fourth reporting period, the City achieved Preliminary, Secondary, and Full compliance with this paragraph.

To assess Preliminary compliance we reviewed the City's relevant policies and records following the process described in the Consent Decree (¶¶626-41), which outlines applicable consultation, resolution, workout, and public comment periods. To evaluate Secondary compliance, we reviewed, among other things, the City's training development, implementation, and evaluation. To assess full compliance, the IMT determined whether the City and Police Board had sufficiently implemented their policies and training using "best efforts" as defined by ¶729.

The Police Board produced to the IMT the *Police Board Rules of Procedure*, dated February 18, 2021, on May 6, 2021. Section II.A of the Police Board Rules of Procedures completely addresses this paragraph and includes additional information to further explain the process. The Police Board meets Full compliance for this paragraph.

## Accountability and Transparency: ¶540

*540. Within 180 days of the Effective Date, Police Board members and hearing officers will receive initial and annual training that is adequate in quality, quantity, scope, and type and will cover, at minimum, the following topics: a. constitutional and other relevant law on police-community encounters, including law on the use of force and stops, searches, and arrests; b. police tactics; c. investigations of police conduct; d. impartial policing; e. policing individuals in crisis; f. CPD policies, procedures, and disciplinary rules; g. procedural justice; and h. community outreach.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Deadline:** | October 30, 2021*  ☑ **Not Yet Applicable** |
| | *Extended from August 28, 2021, due to COVID-19 |
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City and the Police Board remain under assessment for Preliminary compliance with ¶540.

To evaluate Preliminary compliance with ¶540, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[272] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

While the City did not provide the IMT with sufficient evidence of Preliminary compliance during previous reporting periods, the IMT noted that discussions with the Police Board demonstrated that the Police Board was actively working toward compliance with ¶540.

In the fourth reporting period, the Police Board continued to work with a local law firm that has agreed to provide training development at no cost to the Police Board. As stated in previous reports, the IMT supports the Police Board and its decision to seek assistance in developing appropriate and relevant training for the Police Board and the Police Board Hearing Officers since it has no staff to develop or deliver training. As stated in our last report, only two blocks of instruction—Training in Police Boards in other Major U.S. Cities and Training on the CPD Consent

---

[272] *See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

Decree—have been developed and have been delivered virtually to the Police Board members. We reviewed both blocks of instruction and found them to be complete and thorough. While neither of these blocks of instruction apply directly to ¶540, the consultant and the Police Board felt it was necessary to provide this information initially to determine if the training blocks of instruction are effective and to provide a baseline of information to develop the lesson plans for the requirements of ¶540.

Late in the fourth reporting period, the Police Board produced a "training agenda" that details what the Police Board hopes to accomplish during the next reporting period as it relates to training. We did not have sufficient time before the close of the period to provide a detailed review of this document. It does, however, appear that the Police Board has the framework of a training plan for Police Board members and Hearing Officers. The IMT looks forward to discussing this training agenda with the Police Board in the next reporting period.

While, the Police Board did not meet Preliminary compliance for this reporting period, the IMT has high expectations that quality blocks of instruction will be developed and delivered during the fifth reporting period and recognizes that the Police Board is relying on pro bono outside assistance to develop lesson plans. The Police Board should also be recognized for its innovative way to develop and deliver training at no cost to the City or the Police Board. The IMT expects some level of training will be developed and delivered to the Police Board during the next reporting period.

# Accountability and Transparency: ¶541

***541.** The trainings [referenced in ¶540] will be provided by sources both inside and outside of CPD, as needed, to provide high quality training on investigative techniques, and CPD policies, procedures, and disciplinary rules.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Under Assessment* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed compliance with ¶541 for the first time in the fourth reporting period. The City did not reach Preliminary compliance with ¶541 in the fourth reporting period and remains under assessment.

To evaluate Preliminary compliance with ¶541, the IMT reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[273] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

In the third reporting period, the IMT noted the partnership with a law firm to develop and provide training required by this paragraph to the Police Board. Police Board members participated in two training sessions in third reporting period: Training on Police Boards in Other Major U.S. Cities and Training on the CPD Consent Decree.

In the fourth reporting period, the Police Board continued to work with a local law firm that has agreed to provide training development at no cost to the Police Board. As stated in our last report, only two blocks of instruction—Training in Police Boards in other Major U.S. Cities and Training on the CPD Consent Decree—have been developed and delivered virtually to the Police Board members. We reviewed both blocks of instruction and found them to be complete and thorough. While neither of these blocks of instruction apply directly to ¶541, the consultant and the Police Board felt it was necessary to provide this information initially to determine if the training blocks of instruction are effective and to provide a baseline of information to develop the lesson plans for the requirements of ¶541.

Days before the end of the fourth reporting period, the Police Board produced a "training agenda" that details what the Police Board hopes to accomplish during the fourth reporting period. We have not had the opportunity to provide a detailed

---

[273] *See also Stipulation Regarding the Policy and Training Review Process for COPA, Illinois v. Chicago*, Case No. 1:17-cv-06260 (January 30, 2020).

review of this document before the end of fourth reporting period, however it appears that the Police Board has the framework of a training plan for Police Board members and Hearing Officers. We look forward to discussing this training agenda with the Police Board in the fifth reporting period.

While, the Police Board is still under assessment for this reporting period, the IMT has high expectations that quality blocks of instruction will be developed and delivered during the next reporting period and recognizes that the Police Board is relying on pro bono outside assistance to develop lesson plans. The Police Board should also be recognized for its innovative way to develop and deliver training at no cost to the City or the Police Board. The consultant should be recognized for its willingness to become a partner to the City and the Police Board; it is hoped that other companies will consider this community contribution. The IMT expects some level of training will be developed and delivered to the Police Board during the fourth reporting period.

## Accountability and Transparency: ¶542

*542. Within 90 days of the Effective Date, the City will create a training policy for Police Board members and hearing officers.*

Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *Under Assessment*
**Secondary:**       *Not Yet Assessed*
**Full:**                 *Not Yet Assessed*

The City has not met any level of compliance with ¶542 in previous reporting period. And the City's compliance with ¶542 remained under assessment at the end of the fourth reporting period.

To evaluate Preliminary compliance with ¶542, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[274] which details applicable consultation, resolution, workout, and public comment periods.

In the third reporting period, the Police Board provided the IMT with a letter from its Executive Director explaining that the Police Board was actively working toward developing the training materials as required by ¶542.

In the fourth reporting period, the Police Board continued to work with a local law firm that agreed to provide training development at no cost to the Police Board. As stated in previous reports, the IMT supports the Police Board and its decision to seek assistance in developing appropriate and relevant training for the Police Board and the Police Board Hearing Officers since it has no staff to develop or deliver training. As we noted in the third reporting period, only two blocks of instruction—Training in Police Boards in other Major U.S. Cities and Training on the CPD Consent Decree—have been developed and delivered virtually to the Police Board members. We reviewed both blocks of instruction and found them to be complete and thorough. While neither of these blocks of instruction apply directly to ¶542, the consultant and the Police Board felt it was necessary to provide this information initially to determine if the training blocks of instruction are effective and to provide a baseline of information to develop the lesson plans for the requirements of ¶542.

---

[274] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

At the end of the fourth reporting period, the Police Board produced a "training agenda" that details what training the Police Board hopes to accomplish in the fifth reporting period. The IMT was not able to complete a detailed review of this document before the close of the fourth reporting period. However, it appears to provide a framework plan for training Police Board members. The IMT looks forward to discussing this training agenda with the Police Board in the fifth reporting period.

Moving forward, we have high expectations that the Police Board will develop and deliver quality blocks of instruction during the fourth reporting period. The Police Board should also be recognized for its innovative way to develop and deliver training at no cost to the City or the Police Board. The consultant should be recognized for its willingness to become a partner to the City and the Police Board; it is hoped that other companies will consider this community contribution.

# Accountability and Transparency: ¶545

**545.** *To the extent permissible by law, within 60 days of its implementation, each CPD policy and directive, including those created pursuant to this Agreement, will be posted online and otherwise made publicly available. Any exception will be limited to documents that must remain confidential to protect public safety, and as approved by the Superintendent.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

We assessed the City's compliance with ¶545 for the first time in the fourth reporting period, and the City did not reach Preliminary compliance.

To evaluate Preliminary compliance with ¶545, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41), which details applicable consultation, resolution, workout, and public comment periods.

In May 2021, the City indicated that G01-03, *Department Directives* System, supports compliance with ¶545. The City and the CPD had previously provided G01-03 for review for compliance with other Consent Decree requirements. As a result, the City and the CPD received no-objection notices from the IMT and the OAG for G01-03 under separate paragraphs. At the end of the fourth reporting period, the review process for G01-03 was ongoing for ¶545.

We note that the CPD does not consistently solicit, receive, or incorporate public comment into its various types of policies across units. While G01-03 does direct the CPD to make some policies publicly available, G01-03 does not currently require the CPD to make each CPD policy and directive—including those created pursuant to the Consent Decree—publicly available. Further, policies that are not made available for public comment are not identified as needing to be confidential to protect public safety.

Still, in the fourth reporting period, the City, the CPD, the OAG, and the IMT began to make progress regarding how the CPD should consistently solicit, receive, and incorporate public feedback into various CPD policies. We hope to be able to reporting on additional progress in future reports, as well as reviewing new or revised policies, training materials, and practices that reflect that progress.

# Accountability and Transparency: ¶546

*546. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing CPD activity during the previous calendar year ("CPD Annual Report"). The purpose of the CPD Annual Report will be to inform the public of the City's law enforcement achievements and challenges, as well as new programs and steps taken to address challenges and build on successes. The CPD Annual Report will further provide information regarding the City's implementation and status of this Agreement. The CPD Annual Report will not include any specific information or data by law that may not be disclosed. Subject to applicable law, the CPD Annual Report will provide data and program updates analyzing: a. community engagement and problem-solving policing efforts, identifying successes, challenges, and recommendations for future improvement; b. stop, search, and arrest data and any analysis of that data that was undertaken; c. use-of-force data and associated analyses; d. CPD responses to requests for service from individuals in crisis; e. initiatives that CPD has implemented for officer assistance and support; f. recruitment efforts, challenges, and successes; and g. in-service and supplemental recruit training.*

## Compliance Progress                    (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          August 30, 2021*          ☑ **Not Yet Applicable**
                       *Extended from June 28, 2021, due to COVID-19
**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

The City and the CPD did not meet Preliminary compliance with ¶546 in previous reporting period. The City has until August 30, 2021, to produce the corresponding annual report. In the third reporting period, we reviewed the 2019 CPD Annual Report, and we determined that the City and the CPD did not meet Preliminary compliance with ¶546 and missed the October 30, 2020 deadline for this paragraph.

The 2019 Annual Report included information about CPD's organizational command, but did not include information about some of the units that may be most interesting to the community, including the Force Review Unit, BIA, Training, and Crisis Intervention Team (CIT). The Annual Report extensively reported various

crime statistics across 35 pages, but only dedicated one page to the work that the CPD does in and with the community as required by this paragraph.[275]

The IMT looks forward to working closely with the City to assess the CPD's *2020 Annual Report* in the next reporting period.

---

[275] *See Special Report: the City's and the CPD's Responses to Protests and Unrest under the Consent Decree*, INDEPENDENT MONITORING TEAM (July 20, 2021) (IMT recommendation to "Continue New Forms of Community Engagement by, among other things, (1) clearly communicating time, place and manner restrictions; (2) conducting community-sentiment assessments; (3) engaging with community review of and comment on policies and training; (4) creating and maintaining community and business safety plans; (5) improving victim services"), https://cpd-monitoringteam.com/wp-content/uploads/2021/07/2021_07_20-Independent-Monitoring-Team-Special-Report-filed.pdf.

# Accountability and Transparency: ¶547

**547.** *CPD will regularly analyze the information it collects regarding reportable uses of force to identify significant trends. CPD will include information about any such trends in the CPD Annual Report.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | August 30, 2021* | ☑ **Not Yet Applicable** |
| | *Extended from June 28, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

The CPD has not reached Preliminary compliance with ¶547 in previous reporting periods. And, as mentioned in ¶546, the City has until August 30, 2021, to produce the corresponding annual report. In the third reporting period, the CPD provided the IMT with its 2019 Annual Report to demonstrate compliance with ¶547. However, the Annual report did not contain information regarding trends in reportable uses of force as required by ¶547.

The IMT looks forward to working closely with the City to assess the CPD's *2020 Annual Report* in the fifth reporting period.

## Accountability and Transparency: ¶548

*548. Within 180 days following the expiration of each calendar year of the term of this Agreement, the City will produce and publish an annual report describing certain legal activity involving CPD during the previous calendar year ("CPD Annual Litigation Report"). The CPD Annual Litigation Report will not include any specific information or data that may not be disclosed pursuant to applicable law. Subject to applicable law, the CPD Annual Litigation Report will address: a. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and information that either (i) the lawsuit was concluded by final order and all opportunities for appellate review were exhausted, or (ii) any judgment was satisfied during the prior calendar year. This list will include civil lawsuits handled by the City's Department of Law's ("DOL's") Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. b. for each case identified in (a) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. the date the trial court entered the final order; iv. a list of the parties at the time the final order was entered; v. the nature of the order (e.g., dismissal with prejudice, summary judgment for plaintiff(s)/defendant(s), judgment of not liable, judgment of liable); vi. the amount of the compensatory and punitive damages awarded (if applicable); and vii. the amount of attorney's fees and costs awarded (if applicable). c. a list of civil lawsuits in which the plaintiff(s) seek(s) to hold the City responsible for the conduct of one or more current or former CPD members and a settlement was reached (including approval by City Council, if applicable) during the prior calendar year. This list will include civil lawsuits handled by DOL's Federal Civil Rights Division, as well as such lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle pursuit, only. d. for each case identified in (c) above, the following information will be provided in spreadsheet or open-data format: i. case name; ii. case number; iii. a list of the parties at the time the case was settled; iv. the amount of the settlement; and v. the amount of settlement allocated to attorney's fees and costs (if known). e. the amount of attorney's fees paid by the City during the prior calendar year to outside counsel engaged to defend the City and/or one or more current or former CPD members in civil lawsuits handled by DOL's Federal Civil Rights Division, as well as*

*such lawsuits handled by DOL's Tort's Division if the complaint seeks relief associated with a vehicle pursuit, only. This amount will be presented in the aggregate. f. for all individually named defendants in the cases identified in (a) and (c) above, the status (e.g., pending with BIA/COPA/OIG or charges sustained, not sustained, unfounded, or exonerated by BIA/COPA/OIG) of any administrative investigation(s) by BIA, COPA, or OIG at the time the trial court entered its final order or the settlement was reached. g. the disposition of any felony criminal prosecutions of current or former CPD members from the previous year. h. the number of pending civil lawsuits that seek to hold the City responsible for one or more current or former CPD members that the City is defending. This number will include civil lawsuits handled by the Department of Law's Federal Civil Rights Division, as well as lawsuits handled by DOL's Torts Division if the complaint seeks relief associated with a vehicle only.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Deadline:** | August 30, 2021*  ☑ **Not Yet Applicable** |
| | *Extended from June 28, 2021, due to COVID-19 |
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the third reporting period, the City and the CPD met Preliminary compliance with ¶548. As mentioned in ¶546, the IMT is not making a determination of this paragraph in the fourth reporting period since the annual report is not due until 180 days after the end of the calendar year.

In the third reporting period, the City and the CPD met Preliminary compliance with ¶548 and met the September 15, 2020 deadline for this paragraph. The IMT reviewed the City's 2019 Annual Litigation Report, which is thorough and comprehensive, providing significant detail to the reader. The City published its Report on September 15, 2020, consistent with the Consent Decree deadline.

The IMT expects that this report will be published on an annual basis as required, which will help the City and the CPD to reach additional levels of compliance.

# Accountability and Transparency: ¶549

**549.** *As part of the CPD Annual Litigation Report, the City will analyze the data and trends collected, and include a risk analysis and resulting recommendations.*

## Compliance Progress (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** August 30, 2021*  ☑ **Not Yet Applicable**
*Extended from June 28, 2021, due to COVID-19
**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

The City reached Preliminary compliance with ¶549 in the third reporting period. As with ¶546, we are not making a compliance determination for this paragraph in the fourth reporting period since the annual report is not due until 180 days after the end of the calendar year.

In the third reporting period, we determined that the City and the CPD met Preliminary compliance with ¶549 and met the September 15, 2020 deadline for this paragraph, after reviewing the City's 2019 Annual Litigation Report. The report was thorough and comprehensive, providing significant detail to the reader. The City published its Report on September 15, 2020, and therefore, met the Consent Decree deadline.

The IMT expects that this report will be published on an annual basis, which will help the City and the CPD to reach additional levels of compliance.

## Accountability and Transparency: ¶550

*550. By April 2020, CPD and COPA will electronically publish quarterly and annual reports that will include, at a minimum, the following: a. aggregate data on the classification of allegations, self-reported complainant demographic information, and complaints received from anonymous or third party complainants; b. aggregate data on complaints received from the public, specified by district or unit of assignment and subcategorized by classification of allegations; c. aggregate data on the processing of investigations, including: i. The average time from the receipt of the complaint by COPA, BIA, or the district to the next or initial contact with the complainant or his or her representative; ii. the average time from the investigative findings and recommendations to the final disciplinary decision; iii. the average time from the investigative findings and recommendations to a final disposition; and iv. the number of investigations closed based on the absence of a complainant affidavit, including the number of attempts (if any) to obtain an override affidavit in the absence of a signed complainant affidavit; d. aggregate data on the outcomes of administrative investigations, including the number of sustained, not sustained, exonerated, and unfounded allegations; the number of sustained allegations resulting in a non-disciplinary outcome; and the number resulting in disciplinary charges; e. aggregate data on discipline, including the number of investigations resulting in written reprimand, suspension, demotion, and termination; f. aggregate data on grievance proceedings arising from misconduct investigations, including: the number of cases grieved; the number of cases that proceeded before the Police Board; the number of cases that proceeded to arbitration; and the number of cases that were settled prior to a full evidentiary hearing, whether before the Police Board or in arbitration; g. aggregate data on outcomes of misconduct investigations by classification of allegations, broken down by self-reported race, gender, and age of the complainant and the CPD member; h. aggregate data on (i) the number of CPD members who have been the subject of more than two completed misconduct investigations in the previous 12 months, and (ii) the number of CPD members who have had more than one sustained allegation of misconduct in the previous 12 months, including the number of sustained allegations; i. aggregate data on CPD members who have been the subject, in the previous 12 months, of more than two complaints in the following classifications of alle-*

*gations, regardless of the outcome of those complaint investigations: i. allegations of discriminatory policing based on an individual's membership or perceived membership in an identifiable group, based upon, but not limited to: race, physical or mental disability, gender, gender identity, sexual orientation, religion, and age; ii. allegations of excessive force; and iii. allegations of unlawful stops, searches and arrests; j. the disposition of misdemeanor criminal prosecutions of current CPD members.*

## Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | | | | |
|---|---|---|---|---|---|
| **Deadline:** | Quarterly | ✓ | **Met** | ☐ | **Missed** |
| **Deadline:** | Annually | ✓ | **Met** | ☐ | **Missed** |

| | | |
|---|---|---|
| **Preliminary:** | | *Not in Compliance*[276] |
| | CPD | *In Compliance* (NEW) |
| | COPA | *Not in Compliance* |
| **Secondary:** | | *Not Yet Assessed* |
| **Full:** | | *Not Yet Assessed* |

We assessed the City's compliance with ¶550 for the first time in the third reporting period, and found that the City did not reach Preliminary compliance. While the CPD met Preliminary compliance with ¶550, COPA did not provide sufficient evidence until after the end of the reporting period.

In the last reporting period, we reviewed the BIA *Quarterly Report* for the Second Quarter of 2020. That report provided a good overview of the relevant time period, addressed many of the requirements of ¶550, and provided necessary details about complaints and investigations. However, three relevant topics were not included in the Quarterly Report due to technology reporting issues.

In the fourth reporting period, the CPD's BIA produced its first quarterly report—covering Quarter two of 2020—to the IMT in December 2020. This inaugural quarterly report is a very good first BIA Quarterly Report. The report addresses many of the requirements of ¶550 and ¶551. And BIA identified those sub-paragraphs which require additional work. It is evident that BIA has invested much time and effort in getting the quarterly report "right" on the first attempt. Notably, in the

---

[276] As referenced above, the Consent Decree requires actions by various City entities, including the CPD, COPA, the Police Board, and OIG. Ultimately, the City is responsible for ensuring compliance. As a result, if a Consent Decree paragraph requires actions by multiple City entities, we will not find that the City has met Preliminary, Secondary, or Full compliance until all those entities have met the corresponding level of compliance. Nonetheless, for some paragraphs, we will clarify compliance assessments for each entity to demonstrate which benchmarks have been met.

third reporting period, BIA was rendered unable to produce a quarterly report until the CPD provided a fulltime analyst to BIA.

Also, in June 2021, BIA also produced it second quarterly report, the BIA *Third Quarter 2020 Quarterly Report*. This report demonstrates BIA's continuing efforts to improve its quarterly reports. IMT reviewed and compared the Second Quarter Report to the Third Quarter Report and noted several improvements and enhancements.

These quarterly reports are easy to read and understandable. With them, BIA appears to be committed to transparency and building trust, internally and externally, in its operations. And, with the *Third Quarter Report*, BIA addressed all subparagraphs of ¶550, except ¶550(c)(i). We note that BIA continues to develop this missing data set and it will be included in future quarterly reports.

Because BIA's second and third quarterly reports demonstrate commitment to providing all called-for data and an overall eye toward transparency—and with the understanding that BIA will develop and include the information delineated in ¶550(c)(i) in the next quarterly report—we find that BIA reached Preliminary compliance with ¶550. Additionally we expect that BIA will develop a Unit Directive that directs the work of BIA quarterly reports relevant to for the fifth reporting period.

In addition to reviewing BIA quarterly reports, we also reviewed draft Unit Directive, *Case Management System*. The draft directive partially addresses ¶550 by explaining that data for the quarterly and annual reports will be fed by the Case Management System (CMS). This is an important step in explaining where the data come from. We recommend that this process be included in a public facing document.

Turning to COPA's efforts, we note that COPA continues to develop, refine, and publish its quarterly and annual reports with 2021 first and second quarter reports published prominently on the COPA website. We note that COPA's reports fail to address all of the requirements set forth in 550 (a), (c)–(g), and (i)–(j). While COPA's *2021 Quarter 2* report aims to address those gaps, it was not completed until after this reporting period ended. COPA's 2020 Annual Report is also prominently published on its Website. COPA has annual reports and quarterly reports beginning in 2017 on its website suggesting that annual reports are expected and consistently posted by COPA. We recommend, however, that COPA develop a policy directing continued publishing of these reports.

The IMT looks forward to reviewing additional reports from the CPD and COPA in future reporting periods and to working with the CPD to receive those reports closer in time to the end of each quarter.

## Accountability and Transparency: ¶551

**551.** *BIA's quarterly and annual reports will include data reflecting investigations conducted by the districts.*

**Compliance Progress**  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | | |
|---|---|---|---|
| **Deadline:** | Quarterly | ☑ **Met** | ☐ **Missed** |
| **Deadline:** | Annually | ☑ **Met** | ☐ **Missed** |

**Preliminary:** *Not in Compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

We assessed the City's compliance with ¶551 for the first time during the third reporting period. We found that the City did not reach Preliminary compliance by the end of the third reporting period. Similarly, the City did not reach Preliminary compliance with the paragraph in ¶551 in the fourth reporting period but did meet reporting deadlines related to this paragraph for this reporting period.

To evaluate Preliminary compliance with ¶551, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[277] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

BIA did not meet Preliminary compliance with ¶551 nor meet the quarterly or annual requirements of this paragraph by the end of the third reporting period. We made this determination after reviewing the BIA's *Quarterly Report for the Second Quarter of 2020*. That report provided a good overview of the relevant time period and discussed some of the requirements of ¶551 in narrative form, but data reflecting investigations conducted by the districts was not included in the report. This is due to the fact that the CMS had no queries built to collect and report this data. Therefore, BIA had no way to track this information.

In the fourth reporting period, BIA attempted to address the requirements of this paragraph with the BIA's Second and Third Quarter Reports. Paragraph 551 requires specific data about investigations conducted by the Accountability Ser-

---

[277] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

geants in each district/unit. In a phone conference with BIA in July 2021, BIA indicated that they have addressed the issue of developing and providing the information required by ¶551 in its quarterly and annual reports. BIA indicated during the conversation that they expect the Fourth Quarter 2020 to include this information and subsequent quarterly and annual reports will continue to contain the information required by this paragraph. The IMT looks forward to reviewing the fourth quarter 2020 report in the next reporting period.

In addition, to reviewing reports, we also reviewed the draft BIA Unit Directive, *Case Management System*. This draft policy addresses the requirements of ¶551. We look forward to continuing to collaborate with BIA as it revises, posts for public comment, and finalizes the policy.

Because the policy remains in the collaborative review and revision process, and issues remain with BIA quarterly reports, the City has not yet reach Preliminary compliance with this paragraph but did meet the deadline requirements of this paragraph in this reporting period.

# Accountability and Transparency: ¶552

> *552. For non-disciplinary purposes, including historical trend analysis, CPD will track, for each CPD member, for every misconduct investigation: the nature of allegations, the outcome of the investigation, and the disposition of discipline.*

## Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The IMT assessed the City's compliance with ¶552 for the first time in the fourth reporting period. The City did not reach any level of compliance with this paragraph.

To evaluate Preliminary compliance with ¶552, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[278] which details applicable consultation, resolution, workout, and public comment periods. Paragraph 626, for example, requires policies to be "plainly written, logically organized, and use clearly defined terms."

In this reporting period, the IMT reviewed a draft of BIA's Unit Directive, *Case Management System*, which was produced to us on June 24, 2021. Section IV.B of the draft unit directive partially addresses this paragraph, however, additional edits will need to occur before this draft directive will demonstrate compliance with ¶552 requirements. Notably, we believe the Case Management System (CMS) provides the CPD with a path to comply with ¶552 requirements. However, the CPD will need a policy or directive relevant to the paragraph's requirements. This policy should also explain how data is made available to department members, describe whether the data is available to the public, and direct how department members' identities or identifying information will be managed.

Furthermore, the IMT suggests that the CPD assign some level of responsibility to command staff members to review the information produced pursuant to ¶552 and work with appropriate units to rectify inappropriate behaviors and tactics and to encourage good tactics and behavior.

---

[278] The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

Because the CPD has not yet finalized a policy that addresses the requirements of ¶552, they have not reached Preliminary compliance.

## Accountability and Transparency: ¶553

*553. Beginning in 2020, CPD will audit, on at least an annual basis, the investigation and disciplinary process involving complaints investigated by BIA and the districts to ensure that the investigations are conducted in accordance with BIA policies and this Agreement. The audits will include completed investigations and the recommendations of discipline. CPD will make public any of the audit findings, ensuring that any personally identifiable information is redacted.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

The City reached Preliminary compliance with ¶553 in the third reporting period. The City maintained Preliminary compliance but did not reach additional levels of compliance in the fourth reporting period.

In the third reporting period, the CPD met Preliminary compliance with ¶553, because the CPD's Audit Division completed its annual report, CD-553-2020, *Review of Data on Investigations Into Allegations Made Against Department Members* (2019). As a result, the City and the CPD also met the corresponding deadline.

In this reporting period, the IMT reviewed a draft of BIA's Unit Directive, *Case Management System*. Section IV.D.2 of this draft directive addresses the requirements of ¶553. While it is good that BIA addresses in their Unit Directive, ¶553 should also be addressed in a department-wide directive.

This reporting period, we also reviewed the *Complaint and Disciplinary Procedures* policy (G08-01). This draft policy requires the Audit Division to conduct BIA and District audits to ensure that the administrative investigations are conducted with existing directives which meets the requirements of this paragraph. We look forward to continuing to work with the City to revise these policies and develop training materials related to the requirements of this paragraph.

## Accountability and Transparency: ¶554

*554. OAG acknowledges that the City adopted a policy relating to the public release of video footage capturing weapons discharges and incidents involving death or serious bodily injury. Consistent with applicable law, the City will continue to ensure COPA publicly releases such video footage pursuant to the June 2016 Video Release Policy for the City of Chicago. The Video Release Policy will not supersede or otherwise limit the City's legal obligations pursuant to state and federal transparency laws, including the Illinois Freedom of Information Act, 5 ILCS 140/1 et seq.*

### Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

We assessed the City's compliance with ¶554 for the first time in fourth reporting period and found that the City reached compliance with the paragraph. As men-mentioned in the text of ¶554, prior to the implementation of the Consent Decree, City had adopted a policy relating to the public release of footage of weapons discharges and incidents involving death or serious bodily injury.

## Accountability and Transparency: ¶555

*555. On an annual basis, the Police Board will track and publish case-specific and aggregate data about Police Board decisions. Such publications will contain and include, at minimum, the following: a. the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint or notification for investigation; b. the date of the Police Board hearing over which the hearing officer presided; c. the disciplinary recommendations and/or decisions (where applicable) made by COPA, BIA, the Superintendent, and the Police Board; d. the average time between the filing of disciplinary charges with the Police Board and the first day of hearing; e. the average time between the filing of disciplinary charges with the Police Board and the Police Board's decision; f. the average time between the date on which the investigating agency (COPA, BIA, district, or OIG) received the complaint for investigation and the Police Board's decision; g. the date of the alleged misconduct; h. the average time between the date of the alleged misconduct giving rise to the complaint or notification and the Police Board's decision; and i. whether any Police Board decision has been appealed to any state court and, if so, the court's final judgment.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**       December 31, 2021      ☑ **Not Yet Applicable**

**Preliminary:**    *In Compliance (THIRD REPORTING PERIOD)*
**Secondary:**      *Not Yet Assessed*
**Full:**           *Not Yet Assessed*

The City reached Preliminary compliance with ¶555 in the third reporting period. The City maintained Preliminary compliance with this paragraph in the fourth reporting period.

To evaluate Preliminary compliance with ¶555, the IMT has reviewed the City's, the CPD's, and COPA's policies following the policy process described in the Consent Decree (¶¶626–41),[279] which details applicable consultation, resolution, workout, and public comment periods.

---

[279]  The OAG, the City, and the IMT have agreed to a stipulation that provides a different review process for review of COPA policies and training materials. *See* Stipulation Regarding the Policy and Training Review Process for COPA, *Illinois v. Chicago*, Case No. 1:17-cv-06260 (Jan. 30, 2020). The review process in the Stipulation mirrors the review process under ¶¶626–41, but

In previous reporting periods, we reviewed the Police Board's website and the 2017, 2018, and 2019 *Police Board Annual Reports*. We found the website and reports to be well organized and easy to understand. With these, we determined that the Police Board met Preliminary compliance with ¶555 in the third reporting period.

By the close of the fourth reporting period, the Police Board had not yet provided us its *2021 Annual Report*—although the Police Board still has time to do so. The 2020 Annual Report was produced in March of 2020. However, during the fourth reporting period, the Police Board provided an Excel Spreadsheet detailing Police Board Cases spanning from March 2010 to January 2021.

The comprehensive spreadsheet includes information regarding the Police Board Case number, the date filed with the Police Board, the respondent name, rank and star number, the CR/Log #, date of incident, primary charges, superintendent recommendation and all information regarding the police board hearing.

And the Police Board Quarterly Report, dated March 31, 2021, provides information consistent with the quarterly report reviewed in the third reporting period. We suggests that the Police Board include previous quarterly reports on its website to provide readers with historical context.

With these efforts, the Police Board maintained Preliminary compliance.

We look forward to receiving and reviewing the *2021 Police Board Annual Report*. We will look for evidence that the Police Board has allocated sufficient resources to develop and publish relevant data on an annual basis. We will also consider whether annual publications capture case-specific and aggregate data regarding Police Board decisions.

---

among other things, gives the OAG and the IMT a shorter timeframe for review of COPA policies and training materials.

# Accountability and Transparency: ¶556

**556.** *The Deputy PSIG will conduct periodic analysis and evaluations, and perform audits and reviews as authorized by Municipal Code of Chicago § 2-56-230.*

## Compliance Progress          (Reporting Period: January. 1, 2021, through June 30, 2021)

**Preliminary:**     *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**       *In Compliance* (NEW)
**Full:**            *In Compliance* (NEW)

The IMT has determined that the City and the Deputy PSIG have reached Secondary and Full compliance with the requirements of ¶556 during the fourth reporting period.

In the fourth reporting period, the IMT reviewed documentation to demonstrate PSIG's compliance with the requirements of ¶556, including the quarterly reports from both 2020 and 2021[280] and the *Public Safety Section 2020 Annual Report*[281], all of which were produced in a timely manner following their respective reporting periods. The quarterly reports, and specifically the *2020 Annual Report*, provide detailed information regarding the reviews and audits that the PSIG conducted during 2020 and 2021. The *2020 Annual Report* contains hyperlinks to data dashboards providing the reader access to the data underpinning the reports. The data dashboards are updated daily, allowing the public and the CPD to determine current trends on a variety of topics. We recommend that the CPD utilize these data dashboards daily to determine trends in officer behavior and activity. The *2020 Annual Report* also announced three new data dashboards that should be considered a valuable resource for CPD and the public.

The PSIG also provided the IMT with a copy of its *Public Safety Section Policies Manual*, dated August 19, 2021. This policy manual is comprehensive and is designed to address the analysis and evaluations and perform audits and reviews as authorized by the Municipal Code of Chicago as stated in ¶556. This manual includes a Revision Log which documents updates and changes to the manual. The PSIG continues to produce quality and substantive reports analyses and evaluations, each of which is available on the OIG/PSIG webpage, in accordance with

---

[280] *See Quarterly Reports*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO, https://igchicago.org/publications/quarterly-reports/.

[281] *See Public Safety Section Annual Report 2020*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO (June 18, 2021), https://igchicago.org/2021/06/18/public-safety-section-annual-report-2020/.

¶556.[282] In short, the City and the Deputy PSIG have demonstrated Full compliance with the requirements of ¶556.

---

[282] *See Current Projects*, OFFICE OF THE INSPECTOR GENERAL FOR THE CITY OF CHICAGO, https://igchicago.org/about-the-office/our-office/public-safety-section/current-projects/.

# Accountability and Transparency: ¶557

*557. The Deputy PSIG's audits and reviews will be conducted pursuant to the Association of Inspectors General Principles and Standards for Offices of Inspector General.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**      *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:**      *In Compliance* (NEW)
**Full:**      *In Compliance* (NEW)

In the fourth reporting period, the City and the Deputy PSIG reached Full compliance with the requirements of ¶557 during the fourth reporting period.

In the fourth reporting period, the IMT also reviewed a letter from the Association of Inspectors General (AIG), dated May 30, 2020, regarding a Peer Review Team review of the OIG. This letter concluded that the Investigations and APR sections comply with the major standards set by the AIG Principles and Standards for Offices of Inspector General Green Book and Yellow Book.[283]

The City also provided PSIG's staff training materials and class rosters, which included the following:

- Principles and Standards for Offices of Inspector General;

- Inspections Unit Training;

- NACOLE Legal Update;

- Law Enforcement Bill of Rights;

- Implementing Procedural Justice;

- Strategies for Analyzing Police Stops; and

- What Went Wrong? Deficiencies in the Investigation of an Officer Involved Shooting.

The IMT found the training materials to be thorough and complete and that the necessary employees attended the trainings.

---

[283] The AIG's Peer Review process is described on its website. *See Association of Inspectors General Peer Review*, ASSOCIATION OF INSPECTORS GENERAL, https://inspectorsgeneral.org/about/peerreview/.

In addition, during a May 2021 site visit, the IMT observed how the PSIG's Community Engagement Team connects with the community in a variety of social media platforms and developed databases to help them better understand their efficacy.

The City and the PSIG have demonstrated Full compliance with ¶557.

# Accountability and Transparency: ¶558

*558. Within 60 days of the Effective Date, the Deputy PSIG will develop policies for regularly, and at least annually, conducting data-driven reviews and audits to measure the effectiveness of the City and CPD's accountability practices. These reviews and audits will be designed to measure whether members of the community can readily make a complaint alleging misconduct and whether such complaints are investigated and adjudicated consistently with CPD policy, this Agreement, and the law. Reviews and audits will include: a. analysis of the number of complaints received, the disposition of complaints by complaint type, the timeliness and average length of administrative investigations, and disciplinary actions taken; b. analysis of complaint trends; c. analysis of CPD's enforcement of its Rule 14, Rule 21, and Rule 22; d. analysis of the thoroughness of administrative investigations, and of the justifications for terminating investigations before the investigative findings and recommendations; e. analysis of disciplinary grievance procedures and outcomes; and f. analysis of complainant-involved mediation.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☑ Met  ☐ Missed |
| | *Extended from December 31, 2020, due to COVID-19 | |
| **Deadline:** | December 31, 2021 | ☑ Not Yet Applicable |

| | |
|---|---|
| **Preliminary:** | *In Compliance* (FIRST REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

In the fourth reporting period, the City and the Deputy PSIG met Full compliance with ¶558.

The City of Chicago Office of Inspector General Public Safety Section *Policies Manual*, dated April 19, 2021, directs that the Deputy PSIG will, among many other responsibilities, conduct data-driven review and audits of the City's and the CPD's accountability practices. These reviews and audits include, but are not limited to; Service Call Response Times, Beat Integrity, Duty Restrictions for CPD Members, Compliance with Chicago's Welcoming Ordinance, Asset Forfeiture, Promotions, Inventory, Use and Impact of Military Grade Equipment and Homicide Clearance Rates.

The Deputy PSIG engages the public in a variety of ways and on a variety of issues but specifically, the PSIG seeks community input and feedback on each report or

audit it conducts in a variety of ways, including publishing the reports and audits on the PSIG website, social media pages, local and national media, and in geographic community and community of interest meetings.

Because PSIG has continued to track and provide data on the requirements enumerated in each subparagraph of ¶558 and its yearly project plan, the City and the Deputy PSIG have met Full compliance with ¶558.

## Accountability and Transparency: ¶559

> **559.** *The Deputy PSIG will conduct reviews of individual closed COPA and CPD administrative investigative files for thorough-ness, fairness, and objectivity, and will make recommendations based on those reviews, including the recommendation that an investigation be reopened upon a finding of a deficiency that ma-terially affects the outcome of the investigation.*

### Compliance Progress                (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Preliminary:**    *In Compliance* (NEW)
**Secondary:**    *In Compliance* (NEW)
**Full:**    *In Compliance* (NEW)

The City and the Deputy PSIG met Full compliance with the requirements of ¶559 during the fourth reporting period. This is the first period during which the IMT assessed the City's compliance with ¶559.

The revised City of Chicago Office of Inspector General Public Safety Section *Policies Manual* (*PSIG Policy Manual*), dated April 2021, provides for a complete re-view process for closed COPA and the CPD administrative investigative files on pages 39-44. The review process includes reviews for completeness, objectivity, and fairness, including a detailed process for recommendations that investigations be reopened by COPA or the CPD, per ¶559.

Further, the *PSIG Policy Manual* directs regular Case Intake Meetings to include the specific PSIG members responsible for reviewing the closed case and supervi-sory PSIG personnel, who discuss the cases and collectively determine whether a recommendation to reopen a case should be recommended to the CPD or COPA. On Friday, May 14, 2021, members of the IMT observed a PSIG Virtual Case Intake Meeting. Every member who is directed by the Policy Manual was in attendance; and the appropriate staff provided detailed presentations with robust discussion involving each case. Further, this particular Case Intake Meeting was not a "first time" meeting to address the requirements of the Consent Decree. Instead, it was a standing meeting that has been ongoing for some time, with the participants from the Policy Manual designated group free to engage in the discussion or ask questions of the Inspections Unit Staff.

The City also provided examples of administrative investigative files for the IMT's review, which reflect that PSIG reviewed the administrative investigative files for thoroughness, fairness, and objectivity and made proper recommendations when necessary.

The PSIG Policy Manual provides direction, the Case Intake Meeting demonstrates that the policy is being followed, and the provided examples demonstrate that the policy and work sufficiently address ¶559. As a result, the City and PSIG demonstrated Full compliance with the requirements of ¶559.

## Accountability and Transparency: ¶561

> **561.** *The Deputy PSIG will hire a full-time staff member respon-sible for diversity and inclusion issues, who will have specific au-thority to review CPD actions for potential bias, including racial bias, on any matter within the Deputy PSIG's statutory authority. The Deputy PSIG will regularly publish reports on diversity and inclusion issues, no less frequently than on an annual basis, which will contain findings and analysis.*

### Compliance Progress      (Reporting Period: Jan. 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Deadline:** | March 5, 2021*    ☑ Met   ☐ Missed |
| | *Extended from December 31, 2020, due to COVID-19 |
| **Preliminary:** | *In Compliance* (SECOND REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *In Compliance* (NEW) |

During the fourth reporting period, the City and the Deputy PSIG have met Full compliance with the requirements of ¶561.

In 2020, the PSIG introduced a diversity, equity, and inclusion (DEI) framework across its many functions, reports, and audits. For example, the DEI officer pro-vides DEI-anchored feedback at the beginning stage of work in each OIG section; stays closely involved throughout the data collection and analysis process; reviews information for policy deficiencies and patterns, which raise diversity, equity, and inclusion-specific concerns; and provides feedback around project scope and data sources. The DEI officer also monitors departments interfacing with OIG over the course of projects, and their official responses to OIG findings, to identify any cul-ture and accountability trends or issues.

During the third reporting period, the PSIG experienced a transition in the position required by this paragraph, as the DEI director initially hired by the PSIG left OIG employment. In the fourth reporting period, the PSIG acted quickly to fill the po-sition, and on May 10, 2021, the IMT was introduced to the new, well-qualified PSIG director of Diversity, Equity, and Inclusion. During the conversation, the DEI Director shared that they not only serve in the role for PSIG but for the entire In-spector General's Office, providing input in the planning, actual audit/review pro-cess, and the final audit/review/report for all OIG products. Additionally, the DEI

Director is responsible for audits/reviews and reports that focus directly on the issues of diversity, equity, and inclusion.[284]

During the fourth reporting period, the IMT reviewed, for example, the *Evaluation of the Demographic Impacts of the Chicago Police Department's Hiring Process* draft report, dated April 2021. This comprehensive report contains findings and recommendations regarding the demographic impacts during the stages of the CPD hiring process, including a specific focus on bias in the hiring process.

The City and the Deputy PSIG have demonstrated Full compliance with the requirements of ¶561.

---

[284] *See Reviews and Reports*, Office of the Inspector General for the City of Chicago, https://igchicago.org/category/publications-and-press/public-reports/. *See also Current Projects*, Office of the Inspector General for the City of Chicago, https://igchicago.org/about-the-office/our-office/public-safety-section/current-projects/.

## Accountability and Transparency: ¶562

**562.** *The Deputy PSIG will provide all staff members with comprehensive initial onboarding training and annual in-service training. The Deputy PSIG will create initial and in-service training plans and submit these plans to the Monitor and OAG for review and comment.*

### Compliance Progress  (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:** March 5, 2021*  ☑ Met  ☐ Missed
Extended from December 31, 2020, due to COVID-19

**Preliminary:** *In Compliance* (NEW)
**Secondary:** *In Compliance* (NEW)
**Full:** *In Compliance* (NEW)

In the fourth reporting period, the City and the Deputy PSIG met Full compliance with the requirements of ¶562.

The City and PSIG provided the initial onboarding and annual in-service training for all their staff members, along with class rosters. As discussed above, the IMT found the training to be thorough and comprehensive instruction for the PSIG staff members. As a result, the City and the Deputy PSIG demonstrated Full compliance with the requirements of ¶562.

# Accountability and Transparency: ¶563

**563.** *At least 60 days prior to publishing its annual audit plan, the Deputy PSIG will provide the Monitor with a draft of its audit plan for review and comment.*

## Compliance Progress          (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**          January 4, 2021*          ✓ Met          ☐ Missed
                       *Extended from November 2, 2020, due to COVID-19
**Preliminary:**       *In Compliance* (SECOND REPORTING PERIOD)
**Secondary:**         *In Compliance* (THIRD REPORTING PERIOD)
**Full:**              *In Compliance* (THIRD REPORTING PERIOD)

During the fourth reporting period, the City and the Deputy PSIG maintained Full compliance with the requirements of ¶563.

In the third reporting period, the Deputy PSIG met Secondary and Full compliance with ¶563. In the third reporting period, the Deputy PSIG provided the IMT with its draft OIG Public Safety Section *2021 Outlook on Police Oversight and Accountability* ("2021 Audit Plan") for review and comment 60 days before publishing the plan. By providing the IMT with its Audit Plan consistent with ¶563 for two years in a row, the Deputy PSIG has demonstrated that it regularly produces an annual audit plan that directs the PSIG's work for the following 12 months.

In the fourth reporting period, the PSIG provided the IMT with the OIG Public Safety Section *2021 Outlook on Police Oversight and Accountability* audit plan. As required by this paragraph, the PSIG produced a draft of this plan to the IMT for review and comment sixty days before its publication. This is the second iteration of the PSIG audit plan where the PSIG submitted the draft plan to the IMT sixty days prior to publishing the formal plan. The production of the annual audit plan is directed by the PSIG Section *Policies Manual*, dated April 19, 2021.

# Accountability and Transparency: ¶565

*565. At least quarterly, COPA, the Deputy PSIG, and the President of the Police Board, or his or her designee, will meet to confer and share information regarding trends and analyses of data relating to CPD. They will jointly or separately provide any resulting recommendations for changes in CPD policy or rules, in writing, to the Superintendent. Thereafter: a. the Superintendent will respond to any such recommendation within 60 days of receipt; b. the Superintendent's response will include a description of the actions that the Superintendent has taken or plans to take with respect to the issues raised in the recommendations; and c. all policy recommendations and responses to the same will be published on a City website.*

## Compliance Progress     (Reporting Period: Jan. 1, 2021, through June 30, 2021)

**Deadline:**     Quarterly     ☑ Met ☐ Missed

**Preliminary:**     *In Compliance* (FIRST REPORTING PERIOD)
**Secondary:**     *In Compliance* (SECOND REPORTING PERIOD)
**Full:**     *In Compliance* (NEW)

The City and its entities achieved Full compliance with the requirements of ¶565 during the fourth reporting period.

In previous reporting periods, the IMT reviewed minutes of quarterly meetings between the Police Board President, COPA, and the Deputy PSIG to determine that the City had met Preliminary and Secondary compliance with ¶565.

On a quarterly basis, during the third and fourth reporting periods, the COPA Chief, Deputy Inspector General for Public Safety, and the Police Board President and Vice President meet to discuss trends and share information regarding data analysis related to the CPD. During the fourth reporting period, the IMT discussed these meetings with the members separately regarding the effectiveness of these meetings. Each person indicated that the meetings began as an obligation to the Consent Decree but have evolved over time to become a meaningful opportunity to discuss the very issues this paragraph intended. Each indicated that they did not expect to make recommendations to CPD as a group, rather doing so as individual organizations. All three entity leaders indicated that if the need arose, they believed they would come together to make recommendations to the CPD. The meetings have also helped to build relationships among the three organizations. The Police Board Executive Director develops the meeting agendas and maintains meeting minutes. The group is developing a common understanding of the policy-

recommendation process; and how to maintain documentation on any policy recommendations they may make to CPD.

The City has reached Full compliance with the requirements of ¶565.

# X. Data Collection, Analysis & Management

This is the Data Collection, Analysis, and Management section of the Independent Monitoring Team's (IMT's) fourth semiannual Independent Monitoring Report. It includes our assessments and status updates for the City of Chicago (the City) and its relevant entities' Data Collection, Analysis, and Management compliance efforts from January 1, 2021, though June 30, 2021, for this section of the Consent Decree.

## Guiding Principles

The IMT assessed compliance with applicable Data Collection, Analysis, and Management paragraphs in accordance with the Consent Decree's "Guiding Principles." These principles "are intended to provide the Court, the Monitor, and the public with the context for the subsequent substantive requirements" and "the overall goals" (¶757):

> **566.** *Data can empower CPD to engage in the type of critical self-examination essential to instilling and maintaining constitutional policing. CPD can leverage data to ensure constitutional policing by: systematically collecting enough data to have a broad-based understanding of officers' interactions with the public; auditing the data to ensure it accurately reflects those interactions; analyzing the data to identify trends or areas of concern; developing tailored support and interventions to address behavior that is or may become problematic; and assessing the effectiveness of attempts to modify officers' behavior.*

> **567.** *In addition to enhancing CPD's capacity for internal accountability, CPD can use data to promote accountability to the public by regularly publishing data it collects.*

# Assessing Compliance

In accordance with ¶¶661–662 and 642, we assess how the City, the Chicago Police Department (CPD), and other City entities comply with each paragraph of the Consent Decree in three successive levels: (1) Preliminary compliance, (2) Secondary compliance, and (3) Full compliance. Typically, these levels correspond with whether the City or its relevant entities have (1) created a compliant policy, (2) adequately trained personnel on that policy, and (3) successfully implemented the policy reform in practice. The three compliance levels often apply differently to various paragraphs. For some paragraphs, for example, Preliminary compliance may refer to efforts to establish the requisite training, rather than to creating a policy. Still, to reach and sustain Full compliance, the City may need to create a policy to ensure that it provides training consistently, as appropriate.

Under the Consent Decree, the City, the CPD, and other relevant entities are not technically in compliance with any of the requirements of the Consent Decree until the City has provided sufficient proof to the IMT that the City, the CPD, or other relevant entities are in compliance (See ¶720). Even if the City has made significant efforts toward complying with a requirement, the City still has the additional burden of providing the IMT and the OAG with sufficient proof of its efforts.

To reflect the City's and its relevant entities' progress through the Consent Decree process, for paragraphs under assessment in the fourth reporting period, we have added specific categories for each of the three levels of compliance, as appropriate:

- **In Compliance.** Based on the evidence that the City has produced, the City has met a level of compliance with a requirement of the Consent Decree.

- **Under Assessment.** Based on the evidence that the City has produced, the IMT is still assessing whether the City has met a level of compliance with a requirement of the Consent Decree. This may occur, for example, when the City's efforts do not cleanly overlap with a reporting period.

- **Not in Compliance.** Based on the evidence that the City has produced, the City has not met a level of compliance with a requirement of the Consent Decree.

- **Not Yet Assessed.** The IMT has not yet assessed whether the City has met this level of compliance with a requirement of the Consent Decree. This may occur, for example, when the IMT is still assessing a lower level of compliance or the City has not met a lower level of compliance.

## Summary of Compliance Assessments

During the fourth reporting period, the IMT continued to work with the CPD to address critical issues regarding data collection, analysis, management, and evaluation. We also continued to monitor how Chicago Police will use data to inform the Early Intervention System which is comprised of two new systems: the Officer Support System (also known as OSS) and the Talent Management System (also known as TMS).

The IMT also continued to review the CPD's data collection tools and auditing mechanism for uses of force, which also feed into the City's accountability systems. The CPD made significant strides with its tracking of use of force data, achieving Preliminary compliance with ¶¶569 and 571. The CPD also achieved Preliminary compliance for ¶608 which relates to the Information Systems Development Group.

Overall, we continue to encourage the CPD to focus more efforts on their data and data systems. Without regular and clear communication among the entities within the CPD that collect, manage, and analyze data, the path forward will be more difficult. We note, however, that the CPD also achieved Preliminary compliance for ¶608 which relates to the Information Systems Development Group, which comprises CPD leaders from across the agency who are responsible for moving the CPD's overall data strategies forward.

In the fourth reporting period, the City and the CPD also made progress toward paragraphs relating to the review of use of force incidents, achieving Secondary compliance for ¶¶574, 575, and 609.

However, the City and the CPD have significant efforts still to make in this section, particularly as it relates to the comprehensive data assessment outlined in ¶606. As all sections of the Consent Decree will ultimately require reliable data to demonstrate compliance, the CPD will need to seriously assess their current data collection, analysis, and retention efforts.

In this reporting period, we assessed the City's compliance with 37 of the Consent Decree's Data Collection, Analysis, and Management paragraphs (¶¶ 569–96, 598, 601–04, and 606–09).

At the end of the fourth reporting period, the City maintained Preliminary compliance for eight paragraphs (¶¶570, 577–82, and 601), achieved Preliminary compliance for three paragraphs (¶¶569, 571, and 608), achieved Secondary compliance for three paragraphs (¶¶574–75, and 609), and failed to reach Preliminary compliance with the remaining 23 paragraphs (¶¶572–73, 576, 583–96, 598, 602–04, and 606–07). *See* Data Figure 1 below.

Data Figure 1:   Compliance Progress for Data Collection, Analysis & Management
Paragraphs at the End of the Fourth Reporting Period (June 30, 2021)



In the fourth reporting period, the City had six deadlines in the Data Collection, Analysis, and Management section (¶¶581, 590, 596, 603(2), and 609). The City met two deadlines (¶581 and 603(1)) and missed four deadlines (¶¶590, 596, 603(1), and 609). For the missed deadlines, the City did not achieve any of the underlying deadline requirements before the end of the reporting period. *See* Data Figure 2 below.

Data Figure 2:   Total Data Collection, Analysis & Management Deadlines
in the Fourth Report: 6



## Data Collection, Analysis & Management: ¶569

*569. CPD must collect, track, and maintain all available documents related to use of force incidents, including: a. TRRs, or any other similar form of documentation CPD may implement for initial reporting of reportable use of force incidents; b. TRR-Is, or any other similar form of documentation CPD may implement to document supervisory investigation of reportable use of force incidents; c. Tactical Response Reports – Review ("TRR-Rs"), or any other similar form of documentation CPD may implement to document review or auditing of reportable use of force incidents; d. arrest reports, original case incident reports, and investigatory stop reports associated with a reportable use of force incident; e. administrative investigative files, including investigative materials generated, collected, or received by BIA, or COPA, or any similar form of documentation CPD may implement for misconduct allegations or civilian complaints; and f. all reasonably available documentation and materials relating to any reportable use of force, in-custody injury or death, or misconduct allegation, including body-worn, in-car, or known third-party camera recordings, and statements, notes, or recordings from witness and officer interviews.*

### Compliance Progress (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and CPD met Preliminary compliance with ¶569.

To evaluate Preliminary compliance, the IMT identified and reviewed each element of ¶569 and the corresponding CPD directive requiring their collection process, including the following policies:

- *Tactical Response Report (TRR)*: G03-02-02
- *Tactical Response Investigation Report (TRR-I)*: G03-02-08
- *Tactical Response Report Review (TRR-R)*: G03-02-08
- *Arrest Report*: G06-01-01 and G03-02-02
- *Case Incident Report: Field Reporting Manual*, S04-13-06, D20-03, and G03-02-02
- *Investigatory Stop Report*: S04-13-09
- *Administrative Case Files*: G08-01

- *Body-Worn Camera*: S03-14
- *In-Car Camera*: S03-05
- *Third-Party Recordings*: G03-02-02
- *Witness Interviews*: G03-02-02
- *Officer Interviews*: G03-02-02

For each of the required ¶569 elements, the CPD now possesses a data-collection tool and corresponding directive to collect relevant information necessary to conduct a comprehensive investigation into uses of force and to conduct audits to identify trends in force use and reporting.

In prior reports, we noted data issues that called into question the reliability of data points found in ¶569. During this reporting period, these data issues have remained. For instance, data inconsistencies continue to exist between the data set used by the Force Review Division and the data set used by others who track and analyze use of force data, including those who manage the data dashboard. We understand that the CPD is currently exploring ways to create a single dataset to resolve such inconsistencies. Additionally, in our prior reports, we noted inconsistencies between the data found on the respective websites of Bureau of Internal Affairs (BIA) and Civilian Office of Police Accountability (COPA) data. For both the issues related to use of force and accountability, we refer to those sections within this report for further discussion. However, the City cannot obtain Full compliance with ¶569 until they address these issues.

For some elements of ¶569, we note that the CPD officers' adherence to the requirements of policy remains lacking. For instance, the Force Review Division's 2020 year-end report indicates that in 8.6% of force events audited, there was not reviewable body-worn-camera footage. Recommendations for training regarding all body-worn-cameras deficiencies made up the bulk of recommendations (501 or 83.3%) from the Force Review Division in 2020. Deficiencies included not activating the body-worn cameras, late activation, and early termination, among other issues. Additionally, in 22.8% of events audited, officers did not describe the force mitigation efforts they took during the event, as required. In order to "track" the elements as ¶569 requires, the CPD's data must be reliable.

In order to resolve these issues, the CPD must conduct regular audits and employ a broad training approach to ensure officers and supervisors are familiar with their reporting requirements and are coding items appropriately. We note, however, that the CPD has taken positive steps in a number of areas. For instance, the FRD has made numerous recommendations to command staff to improve the information and data captured by TRRs, including improvements in describing the de-escalation tactics employed, re-enrolling the entire department in the body-worn-camera eLearning module, and providing TRR training for all supervisors. Additionally, the Audit Division made recommendations about updating the TRR to better

capture elements of force events and to improve the electronic reporting system to enable appropriate review. These positive steps move toward improving the quality of data necessary for Full compliance with the requirements of ¶569. When audits identify deficiencies, updated training should be provided and, where necessary, officers should begin to be held accountable when they are impeding the data collection efforts by turning in deficient reports and failing to activate their body-worn cameras.

## Data Collection, Analysis & Management: ¶570

*570. The City will ensure that reasonably available documents related to reportable uses of force that are or become subject to misconduct complaints or investigations are promptly provided to the appropriate investigative entity (e.g., COPA, BIA). The City will ensure that any reasonably available documents related to reportable uses of force subject to misconduct complaints or investigations, except for open confidential investigations, are accessible in the CMS the City is working to create, or in any similar electronic system, by June 30, 2020. Within seven days of the receipt of a misconduct complaint or the initiation of an administrative investigation, whichever occurs first, the City will identify any available reportable use of force documentation associated with the incident and ensure such documentation is accessible via the CMS or similar system. By June 30, 2020, whenever a reportable use of force incident becomes the subject of a misconduct investigation, COPA will notify CPD via the CMS within three days of the initiation of the investigation.*

### Compliance Progress (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City maintained Preliminary compliance with ¶570.

In our prior report, we noted that Case Management System (also known as CMS) allows for tracking of administrative investigations and corresponding documents, videos, and other information including the documents related to use of force referenced in ¶570. Additionally, we maintain that the Case Management System is capable of uploading, accessing, and maintaining force-related documents (including relevant video files) for cases involving allegations of inappropriate use of force. However, we refer to the assessments found in the Accountability and Transparency section of this report regarding the overall operation of the Case Management System.

While the Case Management System is presently capable of accomplishing the goals of ¶570, the broader system is still being built-out. Therefore, certain elements have not been written into the system's operating code and this will be necessary for additional levels of compliance. For instance, we will look to ensure that the system code memorializes the CPD unit or position responsible for providing relevant evidence to COPA. For its part, COPA has sufficiently memorialized the

operation of Case Management System into their Directive 3.1.6 (*CLEAR and COL-UMN CMS Systems*). However, the CPD does not have a comprehensive companion directive; the CPD cannot achieve further levels of compliance without a companion directive.

In addition to finalizing the code, additional levels of compliance will require an audit of the Case Management System for allegations of inappropriate force to ensure (1) the records are contained within the Case Management System and (2) the records were requested and uploaded within the timelines set out in ¶570. We look forward to working with the CPD on developing such an audit.

## Data Collection, Analysis & Management: ¶571

*571. CPD must have an electronic system that accurately and reliably tracks all data derived from reportable use of force incidents, including: a. the response by CPD members during the incident, including the type(s) of force used; b. the date, time, location, and district of the incident; c. whether a foot or vehicle pursuit occurred that is associated with the incident; d. the actual or, if unavailable, perceived race, ethnicity, age, and gender of the subject; e. the name, watch, employee number, and unit and beat of assignment of any CPD member(s) who used force; f. CPD units identified in the incident report as being on the scene of the use of force incident; g. whether the incident occurred during an officer-initiated contact or a call for service; h. the subject's mental health or medical condition, use of drugs or alcohol, ability to understand verbal commands, or disability, as perceived by the CPD member(s) at the time force was used; i. the subject's actions that led to the CPD member's use of force; j. whether the CPD member perceived that the subject possessed a weapon and, if so, what type(s); k. whether the subject possessed a weapon and, if so, what type(s); l. whether reportable force was used against a subject that was handcuffed or otherwise in physical restraints; m. any injuries sustained by CPD members; n. any injuries sustained or alleged by the subject(s) and any medical treatment that was offered or performed on the scene of the incident; o. for each weapon discharged by an officer, including firearms, Tasers, and OC devices, the number of discharges per weapon; and p. whether the subject was charged with an offense and, if so, which offense(s).*

### Compliance Progress      (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD met Preliminary compliance with ¶571.

During the fourth monitoring period, the CPD finalized enhancements to the Tactical Response Report (TRR) form, which contains the requirements of ¶571. After the TRR is completed, the data is entered into the Automated Tactical Response Report (A-TRR) application, where it is stored in the CLEARNET system. The database is then used to generate the Use of Force Dashboard (*see* ¶¶581 and 582). The CPD therefore has a system and database consistent with the requirements of

¶571. Additionally, the Force Review Division acts as an audit mechanism for the data being entered into the A-TRR, ensuring that officers are reliably documenting the force event.

As discussed above, there remains data inconsistencies within the CPD data. For instance, while the OEMC has processes in place that capture foot pursuits (see ¶571c), we have been alerted to the fact that there are serious issues of data quality regarding such pursuits. This continues to raise a number of concerns for us regarding the percentage of uses of force during foot pursuits, as well as the serious data quality issues within the City. Additionally, we discuss in prior paragraphs that the Force Review Division (FRD) dataset and the use of force database found on the CPD's website are inconsistent and that CPD has not developed a single database for all use of force events. CPD will need to resolve these issues for Full compliance.

Although CPD officers have been trained on completing prior versions of the TRR, the force documentation and review process has undergone numerous changes as a result of Consent Decree requirements. Thus, we expect the CPD to provide updated training to all members on completing the TRR to ensure that the data system is being filled with reliable data. To their credit, the CPD has developed supervisory training in this area including the following:

- an in-service supervisor refresher course for 2021 that addresses TRR issues, including report writing, use of force, and comments from the audit division and the FRD (*see, e.g.*, ¶222 above); and

- a *2020 TRR Training Guide: Force Review Division Recommendations (TRR Training for Supervisors)* and a *TRR Training Worksheet for Supervisors*.

Upon successful delivery of this training (combined with the officer training noted above), we believe the CPD will achieve Secondary compliance with the requirements of this paragraph. Full compliance depends upon ongoing data auditing and reliable tracking related to ¶¶ 572, 581, and 582. In the next monitoring period, the IMT will work with the CPD to develop a data auditing process to accomplish these tasks.

# Data Collection, Analysis & Management: ¶572

*572. CPD will regularly review citywide and district-level data regarding reportable uses of force to: a. assess the relative frequency and type of force used by CPD members against persons in specific demographic categories, including race or ethnicity, gender, age, or perceived or known disability status; and b. identify and address any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

## Compliance Progress        (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring, the City and the CPD did not reach any level of compliance with ¶572.

CPD General Order G03-02-02 (*Incidents Requiring the Completion of a Tactical Response Report*) indicates that TRRs are used to assess the "frequency and type of force used by CPD members." However, the GO is silent on the fact that the assessments must include measures of race, ethnicity, gender, age, or perceived or known disability status. Furthermore, the GO does not explicitly identify the entity that is responsible for conducting such assessments and it remains unclear whether this responsibility falls on the Force Review Division.

General Order G03-02-02 also contains the requirement of subsection (b) of ¶572 and indicates that the Force Review Division is responsible for suggesting changes to policy, training, tactics, equipment, or Department practice. A review of the FRD's quarterly and annual reports indicates the Division has taken their responsibilities seriously as we detail in our assessment of paragraphs devoted to FRD. However, the quarterly and annual reports do not sufficiently evaluate force frequency or force type. Additionally, the reports don't examine demographics in any capacity.

The CPD must memorialize the requirements of ¶572 into policy in order to achieve Preliminary compliance. For Secondary compliance, we are still awaiting a methodology for the regular review described in ¶572. Assuming a qualified analyst within the CPD is tasked with conducting the review, we would consider this methodology to satisfy the training element of ¶572. Upon receipt of the methodology, the IMT will provide comments and suggestions as necessary to ensure the methodology is reflective of the review required by ¶572. In doing so, the IMT will also ensure that the methodology comports with published, peer-reviewed methodologies and the broader Consent Decree.

## Data Collection, Analysis & Management: ¶573

*573. Prior to conducting the initial assessment required by Paragraph 572, CPD will share its proposed methodology, including any proposed factors to be considered as part of the assessment, with the Monitor for review and approval. The Monitor will approve CPD's proposed methodology provided that the Monitor determines that CPD's methodology comports with published, peer-reviewed methodologies and this Agreement.*

### Compliance Progress    (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the CPD did not achieve any level of compliance with the requirements of ¶573.

The IMT is still awaiting the CPD's methodology for the assessment required by ¶573. Upon receipt of the methodology, the IMT will provide comments and suggestions as necessary to ensure the methodology is reflective of the review required by ¶572. In doing so, the IMT will also ensure that the methodology comports with published, peer-reviewed methodologies and the broader Consent Decree.

## Data Collection, Analysis & Management: ¶574

*574. A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected regarding each level 2 reportable use of force incident, a representative sample of level 1 reportable use of force, and incidents involving accidental firearms discharges and animal destructions with no human injuries to ensure: a. CPD members completely and thoroughly reported the reason for the initial stop, arrest, or other enforcement action, the type and amount of force used, the subject's actions or other circumstances necessitating the level of force used, and all efforts to de-escalate the situation; b. the district-level supervisory review, investigation, and policy compliance determinations regarding the incident were thorough, complete, objective, and consistent with CPD policy; c. any tactical, equipment, or policy concerns are identified and, to the extent necessary, addressed; and d. any patterns related to use of force incidents are identified and, to the extent necessary, addressed.*

### Compliance Progress  (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not in Compliance* |

In the fourth reporting period, the City and the CPD reached Secondary compliance with ¶574.

The CPD has General Order G03-02-08 (*Department Review of Use of Force*) which memorializes the role of the Force Review Division (FRD) with regards to ¶574. Additionally, the FRD possesses a comprehensive Standard Operating Procedure (SOP) which provides clear instruction on how to conduct the FRD's audits, including the points of review described in ¶574(a–d). Furthermore, FRD members have received sufficient training to carry out the tasks in accordance with the SOP. For instance, the FRD was responsive to one of the IMT's comments that FRD reviewers be familiar with the concept of de-escalation as detailed in CPD's Crisis Intervention Team (CIT) training. During the fourth monitoring period, FRD personnel were provided with an 8-hour CIT training which included modules related to de-escalation. The SOP and training satisfy the first of our criteria for achieving Secondary compliance.

As we noted in our last report, the ability of CPD to adequately staff the FRD is another criterion for Secondary compliance, one for which the CPD has demonstrated significant improvement. During the last monitoring period, we noted that

the FRD was experiencing a backlog of approximately 450 cases pending assignment as well as 41 Pointing of a Firearm cases pending assignment. We noted that the timely identification of trends is necessary for the CPD to improve its overall approach and recommended the CPD provide the FRD with the resources necessary to work through the backlog. During the fourth monitoring period, a CPD memo reported that the FRD had increased the number of positions by adding two police officers and one sergeant. Also during this period, the FRD reduced the backlog of cases waiting to be assigned from 468 TRRs at the beginning of 2021 to 19 TRRs as of May 12, 2021 (an approximate 96% reduction). Furthermore, CPD reports that of the 19 TRRs pending assignment, all but one were associated with incidents that occurred within eight days prior to the memo. The CPD presents the reduction of the backlog as evidence that the full staff of seven Sergeants and 29 officers demonstrates "sufficient resources" have been provided to the FRD (see also ¶575). We agree and believe such resources satisfy our second criteria for Secondary compliance.

The FRD uses a tiered approach to conducting its audits. The first tier evaluates individual deficiencies based on officers' TRRs and supervisors' investigations and reviews of the force events. The FRD then forwards these identified deficiencies to the involved officer as a learning opportunity. In its second tier of review, the FRD identifies concerns at the unit level as compared with other units. The FRD then forwards these concerns to the District Commander for remediation. Lastly, the FRD's third tier aims to identify department-wide trends and may provide recommendations to the Education and Training Division or to the Research and Development Division to address the identified issues.

The FRD's quarterly reports detail the manner in which the FRD identifies meaningful trends and provides responsive recommendations. Based on the May 2021 report detailing FRD activities in the first quarter, over two-thirds (67.2%) of TRR reviews resulted in recommendations. The most common debriefing point for involved members was not describing the de-escalation and force mitigation efforts used prior to using force. The most common debriefing point for Reviewing Supervisors was not requesting an evidence technician when needed. During the first quarter there were also 198 TRRs related to a foot pursuit. CPD is in the beginning stages of developing a foot pursuit policy that may help to reduce use of force during foot pursuits.

Overall, we remain appreciative of the FRD and its work to date. Members of the FRD are provided clear instruction on their tasks, have demonstrated an ability to evaluate force events with a critical eye, and have made meaningful recommendations for improving the department.

Through comprehensive SOPs, the reduction of FRD backlogs, and the increase in resources to the Division, we find that CPD has achieved Secondary compliance for

¶574. Full compliance with ¶574 will depend on the IMT being able to replicate the work of the FRD through an audit of their methodologies, data, and findings. We will work with the FRD in the next monitoring period to conduct the audit.

# Data Collection, Analysis & Management: ¶575

**575.** *CPD recently established a Force Review Unit ("FRU") and tasked the FRU with certain responsibilities described in the preceding paragraph. CPD will ensure that the FRU or any other unit tasked with these responsibilities has sufficient resources to perform them. CPD will ensure that the FRU or any other unit tasked with these responsibilities is staffed with CPD members, whether sworn or civilian, with sufficient experience, rank, knowledge, and expertise to: effectively analyze and assess CPD's use of force practices and related reporting and review procedures; conduct trend analysis based on use of force data; identify tactical, equipment, training, or policy concerns based on analysis of use of force incidents and data; and develop recommendations regarding modifications to tactics, equipment, training, or policy as necessary to address identified practices or trends relating to the use of force.*

## Compliance Progress          (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *In Compliance* (NEW) |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD achieved Preliminary and Secondary compliance with ¶575.

In prior assessments of ¶575, we noted that the work of the FRD[285] appeared to be of high quality, but the division was experiencing a backlog of cases. As described in ¶574, we noted that the timely identification of trends is necessary for the CPD to improve its overall approach and recommended the CPD provide the FRD with the resources necessary to work through the backlog. During the fourth monitoring period, a CPD memo reported that the FRD had increased the number of positions by adding two police officers and one sergeant. Also during this period, the FRD reduced the backlog of cases waiting to be assigned from 468 TRRs at the beginning of 2021 to 19 TRRs as of May 12 (an approximate 96% reduction). Furthermore, the CPD reports that of the 19 TRRs pending assignment, all but one were associated with incidents that occurred within eight days prior to the memo.

The CPD ensures that they select and train officers assigned to the FRD in accordance with the requirements of ¶575. For instance, when considering prospective FRD candidates, the CPD ensures that the candidates have been an officer for at

---

[285] We note that while this paragraph refers to the CPD's "Force Review Unit," it is currently referred to as the "Force Review Division (FRD)," and performs the same functions.

least five years, pass a pre-test, and are proficient in Microsoft Word, CLEAR, CLEARNET, Hot Desk, and other department databases and computer systems. Additionally, the CPD ensures that the candidates' record is clear of sustained allegations of inappropriate force incidents within the past five years. The CPD grades these requirements on a pass/fail basis. Additionally, the FRD prefers candidates who come from patrol with recent street experience. The FRD then ranks candidate officers based on the evaluation criteria and selects those most qualified.

Given these steps, we are comfortable that the officers currently assigned to the FRD have "sufficient experience, rank, knowledge, and expertise" to conduct the evaluation process and that future officers may be reliably selected based on the evaluation criteria.

Training requirements for all members of the FRD are outlined in *the Force Review Division's Standard Operating Procedure* (SOP 2020-001), which includes an annual refresher training on the CPD's use of force policies, use of force law, and best practices in force review. As detailed in the FRD's Q1 2021 Report[286], FRD members attended 40 hours of in-service training which covered topics including: control tactics, vehicle stops and occupant control, VirtTra simulator, law review, Taser training, tactical room entry, and crisis intervention training. This training was required in addition to the 40-hour mandatory in-service training for all department members in 2021. As detailed in the FRD's 2020 Year End Report[287], in 2020, FRD staff completed similar levels of training including 42-hours of in-service training on top of the 32-hour training minimum for department members. Training topics in 2020 were similar to those listed for 2021 (use of force, Taser, control tactics, room entry, 4th Amendment, vehicle stops & occupant control, foot pursuits and VirTra training).

Through comprehensive SOPs, training, the reduction of FRD backlogs, and the increase in resources to the Division, we find that CPD has achieved Secondary compliance for ¶575. Full compliance with ¶575 will depend on the IMT being able to replicate the work of the FRD through an audit of their methodologies, data, and findings. We will work with the FRD in the next monitoring period to conduct the audit.

---

[286] *See Force Review Division 2021 Q1 Report*, CHICAGO POLICE DEPARTMENT (May 11, 2021), https://home.chicagopolice.org/wp-content/uploads/Q1-2021.pdf.

[287] *See Force Review Division 2020 Year-End Summary*, CHICAGO POLICE DEPARTMENT (April 28, 2021, 2021), https://home.chicagopolice.org/wp-content/uploads/FRD-2020-Year-End-Report.pdf.

## Data Collection, Analysis & Management: ¶576

> **576.** *CPD will conduct random audits of body-worn and in-car camera recordings of incidents that involved civilian interactions to assess whether CPD officers are complying with CPD policy. CPD will take corrective action to address identified instances where CPD officers have not complied with CPD policy as permitted by law, and will identify any trends that warrant changes to policy, training, tactics, equipment, or Department practice.*

### Compliance Progress      (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not achieve any level of compliance with ¶576.

The CPD is addressing the requirements of ¶576 through two different approaches, both of which provide important evaluative elements: (1) through daily supervisor audits of body-worn-camera and in-car-camera footage and (2) through periodic body-worn-camera audits by CPD's Audit Division. The first approach of conducting daily supervisor audits of body-worn-camera footage has the benefit of allowing Watch Operations Lieutenants to monitor the type and quality of interactions occurring within their District on their watch. As a supervisory tool, we believe this is an important approach.

In our last report, we noted that while CPD had been conducting a pilot test in the 19th District for reviewing body-worn-camera video, there were no plans to expand it due to the expense of the AXON software. In the fourth monitoring period, CPD began developing an in-house application (Random Video Review or "RVR") which would accomplish the randomization function of the AXON software. The IMT's primary concern about CPD's prior practice was that Watch Operations Lieutenants would purposefully select videos; the randomization function of CPD's current software largely resolves this issue.

The CPD, however, does not have a satisfactory policy on conducting the Watch Operations Lieutenant reviews of body-worn-camera video and the IMT is currently in discussion with CPD regarding Special Order S03-14 (*Body Worn Cameras*) as it relates to the random reviews. Additionally, the IMT has yet to be provided with finalized parameters for the software to randomly choose videos. For instance, we would not expect Watch Operations Lieutenants to review 5-second

videos as this would not provide sufficient information to evaluate the officer. Conversely, we would not expect Watch Operations Lieutenants to review 2-hour videos as part of their daily responsibilities.

Late in the monitoring period, the CPD provided the IMT with a set of draft parameters but additional documents and clarification will be necessary before we consider the parameters to be finalized. While we believe the parameters address many of the issues with randomly reviewing videos, there are areas where the parameters could be improved. For instance, the IMT will want to make sure the selection parameters are capturing relevant video categories – a hurdle for CPD given that a substantial number of body-worn-camera videos are not consistently categorized (see below for further discussion regarding categorizing videos).

Similar to the random body-worn-camera video reviews, we have not yet received a satisfactory policy regarding Watch Operations Lieutenant reviews of in-car-camera videos. Presently, CPD has Special Order S03-05 (*In-Car Video Systems*). However, the section related to Watch Operations Lieutenant reviews suffers from many of the same shortcomings as S03-14 and the directive will need to be revised to reflect CPD's planned process to use the randomizer application to select videos.

The second approach is housed in the CPD's Audit Division, which has begun conducting a series of audits related to body-worn-camera and in-car-camera video. For instance, in January of 2021, the CPD provided report SPEC-I-2020 (*Review of In-Car Camera Video & Related Arrest Reports*). Additionally, in March of 2021, CPD provided report SPEC-A-2021 (*Review of Body Worn Camera Video & Related Investigatory Stop Reports (ISRs)*). In addition, the Audit Division has assisted in developing the Watch Operations Lieutenant reviews discussed above and has plans on auditing body-worn-camera and in-car-camera video to evaluate compliance with policies relevant to the Consent Decree. An initial review of the reports provided to date as well as the audit plan for 2021 indicates the Audit Division is taking seriously the tasks related to ¶576 (as well as other paragraphs throughout the Consent Decree).

However, for both of the CPD's approaches, the IMT is concerned about the regularity with which CPD members appropriately tag videos in evidence.com. For instance, a review of videos from January 1, 2021 and May 31, 2021 revealed that approximately 30% of videos do not have an associated category. Additionally, approximately 25% do not have an associated case ID. Finally, about 1.5% of videos do not have an associated CPD member. These findings are consistent with those of CPD based on the January 2021 audit review of in-car-camera video. In that audit, they found that only "one in every three of the 120 arrests that were made on 26 June 2020 had readily identifiable [in-car-camera] footage." The audit also references a CPD survey which found that "more than half of these district-level

supervisors reported that they rarely or never review in-car-camera footage to ensure compliance with policy."

These issues are further compounded by malfunctions in body-worn-camera and in-car-camera hardware. For instance, CPD's audit of in-car-camera hardware reveals that at any given time, more than 10% of in-car cameras could be malfunctioning.

CPD still has many steps it will need to take to comply with ¶576. For Watch Operations Lieutenant reviews of both body-worn-camera video and in-car-camera video, CPD will need to satisfactorily memorialize the process of review in S03-14 and S03-05, respectively. The monitoring team will also need to approve reasonable parameters surrounding videos that Watch Operations Lieutenants could select for review. The CPD will reach a preliminary level of compliance if it completes these steps.

For Secondary compliance, the CPD will need to ensure that body-worn-camera and in-car-camera hardware is adequately working and that CPD members are consistently and reliably tagging videos in a way that would facilitate the Watch Operations Lieutenant reviews. CPD will also need to train Watch Operations Lieutenants on an updated review protocol, ensuring that each review is of consistent quality. Full compliance will then depend on Watch Operations Lieutenants conducting their reviews with the IMT conducting audits of reviews to ensure their accuracy and adequacy. Full compliance will also hinge on CPD using the Audit Division's reports to improve operations and ensuring compliance with departmental policy.

## Data Collection, Analysis & Management: ¶577

**577.** *CPD will create a Force Review Board ("FRB") to review, from a Department improvement perspective: (a) any level 3 reportable use of force incident, except for accidental firearms discharges and animal destructions with no human injuries, and (b) any reportable uses of force by a CPD command staff member.*

**Compliance Progress**          (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶577.

CPD currently has Directive G03-02-08 (*Department Review of Use of Force*) which memorializes the role of FRB in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance.

Additionally, the CPD continues to use SOP 2020-002 (*Force Review Board*), which acts as a training tool for the FRB employees. This SOP is designed to provide a step-by-step process for all FRB reviews and includes the requirements of ¶577. Additionally, in January of 2021, CPD provided a training to the FRB regarding the requirements of FRB hearings.

The combination of the SOP and the training received by FRB members would be sufficient for Secondary compliance had CPD responded to a long-standing IMT recommendation for FRB operations. For the past two monitoring periods, the IMT has suggested that the FRB conduct reviews of deadly force using a decision-point approach rather than a moment-of-force approach. A "decision-point analysis" uses each critical point in time to comprehensively evaluate how an event unfolded. Where an officer's action or inaction significantly alter or influence the course of the event, the department should evaluate the reasonableness of the action or inaction to make recommendations related to department policy, training, tactics, or equipment. This approach has been incorporated in other departments.[288]

---

[288] For example, the New Orleans Police Department's (NOPD's) Use of Force Review Board hears "detailed descriptions of the actions of each participants in the use of force event, often starting with the actions of the 9-1-1 center call taker and ending with the first NOPD supervisor who arrives on the scene and establishes incident control." *Special Report of the Consent Decree monitor for the new Orleans Police Department Consent Decree On NOPD Uses of Force,*

However, the SOP still does not incorporate the IMT's suggestion and therefore neither did the training. While we believe the SOP and training material was otherwise comprehensive, it is unclear why the CPD has not provided a response to our long-standing recommendation. The CPD cannot achieve Secondary compliance until this issue is resolved.

Upon resolution of our outstanding recommendation, we believe the CPD will achieve Secondary compliance with the requirements of ¶577. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken, including the identification and incorporation of policy, training, equipment, and personnel recommendations.

---

CONSENT DECREE MONITOR NEW ORLEANS, LOUISIANA (May 5, 2017), https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/12-1924-517-Monitor-s-Special-Report-on-the-NOPD-s-Uses-of-Force-(002).pdf/.

## Data Collection, Analysis & Management: ¶578

> **578.** *For any reportable use of force incident subject to an ongoing investigation by COPA, COPA will be exclusively responsible for recommending disciplinary action relating to the incident. The purpose of FRB's review will be to: a. evaluate if actions by CPD members during the incident were tactically sound and consistent with CPD training; and b. if applicable, identify specific modifications to existing policy, training, tactics, or equipment that could minimize the risk of deadly force incidents occurring and the risk of harm to officers and the public.*

### Compliance Progress  (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶578.

The CPD currently has Directive G03-02-08 (*Department Review of Use of Force*) which memorializes the role of COPA and the role of the FRB in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find the CPD has remained in Preliminary compliance.

Additionally, the CPD continues to use SOP 2020-002 (*Force Review Board*), which acts as a training tool for the FRB employees. This SOP is designed to provide a step-by-step process for all FRB reviews and includes the requirements of ¶578. Additionally, in January of 2021, CPD provided a training to the FRB regarding the requirements of FRB hearings.

The combination of the SOP and the training received by FRB members would be sufficient for Secondary compliance had CPD responded to a long-standing IMT recommendation for FRB operations. For the past two monitoring periods, the IMT has suggested that the FRB conduct reviews of deadly force using a decision-point approach rather than a moment-of-force approach. A "decision-point analysis" uses each critical point in time to comprehensively evaluate how an event unfolded. Where an officer's action or inaction significantly alter or influence the course of the event, the department should evaluate the reasonableness of the

action or inaction to make recommendations related to department policy, training, tactics, or equipment. This approach has been incorporated in other departments.[289]

However, the SOP still does not incorporate the IMT's suggestion and therefore neither did the training. While we believe the SOP and training material was otherwise comprehensive, it is unclear why the CPD has not provided a response to our long-standing recommendation. Secondary compliance cannot be achieved until this issue is resolved

Upon resolution of our outstanding recommendation, we believe the CPD will achieve Secondary compliance with the requirements of ¶578. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

---

[289] For example, the New Orleans Police Department's (NOPD's) Use of Force Review Board hears "detailed descriptions of the actions of each participants in the use of force event, often starting with the actions of the 9-1-1 center call taker and ending with the first NOPD supervisor who arrives on the scene and establishes incident control." *Special Report of the Consent Decree monitor for the new Orleans Police Department Consent Decree On NOPD Uses of Force*, CONSENT DECREE MONITOR NEW ORLEANS, LOUISIANA (May 5, 2017), https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/12-1924-517-Monitor-s-Special-Report-on-the-NOPD-s-Uses-of-Force-(002).pdf/.

# Data Collection, Analysis & Management: ¶579

> **579.** *The FRB will be chaired by the Superintendent, or his or her designee, and will include, at a minimum, the Chief of the Bureau of Patrol, or his or her designee, and CPD members at the rank of Deputy Chief, or above, who are responsible for overseeing policy development, policy implementation, training, and misconduct investigations. CPD's General Counsel, or his or her designee, will also serve on the FRB.*

---

**Compliance Progress**  (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶579.

The CPD currently has Directive G03-02-08 (*Department Review of Use of Force*) which memorializes the role of FRB in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance.

Additionally, the CPD continues to use SOP 2020-002 (*Force Review Board*), which acts as a training tool for the FRB employees. This SOP is designed to provide a step-by-step process for all FRB reviews and includes the requirements of ¶579. Additionally, in January of 2021, CPD provided a training to the FRB regarding the requirements of FRB hearings.

The combination of the SOP and the training received by FRB members would be sufficient for Secondary compliance had CPD responded to a long-standing IMT recommendation for FRB operations. For the past two monitoring periods, the IMT has suggested that the FRB conduct reviews of deadly force using a decision-point approach rather than a moment-of-force approach. A "decision-point analysis" uses each critical point in time to comprehensively evaluate how an event unfolded. Where an officer's action or inaction significantly alter or influence the course of the event, the department should evaluate the reasonableness of the action or inaction to make recommendations related to department policy, training, tactics, or equipment. This approach has been incorporated in other departments.[290]

---

[290] For example, the New Orleans Police Department's (NOPD's) Use of Force Review Board hears "detailed descriptions of the actions of each participants in the use of force event, often starting with the actions of the 9-1-1 center call taker and ending with the first NOPD supervisor

However, the SOP still does not incorporate the IMT's suggestion and therefore neither did the training. While we believe the SOP and training material was otherwise comprehensive, it is unclear why the CPD has not provided a response to our long-standing recommendation. Secondary compliance cannot be achieved until this issue is resolved

Upon resolution of our outstanding recommendation, we believe CPD will be in Secondary compliance with the requirements of ¶579. Full compliance will be achieved upon the IMT observing the FRB process to verify that all necessary steps are being taken (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

---

who arrives on the scene and establishes incident control." *Special Report of the Consent Decree monitor for the new Orleans Police Department Consent Decree On NOPD Uses of Force*, Consent Decree Monitor New Orleans, Louisiana (May 5, 2017), https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/12-1924-517-Monitor-s-Special-Report-on-the-NOPD-s-Uses-of-Force-(002).pdf/.

# Data Collection, Analysis & Management: ¶580

*580. The FRB will review each incident within its purview promptly, which will in no event be more than 96 hours after the incident occurs. Within 30 days after its review of an incident, the FRB will issue recommendations, if appropriate, to the Superintendent regarding any need for additional training or modifications to policies, tactics, equipment, or Department practices. Upon review and approval by the Superintendent, or his or her designee, the FRB will assign each approved recommendation to a specific CPD command staff member for implementation. CPD will promptly implement each approved recommendation.*

## Compliance Progress          (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not in Compliance* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶580.

CPD currently has Directive G03-02-08 (*Department Review of Use of Force*) which memorializes the role of FRB in reviewing Level 3 uses of force and reportable uses of force by a CPD command staff member. As the FRB continues to be detailed in policy, we find CPD has remained in Preliminary compliance.

Additionally, the CPD continues to use SOP 2020-002 (*Force Review Board*), which acts as a training tool for the FRB employees. This SOP is designed to provide a step-by-step process for all FRB reviews and includes the requirements of ¶580. Additionally, in January of 2021, CPD provided a training to the FRB regarding the requirements of FRB hearings.

The combination of the SOP and the training received by FRB members would be sufficient for Secondary compliance had the CPD responded to a long-standing IMT recommendation for FRB operations. For the past two monitoring periods, the IMT has suggested that the FRB conduct reviews of deadly force using a decision-point approach rather than a moment-of-force approach. A "decision-point analysis" uses each critical point in time to comprehensively evaluate how an event unfolded. Where an officer's action or inaction significantly alter or influence the course of the event, the department should evaluate the reasonableness of the

action or inaction to make recommendations related to department policy, training, tactics, or equipment. This approach has been incorporated in other departments.[291]

However, the SOP still does not incorporate the IMT's suggestion and therefore neither did the training. While we believe the SOP and training material was otherwise comprehensive, it is unclear why the CPD has not provided a response to our long-standing recommendation. Secondary compliance cannot be achieved until this issue is resolved.

Full compliance will depend on the CPD extending an invitation to the IMT to sit in on FRB proceedings (including the identification and incorporation of policy, training, equipment, and personnel recommendations) to ensure that the process is operating as intended from start to finish.

---

[291] For example, the New Orleans Police Department's (NOPD's) Use of Force Review Board hears "detailed descriptions of the actions of each participants in the use of force event, often starting with the actions of the 9-1-1 center call taker and ending with the first NOPD supervisor who arrives on the scene and establishes incident control." *Special Report of the Consent Decree monitor for the new Orleans Police Department Consent Decree On NOPD Uses of Force*, Consent Decree Monitor New Orleans, Louisiana (May 5, 2017), https://nola.gov/getattachment/NOPD/NOPD-Consent-Decree/12-1924-517-Monitor-s-Special-Report-on-the-NOPD-s-Uses-of-Force-(002).pdf/.

# Data Collection, Analysis & Management: ¶581

**581.** *Beginning within 180 days of the Effective Date, CPD will publish on at least a monthly basis aggregated and incident-level data, excluding personal identifying information (e.g., name, address, contact information), regarding reportable use of force incidents via a publicly accessible, web-based data platform.*

## Compliance Progress (Reporting Period: January 1, 2021, through June 30, 2021)

| Deadline: | Monthly | ✓ Met | ☐ Missed |
|---|---|---|---|

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶581 by maintaining their use of force dashboard which updates on a monthly basis.

The CPD has incorporated many of the IMT's recommendations into the dashboard. The updated dashboard enables community members to see use of force incident frequencies, demographic information, and the type of force used at the citywide, district, neighborhood, and ward levels. The dashboard utilizes a number of graphs, charts, and other data visualizations to make the information readily understandable. While the IMT believes that additional steps may improve the interactive functions of the dashboard (for example, sub-group comparisons across all tabs), the minimum requirements of ¶581 are captured in the updated dashboard. Additionally, the CPD's Use of Force Dashboard continues to allow users to download the data, fulfilling ¶581's requirement to include incident-level data.

The IMT maintains that, at its basic level, the publication of the dashboard is for the benefit of community members; therefore, subsequent levels of compliance will depend largely on the CPD ensuring that users find the dashboard to be functional and user-friendly.

To achieve Secondary compliance, we recommend the CPD to put in place mechanisms for collecting community feedback, including creating online dashboard tutorials and providing an avenue for community member feedback regarding the Dashboard. Should the CPD receive actionable feedback or find themes in the feedback received, we would expect the CPD would modify the dashboard or provide a list of Frequently Asked Questions to help community members navigate the dashboard.

# Data Collection, Analysis & Management: ¶582

*582. The publicly accessible, web-based data platform will enable visitors to: a. identify where reportable uses of force occur through interactive maps depicting incident frequencies at a citywide, district, neighborhood, and ward level; b. identify the frequency, in the aggregate and by type, of reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations; and c. review aggregate demographic information about the race, ethnicity, age, and gender of persons subjected to reportable uses of force at the citywide, district, neighborhood, and ward level through graphs, charts, and other data visualizations.*

## Compliance Progress    (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (THIRD REPORTING PERIOD) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶582.

The CPD has incorporated many of the IMT's recommendations into the dashboard. The updated Dashboard enables community members to see use of force incident frequencies, demographic information, and the type of force used at the citywide, district, neighborhood, and ward levels. The dashboard utilizes a number of graphs, charts, and other data visualizations to make the information readily understandable. While the IMT believes that additional steps may improve the interactive functions of the dashboard (for example, sub-group comparisons across all tabs), the minimum requirements of ¶582 are captured in the updated dashboard.

As described in the preceding paragraph, the IMT maintains that, at its basic level, the publication of the dashboard is for the benefit of community members; therefore, subsequent levels of compliance will depend largely on the CPD ensuring that users find the dashboard to be functional and user-friendly.

For Secondary compliance, we would expect the CPD to put in place mechanisms for collecting community feedback, including creating online dashboard tutorials and providing an avenue for community member feedback regarding the dashboard. Should the CPD receive actionable feedback or find themes in the feedback received, we would expect the CPD would modify the Dashboard or provide a list of Frequently Asked Questions to help community members navigate the dashboard.

## Data Collection, Analysis & Management: ¶583

*583. CPD must collect and provide information to supervisors that enables them to proactively identify at-risk behavior by officers under their command, and to provide individualized interventions and support to address the at-risk behavior. CPD must provide supervisors with an automated electronic system that provides this information and equips supervisors to perform these duties.*

Compliance Progress          (Reporting Period: January 1, 2021, through June 30, 2021)

**Preliminary:**          *Not in Compliance*
**Secondary:**          *Not Yet Assessed*
**Full:**          *Not Yet Assessed*

In the fourth reporting period, CPD did not achieve any level of compliance with ¶583.

The CPD uses two systems to accomplish the goals of the Early Intervention System (also known as EIS) section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶583 apply to the Talent Management System.

As described in our last report, the CPD was making a switch to a Talent Management System to replace the antiquated Performance Recognition System (also known as PRS). The forthcoming Talent Management System will resolve the user-end faults of the Performance Recognition System by allowing supervisors a one-stop system for reviewing officer uses of force, allegations of misconduct, and other work-related statistics. However, through the fourth monitoring period, no directive related to Talent Management System exists[292] and a finalized version of the system application has not been provided. Therefore, while the CPD collects the necessary data (though see below for commentary regarding Full compliance on this issue), the Department has not delivered an acceptable system for supervisors to utilize nor has the Department equipped supervisors to perform their duties through policy or training.

In order to achieve Preliminary compliance, the CPD must finalize the system application and create a corresponding directive regarding its use. Further levels of

---

[292] The CPD does have a directive E05-02 (*Performance Recognition System*); however, that directive is outdated and the CPD has agreed that it will be moot upon implementation of the Talent Management System.

compliance will require CPD to adequately train supervisors on using the new system as well as evidence demonstrating consistent use by supervisors. Full compliance will also be conditioned on IMT being assured that the data used by supervisors is a true and accurate reflection of officer behavior on the street. As discussed in our assessment of ¶569, CPD data related to use of force and accountability are not always consistent in definition or reliability. The CPD will need to ensure that the data they are using is reliable and we recommend the Audit Division assist in identifying and remediating the full scope of CPD data issues. *See also* ¶585(d).

# Data Collection, Analysis & Management: ¶584

*__584.__ The automated electronic system must be: a. data-driven and developed with statistical methods and analytic techniques; b. customizable to CPD; c. adaptive as new information becomes available; d. capable of being audited and evaluated to improve accuracy; and e. able to generate sufficient data that enables assessment of the effects, if any, of support provided and interventions undertaken.*

## Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and CPD did not achieve any level of compliance with ¶584.

The CPD uses two systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶584 apply to both systems.

CPD has made progress in complying with ¶584 by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System pilot though further revisions in accordance with ¶602 are needed prior to Preliminary compliance being achieved. For instance, the policy does not include outline steps for auditing and evaluating the system to improve accuracy, as required in ¶584 as well as ¶602.

In order to achieve Preliminary compliance, the CPD will need to tailor Department Notice D20-04 to account for the elements of ¶584 and ¶602. For subsequent levels of compliance, the CPD need to memorialize a process for ensuring the elements of ¶584 are being followed. This will most likely require an SOP that provides a training framework for conducting audits and evaluating the system for accuracy. We recommend using the findings from the pilot when developing the protocols. Full compliance will then depend on the CPD providing evidence of such audits, findings, and corresponding actions.

Related to this, the CPD cannot be assured that audit findings are valid if they are not assured that the underlying data is valid. Presently, the CPD is using an outside vendor to conduct a comprehensive assessment of the underlying Officer Support

System data. While this was originally presented to the IMT as an assessment related to ¶606 (see our assessment below), the assessment approach does appear to be sufficient to evaluate the Officer Support System data. We look forward to reviewing the results of this assessment and seeing how the CPD incorporates the findings into their overall data systems.

## Data Collection, Analysis & Management: ¶585

**585.** *The automated electronic system must perform these primary functions: a. using statistical methods to identify officers who are at elevated risk of engaging in conduct leading to at-risk behavior; b. identifying and facilitating support and interventions that prevent or reduce the occurrence of the identified at-risk behavior; c. providing supervisors with a dashboard of relevant information about members under their direct command to facilitate appropriate supervisory intervention and support; and d. performing peer group analysis with comparative data to account for differences in job assignments, and to identify group- and unit-level patterns of activity.*

### Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and CPD did not achieve any level of compliance with ¶585.

The CPD uses two systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶585 apply to both.

Subsections (c) and (d) of ¶585 require supervisors to use the Talent Management System. However, as described in other paragraph assessments, the Talent Management System has not yet been fully implemented and no directive has been enacted. The CPD will need to finalize the Talent Management System directive in order to comply with ¶585.

Similarly, while the CPD has made progress in complying with ¶584 by implementing the Pilot Program of the Officer Support System, the policy which drives the Officer Support System pilot requires revision before the pilot can be expanded to additional districts.

The CPD is using four specific algorithmic scoring models as well an overarching model to identify potentially problematic officers. However, in meetings with the CPD and the University of Chicago's Urban Lab (which is being contracted to develop the Officer Support System), we have indicated concerns with the statistical

methods used to identify officers who are elevated risk of engaging in conduct leading to at-risk behavior. For instance, we note that one of the models has an approximately 90% false positive rate. One of the most critical elements of an effective Early Intervention System is that officers and supervisors need to trust the system in order to be receptive to the interventions being offered. If officers become aware that only one in ten officers flagged by the model actually go on to have the adverse event, officers may take the need for an intervention less seriously.

To address our concerns, and achieve Preliminary compliance, the CPD is currently in the process of measuring preliminary Officer Support System data and associated actions and outcomes to evaluate the current pilot district. The CPD informed us they will use this data to determine revisions to policy, training, and implementation of the Officer Support System as part of an expanded pilot in additional districts.

As part of their evaluation, we recommend the CPD evaluate both quantitative and qualitative data before expanding the pilot. For instance, we informed the CPD that they should evaluate the experiences of officers who were subject to reviews in order to gauge whether there was buy-in and whether the officer felt the experience was overall beneficial. To their credit, the CPD gathered feedback from chain-of-command supervisors to hear their experiences and we recommend the CPD include all involved to gain comprehensive feedback.

During the pilot-assessment phase, the CPD should also work with supervisors to ensure the dashboard of relevant information about members under their command is user friendly and provides the types of information needed to facilitate intervention and support. These practices should be reflected in the forthcoming directive guiding implementation of the Talent Management System.

## Data Collection, Analysis & Management: ¶586

*586. A primary goal of the automated electronic system will be to facilitate early identification of officers at elevated risk of being involved in certain types of events so that the officers can receive tailored interventions intended to reduce such risk. The types of events sought to be avoided could include, depending upon the feasibility of identifying these events using statistical methods and analytic techniques, examples such as any instance in which a CPD member is: directly involved in an excessive force incident; subject to a sustained finding in a misconduct investigation; a defendant in a civil lawsuit resulting in an adverse judgment or settlement; suspended more than five days; the subject of a recommendation of employment termination by COPA, BIA, or the Superintendent; a direct participant in an officer-involved shooting or death determined to be unjustified or out of policy by COPA, BIA, the Superintendent, the Police Board, or a court of law; convicted of a crime; or subject to an increased risk of suicide or alcohol and/or substance abuse*

### Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and CPD did not achieve any level of compliance with ¶586.

The CPD uses two systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶586 apply to both.

However, as described in other paragraph assessments, the Talent Management System has not yet been fully implemented and no directive has been enacted. The CPD will need to finalize the Talent Management System directive in order to comply with ¶586. This directive should outline the types of events that will lead to an officer receiving an intervention.

The CPD is using four specific algorithmic scoring models as well an overarching model to identify potentially problematic officers. However, in meetings with the

CPD and the University of Chicago's Urban Lab (which is being contracted to develop the Officer Support System), we have indicated concerns with the statistical methods used to identify officers who are elevated risk of engaging in conduct leading to at-risk behavior. For instance, we note that one of the models has an approximately 90% false positive rate. One of the most critical elements of an effective Early Intervention System is that officers and supervisors need to trust the system in order to be receptive to the interventions being offered. If officers become aware that only one in ten officers flagged by the model actually go on to have the adverse event, officers may take the need for an intervention less seriously.

To address our concerns, and achieve Preliminary compliance, the CPD is currently in the process of measuring preliminary Officer Support System data and associated actions and outcomes to evaluate the current pilot district. The CPD informed us they will use this data to determine revisions to policy, training, and implementation of the Officer Support System as part of an expanded pilot in additional districts.

As part of their evaluation, we recommend the CPD evaluate both quantitative and qualitative data before expanding the pilot. For instance, we informed the CPD that they should evaluate the experiences of officers who were subject to reviews in order to gauge whether there was buy-in and whether the officer felt the experience was overall beneficial. To their credit, the CPD gathered feedback from chain-of-command supervisors to hear their experiences and we recommend the CPD include all involved to gain comprehensive feedback.

During the pilot-assessment phase, the CPD should also work with supervisors to ensure the dashboard of relevant information about members under their command is user friendly and provides the types of information needed to facilitate intervention and support. These practices should be reflected in the forthcoming directive guiding implementation of the Talent Management System.

# Data Collection, Analysis & Management: ¶587

*587. The automated electronic system must include a computerized relational database that will be used to collect, maintain, integrate, analyze, visualize, and retrieve data for each CPD officer. The information collected and maintained must include but is not limited to: a. all reportable uses of force; b. all arrests by CPD personnel; c. all injuries to and deaths of persons in CPD custody; d. all injuries and deaths resulting from conduct by CPD personnel; e. all vehicle pursuits and traffic collisions involving CPD equipment or personnel; f. all misconduct complaints and investigations involving CPD officers, including the disposition of each allegation; g. all civil or administrative claims initiated against the City or CPD, or CPD officers for Jobs-related conduct; h. all criminal proceedings initiated against a CPD officer, which CPD will require officers to report; i. all instances in which CPD is notified that a court has made a negative credibility determination regarding a CPD officer; j. instances in which CPD learns through the Cook County State's Attorney's Office that an affirmative finding was made during the course of a criminal proceeding that a CPD member was untruthful, including any findings made at suppression hearings; k. all instances in which CPD learns through the Cook County State's Attorney Office, the United States Attorney's Office for the Northern District of Illinois, or other prosecutorial authority that prosecution was declined based in whole or in part on concerns about a CPD officer's credibility; l. judicial proceedings where an officer is the subject of a restraining or protective order, which CPD will require officers to report; m. disciplinary history for all CPD members; n. all non-disciplinary corrective action retained electronically; o. all violations of CPD's body-worn and in-car camera policies; p. all awards and commendations received by CPD officers; q. officer sick leave usage; r. missed court appearances; s. training history; and t. rank, assignment, and transfer history.*

## Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD did not achieve any level of compliance with ¶587.

As noted elsewhere, the CPD is transitioning to a new system called the Talent Management System for supervisory review of officers. However, the CPD has not provided us with any directive that contains the requirements of Talent Management System. Until the CPD provides us with a directive related to Talent Management System, we cannot assess if CPD meets the requirements of ¶587. In order to achieve Preliminary compliance, the CPD must finalize the system application and create a corresponding directive regarding its use.

# Data Collection, Analysis & Management: ¶588

*588. CPD will collect and maintain all information reasonably necessary to identify patterns of behavior that are indicative of a future instance of at-risk behavior. The automated electronic system must employ specific criteria to identify officers who will be subject to an intervention or targeted support. The criteria may be based on a single indicator, such as the number of misconduct complaints against an officer, a combination of multiple indicators, or an algorithmic scoring model. CPD will adjust the criteria as necessary based on data and experience to ensure interventions and support are optimally targeted.*

## Compliance Progress   (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not achieve any level of compliance with ¶588.

The CPD has made substantial progress by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System, but this policy is limited in scope to the pilot districts.

To achieve Preliminary compliance the CPD needs to incorporate lessons learned from the pilot to revise the Officer Support System and D20-04 and expand to additional districts. For subsequent levels of compliance, the CPD will then need to evaluate full-scale implementation of the Officer Support System.

# Data Collection, Analysis & Management: ¶589

**589.** *CPD will ensure that all required information is entered into the automated electronic system in a timely, accurate, and complete manner. All information captured within the automated electronic system will be accessible in an organized manner that facilitates identification of at-risk officer conduct.*

## Compliance Progress    (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and CPD did not achieve any level of compliance with ¶589.

CPD has made substantial progress by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System, but this policy is limited in scope to the pilot districts. To achieve Preliminary compliance, the CPD should respond to the monitoring team's suggested revisions to this directive which would bring the policy into Preliminary compliance with ¶589.

Subsequent levels of compliance will require the CPD to incorporate lessons learned from the pilot to revise the Officer Support System and D20-04 and expand to additional districts. The CPD will then need to evaluate full-scale implementation of the Officer Support System. Additionally, the CPD is using an outside vendor to conduct a comprehensive assessment of the underlying Officer Support System data. While this was originally presented to the IMT as an assessment related to ¶606 (see our assessment below), the assessment approach does appear to be sufficient to evaluate the Officer Support System data. Full compliance will therefore also depend on how CPD incorporates the findings of the report into the data systems that inform Officer Support System.

# Data Collection, Analysis & Management: ¶590

> **590.** *CPD will require unit commanding officers to review the automated electronic system data regarding all officers who are transferred to their command within 14 days of the transfer. CPD will require supervisors to conduct monthly reviews of the automated electronic system data regarding officers under their direct command. The purpose of these reviews will be for supervisors to identify and address patterns of behavior by officers under their direct command that are indicative of a future instance of at-risk behavior. CPD will also require supervisors to review the automated electronic system data together with officers under their direct command during the annual performance evaluation process.*

## Compliance Progress            (Reporting Period: January 1, 2021, through June 30, 2021)

**Deadline:**          Monthly                    ☐ **Met**   ☑ **Missed**

**Preliminary:**       *Not in Compliance*
**Secondary:**         *Not Yet Assessed*
**Full:**              *Not Yet Assessed*

In the fourth monitoring period, the City and CPD did not achieve any level of compliance with ¶590.

As described in our last report, the CPD was making a switch to a Talent Management System to replace the antiquated Performance Recognition System. The forthcoming Talent Management System will resolve the user-end faults of the Performance Recognition System by allowing supervisors a one-stop system for reviewing officer uses of force, allegations of misconduct, and other work-related statistics. However, through the fourth monitoring period, no directive related to Talent Management System exists[293] and a finalized version of the system application has not been provided. As a result, supervisors have continued to be derelict in their requirements to conduct monthly reviews of officers under their direct command.

In order to achieve Preliminary compliance, the CPD must finalize the system application and create a corresponding directive regarding its use. Further levels of

---

[293] The CPD does have a directive E05-02 (*Performance Recognition System*); however, that directive is outdated, and the CPD has agreed that it will be moot upon implementation of the Talent Management System.

compliance will require the CPD to adequately train supervisors on using the new system as well as evidence demonstrating consistent use by supervisors.

## Data Collection, Analysis & Management: ¶591

**591.** *The automated electronic system will employ push notifications and similar mechanisms to alert supervisors when patterns of conduct indicative of a future instance of at risk behavior are identified. CPD will provide appropriate interventions and support in a timely manner.*

### Compliance Progress          (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period the City and CPD did not achieve any level of compliance with ¶591.

CPD has made substantial progress by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System, but this policy is limited in scope to the pilot districts. To achieve Preliminary compliance, the CPD should respond to the monitoring team's suggested revisions to this directive, which would bring the policy into Preliminary compliance with ¶591.

Subsequent levels of compliance will require the CPD to incorporate lessons learned from the pilot to revise the Officer Support System and D20-04 and expand to additional districts. The CPD will then need to evaluate full-scale implementation of the Officer Support System.

## Data Collection, Analysis & Management: ¶592

**592.** *CPD will ensure that any CPD member required to receive counseling after being identified through the automated electronic system has the opportunity to participate in an initial counseling session within 14 days of the member being notified of the requirement.*

### Compliance Progress       (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period the City and CPD did not achieve any level of compliance with ¶592.

CPD has made substantial progress by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System, but this policy is limited in scope to the pilot districts. To achieve Preliminary compliance, the CPD should respond to the monitoring team's suggested revisions to this directive which would bring the policy into Preliminary compliance with ¶592.

Subsequent levels of compliance will require the CPD to incorporate lessons learned from the pilot to revise the Officer Support System and D20-04 and expand to additional districts. The CPD will then need to evaluate full-scale implementation of the Officer Support System.

# Data Collection, Analysis & Management: ¶593

**593.** *CPD will ensure that command staff regularly use the automated electronic system data to effectively manage CPD officers and supervisors across all ranks, watches, beats, and districts.*

## Compliance Progress          (Reporting Period: January 1, 2021, through June 30, 2021)

**Preliminary:**      *Not in Compliance*
**Secondary:**       *Not Yet Assessed*
**Full:**            *Not Yet Assessed*

During the fourth monitoring period, the City and CPD did not achieve any level of compliance with ¶593.

As described in our last report, and in the preceding paragraphs, the CPD was making a switch to a Talent Management System to replace the antiquated Performance Recognition System. However, through the fourth monitoring period, no directive related to Talent Management System exists[294] and a finalized version of the system application has not been provided. In order to achieve Preliminary compliance, the CPD must finalize the system application and create a corresponding directive regarding its use that includes outlining how the CPD will ensure that command staff regularly use system data to effectively manage officers and supervisors. Further levels of compliance will require presenting data on use of the Talent Management System to provide evidence that command staff are effectively managing officers across all ranks, watches, beats, and districts.

---

[294] The CPD does have a directive E05-02 (*Performance Recognition System*); however, that directive is outdated and the CPD has agreed that it will be moot upon implementation of the Talent Management System.

# Data Collection, Analysis & Management: ¶594

**594.** *CPD will provide training to all officers, supervisors, and command staff regarding the automated electronic system to ensure proper understanding and use of the system.*

## Compliance Progress (Reporting Period: January 1, 2021, through June 30, 2021)

**Preliminary:** *Not in compliance*
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the fourth reporting period the City and CPD did not achieve any level of compliance with ¶594.

CPD has made substantial progress by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System, but this policy is limited in scope to the pilot districts. To achieve Preliminary compliance, the CPD should respond to the monitoring team's suggested revisions to this directive which would bring the policy into Preliminary compliance with ¶594.

Although the CPD will need to revise their policies to achieve Preliminary compliance, we note that they have already taken significant steps to achieving Secondary compliance with the requirement of ¶594. The CPD has developed a supervisor training on understanding the Officer Support System and conducting "difficult discussions" with members who receive Officer Support System Work Items. In reviewing the training, we felt it was overall well developed. However, the training we received did not contain any evaluation criteria, a necessary component for comprehensive training. Additionally, the training did not contain any guidance on explaining to officers how and why the Officer Support System identified them as potentially needing intervention. As the Officer Support System uses advanced predictive statistics, the CPD will need to ensure that supervisors receive comprehensive training. Additionally, the CPD will need to ensure that all officers and command staff have received similar training. Such improvements to the training will be needed before expanding the Officer Support System department-wide.

# Data Collection, Analysis & Management: ¶595

**595.** *CPD will train all supervisors to use the automated electronic system as designed, to interpret the outputs, to perform appropriate interventions and support, to address underlying stressors to promote officer well-being, and to improve the performance of officers under their direct command.*

**Compliance Progress**     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not achieve any level of compliance with ¶595.

The CPD has made substantial progress by implementing the Pilot Program of the Officer Support System. Department Notice D20-04 outlines the policy associated with the Officer Support System, but this policy is limited in scope to the pilot districts. To achieve Preliminary compliance, the CPD should respond to the monitoring team's suggested revisions to this directive which would bring the policy into Preliminary compliance with ¶595.

Although CPD will need to revise their policies to achieve Preliminary compliance, we note that they have already taken significant steps to achieving Secondary compliance with the requirement of ¶595. The CPD has developed a supervisor training on understanding the Officer Support System and conducting "difficult discussions" with members who receive Officer Support System Work Items. In reviewing the training, we felt it was overall well developed. However, the training we received did not contain any evaluation criteria, a necessary component for comprehensive training. Additionally, the training did not contain any guidance on explaining to officers how and why the Officer Support System identified them as potentially needing intervention. As the Officer Support System uses advanced predictive statistics, the CPD will need to ensure that supervisors receive comprehensive training. Such improvements to the training will be needed before expanding the Officer Support System department-wide.

## Data Collection, Analysis & Management: ¶596

**596.** *CPD will conduct annual audits of the automated electronic system. The audits will: a. assess the overall effectiveness of the automated electronic system and the support and interventions prompted by the system; b. assess whether and to what extent supervisors are completing monthly reviews of the automated electronic system information regarding officers under their direct command; c. assess whether and to what extent CPD is providing interventions and support in a timely manner; d. assess whether the interventions and support provided are appropriate and effective; and e. identify any recommended changes to improve the effectiveness of the automated electronic system.*

### Compliance Progress (Reporting Period: January 1, 2021, through June 30, 2021)

| | | | |
|---|---|---|---|
| **Deadline:** | March 5, 2021* | ☐ Met | ☑ Missed |
| | *Extended from December 31, 2020, due to COVID-19 | | |
| **Preliminary:** | *Not in Compliance* | | |
| **Secondary:** | *Not Yet Assessed* | | |
| **Full:** | *Not Yet Assessed* | | |

In the fourth reporting period, the City and the CPD did not meet any level of compliance with ¶596.

The CPD uses two systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶596 apply to both systems.

As discussed in our compliance assessment of ¶590 above, the CPD is transitioning to a new system called the Talent Management System for supervisory review of officers. However, the Talent Management System has not yet been fully implemented and no directive has been enacted; therefore, the CPD cannot conduct the annual audits of this system as required by ¶596.

Additionally, the CPD is still in the process of implementing the Officer Support System and was pilot tested in the 5th District. After evaluating the pilot test, CPD is now planning on expanding the pilot. However, CPD's Directive D20-04 (*Officer Support System (OSS) – Pilot Program*) requires further revision and we recommend this occur prior to expansion. Additionally, we have not been provided with any measures of success from the 5th District. While the University of Chicago's

Urban Labs Crime Lab has provided us with results from preliminary data exploration, we are presently unaware of the number of officers flagged, the actions taken by supervisors, or any other outcomes (for instance, whether officers attended counseling if directed to) related to the 5th District pilot.

Further, measures of success aren't limited to quantitative data. For instance, subsection d of ¶596 requires CPD to "assess whether the interventions and support provided are appropriate and effective." In order to assess this, CPD will need to gather feedback from the officers who were flagged in order to gauge whether officers are buying into the system. For instance, some of the outcomes measured by the Officer Support System show a 90% false positive rate. If officers feel like the Officer Support System is not sufficiently discriminate (e.g., "you're singling me out for no reason") then trust in the system will be undermined and the system will ultimately fail.

Before expanding the pilot, the CPD will need to provide a satisfactory policy regarding pilot testing the Officer Support System as well as gather and assess currently available measurements of success (including officer and supervisor perspectives). We further look forward to discussing what measures of success will be used to satisfy the audit requirement of ¶596 and how the CPD will conceptualize those measures.

In order to achieve Preliminary compliance with the requirements of ¶596, the CPD will need to revise and finalize directives relates to the Talent Management System and Officer Support System. For Secondary compliance, the CPD will need to provide the IMT with a methodology for conducting annual audits which will act as a training tool for the auditors. Finally, CPD will need to provide annual reports detailing the findings of the audit, associated recommendations, and subsequent changes to the system based on the report. As practice, we recommend the CPD follow these steps for the 5th District pilot before further expanding to other districts.

# Data Collection, Analysis & Management: ¶598

**598.** *In seeking to provide improved support and wellness to its officers, CPD will seek to identify which supports and interventions are most helpful to officers and develop support and training based on CPD feedback and best practices. The types of support services offered to CPD officers may include, but not be limited to: counseling; training; coaching and mentoring; and additional supervision or monitoring.*

**Compliance Progress**          (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

During the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶598.

The CPD uses two systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows supervisors to view officer performance metrics in a centralized location. The requirements of ¶598 apply to both systems.

For both the Talent Management System and the Officer Support System, the CPD has not provided sufficient directives; therefore, we cannot assess compliance with the requirements in ¶598. In order to achieve Preliminary compliance, the CPD must finalize directives related to the two systems.

Secondary compliance will depend on the CPD providing a methodology for conducting the types of reviews required by ¶598. As part of their evaluation, we recommend the CPD evaluate both quantitative and qualitative data. For instance, we informed the CPD that they should evaluate the experiences of officers who were subject to reviews in order to gauge whether there was buy-in and whether the officer felt the experience was overall beneficial. To their credit, the CPD gathered feedback from chain-of-command supervisors to hear their experiences and we recommend the CPD include all involved to gain comprehensive feedback. We would expect these actions to be part of the CPD's broader assessment methodology and that the methodology be completed before expanding the Officer Support System department-wide.

To achieve Full compliance, the CPD will need to conduct an initial and ongoing evaluations of the interventions and support being provided. The IMT will then audit CPD data and findings.

# Data Collection, Analysis & Management: ¶601

**601.** *CPD will continue to solicit input and feedback from representatives of its collective bargaining units during the development and implementation of the EIS.*

## Compliance Progress (Reporting Period: January 1, 2021, through June 30, 2021)

**Preliminary:** *In Compliance* (THIRD REPORTING PERIOD)
**Secondary:** *Not Yet Assessed*
**Full:** *Not Yet Assessed*

In the fourth reporting period, the City and the CPD maintained Preliminary compliance with ¶601.

In our last report, we noted that bargaining units for each rank were invited to introductory and developmental meetings related to the Officer Support System and that members of bargaining units actively participated in some meetings during the development of the system.

While CPD's initial efforts formed the basis of Preliminary compliance for ¶601, future opportunities will exist for CPD to engage with members of various bargaining units. To achieve subsequent levels of compliance, we recommend CPD conduct a comprehensive assessment of the pilot test in the 5th District (see our assessment of ¶596) and then re-engage with members of bargaining units, using the findings of the audit as a framework for discussion. After engagement, the CPD should then revise directives, training, and the Officer Support System model (if necessary) before expanding the pilot program. The CPD can then repeat this process before expanding the Officer Support System department-wide.

# Data Collection, Analysis & Management: ¶602

**602.** *Prior to beginning the phased implementation of the EIS, CPD will develop and implement new or revised policies and procedures for using the EIS and, if applicable, the updated PRS and information obtained from them. The policies and procedures will address data storage, data retrieval, data analysis, reporting, pattern identification, supervisory use, intervention and support options and procedures, documentation and audits, access to the system, and confidentiality of personally identifiable information.*

## Compliance Progress    (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶602.

The CPD is utilizing two separate systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶602 apply to both systems.

The CPD utilized Department Notice D20-04 (*Officer Support System – Pilot Program*) for the pilot test in the 5th District. However, in our last report, we noted that we had not been provided an opportunity to give feedback on the directive prior to implementation. In this monitoring period, we received such an opportunity for feedback and noted that D20-04 does not contain all the elements of ¶602 and requires further revision. We recommend the further revision occurs prior to expansion to other districts.

The CPD is also making a switch to a Talent Management System to replace the antiquated Performance Recognition System. The forthcoming Talent Management System will resolve the user-end faults of the Performance Recognition System by allowing supervisors a one-stop system for reviewing officer uses of force, allegations of misconduct, and other work-related statistics. However, through the fourth monitoring period, no directive related to Talent Management System exists and a finalized version of the system application has not been provided.

Although the CPD will need to revise their policies to achieve Preliminary compliance, we note that they have already taken significant steps to achieving Secondary compliance with the requirement of ¶602. The CPD has developed a supervisor training on understanding the Officer Support System and conducting "difficult discussions" with members who receive Officer Support System Work Items. In reviewing the training, we felt it was overall well developed. However, the training we received did not contain any evaluation criteria, a necessary component for comprehensive training. Additionally, the training did not contain any guidance on explaining to officers how and why the Officer Support System identified them as potentially needing intervention. As the Officer Support System uses advanced predictive statistics, supervisors will need to walk the line between trying to explain complex models and providing an insufficient explanation (see also ¶594).

Both of these issues will need to be resolved before the CPD provides the training department-wide in order to achieve Secondary compliance. Additionally, the training was developed based on lessons learned from the pilot in the 5th District. Upon expansion to the 4th, 6th, and 7th Districts, the CPD should solicit additional feedback from district commanders and revise the training as necessary given their input. While these steps still need to be taken, we appreciate the clear effort made to develop the training and feel it represents a serious approach on the part of the CPD.

## Data Collection, Analysis & Management: ¶603

> **603.** *After the completion of the development of the EIS, CPD will implement the EIS through a phased rollout that incorporates pilot testing to identify and address any technical or design issues. CPD will begin phased implementation of the EIS within 18 months of the Effective Date, and will complete full implementation of the EIS by no later than 24 months after the Effective Date.*

**Compliance Progress** (Reporting Period: January 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | November 3, 2020* | ☑ Met  ☐ Missed |
| | *Extended from September 1, 2020, due to COVID-19 | |
| **Deadline:** | May 3, 2021* | ☐ Met  ☑ Missed |
| | *Extended from March 1, 2021, due to COVID-19 | |
| **Preliminary:** | *Not in Compliance* | |
| **Secondary:** | *Not Yet Assessed* | |
| **Full:** | *Not Yet Assessed* | |

In the fourth reporting period, the City and the CPD did not meet any level of compliance with ¶603. While the City and the CPD met the first deadline by beginning the process for a phased implementation of the Early Intervention System by November 3, 2020, the City and the CPD did fully implement the Early Intervention System by May 3, 2021—or by the end of the fourth reporting period.

The CPD is utilizing two separate systems to accomplish the goals of the Early Intervention System section of the Consent Decree. The first system is an Officer Support System, which incorporates several data points into a statistical model to predict which officers are at higher risk of future adverse events. The second is a Talent Management System, which allows for supervisors to view officer performance metrics in a centralized location. The requirements of ¶603 apply to both systems.

Although the CPD has created draft policies related to the Officer Support System and Talent Management System, they are not finalized. The requirements of ¶603 are designed to come *after* the finalization of policies (*see* ¶602) and therefore Preliminary compliance will require the CPD to finalize the system applications and create corresponding directives that comprehensively incorporate all paragraphs related to the Early Intervention System section of the Consent Decree. Subsequent levels of compliance will require training (as discussed in other paragraphs assessments) and the implementation of the Officer Support System/Talent Management System department-wide.

## Data Collection, Analysis & Management: ¶604

**604.** *Prior to full implementation of the EIS, CPD will continue to use the PRS as well as other existing tools and resources to identify patterns of conduct by officers that warrant support and intervention. Following the development and implementation of the EIS, the functions required of the automated electronic system described above may be performed by a combination of the EIS and the PRS as long as all required functions are performed and supervisors are using the system(s) as required by CPD policy. To the extent CPD continues utilizing PRS to perform any of the functions required by this Agreement, CPD will update the PRS to enhance the system's effectiveness, usability, and accuracy by no later than January 1, 2020.*

**Compliance Progress** (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶604.

As allowed by ¶604, the CPD is using a combination of the Officer Support System and Talent Management System to achieve "the functions required of the automated electronic system described [in the Early Intervention System section of the Consent Decree]." As indicated in our assessment of various paragraphs above, the IMT believes that the CPD is well on their way to achieving those required functions. However, additional policy revisions are necessary to achieve Preliminary compliance with the requirement of ¶604.

For instance, the CPD is making a switch to a Talent Management System to replace the antiquated Performance Recognition System. The forthcoming Talent Management System will resolve the user-end faults of the Performance Recognition System by allowing supervisors a one-stop system for reviewing officer uses of force, allegations of misconduct, and other work-related statistics. However, no directive related to Talent Management System exists and a finalized version of the system application has not been provided. These issues will need to be resolved and updated training will need to be provided for supervisors in using the Talent Management System.

# Data Collection, Analysis & Management: ¶606

*606. Within 365 days of the Effective Date, CPD will conduct an assessment of CPD's current information collection mechanisms and data management technology to identify: a. what data CPD currently collects and what additional data is required to be collected to comply with this Agreement; b. the manner of collection (e.g., electronic or paper); c. the frequency with which each type of data is updated; d. the quality control mechanisms in place, or the need for such mechanisms, to ensure the accuracy of data collected; e. what software applications or data systems CPD currently has and the extent to which they are used or accessed by CPD members; f. redundancies or inefficiencies among the applications and systems currently in use; and g. the extent to which the applications and systems currently in use interact with one another effectively.*

## Compliance Progress    (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth reporting period, the City and the CPD did not meet Preliminary compliance with ¶606.

During the fourth monitoring period, the CPD provided a Data Systems Plan from a company the City contracted with to conduct a partial-assessment of that required by ¶606. At the end of the fourth reporting period, the records we received reflected that the Plan only relates to evaluating the data systems necessary to implement the Officer Support System. Outside of this system, there was no mention data collection systems for other areas such as community engagement or impartial policing and no meeting had been held with all IMT Associate Monitors to gather input on "what additional data is required to be collected to comply with this Agreement."

The subsections of ¶606 requires evaluation of <u>all</u> "information collection mechanisms and data management technology" and "the extent to which applications and systems currently in use interact with one another effectively" (among other things). Conversations with CPD personnel since the beginning of our tenure as monitor have indicated that these will be major tasks. To achieve Preliminary compliance with ¶606, the City and the CPD will need to create a data systems plan to reflect the entirety of the paragraph rather than just the Officer Support System. As part of this, we recommend the City meet with the IMT Associate Monitors in

order for each Associate Monitor to be confident that data systems related to their section are being fully evaluated.

To clarify, in the fifth reporting period, the City and the CPD began to demonstrate that the assessment will have a larger scope. Because we received this information after the fourth reporting period, we will update this assessment with that new information in the next reporting period.

Secondary compliance for this paragraph will depend on a comprehensive report detailing CPD's current information collection mechanisms and data management technology. Full compliance will then require the CPD to implement necessary remedial actions based on the findings of the report.

# Data Collection, Analysis & Management: ¶607

*607. Within 90 days of completion of the assessment described in the preceding paragraph, CPD will develop a plan, including a timeline for implementation, to prioritize and address the needs identified to enhance CPD's information collection mechanisms and data management technology ("Data Systems Plan"). CPD will implement the Data Systems Plan in accordance with the specified timeline for implementation.*

## Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *Not in Compliance* |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD did not meet any level of compliance with ¶607.

Paragraph 607 is a moving deadline, which did not apply in the fourth reporting period. *See* ¶606.

As noted in our assessment of ¶606, the City released a Data Systems Plan that only relates to evaluating the data systems necessary to implement the Officer Support System. Outside of this system, there is no mention data collection systems for other areas such as community engagement or impartial policing and no meeting has been held with all IMT Associate Monitors to gather input on "what additional data is required to be collected to comply with this Agreement."

To achieve Preliminary compliance with ¶607, the City and the CPD will first need to create a data systems plan to reflect the entirety of ¶606 rather than just the Officer Support System.

## Data Collection, Analysis & Management: ¶608

**608.** *CPD will continue to maintain an Information Systems Development Group ("ISDG"). The ISDG will continue to be chaired by the Chief of the Bureau of Technical Services or other high-ranking member of CPD's command staff. The ISDG will also include, in some capacity, personnel from various units of the Department that are responsible for overseeing patrol field operations; conducting criminal investigation and processing juvenile offenders; initiating and conducting investigations of organized crime; overseeing the administrative aspects of CPD; managing data, technology, and information systems; coordinating and exercising supervision over disciplinary matters; administering training; providing legal advice; developing and publishing department policies and procedures; and overseeing and coordinating CPD's budget and fiscal responsibilities. The ISDG will be responsible for: a. ensuring implementation of the Data Systems Plan; b. ensuring CPD's information collection mechanisms and data management technologies are in the best long-term interests of the Department for improving operations and management consistent with the terms of this Agreement; and c. recommending strategies to promote the development, sharing, and reporting of relevant information to the Superintendent, the public, the FRB, COPA, BIA, and OIG.*

### Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | |
|---|---|
| **Preliminary:** | *In Compliance* (NEW) |
| **Secondary:** | *Not Yet Assessed* |
| **Full:** | *Not Yet Assessed* |

In the fourth monitoring period, the City and the CPD achieved Preliminary compliance with the requirements of ¶608.

In this monitoring period, the CPD revised Special Order S09-01-01 (*Information Systems Development Group*) which now contains the requirements of ¶608. In addition to the requirements of ¶608, the Special Order notes that the ISDG will identify user needs, recommend project that are in the best long-term interests of the department, and recommend policies and strategies that promote data security and integrity (among other things). However, we have not received any SOP that identifies methodologies for accomplishing these tasks which is a necessary component for Secondary compliance. Full compliance will then depend on a demonstrated ability to provide sound guidance on data system integrity as well as assisting in the implementation of recommendations born out of the ¶606 review.

# Data Collection, Analysis & Management: ¶609

**609.** *On an annual basis, to improve the accuracy, reliability, and efficiency of its data collection, CPD will review and, as necessary, revise departmental forms relating to: use of force, arrests, interactions with individuals in crisis, and the disciplinary process.*

## Compliance Progress     (Reporting Period: January 1, 2021, through June 30, 2021)

| | | |
|---|---|---|
| **Deadline:** | March 5, 2021* | ☐ **Met**   ☑ **Missed** |
| | *Extended from December 31, 2020, due to COVID-19 | |
| **Preliminary:** | *In Compliance* (NEW) | |
| **Secondary:** | *In Compliance* (NEW) | |
| **Full:** | *Not Yet Assessed* | |

In the fourth reporting period, the City and the CPD met Preliminary and Secondary compliance with ¶609.

During the fourth reporting period, the CPD provided the IMT with a revised version of Special Order S09-03-02, *Forms Management System*, which clearly states that the CPD will review departmental forms on an annual basis consistent with the requirements of ¶609. Additionally, S09-03-02 identifies the process for ensuring forms are reviewed annually, including the unit responsible for the overall process and the necessary steps for sending the forms to those conducting the review. We therefore find that a policy exists and a process for review is spelled out, thereby creating a potential training component.

As they relate to the Consent Decree sections on Use of Force and Crisis Intervention, the CPD has extensively reviewed and revised the forms related to use of force (*e.g.*, the TRR) and interactions with individuals in crisis (*e.g.*, CIT Report). Both the TRR and the CIT Report have been revised in accordance with IMT comments and both have received no-objection letters from the IMT. Moving forward, to maintain Secondary compliance, the City and the CPD will need to demonstrate that S09-03-02 is sufficient to ensure that the CPD does the requisite reviews and revisions annually. To date, however, the IMT has not been provided any evidence that forms related to arrests and disciplinary processes have been revised.

For Full compliance, the City and the CPD will need to demonstrate that they have followed the policy and training to complete the necessary reviews and revisions annually.

# XI. Implementation, Enforcement & Monitoring

This is the last section of the Independent Monitoring Team's (IMT's) fourth semi-annual Independent Monitoring Report. It includes our status updates for the City of Chicago's (City's) and its relevant entities' efforts from January 1, 2021, through June 30, 2021, regarding the implementation, enforcement, and monitoring obligations of the Consent Decree.

As we identified in our Monitoring Plan for Year Two, the City has certain obligations that fall outside the 10 topic areas. While these paragraphs do not fall within the specific topic areas discussed above, these obligations are critical to the success of the reform efforts across all 10 topic areas of the Consent Decree. For this reason, the IMT is providing updates on the City's efforts under the following paragraphs: ¶¶677–79, 683–86, 711, and 720.

## Consent Decree ¶677–78

*677. The City and CPD agree to hire, retain, or reassign current City or CPD employees to form a unit with the knowledge, skills, and abilities necessary to facilitate compliance with this Agreement.*

*678. At a minimum, CPD will designate personnel to be responsible for: a. coordinating the City's and CPD's compliance and implementation activities; b. facilitating the provision of data, documents, materials, and access to the City's and CPD's personnel to the Monitor and OAG, as needed; c. ensuring that all data, documents, and records are maintained as provided in this Agreement; and d. assisting in assigning implementation and compliance related tasks to CPD personnel, as directed by the Superintendent or the Superintendent's designee.*

### Status

The City and the Chicago Police Department (CPD) continue to garner the resources necessary to achieve compliance with the Consent Decree. The City and the CPD have designated the following entities to be responsible for the following provisions of ¶678:

678(a): the CPD's Reform Management Group and the City's Department of Law;

678(b) and (c): the CPD's Office of Legal Affairs and the City's Department of Law; and

678(d): the CPD's Reform Management Group.[295]

Overall, personnel from the City, the CPD, and other relevant City entities continue to assist the IMT by providing information, updates, and evidence of compliance efforts. These representatives frequently arrange communications and help the IMT navigate the complexity of the City entities.

As with previous reporting periods, we have had a few specific concerns about the lack of consistent staffing and retention levels in the Reform Management Group and the high level of turnover in the two years since the Consent Decree began. The Reform Management Group is located within the CPD's Office of Constitutional Policing and Reform and works closely with the CPD's Office of Legal Affairs and the City's Department of Law. The personnel in these groups have many of the "knowledge, skills, and abilities necessary to facilitate compliance with this Agreement." The City's Department of Law provides many of the project management functions for the relevant city entities—the Civilian Office of Police Accountability (COPA); the Chicago Police Board; the City Office of Inspector General (OIG), including the Deputy Inspector General for Public Safety (Deputy PSIG); and the Office of Emergency Management and Communications (OEMC). The Reform Management Group provides many of these project management functions for the CPD.

Likewise, since the beginning of the Consent Decree, we have had concerns regarding a lack of direct participation from CPD Command staff in reform activities. Those continued throughout the fourth reporting period. With some high-profile and notable exceptions, it is unclear to the IMT, for example, whether Command staff regularly review policy revisions or training curricula before the IMT and the Office of the Illinois Attorney General (OAG) receive them for review. CPD leadership does not seem to be a part of the "unit" described above. The Office of Constitutional Policing and Reform used to include a Chief/Commanding Officer position, but since the retirement of Chief James O'Donnell in May 2021, that leadership position has been vacant. The CPD's leadership—from sergeants up to the Superintendent—must consistently and intentionally participate in reform to achieve compliance with the Consent Decree more expeditiously.

We also note our concern with the staffing in a few other units within the CPD that are crucial drivers of Consent Decree compliance. The City and the CPD must continue to make efforts to maintain staffing at appropriate levels at all times in the

---

[295]  The CPD's Reform Management Group used to be called the Office of Reform Management and is referred to as such in previous reporting periods. We understand that the CPD may be currently undergoing additional changes to this structure in the fifth reporting period.

following key departments: the Research and Development Division, the Force Review Division, the Legal Affairs Division, the Education and Training Division, the Crisis Intervention Team, the Audit Division, and the Reform Management Group.

Further, during previous reporting periods, we identified several additional staffing and resource needs, noting the impacts of organizational changes. Throughout this reporting period, Superintendent David Brown has continued to make organizational changes. As we noted earlier, changes in leadership can disrupt efforts toward reform during transition periods.

Many of the City's and CPD's efforts and achievements in the first three reporting periods continued into the fourth reporting period. The City Department of Law, the CPD's Office of Constitutional Policing and Reform, the Legal Affairs Division, and the Research and Development Division (¶¶677–78) continued to be fully engaged in the monitoring process. The City and the CPD also maintained regular channels of communication with the IMT and the OAG and continued dialogue, problem-solving, and brainstorming about requirements and challenges regarding the paragraphs of the Consent Decree.

We recognize that the City's and the CPD's resources are limited. As referenced above, the City and the CPD have already added many resources to guide compliance efforts.

In our first report, we recommended that the City and the CPD increase resources and staffing to various departments. In response, the CPD increased staffing in the following departments:

❖ **The Research and Development Division.** The Research and Development Division frequently works with the IMT to develop compliance documents and policies. As a result, increases in staffing in this department reduced bottlenecking with limited personnel.

❖ **The Force Review Division.** As discussed further in the Use of Force section above, the Force Review Division is critical to several Consent Decree requirements. The CPD agreed that the workload of this department was greater than the department's capacity and has struggled to keep consistent, appropriate staffing levels.

Before the COVID-19 pandemic, many of these staffing increases had begun to make the City's compliance efforts more efficient. While we understand that ongoing challenges continue based on limited resources and staff and the continuing effects of COVID-19, we reiterate the need for the City and the CPD to devote sustained or increased resources and staffing to the Legal Affairs Division, the Training Division, and Crisis Intervention.

## Consent Decree ¶679

> **679.** *The City and CPD agree to collect and maintain all data and records necessary to document compliance with this Agreement, including data and records necessary for the Monitor to conduct reliable compliance reviews and audits.*

### Compliance Status

As we have noted in each of our previous Independent Monitoring Reports and in the Data Collection, Analysis, and Management section of this report, the City and the CPD are not currently collecting and maintaining "all data and records necessary to document compliance with this Agreement." This is due, in part, to pervasive data systems challenges.[296] Not only do we need complete and verifiable data to assess compliance across all areas of the Consent Decree, but also the City and the CPD need this data to monitor, reform, and adapt its efforts to current and future challenges. The research, analysis, and data collection under the Consent Decree and best practices are demanding. To effectively identify and resolve existing and upcoming challenges, the City and the CPD must maintain, track, and analyze the data. To meet these challenges, the City, the CPD, and the OAG continue to engage in data discussions for each topic area. Based on these discussions, there is universal agreement that the CPD has a long way to go to meet the data requirements of the Consent Decree.

The CPD still does not have a consistent system for auditing and validating its data systems or correcting and upgrading those systems based on regular audits. While the CPD may maintain, assess, and correct data system problems regularly, it is not doing so based on a standard audit process.

In short, the CPD does not currently have the data resources and systems in place to meet the demands of the Consent Decree. We are aware that the CPD is still in the process of assessing and reorganizing several facets of its data management systems, and we hope that the reorganization is effective. We will continue to work with the City and the CPD to ensure that these efforts continue.

---

[296] *See, e.g.*, our analysis of ¶¶168 and 174, which detail specific data concerns regarding foot pursuit data collection and analysis, and our analysis of ¶606, which details some overarching data issues.

## Consent Decree ¶680

**680.** *Beginning with the Monitor's first report filed with the Court, and for each subsequent semiannual report by the Monitor, the City agrees to file a status report one month before each of the Monitor's reports is due for the duration of this Agreement. The City's status report will delineate the steps taken by CPD during the reporting period to comply with this Agreement, and CPD's assessment of the status of its progress implementing this Agreement.*

## Compliance Status

The City filed the status reports required by ¶680 before the IMT issued its draft monitoring reports for the first three reporting periods. In the fourth reporting period, however, the City and the CPD filed the status report on September 8, 2021.[297] The City's most recent status report assesses its progress implementing the requirements of the Consent Decree and addresses topics including community policing, policy development, community engagement, training, and pilot programs.

As with the IMT's semiannual reports, the City's reports will likely become longer and more detailed over time. The IMT views these status reports as a helpful tool as the City's and the CPD's self-assessment to help clarify the City's progress and make accurate compliance determinations.

---

[297] *See Chicago Police Department Reform Progress Update,* CITY OF CHICAGO, (September 8, 2021), https://home.chicagopolice.org/wp-content/uploads/CPD-IMR-4-Reform-Progress-Update.pdf. The City filed its first semiannual status report with the Court on September 3, 2019. *See The City of Chicago's Semiannual Status Report,* CITY OF CHICAGO (September 3, 2019), https://home.chicagopolice.org/wp-content/uploads/2020/06/Citys-First-Status-Report-IMR-1-2019-.pdf. The City filed its second semiannual status report with the Court on March 5, 2020. *See Chicago Police Department Reform Progress Update,* CITY OF CHICAGO (February 7, 2021), https://home.chicagopolice.org/wp-content/uploads/2021/02/CPD-Reform-Status-Report-compressed.pdf. The City filed its third semiannual status report on February 7, 2021. *See The City of Chicago's Amended Second Semiannual Status Report,* CITY OF CHICAGO (March 5, 2020), https://home.chicagopolice.org/wp-content/uploads/2020/06/5-March-2020-City-of-Chicago-Consent-Decree-Status-Report-Amended.pdf.

## Consent Decree ¶683

**683.** *CPD will notify the Monitor as soon as practicable, and in any case within 24 hours, of any officer-involved shootings, any death of a person in CPD custody, or any arrest of a CPD member. In the event a CPD member is arrested by a law enforcement agency other than CPD, CPD will notify the Monitor as soon as practicable, and in any case within 24 hours of receiving notice of the arrest. The Monitor will cooperate with the City to obtain access to people and facilities in a reasonable manner that, consistent with the Monitor's responsibilities, minimizes interference with daily operations.*

### Compliance Status

Since the beginning of the monitoring process, the CPD has consistently notified the IMT of any officer-involved shootings, any death of a person in CPD custody, and any arrest of a CPD member within 24 hours after the event through its Crime Prevention and Information Center (CPIC) email notification system.

As of the date of this report, three members of the IMT are subscribed to the CPIC notification system and receive automatic emails about these events. The CPD and the City have provided IMT access to City personnel and facilities across entities. They have also allowed members of the IMT to observe and learn more about officer-involved shooting scenes and processes.

## Consent Decree ¶684

**684.** *The City and CPD will ensure that the Monitor has prompt access to all City and CPD documents and data related to the Agreement that the monitor reasonably deems necessary to carry out the duties assigned to the Monitor by this Agreement, except any communications, documents, or data to which access is limited or precluded by court order, or protected by the work product doctrine or the attorney-client privilege (collectively, "privilege").*

### Compliance Status

The City and the CPD have made many efforts to provide the IMT with access to documents and data relevant to the Consent Decree.

As noted in our first three monitoring reports, we had significant concerns regarding document and data productions, as a substantial number of materials would arrive at or near the end of the reporting period. While this challenge continued

in the fourth reporting period, the City and its relevant entities made significant improvements. Further, throughout this monitoring period, the City and the CPD discussed with the IMT how to improve the quality of their document and data productions. We welcome and look forward to continued discussions and developments.

Further, early in the Consent Decree, the IMT and the OAG began to have concerns regarding how promptly the City and some of the City's relevant entities respond to requests for information. In the fourth reporting period, the City, the CPD, the OAG, and IMT continued to dedicate time toward addressing these concerns and improving the request and production procedures.

We look forward to continuing to work with the City and the CPD to resolve the access issues and hope for more timely responses to our requests for information in future reporting periods.

## Consent Decree ¶¶685 and 686

*685. Privilege may not be used to prevent the Monitor from observing training sessions, disciplinary hearings, or other CPD, COPA, or Police Board activities or proceedings that do not involve the provision or receipt of legal advice. The City is not required to provide the Monitor with access to documents or data that is privileged. Should the City or CPD decline to provide the Monitor with access to communications, documents, or data based on privilege, the City or CPD will inform the Monitor and OAG that documents or data are being withheld on the basis of privilege which may, but need not be, in the form of a privilege log. If the Monitor or OAG objects to an assertion of privilege, the Monitor or OAG may challenge the propriety of the privilege assertion before the Court.*

*\*\*\**

*686. In coordination with the City's legal counsel, OAG and its consultants and agents will have access to all City and CPD personnel, facilities, training, documents, and data related to this Agreement, except any documents or data protected by privilege. OAG and its consultants and agents will coordinate with the City's legal counsel to access personnel, facilities, training, documents, and data in a reasonable manner that is consistent with OAG's right to seek enforcement of this Agreement and that minimizes interference with daily operations. The City is not required to provide the Monitor with access to communications, documents, or data that is privileged. Should the City or CPD decline*

*to provide OAG with access to documents or data based on privilege, the City or CPD will inform OAG that that documents or data are being withheld on this basis, which may, but need not be, in the form of a privilege log. If OAG objects to a privilege assertion by the City or CPD, OAG may challenge the propriety of the privilege assertion before the Court.*

## Compliance Status

We do not believe that the City has deliberately used privilege to prevent us from accessing events (such as training sessions or meetings), documents, data, or communications "that do not involve the provision or receipt of legal advice" per ¶685. While we have concerns that the production of some materials has been unnecessarily delayed, we continue to note significant improvements regarding the willingness to share confidential information with the IMT on a timely basis.

Further, since the beginning of the Consent Decree, there have also been access issues and disputes between the OAG and the City. We believe that the City and the OAG, collectively the Parties, continue to make progress toward resolving those issues.

## Consent Decree ¶711

*711. Nothing in this Consent Decree is intended to (a) alter any of the CBAs between the City and the Unions; or (b) impair or conflict with the collective bargaining rights of employees in those units under the IPLRA. Nothing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the terms of the CBAs, including any Successor CBAs resulting from the negotiation process (including Statutory Impasse Resolution Procedures) mandated by the IPLRA with respect to the subject of wages, hours and terms and conditions of employment unless such terms violate the U.S. Constitution, Illinois law or public policy, or (ii) any bargaining obligations under the IPLRA, and/or waive any rights or obligations thereunder. In negotiating Successor CBAs and during any Statutory Resolution Impasse Procedures, the City shall use its best efforts to secure modifications to the CBAs consistent with the terms of this Consent Decree, or to the extent necessary to provide for the effective implementation of the provisions of this Consent Decree.*

## Compliance Status

As explained in our previous reports, the City is a party to collective bargaining relationships with four labor unions representing sworn police officers:

- The Fraternal Order of Police, Chicago Lodge No. 7 (FOP);

- The Policemen's Benevolent & Protective Association of Illinois (PBPA), Unit 156 – Sergeants;

- PBPA of Illinois, Unit 156 – Lieutenants; and

- PBPA of Illinois, Unit 156 – Captains (collectively, the "Unions").

Paragraph 711 of the Consent Decree harmonizes the City's statutory bargaining obligations with the Unions with the City's Consent Decree obligations. Specifically, Paragraph 711 adopts the following key tenets:

- As a threshold matter, the Consent Decree is not intended to alter the City's collective bargaining agreements or otherwise to impair or conflict with the officers' statutory rights to engage in collective bargaining through their chosen representatives (the Unions);

- Likewise, the Consent Decree does not obligate the City (or the Unions) to violate the terms of their collective bargaining agreements, or to violate or waive any bargaining rights or obligations;

- Nevertheless, in recognition of the fact that the City's labor agreements can and will directly impact its compliance with various provisions in the Consent Decree, the Consent Decree obligates the City to "use its best efforts" in the collective bargaining process "to secure modifications" to its collective bargaining agreements covering sworn officers that are consistent with the terms of the Consent Decree or to the extent necessary to implement the provisions of the Consent Decree.

The City's most recent collective bargaining agreements were long expired before the start of the Consent Decree. Throughout the Consent Decree process, the City has been engaged in negotiations with the Unions for successor agreements. While negotiations continued, the City applied the provisions of the expired agreements.

To monitor compliance with ¶711, the City, the IMT, and the OAG met on a near-monthly basis throughout the fourth reporting period, just as they had done in previous reporting periods, to discuss updates on the City's progress in bargaining successor labor agreements with the Unions.

During these meetings, the City provided access to members of its bargaining committee. These members explained the City's various contract proposals to the Unions, seeking to modify terms in the expired labor agreements to achieve compliance with various Consent Decree provisions. Among the most significant of the

City's proposals (and, to the Unions, among the most contentious), the City has sought to modify the process for receiving and investigating complaints of officer misconduct, including allowing for the investigation of complaints that are anonymous or not backed by a sworn affidavit. *See, e.g.*, ¶¶421, 425, 427, 431, 461, 462, 475, 477, 508, and 514. The City also has proposed changes to retain disciplinary records indefinitely, rather than for five years. *See* ¶508.

Throughout the parties' negotiations, the Unions have consistently rejected these proposed changes. As a result of the parties' continuing disputes on these and other proposed contract terms, the City had yet to secure an agreed settlement for a successor labor agreement with any of the Unions by the end of the fourth monitoring period.

Nevertheless, the City made varying degrees of progress with the separate Unions during the fourth monitoring period. More significant, shortly following the conclusion of the fourth monitoring period, the City announced that it had reached an "interim agreement" with the FOP to implement a series of "accountability changes" to the parties' collective bargaining agreement.

After the fourth reporting period, the new proposed agreement with the FOP was approved by the FOP's membership through a ratification vote. The proposed agreement was then approved by a majority vote of the City Council. The new eight-year labor agreement reaches back to the expiration of the prior agreement, July 1, 2017, and continues through June 30, 2025.

The new agreement includes the following changes to the expired agreement, which are aimed at furthering CPD's compliance with various Consent Decree provisions:

- Eliminates the prior ban on anonymous complaints about police misconduct;

- Eliminates the requirement for sworn complainant affidavits, providing instead for an expedited "override" process for anonymous complaints and in situations where the complainant refuses to be identified;

- Removes the requirement to destroy disciplinary records older than five years;

- Allows for broader of use of disciplinary records in cases involving police misconduct;

- Adds language that explicitly requires supervisors to report all misconduct;

- Removes the contract language that was viewed as a "ban" on rewarding/recognizing officers who report misconduct, stating instead that officers who report potential misconduct are acting in the highest traditions of public service.

Several changes have also been made to collective bargaining agreements with the PBPA (the Union that represents sergeants, lieutenants, and captains). As explained in the last monitoring report, an Interest Arbitration Board issued a decision concerning the bargaining dispute between the City and the PBPA on June 26, 2020. Significantly, the Board's decision accepts the City's position with respect to several disputed contract proposals that have a direct impact on Consent Decree provisions. Most notably, the decision confirms the City's right to use anonymous complaints as a basis for investigations of alleged officer misconduct and accepts the City's position regarding the retention of disciplinary records.

The PBPA filed a state court lawsuit seeking to have the Interest Arbitration Board's decision vacated. The Union's state court challenge to the interest arbitration decision remains pending.

## Consent Decree ¶720

> **720.** *At all times, the City will bear the burden of demonstrating by a preponderance of the evidence it has achieved full and effective compliance with the requirements of this Agreement.*

### Compliance Status

To reach compliance with the Consent Decree, the City and the CPD must provide the IMT with sufficient evidence that they are making reforms. The CPD must also show that it has appropriate procedures that will effectuate timely and sustainable compliance.

We believe that the City understands that it holds the burden of demonstrating compliance with the Consent Decree. In fact, we believe that the City and many of its relevant entities have taken increased ownership over this obligation through large unilateral productions of compliance records. Since the City and its entities have started making these productions, the number of OAG and IMT requests for information has decreased. While there continue to be challenges with the City meeting the remaining requests for productions, the City and the CPD have maintained the level of improvement that they began in the third reporting period through the fourth reporting period.

# Conclusion and Looking Ahead to Independent Monitoring Report 5

We have concluded our monitoring efforts for the fourth reporting period (January 1, 2021, through June 30, 2021). The City met additional Consent Decree requirements during this reporting period while facing a number of challenges, including the COVID-19 pandemic; rising violent-crime rates; and many leadership changes. Despite sustained and emerging challenges, the Parties and the IMT continue to work together to improve policies, training, and practices.

In the near future, we will release several reports to reflect additional Consent Decree efforts, challenges, and achievements. These will include the following reports:

❖ Monitoring Plan for Year Three (January 1, 2022, through December 31, 2022);

❖ Special Report on its Year Two Community Focus Groups; and

❖ Second citywide Community Survey Report (¶¶645–51).

To date, we are encouraged by the reform efforts made by many hard working City personnel, including the significant compliance progress made by the CPD's Research and Development Division; COPA; the Chicago Police Board; the OIG, including the Deputy PSIG; and the OEMC.

The IMT's next semiannual report, Independent Monitoring Report 5, will cover the reporting period from June 1, 2021, through December 31, 2021. As with previous reports, we will continue to work with the City and the OAG to address the paragraphs we assessed in the first, second, third, and fourth reporting periods. We will also continue to hear from Chicagoans to determine whether these reforms are being felt in their communities.

Attachment A:
Office of the Illinois Attorney General
Comments
September 28, 2021



# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

September 28, 2021

**SENT VIA EMAIL**

Margaret A. Hickey
Independent Monitor
Schiff Hardin LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
*Via Email* (MHickey@schiffhardin.com)

**Re:    Comments on the Fourth Independent Monitoring Report**
        **Consent Decree, *Illinois v. Chicago*, 17-cv-6260 (N.D. Ill.)**

Dear Ms. Hickey:

The Consent Decree gives the Office of the Illinois Attorney General (OAG) an opportunity to comment on the Fourth Monitoring Report (Fourth Report) before it is filed with the Court. In addition to the ongoing COVID-19 pandemic, the Fourth Report covers a period that includes the fatal police shootings of Adam Toledo and Anthony Alvarez following foot pursuits. These traumatic incidents have underscored the urgency of the reforms that the Chicago Police Department (CPD) has yet to implement.

OAG appreciates CPD's efforts to comply with the Consent Decree and acknowledges that the City and CPD have made progress in some areas. Yet two and a half years into the court-ordered reform process, the City and CPD still have not completed the first step towards reform: developing the policies and procedures required for preliminary compliance across every section of the Consent Decree. We agree with Superintendent Brown that to "implement lasting and transformative reforms within the Department, it is essential we do so with the goal of rebuilding and strengthening community trust."[1] But, based on the still lagging pace of Consent Decree implementation, the ultimate goal of establishing community trust in CPD remains far in the

---

[1] Chicago Police Department's Reform Progress Update for Independent Monitoring Period No. 4, p. 2.

500 SOUTH SECOND STREET, SPRINGFIELD, ILLINOIS 62706 • (217) 782-1090 • TTY: (217) 785 -2771 • FAX: (217) 782-7046
100 WEST RANDOLPH STREET, CHICAGO, ILLINOIS 60601 • (312) 814-3000 • TTY: (312) 814-3374 • FAX: (312) 814-3806
1001 EAST MAIN, CARBONDALE, ILLINOIS 62901 • (618) 529-6400 • TTY: (618) 529-6403 • FAX: (618) 529-6416

distance. OAG provides below a summary of its assessment of the major accomplishments, delays, and roadblocks towards compliance with the Consent Decree.

## The City and CPD's Progress This Period

The Fourth Report identifies several key steps forward taken by the City and CPD towards compliance with the Consent Decree. Highlights include:

- CPD finalized a revised policy related to respectful interactions with transgender, gender non-conforming, and intersex individuals after robust community engagement. CPD's work with relevant stakeholders to finalize this policy should serve as a model for future community engagement.
- The City and CPD made meaningful progress in the Crisis Intervention section, including marked improvement at providing adequate support for the CIT program through dedicated resources at the leadership, team, and officer level. The Office of Emergency Management and Communication also made notable progress by finalizing standard operating procedures and related training materials in this area.
- The Civilian Office of Police Accountability (COPA) made substantial progress this period, reaching some level of compliance with approximately 72% of the assessed paragraphs this period. OAG also recognizes the efforts of the COPA Community Working Group for their thoughtful review and input on COPA's various draft policies and commends COPA for meaningfully incorporating the Working Group's feedback.
- The Police Board reached full compliance with most of the paragraphs where it was assessed, and the Office of the Inspector General and the Deputy Inspector General for Public Safety reached full compliance with all of the paragraphs where they were assessed.

## The Key Challenges to Full and Effective Consent Decree Implementation

In other key areas of reform, however, CPD made little progress or even moved backwards. OAG identifies below four key obstacles to the City and CPD achieving Consent Decree compliance.

### 1. Data Quality Problems and Antiquated Data Collection Practices

CPD and the City cannot achieve full and effective compliance with the Consent Decree until there are robust, auditable data collection systems. Without accurate data, CPD and the City cannot meaningfully evaluate whether reforms implemented under the Consent Decree are working. Despite a deadline that has long since passed, CPD currently lacks baseline knowledge of what data collection systems exist across the Department, much less whether those systems are reliably capturing accurate information.

In a troubling move backwards, CPD disabled its foot pursuit data dashboard and revealed that the data it had collected over the past two years was deeply flawed, causing it to fall out of compliance with certain requirements. CPD has yet to fully explain the scope of these data flaws

or how CPD will resolve them in the future. These data quality issues also contributed to the City and CPD's failure to adopt a foot pursuit policy by the mandated deadline, a reform that that was already long overdue.

OAG is also concerned that CPD has not conducted the required data assessment of the frequency of misdemeanor arrests and administrative notices of violation made by CPD officers of persons in specific demographic categories, such as race and gender. OAG is particularly concerned that CPD prepared a draft report over a year ago, but that "CPD administrators were unhappy with the large racial disparities present in the findings"[2] and have since outsourced the project. CPD's lack of transparency here is troubling; OAG urges CPD to conduct a transparent assessment, with methodology approved by the IMT, in the near future.

In other areas, CPD's systemic data problems prevent CPD from showing that it is implementing reforms in practice. For example, even though CPD's Professional Counseling Division has made progress in hiring additional clinicians and certified drug and alcohol counselors, CPD has no software to assess its members' use of these services. In one case, the lack of a technology solution to collect and report on wellness data caused CPD and the City to fall out of preliminary compliance with a requirement in the Officer Wellness section. Issues with data collection and analysis also threaten CPD's ability to make progress toward mandated requirements in the Recruitment, Hiring, and Promotion and Supervision sections.

The City and CPD must prioritize data collection and accuracy in the coming monitoring period. In particular, the City and CPD must begin the long overdue comprehensive data assessment, identify and validate data CPD currently collects, and create systems to collect data to analyze and improve Department policies and procedures required by the Consent Decree. Further inattention to CPD's data reliability problems threatens to stall or even reverse the progress made in multiple sections of the Consent Decree.

## 2. Lack of Integration of Community Policing Principles

CPD has yet to integrate the principles of community policing as fundamental to its larger policing and crime fighting strategies, as required by the Consent Decree. For example, OAG is concerned that the City and CPD continue to create and expand roving City-wide units, such as the community safety team, critical incident response team, and newly announced gun team, which do not sufficiently incorporate community policing principles and do not use sufficient metrics to judge their effectiveness. Community policing should be a necessary and first step in developing all crime fighting strategies, not an afterthought superficially tacked on at the end of a process. Integrating the principles of community policing into CPD's internal mechanisms for developing crime reduction strategies must start at the beginning and include better communication between the Bureau of Patrol and Office of Community Policing.

CPD also continues to lag in incorporating community input and finalizing policies governing interactions with youth. CPD has not yet finished critical policies requiring officers to interact with youth in developmentally appropriate ways and to encourage diversion and deflection of youth from the criminal legal system. CPD also has not revised its School Resource Officer

---

[2] Fourth Report, Paragraphs 79-82.

Policy to incorporate more recent stakeholder feedback and to incorporate comments from the IMT and OAG. Prioritizing community policing principles and finalizing these policies are crucial for CPD to effectively train officers about their new community policing responsibilities, and, ultimately, for CPD to transform to a culture of policing guided in all aspects by the principles of community policing and problem solving.

### 3. Lags in Developing Critical Policies and Incorporating Community Input

Policy development is only the first step towards many required reforms, and yet halfway through the third year under the Consent Decree, the City and CPD have not met this first level of compliance in nearly half of the paragraphs assessed in the Fourth Report. In addition to the above-mentioned delays in finalizing policies governing youth interactions, CPD and the City have still not put in place policies or procedures related to the following required reforms:

- Independent investigations of officer-involved shootings and deaths that are consistent with the legal requirements of the Police Community Relations Improvement Act;
- Prohibition against sexual misconduct by CPD members;
- Permitting the public to record police officers performing their duties in a public place;
- Respectful and lawful interactions with members of religious communities;
- Requiring effective communication and meaningful access to police services for individuals with physical, mental, or developmental disabilities;
- Providing timely and meaningful access to police services for people with limited ability to speak, read, write, or understand English; and
- Mandating use of body-worn cameras consistent with the Consent Decree and state law.

These policies deeply affect Chicago's most vulnerable communities, and the City and CPD cannot develop these policies without listening and responding to their input. OAG shares the ongoing concerns expressed by IMT regarding CPD's lack of community engagement during its policy development procedures. For example, despite CPD's successful community engagement efforts in finalizing its "Interactions with Transgender, Gender-nonconforming, and Intersex Individuals (TIGN)" policy, CPD has yet to complete six other critical policies in the Impartial Policing section -- due in large part to its failure to incorporate and respond to the required community input.

Inadequate community engagement also hampers CPD's ability to build community trust in its policies. For example, the City and CPD's progress in adopting revised use of force policies and in-service training during this period has been marred by their lack of meaningful engagement with the Use of Force Working Group. The Use of Force Working Group ultimately expressed to the IMT that they did not believe that "the City was open to real, meaningful community engagement and input through this process."[3] And, as the IMT also observes, CPD's rush to issue new policies governing high-profile issues like search warrants and foot pursuits – without first seeking community input or feedback at the formative stages – raises concerns about its efforts to build community trust.

---

[3] Fourth Report, Use of Force, Paragraph 160.

In the coming monitoring period, the City and CPD must focus on policy development, listen to and incorporate community input, and commit to implementing the policies they have promised to develop or revise under the Consent Decree.

## 4. Delays in Reforming CPD Accountability Systems

In contrast to the improvements made by COPA, the Police Board, and the Public Safety Inspector General, CPD itself made little to no progress this period in reforming its critical accountability systems. In the final weeks of 2020, CPD had positioned itself to gain preliminary compliance with several Consent Decree requirements in the Fourth Report. However, CPD submitted draft procedures late in the reporting period and seemed to lack a strategic approach to codifying the Consent Decree's requirements. OAG is deeply concerned that CPD has reached some level of compliance with approximately 8% of the paragraphs for which it was assessed this period in the Accountability section. That dismal rate is even worse than the last reporting period. Because CPD (not COPA) investigates nearly 70 percent of complaints against CPD officers, CPD's delays in reforming its internal accountability mechanism harm public confidence in the entire process. OAG recognizes the dedicated staff in CPD's Bureau of Internal Affairs who are working toward gaining compliance with various Consent Decree requirements, but the City must commit its resources to making substantial progress in this area.

Finally, the City has ignored a critical requirement of the Accountability section. OAG shares the IMT's concern that the City has not prioritized reform of its policies and practices concerning investigations of officer-involved shootings and deaths. OAG strongly urges the City to prioritize implementing these reforms to ensure that its most complex, public investigations are transparent and consistent with best practices and state law.

## Conclusion

The people of Chicago have waited far too long for genuine change in how the police treat those whom they ostensibly serve. The City and CPD must prioritize implementing Consent Decree mandated reforms as a first step towards changing Department culture and building community trust. OAG looks forward to continuing to work with the City, CPD, IMT, the Coalition, and community members to achieve more significant progress in the future.

Respectfully,

KWAME RAOUL
Attorney General of the State of Illinois

By: s/Mary J. Grieb
Mary J. Grieb
Deputy Bureau Chief, Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 11th Flr.
Chicago, Illinois 60601
Phone: 312-814-3877

Email: Mary.Grieb@ilag.gov

cc: Tyeesha Dixon and Allan Slagel, Counsel for the City of Chicago; Dana O'Malley, General Counsel for the Chicago Police Department (via email)

# Attachment B:
# City of Chicago Comments
# September 28, 2021



## City of Chicago's Comments to
## Fourth Independent Monitoring Period (IMR4) Report
*September 28, 2021*

Pursuant to Consent Decree Paragraph 663, the City of Chicago ("City") provides the following comments to the Independent Monitoring Team's (IMT) September 13, 2021, draft *Independent Monitoring Report 4* ("IMR4 Report"). The City looks forward to continued compliance progress in the next monitoring period.

### Summary of the City's Continued Increase in Compliance

The City requests that the Executive Summary of the IMR4 Report more clearly emphasize that the **City has achieved some compliance with more than 50 percent** of the 509 paragraphs IMT has thus far evaluated for compliance (266 paragraphs). This means Chicago has achieved some level of compliance with **more paragraphs than any other comparable city in its first two years** under consent decree. A roughly 50% compliance rate is also a relatively common benchmark among other cities at the two-year mark. In addition, Chicago's consent decree contains the highest number of requirements of any large city to undertake a consent decree since the late 1990s. Chicago is still very early in the lifecycle of consent decree implementation relative to peer cities.

The City also requests that the Executive Summary more clearly reflect that the City and CPD continue to demonstrate an upward trajectory of increased compliance each monitoring period:





### Deadlines Calculations

The Consent Decree can only be terminated if the City can show that it "sustained compliance with all material requirements" of the Consent Decree (Consent Decree Par. 717). The City's ultimate compliance with the Consent Decree therefore is determined by whether the City has adequately implemented the requirement through policy, training, and in operational practice (Consent Decree Par. 642), not deadline compliance. Therefore, the City and CPD have focused reform efforts on progressing toward sustained compliance and effecting systemic change, rather than strict deadline compliance.

While the City and CPD acknowledge the importance of meeting consent decree deadlines, the City believes it is important the Report emphasize for the public that these deadlines represent an ever-decreasing proportion of the IMT's assessments. Moving forward, deadline assessments will focus almost entirely on recurring requirements (*e.g.*, publishing CPD's annual report). The City's level of compliance with all the paragraphs assessed, rather than solely its achievement of deadlines, is the measure that is more representative of the totality of the City's reform efforts.

The City also maintains its previously stated position that frequency requirements (*e.g.*, annually, quarterly, regularly) do not impose additional deadline requirements. This is particularly true where the IMT has indicated a deadline such as "ongoing", and no specified date or metric is provided such that IMT or the City can assess whether a deadline was missed.

### IMR4 Achievements and Efforts to Accelerate Compliance

As the City worked to return to expanded operations following the height of the COVID-19 pandemic, the City and CPD redoubled efforts to accelerate reform progress during IMR4. The Department instituted new processes and devoted additional resources, including the creation of a Professional Standards and Compliance Division, to accelerate the pace and quality of work on reform activity throughout the Department, while simultaneously making a concerted effort to more consistently and meaningfully include community, IMT, OAG, and other important stakeholder input during the development of these important changes.

Significantly, during IMR4, CPD continued meeting with the Use of Force Community Working Group to further progress discussions on topics that were not fully addressed or resolved during the previous year's meetings. Some of these topics included definition of force, de-escalation, and the use of tasers. CPD and the working group met every other week from February through the middle of June. The revisions from the initial IMR3 engagement with the Working Group are reflected in the Department policies that were made effective and implemented on April 15, 2021. The Training Division created an eLearning training to inform members of the policy changes that took effect on April 15. Policy changes resulting from the dialogue with the Working Group in the first half of 2021 will be reflected in revised Use of Force policies that will take effect in 2022.



Among numerous other CPD achievements, efforts during IMR4 also culminated in:

- Expanding the Neighborhood Policing Initiative, which bolsters problem solving and community engagement efforts, to five additional districts

- Publishing its second annual Hate Crimes Report, tracking and detailing hate crime and bias-motivated incident statistics

- Implementing its pilot program for the Officer Support System, which aims to identify and support Department members potentially at risk for adverse outcomes

- Establishing positions for district-level Affinity Liaison Officers, including a city-wide Religious Minority Outreach Liaison Officer, a Homeless Outreach Liaison Officer, an Immigrant Outreach Liaison Officer, an LGBTQ+ Liaison Officer, and five Area-level LGBTQ+ Liaison Officers

- Revising the Department's policy governing interactions with Transgender, Intersex, and Gender Non-conforming (TIGN) individuals based on extensive community input

Other examples of significant achievements the City accomplished in IMR4 include:

- The Office of the Inspector General (OIG) and Public Safety Inspector General (PSIG) have now achieved full compliance on 100 percent of paragraphs evaluated.

- The Civilian Office of Police Accountability's (COPA) increased the number of paragraphs with some level of compliance by nearly sixfold since the last monitoring period, achieving partial compliance with more than 70 percent of paragraphs assessed this period.

- The Police Board achieved full compliance with nearly all paragraphs assessed.

The City and CPD acknowledge the areas that remain out of compliance and commits to continuing to work diligently toward the systemic change the Consent Decree contemplates. The City looks forward to continuing to work alongside the IMT, OAG, and community to implement the transformational change needed to make CPD a better department.

## **Methodologies**

As noted in prior correspondence, many of the methodologies add substantive requirements beyond the Consent Decree's legal requirements. Others do not provide adequate detail about the data sources and analysis methods that will be used to assess compliance.



However, as noted in the City's prior responses to the IMT's proposed methodologies, the City recognizes the complexity and difficulty of developing distinct methodologies for several hundred Consent Decree requirements spanning numerous topics. Keeping with the spirit of Consent Decree Paragraphs 655 and 717, the City intends to continue engaging in ongoing dialogue with the IMT to clearly define and align on the methodologies that will be applied for each assessment. The City therefore reserves the right to provide responses or objections to the compliance methodologies identified in the IMR4 Report, or the application of any methodology to a specific Consent Decree requirement.

**Specific Comments**

The City's below comments follow the order of sequence in the draft report:

1. **Executive Summary: Data Issues.** The discussion regarding Par. 172 references a deadline that did not fall in IMR4 and therefore is not within the purview of the IMR4 report. CPD also requests the IMT acknowledge that CPD self-identified the data issue and disabled the dashboard to investigate the cause.

2. **Executive Summary: The City of Chicago's Principal Achievements and Challenges.** CPD requests that the IMT move this section (Pages 26-30) earlier in the executive summary, closer to the discussion of the challenges. This revision would provide the reader a more rounded perspective of the City's progress.

3. **Executive Summary – CPDs Community Engagement and Trust Building.** The City respectfully requests that IMT amends the portion of this executive summary that describes CPD's "lack of community engagement." CPD recognizes and agrees with the IMT that more community engagement is needed, building on what has been done; however, the term "lack of" may mislead the reader that none took place in IMR4, which is not accurate. This change is in line with the IMT's comments later in the section.

4. **Executive Summary – CPDs Community Engagement and Trust Building.** The characterization of the CPD's response to the Use of Force's working group's request for the draft policy in advance is inaccurate. If this characterization is attributable to a source in the record, the City requests that IMT provide a specific citation to same.

5. **Paragraph 78.** The assessment does not account for the COVID-19 extension in its assessment of the deadline for this paragraph.

6. **Paragraphs 100, 101, 103, 106, 107, 115, 120**. The IMT's assessment does not reflect evaluation of all record evidence timely submitted. The City's position is that preliminary compliance has been established, and the City respectfully requests a reassessment. Specifically, on June 23, 2021, the City and CPD submitted a letter explaining that the requirements of these paragraphs have been incorporated into CPD directive S05-14, *Crisis Intervention Team (CIT) Program* and referring to record evidence to so demonstrate. IMT's assessment does not reflect consideration of S05-14.



7. **Paragraph 245.** The assessment states the Department "will provide all current CPD officers with in-service use of force training on at least an annual basis". This was completed in IMR-4 by the COVID-19 extended deadline of March 5, 2021. It is therefore unclear why the IMT determined that a deadline was missed. This assessment should reflect that the deadline was met.

8. **Paragraph 246.** IMT assessed secondary compliance and acknowledged 95% completion of the annual use of force training, but states that CPD missed the deadline. This assessment should reflect that the deadline was met.

9. **Paragraph 279**. The IMT's assessment does not reflect evaluation of all record evidence timely submitted. The City's position is that preliminary compliance has been established, and the City respectfully requests a reassessment. Specifically, on May 6, 2021, CPD submitted a letter explaining that the requirements of these paragraphs have been incorporated into CPD directive G01-03, *Department Directives System*, and referring to record evidence to so demonstrate. IMT's assessment does not reflect consideration of G01-03.

10. **Paragraph 440**. The City's position is that preliminary compliance has been established, and the City respectfully requests a reassessment. Specifically, the report states that IMT could not identify any COPA policies that specifically address the requirements of 440(e) and f. However, 440(f) is explicitly referenced in III.A.1 of the Intake Policy. Regarding Paragraph 440(e), these requirements are not a COPA mandate ("COPA will receive"). Nevertheless, COPA's jurisdiction of 440€ (i-iv) incidents are set forth in its current ordinance, 2-78-120. COPA's actionable part of 440(e)—assignment of major case/440(e) incidents - is further referenced in V.C of its Intake policy. 'Major case incidents' is a defined term in the policy which tracks 440(e) incidents. As COPA's policy and ordinance mirror 440(e) requirements and provide investigators relevant "plainly written, logically organized, and [with] clearly defined terms" guidance, COPA has established preliminary compliance for 440(e).

11. **Paragraph 511.** The City's position is that the City has demonstrated full compliance with this paragraph. In IMR3, the City submitted extensive documentation demonstrating that the outside subject matter the City retained to conduct this community engagement completed this effort. No additional documentation was submitted in IMR4 because the consultant's work was completed in IMR3, and all available evidence was already part of the record.

12. **Paragraph 519.** The City's position is that this paragraph should not be assessed for compliance because it contains no affirmative obligation for the City.

13. **Paragraphs 522, 523**. Comments from the Office of the Inspector General are attached hereto.

14. **Paragraph 545.** The City's position is that preliminary compliance has been established, and the City respectfully requests a reassessment. Specifically, this requirement is



memorialized in General Order G01-03, *Department Directives System*, which the City submitted on May 6, 2021. IMT's assessment does not reflect review or consideration of this evidence.

15. **Paragraph 551. The assessment indicates** BIA's quarterly and annual reports do not include data reflecting investigations conducted by the districts. However, every quarterly report contains data reflecting investigations conducted by the districts. This is addressed on page 13 of the Quarter 3 2020 report: "All data presented in this report reflects investigations conducted by BIA Investigators and the district Accountability Sergeants." This language is also found on p. 14 of Q2 report and p. 10 of the Q4 report.

16. **Paragraph 606.** IMT's assertion that the "City contracted with to conduct a partial-assessment of that required by ¶606. The Plan only relates to evaluating the data systems necessary to implement the Officer Support System (OSS)" is inaccurate. The Par. 606 assessment currently underway will address the requirements listed in Par. 606. *See* MONITOR00247328.

# ATTACHMENT



JOSEPH M. FERGUSON
INSPECTOR GENERAL

CITY OF CHICAGO
OFFICE OF INSPECTOR GENERAL
740 NORTH SEDGWICK STREET, SUITE 200
CHICAGO, ILLINOIS 60654
TELEPHONE: (773) 478-7799
FAX: (773) 478-3949

**VIA ELECTRONIC MAIL**

September 23, 2021

Independent Monitoring Team
Margaret A. Hickey, Independent Monitor
Harold Medlock, Associate Monitor
233 S. Wacker Dr., Ste. 7100
Chicago, Illinois 60606
mhickey@schiffhardin.com
Harold.Medlock@cpdmonitoringteam.com

Re: Office of Inspector General Comments on IMR4 Revised Draft Report

Dear Ms. Hickey and Mr. Medlock:

We write to submit the Office of Inspector General's (OIG) comments on the revised draft of Independent Monitoring Report 4 (IMR4), which was received by OIG on Monday, September 13, 2021.

OIG is pleased that IMT has revised its written assessment for Paragraph 522 to find the Deputy Inspector General for Public Safety (PSIG) in full compliance. Moreover, OIG is also pleased that— during a September 16, 2021 meeting between OIG, IMT, and the Office of the Illinois Attorney General—IMT stated that it was revising its Paragraph 523 assessment to find PSIG in full compliance with that paragraph as well.

\* \* \*

As IMT has now found OIG and PSIG in full compliance with all paragraphs under assessment in IMR4, OIG has no additional comments on the IMR4 draft report. OIG appreciates the opportunity to offer comments.

Respectfully,

Joe Ferguson
Inspector General

Deborah Witzburg
Deputy Inspector General for Public Safety

cc:    Office of the Attorney General, State of Illinois
       Nathaniel Wackman, Associate General Counsel for Public Safety, OIG
       Tyeesha Dixon, Deputy Corporation Counsel, Department of Law
       Allan Slagel, Partner, Taft

Independent Monitoring Team | Chicago Police Department Consent Decree