# EXHIBIT 1

 

 

February 25, 2022

Robert Boik, Executive Director of Constitutional Policing and Reform
Michael Millstein, Deputy Director of Community Policing
Chicago Police Department
3510 S. Michigan Avenue
Chicago, IL 60653

    Re: <u>Policy Comments regarding General Order G03-07</u>

Dear Executive Director Boik and Deputy Director Millstein,

  We represent a coalition of lawyers and Latinx community non-profits from the Hispanic Lawyers Association of Illinois (HLAI), Pilsen Law Center (PLC), Illinois Latino Agenda (ILA) and Business and Professional People for the Public Interest (BPI).[1] We write regarding the Chicago Police Department's ("the Department") February 10, 2022 draft of General Order G03-07, concerning foot pursuits ("the Policy"), with policy recommendations that we sincerely hope the Department will take to heart.

  We acknowledge the considerable progress that the Department has made since issuing its interim foot pursuit policy ("the Interim Policy") on May 26, 2021, following the tragic lethal shootings of Adam Toledo and Anthony Alvarez. We provided the Department with policy comments following the release of the Interim Policy, and we can appreciate the measurable improvement that the current Policy represents over its predecessor.

  At the same time, we believe there remain opportunities to improve the Policy to strike the appropriate balance between public safety and law enforcement needs. We strongly encourage the Department to carefully consider these recommendations before issuing the final version of the Policy. In the event any of these comments are not incorporated into the Policy, we believe the Department needs to keep these concerns and recommendations top of mind as it provides training, implements the Policy, monitors its impact on the communities—especially the Black and Brown communities—of Chicago, and refines the Policy in the future. We intend to share our comments

---

[1] We would also like to thank Jenner & Block LLP for providing pro bono assistance in this matter.

with the Independent Monitor, the Illinois Attorney General's Office and file in the pending federal docket before U.S. District Judge Robert Dow.

## I. The Policy should eliminate or at least significantly circumscribe Section IV.D.

First and foremost, the Department should reconsider the inclusion of Section IV.D, which provides that law enforcement officers may engage in a foot pursuit when a person "in a location known for certain criminal activity runs, unprovoked" and there is "an articulable reason to believe the person is running because they are involved in the type of criminal activity prevalent in that location." Given the vagueness and subjectivity of each of these conditions, this provision appears to create an exception for so-called 'high-crime areas' to the general rule of Section IV.B that officers "may only engage in a foot pursuit if there is a valid law enforcement need" to detain the person being pursued that the officer "reasonably believe[s] outweighs the threat to safety posed by the pursuit." Such an approach risks treating individuals "who happen to live in high-crime areas" as if they were "second-class citizens"—a notion the Policy must emphatically reject. *See, e.g.*, *United States v. Curry*, 965 F.3d 313, 338 (4th Cir. 2020) (Wynn, J., concurring).

In particular, we are not aware of any definitions or limiting principles—whether in the Policy itself, other departmental policies, Illinois law, the Fourth Amendment, or any other source of law—that may be brought to bear upon the Policy's use of the phrases "a location known for certain criminal activity" or "the type of criminal activity prevalent in that location." And yet, we are all too aware of the reality that law enforcement officers in major cities often use such undefined criteria to engage in arbitrary, and indeed racially biased, policing.[2] And, as the Department undoubtedly is aware, the areas of Chicago that tend to suffer from the highest rates of crime are overwhelmingly Black and Latinx communities, which have long suffered from the consequences of over-policing. Against this backdrop, Section IV.D's invitation to pursue residents of these communities more permissively than residents of other communities raises serious concerns about racially disparate policing—concerns which the Independent Monitor herself voiced in consecutive recent reports regarding the consent decree.[3] As scholars have

---

[2]
> [W]e find evidence that [New York Police Department] officers often assess whether areas are high crime using a very broad geographic lens; that they call almost every block in the city high crime; that their assessments of whether an area is high crime are nearly uncorrelated with actual crime rates; that the suspect's race predicts whether an officer calls an area high crime as well as the actual crime rate; that the racial composition of the area and the identity of the officer are stronger predictors of whether an officer calls an area high crime than the crime rate itself; and that stops are less or as likely to result in the detection of contraband when an officer invokes high-crime area as a basis of a stop.

Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*, 107 CAL. L. REV. 345 (2019), available at https://scholarship.law.duke.edu/faculty_scholarship/3920/.

[3] *See* Independent Monitoring Report 3 (Amended) at 162, *State of Ill. v. City of Chi.*, No. 17-cv-6260 (N.D. Ill. Apr. 8, 2021), ECF No. 942; Independent Monitoring Report 4 at 124, *State of Ill. v. City of Chi.*, No. 17-cv-6260 (N.D. Ill. Oct. 8, 2021), ECF No. 978.

increasingly noted, such 'hot-spot' or 'predictive policing' "raise[s] the question of whether this data-driven focus serves merely to enable, or even justify, a high-tech version of racial profiling."[4]

At the very least, the Policy should define Section IV.D's terms with greater specificity or circumscribe them with objective criteria for which officers can be held accountable. In this regard, we suggest at a minimum placing temporal and geographic modifiers to Section IV.D, as follows: "If otherwise consistent with this policy, a Department member may conduct a Foot Pursuit when a person in a *specific* geographically defined location known for certain *recent* criminal activity— both as defined by the Department—runs, unprovoked . . ." Alternatively, we suggest modifying the conditions to delineate specific criminal activities, rather than using the vague phrase "certain criminal activity." But the better approach, we maintain, is to eliminate Section IV.D altogether, and simply apply the same criteria to all foot pursuits.

Without in any way diminishing the significance of our other comments, the need to eliminate or substantially revise Section IV.D is essential to the establishment of a policy that does not perpetuate past inequities.

## II. The Policy should better emphasize the inherent danger of foot pursuits, beginning with the Core Principles section.

More generally, and considering the fatal shootings of Adam and Anthony, the Policy should go further in recognizing and accounting for the danger that foot pursuits entail. We strongly recommend that, in its final form, the Policy state this danger explicitly at the outset, in the Purpose section, and reiterate it throughout. The New Orleans Police Department's foot pursuit policy states the same in the Purpose section of its policy.[5]

For instance, although the Core Principles section implicitly acknowledges "the risk and potential for injury" to the individual being pursued, in Section II.D, it should make these dangers *explicit*, in the Purpose section and through a Core Principle dedicated to the fact that foot pursuits are inherently dangerous for all involved. In fact, the reality that foot pursuits *are* inherently dangerous is missing from the Core Principles section, and is undermined by the Policy's statement in Section IV.A that foot pursuits only "could be dangerous." Such language minimizes the crucial risks at issue, about which the Policy must be clear-eyed if officers are to properly balance the risk of danger versus the need for immediate apprehension, especially in the high-adrenaline context of a foot pursuit.

---

[4] Andrew G. Ferguson, *Policing Predictive Policing*, 94 WASH. U. L. REV. 1109, 1149 (2017), available at https://openscholarship.wustl.edu/law_lawreview/vol94/iss5/5; *cf. Curry*, 965 F.3d at 344 ("Predictive policing is merely a covert effort to attempt to justify racial profiling.").

[5] "Foot pursuits are inherently dangerous and require legal justification, sound tactics, and heightened officer safety awareness." New Orleans Police Department Operations Manual, Chapter 41.4, available at https://www.nola.gov/getattachment/NOPD/Policies/Chapter-41-4-4-Online-Non-Emergency-Crime-Reporting-EFFECTIVE-4-8-18.pdf/.

3

Finally, while the Policy states in several areas that law enforcement officers should consider "reasonable alternatives" to engaging in a foot pursuit, the Policy fails to express a clear *preference* for pursuing such safer options—whether containment, saturation, video monitoring, or others—wherever one is available and appropriate. As the Baltimore policy expressly acknowledges, such alternatives to a foot pursuit "are generally the safest tactics for apprehending fleeing persons." The Policy's provision that "any doubt" regarding the safety of a foot pursuit should be resolved in favor of such alternatives is not enough given the fundamental premise that the safety of a foot pursuit should always be the first consideration before engaging in a foot pursuit. As a result, a statement in the Purpose and Core Principle section that places a thumb on the scale in favor of reasonable alternatives is an essential component of striking an adequate balance between the countervailing risks at issue.[6]

### III. The Policy should limit the scope of Class A misdemeanors that suffice to allow for a foot pursuit to those involving a sufficient risk of danger to the community.

Section IV.B should limit the universe of Class A misdemeanors that furnish a "valid law enforcement need" to engage in a foot pursuit to those that pose some danger to others. After all, the presence of a "valid law enforcement need" remains subject to the act of balancing the inherent danger of engaging in a foot pursuit with the need for immediate apprehension, which would seem low when the individual poses no apparent danger to public safety. And if traffic offenses are limited to those "that endanger[] the physical safety of others," we see no reason why the same qualification should not extend to the broad category of Class A misdemeanors.

As if tacitly acknowledging this perspective, the "examples" in the subparagraph to Section IV.B focus on Class A misdemeanors that endanger others, such as aggravated assault and battery. (That said, we question whether retail theft entails the same risk of harm to others, and we would urge the Department to consider further limiting the scenarios in which retail theft can form the basis of a foot pursuit.) Confusingly, however, we do *not* read Section IV.B.1 to restrict the scope of Class A misdemeanors that provide a "valid law enforcement need" to similarly dangerous examples. This disconnect not only is confusing, but raises the question of why *all* Class A misdemeanors, including many far afield from those identified as examples, should furnish the requisite "law enforcement need." At the very least, the Policy should provide guidance as to how officers should balance the danger of engaging in a foot pursuit with the need for immediate apprehension in scenarios where the individual is suspected of having committed a Class A misdemeanor that poses no danger to the safety of others.

---

[6] We recognize that in certain circumstances it may be legally permissible to initiate a foot chase based on a Reasonable Articulable Suspicion and that CPD has concerns about limiting foot chases to instances in which an officer can establish Probable Cause. Nevertheless, given the inherent dangers of a foot chase, as the proposed policy is implemented and data is gathered and evaluated, continued consideration should be given to the adoption of a Probable Cause standard in the interest of enhancing the safety of officers and the public.

**IV.  The Policy should incorporate additional circumstances where foot pursuits are prohibited.**

Similarly, the Policy would benefit from demarcating further scenarios in which the balance of the inherent danger of foot pursuits versus the need for immediate apprehension tilts decidedly against, and thus prohibits, engaging in a foot pursuit. Although the current Policy does streamline the "Prohibitions" section (Section V) compared to the Interim Policy, no new circumstances were added to the list. This represents a missed opportunity. The more bright lines the Policy can draw for officers about when to engage, and when not to engage, in a foot pursuit, the easier it will be for them to perform this risky balance in the rush of real time.

One meaningful way to address these concerns would be to incorporate many of the circumstances described in the "Pursuit Guidelines" section (Section VI), which currently stops at advising officers to consider alternatives to engaging in a foot pursuit, into bright line prohibitions. For instance, the scenario described in Section VI.B, in which the person being pursued is visibly armed with a gun (or other lethal weapon, we would add), presents an immense risk of danger to the officer, the individual, and the public at large, such that an officer should be required to disengage in the pursuit and pursue any available alternative. In the same vein, when the person being pursued enters a building, structure, confined space, isolated area, or dense or difficult terrain, and there are insufficient law enforcement officers to provide for backup and containment, as described in Section VI.D, an officer should be prohibited from continuing with such a high-risk pursuit. Given the extraordinary danger and futility alike of pursuing an individual whose location is no longer known, the scenario set forth in Section VI.F, a foot pursuit should be off-limits in this scenario as well. For reasons that appear plain, a foot pursuit ought not continue when the officer's own safety is threatened by inclement weather, environmental conditions, or vehicular traffic, the scenarios contemplated in Sections VI.H and I. Likewise, whenever information sufficient to apprehend the person being pursued at a later time exists, and it reasonably appears that the person poses no immediate threat to anyone, the balancing inquiry in which an officer must engage would seem to categorically foreclose the possibility of a foot pursuit.

**V.  The Policy should increase supervisorial duties related to foot pursuits.**

Compared to the Interim Policy, the current Policy appears to water down the obligations placed on supervisors to monitor ongoing foot pursuits, to continuously assess the circumstances, to coordinate resources, and to advise an officer to discontinue a foot pursuit if an effective alternative exists to apprehend the individual at a later time. For example, Section VII.C.2 of the Interim Policy provided that supervisors "will continuously assess the circumstances of the pursuit and consider the potential risks to the involved members, members of the public, and the subject in relation to the necessity for immediate apprehension of the subject," whereas Section XI.B of the current Policy only requires that supervisors "will continuously assess the situation in order to ensure the Foot Pursuit is conducted within established Department guidelines." Officer accountability checks should be strengthened in the final policy, not weakened.

5

Furthermore, the current Policy in Section XI.C.2 provides that a notified supervisor will discontinue foot pursuit when "the risk to pursuing Department members or the public appears to unreasonably outweigh the objective of immediate apprehension of the person being pursued." To minimize safety risks to all, however, supervisors should be held accountable for ceasing a foot pursuit as soon as it violates the policy's balancing framework, not only when the situation escalates so far such that it has *unreasonably* violated the policy.

## VI. The Department should strengthen the Policy's data, reporting, and auditing requirements.

As for the Policy's reporting requirements in Section XIV, these should make it clear that the entire universe of foot pursuits will be reported, and that this collected data will be reviewed in aggregate. It is vital that data on all foot pursuits—not just those resulting in an apprehension—is collected and compiled, including foot pursuits which are discontinued by an officer or foot pursuits in which an individual escapes. This is essential to rigorously evaluate how officers implement and apply the Department's Policy.

In the same vein, Section XVII.A, which provides that the watch operations lieutenant will review all foot pursuits associated with reportable uses of force or arrests, should encompass the entire universe of foot pursuits—not just those that result in uses of force or arrests. To gain a fuller understanding of whether officers are properly discontinuing foot pursuits, it will be important to monitor instances where foot pursuits were discontinued or where the individual was not apprehended.

Moreover, in addition to the watch operations lieutenant's review, which will be helpful to provide training and supervision to officers in the district, the policy should call for regular, independent, third-party audits of Department foot pursuits. This independent auditor will be able to make Department-wide assessments regarding how the policy functions on the ground to inform further policy development and training.

## VII. The Department should implement a robust in-person training program.

Finally, while Section XVII of the Policy states that the Department will provide members with training on the policy, including scenario-based training, the Policy does not mention *in-person* scenario-based training. For foot pursuits in particular, in-person training is critical to attempt to replicate the high-adrenaline scenarios in which officers are required to make split-second, yet crucial decisions that affect the safety of our communities. For this reason, the Department should implement robust in-person, scenario-based training on foot pursuits as soon as possible after the Policy goes into effect.

**VIII.     Conclusion**

We appreciate the Department's engagement with us leading to the release of the updated Foot Pursuit Policy and the effort that has gone in to improving the Department's Policy so far. Many positive strides have been made, and further incorporating the comments herein into the final version of the Policy will allow it to reflect Chicago's unique demographic, social, and economic conditions and foster a stronger relationship between our communities and the Department. To the extent the issues raised in these comments are not addressed or incorporated into the new Policy, it is essential that they be kept at the top of mind in terms of monitoring, implementation, training, and evaluation of the final Foot Pursuit Policy.

We request the Department to make public all comments submitted via the first and second comment process, both via the portal and in community engagement meetings, as well as the Department's specific responses to those comments. And we welcome a follow-up meeting with the Department's leadership to address our comments and recommendations provided herein before the final version of the Policy is issued.

Finally, we thank the Department for inviting us to the table to share our comments and concerns regarding the current version of the Policy, and we hope that our feedback helps foster a productive conversation about the room for improvement that remains. We strongly believe that the end goal of the Policy is to avert future fatal shootings like those of Adam Toledo and Anthony Alvarez. We certainly hope that Mayor Lightfoot, Superintendent Brown and Chicago Police Department leadership share this same goal.

Sincerely,

/s/

Andrea Belard, President
Martín Montes, Board Member
HISPANIC LAWYERS ASSOCIATION OF ILINOIS
27 N. Wacker Drive, Suite 462
Chicago, IL 60606
(312) 620-5303

Sylvia Puente
ILLINOIS LATINO AGENDA
180 N. Michigan Avenue, Suite 1250
Chicago, IL 60601
(312) 373-1766
spuente@latinopolicyforum.org

Arturo Jáuregui
PILSEN LAW CENTER
1545 W. 18th Street
(312) 422-1300
ajauregui@pilsenlawcenter.com

Cara Hendrickson
Amy Thompson
Shareese Pryor
BPI
25 E. Washington Street, Suite 1515
(312) 641-5570
chendrickson@bpichicago.org
athompson@bpichicago.org
spryor@bpichicago.org

7