# EXHIBIT 6 (PART 2)

civil lawsuit against the City of Chicago and police officers including defendant alleging, among other things, that police suffocated Hobley with a typewriter cover while Hobley was in custody. Tr. 632, 710-12. Hobley also brought a *Monell* claim, alleging that city practices and policies created an environment that allowed Hobley's civil rights to be violated. Tr. 635; *see Monell v. Department of Social Services*, 436 U.S. 658 (1978). Part of the *Monell* claim specifically involved defendant's conduct. Tr. 637. Another part of the *Monell* claim involved an allegation that CPD's Office of Professional Standards was not doing its job to police the police. Tr. 663.

Discovery in *Hobley* included interrogatories propounded on defendant. Tr. 644. Interrogatory answers can be used to find facts that are admissible evidence or which will lead to admissible evidence, as admissions, and in support of a motion for summary judgment. Tr. 725.

One of defendant's civil attorneys authenticated at trial defendant's answers to two sets of interrogatories. Tr. 672, 710. The first set of interrogatories requested defendant to:

> State whether you have ever used methods, procedures or techniques involving any form of verbal or physical coercion of suspects while in detention or during interrogation, such as deprivation of sleep, quiet, food, drink, bathroom facilities or contact with legal counsel and/or family members; the use of verbal and/or physical threats or intimidation, physical beatings or hangings; the use of racial slurs or profanity; the use of physical restraints such as handcuffs; the use of photographs or polygraph testing; the use

4

of physical objects to inflict pain, suffering or fear, such as firearms, telephone books, typewriter covers, radiators or machines that deliver an electric shock. For each such use of verbal or physical coercion identify the detainee and/or suspect, any other officers or individuals involved, the date of the incident, the specific conduct in which you or any other officer engaged, and whether you or any other officer was the subject of any complaint or discipline as a result of said conduct.

Tr. 706-07. Defendant's attorneys objected to the question, and defendant answered, "I have never used any techniques set forth above as means of improper coercion of suspects while in detention or during interrogation." Tr. 707-08. The next question asked whether defendant was aware of other officers' conduct similar to that described in the previous question, and defendant answered, "I am not aware of any." Tr. 708.

In the second set of interrogatories, defendant was asked:

Is the manner in which Madison Hobley claims he was physically abused and/or tortured as described in plaintiff's complaint (including, for example, the allegation of bagging with a typewriter cover) consistent with any other examples of physical abuse and/or torture on the part of Chicago police officers at Area 2 which you observed or had knowledge of? Please explain your answer and identify any other instances or examples of the same or similar physical abuse and/or torture.

Tr. 710-12. Defendant answered, "I have not observed nor do I have knowledge of any other examples of physical abuse and/or torture on the part of Chicago police officers at Area 2." Tr. 712.

5

MONITOR00227522

Hobley's attorney received defendant's answers to interrogatories, and treated admissions, if any, as admissions of a party. Tr. 716.

### *Anthony Holmes*

On May 29, 1973, Anthony Holmes, whose nickname was "Satan," was at home with his wife and children when defendant and other officers arrested Holmes and took Holmes to Area 2. Tr. 71-73, 76-78. When they arrived, defendant began questioning Holmes about various murders. Tr. 78. Holmes replied that he did not know anything about the murders. Tr. 78. In response, defendant hit Holmes, splitting Holmes' lip. Tr. 78, 145. After more questions, defendant left the room and returned with a black box that defendant plugged into the wall. Tr. 79. Holmes was handcuffed, wires from the box were attached to his handcuffs, and a plastic bag was put over his head and twisted until Holmes could not breath. Tr. 79-80. Holmes sucked the bag in and used his teeth to bite a hole in it. Tr. 81. A second bag was placed over Holmes' head. Tr. 81. Holmes tried to bite a hole in that bag, but could not. Tr. 81. Holmes felt an electric current going through his body. Tr. 82. It felt like a thousand needles were going through him, burning him until he passed out. Tr. 82.

When Holmes regained consciousness, defendant continued questioning Holmes, Holmes denied knowing anything, and defendant suffocated and shocked Holmes until Holmes passed out. Tr. 82-83. Holmes could not remember

6

MONITOR00227523

how many times this sequence repeated itself, but remembered being willing to do anything to make it stop. Tr. 83-84. Eventually, Holmes agreed to tell the officers whatever they wanted him to say, and at some point signed a statement. Tr. 84.

A short time later, Holmes' friends Luella Woods and Frances Boatman visited him at Area 2. Woods described seeing Holmes with a cut lip and his face puffed up. Tr. 261. Holmes told Woods that police choked him, hit him, put a bag over his head, and shocked him. Tr. 262-63. Boatman also saw Holmes with a split lip and bruises on his wrists. Tr. 909-11. Holmes told Boatman that officers put a bag over his head and tried to electrocute him. Tr. 912. Boatman recalled the officer who Holmes accused was named Burge. Tr. 913.

The first lawyer appointed for Holmes after his 1973 arrest was Lawrence Suffredin, who had been a licensed attorney for less than a month. Tr. 218-20. During Suffredin's first meeting with Holmes, Holmes cried as he told Suffredin that after Holmes was arrested, Holmes had a plastic bag placed over his head and was electrocuted. Tr. 221-22.

Based upon the statement Holmes gave at Area 2, Holmes was convicted of one of the murders defendant asked him about, and served 30 years in prison. Tr. 85.

7

### *Melvin Jones*

On February 5, 1982, Melvin Jones was at his girlfriend's house when officers arrested Jones and took him to Area 2. Tr. 328-31. Once there, defendant began asking Jones about a murder. Tr. 333-34. Defendant asked Jones if Jones knew who defendant was, and defendant said that he was going to use the same device on Jones that had "Satan" crawling on the floor begging to answer questions. Tr. 334-35.[2] After asking more questions, defendant left the room and came back with a box. Tr. 337-38. Defendant took a device out of the box and plugged it into the wall. Tr. 338-39. Another officer pulled Jones' pants down. Tr. 341. Defendant then used the device to shock Jones on Jones' foot, inner thigh, and genitals. Tr. 342-43. Jones passed out for a few seconds. Tr. 343. Shortly thereafter, defendant told Jones that Jones had a reprieve, and defendant left. Tr. 343-44.

Jones recalled being held at Area 2 for four days. Tr. 344.[3] During that time, defendant pointed a gun at Jones' head, told Jones defendant would "blow his black head off," and hit Jones in the head with a stapler. Tr. 346, 348. At no point did Jones confess to any crime. Tr. 350.

---

[2] Jones knew "Satan" to be Anthony Holmes. Tr. 335.

[3] CPD records showed that Jones was arrested Friday and was transported from Area 2 on Sunday. Tr. 602.

8

On February 10, 1982, Cassandra Watson met Jones and filed her appearance as Jones' attorney. Tr. 557. Jones told Watson that while in custody, he was struck in the head, shocked on various parts of his body, and had a gun put to his head. Tr. 560.

Jones ultimately was charged with unlawful use of a weapon. Tr. 399. After serving approximately eight months on that charge, the case was dismissed. Tr. 399.

Whenever she went to Area 2 to see clients, Watson repeatedly asked defendant about the box he used to shock people. Tr. 565. On most occasions defendant denied using a box, but on one occasion he said the box did not leave marks. *Id.*

### *Andrew Wilson*[4]

On February 14, 1982, Andrew Wilson was arrested for the murder of two police officers. Tr. 1008-11. After police found Wilson, defendant told officers not to mess with Wilson, and that they would deal with him when they got to the station. Tr. 1018-23.

---

[4] Andrew Wilson died in 2007 while in custody of the Illinois Department of Corrections. Tr. 1005. Prior to his death, Wilson testified against defendant in a civil jury trial and two other civil proceedings. Tr. 1006. Pursuant to Federal Rule of Evidence 804(b)(1), the jury in this case heard the direct and cross-examination from Wilson's civil trial, as well as impeachment chosen by the defense from other proceedings. Tr. 1254, 1262-63.

Wilson was taken to Area 2, where approximately seven officers began hitting Wilson, kicking him, and suffocating him with a plastic bag. Tr. 1027-30. The only officer who Wilson remembered specifically being there was officer John Yucaitis. Tr. 1025. After a short period of time, defendant entered the room and told the officers that he would not have put any marks on Wilson. Tr. 1031.

Wilson was then taken to another room by Yucaitis. Tr. 1033. After some time, defendant came in and told Wilson that Wilson was going to make a statement because defendant's reputation was at stake. Tr. 1039-40. Yucaitis then came in with a box. Tr. 1040. The box had wires, a crank, and alligator clips attached to it. Tr. 1042, 1297. Yucaitis attached the clips to Wilson's nose and ear and cranked the box. Tr. 1043. The device shocked Wilson, making his teeth grind. Tr. 1043. Yucaitis continued to crank the box, and Wilson screamed. Tr. 1044-45.

Later, detective Patrick O'Hara came and took Wilson to see Assistant State's Attorney Lawrence Hyman. Tr. 1046-47. Wilson asked Hyman if Hyman expected Wilson to make a statement after he had been tortured, and Hyman told the officers to take Wilson away. Tr. 1049. O'Hara took Wilson back to the interrogation room. Tr. 1050. Defendant came into the room with the same box Yucaitis used earlier and said, "fun time." Tr. 1051-52. Defendant and detective Fred Hill then used the device to electrocute Wilson. Tr. 1052, 1179-81.

10

MONITOR00227527

Defendant and Hill stretched Wilson, kneeling, against a radiator, with Wilson's arms handcuffed on either side of the radiator and his chest against it. Tr. 1053-55. Defendant continued to shock Wilson with the original device, and used another device around Wilson's groin. Tr. 1056-87. Wilson struggled, and Wilson's legs, face, and chest slammed into the hot radiator. Tr. 1058.

That afternoon, Wilson was taken to Area 1 for a lineup. Tr. 1059. While at Area 1, defendant put his gun into Wilson's mouth and "clicked" it. Tr. 1059-60. O'Hara and detective Thomas McKenna then took Wilson back to Area 2. Tr. 1061. Once there, defendant told Wilson that Wilson would make a statement or defendant would do what he had done earlier. Tr. 1062. Wilson agreed to make a statement. *Id.* O'Hara, Hyman, and a court reporter were present for Wilson's statement. *Id.* After it was over, Wilson told the court reporter that the officers were going to torture him more, and the court reporter said he could not do anything about it. Tr. 1065.

Wilson was then taken to jail. Tr. 1071. On the way, two officers transporting Wilson slammed him into a wall, opening a wound on Wilson's forehead. Tr. 1067. Once at the jail, the lockup would not accept Wilson because of his injuries and required that Wilson be taken to a hospital. Tr. 1071.

Patricia Crossin was the supervising nurse on duty in Mercy Hospital's emergency room on February 14, 1982. Tr. 1315-17. When Wilson arrived, the

11

MONITOR00227528

officers transporting him announced that Wilson was a cop killer and that if Wilson knew what was good for him he would refuse treatment. Tr. 1319. When Crossin asked Wilson if he wanted treatment, he first shook his head no, and then nodded yes. Tr. 1321. Crossin saw a cut on Wilson's head. Tr. 1321. Crossin removed Wilson's clothes, revealing what appeared to be burns on Wilson's chest and thigh. Tr. 1324-27. When Crossin saw one of the officers with his gun out, she left to find a supervisor. Tr. 1329-30. Upon Crossin's return, Wilson refused treatment, and was signed out against medical advice and returned to the jail. Tr. 1331, 1073.

On February 15, 1982, Barbara Steinberg was appointed as Andrew Wilson's attorney at bond court. Tr. 1682-83. When Steinberg met with Wilson, he said he had been beaten and electrically shocked by police. Tr. 1688. Wilson pulled up his shirt and showed Steinberg dark vertical marks on his chest and abdomen. Tr. 1692. Steinberg concluded that Wilson had been pushed against a radiator and burned. Tr. 1694. Steinberg also noted that Wilson was bruised and bloody. Tr. 1696.

On the evening of February 15, 1982, Wilson was examined by Dr. John Raba, the director of Cermak Health Services, which served inmates at Cook County Jail. Tr. 1356-62. Dr. Raba became involved after Dr. Steven Goodman, the doctor on duty at Cermak, requested that Dr. Raba look at some unusual

12

                                                                 MONITOR00227529

injuries. Tr. 1362. Dr. Raba visited Wilson in his cell, and observed, among other injuries, a laceration on Wilson's forehead, two blistering lesions on Wilson's cheek, linear blistering lesions on Wilson's chest, and a large linear lesion that was partially blistering on Wilson's thigh. Tr. 1367. Wilson explained to Raba that he was beaten by police, handcuffed and pushed into a radiator, and electrically shocked. Tr. 1368. Dr. Raba believed that Wilson's injuries on his chest, cheek, and thigh were consistent with radiator burns. Tr. 1370-75.

On February 16, 1982, Dale Coventry was appointed to be Andrew Wilson's attorney. Tr. 733. That same day, Coventry and an investigator took dozens of photographs of Wilson's injuries. Tr. 738-57. Among other things, the photographs showed injuries to Wilson's nose, ear, forehead, eye, chest, thighs, and the back of his head. Tr. 740-50. Wilson described to Coventry that Wilson was pressed against a radiator and shocked with an electrical device held to his body with clips. Tr. 745, 750.

### Gregory Banks

On October 28, 1983, Gregory Banks was working at a game room when he was arrested by defendant, detective John Gallagher, and other officers. Tr. 1743-45, 1778-79. After being taken to Area 2, Banks remained in an interview room from approximately 9:00 p.m. until 2:30 a.m. Tr. 1779. During this time, detective Sammy Lacey attempted to interview Banks, but Lacey was

13

unsuccessful in obtaining a statement. Tr. 1568-69. Gallagher also asked Banks if Banks was willing to make a statement, and Banks declined. Tr. 1748. When Gallagher left at around midnight, Banks had no injuries on his wrists or any other parts of his body. Tr. 1749.

At around 2:30 a.m., a detective moved Banks to another room. Tr. 1779. While in the second room, an officer took a handgun and placed it in Banks' mouth while asking him about a murder. Tr. 1780. When Banks denied knowing anything about the crime, the officer took out a flashlight and hit Banks across his chest. Tr. 1781. Banks fell out of his chair, and another officer began kicking Banks on his chest, side, and ankles. *Id.* One of the officers said, "we have something special for niggers," and placed a plastic bag over Banks' head. Tr. 1781. Banks struggled, and couldn't breathe. *Id.* The bag was removed, and when Banks continued to deny that he knew anything about the crime, the bag was placed over his head again. Tr. 1782-83. Banks decided to tell the officers what they wanted to know. Tr. 1783. Banks led the officers to an address where he had hidden drugs and a handgun. Tr. 1783-84. Banks then agreed to give a statement to an ASA and court reporter. Tr. 1786. Defendant was not one of the officers that abused Banks, but Banks remembered defendant looking in on him in the interrogation room once or twice. Tr. 1784.

14

The next day, Lacey saw Banks again. Tr. 1569. Banks looked different than he had when Lacey had attempted to interview Banks – Banks was disheveled and had footprints on his chest, stomach, groin, and leg. Tr. 1569.

In early November 1983, Lee Carson was appointed as Banks' attorney. Tr. 1890. During their first meeting, Banks told Carson that Banks was beaten, struck with a flashlight, and suffocated with a plastic bag until he agreed to give a statement to police. Tr. 1893.

Approximately one week after Banks' arrest, he was treated at Cermak Health Services by Dr. Ross Romine. Tr. 2132-33. During their consultation, Banks told Dr. Romine that police had beaten him and put a bag over his head. Tr. 2137. During his examination, Dr. Romine found cuts, scratches, lumps, swelling on the left side of Banks' rib cage, and handcuff lacerations on Banks' wrists and ankle. Tr. 2140.

Banks was eventually convicted of the murder that he was questioned about at Area 2, and served 7 years and 3 days in prison before his conviction was overturned. Tr. 1777-78.

### Shadeed Mu'min

On October 30, 1985, Shadeed Mu'min was arrested for robbery and attempted murder. Tr. 2208, 2240. Mu'min, who lived in Milwaukee, had never been arrested in Chicago before and had never met or heard of defendant.

15

Tr. 2231. Mu'min was transferred to Area 2, where defendant asked if Mu'min had anything he wanted to tell defendant. Tr. 2210-12. Mu'min did not, and defendant became angry and pushed Mu'min into a wall and handcuffed him tightly. Tr. 2212-13. Defendant left, but returned a short time later and again asked if Mu'min was willing to tell defendant what defendant wanted to know. Tr. 2213. Mu'min again refused, and defendant tightened Mu'min's handcuffs. Tr. 2214.

Eventually, defendant took Mu'min into defendant's office. Tr. 2215. Mu'min sat in front of defendant's desk, and defendant sat behind the desk. Tr. 2217, 2220. After some conversation between the two, defendant pulled out a revolver. Tr. 2220. Defendant told Mu'min that defendant would blow Mu'min's brains out if Mu'min did not tell defendant what defendant wanted to know. Tr. 2220. Defendant then removed all of the bullets from the gun except one, and spun the cylinder. Tr. 2220-21. Defendant held the gun to Mu'min's head, spun the cylinder again, and clicked the gun. Tr. 2222. Defendant did this three times, and told Mu'min that Mu'min would talk. Tr. 2222-23.[5]

---

[5] An experienced gun user would know whether a revolver loaded with a single bullet would fire that bullet simply by looking at the firearm. Tr. 2358-62. Specifically, the cylinder of a revolver rotates counterclockwise as the trigger is pulled. Tr. 2361. By looking at the cylinder, the user can see whether a bullet is loaded into the chamber that will rotate into firing position. Tr. 2361.

16

MONITOR00227533

When Mu'min did not talk, defendant became angry, and tried to push a typewriter cover over Mu'min's face and mouth. Tr. 2224. Mu'min became short of breath, and started to struggle. Tr. 2225. Mu'min believed that another police officer was standing in the doorway while this occurred. Tr. 2223. When Mu'min struggled, defendant said, "fun time," and told the other officer to hold Mu'min down. Tr. 2226. Mu'min felt a hand on his shoulder, pushing him down as defendant kept smothering Mu'min with the typewriter cover. Tr. 2226-27. Mu'min twice lost consciousness. Tr. 2228. Eventually, Mu'min told defendant that Mu'min would tell defendant what defendant wanted to know. Tr. 2228. Defendant released the typewriter cover, and told Mu'min that Mu'min would sign a statement. Tr. 2229. Defendant then put Mu'min in an interview room; the next day Mu'min signed a statement for the ASA. Tr. 2229.

Retired sergeant Michael McDermott testified at trial pursuant to an immunity order. Tr. 1961. McDermott – who never spoke with the government except when compelled by a court to do so – was eventually declared a hostile witness after a series of impeachments with portions of his grand jury testimony. Tr. 1962, 1975-83. McDermott told the grand jury that he requested immunity "because [he] witnessed an abusive act by Jon Burge." Tr. 2073. McDermott then described his observations of defendant's abuse of Shadeed Mu'min. Tr. 1975-83. By the time of trial, McDermott minimized or denied most of his prior

17

     MONITOR00227534

descriptions. *Id.* McDermott was afraid his testimony would cause him to lose his job as an investigator with the State's Attorney's Office, as well as his CPD pension. Tr. 1996, 1999-2000.

McDermott was a detective in Area 2 violent crimes during the mid-1980s. Tr. 1964. During that time, defendant was McDermott's commanding officer. *Id.* McDermott remembered seeing Mu'min in defendant's office despite the fact that defendant was not assigned to Mu'min's case. Tr. 1969, 1985. At trial, McDermott denied seeing defendant point a gun at Mu'min. Tr. 1975. However, before the grand jury, McDermott testified that he saw defendant point a gun at Mu'min. Tr. 1976. McDermott further told the grand jurors he was sure that as defendant pointed the gun at Mu'min, defendant said something to Mu'min about confessing. Tr. 1978. McDermott denied at trial that he had seen defendant put something over Mu'min's head, although McDermott testified before the grand jury that after defendant pointed a gun at Mu'min, he approached Mu'min and put something over his head. Tr. 1981-82. McDermott acknowledged at trial that defendant approached Mu'min from behind, and covered Mu'min's face with a transparent material. Tr. 1982-83. Although he quibbled at trial about whether Mu'min could breathe, McDermott testified before the grand jury that he did not believe that Mu'min could breathe with the object over his face and "that's the whole idea of doing that." Tr. 1988.

18

                                         MONITOR00227535

McDermott did not see Mu'min initiate any physical contact with defendant. Tr. 1983.

Mu'min was convicted of the armed robbery and attempted murder that he gave a statement about, and was sentenced to 15 years' imprisonment. Tr. 2207.

### Defendant's Admissions

Defendant also bragged about the abuse of suspects. Tr. 1506-08, 1649-52. Specifically, Darlene Lopez's sister dated defendant in the late 1970s and early 1980s, and Lopez spent time with her sister and defendant on defendant's boat. Tr. 1496-98. During one excursion, defendant laughingly told Lopez about officers holding a suspect with arms outstretched and beating him with a stick in order to get him to confess to a crime. Tr. 1507-08.

Diane Panos met defendant in a bar in the late 1980s. Tr. 1649, 1653. Panos recalled defendant telling her that the Wilson brothers were beaten in order to secure confessions. Tr. 1651. Panos further recalled defendant saying that it was acceptable to beat suspects to obtain confessions because even if a confession were false, the suspect probably engaged in other criminal activity. Tr. 1651-52. When Panos disagreed, defendant ridiculed her and told her that the Fourth, Fifth, and Sixth Amendments did not apply to criminal defendants. Tr. 1652.

19

*Defense Evidence*

The defense presented testimony that in post-arrest statements, various arrestees did not allege that they were abused by police. Tr. 2399, 2406, 2410, 3038, 3170, 3189, 3240. These defense witnesses acknowledged that they were not present for the police interrogations, and that Wilson's and Mu'min's interviews were conducted contrary to usual policy. Tr. 2439-40, 3094-95, 3215-17, 3259. The defense also called an inmate with a history of providing false information about fellow inmates who testified that Melvin Jones was not abused at Area 2. Tr. 2985-86, 2995-98. Finally, the defense called a series of witnesses to challenge Andrew Wilson's allegations of abuse – including an ASA who had been at Area 2 on February 14, a former CPD captain who had seen Wilson in the middle of the day on February 14, the wife of a detective who Wilson testified was one of his torturers, and a forensic pathologist who examined photographs and opined that some of Wilson's injuries were not consistent with Wilson's account. Tr. 2459-65, 2539-53, 3117, 3137.[6]

The defendant testified, and acknowledged that he interrogated Anthony Holmes, and spoke with Melvin Jones and Shadeed Mu'min, but denied abusing

---

[6] The forensic pathologist determined that some of Wilson's injuries were consistent with Wilson's allegations. Specifically, he determined that the mark on Wilson's thigh was a second degree burn, and that puncture marks on Wilson's ears and nose could have been made by alligator clips. Tr. 2554, 2599, 2602.

20

them. Tr. 2663-67, 2676-77, 2684-87, 2765-72. Defendant acknowledged being present at Gregory Banks' arrest, and stated that he saw Banks later in one of the interview rooms, but denied seeing any abuse. 2752-56. Defendant acknowledged being responsible for the investigation into the murder of two police officers that Andrew Wilson killed, but denied participating in Wilson's interrogation. Tr. 2699, 2706-07, 2719, 2749. Defendant denied speaking with Cassandra Watson about a black box and having any conversation with Darlene Lopez where he admitted knowing about police abuse. Tr. 2695-96, 2774. Defendant further stated that he did not remember meeting Diane Panos. Tr. 2776. Defendant agreed that he signed the interrogatory answers charged in the indictment, and also that he would have been personally liable for punitive damages arising from *Hobley*.  Tr. 2786, 2788-89, 2794.

On June 28, 2010, after the month-long trial, the jury found defendant guilty of obstruction of justice and perjury. R. 235, 291.

## SUMMARY OF ARGUMENT

1.     The requirements of 18 U.S.C. § 1512(c)(2) were properly pled in the indictment and proved in court.   In this case, defendant obstructed and attempted to obstruct the official proceeding of *Hobley v. City of Chicago, et. al.*, a federal civil lawsuit, by submitting false answers to interrogatories as part of discovery in that lawsuit. The government proved the only nexus required

21

between the obstructive conduct and the official proceeding: that defendant intended to obstruct, influence, or impede the official proceeding.

2.     The district court properly denied a mistrial and excluded evidence regarding the underlying merit of *Hobley* because this evidence was irrelevant to the crimes with which defendant was charged. The elements of perjury and obstruction do not require the government to show that the underlying proceeding was likely to succeed. Nor has any court held that it is a defense to perjury or obstruction that another person lied first.

3.     There were no defects with respect to the element of materiality. The government presented sufficient evidence for a rational juror to find that defendant's lie was capable of affecting *Hobley's* outcome where defendant denied supervising and participating in more than a decade of torture in a lawsuit regarding whether CPD had a policy and practice of torture. The district court did not abuse its discretion in excluding defendant's proposed expert testimony given that it was both confusing and a misstatement of the law. Additionally, the indictment was not constructively amended by a jury instruction describing one way in which the outcome of *Hobley* could have been affected.

4.     The district court did not abuse its discretion in excluding prior testimony under Rule 807. The district court properly concluded that the

testimony was untrustworthy, because the witnesses had significant motivation to lie when they testified. Additionally, other non-hearsay evidence was available to defendant on the same issues that the prior testimony involved. Finally, because the prior testimony was untrustworthy, the interests of justice did not require its admission.

5. The district court did not use unreliable evidence by referencing a victim's letter at sentencing. Defendant did not challenge the reliability of the letter at sentencing, and even now does not produce any evidence to show the letter was inaccurate. Moreover, the letter was corroborated by other victims' accounts. Therefore, it was not clear error for the district court to discuss the letter before imposing sentence.[7]

---

[7] Defendant mentions in his Statement of Facts numerous adverse rulings, including: the denial of his motion for change of venue; the denial of his motion for recusal; the denial of his motion for dismissal of the indictment for pre-indictment delay; the finding that defendant violated *Batson* during jury selection; the refusal to give a unanimity instruction; the district court providing a magnifying glass to jurors *ex parte*; pre-trial and trial publicity; and the belief that he was not administered an oath as part of his interrogatory response. These issues were argued extensively prior to, during, and after trial. Defendant does not challenge any of the rulings in his argument section, or provide any legal authority to support a conclusion that the district court erred. Therefore, these issues are waived. *See United States v. Martinez*, 650 F.3d 667, fn. 3 (7th Cir. 2011) (noting that arguments not raised in opening brief are waived).

17-cv-06260                                                                                   MONITOR00227540

## ARGUMENT

### I.   There Were No Defects with Respect to the Indictment or Proof on Counts One and Three.

Defendant argues that his convictions for obstruction of an official proceeding must be overturned because defendant did not take an action "in" an official proceeding.  Because the statute with which defendant was charged does not have such a requirement, defendant's convictions on Counts One and Three should be upheld.

### A.   Standard of Review

A district court's refusal to dismiss an indictment is reviewed *de novo*. *See United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

Challenges to the sufficiency of the evidence are reviewed *de novo*, considering all the evidence in the light most favorable to the government.  *See United States v. Vallar,* 635 F.3d 271, 286 (7th Cir. 2011). The verdict will be upheld when any rational trier of fact could have found the defendant guilty.  *Id.* "Proving that no such evidence exists presents a nearly insurmountable hurdle to the defendant." *Id.*

17-cv-06260                                                            MONITOR00227541

## B.     Background

Defendant was charged in Counts One and Three with obstruction and attempted obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2).  R. 1, SA1-7.

Prior to trial, defendant moved to dismiss the indictment, arguing that the submission of false answers to interrogatories in a federal lawsuit does not constitute obstruction or attempted obstruction as a matter of law.  R. 50.  The district court denied defendant's motion. R. 138, SA40-41.

Defendant contended in his post-trial motion for Judgment of Acquittal that the government's proof was insufficient for the same reasons he raised in his motion to dismiss. R. 300. The district court also denied this motion. R. 353, SA109-110.

## C.     The Government Charged and Proved an "Official Proceeding"

At the time of defendant's conduct, 18 U.S.C. § 1512(c) provided:

Whoever corruptly  --
(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, or
(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
shall be fined under this title or imprisoned not more than 20 years, or both.

25

                                               MONITOR00227542

The term "official proceeding" included "a proceeding before a judge or court of the United States." 18 U.S.C. § 1515. For a prosecution to proceed under § 1512, the defendant need not know that the proceeding was a federal proceeding, nor does the proceeding need to be "pending or about to be instituted at the time of the offense." *See* 18 U.S.C. §§ 1512(f), 1512(g). The only "nexus" required between the defendant's obstructive conduct and the proceeding is that the defendant "believe that his acts will be likely to affect a pending or foreseeable proceeding." *See United States v. Matthews*, 505 F.3d 698, 707-708 (7th Cir. 2007).

The requirements of § 1512(c)(2) were properly pled in the indictment and proved in court. An indictment is legally sufficient as long as it: "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *White*, 610 F.3d at 958. In this case, the indictment charged that defendant obstructed and attempted to obstruct the official proceeding of *Hobley v. City of Chicago, et. al.*, a lawsuit pending in the U.S. District Court for the Northern District of Illinois, by submitting false answers to interrogatories as part of discovery. SA1-7.

Despite defendant's assertion to the contrary, § 1512(c)(2) does not require the obstructive conduct to occur "in" the proceeding to be obstructed. By its own

26

                                                                                  MONITOR00227543

terms, § 1512(c)(2) requires only that the defendant "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." Moreover, § 1512(c) explicitly encompasses many types of obstructive conduct unlikely to occur *in* court, such as destroying or concealing documents. For that reason, this Court regularly approves of prosecutions under § 1512(c) that do not involve in-court conduct. *See, e.g., United States v. McKibbins,* 656 F.3d 707, 709-11 (7th Cir. 2011) (affirming § 1512(c)(1) conviction where defendant encouraged family members to destroy and hide computer equipment after learning of a search warrant); *United States v. Peel,* 595 F.3d 763, 766-67 (7th Cir. 2010) (holding that § 1512(c)(2) may be a lesser-included offense of bankruptcy fraud, but taking no issue with the premise that a defendant who blackmailed his ex-wife to obtain settlement in a bankruptcy proceeding had committed obstruction); *Matthews*, 505 F.3d at 708 (upholding conviction under § 1512(c)(1) where defendant concealed a weapon to hide it from the grand jury); *see also United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007) (affirming conviction under § 1512(c)(2) where defendant forged a court order which he faxed to a party to civil litigation to induce the withdrawal of a previous filing).

Defendant relies upon *Dunn v. United States*, 442 U.S. 100 (1979), for his conclusion that obstruction cannot occur through an interrogatory answer. However, Dunn was not charged with obstruction. Rather, Dunn was charged

17-cv-06260    MONITOR00227544