# EXHIBIT 9 (PART 1)

## BEFORE THE POLICE BOARD OF THE CITY OF CHICAGO

IN THE MATTER OF CHARGES FILED AGAINST )
POLICE OFFICER PATRICK KELLY,               )          **No. 19 PB 2966**
STAR No. 19397, DEPARTMENT OF POLICE,       )
CITY OF CHICAGO,                            )
                                            )
                                            )          **(CR No. 1033096)**
                        RESPONDENT.         )

## FINDINGS AND DECISION

On October 10, 2019, the Superintendent of Police filed with the Police Board of the City

of Chicago charges against Police Officer Patrick Kelly, Star No. 19397 ("Respondent"),

recommending that Respondent be discharged from the Chicago Police Department for violating

several Rules of Conduct.

A hearing on the charges against the Respondent took place before Hearing Officer

Allison L. Wood on March 8–12, 2021, via Zoom video conferencing. Following this

evidentiary hearing, the members of the Police Board read and reviewed the record of the

proceedings, including the Hearing Officer's report (neither party filed a response to this report),

and viewed the video recording of the entire evidentiary hearing. Hearing Officer Wood made

an oral report to and conferred with the Board before it rendered its findings and decision.

## POLICE BOARD FINDINGS

As a result of its hearing on the charges, the Police Board finds and determines that:

1. Respondent was at all times mentioned herein employed as a police officer by the

Department of Police of the City of Chicago.

2. A copy of the charges filed, and a notice stating the date, place, and time the initial

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

status hearing would be held, were personally served upon Respondent not fewer than five (5)

days before the date of the initial status hearing for this case.

3. At the hearing on the charges Respondent appeared and was represented by legal

counsel.

### Introduction

4. Respondent has been a Chicago police officer since 2004. It is undisputed that

Respondent was off-duty on the evening of January 11, 2010. He spent time with his childhood

friend Michael LaPorta ("LaPorta") at two local bars—first McNally's (a 2:00 a.m. bar), and

then Brewbakers (a 4:00 a.m. bar). In the early morning hours of January 12, 2010, Respondent

and LaPorta returned to Respondent's home, where they continued drinking. At approximately

4:35 a.m., LaPorta was shot in the head with Respondent's service weapon. No one was present

at the time of the shooting apart from Respondent and LaPorta. The bullet entered LaPorta's

head on the back, left side, approximately three inches above LaPorta's left ear. The cartridge

casing of the bullet that was fired failed to eject properly; it was found in the chamber of

Respondent's gun, a Double Action Kellerman ("DAK") Sig Sauer. Respondent called 911 at

about 4:35 a.m. and reported that LaPorta had committed suicide. During that call Respondent

realized that LaPorta was still breathing. Respondent called 911 a second time at about 4:40

a.m., asking when the paramedics would arrive at his home; paramedics arrived during the

course of that phone call. Respondent became upset when he was not allowed to travel to the

hospital in the ambulance with LaPorta, leading responding officers to take him to the ground

and arrest him. LaPorta survived the shooting, but was left with a severe brain injury that

prevented him from communicating with investigating officers regarding the incident until 2016.

The charges against Respondent arise out of the events that took place in the early

2

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

morning hours of January 12, 2010, and the ensuing investigation. In the years following the shooting—including during the hearing on the charges before the Board—Respondent maintained that LaPorta shot himself in the head. The charges include: (1) on the morning of January 12, 2010, Respondent discharged his firearm in the direction of LaPorta without justification; (2) in a statement made to the Independent Police Review Authority ("IPRA") on January 11, 2011, Respondent said that he went to grab for the gun but did not touch it; and (3) in the same January 11, 2011 statement to IPRA, Respondent answered "no" when he was asked if he shot LaPorta.

The Board concludes that the preponderance of the evidence presented in this case established that Respondent pulled the trigger on the morning of January 12, 2010, and subsequently lied about it during an interview with IPRA on January 11, 2011. His statement that he did not shoot LaPorta was inconsistent with the physical and circumstantial evidence in this case. Accordingly, the Board finds Respondent guilty of violating Rules 2, 8, 9, 14, and 38.

## Charges Against Respondent

5. Police Officer Patrick Kelly, Star No. 19397, is **guilty** of violating Rules 2, 8, 9, and 38 in that the Superintendent proved by a preponderance of the evidence the following charges:

On or about January 12, 2010, Officer Patrick Kelly discharged his firearm in the direction of Michael LaPorta without justification. Officer Kelly thereby violated:

a. Rule 2, which prohibits any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department;

b. Rule 8, which prohibits disrespect to or maltreatment of any person, while on or off duty;

c. Rule 9, which prohibits engaging in any unjustified verbal or physical altercation with any person, while on or off duty; and

3

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

    d. Rule 38, which prohibits unlawful or unnecessary use or display of a weapon.

The Superintendent has the burden to prove by a preponderance of the evidence that it is more likely than not that Respondent discharged his firearm in LaPorta's direction without justification on the morning of January 12, 2010. *See generally Clark v. Bd. of Fire & Police Comm'rs of the Vill. of Bradley*, 613 N.E.2d 826 (Ill. App. Ct. 1993). While it is impossible to know exactly what transpired in those early morning hours, the physical and circumstantial evidence presented to the Police Board render it more likely than not that Respondent fired the shot that struck LaPorta.

*First*, the Police Board finds LaPorta's testimony that he did not shoot himself to be credible. Although LaPorta has undeniably suffered an extremely severe brain injury, the Police Board found credible the amount of detail LaPorta was able to recall during his testimony.[1] And while Respondent's expert, Dr. Robert Heilbronner, testified that LaPorta's recollection of the night at issue has resulted from memory confabulation,[2] there is simply no evidence in the record to support that theory. Indeed, there is no evidence before the Police Board indicating that a member of LaPorta's family—or any other individual in close contact with him—discussed what transpired on the morning of January 12, 2010, with him, or otherwise told him that he was shot by Respondent.

On the other hand, the Police Board was given several reasons to question the veracity of

---

[1] LaPorta's memory was sufficient enough to correct Respondent's counsel when she misstated particular facts during the Police Board hearing. LaPorta corrected Respondent's counsel when she confused the last name of Respondent's sister. When Respondent's counsel incorrectly stated that LaPorta resided in a dormitory with Respondent in college, he clarified that they lived in a house.

[2] Dr. Heilbronner explained that memory confabulation describes a situation where someone (typically with a brain injury) does not recall events accurately. The brain, in its injured state, tries to put together a cohesive picture of what happened based on various sources of information (*i.e.* statements by others), and the ultimate picture it presents is inaccurate.

MONITOR00264478

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

Respondent's claim that LaPorta shot himself. As an initial matter, Respondent's description of the shooting defies common sense. Officer Kelly testified that, in the middle of an otherwise normal conversation, LaPorta entered his bedroom and retrieved his service weapon, which was kept in a nightstand when he was off-duty. It is not credible that LaPorta—who would have no way of knowing where Respondent kept his weapon when he was off-duty (and there was no evidence offered to the contrary)—would abruptly end an otherwise normal conversation in order to retrieve the gun and attempt suicide.

Respondent's claim that he was not intoxicated at the time of the shooting also gave the Police Board reason to question both the veracity of his testimony as a whole and his specific recollection of what transpired on the morning of January 12, 2010. Those who responded to the scene after the shooting, including Sergeant Stephen Coyne, testified that Respondent appeared to be highly intoxicated.[3] The Police Board was particularly persuaded by the testimony of the Superintendent's expert, Dr. Albert Larsen. Using data from the Breathalyzer test that was administered at 12:37 p.m. on January 12, 2010, Dr. Larsen performed a back extrapolation.[4] Given Respondent's alcohol reading of .093 approximately eight hours after the shooting, Dr. Larsen explained that Respondent's claim that he drank no more than five light beers over the course of approximately five hours (two at McNally's, two at Brewbakers, and part of a beer upon returning to his home with LaPorta) could not be accurate. Based on Dr. Larsen's calculation, Officer Kelly's blood alcohol concentration at the time of the shooting was between

---

[3] The Police Board recognizes that Respondent's actions (yelling, screaming, crying, and swearing at the responding officers) could have been brought on—at least in part—by concern for his friend (as Respondent claims). However, the idea that a sober individual—especially a police officer—would attempt to kick out the back window of a squad car is implausible.

[4] A back extrapolation is a calculation that uses the results of a later-in-time Breathalyzer to determine the range of alcohol concentration in an individual's body at the time of an earlier incident.

17-cv-06260 MONITOR00264479

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

.169 and .246 grams of alcohol per deciliter, a range consistent with consumption of between ten and fourteen beers.[5]

    *Second*, all available evidence suggests that LaPorta would not—and could not—shoot himself at an angle consistent with the entry wound on the back, left side of his head (approximately three inches above LaPorta's left ear). Respondent testified that LaPorta shot himself using his left hand, rather than wrapping his right arm around his head to fire the shot. If, indeed, LaPorta did shoot himself, it would be physically more plausible that he would have used his left hand. However, apart from Respondent's uncorroborated testimony that LaPorta was ambidextrous, there is no indication in the record that LaPorta would have handled the gun with his left hand. LaPorta's uncle, David Battistoni, is an experienced gun owner who testified that he has gone hunting with LaPorta hundreds of times since he was a young child. Mr. Battistoni taught LaPorta how to shoot a loaded gun when he was ten or eleven years old; only knowing how to shoot with his right hand himself, Mr. Battistoni taught LaPorta to shoot with his right hand. Mr. Battistoni further testified that, during their many hunting trips, he never saw LaPorta shoot with his left hand. The Police Board has no reason to think that LaPorta would use his left hand to fire a gun to attempt suicide.

    The location and direction of LaPorta's injury is also inconsistent with a self-inflicted injury—regardless of whether the gun was held in LaPorta's left or right hand. David Balash, a forensic science consultant and independent firearms examiner, demonstrated how the location and direction of LaPorta's injury was inconsistent with someone holding the gun in the right

---

[5] Dr. Larsen acknowledged that, if Respondent suffered from improper liver functioning resulting from alcoholism (as Respondent claimed), his calculation of Respondent's blood alcohol concentration at the time of the shooting could be "off." However, there is no indication that this calculation could have been so affected by Respondent's liver functioning as to discount the conclusion that Respondent lied when he said he only consumed five light beers over the course of roughly five hours.

17-cv-06260

MONITOR00264480

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

hand, contorting their arm around their head, and pulling the trigger with their index finger.[6] Mr. Balash also credibly testified that a left handed shot would not line up with the wound location; even if it had, such a shot would have resulted in a through and through wound[7] with more catastrophic injuries. Finally, Mr. Balash testified that the failure of the cartridge casing to eject from Respondent's weapon was inconsistent with someone holding the gun in their left hand against their left temple and firing.[8]

*Third*, the available physical evidence is totally inconsistent with Respondent's claim that LaPorta pulled the trigger. The testimony of Dr. Mariusz Zieweski, an expert witness in the field of biomedical engineering, was particularly persuasive on this point. Dr. Zieweski testified that, based on the blood spatter pattern that was left on the floor of Respondent's living room,[9] LaPorta must have been facing a south or southwest direction at the time of the shooting (*i.e.*, facing into the living room with his back to Respondent's bedroom). The blood spatter pattern

---

[6] During the hearing, much time was dedicated to the distinctions between Respondent's service weapon and the gun Mr. Balash used to prepare his expert report and provide demonstration during the Police Board hearing. Mr. Balash used a Double Action Only ("DAO"), and Respondent's service weapon is a DAK. Mr. Balash testified that, even when the gun was held to the location of the entry wound with the left hand, an individual could not pull the trigger with their left index finger. Respondent's expert, Rick Wyant, testified that a DAK has half the trigger pull of a DAO, making it easier to fire in a variety of positions. Regardless of that fact, all other available evidence —including LaPorta's experience firing guns with his right hand, the location and direction of the injury, and the fact that there was not an exit wound—indicates that the likelihood of LaPorta firing the gun with his left hand is very low.

[7] The shot fired at LaPorta did not result in an exit wound.

[8] Respondent's expert, Mr. Wyant, testified that the clicking sound Respondent claims to have heard and the failure of the fired cartridge case to eject from the weapon could have resulted from the failure of the shooter to fully commit to the trigger pull (*i.e.*, pulling the trigger back a bit and then releasing it). He went on to explain that the failure of the fired cartridge case to eject could have resulted from "limp wristing"—a term of art used to describe cases where the shooter does not hold the gun firmly, allowing the gun to move in the shooter's hand when the trigger is pulled. The Superintendent's expert, Mr. Balash, agreed that failure to hold the gun firmly as a result of alcohol intoxication could have caused the weapon to malfunction and not eject correctly. Respondent and LaPorta had been drinking on the night of the shooting; their respective intoxication levels could have caused either of them to fail to hold the gun firmly. Therefore, the Police Board does not believe that this testimony weighs in favor of or cuts against Respondent's claim that LaPorta pulled the trigger.

[9] Importantly, Dr. Zieweski testified that the blood spatter pattern underlying his analysis had not been disturbed by the police officers and paramedics who responded to the scene on the morning of January 12, 2010.

7

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

indicates that LaPorta rotated before ultimately landing on his back on the living room floor. Respondent, on the other hand, testified that LaPorta shot himself in the head while facing north, and then fell straight backwards, landing on his back.[10]

Dr. Zieweski further testified that the location of scalp and hair fragments on a south window sill and the couch (located against the south wall) were consistent with the conclusion he had reached based on the blood spatter pattern. The testimony of Respondent's expert, Rick Wyant, that the location of these displaced scalp and hair fragments was consistent with a contact or near contact shot does not cut against Dr. Zieweski's testimony (which assumes LaPorta was shot from behind at a close range). Therefore, the Police Board concludes that Respondent's version of events is wholly inconsistent with the physical evidence in his living room.[11]

Taken together, all of this evidence indicates that LaPorta did not fire the shot that struck him in the back of the head. The Superintendent has met his burden of proving that it is more likely than not that, on the morning of January 12, 2010, Respondent discharged his firearm in the direction of LaPorta without justification.

---

[10] Respondent testified that he followed LaPorta into his bedroom; as Respondent walked into the bedroom, LaPorta walked out towards the living room. Respondent stated that he turned around so he was face to face with LaPorta, who had Respondent's service weapon held to the left side of his head (and was facing north—towards Respondent and the door of the bedroom). Respondent testified that LaPorta fired the gun, fell backwards, and landed on his back.

[11] There is also a significant amount of evidence in the record regarding gun powder residue. Robert Berk, the Illinois State Police trace analyst who worked on this case, testified that he was unable to locate any gunshot residue particles on the back of Respondent's hands, on the cuffs of the shift Respondent was wearing at the time of the shooting, or on the left cuff or collar of the shirt LaPorta was wearing at the time of the shooting. Mr. Berk identified gunshot residue on the right cuff of LaPorta's shirt. Given the failure to test LaPorta's hands for gunshot residue, the excessive handling of LaPorta's garments at the hospital, and the risk of transfer of materials from one surface to another (all of LaPorta's clothing was placed in a single brown paper bag), the Police Board does not believe that this gun powder residue physical evidence is (1) sufficient to draw a conclusion about who fired the gun, or (2) inconsistent with its determination that it is more likely than not that Respondent shot LaPorta.

MONITOR00264482

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

6. Police Officer Patrick Kelly, Star No. 19397, is **guilty** of violating Rules 2 and 14 in that the Superintendent proved by a preponderance of the evidence the following charges:

On January 11, 2011, Officer Patrick Kelly made a false, misleading, or deliberately incomplete statement to the Independent Police Review Authority (IPRA) when describing the events of the evening on which Michael LaPorta received a gunshot wound to the head. In that statement, Officer Kelly described the moments before Michael LaPorta was shot, and said that he (Kelly) went to grab for the gun but did not touch the gun, or words to that effect, when in fact Kelly did touch the gun. Officer Kelly thereby violated:

    a. Rule 2, which prohibits any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department; and

    b. Rule 14, which prohibits making a false report, written or oral.

See the findings set forth in Section No. 5 above, which are incorporated herein by reference.

As laid out in Section No. 5, it is more likely than not that Respondent fired his service weapon in LaPorta's direction. This determination necessarily means that, at one point in the moments before LaPorta was shot, Respondent touched the gun. The Board finds that Respondent's statement to IPRA on January 11, 2011—that he went to grab for the gun but did not touch it—was a willfully false statement about a fact that was material to the incident under investigation. The Superintendent has met his burden to prove that Respondent made a false statement to IPRA and is guilty of violating Rules 2 and 14.

7. Police Officer Patrick Kelly, Star No. 19397, is **guilty** of violating Rules 2 and 14 in that the Superintendent proved by a preponderance of the evidence the following charges:

On January 11, 2011, Officer Patrick Kelly made a false, misleading, or deliberately incomplete statement to IPRA when describing the events of the evening on which Michael LaPorta received a gunshot wound to the head. In that statement, Officer Kelly answered "no" when asked if he shot Michael LaPorta, or words to that effect, when in fact Officer

 MONITOR00264483

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

Kelly did shoot Michael LaPorta. Officer Kelly thereby violated:

a. Rule 2, which prohibits any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department; and

b. Rule 14, which prohibits making a false report, written or oral.

See the findings set forth in Section Nos. 5 and 6 above, which are incorporated herein by reference.

As laid out in Section No. 5, it is more likely than not that Respondent fired the shot that struck LaPorta in the head on the morning of January 12, 2010. Consequently, Respondent's statement to IPRA on January 11, 2011, that he did not shoot LaPorta was a willfully false statement about a fact that was material to the incident under investigation. The Superintendent has met his burden to prove that Respondent made a false statement to IPRA and is guilty of violating Rules 2 and 14.

**Disciplinary Action**

8. The Police Board has considered the facts and circumstances of the conduct of which it has found Respondent guilty, and the evidence Respondent presented in his defense and mitigation.

Respondent's evidence in mitigation included the testimony of two witnesses. Jane Bansley, Respondent's younger sister, testified that Respondent has no history of mistreating his friends. While LaPorta testified that the argument that ultimately led to the shooting arose out of Respondent yelling at and hitting his dog, Ms. Bansley also testified that Respondent has no history of mistreating animals. Hillary Clark, Respondent's wife and a former Chicago Police Officer, testified that Respondent is a loving husband and father. Ms. Clark also

10

MONITOR00264484

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

testified as to Respondent's interaction with their dogs, saying she has never witnessed concerning behavior.

In addition, the Board considered Respondent's complimentary and disciplinary histories. Since he joined the Department in 2004, Respondent has earned 53 total awards, including five Department Commendations, 33 Honorable Mentions, one Deployment Operations Center Award, one Attendance Recognition Award, and one Emblem of Recognition for Physical Fitness. He has no sustained complaints on the report of his disciplinary history.

Nevertheless, after thoroughly considering Respondent's evidence in mitigation and service as a police officer, the Board finds that his accomplishments as an officer and the positive evaluations of him do not mitigate the seriousness of his misconduct in this case. The Board finds that Respondent's misconduct is incompatible with continued service as a police officer.

Respondent's actions in shooting of Michael LaPorta in the head were reckless, violent, and unjustified. The Board finds that returning Respondent to his position as a police officer, in which he would be armed and authorized to use deadly force, poses an unacceptable risk to the safety of the public. His discharging his firearm without justification indicates a gross disregard for public safety and a lack of judgment so serious as to warrant removing him from his position as a Chicago police officer.

In addition, Respondent attempted to cover up his actions by knowingly making false material statements to the Independent Police Review Authority. Respondent's dishonesty relates directly to his public duties as a police officer, and renders him unfit to hold that office. Trustworthiness, reliability, good judgment, and integrity are all material qualifications for any

11

MONITOR00264485

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

job, particularly one as a police officer. The duties of a police officer include making arrests and testifying in court, and a police officer's credibility is at issue in both the prosecution of crimes and in the Police Department's defense of civil lawsuits. A public finding that an officer has knowingly made a material false statement to an investigator is detrimental to the officer's ability to perform his responsibilities, including his credibility as a witness, and, as such, is a serious liability to the Department. *See Rodriguez v. Weis*, 946 N.E.2d 501, 507 (Ill. App. Ct. 2011).

The Board finds that Respondent's conduct is sufficiently serious to constitute a substantial shortcoming that renders his continuance in his office detrimental to the discipline and efficiency of the service of the Chicago Police Department, and is something that the law recognizes as good cause for him to no longer occupy his office.

[The remainder of this page is left blank intentionally.]

MONITOR00264486

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

## POLICE BOARD DECISION

The members of the Police Board of the City of Chicago hereby certify that they have read and reviewed the record of proceedings, viewed the video-recording of the entire evidentiary hearing, received the oral report of the Hearing Officer, and conferred with the Hearing Officer on the credibility of the witnesses and the evidence. The Police Board hereby adopts the findings set forth herein by the following votes.

By a vote of 8 in favor (Ghian Foreman, Paula Wolff, Matthew C. Crowl, Michael Eaddy, Steve Flores, Jorge Montes, Rhoda D. Sweeney, and Andrea L. Zopp) to 0 opposed, the Board finds Respondent **guilty** of the charges in Specification Nos. 1–3, as set forth in Section Nos. 5–7 above.

As a result of the foregoing and for the reasons set forth in Section No. 8 above, the Board, by a vote of 8 in favor (Foreman, Wolff, Crowl, Eaddy, Flores, Montes, Sweeney, and Zopp) to 0 opposed, hereby determines that cause exists for discharging Respondent from his position as a police officer.

**NOW THEREFORE, IT IS HEREBY ORDERED** that Respondent Police Officer Patrick Kelly, Star No. 19397, as a result of having been found **guilty** of all charges in Police Board Case No. 19 PB 2966, be and hereby is **discharged** from his position as a police officer and from the services of the City of Chicago.

This disciplinary action is adopted and entered by a majority of the members of the Police Board: Ghian Foreman, Paula Wolff, Matthew C. Crowl, Michael Eaddy, Steve Flores, Jorge Montes, Rhoda D. Sweeney, and Andrea L. Zopp.

DATED AT CHICAGO, COUNTY OF COOK, STATE OF ILLINOIS, THIS 17th DAY OF JUNE, 2021.

13

MONITOR00264487

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

Attested by:

/s/ GHIAN FOREMAN
President

/s/ MAX A. CAPRONI
Executive Director

14

MONITOR00264488

Police Board Case No. 19 PB 2966
Police Officer Patrick Kelly
Findings and Decision

## DISSENT

The following members of Board hereby dissent from the findings and decision of the

majority of the Board.

[None]

RECEIVED A COPY OF

THESE FINDINGS AND DECISION

THIS _____ DAY OF _____, 2021.


_____
DAVID O. BROWN
Superintendent of Police

15

MONITOR00264489

**BEFORE THE POLICE BOARD OF THE CITY OF CHICAGO**

IN THE MATTER OF CHARGES FILED AGAINST  )
POLICE OFFICER JAMIE JAWOR,             )      **No. 20 PB 2978**
STAR No. 6740, DEPARTMENT OF POLICE,  )
CITY OF CHICAGO,                             )
                                         )
                                       )      **(CR No. 1085722)**
                  **RESPONDENT.**     )

**FINDINGS AND DECISION**

On August 4, 2020, the Superintendent of Police filed with the Police Board of the City of Chicago charges against Police Officer Jamie Jawor, Star No. 6740 ("Respondent"), recommending that Respondent be discharged from the Chicago Police Department for violating several Rules of Conduct.

A hearing on these charges against Respondent took place before Hearing Officer Allison Wood on April 28 – 30, 2021, via Zoom video conferencing. Following this evidentiary hearing, the members[1] of the Police Board read and reviewed the record of the proceedings, including the Hearing Officer's Report and the parties' responses to this report, and viewed the video recording of the entire evidentiary hearing. Hearing Officer Wood made an oral report to and conferred with the Board before it rendered its findings and decision.

**POLICE BOARD FINDINGS**

As a result of its hearing on the charges, the Police Board finds and determines that:

1. Respondent was at all times mentioned herein employed as a police officer by the

---

[1] Board Vice President Paula Wolff recused herself from this case pursuant to § 2-78-130(a)(iii) of the Municipal Code of Chicago.

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

Department of Police of the City of Chicago.

2. A copy of the charges filed, and a notice stating the date, place, and time the initial status hearing would be held, were personally served upon Respondent not fewer than five (5) days before the date of the initial status hearing for this case.

3. Throughout the hearing on the charges Respondent appeared and was represented by legal counsel.

## Introduction

4. Respondent has been a Chicago Police Officer since 2006. The charges in this case stem from a series of events that took place on June 27, 2017, around 1:00 a.m. On that date, Respondent was near the end of her shift, and she was driving with her partner, Officer Mark Mueller, on Independence Boulevard in Chicago. They were both wearing plainclothes and in an unmarked police car, a silver Ford Explorer. Respondent noticed that a black Jeep Grand Cherokee (Jeep) with tinted windows and White Sox plates made two abrupt lane changes. Respondent shared her observation with Officer Mueller and they both began to focus on the Jeep. Respondent also noticed the Jeep roll through a stop sign, failing to make a complete stop. Respondent followed the Jeep and, as she followed the Jeep, the Jeep increased its speed. She could not see the driver of the car, nor did she know how many occupants were in the car. As the Jeep increased its speed, Respondent increased her speed. Both cars were moving at speeds that exceeded the 30-m.p.h speed limit, reaching speeds as high as 103 m.p.h. The Jeep sped through a red light at the intersection of Roosevelt Road and Kostner Avenue and slammed into another vehicle, coming to rest wrapped around a traffic control signal pole. The driver of the Jeep was later identified as Chicago Police Officer Taylor Clark. The driver of the other vehicle was later identified as Chiquita Adams. Both Officer Clark and Ms. Adams died from their injuries.

2

MONITOR00264491

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

## **Respondent's Motions to Dismiss the Charges**

5. Prior to the hearing, Respondent filed a motion to dismiss Specification Nos. 3 – 5 ("Motion") of the charges. At the hearing, following the presentation of the Superintendent's case in chief, Respondent moved to dismiss Specification Nos. 1 and 2 of the charges.

## **Motion to Dismiss Specification Nos. 3 – 5 of the Charges**

In her Motion, Respondent asserts that there is no support for Specifications 3, 4, and 5, pointing to Civilian Office of Police Accountability's ("COPA") changed opinion on these charges. Specifications 3, 4, and 5 were brought under General Order G03-03-01 (Emergency Vehicle Operations – Pursuits). COPA initially found these charges "unfounded" but later found them "sustained" in the supplemental report. Specifications 3, 4, and 5 are as follows:

3) "[W]hile following Officer Taylor Clark, [Respondent] failed to properly initiate a motor vehicle pursuit by failing to properly conduct a balancing test; and/or failing to activate the lights and/or sirens in her unmarked department issued vehicle; and/or by failing to notify the OEMC dispatcher regarding the facts concerning the pursuit";

4) "[Respondent] improperly engaged and/or continued a motor vehicle pursuit by following Officer Taylor Clark's vehicle in her unmarked department issued vehicle at an increasingly high rate of speed, in excess of the posted speed limit for a traffic offense or in the alternative for a theft after the pursued vehicle disregarded a stop sign"; and

5) "[Respondent] failed to properly conduct [a] balancing test while engaging in and/or continuing a motor vehicle pursuit during which she operated her unmarked department issued vehicle at speeds of over 100 m.p.h., well in excess of the speed limit, on an urban street populated with pedestrians and other vehicle traffic."

The Motion explains that the initial COPA investigation concluded Specifications 3, 4, and 5 were "unfounded" under a narrow definition of "motor vehicle pursuit" from General Order G03-03-01. The Motion then asserts that COPA's later supplemental review wrongfully found these allegations sustained as it used a broader definition of the same term than it had during its initial review. The Motion argues that the narrow definition of "motor vehicle pursuit" should

3

MONITOR00264492

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

stand, and that an alternative reading of that order now would be an inappropriate retroactive

application. The Board considers both parts of this argument in turn.

**1.      Support for Specifications 3, 4, and 5**

**A.      Definition of "Motor Vehicle Pursuit"**

Under the law, the definition of "motor vehicle pursuit" under G03-03-01 has not

changed since the incident on June 27, 2017. Both the version in effect during the incident (eff.

3/28/16 – 4/8/19) as well as the current version of the order (eff. 8/15/20) define a "motor vehicle

pursuit" as:

> "An active attempt by a sworn member operating an authorized emergency
> vehicle to apprehend any driver or operator of a motor vehicle who, having been
> given a visual and audible signal by the officer directing such driver or operator to
> bring his or her vehicle to a stop, fails or refuses to obey such direction, increases
> or maintains his or her speed, extinguishes his or her lights, or otherwise flees or
> attempts to elude the officer.
> NOTE: A routine traffic stop or other instance in which an officer activates his or
> her emergency lights and/or siren and the citizen/vehicle operator complies by
> coming to a stop in a reasonably short distance will NOT be considered a motor
> vehicle pursuit."

G03-03-01 (2020), Glossary Terms, Section 3.A. at 11; G03-03-01 (2016), Glossary Terms,

Section 4.

The Motion argues that G03-03-01 narrowly defines a "motor vehicle pursuit" such that

Respondent's high-speed chase does not fit within the order. Respondent's argument turns on the

order's use of an "and" connector between the requirement for the visual signal and audible

signal. *See* Mot. to Dismiss at 4. The Motion points to the fact that COPA found that Respondent

activated her lights *but not* her siren. *Id.* Ex. A at 17. Without both, the Motion asserts, there

cannot be a "motor vehicle pursuit," and thus Respondent cannot be disciplined for specifications

governing the required conduct during such a pursuit.

4

                                                                        MONITOR00264493

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

In the Superintendent's Response to Respondent's Motion to Dismiss ("Response"), the

Superintendent argues that whether Respondent's conduct violates the order is a "bona fide

question of fact for the Board to consider." Response at 5. This, however, misses the mark. There

is no factual dispute in the record. The siren was never on, and even the lights were only

activated near the end of the chase. Request for Review of Non-Concurrence (June 25, 2019).

Instead, the key issue before the Board is a question of *law* concerning statutory interpretation of

the order.

Respondent's argument is flawed because it favors a literal but incongruous reading of

the guidance over reading the rule in a manner consistent with its clear message and intent. No

rule should be read literally if such a reading is contrary to the rule's objective. 2A N. Singer,

Sutherland Statutory Construction § 46.07, at 126 (5th ed. 1992). Although literal

interpretation is often favored, "[t]he intention prevails over the letter." *Id.; see also Coco Bros.,

Inc. v. Pierce*, 741 F.2d 675, 679 (3d Cir. 1984) (quoting *Viacom Int'l Inc. v. Federal

Communications Comm'n*, 672 F.2d 1034, 1040 (2d Cir. 1982)) ("[T]he surest way to

misinterpret a statute or a rule is to follow its literal language without reference to its purpose.").

Case law is equally clear that if the literal text of an act is inconsistent with legislative intent or

leads to an "absurd" result, a statute may be construed to save the text. 2A N. Singer,

Sutherland Statutory Construction § 46:7 (7th ed. 2017) (collecting federal and Illinois-

based cases); *see also Reid v. Dep't of Commerce,* 793 F.2d 277, 281–82 (Fed. Cir. 1986)

(collecting cases to explain that courts may look beyond an act's literal text where "a literal

interpretation would lead to an incongruous result").

Here, the order is meant to provide guidelines to officers "when <u>involved in an eluding or

pursuing incident</u>" as well as to announce a standard for administrative review. G03-03-01

MONITOR00264494

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

(2020) at II.C. (emphasis in original). But, because eluding also involves "issu[ing] a visual and audible signal," the order creates a bizarrely narrow result if "and" is read as a requirement for both lights and siren to be engaged. G03-03-01 (2020) at 2 (Section III.A.). Under Respondent's suggested plain text reading, the order excludes from its definitions conduct which would commonly be thought to fall under "eluding" or "pursuing." In this way, an officer could evade responsibility for misconduct and simply decide not to follow the order by *failing* to engage the lights or siren. This would enable an officer to use an unmarked emergency vehicle at a high rate of speed to try to apprehend another vehicle that has otherwise failed to stop or obey directions without being subject to Department guidance. This result, as COPA noted in its supplemental report, is "highly problematic" because it defies the common sense reading of these terms and has dangerous implications.

There is also evidence that the drafters did *not* intend the word, "and," to provide such a loophole. The order states that "[t]he Department member will only engage in a motor vehicle pursuit when . . . if in a marked vehicle, the emergency-roof lights and siren are activated or, if in an unmarked vehicle, the high-beam flashing headlights, siren, and light bars (if equipped) are activated throughout the duration of the pursuit . . . ." *See* G03-03-01 (2020) at 4 (Section VII.A.2.). If, under a literal construction, a motor vehicle pursuit *requires* both lights and siren signals to be given, it is odd to also require that the Department will only engage in a pursuit when both are activated throughout the duration of that pursuit. Instead, this Section at least contemplates that a "pursuit" *could* occur in a case in which an officer fails to activate both during some (and potentially *all*) of the duration of the pursuit.

Indeed, COPA argued in its supplemental report from 2020 that it is not bound to constrain its interpretation of law in a manner that would result in an injustice. COPA cited

6

MONITOR00264495

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

*Fallen v. United States*, 378 U.S. 139, 142 (1964), holding that the federal rules of criminal

procedure "are not, and were not intended to be, a rigid code to have an inflexible meaning

irrespective of the circumstances" and "are intended to provide for the just determination . . . and

shall be construed to secure . . . fairness." COPA also cited to *Mich. v. Chesternut*, 486 U.S. 567,

576 (1988), in which the Supreme Court characterized behavior of officers as a "police pursuit"

when they accelerated without activating their lights or sirens to catch up to a suspect. These

arguments provide additional support against a literal construction.

Finally, the Board warns against arguments that attempt to interpret General Orders in a

manner to avoid liability. The rules exist to provide officers with *guidance* about their conduct,

not loopholes to avoid discipline. Here, the Board respectfully disagrees with Respondent's

argument and finds that the rule's guidance is sufficiently clear so as to cover her conduct as

charged.

### B.    Retroactivity

The Motion then argues that COPA's later description of the General Order G03-03-01 as

highly problematic cannot be applied because it would be an inappropriate retroactive

application of the law. Mot. to Dismiss at 4. The Superintendent responds that there is no

retroactive application of the order because the order's text regarding the "motor vehicle pursuit"

has not changed. Response at 5.

Indeed, the current General Order does not vary the language in effect during the 2017

incident. Moreover, the General Order has not yet actually been amended to reflect COPA's

concerns. Mot. to Dismiss, Ex. E at 4. The Superintendent correctly notes that "retroactive"

application of the order is thus not in fact applicable. However, the Motion's broader (though

imprecisely articulated) argument is that COPA's later *interpretation* of the G03-03-01 should

7

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

not be retroactively applied.

The issue of announcing and applying an interpretation which is at variance with the literal construction of a text is one of due process and fair notice. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (announcing this principle in a civil case). The consideration is whether the general order, standing alone or as construed, made it reasonably clear at the relevant time that the conduct was prohibited. *See United States v. Lanier*, 520 U.S. 259, 267 (1997) (providing the standard in a criminal case).

Here, the Board is satisfied that the general order was reasonably clear at the relevant time. It was sufficiently apparent at the time of the incident that Respondent's conduct, even without the siren, fell within the ambit of a motor vehicle pursuit. Her actions as a whole were within the common sense understanding of the term. Moreover, the charges brought before the Board are administrative and disciplinary as opposed to criminal. Such an inquiry involves less robust constitutional protections to consider than in the criminal context. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984) (explaining that there are "less searching standards imposed" on retrospective civil legislation under the Due Process Clauses). Here, the general order already clears the *Lanier* test from the criminal context, and therefore fair notice was given.

### 2. Objection to the Reopening of the COPA Investigation

The Motion's second line of argument is that COPA's reopening of the investigation was inappropriate. Mot. to Dismiss at 5. It asserts that but for an "odd request" by the Department of Law to reopen the charges against Respondent after eleven months, she would only be facing

8

MONITOR00264497

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

two (instead of five) charges today. *Id.* at 6. The Motion claims COPA may only "reopen a closed investigation when there is new evidence not previously available, or when COPA determines that a closed investigation resulted in a gross miscarriage of justice." *Id.* at 6 (citing CHI. MUN. CODE § 2-78-120(x)(i)–(ii)). It further asserts that these conditions were not met because no new evidence was found under COPA's Supplemental Summary Report, and a "gross miscarriage of justice" was not met because Respondent could be separated already for an adverse finding under Specification 1 alone.

In the Response, the Superintendent contends instead that the COPA investigation was reopened in the "interest of justice." Response at 7. The Response points to COPA's Supplemental Summary Report to argue that allowing Respondent's actions to escape the definition of pursuit because she failed to activate her lights *and* siren would be against the interest of justice. *Id.* Therefore, COPA's decision to reopen the investigation after reassessing its original, narrow reading of a pursuit was justified to avoid a miscarriage of justice. *Id.*

Under the Chicago Municipal Code, there are three mechanisms for reopening a closed investigation. First, a closed investigation may be reopened where COPA "becomes aware of evidence not available at the time the investigation was closed that could materially affect the results of that investigation." CHI. MUN. CODE § 2-78-120(x)(i). Second, a reopening is also possible where COPA "determines that the manner in which the investigation was concluded has resulted in a gross miscarriage of justice." *Id.* at § 120(x)(ii). Third, an investigation may be reopened too where, "[f]ollowing a review or audit of an investigation by the Deputy Inspector General for Public Safety, the Deputy Inspector General for Public Safety recommends that the investigation be reopened." *Id.* at § 120(x)(iii). This scenario enables COPA to choose whether to reopen a closed investigation; however, if COPA's Chief Administrator declines to reopen in

9

MONITOR00264498

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

this scenario, the Administrator must provide a written explanation of COPA's reasons to the

Deputy Inspector General for Public Safety. *Id.* Additionally, § 2-78-120(h) vests COPA with a

related power to review, in its discretion, "lawsuits or claims against the Police Department, or

one or more of its members . . . where such lawsuit or claim was subsequently settled or resulted

in a judgment against such member . . . for the purpose of reopening a prior investigation or

opening a new investigation of alleged police misconduct."

The Code clearly contemplates mechanisms for reopening an investigation beyond what

the Motion had summarized. The Code also focuses on a determination that the *manner* in which

the investigation concluded resulted in a gross miscarriage of justice. By contrast, the Motion

summarized this standard as just that the concluded investigation resulted in a gross miscarriage

of justice. Regardless, the Motion and Response were correct to focus on the "gross miscarriage

of justice" mechanism in their analyses. This is the justification most applicable to the case facts.

Here, COPA needs to have determined that the manner in which the investigation

concluded resulted in a gross miscarriage of justice. The Board finds that this standard was met.

A "miscarriage of justice" is commonly "[a] grossly unfair outcome in a judicial proceeding, as

when a defendant is convicted despite a lack of evidence on an essential element of the crime."

*Miscarriage of Justice*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Miscarriage of*

*Justice*, MERRIAM-WEBSTER, HTTPS://WWW.MERRIAM-WEBSTER.COM/DICTIONARY/MISCARRIAGE

OFJUSTICE (last visited June 21, 2021) ("[A]n outcome in a judicial proceeding that is unjust

*especially* : an error made in a court of law that results in an innocent person being punished or a

guilty person being free."). While these definitions emphasize the use of this term in the context

of wrongful convictions, the term is notably broader, encompassing unfair and unjust outcomes.

 MONITOR00264499

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

Given this definition, the Motion's argument—that the closed investigation did not result in a gross miscarriage of justice simply because Respondent *could* still be separated based on the original specification list alone—is insufficient. Respondent's argument is essentially that justice has already been served with the initial specifications because, in a retributive sense, she could be separated on the basis of the original count list. Yet, that ignores that the reopened investigation increased the odds of her punishment. It created five (instead of two) sustained counts against her, with three (instead of one) of them suggesting separation.

In addition, COPA's concern about having read the Code too narrowly and thus needing to reopen the investigation is legitimate. The consequence of a potentially incorrect legal interpretation is improperly immunizing police misconduct. This falls within the gambit of a grossly "unfair" or "unjust" result, thereby justifying the choice to reopen the investigation under the Chicago Municipal Code.

**Motion to Dismiss Specification Nos. 1 and 2 of the Charges**

Respondent has also orally moved to dismiss the other allegations, Specifications 1 and 2, at the hearing on April 30, 2021. These charges were found supported in both the original and supplemental COPA reports. Specification 1 concerns failing to drive with due regard for the safety of all persons. Specification 2 relates to driving in excess of the speed limit. Respondent does not challenge these in her Motion, but orally challenged them at the hearing. Respondent asserts that because the charges mistakenly cite to General Order G03-02, instead of G03-03 (Emergency Vehicle Operations - Non-Pursuit), they are defective. General Order G03-02 instead deals with the use of force—not operations of emergency vehicles, police pursuits, or non-pursuits. She further argues that, because the Superintendent never moved orally or in writing to amend the charging document, the charges must be dismissed as a matter of law.

11

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

In response, the Superintendent contends that the point of the charges are to put all parties on notice as to the allegations that will be proven at the hearing. He asserts that this notice has been accomplished because General Order G03-03 has been entered as an exhibit, shown to multiple witnesses, and used by both parties in this case. Furthermore, the section number and date of the order were correct. The only error within Specifications 1 and 2 was in the references to this order number within the subsection d. portions on the Rule 6 violations.

Here, the Board finds that scrivener's or typographical errors such as this one that still provide adequate notice of the charges are insufficient to require dismissal. Even staunch textualists typically concede the necessity of permitting judges to reform a plain typographical mistake. *See, e.g.*, John Copeland Nagle, *Corrections Day*, 43 UCLA L. REV. 1267, 1288 (1996) ("Almost all courts will correct a 'scrivener's error.'"); Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 20 (Amy Gutmann ed., 1997) (acknowledging the scrivener's error doctrine). With that said, in the criminal context, defendants are entitled under the Sixth Amendment to adequate notice of the charges against them in order to afford them with the opportunity to defend against such allegations. *Cole v. Arkansas*, 333 U.S. 196, 201 (1948). But minor typographical errors do not typically deprive a party of adequate notice. *See, e.g.*, *Donval v. Chandler*, No. 05 C 1501, 2005 U.S. Dist. LEXIS 26928, at *40–41 (N.D. Ill. November 4, 2005) (collecting cases involving acceptable minor errors in indictments).

The notice here was sufficient for Respondent to prepare for the allegations against her. In her own Motion, Respondent is clearly aware of the substantive underlying charges. She recounts the incorrect General Order provision cited by COPA but correspondingly provides the

12

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

accurate description of the intended provision (i.e., the non-pursuit provision): "COPA believes these two allegations [Specifications 1 and 2] violated General Order G-03-02 which pertained to **non-pursuit** vehicle operations." Mot. at 2 (emphasis in original). The Board is further persuaded by the Superintendent's argument that there are enough other indicia of the proper charges underlying the typographical error to provide adequate notice. *See Henley v. Jones*, No. 16-24989-CIV-LENARD/REID, 2019 U.S. Dist. LEXIS 18411, at *16–17 (S.D. Fla. February 4, 2019) (finding that where an affidavit's allegation erroneously cited to Fla. Stat. § 832.0593)(a), instead of Fla. Stat. § 832.05(3)(a), but clearly identified the description of the proper section, the scrivener's error did not deprive petitioner of proper notice nor did it constitute a due process violation).

For the aforementioned reasons, Respondent's Motion to Dismiss Allegations 3, 4, and 5 and her oral motion to dismiss Allegations 1 and 2 shall be denied.

## <u>Charges Against the Respondent</u>

6. Police Officer Jamie Jawor, Star No. 6740, is **guilty** of violating Rules 1, 2, 3, 6, and 10 in that the Superintendent proved by a preponderance of the evidence the following charges set forth in Specification No. 1:

> On or about June 27, 2017, at approximately 1:00 a.m., in the vicinity of Roosevelt Road and Independence Boulevard in Chicago, while following and/or pursuing Officer Taylor Clark, Officer Jawor drove in excess of 100 m.p.h. and failed to drive with due regard for the safety of all persons, and/or failed to exercise care when exceeding the speed limit to avoid endangering life or property. Officer Jawor thereby violated:
>
> a. Rule 1, which prohibits violation of any law or ordinance, by committing the offense of speeding in violation of section 11-205 of the Illinois Vehicle Code, 625 ILCS 5/11-601(c) (West 2016), which establishes maximum speed limit in an urban district of 30 m.p.h.;

13

MONITOR00264502

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

    b.  Rule 2, which prohibits any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department;

    c.  Rule 3, which prohibits any failure to promote the Department's efforts to implement its policy or accomplish its goals;

    d.  Rule 6, which prohibits disobedience of an order or directive, whether written or oral, by disobeying Department General Order G03-03, section III (effective June 1, 2003); and

    e.  Rule 10, which prohibits inattention to duty.

The Superintendent has the burden to prove by a preponderance of the evidence that it is more likely than not that when Respondent followed Officer Taylor Clark, Respondent drove in excess of 100 m.p.h., failed to drive with due regard for the safety of all persons, and/or failed to exercise care when exceeding the speed limit to avoid endangering life or property. *See generally Clark v. Bd. of Fire & Police Comm'rs of the Vill. of Bradley*, 613 N.E.2d 826 (Ill. App. Ct. 1993).

We find credible the testimony from the Superintendent's expert witness, Adam Hyde, an expert in traffic crash and reconstruction investigations, that Respondent drove her unmarked Department issued vehicle more than 100 m.p.h. His analysis and opinions were based on his review of the data taken from the Global Positioning System (GPS) of Respondent's unmarked vehicle and video captured by red light cameras and businesses in the vicinity. Mr. Hyde was able to determine and demonstrate via video and pictures that as Respondent pursued Officer Clark, her speed accelerated incrementally such that when she was on Roosevelt Road, continuing westbound west of South Keeler Avenue, her rate of speed was 103 m.p.h. Given that the speed limit for that vicinity was 30 m.p.h., Respondent violated the Illinois Motor Vehicle Code. Respondent did not deny that she was driving at high rates of speed or that at one point her rate was more than 100 m.p.h. Respondent maintained that since she was engaged in a motor

    MONITOR00264503

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

vehicle pursuit, she was afforded an exemption from traffic rules regarding speeding pursuant to

General Order 03-03 (Emergency Use of Department Vehicles). We do not find that Respondent

was afforded any privileges or exemptions pursuant to General Order 03-03. This Order provides

that members engaged in motor vehicle pursuits are afforded special privileges and exemptions

"only when the vehicle is readily identifiable as an emergency vehicle." It defines an

"authorized emergency vehicle" as either a marked police vehicle with emergency roof lights

and siren or an unmarked police vehicle with flashing headlights and sirens. Respondent was not

driving an "authorized emergency vehicle". She was driving an unmarked car without using her

flashing lights or her sirens. Given these unrefuted facts, the opinion that Respondent complied

with the Order that was given by Respondent's expert witness, Robert Johnson, an expert in the

operation of emergency vehicle pursuits, is clearly baseless. Mr. Johnson's opinion that

Respondent was afforded the privilege to exceed speed limits pursuant 625 ILCS 5/11-205

(Public Officers and Employees to Obey Act-Exceptions) is similarly flawed. The statute, which

is contained and referenced within the General Order, states that the privilege to exceed the

speed limit is only available to vehicles that make use of either audible or visual signals.

Respondent did not make use of either audible or visual signals in her pursuit of Officer Clark.

Mr. Johnson's efforts to minimize Respondent's failures were disingenuous. He opined, for

example, that because people do not always hear sirens, reliance on them may be misplaced. He

also opined that Respondent's failure to know how fast she was going and her failure to look at

her speedometer can be overlooked, because looking at her speed may have distracted her from

the pursuit of Officer Clark. Glaringly absent from Respondent's testimony and the testimony of

her expert, is her duty to consider the safety of pedestrians and other cars while she was engaged

in a high speed pursuit of Officer Clark. Given Respondent's decision to pursue Officer Clark at

15

MONITOR00264504

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

high rates of speed, her failure to make use of her lights or sirens, and her failure to provide

Officer Clark with any audible or visual signals, we find that Respondent was inattentive to her

duty and disregarded the safety of pedestrians and other cars in or near the vicinity.


7.  Police Officer Jamie Jawor, Star No. 6740, is **guilty** of violating Rules 1, 2, 3, 6, and

10 in that the Superintendent proved by a preponderance of the evidence the following charges

set forth in Specification No. 2:

> On or about June 27, 2017, at approximately 1:00 a.m., in the vicinity of Roosevelt Road and
> Independence Boulevard in Chicago, while following Officer Taylor Clark, Officer Jawor
> drove her unmarked Department-issued vehicle over 100 m.p.h., more than 35 m.p.h. in
> excess of the speed limit. Officer Jawor thereby violated:

>> a.  Rule 1, which prohibits violation of any law or ordinance, by committing the
>> offense of speeding in violation of section 11-205 of the Illinois Vehicle Code,
>> 625 ILCS 5/11-601(c) (West 2016), which establishes maximum speed limit in an
>> urban district of 30 m.p.h.;

>> b.  Rule 2, which prohibits any action or conduct which impedes the Department's
>> efforts to achieve its policy and goals or brings discredit upon the Department;

>> c.  Rule 3, which prohibits any failure to promote the Department's efforts to
>> implement its policy or accomplish its goals;

>> d.  Rule 6, which prohibits disobedience of an order or directive, whether written or
>> oral, by disobeying Department General Order G03-03, section III (effective June
>> 1, 2003); and

>> e.  Rule 10, which prohibits inattention to duty.

See the findings set forth in Section No. 6 above, which are incorporated here by

reference. We find Respondent guilty on these charges for the same reasons stated in the

previous section. The evidence clearly shows that Respondent's rate of speed was significantly

more than 35 m.p.h. over the 30 m.p.h. speed limit.

16

MONITOR00264505

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

8. Police Officer Jamie Jawor, Star No. 6740, is **guilty** of violating Rules 2, 3, 6, and 10

in that the Superintendent proved by a preponderance of the evidence the following charges set

forth in Specification No. 3:

> On or about June 27, 2017, at approximately 1:00 a.m., in the vicinity of Roosevelt Road and Independence Boulevard in Chicago, while following Officer Taylor Clark, Officer Jawor failed to properly initiate a motor vehicle pursuit by failing to properly conduct a balancing test; and/or failing to activate the lights and/or sirens in her unmarked Department-issued vehicle; and/or by failing to notify the OEMC dispatcher regarding the facts concerning the pursuit. Officer Jawor thereby violated:
>
> a. Rule 2, which prohibits any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department;
>
> b. Rule 3, which prohibits any failure to promote the Department's efforts to implement its policy or accomplish its goals;
>
> c. Rule 6, which prohibits disobedience of an order or directive, whether written or oral, by disobeying Department General Order G03-03-01, section V(A) (effective March 28, 2016), which allows sworn members to engage in a motor vehicle pursuit only after applying the balancing test, activating the high-beam flashing headlights, siren, and light bars (if equipped) in an unmarked vehicle, and notification has been made to the OEMC regarding the facts concerning the pursuit; and
>
> d. Rule 10, which prohibits inattention to duty.

See the findings set forth in Section Nos. 6 and 7 above, which are incorporated here by

reference. We find that Respondent violated General Order G03-03-01 (Emergency Vehicle

Operations – Pursuits) in three ways. First, the General Order expressly prohibits unmarked

vehicles from engaging in motor vehicle pursuits "that involve only traffic offenses." The only

conduct that Respondent observed by Officer Clark was an abrupt lane change and rolling

through a stop sign. These are clearly traffic offenses that prohibited Respondent from engaging

in a motor vehicle pursuit of Officer Clark. Second, the General Order required Respondent to

undertake a balancing test before deciding to pursue Officer Clark. The balancing test is defined

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

as: "The necessity to immediately apprehend the fleeing suspect outweighs the level of inherent

danger created by a motor vehicle pursuit." Members of the Department are to consider the

speed, the potential danger to himself or others, the volume of pedestrians and vehicular traffic,

and the road conditions. Respondent's testimony that she conducted a balancing test was not

credible because if she had conducted a balancing test, she would have recognized that Officer

Clark was not a "fleeing suspect" that needed to be "immediately apprehended." She did not

observe Officer Clark commit any crime and she admitted that he had done nothing wrong.

There was no sense of urgency to apprehend him. Third, the General Order sets forth certain

protocols that members are required to follow when engaged in a motor vehicle pursuit.

Respondent did not follow any of them. She failed to contact the Office of Emergency

Management and Communications (OEMC), failed to report the location and speed of the

pursuit, and failed to wait further instruction from a supervisor. In addition, Respondent failed to

put on her lights or her sirens. Respondent wrongfully initiated a motor vehicle pursuit and

continued to engage in that pursuit without waiting to receive any instruction from a supervisor.

Respondent's testimony in this case was not credible and lacking in candor. To begin

with, her insistence throughout this proceeding that she was not engaged in a motor vehicle

pursuit was simply dishonest. She pursued Officer Clark at high rates of speed for nearly a mile

and argued she was entitled to drive at excessive rates of speed because of the special privileges

afforded to members who engage in motor vehicle pursuits. She completed and signed a Traffic

Pursuit Report on or near the same day of the occurrence, but she testified that she only signed it

because her supervisor directed her to do so. Both her supervisor, Sergeant Martin Chatys, and

her expert witness, Robert Johnson, testified that they had concluded that Respondent had

engaged in a motor vehicle pursuit. When asked whether she believed her pursuit of Officer

18

 MONITOR00264507

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

Clark was prohibited by the General Orders, Respondent disagreed. It was then pointed out that

she had previously given a statement where she agreed that the pursuit was prohibited because

she was in an unmarked car. It was also pointed out that although Respondent maintained that

she did not know how fast she was driving, she told her supervisor that she has been driving 70

m.p.h. Although Respondent testified that Officer Clark had done nothing wrong, Respondent

maintained that she was justified in following him because he was driving a Jeep that fit the

description (black with White Sox plates) of a Jeep that had been involved in a vehicular

carjacking two weeks earlier. Yet, Respondent was unable to recall when she heard about the

Jeep that was involved in a vehicular carjacking, who told her about it, or where any such

conversation took place. She admitted that she had not received any alerts about a Jeep nor was

she given any directive as to what, if anything, she should do, if she encountered a Jeep. She

insisted that she engaged in and continued to pursue Officer Clark to obtain his license plate.

Yet, when she was directly behind the Jeep driven by Officer Clark, she did not make note of his

license plate, did not use her radio, and claimed that the Portable Data Terminal (PDT) in the car

was off-line. With respect to her failure to turn on her sirens, Respondent testified that she was

concerned that if she turned on the siren, her partner would not be able to hear the radio. When

asked if she ever activated the siren and communicated with OEMC at the same time, she

testified that she could not remember. Inexplicably, Respondent pursued Officer Clark at a high

rate of speed for nearly a mile and decided to turn on her lights seconds before Officer Clark ran

through a red light and crashed. This was also the first time any effort was made to communicate

with OEMC and it was her partner, Officer Mueller, who initiated the communication. These

empty gestures were too little too late. The testimony and opinion of Respondent's expert that

Respondent was in compliance with 625 ILCS 5/11-204 (Fleeing or Attempting to Elude a Police

19

MONITOR00264508

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

Officer) and 625 ILCS 5/11-204.1 (Aggravating Fleeing or Attempting to Elude Police Officer),
is simply wrong. Collectively, these sections permit police officers who provide an audible or
visual signal to a suspect to engage in a pursuit if that suspect fails to obey that signal and tries to
elude the police. Respondent did not provide Officer Clark with any signals or any directive that
he failed to obey. Section 204 states that police officers engaging in such pursuits must be in
uniform and must use lights and sirens. Respondent was not in uniform, and she failed to use her
lights or sirens. These sections are also inapplicable because there was no evidence, nor can any
inference be made, that Officer Clark was fleeing and trying to elude the "police." Officer Clark
was clearly trying to elude and flee from an unknown driver in an unknown car at 1:00am after
completing his shift. He was not a suspect and he had not committed any crime. She disregarded
General Orders and statutes to pursue a driver that she had no interaction or communication with.
She did not cease her pursuit of Officer Clark until he ran a red light and crashed. Such thinking
and actions clearly bring discredit upon the Department and fails to promote the Department's
efforts to accomplish its goals.


9.  Police Officer Jamie Jawor, Star No. 6740, is **guilty** of violating Rules 2, 3, 6, and 10
in that the Superintendent proved by a preponderance of the evidence the following charges set
forth in Specification No. 4:

> On or about June 27, 2017, at approximately 1:00 a.m., in the vicinity of Roosevelt Road and
> Independence Boulevard in Chicago, Officer Jawor improperly engaged and/or continued a
> motor vehicle pursuit by following Officer Taylor Clark's vehicle in her unmarked
> Department-issued vehicle at an increasingly high rate of speed, in excess of the posted speed
> limit, for a traffic offense or in the alternative for a theft after the pursued vehicle disregarded
> a stop sign. Officer Jawor thereby violated:
>
> > a.  Rule 2, which prohibits any action or conduct which impedes the Department's
> > efforts to achieve its policy and goals or brings discredit upon the Department;

20

MONITOR00264509

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

b. Rule 3, which prohibits any failure to promote the Department's efforts to implement its policy or accomplish its goals;

c. Rule 6, which prohibits disobedience of an order or directive, whether written or oral, by disobeying the following sections of Department General Order G03-03-01 (effective March 28, 2016):

  i. Section III(B)(3), which prohibits sworn members from engaging in motor vehicle pursuits while operating unmarked vehicles if the most serious offense is a traffic offense;

  ii. Section III(C)(2), which prohibits sworn members from continuing motor vehicle pursuits when the most serious offense a vehicle is wanted for is a theft and after the initial observed violation the pursued vehicle disregards a stop/yield sign;

  iii. Section V(D)(1), which prohibits sworn members driving unmarked vehicles from initiating or engaging in motor vehicle pursuits that involve only traffic offenses; and

d. Rule 10, which prohibits inattention to duty.

See the findings set forth in Section Nos. 6 – 8 above, which are incorporated here by reference. As stated above, Respondent violated the directives in General Order G03-03-01 when she engaged in a motor vehicle pursuit of Officer Clark.

10. Police Officer Jamie Jawor, Star No. 6740, is **guilty** of violating Rules 2, 3, 6, and 10 in that the Superintendent proved by a preponderance of the evidence the following charges set forth in Specification No. 5:

On or about June 27, 2017, at approximately 1:00 a.m., in the vicinity of Roosevelt Road and Independence Boulevard in Chicago, Officer Jawor failed to properly conduct the balancing test while engaging in and/or continuing a motor vehicle pursuit during which she operated her unmarked Department-issued vehicle at speeds of over 100 m.p.h., well in excess of the speed limit, on an urban street populated with pedestrians and other vehicle traffic. Officer Jawor thereby violated:

a. Rule 2, which prohibits any action or conduct which impedes the Department's

21

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

        efforts to achieve its policy and goals or brings discredit upon the Department;

b.  Rule 3, which prohibits any failure to promote the Department's efforts to implement its policy or accomplish its goals;

c.  Rule 6, which prohibits disobedience of an order or directive, whether written or oral, by disobeying the following sections of Department General Order G03-03-01 (effective March 28, 2016):

    i.  Section II(A), which requires sworn members to determine whether the necessity of apprehending the fleeing suspect outweighs the level of inherent danger created by the motor vehicle pursuit during the initiation and continuation of the motor vehicle pursuit;

    ii.  Section III(C)(2), which requires sworn members to determine whether the speeds involved permit the Department vehicle operator complete control of the Department vehicle and do not create unwarranted danger to himself or others; whether the volume of pedestrian and vehicular traffic reasonably permits initiating or continuing the pursuit; and whether the weather and road conditions reasonably permit initiating or continuing the pursuit; and

d.  Rule 10, which prohibits inattention to duty.

See the findings set forth in Section Nos. 6 – 9 above, which are incorporated here by reference. As stated above, we find that Respondent violated General Order 03-03-01 and she failed to conduct a balancing test in deciding to pursue Officer Clark. The Superintendent's expert witness, Mr. Hyde, credibly testified that excessive rates of speed at which Respondent was driving her car would have an impact on her ability to safely control the car. Further, he credibly pointed out in the videos that there were other cars on the road when Respondent was speeding and there were pedestrians standing and/or walking along the sidewalks. Respondent's testimony that she had control of her car was not credible given the excessive rate of speed she was driving. We note that in the videos, Respondent's car is going so fast that the car is lifted off the ground as it passed by the frame. There is no basis for Respondent to believe that driving at excessive rates of speed down an urban street populated with pedestrians and other vehicle traffic

MONITOR00264511

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

was reasonable or justified.

### Disciplinary Action

11. The Police Board has considered the facts and circumstances of the conduct of which it has found Respondent guilty and the evidence Respondent presented in her defense and mitigation.

Respondent presented five mitigation witnesses. Sergeant Martin Chatys supervised Respondent in 2017 when she was part of the Gang Enforcement Unit. He testified that she has a great work ethic, her integrity is beyond reproach, and he wanted her on his team. Her partner, Officer Mark Mueller, has known Respondent for 4 or 5 years and considers her a friend and a co-worker. He described Respondent as honest and forthright. Larry Wert is a friend who has known Respondent for 7 years. He testified that she was always a stand-up person, and he has never had a reason to doubt her integrity. Deputy Chief Randall Darlin testified that Respondent worked for him on a tactical team. He testified that Respondent worked in high crime areas and is a very dedicated officer. He noted that she works well with the community and is always professional. Officer Fachin Walker testified that she trained Respondent; and she never had a problem with Respondent. She was always helpful and professional.[2]

Nevertheless, after thoroughly considering Respondent's years of service as a police officer and the testimony offered in mitigation, the Board finds that her work as an officer and the positive evaluations of her do not mitigate the seriousness of her misconduct in this case.

---

[2] Respondent did not move for entry into the record at the hearing her CPD complimentary history or letters regarding her character. The Superintendent did not move for entry into the record Respondent's disciplinary history.

                                                                 MONITOR00264512

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

The Board finds that Respondent's misconduct is incompatible with continued service as a police

officer.

Respondent violated the law and Department rules and policy by driving at a very high

rate of speed, at one point exceeding 100 m.p.h., on a city street on which there were other

vehicular traffic and pedestrians. In so doing, Respondent endangered the lives of pedestrians

and persons in the vehicles she passed. Her decision making that night and her failure to follow

her training, traffic laws, and CPD rules indicate a gross disregard for the safety of members of

the public and a lack of judgment so serious as to warrant her discharge from the Chicago Police

Department. The Board finds that returning Respondent to duty as a police officer poses an

unacceptable risk to the safety of the public.

The Board finds that Respondent's conduct is sufficiently serious to constitute a

substantial shortcoming that renders her continuance in her office detrimental to the discipline

and efficiency of the service of the Chicago Police Department, and is something that the law

recognizes as good cause for her to no longer occupy her office.

24

MONITOR00264513

Police Board Case No. 20 PB 2978
Police Officer Jamie Jawor
Findings and Decision

### POLICE BOARD DECISION

The members of the Police Board of the City of Chicago hereby certify that they have read and reviewed the record of the proceedings, viewed the video-recording of the entire evidentiary hearing, received the oral report of the Hearing Officer, and conferred with the Hearing Officer on the credibility of the witnesses and the evidence. The Police Board hereby adopts the findings set forth herein by the following votes.

By a vote of 7 in favor (Ghian Foreman, Matthew C. Crowl, Michael Eaddy, Steve Flores, Jorge Montes, Rhoda D. Sweeney, and Andrea L. Zopp) to 0 opposed, the Board denies Respondent's motions to dismiss the charges for the reasons set forth in Section No. 5 above.

By votes of 7 in favor (Foreman, Crowl, Eaddy, Flores, Montes, Sweeney, and Zopp) to 0 opposed, the Board finds Respondent **guilty** of the charges in Specification Nos. 1–5, as set forth in Section Nos. 6 – 10 above.

As a result of the foregoing and for the reasons set forth in Section No. 11 above, the Board, by a vote of 7 in favor (Foreman, Crowl, Eaddy, Flores, Montes, Sweeney, and Zopp) to 0 opposed, hereby determines that cause exists for discharging Respondent from her position as a police officer.

**NOW THEREFORE, IT IS HEREBY ORDERED** that Police Officer Jamie Jawor, Star No. 6740, as a result of having been found **guilty** of all charges in Police Board Case No. 20 PB 2978, be and hereby is **discharged** from her position as a police officer and from the services of the City of Chicago.

This disciplinary action is adopted and entered by a majority of the members of the Police Board: Ghian Foreman, Matthew C. Crowl, Michael Eaddy, Steve Flores, Jorge Montes, Rhoda D. Sweeney, and Andrea L. Zopp. (Board Vice President Paula Wolff recused herself

25

MONITOR00264514