# EXHIBIT 11 (PART 2)

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    redacted personal information.

2              It doesn't really matter what Mr.

3    Usmani's date of birth or gender or whatever else

4    happens to be on here, it doesn't really matter

5    what those are.  That has no relevant or bearing

6    on the charges against Officer Tomescu.

7              What I think is important to show is

8    the type of information that can be accessed and

9    was accessed via LEADS and the fact that the

10   information related to Mr. Usmani and that it was

11   Officer Tomescu accessing that information.  That

12   is why we would be offering Exhibit 9.

13      HEARING OFFICER PERRY:  Stop you there for a

14   moment.  So Exhibits 6, 8, and then this exhibit,

15   I'm assuming you're going to need some kind of

16   stipulation to get into evidence, right?  Because

17   we do not have witnesses who are going to be able

18   to give firsthand information about these.

19      MS. VUOLO-MILAN:  6 and 8 are the attendance

20   and assignment records -- 6 and 8 are the A & As.

21   I would expect to ask Officer Tomescu about

22   those.  If we can reach a stipulation about

23   foundation or admissibility, that would be great.

24   I'm happy to propose something to Mr. McKay.

April Perry Hearing Officer   CORRECTED
October 13, 2021

1   And, again, if for some reason there is an issue,

2   that's one of the reasons that we have Sergeant

3   Welch on our witness list.  He was the

4   investigator who compiled this.  And he would not

5   speak to his investigation, but he can lay the

6   foundation for the record if that became

7   necessary.

8                   I'm happy to propose a stipulation

9   on those.  And per the LEADS documents that we're

10  looking at in Exhibit 9 and coming up in Exhibit

11  10 as well.  I would expect the foundation -- we

12  can try to reach a stipulation on that or from

13  our LEADS witness.

14     HEARING OFFICER PERRY:  Where did these come

15  from?  Just a search that the officer did of

16  other searches that had been run through LEADS in

17  the past?

18     MS. VUOLO-MILAN:  Right.  In the upper

19  left-hand corner, it says Produced by Information

20  Services Division.  My understanding is that

21  during the investigation, the Department

22  determined whether Tomescu accessed records

23  regarding Mr. Usmani.  And this is a summary of

24  the records showing that Officer Tomescu did

April Perry Hearing Officer  CORRECTED
October 13, 2021

1   access Mr. Usmani's records.

2       HEARING OFFICER PERRY:  So is it right to

3   say he has a password that he puts in when he is

4   running searches?

5       MS. VUOLO-MILAN:  So looking near the upper

6   left-hand corner where it says Transaction Time

7   and Operator, the transaction time, as we

8   understand it, is the date on which the LEADS

9   search was run.

10              So this search, for example, was

11  run on July 31st, 2018.  Under operator, it has

12  what's effectively a log-in or PC number that we

13  expect the evidence will show is Officer

14  Tomescu's log-in.  And, of course, the right of

15  that we don't have to rely on the operator log-in

16  number because it clearly says that it is Officer

17  Tomescu was the operator accessing these records

18  on this day.

19      HEARING OFFICER PERRY:  Is this a search

20  that he is denying that he did or is that part

21  agreed to?

22      MR. McKAY:  Are you asking me?

23      HEARING OFFICER WOOD:  Yes.  Is he -- do you

24  anticipate he will testify or has he given

April Perry Hearing Officer  CORRECTED
October 13, 2021

```
 1   statements before this that he, in fact, did run

 2   that search or is that going to be a fact in

 3   dispute?

 4      MR. McKAY:  He gave four statements to

 5   Sergeant Welch in this investigation.  I don't

 6   know if he was asked about these documents.

 7              If he was not, what if somebody is

 8   using Officer Tomescu's password?  Anybody can

 9   sit -- I can't answer the question, Judge,

10   without going over all of these four statements

11   of my client.  If Maria can help me out here.

12              If he admitted it, I can assure

13   this Board that he is going to maintain his

14   previous statements.  But if he was never asked

15   by Welch, I would ask that the Superintendent

16   provide an offer of proof as to how these

17   documents, which are being offered for the truth

18   of the matter asserted, are going to be admitted.

19              So at this point I need an offer of

20   proof from Maria on the admissibility of these

21   documents, these Hot Desk search documents.

22      HEARING OFFICER PERRY:  Well, given your

23   client is the first witness, I'm guessing she is

24   going to ask him.  Do we have a prior statement
```

April Perry Hearing Officer CORRECTED
October 13, 2021

1   by him about this, Ms. Milan?

2       MR. McKAY:  That's my point, I don't know.

3   That's my point.  Like I said, he gave four

4   statements.  I don't recall him being asked

5   specifically about these alleged searches.  He

6   may have.  He may not have.

7       MS. VUOLO-MILAN:  In the course of

8   statements by the Bureau of Internal Affairs, the

9   officer -- the accused officer during the

10  investigation is confronted with the allegations

11  against them.

12              I will be honest with you, I will

13  need to go back and double-check whether these

14  records in particular were discussed during those

15  statements, but either way, for both Exhibits 9

16  and 10, which are very similar, one of them is

17  searches by Tomescu of Usmani.  Exhibit 10 is

18  searches by Officer Tomescu of Officer Iqbal in

19  LEADS.  We would lay a business records

20  foundation.  This is something that can be done

21  through a LEADS witness.  Or alternatively again

22  this is why we have Sergeant Welch as sort of a

23  reserve witness if we need somebody to lay a

24  business record foundation.  I anticipate that

April Perry Hearing Officer  CORRECTED
October 13, 2021

1   this is something he will be able to do.

2       HEARING OFFICER PERRY:  Okay.  You will ask

3   the officer, and I'm sure he will give truthful

4   testimony about whether or not he ran the

5   searches.  If he says no, I would suggest having

6   a backup plan.  I would assume this could be

7   stipulated to, even if the stipulation isn't that

8   he, in fact, ran the search, but more along the

9   lines, here's how LEADS work, you get your

10  operator number, you put your number in, you stay

11  logged in for however long, and, you know, kind

12  of what computers are able to do and what

13  computers aren't.

14               I'm assuming not everyone has

15  access to LEADS, all those types of things.

16               This shouldn't take too long

17  though.  Who is Commander Welch?  Is he --

18      MR. McKAY:  Sergeant and he was the lead

19  investigator in this case.

20      MS. VUOLO-MILAN:  Correct.

21      HEARING OFFICER PERRY:  Does he know those

22  things about how the LEADS database works?

23      MS. VUOLO-MILAN:  Sergeant Welch from, what

24  my co-counsel and I have spoken to him about, he

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    is familiar with LEADS and how the LEADS database

2    works.

3              The level of particularity and

4    specificity that we would want to set forth

5    either through witness testimony or possible

6    stipulation, that's why we included another

7    witness and are attempting to identify this

8    individual with particularity.  Somebody who has

9    -- if they don't want -- who is more familiar

10   with LEADS.  That's why it would likely be

11   someone either from the academy or the

12   Department's IT area.  That's why we have a

13   separate witness on our list for that.

14       HEARING OFFICER PERRY:  Makes sense.  Sorry

15   to take us off track.

16       MS. VUOLO-MILAN:  Thank you.

17       HEARING OFFICER PERRY:  I think we're on No.

18   12.

19       MS. VUOLO-MILAN:  Let's see.  So No. 11 is

20   just another assignment and attendance record.

21       MR. McKAY:  Wait, wait.  Maria, what's

22   Exhibit No. 10?

23       MS. VUOLO-MILAN:  9 and 10 are both the

24   search results determining when, if at all,

April Perry Hearing Officer  CORRECTED
October 13, 2021

 1   Officer Tomescu accessed information in LEADS

 2   regarding Exhibit 9, Mr. Usmani, and Exhibit No.

 3   10 Officer Rafia Iqbal.

 4       MR. McKAY:  Counsel --

 5       MS. VUOLO-MILAN:  Exhibit No. 9, that

 6   relates to attachment 143.  Exhibit No. 10

 7   relates to attachments 116 and 144 in the CR

 8   file.

 9               Exhibit No. 11 is another A & A

10   sheet.  That's attachment 83.

11               Exhibit No. 12, this is when we start

12   getting into the communications between Officer

13   Tomescu and the other two officers in Officer

14   Iqbal's class at the academy.

15               Exhibit 12 are call log and text

16   message of Officer Mark Burckel.  And this

17   includes a text message dated Monday, October 1st,

18   2018, from the respondent, Officer Tomescu, to

19   Officer Burckel.

20       MR. McKAY:  Attachment number, Maria?

21       MS. VUOLO-MILAN:  It is part of attachment

22   44.  It's a three-page exhibit.

23       MR. McKAY:  Why is that missing on the

24   attachment stamp?

April Perry Hearing Officer  CORRECTED
October 13, 2021

```
 1        MS. VUOLO-MILAN:  That I cannot tell you.

 2   It's a four-page attachment.  My first page is

 3   attachment 44.  I can open it up and --

 4        MR. McKAY:  No, no.  I'll look for it.  I

 5   trust you.

 6        MS. VUOLO-MILAN:  Pulled up my copy of the

 7   CR file.  Attachment 44 starts with an e-mail

 8   from Officer Burckel to the investigator and

 9   attached to that e-mail is Officer Burckel

10   tendering copies of the text message and call

11   logs.

12               So attachment 44, pages two, three,

13   and four, I suppose, in the CR file.

14               Exhibit 13 is an October 2nd, 2018,

15   e-mail from Officer Tomescu to then officer, I

16   believe now, Sergeant Spisak.  We would be

17   offering this to show that officer -- just

18   additional corroborating evidence that Officer

19   Tomescu did, indeed, reach out to the other

20   officers in Officer Iqbal's training class at the

21   academy.

22               Counsel, Exhibit 13, that's

23   attachments 13 and 150.

24               Superintendent's Exhibit 14.  This is
```

April Perry Hearing Officer CORRECTED
October 13, 2021

```
 1    a text message thread of messages sent by Officer

 2    Tomescu to Officer Rafia Iqbal on various dates.

 3                    I expect to ask Officer Tomescu about

 4    these.  And also would expect that Officer Rafia

 5    Iqbal would be able to lay the foundation to make

 6    sure -- to explain any dates and times.  I

 7    understand when you take a screenshot of text

 8    messages, it doesn't always show up.  That would

 9    come out into the record from Officer Iqbal.  But

10    these are messages that are -- they include

11    messages that are contained in the charges.  For

12    example, paragraph -- sorry, charge number eight

13    is the charge in which Officer Tomescu is alleged

14    to have sent threatening, harassing, and

15    derogatory comments in a text message to Officer

16    Iqbal.  Those are contained within Exhibit 14.

17                    And, Counsel, Exhibit 14, this is

18    attachment 85, pages one through five.  And also

19    there's portions of attachment 52 as well.

20                    I don't know that we necessarily need

21    to read through the whole text message chain right

22    now.  This is something that would be introduced

23    into evidence at hearing.  Again, this goes to

24    charge eight.  And there's also what we would
```

April Perry Hearing Officer CORRECTED
October 13, 2021

1    speak with Officer Tomescu about.  The end -- the

2    last page of Superintendent's Exhibit 14 -- I'm

3    sorry.  Not the last page of Superintendent's

4    Exhibit 14.  Comments that Officer Tomescu had

5    made via text message to Officer Iqbal saying, I

6    won't interfere with your career.  Think about us.

7    I was wrong.  I think those are statements that we

8    would like to address with Officer Tomescu at the

9    hearing.

10       MR. McKAY:  Are you going to address the

11   hearts that were noted in the messaging?

12       MS. VUOLO-MILAN:  The hearts that are

13   included in here?

14       MR. McKAY:  Just ignore me.  Just continue,

15   please.

16       MS. VUOLO-MILAN:  I suppose I can offer they

17   are heart emojis.

18             We would talk about the most

19   pertinent parts at hearing.  I do think this text

20   message string is relevant.

21             Moving on to Superintendent's Exhibit

22   15.  We're in the home stretch here.  Exhibit 15

23   is an e-mail exchange between Officer Tomescu and

24   Rabia Iqbal Bhatti.  In this e-mail exchange, we

April Perry Hearing Officer CORRECTED
October 13, 2021

1   can see the bottom half that earlier on in

2   October, Officer Tomescu was interacting with

3   Rabia Iqbal as part of his background

4   investigation.  The background investigation into

5   Rabia Iqbal's husband, Mr. Bhatti, and then here

6   we see a few days later, Officer Tomescu has taken

7   this from a professional exchange in his capacity

8   as background investigator to personal exchange

9   seeking to call Officer Iqbal's sister to talk

10  about Officer Iqbal for reasons that we anticipate

11  the evidence will show are purely personal and not

12  work related.  So utilizing information obtained

13  during the background investigation in his

14  official capacity to make personal contacts

15  regarding his romantic relationship.  And,

16  counsel, this is attachment 158.  And it's also

17  attachment 48.  I think there's some duplication

18  in there.

19       MR. McKAY:  Thank you.

20       MS. VUOLO-MILAN:  And, again, just for -- it

21  doesn't really matter what portion of Mr.

22  Bhatti's background investigation was going on at

23  the time.  We've done some redactions there on

24  this exhibit.  It doesn't matter.  His background

April Perry Hearing Officer CORRECTED
October 13, 2021

1    investigation and the substance of it and

2    information that he was providing to the

3    Department during his application process don't

4    matter.  It's the communication that matters.

5                    Exhibit 16 is a text message exchange

6    between Officer Tomescu and Rabia Iqbal Bhatti.

7    Again, Officer Iqbal's sister.  Counsel, this is

8    attachment -- part of attachment 48.  We expect

9    the evidence will show these are text messages

10   that -- a text message exchange on October 9th of

11   2018 with respect to the charges.

12                   Again, in charge number 9, Officer

13   Tomescu is alleged to have used contact

14   information obtained while conducting a background

15   investigation in his official duties to make

16   contact with Officer Iqbal's family for personal

17   reasons.

18                   So using his information obtained in

19   his official capacity to conduct personal

20   business.  Counsel, that's attachment 48.

21      MR. McKAY:  Thank you.

22      MS. VUOLO-MILAN:  Exhibit 17, this will be a

23   separate media file for this.  It is a voicemail

24   that Officer Tomescu left for Rafia Iqbal, also

April Perry Hearing Officer CORRECTED
October 13, 2021

1    on October 9th.  Counsel, this is attachment 181.

2    It is a media file.

3                     Exhibit 18 is a transcribed copy of

4    a voicemail.  And that is attachment 180 in the

5    CR file.

6                     And then finally we have Exhibit 19.

7    This is a text message exchange between Mr. Usmani

8    and Officer Iqbal.  Usmani is Officer Iqbal's

9    ex-boyfriend who Officer Tomescu had contacted.

10   And there are text messages within this that are

11   relevant to that that we would expect one or both

12   of them to testify about.  In particular, there is

13   a text message from Mr. Usmani stating, Is that

14   guy you date -- is that guy who you dated after

15   me?

16                     And, again, this goes to show that

17   Officer Tomescu is holding himself out as a police

18   officer when making these contacts and how that

19   looks to a member of the public when these

20   contacts were made.

21                     Counsel, that's attachment 63.

22                     Maryem?  Did I miss anything?  Is

23   there anything else we need to talk about here?

24        MS. ABDULLA:  No, I think that covers it.

April Perry Hearing Officer - CORRECTED
October 13, 2021

1     MS. VUOLO-MILAN:  Okay.  Those are our

2     exhibits, the Superintendent's exhibits.

3     HEARING OFFICER PERRY:  Thank you.  Mr.

4     McKay, based on the witnesses and exhibits, do

5     you anticipate now -- and I understand you want

6     to reserve your right to everything.  But do you

7     anticipate now any major objections either to

8     relevance or anything else we can deal with at

9     this time?

10    MR. McKAY:  Thank you, Judge.  Early in -- I

11    believe it was -- I believe it was Maryem's

12    recitation, she suggested that Rafia Iqbal is

13    going to testify about her feelings now and how

14    it impacts her career, and she alluded to some

15    dog bite telephone call.  You know, if both of

16    these ladies can direct me to the discovery that

17    reflects this, I'd love that, because I have not

18    seen any discovery regarding this.  And because

19    of that, I will have an objection to that line of

20    testimony.

21           The remaining exhibits, I'd like to

22    further discuss with both ladies regarding

23    possible stipulations.  If they can propose some

24    stipulations regarding the exhibits we have

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    already addressed, that would be great.

2              I think that's -- oh, we're going to

3    have transcript prepared, will we not, of today's

4    proceeding?

5         HEARING OFFICER PERRY:  Yes.

6         MR. McKAY:  I'd like to get a transcript of

7    today's proceeding.

8              Regarding Sergeant Fiedler and

9    Sergeant Johnson, it was alluded to by I believe

10   Maria that there were direct orders given to

11   Officer Tomescu, either regarding no contact with

12   Officer Iqbal and no contact with the recruits.

13             Again, if there's discovery on this

14   that has already been tendered, if you could

15   direct me to that.  If not, I'm going to have an

16   objection to their testimonies, should they be

17   called.  And that's about it at this point,

18   Judge.

19        HEARING OFFICER PERRY:  So is the sole basis

20   for your objection you haven't got discovery on

21   it, or do you have another objection to the

22   content?

23        MR. McKAY:  Because I don't know if I have

24   discovery on it yet, I don't know if I can

April Perry Hearing Officer CORRECTED
October 13, 2021

1    clarify an objection, short of it's not relevant

2    to the charges pending before this Board.

3        HEARING OFFICER PERRY:  That's what I was

4    wondering about.

5        MR. McKAY:  That would be a standard

6    objection I'd make at this point.

7        HEARING OFFICER PERRY:  I was also struck by

8    the -- her feelings with what happened testimony.

9    I'd love your take on why that is relevant in

10   this particular case.

11       MS. ABDULLA:  If I can have one moment to

12   talk to Maria about this, that would be great.

13   Thank you.

14       HEARING OFFICER PERRY:  Sure.

15                        (Recess.)

16       MS. ABDULLA:  To jump into it, the relevancy

17   objection, with respect to how Officer Rafia

18   currently feels about the situation, we did

19   mention that she was unable to carry out her

20   duties as a Chicago police officer when she had

21   to present herself in front of -- but on the

22   phone with Officer Tomescu.  And that just shows

23   the impact that Officer Tomescu's actions had on

24   Officer Iqbal.  It also shows the impact that he

April Perry Hearing Officer - CORRECTED
October 13, 2021

1    had on not only Officer Iqbal as his girlfriend,

2    that aside, but as -- sorry, yes, as his

3    girlfriend, that aside, and a Chicago police

4    officer, and how that impacted her in her daily

5    duties and how that continues three years later.

6    And that impact on her duties is a direct result

7    on his continuous misuse of his position as a

8    Chicago Police police officer.

9              It also goes to the severity of his

10   actions.  And if the Board were to find Officer

11   Tomescu guilty, I think that could go into his --

12   like the gravity of the situation.

13             And, again, I can't stress this

14   enough.  Although these actions happened three

15   years later, Officer Iqbal continues to have some

16   sort of negative impact as a result of this, not

17   only in her personal life, but also in her

18   professional life.

19             With respect to the discovery

20   issue, I'm just going to refer to Section 2(j)(4)

21   of the Rules of Procedure that state that we are

22   to discuss the identity of the witness to be

23   called, and subject matter, and the facts

24   relating to the subject matter on which they will

April Perry Hearing Officer  CORRECTED
October 13, 2021

1  testify.

2                    We are simply bringing this up

3  because we want to avoid surprise at hearing.

4                    We were recently made aware of the

5  situation with respect to the dog bite phone call

6  when we recently spoke to Officer Iqbal.

7                    So our intent here is to bring it

8  up to avoid undue or unfair surprise at the

9  hearing.

10    HEARING OFFICER PERRY:  So this is the first

11  one of these hearings I've done, so please excuse

12  my ignorance on this.

13                    Do you ordinarily -- when new facts

14  come out as you're doing witness prep, which they

15  always do, do you typically write up something to

16  opposing counsel informing them of what the new

17  information is that you received during the prep

18  or is that not a standard practice?

19    MS. ABDULLA:  This is actually my first

20  Police Board hearing.  I was brought on very late

21  in the game because we are unbelievably

22  short-staffed over here.  So I'm going to defer

23  to Maria to answer that question, because I, too,

24  do not know the answer to that.

April Perry Hearing Officer  CORRECTED
October 13, 2021

```
 1        MS. VUOLO-MILAN:  Sure.  I'm trying to think

 2   of any other case I've had where something like

 3   that has come up where we've had to write

 4   something up and disclose it.

 5              Again, co-counsel and I just spoke

 6   with Officer Iqbal.  I don't have the date in

 7   front of me, but it was within the last several

 8   days.  We have this prehearing conference today,

 9   and the point is to go through what witnesses

10   will say.  I know we've said it's like beating a

11   dead horse.  We anticipate they will testify

12   consistently with statements that they've

13   previously -- have been given in the course of

14   the investigation and which have been tendered to

15   counsel without going into every single detail of

16   what they're going to testify about.  But since

17   this is something that was new, we are following

18   our obligation under the rules to at the

19   prehearing conference today ensure that we are

20   disclosing not only the identity of our witnesses

21   but the subject matter and the facts that they

22   will be testifying to.

23              This is something that just came

24   up, so we are ensuring we are disclosing it
```

April Perry Hearing Officer CORRECTED
October 13, 2021

1  today.  I do feel it's relevant.  I feel this is

2  -- I don't think -- I think this is a timely

3  disclosure and it complies with the prehearing

4  procedural rules that are in place under the

5  Board's Rules of Procedure.

6      HEARING OFFICER PERRY:  I agree with you on

7  the relevance.  I'm sure Mr. McKay is going to be

8  putting a lot of evidence in mitigation.  I think

9  this is best viewed as evidence in aggravation to

10 the extent that what he did is still ruining her

11 life years later.  And I'm sure Mr. McKay will

12 want to cross on that theory as well.  But I do

13 think it's relevant.

14          In terms of the new and newly

15 discovered and all that, you have now basically

16 tendered it.  I encourage you kind of as a best

17 practice, if new things come out that you are

18 planning to elicit from a witness, to do just

19 like a simple memo, letter, e-mail to counsel.  I

20 don't think it is necessarily required, but it is

21 always a better practice, because then when the

22 counsel hears it come out on the stand and he

23 starts -- is confused or wants to cross-examine

24 about why is this the first time we're hearing

April Perry Hearing Officer  CORRECTED
October 13, 2021

1   it, it's actually in your best interest for the

2   witness to say, Well, I told them two weeks ago,

3   and you'd have some kind of proof backing that

4   up.  Also, then Mr. McKay won't have that line of

5   cross.

6               So I think that is probably the

7   best way to go there.  If there are new things

8   that develop as you are prepping your witnesses

9   that you think are highly relevant and important,

10  I would encourage you to get those over to Mr.

11  McKay as well.

12              What about the no contact with

13  recruits portion?

14      MR. McKAY:  Judge, can I just address

15  something regarding that point?

16      HEARING OFFICER PERRY:  Of course.

17      MR. McKAY:  If this is deemed newly

18  discovered evidence, fine, so be it, if you ruled

19  it's relevant.  But clearly under Section 2 of

20  the Rules of Procedure of the Chicago Police

21  Board, my client is entitled to statements or

22  summary of statements allegedly made by him.  And

23  if there's some alleged dog bite phone

24  conversation between him and Ms. Iqbal, my

April Perry Hearing Officer CORRECTED
October 13, 2021

1   client's entitled to a summary of what that

2   statement he allegedly made is.  So under

3   discovery rules, I am entitled to it.  If both of

4   these prosecutors can provide the statements

5   themselves, a summary of the statements prior to

6   trial, I would really appreciate it.

7       MS. ABDULLA:  To jump in on that point.  As

8   we mentioned earlier in our prehearing

9   conference, there was no conversation that came

10  from this phone call.  She actually made a phone

11  call to get this animal bite report done.  Heard

12  him identify himself with his name.  Hung up and

13  had someone else complete the animal bite report.

14  There was no communication between the two, aside

15  from what I believe he -- him identifying himself

16  and her not saying anything in return and hanging

17  up.

18      HEARING OFFICER PERRY:  You are eliciting

19  this to show her panic and emotional stress of

20  even the thought of talking on the phone to him?

21      MS. ABDULLA:  That's correct.

22      HEARING OFFICER PERRY:  Does that make

23  sense, Mr. McKay?  Do you need additional

24  discovery on that?

April Perry Hearing Officer  CORRECTED
October 13, 2021

1      MR. McKAY:  No, no.  If that's it, no, I

2   don't need any additional discovery.  I can't

3   wait to meet this young lady.

4      HEARING OFFICER PERRY:  With respect to the

5   two orders to not have contact with any of the

6   recruits or with Iqbal --

7      MS. ABDULLA:  So there are to/froms in the

8   CR file, Mr. McKay.  And they're available to you

9   at this time.

10      MR. McKAY:  Do you know the attachment

11   numbers, Maryem?

12      MS. ABDULLA:  I do not have that in front of

13   me.

14              Maria, if you have that, if you

15   would be willing to share.

16      MR. McKAY:  If you can get the attachment

17   numbers to me after this conference, that's fine.

18      MS. ABDULLA:  They're in the CR file.  I

19   mean if there's no difference between me flipping

20   through the file and you flipping through the

21   file.

22      MR. McKAY:  My point is, we don't have to

23   waste the hearing officer and court reporter's

24   time right now.  Just get them to me after today,

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    that's fine.

2        MS. ABDULLA:  My point is, you can flip

3    through the file and find those yourself.

4        MS. VUOLO-MILAN:  They've been tendered.  I

5    would have to go through my notes and see which

6    CR file attachment it is.  We're not offering

7    them as exhibits, so I don't have them on my

8    exhibit list with a quick reference attachment

9    notes here.

10       HEARING OFFICER PERRY:  All right.

11       MS. VUOLO-MILAN:  I can say they've been

12   tendered.

13       HEARING OFFICER PERRY:  If you can't find

14   those, Mr. McKay, let someone know.

15              Let's go ahead and go to the

16   Respondent's case.  You have tendered your

17   witness list as well.  Thank you for doing that.

18   It is also quite lengthy.

19       MR. McKAY:  Don't be alarmed by the length

20   of the witness list, Judge, because I can cut to

21   the chase.

22              Officer Tomescu is going to testify

23   regarding guilt or innocence, and we seek to call

24   him in our case in chief after the Superintendent

April Perry Hearing Officer CORRECTED
October 13, 2021

1    calls him as an adverse witness.

2                Witnesses two through six on the

3    witness list, with the exception of witness

4    number two, Sergeant Welch, witness three, four,

5    five, they're other investigators that would only

6    be called to prove up impeachment if necessary.

7    I'm not going to call them in my case in chief.

8                Six is just a catchall, that if

9    there is an additional investigator in the

10   reports under the RD numbers listed and the two

11   log numbers listed, again just to prove up

12   impeachment.  I'm not calling them to offer any

13   substantive evidence in my case in chief.

14      HEARING OFFICER PERRY:  Pause one second,

15   Mr. McKay.  What about Sergeant Welch, is that

16   also for potential impeachment?

17      MR. McKAY:  Well, yes.  And assuming the

18   Superintendent does call him in their case in

19   chief, I think I'll be able to get out everything

20   I need during my cross-examination of him.  And I

21   don't need to call him in my case in chief.  If

22   the Superintendent chooses not to call him in

23   their case in chief, then I would seek leave to

24   call him in mine to show things not done by him

April Perry Hearing Officer CORRECTED
October 13, 2021

1  and things done by him but not well.  It goes to

2  the ultimate issue by the Board whether Officer

3  Tomescu is guilty or innocent of these charges,

4  your Honor.

5      HEARING OFFICER PERRY:  Focusing on the

6  impeachment part first.  Am I right to assume you

7  are talking about inconsistent statements from

8  the prior interviews that were done during the

9  case, if the witness does not admit that they

10  gave that inconsistent statement, you would be

11  eliciting testimony that that statement was given

12  on such and such date?

13      MR. McKAY:  Yes, correct.

14      HEARING OFFICER PERRY:  Is it fair to assume

15  that the Superintendent would be willing to

16  stipulate to those -- if it is recorded in a

17  report, that that was a statement that was made

18  by the witness, should that happen?  Or do you

19  typically request that the witness be called to

20  prove up that type of impeachment?

21      MS. VUOLO-MILAN:  Sorry.  Just to make sure

22  I'm clear, is the question if one of -- if a

23  witness that we call testifies inconsistently

24  with a statement that has been previously

April Perry Hearing Officer  CORRECTED
October 13, 2021

1  transcribed in a Bureau of Internal Affairs

2  statement, I mean typically in my experience you

3  just confront the witness like you would with any

4  other impeachment with a prior inconsistent

5  statement.

6           I'm, of course, hopeful we don't

7  have to cross that bridge and our witnesses would

8  testify consistently.

9  HEARING OFFICER PERRY:  Assuming that they

10  not only are inconsistent but also deny having

11  made the prior statement, Mr. McKay is saying he

12  would like to call a witness to say on such and

13  such date they said this.

14  MS. VUOLO-MILAN:  We can talk about it.  I

15  suspect that is probably a stipulation that we

16  can reach, that the transcripts that we have are

17  transcripts of statements that were made.

18           I'll speak with co-counsel about it

19  and see if we have any concerns with that.  But I

20  would anticipate that that is probably a

21  situation counsel and us can reach offline.

22  HEARING OFFICER PERRY:  And then with

23  respect to the things that weren't done in the

24  investigation, Mr. McKay, could you put a little

April Perry Hearing Officer CORRECTED
October 13, 2021

1    more meat on those bones without giving away the

2    store?  I'd be curious what types of things you

3    would be thinking about here.

4       MR. McKAY:  Judge, as the Superintendent's

5    lawyers know, my client fully complied with

6    Sergeant Welch and his investigation when he gave

7    four separate statements to him.

8                 This guy, Welch, had four bites at

9    the apple.  And, indeed, after three of those

10   statements, Sergeant Welch recommended that my

11   client participate in the personal concerns

12   program, which is the subject matter of the

13   motion to dismiss.  And then did absolutely

14   nothing on this case until charges are filed by,

15   God, almost 18 months later.  So that's like the

16   tip of the iceberg.

17                As far as specific things he did, I

18   can say that there are certain things he did not

19   ask of Officer Iqbal, of Officer Burckel, of

20   Officer Sodt, of Mr. Bhatti, of his wife, Rabia,

21   and of the gentleman Arqum Usmani.  There are

22   certain things that he didn't ask that I think

23   call into question the completeness and more

24   importantly the integrity of his investigation.

April Perry Hearing Officer CORRECTED
October 13, 2021

1          Keep in mind, he is the one, after

2    he allegedly concludes his investigation,

3    recommends not termination, but personal concerns

4    program, and then for reasons clearly unknown 18

5    months later he recommends to ultimately the

6    Superintendent that my client be discharged.

7          So those are certain things I would

8    ask Mr. Welch, but I can ask him on cross, if the

9    Superintendent wants to call him in its case in

10   chief.

11         That's it as far as Sergeant Welch

12   is concerned.

13     HEARING OFFICER PERRY:  And does the

14   Superintendent counsel have a response about the

15   relevance of kind of poor investigation, lazy

16   investigator, all that testimony?

17     MS. VUOLO-MILAN:  Yes.  So by the time a

18   case gets to the Police Board -- first of all, I

19   understand that there are a course of things that

20   happen during an investigation, whether it's an

21   investigator making a recommendation or a command

22   channel review.

23         At the end of the day what we have

24   here is what we have here and what's at issue in

April Perry Hearing Officer - CORRECTED
October 13, 2021

1   this case is that the Superintendent of the

2   Police Department has recommended that the Police

3   Board discharge Officer Tomescu from his

4   employment.  That is the recommendation that is

5   at issue here.  It is the Superintendent's

6   recommendation, not the investigator's

7   recommendation.

8               And then to the point about

9   questioning Sergeant Welch about if respondent

10  feels that there are things that should have been

11  asked or should have been done or could have been

12  done during the course of investigation and were

13  not -- again, this is a de novo hearing.  We have

14  charges filed that initiated this case.  And if

15  there were things that Respondent feels are

16  relevant to this case, relevant to the charges

17  that are currently pending before the Board that

18  somehow did not come out during the course of

19  those investigations, those things can be offered

20  as evidence in support of Respondent's position on

21  the statement of charges.

22              This isn't the type of venue where we

23  start dragging out the investigator and the

24  investigation and dragging that out.

April Perry Hearing Officer CORRECTED
October 13, 2021

1          The investigator and his

2   investigation is not on trial here.  Of course

3   it's our position that he reviewed this case and

4   it was a thorough investigation.

5          I understand the parties are going to

6   disagree about that in this case.  Our position is

7   that it was a thorough investigation.

8          But, again, it is not anybody's

9   recommendation but the Superintendent.  What's at

10  issue in this case right now, the Superintendent

11  has recommended discharge.

12         Again, regarding the investigation,

13  if there are things that Respondent feels should

14  have come up and there is an evidentiary basis and

15  they're relevant to the charges at issue now, they

16  can be brought forward as evidence at hearing.

17     HEARING OFFICER PERRY:  I tend to agree with

18  the Superintendent on this one, Mr. McKay.

19         The inadequacy of the

20  investigation, I'm sure you will do an excellent

21  job showing through the cross-examination of the

22  witnesses to the extent they weren't asked

23  questions that they should have been.  Any

24  recommendation made at lower levels, I do think

April Perry Hearing Officer CORRECTED
October 13, 2021

1    it's irrelevant.

2               I would certainly be willing to

3    review if you've got an offer of proof for some

4    type of written filing you'd like to make on the

5    types of things specifically you would be

6    eliciting from Sergeant Welch.  You can make that

7    under file if you don't want to tip your hand too

8    much or under seal.

9               I would be willing to review that.

10   At some point, you will need to get the

11   Superintendent's take on it if I'm inclined to

12   elicit it.  If you'd like to make a written

13   filing, you can.  But at this point, I'm ruling

14   that that type of testimony would not be allowed.

15      MR. McKAY:  That's fair.  Thank you.

16      HEARING OFFICER PERRY:  Let's move on.

17      MR. McKAY:  Regarding witnesses 7 through

18   14, these are witnesses that directly pertain to

19   the issues I've addressed in my motion to

20   dismiss.

21               Now, fully expect that the motion's

22   going to be granted based on everything I allege

23   in the motion and the case law.

24               Now, assume for the sake of argument

April Perry Hearing Officer CORRECTED
October 13, 2021

1    it's not.  Then the evidence and these witnesses

2    and the documents that I attached to my motion,

3    which would be exhibits, I would seek to introduce

4    at the hearing would be offered as mitigation to

5    prevent the Board from discharging Officer

6    Tomescu.

7                    So I do not intend to call these

8    people, witnesses 7 through 14, for guilt or

9    innocence allegations -- guilt or innocence

10   regarding the allegations, but I do seek to

11   introduce as evidence, as mitigation.  Not

12   different from the character witnesses, and,

13   perhaps, character letters if they are allowed in

14   as well.

15                   With all due respect to my colleagues

16   here, this shouldn't go to a hearing.  This should

17   be dismissed by the Board.

18                   If it is going to go to a hearing or

19   it's going to be heard at the same time, then

20   these witnesses would be called to offer the very

21   limited testimony consistent with the documents

22   with their names on it that have been attached to

23   the motion.

24       HEARING OFFICER PERRY:  Superintendent's

April Perry Hearing Officer CORRECTED
October 13, 2021

1   counsel, are you prepared to respond now on those

2   issues, or is this something you're going to need

3   to look a little bit further along with your

4   written response?

5       MS. VUOLO-MILAN:  I can respond briefly now.

6   Of course we reserve when we're responding to the

7   motion to dismiss to preserve all of our

8   arguments in response to the motion to dismiss.

9   I can at least respond with respect to some of

10  the witnesses right now.

11              I mean it's not -- the evidentiary

12  hearing that we have coming up is very

13  specifically a hearing on the charges.

14              I think when you look through the

15  Police Board's Rules of Procedure, the phrase,

16  quote, "hearing on the charges" appears almost a

17  handful of times.

18              It is a hearing on whether Officer

19  Tomescu engaged in the conduct alleged.  If so,

20  did it violate the Department's rules and

21  regulations?  If so, what is the appropriate

22  penalty based on those violations of the rules and

23  regulations?  It is a hearing on the charges, not

24  a hearing on a motion to dismiss.  This is a

April Perry Hearing Officer CORRECTED
October 13, 2021

1   little bit different than if we were in a

2   different venue where there is a hearing on a

3   motion to dismiss, and then if that doesn't work,

4   then there is a hearing on a motion for summary

5   judgment.  Then if that doesn't go, then there is

6   an evidentiary hearing.  We are at the evidentiary

7   hearing stage right now.

8            Arguments to be made on motion to

9   dismiss are appropriately done in writing through

10   motion practice and not through witnesses.

11            I think talking about -- I think

12   we're missing the mark calling these witnesses as

13   mitigation.

14            As counsel had mentioned, it seems

15   like from his witness list, I'm sure they will

16   call some character witnesses to testify about

17   Officer Tomescu's -- whatever favorable about

18   Officer Tomescu would be relevant to him asking

19   the Board that if they do find him guilty of the

20   charges, or any of the charges, to not discharge

21   him or issue a very low-level penalty or whatever

22   the case may be.

23            But I think getting into the issues

24   that were raised in the motion to dismiss, that's

April Perry Hearing Officer CORRECTED
October 13, 2021

1    not appropriate testimony, nor is it really

2    mitigation testimony at an evidentiary hearing on

3    the charges on this case.

4              If we're talking about a legal issue

5    of whether there's a legal basis to dismiss the

6    case, of course Respondent feels there is and the

7    Superintendent disagrees with that and we will be

8    filing a response to that effect, that there is

9    not a basis to dismiss this case and it should

10   proceed.

11             Those are legal issues to flush out

12   in the motion to dismiss briefing, not through

13   witness testimony at an evidentiary hearing on the

14   charges of what Officer Tomescu is alleged to have

15   done in this case.

16     MR. McKAY:  Judge, everything Maria just

17   said flies in the face of what happened in the

18   John Haleas case, which I submitted as authority

19   in my motion to dismiss.

20             The Board decided to hear the case

21   and the motion to dismiss at the same time.  Now

22   I'm amenable to having your Honor and this Board

23   deciding my motion to dismiss first before we

24   even go to the evidentiary hearing on the alleged

April Perry Hearing Officer  CORRECTED
October 13, 2021

1   charges.  That's fine with me.  And I would love

2   to argue this matter, as I believe my colleagues

3   would, too.

4               It is clear, your Honor, that my

5   client was punished for these allegations and

6   successfully completed the program he was ordered

7   to go into.

8               If the Board disagrees with my

9   position, then they can so rule and we can go to

10  the evidentiary hearing.  But I have an absolute

11  right to mitigate to whatever charges the

12  Superintendent believes my client is guilty of to

13  lessen the possible punishment.

14              And in my mind, and certainly in

15  Officer Tomescu's mind, he is being punished twice

16  for the same thing.

17              So regarding procedure, if counsel's

18  objecting to these witnesses being called at the

19  evidentiary hearing because they don't go to the

20  charges, I respectfully disagree.  They absolutely

21  go to the charges, but they also offer mitigation.

22              If the Board and your Honor want to

23  do it separately, I'm fine with that, too.  Either

24  it's a bifurcated hearing or we do it all at the

April Perry Hearing Officer CORRECTED
October 13, 2021

1    same time.

2              But on behalf of Officer Tomescu, I

3    have a right to call these witnesses, albeit for a

4    very limited purpose.

5       HEARING OFFICER PERRY:  I am going to

6    reserve ruling on this until I see the

7    Superintendent's written response.

8              I do agree with Mr. McKay.  I have

9    heard after inquiring with the other hearing

10   officers that it is not unprecedented for the

11   evidence -- any evidence on the motion to dismiss

12   to be presented alongside the trial evidence.

13             Apparently in the case that Mr.

14   McKay was citing, the case name.

15             I do also agree that to the extent

16   the type of punishment has already been given

17   would be relevant information for the Police

18   Board in terms of mitigation when determining the

19   sentence.

20             Do we need seven of those

21   witnesses?  Perhaps not.  I'm going to keep an

22   open mind on this and wait to hear the

23   Superintendent's response.  And then it sounds

24   like Respondent is going to have a reply on that.

April Perry Hearing Officer - CORRECTED
October 13, 2021

1    My goal is to streamline proceedings.

2                But I do want to make sure we get

3    in all the relevant evidence that we need as

4    well.  So let's --

5        MR. McKAY:  Can I ask a question?  Actually,

6    for Maureen.  Maureen, did you hear everything

7    Hearing Officer Perry just mentioned?  On my end

8    of things you were breaking up.

9        THE COURT REPORTER:  I think I have

10   everything.  I am also recording.

11       MR. McKAY:  Here's my segue into my response

12   to their motion for everything to be held

13   remotely.  I object because of these technical

14   issues.  But I did catch the gist of what you

15   were saying, your Honor.  And whatever you'd like

16   to do regarding the procedure, I'm fine with

17   that.

18                I would add witness number 15 is

19   the only civilian witness I would call, but it,

20   of course, relates to the motion to dismiss.

21                So that's it as far as witnesses

22   for guilt/innocence, if we even have to go that

23   far.

24                The remaining witnesses are

April Perry Hearing Officer CORRECTED
October 13, 2021

1    character witnesses, your Honor.

2        HEARING OFFICER PERRY:  I'm going to tell

3    you, Mr. McKay, I have been encouraged by folks

4    to try to encourage you to restrain yourself on

5    character witnesses.

6        MR. McKAY:  How many?

7        HEARING OFFICER PERRY:  I think the Board

8    would like to see between three and four.

9    Similarly, they want to see as diverse a group as

10   possible in terms of knowledge of the Respondent

11   and his background.  If he saved ten puppies from

12   a burning building, we only need to hear that

13   from one person.

14              So I would suggest that you go

15   ahead and pick your top three or four there and

16   that you submit letters for anyone else.

17       MR. McKAY:  Thank you very much, Judge.  I

18   appreciate that.  I will notify all parties of

19   the three or four witnesses that I will call

20   live.

21              You will see from my exhibits,

22   character letters are listed last.  I will submit

23   character witnesses from most people that will

24   not be allowed to testify live.

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    HEARING OFFICER PERRY:  Great.  Now, I see

2  your witness list is kind of broad.  Do you have

3  specific items of these things that you've

4  identified and provided to the Superintendent?

5    MR. McKAY:  Regarding exhibits, first of

6  all, the exhibits attached to the motion to

7  dismiss will be the exhibits I seek to introduce,

8  if they are allowed, during the evidentiary

9  hearing.

10           Regarding the other exhibits, the

11  to/from reports are those exhibits from the

12  motion to dismiss and there's a few in the CR

13  file.  I'm not seeking to admit them for

14  substantive evidence yet.  It may be used if I

15  need to impeach a testifying witness who appears

16  on the to/from reports.

17           The police reports, again, are just

18  documents I would use during cross-examination.

19  I would not seek to admit.  It may be to refresh

20  recollection, perhaps to impeach.

21           I do seek to introduce Officer

22  Livius Tomescu's complimentary history that Max

23  was kind enough to give to both sides.  I would

24  seek to introduce that.

April Perry Hearing Officer  CORRECTED
October 13, 2021

1              And the employee resources I've

2     listed, there's two of them on my witness list,

3     EO6-06 and EO6-05.  These pertain to the motion

4     to dismiss.  And one of them is an exhibit in the

5     motion.

6              The other exhibit, your Honor, I

7     did give to my opponents, the list of police

8     officers on active duty with sustained Rule 14

9     violations.

10             I seek to use that document, your

11    Honor, in my cross-examination of Commander

12    Timothy Moore.  Whether that's admitted is up to

13    your Honor.  But I certainly plan to use that

14    with the witness and allow him to review it

15    should he need to.

16             I'm sure he knows about this list

17    because he and I broached this subject on a

18    previous case.

19             I am going to provide the

20    Superintendent's attorneys with the CPD rules and

21    regulations that pertain to language in the

22    workplace and the treatment of colleagues at the

23    police academy.

24             I don't have those general orders,

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    special orders identified yet.  I will.  And

2    provide them to both of these ladies well before

3    the hearing.

4                    The last exhibits are the character

5    letters I've already mentioned.  Thank you.

6       HEARING OFFICER PERRY:  Superintendent's

7    counsel, do you need any more information at this

8    time about any of those?

9       MS. VUOLO-MILAN:  I suppose just one point

10   of clarification from Mr. McKay.  I think you

11   mentioned the to/from reports would just be used

12   for impeachment.  Are we just talking about

13   to/froms that are contained in the CR file?

14      MR. McKAY:  Yes, yes.  The CR file, yes.

15   And the to/froms that are exhibits in my motion

16   to dismiss.

17      MS. VUOLO-MILAN:  Okay.  Of course I

18   understand for impeachment.  If there is anything

19   else that's not in the CR file or that's not

20   already been tendered with your motion to

21   dismiss, I would just ask that we, of course,

22   receive copies of those in advance of the

23   hearing.

24      MR. McKAY:  Will do, yes, of course.

April Perry Hearing Officer CORRECTED
October 13, 2021

1        MS. VUOLO-MILAN:  I don't believe I have any

2    other questions at this time.

3                    I suppose I'll reiterate the points

4    that I raised with respect to exhibits on motion

5    to dismiss, similar to -- just adopt arguments

6    that I've already made about witnesses on the

7    motion to dismiss.  And, of course, still reserve

8    our right to, you know, respond as necessary in

9    writing by November 11th to that motion.

10                   Regarding Officer Tomescu's

11   complimentary history, we do not object to that

12   coming in after the Board makes a finding of guilt

13   on one of the charges for mitigation at the

14   penalty phase of this hearing, assuming we get

15   there.

16                   I do think I have two other points to

17   make here.  Regarding the FOIA response P466502,

18   sustained Rule 14 violations, as your Honor had

19   noted earlier, I can see a scenario in which that

20   would be relevant cross-examination, but we will

21   reserve our objections as to foundation on that.

22                   If I'm understanding it correctly,

23   we're talking about a list that's -- at least a

24   few years old at this point in time.

April Perry Hearing Officer CORRECTED
October 13, 2021

1        And then also might be absent some

2   information on the circumstances under which the

3   officers contained on that list find themselves,

4   did they go to a Police Board hearing?  Did they

5   have sustained Rule 14 from years ago?  I think

6   just that kind of information.

7        So we'll definitely reserve our

8   objections for hearing to the extent that we feel

9   that there are relevance issues, foundation

10  issues, et cetera.

11       So I would just like to make those

12  two preliminary notes and reserve our right to do

13  that.

14       Regarding the CPD's rules and

15  regulations regarding language in the workplace, I

16  assume that this would be an argument about the

17  allegation that Officer Burckel, who is on our

18  witness list, made a comment to Officer Iqbal,

19  something to the effect of, Oh, so you're

20  Heather's bitch now as the class secretary.

21       I certainly don't condone that

22  language, but I would object to that in the sense

23  Officer Burckel isn't -- this is not a case about

24  Officer Burckel.  He is not being charged or

April Perry Hearing Officer CORRECTED
October 13, 2021

1   accused of violating any sort of orders or

2   directives.

3              What's at issue is Officer Tomescu

4   using his professional capacity to insert himself

5   into a situation that occurred here.  So I would

6   make a relevance objection on those.

7      HEARING OFFICER PERRY:  Let me pause you

8   there.  Is the thought, Mr. McKay, you're going

9   to confront that officer with the general order

10  saying he's not supposed to use bad words?

11     MR. McKAY:  Yes, I do plan to confront

12  Officer Burckel and Officer Sodt.  You should

13  know, your Honor, that the lead investigator in

14  this case failed to mention the general orders

15  that pertain to this issue.  But did recommend

16  Officer Burckel be reprimanded, so he clearly is

17  not an alter boy in this case, and it goes to his

18  conduct and ultimately his credibility at this

19  hearing.

20             So I will submit the general orders

21  that pertain to this, provide them to opposing

22  counsel, and I'm prepared to cross-examine or

23  not, depending on how you rule.

24     HEARING OFFICER PERRY:  I believe my mom

April Perry Hearing Officer CORRECTED
October 13, 2021

1   used to call this two wrongs don't make a right.

2   But I will reserve ruling.

3       MR. McKAY:  My mom said the same thing many

4   times to me.

5       MS. VUOLO-MILAN:  Something about moms, I

6   think.

7       HEARING OFFICER PERRY:  Let's hear how he

8   does.  I think that's a little far afield.  You

9   are certainly going to be talking about the

10  language used.  But I will reserve ruling until

11  the hearing when we get a little bit more out of

12  him.

13      MR. McKAY:  Fair enough.

14      MS. VUOLO-MILAN:  We'll reserve our right to

15  -- if anything is introduced at the hearing, we,

16  of course, reserve our right to make objections.

17              Character letters, we don't have

18  any yet.  To the extent we have some sort of

19  relevance or hearsay objections or something, I

20  would be happy to, again, raise those at a later

21  time upon receipt, and we'll reserve our right to

22  object to that.

23              But I think unless, Maryem, you have

24  anything, I think we've gone through all the

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    exhibits.

2        MS. ABDULLA:  I think so, yes.

3        MS. VUOLO-MILAN:  Thank you.

4        HEARING OFFICER PERRY:  With respect to the

5    Zoom -- Mr. McKay, did you have something first?

6        MR. McKAY:  No.  You read my mind.  I want

7    to address the Zoom motion by the Superintendent

8    and their sealed motion by the Superintendent.

9        HEARING OFFICER PERRY:  Before we get to

10   those, let's pause for a second.  I'm supposed to

11   ask if each party received and reviewed the

12   complete disciplinary file and then ask as a

13   follow-up if any party plans to move for entry of

14   that into the record, any portion of it.

15               Mr. McKay, did you receive and

16   review the complete disciplinary folder?

17       MR. McKAY:  For my client, yes.  I do not

18   plan to introduce it.  Your Honor should know, I

19   fought the disciplinary file on some of the

20   states witnesses and your Honor ruled against me

21   on that issue, so I'm preserving that for the

22   record.  But I do seek to introduce my client's

23   complimentary history.  Thank you.

24       HEARING OFFICER PERRY:  And from the

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    Superintendent, did you receive, review it, do

2    you plan to admit it?  And do you have anything

3    to say about Mr. McKay's admissions?

4        MS. VUOLO-MILAN:  The Superintendent does

5    acknowledge receipt of Officer Tomescu's

6    complimentary and disciplinary histories.

7                    Mr. Caproni provded those to the

8    parties on April 23rd, 2021, so I do acknowledge

9    receipt of that.

10                   Given the -- what is included in

11   the disciplinary history, we do not seek to

12   introduce the disciplinary history.

13                   Again, with respect to the

14   Respondent's complimentary history, we have no

15   objection to that being admitted for the Board's

16   review.

17                   Of course I understand we do all

18   these things at once, but it is a bifurcated

19   process in the sense that would only be relevant

20   after a finding of guilt is made, because it is

21   not relevant to whether he committed the conduct

22   at issue.  But no objection to the Board

23   reviewing that in the penalty phase, I guess I

24   should say, of their decision-making process.

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    HEARING OFFICER PERRY:  Mr. McKay, you

2  wanted to be heard on Zoom?

3    MR. McKAY:  Just a question.  This is not a

4  criticism.  I just received the Superintendent's

5  motion regarding holding the hearing remotely.

6  In general, I object.  My only question is, do

7  you need a response from me?  I gladly will

8  provide one.

9    HEARING OFFICER PERRY:  I don't.  Let's talk

10  through it.  I mean here's what I take into

11  consideration.  We do have about five weeks until

12  the hearing.  COVID could go a lot of different

13  ways in the next five weeks, although it's not

14  looking great at the moment.  We are still in

15  high, if not substantial, transmission.  I can't

16  keep track week to week.  So the pandemic is

17  certainly ongoing.

18            I do not want to violate anybody's

19  rights by asking, but I think it's fair to say

20  given the public statement CPD has made about

21  their vaccination numbers, that we are going to

22  have a number of unvaccinated parties who would

23  be coming into the courtroom.  Maybe not.  And

24  that would certainly change my mind if Mr. McKay,

April Perry Hearing Officer CORRECTED
October 13, 2021

```
1   for example, you knew that all of your witnesses
2   were fully vaccinated or some such thing.  I
3   think that would help give me a little more
4   comfort.  Just working off of the numbers as a
5   whole for CPD, you know, they're at 50, 60
6   percent and all sorts of stuff is going on behind
7   the scene.  So we will see how that pans out in
8   the next few weeks.
9                At this moment, my inclination
10  would be do partially live, partially via Zoom
11  with your non-occurrence witnesses occurring via
12  Zoom.
13                We've got a lot of occurrence
14  witnesses in this case.  So, let's see, we've
15  got -- certainly I think it is important for
16  Officer Tomescu's testimony to be live, Burckel's
17  testimony to be live, anyone who Mr. McKay had on
18  his list as people's whose credibility will be --
19  I will not repeat the L word again.  His top
20  three hit list.  And then, you know, we've got
21  several who are unlikely to be called.  We can
22  probably assume they are not terribly important
23  and would be okay to testify via Zoom, given that
24  they would just be proving up various
```

April Perry Hearing Officer - CORRECTED
October 13, 2021

1    impeachments.

2              Commander Moore, if there is no

3    stipulation, I would say should likely be via

4    Zoom.

5              Usmani I would say probably needs

6    to be live.

7              Is that generally working out with,

8    Mr. McKay, your sense of who the super-duper

9    important witnesses are?

10    MR. McKAY:  Super-duper is exactly the term

11   I would call that.  Yes.  Both the Iqbal sisters,

12   Officer Burckel, and Officer Sodt for sure.  Mr.

13   Bhatti and Mr. Usmani are witnesses that I would

14   like to cross live and in person.

15             The other witnesses, against my

16   general objection to Zoom, I can agree -- or not

17   object, I guess is the better way to put it,

18   regarding the other occurrence witnesses, but I

19   would like to -- your Honor, I would like to cross

20   Sergeant Welch in person.  And if we can't work

21   out a stipulation, I'd like to cross Commander

22   Moore.

23             We're going to keep seeing this

24   witness on other cases if the Superintendent

April Perry Hearing Officer  CORRECTED
October 13, 2021

1   continues to call a Rule 14 witness.  I'd like to

2   cross-examine Commander Moore in person.

3       HEARING OFFICER PERRY:  I will reserve

4   ruling on this at this point.  I will issue

5   something shortly before the hearing once we've

6   got some updated numbers in the world.

7                Again, regarding vaccination

8   status, if anyone wants to choose to provide

9   that, that would be you, Mr. McKay, than anyone

10  else I would think.

11      MR. McKAY:  Your Honor, I've been

12  vaccinated.  I can find out from Officer Tomescu

13  if he has as well.  If he has been vaccinated,

14  I'll advise my colleagues ASAP.

15      HEARING OFFICER PERRY:  Sounds good.  We

16  will all discuss offline.  I don't want to make

17  anyone uncomfortable at this moment.  Although

18  the City of Chicago has a pretty strong policy in

19  place as well.  So let's table that for a moment.

20               I do understand your position, Mr.

21  McKay.  I agree it is important for some of these

22  folks to be live.  I don't want to hold a live

23  hearing if it's going to put anybody's health in

24  jeopardy.  So we will revisit as we draw near.

April Perry Hearing Officer  CORRECTED
October 13, 2021

1          Is there anything else before we

2   handle the confidential motion?

3      MR. McKAY:  I don't need to respond in

4   writing on the Zoom?

5      HEARING OFFICER PERRY:  You don't.

6      MR. McKAY:  Thank you very much.

7      HEARING OFFICER PERRY:  Hearing nothing

8   else, Maureen, we're going to be under seal from

9   here on out, but I do want to keep it on the

10  record.

11              (WHEREUPON, the following

12              proceedings are under seal.)

13

14

15

16

17

18

19

20

21

22

23

24

April Perry Hearing Officer CORRECTED
October 13, 2021

```
1                    *******************

2                    UNDER SEAL

3                    *******************

4            HEARING OFFICER PERRY:  I have been

5     advised by Mr. Caproni that the procedure would

6     be handled if anybody were to FOIA the transcript

7     from here on out is that this portion would not

8     be subject to FOIA or disclosure.

9                    So let me start by asking Mr. McKay,

10    did you receive this motion or am I the only one

11    who has it?

12       MR. McKAY:  I received it -- got it Monday,

13    I believe.  It's recently.  And I need to ask if

14    I need to respond in writing, because I do have

15    an objection to it.  I don't want to say anything

16    right now to violate any sealing of this motion.

17    I do have an objection based on the charges that

18    are pending before this Board regarding my

19    client.

20       HEARING OFFICER PERRY:  You can speak freely

21    at this point, because we are under seal.

22                    Let me ask, though, the

23    Superintendent, might be helpful for my

24    knowledge, first, what of that particular text
```

April Perry Hearing Officer CORRECTED
October 13, 2021

1    message do you plan to admit?  Do you plan to

2    admit the entire text message?  How would you be

3    continuing on with -- what would the direct

4    questions be surrounding that?  And then after

5    they answer that question, Mr. McKay, I'm going

6    to ask what your best-case cross would be.  I'm

7    hoping -- we have two options here -- three

8    options.  I deny the motion altogether would be

9    one.  Two, we let everything in -- or that would

10   be option one, everything comes in.  Two, we

11   don't put any of this in or put it under seal, so

12   that whatever comes in is sealed.  Neither of

13   those is what I'm inclined to do at the moment.

14   I'm hoping that we will be able to reach some

15   kind of sanitized version of what comes in.

16              So, perhaps, as you're talking

17   through what your directs and crosses would be --

18   I don't think we need to get into the details of

19   this woman's abuse.  I am hoping that we can come

20   to some level above that about what she would

21   say, both on direct and cross.

22              Everyone would just have an

23   agreement that they aren't going to delve any

24   deeper and the witness can be instructed to what

April Perry Hearing Officer CORRECTED
October 13, 2021

1    level of information is going to be allowed.

2    Those are my initial thoughts.  I have a very

3    open mind, so I'm going to ask the Superintendent

4    to go first on this.

5        MS. VUOLO-MILAN:  I'm going to share my

6    screen once again.  I think your initial

7    question, Hearing Officer, was the scope of the

8    text messages to be provided.  I think it would

9    be helpful to have a copy of that up.  I'm

10   pulling up Superintendent Exhibit 14.  Can

11   everybody see up at the upper-right-hand corner

12   it says page 1 of 14, Superintendent's Exhibit

13   14?

14       HEARING OFFICER PERRY:  Yes.

15       MS. VUOLO-MILAN:  Wonderful.  So the

16   statement at issue, which we understand that

17   Officer Tomescu is referring to, what he has

18   described as past abuse that Officer Iqbal has

19   related to him, within -- on page one and two of

20   Superintendent's Exhibit 14, in which Tomescu --

21   we believe the evidence will show that he sent

22   this text message that said, "I'm going to get

23   interviewed by IAD regarding a CR.  I will have

24   to tell them all that I know about you to include

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    the fact that you lied about your age on your

2    application for CPD, knowing full well it wasn't

3    your legal age.  And that is just one of the

4    things that I'll go on the record with.  You know

5    what else I'm referring to."  And then he goes on

6    from there.

7              The statement at issue is, You know

8    what else I'm referring to.  From our review of

9    the file and Officer Tomescu's prior statements,

10   again, we anticipate that if he was asked,

11   Officer Tomescu, in this message you say you know

12   what else I'm referring to, what are you

13   referring to?  We anticipate that Officer Tomescu

14   would say, I'm referring to her -- the childhood

15   sexual abuse that he says she related to him.  I

16   would not open the door by asking, What are you

17   referring to when you say you know what else I'm

18   referring to.  I mean I would not open the door

19   to that.

20              This text message is relevant.

21   Looking at the statement of charges in paragraph

22   eight of the statement of charges, Officer

23   Tomescu is specifically charged with making

24   comments to Officer Iqbal, including, but not

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    limited to, threatening to tell CPD's Internal

2    Affairs Division that she lied about her age on

3    her employment application to CPD stating, I

4    thought you were going to throw me under the bus.

5    I'm taking you with me.  Stating, Immigration

6    office will my next stop after the IAD interview.

7    That interview will also involve your sister and

8    brother, and/or threatening to introduce himself

9    to her family without her permission.  For

10   whatever that's worth, we would anticipate that

11   she would testify there were some cultural

12   differences between their families, and she did

13   not disclose the relationship to her family.

14           The comment that's at issue right

15   now, quote, "You know what else I'm referring to,"

16   is not included in the charges.  I don't need to

17   ask a question about it to prove our charges,

18   because it's not listed in paragraph eight of the

19   charges.  I would not open the door to him talking

20   about this past abuse by asking him what he's

21   referring to.  Asking the question that prompts

22   the answer that we're seeking to bar, we would not

23   elicit testimony on that point.

24           I really think that would only serve

April Perry Hearing Officer- CORRECTED
October 13, 2021

```
 1    to embarrass Officer Iqbal.  I mean whether this

 2    is done under seal or not, I think this has

 3    nothing to do with whether or not Officer Tomescu

 4    engaged in the conduct that's alleged in the

 5    charges.  I think it would only serve to embarrass

 6    her and bring up something -- again, I don't know

 7    the facts.  I'm aware of no investigation into

 8    what he says she said to him.  I just -- it has no

 9    bearing on this case.  I would not elicit

10    testimony about that, and I don't think -- I would

11    not be able to fathom that's something that

12    Officer Iqbal would bring up on her own.

13              Of course if there's a ruling that it

14    should not come up, I would expect our witness

15    would comply with that, just as much as another

16    witness.

17        HEARING OFFICER PERRY:  Just so I'm clear,

18    do you plan to submit the text?  You plan to ask

19    him questions about the earlier portion of the

20    text and, perhaps, the later portion of the text.

21    You don't plan to ask him any questions about

22    the, "You know what else I'm referring to," and

23    you are requesting that Mr. McKay not ask him any

24    questions about that either?
```

April Perry Hearing Officer  CORRECTED
October 13, 2021

```
 1        MS. VUOLO-MILAN:  That's correct.  I mean,

 2   of course I would also ask that the -- I would

 3   imagine the only two witnesses that would know

 4   about this and be able to bring it up would be

 5   Officer Rafia Iqbal and Officer Tomescu.

 6              I think in a preliminary

 7   instruction, I suppose not off the record, but

 8   maybe under seal or something, confidentially not

 9   to bring that up would also be preferable.

10              Yes, I do not plan to elicit

11   testimony.  If I ask him, What did you mean when

12   you said You know what else I'm referring to, I

13   anticipate the answer that I would get is

14   specifically the testimony that I am seeking to

15   bar.  So I would not open the door to that and

16   fly in the face of the motion that we filed.

17              Maryem, have I missed anything or

18   is there anything else that you can think of?

19        MS. ABDULLA:  I think you covered

20   everything.  I just want to reiterate the fact

21   that Officer Iqbal's childhood sexual abuse is

22   not mentioned anywhere in the charges, as

23   mentioned by Maria.  And I think it's wildly

24   unrelated to the charges.  For that reason
```

April Perry Hearing Officer CORRECTED
October 13, 2021

1    largely it should be barred.

2        MS. VUOLO-MILAN:  I will say it's also not

3    something that goes to her credibility.  It's not

4    like the allegation as, You know what else I'm

5    referring to is, oh, all of those times that you

6    were convicted of perjury or something like that.

7    I mean this isn't -- you know, somebody whose

8    childhood trauma is not something that would

9    impact her ability to testify in this case.

10   Like, yes, Officer Tomescu sent me these text

11   messages.  It doesn't go to witness credibility.

12   It doesn't go to the charges.  It's not -- it's

13   not relevant.  It's only prejudicial.  Only seeks

14   to embarrass, among other things, I can only

15   imagine Officer Iqbal.

16            And we did relate to her that we

17   filed this motion for whatever that is worth

18   after we filed it.  We did relate to her that

19   this motion was on file.  So that way if

20   appropriate, we can make sure that we instruct

21   her things that should not be coming up, which,

22   again, she wouldn't bring up anyway, which is

23   part of the reason we're filing this motion.

24       HEARING OFFICER PERRY:  Mr. McKay, assuming

April Perry Hearing Officer  CORRECTED
October 13, 2021

1     they admit the text, they discuss the

2     before-and-after portions but you not ask about

3     that statement, what, if any, portions are you

4     inclined to ask your client about?

5          MR. McKAY:  Your Honor, I respectfully

6     disagree with everything counsel just said.  If

7     the Superintendent wants to admit Exhibit No. 14

8     in its entirety, they can't have just some of it

9     asked about.  Either they don't admit Exhibit 14

10    and they don't proceed on charge number eight or

11    they do and everything about that charge is

12    admissible.  And I strongly disagree with

13    counsel's assertion that it doesn't go to Officer

14    Iqbal's credibility.  It absolutely does.  And

15    here's why.  First and foremost, every police

16    applicant is asked on the application, which is

17    subject to a Rule 14, if you lie or you omit in

18    that application, every applicant is asked, Have

19    you ever been a victim of a crime?  Officer Iqbal

20    lied in her application.  And that's a Rule 14

21    violation.

22               Secondly, it is not just Officer

23    Tomescu and Officer Iqbal that knows about the

24    abuse that she suffered at the hands of an adult

April Perry Hearing Officer CORRECTED
October 13, 2021

1    years ago.  Her sister Rabia also knows about it.

2    And they've included Rabia Iqbal as a witness in

3    this case in chief.  She knows about the abuse.

4    And I submit knows that her sister lied about it

5    in not telling anybody officially in the Chicago

6    Police Department in her application.  So the

7    point is this, is that it goes to her -- Officer

8    Iqbal's credibility.  As you know, there is

9    evidence that will be submitted in this hearing

10   that she lied about her age in the application

11   process as well.

12          Now, I don't want to compare lies

13   as to which is serious and which is not, but the

14   bottom line is this, my client is on trial.  He

15   is presumed not liable.  But he is also charged

16   with Rule 14 violations.  So his credibility is

17   at issue.  But the Superintendent doesn't want

18   some things regarding the star witness, we heard

19   that today, her credibility can be shielded

20   somehow if certain evidence is kept out of an

21   exhibit they want to submit.

22          Your Honor, I can't -- I can't

23   stress enough.  They can't have it both ways.

24   They can dismiss charge number eight and this is

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    a moot issue.  But if they're not, I must be

2    allowed to cross Officer Iqbal on it, because the

3    charge reads as follows, That Officer Tomescu

4    sent Officer Iqbal one or more text messages

5    which he made one or more threatening, harassing,

6    and derogatory comments, including, but not

7    limited to, et cetera.  So the charging document

8    allows for all of this to come in.  And I cannot

9    defend Officer Tomescu unless I am allowed full

10   cross-examination of Officer Iqbal regarding

11   prior false statements she made about this

12   incident.

13              At no time am I going to go into

14   the facts of this horrible abuse she suffered

15   years ago.  Her lying about it I do intend to go

16   into if your Honor will allow me.

17       HEARING OFFICER PERRY:  Let me ask you this.

18   It sounds like the first time this is going to

19   raise its head is during Officer Tomescu's

20   adverse direct.  They will not ask him it sounds

21   like on direct what that statement means.  Do you

22   intend to ask him on cross what that particular

23   statement means?

24       MR. McKAY:  I must.  As an officer of the

April Perry Hearing Officer CORRECTED
October 13, 2021

1    court, in defense of my client, I must ask him on

2    cross, ask Officer Iqbal on my cross.  And if I

3    need to, I will ask my client on my direct when I

4    call him in my case in chief.  I don't know the

5    order, but, yes, I intend to call -- strike that.

6              I intend to ask Officer Tomescu

7    about the entirety of that text message the

8    Superintendent wants to admit against him.

9       HEARING OFFICER PERRY:  So you would be

10   asking him, it says, You know what I'm referring

11   to and what were you referring to, and then he

12   would give an answer, something along the lines

13   the fact she was a victim of sexual abuse as a

14   child?

15      MR. McKAY:  And she lied about in her

16   application.

17      HEARING OFFICER PERRY:  All right.  Not

18   thinking of the fact that she was a victim of

19   sexual abuse as a child is relevant, I think you

20   can get the same thing out with some version of

21   she was a crime victim when she was blank years

22   old and did not put that on her application.

23              I think the fact that it is sexual

24   abuse is neither here nor there and is apparently

April Perry Hearing Officer CORRECTED
October 13, 2021

1   something that she has not stated publicly or

2   been comfortable stating. So I'm going to grant

3   the motion to the extent that the crime was

4   sexual abuse. You can ask him, and I expect you

5   to instruct him what the Court's ruling is on

6   this, so -- if you want to lead him through it,

7   that might be best. But the answer he can give

8   is, She was the victim of a crime. How old was

9   she at the time, does he know? When she was a

10  child? When she was eight? Does he know --

11     MR. McKAY: I want -- Maria, I want to say

12  -- Maria, maybe you can help me out. I think she

13  was a very, very young teenager. Maybe 13. I

14  got to go over the discovery. It might have been

15  early as eight, nine or ten.

16     HEARING OFFICER PERRY: He can give the age.

17     MR. McKAY: So was her sister abused by the

18  same person.

19     MS. VUOLO-MILAN: That's irrelevant.

20     HEARING OFFICER PERRY: We'll get to that

21  next. Let's stick with how this is going to

22  arise. He can explain there was a crime. There

23  was a crime procured against her. She was a

24  victim. He can say how old if he knows or just

April Perry Hearing Officer CORRECTED
October 13, 2021

1   as a child and she did not put that on her

2   application.  I think those are fair questions to

3   ask him.  The fact that it was a sexual abuse,

4   who it was committed by, what type of abuse it

5   was, I don't think any of those have any bearing

6   on the issue.

7        MR. McKAY:  I understand and I accept your

8   ruling.  I just have a question.  When I instruct

9   my client to mention a crime, can he mention it

10  was a felony?

11       HEARING OFFICER PERRY:  I --

12       MR. McKAY:  It's a felony.  It ain't a

13  misdemeanor.

14       HEARING OFFICER PERRY:  Can someone provide

15  a little more background?  Do we know?

16       MR. McKAY:  Ms. Iqbal disclosed to her

17  boyfriend, Officer Tomescu, that when she was

18  younger -- I can get the age for you.  She was

19  abused by an adult man who her parents had asked

20  to watch over her.  And, indeed, this person also

21  abused Officer Iqbal's sister Rabia.  Neither

22  young lady disclosed this to their parents.  But

23  I believe one of them did seek counseling later

24  on in life.  The other did not.  Regarding

April Perry Hearing Officer CORRECTED
October 13, 2021

1    Officer Iqbal specifically, she clearly lied

2    about this on her application to the Chicago

3    Police Department, along with her age.

4        HEARING OFFICER PERRY:  We will get to her

5    next.

6                Who else of -- that's the ruling with

7    respect to your client.  I would ask that you

8    use --

9        MS. VUOLO-MILAN:  Can I respond?

10       HEARING OFFICER PERRY:  Yes.

11       MS. VUOLO-MILAN:  May I briefly respond to

12   that?  I mean I think another issue that we have

13   here is that bringing up -- so, one, I mean just

14   like confronting Officer Burckel with rules and

15   regulations that he, you know, used the B word

16   and that's not -- shouldn't do that.  I mean I

17   think insinuating that Rafia -- Officer Rafia

18   Iqbal lied on an application to CPD, I mean,

19   first, there's no evidence of that, other than

20   Tomescu just talking about it.  I think we're

21   really getting into like collateral impeachment

22   that I think is improper.

23               And on top of that, under -- I

24   think it's Rule 404, Rule 608 of the Rules of

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    Evidence, when you are talking about evidence of

2    a person's character trait, I guess we're talking

3    about character of truthfulness now, would only

4    be admissible to prove that the person acted in

5    conformity with that character in certain

6    circumstances.

7                     For example, a party can attack the

8    credibility of a witness by offering opinion or

9    reputation evidence referring to that witness'

10   character for untruthfulness, but what's being

11   offered here is unproven allegations just by way

12   of testimony from the respondent that at some

13   point in time, Officer Iqbal lied about

14   something; that specific fact evidence being used

15   as propensity evidence to show she lied then,

16   therefore she might be lying now, I don't think

17   that's appropriate propensity evidence.  I don't

18   think that's appropriate character evidence.  I

19   don't think that's an appropriate attack on the

20   witness' credibility under the rules of evidence.

21       HEARING OFFICER PERRY:  Let me stop you

22   there.  I think this is a worthwhile discussion

23   to have, but not with respect to Officer Tomescu.

24   Here's why.  You are putting in this exhibit.

April Perry Hearing Officer - CORRECTED
October 13, 2021

 1   You've charged him with basically threatening her

 2   in multiple ways.  You know what I'm talking

 3   about, and I'm going to tell everybody, or

 4   whatever the exact language was.  That is clearly

 5   a threat.  And I think the Police Board is going

 6   to be wondering, What is he talking about?  I

 7   want everybody to be fairly careful on what they

 8   wish for here, because I think the evidence is

 9   both highly helpful to the Superintendent and not

10   terribly helpful to the Respondent here.

11                Superintendent said they are not

12   going to elicit it.  Mr. McKay said he is.  Just

13   as a neutral party here.  You both may want to

14   think about your positions on this one.  I

15   actually think it gives a lot more context to

16   your case and does not make the Respondent look

17   terribly good, the fact that he's threatening to

18   disclose an act of abuse of which she was a

19   victim.

20                You guys put on your cases the way

21   you're going to put on your cases.  But with

22   respect to that at least, you have put in the

23   text message.  If Mr. McKay chooses to go there

24   and puts some basically meat on the bones of the

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    thread, I think it is right to do so, if he

2    thinks that helps his case.

3            I'm viewing that portion of the

4    testimony as not an attack on her credibility as

5    much as a rounding-out of what exactly he was

6    threatening to do here.

7            I think we'll get to when we talk

8    about her cross and what he's allowed to cross

9    her on, the untruthfulness component of it.  Does

10   that make sense?

11     MS. VUOLO-MILAN:  I think so.  I might have

12   a possible solution that I just -- I want to talk

13   about it on my end and run it by my supervisor

14   over here.  If that's the case, maybe talk to Mr.

15   McKay about a possible alternate solution.

16            I have to think about this a little

17   bit more.  Maybe we can offer to redact that

18   portion of the text message so when we're

19   offering the exhibit into evidence, that portion

20   of the text message is not there.  I don't know.

21   I need to think about that.  I'm trying to think

22   about different ways of approaching that.

23            I don't know that that's

24   necessarily the route we would want to go right

April Perry Hearing Officer - CORRECTED
October 13, 2021

 1  now.  But that's something that I will think

 2  about.  And if so, can reach out to counsel about

 3  that.

 4     HEARING OFFICER PERRY:  You guys can discuss

 5  it and make whatever agreement you'd like to on

 6  this.

 7          Mr. McKay seems pretty excited

 8  about the idea of it, but we will get to that,

 9  to Ms. Iqbal's testimony.

10          So setting aside the text message,

11  it sounds like, Mr. McKay, this is the kind of

12  thing you would like to cross her on regardless

13  of whether the text message comes in or not; is

14  that right?

15     MR. McKAY:  Yes, your Honor.  With all due

16  respect to her and what happened years ago, yes.

17  I feel compelled to do so on behalf of my client.

18  I have to.

19     HEARING OFFICER PERRY:  Understand the

20  Superintendent's got a bunch of questions about

21  whether or not this is even legally appropriate.

22          As a baseline, my ruling would be

23  the same on this in terms of you can get out the

24  lie without getting out the details of the sexual

April Perry Hearing Officer  CORRECTED
October 13, 2021

 1   abuse and anything relating to that.

 2                On the other hand, the

 3   Superintendent's counsel, if we do get down this

 4   road, it is to your benefit that the Police Board

 5   gets to hear some types of things about this is a

 6   very embarrassing incident, it was something she

 7   didn't even want to tell her parents it happened,

 8   you know.  There are a lot of good reasons I

 9   would expect you would want to elicit about the

10   hows and whys of why she didn't disclose that.

11                I think this is a little harder to

12   sanitize on your end.

13                I do want you to think about what

14   type of redirect you would want to have, assuming

15   Mr. McKay was allowed to question her on, and the

16   same thing we discussed before, you were, in

17   fact, the victim.  You want to throw in felony,

18   Mr. McKay, that's fine.  You were the victim of a

19   felony when you were 13 years old.  And you did

20   not disclose that on your application.  So that

21   would be what would be coming in.  Superintendent

22   may choose to have some type of redirect about

23   that.

24                But if that's what's coming in, I

April Perry Hearing Officer CORRECTED
October 13, 2021

1    do want to talk a little bit more about the

2    Superintendent's legal position that that is not

3    an appropriate untruthful statement.

4              Mr. McKay, I'm assuming you have

5    thoughts.

6       MR. McKAY:  Can you repeat that?

7       HEARING OFFICER PERRY:  About the legal

8    admissibility of an untruthful statement that was

9    made on her application.

10      MR. McKAY:  Couple of things.  First of all,

11   the Police Board rules clearly indicate that the

12   Rules of Evidence are relaxed at these hearings

13   with the exception of hearsay.

14              Secondly, credibility of all

15   witnesses is the most important thing this Board

16   can consider when it decides guilt or innocence.

17   So this goes directly to the issue of guilt or

18   innocence.  Her credibility, along with all of

19   the witnesses, as well and my witnesses'

20   credibility, is paramount for this Board to make

21   a decision in this particular case.  And this is

22   not an attack on her character.  It goes to show

23   her deception with the Chicago Police Department,

24   both at the application process, and I submit

April Perry Hearing Officer CORRECTED
October 13, 2021

1  with all due respect to my colleagues regarding

2  these charges.  So -- and it does give context to

3  the alleged threats as delineated in charge

4  number eight, because the language of charge

5  number eight encompasses one or more text

6  messages that include but are not limited to

7  these other things that she and the

8  Superintendent now allege threatens her.

9            So for all those reasons, your

10 Honor, this is admissible at this hearing.

11   HEARING OFFICER PERRY:  So just to put a

12 finer point on it, you want to admit a prior act

13 of untruthfulness by a witness for the purpose of

14 proving or showing that they are untruthful now?

15   MR. McKAY:  Well, it goes to her credibility

16 regarding these threats.  Regarding charge number

17 eight.  All right?  And this is allegedly a

18 statement made by my client by way of a text

19 message to her.  So her understanding of that

20 text message and this secretive sentence in it,

21 versus my client who is going to testify and what

22 he meant by it goes directly to charge number

23 eight.

24            It is not propensity evidence

April Perry Hearing Officer CORRECTED
October 13, 2021

1   necessarily, but even if the Superintendent's

2   lawyers think it is, under the Police Board rules

3   regarding the relaxation of the rules of

4   evidence, it still can come in.

5              I would think the Board wants to

6   know the entirety of the alleged threat in charge

7   number eight and what Exhibit No. 14 truly means

8   in its entirety before they make a decision.

9   HEARING OFFICER PERRY:  Yes, and we've

10  already discussed that your client's going to be

11  able to say, Here's what my threat meant and here

12  is what I was referring to general terms.

13             I think the question on the table

14  now is are you going to be able to argue it or --

15  MR. McKAY:  No -- well --

16  HEARING OFFICER PERRY:  -- for the purpose

17  of untruthfulness?

18  MR. McKAY:  Judge, I would argue -- if

19  allowed to, I would argue that it is ironic that

20  this lady is allowed to lie in a police

21  application on not one but two different facts,

22  and she is allowed to remain as a Chicago police

23  officer.  But my client is not allowed to remain

24  a police officer for some alleged Rule 14

April Perry Hearing Officer  CORRECTED
October 13, 2021

1    violation in these charges.

2       HEARING OFFICER PERRY:  We're going to have

3    all sorts of two-wrongs-don't-make-a-right

4    debates, aren't we?

5       MR. McKAY:  Dismiss this case and the Police

6    Board doesn't have to hear the two wrongs make a

7    right.  Because, again, I firmly believe this is

8    a matter that should not be before this Board.

9    Personal issues between two people happen all the

10   time.

11             The Superintendent is now deciding

12   that it's his business.  Be that as it may, her

13   credibility, if they're going to call her, and

14   certainly as it pertains to number eight, is

15   important, and I do seek to argue about her lack

16   of credibility at this hearing.

17      HEARING OFFICER PERRY:  All right.  So we've

18   decided it's coming in for the limited purpose of

19   discussing the context behind the text, assuming

20   that the Superintendent doesn't come up with

21   something ingenious in the meantime that Mr.

22   McKay agrees to.

23             The issue remaining is whether or

24   not the prior act of untruthfulness can be used

17-cv-06260                                    MONITOR00264762

April Perry Hearing Officer - CORRECTED
October 13, 2021

1    to argue her untruthfulness today.

2            It would help me to have short,

3    short briefing on the 608(b) issue.

4            There is a big difference between

5    the federal 608(b) and the state 608(b).  So I

6    don't need volumes about it.  But it would help

7    me to have some discussion of it and how it

8    applies for this particular witness.

9            I don't have a preference on the

10   order, although since this is a Superintendent's

11   motion, you may want to go first.  You could also

12   do simultaneous briefing on this, because I don't

13   know that you're really -- everybody's arguments

14   have been stated pretty well.

15      MR. McKAY:  When do you want these briefs,

16   Judge?

17      HEARING OFFICER PERRY:  We don't need it

18   terribly far beforehand, Mr. McKay.  It is your

19   cross of Iqbal that's it's going to apply to.  If

20   you can have it on file three days before the

21   hearing, that would be great.

22      MR. McKAY:  Thank you, Judge.

23      MS. VUOLO-MILAN:  Would that be the deadline

24   for both parties simultaneously to exchange?

April Perry Hearing Officer - CORRECTED
October 13, 2021

1     HEARING OFFICER PERRY:  Sure.  Unless you're

2   feeling very enthusiastic and want to allow Mr.

3   McKay to respond to yours.

4     MR. McKAY:  Yeah, right.  When will the

5   hearing be, November 15th?

6     HEARING OFFICER PERRY:  That sounds right to

7   me.  If that's not like a Sunday or something.

8     MR. McKAY:  It's a Monday.

9     HEARING OFFICER PERRY:  Okay.  I think that

10   concludes the under seal portion.

11                 (END OF UNDER SEAL)

12         ******************************

13

14

15

16

17

18

19

20

21

22

23

24

April Perry Hearing Officer  CORRECTED
October 13, 2021

1       HEARING OFFICER PERRY:  Does anyone have

2   anything else that we need to discuss before we

3   all resume -- I know I owe you a ruling on the

4   Zoom issue.  You owe me briefing on the 608(b)

5   matters.  You're going to be trying to work out

6   some stipulations and making sure everybody has

7   all the exhibits.  Can I please get -- we're

8   doing everything electronically now.  If I can

9   get both parties' exhibits electronically prior

10  to the hearing, that would be very helpful.

11      MR. McKAY:  Yes, Judge.

12      MS. VUOLO-MILAN:  Yes.

13      HEARING OFFICER PERRY:  Anything else?

14      MR. McKAY:  When can we get a transcript of

15  today's proceedings so I can advise my client

16  what he can and cannot testify about, as well as

17  the briefing schedule?

18      HEARING OFFICER PERRY:  They seem to surface

19  fairly quickly.  So ask Max.

20      MR. McKAY:  Are we meeting before November

21  18th, the first day of the hearing?

22      HEARING OFFICER PERRY:  I do not have

23  anything currently scheduled.  Does anybody think

24  we need to?

April Perry Hearing Officer - CORRECTED
October 13, 2021

1        MS. VUOLO-MILAN:  I don't think we

2    necessarily need to meet, unless there's some

3    additional unforeseen motion practice.  I think

4    we've got briefing schedules and filings

5    deadlines set for things ruled on at or before

6    the hearing dates.  We don't necessarily think we

7    need to meet in person.

8                One thing I was thinking about.  This

9    has nothing to do with us meeting in person.  I

10   know I mentioned asking earlier just in case there

11   were any records or something that I need to seek

12   from my client to make sure our responses are

13   complete and accurate.  To the extent that there's

14   anything I receive also in responsive to

15   discovery, I understand we have an ongoing

16   obligation.

17               I know it feels late in the game if

18   you get documents after a prehearing conference.

19   Just I want to be clear, if there's something I

20   need to ask for to brief that motion that needs to

21   be tendered, I will make sure I go ahead and do

22   that.

23        HEARING OFFICER PERRY:  Great.  Thank you.

24   Everybody please do let us know sooner rather

April Perry Hearing Officer - CORRECTED
October 13, 2021

1    than later if any witness issues pop up and we

2    are going to have attendance problems.

3                    But other than that, I think we're

4    in good shape.

5        MR. McKAY:  Thank you.

6        HEARING OFFICER PERRY:  Thanks, everybody

7    for your time today.

8        MS. VUOLO-MILAN:  Thank you all very much.

9        MS. ABDULLA:  Thank you.

10                       (WHEREUPON, the proceedings

11                       were adjourned at 3:37 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

April Perry Hearing Officer  CORRECTED
October 13, 2021

```
 1   STATE OF ILLINOIS )
                      )  SS:
 2   COUNTY OF C O O K )

 3

 4        MAUREEN A. WOODMAN, C.S.R., being first

 5   duly sworn, says that she is a court reporter

 6   doing business in the City of Chicago; that she

 7   reported in shorthand the proceedings had at the

 8   hearing of said cause; that the foregoing is a

 9   true and correct transcript of her shorthand

10   notes, so taken as aforesaid, and contains all the

11   proceedings of said hearing.

12

13

14

15
                    MAUREEN A. WOODMAN,CSR
16                  License No. 084.002740

17

18

19

20

21

22

23

24
```

HEARING
April 26, 2021

BEFORE THE POLICE BOARD
OF THE CITY OF CHICAGO


IN THE MATTER OF CHARGES )
FILED AGAINST            )
P.O. DAVID TAYLOR        )  Case No.  21 PB 2990-1
P.O. LARRY LANIER        )  Case No.  21 PB 2990-2


         REPORT OF PROCEEDINGS (Via teleconference)

had at the status in the above-entitled matter before

MS. LAUREN FREEMAN, HEARING OFFICER, taken on April

26, 2021, at the hour of 10:13 o'clock a.m.

            *  *  *  *  *  *  *  *  *

REMOTE APPEARANCES:

MS. ELIZABETH M. RALPH,
(Via teleconference),
MS. JULIA RIEDEL EMFINGER
(Via teleconference),

         on behalf of the Superintendent;

MR. JAMES McKAY,
(Via teleconference),

         on behalf of Respondent Taylor;

MR. JAMES THOMPSON,
(Via teleconference),

         on behalf of Respondent Lanier;

POLICE BOARD OF THE CITY OF CHICAGO
MR. MAX CAPRONI, Executive Director,
(Via teleconference.)

HEARING
April 26, 2021

1      HEARING OFFICER FREEMAN:  This is Police Board

2  Case Number 21 PB 2990, Case 1 and 2 regarding the

3  charges against Respondent Officer David Taylor and

4  Larry Lanier, and Lanier is spelled, L-a-n-i-e-r.

5          I'm Lauren Freeman, the Hearing Officer

6  assigned to this case, and we're proceeding via

7  conference call due to the ongoing COVID-19 pandemic.

8          Counsel for the Superintendent, can you

9  please introduce yourself and spell your name for the

10 court reporter followed by Counsel for Respondent

11 Taylor and then Counsel for Respondent Lanier?

12      MS. RALPH:  Good morning.  This is Elizabeth

13 Ralph from Greenberg Traurig on behalf of the

14 Superintendent.  Last name is, R-a-l-p-h.

15      MS. EMFINGER:  Good morning.  This is Julia

16 Emfinger also from Greenberg Traurig on behalf of the

17 Superintendent.  Last name is E, as in echo; m, as in

18 Mary; f, as in Frank, i-n-g-e-r.

19      MR. McKAY:  Good morning, your Honor.  This is

20 James McKay.  Last name is, M-c-K-a-y.  I'm appearing

21 on behalf of Officer David Taylor.

22      HEARING OFFICER FREEMAN:  Mr. Thompson?  Counsel

23 for Respondent Taylor?

24      MR. THOMPSON:  Sorry, good morning.  Was I cut

1   off?

2       HEARING OFFICER FREEMAN:  Yeah.  Can you please

3   introduce yourself and spell your name for the court

4   reporter?

5       MR. THOMPSON:  Sure.  James Thompson,

6   T-h-o-m-p-s-o-n, Counsel on behalf of Officer Larry

7   Lanier.

8       HEARING OFFICER FREEMAN:  Thank you, very much.

9   And Mr. Thompson, have you filed an appearance on

10  behalf of --

11      MR. THOMPSON:  I have not -- I'm sorry, go ahead.

12      HEARING OFFICER FREEMAN:  On behalf of your

13  client?

14      MR. THOMPSON:  This is Jim Thompson.  I was

15  informed this morning we have not, so we will file

16  that immediately after the conference call.

17      HEARING OFFICER FREEMAN:  Okay, thank you.

18          And Mr. McKay, you filed your appearance on

19  behalf of Officer Taylor, and that was two or more

20  days prior to today's date in accordance with the

21  Board rules, correct?

22      MR. McKAY:  Yes, Judge.  I filed it on April 21st

23  along with my motion for discovery.

24      HEARING OFFICER FREEMAN:  And Counsels for

HEARING
April 26, 2021

```
1    Officer Lanier and Officer Taylor, your clients were

2    personally served with the charges as indicated on

3    their notice on April 8th, which was five or more

4    days prior to this initial status, correct,

5    Mr. McKay?

6         MR. McKAY:  Yes, Judge.

7         HEARING OFFICER FREEMAN:  And Mr. Thompson?

8         MR. THOMPSON:  Yes, Judge.

9         HEARING OFFICER FREEMAN:  Okay.  So Mr. Thompson,

10   if you could file your appearance in the next couple

11   of days, today would be great.  The Board rules

12   actually say that you have to have an appearance on

13   file to represent your client, so we're going to

14   continue with this, but just make sure that your

15   appearance is filed by -- before Thursday, okay?

16        MR. THOMPSON:  Sure, we'll get it on file today.

17        HEARING OFFICER FREEMAN:  Okay, thank you.

18             And Counsel for the Superintendant, have you

19   tendered the CR files to either Counsel or do you

20   have it available for them?

21        MS. RALPH:  Yes, this is Elizabeth Ralph.  We

22   have not tendered the CR file yet.  We are going to

23   be seeking entry of an agreed protective order prior

24   to producing the CR file so that we can designate
```

HEARING
April 26, 2021

1   certain documents.

2          Mr. McKay has already signed off on that

3   agreed protective order, and I just sent it to

4   Mr. Thompson during this call, so once we get that

5   squared away, we're prepared to produce the CR files

6   right away.

7       HEARING OFFICER FREEMAN:  Okay, great.  So if you

8   could produce those files by Thursday.  I'm assuming

9   Mr. Thompson will file his appearance by then.

10      MR. THOMPSON:  I'm sorry to hold everybody up.  I

11   will have that on file today and execute the

12   protective order.

13      HEARING OFFICER FREEMAN:  That's okay, no

14   problem.

15          And then Counsel for Respondent Taylor,

16   Mr. McKay, you indicated that you filed your motion

17   for discovery, correct?

18      MR. McKAY:  Yes, that is correct.

19      HEARING OFFICER FREEMAN:  Thank you.

20          And Mr. Thompson, when you file your

21   appearance, you are going to file your motion for

22   discovery also, is that correct?

23      MR. THOMPSON:  That's correct, we'll do that

24   simultaneously.

HEARING
April 26, 2021

```
 1        HEARING OFFICER FREEMAN:  Okay.  So I'm going to

 2   give the Superintendent about three weeks to respond

 3   to your motions for discovery, so that would be April

 4   20th, and then I'm going to --

 5        MR. THOMPSON:  I think you mean May 20th.

 6        HEARING OFFICER FREEMAN:  Sorry, May 20th.  And

 7   then I'm going to give the Respondents about a week

 8   after that so they can review any additional

 9   materials that the Superintendent tenders in response

10   to those motions that are in addition to the CR file.

11           So let's set this case for status about a

12   week after that and meet up again on May 27th.

13           Is that a good date for you -- at 10:00 a.m.

14   Is that a good date and time for you, Ms. Ralph and

15   Ms. Emfinger?

16        MS. EMFINGER:  Yes, that works for me.

17        MS. RALPH:  Let me look at -- that works for me

18   as well.

19        HEARING OFFICER FREEMAN:  Okay.  How about you,

20   Mr. McKay?

21        MR. McKAY:  Your Honor, if it's by phone, yes.

22   If it's in person or by Zoom, no.  I'll be in a

23   courtroom at 9:00 a.m. up in Lake County, but I

24   should be finished by 10:00.  I can certainly call in
```

HEARING
April 26, 2021

```
1   at 10:00 o'clock.

2       HEARING OFFICER FREEMAN:  Yeah, it's by phone.

3       MR. McKAY:  Okay.

4       HEARING OFFICER FREEMAN:  And how is that for

5   you, Mr. Thompson?

6       MR. THOMPSON:  That's good, Judge.

7       HEARING OFFICER FREEMAN:  Is that all right,

8   Mr. Caproni?

9       MR. CAPRONI:  Yes.

10      HEARING OFFICER FREEMAN:  Is that date and time

11  okay?

12      MR. CAPRONI:  Yes, Thursday, May 27th at 10:00

13  a.m. is fine.

14      HEARING OFFICER FREEMAN:  Okay.  Mr. Thompson and

15  Mr. McKay, if you determine that you'll be seeking

16  any further discovery beyond what was initially

17  tendered in the CR file, I'm going to ask you to

18  please file your supplemental motions for discovery a

19  day or two before that day, so let's say by April

20  25th -- no, April 26th, and on the next status

21  hearing --

22      MR. THOMPSON:  You mean May?

23      HEARING OFFICER FREEMAN:  I'm sorry, gosh, I keep

24  doing that.
```

HEARING
April 26, 2021

 1          So for the next status hearing, Mr. McKay

 2    and Mr. Thompson, you should be in a position to

 3    indicate whether you're voiding any additional

 4    discovery or whether you filed a supplemental motion

 5    or whether we're in a position to schedule this case

 6    for hearing and prehearing conference.

 7          And also by the next status date I would

 8    like it if you could reach out to your witnesses to

 9    find out what their availability will be in July and

10    August for hearing.

11          In addition, Mr. Caproni has sent all of the

12    parties reports of the Respondents' complimentary and

13    disciplinary histories that were generated just

14    before the charges in this case were filed.  There

15    have been no prior Police Board cases against either

16    Respondent that the Board is aware of.

17          Also, as set forth in the new amendments to

18    the Police Board rules in Appendix A, the Corporation

19    Counsel shall be given access to the Respondent's

20    complete disciplinary file upon written request to

21    the Superintendant, and each Respondent shall be

22    given access to his own disciplinary file if

23    requested in writing.

24          I'd also like to caution you, the

HEARING
April 26, 2021

 1  Respondents and Counsel for the Superintendent, that

 2  if any of you decide that you may want to use experts

 3  in this case, I suggest that you begin the process of

 4  retaining them as soon as possible because these

 5  cases move a lot faster than civil or criminal cases,

 6  and you'll need to disclose them in advance of the

 7  prehearing conference.

 8         So is that all understood, Ms. Ralph and

 9  Ms. Emfinger?

10      MS. RALPH:  Yes, understood, Ms. Freeman.

11      HEARING OFFICER FREEMAN:  Mr. McKay on behalf of

12  Respondent Taylor?

13      MR. McKAY:  Yes, it's understood, and further I

14  would initially disclose that I will be seeking an

15  expert, so I will have them identified well before

16  May 26th.

17      HEARING OFFICER FREEMAN:  Excellent, thank you.

18         And Mr. Thompson, understood?

19      MR. THOMPSON:  Understood.

20      HEARING OFFICER FREEMAN:  And is there anything

21  further we need to address right now, Counsel for the

22  Superintendent?

23      MS. RALPH:  Not on behalf of the Superintendent.

24      HEARING OFFICER FREEMAN:  Mr. McKay?

HEARING
April 26, 2021

1      MR. McKAY:  Not on behalf of Officer David

2  Taylor.

3      HEARING OFFICER FREEMAN:  And Mr. Thompson?

4      MR. THOMPSON:  Nothing from Officer Lanier.

5      HEARING OFFICER FREEMAN:  All right, great.

6  Thank you.

7          So that concludes our business on this case

8  today, so I will be speaking with you all again on

9  the 27th at 10:00 a.m.  Thank you, very much.

10  Everybody please stay healthy.

11          (WHICH WERE ALL THE PROCEEDINGS HAD.)

12

13

14

15

16

17

18

19

20

21

22

23

24

HEARING
April 26, 2021

```
 1   STATE OF ILLINOIS    )
                          )  ss:
 2   COUNTY OF W I L L    )

 3

 4           I, NANCY DECOLA EATINGER, a Certified

 5   Shorthand Reporter, do hereby certify:

 6           That said proceedings were taken remotely

 7   before me at the time and places therein set forth

 8   and were taken down by me in shorthand and thereafter

 9   transcribed into typewriting;

10           I further certify that I am neither

11   counsel for, nor related to, any party to said

12   proceedings and not in any way interested in the

13   outcome thereof.

14           In witness whereof, I have hereunto

15   subscribed my name.

16   Dated:  April 28, 2021

17

18   _____

     Nancy DeCola Eatinger
19   CSR No. 084-003451

20

21

22

23

24
```

HEARING
August 24, 2021

BEFORE THE POLICE BOARD

OF THE CITY OF CHICAGO

--------------------------------------------------------

IN THE MATTER OF CHARGES
FILED AGAINST

P.O. DAVID TAYLOR              Case No. 21 PB 2990-1
P.O. LARRY LANIER             Case No. 21 PB 2990-2

--------------------------------------------------------

REPORT OF PROCEEDINGS (Via teleconference) had at

the status in the above-entitled matter before MS.

LAUREN FREEMAN, HEARING OFFICER, taken on August 24,

  21, at the hour of 10:00 o'clock a.m., before Carla

Van Roo, RPR, CRR.

                                                    MONITOR00264780

HEARING
August 24, 2021

Page 2

REMOTE APPEARANCES:
GREENBERG TRAURIG, LLP
MS. JULIA D. EMFINGER
Via teleconference),
77 West Wacker Drive
Suite 3100
Chicago, Illinois 60601
appeared on behalf of the Superintendent;
TOMASIK KOTIN KASSERMAN
MR. JAMES P. McKAY, JR.
Via teleconference),
161 North Clark Street
Suite 3050
Chicago, Illinois 60601
appeared on behalf of Respondent Taylor;
GRACE & THOMPSON
By MR. TIMOTHY M. GRACE
Via Teleconference),
MR. JAMES THOMPSON
Via Teleconference),
311 West Superior Street
Suite 215
Chicago, Illinois 60654
312) 943-0600
appeared on behalf Respondent Lanier.
POLICE BOARD OF THE CITY OF CHICAGO
MR. MAX CAPRONI, Executive Director,
(Via teleconference.)

Page 3

1  T R A N S C R I P T   O F   P R O C E E D I N G S
2              HEARING EXAMINER:  We can go on the
3  record.  Good morning, everyone.  This is Police
4  Board Case No. 21 PB 2990, 1 and 2, regarding
5  the charges against respondent Officers David
6  Taylor and Larry Lanier, L-a-n-i-e-r.  "Taylor"
7  is common spelling.
8              I'm Lauren Freeman, L-a-u-r-e-n
9  F-r-e-e-m-a-n, the hearing officer assigned to
10 this case, and we're proceeding via Zoom due to
11 the ongoing COVID-19 pandemic.
12              Counsel for the Superintendent, can
13 you please introduce yourselves and spell your
14 names for the court reporter, followed by
15 counsel for respondent Taylor, and then counsel
16 for respondent Lanier.
17              MS. EMFINGER:  Good morning, my name
18 is Julia, J-u-l-i-a, Emfinger, counsel for the
19 Superintendent.
20              MR. REPKING:  Good morning, this is
21 David Repking, also on behalf of the
22 Superintendent.  My last name is spelled
23 R-e-p-k-i-n-g.
24              MR. McKAY:  Good morning, everyone.

Page 4

1  This is James McKay, M-c-K-a-y.  I'm the
2  attorney appearing on behalf of Officer David
3  Taylor.
4              MR. GRACE:  Good morning, my name is
5  Tim, T-i-m, Grace, G-r-a-c-e.  I'm here on
6  behalf of Officer Larry Lanier.
7              MR. THOMPSON:  James Thompson, and I'm
8  also here on behalf of Officer Lanier.
9              HEARING EXAMINER:  Thanks, everybody.
10 All right.  First I see that on July 9 the
11 Superintendent filed a motion to quash on
12 Taylor's subpoenas to the Chicago Police
13 Department that requested police reports from
14 arrests of Terrell Eason, who's the alleged
15 victim in this case, that occurred in 2004 and
16 2010, and I see in that motion that respondent
17 Taylor also requested that information from the
18 Superintendent via a supplemental discovery
19 motion.
20              This is not going to be an issue in 21
   this case, and I'll get into that in a minute. 22
   But I will note that I agree with the
23 Superintendent that in the future, according to
24 Police Board Rule II-C, subpoenaing the Chicago

Page 5

1  Police Department is not the appropriate means
2  of getting CPD records and the appropriate means
3  is to request the documents from the
4  Superintendent's counsel via a discovery motion;
5  okay?
6              So now before I address your motions
7  regarding Terrell Eason's prior acts of
8  violence, I would like to find out what this
9  case is all about.  So counsel for the
10 Superintendent, before we get into the specific
11 witnesses you want to call and the specific
12 exhibits that you want admitted, can you
13 summarize your case for us?  What do you think
14 the evidence is going to show in this case?
15              MS. EMFINGER:  Absolutely, your Honor.
16 And maybe this is something we can take up
17 preliminarily.  I have conferred --
18              HEARING EXAMINER:  Sorry, hold on one
19 second.  I don't know about everybody else, but
20 your audio is very -- yeah, the court reporter
21 is indicating also that your audio is very
22 spotty so I'm not sure what --
23              (Discussion held off the record.)
24              MS. EMFINGER:  So I think

HEARING
August 24, 2021

Page 6

1  preliminarily, Hearing Officer Freeman, I can --
2  and counsel for respondent can jump in if they
3  want to add anything to this, but just because
4  you mentioned it about exhibit lists and
5  witnesses, I think I have actually conferred
6  with counsel for respondents and I think we were
7  all under the impression or at least agreed
8  logistically that we wanted to get some of the
9  rulings on some of the motions in limine today
10  given that they will probably impact how our
11  strategy is going to proceed.  Whether stuff
12  comes in or doesn't come is going to take some
13  strategizing in terms of what we want in.
14        So certainly there are some witnesses
15  that we can absolutely commit to saying are
16  going to go on in this hearing, but there is a
17  lot of stuff that's up today.  And considering
18  we were a second prehearing conference, I
19  think -- again, counsel for respondents can jump
20  in, but speaking on behalf of all counsel and
21  all parties, I think we were all under the
22  impression that it would make more sense to get
23  those rulings first and then really address a
24  lot of those -- commit to our exhibits and

Page 7

1  witnesses at the next prehearing conference, if
2  that makes sense to you.
3        HEARING EXAMINER:  Okay.  So I
4  understand what you're asking, and what I can do
5  is rule on the motion now based on the
6  representations that you've made in your
7  motions.  And I believe there is only one, which
8  is the one issue really, which is Terrell
9  Eason's prior alleged violent behavior.  I
10  don't -- I didn't see any other motions in
11  limine or motions to admit, unless I missed any.
12        MS. EMFINGER:  The Superintendent
13  filed motions in limine with respect to expert
14  testimony.
15        HEARING EXAMINER:  I'm not prepared to
16  rule on the expert testimony today anyway.  By
17  the way, the responses to those motions in
18  limine on the experts I believe was due
19  August 20.  I did not receive any from the board
20  office, so I don't know if any -- you know, I
21  don't believe any were filed so I can -- there's
22  a lot of information, and I'm going to hold off
23  on ruling on the experts until I hear exactly
24  what this case is about, what the witnesses are

Page 8

1  going to testify to, and what the evidence is
2  going to be.
3        So I believe that the motions in
4  limine were filed and there were no responses to
5  those motions as filed; correct, Ms. Emfinger?
6        MS. EMFINGER:  I did not receive
7  anything either for the expert motions.  And I
8  think for the motion about the prior history, we
9  both filed a motion and then the Superintendent
10  submitted an additional response directed, I
11  think, at the precise subject matter of the
12  respondents opening motion, but those are
13  essentially cross-motions, obviously, and
14  doesn't matter.
15        Tim and Jim, we can hear you, you
16  aren't muted.
17        HEARING EXAMINER:  I didn't hear what
18  they said; I was listening to you, Ms. Emfinger.
19  So what I'm going to do, I'm going to rule on
20  the proof of other crimes motion now based on
21  your representations in the motions as to the
22  facts, which were very briefly summarized in
23  your motions and your response.
24        So I see -- so I saw that on July 21

Page 9

1  of 2021 the respondents filed a joint motion in
2  limine to permit the introduction of prior acts
3  of violence of Terrell Eason.  And then on
4  July 23, 2021, the Superintendent filed the
5  opposite, which was a motion in limine to bar
6  the respondents from introducing at the hearing
7  evidence, questions, testimony, or argument
8  regarding any prior arrests, criminal history,
9  or previous violent or aggressive acts of
10  Terrell Eason.  And the Superintendent also
11  filed a response to the respondents' motion on
12  August 4.  So I thoroughly reviewed your
13  excellent and well-argued briefs and really I
14  don't need any further argument on what's
15  contained in those motions and response.
16        So is there anything outside of your
17  briefs and response that you wish to add?  And
18  I'll start with counsel for the Superintendent.
19        MS. EMFINGER:  No, I think the way
20  things stand in the briefing, we filed the most
21  recent -- the most recent response or the most
22  recent submission.  Depending on what the
23  respondents -- if they have anything to bring up
24  outside of what was in their briefing, I will

HEARING
August 24, 2021

Page 10

1  reserve time to respond to that. But I think in
2  terms of our opening motion and then our
3  response to their opening motion, there is
4  nothing additional that we need to raise.
5          HEARING EXAMINER: Thank you. And,
6  Mr. McKay, is there anything that you wish to
7  add outside of your brief -- your motion on
8  behalf of Officer Taylor?
9          MR. McKAY: Yes, Judge, it doesn't
10  take very long.
11          HEARING EXAMINER: Okay, go ahead.
12          MR. McKAY: Regarding Lynch material
13  that is ordinarily admitted in criminal cases,
14  the Superintendent argues that it's not
15  applicable here in a civil administrative
16  hearing. Our joint motion goes into that and
17  the admissibility of this violent history in
18  civil cases. But here's the thing. The charges
19  against Officer Taylor and Officer Lanier
20  charge, among other rule violations, a Rule 38
21  in that both Taylor and Lanier are charged with
22  unlawfully using their weapon on duty. And when
23  it suggests "unlawful use," Illinois law comes
24  into play here, Judge, and the key element then

Page 11

1  in Illinois law is who is the initial aggressor.
2  And what you should know, your Honor, is on the
3  date in question, July the 3rd, 2018, at about
4  8 o'clock at night, it's broad daylight in early
5  July. Mr. Eason is armed with a gun.
6          So regarding the issue before the
7  board, who's the initial aggressor, Lynch does
8  apply in this civil administrative hearing. And
9  for the reasons elicited in our joint motion
10  regarding the admissibility of this violence on
11  Mr. Eason's behalf prior to that date, it's also
12  admissible, Judge.
13          So for all of those reasons, in
14  addition to what we cited, we believe that this
15  evidence is admissible. We did not respond to
16  the Superintendent's motion in limine because
17  our motion in limine is directly opposite of
18  their motion, so we didn't feel a need to file a
19  response, Judge. We are ready for your ruling
20  today.
21          HEARING EXAMINER: Mr. Thompson,
22  Mr. Grace, anything you wish to add to your
23  motions?
24          MR. GRACE: Judge, the only thing --

Page 12

1  this is Tim Grace. The only thing I would add
2  on to what Mr. McKay articulated is the fact
3  that in federal Civil Rights litigation in
4  federal court, I mean, the Doornbos versus City
5  case clearly says it's relevant. Even what the
6  officers did not know at the time.
7          So I think that the Superintendent has
8  argued we're not in a criminal proceeding, we're
9  in a civil proceeding. Well, I would like to
10  hear, and I didn't really see any response in
11  their motion in limine and the subsequent
12  responses where they argued that the federal
13  judges have it wrong and to allow what is
14  unknown to the officers at the time is not
15  relevant because it's clear, we cited three or
16  four cases where information unknown to the
17  officers is relevant if it tends to make one
18  side's story more or less probable.
19          So it would be important for the
20  police board to understand what the officers --
21  how Mr. Eason's actions were predictable and
22  tend to corroborate what the officers would
23  testify to.
24          HEARING EXAMINER: Ms. Emfinger,

Page 13

1  Mr. Repking, any response to that?
2          MS. EMFINGER: Yes. I mean, I
3  think -- I think, you know, despite the Rule 38
4  violation, with the admission of Lynch
5  materials, an evidentiary matter, and that's
6  procedural and that's the type of case that
7  you're actually in the forum that you're in. In
8  here, in a civil administrative proceeding, the
9  stakes are different, and the justification for
10  allowing material which would ordinarily --
11          The default is that this material is
12  not admissible, it is not relevant and it's not
13  useful, and I'm going to get back to a sort of
14  nuance to that in a second. But, I mean, the
15  difference between being in an actual criminal
16  proceeding and here is important.
17          So, you know, we still maintain that
18  any material proceeding under Lynch does not
19  apply. And to the extent that there are federal
20  Civil Rights cases that acknowledge that this is
21  relevant, I think both counsel in their briefing
22  as well as their arguments today, counsel for
23  respondents Taylor and Lanier have missed the
24  key point that all of those cases, Lynch and the

HEARING
August 24, 2021

Page 14

1  Doornbos line of cases from the Seventh Circuit,
2  federal cases, the information that was unknown
3  to an officer at the time of the shooting is
4  only relevant for resolving different sides of
5  testimony.
6           There is no differing testimony here.
7  The eyewitnesses are Taylor and Lanier and then
8  we have a camera, which is objective. There is
9  going to be -- unlike another eyewitness,
10  another human being whose memory could fade over
11  time or subject to all of the discrepancies the
12  human memory is subject to, a camera doesn't
13  have that, so that's the point that we made in
14  our briefing that I haven't heard respondents
15  respond to, which is that the only time that the
16  evidence is admissible is when it's relevant to
17  help a finder of fact weigh two different
18  stories.
19           We're not going to get two different
20  stories. And we pointed out in our briefing, we
21  might get two different characterizations of
22  what you see on the video, but there is not
23  going to be any other eyewitnesses to the
24  shooting itself who come forward and say, "well,

Page 15

1  I saw him not be aggressive" and then the
2  officers say, "well, he was aggressive." Where
3  you have two verbal human beings relying on
4  their memory telling two different stories. And
5  in all of the cases, Lynch and Doornbos, that's
6  the only time that that normally inadmissible
7  material is admissible.
8           HEARING EXAMINER: Okay. Anything
9  further? All right. So I just want to point
10  out that, of course, all of my decisions go back
11  to the specifications in these charges. And
12  although the officers are charged with a Rule
13  38, Rule 38 is unlawfully or unnecessarily using
14  or displaying a weapon. And in these charges,
15  in specification No. 1, the officers are charged
16  with using deadly force that was not necessary.
17  So I want to point out that it is not incumbent
18  upon the Superintendent to prove that these
19  actions were unlawful under Rule 38.
20           So I've considered your arguments and
21  the many criminal and civil cases that you've
22  cited, and essentially the respondents are
23  arguing that certain prior violent acts alleged
24  to have been committed by Mr. Eason are

Page 16

1  admissible under Lynch in criminal cases or
2  under Doornbos in other civil cases, and the
3  Superintendent has disagreed because there's not
4  going to be any conflicting witness testimony,
5  as Ms. Emfinger just stated, that would justify
6  admitting the prior violent acts according to
7  case law.
8           So I want to be clear, while we often
9  get guidance on -- compelling guidance from the
10  criminal and civil statutes and from case law
11  for our evidentiary rulings, the board's
12  proceedings are only governed by the police
13  board rules. And Police Board Rule Roman
14  Numeral No. III-D states that other than hearsay
15  evidence, quote, The Hearing Officer shall not
16  be bound by the formal or technical rules of
17  evidence, end quote.
18           So as long as the evidence is not
19  overly and unfairly prejudicial to either side
20  and as long as the board could find something
21  relevant, we're going to let some evidence in
22  and let the board decide whether they want to
23  give that evidence weight or not. So we --
24           Hearing officers ask ourselves is this

Page 17

1  something that the board may want to know and
2  make its own determination on what weight, if
3  any, they should give that evidence. And if
4  we're unsure, we'll admit it if it's not overly
5  prejudicial and we will let them decide. But
6  the evidence has to have possible relevance to
7  the specific charges in this case and the board
8  is -- has been very clear that they do not want
9  to review many hearings on other crimes,
10  evidence, or bad acts committed by officers or
11  by alleged victims.
12           And this really is not a case about
13  who the initial aggressor was. As I said, you
14  have to look at the charges. Essentially the
15  question in the first two charges is was the
16  officer's use of deadly force necessary and was
17  their use of deadly force justified. So the
18  issue is were their actions objectively
19  reasonable under the circumstances, not
20  particularly who was the initial aggressor.
21           So I believe the board should be aware
22  of Mr. Eason's 2011 felony conviction for
23  aggravated battery to a peace officer. So I
24  will allow the respondents to enter that

Page 18

1    certified copy of conviction into the record,
2    but that's it. I'm not going to allow any
3    extrinsic evidence about that case or the facts
4    of that case nor am I going to allow the
5    respondents to admit any of the other three
6    alleged incidents of violent behavior that
7    they're requesting in their motion. I find that
8    any probative value they may have or the board
9    might ascribe to them is -- would be
10   substantially outweighed by the danger of unfair
11   prejudice to the Superintendent and, as I said,
12   the board may or may not wish to give weight to
13   Eason's prior conviction or to assess his
14   actions and the reasonableness of the officer's
15   actions. I'm going to leave that up to them,
16   but I'm going to allow them the chance to make
18   that decision as far as the felony conviction is
19   concerned. The rest I don't find particularly
20   relevant to the charges in this particular case
     and I believe that the danger of unfair
21   prejudice is just too high with those incidents.
22        So does everyone understand my ruling?
23   Counsel for the Superintendent?
24        MS. EMFINGER: Yes, your Honor.

Page 19

1        HEARING EXAMINER: Counsel for Officer
2    Taylor?
3        MR. McKAY: Yes, your Honor.
4        HEARING EXAMINER: And counsel for
5    Officer Lanier?
6        MR. GRACE: Judge, I understand your
7    ruling, and I'm not going to belabor this, but
8    if I could just put on the record just a quick
9    response. I suppose I should have took this
10   opportunity before you make a ruling, but let me
11   just go on the record and then we can move on.
12        HEARING EXAMINER: Okay.
13        MR. GRACE: The Superintendent argues
14   that the facts are not in dispute. I'm assuming
15   that they're going to argue, as their expert
16   offered, that Mr. Eason was trying to escape, he
17   was trying to run through the yard. The
18   officers are going to take the position that,
19   no, he was not only trying to escape, he was
20   trying to also place the officers in imminent
21   threat of death or great bodily harm by
22   orientating the weapon in their -- at their
23   direction.
24        So the facts are in dispute, and I

Page 20

1    think to show that this man not only once but
2    twice has placed his hands on law enforcement
3    officers and placed his hands on a security
4    guard would be relevant, so that's just the
5    record. I want to make sure that our argument
6    is clear and where we disagree that the facts
7    are not in dispute, because they are in dispute.
8    With that, I understand your ruling.
9        HEARING EXAMINER: Okay, thank you.
10   And I partially agree. There may not be
11   conflicting testimony in this case, but there
12   will certainly be conflicting versions of the
13   facts based on the video versus the officer's
14   testimony, otherwise we wouldn't be having a
15   hearing. There's the officer's version that
16   Eason was holding the gun and pointed it at
17   them, which is what the respondents' motion
18   actually says, so they -- the officers
19   justifiably shot him in self-defense. And there
20   is the City's version that the shooting was
21   unnecessary and unjustified and he was just
22   attempting to escape, as Ms. Emfinger just
23   stated.
24        So the prior conviction may or may not

Page 21

1    be relevant to the board in deciding which
2    version to go with, even though there is not
3    conflicting testimony, per se. So because the
4    criminal felony conviction is for a crime of
5    aggression towards the police, that may be
6    relevant to the board when assessing the
7    officer's descriptions of Eason's actions when
8    he was shot or it may not.
9        So that's my ruling, and I think we
10   should move on now. Hopefully that will give
11   you some clarification as to your witness lists
12   and your evidence lists and we can go through
13   those. Unfortunately I neglected to request
14   that you send those lists to the board and
15   copies of all the evidence before today, and I
16   do that and I actually ask -- I make that
17   request in every case, but I forgot to do that
18   because I thought I would have them in front of
19   me because we were initially going to meet in
20   person. And when we switched to Zoom, I forgot
21   to ask you all to send those, so I'm going to --
22   I'm hoping that you can share your screens with
23   those lists because I don't believe they were
24   sent, and we can go through the Superintendent's

HEARING
August 24, 2021

Page 22

1  proffered list first; okay? So let's take the
2  Superintendent's proposed witness list first;
3  okay?
4           MS. EMFINGER: Yeah, and especially in
5  light of your ruling I can certainly have that
6  discussion, your Honor. But being candid again,
7  the fact that we had two prehearing conferences
8  scheduled and the absence of an expressed
9  direction, we actually don't have a document
10 prepared that is formalized as a witness list or
11 an exhibit list. And we can certainly do that
12 quickly, in short order, now that we have that
13 ruling if you would like to see it far sooner
14 than the second prehearing conference.
15          But in terms of sharing a screen to
16 give you a physical guide to walk through, I
17 think -- and, again, counsel for respondents can
18 speak up and confirm or disagree with me, but
19 based on the discussions that I had with them in
20 advance of this hearing, I think we were all
21 under the impression that we did not have those
22 prepared, that we were going to do the work to
23 prepare those based on both sides strategizing
24 as to the outcome of --

Page 23

1           I mean, there's a little bit of
2  thought also that has to go into the outcome of
3  some of those motions, and I understand that
4  least with respect to the experts you're not
5  prepared to rule on today, but in terms of
6  even just the motion of Terrell Eason's prior
7  history, you know, I think we were all waiting
8  to see before we really formalized anything.
9           And Tim and Jim and Jim, you can all
10 chime in as to whether you're prepared to do
11 that.
12          MR. THOMPSON: Judge, may I interrupt
13 for a second?
14          HEARING EXAMINER: You may, go ahead.
15          MR. THOMPSON: I don't know if this
16 was inadvertent, we filed a supplemental
17 discovery request back in June, and I just want
18 to go through what we received and what's still
19 outstanding on the supplemental discovery
20 requests at some point here.
21          MS. EMFINGER: Thank you, that is
22 another -- that is another issue. We only --
23          With respect to some of those
24 documents, I will acknowledge, the

Page 24

1  Superintendent is prepared to tender some
2  documents within the next day or two. We only
3  just got them from CPD and they just haven't
4  been Bates-labeled yet.
5           So I guess that's another thing that I
6  had neglected to mention in my summary for all
7  of the parties, is that there may be exhibits
8  that they want to introduce that we worked
9  diligently since June getting documents from
10 CPD, and we were trying to be as fast as we
11 could, but we only did just receive them. So in
12 that universe of documents, to be fair to
13 respondents, there may be exhibits that they
14 want to introduce.
15          MR. GRACE: Also, Judge, I know the
16 expert witness testimony, the motion to bar, as
17 there is a bigger overwhelming issue going on
18 that the City has objected in this case and also
19 in another case about the whole idea of forced
20 science and an almost identical motion was filed
21 regarding the -- in the Luigi Starwy [sp] case,
22 objecting to the same exact witness we were
23 going to call in this case, and that motion we
24 were given a month to pretty much respond.

Page 25

1           MR. THOMPSON: Two months.
2           MR. GRACE: We were given a
3  significant amount of time to respond to that.
4  It's a pretty fairly complicated issue about
5  experts, so that's why we did not respond. We
6  thought that maybe some precedent was going to
7  be set in the Starwy case about whether or not
8  core science was going to be accepted by the
9  police board or not, so there's that issue too.
10 If we get barred, then we're going to have to
11 seek another expert.
12          HEARING EXAMINER: When is that Starwy
13 up for that decision?
14          MR. THOMPSON: So our response to that
15 motion, Judge, is due on Monday, the 30th, and
16 our hearing dates in that case are November 3,
17 November 4, and November 8.
18          HEARING EXAMINER: When is the
19 decision about the experts going to be made? Is
20 there a prehearing conference?
21          MR. GRACE: Our prehearing conference
22 is October 21st. I would imagine that the
23 police board is going to make a ruling on that
24 motion in their September hearing, I would hope.

HEARING
August 24, 2021

Page 26

1  I'm not sure if the hearing officer is going to
2  respond to that or whether the police board
3  itself is going to.  There is really no set
4  rules of how -- which person makes that
5  decision -- which entity makes that decision.
6          HEARING EXAMINER:  Okay.  So you're
7  saying that that decision --
8          So our second prehearing conference is
9  September 15.  It's set for September 15.
10  You're saying that the decision in that case
11  will not be made before September 15?
12          MR. GRACE:  I don't know.  I have no
13  clue.  I don't know if the hearing officer -- I
14  think that's Judge Wood is going to make that
15  decision or if the police board themselves will
16  make that decision.
17          HEARING EXAMINER:  Okay.  That would
18  be Ms. Wood's decision on behalf of the board,
19  of course, but --
20          All right.  So am I correct that --
21  and I actually forgot to have you summarize the
22  cases before the witness list, so let's go back
23  to that.  I would like either side, each party
24  to summarize their cases for me without, at this

Page 27

1  time, going into the specific witnesses and
2  specific exhibits.  What do you each intend to
3  show.  Counsel for the Superintendent?
4          MS. EMFINGER:  Sure, your Honor.  So
5  in -- I mean, we are referring to the charges
6  that -- just as a reminder, this happened in
7  July of 2018.  There was an anonymous report,
8  anonymous call of an individual, a man who was
9  seen with a weapon.  Several officers responded,
10  including Officers Taylor and Lanier.  A foot
11  chase ensued and ultimately Officers Taylor and
12  Lanier ended up in the back yard with the
13  victim, Terrell Eason, the back yard of a
14  residence at -- where Terrell Eason was shot by
15  Officers Taylor and Lanier.
16          This is actually a pretty
17  straight-forward case when it comes to the
18  facts.  Again, characterization and argument
19  about whether force was necessary or not, the
20  two sides have two different takes on that,
21  that's more of a legal matter.  The facts are
22  really not in dispute.  We have the video-worn
23  camera from the officers and we will be showing
24  that body-worn camera.  And the -- then the

Page 28

1  testimony of Officers Taylor and Lanier.  They
2  were the only officers in the yard when
3  Mr. Eason was shot, and Mr. Eason obviously
4  can't testify.  There are no other civilian eye
5  witnesses.  COPA did their investigation, went
6  and talked to people in the neighborhood, and
7  they couldn't identify anyone else who would
8  offer any testimony.
9          So essentially, right now, with the --
10  you know, again, in light of the very limited
11  ruling on what's going to be admitted in terms
12  of Mr. Eason's prior history, maybe there would
13  be something that we would bring in to address
14  that, but essentially it's going to be the
15  Superintendent's case will be the video
16  evidence, the testimony from Officers Taylor and
17  Lanier.  There is the potential there were two
18  other officers involved, Officer Ritchey and
19  Officer Whalen, although they were not in the
20  yard at the time of the shooting.  We might have
21  some short testimony from them just to get a
22  lead-up and background of what happened leading
23  up to the encounter in the back yard, and then
24  our expert -- our use of force expert.

Page 29

1          So that's essentially the
2  Superintendent's case.  It's really about those
3  moments in the back yard and was it necessary
4  for Officers Taylor and Lanier to use the force
5  that they used when they shot him.  And there
6  will be other evidence submitted to lay the
7  foundation of the medical records and the
8  autopsy report, forensic/ballistics testing.
9  And let's see.  Yeah, and then just the video
10  evidence.
11          So obviously we will prove, you know,
12  that -- we will have the coroner's report about
13  what caused Mr. Eason's death and then
14  ballistics to the extent we can trace the
15  bullets that shot Mr. Eason, but that's
16  essentially it.  There's not -- other than what
17  happened on that evening, the Superintendent
18  doesn't intend to introduce a whole lot.  It's
19  just the story of that foot pursuit followed by
20  the encounter with Officers Taylor and Lanier in
21  the residential back yard.
22          HEARING EXAMINER:  Okay.  And counsel
23  for Officer Lanier, what do you intend to show
24  in your case?

Page 30

1  MR. GRACE:  Judge, on July 3, 2018,
2  uniformed officers, this was in broad daylight,
3  were called to 4706 West Fulton on a call of a
4  man waving a gun around.  Ritchey and Whalen got
5  to the location, located Mr. Eason, who matched
6  the description.  Mr. Eason made eye contact and
7  began to flee.  He then takes a very
8  surreptitious run that starts with him going
9  westbound, then northbound, then back south,
10 then eastbound, then back southbound, then back
11 northbound, then back southbound.  He then
12 falls -- the whole time in his right hand he's
13 holding a gun.  I believe it's Officer Whalen
14 who testifies that he sees he's got his finger
15 on the trigger.
16 So they're broadcasting out to
17 responding officers that they're engaged in a
18 foot chase.  Officer Taylor and Lanier are
19 uniformed officers -- I believe they were
20 uniformed also.  Then they responded to the
21 location.  They followed -- they listened to the
22 flight path of Mr. Eason and at one point
23 Mr. Eason, who's running to escape while keeping
24 his hand on that pistol in his right hand, jumps

Page 31

1  a fence and finds himself in the back yard at
2  4730 West Fulton.  When he gets into the back
3  yard at 4730 West Fulton, he finds himself in a
4  situation where he can't get out of the yard by
5  continuing going straight without having to
6  circumvent and then jump over fences.
7  When he gets into the back yard,
8  Officer Taylor is at one location on the other
9  side of the yard.  Then Officer Lanier is
10 south -- north of him on the same side of the
11 yard.  Basically, Judge, they're in the adjacent
12 yard.  There is a chain-link fence.  I believe
13 Taylor jumps the fence, Eason enters the yard.
14 Eason then trips and then kind of loses focus
15 and then begins to rise with the gun in his
16 right hand.  He starts to turn -- you'll see the
17 video evidence.  He starts to turn at this
18 point, and Lanier and Taylor believe that Eason
19 is going to discharge his weapon at either both
20 of them or one of them, and they discharged
21 their weapons pursuant to the general force
22 guidelines of imminent threat of death or great
23 bodily harm.
24 We will have no testimony about which

Page 32

1  police officer fired first, I don't believe, and
2  the question of the day will be is can a police
3  officer defend themselves when someone has a
4  hand on a gun or aims a weapon in your
5  direction.  That's what I think the testimony
6  would show.
7  HEARING EXAMINER:  Thank you.  So
8  exactly what does this video show?
9  MR. GRACE:  Eason being shot after
10 pointing the gun in the direction of Taylor and
11 Lanier, in my opinion.
12 HEARING EXAMINER:  Say that again?
13 I'm sorry.
14 MR. GRACE:  Eason pointing a handgun
15 in the direction of two uniformed officers after
16 running from two other uniformed officers in the
17 direction of the two respondent deputies.
18 HEARING EXAMINER:  That's what the
19 video shows?  That he's -- that he's pointing
20 the gun in their direction?
21 MR. GRACE:  Well, Judge, he's
22 orientating a weapon.  He jumps a fence, he
23 falls, he comes up, he makes eye contact like
24 he's trying to acquire a target.  The officers

Page 33

1  see him doing this.  His arm is swinging with
2  the gun in his right hand and he begins to move
3  in a south -- northwesterly direction and the
4  officers are in fear for their lives so they
5  discharge their weapon.  He's been given
6  multiple verbal commands throughout the chase,
7  so that's basically what it shows.
8  It's not a direct point.  I don't want
9  to mislead you.  It would be good if you watch
10 the video.  He doesn't coast up and take a
11 two-handed grip and point at the officers, but
12 he's to the side of them.  He's probably about
13 half a yard left; maybe 15, 20 feet away from
14 the officers.  He's got the gun and it's
15 orientated towards the officers.
16 HEARING EXAMINER:  Okay.
17 MS. EMFINGER:  And I think -- I just
18 want to clarify.  I may have misspoken when I
19 said body-worn cameras.  Officer Lanier is
20 charged with not turning on his camera, so
21 there's only -- we only have footage from one
22 vantage point.  From Officer Taylor.
23 HEARING EXAMINER:  He does activate
24 his body-worn camera?

HEARING
August 24, 2021

Page 34

1    MS. EMFINGER: He does. There is
2    also, though, with respect to the video
3    evidence, because of the time that he activated
4    it, there is this lag of the cameras, and we
5    will hear explanation about this or we will
6    provide explanation of it. The camera -- from
7    the time you activate them -- the cameras are
8    kind of always running and I expect --
9    MR. GRACE: The audio buffer is for
10   two minutes.
11   MS. EMFINGER: They have like a
12   two-minute time, that after two minutes passes
13   then it disappears. If you activate your
14   body-worn camera, the camera can catch what
15   happens even slightly before activation. It's
16   like a little bit of a -- to make up for
17   reflexes and just the ability to turn on your
18   camera inside is the mechanism.
19   But when you capture footage that way,
20   there is no audio, so there's actually the
21   shooting itself occurred in that time frame
22   before the camera was actually activated so it
23   falls into this window of kind of, I don't know
24   what you want to call it, stopgap or kind of

Page 35

1    backup footage, and you can't hear the audio of
2    what was occurring and it's only from one of the
3    officers, so there is really just that single
4    video.
5    HEARING EXAMINER: Okay. I think what
6    I'm going to have to do, so what you're saying
7    is neither party has their witness lists,
8    neither party has their evidence lists at this
9    time; is that right?
10   MS. EMFINGER: Not in a prepared
11   document that we can share.
12   HEARING EXAMINER: And respondents,
13   you don't have one either; correct? Mr. McKay?
14   MR. McKAY: That is correct, Judge.
15   HEARING EXAMINER: Okay. And
16   unfortunately I'm not pleased about that because
17   I gave you all the admonishments during the last
18   status date about what you were supposed to
19   prepared with today. And, you know, so what
20   we're going to have to do is -- I believe we
21   were supposed to have our second prehearing
22   conference. As I said, on the 15th, we're going
23   to have our -- we are going to continue this
24   prehearing conference to September 15.

Page 36

1    MR. CAPRONI: I was just going to
2    suggest, even though they don't have the witness
3    lists and exhibit lists, I wonder if they could
4    have at least a preliminary discussion of who
5    they plan to call and whether there are, you
6    know, any objections to some of the witnesses,
7    understanding that you can't rule or have
8    objections on all of them, just so you can get
9    something done today and maybe get an idea of
10   who the primary witnesses will be.
11   MR. McKAY: I certainly can do that
12   today.
13   HEARING EXAMINER: Ms. Emfinger?
14   MS. EMFINGER: Yes, I think I kind of
15   outlined it. I tried to be responsive to your
16   concerns by outlining it and a description of
17   what our case is going to be; but, yes, we can
18   do that today.
19   HEARING EXAMINER: Okay, great. And
20   Mr. Thompson, Mr. Grace?
21   MR. GRACE: Yeah, Judge, we can
22   certainly give you an outline. I mean, there
23   are still discovery issues out there. Have
24   there been any civil depositions taken in the

Page 37

1    case that we're aware of? I'm not sure. I'm
2    not sure if the City has had an opportunity to
3    talk to their counterparts in the --
4    MS. EMFINGER: Yeah, and I think we
5    filed -- we provided a written
6    response to the scope of what we were going to
7    provide from the civil case, and I believe we
8    produced them.
9    MR. GRACE: There wasn't any recent
10   depositions taken? Are you sure? Can we just
11   check on that, Julie?
12   MS. EMFINGER: No, Tim, I'm saying I
13   believe we produced them. I don't know when you
14   last reviewed the production, but I think there
15   are deposition transcripts in your production.
16   MR. GRACE: We have some, I agree, but
17   I want to know if there is any more. I think
18   you -- if you're telling me you've given us
19   everything, then okay, we're good.
20   MS. EMFINGER: We're giving you what
21   we're giving you pursuant to this. We did have
22   some objections to the scope, I think, of what
23   you asked for about the case, about the --
24   that's all in our written discovery responses,

HEARING
August 24, 2021

Page 38

1    about the materials that you asked for from the
2    federal Civil Rights litigation, we have given
3    you everything that we believe is responsive
4    consistent with the scope of that.
5              MR. GRACE:  Okay.
6              MS. EMFINGER:  So if you want to go
     back and review our objections and have a meet
     and confer.
9              MR. GRACE:  I want to make sure that
10   since you gave us that response there have been
11   no additional civil depositions taken.
12             MS. EMFINGER:  I don't know that we've
13   gone back continuously every week to check with
14   our counterparts to supplement.  Is that what
     you're asking?
16             MR. GRACE:  Yes.
17             MS. EMFINGER:  We provided deposition
18   transcripts when we provided our discovery
19   responses.  If you're asking us do we have a
20   supplement that would be consistent with the
21   materials that we did not object to, I can
22   follow up and double-check on that for you and
23   see if there is anything more to supplement.
24             MR. GRACE:  That's what I'm asking.

Page 39

1              MS. EMFINGER:  But I believe my
2    response as to the date I responded was
3    complete.
4              MR. GRACE:  Okay.  And my next
5    question, do you think you're going to be able
6    to get to us the supplemental requested
7    discovery from all the training and all those?
8              MS. EMFINGER:  Again, subject to our
9    objections, and we had some objections as to the
10   scope, but within -- they just need to be
11   Bates-labeled, it's just an administrative task,
12   so I'm talking about within two days.
13             MR. THOMPSON:  Okay.  Judge, can we
14   have a discussion about video, the BWC?
15             HEARING EXAMINER:  What sort of
16   discussion?
17             MR. THOMPSON:  So the video that you
18   see, the end product of the BWC, that is a video
19   that is enhanced and is run through a software
20   program, in essence, before it's the video that
21   we see.  So let me give you an example.  If
22   you're standing with your iPhone at night and
23   you take a picture of something and all of a
24   sudden when you get the picture it's illuminated

Page 40

1    and you see everything, that's not what your eye
2    is seeing at the time that the photograph is
3    taken, that's your phone running it through --
4    that sequence through a software program and
5    giving you the best enhanced end product, but
6    that's not what you're seeing at the time that
7    the picture is taken, and in essence that's the
8    same thing that happens with the BWC.
9              So the BWC footage goes through, in
10   essence, a software program and produces the
11   best picture possible that you and I are looking
12   at, but that's not the -- that's not necessarily
13   or usually the same perspective that the person
14   that's there looking at that incident or that
     object actually sees, you know.  And this goes
     into the motion in limine which was:  Well, the
     video is what it is.  It's really not.  That's
     not the original product.  It goes through an
     enhancement through a software program.
20             So our request in this case was to
21   provide us with the original least-compacted
     video so that we can do what we want to do with
     that video.  So the requests that we made, the
     supplemental discovery requests are based --

Page 41

1    some of this them are the range qualifications,
2    certifications.  But the one that's also
3    important to us is to get a copy of the
4    unenhanced video from the police department and
5    it's -- that's important because -- and I think
6    what you said earlier, Judge, about while it's
7    important to give the board information so that
8    they can decide what they want and consider the
9    weight of it, well, this is something that we
10   all should talk about because the BWC is a --
     and what we looked at at the police board is an
     enhanced final product.  And to say that that
13   truly depicts the incident or that's what the
14   officer must have seen is not necessarily true.
15             So the reason why I'm bringing that up
16   is because that's important for us to give to
     our expert because there is a possibility,
18   Judge, that once we have that, he may be able to
19   give us the exact sequence of the gunfire:  Who
20   shot first, which rounds went first, who shot
     second.  We may be able to do all of that.  And
     there is a lot that you can do with the original
     information that you can't do with the end
24   product.

HEARING

August 24, 2021

Page 42

1      So that's one of our requests, and I
2   think it's important for the board to know that
3   if we're relying on a video as evidence in this
4   case or any police board case.
5      HEARING EXAMINER: And when did you
6   request the original videos?
7      MR. THOMPSON: June 20 or June 21st.
8      MS. EMFINGER: I'm going to read from
9   our response, which was submitted July 9, and we
10  have never had a discussion with you about this.
11  And this is signed by me as an attorney, or
12  maybe my colleague, but this is our response: 13
    Subject to and without waiving this objection, 14
    Superintendent states that all body camera
15     footage relevant to this case that is within the
16     possession, custody, or control of CPD and/or 17
    COPA was previously produced as part of this SCR 18
    file. The CPD does not have --
19     Look, I am not a
20     filmography/videography expert, and that they
21     exist, and you guys haven't put one forward.
22     But, Jim, with all due respect to whatever
23     research you may have done, you're not a film or
24     videography expert either, I don't believe.

Page 43

1      So in terms of the technological
2   mechanism that you're talking about and this
3   process of having this thing run through
4   software, what has been explained to us by the
5   technicians at CPD is that what we have at the
6   end of the day, that body-worn camera, that's
7   the only file. If you -- again, if there is
8   some -- if you have an expert who can explain a
9   reverse engineering process or something or you
10  want to take the body-worn camera footage that
11  you have and your expert can extract it and put
12  it back through this program, I don't know, but
13  all I can tell you is the technical -- the
14  response we gave in our written discovery
15     responses more than a month ago, which you've 16
    never followed up on to have the discussion and 17
    find out the information that I'm giving you
18     right now, is 100 percent true. All of the body
19     camera footage relevant to this case that's
20     within the possession, custody, control of CPD
21     and/or COPA was previously produced. That's all
22     they have. They don't have this backup that
23     you're talking about. They don't keep or they
24     don't record it in a way that it can be

Page 44

1   separated.
2      I mean, again, I'm not a technical
3   person, you're talking about all this stuff that
4   you seem to have some knowledge about, but I
5   don't know what to tell you. There is nothing
6   more that exists, and I would have been happy to
7   tell you that if you had picked up the phone
8   sometime before this hearing and maybe we could
9   have hashed some of this out, but the response
10  that we gave you on July 9 to that request is 11
    true, we don't have any.
12     MR. THOMPSON: So, Judge, if that's
13  the City's position, then our expert's opinion
14  is relevant on that matter that that's simply 15
    not true. The videos are produced in zeros and 16
    ones, and then it goes through a program that 17
    enhances it, and you can make it highly
18     compacted, least compacted, high quality, low
19     quality. There is all types of different things
20     that can happen with the video, and our request
21     was, in essence, give us the raw footage.
22     And if the position is that what we
23     received from the department or from COPA is the
24     raw footage, fine, then that makes our expert's

Page 45

1   opinions very relevant in this case to say that
2   that's not true.
3      HEARING EXAMINER: It sounds to me
4   like the Superintendent does not have the raw
5   footage; it's not in their custody, care, and
6   control. Is that correct, Ms. Emfinger?
7      MS. EMFINGER: Yes. And based on my
8   understanding of how the process and the
9   recovery process works, it's not as if we're
10  relying on a technicality and then it was passed
11  on to a third-party or something like that. I
12  mean, my understanding, from having spoken to 13
    our technical -- the person who knows --
14     Again, Jim is talking about technical
15     stuff that none of us sitting around this table
16     are experts on, but my understanding from
17     talking to the technical person is that that
18     just isn't capturable, it's not saved. That
19     information, whatever he's referring to as raw
20     footage, that's not how these cameras -- he 21
    might be mistaken or misunderstanding it or it 22
    just isn't saved once it goes through the
23     program. It's just not there. It doesn't
24     exist.

HEARING

August 24, 2021

Page 46

1    HEARING EXAMINER: Okay. Look, the
2    respondents are welcome to testify. I'm sure
3    they will be testifying about whether the video
4    shows what occurred and if there is any
5    difference in the lighting or if there is any
6    enhancement or anything like that. You are
7    welcome to ask the respondents those questions.
8        As far as raw footage, I'm not going
9    to say that the Superintendent has -- must
10   obtain such footage if it doesn't exist, and it
11   sounds to me like Ms. Emfinger is saying it does
12   not exist and the City does not have any way of
13   obtaining it. So I'm not going to force them to
14   tender something that they can't get and they
15   don't have.
16       You know, like I said, I have not gone
17   through the expert's -- the expert motions yet.
18   I don't know if one of the experts was going to
19   testify about the footage and the raw footage
20   and the enhancement of the video. Was that
21   contained in one of the expert's testimony that
22   you are calling?
23       MS. EMFINGER: None of these experts
24   are videography or film experts. It's more

Page 47

1    about their qualifications. You can't take a
2    course in a software program and call yourself a
3    videography or filmography expert. I mean, I
4    was a theater major at Northwestern. I know a
5    lot of filmmakers who could probably qualify as
6    film experts, but it's just -- I'm previewing a
7    little bit of our motion in limine, but it's
8    just neither of these guys are qualified to talk
9    about how cameras work.
10       HEARING EXAMINER: Mr. Thompson and
11   Mr. Grace, Mr. McKay, are any of you actually
12   going to argue that this video is not an
13   accurate depiction of what occurred? Mr. Grace
14   and Mr. Thompson?
15       MR. THOMPSON: So the answer -- to
16   answer that, Judge, that's partially true; but
17   when we made that request, that was so that we
18   could supply it to the -- our expert because
19   there is a software program out there that does
20   everything that I just discussed and there is a
21   couple of things that happened. This is just
22   focusing on what we're seeing on the video.
23   It's also the timing of the video in terms of
24   sequence of events. So you can --

Page 48

1    Basically if you have multiple
2    body-worn cameras and you run it through the
3    program, you can sync them so that they are
4    actually in time together so that you know
5    what's going on contemporaneously versus
6    necessarily the time stamp at the top which
7    isn't -- usually isn't accurate in terms of the
8    timing of events.
9        So that's why we sent the supplemental
10   requests out, was to get that information. And
11   I'm not saying, Judge -- just so that you know,
12   I'm not saying that what's depicted in the
13   videos, that that didn't happen. We're going to
14   be looking at a video and then we're going to be
15   analyzing in hindsight what did this officer
16   see, what didn't this officer see, is this what
17   he saw because that's what it looks like on the
18   video, and those are all part of the opinions.
19       HEARING EXAMINER: Okay. As far as
20   the supplemental discovery requests, I think
21   Ms. Emfinger has answered that question, there
22   is no such raw footage in their custody, care,
23   and control.
24       As far as the expert question, we're

Page 49

1    going to get to that down the line as to whether
2    the expert can testify about what he knows about
3    what sort of procedures are used to perhaps
4    enhance this video. If he knows that from
5    experience, that might be something that would
6    be admitted. If he's testifying as an expert in
7    filmography and in video, perhaps that is
8    something -- we won't accept his testimony for
9    that purpose because ostensibly your experts
10   are not experts in filmography and video.
11       So that's my ruling as far as the
12   supplemental motion for discovery is concerned
13   regarding the video. So before we got into that
14   issue --
15       MR. THOMPSON: When we do have the
16   hearing, I'd like to make a motion to have my
17   expert make an offer of proof on what we just
18   discussed relative to the department not having
19   raw footage and what I just described not being
20   possible.
21       HEARING EXAMINER: I'm not sure I
22   understand what you're talking about. An offer
23   of proof?
24       MR. THOMPSON: I want it to be a part

HEARING

August 24, 2021

Page 50

1  of the record, and I think it's important that
2  the board understands how these BWCs and how
3  these videos are put together. And it's Axion
4  that does it, and there are certifications and
5  classes out there that you take relative to how
6  all of this happens, and I just think it's
7  important that we all know because that's -- I
8  mean, we're looking in hindsight at videos and
9  then we're all drawing our own conclusions about
10 things that happened based upon the authenticity
11 or the accuracy of the video, and I think it's
12 important information for the board to know.
13          HEARING EXAMINER: I need to review
14 the experts and the motions -- the expert
15 testimony and the motions. I think we're
16 getting a little far afield here. I think that
17 the officers, as I said, will be able to
18 testify, "well, the lighting was different" or
19 this -- they can watch the video and say, "no,
20 the actual video, it was darker or it was
21 lighter," things like that. I don't --
22          And you are certainly welcome to most
23 likely use with your law enforcement expert.
24 You can say, well, these videos are -- you can

Page 51

1  briefly put that process into evidence, that
2  these videos do not always reflect the exact
3  lighting or the exact -- you know, whatever the
4  original footage showed and that they are
5  actually enhanced to show exactly what happened.
6          So I'll allow that, but I think we're
7  getting -- we're not going to have a mini-trial
8  and we're not going to have a long recitation
9  about how videos are put together by the police
10 department; okay?
11          MR. THOMPSON: Judge, just on that
12 point, I'm not presenting this as a defense, I'm
13 presenting this in an effort to provide as much
14 useful information to the board as possible so
15 that we're all aware of what exactly transpired.
16          HEARING EXAMINER: That might not be
17 for the hearing, then. That might be something
18 that the board should learn about, you know, in
19 training or something like that, but it is
20 not -- we're not going to have a tutorial during
21 this hearing about how videos are put together.
22          MS. EMFINGER: And Hearing Officer,
23 just in response to your -- what essentially was
24 a ruling or a suggestion earlier that you would

Page 52

1  allow the respondents to briefly put the process
2  into evidence, I mean, we still have an
3  objection to their expert's qualifications to do
4  that, and that's set forth in our motion in
5  limine, that there is just no expertise to do
6  that, so we just want to reserve our objection
7  on that basis and we'll await your ruling on the
8  motions in limine when you're prepared to rule
9  on them.
10          HEARING EXAMINER: And that's fine,
11 but once again -- I'm repeating myself -- I'm
12 not going to allow their expert testimony on
13 filmography and videography. But if they are --
14 by their experience if they know, if they have
15 seen and have personal experience describing how
16 these -- how the video is actually processed so
17 that it can be seen and tendered to the parties
18 and viewed by the public and by the
19 investigative agencies, if they have personal
20 knowledge about that, then that's not really
21 expert testimony; okay? So I would probably
22 allow that.
23          So I'm just telling you now, I would
24 probably allow them to do that, to corroborate

Page 53

1  if the officers -- if the officers involved say
2  that the video does not accurately show what
3  they saw that night; okay? So we will cross
4  that bridge when we get to it and let's move on
5  from here because, once again, I just don't -- I
6  don't think that this is -- this really deserves
7  the kind of time at this prehearing conference
8  that it's getting.
9          Okay. So why don't we get to --
10 Superintendent, as Executive Director Caproni
11 just suggested, why don't you take me through
12 your witnesses and your evidence as you see
13 them -- as you believe them to be at this time,
14 as you believe that they will be presented.
15          MS. EMFINGER: Yes, your Honor. We
16 will have testimony from Officers Taylor and
17 Lanier, from our use of force expert Mike
18 Gennaco --
19          HEARING EXAMINER: I can't hear you.
20 For some reason you just faded. The respondents
21 adversely?
22          MS. EMFINGER: Yes. Our use of force
23 expert, Michael Gennaco. Potentially the
24 other -- and some of this might depend on

HEARING
August 24, 2021

Page 54

1  whether the respondents plan to call them in
2  their case-in-chief.  If so, we might be able to
3  do what we need to do on cross, but potentially
4  Officers Ritchey and Whalen.
5          HEARING EXAMINER:  Okay.  Can you
6  spell these names for me while you're --
7          MS. EMFINGER:  Oh, sure.
8          HEARING EXAMINER:  Gennaco?
9          MS. EMFINGER:  Michael, and then the
10  last name is Gennaco, G-e-n-n-a-c-o.  The other
11  two officers, Ritchey and Whalen.  "Ritchey" is
12  R-i-t-c-h-e-y and "Whalen" is W-h-a-l-e-n.
13          HEARING EXAMINER:  And they're the
14  initial -- they're the initial responding
15  officers?
16          MS. EMFINGER:  They were also involved
17  in the foot pursuit, yes, with Officers Taylor
18  and Lanier.
19          HEARING EXAMINER:  And what would they
20  be testifying to?
21          MS. EMFINGER:  They would be
22  testifying to that first part of the foot
23  pursuit.  And to the extent that they saw
24  Officers Taylor and Lanier in the beginning of

Page 55

1  their interaction and encounter with Mr. Eason,
2  they can provide information about that.  So it
3  would just be this sort of provides maybe a
4  fuller picture of what happened.
5          But, again, I think depending on
6  whether they're going to be called in
7  respondents' case-in-chief, then that might be
8  something that we would just reserve for
9  cross-examination.
10          HEARING EXAMINER:  Okay.
11          MS. EMFINGER:  And in light of some of
12  the discussion we just had, there would be the
13  potential that we would call a rebuttal.  I
14  understand, you've been very clear, there will
15  be no expert testimony about videography and
16  filmography, but it might be a rebuttal lay
17  witness who would explain from the department's
18  perspective --
19          And, again, a lot of this is just
20  based on what has come out of this hearing
21  today, so I'm not exactly sure what this would
22  look like, but this processing -- this video
23  processing process, whatever it may be in
24  response, it would be rebuttal testimony.

Page 56

1          HEARING EXAMINER:  Okay.  So would
2  that be -- then -- or sorry, any other witnesses
3  that you would --
4          MS. EMFINGER:  Again, possibly
5  rebuttal witnesses, not having heard who they
6  plan to call in their case-in-chief, but that's
7  who I can anticipate at this time.
8          HEARING EXAMINER:  And as far as the
9  ME's report or lab techs and all of that?
10          MS. EMFINGER:  I'm hoping that we can
11  stipulate to those.  But, yes, those would be
12  the evidence in terms of records.  I don't think
13  we will need to call any of those people to
14  authenticate them.  But, yes, the medical
15  examiner's report, ballistic reports from IST
16  and related forensic reports about the bullets
17  themselves, and then of course the body-worn
18  camera footage.
19          HEARING EXAMINER:  Okay.  So -- but no
20  witnesses -- well, assuming that the
21  respondents stipulate to those, you're not
22  intending to call any witnesses for that;
23  correct?
24          MS. EMFINGER:  That's not -- right,

Page 57

1  yeah, that's all in the hope that we can
2  stipulate and reach some agreement, but
3  obviously we will call them if we need to.
4          HEARING EXAMINER:  Okay.  So we've got
5  the respondents adversely, your use of force
6  expert, and Ritchey and Whalen.  Do you need to
7  call both of them if the respondents-- if you
8  decide to call them or just one of them?
9          MS. EMFINGER:  I think they both have
10  different points of view of the foot pursuit.
11  Their testimony would be pretty brief.  I don't
12  think we would need them for very much.
13          HEARING EXAMINER:  Did they say they
14  see Mr. Eason running with the gun in his hand?
15          MS. EMFINGER:  Yes, there is some
16  testimony about that in their public statements.
17          HEARING EXAMINER:  And you said that
18  they see -- do they see the respondents chasing
19  Mr. Eason?
20          MS. EMFINGER:  I believe they were all
21  chasing them.  As Mr. Grace pointed out in his
22  description of the events, it was not -- it
23  wasn't just a straight line, there was some
24  moving around and different people at different

HEARING
August 24, 2021

Page 58

1    times.  But, yes, they were all running together
2    is my understanding at various points.
3              HEARING EXAMINER:  Okay.  I'm just
     going to urge you, if the respondents are going
     to testify to that -- which they will, I'm
6    sure -- I would ask you to keep -- I mean, if
7    they're both really going to both testify to the
8    same thing, but just different perspectives, to
9    only call one; okay?
10             MS. EMFINGER:  Understood.  It's
11   even -- it's possible that we might not call
12   them also.  To be efficient, if we hear from
13   respondents that they're going to be called in
14   their case-in-chief, then maybe we would just
15   make the decision that we will do what we need
16   to do on cross.
17             HEARING EXAMINER:  Okay.  So that's
18   your --
19             So you can't think of any additional
20   witnesses at this time; correct?
21             MS. EMFINGER:  Not at this time.
22             HEARING EXAMINER:  So in terms of
23   exhibits, you said obviously the body-worn
24   camera video, the ME's report, the ballistics --

Page 59

1    you said ballistics reports?
2              MS. EMFINGER:  Yes, and the forensic
3    analysis.
4              HEARING EXAMINER:  I'm sorry?
5              MS. EMFINGER:  And the related
6    forensic analysis that was performed.
7              HEARING EXAMINER:  Okay.  And you're
8    hoping to get a stipulation from the respondents
9    on those items; correct?
10             MS. EMFINGER:  Yes.
11             HEARING EXAMINER:  And any other
12   evidence that you are seeking to admit that you
13   can think of at this time?
14             MS. EMFINGER:  I don't think so.
15             HEARING EXAMINER:  Okay.  And counsel
16   for Officer Taylor, are you going to have any
     objections to any of those witnesses or those -- 18
     or that evidence, those exhibits?
19             MR. McKAY:  Maybe not, your Honor,
20   especially if Officer Taylor and perhaps even
21   Officer Lanier can get a stipulation from the
22   Superintendent's lawyers about the gunshot
23   residue on Mr. Eason's hands and his DNA all
24   over his gun, if we can get stipulations to

Page 60

1    those facts, perhaps we can stipulate.
2              HEARING EXAMINER:  Okay.  So no
3    objection -- you're not going to have any
4    objections.  How about council for Officer
5    Lanier?
6              MR. GRACE:  Probably don't have any
     objections and probably can work with Julie for  8
     the stipulations.  Based upon this hearing,
9    don't know if we're going to be able to come up
10   with a stipulation on the BWC, because based on
11   the Superintendent's response today, they don't
12   know what they don't know, so I think we
13   probably want to cross-examine whoever is trying
14   to put that BWC in, but we will have to see how
15   the expert testimony comes out.  We might be
16   able to get that across in our expert testimony,
17   but if he's barred or that portion is barred
18   then we probably would want to cross-examine 19
     whoever is trying to put the BWC into evidence. 20
             HEARING EXAMINER:  Okay.  So you may 21
     have an objection to the body-worn camera?
22             MR. GRACE:  Not an objection, we're
23   just not going to stipulate to it and they are
24   going to have to call somebody who can

Page 61

1    explain --
2              HEARING EXAMINER:  I lost you.
3              MR. GRACE:  -- how Axion works, how
     BWC works, and lay a foundation.  I'm not saying
     we're going to object to the evidence, we're
6    just going to require that the evidence be put
7    into the record properly with foundation laid
8    with someone who understands how BWCs work.
9              HEARING EXAMINER:  So you're going to
10   object to the foundation.
11             MR. GRACE:  Possibly, possibly.  A lot
12   of that will depend, Judge, on how the ruling is
13   with respect to the expert witnesses.
14             HEARING EXAMINER:  Okay.  So counsel
15   for -- let's start with counsel for Officer
16   Taylor.  Mr. McKay, what witnesses are you
17   intending to call that you know of at this time?
18             MR. McKAY:  In addition to my client
19   and in addition to his character witnesses and
20   possibly witnesses that would pertain to some of
21   the events listed in his complimentary history,
22   which goes only to mitigation, but regarding
23   guilt or innocence, your Honor, I may call the
24   witnesses -- the police officers named by Julia,

HEARING
August 24, 2021

Page 62

1    if she does not.  In addition to those officers,
2    I may call Officer Timothy Loring, L-o-r-i-n-g,
3    and possibly Officer Vito Raimundi.
4              HEARING EXAMINER:  Sorry, can you
5    spell that again?
6              MR. McKAY:  Sure.  Vito, V-i-t-o, last
7    name is Raimundi, R-a-i-m-u-n-d-i.  In addition,
8    your Honor, possibly Detective David Roberts,
9    common spelling.  If there is no stipulation,
10   scientists regarding the gunshot residue and DNA
11   that pertain to Mr. Eason's hands and the weapon
12   he was holding that day.
13             HEARING EXAMINER:  I'm -- I'm hoping
14   that you can reach a stipulation to that
15   testimony --
16             MR. McKAY:  Me too.
17             HEARING EXAMINER:  -- Ms. Enfinger and
18   Mr. Repking.
19             MR. McKAY:  I don't -- because the
20   City will be calling Officer Lanier adversely, I
21   can pose my questions of Officer Lanier on my 22
     cross.  So I would not call Officer Lanier in my 23
     case-in-chief, but I would call my client.
24             And then finally, Judge, I would be

Page 63

1    calling my expert, John Farrell, F-a-r-r-e-l-1,
2    who has been found qualified by this board in  3
     several cases in the area of use of force.  And
4    I would submit, your Honor, when we revisit the
5    issue previously discussed, Mr. Farrell is
6    qualified in the analysis of video-recorded
7    instances, has been certified as such from 2015
8    up to and including just recently in April of  9
     this year.  But, again, we can talk about that 10
     at the next prehearing date.
11             HEARING EXAMINER:  Is that in your --
12   in his expert report that -- I'm sorry, so he's
13   qualified and certified in what?
14             MR. McKAY:  He's going to be qualified
15   and certified in use of force.  And as
16   delineated on page 2 of his report, the training
17   and certification he has received in the
18   analysis of video-recorded incidents and the
19   retraining he has received from 2015 up to and
20   including April of this year.
21             HEARING EXAMINER:  Okay.  That doesn't
22   have to do with the technological --
23             MR. McKAY:  I think the evidence, your
24   Honor, that we seek to elicit, either on

Page 64

1    cross-examination of the Superintendent's
2    witnesses or through the witnesses that Officer
3    Taylor will call, will show in an overwhelming
4    manner that Mr. Eason refused numerous commands
5    to stop, he refused numerous commands to drop  6
     the weapon.  The evidence will show he even
7    stumbled at one point to the ground, got up,
8    still with gun in hand, and continued his
9    disobedience of these police commands.  And the
10   evidence is going to show that in this back
11   yard, while it is at 8 o'clock at night, it is
12   broad daylight on July the 3rd of 2018, and
13   there is no question Mr. Eason is holding a
14   loaded gun.  And you will know, because of your
15   ruling, the board will know, he was a convicted
16   felon, so he is committing a number of felonies
17   that day, not the least of which -- I don't know
18   if your Honor's ruling touched on this or not, I
19   did not hear this, but Mr. Eason had a case
20   pending that day.  He was out on bond while he
21   was possessing a gun while being a convicted
22   felon, and he is in this yard and the evidence
23   will show that he did not take the easiest route
24   to escape from Officer Lanier and Officer Taylor

Page 65

1    and the other uniformed officers that day.
2              And finally, your Honor, I think the
3    evidence will show that he looked at one of
4    these two officers who are now charged with gun
5    in hand, with finger on trigger, and we believe
6    the evidence is overwhelming that Officer Taylor
7    violated none of the CPD rules he is currently
8    charged with.
9              HEARING EXAMINER:  Thank you.
10   Mr. McKay, what was he on bond for at that time?
11   I don't recall.
12             MR. McKAY:  Battery to a police
13   officer out in Markham, Illinois, your Honor.
14             HEARING EXAMINER:  Okay.
15             MR. McKAY:  And I had issued a
16   subpoena to the Markham Police Department for
17   those records, and that case was pending.  He
18   was out on bond on July 3, 2018.
19             HEARING EXAMINER:  And what was the
20   amount of the bond?  Do you know?
21             MR. McKAY:  I would have to double
22   check the records that I have, Judge, but I'm
23   going to suggest it's an iBond in light of
24   recent policies in this town in the last three,

HEARING
August 24, 2021

Page 66

1    four years, but I can get back to you on that,
2    on the amount of bond.
3              HEARING EXAMINER: And I apologize
4    that I did not address this earlier. I will  5
     allow the respondents to enter the fact that he  6
     was on bond for battery to a police officer at
7    the time of this offense and the amount of the
8    bond and nothing further about the facts of the
9    case or, you know, the facts of the battery case
10   in Markham, but I do believe that that could be
11   something that the board would want to know or,
12   like I said, maybe they won't give it any
13   weight, but it's something they should know in
14   this case.
15             MR. McKAY: Yes, your Honor.
16             HEARING EXAMINER: So what about
17   Mr. -- what about Officer Loring, what would he
18   testify to.
19             MR. McKAY: Judge, in summary, similar
20   to Whalen and Ritchey, these are uniformed
21   police officers in that district that are
22   responding to a call of a man with a gun. And
23   Loring, in addition to others, are all
24   testifying to seeing this man with a gun,

Page 67

1    commanding him to stop and drop the gun. Now, I
2    understand, you don't want to hear witness after
3    witness after witness saying the same thing. I
4    get that. But short of a stipulation from the
5    Superintendent's lawyers that all of these POs
6    are going to say that, we seek to call each and
7    every officer to show this board the absolute  8
     disregard on Mr. Eason's part that day when he  9
     refused to drop the gun he was seen in
10   possession of by so many police officers, not
11   the least of which civilians who called 9-1-1 to
12   begin with.
13             HEARING EXAMINER: Ms. Enfinger and
14   Mr. Repking, are you going to contest the fact
15   that officers repeatedly told Mr. Eason to drop
16   the gun?
17             MS. EMFINGER: No, your Honor, I think
18   it's pretty consistent in the COPA statements
19   from a lot of the officers that that occurred.
20   So if you want to discuss a stipulation about
21   that, we'll discuss that along with all the
22   other things that Mr. McKay wants us to
23   stipulate to.
24             HEARING EXAMINER: And is Officer

Page 68

1    Raimundi for the same purpose?
2              MR. McKAY: Yes.
3              HEARING EXAMINER: Okay. Detective
4    David Roberts, same?
5              MR. McKAY: Judge, he conducted the
6    investigation and assisted in processing the
7    scene, the recovery of Mr. Eason's weapon,
8    maintaining the integrity of the collection of
9    the evidence regarding gunshot residue and DNA
10   linking Eason to the weapon. Perhaps he won't
11   be needed if there is stipulation regarding all
12   of those facts, your Honor.
13             HEARING EXAMINER: All right. So I'm
14   confident Ms. Emfinger and Mr. Repking can reach
15   a stipulation as to his testimony. And if I'm
16   misspeaking, Ms. Emfinger or Mr. Repking, please
17   let me know.
18             MS. EMFINGER: Mr. McKay's throwing
19   out kind of a lot of really broad
20   generalizations about the way -- it's a nice
21   preview of their opening statement and closing
22   argument, but we would really have to look at
23   the words on the paper and see what exactly
24   we're being asked to stipulate to and whether

Page 69

1    that matches what we believe the testimony is
2    from all of these witnesses and their COPA
3    statements and their depositions in the civil
4    case. So if they match up and it's something
5    that we can honestly and in good faith agree
6    with the other side about, we are happy to do
7    that. We do not have to belabor where there is
8    not a discrepancy.
9              HEARING EXAMINER: He's just for
10   maintaining the integrity of the crime scene --
11   I'm sorry, of the shooting scene.
12             MR. McKAY: Yes, Judge, that is
13   correct. And by the way, I just need to add, I
14   heard the remark about the closing argument, but
15   I would submit that all of these technical
16   difficulties we are all experiencing today are
17   another reason why this hearing must be in
18   person. I understand, you know, what's been
19   happening lately and the current surge we are
20   under right now, but it is Mr. Taylor's --
21   Officer Taylor's position that we try this case
22   in person on October the 4th and the days that
23   follow. Zoom simply does not work when we have
24   lawyers and your Honor trying to talk, and there

HEARING
August 24, 2021

Page 70

1    are so many technical difficulties that break
2    down, and our court reporter cannot possibly get
3    every word on the record.
4            HEARING EXAMINER:  I think Ms. Van Roo
5    is probably doing an excellent job of capturing
6    everybody's statements in this case, and I
7    personally have not noticed any -- almost -- I
8    mean, barely any technical difficulties today.
9    Barely.  However, we're going to revisit the
10   Zoom issue in a minute.  I just want to finish
11   with your witnesses and your exhibits.
12           Okay.  So I know you mentioned
13   character witnesses as well as witnesses
14   pertaining to his complimentary history.  Those
15   are one in the same, I'm sure you realize that,
16   and I'm going to allow each side, each party,
17   each respondent to call three character
18   witnesses, and no more than that, and hopefully
19   they'll be listed on our next -- for our next
20   prehearing conference on your witness list so
21   that the Superintendent knows who they are going
22   to be.
23           Okay.  So as far as did -- as far as
24   exhibits -- let me ask you this.  Have you --

Page 71

1    Mr. McKay, have you requested,
2    received, and reviewed the respondent's complete
3    disciplinary files, and if so, do you plan to
4    move any relevant aspect of the disciplinary
5    file into the record?
6            MR. McKAY:  Of the disciplinary file?
7    No.  Complimentary history, yes.  And as far as
8    exhibits, Judge, I accept your ruling of three
9    live character witnesses, but I would ask to
10   admit into evidence character letters of other
11   people that will not be allowed to testify live
12   in person.
13           HEARING EXAMINER:  Those will
14   absolutely be admitted.
15           MR. McKAY:  Thank you.  And as far as
16   exhibits, the complimentary history and the
17   letters would be it as far as Officer Taylor.
18   Police reports used to impeach or statements
19   used to impeach obviously would be marked but
20   not admitted by Officer Taylor.
21           And as far as Mr. Farrell's report and
22   his CV, at this time I do not seek to admit
23   those documents, perhaps with the exception of
24   the CV, but those documents will be used as

Page 72

1    exhibits during the direct and
2    cross-examination, I suspect.  And whether they
3    are admitted, I can't say at this point that I'm
4    going to admit the report.  His testimony, yes,
5    of course.
6            HEARING EXAMINER:  So as far as
7    exhibits, besides his CV, you are only -- you
8    only at this time think you're going to be using
9    police reports for impeachment purposes and no
10   other actual exhibits; is that correct?  And the
11   complimentary history, sorry.  But no other --
12           So you're going to admit his
13   complimentary history and the CV of the experts?
14           MR. McKAY:  Yes.  Maybe, yes.
15           HEARING EXAMINER:  Right.  So I have
16   that right?
17           MR. McKAY:  Yes.
18           HEARING EXAMINER:  All right.  Okay.
19   So counsel for Officer Lanier?
20           MR. GRACE:  You froze, Judge.  At
21   least she froze on my screen.
22           MR. McKAY:  I don't know if you can
23   hear me, but there are technical difficulties
24   today.

Page 73

1            HEARING EXAMINER:  I can hear you.
2    They're not -- there are no greater than any
3    other Zoom conversation that I've had in the
4    last year and a half.  So anyway, Officer
5    Lanier -- on behalf of Officer Lanier, any
6    witnesses?
7            MR. GRACE:  So, Judge, I won't go over
8    everything that Mr. McKay just outlined.  I'm
9    pretty much in agreement with them.  I will tell
10   you that we will absolutely be calling Officer
11   Ritchey and Officer Whalen.  Those are the first
12   two officers that made contact with Mr. Eason
13   when he was engaged in his felonious acts.  We
14   will definitely be calling them.  They both
15   provide a very good perspective of how Eason was
16   acting, how he was running, a finger on trigger,
17   the route he took, the manner in which they
18   tried to deescalate by cornering him off and all
19   the actions they took.
20           Because remember, Judge -- I know you
21   don't really know the case real well right now,
22   although I think you're grasping it -- Lanier
23   and Taylor show up after -- they're kind of like
24   after the foot pursuit engaged, so I think that

HEARING

August 24, 2021

Page 74

1    I'll definitely be calling those witnesses.

2    There is no stipulation that I would want from

3    those.

4          HEARING EXAMINER:  And you find it

5    necessary to call both of them?

6          MR. GRACE:  I do, Judge, because if

7    you looked at the map of how this guy ran,

8    you'll see that he just doesn't run down the

9    street.  He runs westbound, northbound,

10   eastbound, southbound, northbound, southbound,

11   northbound -- eastbound, southbound again,

12   northbound again into the back yard.  Officer

13   Ritchey, he runs after him.  Officer -- strike

14   that.  Officer Whalen runs after him, Officer

15   Ritchey begins to run after him but then takes a

16   different route.  Both of those officers do not

17   see the shooting, but both of them are in

18   completely different locations when the incident

19   occurs, so they certainly give a different

20   perspective about what they're engaged with.

21   The other officers that Mr. McKay said we can

22   probably work out stipulations to.

23        HEARING EXAMINER:  Okay.  Any other

24   witnesses that you can think of at this time

Page 75

1    that you would call besides -- well, the expert

2    is on behalf of both of you; right?  The two

3    experts.

4          MR. GRACE:  Yeah, so we would have our

5    expert, your Honor.  Then we would have our

6    three character witnesses.  How I generally like

7    to do the -- put my client on is I let the

8    state -- the City call my client.  I would

9    cross-examine my client merely for the actual

10   what happened, the incident itself; and then we

11   generally will call our client in our

12   case-in-chief.  Not revisit what happened that

13   day, but talk about the mitigation and stuff

14   like that.  That's how I would prefer to do

15   that.

16        HEARING EXAMINER:  That's excellent.

17   So besides your experts and your three character

18   witnesses, any other witnesses on behalf of your

19   client?

20        MR. GRACE:  Not at this time.  I can't

21   think of anybody else.

22        MS. EMFINGER:  And how about exhibits?

23        HEARING EXAMINER:  Go ahead.

24        MS. EMFINGER:  Just a clarification

Page 76

1    point, and this is only so we know how to

2    prepare to cross these experts.  Are both

3    Officer Taylor and Lanier adopting the opinions

4    of both of the experts that were put forward or

5    are you -- I mean, their reports, officer -- I

6    believe John Farrell's report includes expert

7    opinions, which is what we have been provided,

8    that's how we know to prepare for their

9    testimony, has opinions relating to both

10   officers; but Officer Black's expert opinion, I

11   think, does not have any expert -- like does not

12   have any expert conclusions that he reaches

13   about Officer Taylor.

14        So I just need to know, are both of

15   your experts proffered to make expert

16   conclusions about the actions of both

17   respondents?  It seems to be getting a little --

18        MR. McKAY:  I can tell you --

19        MS. EMFINGER:  It's just unclear; and

20   your expert reports, that's not how they read.

21        MR. McKAY:  Okay, can I talk?  This is

22   Jim McKay.

23        HEARING EXAMINER:  Go ahead,

24   Mr. McKay.

Page 77

1        MR. McKAY:  He will testify about the

2    actions of both Officer Taylor and Officer

3    Lanier.

4        HEARING EXAMINER:  I'm sorry, who will

5    be testifying about them?

6        MR. McKAY:  John Farrell will testify

7    consistent --

8        MS. EMFINGER:  And --

9        MR. McKAY:  Excuse me, I'm talking.

10        HEARING EXAMINER:  Sorry,

11   Ms. Emfinger.  Sorry, one minute.  Go ahead,

12   Mr. McKay.

13        MR. McKAY:  Julie, I don't mean to

14   yell.  Again, this Zoom platform cannot work,

15   but anyways, John Farrell will testify

16   consistent with his report where he mentions

17   both Taylor and Lanier.

18        HEARING EXAMINER:  Okay.  So does that

19   mean, Mr. Grace and Mr. Thompson, you are also

20   adopting John Farrell's -- if he testifies, his

21   expert opinion in your case-in-chief also?

22        MR. GRACE:  I'm suspecting that

23   Mr. McKay has called an expert that is going to

24   testify consistently with the report that he

HEARING
August 24, 2021

**Page 78**

1  prepared, so I'm assuming that John Farrell is
2  going to testify in that manner and that
3  testimony is very much helpful to us, I would
4  assume that I would adopt that, yes.
5      HEARING EXAMINER:  Okay.  So only the
6  testimony of Mr. Farrell?
7      MR. McKAY:  Yeah.
8      HEARING EXAMINER:  Okay.
9      MS. EMFINGER:  Judge, I believe
10  Mr. Black's report only relates to -- only
11  offers opinions as to Officer Lanier's actions.
12  So, again, it's just so we know how to prepare
13  for these experts.  If officer -- if John Black
14  intends to testify about Taylor, that's
15  different than what's in his report.  But if I'm
16  just getting a confirmation that they're both
17  going to testify about what's in their reports
18  in terms of scope, then that's helpful.  Thank
19  you.
20      MR. GRACE:  I would hope my expert
21  does not go off of his report because I'm sure
22  that two qualified lawyers would pretty much
23  destroy him on cross-examination, so I'm
24  assuming he's going to be consistent with his

**Page 79**

1  report.
2      MS. EMFINGER:  Okay.  So let me get
3  this straight.  Mr. McKay, you're only offering
4  John Farrell as an expert and Mr. Grace and
5  Mr. Thompson are going to adopt Mr. Farrell's
6  testimony if he testifies -- if he's found
7  qualified, they're going to adopt his testimony
8  in your -- in Mr. Grace's and Mr. Thompson's
9  case; correct?
10      MR. McKAY:  If you're asking me --
11      HEARING EXAMINER:  I'm asking
12  Mr. Grace and Mr. Thompson.
13      MR. GRACE:  Yes, accurate.
14      HEARING EXAMINER:  And Mr. Black is
15  being called by -- who's seeking to call
16  Mr. Black, only Mr. Grace and Thompson?
17      Mr. McKay, are you adopting or do you
18  plan to adopt Mr. Black's testimony also or does
19  this only apply to Mr. Lanier -- or to Officer
20  Lanier.
21      MR. McKAY:  I plan to adopt
22  Mr. Black's opinions.
23      HEARING EXAMINER:  So other than the
24  Officers Ritchey and Whalen and John Farrell,

**Page 80**

1  who else will you be calling, Mr. Grace and
2  Mr. Thompson?
3      MR. GRACE:  Three character witnesses.
4  I like the idea of letters of recommendation
5  that will help us, especially since Officer
6  Lanier honorably served this country, so there
7  could be some letters from some of his superiors
8  in the military.  Obviously I'll call my client
9  and I will probably, more than likely, be
10  adopting the testimony of Officer Taylor.
11      HEARING EXAMINER:  Okay.  So any other
12  witnesses that you can think of at this time?
13      MR. GRACE:  No, I can't, Judge, I
14  think that's it.
15      HEARING EXAMINER:  Okay.  And have
16  you -- Mr. Grace and Mr. Thompson, have you
17  requested, received, and reviewed Officer
18  Lanier's complete disciplinary files, and if so,
19  do you plan to move any relevant aspect of the
20  disciplinary file into the record?
21      MR. GRACE:  We have and we will.
22      HEARING EXAMINER:  Disciplinary file
23  or the complimentary?
24      MR. GRACE:  I don't believe he has any

**Page 81**

1  negative discipline.  I think we're going to
2  move the whole file in, complimentary and any
3  discipline.
4      HEARING EXAMINER:  And Ms. Emfinger
5  and Mr. Repking, have you requested, received,
6  and reviewed and respondents' complete
7  disciplinary files and, if so, do you plan to
8  move any relevant aspects of the disciplinary
9  file into the record?
10      MS. EMFINGER:  We have received those,
11  your Honor.  At this time we do not intend to
12  introduce any of those reports.
13      HEARING EXAMINER:  Okay.  Mr. McKay,
14  I'm sorry, you said that you had requested the
15  disciplinary file and do not intend to move
16  anything into evidence -- is that correct?
17  except the complimentary history?
18      MR. McKAY:  Yes, only because Officer
19  Taylor has no disciplinary history.
20      HEARING EXAMINER:  Okay.  So you
21  requested them and you plan to introduce both?
22      MR. McKAY:  Yes.
23      HEARING EXAMINER:  Okay.  And the
24  Superintendent has requested them and is not

HEARING
August 24, 2021

Page 82

1  going to introduce anything from them?
2      MS. EMFINGER: That's correct, at this
3  time we don't anticipate doing that.
4      HEARING EXAMINER: Okay. Thank you.
5  That's a new provision of the rules. I have to
6  ask each party that question.
7      So as far as other exhibits, Mr. Grace
8  and Mr. Thompson, any exhibits that you -- other
9  than the complimentary history, any exhibits
10  that you plan on entering into evidence?
11      MR. GRACE: I would imagine we are
12  going to enter some of the photographs, some of
13  the stills of the back yard, the location. I
14  would imagine that we are going to enter into
15  evidence a map to show the life that this
16  individual engaged in, and I would imagine we
17  are going to enter -- hopefully, we will get a
18  stipulation on this -- the OEMC of call of a man
19  with a gun.
20      HEARING EXAMINER: Okay. All right.
21  The still photos of the back yard, is that in
22  addition to -- is that taken from the video or
23  is that -- are they independent photos?
24      MR. GRACE: No, I went to the scene

Page 83

1  and took some photos of the area and the front
2  yard of Fulton and -- the alley actually has a
3  name. It's a strange alley. It's called Walen,
4  where Mr. Eason was running through, so we will
5  take a picture of that. I have some shots of
6  that. The garage where he came from. The
7  location of where the offices were standing, all
8  those kinds of things. It won't be too
9  cumbersome.
10      HEARING EXAMINER: And Mr. Black's CV,
11  I take it, also; right?
12      MR. GRACE: Yeah, not -- we wouldn't
13  enter -- his report wouldn't come in but we
14  would enter --
15      HEARING EXAMINER: His CV?
16      MR. GRACE: Yeah.
17      HEARING EXAMINER: Yeah, that's what I
18  said, his CV.
19      Ms. Emfinger, have you had an
20  opportunity to look at those photos yet?
21      MS. EMFINGER: I did not. And, in
22  fact, I am glad that you came back to me because
23  it was only that it just had slipped my memory.
24  We believe we also will be preparing a

Page 84

1  demonstrative of the -- which we will exchange
2  with the other side and they'll get to see it in
3  advance and all of that, but it would be -- I'm
4  trying to give some -- we're not sure exactly
5  what it would look like yet, we're still working
6  on that, but, again, a picture of the back yard,
7  some distances, some reference points.
8      HEARING EXAMINER: Okay. So --
9      MS. EMFINGER: And then I think I
10  mentioned in my list of exhibits our expert's
11  CV, but that we would include too.
12      HEARING EXAMINER: Okay. And so
13  the -- you don't have those photos yet; is that
14  what you're saying? Those demonstrative photos?
15      MS. EMFINGER: Again, it might be more
16  of like a pictorial representation that would
17  show like a map more like that would show some
18  distances.
19      To the extent that we can -- so we can
20  ascertain them, that is -- it's more arts than
21  science, I would say, so it's a little bit of a
22  work in progress, but of course we would tender
23  it at a time when the other parties would have
24  an opportunity to review and object and all of

Page 85

1  that.
2      HEARING EXAMINER: I would like those
3  tendered by both parties. I would like them
4  tendered to each other before -- several days
5  before the next prehearing conference so that
6  you have an opportunity to make any objections
7  that you may be making.
8      I'm also going to ask that you send
9  your exhibits and exhibit lists and your witness
10  lists to Mr. Caproni at the board at least three
11  days before our next prehearing conference,
12  which is going to be September -- what did I
13  say, September 15? That's also via Zoom.
14      Now, the Zoom -- the Zoom issue,
15  obviously when we set this for hearing, no one
16  had any objections to holding the entire hearing
17  in person because there was no Delta variant at
18  that time, but things have changed. And
19  pursuant to the second omnibus order that has
20  been issued by the board, I'm going to be the
21  one that's going to decide what portions of the
22  hearing, if any, will be in-person and -- which
23  will be held by Zoom.
24      So what I'm going to ask you to do

Page 86

1   is -- and I'm very -- I'm very wary of the new
2   variants out there, even though we're
3   vaccinated -- I think we're probably all
4   vaccinated.  As you know, there are plenty of
5   instances recently where there are breakthrough
6   infections, and if somebody is vaccinated,
7   they're going to do much better than someone who
8   is not vaccinated, but they can spread the
9   infection to other people, and this infectious
10  variant is far more infectious than the last
11  variant, when we had the last period of serious
12  COVID in Chicago.
13          So what I'm going to do is I'm going
14  to ask each side, we're going to just -- what
15  we're going to do is we're going to say:  All
16  right, the brunt of this hearing is going to be
17  held by Zoom, is going to be held via Zoom --
18  certainly the arguments, the stipulations -- but
19  I would like --
20          So I'm going to -- I'm going to ask
21  each party to file any objections they may have
22  to hearing certain witnesses in person.  I'm
23  going to ask you to file those objections by
24  September 12, and that will also be the day that

Page 87

1   you need to file your exhibit and witness lists
2   and copies of your -- and send copies of your
3   exhibits to the board; okay?
4           So our next prehearing conference is
5   going to be, as I said before, on September 15
6   via Zoom at 10:00 a.m.  Are there --
7           MS. EMFINGER:  September 12 is a
8   Sunday.  Would you like them the Friday before
9   or that Monday?
10          HEARING EXAMINER:  Let's say that
11  Monday the 13th.
12          MS. EMFINGER:  There were a couple of
13  things that were due on the 13th.  I'm assuming
14  we will do the witness lists, the exhibit lists,
15  the Zoom motions.
16          HEARING EXAMINER:  Yes.  Thank you for
17  that.  All right.
18          MS. EMFINGER:  With respect to
19  in-person hearings --
20          HEARING EXAMINER:  I'm sorry, go
21  ahead, Ms. Emfinger.
22          MS. EMFINGER:  With respect to
23  in-person proceedings, and only because I think
24  this will help us craft our motion, I'm just not

Page 88

1   familiar with what the board is doing or might
2   intend to do in terms of -- I believe that the
3   state is under like an internal masking order.
4   Is the board following that?  Like if you're
5   inside, regardless of vaccination status, I know
6   we're in a bigger -- there is a bigger courtroom
7   now that the board uses, I haven't seen it yet,
8   but social distancing will -- some of those
9   other precautions, should we do anything in
10  person, will all of those be observed?
11          HEARING EXAMINER:  All of those will
12  be observed.  Social distancing, masks over the
13  nose and mouth at all times, the only person who
14  will be unmasked is the person who is testifying
15  if we do any of them in person, if we conduct
16  any of the testimony in person.
17          MR. GRACE:  Even if we're
18  cross-examining a witness you're going to make
19  the lawyer wear their masks?  I mean --
20          HEARING EXAMINER:  Yes.
21          MR. GRACE:  They're not making you do
22  that in other courthouses.
23          HEARING EXAMINER:  Well, I'm going to
24  make -- I'll make the call at the time, but as

Page 89

1   of right now yes, because of the infectious --
2   highly infectious nature of this variant, I'm
3   going to have the -- the attorney who's asking
4   the questions wear a mask.
5           MR. GRACE:  I appreciate what you're
6   saying, and I get it.  Health of everyone is
7   important.  Do you think there is any way that
8   we can maybe put -- figure out a way to put the
9   lawyer that's asking the questions like away on
10  a podium, like you sitting in Judge Gahn's [sp]
11  courtroom or something like that so that he's
12  farther -- he or she is father away from all
13  people in the courtroom?
14          HEARING EXAMINER:  Well, why don't
15  we --
16          MR. GRACE:  Look at that at the time?
17          HEARING EXAMINER:  Yeah, why don't
18  we -- we will figure that out maybe on that day,
19  but everybody come with their masks over your
20  nose and mouth.
21          MR. McKAY:  Of course.
22          HEARING EXAMINER:  Things change on a
23  daily basis.  Things may change in Chicago and
24  they may shut everything down.  That's certainly

HEARING

August 24, 2021

Page 90

1    a possibility.
2         MR. McKAY:  Judge, there is something
3    going on.  I didn't hear a word you said.
4         HEARING EXAMINER:  Okay.  Yeah, it's
5    me, sorry.  What I said was, you know, everybody
6    come prepared with your masks and we will make
7    that determination on that day.  It seems
8    that --
9         MR. GRACE:  We lost you again, Judge.
10        HEARING EXAMINER:  All right.
11   Mr. Caproni, is there anything else issue that I
12   need to address before we adjourn for the day?
13        MR. CAPRONI:  Not that I'm aware of.
14        MR. GRACE:  Judge, there is something
15   I'd like to address.
16        We lost you.
17        HEARING EXAMINER:  Anything else we 18
    need to address before we adjourn for the day?
19        MR. GRACE:  There is, your Honor.  I
20   would like an opportunity to file a response to
21   the State's motion to bar the witness.  I know
22   that was due -- I think it was due yesterday. 23
    To be quite honest with you, I was going to
24   use -- since the motions are pretty much the

Page 91

1    same, I was going to use the motion that I filed
2    in the Luigi Starwy case where they had given us
3    a month to respond to that as opposed to on this
4    quick schedule.  So if I could have until
5    September 3 to file my response to the motions
6    to bar the expert witness.
7         MR. McKAY:  I share in Tim's motion.
8    Listen, we just received the two separate
9    motions to bar from the Superintendent's lawyers
10   last week, and they're a little bit different
11   from each other.  But on behalf of Officer
12   Taylor and his expert witness, John Carol, I
13   would like to respond in writing as well.
14        HEARING EXAMINER:  And I'm going to
15   grant you that opportunity.  When I saw how
16   voluminous the material was and the exhibits, I
17   realized that the two weeks I gave you probably
18   was not sufficient.  So you do have until
19   September 3.  I'm going to warn you, I will not
20   be able to look at any of it until September 13
21   because I'll be on vacation and I will not have
22   access to the internet, so I may as well allow
23   you until -- no, I'm going to allow you until 24
    September 3.

Page 92

1         MS. EMFINGER:  Do we have time to file
2    a reply?  We did file our motions in limine
3    within 5 days after getting their expert report,
4    so we were working on trying really to adhere to
5    that quick turnaround time, but we would like an
6    opportunity, if we're talking about the third 7
    versus the 13th, I mean, that's enough time for 8
    us to prepare a reply if we'd like one.
9         HEARING EXAMINER:  Okay.  And I'm
10   going to allow that, so the reply will be due on
11   the 13th.
12        MS. EMFINGER:  Thank you.
13        HEARING EXAMINER:  Executive Director
14   Caproni, you're still on the line here.  Is
15   there anything else I need to address before I
16   adjourn?
17        MR. CAPRONI:  Not that I'm aware of.
18   Thank you.
19        HEARING EXAMINER:  So we will meet
20   again on September 15 at 10:00 a.m.
21        (Whereupon, the proceedings concluded
22   at 12:03 p.m.)
23
24

Page 93

1    STATE OF WISCONSIN )
                       ) SS:
2    MILWAUKEE COUNTY   )
3
4         I, Carla J. Van Roo, Registered
5    Professional Reporter and Notary Public in and
6    for the State of Wisconsin, do hereby certify
7    that I have carefully compared the foregoing
8    pages with my stenographic notes, and that the
9    same is a true and correct transcript.
10        I further certify that I am not a
11   relative or employee or attorney or counsel of
12   any of the parties, or a relative or employee of
13   such attorney or counsel, or financially
14   interested directly or indirectly in said
15   action.
16        Dated at Milwaukee, Wisconsin, on this
17   3rd day of September, 2021.
18                        _Carla Van Roo_
19                        _____
20                        Carla J. Van Roo
                          Registered Professional Reporter
                          Certified Realtime Reporter
21                        Notary Public
                          vanroo@gmail.com /414-731-5346
22
23
         My commission expires April 26, 2024.
24